

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEG:MKP/TH
F. #2017R01840

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 26, 2018

By Hand and ECF

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Keith Raniere
              Docket No.: 18-M-132

Dear Judge Gold:

      The defendant Keith Raniere is scheduled to appear in the Northern District of Texas tomorrow at 2:00 p.m. for arraignment. The government respectfully submits this letter in anticipation of the defendant's expected removal to the Eastern District of New York and in support of the government's request for a permanent order of detention. As set forth below, the defendant, who was living in Mexico prior to his arrest and has access to vast resources, poses a significant risk of flight. In addition, his long-standing history of systematically exploiting women through coercive practices for his own financial and sexual benefit demonstrates that, if released, he would pose a danger to the community.

I.    Background

    A.    Complaint

      The defendant is charged by complaint with sex trafficking, sex trafficking conspiracy and conspiracy to commit forced labor. As described in detail in the complaint (the facts of which are incorporated by reference into this letter), these charges arise from the defendant's role as the leader of a secret society called "DOS" or "The Vow," in which women were recruited to be slaves under the false pretense of joining a women-only mentorship group. DOS is structured as a pyramid with the defendant at the top. To join DOS, slaves were required to provide their masters with "collateral," which included highly damaging information about themselves and/or family members, naked photographs and rights to their assets. Once they had

joined, slaves learned they had to provide additional collateral, which they did, fearing that otherwise the collateral they had already provided would be used against them. None of the slaves (except for those directly under the defendant) knew that the defendant was involved in the organization when they were recruited.

DOS slaves understood that if they told anyone about DOS, if they left DOS or if they failed to complete assignments given to them by their masters, their collateral could be released. A number of DOS slaves (including Jane Does 1 and 2, as described in the complaint) were given assignments that implicitly or expressly directed them to have sex with the defendant. Moreover, a number of DOS slaves, including Jane Doe 1, performed services other than sex (such as editing the defendant's articles and transcribing interviews) for the benefit of the defendant, believing that if they did not, their collateral could be released. The masters who gave these assignments received the financial benefit of free labor from their slaves. Many DOS slaves were also groomed for sex with the defendant by (1) being ordered to adhere to very restricted diets (the defendant is known to sexually prefer extremely thin women), (2) being ordered to remain celibate (the defendant has taught that women should be monogamous but that men are naturally polyamorous), and/or (3) being ordered to stop waxing or shaving their pubic hair (the defendant is known to sexually prefer women with a lot of pubic hair). The slaves were told that they were being given these orders to benefit themselves. The DOS masters who directed their slaves to have sex with the defendant received financial benefits in the form of continued status and participation in DOS, as well as financial opportunities from the defendant.

DOS slaves were seriously sleep-deprived from participating in "readiness" drills, which required them to respond to their masters any time day or night. DOS slaves were also branded in their pelvic regions with a cauterizing pen with a symbol that, unbeknownst to them, incorporated the defendant's initials.

The government estimates that the defendant has had more than fifty DOS slaves under him.

Many DOS slaves were recruited from Nxivm, which is the umbrella organization for a number of self-help workshops created by the defendant and that have been taught at centers across the country and internationally since 1998. The defendant is revered within Nxivm and referred to as the "Vanguard." Every week in August, the Nxivm community gathers for a week to celebrate the defendant's birthday and pay tribute to him. According to a number of sources, including former high-ranking members of Nxivm, the defendant's word is final within Nxivm and nothing of import happens within Nxivm without the defendant's approval. Nxivm students are also taught that the defendant is the smartest and most ethical man in the world. He frequently cited having earned three degrees from Rensselaer Polytechnic Institute, but a review of his transcript shows that he graduated with a 2.26 GPA, having failed or barely passed many of the upper-level math and science classes he bragged about taking.

Nxivm maintains features of a pyramid scheme, as courses cost thousands of dollars each and participants are encouraged to continue to pay for additional classes and to recruit others to take classes in order to rise within the ranks of Nxivm. Different ranks are marked by different color sashes, and students must reach certain ranks in order to begin receiving salaries or commissions. Members of Nxivm are taught that they can get rich by advancing in Nxivm, but in reality only a small percentage of Nxians make significant income and a much larger percentage find themselves in significant debt to the organization. The defendant had previously been investigated by law enforcement for operating a pyramid scheme called "Consumers' Buyline, Inc." As part of a consent order entered into in 1996 by the defendant and the New York State Attorney General's Office, the defendant was prohibited from operating a multilevel-marketing scheme in New York again.

