**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**18-cr-204 (NGG)**

---

**UNITED STATES OF AMERICA**

**-against-**

**KEITH RANIERE,**

**Defendant.**

---

**MOTION FOR RELEASE ON BAIL**

**BRAFMAN & ASSOCIATES, P.C.**
*Attorney for Defendant*
*Keith Raniere*
767 Third Avenue
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

MARC A. AGNIFILO
JACOB KAPLAN
TENY R. GERAGOS
         *Of Counsel*

**DEROHANNESIAN &**
**DEROHANNESIAN**
677 Broadway – Ste. 707
Albany, NY 12207
Tel:  (518) 465-6420
Fax:  (518) 427-0614

PAUL DEROHANNESIAN II
DANIELLE R. SMITH
         *Of Counsel*

## **Table of Contents**

Preliminary Statement...........................................................................................................1

Introduction and Legal Standard........................................................................................2

Proposed Conditions of Release ........................................................................................3

Summary .............................................................................................................................5

Arrest and Indictment .........................................................................................................8

Raniere Should be Released on Conditions Because He Is Not a Flight Risk or a Danger to the
Community ..........................................................................................................................9

    1.     Raniere Is Not a Danger to the Community...................................................9

    2.     Raniere Is Not a Risk of Flight ...................................................................10

    3.     The Government's Case Is Unsupported by the Facts..............................16

The Facts of This Case Require That Raniere Be Released ..............................................18

    1.   United States v. Brooks.................................................................................19

    2.   United States v. Dreier..................................................................................19

    3.   United States v. Madoff.................................................................................20

    4.   People of the State of New York v. Strauss-Kahn.........................................20

    5.   United States v. Cilins...................................................................................20

    6.   United States v. Valerio.................................................................................21

    7.   United States v. Seng....................................................................................21

    8.   United States v. Webb...................................................................................22

    9.   United States v. Zarrab..................................................................................22

    10. A Review of These Cases Shows That Raniere Should Be Released.........................22

Conclusion .........................................................................................................................23

i

## Table of Authorities

### Statutes

18 U.S.C. § 1591(a)(1)...................................................................................................9, 16

18 U.S.C. § 1591(e)(2)...........................................................................................................9

18 U.S.C. § 1589.....................................................................................................................9

18 U.S.C. § 3142(c)(1)(B) .....................................................................................................2

18 U.S.C. § 201....................................................................................................................17

18 U.S.C. § 641....................................................................................................................17

18 U.S.C. § 666....................................................................................................................17

### Federal Cases

United States v. Brooks, No. 06 Cr. 550 (JS) (E.D.N.Y. 2008) ...................................19

United States v. Cilins, No. 13 Cr. 315 (WHP) (S.D.N.Y. 2013)...............................20

United States v. Dreier, 596 F. Supp. 2d 831 (S.D.N.Y 2009).....................................19

United States v. Fernandez, 272 F.3d 938 (7th Cir. 2010) ...........................................17

United States v. Hines, 541 F.3d 833 (8th Cir. 2008)....................................................17

United States v. Jessup, 757 F.2d 378 (1st Cir. 1985)................................................2, 3

United States v. Madoff, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) .................................20

United States v. Mercedes, 254 F.3d 433 (2d Cir. 2001)................................................2

United States v. Nebbia, 357 F.2d 303 (2d Cir. 1966)....................................................2

United States v. Rodriguez, 950 F.2d 85 (2d Cir. 1991) ................................................2

United States v. Salerno, 481 U.S. 739 (1987) ................................................................2

United States v. Seng, No. 15 Cr. 706 (VSB) (S.D.N.Y. 2015) ...................................21

United States v. Shakur, 817 F.2d 189 (2d Cir. 1987)....................................................2

Stack v. Boyle, 342 U.S. 1 (1954) .....................................................................................2

United States v. Townsend, 630 F.3d 1003 (11th Cir. 2011) .......................................17

United States v. Valerio, 9 F. Supp. 3d 283 (E.D.N.Y. 2014) .......................................................21

United States v. Webb, No. 15 Cr. 252 (PKC) (E.D.N.Y. 2015) ...................................................22

United States v. Zarrab, No. 15 Cr. 867 (RMB), 2016 WL 3681423 (S.D.N.Y. Jun. 16, 2016) ...........................................................................................................................................22

United States v. Zimmermann, 509 F.3d 920 (8th Cir. 2007) .......................................................17

**State Case**

People of the State of New York v. Strauss-Kahn, Dkt. No. 2011NY035773 ..............................20

## MOTION FOR RELEASE ON BAIL

### Preliminary Statement

Through this case, the United States Government seeks to curtail the ways in which independent, smart, curious adults may legally search for happiness, fulfillment and meaning. By condemning DOS as a criminal enterprise and the teachings of Keith Raniere as fraudulent and criminal, the Department of Justice has made itself the morality police. The federal Government apparently does not approve of the way hundreds of women are searching for happiness, fulfillment and meaning in their lives and is now seeking to incarcerate a number of them as well as Raniere, whose ideas inspired this group. To accomplish this unimaginable result, the Government resorts to the Sex Trafficking statute, which, as shown below, does not apply to this conduct. The Government advances an adventuresome legal theory without precedent to assert the emotionally charged crime of "sex trafficking." While some may view certain elements of Raniere's teachings as bold, there are many others who have said, and one day will testify in this very courtroom, that these teachings improved their lives or gave their lives greater meaning. Keith Raniere will wage a vigorous and principled defense to these charges, and the Government's intolerant version of reality will be disproven.

