# EXHIBIT 10



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*610 Federal Plaza*
*Central Islip, New York 11722*

October 30, 2007

**VIA ECF**
The Honorable Joanna Seybert
United States District Judge
United States District Court
1034 Federal Plaza
Central Islip, New York 11722

> Re:  United States v. David H. Brooks and Sandra
>      Hatfield
>      Case No. 06-CR-550(S-1)(JS)

Dear Judge Seybert:

At the October 25 Bail Hearing in this matter the Court requested that the defense specify a set of conditions they believe will guarantee that if released the defendant David H. Brooks will not flee.  The Court also directed the government to present any additional obstruction allegations, particularly any activity surrounding the filing of the initial indictment in this case charging Sandra Hatfield and Dawn Schlegel.  The government submits this letter in response to the Court's requests, and in opposition to the release proposal submitted by Brooks.

The following is a time line of relevant events surrounding the Hatfield/Schlegel Indictment:

The First Indictment is Filed

On Wednesday, August 16, 2006, the Grand Jury returned an indictment charging former DHB C.O.O. Sandra Hatfield and former DHB C.F.O. Dawn Schlegel with Conspiracy, Securities Fraud and Insider Trading.  Several days earlier counsel for Hatfield and Schlegel had been advised that an indictment was anticipated, so that they could prepare their clients to surrender.  On Thursday, August 17, 2006, the indictment was unsealed, Hatfield and Schlegel surrendered to the F.B.I., and they were arraigned

and released on secured and co-signed bail bonds, with the
consent of the government.

August 16, 2006 -    The Day the Indictment is Filed: Brooks Buys
                     a House in London

        On Wednesday, August 16, 2006, David H. Brooks wired
750,060 British pounds (approximately $1.5 million U.S. dollars)
to a bank in London from one of his 26 Goldman Sachs accounts.
Brooks reported to Goldman Sachs that the purpose of the wire was
to purchase a house in London.

August 17, 2006 -    Brooks Continues to Wire Money to London

        From August 17, 2006, through September 1, 2006, Brooks
wired an additional 1.6 million British pounds, bringing the
total wired to London in the two weeks after the indictment was
filed to nearly $5 million in U.S. dollars.

August 18, 2006 -    The Day After the Indictment is Unsealed:
                     Brooks' Brother Jeffrey Removes Subpoenaed
                     Computers From DHB Office

        On Thursday, August 17, 2006, the date the initial
indictment in this case was unsealed, DHB had the locks changed
on its offices in Westbury.  Although the company had moved its
operations and most of its records to Florida, there were still
DHB owned computers and some documents in the space.  DHB placed
notices on the door that anyone wishing access should contact the
company, and provided a phone number to call.

        On Friday, August 18, 2006, a locksmith acting at the
direction of either David H. Brooks or Brooks' brother Jeffrey
changed the locks at the DHB office.[1]  Jeffrey Brooks then
contacted an individual who had previously done computer related
work for both DHB and David H. Brooks, and Jeffrey Brooks
arranged for that person go to the DHB offices at Post Avenue in
Westbury, New York.  Once there, the individual met a TAP
employee and, on instructions from her and Jeffrey Brooks, he
dismantled and removed computer equipment, including a server

_____

[1]In 1992 David H. Brooks and his brother Jeffrey were named as
co-defendants in a lawsuit filed by the S.E.C. alleging that the
two engaged in insider trading.  The suit was settled through the
payment of a $405,000 fine and the two brothers were barred from
the securities industry for five years.  Jeffrey Brooks was never
employed by DHB.

3

used by David Brooks' company TAP, but which had been paid for
with DHB funds, six desktop computers formerly used by DHB
employees David H. Brooks, Dawn Schlegel, Teddy Tawil, and
Marylou Segismundo, and TAP employees Eleanor Kaye, and Leslie
Urban.  Most of the desktop computers removed were paid for by
DHB.  Moreover, all DHB and TAP computer material had been
subpoenaed by the Grand Jury in April 2006.  DHB, Brooks himself,
and Terry Brooks, as a representative of TAP, were served with
subpoenas demanding production of the computer records or DHB and
TAP.  However, as of August 18, 2006, no computer material had
been provided to the Grand Jury.  The computers removed from
DHB's offices were all brought to Brooks' nearby home at 20 Red
Ground Road in Old Westbury.

