UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

               -against-

KEITH RANIERE,

                           Defendant.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**18-CR-204-1 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Keith Raniere has been indicted on charges of sex trafficking by force, threat

of force, fraud, or coercion; conspiracy to commit sex trafficking by force, threats of force, fraud,

or coercion; and conspiracy to cause another to engage in forced labor. (Indictment (Dkt. 14)

¶¶ 1-3.) On June 5, 2018, he filed a motion for release on bail pending trial, which the

Government opposed. (Def. Mot. for Pretrial Release ("Def. Mot.") (Dkt. 43); Gov't Opp'n to

Def. Mot. ("Gov't Opp'n") (Dkt. 44); Def. Reply. in Supp. of Def. Mot. ("Def. Reply") (Dkt.

45).) On June 12, 2018, the court denied the motion without prejudice and stated on the record

its reasons for doing so. (See Tr. of June 12, 2018, Hr'g ("Hr'g Tr.") (Dkt. Number Pending).)

The court issues this opinion to provide a fuller statement of its reasons.

## I.    BACKGROUND

      Defendant is the founder and philosophical leader of Nxivm, a self-help organization

headquartered in Albany, New York, that offers "classes promising personal and professional

development." (Compl. (Dkt. 1) ¶¶ 3-6; Def. Mot. at 5-6.) In his own words, Defendant is an

"ethicist" whose "ethical teachings . . . have focused on raising the level of humanity within each

person." (Def. Mot. at 5.) According to the Government, Nxivm "operates largely in secrecy"

and "maintains features of a multilevel marketing scheme, commonly known as a pyramid

1

scheme, in which members are recruited via a promise of payments or services for enrolling others into the scheme." (Compl. ¶¶ 7-8.)

This case stems from allegations that Raniere oversaw an otherwise all-female "secret society," going by the name "DOS" or "The Vow," within Nxivm. (Id. ¶ 11.)[1] According to the Government, DOS also operates as a pyramid scheme, in which more senior women in the organization (referred to as "masters") recruit more junior women (referred to as "slaves") to serve them and "masters above them in the DOS pyramid." (Id. ¶ 13.) To join DOS, a "slave" must turn over "collateral" (for example, confessions to crimes, statements accusing loved ones of crimes and other bad acts, and embarrassing personal material) that can be released if the "slave" leaves DOS, reveals its existence, or fails to perform her DOS obligations. (Id. ¶¶ 15-16, 18-19.) DOS obligations include serving the "masters," engaging in "acts of self-denial," and performing "readiness drills" night or day. (Id. ¶¶ 20-21, 25-29.) According to the Government, DOS "slaves" were also required to have sex with Defendant, whose role as the ultimate DOS "master" was concealed from all but the highest-ranking DOS "slaves"; to maintain low-calorie diets to conform to Defendant's alleged preferences; and, in some cases, to be branded with Defendant's initials and/or those of his co-defendant, Allison Mack. (Id. ¶¶ 17, 22-24, 30-32.)

Defendant does not dispute that DOS exists, that DOS members were required to provide "collateral" as a condition of joining the organization, or that several DOS members were branded. (Def. Mot. at 6-8.) He argues, however, that DOS was not formally connected to Nxivm, and that DOS members voluntarily joined the organization, provided "collateral," and

---

[1] The Government alleges that "DOS" standards for "Dominus Obsequious Sororium," a broken Latin phrase roughly translating to "Lord/Master of the Obedient Female Companions." (Compl. ¶ 11 n.1.)

2

agreed to be branded. (Id.) He also argues that the "collateral" was never connected to a requirement to have sex with him (or anyone else) and that the collateral was never actually released. (Id.; see also id. at 16-17.)

According to the Government, the existence of DOS became public in mid-2017 following the defection of a DOS "slave" who was also a high-ranking Nxivm member. (Compl. ¶ 33.) In mid-October 2017, The New York Times published an article that relayed a number of disturbing allegations about Nxivm and DOS. See Barry Meier, Inside a Secretive Group Where Women are Branded, N.Y. Times (Oct. 17, 2017), at A1. Several weeks later, "after the FBI began interviewing witnesses," Raniere allegedly flew to Mexico, where he lived in a gated resort in Puerto Vallarta. (Compl. ¶ 35; Gov't Opp'n at 8.)

