## BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN
————

ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

November 14, 2018

BY HAND AND ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY   11201

Re:     United States v. Keith Raniere, et al., Crim. No. 18-204 (NGG)

Dear Judge Garaufis:

Consistent with this Court's prior written decision filed on June 20, 2018 (Exhibit 1, Dkt. No. 46, Memorandum and Order 6/20/18) and the transcript of proceedings of June 12, 2018 (Ex. 2), the defendant Keith Raniere renews his motion for release pending trial by providing this Court with more information about his background with Nxivm and addressing this Court's concerns with the previous bail package.

### 1.     The Teachings of Keith Raniere and Nxivm

The work Keith Raniere and others, many of whom are his co-defendants, have done is a source of great pride. Executive Success Programs ("ESP") was founded in 1998 by Mr. Raniere and Nancy Salzman, the predecessor to Nxivm which was founded in 2003. The company is a for-profit business entity that sells professional success training programs. The programs Nxivm offers include, among others, ethics, logical analysis and problem-solving skills based on a patent-pending system called Rational Inquiry.

Rational Inquiry is a complex, essential concept to the Nxivm teachings. However, in the simplest terms, it is the Socratic Method of pointed questioning. As any law student knows, a law professor may call upon him or her during a lesson and ask well-placed questions to determine what the student believes about a certain topic and where, if anywhere, that belief comes from.

BRAFMAN & ASSOCIATES, P.C.

What the law professor does in a law school classroom, Nxivm does elsewhere regarding how we view ourselves, form relationships and make decisions for ourselves and others.

Just as Socrates challenged the young people of Athens to question sacrosanct beliefs of the time, and indeed was executed for his disruption of a closed-minded system of government,[1] Nxivm challenges participants to question, rather than blindly accept, the fundamental content of their lives. Why, for example, are we practicing the religion we are? Do we really believe its precepts or is it just easier to not disappoint our parents? Do we have the relationships with our parents or our children that we really want? If not, why not? What can we do to have better relationships with the people we love? Nxivm challenges people to ask these questions and challenge one's own limiting beliefs that prevent attaining one's goals. The fundamental premise is that people are not made happy or fulfilled by material items. We are not happier because of a car or a house. Rather, we are happier when we have thought through the true content of our lives and have made a plan to improve ourselves and our relationships by thinking deeply about them, rather than taking them for granted. Nxivm provides its students with effective tools to achieve success and greater happiness.

Two hundred years ago these may have been some of the questions taken up by traditional religion or by students of philosophy. However, as mankind has generally become untethered from religion in favor of a version of spiritual and intellectual freedom,[2] many people find value and content in developing a system of thought and belief through which to address these eternal questions. An overriding theme of Nxivm is that we strive to be part of something larger than we are. That something is humanity. We participate in the progress or lack of progress of humanity in each of our choices.

Another important premise of Nxivm is that each of us harbor emotional associations with different events or triggers. Some of these experiences are positive; others are decidedly negative. If we can free ourselves of the negative ones—the ones that restrain our decision-making—we can be more free and happier. To illustrate the true nature of Nxivm and Keith Raniere, we have attached as Exhibit 3 a brief video that shows how Rational Inquiry transforms students' lives, and in some instances, even successfully helps people transform the debilitating symptoms of Tourette's Syndrome.[3]

---

[1] Bertrand Russell, A History of Western Philosophy, Unwin Brothers Ltd. at p.105 (1946).

[2] The European existential philosophers saw this problem coming. Soren Kierkegaard, a devout Christian, heralded religion and the "knight of faith" as the bulwark against meaninglessness and internal suffering; the French existentialist Jean Paul Sartre studied the condition of man, alone in the absence of an involved God; Frederich Nietzsche famously said "god is dead. God remains dead. And we have killed him. How shall we comfort ourselves?" Nietzsche, Friedrich Wilhelm, The Gay Science at p. 125 (1974).

[3] We are hand-delivering Exhibit 3 on a DVD to the Court and it can also be viewed on YouTube at this web address: https://youtu.be/jBxvVxXOtro.

BRAFMAN & ASSOCIATES, P.C.

