UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>KEITH RANIERE, CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN, and NANCY SALZMAN,<br><br>Defendants. | Case No. 1:18 Cr. 00204-NGG<br><br>**AFFIRMATION**<br><br>**Submitted on November 16, 2018** |

1.      I am Of Counsel to the law firm Brafman & Associates, P.C., and am licensed to practice law in the State of New York. I am also a member of the bar of this Court. As counsel for Keith Raniere, I make this affirmation in support of two of Raniere's Motions, specifically the Motion for Prompt Disclosure of <u>Brady</u> Materials and the Motion for Live Trial Testimony via Closed Circuit Television.

2.      This affirmation is made upon information and belief, the sources of which are discovery material provided by the United States Attorney's Office for the Eastern District of New York ("EDNY"), conversations with the Assistant United States Attorneys assigned to this case, the result of investigative efforts undertaken by the defense to date, conversations with numerous individuals and other documents and materials comprising counsel's file in this matter.

**Facts Supporting the Motion for Brady Material**

3.      In or about November 2017, the United States Attorney's Office for the EDNY began interviewing witnesses in this investigation. (Dkt. 4, Gov't Detention Letter at 4.) In February 2018, they filed a complaint against Keith Raniere (Dkt. 1, Complaint) and by March 26,

2018, the day of Raniere's arrest, they estimated that they had spoken to more than a dozen women whom the EDNY contends were Raniere's victims, as well as many other witnesses. (Id. at 7.) In April 2018, Raniere and Allison Mack were indicted on charges of Sex Trafficking, Sex Trafficking Conspiracy and Forced Labor charges. Since the date of Raniere's arrest and subsequent indictment, the EDNY have spoken to many more witnesses, several of whom, I believe, provided substantial Brady material to the Government.

    4.     Upon information and belief, the FBI and USAO-EDNY have interviewed witnesses who have provided information that directly contradicts, or at the very least substantially alters, the quantum of proof in defendant's favor regarding the following Government theories: (1) DOS members would not have joined the sorority if they knew that Keith Raniere created it (Superseding Indictment ("the Indictment") at ¶ 36); (2) DOS members joined DOS under the false pretense that it was a female-only mentorship group (Gov't Detention Letter at 1); (3) DOS members provided masters with additional collateral because they feared that their original collateral could be released if they did not (Complaint at ¶ 19); (4) DOS members performed "assignments" or "acts of care" because, if they did not, they risked their collateral being released (Id. at ¶ 21); (5) certain DOS members were given the "assignment" to have sex with Keith Raniere (Id. at ¶ 22); (6) DOS members feared that their collateral would be released if they left the group or refused to have sex with Keith Raniere (Id. at ¶ 23); and (7) Nxivm forced its students into debt (Id. at ¶ 6; Gov't Detention Letter at 3; Dkt. 51, Gov't Superseding Indictment Detention Letter at 3).

    5.     In short, I believe at least some of these witnesses have represented that the tenets of DOS—including collateral, acts of care and completion of assignments—was a *choice* they made on their own without any coercion, threats or manipulation. Similarly, I believe that at least

some of these witnesses have represented that if they engaged in a sexual relationship with Keith Raniere, that relationship was entirely consensual, unrelated to their involvement in DOS, and oftentimes kept secret from other members of DOS.

6. Additionally, in some instances, after witnesses provided an account of their experience in DOS, the Government subsequently attempted (and sometimes succeeded) to have these witnesses change their accounts, in whole or in part, by confronting these witnesses with purported statements by a defendant or the Government's opinions about the evidence.

A. **Keith Raniere And Allison Mack's Prior Requests for Brady Material**

7. Before the Superseding Indictment, in Raniere's June 5, 2018 Motion for Bond, the defense requested that the Government provide counsel with Brady materials including statements from the Government's witness interviews that contradicted the prosecution's sex trafficking theory. Specifically, after explaining the true meaning behind the sorority that form a basis of the sex trafficking charge, counsel noted:

> In a novel effort to fabricate the element of coercion as part of the sex trafficking count, the Government artificially links collateral to a requirement of sex with Keith Raniere. However, we expect that the Government has by now spoken with numerous women who have stated to the investigators and prosecutors that collateral was wholly unrelated to sex or an expectation of having sex with anyone, let alone Raniere. The evidence is overwhelming that the collateral was a function of a woman's membership in and commitment to DOS, and nothing more.

