UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:18 Cr. 00204-NGG |
| | **ORAL ARGUMENT REQUESTED** |
| - v. - | |
| KEITH RANIERE, CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN, and NANCY SALZMAN, | |
| | **Submitted on November 16, 2018** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KEITH
RANIERE'S MOTIONS TO DISMISS THE INDICTMENT, MOTION
FOR PROMPT DISCLOSURE OF <u>BRADY</u> MATERIALS AND MOTION
<u>TO OBTAIN LIVE TESTIMONY FROM FOREIGN WITNESSES</u>**

**Table of Contents**

Preliminary Statement ................................................................................................1

The Superseding Indictment's Counts and Racketeering Acts .......................................2

Argument ....................................................................................................................10

The RICO Conspiracy Count Fails to Allege a Sufficient Enterprise or a Horizontally-Related
Pattern of Activity and Should Be Dismissed .............................................................10

The Sex Trafficking Allegations are Duplicitous and Fail to Set Forth a Factual Violation of the
Statute .......................................................................................................................14

      1.  Counts 4, 5 and 6 and Act 8A Are Duplicitous .........................................14

      2.  Counts 4, 5 and 6 and 8A Fail to Set Forth a Factual Violation .................15

The Court Should Dismiss Those Counts and Acts that Fail to Allege Each and Every Element of
the Offense and That Charge More Than One Offense in a Single Allegation ...........17

The Government Should Provide Brady Material Immediately ....................................18

      1.  FBI Reports and Notes of Statements of "DOS Witnesses" and Others Who Have
         Contradicted the Government's Theory as to the Sex Trafficking Charges ...............19

      2.  FBI Reports and Notes of Statements of "DOS Witnesses" and Others Who Have
         Contradicted the Government's Theory as to the Forced Labor Charges ..................20

      3.  Prompt Production of Brady Materials from the New York State Department of
         Health, New York State Police and New York Attorney General ..............................21

The Court Should Permit the Defense to Obtain Testimony from Foreign Witnesses Via Live
Video Conference or, in the Alternative, Take Rule 15 Depositions ............................22

Conclusion ...................................................................................................................25

i

## Table of Authorities

### Cases

United States v. Abu Ghayth, 2014 WL 144653 (S.D.N.Y. Jan. 15, 2015) ...................................24

United States v. Aracri, 968 F.2d 1512 (2d Cir. 1992).....................................................14

United States v. Baston, 818 F.3d 651 (11th Cir. 2016)....................................................15

Brady v. Maryland, 373 U.S. 83 (1963) ........................................................18, 20, 21, 22

United States v. Burden, 600 F.3d 204 (2d Cir. 2010) ......................................................13

United States v. Cohen, 260 F.3d 68 (2d Cir. 2001)........................................................24

United States v. Daidone, 471 F.3d 371 (2d Cir. 2006).....................................................13

United States v. El Gammal, Crim. No. 15-588 .........................................................24

United States v. Gigante, 166 F.3d 75 (2d. Cir. 1999) ....................................................23

United States v. Guild, Crim. No. 07-404, 2008 WL191184 (E.D. Va. Jan. 17, 2008) ...............24

United States v. Gupta, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) .......................................21

H.J. Inc. v. NW. Bell Tel. Co., 492 U.S. 229 (1989)........................................................12

United States v. JB Tax Pressional Services, Inc., No. 13-127, 2014 WL 2533773 ....................22

Kyles v. Whitley, 514 U.S. 419 (1995).....................................................................18

United States v. Lockhart, 844 F.3d 501 (5th Cir. 2016)..................................................15

United States v. Mahaffy, 693 F.3d 113 (2d Cir. 2012) ................................................18, 20

United States v. Marcus, 628 F.3d 36 (2d Cir. 2010) ....................................................16

Mendez v. Artuz, 303 F.3d 411 (2d Cir. 2002).............................................................20

United States v. Mostafa, 14 F. Supp. 3d 515 (S.D.N.Y. 2014).........................................23

Noble v. Harvey Weinstein, 17 Civ. 9260 (RWS).........................................................16

Reich v. Lopez, 858 F.3d 55 (2d Cir. 2017) ...........................................................12, 13

Russell v. United States, 369 U.S. 749 (1962)...............................................................17

United States v. Rivas, 377 F.3d 195 (2d Cir. 2004).....................................................18, 20

ii

United States v. Smith, Crim. No. 09-100, 2010 WL 5211498 (W.D.N.C. Dec. 16, 2010)..........24

Strickler v. Green, 527 U.S. 263, 281 (1999) ................................................................18

United States v. Whiting, 308 F.2d 537 (2d Cir. 1962)...................................................24

Washington v. Texas, 388 U.S. 14 (1967)......................................................................23

Youngblood v. West Virginia, 547 U.S. 867 (2006) .......................................................20

## PRELIMINARY STATEMENT

While the RICO statute is admittedly broad, it is not without meaningful limits in its application. By stretching RICO's enterprise and pattern elements to encompass the activities of Nxivm and DOS, the Government brings these concepts to their breaking point. Nxivm is a wonderful humanitarian organization. If there was a polar-opposite of an organized crime family, Nxivm would be it. Dedicated to achieving peace on a global scale, Nxivm members have sought to end the violence in Mexico, have introduced tools useful to people with difficult conditions, such as Tourette's syndrome, have pioneered multi-linguistic schools for young children, who would become proficient in multiple languages and later multi-cultural adults, and have developed approaches to help people lead happier, more productive, more enriched lives.

