

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MKM:TH/MKP                          *271 Cadman Plaza East*
F. #2017R01840                      *Brooklyn, New York 11201*

June 8, 2018

By Hand and ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Keith Raniere, et al.
            Criminal Docket No. 18-204 (NGG)

Dear Judge Garaufis:

      The government respectfully submits this letter in opposition to the
defendant Keith Raniere's motion for bail. (Dkt. No. 74, June 6, 2018). Consistent with
the recommendation of Pretrial Services, the government seeks a permanent order of
detention because there is no combination of conditions that would adequately protect
the safety of the community, mitigate the risk that the defendant will obstruct justice or
reasonably assure his continued appearance.

      As detailed in the government's prior submission, appended as Exhibit 1,
(Dkt. No. 4, March 26, 2018 (the "Initial Letter")), the defendant is currently charged by
indictment with sex trafficking and conspiracy to commit forced labor in a scheme involving
over fifty female slaves that he directed others to recruit on his behalf, charges which carry a
mandatory minimum sentence of fifteen years and a statutory maximum of life
imprisonment.

      The defendant completed a financial affidavit in the Northern District of Texas
in which he reported that he has a $0 monthly income and no assets aside from partial
ownership of a home with an estimated value of approximately $60,000. The defendant
now proposes pretrial release on an unsecured bond of $10 million, with home detention
to be supervised by a private team of 24-hour armed guards. The defendant's motion does
not specify who will bear the costs of the private security firm. The proposed bond does not
mitigate the danger he poses to the community, the risk of flight created by the nature of

the charges, or the risk that he will obstruct justice.  For these reasons, his motion should be denied.

I.    Background

A.  Indictment and Underlying Facts

At the time the government submitted the Initial Letter, the defendant had been arrested on a complaint.  (See Dkt. No. 1, Feb. 14, 2018 (the "Complaint")).  On April 19, 2018, a grand jury sitting in this District returned an indictment charging Keith Raniere and Allison Mack (identified as "Co-Conspirator 1" in the Complaint) with sex trafficking, sex trafficking conspiracy and conspiracy to commit forced labor.  (Dkt. No. 14, Apr. 19, 2018 (the "Indictment")).

The Indictment tracked the charges in the Complaint, and for purposes of this submission, the government incorporates by reference the facts set forth in the Complaint and in the Initial Letter.  While the defendant characterizes DOS as a way that "hundreds of women are searching for happiness, fulfillment and meaning in their lives," (Def. Mot. at 1), a grand jury has found probable cause that the defendant's actions are criminal and a detention hearing is not the forum for a mini-trial of the government's case.  See United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) ("[A] detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant.") (citation omitted).

The defendant's motion consists largely of attempts to minimize the charges against him and other self-serving assertions, untested by and shielded from cross-examination, that do not merit response.  It is well-settled that this type of mini-trial is entirely inappropriate where a grand jury has already returned an indictment against a defendant.  See, e.g., United States v. Contreras, 776 F.2d 51, 53 (2d Cir. 1985) An "indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause . . . without further inquiry."  Id. (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975)); see also Sciortino v. Zampano, 385 F.2d 132, 133 (2d Cir. 1967) ("A post-indictment preliminary examination would be an empty ritual, as the government's burden of showing probable cause would be met merely by offering the indictment.").

Therefore, the government respectfully submits that the Court should start its analysis by accepting that the Indictment is sufficient, on its own, to establish probable cause that the defendant did commit the crimes of sex trafficking, sex trafficking conspiracy and forced labor.  Contreras, 776 F.2d at 54. ("Were an evidentiary hearing addressing the existence of probable cause required in every § 3142(e) case in which an indictment had been filed, the court would spend scarce judicial resources considering that which a grand jury had already determined, and have less time to focus on the application of the presumptions and the § 3142(g) factors in deciding whether the defendant should be detained.").

## B.  The Defendant's Creation of DOS[1]

The defendant does not dispute that the charges against him are serious and that, if convicted, he faces significant prison time.  The defendant's motion relates instead to what the defendant characterizes as weaknesses in the government's trial proof against him, including assertions that DOS "is a group by and for women" (Def. Mot. at 6) and that DOS was not created "as a way of Raniere having access to women who were brought into DOS," (Def. Mot. at 8).  These assertions are false.

