MKM:TH/MKP
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

          - against -

KEITH RANIERE,
CLARE BRONFMAN,
ALLISON MACK,
KATHY RUSSELL,
LAUREN SALZMAN and
NANCY SALZMAN,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 18-204 (S-1) (NGG) (VNS)


### THE GOVERNMENT'S MEMORANDUM OF LAW REGARDING DEFENDANTS' ASSERTIONS OF ATTORNEY-CLIENT PRIVILEGES


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Moira Kim Penza
Tanya Hajjar
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in connection with the defendants' assertions of attorney-client privilege over certain written communications obtained by the government as part of its ongoing investigation.  As set forth in further detail below, the defendant Clare Bronfman has asserted that written communications between her, attorneys, and various applicants for United States visas are subject to attorney-client privilege.  The non-party entity Nxivm has similarly asserted that an attorney-client privilege protects written communications between Nxivm representatives, including the defendants Bronfman and Russell, among others, and various applicants for United States visas.  Nxivm has also asserted attorney-client privilege over written communications between Nxivm representatives, including the defendants Bronfman and Raniere, and Ricardo Olmedo of Olmedo Gaxiola & Abogados ("Mr. Olmedo Gaxiola") and Diego Ruiz Durán of Bufete Ruiz Durán S.C. and formerly of CLG Abogados ("Mr. Durán").  For the reasons detailed below, Bronfman and Nxivm cannot meet their burden of establishing any applicable attorney-client privilege over the materials at issue because (1) no valid privilege can attach to communications between attorneys, applicants for United States visas, and a third party and (2) the communications between Nxivm representatives and Mr. Olmedo Gaxiola and Mr. Durán are not privileged under the crime-fraud exception.  The government further requests that the Court direct the parties to propose a framework for conducting a privilege review of the relevant materials consistent with these holdings.

FACTUAL BACKGROUND

The defendants are charged by indictment with participating in a long-running racketeering conspiracy, among other crimes, relating to their involvement in several hierarchical pyramid-structured organizations founded by defendant Keith Raniere, including Nxivm and various related entities that purported to offer "self-help workshops," as well as an organization referred to as "DOS."

As alleged in the superseding indictment, Raniere and an "inner circle" of individuals, including the defendants, comprised an organized criminal enterprise that engaged in various criminal activities with the aim of promoting Raniere and recruiting new members into Nxivm and DOS.  Members of Raniere's inner circle held high-ranking positions in one or more of the Raniere-founded organizations, including serving as executives, directors and officers of Nxivm.  The members of the Enterprise carried out its principal purpose by, among other things, committing crimes including identity theft, harboring of aliens for financial gain, extortion, forced labor, sex trafficking, money laundering, wire fraud and obstruction of justice.  Defendant Keith Raniere was the founder of Nxivm, its affiliated organizations, and DOS.  At various times relevant to the superseding indictment, defendants Clare Bronfman and Lauren Salzman served on Nxivm's executive board, defendant Kathy Russell served as Nxivm's bookkeeper, and defendant Nancy Salzman served as Nxivm's president.  At various times relevant to the superseding indictment, defendants Lauren Salzman and Allison Mack were first-line "masters" in DOS.

Defendants Raniere, Bronfman, and Nancy Salzman have asserted an attorney-client privilege over materials in the government's possession based on their personal claims

of privilege.  Raniere and Bronfman have also attempted to assert the attorney-client

privilege on behalf of the entity Nxivm over certain communications in the government's

possession.  The government has been in communication with counsel for Nxivm, Michael J.

Sullivan, Esq., who has provided some additional information regarding the attorneys and

law firms with whom Nxivm asserts it had privileged communications.[1]

The government is still in the process of evaluating the information provided

by defendants in conducting its privilege review.  However, in accordance with the Court's

December 7, 2018 order, the government has identified the following categories of materials

as to which there is no legal basis for an assertion of an attorney-client privilege because (1)

no valid privilege exists, and even if it did, it was waived by the inclusion of a third-party;

and/or (2) it is subject to the crime-fraud exception to the attorney-client privilege.

The government previously requested that the Court direct the defendants to

provide additional information—including updated lists and charts of attorneys and law firms

with whom they assert they had privileged communications—to the prosecution team.  (See

November 27, 2018 letter, Docket Entry No. 206 at 2-3 (citing cases).)  Defendants objected

on the grounds that providing additional information would pose a "serious Fifth

Amendment problem" because it would require defendants "to disclose information that goes

---

[1]   Nancy Salzman, as president of Nxivm, has not attempted to assert any
privilege held by the corporation itself.  Mr. Sullivan has declined to provide any additional
information as to the identity of the person or persons who are authorized to claim a privilege
on the corporation's behalf.

