```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA       *    Case No. 18-CR-204(NGG)
                               *
                               *    Brooklyn, New York
                               *    February 05, 2019
     v.                        *
                               *
KEITH RANIERE, et al.,         *
                               *
          Defendants.          *
                               *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          SHANNON JONES, ESQ.
                            PHILLIP PILMAR, ESQ.
                            Asst. United States Attorney
                            United States Attorney's Office
                            271 Cadman Plaza
                            Brooklyn, NY 11201


For the Defendant:          KATHLEEN CASSIDY, ESQ.
                            CAROLINE GROSSANS, ESQ.
                            Hafetz & Necheles LLP
                            10 E. 40th Street, 48th Floor
                            New York, NY  10016

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1            (Proceedings commenced at 5:06 p.m.)

2            THE CLERK:  Criminal cause for a status conference,

3    Case No. 18-CR-204, United States v. Raniere, et al.

4            Counsel, please state your name for the record

5    starting with the government.

6            MS. JONES:  Shannon Jones and Phillip Pilmar for

7    the United States.  Good afternoon, Your Honor.

8            MR. PILMAR:  Good afternoon, Your Honor.

9            THE COURT:  Tell me your last name again.

10           MR. PILMAR:  Pilmar.

11           THE COURT:  Pilmar.  Okay.

12           MS. CASSIDY:  Good afternoon, Your Honor.  Kathleen

13   Cassidy and Caroline Grosshans on behalf Clare Bronfman.

14           THE COURT:  Okay.  You all in the back look

15   familiar.

16           MR. AGNIFILO:  Hi, Judge.  We're just loitering.

17           THE COURT:  Do you want to make an appearance here?

18           MR. AGNIFILO:  Yeah, we're all here.  Marc

19   Agnifilo, Paul DerOhannesian, and Teny Geragos for Keith

20   Raniere.

21           I don't think we're on the calendar, but we're here

22   if anything comes up.

23           THE COURT:  Okay.  So, did your client want to

24   attend?

25           MR. AGNIFILO:  No.  He's --

3

1          THE COURT:  Okay.  That's what I -- I thought he

2      was, because you had raised the other issue.

3          MR. AGNIFILO:  Yeah.  So we actually, we just had a

4      hearing --

5          THE COURT:  Right.

6          MR. AGNIFILO:  -- in front of Judge --

7          THE COURT:  Yeah, I just heard.  Uh-huh.

8          MR. AGNIFILO:  Yeah, Garaufis.  So we're adjourned

9      until tomorrow when they're back in front of Judge Garaufis,

10     so he does not want to attend this proceeding.  Thank you.

11         THE COURT:  Okay.  So he waives his appearance.

12         MR. AGNIFILO:  He does.  He does.

13         MS. CASSIDY:  And Ms. Bronfman waives her

14     appearance as well.

15         THE COURT:  Okay.  Does anybody else want to sit up

16     with attorneys?  I mean, you know, feel free to move around.

17         MR. AGNIFILO:  All right, Judge.

18         THE COURT:  Okay.  So I don't know who everybody is

19     in the courtroom and the courtroom is open.

20         That being said, I'm going to leave it to counsel

21     to flag for me if we start to talk about something that is on

22     -- is privileged, because that's the sort of -- that's the

23     issue that we're looking at here.  So -- all right.

24         So I hope this conference can be a -- I'm trying to

25     get a practical way to deal with this -- these issues.

4

1          So, I asked the team here, because what I have is -

2    - I'm sorry.  Let me just step back just so you know

3    something, which is that there was a letter from Mr. Shapiro

4    today.

5          It was raised having argument about the motion to

6    suppress.  I believe Judge Garaufis is going to refer that to

7    me, so what we say here might touch on that.  But just so you

8    have that as the background.

9          The motion that we have with regard to the

10   privilege obviously comes from the trial team.

11         MS. JONES:  That's correct, Your Honor.  And they

12   are not here.

13         THE COURT:  They're not here.

14         And the reason I didn't ask for them to come, and

15   this is going -- this touches back on this possibility that

16   we might talk about something that's privileged.

17         And you're going to have to let me know who should

18   or shouldn't be hearing that, because I don't want to be part

19   of the process of waiving anybody's privilege.

20         I'm not asking anyone to do that -- is conceptually

21   and, you know, maybe I introduced the problem, or at least

22   fed the problem was, were there some overarching issues that

23   could help deal with some categorical -- some privileges that

24   apply to categories of documents to try to move this whole

25   process along because we had this conversation late last year

1      when you were looking at an even sooner trial date.

2              But you know, it's really approaching very quickly,

3      and so how to get through whatever the mass of documents are,

4      and I'm going to ask you about that in a minute.

5              So what I have from the trial team obviously, is

6      this motion.  And I would say, correct me if I'm wrong, it

7      really tries to deal with two issues from the government's

8      point of view.

9              One, the immigration related documents.  And this

10     is as I said, the trial team knowing what they know, and I'm

11     not entirely clear what it is that they know, projecting on

12     to what they assume exists, which the taint team then would

13     know about maybe, if you'd gotten to these documents.  But

14     that's one category, immigration.

15             And the other is this idea that there has been a --

16     there should be an exception to the privilege because the

17     communications are either in and of themselves crimes, or

18     they are -- they're conduits to crimes being committed, or

19     whatever, some variation on that, so the crime fraud

20     exception should apply.

21             Sort of a third way of looking at this usually

22     comes from defendant, which is saying, you know, this is

23     totally the wrong approach.  You can't do this categorically,

24     at least without some samples, basically.  We need to know

25     what you're talking about, and even really, judge, we should

6

1     be able to work a lot of this out.

2            That is what I see as the overview here, so I have

3     the practical questions, which is -- are generally about, how

4     does this fit in with the overall work of the taint team,

5     secondarily with the trial team, and your, you know,

6     preparation, trying with maybe some more urgency to sort of

7     dig in and see what can we do to get these privilege issues

8     resolved.

9            I think -- I have reservations about this idea that

10    we can do it without -- we can make these decisions without

11    looking at at least some of the documents through a sampling

12    approach.  But let me just ask some -- to get just a

13    perspective on what you're looking at.

14           Okay.  So, I think there's the very big question

15    which is, you have a lot of material.  There has been this

16    ongoing dispute about where do these materials fall within

17    the warrants.  And so actually there is the suppression

18    issue.

19           But even from your perspective, you know, are we

20    looking at the terabytes of data that we had, or obviously

21    you've some -- many searches, it sounds like, from what you

22    have -- what you and your colleagues, and then you've U.S.

23    Attorney's have said about your efforts to segregate

24    documents based on the lawyers and law firms that are

25    identified by the information provided by the defendants and

7

1    entities related to the defendants.

2         So, you know, you've processed the materials, but I

3    don't have a handle on what you think is what you've covered

4    or what you think remains to be covered.  And then these two

5    broad swaths of documents maybe, or not.  I'm not really

6    sure.

7         Ones that fall under the immigration category.

8    Ones that the crime broad exception applies, and just to get

9    a heads up on what else you see.

10        I'm trying to make this a working conference.  This

11   is really -- so cut to the chase.  Let's --

12        MS. JONES:  Your Honor, it's very difficult to be

13   discussing -- for the taint team to be discussing some of

14   these issues which have been raised and briefed by the

15   prosecution team, because they relate to legal issues and

16   they relate to the legal -- to the facts of the case rather

17   than the content of the material that we're looking at.

18        So I think the idea with the motions that the trial

19   team has raised, and they've asked for oral argument on those

20   if there is a question about it, relate to assertions of

21   privilege that they do not think have a basis in law, which

22   related to the joint representation and the common interest

23   for the immigration documents.

24        THE COURT:  The two theories under the immigration,

25   right.

8

