1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        18-CR-204(NGG)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5          -against-                    February 05, 2019
                                        11:00 a.m.
6   KEITH RANIERE, et al.
              Defendants.
7
    ------------------------------x
8        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
             BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
9             UNITED STATES SENIOR DISTRICT JUDGE
    APPEARANCES
10  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
11                             271 Cadman Plaza East
                               Brooklyn, New York 11201
12                             BY:  MOIRA KIM PENZA, ESQ.
                                    TANYA HAJJAR, ESQ.
13                                  MARK LESKO, ESQ.
                                    KEVIN TROWEL, ESQ.
14                                  SHANNON JONES, ESQ.
                               Assistant United States Attorneys
15
    For Keith Raniere:         BRAFMAN & ASSOCIATES
16                             767 Third Avenue
                               New York, New York 10017
17                             BY:  MARC AGNIFILO, ESQ.
                                    TENY ROSE GERAGOS, ESQ.
18
                               DEROHANNESIAN & DEROHANNESIAN
19                             677 Broadway
                               Albany, New York 12207
20                             BY:  PAUL DEROHANNESIAN, II, ESQ.

21  Also Present               JOHN MATTEO,Facility Manager
    For Bureau of Prisons:     NICOLE McFARLAND, Staff Attorney
22                             ELEAZAR GARCIA, Associate Warden
    Court Reporter:            Rivka Teich, CSR, RPR, RMR, FCRR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

PROCEEDINGS

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.

3          THE COURT:  You may be seated.

4          COURTROOM DEPUTY:  State your appearances.

5          MS. PENZA:  Good afternoon, your Honor, Moira Kim

6   Penza Tanya Hajjar, Mark Lesko for the United States.  Also at

7   counsel table is Nicole McFarland, staff attorney for the MDC;

8   John Matteo, MDC Facility Manager.

9          THE COURT:  Good afternoon.

10          MS. PENZA:  And Associate Warden Eleazar Garcia from

11   the MDC.

12          THE COURT:  Good afternoon.

13          MS. PENZA:  And finally at counsel table is Jonathan

14   Algor who is here for the subsequent proceeding.

15          THE COURT:  Please be seated.

16          MR. AGNIFILO:  Good afternoon, your Honor, Marc

17   Agnifilo, Teny Geragos, and Paul DerOhannesian and for Keith

18   Raniere who is present.

19          THE COURT:  Thank you, please be seated.  We're here

20   on a bail application which is complicated by the conditions

21   that were identified by defense counsel in his letter of

22   February 1st and February 4th at the MDC, correct?

23          MR. AGNIFILO:  Yes, Judge.

24          THE COURT:  The Court has reviewed the defendant's

25   bail application of January 25 and the Government's response.

PROCEEDINGS

1    So let's first talk about the actual bail application and then

2    we'll go into the issue of the current conditions at the MDC,

3    which have been apparently evolving since the fire.  There was

4    a fire that took place that knocked out at electrical system

5    and other equipment during the coldest days of this century.

6          So go ahead.

7          MR. AGNIFILO:  Yes, Judge, thank you.

8          We did file a bail motion, our third bail motion.

9    It's different than the others in that there is a due process

10   component to it.  I think it's significant that we filed that

11   bail motion with the due process component two days before the

12   fire.  So from our argument, even without the events that I

13   think we're going to review in part today, we believe that

14   Mr. Raniere has had his due process rights violated.

15         I'm not going to belabor the points.  Your Honor

16   knows I stand here at almost every court appearance, and

17   admittedly some of my co-counsel don't always ask for what I

18   ask for, but certainly for Mr. Raniere's perspective we've

19   been asking for a trial since he's come to Brooklyn.

20         Now, there have been different reasons that we don't

21   dispute that have amounted to exceptions to the Speedy Trial

22   Act.  And one of the things that is interesting, I don't know

23   that I've ever seen an answer in the case law to this, it's

24   interesting to note that 18 U.S. Section 3164, which is in the

25   Speedy Trial statute says that after 90 days an incarcerated

PROCEEDINGS

1  defendant gets released.  Now, what relevance could that

2  statute have when you also consider that 3161 says after 70

3  days a case gets dismissed.  It can't exist logically; it

4  literally makes no sense.

5          So the argument that we touch upon in our bail

6  motion is that the calculus behind 3164 has to be different

7  than 3161 in some regard.  I think the regard really is this,

8  further on in 3161 they make distinctions between adjourned

9  periods that they call the fault, but say the fault or

10  responsibility of one party or another party.  Motions aside,

11  and motions probably do exclude the time, but the vast

12  majority of the adjournments in this case have been due to a

13  combination of two things:  One is my co-counsel, they have

14  the right to say we don't have the discovery as quickly as we

15  should have.  But what I've endeavor to do is I've endeavored

16  in my motion papers to go through chapter and verse of all the

17  details of how this case did not have to become as

18  unmanageable, complex, whatever term you want to use, as it

19  became.

20          I'm not saying anything to say to besmirch my

21  colleagues at the U.S. Attorney's Office, who I like and

22  respect a great deal for a long time.  They wouldn't meet with

23  us.  We wanted to meet with them, to talk about discovery, a

24  way of making things easier.  They didn't want to.  They said

25  they didn't have to.  And you're right, they don't have to.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    But they certainly didn't contribute to making the case

2    easier.

3           It wasn't until your Honor sent us to Judge Scanlon

4    that Judge Scanlon, in my estimation, maybe the other parties

5    have a different view, held the Government's feet to the fire

6    and demanded answers and got some answers and started to move

7    this case forward.  Because at this point we're in the weeds.

8    Your Honor made the very good point at one point of saying

9    this court, meaning the District Court, is not going to deal

10   with your in-the-weeds discovery issues, nor should it.  And

11   your Honor wisely sent us to Judge Scanlon who got in the

12   weeds with us and then we started to get some progress.

