# EXHIBIT 4

## Brafman & Associates, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

———

ANDREA ZELLAN

JOSHUA D. KIRSHNER

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

August 28, 2018

**BY HAND AND ECF**

Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re:  United States v. Keith Raniere, 18 Cr. 204 (NGG)

Dear Judge Garaufis:

  We represent defendant Keith Raniere in the above-captioned case. Since Mr. Raniere's June 12, 2018 bond hearing, several potential bond co-signers have come forward indicating their willingness to post property or cash in support of a bond for Mr. Raniere. However, for the reasons set forth below, these individuals have a reasonable and demonstrated concern that by participating in this process, they will be subject to reprisal and potentially be the victims of unlawful and criminal conduct. Accordingly, in anticipation of a release application, we make two requests: (1) the sealing of potential co-signers' names and (2) a highly limited courtroom closure in where the co-signers can be fully vetted by the government and the Court in a non-public setting.

**Procedural History**

  Mr. Raniere previously moved for release on bail pending trial on June 5, 2018 (Dkt. No. 43, Deft. Mot. for Release; Dkt. 45, Deft. Reply to Govt Response), which the government opposed (Dkt. No. 44, Govt Response). At a hearing on June 12, 2018, the Court noted that Mr. Raniere's proposed bail conditions were deficient because "there's no moral suasion placed upon the defendant to adhere to the terms of the bail because…he has nothing to lose." (6/12/18 Transcript at 14: ll. 10-12.) Mr. Raniere's proposed bail package did not enable the Court to "question the surety" and ask "[a]re you going to be able to cast moral suasion on this individual to guarantee that this person is going to come back?" (*Id.* at 23: ll. 10-15). This Court denied Mr. Raniere's motion

## Brafman & Associates, P.C.

without prejudice writing that Mr. Raniere "poses a serious risk of flight if he is released pending bail" and that the proposed conditions do not mitigate the court's concerns. (Dkt. No. 46, Memorandum and Order filed 6/20/18 at pp. 12-13.) In short, "[w]ithout anything to offer as collateral, Defendant would have nothing to lose if he were to flee." (*Id.* at p. 13.)

Subsequent to the denial of Mr. Raniere's bail application, a Grand Jury returned a Superseding Indictment, unsealed on July 24, 2018, charging defendants Raniere and Mack, along with four new defendants, Clare Bronfman, Nancy Salzman, Lauren Salzman and Kathy Russell. These defendants are out on bail with varying conditions of release.

The government continues to maintain that there are no conditions it will agree to regarding Mr. Raniere's release. Moreover, the government indicated it will not agree to the sealing of co-signers' names or the partial courtroom closure referenced herein. Accordingly, we bring the instant motion.

### Background

Over the last twenty years, people associated with Executive Success Programs ("ESP") and NXIVM have been the targets of threats, computer-hacking and blatant false statements on websites and other media specifically to damage their reputations, businesses and lives.[1] Specifically, people antagonistic to ESP/NXIVM have created blogs and websites aimed at targeting those associated with the companies. The creators of these blogs have stated publicly that they created the blogs to damage people within ESP/NXIVM's reputations, businesses and lives. These attacks have only increased under the intense media coverage surrounding this case. Accordingly, while there are several individuals who are willing to co-sign a personal recognizance bond for Keith Raniere and to support the bond with their property or funds, they are afraid that their lives and their families will be threatened, their home addresses made public and that they and their families will be the subject of false and defamatory media reports aimed at damaging their businesses and reputations.

### Relief Sought

We move this court for three related forms of relief in connection with a potential upcoming bond application. First, we ask that we be permitted to refer to any potential bond co-signer by a number (Person 1, Person 2, and so on) so that the person's identity (as well as identifying information such as the person's address) is not in any written documents publicly filed with the Court or stated in a public courtroom.[2] On the bond

---

[1] This letter will address a small percentage of the many threats, damaging false statements and other intentional conduct directed at members of the group.

[2] We will of course identify the individuals to the government and the Court in the form of a separate sealed submission at the time of the filing of the bond motion.

**BRAFMAN & ASSOCIATES, P.C.**

itself, we ask that this Court redact the co-signers name and address. Second, we ask that for that portion of the bond hearing when the Court questions the co-signer that this limited, discrete portion of the hearing be conducted in a closed courtroom. The bond hearing will be conducted in public, like any other bond hearing. However, when the Court questions the potential co-signer, only that portion will be closed to the public. Third, we ask that any personal identifying information in the transcript relating to the Court's questioning of the potential co-signer be sealed.[3]

As shown below, these forms of relief are both necessary to protect the co-signers' safety and livelihood and are also sufficiently narrowly tailored to comport with the First Amendment and give the public and the press extensive access to the proceedings.

**Argument**

1. The First Amendment Right to Press and Public Access to Our Courts Is Applicable in This Case

Before discussing the First Amendment implications of the requested relief, it bears noting that the body of case law discussing the Sixth Amendment right to public court proceedings is not invoked here because it is the *defendant* requesting the limited closure. For example, in Waller v. Georgia, 467 U.S. 39 (1984), the prosecution requested a partial courtroom closure and the Supreme Court noted that "when the defendant objects to the closure of a suppression hearing, therefore, the hearing must be open unless the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced." Press Enterprise Company v. Superior Court of California, 478 U.S. 1 (1986); Waller, 467 U.S. at 47. In Gannett Co. v. DePasquale, 443 U.S. 368 (1979), the Supreme Court held that the Sixth Amendment does not grant a public right to attend pretrial proceedings or a criminal trial, and that the Sixth Amendment is a right of a criminal defendant, and of no other party.

Therefore, the Court here does not need to engage in a Sixth Amendment balancing of a criminal defendant's Sixth Amendment right to public proceedings and other competing interests because the defendant is requesting the limited closure. Rather, the analysis is purely a First Amendment balancing of the competing interests.

The First Amendment right of access to criminal trials is no doubt well-established (See Richmond Newspapers v. Virginia, 448 U.S. 555 (1980); Globe

---

[3] It is unclear whether there is a public right of access to co-signers' names, let alone a public's right to listen to a judge question a potential co-signer. The important element is that the judge can, if he sees fit, speak to the co-signer, pose questions and gage for himself whether the co-signer is appropriate given the facts of the case and the court's specific concerns. This can be done in or out of the public eye. Indeed, out of the public eye, the Court may even choose to ask more penetrating questions because the co-signer's right to privacy, always a concern to the Court, is reduced.

BRAFMAN & ASSOCIATES, P.C.

