UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 18 Cr. 00204 (NGG) (VMS) |
| - v. - | |
| KEITH RANIERE, | **Submitted on April 26, 2019** |
| Defendant. | |

**KEITH RANIERE'S RESPONSE IN OPPOSITION TO THE
GOVERNMENT'S MOTIONS IN LIMINE AND MOTION TO ADMIT
EVIDENCE PURSUANT TO RULE 414**

Marc A. Agnifilo, Esq.
Teny R. Geragos, Esq.
**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

Paul DerOhannesian II, Esq.
Danielle R. Smith, Esq.
**DEROHANNESIAN &
DEROHANNESIAN**
677 Broadway, Suite 707
Albany, New York 12207
(518) 465-6420

*Attorneys for Defendant Keith
Raniere*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.    The Court Should Deny the Government's Motion to Require the Parties to Refer to Victim Witnesses by Alternate Names or Their First Names Only ............................ 1

    A.   Allowing This Prejudicial Request Violates Mr. Raneire's Sixth Amendment Rights and Undermines the Presumption of Innocence ........................................ 3

    B.   This Court Should Deny the Government's Motion Because Mr. Raniere Has Not Ever Been Deemed a Danger ................................................................. 5

    C.   The Government's Desire to Protect the Witnesses Names from the Media Raises Concerns in a Case Where Many Government Witnesses and Their Family Members Have Been Present in the Media for Over a Year ............................... 10

    D.   Referring to Witnesses by Pseudonyms Is Untenable in This Expansive Racketeering Case ............................................................................................. 13

    E.   Throughout This Case, the Government Has Changed Their Judgments of Who Is a Co-Conspirator and Who Is a Victim, Which Undermines the Strength of Their Argument ........................................................................................................... 13

II.   Sealing of Evidence ............................................................................................ 14

III.  Government's Motives for Prosecution .................................................................. 14

IV.   Former Prosecutor Motion .................................................................................... 14

V.    Reciprocal Discovery and Rule 26.2 Material ...................................................... 15

    A.   Reciprocal Discovery ........................................................................................ 15

    B.   Rule 26.2 Material ............................................................................................. 17

VI.   The Court Should Deny the Government's Motion to Admit Evidence Pursuant to Federal Rule of Evidence 414 .............................................................................. 17

CONCLUSION ................................................................................................................... 22

## PRELIMINARY STATEMENT

Defendant Keith Raniere respectfully submits this memorandum of law in response to the government's motions in limine (Dkt. 567, Gov't Motions in limine) and motion to admit evidence of an alleged prior uncharged sexual act under Federal Rule of Evidence 414 (Dkt. 569, Gov't 414 Letter).

## ARGUMENT

I.   The Court Should Deny the Government's Motion to Require the Parties to Refer to Victim Witnesses by Alternate Names or Their First Names Only

We strongly oppose any witness testifying under a false or partial name under the facts of this case. While we have indicated that we will work with the government and the Court to minimize the amount of embarrassing material in the public realm (i.e. agreeing to seal evidence, as set forth at Point II below), having witnesses testify at this very serious and important trial under false or partial names is not the answer. We will of course be mindful of decorum and discretion in regard to confidential matters, but we strongly oppose the government's application to alter the names of witnesses for the following reasons.

First, allowing this highly unusual and dubious practice would violate Mr. Raniere's Sixth Amendment right to confrontation and would moreover unfairly signal to the jury that, in the Court's view, the witness is a victim of a sex crime who is in danger. Our contention is that the adult witnesses testifying about actions they engaged in as adults are not victims of a crime, much less the horrible crime of sex trafficking, and that by making any special accommodation in the context of that person's testimony before this jury would signal to this jury that the Court has already deemed them to be victims of sex trafficking, and in need of protection from the Court.

Second, there has been NO evidence in this case whatsoever that Keith Raniere has posed a danger to any witness.[1] In March 2018, he was arrested and put in prison. He has served over thirteen months as a model prisoner and citizen. He has done nothing untoward to anyone and he does not deserve the draconian and constitutionally-dubious remedy of having witnesses against him in a case where a life sentence is a real possibility to testify under false or partial identities.

Third, to the extent that the witnesses seek protection from the media, we contend this raises significant concerns in this case. Many of the purported victims within the purview of the government's proposal have specifically sought out media attention, sometimes making themselves stars of internationally-broadcast podcasts, being featured in books, newspaper articles and in a soon-to-be released HBO documentary. Additionally, many of these same people are contemplating a class-action case and have retained counsel in doing so, another measure that will bring media attention.

