D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

               -against-

KEITH RANIERE,

                            Defendant.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**18-CR-204-1 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Keith Raniere has been indicted on charges arising from his involvement in several hierarchical pyramid-structured organizations he founded. (Second Superseding Indictment ("Indictment") (Dkt. 430) ¶¶ 1-49.) These organizations included Nxivm, which purported to offer self-help courses, and "DOS," a secret society that purported to be a women's empowerment group. (Compl. (Dkt. 1) ¶ 17; Indictment ¶¶ 1-3, 42.) The Indictment charges him with racketeering (or "RICO") conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count One") (id. ¶¶ 13-26); and with racketeering, in violation of 18 U.S.C. 1962(c) ("Count Two") (id. ¶¶ 16-40). It also charges Raniere with participation in a forced labor conspiracy, in violation of 18 U.S.C. § 1589(a) ("Count Six") (id. ¶ 44); wire fraud conspiracy, in violation of 18 U.S.C. § 1343 ("Count Seven") (id. ¶ 45); and sex trafficking offenses, in violation of provisions of 18 U.S.C. § 1591 ("Count Eight," "Count Nine," and "Count Ten") (id. ¶¶ 46-48).

Before the court are Raniere's motions to dismiss various counts and predicate racketeering acts in the Indictment, for a bill of particulars, for prompt disclosure of exculpatory materials pursuant to Brady v. Maryland, 373 U.S. 83 (1963), to preclude the Government's proposed experts, and for an order allowing foreign witnesses to testify via live videoconferencing. (Keith Raniere Mot. to Dismiss Indictment, for a Bill of Particulars, for

<u>Brady</u> Materials, and for Foreign Trial Testimony ("Raniere Mot.") (Dkt. 456).) The court

DENIES Raniere's motions for the following reasons.

## I.  BACKGROUND

### A.  The Government's Factual Allegations[1]

#### 1.  <u>Nxivm and DOS</u>

The Government alleges in its complaint that, in or about 1998, Raniere founded

Executive Success Programs, Inc. ("ESP"), a series of workshops designed (according to its

promotional literature) to "actualize human potential." (Compl. ¶ 3.) In or about 2003, Raniere

founded an organization called Nxivm, which served as an umbrella organization for ESP and

other affiliated entities. (<u>Id.</u>) Nxivm promoted itself as a "professional business providing

educational tools, coaching and trainings to corporations and people from all walks of life," and

described its philosophy as "a new ethical understanding" that allows "humanity to rise to its

noble possibility." (<u>Id.</u>)

Nxivm was headquartered in Albany, New York, and recruited members from around the

world, including from the Eastern District of New York. (<u>Id.</u> ¶ 5.) It offered classes in various

cities within the United States and abroad, which cost up to $5,000 for a five-day workshop.

(<u>Id.</u> ¶ 6.) Nxivm encouraged its participants to continue attending classes and to recruit others

into Nxivm in order to be promoted within the organization and thereby reach certain "goal

---

[1] Naturally, Raniere disagrees with many of the Government's characterizations of Nxivm. (<u>See, e.g.</u>, Raniere Mem. in Supp. of Mot. to Dismiss First Superseding Indictment (Dkt. 198) at 1-2.) The court recites only the Government's factual allegations here for two reasons. First, the court must assume that the Indictment's allegations are true for the purposes of a motion to dismiss. <u>See United States v. Wey</u>, No. 15-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017), at *5 (citing <u>United States v. Velastegui</u>, 199 F.3d 590, 592 n.2 (2d Cir. 1999)). Second, the allegations in the Government's complaint are relevant in assessing whether Defendants have proper notice of the charges against them. <u>See United States v. Walsh</u>, 194 F.3d 37, 45 (2d Cir. 1999) ("[A] court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense.").

levels." (Id.)  The Nxivm curriculum allegedly taught, among other things, that women had inherent weaknesses including "overemotional" natures," an inability to keep promises, and embracing the role of victim.  (Id. ¶ 17.)

In 2015, Raniere created a secret society called "DOS,"[2] which is structured like a pyramid with levels of "slaves" headed by "masters."  (Id. ¶¶ 11, 13.)  DOS slaves were expected to recruit slaves of their own, who in turn would owe service to their own masters and to masters above.  (Id. ¶ 13.)  All DOS participants were women except for Raniere, whose status as the highest DOS master was allegedly concealed from newly recruited slaves, other than those directly under Raniere.  (Id. ¶ 14.)

DOS masters recruited slaves mostly from Nxivm.  (Id. ¶ 15.)  Masters targeted dissatisfied women by telling them that DOS would change their lives and that, to join DOS, they would need to provide "collateral" to ensure they would not leave the group or tell others about it.  (Id. ¶¶ 15-19.)  Collateral included sexually explicit photographs and videos; rights to financial assets; videos made to look to look candid in which the prospective slaves told damning stories (true or untrue) about themselves, friends, or family members; and letters making damaging accusations (true or untrue) about friends and family members.  (Id. ¶¶ 16, 18.)

After joining DOS, slaves were required to provide additional collateral every month; all DOS slaves were ultimately made to provide more collateral than had initially been described to them.  (Id. ¶¶ 18-19.)  Slaves were also obligated to perform "acts of care" for and pay "tribute" to their masters by bringing them coffee, buying them groceries, making them lunch, carrying

---

[2] "DOS" allegedly stands for "Dominus Obsequious Sororium," a Latin phrase that translates roughly to "Lord/Master of the Obedient Female Companions."  (Compl. ¶ 11 n.1.)

their luggage, cleaning their houses, and retrieving lost items for them, among other things.[3] (Id. ¶ 20.) Allegedly, DOS members understood that the slaves' acts of care should amount to the master having the work of at least one full-time employee. (Id.)

Beyond acts of care, slaves were regularly given assignments by their masters. (Id. ¶ 22.) Some masters allegedly gave their slaves assignments that either directly or implicitly required them to have sex with Raniere. (Id.) Other assignments required slaves to adhere to extremely low-calorie diets and to document the food they ate, which was meant to accommodate Raniere's sexual preference for thin women. (Id.) Other women were assigned to periods of celibacy. (Id.) Slaves who were assigned to have sex with Raniere believed that not doing so would risk release of their collateral. (Id. ¶ 23.)

Allegedly, DOS masters profited from directing slaves to have sex with Raniere by receiving the acts of care that came with continued status and participation in DOS, and by receiving increased status and financial opportunities within Nxivm more broadly. (Id. ¶ 24; see Indictment ¶ 4.) Additionally, Raniere promised career opportunities to the slaves who had sex with him and with whom he wanted to have sex. (Compl. ¶ 24.)

The Government's complaint further alleges in detail that Raniere and co-conspirators engaged in sex trafficking and a forced-labor conspiracy with respect to Jane Doe 1 between February 2016 and May 2017 (Compl. ¶¶ 42-51), and sex trafficking with respect to Jane Doe 2 between November 2016 and May 2017[4] (id. ¶¶ 52-57).

---

[3] Slaves were punished for not performing sufficient acts of care and believed that, if they repeatedly failed to do so, they risked release of their collateral. (Compl. ¶ 21.)

[4] The complaint incorrectly states that Jane Doe 2 left DOS in May 2016, which is several months before she allegedly joined DOS; from context, it appears that the Government meant to allege that Jane Doe 2 left DOS in May 2017. (Compl. ¶ 57; see id. ¶ 33 (stating that DOS members defected in May 2017).)

## 2. The Alleged Enterprise

According to the Indictment, in leading Nxivm, DOS, and other affiliated pyramid-structured entities (the "Pyramid Organizations"), Raniere relied on an inner circle of individuals who carried out his directives and held high positions in the Pyramid Organizations. (Indictment ¶¶ 1-3.) This inner circle (the "Enterprise") was allegedly a criminal enterprise, as defined in the RICO statute, see 18 U.S.C. § 1961(4).[5] (Id.)

The Enterprise operated within the Eastern and Northern Districts of New York and elsewhere, including overseas. (Id. ¶ 5.) Its alleged purpose was to obtain financial and personal benefits for its members, including increased power and status within the Enterprise, by promoting Raniere and recruiting others into the Pyramid Organizations. (Id. ¶ 4.) Its members accomplished this by, among other things, "[p]romoting, enhancing and protecting the Enterprise by committing, attempting and conspiring to commit crimes, including but not limited to visa fraud, identity theft, extortion, forced labor, sex trafficking, money laundering, wire fraud, tax evasion, and obstruction of justice" (id. ¶ 6(a)); "[d]emanding absolute commitment to Raniere," including by "exalting" his teachings and ideology and not tolerating dissent (id. ¶ 6(b)); "[i]nducing shame and guilt" to influence members and associates of the Enterprise (id. ¶ 6(c)); "[o]btaining sensitive information about members and associates of the Enterprise" to control them (id. ¶ 6(d)); "[r]ecruiting and grooming sexual partners for Raniere" (id. ¶ 6(e)); "[i]solating associates and others from friends and family and making them dependent on the Enterprise for their financial well-being and legal status in the United States" (id. ¶ 6(f)); "[p]rotecting and attempting to protect Raniere and the Enterprise by . . . gaining political

---

[5] Under 18 U.S.C. 1961(4), an enterprise "is simply a continuing unit that functions with a common purpose." United States v. Pierce, 785 F.3d 832, 838 (2d Cir. 2015) (quoting Boyle v. United States, 556 U.S. 938, 948 (2009)).

influence and evading regulatory agencies" (id. ¶ 6(g)); "[u]sing harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of Raniere" (id. ¶ 6(h)); and "[e]ncouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise" (id. ¶ 6(i)).

## B. Procedural History

### 1. Charges

The Indictment contains eleven counts. (Indictment.) When the Indictment was filed on March 13, 2019, Raniere, Bronfman, Mack, Russell, and Lauren Salzman were joined in a single count charging a racketeering conspiracy in violation of 18 U.S.C. § 1962(c), predicated on acts indictable under thirteen criminal statutes (twelve of them federal), spanning from approximately 2003 to March 2018 ("Count One"). (Id. ¶¶ 13-15.) Count One does not specify who agreed to commit which acts, or when each act, was committed, but does state that each Defendant agreed that a conspirator would commit at least two predicate acts. (Id. ¶ 15.)

Raniere, Bronfman, Mack, and Lauren Salzman were also charged with racketeering in violation of 18 U.S.C. 1962(c) ("Count Two"). (Id. ¶¶ 16-40.) This count is predicated on fourteen acts spanning from roughly to 2003 and March 2018. (Id. ¶¶ 16-17.) There appears to be substantial overlap between the predicate acts alleged in Counts One and Two. Below is a chart depicting Bronfman, Raniere, Mack, and Lauren Salzman's alleged participation in the fourteen predicate acts of racketeering (some of which the Indictment divides into sub-acts). As illustrated below, Bronfman is not alleged to have committed any predicate acts with Mack and Lauren Salzman (the "DOS Defendants"):

|  | | DOS Defendants | | | |
| RICO Acts | Description | Bronfman | Raniere | Mack | L. Salzman |
| --- | --- | --- | --- | --- | --- |
| Act 1-A | Identity Theft Conspiracy, Jane Doe 1[6] | | X | | |
| Act 1-B | Conspiracy to Unlawfully Possess Identification Document | | X | | |
| Act 2 | Sexual Exploitation of a Child, Jane Doe 2 | | X | | |
| Act 3 | Sexual Exploitation of a Child, Jane Doe 2 | | X | | |
| Act 4 | Possession of Child Pornography | | X | | |
| Act 5-A | Identity Theft Conspiracy | X | X | | |
| Act 5-B | Identity Theft, John Doe 1 | | X | | |
| Act 5-C | Identity Theft, John Doe 2 | X | X | | |
| Act 6 | Conspiracy to Alter Records for Use in an Official Proceeding | | X | | |
| Act 7 | Identity Theft Conspiracy, Jane Doe 3 | | X | | |
| Act 8 | Money Laundering | X | | | |
| Act 9-A | Trafficking of Jane Doe 4 for Labor | | X | | X |
| Act 9-B | Document Servitude, Jane Doe 4 | | X | | X |
| Act 10 | Extortion | | X | X | X |
| Act 11 | Visa Fraud | X | | | |
| Act 12-A | Sex Trafficking, Jane Doe 5 | | X | X | |
| Act 12-B | Forced Labor, Jane Doe 5 | | X | X | |

---

[6] The Jane and John Does referenced in this chart are listed next to the crimes that they were victims of or otherwise involved in, per the Indictment.

| | | | | | |
|---|---|---|---|---|---|
| Act 13 | Forced Labor, Jane Doe 6 | | | | X |
| Act 14 | Identity Theft Conspiracy, Jane Doe 7 | X | X | | |

(See id. ¶¶ 17-34.)

The court has dismissed Counts Three, Four, Five, and Eleven without prejudice on motion of the Government. (Apr. 4, 2019 Min. Entry.) Count Six charges Raniere with participation in a forced labor conspiracy, in violation of 18 U.S.C. § 1589(a). (Id. ¶ 44.) Count Seven charges him with wire fraud conspiracy, in violation of 18 U.S.C. § 1343. (Id. ¶ 45.) Count Eight charges him with sex trafficking conspiracy, Count Nine charges him with sex trafficking of Jane Doe 5, and Count Ten charges him with the attempted sex trafficking of Jane Doe 8, all in violation of 18 U.S.C. §§ 1591(a)(1) and 1591(a)(2). (Id. ¶¶ 46-48).

According to the Government, the factual bases for these counts is set forth in the Government's complaint, detention letters, responses to Raniere's motions for pretrial release, and the discovery materials the Government has provided to Defendants. (See Gov't First Mem. in Opp'n to Defs. Mots. to Dismiss ("Gov't First Mem.") (Dkt. 248) at 6-7 (listing the filings and discovery material that set forth the factual bases for each charged count and racketeering acts).)

2.    The Instant Motions

On November 16 and 17, 2018, the six Defendants (none of whom had yet pleaded guilty) moved to dismiss most of the counts in the first superseding indictment in this case. (Lauren Salzman Mot. to Dismiss First Superseding Indictment (Dkt. 192); Bronfman, Russell, and Nancy Salzman Mot. to Dismiss First Superseding Indictment (Dkt. 193); Raniere Mot. to Dismiss First Superseding Indictment (Dkt. 196); Mack Mot. to Dismiss First Superseding Indictment (Dkt. 199).) On March 13, 2019, the grand jury returned the Second Superseding Indictment. (Indictment.) On March 22, 2019, Defendants renewed their earlier arguments and

| Act 13 | Forced Labor, Jane Doe 6 | | | | |
| --- | --- | --- | --- | --- | --- |
| Act 14 | Identity Theft Conspiracy, Jane Doe 7 | | X | | |

(See id. ¶¶ 17-34.)

