O/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,

-against-

KEITH RANIERE,

Defendant.
------------------------------------------------------------------X

**TO BE FILED UNDER SEAL**

**MEMORANDUM & ORDER**

**18-CR-204 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Keith Raniere has been indicted on charges arising from his involvement in several hierarchical pyramid-structured organizations he founded. (Second Superseding Indictment ("Indictment") (Dkt. 430) ¶¶ 1-49.) These organizations included Nxivm, which purported to offer self-help courses, and "DOS," a secret society that purported to be a women's empowerment group. (Compl. (Dkt. 1) ¶ 17; Indictment ¶¶ 1-3, 42.) The Indictment charges him with racketeering (or "RICO") conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count One") (id. ¶¶ 13-26); and with racketeering, in violation of 18 U.S.C. 1962(c) ("Count Two") (id. ¶¶ 16-40). It also charges Raniere with participation in a forced labor conspiracy, in violation of 18 U.S.C. § 1589(a) ("Count Six") (id. ¶ 44); wire fraud conspiracy, in violation of 18 U.S.C. § 1343 ("Count Seven") (id. ¶ 45); and sex trafficking offenses, in violation of provisions of 18 U.S.C. § 1591 ("Counts Eight, Nine, and Ten") (id. ¶¶ 46-48).

Before the court are the Government's motions in limine. First, the Government seeks to admit certain racketeering evidence at trial (the "404 Motion"). (See Gov't Mots. to Admit Certain Racketeering Evidence ("404 Mots.") (Dkt. 414).) Second, the Government moves pursuant to Federal Rule of Evidence 414 ("Rule 414") to admit evidence of Raniere's sexual abuse of the victim described in its 404 Motion (the "414 Motion"). (See Gov't Mot. to Admit

Evidence Pursuant to Fed. R. of Evid. 414 ("414 Mot.") (Dkt. 569).) Third, the Government seeks to protect victim witnesses' identity at trial, to preclude evidence or argument regarding the government's motives for prosecution, and to preclude defense counsel from referring to himself as a "former prosecutor" before the jury. (See Gov't Mots. in Limine ("Apr. Mots.") (Dkt. 567).) Finally, the Government requests that the court order Raniere to produce reciprocal discovery under Federal Rules of Criminal Procedure 16 and 26.2, and argues that his motion to offer witness testimony via CCTV should be denied. (See id.)

For the following reasons, the Governments' motions are GRANTED IN PART and DENIED IN PART.

## I. LEGAL STANDARD

### A. Motions in Limine

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." Gorbea v. Verizon N.Y., Inc., No. 11-CV-3758 (KAM), 2014 WL 2916964, at *1 (E.D.N.Y. June 25, 2014) (citing Luce v. United States, 469 U.S. 38, 40 n.2 (1984); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp., 937 F. Supp. 276, 283 (S.D.N.Y. 1996)). "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." United States v. Paredes, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). Further, "courts considering a motion in limine may reserve decision until trial, so that the motion is placed in the appropriate factual context." Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing Nat'l Union Fire Ins. Co., 937 F. Supp. at 287). The court's ruling on a motion in limine is preliminary and "subject to change when the case unfolds." Luce, 469 U.S. at 41.

## B. General Rules of Admissibility

Evidence must be relevant to be admissible at trial. Fed. R. Evid. 402. Evidence is relevant if it "has any tendency to make a fact [that is of consequence to the determination of the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. This relevance standard is "very low." United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008)). All relevant evidence is admissible unless the United States Constitution, a federal statute, the Federal Rules of Evidence, or rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 402; see also White, 692 F.3d at 246 (2d Cir. 2012). For evidence offered by the Government in a criminal case to be relevant, it "need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 ("Rule 403"). "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Old Chief v. United States, 519 U.S. 172, 184 (1997). In short, Rule 403 requires the court to "make a conscientious assessment of whether unfair prejudice substantially outweighs probative value" with regard to each piece of proffered evidence. Al-Moayad, 545 F.3d at 160 (quoting United States v. Salameh, 152 F.3d 88, 110 (2d Cir. 1998) (per curiam)).

## II. DISCUSSION[1]

### A. The 404 Motion

#### 1. Legal Standard

Evidence of uncharged acts—whether criminal or not, and whether committed by the defendant or others—may be admissible in a racketeering case, either as direct evidence of the existence of an enterprise or a pattern of racketeering or as relevant evidence of other acts under Rule 404(b). "Under Rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, but such evidence may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) (alteration adopted) (quotation marks omitted). The Second Circuit's "inclusionary interpretation of the rule allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity." Id.

In racketeering cases, information about uncharged crimes and other acts may be admissible to establish an enterprise or pattern of racketeering—two of the essential elements of racketeering. See, e.g., United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) ("[I]n prosecutions for racketeering offense, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."); United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) ("[I]t is within the trial court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that

[1] The court assumes the parties' familiarity with the background underlying the case, and discusses facts as relevant to the instant motions.

existed between coconspirators.'" (quoting United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (alteration adopted)).

Such evidence may also be admitted at trial to establish the existence and progression of a relationship of trust between co-conspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior uncharged criminal acts with co-conspirators as relevant evidence "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the two participants in the crime developed" (citation omitted)); Pipola, 83 F.3d at 565-66 ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); Rosa, 11 F.3d at 333-34 (holding that co-defendants' relationship over a 14-year period, during which multiple crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization").

Uncharged crimes and other acts can also be relevant to establish a pattern of racketeering activity, even if the defendant did not participate in them.  Evidence of such acts "can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO."  United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (citation and quotation marks omitted); id. at 207 n.17 (citations omitted); see United States v. Coppola, 671 F.3d 220, 244-45 (2d Cir. 2012) ("Evidence of numerous criminal acts by a variety of persons may be relevant to prove the enterprise and

pattern elements of racketeering . . . . Such conduct is not 'other' crime evidence subject to Fed. R. Evid. 404(b)." (alteration and internal quotation marks omitted)).

2. Application

The Government moves in limine to admit certain evidence at trial of uncharged criminal and other acts committed by Raniere and his alleged co-conspirators. (404 Mots. at 1.) It argues that this evidence is admissible as direct proof of the existence of the enterprise set forth in the Indictment, the relatedness of the acts within the racketeering pattern, and Raniere's ongoing participation in the enterprise's illegal activities. (Id.) It further states that the evidence is admissible as "other crimes, wrongs, or acts" under Rule 404(b) because it "tends to establish [Raniere's] knowledge and intent with respect to the charged crimes and is probative of the issues of planning, preparation and absence of mistake with respect to the conspiracy and substantive counts in the indictment." (Id.)

The evidence the Government moves to admit falls into nine categories: (1) Consumers Buyline, Inc. ("CBI"); (2) Nxivm's teachings and practices; (3) cash smuggling, structuring, and tax evasion; (4) campaign contributions; (5) recruitment of non-citizens and immigration fraud; (6) recruitment and grooming of sexual partners for Raniere; (7) surveillance and harassment of Nxivm enemies; (8) abusive litigation and obstruction; and (9) conduct after DOS was exposed. The court first addresses Raniere's argument that the Government has failed to adequately disclose the uncharged conduct it intends to prove at trial, and then takes each category in turn.[2]

[2] The court notes that these are broad categories of evidence, and the Government has not informed the court as to every individual item of evidence it intends to introduce at trial. Thus, as for all motions in limine, the court's decisions as to each of these categories is preliminary, and "subject to change when the case unfolds." Luce, 469 U.S. at 41. In particular, the court will, on Raniere's motion, consider whether otherwise admissible evidence discussed in this order is impermissibly cumulative when proffered at trial.

