UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-

KEITH RANIERE,

        Defendant.
------------------------------------------------------------------X

MEMORANDUM & ORDER

18-CR-204-1 (NGG) (VMS)

NICHOLAS G. GARAUFIS, United States District Judge.

      Before the court is Defendant Keith Raniere's motion to preclude the Government's proposed experts, Dr. Stuart Grassian and Dr. Dawn Hughes. (Raniere Mot. to Preclude Experts ("Mot.") (Dkt. 633).) Raniere contends that the Government's expert notice was untimely and inadequate, that the proposed testimony does not satisfy the reliability standard set forth in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993), and that portions of the testimony should be excluded as unduly prejudicial under Federal Rule of Evidence 403. (Id.) Alternatively, Raniere requests that the court order a Daubert hearing to determine the reliability of the experts' testimony. (Mot. at 1.) For the following reasons, the court DENIES Raniere's motion as to Dr. Grassian's testimony and to Dr. Hughes's testimony on the first seven of her eight proposed opinions. The court GRANTS Raniere's request for a Daubert hearing as to Dr. Hughes's proposed testimony that "perpetrators often use 'grooming' techniques on adult and child victims to normalize sexual behaviors and make their victims more susceptible to assault" (Gov't May 2, 2019 Letter (Dkt. 616) at 2).

1

I. BACKGROUND

A. Initial Expert Disclosures

On February 19, 2019, the court set a deadline of February 25, 2019 for the Government to disclose its experts pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C).[1] (Feb. 19, 2019 Order.) On February 25, the Government disclosed its intent to offer unnamed experts to testify as to three general topics: (1) the "[p]sychiatric and psychological effects of social, perpetual, and occupational isolation including deleterious defects on mental functioning, such as depression, obsessive thoughts, agitation, confusion and suicidal ideation and behavior;" (2) the "[b]ehavior of victims of sex crimes including common misconceptions about victim behavior, such as why victims often delay reporting to law enforcement and others, why victims continue to communicate and maintain relationships with their assailants, and why victims often do not physically attack their assailants;" and (3) the "[p]sychiatric effects of lack of sleep and severe calorie restriction."[2] (Gov't Feb. 25, 2019 Expert Disclosures (Dkt. 378) at 3-4.)

On March 15, 2019, the Government indicated that it would call Dr. Grassian and Dr. Hughes to address the first two topics it had previously identified. (Gov't Mar. 15, 2019 Expert Disclosures at 1.) The Government provided one-sentence descriptions of these experts' proposed testimony and the experts' curricula vitae. (Id. at 1.) On March 22, 2019, Raniere moved to preclude the Government's experts because the Government's notice was untimely and inadequate. (Raniere Mar. 22, 2019 Mem. (Dkt. 456-1) at 1, 12-15.) On April 29, 2019, the court denied Raniere's motion without prejudice to its renewal and directed the Government to

---

[1] The Government first proposed this deadline. (Gov't Feb. 15, 2019 Letter (Dkt. 347).)

[2] In its February 25, 2019 letter, the Government also disclosed its intent to offer another expert, Dr. Michael Welner, as a witness. (Gov't Feb. 25, 2019 Expert Disclosures at 1.) On March 15, 2019, the Government indicated that it no longer planned to call Dr. Welner. (Gov't Mar. 15, 2019 Expert Disclosures (Dkt. 429) at 1.)

2

complete its expert disclosures by no later than May 2, 2019. (Apr. 29, 2019 Mem. & Order (Dkt. 600) at 62-63.)

### B. Supplemental Expert Disclosures

On May 2, 2019, the Government provided further detail regarding Dr. Grassian and Dr. Hughes's anticipated testimony (Gov't May 2, 2019 Letter) and gave the experts' prior statements to Raniere's counsel (Gov't Resp. to Raniere Mot. to Preclude Experts ("Resp.") (Dkt. 641) at 2). The Government stated that Dr. Grassian, a board-certified psychiatrist that taught at Harvard Medical School for over 25 years, is expected to offer the following testimony at trial:

> (1) severe restriction of social, perceptual and occupational stimulation ("environmental restriction")—including, but not limited to, lack of human contact, restriction of physical activity, lack of occupational stimulation, repetition of routine, and stagnancy of environment—has a profoundly deleterious effect on mental functioning;
>
> (2) individuals who experience environmental restriction often become incapable of maintaining an adequate state of alertness and attention to the environment and may experience agitated confusional states;
>
> (3) individuals who experience environmental restriction often develop severe anxiety and panic disorders;
>
> (4) individuals who experience environmental restriction may become suicidal and self-destructive;
>
> (5) there are documented examples of environmental restriction being used to weaken individuals and make them more susceptible to indoctrination; and
>
> (6) individuals experiencing environmental restriction often experience fear and helplessness because they have to depend entirely on others.

