1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        18-CR-204(NGG)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5           -against-                   June 17, 2019
                                        9:00 a.m.
6    KEITH RANIERE,

7           Defendant.

8    ------------------------------x
                TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
9           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
                UNITED STATES SENIOR DISTRICT JUDGE
10                       BEFORE A JURY

11   APPEARANCES
     For the Government:        UNITED STATES ATTORNEY'S OFFICE
12                              Eastern District of New York
                                271 Cadman Plaza East
13                              Brooklyn, New York 11201
                                BY:  MOIRA KIM PENZA, ESQ.
14                                   TANYA HAJJAR, ESQ.
                                     MARK LESKO, ESQ.
15                              Assistant United States Attorneys

16   For the Defendant:        BRAFMAN & ASSOCIATES
                                767 Third Avenue
17                              New York, New York 10017
                                BY:  MARC AGNIFILO, ESQ.
18                                   TENY ROSE GERAGOS, ESQ.

19                              DEROHANNESIAN & DEROHANNESIAN
                                677 Broadway
20                              Albany, New York 12207
                                BY:  PAUL DerOHANNESIAN, II, ESQ.
21                                   DANIELLE R. SMITH, ESQ.

22
     Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.

PROCEEDINGS

1                    (In open court.)

2

3          COURTROOM DEPUTY:  All Rise.

4          THE COURT:  Be seated.  We're waiting on the

5    defendant and one van of jurors.

6          Have you tested all the equipment with your staff?

7          MS. PENZA:  We have, your Honor.  Hopefully it will

8    all go smoothly.

9          COURTROOM DEPUTY:  Case on trial.

10         Counsel state your appearances.

11         MS. PENZA:  Moira Penza, Tanya Hajjar, Mark Lesko

12   for the United States.  At counsel table is Special Agent

13   Michael Wenniger, Special Agent Michael Lever, Paralegal

14   Specialist Teri Carby and Randall Harvey who is assisting us.

15         MR. AGNIFILO:  Mark Agnifilo, Temy Geragos, Paul

16   DerOhannesan, Danielle Smith for Keith Raniere, who is here

17   with us this morning.

18         THE COURT:  Be seated.  We're still waiting for one

19   van of jurors.

20         Is there something anyone wants to raise before we

21   start?

22         MR. AGNIFILO:  Just, your Honor, I notice that your

23   Honor removed the bias charge from our proposed instructions.

24   We obviously thought that that charge was useful.  We

25   requested and we object to its removal.

PROCEEDINGS

1     THE COURT:  Okay, you have your objection.

2     MR. AGNIFILO:  Thank you, your Honor.

3     THE COURT:  I removed it.  I thought it was much to

4  specific and drew the attention of the jurors to specifics as

5  opposed to the general situation that they could find of

6  possible bias or prejudice.  And I've never given a charge as

7  specific as that while I've been a judge.  I felt that it was

8  suggestive as opposed to helpful.  So that's my ruling on

9  that.

10     Originally I thought I would put it in, then I gave

11  it some thought over the weekend and felt that it was just too

12  specific.

13     MR. AGNIFILO:  Just so our position is clear.  If

14  your Honor prefers a different bias charge that your Honor is

15  more comfortable with, the problem that I see is it's just a

16  topic that's not captured in your Honor's listings of things

17  for the jury to consider in regard to each witness.  So I got

18  this from a Judge Raykoff charge from a case that I had a

19  couple of years ago.  If your Honor has another charge that

20  your Honor is more comfortable with, I'm happy to have

21  whatever your Honor has.

22     THE COURT:  Government?

23     MS. HAJJAR:  We think it's encapsulated from the

24  question you asked on the prior page, which is, did it seem as

25  though the witnesses were telling the truth.  All of those

PROCEEDINGS

1    things, assessing demeanor, bias, are encapsulated within the

2    questions that your Honor asked immediately prior to that.  We

3    don't think anything additional is necessary.

4         THE COURT:  I think that the parties during their

5    closings can raise questions as to certain testimony of

6    certain witnesses and the motivations of those witnesses and

7    let the jury assess that using the list of items that are

8    already there and anything else that they want to bring from

9    their personal experience.  So I'm going to leave it the way

10   it is, thank you.

11        Before we bring the jury in, when everyone is here,

12   let me just address everyone in the courtroom about courtroom

13   decorum.

14        No comments, expressions of approval or disapproval,

15   or any other statements or sounds of any kind are permitted

16   during closing arguments.  I understand that people feel very

17   strongly about certain matters that are at issue in this case,

18   but the purpose of closing argument is for the jury to

19   understand the arguments of the lawyers and not to hear from

20   anyone else.

21        Also, if it's necessary for us to take a sidebar,

22   which I hope it won't be, with the jury in the box, you may

23   stand to stretch wherever you're seated, but there is to be no

24   conversations.  If people carry on conversations, they will be

25   asked by the CSOs to leave and they will not be permitted to

PROCEEDINGS

1     return.  And they will be able to watch the balance of the

2     closing arguments in the over-flow room, which I understand is

3     pretty crowded already.

4              Finally, please do not leave the courtroom while the

5     closings are in progress except in an emergency.  I don't want

6     people walking in and out of the courtroom during oral

7     argument.  It's a distraction to the attorneys.  It's a

8     distraction to the jury.  And it's not appropriate.

9              Those are my instructions to everyone in the room.

10    I'm sure you'll follow those instructions.  Thank you.

11             Ms. Penza, I'll ask the question one more time, how

12    long do you think your closing will take?

13             MS. PENZA:  Estimating four hours.

14             THE COURT:  All right.  Is there a point at the mid

15    point more or less where we could take a ten-minute break for

16    the jury?

17             MS. PENZA:  Certainly, your Honor.  May I suggest

18    that when I get to such a place?

19             THE COURT:  Yes, if you would.

20             MS. PENZA:  Thank you.

21             THE COURT:  We're going to check on the jury and get

22    right back to you.

23             (The Court exits the courtroom.)

24             (Brief recess.)

25             THE COURT:  Let's bring in the jury.

SUMMATIONS - MS. PENZA

1              (Jury enters the courtroom.)

2              THE COURT:  Please be seated everyone.

3              Good morning members of the jury.

4              THE JURY:  (Collectively) Good morning.

5              THE COURT:  At this time we'll proceed with closing

6    arguments.  The Government will give its closing argument

7    first, and then the defense will give a closing argument, to

8    be followed by rebuttal by the Government.

9              You may proceed with your argument, Ms. Penza.

10             MS. PENZA:  Thank you, your Honor.

11             Knoxwood, Clifton Park, New York.  At first glance

12   it looks like an ordinary subdivision in an ordinary suburb.

13   Manicured lawns, tree-lined streets, scenic train ride from

14   New York City.

15             At the beginning of this trial Mr. Agnifilio, he

16   called it idyllic.  Yes.  It looked like the American dream,

17   but if we've learned anything from this trial, it's that looks

18   can be deceiving.  And it's what is the inside that counts.

19             127 Grenadier Court, a naked woman, held down, her

20   arms above her head like a sacrifice, screaming, while the

21   defendant's initials are branded into her body.

22             2 Flintlock Lane, newly married Sylvie ordered to

23   open her legs for the defendant before she could be intimate

24   with her husband.

25             8 Hale Drive, the defendant's executive library.  A

SUMMATIONS - MS. PENZA

 1  library with a sauna, a hot tub, a loft bed, and a collection

 2  of sexually explicit photos including of 15-year-old Camila.

 3  His trophy, his sexual conquest.

 4          120 Victory Way, Nicole, lying naked on a cold

 5  wooden table.  Her wrists, her ankles bound, blind-folded, not

 6  knowing that a video camera is pointed at her.

 7          And 12 Wilton Court, Daniela, alone in her room for

 8  the 700th day in a row, with a pen, a piece of paper, and a

 9  foam pad on the verge of suicide.

10          The closed doors of these cookie-cutter homes had

11  seemed straight out of a horror movie, but for the defendant's

12  victims this was all too real.

13          Sex trafficking, child exploitation, forced labor,

14  and so many more crimes.  Over the past six weeks you were

15  given a look behind these doors and into the inner workings of

16  the defendant's criminal enterprise.  Strict but carefully

17  constructed image the defendant's inner circle made for him,

18  humanitarian, leader, mentor, guru.  You saw him for what he,

19  was a conman, a predator, a crime boss.

20          The crimes he's charged with span nearly 15 years

21  and include sex trafficking, forced labor, sexual exploitation

22  of a child, possession of child pornography, identity theft,

23  wire fraud, and obstruction of justice.

24          It's been a long trial.  And you've heard a lot of

25  evidence.  Among other things, you heard testimony from former

5290

SUMMATIONS – MS. PENZA

1  members of the defendant's inner circle like Lauren Salzman

2  and Mark Vicente.  Those people committed crimes with him and

3  for him.  You met Daniela, who went from hacking e-mail

4  accounts for the defendant to being imprisoned in her own home

5  on his orders.  You met some of the defendant's most recent

6  victims, Sylvie, Nicole, Jay, who were groomed to be the

7  defendant's sex slaves.  You saw the pictures of 15-year-old

8  Camila's private parts.  You saw the hundreds of thousands of

9  dollars in cash that was kept for the defendant at Nancy

10  Salzman's house.  You heard recordings in the defendant's own

11  voice directing his crimes.

12          It's been clear how carefully you paid attention

13  through this trial, and we thank you for that.  Now we're

14  almost done.  My job is to help you go through the process of

15  putting all the evidence you've heard together in a methodical

16  way and show you how to prove the defendant is guilty beyond

17  any reasonable doubt of each of the charged crimes.

18          The defendant is charged with seven crimes in this

19  case.  Racketeering, racketeering conspiracy, wire fraud

20  conspiracy, forced labor conspiracy, sex trafficking

21  conspiracy, sex trafficking, attempted sex trafficking.

22          We're going to talk about racketeering first.  Now,

23  when you hear racketeering, or RICO as it's sometimes called,

24  you might think of the mafia.  But under the law other types

25  of organized crime are also racketeering.  That's because the

SUMMATIONS - MS. PENZA

1   law recognizes that when people commit crimes as part of a

2   group they are more powerful and more dangerous.  Put simply,

3   racketeering means that the defendant was part of a group of

4   people who were working towards a common goal.  Under the law,

5   we say he was part of an enterprise; and as part of his

6   involvement in that enterprise he committed crimes.  Here as

7   you've learned in this trial, the defendant and his inner

8   circle were the enterprise for which he committed crimes.

9            Now that's the who and the purpose of the

10  enterprise, but there is also the why and the how.

11           Now why would they all be part of this enterprise?

12  Because they all benefited.  The whys in this case are as old

13  as time, sex, money, power.

14           As head of the enterprise, the defendant tapped into

15  a never-ending flow of women and money.  He also gained power

16  and influence and means of control and protection.  Alone he

17  would just have been a man; with his inner circle he was the

18  ruler in his universe in Clifton Park, New York.  A crime boss

19  with no limits and no checks on his power.  To the defendant's

20  most trusted insiders, his word was the law and no one acted

21  except on his say-so.

22           For their roles in the enterprise, the members of

23  the inner circle gained special privileges with their boss

24  along with the financial benefits of being close to him.

25           Let's talk about Lauren Salzman for a moment.

SUMMATIONS - MS. PENZA

1    Ms. Salzman testified that she was part of the defendant's

2    criminal enterprise, part of his inner circle.  She admitted

3    to you the crimes she committed on the account defendant's

4    behalf.  Her imprisonment of Daniela.  Her fraud and her

5    extortion of the DOS victims.  And she told you the benefits

6    she received from the enterprise.  A job making over $100,000

7    a year that allowed her to own two homes and travel all over

8    the world.  As well as her personal sexual relationship with

9    the defendant and her dream of having his child.  All of which

10   she would have lost if she stopped doing his bidding.

11            That brings to us the how.  How did this enterprise

12   work?  You'll see many examples as we discuss the charges in

13   this case; but in a nutshell, through abuse and control.

14   Grooming women for the defendant, collecting sensitive

15   information and naked photographs, and humiliation by creating

16   financial dependence, isolating people from their friends and

17   family, and by building an us-against-them mentality, and

18   waging war on anyone who challenged the enterprise's power.

19   Thereby instilling fear of reprisal in anyone who thought

20   about challenging the defendant or his inner circle.

21            In short, the defendant and his inner circle used

22   tactics that destroyed his victim's sense of self and ability

23   to trust.  Making them compliant and vulnerable to being used

24   in whatever way the members of the enterprise chose.

25            And the enterprise was set up to last.  First, the

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SUMMATIONS - MS. PENZA

1   enterprise grew itself and furthered its aim by turning its

2   victims into victimizers.  As just a few examples,we saw this

3   with Daniela who was groomed for the defendant at an age of 16

4   and then ended up facilitating the defendant's relationship

5   with her under-age sister, Camila.  We saw with Camila, who

6   was sexually abused by the defendant at age 15, and then ended

7   up sexually abusing Nicole as the defendant watched.  We saw

8   what Nicole, who was assigned to spy on Robbie Chiappone and

9   turn him over to some unknown person not knowing he was the

10  defendant's romantic rival.  Even Lauren Salzman was abused

11  for years by the defendant before she made the choice to

12  commit the crimes she pled guilty to.  She testified, if she

13  had ever spoken up or said no to the defendant, she would have

14  been ostracized, lost her career, and lost her relationship.

15          Second, is the importance of secrecy as an essential

16  part of the enterprise.  Some of the defendant's goals he

17  could achieve through NXIVM and the other public

18  organizations, but for his criminal ambitions he needed the

19  enterprise:  The naked pictures of 15-year-old Camila; the

20  confinement of Daniela; the operation of DOS; the recruitment

21  of virgin successors for him; the illegal surveillance of his

22  enterprise.

23          It's important to remember too, that not everyone

24  within the enterprise needs to know everything.  Different

25  people serve different purposes for the defendant.

SUMMATIONS - MS. PENZA

1          For example, Pam Cafrtiz and Lauren Salzman, they

2    were the defendant's fixers, when one of his many girlfriends

3    was acting prideful or defiant.  Nancy Salzman, she performed

4    that role as well.  But she and Kristin Keeffe were also at

5    the forefront of efforts to protect the enterprise through

6    surveillance measures and other tactics meant to destroy.

7          That's how criminal organizations work, secrecy.

8    Even among members of the enterprise, it helps protect it and

9    keep it strong.

10          Let's turn to the law.  At the end of closing

11   arguments Judge Garaufis will instruct you on the law that

12   applies in this case.  I'm only going give you an overview.

13   When you go back to deliberate, it's what Judge Garaufis says

14   that controls.  If anything that I say differs from what Judge

15   Garaufis says, you must listen to the Judge.  I expect the

16   Judge Garaufis will instruct you that these are the elements

17   of racketeering.

18          The first element, is that an enterprise existed.

19   This is the enterprise.  You heard and saw throughout trial

20   overwhelming evidence that these people were associated in

21   fact, which is what is required to find that an enterprise

22   existed.

23          The second element is that the enterprise engaged in

24   or its activities affected interstate or foreign commerce.

25   This just means that the operations of the defendant and his

Case 1:18-cr-00204-NGG-VMS   Document 762   Filed 07/10/19   Page 13 of 209 PageID #: 7412

SUMMATIONS - MS. PENZA

1    inner circle involved movements between states or between the

2    United States and another country.  You heard overwhelming

3    evidence of this element, including that members of the inner

4    circle recruited new followers for the defendant from all over

5    the country and all over the world, and that people traveled

6    from these places to New York.

7            You can see this element when you look at

8    racketeering act too.  Daniela being driven to Mexico in order

9    to walk across the border on the defendant's orders.  DOS

10   slaves being recruited from Canada and Mexico.  And you heard

11   about cash being transported over the Mexican border.  These

12   are some the examples of how the enterprise operated across

13   state lines and across the country's borders.

14           Once you find that the enterprise existed, elements

15   three and four that the defendant was associated with the

16   enterprise and participated in the affairs of the enterprise,

17   are simple.  Keith Raniere was the center of the enterprise.

18   Everything else revolved around him.  So of course he was

19   associated.  He was the boss.  And he also participated in the

20   enterprise's affairs.  He ran it.  He was the one calling the

21   shots.

22           And that brings us to the fifth and final element of

23   racketeering, the defendant's participation in a pattern of

24   racketeering activity.  In order to find that the defendant

25   participated in a pattern of racketeering activity, you must

SUMMATIONS - MS. PENZA

1    find that he committed at least two of the racketeering acts

2    that are alleged in this case.  As we go through the evidence

3    this morning you'll see that for each racketeering act, the

4    defendant either committed the act himself or commanded it to

5    happen.

6            As I expect Judge Garaufis will tell you, under the

7    law even if you don't personally commit a crime, if you

8    command it or you help it happen, that's the same as

9    committing it yourself.  That makes sense, that's how crime

10   bosses operate.  Sometimes the defendant was at the scene of a

11   crime, but sometimes he wasn't.  When he wasn't, that doesn't

12   make him any less guilty.

13           You must also unanimously agree on whichever acts

14   that you find.  You must find that the most recent act proven

15   was committed within ten years of a prior act.  I submit to

16   you that you're going to find that we proved all of the

17   alleged acts were committed, not just two.  In any event, in

18   this case most combinations of acts would satisfy this

19   requirement.

20           These last requirements of nexus and relatedness and

21   that the enterprise lasted for a substantial period of time,

22   we'll cover at the end of the presentation.

23           Now we're going to take a brief look at each of the

24   racketeering acts alleged in this case, as well as the stand

25   alone counts.

SUMMATIONS - MS. PENZA

1              Before we do that, I want to talk about the legal

2      concept called conspiracy.  A number of the racketeering acts

3      and stand alone counts are conspiracy counts, which means you

4      must prove there was an agreement between the defendant and at

5      least one other person to commit the crime at issue.  When you

6      hear the word conspiracy, you should remember that the

7      criminal act is the agreement itself, it makes no difference

8      whether the crime was actually committed.  Judge Garaufis will

9      instruct you that defining an you, just find to that the

10     defendant came to a mutual understanding, if even if passibly,

11     to carry out a crime through a joint plan or common scheme.

12     You certainly don't need to find that the defendant sat a

13     table and drew up a formal plan to commit a crime.  That's not

14     how criminals work.

15             Now there is four categories that the racketeering

16     acts fit into.  They are also common threads through the

17     pattern as a whole.

18             For racketeering act one, we'll look at the proof we

19     presented that the defendant agreed with others to transport

20     Daniela across the Canadian border into the United States

21     using someone else's name and birthday.  Now there is two ways

22     that the defendant could have committed that act.  In spots

23     like this, where there are two or more options, under the

24     Racketeering Act you only need to find one of them in order to

25     find that the defendant committed the act.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SUMMATIONS - MS. PENZA

1        For Racketeering Acts two, three, four we'll look at

2    the proof we presented that the defendant took graphic photos

3    of Camila when she was 15 and kept those photos for more than

4    a decade in the executive library, hidden in a folder called

5    studies, along with photos of his adult lovers in the same

6    poses all around the same time period.

7        For Racketeering Act five, we'll look at the proof

8    that the defendant agreed to obtain usernames and passwords of

9    people he deemed to be enemies of enterprise.  That he was

10   directly involved in obtaining Edgar Bronfman and James

11   Loperfido's e-mail usernames and passwords in order to monitor

12   their e-mail accounts.

13       For Racketeering Act six we'll look at the proof of

14   the defendants role in agreeing to alter the video that would

15   be produced in the Franco litigation.

16       For Racketeering Act seven we'll look at the proof

17   of the defendant's agreement to obtain the username and

18   password for his lover, Marianna's e-mail account.

19       For Racketeering eight we'll look at the proof of

20   the defendant's trafficking of Daniela, to have her perform

21   work for him, including his imprisonment of her in a room for

22   nearly two years in an effort to extract work from her, as

23   well as the defendant's role in keeping Daniela's birth

24   certificate from her.

25       Racketeering nine and ten, both relate to the

SUMMATIONS - MS. PENZA

1    Government's proof regarding DOS.

2            For Racketeering nine, we'll look at the proof of

3    the defendant's role in extorting property from DOS slaves

4    under the threat of release of the initial collateral they

5    provided.

6            Racketeering Act ten is another one of the places

7    where there are two ways to prove that the Government proved

8    the act.  The forced slave of Nicole and the sex trafficking

9    of Nicole.  As to forced labor, we'll look at the proof that

10   Nicole was coerced to providing labor and services including

11   editing and transcription work, taking naked photographs, and

12   engaging in sex acts with the defendant under threat of her

13   release of her collateral.

14           As to sex trafficking, we'll look at the proof of

15   that Nicole was coerced in in engaging in a sex act; in this

16   instance, being tied to a table while Camila performed oral

17   sex on her.  And that Allison Mack by offering Nicole up to

18   the defendant in this way, maintained the personal and

19   financial benefits that went with satisfying the defendant and

20   maintaining her role as a first line master.

21           Within DOS there were also stand alone counts --

22   there are also stand alone counts that relate to DOS.

23           When we talk about the DOS related Racketeering

24   Acts, we'll talk about the stand alone count at the same time

25   because most of the proof will be the same for all of them.

SUMMATIONS - MS. PENZA

1           The stand alone counts cover the sex trafficking of

2     Nicole and attempted sex trafficking of Jay, but they also

3     include three conspiracy counts, which we'll walk through.

4     For those counts we'll discuss the proof the Government has

5     presented, that the defendant agreed with others to defraud

6     lower-ranking DOS slaves by concealing his involvement in DOS;

7     to obtain a labor and services from lower-ranking DOS slaves

8     through coercion; and to commit sex trafficking more

9     generally.

10          For Racketeering 11, we'll look at the defendant's

11    agreement that Pam Cafritz's credit card would be used after

12    her death at a time when he claimed that he did not have the

13    right to access her money.  And in an effort to continue to

14    hide the facts of his assets from the IRS and keep his

15    self-judgment free.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

SUMMATIONS – MS. PENZA

1        MS. PENZA:  Now, let's take a look at the verdict

2   form that Judge Garaufis is going to give us.

3        Here on Page 1, you can see that the first count is

4   racketeering.  It says "Count Two" because in the indictment

5   racketeering was listed as Count Two.  But the Court and the

6   parties all thought it would be easier for you to first

7   determine that the defendant committed racketeering.

8        On Pages 2 and 3 are the individual racketeering

9   acts, and those are the ones we just touched on.  So if I had

10  the slide that had them on there, you would have seen all of

11  the different acts and here you'll have for each one what

12  you'll be able to check off whether that act was proved or not

13  proved.

14       And this is what I was explaining before is that for

15  certain of the acts there are two ways to find that that

16  racketeering act was proved.  So, for example, for

17  Racketeering Act 1, you'll find Racketeering Act 1 was proved

18  if you find that either that we proved conspiracy to commit

19  identity theft or conspiracy to unlawfully possess

20  identification documents or both.

21       Once you check yes to two of the acts, two of the

22  underlying acts, then you can go ahead and you can check

23  guilty on the first page because finding the defendant guilty

24  of racketeering, you need to find at least two racketeering

25  acts proven.  But you should go on to consider the other

5302

SUMMATIONS – MS. PENZA

1    racketeering acts once you found that we've proven two of

2    them.

3            Now, if we turn to the third page of the verdict

4    form, you'll see that it says "Racketeering Conspiracy."  And

5    that just has one place to check, guilty or not guilty.

6    That's because to be guilty of racketeering conspiracy, the

7    defendant only has to have agreed with another person that

8    they would commit racketeering.  No part of the plan has to

9    have come to fruition, not the enterprise and not the

10   racketeering acts.

11           So let's hypothetically I found that the defendant

12   and Allison Mack had some great master plan to form the

13   enterprise and that they had planned that someone would carry

14   out at least two racketeering acts in furtherance of that

15   enterprise but they never succeeded.  That agreement alone

16   would be enough to check guilty as to Count One on Page 3.

17           In this case, though, the defendant not only agreed

18   to commit crimes for the enterprise but he actually did so and

19   was successful for a long time until he was arrested.  That's

20   why we submit he is guilty of both Count One and Count Two,

21   racketeering and racketeering conspiracy.

22           And because racketeering conspiracy doesn't require

23   any completed racketeering acts, there's no list of predicate

24   acts under Count Two on the verdict form.  What the Government

25   must prove here is that the defendant agreed that he or a

SUMMATIONS - MS. PENZA

1    co-conspirator would commit two or more racketeering acts and

2    the crimes charged in the indictment and you must be unanimous

3    as to those types.

4           So here are the types of racketeering acts listed in

5    the indictment.  Once you've checked off two racketeering acts

6    as proven, if you find that the defendant agreed to commit

7    those acts as part of the enterprise, then you can go ahead

8    and check off guilty on both racketeering and racketeering

9    conspiracy.  But you can also find the defendant guilty of

10   racketeering conspiracy if you find he agreed with -- that he

11   or another person would commit two acts in any of these

12   categories.

13          For example, if you find that the defendant agreed

14   that two DAS slaves would be defrauded you're there.  If you

15   find the defendant agreed that two DAS slaves would be

16   extorted, you're there.  If you find the defendant agreed that

17   one DAS slave would be extorted and one DAS slave would be

18   defrauded, you're there and so on.

19          Now, finally, on the end of Page 3 and Page 4,

20   you'll see the standalone counts.  And when we talk about the

21   racketeering acts that relate to DAS, we'll talk about those

22   as well because a lot of them will overlap.

23          So let's turn to talking about the evidence you

24   heard at trial and we'll start with Daniela.

25          Let's travel far away from Clifton Park, New York

5304

SUMMATIONS - MS. PENZA

1    for a minute to the small ranching town in Central Mexico

2    where Daniela is from.  She told you what you would have seen

3    if you had looked behind the closed doors of her childhood

4    home:  A happy family, successful, joyful.  From Daniela's

5    testimony, her family was the type of close, tight-knit family

6    everyone yearns for.  But then her parents were introduced to

7    NXIVM.

8            Daniela testified that she set to attend a

9    prestigious Swiss High School on scholarship when her parents

10   gave her the NXIVM 16-day Intensive as a going away present.

11           This is Daniela's family and this is a picture from

12   Daniela's first Intensive in Monterey.  A fresh-faced

13   teenager.  In front of her is Lauren Salzman, the one, who,

14   eight years later, would become her captor at the defendant's

15   direction.  Daniela testified that she wasn't impressed with

16   much of the course, but she was completely taken by the

17   Mission Module.

18           She went into the course hoping to change the world

19   through Green Peace or something similar.  But in that module,

20   the defendant's curriculum taught her that all those things

21   were worthless.  That the only way to save the world was

22   through his Tech.  And that if people didn't get integrated,

23   the world was going to end.  She was even taught that the

24   defendant who's billing as the smartest man in the word she

25   believed had come up with a mathematical formula for the End

SUMMATIONS - MS. PENZA

1   Times.  Her testimony about this can be found at Page 2305

2   through 306.

3           After taking that first class, Daniela testified

4   that she came to believe that all of her dreams were

5   worthless.  And when she was given the opportunity to forego

6   her scholarship and work for the Mission, as she called to,

7   the mission in Albany, she thought hard, sought the advice of

8   her parents who, I submit, had already been sucked in by the

9   defendant's teachings and the parade of wealthy and

10  influential Mexicans who were taking these courses and changed

11  her plans.  Within a few months, Daniela was in Albany, 16

12  about to 17 turn without her family, without any friends,

13  without, and she's handed a data entry job in the admin

14  office.  It was not the life she expected and it certainly

15  wasn't the life she had given up her fancy Swiss school for.

16          But one day, the defendant took an interest in her

17  after she solved a series of difficult brain teasers and that

18  changed things.  He promised he would tutor her, give her an

19  education that would surpass the Ivy League education she

20  dreamt of.  But rather than tutoring her, the defendant began

21  grooming her.

22          Now, around that time, something very important --

23  something happened that is very important that would later

24  change her life.  Daniela testified that at one point when she

25  was 17, she stole $6,000 in cash from the admin office.  She

SUMMATIONS - MS. PENZA

1  put the money back a day after, but she ended up confessing

2  this to the defendant.  Although the defendant acted as if the

3  incident was over and forgotten when she confessed, the next

4  day she was berated by Nancy Salzman and humiliated to learn

5  that everyone in the Intensive that was going on knew what she

6  had done.

7            This is Daniela's testimony about that incident.

8  She said:  "At the time, he felt like the only person who was

9  on my side.  In fact, because of that hell I went through

10 everybody thought I was bad and he didn't adopt that stance, I

11 thought he was understanding."  When asked what she thought

12 about the incident looking back Daniela said, "I think he set

13 it up."  "I think he set me up."  I submit the defendant made

14 himself the hero of that story to get closer to Daniela.

15           Eventually, though this incident faded, it was

16 dredged up years later as pretense to punish her but we'll

17 talk about that in a bit.

18           So going back.  One night, Daniela was in a NXIVM

19 education center and she confided in the defendant that her

20 parents were going through a divorce.  How did the defendant

21 react?  He kissed her.  Daniela was 17, he was 43.  That was

22 her first kiss.  Daniela testified that when she got home that

23 night, the defendant called her and told her she should keep

24 it a secret.

25           Here's her testimony.  You might remember when I

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS - MS. PENZA

1    asked her, "Daniela would you keep additional secrets after

2    that?"  And she said, "Everything about my personal life was a

3    secret from then on."

4         This background provides important context that

5    explains Daniela's mental state years later when the defendant

6    and the Inner Circle convinced her that she had committed an

7    ethical breach that was threatening to destroy them all.  And

8    after that kiss, the defendant's sexual behavior towards

9    Daniela escalated.  He was asking her personal questions about

10   her sexual background of which there was none, which he liked.

11   And he asked her about her pubic hair.  She didn't even know

12   that grooming it was a thing.  Her testimony about this is at

13   Page 2376 to 77.

14        Then, a week after Daniela's 18th birthday, the

15   defendant performed oral sex on her on a dirty mattress on the

16   floor of the offices of the defendant's old company, CBI.  But

17   did he have intercourse with her?  You might remember how

18   Daniela testified that she was confused for years because

19   Daniela knew the defendant hadn't penetrated her that night,

20   yet he insisted he had.  For years.  This is an example, the

21   first example, of many that fit the definition of what

22   Dr. Hughes testified is called "gas lighting," a method of

23   coercive control in relationships.  Her testimony about the

24   effects of these crazy-making techniques is at 3,720 to 21.

25        Daniela also testified she later observed the

SUMMATIONS - MS. PENZA

1   defendant use similar crazy-making techniques on other women.

2   Regardless of whether there was intercourse that night or not,

3   though, at that point things changed.

4           From some time around then, until the infamous Ben

5   Meyers kiss, Daniela was part of the defendant's inner circle.

6   Allowed to be present for the most sensitive meetings and

7   expected to take on sensitive criminal tasks.  During that

8   time, though, something else happened, like the stealing and

9   returning of the $6,000, that marks a key point in her story

10  and this one is the first racketeering act.  The defendant's

11  agreement to have Daniela cross into the country.

12          Now, at the time she entered the United States,

13  Daniela was making that choice voluntarily knowing that it was

14  wrong, but her illegal status in the United States would

15  become a major tool of leverage used by the defendant.

16          Racketeering Act1.  On October 26, 2004, Daniela

17  was denied entry into the United States and was told she would

18  have to wait another year to reenter.  On April 10th in the

19  United States Daniela, returned to hometown.  Daniela wanted

20  to return to Albany and the defendant wanted her to return to

21  Albany.  After all, he was used to her providing him with sex

22  and with work.  Daniela was in regular phone contact with the

23  defendant and eventually defendant Daniela testified the

24  defendant came up with a plan which he explained to her over

25  the phone.  He told Daniela she should fly to Toronto, Canada

5309

SUMMATIONS - MS. PENZA

1    on Christmas Eve where Kristin Keeffe would meet her with a

2    fake Sheriff's I.D. in the name of an Alaskan woman who died

3    but who, according to the defendant, looked similar to

4    Daniela.  Daniela would do some shopping and she and Kristin

5    would cross over the border making it look like they had

6    popped over to do some Christmas shopping.

