```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                        18-CR-204(NGG)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4                                      Brooklyn, New York

 5            -against-                 June 18, 2019
                                        9:00 a.m.
 6   KEITH RANIERE,

 7            Defendant.

 8   ------------------------------x
              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 9        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
              UNITED STATES SENIOR DISTRICT JUDGE
10                      BEFORE A JURY

11   APPEARANCES
     For the Government:        UNITED STATES ATTORNEY'S OFFICE
12                              Eastern District of New York
                                271 Cadman Plaza East
13                              Brooklyn, New York 11201
                                BY:  MOIRA KIM PENZA, ESQ.
14                                   TANYA HAJJAR, ESQ.
                                     MARK LESKO, ESQ.
15                              Assistant United States Attorneys

16   For the Defendant:        BRAFMAN & ASSOCIATES
                                767 Third Avenue
17                              New York, New York 10017
                                BY:  MARC AGNIFILO, ESQ.
18                                   TENY ROSE GERAGOS, ESQ.

19                              DEROHANNESIAN & DEROHANNESIAN
                                677 Broadway
20                              Albany, New York 12207
                                BY:  PAUL DerOHANNESIAN, II, ESQ.
21                                   DANIELLE R. SMITH, ESQ.

22
     Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

SUMMATIONS - MR. AGNIFILO

1         (In open court.)

2              THE COURTROOM DEPUTY:  All Rise.

3              THE COURT:  Appearances.

4              MS. PENZA:  Moira Penza, Tanya Hajjar and Mark Lesko

5    for the United States.  Also at counsel table are Special

6    Agents Michael Lever and Michael Wenniger and Randall Harvey.

7              MR. AGNIFILO:  Mark Agnifilo, Temy Geragos, Paul

8    DerOhannesian, Danielle Smith for Keith Raniere, who is here

9    with us this morning.

10             THE COURT:  Very well, good morning.  And are you

11   ready --

12             MR. AGNIFILO:  I am.

13             THE COURT:  -- to complete your closing?

14             MR. AGNIFILO:  I am.

15             MR. LESKO:  One request, I'm expecting Mr. Agnifilio

16   to end with his best stuff, could we have five minutes after

17   Mr. Agnifilio ends to set up and get organized?

18             THE COURT:  I'll send the jury out for five minutes

19   and then you can organize, and then we'll proceed with the

20   rebuttal.

21             MR. LESKO:  Thank you.

22             THE COURT:  That's fine.

23             Same rules apply as yesterday for the gallery.

24             (Jury enters the courtroom.)

25             THE COURT:  Please be seated.

SUMMATIONS – MR. AGNIFILO

1          Good morning members of the jury.

2          THE JURY:  (Collectively) Good morning.

3          THE COURT:  At this time we'll continue with the

4    defense closing argument.  Mr. Agnifilio, please.

5          MR. AGNIFILO:  Thank you, your Honor.

6          Good morning everybody.

7          THE JURY:  (Collectively) Good morning.

8          MR. AGNIFILO:  I have 30 or 35 minutes for you, then

9    I'm going to sit down.  I think Mr. Lesko is going to talk to

10   you for a while.  Then the parties will be done.  Then later

11   this morning his Honor is going to charge you on the law, then

12   you'll start deliberations.

13         A couple of things.  I think yesterday I said that

14   Nicole was in Delegates, I think it was Jay.  You can remember

15   the testimony as well.  But I think Jay said she was in

16   Delegates.

17         Here is the point, how can it be forced labor if

18   she's if she's getting paid, in this case from the person who

19   actually brought her into DOS.  India was in charge of

20   Delegates, she's actually paying Jay for work.

21         One of the things that the Government mentioned in

22   their summation, that came out in the evidence, is that people

23   worked on Pam's memorial for free and they were not paid.  The

24   Government is going trying to say that is forced labor.  Think

25   about it.  What we know from the testimony, I think, is that

SUMMATIONS - MR. AGNIFILO

1   Pam is somebody everybody talked about, they seemed to love

2   her, admire her, respect her.  She dies tragically of cancer.

3   This is not the kind of thing you expect to be paid for.  This

4   is what people in a community do to each other, for each

5   other.

6           This is really what this was.  Whatever other things

7   you might conclude about what NXIVM was and what DOS was, it

8   was people who lived together in a community.  And everybody

9   was very clear, even the Government witnesses who certainly

10  weren't here to always say nice things about Keith Raniere or

11  DOS or NXIVM, they all said we were a community, it was nice,

12  I had friends, I cared for people.  It seemed to be a nice

13  thing.

14          Part of what I saying yesterday, one of the hardest

15  things to do in this case is to imagine what life was like

16  back in the day.  But you know, because certain people told

17  you about it.

18          Your job really is when you go in the back is to get

19  down to certain essential truths.  You're going to go back

20  there and ask questions.  What was DOS?  What was it?  What

21  was it meant to be?  What was it once it started?  Was it sex

22  trafficking, really?  Was it sex trafficking, or was it

23  something else?  Was it forced, fraud or coercion being used

24  to cause commercial sex, which is what part of the definition

25  of what sex trafficking is.  Was that what it was or was it

SUMMATIONS – MR. AGNIFILO

1  something else?  Was it about commercial sex?  Was that

2  anyone's idea?

3           When you listen to Keith talk in the tapes about the

4  creation of DOS, is there any suggestion, inkling, hey, this

5  is a way to make money.  That is not what the evidence has

6  been.  That is not what the witness's have said, certainly

7  that's not what the witnesses have said.

8           The only person I think who testified at the trial,

9  who I didn't talk about yesterday and I'm going to talk about

10  very briefly now, is Sylvie.  There is a point I'm going to

11  make with Sylvie's testimony.  Sylvie testified, I think the

12  first witness in the case, so going back now six weeks, I'm

13  sure you remember what she said.

14           Basically she said that she was very close with

15  Clare.  Clare kind of brought her over.  You can conclude

16  Clare took very good care for her.  Clare paid for her horse

17  to be shipped from England to Albany.  Clare did a lot of

18  things to help her financially and whatnot.

19           She joins DOS; and is in DOS.  And she talks about a

20  single episode with Keith that I want to talk to you only

21  briefly, because I'm going to ask a few questions once we go

22  through it.

23           What she says is that Keith brings her upstairs, I

24  think 2 Flintlock, goes down on her, performs oral sex on her.

25  The way she described it is she manifested that she was

SUMMATIONS - MR. AGNIFILO

1   enjoying it, that's what she says.  And then I think what her

2   testimony is, and this isn't exactly a quote but awfully

3   close, she says I never had an orgasm before.  Then all of

4   sudden I had an out-of-body experience and then it ended.

5           Here's my question.  What is that?  Why is Keith

6   doing this?  And nothing else happens as part of that episode,

7   and then nothing else happens again.

8           The only sexual connection between Sylvie and Keith

9   is that.  There is this one incident of oral sex where Keith

10  performs sex on her, she appears to have an orgasm.  There is

11  nothing else.  There is no intercourse.  There is no other

12  oral sex events.  Then they never have another sexual

13  encounter.  What is that?

14          And here's what I want you to think about.  We went

15  through the chats, the chats that Sylvie and Keith had.  And

16  you now have the Cami chats.  You have a lot of evidence of a

17  lot of written communication between Keith and other people.

18  I suggest to you, if you could do such a thing, figure out

19  what the ratio is of talking about sex or just talking about

20  intense things and actual sexual contact.  The ratio is like

21  100,000 to one.

22          Here is why I'm bringing this up.  I think it's a

23  fair question to ask:  What is Keith trying to get?  What is

24  Keith searching for?  Is it really sex?

25          Because I think there are a lots of things you heard

5498

SUMMATIONS - MR. AGNIFILO

1    in the evidence that show there were certain periods of time

2    Keith couldn't have sex, okay.  I think Nicole said that at

3    different points.  I think Nicole said, if I'm not mistaken,

4    she and Keith had intercourse three times, a few times, some

5    discreet amount of times.  In one of the Camila chats, you'll

6    remember it because how can you forget it, Keith is sort of

7    berating her for being with this other guy.  And there is talk

8    about penis size and all this other stuff.  And Camila writes,

9    You haven't been -- I can't remember what she said -- you

10   haven't been to your fullest in a long time, or something like

11   that.

12           So I submit to you that what Keith is really after

13   isn't exactly sex.

14           Let me tell you what I mean by that.  So much in

15   this case is about what opens people up.  What stops them from

16   being all self-contained.  Some people like being

17   self-contained, I'm happy being this way, I don't want to be

18   meaningful with other people, I'm happy in this little space

19   that I'm in.  But some people aren't happy being like that,

20   and some people want more than that.  The question is, how do

21   you get people out of themselves.

22           I think what you can find in the evidence that Keith

23   is actually chasing after, I don't think he's chasing after

24   sex, per se.  What he's chasing after is this thing that

25   happens between people who are attracted to each other.  I

SUMMATIONS – MR. AGNIFILO

1    think attraction causes you to kind of come out of yourself a

2    little bit.  I think attraction causes you to reach into the

3    space between people and be not so much confined in yourself.

4    Okay.

5            And I think this is something we've all experienced,

6    I hope everyone in the world has.  That you're attracted to

7    somebody and all of a sudden things change.  Everything

8    changes, your view of yourself changes, things that you talk

9    about in terms of yourself changes, things that you're

10   interested in them change, they are interested in you.  And

11   all of a sudden you're having a discussion, you're having an

12   interaction that people who aren't attracted to each other

13   just don't have.

14           And so I think if you can kind of like take strands

15   of this case, from all these different places in the case, if

16   you can take strands of the case from the communications, from

17   the chats, from what we know about the details of some of

18   these intimate relationships, what I think the place you get

19   is Keith is not really looking for the actual act of sex.

20   He's looking for that -- he's looking for that thing.  That

21   kind of special, rare -- maybe not so rare, it shouldn't be so

22   rare, that special thing that happens when people are engaged

23   in each other in that way.  Because that is what all the

24   evidence in the case points toward.

25           You're going to get all the Camila chats when you go

SUMMATIONS - MR. AGNIFILO

1    in the back.  They are exhausting.  They are exhausting in

2    their length.  They are exhausting in their breadth.  It's

3    constant.  There is chats at times every three minutes for

4    hours on end, day and night, talking about these.  They are so

5    intense and they are so unrelenting, that if you really sit

6    down and read them in one sitting you leave exhausted.  There

7    is no sex in it.  It's the connection.  That's what he's

8    chasing after.

9           And that seems to be what all this is moving toward.

10   It's not because -- it doesn't make sense if he's Sylvie's

11   Grand Master, okay, and he can have supposedly sex with Sylvie

12   as much as he wants, presumably in any way that he wants, and

13   the only thing, the one thing that he did was what we just

14   talked about, it doesn't make sense that at the end of the day

15   this is about sex for him.  It doesn't.  Because the evidence

16   actually points away from that being the case.

17          Now, it's sort of a subtle distinction.  I'm trying

18   to think of an analogy.  Sex this is star.  And around the

19   star is this gravity.  And there is a feeling, there is a

20   feeling around sexual attraction that could have nothing to do

21   with eventual sex, but there is an attraction.  And the

22   attraction makes two people different.  And it makes people

23   talk about different things in a different way.  It makes you

24   share yourself.  It makes you share yourself in a way that you

25   wouldn't ordinarily.  Or you wouldn't go to a person that you

SUMMATIONS – MR. AGNIFILO

1    weren't interested in.  I think what you're trying to do is

2    try to bridge that distance.  Because you're attracted.

3            It's the real definition to the word.  You're

4    attracted to this person, you want them, you want to

5    understand them, you want them to understand you.  And in this

6    the process something happens.  That's I think what Keith is

7    chasing after.

8            I think every single drop of evidence in this case

9    points in that direction.  And the point is, in terms of the

10   charges, none of that amounts to commercial sex.  It's just,

11   commercial sex is on a different, is in a different universe

12   from that, from what I'm describing to you.

13           And there is no evidence, truly no evidence that DOS

14   was created with commercial sex in mind.  Sex for value.

15   That's just not what it was.

16           And it can't be like a gimmick.  Like, well, there

17   is sex and then somebody drove somebody to the airport and

18   driving someone to the airport has value.  There is sex and

19   then somebody wrote a song for Pam's memorial.

20           No.  That has to be a point.  That has to be the

21   point of this.  It's clearly not the point of this.  It's

22   clearly not the point of this.

23           So why DOS?  Why?  One thing that has not really

24   been discussed is the context.  What is going on in Keith's

25   life in 2015/2016.  We know that Keith was very close to

SUMMATIONS - MR. AGNIFILO

1    two -- lots of people -- but two in particular, Barbara Jeske,

2    that's one of the long-term relations that he had, and Pam

3    Cafritz.

4              Barbara Jeske dies in 2014, I think is the testimony

5    at trial.  And Pam Cafritz in 2014 has cancer, and she doesn't

6    die until later.

7              Now, I think there is evidence in the record that

8    Keith, and certainly evidence in terms if we look at the

9    Government's chart here, woman, woman, woman, woman, woman,

10   woman, woman, woman, woman, woman, woman, woman, a couple of

11   guys on there.

12             Do you remember when Mark Vicente was testifying and

13   he's talking about a conversation that he has with Pam

14   Cafritz?  And Pam Cafritz says, maybe you and Keith can be

15   friends, he doesn't have a lot of male friends.  Pam knows him

16   the best.  There is not a lot of evidence of him having male

17   friends.

18             What seems to pretty clear is he relates better to

19   women.  He does.  Not in a bad way, not in a negative way, not

20   in a condescending way.  I don't think there is anything in

21   the case to suggest that Keith has a misogynist view of women.

22             NXIVM was run by women.  I mean, Nancy Salzman ran

23   NXIVM along with Keith.  These women who had critical,

24   important, long-term roles in his life all played tremendously

25   central roles in NXIVM.  So he put his great trust, his

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SUMMATIONS - MR. AGNIFILO

1  greatest of trusts, in these women.  So there is no reason to

2  think that somehow he has a view that women can't do the job;

3  women can clearly do the job.  And so I think that he just

4  relates to women.

5       I think there is every reason to believe that his

6  view of DOS of being something big, something transcendent,

7  lots of different women, women who could do things for women's

8  causes, things like that, is absolutely legitimate.

9       It wasn't just the subject of testimony, and it was

10  the subject of testimony as something that Keith would say,

11  it's on the tapes, it's on the tapes.  Tapes that Keith had no

12  reason to think would be played at his federal criminal trial,

13  it's on the tapes.  He wants DOS to be something bigger than

14  just, I think, I don't know what Lauren Salzman said, 100

15  members, or 100-something members of DOS.

16       Let's stop there for a second.  There is 100 members

17  of DOS.  You heard about sexual contact with what, a handful

18  in DOS, in DOS and through DOS, a handful.  Over 100 members.

19       But getting back to the primary topic, I think he

20  had every reason, and you have every reason to credit the

21  testimony, that's what he wanted it to become.  Not because he

22  wanted them as sex partners.  He was just doing in his life

23  what he's been doing in his life for the last 20 years.  I

24  mean, he has sex with multiple women, as we all know that, it

25  was one first facts we established in this case.  Is this part

SUMMATIONS - MR. AGNIFILO

1  of what he views as his legacy?

2          By the time DOS is created, he's in his early to mid

3  50s.  I think he knows Pam is going to die.  And then she ends

4  up dying.  Barbara Jeske just died.  And he's thinking that

5  some day I'm going to die.  This person who was with me so

6  long is soon to die, what does this mean for me, Keith

7  Raniere.

8          I think DOS is created with the best of intentions.

9  I don't think it's created for sex partners.  I think it's

10  created for the best of intentions.

11          I think it's important that each of the groups are

12  different.  If it's the case that in Allison Mack's group, sex

13  was more common.  I think that's because of how Allison Mack

14  viewed Keith Raniere.  Not from a negative point of view, but

15  possibly from a positive point of view.  There is something

16  about, I don't know, maybe he's safe; maybe because we're not

17  going to get married; maybe because he's not going to want to

18  you know settle down with me; maybe because this is something

19  that so many other people have done; maybe it's somehow safe.

20          And I can experiment, and maybe that's of interest

21  to some people.  Maybe that's something at one point of your

22  life you would say, that's a nice to have a safe place where I

23  can be sexual without strings attached, without any

24  consequences.

25          So I think it's individual.  It's not across the

SUMMATIONS – MR. AGNIFILO

1    board.

2          At one point there is a tremendous shift in

3    perspective and virtually every witness who was with Keith

4    testified in one form or another to this tremendous shift and

5    perspective that each of them went through.  They say things

6    like, at the time I thought; but now looking back at it I

7    think.  That's the shift of perspective.  How did this come

8    about?

9          I suggest it comes about because of a series of

10   steps.  Jay leaves DOS.  And remember, when Jay leaves DOS she

11   takes a lot of collateral that she could get her hands on with

12   her, because she wants that as her safety net.  She take it is

13   with her.  At around the same time Mark Vicente leaves NXIVM.

14         Now Mark Vicente is a very important figure in

15   NXIVM.  He really was in many ways for a long time like

16   Keith's number two guy.  He's very high up in the

17   organization.  I think he has a lot of respect and I think him

18   leaving NXIVM was a real blow.

19         And he leaves NXIVM, and then a lot of things start

20   happening, and a lot of people start talking to each other.

21   I'm not saying it's bad that they spoke to each other, it's

22   utterly natural that they spoke to each other.  But it's

23   important in terms of the shift in perspective.

24         Vicente understandably is concerned, worried,

25   something about the fact that there is this thing going on in

Case 1:18-cr-00204-NGG-VMS   Document 763   Filed 07/19/19   Page 15 of 237 PageID #: 7623

1    the form of DOS, that he knows nothing about because he's

2    pretty high up in NXIVM, so why doesn't he know about it.  It

3    makes sense that he's suspicious of it right off the bat.

4           Also it sounds bad.  It sounds bad.  We don't know

5    exactly what Jay told him.  We know he was talking to

6    everybody.  At one point he testified that he had spoken to

7    over 20 people.  So we don't know exactly who he spoke to, but

8    we can assume that he spoke to over 20 women.  And so it makes

9    sense that he's going to be concerned about this.  And he's

10   going to be worried about it and going to think something

11   nefarious and terrible is going to happen.

12          He then contacts Catherine Oxenberg, India's mother.

13   And I think this brings it to another level.  Because, quite

14   understandably, Catherine Oxenberg being a mom is going to be

15   very concerned about what is happening with her daughter.  And

16   at this point India is still in DOS.  India is still in NXIVM.

17   India is not seeing the world the way Mark Vicente is seeing

18   the world, and she's still in it.

19          I think a battle ensues, you can see this from the

20   evidence, of who's side is everybody going to be on.  Are you

21   going to stay aligned with DOS and NXIVM; or are you going to

22   come to Mark Vicente and other people and kind of renounce

23   DOS.

24          I think what happens, is what often happens in

25   discussions or arguments, both sides dig in.  Vicente I think

SUMMATIONS – MR. AGNIFILO

1    becomes convinced this is evil.  He used the world evil a few

2    times on the witness stand.  This is not a matter of opinion,

3    this is not a matter of interpretation, this is not a matter

4    of one's own decision.  This is sheer and pure evil.  We're

5    trying to figure out who is going to jump on that side of the

6    argument and who is not going to jump on that side of the

7    argument.

8            Everybody starts talking.  Jay is talking.  Sarah

9    Edmondson is talking.  Suki is talking.  Vicente is talking to

10   all of them.

11           Then on June 2, 2017 Vicente calls Franco Parlato.

12   He once worked for NXIVM.  Franco Parlato stopped, he was in a

13   sort of legal dispute with someone and now is a great NXIVM

14   critic, and a blogger.  Vicente speaks to Franco Parlato.  I

15   think what his testimony is that Catherine Oxenberg spoke to

16   Franco Parlato first, so now Vicente is speaking to Franco

17   Parlato.

18           The reason all of this is relevant is because this

19   is all how it leads to the tremendous change in perspective.

20   There is no middle ground anymore.  It's black or it's white.

21   It's evil or it's good.  It's only a matter of what side

22   you're going to be on.  I think you guys saw that in the

23   testimony.

24           A few people, I think Nicole was one of them, would

25   say, would treat this subject with a certain amount of gray.

5508

SUMMATIONS – MR. AGNIFILO

1    There was some good, there was bad.  There was some things

2    that I really liked, there were some things that weren't for

3    me.

4            But there is a real strain in the testimony in the

5    black and the white.  I think neither one is really valid when

6    a witness comes in here and is like it's bad, it's evil, it's

7    terrible.  That's not really that helpful to you because I

8    think it's just too bias.  It's just not an authentic genuine

9    helpful view point.

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMATIONS - MR. AGNIFILO

1          MR. AGNIFILO:  (Continued.) But this battle is going

2     on.  Now, at one point, if you remember when Nicole was

3     testifying, Nicole said that she had a conversation with Frank

4     Parlato and Parlato said, "I have your collateral."  We don't

5     know if Parlato did, we don't know if Parlato didn't but we

6     know from Nicole that that's what Parlato said.  And he also

7     said what Nicole said Parlato said is go talk to law

8     enforcement, all right.

9          Here's what you can take from these two aspects of

10    Nicole's testimony, there's a force out there pushing people

11    to one side or the other and in this case Parlato is pushing

12    people to the, you know, Vicente-Catherine Oxenberg side and

13    I'm not for the purpose of this discussion saying one is right

14    and one is wrong, just for the purpose of what I'm talking to

15    you about right now I'm just saying it's two very

16    diametrically opposed camps, okay, and Nicole ends up kind of

17    going that direction but much later in the fall.

18         The way that this plays itself out in terms of I

19    think what you see in the trial evidence is that there's this

20    tremendous change in perspective because once Keith's motives

21    aren't trusted, the entire nature of DOS indelibly changes and

22    what I mean by that is so much of DOS was about trust, you

23    know, so much of it was about trust, you can give us your

24    collateral but you have to trust that we're not actually going

25    to release it.  So much is about vulnerability and about trust

Holly Driscoll, CSR,FCRR
Official Court Reporter

SUMMATIONS - MR. AGNIFILO

1    and it turns out that when you play with vulnerability and

2    trust, you're playing with fire because while everyone trusts

3    everybody and while everyone is together and on the same page

4    it's okay, okay, but soon as something happens there's this

5    tremendous shift in perspective.

6            And I've been straining for an analogy because this

7    is not -- what happened in this courtroom is not a situation

8    that I think a lot of people can relate to because it didn't

9    happen to you and the only thing that comes to mind is this,

10   and it's an analogy, you guys will consider it for what it's

11   worth:  Let's say you have a very strict father, all right,

12   and your father is like you have to get A-s and if you don't

13   get A-s your father sends you up to your room and he keeps you

14   in your room and he says, you know what, you study, you study

15   hard and if you want to get out of your room you bring an A

16   home next time and you go to your room and you study and you

17   miss your friends outside who are playing baseball because

18   you're in your room studying and you do that throughout your

19   high school and college years and you end up, I don't know,

20   being a lawyer, right, and then your father passes away and

21   you look back at your father with this joy in your heart,

22   okay, this gratitude because my father loved me so much that

23   he pushed me to get good grades and I got good grades and now

24   today I'm a lawyer and thank you, dad, you know, thank you,

25   dad, for being hard on me.  That's one perspective.

SUMMATIONS - MR. AGNIFILO

1          Let's say an angel who has supreme credibility comes

2     from heaven and says to you, you have to know this, your

3     father actually didn't love you, he couldn't stand the sight

4     of you and by making you go upstairs to study was the only way

5     he knew to just get you away from him because he couldn't

6     stand being around you.  That change -- you will not view your

7     father the same way again.  If you believe that, if you

8     believe that, everything has just changed for you, your entire

9     past has just changed for you and do you remember, and I don't

10    know if you guys saw the movie, some of you mentioned the

11    movie The Sixth Sense.  If no one saw the movie, I'm not going

12    to bother.  I'm not sure if you guys saw the movie.  But it's

13    about perspective changes, it's about perspective changes and

14    a little thing changes your whole perspective, what you

15    thought was true, I thought my father loved me, wanted what

16    was best for me and now I see something different about him

17    and I don't trust him anymore and because I no longer trust my

18    father, I view my childhood differently, it's not the same

19    childhood I thought it was.

20         That's what happened here.  That's exactly what

21    happened here.  Because there are great forces, they're great,

22    listen, the federal government has come in and these are, you

23    know, very fine FBI agents and Assistant U.S. Attorneys and

24    they represent the Department of Justice and they've basically

25    said this is bad, this is bad, this is a bad thing.  And

SUMMATIONS - MR. AGNIFILO

1   before that, you know, you had people, Mark Vicente I think

2   had a lot of credibility and he said this is bad, this is

3   evil, don't -- you shouldn't trust Keith, don't trust him,

4   everything you thought, don't think it anymore because it's

5   all different.  And so there's this tremendous change in

6   perspective not because the past has changed but because

7   there's this change of perspective in the present.

8           And one of the ways that you know the first

9   perspective which I suggest to you is the only perspective

10  because it's the perspective at the time, it's the perspective

11  as these events were happening, the only way you know the

12  actual perspective is through the written communications at

13  the time and you should trust them, you should trust the

14  emails, trust the text messages, trust that stuff because that

15  is how everybody felt then, that is how everybody felt before

16  the change in perspective and the change in perspective pretty

17  much changes everything.  But it's not what people were

18  feeling or going through at the time.  All right.

19          I want to talk a little bit about Camila.  In some

20  ways I think Camila is the most important person at this trial

21  because she wasn't at this trial, she wasn't here.  Neither

22  side brought her as a witness.  She didn't testify.  If you

23  believe Daniela, Daniela says that she spoke to Camila during

24  the trial.  So, we have -- if you believe Daniela, you have

25  every reason to think that Camila knows about the trial but

SUMMATIONS - MR. AGNIFILO

1   she's not here.  So, we have to figure out what Camila means

2   and how Camila figures into all of these events without Camila

3   actually ever coming here and telling us herself her

4   experience or how she feels about these events.

5           Here's what I think the evidence shows.  I think

6   Keith Raniere had a very long-term, intense, loving

7   relationship with Camila, all right.  He's not charged with

8   having had sex with her under age so it's not something that

9   I'm even going to talk to you about one way or the other.  But

10  I think what the evidence shows is that they are very much

11  emotionally connected and that they have been for a while.

12          And I think what you see in the Camila chats, and I

13  would encourage you to take some time and read through them

14  and get more of a flavor for all of them, is that Camila

15  stands up to Keith, Camila is not a shrinking violet, Camila

16  is not someone who's just getting run over, you know, by the

17  Vanguardness of Keith Raniere.  She's not.  She pushes back,

18  she puts him in his place.  When he gives her a hard time

19  about things, she knows how to stand up for herself and you

20  will see that time and again in the chats.

21          You will also see, I suggest, something about Keith

22  that I think that you see in other evidence as well.  There's

23  this notion every once in a while that somehow Keith is like,

24  you know, this -- the Wizard of Oz behind the curtain, this

25  powerful figure.  I think if you actually look at the evidence

Case 1:18-cr-00204-NGG-VMS   Document 763   Filed 07/19/19   Page 23 of 237 PageID #: 7631

1    in this case, what you see is the exact opposite.  We hear

2    about Keith having an argument with a woman and hiding in a

3    bathroom, okay.  We have Keith just being out of his mind with

4    jealousy and anger because Camila -- I'm not sure anger --

5    read the chats for yourself, I'm not sure it's quite anger.

6    It's unrelenting, it's how could you do this, but how could

7    you do this, but how could you do this, and tell me about this

8    detail, tell me about this detail, and Camila is like, stop it

9    already, I don't want to be -- no, tell me about this detail,

10   I want to know about this detail, this painful agonizing

11   detail, tell me about this detail.  He's just beside himself.

12   That's not power.  I think that's the exact opposite.

13          At one point when Nicole was testifying I was asking

14   her about that last meeting she had with Keith, I said, did he

15   seem sad?  And I was talking about at the time did he seem

16   sad.  And she says something like, well -- and I said, what,

17   he's always sad?  And she says, yeah, you know.

18          He's not mighty, he's not great, he's not godlike,

19   he's none of those things.  He sits there and he creates

20   curriculum, that's his greatness.  There's nothing high and

21   mighty about him and I don't think he looks to be high and

22   mighty, I think he looks to have relationships with people

23   that are of a certain type and with a certain level of

24   intensity and you'll see that in the chats.

25          All right.  The photos.  The government says they

SUMMATIONS - MR. AGNIFILO

1    were from two particular dates in 2005, and here's my

2    question, there's no indication that those photos -- well, let

3    me back up.  The photos were printed out by the government.

4    There's no evidence that the electronic information that led

5    to the photo ever resulted in a photo from Keith's doing.

6          The state of the information is this, from what I

7    understand, there was a hard drive, there was a Western --

8    whatever it was, the hard drive with the blue circle, all

9    right.  There was a hard drive and at one point it seemed to

10   have been hooked up to a Dell computer or some other computer

11   and that Dell computer or the other computer is no longer

12   around.  So, what seems to have happened is that these photos

13   were taken from the camera with the serial number as they

14   said, went into the Dell computer, the Dell computer had a

15   backup, went to the backup and then the Dell computer is gone

16   because it's probably obsolete because this is back from 2005

17   but the photos were found by the FBI on this hard drive, okay,

18   which I think at the time that the FBI found the hard drive it

19   wasn't connected to anything.  So, it's just there.  I mean,

20   you know, it's a very large device, it has a lot of stuff in

21   it and some of the stuff in it are these photographs, not just

22   photographs of Camila but photographs of a lot of different

23   people.

24          But the Camila photographs are completely different

25   to the extent that they constitute contraband, they're

5516

SUMMATIONS - MR. AGNIFILO

1    illegal, they're illegal in of itself if they're pornography

2    and, you know, if you find, and the judge is going to instruct

3    you on what the definition of all of these things are, they're

4    not sort of the same thing at all and what I mean by that is

5    the government hasn't charged this as just Keith made these

6    photographs or possessed these photographs, they've charged

7    this that he made these photographs and possessed these

8    photographs as part of his involvement in a racketeering --

9    his involvement in an enterprise, as part of his involvement

10   in an enterprise.

11           There's no evidence that these photographs were ever

12   looked at.  There's no -- and I keep saying photographs, the

13   electronic images that could be made into a photograph, they

14   are on a camera, they go into a computer, they go to a hard

15   drive, that's it, that's it.  They're not sent anywhere,

16   they're not shared with anybody.  You know, the FBI CART

17   examiner, I thought he was very good at what he does, he's

18   very smart, he's very experienced, you know, there's no

19   testimony that these were ever sent anywhere.  They seem to

20   have been on a camera, they went to a computer, they went to a

21   hard drive, that's it.  They weren't shared, they weren't

22   viewed, no evidence of any of that.

23           How do they play a role in a racketeering

24   enterprise?  How do they play a role?  How are they part of

25   the common purpose?  How are they part of Barbara Jeske's

SUMMATIONS - MR. AGNIFILO

1    common purpose or Allison Mack's common purpose or Mark

2    Vicente's common purpose or Jim Del Negro's common purpose or

3    any of the common purpose of any of the people on this little

4    bull's-eye chart here?  It's not the common purpose of

5    anybody.  It's Keith.  It's Keith in his private life, you

6    know, it's not Keith as some head of being in the inner circle

7    and that's what they charged.

8           And like I said yesterday, they charged an

9    enterprise and they have to prove an enterprise and there's

10   two aspects of this, there's the enterprise aspect and then

11   there's something called there has to be a pattern of

12   racketeering activity, all right.  So, for the enterprise

13   aspect, we talked about it a little bit yesterday, common

14   purpose.  No one knows about it.  No one knows about it.

15   Nobody knows about it.  Keith seems to know about it.  Camila

16   seems to know about it.  Nobody else knows about it.  It's an

17   absolute drop dead secret.

18          The other thing is in the pattern of racketeering

19   activity is that the acts have to be related, all right.  So,

20   all of the eleven acts that are in the racketeering charges,

21   they have to be related in one form or another.  And the

22   government might say, well, they're related because, you know,

23   Camila is in DOS or they're related because there are other

24   photographs, but there being other photographs doesn't mean

25   that somehow the fact that these are, you know, alleged child

SUMMATIONS - MR. AGNIFILO

1    pornography is like anything else in the case, and I'm going

2    to give you another analogy.

3          You and I go to a bank, say you and I are friends,

4    we go to the bank.  You go with me to the bank the first time,

5    go the second time, go the third time.  The fourth time you

6    and I go to the bank I rob the bank.  You didn't know I was

7    going to rob the bank.  I'm using the same personnel to go to

8    the bank.  Maybe you even told me where the bank was.  But

9    there's a certain central fact that you didn't know and it's

10   such a central basic fact that you don't know that it defeats

11   any commonality, any common purpose that we might have and

12   that is the case with these photographs.

13         So, I suggest to you that the photographs in and of

14   themselves really defeat the enterprise element that you have

15   to find beyond a reasonable doubt because there's no common

16   purpose to them with anything else and they're not related in

17   terms of any of the other racketeering activity.

18         Now, ultimately you have to find that the government

19   has proven the charges beyond a reasonable doubt.  For you to

20   find a racketeering act, you all unanimously have to find that

21   the racketeering act was proven beyond a reasonable doubt.

22   You have to find the existence of an enterprise and the other

23   elements of the racketeering statute beyond a reasonable

24   doubt.  And I don't submit that you can do that.

25         If you listen very closely to His Honor's charge and

SUMMATIONS - MR. AGNIFILO

1    you listen to the elements very closely and you really link

2    the elements to the evidence, you may very well conclude that

3    a lot of what you heard in the evidence in this case was

4    repulsive, disgusting, offensive, all of those things, but we

5    don't convict people in this country for being repulsive or

6    offensive.  We convict people in this country because Congress

7    passes a statute with certain elements and that statute with

8    the elements that Congress passed is violated and the proof of

9    that violation is proven to a jury like yourselves beyond a

10   reasonable doubt.

11           So, I'm going to sit down in about three minutes and

12   I'm never going to have the chance to speak to all of you

13   again so let me end on this note, the attention that you've

14   paid has been remarkable.  The demands that we put on you have

15   been remarkable as well.  You've all been here every day early

16   and on time and really helped us out a tremendous amount and I

17   just want to say thank you.  I want to say thank you for your

18   attention, thank you for trying so hard and you really do I

19   think have one of the hardest jobs to do that I can imagine

20   because I can't imagine the courage that it would take after

21   sitting through the evidence at this trial and acquitting

22   Keith Raniere, I can't imagine the courage that that would

23   take because everything in your innermost being might say to

24   you, I can't do that, that was wrong, so many things that he

25   did were wrong, so many things that he did offended me and I

SUMMATIONS – MR. AGNIFILO

1    can't do that.  But if you go back, and you get instructed by

2    Judge Garaufis, and you really sit down and you go through the

3    elements of the actual charges and you say, you know what, I

4    don't like DOS but I don't think it is about commercial sex, I

5    don't like DOS but I don't think the coercion or the fraud was

6    for the purpose of causing commercial sex, you have to find

7    him not guilty of those counts.  You would have to check not

8    guilty all the while thinking, gosh, I wish I didn't have to

9    but that is part of your duty is to follow the judge's

10   instructions in terms of proof beyond a reasonable doubt and

11   listening to every element of every offense.