### B. History of Sexual Assault and Other Abuse of Girls and Women

The defendant has a decades' long history of abusing women and girls. According to confidential sources, the defendant had repeated sexual encounters with multiple teenage girls in the mid-to-late 1980s and early 1990s. In one instance, the defendant met a fifteen-year-old girl while he was in his 20s and had repeated sexual contact with her. In another instance, the defendant met a twelve-year-old girl whose mother worked for the defendant and began tutoring her. Shortly thereafter, the defendant began having regular sexual intercourse with her, including at his home where he lived with multiple adult sexual partners. One of those partners hired the girl to walk her dog, giving the defendant daily access to the girl. The defendant told one of the DOS slaves he had sex with that he believed the age of consent was too rigid and that it should be lowered to when a child's parent says the child is capable of consent.

Furthermore, the defendant directed the abuse of Nxivm members who had committed so-called "ethical breaches." In one instance, the defendant ordered the long-term confinement of a Nxivm member who was approximately in her early-20s to heal an "ethical breach" because she had developed romantic feelings for someone other than him.[1] During her approximately 18-month confinement, with limited exceptions, the woman had extremely limited contact with her family or other members of the community and she received limited medical attention. Her period of confinement was repeatedly extended for other supposed ethical breaches, including, in one instance, because she cut her hair. The woman felt she could not leave because of the repercussions on her family and also because she was illegally in the United States and the defendant and other members of Nxivm had helped her illegally enter.

The defendant has also physically assaulted at least two intimate partners and in 2012, under the guise of mentorship, he encouraged a woman to run headfirst into a tree and to drink from a puddle. He also co-founded a movement called "Society of Protectors," which, in

---

[1] The defendant claimed that her ethical breach was stealing money, but the purported theft (of money that was later returned) happened significantly before the confinement.

3

part, relied on humiliating women in order to eradicate weaknesses the defendant taught were common in women. For example, women attending the classes were forced to wear fake cow udders over their breasts while people called them derogatory names. Moreover, at least one DOS master who was directly under the defendant told her slaves that her own master, i.e., the defendant, would put her in a cage to punish her.

The defendant has also posed disturbing hypotheticals as part of the Nxivm curriculum, challenging whether incest and rape are actually wrong. He told one DOS slave that incest is not wrong if the "victim" is sexually aroused by the experience, and he questioned whether gang rape is bad if the person being raped has an orgasm.

C.      Defendant's Foreign Ties and Access to Cash

For most of his life the defendant has lived outside Albany, New York, where Nxivm is headquartered. Many members of Nxivm live in the same area. Shortly after the government began interviewing witnesses and victims in November 2017, the defendant flew to Mexico. For over a month and a half, since the arrest warrant in this case was issued, the government has actively worked with Mexican immigration officials to locate the defendant. Finding the defendant was difficult because the defendant purposely concealed his location, began using end-to-end encrypted email and stopped using his phone. Ultimately, the defendant was found to be staying at a luxury villa near Puerto Vallarta, Mexico with several women. The villa was in a gated community where some villas cost over $10,000 U.S.C. a week to rent. The defendant was uncooperative when immigration authorities arrived and after he was taken into custody, the women chased the car in which the defendant was being transported in their own car at high speed.

The defendant pretends to be a renunciate. In reality, however, he has spent his life profiting from his pyramid schemes and has otherwise received financial backing from independently wealthy women. The defendant is currently financially backed by Clare Bronfman, an heiress to the Seagram's liquor fortune. She has financed the defendant repeatedly over the years including providing him with millions of dollars and paying for private air travel costing up to approximately $65,000 a flight. She has also paid for numerous lawyers to bring suits against Nxivm critics. Bronfman also owns a private island in Fiji, which the defendant has visited, and both Bronfman and the defendant have contacts all around the world.

The defendant does not keep any money in his name and has no driver's license. He makes purchases using a credit card in one of his dead lover's names. In the past year and a half, the defendant and the mother of his child have accessed hundreds of thousands of dollars from a bank account in the same dead lover's name, which contains over $8 million dollars.