For the time being, however, Raniere asks only to be released from prison so that he and his lawyers may wage this exhaustive and important fight. Accordingly, we request a prompt hearing at a time convenient to this Court and the Government to determine whether a combination of restrictive conditions exists that would permit Raniere, a United States citizen previously residing in Albany, New York, with no criminal record, to be released pending trial. Raniere's proposed conditions, including round-the-clock security as well as electronic monitoring will ensure no danger of his fleeing because he would be under constant guard.

## Introduction and Legal Standard

Because Raniere is presumed to be innocent, the Supreme Court has observed that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). As the Supreme Court recognizes, "the function of bail is limited." Stack v. Boyle, 342 U.S. 1, 4 (1954). The underling goal is securing the presence of the defendant rather than "the sum of bail." United States v. Nebbia, 357 F.2d 303, 304 (2d Cir. 1966). When deciding an issue of pretrial release, the Second Circuit has noted that "the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987). Indeed, the Bail Reform Act requires that the Court impose "the least restrictive . . . condition, or combination of conditions, that will . . . reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B). While there is a presumption of detention in sex trafficking cases, this presumption is rebuttable. The presumption imposes on the defendant a "burden of production," while the "burden of persuasion" remains with the government. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Although this burden "is not heavy," the defendant must introduce some evidence contrary to the presumed fact. United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991). A defendant can satisfy this burden by coming forward "with evidence that he does not pose a danger to the community or a risk of flight." Mercedes at 436. Even if the defendant presents some evidence satisfying his or her burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.  In Jessup, the benchmark case defining this burden shift, the court explained:

> Since the presumption is but one factor among many, its continued consideration by the magistrate does not impose a burden of persuasion upon the defendant.

And, since Congress seeks only consideration of the general drug offender/flight problem, the magistrate or judge may still conclude that what is true in general is not true in the particular case before him. He is free to do so, and to release the defendant, as long as the defendant has presented some evidence and the magistrate or some judge has evaluated all of the evidence with Congress's view of the general problem in mind.

United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985).

As demonstrated below, the Government's Complaint and Detention Letter contain significant factual errors. As such, the Government has not met its burden of establishing by clear and convincing evidence that Raniere is a danger to the safety of the community or by a preponderance of the evidence that Raniere is a flight risk. Therefore, Raniere should be released.

### **Proposed Conditions of Release**

While this memorandum paints a clearer picture of Keith Raniere justifying his release, in an abundance of caution, Raniere offers the following conditions that we respectfully submit are more than sufficient to ensure Raniere's appearance during this case and ameliorate any of the risks asserted by the Government:[1]

(1) A $10M bond signed by Raniere;

(2) Travel restricted to the Eastern and Southern Districts of New York;

(3) Surrendering of Raniere's passport, and an agreement not to secure new travel documents;

(4) Strict Pretrial Services supervision;

---

[1] Prior to submitting this motion to the Court, the proposed conditions were submitted to the Government to determine whether we could move on consent of the parties. However, as it indicated in court, the Government again stated that there are no conditions under which it will agree to Raniere's release. Accordingly, this very substantial package was rejected by the Government.

(5)   Home detention with GPS monitoring at a residence selected by the security company called TorchStone, under the supervision of Mark Sullivan, former Director of the U.S. Secret Service with thirty-five years of federal law enforcement experience;

(6)   Raniere's presence at this residence to be secured by TorchStone with the following provisions:

     a.    24-hour armed guards;

     b.    Two guards per shift;

     c.    One supervisory security professional overseeing and scheduling the security detail;

     d.    Security both at the residence and accompanying Raniere whenever he leaves the residence pursuant to bail conditions;

     e.    TorchStone will provide a security vehicle with driver whenever Raniere must travel to counsel's office, court, or medical treatment (with prior notification to Pretrial Services); and

     f.    TorchStone will communicate with Pretrial Services, the Court and/or the Government in regard to any violation of any condition imposed by the Court;

(7)   That while Raniere shall be granted access to a computer in order to review the discovery provided in this case and other case-related materials provided by his lawyers, he shall not be permitted internet access;

(8)   That Raniere is permitted access to one telephone that will provided and approved by Pretrial Services to make and receive calls to and from phone numbers agreed to by counsel for Raniere and the Government (including the phone number of the mother of his child); and

(9)   That Raniere will not directly or indirectly associate or have contact, outside the presence of his counsel, with his co-defendants, alleged co-conspirators, or any individual currently or formerly employed by or associated with Nxivm or any affiliated or constituent entity; however, this does not limit the defense attorneys and their investigators from conducting appropriate defense investigation, consistent with the protective order signed by the Court.

## Summary

Keith Raniere is 57 years old.  He grew up in Rockland County, New York, and attended college at Rennselear Polytechnic Institute ("RPI") in Troy, New York. He has lived and worked in the Capital region of Albany, New York, steadily over the past almost forty years. Aside from brief trips to Mexico and Fiji over the last several years, he has resided entirely in the United States and primarily in upstate New York.

In a word, Raniere is an ethicist. His ethical teachings, which have focused on raising the level of humanity within each person, have been a source of help and inspiration to thousands of people. He has been recognized by no less than the Dalai Lama.