Later that evening, well after business hours, a truck
arrived at the DHB office and individuals acting at the direction
of Jeffrey Brooks loaded the truck with boxes taken from the DHB
offices.  Building management called the police and DHB
executives.  The police and a DHB employee responded to the
office, and observed what is believed to be the second load of
boxes were being placed into the truck.  At the direction of the
police the boxes were returned to the office.  The DHB employee
then arranged to have the locks changed yet again.

The next day, Saturday, Jeffrey Brooks brought the
computers that were taken from the DHB offices to an office
building in Westbury, where the individual described above who
helped remove the computers from DHB's offices met Jeffrey Brooks
and set the computers up so that they would function at the new
location.

August 19, 2006 -   Brooks Attempts to Enlist His Pilot in
                    Obstruction

The day after his unsuccessful effort to have boxes
whose contents are unknown removed from the DHB offices in
Westbury, Brooks, who was in Florida, asked his pilot if he knew
someone in New York who could go to the DHB office and remove all
of the records maintained there related to the operation of the
plane.  The pilot declined to do so, and advised Brooks that he
was resigning.  Several days later, when the pilot told Brooks he
was returning to the DHB office to pack up his paperwork, Brooks
told him not to bother, that the documents had all been removed.

August 23, 2006 -   One Week After the Indictment Brooks Wires
                    $700,000 to Canada

4

On Wednesday, August 23, 2006, David H. Brooks wired $700,000 in Canadian dollars (approximately $730,000 U.S.) to Canada. He reported to Goldman Sachs that it was for horse expenses.

<u>August 24, 2007</u> -    <u>Brooks Attempts to Surreptitiously Move $10 Million Overseas</u>

On Thursday, August 24, 2007, David H. Brooks wired $10 million dollars to a company called Premier Gem Corp. ("Premier Gem"). Brooks told Goldman Sachs the wires were for the purchase of a flawless diamond. Within four days Brooks told the proprietor of Premier Gem that he had changed his mind and no longer wanted the diamond. Brooks requested that, rather than returning the money to the accounts where it came from, the proprietor of Premier Gem wire the money to accounts Brooks designated overseas. The proprietor refused to do so.

<u>August 25, 2006</u> -    <u>Brooks Moves His Family To England</u>

On August 25, 2006, just over one week after the indictment charging Hatfield and Schlegel was unsealed, Brooks and his family flew to England, where they apparently own property. Brooks resided there for approximately 7 months, and his ex-wife, and two daughters continue to reside there.

<u>August 29, 2006</u> -    <u>Brooks Begins to Wire $2 Million to Senegal</u>

On August 29, 2006, David H. Brooks, who at this point was living in England, wired over $500,000 to a bank account in Senegal, a country which does not have an extradition treaty with the United States. On September 18, 2006 he wired another $500,000 to an account in the name of the same individual. Brooks continued to wire money to this person, both in Senegal and in England, and by August of this year the total amount wired to him overseas by Brooks exceeded $2.8 million. These wired funds were all proceeds of Brooks' insider trading in 2004.

<u>September 21, 2006</u> - <u>Brooks Begins the Process of Wiring Over $16 Million to Switzerland</u>

On September 21, 2006, Brooks wired $50 million worth of insider trading proceeds into an account at Washington Mutual ("WAMU") from one of his accounts at Goldman Sachs. After spreading the money among over a dozen different WAMU accounts he controlled, Brooks moved over $16 million of it to Switzerland between October 4 and October 12, 2006. No further information regarding these funds is available, pending an MLAT request to Switzerland.

5

ADDITIONAL AREAS of CONCERN REGARDING BROOKS' FINANCES

In addition to the matters described above, Brooks has engaged in other financial transactions that heighten the concern about the risk that he will flee.

1. Brooks is believed to be in possession of over $6 million in Krugerrands, South African Gold coins.

2. Brooks apparently purchased a diamond for over $2 million in June, 2006.

3. In August 2007, Brooks wired approximately $1.3 to England.

4. Brooks has used insider trading proceeds to pay his attorneys and to fund the civil settlement he entered into in the class action lawsuit pending before this Court.

5. Brooks has over 75 active bank and trading accounts, and over the past two years he has moved funds through well over 100 accounts.