On March 26, 2018, Defendant was detained by Mexican authorities, deported to the United States, and arrested in connection with this case. (Def. Mot. at 8-9.) The Government sought a permanent order of detention, arguing that Defendant posed both a flight risk and a danger to the community. (Gov't Mar. 26, 2018, Letter in Supp. of Order of Detention ("Gov't Mar. 26 Ltr.") (Dkt. 4).) On April 13, 2018, Magistrate Judge Steven Tiscione entered an order of detention without prejudice to Defendant's presentation of a bail package. (Apr. 13, 2018, Min. Entry; Order of Detention (Dkt. 13).)

On June 5, 2018, Defendant presented this court with the instant bail motion. In it, Defendant proposes that he should be released pending trial, subject to a number of conditions. (See Def. Mot. at 3-4.) First, Defendant would sign a $10 million bond. (Id. at 3.) His travel would be restricted to the Southern and Eastern Districts of New York, and he would surrender his passport and agree not to secure new travel documents. (Id.) He would be confined to a residence selected by a private security company and would be subject to both GPS monitoring

3

and round-the-clock supervision by two armed guards.  (Id. at 4.)  He would have access to a computer and telephone, but the computer would lack internet access and would be used only to review materials related to this case, and the telephone would be used only to make and receive calls to and from phone numbers agreed to by the Government, including those of his counsel and the mother of his child.  (Id.)  Finally, he would not have contact, outside the presence of his counsel, with his co-defendant(s), alleged co-conspirators, or any other current or former affiliate of Nxivm or any affiliated entity.  (Id.)

## II.    DISCUSSION

Pretrial detainees have a right to bail under both the Eighth Amendment to the U.S. Constitution, which prohibits the imposition of "[e]xcessive bail," as well as the Bail Reform Act, 18 U.S.C. § 3141 et seq.  Under the latter, the court must release a defendant "subject to the least restrictive further condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1)(B).  Only if, after considering the factors set forth at 18 U.S.C. § 1342(g), the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" may the court order the defendant to be held without bail.  Id. § 3142(e)(1).

If, however, there is probable cause to find that the defendant committed one of the offenses specifically enumerated by § 3142(e)(3), a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure" the defendant's appearance or the

safety of the community or others.  Id. § 3142(e)(3).[2]  Where such a rebuttable presumption

arises, "the defendant 'bears a limited burden of production . . . to rebut that presumption by

coming forward with evidence that he does not pose a danger to the community or a risk of

flight.'"  United States v. English, 629 F.3d 311, 319 (2d Cir. 2011) (quoting United States v.

Mercedes, 254 F.3d 433, 436 (2d Cir. 2001)); see also United States v. Rodriguez, 950 F.2d 85,

88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in

order to rebut the presumption." (emphasis added)).  If the defendant offers such evidence, the

presumption favoring detention does not fall away but "remains a factor to be considered among

those weighed by the district court" under 18 U.S.C. § 3142(g).  English, 629 F.3d at 319

(quoting Mercedes, 254 F.3d at 436).  Even in such a "presumption case," however, "'the

government retains the ultimate burden of persuasion by clear and convincing evidence that the

defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of

the evidence that the defendant presents a risk of flight.'"  Id. (quoting Mercedes, 254 F.3d at

436); see also United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986).

### A.   Defendant Is Subject to the Presumption in Favor of Detention

As the parties agree, this is such a "presumption case."  (Def. Mot. at 21 n.8; Tr. of June

12, 2018, Hr'g ("Hr'g Tr.") (Dkt. Number Pending) 30:3-7.)  The Bail Reform Act's list of

enumerated offenses includes any "offense under chapter 77 of this title for which a maximum

term of imprisonment of 20 years or more is prescribed."  18 U.S.C. § 3142(e)(3)(D).  That

describes all three offenses with which Defendant has been charged.  Each offense is proscribed

---

[2]  A different rebuttable presumption arises if the defendant recently committed one of certain offenses while on
release pending trial.  See id. § 3142(e)(2).  This case does not implicate this presumption.

by Chapter 77 of Title 18 of the U.S. Code.  The sex-trafficking and sex-trafficking conspiracy charges are both punishable by up to life in prison, see 18 U.S.C. §§ 1591(b)(1), 1594(c), and the forced-labor-conspiracy charge is punishable by up to 20 years' imprisonment, see 18 U.S.C. §§ 1589(d), 1594(b).  And Defendant's indictment by a grand jury conclusively establishes that there is probable cause to believe that he committed the offenses charged in the indictment.  See United States v. Contreras, 776 F.2d 51, 53 (2d Cir. 1985).  Thus, the court begins with the presumption that no condition or combination of conditions of pretrial release will reasonably assure the Defendant's appearance and the safety of the community.  See 18 U.S.C. § 3142(e)(3).