Nxivm is interesting to certain people because it challenges their existing belief systems, and even what it means to believe something. The valuable intellectual property of Rational Inquiry includes the technology, methods, procedures, discoveries, understandings, course-work, coaching materials and other aspects of a highly developed body of knowledge memorialized, in part, in written materials that Nxivm has developed over many years and which it is continuing to refine.

Intelligent, successful executives, politicians, actors and actresses agree to pay Nxivm for its training services, and decide to continue such training, precisely because of the company's well-developed methods and the confidential and proprietary information it has developed.

In addition to providing the intellectual content for these teachings, Mr. Raniere has lived nearly six decades without any criminal record. While the government raises the specter of danger, this is a case that lacks all the hallmarks of true danger. There are, for instance, no allegations of guns, knives or weapons of any type. There was no physical harm or danger visited upon anyone. To the contrary, Mr. Raniere is a *peaceful* man, whose work includes founding a company Anima, Inc.,[4] which produced and directed the Opening and Closing Ceremonies of the Central American and Caribbean Games in Veracruz, Mexico, in 2014.[5] The ceremonies recited a peace pledge that Mr. Raniere helped create and inspire, and were witnessed by nearly 23,000 live spectates and more than 150 million viewers. This same peace pledge is recited by people every Sunday in Mexico as a stand in solidarity against the violence which pervades their country.

We request a hearing at a time convenient to this Court to determine whether the combination of conditions proposed herein would permit Mr. Raniere, a New York resident with no substantial assets and no criminal record, to be released pending his March trial.

## 2.    The Proposed Release Conditions

The proposed release conditions are as follows:

(1)    A $1M personal recognizance bond;

(2)    The bond shall be secured by the following three properties, with the owners of the properties signing onto the bond:



---

[4]     https://www.facebook.com/animainc/posts/today-is-the-opening-ceremony-of-panamerican-games-guadalajara-2011the-biggest-c/10150324161806883/.

[5] The ceremonies were nominated for Telly awards for this production. (See http://animainc.com/en/produccion/vuela-veracruz-un-solo-corazon/.)

BRAFMAN & ASSOCIATES, P.C.

(3)       Several other people—the identities of whom will be provided to the government and the Court in advance of any hearing, will also sign onto the bond;

(4)       The defendant shall be on full home confinement in Clifton Park, NY;

(5)       The defendant will be electronically-monitored by a GPS device that tracks his every movement;

(6)       The defendant shall not leave the location of his home confinement, except for emergent medical matters and scheduled court appearances; his lawyers will be obligated to travel to this location for any meetings;

(7)       When the trial starts, or if the defendant's presence at court is required on a more regular basis, he will live at a location near the courthouse, and will be accompanied by one of his attorneys from that location to the courthouse;

(8)       The defendant shall not communicate with anyone by phone or in person aside from his attorneys or authorized members of their staff or unless his attorneys are present;

(9)       The defendant shall have access to a computer to review the discovery provided in this case, but no internet access; and

(10)      Surrendering of the defendant's passport and an agreement not to secure new travel documents.

The current bail proposal endeavors to reflect the specific concerns raised by the Court in prior proceedings. For instance, the current proposal does not involve armed security guards. As was apparent from the Court's comments and questions during the proceedings on June 12, 2018, the Court was uncomfortable with private armed guards ensuring Mr. Raniere's appearance. The Court noted concern with the guards' use of force and more generally with the social ramifications of allowing defendants to construct essentially private jail facilities. (Ex. 1: Memorandum and Order at 22.) Accordingly, that condition has been removed.

Moreover, the Court was concerned that the prior proposal did not involve co-signers with moral suasion over Mr. Raniere. (See Ex. 2 at 13.) In contrast, the renewed bail motion proposes a bond with several co-signers who have known Mr. Raniere many years, are confident that he will return to court as expected and have put their own hard-earned funds on the line. Even if he were able to flee, which he is not, Mr. Raniere would not do so because, among other reasons, he would not jeopardize the financial situations of the co-signers. Mr. Raniere has known his suretors for many years and cares for them, and their livelihoods.