(Dkt. 43, Raniere Motion for Bond at 21.) Counsel requested that the Government turn over all such statements to that effect as soon as possible, as they were clear Brady material. (Id. at n.2.)

8. On July 18, 2018, counsel for Raniere and Ms. Mack reiterated this request by sending a letter to the Government requesting prompt production of any and all materials in the possession, custody and control of the Government pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, including Giglio v. United States, 405 U.S. 150 (1972), and United States v. Bagley, 473 U.S. 667 (1985), the Fifth and Sixth Amendments to the Constitution of the United

3

States and applicable law. (Exhibit 1: 7/18/18 Brady Request Letter.) Counsel included a non-exhaustive list of eighteen examples that constitute Brady material. (Id. at 3-4.) Counsel further requested production of these materials by Wednesday, July 25, 2018. (Id. at 2-3.) The Government did not respond to counsel's specifically itemized requests for exculpatory evidence. About a week later, the Government filed the instant Superseding Indictment.

9. Counsel for all defendants again requested all Brady material in a September 11, 2018, letter to this Court. (Exhibit 2: Dkt. 127, Letter re: Discovery, Trial Date, Particulars, and Brady at 1.) Counsel reiterated to the Government, and to this Court, that the Government's "failure to respond to a Brady letter raising significant specific issues [required] immediate attention." (Id.) Counsel asked this Court to direct the Government to provide an answer to our specific Brady request:

> We believe that the Government has been told by a number of people the Government considers "DOS slaves" during proffer sessions with the AUSAs and the FBI agents assigned that no sex trafficking or other illegal conduct took place. These witnesses provided information which contradicts the factual allegations and theory of the prosecution. Defense counsel believes, moreover, that when confronted with these accounts of alleged "DOS slaves" that no illegal conduct took place that the Government attempted to "convince" these witnesses to the contrary. The defense is concerned with the propriety of this investigation in light of this information. The defense is moreover concerned that the Government has ignored for close to two months a specific Brady letter on July 18, 2018.
>
> Simply put, if the Government has been told by someone it believes to be a "DOS slave" that nothing inappropriate happened, contradicts information alleged by any of its witnesses or that any defendant did not act with the requisite mental state required for the commission of the crime, that is the very definition of Brady material, and it must be disclosed immediately.

(Exhibit 2 at 6.)

10. In response to this letter, the Government, in a footnote, acknowledged for the first time the Brady request: "As to Keith Raniere's demand for Brady material, the Government is aware of and will continue to comply with its Brady obligations." (Exhibit 3: Dkt. 129, Gov't

4

Letter Requesting Complex Case Designation at n.3.) Notwithstanding assurances that it is aware of its ethical obligations, the Government has still not responded to counsel's original Brady request (filed five months ago), counsel's subsequent Brady demand (sent four months ago) or counsel's most recent demand for immediate disclosure of Brady materials (filed two months ago).[1]

### B. Brady Materials and Information Related to Recruitment and Collateral

11. In the Complaint, the Government alleges that DOS "masters" "targeted" women within Nxivm who were "experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement within Nxivm." (Complaint at ¶ 15.) According to the Complaint, DOS masters asked their prospective recruits if they would like to join an organization that would change their lives, and if so, they would need to provide collateral to ensure that the prospective member would keep the existence of the sorority secret. (Id.) DOS members and prospective slaves oftentimes worked with each other to develop ideas for collateral. (Id. at ¶ 16.) Collateral would typically be a personal secret that was meant to ensure that the prospective member would keep the existence of the sorority a secret. (Id.) In their pitch to prospective members, the Government contends that DOS "masters" told the woman about DOS's mission and internal structure, then gave her a choice as to whether or not she would want to join. (Id. at ¶¶ 17-18.) When informing prospective members about DOS, the Complaint alleges that "masters" told the women that the sorority's mission was to eradicate personal weaknesses in its members and that their respective relationships would be of masters and slaves. (Id.) The Government alleges that DOS masters

---

[1] Counsel reiterated its Brady demand in Raniere's Second Motion for Bond, filed November 14, 2018. (See Dkt. 191, Raniere Second Motion for Bond at 6.) This Court ordered the Government to respond to this bond motion by November 19, 2018.

concealed Raniere's role "as the highest master," instead referring to it as a women's only organization (Id.) Prospective members were also told that, as members, they would be required to perform "acts of care" for or pay "tribute" to the person who recruited them, which allegedly included bringing them coffee, buying them groceries, making them lunch, carrying their luggage, cleaning their house, and retrieving lost items. (Id. at ¶ 20.)