In 2015, Keith Raniere inspired the creation of DOS. Unlike Nxivm which seeks to reach the humanity in each person, DOS is not for everyone. DOS addresses inner emotional struggle, particularly in women. Admittedly, inner struggle is not uncommon. Henry David Thoreau famously said, "the mass of men lead lives of quiet desperation." But, effective ways of bringing peace to those who struggle is not as common and certainly not as easy. The United States Department of Health and Human Resources characterizes opioid use as a national epidemic.[1] In 2017, the United States hit the $200,000,000 mark for the first time in the total yearly expenditure for mental health services. DOS is free. DOS is also drug-free. Rather, it relies on the most basic ingredient of achieving inner peace: being supported by people who you love and who are committed to you. It is hard to imagine that a concept as beyond reproach as commitment would be so controversial or would inspire a sweeping Sex Trafficking RICO case. However, the

---

[1] The Government estimates that over 130 people die per day in the United States from opioid overdoses; there are currently over 14,000 substance-abuse facilities in the United States to address the opioid crisis.

practices of DOS that have ignited the firestorm of press as well as the ire of the Justice Department are manifestations of each member's commitment to the group.

As part of its inexplicable efforts to destroy these groups and imprison their members, the Department of Justice has also brought sex trafficking charges, carrying penalties of life in prison, and minimum penalties of fifteen years in prison. Undeterred by the fact that there was no commercial sex or sex under pain of fraud, force or coercion, the Government asks this court to take an unprecedented view of these concepts.

The Court should decline the Government's invitation to read the RICO statute and the Sex Trafficking statute with unprecedented breadth. The Court should dismiss those charges and others for the reasons stated. In addition, we ask that the Court compel the Government to provide exculpatory material in its possession and to allow defense witnesses located in Mexico who face potential arrest in the United States to testify via live video conferencing.[2]

## THE SUPERSEDING INDICTMENT'S COUNTS
## AND RACKETEERING ACTS

Keith Raniere has been charged in a seven-count Superseding Indictment (hereinafter "Indictment"), count one of which charges Raniere and his five co-defendants with Racketeering Conspiracy, consisting of ten predicate acts. (Ind. at ¶¶ 14-34.)

### A.      Count One – Racketeering Conspiracy

The Indictment charges a conspiracy to violate the substantive RICO statute of Section 1962(c) lasting from 2003 until March of 2018. ((Ind. at ¶ 15.) While the Indictment refers to two

---

[2] In addition to the arguments set forth in this memorandum, defendant Raniere adopts the arguments in the memoranda of his co-counsel.  Specifically, he adopts the arguments in the memorandum of Clare Bronfman, Kathy Russell and Nancy Salzman to dismiss the Racketeering Conspiracy Count, the arguments in the memorandum of Alison Mack to dismiss the counts and acts related to sex trafficking, and the arguments in the memorandum of Lauren Salzman to dismiss racketeering act 7.

organizations, Nxivm and DOS, neither is charged as the enterprise. (Ind. at ¶¶ 1,7.) Rather, the Government charges that Raniere led Nxivm and DOS and that he did so by relying on certain persons, sometimes called his "inner circle." ((Ind. at ¶¶ 1-7.) Raniere and this purported "inner circle" on which he allegedly relied was charged as an association in fact enterprise. (Ind. at ¶ 3.) The Indictment alleges that Raniere and the "inner circle" participated in the enterprise through seven listed methods and means. (Ind. at ¶ 6.) As set forth below, however, the listed methods and means point to two divergent groups, Nxivm and DOS, rather than one cogent one. Additionally, as stated below, for a majority of the Acts and crimes, Raniere has not been put on notice of which crime he was intending to violate, and it is unclear which crime the Grand Jury voted.[3]

   1. <u>Act One</u>

   Act One is sub-predicated into two acts: (1A) Conspiracy to Commit Identity Theft against Raniere and Kathy Russell taking place in 2004; and (1B) Conspiracy to Unlawfully Possess Identification Documents against Raniere and Russell in December 2004. (Ind. at ¶¶ 17-18.)

   Sub-predicated act 1A specifically charges that Raniere and Russell conspired to unlawfully transfer or use a "means of identification" of Jane Doe 1 to commit another crime, specifically the crime of bringing in, transporting and harboring an alien, in violation of 8 U.S.C §1324(a)(1)(A). However, Section 1324(a)(1)(A) sets out six different crimes, none of which are specified in act 1A. Accordingly, Raniere has not been put on notice of which crime under Section 1324(a)(1)(A) he was intending to commit.  In addition, it is unclear what crime was voted by the Grand Jury as part of this allegation. Therefore, as set forth in III., Act 1A should be dismissed.

---

[3] We rely on and join in co-defendants' Bronfman, Russell and Nancy Salzman's Motion to Dismiss the Indictment addressing this, but expand briefly on this issue in this Memorandum of Law.

Sub-predicated act 1B charges that Raniere and Russell conspired to unlawfully possess a Sheriff's identification card with the intent to defraud the United States.

        2.    <u>Act Two</u>

Act Two is sub-predicated into three acts. (Ind. at ¶¶ 19-21.)

Sub-predicated Act 2A charges Conspiracy to Commit Identity Theft against Raniere, Clare Bronfman, Kathy Russell and Nancy Salzman between August 2005 and November 2008. Specifically, Act 2A charges that these four defendants conspired to transfer, possess and use a means of identification of another person to commit one or more other violations of federal law. However, the Indictment then provides that the other federal law the defendants intended to violate was Intercepting Electronic Communications, in violation of 18 U.S.C. § 2511 and Unlawful Access to Stored Communications, in violation of 18 U.S.C. § 2701. As pled, this allegation either requires the Government to prove that the four defendants conspired to possess the identification information to violate both Section 2511 and 2701, or the Government is charging them in the disjunctive. If the latter, the defendant is not on notice as to what specific statute he is charged with violating because the Government has instead charged that he intended to violate one of two statutes. Moreover, Section 2511 contains several individual crimes listed in its sub-paragraphs. Because the Government has not set forth the subsection of Section 2511 pertaining to this violation, the defendant is not on notice as to what crime he is charged with violating. Moreover, it is unclear what, if any, subsection the Grand Jury voted as part of this allegation. Accordingly, as set forth in III., Act 2A should be dismissed.