Electronic communications obtained by the government pursuant to a search warrant reflect admissions by the defendant that (1) he created DOS; (2) there was a significant sexual component to DOS and that some DOS slaves would be recruited to have sex with the defendant; (3) that the brand received by DOS members was his "monogram"; and (4) that his identity as the head of DOS would be concealed from some DOS slaves.  For instance, on or about October 1, 2015, the defendant exchanged the following messages with a sexual partner who was a "first-line" DOS slave:

> RANIERE:  I think it would be good for you to own a fuck toy slave for me, that you could groom, and use as a tool, to pleasure me…
>
> [DOS Slave]: huh?
>
> [DOS Slave]: not disagreeing, just don't understand
>
> RANIERE:  But your [sic] my wife…she isn't…just a tool for you to use for me…
>
> [DOS Slave]: a person?
>
> RANIERE:  Get a slave… you're her master…

On October 9, 2015, the defendant sent messages to the DOS slave describing DOS as a "secret growing organization" of women "who want to be branded with [his] monogram":

> RANIERE:  Without going into detail.   It caused there to be other slaves, all who want to be branded with my monogram plus a number…your number is reserved…it is number 1.  It is now a secret

---

[1]  The government is entitled to proceed by proffer in a detention hearing.  See United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

> growing organization.  I don't know well some of
> the people involved but I command them
> ultimately.  They are not who you might think. . .
> I think there are 10 or more in the current jness[2]
> track…and others outside of it.

[DOS Slave]: Does that mean that they know about each other?

RANIERE:    No.

*        *        *

[DOS Slave]: I'm ok with you having other slaves, I assume
that these are not sexual

RANIERE:    They may or may not be.  They would be if I
commanded but that is not the reason for the
organization

*        *        *

RANIERE:    It is an absolutely trusted commitment…

[DOS Slave]: I want to be the one that worships your body

RANIERE:    Many will not even know of my existence…some
don't already….

Later that day, the defendant expressed concern that the DOS slave was "continuing to ask
questions without comm[i]ting to feelings or an opinion" and sent the following messages on
October 10, 2015:

RANIERE:    Find a life slave and I'll tell you everything…

[DOS Slave]: What do you mean by life slave?

RANIERE:    Someone who has a collateralized vow with you
for life…

---

[2]       The defendant's motion acknowledges that Raniere created Jness, which it
describes as a company to "promote the furtherance and empowerment of women throughout
the world."  (Def. Mot. at 5.)

4

Contrary to the claims in the defendant's motion for bail (<u>see</u> Def. Mot. at 17), the defendant repeatedly and explicitly associated the acquisition of DOS slaves with sex, as evidenced by the following WhatsApp messages, sent between October 11, 2015 and October 16, 2015:

RANIERE:  I feel badly each time you have to work hard for me to [orgasm]… I thought slaves could remove the burden…and I could get you fresh and not worn

\*    \*    \*

RANIERE:  What are your thoughts feelings?

RANIERE:  All of them have slaves in process… some have several completed…

[DOS Slave]: I feel insecure but at the same time I feel proud of you.  You are worthy of following like that

RANIERE:  So are you… you're number one…

[DOS Slave]: I would be proud to stand next to you

RANIERE:  Even naked with 6 other committed naked women?

\*    \*    \*

[DOS Slave]: Are these slaves for you or for us?

RANIERE:  There are two types.  Both types are for us.  One type is in the program:  you are their Master I am their Grand Master . . . the other type are very select ones you use to heal us: likely being also of the first type…

[DOS Slave]: Ok. I'm asking because these persons will be in our life forever…. But I was not involved in the process of choosing who

[DOS Slave]: I'm afraid that I will not be comfortable with the others

RANIERE:  You choose your slaves…

[DOS Slave]:  What about the 7.

[DOS Slave]:  ?

[DOS Slave]:  Allison [MACK] said these 7 were forever. She
and the others will be forever in my life…

RANIERE:  They are first line to me but if any suit the
purpose I obviously have access…

\*      \*      \*

RANIERE:  [H]aving one or two young slaves devoted to
revving my body sexual to produce more energy
would help.  It would be there [sic] 24/7 job…[3]

In addition, the defendant admits participation in the psychological torture of a young woman by ordering her to be confined to a room for a year-and-a-half, but characterizes her imprisonment as "akin to grounding."  (See Def. Mot. at 9.)  This characterization is appalling in light of evidence that (1) the woman has no human contact except for occasional visits from Nxivm members who were there to make sure the woman was "healing" her "breach,"[4] (2) the defendant threatened to expel the woman, who had no legal status in the United States, from the country without documentation if she did not remain in the room, and (3) security cameras—footage from which is in the government's possession—were installed outside the woman's bedroom in order to ensure she didn't leave. When the woman finally did leave the room, the defendant, as he had threatened, had her driven to the Mexican border and ordered to walk across, without money or identification papers.

C.  The Defendant's Travel and Financial Disclosures

The United States Pretrial Services Department for the Eastern District New York issued a Pretrial Services Report Addendum, dated April 13, 2018, in which it concluded that there were no conditions or combination of conditions that would reasonably assure the defendant's appearance in court and the safety of the community.  (See Pretrial Services Report, dated April 13, 2018, at 2.)

---

[3]      All ellipses in the messages excerpted above appear in the original.