to exactly what [the government] is investigating in this case." (December 6, 2018 Status Conference, Transcript ("Tr.") at 14-15.) The government notes, however, that defendant Bronfman seeks to assert an attorney-client privilege over communications made both in her personal capacity and as corporate representative of her "Fiji companies" and as to the Ethical Science Foundation. There is no basis for Bronfman to withhold documents or information from the prosecution team on Fifth Amendment grounds as to any communications over which she is asserting an attorney-client privilege in her capacity as a corporate representative or agent. See, e.g., Braswell v. United States, 487 U.S. 99, 105 (1988) (noting that prior cases had "settled that a corporation has no Fifth Amendment privilege"); In re Grand Jury Subpoena Issued June 18, 2009, 593 F.3d 155, 157-58 (2d Cir. 2010) (per curiam) (applying rule to small and solely-owned corporations). Accordingly, to the extent that the applicable privilege-holder of any asserted privilege as to the following categories of materials is a corporation, the government renews its request that any additional information regarding the claimed privilege be provided directly to the prosecution team.

A.    Bronfman's Claim of Privilege as to Communications with Frontier Solutions LLC

The defendant Clare Bronfman has asserted a personal attorney-client privilege over written communications between attorneys of Frontier Solutions LLC, including John Sandweg, Esq. ("Mr. Sandweg"), Bronfman, and M.F., an applicant for a United States visa. M.F. is a Mexican national who entered the United States in December 2013 on a B-2 "tourist" visa. According to the partially-redacted list of attorneys provided to the prosecution team by Bronfman, in approximately July 2015, M.F. engaged Frontier

Solutions to assist M.F. in immigration-related matters. Based on United States Department of Homeland Security records, M.F. was denied entry into the United States and her B-2 visa was cancelled in January 2016, on suspicion that M.F. intended to immigrate to the United States. A January 2, 2016 letter submitted on behalf of M.F. by Dennis Burke, another attorney with Frontier Solutions, represented that M.F. "has no intent to remain unlawfully in the United States" and that she continues to live in St. Luis Potosi, Mexico where she "enjoys a large network of family and friends, including her mother and sister who live nearby."[2]

Based on non-privileged materials in the government's possession, the defendants Clare Bronfman and Keith Raniere considered, and assisted M.F. in pursuing, a number of different visas to re-enter the United States. Communications between attorneys with Frontier Solutions and M.F. regarding these efforts were routinely sent to, or shared with, defendants Clare Bronfman and Keith Raniere. Between July 2015 and the present, communications between Bronfman, Raniere, and Mr. Sandweg reflect that Bronfman and Raniere considered and assisted M.F. in pursuing a number of different visas. For example, on August 12, 2015, Mr. Sandweg sent an email to Bronfman regarding the requirements to

_____

[2]     In fact, the government's investigation has revealed that M.F. had been living in the Albany, New York area for nearly a decade as part of the Nxivm community and as an intimate partner of Raniere. In August 2017, M.F. gave birth to Raniere's child in Albany, New York. The relationship between Bronfman and M.F. also appears to be personal in nature. In or around July 2018, after Raniere's arrest, a trust was created named the "KAR 2018 Trust." Bronfman is the sole donor of funds into the trust—approximately $500,000— and M.F. is the sole recipient. The notation "family support" appears on each of the disbursements of funds from the trust to M.F.

"qualify [M.F.] as an E-2 employee" of Jness, a Nxivm-affiliated entity, or an unnamed investment company.[3]  Bronfman forwarded the email to Raniere on September 5, 2015.

On August 6, 2016, Bronfman sent an email to a non-attorney with M.F.'s name in the subject line.  In the email, addressed to  "Whomever It May Concern," Bronfman stated that M.F. is "a Mexican citizen . . . who is asking for a B1/B2 visa to re-enter the USA to care for her closest friend, Pamela Cafritz."[4]  The email attached a letter from Mr. Sandweg in support of a grant of a nonimmigrant visa for M.F.  In the letter, which was addressed to the United States Embassy in Mexico, Mr. Sandweg identified himself as the "former Acting General Counsel for DHS and Acting Director of U.S. Immigration and Customs Enforcement" and stated that M.F. had entered the United States to care for one of her "closest personal friends, Pamela Cafritz" and that M.F. "poses no threat to immigrate to the United States."

On October 11, 2016, Bronfman sent the following email to Raniere:

Hi,

So here are the options in order of best to worst:

––––––––––––––––––

[3]      An E-2 visa is a temporary nonimmigrant visa issued to an alien who seeks to enter the United States to  "to develop and direct the operations of an enterprise in which he has invested . . . a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(E)(ii).

[4]      The defendant Keith Raniere described Pamela Anne Cafritz in his motion for bail as his "deceased long-time significant other."  (ECF Docket Entry No. 74 at 14.)