```
1            MS. JONES:  And so if that was resolved on the law,
2     which when the government has taken the position that that
3     privilege is the burden on the defendant and they haven't met
4     that burden to show that that privilege would exist where
5     there are these three parties to a communication, the
6     potential visa applicant, the potential, I guess, employers,
7     or Ms. Bronfman in certain circumstances, and the attorney,
8     that is a legal issue and that would deal with, you know, I
9     think several hundred documents if it was just like
10    determined if those documents that fall in that category are
11    not privileged.
12            Let's put that aside.
13            THE COURT:  But don't put it aside yet because my
14    question is, how do I make that decision abstractly because
15    it seems like there's a lot of different pieces to that.
16            So there are various people and the entities
17    involved, and your -- the working theory, if drafted by the
18    trial team, seems to be a couple of things.
19            One, that there are -- there's not an alignment of
20    interest between Ms. Bronfman and the parties who she's
21    helping, so that there is no common interest and there is no
22    joint representation.  But the materials that are described
23    are ones that are not privileged.
24            So you know, I understand you're saying they
25    developed the argument.  From what I can tell, they developed
```

9

1    the argument based on information they have seen.

2              But for me to have this -- how do you analyze this

3    without actually looking at a document, right?  Because it

4    seems like there's variations, right?

5              There are different entities that are involved.

6    There's different party -- or not parties.  There's different

7    individuals who are the potential beneficiaries of the

8    immigration benefits.  Obviously, much of the discussion is

9    about MV.

10             But without looking at something and saying, okay,

11   well, this is -- this is purely hypothetical, but this is Ms.

12   Bronfman, she's working with this entity which she retained.

13             She's doing it in her capacity as an officer of

14   this entity, so you have that relationship, and then you have

15   whomever, because it's not completely clear to me that

16   everyone who the government is speculating there are

17   documents about, what their status is.  Are they employees?

18             And obviously there's this email about MV, which

19   has the sort of, I think it's the tripartite theory, you

20   know, which they're saying, well maybe we could, you know,

21   get a visa under this, or maybe we could get a visa under

22   that, or maybe under this, right?

23             But without looking and saying, you know, who is

24   the -- what's Ms. Bronfman's role, what is she doing in the

25   communication, who is she communicating with, and what -- who

1    is or what is the other party that would be benefitting from

2    the immigration status that they're, you know, seeking to

3    achieve, it seems like, I mean, to go to the most basic, it's

4    like, what's the case or controversy?  I don't even know --

5            MS. JONES:  Your Honor --

6            THE COURT:  -- what we're talking about.

7            So that's my concern.  I know I -- maybe I'm

8    responsible for a little bit of this mess because I, you

9    know, asked that question, whether there were some

10   overarching theories.  But --

11           MS. JONES:  Your Honor, let me -- I'd like to

12   separate two different categories of documents within that

13   category.

14           I think what you're talking about is that there may

15   be -- there may be situations where Ms. Bronfman, in her

16   capacity as a member of one organization or another, has

17   counsel.  And she's communicating directly with her counsel

18   about immigration related matters for --

19           THE COURT:  Or the entity's counsel.

20           MS. JONES:  -- potential employees.

21           THE COURT:  Depending.

22           MS. JONES:  Right?

23           THE COURT:  Uh-huh.

24           MS. JONES:  And I don't -- I think that that may be

25   something where we can think about whether or not there's

1     more of a case by case analysis, depending on what the

2     company is and what the attorney is, and who they're talking

3     about.

4            However, I think what -- and again, I'm very

5     uncomfortable arguing this on behalf of the trial team

6     because they made this motion.

7            But I think that what they are talking about are

8     situations where there is a visa applicant also in the

9     communications, which they say, that is a -- and even if

10    there was an attorney -- a valid attorney/client privilege

11    between Ms. Bronfman or her entity and the attorney, putting

12    the visa applicant on it destroys that privilege.

13           And alternatively, if there is an attorney/client

14    privilege between the visa applicant and an attorney, even if

15    that attorney sometimes also represents Ms. Bronfman in other

16    situations, but that attorney is representing the applicant,

17    and then they forward those emails or communications to Ms.

18    Bronfman, that three-part thing is what I think the trial

19    team is arguing in their papers.  That's a waiver, and that

20    there is no common interest.

21           As a matter of law, there is no -- and there's no

22    joint defense as a matter of law that would preserve the

23    privilege in that three-party situation.

24           THE COURT:  So the problem I have with -- that

25    might be correct in some circumstances.

1           So just by way of hypotheticals, and I don't know

2     what these documents are, it would seem to me that depending

3     on the kind of application for an immigration benefit, one

4     we're contemplating.

5           So if you thought about something that was

6     hypothetically -- and each one would be a visa, right?  The

7     model for that is, there's no American who can do the job.

8           And so in that situation, what the company has to

9     do is advertise for the job and go through a whole -- the

10    whole effort of trying to hire somebody.

11          And then, you know, the thought is, we can't find

12    somebody or the potential visa applicant is the most

13    qualified person of all of that.

14          So in that, the employer has certain obligations to

15    the Department of Labor, and then following on to the

16    immigration authorities with regard to really the U.S. labor

17    market, and then our best candidate, and then the applicant,

18    whether he or she is otherwise qualified.

19          You could see there, there is a spectrum of

20    interest and they may not be on the same page.  And it may

21    not be that they have the same legal interest, because maybe

22    you are the best candidate, but you have a criminal record,

23    you have -- you overstayed.  You know, there's some problem.

24          And so, you know, you don't necessarily want to

25    tell your employer, your punitive employer.  Anyway, each of

13

1    them may have separate interests, even though maybe they at

2    other points have a common interest.

3         But take a family, right?  I mean, a husband and

4    wife.  So if a U.S. spouse is sponsoring someone from -- they

5    marry someone from another country, that visa, those two are

6    so entwined that you would expect them to have the same

7    counsel.  I mean, the family story is the family story.

8    Those two are not adverse.  They have no separate obligations

9    to the United States.

10        So just using it as -- those two as an example, or

11   examples of how in an immigration context, the particulars

12   matter as to whether the parties' interests align, so it's

13   not -- it can't just be we have two individuals and a lawyer,

14   and that blows the privilege.  You know.

15        So without looking at the documents or knowing more

16   about what was being done with regard to the immigration

17   process, I'm not sure how -- how do you make the decision

18   with regard to whether there is or isn't a -- either of the

19   possibilities or the theories that's being offered.

20        And so, you know, that -- I hear what you're saying

21   is that you didn't write the brief, but how do I have that

22   conversation with the trial team?  They don't know what the

23   documents are.

24        MS. JONES:  No.  But again, some of these are legal

25   issues, which would cut through, I think.  That was the idea,

14

1    was that hopefully we could cut through like doing --

2              THE COURT:  I'm still looking for a way to cut

3    through.  I'm just hoping it's with you and --

4              MS. JONES:  Your Honor --

5              THE COURT:  -- and you all who know much more about

6    what the documents actually are.

7              And, you know, obviously, one of the strands of

8    this whole analysis is, you know, do we get to the point

9    where there need to be in camera review.  And I'm trying to

10   figure that out.  So --

11             MS. JONES:  Well, Your Honor, let me back up and

12   just give you kind of like a, like a -- what our position is

13   on the documents and what we have been doing.  Okay?

14             So right now we have in our -- we have like a taint

15   database of documents that are segregated away from the

16   prosecution team, that just the taint team has access to.

17        And I think everybody agrees, and counsel for Bronfman

18   agreed to this in her response to government's memo on the

19   privilege issues, that many of these documents are not

20   privileged.

21             And so the priority of the taint team has been