13          It's a case that has a lot of different facets to

14   it.  I think the Government is working hard; I do.  I think

15   they are trying to get stuff to us expeditiously.  But through

16   a series of complications, including and this is the other

17   part of the motion, there have been I don't know how many days

18   in January that legal visiting before even the fire, was

19   suspended in at the MDC.

20          THE COURT:  We're going to get to that, as to the

21   currents circumstances.

22          MR. AGNIFILO:  I'm curious why, it's a major

23   problem.

24          THE COURT:  There is a, Judge Dearcy Hall, who has

25   issued a temporary restraining order in a civil litigation

PROCEEDINGS

1    brought by the Federal Defenders requiring that visitation be

2    restored during regular hours as set forth in the rules of the

3    facility, which I think are 8:00 a.m. to 8:00 p.m. seven days

4    a week.  Whether or not that has been accomplished, we're

5    going to hear from the representatives of the MDC, who are

6    required to be represented by whomever they send, and they've

7    sent three people.

8         So I expect that we're going to get at least some

9    answers as to what the current status is of that and other

10   issues that may effect your client and the other two

11   defendants who we're going to be here in a few minutes.

12        It's important to the Court that we get the answers

13   and also that the improvements that are necessary to deal with

14   some of these really extraordinarily terrible conditions be

15   dealt with, at least with regard to these three defendants.

16        I don't have jurisdiction to run the MDC.  I don't

17   want jurisdiction to run the MDC in formal circumstances.  But

18   I do have jurisdiction to deal with the rights of the

19   individual defendants who have been detained at the MDC who

20   are assigned to me as defendants.  So that's why we are here.

21        MR. AGNIFILO:  I understand.

22        THE COURT:  Frankly for two reasons.  One, you

23   raised the third request for bail.  And two, you've added to

24   it the issue of the circumstances, your client's detention at

25   MDC specifically, I understand all of that.

PROCEEDINGS

1    MR. AGNIFILO:  The other part of it is 3164 says

2 something in the clearest terms, it says that incarcerated

3 defendants shall be given priority.  It says "shall" in the

4 clearest terms.

5    With utmost respect to my colleagues at the United

6 States Attorney's Office, they've done everything other than

7 give Mr. Raniere's case priority.  They are continuing to

8 investigate, as is their right in a general sense, but I don't

9 know if it's their right with an incarcerated defendant.

10    They've taken the position in front of Judge

11 Scanlon, we have discovery that might be relevant to you but

12 we're not going to give it to you because we're still

13 investigating, because there might be a Superseding

14 Indictment.  That's fair and kosher under the rules, except

15 when you consider that there is an actual statute that says

16 you shall give an incarcerated defendant priority.

17    That can't just be meaningless, that has to mean

18 something.  I think what it has to mean is when you have an

19 incarcerated defendant who comes to court and says, you know,

20 Judge, I'm innocent.  I want a trial of the earliest possible

21 date, and I certainly don't want to be incarcerated against my

22 will while I'm waiting for that trial.  I don't think what the

23 Government gets to do then is to look at other defendants,

24 look at other charges, look at other Superseding Indictments.

25 Normally they can do that, but they can't do that when the

PROCEEDINGS

1   defendant is incarcerated because the words "shall be given

2   priority," have to mean something.  They can't be words that

3   we can all decide to ignore.

4           One thing I do want to say, your Honor has been very

5   on top of the fact from the very first minute I stood in this

6   spot and talked to your Honor about this case about your

7   Honor's concern, the first thing you ever said about this case

8   is we're going to try to move Mr. Raniere with alacrity.  I

9   was happy.

10          Here is the problem.  The Government, and I'm not

11  for the moment putting ill motives on them, there is lots of

12  ways of making sure that a case does not move with alacrity.

13  We might supersede once, we might supersede twice.  We have

14  discovery that might be relevant to other charges.

15          From my view of the world, they've put the Court in

16  a box.  I remember standing here in the fall at some point and

17  we tried to reach a consensus on a trial date.  I wanted

18  January 7.  I wanted a January 7 trial, I made that very

19  clear.  My co-counsel didn't.  So we had an all-parties

20  agreement that we were going to try this case on the date that

21  we set in March.

22          It didn't happen in March.  It didn't happen in

23  March certainly for no-fault of the Court, I think the Court

24  was willing and able to have the trial in March.  We didn't

25  have the trial in March because there were discovery issues,

PROCEEDINGS

1    some of my co-counsel wanted more time to respond to the

2    enterprise letter.  I'm aware of all of that.  I'm not trying

3    to take things out of context.

4            But, we have one incarcerated defendant in this

5    case.  And it happens to be the only defendant who has been

6    demanding a prompt trial.  He has not gotten a prompt trial.

7            Even before this situation with the MDC ever started

8    to unfold, I submit that when we get into the facts of the MDC

9    all this fire did on January 27 is shine a spotlight on some

10   other issues within the MDC, which we're going to talk about,

11   lack of heat, things along those lines, we already had a

12   problem.

13           We had a problem as of the date we filed the motion

14   on January 25.  From our estimation we believe Mr. Raniere

15   should be released as a matter of fundamental fairness and due

16   process.  And as a back up, as a Plan B, that he be released

17   on the conditions that we set forth in our motion.  Thank you.

18           THE COURT:  Let me hear from the Government.

19           MS. PENZA:  Thank you, your Honor.  I'm going to

20   address the proprietary of the third bail motion aside from

21   MDC at the first instance because I want your Honor to

22   understand the Government takes the concerns about MDC

23   incredibly seriously.  I don't want my position regarding the

24   impropriety of the third bail motion to suggesting that we do

25   not take those concerns very seriously.