Newspaper Co. v. Superior Court, 457 U.S. 596 (1982); Press Enterprise Co. v. Superior Court, 457 U.S. 596 (1982)(Press Enterprise I)) and is an important part of our nation's history. In Richmond, Chief Justice Berger's plurality opinion devoted considerable attention to the tradition of jury trials in England and the United States, and showed that open trials were conducive to an accurate fact-finding process, public confidence in the legal system and the community's need for justice. Richmond Newspapers, 448 U.S. at 565-573. In Globe, the Supreme Court reasoned that the express freedoms of speech, the press, and assembly share a common goal in guaranteeing open discussion of governmental affairs. [4] The Supreme Court has continued to emphasize that one "important means of assuring a fair trial is that the process be open to neutral observers." Press Enterprise Co. v. Superior Court of California, 478 U.S. 1, 7 (1986)(Press Enterprise II). The Second Circuit has added, "except in rare circumstances, openness preserves, indeed is essential to, the realization of (the right of the accused to a fair trial) and to public confidence in the administration of justice." ABC, Inc. v. Stewart, 360 F.3d 90, 105-06 (2d Cir. 2004); see also United States v. King, 150 F.3d 76, 83 (2d Cir. 1998).

Despite the primacy that the First Amendment right of access enjoys, it is not absolute. Press-Enterprise II, 478 U.S. at 10; Globe, 457 U.S. at 606. In this regard, the Supreme Court has referred to the First Amendment right of access as a "qualified right." Press-Enterprise II, 478 U.S. at 13. The Second Circuit has held that "(t)he First Amendment right of access to criminal proceedings is not absolute. Proceedings may be closed and, by analogy, documents may be sealed if 'specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest'" Matter of New York Times Company v. Biaggi, 828 F.2d 110 (2d Cir. 1987) quoting Press-Enterprise II, 478 U.S. at 13; see also, United States v. Hubbard, 650 F.2d 293, 315 n.81 (D.C. Cir. 1980).

2. The Limited Closure Requested Here Is Constitutional and Required Under the Facts

The highly limited closure requested here is consistent with the requirements of the Supreme Court and the Second Circuit because it is narrowly tailored to serve a compelling interest. First, the motion for bail will be filed publicly. The public and the press will know all of the facts, reasons and arguments Mr. Raniere's counsel advances as to why release on conditions is appropriate, as well as the government's reasons as to why it is not. The public and the press will likewise see that, among other conditions, co-signers are being proposed to secure the requested package. The only information that will not be included in the written materials will be the identities of these co-signers. In this regard, the proposal encouraged by the defense is no more extensive than what the government has already done through the use of Jane and John Doe in the Indictment and in all other documents filed in this case.

---

[4] Significantly, Globe addressed a situation where a Massachusetts law required that any trial involving a sexual assault victim who was a minor be conducted wholly in private. Not surprisingly, the Court found that such a wholesale violation of a basic First Amendment right was not sufficiently narrow to withstand scrutiny.

Brafman & Associates, P.C.

Second, the bail hearing will be held in public and will be memorialized in a written transcript for the public to request and read. Again, the readers will see the arguments of counsel, the questions of the Court and the reasons offered by the parties as to why release is, or is not, appropriate given the conditions proposed. The only part of the proposed proceeding that the public and the press will not see is the portion where the co-signer is brought before Your Honor for questioning. However, as with all such procedures, the Court and the government will have the full ability to vet the proposed co-signer. Both are free to ask whatever questions each sees fit. It bears noting that the government typically questions proposed co-signers in a private setting even in a normal case. So, as far as the government is concerned, the defendant here is not asking for a different procedure than is typically followed.

Third, a transcript of the proceedings will be available, as in a typical case. The only request is that the portion of the transcript reflecting any personal identifying information of the co-signer will be sealed.

The examples where the right to full court access has been suspended on a limited basis are numerous and diverse. For instance, the privacy interest of jurors has been held to be an appropriate basis to close aspects of court proceedings. See Press-Enterprise Company v. Superior Court of California, 478 U.S. 1 (1986). Moreover, it is routine that guilty pleas of cooperating witnesses are held in a closed courtroom where no transcript is available to the press or the public. Even in this very case, as noted, the public indictment contains references to Jane and John Does in lieu of identified people. These are but a few examples showing that limited courtroom-closure or sealing are both commonplace and acceptable where other interests are at stake. The request of limited courtroom closure here is consistent with court precedent for closing courtrooms.

In sum, the defense believes it has crafted a narrowly tailored process that is fair and sufficient to the Court and the government, necessary for the potential co-signers and constitutional to the press and public.

3. **Potential Co-signers Have a Reasonable Basis to Fear That Illegal Action Will Be Taken Against Them**

As set forth below, clients and supporters of ESP/NXIVM have been subject to threats, privacy-invasions and defamatory statements. Since Mr. Raniere's "arrest" and subsequent deportation in Mexico, threatening and menacing letters and comments have been routine—these involve letters to attorneys, including the undersigned, threating gestures made by the public toward members of the defense team and other menacing conduct. While this type of conduct has been occurring for over a decade, the increasing negative press, including false and defamatory statements, against perceived ESP/NXIVM supporters has made potential co-signers fearful to become involved with the court process.

Brafman & Associates, P.C.

Over the course of many years, a known group of anti-NXIVM members have hacked into NXIVM's private computer files, gaining access to confidential personal data. These same persons have used this data to determine the names, addresses and locations of NXIVM clients and subsequently posting this private information online.

Specifically, the anti-NXIVM press is associated with a prolific blogger named Frank Parlato, who is currently under indictment in the Western District of New York in an 18-count fraud case that spans over ten years—from mid-2006 to 2017.[5] (See United States v. Frank Parlato, Jr. 15-cr-00149 (JJM) (WDNY) (Dkt. No. 118), Superseding Indictment filed 5/23/18.) As will be shown in more detail below, Parlato claims to know "key law enforcement strategies" as well as the investigative decisions of the United States Attorney, Richard Donoghue (whom Parlato explicitly names), himself. Parlato strongly suggests that he is aware of such information from law enforcement sources. He often posts that he has inside information that certain persons whom he names publicly are about to be indicted in this case. Sometimes, Parlato's "prophesies" about who will be indicted end up being correct. Sometimes, they do not end up being correct, leaving the person named to suffer massive business and reputational damage. Regardless of whether Parlato actually has inside law enforcement sources, he is not acting as a legitimate media outlet. Rather, as he has stated to many internet outlets who inconspicuously credit him, he is an active antagonist who has admitted publicly that he is obsessed with ruining Keith Raniere and others supportive of ESP/NXIVM.[6]

In addition to Parlato, a journalist from the Albany Times-Union, a former NXIVM consultant (who later went to prison in Texas for an unrelated conviction), and others, as detailed below, have been involved in misappropriating and printing stolen, confidential, personal information hacked and misappropriated from NXIVM's private computer files. These files contain *personal information* about people who sign up for ESP/NXIVM courses. This information is now in the hands of a federally indicted defendant (Parlato), journalists for a widely-read newspaper, and others. Despite the prosecution, conviction and incarceration of a member of a former Saratoga anti-NXIVM blogger who hacked NXIVM, the Times-Union and other "publications" remain in possession of stolen, confidential NXIVM information.