Fourth, given the nature of this Racketeering case, including the number of witnesses testifying and the number of people about whom they will testify, the government's proposal of identifying crime victims with false or partial names is simply untenable and would lead to confusion by the witness and ultimately the jury. DOS had upwards of a one hundred members, at least thirty of whom may be discussed at this trial. Is the government really proposing that we assign a fake identity for each one? Short of providing the witness a glossary of which actual person goes with which fake name, the government's proposal will not work as a practical matter and presents massive Sixth Amendment implications. ███████████████████████████

████████████████████████████████████████████████████████

█████████████████     If, for instance, she was describing a meeting between herself and seven

---

[1] This Court has declined to make such findings in connection with deciding whether Raniere should be granted release with conditions.

DOS members, she would have to identify them by the false names given by the government. If she gets one of the names wrong because she forgets which real person corresponds to which made-up identity, we have the unimaginable problem of not knowing if she got the names wrong because she forgot which real person corresponds to which made-up identity or whether she is lying about the meeting and cannot remember who is there because she is making the whole thing up. This completely avoidable dilemma, which cuts to the very heart of cross-examination because it potentially touches on the witnesses' truthfulness, is eliminated if everyone uses their actual names, as we do in 99.9% of trials in America.

Fifth, the government is constantly shifting their theory of who is a co-conspirator and who is a victim is in this case, which further demonstrates the overriding need to identify people by their true names. ██████████████████████████████████████████████
██████████████████████████████████████ demonstrating flaws with the government's sex trafficking theory and with the requested relief here.

A.     Allowing This Prejudicial Request Violates Mr. Raneire's Sixth
        Amendment Rights and Undermines the Presumption of Innocence

The government has not cited any cases that justify the extreme measures requested where, as here, there was not an explicit threat from the defendant to the particular witness at issue. As a result, Mr. Raniere's Sixth Amendment confrontation rights must prevail. In Smith v. Illinois, 390 U.S. 129 (1986), the Supreme Court held that the Sixth Amendment's Confrontation Clause includes the right to "ask the witness who he is and where he lives" because this is "the very starting point in exposing falsehood and bringing out the truth through cross-examination" when "the credibility of a witness is in issue." Id. at 131 (defendant has Sixth and Fourteenth Amendment rights to cross-examine regarding the witness's actual name and address.) Additionally, the identifying information must be presented to the jury as the evidence bears on

3

the witness' credibility. In <u>Alford v. United States</u>, 282 U.S. 687, 691 (1931), the Supreme Court reversed a defendant's conviction because the district court impermissibly prevented defense counsel from obtaining the address of a prosecution witness—information the Supreme Court held went directly to the witness' credibility, bias and prejudice.

As in <u>Smith</u> and <u>Alford</u>, identifying information is necessary for Mr. Raniere's in-court investigation and ability to cross-examine effectively as to the witnesses' credibility.[2] Moreover, whether the witness is currently employed *or* using NXIVM's technology in their daily life is certainly relevant to their credibility given the allegations stem from NXIVM's apparent widespread abuse of women. Afterall, every DOS member was also enrolled in Executive Success Programs' "workshops designed…to 'actualize human potential.'." (Dkt. 1, Complaint ¶ 3.) NXIVM/ESP itself is as a "professional business providing educational tools, coaching and trainings to corporations and people from all walks of life,' and describes its philosophy as 'a new ethical understanding' that allows 'humanity to rise to its noble possibility.'" (<u>Id.</u> ¶ 4.) Other DOS members were enrolled in other Raniere-affiliated entities, such as The Source[3] (an acting program), The Knife of Aristotle (promoting ethical media analysis), Exo-Eso (a yoga and wellness program) and Jness (a women's group). Mr. Raniere should be entitled to elicit from the witnesses' that despite their experience in DOS or with Mr. Raniere, they remained in DOS or in NXIVM because of the benefits the witness received from those things—benefits that the witness may continue to draw upon in his or her current employment.

---

[2] Counsel does <u>not</u> expect to cross-examine as to the exact address where a witness lives, but in some instances will inquire as to the general location.

[3] ████████████████████████████████████████████████

Additionally, the government's request to conceal the witnesses' names sends a clear and prejudicial message to the jury that this case requires special protective measures for not just the jury,[4] but for government witnesses as well. The jury will infer from the fact that the witnesses' identities are concealed that it is because the defendant is dangerous—not because the government fears that the witnesses will be embarrassed by the media. This request for anonymous witness is akin to a request for an anonymous jury, which carries with it "the possibility of unfair prejudice to the defendant and the danger of encroaching on the presumption of innocence." United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989). Indeed, this Court has already ruled that an anonymous jury in this case is unwarranted because "[t]here is no 'substantial potential threat of corruption to the judicial process' that would require complete anonymity." (Court 4/5/19 Order (citing United States v. Mostafa, 7 F. Supp. 3d 334, 336 (S.D.N.Y. 2014).)  However, the prejudice inherent in the government's request for anonymous witnesses is even more problematic because it impacts directly on Mr. Raniere's ability to fully cross-examine the witnesses.