The court has dismissed Counts Three, Four, Five, and Eleven without prejudice on motion of the Government. (Apr. 4, 2019 Min. Entry.) Count Six charges Raniere with participation in a forced labor conspiracy, in violation of 18 U.S.C. § 1589(a). (Id. ¶ 44.) Count Seven charges him with wire fraud conspiracy, in violation of 18 U.S.C. § 1343. (Id. ¶ 45). Count Eight charges him with sex trafficking conspiracy, Count Nine charges him with sex trafficking of Jane Doe 5, and Count Ten charges him with the attempted sex trafficking of Jane Doe 8, all in violation of 18 U.S.C. §§ 1591(a)(1) and 1591(a)(2). (Id. ¶¶ 46-48).

According to the Government, the factual bases for these counts is set forth in the Government's complaint, detention letters, responses to Raniere's motions for pretrial release, and the discovery materials the Government has provided to Defendants. (See Gov't First Mem. in Opp'n to Defs. Mots. to Dismiss ("Gov't First Mem.") (Dkt. 248) at 6-7 (listing the filings and discovery material that set forth the factual bases for each charged count and racketeering acts).)

2.    The Instant Motions

On November 16 and 17, 2018, the six Defendants (none of whom had yet pleaded guilty) moved to dismiss most of the counts in the first superseding indictment in this case. (Lauren Salzman Mot. to Dismiss First Superseding Indictment (Dkt. 192); Bronfman, Russell, and Nancy Salzman Mot. to Dismiss First Superseding Indictment (Dkt. 193); Raniere Mot. to Dismiss First Superseding Indictment (Dkt. 196); Mack Mot. to Dismiss First Superseding Indictment (Dkt. 199).) On March 13, 2019, the grand jury returned the Second Superseding Indictment. (Indictment.) On March 22, 2019, Defendants renewed their earlier arguments and

collectively moved to dismiss all counts except for Count Seven and various predicate racketeering acts and made several procedural motions. (Bronfman Mot.; Mack Mot. to Dismiss Second Superseding Indictment (Dkt. 460)); L. Salzman Letter Mot. to Dismiss Second Superseding Indictment ("L. Salzman Second Mem.") (Dkt. 455)); Raniere Mot; see Raniere Mem. in Supp. of Mot. to Dismiss Indictment ("Raniere Second Mem.") (Dkt. 456-1) (joining his co-defendants' motions to dismiss various counts and racketeering acts in which he is named).)

Between March 13 and April 19, 2019, Raniere's five co-defendants pleaded guilty. Raniere joined their motions to dismiss, as he is charged in all counts of the Indictment. (See Raniere Second Mem. at 1.) For the sake of clarity, the court will attribute all Defendants' arguments to Raniere. Additionally, in light of the substantial overlap between the two superseding indictments, the court will consider any arguments that were made in support of Defendants' motions to dismiss the First Superseding Indictment, even if Defendants did not explicitly renew these arguments in making their motions to dismiss the Second Superseding Indictment.

To organize its analysis, the court divides the instant motions into the following seven categories:

1. Count One: Raniere's motion to dismiss Count One because it fails to allege predicate acts with sufficient particularity, fails to properly allege the "pattern" element of a RICO charge, and is duplicitous. (See Raniere Mem. in Supp. of Mot. to Dismiss First Superseding Indictment ("Raniere First Mem.") (Dkt. 198) at 10-14; Bronfman, Russell & Nancy Salzman Mem. in Supp. of Mot. to Dismiss First Superseding Indictment ("Bronfman First Mem.") (Dkt. 194) at 13-31; Bronfman Mem. in Supp. of Mot. to Dismiss Indictment ("Bronfman Second Mem.") (Dkt. 458) at 2-6, 7-11; see Raniere Second Mem. at 1 (joining Bronfman's motion).)

2. Count Two: Raniere's motion to dismiss Count Two because it fails to allege predicate acts with sufficient particularity, fails to properly allege the "pattern"

element of a RICO charge, and is duplicitous. (See Raniere First Mem. at 10-14; Bronfman First Mem. at 13-26; Bronfman Second Mem. at 6-11; see Raniere Second Mem. at 1 (joining Bronfman's motion).)

3. Child Pornography: Raniere's motion to dismiss Racketeering Acts 2, 3, and 4, which charge him with sexual exploitation of a child and possession of child pornography. (Raniere Second Mem. at 5-8.)

4. Sex Trafficking: Raniere's motion to dismiss Counts Six, Eight, Nine, and Ten, which charge him with sex-trafficking offenses. (Mack Mem. in Supp. of Mot. to Dismiss First Superseding Indictment ("Mack First Mem.") (Dkt. 200) at 17-27; Mack Mem. in Supp. of Mot. to Dismiss Second Superseding Indictment ("Mack Second Mem.") (Dkt. 461) at 1 n.1; see Raniere Second Mem. at 1 (joining Mack's motions).)

5. Forced Labor Conspiracy: Raniere's motion to dismiss Count Six, which charges him with a forced labor conspiracy. (Raniere First Mem. at 17; L. Salzman Mem. in Supp. of Mot. to Dismiss First Indictment ("L. Salzman First Mem.") (Dkt. 192-3) at 17-19; Mack First Mem. at 6-17; L. Salzman Second Mem. at 4-5; see Raniere Second Mem. at 1 (joining Lauren Salzman's motion).)

6. Extortion: Raniere's motion to dismiss Racketeering Act Ten, which charges him with a state-law extortion offense. (L. Salzman First Mem. at 10-17, 19-22; L. Salzman Second Mem. at 4-5; see Raniere Second Mem. at 1 (joining Lauren Salzman's motion to dismiss Act Ten).)

7. Procedural Motions: This includes Raniere's:

   a. Motion for a bill of particulars (Bronfman First Mem. at 36-38; Mack First Mem. at 30 n.15; L. Salzman First Mem. at 22; Raniere Second Mem. at 10-12; see Raniere Mot. to Dismiss First Superseding Indictment (Dkt. 196) at 1 (joining his co-defendants' motions for a bill of particulars);

   b. Motion for prompt disclosure of Brady materials (Raniere First Mem. at 18);

   c. Motion to preclude the Government's proposed experts (Raniere Second Mem. at 12-15; Mack Second Mem. at 11-14; see Raniere Second Mem. at 1 (joining Mack's motion));

   d. Motion for an order allowing foreign witnesses to testify via live videoconferencing (Raniere First Mem. at 22; Raniere Second Mem. at 15).

## II.    PLEADING STANDARD FOR INDICTMENTS GENERALLY

Federal Rule of Criminal Procedure 7(c)(1) requires, inter alia, that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  An indictment satisfies Rule 7(c)(1)—and thus the requirements of the Fifth and Sixth Amendments[7]—if it "'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)); see also United States v. Lee, 833 F.3d 56, 67-68 (2d Cir. 2016) (stating that an indictment's failure to allege an element of the charged offense is a constitutional violation).

To meet this standard, indictments typically "need do little more than to track the language of the statute charged and state the approximate time and place of the alleged crime." United States v. Thompson, 141 F. Supp. 3d 188, 194 (E.D.N.Y. 2015) (quoting United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013) (alterations adopted)).  Indictments generally do not "have to specify evidence or details of how the offense was committed." Wey, 2017 WL 237651, at *5 (citation omitted).  Moreover, "[w]hen considering a motion to dismiss, the [c]ourt must treat the indictment's allegations as true." Id. at *5 (citing United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir. 1999)).

---

[7] Rule 7(c)(1) "performs three constitutionally required functions: It fulfills the Sixth Amendment right 'to be informed of the nature and cause of the accusation;' it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." Walsh, 194 F.3d at 44 (2d Cir. 1999) (quoting U.S. Const. amend. VI) (citations omitted).

That said, there are "very rare cases in which an indictment that track[s] the statutory language and furnishe[s] the pertinent dates" is constitutionally insufficient. Stringer, 730 F.3d at 125. This is because "for certain statutes[,] specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." Id. at 126; see Hamling, 418 U.S. at 118 ("Where guilt depends so crucially upon [] a specific identification of fact . . . an indictment must do more than simply repeat the language of the criminal statute."); c.f. Russell v. United States, 369 U.S. 749, 764-72 (1962) (the seminal case setting forth a heightened pleading standard for criminal statutes with generic terms). Offenses that require specificity tend to be ones with a generic statutory definition.[8] See Stringer, 730 F.3d at 126-27 (collecting cases).

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation and quotation marks omitted). Contrary to Bronfman's assertion (Bronfman Mem. at 17-19 & n.7, 20 n.9, 28; Bronfman Reply (Dkt. 257) at 2; Bronfman Suppl. Reply (Dkt. 391); Bronfman Second Mem. at 2),[9] courts may dismiss acts on

---

[8] Examples of underlying facts that must be spelled out in an indictment are: the subject of a congressional hearing when the defendant is charged with failing to answer questions pertinent to a congressional committee's inquiry; the statements that are alleged to be false, and in what respect they are false, in certain charges of criminal falsity; and the type of controlled substance at issue when a defendant is charged with manufacturing, distributing, dispensing, or possessing a controlled substance. Stringer, 730 F.3d at 126-27.

[9] Bronfman's reliance on United States v. Basciano, 599 F.3d 184, 206 (2d Cir. 2010), for this point is misplaced. (See, e.g., Bronfman Mem. at 17.) In Basciano, the Government charged multiple defendants with one racketeering offense, some defendants pleaded guilty, and then, to avoid double-jeopardy concerns as to another defendant who had previously been convicted on a separate racketeering charge, the Government sought to narrow the charged pattern against him to include only the predicate acts that defendant was alleged to have committed. 599 F.3d at 202-06. As the Second Circuit stated, "Once a grand jury has charged a pattern of racketeering common to a number of defendants, only the grand jury, not the court, may decide whether an individual defendant should be charged with a different pattern after co-defendants have pleaded guilty." Id. at 206 (emphases removed and added). The Government has not sought to narrow the charged pattern here, and the Second Circuit did not suggest that courts may not dismiss predicate acts without dismissing an entire RICO charge.

which a RICO charge is predicated without dismissing the entire RICO charge. See, e.g., United States v. Yannotti, 541 F.3d 112, 126-27 (2d Cir. 2008) (analyzing whether to dismiss predicate acts but not whether to dismiss the entire RICO count); United States v. Vendetti, No. 10-CR-360 (RJA), 2013 WL 5522434, at *7 (W.D.N.Y. Oct. 3, 2013) (dismissing predicate act); United States v. Urso, 369 F. Supp. 254, 265-68 (E.D.N.Y. 2005) (analyzing whether to dismiss predicate acts); see also Basciano, 599 F.3d at 206 (stating that courts may narrow indictments, that the Government "need not prove all predicate acts alleged . . . to establish an alleged pattern of racketeering," and that the court was not concerned with the government "reducing the number of predicates through which it intends to prove the charged pattern").

## III.   DISCUSSION

### A.   Count One: RICO Conspiracy

Raniere moves to dismiss Count One for three reasons: (i) it fails to allege predicate acts with sufficient specificity; (ii) it fails to properly allege the "pattern" element of a RICO charge; and (iii) it is duplicitous because it alleges two conspiracies—one involving him and one involving the DOS Defendants (Mack and Lauren Salzman).  (See Raniere First Mem. at 10-14; Bronfman First Mem. at 13-31; Bronfman Second Mem. at 2-6, 7-11; see Raniere Second Mem. at 1 (joining Bronfman's motion).)

To engage in a RICO conspiracy, a defendant must "agree[] with others" to "further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." United States v. Cain, 671 F.3d 271, 291 (2d Cir. 2012) (alterations adopted) (citation omitted). Here, Defendants are charged with conspiring to violate 18 U.S.C. § 1962(c), which provides as follows:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate

13

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Id.

### 1.    Specificity

According to Raniere, when a crime charged under one statute depends on the defendant's violation or intent to violate a separate statute, the indictment must identify that underlying offense and plead each element of it. (Bronfman Second Mem. at 2, 7.) Raniere maintains that Count One violates this rule in three ways. First, it lists categories of predicate acts, not specific acts that violate specific statutory provisions. (Id. at 2.) Second, some of the predicate-act categories depend on underlying offenses, which Count One does not specify. (Id.) Third, Count One does not plead each element of the predicate acts or the elements of their underlying offenses. (Id. at 7.) For example, Count One alleges violations of "Title 18, United States Code, Section 1028 (identification document fraud and identification document fraud conspiracy, and identity theft and identity theft conspiracy)." (Indictment ¶ 15(a).) That statute lists at least eight different crimes, none of which are specified in the Indictment. (Bronfman Second Mem. at 3 (citing 18 U.S.C. § 1028(a)(1)-(8), (f).) Further, two of the crimes listed in the statute depend on another underlying offense. (Id. (citing 18 U.S.C. § 1028(a)(4), (7).)

Raniere is wrong. The Government is correct that, "to satisfy Rule 7(c) as to a RICO conspiracy charge," "it is not required to identify specific predicate acts" nor "prove at trial that any of the racketeering acts were committed"—let alone specify underlying offenses that are elements of predicate acts or those underlying offenses' elements. (Gov't First Mem. at 27.) See United States v. Applins, 637 F.3d 59, 81 (2d Cir. 2011) ("Neither overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proved for a section 1962(d) offense." (quoting United States v. Glecier, 923 F.2d 496, 500 (7th Cir. 1991));

14

United States v. Crockett, 979 F.2d 1204, 1208 (7th Cir. 1992) (stating that a RICO conspiracy charge must identify only "the general kinds of racketeering acts that formed the pattern of racketeering activity," which in that case were "murder, extortion, and arson"). The cases Raniere relies on, like United States v. Thompson, are inapposite because they do not involve RICO conspiracy charges. (See Bronfman Mem. at 29-31 (citing Thompson, 141 F. Supp. 3d 188, 192-98 (E.D.N.Y. 2015))); Bronfman Second Mem. at 4 n.3, 4 (citing other cases that do not involve RICO conspiracy charges).)