*a. The Government's Disclosure*

Raniere argues that the Government's motions "should be denied because . . . [they] describe[] the uncharged conduct in nebulous terms that hinder Defendants' ability to present a meaningful response to this motion, frustrate Defendants' preparation for trial, and require the Court to issue vague advisory rulings based on incomplete information." (Bronfman Mem. in Opp'n to 404 Mots. ("Bronfman Mem.") (Dkt. 368) at 2; see Raniere Opp'n to 404 Mots. at 1 (adopting Bronfman's arguments).) This argument has no merit. As the Government observed, there has been "voluminous discovery" in this case, and the Government has sufficiently described its theory of the case in the Indictment, the Complaint, and its numerous other filings. (See Gov't Reply Mem. in Supp. of 404 Mots. ("404 Reply") (Dkt. 407) at 4.) Moreover, courts frequently rule on categorical evidentiary questions on motions in limine. See, e.g., United States v. Ashburn, 11-CR-303 (NGG), 2015 WL 588704, at *3-24 (E.D.N.Y. Feb. 11, 2015 (ruling on the admissibility of broad categories of uncharged criminal behavior, including "gang affiliations," "assaults," and "shootings, murders, and murder conspiracies"); United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 385325, at *6-7 (E.D.N.Y. Feb. 17, 2006) (ruling on the admissibility of broad categories of uncharged criminal behavior, such as "gambling," "loansharking/extortion," and "arson, car theft, narcotics trafficking, fireworks purchase, and [fraud]"). In any event, Raniere remains free to object to the admission of any specific piece of evidence at trial if it becomes, for example, needlessly cumulative or unfairly prejudicial in light of the other evidence offered.

Raniere's objection is therefore without merit.

*b. CBI*

The Government alleges that Raniere founded CBI in or about May 1990. (404 Mots. at 15.) CBI was headquartered in Clifton Park, NY—the same location where Nxivm later operated—and was organized in a pyramid structure that required members to aggressively recruit others in order to receive income. (Id.) CBI was forced to close in 1997 after a settlement with the New York Attorney General followed from an investigation into CBI for allegedly operating as an illegal pyramid scheme. (Id.) The Government seeks to introduce evidence relating to CBI at trial, including evidence of its structure and operation, to "demonstrate that Raniere and his co-conspirators used CBI as a model for Nxivm and that they hoped to replicated CBI's early financial success." (Id.) It claims that this evidence is relevant because it "is inextricably intertwined and provides necessary context for the racketeering conspiracy . . . because Raniere's role as the founder and leader of CBI and his role in CBI at the time of its closing explain the reason for and the timing of [the] founding of Nxivm."[3] (Id. at 16.)

In response, Raniere argues that the CBI evidence should be excluded under Rule 403 because its probative value is substantially outweighed by dangers of unfair prejudice, confusing the issues, and wasting time. (Bronfman Mem. at 4-7.)[4] Raniere is correct that evidence of prior allegedly fraudulent behavior may tend to "insinuate that Raniere committed illegal acts" while

[3] In particular, the Government points to an email sent by a Nxivm employee on November 15, 2007, stating: "We really need to grow staff faster. I'm going to take a closer look to really understand multilevel marketing. Getting ready for CBI part two." (404 Mots. at 16.)

[4] Between March 13 and April 19, 2019, Raniere's five co-defendants pleaded guilty. Raniere adopted their arguments in opposition to the Government's motion. (See Raniere Letter in Opp'n to 404 Mots. ("Raniere Opp'n to 404 Mots.") (Dkt. 373) at 1.) For the sake of clarity, the court will attribute all of his prior co-defendants' arguments to Raniere. Additionally, in light of the substantial overlap between the two superseding indictments, the court will consider arguments made discussing the First Superseding Indictment in light of the Second Superseding Indictment.

founding or running CBI, and as such may lead the jury to believe that Raniere has some propensity for fraudulent behavior. (Bronfman Mem. at 5.)

The question for the court, however, is whether this potential for an improper inference from the jury substantially outweighs the probative value offered by the evidence. It does not. As the Government notes, the similarities between Nxivm and CBI—including their similar pyramid structure and use of women (often the same women) as leaders and recruiters in both—are striking. (See 404 Mots. at 16.) In fact, the Government states that some of the women who participated in as leaders in both Nxivm and CBI are unindicted co-conspirators to the charged crimes. (Id.) As such, evidence regarding CBI helps to explain the "background of the conspiracy charged, [ ] the story of the crimes charged, and . . . how the illegal relationship between the participants in the crime developed." Williams, 205 F.3d at 33-34. Further, as Raniere has acknowledged, he remains free to present evidence to rebut any potential prejudicial inference the jury might glean from evidence regarding CBI. (Bronfman Mem. at 5.)

Raniere argues that the probative value of the CBI evidence is "minimal" because the Government will "surely" introduce other evidence about Defendants' decision to join Nxivm (but does not indicate what other evidence this may be). (Id. at 5.) Without placing the proffered CBI evidence in context of all the other evidence—and without specific examples of evidence that could be used to establish the same kind of contextual background—the court cannot conclude that there will be sufficient other evidence such that excluding the CBI evidence "would not [leave] any gaps in the Government's case, nor [leave] the jury wondering about missing pieces of the story." United States v. Williams, 585 F.3d 703, 707-08 (2d Cir. 2009); see Old Chief, 519 U.S. 172, 188-89 (1997) (holding that the prosecution is entitled to present a

complete narrative of the crime that "satisf[ies] jurors' expectations about what proper proof should be").

Accordingly, the court GRANTS the Government's motion to introduce evidence regarding CBI. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

c. *Nxivm's Teachings and Practices*

The Government seeks to introduce evidence regarding Nxivm's programs, including the substance of its classes and how Raniere and his co-conspirators collected payment for those classes. (404 Mots. at 17.) Specifically, the Government alleges that Nxivm students who were unable to pay were encouraged to pay via work "exchanges" or to pay in installments, and that students were "pressured to take additional courses" (even when they could not afford to do so). (Id. at 17-18.) At trial, the Government plans to "prove that Nxivm recruits were often told that they owed money that they were unaware of, sometimes years after the debts supposedly accrued, or were not given a concrete accounting of the hours they needed to work in order to pay off their debts." (Id. at 17.) Other individuals allegedly took positions with Nxivm that Raniere and his co-conspirators said would be lucrative, but were actually paid little to no income. (Id. at 18.) Because of Nxivm's structure, the Government states, "the benefits accrued to those at the top of the pyramid"—namely, Raniere and his co-conspirators. (Id.)

Additionally, the Government seeks to introduce evidence indicating that Nxivm's "teaching and practices, which [Raniere] and [his] co-conspirators created and promoted, were also designed to increase and maintain power and control over Nxivm members." (Id. at 19.) Such teachings allegedly included that anyone who challenged Nxivm should be avoided, that arbitrary "breaches" of Nxivm's standards required completing tasks to benefit Raniere and his

co-conspirators, and derogatory ideas about women. (Id.) Nxivm also allegedly taught that if its members "found anything distasteful or unappealing about the teachings it was because they had an 'issue' that they have not yet healed." (Id. at 20.)

The Government argues that this evidence is "direct evidence of the charged racketeering conspiracy" because it "demonstrates that the association-in-fact charged in the Indictment is indeed an enterprise with a 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" (Id.) Additionally, it states that the evidence is "highly probative of the pattern requirement because they evidence a number of the alleged means and methods in the Indictment." (Id.) Finally, it contends that the evidence is "inextricably intertwined with the racketeering conspiracy because an understanding of the victims' exposure to those teachings and practices . . . is crucial to understanding their states of mind when [Raniere] and [his] co-conspirators coerced them into forced labor and sex trafficking," allegedly "using those same concepts." (Id. at 21.)[5]

Raniere argues that such evidence is irrelevant because it "essentially" proves only that he was involved with Nxivm, and that this "can easily be proved without 'unsavory details which go beyond what is necessary to make the point.'" (Bronfman Mot. at 8 (citing United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458846, at *13 (E.D.N.Y. Sept. 23, 2011).) This is simply not the case. The Government does not seek to prove merely that Raniere was associated with Nxivm; rather, it seeks to prove that the enterprise existed by introducing evidence of the means, methods, purpose, and longevity of the enterprise, as well as the relationship between

[5] The Government adds that "because several cooperating witnesses perpetuated aggressive sales tactics and coercive teachings with the defendants and co-conspirators, evidence of these practices and teachings is also admissible to corroborate their testimony and to directly address the conduct that is expected to be a focus of their cross-examination." (Id. at 22 (citations omitted).) The court will not address this rationale for admissibility at this time, as it is not yet aware what witnesses the Government is referring to nor what their testimony will be about.