(Gov't May 2, 2019 Letter at 1.) According to the Government, "Dr. Grassian's proposed testimony relies on his extensive study of the psychiatric effects of restricted and isolated

3

conditions of confinement as well as other conditions of restricted environmental and social stimulation."[3] (Id. at 2.) "Dr. Grassian's proposed testimony is also based on his extensive experience evaluating individuals while they were experiencing or after they had experienced environmental and social isolation."[4] (Id.)

In the same May 2, 2019 letter, the Government stated that Dr. Hughes—a board-certified forensic psychologist and a clinical psychologist, a professor at Weill Cornell Medical College, and a leading expert on sexual abuse, interpersonal violence, and traumatic stress—would offer the following testimony:

> (1) the vast majority of sexual assault victims know their perpetrators;
>
> (2) victims routinely fail to formally report sexual assault for a variety of reasons, and the evaluation of the "legitimacy" of a sexual assault should not be based on whether or not a victim reported the event to law enforcement;
>
> (3) victims frequently utilize informal strategies and disclosure to cope with sexual assault, including revealing only partial details of their assault, "talking around" assault and not labeling it as such, and utilizing defense mechanisms of avoidance, dissociation and suppression;
>
> (4) disclosure by sexual assault victims often unfolds over time, and the process of disclosure is influenced by multiple and changing factors including, but not limited to, the specific characteristics of the experience, the victim's psychological vulnerabilities, the victim's relationship to her perpetrator and her pattern of recovery and coping;

---

[3] Such conditions "include, for example, prisoners of war, patients in intensive care units, patients with impairment of their sensory apparatus (such as eye-patched or hearing impaired patients), members of the military, submarine and polar explorers and space travelers." (Id.)

[4] According to the Government's letter, "[i]n his article Psychiatric Effects of Solitary Confinement, 22 Wash. U. Journal of Law & Policy, which has already been provided to the defendants pursuant to 18 U.S.C. § 3500, Dr. Grassian described the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, which largely forms the basis for the testimony he is expected to provide here." (Id.)

4

(5) sexual assault can result in severe, long-lasting and wide-ranging psychological consequences and related difficulties, and can complicate the choice of a victim to formally report assault;

(6) sexual assault victims may maintain relationships with their perpetrators and this is often influenced by the dynamic between the victim and perpetrator, including whether the victim and perpetrator are in intimate or work relationships characterized by abuse, coercion and/or dependence;

(7) false recanting or failure to cooperate with prosecution efforts may occur in situations of interpersonal victimization, and

(8) perpetrators often use "grooming" techniques on adult and child victims to normalize sexual behaviors and make their victims more susceptible to assault.

(Id.) According to the Government, "Dr. Hughes's proposed testimony relies upon her extensive study of the empirical data and social science literature on sexual assault, interpersonal violence and trauma . . . [and] her extensive clinical experience treating hundreds of trauma and abuse patients over the past twenty years." (Id. at 2-3.) "Dr. Hughes' testimony also relies upon her extensive clinical experience treating hundreds of trauma and abuse patients over the past twenty years." (Id. at 3.)

C. Raniere's Motion

On May 8, 2019, Raniere filed the instant motion. He asks the court to preclude the Government's experts for four reasons. First, the Government's failure to meet the original February 25, 2019 deadline for expert disclosures requires preclusion of its expert. (Mot. at 1-2.) Second, the Government's expert disclosures do not comply with Federal Rule of Criminal Procedure 16(a)(1)(G)'s requirements because they "merely provide[] topics that the expert will address, but do[] not inform defense counsel or the court what the expert's opinion is with regard to any of the topics." (Id. at 2-4.) Third, the proposed testimony does not meet the reliability requirement of Federal Rule of Evidence 702 and Daubert. (Id. at 4-6.) Fourth, portions of both

5

experts' testimony should be precluded as unduly prejudicial under Federal Rule of Evidence 403. (Id. at 6-7.)