7         Daniela flew to Canada as planned but when she got

8    there, Kristin Keeffe was not.  Instead, Kathy Russell met her

9    and handed her the fake I.D. that the defendant -- handed her

10   the fake I.D. that the defendant and Kristin Keeffe had

11   arranged for her to have.  She and Kathy Russell crossed over

12   the border with Daniela distracting the officer who was

13   looking at her I.D. and drove down to the Christmas get

14   together in Clifton Park.

15        Now, when she was on the stand, Daniela could not

16   remember if Daniela and Kathy picked Kristin up on the

17   United States side of the border before heading to

18   Clifton Park.  But you heard from Special Agent Wenninger's

19   testimony about the evidence that Kristin was on the

20   United States side of Niagara Falls on December 24, 2004.

21        So, as I mentioned earlier, this racketeering act

22   can be found in one of two ways.  The first is conspiracy to

23   committed identify identity theft.

24        Now, right way, you remember that because this is a

25   conspiracy what matters is the defendant's agreement that the

SUMMATIONS - MS. PENZA

1    crime he did committed.

2         These are the elements of conspiracy to commit

3    identity theft.  Here, the Government proved that the

4    defendant greed with at least Daniela, Kristin, and Kathy that

5    Daniela would possess the means of I.D. of another person

6    knowing that the means would belong to another person without

7    lawful authority in connection with unlawful activity, and

8    that this affect interstate commerce.  The Government proved

9    through Daniela's testimony that she held, that is, possessed

10   the sheriff's I.D. which itself contained a means of

11   identification of a person and used it by presenting it to a

12   border officer.

13        Judge Garaufis will instruct you that a means of

14   I.D. can include a last name or a birth date.  Here Daniela

15   testified that the I.D. contained both Ashana Chenoa's last

16   name and her date of birth.  And if we look at the next slide,

17   you can see that the Government's prove that Ashana Chenoa was

18   a real person, meaning, a real person living or dead.  Her

19   driver's license and a death certificate.

20        Then, on the next slide, is Ashana Chenoa's death

21   certificate and her driver's license and a CBP record showing

22   that Ashana Chenoa crossed the Canadian border on 12/24/04.

23   Daniela also testified that the defendant told her that Ashana

24   Chenoa was a real person who had died.

25        Special Agent Wenninger told you that there is no

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

5311

SUMMATIONS – MS. PENZA

1   Kathy Russell crossing the border the same day as Daniela.

2   Daniela as Chenoa.  No one knows why that might be, but it

3   doesn't change the Government's proof.  Daniela gave specific

4   details about Kathy Russell's involvement including Kathy

5   Russell's frequent retelling of the adventure especially when

6   Kathy Russell, who is also in her 40s, was trying to persuade

7   Daniela to participate in a threesome with her and the

8   defendant.

9            So let's turn back to the elements.

10           Number three.  Without lawful authority means

11   without an official authorization to use the I.D.  Here, this

12   element is proven because there is no way for someone to be

13   authorized to cross the border on another person's I.D.  In

14   addition, Ashana Chenoa was dead by the time Daniela crossed

15   using her I.D.  I expect Judge Garaufis will instruct you that

16   the fourth element, the use of the I.D. in connection with

17   unlawful activity can be proven in one of two ways.  Here,

18   we've proven both.

19           First, the I.D. was used in connection with

20   transporting Daniela, an illegal alien, within the

21   United States from the Canadian border to Clifton Park.

22   Second, the I.D. was used in connection with efforts to

23   ultimately harbor her in the United States and to facilitate

24   her presence in the United States.

25           Finally, the Government has proven the fifth element

SUMMATIONS – MS. PENZA

1    because Daniela's border crossing had an effect on interstate

2    commerce because it involved the moment of people, Daniela and

3    Kathy Russell, as well as the Christmas presents they bought,

4    among other things, from Canada into the United States.

5            So that is one racketeering act proven.

6    Racketeering Act 1, 1-A.  Proved.  But there's still one more

7    way to prove that act:  Conspiracy to unlawfully possess an

8    identification document.

9            Now, here are the elements of that.  This one is

10   fairly self-explanatory and similar in many ways to the

11   identity theft elements we looked at.  Again this is another

12   conspiracy, and the question is:  Did the defendant agree that

13   this crime would be committed.  Here, the Government proved

14   that the defendant agreed with Daniela and others that she

15   would possess a false identification document, in this case, a

16   fake sheriff's I.D.

17           Special Agent Wenninger testified that sheriff's

18   I.D. is something that is intended as a form of I.D. and is

19   commonly accepted in various counties in New York State.

20   Similar to the New York City I.D. card that's available.

21           Finally, the Government has proven that the

22   defendant intended that Daniela use the sheriff's I.D. to

23   defraud the United States because it was supposed to trick the

24   United States official at the border.  So the evidence has

25   established that that subpart in Racketeering Act 1 has also

SUMMATIONS – MS. PENZA

1    been proved.

2         Let's turn back now to what happened when Daniela

3    returns to Clifton Park.  The very night she is bought back

4    across the border, the defendant tries to persuade her and her

5    sister Marianna, with whom she knows he was having a sexual

6    relationship, to engage in a threesome with her.  It ends with

7    the defendant naked and Daniela and Marianna crying.

8         After that Daniela, is left all alone on her first

9    night back in the United States.  With no legal status in the

10   United States, Daniela is now beholden to the enterprise in a

11   way that she didn't come to appreciate until her fight with

12   the defendant in fall 2006.  We'll get there, but from

13   December 2004 until fall 2006, Daniela was the defendant's

14   workhorse.  That testimony is at Page 2511.  She did

15   everything the defendant desired from organizing his library

16   to working on book reports.  And she also had to sexually

17   perform on the defendant's command giving him oral sex up to

18   two times a day.

19        Now, Daniela, she was a very productive member of

20   the enterprise:  She recorded the defendant's words for

21   posterity; she organized his book collection; she digitized

22   his music collection; she cleaned; she taught herself to hack

23   into e-mail accounts of NXIVM's enemies.

24        She did whatever was asked her for all from her

25   perch 3 FlintLock Lane where the defendant lived with Pam,

SUMMATIONS – MS. PENZA

1    Marianna, Kristin, and Karen Unterreiner.

2           Daniela testified about the way the defendant

3    controlled and manipulated her during that time.  Her weight,

4    for example, was constant focus of the defendant and he would

5    tell her that she was hurting him by not dieting.  She was

6    given book reports on graduate level topics that she had never

7    studied and was not paid if she couldn't complete them.  Even

8    if she got 75 or 90 percent of the way there.  In fact, she

9    was never paid for a book report at all.  And she wasn't

10   allowed to make money accept by working for the enterprise.

11   They never paid her.  Always one excuse after another.

12          She was in a state of financial dependence.

13   Economic control.  Notably, Daniela also spent her first years

14   of young adulthood in a world where other women were treated

15   that way.  Oinked at when they went to the fridge.  Spied on.

16   Groped in front of her women.  And you heard this type of talk

17   from the defendant's own mouth.

18          You'll remember the clip where the defendant says

19   that calling a woman a pig but that's something that's, you

20   know, very -- women don't like that.  But then he goes on to

21   say what's even worse than calling a woman a pig is talking

22   about her odor.  And then he goes on to joke that when

23   somebody says it's official at a wedding that what he thinks

24   of it's a fish hole.  That's the clip that you probably

25   remember.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS – MS. PENZA

1          Now, when the defendant impregnated Daniela at age

2     20 after not allowing her to use birth control, Pam Cafritz

3     paid for Daniela's abortion.  And I submit she monitored her

4     at the clinic to make sure Daniela delivered the coverup story

5     that would protect the defendant.  She said she'd only been in

6     the United States for two to three months and that she was

7     considering college in the United States.

8          You saw the records from the clinic that documented

9     the coverup as well.  After her job protecting the defendant

10    was done, Pam left Daniela to experience the abortion alone

11    despite instructions from the clinic that Daniela should be

12    monitored throughout the process.

13         Then, in fall 2006, Daniela will kissed Ben Myers

14    and that was the beginning of the darkest turn she had at the

15    defendant's hands.  With Ben, Daniela finally experienced

16    actual romantic interest.  Actual sexual desire.  Something

17    she never had for the defendant.

18         And nave Daniela, she made the mistake of telling

19    this to the defendant.  She actually thought he'd be happy for

20    her.  But he lost it.  You heard he locked himself in the

21    bathroom.  He threw her across a room.  After that night, they

22    never spoke in person again.

23         After that fight, once again, Daniela's world was

24    shaken.  From then on Daniela, had an ethical breach and was

25    under strict monitoring by the inner circle.  Karen

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS - MS. PENZA

1    Unterreiner, Nancy Salzman started monitoring her program

2    which, of course, again, focused on her weight and having her

3    complete book reports for the defendant's benefit as well as

4    breaking what was termed her "pride" and her defiance.  For

5    the next two years, e-mails between Daniela and the defendant

6    showed the never-ending abuse and manipulation she suffered

7    after that kiss.  Some of those e-mails can be found at

8    Government Exhibit 1578, 1535, 1534, 1563 and 1603.

9          You might remember the graphic questioning about

10   what she had done sexually with Ben.  The defendant commenting

11   that she was making him appear to be an ogre, keeping her

12   locked in a castle.  And during this time, Daniela was

13   threatened with being sent back to Mexico.  Mexico without any

14   contact with her family.  Mexico with no identification

15   documents.  Mexico with no money.

16         These pictures and the scribbling from her journal

17   from that time perhaps give the best insight into her mind.

18   On the left, a note saying:  "I don't want to be alone

19   anymore.  I want to kill myself."  On the right a

20   self-portrait captioned "Horror Story of Failure."

21         Then, in March 2010, the defendant ordered Daniela

22   confined to a room or otherwise she would be sent to Mexico.

23   Perhaps the saddest part of this episode is that Daniela's

24   parents were turned into co-conspirators, too.  And they're at

25   fault.  At fault for letting that man convince them to help

SUMMATIONS - MS. PENZA

1    hurt their daughter.  But make no mistakes, it was the

2    defendant who was in charge.

3         Take a look at Lauren Salzman's testimony.  After

4    that point, the defendant approached her with a plan regarding

5    Daniela.  Yes, he did.  Okay.  What was the plan as to

6    Daniela?  He proposed that Dani be given an ultimatum that she

7    go in her room with no distractions and come up with a plan

8    for how to fix this or be sent back to Mexico.  The defendant

9    also made clear to Lauren Salzman that this was to be kept a

10   secret.  He didn't even want her to discuss it on the phone.

11   This is at Page 1927.  It's okay, we'll read it.

12        You remember the conversation between the defendant

13   and Daniela's mom, Adriana.  And the whole time, Marianna,

14   Daniela's sister, who is also in a sexual relationship with

15   the defendant is translating.  The defendant says, "If you

16   killed someone's child, is it right that the family comes and

17   begs you to do something about it or apologizes to you for

18   being so bad to you.'  Her mother says, "No."  "If the world

19   were like that, it would be very beneficial to kill other

20   people's children, and as they would help make you into a

21   monster."  "If I went and spoke to Dani, I would be doing my

22   part in helping make her monster."  "If I was Danny's parents,

23   and going back to Mexico, I would make her choose between

24   doing the right thing and staying here or losing communication

25   with me or whatever."  "Sometimes it has it be that strict."

SUMMATIONS — MS. PENZA

1        Now, Lauren Salzman, she's a cooperator.  She's

2   accepted responsibility for her crimes and she's agreed to

3   testify.  But she is hoping for leniency at sentencing.  You

4   can consider her testimony with that in mind.  But when you

5   analyze her testimony, you should also consider what we call

6   corroborating evidence that indicates she's been truthful.  As

7   to Daniela's confinement, you have that corroborating evidence

8   including hundreds of letters Daniela wrote to Keith as a

9   recipient, and also e-mails exchanged between Lauren and the

10  defendant which I'll discuss more in a minute.

11       Now, Daniela's confinement in the room brings us to

12  Racketeering Act 8.

13       At issue in Racketeering Act 8 is the defendant's

14  efforts to make Daniela work for the enterprise and for the

15  defendant personally by keeping her in that room for 23 months

16  and threatening with being taken to Mexico and having her

17  identification documents kept from her.  This is another one

18  where there are two ways you can find the act proven so let's

19  talk about the first one:  Trafficking Daniela for labor and

20  services.

21       Now, remember you don't have to find that the

22  defendant personally committed the crime.  It's enough that he

23  commanded it to happen.  The first element is that Daniela was

24  harbored, transported, provided, or obtained.  Harbored simply

25  means that the person was given shelter.

SUMMATIONS - MS. PENZA

1            Now, the Government has proven this element beyond a

2    reasonable doubt with the proof that she was in the room for

3    two years.  And we've also proven beyond a reasonable doubt

4    that she was transported when Kristin Keeffe and her father,

5    at the defendant's direction, drove her to Mexico.

6            The second element is that Daniela was harbored or

7    transported for the purpose of providing or obtaining her

8    labor or services and in violation of the Forced Labor

9    Statute.  You don't have to find that any of the labor or

10   services were ultimately provided.

11           Let's start with the first part of the second

12   element.

13           Labor and services means anything that causes

14   physical or mental effort.  Labor means anything that causes

15   physical or mental effort, and services means conduct that

16   assists or benefits someone.  The labor and services here are

17   Daniela's letters to the defendant while she was in the room.

18           The Government also has proven that Daniela was

19   harbored for labor and was services.

20           First, she was in the room to create a written

21   program.  And so, the hundreds of hours she spent crafting

22   hundreds of letters to the defendant with various proposals --

23   this is Government Exhibit 907 -- was clearly labor.  The

24   mental effort in those letters is evident on their face and

25   Daniela testified about it as well.

SUMMATIONS – MS. PENZA

1          Second, the Government has proven that Daniela's

2     confinement to the room was part of a larger scheme to make

3     her a productive member of the enterprise again, to break her

4     pride, and get her back to her regular work performing labor

5     such as documenting the defendant, writing books reports for

6     him, and satisfying him sexually.

7              This is further supported by the fact that when

8     Daniela was driven back to Mexico, the defendant and the

9     members of the Inner Circle through Daniela's family

10    immediately began demanding book reports.

11         Now, I should note there is no requirement that you

12    find labor and services, only that that is his purpose in

13    harboring her.

14         As to the second part, the Government has proven

15    that Daniela harbored and transported for labor and services

16    in violation of the Forced Labor Statute because she faced

17    threats of serious harm, or because there was a scheme to make

18    her believe that she would suffer serious natural if she did

19    not perform labor and services.

20         I expect Judge Garaufis will instruct you that when

21    someone is in the country illegally, the threat of deportation

22    or being forced to leaving the country may constitute serious

23    harm.  Serious harm can also include psychological harm.

24         Now, Lauren and Daniela both testified that the

25    defendant did threaten to send Daniela back to Mexico.  When

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS – MS. PENZA

1   you're looking at how threats of serious harm would impact

2   someone, I expect Judge Garaufis will instruct you that

3   serious harm involved looking at all the surrounding

4   circumstances.

5          For Daniela, almost all of these factors are met.

6   Verbal abuse.  Daniela's was constantly being told she was

7   pride and destructive.  Isolation.  Daniela went months

8   without any human contact.  Poor living conditions.  She had a

9   phone foam pad on the floor and nothing else.  Blacked out

10  curtains, dirty clothes, denial of adequate food.  You saw in

11  her newsletter that sometimes the food was old or moldy.

12         Daniela testified that she was on the verge of

13  suicide before she left her room.  So you must consider the

14  circumstances when evaluating how susceptible she would have

15  been to the defendant's threat of threat deportation.

16         Additionally, writing those letters was the only way

17  Daniela knew to try and avoid being in the room any longer and

18  bearing additional psychological harm.

19         One last thing on this element.  I expect

20  Judge Garaufis will instruct you that the opportunity to

21  escape is irrelevant to determining whether someone was being

22  trafficked for labor and services.  So Judge Garaufis will

23  tell you the opportunity to escape is irrelevant.  Now, here

24  Daniela testified about all of the reasons why she couldn't

25  leave the room but that is not what matters here.

SUMMATIONS – MS. PENZA

1          The third element is that the defendant acted

2     knowingly.

3          The evidence of the defendant's knowing involvement

4     in Daniela's trafficking includes e-mails with Lauren during

5     Daniela's confinement such as when she reported that Daniela

6     said she was coming undone.  The picture the defendant

7     demanded when Daniela cut her hair, and the defendant's role

8     in keeping her from going to the dentist.

9          There were also the text messages that you saw just

10    late last week where the defendant exchanged with Kristin

11    Keeffe while Daniela was being driven to the Mexican border

12    after the defendant made good on his threat.  Those can be

13    found at Government Exhibit 1353.

14         And there were the letters, hundreds of them.  So

15    many of them where she drafts a program.  So many of them

16    where she begs to be let out.  All addressed to the defendant.

17         With that, Racketeering Act 8, Racketeering Act 8-A

18    is proven.

19         Now, that actually means you found two racketeering

20    acts.  And once you found two racketeering acts proven, that's

21    enough to establish a pattern of racketeering activity and it

22    find the defendant guilty of Counts One and Two.

23         Now, even though Racketeering Act 8 will be

24    satisfied on that trafficking charge alone, there's another

25    way to find that Racketeering Act 8 is proven.  And that's if

SUMMATIONS - MS. PENZA

1  you find the defendant committed document servitude.  Again,

2  he may not have personally committed it but it was on his

3  orders that it happen.

4       Document servitude has two elements.  Here, the

5  Government has proven it first that the defendant commanded

6  the concealment of Daniela's birth certificate.  And the

7  second, that the defendant did so with the intent to commit

8  forced labor or trafficking.  Notably, there is no requirement

9  that the defendant violated the forced labor or trafficking

10  statutes.

11       Here, the Government has proven beyond a reasonable

12  doubt that once Daniela with a deported to Mexico, the

13  defendant directed that her birth certificate be withheld from

14  her with the intent of making her complete book reports by

15  certain deadlines or else be stuck without her identification

16  documents in Mexico.  The proof of this act is correspondence

17  between Daniela and her family and members of the inner circle

18  discussing withholding her papers at the defendant's direction

19  of which we showed you some examples.

20       This is one of the examples here,

21  Government Exhibit 1579.  You can see in the middle the e-mail

22  from Kristin Keeffe, "Hi, all here is the final e-mail.

23  Everyone is in agreement and has reviewed it including L,"

24  Lauren Salzman, and K, the defendant, Keith Raniere, "I think

25  this should come from the family."

5324

SUMMATIONS - MS. PENZA

1          And I'll just read it.  "Please send a book report

2   and I'll e-mail account password you had access to in the last

3   year to me within 48 hours.  This book report must be based on

4   a book that is 250 pages or more and must be a minimum of

5   10,000 words.  Thereafter, you will need to send one new book

6   by midnight every seven days.  If you do not complete these

7   tasks without exception or excuse, it will demonstrate to all

8   of us a lack of care for the family and, therefore, we cannot

9   support such different in values.

10         Additionally, you need to legitimately return to

11  Clifton Park, New York by Wednesday, April 4, 2012.

12  Unfortunately, we cannot consider sending you any of your

13  requested documents."

14         (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1          MS. PENZA:  Daniela testified about this as well on

2     page 2994.  She explained that after she was in Mexico, her

3     family (which the emails evidence was at the direction of the

4     defendant and the members of the inner circle) kept her birth

5     certificate from her and tied it to her completion of book

6     reports.  She also explained that in Mexico without a birth

7     certificate you cannot get an official ID or passport so

8     you're essentially identity-less.

9          Daniela went on to explain that a lawyer friend who

10    worked for a human rights group ultimately helped her get her

11    birth certificate and Daniela explained, "Having an identity

12    is everything."

13         And, therefore, Racketeering Act 8B is proven as

14    well.

15         Daniela was in that room for 100 weeks.  There were

16    no locks on the doors but there were security cameras and, as

17    Daniela explained, as someone illegally in the country, there

18    were a number of fences keeping her where she was as well and

19    all that time she was writing hundreds of letters to the

20    defendant as she was ordered to until finally on the 705th

21    day, having stored up enough cleaning supplies to kill

22    herself, Daniela decided she was going to live and she did and

23    she testified before you about how she survived the

24    defendant's crimes.

25         Now we're going to turn to the category of crimes

5326

1    placed under the category of deception and there was deception

2    in all of them but they're also all similar because they were

3    ways in which the enterprise operated to surveil enemies and

4    protect itself and, of course, to protect the defendant.

5            First we're going to discuss two racketeering acts

6    related to identity theft by way of hacking computers.  So,

7    just like we looked at the identity theft in Racketeering

8    Act 1 that was in relation to a different crime, here we're

9    talking about identity theft where the purpose is to surveil

10   somebody else's email communications.

11           Daniela testified that when she was on her perch at

12   3 Flintlock she was shocked that the defendant and Nancy

13   Salzman were paying $24,000 to purchase email passwords.

14   After the defendant challenged her to see if she could,

15   Daniela ended up successfully obtaining three user names and

16   passwords.  Let's walk through each of them.

17           Now, before we turn to the individuals involved, I

18   think the motive behind the conspiracy is simple, the

19   defendant perceived -- we'll talk about Marianna later, but

20   certainly Edgar Bronfman and James Loperfido and his

21   connection to James O'Hara -- Joseph O'Hara, he viewed them

22   through paranoia and surveillance.  You saw the box and we

23   went through this in pretty great detail about the documents

24   from Canaprobe.  And you also saw the correspondence with

25   Kristin Keeffe where she and the defendant were using coded

1    language in their efforts to obtain personal banking

2    information on individuals.

3              Now, Racketeering Acts 5A, 5B, 5C and Racketeering

4    Act 7 have to do with the monitoring of electronic accounts

5    belonging first as a general conspiracy and then belonging to

6    Edgar Bronfman, James Loperfido and Marianna, and Daniela

7    helped the defendant commit all of these crimes.

8              First, let's look at the hacking of the Edgar

9    Bronfman account.  The story is relatively simple.  Daniela

10   accessed Edgar Bronfman's email account at the direction of

11   the defendant and with the assistance of Clare Bronfman.

12   Daniela explained to you how a keylogger works and how it

13   picks up all of the key strokes that somebody is using on

14   their computer.  Daniela accessed Edgar's email and then would

15   regularly provide the content of the email account to the

16   defendant.  As I said, the motive behind this conspiracy was

17   simple, the defendant perceived Edgar Bronfman as an enemy.

18             Now, throughout the trial you heard about Clare

19   Bronfman and her unwavering commitment to the defendant.  Even

20   up until now she paid -- she put in $14 million to finance the

21   defense in this case for both the defendant and other parties.

22   You've also learned about Clare Bronfman's father, Edgar

23   Bronfman.  Edgar Bronfman was an international name that had

24   connections in powerful circles throughout the world.  In

25   June 2003 Edgar Bronfman informed his daughter, Clare

1    Bronfman, of his distrust of ESP and the defendant.  In fact,

2    Edgar refused to take any ESP curriculum in the future.

3    Moreover, Edgar Bronfman said that he refused to shill for the

4    organization.

5            Only a few months later Edgar Bronfman publicly

6    condemned the defendant and ESP in a Forbes Magazine article

7    published in October 2003.  Edgar Bronfman told Forbes

8    Magazine, "I think ESP is a cult."  With this statement Edgar

9    Bronfman officially became an enemy and although the defendant

10   and ESP considered him an enemy, Edgar Bronfman intended to

11   remain neutral in order to preserve his relationship with

12   Clare Bronfman.

13           In June 2004 Edgar informed Clare that he would not

14   be an advocate for ESP.  Nonetheless, Edgar Bronfman agreed to

15   refrain from criticizing the organization and assumed a

16   neutral position.  Still the defendant would not accept the

17   truce.  In communications with Edgar Bronfman and the

18   defendant in the fall and winter of 2005 the focus on Edgar

19   was clear.  In fact, in November 2005 in an email that's on

20   the screen as Government Exhibit 1456 from November 9th, 2005,

21   in that email Clare Bronfman discusses with the defendant that

22   she was emotional last night during the meeting with the

23   strategy team with regards to her father.

24           Now, Daniela told you that Edgar Bronfman's status

25   as an enemy of ESP drove the defendant's desire to obtain

1    access to his emails.  As a result, Daniela was put to the

2    task.  You saw many emails that this was just -- this was at

3    the exact same time, November 2005, that Daniela started

4    researching keyloggers; Government Exhibit 1516, Government

5    Exhibit 1517, that was the one that attached the white dress

6    jpeg that she said was a tester for the keylogger.

7          On November 6, 2005 she sent the defendant

8    keylogging sites, different websites about keylogging, and

9    that's Government Exhibit 1518.  So, that's only three days

10   prior to this email about the strategy team meeting regarding

11   Edgar Bronfman.

12         During her testimony Daniela explained she created a

13   keylogger file and embedded it on an image.  Daniela provided

14   the image on a USB drive to Clare Bronfman.  Ultimately Clare

15   Bronfman visited her father and physically inserted the USB

16   drive into his computer.  The file was then opened and

17   deployed.  The hack was successful and soon the keylogger

18   revealed Edgar's email password.  After Daniela acquired Edgar

19   Bronfman's password she began to access his emails.  Daniela

20   testified that she was instructed to look for information

21   relative to ESP and ESP's legal cases.  Once found, this

22   information was expected to be passed to the defendant.

23         For years -- page 2556 and 2557 Daniela explained

24   her role in the hacking of Edgar Bronfman's email account.

25   For years Daniela monitored Edgar Bronfman's account and

1    reported the results to the defendant.  Now, in November 2008,

2    and this is even when he and Daniela have not been speaking in

3    person for years, the defendant inquired about the content of

4    Edgar Bronfman's email accounts.  These communications

5    included coded language similar to other instances we've seen

6    in this case such as when the defendant and Kristin Keeffe

7    were communicating about Canaprobe.

8            Now, despite the use of coded language, we know that

9    Edgar Bronfman was a subject of this conversation because

10   Daniela testified to that fact.  So, in this one, and we'll

11   pop it up:  We'll talk about -- it says KLG for our close

12   friend -- who Daniela testified was Marianna and we'll talk

13   about in a minute -- I will check later today, will let you

14   know.  Keylogger for our not so close friend I will also check

15   today and will also let you know.

16           And then in the follow-up email the defendant

17   writes:  By the way, with regard to the keylog is there any

18   additional ones, you gave me one file.

19           And then it goes on about Marianna's account.  But

20   then it says:  What about the other keylog from the test,

21   there's some potentially important things recently.

22           And so we knew that right around this time,

23   November 2008, the defendant had reason to be curious about

24   Edgar Bronfman's communications.  If you recall, this was the

25   exact period of time when Clare Bronfman was in contact with

1   her father and with Stephen Herbits.  You heard from

2   Mr. Herbits in this courtroom.  We also offered emails

3   describing the contentious relationship between Clare Bronfman

4   and Mr. Herbits, particularly during November 2008.

5        Here you can see two days after the email asking --

6   talking about where the defendant writes to Daniela inquiring

7   about the keylogger for their not so close friend, you can see

8   that Stephen Herbits and Clare Bronfman are in a back and

9   forth and you saw this email and Mr. Herbits testified about

10  it as well where Mr. Herbits writes:  Typical -- where first

11  Clare Bronfman has written:  I was under the impression that

12  dad had asked you to come in and help us resolve this

13  situation, that he wanted to help us turn things around and

14  confided in you to do so.

15       And that's when Mr. Herbits responds:  Typical

16  friend or enemy when your father calls me, he said that you

17  and Sara had specifically asked him to ask me if I would be

18  willing to help you, not him.

19       So, right here it is very clear who the defendant is

20  referencing and that it is he who is concerned about Edgar

21  Bronfman's email.  And then you also saw how all of these

22  emails between Edgar Bronfman -- between Stephen Herbits and

23  Clare Bronfman would all be forwarded to the defendant for his

24  reaction and for him to help draft them as well.

25       Now, you heard throughout the trial testimony that

1   Edgar Bronfman was only one of the many people that the

2   defendant and his inner circle considered an enemy.  You saw a

3   whole box full.  Another person who eventually fell into that

4   category was James Loperfido.  James Loperfido testified that

5   he was introduced to NXIVM and ESP through Joseph O'Hara.

6   Mr. Loperfido told you that he was hired to perform

7   accounting-related duties.  In this capacity, Mr. Loperfido

8   worked closely with Kathy Russell.

9        Now, if you recall, Kathy Russell handled most of

10   the accounting and bookkeeping for the defendant, ESP and

11   ESP-related companies.  Government Exhibit 801 from January

12   9th, 2005 shows the interplay of all of these individuals.

13   So, Mr. Loperfido, when he was or the stand Mr. Agnifilo asked

14   him about Mr. Loperfido's personal interactions with the

15   defendant and so this email is an example of Kathy Russell

16   communicating with the defendant about Mr. Loperfido -- about

17   her communications with Mr. Loperfido and Mr. O'Hara and

18   trying to get his buy in on their communications.

19        Now, at a certain point after this Mr. O'Hara and

20   ESP had a falling out and at that point in time O'Hara was

21   labeled as an enemy by the defendant.  At that point O'Hara

22   became the target of a hacking campaign and you heard that

23   Daniela and the defendant, they tried to gain access to

24   Mr. O'Hara's email account but they were unsuccessful.  So, as

25   a result, the defendant set his sights on the unassuming

1   accountant referred to ESP by O'Hara and soon the defendant

2   had devised a plan concerning Mr. Loperfido.

3          According to the plan, Kathy Russell was tasked with

4   occupying Mr. Loperfido while Daniela went in and manually

5   installed the keylogger into his computer and she was

6   successful.  This is Government Exhibit 1527 and we went

7   through this document when Daniela was on the stand.

8          And you know that the results found in Government

9   Exhibit 1527 are accurate because of Mr. Loperfido's

10  testimony.  He confirmed his use of certain passwords found on

11  the raw files discovered in Daniela's email account.  Once

12  these results were obtained they were passed to the defendant

13  for his review.  And so, here you can see, this is Daniela's

14  testimony on page 2545 where she describes what she would do,

15  she would go into the email, she would read it, see if it was

16  relevant, copy/paste it into a text file and then she would

17  bring them to the defendant and she also testified that she

18  would observe the defendant reading and reviewing them.

19         Now, the defendant also used these hacking efforts

20  to control the women in his life.  In fact, Daniela was

21  directed to obtain access to her own sister's electronic

22  devices.  This occurred after Marianna was found to be having

23  issues and throwing tantrums.  Daniela told you that the

24  defendant and Pam Cafritz expected -- and this was on

25  page 2560 -- that Marianna was rekindling a relationship with

1    an ex-boyfriend.  This created jealousy in the defendant and,

2    of course, Pam Cafritz came in as well to be the fixer.

3           Now, in email communications there is evidence that

4    Daniela, Pam Cafritz and the defendant all separately were

5    discussing how to install keyloggers on the devices that

6    Marianna was using so they could monitor communications.

7    Daniela testified that she was able to obtain the necessary

8    password for Marianna's Facebook account.  In an email sent by

9    Daniela to the defendant on November 3rd, 2008, Daniela

10   provided the requested information to the defendant.

11   Additionally, Daniela entered in the raw results of the

12   keylogger in the form of a text file.

13          So, here we see again emails going back and forth

14   with the defendant.  First she says:  Bad news about the --

15   about the keylogger, I can no longer get through.  Kristin

16   will give you details and options.

17          And Daniela testified that was as to the Edgar

18   Bronfman account.

19          But the one in closer proximity, Marianna's account,

20   I have not checked, apparently the machine is not being used.

21   Already talked to Pam but do not think she will make it

22   happen.

23          And then the defendant writes back:  The closer

24   proximity machine I think is in use.

25          Here you can see that Daniela actually attached

Holly Driscoll, CSR
Official Court Reporter

1   again the raw data file to the defendant providing the

2   information on her sister's account and you can see she

3   writes:  My sister's Facebook info, user name, email as

4   always, password ohmy8god.  I don't really want to look into

5   it, this is between you and her.  I have the latest raw text

6   file I am attaching.  I don't read through it.  I just look to

7   find user name password zones.  I haven't found the one for

8   gmail.  There's a bunch of different combos I need to try.  I

9   will let you know.  Didn't find anyone to drive either a

10  distant location today to try the other keyloggers.