12           You might find so many things about him distasteful

13   but a lot of them, most of them aren't part of the charges and

14   so when you get that jury summons, you know you're doing

15   something that's monumentally important in terms of really

16   serving your country but you're also doing something that's

17   monumentally difficult and that you're really now a part of

18   our system, you're an extension of the court, you're an

19   extension really of our society, of our community, you know,

20   and what our rules are is that unpopular ideas aren't

21   criminal, disgusting ideas aren't criminal, disgusting

22   lifestyles aren't criminal, specific things that violate

23   tangible crimes passed by Congress are criminal and nothing

24   else.  So, again I just want to thank you for all of your time

25   and attention.

SUMMATIONS - MR. AGNIFILO

1           Thank you, Judge.

2           THE COURT:  All right.  We're going to take a

3    five-minute break and then we'll have the rebuttal.  All rise

4    for the jury.

5           (Jury leaves courtroom.)

6           THE COURT:  All right.  We'll take five minutes.

7           MR. AGNIFILO:  Yes, Judge.

8           (Recess taken.)

9           THE COURT:  Please bring in the jury.

10          MR. LESKO:  We will be using the Elmo.

11          THE COURT:  Elmo?

12          MR. LESKO:  Yes.

13          THE COURT:  Yes, we're all set on the Elmo.

14          MR. LESKO:  Great.

15          (Jury enters courtroom.)

16          THE COURT:  Please be seated.

17          At this time we'll have the rebuttal of the

18   government.

19          Mr. Lesko, you may proceed.

20          MR. LESKO:  Thank you.

21          THE COURT:  And your microphone is on?

22          MR. LESKO:  (Indicating.)

23          MR. LESKO:  Good morning.

24          A JUROR:  Good morning.

25          A JUROR:  Good morning.

REBUTTAL SUMMATIONS – MR. LESKO

1          MR. LESKO:  We're almost done.  I want to join my

2     colleagues in thanking you for your attention and your

3     patience during the past six weeks.  You heard a lot of

4     witnesses.  It's a complicated case.  It's an important case.

5     You paid attention and it's been remarkable really.

6          And you've heard that the government, the government

7     bears the burden of proof and we have the opportunity to

8     provide the final say, the final rebuttal argument and that's

9     what I'm going to do today and I'm going to ask you to bear

10    with me a little bit, I'm going to try to be efficient, I'm

11    going to try to be fast but Mr. Agnifilo spoke for over three

12    hours so there's a little bit to discuss here, okay.

13         Before I get to what Mr. Agnifilo argued, let's talk

14    about what's not in dispute in this case, okay.  What's not in

15    dispute is interstate or foreign commerce, you didn't hear

16    anything about that.  And you heard evidence that Nicole lived

17    in Brooklyn, New York and you heard evidence about witnesses

18    and victims traveling through JFK Airport and you heard --

19    remember that little piece of evidence about the Domino's

20    purchase on the Cafritz credit card in Brooklyn, so venue is

21    not in dispute, okay, in the Eastern District of New York.

22         There are no arguments and I would suggest no

23    dispute that the defendant knew the inner circle, that they

24    knew him, that he was extremely close with each and every one,

25    each and every member of the inner circle and that they

REBUTTAL SUMMATIONS - MR. LESKO

1    revered him, they worshiped him, no dispute about that.

2    Mr. Agnifilo even admitted here before you yesterday that the

3    defendant was part of DOS.  That's no longer in dispute.

4            So, let's talk a little bit about what is in dispute

5    and before I get to that I want to make a point and that is

6    that in many, many of his arguments on the issues in dispute

7    time and time again Mr. Agnifilo attempted to confuse you and

8    attempted to distract you, distract you from the evidence, the

9    evidence that proves that his client, the defendant, is guilty

10   of the crimes charged because Mr. Agnifilo does not want you

11   to focus on the actual evidence in this case, the evidence

12   that proves the defendant guilty beyond a reasonable doubt.

13           Do you remember when Mr. Agnifilo kept -- throughout

14   his summation he kept saying, I think this, I think that, I

15   think Mark Vicente is a good guy, I think Lauren Salzman, she

16   was telling the truth, remember that.  Mr. Agnifilo represents

17   the defendant, ladies and gentlemen, he's a defense counsel.

18   What he thinks, whether it's what he really thinks or

19   something else, it doesn't matter, it's simply irrelevant.

20   It's what you think about the actual evidence in this case

21   that matters.  What Mr. Agnifilo says or thinks does not

22   change the actual evidence in this case, testimony under oath,

23   video recordings, audio recordings, the documents, the

24   physical evidence, the mountain of evidence that you heard

25   over the past six weeks.  What he says doesn't change that.

REBUTTAL SUMMATIONS - MR. LESKO

1    What he says is not evidence.  The questions he asked are not

2    evidence.  What I say here right before you is not evidence.

3    Speculation is not evidence.  Guessing is not evidence.

4    Theories are not evidence.  You heard a lot of theories from

5    Mr. Agnifilo, they're not evidence.

6            As I mentioned to you, the evidence is what you

7    heard from the witnesses and the exhibits, the trial

8    transcript, thousands of pages of it, and it's your

9    recollection, what you recall that matters.  And it's been a

10   long trial so please remember during your deliberations you

11   can ask for the evidence, you can ask for the transcripts, you

12   can ask for the exhibits, you can ask for page numbers, you

13   can ask for testimony from a specific witness, you can ask for

14   a particular topic and you'll get it, the judge will give it

15   to you, and do that if you need to.

16           I'd like to take a few minutes to talk about the

17   witnesses.  In evaluating which witnesses to credit and not to

18   credit, the judge will give you some guidelines about witness

19   credibility and some of the questions you may want to ask

20   include does the witness seem honest, does the witness have

21   any particular reason not to tell the truth, was what the

22   witness said supported by other evidence?

23           And I would suggest to you in Mr. Agnifilo's closing

24   that he really didn't attack any witness except for Daniela,

25   okay, he attacked Daniela.  Why did he attack Daniela, because

REBUTTAL SUMMATIONS – MR. LESKO

1    he has to, because Daniela testified for five days in front of

2    you in excruciating detail laying it all out, the confusion

3    and the specifics.  It's your job to determine whether or not

4    Daniela was telling you the truth and no one is better

5    positioned than you, you sat, what, ten feet from her and saw

6    what happened.

7              When you evaluate the government's witnesses and I

8    would suggest to you when you evaluate Daniela's testimony,

9    you will conclude that it makes sense, that it's reliable and

10   that it is backed up or corroborated by other evidence, the

11   emails, the writings, the other testimony from other

12   witnesses.

13             You can't take Daniela's testimony in a vacuum.

14   Think of Lauren Salzman's testimony about Daniela, you put

15   those pieces of testimony together and they create the full

16   picture, the full tapestry of what happened in this case.  And

17   each witness had very specific information to share with you,

18   a specific perspective on the defendant's conduct and I submit

19   to you you know they were telling the truth for two reasons,

20   the testimony of each of those witnesses backs up the

21   testimony of the other witnesses, they fit, they don't fit

22   perfectly I would suggest to you and that makes sense, nobody

23   remembers everything the same way, but they fit.

24             The second reason you know they're telling the truth

25   is each witness gave you limited testimony.  They didn't

REBUTTAL SUMMATIONS – MR. LESKO

1    generalize or stretch.  They gave you specific information

2    about what happened to them, what they observed and those

3    specific pieces of information, again, fit together.

4           I'll give you an example, you heard from Nicole and

5    you heard from Sylvie and their experiences were very similar,

6    weren't they, but was there any indication that the two of

7    them interacted, that they colluded, that they even knew each

8    other, and think about what happened to them, very similar.

9           So, it's your job to figure out how these details

10   fit together and I would suggest to you when you do that, when

11   you do that work you'll realize that the details do fit

12   together and that the witnesses are telling the truth and when

13   you consider all of their testimony together, I submit to you

14   that the full picture of the defendant's criminal enterprise

15   comes into focus.  All right.

16          So, let's talk about Mr. Agnifilo's arguments.  He

17   started out by talking about the enterprise, remember that,

18   and asking if there was a common purpose, a common purpose.

19   It was interesting though because later he basically answered

20   that question, it was when he was talking about Lauren Salzman

21   and he said the defendant made her life possible, do you

22   remember that, and then he said something to the effect of he

23   made it possible for everyone.  That's important here.  He

24   made everything possible for this inner circle.

25          And what's also important is the enterprise here is

REBUTTAL SUMMATIONS - MR. LESKO

1    not NXIVM and it's not DOS.  The indictment alleges that the

2    purpose of the enterprise was to promote the defendant and to

3    recruit new members into DOS and into NXIVM.  The indictment

4    further alleges that by promoting the defendant, members of

5    the inner circle expected to receive financial opportunities

6    and personal benefits including increased power and status

7    within the enterprise.

8         We do not have to prove a common purpose between

9    NXIVM and DOS.  NXIVM is not the charged enterprise.  DOS is

10   not the charged enterprise.  The defendant and his inner

11   circle are the charged enterprise, a group associated in fact,

12   that's the charged enterprise.  So, Mr. Agnifilo just got it

13   wrong.

14        And you know and I don't -- I would suggest there's

15   no dispute about that, that the defendant was the leader, the

16   Vanguard, the grand master.  He controlled everything, every

17   decision, literally every single decision went through him.

18   You know that there was no doubt who was in charge.

19        So, let's talk a little bit about the racketeering

20   acts, okay, and I'll take them roughly in the order -- address

21   them in the order roughly that Mr. Agnifilo did with one

22   exception, I'll explain that when I get to it, but let's start

23   with Racketeering Act 1, that's the identity theft of Ashana

24   Chenoa.  So, basically Mr. Agnifilo argued that, if I recall

25   correctly, Daniela made the fake ID.  That was essentially the

REBUTTAL SUMMATIONS - MR. LESKO

1    argument.

2          What did the evidence show.  Well, the evidence

3    shows that Daniela told you that the defendant's plan was to

4    have her cross the border, the Canadian border into the U.S.

5    with a fake identification and Kathy Russell met her and took

6    her across the border and you know that Kathy Russell was in

7    upstate New York near the border, Mr. Agnifilo acknowledged

8    this, she bought gas at a gas station in I think it was

9    Clifton Falls which is sort of near Niagra falls or on the way

10   to Niagra falls.  And you know that Daniela was terrified

11   about the border crossing and you know that when they got to

12   the border crossing she told the Border Patrol -- asked about

13   the weather and adrenaline is pumping, heart is pumping and

14   they are allowed to cross the border and you know the records

15   show that Lisa Chenoa, that was Ashana Chenoa because it was

16   her birth date and her last name and that you also know that

17   Lisa Chenoa was on the records as crossing the Canadian border

18   on Christmas Eve, you remember that.  And you know that Ashana

19   Chenoa was a real person because you saw her death

20   certificate, you saw her driver's license and you know she

21   died in a car wreck.

22          It doesn't matter that the fake identification, the

23   sheriff's identification used the first name Lisa, the use of

24   the Chenoa last name and her date of birth is enough to

25   qualify as a means of identification.  And how do you know

REBUTTAL SUMMATIONS - MR. LESKO

1    that the defendant's plan involved the use of fake

2    identification of an actual person, how do you know that?

3    Well, I'm going to say something that sounds obvious, you know

4    it because Ashana Chenoa was a real person and her information

5    and her name, her date of birth was used on the identification

6    and the defendant led a plan that used that information in the

7    sheriff's identification so you can probably period, put --

8    stop there and that's been established but there's more.

9            You know that the identification was going to be

10   used at a border crossing where there was going to be sort of

11   a heightened level of scrutiny, I mean this wasn't like a

12   teenager buying beer at a 7-Eleven or something like that.

13   This was going to be a border crossing and that they would

14   use -- the defendant certainly, careful as he was, would use a

15   real person's identity to survive that level of scrutiny, the

16   possibility that the information provided would be run through

17   databases and so forth at the border and you know that the

18   defendant was the decision maker so it's safe to infer like

19   everything else that ultimately the decision to use the Chenoa

20   identity was ultimately his to make and he made it.

21           And you know that the defendant went to great

22   lengths to get Daniela across that border, he sent two of his

23   closest associates, Kristin Keeffe and Kathy Russell, sent

24   them, dispatched them, had them transport Daniela across the

25   border and that meant this was very important to him.  He

REBUTTAL SUMMATIONS - MR. LESKO

1    didn't want to risk failure, further allowing you to infer

2    that he knew that Chenoa was a real person, took risk out of

3    that equation.

4           You also know that Kathy Russell was the one who

5    took responsibility for this, for getting Daniela across the

6    border because she used that as leverage, do you remember

7    that, she used it as leverage to get Daniela to participate in

8    sex, in threesomes with the defendant, remember that.  And I

9    would also suggest to you that it's perfectly understandable

10   that after that blast of adrenaline at the border and getting

11   into the United States that Daniela's memory right after

12   faded.  Think about it in your own lives when you have that

13   sort of experience, that tense, stressful experience, right

14   after is sort of like a blur and I would suggest to you that's

15   what happened here.

16          Now, much was made, Mr. Agnifilo made a lot out of

17   the Kristin Keeffe theory, it's a theory, the theory is that

18   she's a free agent, she's acting on her own, maybe she's the

19   mastermind, maybe she's doing all this bad stuff, I don't

20   know, I couldn't quite make all of it out, but he definitely

21   points the finger at Kristin Keeffe.

22          (Continued on next page.)

23

24

25

Holly Driscoll, CSR,FCRR
Official Court Reporter

Case 1:18-cr-00204-NGG-VMS   Document 763   Filed 07/19/19   Page 40 of 237 PageID #: 7648

1          MR. LESKO:  (Continued.) And you know that's not

2     true.  You know that she wasn't a free agent.  You know that

3     the defendant, like many crime bosses, gave orders to his

4     associates to execute, to execute all those orders.

5          And Kristin Keeffe was, for a period of time, one of

6     his closest and most trusted associates and she executed many

7     of the defendant's orders.  And you know that Kristin Keeffe,

8     like, all the members of the Inner Circle didn't do anything

9     without running it by the defendant.  You know this

10    specifically about Kristin Keeffe because Daniela told you

11    that.  You remember the morning meetings?  In fact, what we'll

12    do is, let's go through and Alex is going to help me, I'm

13    going to go old school on this.  We're going to use the Elmo.

14         So I'm going to show you Daniela's testimony at

15    Page 2516 and let's start with Line 13.  Actually, start with

16    Line 11.

17         "QUESTION:  Can you explain a little bit about that

18    back and forth how that back and forth would work?"

19         "ANSWER:  Yes.  So the interactions were obviously

20    Kristin, like, was actually out in the field, like, doing the

21    work.  Like she was -- is the one actually doing things.  But

22    she would also, she would always be there going back to Keith

23    reporting on what was happening.  So he was fully aware of

24    everything that was happening and would be the one thinking

25    about the things.  And when they interacted, clearly, she

REBUTTAL SUMMATIONS - MR. LESKO

1    presented certain options and this was going on, this is going

2    on with so and so.  So it would be all of the specifics and

3    Keith would be the one to decide so he would have a last say.

4    He would say, okay, I think you're right, I think you should

5    do this, or he would come up to the idea or he would," next

6    page, "tell her you should try to do this or you should try to

7    get that.  But it was very clear to me that it was Keith that

8    was making all of the decisions."

9            That was 2516.

10           Do we have 2507?  If you go to 2507, just a couple

11   pages before that, Daniela is talking about sort of the

12   process of the morning at Flintlock and how Kristin Keeffe

13   would come downstairs, start of the day, remember that, with

14   the hair in the rollers and discuss legal matters with the

15   defendant.  Literally, like, the first conversation of the day

16   was with Kristin Keeffe on a very regular basis.  And she's

17   reporting to him, asking him for permission, similar to the

18   transcript we just read.  She didn't do a thing without

19   getting direction from the defendant.  She reported everything

20   to the defendant.  She was one of the executors in the

21   enterprise.

22           I should also point out here that Racketeering

23   Act 1, like some of the racketeering acts have, like, parts A

24   and B and parts A, B, and C.  These are called subpredicates.

25   And what they mean you find any one of them is committed, and

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

REBUTTAL SUMMATIONS - MR. LESKO

1    not that all of them have been committed but any one within a

2    racketeering act you must find the defendant guilty of that

3    racketeering act.  They're called subpredicates.

4              Let's talk a little bit about racketeering act --

5    and I'm going to group 5 and 7 together because they're sort

6    of go together and those are the key logging racketeering

7    acts.

8              And Mr. Agnifilo spent quite a bit of time talking

9    about key logging.  This is the conspiracy to key log and the

10   key logging of James Loperfido, Edgar Bronfman, and Marianna.

11   And, again, essentially, Mr. Agnifilo's argument is pretty

12   straightforward in it that Kristin Keeffe did it.  That this

13   was a Kristin Keeffe operation.  And we've talked about

14   Ms. Keeffe.

15             Let's talk about James Loperfido.  Nice guy

16   according to Mr. Agnifilo.  That's for you to decide.  But you

17   know why his e-mails were monitored.  It was about Mr. O'Hara,

18   Joseph O'Hara, an arch enemy who allegedly did not pay back

19   the $2 million loan I think it was partly for a vineyard up in

20   New York.  And why was this so important, and why this

21   scorched earth around Mr. O'Hara that involved key logging

22   Mr. Loperfido, his business associate?  Because Clare Bronfman

23   was involved.  The defendant's piggybank who provided him

24   millions and millions and millions of dollars.  Tens of

25   millions of dollars throughout the life of this enterprise.

5534

REBUTTAL SUMMATIONS – MR. LESKO

1  She was the money, she was funneling the money, so this struck

2  close to home.

3       And you know that several of the intercepts of

4  Mr. Loperfido's e-mails actually did involve Mr. O'Hara.  We

5  saw the exhibit with the name of Mr. O'Hara's company and I

6  think his son's name, if you recall correctly.

7       You also know, and I'm not going to spend too much

8  time on this, that Edgar Bronfman was an enemy, and an arch

9  enemy.  And there are lots of reasons for that we may talk

10  about an e-mail in a bit.  The reasons for that are pretty

11  simple and they go back, I think the Forbes article is sitting

12  there somewhere, called NXIVM a cult.  Could we have that in

13  the Forbes article.  It's not important, you saw it.

14       And you know that the defendant was directly

15  involved, intimately involved, intimately aware of the key

16  logging.  Mr. Agnifilo made much of this thumb drive,

17  sometimes the data was on a thumb drive, sometimes it was sent

18  by e-mail.  That doesn't matter.  I mean Daniela could have

19  taken the data and slipped it under his door for all it's

20  worth, it doesn't matter.  What matters is that he was

21  receiving the data, receiving the e-mails on a regular basis

22  that Daniela was mining using the key logging.

23       And you even know from the outset that Daniela was

24  reporting to the defendant when she learned how to key log.

25       Let's pull up Government's 1518.

REBUTTAL SUMMATIONS - MR. LESKO

1          You remember this exhibit this was sent to the

2     defendant November 6, 2005, and Daniela is doing Internet

3     research trying to figure out how to get passwords user names

4     so they can access the e-mails.  And she finds this Magic

5     Lantern program and teaching herself how to use that.  So

6     right from the start this is a defendant operation.  Right

7     from the start.

8          Mr. Agnifilo also discussed Racketeering Act 7,

9     that's the key logging of Marianna.  And that argument I

10    didn't understand quite as easily.  I think it was something

11    to the effect, oh, they were living together and he was doing

12    it and she was doing it and they were all doing it and I think

13    it was some sort of he had quasi-permission to access

14    Marianna's Facebook account.  Does that make any sense to you?

15    Permission to hack her Facebook account?  So I'm going to give

16    you permission to have my sister hack through key logging my

17    Facebook account so you can see my communications on Facebook.

18    If she was going to give permission and she's, you know,

19    according to Mr. Agnifilo, living with the defendant, why

20    didn't she just give him her password.  Go look at my Facebook

21    account.  Not go have my sister hack into it.  Why would you

22    ever do that?  And, more importantly, perhaps there's

23    absolutely no evidence that Marianna gave the defendant

24    authority to access her Facebook account.

25          And, just briefly, let's look at some of the e-mails

REBUTTAL SUMMATIONS - MR. LESKO

1    where the defendant discussed the key logging of Marianna's

2    Facebook account.  Government's 1591.  And I'll just go

3    through this briefly.  You've seen a bunch of these e-mails.

4    Right at the bottom there, it's on the third page.  Zoom in.

5            So this is from the defendant on November 5, 2008.

6    "Where are you?  Did you get any KYLG stuff?"  Key log stuff.

7    The defendant's own words.

8            Next page, right at the bottom.  This is just a

9    sampling, I'm not going to go over it all.  Right at the

10   bottom.  Daniela, to the defendant:  "Did you get the Facebook

11   info?"  "Yes."  Defendant right above responds, "Yes, give me

12   an overview of what these things are."

13           There's no doubt whatsoever the defendant directed

14   Daniela to do the key logging.  Received the e-mails that she

15   mined from the key logging.  Reviewed them.  This was a

16   defendant operation.  And if you want to take a look at some

17   e-mails regarding, that relate to Edgar Bronfman, turn your

18   attention to Government's 1543.  Those relate, actually, let's

19   take a look at 1543, actually.  So 1543, it's a whole

20   collection of e-mails.  These all relate to the Edgar Bronfman

21   key logging.  And then 1541 is an e-mail from Clare Bronfman

22   to the defendant again discussing her father.

23           And so, you know what the motivation was in terms of

24   key logging Edgar Bronfman's as e-mails.  And you know there's

25   multiple communications regarding those.

REBUTTAL SUMMATIONS - MR. LESKO

1        Remember there was the near friend and the far away

2  friend in some discussion in some of the e-mails.  And I turn

3  your attention review government's 1543 and 1419.

4        All right.  Let's turn to Racketeering Act 6.

5  That's the videotape racketeering act.  You heard a lot about

6  the videotapes, a lot, and I'll try to brief.  But you know

7  from the outset Mr. Agnifilo characterizes as a crime on the

8  court, remember that, and he's right.

9        By providing altered videotapes in discovery in a

10  federal case to the federal courtroom like the courtroom we're

11  in here this morning, and having his attorney lie to a federal

12  magistrate judge about it that was indeed a crime on the court

13  and he altered videotapes.  Here, Mr. Agnifilo's argument is

14  pretty straightforward.  I think it's that Mr. Vicente did not

15  know that the tapes were going to be produced in a specific

16  lawsuit, and that he got the project, the alteration project,

17  mixed up with some other project relating to videotapes.  And

18  he's right.  He predicted this was a conspiracy account so

19  that specific knowledge about the specific case is not

20  required.  All that's required is the agreement to actually

21  alter the videotapes and you know that that happened and we'll

22  talk about that in a moment.

23        And I would suggest to you that the arguments about

24  Mr. Vicente grossly mischaracterize his testimony.

25  Mr. Vicente was very clear at the outset to alter videotapes

REBUTTAL SUMMATIONS – MR. LESKO

1    and he knew they would be handed over in a case, let's take a

2    look at transcript Page 653.

3            And this is Mr. Vicente recounting his conversation

4    with the defendant.  And when he tells the defendant he knows

5    how to put the glitches in the tapes, Line 17, the defendant

6    says, "Oh, that's good.  There's some things we need removed

7    the legal department has some things that need to be removed

8    from the tapes and it has to do with a case where our

9    methodology is being evaluated and our patent is being looked

10   at."  And right then, Mr. Vicente agreed to the conspiracy.

11   Done, completed right there.  But you know it went further.

12           Look at Government's 1397R.  You know that

13   Mr. Vicente worked on the project, wrote memos about the

14   project.  He told you ultimately that the project was

15   completed and 1397 tells you around the end of June.  By the

16   way, you may recall that the tapes were produced July 1, 2008,

17   a couple days before, look at the Monday or Tuesday heading,

18   first and second bullets.  Ms. Penza talked about this in her

19   closing.  "Duplication of tapes Keith has asked me for.  Aging

20   and weathering of the masters."  Right there in the memo.

21           So let's talk about Mr. Vicente's understanding of

22   the case and this is maybe where the confusion occurred.

23           Mr. Vicente explained that at the time he thought

24   the lawsuit was a case involving a patent.  He later finds out

25   that the lawsuit was specifically the Franco lawsuit.  It was

REBUTTAL SUMMATIONS - MR. LESKO

1    a lawsuit no matter what, but he had specific knowledge of

2    what the lawsuit was later in time.

3            Let's take a look at transcript of Mr. Vicente's

4    testimony are Page 1299 he explains this here and

5    Mr. Agnifilo, in his cross-examination, pulled out a selected

6    question where Mr. Vicente is explaining, "At the time, I

7    didn't know it was the Franco lawsuit.  I learned that after

8    the fact, but I knew it was a lawsuit."

9            Okay so, let's take a look at what Mr. Vicente said.

10   1299 and let's start at Line 11.

11           "QUESTION:  What videotape alteration project was

12   the bullet referring to?"

13           And we're talking about the memo we just discussed.

14           He says:

15           "ANSWER:  "No."

16           What is that referring to?  It refers to the

17   extraction of certain things from the Intensive tapes to be

18   handed over and what I thought, you know, was a protected

19   patent-type case to later being told it was part of discovery

20   for an actual case."

21           "QUESTION:  So it involved a case?"

22           "ANSWER:  Yes."

23           "QUESTION:  What is your interpretation of the

24   case?"

25           "ANSWER:  Well, what I find interesting was

REBUTTAL SUMMATIONS - MR. LESKO

1   basically that's the -- there was a legal wrangling going on

2   between NXIVM and I think it is Rick Ross/Stephanie Franco.

3   My understanding was than they had asked to see NXIVM's

4   materials," he next page, "from a particular year."

5         "QUESTION:   Let me stop you.   That was your

6   understanding of what the actual case but you said a patent

7   case."

8         "ANSWER:  Oh, it was more, no.  To be precise, what

9   I understood at that point is that there was a case going on

10  and that the patent, I was told the patent was at risk because

11  of this case.  That's what I understood."

12        "QUESTION:  So you knew there was litigation

13  involved?"

14        "ANSWER:  Yes."

15        Mr. Agnifilo also tried to argue that Mr. Vicente

16  confused this project with other projects, you remember That.

17  He's simply wrong and Mr. Vicente explained that.

18        He explained that the digital project, I think it

19  was digitizing some historical tapes that the defendant had

20  made, videotapes were of everything, happened in 2014 when

21  Clare Bronfman brought this expensive machine, I think it was

22  called a Raid machine.  You remember that he explained there

23  was a Mexico film project going on.  And he said at that time

24  in 2008 that was happening in Mexico, that hasn't happening in

25  Clifton Park.  And he was crystal clear that the legal

REBUTTAL SUMMATIONS - MR. LESKO

1    department videotape project in 2008 was the altering of the

2    videotapes in that case.  Crystal clear.

3           Let's turn next to Racketeering Act No. 11.  This is

4    the use of the Pam Cafritz American Express card.  And

5    Mr. Agnifilo said something interesting.  He said that the

6    defendant was doing what he had always done.  And you know

7    what, that's true.  He always used other people's money.  He

8    never used his own money, although it all was his money.  He

9    did that to pretend was a renunciate because he didn't want to

10   pay taxes.

11          But this was a little different, right?  And why was

12   it different?  This time he used a dead person's money.

13          Let's keep this one real simple, folks.  Pam Cafritz

14   died.  She couldn't give authorization to use her credit card.

15   Dead people can't give authorization to use their credit cards

16   from their graves.  Mr. Agnifilo mentioned something about the

17   defendant being entitled to the trust or the estate, but why

18   hadn't he received the estate.  Why was he continuing to use

19   this credit card time and time again for years and pay for the

20   balance out of the Key Bank account because he didn't want to

21   pay taxes.

22          I would note also there is nowhere in the indictment

23   where it says, "income tax."  It says, "federal tax," and you

24   know the defendant was obsessed with not paying taxes.  You

25   know that because you saw the declaration, I think, it's

REBUTTAL SUMMATIONS – MR. LESKO

1   Government's 762 in that federal Texas case where he said he

2   didn't have money to pay the $400,000 fee that was imposed on

3   him.  That was a bald faced lie.

4          How do you know that?  He could have paid it on the

5   credit card.  He could have paid it out of the Key Bank

6   account.  He had access to hundreds of thousands of dollars

7   just there.  And you saw all the charges during that time

8   period, so you know he had access to this credit card.  Yet,

9   he told the federal court that he had no assets when he had

10  half a million dollars in cash hidden in Nancy Salzman's

11  house.  Come on.

12         And you know he was obsessed with taxes.  You know

13  that he spoke about it at the Intensive that Stephanie Franco

14  attended because she was startled by what he was saying about

15  not having to pay taxes.  James Loperfido told you that pretty

16  much his entire job was to figure out a way for NXIVM not pay

17  to taxes.  The ultimate goal was zero taxes.  Mr. Loperfido

18  told you the defendant controlled all the companies,

19  controlled everything.  Yet, Cathy Russell told Mr. Loperfido

20  that the defendant didn't make any income.  Did that make any

21  sense?

22         And, of course, Mr. Loperfido told you about that

23  movie at V Week, remember that?  Not paying taxes, some sort

24  of tax protest money movie.  And he was concerned about that,

25  wanted to talk to the group and they wouldn't let him.

REBUTTAL SUMMATIONS – MR. LESKO

1          So we know that the defendant's scheme to maintain

2     the appearance of having no income and no assets while living

3     an expensive lifestyle:  Hot tubs, saunas, trips to Mexico,

4     was all done not to pay taxes.  And that's why you know the

5     conspiracy to use Ms. Cafritz's credit card was done in

6     connection with the crime of tax evasion.

7          Let's move on.

8          Racketeering Act 8.  This is another racketeering

9     act with subpredicates that involve the trafficking of Daniela

10    for labor and services as well as document servitude.  Just

11    need one of the subpredicates.

12         I would suggest to you that when it came to Daniela,

13    it was always about work.  Yeah, they had a sexual

14    relationship for, I think, it was a couple of years but the

15    constant was work.  Before she went in the bedroom, she was

16    cleaning people's houses; she was doing book reports.  You

17    remember that?  Extensive book reports.  She explained that to

18    you in detail.  She was doing the key logging.  She was

19    following, I guess, following the defendant around documenting

20    his every move.  Organizing the library which appeared to be

21    no easy task.  Work, work, work, work.  That's what it was all

22    about with Daniela.

23         And then when she gets put in the bedroom, it's

24    still about work.  But this time she's put to work to fix her

25    issue.  She has to figure out and she's given tools to do this

REBUTTAL SUMMATIONS - MR. LESKO

1    work what are the tools a notepad and something to write with.

2    And what does she do?  She works.  She writes plans.  She

3    writes letters.  She writes and writes and writes and writes

4    and you know what's proof of that?  Government's 907.  Take a

5    look at them.  Here's all her letters.  Here's all her work.

6    Her work product from that two years in the bedroom.

7             Daniela was also in fear, fear of having to go back

8    to Mexico.  Fear of encountering law enforcement, getting

9    deported.  Fear that she didn't have her papers.  She didn't

10   have her birth certificate and fear that she would lose

11   communication, lose contact with her family.  It was a climate

12   of fear that surrounded her when she was in the bedroom.

13            And when she finally left, it's taken to the border

14   and she went back to Mexico, it was back to work.  Work.  So

15   how is she going to get her papers, do you remember how that

16   was going to happen?  She had to do book reports again.  These

17   damn book reports.  And it was so extensive, the volume was so

18   high, she couldn't keep up with it.  And then she was back in

19   the cycle -- more work, more work.  So it was always about

20   labor when it came to Daniela.

21            I want to point out something else.  Do you remember

22   when Mr. Agnifilo said that Daniela was, "Playing games."

23   Remember when he said that?  Was that eerily reminiscent of

24   something?  Reminiscent of communications between Kristin

25   Keeffe and the defendant when Kristin Keeffe was taking the

REBUTTAL SUMMATIONS - MR. LESKO

1   defendant to the Mexican border.  Your recollection controls,

2   not mine, but if my recollection is right, didn't he, the

3   defendant, say the exact same thing that she's playing games.

4   Maybe he said that when she was in Mexico, but it was after

5   she left the bedroom.

6          And what was Mr. Agnifilo doing by using that

7   terminology by saying that Daniela was playing games?  He's

8   blaming the victim.  That's what he's doing.  It was Daniela's

9   has fault.  It's the same blame that the defendant placed on

10  her to convince everybody that what he was doing to her was

11  right.  It was Daniela's fault, she deserved to spend the 700

12  days in the bedroom.  That's what that argument was about.

13         And didn't Mr. Agnifilo accuse her of stealing from

14  those stores that were listed in that list?  Wasn't that

15  eerily reminiscent of something?  Didn't the defendant accuse

16  her of stealing?  Wasn't that the whole sort of basis for the

17  treatment of Daniela?  There's echos in the argument that you

18  heard here today from Mr. Agnifilo from the abuse of Daniela

19  by the defendant even here just yesterday.

20         And incidentally, with regard to stealing from the

21  stores, why would she lie about that?  She admitted to

22  stealing money, she admitted to key logging, she did that all

23  under oath in federal court.  Why would she make up the story

24  about not remembering?  Is she not remembering stealing from

25  the stores?

REBUTTAL SUMMATIONS - MR. LESKO

1          Mr. Agnifilo also seemed to argue that this was just

2     a family matter.  Remember that?  That her father was

3     involved.  That Daniela was put in the room for 700 days

4     because her father was frustrated.  Is there any doubt the

5     defendant had total control over this family?

6          Remember the audiotape with Adriana, Daniela's

7     mother, where the defendant is manipulating her:  You kill the

8     child would you go party or something like that.  I mean, all

9     this manipulation of the mother to get her on board with this

10    plan to put her daughter in the room.  Is there any doubt he's

11    in control?

12         And the father, the father.  This is the father that

13    sent his young children to Albany.  I guess, ultimately, in

14    the care of the defendant without sending any adult with them.

15    This is the father whose three daughters had sexual

16    relationships with the defendant.  Abortions.  This is the

17    father whose youngest, Camilla, was having a sexual

18    relationship with the defendant when she was 15.  Is that a

19    father in control?  Was this just a routine grounding?  I

20    don't know about you, but when I was grounded it is like I

21    couldn't go out Saturday night, right?  I've never heard of

22    grounding where someone's put in a bedroom for 705 days.  I

23    don't know about you.  Family matter.

24         How do you know that the defendant and not the

25    father was in control?  Well, Lauren Salzman told you that.

REBUTTAL SUMMATIONS - MR. LESKO

1          Lauren Salzman, let's talk about her for a second.

2     Lauren Salzman, who pled guilty to two racketeering offenses.

3     Lauren Salzman who pled guilty pursuant to this cooperation

4     agreement, Government's 3500-LS-6.  Read every single page of

5     this cooperation agreement.  And you'll know that Lauren

6     Salzman is facing 20 years in prison.  And you know that

7     Lauren Salzman was Daniela's keeper in the bedroom.  This was

8     a project that was assigned to her by the defendant, that she

9     was going to be the keeper in the bedroom.  And you know how

10    she feels about that.  You saw her reaction.  In fact, I would

11    suggest that if anything that Lauren Salzman did, I would

12    suggest she feels worse about this, keeping Daniela in that

13    bedroom for two years.

14          So let's look at what Lauren Salzman says about

15    Daniela's father.  Transcript 2125.  Right at the bottom.

16    Line 25.  "Hector, the father, in my experience is an

17    incredibly," we'll go to the next page, "Weak personality and

18    could have been enrolled to be on board if Marianna was on

19    board, or Cami was on board.  Like, if the whole family said

20    we're not on board, then I think Hector would not have been on

21    board."  End of the question.  At Line 7, "He supported her

22    staying in the room; correct?  Lauren Salzman's answer, "It's

23    true and he withheld her documents in the end as well."