D.      Past Obstruction

According to multiple confidential sources, in connection with a civil action brought in the District of New Jersey against cult critic Rick Ross and others that was dismissed this year, the defendant directed several members of Nxivm to edit video recordings of Nxivm classes that Nxivm had been ordered to produce in discovery. The edits removed portions of the classes that the defendant thought would be damaging to Nxivm's case.

In addition, since defecting, several DOS victims have received "cease and desist" letters from a Mexican attorney. As set forth in the complaint, the defendant was involved in sending those letters.

II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141, et seq. (the "Act"), federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of risk of dangerousness must be supported by clear and convincing evidence and a finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

(1)     "the nature and circumstances of the offense charged. . .";

(2)     "the weight of the evidence against the person";

(3)     "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

(4)     "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). In addition – and significantly – when a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence. United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985). Moreover, the Second Circuit has held that "prior acts of domestic violence are relevant to a determination of dangerousness" because a "willingness to strike loved ones offers probative evidence of tendency to violence and dangerousness towards others." United States v. Mercedes, 354 F.3d 433, 4337-38 (2d Cir. 2001).

The government is entitled to proceed by proffer in detention hearings. United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).

III. Argument

The nature of the charges outlined in the complaint demonstrates that the defendant poses a significant risk of flight and danger to the community. The defendant is charged with sex trafficking and conspiracy to commit forced labor in a scheme involving over fifty female slaves he directed others to recruit on his behalf. He is charged with trafficking these women through coercion and manipulation, tactics that he has used before.

After law enforcement began interviewing witnesses about the defendant's criminal conduct, he fled to Mexico where he was apprehended only after a month-and-a-half of active searching. The defendant began using encrypted email and stopped using the phone that had been known to law enforcement shortly after the government began interviewing witnesses. The defendant faces a mandatory minimum sentence of 15 years' imprisonment and an approximate Guidelines range of at least 188 to 235 months' imprisonment on the sex trafficking charge alone. The Second Circuit has held that the possibility of a severe sentence is an important factor in assessing flight risk. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). The defendant also does not keep assets in his name and, through his connections and followers, has access to millions of dollars and a private island.

Moreover, the risk of flight and dangerousness is further supported by every one of the Bail Reform Act factors. First, the defendant is charged with very serious crimes that involve sex trafficking of vulnerable women through coercion and manipulation, tactics the defendant has mastered over decades.

6

Second, the evidence against the defendant is exceedingly strong. The government has spoken to more than a dozen women who have been victimized by the defendant, as well as many other witnesses. Their statements have been corroborated, including by the defendant's own emails and electronic communications.

Third, the defendant's personal characteristics demonstrate that he is someone who is both a risk of flight and a danger to the community. As described above, he has spent decades pretending to be a renunicate while scamming people out of money and living a secret life of luxury. He has also previously directed others to falsify records to be used in a civil lawsuit and sent "cease and desist" letters to witnesses, actions which evince a willingness to obstruct justice.

With respect to the danger he poses (as relevant to both the third and fourth factors of the Bail Reform Act), the allegations in the complaint speak for themselves, and are the culmination of decades of abusing women and girls through manipulation and coercion and, at times, physical violence. The extent of his brazenness is demonstrated by the fact that he identified his adherents as "slaves" and had them branded with his initials. If released, the defendant poses a risk to numerous women, including many DOS slaves who still believe they are under his control. There is a very real concern that the defendant may attempt—either directly or indirectly through his slaves—to intimidate possible witnesses against him into silence.

## CONCLUSION

For the reasons set forth above, the government intends to request that the defendant be removed in custody to the Eastern District of New York when he appears for arraignment in the Northern District of Texas tomorrow. In the event that bail proceedings take place before this Court, the government will seek a permanent order of detention. The government submits that the defendant poses a danger to the community and a risk of flight. There is no condition or combination of conditions that will assure the safety of the community,

7

the defendant's return to court, or his compliance with the Court's directives.  Accordingly, the government requests that the defendant be permanently detained pending trial.

Respectfully submitted,

RICHARD P. DONOGHUE  
United States Attorney

By:    /s/_____  
       Moira Kim Penza  
       Tanya Hajjar  
       Assistant U.S. Attorneys  
       (718) 254-6454 (Penza)

cc:    Defense Counsel