The accomplishments of Raniere and others working with him are too numerous to recite here. Two of the more notable accomplishments include a film called "My Tourette's," an award-winning feature length movie about Tourette's syndrome and the use of teaching methods developed by Raniere and others to overcome debilitating symptoms of Tourette's and a successful peace movement in Mexico to curb drug cartel violence.

In 1998, Raniere and his business partner incorporated Executive Success Programs ("ESP") with the goal of helping people permanently improve and change their lives with reproducible technology. ESP consists of thousands of multi-hour "modules" and classes which help create the foundation necessary to acquire and build skills for success.

In 2003, Raniere and others founded Nxivm Corporation and have created other Raniere-inspired companies since that time. For example, one company—Jness—was founded in 2008 to promote the furtherance and empowerment of women throughout the world. Another Raniere-inspired company is Rainbow Cultural Garden, a child development program which promotes children's cultural, linguistic, emotional, psychical and problem-solving potential. Nxivm

5

Corporation exists to scientifically study education and technology to help its student's excel, thereby creating a rational and ethical world.

In 2015, a group called DOS or The Vow was created. DOS was inspired no doubt by Raniere's teachings but it is a group created by and for women. In addition, while Nxivm and DOS have similar curricula and many members in common, they are not structurally related. The Complaint seeks to connect Nxivm and DOS by alleging that "DOS masters recruited slaves mostly from within Nxivm's ranks." Complaint ¶ 15. This is misleading for several reasons. First, rather than being recruited, women joined DOS because they were genuinely interested in being part of a sisterhood of strong, independent women and in the benefits provided by a union of this type. Second, prospective members were not targeted. Rather, the possibility of joining DOS was offered as a way of coping with, and hopefully overcoming, basic challenges facing many people. Third, to the extent there is overlap between Nxivm and DOS memberships, this is because women who are friendly with each other due to Nxivm asked each other from time to time to join DOS.

As noted, DOS is a group of women connected by mutual commitment. As part of a woman's membership in DOS, her commitment is offered by agreement to provide "collateral." Complaint ¶ 15. The form of collateral was the individual choice of the woman, *i.e.*, what would be sufficient for that woman to view her voluntary membership in DOS as a meaningful life commitment. If a particular woman does not wish to provide collateral, she is absolutely free to choose to not join the group. She is also free to discuss the collateral with the woman bringing her into the group. However, there has never been an instance where a woman provided collateral against her will, or where she was compelled to join DOS against her will. Rather,

every woman who provided collateral in connection with her admission into DOS did so knowingly, intelligently and with full knowledge and awareness of her actions.

Moreover, counsel is aware of no instance where the collateral of anyone was actually released as a punishment or for any other reason. The collateral is akin to "consideration" in a contract or as a form of commitment to one's membership in DOS. The view shared by many DOS members is that DOS is effective precisely because it requires a tangible commitment, and that the collateral is central to the personal commitment that makes DOS effective.

In a novel effort to fabricate the element of coercion as part of the sex trafficking count, the Government artificially links collateral to a requirement of sex with Keith Raniere. However, we expect that the Government has by now spoken with numerous women who have stated to the investigators and prosecutors that collateral was wholly unrelated to sex or an expectation of having sex with anyone, let alone Raniere.[2] The evidence is overwhelming that the collateral was a function of a woman's membership in and commitment to DOS, and nothing more.

Another feature of DOS membership – one on which the Government focuses – is the fact that several of the women in DOS chose to voluntarily brand themselves. There are several instances of women who joined DOS who chose not to be branded and were not. The decision of some DOS women to brand themselves was absolutely knowing and voluntary, and a product solely and exclusively of their free will. In fact, the woman being branded typically placed the stencil on her body where she wanted the brand to be located. The Government does not allege (because there are no such instances) of a woman branded against her will, nor of a woman branded who did not expect and voluntarily choose to be branded. Indeed, there are numerous

---

[2] The defendant requests that the Government turn over all such statements as soon as possible as Brady material.

7

examples of women who joined DOS who chose not to be, and were not, branded. Finally, while there may be instances of someone branded who later second-guessed or regretted her decision, the evidence will be clear that the decision was knowing, voluntary and based on free will at the time it was made. [3]

It is worth mentioning that members of a number of male fraternities and social groups regularly brand themselves to signify their membership. For example, Omega Psi Phi, an international fraternity dating back to 1911 with over 750 undergraduate and graduate chapters, has developed an unofficial practice where members voluntarily brand themselves to show dedication to the group. However, the Government rushes to judgment that women who similarly brand themselves must be victims, a notion that is anathema not only to the principles underlying the very creation of DOS, but also to the freedom of choice we are all afforded.

The Government's overarching premise is that DOS was created as a way of Raniere having access to women who were brought into DOS on an ongoing basis. This is absolutely false and will be soundly disproven through the testimony of the actual DOS members who will testify at the trial.

## Arrest and Indictment

On March 26, 2018, Mexican police officials entered a residence in Mexico and forcefully seized Raniere. However, he was not arrested based on the U.S. arrest warrant. Rather, he was incarcerated in Mexico as a deportable U.S. person. Denied access to a lawyer and the ability to communicate with anyone, he was taken across the border into the United States without being presented to a Mexican court and in the absence of any legal process. After

---

[3] To the extent that one or more former DOS members have made public statements that this branding was not knowing and voluntary, such statements are provably false. The evidence is overwhelming and beyond contention that these brandings were knowing, voluntary and products of each woman's free will. Any statements to the contrary will be readily disproven.

he was brought to the United States, he was arrested on the instant arrest warrant. He has been held at the Metropolitan Detention Center in Brooklyn since April.