7. Brooks faces the likely reversal of $164 million in tax deductions, along with interest and fines, for his abuse of Charitable Trusts of which he is Trustee. See, Letter Re: CRATS, from IRS Fraud Specialist, attached hereto as Exhibit 1. Brooks also faces many millions of dollars of further tax liability, plus interest and fines, for his tax treatment of his DHB stock sales in 2003 and 2004.

8. Brooks has not filed income tax returns for 2005 or 2006 and has not made estimated payments likely to be remotely sufficient to cover his tax liability.

9. Brooks has not disclosed one fact about his assets. He has not disclosed his net worth, or the terms of his alleged divorce with respect to money and property distributions despite the fact that he proposes his ex-wife as a suretor. Consequently, the Court and the government are left to speculate about the whereabouts of Brooks' assets, the amount of Brooks' assets, and the reason for the massive and apparently inexplicable international movement of funds.

6

## ADDITIONAL AREAS OF CONCERN REGARDING BROOKS' WILLINGNESS TO OBSTRUCT JUSTICE

In addition to the acts of obstruction which occurred at or near the filing of the initial indictment in this case, and are described above, the following are further examples of Brooks' willingness to obstruct justice:

1. Brooks is indicted for Obstruction of Justice and Lying to Auditors during the investigation of this case.

2. Brooks has demonstrated a pattern of seeking to influence investigations through threats, including the threats described in the government's bail letter of October 25, 2007.  In addition to the incidents described in the October 25 letter, Brooks also threatened the lead partner of the accounting firm that audited DHB's 2005 financial statements.  According to one witness who testified before the SEC, Brooks told him that if the partner was not careful Brooks would have "his friends" pay her a visit and she would "end up with cement blocks on her feet in the Atlantic Ocean.

3. Brooks has frequently referred to his relationship with organized crime figures to threaten persons with whom he had business or other disputes.  The government has recently confirmed that Brooks sent Frank Lagano, a member of the Genovese crime family with whom Brooks had a relationship as described in our previous submission, to extort a businessman whom Brooks falsely claimed owed Brooks money and/or stock.  Lagano confronted the victim at his office and told him that Brooks was a "crazy man" and that Brooks could not be controlled.  Lagano advised the businessman, who knew Lagano to be involved with organized crime, to give Brooks what he wanted, otherwise his life would be in danger.  The victim was understandably terrified and took steps to avoid being seen by Lagano again.  He eventually paid Brooks $50,000.

4. Literally dozens of witnesses have expressed to the government that, based on Brooks' history of intimidation and threats, and on the behavior they have personally observed him engage in, they fear retaliation from Brooks.  Several have requested police protection if their identities are disclosed.  Indeed the government just recently received yet another report of such behavior from a former employee of Brooks.  The email communication is attached hereto as Exhibit 2.

7

5.  Brooks has lied under oath.  The government is aware of two
    specific instances in which Brooks lied under oath in civil
    proceedings and is actively investigating several other
    allegations of obstructive conduct in connection with civil
    litigation.

6.  Brooks remains in possession of subpoenaed grand jury
    materials, which he stole from DHB, including the TAP
    server, his own laptops, and the desktops taken the day
    after Schlegel and Hatfield were arrested.

BROOKS' BAIL PROPOSAL

Brooks has now proposed that he be released on a set of
conditions that would include home detention in a Manhattan
apartment, a $400 million bond co-signed by members of Brooks'
family, secured by the assets seized by the government plus an
additional $60 million, guards at the door of Brooks' apartment,
and an electronic ankle bracelet.  Because this proposal is
woefully inadequate to address the extraordinary risk of flight
present in this case, or the risk of obstruction described above
as well as in the government's October 25, 2007 letter, Brooks'
proposal should be rejected and the order of detention should be
continued, with leave to renew.

As the government explained at the October 25, 2007,
bail hearing, and as we reiterate here, David H. Brooks plainly
presents a far greater risk of flight than the defendants in the
recent case of United States v. Sabhnani, 493 F.3d 63, (2d Cir.
2007).  For example, the Sabhnani defendants lived in a home in
the Eastern District of New York, where they had resided for  25
years, along with their four children, three of whom were in
school here.  Brooks, on the other hand, recently lived in London
and now lives alone in a rental apartment in Manhattan; two of
his three children live overseas, while the third is in school in
Florida.  In addition, the evidence in this case and the
potential sentence are far greater than that faced by the
Sabhnani defendants.  As noted previously, Brooks' likely
guideline recommendation is life imprisonment, and proof of his
unjust enrichment though fraud upon DHB is nearly undeniable.
The Sabhnani defendants received income from overseas sources,
but they were not alleged to have inexplicably sheltered assets
in Swiss bank accounts or in countries which do not have an
extradition treaty with the United States, as Brooks has done.
Perhaps most importantly, the Sabhnani defendants were not
alleged to be a risk to obstruct justice, whereas Brooks does
indeed present such a risk, having a demonstrated history of
obstruction.  Finally, Brooks, unlike the Sabhnanis, has
exhibited bizzare and troubling behavior in the recent past,