### B.      Defendant Is a Flight Risk Notwithstanding the Proposed Conditions

The court next considers whether Defendant has introduced evidence rebutting the statutory presumption that he is a flight risk and a danger to the community and others.  In support of his bail motion, Defendant has attached several photographs of immigration documents, as well as receipts for flights and a canceled reservation for an Airbnb in Canada. (See Def. Mot., Exs. 1-7, 9 (Dkts. 43-1 to 43-7, 43-9).)  He contends that these documents undermine the Government's account that he traveled to Mexico in November 2017 to flee from law enforcement, and instead corroborate his explanation that he traveled to Mexico in October 2017 to be with the mother of his child, a Mexican citizen whose U.S. visa was expiring.  (Def. Mot. at 12-14.)  Defendant has also provided the court with a copy of a document, filed in the New York Surrogate's Court, Saratoga County, in January 2018, in which he renounced his appointment as executor to the estate of his deceased romantic partner, Pamela Cafritz.  (See Renunciation of Nominated Executor and/or Trustee (Dkt. 43-8).)  This document was notarized by a Mexican notario publico who provided his name and location (Guadalajara, Jalisco) on an

6

apostille to the document.  (See id. at ECF p.7.)  Defendant argues that the fact that he filed this
document in state court shows that he did not conceal his location from U.S. authorities.

Defendant has carried his "limited burden of production . . . by coming forward with
evidence that he does not pose a . . . risk of flight." English, 629 F.3d at 319 (internal quotation
marks and citation omitted).  That is not to say that this evidence is particularly persuasive: As
the court explains further below, these documents only weakly support Defendant's account that
his relocation to Mexico, use of encrypted email, and decision to stop using his phone had
nothing to do with law enforcement's increased interest in him following publication of the New
York Times article.  Because Defendant has provided "some evidence" that he is not a flight risk,
the court turns to whether the Government has carried its ultimate burden of persuasion on this
issue.  See Rodriguez, 950 F.2d at 88.  (Because, as stated below, the court denies Defendant's
motion based on a finding that he poses a flight risk, it need not decide whether he has proffered
any "evidence that he does not pose a danger to the community."  See English, 629 F.3d at 319
(internal quotation marks and citation omitted).)

The court considers the question of whether the Government has shown that there are no
conditions of release sufficient to reasonably assure Defendant's appearance before the court in
light of the factors listed by 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged, including
> whether the offense is a crime of violence, a violation of [18 U.S.C.
> §] 1591, a Federal crime of terrorism, or involves a minor victim or
> a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the [Defendant];
>
> (3) the history and characteristics of the [Defendant], including—
>
>> (A) the [Defendant]'s character, physical and mental
>> condition, family ties, employment, financial resources,

7

length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the [Defendant] was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the [Defendant's] release. . . .

As the court explains below, these factors, taken together, support the conclusion that Defendant remains a flight risk notwithstanding his proposed bail conditions.

> 1.    The Nature and Circumstances of the Offense Charged

The first § 3142(g) factor weighs heavily in favor of continued detention. This factor specifically directs the court to consider whether the defendant seeking pretrial release has been charged with "a violation of [18 U.S.C. §] 1591," a sex-trafficking statute that Defendant has been charged with violating and conspiring to violate. "By specifically enumerating the type of violation alleged here, the statute suggests that [Defendant]'s alleged actions militate in favor of detention." United States v. Goodwin, No. 15-CR-101, 2015 WL 6386568, at *2 (W.D. Ky. Oct. 21, 2015).

The offenses with which Defendant has been charged are also subject to extremely lengthy sentences. If convicted, Defendant faces a maximum sentence of life imprisonment for the sex-trafficking and sex-trafficking-conspiracy charges, as well as up to 20 years' imprisonment for the forced-labor-conspiracy charge. See 18 U.S.C. § 1591(b)(1) (sex trafficking by force, threat, fraud, or coercion); id. § 1594(c) (conspiracy to violate § 1591); id.