In addition, these co-signers are willing to come to court and be questioned by Your Honor. As we have indicated in prior motions, there is significant apprehension shared by people who otherwise would be willing to co-sign a bond for Mr. Raniere. (Dkt. No. 116, Motion to Seal Co-Signer Names ("Mtn. to Seal") at 2-3.) The government has repeatedly sent federal agents to the homes of people who may be defense witnesses or are viewed by the government as assisting the

BRAFMAN & ASSOCIATES, P.C.

defense. Moreover, anyone showing allegiance to Mr. Raniere is defamed in blog sites to the potential detriment of their livelihoods.[6] These co-signers' willingness to sacrifice their resources and face public scrutiny, if not obloquy and defamation, further enhances the value of their commitment.

As the Court will undoubtedly note, the sum of money securing Mr. Raniere's bond is significantly less than for other defendants in this case. However, as this Court is aware, Mr. Raniere does not have any financial resources of his own. ("And every defendant is different. Mr. Raniere is different, he has no assets to speak of." (7/24/18 Tr. at 31)). While this was stated as an explicit concern of the Court in its written decision, we address this concern below.

**3.      The Section 3142(g) Factors**

Following the initial bail hearing, the Court conducted an analysis of the Section 3142(g) factors. The defendant accepts the Court's analysis and offers these additional considerations in light of the renewed bail proposal.

**A.      The Nature and Circumstances of the Offense**

Sex Trafficking has been deemed a significant enough crime to warrant a presumption of detention. However, this is far from a typical sex trafficking scenario, if indeed these facts satisfy the statute at all.[7] The crime of sex trafficking was intended to bring appropriately harsh sentences to individuals and groups who recruit women into, and profit from, prostitution. Without belaboring the point, the current facts are quite distinct. Accordingly, the defense contends that the fact alone that Mr. Raniere is charged with sex trafficking should not militate in favor of detention.

However, acknowledging that sex trafficking has a rebuttable presumption of detention, Mr. Raniere can rebut such a presumption with evidence that he does not pose a danger to the community and is not a risk of flight. (18 U.S.C. § 3142(c)(1)(B).)

**B.      The Weight of the Evidence**

The Court noted in its decision that this factor "weighs at least weakly in favor of detention," while still recognizing Mr. Raniere's defenses. (Ex. 1 at 9.) Specifically, the Court noted the defense argument that women "joined and remained in the group willingly and that they engaged in any sexual activity with [Raniere] consensually" and "that 'there is no evidence that anyone engaged in a commercial sex act, within the meaning of the [sex-trafficking] statute.'" (Id.

---

[6] Frank Parlato, <u>Court does not need to seal names of Raniere co-guarantors – Frank Report knows already</u>, FRANK REPORT (Sept. 26, 2018),  https://frankreport.com/2018/09/26/court-does-not-not-to-seal-names-of-raniere-co-guarantors-frank-report-knows-already/.

[7] This latter argument will be addressed in the defendants' motion to dismiss, which will be filed on November 16, 2018.

BRAFMAN & ASSOCIATES, P.C.

at 9-10.) In a thoughtful analysis of the proffered evidence, the Court concluded that it "lacks sufficient evidence from which to make a confident assessment as to the strength of the government's case…." (Id. at 10.)

However, the Court, as well as the defense, is being kept in the dark as to critical exculpatory evidence currently in the government's possession directly related to the sex trafficking charges. (See Dkt. No. 127, Letter re: Discovery, Trial Date, Particulars, and Brady at 6.) Specifically, the government has stated, and this Court accepted, that "DOS 'slaves' were also required to have sex with Defendant." (Ex. 1 at 2.) However, this assertion is absolutely false and the government now knows it is false. Specifically, the government has been informed directly by multiple women during interviews that these women were in DOS and were not required to have sex with Mr. Raniere.[8] Moreover, the government well knows that the overwhelming majority of women in DOS did not, were not asked to, and certainly were not required to, have sex with Mr. Raniere. And at trial, the defense will show that any sexual relationships with Mr. Raniere were entirely consensual and aggressively pursued by Mr. Raniere's partners. Yet, the government, in pressing for detention, conceals this information from the Court and counsel.