        **i.    Keith Raniere's Role as the Conceptual Founder of DOS Neither Played a Role in the Witnesses Experience in the Sorority, Nor Was It a Material Omission That Caused Members to Give "Property" to Their Masters**

12. The Government alleges that "women were recruited to be slaves *under the false pretense* of joining a women-only mentorship group" and that '[n]one of the slaves (except for those directly under the defendant) knew that the defendant was involved in the organization when they were recruited. (Gov't Detention Letter at 1-2.) This allegation is now a basis of the Wire Fraud Conspiracy in Count Three of the Indictment. (Indictment at ¶ 36.) During interviews and proffers, law enforcement personnel have told witnesses that Raniere was the "originator" of DOS and that DOS's purpose was to manipulate women.

13. Counsel has learned from directly and indirectly that multiple witnesses, *some prior to charging the wire fraud conspiracy count*, have told the Government that it was immaterial that DOS members may not have told them about Raniere's involvement in the sorority. Moreover, the witnesses have informed the Government that they did not feel manipulated. When asked if the witnesses knew that Raniere was involved in DOS (i.e., the originator, or the conceptual founder of many of the tenants of the sorority, as alleged in the Complaint) and whether his involvement would deter them from their participation, witnesses have stated that Raniere's involvement in the sorority was irrelevant to their participation. These members have stated that their participation in DOS was solely to overcome certain issues very personal to themselves, and not encumbered by

Raniere's involvement. Further, witnesses have stated that they knew Raniere inspired and developed the ideas and concepts of the sorority.

> ii. **DOS Members Have Told the Government That the Sorority Gave Them a Chance to Grow as a Person, Develop a Stronger Character, and Obtain the Female Mentorship They Sought**

14. Several DOS witnesses have told the Government that the pitch DOS members gave them—that DOS would overcome their weaknesses and give them the opportunity to build character—was entirely true. Rather than feel manipulated or coerced, several witnesses feel that they joined a mentorship group that helped build their bond to women and gave them tools to overcome their current life's difficulties.

15. Several women have told the Government that the sorority sought to uphold honor, trust and respect for women. That this was a group of women who wanted to grow beyond petty attachments in the material world and become the best versions of themselves. These women understood that to accomplish that goal, they would need to commit to overcoming their fears and overcoming attachments to negative experiences that erode at their everyday life. Witnesses have told the Government that being part of a group of women who were also committed to achieving this goal was the true mission of DOS.

16. These witnesses have informed the Government that while DOS was not easy and while there were moments that they felt challenged, they still chose to join DOS, to invest in helping one another and to commit to building character in oneself.

> iii. **Despite the Fact That DOS Members Gave to Their Masters Potentially Damaging Collateral, Many Witnesses Did Not Fear Their Collateral Would Be Released**

17. Witnesses have informed the Government that the purpose of continuing to give collateral was to build their word and build their commitment to each other, not out of fear that their collateral would be released. When law enforcement has asked witnesses, in sum and

7

substance, "weren't you afraid that other people had collateral over you?," witnesses have stated that they *trusted* that their "master" would not disclose it to anyone. Although a DOS member may have held a witness's collateral, she did not feel coerced, forced or threatened to complete an assignment out of fear that her collateral would be released.

### C. Additional Collateral and "Assignments"

18. After women were presented with the tenets of DOS—acts of care for their master, master/slave relationship, and *voluntary* additional collateral to join the sorority—women were free to join or say no. (Complaint at ¶¶ 18-19.) Women who joined "were ultimately required to provide collateral beyond what had initially been described to them." (Id. at 19.) The Government alleges that women did provide additional collateral "fearing that otherwise, the collateral they had already provided would be used against them." (Gov't Detention Letter at 2.) Women apparently also understood that if they told anyone about DOS, left DOS or failed to complete assignments, they risked release of their collateral. (Id. at 2; Complaint at ¶ 28.)

#### i. Women Told Law Enforcement That They Did Not Provide Additional Collateral Fearing That Original Collateral Would Be Used Against Them

19. Contrary to the Government's allegations, witnesses have informed the Government that they did not provide additional collateral for fear that their original collateral could be used against them. When law enforcement asked witnesses whether more collateral was required if initial collateral was insufficient, witnesses have stated while more collateral was an "expectation," it *was not required* and they were *not forced* to give more collateral. DOS members have told the Government that they knew their masters were not going to do anything bad with their initial collateral and that they provided additional collateral to build character and strengthen their word to their masters.