Sub-predicated Act 2B charges Raniere and Russell with possessing the identity information of John Doe 1 with the intent to commit the crimes of Intercepting Wire and Electronic

Communication and Unlawfully Accessing Stored Communication.[4] This allegation suffers the same problems with notice and in regard to the Grand Jury vote as Act 2A. Accordingly, as set forth in III., Act 2B should be dismissed.

Sub-predicated Act 2C charges Raniere and Bronfman with possessing the identity information of John Doe 2 with the intent to commit the crimes of Intercepting Wire and Electronic Communication and Unlawfully Accessing Stored Communication, an allegation suffering from the same problems as above. Accordingly, as set forth in III., Act 2C should be dismissed.

3.     Act Three

Act Three charges Raniere and Nancy Salzman with Conspiracy to Alter Records For Use in an Official Proceeding, specifically the case NXIVM Corp. et al. v. Ross Institute et al. between February 2008 and March 2018. (Ind. at ¶ 22.)

4.     Act Four

Act Four charges Raniere with Conspiracy to Possess Identification Information of Jane Doe 2 with the intent to commit the crimes of Intercepting Wire and Electronic Communication and Unlawfully Accessing Stored Communication. (Ind. at ¶ 23.) This allegation suffers from the same problems as Acts 2A, 2B and 2C above, specifically that the statute fails to allege what other crime Raniere was intending to commit in order to violate the Identity Theft Conspiracy statute of Section 1028(f). For the reasons set forth in III, it should be dismissed.

---

[4] The Government referred to this crime as "Unlawfully Accessing Wire and Electronic Communication" in violation of 18 U.S.C. § 2701 throughout Act 2. However, the name of the crime is Unlawful Access to Stored Communication.

5.      Act Six

Act Six is sub-predicated into two acts: (6A) Trafficking of Jane Doe 4 for Labor and Services against Raniere and Lauren Salzman between March 2010 and April 2012; and (6B) Document servitude of Jane Doe 4 between March 2010 and April 2012. (Ind. at ¶¶ 26-27.)

Act 6A charges that Raniere and Lauren Salzman did "recruit, harbor, transport, provide and obtain…Jane Doe 4 for labor and services in violation of Title 18, United States Code, Chapter 77, to wit: (1) document servitude, in violation of Title 18, United States Code, Section 1592; and (2) forced labor, in violation of…Section 1589, all in violation of…Section 1590 and 2." However, while the Indictment refers to violations of Sections 1592 and 1589, it does not state how either of these statutes were violated, nor does the allegation contain the statutory language of either statute, nor the elements of the offense being charged.

Section 1592 provides that "(a) whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government document identification document, of another person – (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591 or 1594(a); (2) with intent to violation section 1581, 1583, 1584, 1589, 1590 or 1591; or (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons…."

Section 1589 provides that "(a) whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means – (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person;

6

(3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished."

Finally, Section 1590 provides "(a) whoever knowingly recruits, harbors, transports, provides or obtains by any means, any person for labor or services in violation of this chapter," shall be punished."

While the Government did set forth the statutory elements for a violation of Section 1590, it did not enumerate or set forth the statutory elements of the other violation of this chapter, Chapter 77, which it is alleging as part of this offense. As Section 1590 plainly states, it is illegal to harbor a person for labor or services only if done in violation of Chapter 77. Therefore, the Indictment must set forth what specific violation of Chapter 77 gives rise to this offense. It is insufficient to allege merely that the defendant violated Sections 1589 and 1592. This is because each statute can be violated in multiple ways, and the Indictment fails to indicate what violation of which statute is being charged.  Because the Indictment is silent as to the essential elements being charged as part of this allegation, the defendant is not on notice of what crime he is being charged with committing. Moreover, it is unclear what specific crime the Grand Jury voted. Accordingly, as set forth in III., Act 6A should be dismissed.

Act 6B charges Raniere and Lauren Salzman with Document Servitude of Jane Doe 4, and alleges that the defendants "did knowingly and intentionally conceal, remove, confiscate and possess one or more immigration documents and actual government identification documents of a person, to wit: Jane Doe 4, in the course of, and with intent to commit, one or more violations of … Sections 1589 and 1590, all in violation of Sections 1592 and 2". This act suffers from the same

legal infirmity as Act 6A and should be dismissed. Accordingly, as set forth in III, Act 6B should be dismissed.

6.   Act Seven

Act Seven charges Raniere, Allison Mack and Lauren Salzman with Extortion under New York law between September 2015 and June 2017. This Act is addressed in the memorandum of Lauren Salzman. (Ind. at ¶ 28.)

7.   Act Eight

Act Eight is sub-predicated into three acts; (8A) Sex Trafficking of Jane Doe 5 against Raniere and Mack between February 2016 and June 2017; (8B) Forced Labor of Jane Doe 5 against Raniere and Mack between February 2016 and June 2017; (8C) New York State Extortion of Jane Doe 5 between February 2016 and June 2017 against Mack. (Ind. at ¶ 29.)

Sub-predicated Act 8A, charging Sex Trafficking against Raniere and Mack, is addressed in the Ms. Mack's Motion to Dismiss.

Sub-predicated Act 8B, charging Forced Labor against Raniere and Mack, is addressed in Ms. Mack's Motion to Dismiss.