[4]      As set forth in the government's Initial Letter, the woman's "breach" was having developed romantic feelings for someone other than the defendant.  (Initial Letter at 4.)

The defendant refused to provide any employment or financial information to Pretrial Services on the advice of counsel. Pretrial Services concluded that the defendant posed a risk of non-appearance and danger based on the "nature of the instant offense" and found he posed a risk of nonappearance based on his use of "false identifications," his "ties to a foreign country," his "unstable" living situation, "potential access to large sums of money," "undisclosed employment and financial history," and "unverified social history." Id. at 2.

The defendant completed a financial affidavit in the Northern District of Texas, appended as Exhibit 2. In that affidavit, the defendant claimed to be self-employed, to make $0 a month, to have no "cash on hand or money in savings or checking account." When asked if he owned any "real estate, stocks, bonds, notes, automobiles, or other valuable property," the defendant reported only a 50% interest in a house he estimated to be worth $60,000 including a reference to "Property probate Court from Pamela KFritz."[5]

While the defendant portrays himself as a man of few means,[6] he has access to enormous wealth, as evidenced by his instant application to be guarded by armed security personnel, as well as the private and first class air travel, luxury accommodations and other evidence of wealth described in the Initial Letter.[7]

The defendant's claims that he does not pose a risk of flight because "[i]nquiries were made to different prosecutorial offices"[8] when he became aware of a potential investigation (Def. Mot. at 10), or because he had several documents notarized in

---

[5]     The defendant appears to be referring to Pamela Anne Cafritz, described in the defendant's motion for bail as his "deceased long-time significant other." (Def. Mot. at 14.)

[6]     The defendant has publicly admitted that he does not pay taxes, claimed that it is because he "live[s] under the poverty level," and stated that his clothes "usually appeared" without his paying for them. See Vanessa Grigoriadis, The "Sex Cult" That Preached Empowerment, New York Times Magazine, May 30, 2018. The defendant further stated that since the dissolution of Consumers' Buyline, his failed pyramid scheme, he was "careful not to put his hands on much [money] himself." Id.

[7]     Defense counsel has estimated that the proposal they put forth will cost $40,000 a month. However, detention supervised by a full time private security company in other cases has been estimated to cost as much as $144,000 a month. See, e.g., United States v. Dan Zhong, 16-CR-614 (E.D.N.Y.).

[8]     The defendant does not claim to have made inquiries to the Eastern District of New York, where several media outlets had reported the investigation was based. In November 2017, agents with the Department of Homeland Security and the Federal Bureau of Investigation visited the Nxivm center in Monterrey, Mexico and asked to speak with the defendant, but were told he was unavailable. The agents' telephone numbers were left for the defendant but neither he nor an attorney ever contacted them.

Mexico (see Def. Mot. at 14), are beside the point. The defendant admits deep ties to Mexico, and at the time the warrant for the defendant's arrest was issued he was in hiding on a luxury beach resort that was essentially a fortress with armed guards stationed at all entry and exit points. Despite active surveillance efforts, the defendant eluded law enforcement for over two months. He stopped using his phone, turned to encrypted email and left Monterrey, Mexico, where the mother of his child was living. Facing a lengthy term of imprisonment, and with followers around the world, the defendant has every incentive to flee.

## II.   The Defendant's Proposed Bail Package Is Insufficient to Protect the Community or Mitigate the Risk of Flight or Obstruction

The defendant has proposed that he be released with the following conditions: (i) a $10 million unsecured bond signed only by himself; and (2) home detention with electronic monitoring and 24/7 supervision by "armed guards" employed by TorchStone, a private security company, who would "communicate" with Pretrial Services, the Court, and the government "in regard to any violation of any condition imposed by the Court." (Def. Mot. at 4.) In light of the seriousness of the offenses charged against the defendant, the weight of the evidence in support of those charges, and the potential sentence that could result from a conviction, the defendant's proposed bail package is entirely inadequate. The bond proposal provides no meaningful assurance against the danger that the defendant poses to the community; in effect, the defendant proposes to build a personal jail for himself, supervised by private guards in a residence of his choosing, none of which would impede his flight or his ability to intimidate witnesses against him.

### A.   Applicable Law on Ineffectiveness of Detention Outside Government-Run Facility

#### i.   Home Detention and Electronic Monitoring

The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants. See United States v. Ferranti, 66 F.3d 540, 543-44 (2d Cir. 1995) (rejecting $1 million bail package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property). The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicates a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community

8

would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted). See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