EB5 - money is invested (it needs to be from her) into a company that is used to [sic] this process, then we wait for the approval of the visa. This takes about 9 months (we may be able to extend her current visa in the interim)
Pros - least scrutiny, long term solution
Cons - $550,000 investment (we may be able to get the $50K fee down a little). Long wait time

Marriage: Self explanatory!
Pros: It can be done immediately no investment of funds
Cons: Scrutiny, likely a fraud investigation - likely won't prove it is fraud but it will be unpleasant, I am looking into if it is 100% confidential - if fraud is found, she could get banned

EB1C - Use Saggita[5] as the company she would be coming to manage the company - but she would need to legitimately prove she had the skills and ability and that the company is in a place it wants to open here - it is legitimate and a good business plan
Pros: Fastest, none of the investment of [sic] marriage problems
Cons: There is significant history to go against it: Current visa's, [M.F.'s family member's] visa issues, the state of the US aspect of the company.  John [Sandweg] feels there is a high risk of either denial or denial with a ban for fraud.

Cx

(See October 11, 2016 Email, Exhibit 1.)

Based on non-privileged materials in the government's possession, by December 2016, Bronfman and Raniere began discussing ways in which M.F. could qualify

---

[5]    In a sworn statement provided to the Department of Homeland Security on January 5, 2016, M.F. indicated that she did "advertisement and graphic design" for Sagitta LLC, a company owned by her father.

as an EB-5 investor.[6]  On December 21, 2016, in an email that was later forwarded to Raniere, Matt C. Burbach, an attorney with Burbach Law LLC, sent Mr. Sandweg a "draft Notice of Gift from Keith Raniere to [M.F.]" in connection with "an EB-5 project."  Mr. Sandweg forwarded the email to Bronfman, who forwarded the entire email to Raniere the same day.  Raniere responded to Bronfman with the following email:  "I don't have the money yet to make this gift…  I won't even be able to assess that for a while… but Pam [Cafritz] had a desire to make this gift which can be done from her estate or something like that…"[7]  (See December 21, 2016 Email, Exhibit 2 (punctuation in original).)

On May 17, 2017, a Frontier Solutions attorney submitted a petition for entry into the United States on behalf of M.F. under the EB-5 Immigrant Investor Program on the basis of a $500,000 investment in the Steiner Brooklyn Navy Yard Redevelopment Project. The supporting documents for the petition reflect that the funds for M.F.'s investment were a gift by Bronfman.

---

[6]     Under the EB-5 Immigrant Investor program, visas may be issued to foreign investors who contribute a specific amount of capital to United States companies that will create full-time positions for at least 10 qualifying employees.  In general, the minimum qualifying investment in the United States is $1 million, although the minimum qualifying investment in a high-unemployment area or rural area in the United States is $500,000.

[7]     Ms. Cafritz died on November 7, 2016.

B.      Other Claimed Privileges As To Communications with Jonathan Ware, Esq.

Bronfman has also asserted attorney-client privilege—either in a personal capacity or as owner of the Ethical Science Foundation—over written communications between her, various applicants for United States visas, and Georgia-based attorney Jonathan Ware ("Mr. Ware").[8]  For instance, Bronfman has claimed that an attorney-client privilege attached to communications between her, Mr. Ware, and B.M., a South African national, relating to "immigration communications."  Bronfman has claimed a similar privilege for communications between her, Mr. Ware, and P.S.H., a German national and H1B visa applicant who listed, as her employer, the Ethical Science Foundation.

C.      Nxivm's Claim of Privilege As To Communications of Visa Applicants

Counsel for Nxivm, Michael J. Sullivan, Esq., has also asserted attorney-client privilege over communications involving a number of Nxivm representatives—including defendants Bronfman, Nancy Salzman and Russell—and non-citizen visa applicants relating

---

[8]      Notably, Bronfman has claimed such a privilege even where the email communication was shared with a third-party employed by Nxivm, such as the defendant Kathy Russell.

to "immigration application[s] and documents." [9]   Among the attorneys and law firms with whom Mr. Sullivan asserts that Nxivm had privileged communications as to "immigration matters" are Frontier Solutions (including Mr. Sandweg) and Mr. Ware.

     D.    <u>Nxivm's Claim of Privilege As To Communications with Mr. Olmedo Gaxiola and Mr. Durán</u>

Mr. Sullivan has also asserted on behalf of Nxivm an attorney-client privilege over communications between Nxivm representatives and Mr. Olmedo Gaxiola, and communications between Nxivm representatives and Mr. Durán.  Mr. Olmedo Gaxiola and Mr. Durán are attorneys in Mexico.