22   trying to figure out ways to quickly identify things that

23   everybody agrees are not privileged and try to toss them over

24   to the prosecution team.

25             THE COURT:  Okay.  So just to have an example, is

1      that the Raniere communication?

2            MS. JONES:  Well, for example, they gave us those

3      charts of who represented who and what was the scope of the

4      representation, and there were some specific notations where

5      a party may have said, we're not asserting privilege over

6      this, or we're not asserting privilege over that.

7            So we have attempted to do searches to go through

8      the documents we have to identify all those.

9            And then, we're not just saying, okay, now we're

10     going to give them to the prosecution team.  We have been

11     doing a process where we send the list to the defense counsel

12     of, these are all the documents --

13           THE COURT:  Right.

14           MS. JONES:  -- document by document that we've

15     marked as not privileged either because it appeared that they

16     already had agreed they were not privileged, or it looked

17     from the face as we were clicking through documents, that

18     they weren't privileged.  And then they've gotten back to us

19     and for the most part to say, we agree or we disagree.

20           So we've done that twice so far, where we've

21     identified a little over 2,000 documents which we -- which

22     appeared to be not privileged to us. And they've gotten back

23     to us.

24           The first round, I think, was the less

25     controversial one because we were really just relying on

1    their charts as to like what is and is not within the scope.

2    And that, we're down to like I think about 30 documents that

3    are in dispute as -- between the parties as to whether or not

4    they're privileged.

5            For the second tranche where --

6            THE COURT:  All right.  So that -- just so I -- the

7    first tranche you've -- you agree, except for about 30

8    documents --

9            MS. JONES:  Yeah.  Out of about 1,000.

10           THE COURT:  -- and this is based on -- okay.

11           MS. JONES:  Okay.  And that took like -- you know,

12   it was over Christmas and New Year's, but it did take like

13   several weeks, particularly since a lot of the privilege

14   asserted belonged to NXIVM, and they had to get involved in

15   the process and that took -- that delayed things a little

16   bit.

17           The second tranche, I mean, we've also had

18   conversations where they've made clear to us that they're

19   waiting for us to designate things as not privileged.

20           And so, I'm really not going to even -- I have

21   asked some questions, and I have gotten some responses, but

22   it basically has been kind of like, the burden is on you to

23   go through these and tell us what you think is not

24   privileged.

25           So for the second one we are -- we put things that

17

1    I think are a little bit more -- there's not as much

2    agreement.  So with the second set of documents, there were

3    about 1,200 that we sent over, and right now --

4              THE COURT:  Is it 1,200 pages, 1,200 documents?

5              MS. JONES:  Twelve hundred documents.

6              THE COURT:  Okay.

7              MS. JONES:  And so those 1,200 documents, there are

8    about 330 that counsel for Bronfman has disputed that they're

9    -- says that they're privileged, despite our -- we're

10   thinking that they're not.

11             And then counsel for Raniere initially told us

12   about 140 were not privileged, but has come back and I think

13   has narrowed it down to like 30 to 40.

14             Counsel for Bronfman has given us some explanations

15   as to -- again, this is a bit of a slow process.  Like, after

16   she gave us the list, about a week later she gave us the

17   explanations as to why she thinks these documents are still

18   privileged.  And we're still waiting for that explanation

19   from Keith Raniere.

20             And there has -- with the first set, there was a

21   little bit of a back and forth and we both changed positions

22   where we agreed on a couple, they agreed on a couple.

23             And for the second set, I think there will probably

24   be a little bit of that too.  But I think there are probably

25   about 10 different areas right now where there is a dispute

1    between the parties as to whether or not documents are

2    privileged.

3             And I'm not going to talk about content, but there

4    are like some overarching legal issues that I think it's just

5    going to come down to a matter of law.

6             For example, there are a lot of oral common

7    interest agreements that are being asserted as to whether or

8    not something is privileged.

9             Counsel for Bronfman has told me that her position

10   is based on case law that the legal interest has to be

11   similar, not identical.

12            There are other case law cases in this district, in

13   this circuit, in this district that are more recent that say,

14   no, they have to be identical.

15            So there is this like, legal issue, common

16   interest, identical or similar, what's good enough, and where

17   do these documents fall in.

18            Again, we have the immigration documents.  There

19   are a lot of those.  And then we have some large categories

20   of documents for like the 330 that are currently in dispute

21   with Ms. Bronfman, about half of them I think the dispute

22   will come down to whether or not a party is being retained

23   for legal services or for some other services, primarily like

24   something that's beyond the scope of legal representation but

25   more like public relations.

1          So we have like -- we'll have arguments about is

2     this, is this in aid of an attorney's representation and to

3     provide legal vision, or is this -- is this a PR campaign.

4          So we -- I think what we can do is what we will do

5     is we can go back to defense counsel and say, of these

6     documents that are currently in dispute -- and again we're

7     waiting for counsel for Raniere to clarify which ones they

8     really are disputing -- we can say, this is where like kind

9     of we are not in agreement and it appears we may not be able

10    to work it out.

11         So we can start putting together categories of in-

12    camera documents that they can raise for you for in-camera

13    review and explain why they think it's privileged.

14         I think once we have some preliminary decisions on

15    some of those, it may address other documents that have not

16    yet been reviewed.

17         THE COURT:  Are you proposing you're going to do

18    that, or the -- I mean --

19         MS. JONES:  I could tell them this is where we do

20    not agree.

21         THE COURT:  Okay.

22         MS. JONES:  So the privilege -- the burden is on

23    you to support that the documents are privileged.

24         So we can -- I can certainly provide a framework

25    of, these are the documents, and these are the areas that we

20

1    have a, like a dispute, and this is kind of the basis for the

2    dispute.

3            And they can decide, are we -- do we want to find

4    that?  Are we going to put this before the judge and argue

5    that these documents are in fact privileged.

6            THE COURT:  Okay.  Just to go back to my

7    immigration category.

8            So you're saying the -- does the trial team's brief

9    cover the disputes related to the immigration documents which

10   appear to be a subset of the about 330 documents?

11           MS. JONES:  There are, let's see, I think there are

12   about -- to be honest, Your Honor, when we realized that this

13   was hopefully going to be resolved on a legal ground, we did

14   not focus on immigration matters.

15           We do have about 40 documents right now that we

16   have on our sheets that we said, these are not privileged.

17   They say they are privileged.  So we do have like a sampling.

18           But it's not all of them because we were kind of

19   hoping that this would be resolved on the law, and we

20   wouldn't have to do it document by document.

21           But I think there is -- there is probably enough

22   documents that if you wanted to get like a flavor of like,

23   what are we talking about here, then there are enough

24   documents that are marked that you could certainly go

25   through, you know, go through them and see them.

1          THE COURT:  Okay.  So that's -- so set A, you have

2      about 30 that are in dispute.  Set B, for tranche B, Bronfman

3      has about 330, Raniere 30 or 40, and then --

4          MS. CASSIDY:  Your Honor, I think it -- if you

5      count, or if you just counted unique --

6          THE COURT:  Are they overlapping?

7          MS. CASSIDY:  -- email chains, there are many, many

8      duplicates, and there are many documents within the 330 that

9      are pieces of an email chain.

10         MS. JONES:  Right.

11         MS. CASSIDY:  So we estimate that it's really about

12     82 unique email chains.

13         MS. JONES:  That may be correct.  And, Your Honor,

14     when I say 322, that includes both tranches 1 and 2.

15         THE COURT:  Okay.

16         MS. JONES:  I combined them and --

17         THE COURT:  Okay.

18         MS. JONES:  -- so, so 322 for Bronfman.

19         And Ms. Cassidy is correct.  There are a lot of

20     duplicates but they come up on our searches that way and we

21     just click and move on.

22         THE COURT:  All right.  Just, you know, this is a

23     case where we've been talking about gigabytes and terabytes,

24     so I just want to know where you are.

25         MS. JONES:  Yeah.

22