PROCEEDINGS

1      So, your Honor, the third motion for bail that the

2  defendant put forth makes no meaningful difference.  There has

3  been no change regarding the defendant's risk of flight,

4  regarding the dangerousness which your Honor has not yet even

5  reached, having found twice that the defendant was a risk of

6  flight based on two other packages.

7      And I think Mr. Agnifilo is stressing here the fact

8  that his co-counsel have now sought an adjournment, six-week

9  adjournment, based on the complexity of the case.  He's --

10     THE COURT:  As I recall it, it was on complexity,

11  which is driven in large measure by the amount of discovery

12  that needs to be reviewed by counsel.  Do I not remember that

13  correctly?

14     MS. PENZA:  Your Honor, that is true.  But that has

15  not meaningfully shifted from when those defendants agreed to

16  the trial date in March.  And so I think that's the difference

17  here.

18     So in terms of this case moving with alacrity, this

19  is a racketeering case, the charges span a long period of

20  time, there are six defendants, there is 12 terabytes of

21  discovery.  So the case has been moving with alacrity.

22     Defense counsel has litigated at every single step,

23  as is their right to do, but every single step of that.  There

24  is a reason why that is taken into account when you are doing

25  the speedy trial calculation.  You can't have it both ways.

PROCEEDINGS

1    You can't litigate every single aspect and get your speedy

2    trial.

3            So even just the defendant's tactics alone pretrial,

4    which he is more than entitled to engage in, are one of the

5    real reasons why this case has taken the time it has, which is

6    not an unusual amount of time.  Parties on both sides of the

7    table have had to request additional amount of time for

8    filings at various periods because we did agree to an

9    incredibly compressed motion schedule.

10           But the Government from the beginning has agreed to

11   try this case whenever your Honor set forth.  We first

12   proposed a joint schedule with a January date, because that's

13   what the Court ordered.  It was even tighter than the one we

14   ended up with, but that is what the Government said they would

15   do.  When it was March, the Government said the same exact

16   thing, we will get our motions done, we will do whatever we

17   need to do to try the case.

18           But nothing meaningfully changed regarding the

19   amount of discovery.  So defendants knew there was 12

20   terabytes of discovery back when we agreed on the March date.

21   Judge Scanlon set December 6 as the date by which we had to

22   produce substantial portions of discovery, we did that.  And

23   despite the fact that we did that, because there was so much,

24   as is reasonable, three of the defendants have said that they

25   need more time to review that material.

PROCEEDINGS

1    So that's the situation we find ourselves in.  There

2  is nothing that the Government has done differently from when

3  we began trying this case.  So we have taken steps at every

4  single turn to protect the defendant's rights and to move

5  forward with alacrity, but certain things that the defendant

6  had done have not advanced that goal.

7    For example, your Honor, there were motions to

8  dismiss.  Those could have been filed long before November

9  when they were eventually filed, if the defendant had wanted

10  to do so.  There was nothing preventing him from trying to get

11  those issues before your Honor sooner; and therefore, we would

12  have had other issues kind of rolling along.

13    Additionally, when we're talking about discovery,

14  right now our colleagues are planning to go before Judge

15  Scanlon this afternoon to talk about privilege issues in this

16  case.  We do still have discovery that has not been produced

17  to any of the defendants, except the defendants who are the

18  privileged holders, because there are complicated privilege

19  issues in this case.  There are 45,000 e-mails that are

20  hitting on privilege terms.  We have counsel for Nxivm that is

21  involved being guided by the defendants who are asserting very

22  complicated, if not fantastical, privileges at this point.  So

23  the idea that the complexity is real, your Honor, and the

24  Government objects --

25    THE COURT:  Who is the counsel for Nxivm?

PROCEEDINGS

1          MS. PENZA:  Michael Sullivan, your Honor.

2          THE COURT:  Go on.

3          MS. PENZA:  So, your Honor, the Government objects

4    to this characterization that somehow the latest adjournment

5    of the trial is in any way due to the Government not

6    fulfilling its obligations.  It's just not the truth.  Three

7    of the defendants put in a letter, put in their motion --

8          THE COURT:  I'm trying to recall, is Nxivm a

9    corporation?

10          MS. PENZA:  It is, but it's complicated.

11          THE COURT:  I'm sure.

12          MS. PENZA:  We have used that as an umbrella term

13    for a large number of organizations, including corporations

14    affiliated with individual defendants.  So I'm using it as an

15    umbrella term.

16          THE COURT:  And Judge Scanlon is dealing with this.

17          MS. PENZA:  Yes.

18          THE COURT:  Go on -- let me, just before you

19    continue.  I just want to clarify that Mr. Raniere did consent

20    to a March 18, 2019, trial, did he not, moving it from January

21    to March?

22          MR. AGNIFILO:  We consented, yes.  That's right.

23          THE COURT:  Okay.  There was that period that was

24    consented to by everybody, I take it, as I recall, including

25    Mr. Raniere.

PROCEEDINGS

1          MR. AGNIFILO:  That's right.

2          THE COURT:  So the only, the jump was from March 19

3    to April 29, which was not consented to by Mr. Raniere.

4          MR. AGNIFILO:  That is true also.

5          THE COURT:  Go ahead.

6          MS. PENZA:  So, your Honor, I believe if there is

7    any particular questions, the Government is happy to raise

8    them.

9          THE COURT:  What about the due process issue

10   generically?

11         MS. PENZA:  Your Honor, we don't believe that the

12   defendant has cited a single case that holds the position that

13   they are now taking.  The defendant has been incarcerated for

14   less than a year.  When you compare that with other

15   racketeering cases that is a significantly less, a shorter

16   period of time.

17         I'm not saying whether that is -- I think your

18   Honor's decision to move with alacrity and all of the parties'

19   efforts in that regard are correct but, I don't think we're

20   even close to a consideration on a due process violation.