As a result, potential co-signers of a bond for Mr. Raniere are reasonably concerned (1) that they and their families will be threatened, (2) that they and their families' personal private information may have been among the information hacked by,

---

[5] Parlato is charged with, among other things, using shell companies and IOLA (attorney accounts) to defraud the Internal Revenue Service out of millions of dollars of taxable income.

[6] See VICE News: The Man Who Blew the Whistle On Alleged Sex Cult Inside NXIVM (HBO published May 17, 2018). Parlato states that, "I sharpened my axe" and that "part of my strategy was to mock Raniere. I photoshopped images of him, I wrote-I wrote fictional stories about him, just to make him look ridiculous, because sometimes that's…necessary, too."

BRAFMAN & ASSOCIATES, P.C.

and be in the possession of, people looking to harm them, and (3) that they and their families will be the subject of defamatory public statements specifically intended to damage their businesses and reputations.

As set forth below, the hacking of NXIVM's private computer system has been an ongoing criminal scheme perpetrated by many anti-NXIVM members over several years including a number of likely government witnesses in this case.

A. The Hacking and Subsequent Prosecution of NXIVM's
Computer System Between 2006 and 2011

On November 5, 2014, John Tighe, a freelance journalist with a blog, pleaded guilty to the felony of Computer Trespass, in violation of New York Penal Law Section 156.10(2) in the Albany County Court. (Exhibit 1: 11/5/14 Transcript of Plea and Allocution.) He admitted to one particular computer trespass on November 4, 2010 at 9:35 p.m., and admitted to accessing the server a total of 50 or 60 occasions over several years. (*Id.* at p 14.) He intentionally accessed the NXIVM computer network using the identity information of a former NXIVM student without the permission and authority of either the student or of NXIVM.[7] (*Id.*) He further admitted during the public plea proceeding that he knew that Joe O'Hara (NXIVM's former consultant, a now disbarred attorney who later served time in prison in Texas for an unrelated conviction) had also accessed the NXIVM server by utilizing the student's identity information. Tighe stated that his conspirator O'Hara informed him that James Odato, then a reporter for the Times-Union, also had access to the information that was illegally obtained by Tigue and O'Hara. Corroborating Tigue's plea allocution concerning Odato's involvement is the fact that an IP address belonging to the Times-Union was used repeatedly to access NXIVM's confidential database. This amounts to incontrovertible proof that the Times-Union illegally accessed the confidential NXIVM database and used stolen secret information in articles about NXIVM and the accused.

Because NXIVM prompted law enforcement to investigate James Odato of the Times-Union as being complicit in the computer trespass and also sued Odato for these transgressions, press publications outside of the Times-Union quickly came to the Times-Union's defense.[8] For instance, on November 18, 2014, the Nation published an article entitled "How a Strange Secretive, Cult-like Company Is Waging Legal War Against

---

[7] To the extent that this student was a victim of Tighe's identity theft, her name is not being included in this filing. If the Court or the government would like the name, it will be provided without a public filing.

[8] NXIVM's lawsuit against Odato was later dismissed because the court found that the statue of limitations had run. (See 14-cv-1375 (LEX/RFT) (NDNY) Dkt. No. 83 filed 9/17/15.)

Brafman & Associates, P.C.

Journalists."[9] The article stated that the case against Tighe, author of a blog called "Saratoga in Decline," was a "thinly veiled attempt to retaliate against journalists." (*Id.*) Far from being "thinly veiled," however, the case against Tighe and the others was shown to be absolutely true, as Tighe stated unequivocally during his guilty plea allocution. Indeed, once the authorities came into possession of Tighe's computer in connection with the hacking investigation, they found a cache of child pornography resulting in a 70-month federal sentence. (See United States v. John Tighe, 14-cr-464 (TJM) (NDNY), Dkt. No. 34, Judgment as to John Tighe).

Parlato, unsurprisingly, falsely reported his confederate John Tighe had been framed with regard to the child pornography on his computer.[10] Parlato's defense of Tighe proved to be inaccurate as Tighe readily admitted his guilt during his plea allocution and accepted full responsibility for possessing child pornography, stating there was no one to blame but himself.

As for the Times-Union reporter, Odato, he was released from the paper in light of the allegations of his knowing complicity in the computer trespass of NXIVM's computer system and in causing stolen, secret information to be repeatedly published by the Times-Union.[11] Following Tighe's theft of NXIVM information, Odato went on to write several articles based on the stolen information. Indeed, on October 8, 2007, just six days after an October 2, 2007 illegal breach of the NXIVM computer system traced to a Times-Union IP address, Odato published an article about NXIVM in the Albany Times Union in which he admitted being in possession of the NXIVM client list. (See Exhibit 2 at p. 1.)

B. The Misappropriation and Theft of the NXIVM Computer
   System Files in June 2017

Between June 4 and June 8, 2017, NXIVM administrators discovered that their systems were being accessed in Canada and that data in the NXIVM servers were being deleted and manipulated. Upon further investigation, the undersigned counsel has learned

---

[9] William Cohan, How a Strange, Secretive, Cult-like Company Is Waging Legal War Against Journalists, THE NATION (Nov. 18, 2014), https://www.thenation.com/article/how-strange-secretive-cult-company-waging-legal-war-against-journalists/.

[10] Frank Parlato, Rethinking John Tighe: Ailing blogger; a fierce critic of Raniere, imprisoned after child porn 'found' on seized computer, FRANK REPORT (Nov. 2, 2017), https://frankreport.com/2017/11/02/rethinking-john-tighe-ailing-blogger-a-fierce-critic-of-raniere-imprisoned-after-child-porn-found-on-seized-computer/.

[11] Joe Pompeo, Journalist on leave after tangle with secretive 'NXIVM' group, POLITICO (Nov. 26, 2014 4:51 AM),  https://www.politico.com/media/story/2014/11/journalist-on-leave-after-tangle-with-secretive-nxivm-group-003145.