B.     This Court Should Deny the Government's Motion Because Mr. Raniere
        Has Not Ever Been Deemed a Danger

When the government seeks to prevent the revelation in open court of identifying information, the government "should come forward with its reason," see United States v. Marti, 421 F.2d 1263, 1265 (2d Cir. 1970), "such as fear of reprisal, humiliation or annoyance to the witness." United States v. Marcus, No. 05-CR-457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007). If the government can identify a need to protect the witness' full identity, the defendant must demonstrate a particularized need for the information. Id.

---

[4] The jurors are semi-sequestered.

5

The government relies heavily on United States v. Marcus, 2007 WL 330388, for the proposition that potential harassment (from the bondage, dominance/discipline, submission/sadism and masochism ("BDSM") community), potential loss of employment and explicit anticipated testimony are legitimate reasons to protect witnesses' full identities. (Gov't Motions in limine at 5-6.).

However, Marcus is distinct for at least three reasons: first, the extent of the abusive conduct; second, the fact that the defendant put a bounty on the witness because of her testimony; and third, because the defendant explicitly used the BDSM community, of which the defendant and the witness were members, to put pressure on the witness. These reasons distinguish Marcus from the instant case, where Mr. Raniere is not alleged to have placed witnesses under any form of pressure or tampered with a witness in any fashion.

The charges in Marcus stemmed from a BDSM relationship where the defendant whipped the victim for "three to four days," and carved the word 'slave' on her stomach with a knife." Id. She visited the defendant one more time, and afterwards decided to move into another one of the defendant's "slave's" apartments and submitted a petition where she asked the defendant to allow her to serve him as his slave. Id. By serving as his slave, the defendant would visit the apartment every two weeks for days at a time and order the slaves to do the following:

- Not wear clothing, eat, drink or speak without permission and not allowed to sleep for hours at a time; Id.

- Shaving the victim's head and branding "G" into her buttocks with a coat hanger, which later developed into a severe injury that the defendant would not allow her to seek medical attention; Id.

- Requiring the victim and the other slave to "wear butt plugs or breast clamps for long periods of time…if either failed to follow instructions, the other would inform the defendant and he would…administer punishments; Id. at 294-295.

6

These punishments began to depress the victim and she burned herself with a cigarette. She confessed to the defendant and he required the other slave to "defecat[e] on [the victim's] face in the bathtub and make her clean the bathtub with her tongue." Id. Over a period of two years, the victim decided she wanted to leave and the defendant carried out the following punishments on her, including, but not limited to:

- Told the victim to shut up, put a whiffle ball inside her mouth, closed her lips shut with surgical needles so that she was unable to speak, and placed a hood over her head, beat her with a case over an extended period of time and had sexual intercourse with her;

- Attempted to sew her vagina closed with a sewing needle until the needle broke, inserted a butt plug into her anus, and used a knife to carve his initials into the soles of her feat— all the while she was crying and screaming; Id. at 295.

- Threatened to send photographs of the other slave to her father and godson if she did not continue to serve him; Id. at 296

- Put a safety pin through her labia and attached a padlock to it, then whipped her with a knife to stop her from crying; Id.

- Zipping her into a plastic garment bag and choking her through the plastic; id.

- Banged her head against a beam, bound her hands and ankles to the beam, whipped her for an hour, and put a surgical needle through her tongue; Id. at 297.

After the victim left the defendant, "**he offered a reward in the form of free membership to his website to anyone who located her**." Marcus, 2007 WL 330388, at n. 1 (emphasis added). The court allowed the witnesses to testify using "their first names only." Id. at *4.  The court in Marcus was understandably concerned that the defendant was actively looking to locate a witness against him by offering something of value to anyone to the BDSM community, a community that included the witness. The same concern simply does not exist here.

The government's reasons for anonymous witnesses or partially-named witnesses lacks sufficient justification and has not been recognized by any court under these facts. The

7

government's fallback request to have witnesses testify with their first names relies on cases completely distinguishable from the instant matter. See United States v. Rivera, 09-CR-619 (E.D.N.Y. Dkt. 231) (granting victims who were testifying about acts of forced prostitution and sexual contact with customers at others at bars "[d]ue to the potential for embarrassment, reprisal, humiliation, annoyance, and the possibility of media coverage…") In Rivera and Marcus, both courts were obviously concerned with retaliation, either from the BDSM community (Marcus, supra, at *3) or the defendants who used a "climate of fear" against the victims including raping the victims, forcing victims to use illegal drugs, stealing money from victims, and threatening to report the victims to immigration authorities (Rivera, supra, at 1-2.)