RICO conspiracy indictments satisfy Rule 7(c) if they identify an enterprise, name the defendant as someone associated with that enterprise, allege that the defendant conspired to violate RICO, specify the time period during which the conspiracy operated, list specific types of predicate crimes allegedly committed, and discuss in detail the means and methods of the conspiracy. United States v. Bronson, No. 05-CR-714 (NGG), 2007 WL 2455138, at *3 (E.D.N.Y. Aug. 23, 2007); see Applins, 637 F.3d at 82 (stating that a jury must be unanimous only "as to the types of predicate racketeering acts" that defendants agreed to commit, not as to "specific predicate acts" (emphasis added)); United States v. D'Amico, 734 F. Supp. 2d 321, 332-35 (S.D.N.Y. 2010) (denying motion to dismiss RICO conspiracy charges for similar reasons). Count One meets these requirements. (See Indictment ¶¶ 1-15.)

    2.    "Pattern" Element: Whether the Predicate Acts are Related

"The pattern element serves to prevent application of the racketeering statute to perpetrators of isolated or sporadic criminal acts." United States v. Coppola, 671 F.3d 220, 243 (2d Cir. 2012) (citation and quotation marks omitted). To establish the "pattern" element of a RICO conspiracy charge at trial, the Government must prove that the defendants agreed to commit two or more crimes within ten years that "are related to each other and to the enterprise,

and together pose a threat of continuing criminal activity." United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 4083571, at *4 (E.D.N.Y. Sept. 13, 2017) (citing, inter alia, United States v. Vernace, 811 F.3d 609, 615 (2d Cir. 2016)); Cain, 671 F.3d at 284. These two components of a RICO pattern are known as "relatedness" and "continuity." Reich v. Lopez, 858 F.3d 55, 59 (2d Cir. 2017). To meet the "relatedness" requirement in any RICO case (civil or criminal), "[p]redicate crimes must be related to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')."[10] Id. at 60 (citation omitted) (civil case); accord Vernace, 811 F.3d at 615 (criminal case); see also Reich, 858 F.3d at 61 n.4 (stating that the Supreme Court has instructed courts to interpret the pattern element the same way in civil and criminal cases).

But there is a difference between what the Government must prove at trial and what it must plead in the indictment. See United States v. Messina, No. 11-CR-31 (KAM), 2012 WL 463973, at *4 & n.1 (E.D.N.Y. Feb. 13, 2012) (rejecting pre-trial challenge to "relatedness" in a criminal RICO case as premature). Raniere posits that an indictment must spell out why a RICO conspiracy's predicate acts are both horizontally and vertically related.[11] These arguments "confuse the standards of pleading with standards of proof." Id. at *4. While there is no Second Circuit ruling directly on point, other case law indicates overwhelmingly that the Government

---

[10] "[P]redicate acts are horizontally related when they [] have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Reich, 858 F.3d at 61 (citation and punctuation omitted) (emphasis in original); accord Vernace, 811 F.3d at 615 (citation omitted). "Vertical relatedness requires that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." Vernace, 811 F.3d at 615 (citation and quotation marks omitted); accord Reich, 858 F.3d at 61 (citation omitted).

[11] Specifically, Raniere asserts that the Government failed to allege horizontal relatedness between the predicate acts of the DOS Defendants and of Bronfman. (Raniere First Mem. at 10-14; Raniere Reply (Dkt. 258) at 2-4; Bronfman First Mem. at 18-19; Bronfman Reply (Dkt. 257) at 12-16.) Raniere further contends that the acts she is alleged to have committed are not even related to each other and that some of them are not vertically related. (Bronfman Mem. at 16-20.)

does not have to plead either subpart of the "pattern" element—relatedness or continuity—with the particularity that Bronfman and Raniere suggest, and that, at most, an indictment need only specify predicate acts "that evidence continuity and relatedness." United States v. Giovannelli, No. 01-CR-749 (JSR), 2004 WL 48869, at *3 (S.D.N.Y. Jan. 9, 2004) (citing H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)); see United States v. Torres, 191 F.3d 799, 806-07 (7th Cir. 1999) (asserting that an indictment need not allege continuity with particularity because it is "not an element of the offense"); United States v. Palumbo Bros., 145 F.3d 850, 877 (7th Cir. 1998) (same, and adding that an indictment must contain facts showing that the alleged predicate acts are related and "establish or threaten continuing criminal activity"); Messina, 2012 WL 463973 at *4 (rejecting arguments that an indictment alleged separate and unrelated conspiracies).[12] This follows from two general principles: (1) indictments need not "specify evidence or details of how the offense was committed," Wey, 2017 WL 237651, at *5 (citation omitted), and (2) "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment," but rather on a post-trial motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, Messina, 2012 WL 463973, at *4 (quoting United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998)).

In this case, the Indictment describes the alleged Enterprise (Indictment ¶¶ 1-3) and its purpose, means, and methods (id. ¶¶ 4-6), and alleges that the Defendants agreed to commit thirteen different types of crimes between 2003 and March 2018 in furtherance of the Enterprise

---

[12] See also United States v. Woodman, 980 F.2d 740 (table), 1992 WL 357106, at *6 (9th Cir. Dec. 4, 1992) (holding that indictments need only allege facts sufficient to show that predicate acts are related and pose the threat of continued criminal activity, and need not treat relatedness and continuity as separate elements); United States v. Ortiz, No. C 12-00119, 2013 WL 6842541, at *3 (N.D. Cal. Dec. 27, 2013) (suggesting the same); United States v. Garcia, No. 11-CR-68, 2012 WL 6623984, at *3 (D. Idaho Dec. 19, 2012) (same); United States v. Le, 310 F. Supp. 2d 763, 774-75 (E.D. Va. 2004) (same); United States v. Triumph Capital Grp., Inc., 260 F. Supp. 2d 444, 449-52 (D. Conn. 2002) (same); United States v. Ganim, 225 F. Supp. 2d 145, 161-62 (D. Conn. 2002) (same); United States v. Mavroules, 819 F. Supp. 1109, 1117 (D. Mass. 1993) (same); United States v. Marchese, No. 89-CR-229 (PKL), 1991 WL 60338, at *1-2 (S.D.N.Y. Apr. 11, 1991) (same).

and consistent with its means and methods (id. ¶¶ 14-15). It states that each Defendant agreed that a conspirator would commit at least two of the acts. (Id. ¶ 15.) These allegations "evidence continuity and relatedness," even though the Indictment does not spell out how the predicate acts are horizontally and vertically related. Giovannelli, 2004 WL 48869, at *3. Therefore, the Government has properly alleged the "pattern" element of a RICO conspiracy.

To support his contention that the Government has failed to plead relatedness with sufficient particularity, Raniere relies on civil RICO cases like Reich v. Lopez. (Bronfman First Mem. at 13-21; Bronfman Reply at 12-16.) Raniere is correct that courts must interpret RICO's "pattern" element consistently in criminal and civil cases, and that the Government must prove the same elements at trial as a civil plaintiff. (Bronfman Reply at 12 (citing Reich, 858 F.3d at 61 n.4); Tr. of Jan. 9, 2019 Oral Argument ("Hr'g Tr.") (undocketed) at 54:7-13.) But he fails to acknowledge that criminal and civil pleading standards are different, even in RICO cases. Compare TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd., 536 F. App'x 45, 47 (2d Cir. 2013) (applying Twombly pleading standard to civil RICO complaint and finding that it did not properly allege continuity), with United States v. Vaughn, 722 F.3d 918, 926 (7th Cir. 2013) (declining to apply Twombly standard to a criminal indictment and noting that no other court has done so either); see also United States v. Gatto, 295 F. Supp. 3d 336, 348 (S.D.N.Y. 2018) (denying motion to dismiss RICO indictment and stating that "[d]efendants' reliance on two civil RICO cases is confounding"); Marchese, 1991 WL 60338, at *2 (stating that cases about motions to dismiss civil RICO complaints are inapposite when considering a criminal indictment).[13]

---

[13] Raniere makes much of Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 15 (2d Cir. 1989). In that civil RICO case, the court stated that "when facing a RICO count in an indictment or complaint . . . if a pleading does not indicate the existence of [relatedness and continuity], a RICO claim should be dismissed." Procter & Gamble, 879 F.2d at 15 (emphasis added). Unlike Raniere (Bronfman Reply at 9-10), the court does not read this statement to require courts to apply identical standards of review at the motion-to-dismiss stage of civil and criminal RICO cases. First, the standard articulated in Procter & Gamble is not contrary to the one this court has set forth—indictments must allege facts that evidence relatedness and continuity. Second, a single reference to indictments in a

Raniere cites only two cases—both decades old—in which courts dismissed RICO counts because the indictment failed to show that the predicate acts amounted to a pattern. (See Bronfman Reply at 10-11 (citing United States v. Crysopt Corp., 781 F. Supp. 375, 382-86 (D. Md. 1991), and United States v. Berlin, 707 F. Supp. 832, 837-38 (E.D. Va. 1989).) These decisions do not bind this court and, in any event, the court respectfully disagrees with their analysis because "each [decision] treats criminal indictments as if they were civil RICO complaints and cites civil RICO precedents from the Fourth Circuit as support for dismissal of the RICO count of a criminal indictment." Mavroules, 819 F. Supp. at 1118 (rejecting those same decisions' analysis because "a criminal indictment containing a RICO charge is not subject to the same type of analysis to which a civil RICO complaint would be subject on a motion to dismiss").

3.     Duplicity: Whether Count One Charges Multiple Conspiracies

    a.     Overview of Raniere's Arguments

Raniere argues that the Indictment is impermissibly duplicitous in that it charges two RICO conspiracies—one involving Raniere and the DOS Defendants, and one involving Raniere and Bronfman[14]—as one. (Bronfman First Mem. at 21; Bronfman Second Mem. at 10.) The first conspiracy involves coercive acts like sex trafficking, forced labor, and extortion (all of which began in 2015, according to the First Superseding Indictment), and the second conspiracy involves non-coercive acts like identity theft, alteration of records, and money laundering (some

---

thirty-year-old civil RICO decision—indeed, one that reversed a district court's dismissal of a RICO complaint, Procter & Gamble, 879 F.2d at 14—does not overturn the well-settled difference between civil and criminal pleading standards.

[14] In making this argument, Raniere relied on the First Superseding Indictment's identification of specific predicate acts committed by specific Defendants. (Bronfman First Mem. at 21.) The Second Superseding Indictment does not identify specific predicate acts or their perpetrators, but the court entertains Raniere's duplicity argument nonetheless.

of which took place between 2004 and 2010, according to the First Superseding Indictment). (Bronfman First Mem. at 22-23.) Per Raniere, no common purpose unites these two sets of acts, and thus the court should either dismiss Count One or direct the Government to elect which conspiracy it will seek to prove at trial. (Id. at 21.)

b.  *Legal Standard*

Duplicity is the charging of multiple, separate offenses in the same count. United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992); see United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (stating that Federal Rule of Criminal Procedure 8(a) requires that there be "a separate count for each offense"). An indictment is not duplicitous if a single count alleges "commission of a crime by several means." Aracri, 968 F.2d at 1518 (citation and quotation marks omitted). Moreover, "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as a part of a single continuing scheme." United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006). With respect to conspiracy charges generally, "in this Circuit it is well established that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." Aracri, 968 F.2d at 1518 (internal quotation marks and alterations omitted).

RICO conspiracies may be even broader than ordinary conspiracies to commit discrete crimes. See United States v. Friedman, 854 F.2d 535, 562 (2d Cir. 1988); see also United States v. Salinas, 522 U.S. 52, 65-66 (1997). To avoid being duplicitous, a RICO indictment must allege only one enterprise—individuals associated in fact who share a "common purpose," Boyle, 556 U.S. at 946—and must allege that the defendants agreed to participate in certain "types of predicate racketeering acts," Applins, 637 F.3d at 81-82. These predicate acts may

themselves be conspiracies to commit discrete crimes. See, e.g., United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir. 1984), abrogated on other grounds by, Salinas, 522 U.S. at 61-64. Alleged RICO conspirators need not conspire to commit all of the predicate acts or conspire directly with every other co-conspirator, so long as every co-conspirator has agreed to participate in the affairs of the same enterprise. See Salinas, 522 U.S. at 65; Friedman, 854 F.2d at 562-63 (stating that RICO co-conspirators may commit "different, even unrelated crimes" and need not "conspire directly with each other" (citations omitted)); United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008) ("[I]t is not necessary that the conspirators even know the identities of all the other conspirators" or that they "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan" (citations and quotation marks omitted)). Further, differences in time periods between racketeering acts do not cause duplicity issues "so long as there is sufficient proof of mutual dependence and assistance." Eppolito, 543 F.3d at 48.

In sum, if a RICO conspiracy count properly alleges the "pattern" element, it will almost certainly not be duplicitous. See Garcia, 2012 WL 6623984, at *6 (rejecting duplicity argument as an "offshoot" of defendants' failed "pattern" arguments); United States v. Ali, No. 04-CR-611, 2005 WL 2989728, at *1 (E.D. Pa. Aug. 19, 2005) ("Courts have repeatedly recognized that schemes that might ordinarily constitute different criminal conspiracies are properly joined in a RICO enterprise offense, provided those schemes are sufficiently 'related' under the statute." (citing United States v. Eufrasio, 935 F.2d 553, 564-67 (3d Cir. 1991); United States v. Pungitore, 910 F.2d 1084, 1136 (3d Cir. 1990); United States v. Riccobene, 709 F.2d 214, 224-25 (3d Cir. 1983).).

### c. Application

The principles outlined above make clear that Count One is not pleaded duplicitously. It charges one RICO conspiracy with one common purpose uniting its predicate acts: receiving financial opportunities and personal benefits, including increased power and status within the Enterprise, by promoting Raniere and recruiting others into the Pyramid Organizations. (Indictment ¶ 4.) Each Defendant allegedly agreed on this "essential nature of the plan." Eppolito, 543 F.3d at 47. Despite Raniere's contentions (Bronfman First Mem. at 23), this common purpose is not overly broad.[15] As the Government correctly notes, the pursuit of financial and personal benefits is often the purpose of criminal RICO indictments. (Gov't First Mem. at 41 (citing United States v. Basciano, No. 03-CR-0929 (NGG) (Sept. 29, 2006) (Dkt. 604) (Indictment) ("The principal purpose of the Bonanno family was to generate money for its members and associates. . . . [t]he members and associates at times used the resources of the Bonanno family to settle personal grievances and vendettas.")).)