Raniere and his co-conspirators. (See 404 Mots. at 20-21.) And, as the Government points out (404 Reply at 8), such evidence is also directly relevant to the predicate acts and substantive charges related to forced labor and sex trafficking because, for example, the statutes define "serious harm" as harm "that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing" labor or services or commercial sexual activity, respectively. 18 U.S.C. §§ 1589(c)(2), 1591(e)(4) (emphasis added). Involvement with Nxivm's teachings will provide context for jurors to evaluate the relevant background and current circumstances of the alleged victims of forced labor and sex trafficking. This is particularly true given the Government's allegations that Raniere and his co-conspirators used Nxivm to obtain work in exchange for classes, and that they used Nxivm's teachings to "increase and maintain power and control over Nxivm members." (Id. at 19.)

Raniere also argues, presumably under Rule 403, that this evidence is especially likely to inflame the jury because the Government "intends to portray Nxivm as misogynistic and reminiscent of Scientology." (Bronfman Mem. at 8 (citations omitted).) To the court's knowledge, the Government has not mentioned Scientology and has not indicated that it intends to do so at trial. And, while the suggested evidence might lead a juror to conclude that Nxivm is misogynistic, any such prejudicial effect does not substantially outweigh the probative value given the close connection between Nxivm, its teachings, and the existence of the alleged enterprise.[6]

[6] In a single sentence, Raniere also claims that admitting such evidence would be "an affront to the First Amendment." (Id. at 9 (citation omitted).) This First Amendment argument is unavailing. As discussed above, the Government is using evidence about Nxivm's teachings "for permissible purposes, [and] not merely to show that [Raniere] [i]s 'morally reprehensible' due to his 'abstract beliefs.'" United States v. Fell, 531 F.3d 197, 229 (2d Cir. 2008). The First Amendment is therefore no bar to the admission of evidence regarding Nxivm's teachings and practices.

Accordingly, the court GRANTS the Government's motion to introduce evidence regarding Nxivm's practices and teachings. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

*d. Cash Smuggling, Structuring, and Tax Evasion*

Next, the Government seeks to introduce evidence about cash smuggling, structuring, and tax evasion schemes engaged in by Raniere and his co-conspirators. (404 Mots. at 22-23.) This includes testimony about efforts to avoid customs reporting requirements, failure to report cash as income for tax purposes, advocating tax avoidance, failure to file tax returns, and tax evasion schemes allegedly aimed to "keep money out of Raniere's name, even though he had access to and control of the funds." (Id.)

The Government argues that these financial schemes were "inextricably intertwined with the conspiracy," and contend that this evidence is thus admissible as direct evidence of the charged racketeering conspiracy. (Id. at 23.) It contends that the evidence helps demonstrate "that the association-in-fact charged in the Indictment is indeed an enterprise, including the features of purpose and continuity." (Id. (citations omitted).) The court generally agrees. Under the Government's theory of the case, protecting and benefiting Raniere was a central purpose of the alleged enterprise. (Id.) This evidence goes directly to the method by which that purpose was achieved. Particularly, according to the Government, it demonstrates one of the purposes of the enterprise: to benefit the members financially and to promote Raniere. (Id.; see also Indictment ¶ 4.) It is also relevant to show the degree of trust and the close ties between the co-conspirators.

In response, Raniere argues that such evidence constitutes improper evidence of "other crimes." (Bronfman Mem. at 12.) However, as the Government notes in reply (see 404 Reply at

10-11), such evidence is admissible where, as here, it is offered to prove the existence of a racketeering enterprise. See United States v. Mejia, 545 F.3d 179, 206 (2d Cir. 2009) ("Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated." (quotation marks and citations omitted)).

Moreover, despite Raniere's claim that such evidence will be "distracting and prejudicial" (Bronfman Mem. at 11), any prejudice resulting from evidence of these financial schemes does not substantially outweigh its probative value. See Fed. R. Evid. 403. Raniere does not explain what other evidence the Government could provide in place of the evidence regarding financial schemes,[7] and the court is not aware of other evidence that so directly indicates one of the alleged purposes of the enterprise, i.e. to financially benefit its members and to promote Raniere (see Indictment ¶ 4). Thus, it has substantial probative value that outweighs any prejudicial effect.

Accordingly, the court GRANTS the Government's motion to introduce evidence regarding evidence about cash smuggling, structuring, and tax evasion. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

*e. Campaign Contributions*

At trial, the government intends to introduce witness testimony and documents demonstrating that in 2007, enterprise members were involved in an illegal scheme to exceed

[7] Raniere raises the same objection he raised as to evidence regarding Nxivm's teaching and practices: that the Government really only seeks to show that Raniere and his co-conspirators were involved in Nxivm, and thus that evidence of criminal behavior is unnecessary. (See Bronfman Mem. at 12-13.) The court rejects this argument for the reasons explained supra, Section 2(A)(2)(b).

contribution limits to a presidential primary campaign. (404 Mots. at 24.) It states that the evidence demonstrates that multiple members of Nxivm, including five conspirators, made the maximum campaign donation to a primary campaign with the understanding that they would be reimbursed by Clare Bronfman or Nancy Salzman. (Id.) The contributions were allegedly "bundled" and presented to the candidate at a fundraising event attended by 25 conspirators, and the Government states that a cooperating witness will testify that the conspirators aimed to obtain political influence to advance their own agenda, including targeting perceived enemies of Raniere. (Id. at 23-24.) The government will also seek to introduce evidence of similar conduit contributions to other elected officials, as well as use of other political lobbyists in attempts to gain influence. (Id. at 24.)

This evidence is relevant as direct evidence of the existence of the alleged enterprise and pattern of racketeering activity because it demonstrates the relationship of trust among Raniere and his co-conspirators, which is proof of the existence of an enterprise. See Diaz, 176 F.3d at 79 ("[I]t is within the trial court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.'" (quoting Rosa, 11 F.3d at 334 (2d Cir. 1993)). Further, the evidence of illegal campaign contributions is also relevant as to the conspirators' "us[e of] harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE" (Indictment ¶ 6(h) (emphasis added)), an alleged method or mean of the charged enterprise. The evidence is probative on this issue because the Government intends to prove that "the bundled campaign contributions were part of an attempt to curry favor with a presidential nominee to

advance the goals of the defendants and co-conspirators, including by obtaining indictments against enemies and gaining advantages in litigation." (404 Mots. at 25 (emphasis added).)[8]

Raniere objects in particular to the proposed evidence regarding the use of political lobbyists, stating that such activity is protected by the First Amendment. (See Bronfman Mem. at 16.) However, the Government states that it only intends to introduce evidence that the defendants relied on political strategists and lobbyists to illegally gain political influence and "in connection with their attempt to have perceived enemies . . . indicted for crimes they did not commit or on the basis of false or misleading information." (404 Reply at 12.) And, as the Government argues (see id. at 12-13), the First Amendment does not protect lobbying where used illegally. Cf. United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching.")

The court therefore GRANTS the Government's motion to introduce evidence regarding illegal campaign contributions. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

*f. Recruitment of Non-Citizens and Immigration Fraud*

The government seeks to introduce evidence that Raniere and his co-conspirators sought to secure visas and immigration status for various non-citizens so that they could work in Nxivm-affiliated organizations. (404 Mots. at 26.) In some instances, allegedly, the efforts to

[8] Raniere also suggests that the evidence is needlessly cumulative (Bronfman Mem. at 14), see Fed. R. Evid. 403; however, the court is not yet aware of what other evidence the Government seeks to introduce regarding the alleged intimidation of Raniere's enemies using abusive litigation tactics and fraudulently obtained indictments. Raniere remains free to raise this objection at trial, when the court will be better positioned to assess the nature of the evidence in context.

secure visas constituted immigration fraud. (Id. at 26-27.)  The Government also seeks to introduce evidence that conspirators assisted Raniere's sexual partners, many of whom did not have legal status, in entering or remaining in the United States. (Id. at 27.)  Finally, the Government seeks to introduce evidence that Raniere and his co-conspirators arranged "sham" marriages for some of these individuals so that they could remain in the United States. (Id.)

This evidence is admissible.  As the Government states, the conspirators' "joint efforts to commit various forms of immigration fraud, for the purpose of obtaining workers or sex partners for Raniere, demonstrates the continuity of the Enterprise, its common purpose and the relationship of trust among the defendants and co-conspirators." (Id. at 27-28 (citing Williams, 205 F.3d at 33-34).).  In particular, the evidence is relevant to demonstrate the central purpose of the enterprise: promoting Raniere (see Indictment ¶ 4).  As with the categories previously discussed, this evidence "constitute[s] some evidence of the nature of the enterprise, which, in turn, [helps] prove the relatedness and continuity essential to a pattern, thereby helping to establish . . . a pattern within the meaning of RICO." United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (citation and quotation marks omitted).