## II. DISCUSSION

### A. Timeliness

As Raniere acknowledges (Mot. at 2), the court has already rejected his argument that the Government's failure to meet the February 25, 2019 deadline for disclosures requires preclusion of its experts. (Apr. 29, 2019 Mem. & Order at 62-63.) The court found that "Raniere has not shown that the extreme remedy of preclusion is warranted here, where the Government disclosed two experts . . . nearly two months before trial." (Id.) The court directed the Government to complete its expert disclosures by May 2, 2019 (id.), and the Government did so (Gov't May 2, 2019 Letter). Raniere offers no reason why the court should reconsider its decision not to preclude the Government's experts because the Government missed the February 25 deadline. (See Mot. at 1-2.) Accordingly, the court rejects Raniere's first argument.

### B. Adequacy of Notice under Rule 16(a)(1)(G)

Rule 16(a)(1)(G) requires the government, upon a defendant's request, to "give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided [] must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). The Government's May 2, 2019 letter meets this standard. First, the letter "describe[s] the witness[es'] opinions" because it describes six opinions to which Dr. Grassian will testify, and eight opinions to which Dr. Hughes will testify. (Gov't May 2, 2019 Letter at 1-2.) Contrary to Raniere's contention, the May 2, 2019 letter includes affirmative statements that clearly identify the experts'

6

conclusions about the topics on which they will testify. For example, the letter states that Dr. Grassian will testify that "individuals who experience environmental restriction[5] often develop severe anxiety and panic disorders," and Dr. Hughes will testify that "the vast majority of sexual assault victims know their perpetrators." (Id.) The experts' conclusion on each proposed topic—six topics for Dr. Grassian and eight topics for Dr. Hughes—is clear. (Gov't May 2, 2019 Letter at 1-2.) See United States v. Lipscomb, 539 F.3d 32, 37 (1st Cir. 2008) (finding, in response to a defendant's Rule 16 argument, that "there is no dispute that [the defendant] was on notice with respect to the particular conclusions drawn by the witnesses," where the Government provided a similar degree of notice as it did here); cf. United States v. Duvall, 272 F.3d 825, 828-29 (7th Cir. 2001) (stating that Rule 16 requires the Government to "identify what opinion the expert would offer, not merely to "provide[] a list of the general subject matters to be covered").

Second, the Government's letter "describe[s] the . . . bases and reasons for [the witnesses'] opinions." Fed. R. Crim. P. 16(a)(1)(G). According to the letter, "Dr. Grassian's proposed testimony relies on his extensive study of the "psychiatric effects of restricted and isolated conditions of confinement as well as other conditions of restricted environmental and social stimulation."[6] (Gov't May 2, 2019 Letter at 2.) "Dr. Grassian's proposed testimony is also based on his extensive experience evaluating individuals while they were experiencing or after they had experienced environmental and social isolation."[7] (Id. at 2.) Meanwhile, "Dr.

---

[5] "Environmental restriction" is defined as "severe restriction of social, perceptual, and occupational stimulation . . . including, but not limited to, lack of human contact, restriction of physical activity, lack of occupational stimulation, repetition of routine, and stagnancy of environment." Resp. at 4.

[6] Such conditions "include, for example, prisoners of war, patients in intensive care units, patients with impairment of their sensory apparatus (such as eye-patched or hearing impaired patients), members of the military, submarine and polar explorers and space travelers." (Gov't May 2, 2019 Letter at 2.)

[7] According to the Government's letter, "[i]n his article Psychiatric Effects of Solitary Confinement, 22 Wash. U. Journal of Law & Policy, which has already been provided to the defendants pursuant to 18 U.S.C. § 3500, Dr. Grassian described the extensive body of literature, including clinical and experimental literature, regarding the

7

Hughes's proposed testimony relies upon her extensive study of the empirical data and social science literature on sexual assault, interpersonal violence and trauma . . . [and] her extensive clinical experience treating hundreds of trauma and abuse patients over the past twenty years." (Id. at 2-3.) "Dr. Hughes' testimony also relies upon her extensive clinical experience treating hundreds of trauma and abuse patients over the past twenty years." (Id. at 3.) This degree of notice regarding the bases and reasons for Dr. Grassian and Dr. Hughes's opinions satisfies the concerns animating Rule 16's expert disclosure requirements. See Fed. R. Crim. P. 16, Advisory Committee's Notes to 1993 Amendment ("[Rule 16's expert disclosure requirements are] intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."); United States v. Cerna, No. 08-CR-730, 2010 WL 2347406, at *2 (N.D. Cal. June 8, 2010) ("Rule 16(a)(1)(G) does not require recitation of the chapter and verse of the experts' opinions, bases and reasons. No rule, statute, or decision necessitates such comprehensive disclosure.").