11          So, here Daniela and the defendant clearly are

12  communicating about the keyloggers.  So, I submit that based

13  on this, the government has proven three additional

14  racketeering acts.  So, here you can see this was the raw

15  results and where you can find where it has her email account

16  and the password and Daniela walked us through how she would

17  use the raw data and actually extract out those user names and

18  passwords.

19          So, what we just went through covers Racketeering

20  Act 5 which has three subparts; 5A, conspiracy to commit

21  identity theft, and so that relates to the general agreement

22  of the defendant with other members of the enterprise, Nancy

23  Salzman, Kristin Keeffe, Daniela, to obtain user names and

24  passwords generally, so Kim Snyder's password, Joseph O'Hara's

25  password and all of the other passwords that we talked about.

                        Holly Driscoll, CSR
                      Official Court Reporter

1    And then there's two additional subparts, identity theft of

2    James Loperfido because they actually did obtain his user name

3    and password, and identity theft of Edgar Bronfman because

4    they actually did obtain his user name and password.

5            And then Racketeering Act 7 is conspiracy to commit

6    identity theft as to Marianna and there the defendant's

7    agreement with Daniela, with Pam Cafritz to obtain the user

8    name and password for Marianna in order to surveil her

9    communications is what we're talking about there.

10           And so, the elements here of identity theft are the

11   same as we looked at in the very first racketeering act when

12   we looked at conspiracy to commit identity theft as to Ashana

13   Chenoa.  The difference is that for the fourth element where

14   before we had the -- before the identity theft was in

15   connection with various immigration-related offenses of

16   transporting aliens across the border, here the unlawful

17   activity that it is in connection with is the interception of

18   wire and electronic communications and so for each of these,

19   again we're talking about conspiracy as to Racketeering Act 5A

20   and Racketeering Act 7 but as to the other ones it is enough

21   that the defendant commanded or helped to put in place what

22   happened.

23           And so for each of these you know that Daniela,

24   either in agreement with the defendant or at his command,

25   possessed a means of ID of another person, and a user name and

1     a password to your computer is in fact a means of ID of a

2     person, and that they knew that the means of ID belonged to

3     another person, these were all real people that they knew and

4     understood.  There's no lawful authority to go into another

5     person's email account.  And that they acted in connection

6     with the desire to read these people's email addresses

7     intercepting wired electronic communications.  Additionally,

8     that this affected interstate or foreign commerce.  Here

9     Daniela was using the internet, was using various materials

10    and people were in different states at different times.

11           And so, I submit that this proved an additional two

12    racketeering acts, Racketeering Act 5, and there's three

13    subparts there, so the general conspiracy to commit identity

14    theft, the general agreement that they were going to hack into

15    people's emails accounts using their user names and passwords,

16    proved; that they were going to do this specifically as to

17    James Loperfido, proved; and that they were going to do this

18    specifically as to Edgar Bronfman, proved; and then for

19    Racketeering Act 7, that there was this agreement to do the

20    same process in regards to Marianna, also proved.

21           Now we're going to turn to Racketeering Act 6, again

22    in that deception category, and Racketeering Act 6 alleges

23    that the defendant conspired to alter videotapes for use in

24    the Stephanie Franco case in federal court in New Jersey.  The

25    goal of the conspiracy was clear, to protect against the

1   release of damaging statements included in the videotapes

2   particularly to the parties in the lawsuit who included many

3   of the defendants' enemies.

4        To do this the defendant and his co-conspirators had

5   to corrupt the integrity of the videotapes and their

6   availability in the case by altering them.  The defendant and

7   his co-conspirators altered the videotapes with the corrupt

8   intent to obstruct the administration of justice and in doing

9   so not only submitted the altered videotapes to the parties

10  but lied to a federal magistrate judge, a federal magistrate

11  judge whose purported bank records were within the box,

12  Government Exhibit 204 that we've looked at, and by telling

13  him that the videotapes were, quote unquote, unedited.

14       So, let's discuss the alteration of the videotapes.

15  In June 2008 the defendant asked Mark Vicente if there was any

16  way to remove stuff from a videotape in such a way that

17  doesn't make it look like it was removed.  Mark Vicente

18  testified to that on page 653.

19       The defendant further asked if there was a way to do

20  it so that it looked like a glitch or that it was part of a

21  natural process to remove something.  Mr. Vicente told you

22  that he knew how to create glitches and that it could be done

23  by moving from a digital version to the analog or VHS version.

24  Mr. Vicente specifically told the defendant that there were

25  ways to create glitches on analog VHS tapes and that there

1    were ways to hide the removal of portions of a videotape with

2    certain kinds of glitches.  Mr. Vicente explained that when he

3    used the term "glitches," he was referring to alterations of a

4    videotape that created interferences in the tape itself.  He

5    further explained that VHS did not contain the same

6    information as digital formats and that when a videotape moved

7    from a digital to a VHS you can't see things like missing time

8    code -- you can't look at things like time code information

9    and see if there's something missing.

10          And so, what was the defendant's reaction, he said,

11   "Oh, that's good.  There's some things we need removed."  And

12   the defendant asked if -- and the defendant said that it had

13   to do with the legal department and needing to have some

14   things removed from tapes to do with the case where the

15   methodology is -- their methodology, the ESP tech methodology

16   is being evaluated and the patent is being looked at.

17          The defendant asked Mr. Vicente to alter the

18   videotapes and to remove segments from them and Mr. Vicente

19   knew that the videotapes would be produced in some litigation,

20   some legal case.  Mr. Vicente also recalled that the segments

21   that were to be removed involved Nancy Salzman making claims

22   that the NXIVM curriculum could affect a person's health like

23   curing a disease or removing headaches.  Mr. Vicente explained

24   that he believed the patent would be at risk if the tapes were

25   handed over.  And Mr. Vicente agreed to alter the videotapes

1   as requested by the defendant.  So, all of the information

2   that I just provided are between pages 664 and 670 in the

3   transcript.

4           And ladies and gentlemen, Mr. Vicente told you that

5   altering the videotapes was illegal and you heard about the

6   process of altering the videotapes.  The legal department had

7   to determine what needed to be removed from the videotapes.

8   Mr. Vicente explained that the people he worked with in the

9   legal department were not lawyers and that he primarily worked

10  on the project with Kristin Keeffe and Clare Bronfman.

11  Mr. Vicente also told you that the legal department gave the

12  video department a list of time code segments that needed to

13  be removed.  He told you that he saw the handwritten notes

14  with time codes on the desk.  The video department then used

15  those various processes to create the glitches and multiple

16  copies of each videotape were made to make them appear older.

17          Mr.Vicente told you that while he oversaw the

18  project, other people in the video department also worked on

19  editing the videotapes.  He explained in some detail the

20  actual procedures that were involved in altering the

21  videotapes.  He mentioned moving the videotapes into a

22  computer editing system and removing segments and sometimes

23  putting static in the videotape.  He recalled that sometimes

24  they used machine-to-machine dubbing and jiggled the cables

25  between the machines to create interference.  He explained

1    that they randomized the procedures to make it seem natural or

2    organic, so there might be a glitch in a place where they

3    weren't really looking to cut anything out but just to make it

4    look like the glitches were appearing naturally.  And, of

5    course, all of the time codes and metadata was removed.

6         Mr. Vicente further described to you why the types

7    of glitches that were created were not natural because there

8    was no consistent pattern to the glitches, like a consistent

9    line or a wave that you would see if there had been a power

10   outage.  Mr. Vicente then wrote down for you four different

11   types of edits or glitches that were used to alter the

12   videotapes.

13        The first he talked about was called a static cut-in

14   where a segment would be removed and static was used to

15   replace it.  The second was a jiggle which was done

16   machine-to-machine and the connecting cables would be jiggled

17   or pulled out for a minute and that would create glitches.

18   And Mr. Vicente explained that the jiggle was used to suggest

19   that there was something wrong with the tape and that it could

20   also be used to hide the static glitch.  The third he talked

21   about was the pause cut which was also machine-to-machine and

22   the recording machine would be paused.  The fourth type was

23   another stop cut machine-to-machine where instead of pausing,

24   the recording machine was stopped.

25        Mr. Vicente showed you examples of some of these

1    methods and the actual videotapes themselves, Government

2    Exhibit 605 A through D, and he recognized the methods as

3    being consistent with the methods he used to alter the

4    videotapes in 2008.

5              (Pause.)

6              That's okay, I'll let your memory serve.

7              And so, Mr. Vicente walked us through various

8    different types of these cuts, if you remember, and so 605-C

9    showed the jiggling and the static insert, 605-B showed three

10   types of glitches, the static insert, the jiggling and the

11   pause cut and those are the examples I was going to show you

12   now.

13             Mr. Vicente also testified that the initial dubbing

14   to create the master tapes occurred at 13 Twilight Drive and

15   that the multiple copying of the videotapes happened at

16   Apropos.  He recalled that several VHS or combo DVD/VHS

17   machines were purchased for the project, that they laid around

18   for years afterwards.  All of this is at page 682.

19             Mr. Vicente didn't watch all of the videotapes

20   because he was focused on the alterations or the glitches.

21   You learned that at the end Mr. Vicente had boxed the

22   videotapes that were delivered back to the legal department.

23             Now, you saw emails where the alteration of the

24   videotapes were discussed.  This is Government Exhibit 1397R

25   and it is from June 30th, 2008, and it says:  The

5343

1    duplication -- it talks about the duplication of tapes Keith

2    has asked me for and the aging and weathering of the masters.

3            There was also an email in 1396R on June 21st to

4    Nancy -- from Chris to Nancy Salzman copying Kristin Keeffe,

5    Clare Bronfman and Mark Vicente where reviewing and editing

6    the videotapes was discussed and purchasing a VCR was

7    discussed.  And so this, what we were just looking at, is a

8    memo that Mark Vicente had wrote about the "project that never

9    seemed to end" and in it he discussed the new machines and

10   cleaning up the house -- that was where it was also discussed

11   cleaning up the house, but also discussing the new machines as

12   well and the duplication of tapes for Keith.

13           Now, you saw another email, Government

14   Exhibit 1395R, a July 12, 2008 email from Mark, Mr. Vicente,

15   when the project was going to be completed and then there's a

16   response where he talks about the copying of videotapes and

17   Nancy Salzman's review of the videotapes.  So, all of this is

18   going on in July 2008.

19           So, where did the videos go?  You know where the

20   videotapes went because Anthony Valenziano, Stephanie Franco's

21   attorney, testified last week and told you where they went.

22   He told you that the altered videotapes were produced by

23   NXIVM's attorneys to Stephanie Franco's attorneys in the

24   federal civil cause brought against Stephanie Franco by NXIVM,

25   the case initially filed in federal court in Albany, New York

1    that was later transferred to federal court in New Jersey.

2    You'll recall that Mr. Valenziano explained the facts of the

3    case including Ms. Franco's being startled by some of the

4    representations that the intensive include -- representations

5    of the intensive.

6          Now, Mr. Valenziano told you that the main issue was

7    a binder of Stephanie Franco's that ultimately made its way to

8    Rick Ross, who also testified before you last week, and that

9    professors wrote articles about the binder and that those

10   articles were published on Mr. Ross's website.  Mr. Ross also

11   told you about this in significant detail.  And Mr. Valenziano

12   explained the long, tortured procedural history of the case

13   which I will not go into in detail right now.

14         Now, he testified that the case was transferred to

15   federal court in New Jersey in 2006 and that Judge Cavanagh

16   was the judge in the case until 2013 and that Judge Falk was

17   the assigned magistrate judge.  You'll recall that there were

18   files on both Judge Cavanagh and Magistrate Judge Falk in the

19   Canaprobe box recovered from Nancy Salzman's home.

20         And you also know the case originally brought by

21   NXIVM against Ms. Franco lasted for 14 and a half years where

22   NXIVM had ten or eleven law firms and eventually settled in

23   2018 for a dollar all because of Stephanie Franco's binder.

24         Mr. Valenziano also told you that Ms. Franco's

25   attorneys requested the production of the videotapes in 2007

Holly Driscoll, CSR
Official Court Reporter

1    or 2008 because they believed the videotapes included false

2    statements and that one of the videotapes related to the

3    Forbes article about NXIVM.  Another reason they wanted to see

4    the videotapes was because they wanted to see some of the

5    statements that had startled Ms. Franco, like the statements

6    about not paying taxes.  At this point Ms. Franco was

7    considering and ultimately did bring her own countersuit.

8            Mr. Valenziano testified that the 35 videotapes were

9    eventually produced on July 1st, 2008 and that later another

10   22 videotapes were produced for a total of 57 videotapes and

11   he identified those videotapes for you which are in evidence

12   as Government Exhibit 605.  And this scattered production of

13   the altered videotapes is entirely within the timeline

14   established by the emails that you looked at from Mark Vicente

15   and his memo and those were -- the videotapes that he

16   identified were the same ones that Mark Vicente said that

17   although he hadn't paid attention to what the videos

18   themselves were, that he could identify the various glitches

19   as being consistent with the types of glitches that he did to

20   the videos that were produced in the Franco litigation.

21           Now, this is the email -- there was an email from

22   NXIVM's attorney producing the initial videotapes at

23   Government Exhibit 619 where the attorney said that the

24   initial 35 videotapes were being produced exactly as they were

25   kept in the ordinary course and the cover letter dated

1    July 1st, 2008 producing the videotapes, which is in evidence

2    as Government Exhibit 618, and you saw the letter from Ms.

3    Franco's attorney to Magistrate Judge Falk also dated

4    July 1st, 2008 which quoted NXIVM's attorneys falsely saying

5    that the 35 videotapes were produced in unedited fashion as

6    requested, and that's Government Exhibit 617 which is on the

7    screen right now.

8           Mr. Valenziano also testified that he had concerns

9    about the videotapes because they didn't seem to include the

10   statements that had startled Ms. Franco, they didn't appear to

11   be complete, they appeared to have jump cuts and seemed to be

12   skipping around.  Mr. Valenziano testified to this on page

13   4527.  Mr. Valenziano explained that they actually considered

14   retaining an expert to look at this but that it was too

15   expensive.

16          So, Racketeering Act 6 charges the defendant with

17   conspiracy to alter records for use in an official proceeding.

18   Racketeering Act 6 is another one of the racketeering acts

19   that charges the defendant with conspiracy.  So, here the

20   concern is whether the defendant agreed with others to commit

21   the crime.

22          Now, to prove that the defendant is guilty of this

23   conspiracy, here the elements -- these are the elements of

24   conspiracy to obstruct justice and so here the defendant has

25   to have agreed with at least one other person, here it could

1    be Kristin Keeffe, it could be Mark Vicente, to commit this

2    crime and here the elements are the altered or mutilated video

3    recordings, that they acted with the intent of impairing the

4    recording's integrity or availability for use in an official

5    proceeding, and that they acted corruptly.

6            Now, as I expect Judge Garaufis will instruct you

7    that the Franco case in federal court in New Jersey was an

8    official proceeding, there really is no doubt about that.  And

9    here, although there is no need for us to prove it, you know

10   that the object of the conspiracy actually was completed, the

11   videotapes were altered as instructed by the defendant and

12   produced to the parties in the Franco case.

13           I also expect Judge Garaufis will instruct you that

14   to act corruptly means to act with an improper purpose and to

15   engage in conduct knowingly and dishonestly and with the

16   intent to obstruct, impede or influence the due administration

17   of justice, in this case the Franco federal case.

18           We don't have to prove with certainty that the

19   conduct would actually affect the Franco case, only that he

20   acted corruptly in the manner described.  I'd also note that

21   we do not have to prove that the defendant's conduct actually

22   obstructed justice or that the altered videotapes contained

23   particularly material evidence related to the Franco case.

24   Instead, the defendant's conduct must only have had the

25   natural and probable effect of interfering with the due

1    administration of justice in the Franco case, in other words,

2    the fair, impartial, uncorrupted and unimpeded investigation,

3    prosecution, or disposition of any matter in the Franco case.

4    And, lastly, the due administration of justice includes every

5    step in the Franco case to assure the just consideration and

6    determination of the rights of the parties.

7            Here we more than meet our burden on this

8    racketeering act and there's no doubt that the defendant

9    conspired with Mark Vicente and others to alter the videotapes

10   and that he did so corruptly and with the intent that the

11   edited portions of the videotapes not be provided to the

12   parties.  The production of the altered videotapes in the

13   Franco case deprived the parties of particularly material

14   evidence, as explained by Mr. Valenziano, and clearly

15   interfered with the due administration of justice by impeding

16   the parties' ability to examine the complete, unedited

17   videotapes.  Therefore, there's overwhelming proof that the

18   defendant participated in the conspiracy to alter the

19   videotapes in the Franco case.  That brings us to Racketeering

20   Act 6 as also having been proved.

21            (Continued on next page.)

22

23

24

25

```
1              MS. PENZA:  Your Honor, is now a good time to take a

2    break?

3              THE COURT:  Yes.  Let's take a ten-minute break.

4    All rise for the jury.

5              (Jury exits the courtroom.)

6              (Brief recess.)

7              THE COURT:  Have you received this letter from the

8    Government regarding the sentence and the charge?

9              MR. AGNIFILO:  I'm not sure that I've seen it,

10   Judge.

11             THE COURT:  All right here.  I'll give you a copy.

12   We'll talk about it at lunch time.  Let's bring in the jury.

13             (Jury enters the courtroom.)

14             THE COURT:  Please be seated.

15             I'll set, Ms. Penza?

16             MS. PENZA:  Yes, your Honor.  Thank you.

17             So we fixed a few things.  So this is the slide that

18   I originally wanted to show you at the beginning of my

19   presentation; I think it's still worth showing now.

20             So as we've been going through the various

21   Racketeering Acts, so far we've gone through what I

22   categorized under trafficking of Daniela.  And that's when we

23   went through Racketeering Act 1, related to her crossing over

24   the border.  Then Racketeering Act 8, which related to labor

25   and services starting when she was in the room and then
```

1    following through until she was in Mexico.  Then we moved on

2    to the deception category, and so far first we went over

3    Racketeering Act 5 and the three different ways that

4    Racketeering Act 5 could be proven.  And then we went to

5    Racketeering Act 7, because those go together.

6           Now we just went over the conspiracy to alter

7    records in an official proceeding.

8           We're going to move on now to Racketeering Act 11,

9    which was related to the use of Pam Cafritz's credit card

10   after her death, which is another form of identity theft.

11   Then after that, we'll cover the exploitation of Camila.  Then

12   we'll cover DOS.

13          As you can see with DOS, what I was trying to

14   explain earlier but it was difficult without a visual, is that

15   for DOS we're covering two Racketeering Acts.  But we'll also

16   be talking through the five different stand alone counts.

17          Now you can kind of see the way we were moving.  So

18   we went diagonally, then back up to Camila, then we'll finish

19   off with DOS.

20          I think the videos are working too.  I think there

21   is some that you remember but we're going to go over one of

22   the video alterations because it's been a while since we've

23   watched that.

24          (Video played)

25          So that was an example of Mark Vicente's testimony

1    that he testified as an example, Government's Exhibit 605C of

2    jiggling and the static insert.  We can watch 605B also.

3              (Video played)

4              That was an example of a jiggle static.

5              So now we'll move on to Racketeering Act 11.  Again,

6    this is one that we have in the deception bracket.

7    Racketeering Act 11 is conspiracy to commit identity theft of

8    Pamela Cafritz.  This act is straight forward as it involves

9    unauthorized use of Pam Cafritz's credit card after she died.

10             So you know that Pam Cafritz died on November 7,

11   2016, because you saw the death certificate, this is

12   Government's Exhibit 1108.  You saw document relating to Pam

13   Cafritz's estate that told that you Ms. Cafritz's will

14   dominated the defendant the sole beneficiary and executor of

15   her estate.  That the defendant renounced his appointment as

16   the executor on December 20, 2017, while he was in Mexico.

17   That was Government's Exhibit 724.

18             Then Government's Exhibit 722 were the full American

19   Express records that were put into evidence.  Government's

20   Exhibit 725 was the schedule that Investigator Guerci put

21   together which summarized all of those records and made them

22   more digestible.

23             And so you heard from Investigator Guerci, when he

24   walked through his schedule of the Cafritz American Express

25   statements after her death that basically start with the

1    charge for an ambulance on the date of her death.  Then

2    Investigator Guerci pointed out a number of charges on the

3    American Express after Ms. Cafritz died.  Charges to Amazon

4    Marketplace, a number of charges to Keith Donato.  Those

5    charges used a Square device.  To Restoration Hardware for

6    thousands of dollars; a pet shop, a Dominoes Pizza; sock store

7    in Brooklyn; other pizza parlors; Neiman Marcus for $4,457; a

8    charge to Bergdorf Goodman for 11,350; a charge to Saks Direct

9    for $1,159; a National Grid utility bill; a Netflix bill; a

10   Satellite radio bill; a charge for Executive Success Programs

11   for $3,140; and charges to baby companies.  All together you

12   saw a total of $135,000 in charges on the Cafritz American

13   Express from November 7, 2016, the date of Pam's death, until

14   February 8, 2018.

15          You'll hear that Investigator Guerci determined

16   there was no authorized user of the Cafritz American Express

17   card; only Pam Cafritz and she was dead.

18          The American Express records also showed payments

19   received from Ms. Cafritz's Key bank account.  You saw the

20   checks from the Key bank contact that paid the American

21   Express bills, checks that were signed by the defendant.  Like

22   a check signed by the defendant a few weeks after Pam died.

23   And another check signed by the defendant for $29,390 on

24   January 19, 2017, a little over two months after Pam Cafritz

25   died, government's Exhibit 723.

1          Now, we also put into evidence Key bank records,

2     Government's Exhibit 721.  The Key bank records, 726, the

3     summary.  And then Government's Exhibit 727, which were the

4     summary of the checks signed by the defendant.

5          On page -- Government's Exhibit page -- Government's

6     Exhibit 721 pages 343 and 371, we saw something curious.  On

7     page 343 you saw check signed by Pam Cafritz on November 18,

8     2016, 11 days after she died.  On page 371 you saw a check

9     Buyer's Advocate signed by Pam Cafritz on November 7, 2016,

10    the day she died.

11         As I mentioned, you saw checks drawn on the Cafritz

12    Key bank account that were signed by the defendant.

13    Investigator Guerci explained to you that defendant did not

14    have signing authority or signature card for the Cafritz Key

15    bank account, but that didn't stop the defendant.  He just

16    kept signing check after check.  You saw these checks on

17    Investigator Guerci's schedule.

18         Checks paid the Cafritz American Express bill; a

19    check for insurance; to a plumber; and for work on a house and

20    for water bill; and Audi car payments; pool and tennis dues.

21    Checks for Siobhan and Samantha for personal assistance.  A

22    $60,847 check to Clare Bronfman.  The defendant signed

23    $320,305 worth of checks out of Ms. Cafritz's Key bank account

24    months and months after she died, without signature authority,

25    and none of the payments had anything to do with being the

1    executor of Ms. Cafritz's estate.

2            We listed all of Ms. Cafritz's Key bank account

3    after she died, which Investigator Guerci summarized in a

4    schedule, Government's Exhibit 726.

5            We looked at any anumber of payments.  Payments to

6    Danielle Roberts, Juliana Vicente, Kathy Russell.  A payment

7    of $1,700 to Edgarda, a first line DOS slave and master to

8    reimburse her for surveillance cameras.  Mortgage payments,

9    Knoxwood association dues.  Trips to the movies, and pizza,

10   Dunkin Donuts, Cracker Barrel, and more pizza.

11           You heard That investigator Guerci tallied all the

12   disbursements, all of this disbursements out of this account

13   totaled $736,856.

14           You also saw the deposits into bank account by

15   primarily from another Cafritz Key bank account totaling

16   $695,661.  Hundreds of thousands of dollars passing through

17   the Cafritz Key bank account, most of it coming from another

18   Cafritz Key bank account, all without authority, all months

19   and even years after Pam Cafritz died.

20           You also saw e-mails that were ultimately forwarded

21   from Clare Bronfman to the defendant.  You saw one of these

22   e-mails, one of the first e-mails, in November 22, 2016, about

23   2 weeks after Pam died, where Michelle Tarzia tells Clare

24   Bronfman that she needs to pay the American Express bill and

25   the card is still being used.  What is Clare Bronfman's

 1    response:  Oh, shit, okay.  Let me figure this out.

 2             Then she forwards the e-mail chain to the defendant

 3    and says:  Hey, I'm just forwarding these to you for your

 4    review and approval.

 5             We saw an e-mail chain requesting approval for the

 6    American Express bill in June 2017, government's Exhibit

 7    734-35, seven months after Pam's death.  What was the

 8    defendant's response:  Yup, pay it.

 9             You saw an e-mail chain requesting permission to pay

10    the Cafritz American Express bill, all forwarded to the

11    defendant.  How do you know the defendant participated in the

12    use of the Cafritz American Express card after she died

13    without authority?  Well, you heard from Keith Donato, the

14    chiropractor.

15             Dr. Donato treated the defendant and a number of

16    other members of the NXIVM community for many years.  He

17    testified that he treated the defendant starting in 2008 and

18    then into 2017, so about ten years.  Dr. Donato explained that

19    he was prepared to meet the defendant by Clare Bronfman or

20    Nancy Salzman, that he was told the defendant was like a monk

21    and did not drive and did not pay for himself.  Dr. Donato

22    told you that he was advised that someone else would be paying

23    for the defendant.  And that in all the years he treated the

24    defendant, the defendant may have only paid for himself once.

25             Dr. Donato explained that he saw the defendant

1    often, weekly sometimes.  And that most of the time he was

2    accompanied by Pam Cafritz and Marianna.

3              He also recalled that before she died, Pam Cafritz

4    always paid for the defendant's visits.  She paid with a

5    credit card.  Dr. Donato started using the Square reader.  He

6    explained that customers could swipe their card on the device

7    attached to the phone or they could manually enter their card

8    number.

9              Dr. Donato started using Nancy Salzman's house to

10   treat members of the NXIVM community in August 2016, to

11   accommodate Pam Cafritz's health problems.  He received

12   payments by credit card using his Square reader; until she

13   died, Pam Cafritz paid for the defendant.  Pam's health was

14   declining.  She started forgetting her credit card.  She

15   stopped swiping her card and started keying in her number.  We

16   saw that happened in October 2016 in Dr. Donato's receipts.

17             After Pam died, Dr. Donato recalled that Marianna

18   took over responsibility for paying for the defendant's

19   visits.  She always manually keyed in the number of Pam

20   Cafritz's American Express card.  You saw the Square receipts,

21   they show the number was always keyed in.

22             Government's Exhibit 710 is Dr. Donato receipts for

23   the payments received from the Cafritz credit card.  He

24   testified that each receipt involved the treatment of the

25   defendant.  Sometimes they also reflected treatment of

1    Marianna also, but on each of those days the defendant was

2    definitely treated.

3           Dr. Donato reviewed the receipts and testified from

4    November 16, 2016, nine days after Pam died, until November 8,

5    2017, he treated the defendant 35 times.  There were 35

6    receipts during that time period, ranging in payment amounts

7    from $145 to $285.

8           So based on Dr. Donato's testimony you know without

9    a doubt that the defendant was actively involved in using the

10   Cafritz American Express card for his own benefit after she

11   died.

12          Let's discuss the law related to Racketeering Act

13   11.  Again, this is a conspiracy and so here the crime is the

14   agreement.  And here the Government must prove that the

15   defendant knowingly transferred or possessed or used a means

16   of identification of Pam Cafritz.  That he knew the means of

17   identification belonged to Pam Cafritz.  That the defendant

18   acted without lawful authority.  That the defendant acted with

19   the intent to commit or to aid and abet or in connection with

20   an unlawful activity that violates federal law.  And that the

21   transfer or possession or use of the means of identification

22   occurred in or affected interstate or foreign commerce.

23          There can be no doubt that the defendant conspired

24   to use the Cafritz American Express card after she died.  That

25   he knew the card belonged to Pam.  And that he did not have

5358

1   lawful authority to use the card.  There is no doubt that the

2   card affected interstate commerce.

3          So let's discuss the fourth element, which requires

4   us to prove beyond a reasonable doubt that the defendant used

5   or transferred or possessed the means of identification with

6   the intent to commit or to aid and abet in connection with the

7   crime of tax evasion.

8          The crime of tax evasion prohibits the willful

9   attempt to evade or eschew any tax imposed by the Internal

10  Revenue Code.  And to act willfully requires that we prove

11  that the law impose a duty on the defendant, that the

12  defendant knew of this duty and that he voluntarily violated

13  that duty.

14         I would suggest to you that we all have a duty to

15  pay tax, and we certainly know that the defendant knew about

16  this duty.

17         It's also important to note that the Government does

18  not need to prove that the defendant actually committed tax

19  evasion.  It's enough if the defendant used or transferred or

20  possessed the means of identification or conspired to do so

21  with the intent to commit, aid and abet, or in this connection

22  with the crime of tax evasion.

23         So you how do you know that the defendant conspired

24  to use the Cafritz American Express card without authority to

25  evade having to pay taxes?  Well, you heard from Investigator

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

1    Guerci that he was unaware that the defendant had any assets,

2    you heard from Mark Vicente that the defendant denounced it,

3    someone who had no connection.  And the quotes from Mark

4    Vicente can be found from pages 585 through 610.

5           He also told you that the defendant was concerned

6    about bankruptcy, that he created so many companies to be

7    bankruptcy remote so that he could not be destroyed by the

8    forces against him.

9           And you know that the defendant had another company,

10   CBI, that had drawn the attention of Attorneys Generals and

11   was shut down.

12          Additionally, you had seen a lot of cash in this

13   case.  There was cash -- you saw cash going to Nicole.  Lauren

14   Salzman testified that she received from Dawn Morrison an

15   envelope of cash containing royalties that were owed to the

16   defendant.

17          Just last week we saw an XOSO document indicating

18   that the defendant was entitled to 10 percent of the XOSO

19   overall.

20          There was over $500,000 of cash in Nancy Salzman's

21   home.  I submit that given the defendant's not keeping assets

22   in his name that you can infer that that money did belong to

23   him.  Here is a picture of the $550,000 in cash that had been

24   secreted in Nancy Salzman's house.  Remember there was two

25   shoe boxes of cash that were in a crawl space behind a closet

1    door.  And then behind in a walk-in closet there was a crawl

2    space in the walk-in closet.  There was an additional bag of

3    cash in another closet.

4         Remember that when Officer Fontanelli testified

5    regarding the search of Nancy Salzman's house, he identified

6    multiple pictures of the defendant throughout the house on her

7    mantle piece, that was one example.  On the second floor of

8    the house.  Then in the gym area there were three pictures,

9    large pictures, of the defendant down there as well.  This is

10   Government's Exhibit 762.

11        We saw this during the trial.  It's a declaration

12   filed in a case involving the defendant and Microsoft and AT&T

13   in Federal Court in Texas, where the defendant had been

14   ordered to pay $400,000.  Now he filed, he put in motion

15   papers in order to stay having to pay that $400,000.  It

16   states that as of December 30, 2016, the defendant could not

17   pay the fee, because he stated under penalty of perjury, that

18   he did not have access to money.  This was at the same time he

19   was charging thousands of dollars to the Cafritz American

20   Express card, and writing hundreds of thousands of dollars in

21   checks out of the Cafritz Key bank account.

22        The defendant is living an expensive lifestyle,

23   traveling to Mexico, Audi payments, volleyball games, NXIVM.

24   Customers are paying thousands of dollars; and he gets the

25   10 percent cut of everything.  Using Pam Cafritz's American

1    Express and writing checks out of her bank account.  And he

2    claims he has no assets.

3           Why?  Why hide all the assets?  Why did he use Pam

4    Cafritz's credit card after she was dead to fund his

5    lifestyle?  To avoid paying taxes.  Because not he didn't want

6    to take that money into his own name because the defendant was

7    obsessed with not paying taxes.

8           You heard Stephanie Franco was startled that she

9    didn't have to -- that he didn't have to pay taxes.