24          This wasn't led by her father.  This was led by the

25    defendant.  And how do you know that?  We're going to take a

5548

REBUTTAL SUMMATIONS – MR. LESKO

1   look at some brief he can certainties of Lauren Salzman's

2   testimony where she explains that she reported back to the

3   defendant when she interacted with Daniela in the bedroom and

4   that he was in total control and we'll go through this very

5   quickly.

6           Page 1927 of the transcript, Line 6.

7           "QUESTION:  Did the defendant appear confident and

8   secure in that choice?"

9           This is the choice to put her in the bedroom.

10          "ANSWER:  Yes."

11          "QUESTION:  Did the defendant ask you to keep this

12  project a secret?"

13          "ANSWER:  Yes.  He told me to the know anyone about

14  it not to discuss it with anyone."

15          Going to Page 1934, Line 4.

16          "QUESTION:  And during this period of time, did you

17  report to the defendant?"

18          "ANSWER:  Yes.  Every time I interacted with her I

19  did report to him."

20          "QUESTION:  And what did he tell you in these

21  reports?"

22          "ANSWER:   Similar to what I said before.  I mean,

23  that, you know, sometimes he would be thinking about what,

24  what should be done and sometimes I would ask him for

25  direction."

REBUTTAL SUMMATIONS – MR. LESKO

1        Next page is 1937.  Right at the top.

2        "QUESTION:  Did the defendant give you instruction

3   about what you were permitted to tell Daniela?"

4        "ANSWER:  I wasn't permitted to tell her anything.

5   He told me not to tell her.  I couldn't tell her what to do."

6        Let's go to the next question on Line 8.

7        "QUESTION:  Did the defendant ever tell you that

8   Daniela should remain in the room for longer?"

9        "ANSWER:  Yes."

10       Then go down to the last then go down to the last

11  line.

12       "ANSWER:  And he told me to come up with a way to

13  fix that.  And that a way to fix was staying in the room until

14  the hair grew back."

15       Again, work, fixing the issue.

16       1940, Line 15.

17       "QUESTION:  How often did you check in with the

18  defendant about Daniela?"

19       "ANSWER:  Whenever I went to see her, but there were

20  times when I wasn't seeing her a lot."

21       Next Page.  1941, Line 3.

22       "QUESTION:  Did the defendant express concern about

23  the family interfering with the project at any point?"

24       "ANSWER:  Yes.  He thought they were interfering

25  with the project."

REBUTTAL SUMMATIONS – MR. LESKO

1      Let's move on to Page 1966, Line 15.

2      "QUESTION:  Did you believe you had authority to

3  determine when and if Daniela would be sent to Mexico?"

4      "ANSWER:  No, absolutely not."

5      "QUESTION:  Who had that authority?"

6      "ANSWER:  Keith.  And I don't believe Daniela

7  believed that I had the authority."

8      Page 1985.

9      "QUESTION:  Who told you her behavior was

10  manipulative and game playing?"

11      "ANSWER:  Keith consistently told me that until we

12  all started to see it that way."

13      Game playing.  We talked about that.  Lauren also

14  explained that the defendant had to get permission for Daniela

15  to visit the dentist.  Do you remember?

16      Let's look at Lauren Salzman's testimony on that

17  point, Page 1958.  Right at the bottom there.

18      This is her answer:

19      "ANSWER:  I went to Keith to ask if I could take

20  her, or if she could go to the dentist and he said he would

21  think about it.  And it took six weeks for him to decide that

22  she could go," next page, "and, I mean, part of her tooth

23  broke off before it was okay to take her."

24      "QUESTION:  During those six weeks, did Daniela tell

25  you that she was in pain?"

REBUTTAL SUMMATIONS - MR. LESKO

1    "ANSWER:  Yes, she was telling me that she needed to

2    go to the dentist."

3    "QUESTION:  Why did you wait six weeks before she

4    went?"

5    "ANSWER:  Because I wouldn't take her unless Keith

6    said that it was okay for her to go."

7    Lauren also explained that she and the defendant

8    exchanged e-mails while Daniela was in the bedroom.  And you

9    saw some those e-mails, I'm just going to go quickly through

10   them.  Just show them to you, really.

11   Let's start with Government's 1238.  And right at

12   the bottom there, after Doom, I think, it says tomorrow is

13   Goldie's birthday and Hector is asking if the family can write

14   her letters.  This is Government's 1238.

15   Go to the next page, Government's 1241.  First line,

16   this is a 3:46 a.m. e-mail to the defendant from Lauren

17   Salzman, first line.  "I'm going to sleep but apparently Bobo

18   wrote a letter that said, "Let me out, I'm coming undone."

19   And Government's 1242 at the top, it is an e-mail

20   from the defendant.  This is on November 9, 2010, and just

21   right in the middle there second line.  It starts, "Might try

22   asking her the difference between being in the room for a

23   day... or as long as she has."

24   These e-mails are damaging, ladies and gentlemen.

25   Extremely damaging.  It indicates the defendant knew she was

REBUTTAL SUMMATIONS – MR. LESKO

1    in the room at his direction and for a significant period of

2    time that Daniela is coming undone in the bedroom.  And to

3    address Mr. Agnifilo's argument, specifically, the first

4    e-mail reflects that the father, the father who is allegedly

5    responsible for this, is asking if he can rite write letters

6    to his daughter.  Is he in control?  Of course he's not in

7    control.  The defendant was in control, complete control like

8    always.

9          Another minor point, but I think it's one that

10   illustrates how Mr. Agnifilo played fast and loose with the

11   facts before you.  Remember he mentioned the e-mails forwarded

12   that involved an immigration lawyer that were forwarded to

13   Daniela.  I guess the argument is something to the effect that

14   she had the opportunity to consult with this lawyer and didn't

15   avail herself of that opportunity.

16         Let's take a look at it.  And I ask you to take a

17   look at it, it's Government's 1554.

18         So if you look, look sort of midway down maybe we

19   can magnify this.  Look at that last paragraph that says,

20   Because."  Adrian and Camila.  It's throughout, I won't bore

21   you with this.  All throughout, this e-mail is about Adrian

22   and Camila and their visa issues.  It has nothing whatsoever

23   to do with Daniela.  So that's a false impression.

24         There was another misleading argument, and I think,

25   you know, common sense would prevail here and you knew what

5553

REBUTTAL SUMMATIONS - MR. LESKO

1   was going on.

2            Mr. Agnifilo called Daniela slick, and as an example

3   of that, he pointed to the abortion clinic records where she

4   said she was in the country as an, I think, a student or

5   something like that, wanted to go to college here, that it was

6   misleading.  She's there with Pam Cafritz, and you know who

7   Pam Cafritz is, right at the top.  Right at the top of the

8   Inner Circle.  Pam Cafritz was the fixer.  She minded the

9   women and she was there to make sure that nothing bad happened

10   at that clinic and that Daniela had gotten her abortion.

11            Daniela lied at Pam's direction and at the

12   defendant's direction.  She didn't want to raise any red flags

13   and they didn't want to raise red flags and they're illegally

14   harboring her.  She became impregnated pregnant while they

15   harbored her.  Wouldn't that have raised a couple red flags at

16   the clinic?  Because they wanted her to have an abortion and

17   you know it was an abortion she had endured alone.  And it

18   happened.

19            All right.  So let's talk about DOS.  Mr. Agnifilo

20   spent quite a bit of time on DOS.

21            Let's start with the arguments you heard today and

22   we'll get back into what was said yesterday a little

23   backwards, but I think we heard some arguments so let's sort

24   of deal with that.

25            First, Mr. Agnifilo claimed that Jay, that the labor

REBUTTAL SUMMATIONS - MR. LESKO

1    performed by Jay, was all sort of under the delegates program

2    and you know that's not true.  I'm not going to spend too much

3    on that.  There was some work at delegates.  I think Jay

4    indicated she got paid a pittance, if anything, for that work.

5    And then there was an another other set of work as part of

6    DOS.  Acts of care, assignments, and specifically you may

7    recall the transcript writing assignment involving Pam

8    Cafritz's memorial and the hours that Jay spent on that and

9    got no pay whatsoever.  So this was about labor.

10          I think you also heard that Nicole had the same

11   experience with the transcripts and the Pam Cafritz memorial.

12   She was required to write those transcripts, I think she said,

13   she stayed up like 23 hours or something like that to get them

14   done.  Never paid for any of it.

15          Mr. Agnifilo said that the sex in DOS was a small

16   amount.  How do you know that?  How do you know what the

17   ratios were?  I mean, you know there were a lot of

18   photographs, right?  But how do you know how much sex there

19   was.  And if you want to look at sort of, like, let's do a --

20   the defendant likes mathematical formulas so let's do one.

21          You know there was a high involve of sex because

22   Daniela told you about her sexual relationship with the

23   defendant that almost exclusively involved at all times of the

24   day having to have him drop his pants and having to give him

25   oral sex, right?  Two to three times a day I think she

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

REBUTTAL SUMMATIONS - MR. LESKO

1    quantified it.  So I'm not really good at math, that's why I'm

2    a lawyer, so if it's two years and you have 365 days a year,

3    what is that, that's -- oh, my gosh -- 730 days.  And if she's

4    having oral sex with the defendant, let's be fair, twice a

5    day, that's 1,400-plus incidents of oral sex with the

6    defendant with Daniela.  So don't come in here and say that

7    there's a small amount of sex going on in this case.

8            Mr. Agnifilo made an argument about this one.  I

9    don't understand, but this was all about attraction and a

10   person and some star and gravity, and gravity is pulling

11   people together.  I mean, last I looked this is what happened

12   with gravity, all right.  It's one way, down.

13           These women were not attracted to the defendant,

14   they told you that.  Sylvie told you she had found him creepy.

15   Nicole said she wasn't attracted to him.  Jay said she wasn't

16   attracted to him.  This isn't about attraction, that's a

17   smokescreen, that's a red herring.

18           And what about the vagina shots was meant to be

19   attractive?  How did they help in this

20   star-magnetism-attraction dynamic.  The open-leg photographs.

21   How did the dungeon help with that?  That tail thing, was that

22   about attraction?  Attraction went one way, the defendant's

23   attraction.  That's what mattered.

24           Mr. Agnifilo talked about shifting perceptions.

25   Your recollection controls, not mine.  But I would suggest to

REBUTTAL SUMMATIONS – MR. LESKO

1    you that when it came to the three victims in this case and

2    even Lauren Salzman there was not a change in perception.

3    There was a change in perceived control.  There was a change

4    in a coercive dynamic.  There was a change in extortion.

5    There was a change in dynamic there.  But in terms of

6    perception, I think the record reflects that Sylvie, that

7    Nicole when they were having sex with the defendant knew that

8    was wrong.

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REBUTTAL SUMMATIONS – MR. LESKO

1          MR. LESKO:  (Continued.) And knew that was bad.  And

2     that Jay, when she was ordered to have sex with the

3     defendant -- you know this for a fact -- she knew that was

4     wrong, she decided to head for the hills.  And even Lauren

5     Salzman when she finds out about the sex, she knew that was

6     wrong.  Remember the testimony about going to Mexico and

7     having the group orgy.  And remember how she was testified

8     about that.  She didn't want to do that, she knew that was

9     wrong.  She was going to see if it was actually going to

10    happen, that's why she went to Mexico.

11         Mr. Agnifilio talked about what happened in the

12    aftermath of all of this.  This fellow, Franco Parlato, and

13    all that stuff.  I want to be clear here, the sex trafficking

14    happened when it happened.  The aftermath is of no moment.

15         The collateralized sex as a result of extortion and

16    the threat of the release of the collateral and based on the

17    lies that were presented to the victims, DOS, no explanation

18    of the requirements of DOS, no explaining of the assignment of

19    additional collateral or Andy, all those lies when they led to

20    the victims having sex that's the completed crime.

21         So what happens after communications between victims

22    and the defendant, Mark Vicente, Franco Parlato, it's of no

23    moment.

24         Mr. Agnifilio argued that DOS was all about trust.

25    Do you remember that?  Trust.  It wasn't about trust.  If it

REBUTTAL SUMMATIONS - MR. LESKO

1    was about trust, why do you have to collateralize the slaves?

2    Why do you have to have blackmail material if you trust them

3    so much, if this is a community of trust?  Why take naked

4    photos and sex tapes and letters lying about their parents and

5    themselves and secrets and property?  Why do you need all of

6    that stuff if it's so trusting.  You know that's not true.

7         Mr. Agnifilio went on to tell you the story about

8    the father who makes the son study hard.  And the son becomes

9    a lawyer, the angel comes down -- it gets a little crazy.  The

10   gist of the story, as I understand it, is that the study, the

11   requirement to study, takes on a different flavor when the

12   angel says the father hates son.

13        Study is not illegal.  You can interpret why you

14   were made to study, that's not illegal.  What if the father

15   asked the son to perform oral sex on him?  Does that

16   perception change?  At the time or after?  What if the angel

17   said, your father he hated you when he made you have oral sex.

18   It's still illegal.  It was illegal then, it is illegal later.

19   It doesn't matter.

20        Mr. Agnifilio talked a lot about the communications

21   between some of the victims and the defendant after they had

22   sex with him as a result of the assignment.  I think he also

23   maybe read some of the communications involving Daniela.  You

24   know that this, from a psychological perspective, is a very

25   confusing experience for these women.  Dr. Hughes told you

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

REBUTTAL SUMMATIONS – MR. LESKO

1  about that.  And that the process of sort of exiting these

2  sort of relationships, it doesn't happen overnight.  It takes

3  time.  And it's very confusing to the witnesses.  And

4  Dr. Hughes told you that, but the witnesses told you that.

5  And they fully acknowledged that, that was a very confusing

6  process.

7        For Nicole it was particularly confusing, she was

8  still collateralized.  Daniela, confusing because for a period

9  of time they still had her birth certificate.  And think about

10  that relationship going back to which she was not even 18

11  years old.  Very confusing, and that's understandable.

12        So let's talk a little about what Mr. Agnifilio said

13  yesterday about DOS.  He started out by saying that the SOP

14  tape was the best evidence of why DOS was formed.  Again, a

15  distraction.  Was the SOP tape in 2012 about the men's group,

16  like the collateral, you recall this.  Collateral was like

17  related to recruitment of new numbers.  You had to put a

18  thousand bucks down and if you only recruited three you lost

19  your thousand; if you recruited more than that –– I'm probably

20  getting it partially wrong, but that's the gist of it.  I'll

21  bring five people in; if not, I lose my thousand.

22        That was fundamentally different than the collateral

23  in DOS.

24        And best evidence of DOS?  Better evidence than the

25  Cami chat?  Let's look at Government's Exhibit 1779, page 285.

REBUTTAL SUMMATIONS - MR. LESKO

1  Let's look at it again.  This is showing this is the raw

2  format, which you can go through.  But if you look --

3  Ms. Penza went over this and I'm going to go over it again --

4  October 1st, 2015, 9:19 p.m. the defendant chats to Cami, I

5  think it would be good for you to own a fuck toy slave for me

6  that you could groom and use as a tool to pleasure me, dot,

7  dot, dot.

8         So this SOP tape is better evidence than that?

9  Better evidence than all the other texts with Camila about the

10  DOS concept at around the time it was formed?  Better evidence

11  than the recordings you heard about the defendant talking

12  specifically about DOS and the branding and making the women

13  position them as if they are being sacrificed.  And make them

14  ask to be branded so it appears that they are not coerced;

15  because why, because they are being coerced.  And it's coming

16  out of his mouth, you heard on audio tape.

17         Better evidence than the DOS policies that you saw?

18  The formulas regarding collateral, what weighed what.

19  Ms. Penza went over this in detail, I'm not going to go over

20  all of this stuff.

21         The DOS book, you saw the DOS book.  What is better

22  evidence about DOS than the DOS book.

23         Better evidence than, let's look at Lauren Salzman's

24  testimony.  How is the SOP tape from 2012 better evidence than

25  what is reflected on page 1794 of Lauren Salzman's testimony,

REBUTTAL SUMMATIONS - MR. LESKO

1    Ms. Penza went through this also.

2              Question:  "What did you say?

3              Answer:  "Is he fucking your slaves is what I said.

4              Question:  "What did she say?

5              Answer:  "She said just Nicole and Suzy.  We're

6    going to start working with India and Jay.  And I said to her,

7    when you say working, do you mean fucking?  And she said yes."

8              Better evidence than that?

9              As an aside, while I'm talking about Lauren Salzman,

10   Mr. Agnifilio spent a lot of time about how Lauren Salzman

11   broke up with the defendant.  This isn't high school, ladies

12   and gentlemen.  This is serious business.  And I said this

13   earlier, but what Lauren Salzman did in this courtroom wasn't

14   breaking up with the defendant.  It was testifying under oath,

15   under a cooperation agreement after pleading guilty to two

16   racketeering offenses, and facing 20 years.  That's what she

17   did.

18             So let's cut to the chase.  It's 2015, Pam Cafritz

19   is dying.  Pam is the member of the inner circle who for years

20   procured sex partners for the defendant, often beautiful

21   women, and she wasn't going to be around much longer.  So what

22   did the defendant do?  Maybe he was in a panic.  He leveraged

23   his manipulation and his mind control to create an

24   organization that would serve up and continue to serve up a

25   steady stream of sex partners for him.  But this time he

REBUTTAL SUMMATIONS - MR. LESKO

1   didn't have Pam.  I imagine Pam was a very nice person, no

2   reason not to believe that.  He didn't have her.  So what did

3   he have to use?  Lies, coercion, collateral.  Because Pam

4   wasn't going to be around anymore.

5           Remember when Mr. Agnifilio repeated that nursery

6   rhyme?  I don't think I ever said it, 'cross my heart hope to

7   die stick a needle in my eye,' that's what little kids say.

8           But you heard Nicole's testimony.  You heard Lauren

9   Salzman's testimony.  You heard Jay's testimony.  You heard

10  Sylvie's testimony.  Collateral is what caused Nicole to be

11  strapped to a table with a stranger performing oral sex on

12  her.  Needle in the eye, does that sound like a game to you?

13          Mr. Agnifilio did admit something about DOS, he

14  admitted the defendant was connected to it.  He had to, the

15  tapes, the evidence, so overwhelming.

16          But then he said something interesting, he said the

17  defendant was not the CEO of DOS.  I agree.  He was the Grand

18  Master of DOS.  He was the Master of all the slaves, the sex

19  slaves.  He was the Supreme Being in this organization.

20          Listen to the tapes, is there any back and forth

21  between the defendant and the first line slaves?  He's giving

22  orders instructions.  It's all flowing from him.  He's not

23  renting his brain out, that's absurd.  This is his idea.  He's

24  thinking up the branding.  He's thinking up the details, the

25  positioning, where the hands go, what is said right before the

REBUTTAL SUMMATIONS - MR. LESKO

1    branding.  He's doing all of that.

2           Mr. Agnifilio also claims that DOS was created to

3    heal Camila.  Do you remember that, that she slit her wrists I

4    guess.  You know that's not true.  Again, a

5    mischaracterization of the evidence.

6           You know that DOS was created before Camila joined

7    the first line.  It wasn't created for Camila.  You also know

8    in that tape that the first line, some of them pushed back

9    against Camila joining the first line.  It wasn't a foregone

10   conclusion.  This wasn't created to heal Camila.

11          Mr. Agnifilio also argued that DOS was not created

12   for sex.  So let me get this right, if it's not created for

13   sex, then what was going to happen in the dungeon with the

14   cages and the tails and all of other stuff?  Were they going

15   to knit sweaters in the dungeon?  Is that what is going to

16   happen?  Of course it was about sex.

17          Mr. Agnifilio also talked about relationships.  You

18   may recall that.  He said each relationship was unique.  Well,

19   that's definitely not true.  To the extent you want to call

20   the dealings with the sex slaves, with the DOS slaves, to be

21   relationships, they were relatively uniform, weren't they?

22   Many of the slaves in fact looked similar, many were branded,

23   forced to perform acts of care, assignments, weight-monitored,

24   sex with the defendant, send naked photos, send collateral.

25   It's pretty form relationship with those women, not unique in

5564

REBUTTAL SUMMATIONS - MR. LESKO

1     almost any respect.

2              It's interesting, the defendant points to -- they

3     all look the same -- Rosa Laura Junco.  He pointed to Rosa

4     Laura and says she didn't have a relationship with the

5     defendant.  Let's talk about Rosa Laura for just a moment.

6              She's the first line slave in DOS.  And let's pull

7     out Government's Exhibit 1325.  Think about this e-mail.

8     Mr. Agnifilio says she doesn't have a relationship with the

9     defendant.  Right at the start -- this is an e-mail, remember

10    he's forwarding this e-mail to this encrypted e-mail account

11    right when everything is falling apart, trying to get rid of

12    stuff.  And this is forwarding an e-mail originally sent by

13    Rosa Laura to him October 4, 2015.  Hello M, hello Master.  I

14    fear I may be affecting Laureisa and your possibility for

15    succession.  The next line, I am being a crappy SL DOS, dot,

16    dot, dot slave.  On the bottom, I'm a 100 percent clear that

17    you are what I want for my daughter, and obviously for myself.

18             So let's unpack this e-mail, we've done it before,

19    let's do it again.  The defendant is on the hunt for a

20    successor.  I suggest to you a successor is an underage

21    virgin.  Laureisa, Rosa Laura's daughter, I don't know if

22    she's a virgin or not, but she's underage, she's a teenager.

23    Rosa Laura, who allegedly has no relationship with the

24    defendant, is serving up her teenage daughter to be the

25    defendant's successor, to have sex with him.  And then she's

REBUTTAL SUMMATIONS – MR. LESKO

1  saying that he is what she wants for her daughter; she wants

2  her daughter to have sex with him and obviously for myself.

3  And this is somebody who Mr. Agnifilio says has no

4  relationship with the defendant.  Does that sound truthful?

5        Mr. Agnifilio also claims that Allison Mack's

6  circle, that they were doing something different from the

7  other circles.  They were having sex, I guess the argument is

8  the others weren't in the other circles.  You know that's not

9  true.  Again not true.  Why?  Sylvie told you.

10        Who is Sylvie's master, not a quiz, you don't have

11  to answer it.  I'll answer it for you, it was Monica Duran,

12  not Allison Mack.  And Sylvie got the assignment to have oral

13  sex with the defendant.  So it just wasn't Allison Mack.

14        Mr. Agnifilio also claimed the defendant was never

15  abusive, do you remember that?  What courtroom has he been in

16  for the last six weeks?  Never abusive.

17        Not only was the defendant physically abusive, you

18  heard from Daniela when he threw her on the ground.  Do you

19  remember that?  But he was sexually abusive and he was

20  psychologically abusive.

21        You heard Dr. Hughes, I'm not going to go through

22  her testimony, but you can ask for her testimony.  You heard

23  her explain all of the types of isolation, surveillance, all

24  that stuff, used in abusive relationships.  She called it the

25  coercive dynamic.  Do you remember that?  He must have read

REBUTTAL SUMMATIONS - MR. LESKO

1    the text book on coercive dynamic.  The defendant used almost

2    every single technique.  The level of manipulation, the level

3    of coercion, the level of mind control, astounding.  This

4    wasn't some prisoner of war camp in North Korea, this was in

5    Knoxwoods, in Clifton Park, that's where this happened.

6          Mr. Agnifilio described Nicole's leaving telling the

7    defendant, she was leaving, and again it was very nice, it was

8    a nice description.  Am I ever going to see you again, sort of

9    one of those movie moments, right?  He left out that one part,

10   again distracting, confusing, he left out a part.  That was

11   the part when he asked for his money back, do you remember

12   that?  He asked for his three grand back, the $3,000 that

13   Nicole had access to.  10,000 she had access, she took 3,000.

14   He gave her that money so she could continue to be a sex

15   partner for him.  Forgot that part.

16         He also said that Nicole didn't tell Allison Mack

17   about her sexual relationship with the defendant.  Again, your

18   recollection controls, but that's simply untrue.  What did

19   Nicole do right after the table, right after the table?  She

20   went right to Allison Mack and told her about it.  So she

21   wasn't keeping that a secret.

22         He also argued that Allison wanted to somehow help

23   Nicole.  I'm not going to show it again, but you know what

24   that meant, you know working meant fucking.

25         Mr. Agnifilio also made an argument about Nicole

REBUTTAL SUMMATIONS - MR. LESKO

1  that may have shocked you.  First he said that after the table

2  incident, that Nicole's e-mails were less dark.  Nicole were

3  grappling with weighty issues, her e-mails were less dark.

4  And he forgot to mention that in her testimony she told you

5  that during that time period she was weighing options.  I

6  would suggest, you remember this clearly, because I think she

7  said one of the options was Witness Protection, she was

8  thinking about going into witness protection.  She also said

9  at that time that another option was suicide.  So she was

10 still thinking about suicide.

11          And then this is the shocking part.  Mr. Agnifilio

12 suggested that the oral sex on the table, blind folded, while

13 she was collateralized with a total stranger when she was

14 being videotaped, somehow worked.  Somehow worked.  It was

15 strong medicine.  Being strapped to a table while a stranger

16 performs oral sex on you is medicine, strong medicine?  That's

17 no medicine.  That's a sex crime.  That's what that is.

18          And what was Mr. Agnifilio really arguing here?

19 What was he really saying?  I would suggest, but you

20 ultimately have to determine that, he was arguing that Nicole

21 wanted it.  That it was good for her.  Sort of like when the

22 defendant was writing about raping good, remember, having

23 orgasms for the first time during rape that it was good for

24 her.  That she wanted it.

25          Don't let him do that.  Don't let him do that in

REBUTTAL SUMMATIONS - MR. LESKO

1    this courtroom.  She didn't want that.

2              Mr. Agnifilio also suggested that extortion wasn't

3    in their heart, do you remember that argument?  You can read

4    the jury instructions all day and all night and you won't see

5    anything about extortion being in anyone's heart.  You're

6    going to hear Judge Garaufis instruct you on the law, and his

7    instruction controls on every aspect of the law in this case,

8    but I would suggest to you that part of his instruction will

9    focus on instilling fear, instilling in the victim fear as the

10   sort of central aspect of the law of extortion.

11             The defendant's intentions are not at issue.  The

12   victim's fear is.  That fear was clearly justified.

13             On the issue of in a heart somewhere, what was

14   Allison Mack doing when she ordered Jay to seduce the

15   defendant and got push back.  Then she immediately played the

16   sexual abuse, this will help you with your traumatic sexual

17   abuse.  Then afterwards, I instruct you to enjoy it.  Was she

18   speaking from the heart then?

19             Mr. Agnifilio also suggested that Nicole just left,

20   Jay just left.  There were no repercussions whatsoever.  I

21   would point out that the timing is off on Nicole.  You can

22   check this in the record, but he seemed to indicate that she

23   was sending e-mails to Allison Mack on May 25 about the walk,

24   and he's off on that.

25             Nicole told you that table happened on May 31 and

REBUTTAL SUMMATIONS - MR. LESKO

1    the metadata associated with the photograph of the table

2    confirms that it was May 31, that was just a day or so before

3    the co-summit where the DOS became public and everything

4    started falling apart.  It's significant because May 31 is the

5    day after Jay takes the hike with Valerie, and so that's

6    unraveling on the West Coast, and Nicole is on the table.  And

7    Nicole left a few weeks later I believe.  This is when

8    everything is unraveling.

9            I should also note, Jay, you'll recall at that time,

10   was taking a hike.  Prior to that she had made peace with the

11   fact, okay, my collateral is going to get released and then

12   the process started for her.  And Audrey left in the same time

13   frame, June 2017.  They left because it was all falling apart.

14           And Lauren Salzman explained this to you, go look at

15   her testimony about this.  And during this entire process

16   where DOS is falling apart, people are leaving, ask yourself

17   one simple question, what didn't happen as part of that

18   process?  You know what didn't happen, none of them got their

19   collateral back.  You know that release of collateral was

20   discussed.  Sylvie told you about warning Anna Gaby that her

21   collateral would be released if she did not behave.  And

22   Lauren Salzman told you that the defendant contemplated the

23   release of Sarah's collateral.  And you know that while each

24   and every one of you were sitting in these chairs in this

25   jury, that collateral was released in Mexico, Sarah's

REBUTTAL SUMMATIONS - MR. LESKO

1    collateral.

2         Let's talk about commercial sex.  Mr. Agnifilio

3    spent sometime on that.  I'm going to spent a little time --

4    I'm close to the end, I'll tell you that.

5         And I expect, again judge Garaufis' instructions

6    control, but he'll explain in connection with commercial sex a

7    thing of value need not be financial.  And that any thing of

8    value can go to any person involved in the venture.  He'll

9    instruct that you any sex act is defined, any act for sexual

10   gratification that includes oral sex.

11        And things of value did go to people involved in

12   this sex trafficking in DOS.  Let's talk about that.  As

13   Ms. Penza explained, the e-mail explained that Allison Mack

14   and her getting paid for the source was contingent upon India

15   completing the assignment.  You heard that Nicole got access

16   to $10,000 and that she actually used $3,000 while a DOS

17   slave.  And what is the first thing the first thing the

18   defendant asked her the moment she said she was leaving, I

19   want my money back.

20        Access to the defendant was valuable in and of

21   itself.  The first line slaves craved it.  Access to the

22   defendant, particularly for the first line slaves, meant

23   increased financial benefits.  You know that because of the

24   Allison Mack situation, that's an example.  Mr. Vicente

25   actually told you that Nancy Salzman quantified the value of

REBUTTAL SUMMATIONS - MR. LESKO

1   the defendant's time, that it was $100,000 per hour.  Jay, Jay

2   was told this was an opportunity to heal her sexual trauma.

3   And you may recall during her entire time in DOS she had the

4   expectation that she and the defendant would start a T-shirt

5   company that would generate profits.

6          And lastly, DOS was literally, literally a

7   pornography machine.  Pumping out countless photos of women,

8   nude women, posed just like the defendant liked them fully

9   nude, pubic hair, open legs, vaginas exposed, shots of their

10  face, carefully posed so he could add them to his collection

11  of pornography, his pornography trophies.  And that

12  pornography had value, enormous value, to the defendant.

13         Mr. Agnifilio said -- let's turn to the child

14  pornography.  He didn't spend much time on the child

15  pornography itself.  I would suggest that there is no doubt

16  that the evidence shows that there are two dates.  Let's pull

17  up Government's Exhibit 550, just to remind everybody.

18         You have the folder then the two dates associated

19  with the sub-folder, November 2, 2005 and November 24, 2005.

20  If we can pull up Government's Exhibit 504B.  Those two dates

21  correspond to the two folders on the hard drive.  And then

22  504B is the exit data.  I'm no expert, don't get me wrong, but

23  I heard Examiner Boothe, just like you did.  Exit data is

24  extremely reliable.  It's embedded in the jpeg, in the image

25  itself.  And the exit data shows that the data was created on

REBUTTAL SUMMATIONS - MR. LESKO

1  the camera, in this instance, this particular instance, the

2  150 jpeg on November 2, 2005 which consistent with the title

3  of the folder.

4        Then if you go, Alex, to page six under the

5  Exhibit 504B6, right above all those zeros.  It's the camera

6  you saw that was recovered from the defendant's library.  You

7  know the hard drive was in the library as well.

8        So really the defendant's argument with respect to

9  the child pornography is that all the Racketeering Act have to

10  be for a common purpose, but that's not all.

11        And Judge Garaufis will instruct you on the law.  I

12  expect that he will instruct you as follows.  That two

13  Racketeering Acts may be related.  And the relationship may be

14  established by evidence that the defendant was enabled to

15  commit the Racketeering Act solely by virtue of his position

16  in the enterprise or involvement in or control over its

17  affairs.  So the child pornography counts are related to the

18  enterprise because the defendant was able to commit them due

19  to his position in the enterprise.

20        I just told you what I expect Judge Garaufis to

21  instruct you on.  Here members of the enterprise of the inner

22  circle were involved in facilitating the defendant's access to

23  Camila.  Nancy Salzman hired her as a maid, keeping her away

24  from her siblings and closer to the defendant's reach.  And

25  Pam Cafritz helped protect the defendant by making him lie to

REBUTTAL SUMMATIONS – MR. LESKO

1  medical professionals about his sexual partners.  The

2  defendant was able to exploit Camila and take photographs of

3  her, that are child pornography.

4          My colleague has advised me I may have misstated

5  something.  I want to clarify the record, the assignment for

6  Nicole was in 2016 not 2017, she left in 2017.  So I apologize

7  for that.

8          I would also note that, I think it's a fair

9  inference, that at the time Camila was photographed she was

10 the successor, she was the virgin successor, which was one of

11 the defendant's top priorities.  She was a member of the

12 family, Daniela's family, that were brought here.  Remember, a

13 family where three of the daughters were sexual parters with

14 the defendant, and the son worked in the community.  So I

15 think that intercuts Mr. Agnifilio's argument that this was

16 not part of the enterprise.

17         We reached the final stage of this trial.  You're

18 the triers of fact, not us lawyers, and not the judge.  And

19 when you look at the facts, use your common sense.  Think

20 about what is reasonable and what is not reasonable.  Think

21 about what the evidence is and reject arguments that are not

22 supported by the evidence.  We asked you to base your verdict

23 on the evidence and the law, not on any potential fear, favor,

24 sympathies, biases, and be fair to the defendant.

25         When you go back to that jury room later today, I'm

REBUTTAL SUMMATIONS – MR. LESKO

1   going to offer you a suggestion.  I'm going to ask you to

2   think about five places, five places as Ms. Penza described to

3   you, behind closed doors.

4          The first place is the basement of 7 Generals Way,

5   Allison's house.  Jay's in this the basement.  She gets a

6   phone call.  It's Allison.  Allison tells her how well she's

7   doing and how great she's doing, and tells her she has to

8   seduce the defendant.  She says, you're celibate, what is the

9   big deal, what is one more?  And Jay being Jay, she said her

10  spy sense kicked in.  She knew this was wrong.  She pushed

11  back.  Allison went right for the gut, this is going to solve,

12  cure, your sexual abuse.  And Jay backed off.  And Allison

13  said, I give you permission.  Permission, I may have said

14  instruct earlier, permission to enjoy this.  And Jay hung up

15  the phone.  And she said the walls were closing in on me.

16  Alone in the basement, having just received the assignment to

17  have sex with the defendant.

18         The second place is 2 Flintlock.  Sylvie walking

19  into a bedroom with the defendant.  Being asked to take her

20  clothes off.  Being asked to lie down on a bed with a dirty

21  sheets.  And the defendant having oral sex with her.  And she

22  hasn't had sex with her husband.  And she described to you

23  that horrible thought process when the defendant was having

24  oral sex that never seemed to end.

25         The third place is 12 Wilton.  Daniela in the

REBUTTAL SUMMATIONS - MR. LESKO

1   bedroom unraveling, early 20s, prime of her life, her mind

2   drifting away.  The cleaning products, I'm going to commit

3   suicide.  The loneliness, the despair.  Do you remember those

4   drawings, the letters?  The wilting times.  The day, after

5   day, after day.  Most of that time, or some of that time, the

6   window blacked out and just a mattress on the floor and note

7   pad.

8           The fourth place is 120 Victory, and Nicole.  Being

9   led into, blind folded, double-blind folded, forced to

10  undress.  Forced to lie on a cold table, legs strapped to the

11  table.  And all of a sudden as she hears the defendant's

12  voice, then there is someone else in the room, and that

13  someone else started to give her oral sex.  And then the

14  defendant starts questioning her about her sexual history and

15  all the while she's being videotaped.