The Indictment charges Keith Raniere and Allison Mack with three counts: (1) Conspiracy to Commit Sex Trafficking, in violation of Title 18, United States Code, Section 1591(e)(2); (2) Sex Trafficking, in violation of Section 1591(a)(1); and (3) Conspiracy to Commit Forced Labor, in violation of Section 1589.

### Raniere Should Be Released on Conditions Because He Is Not Danger to the Community or a Flight Risk

1.     Raniere Is Not a Danger to the Community

The Government claims that the defendant is both a danger to the community and a risk of flight. See Dkt. No. 4: Government Detention Letter at 6. To bolster this contention, the Government states that "[a]ccording to confidential sources, the defendant had repeated sexual encounters with multiple teenage girls in the mid-to-late 1980s and early 1990s." Id. at 3. Raniere flatly denies this unsubstantiated and inflammatory statement relating to supposed events from three decades ago. Moreover, these allegations were investigated by law enforcement and Raniere was never charged. The Government also states that Raniere ordered the "long-term confinement" of a Nxivm member for an ethical breach. Id. However, the Government failed to inform the Court that this supposed "long-term confinement" was more akin to "grounding" than confinement, as it was in a bedroom of the woman's own home with the door unlocked and her family present.

There are no actual facts that this defendant, with no prior criminal record, is a danger to anyone. However, even if Raniere was a danger – and he clearly is not – the conditions proposed above would eliminate any potential danger that could otherwise exist. Therefore, in light of the proposed conditions of house arrest, electronic monitoring and armed security by an elite

9

security team, Raniere is not in a position to pose a danger to the community and should be released.

        2.      <u>Raniere Is Not a Risk of Flight</u>

Raniere is likewise not a flight risk. He is a United States citizen who has lived in the United States and upstate New York his entire life. There is no basis to believe he will do anything but fight this case hard and will return to court each time to do so. As shown below, he has never evaded this, or any, investigation. On the contrary, in the Fall of 2017, when Raniere became aware of a potential investigation, he employed the former United States Attorney for the District of Massachusetts, Michael Sullivan, for legal representation. Inquiries were made to different prosecutorial offices including the New York State Attorney General and the United States Attorney's Office for the Northern District of New York (NDNY), where Nxivm and Raniere were located.

Raniere, through his counsel, was interested in sharing his side of the story with the NDNY. Mr. Sullivan, on Raniere's behalf, contacted the United States Attorney for the NDNY, Grant Jacquith, on or about March 15, 2018 and understood based on that call, that there was not a criminal investigation being conducted by the NDNY, nor did it appear that the NDNY was aware of a criminal investigation by another District. Mr. Sullivan understood the NDNY would attempt to determine if another District had opened a matter related to Raniere and if it had, would make that District aware of Mr. Sullivan's interest in speaking with them on behalf of Raniere. After a few days, Sullivan again contacted the NDNY, at least once and possibly twice, in an attempt to see if there was an open matter in order to provide the Government information that would dispute and undermine the assertions being made in the media. To this date, Mr.

Sullivan has not received a response from Mr. Jaquith or anyone in his office.[4] Having an attorney reach out to the United States Attorney is the antithesis of running, hiding or fleeing investigators.

In addition, the Government's repeated statements that Raniere fled to Mexico due to this investigation are patently false. Specifically, in the Government's Complaint against Raniere (see Dkt. No. 1 ¶ 34), their Detention Letter (see pp. 4, 6), and their May 23, 2018 Verified Complaint In Rem against third-party properties (see United States v. Real Property at 8 Hale Dr. et al., No. 18-CV-3041-SJ, Dkt. No. 1 ¶ 34 (E.D.N.Y. 2018)), the Government has continually argued that Raniere "fled" to Mexico to avoid the consequences of the investigation.

Specifically, in the Government's Complaint and Affidavit in Support of Raniere's arrest, Special Agent Michael Lever swore to the following facts:

> In or about October 2017, the New York Times published an article revealing the existence of DOS. Several weeks after that article was published and after the FBI began interviewing witnesses, Raniere flew to Mexico with an heiress "the "Heiress" who is a member of Nxivm's Executive Board and is a known financial backer of RANIERE and Nxivm. Prior to this trip, RANIERE had not flown out of the country since 2015, when he visited the Heiress's private island in Fiji. RANIERE is currently believed to be residing in Monterrey, Mexico, where Nxivm maintains a center, with a branded DOS slave.

Complaint ¶ 34. The nearly exact same paragraph is included in the In Rem action filed recently to seize third-party properties in Albany. See United States v. Real Property at 8 Hale Dr. et al., Dkt. No. 1 ¶ 34. Furthermore, the Government argues in several points in their Detention Letter that "[a]fter law enforcement began interviewing witnesses about the defendant's criminal conduct, he fled to Mexico where he was apprehended only after a month-and-a-half of active searching." Detention Letter at 6; see also id. at 4 ("Shortly after the government began

---

[4] Mr. Sullivan is available to either submit a declaration or testify should this Court have any question about his contacts with the Department of Justice.

interviewing witnesses and victims in November 2017, the defendant flew to Mexico."). The suggestion is clear: Keith Raniere went to Mexico because of an investigation and newspaper article.