8

including several inexplicable incidents involving attorneys and
others while living in England, and his under psychiatric which
includes what he concedes is an extraordinarily high dosage of
psychiatric medication.

Nevertheless, Brooks proposes that the Court release
him on conditions that do not remotely approach those the Second
Circuit found adequate in Sabhnani.  Without providing a single
reason why his conditions should be less restrictive than those
imposed in Sabhnani, Brooks suggests that unlike the Sabhnani
defendants, he can be released:

-   without divulging one iota of financial disclosure.  Brooks
    does not even propose to provide his net worth or inform the
    Court of his overseas assets;

-   without any restrictions or monitoring whatsoever on his use
    of telephones or other communications media such as
    computers;

-   without any restraints on his ability to engage in financial
    transactions or transfer assets beyond those assets that are
    subject to forfeiture by the government;

-   with access to his apartment by business and personal
    contacts who are not attorneys, including his brother who
    has assisted him in obstructing the investigation in this
    case;

-   without random access to the home by pretrial services, and
    the security firm charged with guarding the defendant; and

-   without alarm or video surveillance.

The only support Brooks offers for this proposal is a
citation to a line from the Sabhnani opinion stating that "the
more effectively a court can physically restrain these
defendants, the less important it becomes to identify and
restrain each and every asset over which the defendants may
exercise some control in order to minimize the risk of flight."
493 F. 3d at 40-41.  Remarkably, however, Brooks proposes less
restraint than was imposed in Sabhnani, and no disclosure or
restraint of assets, beyond those assets already restrained or
those that would be subject to forfeiture.  Such conditions are
obviously unacceptable.

Brooks's argument in support of his proposal completely
ignores the statement in Sabhnani which immediately precedes the

9

language he relies upon.  As the <u>Sabhnani</u> court concluded, "it is apparent that significant physical <u>as well as</u> financial restrictions are necessary to assure defendants' appearance at trial."  493 F.3d at 40.  The government has explained previously, it is readily apparent that Brooks requires <u>more</u> stringent restrictions and monitoring, as well as <u>greater</u> financial disclosure than the <u>Sabhnani</u> defendants did.  Brooks' deliberate efforts to secrete assets outside the United States, to convert assets into untraceable commodities such as diamonds or gold, and his use of a myriad of convoluted transactions conducted through nominee accounts all bespeak a far more nefarious pattern of conduct than the Sabhnanis' single suspicious transaction in the amount of $850,000.  Moreover, as the court in <u>Sabhnani</u> pointed out, "the deterrent effect of any bond is necessarily a function of the totality of the defendant's assets."  <u>Id</u>. at 39.  The notion that an appropriate bond or the amount of that bond that must be secured by assets can be determined without asset disclosure is contrary to common sense and it defeats the concept of the deterrent effect of a secured bond.  Here, for example, where the defendant proposes only to secure his bond with assets of his that the government could forfeit upon conviction, it is difficult to imagine why he would not "prefer to lose [a portion of] his financial assets rather than his freedom."  <u>Id</u>. At 40.

Finally, Brooks' proposal fails completely to address the amelioration of the very real risk of obstruction his release would pose.  While this case may not rise to the level of <u>United States v. Orena</u>, 986 F,2d 628 (2d Cir. 1993), in which the Second Circuit found that no conditions could protect the community from participants in a violent organized crime gang war, it is clear that the Court here must take some steps to insure that if released Brooks would not threaten, intimidate or otherwise tamper with witnesses.  In addition, Brooks' release should be premised upon compliance with Grand Jury subpoenas and return of property wrongfully taken from DHB.  Finally, Brooks cannot be permitted unmonitored contact with his brother Jeffrey, since Jeffrey has been an active participant in several of Brooks' acts of obstruction, Jeffrey has received some of the benefits of Brooks' fraud, and Jeffrey has a regulatory history of acting in concert with Brooks.