§§ 1589(a), (d), 1594(b) (forced-labor conspiracy).[3]  Additionally, Defendant faces a 15-year

statutory minimum sentence if convicted on the substantive sex-trafficking charge.  Id.

§ 1591(b)(1).  Faced with the possibility that, if convicted, he may spend the rest of his life in

prison, Defendant clearly has "a strong motive to flee."  United States v. Sabhnani, 493 F.3d 63,

76 (2d Cir. 2007); see also United States v. Khusanov, — F. App'x —, 2018 WL 1887339, at *1

(2d Cir. 2018) (summary order).

### 2.    The Weight of the Evidence

The second § 3142(g) factor weighs at least weakly in favor of detention.  There appears

to be substantial evidence against Defendant.  A grand jury has determined that there is probable

cause to believe that Defendant committed the charged offenses.  The Government has also

proffered a number of text messages sent by Defendant that suggest that, as the Government puts

it, Defendant "created DOS," that "there was a significant sexual component to DOS and that

some DOS slaves would be recruited to have sex with [him]," and "that his identity as the head

of DOS would be concealed from some DOS slaves."  (Gov't Opp'n at 3; see id. at 3-6.)

There are, however, reasons to proceed cautiously at this point in the proceedings.  From

Defendant's motions and his counsel's statements to the court, it appears that his defense will

rely heavily on arguments that the so-called "DOS slaves" joined and remained in the group

willingly and that they engaged in any sexual activity with him consensually, not because they

feared that their "collateral" would be released.  (See, e.g., Def. Mot. at 17.)  Defendant also

contends that "there is no evidence that anyone engaged in a commercial sex act, within the

---

[3]  Violations of 18 U.S.C. § 1589 that "include[] . . . aggravated sexual abuse" are punishable by up to life
imprisonment.  Id. § 1589(d).  The Government has not, however, charged Defendant with an aggravated-sexual-
abuse enhancement.

meaning of the [sex-trafficking] statute." (Id.)  At this early stage in the case, the court lacks

sufficient evidence from which to make a confident assessment as to the strength of the

Government's case on these points.

        3.     Defendant's History and Characteristics

      The third § 3142 factor, however, weighs especially strongly in favor of detention,

notwithstanding Defendant's proposed conditions of bail.

        *a.*     *Defendant is a flight risk.*

      Defendant's history and characteristics strongly support the conclusion that he is a flight

risk.  Certain aspects of Defendant's history and characteristics weigh in his favor.  He is a

longtime resident of upstate New York, and the court is not aware of any indication that he has a

prior record of arrests or convictions, a substance-abuse problem, or a history of missed court

appearances.  See 18 U.S.C. § 1342(g)(3)(A).  Nor was he on probation, parole, or other release

at the time of his arrest for the charged offenses.  See id. § 1342(g)(3)(B).  The court is troubled,

however, by evidence of Defendant's conduct in recent months, his lack of an ordinary job or

personal financial resources that could secure a meaningful bond, and his apparent access to

extensive financial resources supplied by anonymous third parties.  These factors all point to a

substantial risk of flight.

      First, the court finds that it is more likely than not that Defendant moved to Mexico last

fall at least partly to elude law enforcement.  Despite having little history of international travel,

Defendant relocated to Mexico soon after attention turned to his alleged activities in connection

with Nxivm and DOS.  The Government avers that, while in Mexico, Defendant also began

using end-to-end encrypted email and stopped using his phone.  (Gov't Mar. 26 Ltr. at 6; Gov't

Opp'n at 8.)  As a result, the Government avers, it took a month and a half for authorities to track Defendant down.

Defendant has innocent explanations for his change of scenery and behavior.  He avers that he traveled to Mexico last October to be with his child and with the child's mother when her U.S. visa expired.  (Def. Mot. at 12-14.)  While he admits to using different phones and email addresses, he states that he did so not to evade authorities but to evade an anti-Nxivm group that he says harassed him for years.  (Id. at 15.)  Finally, he contends that the Government was, or should have been, aware of his location because of the document he filed in Saratoga County Surrogate's Court and because "his attorney left a phone number with the Department of Justice on two occasions by which he could be reached."  (Id. at 14, 15.)