With Mr. Raniere's pretrial liberty currently on the line, the government should be compelled to inform the Court of how many women in DOS have told the U.S. Attorney's Office and/or the FBI that DOS had nothing to do with sex with Mr. Raniere and similar facts. (See Ex. 3 at 6.) In the absence of the government being candid with the Court on this central fact, the Court will be compelled rule on Mr. Raniere's liberty based upon false, misleading and materially incomplete information. This is unfair both to the Court and to Mr. Raniere.

### C.      Defendant's History and Characteristics

The Court had two overriding concerns with the defendant's history and characteristics that bear explanation. First, the Court concluded that the defendant moved to Mexico at least partly to evade law enforcement. Again, without objecting to the Court's conclusion, we point out that the government repeatedly made factual assertions that were patently false and misleading about Mr. Raniere's travel to Mexico that unfairly colored the Court's view of him. Second, the Court expressed concern about Mr. Raniere's financial situation, specifically that he lacks his own resources. These will be addressed in turn.

### i.      Mr. Raniere Did Not Flee the Government in Mexico

As stated in our earlier memorandum, Mr. Raniere did not flee the United States for Mexico. (Dkt. No. 43, Deft. Mtn. for Release at 10-15.) He is a United States citizen who has lived in New York for his entire life. There is no basis to believe he will do anything but fight this case, in keeping with his character. He has only been out of the country a handful of times in the past few years—twice to visit Fiji, and most recently, to be with the mother of his child and his infant

---

[8] That the government still refuses to provide the defense with the substance of these interviews, despite repeated requests for this information as clear Brady material, will be addressed in a Brady motion to be submitted on November 16, 2018.

BRAFMAN & ASSOCIATES, P.C.

child in Mexico after her visa expired in October 2017 such that she could not remain in the United States. (Id. at 12-14.)

The government's repeated and knowingly misstatements as to Mr. Raniere's dates of travel in several sworn affidavits are highly misleading. Specifically, in the government's Complaint and Affidavit in Support of Mr. Raniere's arrest, Special Agent Michael Lever swore to the following facts:

> In or about October 2017, the New York Times published an article revealing the existence of DOS. Several weeks after that article was published and after the FBI began interviewing witnesses, Raniere flew to Mexico with an heiress "the "Heiress" who is a member of Nxivm's Executive Board and is a known financial backer of RANIERE and Nxivm. Prior to this trip, RANIERE had not flown out of the country since 2015, when he visited the Heiress's private island in Fiji. RANIERE is currently believed to be residing in Monterrey, Mexico, where Nxivm maintains a center, with a branded DOS slave.

(Complaint ¶ 34; see also United States v. Real Property at 8 Hale Dr. et al., Dkt. No. 1 ¶ 34.) The government additionally argued in their Detention letter that "[a]fter law enforcement began interviewing witnesses about the defendant's criminal conduct, he fled to Mexico where he was apprehended only after a month-and-a-half of active searching." (Dkt. No. 4, Gov't Detention Ltr. at 6; see also id. at 4 ("Shortly after the government began interviewing witnesses and victims in November 2017, the defendant flew to Mexico.")). The suggestion is clear: Keith Raniere went to Mexico because of an investigation and newspaper article. As stated in our earlier memorandum and reiterated herein, these statements are inaccurate and contradicted by the records that were in the government's possession at the time.

The truth is that Mr. Raniere did not leave the country because of The New York Times article, but rather came back into the country the day the story was published. As stated in our earlier memorandum:

> The mother of Raniere's child is a Mexican citizen, who most recently entered the United States on a B1/B2 visitor's visa on April 15, 2017. Pursuant to that visa, she was only authorized to remain in the United States until October 14, 2017. The six-month duration of this stay in the United States is corroborated by the second date on the I-94 form of October 14, 2017. This means that she was required to leave the United States no later than October 14, 2017 or be in violation of United States law. On advice of counsel, Raniere and the mother of his child were advised to arrange for her to leave the country. Wanting to be close to his home and business, Raniere and the mother of his child rented an Airbnb in [Montreal] Canada for the family to live in while they resolved the immigration issues. However, when they attempted to enter Canada on October 13, 2017, Immigration, Refugees and Citizenship Canada ("Immigration Canada") denied them entry. With less than 24 hours to be in compliance with United States immigration law, on October 14,

BRAFMAN & ASSOCIATES, P.C.