8

20. Contrary to the Government's theory that DOS women feared that the collateral they had already provided would be released, at least one DOS "slave" told the Government that they provided additional collateral *to strengthen their word* and not because they were in fear that their initial collateral would be released. These complete statements should be turned over to the defense immediately.

> ii. **The "Assignments" That Many Women Were Given Did Not Include an Assignment to Have Sex With Raniere; Even If Women Were Given an Assignment to Seduce Raniere, They Did Not Fear Release of Collateral If They Did Not Complete the Assignment**

21. I believe that law enforcement has asked witnesses whether having sex with Raniere is a requirement of joining the sorority and witnesses have resoundingly answered "no." Law enforcement then asks whether having sex with Raniere is part of the assignment that masters gave slaves. Witnesses have answered that that is *not* part of the assignment and that, if given a sexual assignment, the assignment is incredibly vague and personal to each person—for some, it is to challenge certain fears (such as rejection or self-esteem issues). Moreover, witnesses who have been given an "assignment" have told law enforcement that they did not feel forced or coerced to do it. And, when law enforcement asked what happened during the supposed "assignment to have sex with Raniere," witnesses have told the Government that Raniere did not try to have sex with the women and instead asked how he could help the women.

22. I also believe that at least one witness who was apparently given an assignment to seduce Raniere has spoken to the Government and told them that she did not fear the release of their collateral if she did not complete this assignment. Notably, she has informed law enforcement that this "assignment" did not actually result in seducing Raniere.

9

23.     In addition, I believe that another witness has informed law enforcement that Jane Doe 5[2] told the witness about the sexual experience referred to in the Complaint. (See Complaint at ¶ 45.)[3] This witness told law enforcement that Jane Doe 5 told the witness that she (Jane Doe 5) was into "kinky" stuff, like the rendezvous described in the Complaint. Jane Doe 5 went on to tell the witness that she apparently "fantasized" about having an experience such as this and *wanted to participate in it*.

24.     I believe it is also very possible that Jane Doe 5 has said similar things to the Government during their many proffer sessions. This would be clear Brady material if said. Moreover, it goes without saying that such information would be Brady material regardless of whether it was reduced to a note or report.

        **iii.**        **Women Have Told the Government That They Did Not Feel They Risked Release of Their Collateral If They Failed to Perform "Acts of Care"**

25.     The Government claims that the slaves were manipulated, coerced or forced to perform "acts of care" because their masters had collateral. (See Complaint at ¶ 21 ("[s]laves were chastised and punished for not performing sufficient acts of care, and slaves believed that if they repeatedly failed at acts of care they risked release of their collateral")). Witnesses have outright told law enforcement their theory of "forced labor" is untrue. Rather, women joined DOS to be

---

[2] Jane Doe 5 in the Indictment is Jane Doe 1 in the Complaint.

[3] As the only enumerated example of sexual activity within DOS, Ms. Mack allegedly assigned Jane Doe 5, as she is referred in the Indictment) to meet Raniere. Raniere allegedly led her to a house across the street, directed her to remove all her clothes, blindfolded her, led her through trees to a shack, where she was tied on a table. Another woman then began performing oral sex on her. (Complaint at ¶ 45.) "Jane Doe 5 did not want to participate in this sexual activity, but believed it was part of her commitment to DOS and that if she broke her commitment to DOS her collateral could be released." (Id.)

kinder people who would be more giving to others and did not feel manipulated, coerced or forced to perform kind acts because their masters had collateral. Hence, the term, "acts of *care*."

26. Additionally, women have told law enforcement that they did not get chastised or punished for not performing acts of care. Instead, they performed these acts to be kinder to others.

### D. Witnesses Have Told the Government that Nxivm Does Not Force Students Into Debt

27. I believe that in response to questions about whether Nxivm "forces" students into debt thereby not enabling them to move on from the organization, witnesses have told the Government flatly "no." Witnesses have stated that Nxivm provides ways for students to defer payments and live in Albany affordably, but that many students abuse that and "get lazy."

28. Additionally, the Government has asked DOS witnesses whether they ever felt forced to take more Nxivm curricula and those DOS witnesses have stated "no." Witnesses have not felt that their "success in the Nxivm ranking system depended on their successfully completing DOS assignments." (Complaint at ¶ 28.)