8.   Act Nine

Act Nine is sub-predicated into two acts: (9A) Forced Labor of Jane Doe 6 charged against Lauren Salzman between February 2017 and June 2017; and (9B) New York State Extortion of Jane Doe 6 against Lauren Salzman. (Ind. at ¶¶ 32-33.) We rely on co-defendant Lauren Salzman's Motion to Dismiss.

9.   Act Ten

Act Ten charges Raniere and Bronfman with Conspiracy to Commit Identity Theft with the intent to commit another crime, which is listed as a violation of Title 26, U.S.C., Section 7201,

the title of which is the attempt to evade or defeat taxes. (Ind. at ¶ 34.) However, the Indictment fails to plead the essential elements of the charged tax evasion offense. We rely on co-defendant Bronfman's motion to dismiss this Count.

### B. Count Two

Count Two charges Forced Labor Conspiracy against Raniere, Mack and Lauren Salzman between September 2015 and June 2017.

### C. Count Three

Count Three charges Raniere, Mack and Lauren Salzman with Wire Fraud Conspiracy between September 2015 and June 2017. (Ind. at ¶ 36.)

### D. Count Four

Count Four charges Raniere and Mack with Sex Trafficking Conspiracy between February 2016 and June 2017. (Ind. at ¶ 37.) We rely on co-defendant Mack's motion to dismiss this Count.

### E. Count Five

Count Five charges Raniere and Mack with Sex Trafficking of Jane Doe 5 between February 2016 and June 2017. (Ind. at ¶ 38.) We rely on co-defendant Mack's motion to dismiss this Count.

### F. Count Six

Count Six charges Raniere and Mack with Attempted Sex Trafficking of Jane Doe 8 between February 2016 and June 2017. (Ind. at ¶ 39.) We rely on co-defendant Mack's motion to dismiss this Count.

### G.     Count Seven

Count Seven charges Raniere and Bronfman with Conspiracy to Commit Identity Theft against Jane Doe 7 between November 2016 and March 2018. We rely on co-defendant Bronfman's motion to dismiss this Count.

## ARGUMENT

## I.     The RICO Conspiracy Count Fails to Allege a Horizontally-Related Pattern of Activity and Should Be Dismissed[5]

Everything, even the breadth of a RICO enterprise and its pattern of racketeering activity, has a limit. While the law has allowed a RICO enterprise to take virtually any form and to be almost endlessly broad, it does not allow its pattern of racketeering activity to be random, *ad hoc* or internally-unrelated. The Government has attempted to formulate an enterprise from two disparate organizations, Nxivm and DOS. However, other than Keith Raniere providing the intellectual content for each, the two entities could hardly be more different. Nxivm is a professional business providing educational tools, coaching and training to corporations, their executives and others. It maintains corporate offices, generates a large amount of written material, develops curriculum for different courses and has executives. The purpose of Nxivm is to provide a valuable service and make money.

DOS is a secret association of women. It has no leader. It has no office. It owns no property. It generates, possesses and spends no money. It creates no product. To the extent that it renders a service, this service is nothing more than the support, love and trust created and maintained by a group of women who have made a lifetime commitment to each other.

---

[5] Defendant Raniere joins the arguments advanced by co-defendants Bronfman, Russell and Nancy Salzman to dismiss the RICO Count on the grounds advanced in their Memorandum of Law.

The central differences between Nxivm and DOS are apparent from the Indictment's "means and methods" paragraph (Ind. ¶ 6), in that each charged means and method, regardless of how wrong or distorted it might be, appears to be related either to DOS or to Nxivm, but never to both.  Paragraph 6(a) sets forth mere legal conclusions and provides no factual description of the charged enterprise. Paragraph 6(b) charges that the enterprise requires "absolute commitment" to Raniere. This is a perversion of a DOS principal and has no relation to the business of Nxivm. Paragraph 6(c) charges that the enterprise "induced shame and guilt in order to influence and control members and associates of the Enterprise." This is the Government elevating the private regrets and misgivings of one or two people to the stature of allegations in a racketeering indictment. In any event, it has no plausible connection to Nxivm or, for that matter, to DOS. Paragraph 6(d) charges that the enterprise obtained "sensitive information about members and associates of the Enterprise in order to maintain control over them." This seems to relate to the Government's misunderstanding of the concept of collateral in DOS, and has no relation to Nxivm. Paragraph 6(e) charges that the enterprise was involved in "recruiting and grooming sexual partners for Raniere." Again, this is a distortion and blatantly false, but it can only be related to DOS. Paragraph 6(f) charges that the enterprise was involved in "using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of Raniere." As set forth in prior filings, the Government is referring to the fact that several people have committed crimes and civil torts against Nxivm and have been sued or the subject of appropriate legal action. Nonetheless, this can be related only to Nxivm as DOS has no money and no ability to sue anyone. Paragraph 6(g) charges that the enterprise is involved in "encouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise." This allegation, wrong as it is, can

11

be related only to Nxivm. Based on the Government's own charged means and methods, therefore, the fundamental differences between Nxivm and DOS become apparent.

The Government's theory fares no better when the ten acts of racketeering are examined for their inter-relationship. As set forth in the memorandum of Bronfman, Russell and Nancy Salzman, the DOS defendants and the non-DOS defendants are charged with very different conduct, further demonstrating the lack of relationship across the charged racketeering acts.