## ii. Private Jails

The Second Circuit has never directly addressed whether a private jail, which seeks to replicate the conditions of a government-run detention facility in a defendant's home, is a condition of "release" that implicates the Bail Reform Act. "[T]here is a debate within the judiciary over whether a defendant, if she is able to perfectly replicate a private jail in her own home at her own cost, has a right to do so under the Bail Reform Act and the United States Constitution." United States v. Valerio, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (collecting cases); see also Sabhnani, 493 F.3d at 78 n.18 ("The government has not argued and, therefore, we have no occasion to consider whether it would be 'contrary to the principles of detention and release on bail' to allow wealthy defendants 'to buy their way out by constructing a private jail." (citations omitted)). While "troubled by [the] possibility" of wealthy defendants' being allowed to construct a private jail, this Court has not yet had occasion to decide whether district courts "routinely must consider the retention of self-paid private security guards as an acceptable condition of release before ordering detention." United States v. Banki, 369 F. App'x 152, 153-54 (2d Cir. 2010) (summary order); see Valerio, 9 F. Supp. 3d at 293-94 (noting that the Bail Reform Act addresses solely "conditions of release, not conditions of detention"). Indeed, a recent Southern District of New York decision reasoned that the private jail proposal presented did "not appear to contemplate 'release' so much as describe[] a very expensive form of private jail or detention." United States v. Zarrab, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016); see

9

also <u>United States v. Dan Zhong</u>, 682 F. App'x 71 (2d Cir. 2017) (summary order) (affirming district court's rejection of private jail proposal).

Courts have long been troubled by private jail proposals which, "at best 'elaborately replicate a detention facility without the confidence of security such a facility instills."' <u>Orena</u>, 986 F.2d at 632 (citations omitted)); <u>Valerio</u>, 9 F. Supp. 3d at 295. But "such [private prison] arrangements are never one hundred percent infallible[.]" 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) (quoting <u>Borodin v. Ashcroft</u>, 136 F.Supp.2d 125, 134 (E.D.N.Y.2001)).

The <u>Zarrab</u> decision highlights a number of legal and practical uncertainties regarding the proposed use of private jail services. In denying the defendant's proposal, the <u>Zarrab</u> court reasoned that private jail "substitutes judicial oversight and management for (more appropriate) reliance upon trained, experienced, and qualified professionals from the Bureau of Prisons and the Marshals Service." <u>Id.</u>; <u>see also</u> <u>id.</u> at *11–12 (holding that "judicial involvement [was] inherent in the proposed privately funded armed guard regime" because the court could be asked to "decide whether the private security guards should be armed or unarmed[,] ... determine the appropriate level of force that may be used to secure Mr. Zarrab ... [, and] to make attorney/client determinations for Mr. Zarrab"). The court also found Mr. Zarrab's proposal for private jailing unreasonable because "it raise[d] serious issues of liability surrounding the use of force against [Mr. Zarrab] and persons who may interact with him." <u>Id.</u> at *12 (questioning whether signed "waivers from defendants permitting the 'future use of reasonable force' against them" were valid, enforceable, and reasonable); <u>see also</u> <u>id.</u> ("There are some conditions that are simply not appropriate to be contracted out, and detention under armed guard would seem to be one of those." (quoting <u>Valerio</u>, 9 F. Supp. 3d at 295)). Lastly, the court determined that Mr. Zarrab's proposal to use a "privately funded armed [security company was] unreasonable because it helps to foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy, such as Mr. Zarrab." <u>Id.</u> at *13 (citing cases for the proposition that distinguishing defendants based on their financial situations is entirely inapposite to long-standing legal precedent); <u>see also</u> <u>id.</u> ("[I]t is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." (quoting <u>Borodin v. Ashcroft</u>, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))).

B. <u>Private Jail Will Not Sufficiently Mitigate the Risk of Danger, Flight or Obstruction in this Case</u>

As set forth in greater detail in the Initial Letter, the government respectfully submits that the defendant poses a danger to the community and a significant risk of flight and obstruction, and therefore should be detained. The heart of the defendant's proposal is that he will be supervised at a residence within the Eastern or Southern Districts of New York, where he has no ties, by private security guards paid for by an unknown source of funds. Without even considering the policy implications of allowing the very wealthy to buy

themselves out of jail and the concern that such arrangements are not contemplated by the provisions of the Bail Reform Act, the government respectfully submits that the defendant's proposal should be rejected because private jail is not a "substitute for detention" and will not mitigate these risks.[9]  See Banki, 369 F. App'x at 154.

The facts underlying the charges in the Indictment alone demonstrate a disturbing pattern of conduct in which the defendant trafficked women through coercion and manipulation.  The defendant poses a particular threat if he were released because of his reliance on subordinate "slaves," who had pledged a vow of lifelong obedience, to carry out the crimes with which he is currently charged.  See United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); Colombo, 777 F.2d at 99-100; United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Therefore, even if the defendant were released on a substantial bond with extensive conditions, the Court would not have sufficient means to ensure that the defendant would not commit additional crimes during any period of release or direct others to do so on his behalf, or that he would not otherwise violate any bail conditions, such as by contacting his former cocconspirators or any cooperating witnesses or other witnesses who could testify against him.  In short, the government cannot monitor his activity in a manner that would be required to protect the community or the integrity of the trial during any period of release, and is not required to dedicate the resources to try to do so.  Bellomo, 944 F. Supp. at 1167 ("The government is not obligated to replicate a jail in Bellomo's home so that he can be released.") (citing, inter alia, Orena, 986 F.2d at 630-33).