As alleged in the superseding indictment, among the means and methods by which the defendants participated in the conduct of the affairs of the Enterprise were by "using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics" of Raniere.  (Indictment at ¶ 6.)  Soon after public disclosure of DOS,

---

[9]     Nxivm has yet to provide complete information to the government regarding the attorneys as to whom it intends to assert an attorney-client privilege.  For instance, the list provided by Nxivm on December 7, 2018 lists "Carmen Gutierrez" with no contact information, email address, or associated law firm as an attorney in connection with the <u>NXIVM v. Rick Ross</u> matter.  Neither Bronfman nor Raniere had previously listed Ms. Gutierrez as an attorney who represented Nxivm.  In response to a request by the government, Mr. Sullivan indicated he would promptly provide additional information regarding the identity of Ms. Gutierrez.  To date, Nxivm has provided no additional information.

defendants Bronfman and Raniere made efforts to silence and intimidate DOS "slaves," including Jane Does 8 and 9.[10]

Based on non-privileged materials in the government's possession, on or before September 6, 2017, Raniere and Bronfman were alerted to the fact that The New York Times would shortly be publishing an article about DOS, based in part on interviews with former Nxivm members.  On September 13, 2017, Raniere sent Bronfman the following email with the subject line, "What are your thoughts?":

Ms. [Jane Doe 9],

I am the chief attorney of a criminal investigation in Mexico of more than 20 individuals tied together in a cooperative destructive network. These individuals, including yourself, have been acting against individuals who participate in the NXIVM corporation community.

You are currently connected to the criminal investigations involving fraud, coercion, extortion, harassment, stalking, theft of trade secrets (which includes use of trade secrets compromised of, amongst other things, client lists), criminal conspiracy, computer crimes and corporate espionage.

I strongly suggest that you cease and desist, undo, reverse, cancel, and retract, participation in all past, present, and future, conversations, conference calls, meetings, news media, social media, blogs, or websites, relating to this subject matter until the criminal matters are resolved. You should do everything in your power to affect this.

Your best course of action to minimize your exposure, in addition to the above, is to repair all damages to parties you have acted against, reconciling with them, and fully cooperating with the criminal investigations. In this regard, I can help you for I represent some of your victims and have access to others.

---

[10]   Jane Doe 9 is not referenced in the superseding indictment.

11

I know that people in the media (and also bloggers and the like) can be coercive, abusive in their power, and force unwitting, uninformed, participants to complicate situations and potentially even waive rights. You still have the ability to pull away from all participation with these people.

Please contact me as soon as possible,

(September 13, 2017 Email, Exhibit 3.)  Less than thirty minutes later, Bronfman sent the

text of the email to a co-conspirator ("CC") based in Mexico.  The following day, September

14, 2017, Jane Doe 9 received an email from Mr. Olmedo Gaxiola with the subject line

"CAUSA PENAL EN MEXICO."  Attached to the email was a Microsoft Word document

containing, word-for-word, the text of the email sent by Raniere to Bronfman.  (See 9/14/17

Olmedo Gaxiola Letter, Exhibit 4.)  The metadata of the Word document received by Jane

Doe 9 reflects that the creator of the document was Bronfman.

On September 18, 2017, Raniere sent Bronfman the following email with the

subject line "Draft":

Ms. [Jane Doe 9],

You are the only person receiving this letter. This overture is against my better judgement as I feel there is little probability of success yet more expense, but I am writing you on my clients' behalf.  If you do not respond affirmatively to this letter by 1:00pm September 19th I will need to proceed as previously required.  I will then not contact you informally again.

My clients want to give you this opportunity to cooperate and minimize the impact on your life. The criminal investigations will increase in number, and thoroughness, and will not stop until justice is served. This will not go away.

The group with which you are involved contains individuals who have already served prison time, others who are currently indicted, and some that face extradition proceedings.  The others are under investigation for quite serious crimes.  The form of justice to which they subscribe is trial and conviction by media, personal opinion, and abuse of power.  They appear to have no issue with committing a crime when it suites [sic] them. They use the actions of others to justify this.  Whether the person they

12

target is right or wrong, this method of persecution is very wrongful.  You must separate from them completely to mitigate the effects on yourself.

Please divest yourself from this wrongfulness and this group. Please write to me affirmatively by the above deadline indicating you will cooperate fully. I can also help you with any criminal investigations within the United States.

Sincerely,

(September 18, 2017 Email, Exhibit 5.)  That same day, Jane Doe 9 received an email from Mr. Olmedo Gaxiola attaching a second letter as a document in Microsoft Word.  (See 11/16/17 Olmedo Gaxiola Letter, Exhibit 6.)  The letter contained nearly exactly the same text as that sent to Bronfman by Raniere, and, the metadata of the Word document reflects that the creator of the document was Bronfman.

Jane Doe 8 and other DOS "slaves" have received similar communications and letters from Mr. Durán.  On October 11, 2017—six days before The New York Times published its reporting on DOS[11]—Jane Doe 8 received an email from Mr. Durán.  In the email, Mr. Durán stated that he was taking "the liberty to writing to you to let you know that the State's Attorney's Office in Mexico, has issued some directives against you and other individuals."  (October 11, 2017 Email, Exhibit 7.)  Mr. Durán enclosed a letter in Spanish and a document containing an English translation directing Jane Doe 8 to "[s]top, abstain and refrain from incurring in any type of intimidation, acts of nuisance or disturbances against"

---

[11]     See Barry Meier, Inside a Secretive Group Where Women Are Branded, N.Y. Times (Oct. 17, 2017).