```
 1                THE COURT:  All right.
 2                MS. JONES:  And then for Mr. -- for Defendant
 3      Raniere, it's a much smaller number, but I don't know what it
 4      is because it hasn't been finalized yet.
 5                THE COURT:  Okay.
 6                MS. CASSIDY:  I'll just add that it's about, I
 7      think, 30 to 40 emails, but I think three or four email
 8      chains.
 9                THE COURT:  Okay.
10                MS. JONES:  And, Your Honor, as you can see, like
11      this is, this is only like 2,000 documents out of like
12      67,000.
13                And I think that number will go down a lot for --
14      there's like -- there is a pile of documents in there that
15      hopefully will get moved out and won't be part of this
16      process.
17                But there are, at least, I think, 30 to 40,000
18      documents that we still need to review.  So this is not going
19      to be -- it's not like this is going to resolve everything.
20                THE COURT:  Okay.  Hold that thought for one
21      second.
22                So there's these two tranches.  Is there another,
23      or are there other groups that you know about, or you haven't
24      had a chance to dig in yet and say, we think there's another
25      3,000 that -- I'm making up the numbers, you know -- 2,000,
```

23

1    3,000 that fall into this category and this category, besides

2    the one that you just mentioned that might get moved up?

3              MS. JONES:  Your Honor, I can't really say that

4    there is because we try to get like a good -- I mean, we're

5    continually reviewing documents, but we like to get like a

6    good number together to send over to defense counsel so they

7    can like, click through them and make -- like agree or not

8    agree so we can move them, move them out.

9              So that process of like basically document by

10   document, this is what we think, this is what you think, we

11   agree, we disagree, we're back and forth, and then it does --

12   it takes a while which is why this is -- we're concerned

13   about the trial date.

14             THE COURT:  As am I.  That's why --

15             MS. JONES:  We're also concerned --

16             THE COURT:  -- we're here.

17             MS. JONES:  -- about like, we have been trying to

18   do the easy calls first, the ones we think that there's not

19   going to be dispute, that where we can see that there seems

20   to be like a waiver because people are on documents who

21   shouldn't be.

22             But we are trying to, you know, try to figure out

23   how to do smart searches so we can -- we may not get through

24   everything, so we want to focus on the things that look like

25   it's not going to be easy either.  Easy calls are things that

24

1    like look like they're really important.

2              THE COURT:  So given the trial date, what's your --

3              MS. JONES:  We're just moving as fast as we can,

4    Your Honor, which is why we were hoping that we could resolve

5    some of these legal issues.

6              And then with these, if we could get through --

7    hopefully, let's do this in-camera process, and then once we

8    get to some decisions, then hopefully that will make it --

9    there will be less back and forth because we will know this

10   is what the Court has ruled and we can get on the same page

11   and just move forward.

12             Or maybe we'll be able to work some things out.  I

13   don't know.

14             THE COURT:  Okay.  All right.  Your thoughts on how

15   do this and -- well, generally.

16             MS. CASSIDY:  You know, I think, Your Honor, you

17   articulated a lot of the concerns that we have about the

18   process.

19             I mean, I think fundamentally this is a document

20   specific analysis, particularly in the area of immigration

21   and it's not possible to cut through this with a one -- you

22   know, with a legal ruling in the abstract.

23             There are endless variations of, you know, Ms.

24   Bronfman is the head of for and the Executive Board of NXIVM,

25   and this is a NXIVM employee, and the type of visa, or

1   another entity that she is working on behalf of.  And I don't

2   think it's possible to do that without looking at the

3   documents.

4           I do not believe -- the second tranche, I think,

5   has a few immigration documents, but my sense is the vast

6   majority of immigration documents are not within either of

7   those first two tranches.  So we haven't really --

8           THE COURT:  Why not?

9           MS. JONES:  Oh, they're --

10          MS. CASSIDY:  -- dealt with those.

11          MS. JONES:  I mean, again, we've been --

12          THE COURT:  You pushed it to the side.

13          MS. JONES:  -- tabling those.

14          THE COURT:  Right.

15          MS. CASSIDY:  Right.

16          THE COURT:  Do you have enough to have a sampling

17  for the immigration?

18          MS. JONES:  We can -- we can look at what we have

19  and we can try to focus on the -- in our next like -- we can

20  try to focus on pulling out ones that we think are good

21  examples.

22          So we can try to do that and then send them over to

23  defense counsel separately and just say, what's your position

24  on these?  Privileged?  Not privileged?

25          And so far I think they've basically been, for the

1      most part, saying it's privileged.

2                  THE COURT:  Right.  And then the crime fraud

3      exception argument?  Does that add to --

4                  MS. JONES:  Your Honor, the current fraud

5      exceptions to a large part depend on the facts of the

6      investigation, which AUSA Pillmar and I are not a part of.

7                  Like, the arguments about -- and that were put in

8      the memo about, you know, someone has been living in the

9      United States for an X amount of time and the statements in

10     her application that she'd been complying with immigration

11     laws are not true, that is something that is like, beyond the

12     scope of what the taint team can do.  I mean, we can --

13                 THE COURT:  I guess I still don't understand that

14     because how do I get to -- okay.

15                 So just again, sort of you know, glossing over the

16     details, right.  So the overall theory that there were a

17     variety of efforts to intimidate, threaten, harass, you know,

18     many, many people, sort of, you know, sort of the one thread

19     that runs through this case.

20                 And just taking the example that's here, these --

21     the drafts of letter, you know, emails, letters that are then

22     -- I don't really understand what it is, but these letters

23     that are sent from seemingly from Mexican attorneys.

24                 I mean, how -- without looking at the documents

25     that are the ones that the privilege would be waived by this,

1    how -- I don't know how to make that connection.  So, you

2    know, I understand what you're saying, right?  They have the

3    big picture.  They know what all the documents that have

4    become public, or at least been released to the, you know,

5    all the parties here.

6              But without looking at a document, which is

7    something that the trial team can't do until the decision is

8    made, how do you make these decisions?  I mean,  I --

9              MS. JONES:  Well, Your Honor, some of --

10             THE COURT:  -- I'm not sure.

11             MS. JONES:  -- some of these -- I would say that

12   nothing that we've discussed here today contains privileged

13   content.  There is no reason why the prosecution team

14   shouldn't be here.  I mean, I --

15             THE COURT:  Okay.  But what are the -- so, you can

16   tell me what they're going to tell me.

17             MS. JONES:  And so, and when I -- in other cases

18   where there has been dispute about privilege, the prosecution

19   team, the trial team is perfectly able to litigate those

20   issues that relate to the law without seeing the documents

21   here.

22             Again, to the extent that we need to do an in-

23   camera process and we need to talk about specific documents,

24   we are here and that's our job, and we are ready to do it.

25             But to the extent that there's litigation about

1    like, is there a valid, you know, attorney/client

2    relationship that common interest would apply, which you

3    know, was litigated in the *FIFA* case, and there was a hearing

4    and the trial team handled that hearing, and to the extent

5    that there was anything relied on, I think specific documents

6    that's handled in camera, outside the presence of the public

7    or the trial team, and that can be dealt with.

8              But the fact that whether or not there is an

9    attorney/client relationship, the scope of that relationship,

10   the -- what waives or what doesn't waive that relationship,

11   those are not privileged in of themselves, and there's no

12   reason why even if they are not taking the lead, that the

13   prosecution team isn't more involved in what's going on right

14   here today.

15             MS. CASSIDY:  Your Honor, this is exactly what puts

16   us sort of in a bind is that the prosecution team argues,

17   well, there's crime fraud.  They haven't seen the documents.

18   They haven't articulated what communications are in

19   furtherance of a supposed crime or fraud.  And then we are

20   trying to respond in the abstract.

21             I mean, there are, you know, hundreds or if not

22   thousands of emails with the attorneys that they have said,

23   oh, okay, these Mexican attorneys, that's a crime of fraud.

24             I mean, am I -- I don't think I'm the one who

25   should be putting forth saying -- I assume you're saying that

1      this document is --

2              THE COURT:  Yeah, I mean, the crime fraud is a

3      little bit of a challenge here right, because most of this

4      has been up to the defendant to say that it's privileged.