21         THE COURT:  Mr. Agnifilo, how do you believe you've

22   overcome the conclusion the Court reached that the defendant,

23   taking into account this new application, that the defendant

24   is a flight risk even with this additional $300,000 commitment

25   by a suretor.

PROCEEDINGS

1          MR. AGNIFILO:  Judge, I think we've been trying to

2     sort of erode away at the initial notion that the Government

3     put forward that he fled to Mexico.  I think your Honor in his

4     second decision did walk that back quite a bit.  And said you

5     were somewhat concerned about the cellphone usage and things

6     like that, but it was less clear because of the timing of

7     things.  Because it's not as though -- he actually came back

8     to the United States on the day of the New York Times article

9     that talked about the branding or soon thereafter, rather than

10    went to Mexico for the first time.

11          My argument is there is really nothing strong in the

12    record.  I say this -- I don't want to ask to reargue the

13    issue of flight -- and I don't.  I think your Honor was very

14    circumspect in your prior decision that there was not strong

15    evidence of flight.

16          I think that with a first arrest, U.S. citizen, I

17    think that we have a colorable argument that at some point we

18    have to meet a threshold that makes sense.  I think all things

19    get to be considered together.  I think it's one thing to keep

20    someone incarcerated when he's a first arrest, U.S. citizen,

21    for three months pending a trial, maybe even four months

22    pending a trial; but now we're talking a year pending a trial.

23          And the Government didn't have to do this.  The

24    Government is taking advantage of certain procedural

25    implements in the law that they can supersede Indictments, but

PROCEEDINGS

1   if they wanted to try Raniere right away they could have tried

2   Raniere in the fall if they wanted to, but they didn't want

3   to.  That's the point.  They wanted to add, they want to do

4   everything other than give him the priority that section 3164

5   says he's assured of.  They could have tried Raniere and

6   Allison Mack or Raniere alone in the fall.  But they didn't

7   want to, because they got what they wanted, they got him in

8   jail.

9           One wonders, if he wasn't in jail would they be

10  pressing for a fall trial?  They might have, that might have

11  changed things.

12          I'm not saying they don't have a right to supersede

13  Indictments, they have the right to do all those things.  I

14  think they have been -- one of the things I think is important

15  is we didn't get engaged with the firewall team until October.

16  Mr. Raniere got locked up in March.  They had to see that

17  there were going to be attorney-client issues.

18          In answer to your Honor's question, counsel for

19  Nxivm is the former United States Attorney for Massachusetts.

20  He's a pretty -- he seems to be above approach.  I've never

21  been a former U.S. attorney of anywhere.

22          THE COURT:  U.S. Attorney?

23          MR. AGNIFILO:  Yes, for Massachusetts, correct, for

24  a big stretch of time.  I think if the Government really

25  wanted to move this case along, with a sense of urgency, there

PROCEEDINGS

1    are certain things they could have done different.

2                 THE COURT:  I take it he's been compensated from

3    this Trust as well, or certainly could be, could he not?

4                 MS. PENZA:  He is, your Honor.  He has represented

5    to us that he is being compensated.

6                 THE COURT:  So he's paid by the Trust as well.

7                 MR. AGNIFILO:  That's fine.

8                 THE COURT:  I'm just pointing that out, that

9    everybody is being paid by the Trust.

10               MR. AGNIFILO:  We're just happy the lawyers are

11   being paid, that's a step in the right direction.

12               THE COURT:  Well, we'll talk about that during the

13   Curcio hearing.  I'm not going to talk about that now.  I just

14   wanted that clarified, that everyone, as they have a right to,

15   is being paid for their representation of the defendants and a

16   also Nxivm.  Okay.

17               MR. AGNIFILO:  The point is, the Government

18   shouldn't have the ability to keep someone in jail and then do

19   everything other than try his case.  3164 has to mean

20   something; it can't mean what has happened here.

21               THE COURT:  Isn't it true, though, that on the issue

22   of due process, there is no case law in the Second Circuit

23   that indicates that a year or 13 months, which what it would

24   be when we start trying this case, period of detention

25   constitutes a due process violation under Second Circuit case

PROCEEDINGS

1    law; isn't that fair?

2              MR. AGNIFILO:  The Second Circuit, I would submit,

3    even goes further than that.  The amount of the incarceration

4    is far from dispositive, that it's other factors.

5              I think the Government is right, there are cases

6    where someone has been incarcerated for 15 months, 16 months

7    pending trial.  I don't know in those cases that that

8    defendant has been pretty much demanding, to the extent I can

9    demand anything, an immediate trial since the second we got to

10   the district.

11             THE COURT:  But that having been said, with all due

12   respect, you didn't say at the time that you actually

13   consented to moving the trial from January to March, you

14   weren't saying that we want a trial tomorrow; because you

15   could have said that too.  You were telegraphing that to me

16   that it would be useful for you to have the additional time,

17   and that you were consenting to having the trial pushed back

18   to March 18.  I'm the one who was trying to get it tried on

19   March 18, actually perhaps along with you, but there were some

20   real issues that effected at least three of Mr. Raniere's

21   co-defendants.

22             And there is case law that makes it clear that the

23   Court has the authority to take those concerns into account

24   when setting a trial date.  Yes?

25             MR. AGNIFILO:  There is no doubt the Court has that

PROCEEDINGS

1   authority.  What I think I put on the record --

2              THE COURT:  I'm asking you about the due process

3   issue.  You're raising a due process issue that has never been

4   recognized or at least under circumstances that have not been

5   recognized as requiring a defendant to be released from

6   detention or have an immediate trial.  That's what I'm trying

7   to arrive at here.

8              MR. AGNIFILO:  Right.  So ultimately everything your

9   Honor said is correct.  Part of the problem -- I'm not putting

10  this exclusively on the Government.  My co-defendants -- I

11  wanted a January 7 trial, my co-defendants said no way we

12  don't want a January 7 trial, our clients are released.