**BRAFMAN & ASSOCIATES, P.C.**

that three accounts logged in and accessed the NXIVM servers: the accounts of J.O. [12], Jennifer Kobelt and Sarah Edmondson. Edmondson was a former high-ranking NXIVM member, recruiter and ESP Vancouver center co-owner. At the end of May 2017, Edmondson resigned from NXIVM, telling her friends within the community that she wanted to focus on her family and not lead the ESP Vancouver Center anymore. Her assistant, Jennifer Kobelt, was also a long-time client of NXIVM's and an assistant to Mark Vicente, another co-owner of the ESP Vancouver center who had recently resigned.

While Edmondson, Kobelt, and J.O. were previously authorized to legitimately access the system (prior to their resignation), suddenly their login credentials were used *58 times* over the course of five days. Those same accounts then deleted data, stole ESP student profiles and documentation and cancelled over $100,000 worth of credit card payments. This amounts to intentional criminal conduct where the names, financial data and other identity information were unlawfully accessed and misappropriated.

Specifically, on June 4th, Kobelt and others' accounts logged into the NXIVM system and changed their profiles (i.e. names, *but not passwords*) to mask the identities of who was logging into the system. The accounts continued to be used. For example, the account linked to J.O. logged into the system and viewed enrollment history information. The account linked to Sarah Edmondson logged into the system the same day and viewed a salesperson report. On June 5th, the account linked to J.O. again logged into the system and viewed enrollment history. Additionally, the account linked to Kobelt repeatedly logged into the system over those five days and cancelled dozens of payments from NXIVM clients. Kobelt's account also deleted at least 13 files from an area on the server designated to the clients that Vicente enrolled. Each of these files contained numerous NXIVM contracts with client information.

This theft of client files gave those accessing NXIVM's servers access to confidential data including client lists, contact information and the intellectual property of the company. It is therefore not surprising that in counsel's investigation of this case, we have discovered that Edmondson, together with others including Vicente were able to contact nearly every NXIVM client and harass them through calls, Telegram and WhatsApp messages after this date—messages that continue to the present.

---

[12] We have used a person's initials if that person has not spoken publicly to media outlets in connection with this case—assuming that person would like to remain private. If the Court or the government would like the name, it will be provided without a public filing. However, we have included the full names of those who have sought public attention in connection with their roles in this matter, including Edmondson who announced her documentary TV series less than one week after Raniere and Mack were indicted. (See Nelli Andreeva, Former NXIVM Member Sarah Edmondson To Star in Documentary Series Produced By Brian Graden, DEADLINE HOLLYWOOD (Apr. 25, 2018, 10:30 AM), https://deadline.com/2018/04/ex-nxivm-member-sarah-edmondson-star-docu-series-produced-by-brian-graden-sex-cult-1202373257/.)

**BRAFMAN & ASSOCIATES, P.C.**

It is also not the least bit surprising that the day after the NXIVM system was accessed nearly 60 times by these profiles, Frank Parlato posted his first story on his recounting of DOS.[13] Specifically, he writes that his "report has been developed from information provided from sources" he chose not to name.

### C. Parlato's Purported Connection to Law Enforcement Sources in This Case

Frank Parlato runs three websites--"The Frank Report," "Art Voice" and "The Niagra Falls Reporter," all devoted to publishing negative information, regardless of its truth, about anyone favorably disposed to Mr. Raniere or NXIVM. He routinely states that he has high-level sources and intimates that his sources are members of law enforcement involved in this case.[14]

The following are just a few examples:

- On August 19, 2018, he wrote, "according to sources, the FBI investigation into NXIVM is reportedly not over and the latest superseding indictment is not to be the last."[15] As written, this is something that Parlato can only "know" through law

---

[13] Frank Parlato, <u>Part 1: Branded Slaves and Master Raniere; Sources: Human branding part of Raniere-inspired women's group</u>, FRANK REPORT (Jun. 5, 2017), https://frankreport.com/2017/06/05/part-1-branded-slaves-and-master-raniere-sources-human-branding-part-of-raniere-inspired-womens-group/.

[14] <u>See</u> Frank Parlato, <u>Misc. notes and info picked up from various sources on NXIVM</u>, FRANK REPORT (Aug. 19, 2018), https://frankreport.com/2018/08/19/misc-notes-and-info-picked-up-from-various-sources-on-nxivm/;
Frank Parlato, <u>It's not over: Emiliano Salinas is FBI target now!</u>, FRANK REPORT (Jul. 29, 2018), https://frankreport.com/2018/07/29/its-not-over-emiliano-salinas-is-fbi-target-now/;
Frank Parlato, <u>Son of former Mexican President Carlos Salinas reportedly under FBI investigation for role in sex-slaver cult that branded women</u>, FRANK REPORT (Apr. 16, 2018), https://frankreport.com/2018/04/16/son-of-former-mexican-president-carlos-salinas-reportedly-under-fbi-investigation-for-role-in-sex-slaver-cult-that-branded-women/;
Frank Parlato, <u>Times Union Breaking News, "NXIVM co-founder Keith Raniere charged in federal complaint</u>, FRANK REPORT (Mar. 26, 2018), https://frankreport.com/2018/03/26/times-union-latest-news-nxivm-co-founder-keith-raniere-charged-in-federal-complaint/.

[15] Frank Parlato, <u>Vanguard Week starts tomorrow – but Silver Bay doesn't seem to be hosting 10 day celebration</u>, FRANK REPORT (Aug. 19, 2018), https://frankreport.com/2018/08/19/vanguard-week-starts-tomorrow-but-silver-bay-doesnt-seem-to-be-hosting-10-day-celebration/.

BRAFMAN & ASSOCIATES, P.C.

enforcement sources. After all, it would be highly improper for the U.S. Attorney to inform witnesses of who it intends to indict. Yet, Parlato purports to have precisely this type of information, suggesting, as he says, that he has sources in law enforcement.

- On July 29, 2018, Parlato wrote, "Sources tell me that US Attorney in the Eastern District, Richard P. Donoghue, has ordered his office to further investigate (a named person) and that additional federal resources have been made available for that part of the case."[16] Absent law enforcement sources, Parlato cannot possibly know what the United States Attorney has ordered his office to investigate or how federal resources are allocated.

- On July 18, 2018, Parlato wrote "there is much I cannot share with you at this time. I trust that most of you will be able to read between the lines."[17] He then went on to surmise about the timing of the Superseding Indictment, intimating he had inside information from sources that he did not want to share with the reader.

- On July 13, 2018, Parlato wrote "there is some information I have to withhold to protect my sources. But, just to give readers a hint – and without giving away any key law enforcement strategies, **which are being leaked to me on a regular basis**…I can assure you from reports of at least three knowledgeable sources – this is going to be huge."[18] Parlato here claims to know "key law enforcement strategies" which are "being leaked on a regular basis."[19]

---

[16] Frank Parlato, It's not over: Emiliano Salinas is FBI target now!, FRANK REPORT (Jul. 29, 2018), https://frankreport.com/2018/07/29/its-not-over-emiliano-salinas-is-fbi-target-now/.