Here, unlike Marcus, the acts Mr. Raniere is accused of pale in comparison. The government's indictment does not allege violent acts such as those detailed within Marcus and, in fact, the evidence the government has thus far set forth indicates that Mr. Raniere knew the phone numbers, email addresses and location of the DOS members and did not retaliate against them. Indeed, the worst the government will be able to say he did was send cease and desist letters to a select number of DOS members. (See Dkt. 256, Gov't Memo of Law re: Defts' Assertions of Privilege at 10-14, 25-27) (denied as moot by Judge Scanlon). Moreover, while the acts in Marcus center around BDSM activities, the vast majority of DOS slaves will testify that DOS had no BDSM component and they were not asked by their masters to seduce Raniere.[5]

Similarly, unlike Rivera, a typical sex-trafficking case, the "climate of fear" evidence present there does not exist here. In Rivera, the victims were forced to work in bars, were subject

---

[5] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████

to threats and physical violence, rapes, demands to consume large amounts of alcohol, and threats to immigration authorities to deport them. <u>Rivera</u>, <u>supra</u>, at 1-2. Here, Mr. Raniere is accused of quite the opposite—trying to induce NXIVM members to *stay* in the United States, rather than threaten them with deportation. (<u>See</u> S-2, Racketeering Act 11.) Though the government will likely argue that Jane Doe 4 was "threatened with deportation to Mexico," it also has consistently withheld the truth from the Court, that Jane Doe 4's father drove her there. Moreover, no DOS member or alleged victim will testify that Mr. Raniere or anyone else in NXIVM forced illegal drugs or alcohol on them. Quite the opposite: NXIVM was a drug-free community.

Most importantly, present in both <u>Rivera</u> and <u>Marcus</u> are the courts' concern of "retaliation" against witnesses—a concern lacking here. The government does not argue that he is a danger to witnesses or that the government witnesses fear retaliation from Mr. Raniere or the NXIVM community. NXIVM's President (Nancy Salzman), two board members (Lauren Salzman and Clare Bronfman) and its bookkeeper (Kathy Russell) have pleaded guilty. The government cannot allege that the "community" could pose a threat to these witnesses. Similarly, Mr. Raniere has been incarcerated at the government's insistence for a year and has no ability nor desire to "retaliate" against these witnesses, nor could the government credibly allege such a threat. Accordingly, the concerns contemplated by the government and the courts in these cases are not present here.

Moreover, the government's request that the witnesses testify under a "nickname or pseudonym only" (Dkt. 267 at 2) lacks support in Second Circuit and Eastern District jurisprudence, as the cases cited as persuasive by the Government all involve direct threats from the defendant or environments created by the defendant that are inherently threatening. <u>See</u>

9

United States v. Dan Zhong, No. 16-CR-614 (DLI), 2018 WL 6173430 (E.D.N.Y. 2018) (granting the government's motion (Dkt. 115) to have victim witnesses testify using pseudonyms after the government argued that the defendant's company had a "history of violent reprisals," (Dkt. 115) "sought to abduct the victims after they escaped from [the company's custody'," (Dkt. 115) and have "seized real estate properties they posted as collateral for victims to travel to the United States"). Even in Marcus, where the defendant offered a financial benefit to locate a victim, the Court did not order that the victims testify with pseudonyms.

Therefore, because the government has not articulated or put forward a good faith basis that Mr. Raniere is a danger to the witnesses—nor could they—we submit that the government's draconian remedy should not be granted.

C.      The Government's Desire to Protect the Witnesses Names from the Media
        Raises Concerns in a Case Where Many Government Witnesses and Their
        Family Members Have Been Present in the Media for Over a Year

As will be developed more below, due to the massive press in this present case, including The Frank Report, which has published the names of countless numbers of DOS members, the true names of the witnesses are either already widely known or can be known in matter of seconds through a simple search of that website.[6] Moreover, a number of the government witnesses and DOS members (1) worked together with Frank Parlato to smear Mr. Raniere and others on his blog, The Frank Report, (2) made themselves public *by choice* in The New York Times and several other news organizations, and (3) have been interviewed in the upcoming

---

[6] See, e.g., █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

HBO documentary on this case. The following are just a few examples of the amount of media

the government witnesses have *themselves* pursued before ever stepping foot in the courtroom:

<u>Frank Parlato</u>



<u>News Outlets</u>

- DOS members Sarah Edmondson[7] and Soukaina Mehdaoui and Nxivm members Mark Vicente, Bonnie Piesse, Anthony Ames and Jennifer Kobelt were all featured prominently in a New York Times article published in October 2017.[8] ████████████ ████████████