Further, the Indictment describes "mutual dependence and assistance" among the predicate acts. Id. The DOS Defendants' acts and Bronfman's acts involve organizations founded by Raniere that are intertwined with one another—for example, DOS slaves were allegedly recruited from Nxivm (Compl. ¶ 15). (Indictment ¶¶ 17-23, 26-31, 34.) Each DOS Defendant was a high-ranking Nxivm member. (Id. ¶¶ 9, 11.) Contrary to Raniere's arguments (Bronfman First Mem. at 23-24), the fact that the DOS Defendants' acts and Bronfman's acts are different in character and occurred at different times does not make Count One duplicitous. See Friedman, 854 F.2d at 562-63; Eppolito, 543 F.3d at 47-48.

---

[15] Kotteakos v. United States, 328 U.S. 750, 765 (1946) and United States v. Swafford, 512 F.3d 833, 842 & n.3 (6th Cir. 2008), two cases Raniere relies on (Bronfman Mem. at 23-24, 26), are not to the contrary because they involved conspiracies to commit discrete crimes, not RICO conspiracies. See Friedman, 854 F.2d at 562-63; Ruggerio, 726 F.2d at 913.

Accordingly, Count One alleges a single RICO conspiracy; it is not pleaded duplicitously.[16]

## B.    Count Two: Substantive RICO

Raniere contends that Count Two, or some of its predicate acts, should be dismissed for similar reasons. (Bronfman Second Mem. at 6-11; see Raniere Second Mem. at 1 (joining Bronfman's motion).) First, he avers that it is insufficiently pleaded because, with respect to several predicate acts, it does not identify the underlying offenses or the elements of such offenses, and it does not allege each element of Act Eleven. (Bronfman Second Mem. at 6-9.) Second, he claims that Act One-A is defective because it alleges a violation of 8 U.S.C. § 1324(a)(1)(A), which includes four subsections, one of which—§ 1324(a)(1)(A)(iv)—is overbroad in violation of the First Amendment. (Bronfman Second Mem. at 9.) Third, he posits that Count Two's fourteen predicate acts are insufficiently related. (Id. at 10.) Fourth, he insists that Count Two is duplicitous. (Id.)

### 1.    Specificity

Count Two alleges fourteen predicate acts, some of which are divided into sub-acts. (Indictment ¶¶ 18-40.) According to Raniere, the following acts improperly fail to identify the underlying offenses on which they rely: One, Five, Seven, Eight, Nine, and Eleven. (Bronfman Second Mem. at 6.) Further, Act Eleven is missing essential elements because it does not identify Raniere's false statements, explain why they are false, or state that the false statements were made under oath or penalty of perjury. (Id. at 8-9.)

---

[16] To defeat duplicity arguments at trial, the Government will have to prove "beyond a reasonable doubt (1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent." Eppolito, 543 F.3d at 48 (quoting United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (quotation marks omitted)).

In the Government's view, Raniere's arguments on Count Two are foreclosed by United States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012). (Gov't Second Mem. in Opp'n to Mots. to Dismiss ("Gov't Second Mem.") (Dkt. 485) at 18-26.) In D'Amelio, the Second Circuit held that an indictment provides sufficient notice if it alerts the defendant to the "'core of criminality' of an offense"—i.e., the "essence of a crime, in general terms"—and that "the specific means used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense."[17] 683 F.3d at 418, 422. Per the Government, D'Amelio makes clear that Count Two's predicate acts give ample notice to Raniere. (Gov't Second Mem. at 21.)

The court agrees with the Government. In every act to which Raniere points, the underlying offense is part of a "to wit" clause identifying the means by which a defendant effected the crime, and thus is not an essential element of the alleged crime. See Bastian, 770 F.3d at 221 ("As a preliminary matter, we have never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment."); United States v. Agrawal, 726 F.3d 235, 261 (2d Cir. 2013) ("When the indictment is thus considered as a whole, the 'to wit' clause is properly understood to be illustrative rather than definitional of the core of criminality charged by the grand jury."). Even though the Indictment does not plead underlying offenses, Raniere has ample notice of the predicate acts the Government will seek to prove at trial. The court discusses each challenged act (see Bronfman Second Mem. at 6) in turn.

---

[17] In D'Amelio, the indictment alleged that the defendant attempted to entice a minor by using a facility of interstate commerce, "to wit, . . . a computer and the Internet." Id. at 414 (emphasis in original). At trial, though, the jury instructions permitted the jury to find the defendant guilty "based on his use of either the telephone or the Internet"—i.e., by a means not identified in the "to wit" clause of the indictment. Id. at 416 (emphasis added). The Second Circuit upheld the defendnat's conviction, finding that the instructions did not alter an essential element of the charge and that the defendant had sufficient notice of the "'core of criminality' of the charge to be proven at trial—attempted enticement of a minor." Id. at 424; see United States v. Bastian, 770 F.3d 212, 220 (2d Cir. 2014) ("So long as the indictment identifies the 'essence of [the] crime' against which the defendant must defend himself, discrepancies in 'the particulars of how a defendant effected the crime'" do not deprive the defendant of notice of the crime to be proven at trial (quoting D'Amelio, 683 F.3d at 418)).

a.     *Act One*

Act One-A alleges that Raniere participated in a conspiracy to commit identity theft in 2004, in violation of 18 U.S.C. § 1028(a)(7). (Indictment ¶ 19.) An element of that crime is that the conspiracy must have been undertaken with "intent to commit, and to aid and abet, and in connection with" another federal crime. 18 U.S.C. § 1028(a)(7). The Indictment alleges that element. (Indictment ¶ 19.) Act One-A also contains a to-wit clause, which alleges that the other crime was "bringing in, transporting and harboring an alien, in violation of [8 U.S.C. § 1324(a)(1)(A)]." (Id.) Because that statute is not an essential element of the predicate act (conspiracy to commit identity theft) and is referenced in a "to wit" clause, the Indictment need not identify one of § 1324(a)(1)(A)'s four subsections, which list means by which that crime may be effected. See United States v. Whyte, 630 F. App'x 104, 108 (2d Cir. 2015) ("[W]here there are several ways to violate a criminal statute . . . a conviction [under that statute] will be sustained if the evidence indicates that the statute was violated in any of the ways charged.") Bronfman and Raniere also know the names of Act One-A's victim. (Gov't Second Mem. at 21 n.12.) See Stringer, 730 F.3d at 127 (holding that an indictment need not include the name of an identity-theft victim, so long as the Government provides the name at the defendant's request). Furthermore, Act One-B arises from the same pattern of conduct as 1-A and indicates that the identity theft underlying One-A was effectuated via a "sheriff's identification card with the last name and date of birth of [the victim]." (Indictment ¶ 20; Gov't Second Mem. at 22.) In sum, considering "the record as a whole" and not just the Indictment, Walsh, 194 F.3d at 45, Raniere appears to know the specific facts that are most "importan[t] to the fairness of the proceeding." Stringer, 730 F.3d at 126;

b.    *Acts Five and Seven*

For the same reasons, Acts Five and Seven pass muster.  Both state that the alleged

conspiracy to commit identity theft was undertaken with "intent to commit, and to aid and abet,

and in connection with" another federal crime.  (Indictment ¶¶ 25 (Act 5-A), 29 (Act Seven).)

Both indicate time frames in which the alleged crimes took place.  (Indictment ¶¶ 25, 26 (Act 5-

B), 27 (Act 5-C), 29.)  Raniere knows who the victims are.  (Gov't Second Mem. at 21 n.12, 22-

23.)  These allegations thus provide notice of the core criminality of the alleged offenses.

c.    *Act Eight*

Act Eight alleges that Bronfman engaged in money laundering in or about March 2009,

in violation of 18 U.S.C. § 1956(a)(2)(A).  (Indictment ¶ 30.)  Under that statute, the

Government must show that Bronfman acted with the intent to promote specified unlawful

activity.  18 U.S.C. § 1956(a)(2)(A).  In "to wit" clauses, Act Eight states that Bronfman used

wire transfers to launder and that the specified unlawful activity was visa fraud, in violation of

18 U.S.C. § 1546.  (Indictment ¶ 30.)

This is sufficient.  It makes no difference that § 1546 lists multiple crimes.  A money-

laundering indictment need not provide elements and other details of the "specified unlawful

activity."  See United States v. Cherry, 330 F.3d 658, 667-68 (4th Cir. 2003) ("[D]etails about

the nature of the unlawful activity underlying the money laundering need not be alleged."

(citation omitted) (alteration adopted)); United States v. Caldwell, 302 F.3d 399, 413 (5th Cir.

2002) (finding that an indictment sufficiently charged a defendant  with money laundering even

though it did not allege elements of the specified unlawful activity); United States v. McGauley,

279 F.3d 62, 70 (1st Cir. 2002) ("[W]e do not require the indictment to specify the predicate

offense underlying a money laundering charge." (quotation marks omitted)); cf. Whyte, 630 F.

App'x at 108 ("[W]here there are several ways to violate a criminal statute . . . a conviction [under that statute] will be sustained if the evidence indicates that the statute was violated in any of the ways charged.").

### d.    *Act Nine*

Act Nine alleges that Raniere and Lauren Salzman trafficked Jane Doe 4 for document servitude and forced labor between March 2010 and April 2012, in violation of 18 U.S.C. §§ 1590 and 1592. (Indictment ¶¶ 31-33.) 18 U.S.C. § 1590 makes it a crime to knowingly recruit, harbor, transport, provide, or obtain any person for forced labor. 18 U.S.C. § 1592 prohibits knowingly altering or possessing another person's immigration document while violating forced-labor laws. The Government has pleaded the elements of both statutes (id.) and Raniere and Lauren Salzman know the identity of Jane Doe 4 (Gov't Second Mem. at 23). This is sufficient. The Government did not need to specify how it will prove the forced-labor element of either crime. See Wey, 2017 WL 237651, at *5 (stating that indictments need not "specify evidence or details of how the offense was committed" (citation omitted)). Moreover, Bronfman has not provided any support for the proposition that either §§ 1590 or 1592 is one of the few statutes for which "specification of how a particular element of a criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." Stringer, 730 F.3d at 126.

### e.    *Act Eleven*

Act Eleven alleges that Bronfman committed visa fraud between October 2015 and January 2018, in violation of 18 U.S.C. § 1546(a). (Indictment ¶ 35.) She allegedly worked with others to "knowingly and intentionally present an application, affidavit, and other document required by the immigration laws and regulations prescribed thereunder, which contained one or

more false statements with respect to a material fact and which failed to contain any reasonable basis in law and fact." (Id.) "[T]o wit, Bronfman caused to be submitted to the United States consulate an offer of employment that Bronfman knew to contain materially false and fraudulent statements, which offer of employment was submitted in support of a visa application for another individual." (Id.)

The court must address two issues Raniere raises regarding Act Eleven.[18] First, he complains that it does not specify which immigration laws required the submission of the document in question. (Bronfman Second Mem. at 6.) As the Government notes (Gov't Second Mem. at 24), though, a § 1546(a) indictment need not do that. See United States v. Archer, 671 F.3d 149, 154 (2d Cir. 2011) ("Visa fraud, as charged here, has five elements: the defendant (1) knowingly (2) presented (3) an application or 'document required by the immigration laws' (4) that contained a false statement (5) as to a material fact." (citing 18 U.S.C. § 1546(a))). Furthermore, the Government has produced the relevant document—an offer of employment that Bronfman sent the United States consulate—to the defendants in Rule 16 discovery, so Raniere has notice of which immigration laws required its submission. (Gov't Second Mem. at 25 & n.15.)

Second, Raniere avers that Act Eleven is deficient because, while it alleges that Bronfman submitted "materially false and fraudulent statements" to a United States consulate, it does not identify those statements or explain why they were false. (Bronfman Mem. at 8-9.) He relies on Stringer, which notes that an indictment charging criminal falsity under certain statutes must specify "what statements are alleged to be false, and in what respect they are false." 730

---

[18] Raniere also raises a third issue: that Act Eleven does not allege that the false statements at issue were made under oath or penalty of perjury, which is supposedly an essential element of § 1546(a). (Bronfman Second Mem. at 9.) He concedes that the Second Circuit's holding in United States v. Khalje, 658 F.2d 90, 91-92 (2d Cir. 1981) requires this court to rule against him, but he wishes to preserve the issue for appeal. (Bronfman Second Mem. at 9.)

F.3d at 126-27 (citing United States v. Pirro, 212 F.3d 86, 93 (2d Cir. 2000) (discussing an indictment charging filing of a false tax return); United States v. Tonelli, 577 F.2d 194, 200 (3d Cir. 1978) (discussing an indictment charging a defendant with making false statements to a grand jury). But he offers no support for her assertion that § 1546(a) is one of those statutes; indeed, at least one other court has ruled that it is not such a statute. See United States v. Imran, No. 15-CR-259, 2015 WL 9008152, at *2 (E.D. Va. Dec. 15, 2015) (rejecting a similar argument that a § 1546(a) charge lacked specificity). Moreover, the purpose of the rule articulated in Stringer is to ensure that a defendant has proper notice of the charges against him. See Stringer, 730 F.3d at 126 ("[F]or certain statutes[,] specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment."); United States v. Rigas, 490 F.3d 208, 229 (2d Cir. 2007) ("When the crime charged involves making false statements, the 'core of criminality' is not the substance of the false statements but rather that knowing falsehoods were submitted . . . . In our opinion, Defendants were notified of the 'core of criminality' the government intended to prove." (citations and quotation marks omitted)). Here, Raniere has sufficient notice. Act Eleven makes clear that the false statements are in an offer-of-employment letter that Bronfman sent to the United States Consulate in support of another person's visa application (Indictment ¶ 35), and the Government gave her the document in question (Gov't Second Mem. at 25 & n.5). The Government did not also need to highlight the particular statements in the document that were allegedly false. See Imran, 2015 WL 9008152, at *2; c.f. United States v. Kamdar, No. 04-CR-156, 2009 WL 2407676, at *2-3 (W.D.N.Y. Aug. 5, 2009) (citing Rigas and finding that an indictment charging mail fraud in violation of 18 U.S.C. § 1341 did not need to "identify the false representations allegedly made by defendant").