Additionally, evidence of immigration fraud is directly relevant to the alleged pattern of racketeering activity because it helps to prove the relatedness of the various predicate acts, and to show that they were a part of a pattern of activity.  For example, the government states that Racketeering Act One is based on a scheme by defendants and co-conspirators to bring someone who was both a sexual partner of Raniere's and a worker for the Enterprise back into the United States illegally (see Indictment ¶¶ 18-20), and Racketeering Act Eleven is based on a scheme by defendants and co-conspirators to bring someone into the United States illegally (see Indictment

¶ 35). The other immigration fraud evidence helps prove the relatedness of these racketeering acts to the alleged enterprise and to each other.

Raniere raises much the same arguments as to this category of evidence as he raises with regard to the previous categories[9] (see Bronfman Mem. at 16 ("[The Government's] assertions have no more merit when applied to immigration crimes than when applied to financial or political crimes.")); the court rejects them for largely the same reasons. Raniere adds that this particular category of crimes "creates a severe risk of unfair prejudice in the current political climate." (Id. at 17.). However inflammatory the issue of immigration might be, the court cannot exclude all evidence regarding the topic given the nature of the charged crimes and predicate acts (e.g., visa fraud (see Indictment ¶ 35)). And, in general, where uncharged crimes are no more serious than the charged offenses and are based on the same proof—as the Government represents they will be here (see 404 Reply at 17)—the danger of prejudice from evidence of those crimes is seriously diminished. See, e.g., United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 544465, at *1 (E.D.N.Y. Mar. 6, 2006); United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

The court therefore GRANTS the Government's motion to introduce evidence regarding recruitment of non-citizens and immigration fraud. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

---

[9] Although Raniere joined all of his then co-defendants arguments in opposition to this motion (see Raniere Opp'n to 404 Mots. at 1), the court will not address arguments that are clearly inapplicable to him. On this issue, that means that the court will not address Kathy Russell's claim regarding evidence about a property she leased that was allegedly used to house a DOS slave who was not legally in the United States. (See Russel Letter in Opp'n to 404 Mots. at 1 (Dkt. 371).) She argues that the evidence is inadmissible against her because it would improperly lead the jury to conclude that she knew what the property would be used for, even though she did not know about DOS and "there is ample evidence" that she was "intentionally kept in the dark regarding the property's residents." (Id. at 1-2). This issue is irrelevant to Raniere because the Government's evidence regarding this woman involve text messages between herself and Raniere, indicating that he was aware of the situation. (Id. at 2.) Even if the argument were applicable it would be meritless, as questions regarding knowledge are factual disputes and, given that Russell leased the house (see id. at 1), it is for the jury to determine what she knew and when.

g. *Recruitment and Grooming of Sexual Partners for Raniere*[10]

At trial, the Government seeks to introduce evidence that Raniere's former co-defendants and their co-conspirators recruited and groomed sexual partners for Raniere, including one or more underage girls, and, at Raniere's direction, actively engaged in efforts to punish others if their efforts in this regard failed to satisfy Raniere. (404 Mots. at 28.) For example, the Government seeks to offer evidence that, while Raniere was still running CBI, he engaged in a sexual relationship with a girl beginning when she was twelve or thirteen years old. (Id.) A member of CBI who later became a co-conspirator in the charged Enterprise allegedly knew the girl's age, knew of Raniere's relationship with her, and took affirmative steps to aid and abet the relationship in order to please Raniere. (Id.) The Government also seeks to introduce evidence regarding a subsequent sexual relationship between Raniere and a fifteen-year-old girl who eventually became a DOS slave. (Id. at 32.)

In general, evidence regarding the recruitment and sexual partners for Raniere is relevant to show the existence of the charged enterprise, to provide important background regarding the conspiracy, demonstrate the relationship of trust among the co-conspirators, and allow the jury to understand the complete story of the charged crimes. See Diaz, 176 F.3d at 79; Mejia, 545 F.3d at 206. Moreover, given the nature of the crimes alleged—including crimes involving sexual misconduct (see Indictment ¶ 21 (alleging sexual exploitation of a child); id. ¶ 23 (alleging possession of child pornography))—evidence involving sexual conduct will not be overly inflammatory to the jury. See Mejia-Velez, 855 F. Supp. at 611 (noting that the danger of unfair

[10] Here again, the court will not address arguments made by former defendants that are clearly inapplicable to Raniere. On this issue, that includes the following: Lauren Salzman's argument that the evidence regarding the recruitment of grooming and sexual partners for Raniere is inadmissible as to her because she, unlike Raniere, had not been charged with any sex-related crimes (see L. Salzman Letter in Opp'n to 404 Mots. (Dkt. 370) at 1-2); and Allison Mack's argument that the purported sexual activity involving minors "predated [her] alleged involvement in the crimes charged in the Indictment by many years" (see Mack Mem. in Opp'n to 404 Mots. (Dkt. 372) at 4).

prejudice will be lessened where uncharged crimes are no more serious than the charged offenses and are based on the same proof); see also Basciano, 2006 WL 544465, at *1.

Raniere argues that, in particular, evidence of Raniere's sexual relationships with his former co-defendants is inadmissible because it is minimally probative and unfairly prejudicial. (See Bronfman Mem. at 18.) The basis of his argument is that, while such evidence may indicate a relationship of trust between Raniere and his co-defendants, their "business and friendships with Raniere and each other could serve the same purpose with less unfair prejudice." (Id. (citing United States v. Darui, 545 F. Supp. 2d 108, 112 (D.D.C. 2008).) This may be true, but the court cannot say with certainty, before trial, that the Government's other evidence with regard to the relationship of trust between Raniere and his co-conspirators is so extensive as to render this evidence more prejudicial than probative. Thus, the court reserves judgment as to whether evidence of these sexual relationships may come in, and Raniere remains free to challenge such evidence at trial. See Paredes, 176 F. Supp. 2d at 181 ("Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds.").

Raniere also specifically challenges the admission of evidence regarding sexual contact between Raniere and two underage girls. (404 Mots. at 31-32.) Evidence regarding the later sexual relationship is relevant to the Government's charges that Raniere took and possessed nude photographs of that same fifteen-year-old girl, Jane Doe 2 (see Indictment ¶¶ 21-23 (charging Raniere with child-pornography counts)). Raniere argues that this evidence is inadmissible because the Government intended to demonstrate this sexual relationship only on an "inadmissible journal entry" without "independent corroborating evidence" (Raniere Opp'n to 404 Mots. at 6); in fact, the Government states that it plans to introduce several specific sources

of evidence, including: (1) dated images of the victim, constituting child pornography, allegedly created and possessed by Raniere; and (2) electronic communications between the victim and Raniere indicating the sexual nature of their relationship and the time period over which it occurred. (See 404 Reply at 14.) It may therefore be introduced at trial so long as it is not otherwise inadmissible.

However, the evidence relating to Raniere's alleged sexual relationship with the twelve-year-old girl is much less relevant to the enterprise as a whole, given that it appears to have occurred in the early 1990s (see Opp'n to Apr. Mots at 19 (suggesting that Jane Doe X alleges "sexual 27-year-old contact with a twelve or thirteen-year-old minor")), years before the alleged enterprise was formed (and years before any of the charged crimes or predicate acts allegedly occurred). As discussed further below, see infra, Section II(B), it is inadmissible because its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Therefore, this motion is GRANTED IN PART and DENIED IN PART. If otherwise admissible, the Government may introduce evidence regarding the recruitment and grooming of sexual partners for Raniere, including evidence about the alleged sexual relationship he had with Jane Doe 2 while she was underage. It may not, however, introduce evidence regarding his alleged relationship with Jane Doe X while she was underage. If Raniere believes he has grounds to object to additional specific evidence, he may do so at trial.