Third, the Government has adequately described "the witness[es'] qualifications." Fed. R. Crim. P. 16(a)(1)(G). On March 15, 2019, the Government shared its experts' curricula vitae with Raniere. (Gov't Mar. 15, 2019 Expert Disclosures at 1.) In its May 2, 2019 letter, the Government stated that

> Dr. Grassian is a board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts and was on the teaching faculty of the Harvard Medical School for over 25 years. He is one of the world's leading experts on the effects of environmental restriction. Dr. Grassian's work has focused on

---

effects of decreased environmental and social stimulation, which largely forms the basis for the testimony he is expected to provide here." (Id.)

8

> studying the effects of such isolation on prisoners in solitary confinement.

(Gov't May 2, 2019 Letter at 1.) Further, the Government represented that

> Dr. Hughes is a board-certified forensic psychologist and a clinical psychologist. She is a leading expert on sexual abuse, interpersonal violence and traumatic stress. Dr. Hughes is a Clinical Assistant Professor of Psychology in Psychiatry at Weill Cornell Medical College, she served as President of the Women's Mental Health Consortium from 2009 to 2017 and she has frequently published and presented on the topics that will be the subject of her testimony.

(Id. at 2.) This notice about the experts' qualifications was sufficient. Raniere cites no authority for the proposition that the amount of notice the Government has provided is inadequate. Accordingly, the court rejects Raniere's second argument.

### C. Reliability

#### 1. Legal Standard

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

(Id.) In Daubert, the Supreme Court made clear that the district court is charged with the gatekeeping function of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. To gauge the reliability of proffered

9

testimony, "the district court should consider the indicia of reliability identified in Rule 702," which are not exhaustive. Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004). The district court may consider additional factors identified in Daubert, including (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) in the case of a particular scientific technique, the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained "general acceptance." Daubert, 509 U.S. at 593-94.

The district court's inquiry into the reliability of expert testimony is "flexible," and Daubert factors are neither exclusive nor dispositive, id. at 594-95; they "neither necessarily nor exclusively appl[y] to all experts or in every case," Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). The district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142.

The burden is on the party proffering the expert to demonstrate that the expert testimony is admissible by a preponderance of the evidence. United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007); Fed. R. Evid. 702 Advisory Committee's Note to the 2000 Amendment. "The Second Circuit's standard for admissibility of expert testimony is especially broad." United States v. Herron, No. 10-CR-615 (NGG), 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014) (citations and quotation marks omitted); see Clarke v. LR Sys., 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002) (collecting cases). The rejection of expert testimony is "the exception rather than the rule." Clarke, 219 F. Supp. 2d at 332 (quoting Fed. R. Evid. 702 Advisory Committee's Note to the 2000 Amendment). Because Rule 702 "embodies a liberal standard of admissibility for expert opinions, the assumption the court is that a well-qualified expert's testimony is

admissible." In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (quoting Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005) (quotation marks omitted)). Whether to hold a separate Daubert hearing in advance of admitting expert testimony is within the trial court's discretion. See Williams, 506 F.3d at 161.

2. Application

a. *Dr. Grassian's Testimony*

Dr. Grassian's proposed testimony as to six opinions he holds meets the Rule 702 and Daubert standard because it "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. His curriculum vitae makes clear that he is an expert with regard to the psychological effects of restricted and isolated conditions of prolonged confinement. This topic is relevant to the allegations in a racketeering act identified in the Second Superseding Indictment: specifically, that Jane Doe 4 was confined to a room for over a year while being subject to forced labor and document servitude. (See Resp. at 4; Second Superseding Indictment (Dkt. 430) ¶¶ 31-33.)

Raniere maintains that, because Dr. Grassian's work focuses primarily on the impact of solitary confinement on prison inmates, his expertise is inapplicable to this case, which does not involve prison inmates. (Mot. at 5.) This is an overly narrow assessment of Dr. Grassian's expertise. As the Government notes, his work also includes research into how environmental restrictions affect persons in non-prison settings, including isolation in the context of aviation, small-group confinement (on expeditions, in submarines, and in Antarctic stations), solo voyages, medically required isolation like bed rest and tank-type respirators, and sensory

deprivation laboratories.[8] (Resp. at 5 (citing documents provided to Raniere's counsel).) Dr. Grassian's proposed testimony on the psychological effects of non-prison environmental restrictions is thus within the scope of his expertise. See United States v. Chin, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.")