10          You heard from James Loperfido, the tax preparer.

11   Mr. Loperfido explained that NXIVM created many companies to

12   take advantage of tax benefits.  And Kathy Russell told

13   Mr. Loperfido that his job was to make as much tax liability

14   as possible for the NXIVM company.  The ultimate goal for the

15   company was zero tax; that was the ultimately goal for the

16   defendant as well.

17          Mr. Loperfido testified that there was always a

18   question about the defendant's assets because it was clear he

19   was running them and making all the decisions.  While the

20   defendant is running all these companies, the accountant,

21   Kathy Russell, is telling Mr. Loperfido that the defendant did

22   not have any income.  No income while he was -- no income,

23   even though he was getting a 10 percent cut of all of the

24   companies.

25          So where is that?  That's where we submit all this

1    cash is coming from, it's all the defendant's.

2            Mr. Loperfido told you about a movie shown at V Week

3    that concerned him very much.  The documentary claimed that

4    taxes were unconstitutional.  And Mr. Loperfido wanted to

5    address the audience, because the movie was showing a

6    one-sided stand on not paying taxes.  He was not allowed to

7    address the crowd.  That testimony was page 3373 to 3374.

8            I suggest to you -- I submit, that the defendant's

9    entire scheme to maintain the appearance of having no assets,

10   no income, while funding a lifestyle, was all done so he does

11   not to have pay taxes.  That's why the conspiracy to use Pam

12   Cafritz's American Express card without authority was done

13   with the intent to commit or and aid and abet or in connection

14   with the crime of tax evasion.  I submit that we've proven

15   that one as well, which is Racketeering Act 11.

16           Now we're going to move on to Racketeering Act 2, 3,

17   4.  So now we're in the portion of the category slide that

18   deals with the crimes related to the sexual exploitation of

19   Camila and the possession of child pornography.

20           Racketeering Act 2 is sexual exploitation of a child

21   and the actual producing of the pictures of Camila.  And that

22   happened on two different occasions, so that's why there are

23   two Racketeering Acts related to that.  Then Racketeering Act

24   4 is the actual possession of those photographs.

25           So you've heard a lot of evidence about Camila

5363

1    during the course of this trial.  You learned that the

2    defendant began having sex with Camila when she was just 15

3    years old and he was 45.

4            This photograph was taken when Camila was 13 or 14

5    years old, just when she started going to school in Cohoes,

6    New York.  Now, at that point in time Daniela testified

7    Camila's parents were around while she was there for the

8    school year.  But then Camila went home to Mexico and then

9    there was an effort by the defendant in discussions with

10   Daniela to encourage her younger siblings to come back to the

11   United States.  When they came back, their parents weren't

12   there.

13           You heard from Daniela that the plan the defendant

14   had for Camila was to have her work as a maid for Nancy

15   Salzman, for Camila to clean Nancy Salzman's home, and to be

16   very far away from where Camila's other siblings were.  At

17   that point in time, their parents are still in Mexico.  And

18   Daniela testified she and Marianna are living apart from their

19   brothered, Adrian, who is far away, and then Camila is far

20   away as well.  This was part of the defendant's plan.

21           In Daniela's words, "Camila was isolated from her so

22   the defendant could have easy access."  Daniela testified to

23   that on page 2,471 of the transcript.

24           Daniela testified that sometime before the fall of

25   2006 she asked the defendant if he was asking sex with Camila.

5364

1    He replied that he was.  He asked whether Daniela minded.

2    Daniela was brutally honest when she testified.  She said that

3    she remembers this because she was actually jealous.  She felt

4    jealous because the defendant had made Daniela wait until her

5    18th birthday, while her sister was allowed to have sex with

6    him before she turned 18.  The defendant responded that some

7    women girls are more mature, emotionally mature, than others.

8    And that's at transcript page 2,473.

9            Those words might sound familiar to you.  Just last

10   Friday you heard the defendant speaking about the age of

11   consent.  And he said in that context that it mattered, that

12   the real question was whether the person was a child or

13   adult-like.

14           You also know -- we looked last Friday at

15   Government's Exhibit 1071.  This was another one of the

16   defendant's teachings.  In that one he talked, he asked

17   whether there was anything wrong with an adult and a child

18   having sex.  And first there were -- he posited there could be

19   concerns about pregnancy or disease.  But then he says, "There

20   is sex that doesn't involve -- that involves -- that doesn't

21   involve, that minimally involved the need of transferring

22   procreation.  So for example, an adult manually stimulates the

23   child, should the child be allowed to masturbate the adult?

24   Should the adult be allowed to masturbate the child?"  The

25   defendant included an answer, "These are things students have

1    to think out for themselves.  We're raising the issues on how

2    to think about the issue and generate an opinion.  Be careful

3    as head trainer not to give any opinion."

4            You also know that Camila was only 15 when the

5    defendant started having sex with her because of the e-mails

6    and chats that you saw.  You saw the WhatsApp chats from 2014

7    where the defendant says that he was proud to have been

8    Camila's husband for 8.75 years, which would have meant that

9    their relationship began in 2005.

10           This was another example from those WhatsApp

11   messages that also showed that the defendant had been having

12   sex with Camila since she was 15.  This is in one of the

13   conversations, which we're going to talk about more in a

14   minute, about finding a successor for the defendant.  The

15   defendant asked whether, who would be interested given age, et

16   cetera.  She says something flattering.  He says, "Even an

17   inexperienced 18 year old?"  And Camila responds, "Even an

18   inexperienced 15 year old."  The defendant certainly doesn't

19   respond, What are you talking about.  He responds, "It needs

20   to be a once in a lifetime person.  And I have that.  And I

21   lost it."

22           You also saw that even back in 2009 the defendant

23   was calling Camila his slave.  This one example, Government's

24   Exhibit 1400, where she talks -- where the defendant is

25   responding.  This was the Camiliacastle account, where the

1    defendant and Camila would both communicate on the same

2    account.  So it looks as if the same person is sending the

3    e-mail, but really they are both logging in and responding to

4    each other.

5          And so in this e-mail, written by the defendant, he

6    writes something sexual that he wants to have happen.  He

7    says, "by very obedient slaves."

8          I submit within -- there were in the same set of

9    e-mails there were other references to BDS-type sex, and she

10   signed other e-mails your slavey slave.

11         Also in 2009 all of these messages reflect a much

12   longer-standing relationship than one would have been possible

13   to have begun had it begun by the time she turned 18.

14         And so, this one is also Government's Exhibit 1400,

15   Camila is writing another sexual comment, and then she notes

16   that she's "fresh out of jail bait grounds."

17         Racketeering Act 2 and 3 are based on the same

18   conduct.  That on November 2, 2005, and again on November 24,

19   2005, the defendant took graphic and sexual photographs of

20   Camila who was then only 15 years old, a child.  For both of

21   those crimes there are three elements.

22         One additional piece of evidence regarding the fact

23   that their relationship started well before Camila turned 18.

24   This is in August 2011, she says five years.  That when we

25   looked at records from her gynecological visits, the nurse

1    practitioner explained this is a very important question, so

2    you can monitor their sexual health properly.  Here Camila had

3    written she had been five years with her partner.  And from

4    all of the evidence in this case, I submit, that had to have

5    been the defendant.

6            But here that would have turned out to be roughly

7    16.  The five years then is an approximation that people often

8    use; but regardless, long before she turned 18.

9            So here are the elements of sexual exploitation of

10   child.  First, that Camila was under 18 at the time of the

11   acts alleged, November 2, 2005 and November 24, 2005.  That

12   the defendant used, employed or persuaded Camila to take part

13   in sexually explicit conduct for the purpose of producing a

14   visual image of that conduct.  Sexually explicit conduct

15   includes lascivious exhibition of the genitalia and the pubic

16   area.  And lascivious exhibition is a depiction designed to

17   excite lustfulness and sexual stimulation in a viewer.  So the

18   difference between baby in a bubble bath and the types photos

19   that you saw of Camila.  Now, the third element is that the

20   visual depiction produced was produced using materials mailed,

21   shipped, transported in or affecting interstate commerce.

22           Let's talk about the second element first.  You now

23   that the defendant took sexually explicit photographs of

24   Camila.  Daniela identified a redacted version of one of those

25   images as being of her little sister.  So that's Government's

1    Exhibit 929, combined with on the top there is a transcript

2    cite to page 2,477.  You saw all of the images.  That's the

3    redacted version.  They are in evidence as Government's

4    Exhibit 518 A through U.  I'm not going to show you them

5    again.  But you did see them.  And you if feel it necessary,

6    you can you determine if they are necessary, if you want to,

7    you can request to see them again during your deliberations.

8    They clearly focus on Camila's genitals, which mean they are

9    what is called a lascivious exhibition under the law, or

10   visual depiction of a child's genitals for sexual stimulation.

11            You heard evidence of about where those images were

12   kept, on a hard drive, the defendant's executive library.

13            So that's the defendant on the left with the drive

14   behind him, that's the picture that was taken in

15   February 2012.  And then on the right you can see the hard

16   drive, which Special Agent Mills testified he recovered in

17   2018.  And so you can see that it has not moved from the same

18   spot since then.  Those are Government's Exhibit 175A-1 and

19   Government's Exhibit 502A-34.

20            The images were found in a folder that the defendant

21   called his studies.  Now, how do you know that this was the

22   defendant's hard drive, that it was the defendant's studies

23   folder?

24            First, because of Daniela's testimony.  Daniela

25   testified that the defendant had a Dell computer and a Western

1   Digital hard drive and a Dell drive and a big professional

2   camera.  She testified to that on pages 2,568 through 69.

3          Daniela testified that she went through the

4   defendant's Dell computer and found pictures of naked women,

5   women that she knew the defendant had been with.  That was on

6   page 2,571 of the transcript.

7          She testified that she distinctly remembered seeing

8   Monica Duran's photograph, because she hadn't known up until

9   that point that the defendant was having sex with her.

10         She also testified that she set up the hard drive to

11  back up the defendant's Dell computer.  You also know that it

12  was the defendant's studies folder because you saw what was in

13  the folder.  There were 11 folders of sexually explicit

14  photographs, all of women that the defendant was having sex

15  with.  You can look at Government's Exhibit 550, which was the

16  stipulation identifying the women in each of those individual

17  folders.

18         The first folder, 4L122505, naked photographs of

19  Lauren Salzman, which the defendant titled the folder after

20  his nickname for her Forelorn.  A111005, naked photographs of

21  Angel Smith.  BJ103005, naked photographs of Barbara Jeske.

22  101705, naked photographs of Dawn Morrison.  A lot of these

23  people are on the inner circle board as well.  DF101905, naked

24  photographs of Daniela.  J10605 naked photographs of Barbara

25  Bouchey, who went by the nickname Ja, that was from Lauren

1    Salzman on page 1992.  L102805, those were naked pictures of

2    Loretta Garza, one of the defendant's first line DOS slaves as

3    well.  NMP102005, those were naked pictures of Marianna and

4    Pam Cafritz together.  MO101805 were pictures of Monica Duran.

5    And then MS -- we're missing one.  There was also MS Kathy

6    Russell's photographs were in a folder that was labeled MSK at

7    the beginning; and you heard through testimony that one of her

8    nicknames was Ms. Kathy.  Then finally V110205, which were

9    naked photographs of Camila.  Now, why the V?  Well, you know

10   by now, you've seen her nickname over and over, all over the

11   place, Virgin Camila, Vicky Baby, CV Baby, the name was given

12   to her by the defendant.

13        The defendant talks with Camila about the fact that

14   he had these photographs.  You saw that in the WhatsApp chat,

15   Government's Exhibit 302R, page 44.  He says, "You know I

16   guard the other pictures, right?"  Camila responds, "From way

17   back when?"  The defendant responds, "I wanted the original

18   forever.  I thought it was truly mine.  Yes.  From way back

19   when."  Which brings us to the first element of the crime of

20   child exploitation.  The evidence is overwhelming that Camila

21   was under the age of 18 when the photographs were taken.

22        First of all, you know Camila's birthday was

23   March 1st, 1990.  You know that because Daniela testified to

24   it.  But you also know it because of Camila's passport that

25   was scanned in her e-mail account, and her medical records,

1   all of which consistently show her birthday of March 1st,

2   1990.

3          Next you know when the photographs were taken

4   because of when they were dated.  I don't think we have the,

5   we don't have the -- so there is -- the first one is B110205,

6   and then -- we'll come back to it before we finish.

7          Now the defendant clearly came up with the folder

8   title, because it's his own private nicknames for the women

9   who's pictures are inside them.  Each of these folders contain

10  photographs that match the date on which they were taken.  You

11  know it because Lauren Salzman and Daniela both testified that

12  the defendant took naked photographs of them in 2005.  And the

13  naked photographs they described having been taken are exactly

14  like the ones that you saw in the studies on the Western

15  digital hard drive.

16         Now you also know that the photographs were taken in

17  2005 because that's what the data shows.  The forensic

18  examiner, Brian Booth testified that the most reliable

19  metadata that the FBI could obtain from the images on the

20  Western digital hard drive, said that they were taken exactly

21  when the folders stated they were taken.  So Government's

22  Exhibit 518 A through N, now we can see it, were taken on

23  November 2, 2005.  And Government's Exhibit 518 O through U

24  were taken November 24, 2005.

25         You also know that the photographs were taken when

1    Camila was under 18 because you know that Camila's appendix

2    surgery was on January 9, 2015, when she still 16 years old,

3    she wouldn't turn 17 until the following March.  You know that

4    the wounds were bad.  You heard it described in detail,

5    watching her mother clean it out.  You yourselves have

6    compared a recent photograph of Camila's abdomen where the

7    scar is still visible.  You know it's a recent photograph

8    because you can also see her brand on there.

9            In that photograph, when you compared that

10   photograph to the photograph from the studies folder, I submit

11   to you, there is no scar.  Special Agent Wenniger also told

12   you there was no scar.  So the images must have been taken

13   before Camila turned 17.

14           The third element, the last element, is also clearly

15   mapped because the materials that had been mailed, shipped or

16   transported in or affecting interstate or foreign commerce.

17           So here, as you know, the images were taken from

18   this camera, the Canon EO 20D, which is Government's Exhibit

19   520.  You can see that right on it, it says that it was made

20   in Japan.  You know because the active data from every single

21   photograph taken from the defendant's studies folder showed

22   the photograph was taken by this camera with this serial

23   number 1420908348.  This is in evidence.

24           It looks just like the camera that Lauren Salzman

25   and Daniela described the defendant taking pictures of them

1    with.  You can inspect it yourself in the jury room.

2              As Special Agent Mills testified, the camera says it

3    was made in Japan.  You can see it for yourselves, which

4    proves the third element of the Racketeering Act 2 and 3

5    beyond a reasonable doubt.

6              Now, as for Racketeering Act 4, the defendant was

7    charged with possession of child pornography.  The child

8    pornography with which he possessed is the same as the images

9    he took of Camila when she was under 18 years old.

10             The elements of Racketeering Act 4 are that the

11   defendant knowingly possessed the visual depiction.  That the

12   visual depiction was produced using material that had been

13   transported in interstate or foreign commerce.  That the

14   production of the depiction involved the use of a minor

15   engaged in sexually explicit conduct.  And that the defendant

16   knew that the production of the visual depiction involved the

17   use of a minor engaging in sexually explicit conduct.

18             So Racketeering Act 4 is similar to Racketeering Act

19   2 and 3 because elements two and three are the same.  The

20   difference for Racketeering Act 4 is that Racketeering Act 4

21   charges the possession, not the creation, of the images of

22   Camila.  All possession means is that the defendant had

23   control over the images at some point between when the images

24   were created in November 2005 and when they were seen by

25   Special Agent Mills in March 2018.

5374

1           You know the defendant did, because again, the

2     defendant took those photos.  He labels the photos with the

3     first initial of his nickname for Camila, Virgin Camila, and

4     he tells her that he has the photos from way back when.

5                (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MS. PENZA:  Now, it's not just -- let's check off

2    our three racketeering acts.

3           So I submit that what we just went through proved

4    Racketeering Acts 2, 3, and 4.

5

6           Now, the fact that in addition to the fact that he

7    began his relationship with request Camila when she was still

8    a child, 15.  It was coercive and abusive in so many other

9    ways.  You saw the nature of that relationship.  The WhatsApp

10   chats Special Agent Reiss read were a special window into the

11   defendant's relationship with Camila.  You saw how controlling

12   he was.  How Camila asked permission to eat, to sleep, to cut

13   her hair, to see a friend, to text her family.

14          At the beginning of this case, Mr. Agnifilo, told

15   you that that a lot of the time the defendant was being

16   controlling, he said what's behind the control?  This is

17   something these people signed up for.  They are here to make

18   their lives better and they have signed up for this.  But you

19   saw the messages, you heard the testimony.  This was not about

20   making anyone's life better, and either Camila nor her sister

21   signed up for anything like this:  The control, the abuse, the

22   threats to send her back to Mexico.  And you likely remember

23   the defendant's obsession with Robbie.

24          The defendant also told Camila that by ruining her

25   period she had ruined herself as the defendant's successor.

1 And he tasked her with finding a new virgin to take on the

2 role.

3          You saw the defendant's messages with Camila about

4 Robbie asking her the most excruciating details about her

5 sexual encounters with him.  Eerily similar to the messages

6 exchange between Daniela and the defendant about Ben Meyers.

7          This is Government Exhibit 301-R.  This is a concept

8 of finding a successor for her.  Oh, sorry, I didn't show you

9 the appendix scar.  We'll talk about it before, but if you

10 want to look at the record, Government Exhibit 530-R is the

11 actual appendectomy records.

12          So this is the line about the successor where the

13 defendant says to Camila, "Make another successor.  Give me

14 you in ways you never would have."  And then he goes on about

15 how she had ruined herself for him.

16          Now, because Camila had been with Robbie, the

17 defendant no longer considered her worthy of being his

18 successor.  And you heard from witnesses and saw e-mails and

19 messages about what the defendant wanted for his successor.  A

20 young version that Camila was supposed to recruit and groom

21 into becoming his new sexual partner.  You saw on WhatsApp

22 chats that the defendant told Camila Rosa Laura could help in

23 finding a successor.  She could assist in her becoming friends

24 with young future candidates and shepherding them over time.

25 And you also saw Camilla's actual efforts to find the

1    defendant a virgin on Tinder.  This is

2    Government Exhibit 1779-534.  This is where the defendant says

3    Rosa Laura could assist her in finding a successor.

4            The defendant also said that the person needed to be

5    very pure, more than just being a virgin, and "at least as

6    pure as you were when I first met you."

7            And you saw this e-mail from Rosa Laura Junco to the

8    defendant telling him she was concerned she wasn't doing

9    enough to facilitate her own teenage daughter Laureisa's

10   possibility for succession.

11           This is consistent with Lauren Salzman's testimony,

12   too, at Pages 1899 and 1900.  Lauren Salzman testified about

13   the defendant's young virgin successor that Daniela Padilla,

14   Loreta Garza, and Rosa Laura Junco, were trying to bring in

15   sisters or cousins from Mexico to come to Albany for this

16   purpose.  Rosa Laura was even willing to give up her own

17   daughter.

18           Now, you remember this clip, right, this is when

19   Nancy Salzman was parroting the defendant's words about age of

20   consent in the Jness room.  I want you to look on the

21   left-hand side.  As Sylvie testified, those are the underage

22   girls from Mexico that were being taught in this girl's school

23   of Rosa Laura Junco's.  I submit that the defendant wanted

24   those girls to hear that age of consent conversation to

25   believe that able of consent was just a societal construct,

1    that it would be okay to have sex with an adult as long as

2    they them themselves were adult-like.  I submit that that is

3    grooming right there.

4            Now, if you want to review the testimony from Lauren

5    about Rosa Laura's Junco's girls program, you can review the

6    testimony on Page 1901.

7            Now, why the defendant instructed Camila to find him

8    a successor virgin because from the beginning the defendant

9    relied on his female sex partners to approach, recruit, and

10   groom other women as his sex partners.  You saw that time and

11   time again.  You heard that from Daniela who Pam Cafritz

12   facilitated her and her sister's abortions to quote, Make sure

13   everything went according to plan and that nothing implicated

14   the defendant.  And that's on transcript Page 2647.

15           You heard that from Lauren Salzman, too, who

16   testified that Pam Cafritz facilitated all of Keith's

17   objectives, whatever Keith wanted especially in terms of

18   getting sex partners for the defendant.  That's on Page 1707.

19           Lauren Salzman testified that Pam's illness and

20   death meant that no one was going to fill at that role to be

21   able to do that for him.  That was until DOS.  It was through

22   DOS that the defendant executed on his plan to have women

23   formally recruit other women and lock them into a

24   collateralized vow of obedience to him so that they couldn't

25   leave him, couldn't be unfaithful, to do work for him, to have

1    sex with him, and to recruit new sex partners for him and here

2    they are, the defendant and the seven first line DOS slaves.

3           Having women recruit other women was an important

4    part of this plan.  Why?  Because these women trust -- because

5    the women who were brought into DOS trusted the women who

6    recruited them.  And the defendant exploited that trust for

7    the things he wanted.

8           But make no mistake about it.  The defendant did not

9    create DOS to be a sisterhood as Mr. Agnifilo put it in his

10   opening statement.  It was not as he put it, "A group of best

11   buddies."

12          To know what DOS really was, just look at the

13   defendant's own words.  "I think it would be good for you to

14   own a fuck toy slave for me that you could groom and use as a

15   tool to pleasure me."  That's October 2015.

16          The evidence is overwhelming that the defendant

17   created DOS not to empower women but to benefit and to satisfy

18   himself so that he could have DOS slaves do work for him and

19   have sex with him.  Lauren Salzman testified about the sexual

20   aspects of DOS.  She told you that the defendant was having

21   sex with his first line DOS slaves including herself.  She

22   told you about the naked photographs, the up-close vagina

23   pictures that were sexual in nature.  She told you about the

24   dungeon with the BDSM equipment that Daniela Padilla bought.

25   She told you about seduction assignments and the sexual

1   relationships between the defendant and the DOS slaves.  And

2   that testimony on Page 1790.

3           And this is the testimony about the dungeon.  9

4   Milltowne Drive, the sorority house the defendant told his

5   slaves to purchase.  And you can see here the warranty deed

6   dated October 25, 2018, with Stinka, LLC signed by Nicole

7   Clyne.  She is one of the first line DOS slaves.  And they

8   quote from Lauren Salzman about the dungeon is at Page 1638.

9           And the items that they told the first line DOS

10  slaves to buy for him.  The ones Salzman described as a BDSM

11  sex torture place like the cage.  And you saw the invoices.

12  And you saw what Daniela Padilla actually bought is

13  Government Exhibit 864 and Government Exhibit 863.  These are

14  just a few of the items.  Can there really be any doubt that

15  DOS was anything other than a way for the defendant to get

16  what he wanted from the women including sex.

17          All of this was for him to satisfy the defendant's

18  desire for sex and power and control.  Here he is talking

19  about changing the vote, finding women of influence.

20          (Audio file played in open court.)

21          (Audio file concludes.)

22          MS. PENZA:  So you you've time and time again the

23  defendant speaking out seeking out political influence.

24          Now, here, he wants to do that and you heard Lauren

25  Salzman testified that Cici, whose name we're not using, is

1    somebody who was a woman who did have very powerful

2    connections in Mexico.  And the idea of changing a vote shows

3    that the defendant has envisioned, I submit, that all of these

4    women will be collateralized vows.  And he what he says from

5    top down everyone's voting one way, he believes that everyone

6    will have to obey that.  And so, this was the grand plan that

7    the defendant had envisioned.

8         Now, Lauren Salzman testified about the structure of

9    DOS and she told you making it abundantly clear throughout the

10   trial that the defendant was at the top of it.  He was the

11   grandmaster, he was the supreme master.  And that's a

12   transcript Page 1506.

13        And Lauren Salzman also testified about the Excel

14   spreadsheet that's in evidence as Government Exhibit 357 and

15   it documented the enrollments of individuals of women into DOS

16   and you can take a look at it during your deliberations.

17   You'll see the names of everyone in the first line and you'll

18   see the names of all of the slaves that they enrolled.

19        Now, this chart includes only a few of those names,

20   but you can see all of the people who were DOS slaves who you

21   heard from and about:  Nicole, Jay, Lauren Salzman, Sylvie.

22   And all the ones you heard about:  India, Michele, Daniela,

23   Audrey, Sarah.  All of these slaves were ultimately under the

24   defendant.  He was their master, he was their grandmaster, he

25   was their supreme master.

5382

1            Now, the victims you heard from in this case, and
2     the other women who were recruited into DOS below the first
3     line, had no idea all of this was going on behind the scenes.
4            We're going to go through each of them individually
5     later, but the DOS victims who testified:  Sylvie, Nicole,
6     Jay, were never told that the defendant was the head the
7     group; that the defendant was ultimate master, that they never
8     were expected to get naked for or send naked pictures to the
9     defendant.  That they would have ever have to turn over
10    additional collateral, or they would be expected to have sex
11    with the defendant.  None of them testified that they were
12    told that a BDSM dungeon, the defendant's idea, was being
13    built at the bottom of the house owned by the women in DOS and
14    that the defendant had been interested in BDSM for years.
15           In short, none of the DOS victims testified that
16    they were told that that group had anything to do with sex.
17    And based on the misrepresentation of the group as being about
18    female empowerment and the concealment of the defendant's
19    role, we'll talk about which women handed over property.
20           Now, you heard of how much this collateral meant to
21    these women.  You saw the lists of collateral that were
22    provided by Michelle and her insistence that her slave, Suzie,
23    provide additional collateral including renunciations of their
24    inheritances.  And that's in evidence as
25    Government Exhibit 1816.

5383

1              You also saw the types of pictures that women handed

2     over as collateral.  Close ups of their vaginas with their

3     faces in the same frame.  I'm not going to show you these now,

4     you can ask to see them while you deliberate if you wish.  But

5     some examples are Government Exhibit 1806, 1807, 1809, 1811,

6     and 1812.  I submit these were pictures that no one would

7     released.  Life destroying pictures.

8              You also heard that women like Nicole and Jay turned

9     over intimate videos as well.  Of course, the victims did not

10    know, couldn't have known, that they were being asked to pose

11    in a way that was most sexually pleasing to the defendant.

12             At the beginning of the trial, Mr. Agnifilo said

13    that the naked photos that the DOS slaves provided were not

14    sexual.  The photos the DOS slaves provided are nearly

15    indistinguishable save the Nokia phone and the old VCR from

16    the trophies the defendant kept in his study from over a

17    decade earlier.  I submit those photos that the DOS slaves

18    provided were for the defendant's sexual gratification and

19    nothing else.

20             Now, several of the racketeering acts in all of the

21    standalone charges in this case are related to DOS and here

22    they are.

23             So the first one we're going to talk -- the way

24    we're structure the order in which we're going to go through

25    them I think is the way that it makes the most sense as we

1  talk about the facts as the DOS slaves were of them and as we

2  went through the evidence in the course of the case.

3         So the first count that we're going to talk about is

4  the wire fraud conspiracy and the concealment of the

5  defendant's role in DOS and the fact that it included making

6  women available to the defendant for sex brings us to the

7  first of those charges,s wire fraud conspiracy.

8         Now, this is another conspiracy charge, so, again,

9  it's the agreement to commit the wire fraud that's the crime.

10         And these are the elements of wire fraud.

11         The first element of wire fraud is the existence of

12  a scheme or artifice to defraud or to obtain money or property

13  by materially false and fraudulent pretenses, representations,

14  or promises.

15         The law says that materially false and fraudulent

16  pretenses, representations, or promises includes not only

17  deceitful statements but also half truths and concealment of

18  material facts.

19         As to the first element, the defendant and his first

20  line agreed that they defraud the lower-ranking DOS slaves by

21  concealing the true nature of DOS including the defendant's

22  involvement in the organization and the sexual aspects of it.

23         Lauren Salzman testified that she was instructed to

24  conceal the defendant's identity from her slaves, and that she

25  followed that instruction.  And you can read Lauren's

5385

1    Salzman's testimony on Page 1602.  And you read the

2    defendant's own words to Camilla saying that there were slaves

3    who would never know of his existence.  And as of October

4    2015, there were some who already did.

5              And you also heard from Nicole and Jay who said that

6    they had no idea that the defendant was involved when they

7    joined, and they would not have joined if they had known.  And

8    so, Nicole's testimony on this can be found on Page 3862 and

9    Jay's testimony can shall found on Page 4324.

10             And I think it's just notable, also, I submit when

11   you read the transcript of these women, these women had the

12   best of intentions.  They wanted good in the world and that

13   was used against them.  Here Jay testifies that, you know, she

14   wanted to be this strong force of light in the world and that

15   was what was used against her.  And here Jay is again.  "Would

16   you have joined the vows if you were told or man or men was

17   involved in the organization?"  "Absolutely not."  "Why not?"

18   "Because no offense to me, but there are just some things that

19   men don't understand that only woman do and because of

20   everything that I had been through.  And my mother not being

21   present, I definitely wanted to form more bonds with women and

22   it just made sense.  It wouldn't make sent if there was a man

23   running things."

24             I submit that the defendant and the first line knew

25   women were not going to hand over their property, their

1   collateral, if they knew the truth.  And I submit obtaining

2   that initial collateral was vitally important.  At that point,

3   the fear of release is established and the power dynamic

4   immediately shifts.

5        So looking back at the elements of wire fraud

6   conspiracy, to prove the first element, Judge Garaufis will

7   instruct you to consider whether a reasonable person would

8   have considered the omitted information to be a concern when

9   making a decision.

10       Now, you heard interest Nicole and Jay on this

11  point, but I submit that any reasonable woman would have

12  considered it important, would have considered it important to

13  know that there was actually a man at the head of this women's

14  group before joining.  Especially one where they were being

15  asked to provide naked photographs and sex tapes in order to

16  join.

17       Additionally, a reasonable woman would want to know

18  that a group she thinks will be about women's mentorship has

19  an explicit sexual bent and that the existing members already

20  understand sex and nudity to be part of the group.

21       Now, the second element requires the Government to

22  prove the defendant or conspirator knowingly and willfully

23  provides or participated in the scheme with a specific intent

24  to defraud.  In short, the scheme of the defendant knew of the

25  lies being told to the DOS slaves, and that he intended to

1   obtain property through those lies.

2           The defendant was the creator of DOS and his first

3   line knew his identity had to be concealed, so there is no

4   doubt this element has been proven.  Naked photos, videos,

5   rights to assets, those are things of real value in the real

6   world.

7           The third element that there was an agreement that

8   interstate or foreign wire communications would be used to

9   commit the scheme.

10          Again, this is an element where there really can be

11  no doubt that the Government has proven it.  You heard the

12  women were recruited into DOS from California, from Mexico,

13  from Canada, of course communications would cross state lines

14  and national boundaries.  Of course, communications that would

15  cross state lines and national boundaries were envisioned as

16  part of this.  In fact, Lauren Salzman testified that she

17  recruited two of her slaves in Mexico over Skype while they

18  were in Mexico and she was in New York.  Her testimony about

19  that can be found on Page 1604.

20          You also heard bunch of DOS's operation occurred

21  over telegram and that telegram did not operate in the

22  United States.  There was testimony about that which appears

23  on Page 1604 and 1371.

24          With that, we submit we've proven the wire fraud

25  conspiracy and we can check off as guilty Count Four, wire

1    fraud conspiracy.

2            So we talked about the lies that brought women into

3    DOS who induced them to give up their property their

4    collateral, but let's talk now about what the DOS slaves

5    believed they're collateral meant.

6            As you'll see in a second, there is ample evidence

7    that the defendant and his co-conspirators intended to release

8    collateral if necessary.  But even if that were the case, the

9    question is what victims believed based on the defendant's and

10   their co-conspirators words and actions.  That's the key to

11   the coercion that will be at the heart of the rest of the

12   DOS-related crimes.

13           Let's look first at the evidence that the defendant

14   intended to release collateral, if necessary.

15           Here he is talking on tape.

16           (Audio file played in open court.)

17           (Audio file concludes.)

18           MS. PENZA:  Executing the collateral.  The defendant

19   is talking there about releasing it.  Now, just last -- and

20   that's Government Exhibit 494 in evidence.