16          The fifth place, ladies and gentlemen, is 8 Hale.

17  In 8 Hale was this, Government's Exhibit 503, the hard drive.

18  This is the place where the defendant stored Camila's

19  childhood, after he took it from her.  After he took her

20  innocence.  She wasn't adult-like when he was photographing

21  her with her legs spread.  She was a child.  She was a child.

22  He did that to that child.

23          So we're at the final stage.  I would suggest to you

24  that we've reached the time when this man, the defendant, can

25  be held responsible for his years of lies, his years of

REBUTTAL SUMMATIONS – MR. LESKO

1  extortion and abuse and coercion and manipulation, his sex

2  crimes.  Hold him responsible for those crimes.  Not because I

3  say he's guilty, not because my colleagues say he's guilty,

4  but because the evidence proves him guilty.  We have proved

5  him guilty beyond a reasonable doubt.

6          Ladies and gentlemen, find the defendant guilty

7  because he is guilty.  Thank you.

8          THE COURT:  Members of the jury, this completes the

9  final argument.  And we will begin the charge as soon as we've

10  had a five-minute break for the jury.

11          At 1:00 o'clock we'll have lunch for about half an

12  hour, then come back so we can complete all of the jury

13  instructions before the end of the day.

14          All rise for the jury.

15          (Jury exits the courtroom.)

16          (Brief recess.)

17          (Continued on next page.)

18

19

20

21

22

23

24

25

JURY CHARGE

1          THE COURT:  All right, let's bring the jury.

2          (Jury enters courtroom.)

3          THE COURT:  Please be seated.  All right.

4          Members of the jury, at this time it is my

5   obligation to charge you as to the law that you must apply to

6   the facts in this case as you find them.  And the charge is

7   rather extensive, it's over 130 pages long and I am going to

8   read the first portion before lunch and then when you come

9   back from lunch I am going to ask my law clerks to take turns

10  reading portions of the charge and then I will read the last

11  portion and so we're going to do this as a team, so to speak,

12  and all you need to do is listen.

13         You'll each receive a copy of the charge back in the

14  jury room and you'll also receive a copy of the verdict sheet

15  and I will tell you more about that at the end.

16         Now that the evidence in this case has been

17  presented and the attorneys for the government and the

18  defendant have concluded their closing arguments, it is my

19  responsibility to instruct you as to the law that governs this

20  case.  My instructions will be in three parts.

21         I will instruct you regarding the general rules that

22  define and govern the duties of a jury in a criminal case.

23         Second, I will instruct you as to the legal

24  elements of the crimes charged in the indictment, that is, the

25  specific elements that the government must prove beyond a

JURY CHARGE

1    reasonable doubt to warrant a finding of guilt; and.

2              Third, I will give you some general rules regarding

3    your deliberations.

4              The statutory language quoted in this final charge

5    is set forth in bold lettering.

6              First, I will talk about The Role of the Court.

7              Members of the jury, you have now heard all of the

8    evidence in the case as well as the final arguments of the

9    lawyers for the parties.

10             My duty at this point is to instruct you as to the

11   law.  It is your duty to accept these instructions of law and

12   apply them to the facts as you determine them, just as it has

13   been my duty to preside over the trial and decide what

14   testimony and what evidence is relevant under the law for your

15   consideration.

16             On these legal matters you must take the law as I

17   give it to you.  If any attorney has stated a legal principle

18   different from any that I state to you in my instructions, it

19   is my instructions that you must follow.

20             You should not single out any instruction as stating

21   the law on its own.  You should instead consider my

22   instructions as a whole when you retire to deliberate in the

23   jury room.

24             You should not be concerned about the wisdom of any

25   rule that I state.  Regardless of any opinion that you may

JURY CHARGE

1    have as to what the law may be, or ought to be, it would

2    violate your sworn duty to base a verdict upon any other view

3    of the law than that which I give you.

4              Now we'll talk about The Duties of the Jury.

5              To begin with, it is your duty to find the facts

6    from all the evidence in this case.  You are the sole judges

7    of the facts.  It is, therefore, for you and you alone to pass

8    upon the weight of the evidence, to resolve such conflicts as

9    may have appeared in the evidence, and to draw such inferences

10   as you deem to be reasonable and warranted from the evidence

11   or lack of evidence in this case.

12             With respect to any question concerning the facts,

13   it is your recollection of the evidence that controls.

14             You must apply the law in accordance with my

15   instructions to the facts as you find them.  While the lawyers

16   may have commented on some of the legal rules, you must be

17   guided only by my instructions about the rules.  You must

18   follow all of the rules as I explain them to you.  You may not

19   follow some rules and ignore others.  Even if you disagree

20   with the rules or don't understand the reasons for them, you

21   are bound to follow the legal rules that I describe.

22             All Parties are Equal Before the Court.

23             The fact that this prosecution is brought in the

24   name of the United States Government does not entitle the

25   United States to any greater consideration than the defendant.

5580

JURY CHARGE

1   By the same token, it is entitled to no less consideration.

2   The parties, the United States Government and the defendant,

3   are equal before this court, and they are entitled to equal

4   consideration.  Neither the government nor the defendant is

5   entitled to any sympathy or favor.

6           At times during the trial I found it necessary to

7   admonish the lawyers.  You should not, however, let that

8   prejudice you toward a lawyer or that lawyer's client because

9   I have found it necessary to correct him or her.  To the

10  contrary, each attorney in this trial has professionally and

11  competently served his or her client, and the court has great

12  respect for all the attorneys in this courtroom.

13          I will now discuss the Presumption of Innocence.

14          The indictment that was filed against the defendant

15  is the means by which the government gives him notice of the

16  charges against him and brings him before the court.  It is

17  nothing more.  The indictment is only an accusation.  The

18  indictment is not evidence and you are to give it no weight in

19  arriving at your verdict.

20          The defendant pleaded not guilty in response to the

21  indictment.  He is presumed to be innocent unless and until

22  guilt has been proved beyond a reasonable doubt.  I therefore

23  instruct you that the defendant is to be presumed by you to be

24  innocent throughout your deliberations on each charged count

25  until such time, if ever, that you as a jury are satisfied

JURY CHARGE

1   that the government has proved him guilty beyond a reasonable

2   doubt on that count.   The presumption of innocence alone,

3   unless overcome, is sufficient to acquit him.   The defendant

4   is on trial for the crimes charged in the indictment and not

5   for anything else.

6          Evidence has been introduced as to the involvement

7   of other persons in the crimes charged.   That those persons

8   are not also on trial here is not a matter of concern for you.

9   You should not speculate as to the reasons why those persons

10  are not on trial.   Your only concern is whether the government

11  has or has not proved the guilt of the defendant beyond a

12  reasonable doubt as to each crime.

13         The Burden of Proof is on the Government.

14         Since the law presumes the defendant to be innocent,

15  the burden of proving his guilt beyond a reasonable doubt is

16  on the government throughout the trial.   The defendant never

17  has the burden of proving his innocence or producing any

18  evidence at all.   As a result, the law never imposes upon a

19  defendant in a criminal case the burden or duty of calling any

20  witnesses, including any expert witnesses, or producing any

21  evidence.

22         I will now discuss Proof Beyond a Reasonable Doubt.

23         For each crime with which the defendant is charged,

24  the government must prove each element of the crime beyond a

25  reasonable doubt.   I will explain the elements of the crimes

5582

JURY CHARGE

1    that the indictment charges later on but now I shall address

2    the phrase "reasonable doubt."  Proof beyond a reasonable

3    doubt does not mean proof beyond all doubt.  The government is

4    not required to prove the defendant's guilt to a mathematical

5    certainty.  Rather, the test is one of reasonable doubt.

6         A reasonable doubt is a doubt based on reason and on

7    common sense.  This means that if, after you have considered

8    all of the evidence in this case, you have a doubt that is

9    based upon your own experience, judgment and common sense, you

10   must find him not guilty of the crime in question.

11        A reasonable doubt, however, is not a doubt that

12   arises out of whim or speculation.  Nor is a reasonable doubt

13   an excuse to avoid performing an unpleasant duty.

14        You should consider all of the proof presented at

15   trial, or any lack of proof, in determining whether you have a

16   reasonable doubt.  In considering each count in the

17   indictment, unless the government proves beyond a reasonable

18   doubt that the defendant has committed each and every element

19   of the offense charged in the count, you must find the

20   defendant not guilty of that offense.

21        You should consider each count of the indictment

22   separately.  It is thus possible for you to find the defendant

23   guilty on one count with which he is charged and not guilty on

24   another count.  Conversely, you might find the defendant

25   guilty of each crime charged in the indictment, or you might

5583

JURY CHARGE

1   find him not guilty of all the crimes charged in the

2   indictment.

3          On any count of the indictment, if, after a fair and

4   impartial consideration of all the evidence, you honestly

5   conclude that you have such a doubt as would cause a prudent

6   person to hesitate to act in matters of importance in his or

7   her own life, then you have a reasonable doubt.  In that

8   event, it is your duty to acquit the defendant on that count.

9          If, on the other hand, after a fair and impartial

10  consideration of all the evidence, you do not have such a

11  doubt, then you have no reasonable doubt and, in that

12  circumstance, you should convict the defendant on that count.

13         The punishment is not the jury's concern.  The

14  question of possible punishment of the defendant is of no

15  concern to the jury and should not, in any sense, enter into

16  or influence your deliberations.  The duty of imposing a

17  sentence rests exclusively upon the court.  Your function is

18  to weigh the evidence in the case and to determine whether or

19  not the defendant is guilty beyond a reasonable doubt solely

20  upon the basis of the evidence.  Under your oath as jurors,

21  you cannot allow a consideration of the punishment that may be

22  imposed upon the defendant, if he is convicted, to influence

23  your verdict in any way, or, in any sense, enter into your

24  deliberations.  The court notes that the death penalty is not

25  available as a punishment in this case.  Furthermore, any

JURY CHARGE

1    references during closing arguments to the possible sentence

2    the defendant may face were arguments and nothing more.  As I

3    have noted, the question of possible punishment is not your

4    concern and the duty of imposing sentence rests with the court

5    alone.

6            The Dates in the Indictment are Approximate.

7            The indictment charges "in or about" and "on or

8    about" and "between" certain dates.  The government need not

9    establish with certainty the exact dates of an alleged

10   offense.  It is sufficient if the evidence establishes beyond

11   a reasonable doubt that an offense was committed on a date

12   reasonably near the dates alleged.

13           Now I am going to discuss Evidence.  What is

14   Evidence:  I wish to instruct you now as to what is evidence

15   and how you should consider it.  The evidence you will use to

16   decide what the facts are comes in three forms:

17           (1) sworn testimony of witnesses, both on direct and

18   cross-examination, from the witness stand;

19           (2) exhibits that have been received by the court in

20   evidence; and.

21           (3) stipulations.

22           If evidence was received for a limited purpose, you

23   must consider that evidence for that limited purpose only.

24           What is not evidence:  When deciding the facts, you

25   must disregard the following things that are not evidence:

JURY CHARGE

1          1.  Arguments or statements by lawyers are not

2     evidence.

3          2.  Questions put to the witnesses are not evidence.

4          3.  The indictment is not evidence.

5          The indictment is merely a statement of charges and

6     not itself evidence.

7          Transcripts of videos and audio recordings are not

8     evidence.

9          The government has been permitted to distribute and

10    display typed documents which contain the government's

11    interpretation of what appears on audio recordings that have

12    been received in evidence.  Those documents were provided to

13    you as an aid or guide to assist you in listening to the

14    recordings.  However, they are not in and of themselves

15    evidence.  You alone should decide what appears on the

16    recording based on what you heard.  If you think you heard

17    something differently than it appeared on the transcript, then

18    what you heard is controlling.  Let me say again, you, the

19    jury, are the sole judges of the facts.

20         Objections to questions or to offered exhibits are

21    not evidence.

22         In this regard, attorneys for both the government

23    and the defendant have a duty to their client to object when

24    they believe evidence should not be received.  You should not

25    be influenced by the objection or by the court's ruling on the

JURY CHARGE

1    objection.  If the objection was sustained, ignore the

2    question and the answer, if an answer was given.  If the

3    objection was overruled, treat the answer like any other

4    answer.

5            Anything you may have seen or heard outside the

6    courtroom is not evidence.

7            Your verdict must be based solely upon the evidence

8    or lack of evidence developed at trial.  You are not to engage

9    in speculation or guesswork.

10           In reaching your decision as to whether the

11   government sustained its burden of proof, it would be improper

12   for you to consider any personal feelings you may have about

13   the defendant's race, national origin, ethnic background, sex,

14   age, or other personal characteristics.  All persons are

15   entitled to the presumption of innocence and the government

16   has the same burden of proof in all criminal cases.

17           In addition, it would be equally improper for you to

18   allow any feelings you might have about the nature of the

19   crimes charged to interfere with your decision-making process.

20           It would also be improper for you to draw any

21   conclusions about the defendant's guilt or innocence from

22   anything you may or may not have observed about the spectators

23   inside or outside the courtroom.  As I have said, your verdict

24   must be based solely upon the evidence presented at trial.

25           Under your oath as jurors, you are not to be swayed

JURY CHARGE

1    by sympathy for one side or the other.  You are to be guided

2    solely by the evidence in this case and the crucial central

3    question you must ask yourselves when you sift through the

4    evidence is:  has the government proved the guilt of the

5    defendant beyond a reasonable doubt.

6         It is for you alone to decide whether the government

7    has proved that the defendant is guilty of the crimes charged

8    solely on the basis of the evidence and subject to the law as

9    I charge you.  It must be clear to you that if you let fear or

10   prejudice or bias or sympathy interfere with your thinking,

11   there is a risk that you will not arrive at a true and just

12   verdict.

13        If you have a reasonable doubt as to the defendant's

14   guilt, you must render a verdict of not guilty.  But on the

15   other hand, if you should find that the government has met its

16   burden of proving the defendant's guilt beyond a reasonable

17   doubt, you must not hesitate to render a verdict of guilty

18   balls of sympathy or any other reason.

19        To repeat, your verdict must be based exclusively

20   upon the evidence or the lack of evidence in the case.

21        I will now discuss Direct and Circumstantial

22   Evidence.

23        I told you that evidence comes in various forms such

24   as the sworn testimony of witnesses, exhibits and

25   stipulations.  There are, in addition, two different kinds of

JURY CHARGE

1   evidence, direct and circumstantial.

2           Direct evidence is the communication of a fact by a

3   witness who testifies to the knowledge of that fact having

4   been obtained through one of the five senses.  So, for

5   example, a witness who testifies to knowledge of a fact

6   because he saw it, heard it, smelled it, tasted it or touched

7   it has provided direct evidence.  As I explained to you in my

8   opening instruction, if you went outside and saw that it was

9   raining, you would have observed direct evidence of rain.

10  What remains is your responsibility to pass upon the

11  credibility of the witness who provides the direct evidence.

12          Circumstantial evidence is evidence that tends to

13  prove a fact in issue by proof of other facts from which the

14  fact in issue may be inferred.  The word "infer" or the

15  expression "to draw an inference" means to find that a fact

16  exists from proof of another fact.  For example, if a fact in

17  issue is whether it is raining at the moment, none of us can

18  testify directly to that fact sitting here as we are in this

19  courtroom without facing the window.  Assume, however, that as

20  we are sitting here, a person walks into the room through that

21  back door wearing a raincoat that is dripping wet and carrying

22  an umbrella dripping water.  We may infer that it is raining

23  outside.  In other words, the fact of rain is an inference

24  that could be drawn from the wet raincoat and the dripping

25  umbrella.  An inference is to be drawn only if it is logical

5589

JURY CHARGE

1    and reasonable to do so.  In deciding whether to draw an

2    inference, you must look at and consider all of the facts in

3    light of reason, common sense and experience.  Whether a given

4    inference is or is not to be drawn is entirely a matter for

5    you, the jury, to decide.  Please bear in mind, however, that

6    an inference is not to be drawn by guesswork, suspicion or

7    speculation.

8              I remind you again that you may not convict the

9    defendant unless you are satisfied of his guilt beyond a

10   reasonable doubt, whether based on direct evidence,

11   circumstantial evidence, or the logical inferences to be drawn

12   from such evidence.  Circumstantial evidence does not

13   necessarily prove less than direct evidence, nor does it

14   necessarily prove more.  You are to consider all the evidence

15   in the case, direct and circumstantial, in determining what

16   the facts are and in arriving at your verdict.

17             I will now discuss Deciding What to Believe.

18             In deciding what the facts are, you must decide

19   which testimony to believe, which testimony not to believe,

20   and how much weight to give to the testimony of each witness.

21   In making those decisions, there are a number of factors you

22   may take into account including the following:

23             Did the witness seem to be honest?

24             Did the witness have any particular reason not to

25   tell the truth?

JURY CHARGE

1        Did the witness have a personal interest in the

2  outcome of the case?

3        Did the witness seem to have a good memory?

4        Did the witness have the opportunity and ability to

5  observe accurately the things he or she testified about?

6        Did the witness appear to understand the questions

7  clearly and answer them directly?

8        Was what the witness said supported by other

9  evidence?

10        Did the witness' testimony differ from the testimony

11  of other witnesses?

12        People sometimes forget things.  A contradiction may

13  be an innocent lapse of memory or it may be an intentional

14  falsehood.  Consider, therefore, whether the contradiction has

15  to do with an important fact or only a small detail.

16        Different people observing an event may remember it

17  differently and therefore testify about it differently.

18        You may consider the factors I have just discussed

19  with you and other relevant factors in deciding how much

20  weight to give to testimony.

21        Finally, if you find that a witness has lied to you

22  about any matter, however insignificant, you may choose to

23  disregard that witness' testimony in part or in whole.

24        The fact that one party called more witnesses and

25  introduced more evidence than the other party does not mean

JURY CHARGE

1   that you should find the facts in favor of the side offering

2   the most witnesses.  By the same token, you do not have to

3   accept the testimony of any witness, even if that witness has

4   not been contradicted or impeached, if you find the witness

5   not to be credible.  You also have to decide which witnesses

6   to believe and which facts are true.  To do this, you must

7   look at all the evidence, drawing upon your own common sense

8   and personal experience.

9          You have heard evidence that certain witnesses made

10  statements on earlier occasions that counsel argues are

11  inconsistent with the testimony of those witnesses at trial.

12  Evidence of a prior inconsistent statement is not to be

13  considered by you as affirmative evidence bearing on the

14  defendant's guilt.  Evidence of the prior inconsistent

15  statement was placed before you for the more limited purpose

16  of helping you to decide whether to believe the trial

17  testimony of the witness who contradicted him or herself.  If

18  you find that the witness made an earlier statement that

19  conflicts with his or her trial testimony, you may consider

20  that fact in deciding how much of his or her trial testimony,

21  if any, to believe.

22         In making this determination, you may consider

23  whether the prior statement was inconsistent with the witness'

24  statement at trial; whether the witness purposely made a false

25  statement or whether it was an innocent mistake; whether the

JURY CHARGE

1  inconsistency concerns an important fact, or whether it had to

2  do with a small detail; whether the witness had an explanation

3  for the inconsistency; and whether that explanation appealed

4  to your common sense.

5          It is exclusively your duty, based upon all of the

6  evidence and your own good judgment, to determine whether the

7  prior statement was inconsistent, and if so, how much, if any,

8  weight to be given to the inconsistent statement in

9  determining whether to believe all or part of the witness'

10 testimony.

11         In evaluating the credibility of a witness, you

12 should take into account any evidence that the witness who

13 testified may benefit in some way from the outcome of the

14 case.  Such an interest in the outcome creates a motive to

15 testify falsely and may sway the witness to testify in a way

16 that advances his or her own interests.  Therefore, if you

17 find that any witness whose testimony you are considering may

18 have an interest in the outcome of this trial, then you should

19 bear that factor in mind when evaluating the credibility of

20 his or her testimony and accept it with great care.

21         This is not to suggest that a witness who has an

22 interest in the outcome of the case will testify falsely.  It

23 is for you to decide to what extent, if at all, a witness's

24 interest has affected his or her testimony.

25         I am now going to discuss Cooperating Witnesses

JURY CHARGE

1  Called by the Government.

2          You have heard witnesses who testified that they

3  were involved in planning and carrying out certain crimes with

4  the defendant.  There has been a great deal said about these

5  so-called cooperating witnesses in the summations of counsel

6  and about whether or not you should believe them.

7          The government argues, as it is permitted to do,

8  that it must take the witnesses as it finds them.  It argues

9  that only people who themselves take part in criminal activity

10  have the knowledge required to show criminal behavior by

11  others.  For those very reasons, the law allows the use of

12  accomplice or co-conspirator testimony.  Indeed, it is the law

13  in federal courts that the testimony of a single accomplice or

14  co-conspirator may be enough in itself for conviction, if the

15  jury finds that the testimony establishes guilt beyond a

16  reasonable doubt.

17          However, it is also the case that cooperator

18  testimony is of such a nature that it must be scrutinized with

19  great care and viewed with particular caution when you decide

20  how much of that testimony to believe.  I have given you some

21  general considerations on credibility and I will not repeat

22  them all here.  Nor will I repeat all of the arguments made on

23  both sides.  However, let me say a few things that you may

24  want to consider during your deliberations on the subject of

25  accomplice and co-conspirator witnesses.

5594

JURY CHARGE

1          You should ask yourselves whether these witnesses

2     would benefit more by lying or by telling the truth.  Was

3     their testimony made up in a way because they believed or

4     hoped that they would somehow receive favorable treatment by

5     testifying falsely?  Or did they believe that their interests

6     would be best served by testifying truthfully?  If you believe

7     that a witness was motivated by hopes of personal gain, was

8     the motivation one that would cause him or her to lie or was

9     it one that would cause him or her to tell the truth?  Did

10    this motivation color his or her testimony.

11          In sum, you should look at all of the evidence in

12    deciding what credence and what weight, if any, you will want

13    to give to cooperating witnesses.

14          I will now discuss Punishment of Accomplice and

15    Cooperating Witnesses.

16          You have heard testimony that a cooperating witness

17    in this case has been promised that if she provides

18    substantial assistance to the government and testified

19    truthfully, completely and fully, the government will present

20    to the sentencing court what is called a 5K1.1 letter.  The

21    5K1.1 letter sets forth the cooperating witness's criminal

22    acts as well as the substantial assistance the witness has

23    provided.  I instruct you that the 5K1.1 letter does not

24    guarantee the cooperating witness a lower sentence.  This is

25    because the sentencing court may, but is not required to, take

JURY CHARGE

1    the 5K1.1 letter into account when imposing sentence on the

2    cooperating witness.  The court has discretion, whether or not

3    a 5K1.1 letter is written, to impose any reasonable sentence

4    the Court deems appropriate up to the statutory maximum.  The

5    determination whether to write a 5K1.1 letter rests with the

6    government.  However, if the government does not write a 5K1.1

7    letter, the court would be obligated to impose at least any

8    minimum sentence required by law.  The final determination as

9    to the sentence to be imposed rests with the Court, not the

10   government.

11        I will now talk about Guilty Pleas of Other

12   Individuals.

13        You have heard testimony from a witness who pled

14   guilty to charges arising out of the same facts as this case.

15   You are instructed that you are to draw no conclusions or

16   inferences of any kind about the guilt of the defendant on

17   trial from the fact that another individual pled guilty to

18   similar charges.  Her decision to plead guilty was a personal

19   decision about her own guilt.  That decision may not be used

20   by you in any way as evidence against the defendant on trial

21   here.

22        I will now discuss Expert Witnesses.

23        In this case I have permitted certain witnesses to

24   express their opinions about matters that are in issue.  A

25   witness may be permitted to testify to an opinion on those

JURY CHARGE

1  matters about which he or she has special knowledge, skill,

2  experience and training.  Such testimony is presented to you

3  on the theory that someone who is experienced and

4  knowledgeable in the field can assist you in understanding the

5  evidence or in reaching an independent decision on the facts.

6       In weighing this opinion testimony, you may consider

7  the witness's qualifications, his or her opinions, and his or

8  her reasons for testifying, as well as all the other

9  considerations that ordinarily apply when you are deciding

10  whether to believe a witness's testimony.  You may give the

11  opinion testimony whatever weight, if any, you find it

12  deserves in light of all the evidence in this case.  You

13  should not, however, accept opinion testimony merely because I

14  allowed the witness to testify concerning his or her opinion.

15  Nor should you substitute it for your own reason, judgment and

16  common sense.  The determination of the facts in this case

17  rests solely with you, the jury.

18       I will now discuss Testimony of Government

19  Witnesses, Government Agents and Law Enforcement Witnesses.

20       During this trial you heard testimony from

21  government employees and law enforcement witnesses.  That a

22  witness works in law enforcement or is a government employee

23  does not mean that his or her testimony is entitled to any

24  greater weight.  By the same token, his or her testimony is

25  not entitled to any less consideration simply because he or

JURY CHARGE

1    she works in law enforcement or is a government employee.  You

2    should consider the testimony of government agents and law

3    enforcement officers just as you would consider any other

4    evidence in the case and evaluate their credibility just as

5    you would that of any other witness.  After reviewing all the

6    evidence, you'll decide whether to accept the testimony of law

7    enforcement and government employee witnesses and what weight,

8    if any, that testimony deserves.

9         I will now discuss The Defendant's Right Not to

10   Testify.

11        The defendant did not testify in this case.  Under

12   other Constitution, he has no obligation to testify or to

13   present any other evidence because it is the government's

14   burden to prove his guilt beyond a reasonable doubt.  You may

15   not attach any significance to the fact that the defendant did

16   not testify.  Nor may you draw any adverse inference against

17   the defendant because he did not take the witness stand.  In

18   your deliberations in the jury room you may not consider this

19   decision against the defendant in any way.

20        All Available Witnesses Need Not Be Produced.

21        The law does not require the government to produce

22   all available evidence or to call as witnesses all persons

23   involved in the case who may have been present at any relevant

24   time or place, or who may appear to have some knowledge of the

25   matters at issue in this trial.  Nor does the law require any

JURY CHARGE

1  party to produce as exhibits all papers and objects mentioned

2  during the course of the trial.  You are always entitled,

3  however, to consider any lack of evidence in determining

4  whether the government has met its burden of proof.

5         I will now discuss Uncalled Witnesses Equally

6  Available to Both Sides.

7         Both the government and the defense have the same

8  power to subpoena witnesses to testify on their behalf.  If a

9  potential witness could have been called by the government or

10  by the defendant and neither called the witness, then you may

11  draw the conclusion that the testimony of the absent witness

12  might have been unfavorable to the government or to the

13  defendant or to both.

14         On the other hand, it is equally within your

15  province to draw no inference at all from the failure of

16  either side to call a witness.  You are to remember that there

17  is no duty on either side to call a witness.  An uncalled

18  witness's testimony might have been merely cumulative of

19  testimony already in evidence, or might have merely provided

20  additional testimony to facts already in evidence.

21         I remind you, however, that because the law presumes

22  the defendant to be innocent, the burden of proving his guilt

23  beyond a reasonable doubt is on the government throughout the

24  trial.  The defendant never has the burden of proving his

25  innocence or of producing any evidence or calling any

JURY CHARGE

1  witnesses at all.

2          I will now discuss Evidence Obtained Pursuant to

3  Searches.

4          During the trial in this case you have heard

5  evidence seized during the execution of search warrants on two

6  residences which occurred on March 27th, 2018 in upstate New

7  York, as well as evidence recovered from searches of email

8  accounts and from other locations.  I instruct you that these

9  searches were lawful and any evidence that was presented to

10  you from these searches was obtained legally and can be

11  considered by you.  The fact of the search itself and the

12  manner in which the search was conducted should not enter into

13  your deliberations in any respect.  You must therefore give

14  this evidence full consideration along with all the other

15  evidence in the case in determining whether the government has

16  proved that the defendant is guilty beyond a reasonable doubt.

17          I will now discuss Evidence of Other Crimes.

18          You have heard evidence that the defendant engaged

19  in conduct, including crimes, other than the crimes charged in

20  the indictment.  The defendant is not on trial for committing

21  any acts not charged in the indictment.  Consequently, you may

22  not consider evidence of those other acts as a substitute for

23  proof that the defendant committed the crimes charged.  Nor

24  may you consider evidence of these other acts as proof that

25  the defendant has a criminal propensity, that is, that he

JURY CHARGE

1   likely committed the crimes charged in the indictment because

2   he was predisposed to criminal conduct.

3          As I have charged you during the trial, the evidence

4   of uncharged conduct by the defendant is admitted for a

5   limited purpose, and you may consider it only for those

6   limited purposes.  The purposes for which such evidence is

7   admitted are as follows:

8          1.  As evidence of the existence of the charged

9   enterprise and as evidence that the enterprise engaged in

10  racketeering activity.

11         2.  As evidence of the defendant's position or role

12  within the enterprise.

13         .  As evidence of the development of relationships

14  of trust between the defendant and others with whom they are

15  charged with carrying out the charged crimes.

16         .  As evidence enabling you to understand the

17  complete story of the charged crimes.

18         .  As evidence of conduct that is inextricably tied

19  with the charged crimes.

20         .  As evidence corroborating the testimony of other

21  government witnesses.

22         Evidence of uncharged conduct by the defendant may

23  not be considered by you for any purpose other than the ones I

24  have just listed.

25         I will now discuss Discrepancies in Testimony.

JURY CHARGE

1        You have heard evidence of discrepancies in the

2   testimony of certain witnesses and counsel have argued that

3   such discrepancies are a reason for you to reject the

4   testimony of those witnesses.

5        Evidence of discrepancies may be a basis to

6   disbelieve a witness's testimony.  On the other hand,

7   discrepancies in a witness's testimony or between his

8   testimony and that of others do not necessarily mean that the

9   witness's entire testimony should be discredited.

10       People sometimes forget things and even a truthful

11  witness may be nervous and contradict him or herself.

12  Further, two people witnessing an event may see or hear it

13  differently.  Whether a discrepancy pertains to a fact of

14  importance or only to a trivial detail should be considered in

15  weighing its significance.  A willful falsehood is always a

16  matter of importance and should be considered seriously.

17       It is for you to decide, based upon your total

18  impression of a witness, how to weigh the discrepancies in his

19  or her testimony and you should, as always, use common sense

20  and your own good judgment.

21       I am going to talk about Multiple Counts.

22       The indictment contains a total of seven counts or

23  charges against the defendant.  Each count charges the

24  defendant with a different crime.  You must consider each

25  count separately and return a separate verdict of guilty or

JURY CHARGE

1    not guilty for each count.  Whether you find Mr. Raniere

2    guilty or not guilty as to one count should not affect your

3    verdict as to any of the other charged counts.

4            Stipulations.

5            The attorneys for the United States and the

6    defendant have entered into stipulations concerning facts

7    which are relevant to this case.  When the attorneys on both

8    sides stipulate and agree to the existence of a fact, you

9    must, unless otherwise instructed, accept the stipulation as

10   evidence and regard that fact as proved.

11           I will now discuss the concept of Venue, V-E-N-U-E,

12   Venue.

13           Venue refers to the location of the charged crimes.

14   The indictment alleges that the crimes charged occurred in

15   whole or in part in this judicial district, the Eastern

16   District of New York.  The district encompasses the boroughs

17   of Brooklyn, Queens and Staten Island, as well as Nassau and

18   Suffolk Counties on Long Island.  To establish that venue for

19   a charged crime is appropriate in this district, the

20   government must prove that some act in furtherance of the

21   crime occurred here.  That means that, with respect to the

22   crime charged, even if other acts were committed outside this

23   district or if the crime was completed elsewhere, venue is

24   established in the Eastern District of New York so long as

25   some act in furtherance of the crime took place in this

5603

JURY CHARGE

1    district.

2              Let me further instruct you that while the

3    government's burden as to everything else in this case is

4    proof beyond a reasonable doubt, a standard that I have

5    already explained to you, venue need only be proved by the

6    lesser standard of preponderance of the evidence.  To prove

7    something by a preponderance of the evidence means simply to

8    prove that the fact is more likely true than not true.  I

9    emphasize that this lesser standard applies only where I

10   specifically mention it in this charge.

11             I am now going to talk about Publicity.

12             Your verdict must be based solely on the evidence

13   presented in this courtroom in accordance with my

14   instructions.  You must completely disregard any reports that

15   you have read in the press, seen on television, heard on the

16   radio or seen online.

17             I will now discuss Particular Investigative

18   Techniques Not Required.

19             I instruct you that there is no legal requirement

20   that the government use any specific investigative techniques

21   to prove its case.  Law enforcement techniques are not your

22   concern.  Your concern is to determine whether or not, based

23   upon all of the evidence in the case, the government has

24   proved that the defendant is guilty beyond a reasonable doubt

25   as to each count charged against him.

5604

JURY CHARGE

1    And, finally, Interviews of Witnesses.

2         There was testimony at trial that the attorneys for

3    the government interviewed witnesses when preparing for and

4    during the course of the trial.  You should not draw any

5    unfavorable inference from that testimony.  To the contrary,

6    the attorneys for both sides were obliged to prepare this case

7    as thoroughly as possible and might have been derelict in the

8    performance of their duties if they failed to interview

9    witnesses before the trial began and as necessary throughout

10   the course of the trial.

11        So, that completes Section One.  We're going to go

12   on after lunch to Section Two which is to discuss the

13   indictment and to discuss the specific charges and the

14   elements of the crimes and for most of those sections I am

15   going to enlist the assistance of my law clerks.

16        We'll resume at 10 to 2, it's now 1:00.  Have a good

17   lunch.  All rise for the jury.

18        (Jury leaves courtroom.)

19        THE COURT:  I think we had a slight duplication in

20   one of the items so I didn't reread it but hold on.

21        (Pause.)

22        MR. AGNIFILO:  Section 25, Judge.

23        THE COURT:  Yes, Other Persons Not on Trial.

24        MR. AGNIFILO:  Right, I noticed you didn't read it.

25        THE COURT:  Any objection to leaving that out?

Holly Driscoll, CSR, FCRR
Official Court Reporter

JURY CHARGE

1          MR. AGNIFILO:  I think that's fine.

2          MS. HAJJAR:  Thank you, Your Honor, that's fine.

3          THE COURT:  Okay.  We'll resume at 1:45.

4          MR. AGNIFILO:  Thank you, Judge.

5          THE COURT:  And we're going to try to get through

6     everything this afternoon.

7          MR. AGNIFILO:  Great.

8          THE COURT:  Thank you.  Oh, and think about

9     assembling the evidence which is I think in this case a big

10    project because you're going to have to roll that evidence --

11    I'm sorry, that evidence will have to be rolled into the jury

12    room except certain items such as the nude photographs, so

13    you'll tell me what you decide should be left out but

14    available to the jury if they request it.

15         MR. AGNIFILO:  Very good.

16         THE COURT:  Okay.  Thank you.

17         MR. AGNIFILO:  Thank you.

18         (Luncheon recess taken.)

19         (Continued on next page.)

20

21

22

23

24

25

JURY CHARGE

1        AFTERNOON SESSION

2            (In open court.)

3            THE COURT:  Everybody ready?

4            MR. AGNIFILO:  Yes, Judge.

5            THE COURT:  Bring in the jury.

6            (A brief pause in the proceedings was held.)

7            THE COURT:  Let me introduce my third law clerk,

8    Eleanor Davis, who has been watching from above.

9            (A brief pause in the proceedings was held.)

10           COURTROOM DEPUTY:  Jury entering.

11           (Jury enters courtroom.)

12           THE COURT:  All right.  Please be seated.

13           All right.  Members of the jury, we're now going to

14   continue with the charge on the law.