These statements are inaccurate and are belied by documents and records in the Government's possession which they have overlooked and not provided to the Court. Contrary to paragraph 34 of the Complaint, Raniere had flown out of the country prior to his trip to Mexico in November 2017, and the circumstances surrounding his trip to Mexico were not to evade law enforcement's investigation. In fact, Raniere and the mother of his child were seeking to comply with United States law. The goal was not to travel south to Mexico, but rather north to Canada.

The mother of Raniere's child is a Mexican citizen, who most recently entered the United States on a B1/B2 visitor's visa on April 15, 2017. Pursuant to that visa, she was only authorized to remain in the United States until October 14, 2017. See Ex. 1: I-94 Form. The six-month duration of this stay in the United States is corroborated by the second date on the I-94 form of October 14, 2017. Id. This means that she was required to leave the United States no later than October 14, 2017 or be in violation of United States law. On advice of counsel, Raniere and the mother of his child were advised to arrange for her to leave the country. Wanting to be close to his home and business, Raniere and the mother of his child rented an Airbnb in Canada for the family to live in while they resolved the immigration issues. See Ex. 2: Airbnb Rental. However, when they attempted to enter Canada on October 13, 2017, Immigration, Refugees and Citizenship Canada ("Immigration Canada") denied them entry. With less than 24 hours to be in compliance with United States immigration law, on October 14, 2017, to comply with the visa, Raniere, the mother of his child and his child flew to San Diego and entered Mexico by crossing the San Ysidro port of entry. See Ex. 3: Raniere Flight to San Diego, CA; Ex. 4: Mother Flight to

San Diego, CA. As shown by both Raniere's passport (Ex. 5: Raniere passport stamps) and the mother of his child's passport (Ex. 6: Mother's passport stamps), they both entered Mexico on October 14, 2017. Therefore, documentary evidence conclusively shows that Raniere and the mother of his child left the United States on the precise date that her visa was to expire and that they did so to avoid any violation of United States law.

Additionally, their entry into Mexico was *prior to* the publication of The New York Times article "revealing the existence of DOS." Ironically, and contrary to the Government's flight theory due to The New York Times story, the day The New York Times published the article on DOS, Raniere flew back to Albany from Mexico. See Ex. 7: Raniere Flight to NY. His flight itinerary was sent to his Yahoo! email account, on which the Government has executed a search warrant, yet they have still represented in their multiple public filings that prior to November 2017, he had not flown out of the country since 2015—ignoring that Raniere had traveled to Mexico weeks earlier.

Raniere stayed in Albany until November 10, 2017 (several weeks after The New York Times published its article), to be at his former partner's home on November 7, 2017, the one year anniversary of her passing. Raniere's open return to his New York home for several weeks while under threat of prosecution and having his attorney communicate with the Justice Department militates against detention. After several weeks in Albany and the one-year anniversary of her death, Raniere flew back to Mexico to be with his child and the mother of his child. See Ex. 5: Raniere passport stamps; Ex. 9: Raniere flight to Mexico.

To support its flight theory, the Government asserts that Raniere "flew to Mexico" and "[f]inding the defendant was difficult because the defendant purposely concealed his location." Detention Letter at 4. This is demonstrably false. Documents in the Government's possession,

13

and turned over to the defense in discovery, show that while in Mexico, Raniere filed documents in Saratoga County Surrogate's Court which identified by name and location the Mexican notary before whom he appeared. On December 20, 2017, Raniere appeared before Notario Publico[5] Jose Guillermo Meza Garcia to sign a document renouncing his role as executor of the estate of Pamela Anne Cafritz, his deceased long-time significant other.[6] See Ex. 8: Renunciation of Nominated Executor. The Notario indicated his name and address on the apostile. Id. Raniere's renunciation was filed as a public document in the Saratoga County Surrogate's Court and scanned into the court file on January 17, 2018. Raniere was not hiding in Mexico. He was openly appearing before a Mexican legal official and openly filing a document in the courts of New York. *The Government was in possession of this document.*

The exact timeline is set forth below:

| Date | Event | Exhibit |
|---|---|---|
| April 15, 2017 | Mother of Raniere's child admitted to the United States on a visa which expires on October 14, 2017. | 1 |
| October 13, 2017 | Raniere, the mother of his child, his child, and one other drove to Canada to stay in a rented Airbnb, but Immigration Canada denied them entry. | 2 |
| October 14, 2017 | The mother of Raniere's child's visa is set to expire at midnight; so she, Raniere, and the child fly to San Diego, to drive to Mexico. | 3, 4, 5, 6 |
| October 17, 2017 | Raniere flies back to Albany, NY from Monterrey, Mexico. | 7 |
| October 17, 2017 | The New York Times article is published. (Available online | n/a |

---

[5] A notary public in Mexico, or Notario Publico, has greatly different role and position compared with an American notary. The Mexican notary must be an attorney and undergo specialized education and a rigorous test and to assume legal responsibilities beyond those of a notary public in the United States.