10

## Conclusion

      Unless or until Brooks proposes a realistic set of
conditions which adequately address both the risk of flight and
the risk of obstruction, a permanent order of detention is the
only means to assure the Brooks will not flee, obstruct justice,
or threaten witnesses.

                            Respectfully submitted,

                            BENTON J. CAMPBELL
                            United States Attorney

By: _____/s/_____
                            John G. Martin
                            Assistant U.S. Attorney

cc:  Paul Shechtman



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
Washington, D.C. 20224

TAX EXEMPT AND GOVERNMENT ENTITIES

DATE: October 29, 2007

MEMORANDUM FOR: Mary L. Young, Internal Revenue Agent LMSB 1647

FROM:          Lucy Acosta, Forensic Investigator/EO Fraud Specialist
               TEGE: EO: FIU 7732

SUBJECT:       Potential Adjustments
               CRUTS/CRATS/CRTS – David Brooks

Gear to Gear/EIN 20-6093683 MFT 37 F5227 David Brooks Grantor/Trustee
Private Time Trust/EIN 20-6389739 MFT 37 F5227 David Brooks Grantor/Trustee

David Brooks signed as President on behalf of related corporations;
Pathfinder Trust /EIN 20-6389739 MFT 37 F5227/David Brooks Trustee
Like A Prayer Trust/EIN 20-6388370 MFT 37 F5227/ David Brooks Trustee
Magic Moments Trust/EIN 20-6383831 MFT 37 F5227/ David Brooks Trustee
Saving Lives Trust/EIN 20-6383831 MFT 37 F5227/ David Brooks Trustee
Showtime Trust/EIN 20-6383853 MFT 37 F5227/ David Brooks Trustee

The following are the potential issues identified with the Charitable Remainder Annuity
Trusts created by David Brooks as Grantor and David Brooks as President on behalf of
associated related corporations.

Tax Avoidance/Evasion Scheme – It appears the TP, David Brooks has set up these
trusts for the sole purpose of tax avoidance/evasion and the trusts should be
disregarded for tax purposes and treated as shams. The potential adjustment is
approximately $164,324,408, based on the trust amounts provided.

The service should challenge this scheme under the following doctrines:

- Substance vs. Form – economic substance vs. tax avoidance/evasion
- Assignment of Income – tax gain/income on sale of assets to donor not the trust
- Trust qualifications -trust does not qualify under IRC section 664.

The grantors actions before and after setup of the trust clearly support this position.
A more detailed discussion will follow as more evidence is reviewed. In alternative to
the above stated position, the IRS can assess self dealing IRC 4941 taxes.

EXHIBIT 1

## Martin, John (USANYE)

| | |
|---|---|
| **From:** | Nardoza, Robert (USANYE) |
| **Sent:** | Tuesday, October 30, 2007 8:54 AM |
| **To:** | Donoghue, Richard (USANYE); Komitee, Eric (USANYE); Casey, Sean (USANYE); Haran, Sean (USANYE); Martin, John (USANYE); McGinn, Denise (USANYE) |
| **Subject:** | FW: David Brooks |

fyi

-----Original Message-----

Sent: Tuesday, October 30, 2007 3:34 AM
To: Nardoza, Robert (USANYE)
Subject: David Brooks

Dear Mr. Nardoza,

I've been following the indictment and pending case of Mr. David Brooks very closely and I was happy to see that the government finally caught up to him. I have been waiting for this day for 12 years.

Please do not let David Brooks make bail.  He will disappear or he WILL hurt someone.  I know firsthand as I have seen his work personally.

I was the first person he hired back in 1995 for his company NDL that he bought out of bankruptcy down in Florida.  It is where the former DHB is located in Pompano Beach.  He threatened to kill me more than once in the 4 months I worked for him and after I left the company. In my first week on the job for him I also witnessed him try to stab a cab driver in Munich, Germany where I had to literally pull him off the cab driver and watched him pull a knife and threaten the head of one of our European Wholesalers at dinner, in Amsterdam right after the Munich incident.

You can not let this man get away or allow him to be released on bail or get away with everything that he has done.  You are just scratching the surface of the things this despicable human being has done to other fine people.

Sincerely,

1

EXHIBIT 2