These explanations are not persuasive.  While it may be the case that Defendant traveled briefly to Mexico in October to be with the mother of his child in Monterrey, that does not explain why he traveled back to Mexico the following month—or why, when he did, he moved hundreds of miles away, to Puerto Vallarta.  (See Hr'g Tr. 18:23-19:14.)  If Defendant had been seeking to avoid anti-Nxivm activists, not the Government, it is not clear why he would have stopped using his phone entirely, as the court is not aware of how the former would have the ability to track Defendant's phone.  That Defendant's attorney left a callback number with prosecutors does not imply that Defendant was forthcoming with authorities about his location. Finally, the court does not see how law enforcement could have inferred that Defendant was residing in Puerto Vallarta from the fact that he filed in Saratoga County Surrogate's Court a document notarized in Guadalajara, about a five-hour drive from Puerto Vallarta.  See Directions from Guadalajara, Jalisco, to Puerto Vallarta, Jalisco, Google Maps,

11

https://www.google.com/maps/dir/Guadalajara,+Jalisco,+Mexico/Puerto+Vallarta,+Jalisco,+Me

xico/ (last visited June 14, 2018).

Second, the court also has grave concerns about Defendant's financial situation.

According to Defendant's financial affidavit, he is self-employed and has no income or assets

other than a partial interest in a home in Clifton Park, New York, worth approximately $60,000.

(Financial Aff. (Dkt. 44-2).)  Even accepting that this affidavit is truthful, Defendant has little to

lose if he were to flee, and nothing with which to secure a meaningful personal bond.  (But see

Gov't Mar. 26 Ltr. at 4 (stating that Defendant has made purchases using a credit card in the

name of a deceased romantic partner and has drawn extensively on a bank account in her name

containing $8 million).)  Besides having no income or assets of his own, Defendant also appears

to have access to enormous financial resources contributed by anonymous third parties.  The

Government contends that Defendant is financially backed by "independently wealthy women,"

including a liquor-fortune heiress whom the Government contends has provided Defendant with

millions of dollars and access to private air travel and to a private island in Fiji.  (Gov't Mar. 26

Ltr. at 4.)  Indeed, Defendant himself proposes that he should be released into home detention,

guarded by a private security company at a cost of at least $40,000 per month, to be paid for by

an unidentified trust funded by anonymous third parties.  (Gov't Opp'n at 7 n.7.)  This

arrangement only underscores the court's concern that Defendant may have access to extensive

but unknown financial resources.

In light of these concerns, the court must conclude that Defendant poses a serious risk of

flight if he is released pending trial.

   b.    *The proposed conditions of release do not adequately mitigate this*
         *risk.*

Defendant's proposed conditions of release do not mitigate these concerns. Defendant

proposes release on a $10 million bond, but the court views such a bond as basically worthless in

light of Defendant's lack of personal assets. Without anything to offer as collateral, Defendant

would have nothing to lose if he were to flee. Nor does Defendant offer a surety (such as a

family member or other loved one) who would stand to lose something if he were to flee.

Accordingly, as his counsel admitted at oral argument, the court lacks any moral suasion over

Defendant to induce him to remain here and face trial. (Hr'g Tr. 13:18-14:2, 17:7-9.)

   To compensate for his inability to post such collateral, Defendant proposed an

"admittedly unorthodox" bail package, under which round-the-clock armed guards would be

responsible for keeping him confined to a selected residence. (Id. 16:23) While the court

commends Defendant's counsel for both his creativity in structuring this proposal and for his

candor in describing it to the court, the proposal does not mitigate Defendant's flight risk.

   Defendant seems to accept that armed guards are necessary to ensure his appearance at

trial. As the Second Circuit has observed, however, the conclusion that "deadly force may need

to be used to assure defendant['s] presence at trial . . . . would, in fact, demand a defendant's

detention." Sabhnani, 493 F.3d at 74 n.13. As other courts in this circuit have mused, "What

more compelling case for an order of detention is there than a case in which only an armed guard

and the threat of deadly force is sufficient to assure the defendant's appearance?" United States

v. Zarrab, No. 15-CR-867 (RMB), 2016 WL 3681423, at *12 (S.D.N.Y. June 16, 2016) (quoting

United States v. Valerio, 9 F. Supp. 3d 283, 295 (E.D.N.Y. 2014)); see also United States v.

Colorado-Cebado, No. 13-CR-458, 2013 WL 5852621, at *6 (W.D. Tex. Oct. 30, 2013).