2017, to comply with the visa, Raniere, the mother of his child and his child flew
to San Diego and entered Mexico by crossing the San Ysidro port of entry.

(Deft. Mtn. for Release at 12.)[9] These facts were not rebutted by the government. Moreover, the government had this information, yet it was not disclosed in its detention letter. Shortly after getting his child and the mother of his child settled in Monterrey until her visa situation could be sorted out, Mr. Raniere *flew back to Albany*. (Id. at 13, Ex. 7.) He stayed in Albany until November 10, 2017 to be at his deceased long-time partner, Pamela Cafritz's home on November 7, 2017, the one-year anniversary of her passing.

This Court stated that Mr. Raniere did not explain why he traveled back to Mexico in November. (Ex. 1 at 11.) Mr. Raniere traveled back to Mexico to be with his three-month-old son who was with the mother as she was awaiting a new visa. Mr. Raniere travelled back to Monterrey, Mexico, to be with them. And, in an abundance of caution, hired a well- respected attorney, Michael Sullivan, the former United States Attorney for the District of Massachusetts to interface with any governmental entities that may be investigating any charges stemming from false allegations of coercion. (Id. at 10-11.) Mr. Sullivan openly communicated with the U.S. Attorney's Office in the Northern District of New York, thereby demonstrating Mr. Raniere had no intention of fleeing or hiding.

While we believe this narrative is clear evidence of Mr. Raniere's willingness to cooperate with law enforcement, we do wish to provide greater transparency—to the extent that we did not include enough information into the first memorandum—into Mr. Raniere's stay in certain locations while in Mexico. At the June 12th hearing, this Court asked "what about the situation with him going down to…Puerto Vallarta, Mexico and staying in a gated community and operating an [encrypted] email account….Why would you do that if you were not trying to evade law enforcement?" (Ex. 2 at 17-18.)

First, as we have written in previous memoranda, for nearly two decades, people associated with ESP and Nxivm have been the targets of threats, computer-hacking and blatant false statements on websites and other media specifically to damage their reputations, business and lives. (Mtn. to Seal at 2.) One hacking defendant John Tighe even pleaded guilty to the felony of Computer Trespass, in violation of New York Penal Law Section 156.10(2) in Albany County Court. (Id. at 7-8.) Most recently, in the summer of 2017, before Mr. Raniere and the mother of his child went to Mexico to comply with her visa requirements, Nxivm became aware that the login credentials of former students, Sarah Edmondson, Jennifer Kobelt and J.O. were accessing Nxivm servers from Canada. These accounts deleted data, stole ESP student profiles and documentation and cancelled over $100,000 credit card payments. (Id. at 8-9.) Conspicuously, days later, personal and identifying information about Nxivm clients was published on the internet. (Id. at 10.)

---

[9] As Mr. Raniere's child did not have a passport, the only way for the mother and child to leave together was by land, not air. This route was the safest option for the family because most areas to cross the border into Mexico are violent.

BRAFMAN & ASSOCIATES, P.C.

Second, as we stated in earlier memoranda, anti-NXIVM press was and continues to be associated with a prolific blogger named Frank Parlato, who is currently under indictment in the Western District of New York. (Id. at 6.) Parlato is an active antagonist who has admitted time and again that he is obsessed with ruining Mr. Raniere and others supportive of the organization. Apparently, this obsession does not stop with posting photos of Mr. Raniere's newborn baby. On multiple occasions, Parlato published the exact location of Mr. Raniere's whereabouts in Monterrey, Mexico, and even published multiple photos of him walking his child in the daytime.[10]

It is no wonder, then, that with the presence of this blogger posting Mr. Raniere's daily whereabouts together with photographs of his four-month-old child, that Raniere would choose to leave Monterrey to protect his child. Moreover, with a recent Nxivm server breach and misappropriation of electronic information, Mr. Raniere chose to use an encrypted email shortly after Sarah Edmondson's story was published in The New York Times.[11] Rather than trying to evade law enforcement, Mr. Raniere chose a more secure location to reside, and an email server that could prevent hacking from a mobilized group of enemies who were ready and willing to hack in the past and willing to publicize their illegally seized information.