29. Above, counsel has provided numerous examples of witness statements to law enforcement that directly contradicted the Government's theories. Yet, in the eight months since Raniere's expulsion from Mexico and subsequent arrest, the Government has still failed to provide these exculpatory statement, clearly within the purview of Brady and its progeny.[4]

---

[4] While counsel is aware of some of these witnesses' statements, this does not relieve the Government of its ethical obligations under Brady. Counsel were not present at these witness interviews and therefore do not know exactly what these witnesses told law enforcement. Moreover, while counsel know that some witnesses provided exculpatory information, we do not know how many other witnesses have provided similar information. Only the Government knows the full extent of the exculpatory information.

11

### Facts Supporting the Motion for Live Trial Testimony Via CCTV

30. There are a number of defense witnesses with relevant testimony who are Mexican natives and currently reside in Mexico. Defendant's preference and that of his counsel is that these witnesses appear in court and provide live testimony. However, as set forth below, many of these witnesses have reason to fear that the Government may arrest or detain them if they travel to the United States to testify. Counsel is currently in discussions with the Government regarding whether the Government will agree to grant safe passage to these witnesses. As of the filing of this motion, the Government has not reached a final decision.

31. Upon information and belief, racketeering acts one, two, four and six all involve Jane Doe 4. Upon information and belief, racketeering acts seven, eight and nine, Count Three, Count Four, Count Five and Count Six all involve the DOS defendants. Upon information and belief, Count Seven involves a witness who resides in Mexico.

32. Counsel has asked the Government to refrain from arresting, detaining, or threatening to arrest or detain the following categories of defense witnesses: (1) members of Jane Doe 4's family; (2) "first-line DOS masters;" and (3) DOS slaves. As noted below, these witnesses are currently unavailable to the defense because the Government has not yet confirmed whether they will offer safe passage for these witnesses. Therefore, as it stands now, the Government may arrest and/or detain these witnesses if they come to the United States to testify in this trial. Even if the witnesses were willing to enter the country without safe passage, several of these witnesses do not have a visa that will allow them to enter the United States. Accordingly, we would need the Government to grant them parole to gain their appearance.

> **A.     Jane Doe Four's Family Members Are Material Witnesses and They Are Currently Unavailable to Travel to the United States to Testify at the Trial**

33.     Racketeering Act Six alleges trafficking Jane Doe 4 for labor and services and document servitude. The Government alleges that these acts "stem from years of abuse of an illegal alien living in Clifton Park, New York who was at one time a member of Raniere's inner circle and a sexual partner of Raniere's, in part to extract work from her." (Dkt. 51, Gov't Superseding Indictment Detention Letter at 3.) The Government's theory is that "the victim was confined to a room as punishment after she developed romantic feelings for a man who was not Raniere" and that she only had "sporadic visitors, including Lauren Salzman." (Id.)

34.     As counsel has stated in previous memoranda:

> [t]he thousands of emails and handwritten notes from this adult woman show that this woman willingly stayed in her *unlocked* bedroom for a year and a half to work on many issues, such as the fact that she would constantly steal from people in the community. In addition, she lived in the house *with her family*, who bought her fresh food and prepared her meals for her. Incredibly, and what the Government conveniently leaves out, is that her mother stayed in the room next door to the woman for nearly a year, also entirely of her own volition.

(Raniere Second Motion for Bond at 12) (emphasis in original); see also Dkt. 43, Raniere Motion for Bond at 9). If allowed to travel to the United States and testify, Jane Doe 4's family members would testify in court and provide firsthand knowledge that prove the falsity of the Government's allegation and establishing that Jane Doe 4 was not "confined" in any sense of the word.

35.     Members of Jane Doe 4's family currently reside in Mexico. Given the Government's allegations related to Jane Doe 4 which implicate her family members,[5] they have

---

[5] The Government alleges that Jane Doe 4 "was told that if she left the room she would be sent to Mexico without any identification papers." (Gov't Superseding Indictment Detention Letter at 3.) When Jane Doe 4 decided to leave the room, her father drove her to Mexico. (Raniere Second Motion for Bond at 12.) While in Mexico, without identification papers, the Government alleges that Jane Doe 4 sent an email to her father asking for her papers and that he forwarded it "to Lauren

13

a legitimate fear of being arrested in the United States.[6] Therefore, we have asked the Government to provide both family members with safe passage into the country.

36. In the event that the Government does not grant these requests, counsel asks this Court to allow us to conduct live, two-way videoconferencing with the witnesses during trial.