The issue, therefore, is this: given the differences between Nxivm and DOS, and the unique qualities of each, especially the fact that DOS is intended to be secret from everyone, including from those in Nxivm, whether the mere fact that Raniere created both entities permits the Government to charge a single, cogent enterprise that would encompass the diverse activity of both groups in a single pattern of racketeering. It is well-known that a RICO pattern of racketeering activity requires that the racketeering acts are interrelated with at least a threat of continuity. H.J. Inc. v. NW. Bell Tel. Co., 492 U.S. 229 (1989). In determining whether the racketeering acts are interrelated, courts have developed two further concepts: horizontal relatedness and vertical relatedness. Reich v. Lopez, 858 F.3d 55, 59 (2d Cir. 2017). To be horizontally related, acts must "have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240. Even if acts are not horizontally related, they can, under certain circumstances, constitute a pattern if they are vertically related. By the term vertically related, the law means the interconnection between the racketeering activity and the charged enterprise. Therefore, vertical relatedness is satisfied where "the defendant was enabled to commit the offense solely because of his position in the enterprise" or due to the defendant's "involvement in or control over the enterprise's affairs,

or because the offense related to the activities of the enterprise." Reich, 858 F.3d at 61 (quoting United States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010).

The primary way of satisfying RICO's relatedness requirement is by reference to horizontal relatedness. In other words, the requirement is that the acts themselves must be related to each other. However, the law allows the Government to show relatedness through the alternative method of vertical relatedness, specifically that the acts are related to each other solely because each is vertically related to the enterprise, but only under certain circumstances, which are not present here. Specifically, the law recognizes that in regard to those enterprises such as a La Cosa Nostra organization, where the enterprise's very existence depends on criminal conduct, RICO's relatedness requirement can be satisfied by vertical relatedness. United States v. Daidone, 471 F.3d 371, 375 (2d Cir. 2006). However, where, as here, the charged enterprise and its members comprise a legitimate, non-criminal association which, as alleged, has engaged in criminal activity during the course of its otherwise law-abiding business endeavors, RICO's relatedness requirement cannot be predicated on vertical relatedness alone. Reich v. Lopez, 858 F.3d at 61. Rather, with non-criminal enterprises, RICO requires that the acts are horizontally related. Id.

As revealed by the distinctions between what are the allegedly DOS-related acts, such as sex trafficking, extortion and forced labor, and the non-DOS acts, such as identity theft, altering records in a court proceeding, and inducing the entry of aliens, as well as the differences in timing of these acts and of personnel, the ten racketeering acts are not horizontally related. Moreover, because the charged enterprise is legitimate, the Government cannot resort to vertical relatedness in satisfying the relatedness requirement. Therefore, it is of no moment that Raniere may have been the progenitor of both Nxivm and DOS, or that Raniere may have been able to commit both non-DOS acts and DOS-related acts due to his connection to both groups. Accordingly, the

13

Government has failed to allege a pattern of racketeering because the Indictment fails to adequately factually allege that the acts are related – horizontally related – to each other.

## II.    The Sex Trafficking Allegations Are Duplicitous and Fail to Set Forth a Factual Violation of the Statute[6]

### 1.    Counts 4, 5 and 6 and Act 8A Are Duplicitous

The crime of Sex Trafficking can be committed in either of two ways. First, under 1591(a)(1), as relevant here, a person commits the offense when he "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes or solicits by any means a person"… "knowing …that means of force, threats of force, fraud, coercion… or any combination…will be used to cause the person to engage in a commercial sex act."

Second, under 1591(a)(2), a person commits the offense when he "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in paragraph (1)" …"knowing …that means of force, threats of force, fraud, coercion… or any combination…will be used to cause the person to engage in a commercial sex act."

In Counts Four (Sex Trafficking Conspiracy), Five (Sex Trafficking) and Six (Attempted Sex Trafficking), as well as Racketeering Act 8A (Sex Trafficking), the Indictment charges both subsections of Section 1591(a) in a single Count or Act.  To the extent that subsections (a)(1) and (a)(2) each set forth distinct crimes with different elements that would violate Section 1591, Counts Four, Five and Six, and Racketeering Act 8A are duplicitous. Duplicity is a pleading defect in which a count of an indictment, or an act in a RICO indictment, joins two or more distinct crimes. United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992). Because the Indictment joins two

---

[6] Defendant joins the arguments made by co-defendant Alison Mack to dismiss the Sex Trafficking Acts and Counts.

different crimes under Section 1591 in the same Counts and Racketeering Act, Counts 4, 5 and 6, as well as Act 8A are duplicitous and should be either dismissed or corrected prior to trial.

> 2.    Counts 4, 5 and 6 and Act 8A Fail to Set Forth a Factual Violation

There are at least two self-evident problems with the Government's allegations concerning sex trafficking: the lack of any allegation or proof of a commercial sex act, and the lack of any allegation or proof of force, fraud or coercion being used on anyone to have sex of any sort, much less to engage in a commercial sex act. The Government has brutally misused a statute reserved for truly despicable conduct[7] by either ignoring outright or fancifully interpreting its key terms.

The Government's theory of commercial sex is that women had sex in exchange for an increase in their social status in the eyes of those around them, including Raniere:

> Those DOS masters received a financial benefit in the form of continued status and participation in DOS, i.e. the masters continued to receive acts of care and the work of the equivalent full time employee. In addition, by requiring DOS slaves to have sex with Raniere, DOS masters also received benefits from Raniere in the form of increased status and financial opportunities within Nxivm more broadly. Raniere also often discussed or promised career opportunities to the DOS slaves who had sex with him and the DOS slaves with whom he expressed an interest in having sex.

(Complaint at ¶ 24.)