The defendant's proposal of private jail does not address this problem.  Privately funded security guards would be placed in the potentially perilous position in which their detainee, or his associates, are paying their salary.  The "fierce competition" for these rare and "highly lucrative" contracts creates a conflict of interest for these private security guard companies.[10]  How strict a guard will be in enforcing each condition of a defendant's release could and would be influenced by this unconventional arrangement, especially where, as here, the defendant apparently has access to enormous amounts of wealth.  Given that is a case in which even momentary access to a cell phone could threaten the safety of witnesses and victims or the ability of the government to properly investigate its

---

[9]     A bond signed by the defendant alone, even in the amount of $10 million, is not meaningful security given his claim that he is impoverished.

[10]     See Feuer, Alan, Bail Sitters, The New York Times (Dec. 24, 2009) ("There is fierce competition . . . for the limited number of bail-monitoring cases, which, after all, are highly lucrative and mainly involve, after the initial setup, hanging out with people at their home.")

case, it is crucial that the defendant's detention is overseen by trained, qualified, and fully objective law enforcement officers.[11]

        The concerns courts have raised about the serious and unresolved questions of liability around the ability of private security guards to use force to restrain their subjects is of particular concern in this case. See Zarrab at 41-42. The defendant in Zarrab agreed to sign a waiver permitting the use of force against him should he attempt to escape, but the validity and enforceability of this type of waiver was uncertain. The defendant has not suggested such a waiver, leaving open a question of how far these guards are permitted to go in attaining the defendants' compliance with his detention and whether they will be able to do so effectively. Additionally, any waiver would not cover third parties, and given the nature of this case, one could imagine scenarios where any escape or obstruction plan would involve the presence or help of one of the defendant's devotees or slaves. An escape attempt could result in armed guards pursuing the defendant in New York City streets. Such an arrangement does not mitigate the risk of the safety of the community.

---

[11]    As set forth in the Initial Letter, the defendant has demonstrated willingness and ability to obstruct justice, including filing lawsuits intended to silence critics, and to elude capture by the authorities. Moreover, in addition to many DOS slaves who are still collateralized and owe duties of loyalty to him, as part of his men's movement, The Society of Protectors, the defendant has created a system where he (or another member) can galvanize the members at a moment's notice to carry out orders from the defendant.

V.    <u>Conclusion</u>

   For the foregoing reasons, the government respectfully requests that the Court enter a permanent order of detention as to defendant Keith Raniere.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

     By:   /s/            
        Moira Kim Penza
        Tanya Hajjar
        Assistant U.S. Attorneys
        (718) 254-7000

cc:  Clerk of Court (NGG) (by ECF)
   Defense Counsel (by ECF)



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| MEG:MKP/TH | *271 Cadman Plaza East* |
| F. #2017R01840 | *Brooklyn, New York 11201* |

March 26, 2018

By Hand and ECF

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     United States v. Keith Raniere
>           Docket No.: 18-M-132

Dear Judge Gold:

The defendant Keith Raniere is scheduled to appear in the Northern District of Texas tomorrow at 2:00 p.m. for arraignment. The government respectfully submits this letter in anticipation of the defendant's expected removal to the Eastern District of New York and in support of the government's request for a permanent order of detention. As set forth below, the defendant, who was living in Mexico prior to his arrest and has access to vast resources, poses a significant risk of flight. In addition, his long-standing history of systematically exploiting women through coercive practices for his own financial and sexual benefit demonstrates that, if released, he would pose a danger to the community.

I.     Background

   A.     Complaint

The defendant is charged by complaint with sex trafficking, sex trafficking conspiracy and conspiracy to commit forced labor. As described in detail in the complaint (the facts of which are incorporated by reference into this letter), these charges arise from the defendant's role as the leader of a secret society called "DOS" or "The Vow," in which women were recruited to be slaves under the false pretense of joining a women-only mentorship group. DOS is structured as a pyramid with the defendant at the top. To join DOS, slaves were required to provide their masters with "collateral," which included highly damaging information about themselves and/or family members, naked photographs and rights to their assets. Once they had

joined, slaves learned they had to provide additional collateral, which they did, fearing that otherwise the collateral they had already provided would be used against them.  None of the slaves (except for those directly under the defendant) knew that the defendant was involved in the organization when they were recruited.