CC, legal representative of Nxivm Mexico, "and/or any person with any sort of relation to the Company referred herein."[12]

On September 14, 2017 and again on October 12, 2017, Bronfman sent Raniere emails attaching a spreadsheet titled "Individuals Involved" listing individuals and the purported "damage" they caused to Raniere and Raniere-created entities. One column in the spreadsheet is titled "Crime," under which Bronfman documented the supposed crimes each individual committed against Raniere, and another column in the spreadsheet is titled "Priority Level," with numbers listed beneath. The names of multiple former DOS "slaves" appear on the list, including Jane Doe 8 and Jane Doe 9. Next to Jane Doe 8 and Jane Doe 9's name, under "Crime," was listed, "Use of Trade secrets" and "secret disclosure." The "Priority Level" indicated for Jane Doe 9 was 1.

LEGAL STANDARD

I.    The Attorney-Client Privilege Is Narrowly Confined

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (citation omitted). "[T]he party invoking a privilege bears the burden of establishing its applicability to the case at hand." In re Grand Jury Subpoenas Dated March

---

[12]    Jane Doe 8 was not involved in Nxivm Mexico and did not have any significant interaction with CC.

19, 2002 and August 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003); see also United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997) ("The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it.") (citing United States v. Schwimmer, 892 F.2d 237, 244 (2d Cir. 1989)).

The burden of establishing the applicability of an attorney-client privilege "is a heavy one, because privileges are neither 'lightly created nor expansively construed.'"  In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002, 318 F.3d at 384 (citations omitted).  Therefore, privileges are recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." Trammel v. United States, 445 U.S. 40, 50 (1980) (quoting Elkins v. United States, 364 U.S. 206, 234, (1960) (Frankfurter, J., dissenting)).  This heavy burden "reflects the policy that the privilege be used sparingly, only when well identified and established."  United States v. Weissman, No. 94 CR 760, 1996 U.S. Dist. LEXIS 19066, at *16-17 (S.D.N.Y. April 3, 1996), aff'd 195 F.3d 96 (2d Cir. 1999).  As the Supreme Court has explained:

> We do not create and apply an evidentiary privilege unless it
> promotes sufficiently important interests to outweigh the need
> for probative evidence.  Inasmuch as testimonial exclusionary
> rules and privileges contravene the fundamental principle that
> the public has a right to every man's evidence, any such
> privilege must be strictly construed.

Univ. of Pennsylvania v. E.E.O.C., 493 U.S. 182, 189 (1990) (internal quotations, alterations and citations omitted).

Courts thus carefully limit any privilege to its "narrowest possible limits" because the privilege interferes with the truth-seeking function of the court.  See Int'l Bhd. of Teamsters, 119 F.3d at 214 (internal quotation and citations omitted).  "The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose."  United States v. Goldberger & Dublin, P.C., 935 F.2d 501, 504-05 (2d Cir. 1991) (citations omitted).  In recognition of the important implication of these principles, the Second Circuit "remains committed to the narrowest application of the privilege such that it protects only legal advice that discloses confidential information given to the lawyer by the client."  Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996).

II.     The Common Interest Doctrine Only Applies Where Parties Share an Identical Legal Interest and Agree to Pursue the Same Legal Strategy

"A 'common interest' doctrine, erroneously called 'common interest privilege' or 'joint defense privilege,' is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege."  Sokol v. Wyeth, Inc., No. 07 CV 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008).  "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."  Schwimmer, 892 F.2d at 243.  Thus, "only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected."  Id.

The doctrine "neither creates an independent privilege nor provides a separate basis for establishing the existence of an attorney-client relationship."  In re Rivastigmine Patent Ltg., No. 05 MD 1661, 2005 WL 2319005, at *2 (S.D.N.Y. Sept. 22, 2005), aff'd 2005 WL 3159665 (S.D.N.Y. Nov. 22, 2005).  In other words, it "is not an independent source of privilege or confidentiality" so "[i]f a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply."  Sokol, 2008 WL 3166662, at *5 (citations omitted).

"Obtaining the protection of the common interest doctrine requires showing (1) a common legal, rather than commercial, interest and (2) that the exchange of the information was made in the course of formulating a common legal strategy, and that the parties understood the communication was in furtherance of the shared legal interest." Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., No. 12 MC 275, 2013 WL 238176, at *2 (S.D.N.Y. Jan. 18, 2013) (citing Fireman's Fund Ins. Co. v. Great Am. Ins. Co., 284 F.R.D. 132, 139-40 (S.D.N.Y. 2012); SEC v. NIR Group, LLC, 283 F.R.D. 127, 131–32 (E.D.N.Y. 2012)).

III.     The Attorney-Client Privilege is Limited by the Crime-Fraud Exception

The attorney-client privilege is limited by, inter alia, the "crime-fraud exception," which "strips the privilege from attorney-client communications that relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."  In re John Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994) (quoting In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984)); see also United States v. Zolin, 491 U.S. 554, 562-63 (1989) (holding that the justification for the

privilege "ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing" (emphasis in original)).