5      But the breach of the privilege by acts of criminal acts

6      would be really from the government.

7              So I just --

8              MS. CASSIDY:  And that is the --

9              THE COURT:  But I don't, I mean, I just -- sorry if

10     I'm, you know, have a mental block on this.

11             I don't understand how I could make an assessment

12     about a particular document without seeing the document on

13     the group of documents that the government is saying there's

14     a crime fraud exception.

15             Because are you saying, okay, look, there were

16     these -- what's in here, right?  There is this email -- the

17     email with the drafts, and then seemingly sent by Mexican

18     attorneys.

19             And okay, because these letters were sent, any

20     communications involving these lawyers are -- must be the

21     crime fraud?  I don't know how you can say that.

22             I mean, I don't know what the -- I have no idea

23     what these lawyers did except for what's being suggested

24     here.  So, I don't know.  Maybe they're real estate lawyers.

25     Maybe they're -- maybe they incorporated company.

1              I mean, I don't know what they did, and without

2       looking at the document, how do I know that that was in

3       furtherance of a criminal act?

4              I mean, it's already hard to read the documents

5       that are here.  I don't even really understand them because

6       if you -- I mean, I'll just tell you what my sort of

7       take/question is, right.

8              So there is the opening -- of course I can't find

9       it as I try to say it.  But there is the opening paragraph,

10      which seems very confusing, suggesting that the author is the

11      prosecutor, I guess is what this is supposed to be.

12             But then the rest of it, I mean, people send cease

13      and desist letters all the time, and it doesn't mean that

14      there is any -- that that's a crime.  That that's harassment.

15             I mean, you know, people hate getting them and they

16      argue, but so what?  I mean, it's just, it's not a crime in

17      and of itself.

18             Now maybe to, I guess Ms. Jones your point, you

19      know, maybe the trial team could put it in a more of a

20      context of the overall acts that are alleged here, and so

21      then contextually it would have more significance.

22             The most problematic line in these letters, I don't

23      know, at least from just reading all of this is, now for

24      example I'm looking at 256-3, you know, I'm the chief

25      attorney of a criminal investigation in Mexico, you know, et

31

1    cetera.  That's the draft, and then the letter has that

2    sentence in it.  Anyway --

3              MS. JONES:  Your Honor, the trial team has asked

4    for oral argument on this motion.

5              And again, AUSA Pillmar and I, we are not part of

6    the litigation team.

7              That's the whole point of us, is that we're

8    supposed to be separate and apart from them and focusing on

9    the review of the documents.

10             So to the extent that there -- you want our oral

11   argument on this motion --

12             THE COURT:  No, what I want to know is, how do I

13   make a decision and take the arguments that are being made,

14   which is a serious argument that the lawyers were engaged in

15   criminal activity, and make a decision about that based on

16   the documents that the trial team has, when we don't -- the

17   trial team does not know what the documents are?

18             Now maybe the answer is some permutation of what we

19   have talked about, which is you give me the documents, I have

20   a conversation or oral argument, whatever it is, you know,

21   with the trial team, and I piece it together.

22             But it's hard to get it -- to get what defense

23   counsel's view is, you know, if it's -- you know, their -- I

24   don't know.  I don't know what the right word is.

25             But if you can't speak freely because you're like,

32

1    okay, half my brain can talk to Ms. Jones because she knows

2    all this, and my other have, you know, can talk to Ms. Penza

3    because she knows that.  But the twain shall never meet.  So,

4    all right.

5            I mean, I'm trying to tell you what the practical

6    problem seems to be from my side, you know, my perspective.

7    So I'm open to hearing whatever your suggestions are, and I

8    think, you know --

9            MS. JONES:  Your Honor, I think we need to start

10   moving documents to an in-camera review for you.

11           So I think what we will do is we will give the

12   defense counsel our final list of like, we have like

13   considered their statements that these are, in fact,

14   privileged, we'll confirm it, and we'll say look, these are

15   where we are in dispute.

16           And because we are in dispute about what the law is

17   on privilege and how that applies to these particular

18   documents, and then we'll just -- and then I think that it

19   will be upon the defendants to justify to you why these

20   particular documents are privileged.

21           THE COURT:  Okay.  So that will be for tranche --

22   what I'm going to call tranche A and tranche B.

23           MS. JONES:  Yes.  And we will try to identify

24   additional immigration documents to --

25           THE COURT:  Okay.

1          MS. JONES:  -- include within that, so that there

2     is a more of a sampling.

3          THE COURT:  Okay.  So I think that is the way to

4     go.  Defendant, do you disagree?

5          MS. CASSIDY:  And I would be --

6          THE COURT:  Or do you have a different suggestion?

7          MS. CASSIDY:  No.  Would that be in a submission to

8     the Court, that these are the documents that we believe that

9     there is a dispute on?

10          THE COURT:  You all are going to have a

11     conversation.

12          MS. JONES:  No, we are going to -- we are going to

13     tell you, these are the ones we do not agree with your

14     privilege designation.  And then you provide the

15     justification to the Court as to why these are privileged.

16          MS. CASSIDY:  As long as that does not involve the

17     documents that are -- that they're arguing are subject to

18     crime fraud, I'm okay with that procedure.

19          THE COURT:  Okay.  So I think -- so to me there's

20     two big pieces here, right?  One is your assertion of

21     privilege.  So that's what we're talking about right now.

22          MS. CASSIDY:  Correct.

23          THE COURT:  And I think at least a sampling would

24     work.  And, you know, maybe for some of these it's not even

25     really that much.  You know, it sounds like a lot because

1    it's the email chains, but --

2            MS. JONES:  But I think we should get some legal

3    precedent sort of going, and then we'll see -- then I think

4    hopefully that will help expedite further review if we know

5    that this is -- we had this disagreement, but it's been

6    resolved and now we have to move forward.

7            THE COURT:  So I think that's true on all the ones

8    that are the assertion of privilege.  It may be that you need

9    some details filled in that only the trial team has.  Maybe

10   you have to get them from the crime fraud.  This I have a

11   harder time thinking about how this happens, because this is

12   a burden on you.

13           MS. CASSIDY:  Right.

14           THE COURT:  Because you're suggesting that it's the

15   exception, and yet you're saying that the trial team is the

16   group that knows about it, and yet they can't look at the

17   documents.  And I mean, what do I say?

18           Even hypothetically I say, okay, those attachments

19   to these submissions on privilege, yeah, that looks like a

20   crime.

21           What does that do, except if there are other

22   versions of this?  You know, there is enough of a showing to

23   say that we should -- that there's some kind of waiver.  But

24   what does that mean?

25           And then I take other documents and I say, oh look,

1   those are other iterations of letters sent to -- I'm making

2   this up.  I have no idea if this happened.

3         But look, you know, these letters -- these are

4   similar letters that were sent to other individuals with a

5   similar kind of, in quote, threat.

6         So but, you know, it seems like the -- I'm not

7   sure, but reading the brief seems like the trial team would

8   like the crime fraud exception to have a bigger impact.  And

9   you don't know.

10         MS. CASSIDY:  Right.  I mean --

11         THE COURT:  Because -- go ahead.  Sorry.

12         MS. CASSIDY:  Yeah.  My sense is that the taint

13   team's job is to look at the documents and see if there's a

14   basis to overcome the privilege.

15         And one of those basis could be crime fraud.  I

16   don't think they need all of the information that the

17   prosecution team has in order to make that application to the

18   Court.

19         MS. JONES:  Your Honor, that's not how crime fraud

20   works.

21         It's like, yes, if a document looked like on its

22   face, you know, client A is writing to a lawyer, hey, I'm

23   committing a crime, you help me, that's fine.

24         But without knowing like what the actual -- the

25   facts are behind the case, like a lawyer -- crime fraud can

1    apply even if a lawyer isn't aware of that he's furthering

2    the crime.

3              So the fact that there is -- if a crime has been

4    committed and these are communications are being used as part

5    of that then it doesn't really -- like, you may not

6    necessarily see from the face of an email that -- or realize

7    the significance if you don't know the bigger picture of what

8    actually --

9              THE COURT:  Right.

10             MS. JONES:  -- what the crime is.

11             THE COURT:  So this is your point, if I -- this