13             THE COURT:  Then again, I come back to the Trust,

14  some people who are being paid their fees by the Trust want a

15  trial later, some want a trial now.

16             My concern is that is anybody manipulating this

17  process on the defense side, I'm sorry they are not all here,

18  but I'm happy to mention this tomorrow when we meet again,

19  that's a concern that I have.  This situation has been

20  complicated by circumstances that do not normally arise in a

21  multi-defendant setting.  Everyone has their own lawyer.  They

22  are being paid by their client or they are being paid through

23  Federal Defenders or CJA, and so there isn't this aggregation

24  of interests that exists due to how the attorneys are being

25  compensated.  That's just one of my concerns.

PROCEEDINGS

1          So you may be arguing this and you may have every

2    right to feel this way, but the law isn't with you on this.

3    Because you've basically acceded to the delay.  It's only a

4    six-week delay beyond the date I was going to try the case any

5    way that you agreed to, that's really where we are.  It was

6    March 18, and when we moved it, we moved it April 29, that's

7    six weeks.  And you had agreed to March 18; isn't that right?

8          MR. AGNIFILO:  I agreed to March 18 because I have

9    co-counsel who wouldn't do another -- what I said to the Court

10   at the time, I said this was -- because your Honor was upset,

11   in my recollection, that I thought your Honor thought that

12   March 18 was too far into the future.  Because if I remember

13   right, I think your Honor was considering moving the January 7

14   date only a couple of weeks.  Then we come back with March 18

15   and your Honor I think was concerned that that was too far.

16         THE COURT:  You agreed to it, so why are we arguing

17   about this?  We're not arguing, we're just considering these

18   different aspects of what has happened.  This is the history

19   of the case.

20         I'd like to move on to the future of the case.

21         MR. AGNIFILO:  Very good.  Me too, Judge.

22         THE COURT:  Do you have something else you'd like to

23   say, ma'am?

24         MS. PENZA:  Your Honor, we just again believe that

25   risk of flight needs to revisited right now.  If there are any

PROCEEDINGS

1    questions about the defendant's package he proposed, we can

2    address that.

3                THE COURT:  I think you did address it in your

4    papers, did you not?

5                MS. PENZA:  Just regarding the -- we've put in a

6    very brief letter, your Honor.

7                THE COURT:  I know.  Did you want to say more?  So

8    say it, so we have a record here.

9                MS. PENZA:  The only thing we would say is that

10   defendant's characterization regarding the flight from Mexico,

11   the Government still stands by its assertion that the

12   defendant was attempting to evade law enforcement at the time

13   that he was in Mexico.  And that is evidenced, in part, by the

14   fact that, as we put in our most recent filing last night

15   which is not on the docket yet, but in our most recent filing

16   that at the time of his actual arrest he was hidden in a back

17   room at the time being hidden by "DOS" slaves, as we've been

18   calling them, in quotes.

19               There are a couple of concerns regarding redactions

20   that we are conferring with defense counsel, which is why we

21   haven't filed it on the docket yet.

22               THE COURT:  Has Mr. Raniere's counsel seen it?

23               MR. AGNIFILO:  We have.  It was e-mailed to us last

24   night.

25               THE COURT:  Okay, good.  That's what I'm most

PROCEEDINGS

1    concerned about.  Anything else?

2          MS. PENZA:  Then we have a concern regarding the

3    person that they have proposed as a suretor.  There are

4    significant concerns about his involvement in criminal

5    activity within this case.

6          THE COURT:  If we get there.

7          MS. PENZA:  Thank you, your Honor.

8          THE COURT:  So now, another aspect of this is, if

9    there were to be some package that the Court would seriously

10   consider, there is a question of what is going on at the MDC

11   and what's been going on there since the fire about a week

12   ago, a little more than a week ago.  Perhaps a representative

13   of the MDC could provide the Court with a status report on the

14   conditions under which Mr. Raniere is currently detained at

15   the MDC.  I don't want to hear from a lawyer.

16         MS. PENZA:  I think Mr. Matteo, the facility

17   manager, could testify.

18         THE COURT:  Thank you for coming, sir.  Fill us in.

19   Where is he being housed?  Let's start there.  I'm going to

20   examine you.  How is he being housed?  Where is he being

21   housed specifically at the MDC?

22         MR. MATTEO:  I believe I62 housing unit, located in

23   MDC Brooklyn's west building.

24         THE COURT:  In the west building.

25         MR. MATTEO:  Correct.

PROCEEDINGS

1          THE COURT:  That's the building that had the fire?

2          MR. MATTEO:  Correct.

3          THE COURT:  What floor is that on?

4          MR. MATTEO:  The fire took place on the second

5    floor.

6          THE COURT:  Where is he being housed?

7          MR. MATTEO:  Sixth floor.

8          THE COURT:  Is he in a unit or is he in special

9    housing?

10          MR. MATTEO:  I believe he's in a regular housing

11   unit.

12          THE COURT:  What are the conditions in the regular

13   housing unit at this time in terms of heat, hot water, food

14   service, availability of medical attention, availability of

15   medicines.  I don't know whether he's taking any medicine,

16   we're not going to discuss the specifics of his medical

17   condition because we're in open court, but if you could just

18   explain where are we on Tuesday, February 5, 2019, with regard

19   to his housing unit.

20          MR. MATTEO:  Your Honor, MDC Brooklyn is fully

21   restored as far as electrical.  It was restored on Sunday

22   approximately 1:10 in the afternoon.  So MDC Brooklyn is

23   fully, got full electrical coming from the utility company,

24   Con Edison.  All housing units have full lighting, life safety

25   devices, fire alarm, protection, sprinkler protection.  It

PROCEEDINGS

1   does have hot water.  It has heating and ventilation

2   throughout the building.