[17] Frank Parlato, Update on FBI Investigation into Bronfman-Raniere crime organization: Emiliano Salinas is major target, FRANK REPORT (Jul. 18, 2018), https://frankreport.com/2018/07/18/update-on-fbi-investigation-into-bronfman-raniere-crime-organization-emiliano-salinas-is-major-target/.

[18] Frank Parlato, Noose tightening for NXIVM members – feds in Knox Woods neighborhood against today – and more coming as indictments near, FRANK REPORT (Jul 13. 2018), https://frankreport.com/2018/07/13/noose-tightening-for-nxivm-members-feds-in-knox-woods-neighborhood-again-today-and-more-coming-as-indictments-near/.

[19] If the United States Attorney's Office for the Eastern District of New York was not already aware that Parlato, an indicted defendant in another federal district, has repeatedly suggested that he has law enforcement sources regularly leaking information to him in this case, it is now on clear notice. The government is also on notice that these posts are, in defense counsel's view, obstructing justice, in part, because they purport to be based on inside sources.

Case 1:18-cr-00204-NGG-VMS   Document 409-3   Filed 03/12/19   Page 13 of 35 PageID #:
Case 1:18-cr-00204-NGG-VMS   Document 116   Filed 05/20/18   Page 12 of 13 PageID #:
3973

## BRAFMAN & ASSOCIATES, P.C.

Furthermore, and perhaps most troubling, is that Parlato, even as recently as last weekend, posted the names, whereabouts and photos of those who he believes still remain clients and/or leaders of NXIVM. [20] Upon our information and belief, this information was given to Parlato by those who misappropriated and stole NXIVM's client files.

These postings are not the normal operation of media outlets covering a case. Rather, they are specifically aimed at scaring potential defense witnesses and bond co-signers. After all, hard-working, honest, innocent people considering whether to co-sign a bond for their long-time friend, Keith Raniere, are placed in an impossible position. On the one hand, they can take Parlato at his word, which is that he is the recipient of a steady stream of law enforcement leaks, with law enforcement knowing all the while that its leaked information is being published to the considerable detriment of people who have not been charged with any crime. On the other hand, people can view Parlato as someone posing as the recipient of law enforcement leaks as a way of giving his posting greater credibility. In either event, however, a co-signer can expect that he or she will be targeted by Parlato, who will publish that law enforcement informs him that such person is being investigated or is about to be charged with a crime. This is a brutally unfair and highly unusual situation that calls out for a remedy.

---

[20] See Frank Parlato, The Top 150 plus remaining High Rank of NXIVM revealed, ART VOICE (Aug. 24, 2018), https://artvoice.com/2018/08/24/the-top-150-plus-remaining-high-rank-of-nxivm-revealed/#.W4Q74yRKhpg; and https://frankreport.com/2018/08/24/the-top-150-plus-remaining-high-rank-of-nxivm-revealed/.

# BRAFMAN & ASSOCIATES, P.C.

### Conclusion

Accordingly, we ask the Court for the highly limited closure set forth above. In the event the Court grants the limited closure we request, the names of potential co-signers and all relevant background information will be provided to the government and the Court prior to any bail hearing. That way, both the Court and the government will know who the proposed co-signers will be in advance of the hearing. Simultaneously, Mr. Raniere will file a bail motion in the normal course setting forth the reasons why release on conditions is appropriate.

We thank the Court for its attention to this matter.

Respectfully,

**Brafman & Associates, PC**

By:  Marc Agnifilo
      Jacob Kaplan
      Teny Geragos

**DerOhannesian & DerOhannesian**

By:  Paul DerOhannesian II
      Danielle R. Smith

cc:   All Counsel (via ECF)

# EXHIBIT 1

Case 1:18-cr-00094-NGG-VMS Document 409-3 Filed 02/12/19 Page 16 of 35 PageID #:
Case 1:18-cr-00094-NGG-VMS Document 110 Filed 06/28/18 Page 16 of 35 PageID #:
3976

STATE OF NEW YORK
COUNTY OF ALBANY          COUNTY COURT
-----------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

      -against-                                    SCI NO.
                                          14-495

JOHN TIGHE,

                         Defendant.

-----------------------------------------------------------

**<u>P L E A</u>**


BEFORE:                    HON. PETER A. LYNCH,
                          Albany County Court Judge


APPEARANCES:

For the People:           HOLLY TREXLER, ESQ.
                          90 State Street
                          Suite 1400
                          Albany, NY 12207
                          Special Prosecutor


For the Defendant:        LEE C. KINDLON, ESQ.
                          74 Chapel Street
                          Albany, NY 12207

                          JOHN TIGHE, in person.


    TRANSCRIPT OF PROCEEDINGS in the above-entitled matter

held in Albany County Court, Albany County Judicial Center,

6 Lodge Street, Albany, New York, on Wednesday, November 5,

2014.

```
 1                    (Proceedings commenced at approximately

 2         9:05 a.m. as follows:)

 3                    THE COURT:  John Tighe.  This is the matter of

 4         People of the State of New York against John Tighe.  Are

 5         you John Tighe, sir?

 6                    THE DEFENDANT:  Yes I am.

 7                    THE COURT:  Counsel, would you put your

 8         appearances on the record please.

 9                    MR. KINDLON:  Lee Kindlon, 74 Chapel Street,

10         Albany, New York, on behalf of John Tighe.

11                    MS. TREXLER:  Holly Trexler for the People.

12                    THE COURT:  Before we get going on this matter

13         I've had a conference with counsel and it appears that the

14         alleged victim in this matter is the NXIVM organization,

15         that's N-X-I-V-M, and I disclosed to counsel that

16         approximately ten years or so ago I did do some legal

17         research for that group for a brief period of time of

18         maybe a month or two and as a result of having previously

19         represented that entity, which is the alleged victim in

20         this case, I've advised counsel that I'm going to

21         disqualify myself from this case subject to remittal,

22         which I have discussed with counsel and asked counsel to

23         speak with Mr. Tighe outside of my presence.  Mr. Kindlon.

24                    MR. KINDLON:  Thank you, Your Honor.  I had the

25         opportunity to speak to my client about a potential
```

 1          conflict.  We would waive any conflict and ask that Your

 2          Honor sit over this case.

 3                    THE COURT:  Is that correct, sir?

 4                    THE DEFENDANT:  Yes.

 5                    THE COURT:  Ms. Trexler, do you also waive any

 6          potential conflict?