- Sarah Edmondson and Jenn Kobelt starred in a podcast, <u>Escaping Nxivm</u> on Canadian Broadcasting Company;

- Mark Vicente and Sarah Edmondson were featured prominently in a 20/20 episode on NXIVM;

---

[7] Edmondson also has plans to star in a documentary series (not HBO): Former NXIVM Member Sarah Edmondson To Star in Documentary Series Produced By Brian Graden, DEADLINE HOLLYWOOD (Apr. 25, 2018, 10:30 AM), https://deadline.com/2018/04/ex-nxivm-member-sarah-edmondson-star-docu-seriesproduced-brian-graden-sex-cult-1202373257/.

[8] Berry Meier, <u>Inside Secretive Group Where Women Are Branded</u>, THE NEW YORK TIMES (Oct. 17, 2017), https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html.

- Catherine Oxenberg has featured her daughter prominently in the media over the past two years in countless publications, television shows[9] and her book, Captive, all the while acknowledging that her daughter repeatedly asked her to stop publicizing her private life;

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ This is a defense that Mr. Raniere should be allowed to explore on cross-examination when the government's theory is that Mr. Raniere was responsible for government witnesses' humiliation.

Because the vast majority of the witnesses' names are already in the public realm by the alleged victims themselves, █████████████████████████████████████████████████ or by other parties not including the defense, this motion should be denied.

---

[9] Oxenberg has discussed her daughter, India's involvement in DOS with the Today's Show in 2017, to Megyn Kelly NBC and Dateline in August 2018 coinciding with the release of her book, Captive on the same day, and has spoken publicly about her daughter's apparently choice to "leave Nxivm" in August 2018. See, e.g., https://www.today.com/video/catherine-oxenberg-talks-about-her-fight-to-save-her-hijacked-daughter-1087139395742),https://www.nbcnews.com/news/us-news/former-dynasty-star-catherine-oxenberg-speaks-about-daughter-s-involvement-n898031;   https://people.com/crime/catherine-oxenberg-says-her-daughter-who-has-left-nxivm-is-moving-forward/.

D.    Referring to Witnesses by Pseudonyms Is Untenable in This Expansive
      Racketeering Case

Mr. Raniere also submits that referring to witnesses by pseudonyms is not practical in a

vast racketeering case that involves hundreds of people. This is a case where witnesses are going

to discuss relationships with one another before, during and after the formation of DOS.[10]

Additionally, a great deal of the evidence relates to written communications to and from DOS

"masters" and DOS "slaves." Allowing the witnesses to testify under a different name entirely is

simply not practical because it will cause the parties—2 weeks before trial—to redact and change

potential trial exhibits and will be confusing and misleading for the parties who have been

familiar with witnesses' true names since the inception of the case.

E.    Throughout This Case, the Government Has Changed Their Judgments of
      Who Is a Co-Conspirator and Who Is a Victim, Which Undermines the
      Strength of Their Argument

Lastly, the government is unable to make a sufficient showing because their lines

between "co-conspirator" and "victim" have *always* been blurred in this case. ███████████

████████████████████████████████████████████████████████████ ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

---

[10] The defense can submit examples of this expected testimony under seal to this Court if this
Court wishes.

[11] ████████████████████████████████████████████████████████████████
████████████████████████

[12] Jane Doe 2 in the Complaint is Jane Doe 8 in the Second Superseding Indictment.

████████████████████████████████████████████████████████

████████████████████████████████████████████████ The

government's inconsistencies also exist with respect to Jane Doe 2, who is an alleged victim of

*child exploitation*. She is both a victim in the government's eyes and yet "continues to be a

member of the Enterprise." (Dkt. 485, Government Opposition to Motions to Dismiss Second

Superseding Indictment at 12.) ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████

## II.   Sealing of Evidence

Defendant Raniere joins in the government's motion to seal certain categories of

evidence at trial. (Dkt. 567 at 11-13.) Mr. Raniere does not believe that any DOS members'

collateral should be released into the public domain—as the entire point of the collateral from the

beginning was for it to remain secret.

## III.   Government's Motives for Prosecution

The defense does not intend to discuss the government's motives for prosecution. In 29

years trying cases, I cannot think of a time that I have ever raised such an issue, as it tends to be

irrelevant.

## IV.   Former Prosecutor Motion

Proud as I am of my tenures at the Manhattan District Attorney's Office and the United

States Attorney's Office for the District of New Jersey, I have NEVER discussed my former job

as a prosecutor at any defense trial, as that would be utterly improper. Since the government

singled out only my former prosecution jobs, I assume I am free to discuss at length my five

years delivering the Herald Statesman newspaper to the homes of scores of readers in Yonkers, New York and that I used his Huffy three-speed, with a banana seat, in doing so.