### 2. Act One-A: Constitutionality of 8 U.S.C. § 1324(a)(1)(A)(iv)

As noted above, Act One-A contains a to-wit clause, which alleges that the underlying offense was "bringing in, transporting and harboring an alien, in violation of [8 U.S.C. § 1324(a)(1)(A)]." (Indictment ¶ 19.) That statute has four subsections. Raniere argues that one of them—18 U.S.C. § 1324(a)(1)(A)(iv) ("Subsection (iv)"), which makes it a crime to "encourage[] or induce[] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law"—is overbroad in violation of the First Amendment, as well as unconstitutionally vague and discriminatory. (Bronfman Reply at 8; Bronfman Suppl. Mem. (Dkt. 233); Bronfman Suppl. Reply (Dkt. 391).)

The Government represents that it can prove Raniere effected the crime by means of any of the three remaining subsections of § 1324 (a)(1)(A). (Gov't Second Mem. at 22 n.13.) Therefore, while the court has serious doubts about the constitutionality of Subsection (iv), see United States v. Sineneng-Smith, 910 F.3d 461, 471 (9th Cir. 2018) (holding that Subsection (iv) is overbroad in violation of the First Amendment), the court need not decide that question now. After trial, if Raniere believes that the Government's evidence has only proven a violation of Subsection (iv) and none of the other three subsections, he may renew his motion to dismiss Act One-A.

### 3. "Pattern" Element: Whether the Predicate Acts are Related

Raniere argues that Count Two's predicate acts are insufficiently related to each other. (Bronfman Second Mem. at 10.) He repeats the same arguments that he made about Count One. (Id.) The court rejects them for the same reasons. Counts One and Two appear to include the same predicate acts, but Count Two describes them in greater detail, indicating individual

perpetrators and approximate dates for each act. Thus, if Count One contains facts that "evidence continuity and relatedness," so does Count Two. <u>Giovannelli</u>, 2004 WL 48869, at *3 (citing <u>H.J., Inc.</u>, 492 U.S. at 239).

        4.     <u>Duplicity: Whether Count One Charges Multiple Conspiracies</u>

For the same reasons that Count One is not pleaded duplicitously, neither is Count Two.

## C.    Acts Two, Three, and Four: Child Pornography

Raniere moves to dismiss or sever Acts Two, Three, and Four, which are premised on sexually explicit photographs of Jane Doe 2, a minor, allegedly recovered from Raniere's hard drive, arguing that they are neither related to the other racketeering acts nor to the charged enterprise. (Raniere Second Mem. at 5-8.) The court is not aware of any authority for the proposition that it may dismiss or sever individual racketeering acts pretrial because they do not appear related to the other acts in an otherwise valid RICO charge. <u>See Urso</u>, 369 F. Supp. 2d at 262 (E.D.N.Y. 2005) (noting that a defendant had cited "no precedent whatsoever in support of the extraordinary proposition that some racketeering acts may be severed from the other racketeering acts charged under a single count of racketeering"); <u>see also Messina</u>, 2012 WL 463973, at *4 & n.1 (rejecting pretrial challenge to "relatedness" in a criminal RICO case as premature). In any event, the Government has properly alleged that these acts were vertically and horizontally related. Per the Government, Jane Doe 2 was a member of the Enterprise and Raniere took these photos for his own benefit and contemporaneously with similar photographs of other members of the charged enterprise. (Gov't Second Mem. at 2.) Thus, Acts Two, Three, and Four had similar purposes and participants as Count Two's other acts—suggesting horizontal relatedness—and Raniere was able to commit them because of his involvement in the

Enterprise—suggesting vertical relatedness. See Reich, 858 F.3d at 61 (defining horizontal and vertical relatedness); Vernace, 811 F.3d at 615 (same).

**D.    Count Six And Act Thirteen: Forced Labor**

1.    Overview of the Charges

Count Six charges Raniere (along with Mack and Lauren Salzman) with a forced-labor conspiracy, i.e., with conspiring to provide and obtain the labor and services of one or more lower-ranking DOS members by means of force, physical restraints (or threats of physical restraints), or serious harm (or threats of it) between September 2015 and June 2017 within the Eastern District of New York and elsewhere, in violation of § 1589(a). [19] (Indictment ¶ 44.)  The Indictment states that they conspired to provide and obtain the labor and services of lower-ranking DOS members by means of force and threats of force, harm and threats of harm, and threats to reveal damaging collateral.  (Id.; see Compl. ¶ 42 (detailing the collateral used).)

Act Thirteen of Count Two alleges that Lauren Salzman obtained the labor and services of Jane Doe 6 by means of force, physical restraints (or threats of physical restraints), or serious harm (or threats of it) between September 2015 and June 2017 within the Eastern District of New York and elsewhere, in violation of § 1589(a).

2.    Motions to Dismiss

Raniere moves to dismiss Count Six and Act Thirteen for failure to plead the crimes alleged with sufficient specificity and, with respect to Count Six, failure to state an offense.

---

[19] Under 18 U.S.C. § 1589(a), it is a crime to compel another person to provide "labor or services" through prohibited means of coercion, including "force, threats of force, physical restraint, or threats of physical restraint," "serious harm or threats of serious harm to that person or another person," and "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  § 1589(a)(1), (2), (4).

(Raniere First Mem. at 17; L. Salzman First Mem. at 17-19; Mack First Mem. at 6-17; L. Salzman Second Mem. at 4-5.) The court denies Raniere's motion for the following reasons.

### i. Specificity

Raniere adopts Mack's and Lauren Salzman's arguments[20] that Count Six is pleaded improperly because the alleged 21-month time span is overly broad, and because it does not identify with specificity the "lower-ranking DOS members" whose labor was compelled, the "serious harm" that Defendants allegedly threatened to inflict on their victims, or what "labor and services" were obtained through threats. (Raniere Second Mem. at 1; see Mack First Mem. at 6-11; L. Salzman First Mem. at 17-19; L. Salzman Second Mem. at 4-5.) According to Raniere, charges involving threats, like § 1589(a), must identify specific victims. (Id. at 8 (citing Sira v. Morton, 380 F.3d 57, 73 (2d Cir. 2004)); see L. Salzman First Mem. at 17.) Further, he states, Count Six is deficient because it merely recites three of the four means of illegally compelling forced labor that § 1589(a) lists, without specifying which means were used by Defendants. (Id. at 9 (citing United States v. Peterson, 544 F. Supp. 2d 1363, 1375 (M.D. Ga. 2008)); see L. Salzman First Mem. at 18-19.) Per Raniere, tracking generic statutory language is insufficient here because this case involves "an entirely voluntary organization"—DOS— "distinct from a typical forced labor situation." (Id. (citing Pirro, 212 F.3d at 92; Russell, 369 U.S. at 768).) "Without more specificity," he claims he does not know (1) what the Government finds criminal about the alleged conduct or (2) what labor and services were illegally obtained. (Mack First Mem. at 9.)

Essentially, Raniere complains of a lack of notice as to the accusations against him. If the Indictment were the only notice that he had received as to Count Two, he might have a good

---

[20] Going forward, the court refers to these as Raniere's arguments.

argument. But, as the Government notes (Gov't First Mem. at 49), the complaint and the Raniere detention letter contain significant detail as to the forced-labor charges, including reference to particular victims, statements by witnesses, and specific electronic communications. (Compl. ¶¶ 15-21, 25-29, 36-39, 42-51; Raniere Detention Letter at 1-3.) Additionally, the Government represents that it has provided ample discovery relating to Count Six, such as the names of victims and conspirators. (Gov't First Mem. at 49.)

Raniere does not dispute that he has received this information. (See Mack Reply (Dkt. 254) at 3.) Nor does he claim to be unaware of the names of the "lower-ranking DOS members" that Count Six references or of the Government's theory of the forced-labor conspiracy. Indeed, despite complaining of a lack of notice, he simultaneously argues that—based on the forced labor and the threats alleged in the complaint—Count Two fails to state a forced-labor offense, suggesting that he does in fact have notice of the Government's theory. (Mack Mem. at 11-17.) Considering "the record as a whole" and not just the Indictment, Walsh, 194 F.3d at 45, Raniere appears to know the specific facts that are most "importan[t] to the fairness of the proceeding."[21] Stringer, 730 F.3d at 126; see id. at 127 (holding that an indictment need not include the name of an identity-theft victim, so long as the Government provides the name at the defendant's request); Stavroulakis, 952 F.2d at 693 ("When an indictment delineates the elements of a charged offense, however concisely, the underlying concerns of proper pleading—notice of the charge to be met and protection against double jeopardy—may be further promoted by a bill of

---

[21] An important caveat in Walsh is that an indictment must be "minimally sufficient" before a court looks to the "record as a whole" in assessing whether the Government gave proper notice. 194 F.3d at 45. Here, Count Two is minimally sufficient because it "delineates the elements of [the] charged offense, [albeit] concisely." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (citing United States v. McClean, 528, F.2d 1250, 1257 (2d Cir. 1976).

particulars or pre-trial discovery." (citation omitted)). Consequently, the court denies his motion to dismiss Count Six for a lack of specificity.

Raniere makes similar arguments about Act Thirteen. (See L. Salzman Mem. at L. Salzman First Mem. at 17-19.) The court rejects them for the same reasons.

ii.    Failure to State an Offense

Raniere further contends that, taking the allegations in the complaint as true, Count Six fails to state an offense and should be dismissed under Rule 12(b)(3)(B)(v) for two reasons. First, the "labor and services" that the Indictment alleges were obtained are not the kind of "labor or services" that fall within the scope of § 1589. (Mack First Mem. at 12-14.) The "labor and services" referred to in the Indictment were, Raniere argues, "'acts of care' and 'tribute' largely in the form of various personal favors and errands." (Id. at 14.) He claims that these acts fall outside the "paradigmatic forced labor" situation because they do not constitute activities that were "onerous, required, and taxing." (Id.; Mack Reply at 4.) For support, he points to two cases: United States v. Toviave, 761 F.3d 623 (6th Cir. 2014), where the Sixth Circuit granted a post-trial Rule 29 motion because "requiring one's children to do their homework, babysit on occasion, and do household chores" was not "forced labor" within the meaning of § 1589, id. at 623, 625; and Petersen v. Boeing Co., No. 10-CV-999, 2015 WL 12090213 (D. Ariz. Feb. 18, 2015), where the court dismissed a civil suit by a Boeing employee alleging forced labor when "his presence was required at an office for eight hours a day without work" because "there [was] no 'exertion' conveying effort," id. at *7.

Second, he argues that the release of collateral cannot amount to "serious harm" within the meaning of the forced-labor statute.[22] (Mack First Mem. at 17.) "Serious harm" requires a

---

[22] The forced-labor statute defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to

showing of improper threats or coercion—not merely "adverse[] but legitimate consequences"—and the victim's "continued acquiescence to servitude must be objectively reasonable under the circumstances." (Id. at 15 (citing Adia v. Grandeur Mgmt. Inc., No. 17-CV-9349 (RWS), 2018 WL 4300528, at *3 (S.D.N.Y. Sept. 10, 2018); DeSilva v. N. Shore-Long Island Jewish Health Syst., Inc., No. 10-CV-1341 (JFB), 2012 WL 748760, at *7 (E.D.N.Y. Mar. 7, 2012); United States v. Bradley, 390 F.3d 145, 155 (1st Cir. 2004)).) In Raniere's view, typical forced labor cases involve "squalid living conditions, extreme isolation, actual threats of physical harm, and exploitation of the victim's lack of education or familiarity with the English language." (Id. (citing Muchira v. Al-Rawaf, 850 F.3d 605, 618 (4th Cir. 2017)).) Raniere compares the Government's case with that in Headley v. Church of Scientology Int'l, 687 F.3d 1173 (9th Cir. 2012), in which the Ninth Circuit held that threatening Scientology members with excommunication that could result in the potential loss of contact with their Scientologist family and friends does not qualify as threatening "serious harm." Id. at 1180 ("A church may [] warn that it will stop associating with members who do not act in accordance with chuch doctrine" without violating § 1589.). To support its decision, the Ninth Circuit noted that the victims had "many opportunities to leave" the defendants. Id. at 1181. Here, Raniere states that even if the release of collateral could amount to "serious harm," no DOS slave felt compelled to stay and when people left DOS, their collateral was not released. (Mack Mem. at 17.)

Neither of Raniere's arguments warrant dismissal of Count Six at this stage. The court is not prepared to rule, as a matter of law, that Raniere's alleged conduct (Compl. ¶¶ 15-21, 25-29,

---

compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

36-39, 42-51; Raniere Detention Letter at 1-3) does not fall within the ambit of the forced-labor statute.

First, while Raniere is correct that there are "limiting principle[s]" to § 1589(a)'s definition of "labor and services" (Mack Reply at 3), no such principles preclude the Government's proffered theory. See United States v. Kaufman, 546 F.3d 1242, 1260-61 (10th Cir. 2008) (holding that "labor and services" need not be "work in an economic sense" and may involve "physical or mental effort" (emphasis added)); United States v. Marcus, 487 F. Supp. 2d 289, 300 (E.D.N.Y. 2007) (same), vacated on other grounds, 538 F.3d 97 (2d Cir. 2008), rev'd, 560 U.S. 258 (2010), and aff'd in part, vacated in part, remanded, 628 F.3d 36 (2d Cir. 2010). In fact, some of the work allegedly performed by DOS slaves clearly qualifies as "labor and services." (See Compl. ¶ 50 (alleging that Jane Doe 1 was tasked with spending hundreds of hours reviewing dense articles and transcribing interviews for Raniere's benefit).) Whether the DOS slaves' work actually qualifies as "labor or services" is a question of fact to be determined at trial and on a Rule 29 motion. See Messina, 2012 WL 463973, at *4 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment." (quoting Alfonso, 143 F.3d at 776-77)).

Second, the court cannot rule that the release of collateral—i.e., embarrassing material voluntarily given—never constitutes "serious harm." Whether the DOS slaves' "continued acquiescence to servitude [was] objectively reasonable under the circumstances" (Mack Mem. at 15) is an intensely factual issue that may only be decided after a trial. Messina, 2012 WL 463973, at *4 (quoting Alfonso, 143 F.3d at 776-77). Headley, upon which Raniere relies for this point, is not binding on this court, is related to a civil summary-judgment motion, and is easily distinguishable because the plaintiffs in that case faced only one potential adverse

consequence: excommunication from the Church of Scientology. 687 F.3d at 1175, 1180.

Threatening excommunication was a "legitimate warning," not an improper threat, because "a

church is entitled to stop associating with someone who abandons it" and "may also warn that it

will stop associating with members who do not act in accordance with church doctrine." Id. at

1180. But in this case—taking the Government's allegations as true—the release of collateral

could damage DOS slaves in other ways, such as ruining their careers, finances, and personal

relationships with non-DOS members. (See, e.g., Compl. ¶¶ 16, 18.)