*h. Surveillance and Harassment of Nxivm's Enemies*

The Government seeks to introduce evidence regarding the conspirators' "methods of investigating" Raniere's enemies, including obtaining bank statements, and their surveillance and

harassment of individuals including "federal judges overseeing litigation in which Nxivm was a party, political operatives, high-ranking politicians, reporters, ex-girlfriends of Raniere, Nxivm's own lawyers, legal adversaries and their families, John Doe 2 and John Doe 1's employer." (404 Mots. at 32.)

This category of evidence is relevant because the charged conduct involves a scheme to surveil email accounts illegally (see Indictment ¶¶ 24-27 (alleging identity theft); 404 Mots. At 33-34 (describing this alleged identity theft as a scheme to "monitor[] the email accounts of John Doe 1 and John Doe 2")). Evidence that, at the same time, Raniere and his co-conspirators were engaged in additional surveillance schemes (including, according to the Government, against the same victims (see 404 Reply at 17)) is therefore directly relevant to the existence of the enterprise and to its means and methods. It also demonstrates a relationship of trust among Raniere and his co-conspirators. Raniere raises much the same arguments as he raises with regard to previous categories (see Bronfman Mem. at 20 ("[The Government's] arguments are the same as those addressed above and can be rejected for the same reasons."); the court rejects them for largely the same reasons.

Finally, Raniere contends that the alleged surveillance of judges and politicians is "particularly prejudicial" and should therefore be excluded on that ground. (Id. at 21 (citing Basciano, 2006 WL 385325, at *8).) However, without knowing more details about the alleged surveillance, the identities of the judges and politicians, and the context in which the evidence is offered into testimony, the court cannot now meaningfully weigh the evidence's probative value against its prejudicial effect. Raniere may object to any specific evidence offered at trial if he believes it is inadmissible under Rule 403.

The court GRANTS the Government's motion to introduce evidence regarding the surveillance and harassment of Nxivm's enemies. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

i. *Abusive Litigation and Obstruction*

The Government alleges that, for many years, Raniere and his co-conspirators used the legal system to seek retribution against individuals who left Raniere, defected from Nxivm, or who spoke critically of either Raniere or Nxivm (including through the lawsuit underlying Racketeering Act Six). (404 Mots. at 34.) Nxivm has allegedly pursued both criminal charges and civil lawsuits in at least three countries. (Id.) At trial, the government will offer the testimony of witnesses to establish that the defendants instituted these actions in order to instill fear in members of Nxivm and defectors from the organization. (Id.) The evidence described above is direct evidence of the racketeering conspiracy because it demonstrates a relationship of trust between Raniere and his co-conspirators, who, as the Government describes, "galvanized coordinated, long-term efforts to carry out abusive litigations and campaigns to bring criminal charges against perceived enemies." (Id.) It also bears directly on the alleged mean or method of "using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE." (Indictment ¶ 6(h) (emphasis added)).

Raniere attacks the admissibility of this evidence for the same reasons as previous categories of evidence (see Bronfman Mem. at 21 ("[The Government's arguments about the RICO pattern, relationships, and means and methods are meritless for the reasons above." (internal citations omitted))); the court rejects those arguments for the same reasons.[11] The court

[11] Additionally, Raniere argues that evidence of these litigation tactics is protected by the First Amendment, stating that "'First Amendment doctrine protects efforts to influence governmental action through litigation,' including 'efforts incident to litigation, such as pre-litigation threat letters and settlement offers.'" (Id. (citing Singh v. NYCTL 2009-A Tr., 683 F. App'x 76, 77 (2d Cir. 2017) (alterations adopted)).) Therefore, Raniere argues, "the litigation

therefore GRANTS the Government's motion to introduce evidence regarding allegedly abusive litigation and obstruction. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

*j. Conduct After DOS was Exposed*

Finally, the Government seeks to introduce evidence that, after the existence of DOS was publicly disclosed, the conspirators protected Raniere and the alleged enterprise by, inter alia, attempting to silence and intimidate DOS slaves and issuing public statements falsely denying Raniere's involvement in DOS. (404 Reply at 20.) This includes evidence about hiring private investigators to investigate defectors, using a public relations firm to rebrand DOS as independent of Nxivm, Raniere's decision to remain in Mexico, his change of cell phone number, his use of encrypted email addresses, and efforts by his co-conspirators to hide him from law enforcement. (404 Mots. at 36-37.) It also includes evidence that Clare Bronfman provided funds for the payment of her co-defendants' legal teams.[12] (Id. at 38.)

The defendants' participation in these efforts are direct evidence of the charged conspiracy and enterprise. In particular, this evidence indicates the relationship between the DOS-acts and the rest of the enterprise—which has been dispute here—by showing the joint efforts to protect it and Nxivm as a whole (both by individuals alleged to have been involved in DOS and those not alleged to have been involved in it). (See 404 Mots. at 38.) It also demonstrates the existence of a relationship of trust between the conspirator members.

evidence should be excluded because its impact on Defendants' constitutional rights outweighs its minimal probative value." (Id.) However, the case Raniere cites, Singh, applies the Noerr-Pennington doctrine to find that antitrust claims were barred. 683 F. App'x at 77. It is simply inapplicable.

[12] The court discusses the admissibility of Bronfman's provision of funds for her co-defendants' legal fees in its Memorandum & Order regarding Raniere's motions in limine. (See May 3, 2019 Mem. & Order (Dkt. 617).)

The court therefore GRANTS the Government's motion to introduce evidence regarding conduct after DOS was exposed. If Raniere believes he has grounds to object to specific evidence, he may do so at trial.

**B. The 414 Motion**

The Government moves pursuant to Rule 414 to admit Jane Doe X's testimony that Raniere had sexual intercourse with her when she was twelve or thirteen years old. (414 Mot.) According to the Government, this testimony is relevant to its charges that Raniere took and possessed nude photographs of a fifteen-year-old girl, Jane Doe 2. (Id. at 1-2; see Indictment ¶¶ 21-23 (charging Raniere with child-pornography counts).) Raniere argues that the Government failed to provide proper notice under Rule 414(b) and that this evidence should be excluded under Rule 403. (Opp'n to Apr. Mots. at 17-22.)+98

The court first considers whether Jane Doe X's testimony may be admitted under Rule 414 before addressing whether Rule 403 requires its exclusion.

1. Rule 414 Analysis

*a. Scope of Rule 414(a)*

Jane Doe X's testimony is the type of evidence that Rule 414 permits. Rule 414 states that "in a criminal case in which a defendant is accused of child molestation," a court "may admit evidence the defendant committed any other child molestation." Fed. R. Evid. 414(a). Such evidence "may be considered on any matter to which it is relevant," including the defendant's propensity to commit the crime with which he is accused. Id.; United States v. Spoor, 904 F.3d 141, 154 (2d Cir. 2018). "Child molestation" is defined in Rule 414 to include several categories of conduct including: (1) "a crime under federal law . . . involving conduct prohibited by 18 U.S.C. chapter 110" ("Chapter 110"), and (2) contact between a defendant's

genitals and a child's body or between a child's genitals and a defendant's body, where the child is under fourteen years old. Fed. R. Evid. 414(d)(1),(2)(B)-(D). Child exploitation under 18 U.S.C. § 2251 and possession of child pornography under 18 U.S.C. § 2252, which form the basis for predicate racketeering acts Raniere is accused of (Indictment ¶¶ 21-23), both fall under Chapter 110. Accordingly, this is a "criminal case in which the defendant is accused of child molestation," and Jane Doe X's testimony that she had sexual intercourse with Raniere when she was twelve or thirteen years old is evidence of "any other child molestation" falls within the scope of Rule 414(a).

*b. Rule 414(b)'s Notice Requirement*

Contrary to Raniere's contention (Opp'n to Apr. Mots. at 18-19), the Government complied with Rule 414(b)'s requirement that it disclose this type of evidence at least 15 days before trial. The Government stated its intent to introduce evidence of Raniere and Jane Doe X's sexual relationship in a memorandum submitted on February 4, 2019. (Gov't Mem. in Supp. of Mot. to Admit Enterprise Evid. (Dkt. 414) at 29, 31-32.) Further, Raniere knows Jane Doe X's identity and has received copies of all of Jane Doe X's statements regarding her relationship with Raniere that are in the Government's possession. (414 Mot.)