Accordingly, and in light of the court's starting "assumption [] that a well-qualified expert's testimony is admissible," In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d at 282, the court exercises its discretion to permit Dr. Grassian to testify without holding a Daubert hearing. See Williams, 506 F.3d at 161.

### b. Dr. Hughes's Testimony

#### i. Dr. Hughes's first seven opinions

The first seven of Dr. Hughes's eight disclosed opinions, each of which are about sexual assault victims and their psychologies, meet the Rule 702 and Daubert standard. She is a highly credentialed and board-certified forensic psychologist and a clinical psychologist, and her curriculum vitae indicates that she is an expert on the psychological consequences of sexual abuse on its victims. (See Resp. at 6-7.) Her testimony will rely on her extensive study of empirical data and medical and social science literature and her substantial clinical experience. (See Gov't May 2, 2019 Letter at 2-3; Resp. at 7.) She has provided expert reports on similar topics in other cases (see Resp. at 7 (describing the reports)), and these reports were given to

---

[8] Raniere notes that Dr. Grassian has published several peer-reviewed articles that contain the phrase "solitary confinement" in the title, but none that include the phrase "environmental restriction." In the court's view, this distinction is semantic and not probative as to whether Dr. Grassian is qualified to offer the proposed testimony.

Raniere's counsel (Mot. at 5-6 (acknowledging that Raniere's counsel received these reports).) One of her expert reports identifies numerous studies that support the first seven of the eight opinions about which she will testify. (Mot. at 7.)

Raniere's quibbles with the level of detail and intellectual rigor in Dr. Hughes's expert reports (Mot. at 5-6) are too minor to preclude her from testifying as to her first seven opinions. Raniere notes that Dr. Hughes's expert reports often cite a study as support for an opinion without specifically identifying how the study supports the opinion. (Mot. at 6.) In the example Raniere points to, Dr. Hughes asserts that "one of the wide-reaching negative effects of early childhood sexual trauma is the risk of being sexually victimized again," and cites two studies as support without providing further information about these studies (like the statistical evidence underlying them or the studies' error rate). (Id.) Under Daubert, statistical evidence and error rates are just factors that the court may consider in exercising its gatekeeping function; their absence does not compel the court to preclude Dr. Hughes's testimony. 509 U.S. at 593-94; see Kumho Tire, 526 U.S. at 142 (stating that a district court has "broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."). In the court's view, Dr. Hughes's extensive study of the relevant data and literature and her clinical experience treating hundreds of trauma and abuse patients over the past twenty years qualify her to testify as to her proposed conclusions about sexual abuse victims and their psychologies. See United States v. Bighead, 128 F.3d 1329, 1330 (9th Cir. 1997) (permitting a psychologist to testify about victims' delayed disclosure of child abuse based on the expert's clinical experience, including over 1,300 interviews with alleged child abuse victims); United States v. Maurizio, No. Crim. 3:14-23, 2015 WL 5228031, at *5 (W.D. Pa.

13

Sept. 8, 2015) (admitting testimony by expert who "conducted hundreds of interviews of sexual abuse victims").

Accordingly, and in light of the court's starting "assumption that a well-qualified expert's testimony is admissible," In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d at 282, the court exercises its discretion to permit Dr. Hughes to testify as to her first seven opinions without holding a Daubert hearing. See Williams, 506 F.3d at 161.

ii. Dr. Hughes's eighth opinion

Raniere takes particular issue with Dr. Hughes's eighth opinion: that "perpetrators often use 'grooming' techniques on adult and child victims to normalize sexual behaviors and make their victims more susceptible to assault." (Mot. at 6.) Raniere contends (Mot. at 6), and the Government appears not to dispute (Resp. at 7), that the Government has not referenced any studies establishing the reliability of this opinion. The Government responds that other "[c]ourts have found expert testimony on the modus operandi of abusers to be appropriate as 'this specialized information may very well be beyond the knowledge of many jurors.'" (Resp. at 7 (alteration adopted) (quoting United States v. Batton, 602 F.3d 1191, 1201 (10th Cir. 2010)).) While that is true, that does not make Dr. Hughes's opinion about grooming techniques reliable under the Daubert standard. To the court's knowledge, Dr. Hughes has never testified in court or provided expert reports as to this opinion before. Further, her extensive academic and clinical experience appears focused on victims of sexual abuse, not perpetrators.[9]

Based on the current record, the court cannot determine whether Dr. Hughes's opinion regarding sexual abusers' use of grooming techniques is sufficiently reliable. Thus, before

---

[9] The first seven topics on which Dr. Hughes will testify all relate to the psychology of victims, not perpetrators, and are thus clearly within her expertise. (May 2, 2019 Letter at 2.)