21           Now, also, just last week with

22   Special Agent Wenninger.  We looked at an internal document

23   sent by Rosa Laura Junco to the defendant which he then saved

24   in November 2017.  So then here Rosa Laura Junco is sending

25   the document to the defendant on October 15, 2016.  "Find

1    attached the document promised the letter S," stands for what

2    you can imagine, "and it attach letters for M."  And this is

3    Government Exhibit 1326.  And this document describes how to

4    measure the specific collateral.

5            And the first one of the criteria was proven

6    authenticity.  As you can see right underneath it asks "How

7    much can we prove collateral is authentic.  This determines

8    how much the collateral is actual."  Actual, executable, can

9    be released.  Those are all words for the same thing.

10           Now, the criteria goes from whether the collateral

11   is typed versus handwritten versus notarized, to audio, to

12   video, and it whether there is an actual legal title to the

13   document.  And there is different points that are to be

14   assigned to how valuable that collateral is.

15           I submit there is no way to interpret this other

16   than its plain language that they were trying to figure out

17   how executable the collateral would be, meaning, they were

18   trying to figure out could they take the property.  If they

19   have the title, makes it easier to execute the collateral.

20   And could they make clearer that it was really belonging to

21   the DOS slave.  Would it have the effect of damaging her

22   because it could be directly tied to her?  Same document,

23   Page 1326.  At the end of the document, there is a section

24   called depth of collateral.

25           And the points for the authenticity section and

```
 1   another section were to be multiplied by how damaging the

 2   collateral would be.  The levels there ranged from become an

 3   inconvenience to affects by limiting options permanently to

 4   affects freedom and all experience of self.  I submit this is

 5   a document that only for the defendant and his first line and

 6   the only way to the language of this document makes sense that

 7   they intended to be able to release the collateral effectively

 8   that is with the appropriate damage if they determined it was

 9   necessary.

10           Your Honor, do you want to stop?

11           THE COURT:  Is this a good place to stop?

12           MS. PENZA:  This is fine.

13           THE COURT:  Okay.  What we're going to do now,

14   minimum, is we're going to take 45 minutes for lunch and then

15   we'll return and hear the rest of the Government's closing and

16   then we'll move on to the defense closing.

17           All rise for the jury.

18           (Jury exits courtroom.)

19           THE COURT:  Please be seated.  Ms. Penza.

20           MS. PENZA:  I think I'm doing pretty well.

21           THE COURT:  Congratulations.

22           Nothing like fishing for a compliment.  About how

23   much longer do you have?

24           MS. PENZA:  Less than an hour.

25           THE COURT:  Let me advise you that we have checked
```

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

5391

1    with the jury.  I ask that they can still till 6:00, but they

2    can only stay till 5:00 tonight.  So the defense closing will

3    spill over to tomorrow morning.

4              MR. AGNIFILO:  May or may not, Judge.

5              THE COURT:  Well, if it does, I want to let you know

6    we can't go past 5:00 today.

7              Let's take 40 minutes for lunch.

8              (Defendant exits from courtroom.)

9              (Luncheon recess taken.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5392

```
 1                    (Afternoon session.)

 2                    THE COURT:  All right.  Get the defendant.

 3                    Good.

 4                    All right.  Be seated for a moment, everybody.

 5                    (Pause in proceedings.)

 6                    MS. PENZA:  I'm ready, Your Honor.

 7                    THE COURT:  Are you ready?

 8                    MS. PENZA:  Yes.

 9                    THE COURT:  Please bring in the jury.

10                    (Pause in proceedings.)

11                    (Jury enters the courtroom.)

12                    (Jury present.)

13                    THE COURT:  Please be seated.

14                    MS. PENZA:  Thank you, Your Honor.

15                    THE COURT:  All right.  Ms. Penza, you may continue

16      your closing argument for the Government.

17                    MS. PENZA:  Thank you, Your Honor.

18      BY MS. PENZA:

19                    Good afternoon.

20                    THE JURY:  Good afternoon.

21                    MS. PENZA:  So where we left off, we were talking

22      about the collapse and the understanding among the first-line

23      DOS members and the defendant that collateral was meant to be

24      used.

25                    Now, additionally, Lauren Salzman testified the
```

David R. Roy, RPR - Official Court Reporter

5393

```
1    initial collateral she proposed, that the initial collateral

2    she proposed which described the true story of her, her mom,

3    and the defendant's role in corrupting a woman who was having

4    a mental breakdown following a NXIVM class was rejected

5    because the defendant might have been uninclined to release it

6    since it implicated himself.

7            And so this is Lauren Salzman's quote on Page 1691

8    and she said -- she told me she would rejected it because it

9    would be a conflict of interest for Keith to release the

10   collateral because he would be implicated in the collateral.

11   So if I were to ever violate the vow, he wouldn't be able to

12   use it because it would hurt him so she didn't accept it and

13   at that time did you believe your collateral would be released

14   if you violated your vow.

15           And she said yes.

16           I submit also the common meaning of the word

17   "collateral" implies execution.  The bank, for example, can

18   foreclose on your house if you don't pay your mortgage.

19   Regardless, what matters at the end of the day is not what the

20   defendant actually intended to release or not release

21   collateral, what matters is the defendant knew the victims

22   believed their collateral could be released.  That is where

23   the power lies.  A master has also the ample proof that

24   victims did get release of their collateral and that the

25   defendant and the first-line masters re-enforced that.
```

David R. Roy, RPR - Official Court Reporter

5394

1            Remember Sofie from the very beginning of the trial

2    and is this is her testimony on Page 273.  She had decided

3    that her master, Monica Duran, right there (indicating) told

4    her that the defendant had said that another one of Monica

5    Duran's slaves, named Gaby was at risk for having her

6    collateral released.  Sofie testified that Monica told they

7    are that the defendant had said Ana Gaby might have to be the

8    first one to, "take the fall."  Sophie testified that scared

9    her and she called her Ana Gaby and tried to persuade her to

10   do what she was supposed to be doing because Sofie was so

11   worried about Anna Gaby's collateral to be released.  Her

12   testimony, if you want to read it, is contained on the bottom

13   of Page 274 as well.

14           And Nicole also testified that she had experiences

15   that made her fearful that her collateral would be released if

16   she was not obedient.  The first is just when a month -- the

17   first was one just a month and a half after having joined DOS

18   Nicole tried to leave.  Allison told her that she had like an

19   arranged marriage and couldn't get out.  Now we'll talk about

20   that a little more in a day, but Allison also told her that

21   Allison's own master, the defendant, who Nicole did not know

22   at that time was the defendant, had once threatened to release

23   a sex tape Allison had provided as collateral when Allison

24   wouldn't keep to her diet and Nicole testified after Allison

25   said this, Nicole used the disobedience as grounds for release

5395

1    of her collateral.  Nicole's testimony on this could be found

2    on Page 3875 to 76, if you want to review it.

3            The second was -- time was when Nicole tried to talk

4    to the defendant about leaving DOS.  And he told her the story

5    of Billy Budd.  Nicole's takeaway from the defendant was that

6    Billy Budd had been hanged in order to uphold the code of the

7    Navy, even though there weren't actual laws to be upheld.

8    Nicole told her that after that conversation she contemplated

9    options where perhaps DOS would not have to release her

10   collateral, like joining the witness protection program.  She

11   was desperate to find any way to get out without DOS having to

12   make an example of her and release her collateral in order to

13   keep their code.

14           Now we're going to move on to extortion.  I submit

15   that when the lower-ranking DOS slaves went through the

16   process of providing their initial collateral they thought the

17   worst of it was over.  You heard, though, that once they were

18   in, they were informed for the first time that there was a

19   requirement of monthly collateral, and that brings us to the

20   next criminal act charged as part of DOS, extortion under

21   New York State Law, which is charged as racketeering, which is

22   actually charged as Racketeering Act 9.

23           Now, the premise here is that once the women had

24   provided their initial collateral, any subsequent property

25   that was obtained was obtained based on the threat of the

1    release of that initial collateral.  Now extortion under

2    New York State Law requires the Government to prove that the

3    defendant obtained property illegally by extortion.  This is

4    another act that has been charged under the aid and abetting

5    theory.  So if you find that the defendant didn't get his own

6    hands dirty or commanded or held others in the process, then

7    you can find this act proven.  Extortion means instilling in a

8    victim of fear that if they don't hand over property, the

9    defendant or another person would expose a secret or publicize

10   an asserted fact, whether true for false, tending to subject

11   some person, could be the victim or someone else, to hatred,

12   contempt, or ridicule or perform any other act which would

13   harm another person materially with respect to his health,

14   safety, business, calling, career, financial condition,

15   reputation or personal relationship.  I submit there couldn't

16   be a more perfect statement of what the threat posed by

17   release of that collateral was.

18        DOS slaves uploaded their monthly collateral to

19   avoid the release of their initial collateral which had been

20   specifically designed to harm them with respect to their

21   business, their calling, their career, their financial

22   condition, their reputation, their personal relationship.

23   Plus the fact that the initial -- at the DOS collateral

24   document that we had been looking at before,

25   Government's Exhibit 1326.  There is a section called Areas.

David R. Roy, RPR - Official Court Reporter

5397

 1    And that that is A collateral is committed affecting a

 2    specific area or areas.  The more areas are affected, the

 3    stronger it is.  Each area affected is worth five points.

 4    These are the areas:  Work, family, social credibility,

 5    important people affected, assets, wealth, possessions,

 6    rights.  It reads almost -- it's very similar to the list in

 7    the extortion statute.

 8            Now Nicole also testified explicitly that the fear

 9    of her original collateral being released is what kept her to

10    submit more, the fear of harming her family.  And you can find

11    that testimony on Page 4017.  And you also saw some of the

12    initial additional collateral Nicole provided, and she told

13    you she also provided many more additional naked pictures.  I

14    submit that the Government has also proven that the defendant

15    engaged in state law extortion beyond a reasonable doubt, so

16    Racketeering Act 9 has been proven.

17            Now, the remaining DOS related crimes that we're

18    going to look at rely in part on an analysis of whether

19    tactics of force, fraud or coercion were used on victims.

20    Let's look at all the tactics of coercion that were being

21    reported DOS beyond the collateral.  First you have the

22    branding with the defendant's initials, the humiliating act of

23    possession.

24            Lauren Salzman and Nicole both described how painful

25    this process was.  Lauren even described her slave, Jimena,

David R. Roy, RPR - Official Court Reporter

5398

1    squealing and screaming and said it looks horrendous and

2    really scary.  Lauren Salzman's testimony about this is on

3    Page 1748.  And let's take a look at that, what that chat

4    between, again, October 2015 with -- between Camila and the

5    defendant and even all the way back in October 2015 even

6    though the slave would not end up being branded until early

7    2017.  The defendant is talking about branding he says it

8    caused her and other slaves all that wanted to be branded with

9    my monogram plus a number, so the defendant's initials were

10   always conceded to be what the brand was going to be.

11              (Audio plays.)

12              (Audio stops.)

13              MS. PENZA:   Now, you heard that the ceremonies

14   played out exactly as the defendant described, that all slaves

15   were naked.  The ceremonies were videoed to create more

16   collateral.  Their hands were held above their heads like a

17   sacrifice.  You also heard that the victims had to say, Master

18   please brand me, so it didn't seem like they were being

19   forced.

20              I submit that line in the recording was a submission

21   by the defendant that, in fact, the brands which secretly

22   contained his monogram was obviously coercive or he wouldn't

23   have thought that the statement was necessary.  He knew if the

24   true meaning of the branding came out he would need to protect

25   himself.  And look at the brand.  I don't think you need me to

1   trace his initials anymore.  You know what it is.  Just like

2   Nicole knows what it is, when she looks down and sees that

3   permanent scar on her body every day.

4           Dr. Hughes described in her testimony a number of

5   tactics of coercion that victims experienced and the relevant

6   effect.  She talked about isolation, how that keeps abusive

7   secrets and stops victims from getting help.  She talked about

8   indoctrination and how it takes away freedom of though.  She

9   talked about subjugation, treating someone as less than them.

10  She talked about surveillance and checking in and creating a

11  sense that the abuser is omnipotent.  She talked about secrecy

12  and intimidation, about controlling vital functions like

13  eating, sleeping, grooming, and she talked about shame,

14  humiliation and emotional abuse.  Dr. Hughes' testimony on

15  these topics can be found on Page 3721 through 28 and she told

16  you the goal of these behaviors is entrapment.

17          The evidence showed that those tactics are used by

18  the defendant time and time again, perhaps most formally

19  within DOS.  There was a push to isolate the members of DOS by

20  forcing them to stay in Clifton Park as much as possible.  For

21  example, Nicole testified that she was expected to travel

22  nearly every day off even if it was only overnight.  You can

23  read about her grueling schedule on transcript Page 3953.  And

24  the DOS slaves were in a master/slave relationship.  There

25  could be no greater subjugation.  They were doing readiness

5400

1    drills at all hours, walked at all hours, naked pictures on

2    demand.  Nicole testified that she even needed permission to

3    cut her hair, and I submit it's just common sense that when

4    people are sleep deprived and living on 500 calories a day,

5    that they are more easily manipulated and coerced.

6          For those willing to make a career of it, success in

7    EPS was explicitly tied to -- success in DOS was explicitly

8    tied to their success in ESP, an additional tactic of

9    coercion.  For example, in one of the text messages we

10   discovered in Exhibit 432 between Audrey and Lauren Salzman,

11   Lauren said, I'm telling you this not just as your M, a

12   master, but as a green in ESP, very high rank.

13         That brings us to the next type of criminal conduct

14   that occurred within DOS, forced labor.  And here there was

15   one standalone task related to forced labor, and there's one

16   subpart of a racketeering act, forced labor of Nicole is 10B.

17   We're going to talk about them together, but for the

18   conspiracy count, again you only need to find an agreement and

19   for the racketeering act you do not need to find that the

20   defendant committed it himself if he commanded it or caused it

21   to happen.

22         Now starting with the first element, the Government

23   has proved that the defendant agreed with his first line slave

24   including Lauren Salzman and Allison Mack to obtain the labor

25   of lower-ranking slaves and that the defendant did

1    specifically obtain the labor and services of Nicole.

2    Throughout the trial there was ample evidence DOS operated as

3    a way for the defendant to obtain sex and labor from

4    lower-ranking slaves.  This is what's in evidence as

5    Government's Exhibit 1404 and that's the entirety of the DOS

6    book, but take this example from the DOS book where it says

7    that you surrender your life, mind, body and possessions for

8    unconditional use.

9            You can also look at Lauren Salzman's testimony.

10   This is on Page 1618 and 19.  She testified that the defendant

11   had said that the first-line DOS members should be getting

12   approximately 40 hours of labor per week from their slaves.

13   And you also saw the text message, Government's Exhibit 432

14   that she -- that Lauren Salzman texted one of her slaves

15   where -- that she was conveying that her slave needed to

16   provide her with work and she told the slave, who was a

17   professional, that the type of work Audrey should be doing

18   should be commensurate with Audrey's skill set.  So, for

19   example, I submit that if Audrey were a lawyer, Lauren

20   expected an hour of legal work from her.  Notably as mentioned

21   before, Lauren also threw around her power of a high ranking

22   member of NXIVM with Audrey who herself was looking to be

23   promoted within NXIVM.

24           Now as to the second element, the Government has

25   proven then the defendant agreed to obtain the labor of DOS

1    slaves and he did obtain labor from Nicole through threats of

2    serious harm or a scheme, plan or pattern intended to cause

3    them to believe that if they did not perform such labor and

4    services they or someone else would suffer serious harm.

5          As I mentioned before, I expect Judge Garaufis will

6    instruct you that serious harm includes psychological,

7    financial and reputational harm.  I submit that the scheme

8    language is particularly appropriate here because there was no

9    need to threaten harm day in and day out to get women to do

10   things once they were DOS slaves.  The collateral served this

11   intended purpose and served as an ever present threat to the

12   psychological, financial and reputational stability and took

13   away the ability of the DOS slaves to make their choices

14   freely.  And remember, when you're analyzing whether the DOS

15   slaves would have felt that serious harm would befall them if

16   they did not provide labor and services, the question is what

17   a reasonable person in the DOS slaves circumstances would do.

18   That's a reasonable person who has been isolated, who has been

19   sleep deprived, limited in eating and who is being humiliated.

20

21         Count 4, forced labor conspiracy.  So that has led

22   us to forced labor and conspiracy and we have proved it

23   because the defendant did get labor and services.  He agreed

24   to get labor and services.  So forced labor conspiracy has

25   been proven guilty.

David R. Roy, RPR - Official Court Reporter

1          Now the defendant also actually got the labor and

2     services, and so that's where we're going to talk about the

3     racketeering act.  Now, Nicole and others transcribed

4     recordings of Pam Cafritz speaking for her memorial service

5     and you heard that Nicole stayed up all night to do that after

6     getting home from her nightclub job.  If you wish to review

7     her testimony, it's at Pages 4039 and 4040.

8          Now, if you look at Government's Exhibit 658, that

9     is the attachment that Nicole sends with her transcription and

10    she writes, It took me about five and a half hours just to do

11    this first part.

12         Now, Sylvie testified that other people in the

13    Community, including Sylvie were getting paid for tasks

14    related to the memorial.  In fact, Sylvie said she was

15    supposed to do the transcription but realized that she

16    couldn't get it all done and that's when it was suggested that

17    Allison's slave do it.  I submit there was no chance Nicole

18    would have stayed up for 23 hours in a row to transcribe

19    recordings of Pam's tape unless she felt she had no choice.

20         Nicole and Sylvie also edited the defendant's

21    articles for hours a day for weeks straight.  I submit that

22    the purpose of those articles being edited was to benefit the

23    defendant and make them available for curriculum or for the

24    defendant to publish.  Now these are some examples.  This is

25    Government's Exhibit 1358 and Government's Exhibit 1360.

David R. Roy, RPR – Official Court Reporter

1          Now throughout the trial you've heard about other

2     types of labor and services performed as well such as acts of

3     care, including running errands and buying groceries.  I mean

4     there's a regular taking of naked photographs which is its own

5     form of labor.  Sofie testified she would spend all this time

6     in the bathroom to take pictures for the defendant.  The

7     evidence of the labor Nicole actually performed means that the

8     Racketeering Act 10B has been proven.

9          Now, we're at the final set of DOS-related crimes.

10    Count 5, sex trafficking conspiracy.  Count 6 and racketeering

11    10A, which both relate to the sex trafficking of Nicole and

12    Count 7 which relates to the attempted sex trafficking of Jay.

13    Before we discuss the elements of sex trafficking I'm going to

14    ask you to keep a few things in mind.  We've discussed already

15    the fact that the sexual component of DOS was concealed from

16    DOS slaves when they joined while all the first-line slaves

17    were in sexual relationships with the defendant.  And you can

18    look to the Government's Exhibit 1779, Page 285.

19         And keep this in mind, too, this Exhibit 1779, Page

20    285.  October 1st, 2015, the defendant's order that Camila is

21    a fuck-toy slave for him.  Keep this in mind as you walk

22    through the sex trafficking of Nicole starting with her

23    recruitment into DOS in February of 2015, four months after

24    Camila received this WhatsApp message.  Now in February

25    of 2016 Nicole was spending her first winter in the city

David R. Roy, RPR - Official Court Reporter

1  having moved from California to pursue her acting career.

2  Things weren't going well and she was actually suicidal.

3  Prior to that I submit Allison had begun pushing her way into

4  Nicole's life, arranging for Nicole to sleep in her bed and

5  hinting at the women's mentorship group she was a part of.

6  She would also assign Nicole to a personal journal entry to

7  Allison as part of their source work.  But back to February

8  of 2016, Allison repeated to Nicole, Did Allison suggest

9  Nicole see a therapist?  Go home to California for a while and

10  spend time with her family?  No.

11         So this is February 10th, Nicole sends, Tonight was

12  brutal.  I haven't felt this low in a very long time.  I

13  haven't felt suicidal like this in a long time.  This is

14  Government's Exhibit 657.  The very next day Allison Mack

15  meets with Nicole at the Ace Hotel in New York City and

16  pitches her on DOS.  Nicole testified that meeting with

17  Allison made her feel hopeful.  You can read about this

18  initial meeting through the process -- through the process of

19  her joining on Pages 3845 to 3856.  Nicole thought she was

20  being given an opportunity to be mentored by an established

21  actor.  Now, within a few days, and this is an e-mail from

22  Allison to Nicole saying, I'm so excited to share what I'm

23  doing.  This is exactly what you need.  Trust me, you'll be

24  okay.  Is your collateral finished.

25         And so this is three days after Nicole had sent the

David R. Roy, RPR - Official Court Reporter

5406

1    note -- the e-mail saying that she was feeling suicidal.

2            Now, within a few days Nicole did submit her

3    collateral, the process was difficult and Nicole broke down on

4    the stand when she described writing a letter of her father's

5    sexual abuse.  You can see that spot in the transcript on

6    Page 3850.  But then she was in and she was hopeful, but she

7    didn't know what she had signed up for.  Nicole testified that

8    she was okay with the first commitment, stop sleeping with her

9    on and off boyfriend, try being celibate for three months.

10   Nicole told herself that maybe those things were good for her.

11   I submit what Nicole did not know was that the defendant

12   required all women he had sex with to be monogamous and that

13   he already had his eyes set on having sex with her.  At the

14   beginning they were also signs that maybe DOS was a membership

15   group.  Allison got her prestigious off-Broadway audition and

16   an interview with Allison's agent which Nicole describes on

17   Page 3866.  But fast-forward to late March 2016.  By then,

18   Nicole was doing a bit better and one night at her job she met

19   a cute guy who asked for her number and her e-mail journal to

20   Allison that night Nicole wrote about what had happened.

21   Nicole testified that she was concerned by Allison's reaction

22   was to flip out.  Allison then went on to tell Nicole she

23   needed to fix it.  After that Nicole felt, quote, super

24   unnerved.  You can review Nicole's testimony about this

25   interaction on Page 3869 of the transcript.  It was then that

David R. Roy, RPR - Official Court Reporter

1   Nicole decided she didn't want to be in DOS anymore, but she

2   tried to tell Allison.  Allison told her it wasn't an option.

3   At that point Allison told Nicole about the time the defendant

4   threatened to release Allison's sex tape.

5           After that meeting Allison sent the following

6   e-mail.  This is March 29th.  Why are you scaring yourself --

7   go back, I'm sorry.

8           Okay.  So on the 29th -- take that back.

9           So on the 29th this is where Nicole talks about

10  wanting to give -- if I wanted to give out my number to get

11  coffee or even kiss a boy, small things that make me smile, I

12  don't see how that's bad, I just don't.  And then within two

13  days, Allison Mack is saying, Why are you scaring yourself?

14  This is the after they had the conversation where Allison

15  had -- Allison Mack had talked about the defendant threatening

16  to release her sex tape, although Nicole didn't know it was

17  the defendant at the time.  And Allison Mack says, Why are you

18  scaring yourself?  I want to remind you that ou made a

19  commitment.  You can't go back.  It's not an option.  It's

20  like an arranged marriage.  Why waste time contemplating

21  changing your mind.  Take that energy and move into the choice

22  you made.  You don't get to question.  It's a choice you made,

23  now what are you going to do about it?  You will find freedom

24  in the commitment you already made.  Don't question, don't

25  waste time, just do.

David R. Roy, RPR – Official Court Reporter

1          And I submit that behind the scenes Allison was

2     discussing every step of this with the defendant because

3     within one week of saying she wanted to leave DOS, Allison

4     tasked Nicole with making contact with the defendant.  So at

5     that point Nicole still did not know he was a part of DOS, and

6     it was less than two months after that Nicole was staying at

7     Allison's house when she was commanded to go on a walk with

8     the defendant and say she would do anything he asked her to

9     do.  And before she left, Allison ordered her to be a good

10    slave.  This testimony is on Page 3916 through 17.

11         And so here you can see the increase in

12    communication.  Within a week she is, a little bit after that

13    Allison is passing her getting the attention of the smartest

14    man in the world and then there was a series of e-mails that

15    Allison wrote and it would be about a month, a little over a

16    month later that she was given the assignment to do whatever

17    the defendant wanted her to do.

18         And so before we go on, there's one -- another

19    WhatsApp message that I wanted you to bear in mind as we

20    consider what happens to Nicole.  And this is where the

21    defendant is saying to her, again, October 2015, What if we

22    suggested that another woman seduced me with you?

23         Now, when Nicole went on the first walk and said to

24    the defendant she would do anything he wanted her to do.  He

25    asked her what the worst thing he could ask her to do was.

1    She said she thought the worst was something sexual, but

2    hadn't realized it's the worst thing would actually be to get

3    asked to hurt her family or hurt herself.  So the defendant

4    went for second worst.  On the walk after that, which I submit

5    based on the e-mail was likely a week after the one where she

6    asked what the worst thing walk he could do for her was --

7    asked her to do was, Allison again arranged for Nicole to walk

8    with the defendant.  Testimony regarding what's the following

9    on this walk and the prior walk can be found on Pages 3917

10   through 37.  I'm sure you remember what Nicole's testimony was

11   next.  She described the terrifying and disorienting moment

12   when she was lying on a wooden table, tided down and

13   blindfolded and felt someone begin to go down on her.  She

14   assumed it was the defendant but then she heard his voice and

15   realized there was a third person there.  She testified that

16   in that moment she worried there were even more people in the

17   room.  What Nicole didn't know then but you know now, is that

18   the person who was going down on her was Camila, the very DOS

19   slave who the defendant had commanded to recruit fuck-toy

20   slaves, and who the defendant had sexually abused when she was

21   a minor.

22           Lauren testified that the defendant told her it was

23   Camila.  Lauren's testimony on that is at Page 1870.  And this

24   happened at Camila's apartment 120 Victory Way, which I submit

25   is a secret apartment where the defendant hid Camila.  You

David R. Roy, RPR - Official Court Reporter

1   heard evidence that the apartment was paid for and this

2   testimony can be found at 3338.  You heard evidence that the

3   apartment was paid for in cash by Kathy Russell, using a fake

4   name Kathy O'Sullivan.  And the woman -- the landlord

5   testified and was shown a picture of Kathy Russell and

6   identified her as Kathy O'Sullivan the woman who had been

7   paying a year's worth of rent upfront in cash in a bag at

8   Starbucks for seven years.  And that testimony is on

9   Page 3338.

10          Now, when the Government obtained a search warrant

11  for Camila's Google account, this picture with the wooden

12  table -- with the wooden table moved out of its usual spot.

13  And the tie that was used, I submit the tie that was used to

14  bind Nicole's wrist or ankle still hanging off to the side on

15  the upper right of that picture was dated the same day Nicole

16  told us that this incident happened.

17          And you also saw the video of 120 Victory Way that

18  the landlord took.  You also saw the video of 120 Victory Way

19  that the landlord took and there were items all over that

20  video but that all were in this -- all were in this.  And so

21  Nicole told you that while she was tied to the table -- that

22  while she was tied to the table the defendant circled her

23  asking probing questions about her sexual history.  Based on

24  that picture, I submit that what Nicole didn't know is that

25  the defendant had a videocamera pointed at her while she was

David R. Roy, RPR - Official Court Reporter

5411

1    tied to that table.  I submit the defendant videoed Nicole

2    without her knowledge to have as additional collateral on both

3    her and Camila and for his own sexual gratification.

4              Tellingly, after this was over, the defendant sat

5    Nicole down and told her that there was nothing wrong with

6    what had happened.  I submit the defendant said that to Nicole

7    because he knew what had happened was very, very wrong.  And

8    of course --

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David R. Roy, RPR - Official Court Reporter

```
 1          MS. PENZA:  Of course he told her not to tell
 2    anyone, making an exception only for Allison.  The defendant
 3    also told Nicole she was great.
 4          Now Nicole sent an e-mail close in time to this
 5    saying that she was looking forward to working more with
 6    defendant.  Nicole and the defendant had sex after that and
 7    she sometimes sent messages initiating contact with the
 8    defendant.  Describing this period where she would try to make
 9    the situation she thought she was stuck in work.
10          And Dr. Hughes provided psychological insight as
11    well for this behavior.  She told us that the fact of
12    continued contact or even a relationship after a sexual
13    assault does not mean the assault did not happen.  She
14    explained a perpetrator might get attacked later in the day
15    after a sexual assault and say, it was so nice seeing you.
16    Dr. Hughes explained, the victim may be thinking, well, it
17    wasn't nice to be raped, but I'm going to keep you happy
18    because I know that is what you want to hear because that's
19    what is going to keep me safe.  Dr. Hughes' testimony on this
20    point can be found at 3,733.
21          Look at Nicole.  I submit you'll see displaced anger
22    and avoidance that Dr. Hughes told you is very common in
23    sexual assault victims.  Dr. Hughes' testimony is at 3,708 and
24    3,709.  All of Dr. Hughes' testimony is valuable in
25    considering the victims.  If you feel it may help, you should
```

1  ask for her testimony.

2          Do not forget that as soon as DOS blew up and Nicole

3  confirmed with Allison that her collateral wouldn't be

4  released, Nicole didn't feel the need to breakup with the

5  defendant.  I submit that Nicole's behavior, once she was

6  unburdened, showed that all of her interactions with the

7  defendant were the product of coercion and direct result of

8  being collateralized.  Without DOS, I submit, there is no

9  chance for the defendant ever having sex with Nicole.  What

10 happened to Nicole on May 31, 2016 was sex trafficking.

11         Let's talk about the elements of sex trafficking,

12 all of which are proven here.  Now, again, the defendant is

13 guilty if he committed the crime or if he helped to commit the

14 crime.

15         The first element is that the defendant knowingly

16 recruited, enticed, harbored Nicole, or that the defendant

17 knowingly benefited financially or by receiving something of

18 value from participating in a venture that recruited, enticed,

19 transported, provided or obtained Nicole.  I submit you can

20 find that this element is proven under theory the defendant

21 recruited, enticed Nicole to do so.  The defendant was also

22 part of DOS and knowingly benefited financially from DOS

23 eventually.

24         The second element is that the defendant knew or

25 recklessly disregarded that force, fraud or coercion would be

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

5414

1    used with respect to Nicole.  This element is proven once

2    again by the coercion stemming from the collateral.

3              And now the forced labor context above.  Here the

4    defendant was also the direct participant in the use of force

5    against -- in the use of force against Nicole, given that she

6    was tied to the table.

7              The third element in that is the defendant knew that

8    Nicole would be engaged in a commercial sex act.  Here the sex

9    act is obvious, Nicole having other sex performed on her by

10   Camila for the defendant's sexual gratification.

11             Now what make this is act commercial?  I expect

12   Judge Garaufis will instruct you that a commercial sex act is

13   any sex act in which anything of value is given to any person

14   because of the sex act.  Here it's Allison Mack who is the one

15   who received a thing of value by providing Nicole for a sex

16   act to the defendant.  A thing of value need not involve a

17   monetary exchange, and need not have any financial component.

18             As we looked at before, there were certain

19   privileges, including economic privileges, that came with

20   being in the first line, including the longest line of free

21   labor flowing up to you.  Maintaining a spot in the first line

22   and receiving those benefits, meant keeping the defendant

23   happy.  And because Allison kept the defendant happy and

24   maintained that position by providing the defendant with women

25   to have sex with, she received a commercial benefit.  The

1  defendant knew, and the defendant committed the sex

2  trafficking.  Nicole even testified that Allison was called

3  Madam Mack.

4        Additionally, e-mail correspondence between the

5  defendant and Allison about an assignment for India to take

6  her clothes you off and pose in the most revealing way for

7  her, demonstrates the commercial ties for Allison to her

8  providing women for the defendant.  This is the e-mail I just

9  described.  You can see it was written only three-and-a-half

10  weeks before Nicole -- so again, the top header is when the

11  defendant ended up sending himself a lot of e-mails in

12  November 2017, but at the bottom you can see that the original

13  date is March 3rd, 2016.

14        The defendant writes, Does India know to complete

15  her she needs to take off all her clothes while pose in the

16  most revealing way and have me take a picture of her with her

17  phone to be immediately sent to you as proof.  And Allison

18  Mack writes back, Wahoo, smiley face.  And then the next day

19  Allison writes to the defendant, I'm so sorry to bug you but I

20  have not been paid as head trainer for the source since last

21  year and I'm struggling a little with income.  Clare says she

22  cannot approve the payments until you review them, is there

23  someway you might be able to review this sooner rather than

24  later?  I know you're slammed, if I can help in any way to

25  make this simply, please let me know.  I'll try to figure out

1    to be more streamlined with this too.  The defendant

2    responded, Yes.  Any news on India?  Then an hour later

3    Allison replied telling the defendant that India has changed

4    her flight, inclined that she was now, she has changed her

5    flight and is really emotional as money is tight, but totally

6    sees what the value in what the lessen and how it is moving

7    her ahead.  She sees how this relates to her whole life.  It

8    is good.  She should reach out to you.  You're meeting again

9    to complete the assign.

10             I submit this is evidence of a quid pro quo between

11   Allison the defendant.  She grooms women for him, and he gives

12   her financial benefit for it.

13             Finally, you must find that the defendant's conduct

14   was in or effecting interstate commerce.  Here the element can

15   be met in many ways, but at least because Nicole took either

16   Amtrak or Greyhound to and from Albany the day of that

17   assignment -- Amtrak or a bus, a commercial bus.  The use of

18   these modes of transportation affect interstate commerce.

19   With that we have proven sex trafficking as to Nicole.  Both

20   Racketeering Act 10A and Count Six.

21             Now, on this question on six there is one more

22   thing, so there is another box underneath, it says, "Do you

23   find that the defendant knew means of force, fraud or coercion

24   to be used to cause one or more persons to engage in one or

25   more commercial sex acts."  This question is there because

1   this count can be proven by evidence that the defendant

2   recklessly disregarded facts in front of him; but here the

3   defendant was the prime mover and knew exactly what was

4   happening every step of the way.  I submit you can check yes

5   to that as well.

6           Turning now to sex trafficking conspiracy.  From

7   what we've already discussed, you can check it.  We've proven

8   that Allison and the defendant agreed that Nicole would be sex

9   trafficked.  That is enough to find the conspiracy count as

10  well.  I'll check it off, that is Count Five.

11          You can look at other examples as well to consider

12  whether this conspiracy existed.  Like Sylvie, from the very

13  beginning of trial, described receiving an assignment to

14  seduce the defendant and ended up performing oral sex on him.

15  You can review that on pages 254 to 255.  Her master, Monica

16  Duran, who is also in a first line, I submit would have

17  received the benefit Allison did by being in the first line.

18          Sylvie receiving that assignment was calculated and

19  planned, just as Nicole's was.  Similar to what happened with

20  Nicole, not long before she was recruited into DOS, Sylvie was

21  told she had to be celibate with her husband by Keith, by

22  Clare, by also by Rosa Laura Junco.

23          Another similarity, after the assault on Sylvie the

24  defendant told Sylvie that she was brave, that she was

25  special.  Sylvie testified that she was disgusted by this.

1       Her testimony about this is on page 255.

2                Finally let's talk about the last count in the

3       Indictment, that's Count Seven, the attempted sex trafficking

4       of Jay.  As she described on page 4,427, Jay was assigned to

5       seduce the defendant and have him take a picture of her and

6       send it to India to prove it was done.  Allison told her to

7       keep the assignment.  Jay pushed back with Allison.  And Jay

8       testified on page 4,418, Allison tried to convince her that it

9       would help her with her child sexual abuse.  Jay also directly

10      asked Allison if the defendant was part of the vow and Allison

11      lied and said no.  Finally, at one point, Allison stated to

12      Jay, I give you permission to enjoy it in regards to the

13      assignment.

14               Given what happened with Sylvie and Nicole, I submit

15      it's clear that Jay was being sent to the defendant to engage

16      in a sex act.  They thought because of her collateral she

17      could be coerced like the others.  In fact, Allison admitted

18      it that Jay that was supposed to have sex with the defendant.

19      This is page 1,794.  Lauren Salzman testified that she asked

20      Allison if the defendant was having sex with her slaves.

21      Allison said, just Nicole and Suzy, but we're going to start

22      working with India and Jay.  Lauren then asked, when you say

23      working, do you mean fucking?  And Allison said yes.

24               Additionally, the coercive power collateral is made

25      clear by the fact that she decided she needed to download

1   other people's collateral to have leverage if they tried to

2   release hers.

3           The rest of the analysis isn't the same.  Allison's

4   commercial benefit is based on her arrangement with the

5   defendant.

6           Here interstate commerce is effected by Jay's

7   flights in and out of J.F.K. from California.  With that the

8   Government has proven that Jay was also being set up to have

9   sex with the defendant, and you can check guilty.

10          At this point we've gone through all the counts, and

11  every Racketeering Act.  I submit we have proven.  I submit

12  we've already now checked off guilty on Racketeering, even

13  though you could have checked that off as soon as you find

14  two.  We already checked off Racketeering conspiracy.  And now

15  finally checking off Jay.

16          At the beginning I said I would come back to

17  relatedness and the threat of continued criminal activity.  So

18  here we are.

19          A nexus that is a connection to the enterprise.  I

20  submit there is a substantial overlap in the participants and

21  victims in these counts.  Additionally, the defendant was able

22  to commit each of the Racketeering Acts because of the

23  position in the enterprise and his position in the enterprise

24  helped him commit those acts.  Either of those factors alone

25  satisfy both these requirements.

1           Finally you have to find that the Racketeering Act

2    occurred over a substantial period of time where there was a

3    threat of continued criminal activity.  You can look at the

4    timeline.  I don't think there can be a dispute on this.  The

5    Racketeering at issue here span nearly 15 years.  There was no

6    sign that the defendant or his inner circle had any intention

7    of stopping.  Which brings us to the end.

8           In November 2016 the defendant fled to Mexico

9    leaving Lauren Salzman and others holding down Clifton Park.

10   A short time after, that he dropped his phones and stopped

11   using his e-mail.  He went into hiding.

12          On the day the defendant was arrested in Mexico he

13   was with several of the first line slaves, including Lauren

14   Salzman, with the intention that they could recommit

15   themselves to the defendant and DOS through group sex.  But

16   his fantasy never happened.  The Federalies came to his villa

17   and the defendant hid behind another door, in fact two doors;

18   but the defendant can't hide anymore.

19          A light has been shown into the darkness and the

20   defendant's crimes have been exposed.  The victims are

21   thriving.  Justice has been a long time coming, and for the

22   first time he's being held accountable to you.

23          Trust the evidence.  Trust your judgment.  And find

24   the defendant guilty of all counts.  Thank you.

25          THE COURT:  At this time we'll hear the closing

SUMMATIONS - MR. AGNIFILO

1  argument from the defense.

2          Mr. Agnifilio, you may proceed.

3          MR. AGNIFILO:  Thank you, Judge.  Good afternoon

4  everyone.

5          THE JURY:  (Collectively) Good afternoon.

6          MR. AGNIFILO:  So more than most cases, I think it's

7  very important that you look at each of the charges and you

8  link each of the charges with the evidence.

9          It's a very difficult job you have to do.  It's

10 quite frankly a very difficult job that I have to do.  I have

11 to sort through all the different evidence in the case, very

12 powerful evidence, evidence that causes strong emotional

13 reaction.  And what we have to do, though, and I have to try

14 and do it myself, is to go through the charges and actually

15 really go through what is actually charged, what is not

16 charged, what is charged.  And let me just give you an

17 example.

18         Keith Raniere is not charged in any way, shape or

19 form with having sex with Camila.  It's just not one of the

20 charges.  He's charged with the photographs.  He's charged

21 with possessing the child pornography.  But he's not charged

22 with having sex with her.  That's just one example.

23         So what I want to do is I want to take you step by

24 step -- the Government started this, so I'm just going to

25 finish it -- going through the charges.  Now one of the things

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    that you heard in the Government's opening statement is that

2    this case is about, and this is how they charged it, an

3    enterprise.  It's not about Keith Raniere alone.  It's about

4    an entire enterprise.

5         And it's basically the enterprise, as I understand

6    it, I think that's the way they described it in their

7    summation, is Keith Raniere and all the people in that circle

8    of people in the poster that was sitting here during the

9    Government's summation.  And what you guys have to figure out

10   is, is that right?  Is that true?  Does that make sense?  Does

11   that hold together?

12        Because the reason we're in federal court with a

13   racketeering charge, racketeering charges, is because the

14   Government is basically saying to you, Keith Raniere didn't

15   work alone.  That's their theory.  That's what they have to

16   prove to you.  He didn't work alone.  He worked as part of an

17   enterprise.

18        And Judge Garaufis -- when I finish, my colleague

19   Mr. Lesko, goes, and then we're done.  And then Judge Garaufis

20   takes over.  And judge Garaufis instructs you on the law.  And

21   I agree wholeheartedly with what my colleague, Ms. Penza said,

22   if I say anything that is somewhat legal, it's Judge Garaufis

23   that instructs you on the law and nobody else.  So if I

24   venture into legal principles, it's really with an eye toward

25   marrying the evidence to the legal principles.  The most

SUMMATIONS - MR. AGNIFILO

1    important thing is when you hear the Judge's final

2    instruction, listen to everything obviously that he says, then

3    put it in context with everything else.

4           What Ms. Penza did, did I'm going to do something

5    similar.  I'm going to talk about discreet legal principles.

6    At the end of the day, listen to the instruction in one shot.

7    That's what Judge Garaufis is going to give to you.  And what

8    the Judge says is what is the law is and nothing else.

9           So for sake of this part of the discussion, the

10   Government has seen fit to charge and now has to prove an

11   enterprise.  Again, not that Keith Raniere worked alone, that

12   he was part of an enterprise.

13          And one little part out of the racketeering statute

14   that I want you to focus on, it's simply two words:  Common

15   purpose.  Common purpose.

16          When Judge Garaufis instructs you on the law,

17   probably sometime tomorrow, he's going to tell you many things

18   about enterprise.  One of the things he's going to say is that

19   the different people in the enterprise have to have a common

20   purpose.

21          And what I want you to think about as you go through

22   the evidence the way Ms. Penza described it to you, the way

23   I'm going to describe it to you, do we have that?

24          Do we have common purpose?  Who has a common purpose

25   with Keith?  Is his purpose common to anybody else?  Is his

SUMMATIONS - MR. AGNIFILO

1    purpose common with Karen Unterreiner?  Is his purpose common

2    with Pam Cafritz's purpose?  Is his purpose common with

3    Nicole's purpose in this case?

4            This isn't just a technicality, this is the charge.

5    This is how the Government is able to bring all these

6    different charges together in one case.  This is how the

7    Government is able to say, well, you were involved in identity

8    theft by Daniela coming into the United States from Canada in

9    2004.  You were involved in this in 2006; you were involved in

10   this in 2008, and 2010, and 2015, and 2017.  This is how they

11   are able to bring all of this together because the

12   racketeering statutes, Counts One and Two, RICO conspiracy,

13   the Judge will tell you how those statutes work, allow them to

14   bring all of this together.

15           So we don't just have a trial on what happened in

16   2004.  We don't just have a trial on what happened in 2006.

17   We don't have a trial in what happened in 2008.  We have a

18   trial on the whole thing.  But the reason we can have a trial

19   on the whole thing is because they have charged and now must

20   prove an enterprise.

21           I'm going to get into that a little bit.  Common

22   purpose.  Two words.  It will be the heart of what I think you

23   have to decide when you decide is there an enterprise, is

24   there a common purpose.

25           What is the common purpose between NXIVM on the one

SUMMATIONS - MR. AGNIFILO

1   hand and DOS on the other?  NXIVM is a business that is about

2   making money.  NXIVM is a business that opens centers around

3   the world.  There is centers in Mexico.  There is centers

4   throughout the United States.  Mark Vicente when he testified

5   did a good job taking you through some of the different

6   locations where the centers are.  But it's a true business.

7   NXIVM is a business.

8           There is nothing, nothing whatsoever business like

9   about DOS, nothing.  NXIVM makes money.  NXIVM has employees.

10  DOS is a social group.  It has nothing to do with commerce.

11  It has nothing to do with making money.

12          And so one of the things I'm going to want you to

13  ask yourself when you go back to the jury room and try to

14  figure out, is there an enterprise in this case, what is the

15  common purpose.  What is the common purpose between DOS on the

16  one hand and NXIVM on the other?  What is the common purpose

17  between the different people that are involved in the alleged

18  enterprise?  Is there a common purpose?

19          So we're going to start -- I'm going to basically,

20  and Ms. Penza got a good running start because she did a good

21  job going through the charges, I'm able to save some time --

22  we're going to start with the first Racketeering Act.  The

23  first Racketeering Act is identity theft conspiracy of someone

24  named Ashana Chenoa.  That's the crime.

25          This is why I said we have to focus on the crime.

SUMMATIONS - MR. AGNIFILO

1    The crime is not whether or not Keith Raniere helped Daniela

2    get over the border from Canada the United States on Christmas

3    Eve 2004.  That's not the crime.  The crime is specific, a

4    conspiracy, an agreement, the way Judge Garaufis will describe

5    it to you, an agreement that Keith Raniere and others, were

6    going to have Daniela get across the border by using a fake

7    identification card of another real person, living or dead.

8    All of those elements.

9              It can't just be any identification card.  It can't

10   just be, we're going to make an identification card for

11   Daniela that's fake.  That's not identity theft.

12             I want to read you, before I go any further, I want

13   to read you portion of Daniela's testimony on this point.  The

14   reason I'm going to read it to you is because at no place, and

15   this is very important, at no place in her testimony does she

16   ever say that Keith was involved in helping her get across the

17   border by means of an identification other another real

18   person.  So because I want you to focus on what she doesn't

19   say, I'm going to read certain parts of it.

20             I'm looking now at page 2409 of the transcript, line

21   16.  "The defendant Keith Raniere says he came up with a plan,

22   he came up with a plan to bring me back.  It was an exciting

23   time for me.  I mean that Keith wanted me back so bad that he

24   was planning this strategy.  He was the one that, like, he

25   was, he was figuring out maybe you can come through Canada and

SUMMATIONS - MR. AGNIFILO

1   then, you know, do this and that.  And he told me that he was,

2   he told me he was coming up, like he was going to have someone

3   have an ID for me.  So his plan was this.  He had like a

4   master plan for bringing me back."

5            Going to the next page 2410.

6            Question:  "And so was he telling you this plan

7   while you're in Mexico?

8            Answer:  "Yes.

9            Question:  "And he's communicating all the details?

10           Answer:  "Yes.

11           Question:  "Did you, do you have any other

12  conversation that you remember with anyone else while you were

13  in Mexico about this plan?

14           Answer:  "Not that I remember.

15           Question:  "So what happened?  What does the

16  defendant actually tell you the plan is?

17           Answer:  "He tells me the plan is that I will fly to

18  Canada.  At the time a Mexican did not need a visa to fly and

19  stay in Canada, so that wasn't going to be an issue.  So I

20  would fly to Canada and in Canada he would send someone to

21  meet you.  That someone in this case was going to be Kristin.

22  So, and Kristin would bring with her a fake ID for me.  And I

23  would be crossing the border on the U.S. to the U.S.A. as

24  American.  So it was going to be like with a fake ID.  It is,

25  wasn't a fake visa, it was a fake ID.  The plan was that this

SUMMATIONS - MR. AGNIFILO

1    was going to happen on Christmas Eve.  So like the holiday

2    rush would kind of things would be busy, so maybe there would

3    be more like, it was like, the likelihood of it succeeding it

4    would be higher and that would" -- that's her testimony.

5           No talk about a person.  So even if you believe

6    every word she says, and for the next five minutes I'm going

7    to go through why you shouldn't because there are objective

8    problems with what she said, we'll put that aside for a

9    second.  If you believe every single thing she says in the

10   testimony, Racketeering Act 1 is not proven.

11          Because there is nothing in the testimony that Keith

12   Raniere was involved in a plan that involved a fake

13   identification card of another person, living or dead.

14          So let's get into the type of evidence that does

15   exist.  That's it.  That's the testimony.  There are no

16   e-mails.  There are no text messages.  There is no other

17   written evidence connecting Keith Raniere to any aspect of

18   Daniela crossing the border.  And there is certainly no

19   evidence of him using a bogus sheriff's ID card for this

20   purpose.  There is no evidence.  There is no testimony.  There

21   is nothing in the record as well.  Daniela is really the only

22   source of information on this point.

23          Now here are the problems, I submit to you -- and

24   just so you probably picked this up already -- I'm going to

25   make a lot of suggestions in the next two hours, whatever it

SUMMATIONS - MR. AGNIFILO

1    is.  You guys decide what is what.  If I tell you, I think a

2    witness is truthful or untruthful, you know what, it doesn't

3    mean anything.  It's my suggestion.  It's what you guys think.

4          I think the first thing I ever said to you guys when

5    I gave my opening statement, I said, the case is two things:

6    All of you and it's about him, the man who is behind the

7    screen there.  That's really what it is about.

8          You guys are really, I agree with my colleague who

9    said you're sort of an unusual jury.  I've never had a jury

10   for six, seven weeks be here on time every single day.  Every

11   single one of you -- I've been doing this a while -- you've

12   been paying close attention, and I appreciate it.

13         And now the hard work, you have to go into the jury

14   room and figure out what do you guys believe regardless of

15   what I say, regardless of what Ms. Penza says, Mr. Lesko says,

16   Ms. Hajjar says.  What do you believe.  Really dig in, don't

17   just accept it.  You're on the jury to be critical thinkers.

18         A couple of things I want you to think about.  Do

19   you remember what Daniela said about what how she flew to

20   Canada?  Here she is saying Keith comes up with a master plan,

21   don't you think somebody in NXIVM would pay for it, Keith,

22   Clare, somebody?  No.  Her testimony is her father paid.  Her

23   father pays for her ticket to go to Canada.  She says clearly,

24   her father paid for the ticket.  She says Kathy Russell met

25   her in Canada and gave her this ID card.  In the name of Lisa

SUMMATIONS - MR. AGNIFILO

1    Chenoa.  I don't know what it means, Lisa Chenoa, different

2    name than Elana Chenoa.  Same date of birth, but there is a

3    Elana -- sorry, Ashana, I keep saying Elana -- Ashana Chenoa,

4    that's the person who is a real person.  Ashana Chenoa is the

5    one who has to exist for this to be a crime.  The person has

6    to exist.  We know she existed, we saw her driver's license

7    and obituary.  The name on the crossing is not Ashana Chenoa,

8    it's Lisa Chenoa.  Is it Ashana Chenoa?  Lisa Chenoa?  I don't

9    know.  I don't know.  You may not know either.

10            So she says that Kathy Russell goes to Canada and

11   she gives her this identification card in the name of Lisa

12   Chenoa.  Two problems with that.  There is no record, there is

13   no record of Kathy Russell leaving the United States or coming

14   back to the United States.  I can see missing one.  I can see

15   with all the people going back and forth across the border,

16   maybe one person doesn't get entered into the system.  You

17   don't get entered in the system either time?  I don't know.

18   That seems sort of suspicious.

19            Because there is no record of Kathy Russell --

20   remember what she said, Kathy Russell drove in a car over the

21   border, went to Canada, gave her the ID card.  They did

22   shopping, made it look to the border guys they were shopping,

23   then drove back together.  So Kathy Russell crosses twice,

24   presumably in the same day, and there is no record of either

25   one.  It's hard to believe.  It's hard to believe.

SUMMATIONS - MR. AGNIFILO

1          So what does it mean?  Well, I submit it means Kathy

2    Russell didn't go to Canada and meet her with an

3    identification card.  Because if she had, one of those two

4    crossings would be captured in an official document, and

5    neither of them are.

6          So that means Daniela made her own identification

7    card?  Well, let's run that down for a minute.

8          Do you remember the cross-examination of Daniela?  I

9    think one of the first thing I asked her -- she didn't say a

10   word about this on direct examination -- one of the first

11   questions I asked her, didn't you make a fake identification

12   card for your sister?  Didn't you make a fake identification

13   card for Camila so that she could cross the border?  She said

14   no -- yes, I did make it, I did make a fake identification

15   card.  A fake Mexican national identification card for Camila

16   in 2017 so that she could travel around Mexico.

17         And she got into details about how she did it.  She

18   had a contact with her mother.  She made it in a certain

19   place.  She didn't mention it on direct.

20         I asked her, did you tell the Government about it?

21   I think I did. I think I didn't.  I don't know.

22         That's a big thing.  You would think you would

23   remember that, that she made a fake Mexican identification

24   card.  Did she do it again?  Did she do it before?  Is that

25   how she got this identification card?

SUMMATIONS - MR. AGNIFILO

1          What are the different possibilities?  I see three,

2     maybe there are more, but I see three.

3          One, is that Kathy Russell did go to Canada, and

4     didn't get logged in either time.  Remote.

5          Two, someone else did make the identification card

6     and mailed it to her?  Sent it to her somehow?  That doesn't

7     make sense, though, I'll tell you why.  Remember what she

8     says, she says it was like amateur hour.  It was a terrible

9     identification card.  It was really, really bad.  And the

10    terms she used, it was like amateur hour.  So I submit to you,

11    if someone is going to mail her a really bad, an amateur hour,

12    identification card ahead of time, she's going to say, I'm not

13    using this.  I don't want to get in trouble.  She would wait

14    until she got a non-amateur hour identification card.  So that

15    one doesn't make sense either.

16         So the third possibility is she made it herself.

17    That's an interesting possibility, because that's inconsistent

18    with what she testified to here.  Because what she testified

19    to here was that Keith came up with this master plan, those

20    are her words, came up with this master plan to get her back

21    into the United States.  So what part of the master plan

22    involves her making her own identification card?  One of the

23    things that she couldn't remember, and Ms. Penza referred to

24    this in her summation as well, is that Kristin Keeffe was

25    there.  I don't think that's just a mere oversight.  Because

SUMMATIONS - MR. AGNIFILO

1    what we know, and I'm going to talk quite a bit in my talk

2    about Kristin Keeffe, that Kristin Keeffe does the operational

3    things.

4              When you go back in the jury room and you're given

5    that box the box of stuff that was found in Nancy Salzman's

6    house, you go through it and what you're going to conclude, I

7    submit, in very short order is that's Kristin Keeffe's stuff.

8    You're going to conclude it for a few different reasons.

9              One, as Special Agent Wenniger testified a couple of

10   days ago, in the written notes that seem all to be in the same

11   handwriting, there are references to Gaelyn, her son with

12   Keith Raniere.  And the references to him as her son, not some

13   other kid.  And you'll just be able to tell.

14             What I'd ask you to do is actually go through some

15   of the handwritten notes.  Because it's very important, in my

16   opinion, for you to understand her.  You have to understand,

17   in my opinion, how she thinks, what she does, what she's like.

18   And she's not here, obviously she didn't testify at the trial,

19   but that doesn't mean you can't kind of look at different

20   things that she has written in her notes see how she does

21   things.  And she, I submit to you, is busy, she's active,

22   she's always doing something.  She's 24/7.  She does not take

23   a break.

24             And so I submit to you that she played some role,

25   rather than Keith Raniere directly, she played some

SUMMATIONS - MR. AGNIFILO

1   significant role in trying to get Daniela back into the

2   country.  And we know that she was in the Niagara Falls area.

3   If I'm not mistaken, there is a receipt from a Denny's

4   restaurant from Christmas Eve from December 24, 2004, that she

5   submitted for repayment.

6          Now I have no doubt that Kathy Russell was in the

7   area, I just have a doubt as to whether she went to Canada, is

8   my point.

9          Because what we know is that Kathy Russell was in

10  the area, because there is a credit card receipt of her buying

11  gas off of Route 80, in some town Clifton Springs, New York,

12  which is kind of like on the way near Rochester, you're

13  getting close to Niagara Falls.  I have no doubt that two

14  people went to meet Daniela coming across the border, and

15  those two people were Kristin and Kathy.

16         How can Daniela -- think about how Daniela -- think

17  about the level of detail, and I say this because what I'm

18  asking you to figure out is, is she making it up because the

19  level of detail of her crossing the border is so clear.

20         She says she's in a car.  She's in the passenger

21  side of the card.  And that Kathy Russell is driving.  They

22  get to the border patrol guy and she reaches over and she

23  gives Kathy her identification card.  And Kathy gives both

24  identification cards, very important thing.  If the border guy

25  is going to miss putting Kathy into the system, but puts

SUMMATIONS - MR. AGNIFILO

1     Chenoa in the system, he has both cards, that's her testimony.

2     I hand both cards and the border guy is looking at the card,

3     scrutinizing my card, I get nervous and I say, what is the

4     weather ahead.  I distract him.  She remembers that level of

5     detail, but she doesn't remember who drove her back to Albany.

6          Does that really make any sense?  That she remembers

7     that level of detail about the interaction with the border

8     patrol agent, but she doesn't know if Kristin Keeffe alone or

9     Kristin Keeffe with Kathy Russell drove her back to Albany.

10    It doesn't make any sense.  I submit to you, she's trying to

11    keep Kristin Keeffe out of it, for whatever reason.

12         But what she doesn't know, Daniela doesn't know, as

13    she's saying I don't remember if Kristin drove me back is she

14    doesn't know there is a receipt.  She doesn't know there is a

15    receipt from a Denny's in Niagara Falls from Christmas Eve

16    2004.  The story starts to fall apart.

17         At the end of the day, though, you don't need to get

18    into that level of detail.  I gave you the whole thing because

19    I wanted to give you the whole thing.

20         The easy answer for Racketeering Act 1 is there is

21    no evidence in this record that Keith Raniere was involved in

22    getting Daniela over the border by means of an identification

23    card in the name of another person.  There is just nothing in

24    the record.

25         Racketeering Act 2, 3, 4 are the Racketeering Acts

SUMMATIONS - MR. AGNIFILO

1    that are related to the photographs of Camila.  I'm going to

2    come back to those.

3           Racketeering Act 5 relates to a conspiracy to commit

4    identity theft in regard to -- first it's a conspiracy.  So

5    one of the things when you get the verdict sheet it will make

6    sense, these Racketeering Acts they are sometimes called

7    sub-predicated, so they will be three different ways in this

8    instance that Racketeering Act 5 is charged.  It's a

9    conspiracy, then it is a identity theft for James Loperfido,

10   then identity theft for Edgar Bronfman, and it relates to

11   Daniela's efforts to do keylogging.

12          The question is obviously not whether Daniela was

13   engaged in keylogging, we know she was.  She says she was.

14   There is e-mail between her and Kristin Keeffe about it.

15          The issue that you have to decide is what, if any,

16   role did Keith Raniere play in this.  Let's talk about

17   Loperfido first.

18          Loperfido testified.  He seems to be a lovely man,

19   but he doesn't know Keith Raniere very well.  And I submit to

20   you that there is no reason for Keith Raniere to be in any way

21   involved in trying to get into James Loperfido's keylogs and

22   see what key strokes he's making on his computer.  That is

23   just not really a Keith Raniere issue.  There is no reason for

24   him to do that.  They don't have any real connection.  I think

25   Loperfido's testimony is that he met Raniere twice, both in

SUMMATIONS - MR. AGNIFILO

1    regards to some investment that Raniere was talking about.

2            I submit to you James Loperfido is just not somebody

3    who is on Keith Raniere's radar screen.  And it just doesn't

4    make sense for him to be involved in that.

5            You might think, well, if Kristin Keeffe is involved

6    in it, at this point, I think at this point, Keith is living

7    with Kristin Keeffe, Marianna and Pam.  But, you saw in the

8    e-mail just a couple of days ago at one point in regard to the

9    CannaPro business, the Canadian company from Quebec that was

10   basically defrauding Clare Bronfman by getting bogus bank

11   records.

12           At one point Kristin Keeffe sent an e-mail, don't

13   send these to Keith anymore.  Keith is off of this.

14           I submit to you that the way that Kristin Keeffe did

15   her job, in any way, you'll see this from the e-mails and in

16   that one particular e-mail she just does it, she's not

17   necessarily sharing it.  Sometimes she does, sometimes she

18   doesn't.  There is no indication in this case that she did

19   with James Loperfido.  There is no indication she did with

20   Edgar Bronfman either.  That's the other sub-predicated act of

21   Racketeering Act 5.  There is no indication that she sent him

22   any information.

23           That's in contrast to what we're going to get to in

24   a few minutes, Racketeering Act 7, which is the keylogging of

25   Marianna's Facebook account.  And the difference is that in

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1   connection with the Marianna Facebook account, she sends, if

2   you remember, she sends Keith the actual keylogs, she e-mails

3   it to him.

4        And so there is no doubt that Keith Raniere knows

5   about that because Daniela e-mails Keith the Marianna

6   keyloggings.  So as Marianna is going on Facebook and making

7   key entries, because of the keylogger Daniela is capturing

8   that then she sends that to Keith.

9        Now, how does Daniela explain that she didn't do the

10  same thing with Loperfido and Bronfman?  Because we know she

11  doesn't e-mail it, because there is no e-mail.  She says, I

12  don't email.  She says, I put it on a thumb drive and I give

13  it to him.  But no, you don't.  No, you don't.  Because you

14  e-mailed it, you e-mailed him the Marianna one.  So you don't

15  put it on a thumb drive.  You do e-mail it, if he's involved.

16  With Marianna he was involved.  We know he was involved.  He

17  got an e-mail from her, we'll get to that in a minute.

18       The Edgar Bronfman situation seems to be related to

19  this the Rick Ross who testified here.  When you go through

20  the Kristin Keeffe box, you're going to see an absolute

21  obsession with everything that is Rick Ross.  There are

22  handwritten notes of Kristin, Rick Ross' P.O. box, his phone

23  records, where he goes, who he speaks to.  She's absolutely

24  obsessed with Rick Ross.

25       So I submit to you that what the evidence shows in

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    total, is that this is Kristin.  This is Kristin and this is

2    Daniela doing these keyloggings.  I'll get to the Marianna in

3    a minute.

4              In terms of Loperfido and in terms of Edgar

5    Bronfman, this is really Kristin and Daniela, that's what the

6    e-mail shows you.  When you go in the back and you get all the

7    evidence, you'll see the e-mails between them.  There is a

8    lot.

9              You'll see the one where I think at one point

10   Kristin gives Daniela e-mail addresses.  And it's just between

11   the two of them.  There is really nothing, there is really

12   nothing connecting Keith Raniere to this.  I submit to you

13   that he's not involved in these key loggings.

14             Racketeering Act 6, relates to the videos.  The

15   videos that Mark Vicente testified to in the beginning of the

16   case.  And I submit to you the Government's proof on this is,

17   with all due respect to my colleagues, very confused, very

18   indefinite, and does not amount to proof quite frankly of

19   anything.  Let me tell you why I'm saying that.

20             Mr. Vicente testified on page 710, to what he

21   recalls about sort of these glitches and all the four

22   different ways of making, taking, jiggling the cord or

23   whatever the four ways are.

24             But what he can't do, and I submit that he's an

25   honest guy, he doesn't really remember, and he says that.  But

SUMMATIONS - MR. AGNIFILO

1    what he can't do is he can't really link the videotapes that

2    he himself altered or had other people alter, and those being

3    the same videotapes that got turned over in discovery.  He

4    just can't do that.

5            On page 710, at line three, I asked him the

6    following question and he gave the following answer:  "And you

7    have no specific recollection, you don't know what tapes were

8    altered at the end of the day through the process you

9    described this afternoon?  Answer:  Specifically, no.  Not all

10   these years later I can't say with absolute certainty."

11           That's his testimony on that.  He can't say with

12   absolute certainty.  If he can't say with absolute certainty,

13   you guys can't say with absolute certainty, you just don't

14   know.  You don't know because there is nothing in the record

15   that shows that the actual videotapes that he and the video

16   unit did the stuff to, glitched whatever it might be, are the

17   same videotapes that got turned over in the Ross litigation.

18           And if it's not the same videotapes, then it's not

19   the videotapes.

20           The Government is going to say, Mr. Lesko when he

21   gets up in this on rebuttal, but it's a conspiracy.  It's a

22   conspiracy.  It doesn't have to be the same videotapes.  He

23   can be wrong with the videotapes, as long as there is an

24   effort to do that.

25           He's right about that.  Let me talk about that.  I

SUMMATIONS - MR. AGNIFILO

1  think what you can glean from Mark Vicente's testimony is that

2  there are a number of projects all going on at the same time.

3  You remember -- you'll get all of it when you go back to the

4  jury room -- a bunch of emails and then a memo.  Then there

5  was a reference to, I think the never-ending project.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMATIONS - MR. AGNIFILO

1          MR. AGNIFILO:  All right.  "The Never Ending

2     Project."  And I asked Mr. Vicente what's "The Never Ending

3     Project"?  And he said, well, it could have been, it could

4     have been the project we were doing for legal for Kristin,

5     okay?  I said, well, weren't you doing a long project for

6     Keith?  And he says, yeah.  And I said, wasn't the long

7     project you're doing for Keith related to digitizing all of

8     these old tapes that you had because, as we all know, Keith

9     wants everything that he says preserved for the rest of time.

10    And so, what he wanted is he wanted the full digitization of

11    all of these different things that he said in all the

12    different forms that he did.  And you'll see reference in the

13    e-mails to this project going on for over a very long period

14    of time.

15         So I submit to you that when Mr. Vicente, and I

16    think he refers to in one of the e-mails as "The Never Ending

17    Project."  The Never Ending Project is this long-term

18    digitization project that he and the other people in the video

19    unit were working on.  Which has nothing to do with what

20    Kristin Keeffe is going in the legal department, whatever that

21    might be, about trying to eliminate something that Nancy

22    Salzman said that is somehow bad in whatever way, shape, or

23    form.

24         Now, Vicente is clear that Keith never mentioned

25    anything to him about tapes being changed in connection with

SUMMATIONS - MR. AGNIFILO

1    the lawsuit, all right?  And that's a very important part

2    because that's the crime.  The crime here is essentially a

3    form of obstruction of justice.  It's that these tapes were

4    changed not for any other reason, but because they were being

5    provided in a lawsuit, and by changing the tapes in connection

6    with the lawsuit, you know, you cheated in terms of the

7    discovery process.  You committed fraud, you committed

8    corruption against the Court.

9           So at the end of the day, this is a crime against

10   the Court, all right?  So if it's not linked to that, if Keith

11   wasn't involved in that, then he's not involved in that crime.

12   And so, let me read you another part of Mr. Vicente's on

13   Page 11457 starting at Line 8.

14          "QUESTION:  And do you recall him specifically

15   telling you that these videos were being turned over in

16   discovery in a lawsuit?"

17          "ANSWER:  I don't recall him saying that

18   specifically."

19          "QUESTION:  All right.  So you have no specific

20   recollection of Keith Raniere saying to you that these videos

21   were being turned over in connection with a lawsuit, am I

22   right?"

23          "ANSWER:  That's true.  Because I only realized

24   about the actual lawsuit later."

25          "QUESTION:  Isn't it true that the person who told

SUMMATIONS - MR. AGNIFILO

1   you that was Kristin Keeffe?"

2          "ANSWER:  Later, she shared with me that it was in

3   relation to the Stephanie Franco case."

4          To be even more clear, a few pages later, Page 1171

5   I asked Mr. Vicente question on Line 3 of 1171.

6          "QUESTION:  Your sole basis for believing that this

7   tape dubbing was in connection with a discovery in a lawsuit

8   is base on what Kristin Keeffe told new 2017?"

9          "ANSWER:  Yes.  I think in addition I did some

10  reading and then I came to that conclusion."

11         "QUESTION:  What did you read?"

12         "ANSWER:  I cannot remember. "

13         Okay.  So to the extent that Mark Vicente got in

14  this courtroom and took the witness stand and said that these

15  tapes that Keith somehow knew these tapes were going to be

16  provided in discovery.  He certainly didn't get that from that

17  Keith Raniere.  And she's very honest about it.  He said he

18  got that from Kristin Keeffe years later.  These are tape

19  projects going in, what, 2006, 2007, 2008.

20         He got this information about the lawsuit in 2017

21  from Kristin Keeffe, okay?  So he didn't get it from Keith

22  Raniere and there's no indication that Keith Raniere had any

23  idea, or had any involvement, in tapes being corrupted that

24  are being provided over as discovery in a lawsuit.  There's

25  just no evidence of it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1          Okay.  Racketeering Act 7.  That's the Marianna key

2    log and it is an identity theft.  One of the things that you

3    have to conclude in order to find that this has been proven is

4    that there was no authorization from Raniere to do this.  Who

5    is Marianna to Keith Raniere?  They have a child together.  We

6    know that.  They live together for many, many years.  We know

7    that.  They've been in a very close, loving relationship for

8    many, many years.  We know that.  Marianna certainly didn't

9    come in here to say that he wasn't authorized.

10          How do you know it was unauthorized?  I mean, you

11   might not be happy that your loved one goes on your Facebook.

12   You might not be happy that the man or woman that you've

13   within with for ten years goes on your Facebook.  It doesn't

14   sound like a crime.  And there's no indication that he had

15   criminal intent.  What it seems to be, if you remember, and I

16   think this is the way Daniela described it.  There were

17   indications from the key logging that Marianna was trying to

18   get into Keith's, you know, sort of Facebook or one of his

19   computers.  I think she testified to that and I think that's

20   in the key log materials that Daniela actually e-mailed to

21   Keith.  So she's doing it, he's doing it, you know, that's

22   what they're doing.  These are two people that have been

23   together a very, very long time and there's no indication that

24   it's not authorized to do it.  Maybe he's being a little bit

25   of a pain in the neck kind of by getting into her Facebook,

5446

SUMMATIONS - MR. AGNIFILO

1   but there's no evidence that she's objecting to it.

2            Racketeering Act 8.  The trafficking of Daniela for

3   labor or services subpredicated with document servitude, okay.

4            This is where it's important to keep in mind how

5   what's charged and what's not charged because it's not charged

6   with somehow keeping Daniela in a room.  That's not a charge.

7   It's not a kidnapping charge.  It's not a false imprisonment

8   charge.  He's charged with a specific thing of keeping her in

9   a room trafficking her.  So you have to find in the first

10  instance that her staying in her family's house with her

11  family is trafficking.  You have to reach that conclusion.

12           And second, that the purpose of this was for labor

13  or services.

14           And I submit to you that that is absolutely

15  inconsistent with everything that the Government has said is

16  their theory of why she's in her room.  There's been no

17  evidence at this trial that Daniela was put in a room so she

18  would work.  That's not why she was there.  The theory, as I

19  understood her testimony, and it's your understanding that

20  matters, not mine, is that this is some form of punishment.

21  That it's punishment.  And that the way to get out of the room

22  was to do certain things and fix certain, you know, ethical

23  breaches.  Certain things that she maybe did wrong in the eyes

24  of different people that she would have to repair.

25           Now, one of the things that I think has been

SUMMATIONS - MR. AGNIFILO

1   conveniently ignored in describing this room situation is that

2   Daniela has a family and this is the family's house.  She has

3   a father, she has a mother, she has a brother, she has

4   sisters.  And it kind of ignore that and say, well, you know,

5   Keith did it, let's blame Keith, Keith did it, is to ignore a

6   pretty big fact.

7          Daniela told us about her father.  The father is a

8   very successful businessman.  He's a very successful

9   businessman with a very successful business in Mexico that's

10  involved in drilling.  He's educated, he's smart.  I think she

11  said he went to college on a scholarship.  He seems to be an

12  eminently capable man and father.  She describes him as being

13  very involved in her life growing up.  And in her brother and

14  sister's lives growing up.  He made sure the all got

15  educations.  He made sure they all played sports.  He was very

16  on the scene, he was very involved, and he's there.  There is

17  a dad.  You know there is a dad in this equation.

18          And there's no evidence in this record that somehow

19  dad had got overwhelmed, got overcome, above the bowled over,

20  got run over by Keith Raniere.  There's just no evidence in

21  the record at all, okay?  And the dad is involved in this

22  situation.  The dad is living at the house.  At times, he goes

23  to Mexico, at times he comes back.  He's living at the house.

24  He's living at the house with the mother, which at some point

25  goes into the other room.  But the dad is there and the dad is

SUMMATIONS - MR. AGNIFILO

1    a factor and the dad is not to be ignored.  The dad is on the

2    e-mails.

3           Some of the e-mails when I think Daniela is being

4    driven to Mexico by the dad, okay, we'll talk about that in a

5    minute.  When Daniela will being driven to Mexico by dad and

6    Kristin Keeffe there are e-mails back and forth involving the

7    dad.  And the dad is expressing real frustration with his

8    daughter Daniela.  And as relationships between fathers and

9    daughters go, there's a world of facts that the dad knows that

10   none of us know because he's her dad.  We don't know what he

11   knows.  We can glean some of what he knows because he writes

12   some of it in an e-mail.  And he says at one point that he's

13   says it in sort of angry tones, you can read the e-mail for

14   yourself, that Daniela stole money from him and hacked into

15   his Facebook.  This is the dad, this is the dad talking about

16   his daughter.  All right?  She stole money from me and she

17   hacked into my Facebook.

18          And what I submit to you is that by this point the

19   dad's frustrated because these are not, and I'm not doing this

20   to pick on Daniela, I'm just giving you the facts that I think

21   have been developed during the trial.  I think there's

22   certainly enough evidence in the record for you to conclude

23   that the father is frustrated because there's a course of

24   conduct, all right?  It's not just the $6,000 in cash that she

25   stole from Karen Unterreiner's drawer when she was younger.

5449
SUMMATIONS - MR. AGNIFILO

1    And I say that because at one point she wrote a little kind of

2    one-page thing that we looked at that, I think, Ms. Penza

3    showed her on direct and I showed her on cross.  All the

4    different things that she kind of did wrong and she was trying

5    to make amends for.

6            And one of the things that she said she did wrong is

7    she says, she has an entry, she say, "Pay back what taken."

8    "Pay back what taken."  And then she lists a number of stores.

9    All right?  And the only reason she would do that is because

10   she stole from the stores.  There's no reason for her to write

11   this down, "Pay back what taken," and then write, Havers,

12   Walmart, Arlene's, Marhsalls unless two things existed.  One,

13   she stole from those stores.  And two, someone other than her

14   knows it or else why mention it.

15           So I submit to you have every reason to believe that

16   both of those things are true.  She stole from the stores and

17   someone other than her knows it.  And you know who that

18   someone probably is?  It's probably her father.  This doesn't

19   seem like a real, you now, Keith matter.  You know, I'm not

20   saying you should steal from Walmart, that's not my point.

21   But that's like a dad issue.  And so, by the time that the dad

22   expresses frustration with her for stealing from him, which

23   she admitted, and for hacking into his Facebook, which she

24   admits, I think we're at the tail end of a series of things

25   that have caused the dad to be frustrated.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1          And so, why is all of this Keith's fault somehow?

2    How is this all on him when there's a dad.  We heard reference

3    to the fact that once Marianna did something wrong, she got

4    grounded you know.  She's an adult child.  And he's her dad.

5          Now, one of the things, I submit to you, that the

6    dad could have been frustrated about, and you guys can reach

7    this conclusion on your own or not.  Let's say that Daniela

8    really did steal from those stores.  Why didn't she just admit

9    it?  You wrote on your sheet of paper, "Pay back what taken

10   from Marshalls, from Walmart, from blah blah blah, from blah

11   blah blah.  Yeah, yeah, I wrote that down because I stole from

12   those stores.  That's what seems to have happened.  She lies

13   about it.  She doubles down.  No, I don't know why I wrote it.

14   Yeah, that's my handwriting.  I don't know if I wrote it, but

15   that is my handwriting.  Of course you wrote it.  Of course

16   you wrote it.  Why did you write it?  Were you making it up?

17   Did you think you stole from Walmart and you didn't it?  You

18   wrote it because you wrote it, just say it.  She just doesn't

19   say it.

20         The other part of Racketeering Act 8, this is sub-B,

21   relates to her official documents.  And what you'll see in the

22   e-mails that she's asking her father, her father, her father

23   for her documents.

24         If you remember, after she left the room and she

25   went to Mexico.  And remember how she got there because the

SUMMATIONS - MR. AGNIFILO

1   dad is involved, the dad drove her, Kristin Keeffe and the dad

2   drove her to Mexico.  She testified that the dad had an

3   accountant for his company waiting on the other side of the

4   border for her.  So he's not just leaving her to fend for

5   herself, but he is sending his adult daughter back to Mexico,

6   all right?  And think for a minute, how did you she get

7   herself into this problem?  All right.  Because as an adult,

8   as an adult, she made a decision.  She made an adult decision

9   to come into this country illegally.  Yes, with help.  Yes,

10  with help.  She made an adult decision to come into this

11  country illegally.

12          And then, if you remember, there's an e-mail, I

13  think it's from 2008, where the dad says to the daughters.

14  This is a lawyer, a lawyer involved in the lawyer e-mail, you

15  might remember it.  He basically says, To my kids, I want you,

16  if you have any issues, I want you to try and take care of

17  them, you know, and he sends to Fluffy and I think he sends it

18  to Marianna.  I can't remember all of them.

19          But the e-mail gets forwarded at one point to

20  Daniela and I asked her about it on cross.  I said you get

21  this e-mail forwarded from your father about if you have some

22  issues with your status in the country, and the e-mail chain

23  has a lawyer on it who is an immigration lawyer, did you do

24  anything about it?  No, I didn't do anything about it.  I just

25  stayed here illegally.  I made an adult decision just to stay

SUMMATIONS - MR. AGNIFILO

1    here illegally.  And now what?  I want to be a victim.  I

2    mean, come on, that's not right.  And this bit, you know,

3    she's playing the game.  She goes to that clinic.  She goes to

4    the women's health clinic.  She's not honest with them.  She

5    says, I'm just visiting.  I live in Mexico.  This is in 2006.

6    She's not visiting, she's living in Clifton Park, New York.

7    She's not visiting.  But she's -- she plays the game.  She

8    plays the game.  She has it in her when a border patrol

9    officer is staring at her identification card, whoever made

10   it, and it's starting to get a little hot.  Hey, officer

11   what's the weather ahead?  She's slick.  She's slick.

12          And she knows how to play the game and she knows how

13   to go to the medical office and lie to the staff.  No, I'm not

14   from here.  I'm visiting because I might go to college here.

15   I live in Mexico.  You don't live in Mexico.  You live in

16   Clifton Park, New York.

17          So I don't think you should necessarily, and I'm not

18   going to say this for every witness.  I think a lot of the

19   witnesses actually came here and told the truth.  I don't know

20   that she did.  I don't.  I think there's ample basis to

21   believe that she wasn't fully honest with you.  About

22   everything because to conclude that she wasn't fully honest.

23          All right.  We're going to skip over Racketeering

24   Acts 9 and 10 because they relate to sex trafficking and we're

25   going to go to -- is this a good time do you want to do the

SUMMATIONS - MR. AGNIFILO

1    break now?

2              THE COURT:  If you think so.

3              MR. AGNIFILO:  This is fine, Judge.

4              THE COURT:  Take a short break.

5              MR. AGNIFILO:  Yes, short break.

6              THE COURT:  All right.  All rise for the jury.

7              (Jury exits courtroom.)

8              THE COURT:  Okay.  Ten-minute break.

9              (Defendant exits from courtroom.)

10             (A recess in the proceedings was taken.)

11             THE COURT:  Let's bring in the defendant.

12             (Defendant enters the courtroom at.)

13             THE COURT:  Bring in the jury.

14             COURTROOM DEPUTY:  Jury entering.

15             (Jury enters courtroom.)

16             THE COURT:  You may be seated.  All right.

17             Mr. Agnifilo, you may continue your closing

18    argument.

19             MR. AGNIFILO:  Thank you, your Honor.

20             Before I get too far away from this key logging

21    business, I just want to point out a couple of documents which

22    are already in evidence for you guys.

23             Government's Exhibit 1515 is from Kristin Keeffe to

24    Daniela has two different Pacific e-mails on it that I are

25    think are going to be key logging efforts.  Neither of which

SUMMATIONS - MR. AGNIFILO

1   is Mr. Loperfido or Mr. Bronfman's.

2           So the point is there's lots of key logging efforts

3   going on.  It's not just Marianna or Mr. Bronfman or

4   Mr. Loperfido.  There are a number of them.  There is Kim

5   Snyder which seems to be related to them trying to figure out

6   where Kristin Snyder is because she seems to have been dead

7   but they didn't though she was dead.  She was figuring in

8   these articles, these anti-NXIVM articles.  So there's a lot

9   of different efforts, you know, out there.

10          But what you'll see from these e-mails it's really

11  communication between, you know, Daniela and Kristin.  And

12  Daniela basically you know would go to these different cafes

13  and use the public WiFi and she would talk to Kristin if that.

14          All right.  So we're going to Racketeering Act 11.

15          Racketeering Act11 is kind of a complicated

16  racketeering act because it's basically charges that Keith

17  stole Mariana's identity for the purpose of committing income

18  tax fraud so we have to kind of run down both of those things.

19          So my first question is, is there any evidence in

20  this record whatsoever that Keith Raniere didn't have the

21  authorization to use Mariana's credit card or bank account?

22          Now, we know that while Marianna was alive because

23  you saw when Rick Guerci, the investigator for the U.S.

24  Attorney's Office testified, I think, on cross-examination I

25  took him through certain credit card records from when

SUMMATIONS - MR. AGNIFILO

1    Marianna was alive.  And for those credit card records where

2    there were airline flights, the names are actually on the

3    credit card record unlike if you it a store, you go to the

4    A&P, there's no name on to.  If you buy airline tickets at

5    Delta, there will be three names on it if three people were

6    traveling.

7              So especially what the travel records show from the

8    credit card records is that on Mariana's, I'm sorry, on Pam's

9    credit card there were travel, there were airline tickets and

10   related airline ticket things for Keith, for Marianna and for

11   Pam.

12             So, obviously, what seems to be the case is that Pam

13   financed Marianna and Keith's lifestyle because that's what it

14   looks like from the credit card records.  So really, all that

15   happens is Pam passes away and Keith just doesn't do anything

16   different.  You know, it's they stole the credit card, he uses

17   the credit card the way he's always used the credit card.  And

18   Marianna uses the credit card the way she's always used the

19   credit card.  The three of them were living together.  Keep

20   that in mind.  These aren't strangers, these are far from it.

21   Keith and Marianna and Pam were living together.  And I think

22   you can look at the evidence and conclude they had a

23   three -- you know, they were intimate, the three of them,

24   that's what the evidence shows you.

25             (Continued on the next page.)

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1           MR. AGNIFILO:  So, there's nothing in this record to

2    suppose for even a second that Pam would not have wanted this

3    to happen or wouldn't have authorized it because she let it

4    happen while she was alive, she let them use the credit card,

5    she bought things on the credit card for their travel, their

6    names are on the records, you can look at the records

7    yourself.

8           Interestingly, after Pam dies and there's still the

9    bank account open, Keith does write checks on Pam's account

10   but without fail, without fail he signs Keith Raniere.  This

11   is Government Exhibit 721 and I happen to be looking at page

12   377 but you really virtually can look at any page.  Keith

13   Raniere -- you probably can't see it way in the back but it's

14   Keith Raniere, he signs Keith Raniere.  He doesn't forge a

15   name, he doesn't forge Pam's name.

16          Ms. Penza showed you some checks with Pam's name

17   after she died.  I submit to you if you look at it, it looks

18   like a stamp but that does not seem to be how Keith does it

19   because when you look at the checks Keith signs, Keith Raniere

20   on Pam's account.  And as I asked Investigator Guerci, I said:

21   Did you have any indication based on your investigation that

22   the bank didn't clear those checks?  He said:  No, they

23   cleared the checks.  So, everybody knows the deal, the bank

24   knows the deal and they've all been together a long time, I

25   think Keith and Pam were together for 30 years, so no one is

SUMMATIONS - MR. AGNIFILO

1    doing anything different.  This isn't like some scheme, you

2    know, somehow to steal Pam's identity and then somehow commit

3    income tax fraud.  I mean he's doing what he's always done,

4    there's just -- there's no change, there's no change

5    whatsoever.

6           The important thing, and I submit to you this really

7    cuts to the heart of the government's theory on this

8    particular racketeering act, is that Keith is getting the

9    entirety of Pam's estate, right, so think about that.  Pam

10   passes away, there's a will, we put the will into evidence,

11   you can see it if you want to, and the will makes reference to

12   a trust and the trust has Keith Raniere as beneficiary, so

13   Keith is getting Pam's entire estate.  So, what interest would

14   there be for Keith Raniere to loot Pam's estate that he's

15   getting anyway.  It's his money, I mean it's his money, he is

16   taking his money and he's writing checks based on his money

17   because he's beneficiary of the estate.  So, there's no

18   indication, there's no evidence in this record that this is

19   somehow identity theft or that Pam doesn't authorize this.

20   There's literally no evidence in the record that this isn't

21   fully authorized and there's every indication in the record

22   that Pam is fine with this because she's been fine with it her

23   whole life.

24          The other part of this racketeering act is this

25   identity -- the way they charged it is the identity theft has

Holly Driscoll, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    to be with the intent of committing income tax fraud, okay.

2    Has there been any evidence -- did I miss the evidence of what

3    the income due on using another person's credit card is, has

4    anybody gotten on the witness stand and said when you use

5    another person's credit card it's income.  There's no evidence

6    in this record that this is income.  And there's no evidence

7    in this record of if it's income, what the income would be.

8    And when the judge charges you, when Judge Garaufis charges

9    you on this particular racketeering act, listen very

10   carefully, like I know you will for all of the charges, in a

11   tax case, there's a special charge in a tax case and in a tax

12   case in essence -- and Judge Garaufis when he charges you,

13   that's the law, not what I'm about to say -- the government

14   has to show that the defendant knew that there was an income

15   tax due and that he willfully, willfully didn't pay the income

16   tax that he knew was due, that he knew he had an obligation to

17   pay the income tax.  And the problem for the government, in my

18   opinion with the state of the record as it is, there's no

19   evidence in this record that there's any income tax due,

20   there's just nothing.

21        I mean the government called Investigator Guerci, I

22   think he was an IRS agent for many, many years, 20, 30 years,

23   I can't remember how long but a long time, he's a very good,

24   experienced agent, they could have asked him, hey, when you

25   use someone else's credit card, is there income due?  They

SUMMATIONS - MR. AGNIFILO

1    didn't.  They didn't ask him.  As a result, you don't know

2    because there's no evidence in the record.

3            All right.  We are going to segue now into DOS and

4    we're going to talk about DOS in conjunction of the extortion

5    and the sex trafficking together.  So, where does DOS come

6    from?  Why is there a DOS?  What's the start of it?  And I

7    submit to you that the closest thing that we have in the

8    record to the kind of like intellectual foundation of DOS is

9    an audiotape that we played for you I think during

10   Mr. Vicente's testimony that was made on October 29th, 2012.

11           And if you remember, this is going back now toward

12   the beginning of the case, we played this audiotape and it's

13   basically -- it's the Society of Protectors, SOP, which is the

14   men's group, having a meeting where they're trying to figure

15   out what SOP was going to do and I think at this meeting we

16   have Keith Raniere, we have Mark Vicente, we have Mike Baker,

17   we have Damon Brink and I think we have Jim Del Negro, I think

18   it's those five and they're basically just talking about what

19   are we doing, if we create this SOP what's it going to do, how

20   is it going to be, what's our mission, how are we going to do

21   it, what does it mean to be a member and they're kind of going

22   through all the different things that you would think of when

23   you're trying to create such a group.

24           And you can listen to the tape if you want to but

25   basically Keith does 90 percent of the talking and he's

SUMMATIONS - MR. AGNIFILO

1    basically giving his view of what this SOP group would be and

2    he talks a lot about commitment, okay.  Now we're talking in

3    the context of a men's group, this is three years before DOS

4    is, you know, germinating in anybody's mind.  We're talking

5    about a men's group and he's talking about commitment, power

6    of commitment and he says:  It's the power of commitment, the

7    potency of commitment.  And he talks about the commitment at

8    great length, commitment is virtue, commitment builds

9    character, commitment is personal power, all right.  He's

10   basically saying, I'm not even talking about what you might be

11   committed to yet, I'm talking about the actual act of being

12   committed, of feeling commitment and he's talking about that

13   saying this has to kind of be the glue of our group, this

14   commitment, individual commitment and then commitment as a

15   group and then he kind of gives the flip side, he says:

16   Without commitment everything falls apart, without commitment

17   there's no character, without commitment there's no personal

18   potency, okay.

19        So, the reason -- I submit to you this is very, very

20   important because when we get to DOS it starts to look like,

21   wait, the collateral is coercive, the collateral is blackmail,

22   the collateral is extortion, wait a minute, think about where

23   this came from, and I get back to what I said to you guys my

24   first few minutes of my opening statement, the most important

25   thing in this case is what you guys think he thinks, what he's

SUMMATIONS - MR. AGNIFILO

1   intending, this whole case comes down to his intentions.

2          A lot of people have taken the witness stand and

3   they said what they think, I thought this was going to happen,

4   I was thinking this, I was afraid of this.  That's all

5   valuable, that's good to know, it's important but it's not how

6   you decide guilt and innocence.  You decide guilt and

7   innocence by what he thinks, by what's in his mind literally.

8          The judge is going to give you a long instruction on

9   how you go about figuring what someone intends.  Listen

10  carefully, it's a very important thing to do but here you

11  don't have to work quite so hard because you have Keith

12  Raniere telling you in his own words what commitment is about.

13         And then he talks about collateral, he uses the same

14  word, collateral, in the context of the men's group, SOP, in

15  2012.  And what he says in substance is that the collateral

16  doesn't matter because the collateral is part of the

17  commitment, the collateral is so you keep your word.  He's not

18  talking about collateral -- and this is him talking, this is

19  him now, he's not talking about collateral as something that

20  instills fear, he's not talking about collateral as something

21  you can hold over somebody's head.  He's talking about

22  collateral as giving weight, as giving substance, as giving

23  more content to the commitment.

24         You know, and I think I might have said this in the

25  opening, it's sort of a silly childish example but it's an

SUMMATIONS - MR. AGNIFILO

1    example, if you challenge my word on something, you know, I

2    climbed to the top of that tree, no, you didn't, cross my

3    heart, hope to die, stick a needle in my eye.  We used to say

4    that as kids.  What does that even mean.  But it's a way of

5    saying, no, no, I'm serious, I'm serious, and may I be lying

6    if something bad happened to me, I'm not going to hope to die

7    and stick a needle in my eye but I want to instill in you that

8    somehow I'm serious, I'm doing something to kind of give my

9    word additional weight.  That's really all it is.  That's

10   really all it is.

11          There's no suggestion in SOP that this collateral is

12   going to be used with bad motives, that it's going to be used

13   to hurt anybody.  It's a function of the commitment, it's part

14   of the commitment.

15          Now, what's going on at this general time period,

16   and we've heard a lot in this trial about the fact that NXIVM

17   got very popular in Mexico and it specifically got popular in

18   Mexico with affluent and influential Mexican citizens and one

19   of the things that kept getting brought up was kidnappings

20   because it is a major issue and there's evidence in the trial

21   about this.  It's a major issue and I submit to you that

22   because of the connection to Mexico and because of the fear of

23   kidnappings and because of the desire to have something in

24   place should a kidnapping occur or should something untoward

25   happen in Mexico, the group started to develop certain

SUMMATIONS - MR. AGNIFILO

1    characteristics.  One of them is readiness.  And you guys

2    heard the evidence about readiness.  Readiness isn't meant to

3    be abusive, readiness isn't meant to wear down your will,

4    readiness isn't meant to keep you sleepless and to harm you.

5    Readiness is a real thing and if you live in Mexico and you

6    have to deal with these things and you're part of a group,

7    it's not such a bad idea, you know, it's not such a bad idea.

8         So, a lot of these concepts come from very tangible

9    places and kind of come into the stream, you know, that ends

10   up being DOS.  So, one of the things that I hope you'll

11   consider doing is listen to the tape, listen to the SOP tape

12   from October 29th, 2012, and listen to Keith's voice, his

13   voice, not someone talking about what I think he might do,

14   what I thought might happen.  Listen to him, listen to him

15   talking about commitment and collateral.  That, I submit to

16   you, that's your best evidence, that's your best evidence of

17   what he really thinks, of what he really feels about this, not

18   what someone else says about what I thought he might do, you

19   know, so, and we have it, we have it in the record, it's a

20   piece of evidence that's there for you.

21        All right.  Let's move ahead a few years.  There are

22   a number of audiotapes where Keith is talking about the

23   creation of DOS.  And let me be very clear, if I haven't been

24   already, I do not for a second walk away from the very clear

25   reality that Keith had a very direct connection to the

Holly Driscoll, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    creation of DOS.  He did clearly, there's no doubt about it.

2    Does that mean he runs DOS.  I don't know that DOS is run that

3    way.  I don't know that it is a corporation with a CEO, I mean

4    DOS doesn't have a CEO but Keith's concepts are clearly baked

5    into DOS at a very deep level.  And you know this because the

6    taped conversations, which (A) they taped and (B) they kept,

7    show that Keith is speaking with a bunch of people, I mean

8    Allison Mack is on one of the tapes, you know, I think Monica

9    Duran is on one of the tapes.  There's a bunch of people.

10   It's Keith maybe and like, you know, three or four women and

11   there's one particular vignette I think that kind of sums up

12   kind of what Keith's role is vis-a-vis everybody else

13          I think at one point Nicki Clyne is coming up with

14   some idea of like a game, talking about the game, and Keith

15   doesn't apparently think that much of the idea and he

16   basically says something along the following lines:  You can

17   do one of two things, this is what Keith says, you can use

18   your own brains or you can rent my brain.  I would rather you

19   use your own brains.  And this is on one of the tapes and

20   that's pretty much a quote and I think that pretty much sums

21   it up.  I think he wanted them to do it but they weren't doing

22   it to his satisfaction so he did it and he clearly did it, he

23   was clearly involved at a very deep level in the creation of

24   DOS.

25          So, if you listen to the tapes that's basically what

Holly Driscoll, CSR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1     you're going to hear, you're going to hear Keith saying this

2     is what I think it should be, it should work like this.

3     You'll hear him saying, well, but what do you guys think, what

4     do you want to do.  And you know what, they don't really know.

5     The women just aren't clear, the women don't fill the breach

6     and sort of say this is what it's going to be, so Keith ends

7     up doing it.

8             So, now why DOS, why does it happen?  There's

9     evidence in the record, there's evidence in the record that at

10    one point Camila cut herself, cut her wrist, possibly trying

11    to commit suicide, possibly not, I mean it's not terribly

12    clear, and I think the evidence, as I recall it, is that Keith

13    sort of finds this out and wants her to make a commitment to

14    something and I don't know that a commitment to him is really

15    going to get it done so what he basically says and I think --

16    if I remember, I think Lauren testified to this, that he

17    creates a group, he creates a group and the commitment is

18    going to be to the group and the group ends up being DOS

19            And the reason I think that resonates to a certain

20    extent is because if you listen to these tapes, you'll hear,

21    you heard it already, you can go back and listen to them

22    again, is that Keith is saying to Monica and Nicki Clyne, hey,

23    I want Camila in the group, I want Camila in the group and he

24    says that and that's kind of met with not a whole lot of

25    enthusiasm, they don't seem to want her in the group, you

SUMMATIONS - MR. AGNIFILO

1    know, but Keith pushes it, no, I want Camila in the group.

2           And I think they say something, well, she doesn't

3    really hang out with us, she doesn't really socialize with us.

4    And at one point I think Keith, you know, takes it to the next

5    level and is like, I'm not forcing you to, this is words and

6    substance, I'm not forcing you to but I'd really like you to,

7    I'd really like you to.

8           And so, I think there's some truth to it but the

9    evidence to a certain extent is anecdotal, you know, but the

10   tapes aren't, the tapes are very clear.  The tapes are that

11   Keith is creating this group and he's trying to work Camila

12   into the group and the other women, you know, are a little

13   lukewarm to it but that's one of the ways that DOS is created

14   and kind of gets to the next level.

15          All right.  So, what I'd like to do is to take you

16   through a couple of actual relationships that you've heard

17   about from people who have testified at the trial.  One of the

18   things that this trial features is there's some evidence

19   sources where it is a witness and the witness comes here and

20   tells you his or her story and then because it's a RICO trial

21   and there's lots of evidence from lots of different sources

22   sometimes there is no witness, sometimes it is just an email,

23   sometimes it's, you know, it's a chat, it's a WhatsApp message

24   or whatever but without a witness

25          So, let's go through some of the actual

SUMMATIONS - MR. AGNIFILO

1  relationships that Keith had and the reason they're important

2  is because what I submit to you is that there's no uniformity.

3  You know, I know the word "cult" has come up at this trial a

4  couple of times.  I don't think that helps you.  If you go

5  back in the jury room and you're trying to figure out is it a

6  cult, is it not a cult, I think that's kind of a dead end, I

7  think that's just a word.  I think you guys have to look at

8  the content, you know, and not be so swayed by that word.

9        But what I would suggest to you is this, is that

10  each of the relationships with different women that you've

11  heard about, because the women have come here and testified,

12  are absolutely unique.  There's not one type of relationship,

13  they're not all one way, you know, they're absolutely unique

14  and I want to start with Lauren, all right, Lauren Salzman.

15  That's the longest relationship of the ones that I'm going to

16  discuss where people came in and testified to their

17  relationship with Keith Raniere.  This is a long-term serious

18  relationship.

19        She testified that she and Keith Raniere had a life

20  commitment to each other, that was her testimony.  You might

21  remember I think early on in her testimony she was asked a

22  question, if her relationship with Keith Raniere has ended?

23  And her answer I thought was interesting because her answer

24  was:  For me it has.  For me it has.  Has your relationship

25  with Keith Raniere ended?  For me it has.  For him it hasn't.

SUMMATIONS - MR. AGNIFILO

1   I asked her about it on cross-examination, I said:  Why was

2   that your answer?  And I think what she said was:  Well, we

3   had a life commitment and I never had the chance to talk to

4   him about it.  What she said was after he was arrested in

5   Mexico she never had the opportunity to speak to him about it

6   so she doesn't know how he feels.

7           I thought -- in my opinion, I think Lauren came here

8   and told you exactly how she feels.  I think she told you the

9   absolute truth about her feelings and I think her feelings are

10  that she's hurt, I think she's heartbroken and I think you can

11  see that.  She's not just imparting information.  She didn't

12  just come in here, take this witness stand and impart

13  information almost like a typical witness who's just telling a

14  story.  I think in some ways she came here and she broke up

15  with Keith Raniere in front of all of you and I think there's

16  a way of looking at her testimony in that light and let me

17  tell you why I say that, and I'll frankly never forget it.

18          I think it was before lunch one of the days she was

19  testifying and she was being asked about the arrest in Mexico

20  and I don't know what you guys thought, I thought that was

21  incredibly powerful testimony, incredibly powerful, from the

22  heart, unvarnished, from a very deep place in her soul and she

23  took you guys through it and, quite frankly, I sat there and

24  listened just like you all did.

25          And I think she went through that story for a

SUMMATIONS - MR. AGNIFILO

1   reason, because I'm not even sure that really a question was

2   asked that would cause her to go on, what, a seven-minute,

3   ten-minute long detailed emotional answer about her being in

4   Mexico with Keith, the Mexican police coming in with machine

5   guns, in black hoods and the only thing standing between these

6   guys with machine guns and Keith is Lauren Salzman.

7          And what I think, that was her way of saying, you

8   know what, we're done, I'm not doing it anymore, I'm breaking

9   up with you, my life commitment is over.  Because she went

10  through with you all the things she went through with him, all

11  the frustrations, all the heartbreak and now she's done and I

12  think part of her testimony was her breaking up with him right

13  in front of your eyes.

14         The reason it's important, the reason it's important

15  is because it was a relationship, it was a real, deep,

16  substantial, very important relationship.  I think my

17  colleagues with the government asked her at one point:  Who is

18  Keith Raniere to you?  And her answer was:  He's the most

19  important person to me.  There's something incredibly clear

20  and just basic and pared down and real.  I mean think what

21  that means, the most important person -- no -- no

22  conditioning, no the most important person I ever met in the

23  last five years, he's the most important person to me.

24         Now, my colleagues at the government might say,

25  well, that's because, I don't know, he had undue influence

SUMMATIONS - MR. AGNIFILO

1    over her, but I don't think that's it.  I'll tell you what I

2    think it is, and this is the hardest part, in my opinion this

3    is the hardest part of this trial to really grasp because here

4    we're all sitting in 2019 and everybody who gets on this

5    witness stand has had a tremendous change in perspective, and

6    I'm going to talk about that in a little while, a tremendous

7    change in perspective.  The way they saw it in 2015 and 2013

8    and 2017 is not the way they see it now.  And so, the hardest

9    thing to do is to almost like teleport you guys, if I could,

10   teleport you guys back to when NXIVM was NXIVM, you know,

11   pre-DOS when NXIVM was NXIVM and I think your only chance of

12   really seeing what that's like is to appreciate the testimony

13   of Lauren Salzman in this way:

14          Every witness who got up here said amazingly

15   positive things about what they thought NXIVM was doing and

16   Lauren is certainly no exception.  I thought Lauren was

17   incredibly emotional about how much of her heart she put into

18   this.  You know, this is -- I mean she is a NXIVM marine, you

19   know, she is all in, I mean she is leaning in and this is her

20   life and when she says Keith Raniere is the most important

21   person to me, that's because for a long period of time he made

22   her life possible.  That's not an overstatement.  He made her

23   life possible and here's what I mean by that; we know that she

24   went to the -- she taught I think it was a 16-day or an 11-day

25   in Monterey, Mexico and we know that because we have a photo

SUMMATIONS - MR. AGNIFILO

1    of it and it's I think the one when Daniela, you know, the

2    first course that Daniela went to.

3          Think about what's happening, that's one little

4    window into her life, she's flying all over the world, she's

5    flying to Monterey, she's flying to Vancouver, she's flying to

6    San Francisco and she literally thinks sincerely in her heart

7    and soul, I am doing something to help humanity, that's

8    really -- that's what she believes, and not only do I get to

9    fly around the world doing things that help humanity, I get

10   paid for it, I get paid for it and what makes it all possible

11   is that Keith Raniere has created this curriculum.  He makes

12   it all possible.  He made her life possible.  He made her life

13   difficult, I'm going to get to that too, he made her life

14   difficult but he made it all possible and he didn't just make

15   it possible for her, he made it possible for everyone, all

16   right.

17         So, they don't love him because his picture is in

18   the center.  They don't love him because he's called Vanguard.

19   These are fairly successful, sophisticated people, you know,

20   who are attracted to NXIVM.  I mean there's talk of Richard

21   Branson coming and Edgar Bronfman took courses, I mean these

22   are smart people with tremendous opportunity and capability.

23   You know, if this is just a, you know, not a serious program

24   they're going to know and it wasn't for everybody but they're

25   going to know.  But everybody who really tried to make their

SUMMATIONS - MR. AGNIFILO

1    careers, to really sort of hitch their wagons to NXIVM, to

2    say, you know what, I believe in this, like Mark Vicente said.

3         Mark Vicente, I think you guys, you know, size him

4    up however you want, I think he's a seeker, I think he's

5    trying to do something special and he said he was and, you

6    know what, I believe him.  I think he's trying to do something

7    special, I think because of where he comes from in South

8    Africa and he saw an abusive government, I think he realizes I

9    want to do something good, I want to do something important

10   and he took to NXIVM hook, line and sinker because he believed

11   it and they all did, they all believed and what they believed

12   in, warts and all, was Keith Raniere because Keith Raniere

13   made it all possible

14        So, when Lauren Salzman says he's the most important

15   person to me, that's what she's talking about.  And what I'm

16   going to really ask you guys to do, because it is so

17   important, is always keep that part in mind.  I know everybody

18   gets on the witness stand and looking back at it now, this is

19   what I think.  No, no, no, not looking back at it.  Let's talk

20   about the "it," let's talk about the time you were there,

21   let's talk about what life was like in 2001 and 2010 and 2015

22   and 2017, because they did things they believed in, they did

23   things they thought were important.

24        All of these different things, the Mexico peace

25   initiative that they tried, it was important.  I think that

5473

SUMMATIONS - MR. AGNIFILO

1    the school, the Rainbow -- now I can't remember the names but

2    it's wonderful, the Rainbow Garden, wonderful, wonderful.  I

3    mean there's been a lot of testimony about it so let me

4    comment on it.  In my opinion, if you can have one idea that

5    actually could change things in the world, it's not about

6    armies, it's not about us against them, it's not about any of

7    those things.  You know what it is, it's about taking little

8    kids when they can still learn languages and still learn

9    cultures and exposing them to lots of different languages and

10   lots of different cultures when they're young so they can

11   learn to speak Mandarin or Cantonese or Arabic or, you know,

12   Thai or French or whatever it might be so they would be, as

13   Mark Vicente said, citizens of the world, citizens of the

14   world.  It's not us against them, it's us, it's us.

15            (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

SUMMATIONS - MR. AGNIFILO

1      MR. AGNIFILO:  I think it's a beautiful side, and I

2  think more importantly they thought it was a beautiful idea.

3  I think the Mexican peace process was a beautiful idea.  And

4  more importantly, they thought it was a beautiful idea.  They

5  were in it because it was real.  It was real to them and it

6  mattered to them, and they didn't thank Vanguard because they

7  were a bunch of robots.  Again, it's a borrowed concept, you

8  know, it might be a little corny but whatever.  They thanked

9  him because he created a curriculum, and they were, in fact,

10  thankful.  So it's very hard.  I think it's almost impossible

11  for you guys sitting in a courtroom to see Keith Raniere

12  remotely the way they say Keith Raniere back at that time.  I

13  think it's almost impossible to do.

14      So when Lauren Saltzman comes in here with as much

15  emotion as she had, and you know, let's go through the bad

16  part, too.  I asked her, I said, you know, she said, I found

17  myself being attracted to Keith.  She said she was attracted

18  to Keith first.  She said she found herself feeling jealous

19  that Keith was getting attention from other women and she

20  wanted to be in a relationship with Keith.  And I said, But

21  didn't you know Keith was living with three women at the time?

22  Yeah, I knew.

23      Didn't you know that in addition to living with thee

24  women, Keith had all these other women seemingly on the side?

25  Yeah, I knew.

SUMMATIONS - MR. AGNIFILO

1        Why?  Why did you do it?  And she wanted to do it.

2    She said that she made a choice.  She made a choice, and I

3    think the choice brought her some happiness.  I think the

4    choice brought her some frustration, but it was a choice.  And

5    that -- that's the key.  I think that people are making

6    choices.  I think it's very easy to take a way out now and

7    say, Well, you know, I didn't know.  I was coerced and all

8    these things.  I just don't thing.  I think they were making

9    choices.

10        I asked her -- I asked her, Did Keith ever abusive

11   to you?  She said, Well, one time he was trying to pull my

12   pants down, and I said, no, and then I said no again, and he

13   stopped.  And that was the only thing she pointed to in what,

14   18 years?  So there's nothing in the record.  There's nothing

15   in the record -- I'm going to go through all of this -- you

16   know, that Keith was abusive to his long-term relations.  No,

17   nothing.  I mean, you know, and Lauren certainly didn't say

18   anything like that.

19        It's imbalanced.  Keith lives a lifestyle that is in

20   some way inconceivable.  You know, I mean, who in their right

21   mind can really even imagine saying, I'm going to be with as

22   many women as I want and you have to only be with me?  I mean,

23   it's amazing you get the words out of your mouth, you know,

24   but he did and they agreed.  That's what he did.  And it was

25   his lifestyle, and it was well-known by everybody.  But also

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    keep in mind this:  No one really, no one took the witness

2    stand, there's no evidence in this case that being with Keith

3    is linked to, you know, being elevated in NXIVM or in DOS or

4    anything like that.  I mean, Rosa Laura Junco, no relation

5    with Keith.  That's clear.  But I think a few women said that,

6    no intimate relation with Keith.  She is a high-ranking

7    proctor.  It -- it doesn't -- one has nothing to do with the

8    other.  I mean, Keith has just lived a lifestyle -- let me see

9    if I --

10           Do you guys still have your chart?

11           Oh, one second.

12           (Pause in proceedings.)

13           MR. AGNIFILO:  Okay.

14           All right.  So -- all right.  Pam Carfitz, we know,

15   long-term relation; Barbara Jeske, the same; Karen

16   Unterreiner, the same; Kristin Keeffe, the same.  But then

17   Kristin Keeffe left and then took Gaylyn, their son; Dawn

18   Morrison, the same.  Nancy Salzman, there's some evidence that

19   back in the day there was some intimate relationship.  Lauren

20   Saltzman, we know.  Barbara Bouchey had a relation with Keith.

21   Kathy Russell, the same; Daniela, we know.  Marianna, we know.

22   Camila, we know; Monica Duran; Ivy Nevares; Loreta Garza;

23   Clare.  So -- well, let's just stop right there.  All of these

24   women are pre-DOS, okay?  So there's no shortage.  There's

25   been no shortage of intimate partners for Keith Raniere

SUMMATIONS - MR. AGNIFILO

1    pre-DOS.  He doesn't need DOS to create, to generate intimate

2    partners because he has had them his whole life, and he's has

3    them while he was doing everything else.  While he was

4    building NXIVM and growing NXIVM and one has nothing to do

5    with the other.  This is just his lifestyle.  For better or

6    worse, this is his lifestyle and has nothing to do with the

7    business.

8            Nicki Clyne, I think, is also pre-DOS, at least that

9    is what I think Lauren Saltzman.  Rosa Laura Junco, is I think

10   the only woman on her who hasn't had sex which him, and she

11   hasn't suffered professionally.  She's doing well in NXIVM.

12   You know, I guess that's -- she's a proctor.  So, obviously,

13   that's not dispositive.

14           So what does it mean?  It means that I think you

15   have to separate out what his lifestyle's been for 30 years

16   and what his designs are, you know, in the last the four

17   years.  I mean, because I don't think that is anything to

18   suggest that he created DOS so that he could have sex with

19   people.  In the instance of Lauren Saltzman, he had sex with

20   her in 2001.  He doesn't need to have DOS to have sex with

21   Lauren Saltzman.  I mean, it doesn't make any sense.  Sarah

22   Edmondson, very successful, ran the Vancouver Center.  No

23   relationship to Keith.

24           Keep in mind, this is very important.  None of

25   Lauren Saltzman's slaves had any sexual relationship with

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1  Keith.  So this notion somehow that DOS is like this

2  cross-the-board, you know, sort of thing for sex, is just

3  renders untrue just by that alone.  I mean, it's all

4  individualized you know.

5          I submit to you that Allison Mack's group was doing

6  something that none of the other groups were doing, at least

7  certainly to the same extent.  I don't know why exactly.  I

8  mean I know that -- we know that Allison had a sexual

9  relationship with Keith.  That's beyond any dispute.  We know

10 that she had a sexual relationship with Keith along with Dani

11 Padilla, you saw an email along these lines.  So is this

12 something that Allison's doing, you know, sort of with her

13 people.  Is she, you know, encouraging this?  That seems to be

14 reasonable, because we know that Lauren Saltzman is not

15 engaging it, and as a result, Keith isn't have sex with

16 anybody in Lauren's group.  All right.  Let's go ahead.

17 Nicole.  Nicole had what I think is very characterized based

18 on what Nicole has said about it, a casual intimate relation

19 for a limited period of time with Keith Raniere.

20          Now, in terms of what the Government summed up on,

21 what Nicole testified about as to anything on the table, okay,

22 she was estimating a date, but I submit you based on the

23 e-mails, on e-mails that she sent, I think we can pinpoint

24 when that was.  And I'm looking now at an e-mail that Nicole

25 sent to Allison Mack on May 25, 2016.  That's her May 25th

SUMMATIONS - MR. AGNIFILO

1   journal entry.  It's Government's Exhibit 659.  I'm looking on

2   Page 3.

3           I have an audition tomorrow.  I's so excited.  It's

4   a national GMC commercial, nothing crazy, but I miss

5   commercial auditions and commercials so much, and I'm excited

6   to play, engage where I am at and how I've grown.

7           I had a great and changing talk with KR today.

8   A gave me the mission of putting myself in a vulnerable

9   position and submitting to KR, and wherever the walk led,

10  which I did.  It led many places, and I was completely

11  exhausted by the end of it.  I am embarking on some new

12  discipline starting tomorrow scheduling and improving-wise.

13  We should see how it unfolds.

14          Now, keep in mind one very important fact, that for

15  a period of time, Nicole was not telling Allison that Nicole

16  was having an intimate relation wit Keith.  So this notion

17  that somehow this is like a function, you know, like there's

18  commercial sex somehow because of Allison's involvement in

19  this situation, for a long time Allison didn't know it.  So

20  here's what I think is happening in this e-mail, in this

21  journal that she sends.  And she says certain things, you

22  know, directly, I had a great and challenging talk with KR

23  today, all right?  So, obviously, she saw Keith and had a

24  challenging talk with him.  A gave me the mission of putting

25  myself in the vulnerable position and submitting to KR.  Okay?

SUMMATIONS - MR. AGNIFILO

1   That's what she says and then she sends it to Allison.   Then

2   she writes, Wherever the walk led -- which it did -- it led

3   many places.

4           I don't think she's talking geography.  I don't

5   think she's talking about where they actually went on the

6   walk.  I think she's talking in somewhat of a coded sentence

7   about the fact that she did something with Keith recently

8   right before she wrote this journal entry that she's making a

9   journal entry about, but not explicitly telling Allison that

10  she did, which is why she's writing it that way.  And then he

11  ends it by saying I was completely exhausted by the end of it.

12          In all of the journal writing and all of the

13  e-mails, she never says anything about an unwanted encounter.

14  She never characterized this as unwanted, as outrageous as

15  something she, you know, didn't want.  And then she proceeds

16  to have a relationship with Keith.  Now, I heard her

17  testimony, too, that she felt she had to and she wanted to

18  make the best of it.  But I think she had more opportunities,

19  she had more options than that like many of the people that

20  we've spoken to in this case.  She had a wonderful, loving

21  family.  You know, they seem to have several homes, including

22  vacation homes.  She spends a lot of time with them.  If she

23  wants to leave Clifton Park and just leave, she can leave.

24  And she doesn't, you know.  She gets into a relation with

25  Keith that seems, for the most part, to be sort of a sweet,

SUMMATIONS - MR. AGNIFILO

1    caring, casual relationship.  You know she, sends him nice

2    notes.  He sends her nice notes.  They're sweet to each other.

3         They find time to spend together.  She arranges to

4    have pizza together.  They go on walks together.  You know,

5    sometimes Keith, I think, asks, What do you want do?  Do you

6    want to go to the library or do you want to go on a walk?  And

7    she goes, I want to go on a walk, and they go on a walk.  And

8    it's a relationship like many other relationship.  Theres

9    nothing unusual about it.  I mean, it's just Keith having a

10   relationship and she's having a relationship with him.

11        I think the end of the relationship is sort of

12   significant just the way it happened.  She drives to

13   Clifton Park and she meets him there.  And she's waiting for

14   him, she's waiting for him.  She's rents the car and she

15   doesn't want to stay too late, and Keith is kind of keeping

16   her waiting because of volleyball or whatever he's doing, and

17   they find each other.  And they have what I would character as

18   sort of a heart-to-heart talk.  And Keith really just asks her

19   two questions.  And the questions he asks are:  Am I ever

20   going to see you again?  Am I ever going to speak to you

21   again?  And are you going to say bad things about me?  And she

22   leaves, and the way she describes it, You know, the sun is

23   coming up and she said, The drive back to New York is very

24   beautiful and their relationship ends.  And it's a

25   relationship, just like he had a relationship with a different

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    time with Lauren, he has this relationship with Nicole.  And

2    here's what I think is interesting, before Allison invites her

3    to join DOS, and Ms. Penza commented on this in her summation,

4    Nicole is battling some pretty serious feelings, and she wrote

5    about it in e-mails and sort of journal entry that she has.

6    You know, she said she was struggling with depression.  She

7    was struggling with, you know, suicide, she said it.

8         And Allison -- there's no reason to think that

9    Allison saw her as vulnerable and went and caught her, you

10   know.  There's no reason -- there's nothing in the evidence

11   that would make you conclude that.  I think the conclusion is

12   that Allison actually cared about her.  Allison actually liked

13   her.  Allison was actually worried about her, and Allison

14   really believed that DOS would help.  And that's why Allison

15   drove to New York and made time and spent time and tried to

16   help Nicole.  The balance, if you look at all the e-mails and

17   whatnot and her journal entries and listen to her testimony

18   and I think what you will conclude is that she never did

19   quite eased into DOS.  It was really never quite for her, you

20   know.  Some people took to it.  Allison took to it.  Nicole

21   Clyne really didn't quite take to it that way.  You know, she

22   always kind of struggled with it.  It was always like, one eye

23   on the door type of thing, you know.  And then ultimately, she

24   was let out and nothing happened.  Nothing was released.  You

25   know, Allison told her what if -- nothing would ever happened

SUMMATIONS - MR. AGNIFILO

1   to your family, what if we're never going to release the

2   collateral?  And she said, that's what I've been waiting to

3   hear.  Thank you.  They had a nice exchange, and it ends.

4   There's no hard feelings.  There's no threat.  There's no hard

5   edges.  You know, it's sort of loving and understanding and

6   the relationship ends.

7          I think you saw the same thing with Lauren and

8   Audrey.  Do you remember when Lauren testified, We went

9   through a series of chats between her and Audrey, and at one

10  point it's just apparent to Lauren that Audrey doesn't want to

11  stay.  This is now in the spring of 2017, you know, everything

12  is kind of hitting the fan, things are starting to change and

13  it's apparent that Audrey wants to leave and she leaves.  And

14  if I remember right, some of the last communications they had

15  was, I love you.  I love you.  I'll miss you.  I'll miss you.

16         Where is the extortion?  Where is the extortion?

17  You know, extortion is purely theoretical, but it's not in

18  anybody's heart is my point.  You can't have extortion and

19  pressure like that that exists only in a theoretical realm.

20  You actually have to have it in your heart.  You have to have

21  in you heart, If you this, I'm going to hurt you.  I'm going

22  to hurt you.  I'm going to hurt your family.  I'm going to

23  hurt your reputation.  I'm going to hurt you forever.  That's

24  just not in this case.  It's just not.  Extortion is in the

25  heart and there is nobody here who has extortion in their

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    heart.  There's no evidence of that.

2         There's no threats.  No one testified to a threat.

3    No one testified that they got threatened.  No one testified

4    someone said to me, If I do this, I'm going to release your

5    collateral.  No one said that.  That's not in the evidence,

6    because no one said it.  Because that was never the point.

7    That was never the point.

8         Now, the Government makes a compelling case, and I

9    hear them, that you know it's almost like, Speak softly and

10   carry a big stick.  It's there.  You don't have to threaten me

11   because it's there.  But it's not there to be a threat,

12   because if it were there to be a threat, it would have been

13   threatened.  And if someone would have actually been threaten,

14   the Government, who is very capable, would have found that

15   person and put them on the witness stand and said, They

16   threatened me.  Someone looked me dead in the eye and said, If

17   you leave, I'm going to release your collateral and I'm going

18   to make your life miserable.  They would have found that

19   person.  They are very good at what they do, and they didn't

20   find that person because there isn't that person.

21        What I think you see, though, is that -- getting

22   back to Nicole for a second -- is that even though she kind of

23   struggled with DOS and everybody took to it, you never saw the

24   same kind of dark e-mails again.  You didn't see the same kind

25   of dark journal entries again.  In the days before she joined

SUMMATIONS - MR. AGNIFILO

1   DOS she was saying some dark things.  She didn't say things

2   like that again.  So maybe, maybe it worked.

3           It's not for everybody.  DOS isn't for everybody.

4   If your life is great and your life is perfect and you're

5   happy, there's no reason -- DOS is not for you.  It's just not

6   your thing.  It's strong medicine and it's strong medicine but

7   it has to be used in the right circumstances and with the

8   right people at the right time.

9           In terms of forced labor with Nicole's situation, I

10  think she testified about something called Deli-It's, which

11  was the business that India Oxenberg had, which was basically

12  like you call them and they can do different things for you.

13  And I think what she said is that she worked for Deli-It's for

14  a period of time and she got paid.  You know, so here she is

15  working and getting paid.  It's hard to see how this can be

16  forced labor when she's actually getting paid for her work.

17          All right.  When we get to Jay, Jay is really sort

18  of a very quick, but I think, an important story.  And the

19  story is this:  The story is Jay was asked to do the

20  assignment.  India said, Go seduce Keith.  Jay thought that

21  meant have sex with Keith and she was out.  Not for her and

22  that's it.  Again, no collateral released.  That's really the

23  upshot of Jay's testimony.  Is that she joined DOS.  She loved

24  NXIVM, she's all about it.  Great humanitarian organization.

25  Finally I found something that's kinds of in accordance with

SUMMATIONS - MR. AGNIFILO

1    my view of the world.  She really liked it, thought the world

2    of it, was totally in hook, line and sinker and then she gets

3    confronted with this assignment, no, not for me and she

4    leaves.  She writes Keith a very nice card either because it's

5    sincere or because it's strategic, we don't really know which.

6    It's kind of a lovely card, you'll have it back in the jury

7    room, you can look at it.  She said that she was being

8    strategic and maybe she was, maybe she was, maybe she meant

9    it.  She said she meant some of the things when she testified,

10   but it wasn't for her and she left.  And that's the bottom

11   line because there is a choice.  There is a choice.  And it's

12   obvious there's a choice because people made the choice and

13   nothing happened.

14          Now, the Government spoke about commercial sex.

15   Commercial sex is a very important concept in this case, and

16   the Judge is going to give you an instruction on sex

17   trafficking that is -- the Judge is going to discuss

18   commercial sex.  And if I have my thing here -- all right.

19   Yeah, I'm just going to read a portion, a very small portion

20   of what the Judge is going read you tomorrow.  And the

21   important thing, when the Judge reads it, it's part of your

22   overall charge and you have to listen to the whole thing.  I'm

23   just going read you the section on the statute of the

24   commercial sex -- I'm sorry, sex trafficking.  Whoever

25   knowingly in or affecting interstate or foreign commerce,

SUMMATIONS - MR. AGNIFILO

1   recruits or entices harbors, transports, provides or obtains

2   by any means a person; or, two, benefits financially by

3   receiving anything of value from participation in a venture

4   which has engaged in an act just described, knowing, okay,

5   knowing that force, fraud, or coercion will be used to cause

6   the person to engage in a commercial sex act shall be

7   punished.

8          Okay.  The force, fraud or coercion has to be used

9   to cause a commercial sex act.  So it's not enough that

10  there's force, fraud or coercion and then a commercial sex

11  act.  What the statute says very clearly is one has to cause

12  the other.  All right?

13         And so let's talk about commercial sex for a second

14  and we'll do that for five minutes and then Your Honor, I'll

15  have a little bit more tomorrow.  The statute requires

16  commercial sex and the Judge again is going to instruct you on

17  commercial sex is, okay?

18         When you're thinking about it and it's in exchange

19  for something of value, all right, if you take that to the

20  extreme, what wouldn't be commercial sex?  If you're having

21  sex because you want the person to love you, being loved has

22  value.  Does that make it commercial sex?  No.  What are the

23  limits?  What are the limits of commercial sex?  And do you

24  have commercial sex in this case?  Is this really what's

25  behind this?  Was DOS created to cause commercial sex?  And I

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1   think there's absolutely nothing in the evidence that suggests

2   that.  That this is some way of getting money?  I mean, DOS is

3   created so that someone gets money or someone gets something

4   of -- of -- that's valuable.  Someone gets some sort of

5   property.  Someone gets some sort of work product by creating

6   DOS?  That just doesn't make any sense and this is just not

7   what this evidence, I submit, is showing you.  You know, that

8   this isn't a commercial undertaking and what the Government, I

9   submit, is trying to do is and the conduct looked at

10  objectively is pretty out there.  Okay?  I mean, it's really

11  pretty out there.  I mean I'm not telling you something you

12  guys have not thought of already.  You know.  You have this

13  situation, you know, where people are getting branded and, you

14  know, there's the assignments that some people are getting to

15  seduce Keith Raniere, it's pretty out there.  That doesn't

16  make it a crime?  It might just be pretty out there.  There's

17  a lot of stuff that's pretty out there that's not a crime.  So

18  I know I said this to you guys in my opening statement,

19  there's a lot about this case you're not going to like, that's

20  going to offend you possibly, that's going to make you upset

21  and there really is going to be a certain number of things

22  that Keith Raniere has done that you don't like, that make you

23  upset, that offend you, and I am not looking to talk you out

24  of that.  I'm not.  Your standards and your morals are your

25  standards and morals and we put you on the jury because you're

SUMMATIONS - MR. AGNIFILO

1    good jurors and you're right jurors.

2              But that's not the whole issue.  The whole issue is,

3    is this, is all of this sex trafficking?  Is all of this

4    really at the end of the day about commercial sex?  And I

5    submit to you when you listen to all of the evidence and you

6    listen to the arguments that have been, you know, put forth

7    forward to you, I think you're not going to think so.  That's

8    just not what it is.  It might be distasteful.  It might be

9    offensive but it's just not commercial.  That's not what it

10   is.  It's a problem of a different nature.

11             Your Honor, this would be a good time to break.

12             THE COURT:  All right.  Members of the Jury, we're

13   going to recess for the evening.  I remind you of tomorrow,

14   we'll complete the defense closing arguments and have the

15   Government's rebuttal and then the Court will provide you with

16   the charge as to the law, after which you will retire to

17   consider your verdict.  And I would like to remind you again

18   that it's very important that you follow my instruction, do

19   not discuss the case with anybody, not your family, friends or

20   business associates and not you fellow jurors.  When I say not

21   your fellow jurors, I mean not your fellow jurors until you

22   start actually deliberating after I've given you the charge.

23             In addition, you must not read, listen to or watch

24   or access any accounts of this case in any form of media,

25   whether it's newspapers, TV, radio, pod cast or the Internet,

David R. Roy, RPR - Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    no research or seek out outside information about any aspect

2    of the case and do not communicate with anyone about the case

3    on your phone, whether it's e-mail, text messaging or any

4    other means or by way of any blog or website or by way of any

5    social media, including Facebook, Twitter, Instagram, YouTube

6    or other similar sites.  Do not consider anything you may have

7    read or heard about the case outside of this courtroom,

8    whether you read it before or during jury selection or trial,

9    and do not visit any of the locations identified during the

10   course of jury selection or trial.

11          Tomorrow morning we will begin at 9:00 a.m. or soon

12   thereafter as everyone is here.  Thank you very much for your

13   attention today.  Get some rest tonight.

14          Please rise for the jury.

15          (Jury exits the courtroom.)

16          (The following matters occurred outside the presence

17   of the jury.)

18          THE COURT:  All right.  Please be seated everyone.

19          Mr. Agnifilo, how much more do you have.

20          MR. AGNIFILO:  45 minutes tops, probably less.

21          THE COURT:  Okay.  And then the rebuttal, less than

22   an hour still?

23          MR. LESKO:  I think so.

24          THE COURT:  Okay.  All right.  Which means we'll get

25   the charge finished by midafternoon and be able to send the

SUMMATIONS - MR. AGNIFILO

1    case to the jury in the afternoon.

2            The jury informed me that they don't want to stay

3    past 5:00 o'clock but that could change and they can work it

4    out.  It will be up to them how late they stay.

5            Now, with regard to this letter from the Government,

6    have you looked at it?

7            MR. AGNIFILO:  I have, Your Honor.  I think it's

8    okay.

9            THE COURT:  All right.  So we're going to take that

10   one sentence out of the proposed instruction at 123 and 124.

11           MR. AGNIFILO:  Very good.

12           THE COURT:  All right.  Anything else?

13           MR. AGNIFILO:  Nothing for us.

14           THE COURT:  Anything else from the Government?

15           MS. PENZA:  No, Your Honor.

16           THE COURT:  All right.  See you at 9:00 o'clock

17   tomorrow morning.

18           (Proceedings adjourned at 5:00 p.m. to resume on

19   June 18 , 2019 at 9:00 a.m.)

20

21

22

23

24

25