15           This section is going to be read by Andrew Haddad,

16   one of my law clerks, who you previously met.  And then we'll

17   move on to the next section, and hopefully, we'll get this all

18   done by 5:00 o'clock.

19           Okay, Andrew.  Thank you.

20           MR. HADDAD:  The defendant is formally charged in a

21   superseding indictment which I will simply call "the

22   indictment."

23           As the judge instructed you at the beginning of this

24   case, an indictment is a charge or accusation.

25           The indictment in this case contains seven separate

JURY CHARGE

1   counts and you will be called upon to render a separate

2   verdict on each.  I remind you that whether you find the

3   defendant guilty or not guilty as to one offense should not

4   affect your verdict as to any other offense charged.

5            I will now instruct you as to the legal elements of

6   the crimes charged.

7            During these instructions, you will hear me use the

8   words "knowingly" and "intentionally" from time to time.

9            A person acts knowingly when he acts intentionally

10  and voluntarily, and not because of ignorance, mistake,

11  accident, or carelessness.  Whether a defendant acted

12  knowingly may be proved by his conduct and by all of the facts

13  and circumstances surrounding a case.  A person acts

14  intentionally when he acts deliberately and purposefully; that

15  is, a defendant's acts must have been a product of his

16  conscious objective decision rather than the product of a

17  mistake or accident.

18           These issues of knowledge and intent require you to

19  make a determination about the defendant's state of mind,

20  something that can rarely be proved directly.  A wise and

21  careful consideration of all the circumstances of the case

22  may, however, permit you to make such a determination as to

23  the defendant's state of mind.

24           Indeed, in your everyday affairs, you frequently are

25  called upon to determine a person's state of mind from his or

JURY CHARGE

1   her words or actions in a given circumstance.  You are asked

2   to do the same here.

3            I will now instruct you on the law of conspiracy.

4            You should understand that a conspiracy is an

5   offense separate from the commission of any offense that may

6   have been committed pursuant to the conspiracy.  That is

7   because the formation of the conspiracy, a partnership for

8   criminal purposes, is in and of itself a crime.  If a

9   conspiracy exists, even if it fails to achieve its purpose, it

10  is still punishable as a crime.

11           The essence of the charge of conspiracy is an

12  understanding or agreement between or among two or more

13  persons that they all together to accomplish a common

14  objective that they know was unlawful.

15           The two elements of the crime of conspiracy are as

16  follows:

17           First, that two or more persons entered the unlawful

18  agreement charged in the conspiracy count that you are

19  considering, and;

20           Second, that the defendant knowingly and

21  intentionally became a member of the conspiracy with the

22  intent to accomplish its unlawful purpose.

23           Let me discuss these two elements of a conspiracy

24  charge in a little more detail.

25           First, as to the existence of a charged conspiracy,

JURY CHARGE

1    the Government must prove that two or more persons entered

2    into the unlawful agreement that is charged in the count or

3    racketeering act that you are considering.  One person cannot

4    commit the crime of conspiracy alone.  Rather, the proof must

5    convince you that at least two people are joined together in a

6    common criminal scheme.  The Government does not have to prove

7    an express or formal agreements when it seeks to prove a

8    conspiracy.

9         It need not prove the conspirators stated in words

10   or in writing what the scheme was, its object or purpose, or

11   the means by which it was to be accomplished.

12        It's sufficient, if the proof establishes, that the

13   conspirators tacitly came to a mutual understanding to

14   accomplish an unlawful act by means of a joint plan or a

15   common design.  Put another way, to establish a conspiracy,

16   the Government is not required to prove that the conspirators

17   sat around a table and entered into a solemn contract orally

18   or in writing stating that they have formed a conspiracy to

19   violate the law setting forth details of the plans, the means

20   by which the unlawful project is to be carried out, or the

21   part to be played by each conspirator.  It would be

22   extraordinary if there was such a formal document or specific

23   oral agreement.

24        Common sense would suggest that when people do, in

25   fact, undertake to enter into a conspiracy, much is left to an

JURY CHARGE

1  unexpressed understanding.  A conspiracy by its very nature is

2  almost invariably secret in both origin and execution.

3  Therefore, it is sufficient for the Government to show that

4  the conspirators somehow came to a mutual understanding to

5  accomplish an unlawful act by means of a joint plan or common

6  scheme.  Moreover, since a conspiracy is by its very nature

7  characterized by its secrecy, you may infer its existence from

8  the circumstances of the case and the conduct of the parties

9  involvement.

10       In a very real sense, then, in the context of

11  conspiracy cases, actions often speak louder than words.  In

12  this regard, you may, in determining whether an agreement

13  existed here, consider the actions and statements of all of

14  those you find to be participants as proof that a common

15  design existed on the part of the persons charged to act

16  together to accomplish an unlawful purpose.

17       The second element requires that if you find the

18  conspiracy existed you must determine whether the defendant

19  was a member.  That is, you must determine whether he

20  participated in the conspiracy willfully and with knowledge of

21  its unlawful purpose and in furtherance of its unlawful

22  purpose.

23       To act willfully means to act knowingly and

24  purposely with an intent to do something the law forbids.

25       A defendant's knowledge is a matter of inference

JURY CHARGE

1    from the facts proved.

2              To become a member of the conspiracy, a defendant

3    need not have known the identities of every member, nor did he

4    have bee to be apprised of their activities.

5              Moreover, a defendant need not have been fully

6    informed as to all of the details or the scope of the

7    conspiracy in order to justify an inference of knowledge on

8    his or her part.  However, that defendant must agree on the

9    essential nature of the plan and be conscious of its general

10   nature and extent.

11             The extent or duration of a defendant's

12   participation does not necessarily bear on the issue of that

13   defendant's guilt.  An equal role in the conspiracy is not

14   what the law requires.

15             If you find that the conspiracy existed, and if you

16   further find that the defendant participated in it knowingly

17   and willfully, the extent or degree of his participation is

18   not material.  Moreover, it is not required that a person be a

19   member of the conspiracy from its very start.  I want to

20   caution you, however, that the defendant's mere presence at

21   the scene of criminal activities, or at locations frequented

22   by criminals, the does not by himself make him a member of the

23   conspiracy.

24             Similarly, mere association with one or more members

25   of a conspiracy does not automatically make the defendant a

JURY CHARGE

1    member.  A person may know or be friendly with a criminal

2    without being a criminal himself.  Indeed, a person may be a

3    criminal without being a member of the charged conspiracy.

4    Mere similarity of conduct, or the fact that individuals may

5    have assembled together and discussed common aims and

6    interests, does not necessarily establish proof of the

7    existence of the conspiracy.

8           I further caution you that mere knowledge or

9    acquiescence without participation in the unlawful plan is not

10   sufficient.  The fact that the acts of a defendant merely

11   happen to further the purposes or objectives of a conspiracy

12   without his knowledge does not make that defendant a member,

13   more is required under the law.  What is necessary is that the

14   defendant must have participated with knowledge of at least

15   some of the purposes or objectives of the conspiracy and with

16   the intention of aiding in the accomplishment of those

17   unlawful ends.

18          Thus, while someone who is present during the

19   conspiracy is not necessarily a member, I further instruct you

20   that you may find that the defendant knowingly and willfully

21   became and was a member of the conspiracy if you find that his

22   presence was purposeful; that is, that the defendant's

23   presence on one or more occasions was intended to serve the

24   purposes of the conspiracy.

25          In sum, the defendant, in order to be a member of a

JURY CHARGE

1    conspiracy, must have intentionally engaged, advised, or

2    assisted in that conspiracy for the purpose of furthering the

3    illegal undertaking and must have done so with the

4    understanding of the unlawful character of the conspiracy.  In

5    so doing, the defendant would have been a knowing and willful

6    participant in the unlawful agreement, that is to say, a

7    conspirator.

8            Before turning to the specific crimes charged, I

9    will also inform you of the principle of aiding and abetting

10   liability under federal law and New York State law.

11           Title 18, United States Code, Section 2 provides:

12   "Whoever commits an offense against the United States, or aids

13   or abets or counsels, commands, or induces or procures its

14   commission is punishable as a principal.  And whoever

15   willfully causes an act to be done which, if directly

16   performed by him, would be an offense against the

17   United States is punishable as a principal."

18           Under The Aiding and Abetting Statute, it is not

19   necessary for the Government to show that the defendant

20   himself physically committed the crime with which he is

21   charged in order for the Government to sustain its burden of

22   proof.  A person who aids or abets another to commit an

23   offense is just as guilty of that offense as if he committed

24   to himself.

25           Accordingly, you may find the defendant guilty of

JURY CHARGE

1    the offense charged if you find beyond a reasonable doubt that

2    the Government has proved that another person actually

3    committed the offense with which the defendant is charged and

4    that the defendant aided or abetted that person in the

5    commission of the offense.

6         Under The Aiding and Abetting Statute, the first

7    requirement is that you find that another person has committed

8    the crime charged.  Obviously, no one can be convicted of

9    aiding or abetting the criminal acts of another if no crime is

10   committed by the other person in the first place.  But if you

11   do find that a crime was committed, then you must consider

12   whether the defendant aided or abetted the commission of that

13   crime.

14        In order to aid or abet another to commit a crime,

15   it is necessary that a defendant knowingly associated himself

16   in some way with the crime, and that he participated in the

17   crime by doing some act to help make the crime succeed.

18        To establish that the defendant knowingly associated

19   himself with the crime you are considering, the Government

20   must establish that the defendant knew that the crime was

21   being committed.  To establish that the defendant participated

22   in the commission of the crime, the Government must prove that

23   the defendant engaged in some affirmative conduct or overt act

24   for the specific purpose of bringing about that crime.

25        The mere presence of a defendant where a crime was

5615

JURY CHARGE

1  being committed, even coupled with knowledge by that defendant

2  that a crime was being committed or merely associating with

3  others who are committing the crime is not sufficient to

4  establish aiding and abetting.

5          One who has no knowledge that a crime is being

6  committed, or is about to be committed, but inadvertently does

7  something that aids in the commission of that crime is not an

8  aider and abettor.  An aider and abetter must know that the

9  crime is being committed and act in a way that is intending to

10 bring about the success of the criminal venture.

11         To determine whether the defendant aided or abetted

12 the commission of the crime with which he is charged, ask

13 yourself these questions:

14         Did he participate in the crime charged with

15 something he wished to bring about?  Did he knowingly

16 associate himself with the criminal venture?  Did he seek by

17 his actions to make the criminal venture succeed?  If he did

18 these things, then the defendant is an aider and abettor and

19 therefore guilty of the offense.

20         If, on the other hand, your answer to any one of

21 these questions is no then the defendant is not an aider and

22 abettor and you must find him not guilty under that theory.

23         The relevant New York State statute on aiding and

24 abetting is Section 20 of the New York Penal Law which

25 provides in pertinent part as follows:

JURY CHARGE

1       "When one person engages in conduct which

2  constitutes an offense, another person is criminally liable or

3  such conduct when, acting with the mental culpability or

4  required for the commission thereof, he solicits, requests,

5  importunes, or intentionally aids such person to engage in

6  such conduct."

7       Under New York State law, as under federal law, a

8  defendant charged with aiding and abetting a crime may be

9  liable for the crime even if he, himself, does not commit the

10  crime charged.

11      Before the defendant may be held criminally liable

12  for the crime of another under New York State law, you must

13  find each of the following two elements.

14      First, that the defendant solicited, requested,

15  commanded, importuned or intentionally aided the other person

16  to engage in the criminal conduct.

17      And second, that the defendant did so with the state

18  of mind required for the commission of the offense.

19      I will now discuss co-conspirator statements and

20  liability.

21      The charges against the defendant allege that he

22  participated in a certain conspiracy.  In that regard, the

23  judge admitted into evidence against the defendant the acts

24  and statements of the others because these acts and statements

25  were committed by persons who the Government alleges were also

JURY CHARGE

1    confederates or co-conspirators of the defendant on trial.

2         The reason for allowing this evidence to be received

3    against the defendant has to do with the nature of the crime

4    of conspiracy.

5         A conspiracy is often referred to as a "partnership

6    in crime."  Thus, as in other types of partnerships, when

7    people enter into a conspiracy to accomplish an unlawful end,

8    each and every member becomes an agent for the other

9    conspirators in carrying out the conspiracy.

10        Accordingly, the reasonably foreseeable acts,

11   declarations, statements, and omissions of any member of the

12   conspiracy and in furtherance of the common purpose of the

13   conspiracy are deemed under the law to be the acts of all of

14   the members, and all of the members are responsibility for

15   such acts, declarations, statements, and omissions.

16        Thus, if you find that the defendant was a member of

17   a charged criminal conspiracy, then any acts done or

18   statements made in furtherance of the conspiracy by persons

19   also found by you to have been members of that conspiracy may

20   be considered against the defendant.  This is so even if such

21   acts were done and statements whether made in the defendant's

22   absence and without his knowledge.

23        Before you may consider the statements or acts of a

24   co-conspirator in deciding the issue of the defendant's guilt,

25   you must first determine that the acts and statements were

JURY CHARGE

1  made during the existence and in furtherance of the unlawful

2  scheme.  If the acts were done, or the statements made, by

3  someone whom you do not find to have been a member of the

4  conspiracy, or if they were done or said in furtherance of

5  that conspiracy, they may not be considered by you as evidence

6  against the defendant as to that conspiracy.

7          Now, I will instruct you on each of the counts in

8  the indictment.  The order of the counts of the indictment is

9  not important.

10          Counts One and Two of the indictment charge the

11  defendant, Keith Raniere, with the crimes of racketeering

12  conspiracy and racketeering commonly referred to as violations

13  of the RICO statute.

14          I will first instruct you on the law regarding Count

15  Two which charges the defendant with the crime racketeering

16  and then instruct you on the law as it relates to Count One

17  which charges the defendant with the crime of racketeering

18  conspiracy.

19          Count Two reads as follows:

20          "In or about and between 2003 and March 2018, both

21  dates being approximate and exclusive, within the Eastern

22  District of New York and elsewhere, the defendant, Keith

23  Raniere, also known Vanguard, Grandmaster and Master, together

24  with others, being persons employed by and associated with the

25  enterprise, an enterprise that engaged in the activities of

JURY CHARGE

1   which affected interstate and foreign commerce, did knowingly

2   and intentionally conduct and participate directly and

3   indirectly in the conduct of the affairs of such enterprise

4   through a pattern of racketeering activity as that terms is

5   defined in Title 18, United States Code, Sections 1961(1) and

6   1961(5) consisting of the racketeering acts set forth below."

7       The relevant provision of the RICO statute provides

8   as follows:

9       "It shall be unlawful for any person employed by or

10  associated with any enterprise engaged in, or the activities

11  of which affect interstate or foreign commerce to conduct or

12  participate, directly or indirectly, in the conduct of such

13  enterprise's affairs through a pattern of racketeering

14  activity."

15      To prove this crime, the Government must prove five

16  elements beyond a reasonable doubt.

17      First:  An enterprise as described in the indictment

18  existed on or about the time alleged in the indictment.

19      Second:  The enterprise engaged in, or its

20  activities affected, interstate or foreign commerce.

21      Third:  The defendant was employed by or was

22  associated with the enterprise.

23      Fourth:  The defendant knowingly conducted or

24  participated, either directly or indirectly, in the conduct of

25  the affairs of the enterprise.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JURY CHARGE

1         And fifth:  The defendant knowingly participated in

2    the conduct of the affairs of the enterprise through a pattern

3    of racketeering activity as described in the indictment; that

4    is, to the commission of at least two of the charged

5    racketeering acts which must have occurred within ten years of

6    each other or through causing or aiding and abetting the

7    commission of two such racketeering acts.

8         I will now explain each of these elements in greater

9    detail.

10        The first element the Government must prove beyond a

11   reasonable doubt is that an enterprise existed.

12        The indictment alleges the existence of the

13   following enterprise?

14        "The defendant, Keith Raniere, also known as

15   Vanguard, Grandmaster, and Master, was the founder of several

16   pyramid-structured organizations ("the pyramid organizations")

17   including but not limited to, one, NXIVM, Executive Success

18   Programs, Inc., Jness, LLC, Society of Protectors LLC, Ultima,

19   and other related entities collectively NXIVM.

20        And two, an organization referred to as DOS, the

21   Vow, and the Sorority.  Collectively DOS.

22        In leading the pyramid organizations, Raniere relied

23   on certain individuals sometimes referred to as his Inner

24   Circle who were accorded special positions of trust and

25   privilege with Raniere and who carried out his directives.

JURY CHARGE

1          Members of Raniere's Inner Circle also held high

2   positions in one or more of the pyramid organizations

3   including serving as executives, directors, and officers of

4   NXIVM.

5          Members of Raniere's Inner Circle also, at times,

6   served as first line masters in DOS directly under Raniere,

7   meaning, that they comprise the second highest level with the

8   DOS pyramid, and that other than Raniere they wielded the most

9   power within DOS.

10          Raniere and his Inner Circle and others known and

11   unknown comprised an organized criminal enterprise.  The

12   enterprise including its leadership, membership, and

13   associates constituted an enterprise as defined in Title 18,

14   United States Code, Section 1961(4), that is, a group of

15   individuals associated-in-fact that was engaged in and the

16   activities of which affected interstate and foreign commerce.

17          The enterprise constituted an ongoing organization

18   whose members functioned as a continuing unit for a common

19   purpose of achieving the objectives of the enterprise.

20          The principal purpose of the enterprise was to

21   promote the defendant, Keith Raniere, also known as Vanguard,

22   grand Master and Master, and to recruit new members into the

23   pyramid organizations by promoting Raniere and recruiting

24   others into the pyramid organizations, the members of the

25   enterprise expected to receive financial opportunities and

JURY CHARGE

1  personal benefits including increased power and status within

2  the enterprise.  The enterprise operated within the Eastern

3  District of New York, the Northern District of New York and

4  elsewhere including overseas.

5          Among the means and methods by which the defendant

6  and his associates participated in the conduct of the

7  enterprise were the following:

8          Promoting, enhancing, and protecting the enterprise

9  by committing, attempting, and conspiring to commit crimes

10  including, but not limited to, visa fraud, identity theft,

11  extortion, forced labor, sex trafficking, wire fraud, tax

12  evasion and obstruction of justice.

13          Demanding absolute commitment to Raniere including

14  by exalting Raniere's teachings and ideology and not

15  tolerating dissent.

16          Inducing shame and guilt in order to be influence

17  and control members and associates of the enterprise.

18          Obtaining sensitive information about members and

19  associates of the enterprise in order to maintain control over

20  them.

21          Recruiting and grooming sexual partners or Raniere

22  in obtaining nude photographs of women for Raniere.

23          Isolating associates and others from friends and

24  family and making them dependent on the enterprise for their

25  financial well being and legal status in the United States.

JURY CHARGE

1          Protecting and attempting to protect Raniere and the

2    enterprise by, among other things, gaining political influence

3    in evading regulatory agencies, using harassment and coercion

4    and abusive litigation to intimidate and attack perceived and

5    critics of Raniere, and encouraging associates and others to

6    take expensive NXIVM courses and incur debt to do so is a

7    means of exerting control over them and to obtain financial

8    benefits for members of the enterprise."

9          The term "enterprise" as used in these instructions

10   may include any group of people associated-in-fact even though

11   this association is not recognized as a legal entity.  Thus,

12   an enterprise need be not a formal business entity such as a

13   corporation but meeting merely as informal association of

14   individuals.

15         The term "enterprise" includes legitimate and

16   illegitimate enterprises.  An enterprise can merely be a

17   vehicle used by a defendant to commit crimes.

18         The enterprise does not have to have a particular

19   name, or for that matter, any name at all.  Nor must it be

20   registered or licensed as an enterprise or be a commonly

21   recognized legal entity such as a corporation, a partnership,

22   a business or the like.

23         A group or association of people can be an

24   enterprise if these individuals have associated together for a

25   common purpose of engaging in a course of conduct.  Mere

5624

JURY CHARGE

1  similarity of conduct or the fact that individuals may have

2  assembled together and discussed common aims and interests

3  does not necessarily establish proof of the existence of an

4  enterprise though you may consider such factors.

5          Such an association of persons may be established by

6  evidence showing an ongoing organization or more informal, and

7  by evidence that the people making up the association

8  functioned as a continuing unit.

9          The Government must prove an association-in-fact

10  enterprise existed by evidence of an ongoing organization,

11  formal or informal, and by evidence that the various

12  associates functioned as a continuing unit.

13          The enterprise must have the three following

14  structural features:  A purpose, relationships among those

15  associated with the enterprise, and longevity sufficient to

16  permit these associates to pursue the enterprise's purpose.

17          It is not necessary that the surprise have any

18  particular or formal structure, but it must have sufficient

19  organization that its members functioned and operated in a

20  coordinated manner in order to carry out the alleged common

21  purpose or purposes of the enterprise.

22          Such a group need not have a hierarchal structure or

23  chain of command.  Decisions may be made an ad hoc basis and

24  by any or number of methods by majority vote, consensus, show

25  of strength, et cetera.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

JURY CHARGE

1        Members of the group need not have fixed roles.

2   Different members may perform different roles at different

3   times.  The group need not have a name, regular meetings,

4   dues, established rules and regulations, disciplinary

5   procedures, or initiation procedures.

6        While the group must function as a continuing unit

7   and remain in existence long enough to pursue a course of

8   conduct, you may nonetheless find that the enterprise element

9   is satisfied by finding the existence of the group whose

10  associates engage in spurts of activity punctuated by periods

11  of inactivity.

12        Thus, an enterprise need not have role

13  differentiation, a modus operandi, a chain of command,

14  sophistication, organization, diversity and complexity of

15  crimes, uncharged or additional crimes aside from the alleged

16  racketeering activity, or an enterprise name.

17        Moreover, an enterprise is not required to be

18  businesslike in its form or function and it may but need not

19  have an economic or profit seeking motive.  Indeed, RICO is

20  not limited to groups or crimes are sophisticated, diverse,

21  complex, or unique.

22        Such an association of individuals may retain status

23  as an enterprise even though the membership of the association

24  changes over time by adding or losing individuals during the

25  course of its existence.  The exist of the enterprise

JURY CHARGE

1   continues even if there is a gap or interruption of the

2   enterprise's racketeering activity.

3        Although, whether an enterprise existed is a

4   distinct element that must be proved by the Government, common

5   sense dictates that the existence of an enterprise is

6   oftentimes more readily proved by what it does rather than by

7   an abstract analysis of its structure.

8        Thus, the evidence used to prove the pattern of

9   racketeering in the enterprise my coalesce.  Therefore, you

10  may consider proof of the racketeering acts to determine

11  whether the evidence establishes the existence of an

12  enterprise, and further, you may infer the existence of an

13  enterprise with evidence of a pattern of racketeering

14  activity.

15       The Government is not required to prove each and

16  every allegation about the enterprise or the manner in which

17  the enterprise operated.  The enterprise proved, however, must

18  be essentially the one alleged in the indictment.

19       The second element that the Government must prove

20  beyond a reasonable doubt is that the enterprise was engaged

21  in, or had an affect on, interstate or foreign commerce even

22  if it was only a minimal affect.

23       Interstate commerce means trade or conducting

24  business or travel between one state and another state or the

25  District of Columbia.  Foreign commerce means such trade,

JURY CHARGE

1    business, or travel between the United States and another

2    country.

3            Therefore, interstate and foreign commerce may

4    include the movement of money, goods, services, or persons

5    from one state to another state or the District of Columbia,

6    or between the United States and another country.

7            This may include, among other matters, a purchase or

8    sale of goods or supplies from outside the United States.  The

9    use of interstate or international mail or wire facilities or

10   the causing of any of those things.

11           The Government need not prove that the acts of the

12   defendant affected interstate or foreign commerce, or that the

13   defendant knew that he was affecting interstate state or

14   foreign commerce.

15           Regarding an alternative method of satisfying this

16   element to establish the requisite of affecting interstate or

17   foreign commerce, the Government is not required to prove a

18   significant or a substantial affect on interstate or foreign

19   commerce.

20           This element simply ensures federal jurisdiction

21   over the conduct has satisfied if even a minimal affect on

22   interstate or foreign commerce.  The affect need not be

23   direct.  Any affect, even if it is postponed, indirect or

24   slight, is sufficient to satisfy the interstate or foreign

25   commerce element.  It does not matter whether the affect is

JURY CHARGE

1  harmful or beneficial to interstate or foreign commerce.

2  Moreover, it's not necessary for the Government to

3  proof that the defendant knew that the enterprise would affect

4  interstate or foreign commerce that the defendant intended to

5  affect interstate or foreign commerce, or that the defendant

6  engaged in, or that his activities affected interstate or

7  foreign commerce.

8  I instruct you that it makes no difference whether

9  the type of interstate or foreign commerce affected is legal

10  or illegal.  It is not necessary for the Government to prove

11  that the individual racketeering acts themselves affected

12  interstate or foreign commerce.

13  Rather, it is the enterprise and its activities

14  considered in their entirety that must be shown to have that

15  affect.  On the other hand, this affect on interstate or

16  foreign commerce may be established through the affect caused

17  by the individual racketeering acts.

18  The third element that the Government must prove

19  beyond a reasonable doubt is that the defendant was associated

20  with or employed by the enterprise at some time during the

21  period charged in the indictment.

22  Associated with should be given its plain meaning.

23  Associate means to join often in a loose

24  relationship as a partner, fellow worker, colleague, friend,

25  companion, or ally to join or connect with one another.

JURY CHARGE

1          Therefore, a person is associated with an enterprise

2     when, for example, he joins with other members of the

3     enterprise and he knowingly aids or furthers the activities of

4     the enterprise, or he conducts business with or through the

5     enterprise with or through the enterprise.

6          The defendant need not have been a member of or

7     associated with the enterprise for the entire period of its

8     existence, but the defendant must have been associated with

9     the enterprise at the time he allegedly committed the crimes

10     charged.  That is, the Government must prove that the

11     defendant was connected to the enterprise in some meaningful,

12     way, and that he knew of the existence of the enterprise and

13     of the general nature of its activities.

14          A person cannot be associated or employed by an

15     enterprise if he does not know of the enterprise's existence

16     or the nature of its activity.

17          The fourth element that the Government must prove is

18     that the defendant knowingly conducted or participated either

19     directly or indirectly in the conduct of the affairs of the

20     enterprise.

21          This means that the defendant must have played some

22     part in the operation or management in the enterprise, and

23     that the defendant intentionally performed acts, functions, or

24     duties that are necessary to, or helpful, in the operation of

25     the enterprise.

JURY CHARGE

1        Thus, if the defendant participated in the operation

2   or management of the enterprise itself, or he had some part in

3   directing the enterprise's affairs, that would satisfy this

4   element.  In other words, all who participate in the conduct

5   of the enterprise whether they are generals or foot soldiers

6   are responsible for the affairs of the enterprise.

7        The fifth element the Government must prove beyond a

8   reasonable doubt is that the defendant engaged in a pattern of

9   racketeering activity.

10       The term "racketeering activity" is defined to mean

11  the commission of certain crimes.  The pattern of racketeering

12  activity generally means the following;

13       First, the defendant intentionally committed or

14  caused or aided and abetting the commission of two or more of

15  the racketeering acts alleged in the indictment.  At least two

16  of which must have occurred within ten years of each other.

17       Your verdict must be unanimous as to which specific

18  racketeering acts you find that the defendant committed,

19  caused, or aided and abetted.

20       Shortly, I will instruct you on the elements

21  regarding each of the alleged racketeering acts.

22       Second, the racketeering acts must have a nexus to

23  the enterprise and the racketeering acts must be related.

24       A racketeering act has nexus to the enterprise if it

25  has a meaningful connection to the enterprise to be related,

JURY CHARGE

1   the racketeering acts must have the same or similar purposes,

2   results, participants, victim, or methods of commission, or be

3   related by distinguishing characteristics and not be merely

4   isolated events.

5          Two racketeering acts may be related even though

6   they are dissimilar or not directly related to each other

7   provided that the racketeering acts are related to the same

8   enterprise.

9          For example, for both nexus and relatedness

10   purposes, the requisite relationship between the RICO

11   enterprise and the predicate racketeering act may be

12   established by evidence that the defendant was enabled to

13   commit the racketeering act solely by virtue of his position

14   in the enterprise or involvement in or control over its

15   affairs, or by evidence that the defendant's position in the

16   enterprise facilitated his commission of the racketeering act;

17   or by evidence that the racketeering act benefited the

18   enterprise, or by evidence that the racketeering act was

19   authorized by the enterprise or by evidence the racketeering

20   act promoted or furthered the purposes of the enterprise.

21          Third, the racketeering acts themselves either

22   extended over a substantial period of time or posed a threat

23   of continued criminal activity.

24          The Government need not prove such a threat of

25   continuity by any mathematical formula or by any particular

JURY CHARGE

1   method of proof, but rather, may prove it in a variety of

2   ways.

3          For example, the threat of continued unlawful

4   activity may be established when the evidences shows that the

5   racketeering acts are part of a long-term association that

6   exists for criminal purposes, or when the racketeering acts

7   are shown to be a regular way of conducting the affairs of the

8   enterprise.

9          Moreover, in determining whether the Government has

10  proved the threat of continued unlawful activity, you are not

11  limited to consideration of the specific racketeering acts

12  charged against the defendant.

13         Rather, in addition to considering such acts, you

14  also may consider the nature of the enterprise and other

15  unlawful activities of the enterprise and its members viewed

16  in their entirety including both charged and uncharged

17  unlawful activities.

18         (Continued on the next page.)

19

20

21

22

23

24

25

JURY CHARGE

1    MR. HADDAD:  (Continued.)  I will now explain the

2  law governing the eleven racketeering acts that the government

3  has alleged.  As a reminder, you must render separate verdicts

4  of proven or not proven with regard to each of these alleged

5  racketeering acts on the verdict sheet under Count Two.

6    I will now discuss Racketeering Act One.

7    Racketeering Act One alleges that the defendant

8  committed two separate crimes:  conspiracy to commit identity

9  theft and conspiracy to unlawfully possess an identification

10  document.  Thus, Racketeering Act One has two parts, and you

11  will render separate verdicts on each part.  If you find that

12  the defendant committed either or both of these two crimes,

13  you must find that the government has proved Racketeering

14  Act One.

15    Racketeering Act 1A, which is Conspiracy to Commit

16  Identity Theft of Ashana Chenoa.

17    The first part of Racketeering Act One, which is

18  referred to on the verdict sheet as Racketeering Act 1A,

19  alleges that the defendant committed conspiracy to commit

20  identity theft as to Ashana Chenoa.  With respect to

21  Racketeering Act 1A, the indictment reads as follows:

22    "In or about 2004, within the Northern District of

23  New York and elsewhere, the defendant Keith Raniere, together

24  with others, did knowingly and intentionally conspire to

25  transfer, possess and use, without lawful authority and in and

JURY CHARGE

1   affecting interstate and foreign commerce, one or more means

2   of identification of another person, to wit: Ashana Chenoa,

3   with the intent to commit, and to aid and abet, and in

4   connection with, unlawful activity that constituted one or

5   more violations of federal law, to wit: bringing in,

6   transporting and harboring an alien, in violation of Title 8,

7   United States Code, Section 1324(a)(1)(A), contrary to

8   Title 18, United States Code, Section 1028(a)(7), all in

9   violation of Title 18, United States Code, Section 1028(f)."

10          Racketeering Act 1A alleges that the defendant

11  conspired to violate Title 18, United States Code,

12  Section 1028(a)(7).  There are two relevant statutory

13  provisions in Racketeering Act 1A.  First, Title 18, United

14  States Code, Section 1028(a)(7) makes it a federal crime for

15  anyone knowingly to transfer, possess and use, without lawful

16  authority, a means of identification of another person in

17  order to commit, or to aid and abet, or in connection with,

18  any unlawful activity that violates federal or state law.

19  Second, Title 18, United States Code, Section 1028(f) makes it

20  a federal crime to conspire to commit the crime I just

21  described.

22          The defendant is charged with conspiring under

23  Section 1028(f) to commit the crime defined in

24  Section 1028(a)(7).  I have already instructed you on the

25  general definition of conspiracy, which is an agreement among

Holly Driscoll, CSR, FCRR
Official Court Reporter

JURY CHARGE

1   two or more people to commit a crime.  I remind you that the

2   crime of conspiracy to violate a federal law is a separate

3   offense from the underlying crime.  It is separate and

4   distinct from an actual violation of identity theft, which is

5   the object of the conspiracy and what we call the substantive

6   crime.  In order to find the defendant guilty of conspiracy to

7   commit identity theft, you must find that two or more persons

8   agreed to commit the crime of identity theft, and that the

9   defendant knowingly and intentionally became a member of the

10  conspiracy.

11          The elements of the crime of identity theft are as

12  follows:

13          First, that the defendant or a co-conspirator

14  knowingly transferred or possessed or used a means of

15  identification of another person;.

16          Second, that the defendant or a co-conspirator knew

17  that the means of identification belonged to another person;.

18          Third, that the defendant or a co-conspirator acted

19  without lawful authority;.

20          Fourth, that the defendant or a co-conspirator acted

21  with the intent to commit, or to aid and abet, or in

22  connection with, an unlawful activity that violates federal

23  law;.

24          Fifth, that the transfer or possession or use of the

25  means of identification occurred in or affected interstate or

Holly Driscoll, CSR, FCRR
Official Court Reporter

JURY CHARGE

1    foreign commerce, or the means of identification was

2    transported in the mail in the course of the transfer or

3    possession or use.

4            As to the first element, the government must prove

5    beyond a reasonable doubt that the item described in the

6    indictment is a means of identification of another person.

7    The term "means of identification" means any name or number

8    that may be used, alone or in conjunction with any other

9    information, to identify a specific individual, including a

10   name, social security number, date of birth, official state or

11   government issued driver's license or identification number,

12   alien registration number, government passport number, or

13   employer or taxpayer identification number.  The means of

14   identification may belong to a living or deceased person.

15           I further instruct you that to use a means of

16   identification is to present, display, certify, or otherwise

17   employ the document in any manner so that it would be accepted

18   as identification.  To transfer a means of identification

19   means simply to turn over possession or control of the means

20   of identification.  To possess a means of identification means

21   to have it within a person's control.  This does not mean that

22   the person must have actual possession of it.  As long as the

23   means of identification was within the person's control, he

24   possessed it.  If you find that the person either had actual

25   possession of the means of identification or that he had the

JURY CHARGE

1    power and intention to exercise control over it, even though

2    it was not in his physical possession, you may find that the

3    government has proved possession.

4           Possession may be sole or joint.  If one person

5    alone possesses something, that is sole possession.  However,

6    it is possible that more than one person may have the power

7    and intention to exercise control over a means of

8    identification.  That is called joint possession.  If you find

9    that a person had such power and intention, then he possessed

10   the means of identification even if he possessed it jointly

11   with another person.

12          As to the third element, the government must prove

13   that the defendant or a co-conspirator was not authorized to

14   use the means of identification.  The government must also

15   prove that the defendant or a co-conspirator used or

16   transferred or possessed the means of identification

17   knowingly, that is, he or she did so voluntarily and

18   intentionally and not because of accident, mistake or some

19   other innocent reason.

20          The fourth element the government must prove beyond

21   a reasonable doubt is that the defendant or a co-conspirator

22   used or transferred or possessed the means of identification

23   with the intent to commit, or to aid and abet, or in

24   connection with, an unlawful activity that violates federal

25   law.  In this case the government has alleged the defendant

JURY CHARGE

1    acted with the intent to commit the bringing in, transporting

2    and harboring of an alien, that is, a person who is not a

3    citizen of the United States, in violation of Title 8, United

4    States Code, Section 1324(a)(1)(A).  In relevant part,

5    Section 1324(a)(1)(A) prohibits two categories of criminal

6    acts:  first, it prohibits a person from transporting or

7    moving an alien within the United States, or attempting to do

8    so, knowing or in reckless disregard of the fact that the

9    alien is in the United States in violation of law, and in

10   furtherance of the alien's violation of the immigration laws;

11   and second, it prohibits a person from concealing, harboring,

12   or shielding from detection an alien within the United States,

13   or attempting to do so, knowing or in reckless disregard of

14   the fact that the person is in the United States in violation

15   of law, and to facilitate the alien's ability to remain in the

16   United States, that is, to make the alien's remaining in the

17   United States illegally substantially easier or less

18   difficult.

19        To establish this element, the government does not

20   need to prove that the defendant actually committed any of the

21   crimes prohibited by 1324(a)(1)(A).  This element is satisfied

22   if you find that the government proved beyond a reasonable

23   doubt that the defendant used or transferred or possessed the

24   means of identification, or conspired to do so, with the

25   intent to commit, aid and abet, or in connection with any of

JURY CHARGE

1    these offenses.

2            Finally, as to the fifth element, I instruct you

3    that interstate or foreign commerce simply means the movement

4    of goods, services, money and individuals between any two or

5    more states or a state and a foreign country.  To satisfy this

6    element, the government must prove that the defendant's

7    conduct affected interstate or foreign commerce in any way, no

8    matter how minimal.

9            I will now discuss Racketeering Act 1B which is

10   Conspiracy to Unlawfully Possess an Identification Document.

11           The second part of Racketeering Act One, which is

12   referred to on the verdict sheet as Racketeering Act 1B,

13   charges the defendant with conspiracy to unlawfully possess an

14   identification document.  With respect to Racketeering Act 1B

15   the indictment reads as follows:

16           "In or about December 2004, within the Northern

17   District of New York and elsewhere, the defendant Keith

18   Raniere, together with others, did knowingly and intentionally

19   conspire to possess a false identification document, to wit: a

20   sheriff's identification card with the last name and date of

21   birth of Ashana Chenoa, with the intent that such document be

22   used to defraud the United States, contrary to Title 18,

23   United States Code, Section 1028(a)(4), in violation of

24   Title 18, United States Code, Section 1028(f)."

25           Racketeering Act 1B alleges that the defendant

JURY CHARGE

1   conspired to violate Title 8, United States Code,

2   Section 1028(a)(4) -- I'm sorry, that's Title 18, United

3   States Code, Section 1028(a)(4).

4            THE COURT:  Okay.

5            MR. HADDAD:  As with Racketeering Act 1A, there are

6   two relevant statutory provisions in Racketeering Act 1B.

7   First, Title 18, United States Code, Section 1028(a)(4) makes

8   it a federal crime for anyone knowingly to possess an

9   identification document, authentication feature, or false

10  identification document with the intent that it be used to

11  defraud the United States.  Second, Title 18, United States

12  Code, Section 1028(f) makes it a federal crime to conspire to

13  commit the crime I just described.

14           The defendant is charged with conspiring under

15  Section 1028(f) to commit the crime defined in Section

16  1028(a)(4).  I have already instructed you on the general

17  definition of conspiracy.  You should apply that definition

18  here.  I will now define the elements of unlawful possession

19  of an identification document.

20           The elements of the crime of unlawful possession of

21  an identification document are as follows:

22           First, the document described in the indictment,

23  i.e. a sheriff's identification card with the last name and

24  date of birth of Ashana Chenoa is a false identification

25  document;.

JURY CHARGE

1      Second, the defendant or a co-conspirator possessed

2    that document;.

3      Third, the defendant or a co-conspirator possessed

4    that document knowingly and with the intent that such document

5    would be used to defraud the United States.

6      With respect to the first element.  I instruct you

7    that false identification document means a document of a type

8    intended or commonly accepted for the purposes of

9    identification of individuals that was not issued by or under

10   the authority of a governmental entity or was issued under the

11   authority of a governmental entity but was subsequently

12   altered for the powers of deceit, and appears to be issued by

13   or under the authority of the United States Government or a

14   state or local government.

15     With respect to the second element, I have already

16   instructed you on the meaning of the word "possess."  You

17   should apply those instructions here.

18     Finally, with respect to the third element, I have

19   instructed you on the definition of the word "knowingly" and

20   you should apply those instructions here.  The phrase "intent

21   that such document would be used to defraud the United States"

22   means the intent to mislead or deceive an officer or employee

23   of the United States Government in carrying out that officer

24   or employee's official duties.  However, it is not necessary

25   that the government prove that any government officer or

JURY CHARGE

1    employee was in fact misled or deceived.

2              THE COURT:  Okay.  Thank you, Andrew.

3              If you'd like to just take a stretch, take a stretch

4    while we make a change.

5              (Pause.)

6              THE COURT:  Okay.  You may be seated.

7              All right.  The next section is going to be read by

8    my law clerk, Ms. Strohmeier, and you've met her too.

9              So, Sequin, please go ahead.

10             MS. STROHMEIER:  The next section concerns

11   Racketeering Act Two: Sexual Exploitation of a Child—Camila.

12             Racketeering Act Two alleges that the defendant

13   sexually exploited a child, specifically Camila, on or about

14   November 2nd, 2005.  The indictment reads as follows:

15             "On or about November 2nd, 2005, within the Northern

16   District of New York, the defendant Keith Raniere did

17   knowingly and intentionally employ, use, persuade, induce,

18   entice and coerce a minor, to wit: Camila, to engage in

19   sexually explicit conduct for the purpose of producing one or

20   more visual depictions of such conduct, which visual

21   depictions were produced and transmitted using materials that

22   had been mailed, shipped and transported in and affecting

23   interstate and foreign commerce by any means, in violation of

24   Title 18, United States Code, Sections 2251(a) and 2251(e)."

25             Racketeering Act Two charges the defendant with

5643

JURY CHARGE

1    violating Title 18, United States Code, Section 2251(a).  That

2    section provides in relevant part that:  "Any person who

3    employs, uses, persuades, induces, entices, or coerces any

4    minor to engage in, or who has a minor assist any other person

5    to engage in, or who transports any minor in or affecting

6    interstate or foreign commerce with the intent that such minor

7    engage in any sexually explicit conduct for the purpose of

8    producing any visual depiction of such conduct or for the

9    purpose of transmitting a live visual depiction of such

10   conduct, shall be punished if that visual depiction was

11   produced or transmitted using materials that had been mailed,

12   shipped, or transported in or affecting interstate or foreign

13   commerce by any means, including by computer."

14           To prove the defendant committed this racketeering

15   act, the government must prove the following three elements

16   beyond a reasonable doubt:

17           First, that Camila was under the age of eighteen at

18   the time of the acts alleged in the indictment;.

19           Second, that the defendant used, employed,

20   persuaded, induced or enticed Camila to take part in sexually

21   explicit conduct for the purpose of producing or transmitting

22   a visual depiction of that conduct; and.

23           Third, that the visual depiction was to be mailed or

24   transported or transmitted in or affecting interstate or

25   foreign commerce or using a facility of interstate and foreign

JURY CHARGE

1    commerce or produced using materials that had been mailed,

2    shipped, or transported in and affecting interstate and

3    foreign commerce.

4            As to the first element, the government must prove

5    beyond a reasonable doubt that Camila was less than

6    eighteen years old at the time of the acts alleged in the

7    indictment.  The government does not need to prove that the

8    defendant knew that Camila was less than eighteen years old.

9            As to the second element, the words "used,"

10   "employed," "persuaded," "induced" and "enticed" are words of

11   common usage and I instruct you to interpret these words by

12   using your own common sense.  The words "persuade," "induce"

13   and "entice" are, in effect, synonyms that convey the idea of

14   leading or moving another person by persuasion as to some

15   action, state of mind, etc., or to bring about, produce or

16   cause.

17           A "visual depiction" includes any photograph, film,

18   video or picture, including undeveloped film and videotape,

19   data stored on computer disc or by electronic means which is

20   capable of conversion into a visual image or data that is

21   capable of conversion into a visual image that has been

22   transmitted by any means.  A visual depiction includes a

23   digitally recorded photograph or video.

24           "Sexually explicit conduct" means, among other

25   things, actual or simulated sexual intercourse, including

JURY CHARGE

1  genital-genital, oral-genital, anal-genital, or oral-anal,

2  whether between persons of the same or opposite sex;

3  masturbation; or lascivious exhibition of the genitals or

4  pubic area of any person.

5          The term "lascivious exhibition" means a depiction

6  that displays the genitals or pubic area of a child in order

7  to excite lustfulness or sexual stimulation in the viewer.

8  Not every exposure of the genitals or pubic area constitutes

9  lascivious exhibition.  In deciding whether a particular

10 visual depiction constitutes a lascivious exhibition, you

11 should consider the following questions:

12         whether the focal point of the visual depiction is

13 of the child's genitals or pubic area or whether there is some

14 other focal area;.

15         whether the setting of the visual depictions makes

16 it appear to be sexually suggestive, for example, in a place

17 or pose generally associated with sexual activity;.

18         whether the child is displayed in an unnatural pose

19 or in inappropriate attire, considering the age of the child;.

20         whether the child is fully or partially clothed or

21 nude, although nudity is not in and of itself lascivious;.

22         whether the visual depiction suggests sexual coyness

23 or a willingness to engage in sexual activity;.

24         And whether the visual depiction was intended or

25 designed to elicit a sexual response from the viewer.

JURY CHARGE

1          It is not required that a particular visual

2    depiction involve all of the factors that I have just listed

3    for you.  The importance you give to any one factor is up to

4    you to decide.

5          While the government must prove that the defendant

6    acted with the purpose of producing a sexually explicit visual

7    depiction, the government does not need to prove that a visual

8    depiction of sexually explicit conduct was actually produced.

9    In deciding whether the government has proved that the

10   defendant acted for the purpose of producing or transmitting a

11   visual depiction of sexually explicit conduct, you may

12   consider all of the evidence concerning the defendant's

13   conduct.

14         Whether or not a minor consented to engage in

15   sexually explicit conduct is irrelevant, as the consent or

16   voluntary participation of a minor is not a defense to the

17   charge.

18         As to the third element of the underlying crime, I

19   will now further define what it means for a depiction to be

20   transported or transmitted in or affecting interstate or

21   foreign commerce or using a facility of interstate or foreign

22   commerce or produced using materials that had been mailed,

23   shaped and transported in and affecting interstate or foreign

24   commerce.  If a visual depiction of sexually explicit conduct,

25   as I have defined that term, is recorded or stored on a device

JURY CHARGE

1    that was made either outside the State of New York or in a

2    foreign country, then that is sufficient to satisfy the

3    interstate or foreign commerce element.  It is not necessary

4    for the government to prove that the defendant knew that the

5    device had been made outside of the State of New York or in a

6    foreign country.

7            I will now discuss Racketeering Act Three: Sexual

8    Exploitation of a Child-Camila.

9            Racketeering Act Two (sic) alleges that the

10   defendant sexually exploited a child, specifically Camila, on

11   or about November 24th, 2005.  The indictment reads as

12   follows:

13           "On or about November 24th, 2005, within the

14   Northern District of New York, the defendant Keith Raniere did

15   knowingly and intentionally employ, use, persuade, induce,

16   entice and coerce a minor, to wit: Camila, to engage in

17   sexually explicit conduct for the purpose of producing one or

18   more visual depictions of such conduct which visual depictions

19   were produced and transmitted using materials that had been

20   mailed, shipped and transported in and affecting interstate

21   and foreign commerce by any means in violation of Title 18,

22   United States Code, Sections 2251(a) and 2251(e)."

23           I just instructed you regarding the crime of sexual

24   exploitation of a child under Racketeering Act Two.  You

25   should apply those instructions here.

Holly Driscoll, CSR, FCRR
Official Court Reporter

JURY CHARGE

1    THE COURT:  Okay.  Before we go further, Sequin just

2  read the charge in Racketeering Act Three, just to correct

3  what was misstated on the -- there's a misstatement on page

4  65, it says Two.  So, it is Racketeering Act Three.

5    MS. STROHMEIER:  Three.

6    THE COURT:  And it is a different date from

7  Racketeering Act Two.  We'll make the correction before you

8  receive the document, the charge in the jury room.

9    So, let's move on to Racketeering Act Four then.

10    MS. STROHMEIER:  Racketeering Act Four: Possession

11  of Child Pornography.

12    Racketeering Act Four alleges that the defendant

13  possessed child pornography in or about and between

14  November 2005 and March 2018.  The indictment reads as

15  follows:

16    "In or about and between November 2005 and

17  March 2018, both dates being approximate and inclusive, within

18  the Northern District of New York, the defendant Keith Raniere

19  did knowingly and intentionally possess matter containing one

20  or more visual depictions, to wit: images contained in digital

21  files stored on a Western Digital hard drive, which were

22  produced using materials which had been mailed and shipped and

23  transported using a means and facility of interstate and

24  foreign commerce and in and affecting interstate commerce, the

25  production of such visual depictions having involved the use

JURY CHARGE

1   of a minor engaging in sexually explicit conduct, and such

2   visual depictions were of such conduct, in violation of

3   Title 18, United States Code, Section 2252(a)(4)(B)."

4           Racketeering Act Four alleges a violation of

5   Title 18, United States Code, Section 2252(a)(4)(B).  That

6   section provides in relevant part, that:

7           "Any person who knowingly possesses, or knowingly

8   accesses with intent to view, one or more books, magazines,

9   periodicals, films, videotapes, or other matter which contain

10  any visual depiction that has been mailed, or has been shipped

11  or transported using any means or facility of interstate or

12  foreign commerce or in or affecting interstate or foreign

13  commerce, or which was produced using materials which have

14  been mailed or so shipped or transported, by any means

15  including by computer, if the producing of such visual

16  depiction involves the use of a minor engaging in sexually

17  explicit conduct; and (ii) such visual depiction is of such

18  conduct shall be punished."

19          In order to prove the defendant guilty of possessing

20  child pornography, the government must establish beyond a

21  reasonable doubt:

22          First, that the defendant knowingly possessed a

23  visual depiction;.

24          Second, that the visual depiction was transported in

25  or affecting interstate or foreign commerce or the visual

JURY CHARGE

1   depiction was produced using materials that had been

2   transported in interstate or foreign commerce;.

3            Third, that the production of the visual depiction

4   involved the use of a minor engaging in sexually explicit

5   conduct and portrays that minor engaged in that conduct; and.

6            Fourth, that the defendant knew that the production

7   of the visual depiction involved the use of a minor engaging

8   in sexually explicit conduct and portrayed a minor engaged in

9   that conduct.

10            The first element that the government must prove

11   beyond a reasonable doubt is that the defendant knowingly and

12   intentionally possessed a visual depiction.  You have already

13   been instructed on the meaning of the term "visual depiction."

14   I have already explained the meaning of "knowingly and

15   intentionally" and those instructions apply here.  To

16   "possess" something means to have it within a person's

17   control.  This does not necessarily mean that the person must

18   hold it physically, that is have actual physical possession of

19   it.  As long as the visual depiction is within a person's

20   control, he possesses it.  If you find that the defendant

21   either had actual possession of the depiction or that he had

22   the power and intention to exercise control over it, even

23   though it was not in his physical possession, you may find

24   that the government has proved possession.  The government

25   must prove that the defendant received the depiction

JURY CHARGE

1   knowingly, as I have already defined that term.

2              As to the second element, the government must prove

3   beyond a reasonable doubt that the visual depiction was to be

4   mailed or transported or transmitted in or affecting

5   interstate or foreign commerce or using a facility of

6   interstate and foreign commerce or produced using materials

7   that had been mailed, shipped or transported in or affecting

8   interstate or foreign commerce.  Here, the government alleges

9   that the images in question were produced using material that

10  had been mailed, shipped or transported in or affecting

11  interstate or foreign commerce.  I instruct you that, as a

12  matter of law, if a visual depiction of sexually explicit

13  conduct, as I have defined that term, is recorded or stored on

14  a device that was made either outside the State of New York or

15  in a foreign country, then that is sufficient to satisfy this

16  element.

17             The third element that the government must prove

18  beyond a reasonable doubt is that the production of the visual

19  depiction involved the use of a minor engaging in sexually

20  explicit conduct, as I have already explained that term to

21  you, and portrays that minor engaged in that conduct.  The

22  visual depiction must be of a real person under the age of

23  eighteen engaging in sexually explicit conduct.  Although the

24  government does not have to prove the identity of the minor or

25  the exact age of the minor, the government alleges that the

1    depictions at issue here are of Camila.  You may consider all

2    of the evidence in determining whether the depiction portrayed

3    an actual person under the age of eighteen engaging in

4    sexually explicit conduct.

5            The fourth element that the government must prove

6    beyond a reasonable doubt is that the defendant knew both that

7    the production of the visual depiction involved the use of a

8    minor engaging in sexually explicit conduct, and that it

9    portrayed a minor engaged in that conduct.  As I stated

10   before, an act is done knowingly when it is done voluntarily

11   and intentionally and not because of accident, mistake or some

12   other innocent reason.  In this case the term "knowingly"

13   refers to an awareness of the sexually explicit nature of the

14   material and to the knowledge that the visual depiction was in

15   fact of an actual minor engaged in that sexually explicit

16   conduct.

17           The government must show that the defendant had

18   knowledge of the general nature of the contents of the

19   material.  The defendant need not have specific knowledge as

20   to the identity or actual age of the minor depicted, but the

21   defendant must have knowledge or an awareness that the

22   material contained a visual depiction of a minor engaging in

23   sexually explicit conduct.  Such knowledge may be shown by

24   direct or circumstantial evidence, or both.  Eyewitness

25   testimony of the defendant's viewing of the material is not

JURY CHARGE

1   necessary to prove his awareness of its contents; the

2   circumstances may warrant an inference that he was aware of

3   what the material depicts.  Furthermore, the defendant's

4   belief as to the legality or illegality of the material is

5   irrelevant.

6           The next section is Racketeering Act Five:

7   Conspiracy to Commit Identity Theft.

8           Racketeering Act Five alleges that the defendant

9   committed three separate crimes, conspiracy to commit identity

10  theft, the identity theft of James Loperfido, and the identity

11  theft of Edgar Bronfman.  Thus, Racketeering Act Five has

12  three parts to it, and you will render separate verdicts on

13  each part.  If you find the defendant committed any of these

14  three crimes, you must find that the government has proved

15  Racketeering Act Five.

16          I will first discuss Racketeering Act 5A: Conspiracy

17  to Commit Identity Theft.

18          The first part, which is referred to on the verdict

19  sheet as Racketeering Act 5A, alleges that the defendant

20  conspired to commit identity theft between November 2005 and

21  November 2008.  The indictment reads as follows:

22          "In or about and between August 2005 and

23  November 2008, both dates being approximate and inclusive,

24  within the Northern District of New York and elsewhere, the

25  defendant Keith Raniere, together with others, did knowingly

JURY CHARGE

1    and intentionally conspire to transfer, possess and use,

2    without lawful authority and in and affecting interstate and

3    foreign commerce, one or more means of identification of one

4    or more other persons with the intent to commit, and to aid

5    and abet, and in connection with, unlawful activity that

6    constituted one or more violations of federal law, to wit:

7    (1) intercepting wire and electronic communications in

8    violation of Title 18, United States Code, Section 2511; and

9    (2) unlawfully accessing wire and electronic communications,

10   in violation of Title 18, United States Code, Section 2701,

11   contrary to Title 18, United States Code, Section 1028(a)(7),

12   all in violation of Title 18, United States Code, Section

13   1028(f)."

14            I have already instructed you on the general

15   definition of conspiracy, which, as I said, is an agreement

16   among two or more people to commit a crime.  I remind you that

17   the crime of conspiracy to violate a federal law is a separate

18   offense from the underlying crime.  It is separate and

19   distinct from an actual violation of identity theft which is

20   the object of the conspiracy and what we call the substantive

21   crime.  In order to find the defendant guilty of conspiracy to

22   commit identity theft, you must find that two or more persons

23   agreed to commit the crime of identity theft and that the

24   defendant knowingly and intentionally became a member of the

25   conspiracy.

JURY CHARGE

1          I also previously instructed you regarding the law

2     on the crime of identity theft under Racketeering Act 1A.

3     However, because Racketeering Act 5A alleges that the

4     defendant or a co-conspirator acted with the intent to commit,

5     or to aid and abet, or in connection with, a different federal

6     crime, the fourth element is different.  I will therefore

7     instruct you on the law that you should consider for

8     Racketeering Act 5A.  The elements of the crime of identity

9     theft are as follows:

10          First, that the defendant or a co-conspirator

11     knowingly transferred, or possessed, or used a means of

12     identification of another person;.

13          Second, the defendant or a co-conspirator knew that

14     the means of identification belonged to another person;.

15          Third, that the defendant or a co-conspirator acted

16     without lawful authority;.

17          Fourth, that the defendant or a co-conspirator acted

18     with the intent to commit, or to aid and abet, or in

19     connection with an unlawful activity that violates federal

20     law; and.

21          Fifth, that the transfer or possession or use of the

22     means of identification occurred in or affected interstate or

23     foreign commerce or the means of identification was

24     transported in the mail in the course of the transfer or

25     possession or use.

JURY CHARGE

1              As to the first element, the government must prove

2      beyond a reasonable doubt that at item described in the

3      indictment is a means of identification of another person.  I

4      have already defined the terms "means of identification,"

5      "use," "transfer," and "possess" and will not repeat them

6      here.  I instruct you that user names and passwords may

7      constitute a means of identification of another person.

8              As to the third element, the government must prove

9      that the defendant or a co-conspirator was not authorized to

10     use the means of identification.  The government must also

11     prove that the defendant or a co-conspirator used or

12     transferred or possessed the means of identification

13     knowingly, that is, he or she did so voluntarily and

14     intentionally and not because of accident, mistake or some

15     other innocent reason.

16              (Continued on next page.)

17

18

19

20

21

22

23

24

25

JURY CHARGE

1              MS. DAVIS:  (Continued) As to the fourth element,

2      the Government must prove beyond a reasonable doubt that the

3      defendant or a co-conspirator used or transferred or possessed

4      the means of identification with the intent to commit, or

5      to aid and abet, or in connection with either one of two

6      federal crimes:  The crime of intercepting wire and electronic

7      communications in violations of Title 18 United States Code

8      2511; or, two, the crime of unlawfully accessing wire and

9      electronic communications in violation of Title 18 United

10     States Code, Section 2701.  In relevant part the, crime of

11     intercepting wire and electronic communication in violation of

12     Title 18 United States Code, Section 2511 prohibits accessing

13     without authorization a system through which electronic

14     communication service is provided and obtaining wire or

15     electronic communications.  In relevant part, the crime of

16     unlawfully accessing wire and electronic communications in

17     violation of Title 18 United States Code, Section 2701,

18     prohibits intercepting electronic communications.  I instruct

19     you that an e-mail is a wire or electronic communication.

20              To establish this fourth element of identity theft

21     the Government does not need to prove that the defendant or a

22     co-conspirator actually committed either of these two crimes.

23     This element is satisfied if you find that the Government

24     proved beyond a reasonable doubt that the defendant used or

25     transferred or possessed the means of identification or

JURY CHARGE

1    conspired to do so with the intent to committed, aid and abet,

2    or in connection with either of these offenses.

3           Finally, as to the fifth element, I instruct you

4    that interstate or foreign commerce simply means the movement

5    of goods, services, money, and individuals between any two or

6    more states or a state and a foreign country.  To satisfy this

7    element, the Government must prove that the defendant's

8    conduct affected interstate or foreign commerce in any way, no

9    matter how minimal.

10          If you find that the Government proved beyond a

11   reasonable doubt that the defendant knowingly and

12   intentionally agreed with others to commit the crime of

13   identity theft, then you should find the defendant guilty of

14   Racketeering Act 5A.  As I already instructed you, a

15   conspiracy is a crime, even if it does not achieve its

16   purpose.  The Government does not have to prove that the

17   defendant or his co-conspirators actually committed the crime

18   of identity theft.  What the Government must prove is that the

19   defendant voluntarily entered into a conspiracy, the purpose

20   of which was to commit identity theft.

21          I will now discuss Racketeering Act 5B, identity

22   theft James Loperfido.  The second part of Racketeering Act 5,

23   which is referred to on the verdict sheet as Racketeering Act

24   5B, alleges that the defendant committed, or aided or abetted

25   the commission of the identity theft of James Loperfido.  The

JURY CHARGE

1   Indictment read as follows:

2          "In or about and between January 2006 and

3   November 2008, both dates being approximate and inclusive,

4   within the Northern District of New York and elsewhere, the

5   defendant Keith Raniere, together with others did knowingly

6   and intentionally transfer, possess and use without lawful

7   authority and in and affecting interstate commerce one or more

8   means of identification of another person, to wit; James

9   Loperfido, with the intent to commit and to aid and abet and

10  in connection with unlawful activity that constituted one or

11  more violations of federal law, to wit; One, intercepting wire

12  and electronic communications in violation of Title 18 United

13  States Code, Section 2511; and Two, unlawfully accessing wire

14  and electronic communications in violation of Title 18 United

15  States Code, Section 2701.  All in violation of Title 18

16  United States Code, Sections 1028(a)(7) and 2.

17         To prove this crime, the Government must prove the

18  following elements beyond a reasonable doubt.

19         First, that the defendant knowingly transferred or

20  possessed or used a means of identification of James

21  Loperfido.

22         Second, the defendant knew that the means of

23  identification belonged to James Loperfido.

24         Third, that the defendant acted without lawful

25  authority.

JURY CHARGE

1            Fourth, that the defendant acted with the intent to

2    commit or to aid and abet, or in connection with, the crime of

3    intercepting wire and electronic communications in violation

4    of Title 18 United States Code, Section 2511, or the crime of

5    unlawfully accessing wire and electronic communications in

6    violation of Title 18 United States Code, Section 2701.

7            And Fifth, that the transfer or possession or use of

8    the means of identification occurred in or affected interstate

9    or foreign commerce, or the means of identification was

10   transported in the mail in the course of the transfer or

11   possession or use.

12           I've already instructed you regarding the elements

13   of the crime of identity theft under Racketeering Act 5A, you

14   should refer to those instructions when considering this

15   count.

16           You may also find the defendant guilty of

17   Racketeering Act 5B if the Government has proved beyond a

18   reasonable doubt that he aided and abetted the identity theft

19   of James Loperfido.  In determining whether the defendant is

20   guilty as an aider and abettor, you must follow the general

21   instructions on aiding and abetting under federal law that I

22   have already given you.

23           Finally, Racketeering Act 5C, identity theft Edgar

24   Bronfman.

25           The third part of Racketeering Act 5, which is

JURY CHARGE

1   referred to on the verdict sheet as Racketeering Act 5C,

2   alleges that the defendant committed, or aided and abetted the

3   commission of, the identity theft of Edgar Bronfman.  The

4   Indictment reads as follows.

5          "In or about and between January 2006 and

6   November 2008, both dates being approximate and inclusive,

7   within the Northern District of New York and elsewhere, the

8   defendant Keith Raniere, together with others did knowingly

9   and intentionally transfer, possess and use without lawful

10  authority and in and affecting interstate commerce, one or

11  more means of identification of another person; to wit, John

12  Doe 2, with the intent to commit, and to aid and abet, and in

13  connection with unlawful activity that constituted one or more

14  violations of federal law; to wit, One intercepting wire and

15  electronic communications in violation of Title 18 United

16  States Code, Section 2511; and Two, unlawfully accessing wire

17  and electronic communications in violation of Title 18 United

18  States Code, Section 2701, all in violation of Title 18 United

19  States Code, Sections 1028(a)(7) and 2."

20          I have just instructed you regarding the elements of

21  this crime.  You should apply those instructions here.

22          You may also find the defendant guilty of

23  Racketeering Act 5C if the Government has proved beyond a

24  reasonable doubt that he aided and abetted the identity theft

25  of Edgar Bronfman.  In determining whether the defendant is

JURY CHARGE

1    guilty as an aider and abettor, you must follow the general

2    instructions on aiding and abetting under federal law that I

3    have already given you.

4              The next section concerns Racketeering Act 6,

5    conspiracy to alter records for use in an official proceeding.

6              Racketeering Act 6 alleges that the defendant

7    conspired to alter records for use in an official proceeding

8    in or about and between February 2008 and March 2018.  The

9    Indictment reads as follows:

10             "In or about and between February 2008 and

11   March 2018, both dates being approximate and inclusive, within

12   the District of New Jersey and elsewhere, the defendant Keith

13   Raniere, together with others did knowingly and intentionally

14   conspire to corruptly alter, destroy, mutilate and conceal one

15   or more records, documents and other objects; to wit, video

16   recordings, with the intent to impair such objects' integrity

17   and availability for use in an official proceeding; to wit,

18   NXIVM Corp., et al Versus Ross Institute, et al

19   06-CV-1051(DNJ), contrary to Title 18 United States Code,

20   Section 1512(c)(1), all in violation of Title 18 United States

21   Code, Section 1512(k)."

22             I have already instructed you on the general

23   definition of conspiracy, which as I said, is an agreement

24   among two or more people to commit a crime.  Here the alleged

25   crime is altering records for use in an official proceeding.

JURY CHARGE

1    Therefore, in order to prove this Racketeering Act, the

2    Government must prove that two or more persons agreed to alter

3    records for use in an official proceeding, and that the

4    defendant knowingly and intentionally became a member of the

5    conspiracy.  The relevant statute is Section 1512(c)(1) of

6    Title 18 United States Code, which provides that, quote,

7    "Whoever corruptly alters, destroys, mutilates or conceals a

8    record document or other object or attempts to do so with the

9    intent to impair the objects' integrity or availability for

10   use in an official proceeding, shall be guilty of a crime."

11          The elements of the crime of altering records for

12   use in an official proceeding are as follows:

13          First, that the defendant or a co-conspirator

14   knowingly altered or destroyed or mutilated or concealed any

15   record, document, or tangible object as alleged in the

16   Indictment.

17          Second, that the defendant or a co-conspirator acted

18   with the intent of impairing the object's integrity or

19   availability for use in an official proceeding.

20          And Third, that the defendant or a co-conspirator

21   acted corruptly.  I.

22          Will now explain each element in greater detail.

23          The first element the Government must prove beyond a

24   reasonable doubt is that the defendant or a co-conspirator

25   altered, or destroyed or mutilated or concealed any record

JURY CHARGE

1    document or tangible object as alleged in the Indictment.

2          The second element the Government must prove beyond

3    a reasonable doubt is that the defendant acted with the intent

4    to impair the object's integrity or availability in an

5    official proceeding.  An official proceeding means a

6    proceeding before a court, judge, or federal agency.  You are

7    instructed that a civil court case in the United States

8    District Court for the District of New Jersey is an official

9    proceeding.

10         The third element the Government must prove beyond a

11   reasonable doubt is that the defendant acted corruptly.  To

12   act corruptly means to act with an improper purpose and to

13   engage in conduct knowingly and dishonestly and with the

14   intent to obstruct, impede or influence the due administration

15   of justice.  A defendant does not need to know with certainty

16   that his conduct would affect judicial proceedings.  Indeed,

17   the Government does not need to prove that the defendant's

18   conduct actually obstructed justice, or that the altered

19   records contained particularly material evidence pertaining to

20   the official proceedings.  Instead, the defendant's conduct

21   must only have the natural and probable affect of interfering

22   with the due administration of justice.

23         The due administration of justice refers to the

24   fair, impartial, uncorrupted and unimpeded investigation,

25   prosecution, or disposition of any matter in the courts of the

JURY CHARGE

1    United States.  It includes every step in a matter or

2    proceeding in the federal courts to assure that just

3    consideration and determination of the rights of parties,

4    whether Government or individual.

5           A defendant's knowledge is a matter of inference

6    from the facts proved.  Since we have no way of looking into a

7    person's mind directly, the fact of knowledge or intent may be

8    established by circumstantial evidence, just as any other fact

9    in this case.

10          If you find that the Government proved beyond a

11   reasonable doubt that the defendant knowingly and

12   intentionally agreed with others to commit the crime of

13   obstruction of justice, then you should find the defendant

14   guilty of Racketeering Act 6.  As I already instructed, a

15   conspiracy is a crime even if it does not achieve its purpose.

16   The Government does not have to prove that the defendant or

17   his co-conspirators actually committed the crime of

18   obstruction of justice.  What the Government must prove is

19   that the defendant voluntarily entered into a conspiracy whose

20   purpose was to commit obstruction of justice.

21          Next I'll discuss Racketeering Act 7, conspiracy to

22   commit identity theft, Marianna.

23          Racketeering Act 7 charges the defendant with

24   conspiring to commit identity theft as to Marianna in or about

25   November 2008.  The Indictment reads as follows:

5666

JURY CHARGE

1          "In or about November 2008, within the Northern

2     District of New York and elsewhere, the defendant Keith

3     Raniere, together with others, did knowingly and intentionally

4     conspire to transfer, possess and use without lawful authority

5     and in and affecting interstate commerce, one or more means of

6     identification of another person; to wit, Marianna, with the

7     intent to commit and to aid and abet, and in connection with

8     unlawful activity that constituted one or more violations of

9     federal law; to wit, intercepting wire and electronic

10    communications in violation of Title 18 United States Code,

11    Section 2511, and unlawfully accessing wire and electronic

12    communications in violation of Title 18 United States Code,

13    Section 2701, contrary to Title 18 United States Code, Section

14    1028(a)(7) all in violation of Title 18 United States Code,

15    Section 1028(f)."

16          I previously instructed you on the elements of the

17    crime of conspiracy to commit identity theft under

18    Racketeering Act 5A, you should apply those instructions here.

19          Next I'll discuss Racketeering Act 8, trafficking of

20    Daniela for forced labor and document servitude.

21          Racketeering Act 8 alleges that the defendant

22    committed two separate crimes, the trafficking of Daniela for

23    labor and services in violation of Title 18 United States

24    Code, Section 1590, and the document servitude of Daniela in

25    violation of Title 18 United States Code, Section 1592.  Thus,

JURY CHARGE

1    Racketeering Act 8 has two parts to it.  You will render

2    separate verdicts on each part.  If you find that the

3    defendant committed either of these two crimes, you must find

4    that the Government has proved Racketeering Act 8.

5           The first part is Racketeering Act 8A, trafficking

6    of Daniela for labor and services.

7           The first part, which is referred to on the verdict

8    sheet as Racketeering Act 8A, alleges that the defendant

9    trafficked Daniela for labor and services.  The Indictment

10   reads as follows:

11          "In or about and between March 2010 and April 2012,

12   both dates being approximate and inclusive, within the

13   Northern District of New York and elsewhere, the defendant

14   Keith Raniere, together with others did knowingly and

15   intentionally recruit, harbor, transport, provide and obtain a

16   person; to wit, Daniela, for labor and services in violation

17   of Title 18 United States Code Chapter 77; to wit, forced

18   labor in violation of Title 18 United States Code, Section

19   1589 in violation of Title 18 United States Code, Section 1590

20   and 2."

21          The statute relevant to this Racketeering Act is

22   Section 1590.  It provides in relevant part as follows:

23          "Whoever knowingly recruits, harbors, transports

24   provides or obtains by any means any person for labor or

25   services in violation of this chapter commits a crime."

5668

JURY CHARGE

1       In order to prove this Racketeering Act the

2   Government must prove beyond a reasonable doubt each of the

3   following three elements.

4       First, the defendant recruited, harbored,

5   transported, provided or obtained Daniela.

6       Second, the defendant did so for the purpose of

7   providing or obtaining the labor or services of Daniela in

8   violation of the forced labor statute, Section 1589; that is,

9   that the defendant trafficked Daniela, as I have just

10  described, with the purpose of providing or obtaining her

11  labor or services by means of serious harm or threats of

12  serious harm to Daniela or another person, or by means of any

13  scheme plan or pattern intended to cause Daniela to believe

14  that if Daniela did not perform such labor or services Daniela

15  or another person would suffer serious harm or physical

16  restraint.  Labor or services that are provided or obtained by

17  these unlawful means are called forced labor.

18      And Third, the defendant acted knowingly.

19      With respect to the first element, the word harbor

20  simply means to provide shelter to that person.  To obtain

21  someone means to acquire control or possess that person, even

22  if only for a short period.

23      With respect to the second element, the Government

24  must prove beyond a reasonable doubt that the defendant

25  recruited, harbored, transported, provided or obtained

JURY CHARGE

1    Daniela; that is, the defendant trafficked Daniela for the

2    purpose of providing or obtaining Daniela's forced labor; that

3    is, labor or services provided or obtained by one of the

4    prohibited means that I described a moment ago.  The crime

5    prohibited by Section 1590 is trafficking a person for this

6    unlawful purpose.  To establish this element the Government

7    does not need to prove that the defendant actually obtained or

8    attempted to obtain Daniela's forced labor.  Only that the

9    defendant trafficked Daniela for the purpose of providing or

10   obtaining it.

11          I will define for you some of the terms you will

12   consider in determining whether the defendant had this

13   unlawful purpose.

14          First, labor means the expenditure of physical or

15   mental effort.  And services means conduct or performance that

16   assists or benefits someone.

17          A threat is a serious statement expressing an

18   intention to inflect harm at once or in the future, which is

19   different from idle or careless talk, exaggeration or

20   something said in a joking manner.  For a statement to be a

21   threat, it must have been made under such circumstances that a

22   reasonable person who heard or read the statement would

23   understand it as a serious expression of an intent to cause

24   harm.  In addition, the statement must have been made with the

25   intent that it be a threat, or with the knowledge the

JURY CHARGE

1    statement would be viewed as a threat.

2            The term serious harm includes both physical and

3    non-physical types of harm.  It can include psychological,

4    financial or reputational harm.  Therefore, a threat of

5    serious harm need not involve any threat of physical violence.

6    I instruct you that threats of deportation or being forced to

7    leave the United States may constitute such serious harm.

8    However, the threats must be serious enough that considering

9    all the surrounding circumstances, a reasonable person of the

10   same background and in the same circumstances as the alleged

11   victim, would perform or continue performing labor that the

12   victim would otherwise not have willingly performed in order

13   to avoid that harm.  In considering whether a threat of harm

14   would be sufficient to compel or coerce an alleged victim's

15   services, you may consider the totality of the defendant's

16   conduct as well as the victim's age and background or

17   circumstances that were known to the defendant and that would

18   make the alleged victim especially vulnerable to pressure.

19   You may consider surrounding circumstances, such as verbal

20   abuse and insults, isolation, poor working and living

21   conditions, denial of adequate rest, food and medical care,

22   pay withholding or any combination of these conditions and any

23   other techniques you find that the defendant used to

24   intimidate Daniela and compel her to work.

25            You should give the words scheme, plan and pattern

JURY CHARGE

1    their ordinary meaning.  A scheme is a plan or program of

2    action, especially a crafty or secret one.  A plan is a method

3    for achieving an end or a detailed formulation of a program of

4    action.  A pattern is a mode of behavior or series of acts

5    that are recognizably consistent.

6         If you find that the defendant trafficked Daniela

7    for the unlawful purpose I have described, the fact that

8    Daniela may have had an opportunity to escape is irrelevant if

9    the defendant placed her in such fear or circumstances that

10   the victim reasonably believed that she could not leave.  A

11   victim who has been placed in such fear or circumstances is

12   under no affirmative duty to try to escape.

13        When considering whether the defendant had the

14   unlawful purposes I described to you, you must also consider

15   any condition that made Daniela vulnerable to pressure, so

16   long as you believe the defendant also knew about it.  You may

17   consider, for example, the background, physical and mental

18   condition, experience, education, socioeconomic status and any

19   inequalities between Daniela and the defendant, but only if

20   these conditions were known to the defendant at the time.

21   Simply put, you may ask whether Daniela was vulnerable in some

22   way known to the defendant such that the defendant's actions

23   or planned actions, even if not sufficient to compel another

24   person, were enough to compel Daniela to work.

25        I previously instructed you as to the definition of

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

JURY CHARGE

1    knowingly and you should apply that definition to the third

2    element here.

3            Racketeering Act 8A is also charged under an aiding

4    and abetting theory; that is, that the defendant aided and

5    abetted another in trafficking Daniela for the unlawful

6    purpose I have described.  You may find Racketeering Act 8A

7    proven as to the defendant if you find that he aided and

8    abetted the trafficking of Daniela.  I have already instructed

9    you on aiding and abetting under federal law.  When

10   deliberating on Racketeering Act 8A, apply those instructions.

11           I'll now discuss Racketeering Act 8B, document

12   servitude, Daniela.

13           The second part of Racketeering Act 8, which is

14   referred to on the verdict sheet as Racketeering Act 8B,

15   alleges that the defendant committed the crime of document

16   servitude.  The Indictment reads as follows:

17           "In or about and between March 2010 and April 2012

18   both dates being approximate and inclusive, within the

19   Northern District of New York and elsewhere, the defendant

20   Keith Raniere, together with others did knowingly and

21   intentionally conceal, remove, confiscate and possess one or

22   more immigration documents, an actual Government

23   identification documents of a person; to wit, Daniela, in the

24   course of and with the intent to commit one or more violations

25   of Title 18 United States Code, Sections 1589 and 1590, all in

JURY CHARGE

1    violation of Title 18 United States Code Section 1592 and 2."

2              The relevant statute is Section 1592 of Title 18

3    United States Code, which provides in relevant part that,

4    quote, "Whoever knowingly destroys, conceals, removes,

5    confiscates or possesses any actual or purported passport or

6    other immigration document or any other actual or purported

7    Government identification document of another person; One, in

8    the course of a violation of Section 1589, the forced labor

9    statute or 1590 the trafficking statute; or Two, with intent

10   to violate Section 1589, the forced labor statute, or 1590 the

11   trafficking statute, has committed a crime."

12             In order to prove this Racketeering Act the

13   Government must prove beyond a reasonable doubt each of the

14   following three elements.

15             First, that the defendant concealed, removed

16   confiscated or possessed an actual or purported passport, visa

17   or other identification document of Daniela.

18             Second, that the defendant did so, One, in the

19   course of violating the forced labor statute or trafficking

20   statute; or Two, with intent to violate the forced labor

21   statute or trafficking statute.

22             And Third, that defendant acted knowingly.

23             With respect to the first element, the word conceal

24   means the act of refraining from disclosure or preventing the

25   discovery of the document or hiding the document.  To remove

JURY CHARGE

1    means to take away or transfer from one place to another.  To

2    confiscate means to appropriate or seize the document.  To

3    possess means to hold and have actual control of the document.

4    The term identification document, includes in relevant part, a

5    document made or issued by or under the authority of the

6    United States Government, a foreign Government, political

7    subdivision of a foreign Government, an international

8    Governmental or an international quasi-Governmental

9    organization, which when completed with information concerning

10   a particular individual is of a type intended or commonly

11   accepted for the purpose of identification of individuals.

12             With respect to the second element, the Government

13   must prove that the defendant engaged in the concealment,

14   removal, confiscation or possession of the document either;

15   One, in the course of violating the forced labor statute

16   Section 1589 or the trafficking statute Section 1590; or Two,

17   with the intent to commit forced labor or trafficking.  When

18   considering whether the defendant concealed, removed

19   confiscated or possessed the documents in the course of a

20   forced labor or trafficking offense, you should consider the

21   instructions that I previously gave you regarding forced labor

22   and trafficking.  When considering whether the defendant

23   concealed, removed, confiscated or possessed the documents

24   with intent to violate the forced labor or trafficking

25   statutes, I instruct you that the Government need not prove an

JURY CHARGE

1    actual violation of the forced labor or trafficking statute to

2    prove this element beyond a reasonable doubt.  Even if the

3    defendant did not succeed in committing forced labor or

4    trafficking, this element will be satisfied if the defendant

5    concealed, removed, confiscated or possessed the documents and

6    acted with the intent to violate the forced labor or

7    trafficking statutes.

8              With respect to the third element, I have previously

9    instructed you on the definition of knowingly and you should

10   apply that definition here.

11             THE COURT:  Thank you.  At this time we'll take five

12   minutes and try to finish today.  I'll rise.

13             (Jury exits the courtroom.)

14             (Brief recess.)

15             THE COURT:  If we don't finish with by five, we

16   checked with the jury they can't stay past five, several of

17   the jurors have commitments and we'll just finish first thing

18   tomorrow morning.

19             But in the meantime, at 5:00 o'clock, you can start

20   putting together all the evidence so that we're ready to role

21   it in tomorrow morning first thing.

22             Let's bring in the jury.

23             (Jury enters the courtroom.)

24             THE COURT:  Please be seated.

25             My law clerk Eleanor Davis will take us through the

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

JURY CHARGE

1    next portion of the charge.

2              MS. DAVIS:  The next section discusses Racketeering

3    Act 9, State law extortion.

4              Racketeering Act 9 charges the defendant with

5    extortion under New York State law in or about and between

6    September 2015 and June 2017.  The Indictment reads as

7    follows.

8              "In or about and between September 2015 and

9    June 2017, both dates being approximate and inclusive, within

10   the Eastern District of New York and elsewhere, the defendant

11   Keith Raniere, together with others, did knowingly and

12   intentionally steal property by extortion, in that Raniere and

13   others obtained property; to wit, personal property and other

14   things of value by compelling and inducing one or more

15   persons; to wit, lower-ranking DOS members to deliver such

16   property by instilling in them a fear that if the property

17   were not so delivered, Raniere and others would; One, expose a

18   secret and publicize an asserted fact, whether true or false,

19   tending to subject one or more persons to hatred, contempt and

20   ridicule; and Two, perform an act which would not in itself

21   materially benefit Raniere and others, but which was

22   calculated to harm one or more persons materially with respect

23   to their health, safety, business, calling, career, financial

24   condition, reputation, and personal relationships in violation

25   of New York Penal Law Sections 155.30(6), 155.05(2)(e)(v),

JURY CHARGE

1    155.05(2)(e)(ix) and 20.00."

2             Racketeering Act 9 charges the defendant with

3    committing fourth degree grand larceny under New York State

4    Penal Law 155.30(6).  Under New York State law, a defendant is

5    guilty of grand larceny in the fourth degree if he obtains

6    property illegally, and that property, regardless of its

7    nature and value, is obtained by extortion.

8             A person obtains person illegally when with intent

9    to deprive another of property or to appropriate the same to

10   himself or to a third person, that person wrongfully takes,

11   obtains or withholds such property from an owner of the

12   property.  A person obtains property by extortion when that

13   person compels or induces another person to deliver such

14   property to himself or to a third person by means of

15   instilling in the victim a fear that if the property is not

16   delivered, the defendant or another person will expose a

17   secret or publicize an asserted fact, whether true or false,

18   tending to subject some person to hatred, contempt or

19   ridicule; or perform any other act which would not in itself

20   materially benefit the defendant or other person, but which is

21   calculated to harm another person materially with respect to

22   his health, safety, business, calling, career, financial

23   condition, reputation, or personal relationships.

24             Racketeering Act 9 is also charged under an aiding

25   and abetting theory; that is, that the defendant aided and

JURY CHARGE

1    abetted the extortion of lower-ranking DOS members.  You may

2    find Racketeering Act 9 proven as to the defendant if you find

3    that the aided and abetted the extortion of lower-ranking DOS

4    members.  I have already instructed willed you on aiding and

5    abetting under New York State law.  When deliberating on

6    Racketeering Act 9, apply those instructions.

7            The next section discusses Racketeering Act 10, sex

8    trafficking and/or forced labor of Nicole.

9            Racketeering Act 10 alleges that the defendant

10   committed two separate crimes, sex trafficking of Nicole and

11   forced labor of Nicole.  Thus, Racketeering Act 10 has two

12   parts to it, and you'll render separate verdicts on each part.

13   If you had find that the defendant committed either of these

14   two crimes, you must find that the Government has proved

15   Racketeering Act 10.

16           Racketeering Act 10A, sex trafficking of Nicole.

17           The first part of Racketeering Act 10, which is

18   referred to on the verdict sheet as Racketeering Act 10A,

19   charges the defendant with sex trafficking by force, fraud or

20   coercion as to Nicole between February 2016 and June 2017.

21   With respect to Racketeering Act 10A, the Indictment reads as

22   follows:

23           "In or about and between February 2006 and

24   June 2017, both dates being approximate and inclusive, within

25   the Eastern District of New York and elsewhere the defendant,

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

JURY CHARGE

1    Keith Raniere, together with others did knowingly and

2    intentionally recruit, entice, harbor, transport, provide

3    obtain, maintain, patronize and solicit a person; to wit,

4    Nicole, in and affecting interstate and foreign commerce.  And

5    did benefit financially and by receiving anything of value

6    from such participation in a venture that engaged in such

7    acts, knowing and in reckless disregard of the fact that means

8    of force, threats of force, fraud and coercion, and a

9    combination of such means would be used to cause Nicole to

10   engage in one or more commercial sex acts, in violation of

11   Title 18 United States Code Sections 1591(a)(1), 1591(a)(2),

12   and 2."

13           The relevant statute provides in pertinent part,

14   whoever knowingly; One, in or affecting interstate or foreign

15   commerce recruits, entices, harbors, transports, provides or

16   obtains by any means a person; or Two, benefits, financially

17   or by receiving anything of value, from participation in a

18   venture which has engaged in an act just described, knowing

19   that force, fraud or coercion will be used to cause the person

20   to engage in a commercial sex act, will be punished."

21           To prove this crime the Government must prove beyond

22   a reasonable doubt the following four elements.

23           First, A, the defendant knowingly recruited,

24   enticed, harbored, transported, provided, maintained,

25   patronized or solicited a person by any means; or B, the

JURY CHARGE

1    defendant knowingly benefited financially or by receiving

2    something of value from participating in a venture that

3    recruited, enticed, transported, provided or obtained a

4    person.

5              Second, that the defendant knew or recklessly

6    disregarded that force, fraud or coercion would be used with

7    respect to such person.

8              Third, that the defendant knew that such person

9    would be engaged in a commercial sex act.

10             And Fourth, that defendant's conduct was in or

11   affecting interstate or foreign commerce.

12             I will now further define these elements.

13             The first element that the Government must prove is

14   that the defendant knowingly recruited, enticed, harbored,

15   transported, provided, obtained, maintained, patronized or

16   solicited a person, or that the defendant knowingly benefited

17   financially or by receiving something of value from

18   participating in a venture that did one of these things.

19             So, the statute sets forth two different ways that

20   the Government can prove this element.  The first is by

21   proving that the defendant himself engaged in at least one of

22   a list of prohibited trafficking activities, and the second by

23   proving that the defendant took part in a venture that engaged

24   activities and that the defendant benefited financially or by

25   receiving a thing of value from that venture.

JURY CHARGE

1          The first way to satisfy the first element is by

2     proving that the defendant himself knowingly recruited,

3     enticed, harbored, transported, provided or obtained Nicole.

4     In considering whether the defendant did any of these things,

5     use the ordinary, everyday definitions of those terms.  To

6     harbor a person means to provide shelter for that person.  To

7     obtain person, refers to acquiring, controlling or possessing

8     that person for even a short period of time.  To maintain

9     someone, means to upkeep someone, or to put care or work into

10    them.

11         I'll now explain the second alternative way to

12    satisfy the first element.  To satisfy this element the second

13    way, the Government need not prove that the defendant himself

14    engaged in the trafficking activities of recruiting, enticing,

15    harboring, transporting, providing or obtaining a person.  The

16    Government need only prove that there was a venture that

17    engaged in one of these activities, that the defendant

18    participated in someway in the venture and that the defendant

19    benefited financially or by receiving a thing of value from

20    that venture.  In considering whether the defendant

21    participated in such a venture, I instruct you that a venture

22    is defined as any group of two or more individuals associated

23    in fact, whether or not as a legal entity.  So if two or more

24    people associated with one another, you may find that those

25    people formed a venture.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

JURY CHARGE

1        You may find that the defendant participated in the

2   venture if the defendant in any way took part in that venture.

3   The defendant may be, but need not be, one of the people who

4   formed that venture.  Likewise, the defendant need not be an

5   organizer or a main participant in the venture, and need not

6   have participated throughout the length of the venture.  It is

7   enough if the defendant took some part in or played some role

8   in the venture for any period of time while the venture was

9   still ongoing.  It is sufficient if the defendant played any

10  role in the venture, even if that role was minor, even if that

11  role was not related to the actual recruiting, enticing,

12  harboring, transporting, providing or obtaining of persons for

13  commercial sex acts that the venture engaged in.

14       Now, as I have stated, the defendant must also

15  benefit financially or by receiving a thing of value from the

16  venture.  You may find that this requirement is satisfied if

17  the defendant received any form of profit, benefit, value or

18  advantage, no matter how minor from the venture.  Of course,

19  if you find that the defendant himself recruited, enticed,

20  harbored, transported, provided or obtained, you need not

21  consider whether the defendant benefited from doing so.  You

22  need only consider whether the defendant benefited if you find

23  that the defendant's involvement in sex trafficking was

24  through participating in the trafficking venture rather than

25  the trafficking activity itself.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

JURY CHARGE

1          The statute also requires the Government to prove

2   that the defendant acted knowingly.  So the Government must

3   prove that the defendant acted knowingly in either engaging in

4   the trafficking activity or joining in a venture that engaged

5   in a trafficking activity.  I have already instructed you

6   regarding what it means to act knowingly.  You should apply

7   that instruction here.

8          The second element the Government must prove beyond

9   a reasonable doubt is that the defendant knew or was in

10  reckless disregard of the fact that force, fraud or coercion

11  would be with respect to Nicole.  Fraud, as I just used that

12  term, means that the defendant knowingly made a misstatement

13  or an admission of material fact to entice the victim.  A

14  material fact is one that a reasonable person would expect to

15  rely on when making a decision.

16         Coercion means, A, a threat of serious harm or

17  physical restraint against a person; b, any scheme, plan or

18  pattern intended to cause a person to believe that failure to

19  perform an act would result in serious harm to or physical

20  restraint against a person; or C, the abuse or threatened

21  abuse of law or legal process.  A threat is a serious

22  statement expressing an intention to inflict harm at once or

23  in the future, as distinguished when idle or careless talk,

24  exaggeration, or something said in a joking manner.  A

25  statement is a threat if it was made under such circumstances

JURY CHARGE

1  that a reasonable person hearing the statement would

2  understand it as a serious expression of intent to cause harm.

3       The term serious harm, includes both physical and

4  non-physical types of harm, including psychological,

5  financial, or reputational harm, that is sufficient under all

6  the surrounding circumstances to compel a reasonable person of

7  the same background and in the same circumstances to perform

8  or to continue performing commercial sexual activity in order

9  to avoid incurring that harm.  In determining whether the

10 defendant made a threat of serious harm, you should consider

11 the victim's particular station in life, physical and mental

12 condition, age, education, training, experience and

13 intelligence.  A threat of serious harm must be sufficient in

14 kind or degree to completely overcome the will of an ordinary

15 person having the same general station in life as that of a

16 victim, causing a reasonable belief that there was no

17 reasonable choice except to engage in a commercial sex act as

18 directed by the defendant.

19      Coercion can also mean that the defendant engaged in

20 a course of behavior intended to cause the victim to believe

21 that if she did not engage in a commercial sex act as directed

22 by the defendant, any person, including the victim or someone

23 close to her, would suffer serious harm.  Coercion can also

24 mean to use threats of legal action, whether administrative,

25 civil or criminal, in any manner or for any purpose for which

JURY CHARGE

1    the law was not designed in order to coerce someone into

2    working against that person's will.

3             To satisfy this element, the Government must prove

4    that force, fraud or coercion, as I have just defined those

5    terms, was used.  And also that the defendant knew or was in

6    reckless disregard of the fact that it would be used against

7    Nicole.  Whether or not the defendant had this knowledge is a

8    question of fact to be determined by you on the basis of all

9    the evidence.  As a reminder, an act is done knowingly only if

10   it is done purposely and deliberately, and not because of

11   accident, mistake, negligence, or other innocent reason.  If

12   you find that the evidence establishes beyond a reasonable

13   doubt that the defendant actually knew that coercion would be

14   used, then this element is satisfied.  Even if the evidence

15   does not establish actual knowledge, this element is satisfied

16   if you find that the Government has proved beyond a reasonable

17   doubt that the defendant acted with reckless disregard of the

18   facts concerning the use of coercion.  The phrase, reckless

19   disregard of the facts, means deliberate indifference to facts

20   that if considered and weighed in a reasonable manner indicate

21   the highest probability that the victim was coerced to engage

22   in a commercial sex act.

23             The third element that the Government must prove is

24   that the defendant knew that Nicole would be engaged in a

25   commercial sex act.  A commercial sex act is any sex act

JURY CHARGE

1   anything of which anything of value is given to or received by

2   any person because of such sex act.  It is not required that

3   the victim actually performed a commercial sex act, as long as

4   the Government has proved that the defendant recruited,

5   enticed, harbored, transported, provided, obtained,

6   maintained, patronized or solicited the victim for purposes of

7   engaging in commercial sex acts.  A thing of value need not

8   involve monetary exchange and need not have any financial

9   component.  The phrase, any sex act, should be given its plain

10  meaning and may include any act performed with another for

11  sexual gratification.

12          Lastly, the fourth element that the Government must

13  prove beyond a reasonable doubt is that the defendant's

14  conduct was in or affecting interstate or foreign commerce.

15  This definition is the same as previously described.  As a

16  reminder, interstate or foreign commerce simply means the

17  movement of goods, services, money and individuals between any

18  two or more states, or between one state and the District of

19  Columbia or between a state and a U.S. territory or possession

20  or between the United States and a foreign country.  To

21  satisfy this element the Government must prove that the

22  defendant's conduct affected interstate or foreign commerce in

23  any way, no matter how minimal.  You do not up have to find

24  that the defendant's conduct actually affected interstate or

25  foreign commerce if you find that the defendant's conduct

JURY CHARGE

1  would have affected interstate or foreign commerce if he had

2  successfully and fully completed his actions.  The Government

3  does not have to show that the defendant actually knew his

4  actions affected or would affect interstate or foreign

5  commerce.

6          You may also find Racketeering Act 10A proven if the

7  Government has proved beyond a reasonable doubt that the

8  defendant aided and abetted sex trafficking.  In determining

9  whether the defendant is an aider and abettor, you must follow

10 the general instructions on aiding and abetting under federal

11 law that I have already given to you.

12         The next section discusses Racketeering Act 10B,

13 forced labor of Nicole.

14         The second part of Racketeering Act 10, which is

15 referred to on the verdict sheet as Racketeering Act 10B,

16 alleges that the defendant obtained the forced labor of

17 Nicole.  With respect to Racketeering Act 10B, the Indictment

18 reads as follows:

19         "In or about and between February 2016 and

20 June 2017, both dates being approximate and inclusive, within

21 the Eastern District of New York and elsewhere, the defendant

22 Keith Raniere, together with others did knowingly and

23 intentionally provide and obtain the labor and services of a

24 person; to wit, Nicole, by means of; A, force, threats of

25 force, physical restraint, and threats of physical restraint,

5688

JURY CHARGE

1  to her and one or more other persons; B, serious harm and

2  threats of serious harm to her and one or more other persons;

3  and C, one or more schemes, plans and patterns intended to

4  cause her to believe that if she did not perform such labor

5  and services she and one or more other persons would suffer

6  serious harm and physical restraint, and a combination of such

7  means in violation of Title 18 United States Code, Sections

8  1589(a) and 2."

9           The relevant statute reads as follows:

10           "Whoever knowingly obtains the labor or services of

11  another person; One, by means of force, threats of force,

12  physical restraint or threats of physical restrain to that

13  person or another person; Two, by means of serious harm or

14  threats of serious harm to that person or another person; or

15  Three, by means of any scheme, plan or pattern intended to

16  cause the person to believe that if the person did not perform

17  such labor or services that person or another person would

18  suffer serious harm or physical restraint, shall be guilty of

19  a crime."

20           To prove that the defendant committed this

21  Racketeering Act the Government must prove three elements

22  beyond a reasonable doubt.

23           First, the defendant obtained the labor or services

24  of Nicole.

25           Second, the defendant did so through one of the

JURY CHARGE

1  following prohibited means; A, through threats of serious harm

2  to or physical restraint against Nicole or any other person;

3  or B, through a scheme, plan, or pattern intended to cause

4  Nicole to believe that non-performance would result in serious

5  harm to, or physical restraint against, Nicole or any other

6  person.

7       And Third, the defendant acted knowingly.

8       The first element the Government must prove is that

9  the defendant obtained the labor or services of another

10  person, in this case Nicole.  I have already instructed you on

11  the meaning of obtain and you should apply that instruction

12  here.  Labor means the expenditure of physical or mental

13  effort.  Services means conduct or performance that assist or

14  benefits someone.  The Government does not have to prove that

15  Nicole performed work for the defendant in the economic sense,

16  although that would satisfy this element.  All the Government

17  must prove is that Nicole provided labor or services, as I've

18  just defined them.

19       As to the second element, if you find that the

20  defendant obtained the labor or services of Nicole, then you

21  must determine whether the defendant did so through one of the

22  two prohibited means; that is, either through threats of

23  serious harm to or physical restraint against, a person, or

24  through a scheme, plan or pattern intended to cause the person

25  to believe that serious harm would result if she did not

JURY CHARGE

1   perform the labor or services required of her.  In order to

2   find that the second element has been satisfied, you must find

3   beyond a reasonable doubt that at least one of the prohibited

4   means I just mentioned was used to obtain Nicole's labor or

5   services.

6        I now want to define some of the terms you will be

7   considering in determining whether or not this second element

8   of Racketeering Act 10B has been satisfied.  As I previously

9   instructed, the term serious harm includes both physical and

10  non-physical types of harm, including psychological,

11  financial, or reputational harm.  A threat of serious harm

12  therefore need not involve any threat of physical violence.

13  It includes improper threat of consequences, whether physical

14  or non-physical, that are sufficient under all the surrounding

15  circumstances, to compel or coerce a reasonable person in the

16  same situation to provide, or to continue providing, labor or

17  services in order to avoid that harm.

18       The words scheme, plan, and pattern are to be given

19  their ordinary meanings.  The scheme, plan or pattern need not

20  involve actual threats of serious harm, but may involve any

21  other means, including deception or psychological coercion,

22  used to cause the victim to reasonably believe that she, her

23  family, or any other person would suffer serious harm if she

24  refused continue providing labor or services.  If you find

25  that any of the two prohibited means I mentioned earlier was

JURY CHARGE

1    used, then you must determine whether such use was sufficient

2    to cause Nicole reasonably to believe that she had no choice

3    to work or remain working for the defendant.  In making that

4    determination, you may consider the cumulative effect on

5    Nicole of the defendant's conduct.

6           You may also consider Nicole's special

7    vulnerabilities, if any.  In this regard, you may find that

8    not all persons are of the same courage or firmness.  You may

9    consider, for example, Nicole's background, physical and

10   mental condition, experience, education, socioeconomic status,

11   and any inequalities between Nicole and the defendant with

12   respect to these considerations, including their relative

13   station in life, among other things.  Simply put, you may ask

14   whether Nicole was vulnerable in some way so the actions of

15   the defendant, even if not sufficient to compel another person

16   to work, were enough to compel Nicole to work.

17          A few final things about this second element of the

18   offense of forced labor.  To prove forced labor, the

19   Government does not need to link each the threats allegedly

20   made or actions allegedly taken against Nicole to particular

21   labor tasks performed by her.  If Nicole was threatened with

22   or suffered certain consequences in connection with the

23   services she rendered, either as punishment or as part of a

24   climate of fear that overcame her will and compelled her

25   service, that is sufficient to establish the second element of

JURY CHARGE

1    the offense of forced labor.  The Government also need not

2    prove physical restraint, such as the use of chains, barbed

3    wire or locked doors in order to establish the offense of

4    forced labor.  The fact that Nicole may have had an

5    opportunity to escape is irrelevant if the defendant placed

6    Nicole in such fear or circumstances that she did not

7    reasonably believe she could leave.  A victim who has been

8    placed in such fear or circumstances is under no affirmative

9    duty to try to escape.

10            Finally, in considering whether service performed by

11   someone was involuntary, you are instructed that it is not a

12   defense to the crime of forced labor that the person may have

13   initially agreed voluntarily to render the service or perform

14   the work.  If a person willingly begins work, but later

15   desires to withdraw, and is then forced to remain and perform

16   work against her will by threats of serious harm or by a

17   scheme, plan or pattern, intended to cause her to believe that

18   non-performance will result in serious harm to her or another

19   person, then her service becomes involuntary.  Also, whether a

20   person is paid a salary or a wage is not determinative of the

21   question of whether that person has been held in forced labor.

22   In other words, if a person is compelled to labor against her

23   will by anyone of the means prohibited by the forced labor

24   statute, such services is involuntary, even if she is paid or

25   compensated for the work.

JURY CHARGE

1    With regard to the third element, the Government

2 must prove that a defendant acted knowingly, a concept that I

3 have already explained to you.

4    The next section is Racketeering Act 11, conspiracy

5 to commit identity theft of Pam Cafritz.

6    Racketeering Act 11 charges the defendant with

7 conspiracy to commit identity theft as to Pam Cafritz between

8 November 2016 and March 2018.  The Indictment reads as

9 follows.

10    "In or about and between November 2016 and

11 March 2018, both dates being approximate and inclusive, within

12 the Northern District of New York and elsewhere the defendant,

13 Keith Raniere, together with others s, did knowingly and

14 intentionally conspire to transfer, possess and use without

15 lawful authority in and affecting interstate and foreign

16 commerce one or more means of identification of another

17 person; to wit, Pam Cafritz, with the intent to commit and to

18 aid and abet, and in connection with unlawful activity that

19 constituted one or more violations of federal law; to wit, tax

20 evasion, in violation of Title 26, United States Code, Section

21 7201, contrary to Title 18 United States Code, Section

22 1028(a)(7), all in violation of Title 18 United States Code,

23 Section 1028(f)."

24    I previously instructed you regarding the elements

25 of the crime of conspiracy to commit identity theft under

JURY CHARGE

1    Racketeering Act 5A; however, because Racketeering Act 11

2    alleges that the defendant or a co-conspirator acted with the

3    intent to commit or to aid and abet, or in connection with a

4    different federal crime, the fourth element is different.  I

5    will therefore instruct you on the law that you should

6    consider for Racketeering Act 11.

7            As a reminder, the elements of the crime of identity

8    theft are as follows:

9            First, that the defendant or a co-conspirator

10   knowingly transferred or possessed or used a means of

11   identification of another person.

12           Second, that the defendant or a co-conspirator knew

13   that the means of identification belonged to another person.

14           Third, that the defendant or a co-conspirator acted

15   without lawful authority.

16           Fourth, that the defendant or a co-conspirator acted

17   with the intent to commit or to aid and abet or in connection

18   with an unlawful activity that violates federal law.

19           Fifth, that the transfer or possession or use of the

20   means of identification occurred in or affected interstate or

21   foreign commerce, or the means of identification was

22   transported in the mail in the course of the transfer or

23   possession or use.

24           (Continued on next page.)

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

5695

JURY CHARGE

1        MS. DAVIS:  As to the fourth element under

2   Racketeering Act 11, the Government must prove beyond a

3   reasonable doubt that the defendant or a co-conspirator used

4   or transferred or possessed the means of identification with

5   the intent to commit or to aid and abet, or in connection with

6   the crime of tax evasion in violation of Title 26, United

7   States Code, Section 7201.

8        In relevant part, the crime of tax evasion prohibits

9   the willful attempt to evade or defeat any tax imposed by the

10  Internal Revenue Code.

11       In this context, to act willfully requires the

12  Government to prove that the law imposed a duty on the

13  defendant; that the defendant knew of this duty, and that he

14  voluntarily and intentionally violated that duty.

15       To establish this fourth element of identity theft,

16  the Government does not need to prove that the defendant or a

17  co-conspirator actually committed tax evasion.  This element

18  is satisfied if you find that the Government proved beyond a

19  reasonable doubt that the defendant used or transferred or

20  possessed the means of identification or conspired to do so

21  with the intent to commit, aid and abet, or in connection with

22  the crime of tax evasion.

23       I further instruct you that if the defendant used or

24  transferred or possessed the means of identification or

25  conspired to do so with the intent to commit, aid and abet, or

JURY CHARGE

1    in connection with an act that he believed in good faith was

2    lawful under the United States Tax Code, then he did not have

3    the intent to commit the crime alleged in Racketeering Act 11

4    and you should find it not proved.

5         If you find that the Government proved beyond a

6    reasonable doubt that the defendant knowingly and

7    intentionally agreed with others to commit the crime of

8    identity theft, then you should find the defendant guilty of

9    Racketeering Act 11.

10        As I already instructed you, a conspiracy is a crime

11   even if it does not achieve its purpose.  The Government does

12   not have to prove that the defendant or his co-conspirators

13   actually committed the crime of identity theft.  What the

14   Government must prove is that the defendant voluntarily

15   entered into a conspiracy whose purpose was to commit identity

16   theft.

17        I have just finished charging you on the 11

18   racketeering acts alleged in Count Two of the indictment.

19        In sum, to find the defendant guilty of Count Two,

20   you must find that the Government has proved the following

21   five elements beyond a reasonable doubt;

22        First:  An enterprise as described in the indictment

23   existed on or about the time alleged in the indictment.

24        Second:  The enterprise engaged in, or its

25   activities affected, interstate or foreign commerce.

JURY CHARGE

1          Third:  The defendant was employed by, or was

2    associated with, the enterprise.

3          Fourth:  The defendant knowingly conducted or

4    participated, either directly or indirectly, in the conduct of

5    the affairs of the enterprise.

6          And fifth:  The defendant knowingly participated in

7    the conduct of the affairs of the enterprise through a pattern

8    of racketeering activity as described in the indictment, that

9    is, through the commission of at least two of the charged

10   racketeering acts which must have occurred within ten years of

11   each other, or through causing or aiding and abetting the

12   commission of two such racketeering acts.

13         The next section discusses Count One, racketeering

14   conspiracy.

15         Count One of the indictment charges the defendant,

16   Keith Raniere, with conspiring to violate the RICO statute.

17         Count One reads as follows:

18         "In or about and between 2003 and March 2018, both

19   dates being approximate and inclusive, within the Eastern

20   District of New York and elsewhere, the defendant, Keith

21   Raniere, also known as Vanguard, Grandmaster and Master,

22   together with others, being persons employed by and associated

23   with the enterprise, an enterprise that engaged in and the

24   activities which affected interstate and foreign commerce did

25   knowingly and intentionally conspire to violate Title 18,

JURY CHARGE

1    United States Code, Section 1962(c); that is, to conduct and

2    participate directly and indirectly in the conduct of the

3    affairs of such enterprise through a pattern of racketeering

4    activity as that determine is denied Title 18, United States

5    Code, Sections 1961(1) and 1961(5).

6            The pattern of racketeering activity through which

7    the defendant, Keith Raniere, together with others, agreed to

8    conduct and participate directly and indirectly in the conduct

9    of the affairs of the enterprise consisted of multiple acts

10   indictable under Title 18, United States Code, Section 1028;

11   identification document fraud and identification document

12   fraud conspiracy, and identity theft and identity theft

13   conspiracy.  Title 18, United States Code, Section 1343; wire

14   fraud.  Title 18, United States Code, Section 1512;

15   obstruction of justice and obstruction of justice conspiracy.

16   Title 18, United States Code, Section 1589; forced labor.

17   Title 18, United States Code, Section 1590; trafficking in

18   persons.  Title 18, United States Code, Section 1591; sex

19   trafficking.  Title, United States Code, Section 1592;

20   document servitude.  Title 18, United States Code;

21   Section 2251, child exploitation.  And Title 18, United States

22   Code, Section 2252; possession of child pornography.

23           And multiple acts involving extortion in violation

24   of New York Penal Law Sections 155.30(6) and 20.00.

25           It was part of the conspiracy that each defendant

JURY CHARGE

1  agreed that a conspirator would commit at least two acts of

2  racketeering in the conduct of the affairs of the enterprise."

3  In order to convict the defendant on the RICO

4  conspiracy offense charged in the indictment, the Government

5  must prove that the defendant knowingly agreed that he and/or

6  a conspirator would commit racketeering in violation of

7  Section 1962(c) of the RICO statute which, again, reads as

8  follows:

9  "It shall be unlawful for any person employed by, or

10 associated with, any enterprise engaged in, or the activities

11 of which affect interstate or foreign commerce, to conduct or

12 participate directly or indirectly in the conduct of such

13 enterprise's affairs through a pattern of racketeering

14 activity."

15 Thus, in order to convict the defendant on the RICO

16 conspiracy offense based on a conspiracy or an agreement to

17 violate Section 1962(c), the Government must prove the

18 following five elements beyond a reasonable doubt.

19 One:  The existence of an enterprise or that an

20 enterprise would exist.

21 Two:  The enterprise was, or would be, engaged in,

22 or its activities affected or would affect interstate or

23 foreign commerce.

24 Three:  The defendant was, or would be, employed by

25 or associated with the enterprise.

5700

JURY CHARGE

1          Four:  The defendant did, or would, conduct or

2   participate either directly or indirectly in the conduct or

3   the affairs of the enterprise; and,

4          Five:  The defendant knowingly agreed that he or a

5   conspirator would participate in the conduct of the affairs of

6   the enterprise through a pattern of be racketeering activity

7   as described in the indictment; that is, the defendant agreed

8   that he or a conspirator would commit at least two acts of

9   racketeering activity of the types alleged in the indictment

10  and the types of which I just listed.

11         Thus, in order to convict indictment of Count One,

12  you must determine that the defendant knowingly and

13  intentionally conspired with at least one or person that he

14  and/or a conspirator would be employed by, or associated with,

15  an enterprise that affect interstate or foreign commerce as I

16  have explained each of these elements to you in Count Two.

17         To establish a pattern of racketeering activity as

18  alleged in Count One of the indictment, the Government must

19  prove three things beyond a reasonable doubt.

20         First:  The defendant agreed that he and/or another

21  conspirator would commit two or more of the racketeering acts

22  of the type or types alleged in Count One of the indictment in

23  the conduct or the affairs of the enterprise.  Conduct of the

24  affairs of the enterprise.

25         The government is not required to prove that the

JURY CHARGE

1    defendant personally committed two racketeering acts, or that

2    he agreed to personally commit two racketeering acts.

3           Rather, the Government must prove that the defendant

4    agreed to participate in the enterprise with the knowledge and

5    intent that at least one member of the racketeering conspiracy

6    which could but need not be the defendant himself would commit

7    at least two racketeering acts of the type or types alleged in

8    Count One of the indictment in the conduct of the affairs of

9    the enterprise.

10          These two acts need not be agreed to at the same

11   time.  They may be agreed to throughout the course of the

12   conspiracy.  Your verdict must be unanimous as to which type

13   or types of racketeering activity you find that the defendant

14   agreed was, or would be, committed, caused, or aided and

15   abetted.

16          I have already instructed you on the elements

17   regarding each of the alleged types of racketeering activity

18   with the exception of wire fraud which I will discuss later.

19          Second, the racketeering activity have, or would,

20   have a nexus to the enterprise, and the racketeering activity

21   was or would be related as I have defined those concepts

22   earlier.

23          Third:  The racketeering activity must have extended

24   over a substantial period of time, or the racketeering

25   activity posed, or would pose, a threat of continued criminal

JURY CHARGE

1    activity.

2              As I noted earlier, the Government need not prove

3    such a threat of continuity by any mathematical formula or by

4    any particular method of proof but rather may prove it in a

5    variety of ways.

6              For example, the threat of continued unlawful

7    activity may be established when the evidence shows that the

8    racketeering activity is part of a long-term association that

9    exists for criminal purposes, or when the racketeering

10   activity is, or would be shown to be, the regular way of

11   conducting the affairs of the enterprise.

12             Moreover, in determining whether the Government has

13   proved the threat of continued unlawful activity, you are not

14   limited to consideration of the specific type or types of

15   racketeering activity alleged against the defendant.

16             Rather, in addition to considering such activity,

17   you also may consider the nature of the enterprise and other

18   unlawful activities of the enterprise and its members viewed

19   in their entirety including both charged and uncharged

20   unlawful activities.

21             In order to convict the defendant of the

22   racketeering conspiracy offense, your verdict must be

23   unanimous as to which type or types of predicate racketeering

24   activity the defendant agreed would be committed.  For

25   example, at least two acts of identity theft, wire fraud,

JURY CHARGE

1   obstruction of justice, forced labor, human trafficking, sex

2   trafficking, document servitude, child exploitation, child

3   pornography, or any combination thereof.

4           The next section discusses the statute of

5   limitations for Counts One and Two.

6           If you find that the Government has proved beyond a

7   reasonable doubt all of the elements of Count One and/or Count

8   Two for the defendant, you must determine whether the statute

9   of limitations requires you to find the defendant not guilty.

10          The statute of limitations for racketeering and

11  racketeering conspiracy is five years.  Thus, you must

12  determine whether the racketeering charged in Count Two or the

13  racketeering conspiracy charged in Count One continued beyond

14  July 23, 2013.

15          If you find that the racketeering, or the

16  racketeering conspiracy, was limited in time and did not have

17  a continuing purpose, you must consider whether their purposes

18  were accomplished or abandoned before July 23, 2013.  If so,

19  you must find the defendant not guilty on Counts One and Two.

20          If, on the other hand, you find that the

21  racketeering and the racketeering conspiracy had a continuing

22  purpose, they are presumed to have continued beyond July 23,

23  2013.

24          In that scenario, it is the defendant's burden to

25  prove that the purposes of the racketeering and racketeering

JURY CHARGE

1    conspiracy were accomplished or abandoned before July 23,

2    2013.

3            If you find that the Government has proved that the

4    purposes of the racketeering or racketeering conspiracy were

5    accomplished or abandoned before July 23, 2013, you must find

6    the defendant not guilty on Counts One and Two.

7            The next section discusses Count Three, forced labor

8    conspiracy.

9            Count Three of the indictment charges the defendant

10   with conspiracy to commit forced labor of lower-ranking DOS

11   members between September 2015 and June 2017.

12           The indictment reads as follows:

13           In or about and between September 2015 and

14   June 2017, both dates being approximate and inclusive within

15   the Eastern District of New York and elsewhere, the defendant,

16   Keith Raniere, also known as Vanguard, Grandmaster, and

17   Master, together with others, did knowingly and intentionally

18   conspire to provide and obtain the labor and services of one

19   or more persons to wit:  Lower-ranking DOS members by means

20   of, A:  Force, physical restraint and threats of physical

21   restraint to them and one or more other persons.  B:  Serious

22   harm and threats of serious harm to them and one or more other

23   persons.  And C; one or more schemes, plans, and patterns

24   indebted to cause them to believe that if they did not perform

25   such labor and services, they and one or more other persons

JURY CHARGE

1 would suffer serious harm and a combination of such means

2 contrary to Title 18, United States Code, Section 1589(a).

3          I have already instructed you on the general

4 definition of conspiracy which, as I said, is an agreement

5 among two or more people to commit a crime.

6          Here, the defendant is charged with conspiracy to

7 commit the crime of forced labor.

8          I previously instructed you on the elements of this

9 underlying crime when I discussed Racketeering Act 10(b).  You

10 should apply those instructions here.  I remind you that the

11 crime of conspiracy, an agreement to violate a law, as charged

12 in this count of the indictment is an independent offense.  It

13 is separate and distinct from the actual violation of any

14 specific law such as the law prohibiting the crime of forced

15 labor.

16          Accordingly, you may find the defendant guilty of

17 the offense charged in Count Three even if you find that the

18 crime of forced labor was never actually committed.

19          The next section discusses Count Four, wire fraud

20 conspiracy.

21          Count Four charges the defendant with participating

22 in, and conspiracy to commit, wire fraud between

23 September 2015 and June 2017.

24          The indictment reads as follows:

25          "In or about and between September 2015 and

JURY CHARGE

1   June 2017, both dates being approximate and inclusive, within

2   the Eastern District of New York and elsewhere, the defendant,

3   Keith Raniere, also known as Vanguard, Grandmaster and Master,

4   together with others, did knowingly and intentionally conspire

5   to device a scheme and artifice to defraud one or more persons

6   to wit:  Lower-ranking DOS members and to obtain money and

7   property including rights to assets, credit card

8   authorizations, and sexually explicit photographs and videos

9   from them by means of materially false and fraudulent

10  pretenses, representations, and promises, and for the purpose

11  of executing such scheme and artifice to transmit and cause to

12  be transmitted by means of wire communication in interstate

13  and foreign commerce writings, signs, signals, pictures, and

14  sounds, to wit:  Electronic messages, telephone text messages,

15  and telegram messages contrary to Title 18, United States

16  Code, Section 1343."

17          I have already instructed you on the general

18  definition of conspiracy which, as I said, is an agreement

19  among two or more people to commit a crime.  I remind you that

20  the crime of conspiracy to violate a federal law is a separate

21  offense from the underlying crime.

22          Conspiracy to commit wire fraud is thus separate and

23  distinct from an actual violation of wire fraud which is the

24  object of the conspiracy and what we call the "substantive

25  crime."

JURY CHARGE

1          In order to find a defendant guilty of conspiracy to

2     commit wire fraud, you must find that two or more persons

3     agreed to commit the crime of wire fraud, and that the

4     defendant knowingly and intentionally became a member of the

5     and.

6          I will now instruct you on the elements of the crime

7     of wire fraud.

8          The wire fraud statute provides in relevant part:

9          "Whoever, having devised or intending to devise any

10    scheme or artifice to defraud, or for obtaining money or

11    property by means of false or fraudulent pretenses,

12    representations, or promises transmits or causes to be

13    transmitted by means of wire, radio, or television

14    communication in interstate or foreign commerce any writings,

15    signs, signals, pictures, or sounds for the purpose of

16    executing such a scheme or artifice shall be guilty a crime."

17         The crime of wire fraud has three essential elements

18    that the Government must prove beyond a reasonable doubt.

19         First:  That there was a scheme or artifice to

20    defraud, or to obtain money or property from lower-ranking DOS

21    members by materially false and fraudulent pretenses,

22    representations, or promises.

23         Second:  That the defendant or a co-conspirator

24    knowingly and willfully devised or participated in the scheme

25    or artifice to defraud with knowledge of its fraudulent nature

5708

JURY CHARGE

1    and with specific intent to defraud, and;

2              Third:  That in the execution of that scheme, the

3    defendant or a co-conspirator used or caused the use of

4    interstate or foreign wire communications.

5              The first element the Government must prove beyond a

6    reasonable doubt is the existence of a scheme or artifice to

7    obtain money or property by means of false or fraudulent

8    pretenses, representations, or promises.

9              A scheme or artifice is merely a plan for the

10   accomplishment of an object.  In this case, the term "defraud"

11   means to deprive another person of money, property, or any

12   other thing of value by dishonest means.

13             Therefore, a scheme to defraud here is simply any

14   plan, device, or course of action to obtain money or property

15   from someone by trick, deceit, deception, or swindle.

16             In this case, the scheme to defraud is alleged to

17   have been carried out by making false and fraudulent

18   statements, representations, and claims.

19             A statement, representation, or claim is false if it

20   is untrue when made and was then known to be untrue by the

21   person making it or causing it to be made.

22             A representation or statement is fraudulent if it

23   was falsely made with the intention to deceive.  Deceitful

24   statements or half-truths or the concealment of material facts

25   may also constitute false or fraudulent statements under the

JURY CHARGE

1   statute.

2         The deception need not be premised upon spoken or

3   written words alone.  The arrangement of the words, or the

4   circumstances in which they are used, may convey a false and

5   deceptive appearance.  If there is a deception, the manner in

6   which it is accomplished is immaterial.

7         The false or fraudulent pretense, representation,

8   promise, or statement must relate to a material fact or

9   matter.

10         A material fact is one that reasonably would be

11   expected to be of concern to a reasonable and prudent person

12   in relying upon the pretense, representation, promise, or

13   statement in making a decision.  This means that if you find a

14   particular statement of fact or representation to have been

15   false, you must also determine whether that statement or

16   representation was one that a reasonable person would have

17   considered important in making his or her decision.

18         The same principle applies to fraudulent half-truths

19   or omissions of material facts that were necessary to render

20   the statements that were made not materially misleading.

21         The Government does not need to prove that anyone

22   actually relied on the false statement or representation.

23   Rather, it is sufficient if the misrepresentation was one that

24   is capable of influencing a reasonable person's decision and

25   it was intended to do so.

JURY CHARGE

1        In addition to proving that a pretense,

2    representation, promise, or statement was false or fraudulent

3    and related to material fact, in order to establish a scheme

4    to defraud, the Government must prove that the alleged scheme

5    contemplated depriving another of money or property.

6        The Government is not required, however, to prove

7    that the scheme or artifice to defraud actually succeeded.

8    That is, the Government is not required to prove that the

9    defendant or a co-conspirator realized any gain from the

10   scheme, or that the intended victim suffered any loss or harm.

11       The question for you to decide is whether the

12   Government has proved that the defendant knowingly devised or

13   participated in a scheme to defraud.  Whether or not the

14   scheme actually succeeded is not a question you may consider

15   in determining whether such a scheme existed.

16       A scheme or artifice to defraud need not be shown by

17   direct evidence but may be established by all the

18   circumstances and facts in the case.

19       The second element of the wire fraud count that the

20   Government must be establish beyond a reasonable doubt is that

21   the defendant devised or participated in the fraudulent scheme

22   knowingly, willfully, and with the specific intent to defraud.

23   To devise a scheme to defraud is to concoct or plan it.  To

24   participate in a scheme to defraud means to associate one's

25   self with it with a view and intent to toward making it

JURY CHARGE

1    succeed.  I have previously defined the terms "knowingly" and

2    "willfully" and you should follow those instructions here as

3    well as.

4              Intent to defraud means engaging or participating in

5    the fraudulent scheme with some realization of its fraudulent

6    or deceptive character and with an intention to be involved in

7    the scheme to defraud and to help it succeed with the purpose

8    of obtaining money or property from the victim.

9              I further instruct you that a false representing or

10   omission of a material fact does not amount to a fraud unless

11   done with fraudulent intent.  However misleading or deceptive

12   a plan may be, it is not fraudulent if it was devised or

13   carried out in good faith.  An honest belief in the truth of

14   the representations made by a defendant is a complete defense

15   to this count however inaccurate the statements may turn out

16   to be.

17             The question of whether a person acted knowingly,

18   willfully, and with intent to defraud is a question of fact

19   for you to determine like any other fact question.  This

20   question involves one's state of mind.

21             As I have previously mentioned, direct proof of

22   knowledge and fraudulent intent is often not available.

23   Indeed, it would be a rare case where it could be shown that a

24   person wrote or stated that as of a given time in the past, he

25   committed an act with fraudulent intent.  Such direct proof,

JURY CHARGE

1    however, is not required.

2            Now, the third and final element that the Government

3    must establish as to the wire fraud count is that interstate

4    wire facilities were used in furtherance of a scheme to

5    defraud.

6            The interstate or foreign requirement means that the

7    wire communication must pass between two or more states as,

8    for example, an telephone call, a wire transfer of funds

9    between banks in different states, or an e-mail or electronic

10   message that was transmitted over interstate wires.  It is not

11   necessary for the defendant to be directly or personally

12   involved in any wire communication as long as the

13   communication is reasonably foreseeable in the execution of

14   the alleged scheme to defraud in which the defendant is

15   accused of participating.

16           In this regard, it would be sufficient to establish

17   this element of the crime if the Government has proved that

18   the defendant caused the wires to be used by others.  And if

19   this does not mean that the defendant himself must have

20   specifically authorized or directed others to execute a wire

21   communication.

22           When a person acts with knowledge that the use of

23   wire facilities will follow in the ordinary course of business

24   or where the use of wire facilities can reasonably be foreseen

25   even though not actually intended, then he causes the wires to

JURY CHARGE

1    be used.

2          Furthermore, the requirement that an interstate or

3    foreign wire facility was used is satisfied even if a wire

4    facility was used by a person with no knowledge of the

5    fraudulent scheme including a victim of the alleged fraud so

6    long as the wire was in furtherance of the alleged scheme.

7          The use of a wire facility need not itself be

8    fraudulent.  Stated another way, the material sent by wire

9    need not contain any fraudulent representation or any request

10   for money.  It is sufficient if a wire facility was used to

11   further or assist in carrying out the scheme to defraud.

12         Only the use of the wire facility must be reasonably

13   foreseeable, not its interstate or foreign component.

14         Thus, if you find that the use of a wire facility

15   was reasonably foreseeable, and an interstate or foreign wire

16   facility was actually used, then this element is satisfied.

17   Even if it was not foreseeable that the wire communication

18   would cross state or national boundaries.

19         I remind you that the crime of conspiracy, an

20   agreement to violate a law, as charged in this count of the

21   indictment is an independent offense.  It is separate and

22   distinct from the actual violation of any specific law such as

23   the law prohibiting the crime of wire fraud.

24         Accordingly, you may find the defendant guilty of

25   the offense charged in Count Four even if you find that the

JURY CHARGE

1    crime of wire fraud with never actually committed.

2              THE COURT:  Thank you.

3              I'm now going to discuss Count Five, sex trafficking

4    conspiracy.

5              Count Five of the indictment charges the defendant

6    with conspiracy to engage in sex trafficking of lower-ranking

7    DOS members.

8              The indictment reads as follows:

9              "In or about and between February 2016 and

10   June 2017, both dates being approximate and inclusive, within

11   the Eastern District of New York and elsewhere, the defendant,

12   Keith Raniere, also known as Vanguard, Grandmaster and Master

13   together with others, did knowingly and intentionally conspire

14   to recruit, entice, harbor, transport, provide, obtain,

15   maintain, patronize, and solicit one or more persons to wit:

16   One or more lower-ranking DOS members in and affecting

17   interstate commerce and to benefit financially, and by

18   receiving anything of value from participation in a venture

19   that engages in such acts.  Knowing and in reckless disregard

20   of the fact that means of force, threats of force, fraud and

21   coercion and a combination of such means would be used to

22   cause such persons to engage in one or more commercial sex

23   acts which offense was affected by force, fraud, coercion, and

24   a combination of such means contrary to Title 18, United

25   States Code, Section 1591(a)(1) and 1591(a)(2).

JURY CHARGE

1          I have already instructed you on the general

2     definition of conspiracy which, as I said, is an agreement

3     among two or more people to commit a crime.

4          Here, the defendant is charged with conspiracy to

5     commit the crime of sex trafficking which I will refer to as

6     "the underlying crime."

7          I previously instructed you on the elements of the

8     crime of sex trafficking under Racketeering Act 10(a).  You

9     should apply those instructions here.

10          If you find that the Government proved beyond a

11     reasonable doubt that the defendant knowingly and

12     intentionally agreed with others to commit sex trafficking of

13     one or more lower-ranking DOS members, then you should find

14     the defendant guilty of Count Five.

15          As I already instructed you, a conspiracy is a crime

16     even if it does not achieve its purpose.  The Government does

17     not have to prove that the defendant or his co-conspirators

18     actually committed the crime of sex trafficking.

19          What the Government must prove is that the defendant

20     voluntarily entered into the conspiracy whose purpose was to

21     commit sex trafficking.

22          I will now go on to Count Six:  Sex Trafficking.

23           Count Six charges the defendant with committing sex

24     trafficking as to Nicole between February 2016 and June 2017.

25          The indictment reads as follows:

JURY CHARGE

1          "In or about and between February 2016 and

2   June 2017, both dates beings approximate and inclusive, within

3   the Eastern District of New York and elsewhere, the defendant,

4   together with others, did knowingly and intentionally recruit

5   entice, harbor, transport, provide, obtain, maintain,

6   patronize and solicit a person to wit:  Nicole, in and

7   affecting interstate and foreign commerce and did benefit

8   financially and by receiving anything of value from

9   participation in a venture that engaged in such acts knowing

10  and in reckless disregard of the fact that means of force,

11  threats of force, fraud and coercion, and a combination of

12  such means would be used to cause Nicole to engage in one or

13  more commercial sex acts which offense was affected by force

14  fraud, coercion, and a combination of such means."

15          I instructed you regarding the elements of this

16  crime under Racketeering Act 10(a).  You should refer to those

17  instructions when considering this count.

18          Count Seven:  Attempted Sex Trafficking of Jay.

19          Count Seven charges the defendant with attempted sex

20  trafficking of Jay between February 2016 and June 2017.

21          The indictment reads as follows:

22          "In or about and between February 2016 and

23  June 2017, both dates being approximate and inclusive, within

24  the Eastern District of New York and elsewhere, the defendant,

25  Keith Raniere, also known as Vanguard, Grandmaster and Master,

JURY CHARGE

1   together with others, did knowingly and intentionally attempt

2   to recruit, entice, harbor, transport, provide, obtain,

3   maintain, patronize, and solicit one or more persons to wit:

4   Jay, in and affecting interstate and foreign commerce and to

5   benefit financially and by receiving anything of value from

6   participation in a venture that engaged in such acts knowing,

7   and in reckless disregard, of the fact that means of force,

8   threats of force, fraud, and coercion, and a combination of

9   such means would be used to cause such person to engage in one

10  or more commercial sex acts which offense was affected by

11  force, fraud, coercion, and a combination of such means in

12  violation of Title 18, United States Code, Section 1591(a)(1)

13  and 1591(a)(2)."

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

JURY CHARGE

1       THE COURT:  To prove Count Seven the Government does

2   not have to prove that the defendant actually committed sex

3   trafficking with respect to Jay.  I've already instructed you

4   regarding the elements underlying the crime of sex trafficking

5   under Racketeering Act 10A, and you should apply those

6   instructions here.  Just remember that with regard to Count

7   Seven you're being asked to determine not whether the

8   underlying crime was committed, but only whether the defendant

9   attempted to commit that crime.

10      To prove the defendant attempted to commit sex

11  trafficking as to Jay, the Government must establish the

12  following two elements beyond a reasonable doubt.

13      First, the defendant intend to commit the crime of

14  sex trafficking of Jay.

15      And Second, that the defendant did some act that was

16  a substantial step in an effort to bring about or establish

17  the crime.

18      The first element the Government must prove beyond a

19  reasonable doubt is that the defendant intended to commit the

20  crime of sex trafficking.  You should apply my previous

21  instructions as to intent to this element.

22      The second element the Government must prove is that

23  the defendant took a substantial step toward this goal of

24  committing the crime of sex trafficking of Jay.  Mere

25  intention to commit a specific crime does not amount to an

JURY CHARGE

1    attempt.  To convict the defendant of an attempt you must find

2    beyond a reasonable doubt that the defendant intended to

3    commit the crime charged, and that he took some action that

4    was a substantial step toward the commission of that crime.

5            In determining whether the defendant's actions

6    amounted to a substantial step toward the commission of the

7    crime, it is necessary to distinguish between mere preparation

8    on the one hand, and the actual doing of the criminal deed on

9    the other.  Mere preparation, which may consist of planning

10   the offense or of devising, obtaining or arranging a means for

11   its commission is not an attempt, although some preparations

12   may amount to an attempt.  The acts of a person who intends to

13   commit a crime will constitute an attempt when the acts

14   themselves clearly indicate an intent to commit the crime, and

15   the acts are a substantial step in the course of conduct

16   planned to culminate in the commission of the crime.

17           All right.  I will now give you some general rules

18   regarding your deliberations.  Keep in mind that nothing I

19   have said in these instructions is intended to suggest to you

20   in any way what I think your verdict should be, that is

21   entirely for you to decide.

22           I remind you that it is your responsibility to judge

23   the facts in this case from the evidence presented during the

24   trial, and to apply the law as I have given it to you to the

25   facts as you find them from the evidence.

JURY CHARGE

1          Each of you will be provided with a copy of these

2    instructions and a verdict sheet for your use during

3    deliberations.  You'll receive most of the evidence for your

4    review in the jury room.  If you require any of the other

5    items, evidence or testimony, please advise me.

6          And I have the verdict sheet here.  There will be a

7    place on the last page of one copy of it for the foreperson to

8    sign it, when you've completed your work, and to date it.  But

9    everybody else will get a copy of the verdict sheet as well so

10   you can follow along.

11         When you retire, your first duty is to elect a

12   foreperson.  Traditionally, juror number one acts as the

13   foreperson.  Of course, the foreperson's vote is entitled to

14   no greater weight than of any other juror.

15         It is your duty to discuss the case for the purpose

16   of reaching a verdict.  Each of you must decide the case for

17   yourself.  You should make your decision only after

18   considering all the evidence, listening to the views of your

19   fellow jurors, and discussing it fully.  It is important that

20   you reach a verdict, if you can do so, conscientiously.  You

21   should not hesitate to reconsider your opinions from time to

22   time, and to change them if you are convinced that they are

23   wrong.  However, do not surrender an honest conviction as to

24   the weight and effect of the evidence simply to arrive at a

25   verdict.

JURY CHARGE

1          Remember also that your verdict must be based solely

2     on the evidence or lack of evidence in this case, and the law

3     as the Court has given it to you, not on anything else.

4     Opening statements, closing arguments, other statements or

5     arguments of counsel are not evidence.  If your recollection

6     of the facts differs from the way counsel has stated the

7     facts, then your recollection controls.

8          Finally, bear in mind that the Government has the

9     burden of proof and that you must be convinced of the

10    defendant's guilt beyond a reasonable doubt to return a guilty

11    verdict.  If you find that this burden has not been met, you

12    must return a verdict of not guilty.  By contrast, if you find

13    the Government's burden has been met, then you must return a

14    verdict of guilty.

15         You cannot allow consideration of the punishment

16    that may be imposed upon the defendant if convicted to

17    influence your verdict in any way or to enter into your

18    deliberations.

19         The duty of imposing sentence rests exclusively with

20    me.  Your duty is to weigh the evidence in the case and to

21    determine the guilt or non-guilt solely upon such evidence or

22    lack of evidence and upon the law without being influenced by

23    any assumptions, conjecturers, sympathy or inference not

24    warranted by the facts.

25         It is very important that you not communicate with

JURY CHARGE

1    anyone outside the jury room about your deliberations, or

2    about anything else related to this case.  There is only one

3    exception to this rule, if it becomes necessary during your

4    deliberations to communicate with me, you may send a note

5    through the Marshal, signed by your foreperson or by one or

6    more of a members of the jury.  No member of the jury should

7    ever attempt to communicate with me, except by a signed

8    writing.  And I will never communicate with any member of the

9    jury on any subject touching the merits of the case, other

10   than in writing or orally right here in court.  If you send

11   any notes to the Court, do not disclose anything about your

12   deliberations.  Specifically, do not disclose to anyone, not

13   even me, how the jury stands numerically or otherwise on the

14   question of a guilt or non-guilt of the defendant, until after

15   you have reached a unanimous verdict or have been discharged.

16          You have the right to see exhibits or hear testimony

17   during your deliberations.  Many of the exhibits will be

18   provided to you in the jury room.  If you would like to review

19   a witness's testimony during your deliberations, you may send

20   a note, a signed note, to me requesting the specific portion

21   of the testimony and we'll provide it to you.  Please be

22   patient, as it may take a while to locate the relevant portion

23   of the transcript.  Please make your requests as specific as

24   possible so that we may more promptly assist you.

25          If you wish to see an item of evidence, such as a

JURY CHARGE

1    video or voice recording or a photograph, which has not been

2    provided to you, please advise us in writing about what you

3    wish to receive and you will be brought out here so that the

4    whatever the item of evidence that could not be brought to you

5    will be shown to you, if you so request it.  Please be

6    specific as to exactly what it is, or generally, what it is

7    that you're looking to review.

8          When you have reached a decision, have the

9    foreperson sign the verdict form and put the date on it and

10    notify the Marshal by note that you have reached a verdict.

11    Any verdict you reach must be unanimous.

12          Your oath sums up your duty, and that is:  Without

13    fear or favor to any person you'll well and truly try the

14    issues in this case according to the evidence given to you in

15    court and the laws of the United States.

16          Now, you'll recall that at the end of every day I

17    gave you instructions of what you're not to do, those

18    instructions apply.  The only time that the jurors can discuss

19    the case in the jury room is when all 12 of you are present.

20    So if someone goes to the lavatory or to make a phone call or

21    whatever it is, you're to stop deliberating.  When the person

22    comes back, you can continue to deliberate.  The 12 jurors

23    will be in the jury room; the four alternates will be in a

24    separate jury room.  And you'll be provided with your lunch

25    meal in the jury room so you don't have to travel and so you

5724

JURY CHARGE

1   can give all your attention to the work at hand of reaching a

2   verdict.

3           Also, between the hours of one and two the lawyers

4   and the rest of us get to go to lunch.  If you send us a note

5   at ten to one, we'll start working on it as soon as we get

6   back from lunch, so you may have to wait a little longer.  I

7   just point that out to you as well.

8           In addition, if it becomes necessary for you to

9   continue to deliberate past Friday -- we all understand the

10  problem that we're going to have on Monday if we lose a juror

11  or two -- so I may ask you to deliberate on Saturday, if it's

12  possible for you to, if you think it's possible for you to

13  reach a verdict by Saturday.  But we're not there yet.  I just

14  wanted to raise the issue.

15          I know you talked to Joe about scheduling issues,

16  and he talks to me, and I talk to all of the lawyers.  So

17  we'll e fully informed of anything you wish to bring to us.

18          But, at this point before we go any further and you

19  go home for the night, let me just ask the parties for a very

20  brief sidebar.

21          (Continued on the next page.)

22

23

24

25

SIDEBAR CONFERENCE

1        (Sidebar conference.)

2        THE COURT:  Other than the issues that I ruled on

3   during the course of preparing the jury charge?  Are there any

4   other issues?

5        MR. AGNIFILO:  Is your Honor intending to put common

6   before purpose on page 45?

7        THE COURT:  Was it placed in there?

8        MR. AGNIFILO:  I thought.

9        THE COURT:  I could put it in there.  I can put it

10  in the instruction.

11       MS. HAJJAR:  I know you requested it, but I didn't

12  think --

13       MR. AGNIFILO:  You didn't agree?  I thought you did.

14       MS. HAJJAR:  We hadn't agreed to the remainder.  I

15  guess we don't have a particular objection to that.

16       THE COURT:  Can I just put it in?

17       MR. AGNIFILO:  That's fine.

18       THE COURT:  You want me to read it?

19       MR. AGNIFILO:  You don't have to read it.

20       THE COURT:  On page 45 I'll put it in.  I don't feel

21  one way or the other about it.

22       MR. AGNIFILO:  I don't think you need to read it,

23  just write it in, it's fine.

24       THE COURT:  I think we discussed it; I can't

25  remember if we resolved it.

SIDEBAR CONFERENCE

1          MS. GERAGOS:  We discussed it in a letter on the

2    proposed charge, but Ms. Hajjar did agree to --

3          THE COURT:  I'll just add it.

4          MR. AGNIFILO:  Real minor, I think it's Racketeering

5    Act on 77.

6          THE COURT:  Yes, Racketeering Act on 77.  We've got

7    some typos, we're going to fix them.

8          MR. AGNIFILO:  Racketeering Act on 78.

9          THE COURT:  We got that.

10          MR. AGNIFILO:  What do you feel about Count Six, sex

11    trafficking of Nicole.

12          THE COURT:  We'll add Nicole.

13          Anything else?  Otherwise we're good?  We can send

14    them home?

15          MR. AGNIFILO:  Yes.

16          MS. HAJJAR:  Yes.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

PROCEEDINGS

1    (In open court.)

2    (Marshal sworn.)

3    THE COURT:  Ladies and gentlemen of the jury, we're

4    done for the day.  Tomorrow morning when you arrive, when all

5    12 of are you in the jury room, you may start your

6    deliberations.  We will provide you with the materials we

7    promised you.  We're not going to call you out to start, but

8    all 12 of you need to be present to start.

9    All rise for the jury.

10    (Jury exits the courtroom.)

11    THE COURT:  You may be seated.  So tell me about the

12    marshaling of the evidence.

13    MS. PENZA:  Thanks to our amazing paralegals, I

14    think we're actually very close.  I think we have almost all

15    of our exhibits, so we're working to pull out the more

16    sensitive material.  And we'll have a discussion about which

17    things, there are a couple of items that we would request go

18    back redacted.  But other than that, I think we're pretty

19    close.

20    THE COURT:  Why don't we then meet at 9:00 o'clock

21    tomorrow morning.

22    MR. AGNIFILO:  We have ours, Judge.  I haven't

23    checked it, but I'm led to believe we have ours, subject to a

24    final check.

25    THE COURT:  Discuss this among yourselves.  This way

PROCEEDINGS

1    at nine tomorrow morning when the jurors get here, they get

2    here between nine and 9:15 depending on traffic, we can send

3    everything into them and they can take it from there.

4              MR. AGNIFILO:  Okay.

5              THE COURT:  All right.  Is there anything else for

6    this evening?

7              MS. PENZA:  No, your Honor.

8              THE COURT:  Anything else?

9              MR. AGNIFILO:  Nothing from us, Judge.

10             THE COURT:  Have a good night.  Thank you.

11             MR. AGNIFILO:  What time do you want the defendant,

12   nine or 9:30?

13             THE COURT:  Do you need the defendant to look at

14   these items?  I think he should be here at nine.  I think

15   everybody should be here at nine.  I don't want to leave him

16   out of any of the discussion.

17             Thank you very much, Deputies.

18             (Proceedings adjourned at 5:05 p.m. to resume on

19   June 19, 2019 at 9:00 a.m.)

20

21

22

23

24

25