[6] Raniere was Pamela A. Cafritz' power of attorney and the nominated Executor of her estate. Raniere renounced his authority to manage the estate through this document. Ms. Cafritz' estate assets are to pass to a trust she created, although, as of this date, this has not yet occurred, pending certain legal work related to the trust. Nonetheless, Raniere has no control over the estate assets and will renounce his right to manage the trust, of which he is an alternate trustee and sole beneficiary. Defense counsel agrees to keep all interested parties updated as to the creation of the trust and the disposition of these assets.

| | | |
|---|---|---|
| | prior to publication.) | |
| November 7, 2017 | On the one-year anniversary of Raniere's 20-year long partner's death, Raniere spends the day in the Clifton Park home they lived in to celebrate her life. | n/a |
| November 10, 2017 | Raniere flies back to Monterrey to join his family and to celebrate the mother of his child's birthday. | 5, 9 |
| November 15, 2017 | The mother of Raniere's child's birthday. | n/a |
| December 20, 2017 | Raniere appears before Notario Publico Jose Guillermo Meza Garcia to sign a document renouncing his role as executor. | 8 |
| January 17, 2018 | Raniere's renunciation was scanned into the Surrogate's Court file. | 8 |
| March 15, 2018 | Raniere's attorney, former United States Attorney Michael Sullivan, contacts NDNY United States Attorney Grant Jaquith. | n/a |

Accordingly, any suggestion that the timing of this visit to Mexico was due to the U.S. investigation or that Raniere was hiding in Mexico is provably false based on records maintained by the Government.

Another fact that makes flight far less plausible is that Raniere's case, as well as his image and his popularity make him instantly recognizable. It is well-known, and not disputed, that there is a group of critics of Nxivm and Raniere who located him in Mexico and took photographs of him and others. His activities in Mexico were reported on and photographed by detractors. Indeed, the members of Nxivm had, and continue to have, reason to be afraid of this group, which has utilized aggressive methods to intimidate Nxivm members and has engaged in significant criminal conduct.

On this point, it bears mentioning that if Raniere and others utilized different phones and email addresses on occasion, it was not to evade law enforcement but rather this well-organized anti-Nxivm group which has harassed Raniere and others for several years. Moreover, his attorney left a phone number with the Department of Justice on two occasions by which he could be reached.

3.      The Government's Case Is Unsupported by the Facts

While the Government is using fearsome statutes with lengthy minimum sentences, its attempt to transform a volitional union of free-minded, educated, intelligent, willful, successful adult women into a helpless band of victims is baseless. With the exception of a few people,[7] the members of DOS will come to Court and will tell the truth, specifically that they are not victims of sex trafficking, or of anything else, and that the Government's allegations to the contrary are simply false.

Even viewing the purported conduct in a light most favorable to the prosecution, the allegations do not amount to a violation of Title 18, United States Code, Section 1591(a)(1), the title of which is "Sex trafficking of children or by force, fraud or coercion."

The statute reads as follows:

(a)      Whoever knowingly –

(1) in or affecting interstate or foreign commerce…recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person…knowing, or…in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act….

(2) The term "coercion" means – (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or legal process.

(3) the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

---

[7] Among a few former-Nxivm-members-turned-critics who are speaking to the Government are a former DOS member who has secured a docu-series since Raniere was arrested, another who has launched a podcast, another who has secured a book deal and a fourth who is under Indictment in the Western District of New York.

> (4) the term "serious harm" means any harm, whether physical or
> nonphysical, including psychological, financial or reputational harm, that
> is sufficiently serious, under all the surrounding circumstances, to compel
> a reasonable person of the same background and in the same
> circumstances to perform or to continue performing commercial sexual
> activity in order to avoid incurring that harm.

The evidence in this case lacks two critical elements required by the statute. First, there is no evidence of force, threats of force, fraud, coercion or any combination. None of the women have stated, nor could truthfully state, that Raniere had sex with them against their will. This is not a case of non-consensual sexual conduct. Rather, the Government seems to be manufacturing a case where women feel compelled to remain in DOS because they voluntarily gave collateral when they joined. But, this is in essence a contract. Also, there is no evidence that the collateral has any connection whatsoever to sexual conduct. Instead, the collateral relates solely to that person's commitment to DOS. Therefore, there will be no evidence that there was ever any sexual conduct based on force, fraud or coercion.

Second, there is no evidence that anyone engaged in a commercial sex act, within the meaning of the statute. As noted, the element of "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. The term used in the definition "anything of value" appears regularly in the criminal law. See 18 U.S.C. § 201 (bribery of federal officials and witnesses); 18 U.S.C. § 641 (theft of federal property); and 18 U.S.C. § 666 (bribery in relation to federally-funded programs). The term is generally understood to involve both tangible and intangible remuneration. United States v. Townsend, 630 F.3d 1003 (11th Cir. 2011); United States v. Fernandez, 272 F.3d 938 (7th Cir. 2010); United States v. Hines, 541 F.3d 833 (8th Cir. 2008); United States v. Zimmermann, 509 F.3d 920 (8th Cir. 2007).

However, to the extent that the Government's theory of remuneration in the instant case is the status of Raniere or of another person, the Government cites no precedent for such a theory. Plainly, this case does not involve prostitution in any regard. There is no allegation, nor could there be, that anyone in this case was involved in prostitution or anything remotely similar to it. While the Government may believe that the sex trafficking statute is sufficiently broad to cover this conduct, we are confident a jury will not share the Government's view.

Accordingly, while it is admittedly too early to litigate the merits of the Government's claims, the Government faces substantial legal and factual issues.

## The Facts of This Case Require That Raniere Be Released

Given the fact that Raniere is a United States citizen without a criminal (or arrest) record who has lived and worked his life in New York State, he should be released under a traditional personal recognizance bond secured by property and co-signors subject to pretrial supervision. In other words, the defense should not have to resort to the extreme conditions set forth above involving, among other things, full house arrest with a GPS monitor and armed twenty-four hour guards. However, in order to ensure that the defendant is released, we are willing to do so.

A review of other cases where conditions similar to these had been proposed by the defense shows that Raniere should be released on the proposed conditions. Over the past ten years, there have been a number of noteworthy cases where conditions such as house arrest with security guards have been proposed. The ultimate decision as to whether the court releases the defendant based on these conditions turns on a number of factors all of which weigh in defendant's favor here. First, many of the decisions turn on the citizenship status of the defendant. Second, several turn on whether the offense conduct comprises threats to witnesses or charges of obstruction of justice. Third, several of the cases focus on whether the defendant lied

18

to the court in regard to his financial resources or as to assets overseas. A review of several of the recent decisions in this area indicates that the current case is one where release on conditions should be granted.

1.      United States v. Brooks, No. 06 Cr. 550 (JS) (E.D.N.Y. 2008)

The Honorable Joanne Seybert of this District allowed David Brooks to be released on rigorous conditions despite the fact that Brooks had bought a house in London the day the Indictment against him was filed, and despite meaningful attempts by Brooks to obstruct the investigation, including the removal of a number of computers allegedly used by Brooks to engage in the charged conduct. The measures taken by Brooks to flee, move millions of dollars overseas and obstruct justice are set forth in a letter from the Government dated October 30, 2007, attached hereto as Exhibit 10. Despite this conduct, Judge Seybert released Brooks on electronic monitoring with two guards, one of whom was armed.

2.      United States v. Dreier, 596 F. Supp. 2d 831 (S.D.N.Y 2009)

The Honorable Jed S. Rakoff released Marc Dreier who was charged with a $400,000,000 fraud where "tens of millions of dollars were missing." See United States v. Dreier, 596 F. Supp. 2d 831, 833 (S.D.N.Y 2009). Significantly, Dreier was dishonest about recent travel, having falsely denied a trip to Turkey. Nonetheless, despite Dreier's falsehoods regarding travel, the "colossal criminality" of his fraud (id. at 1) and the missing money, the Court concluded that the proposed package – involving house arrest with security guards – sufficiently minimized any risk of flight. Reviewing the proposed conditions, the Court noted, "the most potentially efficacious, and controversial, is Dreier's proposal to have armed guards staying at his apartment at all times, authorized to prevent his leaving his apartment at any time except upon express prior Order of the Court." Id. at 5.

3.    United States v. Madoff, 586 F. Supp. 2d 240 (S.D.N.Y. 2009)

As is well known, Bernard Madoff, in one of the largest fraud cases in this nation's history, was released on restrictive conditions including 24-hour security guards. Despite knowing he was facing a sentence of life in prison, and despite the fact that the case involved an unknown amount of missing funds, Madoff was trusted to return to court, and he did so. Significantly, the Government consented to the conditions. See United States v. Madoff, 586 F. Supp. 2d 240, 244.

4.    People of the State of New York v. Strauss-Kahn, Dkt. No. 2011NY035773

While this was a New York State prosecution of the former head of the International Monetary Fund for allegations of raping an employee of a Manhattan hotel, the case is noteworthy for two reasons. First, the District Attorney's Office maintained initially that the case was overwhelming against the defendant - a statement also maintained by the prosecution here - only to conclude after further investigation that the charges were unfounded. Second, despite the defendant being a citizen of a country (France) that refused to extradite its own citizens, the massive wealth of the defendant's wife at the time, and the serious nature of the rape allegations, the Court released Mr. Strauss-Kahn under conditions including house arrest with armed guards.

5.    United States v. Cilins, No. 13 Cr. 315 (WHP) (S.D.N.Y. 2013)

This case also involved a French citizen who was charged with three counts of witness tampering as well as obstructing justice and falsifying records in a federal investigation. In addition, the Honorable William H. Pauley concluded that Cilins had not been honest about his financial resources and that he omitted mentioning a bank account with over a $1,000,000. Due to the nature of the charges, the defendant's French citizenship and the defendant's lack of

candor, the Court rejected the defendant's proposal. These three factors, which comprised the basis of the Court's decision, are each absent here. Accordingly, Cilins is readily distinguishable.

      6.    United States v. Valerio, 9 F. Supp. 3d 283 (E.D.N.Y. 2014)

The Honorable Joseph F. Bianco of this District denied release for a defendant charged with the actual production of child pornography involving two minors – a six-year-old child and a three-year-old child. The Court concluded that given the nature of the offense, specifically the actual production of child pornography involving these young children, the defendant was unable to rebut the statutory presumptions of dangerousness and flight. The Court noted that the defendant's inability to rebut the presumption was due, in part, to the fact that (i) the defendant had a prior conviction for "attempted forcible touching" of a woman's genitals at a water park on Long Island, (ii) the defendant had hidden cameras in the floor, ceiling and wall, and (iii) that the defendant stated he would kill himself. Accordingly, because of the specific facts of Valerio, it is distinct from the present case.[8]

      7.    United States v. Seng, No. 15 Cr. 706 (VSB) (S.D.N.Y. 2015)

The Honorable Vernon Broderick's decision in United States v. Ng Lap Seng, No. 15 Cr. 706 (S.D.N.Y.) fully supports Raniere's application here. Mr. Ng, a citizen of China worth $1.8 billion, was arrested on a complaint while boarding his private jet about the leave the United States. Despite this massive personal wealth, his access to private jets, the absence of any ties to the U.S. and that he was charged with a large-scale bribery of a United Nations Official, Mr. Ng was released on house arrest with 24-hour security guards. Moreover, Judge Broderick allowed Mr. Ng to remain out on these bail conditions even after Mr. Ng was convicted and awaiting sentence.

---

[8] Although there is a rebuttable presumption of detention in Raniere's case, the proposed bail conditions adequately rebut this presumption.

8.      United States v. Webb, No. 15 Cr. 252 (PKC) (E.D.N.Y. 2015)

In the 2015 FIFA bribery case, Judge Vera Scanlon of this District released defendant Jeffrey Webb, a citizen of the Cayman Islands who was extradited from Switzerland, on a $10 million bond with the condition, inter alia, that Mr. Webb pay for a private security service to "monitor the defendant's physical location and provide security 24 hours per day, 7 days per week." See United States. v. Webb, 15 Cr. 252 (PKC) Dkt. No. 40 at Attachment A, ¶ 6. Notably, as there is no docket entry for a bail hearing in that case, it appears that the U.S. Attorney's Office for the E.D.N.Y. agreed to this condition.

9.      United States v. Zarrab, No. 15 Cr. 867 (RMB), 2016 WL 3681423 (S.D.N.Y. Jun. 16, 2016)

While the Honorable Richard Berman denied release for the dual Iranian/Turkish citizen Reza Zarrab in a massive Iranian sanctions prosecution, the facts of that case are distinct. First, as a citizen of Iran and Turkey, Mr. Zarrab could find refuge in either country, especially Iran. Second, it was believed that Zarrab had a close relationship with the Turkish President which made it virtually impossible for the U.S. to extradite him. Third, Zarrab had never previously set foot on U.S. soil.

10.      A Review of These Cases Shows That Raniere Should Be Released

A comparison of these cases to the instant case indicates that Raniere should be released on appropriate conditions. First, Raniere is a United States citizen. Second, Raniere does not have wealth. As noted above, while Raniere did spend some time recently in Mexico, he did not flee there, as alleged by the Government. Also, when the United States wanted his appearance in Court, it arrested him in Mexico and took him across the border in a matter of hours. So, any concern that Raniere might flee to Mexico is eliminated by the fact that the U.S. authorities have full access to U.S. citizens residing in Mexico. Third, unlike some of the above cases, there is no

22

allegation that Raniere has millions of dollars in overseas assets. Fourth, the instant case does not involve allegations of witness tampering or obstruction of justice. Accordingly, a review of other cases with similar proposals indicates that Raniere should be granted release on the conditions proposed.

## <u>Conclusion</u>

For the reasons set forth above, we move this Court to release Raniere under the following conditions:

(1)  A $10M bond signed by Raniere;

(2)  Travel restricted to the Eastern and Southern Districts of New York;

(3)  Surrendering of Raniere's passport, and an agreement not to secure new travel documents;

(4)  Strict Pretrial Services supervision;

(5)  Home detention with GPS monitoring at a residence selected by the security company called TorchStone, under the supervision of Mark Sullivan, former Director of the U.S. Secret Service with thirty-five years of federal law enforcement experience;

(6)  Raniere's presence at this residence to be secured by TorchStone with the following provisions:

   a.     24-hour armed guards;

   b.     Two guards per shift;

   c.     One supervisory security professional overseeing and scheduling the security detail;

   d.     Security both at the residence and accompanying Raniere whenever he leaves the residence pursuant to bail conditions;

   e.     TorchStone will provide a security vehicle with driver whenever Raniere must travel to counsel's office, court, or medical treatment (with prior notification to Pretrial Services); and

       f.     TorchStone will communicate with Pretrial Services, the Court and/or the Government in regard to any violation of any condition imposed by the Court;

(7) That while Raniere shall be granted access to a computer in order to review the discovery provided in this case and other case-related materials provided by his lawyers, he shall not be permitted internet access;

(8) That Raniere is permitted access to one telephone that will provided and approved by Pretrial Services to make and receive calls to and from phone numbers agreed to by counsel for Raniere and the Government (including the phone number of the mother of his child); and

(9) That Raniere will not directly or indirectly associate or have contact, outside the presence of his counsel, with his co-defendants, alleged co-conspirators, or any individual currently or formerly employed by or associated with Nxivm or any affiliated or constituent entity; however, this does not limit the defense attorneys and their investigators from conducting appropriate defense investigation, consistent with the protective order signed by the Court.

Respectfully submitted,

_____/s/_____
Marc Agnifilo, Of Counsel
Jacob Kaplan
Teny Geragos
Brafman & Associates, PC
767 Third Avenue
New York, NY 10017

_____/s/_____
Paul DerOhannesian II
Danielle R. Smith
DerOhannesian & DerOhannesian
677 Broadway – Ste. 707
Albany, NY 12207

cc:    The Clerk of Court (by hand and email)
        Counsel for the Government (via ECF and email)