13

It is also not clear that these guards could actually prevent Defendant from fleeing, if he were to attempt to escape. Defendant indicated that he would consent in advance to the use of force against him if he attempted to escape, but he would not—nor, it seems, could he—consent to the use of deadly force against him. (Hr'g Tr. 11:22-12:1.) Nor could Defendant consent to the use of deadly force against any Nxivm or DOS acolytes who might plausibly attempt to help him escape. (See Gov't Opp'n at 12.) As the Government also correctly notes, any escape attempt would also present the risk of a confrontation between armed guards and Defendant (or his followers) in the streets of New York City, which would mean that any reduction in the Defendant's flight risk from this proposal would be at least partially offset by a greater risk to the community. (See id.)

Nor does the court have any basis for concluding that the proposed private security firm could keep Defendant confined. The court in no way impugns the private security firm that Defendant has proposed. This firm appears to employ a number of experienced law-enforcement veterans, and it would surely have a strong reputational incentive to keep Defendant confined. The court nevertheless has general concerns about the use of a private security company to monitor a defendant's home confinement, particularly where the company has been chosen by the defendant, where the Government "exercises no hiring, training, or supervisory control" over it, Valerio, 9 F. Supp. 3d at 295, and where the court knows nothing about the individuals who would be responsible for monitoring the defendant on a day-to-day basis. Cf. Sabhnani, 493 F.3d at 78 (noting that, in that case, the government had chosen the private firm responsible for monitoring the defendant's home confinement, so it was "not a case in which government reservations about either the competency or integrity of a private security firm might give a court pause about the effectiveness of home confinement in deterring flight"). These generalized

14

misgivings about the use of private security firms in this context are exacerbated by the unique circumstances of this case, in which Defendant is accused of running an organization with a number of devoted adherents, faces strong incentives to flee, and may have access to substantial financial resources. In such a case, broad assurances about the private security company's experience or reputational incentives are no substitute for an actual jail. See Valerio, 9 F. Supp. 3d at 295.

Finally, the court is also troubled by the lack of clarity about who would actually pay for these armed guards. As Defendant cryptically avers in his reply, the guards would be "paid by an irrevocable trust funded by third-party contributors." (Def. Reply at 2.) His proposed bail package offered no information about the terms of the trust, its corpus, or its settlors. Indeed, at oral argument, it emerged that the parties did not know to a certainty exactly who was funding the trust (although they speculated that the aforementioned liquor-fortune heiress was responsible). (Hr'g Tr. 22:21-28:2.) The court cannot make a reasoned assessment of the adequacy of Defendant's proposed home confinement without knowing who would actually pay for Defendant's round-the-clock armed guards.

    4.    The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release.

Fourth, the court concludes that the last § 3142 factor also weighs in favor of detention. Defendant is charged with serious felonies based on his alleged role in running a secretive, cult-like organization in which "slaves" are allegedly branded with his initials and tasked with serving him and other senior members of the organization. In light of these charged offenses, see United States v. Nikolow, 534 F. Supp. 2d 37, 39 (D.D.C. 2008), and the Government's representations that Nxivm critics and defectors have faced harassment (Gov't Mar. 26 Ltr. at 5,

15

7; Gov't Opp'n at 12 n.11), there is at least some risk that if Defendant is released, he may unlawfully exploit women or obstruct justice.

     5.    <u>The presumption in favor of detention.</u>

Finally, the court notes again that Defendant has been charged with offenses triggering a presumption of detention. Although he has rebutted that presumption by introducing evidence that he is not a flight risk, the presumption remains to be considered by the court alongside the aforementioned four § 3142(g) factors.

*    *    *

The court concludes that the Government has easily shown that Defendant's proposed conditions are insufficient to reasonably assure his appearance. Because it is at least conceivable that Defendant could address the court's concerns, this denial is without prejudice to refiling a revised bail package. Because the court determines that Defendant remains a flight risk notwithstanding the proposed bail conditions, it need not consider at this time whether the Government has also shown by clear and convincing evidence that no condition or set of conditions would reasonably assure the safety of others and the community.

## III.   CONCLUSION

Defendant's motion for release on bail (Dkt. 43) is DENIED without prejudice.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     June 15, 2018

NICHOLAS G. GARAUFIS
United States District Judge

16