Third, Mr. Raniere was arrested in a gated resort near Puerto Vallarta where he was on a vacation openly socializing with friends from Albany and different parts of Mexico. The friends were all together for the weeks leading up to "Holy Week" in Mexico. Many of the Mexican families left the resort near Puerto Vallarta on March 25th to begin the Holy Week celebrations with their families and some guests stayed, including Mr. Raniere and guests from Albany. Therefore, Mr. Raniere's presence in the Puerto Vallarta area was simply to go on a vacation with his friends, many of whom he had not seen since leaving Albany in November 2017.

Lastly, the Court also observed that at the time Mr. Raniere was arrested, the mother of his child was residing in Monterrey and not at the resort in Puerto Vallarta. (See Ex. 2 at 19.) Indeed, the mother of his child and his child were in Puerta Vallarta beginning on March 16th and stayed with Mr. Raniere until March 25th, the day before Mr. Raniere's arrest. (See Ex. 4: Flight Itinerary.) That day, they left just a few hours earlier with friends so that their child could continue his language development at a school in Monterrey. Because companions and others from Albany were still vacationing in the Puerto Vallarta resort, Mr. Raniere stayed behind and planned to join the mother of his child and his child later.

Therefore, we respectfully submit that Mr. Raniere was not attempting to evade law enforcement. While Mr. Raniere was residing in Mexico not in the United States at the time because the mother of his child did not have a visa to stay in the United States, he retained respected

---

[10] Frank Parlato, Raniere photographed in Monterrey – with Mariana and baby, FRANK REPORT (Dec. 18, 2018), https://frankreport.com/2017/12/18/raniere-photographed-in-monterrey-with-mariana-and-baby/.

[11] Meier, Barry, Inside a Secretive Group Where Women Are Branded, NEW YORK TIMES (Oct. 18, 2017), https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html.

BRAFMAN & ASSOCIATES, P.C.

counsel in the United States to engage in productive discussions and to ensure that he would not undermine the law.

ii.     Mr. Raniere's Lack of Personal Wealth

The Court understandably expressed concern with the fact that Mr. Raniere's lack of personal wealth means that he has little to lose if he flees. (Ex. 1 at 12.) While it is true that virtually everyone is concerned with losing money, there are other things that one can fear losing. Mr. Raniere's life has not been about money or wealth. He has had the support of people with substantial means, no doubt. His long-time partner, Pamela Cafritz, with whom he had shared his life for nearly thirty years before she passed away on November 7, 2016, had means.[12] At the risk of sounding too trite, Mr. Raniere had two things primarily that he risks losing: love and respect. If he were to leave, his life's work and his reputation would be lost.

The government has lamented in several filings that people paid a lot of money and spent a lot of time to go to Mr. Raniere's birthday celebration (See Compl. at ¶ 9; Dkt. No. 4; Gov't Detention Ltr. at 2.) These people were not forced to celebrate Mr. Raniere's birthday, nor did they go because they were brainwashed, nor because they would lose their "cult" status if they failed to go. They went for the same reason that one might go to another person's birthday party: because they love him. This love is precisely why people are willing to sign on as suretors, despite the negative effect it will have on their lives. The respect, love and admiration of the people whose lives he has touched is ultimately all Mr. Raniere has. Fleeing a court obligation would be cowardly, unethical, wrongful, illegal, and morally-weak. If Mr. Raniere were to do that, he would lose everything he ever had.

D.     Danger to the Community

We appreciate the Court's concern that the nature of the charges connotes a form of danger. However, as we have noted, this case lacks all of the hallmarks of true danger. Mr. Raniere has no arrest history and has lived and worked in New York state for his entire life. There are, for instance, no allegations of violence, guns, knives, or weapons of any type; there is no suggestion that

---

[12] Prior to her death, Ms. Cafritz established a living trust and Mr. Raniere is named the sole beneficiary and trustee. In accordance with her Will, the entirety of Ms. Cafritz' Estate will be transferred to the trust. However, the full extent of the Estate's liabilities have not been identified and must be identified before monies can be distributed to the trust. Accordingly, no transfers from the Estate have yet been made. In light of the as yet unidentified liabilities, Mr. Raniere's interest in the Estate assets is best described as an unknown contingent interest. Mr. Raniere renounced his status as Executor of the Estate and therefore has no control over the Estate assets. Nor is he able to access any Estate funds. Although it is unlikely that any monies will be transferred to the trust in the near future, we will immediately notify the court should a transfer occur. Mr. Raniere understands that if a distribution to the trust occurs while he is released on bond, this Court may wish to revisit his status.

BRAFMAN & ASSOCIATES, P.C.

someone stole another person's money[13] or that the Nxivm classes were bogus;[14] there are no physical injuries, no black eyes, no bloody noses, no fists, punching, slaps or pulling hair. This is an organization that has advocated peace and humanity to the exclusion of all else. It is a group of people that has taken tremendous pride in their accomplishments. As a result, there is no violence and no danger. However, there is one feeling that apparently has afflicted a certain number of people: regret. Apparently, certain people have regrets about choices they made and things they did of their own adult volition. While regret may be painful, it is thankfully not a cognizable form of violence or danger under the Bail Reform Act.

The second form of danger that must be addressed is this notion that Nxivm harassed people who left the group through litigation. As we set forth in great detail in a prior filing, and which has not been factually contradicted by the government, a group of people, including members of the press, repeatedly hacked into Nxivm's confidential computer system. Nxivm sued these people because they committed both a criminal and civil wrong against them. On another occasion, a group of nine women sent an extortionate letter on the eve of a well-publicized event stating that if a large sum of money was not paid, these former Nxivm members would make false and disparaging statements to the press. Legal measures were taken to address this situation. These are but two examples of instances where former clients or contractors of Nxivm took unlawful actions and were then faced with legal process to address these actions. To characterize these reasonable legal measures as harassment of potential witnesses is brutally unfair and untrue.

---

[13] The closest thing to this is that the government says that Mr. Raniere and the mother of his child used Pamela Cafritz's credit card after her death. (See Superseding Indictment at ¶ 40 (Count Seven); Gov't Detention Ltr. at 7.) It is undisputed that Ms. Cafritz and Mr. Raniere were live-in lovers, partners and the best of friends for the better part of three decades. Mr. Raniere had an unlimited Power of Attorney over her affairs, was her estate's executor, and sole beneficiary. So, the notion that Mr. Raniere misappropriated funds from an estate of which he was the beneficiary, with the goal of committing tax evasion on tax not yet due, is ridiculous.

[14]      The government alleges that Nxivm classes can cost up to $5,000 and participants "are encouraged to keep attending classes and to recruit others into the organization in order to rise within the ranks" of the organization. (Dkt. No. 1, Complaint at ¶ 6.) First, Nxivm offers classes that anyone can pay for and attend. Second, if one chooses to advance up the "stripe path" within the organization, students must achieve certain goals or skills. When one attains the goals, students could advance. It is hardly a "recruit"-based system of advancement.

Moreover, the government has alleged that "only a small percentage of Nxians make a significant income and a much larger percentage find themselves in significant debt to the organization." (Gov't Detention Ltr. at 3.) This is, of course, ironic because the government's star witness, Sarah Edmondson, who has repeatedly spoken publicly about her apparent experience in Nxivm recently told a CBC podcast that once she started recruiting students into Nxivm she "got out of debt." Needless to say, the government has *never* alleged, nor could they ever allege, that the classes the organization offered are bogus.

BRAFMAN & ASSOCIATES, P.C.

Third, the government has made factual assertions to the Court that Mr. Raniere has an alleged "decades' long history of abusing women and girls," which he flatly denies. In support of this allegation, the government has stated, and even now indicted, an instance where Mr. Raniere purportedly "ordered the long-term confinement of a Nxivm member who was approximately in her early-20s to heal an 'ethical breach' because she had developed romantic feelings for someone other than him." (Gov't Detention Ltr. at 3.) The thousands of emails and handwritten notes from this adult woman show that this woman willingly stayed in her *unlocked* bedroom for a year and a half to work on many issues, such as the fact that she would constantly steal from people in the community. In addition, she lived in the house *with her family*, who bought her fresh food and prepared her meals for her. Incredibly, and what the government conveniently leaves out, is that her mother stayed in the room next door to the woman for nearly a year, also entirely of her own volition.

The government proffers that "[w]hen the woman finally did leave the room, the defendant, as he had threatened, had her driven to the Mexican border and ordered to walk across, without money or identification papers." (Dkt. No. 44, Govt. Response at 6.) Notably, once this woman wanted to leave her bedroom, she was driven to Mexico *by her father* and another person.

### 4.      Changes in Circumstance That Impact on This Court's Bail Analysis

Since the last bail application, there have been several developments that impact the Court's decision as to Mr. Raniere's release. Specifically, at the time of the prior bail application in June of 2018, the only defendants in this case were Mr. Raniere and Allison Mack. At the June 12, 2018 Court proceeding, the Court expressed concern about a number of issues that were at the time unknown to the Court. First, the Court was concerned that someone, specifically Clare Bronfman, may facilitate Mr. Raniere's departure from the jurisdiction. (See Ex. 2 at 14, 21.) At the time, Ms. Bronfman had not yet been indicted and the Court knew nothing about her financial situation, except for representations by the government. (See id. at 25: "It is really unimaginable wealth and limitless wealth that we're talking about here. So the idea that any amount of money would not be worth it to this person to allow the defendant to flee…is unimaginable.") Moreover, because Ms. Bronfman was not yet a defendant, the Court had no power to influence her actions.

This situation has completely changed in the last several months. In July 2018, Ms. Bronfman and three others were arrested. The Court has since received a great deal of information about Ms. Bronfman's financial situation, and, most importantly, she is subject to stringent conditions and pretrial supervision. Moreover, this Court has received assurances from her trust advisors that they have "the ability to and propose to enter into a binding agreement in a form acceptable to the Court to limit distribution to Clare to pay for certain expenditures that are encompassed within the overall purview of Clare's health, education, maintenance, and support…" (Dkt. No. 68-2 at ¶ 12; 68-3.) Notably, *these expenditures do not include supporting Mr. Raniere*. In an abundance of caution, the advisors provided comfort to the Court that they will "inform Pretrial Services three days in advance of any proposed individual distribution from the Trust greater than $25,000 for any reason other than legal fees associated with Clare's criminal case or necessary medical expenses." (Id. at ¶ 13.) What may have once been an "unknown" in June of 2018 is now very much "known." Accordingly, the Court need not have the concerns it once had

BRAFMAN & ASSOCIATES, P.C.

about the possibility that Clare Bronfman could arrange for Mr. Raniere's departure from the District.

Finally, since the Superseding Indictment, the government "has produced over 96,000 pages of discovery" and has made available "forensic copies of nearly all the devices seized from the residence of defendant Nancy Salzman." (Dkt. No. 188, Gov't Ltr. Providing Status Update on Discovery at 1.) The volume of discovery that the government has turned over is enormous. In fact, the government repeatedly characterizes as 144 "library floors" of data. (9/13/18 Tr. at 7; Dkt. No. 129, Gov't Ltr. Requesting Complex Case Designation at 2.) Among other reasons, Mr. Raniere requests to be released from prison so that he and his lawyers can prepare for trial and so Mr. Raniere can assist in reviewing the vast amounts of discovery that have recently been produced to counsel. (See Gov't Ltr. Providing Status Update on Discovery at 1.)

**5.       The Current Bail Package Addresses Any Issues with Flight, Danger and Witness Matters**

Under the proposed conditions, Mr. Raniere will be without his passport, will be on full-time GPS monitoring and under the strict supervision of Pretrial Services. In addition, he has absolutely no means to flee, as he lacks any of his own money. Also, as noted, to the extent that the Court was once concerned that Ms. Bronfman may help Mr. Raniere flee, that concern has been eliminated with her arrest and current pretrial conditions.

Similarly, the proposed package eliminates any potential danger to a witness or to anyone in the community. Since Mr. Raniere will be permitted to speak only to his counsel and others in the presence of his counsel, the potential danger to witnesses is fully eliminated.

**6.       Conclusion**

For these reasons, we ask that the Court approve the bail package set forth above.

Sincerely,

/s/
Marc Agnifilo

cc:      All Counsel (via ECF)