**B. Prospective DOS Witnesses at the Trial Are Material Witnesses to the DOS Defendants and Currently Unavailable to Testify at the Trial**

37. Counsel intends to call two categories of DOS witnesses to testify at this trial: (1) "first-line DOS masters," meaning that they are directly under Raniere in the "DOS pyramid" (Ind. at ¶ 2), and "DOS slaves" to impeach the Government's witnesses. The "first-line DOS masters" are essential to the factual defense because each of them played a role in developing and implementing the principles of the sorority: the name, collateral (and what it should be), assignments, acts of care, readiness, and branding.

38. These "first-line" DOS women will testify that DOS was a goals program meant to strengthen loyalty to one another, to grow and to empower each other. Moreover, they will testify that branding was a choice and that slaves could opt out if they chose. They will also testify that they never threatened any of their slaves with release of collateral.

39. The first-line DOS women will further testify that the concept of collateral was not created in DOS as it was first used in a Nxivm entity called "Society of Protectors." Therefore, these women will testify that a majority of the women in DOS, who were allegedly "mostly from within Nxivm's ranks" (Complaint at ¶ 15), knew of and had used this as a tool in the past. "First-

---

Salzman and *other co-conspirators*." (Gov't Superseding Indictment Detention Letter at 7) (emphasis added).

[6] Additionally, Jane Doe 4's sister does not have the immigration papers necessary to enter the United States and testify at the trial.

line" DOS masters will also testify that many DOS slaves stated that they did not want to give collateral and received no negative consequences.

40. Accordingly, Raniere, Mack and Lauren Salzman have legitimate defenses, which, if credited by the jury, would negate the *mens rea* of the charges against them (sex trafficking, sex trafficking conspiracy, forced labor, wire fraud conspiracy and a RICO conspiracy predicated on state law extortion). However, in order to promote these defenses, counsel must call the "first-line" DOS masters who developed the tenets of the sorority. Upon information and belief, all but one of the unindicted first-line DOS masters reside in Mexico.

41. In addition, counsel intends to call the DOS "slaves" who reside in Mexico who can impeach the testimony of the Government's witnesses as to key aspects of the branding ceremonies. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There are several witnesses who reside in Mexico who have material information to contradict and impeach this false testimony. This is just one example. Therefore, testimony from "DOS slaves" is essential to rebut Count Three (the wire fraud conspiracy) and Count One (the RICO conspiracy).

42. As counsel has reiterated on numerous occasions, Raniere proclaims his innocence. Not only did women willingly join DOS but they also willingly gave collateral to their prospective masters *after learning about the requirements of DOS*, willingly got branded, and the ones who engaged in sexual activity with Raniere did so consensually.

43. These witnesses are located in Mexico, however, and are indisputably beyond the reach of U.S. legal process. Accordingly, the defense is unable to legally subpoena these witnesses

to appear in court. Nevertheless, these witnesses would be willing to come to the United States if they can do so safely without being arrested, detained and/or charged by the Government. Counsel has spoken to these witnesses[7] who indicate they would testify truthfully about DOS and the events surrounding its creation and existence.

44. If the Government does not grant safe passage to these witnesses, the witnesses will not come to the United States out of fear that they will be arrested. Indeed, the Government has already charged two other first-line DOS masters—Allison Mack and Lauren Salzman—under a legal theory that could similarly implicate our witnesses.

45. Accordingly, as with Jane Doe 4's family members, if the Government does not grant these witnesses safe passage to the United States to testify live in the courtroom, we request that the Court order live, two-way teleconferencing for their testimony at the trial. In the alternative, counsel asks this Court to order Rule 15 depositions in Mexico.

Dated:   November 16, 2018
         New York, New York

                                                    Respectfully submitted,

                                                    Marc Agnifilo, Esq.

---

[7] While we have indicated the names of Jane Doe 4's family members to the Government, we have not indicated the names of the "first-line" DOS masters and other DOS members that we propose to the Government. Counsel does not believe that Raniere, Mack and Lauren Salzman should be required to lay bare our proposed defense witness testimony to the Government, when we only have limited information as to who the Government witnesses are from reading search warrant affidavits, the indictment and the Complaint. Also, because several witnesses have expressed concern that if they were identified to the USAO-EDNY that they may be charged with an offense and extradited in a manner similar to Raniere's arrest, counsel requests that any further disclosures concerning the identity of DOS witnesses and the materiality of their testimony be provided to the Court *in camera*.