---

[7] Two cases highlight the sort of criminal activity sought to be addressed by the Sex Trafficking statute. In United States v. Baston, 818 F.3d 651, 657 (11th Cir. 2016), the defendant, Damion Baston, who also went by "Dracula," studied to be a pimp. He recruited women who had been sexually abused as children and once they started working for him, he repeatedly "punched, slapped, choked and threatened to kill" them unless they had sex for money, the amount of which he determined, and provided him with the lion's share of their profits. When women in Baston's employ got out of line, he bit their faces until they bled, heated kitchen knives over a flame, threatening to slit their throats, and told them he would chop them up and bury them. Id. In United States v. Lockhart, 844 F.3d 501, 507 (5th Cir. 2016), the defendant, Deion Lockhart, a gang member with the Folk Nation Gangster Disciples, and several fellow gang members, made the business decision one day to prostitute underage girls rather than continuing to deal narcotics. If a girl lacked enthusiasm over her job description, the gang beat her in the presence of the other girls. This maintained discipline among the underage prostitutes and ensured the steady stream of gang income.

Strain as they might to conjure up commercial sex, the Government just isn't close. The Indictment pleads no facts of a commercial nature. There is no allegation, nor could there truthfully be, that any person received money, property, gifts or anything of economic value in exchange for having sex with anyone. Conversely, there is no allegation, nor could there truthfully be, that Raniere benefitted in any way economically from a person having sex with anyone. By alleging in the complaint that women gained social status by allegedly having sexual relations with Raniere, the Government is trying to conflate commercial benefit with social benefit, and the two are not remotely similar. The statute does not criminalize sexual relations that result in a change in one's social standing. It criminalizes people being compelled by force, fraud or coercion to engage in sex for money, or if not money, something else of clear economic value. For the statute to retain a core of meaning, and not over-criminalize sexual relations and social conduct, the commercial element of the statute must remain a rigorous element. So too must the element of force, fraud or coercion as the cause of the commercial sex proscribed by the statute.

The decisions in this area interpret the term "commercial" to mean money or other things of genuine commercial value. United States v. Marcus, 628 F.3d 36 (2d Cir. 2010)(defendant sold photographs of his BDSM partner on line for a profit). As set forth more fully in Allison Mack's memorandum, there are no criminal cases that have sustained the Government's theory of commercial sex, as set forth here.

Moreover, civil actions brought under the "remedial provision" of Section 1595 are of no relevance to an examination of the sex trafficking statute charged as a criminal offense. As the recent civil decision in Noble v. Harvey Weinstein, 17 Civ. 9260 (RWS) made clear, "the remedial provision at issue, Section 1595, which permits civil actions for damages under Section 1591, requires broad interpretation." As the Court further noted, "Section 1595 amended the TVPA for

the remedial purpose of 'enhancing…protections of trafficking victims.'" 18 U.S.C. § 1595.  In contrast to the civil, remedial provisions of Section 1595, the criminal iteration of the statute carries a fifteen-year statutory minimum sentence and is, therefore, to be appropriately narrowly construed.

Even aside from the distinction between the civil and criminal applications of the statute, the Weinstein case is distinct because the defendant was allegedly buying sex with the clear representation that he would make the women a famous and wealthy actress. In contrast to the allegations in the instant case, the sexual encounter in Weinstein was allegedly procured through the promise of commercial success. Because the Government has failed to allege facts showing commercial sex, the Sex Trafficking Counts and Acts should be dismissed.

In addition, the Indictment fails to allege facts showing that a commercial sex act was caused by "means of force, threats of force, fraud or coercion" as required by Section 1591.  On this point, Raniere incorporates the arguments made by co-defendant Allison Mack in her motion to dismiss the Sex Trafficking allegations.

### III.    The Court Should Dismiss Those Counts and Acts That Fail to Allege Each and Every Element of the Offense and That Charge More Than One Offense in a Single Allegation

The Sixth Amendment requires that Indictments give criminal defendants notice of the charges against them; in addition, the Fifth Amendment requires prosecutors to try defendants only based on crimes voted by a Grand Jury. Russell v. United States, 369 U.S. 749 (1962).[8] The following acts and counts against Raniere fail by these standards, and should be dismissed: Act 1A, 2A, 2B, 2C, 4, 6A, 6B, and 10; Count 7.

---

[8] The argument that the Indictment fails to provide sufficient notice or identify the charge voted by the Grand Jury is set forth in the memorandum of Bronfman, Russell and Nancy Salzman, and we incorporate those arguments here.

**IV.     The Government Should Provide <u>Brady</u> Material Immediately**

Mr. Raniere moves for the immediate production of exculpatory material pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). We have made a written, specific <u>Brady</u> demand of the Government in a letter dated July 18, 2018. (<u>See</u> Agnifilo Aff., Ex. 1.) In response, the Government indicated that it was aware of its obligation and has not since provided any <u>Brady</u> material. (<u>See</u> Agnifilo Aff., Ex. 3.) While we do not know the specific information in the Government's possession, we have a strong reason to believe that several witnesses have provided the Government with material, exculpatory information as to the most serious charges in this Indictment. In addition, we believe the Government has spoken with numerous women, known and unknown, who have repeatedly debunked the Government's core theory on DOS. (<u>See</u> Agnifilo Aff. at ¶¶ 4,5, 13-26.) We demand all such material immediately.

Under <u>Brady</u>, the government has a "broad duty" to disclose material information favorable to the defense in a timely manner prior to trial. <u>Strickler v. Green</u>, 527 U.S. 263, 281 (1999). <u>Brady</u> imposes an obligation on the prosecutors to provide any potentially exculpatory information that may directly, or indirectly, rebut the prosecution's case "to assist the defense in making its case," <u>Bagley</u>, 473 U.S. 667, 675 & n.6, even if that information also contains portions that are consistent with the government's theory. <u>United States v. Mahaffy</u>, 693 F.3d 113, 130-33 (2d Cir. 2012). In <u>United States v. Rivas</u>, 377 F.3d 195, 199-200 (2d Cir. 2004), the Second Circuit vacated the conviction where the government failed to disclose a statement by a testifying witness that, though in some sense incriminating, also exculpated the defendant because it supported the defendant's theory of the case. "The prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-38 (1995).

1.    <u>FBI Reports and Notes of Statements of "DOS Witnesses" and Others Who</u>
<u>Have Contradicted the Government's Theory as to the Sex Trafficking</u>
<u>Charges</u>

The heart of the government's allegations against Raniere and Mack are that (1) slaves were recruited to join DOS under the false pretense of joining a women-only group, (2) after providing initial collateral, slaves had to provide additional collateral because they feared it they did not, their collateral would be used against them, (3) only the slaves directly under Mr. Raniere knew of his involvement, (4) if the slaves left DOS, their collateral could be released, (5) the slaves were groomed for sex and given an assignment to have sex with Raniere, and (6) they were encouraged to take further Nxivm courses which would catapult them into debt.

As noted in counsel's attached affirmation, the defense has reason to believe that witnesses have provided information to the government that directly contradict the government's allegations including, but not limited to, information that establish the following: (Agnifilo Aff. at ¶ 4.)

- Sexual activity did not play a role in DOS and sexual activity with Raniere was not a requirement of the sorority (<u>Id.</u> at ¶ 21);

- There was no requirement or expectation that sexual activity would take place even if women were tasked to "seduce" Mr. Raniere (<u>Id.</u> at ¶ 22);

- DOS members did not believe their collateral would be released (<u>Id.</u> at ¶ 20);

- DOS members never released or threatened to release collateral (<u>Id.</u> at ¶ 38);

- DOS members knew of Raniere's involvement with the sorority at time of joining, or if they did not and later found out, that did not materially affect their experience in DOS (<u>Id.</u> at ¶ 12,13).

Moreover, as noted in our previous filings, women joined DOS willingly and anyone who had sexual relations with Mr. Raniere did so consensually:

there is no evidence of force, threats of force, fraud, coercion or any combination. None of the women have stated, nor could truthfully state, that Raniere had sex with them against their will. This is not a case of non-consensual sexual conduct. Rather, the Government seems to be manufacturing a case where women feel

19

> compelled to remain in DOS because they voluntarily gave collateral when they joined. But, this is in essence a contract. Also, there is no evidence that the collateral has any connection whatsoever to sexual conduct. Instead, the collateral relates solely to that person's commitment to DOS. Therefore, there will be no evidence that there was ever any sexual conduct based on force, fraud or coercion.

(Dkt. No. 43, Raniere Motion for Bond at 21; see also Agnifilo Aff. at ¶ 42.) The government is in possession of statements supporting Mr. Raniere's theory—which we have stated on the record, in court filings and otherwise—and should disclose this evidence immediately. These statements are material to Mr. Raniere's defense and necessary to conduct additional investigation and locating potential defense witnesses.

All of these witnesses have spoken to law enforcement and have provided statements or information directly contradicted the government's sex trafficking theory against Mr. Raniere and Ms. Mack. As the Supreme Court has determined, information that "squarely contradict[s] the [government's] account of the incidents" is Brady. See Youngblood v. West Virginia, 547 U.S. 867, 868-70 (2006); Mendez v. Artuz, 303 F.3d 411, 413-14 (2d Cir. 2002) ("[I]nformation is exculpatory and thus favorable to the defense for Brady purposes when it directly contradicts the motive theory testified to by prosecution witnesses." (internal citation omitted)); see also Cone v. Bell, 556 U.S. 449, 470 n.16 (2009) ("evidence . . . consistent with" defendant's defense is Brady); Mahaffy, 693 F.3d at 130 (same); Rivas, 377 F.3d at 199 (same).

2. FBI Reports and Notes of Statements of "DOS Witnesses" and Others Who Have Contradicted the Government's Theory as to the Forced Labor Charges

Central to the government's theory of forced labor is the allegation that DOS members performed "acts of care" that amounted to the work of at least one full-time employee. (Complaint at ¶ 20.) Work included bringing masters coffee, "buying them groceries, making them lunch, carrying their luggage, cleaning their houses and retrieving lost items for them." (Id. at 20.) The

20

government alleges that members believed if they repeatedly failed at acts of care they risked release of their collateral. (Complaint at ¶ 21.)

The defense has reason to believe that witnesses have told the government that they were never threatened with release of their collateral if they did not perform acts of care and that, therefore, they never feared their collateral would be released for non-compliance. Moreover, some witnesses have told the government that they chose to perform these acts of care because they wanted to become a kinder person and more thoughtful person, not because they were forced to do so by the defendants or co-conspirators. These witness statements are <u>Brady</u> and should be turned over immediately.

>   3.   <u>Prompt Production of Brady Materials from the New York State Department of Health, New York State Police and New York Attorney General</u>

Where the government conducts a "joint investigation" with other governmental agencies, "courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for <u>Brady</u> evidence." <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (citing <u>United States v. Upton</u>, 856 F. Supp. 727, 749–50 (E.D.N.Y. 1994)). As Judge Rakoff wrote in <u>Gupta</u>, "[t]hat separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all." <u>Id.</u> at 492.

Here, upon information and belief, the FBI and the EDNY have jointly investigated this case with the New York Attorney General, New York State Police and the Department of Health. Therefore, we request all <u>Brady</u> materials from all other offices in this joint investigation. It is incumbent on the government to seek out and obtain any <u>Brady</u> materials in the possession of

either agency. See United States v. JB Tax Pressional Services, Inc., No. 13-127, 2014 WL 2533773, at *2-3 (E.D. La. Jun. 5, 2014) (requiring "assurance that the government has disclosed all such materials in its possession, custody or control," including from other government agencies). Accordingly, if either the New York State Police or Department of Health have Brady material in their possession, it should be turned over to the defense.

## V. The Court Should Permit the Defense to Obtain Testimony From Foreign Witnesses Via Live Video Conference or, in the Alternative, Take Rule 15 Depositions

Defendant Keith Raniere asks for an order allowing him to obtain trial testimony of witnesses located in Mexico to effectively present his defense at trial. This case is unusual because many of the witnesses who have first-hand personal knowledge of the alleged fifteen-year conspiracy are Mexican natives residing in Mexico. Defendants are currently in discussions with the government as to whether the Government will grant safe passage to these witnesses so that they can testify live before the jury. However, if the Government refuses our request for safe passage, we ask this Court to allow live video conference testimony during trial.

The defense has spoken to several foreign witnesses who could provide testimony that would tend to exculpate Raniere, Mack and Lauren Salzman of the DOS-related charges. The defense has commitments from several potential defense witnesses that they are want to testify on behalf of Raniere, but fear arrest in the United States. Many of these witnesses are either considered victims or co-conspirators of charged offenses by the government. As a result, their testimony is material to the trial and to Raniere's defense.

These unusual circumstances call for judicial intervention. While we will continue to negotiate with the government about granting safe passage to defense witnesses, we respectfully

ask the Court to permit any foreign witness enumerated in the three categories above to be given the ability to testify during Raniere's trial via live video conferencing.

It is undisputed that defendants have a fundamental due process right to present witnesses on their behalf. The Supreme Court has recognized this "right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." Washington v. Texas, 388 U.S. 14, 19 (1967). The Court continued, "an accused . . . has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." Id.

It is long-standing law in the Second Circuit that in circumstances in which an individual with material information is unavailable to physically appear as an in-person witness, live trial testimony of that witness, via closed-circuit television ("CCTV") is permissible. United States v. Gigante, 166 F.3d 75, 81 (2d. Cir. 1999). In Gigante, the Second Circuit upheld the introduction of testimony "via two-way, closed-circuit television testimony from a remote location," 166 F.3d at 79, over the defendant's Confrontation Clause challenge. There, the witness was unavailable to testify due to health reasons and instead testified via CCTV. Id. at 80. During trial, the witness was visible to the jury, the defendant, the Judge and defense counsel on video screens. Id. The Court found that while "closed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness…upon a finding of exceptional circumstances,…a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Id.

Courts in this Circuit have followed Gigante as precedent to allow the prosecution to obtain testimony from foreign witnesses via CCTV, despite that it may implicate the defendants' Confrontation rights, (See, e.g., United States v. Mostafa, 14 F. Supp. 3d 515 (S.D.N.Y. 2014)

23

(Forrest, J.); United States v. Abu Ghayth, 2014 WL 144653 (S.D.N.Y. Jan. 15, 2015) (Kaplan, J.)), a concern not present here because it is the defense requesting the procedure. In cases like this one, where the government has no corresponding constitutional interest in requiring in-court testimony, district courts should be more amenable to the procedure than when it is requested by the Government, which has no confrontation rights.  In fact, court have also allowed such defense requests. (See, e.g., United States v. El Gammal Crim. No. 15-588 at Dkt. 146 (allowing live CCTV testimony of a defense expert who was unavailable to testify in person because he was already committed to testifying in a capital trial in Georgia); United States v. Guild, Crim. No. 07-404, 2008 WL191184 (E.D. Va. Jan. 17, 2008) (finding the defense put forward adequate measures and compelling circumstances to take CCTV testimony where there was a great cost associated with bringing foreign witnesses to the U.S. and much of the charged conduct took place overseas); United States v. Smith, Crim. No. 09-100, 2010 WL 5211498 (W.D.N.C. Dec. 16, 2010) (the court allowed a doctor located in Oklahoma to testify via CCTV in a trial in North Carolina due to the cost of travel)).

However, the use of CCTV "must be carefully circumscribed" (Id. at 80) and courts have applied the "exceptional circumstances" test that applies in a Fed. R. Crim. P. 15 deposition. (See id. (explaining that "exceptional circumstances" has the same meaning as in the context of a Fed. R. Crim. P. 15 deposition). Under Rule 15, the movant "must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001); see also United States v. Whiting, 308 F.2d 537, 541 (2d Cir. 1962) (movant bears burden).

As shown above, the prospective witnesses are unavailable to testify at the trial because they have a legitimate fear of arrest if they were to come to the United States, as many of these

24

witnesses are considered co-conspirators. (Agnifilo Aff. at ¶¶ 30, 35, 44.) Moreover, their testimony is material because their testimony would rebut the material allegations in the indictment. (See (Agnifilo Aff. at ¶¶ 33-34.) Accordingly, in the event the Government refuses safe passage to the prospective defense witnesses, we ask that the Court permit the video conferencing procedure set forth here. The extraordinary circumstances involved in this case— where most material witnesses with material information reside in Mexico and are unavailable to travel to the United States—require such relief. In the alternative, we ask the Court to allow us to conduct Rule 15 depositions of foreign witnesses.

## CONCLUSION

For these reasons, we ask for the relief set forth in each point.

Dated:     November 16, 2018
           New York, New York

                                        Respectfully submitted,


                                        Marc Agnifilo, Esq.
                                        BRAFMAN & ASSOCIATES, P.C.
                                        767 3rd Avenue, 26th Fl.
                                        New York, NY 10017
                                        Tel: (212) 750-7800
                                        Fax: (212) 750-3906

25