DOS slaves understood that if they told anyone about DOS, if they left DOS or if they failed to complete assignments given to them by their masters, their collateral could be released.  A number of DOS slaves (including Jane Does 1 and 2, as described in the complaint) were given assignments that implicitly or expressly directed them to have sex with the defendant.  Moreover, a number of DOS slaves, including Jane Doe 1, performed services other than sex (such as editing the defendant's articles and transcribing interviews) for the benefit of the defendant, believing that if they did not, their collateral could be released.  The masters who gave these assignments received the financial benefit of free labor from their slaves.  Many DOS slaves were also groomed for sex with the defendant by (1) being ordered to adhere to very restricted diets (the defendant is known to sexually prefer extremely thin women), (2) being ordered to remain celibate (the defendant has taught that women should be monogamous but that men are naturally polyamorous), and/or (3) being ordered to stop waxing or shaving their pubic hair (the defendant is known to sexually prefer women with a lot of pubic hair).  The slaves were told that they were being given these orders to benefit themselves.  The DOS masters who directed their slaves to have sex with the defendant received financial benefits in the form of continued status and participation in DOS, as well as financial opportunities from the defendant.

DOS slaves were seriously sleep-deprived from participating in "readiness" drills, which required them to respond to their masters any time day or night.  DOS slaves were also branded in their pelvic regions with a cauterizing pen with a symbol that, unbeknownst to them, incorporated the defendant's initials.

The government estimates that the defendant has had more than fifty DOS slaves under him.

Many DOS slaves were recruited from Nxivm, which is the umbrella organization for a number of self-help workshops created by the defendant and that have been taught at centers across the country and internationally since 1998.  The defendant is revered within Nxivm and referred to as the "Vanguard."  Every week in August, the Nxivm community gathers for a week to celebrate the defendant's birthday and pay tribute to him.  According to a number of sources, including former high-ranking members of Nxivm, the defendant's word is final within Nxivm and nothing of import happens within Nxivm without the defendant's approval.  Nxivm students are also taught that the defendant is the smartest and most ethical man in the world.  He frequently cited having earned three degrees from Rensselaer Polytechnic Institute, but a review of his transcript shows that he graduated with a 2.26 GPA, having failed or barely passed many of the upper-level math and science classes he bragged about taking.

Nxivm maintains features of a pyramid scheme, as courses cost thousands of dollars each and participants are encouraged to continue to pay for additional classes and to recruit others to take classes in order to rise within the ranks of Nxivm. Different ranks are marked by different color sashes, and students must reach certain ranks in order to begin receiving salaries or commissions. Members of Nxivm are taught that they can get rich by advancing in Nxivm, but in reality only a small percentage of Nxians make significant income and a much larger percentage find themselves in significant debt to the organization. The defendant had previously been investigated by law enforcement for operating a pyramid scheme called "Consumers' Buyline, Inc." As part of a consent order entered into in 1996 by the defendant and the New York State Attorney General's Office, the defendant was prohibited from operating a multilevel-marketing scheme in New York again.

### B.   History of Sexual Assault and Other Abuse of Girls and Women

The defendant has a decades' long history of abusing women and girls. According to confidential sources, the defendant had repeated sexual encounters with multiple teenage girls in the mid-to-late 1980s and early 1990s. In one instance, the defendant met a fifteen-year-old girl while he was in his 20s and had repeated sexual contact with her. In another instance, the defendant met a twelve-year-old girl whose mother worked for the defendant and began tutoring her. Shortly thereafter, the defendant began having regular sexual intercourse with her, including at his home where he lived with multiple adult sexual partners. One of those partners hired the girl to walk her dog, giving the defendant daily access to the girl. The defendant told one of the DOS slaves he had sex with that he believed the age of consent was too rigid and that it should be lowered to when a child's parent says the child is capable of consent.

Furthermore, the defendant directed the abuse of Nxivm members who had committed so-called "ethical breaches." In one instance, the defendant ordered the long-term confinement of a Nxivm member who was approximately in her early-20s to heal an "ethical breach" because she had developed romantic feelings for someone other than him.[1] During her approximately 18-month confinement, with limited exceptions, the woman had extremely limited contact with her family or other members of the community and she received limited medical attention. Her period of confinement was repeatedly extended for other supposed ethical breaches, including, in one instance, because she cut her hair. The woman felt she could not leave because of the repercussions on her family and also because she was illegally in the United States and the defendant and other members of Nxivm had helped her illegally enter.

The defendant has also physically assaulted at least two intimate partners and in 2012, under the guise of mentorship, he encouraged a woman to run headfirst into a tree and to drink from a puddle. He also co-founded a movement called "Society of Protectors," which, in

---

[1]      The defendant claimed that her ethical breach was stealing money, but the purported theft (of money that was later returned) happened significantly before the confinement.

3

part, relied on humiliating women in order to eradicate weaknesses the defendant taught were common in women. For example, women attending the classes were forced to wear fake cow udders over their breasts while people called them derogatory names. Moreover, at least one DOS master who was directly under the defendant told her slaves that her own master, i.e., the defendant, would put her in a cage to punish her.

The defendant has also posed disturbing hypotheticals as part of the Nxivm curriculum, challenging whether incest and rape are actually wrong. He told one DOS slave that incest is not wrong if the "victim" is sexually aroused by the experience, and he questioned whether gang rape is bad if the person being raped has an orgasm.

C.  Defendant's Foreign Ties and Access to Cash

For most of his life the defendant has lived outside Albany, New York, where Nxivm is headquartered. Many members of Nxivm live in the same area. Shortly after the government began interviewing witnesses and victims in November 2017, the defendant flew to Mexico. For over a month and a half, since the arrest warrant in this case was issued, the government has actively worked with Mexican immigration officials to locate the defendant. Finding the defendant was difficult because the defendant purposely concealed his location, began using end-to-end encrypted email and stopped using his phone. Ultimately, the defendant was found to be staying at a luxury villa near Puerto Vallarta, Mexico with several women. The villa was in a gated community where some villas cost over $10,000 U.S.C. a week to rent. The defendant was uncooperative when immigration authorities arrived and after he was taken into custody, the women chased the car in which the defendant was being transported in their own car at high speed.

The defendant pretends to be a renunciate. In reality, however, he has spent his life profiting from his pyramid schemes and has otherwise received financial backing from independently wealthy women. The defendant is currently financially backed by Clare Bronfman, an heiress to the Seagram's liquor fortune. She has financed the defendant repeatedly over the years including providing him with millions of dollars and paying for private air travel costing up to approximately $65,000 a flight. She has also paid for numerous lawyers to bring suits against Nxivm critics. Bronfman also owns a private island in Fiji, which the defendant has visited, and both Bronfman and the defendant have contacts all around the world.

The defendant does not keep any money in his name and has no driver's license. He makes purchases using a credit card in one of his dead lover's names. In the past year and a half, the defendant and the mother of his child have accessed hundreds of thousands of dollars from a bank account in the same dead lover's name, which contains over $8 million dollars.

D.    Past Obstruction

According to multiple confidential sources, in connection with a civil action brought in the District of New Jersey against cult critic Rick Ross and others that was dismissed this year, the defendant directed several members of Nxivm to edit video recordings of Nxivm classes that Nxivm had been ordered to produce in discovery.  The edits removed portions of the classes that the defendant thought would be damaging to Nxivm's case.

In addition, since defecting, several DOS victims have received "cease and desist" letters from a Mexican attorney.  As set forth in the complaint, the defendant was involved in sending those letters.

II.    Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141, et seq. (the "Act"), federal courts "shall" order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).  A finding of risk of dangerousness must be supported by clear and convincing evidence and a finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

    (1)    "the nature and circumstances of the offense charged. . .";

    (2)    "the weight of the evidence against the person";

    (3)    "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

    (4)    "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). In addition – and significantly – when a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence. United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985). Moreover, the Second Circuit has held that "prior acts of domestic violence are relevant to a determination of dangerousness" because a "willingness to strike loved ones offers probative evidence of tendency to violence and dangerousness towards others." United States v. Mercedes, 354 F.3d 433, 4337-38 (2d Cir. 2001).

The government is entitled to proceed by proffer in detention hearings. United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).

III.    Argument

The nature of the charges outlined in the complaint demonstrates that the defendant poses a significant risk of flight and danger to the community. The defendant is charged with sex trafficking and conspiracy to commit forced labor in a scheme involving over fifty female slaves he directed others to recruit on his behalf. He is charged with trafficking these women through coercion and manipulation, tactics that he has used before.

After law enforcement began interviewing witnesses about the defendant's criminal conduct, he fled to Mexico where he was apprehended only after a month-and-a-half of active searching. The defendant began using encrypted email and stopped using the phone that had been known to law enforcement shortly after the government began interviewing witnesses. The defendant faces a mandatory minimum sentence of 15 years' imprisonment and an approximate Guidelines range of at least 188 to 235 months' imprisonment on the sex trafficking charge alone. The Second Circuit has held that the possibility of a severe sentence is an important factor in assessing flight risk. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). The defendant also does not keep assets in his name and, through his connections and followers, has access to millions of dollars and a private island.

Moreover, the risk of flight and dangerousness is further supported by every one of the Bail Reform Act factors. First, the defendant is charged with very serious crimes that involve sex trafficking of vulnerable women through coercion and manipulation, tactics the defendant has mastered over decades.

Second, the evidence against the defendant is exceedingly strong. The government has spoken to more than a dozen women who have been victimized by the defendant, as well as many other witnesses. Their statements have been corroborated, including by the defendant's own emails and electronic communications.

Third, the defendant's personal characteristics demonstrate that he is someone who is both a risk of flight and a danger to the community. As described above, he has spent decades pretending to be a renunicate while scamming people out of money and living a secret life of luxury. He has also previously directed others to falsify records to be used in a civil lawsuit and sent "cease and desist" letters to witnesses, actions which evince a willingness to obstruct justice.

With respect to the danger he poses (as relevant to both the third and fourth factors of the Bail Reform Act), the allegations in the complaint speak for themselves, and are the culmination of decades of abusing women and girls through manipulation and coercion and, at times, physical violence. The extent of his brazenness is demonstrated by the fact that he identified his adherents as "slaves" and had them branded with his initials. If released, the defendant poses a risk to numerous women, including many DOS slaves who still believe they are under his control. There is a very real concern that the defendant may attempt—either directly or indirectly through his slaves—to intimidate possible witnesses against him into silence.

<u>CONCLUSION</u>

For the reasons set forth above, the government intends to request that the defendant be removed in custody to the Eastern District of New York when he appears for arraignment in the Northern District of Texas tomorrow. In the event that bail proceedings take place before this Court, the government will seek a permanent order of detention. The government submits that the defendant poses a danger to the community and a risk of flight. There is no condition or combination of conditions that will assure the safety of the community,

the defendant's return to court, or his compliance with the Court's directives.  Accordingly, the government requests that the defendant be permanently detained pending trial.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/_____

Moira Kim Penza
Tanya Hajjar
Assistant U.S. Attorneys
(718) 254-6454 (Penza)

cc:    Defense Counsel

| CJA 23 (Rev 11/11) | **FINANCIAL AFFIDAVIT** |
|---|---|
| | IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE |

IN THE UNITED STATES ☐ DISTRICT COURT ☐ COURT OF APPEALS ☐ OTHER *(Specify below)*

| IN THE CASE OF | | **LOCATION NUMBER** |
|---|---|---|
| _____ v. _____ | **FOR** _____ | |
| | **AT** _____ | |

PERSON REPRESENTED *(Show your full name)*

Keith Raniere

| | **DOCKET NUMBERS** |
|---|---|
| 1 ☐ Defendant - Adult | Magistrate Judge |
| 2 ☐ Defendant - Juvenile | |
| 3 ☐ Appellant | District Court |
| 4 ☐ Probation Violator | |
| 5 ☐ Supervised Release Violator | |
| 6 ☐ Habeas Petitioner | Court of Appeals |
| 7 ☐ 2255 Petitioner | |
| 8 ☐ Material Witness | |
| 9 ☐ Other *(Specify)* | |

CHARGE/OFFENSE *(describe if applicable & check box →)*  ☐ Felony  ☐ Misdemeanor

---

**ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY**

**INCOME & ASSETS**

**EMPLOYMENT**

Are you now employed? ☐ Yes ☐ No ☑ Self-Employed

Name and address of employer: Self Empowerment / Personal Growth Classes

IF YES, how much do you earn per month? $ 0

IF NO, give month and year of last employment? _____ How much did you earn per month? $ _____

If married, is your spouse employed? ☐ Yes ☑ No

IF YES, how much does your spouse earn per month? $ _____

If you are a minor under age 21, what is the approximate monthly income of your parent(s) or guardian(s)? $ _____

**OTHER INCOME**

Have you received within the past 12 months any income from a business, profession or other form of self-employment, or in the form of rent payments, interest, dividends, retirement or annuity payments, or other sources? ☐ Yes ☑ No

IF YES, give the amount received and identify the sources

**RECEIVED** $ _____  **SOURCES** _____

$ _____ _____

**CASH**

Do you have any cash on hand or money in savings or checking accounts? ☐ Yes ☑ No  IF YES, total amount? $ 0

**PROPERTY**

Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)? ☑ Yes ☐ No

owns 50% of house

IF YES, give value and description for each

**VALUE** $ 60,000 ▮▮▮ DESCRIPTION Clifton Park NY

$ _____ Property Peace Court from Pamela K[...]

$ _____

$ _____

---

**OBLIGATIONS & DEBTS**

**DEPENDENTS**

MARITAL STATUS
☐ Single
☐ Married
☐ Widowed
☐ Separated or Divorced

Total No. of Dependents: 2

List persons you actually support and your relationship to them

14yr old no contract

7 month old in Mexico with Mother

**DEBTS & MONTHLY BILLS** *(Rent, utilities, loans, charge accounts, etc.)*

| DESCRIPTION | TOTAL DEBT | MONTHLY PAYMENT |
|---|---|---|
| Residing in Clifton Park NY | $ 0 | $ 0 |
| in Mexico Past 4 months! | $ 0 | $ 0 |
| | $ _____ | $ _____ |
| | $ _____ | $ _____ |

---

I certify under penalty of perjury that the foregoing is true and correct.

_Keith Alan Ranière_

SIGNATURE OF DEFENDANT (OR PERSON REPRESENTED)

3-27-18

Date