To establish that the crime-fraud exception applies to a communication, the government must "demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997) abrogated for other reasons by Loughrin v. United States, 134 S. Ct. 2384 (2014); accord In re Grand Jury Subpoenas Dated Mar. 2, 2015, No. 15-1976, 2015 WL 5806060, at *2 (2d Cir. Oct. 6, 2015) (party invoking exception must "prove (1) that the client communication . . . was itself in furtherance of the crime or fraud and (2) probable cause to believe that the particular communication with counsel . . . was intended in some way to facilitate or to conceal the criminal activity") (internal quotation marks and citations omitted).

Notably, the "crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication." In re Grand Jury Subpoena, 731 F.2d at 1038. Therefore, "[i]f a fraudulent plan were ineffective, the client's communications would not thereby be protected from disclosure." Id. Moreover, the government need not "definitively" establish "the fraudulent nature of the objective. . . . [T]here need only be presented a reasonable basis for believing that the objective was fraudulent." Id. In addition, the crime-fraud exception applies even if the attorney had no knowledge of, and did not intend to facilitate or conceal the crime or fraud. See, e.g., In re Grand Jury, 705 F.3d 133, 157 (3d Cir. 2012) ("For the crime-fraud exception to apply, the

18

attorney does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme.")  (internal citations omitted); United States v. Sabbeth, 34 F. Supp. 2d 144, 150 (E.D.N.Y. 1999) ("the fact that the attorney may have been oblivious to the significance of the communication made by the client is not controlling").

   Where it is not clear whether the crime-fraud exception applies to a set of documents that one party asserts to be privileged, courts may conduct an in camera review of those documents.  See Zolin, 491 U.S. at 574-75.  To obtain in camera review of such materials, the government need not meet the "probable cause" standard described above. Instead, prior to an in camera disclosure of purportedly privileged communications, a court "should require" only "a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  In re John Doe, Inc., 13 F.3d at 636 (quoting Zolin, 491 U.S. at 572).

ANALYSIS

   For the reasons set forth below, the government respectfully requests that the Court issue an order holding that (1) no valid privilege can attach to communications between attorneys, applicants for United States visas, and a third party and (2) the communications between Nxivm representatives and Mr. Olmedo Gaxiola and Mr. Durán are not privileged under the crime-fraud exception.

19

I.     Bronfman's and/or Rainere's Inclusion on Communications with Frontier Solutions
       Attorneys and Their Clients Breaks Any Privilege

       Although Bronfman seeks to assert privilege over the communications of

Frontier Solutions, she clearly has no standing to assert a privilege on behalf of M.F. or any

other visa applicants who sought legal advice from Frontier Solutions.[13]  Moreover, unless an

exception applies, the inclusion of Bronfman and/or Raniere on communications between a

visa applicant and her attorney constitutes waiver of any attorney-client privilege.  As the

Second Circuit has made clear, "it is vital to a claim of privilege that the communications

between client and attorney were made in confidence and have been maintained in

confidence," and "the person invoking the privilege must have taken steps to ensure that it

was not waived."  Meija, 655 F.3d at 134 (quoting In re Horowitz, 482 F.2d 72, 81–82 (2d

Cir. 1973); see id. at 134-35 (affirming district court's finding that inmate's call to an

attorney, made while inmate was aware that his calls were monitored by prison facility, was

not privileged); see also NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 138 (N.D.N.Y. 2007)

("Obviously, when communications between a party and her attorney occur in the presence

of a third party, the privilege may be waived.").

       Bronfman has refused to provide to the prosecution team any legal basis for

her claim that attorney-client privilege attaches to communications between Bronfman,

counsel, and an applicant for a United States visa.  Because no exception to the general

---

[13]     Bronfman has not established that she had any attorney-client relationship with
any of the Frontier Solutions attorneys.

waiver rule could apply under these circumstances, Bronfman cannot meet her burden of demonstrating that these communications are privileged.

Bronfman cannot rely on the <u>Kovel</u> line of cases, which held that the attorney-client privilege can "protect communications between a client and his accountant, or the accountant and the client's attorney, when the accountant's role is to clarify communications between attorney and client." <u>United States v. Ackert</u>, 169 F.3d 136, 139 (2d Cir. 1999) (citing <u>United States v. Kovel</u>, 296 F.2d 918 (2d Cir. 1961)). The <u>Kovel</u> extension "has always been a cabined one." <u>Mejia</u>, 655 F.3d at 132; <u>see also</u> <u>United States v. Weissman</u>, 195 F.3d 96, 100 (2d Cir. 1999) (per curiam) (concluding that the privilege "should be narrowly construed and expansions cautiously extended"). The involvement of the third-party agent must be necessary "to improve the comprehension of the communications between attorney and client." <u>Ackert</u>, 169 F.3d at 139; <u>see also</u> <u>Calvin Klein Trademark Trust v. Wachner</u>, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (the privilege applies only where the third-party agent "enabl[es] counsel to understand aspects of the client's own communications that could not otherwise be appreciated."). "[A] communication between an attorney and a third-party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." <u>Ackert</u>, 169 F.3d at 139.

Bronfman was not necessary to facilitate the provision of legal advice to the applicants for visas, <u>Ackert</u>, 169 F.3d at 139, nor did she serve any specialized function that can be analogized to the interpreters or accountants in <u>Kovel</u>. Each of the visa applicants at issue is fluent in English and did not rely on Bronfman for the provision of legal advice.

"Because [Bronfman's] role was not as translator or interpreter of client communications, the principle of <u>Kovel</u>" does not apply.  <u>Ackert</u>, 169 F.3d at 140.  Nor can Bronfman rely on the content of the communications themselves to create a privilege where there is none.  <u>SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties LLC</u>, No. 01 CIV. 9291 (JSM), 2002 WL 1455346, at *5 (S.D.N.Y. July 3, 2002) ("[T]he fact that private parties agree that something is privileged does not make it so." (citations omitted).

   Nor can Bronfman claim that she shares a common legal interest with the visa applicant.  To satisfy this standard, Bronfman would have to show that the "parties understood the communication was in furtherance" of a "shared legal interest" and that the common interest be "legal, rather than commercial."  <u>Mitsui O.S.K. Lines, Ltd.</u>, No. 12 MC 275, 2013 WL 238176, at *2.  "[T]he common interest doctrine does not encompass a joint business strategy[.]"  <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.</u>, 160 F.R.D. 437, 447 (S.D.N.Y. 1995).  It is difficult to conceive of any possible legal interest that Bronfman could share with any of the visa applicants sufficient to invoke the common interest doctrine.  Although Bronfman could, for example, share a common personal or financial interest in a grant of a visa to a visa applicant, such a relationship does not and cannot fall in the narrow category primarily reserved for co-litigants pursuing a shared legal strategy.  <u>See</u> <u>id.</u> at 448 ("In the absence of some evidence of a coordinated legal strategy, the presence of such a concern about litigation does not bring a disclosure within the common interest doctrine.").

   Because, at most, Bronfman is a third party with no privileged relationship to the visa applicants, her inclusion on communications between the applicants and counsel

22

waived any arguably applicable attorney-client privilege.  The fact that Bronfman frequently shared such communications with Raniere further "demonstrate[s] that the communication was not intended to be confidential."  McCormick on Evidence § 91 & n.9 (7th ed.); Meija, 655 F.3d at 134.

At the status conference before the Court on December 6, 2018, counsel for Bronfman stated that the "doctrine of dual representation" in the "immigration context" extended the attorney-client privilege over communications between a "sponsor of a visa" and the "potential visa holder."  (December 6, 2018 Status Conference, Tr. at 22.)  There is no legal authority for such a position.[14]  In In re De Mayolo, one of the few cases to have directly addressed a claim of attorney-client privilege based on the doctrine of dual representation, the district court rejected the employer's claim of privilege based on a simultaneous attorney-client relationship with an alien beneficiary and employer petitioner. No. 06-MC-64-LRR, 2007 WL 1121303, at *7 (N.D. Iowa Apr. 16, 2007).  Although the attorney in question testified, at a hearing, that "dual representation" was a "common practice in immigration matters," the district court was not persuaded that any privilege could be established over communications between the attorney, alien, and employer:

> The court can find no support for [the employer's] position in governing Supreme Court or Eighth Circuit Court of Appeals law.  Further, such an interpretation of the doctrine is in tension with traditional understandings of the attorney-client privilege.

---

[14]     Even if Bronfman could demonstrate some authority for the asserted privilege, she did not sponsor M.F.'s visa.  Nor has she provided any indication that she sponsored B.M. or P.S.H. for visas.

> The attorney-client privilege is generally strictly construed,
> because it inhibits the search for truth.

Id. (internal citations and quotation marks omitted).  Ultimately, the court did not find it

necessary to reach the question, finding that the employer was, in any event, not acting

lawfully.  The court noted that attorneys "knowingly place themselves in a precarious ethical

situation when they undertake to represent an employer and an employee when both the

employer and the employee are engaged in illegal activity."  Id.

Similar concerns are implicated here.   Bronfman's October 11, 2016 email to

Raniere reflects that the use of Frontier Solutions to secure M.F.'s visa was not legitimate.

See Exhibit 1 ("Pros – least scrutiny"; "likely won't prove it is fraud but will be unpleasant";

"John [Sandweg] feels there is a high risk of either denial or denial with a ban for fraud").

Raniere's December 21, 2016 email to Bronfman stating that his deceased partner "had a

desire to make this gift [to M.F.] which can be done from her estate or something like that"

further evinces a scheme to circumvent the immigration laws and to fraudulently use assets

from an estate in probate to "make [a] gift" to M.F. for use in obtaining an investor's visa.

For the crime-fraud exception to privilege to apply, the "crime or fraud need not have

occurred . . . it need only have been the objective of the client's communication."  In re

Grand Jury Subpoena, 731 F.2d at 1038.  That Frontier Solutions was used in an effort to

fraudulently obtain a visa for M.F. is further evidenced by the significant omissions in the

letters written by lawyers for Frontier Solutions on her behalf.  Notwithstanding the fact that

M.F. had been living with Raniere in Albany, New York, for years, and working for a

Nxivm-affiliated entity, Jness, the letters written by attorneys for Frontier Solutions falsely

disclaimed any intent by M.F. to immigrate to the United States.  The crime-fraud exception applies even in cases where an attorney had no knowledge of, and did not intend to facilitate or conceal the crime or fraud.  See, e.g., In re Grand Jury, 705 F.3d at 157 ("For the crime-fraud exception to apply, the attorney does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme.").

In sum, Bronfman cannot demonstrate any grounds to assert an attorney-client privilege over communications shared between Bronfman, a visa applicant, and her attorney.

II.    Communications Between Nxivm Representatives, Prospective Visa Applicants, and Counsel Are Not Privileged

For the same reasons, Nxivm's assertions of privilege over communications including Nxivm representatives and non-citizen visa applicants relating to "immigration applications and documents" also fail.  Even if Nxivm were able to demonstrate a valid attorney-client relationship between counsel and each individual visa applicant, there is no legal authority for such a privilege to be extended to communications that involve representatives of an employer-sponsor.  See In re De Mayolo, 2007 WL 1121303, at *7.

III.   Communications Between Nxivm Representatives, Including Bronfman and Raniere, and Mr. Olmedo Gaxiola and Mr. Durán Are Not Privileged

Even if Nxivm could satisfy its burden of showing that the email communications between a Nxivm representative and Mr. Olmedo Gaxiola or Mr. Durán were privileged, application of the crime-fraud exception would "strip[] the privilege from [these] communications" to the extent they were made in furtherance of defendants Bronfman and Raniere's efforts to intimidate or harass potential witnesses.  See In re John Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994).

The crime-fraud exception encompasses "other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." Madanes v. Madanes, 199 F.R.D. 135, 149 (S.D.N.Y. 2001).  The Second Circuit has noted that "advice in furtherance of a fraudulent or unlawful goal cannot be considered sound," because "advice in furtherance of such goals is socially perverse, and the client's communication seeking such advice are not worthy of protection." In re Grand Jury Subpoena, 731 F.2d at 1038; see also NXIVM Corp. v. O'Hara, 241 F.R.D. at 135-36 (holding that crime-fraud exception did not apply to facts underlying a "sting operation" conducted by a private investigative firm hired by an attorney for Nxivm, which violated disciplinary rules prohibiting contact with a represented adversary); Wachtel v. Guardian Life Ins. Co., 239 F.R.D. 376 (D.N.J. 2006) (assigning a special master to determine which documents were subject to the crime-fraud exception based in part on probable cause to believe lawyers engaged in efforts to delay civil discovery).

To establish that the crime-fraud exception applies, the government must "demonstrate that there is a factual basis for a showing of probable cause to believe that a crime or fraud has been committed." United States v. Jacobs, 117 F.3d at 87 (emphasis added).  The probable cause threshold is easily met here, given that, among other things, (1) Bronfman and Raniere were alerted to the fact that DOS would shortly be publicly disclosed by The New York Times; (2) Bronfman and Ranere had targeted DOS victims as "individuals involved" in causing "damage" to Raniere; (3) Bronfman and Raniere—not their attorneys—drafted the letters in the first instance; (4) Bronfman and Raniere used attorneys licensed to practice only in Mexico to send the letters, even though Bronfman,

Raniere, Jane Does 8 and 9 all lived in the New York area; and (5) the language of the letters suggest the threat of criminal prosecution.  Because it would be "socially perverse," <u>In re Grand Jury Subpoena</u>, 731 F.2d at 1038, to protect communications with attorneys made for no other purpose than to contact crime victims in an effort to keep them from publicly disclosing the existence of DOS and from reporting their experiences to law enforcement, the communications between Nxivm representatives and Mr. Olmedo Gaxiola and Mr. Durán are not privileged.

CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court issue an order holding that (1) no valid privilege can attach to communications between attorneys, applicants for United States visas, and a third party (including Bronfman and/or Raniere) and (2) the communications between Nxivm representatives and Mr. Olmedo Gaxiola and Mr. Durán are not privileged under the crime-fraud exception.  The government further requests that the Court direct the parties to propose a framework for conducting a privilege review of the relevant materials consistent with these holdings.

Dated:    Brooklyn, New York
          December 28, 2018

                                   Respectfully submitted,

                                   RICHARD P. DONOGHUE
                                   UNITED STATES ATTORNEY
                                   Eastern District of New York
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


Moira Kim Penza
Tanya Hajjar
Assistant United States Attorneys
       (Of Counsel)