12   question about the trial team is the better able, more

13   informed for contextualizing the communications.

14             MS. JONES:  Right, and --

15             THE COURT:  But without having the communications,

16   which they're not allowed to do, how do they do that?

17             MS. JONES:  Well, I think they managed to already

18   show you that it appeared that a crime has been committed,

19   and --

20             MS. CASSIDY:  Your Honor, if I may just add one

21   thing?

22             THE COURT:  We haven't had that conversation yet.

23             MS. CASSIDY:  I don't think they've even alleged

24   what crime it would be.

25             THE COURT:  Yeah.  I'm not --

1          MS. CASSIDY:  They're just saying crime fraud.

2     They're saying threats of harassment, and there's no

3     allegation of a crime.  And I've been involved in crime fraud

4     litigation before.  There's an allegation of an actual crime

5     that's been committed.

6          MS. JONES:  And they should be here to be making

7     these arguments.  Why are we dealing with this?  This is like

8     -- this is a litigation matter.

9          THE COURT:  Okay.  I understand, Ms. Jones, you

10    don't like this position that you're in, but this is -- the

11    difficulty is, you're the one -- or you and your colleague,

12    and whoever is doing whichever -- are the ones who have seen

13    the documents.

14          And without that knowledge, I don't know how one

15    makes an informed statement about the documents, unless they

16    are very similar.

17          So yes, of course, Ms. Penza, Ms. Hajjar, whoever

18    else is working on the team could come in here and hopefully,

19    you know, bring me up to speed with what you all have

20    developed as your evidence theory that you, you know, have

21    shared with the defendants and, you know, could be on the

22    public record.

23          And I, you know, I agree with you that there is the

24    possibility that there might -- you know, something might

25    seem -- these are my words, but I think those are -- so

1    anyway, seem innocuous until you understand, well, you know,

2    this is person A who -- you know, something had happened,

3    they've been threatened, they were the victim, they were

4    whatever, and now when you add some kind of communication on

5    top of that it has a different significance than you know, if

6    it just went to somebody who was not part of all of that.

7         Or to take a totally different kind of example, in

8    other, you know say, in drug cases, often a lot of things are

9    said in code.

10        And, you know, without somebody to give you

11   essentially the translation, I wouldn't know what the -- it

12   would seem like, you know, I mean you -- I'm sure you

13   probably have all seen these kinds of things where they look

14   like almost like recipes.

15        Like, you know, there will be a communication like,

16   I'd like to order, you know, a pound of beef and pound of

17   pork.

18        And you think, all right, well you know, is that a

19   recipe for you know, dinner?  Or no, what they're actually

20   doing is ordering drugs, right?  You know, there's a lot of

21   that kind of thing going on.

22        So, yes, there are many communications that I might

23   need the context for.  But without somebody who's seen the

24   document speaking to it, especially when the burden is on the

25   government, I feel I'm a little bit uncertain as to how this

1    can happen.  I'm not opposed to hearing from your colleagues

2    on this.

3           What I wanted to do today was to try to see if we

4    could cut to the chase on some of this with some helpful

5    information from individuals who have, you know, seen the

6    documents.

7           MS. JONES:  Well, I think she can move forward with

8    the procedure we discussed about the --

9           THE COURT:  On the first -- yeah, the one, point

10   one, which is these various claims of privilege and your --

11   so it would be, you know, helpful to, in a minute, talk about

12   a time line.  But crime fraud?

13          I mean, an oral argument based on this will fill in

14   some gaps but --

15          MS. CASSIDY:  Your Honor, it's also --

16          THE COURT:  -- I really don't know.

17          MS. CASSIDY:  It's not the case that the taint team

18   has no context.  I mean, they have obviously read the

19   government's brief, so they know what it is that they're

20   looking for.  And then they have seen the privilege

21   documents.

22          So I don't really understand why they wouldn't make

23   -- be in the position to make an argument to Your Honor that

24   they think that crime fraud is, you know, vitiates from

25   privilege with respect to certain documents.

1          MS. JONES:  Your Honor, we have -- I have read the

2    briefs.  But, you know, we are not participating in the

3    witness interviews, we're not reviewing the other documents

4    that, you know, they're focusing on for trial.  We're not

5    participating in the trial preparation.  We're just focusing

6    on this.

7          THE COURT:  All right, well --

8          MS. CASSIDY:  I mean, you're sort of saying that

9    neither half of the government can meet its burden on crime

10   fraud.  So --

11         THE COURT:  Look, I mean, you know, I've spent the

12   last 15 minutes basically saying that.  So this is the

13   government's burden.

14         And so maybe what makes sense, talk about the

15   schedule for the other documents, and then for you as the

16   taint team, to talk to your colleagues and if you think that

17   the way to get the information that would provide some more

18   context that would be helpful in the motion is just to come

19   back here and, you know, have them speak.

20         And then, you know, maybe that will make this a

21   pure question of law.  I'm skeptical, given what the issue

22   is, but -- and the submission that's been made.

23         But, you know, I don't know.  Maybe they have

24   helpful information that they could share that would help

25   with this.

1          If not, I really don't know -- I don't know where

2    we would go after that.

3          Okay.  So in terms of the timing, so I think the

4    next step is -- or it's really maybe amplifying what you've

5    already done, is for the taint team to -- oh, well I think --

6    I'm sorry.  You said you were waiting for some responses?

7          MS. JONES:  We don't have a final list from

8    Defendant Raniere --

9          THE COURT:  Right.  Raniere.  Okay.

10         MS. JONES:  -- as to what documents he's asserting

11    privilege over.

12         THE COURT:  Okay.  So I know you're only hearing --

13    I don't know, you're sitting on the back bench, not on a

14    microphone.

15         UNIDENTIFIED SPEAKER:   Sitting in the back here.

16         THE COURT:  Not technically appearing, but what's

17    the schedule that you think that --

18         UNIDENTIFIED SPEAKER:  I went through yesterday --

19         THE COURT:  -- you can do?

20         UNIDENTIFIED SPEAKER:  -- and a lot of the

21    documents I originally marked as privileged, I no longer

22    marked as privileged.

23         I am waiting on just -- it's about 30 emails, but

24    three email chains that I have to go over with my client, and

25    today was the first time I could see him.

42

1          THE COURT:  Right.  Because there --

2          UNIDENTIFIED SPEAKER:  We have another appearance

3    tomorrow, so I could imagine that I get this done by

4    Thursday.

5          THE COURT:  Okay.  And is the delay because of

6    the --

7          UNIDENTIFIED SPEAKER:  Yes.

8          THE COURT:  -- difficulties with the MDC?

9          UNIDENTIFIED SPEAKER:  I have not been able to see

10   him since Sunday.  Whatever this -- not this last -- the

11   27th.

12         THE COURT:  Okay.  All right.  So you're going to

13   get back as quickly as you can, but you think by the end of

14   the week?

15         UNIDENTIFIED SPEAKER:  Thursday morning.

16         THE COURT:  Okay.

17         UNIDENTIFIED SPEAKER:  I can imagine Thursday.

18         THE COURT:  All right.  So that will be Raniere.

19   What about Ms. Bronfman's documents?

20         MS. JONES:  So we have gone back -- like we've gone

21   back and forth, and you know, as I've said, we've got a total

22   of 322.

23         We haven't gone through with the second tranche, we

24   haven't gone back to look again and take a second look out of

25   the ones she is arguing are privileged.

43

1          So we'll do that and figure out if we are -- want

2     to, you know, rethink our position based on the explanation

3     she's provided as to why it's privileged.

4          And then we will tell her, we will try to give her

5     an answer by Monday as to what we are not going to agree on,

6     and we will also try to get her before then, an additional

7     set of immigration documents.

8          It won't be all of them, but we'll try to get

9     through a number of them so then she can come back and say

10    whether or not she disagrees with our not privileged

11    designation.

12         And then we'll have a list of -- these are the

13    documents in dispute, and then she can provide a copy of them

14    to you in-camera with an explanation, which we should be

15    copied on the explanation so we can argue, because I think

16    there are going to be legal disputes as to what -- whether or

17    not they're privileged -- whether or not these documents are

18    privileged.

19         And I think it will come down to are these in fact

20    -- is there a valid common interest agreement, or have they

21    met that burden, and whether or not certain documents fall

22    within the scope of her privilege.

23         So I think there will be like -- we would like to

24    see what they submit to you and their arguments as to why

25    they're privileged, respond, and then you can make your

44

```
1      determination after reviewing the documents.

2              THE COURT:  What's defendant's counsel's thought

3      about that?

4              MS. JONES:  Oh, also, I want to raise that a lot of

5      these are going to be NXIVM's privilege, so it's not clear to

6      me whether or not Ms. Bronfman or Mr. Sullivan is going to be

7      making the submission to you.

8              Your Honor, I mean, I don't object to providing the

9      taint team with my explanation of why it's privileged, or

10     case law on why it's privileged.

11             If I'm going to go beyond what's already in the

12     document and reveal additional privileged information that

13     would support my argument, you know, and my burden of

14     establishing the privilege, then I do think that that should

15     just be made ex parte.

16             MS. JONES:  I thought that was the whole point of

17     us.

18             MS. CASSIDY:  Well, you know, I don't know what --

19             THE COURT:  Privileged information that's not --

20             MS. CASSIDY:  -- whether there's information

21     that --

22             THE COURT:  -- in the documents.

23             MS. CASSIDY:  -- flows between the taint team and

24     the prosecution team.  I mean, it certainly seems like --

25             THE COURT:  It's supposed to be a one-way street.
```

1           MS. JONES:  And it is, Your Honor.

2           THE COURT:  Them to you, not you to them.  Except

3      for asking questions about information.

4           MS. CASSIDY:  Them to -- the taint team to me.

5           THE COURT:  No, the --

6           MS. CASSIDY:  The prosecution team.

7           THE COURT:  -- information should be going from the

8      trial team to the taint team, and the only thing going from

9      the taint team to the trial team, until a question of

10     privilege is resolved, is possibly a solicitation of

11     information.

12          Okay.  So you're saying -- I mean, where are you?

13          MS. CASSIDY:   I mean, I'd have to see the

14     documents to see what they're challenging and, you know,

15     where we come out on this.

16          THE COURT: All right.  Yeah.  I guess we can

17     reserve on that, whether --

18          MS. CASSIDY:  Yeah.

19          THE COURT:  All right.  But what, in terms of a

20     time line?  You're suggesting -- the government is suggesting

21     that --

22          MS. CASSIDY:  Suggesting they'll give us --

23          THE COURT:  The list.

24          MS. CASSIDY:  -- the list by Monday. I would say by

25     the following Monday.

1    THE COURT:  Okay.  I'm sorry, let me go back, Ms.

2  Jones.  Will that include the immigration in your list?  At

3  least some?

4    MS. JONES:  At least some.

5    THE COURT:  Okay.

6    MS. JONES:  I don't know if we'll get through all

7  the immigration documents.

8    There are a number of them, but we definitely try

9  to mark some more immigration documents so we can have a

10  bigger selection to -- for you to review.

11    THE COURT:  Okay.  And so just I mean, you're free,

12  the 18th is the holiday I think, right?  Isn't that

13  President's Day?  Yeah.

14    And then is there a suggestion that right then

15  you'll just give me the documents that you disagree about?

16    MS. CASSIDY:  Yes.

17    THE COURT:  Okay.  All right.

18    So that will be an ex parte submission.  You'll

19  have to see.

20    I mean, I guess the taint team can see some,

21  possibly all of it.

22    Do you want to respond to that?  Do you want to

23  just have arguments?

24    MS. JONES:  I do, Your Honor, because we have our

25  reasons why we've marked these as non-privileged, and we will

1    have our reasons for why we haven't agreed with them when

2    they objected to it, because I think we just have a different

3    views on the law and how the privilege applies to these

4    documents.

5              THE COURT:  Okay.  Given -- I mean, you should be

6    able to give me that pretty quickly, right?

7              MS. JONES:  After we get -- after we see what there

8    is --

9              THE COURT:  Yeah, but you already know why you

10   think that they are privileged and what your different review

11   is.  Sorry, why they are not privileged in your different

12   view.

13             MS. JONES:  Uh-huh.

14             THE COURT:  Just looking at a --

15             MS. CASSIDY:  Your Honor, the Monday is the

16   President's Day?

17             THE COURT:  Uh-huh.

18             MS. CASSIDY:  I might want to do it the Tuesday,

19   just to be sure that I can confer with NXIVM counsel, because

20   I don't know their -- I don't know his schedule.

21             THE COURT:  All right.  The government, if you have

22   anything you want to say can you do it by Friday, the 22nd?

23             MS. JONES:  Your Honor, can we have the following

24   Monday?  I just, that week is a holiday.  It's for the --

25             THE COURT:  Oh, the schools?

48

1        MS. JONES:  School is closed that entire week.

2        THE COURT:  And, you know, the downside of all of

3   this you're saying basically, you know, it's not going to be

4   -- it's going to be three weeks before I get what you're

5   submitting.  And what's your trial date again?

6        MS. JONES:  April --

7        MS. CASSIDY:  April 29th.

8        THE COURT:  All right.  So it basically gives you

9   two months.

10       MS. CASSIDY:  But this is only on the first two

11  tranches of documents --

12       THE COURT:  I know.

13       MS. CASSIDY:  -- and I assume there are many more.

14       I mean, I don't have a sense, I mean, from what

15  they have said today, I assume that these are the only

16  documents that they've gone through document by document.

17       I don't know whether there's a whole -- you know,

18  are there 10,000 documents that they can say, okay, we agree

19  those are privileged.  We're not discussing those.

20       I mean, I think it will be helpful to have some

21  sense of how far -- how many more rounds of this --

22       THE COURT:  I mean, that was sort of where we tried

23  to start.

24       MS. CASSIDY:  -- there might be.

25       MS. JONES:  And, Your Honor, we've been -- our

1  focus is on identifying what's not privileged.

2          Not, you know, just trying to -- and if we see a

3  document and it looks clearly privileged, we've been marking

4  it privileged.  But again, we're doing searches to try to

5  figure out like, what is not privileged here.

6          And so we have identified what we have so far -- I

7  mean, we do have like, I don't know how many more we have,

8  like in the queue of what we've like continued to review and

9  haven't sent over yet, but I think when we do this back and

10 forth, that's kind of what we shift our focus to instead of -

11 -

12          THE COURT:  Do you have any approximation of --

13          MS. JONES:  Look.  I think there are about -- I

14 think there are still about over 30,000 -- 35,000 documents I

15 think that still have not been reviewed.

16          THE COURT:  I'm trying to understand.  Reviewed

17 means --

18          MS. JONES:  That we've looked at it and we've

19 marked it either privileged or not privileged.

20          THE COURT:  Okay.  What about --

21          MS. JONES:  All right --

22          THE COURT:  How many numbers are showing up in your

23 searches that are, from your perspective, arguably not

24 privileged?  I mean, that's really -- right?

25          Because from defendant's perspective, they don't

50

1   want to hear that a month from now and a month out from trial

2   or a month out, whatever that is, you know, two months out

3   from trial, that there's --

4            MS. JONES:  Your Honor, they have --

5            THE COURT:  -- some enormous number.

6            MS. JONES:  They have all the documents we have.  I

7   mean, it's not like we're sitting on them.

8            Like, they are just as capable as we are as like

9   conducting searches to see what's in there.  And I know it's

10  they're not, they're saying --

11           THE COURT:  Wait, they've asserted the privilege.

12  They want to know what you disagree with, right?

13           MS. JONES:  No, no, no.  We are saying what's not

14  privileged, and then they say whether or not they agree with

15  us.  They are not asserting privilege over anything.

16           THE COURT:  I thought that was the whole

17  segregation point.

18           MS. JONES:  No.

19           THE COURT:  These documents were segregated.

20           MS. JONES:  They are segregated --

21           MS. CASSIDY:  They're segregated as potentially --

22           THE COURT:  And then --

23           MS. CASSIDY:  -- privileged.

24           THE COURT:  -- on the working assumption that the

25  documents that involve various attorneys and law firms,

1    there's a strong likelihood that those are privileged.

2    That's why they were segregated.

3         Now you're going through and saying, oh, the

4    example you gave earlier, which is that, oh, there are other

5    people on this chain so the privilege has been lost.

6         And then you identify those to them or whatever,

7    crime fraud, or whatever the argument is that you're making.

8    And then they're saying, no, you're incorrect about the

9    waiver.

10        MS. JONES:  No, Your Honor, these documents --

11        THE COURT:  Or that, I'm sorry, they say there's a

12   privilege and it hasn't been lost.  That sort of thing.

13        MS. JONES:  These documents are potentially

14   privileged just because of the search terms.  So if anywhere

15   in the document or the attachment, a lawyer's name appears,

16   it's in our pile.

17        THE COURT:  Right.

18        MS. JONES:  So it's not -- they have made very

19   clear that they have not asserted privilege over all these

20   documents; that they're waiting for us to say what's not

21   privileged so they can say whether or not they agree or not

22   agree with it.

23        THE COURT:  Okay.  The practical point is, they

24   don't want anything to be given to the trial team or the

25   world if it is privileged.

1        And what I think, and you correct me if I'm wrong,

2    your concern increasingly is, the closer you get to trial,

3    you don't want to hear, oh, look, we don't think this group,

4    despite the fact that there are these attorneys' names on it,

5    or law firms' name on it, or domain names and all the other

6    various permutations which you identified lawyers, those are

7    not privileged, and now suddenly we have another whatever,

8    one, two, three, however many thousand documents, or hundreds

9    of documents that we have to deal with for trial.

10           MS. CASSIDY:  That's correct.

11           THE COURT:  And that's the practical consideration.

12        And whether the dance is, you know, you haven't

13    asserted privilege but they have -- as I understand this

14    exercise, the defendants have said, these are attorneys and

15    law firms that our clients dealt with, and you segregated

16    that because attorney/client privilege.  And now you're doing

17    the analysis of that.

18        So the point is, at what speed and with what degree

19    of accuracy and breadth are you getting through your

20    analysis.  Right?  Because --

21           MS. JONES:  Your Honor, we're moving as quickly as

22    we can with the resources that we have.  And again --

23           THE COURT:  Again, I will flag, and this is not

24    your issue, the resources that you have has been something

25    that's been a concern for me the whole time because it's a

1        big case with a lot of lawyers, a lot of defendants.

2                And if you can't do what you need to do, and I have

3        no idea whether you can or can't, then your office should be

4        staffing this in a way that lets you do it.

5                That's really, you know -- and now, that's you

6        know, a professional and an administrative decision for the

7        US attorney's office to make.  But --

8                MS. CASSIDY:  And just to that --

9                THE COURT:  -- it's been an issue along the way, if

10       this is too much for anybody to do.  But, okay.  So --

11               MS. CASSIDY:  Just to that point, Your Honor.

12               I mean, some of these documents that are in their

13       queue to review, they were seized at the beginning of this

14       year.  And while they --

15               THE COURT:  2019.

16               MS. CASSIDY:  No, sorry.  The beginning of last

17       year.

18               THE COURT:  Yes.

19               MS. CASSIDY:  The beginning of 2018.

20               And while I realize that, you know, they seized

21       them from my client's email account, and she hadn't been

22       indicted yet so they weren't going to ask me for a list of

23       attorneys at that point, all of the documents seized from Ms.

24       Salzman's house, she was well aware that a search warrant was

25       executed, so they could have asked her for a list of

1      attorneys --

2                THE COURT:  Right.

3                MS. CASSIDY:  -- and been going through and doing a

4      privilege review all year --

5                THE COURT:  Right.  So I think --

6                MS. CASSIDY:  -- long.

7                THE COURT:  -- what you're flagging goes to the

8      arguments that are most likely going to be made to Judge

9      Garaufis that, enough is enough and there has to be a line

10     drawn on production and what they can reasonably rely on at

11     trial.

12               And we've already had this conversation in various

13     iterations, including the fact that there was a very extended

14     period in which the government itself was getting practical

15     access, right?

16               The seizures happened, then there was some period

17     of discussion, negotiation, then there was a need for an

18     outside vendor, then there was the technical loading of the

19     documents on the vendor's machinery, you know, software or

20     whatever it was, breaking off the ones that the vendor

21     couldn't deal with and are apparently down at Quantico, and I

22     have no idea what's going on with that.

23               And here we are, and you've -- this is not a

24     criticism of the work.  This is a look at the time line,

25     which is true, the government has had these documents a long

1     time.

2           That being said, I don't think it's going to be my

3     -- it's not my decision to say where this line is drawn.

4     We've talked about it a good bit before as to other issues.

5           So, again, the question is, as a practical matter

6     is there any way for me and the defendants to get some sense

7     of where the -- and how the taint team, you see yourself

8     working through this enormous number of documents?

9           So one thing we've talked about is, all right, once

10    we get some sample documents and can have a resolution, then

11    you could apply those rulings to some of the documents.

12          But there is a lot of other documents behind that

13    and I, you know -- I mean, you know, there's different

14    scenarios.

15          One, you're looking for the ones that are the most

16    likely to not be privileged, right?  So you looked for --

17    your first example.  You looked for change of documents that

18    had non-attorneys on it, right, and you all kind of worked

19    your way through that. And now you're in this next category

20    where you can group it.

21          But is there, you know, is behind that

22    communications that you agree probably are privileged and

23    that's it?  Or are you just going to keep working all the way

24    -- I don't know, until whenever I guess the trial judge says

25    that's it?  I mean, the numbers are huge.  The numbers in

1    this case have always been huge.

2              MS. JONES:  And I know, that's why we were

3    hoping --

4              THE COURT:  But there's a trial date.

5              MS. JONES:  That's why we were hoping to get some

6    of these issues resolved as a matter of law.

7              THE COURT:  Well, they may be matters of law, but

8    they are going to be tied to the documents.

9              But what we, defendants and I have heard is, the

10   ones that you all worked through, the ones that you are in

11   the process of identifying and I think are trying to get a

12   handle, or I'm trying to get a handle for my schedule at a

13   minimum as to, is there a whole other group of documents that

14   you suspect are not privileged and that you're going to raise

15   that, and there will be a whole other round of analysis, or

16   is this most of the work?

17             And, you know, once we resolve this so, you know, a

18   month out from -- whatever.  A month from now, or something

19   like that.  You know, they will know where they stand with

20   regard to those segregated documents.

21             MS. JONES:  Your Honor, I think we need to discuss

22   amongst ourselves if there is a way that we can mass-tag

23   documents and you know, maybe we'll try doing that forward,

24   but I think -- well, we'll try that.

25             We'll see if we can mass-tag documents, but I think

57

1     what's going to happen is that we're going to go back and

2     forth, and we're saying mass-tagging them, not privileged.

3     We're going to mass-tag them privileged.

4              So it's just going to be, if we do it by -- there

5     doesn't -- we would like to get away from a document by

6     document analysis, but we're not getting anything from

7     defense counsel other than, let's do this document by

8     document.

9              We gave them a tranche of documents and then it

10    takes them, you know, a week or two weeks, or three weeks to

11    get back to us saying what they agree on.  So --

12             THE COURT:  All right.  I'm not -- I just, I don't

13    think there's any way in which the responsibility for this

14    being a detailed process and slow can be put on to

15    defendant's counsel, given the very long time the United

16    States government had the documents.

17             It just doesn't seem balanced to say that.  It's

18    labor intensive and that's what you're working through, but -

19    - all right.

20             So as a practical matter what we're going to do is,

21    you're -- on the privilege claims that defendants are

22    asserting and government is questioning, the taint team is

23    going to give the documents, or identify the documents by the

24    11th.  The government -- I'm sorry.

25             The defendants will respond and give me those which

1    you have not come to an agreement by the -- well, by the

2    19th.  And then the 25th if the government wants to say

3    anything about that.

4              And then crime fraud, where are we going to leave

5    this?  You're going to talk to your colleagues and --

6              MS. JONES:  I think that -- I think the prosecution

7    team needs to be involved in these arguments about crime

8    fraud.

9              THE COURT:  And you think -- I mean, I guess my

10   thought is, all right, we'll try but I don't know if it's

11   going to get us anywhere.

12             MS. CASSIDY:  I think it's a waste of time.

13   They've put in their submissions, they've said what they can

14   say without having seen the documents.

15             So unless the taint team wants to make a separate

16   submission identifying the documents that they think, in line

17   with the prosecution team's you know, factual arguments --

18             THE COURT:  Right.

19             MS. CASSIDY:  -- are subject to crime fraud --

20             THE COURT:  Right.

21             MS. CASSIDY:  -- I don't know where that -- I

22   don't think that gets us anywhere to have a discussion.

23             THE COURT:  Do you know what their availability is?

24             MS. JONES:  I don't.  I know they have something

25   tomorrow, but --

1          MS. CASSIDY:  We have a conference tomorrow.

2          THE COURT:  You'll all be here.  What time is --

3     what time is that?

4          MS. CASSIDY:  Our conference tomorrow is at 11:00

5     a.m.

6          THE COURT:  At 11:00.  Is it unreasonable to say,

7     pick this conversation up after that, or --

8          MS. JONES:  I don't know what their schedule is,

9     Your Honor.  I hate to talk -- speak for them because I

10    haven't -- I didn't even raise this with them.  All I know is

11    that they had a -- they were going to see Judge Garaufis

12    tomorrow.

13         THE COURT:  I'm just looking at the schedule.

14    Everybody -- Friday?  I mean, I'm on criminal duty so I have

15    to be a little bit flexible.

16         It could either be fairly early in the morning or -

17    - I don't know, it's hard to say.

18         MS. CASSIDY:  We could check with the prosecution

19    team tonight and see if they're able to do it tomorrow after

20    the court appearance.  I mean, I don't know.

21         I don't have a sense of how long that court

22    appearance will take, but it should certainly be finished by

23    1:00, I would think.

24         MS. JONES:  And you're contemplating that we, that

25    we all show up, taint team and prosecution team.

1          THE COURT:  I guess you might as well learn what

2     they know.

3          MS. JONES:  Okay.

4          THE COURT:  Yeah.  So I mean, why don't you touch

5     base with them, everybody.

6          We could do it tomorrow at lunch, or -- and so you

7     should just call my chambers and let me know.  Or Friday, I

8     would say --

9          MS. CASSIDY:  If we want --

10         THE COURT:  It really depends on your schedule.

11    I'm in criminal duty so it's pretty unpredictable.  The

12    morning, you know, I hate to say this, the mornings are

13    usually not so busy.

14         So like right after whatever happens in

15    arraignments, or we could start, I could go there, come back.

16         MS. CASSIDY:  If we want Raniere's team here, I

17    don't believe they're available on Friday.

18         THE COURT:  Oh, you're not.  Okay.

19         UNIDENTIFIED SPEAKER:  I'm not.  I'm sorry.

20         THE COURT:  Okay.

21         UNIDENTIFIED SPEAKER:  I'm available all Thursday.

22    I do expect -- I do think the conference in front of Garaufis

23    is going to be relatively short tomorrow.  So --

24         THE COURT:  Okay.

25         UNIDENTIFIED SPEAKER:  And I really could just

1      email them now and ask if they're available.

2              UNIDENTIFIED SPEAKER:  I'm doing that right now,

3      Judge.

4              UNIDENTIFIED SPEAKER:  Oh, okay.

5              THE COURT:  Okay.  All right.  If not I would say,

6      then how is Monday at 12:30?

7              MS. CASSIDY:  That's fine for me.

8              UNIDENTIFIED SPEAKER:  That's fine for us.

9              MS. JONES:  Right now it looks okay for the taint

10     team.

11             THE COURT:  Okay.  So why don't you just give us a

12     call in the morning, whether you're going to come by.  You

13     know, I have some conferences on.  They don't look like

14     they're going to be that long.

15             I certainly have the lunch break.  Or, yeah, Monday

16     at 12:30.  Just let me know which one you want to do.

17             MS. JONES:  So either tomorrow or Monday at 12:30?

18             THE COURT:  Yes.

19             MS. JONES:  Okay.

20             THE COURT:  All right.  What I've told you my

21     impressions of this.

22             If you think I'm misguided, we should reorient --

23     look at this some other way that we haven't talked about.

24     Does anybody have, other than what we've already talked

25     about, any practical or impractical but interesting

62

1      suggestions about how to do this?

2              No?  All right.  Well, if something -- if you do

3      have an insight, think about it differently, et cetera, you

4      can let me know.  All right.  Anything else?

5              Oh, sorry.  I mean, obviously I should -- if your

6      clients want to come, I guess they'll be -- are they --

7      they'll be here for that conference?

8              MS. CASSIDY:  Mine will.  Yes.

9              THE COURT:  You should work out that they could

10     attend.

11             MS. CASSIDY:  Thank you.

12             THE COURT:  Right?  I mean, they weren't noticed

13     for this in particular, but hopefully we can, you know, put

14     it on the calendar, let the marshal know, and go from there.

15     All right.  Anything else?

16             No?  All right.  I appreciate you staying late.

17             MS. JONES:  Thank you.

18             MS. CASSIDY:  Have a good night.

19             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  Good

20     night.

21          (Proceedings concluded at 6:19 p.m.)

22

23

24

25

1

2              I, CHRISTINE FIORE, court-approved transcriber and

3      certified electronic reporter and transcriber, certify that

4      the foregoing is a correct transcript from the official

5      electronic sound recording of the proceedings in the above-

6      entitled matter.

7

8      *Christine Fiore*

9      _____          February 7, 2019

10     Christine Fiore, CERT

11

12

13

14

15

16

17

18

19

20

21

22

23

24