3            THE COURT:  With regard to the distribution of

4   medicine and the availability of medical attention for

5   detainees who are in need of such help.

6            MR. MATTEO:  Your Honor, I'm the facility manager at

7   the institution, I deal with the construction maintenance.

8   But I can say I've been at the institution every day since the

9   fire, and I can say that medical rounds and medication has

10  been distributed to every single housing unit daily.  I've

11  witnessed it with my eyes, medical staff going unit to unit,

12  as I was going to each housing unit throughout the day.

13           THE COURT:  With respect to any additional

14  components of the operation that are not operable now, what

15  are you working on to bring those up to speed or back to speed

16  so that you're fully operational?

17           MR. MATTEO:  As of Sunday when we restored

18  electrical service to the building, the entire building, all

19  functions, as far as inmate telephones, e-mail access, inmate

20  TVs, have been fully restored.

21           THE COURT:  Ms. McFarland, you received the TRO from

22  the Court in this the case involving Federal Defenders.  Are

23  you in compliance with the requirement that attorney-client

24  visitation take place from 8:00 a.m. to 8:00 p.m. seven days a

25  week?

PROCEEDINGS

1          MS. McFARLAND:  This morning we started legal

2     visiting from 8:00 a.m.  We were progressing.  I checked

3     before I left, it was still in progress.

4          THE COURT:  Mr. Agnifilo, do you have anything to

5     report on this subject?  We have representatives, senior

6     representatives, of the MDC here and so it would be useful for

7     the Court to hear what problems you continue to have, if

8     you're continuing to have problems.

9          MR. AGNIFILO:  So legal visiting was canceled on the

10    following day, each day:  January 4, January 5, January 6,

11    January 9, January 10, January 11, the 14th, the 21st, then

12    the week of the fire.  Starting from the 27th, which was the

13    day of the fire through -- I think legal visiting was, there

14    was some legal visiting for half an hour, 45 minutes maybe

15    yesterday.  That's more than half of January.

16         THE COURT:  Before the fire, I hear you.  I'm going

17    to ask about that.  But before the fire, were you able or was

18    Mr. Raniere able to reach you by telephone during the entire

19    month of January until the fire?

20         MR. AGNIFILO:  So he can reach us through Core

21    Links, which is an e-mail service.  The e-mails are obviously

22    delayed sometimes only a few hours, sometimes a few days.  We

23    will try to communicate with him and tell him things that we

24    want to talk about at the meeting a day or two days ahead of

25    time and he doesn't get the e-mail until after two days when

PROCEEDINGS

1   we go to see him.  I don't know why the Core Links system

2   takes so long sometimes and not others.  But it is a problem.

3   So there is that.

4            We don't speak on the phone because the calls are

5   recorded.  And we don't want to have attorney-client

6   communications being recorded, so we don't do that.

7            THE COURT:  All right.  But one of my questions is,

8   why were there no attorney-client visitations during the part

9   of January before the fire?  I don't understand that.  Is

10  there an answer to that question?

11           MS. McFARLAND:  On the 4th, 5th, 6th I believe we

12  had power issues.  Mr. Matteo can speak to that, back on the

13  4th, 5th, 6th it was canceled.

14           THE COURT:  Because of power issues.

15           MS. McFARLAND:  Yes.

16           THE COURT:  Is that power issues in the same

17  facility that had the fire?

18           MR. MATTEO:  Correct.

19           THE COURT:  So you knew there were power issues in

20  early January.

21           MR. MATTEO:  We did experience an electrical issue

22  prior to the fire.  We did have representatives from the

23  equipment come in and do a full check of the system.

24           THE COURT:  They did a good job apparently.  I'm

25  being facetious.

PROCEEDINGS

1          These are people who fix something that then had a

2     fire; isn't that right?

3          MR. MATTEO:  Well --

4          THE COURT:  I'm not trying to manage your business,

5     but if there is a continuing problem with the power supply and

6     they are not adequately fixing it, it's time to get someone

7     else who knows how to do it.

8          MR. MATTEO:  Your Honor, the company that we had

9     come in is the manufacturer of the equipment.

10          And the issue that we had initially on the fourth, I

11     believe the date was, we got it back online.  We checked the

12     equipment in that whole cabinet where the fire took place, in

13     a similar location but the back portion of the cabinet, not

14     the portion we were having the problem with.  We have since

15     had an engineering firm come in and start a package, the

16     investigation to get us back.

17          THE COURT:  So let me ask this, what about the

18     problem with communication between by computer by e-mail

19     between a detainee and his or her attorney, that's effected by

20     the power availability, right?

21          MR. MATTEO:  Right.

22          THE COURT:  Is that all back in operation now?

23          MR. MATTEO:  Correct, we're fully functioning.

24          THE COURT:  Why is there a substantial delay, if

25     there is substantial delay that Mr. Agnifilo speaks of, for

PROCEEDINGS

1    e-mails to get back and forth between a lawyer and his client

2    or her client?

3            MR. GARCIA:  We would have to see if Mr. Raniere, if

4    he's on a mail monitoring or e-mail monitoring.  A lot of

5    times through intelligence we have to review the e-mails

6    before we release them back to the inmate.

7            THE COURT:  Even if they are addressed to his

8    lawyer?  I thought those were privileged.

9            MR. GARCIA:  I believe they probably are, sir.  If

10   they are identified as attorney-client we don't review them.

11           THE COURT:  You need to make sure that if the

12   e-mails are addressed to Mr. Agnifilo, his attorney, then

13   those should go through.  You should have a program that

14   permits those to go through promptly.  I appreciate it if you

15   would examine whether there is any problem with that and

16   rectify it so that those communications going back and forth

17   are provided promptly to the recipient.

18           MR. GARCIA:  Yes, sir.

19           MS. PENZA:  Your Honor, if I may, I do want to

20   clarify regarding the phone calls.  That is a choice that

21   Mr. Raniere and his counsel have clearly decided to make, but

22   the Government does not receive phone calls between a

23   defendant and his attorney.  We have arrangements with the MDC

24   if we send a subpoena to receive phone calls, we specifically

25   ask that those phone calls be excluded.

PROCEEDINGS

1          I've worked with Mr. Agnifilo on other cases, he

2    knows that we follow that protocol so he would be able to

3    reach him immediately that way.

4          THE COURT:  I understand that, but he may prefer to

5    either meet in person or operate by e-mail.  That's his

6    privilege.  But I've always understood, and you're just

7    reaffirming, that you don't monitor attorney-client phone

8    calls out of the MDC.

9          MS. PENZA:  Correct.

10          THE COURT:  You understand that to be case

11    generally?  Do you believe that the Government -- let's cut to

12    the chase here, do you believe that the Government is

13    monitoring your phone calls with Mr. Raniere from the MDC?  If

14    you do, I want to know about it and I'll order them not to do

15    it.

16          MR. AGNIFILO:  I have no reason to think that they

17    are.

18          THE COURT:  All right.  That's fine, thank you.

19          MR. AGNIFILO:  There are a few other questions that

20    I have.

21          THE COURT:  Please.

22          MR. AGNIFILO:  My understanding, Judge, is that at

23    least Mr. Raniere's unit, I think other units too, have been

24    without heat not just because of the fire, but for substantial

25    periods beforehand.  One of the problems is we'll go to meet

PROCEEDINGS

1    with Mr. Raniere on one of the days when there is visiting in

2    January and he's frankly, he looks bedraggled and exhausted.

3    He tells me his drinking water freezes at night.

4              I can also say with Judge Torres' hearing this

5    morning, where it's becoming very quickly established as what

6    seems to be a conclusive fact that there was no heating for

7    different periods of time throughout January, including from

8    January 14 to January 16, which is before the fire by two

9    weeks.

10             THE COURT:  The reason you're here and not there is

11   because she's conducting a hearing for certain individuals who

12   are defendants in her cases.  And I'm holding a hearing here

13   for individuals who are defendants in cases assigned to me.

14   So whatever she's doing over there, I wish her well.

15             But I'm trying to get to the bottom of whether this

16   is a problem, that there are problems with the way services

17   are being delivered at the MDC for Mr. Raniere, and in a few

18   minutes for two other defendants who their attorneys have

19   specific concerns.

20             And so like I said at the beginning, I'm not hear to

21   resolve the problem of the fact that the MDC should probably

22   be torn down and a new building put up.  I'm not the

23   appropriator.  I'm not the executive branch.

24             I'm just worried about Mr. Raniere, whether he's

25   going to have heat, hot water, the ability to talk to his

PROCEEDINGS

1    attorney, the ability to have medication as required, the

2    ability to have recreation, all of that, if he's still in

3    jail.  That's what I'm here for.

4                MR. AGNIFILO:  I appreciate that.

5                THE COURT:  I don't want to conflate what Judge

6    Torres is doing for the defendants she's dealing with and what

7    I'm doing with regard to the defendants I have in my

8    jurisdiction.

9                MR. AGNIFILO:  So my concern then --

10               THE COURT:  I don't want to know about her hearing.

11   Her hearing is irrelevant to me.

12               MR. AGNIFILO:  I understand.  But what your Honor is

13   saying is relevant to unit 62, where Mr. Raniere is.  And my

14   understanding --

15               THE COURT:  I'll ask the question.  You had didn't

16   raise that question.

17               MR. AGNIFILO:  -- that unit 62 is without heat.

18               THE COURT:  All right, stop.

19               Unit 62 is without heat, according to Mr. Agnifilo,

20   and that occurred before the fire in the power room or

21   whatever it's called.  Do you monitor this regularly?  Is

22   there a central system for establishing what the heat is in a

23   given unit?  Is there say thermostat on unit 62?  How can you

24   address that?

25               MR. MATTEO:  Your Honor, we've been taking

PROCEEDINGS

1    temperature readings.  We did have a mechanical piece of

2    equipment fail, as they claim.  As soon as we realized --

3              THE COURT:  What did that piece of equipment?

4              MR. MATTEO:  It's the heating coil for that unit.

5    Every housing unit has two heating coils, one for the cell

6    areas where the inmates sleep, and one of the common areas,

7    two different units.  The one for the cells did experience --

8              THE COURT:  Did experience.

9              MR. MATTEO:  It did experience a mechanical problem.

10   We fixed the repairs.  We continued to have a little repairs,

11   adjustments, throughout the week.

12             THE COURT:  What is the situation as of today?

13             MR. MATTEO:  The current situation is yesterday --

14   this morning I was in two different courts, your Honor, so I

15   don't have the temperature readings for today.  But I can tell

16   you for the last couple of days -- they just showed me one for

17   today, one second.

18             As of Friday, February 2, 2019 at noon.

19             THE COURT:  February 2 was Saturday.

20             MR. MATTEO:  As of Saturday, sorry, as of February 2

21   at noon I62 unit temperature, cell temperature, was 68 degrees

22   which is in compliance with the Bureau of Prison's policy,

23   that's our target set point.

24             THE COURT:  You don't know what it's been since

25   then.

PROCEEDINGS

1      MR. MATTEO:  From the readings that the staff took

2   today, it's 79 degrees in the south.  We've been monitoring

3   the temperature throughout on a daily basis, not always at

4   noon, not always at 8:00 o'clock in the morning.

5      I came in personally early one morning at

6   6:00 o'clock, I went straight to all the housing units, took

7   temperature readings at 6:00 o'clock in the morning to get a

8   variation of temperature throughout different hours of the

9   day.  Within the last couple of days, a week, they all have

10   been on target with Bureau of Prisons', policy which is our

11   target point of 68 degrees.

12      MR. AGNIFILO:  Your Honor, I have no reason to

13   believe that the temperature has been a problem for the last

14   two or three days.  That's not the basis of my concern.

15      The basis I believe the temperature was in the 30s

16   during the days following the fire and on Martin Luther king

17   day, specifically, I think it was 3 or 4 degrees here in New

18   York City.

19      THE COURT:  I remember.

20      MR. AGNIFILO:  My concern also is, I think it was so

21   cold that the personnel who worked at the jail had hats,

22   coats, scarves but the inmates were given none of those

23   things.  There weren't any blankets given, although the city

24   sent blankets to the inmates, they weren't given.  Some staff

25   members had area heaters.  I understand they don't want to

PROCEEDINGS

1   give those to the inmates, but they didn't give them to the

2   inmates.  They didn't give them clothing.  They had didn't

3   give them blankets.  Quite frankly, they let them freeze for

4   an extended period of time.

5            THE COURT:  I understand all of that.  Obviously

6   this has been a major crisis at the MDC, not just for your

7   client.  I understand that.

8            I'm trying to understand in connection with your

9   bail application, what is the current situation and what might

10  it be going forward.  That's really where I am.  I'm not

11  talking about January anymore.  I'm talking about February and

12  March, the balance of the cold months, how is it going to be.

13  You've raised the issue, I'm trying to elicit the current

14  status from representatives who are here to answer the

15  questions.

16           MR. AGNIFILO:  My concern is that we look at today's

17  situation in a continuum, because it's not as though there

18  weren't any problems at all before the fire, there were

19  substantial problems before the fire and they continue.  I

20  think these three representatives probably worked very, very

21  hard, and none of this is their fault, but there is a problem.

22  There is a probable.  There is a well-documented problem that

23  is rooted in history, to think it's all going to be solved now

24  that they had a fire, I just don't think so.

25           So I think the past is relevant in predicting the

PROCEEDINGS

1    future.  I think that they are probably trying, they are

2    probably working on it, a lot of hard working people are

3    trying the best they can, but there is a history.  The water

4    is brown sometimes for two days on end.  There are issues with

5    light.  There is issues with the heating that we've just

6    started to get into.  There is issues with the food.  I don't

7    want to belabor the whole thing, but it's really a problem.

8    It all is part of the due process application.

9              THE COURT:  I see.  All right, thank you.

10             I just came from a meeting of the Board of Judges of

11   the Court, and we were advised about a number of facts, some

12   of which would give us some hope that there will be a more

13   comprehensive solution of the problems of the operation of the

14   MDC.  The head of the Bureau of Prisons, I think, is aware of

15   these problems.  The Acting Attorney General was here in New

16   York and was made aware of the problems.  And the U.S.

17   Attorney of this District and the U.S. Attorney of the

18   Southern District have both engaged on these problems.

19             Part of the problem is going to be obtaining the

20   financial resources necessary to upgrade systems, the roof

21   needs to be fixed.  There are all these problems that

22   transcend the immediate problem of heat, hot water, and hot

23   food.  But I can only deal with the immediate problem.

24             And it would appear to the Court that even if there

25   was a problem, if it continued would have made it more

PROCEEDINGS

 1  difficult to make a decision about what to do about bail.  The

 2  fact is that the conditions in the facility are better and

 3  more up to standard at this point.  The Court was concerned

 4  about the heat problem.  The Court was concerned about the

 5  food problem.  The Court was concerned about the problem of

 6  counsel meeting with the detainees, because that is a true due

 7  process problem.  All of those problems have been dealt with

 8  in the immediate term, as far as the Court is aware.  If those

 9  problems reoccur, you can bring them to my attention at any

10  time, and we will dispose of those problems, depending on what

11  the circumstances are.

12          I'm going to take everything you've said into

13  account, everything the Government has said into account, and

14  I'll rule on your application for release on bail by the time

15  we meet tomorrow.

16          I just want you to understand that part of what I'm

17  looking into has to do with, should your client remain

18  incarcerated until the trial, will you be in a position to

19  adequately prepare your defense.  That's a major issue for the

20  Court.  To the extent that -- I take it you're not interested

21  in further delay of the trial in order to do so, I know you're

22  extremely talented and that you will do whatever is necessary

23  to be ready for trial on April 29.  So I'm not even going to

24  ask you would you like to have because of this situation that

25  existed in January further delay of the trial.  You don't, do

PROCEEDINGS

1   you?

2          MR. AGNIFILO:  I don't.

3          THE COURT:  There you go.  All right.

4          Is there anything else from the defense in

5   connection with the bail application?

6          MR. AGNIFILO:  I want to thank you for seeing us on

7   short notice on these issues.

8          THE COURT:  Let me say this, it's I think it's

9   really important that you brought this to my attention.  I

10  can't imagine people in the dark, in subfreezing temperatures

11  without any understanding of when it will all end.  It's not

12  humane.  And whatever the reasons were, which were not under

13  the control of the people sitting here, apparently, it still

14  raised tremendous concerns on my part.

15         I would also say on the part of all the other judges

16  who have defendants sitting in detention, so you should

17  understand that this issue has been raised about as high as it

18  can go within the judiciary in this District and in the

19  Southern District and will continue to, those who don't have

20  the case involving the civil case will continue to manage our

21  cases and our defendants' circumstances, very, very closely.

22  So you should understand that.

23  (Continued following page.)

24

25

PROCEEDINGS

1

2           We're going to adjourn, Mr. Raniere.  And we're

3   doing to have the second matter with the two defendants in the

4   other case.  And the representatives of the Bureau of Prisons

5   need to stay for that.

6           (Whereupon, the matter was concluded.)

7                   *    *    *    *    *

8   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

9

10  Rivka Teich, CSR RPR RMR FCRR
    Official Court Reporter
11  Eastern District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25