 7                    MS. TREXLER:  Absolutely.

 8                    THE COURT:  Then I'll entertain the case and

 9          counsel put the proposal on the record.

10                    MS. TREXLER:  Your Honor, the People are

11          prepared to offer a plea to computer trespass in violation

12          of Section 156.10(2) of the Penal Law of the State of New

13          York, a class E felony.  Should Mr. Tighe enter a plea of

14          guilty to said charge, we would recommend, with the

15          Court's consent, a sentence of one year in the Albany

16          County Correctional Facility, waiver of his right to

17          appeal and cooperation against others in the investigation

18          as well as a conditional discharge to stay away from the

19          members of this organization.

20                    THE COURT:  A conditional discharge or order of

21          protection?

22                    MS. TREXLER:  Well, the organization is vast,

23          Your Honor, so maybe just the officers of the

24          organization.

25                    THE COURT:  Well, I suggest that you create an

1           order of protection specific to what your request is.

2                   MS. TREXLER:  Okay.  Fair enough.

3                   THE COURT:  Mr. Kindlon.

4                   MR. KINDLON:  Your Honor, that is the offer as

5       we understand it.  I've had a lot of time to talk to

6       Mr. Tighe about the case, the facts against him, any

7       potential defenses, the sentence, and any cooperation.

8       And given all that, Your Honor, he is willing to waive all

9       of his rights and proceed forward with the plea today.

10                  THE COURT:  Is that correct, sir?

11                  THE DEFENDANT:  Yes.

12                  THE COURT:  Before I can accept your guilty plea

13      I do have to ask you a series of questions so the clerk of

14      the court will swear you in.

15                  (The defendant was sworn.)

16                  THE COURT:  Okay.  Can you tell me your full

17      name for the record please?

18                  THE DEFENDANT:  John Joseph Tighe.

19                  THE COURT:  How old are you?

20                  THE DEFENDANT:  57.

21                  THE COURT:  What is your date of birth?

22                  THE DEFENDANT:  7/20/57.

23                  THE COURT:  And your address?

24                  THE DEFENDANT:  496 Rowland Street, Building 6,

25      Apartment 4, Ballston Spa, New York 12020.

```
1              THE COURT:  What is the highest grade that you

2     completed in school?

3              THE DEFENDANT:  High school.  I graduated.

4              THE COURT:  Do you have any problem

5     understanding or reading the English language?

6              THE DEFENDANT:  As long as I have my reading

7     glasses I can read it.

8              THE COURT:  Do you understand the proposed plea

9     agreement that counsel just put on the record a moment

10    ago?

11             THE DEFENDANT:  Yes, I do.

12             THE COURT:  Is that what you'd like to do?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Are you a citizen of the United

15    States?

16             THE DEFENDANT:  Yes, I am.

17             THE COURT:  Okay.  Do you understand that you do

18    have the right to have your case presented to a grand jury

19    and the further right to be prosecuted by means of an

20    indictment filed by a grand jury?

21             THE DEFENDANT:  Yes.  I waive those rights.

22             MR. KINDLON:  He understands he has those

23    rights.  He's willing to waive them, Judge.

24             THE COURT:  Here's how this is going to work.

25    All I want you to do is listen to one question at a time,
```

*(People v Tighe)*                                                                                          6

```
 1              answer the question and then I'll move on to the next

 2              question.  There's a whole series of questions that I'm

 3              going to ask you.  Can we agree on that?

 4                      THE DEFENDANT:  Yes.

 5                      THE COURT:  And do you understand that you have

 6              the right to testify before that grand jury and the

 7              further right to ask the grand jury to listen to witnesses

 8              that you identify?

 9                      THE DEFENDANT:  Yes.

10                      THE COURT:  It is my understanding that you are

11              desirous of giving up those grand jury rights and that you

12              consent to be prosecuted by means of a superior court

13              information which is a charge drawn up by the special

14              prosecutor.

15                      THE DEFENDANT:  Yes.

16                      THE COURT:  Is that what you would like to do?

17                      THE DEFENDANT:  Yes.

18                      THE COURT:  And do you understand that this

19              superior court information has the same legal effect as if

20              it were an indictment charging you with computer trespass

21              as a class E felony?

22                      THE DEFENDANT:  Yes.

23                      THE COURT:  I'm going it provide to you and your

24              attorney a written waiver of indictment.  If you

25              understand it and agree to be bound by it, I'd ask that
```

1      you sign it.

2                    (Short suspension of proceedings.)

3                    THE COURT:  Sir, is that your signature on the

4      waiver of indictment?

5                    THE DEFENDANT:  Yes, it is.

6                    THE COURT:  You understand it and agree to be

7      bound by it?

8                    THE DEFENDANT:  Yes.

9                    THE COURT:  Let the record reflect I've signed

10     the order approving the waiver of indictment.  And,

11     Mr. Kindlon, do you acknowledge receipt and waive a formal

12     reading of the superior court information?

13                   MR. KINDLON:  Yes, Your Honor, I do.

14                   THE COURT:  Sir, do you understand that with

15     respect to the charges against you, that you do have a

16     constitutional and an absolute right to remain silent?

17                   THE DEFENDANT:  Yes.

18                   THE COURT:  Clearly by speaking with me and

19     entering a guilty plea you are giving up your right to

20     remain silent and you are incriminating yourself.  Do you

21     understand that?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  In the last two days have you

24     consumed any alcohol or medication?

25                   THE DEFENDANT:  I take eight medications a day

```
 1              under a doctor's prescription.
 2                   THE COURT:  Does that medication affect your
 3              ability to think clearly?
 4                   THE DEFENDANT:  No.
 5                   THE COURT:  Are you thinking clearly here today?
 6                   THE DEFENDANT:  Yes.
 7                   THE COURT:  Do you believe that this plea
 8              agreement is in your best interest?
 9                   THE DEFENDANT:  Yes.
10                   THE COURT:  Now, have you had a full opportunity
11              to speak with your attorney about all of the relevant
12              issues in your case, about the evidence that the
13              prosecution has against you and about any possible
14              defenses that you may have?
15                   THE DEFENDANT:  Yes.
16                   THE COURT:  Are you satisfied with the legal
17              representation that Mr. Kindlon has provided to you?
18                   THE DEFENDANT:  Yes.
19                   THE COURT:  Do you understand that you do have
20              an absolute right to go to trial on these charges either
21              before a jury or a non-jury trial before the Court?
22                   THE DEFENDANT:  Yes.
23                   THE COURT:  Now, at a trial the burden of proof
24              is on the prosecution to prove your guilt beyond a
25              reasonable doubt and you are not required to prove or
```

```
1      disprove anything.  Do you understand that?

2                  THE DEFENDANT:  Yes.

3                  THE COURT:  At trial you have the right to

4      confront, that is through your attorney the right to

5      cross-examine, all witnesses.  Do you understand that?

6                  THE DEFENDANT:  Yes.

7                  THE COURT:  And although you're not required to

8      do so, you do have the right to testify at trial if you

9      wish and the further right to call witnesses to testify on

10     your behalf.  Do you understand that?

11                 THE DEFENDANT:  Yes.

12                 THE COURT:  Clearly if you plead guilty there's

13     not going to be a trial and you waive, that is you give

14     up, your right to any pretrial hearings, you give up all

15     trial-related rights and you give up any defenses that you

16     may have.  Do you understand that?

17                 THE DEFENDANT:  Yes.

18                 THE COURT:  Now, has anyone threatened, coerced

19     or forced you in any way to enter this plea?

20                 THE DEFENDANT:  No.

21                 THE COURT:  And are you pleading guilty of your

22     own free will?

23                 THE DEFENDANT:  Yes.

24                 THE COURT:  Are you pleading guilty because you

25     are in fact guilty of criminal trespass as charged?
```

10

```
 1                    THE DEFENDANT:  Yes.

 2                    MS. TREXLER:  Computer trespass.

 3                    THE COURT:  Excuse me.  Computer trespass as

 4          charged.  Do you understand?

 5                    THE DEFENDANT:  Uh-huh.

 6                    THE COURT:  Now, do you understand you're

 7          pleading guilty to a class E felony for which the maximum

 8          sentence is one and a third to four years in state prison?

 9                    THE DEFENDANT:  Yes.

10                    THE COURT:  Now, as we've already discussed,

11          when you do plead guilty you automatically forfeit the

12          right to remain silent, the right to confront your

13          accusers and the right to trial by jury.  Do you

14          understand that?

15                    THE DEFENDANT:  Yes.

16                    THE COURT:  Not withstanding the automatic

17          forfeiture of those rights upon a guilty plea, in the

18          ordinary course you would still have the right to appeal

19          your case to a higher court.  Do you understand that?

20                    THE DEFENDANT:  Yes.

21                    THE COURT:  Here, however, the plea agreement

22          requires, in addition to the waiver of your trial rights,

23          that you also waive your right to appeal with respect to

24          both the conviction and the sentence to be imposed as long

25          as the sentence is in accord with the plea agreement.  Do
```

```
 1          you understand that?

 2                    THE DEFENDANT:  Yes.

 3                    THE COURT:  And do you agree with that?

 4                    THE DEFENDANT:  Yes.

 5                    THE COURT:  In a moment I'm going to give you a

 6          written waiver of the right to appeal.  Please review it

 7          with Mr. Kindlon.  If you understand it and agree to be

 8          bound by it, I'd ask that you sign it.

 9                    (Short suspension of proceedings.)

10                    THE COURT:  Sir, is that your signature on the

11          waiver of right to appeal?

12                    THE DEFENDANT:  Yes, it is.

13                    THE COURT:  Do you understand it and agree to be

14          bound by it?

15                    THE DEFENDANT:  Yes.

16                    THE COURT:  I'm going to make that a part of the

17          record of this proceeding.  Now, subject to a presentence

18          report, it is my current intent to abide by the plea

19          agreement.  So all things being equal at the time of

20          sentencing, you'll receive a definite sentence of one year

21          in the Albany County jail.  Is that your understanding of

22          the plea agreement?

23                    THE DEFENDANT:  Yes.

24                    THE COURT:  Now, the conditions on that sentence

25          are, one, that you timely meet with probation in the
```

1       preparation of a presentence report and provide answers to

2       their questions consistent with your guilty plea here

3       today; two, that you not commit any further crime between

4       now and the time of sentencing; three, that you comply

5       with your cooperation agreement with the prosecutor; and,

6       four, that you show up for sentencing.

7              If you comply with those conditions, all things

8       being equal, you'll get the benefit of your plea agreement

9       and the one year definite sentence.  What you have to

10      understand is if you violate one or more of those

11      conditions, your plea of guilty would remain in full force

12      and effect but the sentencing agreement would not and you

13      could receive a sentence of up to one and a third to four

14      years in state prison.  Do you understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  So other than my intent on

17      sentencing that I've just described to you, has anyone

18      made any other promise or representation to you in order

19      to get you to plead guilty?

20             THE DEFENDANT:  No.

21             THE COURT:  Mr. Kindlon, are you satisfied that

22      your client's desire to plead guilty and the waiver of his

23      trial and appellate rights have all been knowingly,

24      intelligently and voluntarily made?

25             MR. KINDLON:  Yes, I am, Your Honor.

1          THE COURT:  Now, directing your attention to the

2     superior court information, Mr. Tighe, do you admit that

3     on the 4th day of November of 2010 at approximately

4     9:35 p.m. at 80 State Street, 7th floor, in the City and

5     County of Albany, State of New York, that you did

6     knowingly access the computer network of NXIVM using a

7     user name and a password of a former student without her

8     permission or authorization and thereby you gained access

9     to "1contact.php." which contained a list of active

10    participants and clients of NXIVM including contact

11    information of those individuals?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Did you do that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Do you understand everything that

16    we've done here today?

17          THE DEFENDANT:  Uh-huh.

18          MR. KINDLON:  Yes?

19          THE DEFENDANT:  Yes.

20          THE COURT:  How do you plea to the charge of

21    computer trespass in violation of Penal Law

22    Section 156.10(2), a class E felony, guilty or not guilty?

23          THE DEFENDANT:  Guilty.

24          THE COURT:  The Court will accept your plea.

25    Mr. Kindlon, is January 7, 2015, convenient for

Case 1:18-cr-00204-NGG-VMS   Document 40-1   Filed 03/12/19   Page 29 of 35 PageID #: 3989
Case 1:18-cr-00204-NGG-VMS   Document 116-1   Filed 08/23/18   Page 13 of 18 PageID #: 735

*(People v Tighe)*                                                                14

1  sentencing?

2          MR. KINDLON:  Yes.

3          MS. TREXLER:  Your Honor, may I ask a couple

4  questions?

5          MR. KINDLON:  We need further allocution I

6  believe.

7          THE COURT:  Do you want to make a further

8  allocution?

9          MS. TREXLER:  Just a couple of questions,

10  Mr. Tighe, if I could.  Approximately, if you know, how

11  many times did you access these servers with that user

12  name and password?

13          THE DEFENDANT:  Roughly 50 to 60.

14          MS. TREXLER:  What user name and password were

15  you using, sir?

16          THE DEFENDANT:  I don't recall.

17          MS. TREXLER:  Was it a password of ███████

18  ██████?

19          THE DEFENDANT:  Yes.

20          MS. TREXLER:  And a user name of hers as well?

21          THE DEFENDANT:  Yes.

22          MS. TREXLER:  Did you have her permission to do

23  so?

24          THE DEFENDANT:  I was told I did but not from

25  her.

1      MS. TREXLER:  You did not have it from ███

2      ███; right?

3          THE DEFENDANT:  No, I did not.

4          MS. TREXLER:  Who else did you know was

5      accessing the NXIVM servers using that user name and

6      password?

7          THE DEFENDANT:  I know Joe O'Hara told me

8      firsthand that he was.  I was told through Joe O'Hara that

9      Toni Folet or Natale had access to it and I was told

10     vaguely by Joe O'Hara that others did without being named,

11     but when I asked him about Jim Odato he said he had access

12     to the same information I did without specifically saying

13     he had access to the passwords.

14         MS. TREXLER:  And you had no contact with

15     Suzanna Andrews of Vanity Fair?

16         THE DEFENDANT:  To the best of my knowledge, no.

17         MS. TREXLER:  Thank you, Your Honor.

18         THE COURT:  Okay.  Sentencing is January 7,

19     2015, at 9 a.m.  What is your client's status?

20         MR. KINDLON:  Your Honor, he has been released

21     from Albany City Court on his own recog.

22         MS. TREXLER:  He was.

23         THE COURT:  He was released in his own

24     recognizance?

25         MR. KINDLON:  Your Honor, he's also on federal

```
 1        probationary pretrial release supervision.

 2                THE COURT:  I'll continue that status subject to

 3        a Parker.

 4                MR. KINDLON:  Thank you.

 5                (Short suspension of proceedings.)

 6                THE COURT:  Sir, is that your signature on the

 7        Parker admonishment?

 8                THE DEFENDANT:  Yes, it is.

 9                THE COURT:  You understand it and agree to be

10        bound by it?

11                THE DEFENDANT:  Yes.

12                THE COURT:  I'll make that part of the record.

13        Your release is subject to the Parker.  I'm going to give

14        you the instructions to go down to probation.  I want you

15        to go down there this morning and give them your contact

16        information.  Make sure you cooperate with probation so

17        you can get the benefit of your plea.  That's it.

18                MR. KINDLON:  Thanks, Judge.  Have a good day.

19                (Proceedings concluded at approximately

20        9:22 a.m.)

21

22

23

24

25
```

```
 1                    C E R T I F I C A T I O N

 2

 3        I, AMY E. MACKENZIE, a Court Reporter and Notary Public

 4

 5        in and for the State of New York, do hereby certify that

 6

 7        the foregoing transcript in the above-entitled matter

 8

 9        is a true and accurate transcript to the best of my

10

11        knowledge and belief.

12

13

14                              Amy E. MacKenzie

15

16

17

18        DATED:  November 6, 2014

19

20

21

22

23

24

25
```

(Amy E. MacKenzie, Senior Court Reporter)

Case 1:18-cv-00204-NGG-VMS   Document 116-2   Filed 08/28/18   Page 1 of 3 PageID #:740
3993

# EXHIBIT 2

Case 1:18-cr-00204-NGG-VMS   Document 409   Filed 09/12/19   Page 34 of 35 PageID #:
Case 1:18-cr-00204-NGG-VMS   Document 116-9   Filed 03/18/19   Page 2 of 4 PageID #:
3994

## *INTEREST IN HORSES LED TO BRUNO MEETING*

The Times Union (Albany, New York)

October 8, 2007 Monday, 1 EDITION

Copyright 2007 The Hearst Corporation All Rights Reserved

**Section:** MAIN; Pg. A3

**Length:** 518 words

# Body

Political consultant Roger Stone acknowledges he introduced the millionaire Bronfman sisters, Sara and Clare, devotees of the **NXIVM** executive training program, to Senate Majority Leader Joseph L. Bruno because of a common interest in horses.

The Bronfmans ended up writing checks totaling $31,600 last year to the Senate Republican Campaign Committee. A limited liability corporation using the same address as the women provided $34,763 in air transportation - in-kind contributions - to the Senate GOP housekeeping account. The jet rides were likely for Bruno, Senate officials say.

Stone won't say whether he is a student of **NXIVM**, the controversial organization based in the Capital Region, which does business as Executive Success Programs. But he and his son, Scott Stone, who run a political consulting business, are on a list of **NXIVM** students obtained by the Times Union.

Roger Stone recently lost his job helping the Senate Republicans after a person with his voice and using his telephone number left an obscenity-laced message on the office phone of Gov. Eliot Spitzer's father. Stone has denied it was him.

It's fine with him After insisting he isn't a lobbyist, American Racing and Entertainment Chairman Jeff Gural has agreed to register as one after all and to pay a $500 penalty.

Gural, a Manhattan real estate executive who's invested a small fortune in video slots at Tioga Downs and Vernon Downs, could have faced a fine as high as $25,000, but came away with the $500 charge after agreeing to register as a lobbyist for American Racing.

Gural said earlier he didn't consider himself a lobbyist since he already pays for one and isn't paid for lobbying work.

The staff of the former state lobbying commission, in one of its last investigations, concluded Gural had been lobbying the Legislature on behalf of American Racing to let VLT operators keep more of the money that goes into the gambling machines, and had more than $5,000 in expenses. By law, someone who works for passage or defeat of a bill and spends or is paid at least $5,000 is a lobbyist, and must register with the state.

Leader's new office Perhaps it's a case of office envy. Or just a needed upgrade, as Curtis Taylor, director of communications for Senate Minority Leader Malcolm Smith, describes the renovation project on the third floor of the Capitol.

Workers have been tearing up Taylor's office in recent days, ripping down the wall that separated his quarters from his press officer's. In the end, he'll have the back office all to himself, and some Senate staffers say it's because Taylor has compared his relatively small digs to the bigger work area of his counterpart in the Senate majority, John McArdle.

INTEREST IN HORSES LED TO BRUNO MEETING

Taylor said "updating" was needed, such as new wiring and a new wall, "nothing out of the ordinary," and suggested the communications office won't be changing.

A Senate Democrat said Taylor's staff will be working upstairs from his office because of the rearrangement.

Contributors: State editor Jay Jochnowitz and Capitol bureau reporter James M. Odato. Got a tip? Call 454-5424 or e-mail *jjochnowitz@timesunion.com*

## Notes

Capitol Confidential

**Load-Date:** October 8, 2007

End of Document