V.     Reciprocal Discovery and Rule 26.2 Material

The government argues that the Court should order Mr. Raniere to produce reciprocal discovery under Rule 16 and Rule 26.2.

A.     Reciprocal Discovery

The government seeks an order from the Court to require Mr. Raniere to produce documents that the defendant will seek to admit during the cross-examination of a witness during the government's case-in-chief to affirmatively support the defendant's theory of the case. (Gov't Motions in limine at 14.) The Second Circuit has not addressed this issue, and the government relies on district court cases from the D.C. Circuit, the District Court of Idaho, the Northern District of California, and District of Nevada, among others.

To the extent that the government interprets case-in-chief to interfere with traditional cross-examination, Mr. Raniere objects. The term case-in-chief means the evidence offered by that party through its own witnesses. By definition, the term case-in-chief is the opposite of cross examination of your adversary's witness. The government's request would mean that prior to the testimony of a government witness, the defendant would have to lay bare his cross-examination strategies, including the emails and other documents that the defense would use during cross-examination. This is absolutely anathema to what cross-examination is, and must continue to be. A criminal defendant, with no burden of proof, should not be forced to give the government a preview of his cross-examination of government witnesses.

Additionally, it is not always clear what materials will be used on cross-examination until a witness testifies on direct-examination. For example, if a witness is combative with the cross-

15

examiner, the cross-examiner may embark on a different line of inquiry, involving different materials, than if the witness is more agreeable. These are instinctive trial decision made in the moment and cannot be scripted ahead of time.

After examination of this issue in United States v. Shkreli, 15 CR 627 (KAM), Judge Matsumoto ruled that if

> the defense wishes to offer into evidence a lengthy series of exhibits or set of documents, it should provide the documents pre-marked with exhibit numbers to the court for *in camera* review, accompanied by a brief explanation of the bases for their admissibility, with sufficient time to enable the court to issue a prompt ruling and avoid lengthy sidebars.

Shkreli 7/5/17 Order. In closing, the defendant should not be required to preview his cross-examination of government witnesses, which would violate his fundamental right to Due Process and would also be in violation of Fed. R. Crim. P. 16(b)(A)(i) and (ii), which provides that a criminal defendant must disclose only those materials it intends to use on the defendant's case-in-chief. Conversely, there is no requirement—statutory or otherwise—to compel a criminal defendant to provide discovery or notice of the materials he intends to use to cross-examine government witnesses during the prosecution's case in chief.

That the government requests this to "avoid surprise and gamesmanship" (Gov't Motions in limine at 16 (quoting Hsaia, 98 CR 0057 (PLF) 2000 WL 195067, at *1(D.D.C. Jan. 21, 2000)) is ironic, given that the government has produced over 13 terabytes of discovery to the defendant and consistently refused to provide a bill of particulars. Finally, the government has produced § 3500 material on 125 individuals, but will not give Mr. Raniere a witness list. It is impractical and a hardship to expect Mr. Raniere to produce discovery relating to all of these witnesses, when a vast majority will likely not be called to the witness stand.

16

B.    Rule 26.2 Material

The government requests production of statements of defense witnesses pursuant to Rule 26.2. At this point in time, Mr. Raniere does not plan to put on a case-in-chief and therefore does not have any statements of any potential defense witnesses in our possession to provide to the government. If based on the presentation of the governmnet's case in chief, this position changes, we will adapt accordingly.

VI.    The Court Should Deny the Government's Motion to Admit Evidence Pursuant to Federal Rule of Evidence 414

The government seeks to introduce evidence that Mr. Raniere engaged in a sexual relationship with Jane Doe X when she was twelve or thirteen-years-old. (Dkt. 569, Gov't 414 Motion.) The government maintains that the evidence is admissible under Rule 414 because Jane Doe X will testify that she was sexually molested by Mr. Raniere when she was a child, and Racketeering Acts Two, Three and Four accuse Mr. Raniere of child exploitation and possession of child pornography. (Id. at 2-3.) Mr. Raniere incorporates his arguments in response to the government's Enterprise Motion (see Dkt.323 (under seal)) and submits further argument herein.

It must be noted, however, that Mr. Raniere is not charged with having a sexual relationship with Jane Doe 2. The charges, rather, are that Mr. Raniere took a number of naked photographs of Jane Doe 2. The naked photographs alone are the subjects of the charge. Mr. Raniere is charged with child exploitation because he allegedly took naked photographs of a fifteen-year-old female. Moreover, the contention that Mr. Raniere maintained these photos in his possession is the basis for the possession of child pornography charge. Therefore, because Mr. Raniere simply is not charged with having sex with the fifteen-year-old female, the testimony of Jane Doe X is already less relevant than otherwise.

The Second Circuit in <u>Spoor</u> makes clear, "it does not follow that propensity evidence relative to child molestation [under Rule 414] is always admissible." <u>United States v. Spoor</u>, 904 F.3d 141, 154 (2d Cir. 2018). While there exists no bright line rule as to when Rule 414 propensity evidence may be admitted, the Second Circuit has set forth the following factors to consider: "(1) 'the similarity of the prior acts to the acts charged,' (2) the 'closeness in time of the prior acts to the acts charged,' (3) 'the frequency of the prior acts,' (4) the 'presence or lack of intervening circumstances,' and (5) 'the necessity of the evidence beyond the testimonies already offered at trial. The district court should also consider the potential for unfair prejudice, including the possibility that prior act evidence will lead the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving of punishment — a particular risk with this sort of evidence.'" <u>Spoor</u>, 904 F.3d at 154-155 (citations omitted).

For several reasons, the prosecution's motion should be denied as the above factors weigh heavily in Mr. Raniere's favor.

<u>First</u>, the prosecution has failed to provide sufficient notice under Rule 414(b). At the outset, Rule 414(b) requires the prosecution to disclose the "witnesses' statements or a summary of the expected testimony" at least 15 days before trial. It is impossible to tell from the disclosed material the acts, number of acts and place of acts the government would offer. █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  It is impossible to know precisely what the prosecution is offering as evidence.

Furthermore, instead of providing the specific purpose of the Jane Doe X evidence, the government's proffer simply refers the reader to their Enterprise Motion without explanation.

(Gov't 414 Motion at 1 (citing Dkt. 414, Gov't Enterprise Motion, at 29).) However, the Enterprise Motion is nearly as devoid of facts as the government's Rule 414 Motion. Specifically, page 29 of the Enterprise Motion, as it presumably pertains to Jane Doe X, alleges the following: "before and after founding of NXIVM Raniere's co-conspirators groomed sexual partners for Raniere, including one or more underage girls. For example, while Raniere was still running CBI, he engaged in a sexual relationship with a girl beginning when she was twelve or thirteen years old. A member of CBI who later became a coconspirator in the charged Enterprise knew the girl's age, knew of Raniere's relationship with her, and took affirmative steps to aid and abet the relationship in order to please Raniere." (Gov't Enterprise Motion at 29) (emphasis added). However, as with the government's Rule 414 proffer, the Enterprise Motion fails to include several crucial facts including the location of any of the sexual acts, the relevant time period and the identities of any of the alleged co-conspirators.

Second, the government's offer fails the test of similarity. Among the criteria in evaluating probative value and admissibility under Rule 414 is the similarity of the prior acts to the charged acts. Spoor, 904 F.3d at 154. The indictment contains no substantive counts of child sexual exploitation. The substantive acts are RICO Conspiracy, RICO, Forced Labor Conspiracy, Wire Fraud Conspiracy, Sex Trafficking Conspiracy, Sex Trafficking, Attempted Sex Trafficking, and Conspiracy to Commit Identity Theft. The uncharged acts the government seeks to introduce, alleging sexual 27-year-old contact with a twelve or thirteen-year-old minor, is dissimilar to the substantive offenses alleged in the instant indictment, as well as the eleven remaining Racketeering Acts against Mr. Raniere. Eight of the Racketeering Acts against the defendant Mr. Raniere are not sexual offenses. The three Racketeering Acts which fall within the definition of sexual offense (Acts Two, Three and Four) do not involve any allegations of actual

19

sexual contact with an underage person. Conversely, there is no evidence that Jane Doe X would testify that Mr. Raniere took any sexually explicit photographs of her while she was a minor. Accordingly, the Jane Doe X evidence the prosecution seeks to admit is simply not related to Racketeering Acts Two, Three or Four.

Third, the prosecution offer fails the <u>Spoor</u> test of closeness in time between the charged and uncharged acts. The government's proffer omits the time period between the charged and uncharged acts: 27 years. In <u>Spoor</u>, which the government cites as authority, the Second Circuit specifically noted that the evidence whose admission it approved under Rule 414 occurred "relatively recently" as a basis for its admission. <u>Spoor</u>, 904 F.3d at 155.

Fourth, the prosecution's offer fails the test of "necessity." <u>Spoor</u>, 904 F.3d at 154. Another significant factor in evaluating probative value and admissibility under Rule 414 is the necessity of the evidence in light of the offered proof. In this case the prosecution possesses the images and forensic data in support of the production and possession predicate acts. The prior act evidence of Jane Doe X is simply not necessary for the prosecution to establish the Racketeering Acts to which the prosecution claims the Rule 414 evidence is offered.

Fifth, the prosecution's introduction of the uncharged acts would be confusing and eclipse the reason for the trial, i.e., the crimes with which the defendant is charged (the substantive counts).

This Court is always free to preclude evidence where the probative value of the evidence is substantially outweighed by its prejudicial nature and would unduly delay trial. Fed. R. Evid. 403. According to the prosecution's proffer, the evidence concerning Jane Doe X will be properly introduced to corroborate the Racketeering Acts involving Jane Doe 2 (predicate acts Two, Three and Four). (Gov't 414 Motion at. 2-3.) However, Mr. Raniere is also accused of Sex

Trafficking Conspiracy (Count 8), Sex Trafficking (Count 9), and Attempted Sex Trafficking (Count 10). These three substantive charges involve adult women who are legally capable of consent and therefore entirely dissimilar to the allegations concerning Jane Doe X. Nevertheless, it would be difficult, if not impossible, for the jury to consider the alleged sexual abuse of Jane Doe X when evaluating Mr. Raniere's guilt as to Racketeering Acts Two, Three and Four, but ignore the Jane Doe X allegations when evaluating Mr. Raniere's guilt as to the other sex related offenses (Counts 8, 9 and 10). In a complicated RICO case, involving allegations as diverse as identity theft and immigration and wire fraud, uncharged evidence of sexual contact with a twelve-year-old would be a focus for not only the defense, but also the jury, for conduct which did not even occur in the Eastern District of New York. This is the type of Rule 414 allegation which will "contribute to an improperly-based jury verdict" and "distract the jury from the central issues of the trial." United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998).

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

Sixth, the prosecution proffer is prejudicial because its age makes it difficult, if not impossible, to defend in addition to the fact that the prior act has not been "clearly proved" and is "seriously disputed." Enjady, 134 F.3d at 1433. Statutes of Limitation are based on long standing international legal concepts involving the necessity and fairness in not subjecting an individual to an allegation that may be easy to make, but difficult to defend against decades later. In Spoor and other cases, that concern is obviated or minimized when the prior conduct is based on a criminal

conviction. <u>Spoor</u>, 904 F.3d at 146-47, 155. Here, no conviction underlies the bad act and the conduct is strongly disputed and denied. In fact, there was not even an arrest. Many factors suggest that the case was rejected by law enforcement and prosecutorial authorities. Now the prosecution seeks to resurrect a claim long barred by the statute of limitations. There is no documentation of the review and evaluation of the case by law enforcement and local prosecutors. [13] There are several factors raising credibility issues in the allegations. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Pursuing the documentary evidence is impossible because of the passage of time. Moreover, key witnesses referred to by the complainant, long after her first report, who could dispute her allegations are deceased. Nor is there any evidence these deceased witnesses ever corroborated the uncharged conduct.

Based on the foregoing, Mr. Raniere respectfully submits that the government's request to admit evidence pursuant to Rule 414 must be denied.

<u>CONCLUSION</u>

Defendant Keith Raniere respectfully requests that this Court deny the government's motions <u>in limine</u> requesting that the parties refer to victim witnesses by their first names only or pseudonyms, (2) grant the government and defendant's request to admit certain categories of evidence under seal; (3) deny, as moot, the government's motion to preclude argument regarding the government's motives for prosecution; (4) deny, as moot, the government's motion to preclude Marc Agnifilo from referring to himself as a former prosecutor as moot; (5) deny the

---

[13] If the prosecution has information that the allegation was rejected for arrest or prosecution, that information should be, and should have been, disclosed pursuant to <u>Brady</u>.

government's motion to compel Mr. Raniere to lay bare his cross-examination documents so far in advance; and (6) deny, as moot, the government's motion for Rule 26.2 material. Defendant Raniere further respectfully requests that this Court denied the government's request to admit evidence pursuant to Rule 414.

Dated:      April 26, 2019
            New York, NY

                                        Respectfully submitted,

                                        /s/ _____
                                        Marc A. Agnifilo, Esq., Of Counsel
                                        Teny R. Geragos, Esq.
                                        **BRAFMAN & ASSOCIATES, P.C.**
                                        767 Third Avenue, 26th Floor
                                        New York, NY 10017
                                        (212) 750-7800

                                        Paul DerOhannesian II, Esq.
                                        Danielle R. Smith, Esq.
                                        **DEROHANNESIAN &
                                        DEROHANNESIAN**
                                        677 Broadway, Suite 707
                                        Albany, New York 12207
                                        (518) 465-6420

23