In fact, all of the decisions Raniere cites in support of his Rule 12(b)(3)(B)(v) motion are

inapposite because they had different procedural postures. See, e.g., Toviave, 761 F.3d 623

(Rule 29 motion for judgment of acquittal); Headley, 687 F.3d 1173 (civil summary-judgment

motion); Petersen, 2015 WL 12090213 (civil motion to dismiss). When resolving Rule 29 or

summary judgment motions, courts assess the sufficiency of the evidence. See Fed R. Crim. P.

29; Fed. R. Civ. P. 56. When assessing civil motions to dismiss, courts assess whether the

plaintiff pleaded sufficient factual content to make their claim facially plausible. See Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009). Courts do neither of those things when assessing criminal

motions to dismiss for failure to state an offense "[u]nless the government has made what can

fairly be described as a full proffer of the evidence it intends to present at trial," which is not the

case here (Gov't Mem. at 50). See Messina, 2012 WL 463973, at *4 (quoting Alfonso, 143 F.3d

at 776-77).

In conclusion, the court denies Raniere's motion to dismiss Count Six for failure to state

an offense.

### E. Act Ten: Extortion

#### 1. Overview of the Charges

Act Ten of Count Two alleges that, between September 2015 and June 2017, Raniere, Mack, and Lauren Salzman stole property from lower-ranking DOS members by threatening to release their collateral, which constitutes extortion under New York state law. (Indictment ¶ 34.) Raniere adopts Lauren Salzman's arguments[23] for why Act Ten should be dismissed. (Raniere Second Mem. at 1; see L. Salzman First Mem. at 10-17, 19-22; L. Salzman Second Mem. at 4-5.)

#### 2. Motions to Dismiss

##### a. Lack of Specificity

Raniere argues that Act Ten is subject to a heightened pleading standard because, under New York State law, counts charging extortion-related offenses must describe the alleged threats in detail. (L. Salzman First Mem. at 12.) Specifically, he contends that the Indictment must allege a nexus between a threat and the taking of property. (Id. at 13.) Act Ten does not do this. (Id. at 13-16; see Indictment ¶¶ 28, 33.) It does not provide the specific identities of the alleged victims, the location within the Eastern District of New York where these extortionate acts occurred, the dates and times of the offenses, the nature of the threats allegedly employed, or the secret that Defendants threatened to expose. (L. Salzman First Mem. at 14.) Accordingly, Raniere argues, Act Ten should be dismissed. (Id.) But he has not cited, and the court is not aware of, any case in which a court dismissed any RICO act for failing to allege the specifics he requests here. (See Hr'g Tr. at 51:22-52:8 (where Lauren Salzman's counsel states that the case that comes closest to indicating that the Government must allege specifics of RICO acts is

---

[23] Going forward, the court refers to these as Raniere's arguments.

Yannotti, 541 F.3d 112, where the Second Circuit upheld the denial of a motion to dismiss a racketeering act for lack of specificity).

The Government's argument on the extortion racketeering acts in the First Superseding Indictment focused on the fact that extortion was previously alleged as part of a RICO conspiracy. (Gov't First Mem. at 30-34.) Specifically, the Government contended that it need not plead predicate acts of a RICO conspiracy with the specificity sought by Raniere because the charged crime is the RICO conspiracy, not the predicate acts. (Id.) See Applins, 637 F.3d at 81 ("Neither overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proved for a section 1962(d) offense." (quoting Glecier, 923 F.2d at 500)). The Government has not updated its argument to reflect that Act Ten is now alleged as part of a substantive RICO charge. (See Gov't Second Mem. (not addressing Lauren Salzman's arguments regarding extortion).) It is not clear to the court whether a heightened pleading requirement may apply to a predicate act of a substantive RICO charge.

Nevertheless, Raniere appears to have sufficient notice of what is alleged in Act Ten. The Government represents that it has disclosed the victims' names to him (Gov't Second Mem. at 26) and that its complaint, letters concerning bail and detention, and discovery provide ample information about the alleged extortion (Gov't First Mem. at 34). Raniere has not shown that the Indictment's failure to identify specific victims or provide greater detail as to the alleged extortion prejudices him in any way or somehow affects "the fairness of the proceeding." Stringer, 730 F.3d at 126.

### b. *Multiplicity*

Raniere also adopted Lauren Salzman's arguments that the two extortion racketeering acts in the First Superseding Indictment were multiplicitous. (Raniere Second Mem. at 1; see L.

Salzman Mem. at 19-22.) Count Two in the new Indictment alleges only one extortion racketeering act. (See Indictment ¶ 34.) Accordingly, Raniere's multiplicity arguments are moot.

### F.     Counts Eight, Nine, and Ten, and Act Eight: Sex Trafficking

#### 1.     Overview of the Charges

Count Eight charges Raniere with sex trafficking conspiracy, Count Nine charges him with sex trafficking of Jane Doe 5, and Count Ten charges him with the attempted sex trafficking of Jane Doe 8, all between February 2016 and June 2017 in violation of 18 U.S.C. §§ 1591(a)(1) and 1591(a)(2).[24] (Id. ¶¶ 46-48). Act Twelve-A of Count Two appears to be based on the same allegations as Count Nine.

#### 2.     Motions to Dismiss

Raniere adopts Mack's motion to dismiss all counts and the predicate act relating to sex trafficking. (Raniere Second Mem. at 1; see Mack First Mem. at 17-27.) He asserts that Counts Eight, Nine, and Ten should be dismissed because they lack specificity, they fail to state a claim, they are unconstitutionally vague as applied, and they are duplicitous. (Raniere First Mem. at 14-17; Raniere Reply at 4-6; Mack First Mem. at 10-11, 17-30; Mack Reply at 1-3, 5-10.)

---

[24] It is a violation of 18 U.S.C. § 1591(a) to (1) knowingly entice, harbor, transport, provide, obtain, maintain, patronize, or solicit by any means a person, or (2) benefit, financially or by receiving anything of value, from participation in a venture which has engaged in one of those acts, knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act. For the purposes of this subsection, the phrase "coercion" means "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2). "Commercial sex act" means "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

*a.      Specificity*

Raniere argues that Counts Eight, Nine, and Ten lack specificity because they rely on "unspecified threats of force, fraud and coercion." (Mack Mem. at 10; Mack Reply at 2.)  As with the forced labor count, he contends that Count Eight is deficient because it fails to identify with specificity victims or "lower-ranking DOS members." (Mack Mem. at 10.)  He also argues that Counts Eight, Nine, and Ten are deficient because they provide no specificity as to the nature of the threats or how, when, and by whom they were communicated. (Id.)  In addition, he asserts that the Government must provide more detail about the location of the alleged acts beyond that they occurred "within the Eastern District of New York and elsewhere." (Id.)  Further, he maintains that these counts are insufficient because they fail to provide specifics regarding the nature of the alleged commercial sex acts, who performed them and when and where they did so, or what value was exchanged on their account. (Id.)  He insists that the lack of specificity is compounded by the fact that these counts do not specify whether defendants violated the first or second paragraph of 18 U.S.C. § 1591(a), "each of which exposes a defendant to liability under different types of conduct." (Id. at 11.)  Finally, he contends that the problems with the Indictment are not cured by the complaint because "the undisputed facts, for purposes of this motion, contained within the complaint are also deficient." (Mack Reply at 3.)

Essentially, as with the forced labor count, Raniere complains of a lack of notice as to the accusations against him.  As the Government notes, however, the complaint and detention letters set out in detail the factual basis for the allegations relating to trafficking. (Gov't Mem. at 49; see Compl. ¶¶ 15-24, 39-57; Raniere Detention Letter at 1-4.)  In addition, he has been provided with "ample discovery," including the names of victims and co-conspirators. (Gov't Mem. at 49.)  Raniere does not dispute he has received this information, and, as with the forced labor

count, his briefing suggests that he does in fact have notice of the Government's theory. (See Mack Reply at 3; Mack Mem. at 11-17.) For the same reason articulated with respect to the forced labor count, therefore, the court denies Raniere's motion to dismiss Counts Eight, Nine, and Ten for lack of specificity.

### b.    Failure to State an Offense

Raniere contends that Counts Eight, Nine, and Ten should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) for failure to state a claim under 18 U.S.C. § 1591 for two reasons: (1) the Government cannot state that he and Mack participated in a commercial sex-trafficking venture, and (2) the Government cannot state that he and Mack knew force, fraud, or coercion would be used to cause someone to engage in a commercial sex act. (Mack Mem. at 17, 22; Mack Reply at 5-7; Raniere Mem. at 15.)

### i.    Commercial Sex Trafficking Venture

Raniere argues that the Government cannot make out a claim that he and Mack participated in a commercial sex trafficking venture because, first, the "things of value" that the Indictment alleges Mack received on account of sex acts are not the kind of "things of value" that would render those acts "commercial sex acts" within the ambit of § 1591.[25] (Raniere Mem.

---

[25] Section 1591 states that anyone who knowingly does the following has committed a crime:

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). A "commercial sex act" is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

at 17-19.) Raniere argues that the legislative history of § 1591 shows that its purpose is to regulate "a class of activities that are economic in nature, more specifically, sexual exploitation for profit." (Id. at 18 (citing Todd v. United States, No. C11-0470, 2012 WL 2952084 (W.D. Wash. June 26, 2012), at *6, report and recommendation adopted, 2012 WL 2952067 (W.D. Wash. July 19, 2012); United States v. Campbell, 111 F. Supp. 3d 340, 344-46 (W.D.N.Y. 2015)).) According to Raniere, the "things of value" referred to in the Indictment were "increased status," "financial opportunities," and "acts of care." (Id. at 19.) None of these, Raniere argues, "comes close to this Court's understanding of 'things of value' in exchange for commercial sexual services" because they are not connected to "profit generation." (Id. at 19.) In support of this argument, he points to Marcus, 487 F. Supp. 2d 289. There, the district court explained that "a narrow construction of [§ 1591] restricting its reach to prostitution is unwarranted" and that, under § 1591, "a commercial sex act may include sexual acts that are photographed for commercial gain." Id. at 307. In contrast, Raniere insists, there are no allegations that Mack received any "commercial gain" or "financial benefit" from the alleged sex acts. (Id. at 19-20.) Raniere similarly argues that having sex "in exchange for an increase in [] social status" is not sufficient because "commercial" must be understood to mean "money or other things of genuine commercial value." (Id. at 15-16 (citing United States v. Marcus, 628 F.3d 36 (2d Cir. 2010); see also Raniere Reply at 4.)

Second, Raniere argues that, to the extent that these "non-monetary items" do qualify as "things of value," "they were not given 'on account of' any sex act." (Mack Mem. at 20.) He maintains that the Government cannot make out a claim under § 1591 because the Complaint's allegations "show that Ms. Mack did not receive anything of value because anyone had sex with Mr. Raniere." (Mack Mem. at 20.) A "commercial sex act" is defined as "any sex act, on

account of which anything of value is given to or received by any person." 18 U.S.C § 1591. The phrase "on account of" means that there must be "a causal relationship between the sex act and an exchange of an item of value." (Mack Mem. at 20 (quoting Marcus, 487 F. Supp. 2d at 306).) Raniere contends that the Indictment fails to allege this requisite causal relationship because all it shows is that Mack belonged to the same organization as did the person who committed the alleged sex acts, and that as a result of this membership, Mack received benefits that were unrelated to the sex acts. (Id.) Accordingly, he argues, there were no "commercial sex acts." (Id.)

Raniere compares the Government's case with Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc., No. 10-CV-4124, 2013 WL 6816174, (W.D. Ark. Dec. 24, 2013), in which a court held that plaintiffs who had been sexually abused by a church's leader could not establish that church members violated § 1591 by stating that "abuse was committed by the ministry's leader and that members of the ministry had their expenses paid for through ministry funds." Id. at *16. Similarly, Raniere argues, the Indictment here fails to allege that Mack received benefits as "some sort of quid pro quo for the sex acts that occurred." (Mack Mem. at 21 (citing Kolbek, 2013 WL 6816174, at *16).)

For these reasons, Raniere insists, the Government also cannot show that Mack violated 18 U.S.C. § 1591(a)(2)[26] because Mack "did not benefit financially, or otherwise, from the alleged victims having sex with Mr. Raniere, nor were the sex acts between [the alleged victims and Raniere] of a commercial nature." (Mack Mem. at 22.) In other words, he denies that (1) Mack benefitted from her participation in the alleged venture and (2) the alleged venture was involved with commercial sex acts.

---

[26] This statute makes it a crime to "benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in an act [prohibited by § 1591(a)(1)]." 18 U.S.C. § 1591(a)2.

These arguments do not warrant dismissal of Counts Eight, Nine, and Ten at this stage. First, the court is not prepared to rule, as a matter of law, that the alleged conduct (Compl. ¶¶ 15-24, 39-57; Raniere Detention Letter at 1-4) falls outside the ambit of the sex trafficking statute. Courts have consistently held that "anything of value" encompasses more than simply monetary exchanges. See, e.g., United States v. Cook, 782 F.3d 983, 988-89 (8th Cir. 2015) (holding that "[t]he phrase 'anything of value' is extremely broad" and encompasses "sexual acts, photographs, and videos"); Noble v. Weinstein, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018) ("Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading."); United States v. Rivera, No. 6:12-CR-121, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012) (holding that the term "anything of value" "encompasses more than just monetary gain," including "ordination as a prophet"), aff'd, 551 F. App'x 531 (11th Cir. 2014).

Raniere cites several authorities, two of which deal almost exclusively with Commerce Clause jurisprudence and a third which involves a civil summary-judgment motion, for the proposition that a commercial sex act must be "economic in nature." (Mack Mem. at 18 (citing, inter alia, Todd, 2012 WL 2952084, at *6; Campbell, 111 F. Supp. 3d at 344-46).) In Todd v. United States, 2012 WL 2952084, the magistrate judge recommended denying the defendant's facial constitutional challenge to § 1591 because he presented no basis for challenging the Ninth Circuit's conclusions that the "'sex traffic in this case was conducted by advertising across state lines and so affected interstate commerce[,]' and that the [Trafficking Victims Protection Act] 'deals with commerce within the power of Congress to regulate.'" Id. at *6. Similarly, in United States v. Campbell, 111 F. Supp. 3d 340, the court considered whether § 1591 is "an unconstitutional exercise of Congress's power under the commerce clause." Id. at 344. The

economic commerce under consideration in these two cases is clearly distinguishable from the instant commercial sex act analysis. Moreover, the fact that many § 1591 cases involve "clear connections to sexual exploitation for profit" (see Mack Mem. at 19 (citing United States v. Estrada-Tepal, 57 F. Supp. 3d 164, 171 n.7 (E.D.N.Y. 2014)[27])—or what Raniere describes as "classic example[s] of sex trafficking," i.e., a situation in which a pimp controls the activities of a prostitute (see Mack Mem. at 22)—does not compel an opposite conclusion. Finally, the court's analysis in Marcus, on which Raniere relies heavily, supports the Government's case. See Marcus, 487 F. Supp. 2d at 306-07 (finding that "a narrow construction of the statute restricting its reach to prostitution is unwarranted" and that "[t]he court's more expansive understanding of the term is supported by the statute's purpose, which was to protect individuals from being victimized by trafficking").

The court also cannot rule as a matter of law that things of value were not received "on account of" sex acts. Whether or not Mack or Raniere received benefits such as "status" or "acts of care" before the alleged sex acts occurred, simply as a result of their membership in an organization (Mack Mem. at 20-21)—or whether they received these benefits on account of the alleged sex acts—is a factual question not appropriate for resolution on a pre-trial motion to dismiss. See Messina, 2012 WL 463973, at *4 (quoting Alfonso, 143 F.3d at 776-77). Kolbek, 2013 WL 6816174, upon which Mack relies for this point, is not binding on this court and is inapposite, given that it involved a civil summary-judgment motion. Id. at *1. As explained above, when assessing criminal motions to dismiss for failure to state an offense, courts do not

---

[27] Raniere points to Estrada-Tepal as supplying a list of "cases under section 1591, all of which have clear connections to sexual exploitation for profit," but the court in Estrada-Tepal collected those cases in support of a wholly different contention—namely, that that the court was "not aware of an application of 18 U.S.C. § 1591 to anyone other than an individual directly and substantially involved in an underlying sex trafficking scheme." Estrada-Tepal, 57 F. Supp. 3d at 171 n.7.

assess the sufficiency of the evidence "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," which is not the case here (Gov't Mem. at 50). Messina, 2012 WL 463973, at *4 (quoting Alfonso, 143 F.3d at 776-77).

ii.     Knowledge of Force, Fraud, or Coercion

Raniere further contends that Counts Eight, Nine, and Ten should be dismissed because the Complaint demonstrates that "no one was coerced as a matter of law to engage in a sex act, let alone that Ms. Mack knew that would occur." (Mack Mem. at 22-23.)

First, he argues that, as with the forced labor count, the release of collateral cannot amount to "serious harm" within the meaning of the sex trafficking statute. (Id. at 23-25.) For the reasons explained supra, the court concludes that whether the alleged victims' decision to engage in sexual acts in order to avoid the release of collateral was "objectively reasonable under the circumstances" (Mack Mem. at 23 (quoting Rivera, 799 F.3d at 186-87)) is a factual matter that may only be decided after a trial.

Second, Raniere argues that the complaint does not allege that Mack knew that coercion would be used to cause alleged victims to engage in sex acts. (Mack Mem. at 25-26.) He explains that the Government cannot make out a claim that Mack knew "in the sense of being aware of an established modus operandi that will in the future cause a person to engage in [commercial sex acts]" (id. (quoting United States v. Roy, 630 F. App'x 169, 170-71 (4th Cir. 2015)), because the Complaint alleges that Mack "barely had any involvement, or even knowledge of the sex acts" (id. at 25), and that "DOS members [only] felt that their collateral 'could' or 'might' be released, not that it 'would' be released" (id. at 26). These arguments, however, which concern the sufficiency and/or truth of the allegations in the Complaint, raise

48

factual questions not appropriate for decision on a pretrial motion to dismiss. See Messina, 2012 WL 463973, at *4 (quoting Alfonso, 143 F.3d at 776-77).

c. <em>Unconstitutionally Vague</em>

Mack also averred that, as applied to her conduct, 18 U.S.C. § 1591 is unconstitutionally vague because no one in her position would understand that the allegations underlying Counts Eight, Nine, and Ten would subject her to criminal liability. (Mack Mem. at 27; see Mack Reply at 7-10.) She contended that should not have been expected to know that receiving benefits and "acts of care" could be interpreted as a violation of the statute, particularly since she was already receiving these benefits as a result of her membership in DOS prior to any sex acts occurring. (Id. at 29.) Finally, she argued that prior applications of the statute fail to provide notice to Mack that her alleged conduct would be covered since she was not "directly or substantially involved in an underlying sex trafficking scheme." (Id. at 29-30.) Raniere purports to adopt these arguments. (Raniere Second Mem. at 1.)

"In the absence of first amendment considerations, vagueness challenges must be considered in light of the facts of the particular case." United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991) (citing New York v. Ferber, 458 U.S. 747, 767 (1982); United States v. Powell, 423 U.S. 87, 92 (1975)). Thus, to succeed on his vagueness challenge, Raniere "must demonstrate that the statute, as applied, failed to adequately warn of the prohibited conduct." United States v. Coonan, 938 F.2d 1553, 1562 (2d Cir. 1991). "An implicit requirement of this test is that it must be clear what the defendant did." United States v. Ford, No. 3:14-CR-00045, 2016 WL 4443171, at *14 (D. Or. Aug. 22, 2016). In other words, Raniere "must wait to bring an as-applied vagueness challenge until the facts have been established by evidence introduced at trial and the fact-finder has had an opportunity to weigh in." Id. (citing United States v. Reed,

49

114 F.3d 1067 (7th Cir. 1997)) (holding that district court erred in construing defendant's facial vagueness challenge as an as-applied one, and further erred by ruling on the motion before trial); United States v. Kettles, No. CR 3:16-00163-1, 2017 WL 2080181, at *3 (M.D. Tenn. May 15, 2017) (finding that pretrial as-applied challenge to § 1591(a) was premature because "[t]he court cannot determine the nature and extent of [defendant's] conduct in this case and, therefore, also cannot determine whether § 1591(a) is void for vagueness as applied to that conduct"); United States v. Reyes, No. CR06-00556, 2007 WL 831808, at *8 n.1 (N.D. Cal. Mar. 16, 2007) (finding as-applied constitutional challenge premature because "[w]ithout reference to any proof of what Defendants' conduct actually was . . . it is impossible to determine whether the statute provided sufficient notice that it prohibited the scheme of conduct in which they actually engaged"). Moreover, Raniere cannot rely on Mack's arguments that the statute was unconstitutionally vague as to her, because "a party who has notice of the criminality of [his] own conduct from the challenged statute may not attack it by arguing that the statute does not give fair warning to other conduct not at issue." United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 180 (E.D.N.Y. 2008). Raniere's as-applied challenge to § 1591(a) is thus denied as premature.

### d.    Duplicity

Raniere also argues that Counts Eight, Nine, and Ten, and Racketeering Act Twelve-A are "duplicitous" and should be dismissed or corrected because the Indictment charges both subsections of § 1591(a)—"distinct crimes with different elements"—in a single Count or Act. (Raniere First Mem. at 14.)

As explained supra, an indictment is "not duplicitous" where it alleges "in a single count [] the commission of a crime by several means." Aracri, 968 F.2d at 1518. The court agrees

50

with the Government that subparagraphs (1) and (2) of § 1591(a) "provide two different ways to violate the statute, not two different offenses," and that it is therefore proper that they are alleged in the same act or count. (Gov't Mem. at 42.) See United States v. Paul, 885 F.3d 1099, 1104-05 (8th Cir. 2018), (observing that subparagraphs of § 1591(a) "are in fact alternative ways of committing a single offense—the defendant violates the statute if he knowingly 'recruits, entices [etc.]," or "benefits . . . from participation,' knowing that 'force, threats of force, fraud, coercion . . . or any combination of such means' will be used") cert. denied, 139 S. Ct. 290 (2018). The court thus finds that Counts Eight, Nine, and Ten and Racketeering Act Twelve-A are not duplicitous.

### G. Procedural Motions

#### 1. Bill of Particulars

##### a. Raniere's Motion

Raniere also moves for a bill of particulars. (See Bronfman First Mem. at 36-38; Mack First Mem. at 30 n.15; L. Salzman First Mem. at 22; Raniere Second Mem. at 10-12; see also Raniere Mot. to Dismiss First Superseding Indictment at 1 (joining his co-defendants' motions for a bill of particulars).) Raniere seeks particulars as to the actions by which he allegedly committed the crimes charged in each predicate act, which specific underlying offenses the government intends to prove at trial, and the names of his alleged co-conspirators. (See Bronfman First Mem. at 37-38; Bronfman Reply at 19; Mack First Mem. at 30 n.15; L. Salzman First Mem. at 22; Bronfman Second Mem. at 12-13; Raniere Second Mem. at 10-12; see also Raniere Mot. at 1 (joining Bronfman's motion for a bill of particulars).) He claims to have an especially acute need for particulars as to Acts Two, Three, and Four—most especially as to the interstate commerce element of the child pornography statutes. (Raniere Second Mem. at 10-

12.) He asserts that, although the Government has allowed him to review the pornographic images, the Indictment "fails to set forth any information demonstrating how the prosecution could prove the interstate element of an act committed approximately 14 years ago, such as: 1) the type of recording device used to create the images; 2) where the recording device was manufactured; and 3) the means by which the images were transmitted." (Id. at 11.)

In response, the Government states that the photographs underlying Acts Two, Three, and Four were taken by Raniere with a camera made in Japan that had been transported in interstate and foreign commerce. (Gov't Second Mem. at 32.)

>    b.    *Legal Standard*

Federal district courts have the authority to "direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f).

> A bill is appropriate to permit a defendant to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.

United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (citation and quotation marks omitted). The district court has broad discretion in deciding whether to grant a motion for a bill of particulars. See United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984). Courts are only required to grant a bill of particulars "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (citation and quotation marks omitted). This standard turns on "whether the information sought is necessary, not whether it is helpful." United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990). In making this determination, "the court must examine the totality of the information [already] available to the defendant—through the indictment, affirmations, and general pre-trial discovery." United States v. Bin Laden, 92 F.

52

Supp. 2d 225, 233 (S.D.N.Y. 2000); see also United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam) ("Generally, if the information sought by [the] defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."). The defendant bears the burden of showing that "the information sought is necessary" and that he will be prejudiced without it. United States v. Fruchter, 104 F. Supp. 2d 289, 312 (S.D.N.Y. 2000) (quoting Facciolo, 753 F. Supp. at 451).

A bill of particulars is not meant to enable a defendant to "obtain a preview of . . . the government's evidence before trial" or "to learn the legal theory upon which the government will proceed." United States v. Kang, No. 04-CR-87 (ILG), 2006 WL 208882, at *1 (E.D.N.Y. Jan. 25, 2006); see United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by, Marcus, 628 F.3d at 41; United States v. Persico, 447 F. Supp. 2d 213, 216 (E.D.N.Y. 2006); United States v. Coffey, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005).

With respect to conspiracy cases, criminal defendants are not automatically entitled to identification of co-conspirators. United States v. Gasperini, No. 16-CR-441 (NGG), 2017 WL 2399693, at *12 (E.D.N.Y. June 1, 2017); see also United States v. Follieri, No. 08-CR-850 (JGK), 2009 WL 529544, at *1 (S.D.N.Y. Mar. 3, 2009) (collecting cases). Courts considering requests for co-conspirator identification consider factors including:

> (i) the number of co-conspirators; (ii) the duration and breadth of the alleged conspiracy; (iii) whether the Government otherwise has provided adequate notice of the particulars; (iv) the volume of pretrial discovery; (v) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (vi) the potential harm to the Government investigation.

United States v. Nachamie, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000). Other details of a conspiracy, including requests for "the nature of the 'wheres, whens, and with whoms'" of a conspiracy, are frequently "held to be beyond the scope of a bill of particulars." United States v. Barret, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) (citation omitted) (collecting cases).

Similarly, "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." United States v. Carroll, 510 F.2d 507, 508-09 (2d Cir. 1975); see also Barret, 824 F. Supp. 2d at 439; United States v. Walker, 922 F. Supp. 732, 739 (N.D.N.Y. 1996) ("[D]etailed evidence of a conspiracy is generally unavailable to defendants through a bill of particulars, and overt acts in furtherance of the conspiracy need not be disclosed.").

### c.  Discussion

Raniere seeks several categories of information, including the names of his alleged co-conspirators; the actions by which he allegedly committed the charged crimes; the specific underlying offenses the government intends to prove at trial; and how the Government intends to prove the interstate element of Acts Two, Three, and Four.  (Bronfman Mem. at 37-38; L. Salzman Mem. at 22.)  He argues that a bill of particulars is necessary because this case involves "voluminous and complex discovery," and the Indictment relates to "over a dozen separate schemes and include[s] a racketeering conspiracy that spanned over fifteen years." (Id. at 37.) Raniere contends that discovery is not an adequate substitute for a bill of particulars because the government has provided "mountains of documents" with little guidance as to which ones are relevant. (Id. at 38; L. Salzman Mem. at 22 (quoting Bortnovsky, 820 F.2d at 575).)

The Government counters that defendants fail to satisfy their burden to show that a bill of particulars is "necessary" (Gov't Mem. at 56), and that the Indictment, the complaint, and the Government's letters concerning bail and detention provide "ample notice of the government's' theory" (Gov't Mem. at 56) as well as "the facts upon which it is based" (id. (quoting United States v. Pugh, No. 15-CR-116 (NGG), 2015 WL 9450598, at *28 (E.D.N.Y. Dec. 21, 2015)).

Raniere replies that these filings "provide little more than the Indictment itself." (L. Salzman Reply at 8.)

The court agrees with the Government that Raniere has not carried his burden to show that a bill of particulars is necessary. The Government's disclosures adequately inform Raniere of the acts he and his co-conspirators are accused of committing. First, the Government has provided substantial discovery, including email communications, audio and video recordings, and summaries of interviews with various witnesses. (See Gov't First Mem. at 25; see also Kathy Russell Second Supplemental Mem. in Supp. of Mot. to Dismiss ("Russell Second Suppl. Mem.") (Dkt. 498) at 1 (describing summaries of FBI interviews with witnesses produced by the Government). Raniere fails to elaborate on the supposed problems with the discovery provided by the Government to date. His assertion, lifted from Bortnovsky but stripped of detail, that the Government provided "'mountains of documents' with little guidance as to which ones are relevant" (id. at 38; L. Salzman First Mem. at 22 (quoting Bortnovsky, 820 F.2d at 575)), is insufficient.[28] Second the Government has outlined its theory and the facts upon which it is based in numerous filings with the court. (See, e.g., Compl.; Gov't Letter Setting Forth Position

---

[28] Bortnovsky is, in any case, inapposite. There, defendants were convicted by a jury on charges related to a scheme to defraud federal and state agencies, including by submitting false claims for burglary losses and false claims for fire damage. Bortnovsky, 820 F.2d at 573-74. At trial, the government introduced evidence of twelve burglaries, although only four were alleged to have been fabricated, and evidence of numerous documents regarding those burglaries, although only three of the documents introduced were alleged to have been false. Id. at 574. During trial, defendants were forced to establish their innocence by proving that eight of the burglaries put before the jury, which even the Government was uncertain were fake, actually occurred. Id. The Second Circuit agreed with defendants that the district court erred by failing to compel the Government to provide defendants with the dates of the allegedly phony burglaries and the identity of the allegedly false documents. Id. The effect of this failure was to impermissibly shift the burden of proof onto defendants. Id. at 575. The Second Circuit further held that this failure was not mitigated by the disclosure of "mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." Id. This was particularly true because one defendant's counsel "had only four days within which to prepare a defense." Id. Consequently, "[t]he relevance of key events was shrouded in mystery at the commencement of and throughout the trial." Id. Such unique facts are vastly different from the situation here, given the information Raniere has received already and the lengthy amount of time Raniere has had to prepare for trial since he was indicted over a year ago (see Original Indictment (Dkt. 14)).

on Bond for Bronfman Defendants (Dkt. 52); Gov't Letter Regarding Detention of Raniere (Dkt. 4); Gov't Letter Setting Forth Position on Bail as to Mack (Dkt. 17); Gov't Response to Raniere's Mot. for Release on Bond (Dkt. 44).) With respect to the identity of co-conspirators, Raniere is aware of, at minimum, the identity of his former co-defendants, with whom he is alleged to have conspired. See United States v. Minaya, 395 F. Supp. 2d 28, 37 (S.D.N.Y. 2005) (denying request for the names of all co-conspirators and aiders and abettors where defendant was "at least aware of the identities of his ten named co-defendants"). And with respect to the interstate commerce element of Acts Two, Three, and Four, the Government has informed Raniere that it plans to show that the relevant photographs were taken by Raniere with a Japan-made camera that had been transported in interstate and foreign commerce. (Gov't Second Mem. at 32.) This is adequate notice. Cf. United States v. Pattee, 820 F.3d 496, 511 (2d Cir. 2016) (holding that the interstate commerce requirement of § 2251(a) is met when the pornography is produced with equipment made outside the state).

Accordingly, and upon review of the Indictment, the parties' filings to date, and the discovery already provided, Defendants have not demonstrated that they are unable to determine the nature of the charges leveled against them. Thus, the court denies Raniere's motion for a bill of particulars.

        2.    <u>Brady Materials</u>

           *a.*    *Raniere's Motion*

Raniere moves for "prompt disclosure" of three categories of what he contends are <u>Brady</u> materials that he allegedly has "strong reason" to believe the government possesses. (Raniere First Mem. at 18.) First, Raniere seeks FBI reports and notes of statements of "DOS witnesses" and others who have contradicted the government's theory of sex trafficking by stating that they

joined DOS willingly and had consensual relations with Raniere. (Id. at 19.) Second, Raniere seeks FBI reports and notes of statements of "DOS witnesses" and others who have contradicted the government's theory as to the forced labor charges by stating that they were never threatened with release of their collateral if they did not perform acts of care, they never feared the release of collateral for non-compliance, and they chose to perform these acts of care believing that they would become kinder, more thoughtful people. (Id. at 21.) Finally, Raniere seeks any Brady materials that might be in the possession of agencies with which the United States Attorney's Office jointly investigated this case. (Id. at 21-22; Raniere Reply at 8.)

b.    *Legal Standard*

"The basic rule of Brady is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citing Brady, 373 U.S. at 87). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." Id. But there is no pre-trial right to statements and reports of witnesses in the Government's possession. Under the Jencks Act, no witness statement or report in the possession of the Government shall be "the subject of subpoena, discovery, or inspection" until the witness has testified on direct examination at trial. 18 U.S.C. § 3500(a); see Coppa, 267 F.3d at 145-46 (finding district court exceeded its authority in ordering pre-trial disclosure of Jencks Act material because the Jencks Act constrained the court's power to issue any such order).

"Brady does not require the government to search for exculpatory material not within its possession or control." United States v. Guerrerio, 670 F. Supp. 1215, 1219-20 (S.D.N.Y. 1987). However, "[w]here the [United States Attorney's Office] conducts a 'joint investigation' with

another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for Brady evidence." United States v. Gupta, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (citing United States v. Upton, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994)).

    c.    *Discussion*

As an initial matter, the court notes that the Government has already provided defendants with voluminous discovery (see Gov't First Mem. at 63). Further, the court directed the Government to provide all 18 U.S.C. § 3500 materials it possessed as of April 4, 2019 by no later than April 12, 2019. (See Apr. 4, 2019 Min. Entry.) These § 3500 materials included summaries of interviews with witnesses. (See Russell Second Suppl. Mem. at 1 (describing summaries of FBI interviews with witnesses produced by the Government).)

Additionally, the Government has pledged that it takes its obligations under Brady, Giglio v. United States, 405 U.S. 150, 154 (1972), and its progeny seriously and that it will continue to comply with those obligations. (Gov't First Mem. at 62.) "The courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to Brady where the Government has made such good faith representations." United States v. Shkreli, No. 15-CR-637 (KAM), 2016 WL 8711065, at *2 (E.D.N.Y. Dec. 16, 2016) (collecting cases).

With respect to the specific categories of information requested by Raniere, the court agrees with the Government that statements by individuals who were not allegedly directed to have sex with Raniere or were not threatened with the release of collateral in exchange for acts of care are not Brady material because they have no bearing on whether the alleged victims were so directed or threatened. (Gov't First Mem. at 65-67.) See United States v. Scarpa, 913 F.2d 993, 1011 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through

proof of the absence of criminal acts on specific [other] occasions."); United States v. Gambino,

838 F. Supp. 744, 748 (S.D.N.Y. 1993) (observing that because "a defendant cannot introduce

evidence of innocent behavior on other occasions to prove his innocence, such testimony would

not be exculpatory within the requirements of Brady").

Moreover, in seeking statements by witnesses who, he contends, were not threatened with

release of their collateral if they refused to perform acts of care (Raniere Mem. at 21), Raniere

makes clear that he is well aware of these statements and capable of interviewing and examining

these witnesses himself. The Government has no obligation to disclose evidence if "the

defendant either knew or should have known of the essential facts permitting him to take

advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.

1982) (internal citations omitted). "The rationale underlying Brady is not to supply a defendant

with all the evidence in the Government's possession which might conceivably assist the

preparation of his defense, but to assure that the defendant will not be denied access to

exculpatory evidence only known to the Government." Id. at 619.

The court thus denies Raniere's motion for immediate disclosure of FBI reports as well as

notes of statements by "DOS witnesses" and others that contradict the Government's theories as

to the sex trafficking and forced labor charges. (See Raniere Mem. at 19-21.)

Raniere also seeks Brady materials that might be in the custody, possession, or control of

any agencies with which the United States Attorney's Office has jointly investigated this case.

(Raniere Reply at 7.) Raniere originally requested all Brady materials in the possession of the

New York Attorney General, New York State Police, and Department of Health on the grounds

that EDNY and the FBI conducted joint investigations with these agencies. (Raniere Mem. at

21-22.) The Government countered that it has not conducted a joint investigation with any

agency listed in Raniere's brief. (Gov't Mem. at 67.) As a result, the Government correctly

stated, it had no obligation to obtain or produce any materials in the possession, custody, or

control of those agencies. (Id.) Raniere then expanded his request to encompass all agencies

with which the United States Attorney's Office has jointly investigated this case. (Raniere Reply

at 7.)

The court agrees that to the extent that the United States Attorney's Office conducted a

joint investigation with another agency, the Government has an obligation "to review[] the

materials in the possession of that other agency for Brady evidence." Gupta, 848 F. Supp. 2d at

493. However, the court accepts the Government's representation that it is aware of its Brady

obligations and that it will continue to comply with those obligations. (See Gov't Mem. at 62.)

Raniere has provided no reason for the court to believe that the Government has not complied

thus far, or that the Government will not continue to comply, with its Brady obligations.

Raniere's requests for the immediate disclosure of Brady materials are accordingly

denied.

### 3.   Motion to Preclude the Government's Proposed Experts

#### a.   *The Government's Disclosures*

On February 19, 2019, the court set a deadline of February 25, 2019 for the Government

to disclose its experts pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C). (Feb. 19,

2019 Order.) On February 25, the Government filed an initial expert disclosure revealing that it

planned to call Dr. Michael Welner as an expert witness. (Gov't Feb. 25, 2019 Expert

Disclosures (Dkt. 378).) The Government outlined the topics of his proposed testimony,

including "[h]ow the actions of the alleged perpetrators within Nxivm and DOS compare to traits

and practices of certain of the comparative groups and how such action can facilitate financial

and sexual exploitation," "[h]ow families who are invested in the belief system of a group are affected and may lose their independence," and "[h]ow abuse of the dynamics of relationships of supervisor-supervisee, teacher-student and other relationships of authority facilitate financial and sexual exploitation." (Id. at 3.) The Government also disclosed its intent to offer additional unnamed experts to testify as to three other topics.[29] (Id. at 3-4.)

On March 15, 2019, the Government indicated that it no longer planned to call Dr. Welner and would instead call Dr. Stuart Grassian and Dr. Dawn M. Hughes. (Gov't Mar. 15, 2019 Expert Disclosures (Dkt. 429) at 1.) The Government provided one-sentence descriptions of these experts' proposed testimony and the expert's resumes. (Id. at 1.) The Government stated that it was still evaluating who it will offer to testify regarding the health effects of extreme calorie restriction and sleep deprivation. (Id. at 1.) As of March 29, 2019, the Government had not yet decided whom it would call to testify on this topic. (Gov't Second Mem. at 30.)

### b.    *Discussion*

Raniere requests that the court preclude the Government's proposed experts because its disclosures were untimely and insufficiently detailed, thus impairing his ability to prepare for trial and to challenge the expert testimony's admissibility under the Federal Rules of Evidence. (Raniere Second Mem. at 12-15; Mack Second Mem. at 11-14; see Raniere Second Mem. at 1 (joining Mack's motion).) He correctly notes that the court has "broad discretion in fashioning a remedy" for the Government's violation of its Rule 16 disclosure obligations, "including

---

[29] These topics were: 1) the "[p]sychiatric and psychological effects of social, perpetual, and occupational isolation including deleterious defects on mental functioning, such as depression, obsessive thoughts, agitation, confusion and suicidal ideation and behavior;" (2) the "[b]ehavior of victims of sex crimes including common misconceptions about victim behavior, such as why victims often delay reporting to law enforcement and others, why victims continue to communicate and maintain relationships with their assailants, and why victims often do not physically attack their assailants;" and (3) the "[p]sychiatric effects of lack of sleep and severe calorie restriction." (Gov't Feb. 25, 2019 Letter at 3-4.)

ordering the exclusion of evidence." (Raniere Second Mem. at 13 (quoting United States v. Lee, 834 F.3d 145, 158 (2d Cir. 2016)).)

Other than to say that it will "continue to work diligently to provide additional information about its noticed experts under Rule 16," the Government has not adequately explained its failure to meet the February 25, 2019 deadline (Gov't Second Mem. at 30)—a deadline that the Government proposed (see Gov't Feb. 15, 2019 Letter (Dkt. 347)). But Raniere has not shown that the extreme remedy of preclusion is warranted here, where the Government disclosed two experts and disclosed the topic of its third expert's testimony nearly two months before the trial (see Gov't Mar. 15, 2019 Expert Disclosures). In the cases Raniere cites in which courts have precluded expert testimony due to untimely disclosures, the testimony was disclosed on the first day of trial or later. (See Raniere Second Mem. at 13-14 (citing United States v. Ulbricht, 858 F.3d 71, 91 (2d Cir. 2017) (affirming a district court's decision to preclude defense experts that were disclosed "[l]ong after the trial began" and "shortly before the government rested")); United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (precluding expert testimony that was disclosed on the first day of trial because the court had previously made clear that any experts not disclosed 10 days before trial would be precluded)).) Further, the court recognizes that the truncated pretrial schedule and the various motions that have been filed in this case have placed great burdens on the parties' counsel. That is why the court has liberally granted deadline extensions to all parties throughout this case. (See, e.g., Apr. 19, 2019 Order Granting Raniere an Extension to File Mots. In Limine (Dkt. 571).) In light of the burdens on the parties' counsel, the court declines to exercise its discretion under Rule 16 to preclude the Government's experts. Raniere's motion is denied without prejudice to its renewal when the Government has completed its expert disclosures.

Additionally, the Government is directed to inform the court and Raniere of any experts it seeks to have testify by no later than Thursday, May 2, 2019, to give Raniere enough time to object.

        4.    <u>Trial Testimony of Foreign Witnesses</u>

Finally, Raniere moves for an order allowing foreign witnesses to testify via live videoconferencing. (Raniere First Mem. at 22; Raniere Second Mem. at 15.) Since filing this motion, however, Raniere's counsel has stated that he does not expect to request live videoconferencing, and will instead ask the Government to allow his foreign witnesses to travel safely to this district so that they can testify in person. (Apr. 24, 2019 Hr'g Tr. (undocketed) at 396:1-17.) Accordingly, the court denies this motion without prejudice to Raniere renewing his motion.

## IV.    CONCLUSION

For the foregoing reasons, the court DENIES Raniere's (Dkt. 456) motions to dismiss various counts and predicate racketeering acts in the Indictment, for a bill of particulars, for prompt disclosure of exculpatory materials pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), to preclude the Government's proposed experts, and for an order allowing foreign witnesses to testify via live videoconferencing. Additionally, the Government is DIRECTED to inform the court and Raniere of any experts it seeks to have testify by no later than Thursday, May 2, 2019.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
April 29, 2019

NICHOLAS G. GARAUFIS
United States District Judge