2. Rule 403 Analysis

*a. Legal Standard*

As Raniere notes (Opp'n to Apr. Mots. at 18), however, "it does not follow that propensity evidence relative to child molestation is always admissible." Spoor, 904 F.3d at 154. Rule 414 is merely an exception to Rule 404's ban on propensity evidence; it permits "the jury to infer a propensity to commit the charged crime from evidence of prior, similar acts." Id. The court still must analyze whether the evidence is admissible under Rule 403, weighing the

probative value of the prior-act evidence. Id. at 154 & n.10. "In determining the probative value of prior act evidence, the district court should consider such factors as: (1) the similarity of the prior acts to the acts charged, (2) the closeness in time of the prior acts to the acts charged, (3) the frequency of the prior acts, (4) the presence or lack of intervening circumstances, and (5) the necessity of the evidence beyond the testimonies already offered at trial." Id. at 154 (quotation marks omitted) (quoting United States v. LeMay, 260 F.3d 1018, 1028 (9th Cir. 2001)). The court "should also consider the potential for unfair prejudice, including the possibility that prior act evidence will lead the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving of punishment—a particular risk with this sort of evidence."[13] Id. at 155.

*b. Application*

In light of the Spoor factors, the court concludes that Jane Doe X's testimony should be excluded under Rule 403, just as the Spoor district court excluded the testimony of three alleged victims of uncharged crimes. Id. at 155. First, the prior and charged acts are somewhat similar in that the prior acts show Raniere's "attraction to children, thus providing evidence of his motive to make pornography," Spoor, 904 F.3d at 155; however, the charged acts do not involve allegations of physical sexual contact with an underage person. Id. at 154 (first factor to consider

[13] In United States v. Spoor, where the defendant was charged with making child pornography between 2009 and 2012, the Second Circuit affirmed the district court's decision to admit a "sanitized version" the defendant's prior conviction for molesting two seven-year-old boys in 2010. 904 F.3d at 147, 154-55. The Second Circuit found that "evidence that Spoor had, relatively recently, abused boys who were similar in age to the boys in the videos was relevant to show his attraction to children, thus providing evidence of his motive to make pornography" and to show that he knowingly possessed child pornography. (Id. at 155.)

Significantly, the Second Circuit also seemed to endorse the district court's decision to exclude (i) the defendant's admission that he molested the two seven-year-old boys and (ii) testimony of three other individuals whom Spoor had allegedly abused or taken nude pictures of. Id. at 155. Per the Second Circuit, exclusion of the three other individuals' testimony was proper because it "limited the potential for graphic and potentially inflammatory testimony" and "limited the potential for a trial within a trial regarding Spoor's prior bad conduct." Id.

is "the similarity of the prior acts to the acts charged" (citation omitted)). Second, the prior and charged acts appear to have taken place more than ten years apart.[14] See id. (second factor to consider "the closeness in time of the prior acts to the acts charged" (citation and quotation marks omitted)). Third, the prior acts involve sexual intercourse with only one victim, and the Government has provided no indication of the "frequency of the prior acts" or how that should factor into the court's analysis. Id. (third factor to consider is "frequency of the prior acts" (citation omitted)). Fourth, the court is not aware of any relevant "intervening circumstances" between the prior and charged acts. Id. (fourth factor to consider is "the presence or lack of intervening circumstances" (citation and quotation marks omitted)). Fifth, and perhaps most significantly, Jane Doe X's testimony about acts in the early 1990s is not necessary to prove that Raniere took and possessed nude photographs of another girl in 2005. Id. (fifth factor to consider is "the necessity of the evidence beyond the testimonies already offered at trial" (citation omitted)). The Government has the nude photographs and claims to have evidence that they were taken and possessed by Raniere. (See Gov't. Mem. in Opp'n to Mot. to Supp. (Dkt. 593) at 4-6; Gov't Mem. in Opp'n to Mots. to Dismiss (Dkt. 485) at 12.) The Government also plans to introduce evidence that Raniere had sexual intercourse with Jane Doe 2 before she was eighteen. (Gov't Opp'n to Raniere Mot. in Limine (Dkt. 612) at 4.) This evidence is sufficient to prove that Raniere had sexual interest in Jane Doe 2 in November 2005; Jane Doe X's testimony would be cumulative.

In sum, Jane Doe X's testimony has little probative value as to the charged acts. Meanwhile, her testimony would likely cause unfair prejudice to Raniere, which is "a particular

[14] The alleged prior acts—Raniere's sexual intercourse with Jane Doe X—took place in the early 1990s. (Opp'n to Apr. Mots. at 19 (suggesting that Jane Doe X alleges "sexual 27-year-old contact with a twelve or thirteen-year-old minor").) The charged acts—Raniere taking and possessing nude photographs of Jane Doe 2—first took place in November 2005. (Indictment ¶¶ 21-23.)

risk with" evidence of child sex abuse. Spoor, 904 F.3d at 155; see United States v. Gatewood, 601 F. App'x 580, 582 (9th Cir. 2015) (Mem.) (Friedland, J., dissenting) ("Even when evidence of a defendant's prior acts of sexual abuse is otherwise admissible, 'potentially devastating evidence of little or no relevance must be excluded under Rule 403.'" (alterations adopted) (quoting LeMay, 260 F.3d at 1027)). Further, as Raniere notes (Opp'n to Apr. Mots. at 21), Jane Doe X's testimony could "confus[e] the issues" or "mislead[] the jury," Fed. R. Evid. 403. As the prior acts took place 27 years ago and Raniere was never charged in relation with them, allowing Jane Doe X to testify would risk creating a "trial within a trial regarding [Raniere's] prior bad conduct." Spoor, 904 F.3d at 155. Moreover, there is a risk that jurors would consider Raniere's alleged sexual abuse of Jane Doe X when evaluating Raniere's guilt as to the sex-trafficking counts, which involve adult woman legally capable of consent. (Opp'n to Apr. Mots. at 21.) And, as explained above, Jane Doe X's testimony would be "needlessly [ ] cumulative" because the Government has other evidence that Raniere had sexual interest in Jane Doe 2 in November 2005. (Gov't Opp'n to Raniere Mot. in Limine at 4.)

In conclusion, the court DENIES the Government's Rule 414 motion, and excludes Jane Doe X's testimony under Rule 403, because the testimony's "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### C. Identification of Government Witnesses

The Government moves in limine to allow testifying victims to testify under a nickname, first name, or pseudonym only, and to not be required to disclose uniquely identifying information. (Apr. Mots. at 2.) In addition, the Government moves to refer to non-testifying DOS victims by first name or nickname, and to preclude disclosure of uniquely identifying

information. (Id.) It argues that "[t]hese measures are necessary to protect victims from potential harassment from the media and others, undue embarrassment and other adverse consequences." (Id.) Raniere, who is aware of these victims' identities (id. at 8), "strongly oppose[s]" the motion, raising five distinct arguments: (1) that keeping the identities of the witnesses confidential would violate Raniere's right to confrontation and would "unfairly signal to the jury that . . . the witness is a victim of a sex crime who is in danger"; (2) that such protection is unnecessary because there is no evidence that Raniere has ever posed a danger to a witness; (3) that "[m]any of the purported victims within the purview of the government's proposal have specifically sought out media attention"; (4) that the Government's "proposal of identifying crime victims with false or partial names is simply untenable and would lead to confusion by the witness and ultimately the jury"; and (5) the government is "constantly shifting their theory of who is a co-conspirator and who is a victim." (Opp'n to Apr. Mots. at 1-3.)

1. Legal Standard

The Sixth Amendment's Confrontation Clause guarantees defendants the right to cross-examine adverse witnesses. U.S. Const. amend VI. This includes the right to "ask the witness who he is and where he lives" because these questions are "the very starting point in exposing falsehood and bringing out the truth through cross-examination." Smith v. Illinois, 390 U.S. 129, 130 (1968). Nevertheless, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). The court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so

as to . . . protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a); see United States v. Whitten, 610 F.3d 168, 183 (2d Cir. 2010) (citations omitted).

The Second Circuit has identified two "central interests" defendants have in the public airing of identifying information about witnesses. See United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970) (discussing Smith, 390 U.S. 129, and Alford v. United States, 282 U.S. 687 (1931)). First, the defense may need testimony as to the witnesses' identity—such as their full name or address—"so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination." Id. "Second, the defense may need the witness to reveal [identifying information] because knowledge [of that information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability." Id.

When the Government "seeks to limit the disclosure of identifying information in open court," it "must provide a reason for the limitation." United States v. Marcus, No. 05-CR-457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970)). This reason "may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." Id. (quoting Marti, 421 F.2d at 1266). Once the Government has provided a valid reason, the defendant must "demonstrate a particularized need for the disclosure of the relevant information, which the court must then weighs against the risks to the witness." Id. (citing United States v. Cavallaro, 553 F.2d 300, 305 (2d Cir. 1977); United States v. Bennett, 409 F.2d 888, 901 (2d Cir. 1969) (quotation marks omitted)).

2. Application

Here, the Government requests that the court allow testifying victims to testify under a nickname, first name, or pseudonym only, and that they not be required to disclose uniquely identifying information, such as their addresses, names of family members, or exact places of education or employment. (Apr. Mots. at 2.) It also requests that non-testifying DOS victims only be referred to by first name or nickname, and that the court preclude the disclosure of any uniquely identifying information about those victims. (Id.) It argues that such "measures are necessary to protect victims from potential harassment from the media and others, undue embarrassment and other adverse consequences." (Id.)

The court agrees. As the Government notes, "requiring victims of sex trafficking, extortion, wire fraud and other crimes to provide their names in public could chill their willingness to testify, for fear of having their personal histories publicized." (Id. at 8.) Such publicity would only cause further "embarrassment and humiliation" (id.), given the inflammatory nature of the conduct alleged. Further, forcing these victims to openly identify themselves could, as the Government states, "cause other victims to fear seeking help from law enforcement as that could subject them to further harassment and embarrassment." (Id.) Protection of witnesses—and non-witness victims—is a valid concern, particularly given the nature of the testimony expected in this case.[15]

The court, then, turns to Raniere's proffered need for the information requested. Raniere does argue that he has a "particularized need" for the information requested, and that this need

[15] Raniere argues that the Government has not sufficiently "come forward with its reason" because Raniere has not ever been deemed a danger. (Opp'n to Apr. Mots. at 5 (quoting Marti, 421 F.2d at 1265); see id. at 5-10.) However, the Government does not argue that Raniere was a danger to the victims, but rather that the potential for humiliation and unwanted media attention would unfairly damage the victims' recovery and hinder reporting in future cases. (See Apr. Mots. at 2.)

outweighs the witnesses' interest in remaining anonymous. However, the court disagrees. First, neither of the "two central interests" protected by the Confrontation Clause are at issue here. See Marti, 421 F.2d at 1266. Raniere knows who the victims are, and is therefore fully able to investigate their testimony outside of court. (See Apr. Mots. at 8.) In response, Raniere states that "identifying information is necessary for [his] in-court investigation," but does not specify how.

Second, argues that the identifying information will be helpful to the jury in determining the witnesses' "credibility or [ ] knowledgeability," Marti, 421 F.2d at 1266. He states that "whether the witness is currently employed or using NXIVM's technology in their daily life is certainly relevant to their credibility given the allegations stem from NXIVM's apparent widespread abuse of women." (Opp'n to Apr. Mots. at 4.) It may be true that whether a witness is employed, or even what kind of work a witness does, is relevant to probe the ongoing effects that involvement with NXIVM may have had on a witness. However, the Government does not ask the court to withhold such information from the jury; rather, it seeks only to prevent the Government from identifying the specific place of employment. Raniere has not identified, and the court is not aware of, any "particularized need for the disclosure" of witnesses' (or non-witness victims') specific places of employment or education. See Marcus, 2007 WL 330388, at *1 (citing Cavallaro, 553 F.2d at 305; Bennett, 409 F.2d at 901).

Somewhat more convincingly, Raniere argues that, if the witnesses' identities are concealed, the jury will infer that "it is because the defendant is dangerous—not because the government fears that the witnesses will be embarrassed by the media." (Opp'n to Apr. Mots. at 5.)[16] To the extent that this fear is warranted, the court is confident that any prejudice can be

[16] In making this argument, Raniere analogizes the Government's request to a request for an anonymous jury, correctly stating that the court "has already ruled that an anonymous jury in this case is unwarranted because there is

cured with a jury instruction explaining that the reason for the anonymity is regard for the witnesses' and non-witness victims' privacy. Given the potentially embarrassing nature of the allegations, and the media attention thus far,[17] such an explanation will certainly seem plausible to the jury.

Other courts have granted motions to protect victims' and witnesses' identities in similar situations. See, e.g., United States v. Zhong, No. 16-CR-614 (DLI), 2018 WL 6173430, at *2 (E.D.N.Y. Nov. 26, 2018) (granting the government's motion to have victim witnesses testify using pseudonyms); United States v. Alimehmeti, 284 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2018) (permitting government to call witnesses using pseudonym where "the information that the[ government seeks to] preclude the defense from publicly eliciting – a [witness]'s identity – is neither exculpatory . . . nor evidently relevant at trial"); United States v. Urena, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) ("Moreover, nothing about UC–188's real name goes to his credibility or knowledge regarding the subject of his testimony. The limitation imposed on the defense is

no substantial potential threat of corruption to the judicial process that would require complete anonymity." (Opp'n to Apr. Mots. at 5 (quoting Apr. 5, 2019 Order).) To the extent the two situations are analogous—despite the different applicable legal standards—the comparison supports granting the Government's request. In the jury context, the court determined that the names of the prospective and empaneled jurors should be provided to the parties and their attorneys only, and that their names should not be made public nor be revealed to the public for the duration of the trial. (Apr. 5, 2019 Order.) Raniere already has identifying information about the witnesses, and the non-witness DOS victims (as does the Government). (See Apr. Mots. at 8.) Thus, if the court were to adopt its approach to the jurors' identities here, it would grant the Government's request to conceal the identifying information from the jurors and the public.

[17] Raniere points to the media attention already present in this case to argue that there is no need to protect the victims' identities. (See id. at 10.) He claims that the names of several victims are already publicly available, and that some victims have made themselves public "by choice." (Id.) Whether true or not, these facts are irrelevant; just because some victims' names are publicly available does not mean that the details of their experience are already available. Further, the choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it, as, in court, the victim will not be able to choose how and to what level of detail she discusses the crime. Raniere's arguments regarding one victim are particularly unavailing. (See id. at 12.) He argues that he should be allowed to question her about her mother's decision to discuss her involvement with Nxivm, as that is relevant to the Government's "theory [] that Mr. Raniere was responsible for government witness's humiliation." (Id.) But this is not a civil trial, and the Government does not seek to prove damages about the victims' public humiliation and its cause. The court does not understand how questions about this alleged "media campaign" by a victim's mother would do anything other than embarrass her.

therefore negligible."); Order (Dkt. 231), United States v. Rivera, No. 09-CR-619 (SJF) at 2 (E.D.N.Y. Apr. 26, 2011) (granting the government's request to "preclude the defendants from referencing the victims' last names and other personal identifying information" because of the "potential for embarrassment, reprisal, humiliation, annoyance, and the possibility of media coverage in this case"); Marcus, 2007 WL 330388, at *1-2 (finding that potential harassment, potential loss of employment, and the explicit nature of the anticipated testimony justified protecting witnesses' full identity and excluding mention of witnesses' home addresses and current places of employment).

The court therefore GRANTS the Government's motion. Testifying victims will be allowed to testify under a nickname, first name, or pseudonym only, and they shall not be required to disclose any uniquely identifying information, such as their addresses,[18] names of family members, and exact place of education or employment. Further, all non-testifying DOS victims shall be referred to solely by first name or nickname, and the court precludes all disclosure of uniquely identifying information about any non-testifying DOS victim.

**D. Sealing of Evidence**

The Government requests that the DOS "collateral" should be admitted into evidence under seal. (See Apr. Mots. at 9-11.) This collateral consists of materials DOS "slaves" were required to provide to their "masters" to prevent them from leaving the group or disclosing its existence to others. (Id. at 9-10.) Examples of collateral include sexually explicit photographs and videos, rights to financial assets, and "confessions" that would be damaging to the "slave's"

[18] Raniere states that he "does not expect to cross-examine as to the exact address where a witness lives, but in some instances will inquire as to the general location." (Opp'n to Apr. Mots. at 4 n.2.) To the extent he wishes to question witnesses as to the "general location" of a testifying witness's address, he will be allowed to do so where otherwise permissible under the Federal Rules of Evidence. The Government may, of course, object to any questions it believes to be so specific as to effectively identify the victim when taken in conjunction with the other testimony provided.

family and friends. (Id. at 10.) Raniere joins in the Government's motion to seal evidence of such collateral at trial. (See Opp'n to Apr. Mots. at 14.) The court GRANTS this motion, and any evidence of collateral admitted at trial will be admitted under seal.

**E. Evidence Regarding the Government's Motives for Prosecution**

The Government asks the court to preclude Raniere "from presenting evidence or arguments concerning the government's alleged motive for this prosecution, alleged government misconduct in the course of this prosecution, or the existence, non-existence or outcome of any previous investigation." (Apr. Mots. at 11.) Raniere states that he does not intend to do so. (Opp'n to Apr. Mots. at 14.) The court GRANTS this motion.

**F. Mr. Agnifilo Referring to Himself as a Former Prosecutor**

The Government seeks to prevent Mr. Agnifilo, Raniere's attorney, from referring to himself as a former prosecutor. (See Apr. Mots. at 13-14.) Mr. Agnifilo states that he has "NEVER discussed [his] former job as a prosecutor at any defense trial, as that would be utterly improper." (Opp'n to Apr. Mots. at 14.) The court takes this to mean that he does not object, and therefore GRANTS this motion.

**G. Reciprocal Discovery**

The Government asks the court to order Raniere to produce reciprocal discovery under Federal Rules of Criminal Procedure 16 and 26.2.

1. Rule 16

Federal Rule of Criminal Procedure 16 ("Rule 16") requires, inter alia, that a defendant provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A)(ii). Pursuant to this rule, the Government asks the court to require Raniere to produce documents that he will seek to admit

during the cross-examination of a witness that affirmatively support his theory of the case. (Apr. Mots. at 14.) It argues that any affirmative evidence Raniere offers—i.e., any evidence other than impeachment evidence—constitutes evidence used in his "case-in-chief," whether offered during cross-examination of a Government witness or after the Government has rested its case. (Id.)

In considering a similar motion, the court in United States v. Hsia agreed with the Government:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law Dictionary (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense. In this case, the defendant has indicated that she intends to put in much (if not all) of her defense through the cross-examination of government witnesses . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

United States v. Hsia, 08-CR-57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000). Almost every court to have subsequently considered the issue has adopted the same approach. United States v. Napout, 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) ("Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant. . . . [T]his interpretation of Rule 16 has been adopted by almost every district court to consider the issue."); see also United States v. Larkin, 12-CR-319, 2015 WL 4415506, at *6 (D. Nev. July 20, 2015); United States v. Holden, 13-CR-444, 2015 WL 1514569, at *5 (D. Or. Mar. 19, 2015); United States v. Swenson, 298 F.R.D. 474, 476-77 (D. Idaho 2014).

This court adopts the same approach, as Raniere provides no relevant case law in opposition.[19] And contrary to his assertions, such a holding does not require him to "lay bare his cross-examination strategies" to the Government. (Opp'n to Apr. Mots. at 15.) Rather, he need only turn over "all non-impeachment exhibits." Napout, 2017 WL 6375729, at *7. This interpretation of Rule 16 makes sense because "where a defendant cross-examines a government witness to 'buttress h[is] theory of the case,' rather than to impeach the testimony given by the witness on direct examination, 'the cross-examination is properly seen as part of the defendant's case-in-chief.'" Id. (quoting Hsai, 2007 WL 195067, at *2 (alterations adopted)).

The Government's Rule 16 motion is therefore GRANTED. Raniere shall produce any documents he intends to use in his case-in-chief, whether he plans to use that evidence after the Government rests or during cross-examination of Government witnesses. He is directed to do so as soon as practicable after determining that he will be using such evidence. Upon the introduction of such evidence, the court may consider (on the Government's motion) whether the defense has failed to timely disclose the exhibit under Rule 16.

Raniere need not produce, of course, any evidence he intends to use on cross-examination for solely impeachment purposes.

2. Rule 26.2

Federal Rule of Criminal Procedure 26.2 ("Rule 26.2") places the substance of 18 U.S.C. § 3500 into the criminal rules, and provides for the production of statements of defense

[19] In United States v. Harry, a court in the District of New Mexico did adopt the opposite approach, holding that Rule 16 used "case-in-chief" to refer only to evidence introduced after the government had rested, not to any evidence introduced during cross-examination of government witnesses. No. 10-CR-1915, 2014 WL 6065705, at *6 (D.N.M. Oct. 14, 2014). However, even that court acknowledged that "some evidence a defendant intends to use in examination of government witnesses may be evidence the defendant intends to use in his 'case-in-chief,'" which, as the Holden court noted, "undermine[d] the [Harry court's] bright-line temporal interpretation of 'case-in-chief.'" Holden, 2015 WL 1514569, at *3 (quoting Harry, 2014 WL 6065705, at *10). Regardless, every other district court to have considered the issue—both before and after Harry—has come to the same conclusion. This court is persuaded by their reasoning. See Napout, 2017 WL 6375729, at *7 (collecting cases).

witnesses. See United States v. Scotti, 47 F.3d 1237, 1249 (2d Cir. 1995). It states that both the government and defendant must provide "any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Fed. R. Crim. P. 26.2(a). Rule 26.2 "is designed to place the disclosure of prior relevant statements of a defense witness in the possession of the defense on the same legal footing as is the disclosure of prior statements of prosecution witnesses in the hands of the government under the Jencks Act, 18 U.S.C. § 3500." Scotti, 47 F.3d at 1249 (citation omitted).

The Government requests that Raniere be ordered to disclose material pursuant to Rule 26.2 and 18 U.S.C. § 3500 ("3500 material"), as he has not yet begun to do so. (See Apr. Mots. at 17.) In response, Raniere states that he "does not plan to put on a case-in-chief and therefore does not have any statements of any potential witnesses in [his] possession." (Opp'n to Apr. Mots. at 17.) The court therefore DENIES this motion without prejudice, and advises Raniere that, in the event he does seek to put on defense witnesses at trial, the court will consider at that time (on the Government's motion) whether he has complied with his production requirements under Rule 26.2.

### H. Defendant's Motion to Offer Witness Testimony by CCTV

The court addressed this motion in its recent Memorandum and Order. (See Apr. 29, 2019 Mem. & Order (Dkt. 601) at 63.) For the reasons stated there, the court denied this motion without prejudice.

## III. CONCLUSION

For the foregoing reasons, the Governments motions in limine (Dkts. 418, 567) are GRANTED IN PART and DENIED IN PART.

The Government may introduce evidence as to the following general categories:

- Consumers Buyline, Inc.;

- Nxivm's teachings and practices;

- cash smuggling, structuring, and tax evasion;

- campaign contributions;

- recruitment of non-citizens and immigration fraud;

- recruitment and grooming of sexual partners for Raniere;

- surveillance and harassment of Nxivm enemies;

- abusive litigation and obstruction; and

- conduct after DOS was exposed.

It may not, however, introduce evidence regarding Raniere's alleged sexual relationship with Jane Doe X.

Additionally, the court ORDERS that:

- testifying victims will be allowed to testify under a nickname, first name, or pseudonym only, and they shall not be required to disclose any uniquely identifying information, such as their addresses, names of family members, and exact place of education or employment;

- all non-testifying DOS victims shall be referred to solely by first name or nickname, and the court precludes all disclosure of uniquely identifying information about any non-testifying DOS victim; and

- any evidence of collateral admitted at trial will be admitted under seal.

Raniere is prohibited from presenting evidence or arguments concerning the government's alleged motive for this prosecution, alleged government misconduct in the course of this prosecution, or the existence, non-existence or outcome of any previous investigation. His lawyer, Mr. Agnifilo, may not refer to himself as a former prosecutor. Additionally, he is DIRECTED to timely produce any documents he intends to use in his case-in-chief, whether he

plans to use that evidence after the Government rests or during cross-examination of Government witnesses.

Out of an abundance of caution, the court initially files this memorandum and order under seal. By May 13, 2019, the parties shall submit a proposal as to the portions of this memorandum and order, if any, that they believe should be redacted and remain sealed.

SO ORDERED.

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
May 4, 2019