14

deciding whether Dr. Hughes may testify as to this opinion, the court must hold a Daubert hearing.

### D. Federal Rule of Evidence 403

Raniere contends that three portions of the proposed expert testimony should be precluded as unduly prejudicial under Federal Rule of Evidence 403. (Mot. at 6-7.) See Nimely, 414 F.3d at 397 (noting "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations"). First, he argues that Dr. Hughes's proposed testimony on grooming techniques will be unduly prejudicial because it suggests "that persons who commit sexual crimes share certain characteristics or that there are typical circumstances under which sexual assaults take place thereby suggesting that the defendant is included in this group and meets the profile of typical sex offenders." (Mot. at 7 (citing United States v. Forest, 429 F.3d 73, 81 (4th Cir. 2005).) As the court has not decided whether Dr. Hughes's testimony on grooming techniques is admissible under Rule 702, the court reserves judgment on whether such evidence would violate Rule 403.

Second, Raniere posits that Dr. Hughes's testimony regarding delayed disclosure of sexual assault victims is unnecessary because "[t]he witnesses in this case are all adults who are capable of providing . . . reasons for their delayed or piecemeal disclosures and the jury does not need help from an expert to evaluate their explanations." (Mot. at 7.) The court disagrees. This testimony may be probative in that it may corroborate witnesses' explanations for their delayed disclosures, thus "help[ing] the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a). It is not "needlessly [] cumulative." Fed. R. Evid. 403. Other courts have permitted comparable expert testimony. See Maurizio, 2015 WL 5228031, at *5

(holding that expert testimony regarding victim characters and victim-offender dynamics was not unduly prejudicial); Gray v. Pate, No. 12:CV-3320, 2014 WL 1232151, at *10 (D.S.C. Mar. 24, 2014) (discussing a state court's choice to permit expert testimony about sexual assault victims' delayed disclosure and finding that the admission of such evidence was not a due process violation).

Third, Raniere insists that "Dr. Grassian's testimony must also be precluded insofar as it references a prison setting or suggests that any of the alleged victims was subject to a prison-like solitary confinement." (Mot. at 7.) In Raniere's view, "[s]uch an association with the facts of this case is not only unsupported by any scientifically approved study, but any such association with Raniere would be unduly prejudicial." (Id.) But the word "prison" does not appear in the Government's descriptions of any of the six opinions about which Dr. Grassian will testify. (May 2, 2019 Letter at 1.) And, as explained above, Dr. Grassian's work covers environmental restrictions in various non-prison settings. According to the Government, "Dr. Grassian will be drawing on his expertise about multiple restrictive environments, including but not limited to prisons, to explain the effect of long-term environmental restrictions." (Resp. at 8.) As the Government notes, while Dr. Grassian's study of prison settings is the source of much of his expertise on environmental restrictions, that does not render his testimony about environmental restrictions prejudicial. (Id.)

If, during Dr. Grassian's testimony, Raniere becomes concerned about the alleged risk that the jury may improperly infer that any alleged victims were subject to a prison-like solitary confinement, he may object, and the court will give a curative instruction to the jury. The Government is DIRECTED to submit a proposed curative instruction to the court and Raniere before Dr. Grassian's testimony begins.

16

## III. CONCLUSION

For the foregoing reasons, the court DENIES Raniere's motion (Dkt. 633) as to Dr. Grassian's testimony and to Dr. Hughes's testimony on the first seven of her eight proposed opinions. The court GRANTS Raniere's request for a <u>Daubert</u> hearing as to Dr. Hughes's proposed testimony that "perpetrators often use 'grooming' techniques on adult and child victims to normalize sexual behaviors and make their victims more susceptible to assault."

SO ORDERED.

Dated: Brooklyn, New York
May 21, 2019

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge