UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

18-CR-204(NGG)

UNITED STATES OF AMERICA,

Plaintiff,

-against-

KEITH RANIERE,

Defendant.

------------------------------x

United States Courthouse
Brooklyn, New York

May 16, 2019
9:30 a.m.

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES SENIOR DISTRICT JUDGE
BEFORE A JURY

APPEARANCES

For the Government: UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: MOIRA KIM PENZA
TANYA HAJJAR
MARK LESKO
Assistant United States Attorneys

For the Defendant: BRAFMAN & ASSOCIATES
767 Third Avenue, 26th Floor
New York, New York 10017
BY: MARC A. AGNIFILIO, ESQ.
TENY ROSE GERAGOS, ESQ.
- and -
DerOHANNESIAN & DerOHANNESIAN
677 Broadway, Suite 707
Albany, New York 12207
BY: PAUL DerOHANNESIAN, ESQ.
DANIELLE SMITH, ESQ.

Also Present: SPECIAL AGENT MICHAEL WENIGER
TERI CARBY, PARALEGAL SPECIALIST

Court Reporter: LINDA D. DANELCZYK, RPR, CSR, CCR
Phone: 718-613-2330
Email: LindaDan226@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

1194



1195



1196





1197

(In open court; Jury not present.)

THE COURT: Bring in the jury.

(Jury enters the courtroom.)

THE COURT: Please be seated. Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: We'll continue with the cross-examination of the witness. Mr. Agnifilio, you may continue.

I remind the witness that he's still under oath.

THE WITNESS: Yes, your Honor.

(Witness takes the witness stand.)

**MARK VICENTE**, called as a witness, having been previously first duly sworn/affirmed, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q Good morning, Mr. Vicente.

A Good morning.

Q I'm going to ask you some more questions this morning.

A Understood.

Q If a question I ask isn't clear, just ask me to rephrase.

Do you recall that in on January 5, 2016, you wrote a letter to the executive board?

A Yes, I believe that was the date.

Q I'll mark it as 326 for identification. I'm just going to show it to the witness. It says 326 on the bottom, and the date, January 5, 2016, correct?
A I didn't see the date -- sorry -- it's right there, yes.
Q Do you recall this letter as you sit here today?
A Yes.
Q Fair to say it was a fairly critical letter of the executive board at the time?
A Of the entire system.
Q Okay. You were expressing criticism of the system. And when you say the system, tell the jury what you mean by the system?
A I was concerned about the way we were treating people. I was concerned about the disparity between what we said we were about and what we seem to actually be doing to people. So in that sense I had a lot of concerns.
Q Do you remember saying that the fixes that have been implemented so far have been nothing more than Bandaids, words to that effect?
A I'd have to read it again.
Q Sure, let me show it to you. I want to scan it back a little so you can get more context.

(Witness reviewing document.)

Take your time and read it over to familiarize yourself with it. I'll ask you questions when you're done.

A I recall the Bandaid comment.
Q What were you conveying to the executive board when you said that the fixes done so far are really just Bandaids?
A I don't know specifically now what I meant by the fixes done thus far.
The Bandaids I think was in reference to we keep going into coach summits doing rah rah, yeah yeah, enroll, enroll, but that's not solving anything.
Q Do you remember saying to the executive board that the technology that NXIVM had was the best thing that you would ever see?
A I would have to see that section.
Q Sure, sure. So it's in the paragraph that says, The first thing I see is. And then it's I think four lines down -- three lines down.
(Witness reviewing document.)
A I've gotten up to, Whisper behind their backs.
Q I think you lost me.
A On the left, Whisper behind their backs.
Q Can you read the whole letter, if you want. I was directing you to one particular point.
A Can you point to the specific question?
Q You see it?
A I see it.
Q Take a look at that part. You can look at anything you

want, but that's the part I'm directing your attention to?

A I see that.

Q Okay. And when you wrote to the executive board that our technology is the best thing you've ever seen, what were you conveying to them?

A Two things. One, I was trying to mitigate punishment. So making sure that I still edified everybody, and edify the technology.

The second was that at that time what I thought it did was I believed at that time, you know.

Q You believed at the time that the technology was the best thing you'd ever seen?

A At the time.

Q When you say technology, tell the jury what you mean by technology?

A Technology was -- the short word they used was tech. The technology was in essence rational inquiry, the body of educational material and the EMs, the Expiration of Meaning.

Q When you say rational inquiry, tell the jury what you mean by that?

A My best understanding of rational inquiry is that was the name of patent, an increase system, EMs were an example of that.

Q Patent, do you know who held the patent?

A I don't. Because since then I've learned perhaps that

there was no patent or it was rejected, so I don't know.

Q What is the rational inquiry concept?

A From what I remember, the way it was written, it's a series of questions to help a person somehow integrate their internal understanding of reality with actual reality.

Q I want to turn to the second page of this letter. Let me let you read the second page, then I'll direct you to a particular part. Take a look then I'll direct you to one particular part.

A So read the whole thing?

Q Yes, to yourself.

(Witness reviewing document.)

Fair to say that one of things that you wanted to convey in this letter is that the leaders of NXIVM ESP were, in your view, arrogant. You used that word several times?

A I said we were arrogant, yes.

Q When you are saying to the executive board, We have arrogance and an excuse strategy. What are you conveying to the executive board?

A That we are arrogant and have a series of excuses.

Q But in what context? When you wrote these words arrogant, about what?

A Our behavior, our leadership.

Q So fair to say you're being critical of the executive board in terms of the executive board's leadership, their

behavior, and you're basically saying that they are arrogant in this letter?

A We.

Q Including yourself.

A Yes.

Q You say at one point here, The old guard is -- A lot of the old guard is straight up punishing. Do you see that there?

A I do. I did see it.

Q When you said that the old guard is straight up punishing, what are you talking about?

A Some the people who had been there a very, very long time, the old guard, I think what I meant was basically people who were there even before the time I was there.

Q So in that case, the people that you're saying are punishing, you're not talking about yourself, you're talking about who? Who specifically?

A Specific people?

Q Yes.

A I think I was thinking about people like Loretta Garza, Nancy Salzman, people who have been there quite a while.

Q So here in this letter you're telling Prefect, among other people, that she's being punishing, right?

A Right.

Q Did anything happen to you after you sent this letter

that the old guard and Prefect was being punishing. And that you all, including yourself, are being arrogant and doing that, what happened to you?

A Do you mean specifically after the letter or as the years went by?

Q Were you kicked out of NXIVM?

A For writing this letter?

Q Yes.

A No, I don't think so.

Q Were you kicked out of NXIVM ever?

A Was I kicked out? No.

Q You resigned?

A I did.

Q You resigned a year-and-a-half later?

A I did.

Q One of the things you go on to say on the bottom, I'm going to focus you on one paragraph, starting with, This has been. Read that to yourself, then I'm going to ask you a couple of questions about it.

(Witness reviewing document.)

A Done.

Q So you say in the letter that you're terrified to say these things, you actually write that?

A That's correct.

Q Then you say, I did something like this once before with

another organization and things went south pretty badly. Right?

A Yes.

Q What is Ramtha?

A What is Ramtha?

Q Right.

A Ramtha is the -- how do I describe it. The spiritual entity that a woman J.Z. Knight believes that she channels.

Q Were you a member of the Ramtha School of Enlightenment at some time before joining NXIVM?

A I was.

Q What years were you there?

A I think various times between 1994 and I think 2004.

Q So for ten years?

A Yes, but I traveled backwards and forwards for ten years.

Q You gave the name of a woman when I asked about Ramtha?

A The woman what has heads the organization is J.Z. Knight.

Q J.Z. Knight?

A Uh-huh.

Q Tell me if this is right, J.Z. Knight believes she is channeling a 35,000 year old warrior?

A That's my understanding.

Q It's your understanding because you were a member of the group?

A It's my understanding because that's what she said again,

and again, and again.

Q How did you come to join Ramtha?

A Somebody referred me at one point and said, hey, you got to check this out, I think in south Africa actually. And then at some point went up and attended a weekend.

Q Where?

A That would have been Yelm, Washington.

Q They have a campus in Washington State, right?

A Yes, they call it the ranch but, yes.

Q Just give us a quick run-down of what would you do in Ramtha? What did you do in Ramtha?

A It was a body of knowledge. One thing I want -- I don't know how much I can say because I -- there may be issues by my discussing things there. I don't know the legal issues for me.

Q Like what?

A Getting sued for saying something. I don't know. I don't understand how the law works in this room. Maybe in this room I can say anything that is mine.

MR. AGNIFILO: I would like permission to ask the witness about his experience.

THE COURT: You can, go ahead. You need to answer, you're under oath. This a Court proceeding.

MR. LESKO: May we have a side bar?

THE COURT: Okay.

MR. LESKO: Your Honor, we haven't objected to this line of cross-examination. I frankly don't expect to object in the near term. But I would make the point that this is extensive cross-examination on the Ramtha affiliation. At some point we will start objecting if it goes too long and too detailed. I want to alert everyone to that factor.

MS. PENZA: Can we have a proffer of how far we'll go?

MR. AGNIFILO: I've never spoken to this witness. I don't know what he's going to say about it. He mentioned it obviously in his letter to the executive board, so I have the right I believe to explore it. I don't think the jury or anybody else wants to hear too much about Ramtha. I do intend to get the basic idea of what Ramtha is. I want to understand what his problem was that he referenced in the letter to the executive board. Because he seems to be linking his own fear, that's what he said when he said in the letter is, I'm terrified writing this I was with another organization and I did something similar and things went south pretty badly. I need to know what that statement that he made to the executive board in a letter means. I need the context for what that means.

MR. LESKO: We don't have the an issue with that. The concern I have is Mr. Agnifilio dwelling or focusing intensely on aliens communicating to this woman and therefore

to her followers.

THE COURT: 35,000 year old aliens.

MR. LESKO: That's unduly prejudicial and inflammatory, and frankly a side-show.

THE COURT: Let's go forward. And when you think things are irrelevant or --

MS. PENZA: I think the word alien is irrelevant.

MR. AGNIFILO: But the jury has to figure out if this man is trustworthy. Is he trustworthy. Is he someone that we should make -- one of the things the Judge is going to instruct on --

I'm speaking. I'm speaking.

MS. PENZA: Speak to the Judge.

MR. AGNIFILO: Fair enough.

When the Court instructs the jury as to whether they would rely on this person in making a serious decision in their own life, I think they should know that he thinks that it's good to join a group where a 35,000 year old warrior is being channeled through a woman. I think that might be something that they would want to consider in whether they should trust him. I'm not going to dwell on it, but we're going to talk about it and see what he says.

THE COURT: Well, I'll be watching. And if you have an objection you'll let me know and we'll take it from there.

(End of sidebar conference.)

(In open court.)

THE COURT: You may continue.

MR. AGNIFILO: Thank you.

BY MR. AGNIFILO:

Q Have you met J.Z. Knight?

A I have met J.Z. Knight.

Q How much time have you spent with J.Z. Knight?

A I don't know that I can quantify it, a fair amount of time.

Q Did you believe that J.Z. Knight was channeling a 35,000 year old warrior?

A For a few years.

Q And how did you reach that conclusion?

A Belief versus evidence.

Q So there was no evidence that compelled you to the conclusion that -- let me finish -- that J.Z. Knight was in fact channeling a 35,000 year old warrior; fair to say?

A There was a evidence. But in retrospect I don't know that I would have called it scientific evidence.

Q What was the evidence that J.Z. Knight was channeling a 35 year old warrior?

A They would bring in scientists to do a series of measurements, run a series of tests. The scientist would the say, this is verifiable, this is really happening.

Q Did you reach a conclusion during your time in Ramtha

that J.Z. Knight perhaps was not channeling a 35,000 year old warrior?

A Towards the end, yes.

Q What caused to you reach that conclusion?

A It didn't make sense in the end to me. I was challenged on something that didn't make sense. Then I felt I was threatened in a way that didn't make sense.

Q How were you threatened?

A What I heard was that during a particular retreat intensive she had allegedly said in front a thousand people that I'm going to die a terrible death. I realized, okay so now a thousand people in that room that may decide that that's what they should do, let me die a horrible death.

Q I misunderstood, J.Z. Knight said that of herself?

A No, allegedly she said it of me, that I would die a horrible death in front of over a thousand very zealous people.

Q That scared you?

A You could say that.

Q What you said in your letter to the executive board of NXIVM, is that you're terrified to write these things because you had done this once before in another group and things went south pretty quickly. That's a passage you just read.

A Yes.

Q So what happened?

A The organization turned against me.

Q Rampantly?

A The whole company.

Q Was that before or after you made the movie, What The Bleep Do We Know?

A That was after it was made.

Q And What The Bleep Do We Know, you made with two other people who are in Ramtha?

A Yes.

Q And was the movie, What The Bleep Do We Know, in someway related to the Ramtha philosophies?

A It was.

Q How so?

A Many of the ideas in that film were ideas that were discussed in that educational model.

Q How did you end up leaving Ramtha?

A I'm not clear on that, what do you mean?

Q How did you leave? Did you resign? Were you kicked out? How did it happen?

A No. I wrote a letter, then those things happened, then I just never went back.

Q So you wrote a letter, and then Ms. Knight said the thing about you dying a violent death.

A That's my understanding, yes.

Q So what was the letter about before the woman channeling

the 35,000 year warrior said these things?

A It was concerns about people back stabbing each other and people saying things behind each other's back. And also I didn't believe she was getting actual information. Because in essence, I don't know if I said exactly this way, but I said everybody is so busy kissing your ass, they are not telling you the truth.

Q You said that to Ms. Knight?

A That was the kind of thing I think I said.

Q You were critical of the head of the program of Ramtha, Ms. Knight?

A The entire system. I thought there was a problem with the system.

Q So fair to say, what you're talking about when you write the letter to the executive board in January 2016, the reference you're making is your circumstances exiting Ramtha years earlier, correct?

A Yes. And expressing myself and what I thought was going on as trying to help and the response was not good.

Q After you sent that letter to the executive board in January, 2016, did Keith Raniere stop speaking to you?

A No, he did not.

Q Did you and he continue to speak about all matter of subjects?

A We did. It changed slightly, but we did still.

Q Did he tell you in conversations that he valued your input?

A He might have, I don't remember specific incident, but he might have.

Q At one point I think in direct examination you were talking about an arbitration between your wife, Bonnie, and Allison Mack that Keith Raniere was playing the role of arbitrator. Do you remember talking about that?

A I do.

Q Just tell the jury again what was the issue?

A The issue at that point I believe was that there were issues that were going on in the source acting company that my wife was pointing out, and regarding the way the leadership is doing things, just excluding people from things and a whole series of things going on.

My wife had been trying to bring this to Allison Mack's attention, and Raniere believed that everything had been resolved. I said to him, It's not resolved. I said, Things are still not working in the company.

He then offer to do an arbitration.

Q Do you recall is this after the letter that you wrote to the executive board in January 2016, this is sometime after that?

A I don't recall.

Q Was it around the same time, only if you remember?

A Again, I don't know the exact sequence.

Q Just take us briefly through the arbitration, what was said, what was done, what, if anything, did Raniere do?

A My recollection was that he began the conversation asking everybody if did everybody believed that everybody at this table has good intent. Everybody nodded.

He then elicited from each person what the different issues were. I recall that Allison Mack admitted that she had been trying to destroy my wife, had a series of jealousies, different things.

Raniere took Allison Mack to task for that and said in essence, this is something you need to heal. He said to my wife, I think you've experienced some kind of loss of innocence because of experiencing something like this. That's what I recall right now.

Q Do you recall during the summer of 2016, your wife had professed to a number of people that she felt she had sort of an enlightenment?

MR. LESKO: Objection.

THE COURT: Sustained.

Q Was there something, I'm not going to ask about conversations between you and your wife. I'm not asking about anything that you two discussed as a married couple. I'm asking about things you observed and what you understood to be kind of -- let me start again.

During the summer of 2016, did you have conversations with Keith Raniere about something that your wife was experiencing?

MR. LESKO: Objection.

THE COURT: Sustained.

Q Was anything of an emotional or spiritual nature, if you understand the question, going on with your wife in the summer of 2016?

A Well, she professed to have some kind of realization. And Raniere said that he believed he understood what it was. He explained to her what he believed it was, that is what I recall.

Q You were privy to any of this?

A I think I was privy to one conversation, maybe, not all of them, but one of them.

Q What was that?

A I think that Raniere was explaining something about, you know, I think he mentioned a Kundalini type thing. He said he understood it well. And he knew what she was experiencing.

Q And if I could stop you there. Describe to the jury what is a -- what do you mean a Kundalini type thing?

A Well, there is the old version of what it is and then I think there is the version he was talking about. I'm not exactly what he was talking about. But there is an old idea in Eastern mysticism that I think they call it the awakening

of the serpent, something like that. Some kind of an energy goes up the spine, hits your head, and you have awareness. That's my understanding of the ancient term.

Q I'm sorry, I interrupted you. Were you describing the conversation you were privy to?

A He said that he understood it and he said he would guide her through her whatever experience this was.

Q At some point your wife Bonnie decided to leave NXIVM EPS, correct?

A Yes.

Q That was January 2017?

A I believe so.

Q What were the circumstances that led to that?

A As far as I remember, she had gone to talk to him to share concerns about what she was seeing, things that she felt that the company was not run on the values that it was suggested but there was a lot of fear, obligation, coercion, that type of thing. I think his response, from what I recall, was something like, you know, don't be the squeaky wheel, don't be the problem.

Q Were you present for that conversation?

A I was not present for that conversation, no.

Q And then your wife did leave the company?

A A while later. She was trying to maintain her responsibilities, and at a certain point she thought it was

time.

Q But you stayed?

A I did.

Q You stayed for five or six months?

A Until the end of May.

Q About five or so months?

A Yes.

Q On April 17, 2017, do you remember getting a phone call from Catherine Oxenberg?

A April 17.

Q On or about that day?

A Could you refresh my memory?

Q Sure, I can do that. Let me ask you, your phone number at the time ended in 5414?

A Correct.

Q Do you know by heart, I'm not going to ask you any full phone numbers at all during our talk here, any aspect of her phone number at the time?

A Potentially the area code, but I don't know other than that.

Q An LA-based area code?

A I believe so.

Q Let me not ask you the date. Do you remember having a phone conversation with Catherine Oxenberg in or about April of 2017?

THE COURT: What year?

MR. AGNIFILO: 2017.

A I'm struggling to remember April. I believe May, but I'm struggling to remember April.

Q April 17, 2017?

A It's possible. I think that was around the time of the intensive. It's possible I may have called about lodgings for one of the staff.

Q Why would you have called Catherine Oxenberg about lodging?

A She had at various times housed staff that were in town for intensives. I'm not saying this for sure, but that's possible.

Q Do you remember, you were having frequent contact in April 2017 and throughout the spring with Sarah, correct?

A Sarah, yes.

Q Frequent phone calls, her calling you, you calling her on a frequent basis?

A Right.

Q Catherine Oxenberg is not someone who you had as frequent contact with, at least in April of 2017, is that fair to say?

A Yes, we hadn't spoken a lot. Not as frequent, no.

Q At some point you and Ms. Oxenberg did start speaking a lot, right?

A In May I recall.

                    Q We'll stick with May. Maybe I'll show you something to refresh your recollection. Do you remember -- I'm going to show you something to refresh your -- to see if you can recall the phone numbers. We provided it to the Government. It doesn't have an exhibit number. I'm just going to show it to him?

THE COURT: That's all right. You can show it just to him.

Q I'm not asking you -- I'm going to ask you not to put any numbers on the record. I'm just going to ask you to look at them.

THE COURT: Does this have an exhibit number?

MR. AGNIFILO: We're going to give it exhibit number. It's going to be 345, Judge.

THE COURT: For identification.

MR. AGNIFILO: Right.

BY MR. AGNIFILO:

Q Let me ask you first, you see the highlighted line?

A I see the highlighted line, yes.

Q Does your phone number appear on the highlighted line?

MR. LESKO: Objection. Withdrawn.

THE COURT: You may answer.

A It does.

Q Without getting into any other digits, the other phone number there is an LA-based area code?

A That's LA-based, yes.

Q Do you recognize that number as being Catherine Oxenberg's number?

A I don't but; I don't memorize numbers anymore.

Q Do you recall speaking to her -- just so we're clear, you don't recall having a phone conversation one way or the other with her on April 17, 2017, at 10:51:28?

MR. LESKO: Objection, your Honor.

Q If you recall. You don't recall --

THE COURT: He doesn't recall it. Is that right?

THE WITNESS: I don't recall a conversation.

MR. AGNIFILO: That's all right.

Q Do you recall the first conversation, regardless of when it was, with Catherine Oxenberg in the spring of 2017?

A I think it was in person, I think.

Q Tell us about that.

A I don't recall the exact date. I think it was May, but I did talk to her and.

MR. LESKO: Your Honor, objection. Could we approach please?

THE COURT: All right.

(Continued on the next page.)

(Sidebar conference.)

MR. LESKO: Your Honor, I'm not objecting to this line of questioning but I am going to ask for the same instruction that your Honor gave with respect to the conversations with Debra and Kayla regarding the use of this testimony just to establish Mr. Vicente's state of mind and the effect on Mr. Vicente, but not for the truth of the matters asserted by Catherine Oxenberg. I think that same principle applies here.

MR. AGNIFILO: More than fair.

THE COURT: Okay, we'll do that now. You can ask your first question and before he answers I'll give the admonition.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

BY MR. AGNIFILO:

Q Mr. Vicente, when we broke briefly you were going to talk about a conversation that you had that you recall in person with Catherine Oxenberg and from what you recall it was May 2017?

A I think it was May.

Q And before you get to that conversation, I think we're going to have a --

THE COURT: I'm going to give an instruction to the jury. I'm permitting the witness to testify about what Catherine Oxenberg said to him during these conversations, conversation or conversations. I'm allowing this because these statements of Ms. Oxenberg are relevant to Mr. Vicente's state of mind and their effect on Mr. Vicente. But they are not being offered for the truth of Ms. Oxenberg's statements themselves. Therefore, you are to consider these statements only to the extent that they had an impact on Mr. Vicente's state of mind and their effect on Mr. Vicente and not for the truth of the statements made by Ms. Oxenberg.

MR. AGNIFILO: Thank you.

THE COURT: Let's proceed with the question.

MR. AGNIFILO: Very good. Thank you, Judge.

BY MR. AGNIFILO:

Q With that understanding, you can tell the jury about the

conversation that you and Ms. Oxenberg had.

A My recollection is that I said that I was deeply concerned about India, her daughter. That I had some understanding of some secret society that I thought she was involved in. That I was concerned about her mental state, her weight, and that I thought she might be in danger. That's what I recall.

Q The way you recall, you reached out to Ms. Oxenberg to give her this information?

A No. It was a follow up conversation. I believe my wife met with her first.

Q I see. Okay.

A And then I think what happened is that I went in person to talk to her.

Q Right. And so you go to Catherine Oxenberg's house and you tell her the information that you just summarized for the jury; fair to say?

A I believe so, yes.

Q Fair to say she was very concerned?

A At first I think she was -- my sense is she was just taking the information in. Then she became concerned later.

Q You at the time were friendly with her daughter, India, correct?

A I thought I was very friendly, yes.

Q Do you recall a time on or about the first week of May of

2017 when you went to the Oxenberg's home in Los Angeles and you spoke with India?

A I do recall, yes.

Q What do you recall about that?

MR. LESKO: Objection, your Honor. Perhaps an instruction?

MR. AGNIFILO: Before --

THE COURT: The question.

MR. AGNIFILO: We're going to have to do it, but I think there is something before a statement is made.

THE COURT: Go ahead with this question, then we'll see.

MR. AGNIFILO: All right.

BY MR. AGNIFILO:

Q Tell me if this is right, was it around the time of India's birthday?

A Yes, I believe so.

(Continued on next page.)

CROSS-EXAMINATION (Continued)

BY MR. AGNIFILO:

Q Okay. And India was in Los Angeles at that time?

A Yes.

Q And were you in Los Angeles at that time?

A Yes.

Q Okay. And you went to the home where India was, correct?

A Yes.

Q Did you bring pies? Do you remember bringing pies?

A I may have brought one or two. Cakes for her, yeah.

Q Okay. Okay. All right.

MR. AGNIFILO: This might be a good time to do it, Judge.

If Your Honor wants to give the instruction because I'm going to segue into what was said both ways.

THE COURT: What kind of pie was it?

THE WITNESS: Ice cream.

THE COURT: It was ice cream.

All right. Members of the Jury, I'm permitting the witness to testify about what India Oxenberg said to him. I'm allowing this because these statements of Ms. India Oxenberg are relevant to Mr. Vicente's state of mind and their effect on Mr. Vicente, but they are not being offered for the truth of the statements made by India Oxenberg; therefore, you are to considered these statements only to the extent that they

had an impact on Mr. Vicente's state of mind, and their effect on Mr. Vicente, and not for the truth of the statements made by India Oxenberg. Okay.

MR. AGNIFILO: Yes, thank you.

THE COURT: Go ahead.

BY MR. AGNIFILO:

Q Now, what do you recall you and India Oxenberg saying to each other during this conversation?

A I recall giving the cakes and then I began sharing with her I was very concerned about what she was involved in. And then I was afraid for her and myself. And that I was also concerned because I had seen her the day before, and then she had had, I understood, immediately called somebody to say that I was there.

I thought is this like I'm being spied on? And I said I don't know what you're involved in, but I think it's bad.

And then I -- I left.

Q You ran into her in a coffee shop previously, correct?

A I think -- yes, the day before when I was actually -- I just -- I think I just picked up the pies.

Q Did you -- were you yelling at her?

A I think I was upset. I was scared for actually both of us.

Q Your voice was raised?

A More than it is now, yes.
Q Did you call her a monster?
A I -- did I call her -- sorry. I have no idea if I did or not.
Q Did you yell at India that she was a monster?
A I don't recall that I did that.
Q Did you yell at India that she was spreading hate?
A I don't know if those were the exact words, but I remember saying something like, you know, are you -- I was concerned about her passing information on about me that could get me into some kind of danger. That I recall. I don't recall the exact words.
Q Did you tell her that her life was in danger?
A I don't -- I'm sorry. I can't recall the conversation with that level of specificity.
Q And just to be clear, there are two conversations that we've covered. There was the conversation that happened at the time you bought the pies, or the cakes, whatever it was, and then there was a second conversation at her house.

For the time being, I'm talking about the conversation at her house.
A Yes.
Q Again, just -- so let's just talk about that conversation specifically.
A Uh-huh.

Q You went there to confront India.
A No, actually I went there to deliver the pies. I was hoping to, you know, just enjoy the party and maybe have an opportunity to, you know, talk to her aside.
Q Did you stay?
A No, I left.
Q You didn't stay.
A I did not stay.
Q Right. You -- did you speak to Catherine Oxenberg at all when you were at this party?
A I don't think I spoke to her at that party, no.
Q The only one you spoke to when you went to this party was India, right?
A Um, I think I also spoke to one of her sisters, I think, who answered the door.
Q And when you spoke to India, you told her her life is in danger; didn't you?
A I don't recall specifically. But that -- I did feel that.
Q You felt when you were at the home and you were talking to India, you felt her life was in danger, correct?
A I don't know. I do know I was very concerned about her. I was concerned that she was being used as an agent against myself and others. I don't recall the specific language that I used.

Q Do you remember telling her that you believed your life was that danger?

A I do think I said something to that effect.

Q And tell the jury exactly what you remember saying to India and how you said it about your life being in danger.

A Well, the sequence I remember is I went to the door. I was intending to bring the pies, you know, maybe attend the party. I was hoping to talk to India and share my concerns.

But when I saw her, I just decided that I couldn't come in and I just told her I was very concerned about what she was involved in. I was concerned about her spreading information about me. I was concerned for my -- I think I was concerned for my safety. I don't remember my exact words. And concerned for hers. And I was worried that she was involved in something that was really bad.

I remember she said to me she didn't know what I was talking about. I think I said I think you do. And then I decided to leave and not attend.

Q Do you remember her telling you that she's never been happier?

A I don't -- but that is consistent with a lot of the -- the DOS women said.

Q And do you recall you saying in exchange that's what they want you to think?

A Sir, I think you have a lot more information about this

conversation than I do, because I don't recall that.

Q But you agree with me you weren't using with India the tone of voice that you're speaking to the jury and to the Court here today?

A I wasn't. I was quite afraid.

Q You were afraid. So it was an urgency about your language; fair to say?

A I think so. I felt it was an urgent situation.

Q And you felt it was a threatening situation?

A Potentially, yes.

Q A threatening situation both to you and to India?

A Both, yes.

Q And were you trying convey to India that magnitude of threat or fear; is that the fair to say?

A I can you ask the question one more time?

Q Yeah.

You were presenting the situation with a great sense of urgency; fair to say?

A Yes.

Q And ultimately, as you said, you did not stay at the party. You delivered the pies or the cakes and you left, right?

A That's correct.

Q Do you recall placing a phone call to Keith Raniere within the week from the time that you saw India and illegally

tape recording him?

MR. LESKO: Objection.

THE COURT: Sustained.

Q Let me break it down.

Did you call Keith Raniere from California where you were and tape record the phone call?

A Can you tell me which -- which call?

Q May 7th. May 7th, 2017.

A It's possible. I had a conversation with him in March that -- I had a conversation with him in March that my phone was recording calls, so it's possible at that point it was recording.

Q Now, do you know if it's legal under California law to record phone calls without telling the other person that they're being recorded?

MR. LESKO: Objection.

Q Only if you know.

THE COURT: Sustained.

Q Has anyone since told that you tape recording someone when you're in California and not telling them they're being tape recorded is illegal?

MR. LESKO: Objection.

THE COURT: Sustained.

Q So you record Keith Raniere, correct?

A I believe my phone was -- was automatically recording,

yes.

Q Were you recording everybody?

A It's possible. It was an automated program. It's possible.

Q So -- and this is on your cell phone?

A It was on a -- yes, an -- an Android, yes.

Q And so it's possible that all these phone calls you had with different people you recorded?

A No, because at a certain point I -- I think I erased the program and I switched phones from Android to iPhone.

Q Now, after the situation that you described earlier with India, where you brought the cakes and the pies and you left, you followup contact with Catherine Oxenberg, correct?

A I did.

Q And you told Ms. Oxenberg, in substance, things didn't go so well with India. She's not really interested in talking to me.

A Yeah, I think it was something like, you know, something to the effect of, you know, I went to have a conversation and I just got too scared.

Q And that's what you told Catherine?

A Something like that.

Q And you didn't bother trying to reach out to India again in that period of time, correct?

A Well, I heard that she had called Raniere right after

that, so I realized not an option anymore.

Q Okay. Now, on May 23rd, was that the date you resigned your position with NXIVM?

A Can you say the date again?

Q Yeah. I think May 23rd?

A I think it was May 22nd.

Q All right. So May 22nd, May 23rd, that time period you resigned your position with NXIVM.

A Yes, sir.

Q All right. And were you having very regular phone contact with Sarah throughout May 2017; fair to say?

A Yes, I was.

Q And you were having very regular contact with Sarah's husband during May of 2017, correct?

A More toward the end.

Well, that's not actually true, because we were -- I just shot the pilot, so we were discussing a lot of the -- the editing needs.

Q And what was your relationship with Sarah's husband?

A We were very good friends.

Q And had you been good friends a long time?

A We became better friends over the years. But we were acquaintances at first and then we became friends.

Q Okay. And I think you said yesterday that your first contact with the FBI was May 26th, 2017?

A I don't remember the exact date, but it was towards the end of May.
Q All right. Do you recall if on May 26th, 2017, you called or were called by Sarah 18 times?
A I don't know the number, but it's possible. It was a fair number of calls.
Q Now, why did you have so many conversations with Sarah on the same day that you called the FBI for the first time?
A I can -- so I can deduce it by the relationship of these two events, but I can't tell you for certain.
I'm --
Q You wanted -- you wanted information from Sarah so when you spoke to the FBI, you would know what you're talking about.
A I wanted to be accurate.
Q So you wanted to be accurate but with someone else's information.
A Well, I was not in that secret society, so I -- I couldn't offer my experience at that time.
Q Were you with Sarah when you placed the -- let me back up.
Did you call the FBI on May 26th, or did they call you?
A I think it was actually both. I think I called and then they called me.

Q And were you and Sarah together?
A No.
Q And whose idea was it for you to call, rather than Sarah to call the FBI?
A I don't recall. I do recall that she was, at that point, very afraid.
I don't recall specifically.
Q Did you tell Sarah you were calling the FBI?
A I think I did.
Q Is it possible that you called the FBI with Sarah's information without telling her?
A It seemed unlikely.
Q You don't recall -- you don't have a specific recollection of telling Sarah, hey, I'm about to call the FBI with the information you gave me?
A I'm assuming I did, but I can't say to you I know absolutely for certain that I said those exact words and that's exactly what happened.
Q I'm not talking about the exact words. My question is --
A The gist of those words.
Q Right. You can't recall.
A Again, I'm assuming that I said that.
Q On the same day, May 26th, that you called the FBI for the first time and you spoke to Sarah all those times, you also spoke to Chris a number of times on the phone.

Case 1:18-cr-00204-NGG-VMS Document 768 Filed 07/19/19 Page 44 of 275 PageID #: 8433

A Are we using that on that day?
Q I am.
A Oh.
Q I think it's on your list.
A I don't recall, but I do know I called her at some point.
Q Okay. And fair to say, by the time that you called the FBI on May 26th, 2017, you had spoken to Sarah about her experiences in DOS, correct?
A I believe so.
Q And fair to say by the time you called the FBI, on May 26th, 2017, you had spoken to Chris about her experiences, also true?
A If the phone records are indicating that I spoke to her that day, which I believe you have, then likely -- likely that was the conversation that happened.
Q All right. You spoke to the FBI again on -- and this is just a -- to back up, this the FBI in the Albany area, correct?
A Northern District, yes.
Q The Northern District FBI.

You spoke to the FBI, again Northern District, on May the 31st, 2017. That's the second time you spoke to them.

Do you remember that?
A I remember numerous calls. I don't remember the exact dates, but it's around about that time.

Q Okay. Do you remember the same time that you called the FBI for the second time, you had 5 calls to or from Catherine Oxenberg, 11 calls with Sarah, and 4 calls with Sarah's husband, all on May 31st, 2017?

A That sounds consistent.

Q And why were you talking to Sarah so many times, Catherine Oxenberg, and Sarah's husband, on the same day that you called the FBI for the second time?

A My recollection is there was a branding ceremony about to take place, and I wanted to prevent those women from going or help some of them to leave before they got branded.

And also I was trying to help Sarah get to the -- to the FBI to have a meeting.

MR. AGNIFILO: Just bear with me one second.

Q Is it your recollection that you told the FBI that a branding ceremony was about to take place?

A I don't specifically recollect if I said that.

Q I'm going to show you 3500-MV-1.

A Okay.

Q Fairly short. It's a two-page document. I'm going to show you the first page and I will show you the second page and you will tell me.

(Whereupon, the witness is reviewing the document.)

Q Can you read that okay?

A Yes.

Q All right. Just read it to yourself.

(Whereupon, the witness is reviewing the document.)

Q That's the first page. I'm going to now show you the second page.

(Whereupon, the witness is reviewing the document.)

A Yes.

Q You didn't tell the FBI a branding ceremony was about to happen?

A Based on that document, they didn't make any notation like that.

Q And June 2nd, 2017, you place a call and have a long conversation with someone named Frank Parlato?

A Yes.

Q Tell us about that.

A I believe that, um, Catherine Oxenberg had spoken to him and she asked me if I would please talk to him. I had some reservations, and then I decided that I would call him and I would share with him everything thus far.

Q Why did you have reservations speaking to Frank Parlato?

A He had worked for Raniere and Bronfman, and even though he had a blog, I wasn't sure it would be safe.

Also, I was concerned about the way that a friend of mine had been treated by him at the request of -- of Raniere and Clare Bronfman. So I was worried.

MR. AGNIFILO: Your Honor might want to give the

instruction that we've been giving for --

THE COURT: All right.

Members of the Jury, again, I will permit this witness to testify about what Frank Carlato said to him. I'm allowing this because these statements of Mr. Carlato are relevant to Mr. Vicente's state of mind and their effect on Mr. Vicente. They're not being offered for the truth of the statements themselves.

Therefore, you are to consider these statements ascribed to Mr. Carlato only to the extent that they had an impact on Mr. Vicente's state of mind, and their effect on Mr. Vicente, and not to the truth of the statements ascribed to Mr. Carlato.

All right, you may can ask you question.

MR. AGNIFILO: Yes. And just so, Parlato is P-A-R-L-O-T-O.

THE COURT: Oh, P.

MR. AGNIFILO: Yes, yes. That's fine.

THE COURT: Yes. It's Parlato.

Go ahead.

MR. AGNIFILO: Thank you.

BY MR. AGNIFILO:

Q All right. Did Frank Parlato say to you that had he a source in the NXIVM legal department?

A He did. I don't know if it was that first conversation.

But at some point he said something like that to me, yes.

Q Do you remembering the meeting with the FBI on December 5th, 2017?

We're going forward a few months.

A Was that in -- was that in Los Angeles?

Q Yes. The Los Angeles office?

A Yes.

Q All right. And you told the FBI that Parlato said he had a source in the legal department, correct?

A I don't know if I said -- told them that.

Q All right. I'm going to show you something, see if it refreshes your recollection.

I'm just going to show this to you. This is 3500-MV-5. And I'm going to show you the third page and it's highlighted on the top.

A I see it.

Q Do you remember telling the FBI that Parlato told you that had he a source within the NXIVM legal department?

A I don't remember specifically telling them, but it is in the report. Sure.

Q Did Parlato tell you that Kristin Keeffe -- that he pays Kristin Keeffe for information?

A At some point he did. I don't remember when that was exactly.

Q Okay. And regardless of when it was, what do you recall

Frank Parlato telling you about the fact that he pays Kristin Keeffe for information?

MR. LESKO: Objection.

THE COURT: You may answer.

A Sorry. The question with one more time?

Q Sure.

What do you recall Frank Parlato saying to you about the fact that Frank Parlato pays Kristin Keeffe for information?

A Just that he had -- he told me that he had paid her for some information. I don't know if it was an ongoing thing, but he told me he had.

Q Information about NXIVM and Raniere, correct?

A I don't think it was specific, but that's the assumption that I think I made.

Q Now, at some point in 2017, you started speaking with Kristin Keeffe, correct?

A Yes.

Q And when did you start speaking with Kristin Keeffe?

MR. LESKO: Objection. May we approach?

MR. AGNIFILO: I return to my duty station.

THE COURT: I was trying to see how far you were going today.

Sidebar please.

(Continued on the next page.)

(The following occurred at sidebar.)

THE COURT: All right. Okay. What seems to be the trouble?

MR. LESKO: So Your Honor earlier called them state of mind statements that were --

THE COURT: Yes.

MR. LESKO: -- admitted, were admitted for a very specific timeline because of the -- because in the witness' mind that led to him to resign from NXIVM and led him to report on DOS.

I think Mr. Agnifilo is using this as a back door in order to elicit hearsay for the truth of the matter asserted, and in particular, this hearsay was elicited or was stated to the witness after he resigned and after the Coach Summit occurred, where this branding ceremony -- which by the way, I don't believe ever occurred, was supposed to occur.

So statements that postdate the early June timeline, I think, are not admissible. They did not have an effect on Mr. Vicente in a way that led him to leave NXIVM, and that was the basis of the original ruling by Your Honor.

THE COURT: So where are we going here?

MR. AGNIFILO: I'm -- in the interest of time, I'm not going to get into everything that he said with every person. I think it's fair to establish, especially on cross-examination. He testified affirmatively to things on

Case 1:18-cr-00204-NGG-VMS Document 768 Filed 07/19/19 Page 51 of 275 PageID #: 8440

cross-examination. He said he learned later from Kristin Keeffe this is witness is collecting information from various sources, and I think that's a fair thing for the jury to know.

Also, this is a witness who had sort of taken it upon himself to sort of, you know, I don't know, be the intrepid do-gooder in connection with bringing down NXIVM, and there's a process to that, and he spoke to a lot of people. I don't need to get into what he said to everybody. I just don't need to do that.

But I think it is important to establish who he had spoken to, because he's not just a mere bystander, he's an active agent, and he -- that's been his testimony.

MR. LESKO: Your Honor, example, Mr. Parlato is a good one. He asked: Was Mr. Parlato paying a source in the legal department at NXIVM, Ms. Keeffe, to show that that actually happened.

He isn't offering that testimony to show that it had an effect on Mr. Vicente. He's trying to establish that there is a sort of boogie men out there, out to get this client, and that's the course of his defense. He's offering this as an --

THE COURT: All right. Let's get there.

MR. AGNIFILO: I'm going to get there.

It's my premise. And I'll do it in the next three questions.

THE COURT: You have only three more questions?

MR. AGNIFILO: Just on this one topic.

THE COURT: Well, what else is there? You said an hour, and we're an hour and 15 minutes.

MR. AGNIFILO: My cross is still half the length of the direct, so I'm winding down, Judge. I really am. I'm winding down. I'm going to be done this morning certainly. Probably well before the morning break, so I'm winding down.

But there's a couple of questions I do want to ask, because I believe this witness wanted to make himself important, a prime source, you know, for certain things, outflanked Kristin Keeffe, possibly, because Kristin Keeffe was going to say things about him.

Three questions I'm going to ask to make that point and I'm going to move on.

MR. LESKO: Your Honor, Mr. Agnifilo proffered the questions because once they're asked in open court in front of the jury --

THE COURT: It's done.

MR. AGNIFILO: So he advises the FBI that Kristin Keeffe was damaged. And I want to say: You said that to the FBI so that the FBI would listen to you, because Kristin Keeffe told you she was talking to the FBI also. And you wanted to control the narrative. That's it.

Those are the questions on Kristin Keeffe, Your Honor, and I'm stuck with his answer. That's not why I said

it and that is his answer.

MR. LESKO: The problem is the FBI --

THE COURT: Could we calm down, please.

MR. LESKO: The FBI, I don't believe, told Mr. Vicente that Kristin Keeffe was talking to the FBI. So Mr. Agnifilo is trying to elicit the statement that Mr. Vicente knew that Kristin Keeffe was talking to the FBI, which came from Kristin Keeffe.

The truth of that matter asserted is to establish that that actually happened, and that's for the truth, that's not an effect on Mr. Vicente. That's trying to do a back-door attempt over hearsay to prove the truth of the matter asserted, Kristin Keeffe was talking to the FBI. That's what he's trying to do.

MR. AGNIFILO: I don't care whether she was or not. It's not for the truth. He believes she was, and he wanted to be the primary source of information to the FBI and -- and it's what he was thinking.

THE COURT: Well, what exact question are you going to ask?

MR. AGNIFILO: I'm going to say: You had reason to believe that Kristin Keeffe was talking to the FBI. You told the FBI that Kristin Keeffe was damaged. You did that so that the FBI would listen more to you and less to other people.

THE COURT: Well, you can ask the question of: Do

you know that she was talking to the FBI.

MR. AGNIFILO: Fine.

THE COURT: But not about a conversation with her.

MR. AGNIFILO: Fine. Fine.

THE COURT: In other words, it's not about a conversation with her: Did you believe this and -- and were you concerned about it.

MR. AGNIFILO: Okay. Fine. Very good.

THE COURT: That's the end of that, and we need to move this along. Because, you know, if -- let me just finish.

I don't want to keep reading this admonishment with every person that you want him to talk about, because then it looks like you're putting in their testimony through him. And once you reach a certain point, which we're now reaching, you know, you can bring them on your case and ask them questions on your case. I don't do this in trials.

I'm just telling you. This isn't a debate. I'm just telling you that I reached the point where I'm not going to do it anymore, because I -- you're taking advantage of something that you are trying --

MR. AGNIFILO: You're angry at me. They're all staring at me.

THE COURT: That's fine.

MR. AGNIFILO: That's okay. I don't mean --

THE COURT: They're talking to each other.

I just want to make a record here, just for the sake of it.

I don't like that. That is even worse. Just stop. These people are out there talking to each other. They're not looking at us.

MR. AGNIFILO: Judge, you've been very fair with me throughout the trial.

THE COURT: Well, I just got the impression now that you're trying to make a record about bias.

MR. AGNIFILO: No, no, no.

THE COURT: And I just don't want that. I'm just saying that's the way it looks to the Court. It's not fair.

MR. AGNIFILO: I don't mean that.

THE COURT: Okay. Good. I'm glad to hear that.

All right. We're on to the next debate.

MR. AGNIFILO: Okay.

THE COURT: Which shouldn't be a debate.

All I'm saying is I don't want to keep asking these questions -- making these charges to the jury, because at a certain point it looks like you're conducting your direct or bringing in evidence that you don't want to bring in on a case that you would have to bring in order to make your points to the jury about what that evidence will be.

I just -- you know, I've allowed this and it's fine, but there has to be an end point. That's all I'm saying.

MR. AGNIFILO: I agree. That's --

THE COURT: Good. That's wonderful. I'm very happy.

MR. AGNIFILO: There's a way to do it. I don't need to get into the substance of our statements.

THE COURT: Okay.

MR. AGNIFILO: I like being on trial with Your Honor. I do. I think it's a very good experience for me.

THE COURT: Well, it's my pleasure.

MR. AGNIFILO: My pleasure, too.

THE COURT: With everybody, by the way.

MS. PENZA: Thank you, Your Honor.

THE COURT: Yes, I'm not going to limit that comment to just you.

MR. AGNIFILO: I didn't think you would.

MR. LESKO: Thanks to Mr. Agnifilo, we'll have a long time together.

MR. AGNIFILO: My cross is one third of the direct.

THE COURT: Stop. You've done your part.

MR. AGNIFILO: He's going to do an hour long.

THE COURT: All right. Okay. We're keeping people waiting.

THE COURT REPORTER: Sealed? Not sealed?

MR. LESKO: It doesn't --

THE COURT: Not sealed.

(In open court; Jury present.)

THE COURT: All right. You may continue your cross-examination.

MR. AGNIFILO: All right. Thank you, Judge.

BY MR. AGNIFILO:

Q Do you recall telling the FBI that Kristin Keeffe was damaged?

A Not specifically. It's possible.

Q Did you -- you were talking to the FBI on a fairly regular basis, correct?

A With the Northern District, not that much.

Q But then with the FBI here in Brooklyn more so, correct?

A More with Brooklyn than the Northern District.

Q Okay. And is it fair to say you wanted to be an ongoing information source to the FBI on the terms of what you knew and what your experience was, correct?

A I wouldn't characterize it that way.

Q Were you concerned -- did you believe that Kristin Keeffe was talking to the FBI as well?

A Was I -- sorry. One more time?

Q Sure.

Were you concerned that Kristin Keeffe was speaking to the FBI?

A I don't recall being concerned about that.

Q Okay. So my question is you didn't tell the FBI that she

was damaged so that they would be less likely or more likely to believe her?

A I'm sorry. I don't know how to answer that question.

Q Okay. That's fine.

You had -- and I'm not going to get into the content of these conversations -- you had ongoing conversations with Frank Parlato, correct?

A For some time.

Q Okay. You and he would speak on a daily basis sometimes on a weekly basis, but you spoke very, very often in -- in and around June and July of 2017; fair to say?

A June and July -- yes. I don't know if it was every day, but, you know, probably once a week at least.

Q Do you recall sometimes you would call Frank Parlato four or five times in a day?

A I don't recall, but if you have my phone records, then you could probably tell.

Q But you recall speaking to him regularly about -- about these matters; DOS and related matters, correct?

A Yes.

Q And you were having fairly regular conversations with Catherine Oxenberg during this same period of time, not getting into the substance of discussions, you were just speaking to her on a regular basis, correct?

A During that time, yes.

Q Okay. At some point did you start using the email address truthteller18?

A No.

Q Did you ever have a Hushmail account?

A I did.

Q And when did you get a Hushmail account?

A It may have been July.

Q And why did you get a Hushmail account?

A Because of the private investigators I believed were being hired to track me.

Q Okay. And so you thought NXIVM was hiring private investigators to track you?

A Absolutely.

Q Were your parents spies?

MR. LESKO: Objection.

THE COURT: Are you objecting to that question?

MR. LESKO: Yes.

THE COURT: All right. Sustained.

Q Did you tell people that you parents were spies?

MR. LESKO: Objection.

THE COURT: Sustained.

Q You thought were you being followed, investigated, spied on, by NXIVM investigators?

A I did.

Q At some only point in July you called a filmmaker named

Karim, correct?

A July?

Q July 26th.

A Yeah. Probably. It's possible, yeah.

Q Why did you call Karim?

A I don't remember specifically why on that -- on that day. Karim and his wife were living in Los Angeles at the time. I don't recall the specific content of conversation.

Q Fair to say throughout August you had many, many phone conversations with Karim?

A Likely.

Q And what were -- what subject matters were you and Karim talking about?

A About --

MR. LESKO: Objection.

MR. AGNIFILO: I'll ask a different question.

Q You wanted to make a film, right?

A Not necessarily at that point.

Q So why were you calling a filmmaker?

A Well, at that point he was somebody that actually, I believe, understood, some of what I was struggling with.

Q And were you friends with him?

A I had been friends -- I mean, I was friends with his wife first, and then over the years I became friends with him.

Q Were you calling him as a friend or were you calling him

as a filmmaker?

A In July -- it may have been both.

Q Because you -- you had -- I mean, when was the last time you spoke to him? Before you called him on July 26th, when the last time you spoke to Karim?

A May have been earlier in the year. I was trying to help him enroll their children in Rainbow.

Q You were trying to enroll their children in Rainbow?

A Yes, myself and Michel Chernitzky.

Q At some point you and Karim start talking about a film project, right?

A There was discussions about, you know, just documenting. There was no -- there was no clear idea of what would happen.

Part of what I was concerned about was trying to make sure that I document my -- my efforts, as I said before, because I believe that things may be turned around on me at some point.

Q And at some point you started going around with a film crew, correct?

A Well, there was a time in March where -- yeah, there was a film crew with me and in Vermont, and then also, I believe, in Clifton Park.

THE COURT: I'm sorry. March of what year?

MR. AGNIFILO: 2018.

THE WITNESS: 2018.

THE COURT: Now in 2018?

THE WITNESS: Yes.

THE COURT: Right.

Q Do you recall writing a lengthy email on March 10th, 2018, to a number of people who were formally in NXIVM ESP?

A Is it the one that starts with "grab a glass of wine"?

Q That's the one.

A I did.

Q And do you recall saying in that email that you have now spoken to over 20 women who were Keith Raniere's lovers, slaves.

Do you remember saying that in the email?

A I believe I did.

Q I'm not going to get into what you said to each one, do you remember the 20 women -- say over 20 women -- that you spoke to?

A It would take me some time to reconstruct.

Q But you believe you had spoken to over -- as of the time you wrote this email on March the 10th, 2018, you had spoken to over 20 women who were Keith Raniere's lovers and slaves or slaves, right?

A That's what I believed.

Q And do you remember writing that these 20 women are all talking to each other and comparing notes?

A Yes.

Q And is that true, that these women --

MR. LESKO: Objection.

THE COURT: I'm sorry.

MR. LESKO: Objection.

THE COURT: Sustained.

Q When you -- when wrote that these 20 women are talking to each other and comparing notes, why did you write that?

MR. LESKO: Objection.

THE COURT: Sustained.

Q You agree with me that you wrote that, correct?

A I believe I did.

Q And was that true?

A I believe so.

Q You had wrote what you believed to be the truth, correct?

A Yes.

Q And because you, in fact, had spoken to over 20 women at that point it time, correct?

MR. LESKO: Objection.

THE COURT: Sustained.

MR. AGNIFILO: I'm not asking about the letter. I'm just asking --

Q At that point in time, had you spoken with over 20 women?

THE COURT: You may answer.

A I believe I had.

Q And to your knowledge, were they comparing notes?

MR. LESKO: Objection.

THE COURT: Sustained.

Q You wrote that they were comparing notes. Do you agree with me?

A Yes.

Q Do you recall in this long email referencing Nancy Salzman and saying that you had to instruct the video department to remove unkind comments that Nancy Salzman made?

A Yes.

Q And is that true, that you had to -- you instructed video department to remove comments because Nancy Salzman had made unkind comments?

A Yes.

Q In the email that you sent -- who did you send this email to, by the way?

A I sent it to some of my -- the people I cared about in the lower -- lower ranks.

Q You make specific reference to India. Do you recall making specific reference to India and saying something along the lines of: This abuse is actually the abuser thing sounds perfectly reasonable to you.

Do you remember writing that?

A I do.

Q And that's because as of this time, that being March the 10th, 2018, India still had not come around. She was still

loyal to NXIVM, correct?

A She -- I believe she was still a true believer.

Q And what do you mean by true believer is that she chose to remain aligned with NXIVM, correct?

A Little more than that.

Q Do you recall that on March 27th, 2018, so 17 days after you send this email where you reference India, you and a film crew went to where India worked and were looking to film her at work.

A I -- we were two blocks away. We were not looking to film her at work.

Q Do you remember being directly across the street from where she worked with you and a film crew and a movie camera?

A Two blocks away, not a movie camera.

Q What kind of camera?

A Um, just give me a moment.

Q Something you put on your shoulder, right?

A I think it was a Sony FS7.

Q And that's a big camera that you kind of can hold like this, or put on your shoulder-type thing?

A Yeah, it's like -- it's like a lower-end video camera.

Q And there was -- there was yourself. There was your wife, right?

A Yes.

Q There was someone named Clare, right?

A Don't recall.

Q Now, Clare is not the Clare that we've been talking about. There's a Clare who's working on this HBO project, correct?

A Yes. I believe so, yes.

Q So she's part of the film crew, right?

A Yes.

Q And it was yourself, right?

A Yes. Yes, I was there.

Q And do you know whether India was filming you?

A Do I know if I -- I'm sorry. Do you want to tell me? I don't know.

Q So do you recall if you were wearing a hat, a baseball hat?

A I don't.

Q Do you wear baseball hats sometimes?

A If my hair's a mess, yes.

Q And where were you exactly in relation to where India worked?

A Two blocks from the restaurant.

Q And you know she worked in a restaurant, right?

A That much I heard.

Q And why were you two blocks away from India's restaurant?

A To not be near the restaurant.

Q Were you looking to shoot India?

A No.

Q You were not looking to film India?

A No.

Q I'm going to show you Defense Exhibit 341.

MR. AGNIFILO: 341.

Q I want you to take a look at that. I'll zoom in a little bit for you.

A Okay.

Q Do you recognize the people?

A I think the first, second from the right, I think is my wife. Um, I think -- I think it's me to the right, but it's very hard for me to really tell. It looks like a cameraman, third from the right.

Q Do you know his name?

MR. LESKO: Your Honor, we're going to object.

Q Let me ask you this -- I'll ask another question.

Does this refresh your recollection about this event?

A Not the -- not this photo so much, but I do recollect the event.

Q Okay. So tell us about the event.

A This I remember was the last-ditch attempt to try to get India to consider maybe going to the authorities and, you know, telling them what she knew.

My understanding at this point is she was still

extremely loyal to the entire structure. And my wife went to talk -- went to try to talk to her in the restaurant, to ask her to please just consider that maybe this entire thing is not harmless, as it's -- as she's suggesting it is.

I believe that she wasn't there.

Q How do you know from two blocks away that she wasn't there?

A Well, because of the sequence of events. When my wife came back, she said that she wasn't there.

Q And what's the role of the camera and the film crew in this process?

A To document the effort.

Q So what you were trying to do is you were furthering your film project by trying to get India on tape?

A Not my film project.

Q You were trying to further a film project where you and your wife, with a cameraman and someone who's making an HBO film, is trying to further a film project, right?

A Not to be argumentative, but not an HBO project at that point.

Q What was it then?

A It was just an independent thing at that point.

Q And you wanted footage. You wanted footage of India and you knew India didn't want to be on tape. You knew that, didn't you?

A Well, I don't think that -- I don't think anyone wanted footage of India. I thought the camera stayed there. And I believe that my wife went on her own to the restaurant.

Q You agree with me about that, at one point your wife and you and Clare from the film crew and cameraman, were all together in a group. At one point in time that's where you were all were, right?

A Yes, two blocks away from Plantmade, I think.

Q Plantmade?

A I think it's Plantmade, was the restaurant.

Q So you -- how did you and the film crew get near Plant Made where India was working?

A Do you mean physically?

Q Yeah, did you take a taxi together? Did you meet there?

A I don't -- I mean, I think we walked.

Q And you knew or you hoped that India would be at work that day.

A Um, well, we hoped that she would be so my wife could maybe reason with her.

Q And the last time you had any contact with India was when you were at her house delivering the pies or cakes all those months earlier, telling her that this was dangerous and you were afraid -- you were afraid and she should be afraid, right? You hadn't had any contact with her in between.

A No.

Q Do you think India would welcome the film crew showing up near her work?

MR. LESKO: Objection.

THE COURT: Sustained.

Q Did you care whether India would welcome the film crew showing up near her work?

A Well, two things. I don't believe the camera actually went to the restaurant. I think it held back.

As for the second question, do you have the second -- ask the question again?

Q Sure.

Did you think that India would welcome the film crew being near her restaurant where she's working?

A Okay.

So as I said, I don't believe the camera did go there. But I believe at that point that she was in a -- in a, almost a trance like situation, and then I thought that her safety was a very high priority.

Q And so you and the film crew were going to save her?

A No. I think -- I know that Bonnie wanted to try and to talk to her.

Q All right. At some point -- and you have made reference to this a few times, both on direct and now on cross, you and the film crew went to Vermont to a film festival, correct?

A Yes.

Q And why did you go to Vermont to a film festival?

A I was trying to -- I had been trying to reason with the filmmaker about continuing to promote the film. And I was hoping to -- to talk to him as well in person.

Q What filmmaker?

A Which filmmaker?

Q Yeah.

A Alessandro Molatore.

Q There was a film being shown at the Green Mountain Film Festival in March of 2018 called My Tourette's, correct?

A Yes.

MR. LESKO: Objection.

May we approach?

THE COURT: I'll sustain. Let's keep going.

MR. AGNIFILO: Your Honor, this is --

Q You tried to gain access --

MR. AGNIFILO: I'll ask another question.

Q You tried to gain access to the screening of My Tourette's that was being shown at the Pavilion Auditorium in Montpelier, Vermont at 2:30.

MR. LESKO: Objection.

Q Isn't that why you were there?

MR. LESKO: Objection.

THE COURT: Sustained.

Q Why were you in Vermont? And what did you do in Vermont?

MR. LESKO: Objection.

MR. AGNIFILO: Your Honor, could we approach?

THE COURT: Why don't we not do that. Let's take our mid-morning break.

All rise.

(Jury exits the courtroom.)

THE COURT: The witness may stand down. Do not discuss your testimony.

(Witness steps down.)

THE COURT: All right. Everyone may be seated.

MR. LESKO: Your Honor, we object to any mention of the Tourette's film. It's going to lead to claims that the inquiry had an effect on Tourette's. Some of the, I believe, participants in the film have subsequently expressed concerns about their depiction in the film.

I believe, Your Honor, has addressed this issue in a ruling. This is a -- this is a completely irrelevant collateral matter and really it -- we're objecting to it.

It's an attempt to try to show that the defendant was involved in good things that are completely irrelevant from what we are talking about in this case. And for all those reasons and anything anyone wants to add.

THE COURT: All right. I hear you, yes.

MR. AGNIFILO: Well, first of all, I don't think it's irrelevant that defendant was involved in good things. I

think it's very relevant that he was involved in good things and I'm surprised that the Department of Justice is afraid to bring out things that are true that defendant did that's good. I think that's absolutely fair ground.

Some of the reason people stayed in NXIVM, they weren't in NXIVM because they were brainwashed. They were in NXIVM because they believed they were doing good things, and one of the things that was good is it did have a way to address the effects of Tourette's and people have the right to notice that, and have the right to stay with organizations that they believe are doing good work.

So to the larger objection, which I have to say, I'm sorry I developed a concern that the government wants to basically cut our legs out from under us so that we can't put in anything that is positive about the defendant, so that they can put in, you know, this is going to be a one-sided case. So I have concerns about that.

The more immediate concern, though, Judge, this man -- and he can describe it any way he wants, is basically going around town with a film crew, exerting pressure on people. It is unwanted pressure.

I don't think India Oxenberg wanted him and a film crew coming to her restaurant after the situation that they had at her house earlier. I don't think the people in Vermont, who are trying to film a movie, screen a movie, want

him and his film crew traveling to Vermont -- from my information is that they tried to gain access with the film crew into the screening of My Tourette's movie.

And Mark Vicente's role as an agent for the destruction of NXIVM, is absolutely relevant and -- and I think I have every right to bring that out. To not let me, Your Honor, is to forestall an entire part of our defense and this didn't just happen.

Mark Vicente, for whatever his own perceptions are, and I think the jury is starting to get a sense of that thought -- thought, genuinely or not genuinely, this was a bad thing that had to be brought up. That's his right, I suppose.

But he did certain things to bring that about and one of the things that he did to bring that about is he went around town and out of town with a film crew. And that is a pressure-filled environment. That's not even like being approached to be interviewed. All of sudden you walk out of It's Your Life and there's a movie camera in your face. That's pressure.

He went to Vermont, not with good intentions, not because he was afraid. What he testified on cross-examination, I think, is implausible, that he went to Vermont with a camera crew because he was afraid for his life. He didn't bring a camera crew because he was afraid for his life. He was prompting -- he was prompting confrontations and

he wanted to capture them on tape. And that's why he went and he went for a reason.

He brought -- and it came out in direct. I didn't bring it up for the first time. I'm following up on something that he testified to on direct.

This isn't a long topic. I can do this in a few minutes.

MR. LESKO: That's a wonderful argument. I imagine we'll hear it again in summation. This the defendant's case. This is the defendant trying to bootstrap through cross-examination their case in chief. They can put on a case. They can call witnesses about this.

And let's be honest about the Tourette's film. They want to establish through this witness in testimony that is well beyond the scope of the direct examination, that NXIVM cures Tourette's. That's what they want to establish here, and they want to be able to argue that to the jury, as some sort of argument that what Mr. Raniere was doing was good.

We are -- we don't believe the truth of that. We don't believe that NXIVM had any role in curing Tourette's whatsoever. But that's precisely what Mr. Agnifilo is trying to do here.

It's a side show. It's a collateral matter. It's -- if he wants to try to establish it in his defense case, have at it. But in cross-examination of this witness, I

think it's totally inappropriate.

I will say, though, if they want -- if I understand their theory. The subject matter of the film is irrelevant. I don't think we have any objection to -- to cross-examining Mr. Vicente about attempts to talk to a filmmaker about a film. But what that film was about, we think is irrelevant.

MR. AGNIFILO: Can I just talk about the -- this is the direct examination, question and answer. It's on page 667, starts at line 20: Question, by Mr. Lesko.

"QUESTION: Was there a understanding at NXIVM about claims that programs offered by NXIVM could result in health benefits?"

Answer on direct examination.

"ANSWER: Well, it was talked about. It was generally accepted that, yes, that is what it did. But we were told, you know, don't make those claims. Be very, very careful that you don't suggest that this thing will do that even though, you know, the experience we had, that there was clear evidence that, yes, it actually did do that, you know. Yes. It removed headaches and it could change panic attacks and it could do all kinds of things."

Direct examination.

"It can do all kinds of things that actually did have a physical benefit, but we're instructed not to make that claim."

They got into this. They got into this on direct examination.

MR. LESKO: He didn't mention Tourette's and there was no discussion about attempt to contact a filmmaker at a film festival in Vermont many, many months after he left NXIVM. We very -- so the remoteness of time and the nature of the content and he did not mention Tourette's whatsoever in his direct examination.

So, again, I mean, this is a side show.

THE COURT: This wasn't about headaches. This was about Tourette's.

MR. AGNIFILO: No, he said "and all kinds of things." I can say --

THE COURT: Well, I mean, yeah.

Are you going to claim he could -- he figured out how to cure cancer?

MR. AGNIFILO: No, but this is --

THE COURT: Is this -- my point -- the point is that I'm not going to make light in this trial of the question of whether, you know, your client figured out how to cure Tourette's, which had is serious illness. If you want to make that claim, make it on your case. We're not going into it.

Tourette's is out.

So if you want to talk about him taking his camera around to confront people or to, you know, that he used this

as a tool to get people to see things his way, you know, I think that's fair game.

But we're not going into the curing of Tourette's in this case. It is not part of the case, unless you decide to make it that, if you put on a case. That's the end of the discussion.

We'll take ten minutes.

(Whereupon, a recess was taken at 11:36 a.m.)

(In open court; outside the presence of the jury.)

THE COURT: All right. Let's bring the witness in. About how much longer? Will you be done this morning?

MR. AGNIFILO: Ten minutes. Ten minutes.

THE COURT: Ten minutes. All right.

MR. AGNIFILO: Mr. Lesko has permission to throw something at me at the ten-minute mark. I would give Your Honor permission, but, Your Honor might actually do it.

THE COURT: All right.

(Pause in proceedings.)

(The witness resumes the witness stand.)

THE COURT: All right. Let's bring in the jurors, please.

(Pause in proceedings.)

(Jury enters the courtroom.)

(Jury present.)

THE COURT: Please be seated everyone.

You may continue your cross-examination, Mr. Agnifilo.

MR. AGNIFILO: Thank you.

THE COURT: The witness is reminded he is still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION (Continued)

BY MR. AGNIFILO:

Q Good morning, Mr. Vicente.

A Good morning.

Q I have five or ten more minutes of questions and then I'll be done.

A Okay.

Q When we left off, we were talking about you going to Vermont with the film crew. All I want to know is I just want to know what you and the folks in the film crew did when you got to Vermont. Is it fair to say that the camera was rolling while you were there for most of the time?

A For some of the time, but, I mean, I recall when I went to the theater, yes.

Q Okay. And is it fair to say at one point you and the film crew tried to gain access to a theater?

A Yes.

Q And do you recall that the security people at the theater were brought into the situation?

A Yes. We were asked to leave.

Q And that's because the people at the theater didn't want you and the film crew with a running camera to be inside the venue; is that fair to say?

A I believe it was because the film festival wanted to honor the director's wishes, and the director's wishes were

that we leave. So the film festival said, We'd like you to leave.

Q Okay. And this is the Green Mountain Film Festival, does that sound right?

A I believe.

Q In Montpelier, Vermont?

A In -- maybe Burlington.

Q Burlington, all right.

And it's in the spring of each year; does that sound right?

A I actually never heard of the festival before, but I don't know if it's every year. But it was that year.

Q So you went up to this film festival specifically because you -- and we're not going to get into specifics, there's a specific movie that you wanted to gain access to?

THE COURT: That's a yes-or-no question.

A Yes.

Q And so although this is not a film festival you were familiar with, you and the film crew made the trip to Vermont for that specific reason?

A Yes.

Q Yes, okay.

Now, at one point I think you said that this film project ended up -- and I might be using the wrong term, so work with me -- ended up being taken over by HBO, right?

A (No audible response.)

Q The film project became an HBO project?

A Oh, sorry. You're talking about a different project now, I understand?

Q No, sir.

A The one in Vermont.

Q Oh, that was a different one?

A The screening in Vermont.

Q No, no, no. Let me break it down.

The movie in Vermont is something different. We're not talking about that.

A Okay.

Q I'm talking about you guys, you and the fill crew travelling to Vermont.

A Yes.

Q That's part of the project that ended up being the HBO project?

A That's correct.

Q And that was the same personnel that you were saying were two blocks away from India's work, those are all the same people?

A (No audible response.)

Q It's Clare and Karim, right, those two?

A I don't believe -- I don't believe Karim was there.

Q No, no, but Clare was there?

A I believe so.

Q Okay.

A She was definitely in Vermont.

Q Okay.

A I'm not sure when you...

Q And Clare is with Karim in the same project, right? They're working together?

A Yes.

Q All right. So and at the time when you were in Vermont, that was not yet an HBO project, but it became one later, is that fair to say?

A She very recently, I think so.

Q Yeah.

You still are in contact with them, correct?

A With?

Q Clare and Karim and all them?

A Yes. I spoke to Karim like two, two and a half weeks ago.

Q And you even traveled with some of them; is that fair to say?

A To Vermont, yes. And to New York, yes.

Q And more recently you were in Utah?

A Yes. I was in Utah in January.

Q And you traveled by plane from Salt Lake City to LA, you, Bonnie and Clare, right?

A I think we traveled back together. I think on the way there it was just my wife and I.
Q So did you have plans on meeting with Clare at -- so this is the film festival in Utah, correct?
A The Sundance Film Festival.
Q All right. And did you have plans to meet with Clare at the film festival or did you just happen to run into each other?
A Not necessarily. We tend to go every year, and she was there that year as well.
Q And you moved back to LA, you, Bonnie, and Clare, correct?
A I think so -- I -- I think we flew back together. We actually walked past in an airport.
Q All right. And you were on the plane together?
A Again, I -- I know -- I know my wife and I were definitely on the plane, but I'm not sure exactly whether Clare was on the plane.
Q Now, what is your -- do you have any book deals as we sit here today?
A I do not.
Q Have you spoken to anybody about having a book deal?
A I did in January 2018 and I decided not to.
Q What, if any, movie deals do you have, other than the thing that's now an HBO project?

A I have nothing.
Q Just the HBO project?
A Yes.
Q And what is your current involvement in the HBO project?
A Subject.
Q Subject meaning you're -- you're expected to be in the movie?
A I think so, yes.
Q And is it fair to say you expect to play the role of someone who is trying to do good things in the movie, positive things and official things?
A I don't expect to play a role. I -- I've done what I've done. Some of that has been captured.
Q You feel you've done important work in -- I want to pick the exact right words.

You feel that you've done the right thing in coming forward with the situation with NXIVM, correct?
A One more time.
Q You feel that you have done the right thing in coming forward with the situation, as you understand it to be concerning NXIVM, correct?
A Yes.
Q And that is going to be depicted in the film, correct?
A Well, I think my sense is many things might be depicted. Maybe that's part of it. You know, I don't know for sure.

Q But you know you're going to be -- you're on camera. I mean, you're not -- you're a filmmaker by trade, right?
A Yes.
Q And in this capacity you're no longer a filmmaker, you're on the other side of the lens, as they say, correct?
A Yes.
Q You're sort of an active agent in the movie. You're not an actor for this, it's not fiction. But you're in the movie as a figure, as Mark Vicente, right?
A Depending on what they choose. I'm in -- I'm in there if that they do.
Q Do you have any input into that?
A I don't.
Q So you've relinquished you said in the beginning you had a certain amount of control?
A Well, there was an understanding well, maybe I could be involved and that changed.
Q And is that partly because of your role in this trial?
A No. It's -- yes, I mean -- you can't -- this is my understanding, you -- you can't make a -- a documentary where you have a subject who's involved in something that's also making creative decisions. It's basically -- journalism.
Q Okay. Is it fair to say that throughout your life, you've been looking to do important things; is that fair to say?

A I would say that.

Q And when you joined Ramtha, you wanted to do important things there, correct?

A Yes.

Q And when you joined NXIVM, you wanted to do important things there, right?

A Yes.

Q Now, we went through finances yesterday. Do you recall in 2017 you only made about $14,000 in income from NXIVM?

A (No audible response.)

Q Yes, I know it's only a partial year because you left in May.

A I don't recall that.

Q Do you think you made more than that?

A I thought I did.

Q What did you think you made?

A Not as -- not as much as previous years, but -- oh, my tax year is October to October. My corporate tax year is October to October, so that would be -- yeah, my -- my -- that corporation wasn't a calendar year.

Q You said a few times on direct and cross-examination -- let me ask you a more specific question.

When I was asking about Ramtha --

A Uh-huh.

Q -- and I asked if you really thought that this woman was

channelling a 35,000-year-old warrior, you felt it was true at that time?

MR. LESKO: Object.

THE COURT: You may answer.

A At the time, yes, I thought it was possible.

Q You don't think it's true anymore, do you?

A No.

Q So you thought it was true through 2004, but you don't think it's true anymore?

A No.

Q And once upon a time you thought NXIVM was wonderful, didn't you?

A Yes.

Q And you don't think so anymore?

A I think there are many wonderful people. But I think there's some problems.

MR. AGNIFILO: Your Honor, I have nothing else.

THE COURT: Very well.

Redirect?

MR. LESKO: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LESKO:

Q Good afternoon, Mr. Vicente.

A Good afternoon.

Q I'll try to be brief.

You were asked many questions about this HBO documentary film by defense counsel.

A Yes.

Q So --

THE COURT: Keep your voice up, please.

THE WITNESS: Yes, Your Honor.

Q And does that documentary film project involve the interview of many people?

A I don't know all the people involved. I'm assuming some people for sure.

Q Do you know if Mr. Agnifilo's been interviewed?

A I've heard a rumor. I can't confirm it, but I heard a rumor.

Q And what did -- you're a documentary filmmaker, correct?

A I'm a filmmaker, and at times I've made documentaries.

Q And some of the documentaries that you've made involve injustice?

A Yes. And actually some of the -- some of the narrative films that I was involved in, in Africa were to do with apartheid stories about Nelson Mandela. So it's been a strong theme in my life.

Q How do you view this HBO documentary of NXIVM?

A My hope is that it gives people some dignity coming out. I think that this is a very difficult situation for a great many people. One of my deep concerns about all the press has

been that honestly, I'm tired of seeing, you know, my name and the word "sex cult next" to it. And I think that that's the case for many of the women as well.

MR. AGNIFILO: I'm going to object to this, Your Honor.

THE COURT: Overruled.

Let's move on.

BY MR. LESKO:

Q So let's talk a bit -- you were asked many, many questions about contacting the FBI in May of 2017 and conferences with Sarah?

A Yes.

Q Among others?

A Yes.

Q Why did you contact the FBI in May of 2017?

A I believed that what I was gathering information about involved illegal activities. I believed that the NXIVM and all the organizations were, in essence, a cover for something far more nefarious, and I began approaching law enforcement, A, to try to help these women that I believed were in a bad situation.

And then, B, to hopefully try to uncover, you know, what was going on, on a larger scale. So I approached many more people than just the FBI.

Q And as part of your attempts to contact the FBI, did you

attempt to facilitate their meeting with anyone?

A I did, yes.

Q Who?

A Meeting with -- to begin with, Sarah and Sally, and then a number of the other women that I knew of that were in DOS -- just left DOS.

Q So let me get this right. You were talking to the FBI about meeting with Sarah and Sally?

A Yes.

Q And were you also talking to Sarah and Sally about meeting with the FBI?

A I was.

Q And were those conversations by telephone?

A They were, yes.

Q And did they happen at the time period we've been discussing, the May 2017 time period?

A Toward the end of May, yes.

Q Did that explain the frequent conversations --

MR. AGNIFILO: I'm going to object. It's still his witness, Your Honor.

THE COURT: Yes.

Rephrase your question.

BY MR. LESKO:

Q I think Mr. Agnifilo suggested that on one day he had 18 phone conversations with Sarah. Do you have an explanation as

to why you may have had that much contact with Sarah?

A Because I had to be very clear on what I told the FBI. My thought was that they didn't want, you know, just hysteria. They wanted some clear details.

Q Did Sarah and Sally, in fact, meet with the FBI?

A They did.

Q Now, Mr. Agnifilo asked you about a conversation with India. I believe it was at the event where you brought the cake or pies?

A Yes.

Q And he was very precise. In fact, it seemed like he quoted you and observed your tone. How would he know that?

A I imagine --

MR. AGNIFILO: I'm going object, Your Honor.

THE COURT: To the answer?

MR. AGNIFILO: No. How would I know that. I'm not sure...

THE COURT: Sustained.

Q Do you have an understanding as to how defense counsel would know exactly what you said when you had this conversation with India?

A My understanding is that she called Raniere or her master straightaway to tell them what happened.

Q So this photograph that you were shown --

MR. LESKO: Your Honor, if we could just show this

to the witness?

THE COURT: Okay. Go ahead.

MR. LESKO: Showing the Government's 341.

THE COURT: I think it's -- is it Defense?

MR. LESKO: I mean Defense 341. I apologize.

Q That photograph, it's taken of you in a group; is that right?

A Yes.

Q And where does it appear to be taken from?

A From inside some kind of structure.

Q Is that through a window?

A It -- I think so. I also see a fence. I'm not sure if it's the metal embedded in the window or if it's just a fence.

Q It's across the street from you, correct?

A Yes.

Q And do you know who took that photograph?

A I don't. Mr. Agnifilo suggested that it was India.

Q So you were asked if you thought you were being spied upon. You were being spied upon, right?

A I believe so.

Q I mean, that's what this photograph shows; is that correct?

A Yes.

Q Now, you were asked questions by defense counsel about this moment in the summer of 2016 where your wife had a moment

                    of enlightenment. Do you remember that?

A Yes. I remember him saying that, yes.

Q And he asked you many questions about her interactions with the defendant about the enlightenment?

A Yes.

Q Do you recall discussions between your wife and the defendant about a tree?

A Yes.

Q Explain the tree discussion.

A My understanding was that they took a walk one night very late, like early morning, and he was telling her that her issue was her boundaries, she had too many boundaries and too many concerns about things. And he wanted her to run towards a tree and run into it.

MR. AGNIFILO: Your Honor, I object and ask that it be stricken.

THE COURT: Let's see where it goes.

Q Did the discussion involve a puddle?

A Yes.

Q What was said?

A My understanding was that he said to her to lick the puddle as part of this, you know, overcoming boundaries and getting past, you know, being hung up about stuff.

Q And was this discussion in the context of the defendant mentoring your wife?

A Yes.

Q You talked -- you were asked questions about Ramtha, right?

A Yes.

Q Did the defendant know about your involvement with Ramtha?

A He did. He -- when -- when we first met, he spent an inordinate amount of time teasing me about it and then told me that he needed to deprogram me from my mystical beliefs.

Q Did Nancy Salzman know about your involvement with Ramtha?

A She did. She was also part of the team to deprogram me.

Q So you were asked a number of questions about your trips to Fiji?

A Yes.

Q And do you recall one of those trips involving a VIP intensive?

A Yes. I think it was the second one.

Q And what was the subject matter of that intensive?

A I believe it was the XOSO program and the reference program were being taught to some VIPs.

Q And if you could, describe the type of VIPs that attended that program.

A Exceptionally wealthy. I don't recall the exact families, but they were very prestigious families from Europe.

Q Any members of royalty?

A Yes. Yes. I think one of them was in the, like, royalty lineage of some kind.

Q Did any of those participants complain about the program?

A They did. They complained about the food. They complained about the cost, and they said that the -- the program itself wasn't worth the money. They complained about the accommodations. There were issues with the accommodations as well.

Q At some point were you asked to do anything regarding those complaints?

A Yes. Clare Bronfman called me and said, Please ask the specific person to leave. And being the owner of this facility, I said okay. So I went to talk to the person and asked them to leave, and it blew up pretty badly.

Q What do you mean?

A They began, you know, screaming at me and called me, you know, cold and callous and unfeeling, and there was a lot of fallout for a long time.

Q Was anyone removed?

A Yes. One person, I believe, left the next day or maybe actually two, I'm sorry, left the next day.

Q Did you have an altercation with Nancy Salzman at this same -- in connection with this same program?

A Not that -- or we did have an altercation in Fiji, but it

wasn't at that time. I think it was a different trip.

Q Another trip?

A Uh-huh.

Q So discuss the altercation you had with Nancy Salzman.

A It was something at the airport. She -- for some reason I can't figure out, she suddenly felt -- seemed insecure about something and in the sort of terminal area, you know, where you put your bags in, she just began screaming at me saying basically, you know, you're the head of Society of Protectors. What kind of man are you? You can't even take care of basic things.

I'm struggling with this-- it was a whole diatribe and then eventually a number of her staff, you know, went to her and calmed her down.

Q Okay. I'm showing you what has been admitted as Government -- I mean, pardon me, Defendant's 328. This is, I believe, the third page --

THE COURT: This is admitted?

MR. LESKO: This is admitted, yes.

Q This is the third page. Do you recognize the people in that photograph?

A I do.

Q Any of them DOS slaves?

A Yes.

Q Could you identify -- is there one or more -- how many

DOS slaves?

A I think there were five.

Q Could you draw circles around the DOS slaves and identify them, please.

A (Witness complies.) I'm sorry, fat circle.

Q I'll correct it. You can go a little bigger.

Go ahead.

A Alejandra.

Q Alejandra.

Okay. And that's the far right photograph in a black bathing suit?

A Yes.

Q Okay.

A Sahajo.

Q Sahaka [phonetic]?

A Sahajo.

Q Sahajo.

And that's immediately to the left of the woman in the black bathing suit?

A Yes.

Q Okay.

A Danielle.

Q She's basically the only person in the front row of the photograph?

A Correct.

Rebecca.

Q Rebecca. That's the back row, second -- second from the left; is that right?

A Correct.

Q Okay.

A The person I thought might be -- I'm not entirely certain.

Q Okay. So you're certain about these four?

A I'm pretty certain, yes.

Q Now could you draw a circle around Danielle?

A (Witness complies.)

Q What role did Danielle have in DOS?

A I believe that she was a -- a -- a slave and a master, and that she was the person that actually did the branding ceremonies.

Q So she was the brander?

A She was the brander.

Q You were asked questions about the film, the documentary film that you did in Mexico?

A Yes.

Q Okay. You got in trouble as a result of that film; isn't that right?

A Can you be more specific? I got in trouble a few --

Q You were accused --

MR. AGNIFILO: Your Honor, leading.

Q Were you accused of anything?

THE COURT: Sustained as to form.

Q Well, was there an issue regarding proper tribute?

A Yes, yes.

Q What was the issue?

A The issue was that according to some of the high ranks, that I wasn't -- I'm using the term loosely, wasn't making a big enough deal about him and I wasn't, you know, propping him up as the most important person in the film. I had several arguments saying, well, you know, by his own admission, he's not Mexican. He's kind of like this -- you know, this white guy who's like, you know, in charge of the whole philosophy. It seems kind of weird. It be good to -- to follow a lot more of the Mexicans and tell that story.

And then also Raniere had said to me at one point, you know, why don't you just put yourself in as well. And I said, well, I -- I don't think that's appropriate. He said, well, actually you're the one that's experiencing the story, why don't you just put yourself in it? And I was like, okay.

Then I got a lot of flak from the upper ranks saying you're trying to make a big deal of yourself. You're trying to more important than, you know, Keith. And I was like seriously, that's not what I am trying to do. I'm just trying to tell a compelling story.

Q Okay. You were asked a number of questions about

feedback. Do you remember those on cross-examination?

A Yes.

Q And I think you testified that, correct me if I'm wrong, NXIVM members would give themselves feedback numbers on certain issues; is that right?

A At the very beginning when you came in as a white, you had a number. I don't recall if there would be numbers once you were of rank.

Q So do you have a different perspective now on feedback in NXIVM as opposed to this perspective you had when you were involved in NXIVM?

A I do.

Q What is your perspective on feedback now?

A Well, the whole system, I think, is designed to make you drop your boundaries. Like in other words, if you're told something, instead of like fighting it, you know, like a normal person would if they think something is, you know, not just, to basically take the hit. So I feel like the whole system was designed to basically if you're truly involved, you will take any hit that comes to you, and you won't complain and you will listen to it. In essence, debilitating your ability to have a sense of self and a sense of identity, a sense of agency about, you know, what you want to do in your life.

Q Did the defendant ever give feedback?

A He did.
Q Okay. Was receiving feedback from the defendant optional or was it mandatory?
A It was never written down as mandatory. But God forbid you argued. And I certainly got feedback.
Q You received feedback from the defendant?
A Oh, yes.
Q This letter to the District Attorney regarding Barbara Bouchey, you were asked questions about that letter --
A Yes.
Q -- do you remember that?
A Yes.
Q Did anyone ask or direct you to send that letter?
A Yes. There was a campaign going on at that time of -- of a number of people sending letters. I recall -- I think there was a number of people together that were crafting a letter, but it was -- I don't recall that Raniere or -- or -- or Nancy Salzman specifically said, Please write a letter to defend me. It was more the -- the upper ranks that said, you know, we must edify them. You know, we must show the world who they really are.

And there was a certain kind of pressure to do these things. It would look really bad as a member of a high ranking to say, you know what, I'm not going send this letter. That would be very poor form.

Q And this calculation of damages to the business caused by Barbara Bouchey's leaving, were you asked to do that?

A I don't recall that I made the calculation necessarily. My general recollection is we were told, you know, this is likely the kind of damages. When I look back at it, I don't know how I would have calculated that. But these kinds of letter writing campaigns involved sort of form bullet points that you needed to hit. So you wouldn't -- somebody wouldn't give you the entire spectrum. They might say these are the points you have to hit in your letter, you know, then write it in your style.

Q You were asked questions about Rainbow Cultural Garden. Do you remember those?

A Yes.

Q Okay. And did some of the girls from the LeBaron community in Mexico participate in Rainbow Cultural Gardens?

A Yes. Some of them were MDSs or maybe just nannies, I'm not certain, but some of them were MDSs. That's the, I think, multidisciplinary specialists, fancy name for a nanny.

THE COURT: Fancy name for what?

THE WITNESS: Fancy name for a nanny.

Q And did MDSs or nannies, in essence, run the program?

A They would be the arms and legs of the program. Loreta Garza ran the program and ran the company under the mentorship of Raniere.

Q All right. And I think you explained that part of the program involved teaching the children languages; is that correct?
A Yes. And also, you know, playing, you know, music from that country, eating food from that country, you know, being surrounded by that culture as much as possible.
Q Did children participate in Rainbow Cultural Gardens in lieu of going to school?
A That's my understanding.
Q So they didn't go to school, they went to Rainbow Culture Gardens?
A That is my understanding.
Q Okay. And the MDSs were the arms and legs, they were the daily --
A Yes. They were the people that came and spent a certain number of hours per day with the children.
Q And some of these MDSs were girls from the polygamous LeBaron community, the Mormons who left Utah who went to Mexico?
A Yes.
Q Did any of these MDSs -- do you know if they were certified or qualified to teach children?
A They were not.
Q And were they certified or qualified to teach languages?
A They were not.

Q Was a screening process used to select these MDS instructors?

A The only process I remember is that Loreta Garza would show Raniere pictures of them, and he would suggest who should or shouldn't be allowed in.

Q Were any of these MDSs screened for prior sex offenses?

A I don't believe so.

Q You were asked questions about and we played the audiotape where you're discussing SOP with the defendant and others. Do you remember that?

A Yes.

Q And you discussed collateral?

A Yes.

Q The collateral that was used in SOP, was it the money put up in exchange for enrollments; is that how that was used?

A That is correct, yes.

Q And I think you mentioned the release of collateral in SOP. Was it the release of the money, is that what you were referring to?

A Yes. In essence, if you didn't do the thing you said you would do, the money that you paid into the system would now be taken. You would not be able to get it back.

Q You indicated on cross-examination that you wore told SOP was a force for good. Has your understanding of SOP changed since then?

A Yes.

Q Could you explain?

A Well, I think there's a number of things. I think it's more of a -- a force of kind of enforcement I think, that the -- the men were abusive to the women. I think that it was -- even though it was codified into an educational thing and they were just following orders, you know, I still think it wasn't good for the women.

I also think it made the men -- because the men were constantly in some ways teased for not being, you know, man enough. You know, Raniere was seen as the ultimate man and then we were, in essence, not man enough. So there was a certain ridiculing of the men as well.

And then the constant readiness thing, you know, keep everyone on standby for whatever. To me it's almost like it was programming people to just be ready for whatever, you know. And because so often there was nothing to do except just answer ready, the few times that there was actually a mission, you know, the guys were very excited about doing it. And my concern later was, you know, what could people be asked to do?

Q I'm going show you what has been admitted as Government's 1797R. And I'm going to position it just like Mr. Agnifilo did when he showed it to you, the top half.

Do you remember looking at this? This is your memo.

Do you recall this?

A Yes.

Q The memo about the videotape editing project?

A The legal project, yes.

Q So now I'm going show you the part you weren't shown, the second part of the memo. Under the heading Monday or Tuesday, what's the first bullet?

A The first bullet is the duplication of tapes Keith has asked me for.

Q Okay. Is there any uncertainty in your mind as to what the bullet is referring to; what -- what videotape alteration project that bullet's referring to?

A No.

Q What is that referring to?

A It's refers to the extraction of certain things from the intensive tapes to be handed over and what I thought was, you know, a protective patent-type case to later being told it was part of discovery for an actual case.

Q So it involved a case?

A Yes.

Q What is your interpretation of a case?

A Well, what I find interesting was basically that's -- that the -- there was a legal wrangling going on between NXIVM, and I think it is Rick Ross, Stephanie Franco. My understanding was that they had asked to see NXIVM's materials

from a particular year --

Q Let me stop you. That's your understanding of what the actual case, but you said a patent case?

A Oh, it was more -- no. To be precise, what I understood at that point is that there was a case going on and that the patent -- I was told the patent was at risk because of this case. That's what I understood.

Q So you knew there was litigation involved?

A Yes.

Q So you recall hearing in the SOP audiotape the defendant saying he would have absolute say over SOP?

A Yes.

Q Did he, in fact, have absolute say over SOP?

A He did.

Q You talked a bit about many NXIVM programs, Jness, SOP, SOP Complaint. Do you have an understanding now regarding how those programs related to DOS?

A My sense now is that they were almost like the hunting grounds for DOS, and they would be -- a lot of the techniques and training that occurred in those trainings would then be intended to used in DOS. And it was -- it was fostering a kind of deference and following orders. That's my sense of how it led to DOS.

Q Okay.

You were asked questions about the thousands of

hours of videotaping that you led or conducted when you were involved with NXIVM. Do you remember that?

A Yes.

Q Pretty much everything, right? It was a videotape?

A Pretty much everything.

Q Forums?

A Yes.

Q V weeks?

A Conversations, executive board conversations between Raniere and notable people that came into town.

Q Were you ever asked to videotape the defendant having sex with DOS slaves?

MR. AGNIFILO: I object to the form of the question.

THE COURT: Sustained.

Q Did you ever videotape the defendant having sex with DOS slaves?

MR. AGNIFILO: I object to the question, Judge.

THE COURT: Overruled.

You may answer.

A No.

Q So you were asked many questions about Sarah. Were you close with Sarah?

A Yes.

Q I'm going show you what's been admitted as

Defense Exhibit 302.

Remind, me, where were you in that photograph?

A I'm holding Sarah and I have a drink in my left hand. I'm in the middle.

Q Where is that location, where are you there?

A This is an after-party for a musical that was done in Mexico City. I was a co-writer on the musical. And this is a picture with -- not the abuser, actually, just some -- this is basically ESP NXIVM high ranks that attended the evening and this was the after-party.

Q Okay. Everybody's smiling?

A I'm sorry?

Q Is everybody smiling?

A Yes.

Q Is everybody happy?

A Yes.

Q Sarah's in the blue dress?

A Yes.

Q Was Sarah smiling like that when she told you she was branded?

MR. AGNIFILO: Object to the form of the question, Judge.

THE COURT: Sustained.

Q Was Sarah happy when she told you she was branded?

MR. AGNIFILO: Objection.

THE COURT: You may answer.

A She was not. She was -- her voice was shaking and she was crying intermittently while she was talking to me.

MR. LESKO: No further questions, Your Honor.

MR. AGNIFILO: I have a couple, not too many.

THE COURT: All right. Recross.

RECROSS-EXAMINATION

BY MR. AGNIFILO:

Q Mr. Vicente, I just have a few questions for you.

A Yes, sir.

Q We're going to go to 1397 that we just looked at --

MR. AGNIFILO: And zoom in on -- it's in evidence so the jury can see it.

Q And so we were looking at the part that makes reference to Keith, and it says the duplication of tapes Keith has asked me for, right?

A That's what it says, yes.

Q It's not the editing, the changes, the modification of tapes, the duplication the copying of tapes that -- that's what this says, the duplication of tapes Keith has asked me for. That's all it says, right?

A That's what it says.

Q Now, this is called Twilight Post, the project that never seemed to end, right?

A Yes.

Q I think yesterday you were talking about -- Keith wanted all of his words and things to be memorialized and that project started in 2006. You talked about yesterday, right?
A Yes.
Q Do you recall the -- you talked about an event that happened in Fiji, someone wasn't happy and was asked to leave the island, right?
A Yes.
Q Do you know if Clare paid that person in full?
A I don't -- I don't understand.
Q Yeah. The person who left the island, that person, do you know if Clare Bronfman paid that person back in full because the person didn't stay for the whole duration of the trip in Fiji?
A I wasn't privy to that kind of information.
Q And do you recall the problem was that this person was not civil to the staff who was taking care of her and others, at Fiji?
A My recollection of the problem was that she felt that this material was not original and she wasn't sure why she was, you know, listening to something that she already heard.
Q And you don't recall any problems with this person being rude to the people taking care of everyone in these accommodations at Fiji?
A It is possible.

Q Okay.

A I don't recall specifically.

Q Okay. And my last question is, you went with a film crew to a location very close to India's place of work and you feel you were being spied on?

A I feel I was being spied on for much of 2017 and some of 2018.

Q Including a time when you went with a film crew to a place where you knew India Oxenberg was working hoping she would be there at the time so you could capture her on film, the fact that she might have taken a picture of you doing that, you consider that spying?

A It was part of what you did in the community, you took pictures of enemies.

MR. AGNIFILO: Thank you. I have nothing I was.

THE COURT: Anything else?

MR. LESKO: No, Your Honor.

THE COURT: All right. The witness is excused. You may stand down.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

(The witness exits the witness stand.)

THE COURT: All right. The Government may call its next witness.

MR. LESKO: Your Honor, the Government calls Stephen

Herbits. We'll need a moment to go get him.

THE COURT: Sure.

(Pause in proceedings.)

MS. PENZA: I'm sorry, Your Honor, while we have a moment, may I introduce into evidence Government's Exhibit 1002A? This is the exhibit that is to replace Government's Exhibit 1002 that had previously been entered into evidence.

MR. AGNIFILO: No objection.

THE COURT: All right. Government's Exhibit 1002A is received in evidence.

You may call your witness.

(Government Exhibit 1002A, was received in evidence.)

MR. LESKO: Thank you, Your Honor.

THE COURT: Call your witness.

MS. PENZA: The Government calls Stephen Herbits to the stand.

(Witness takes the witness stand.)

**STEPHEN HERBITS**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY: Please have a seat.

THE WITNESS: All right.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Stephen Herbits, S-T-E-P-H-E-N; Herbits, H-E-R-B-I-T-S.

THE COURT: All right. You may inquire.

MR. LESKO: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LESKO:

Q Good afternoon, Mr. Herbits.

A Good afternoon.

Q Can you see me?

A Yes.

Q Okay. Good afternoon.

How old are you, Mr. Herbits?

A Seventy-seven.

Q Mr. Herbits, could you briefly describe your career up until April 1977?

A After college -- graduated in '64. I did some graduate work and studied some graduate work in insurance, that was my father's business. I anticipated going back to work with him, but I got a little bit sidetracked and into politics and policy and I ended up in Washington for 11 years from '67 to '77.

During that period I had a number of different jobs. I worked for the staff for House of Representatives, United States Senate, the Pentagon on multiple occasions, and a special trade representative because during the period of

time, I also had a law degree and I wanted to learn something about law that I could make some money from. And a short stint in the White House after Nixon resigned and Ford became president to help them with the transaction to a new presidency. And then I left to go for trade law.

Q Did you have a role in the old volunteer Army?

A I did. One of my first assignments in the House of Representatives in January of '67 was to look at the draft problem. I researched that, spent a lot of time in the Pentagon and wrote a paper for the members of Congress that I was working for as a group that I didn't think the draft was necessary. And there were real problems with the draft because it was getting very selective and they were very unbalanced and there's lot of questionable behavior by draft boards of.

So the paper, I was sent back to do more research which I came back, the document was translated into a paperback book which five members of Congress signed which said how to end the draft.

The case was volunteer force, Nixon endorsed it, got elected, created a commission on the -- to study it, I was put on the commission as the youngest member of the commission. The commission reported back to the President that it was something he should proceed to do. It was then assigned to the Pentagon to draft a detail plan. That took a year and

ultimately the draft, just the calls were down to 0 by December 1972.

Q And the end of your tenure, initial tenure at the Pentagon, what was your role at the Pentagon at end of that initial tenure?

A At the end of that I'd been in the Pentagon, the volunteer force was an issue because there was a problem they brought me back to fix it, the way it was being implemented, and then I left again and then I came back when Secretary Rumsfeld became secretary a little bit afterwards he had been the chief of the staff at the White House, he had Secretary of Defense. And he asked me to come work for him, which I did, and I was his last, what's called in Pentagon the -- a special assistant to the secretary in other departments it's call the chief of staff of the department, but because senior military are chiefs of staff, then the Pentagon doesn't use that for a civilian, so I was his -- essentially his chief of staff for the last year or so of the Ford administration.

Q And this was in the 1970s?

A That was 1970, the beginning of '76 through the election of January of '77.

Q In April 1977 were you interviewed by someone for a job?

A In April of 1970 -- yes, I was interviewed by actually several corporations, but the primary one was Edgar Bronfman

of Seagram's.

Q And who was Edgar Bronfman?

A Edgar Bronfman was the chairman and CEO of the Seagram's Corporation and his father had founded the company who had died in 1971, Edgar in '77 was running the company. And his family were the controlling shareholders of a public company. They had control over it by the amount of shares they had.

Q And what sort of business was Seagram's in?

A At that time it was the largest spirits and wine company in the world. It also had an investment in a small company called Texas Pacific Oil and Gas which was a company that searched for oil and gas. And it -- which was sold to Sunoco in -- in the year 1980.

Q Did Seagram's own other companies?

A They had a lot of subsidiaries around the world. But the money that was earned from the sale was invested ultimately in DuPont and they owned 25 percent of DuPont for their duration. That was a self-imposed limit by Edgar, so the company would still be independent. But they would have some input.

Q Did Seagram's own Universal Studios?

A They bought Universal in the early '90s and it also brought Tropicana at one point at the end of the '80s and at some point, yes, they owned those companies but they came and went.

They bought Universal after selling their shares of DuPont.

Q Was Edgar Bronfman a wealthy man?

A Billionaire, multiple billionaire.

Q What was the job that Mr. Bronfman was interviewing you for?

A I approached him and asked him if I can be his assistant having just been assistant to the Secretary of Defense, I was trying to go laterally because I don't want go down and start at the bottom of some department and crawl up very slowly. And the offer I made to him was he wasn't going to take a risk with me, I'll not sign a contract, if it doesn't work out, I'll leave quietly.

Q Did you get hired?

A I did get hired.

Q And how long did you remain employed by Seagram's?

A Until June of 1997.

Q Could you briefly describe the positions you held during the time that you worked at Seagram's?

A I started off as the assistant but they realized that I should be doing something more important. They sent me to Japan where we had a company that was five years old and was in trouble. And I was the only Westerner there. We had a Japanese who represented the company there and I spent 20 months and a week very precisely in Japan, tough assignment,

but was able the save the company and then they sent me to Europe to do some planning for a new division and then they brought my back to run a wine company in the United States to fix that company and then I went back to Asia to fix another company that was out there and when I came back basically six years later, I was given corporate positions first as a vice president and then ultimately executive vice president with multiple portfolios and I stayed in New York for the duration.

THE COURT: When did you start?

I'm sorry as assistant to Mr. Bronfman.

THE WITNESS: In June of '77 and so I left when I got my 20th anniversary.

THE COURT: That's it. Okay.

All right. Go ahead.

Q So Did you directly report to Edgar Bronfman?

A Off and on. In the first six years I was plight enough though Edgar hired me, gave me my assignments, to report to the executive that in between the companies I was fixing and the chairman.

Q Did you travel with Edgar Bronfman?

A Starting in the mid-'80 when I was back doing my corporate positions he had become very, very -- he did business travel but he also became very active as president of the World Jewish Congress. Because of my national security background, and for another reason, he took my on almost every

trip he went abroad. When he was asked by foreign ministers or asked by heads of state or government in a meeting in which he was discusses World Jewish Congress business he would say, I do not mix my business -- personal business with my Jewish Congress business, but my associate here who is the vice president of the company will be happy to talk to your people about it and then we can confirm when we get back to New York, so I was always with him. Sometimes it was reverse, sometimes he was there on company business and they would want to raise Jewish Congress business and he would say, you need to talk to my associate because I don't mix my business.

Q What was World Jewish Congress?

A World Jewish Congress was created in 1930s out of Europe because of the beginnings of the holocaust and it was to inform the world of what was going on and to try to save the Jews. It consisted -- it grew into an organization where each country has a group that relates to the Jewish people -- to the organizations within that country. America, for instance, has roughly 32 groups and some countries just one group and some countries supervise others.

Those people become regional group and the regions elect the president.

Q So it is an international organization?

A International organization. Most of the work is done internationally. Because there were so many Jewish

organizations in the States he didn't have to spend a lot of time, although he did see Presidents from time to time on what he was doing abroad.

Q So where did you go to work after you retired from Seagram's?

A I retired in part because I was tired and part because I worked very hard I said all right I'll work hard now and then I'll have the second half of my life more leisurely. That didn't turn out very successfully, but I did some consulting, various odds and ends. Edgar asked me to come back and work with him part time on -- he had been appointed by the President as the head of the U.S. Advisory -- Presidential Advisory Committee on Jewish assets in the United States. This was a period of time when the whole asset question banks had and that insurance companies had. People who were killed in the holocaust and banks didn't release the money because there was no birth certificate, things like that.

So he appointed one to see what assets were in the United States and I was a liaison between him because he was very busy and the commission staff, worked with them very closely to get through that year, year and a half assignment.

Q Did you also go back to the Pentagon?

A I went back to the Pentagon in -- I'd been in the Pentagon a couple of times with Seagram's on very short assignments on a very specific thing that was needed sometimes

for four or six weeks with I did it a as dollar a year man because Edgar kept me on the payroll, it's just easier. And in 2001 I went back to do Rumsfeld's transition as Secretary of Defense for the second time. And he asked me to stay in the same job I had for him in the '70s to which I said I couldn't and he said why? I said I'm too old and he said I'm ten years older than you and I said, I -- you need somebody younger. I can't work for you with the strength that you need because he was a very, very, very, very tough hardworking boss.

So I did the transition for him, I left in May and I got a call the day after 911 and he said I want you back here and I said when? At first he began by saying we're at war, I said I know this. And he said I want you back here and I said when. He said how about tomorrow. I said how about Monday, so I can shutdown my life and I went back to Washington. I stayed there full time for five months and then came back for a project in the service for the next two year.

THE COURT: This was after the Pentagon?

THE WITNESS: The Pentagon. It was all under Rumsfeld.

BY MR. LESKO:

Q So at some point, did Edgar Bronfman ask you to work for him again?

A Yes. We stayed very friendly all during that period. So

after 2004 when I left in the spring, I got a call in the fall because there had been public accusations, allegations that his what was then called secretary general, that's just a structural question, the --

THE COURT: Go a little slower. You know, you have to go a little slower with those of us who are in our seventies. We would appreciate it.

THE WITNESS: Got it.

A How far back should I go?

BY MR. LESKO:

Q Well, let me just orient you.

A Sure.

Q Did you go back to work for Edgar this time after World Jewish Congress?

A I went back to Edgar before the World Jewish Congress in the fall of 2004 because of accusations that were made by the executive director of stealing money from a nonprofit.

Q And initially were you retained as a consultant?

A I went as a consultant and I spend four months solving the problems. I rewrote all of the governance organizations, the checks and balances, doing the finance activities, doing all the things to protect the organization. I thought it was done. The Attorney General of the State of New York, Spitzer at that time, assigned his -- his head of charity bureau to take a closer look. She took a closer look and we then

entered a negotiation for a year because the books showed he was stealing. And we -- after a year we agreed on a -- I forgot what it's called, but it assures the discontinuance to maintain structures I had put in and she made me promise before she signed this that I stayed another year to implement it, so I stayed until now 2007.

So Edgar --

Q Let me stop you there. During this time period after the initial four months, did you assume any formal position at the World Jewish Congress?

A I did. The first four months was consultant but because it was the secretary general who was the person -- this was all the allegations were for, his stealing, it made sense do we move him from any decision, give him an advisory role, no -- no financial responsibility. This was done in part with the agreement of the head of the charities bureau and the proper way to get the thing back on its feet was that the plenary session of the World Jewish Congress, 500 people around the world elected me as secretary general, which I then served in that job until the new president was elected.

Q So from approximately January of 2005 until the fall of 2007 you yourself were the secretary general of the World Jewish Congress?

A Yes.

Q And what was Edgar's role?

A He was the president up until June of '77 [sic] when he retired. I continued to do the job at the request of the new president to handle his transition for three months while he did what he wanted to do.

Q So Edgar Bronfman was the president of the World Jewish Congress in the June of 2007?

A Yes, that's right. He had been president since '79 on a temporary basis because the previous president had just moved into Carter's Cabinet, and Edgar was then elected in his own right in '81.

Q And the person you replaced, was that person named Israel Singer?

A Yes.

Q Did you report directly to Edgar Bronfman at the World Jewish Congress?

A Yes.

Q And you mentioned that you left the World Jewish Congress a few months after Edgar Bronfman left in June of 2007?

A He left in June, I left in September.

Q Could you explain -- you mentioned you traveled with Edgar Bronfman. Could you just describe some of your travel with Edgar Bronfman?

A During his very active years he was seeing heads of state, heads of government, foreign ministers, went to Russia on multiple occasions, China on multiple occasions, the

Europeans constantly, and basically in group meetings with World Jewish Congress around the world, sometimes with one-on-one meetings or one-on-one with staff on both sides.

Q And you accompanied him on these trips?

A Virtually all of them when he left the country except if it was a vacation of his.

Q Is Edgar Bronfman deceased?

A Yes.

Q When?

A 2013.

Q And during the time period that you worked for and knew Edgar Bronfman, did you establish a relationship with him?

A Yes, very close relationship. It -- my hours I probably spent more time with him than anyone but his wife.

Q How would you characterize that relationship?

A I tried the maintain a professional relationship with him. I did not do social things, purely social. I did social things with his functions as a diplomat and as a businessman, but I did not -- I tried to not to get involved in family issues.

Q Did you and Edgar Bronfman trust each other?

A I think more than anybody that I've ever trusted and I think that may have been the way he felt, too, but I -- I only because the feeling I got from him. That's my judgment.

MR. LESKO: Your Honor, I'm about the move to

another topic.

THE COURT: All right. We should take or lunch break at this time.

All rise for the jury.

(Jury exits the courtroom.)

(The following matters occurred outside the presence of the jury.)

THE COURT: All right. The witness may stand down. Please do not discuss your testimony with anyone during the lunch break. We take one hour for lunch.

THE WITNESS: Thank you very much.

THE COURT: You're very welcome.

All right. We will take an hour for lunch. I have several status conferences now, so if you have conversations, just take them into the hallway. Thank you very much.

MS. PENZA: Thank you.

MR. AGNIFILO: Thank you, Your Honor.

(Lunch recess taken.)

(Continued on the next page.)

A F T E R N O O N S E S S I O N

(Time noted: 2:00 p.m.)

(In open court; Jury not present.)

THE COURTROOM DEPUTY: All Rise.

THE COURT: Let's bring in the witness, please.

(Whereupon, the witness resumes the stand.)

How much more for this witness?

MR. LESKO: Half hour or so.

THE COURT: And cross?

MR. AGNIFILO: I don't see a long cross at all.

THE COURT: And we're ready for the next witness after that?

MS. PENZA: We are, your Honor.

THE COURT: Let's bring in the jury.

(Jury enters the courtroom.)

THE COURT: Please be seated.

Mr. Lesko, you may continue your examination of the witness.

I remind the witness he's still under oath.

THE WITNESS: Okay.

DIRECT EXAMINATION (Continued)

BY MR. LESKO:

Q Good afternoon. Let's spend a few moments to talk about Edgar Bronfman's family, okay? How many wives did Mr. Bronfman have?

A He was married five times. The second marriage was annulled. His third marriage and the fourth marriage was the same person as the third marriage. And his wife when he died is five.

Q Five times, four wives basically?

A Yes.

Q How many children did Mr. Bronfman have?

A From the first wife he had five, four boys and a girl. From the third and fourth wife he had two daughters.

Q What were his two youngest daughter's named?

A Sarah and Clare.

Q Who was their mother?

A Well, the name I knew her as was Georgiana, but I think her real name was Rita. I'm blanking on her last name.

Q Was it Webb?

A Webb.

Q When was the first time you met Sarah and Clare Bronfman?

A Other than when they were very little children perhapses in the office, it was a meeting in 2005. Edgar asked me to come to lunch at his apartment. When I got there, Sarah and Clare and Nancy Salzman were present. And we had lunch.

Q Was this in New York?

A It was in New York at Edgar's apartment.

Q And what was discussed at this meeting with Edgar Bronfman, Clare Bronfman, Sarah and Nancy Salzman.

A The purpose of the meeting was whether or not I could help them with their public relations. They were concerned about their public relations, or else they wouldn't be coming to me. I took away from the meeting that I thought they thought I was more important than I was; nevertheless, Edgar suggested I listen to them talk about it.

I asked a former employer of mine who had opened his own PR firm, to meet with them and discuss what he could do for them. I'm not a public relations expert; in fact, I use him a lot to advise me in the corporation. And that's what the purpose was.

Q Were you asked to help them?

A I was asked to help them.

Q By who?

A By Edgar.

Q And Sarah and Clare Bronfman, was there a term used in the family to refer to them?

A They were referred to as the girls, which is not different from the first four sons, that were referred to as the boys. But that was just the way when one was talking about them by generation without a specific name, it was the constant way it was phrased.

Q So did you in fact introduce them to your public relations colleague?

A I did.

I don't remember if I introduced them personally, but I did make arrangements for them to meet. They did meet. And it did not continue.

Q Why not, if you know?

A There are two versions of it. He contends that he quit because they wouldn't give him any information for him to help them. And I believe I've been told that some people think that they fired him. But I have no idea. It ended.

Q A part from introducing Sarah and Clare Bronfman to the public relations colleague, did you assist them in any other way?

A Multiple times I was asked to. In 2008 I believe there was some correspondence between me and Edgar, and Edgar and Clare and Sarah and asked me to help them. They were -- and then -- so I agreed to try to try to help.

They asked me to help them with a case involving Rick Ross, who I had not met or had ever spoken to. And who, because they were concerned that they wanted to tie up difficulties they had with him before the possibility that the Dalai Llama, his Holiness, would come to appear, they didn't want any disagreements going on.

THE COURT: Before you go to that.

Were they consulting with you in your capacity as an attorney or in some other capacity?

THE WITNESS: Capacity as looking for Edgar and

Edgar wanted me to help them. I didn't do family stuff. I worked strictly with Edgar in the corporation, but Edgar made an exception and asked me to help them because he was still interested at that point in helping them achieve their goals.

THE COURT: All right, thank you.

Go ahead.

BY MR. LESKO:

Q I'll follow up on that, though.

Did you formalize a relationship with an attorney that was involved?

A The difficulty was I kept asking them to tell me what the problem was. They kept saying it was secret, they couldn't tell me. I said I can't help you if I don't know what I'm doing. I can't help you. So I suggested to them, to be helpful, they ask their attorneys to retain me on an attorney-client privilege for a dollar, and to send me the documents. I would read them and write the attorney back my view and my ideas about what could be done.

Q Was that what happened?

A That is exactly what happened, except they never paid the dollar. But the fact is that I read a very substantial body of documents and I wrote them a seven-page memo saying that everything you suggest here is wrong.

Q And if you could just briefly summarize the advise that you gave them in this memo?

MR. AGNIFILO: I apologize, could we have a brief sidebar?

THE COURT: Sure.

(Continued on the next page.)

(Sidebar conference.)

MR. AGNIFILO: I didn't mean to interrupt Mr. Lesko's presentation. I would imagine, though, if he's acting in a Covell capacity as an adviser through an attorney, he just said that was an attorney-client privilege, is there a collective view, I don't know what it would be, as to whether this is or is not privileged?

MR. LESKO: I believe, we have not been notified that Clare Bronfman is asserting any privilege relating to this communication. But out an abundance of caution, I can move on. I don't have to get into the substance.

THE COURT: Why don't we do that.

MR. LESKO: The only caveat is, the impeachment materials we received from Mr. Agnifilio, I believe it was either this morning or last night, include the memo that Mr. Herbits is discussing and one of the items he relied upon in drafting this memo. I'm not going to go there --

THE COURT: If counsel has the memo, then the privilege has been broken. Yes?

MR. AGNIFILO: Well, but I don't know it's been broken by the client. I think there is a subpoena. My understanding is -- I'm putting this together we just got all this stuff last week -- there was a subpoena to Mr. Herbits and he complied with the subpoena. I have no idea, because it's not my privilege so it's not my client.

MR. LESKO: Your Honor --

MR. AGNIFILO: We got it from the Government.

MR. LESKO: These materials have been produced to the defense; they were produced a while ago. Ms. Bronfman has been very aggressive in asserting various privileges, that your Honor is aware of this, there has been extensive litigation. She's not asserted privilege with respect to these documents. These documents have been distributed to multiple third-parties. Again, I don't have to go into this, but the only reason I'm bringing this up is I don't think it then would be an area of cross-examination.

MR. AGNIFILO: I wouldn't do that. If you're not going to get into it, I'm not going to get into it.

I'm wondering, as a signal, is there a way of you doing what you need to do if there is in fact a privilege in place? I don't know what you're going to ask. I'm trying to raise an issue before it's a problem.

MR. LESKO: I don't think there is a privilege.

THE COURT: If it's presented that this document has been widely distributed, certainly because of that and no privilege has been asserted by Ms. Bronfman in connection with this document, then there is no privilege at this point. So you can do what you want. Up to you. I'm not going to worry about it. She's got many lawyers; she can assert her rights.

(End of sidebar conference.)

(In open court.)

BY MR. LESKO::

Q If you could briefly tell us in a summary fashion the advise that you gave?

A I suggested that the idea of suing him civilly would way extend way beyond the period in which they were trying to achieve their goal, because of the planned visit of the Dalai Llama. I also suggested that suing him criminally, would create a problem that they didn't want, especially if they are making assertions about some of the things they suggested about lawyers saying things, which they contended weren't true. And I raised the issue of the need to be careful about that language because of the possibility of slandering lawyers.

Q Did you mention another avenue or approach?

A I suggest that they go back to what we talked about three year earlier, about an aggressive public relations program to show the merits of the organization and establish its credibility, if they wanted to pave the ground for the visit.

THE COURT: We're talking now about what organization?

THE WITNESS: The request I got were from Clare and Sarah, but clearly it wasn't their personal interest they were talking about. It was primarily, specifically, about the interest of the Dalai Llama visiting the organization.

THE COURT: Which organization?

THE WITNESS: NXIVM.

THE COURT: NXIVM, okay. Thank you.

BY MR. LESKO::

Q Was it your impression that Clare Bronfman and Sarah Bronfman believed you had political connections?

A Explicitly. They believed my positions in Washington gave me some authority, which was completely imaginary. And they believed that I was a lawyer, which was true. And they believed that I was very, very close to Edgar and had influence over him, which was not precisely true, but they thought in any of those ways I could be helpful.

Q Between 2005 and 2007, did Sarah and Clare Bronfman ask you to contact any Government officials on behalf of NXIVM?

A During that period roughly, my mind isn't so clear on the months, in one instance they asked me to contact the Governor of New York and the Governor of New Jersey to ask them to intervene. I don't remember the specifics. I denied that.

Q Did they ask you to contact any Attorney Generals?

A I meant Attorney Generals. No, just the Governors or Attorney Generals. I'm confused. I believe it was the Attorney Generals, not the Governors, that was purely political. They somehow thought that I had something to say to an Attorney General that I never met.

THE COURT: Who were the governors at the time, if

you know?

THE WITNESS: 2007, my memory is not as good as it used to be, I don't know who they were by name. I do remember their titles.

THE COURT: Did they believe you knew the Governors?

THE WITNESS: I don't believe they knew I knew them. They believed because I had some mystical authority over Washington, that I could call an Attorney General or Governor. And I believe part of it was that it was suggested that I was calling Edgar Bronfman, whom they did know. So it was partly in the theory that I would be representing him.

BY THE COURT::

Q Let's talk about the Attorney Generals, what did they want you to ask of the Attorney Generals?

A I believe they were encouraging me to ask them to do the prosecution of --

Q Of who?

A Of Ross. And I don't believe it stop there, but I don't have documents to remind me of that.

Q These were the Attorney Generals from New York and New Jersey?

A New York and New Jersey.

Q Did you actually contact the attorney generals for New York and New Jersey?

A No.

Q Why not?

A Because I felt the request was inappropriate and frankly preposterous.

Q Did Sarah and Clare Bronfman ask you to contact any other prosecutors?

A Two prosecutors in the larger Albany area, we had a long conversation about that. It was on the phone. Because they were upset that the prosecutors would not prosecute the people who they were targeting. It made no difference to me who they were targeting.

They insisted, for instance, the Constitution of the United States required them to prosecute. I explained, from my law degree, that prosecutors have discretion as to which cases they want to prosecute. I explained why I thought that worked, how that was done, and I refused call them.

Q Did Sarah and Clare Bronfman ask you to intervene with any press organizations like newspapers?

A They asked me to call specifically the publisher of the Albany Times Union. Because they had begun, the reports had began an investigation of what was going on there. They wanted me to stop the stories, also in the context of the pre-Dalai Llama visit.

Q Did you do that?

A No.

Q When you say "their" you're referring to NXIVM?

A NXIVM. Nothing that they asked me to do was personal to them. They didn't say, I'm in trouble can you help me. It's that we have a problem. And it wasn't the girls who had the problem, because they were representing an organization. They weren't acting on their only personal behavior.

One of them, for instance, had a hospital bill, called and said can you help me with the hospital bill. That's something I might try to do. But it was on behalf of an institution and what they were asking me to do, I thought, was inappropriate.

Q Could you describe your relationship with Sarah and Clare Bronfman?

A It was never close. It began with my trying to help them because Edgar asked me to do it; but each time they asked me it got further and further from what was logical or right. It became strained until I think I qualified to get on the enemy list.

MR. AGNIFILO: Your Honor, can we have another sidebar?

THE COURT: Yes.

(Continued on the next page.)

1334





1335

1336



(In open court.)

BY MR. LESKO:

Q How would you characterize Sarah and Clare Bronfman's relationship with their father?

A It was an evolving relationship. Officially when they joined the ESP program, Edgar in fact took the course. He was eager to be supportive. I was not near him a lot during that period, and he subsequently made a comment to the press which indicated his nervousness about the situation.

Q What was the comment?

A That he thought that they were joining a cult.

Q What publication was that in?

A Forbes, I believe. That would be before, I wasn't with him every day during that period, that was a quieter time.

Also at that time I believe he sought the advice of Rick Ross to try to help and protect his daughters. They went from there to requests a few years later, beginning in the 2005 period when I met with them, and they asked me to do the public relations help, which turned out not to happen. And then it moved to specific requests, like the issue of the Attorneys General and with the District Attorneys. And where I was beginning to say, I'm not doing those things.

But I did not report a lot to Edgar, for a lot of reasons. It was bothering him and there was some distress, I didn't need to add any. I just minded my own business.

Q During that time period would you say that it was up and down in terms of the relationship or it was uneven?
A Between Edgar and them?
Q Yes.
A I didn't experience Edgar and them personally. I can't evaluate it. I know that Edgar was becoming more distressed because of conversations I had with him. I can't evaluate them in his presence.
Q Fair enough. Prior to 2011 did you become aware of a court proceeding in California about a property investment made by Clare Bronfman?
A I was given a call by someone, I don't remember who, who said get the transcript. I purchased the transcript from the California case, $1400, I remember that, and I read it.
And I'm reading it and reading it, I knew nothing about any of this before. I read this, I didn't know if there was a case, I didn't know that there was real estate going on. In reading that case, my name appears, and it appears in violation of the oath of the people speaking.
Q How was your name mentioned?
A It mentioned me as carrying messages from Edgar to Parlato, instructing him what to do about this project. I never heard the name Parlato before. I never heard anything from Edgar about this case before. And it was, from my law school degree, flat out perjury. But the case was over, so I

decided to do nothing about it.

Q Did you learn how much was lost in this real estate investment?

A I don't remember the specific source, but I believe it was a $28 million case. I believe they won the case for $10 million. And subsequently Edgar complained to me that they spent $11 million to win the $10 million, and that he was angry about that.

Q Was Edgar Bronfman aware that Clare and Sarah were involved in multiple lawsuits?

A Yes.

Q What types?

A There were a number of different types, because some were suing people who had left the group, left NXIVM, and suing them at a cost to the people who left that basically drove them to bankruptcy. There were cases suing, I subsequently learned, Parlato, for his role in originally helping them with the Los Angeles case, but for some reason they were dissatisfied with him. And there were some other types of cases. But the last list that I saw was 14 or 15 cases.

Q Was Edgar Bronfman concerned about this?

MR. AGNIFILO: Object to the form of the question.

THE COURT: Sustained.

Q Did you -- I'll move on.

To the best of your knowledge, was Edgar Bronfman

aware of the lawsuits?

A He was aware of them at the point that I reviewed them with him in July 2011. I sat down with him for an hour and I went through all of the things that I had learned, both directly in relationship to the girls and indirectly from people who were calling. The reason they were calling me is Edgar stopped taking calls or meetings with people who were worried about the NXIVM issue, and assigned that responsibility to me, so I took the calls.

My answer was the same for all these years that he and I agreed with, "I loved my daughters as my daughters. I have nothing to do with their affairs." But that's it. I listened. I made notes. And at some point it got to the point where I felt an obligation to him to brief him on everything I knew.

Q In addition to the real estate lawsuit, did you become aware of other monies that Clare and Sarah Bronfman lost as part of their own involvement in NXIVM?

A Yes, but not directly. I heard --

MR. AGNIFILO: Objection.

THE COURT: Sustained.

Q In approximately 2009, did Edgar Bronfman ask you to do something for his family?

A Again?

Q In the 2009 time frame did he ask to do something with

the trust?

A In 2009 Edgar and his sons asked me to come back to work for them because there was a lot of money and there was not a lot of cash, not unusual for billionaires during the initial part of that crash. They wanted to -- it was told to me by them, they I was the one person they all trusted to be fair. I had been brought back into the trust, which I was not involved in before, and looked at the portfolio. I saw problems with it and I spent the next three years fixing those problems.

Q During this time period, did you get to know Edgar Bronfman's sons?

A Yes, I knew some the sons, a couple work for the corporation. I knew the third one because he was in New York and he was beginning to do a great deal not-for-profit work. I was like an informal consultant and friend. At that period I got to know the fourth son for the first time really, because he was living in California most of the time. And he began assisting Edgar with his foundation and with other issues, and then sort of became the coordinator of the Trust. It was he and his father who called me initially who said will I help out. Then I worked with him very thoroughly over the next three years.

Q How would you characterize the relationship between Edgar Bronfman's sons and Sarah and Clare Bronfman?

A Well, to the degree they mentioned it, it was, don't talk to me about it. They did not want to know. There was some resentment, but I don't know the basis of it. I do know that they weren't all one happy seven-member family.

Q Going back to the 2005 to 2010 time frame, during that time frame do you recall any negative press, other than the Forbes article you mention recalling NXIVM?

A I remember being called by the press frequently. But I usually gave the same statement, and after a while they got bored and stopped calling.

The one person I had more conversations with than anyone with the man, I think his name was Rogato, who was working for the Albany Times Union, who was beginning to dig deeply into what was going on. My purpose in talking to him was to listen. I stuck to the statement because I didn't want to represent anybody.

Q Do you recall Clare Bronfman claiming that her father had funded someone in litigation involving NXIVM, paid someone?

A There was early on in the records that I have, there were allegations that he funded Rick Ross. And but I don't know when that stopped or how it stopped. I was not involved in that.

I do remember later an e-mail that Edgar copied me on to Clare that said, you're wrong, I'm not funding him, and I'm not going to fund him. And it was a fairly hostile

communication between the two.

Q Between 2005 and 2010, do you recall if Edgar Bronfman used a computer?

A Yes, he always used the computer.

Q Did he have one or more than one?

A He had one in his office. But because I traveled with him all the time, I traveled with his laptop. But I always traveled with two laptops. Because sometimes they didn't work, this was in the early years of laptops and he would get frustrated. I would take that one away and give him the other one. When we came back I had them both updated on everything on both of them.

Q The computer in his office was what type of computer?

A I don't know what type.

Q Desktop?

A Desktop.

Q Did he use that computer personally?

A A lot of times during the day.

Q When traveled did he actually use one of the laptops?

A He did. It was his habit after we left a capital some where for him to write a diary on his computer of the trip.

MR. LESKO: Your Honor, if we could initially just publish some exhibits to the witness?

THE COURT: Go ahead.

BY MR. LESKO:

Q Mr. Herbits, I'm showing you on your screen what is marked for identification as Government's Exhibit 1491R. Do you see part of that document before you?

A Yes.

Q This is a three-page document, I'm going to show you the third page. I'm going to show you the second page. And I'm going to show you the first page. Chain of e-mails, do you recognize those e-mails?

A Yes.

Q Are they e-mails between you and Clare Bronfman in November of 2008?

A Yes.

Q I'm going to show you what is marked for identification as Government's Exhibit 1492R, two-page document, start with the second page. Then I'm going to move to the first page. Do you recognize that document?

A Yes.

Q Is that an e-mail from you to Clare Bronfman in November 2008?

A Yes.

Q Showing you what is marked for identification as Government's Exhibit 1493R. I'm going to show you the second page. Now I'll show you the first page. Do you recognize that document?

A Yes.

Q Is that an e-mail back and forth between you and Clare Bronfman on December 6, 2008?
A Yes.
Q I'll be precise, the original e-mail from Clare to you is dated December 4, 2008?
A Right.
Q I'm going to show you what is marked for identification as Government's Exhibit 1494R. I'll start with the last page and work my way forward. Last page, second to last page, third to last page, this is the second page of the document, and the first page. Do you recognize that document?
A Yes.
Q Is that a chain of e-mails between you and Clare Bronfman in December 2008?
A Yes.
Q I'm going to show you what is marked for identification as Government's Exhibit 1495R, do you recognize that document?
A Yes.
Q Is that an e-mail from Edgar Bronfman to Clare Bronfman, yourself, Sarah Bronfman and another individual?
A Yes. The first individual you're talking about?
Q On the CC.
A That's Adam.
Q Adam Bronfman?
A Yes.

Q Is that dated January 6, 2011?
A Yes.
Q And you recognize that?
A Yes.
Q Last in the series, Government's Exhibit 1496R, do you recognize that document?
A Yes.
Q E-mail from you to Clare Bronfman, Sarah Bronfman, CCing Edgar Bronfman on January 19, 2011?
A Yes.

MR. LESKO: Your Honor, we offer Government's Exhibit 1491R, 1492R, 1493R, 1494R, 1495R, 1496R.

MR. AGNIFILO: No objection.

THE COURT: All right. Exhibits 1491R, 1492R, 1493R, 1494R, 1495R, 1496R are received in evidence.

(Government Exhibit 1491R, 1492R, 1493R, were received in evidence.)

(Government Exhibit 1494R, 1495R, 1496R, were received in evidence.)

BY MR. LESKO:

Q I'm going to start with 1491R. So this is an e-mail chain; is that correct?
A Yes.
Q A collection of back and forth e-mails between you and Clare?

A Yes.

Q The initial one, a little tough to tell, the initial one starts here; is that correct?

A Yes.

Q That's dated November 10, 2008 from Clare Bronfman to you?

A Yes.

Q It indicates, After much consideration I've chosen to withhold any evidence at this point. I believe the trust is built and we have not done so yet.

What was your understanding of what Clare was communicating in that e-mail?

A It looks like part of a pattern in which they asked me to help, I asked for the information I needed to help, and they didn't give me the information I needed to help, and I didn't help.

Q So that is reflected in your response, where you say, I can be of no help without adequate assistance.

And your response is on the same date, November 10, 2008?

A Right.

Q You say, I consider myself, quote, "played or gamed," what did you mean by, that if you recall?

A Well, I'm getting the feeling that they want me to do something because of my relationship to Edgar and their

relationship together to Edgar to do things which I had already expressed over a number of times before that I was not going to do. And it was just basically my pushing back.

Q And so the next e-mail, again dated November 10, 2008, Clare Bronfman indicates, I am confused. I was under the impression that Dad had asked you to come in and help resolve this situation. And he wanted to help us turn things around and confided in you to do so. If do you not want to or feel that you are not able to, just tell me and I can find someone who is able to.

Is that what she said in that e-mail?

A That's what I remember.

Q Your response is, Typical - friend or enemy.

What did you mean by that?

A I was beginning to get the impression that those who helped her were friends; and those who they didn't like were enemies. I was beginning to feel the shift that I was joining the second group.

Q You also say in that same e-mail that, Your behavior makes it clear that you want nothing more than a puppet.

What did you mean by that?

A They wanted someone to do their bidding exactly as they want to do it, with or without knowledge, regardless of the consequences, regardless if it was proper or not. And my refusal to do, as I expressed to them, I'm not a puppet. I'm

not simply doing what you told me to do.

Q Let's go to the first page of Government's Exhibit 1491. The bottom part of it, is that November 11, 2008 e-mail from Clare Bronfman to you responding to the e-mail we just discussed?

A Yes.

Q So this e-mail apologizes to you, indicates that Clare Bronfman does not consider you a puppet; is that right?

A That's what she says.

Q Let's talk about some of the sentences here. She says, We also have evidence of clear prejudice wrongdoing and intent to destroy NXIVM's reputations (Sarah and mine along with it) by a different party.

She mentions Times Union stories.

Continues by saying, They fail to seek any of the facts, even to the point that they published Hochman's work without his permission, published several articles with false evidence, and have refused to meet with the company's president.

What was your understanding what she was saying there what, Clare was saying there?

A She was becoming deeply worried about the investigation that the Times reporter was undertaking. And that's her expression of it.

Q Next she says, The owner of this entity is George Hearst.

I'm sure you recollect the situation back in the 70s with Patti Hearst. In the case brought against her, she defended herself through the accusations of brainwashing.

What is Clare Bronfman referring to there?

A The left-over feeling from Edgar was that the girls were getting deeply involved in what he had earlier --

MR. AGNIFILO: I object, Judge. I object to this. That wasn't the question.

MR. LESKO: I'll rephrase, your Honor.

THE COURT: All right.

BY MR. LESKO:

Q What was the situation, if you know back, in the 70s with Patti Hearst?

A Going back a long time for my memory.

MR. AGNIFILO: I object to this as well.

THE COURT: Overruled. If you know.

A I remember the case only from the media, obviously I had no connection with it. But she used a defense that she was brainwashed and shouldn't be found guilty.

THE COURT: Next question.

Q Was she part of a organization?

MR. AGNIFILO: Your Honor, I object. I object. I object to all of this, Judge.

THE COURT: Overruled.

Q Was she part of --

A She was part of an organization, and the organization was under trial, and she was sort of trying to get from underneath it.

Q To cut to the chase, part a group that was committing bank robberies?

A Yes.

Q Her defense was she was brainwashed by the group?

A That's right. And what was eventually found to be crimes in that context, she should be excused from.

Q So Clare Bronfman continues, As any person who values their intelligence is aware, brainwashing implies a lack of free will and is scientifically debunked. Even prisoner of war camps have never been successful in brainwashing inmates. If there were truly an effective method of brainwashing, it would revolutionize the prison system. I can certainly make a logical leap given our other evidence and the actions of the Times Union that Hearst carries an active prejudice against us.

What was your understanding of what Clare Bronfman was saying there?

A This goes beyond my scientific knowledge of brainwashing and cults and stuff like that. But clearly she's simply saying that this person is trying to do to us what is not true, because we haven't been brainwashed.

Q Clare Bronfman goes on in the second paragraph, I do know

that Bill Clinton in his last day in office pardoned Patti.

Next sentence, He might be able to help.

What was your understanding of what Clare Bronfman was alluding to there?

A The implication of that is that the Bronfmans and the Clintons knew each other very well for a long period of time, going back to the 90s when the President asked Edgar to Chair a Presidential Advisory Commission on Holocaust Assets in the United States. It was Hilary who worked that issue, successfully, with some states and the State Department, et cetera. He then I believe gave Edgar a medal, Honor of Freedom or something. Edgar supported Hilary in her Senate races and Presidential race, and they stayed in pretty close contact.

At one point the President, while he was President, did a event for the World Jewish Congress and came to speak to us. And unbeknownst to us, it was a surprise there was so much press as there were, he had told them that he announced an Iranian policy of sanctions for something that they were doing, which got national press.

But they knew each other pretty steadily from the early 90s through his death.

Q How about you? Did you have a personal relationship with Bill Clinton?

A It wasn't one that I could walk up and say, Do you have a

few minutes, I got to talk to you about something. He recognized me when he saw me, as did Hilary. They frequently came to stand where I was standing, because I didn't believe it was my position to go to him. We would talk for a few minutes. We talked about issues. We talked about politics. We talked about the family. But I never had lunch with him.

Q When Clare Bronfman says, He might be able to help. Is she referring to her father or you contacting Bill Clinton?

A She's talking to me, because she continued to believe that I could go to her father and get this taken care of.

Q Next paragraph, last sentence, this is a paragraph dealing with Rick Ross, I also believe you could rapidly facilitate the proper Indictment and conviction of Rick Ross and Joseph O'Hara.

What is your understanding of what Clare Bronfman is saying there?

A It's the same messages going on at that point for three years, four years. And I never changed my position. I was not going to get involved. I have never spoken to the man, never spoken to anybody in his office. It just wasn't something I was going to do.

Q Was it your understanding that Clare Bronfman wanted Rick Ross and Joseph O'Hara to get indicted?

A Yes.

Q Let's turn to your response. You start out by saying,

quote, "A detective with no leads is blind," end quote. What did you mean by that?

A Same story. She was asking me to do something for her without telling me what the specifics were. For instance, if she had given me specifics, demonstrated at least to me that he crossed threshold on behavior of Rick Ross' part that I thought was a problem, a problem either in terms of law or in terms of behavior or morality or something that was negatively effected, I would have taken it to Edgar and said, we need to look at it. But ask me to be a detective without information, I can't do it.

Q Let's move quickly through the next few exhibits. Second page of 1492R is basically blank. First page, for efficiency sake, I'll try to summarize it, then move on.

Fair to say at the top, basically the first paragraph is a quote of an e-mail from Clare Bronfman to you. And then the bottom paragraph is your response to that e-mail. Is that fair to say?

A Right.

Q In essence does Clare Bronfman's e-mail indicate that certain information regarding a loan was made available to Forbes and she's upset by that. And raises the question of whether that implicated attorney-client privilege?

A She was looking at that as a possible way to get to the lawyers to punish them.

Q Who was David Stoll?
A He was Edgar's personal and the Trust's personal lawyer, nothing to do with the corporation, but whom I met a number of times. That was his primary activity, outside counsel.
Q And an e-mail from Clare appears to be dated November 20, 2008, her response is dated November 24, 2008; is that correct?
A Yes.
Q Your response in essence is, Implicating an attorney would be problematic, could be slanderous, and would be expensive.
A Yes.

(Continued on next page.)

DIRECT EXAMINATION (Continued)

BY MR. LESKO:

Q I'm going to show you Government's 1493R, second page contains no contents.

First page starts with a December 4, 2008 email from the Clare Bronfman to you; is that correct?

A Yes.

Q So in that email, Clare Bronfman says: The Ross camp needs to be fearful, back down and look to fix the damage they have done. The thought of criminal charges may help inspire this.

Is this common along the same lines as other comments that you've made about Rick Ross?

A Yes.

Q It says: I know you are incredibly resourceful and have the intelligence to figure this out.

Again, is this similar to the comments you discussed previously?

A Yes, I mean they were still asking me to do things that I didn't think improper.

Q She mentions the Forbes issue, which we just discussed; is that right?

A Right.

Q And then your response, in essence, is that -- you refer to the memo you discussed where you gave you advice to pursue

a PR strategy and you just rely on that memo; is that fair to say?

A Yes, in reading it, that's what I said, right.

Q And then you discuss the Forbes, or you call it Fortune issue, and the bank loan information, right?

A Yes.

Q Okay.

Moving to government's 1494R. The last four pages of this exhibit are essentially blank.

And just to orient all of us, the second page, which is really how the email chain starts, that includes the two emails that we just discussed that are in 1493R; is that correct?

A Right.

Q Okay. So let's go to the next email which starts at the bottom of page 1 of 1494R.

And that's an email dated December 6, 2008 and it's from Clare Bronfman to you; is that right?

A Yes.

Q And it reads: I'm sorry I was not clear. I do not care how or what you do with respect to the results needed for Ross. I just mentioned the indictment thing because I've been told by numerous officials Ross is very indictable. But white collar crimes often needs political clout. I understand you may not have or want to use/do this.

What was your understanding of what Clare Bronfman was saying there?

A That's both imploring me to do it anyway, and sort of gently saying that, you know, if I won't, I won't.

Q Second page she mentions that there's a mediation date upcoming; is that right? At the very top.

A The mediation date, yes.

Q Okay. Then you respond -- well, pardon me.

She sends a subsequent email dated December 15th, 2008, basically saying that she hasn't heard from you; is that right?

A Correct.

Q And in this email, she's talking about resolving the Rick Ross situation and says: It would make, quote, a wonderful story when dad appears at the event with His Holiness in support of Sara and I, end quote.

Do you see that sentence?

A Yes.

Q Okay. Did Edgar Bronfman actually appear at the Dalai Lama event?

A No.

Q And who communicated that fact to Clare Bronfman?

A I think it was me.

Q I'm going to show you --

MR. LESKO: One moment.

Q Sorry. I'm going to go back to 1494R.

A little too quick with the trigger there.

So after mentioning that she has mediation, Clare Bronfman then says quote: I hope the Ross and Sutton Camp are inspired to settle and make substantial appropriate reparations, paren, restoring the good names and monies of NXIVM, comma, Nancy, comma, Keith, comma, my sister and myself, et cetera, end paren.

What was your understanding of what Clare Bronfman meant when she said that?

A This was all in the context of trying to clear up issues before the Dalai Lama came so that NXIVM would be, in a sense by his presence, given a good reputation.

Q So you respond to these two emails, the one from December 6th and the one from December 15th, on December 15th; is that right?

A Right.

Q And, in essence, you basically say you're not listening to me.

A Right.

Q Okay. And that you have nothing to add, right?

A Right.

Q Okay.

All right. Government's 1495R. This is a January 6th, 2011, email from Edgar Bronfman to Clare

Bronfman, Adam Bronfman and Adam.

Do you recognize Adam's email?

A Yes.

Q At the AOL address?

A That's right.

Q Yourself and Sara Bronfman; is that right?

A Yes.

Q So let's just read this. Edgar says quote -- addressing it to Clare, the email to Clare: I've given a lot of attention to your email. I have spoken to both Steve and Adam and have asked them to do whatever is possible to fix the situation. The problem they tell me is that you will not share whatever evidence you have that some charitable organizations are somehow funding Rick Ross and his operations against NXIVM, or anything else adverse to you and Sara. It seems obvious to me that you still think I am supporting Rick Ross in some way or another. That is simply not true. In no shape or form would I do that and tell you that I am not.

Whether or not you want to believe me, I do not lie and I love you two very much. Someone is not telling you the truth. Why aren't you trying to figure out who that might be? Who has something to gain? Certainly not me. What would be my motive? Tons of love, even if not requited, Pops.

What as your understanding of what Edgar Bronfman was communicating to his daughters and his son in that email?

A It was the -- there was another group that Edgar was involved in as a major donor. His brother, in fact, Edgar's brother was, in fact, a cochair and founder of this organization. And it was believed, the girls suggested to me, that money was coming from that organization to Ross, therefore assuming that Edgar had something to do with it.

Q So let's get into that. And this is the last of the series 1496R.

Just to orient all of us, email from yourself to Clare Bronfman, Sara Bronfman and Edgar Bronfman, dated January 19, 2011.

Is that what this email is?

A Yes.

Q Okay. And the organization you just referred to, is that the Birthright organization?

A Yes.

Q Okay. Is the Birthright organization, just for efficiency sake, the nonprofit that funds travel for Jewish Americans to go spend time -- children, young Jewish Americans, to spend time in Israel?

A Yes.

Q And essentially every American Jewish child has the right to take that trip using funds provided by the Birthright.

A Yes.

Q Okay. The allegation is that the Birthright -- some

entity affiliated with Birthright was, in fact, funding Rick Ross; is that right?

A That's what their suggestion to me was that was happening.

Q Okay. So what were you saying in this email to Clare and Sara, cc's Edgar Bronfman?

A That was specific enough for me to check him, because I had sources that those organizations, because Edgar was involved and Charles is involved, I called him and said will you check to see if you have any payments made to Rick Ross. The answer was no.

Q And you basically communicated that to Clare and Sarah Bronfman?

A Yes.

Q Okay. All right.

Just going to ask you if you recognize a few names and then we'll be done.

Do you recognize the name Malcolm Stevenson Forbes?

A I don't know if that's the father or the son.

Q The son, who is that?

A Steve is the Stevenson -- Malcolm Stevenson Forbes, the son Steve, referred to as Steve?

Yeah, he's a popular -- he took over from his father when he died, the magazine. He ran for president, I believe, on a flat tax policy.

Q And the father, what was the father? Was he the founder of Forbes?
A Founder was the father of Forbes.
Q Joe Bruno? Who was Joe Bruno?
A Was a state representor, but I don't remember specifically now. I did at that time, but...
Q In new York State?
A New York state.
Q Eliot Spitzer?
A Eliot was the attorney general for the State of the New York. He was the attorney general when I negotiated with the head of the Charities Bureau. Because of the World Jewish Congress, there was an investigation. I had taken over the investigation -- the World Jewish Congress -- and negotiated the complexity of that situation under the Charities Bureau. Eliot Spitzer, at that time, was the attorney general.
I did not meet him in that contact, but there was context between my lawyer and his, and his -- him and his staff.
Q Was Eliot Spitzer later elected governor of the State of New York?
A Yes.
Q Familiar with the name Yuri Plyam?
A I learned it the first time when I was -- I got the transcript of the case that had been recommended to me, and I

am familiar with the name, and he was, I believe, involved in the development of the property in LA for which this lawsuit arose.

Q Bob Crockett, do you recognize that name?

A I remember him as a lawyer, but I don't remember in what context.

Q Was he a lawyer in the Albany, New York area?

A In the New York area.

Q Is he involved with NXIVM?

A I believe I learned it in that context. I have no other reason to know of any lawyers in Albany.

Q Do you recognize the name Toni Natalie?

A Toni Natalie, I knew, because she was one of the people that called Edgar to teller her about her experiences. I took the call, as Edgar asked me to, because he didn't want to get involved, and she told me her story.

Q And she was -- the experiences were in NXIVM?

A In NXIVM --

Q Charles Schumer --

A -- in and after she left NXIVM.

Q Charles Schumer. Do you recognize the name Charles Schumer?

A Yes, currently the minority leader from the senator for the State of New York.

Q Roger Stone, do you recognize that name?

A Yes, for a long time when I was in Washington, he was a very, very active political consultant. I had worked for some political consultants who, frankly, didn't approve of his tactics, and so I've been aware of him for a very long time, but now anybody that reads the news knows Roger Stone is person who advises Trump.

Q Person known recently.

A Yes.

Q Joe O'Hara, do you recognize that name?

A I do. He was a person who was not in NXIVM. I don't know if he ever was in NXIVM. But he was one of the people who called on behalf of more than one of the people who had left NXIVM to relay to me things about lawsuits against these people and other information.

Q Was he a lawyer?

A I don't know.

MR. LESKO: Nothing further, Your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q Good afternoon. I only have a few questions for you.

You mentioned the name Frank Parlato?

THE COURT: Just introduce yourself.

MR. AGNIFILO: Oh, sorry. I'm sorry. Pardon me. It's been a long day.

Q My name is Marc Agnifilo and I represent Keith Raniere. I have a few questions for you.

I will be surprised if we talk for more than five minutes, and then I'll let you get on your way.

On direct examination you mentioned the name Frank Parlato.

A Yes.

Q And I think you mention it in conjunction with a lawsuit that he had against Clare Bronfman.

Do I have that right?

A I learned the name the first time in the transcript of the LA case.

Q Right. And was it your understanding that Clare and/or Sarah Bronfman were suing Frank Parlato and some other people?

A At a later time I learned that, but not directly from any of the parties.

Q All right. And I think you said on direct examination that Clare and Sara won that lawsuit against Parlato?

A My knowledge was that they won the lawsuit in LA, which was the Plyam lawsuit, and that's the one where the suit was 28 million. They won 10 million. I don't know if that was the last figure, because I think it was reserved in the transcript. And I learned subsequently from their father that they had paid 11 million to win that $10 million.

I'm under the impression, but I'm not sure of the

source, maybe his own articles or something, that he won that lawsuit -- his lawsuit against the -- against the girls. The girls sued against him.

Q And when you say his own articles, you're referring to Frank Parlato because he's a blogger, right?

A Yes, he does articles. I stopped reading them when this all started happening, because I didn't want to get complicated with what I remembered and what I was learning.

Q That's wise.

Now, let's -- now Frank Parlato, when you were talking about the Plyam lawsuit, do you have an understanding that Frank Parlato was a civil defendant in the Plyam lawsuit?

THE COURT: Excuse me. What lawsuit?

MR. AGNIFILO: The Plyam -- Yuri -- Yuri Plyam.

THE COURT: Go ahead.

A I don't remember the role. I read it eight years ago. I have not reread the transcript. It was really long and boring. But I remember the name from that context because it was in that context when the statements were made, that I represented Edgar Bronfman, to Frank Parlato, with instructions about what to do with this property. None of that was true.

Q Got it.

And so the Parlato lawsuit was in relation to a real estate transaction of some sort that Clare and/or Sara were

also involved?

A My -- remembering vaguely from the lawsuit was that they went out and purchased land. It was not doing well under the development. So they sued the developer. And Frank had some role, which I don't really remember. I think he went out there to try to resolve the issue and then the next thing is that they're in court.

Q Okay. And so -- and so Clare was an adversary, a legal adversary, with Frank Parlato, correct?

A I can't be precise about that.

Q You're on opposite sides of a legal dispute.

A Well, I'm not sure of that. The vague memory I have is that they were accusing Edgar of the mess out there by saying that I communicated instructions to Parlato.

Q That you communicated instructions to Parlato?

A A man I've never heard of before I read it.

Q That was my next question.

In fact, you never communicated anything to Parlato.

A That's when I got annoyed because I think perjury is a problem.

Q Have you ever spoken with Frank Parlato?

A No.

Q Have you ever seen Frank Parlato?

A No, never been in the same room with him, to my knowledge.

Q Now, you said that -- you made reference in direct examination that certain people who left NXIVM were sued.

Do you know if those lawsuits were because of allegations that they hacked into the NXIVM computer?

A I do not know that specifically. Most of the praxes that I read of those suits had to do with the accusation by the lawsuits that the people who left were stealing proprietary property.

Q Okay. So now there's the Rick Ross lawsuit. Tell me if this is your understanding.

Is that proprietary information of NXIVM was taken from NXIVM and then used in a context that was inconsistent with the confidentiality agreement that the person signed?

A I never read any of the lawsuits --

Q Okay.

A -- involving Rick Ross.

Q That's fine.

Now, you talked at some length about the relationship between Clare Bronfman and her father, Edgar, correct?

Right? You have to answer so she can --

A Yes. Yes, I'm sorry.

Q All right. And fair to say that Clare was a member of NXIVM, was in NXIVM, for a period of time, correct?

A Excuse me. Yes.

Q Take your time.

I'm not going to have you for another five minutes.

A That's okay.

THE COURT: You have had him for five minutes. This is your second five minutes.

MR. AGNIFILO: I was referring to the second.

THE COURT: I'm watching the clock. Don't keep promises you can't keep.

Go ahead.

Q All right. So -- and now I lost my train of thought. Now it's going to take me ten seconds. All right.

So Clare was in NXIVM for a period of time, right?

A Yes.

Q All right. And she was trying to convince her father that this was a good thing, that she liked this and she wanted to convince Edgar this was helping her, and she wanted Edgar to try it, right?

A Yes.

Q And Edgar tried it and it wasn't for Edgar; fair to say?

A Edgar tried ESP.

Q ESP, okay.

And --

A And he said it wasn't for him personally, but, you know, that was nothing he was worried about at that stage.

Q Okay.

A That was very early.

Q And then at some time or another, Edgar is quoted in a media outlet saying that it was a cult.

Do I have that right?

A Yes, I wasn't around at that time. But I subsequently read it.

Q Okay. And do you know, based on what you were able to observe, if Clare didn't want her father to think this?

A I wasn't there during that period, close enough that they were, either of them, would discuss that with me.

Q Okay. Fair to say at the end of Edgar's life, when Edgar passed away, Clare and Edgar were -- were together. I mean actually, physically together. Clare spent the last day of Edgar's life with her father?

A This requires a very precise answer.

Q Okay.

A Yes. She was there physically.

Q She was with her father the day that Edgar passed away.

A As was I.

Q You were there?

A Yes.

Q Did you go to the funeral?

A No.

Q Do you know if Clare went to the funeral?

A I don't know. I didn't go.

Q And so you were with Clare and Edgar when Edgar passed away.

A I was in his home at 4:00 in the afternoon. I was there until 5:00, with a 20-minute break about because the doctor came in to see him, and resumed, and I left around 5:00. Clare was there.

Q And so Clare was with him literally when her father passed away, Clare was with her father.

A Father passed away at 8:00. I wasn't there between 5:00 and 8:00.

Q And when you left, Clare was still there?

A Clare was there when I left.

Q And they had a complex relationship; fair to say?

A Complex is a gentle word, yes.

Q And sometimes in families where the father has multiple wives, and multiple children from different wives, the relations between a daughter and a father could be complex; fair to say?

A I accept that as public knowledge.

Q And something that you believe as well?

A I have not had that many experiences with that many people with that many wives and that many children.

Q In all of your dealings, have you ever met Keith Raniere?

A No.

MR. AGNIFILO: Nothing else.

REDIRECT EXAMINATION

BY MR. LESKO:

Q So when Mr. Agnifilo just asked you about whether or not Clare Bronfman was with her father when he passed away, you answered that she was there physically.

A Right.

Q What did you mean by that?

A In the last year or so, 2013, second half the 2012, I had in January 2012 removed myself from many further dealings between them, because I was getting to be is asked things that were, I felt, improper; not just wrong or immoral. So I said I don't want to be part of this anymore.

I had my responsibilities for the trust, and things, and so we never really discussed that.

When I was still in touch with the sons, because of the trust, and they would comment to me about tensions about suddenly after all these years --

MR. AGNIFILO: Objection. Son's comments.

THE COURT: Go ahead.

A -- were getting difficult because suddenly they were reentering his life in a way that suggested to them that there were money issues involved.

Q And they, when you say they reentered?

A The sons were beginning to believe that the girls were entering their -- spending time with Edgar and doing these

things for him, because he was beginning to decline.

Q So when she, Clare Bronfman, was with her father the day he passed, you say she was physically there. Where was she mentally?

A I can't tell you where she was mentally.

MR. LESKO: No further questions.

MR. AGNIFILO: I just have one question.

RECROSS-EXAMINATION

BY MR. AGNIFILO:

Q So you're actually going to begrudge a daughter and her last minutes with her father because of something you heard from her half brothers? Is that -- do I understand this right?

A I think you're putting words in my mouth. My relationship with Edgar was one of absolute integrity and honesty. I never violated that with him. And anybody around and close to him will tell you that. That's how I built my reputation and my life for him and for many, many other really important people.

I'm telling you the facts that I see them. I'm telling -- and I spoke to him always about those facts and the fact is this: That it was -- I watched them from 2005 to 2013. The fact is the relationship was up and down during that period; pressuring him and disappointing him, because he expressed that to me; making it unpleasant for him; asking him

to do things that -- he asking me to do things on his behalf; asking him to do things for their behalf, which created problems for him and disappointment.

Towards 2012 and into 2012 and 2013, their behavior increased substantially by dates and times of visits. Those are facts. Those are checkable.

Q Can I ask you a question?

THE COURT: Let him finish.

MR. AGNIFILO: This wasn't the question I asked, Judge.

THE COURT: Let him finish. You opened the door. Let him finish.

MR. AGNIFILO: That's fine, okay.

A So I'm not begrudging them -- the improper term, as far as I'm concerned, anything. I'm describing a situation as I saw it.

THE COURT: Next question.

Q Do you know if Clare was going to see her father more often because she knew he was going to die and she wanted to spend time with him before he did?

A I don't know why Clare did what she did. I'm simply telling you that the pace of visits and the content of those visits increased dramatically as he got closer to death.

Q Did you ever ask with Clare why she was coming to see her soon-to-be-passed-away father more often before he died?

MR. LESKO: Objection.

A I have no reason to.

MR. AGNIFILO: I have nothing further.

THE COURT: Anything further?

MR. LESKO: No, Your Honor.

THE COURT: The witness is excused.

You may stand down, sir.

THE WITNESS: Thank you.

THE COURT: You're welcome.

(Whereupon, the witness was excused.)

THE COURT: We'll take our afternoon break.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT: The next witness is ready. How much on direct?

MS. PENZA: I believe approximately an hour, Your Honor. Maybe a little bit more.

THE COURT: He may roll over to next week -- tomorrow morning. And then you have your next witness who is a cooperator.

MS. PENZA: Yes. That's right, Your Honor.

THE COURT: Okay. We'll take a ten-minute break.

(Whereupon, a recess was taken at 3:29 PM)

THE COURT: Sidebar please.

(Continued on the next page.)

1377



1378



1379





1380

(In open court; Jury not present.)

MS. PENZA: All right, your Honor. I think we're ready.

Do you want me to put it on the record before the jury comes in?

THE COURT: Why don't you put them on the record with the jury present.

MS. PENZA: Fair enough.

THE COURT: Call the jury.

MR. AGNIFILO: So Judge, just so it's clear. Some of the pieces of evidence are going to come in subject to our objection that we raised I think two days ago that the Court ruled on. Some of them are coming in on consent.

So I don't know how Your Honor wants to handle it, but I think what Ms. Penza's prepared to do is, given an entire listing of all the pieces of evidence that will come in through this witness, and I think delineate what is on consent and then what is subject to the --

THE COURT: Let's do it right now so we don't confuse the jury.

MR. AGNIFILO: That's fine.

MS. PENZA: Okay. Your Honor admitted on consent of the defense are Government Exhibits 102, 106, 107, 109, 113, 114, 119, 124, 125, 126, 127, 128, 129, 130, 131, 134, 135, 137, 138, 139, 140, 141, 143, 144.

144 through 149.

153, 154, 155, 158, 160, 161, 162, 163, 168, 171, 174, and 177.

And then 176.

THE COURT: I'm sorry.

MS. PENZA: I'm going -- that was one set of lists so now I'm going back to 176.

THE COURT: Is admitted on consent?

MS. PENZA: Yes, these are still on consent. I'm sorry, they were just in a different -- in a separate place.

THE COURT: Go ahead. Keep going.

MS. PENZA: GX176 -- sorry, Government Exhibit 176, 180, 365, 368, 369, 370, 371, and 1483.

And then over objections that have been raised by defense counsel.

Government Exhibit 204 and 204A. Government Exhibit 1399. Government Exhibit 1401. Government Exhibit 1463 through 1469, and then 1472.

THE COURT: Now, as to those that are over objection, is it subject to something?

MS. PENZA: No, your Honor, those were all the ones where you ruled that they were -- I think --

MR. AGNIFILO: So the basis of the objection was we objected because these are just documents that were found in the box that was in Nancy Salzman's basement.

THE COURT: Oh, right.

MR. AGNIFILO: And we objected on hearsay grounds, the reliability ground --

THE COURT: Right.

MR. AGNIFILO: -- with the absence of a witness.

Your Honor ruled on it, so -- I'm not raising the objection anew, I'm just noting the fact, that's all.

THE COURT: That they were objected to and I overruled the objection.

MR. AGNIFILO: That's right.

THE COURT: Okay. So all of those that have been identified are admitted into evidence, 1, 2, 3, 4 and -- 11 of them are over objection.

MR. AGNIFILO: Yes, Judge.

THE COURT: Okay. All right.

So ordered. Let's move on.

Shall we bring in the jury now?

MS. PENZA: Yes, Your. Honor, thank you.

THE COURT: All right. Please bring in the jury.

(Jury enters the courtroom.)

THE COURT: Please be seated.

The government may call its next witness.

MS. PENZA: Thank you, Your Honor.

The government calls Investigator Charles Fontanelli.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness takes the witness stand.)

**CHARLES FONTANELLI**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat.

Please state and spell your full name for the record.

THE WITNESS: Charles Fontanelli. C-H-A-R-L-E-S, F-O-N-T-A-N-E-L-L-I.

THE COURT: You may inquire.

MS. PENZA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PENZA:

Q Good afternoon, Investigator Fontanelli.

A Good afternoon, ma'am.

Q For whom do you currently work?

A New York State Police.

Q What is your title there?

A I'm an investigator.

Q Do you work with any other agencies?

A Yes, ma'am. I'm a task force officer with the Federal Bureau of Investigation.

Q And what does it mean to be a task force officer?

THE COURT: Could you just stay closer to the

microphone.

THE WITNESS: Yes, sir.

THE COURT: Thank you very much.

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

A To be a task force officer means you're designated as a federal agent on the background -- the FBI conducts a background investigation on you.

You're sworn in as a -- deputized as a federal agent and it allows you to work with the FBI.

Q And how long have you been a task force officer?

A A little over two years now.

Q And do you work with a specific squad of the FBI?

A I work with squad C2 in the FBI New York field office.

Q And what does squad C2 specialize in?

A Squad C2 investigates civil rights violations and hate crimes.

Q How long have you been with the New York State Police?

A I'm currently in my 13th year.

Q What did you do before that?

A Prior to joining the New York State Police, I was a New York City police officer for approximately two years. I was also a teacher for four years. I taught various grades and I ended up teaching sixth grade.

Q And are you -- I'm sorry -- Investigator Fontanelli,

could you explain how you balance your responsibilities to the FBI and the New York State Police?

A Yeah, it's not always easy. I basically have a foot in both worlds. I work part time for the State Police and part time with the FBI.

In the New York State Police, I still have a lot of responsibilities and I manage that with the responsibilities that I have with the FBI.

Q Are you familiar with the criminal investigation into the defendant Keith Raniere and others?

A Yes, I am.

Q And when did you first join that investigation?

A In October of 2017.

Q And have you worked on that case on that -- how frequently have you worked on that case?

A Well, I have been working on it since October of 2017, but I work on it, you know, periodically from time to time.

Sometimes I'll have responsibilities with the New York State Police, so I'm not always available to work on the case, and at other times I'll focus on the case.

Q What types of investigative steps have you participated in as part of this investigation?

A I personally participated in search warrants, the execution of search warrants. Some arrests. Surveillance. Administrative responsibilities, as well as communicating with

other law enforcement agencies in regards to the investigation.

Q Have you also visited locations of interest in the case?

A I have.

(Continued on next page.)

DIRECT EXAMINATION (Continued)

BY MS. PENZA:

Q Are you familiar with a town called Clifton Park, New York?

A Yes, ma'am.

Q For those of us who are unfamiliar with upstate New York, is there a city that Clifton Park, New York is close to?

A Yes. Clifton Park is about a 30-minute drive north of Albany.

Q And is Clifton part New York near any other towns?

A Yes, Clifton Park is basically adjacent to the town of Waterford, Halfmoon, New York, and Colony is also in that area.

Q So when we discuss various locations of part of this case is it sometimes that the addresses will technically be in different towns but they are in various steps, that the addresses are in very close proximity to each other?

A That is correct.

Q What county are the locations we're going to be talking about located in?

A All of the locations are located in Saratoga County.

Q As part of this investigation, have you yourself visited Clifton Park, New York, and its nearby towns?

A Yes, ma'am, I have.

Q And so why is that?

A Well, it's important for an investigator to, at the start of an investigation, to visit the locations to get a good feel for the -- for the area and to visit the residences and the various areas of interest to see how close they are in relation to each other and just to see what's going on.

Q And was that important in this case?

A Yes, it was.

Q And why is that?

A On this particular investigation most of the areas of interest were very -- in very close proximity to each other so it was important to just see -- you know, to see that and just to get up there and to see the areas and the various locations.

MS. PENZA: Mr. Carby -- oh, I'm sorry.

Your Honor, at this time may I have a PowerPoint, please.

Q Mr. -- Investigator Fontanelli?

A All right. It's on.

MS. PENZA: Thank you, Your Honor.

We can publish to the jury.

(Government's Exhibit Number 176 is published to the jury.)

Q This is the --

MS. PENZA: All right -- I'm sorry. Once I show it -- this is already in evidence as Government's Exhibit 176.

THE COURT: Okay.

Q Is this a PowerPoint that you're familiar with, Investigator Fontanelli?

A Yes, I am familiar with this PowerPoint.

Q And can you just describe generally what the PowerPoint is?

A This PowerPoint describes the locations of the various areas of interest in this investigation. In this particular slide here -- oops.

Q And I will have you identify a particular slide in a second. But does the PowerPoint itself contain photographs of various locations?

A Yes, ma'am.

Q And who took those photographs?

A Myself and Special Agent Michael Weaver.

Q For every one of the locations that we're going to look at, have you yourself visited those locations?

A Yes, ma'am.

Q And the PowerPoint presentation that is Government's Exhibit 176 does it fairly and accurately depict the proximity of various locations to each other?

A Yes, it does.

Q And as we go through the PowerPoint I'm not going to ask you to explain the significance of each of the locations, okay?

A Okay.

Q But as a general matter, is it fair to say that we're going to be identifying a number of locations where members of NXIVM lived or interacted with each other?

A That's correct.

Q Let's start with Slide 1. What does this depict?

A This particular slide to the left you have two residences that were involved in this investigation, 13 Twilight Drive which is located in the town of Clifton Park and 557 Englemore Road, which is also located in Clifton Park.

At the bottom of this slide, you have a 455 and 457 New Karner Road, which are located in Albany, New York, that was the NXIVM headquarters and corporate offices.

In the center of the screen there's a yellow circle which contains 17 properties were which also significant in the investigation.

Q And then if we turn to the next slide, what does this circle represent -- this circle that was added represent?

A This circle represents out of all the previous locations that we just addressed, are located within is 5.4-mile radius of each other.

Q Moving to Slide 3, what is indicated on Slide 3 regarding the -- the 17 properties circled?

A This slide represents that all 17 properties within that circle are located within a 1.3-mile radius of each over.

Q And then the next slide, does this slide depict those 17 properties that we have seen -- that were previously indicated in the smaller circle?
A That's correct.
Q Now, can you just describe -- there is an area on this map called Knox Woods. Can you describe what that is?
A Knox Woods is a community within the Clifton Park area, Halfmoon, New York, area. It's a series of townhouses. They're -- they're basically like garden apartments. They're two store. Most of the units are connected and located within clusters throughout the property.
Q And as a more general matter, can you just describe what the area that we're looking on this map is like?
A Yes. This area is basically a suburban area, tree-lined streets. Most of the residences are single-family residences. And then Knox Woods is, like I said, they're multifamily-residences.
Q And are a lot of those attached like townhomes attached to each other?
A That's correct.
Q And so what is depicted in this next -- in Slide 5?
A In this slide you have a street sign there for Knox Woods. You see that at the entrance of the community. And then you have a circle in the middle of the slide. Those Knox Woods locations are located within that circle and all of

those properties are located within a .2-mile radius of each other.

Q Okay. So now let's walk through the Knox Woods property that we're going to talk about.

Is this an overview of the Knox -- the Knox Woods area?

A Yes, ma'am.

Q So what is on this next slide, Slide 7?

A This particular slide here shows a street sign for Generals Way. That's a street located within the community of Knox Woods.

Q And the next slide?

A This particular slide shows a residence located on Generals Way within Knox Woods. That residence is Number 7, and as you can see the Number 7 is highlighted which was above the garage door in the photo.

Q Okay. The next slide.

And can you tell us what street this is?

A This particular street is Grenadier Court, which is also located within the community of Knox Woods.

Q And turning to the next slide can you explain what this is?

A This is a wide shot of a -- the townhomes are located at -- on Grenadier Court. As I was saying, they're mostly garden apartments, two stories, and there's multiple units

within -- within that building.

Q Okay. And so the address that's located there is 127 Grenadier Court. Can you just identify generally in that long row where 127 would be.

You can actually circle with your finger.

A Sure.

127 would be back here in this corner (indicating).

Q Okay. And is this next slide that I just moved to, Slide 11, does that indicate where you had just indicated with your finger?

A Yes. That's a closer shot of the door to 127 Grenadier Court.

Q I know that the print is a little bit small, but can you tell what the next -- next slide is?

A On this particular slide again it's a street sign. It's for Wilton Court, a street located within the Knox Woods community.

Q And the next slide, can you describe what this is?

A This is a picture of a building located on Wilton Court. Again, there's multiple residences in this building.

Q And where it says 12 Wilton Court can you circle when you look at this long row where 12 Wilton would be?

A Sure (indicating). This door here is the entrance to 12 Wilton Court.

Q And is this a close-up of 12 Wilton Court?

A That is correct.

Q And the 12 is pulled out and highlighted?

A Yes, ma'am.

Q Okay. And can you tell us what thing street is?

A This street sign, again, is located within the community of Knox Woods. This is the street sign for Flintlock Lane.

Q Okay. And turn to the next slide. Can you explain what this is?

A This is a group of residences located on Flintlock Lane. There are three particular residences of interest. 1, 2, and 3 and this is a photo of all three residences.

Q Okay. I'm going left to right. Can you just tell us which numbers they would be?

A Sure. Showing on the far left is the residence with the vehicle in the driveway. That's Number 1.

The next residence to the right is Number 2.

And then to the right of two is Number 3 Flintlock Lane.

Q Okay. And then is this -- I know that there's a tree kind of obscuring it, but is this a close-up of Number 1 Flintlock Lane?

A Yes, ma'am.

Q And the one is highlighted?

A That's correct.

Q And then is -- what is the next picture?

A The next picture is Residence Number 2 Flintlock Lane.

Q And was the number sign visible from where you took the picture?

A No, it wasn't.

Q You don't have a cull out as Number 2?

A That's correct, there's no two in the picture, but that Number 2 Flintlock Lane.

Q And then the next -- the next one?

A That's the far right. That's Number 3 Flintlock Lane you can see the Number 3 above the door there.

Q Okay. What is the next street sign that you can see?

A Again, this is another street sign within the Knox Woods community. This particular street sign is for Hale Drive.

Q And so what is the next slide?

A This particular slide is a -- is a wide shot of 3 Hale Drive of the residences on Hale Drive, one of which is three.

Q Okay. And is this a close-up of 3 Hale Drive?

A That's correct.

Q I'm sorry, I should have asked you on the previous one.

Can you identify where three is on the wider shot?

A I believe this is three here (indicating).

Q Showing you Slide 23 of Government's Exhibit 176. Can you describe what this is?

A Again, this is a building on Hale Drive. It's made up of multiple units.

Q And what is the location of -- what is one of the lotions of interest in the complex?
A Number 8 Hale Drive, which is the end unit.
Q And can you circle that with your finger, please?
A Sure (indicating).
Q And is this a closer view of 8 Hale Drive?
A Yes, ma'am. There you can see the Number 8 above the door.
Q And then for the last property that we're going to talk about in Knox Woods, can you tell us what this street sign is?
A This is a street sign again within the Knox Woods community. This particular street sign is for Victory Way.
Q And can you describe -- now we've moved on to the next slide and it says 120 Victory Way. Can you explain what this wide shot is?
A This wide shot, again, the building on Victory Way, multiple apartments, one of which is 120 Victory Way.
Q And can you explain where 120 is?
A Sure. The entrance to 120 would be back here behind these bushes (indicating).
Q Thank you. And is that a closer view of the bushes?
A That's correct.
Q Okay.
And then is this a closer view of what you were describing behind the bushes?

A Yes, ma'am. That's the entrance to 120 Victory Way.
Q And that 120 is a cull-out of what's located on the side of the door?
A That's correct.
Q Turning back in the wider shot and coming a bit little bit out of Knox Woods, what does the next picture indicate?
A The next picture indicates 21 Lake Road and there you see a photograph of the mailbox located at 21 Lake Road in the town of Waterford.
Q And is this 21 Lake Road?
A That is correct.
Q Have you been there?
A I have.
Q And who lived there?
A That's a residence of Warren Salzman.
Q Turning to the next picture, what is this?
A This is a street sign for a street located just outside of Knox Woods called Oregon Trail.
Q And I'm sorry, I just should have confirmed. You've been inside 21 Lake Road; is that correct?
A Yes, ma'am, I've been inside.
Q And then I'm sorry turning to -- oh, you said you mentioned the street sign for Oregon Trail and I'll move on to the next slide.
And what does this picture depict?

A This picture depicts a residence located on Oregon Trail, it's Number 3 Oregon, and that's the -- the front of the photo you can see the mailbox for that residence.

Q And have you been inside that house?

A I've also been inside this residence.

Q And whose residence was that?

A This residence belongs to Nancy Salzman.

Q And we'll talk about this is little bit later in your testimony, but why were you in Nancy Salzman's house?

A This particular location was a location where we conducted a search warrant.

Q Turnings to the next slide, is this another view of 3 Oregon Trail?

A Yes, ma'am.

Q Turning to next slide, what is this?

A This is a secondary residence located on Oregon Trail. This is Number 21 Oregon Trail, which is located just done the block from Number 3.

Q Can you read this street sign?

A This is a street sign for Milltowne Drive which was located in Waterford, New York.

Q And even though it's located in Waterford, is it very close to the residences we've just been looking at?

A It's very close. I think like a 3-minute drive.

Q Turning to next picture. What is this?

A This is a residence located on Milltowne Drive. That's Number 9 Milltowne Drive. You can see the nine culled out there on close proximity to the garage.
Q Okay. May I -- may I have the Elmo for a second, Your Honor?
THE COURT: Sure.
Q And showing you what is -- I'm showing you what is already in evidence as Government's Exhibit 365. Are you familiar with Government's Exhibit 365?
A Yes, I am.
Q And what are these?
A These are documents that were received from an individual by the name of Franca DiCrescenzo, who we served a subpoena on to receive these documents.
Q And what is Franca DiCrescenzo's profession?
A She a real estate agent in the Albany area.
Q And to your knowledge does she handle a lot of real estate transactions for individuals and activities associated with NXIVM?
A That's my understanding.
Q So looking at Government's Exhibit 365, did Ms. DiCrescenzo provide you with any documents related to 9 Milltowne Drive, the house we just looked at?
A Yes, she did.
Q I'm going to walk through a few of those documents. This

document isn't Bates Numbered but I'll show you what is somewhere in the middle of Government's Exhibit 365. And at the top of this document it says -- can you see that it says spreadsheet page?

A Yes, ma'am.

Q And how would you describe this document?

A This is basically is description of the residence located on -- at 9 Milltowne Drive.

Q And is that 9 Milltowne Drive there in the middle where it says address?

A That is correct.

Q And is it the picture of 9 Milltowne Drive?

A Yes, it is.

Q And does it describe whether 9 Milltowne Drive has a basement?

A Yes, it does here on the printout says that it has a full basement.

Q Okay. Can you circle that, please?

A Yes, ma'am (indicating).

Q Thank you.

I'm now showing you a document from Government's Exhibit 365. That has a header Brookfield Place Homeowner's Association, Inc. Do you see that?

A Yes, ma'am.

Q And it has a date of July 30, 2018?

A That's correct.
Q And it's a message about lawn maintenance needed and weeding; is that right?
A Yes, ma'am.
Q And it's related to 9 Milltowne Drive?
A Correct.
Q And this is addressed to -- can you read the name of the company that this is addressed to?
A This is addressed to Stinka, LLC.
Q I'm now showing you also from Government's Exhibit 365, a document that has at the top contract for purchase and sale of real estate.
Do you see that?
A Yes, ma'am.
Q And does this identify a property to be sold in the Number 2 box?
A Yes, it does. It identifies 9 Milltowne Drive.
Q And does it list the seller of that property?
A The seller of this particular property is Stinka, LLC.
Q And turning to the last page of that same -- of the same contract for purchase and sale of real estate is -- is there a signature for the seller at the end?
A Yes, there is.
Q And do you recognize that signature?
A I recognize that signature to be the signature of Nicole

Clyne.

Q And is that document dated?

A That document is dated August 24, 2018.

Q I'm showing you a document from Government's Exhibit 365 that's titled New York State Disclosure Form for Buyer and Seller.

Do you see that?

A Yes, ma'am.

Q I'm turning to the last page of that -- turning to the last page of that document. Does that have a signature of the seller on there?

A Yes, ma'am.

Q And is that same signature that you recognize?

A Yes. I recognize that signature to be Nicole Clyne. And above it you can see that the -- that she printed N. Clyne above where she signed.

Q Okay. I'm know showing you what is in evidence as Government's Exhibit 3 -- 369. Are you familiar with this document?

A Yes, ma'am.

Q And is this a deed selling 9 Milltowne Drive from one individual to Stinka, LLC?

A That's correct.

Q And turning to the second page, does it list the indenture between an individual and Stinka, LLC?

A Yes, it does, and it's dated the 14th day of April, 2017.

Q And does it say after Stinka, LLC a domestic limited liability company with an address of 9 Milltowne Drive Waterford, New York, 12188?

A That's correct.

Q I'm showing you what's in evidence as Government's Exhibit 368. Are you familiar with this document?

A Yes, ma'am.

Q And is this a document deeding 9 Milltowne Drive from Stinka, LLC to another individual?

A That is correct.

Q If you look at the same type of corresponding indenture is it between Stinka, LLC and another individual?

A That's correct and it's dated the 25th day of October 2018.

Q And if we look at the last page, it was signed?

A Again, signed by Nicole Clyne.

Q And it says Nicole Clyne, Member, correct?

A Yes, ma'am.

Q Now just before we turn back to the PowerPoint, did Ms. Decrescenzo provide the documents related to any other properties?

A Yes, she did.

Q And was one of those properties 8 Raleigh Drive?

A That's correct.

Q Showing you a document -- I'm showing you a subset of Government's Exhibit 365. And it has at the top of the page Capital Regional Listing Service Standard Form Contract for Purchase and Sale of Real Estate.

And does this, in the Number 2 box, list the property that's to be sold?

A Yes, ma'am, it does. It's states 8 Raleigh Drive, the town Clifton Park.

Q And does it list who the seller of that property is?

A It does. The seller is listed as Daniella Bergeron.

Q Do you know whether Daniella Bergeron goes by any other name?

A Yes. Daniella Bergeron is also known as Daniella Padilla.

Q And if we turn to the last page of the document, is it signed?

A Yes, ma'am. It's signed dated August 7, 2018. It's signed by Daniella Bergeron.

Q And is that Daniella Bergeron's signature there?

A Yes.

MS. PENZA: May we go back to the PowerPoint, Your Honor?

Q 37 can you describe what -- just to reorient ourselves, s we're still looking at the 17 properties area; is that correct?

A Yes.
Q And now, we're over where it says Apropos?
A That's correct.
Q And is this -- is this an image of Apropos?
A That is an image of Apropos located at 1475 U.S. Route 9 in the town of Clifton Park.
Q And have you conducted surveillance at Apropos?
A I have.
Q Turning to the next slide, can you describe what this is?
A This is a shopping center which is also located on U.S. Route 9. It's to the right of Apropos' and it's called Rome Plaza, and it's also located in the town of Clifton Park, New York.
Q And now moving to next slide, what is this?
A In this particular photo you see a street sign for Woodin Road also in the town of Clifton Park, New York.
Q I know it's -- again, there's a lot of trees, but is this an imagine of 1 Woodin Road?
A Yes, ma'am, that is.
Q And then the next image, what is this an image of?
A This is an image of a Sports Barn which is a building located a 130 New York Route 236 in the town of Halfmoon, New York.
Q And is this a larger image, a wider view of Sports Barn?
A That's correct.

Q Now, this is -- now, we're back to the overview slide that we looked at, at the beginning. And now -- now we're going to look at 455-57 New Karner Road, correct?
A That's correct.
Q Okay. And is this 455 New Karner Road?
A Yes, that's 455 New Karner Road in Albany, that's the NXIVM headquarters.
Q And what is this image of?
A That's a closer image of the front door of that location, 455 New Karner Road, says Executive Success Programs on the glass door.
Q And what is this sign?
A This is a parking sign just a few feet from the front door in the front parking lot. It's a sign that states that that particular parking spot is reserved for N. Salzman.
Q And is this 457 New Karner Road?
A That is correct. It's located in very close proximity of 455 that's a photo of 457 Karner Road.
Q And is this another angle of that building?
A Correct. That's another photo, different angle of the building in which you can clearly see the Number 457 in the upper right-hand corner.
Q Going back to the overview slide are we now going to look at 13 Twilight Drive?
A That's correct.

Q And what is this picture of?
A Here above this white vehicle is the street sign for Twilight Drive which is located in the town of Clifton Park, New York.
Q And what is this image?
A That is a photo of 13 Twilight Drive.
Q Now, going back to the overview again, are we now going to look at 557 Englemore Road?
A Yes.
Q Is this a street sign for Englemore Road?
A Yes. Again, here we took a photo of the street sign for Englemore Road.
Q And is this -- looking at this overview, is that Englemore -- is that the residence that we're going to look at?
A Correct. That circle and the photo is around the residence which we're speaking about.
Q And is this 557 Englemore Road, this image?
A That is correct.
MS. PENZA: May I have the Elmo for a second, Your Honor?
Q I'm showing you what is in evidence as Government's 370. Are you familiar with this document?
A Yes, I am.
Q And is this a deed, deeding -- is this a deed referencing

557 Englemore Road?

A That is correct.

Q And it's transferring that property from another individual to whom?

A To Rosa Laura Junto De La Vega.

Q And does Rosa Laura Junto De La Vega generally go by Rosa Laura Junto?

A That's correct.

Q Turning to the second page is that Rosa Laura Junto's name again?

A That's correct.

Q And it says Rosa Laura Junto residing where?

A 21 Oregon Trail in Waterford, New York.

Q And is there a date on this document?

A Yes, ma'am, there is. It's dated April 2nd, 2014.

Q And I'm know showing you what's in evidence as Government's Exhibit 371. Are you familiar with this document?

A Yes, ma'am.

Q And is this is document from the New York State Department of State regarding Stinka, LLC?

A That's correct.

Q And is there an address with this to which the Department of State will mail the process listed on behalf of the entity?

A That's correct.
Q And what is the address for Stinka, LLC?
A The address is 557 Englemore Road in the town of Clifton Park, New York, 12065.
Q We're going switch directions now. You mentioned earlier as part of your investigation in this case you executed various searches, correct?
A That's correct.
Q And as part of that investigation were there searches on a number of e-mail accounts?
A Yes, ma'am.
Q I'm showing you what is already in evidence as Government's Exhibit 1399. Are you familiar with that?
A Yes, ma'am.
Q Okay. And is that a full copy of the e-mail account thebeacon2009@gmail.com as provided to the Government pursuant to the search warrant?
A Yes, that's correct.
Q And how can you identify this?
A I can identify it be my initials and by yesterday's date that I placed onto this particular exhibit.
Q I'm now showing you what's in evidence as Government's Exhibit 1401. Are you familiar with this?
A Yes, ma'am.
Q And how can you identify it?

A Again, I could identify it by my initials and the date at the bottom of the exhibit.
Q And does this CD contained as Government's Exhibit 1401 contain a full and true and correct copy of the search warrant return provided by Google for the oakhaven.haven@gmail.com account?
A That's correct.
Q I now want to direct your attention to March 27, 2017 -- 2018, rather. Did you participate in the execution of a search warrant on any property on that date?
A Yes, I did. I participated in a search warrant which was executed at the residence of Nancy Salzman located at 3 Oregon Trail in the town of Clifton Park, New York.
Q And when you went to -- when you went to the house, was Nancy Salzman present?
A Yes, she was.
Q Can you describe the general procedure for conducting the search of a residence?
A Sure. Generally before we can conduct a search warrant we'll have a brief on close proximity to the residence prior to going to the residence. This particular day we -- we had a brief at -- in the parking lot of a diner which was located a short drive from the residence. At the brief we discussed, you know, officer safety which is our main concern. We also discussed the parameters of the search warrant and the

evidence that we're looking to collect.

Q Did you have a specific role on the date of the execution of this search on 3 Oregon Trail?

A On that particular day, I assisted Special Agent Michael Weaver and I was -- I was the photographer for the day.

Q And can you just describe the general procedure for photographing -- that takes place when you photograph a property when you're executing a search warrant on it?

A Yes, ma'am. Generally when we get in the residence we'll take exterior photos of the residence prior to entering. As we enter the residence we'll take photos going in and then we'll photograph each room within the residence prior to the search being conducted.

After the search is conducted we'll take photographs of any evidence that we want to document and then we'll take exit photos to show the condition of the house on our way out.

Q I'm showing you what's already in evidence as Government's Exhibit 180.

Are you familiar with this?

A This particular exhibit contains the photos that were secured from the search warrant that day. I recognize my initials and the date at the bottom.

Q Did you select a certain number of those -- this is full set of photographs, but did you select a certain number to show to the jury?

A Yes, ma'am.

MS. PENZA: May I have the PowerPoint, Your Honor?

Q Okay. The first two slides I'm just going to skip back and forth between them. What do those two slides represent?

A These two slides represent a plaque that we took a photograph of prior to taking any photos at the scene. It documents the date, which was March 27, 2018. It has the case identification number, which is blacked out in this photo. It listed the photographer, myself. That's Peter Fontanelli and it identifies the location of 3 Oregon Trail, Waterford, New York, 12188.

Q And so why were there two of those in this instance?

A In this instance there's two plaques because we use two disks. We took so many photos that the first disk filled up. So when we rewrote it with the second disk before we took any photographs we took an additional photo of the plaque.

Q Turning to the slide can you describe what this is?

A This is the exterior of 3 Oregon Trail, the residence in which we conducted the search warrant.

Q And can we see the Number 3 there by the garage?

A Yes, you can see the Number 3 indicated on the pillar next to the garage in this photo.

Q And is this the view inside the garage?

A Yes, ma'am.

Q And was there anything -- anything of note in the bins?

A In those particular bins up on the shelves here we looked through them. The only item of note was there was quite a large number of Forbes magazines contained in those particular bins.

Q Forbes magazine that contained articles about -- not about this case, rather, but about NXIVM?

A That's correct.

Q And can you describe what this picture shows?

A This is a -- this is a picture of the hallway as you enter the residence. It leads from the front door and this is the view.

Q Okay. So what room are we looking into from this view?

A Straight down the hall in the rear of the residence you can see that's the kitchen.

Q And then what is this view?

A When you come in the front door down that hallway this room is directly to your left, I believe it's a den.

Q And is that a piano in that picture?

A Yes, ma'am. There's a large piano in that room.

Q Okay. And what is the image?

A Again, it's that hallway this time looking to the right. That's a library. You walk through those French doors, there's bookshelves with multiple books.

Q And can you describe the next view?

A This is a photo of the kitchen looking into the den and

to the right of those pillars there's a sitting area with couches.

Q And is this the opposite view of the kitchen?

A That's correct, that's the opposite view of the kitchen. Through those doors there's a small hallway which would lead to additional rooms.

Q And then is this another picture of this island in the middle of the kitchen?

A That's correct.

Q And are there computers visible?

A Yes, there are.

Q Can you circle them, please.

A (Witness complies.)

Q Thank you.

Now, were there -- did the FBI have any special techniques brought in for identifying electronics?

A Yes. They have a canine, a dog that could search for computer items somehow. It's pretty amazing.

But on this particular search we did have that canine available to us.

Q And was there also -- were there a number of electronic devices recovered from the search?

A There were quite a number.

Q And did you also bring in a special part of the FBI to help process that, those electronic devices?

A Yes. When we realized the large volume of electronic devices, which were located in the residence we made a request to the New York field office and a member of their evidence team responded to help us process the scene.

Q And I'm showing you Slide 66, essentially a combined PowerPoint.

What is depicted in this picture?

A That's a picture of an Apple computer, I believe it's MacBook Air.

Q And why does it have a number -- can you explain hat it means that it has a number next to it?

A Sure. Throughout the search warrant each piece of evidence when it's located it's given an evidence number. This particular piece of evidence is Number 13.

MS. PENZA: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

Q Investigator Fontanelli, can you take a can look at this and tell me what it is?

A This is evidence Number 13. This is the Apple MacBook which we seized from the home of Nancy Salzman. It's the same MacBook which you see in this picture here.

MS. PENZA: And I note, Your Honor, it's marked as Government's Exhibit 205 for identification.

Q And does it actually have the Number 13 on the back?

A Yes, it actually has the Number 13 here (indicating). It

tells you the room we secured it from, the kitchen, specifically the counter. It tells you a description of the piece of evidence that we're collecting. In this particular instance it's Apple MacBook Pro Air. It will be the serial number of the item. It tells who it was collected by and it gives another identification down here. When we bring it back to the field office this particular number is assigned to the piece of evidence.

Q And Investigator Fontanelli, can I ask you to take the piece of equipment outside of the bag and show it to the jury?

A (Witness complies.)

Q Thank you.

And this is the same computer that's in this photograph?

A That is correct.

Q And you mentioned that there is a special unit of the FBI that processes the electronic devices?

A That's correct.

Q And showing you what are already in evidence as Government's Exhibit 1463, 1464, 1465, 1466, 1467, 1469, and 1472.

Have you seen these documents? I'll show you the Exhibit Number. Have you seen these documents?

A Yes, ma'am.

Q And are these documents that were recovered from the

computer that we just looked at?
A That's correct.
MS. PENZA: May I have the PowerPoint back, Your Honor, please.
Q Continue with our walk-through.
Can you describe what we see here?
A This is, again, we're back at Nancy Salzman's residence. This is a sitting room to the rear of the kitchen and this angle is looking out at the rest of the house.
Q And is that -- in the left-hand side of this photo, is that a table?
A Correct. That's the table there and there's chairs around the table.
Q And have you reviewed videos of the defendant in this case where he is sitting at that table?
A Yes, I have.
Q And where would he typically sit?
A On the video that I reviewed, he was sitting here in this particular seat (indicating).
Q So with the pillar behind him?
A Correct.
Q And can you describe this view?
A This is in the same location, but instead of looking out, you're looking to the right.
At the far end of the room there, you can see the

piano.

Q And so what is this room --

A This room --

Q -- and how did we get here?

A From the kitchen. When you enter that small hallway, it leads you to this particular room. It was some type of photography studio or movie studio.

Q And is this another image from that studio?

A That's correct. That's the stage there, and it's located within that room.

Q And then what does this photo indicate?

A This is a stairway leading to the basement.

Q And then is this in the basement?

A That's correct. When you come to the bottom of the stairs if you make a right, you come to this large room, and that's an accurate picture of it.

Q Okay. On the left-hand side of this photo, can you describe what you see?

A There's various photos of the defendant hanging on the wall here.

Q Can you explain what this room is?

A This was an office located at the rear of that room. There's double doors that led into that office.

Q And what is this?

A This was a white board located in that office.

Q What is this room?

A This is a room that was in close proximity to the office. Again, off that main room in the basement, there was another room and this is a picture of that.

Q Was anything recovered from this room?

A Located in this room, we located a box of documents.

Q And can you describe -- is this the same -- is this another picture of the same room?

A That's the same room taken from a different angle.

Q And can you describe generally where the box of documents was recovered from?

A You can't see in this particular picture, but if you came in the room from the front door, that table and chairs would be your left, and directly on the floor to your right there was a box of documents which we located.

Q Turning to the next slide. Can you describe what we see here?

A In this particular photo you can see that box of documents that I was referring to to the right of the door. It's labelled as Evidence Number 4.

Q And is this a closer-up photo?

A That's a close-up photo of the box.

Q Okay. And then what is this?

A Those are just photos of the -- within this box, there was various folders labeled of individuals' names, and that's

just a photo of the labels.

Q Did you do a cursory look at the box?

A Yes, I did.

Q Okay. And were there any folders that you immediately recognized or did you recognize names?

A Yes. There was -- within this box the various folders were labeled with different politicians' names along with the individuals associated with the organization NXIVM.

Q All right. And did you do an in-depth review of the box?

A No, I didn't.

Q And was the task of actually analyzing the documents within the box, did other agents handle that?

A Yes. There was an in-depth analysis of the photos conducted by my colleagues.

Q Okay.

MS. PENZA: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

BY MS. PENZA:

Q Investigator Fontanelli, I'm showing you what is already in evidence as Government's Exhibit 204. Are you familiar with this?

A Yes. This is the box that we located in that room in Nancy Salzman's house.

Q And the same as with the computer that we just looked at, does it have the same type of labeling as the computer did

indicating where you found it and what the item number was?

A Yes. This -- this particular evidence tag indicates that this piece of evidence is Item Number 4. It was located on the lower floor of the residence at 3 Oregon Trail on 3/27/2018.

Q And I'll just ask you to open it up.

And is it in substantially the same condition as it was when you first recovered it?

A Yes, it is.

MS. PENZA: Your Honor, may I have the Elmo, please.

BY MS. PENZA:

Q I'm just going to go through some of the file folders.

Okay. Can you read the name of this file folder, please?

A Stephen Herbits.

Q Okay. And can you read the name of this file folder, please?

A Edgar Bronfman.

Q Can you read the name of this file folder?

A Roger Stone.

Q Can you read the name of this file folder?

A Rick Ross.

Q Can you read the name of this file folder?

A Charles Schumer.

Q Can you read the name of this file folder?

A Frank Parlato.
Q Can you read the name of this file folder?
A David Soares.
Q Can you read this file folder?
A WJC.
Q I'm just going to open up this one for a second. I'm going to block it because these haven't been redacted yet.
But can you read what the WJC stands for?
A World Jewish Congress.
Q Can you read this one?
A Israel --
Q I'm sorry.
A -- Israel Singers.
Q Can you read this one?
A Toni Natalie.
Q Can you read that one?
A Juval Aviv.
Q Can you read this one?
A Malcolm Stevenson Forbes.
Q Can you read this one?
A Michael Freedman.
Q This one?
A George Hearst.
Q Can you read what this file folder says?
A It's an abbreviation for miscellaneous.

Q And again, I'm going to cover up, because some of these items haven't been redacted yet.

But within the miscellaneous folder, can you read that name?

A Mark Falk.

Q Can you read this name?

A Joseph L. Bruno.

Q Can you read that one?

A Eliot L. Spitzer.

MS. PENZA: Your Honor, I think this is a good place to stop.

THE COURT: All right.

Members of the jury, we're going to adjourn for the day now. Let me remind you that it's extremely important that you follow my instructions; that you not discuss this case with anyone, not your family, friends, business associates, or fellow jurors.

In addition, you must not read, listen to, watch, or access any accounts of this case on any form of media, including newspaper, TV, radio, podcasts, or the Internet. Do not do any research or seek outside information about any aspect of this case. Please do not communicate with anyone about the case on your phone, whether through e-mail, text messaging, or any other means, or any blog, or website, or by way of any social media including Facebook, Twitter,

Instagram, YouTube, or other similar sites.

You must not consider anything you may have read or heard about this case outside of this courtroom whether you read it before or during jury selection, or during this trial. Do not attempt any independent research or investigation about the case, and do not visit any of the locations identified on the questionnaire or discussed during the course of the jury selection process or this trial.

About tomorrow, we will begin at 9:30. We will take a brief lunch break around noon and continue. That will be about a half-hour break and we will continue until 2:00 p.m., at which time we will adjourn for the week, and then you will return again on Monday morning at 9:30.

So get a good night's sleep. Thank you for your attention.

All rise for the jury.

(Jury exits the courtroom.)

(The following matters occurred outside the presence of the jury.)

THE COURT: The witness may step down.

And you'll return at 9:30 tomorrow morning. Please do not discuss your testimony with anyone this evening.

THE WITNESS: Yes, sir.

THE COURT: All right. Everyone may be seated.

You are excused, sir.

(The witness exits the witness stand.)

THE COURT: All right. We have some additional business, mainly for the attorneys. It's having to do with privileged issues.

About how much more do you have with this witness on direct?

MS. PENZA: I would say about a half an hour, Your Honor.

THE COURT: All right. And cross?

MR. AGNIFILO: I would be surprised it if goes half an hour.

THE COURT: All right. And then after that, we are going to have a cooperating witness for the balance of the day?

MS. HAJJAR: Yes, Your Honor.

MS. PENZA: There will be one brief witness as well.

THE COURT: A brief witness and then brief?

MS. PENZA: Brief, half an hour.

THE COURT: Counsel, do you know about this brief witness?

MR. AGNIFILO: I think we're waiting -- I think we know who it is generally. We don't have the exhibits for this witness yet --

THE COURT: All right.

MR. AGNIFILO: -- so hopefully we'll get that soon.

THE COURT: All right. Hopefully.

MR. AGNIFILO: Hopefully.

THE COURT: All right. And then we will go into the direct examination for the cooperating witness, and that will go all day -- the balance of the day and part of Monday?

MS. HAJJAR: Yes, Your Honor.

THE COURT: All right. Very good.

And we will have the overflow room available because of the identity of the cooperating witness. All right?

And so at this point, I am going to meet with the attorney for the cooperating witness on a privilege issue, then I will be back out and we can discuss that with counsel. So I would like the defendant to be available for that.

MR. AGNIFILO: Yes, Judge.

THE COURT: All right. And you can please go with the defendant and tell them we're ready.

And at this point, Mr. Diaz, are you here?

THE COURTROOM DEPUTY: He's outside, Judge.

THE COURT: Oh, okay. Okay.

All right. At this time, we will take a break, and I will meet with the attorney and with the court reporter at this time.

(Recess taken.)

(Continued on the next page.)

THE COURT: Please be seated.

Let me just take your appearances.

MR. CASS: Luke Cass on behalf of Ms. Salzman.

MR. DIAZ: Hector Diaz on behalf of Ms. Salzman.

MS. TAZOLI: Andrea Tazoli on behalf of Ms. Salzman.

THE COURT: Okay, very well. Please be seated.

So this can be in public.

Let me just advise you. I've spoken with counsel for Ms. Salzman, Lauren Salzman, and tomorrow, what I've suggested is with regard to any claims of privilege that result from the joint defense agreement that was entered into in, I've asked Mr. Diaz to chat with Mr. Raniere's counsel, since you're all aware of what the parameters were of the joint defense agreement and what was discussed in connection with the joint defense agreement.

So tomorrow morning when we have the testimony of Miss Salzman, if Mr. Diaz or Mr. Agnifilo believe that the question is -- an answer would be covered by privilege from the joint defense agreement, then you can ask for a sidebar before the witness answers. So that we can resolve the matter before something gets on the public record. That's in dealing with the joint defense agreement.

But then there's another privilege that's been asserted having to do with NXIVM Corporation. And as to that, counsel for NXIVM is going to call in tomorrow morning at

9 a.m., because he can't be here, I guess, and so that we can have a discussion about whether the NXIVM -- the nature of any privilege being -- specific privilege material being asserted by the NXIVM Corporation. But we'll do that without the public present.

MR. AGNIFILO: Just so I understand it, is it Your Honor's intention that I should talk to Ms. Salzman's counsel tonight?

THE COURT: Yes. To the extent you feel comfortable doing so.

MR. AGNIFILO: A hundred percent, yes.

THE COURT: But I'm trying to avoid anything that would possibly be disclosed that is subject to that privilege that was part of the joint defense agreement.

MR. AGNIFILO: Very good.

THE COURT: All right. But I can't be sure about what kind of privilege is being asserted unless it's in the -- unless it's in Judge Scanlon's decision, we're going to take a look at that.

If it's something you've seen Judge Scanlon's decision; haven't you?

MS. HAJJAR: Yes, Your Honor. The government has seen a redacted version of it. It does not address every area that could potentially be elicited on direct or cross-examination of this witness.

THE COURT: Well, you should be here tomorrow and listen to what counsel has to say about what it deems to be a privilege, and you can have a comment on the claims of privilege that the -- that NXIVM's counsel raises.

But they haven't raised it with me. I don't have a letter -- I have a letter from Mr. Diaz. I don't have a letter from NXIVM's counsel, and they know this trial is going on.

So I'd be curious to know and they -- we reached out them, they didn't reach out to us. So I'd be curious to hear what they seem to think would be covered by privilege that would be created by the discussions between the board of NXIVM, upon which Miss Salzman was a member, and counsel for NXIVM, which is the basis for the privilege.

MS. HAJJAR: Yes, Your Honor.

THE COURT: All right.

Are there any questions at this point?

MR. AGNIFILO: Nothing from us.

THE COURT: Is there anything more you would like the Court to do in preparation for this opportunity to chat with the lawyers for NXIVM?

MS. HAJJAR: No, thank you, Your Honor.

THE COURT: I'm just not sure what -- you know, what the range of their concerns are. But we'll find out tomorrow morning at 9:00, and then we'll go from there.

MR. AGNIFILO: I'll speak with counsel for Lauren Salzman at this point.

THE COURT: Right.

MR. AGNIFILO: The reason I'm standing and not saying anything, I don't really know what the issue is. I suppose --

THE COURT: I don't know -- well, I think Mr. Diaz can tell you --

MR. AGNIFILO: Okay, great.

THE COURT: -- what the issue is and -- as he perceives it.

MR. AGNIFILO: Understood.

THE COURT: All right? And that way -- and he's here to protect his -- protect the privilege as to his client.

MR. AGNIFILO: Of course.

THE COURT: All right.

But also, there's a concern that I would have that anything that's privileged that Miss Salzman would otherwise testify to that would have an adverse effect on your client should not be disclosed either, if it came up in the context of the joint defense agreement.

MR. AGNIFILO: Understood.

THE COURT: That's really my concern. On the other hand, I have no idea what NXIVM's counsel has in mind, if anything, in asserting -- as to asserting a privilege when

NXIVM's counsel hasn't really reached out to delineate what -- information that Lauren Salzman has would adversely affect NXIVM Corporation's rights improperly.

MR. AGNIFILO: Right, I understand. Very good. We'll all find out together, I suppose.

THE COURT: Yes.

MS. HAJJAR: Thank you, Your Honor.

THE COURT: So we'll meet tomorrow morning here, without the public present, at 9 a.m.

MR. AGNIFILO: Very good, Your Honor. Thank you, Judge.

THE COURT: All right? Thank you.

Have a good night.

* * * * *

(Proceedings adjourned at 5:30 p.m. to resume on May 17, 2019 at 9:00 a.m.)

I N D E X

| WITNESS | | PAGE |
| --- | --- | --- |
| **MARK VICENTE** | | |
| CROSS-EXAMINATION | BY MR. AGNIFILO | 1198 |
| REDIRECT EXAMINATION | BY MR. LESKO | 1280 |
| RECROSS-EXAMINATION | BY MR. AGNIFILO | 1303 |
| **STEPHEN HERBITS** | | |
| DIRECT EXAMINATION | BY MR. LESKO | 1307 |
| CROSS-EXAMINATION | BY MR. AGNIFILO | 1365 |
| REDIRECT EXAMINATION | BY MR. LESKO | 1373 |
| RECROSS-EXAMINATION | BY MR. AGNIFILO | 1374 |
| **CHARLES FONTANELLI** | | |
| DIRECT EXAMINATION | BY MS. PENZA | 1384 |

E X H I B I T S

| GOVERNMENT | PAGE |
| --- | --- |
| 1002A | 1306 |
| 1491R, 1492R, 1493R | 1346 |
| 1494R, 1495R, 1496R | 1346 |

**MR. AGNIFILO: [138]**
**MR. CASS: [1]** 1428/3
**MR. DIAZ: [1]** 1428/4
**MR. LESKO: [72]** 1206/24 1207/1 1207/23 1208/3 1214/19 1215/4 1219/21 1220/8 1220/19 1221/2 1224/5 1231/2 1231/16 1231/22 1241/3 1241/20 1242/4 1242/7 1243/13 1244/15 1245/2 1245/4 1248/16 1248/24 1251/15 1251/17 1251/20 1252/15 1255/2 1255/4 1255/8 1255/18 1256/1 1259/15 1262/3 1263/12 1263/21 1263/23 1264/1 1264/11 1267/8 1269/3 1280/3 1280/20 1284/25 1285/3 1285/5 1289/19 1303/4 1305/17 1305/25 1306/15 1307/4 1319/25 1321/8 1327/8 1327/13 1328/1 1328/3 1328/18 1334/13 1335/5 1336/4 1336/14 1343/22 1346/11 1350/9 1358/25 1365/17 1374/6 1376/1 1376/5
**MS. HAJJAR: [12]** 1194/16 1194/21 1195/7 1196/9 1196/12 1197/11 1426/15 1427/6 1429/22 1430/15 1430/22 1432/7
**MS. PENZA: [50]** 1194/6 1194/8 1207/7 1208/7 1208/13 1248/12 1306/4 1306/17 1320/16 1321/13 1334/20 1335/2 1335/16 1335/24 1376/16 1376/21 1377/14 1377/16 1378/5 1378/17 1379/4 1379/12 1379/19 1380/12 1380/14 1381/2 1381/8 1381/22 1382/6 1382/9 1382/12 1382/21 1383/18 1383/23 1384/12 1389/14 1389/19 1389/24 1405/21 1408/20 1413/2 1416/15 1416/22 1418/3 1421/16 1422/10 1424/10 1426/7 1426/16 1426/18
**MS. TAZOLI: [1]** 1428/5
**THE COURT REPORTER: [1]** 1248/23
**THE COURT: [248]**
**THE COURTROOM DEPUTY: [7]** 1194/3 1306/22 1306/24 1321/4 1384/1 1384/6 1427/18
**THE JURY: [1]** 1198/6
**THE LAW CLERK: [2]** 1380/1 1380/7
**THE WITNESS: [27]** 1198/11 1220/11 1225/17 1253/25 1254/2 1271/24 1281/6 1295/21 1305/20 1306/23 1307/1 1312/11 1315/20 1316/8 1320/11 1321/20 1324/25 1329/22 1330/2 1331/2 1331/6 1376/8 1384/5 1384/9 1385/2 1385/4 1425/23

**$**

**$10 [3]** 1339/6 1339/7 1366/24
**$10 million [3]** 1339/6 1339/7 1366/24
**$11 [1]** 1339/7
**$11 million [1]** 1339/7
**$14,000 [1]** 1279/9
**$1400 [1]** 1338/14
**$28 [1]** 1339/5
**$28 million [1]** 1339/5

**'**

**'64 [1]** 1307/16
**'67 [2]** 1307/20 1308/8
**'70s [1]** 1315/5
**'76 [1]** 1309/21
**'77 [5]** 1307/21 1309/22 1310/5 1312/11 1318/1
**'79 [1]** 1318/7
**'80 [1]** 1312/21
**'80s [1]** 1310/23
**'81 [1]** 1318/10
**'90s [1]** 1310/22

**-**

**-- and [1]** 1419/4
**-- do [1]** 1294/11
**-- so [1]** 1426/25
**-----------------------------**
**-x [2]** 1193/2 1193/7
**-against [1]** 1193/5

**.**

**.2 [1]** 1393/1
**.2-mile [1]** 1393/1

**1**

**1.3-mile [1]** 1391/25
**10 [3]** 1347/5 1347/19 1348/4
**10 million [1]** 1366/21
**10017 [1]** 1193/17
**1002 [1]** 1306/7
**1002A [3]** 1306/6 1306/10 1306/13
**102 [1]** 1381/23
**106 [1]** 1381/23
**107 [1]** 1381/23
**109 [1]** 1381/23
**10:51:28 [1]** 1220/7
**10th [3]** 1254/4 1254/19 1256/25
**11 [5]** 1237/3 1307/20 1349/3 1383/12 1394/9
**11 million [1]** 1366/24
**11201 [1]** 1193/13
**113 [1]** 1381/23
**114 [1]** 1381/24
**119 [1]** 1381/24
**11:36 [1]** 1270/8
**12 [5]** 1394/21 1394/22 1394/23 1394/25 1395/2
**120 [6]** 1397/14 1397/17 1397/18 1397/19 1398/1 1398/2
**12065 [1]** 1410/4
**12188 [2]** 1404/4 1413/11
**12207 [1]** 1193/20
**124 [1]** 1381/24
**125 [1]** 1381/24
**126 [1]** 1381/24
**127 [5]** 1381/24 1394/2 1394/4 1394/7 1394/11
**128 [1]** 1381/24
**129 [1]** 1381/24
**13 [7]** 1391/8 1407/24 1408/6 1416/14 1416/19 1416/24 1416/25
**130 [2]** 1381/24 1406/22
**131 [1]** 1381/24
**134 [1]** 1381/24
**135 [1]** 1381/24
**137 [1]** 1381/25
**138 [1]** 1381/25
**139 [1]** 1381/25
**1397 [1]** 1303/11
**1399 [2]** 1382/17 1410/13
**13th [1]** 1385/19
**14 [1]** 1339/20
**140 [1]** 1381/25
**1401 [3]** 1382/17 1410/23 1411/3
**141 [1]** 1381/25
**143 [1]** 1381/25
**144 [2]** 1381/25 1382/1
**1463 [2]** 1382/18 1417/20
**1464 [1]** 1417/20
**1465 [1]** 1417/20
**1466 [1]** 1417/20
**1467 [1]** 1417/20
**1469 [2]** 1382/18 1417/20
**1472 [2]** 1382/18 1417/21
**1475 [1]** 1406/5
**1483 [1]** 1382/13
**149 [1]** 1382/1
**1491 [1]** 1349/2
**1491R [5]** 1344/2 1346/12 1346/14 1346/16 1346/21
**1492R [5]** 1344/14 1346/12 1346/14 1346/16 1354/13
**1493R [6]** 1344/22 1346/12 1346/15 1346/16 1356/3 1357/12
**1494R [7]** 1345/8 1346/12 1346/15 1346/18 1357/8 1357/16 1359/1
**1495R [5]** 1345/17 1346/12 1346/15 1346/18 1359/24
**1496R [5]** 1346/5 1346/12 1346/15 1346/18 1361/8
**14th [1]** 1404/1
**15 [2]** 1244/3 1339/20
**153 [1]** 1382/2
**154 [1]** 1382/2
**155 [1]** 1382/2
**158 [1]** 1382/2
**15th [3]** 1358/9 1359/15 1359/15
**16 [1]** 1193/5
**160 [1]** 1382/2
**161 [1]** 1382/2
**162 [1]** 1382/2
**163 [1]** 1382/2
**168 [1]** 1382/2

**1**

**17 [11]** 1217/8 1217/10 1218/5 1220/7 1257/6 1391/15 1391/23 1391/24 1392/1 1405/24 1432/17
**171 [1]** 1382/2
**174 [1]** 1382/3
**176 [7]** 1382/4 1382/7 1382/12 1389/21 1389/25 1390/20 1396/22
**177 [1]** 1382/3
**1797R [1]** 1298/23
**18 [2]** 1234/4 1283/24
**18-CR-204 [1]** 1193/2
**180 [2]** 1382/13 1412/18
**19 [2]** 1346/9 1361/11
**1930s [1]** 1313/13
**1970 [2]** 1309/21 1309/24
**1970s [1]** 1309/20
**1971 [1]** 1310/5
**1972 [1]** 1309/2
**1977 [2]** 1307/15 1309/23
**1980 [1]** 1310/14
**1994 [1]** 1205/13
**1997 [1]** 1311/17

**2**

**20 [11]** 1254/10 1254/15 1254/15 1254/20 1254/23 1255/6 1255/16 1255/22 1268/9 1311/24 1355/5
**20-minute [1]** 1372/4
**2001 [1]** 1315/3
**2004 [4]** 1205/13 1280/8 1316/1 1316/16
**2005 [7]** 1317/21 1322/19 1330/13 1337/18 1342/5 1343/2 1374/22
**2006 [1]** 1304/3
**2007 [6]** 1317/6 1317/22 1318/6 1318/18 1330/13 1331/2
**2008 [15]** 1324/12 1344/11 1344/19 1345/2 1345/5 1345/14 1347/5 1347/20 1348/4 1349/3 1355/6 1355/6 1356/5 1357/17 1358/10
**2009 [3]** 1340/22 1340/25 1341/2
**2010 [2]** 1342/5 1343/2
**2011 [6]** 1338/9 1340/3 1346/1 1346/9 1359/25 1361/11
**2012 [4]** 1373/8 1373/9 1375/4 1375/4
**2013 [4]** 1319/10 1373/8 1374/23 1375/4
**2014 [1]** 1409/15
**2016 [9]** 1198/23 1199/3 1212/15 1212/21 1213/22 1214/16 1215/1 1215/8 1285/25
**2017 [33]** 1216/11 1217/8 1217/25 1218/2 1218/5 1218/15 1218/21 1220/7 1220/14 1222/6 1224/1 1231/8 1233/11 1233/14 1233/25 1234/3 1236/7 1236/11 1236/22 1237/4 1238/11 1240/3 1241/16 1250/11 1279/9 1282/10 1282/15 1283/16 1305/6 1386/13 1386/16 1404/1 1411/8
**2018 [17]** 1253/24 1253/25 1254/1 1254/5 1254/19 1256/25 1257/6 1263/10 1276/23 1305/7 1401/25 1403/3 1404/15 1405/17 1411/9 1413/7 1422/5
**2019 [2]** 1193/5 1432/17
**204 [3]** 1193/2 1382/16 1421/20
**204A [1]** 1382/16
**205 [1]** 1416/23
**20th [1]** 1312/12
**21 [6]** 1398/7 1398/8 1398/10 1398/20 1399/17 1409/13
**22nd [2]** 1233/6 1233/7
**23 [1]** 1396/22
**2330 [1]** 1193/23
**236 [1]** 1406/22
**23rd [3]** 1233/2 1233/5 1233/7
**24 [2]** 1355/6 1403/3
**25 percent [1]** 1310/18
**25th [1]** 1404/14
**26th [9]** 1193/16 1233/25 1234/3 1234/22 1235/23 1236/7 1236/11 1252/3 1253/4
**27 [2]** 1411/8 1413/7
**271 [1]** 1193/12
**27th [1]** 1257/6
**28 million [1]** 1366/21
**2:00 [2]** 1321/2 1425/11
**2:30 [1]** 1263/20
**2nd [2]** 1238/11 1409/15

**3**

**3 Oregon Trail [1]** 1422/4
**3-minute [1]** 1399/24
**3/27/2018 [1]** 1422/5
**30 [1]** 1401/25
**30-minute [1]** 1388/8
**302 [1]** 1302/1
**31st [2]** 1236/22 1237/4
**32 [1]** 1313/19
**326 [2]** 1199/1 1199/2
**328 [1]** 1289/16
**341 [4]** 1259/4 1259/5 1285/3 1285/5
**345 [1]** 1219/14
**35 [1]** 1209/21
**35,000 [7]** 1205/21 1208/2 1208/18 1209/10 1209/17 1210/1 1212/1
**35,000-year-old [1]** 1280/1
**3500-MV-1 [1]** 1237/18
**3500-MV-5 [1]** 1240/14
**365 [9]** 1382/13 1400/8 1400/9 1400/21 1401/2 1401/22 1402/10 1403/4 1405/2
**368 [2]** 1382/13 1404/7
**369 [2]** 1382/13 1403/18
**37 [1]** 1405/23
**370 [2]** 1382/13 1408/22
**371 [2]** 1382/13 1409/17
**3:29 [1]** 1376/23

**4**

**455 [5]** 1391/11 1407/5 1407/6 1407/10 1407/18
**455-57 [1]** 1407/3
**457 [4]** 1391/11 1407/16 1407/18 1407/21
**4:00 [1]** 1372/3

**5**

**5.4-mile [1]** 1391/20
**500 [1]** 1317/18
**5414 [1]** 1217/14
**557 [5]** 1391/9 1408/8 1408/18 1409/1 1410/3
**57 [1]** 1407/3
**5:00 [3]** 1372/4 1372/5 1372/9
**5:30 [1]** 1432/16
**5th [1]** 1240/3

**6**

**66 [1]** 1416/5
**667 [1]** 1268/9
**677 [1]** 1193/19
**6th [2]** 1359/15 1359/25

**7**

**707 [1]** 1193/19
**70s [2]** 1350/1 1350/12
**718-613-2330 [1]** 1193/23
**767 [1]** 1193/16
**7th [2]** 1231/8 1231/8

**8**

**8:00 [2]** 1372/9 1372/10

**9**

**9 a.m [2]** 1429/1 1432/9
**90s [2]** 1352/7 1352/22
**911 [1]** 1315/12
**9:00 [2]** 1430/25 1432/17
**9:30 [4]** 1193/5 1425/9 1425/13 1425/21

**A**

**a.m [5]** 1193/5 1270/8 1429/1 1432/9 1432/17
**abbreviation [1]** 1423/25
**ability [1]** 1293/22
**able [8]** 1267/17 1297/22 1312/1 1348/9 1348/10 1352/2 1353/7 1371/7
**abroad [2]** 1313/1 1314/3
**absence [1]** 1383/5
**absolute [3]** 1300/11 1300/13 1374/15
**absolutely [4]** 1235/17 1251/13 1265/4 1266/5
**abundance [1]** 1327/10
**abuse [1]** 1256/20
**abuser [2]** 1256/20 1302/8
**abusive [1]** 1298/5
**accept [1]** 1372/19
**accepted [1]** 1268/15

A

access [6] 1263/16 1263/18 1266/2 1272/16 1273/15 1424/19
accommodations [3] 1288/8 1288/8 1304/24
accompanied [1] 1319/4
according [1] 1292/6
account [5] 1251/4 1251/6 1251/8 1410/15 1411/6
accounts [2] 1410/10 1424/19
accurate [3] 1234/15 1234/16 1419/16
accurately [1] 1390/20
accusation [1] 1369/6
accusations [3] 1316/2 1316/16 1350/3
accused [2] 1291/24 1292/1
accusing [1] 1368/13
achieve [2] 1325/4 1329/7
acquaintances [1] 1233/23
acting [3] 1213/12 1327/4 1333/5
actions [1] 1351/16
active [6] 1243/12 1278/7 1312/23 1318/23 1351/17 1365/2
activities [3] 1282/17 1316/21 1400/18
activity [1] 1355/4
actor [1] 1278/8
actual [4] 1202/5 1212/4 1299/18 1300/3
Adam [5] 1345/23 1345/24 1360/1 1360/1 1360/10
Adam's [1] 1360/2
add [3] 1264/22 1337/25 1359/21
added [1] 1391/18
addition [2] 1340/16 1424/18
additional [3] 1413/16 1415/6 1426/2
address [10] 1251/2 1265/9 1360/4 1394/2 1401/10 1404/3 1409/23 1410/2 1410/3 1429/23
addressed [5] 1264/16 1391/20 1402/7 1402/8 1402/9
addresses [2] 1388/15 1388/17
addressing [1] 1360/8
adequate [1] 1347/18
adjacent [1] 1388/11
adjourn [2] 1424/13 1425/12
adjourned [1] 1432/16
administration [1] 1309/19
Administrative [1] 1386/25
admissible [1] 1242/18
admission [1] 1292/10
admitted [11] 1214/8 1242/7 1242/7 1289/15 1289/18 1289/19 1298/22 1301/25 1381/22 1382/8 1383/12
admonishment [1] 1246/11
admonition [1] 1221/13
advantage [1] 1246/19
adversary [2] 1368/8 1368/9
adverse [2] 1360/15 1431/19
adversely [1] 1432/2
advice [2] 1337/15 1356/25
advise [4] 1323/10 1325/24 1329/4 1428/8
adviser [1] 1327/4
advises [2] 1244/19 1365/6
advisory [4] 1314/12 1314/13 1317/14 1352/8
affairs [1] 1340/12
affect [1] 1432/2
affiliated [1] 1362/1
affiliation [1] 1207/4
affirmatively [1] 1242/25
affirmed [3] 1198/14 1306/21 1384/4
afraid [11] 1226/11 1230/5 1230/6 1235/6 1261/23 1261/23 1261/23 1265/2 1266/21 1266/23 1266/24
Africa [2] 1206/4 1281/19
after-party [2] 1302/6 1302/10
afternoon [11] 1280/23 1280/24 1307/7 1307/8 1307/11 1321/23 1365/21 1372/3 1376/11 1384/15 1384/16
afterwards [1] 1309/10
agencies [2] 1384/21 1387/1
agency [1] 1293/23
agent [10] 1193/22 1228/23 1243/12 1266/4 1278/7 1385/7 1385/9 1390/15 1400/16 1412/4
agents [1] 1421/12
aggressive [2] 1328/5 1329/17
AGNIFILIO [4] 1193/17 1198/8 1207/24 1327/14
Agnifilo [19] 1242/11 1244/15 1245/6 1248/16 1267/21 1271/20 1272/2 1283/24 1284/7 1285/17 1298/23 1303/8 1366/1 1373/3 1428/17 1433/4 1433/5 1433/7 1433/8
Agnifilo's [1] 1281/11
ago [4] 1275/18 1328/4 1367/16 1381/12
agree [5] 1230/2 1248/1 1255/10 1256/3 1261/4
agreed [3] 1317/2 1324/15 1340/11
agreement [9] 1317/16 1369/13 1428/11 1428/14 1428/15 1428/19 1428/22 1429/14 1431/21
ahead [14] 1206/22 1224/11 1226/5 1239/20 1285/2 1290/7 1312/14 1325/6 1343/24 1367/15 1370/9 1373/19 1382/11 1385/5
aided [1] 1193/25
Air [2] 1416/9 1417/4
airport [2] 1276/14 1289/5
Albany [11] 1193/20 1236/17 1332/6 1332/19 1342/13 1364/7 1364/11 1388/9 1391/12 1400/16 1407/6
Alejandra [2] 1290/8 1290/9
alert [1] 1207/6
Alessandro [1] 1263/8
alien [1] 1208/7
aliens [2] 1207/25 1208/2
aligned [1] 1257/4
all day [1] 1427/5
allegation [1] 1361/25
allegations [4] 1316/2 1317/13 1342/20 1369/4
allegedly [2] 1210/10 1210/15
Allison [4] 1213/7 1213/16 1214/8 1214/11
allowed [2] 1247/24 1297/5
allowing [3] 1222/13 1225/21 1239/5
allows [1] 1385/10
alluding [1] 1352/4
almost [4] 1262/17 1298/15 1300/18 1312/25
alteration [1] 1299/11
altercation [3] 1288/23 1288/25 1289/4
amazing [1] 1415/18
AMERICA [2] 1193/3 1313/18
American [1] 1361/22
Americans [2] 1361/19 1361/20
amount [4] 1209/8 1278/15 1287/8 1310/7
analysis [1] 1421/13
analyzing [1] 1421/11
ancient [1] 1216/3
Andrea [1] 1428/5
Android [2] 1232/6 1232/10
anew [1] 1383/7
Angeles [7] 1224/1 1225/3 1225/5 1240/5 1240/6 1252/7 1339/18
angle [4] 1407/19 1407/20 1418/9 1420/9
angry [2] 1246/21 1339/8
anniversary [1] 1312/12
announced [1] 1352/18
annoyed [1] 1368/19
annulled [1] 1322/2
answer [20] 1206/22 1219/22 1241/4 1244/25 1245/1 1250/3 1255/23 1268/8 1268/13 1268/14 1280/4 1284/15 1298/18 1301/20 1303/1 1340/10 1362/11 1369/21 1371/15 1428/18
answered [2] 1228/15 1373/5
answers [2] 1221/12 1428/20
anticipated [1] 1307/18
anyway [1] 1358/3
AOL [1] 1360/4
apartheid [1] 1281/20
apartment [2] 1322/20 1322/23
apartments [3] 1392/9 1393/25 1397/17
apologize [2] 1285/5 1326/1
apologizes [1] 1349/7

**A**

**appear [4]** 1219/20 1285/9 1324/20 1358/19
**appearances [2]** 1193/10 1428/2
**Apple [3]** 1416/8 1416/19 1417/4
**applies [1]** 1221/9
**appointed [2]** 1314/11 1314/18
**appreciate [1]** 1316/7
**approach [7]** 1220/20 1241/20 1263/13 1264/2 1329/15 1416/15 1421/16
**approached [3]** 1266/17 1282/23 1311/7
**approaching [1]** 1282/19
**appropriate [2]** 1292/17 1359/5
**approve [1]** 1365/3
**April [14]** 1217/8 1217/10 1217/24 1218/3 1218/4 1218/5 1218/15 1218/21 1220/7 1307/15 1309/23 1309/24 1404/1 1409/15
**April 17 [4]** 1217/8 1217/10 1218/5 1220/7
**April 1977 [2]** 1307/15 1309/23
**April 2017 [1]** 1218/15
**April 2nd [1]** 1409/15
**Apropos [4]** 1406/2 1406/4 1406/5 1406/7
**Apropos' [1]** 1406/11
**arbitration [3]** 1213/6 1213/20 1214/2
**arbitrator [1]** 1213/8
**area [22]** 1217/19 1217/21 1219/25 1236/17 1289/7 1328/11 1332/6 1364/7 1364/8 1388/13 1389/3 1392/5 1392/7 1392/8 1392/13 1392/14 1392/14 1393/6 1400/16 1405/24 1415/1 1429/23
**areas [4]** 1389/4 1389/9 1389/12 1390/8
**argue [1]** 1267/17
**argued [1]** 1294/5
**argument [2]** 1267/8 1267/18
**argumentative [1]** 1260/19
**arguments [1]** 1292/10
**arms [2]** 1295/23 1296/13
**Army [1]** 1308/6
**arose [1]** 1364/3
**arrangements [1]** 1324/2
**arrests [1]** 1386/24
**arrogance [1]** 1202/18
**arrogant [6]** 1202/15 1202/16 1202/20 1202/22 1203/1 1204/2
**article [1]** 1342/7
**articles [5]** 1349/17 1367/1 1367/4 1367/6 1414/5
**as assistant [1]** 1312/10
**ascribed [2]** 1239/10 1239/12
**Asia [1]** 1312/4
**aside [1]** 1228/4
**aspect [2]** 1217/17 1424/22
**ass [1]** 1212/6
**assert [1]** 1328/24
**asserted [9]** 1221/8 1242/12 1245/9 1245/13 1328/7 1328/21 1428/24 1429/3 1429/17
**asserting [4]** 1327/9 1328/5 1431/25 1431/25
**assertions [1]** 1329/10
**asset [1]** 1314/14
**assets [3]** 1314/13 1314/18 1352/8
**assigned [4]** 1308/24 1316/24 1340/8 1417/7
**assignment [2]** 1311/25 1314/21
**assignments [3]** 1308/7 1312/17 1314/25
**assist [1]** 1324/10
**assistance [1]** 1347/18
**assistant [6]** 1193/15 1309/14 1311/7 1311/8 1311/20 1312/10
**assisted [1]** 1412/4
**assisting [1]** 1341/19
**associate [2]** 1313/5 1313/11
**associated [2]** 1400/18 1421/8
**associates [2]** 1193/16 1424/16
**Association [1]** 1401/23
**assume [1]** 1317/9
**assuming [4]** 1235/16 1235/22 1281/9 1361/6
**assumption [1]** 1241/14
**assures [1]** 1317/3
**attached [2]** 1392/18 1392/18
**attacks [1]** 1268/20
**attempt [6]** 1245/12 1259/22 1264/19 1269/4 1283/1 1425/5
**attempts [2]** 1268/5 1282/25
**attend [2]** 1229/7 1229/18
**attended [3]** 1206/5 1287/22 1302/9
**attention [5]** 1201/1 1213/17 1360/10 1411/8 1425/15
**attorney-client [3]** 1325/16 1327/5 1354/23
**audible [3]** 1274/1 1274/22 1279/10
**audiotape [2]** 1297/9 1300/10
**Auditorium [1]** 1263/19
**August [3]** 1252/9 1403/3 1405/17
**August 24 [1]** 1403/3
**August 7 [1]** 1405/17
**authorities [1]** 1259/23
**authority [2]** 1330/8 1331/7
**automated [1]** 1232/3
**automatically [1]** 1231/25
**available [5]** 1354/21 1386/19 1415/20 1427/8 1427/13
**avenue [2]** 1193/16 1329/15
**Aviv [1]** 1423/17
**avoid [1]** 1429/12
**awakening [1]** 1215/25
**aware [9]** 1328/6 1338/9 1339/9 1340/1 1340/2 1340/17 1351/11 1365/4 1428/13
**awareness [1]** 1216/2

**B**

**back-door [1]** 1245/11
**background [3]** 1312/25 1385/7 1385/8
**backs [2]** 1200/17 1200/19
**backwards [1]** 1205/15
**bad [5]** 1226/17 1229/15 1266/11 1282/20 1294/23
**badly [3]** 1205/1 1207/19 1288/15
**bag [1]** 1417/10
**bags [1]** 1289/8
**balance [3]** 1386/1 1426/13 1427/5
**balances [1]** 1316/21
**Bandaid [1]** 1200/1
**Bandaids [3]** 1199/18 1200/3 1200/6
**bank [2]** 1351/5 1357/5
**bankruptcy [1]** 1339/16
**banks [2]** 1314/14 1314/16
**bar [1]** 1206/24
**Barbara [2]** 1294/8 1295/2
**Barn [2]** 1406/21 1406/24
**baseball [2]** 1258/13 1258/16
**based [5]** 1217/21 1219/25 1220/1 1238/9 1371/7
**basement [6]** 1382/25 1401/15 1401/17 1419/12 1419/13 1420/3
**basic [2]** 1207/14 1289/10
**basis [10]** 1218/18 1242/20 1249/10 1250/9 1250/10 1250/24 1318/8 1342/3 1382/23 1430/14
**Bates [1]** 1401/1
**bathing [2]** 1290/11 1290/19
**bear [1]** 1237/14
**became [11]** 1223/21 1233/22 1233/23 1252/24 1274/2 1275/10 1308/3 1309/10 1312/23 1333/16 1341/20
**becoming [2]** 1338/6 1349/22
**began [9]** 1214/4 1226/9 1282/19 1288/17 1289/8 1315/13 1332/20 1333/13 1341/19
**beginning [12]** 1278/14 1293/6 1309/21 1337/17 1337/22 1341/15 1342/13 1348/15 1348/17 1373/24 1374/1 1407/2
**beginnings [1]** 1313/14
**begrudge [1]** 1374/10
**begrudging [1]** 1375/14
**begun [1]** 1332/19
**behalf [9]** 1330/14 1333/8 1365/12 1375/1 1375/2 1409/24 1428/3 1428/4 1428/5
**behavior [8]** 1202/23 1203/1 1308/14 1333/5 1348/19 1354/6 1354/8 1375/4
**Belief [1]** 1209/14

**B**

**beliefs [1]** 1287/9
**believer [2]** 1257/2 1257/3
**belongs [1]** 1399/7
**benefit [1]** 1268/24
**benefits [1]** 1268/12
**Bergeron [4]** 1405/10 1405/11 1405/13 1405/18
**Bergeron's [1]** 1405/19
**best [5]** 1200/10 1201/4 1201/11 1201/21 1339/25
**beyond [3]** 1267/15 1329/6 1351/21
**bias [1]** 1247/9
**bidding [1]** 1348/22
**big [3]** 1257/19 1292/8 1292/21
**bigger [1]** 1290/6
**bill [5]** 1333/6 1333/7 1352/1 1352/24 1353/8
**billionaire [2]** 1311/4 1311/4
**billionaires [1]** 1341/4
**bins [3]** 1413/25 1414/1 1414/4
**birth [1]** 1314/17
**birthday [1]** 1224/16
**Birthright [5]** 1361/15 1361/17 1361/23 1361/25 1362/1
**bit [10]** 1259/7 1282/9 1300/15 1307/19 1309/10 1376/17 1394/13 1398/5 1398/6 1399/8
**black [2]** 1290/11 1290/19
**blacked [1]** 1413/8
**blank [2]** 1354/13 1357/9
**blanking [1]** 1322/14
**Bleep [3]** 1211/5 1211/7 1211/10
**blew [1]** 1288/15
**blind [1]** 1354/1
**block [2]** 1399/18 1423/7
**blocks [7]** 1257/10 1257/14 1258/20 1258/23 1260/6 1261/8 1274/20
**blog [2]** 1238/21 1424/24
**blogger [1]** 1367/5
**blue [1]** 1302/17
**board [18]** 1198/24 1199/8 1200/2 1200/9 1201/3 1202/17 1202/19 1202/25 1207/11 1207/16 1207/21 1210/20 1212/15 1212/20 1213/22 1301/9 1419/25 1430/12
**board's [1]** 1202/25
**boards [1]** 1308/15
**Bob [1]** 1364/4
**body [3]** 1201/17 1206/12 1325/21
**Bonnie [5]** 1213/6 1216/8 1262/20 1275/25 1276/11
**boogie [1]** 1243/19
**book [3]** 1276/19 1276/22 1308/18
**books [2]** 1317/1 1414/23
**bookshelves [1]** 1414/23
**bootstrap [1]** 1267/10
**bored [1]** 1342/10
**boring [1]** 1367/18
**boss [1]** 1315/10
**bother [1]** 1232/23
**bothering [1]** 1337/24
**bottom [10]** 1199/2 1204/16 1311/10 1349/3 1354/17 1357/16 1391/11 1411/2 1412/22 1419/14
**Bouchey [1]** 1294/9
**Bouchey's [1]** 1295/2
**bought [3]** 1227/18 1310/22 1311/1
**boundaries [4]** 1286/12 1286/12 1286/22 1293/15
**box [14]** 1382/25 1402/16 1405/5 1420/6 1420/10 1420/15 1420/18 1420/22 1420/24 1421/2 1421/6 1421/9 1421/12 1421/22
**boys [2]** 1322/8 1323/20
**BRAFMAN [1]** 1193/16
**brainwashed [4]** 1265/6 1350/19 1351/7 1351/24
**brainwashing [5]** 1350/3 1351/11 1351/13 1351/14 1351/21
**branded [3]** 1237/11 1302/20 1302/24
**brander [2]** 1291/16 1291/17
**branding [5]** 1237/9 1237/16 1238/7 1242/15 1291/14
**break [12]** 1231/4 1244/7 1264/4 1274/9 1320/3 1320/10 1372/4 1376/11 1376/22 1425/10 1425/11 1427/20
**brief [12]** 1280/25 1326/1 1340/14 1411/20 1411/22 1411/23 1425/10 1426/16 1426/17 1426/17 1426/18 1426/19
**briefly [6]** 1214/2 1222/3 1307/14 1311/18 1325/24 1329/3
**bringing [4]** 1225/9 1243/6 1247/21 1328/10
**Broadway [1]** 1193/19
**broke [1]** 1222/3
**broken [2]** 1327/19 1327/21
**Bronfman [96]** 1238/20 1238/24 1288/12 1304/12 1309/25 1310/2 1310/3 1311/3 1311/5 1312/10 1312/15 1312/20 1315/23 1318/5 1318/14 1318/18 1318/21 1318/22 1319/7 1319/12 1319/21 1321/25 1322/7 1322/17 1322/25 1322/25 1323/16 1324/9 1327/9 1328/4 1328/21 1330/5 1330/6 1330/13 1331/10 1332/4 1332/16 1333/12 1338/11 1339/9 1339/21 1339/25 1340/17 1340/22 1341/25 1342/17 1343/2 1344/10 1344/18 1345/2 1345/13 1345/19 1345/19 1345/20 1345/24 1346/8 1346/8 1346/9 1347/5 1348/5 1349/4 1349/8 1350/4 1351/10 1351/19 1351/25 1352/3 1353/7 1353/15 1353/22 1354/16 1356/6 1356/8 1357/18 1358/1 1358/19 1358/22 1359/4 1359/9 1359/25 1360/1 1360/1 1360/6 1360/24 1361/10 1361/10 1361/10 1362/6 1362/13 1366/9 1366/14 1367/20 1369/19 1373/4 1374/2 1422/18
**Bronfman's [5]** 1321/24 1337/3 1341/12 1341/25 1354/20
**Bronfmans [1]** 1352/5
**Brookfield [1]** 1401/22
**Brooklyn [4]** 1193/4 1193/13 1249/12 1249/13
**brother [2]** 1361/2 1361/3
**brothers [1]** 1374/12
**brought [12]** 1225/10 1232/12 1266/12 1267/3 1272/19 1284/8 1309/8 1310/23 1312/3 1341/7 1350/2 1415/16
**Bruno [3]** 1363/4 1363/4 1424/7
**building [8]** 1394/1 1394/19 1394/20 1396/24 1397/16 1406/21 1407/19 1407/21
**built [2]** 1347/10 1374/17
**bullet [4]** 1295/7 1299/7 1299/8 1299/11
**bullet's [1]** 1299/12
**bureau [5]** 1316/24 1317/16 1363/12 1363/15 1384/23
**Burlington [2]** 1273/7 1273/8
**bushes [3]** 1397/20 1397/21 1397/25
**business [14]** 1295/1 1307/18 1310/9 1312/23 1313/3 1313/4 1313/4 1313/5 1313/9 1313/10 1313/11 1337/25 1424/16 1426/3
**businessman [1]** 1319/18
**busy [2]** 1212/6 1314/20
**Buyer [1]** 1403/5
**bystander [1]** 1243/11

**C**

**C-H-A-R-L-E-S [1]** 1384/9
**C2 [3]** 1385/14 1385/15 1385/16
**Cabinet [1]** 1318/9
**Cadman [1]** 1193/12
**cake [1]** 1284/9
**cakes [6]** 1225/10 1226/9 1227/18 1230/21 1232/12 1261/21
**calculated [1]** 1295/6
**calculation [2]** 1295/1 1295/3
**calendar [1]** 1279/20
**California [6]** 1231/5 1231/13 1231/20 1338/10 1338/14 1341/18
**callous [1]** 1288/18

C

**calm [1]** 1245/3
**calmed [1]** 1289/14
**camera [16]** 1257/13 1257/14 1257/15 1257/19 1257/21 1260/10 1261/2 1262/7 1262/15 1266/18 1266/23 1266/24 1269/24 1272/11 1272/22 1278/1
**cameraman [3]** 1259/12 1260/17 1261/5
**camp [2]** 1356/8 1359/4
**campaign [1]** 1294/14
**campaigns [1]** 1295/7
**camps [1]** 1351/13
**campus [1]** 1206/8
**cancer [1]** 1269/16
**canine [2]** 1415/17 1415/20
**capacity [5]** 1278/4 1324/23 1324/24 1324/25 1327/4
**capital [2]** 1343/20 1405/3
**capture [2]** 1267/1 1305/10
**captured [1]** 1277/13
**CARBY [2]** 1193/22 1389/14
**cared [1]** 1256/16
**career [1]** 1307/14
**careful [2]** 1268/17 1329/12
**Carlato [4]** 1239/4 1239/5 1239/10 1239/13
**carries [1]** 1351/17
**carrying [1]** 1338/21
**Carter's [1]** 1318/9
**case [54]** 1203/15 1246/15 1246/16 1247/21 1264/21 1265/16 1267/9 1267/11 1267/12 1267/25 1269/22 1270/4 1270/4 1270/5 1282/3 1299/17 1299/18 1299/19 1299/21 1300/3 1300/3 1300/5 1300/7 1308/20 1324/16 1338/14 1338/17 1338/18 1338/24 1338/25 1339/5 1339/5 1339/18 1350/2 1350/17 1363/25 1366/12 1386/14 1386/15 1386/20 1386/20 1387/3 1388/14 1389/6 1410/6 1413/7 1414/6 1418/15 1424/15 1424/19 1424/22 1424/23 1425/3 1425/6
**cases [4]** 1332/14 1339/16 1339/20 1339/20
**cash [1]** 1341/4
**Cass [1]** 1428/3
**Catherine [17]** 1217/9 1217/24 1218/9 1218/20 1220/2 1220/14 1221/8 1222/5 1222/12 1223/15 1228/9 1232/13 1232/21 1237/2 1237/7 1238/15 1250/22
**caused [2]** 1210/4 1295/1
**caution [1]** 1327/10
**caveat [1]** 1327/13
**CC [1]** 1345/22
**cc's [1]** 1362/6
**CCing [1]** 1346/8
**CCR [1]** 1193/23
**CD [1]** 1411/3
**cell [1]** 1232/5
**center [2]** 1391/14 1406/10
**CEO [1]** 1310/3
**ceremonies [1]** 1291/15
**ceremony [4]** 1237/9 1237/16 1238/7 1242/15
**certain [22]** 1216/25 1232/9 1234/10 1235/17 1244/10 1246/14 1247/20 1266/13 1278/15 1291/7 1291/8 1291/9 1293/5 1294/22 1295/18 1296/15 1298/13 1299/15 1354/21 1369/2 1412/23 1412/24
**certainly [5]** 1244/6 1294/5 1328/20 1351/15 1360/22
**certificate [1]** 1314/17
**certified [2]** 1296/22 1296/24
**cetera [2]** 1352/11 1359/8
**chain [4]** 1344/7 1345/13 1346/22 1357/11
**Chair [1]** 1352/7
**chairman [2]** 1310/3 1312/19
**chairs [2]** 1418/12 1420/13
**challenged [1]** 1210/5
**change [1]** 1268/20
**changed [4]** 1212/25 1278/17 1297/24 1353/18
**changes [1]** 1303/18
**channeled [1]** 1208/19
**channeling [6]** 1205/21 1209/10 1209/17 1209/20 1210/1 1211/25
**channelling [1]** 1280/1
**channels [1]** 1205/8
**characterize [4]** 1249/17 1319/15 1337/3 1341/24
**charge [1]** 1292/12
**charges [2]** 1247/19 1356/10
**charitable [1]** 1360/13
**charities [3]** 1317/16 1363/12 1363/15
**charity [1]** 1316/24
**Charles [8]** 1362/9 1364/19 1364/21 1364/21 1383/24 1384/3 1384/9 1422/24
**chase [1]** 1351/4
**chat [2]** 1428/12 1430/20
**check [3]** 1206/4 1362/7 1362/10
**checkable [1]** 1375/6
**checks [1]** 1316/21
**Chernitzky [1]** 1253/9
**chief [4]** 1267/11 1309/11 1309/15 1309/18
**chiefs [1]** 1309/16
**child [1]** 1361/22
**children [11]** 1253/7 1253/8 1296/2 1296/7 1296/16 1296/22 1322/7 1322/18 1361/19 1372/16 1372/22
**China [1]** 1318/25
**choose [1]** 1278/10
**chose [1]** 1257/3
**chosen [1]** 1347/8
**Chris [2]** 1235/25 1236/11
**circle [16]** 1290/5 1291/10 1391/14 1391/18 1391/18 1391/19 1391/25 1392/3 1392/24 1392/25 1394/5 1394/21 1397/4 1401/18 1408/16 1415/12
**circled [1]** 1391/23
**circles [1]** 1290/3
**circumstances [2]** 1212/16 1216/13
**city [4]** 1275/24 1302/7 1385/22 1388/7
**civil [3]** 1304/17 1367/12 1385/16
**civilian [1]** 1309/17
**civilly [1]** 1329/5
**claim [3]** 1268/25 1269/15 1269/22
**claiming [1]** 1342/17
**claims [5]** 1264/12 1268/11 1268/16 1428/10 1430/3
**Clare [100]** 1238/24 1257/25 1258/2 1258/2 1258/3 1261/5 1274/23 1274/25 1275/6 1275/16 1275/25 1276/3 1276/6 1276/11 1276/18 1288/12 1304/9 1304/12 1322/11 1322/17 1322/21 1322/25 1323/16 1324/9 1324/14 1327/9 1329/22 1330/5 1330/13 1332/4 1332/16 1333/11 1337/3 1338/11 1339/9 1340/17 1341/25 1342/17 1342/24 1344/10 1344/18 1345/1 1345/4 1345/13 1345/19 1346/8 1346/25 1347/5 1347/11 1348/5 1349/4 1349/7 1349/21 1350/4 1351/10 1351/19 1351/25 1352/3 1353/7 1353/15 1353/22 1354/16 1354/20 1355/5 1356/6 1356/8 1357/18 1358/1 1358/22 1359/3 1359/9 1359/25 1360/9 1360/9 1361/10 1362/5 1362/12 1366/9 1366/13 1366/18 1367/25 1368/8 1369/19 1369/23 1370/12 1371/8 1371/12 1371/13 1371/24 1372/1 1372/6 1372/7 1372/8 1372/11 1372/12 1373/4 1374/2 1375/18 1375/21 1375/24
**clear [14]** 1198/22 1211/17 1220/5 1227/16 1253/13 1268/19 1284/2 1284/4 1330/15 1348/20 1349/11 1357/20 1359/11 1381/10
**clearly [3]** 1329/23 1351/22 1407/21
**client [9]** 1243/19 1269/20 1325/16 1327/5 1327/21 1327/25 1354/23 1431/14 1431/19
**Clifton [17]** 1253/22 1388/3 1388/7 1388/8 1388/10 1388/11 1388/23 1391/9

C

**Clifton... [9]** 1391/10 1392/7 1405/8 1406/6 1406/12 1406/16 1408/3 1410/3 1411/13
**Clifton Park [12]** 1388/3 1388/7 1388/8 1388/11 1388/23 1391/9 1392/7 1406/6 1406/12 1406/16 1408/3 1411/13
**Clinton [3]** 1352/1 1352/24 1353/8
**Clintons [1]** 1352/6
**clock [1]** 1370/7
**close [22]** 1301/23 1305/4 1319/13 1330/10 1333/13 1352/13 1371/9 1374/17 1388/7 1388/17 1389/4 1389/10 1394/25 1395/20 1396/17 1399/23 1399/24 1400/3 1407/17 1411/20 1420/2 1420/22
**close-up [4]** 1394/25 1395/20 1396/17 1420/22
**closely [1]** 1314/21
**closer [10]** 1316/25 1316/25 1375/23 1384/25 1394/11 1397/6 1397/21 1397/24 1407/9 1420/21
**closer-up [1]** 1420/21
**clout [1]** 1357/24
**clusters [1]** 1392/11
**Clyne [5]** 1403/1 1403/14 1403/15 1404/17 1404/18
**co [1]** 1302/7
**co-writer [1]** 1302/7
**coach [2]** 1200/7 1242/14
**cochair [1]** 1361/3
**code [3]** 1217/19 1217/21 1219/25
**codified [1]** 1298/6
**coercion [1]** 1216/17
**coffee [1]** 1226/19
**cold [1]** 1288/18
**collar [1]** 1357/24
**collateral [5]** 1264/18 1267/23 1297/12 1297/14 1297/17
**colleague [2]** 1323/24 1324/10
**colleagues [1]** 1421/14
**collect [1]** 1412/1
**collected [1]** 1417/5
**collecting [2]** 1243/2 1417/3
**collection [1]** 1346/24
**collective [1]** 1327/6
**college [1]** 1307/16
**Colony [1]** 1388/12
**combined [1]** 1416/5
**comfortable [1]** 1429/9
**coming [9]** 1265/23 1277/16 1277/19 1281/23 1323/3 1361/5 1375/24 1381/13 1398/5
**comma [3]** 1359/7 1359/7 1359/7
**comment [6]** 1200/1 1248/13 1337/8 1337/10 1373/16 1430/3
**comments [6]** 1256/8 1256/11 1256/12 1356/13 1356/17 1373/18
**commission [6]** 1308/21 1308/22 1308/22 1308/23 1314/20 1352/8
**Committee [1]** 1314/13
**committing [1]** 1351/4
**common [1]** 1356/12
**communicate [1]** 1424/22
**communicated [5]** 1358/22 1362/12 1368/14 1368/15 1368/18
**communicating [4]** 1207/25 1347/12 1360/25 1386/25
**communication [2]** 1327/10 1343/1
**community [11]** 1295/16 1296/18 1305/13 1392/7 1392/23 1393/10 1393/20 1394/17 1395/5 1396/13 1397/12
**companies [4]** 1310/15 1310/24 1312/18 1314/15
**company [23]** 1211/3 1213/12 1213/19 1216/16 1216/23 1295/24 1310/4 1310/5 1310/7 1310/10 1310/11 1310/12 1310/19 1311/22 1311/24 1312/1 1312/3 1312/4 1312/5 1313/6 1313/9 1402/8 1404/3
**company's [1]** 1349/18
**comparing [4]** 1254/24 1255/7 1255/25 1256/3
**compelled [1]** 1209/15
**compelling [1]** 1292/24
**complain [2]** 1288/4 1293/20
**complained [4]** 1288/5 1288/6 1288/7 1339/6
**Complaint [1]** 1300/16
**complaints [1]** 1288/11
**completely [3]** 1264/17 1264/20 1330/8
**complex [4]** 1372/13 1372/14 1372/17 1397/2
**complexity [1]** 1363/15
**complicated [1]** 1367/8
**complied [1]** 1327/24
**complies [4]** 1290/5 1291/11 1415/13 1417/11
**computer [14]** 1193/25 1343/3 1343/4 1343/13 1343/13 1343/17 1343/21 1369/4 1415/18 1416/8 1417/13 1418/1 1421/24 1421/25
**computer-aided [1]** 1193/25
**computers [1]** 1415/10
**concept [1]** 1202/2
**concern [7]** 1207/24 1265/13 1265/18 1298/20 1411/24 1431/17 1431/23
**concerned [26]** 1199/13 1199/14 1223/3 1223/5 1223/19 1223/21 1226/10 1226/12 1227/10 1228/22 1228/23 1229/10 1229/11 1229/12 1229/13 1229/14 1238/22 1246/7 1249/18 1249/22 1249/24 1253/14 1323/2 1324/18 1339/21 1375/15
**concerning [1]** 1277/21
**concerns [9]** 1199/16 1212/2 1216/15 1229/8 1264/14 1265/17 1281/25 1286/13 1430/24
**conclusion [4]** 1209/13 1209/16 1209/25 1210/4
**condition [2]** 1412/16 1422/7
**conduct [1]** 1411/19
**conducted [7]** 1301/1 1399/11 1406/7 1412/13 1412/14 1413/19 1421/14
**conducting [2]** 1247/20 1411/17
**conducts [1]** 1385/7
**conference [5]** 1208/25 1221/1 1221/14 1327/1 1328/25
**conferences [2]** 1282/11 1320/14
**confided [1]** 1348/8
**confidentiality [1]** 1369/13
**confirm [2]** 1281/12 1313/7
**confirmed [1]** 1398/19
**confront [2]** 1228/1 1269/25
**confrontations [1]** 1266/25
**confuse [1]** 1381/20
**confused [2]** 1330/21 1348/5
**Congress [21]** 1308/10 1308/18 1312/24 1313/3 1313/5 1313/10 1313/12 1313/13 1316/14 1316/15 1317/10 1317/18 1317/23 1318/6 1318/15 1318/17 1319/2 1352/16 1363/13 1363/14 1423/9
**conjunction [1]** 1366/8
**connected [1]** 1392/10
**connection [5]** 1243/6 1288/24 1328/21 1350/18 1428/14
**connections [1]** 1330/6
**consent [5]** 1381/13 1381/17 1381/22 1382/8 1382/9
**consequences [1]** 1348/24
**consider [9]** 1208/20 1222/17 1239/9 1259/23 1260/3 1305/12 1347/22 1349/8 1425/2
**consideration [1]** 1347/8
**considered [1]** 1225/25
**consisted [1]** 1313/16
**consistent [2]** 1229/21 1237/5
**constant [2]** 1298/14 1323/22
**constantly [2]** 1298/10 1319/1
**Constitution [1]** 1332/11
**consultant [5]** 1316/18 1316/19 1317/11 1341/16 1365/2
**consultants [1]** 1365/3
**consulting [2]** 1314/9

C

**consulting... [1]** 1324/23
**contact [20]** 1218/14 1218/21 1232/13 1233/11 1233/13 1233/25 1261/20 1261/24 1269/4 1275/14 1282/15 1282/25 1284/1 1330/14 1330/16 1330/19 1331/23 1332/4 1352/14 1363/17
**contacting [2]** 1282/10 1353/8
**contain [2]** 1390/11 1411/4
**contained [3]** 1411/3 1414/3 1414/5
**contains [3]** 1356/4 1391/15 1412/20
**contended [1]** 1329/11
**contends [1]** 1324/5
**content [4]** 1250/5 1252/8 1269/7 1375/22
**contents [1]** 1356/4
**context [14]** 1199/22 1202/21 1207/21 1286/24 1332/21 1351/9 1359/11 1363/18 1364/6 1364/10 1367/18 1367/19 1369/12 1431/20
**continue [11]** 1198/7 1198/9 1209/2 1212/23 1249/2 1271/19 1321/17 1324/3 1418/5 1425/10 1425/11
**continued [18]** 1220/22 1221/15 1224/18 1225/1 1241/25 1272/1 1318/2 1320/19 1321/21 1326/4 1333/21 1353/9 1355/13 1356/1 1376/25 1387/5 1388/1 1427/24
**continues [2]** 1349/15 1351/10
**continuing [1]** 1263/3
**contract [4]** 1311/12 1402/11 1402/21 1405/3
**control [3]** 1244/23 1278/15 1310/7
**controlling [1]** 1310/6
**conversation [33]** 1214/4 1215/14 1216/5 1216/21 1216/22 1217/24 1220/6 1220/11 1220/13 1222/4 1222/8 1222/13 1223/1 1223/10 1226/8 1227/14 1227/17 1227/19 1227/21 1227/23 1230/1 1231/9 1231/10 1232/19 1236/15 1238/12 1239/25 1246/3 1246/6 1252/8 1284/7 1284/21 1332/7
**conversations [20]** 1213/1 1214/22 1215/2 1221/5 1222/12 1222/13 1227/16 1234/7 1250/6 1250/6 1250/21 1252/10 1283/13 1283/18 1283/25 1301/9 1301/9 1320/14 1338/7 1342/11
**convey [2]** 1202/14 1230/13
**conveying [3]** 1200/2 1201/5 1202/18
**conviction [1]** 1353/13
**convince [2]** 1370/14 1370/16
**cooperating [4]** 1426/13 1427/4 1427/9 1427/11
**cooperator [1]** 1376/20
**coordinator [1]** 1341/20
**copied [1]** 1342/23
**copy [2]** 1410/15 1411/4
**copying [1]** 1303/19
**corner [2]** 1394/7 1407/22
**corporate [4]** 1279/18 1312/6 1312/22 1391/13
**corporation [8]** 1279/20 1310/4 1323/10 1325/2 1341/14 1355/3 1428/24 1429/4
**Corporation's [1]** 1432/3
**corporations [1]** 1309/25
**correct [114]** 1199/3 1204/24 1212/17 1216/9 1217/15 1218/15 1223/23 1225/7 1226/19 1228/21 1230/23 1231/24 1232/13 1232/24 1233/14 1236/8 1236/18 1240/9 1241/13 1241/17 1249/10 1249/12 1249/16 1250/7 1250/19 1250/24 1252/1 1253/19 1255/10 1255/14 1255/17 1257/1 1257/4 1258/4 1262/24 1263/10 1274/18 1275/14 1276/4 1276/12 1277/17 1277/21 1277/23 1278/5 1279/3 1281/14 1285/14 1285/22 1290/6 1290/25 1291/4 1293/3 1296/3 1297/16 1346/22 1347/3 1355/7 1356/6 1357/13 1358/12 1368/9 1369/20 1369/24 1388/18 1391/5 1392/4 1392/20 1395/1 1395/24 1396/6 1396/18 1397/22 1398/4 1398/11 1398/20 1401/11 1402/1 1402/6 1403/23 1404/5 1404/11 1404/14 1404/18 1404/25 1405/25 1406/3 1406/25 1407/3 1407/4 1407/17 1407/20 1407/25 1408/16 1408/19 1409/2 1409/8 1409/11 1409/22 1410/1 1410/7 1410/8 1410/18 1411/4 1411/7 1414/7 1415/4 1415/9 1417/15 1417/18 1418/2 1418/12 1418/21 1419/9 1419/14
**correspondence [1]** 1324/13
**corresponding [1]** 1404/12
**cost [2]** 1288/6 1339/15
**couches [1]** 1415/2
**counsel [19]** 1281/2 1284/19 1285/24 1327/18 1355/4 1382/15 1426/19 1427/12 1428/8 1428/12 1428/25 1429/7 1430/2 1430/4 1430/7 1430/13 1431/1 1431/24 1432/1
**counter [1]** 1417/2
**countries [2]** 1313/19 1313/20
**country [5]** 1296/5 1296/5 1313/17 1313/18 1319/5
**county [2]** 1388/19 1388/21
**couple [6]** 1204/19 1214/23 1244/8 1303/5 1314/24 1341/13
**course [4]** 1243/20 1337/6 1425/7 1431/15
**Courthouse [1]** 1193/3
**courtroom [9]** 1198/3 1264/6 1271/16 1320/5 1321/15 1376/13 1383/20 1425/3 1425/17
**Covell [1]** 1327/4
**cover [2]** 1282/18 1424/1
**covered [3]** 1227/17 1428/18 1430/11
**CR [1]** 1193/2
**crafting [1]** 1294/16
**crash [1]** 1341/5
**crawl [1]** 1311/10
**cream [2]** 1225/17 1225/18
**create [1]** 1329/9
**created [4]** 1308/21 1313/13 1375/2 1430/12
**creative [1]** 1278/22
**credibility [1]** 1329/19
**crew [28]** 1253/19 1253/21 1257/8 1257/13 1258/6 1260/10 1261/5 1261/11 1262/1 1262/5 1262/12 1262/19 1262/24 1265/20 1265/23 1266/1 1266/3 1266/15 1266/23 1266/24 1272/9 1272/10 1272/16 1272/22 1273/19 1274/13 1305/3 1305/8
**crimes [3]** 1351/8 1357/24 1385/17
**criminal [3]** 1193/8 1356/10 1386/9
**criminally [1]** 1329/8
**critical [3]** 1199/7 1202/24 1212/10
**criticism [1]** 1199/10
**Crockett [1]** 1364/4
**cross [27]** 1198/8 1198/16 1207/2 1207/4 1224/19 1242/25 1243/1 1244/4 1248/18 1249/3 1262/23 1266/22 1267/11 1267/25 1268/4 1271/19 1272/1 1279/21 1293/1 1297/23 1321/9 1321/10 1328/11 1365/18 1365/19 1426/9 1429/25
**cross-examination [20]** 1198/8 1198/16 1207/2 1207/4 1224/19 1242/25 1243/1 1249/3 1266/22 1267/11 1267/25 1271/19 1272/1 1279/21 1293/1 1297/23 1328/11 1365/18 1365/19 1429/25
**cross-examining [1]** 1268/4
**crossed [1]** 1354/6
**crying [1]** 1303/3

**C**

**CSR [1]** 1193/23
**cull [2]** 1396/5 1398/2
**cull-out [1]** 1398/2
**culled [1]** 1400/2
**cult [3]** 1282/2 1337/11 1371/3
**cults [1]** 1351/22
**Cultural [3]** 1295/12 1295/16 1296/7
**culture [2]** 1296/6 1296/10
**cure [2]** 1269/16 1269/20
**cures [1]** 1267/16
**curing [2]** 1267/20 1270/3
**curious [2]** 1430/9 1430/10
**current [1]** 1277/4
**cursory [1]** 1421/2
**cut [2]** 1265/14 1351/4

**D**

**dad [2]** 1348/6 1358/15
**daily [2]** 1250/9 1296/14
**Dalai [6]** 1324/20 1329/7 1329/25 1332/22 1358/19 1359/12
**damage [1]** 1356/9
**damaged [4]** 1244/20 1245/23 1249/7 1250/1
**damages [2]** 1295/1 1295/5
**DANELCZYK [1]** 1193/23
**danger [7]** 1223/6 1227/11 1227/13 1228/17 1228/21 1229/2 1229/5
**dangerous [1]** 1261/22
**Daniella [6]** 1405/10 1405/11 1405/13 1405/13 1405/18 1405/19
**DANIELLE [4]** 1193/21 1290/22 1291/10 1291/12
**date [19]** 1198/25 1199/3 1199/4 1217/23 1220/17 1233/2 1233/4 1234/1 1347/19 1358/5 1358/7 1401/25 1409/14 1410/20 1411/1 1411/10 1412/2 1412/22 1413/7
**dated [15]** 1345/5 1346/1 1347/5 1348/4 1355/5 1355/6 1357/17 1358/9 1361/10 1403/2 1403/3 1404/1 1404/14 1405/17 1409/15
**dates [2]** 1236/25 1375/5
**daughter [4]** 1223/3 1223/22 1372/17 1374/10
**daughter's [1]** 1322/10
**daughters [5]** 1322/9 1337/16 1340/11 1340/11 1360/25
**David [2]** 1355/1 1423/3
**De [2]** 1409/5 1409/6
**deal [4]** 1276/22 1292/8 1292/21 1341/15
**dealing [2]** 1353/12 1428/21
**dealings [2]** 1372/23 1373/9
**deals [2]** 1276/19 1276/24
**death [6]** 1210/11 1210/13 1210/16 1211/23 1352/22 1375/23
**debate [3]** 1246/17 1247/15 1247/17
**debilitating [1]** 1293/21
**Debra [1]** 1221/5
**debunked [1]** 1351/12
**deceased [1]** 1319/7
**December [11]** 1240/3 1309/2 1345/2 1345/5 1345/14 1356/5 1357/17 1358/9 1359/15 1359/15 1359/15
**December 15th [3]** 1358/9 1359/15 1359/15
**December 1972 [1]** 1309/2
**December 2008 [1]** 1345/14
**December 4 [2]** 1345/5 1356/5
**December 5th [1]** 1240/3
**December 6 [2]** 1345/2 1357/17
**December 6th [1]** 1359/15
**decide [2]** 1210/12 1270/4
**decided [6]** 1216/8 1229/9 1229/18 1238/17 1276/23 1339/1
**decision [4]** 1208/16 1317/14 1429/18 1429/21
**decisions [1]** 1278/22
**decline [1]** 1374/1
**Decrescenzo [1]** 1404/21
**deduce [1]** 1234/9
**deed [3]** 1403/21 1408/25 1408/25
**deeding [2]** 1404/9 1408/25
**deems [1]** 1430/2
**deep [1]** 1281/25
**deeply [4]** 1223/2 1342/14 1349/22 1350/6
**defend [1]** 1294/18
**defendant [24]** 1193/7 1193/16 1264/19 1264/25 1265/3 1265/15 1267/10 1286/4 1286/7 1286/24 1287/5 1293/25 1294/2 1294/6 1297/9 1300/10 1301/11 1301/16 1367/12 1386/10 1418/14 1419/19 1427/13 1427/16
**defendant's [2]** 1267/9 1289/16
**Defendant's 328 [1]** 1289/16
**defended [1]** 1350/2
**defense [25]** 1243/20 1259/4 1266/7 1267/24 1281/2 1284/19 1285/4 1285/5 1285/24 1302/1 1309/12 1311/8 1315/4 1328/4 1350/18 1351/7 1381/23 1382/15 1428/11 1428/14 1428/15 1428/19 1428/22 1429/14 1431/21
**Defense Exhibit 302 [1]** 1302/1
**deference [1]** 1300/22
**definitely [2]** 1275/3 1276/17
**degree [4]** 1308/1 1332/13 1338/25 1342/1
**delineate [2]** 1381/17 1432/1
**deliver [1]** 1228/2
**delivered [1]** 1230/21
**delivering [1]** 1261/21
**demonstrated [1]** 1354/5
**den [2]** 1414/17 1414/25
**denied [1]** 1330/18
**department [12]** 1239/24 1240/9 1240/18 1243/15 1256/8 1256/11 1265/2 1309/15 1311/10 1352/10 1409/21 1409/24
**departments [1]** 1309/15
**depict [4]** 1390/20 1391/6 1392/1 1398/25
**depicted [4]** 1277/23 1277/24 1392/21 1416/7
**depiction [1]** 1264/15
**depicts [1]** 1399/1
**deprogram [2]** 1287/9 1287/12
**depth [2]** 1421/9 1421/13
**deputized [1]** 1385/9
**DerOHANNESIAN [3]** 1193/19 1193/19 1193/20
**describe [30]** 1205/7 1215/20 1265/19 1287/22 1307/14 1311/18 1318/21 1333/11 1390/5 1392/5 1392/6 1392/12 1394/18 1396/23 1397/13 1401/6 1401/14 1405/23 1406/9 1411/17 1412/6 1413/17 1414/8 1414/24 1418/6 1418/22 1419/18 1420/7 1420/10 1420/16
**described [1]** 1232/11
**describes [1]** 1390/7
**describing [3]** 1216/4 1375/15 1397/25
**description [2]** 1401/7 1417/2
**designated [1]** 1385/6
**designed [2]** 1293/14 1293/19
**Desktop [2]** 1343/15 1343/16
**destroy [2]** 1214/9 1349/12
**destruction [1]** 1266/5
**detail [1]** 1308/25
**detailed [1]** 1207/6
**details [1]** 1284/4
**detective [2]** 1354/1 1354/10
**developed [1]** 1265/13
**developer [1]** 1368/4
**development [2]** 1364/2 1368/4
**devices [4]** 1415/22 1415/25 1416/2 1417/17
**diary [1]** 1343/21
**diatribe [1]** 1289/12
**Diaz [6]** 1427/17 1428/4 1428/12 1428/17 1430/6 1431/7
**DiCrescenzo [2]** 1400/13 1400/22
**DiCrescenzo's [1]** 1400/15
**die [4]** 1210/11 1210/13 1210/15 1375/19
**died [4]** 1310/5 1322/3 1362/24 1375/25
**difference [1]** 1332/9
**different [19]** 1214/7 1214/10 1232/8 1252/16 1274/3 1274/7 1274/10 1289/1

**D**

**different... [11]** 1293/9
1307/22 1323/19 1339/13
1349/13 1372/16 1382/10
1388/16 1407/20 1420/9
1421/7
**difficult [2]** 1281/24
1373/20
**difficulties [1]** 1324/19
**difficulty [1]** 1325/11
**dig [1]** 1342/13
**digits [1]** 1219/24
**dignity [1]** 1281/23
**diner [1]** 1411/22
**diplomat [1]** 1319/18
**direct [30]** 1202/7 1202/8
1213/5 1244/5 1247/20
1248/18 1262/23 1267/3
1267/5 1267/15 1268/8
1268/13 1268/22 1269/1
1269/8 1279/21 1294/13
1307/5 1321/21 1355/14
1366/5 1366/17 1369/1
1376/15 1384/13 1387/6
1411/8 1426/6 1427/4 1429/24
**directing [2]** 1200/21 1201/1
**directions [1]** 1410/5
**directly [8]** 1257/12 1312/15
1318/14 1340/5 1340/19
1366/15 1414/17 1420/14
**director [1]** 1316/17
**director's [2]** 1272/25
1272/25
**disagreements [1]** 1324/21
**disappointing [1]** 1374/24
**disappointment [1]** 1375/3
**disclosed [2]** 1429/13
1431/20
**Disclosure [1]** 1403/5
**discontinuance [1]** 1317/3
**discovery [1]** 1299/18
**discretion [1]** 1332/13
**discuss [10]** 1264/8 1289/4
1320/9 1323/8 1357/4 1371/10
1388/14 1424/15 1425/22
1427/12
**discussed [14]** 1211/15
1214/23 1297/12 1322/24
1349/5 1356/17 1356/21
1356/25 1357/12 1373/14
1411/23 1411/25 1425/7
1428/14
**discusses [1]** 1313/3
**discussing [5]** 1206/14
1233/17 1283/16 1297/9
1327/16
**discussion [6]** 1269/4 1270/6
1286/9 1286/18 1286/24
1429/2
**discussions [4]** 1250/23
1253/12 1286/6 1430/12
**disk [2]** 1413/14 1413/15
**disks [1]** 1413/14
**disparity [1]** 1199/14
**dispute [1]** 1368/11
**dissatisfied [1]** 1339/19
**distress [1]** 1337/24

**distressed [1]** 1338/6
**distributed [2]** 1328/8
1328/20
**DISTRICT [11]** 1193/1 1193/1
1193/9 1193/12 1236/19
1236/20 1236/21 1249/11
1249/13 1294/8 1337/21
**ditch [1]** 1259/22
**division [1]** 1312/2
**do-gooder [1]** 1243/6
**doctor [1]** 1372/4
**document [42]** 1199/23
1200/16 1202/12 1204/20
1237/20 1237/23 1238/2
1238/5 1238/9 1253/15
1260/12 1308/17 1328/19
1328/22 1344/3 1344/5
1344/14 1344/16 1344/24
1345/10 1345/11 1345/17
1346/6 1401/1 1401/3 1401/6
1401/21 1402/11 1403/2
1403/3 1403/4 1403/10
1403/19 1404/7 1404/9 1405/1
1405/15 1408/23 1409/14
1409/18 1409/20 1412/15
**documentaries [2]** 1281/15
1281/16
**documentary [6]** 1278/20
1281/2 1281/7 1281/14
1281/22 1291/18
**documenting [1]** 1253/12
**documents [20]** 1325/17
1325/22 1328/8 1328/8
1331/19 1382/24 1400/12
1400/14 1400/22 1400/25
1404/21 1413/7 1417/22
1417/23 1417/25 1420/6
1420/10 1420/15 1420/19
1421/11
**dog [1]** 1415/17
**dollar [3]** 1315/1 1325/16
1325/21
**domestic [1]** 1404/2
**don't recall [1]** 1304/22
**done [26]** 1199/25 1200/3
1200/5 1204/21 1210/22
1214/3 1244/6 1244/18
1248/19 1271/3 1272/6
1277/12 1277/13 1277/14
1277/16 1277/19 1302/6
1313/24 1316/23 1317/15
1325/18 1332/15 1347/10
1356/10 1362/17 1399/17
**donor [1]** 1361/2
**door [18]** 1228/15 1229/6
1242/11 1245/11 1375/11
1393/16 1394/11 1394/23
1396/10 1397/8 1398/3 1407/9
1407/11 1407/14 1414/10
1414/16 1420/13 1420/19
**doors [3]** 1414/22 1415/5
1419/23
**DOS [16]** 1229/22 1236/8
1242/10 1250/19 1283/5
1283/6 1289/23 1290/1 1290/3
1291/12 1300/17 1300/19
1300/21 1300/23 1301/12
1301/16

**double [1]** 1419/23
**down [27]** 1200/15 1200/15
1206/10 1231/4 1243/6 1244/5
1244/6 1244/7 1245/3 1264/7
1264/9 1274/9 1289/14 1294/4
1305/19 1309/1 1311/9 1320/8
1338/2 1340/3 1356/9 1374/23
1376/7 1414/13 1414/16
1417/6 1425/20
**draft [7]** 1308/8 1308/11
1308/12 1308/14 1308/19
1308/25 1309/1
**drafting [1]** 1327/17
**dramatically [1]** 1375/23
**draw [2]** 1290/3 1291/10
**dress [1]** 1302/17
**drink [1]** 1302/3
**drive [29]** 1388/8 1391/8
1396/13 1396/16 1396/16
1396/17 1396/24 1397/3
1397/6 1399/20 1399/24
1400/1 1400/2 1400/23 1401/8
1401/9 1401/12 1401/14
1402/5 1402/17 1403/21
1404/3 1404/9 1404/24 1405/7
1407/24 1408/3 1408/6
1411/23
**driveway [1]** 1395/15
**drop [1]** 1293/15
**drove [1]** 1339/15
**duly [3]** 1198/14 1306/20
1384/4
**duplication [4]** 1299/8
1303/15 1303/19 1303/20
**DuPont [3]** 1310/18 1310/18
1311/2
**duration [3]** 1304/13 1310/18
1312/8
**duty [1]** 1241/21
**dwell [1]** 1208/21
**dwelling [1]** 1207/24
**dying [1]** 1211/23

**E**

**e-mail [21]** 1342/23 1344/18
1345/1 1345/4 1345/19 1346/8
1346/21 1347/12 1348/4
1348/11 1348/19 1349/3
1349/4 1349/7 1354/16
1354/17 1354/20 1355/5
1410/10 1410/15 1424/23
**e-mails [5]** 1344/7 1344/8
1344/10 1345/13 1346/24
**eager [1]** 1337/7
**early [7]** 1242/17 1286/11
1310/22 1342/19 1343/9
1352/22 1371/1
**earned [1]** 1310/17
**easier [1]** 1315/2
**East [1]** 1193/12
**EASTERN [3]** 1193/1 1193/12
1215/25
**easy [1]** 1386/3
**eating [1]** 1296/5
**Edgar [94]** 1309/25 1310/2
1310/3 1310/5 1310/19 1311/3
1312/15 1312/17 1312/20
1314/10 1315/2 1315/23

**E**

**Edgar... [82]** 1316/13 1316/15 1317/7 1318/5 1318/9 1318/14 1318/18 1318/21 1318/22 1319/7 1319/12 1319/21 1321/24 1322/19 1322/24 1323/5 1323/15 1324/13 1324/13 1324/25 1325/1 1325/2 1325/2 1330/10 1331/10 1333/14 1337/6 1337/23 1338/3 1338/5 1338/6 1338/21 1338/24 1339/6 1339/9 1339/21 1339/25 1340/7 1340/22 1341/2 1341/11 1341/19 1341/24 1342/23 1343/2 1345/19 1346/9 1347/25 1348/1 1350/5 1352/7 1352/11 1352/12 1354/9 1358/19 1359/25 1360/8 1360/24 1361/1 1361/6 1361/10 1362/6 1362/8 1364/14 1364/15 1367/20 1368/13 1369/19 1370/16 1370/16 1370/19 1370/19 1370/20 1371/2 1371/11 1371/12 1371/18 1372/1 1372/1 1373/25 1374/15 1422/18
**Edgar's [6]** 1317/25 1322/23 1355/2 1361/2 1371/11 1371/14
**edified [1]** 1201/7
**edify [2]** 1201/7 1294/20
**editing [3]** 1233/18 1299/3 1303/18
**educational [3]** 1201/18 1211/15 1298/6
**effect [15]** 1199/19 1221/7 1222/15 1222/19 1225/22 1226/1 1229/3 1232/19 1239/6 1239/11 1242/18 1243/18 1245/11 1264/13 1431/19
**effected [1]** 1354/9
**effective [1]** 1351/14
**effects [1]** 1265/9
**efficiency [2]** 1354/13 1361/18
**effort [1]** 1260/12
**efforts [1]** 1253/15
**eight [1]** 1367/16
**either [4]** 1327/15 1354/7 1371/10 1431/20
**elect [1]** 1313/22
**elected [5]** 1308/21 1317/19 1317/20 1318/9 1363/20
**election [1]** 1309/21
**electronic [4]** 1415/21 1415/25 1416/1 1417/17
**electronics [1]** 1415/16
**elicit [2]** 1242/12 1245/6
**elicited [3]** 1214/7 1242/13 1429/24
**Eliot [5]** 1363/9 1363/10 1363/16 1363/20 1424/9
**Elmo [3]** 1400/4 1408/20 1422/10
**email [25]** 1193/24 1251/1 1254/4 1254/9 1254/12 1254/19 1256/6 1256/14 1256/14 1257/7 1356/5 1356/8 1357/11 1357/15 1357/17 1358/9 1358/13 1359/25 1360/2 1360/9 1360/10 1360/25 1361/9 1361/12 1362/5
**emails [2]** 1357/12 1359/14
**embedded [1]** 1285/13
**emotional [1]** 1215/6
**employed [1]** 1311/16
**employer [1]** 1323/7
**EMs [2]** 1201/18 1201/22
**encouraging [1]** 1331/15
**endorsed [1]** 1308/20
**enemies [2]** 1305/14 1348/17
**enemy [2]** 1333/16 1348/13
**energy [1]** 1216/1
**enforcement [3]** 1282/19 1298/4 1387/1
**Englemore [8]** 1391/10 1408/8 1408/10 1408/12 1408/14 1408/18 1409/1 1410/3
**Englemore Road [6]** 1391/10 1408/8 1408/10 1408/12 1408/18 1409/1
**enjoy [1]** 1228/3
**enlightenment [4]** 1205/9 1214/18 1286/1 1286/4
**enroll [4]** 1200/7 1200/8 1253/7 1253/8
**enrollments [1]** 1297/15
**enter [3]** 1412/11 1414/10 1419/5
**entered [3]** 1306/8 1317/1 1428/11
**entering [2]** 1373/25 1412/10
**enters [4]** 1198/3 1271/16 1321/15 1383/20
**entire [7]** 1199/9 1212/12 1260/1 1260/3 1266/7 1295/9 1381/16
**entirely [1]** 1291/6
**entity [4]** 1205/8 1349/25 1362/1 1409/25
**entrance [4]** 1392/23 1394/23 1397/19 1398/1
**environment [1]** 1266/16
**EPS [1]** 1216/9
**equipment [1]** 1417/10
**erased [1]** 1232/9
**ESP [6]** 1202/14 1254/5 1302/9 1337/6 1370/20 1370/21
**especially [2]** 1242/24 1329/9
**ESQ [4]** 1193/17 1193/18 1193/20 1193/21
**essence [12]** 1201/17 1212/5 1214/12 1282/18 1293/21 1295/22 1297/20 1298/12 1354/20 1355/9 1356/24 1359/18
**essentially [4]** 1309/18 1357/9 1361/22 1416/5
**establish [10]** 1221/6 1242/24 1243/10 1243/18 1245/9 1267/14 1267/16 1267/24 1319/12 1329/18
**estate [9]** 1338/17 1339/2 1340/16 1367/25 1400/16 1400/18 1402/12 1402/21 1405/4
**et [2]** 1352/10 1359/8
**Europe [3]** 1287/25 1312/2 1313/13
**Europeans [1]** 1319/1
**evaluate [2]** 1338/6 1338/7
**evening [2]** 1302/9 1425/22
**event [8]** 1259/18 1259/20 1259/21 1284/8 1304/5 1352/16 1358/15 1358/20
**events [2]** 1234/10 1260/8
**eventually [2]** 1289/13 1351/8
**evidence [47]** 1209/14 1209/15 1209/18 1209/19 1209/20 1247/21 1247/23 1268/19 1303/12 1306/5 1306/8 1306/11 1306/14 1346/15 1346/17 1346/19 1347/9 1349/11 1349/18 1351/16 1360/13 1381/11 1381/16 1383/12 1389/25 1400/8 1403/17 1404/6 1408/22 1409/16 1410/12 1410/22 1412/1 1412/15 1412/17 1416/3 1416/13 1416/13 1416/14 1416/19 1417/3 1417/8 1417/19 1420/20 1421/20 1422/2 1422/3
**evolving [1]** 1337/5
**exact [12]** 1214/1 1220/17 1227/8 1227/12 1229/13 1234/1 1235/17 1235/19 1236/24 1245/19 1277/15 1287/24
**exactly [10]** 1212/5 1215/24 1229/4 1235/18 1240/24 1258/18 1276/17 1284/20 1325/20 1348/22
**examination [41]** 1198/8 1198/16 1207/2 1207/4 1213/5 1224/19 1242/25 1243/1 1249/3 1266/22 1267/11 1267/15 1267/25 1268/8 1268/13 1268/22 1269/2 1269/8 1271/19 1272/1 1279/21 1280/21 1293/1 1297/23 1303/7 1307/5 1321/17 1321/21 1328/11 1356/1 1365/18 1365/19 1366/5 1366/17 1369/2 1373/1 1374/8 1384/13 1388/1 1427/4 1429/25
**examined [3]** 1198/14 1306/21 1384/4
**examining [1]** 1268/4
**example [2]** 1201/22 1243/13
**except [3]** 1298/17 1319/5 1325/20
**exception [1]** 1325/3
**Exceptionally [1]** 1287/24
**exchange [2]** 1229/23 1297/15

E

**excited [1]** 1298/19
**excluding [1]** 1213/14
**excuse [3]** 1202/18 1367/13 1369/25
**excused [5]** 1305/18 1351/9 1376/6 1376/10 1425/25
**excuses [1]** 1202/20
**executed [2]** 1410/6 1411/12
**executing [1]** 1412/8
**execution [3]** 1386/24 1411/9 1412/2
**executive [21]** 1198/24 1199/8 1200/2 1200/9 1201/3 1202/17 1202/19 1202/24 1202/25 1207/11 1207/16 1207/20 1210/20 1212/15 1212/20 1213/22 1301/9 1312/7 1312/18 1316/17 1407/10
**Executive Success Programs [1]** 1407/10
**exerting [1]** 1265/20
**exhibit [52]** 1219/5 1219/12 1219/13 1259/4 1302/1 1306/6 1306/6 1306/7 1306/10 1306/13 1344/2 1344/14 1344/22 1345/8 1345/17 1346/5 1346/12 1346/16 1346/18 1349/2 1357/9 1382/12 1382/16 1382/17 1382/17 1382/18 1389/21 1389/25 1390/20 1396/22 1400/8 1400/9 1400/21 1401/2 1401/22 1402/10 1403/4 1403/18 1404/7 1405/2 1409/17 1410/13 1410/21 1410/23 1411/2 1411/3 1412/18 1412/20 1416/23 1417/20 1417/23 1421/20
**Exhibit 1002 [1]** 1306/7
**Exhibit 1399 [1]** 1382/17
**Exhibit 1401 [1]** 1382/17
**Exhibit 1463 [1]** 1382/18
**Exhibit 176 [3]** 1382/12 1389/25 1390/20
**Exhibit 204 [1]** 1382/16
**Exhibit 341 [1]** 1259/4
**Exhibit 365 [2]** 1400/8 1400/9
**Exhibit 368 [1]** 1404/7
**exhibits [5]** 1343/23 1346/14 1354/12 1381/23 1426/22
**exit [1]** 1412/16
**exiting [1]** 1212/16
**exits [6]** 1264/6 1305/22 1320/5 1376/13 1425/17 1426/1
**expect [3]** 1207/2 1277/9 1277/12
**expected [1]** 1277/6
**expensive [1]** 1355/11
**experience [7]** 1206/21 1216/7 1234/19 1248/8 1249/16 1268/18 1338/5
**experienced [1]** 1214/13
**experiences [5]** 1236/8 1236/11 1364/14 1364/17 1372/21
**experiencing [4]** 1214/14 1215/3 1215/19 1292/18
**expert [1]** 1323/9
**Expiration [1]** 1201/18
**explain [12]** 1283/18 1286/9 1298/2 1318/20 1386/1 1390/24 1393/21 1395/7 1397/14 1397/18 1416/10 1419/21
**explained [4]** 1215/11 1296/1 1332/12 1332/14
**explaining [1]** 1215/17
**explanation [1]** 1283/25
**Explicitly [1]** 1330/7
**explore [1]** 1207/12
**expressed [4]** 1264/14 1348/2 1348/25 1374/25
**expressing [2]** 1199/10 1212/18
**expression [1]** 1349/24
**extend [1]** 1329/6
**extensive [2]** 1207/4 1328/6
**extent [4]** 1222/18 1225/25 1239/10 1429/9
**exterior [2]** 1412/10 1413/18
**extraction [1]** 1299/15
**extremely [2]** 1260/1 1424/14

F

**F-O-N-T-A-N-E-L-L-I [1]** 1384/10
**face [1]** 1266/18
**Facebook [1]** 1424/25
**facilitate [2]** 1283/1 1353/13
**facility [1]** 1288/14
**fact [21]** 1209/17 1241/1 1241/8 1255/16 1284/5 1284/11 1300/13 1305/11 1323/9 1323/23 1325/21 1328/15 1337/6 1358/22 1361/2 1361/3 1362/1 1368/18 1374/22 1374/23 1383/7
**factor [1]** 1207/6
**facts [4]** 1349/16 1374/20 1374/21 1375/6
**fail [1]** 1349/15
**fair [47]** 1199/7 1202/13 1202/24 1208/14 1209/8 1209/17 1212/14 1218/21 1221/10 1223/17 1223/19 1230/7 1230/14 1230/18 1233/11 1234/6 1236/6 1236/10 1242/24 1243/3 1247/6 1247/12 1249/14 1250/11 1252/9 1265/4 1270/2 1272/11 1272/15 1272/23 1275/11 1275/19 1277/9 1278/23 1278/24 1338/9 1341/6 1354/15 1354/18 1357/1 1369/23 1370/19 1371/11 1372/13 1372/18 1381/8 1391/2
**fairly [6]** 1199/7 1237/20 1249/9 1250/21 1342/25 1390/20
**Falk [1]** 1424/5
**fall [3]** 1316/1 1316/16 1317/21
**fallout [1]** 1288/19
**false [1]** 1349/17
**familiar [16]** 1273/19 1363/23 1364/1 1386/9 1388/3 1390/2 1390/4 1400/9 1403/18 1404/7 1408/23 1409/17 1410/13 1410/23 1412/19 1421/20
**familiarize [1]** 1199/24
**families [3]** 1287/25 1287/25 1372/15
**family [10]** 1310/6 1319/19 1321/24 1323/17 1325/1 1340/23 1342/4 1353/6 1392/15 1424/16
**fancy [3]** 1295/19 1295/20 1295/21
**far [14]** 1199/18 1200/3 1200/5 1207/7 1216/14 1238/18 1241/22 1282/19 1290/10 1316/9 1375/14 1395/14 1396/9 1418/25
**fashion [1]** 1329/3
**fat [1]** 1290/5
**father [27]** 1310/4 1337/4 1341/21 1342/17 1353/8 1353/10 1362/19 1362/23 1363/1 1363/1 1363/3 1366/23 1369/19 1370/14 1371/8 1371/14 1371/18 1372/7 1372/8 1372/9 1372/15 1372/17 1373/4 1374/2 1374/11 1375/18 1375/25
**father's [1]** 1307/18
**FBI [62]** 1233/25 1234/8 1234/13 1234/22 1235/4 1235/8 1235/10 1235/14 1235/23 1236/7 1236/10 1236/16 1236/17 1236/20 1236/21 1237/2 1237/8 1237/13 1237/15 1238/7 1240/2 1240/8 1240/17 1244/19 1244/21 1244/21 1244/22 1245/2 1245/4 1245/5 1245/7 1245/13 1245/17 1245/22 1245/23 1245/24 1246/1 1249/6 1249/9 1249/12 1249/15 1249/19 1249/23 1249/25 1282/10 1282/15 1282/24 1282/25 1283/7 1283/11 1284/2 1284/5 1385/7 1385/10 1385/13 1385/14 1386/2 1386/5 1386/8 1415/15 1415/24 1417/16
**fear [3]** 1207/16 1216/17 1230/14
**fearful [1]** 1356/9
**federal [3]** 1384/22 1385/7 1385/9
**feedback [8]** 1293/1 1293/4 1293/9 1293/13 1293/25 1294/2 1294/5 1294/6
**feet [2]** 1317/17 1407/13
**fellow [1]** 1424/17
**felt [14]** 1210/6 1214/17

**F**

**felt... [12]** 1216/15 1228/20 1228/21 1230/8 1230/9 1280/1 1289/6 1304/19 1319/23 1332/2 1340/14 1373/11
**fence [2]** 1285/12 1285/13
**festival [13]** 1262/24 1263/1 1263/10 1269/5 1272/24 1273/1 1273/3 1273/11 1273/13 1273/18 1276/4 1276/5 1276/7
**few [19]** 1209/12 1240/4 1262/23 1267/6 1279/21 1291/23 1298/18 1303/9 1318/18 1321/23 1337/17 1353/1 1353/4 1354/12 1362/16 1365/21 1366/2 1400/25 1407/13
**fiction [1]** 1278/8
**field [3]** 1385/14 1416/3 1417/7
**fighting [1]** 1293/16
**figure [6]** 1208/8 1278/9 1289/6 1356/16 1360/21 1366/22
**figured [2]** 1269/15 1269/20
**Fiji [6]** 1287/14 1288/25 1304/6 1304/14 1304/18 1304/24
**file [10]** 1422/12 1422/13 1422/16 1422/19 1422/21 1422/23 1422/25 1423/2 1423/4 1423/24
**fill [1]** 1274/13
**filled [2]** 1266/16 1413/14
**film [68]** 1211/14 1252/17 1253/10 1253/18 1253/21 1257/7 1257/8 1257/11 1257/13 1258/6 1259/2 1260/10 1260/14 1260/15 1260/16 1260/18 1260/18 1261/5 1261/11 1262/1 1262/5 1262/12 1262/19 1262/24 1262/24 1263/1 1263/3 1263/9 1263/9 1264/12 1264/14 1264/15 1265/20 1265/22 1265/25 1266/1 1266/2 1266/15 1267/13 1268/3 1268/6 1268/6 1269/5 1272/9 1272/10 1272/16 1272/22 1272/24 1273/1 1273/3 1273/13 1273/18 1273/19 1273/23 1274/2 1276/4 1276/5 1276/7 1277/23 1281/2 1281/7 1291/18 1291/19 1291/21 1292/9 1305/3 1305/8 1305/10
**filming [1]** 1258/10
**filmmaker [12]** 1251/25 1252/19 1253/1 1263/3 1263/5 1263/6 1268/5 1269/4 1278/2 1278/4 1281/14 1281/15
**films [1]** 1281/19
**finance [1]** 1316/21
**finances [1]** 1279/8
**financial [1]** 1317/15
**fine [11]** 1239/18 1246/2 1246/4 1246/4 1246/8 1246/23 1247/24 1250/4 1369/17 1375/13 1381/21
**finger [3]** 1394/5 1394/10 1397/4
**finish [5]** 1209/16 1246/10 1375/8 1375/11 1375/12
**fired [1]** 1324/8
**firm [1]** 1323/8
**first [48]** 1198/14 1200/14 1219/18 1220/13 1221/12 1223/11 1223/20 1223/25 1233/23 1233/24 1234/8 1235/24 1237/21 1238/3 1239/25 1252/24 1259/10 1264/24 1267/4 1287/7 1299/7 1299/8 1306/20 1308/7 1312/6 1312/16 1315/13 1317/11 1322/8 1322/17 1323/19 1341/17 1344/7 1344/15 1344/23 1345/11 1345/21 1349/2 1354/13 1354/15 1356/5 1363/24 1366/11 1384/3 1386/12 1413/3 1413/14 1422/8
**five [16]** 1217/4 1217/6 1250/15 1272/5 1290/2 1308/18 1311/22 1315/17 1322/1 1322/4 1322/5 1322/8 1366/3 1370/2 1370/4 1370/5
**fix [5]** 1309/8 1312/4 1312/4 1356/9 1360/11
**fixes [3]** 1199/17 1200/3 1200/4
**fixing [2]** 1312/18 1341/9
**flak [1]** 1292/20
**flat [2]** 1338/25 1362/25
**flew [1]** 1276/13
**Flintlock [7]** 1395/6 1395/9 1395/18 1395/21 1396/1 1396/7 1396/9
**Flintlock Lane [4]** 1395/6 1395/18 1395/21 1396/9
**floor [3]** 1193/16 1420/14 1422/4
**focus [2]** 1204/17 1386/20
**focusing [1]** 1207/24
**folder [10]** 1422/13 1422/16 1422/19 1422/21 1422/23 1422/25 1423/2 1423/4 1423/24 1424/3
**folders [4]** 1420/25 1421/4 1421/6 1422/12
**folks [1]** 1272/10
**follow [4]** 1223/10 1292/13 1325/8 1424/15
**followed [1]** 1251/22
**followers [1]** 1208/1
**following [6]** 1242/1 1267/4 1298/7 1300/22 1320/6 1425/18
**follows [3]** 1198/15 1306/21 1384/4
**followup [1]** 1232/13
**Fontanelli [11]** 1383/25 1384/3 1384/9 1384/15 1385/25 1389/17 1390/3 1413/9 1416/17 1417/9 1421/19
**food [2]** 1288/5 1296/5
**foot [1]** 1386/3
**footage [3]** 1260/23 1260/23 1261/2
**Forbes [12]** 1337/13 1342/7 1354/22 1356/21 1357/4 1362/18 1362/21 1363/2 1363/3 1414/3 1414/5 1423/19
**forbid [1]** 1294/4
**force [8]** 1297/24 1298/4 1308/20 1309/7 1384/22 1384/24 1385/6 1385/11
**Ford [2]** 1308/3 1309/19
**foreign [2]** 1313/1 1318/24
**forestall [1]** 1266/7
**forgot [1]** 1317/3
**form [10]** 1292/2 1294/25 1295/7 1301/13 1302/21 1339/22 1360/18 1403/5 1405/3 1424/19
**formal [1]** 1317/9
**formalize [1]** 1325/9
**formally [1]** 1254/5
**former [1]** 1323/7
**forth [3]** 1345/1 1346/24 1413/4
**Fortune [1]** 1357/4
**Forums [1]** 1301/6
**forward [5]** 1208/5 1240/4 1277/17 1277/20 1345/9
**forwards [1]** 1205/15
**fostering [1]** 1300/21
**foundation [1]** 1341/19
**founded [1]** 1310/4
**founder [3]** 1361/3 1363/1 1363/3
**four [13]** 1200/14 1250/14 1291/8 1315/1 1316/19 1317/9 1317/11 1322/5 1322/8 1323/19 1353/18 1357/8 1385/23
**fourth [3]** 1322/2 1322/9 1341/17
**frame [3]** 1340/25 1342/5 1342/6
**Franca [2]** 1400/13 1400/15
**Franco [1]** 1299/24
**Frank [21]** 1238/12 1238/19 1239/4 1239/23 1241/1 1241/7 1241/8 1250/7 1250/14 1365/22 1366/5 1366/14 1367/5 1367/10 1367/12 1367/20 1368/4 1368/9 1368/21 1368/23 1423/1
**frankly [4]** 1207/2 1208/4 1332/2 1365/3
**free [1]** 1351/12
**Freedman [1]** 1423/21
**Freedom [1]** 1352/12
**French [1]** 1414/22
**frequent [6]** 1218/14 1218/17 1218/18 1218/20 1218/22 1283/18
**frequently [3]** 1342/8 1353/2 1386/15
**friend [4]** 1238/22 1252/25 1341/16 1348/13
**friendly [3]** 1223/22 1223/24

F

**friendly... [1]** 1315/25
**friends [10]** 1233/20 1233/21 1233/22 1233/23 1252/22 1252/23 1252/23 1252/24 1348/16 1424/16
**front [11]** 1210/10 1210/16 1244/16 1290/23 1399/2 1407/9 1407/13 1407/14 1414/10 1414/16 1420/13
**frustrated [1]** 1343/10
**FS7 [1]** 1257/18
**full [10]** 1217/16 1304/9 1304/12 1306/25 1315/17 1384/7 1401/16 1410/15 1411/4 1412/23
**functions [1]** 1319/18
**fund [1]** 1342/25
**funded [2]** 1342/18 1342/20
**funding [3]** 1342/24 1360/14 1362/1
**funds [2]** 1361/18 1361/23
**funeral [2]** 1371/22 1371/24
**furthering [1]** 1260/13

G

**gain [6]** 1263/16 1263/18 1266/2 1272/16 1273/15 1360/22
**game [1]** 1270/2
**gamed [1]** 1347/22
**garage [5]** 1393/16 1400/3 1413/20 1413/22 1413/23
**GARAUFIS [1]** 1193/8
**garden [3]** 1295/12 1392/9 1393/25
**Gardens [3]** 1295/16 1296/7 1296/11
**Garza [3]** 1203/20 1295/24 1297/3
**gas [2]** 1310/12 1310/13
**gathering [1]** 1282/16
**general [16]** 1295/4 1316/3 1316/23 1317/12 1317/19 1317/22 1330/24 1331/8 1337/21 1363/10 1363/11 1363/16 1391/2 1392/12 1411/17 1412/6
**generally [8]** 1268/15 1390/5 1394/3 1409/6 1411/19 1412/9 1420/10 1426/22
**generals [10]** 1330/19 1330/20 1330/21 1330/22 1331/13 1331/14 1331/20 1331/23 1393/10 1393/14
**Generals Way [2]** 1393/10 1393/14
**generation [1]** 1323/21
**gentle [1]** 1372/14
**gently [1]** 1358/4
**genuinely [2]** 1266/11 1266/11
**George [2]** 1349/25 1423/23
**Georgiana [1]** 1322/13
**GERAGOS [1]** 1193/18
**girl [1]** 1322/8
**girls [10]** 1295/15 1296/17 1323/18 1333/3 1340/5 1350/5 1361/4 1367/2 1367/3 1373/24
**gist [1]** 1235/20
**given [8]** 1312/6 1338/12 1351/16 1354/5 1359/13 1360/9 1381/15 1416/13
**glad [1]** 1247/14
**glass [2]** 1254/6 1407/11
**gmail.com [3]** 1193/24 1410/16 1411/5
**goal [1]** 1329/7
**goals [1]** 1325/4
**God [1]** 1294/4
**gooder [1]** 1243/6
**Google [1]** 1411/5
**governance [1]** 1316/20
**government [25]** 1193/11 1219/4 1265/13 1289/16 1305/23 1305/25 1306/13 1306/17 1313/2 1318/24 1328/2 1330/14 1346/16 1346/18 1381/23 1382/12 1382/16 1382/16 1382/17 1382/17 1383/22 1383/24 1410/16 1429/22 1433/13
**government's [39]** 1285/3 1298/22 1306/6 1306/7 1306/10 1344/2 1344/14 1344/22 1345/8 1345/17 1346/5 1346/11 1349/2 1356/3 1357/8 1359/24 1389/21 1389/25 1390/19 1396/22 1400/8 1400/9 1400/21 1401/2 1401/22 1402/10 1403/4 1403/18 1404/6 1405/2 1408/22 1409/17 1410/13 1410/22 1411/3 1412/18 1416/23 1417/20 1421/20
**Government's Exhibit 1002A [2]** 1306/6 1306/10
**Government's Exhibit 1399 [1]** 1410/13
**Government's Exhibit 1401 [1]** 1411/3
**Government's Exhibit 1463 [1]** 1417/20
**Government's Exhibit 176 [1]** 1396/22
**Government's Exhibit 180 [1]** 1412/18
**Government's Exhibit 204 [1]** 1421/20
**Government's Exhibit 205 [1]** 1416/23
**Government's Exhibit 3 [1]** 1403/18
**Government's Exhibit 365 [5]** 1400/21 1401/2 1401/22 1402/10 1405/2
**Government's Exhibit 371 [1]** 1409/17
**governor [4]** 1330/16 1330/17 1331/8 1363/20
**governors [4]** 1330/20 1330/22 1330/25 1331/5
**grab [1]** 1254/6
**grade [1]** 1385/24
**grades [1]** 1385/23
**graduate [2]** 1307/16 1307/17
**graduated [1]** 1307/16
**great [4]** 1230/17 1281/24 1341/15 1431/9
**Green [2]** 1263/9 1273/3
**Green Mountain [1]** 1273/3
**Grenadier [4]** 1393/19 1393/24 1394/3 1394/11
**grew [1]** 1313/16
**ground [3]** 1265/4 1329/19 1383/3
**grounds [2]** 1300/19 1383/2
**group [16]** 1205/24 1208/18 1210/22 1261/6 1285/6 1308/11 1313/17 1313/19 1313/21 1319/1 1339/14 1348/18 1351/4 1351/7 1361/1 1395/9
**groups [1]** 1313/19
**guard [5]** 1203/6 1203/7 1203/10 1203/13 1204/1
**guess [1]** 1429/1
**guide [1]** 1216/6
**guilty [1]** 1350/19
**guy [1]** 1292/12
**guys [2]** 1274/13 1298/19
**GX176 [1]** 1382/12

H

**H-E-R-B-I-T-S [1]** 1307/2
**habit [1]** 1343/20
**hacked [1]** 1369/4
**hair's [1]** 1258/17
**HAJJAR [1]** 1193/14
**Hale [7]** 1396/13 1396/15 1396/16 1396/17 1396/24 1397/3 1397/6
**half [13]** 1204/14 1244/4 1275/17 1298/24 1314/8 1314/21 1321/8 1373/8 1374/12 1425/11 1426/7 1426/10 1426/18
**half-hour [1]** 1425/11
**Halfmoon [3]** 1388/12 1392/8 1406/22
**hall [1]** 1414/13
**hallway [6]** 1320/15 1414/9 1414/16 1414/21 1415/5 1419/5
**hand [6]** 1302/3 1384/1 1407/22 1418/10 1419/17 1431/24
**handed [1]** 1299/16
**handle [4]** 1318/3 1381/14 1400/17 1421/12
**hanging [1]** 1419/19
**happier [1]** 1229/20
**happy [6]** 1248/3 1302/15 1302/24 1304/6 1313/6 1342/4
**hard [3]** 1259/12 1314/7 1314/7
**hardworking [1]** 1315/9
**harmless [1]** 1260/4
**hat [3]** 1258/13 1258/14 1416/10
**hate [2]** 1227/7 1385/16
**hats [1]** 1258/16
**HBO [12]** 1258/3 1260/17

H

**HBO... [10]** 1260/19 1273/25 1274/2 1274/16 1275/10 1276/25 1277/2 1277/4 1281/1 1281/22
**head [7]** 1212/10 1216/2 1289/9 1314/12 1316/24 1317/16 1363/12
**headaches [2]** 1268/20 1269/10
**header [1]** 1401/22
**heading [1]** 1299/6
**headquarters [2]** 1391/13 1407/7
**heads [4]** 1205/17 1313/2 1318/23 1318/24
**heal [1]** 1214/12
**health [1]** 1268/11
**heard [14]** 1210/9 1232/25 1258/22 1273/11 1281/12 1281/12 1304/21 1338/23 1338/23 1340/19 1358/10 1368/16 1374/11 1425/3
**hearsay [4]** 1242/12 1242/13 1245/12 1383/2
**Hearst [5]** 1349/25 1350/2 1350/13 1351/17 1423/23
**heart [1]** 1217/16
**Hector [1]** 1428/4
**held [3]** 1201/24 1262/8 1311/18
**helpful [2]** 1325/15 1330/12
**Herbits [12]** 1306/1 1306/17 1306/20 1307/1 1307/2 1307/7 1307/12 1307/14 1327/16 1327/23 1344/1 1422/15
**herself [2]** 1210/14 1350/3
**high [4]** 1262/18 1292/6 1294/23 1302/9
**highlighted [7]** 1219/18 1219/19 1219/20 1240/15 1393/15 1395/2 1395/23
**Hilary [3]** 1352/9 1352/12 1353/2
**himself [2]** 1243/5 1244/9
**hired [4]** 1251/10 1311/14 1311/15 1312/17
**hiring [1]** 1251/11
**hit [4]** 1293/18 1293/20 1295/8 1295/10
**hits [1]** 1216/2
**Hochman's [1]** 1349/16
**hold [1]** 1257/19
**holding [1]** 1302/3
**Holiness [2]** 1324/20 1358/15
**holocaust [3]** 1313/14 1314/16 1352/8
**home [5]** 1224/1 1225/7 1228/20 1372/3 1416/20
**Homeowner's [1]** 1401/23
**honest [1]** 1267/13
**honestly [1]** 1282/1
**honesty [1]** 1374/16
**honor [85]** 1198/11 1207/1 1220/8 1220/19 1221/2 1221/4 1224/5 1225/14 1238/25 1242/4 1242/20 1243/13 1244/15 1244/25 1248/8 1248/12 1259/15 1263/15 1264/2 1264/11 1264/16 1266/7 1271/9 1271/9 1271/24 1272/25 1280/17 1280/20 1281/6 1282/5 1283/20 1284/14 1284/25 1286/15 1291/25 1303/4 1305/17 1305/20 1305/25 1306/4 1306/15 1307/4 1319/25 1320/17 1321/13 1328/1 1328/6 1333/18 1343/22 1346/11 1350/9 1350/22 1352/11 1365/17 1376/5 1376/17 1376/21 1381/2 1381/14 1381/22 1382/21 1383/6 1383/18 1383/23 1384/12 1389/15 1389/19 1400/5 1405/22 1408/21 1413/2 1416/15 1416/22 1418/4 1421/16 1422/10 1424/10 1426/8 1426/15 1427/6 1429/22 1430/15 1430/22 1432/7 1432/10
**Honor's [1]** 1429/7
**HONORABLE [1]** 1193/8
**hope [2]** 1281/23 1359/4
**hoped [2]** 1261/16 1261/18
**hopefully [4]** 1282/22 1426/25 1427/1 1427/2
**hoping [4]** 1228/3 1229/8 1263/4 1305/9
**horrible [2]** 1210/13 1210/16
**hospital [2]** 1333/6 1333/7
**hostile [1]** 1342/25
**hour [12]** 1244/3 1244/3 1248/20 1320/10 1320/13 1321/8 1340/3 1376/16 1425/11 1426/7 1426/11 1426/18
**hours [3]** 1296/16 1301/1 1319/13
**house [16]** 1223/15 1227/19 1227/21 1261/21 1265/24 1307/23 1308/3 1308/7 1309/11 1399/4 1399/9 1400/23 1411/14 1412/16 1418/9 1421/23
**housed [1]** 1218/11
**hundred [1]** 1429/11
**hundred percent [1]** 1429/11
**hung [1]** 1286/23
**hunting [1]** 1300/18
**husband [4]** 1233/14 1233/19 1237/4 1237/7
**Hushmail [3]** 1251/4 1251/6 1251/8
**hysteria [1]** 1284/3

I

**I'm using [1]** 1292/7
**ice [2]** 1225/17 1225/18
**idea [9]** 1207/14 1215/24 1227/3 1235/3 1253/13 1324/8 1327/24 1329/5 1431/24
**ideas [3]** 1211/14 1211/14 1325/18
**identification [10]** 1199/1 1219/15 1344/2 1344/13 1344/21 1345/7 1345/16 1413/8 1416/23 1417/6
**identified [2]** 1383/12 1425/6
**identifies [2]** 1402/17 1413/10
**identify [10]** 1289/25 1290/3 1390/10 1394/3 1396/20 1402/15 1410/19 1410/20 1410/25 1411/1
**identifying [2]** 1391/3 1415/16
**identity [2]** 1293/22 1427/9
**illegal [2]** 1231/21 1282/17
**illegally [1]** 1230/25
**illness [1]** 1269/21
**image [12]** 1406/4 1406/5 1406/20 1406/20 1406/21 1406/24 1407/8 1407/9 1408/5 1408/18 1414/20 1419/8
**imaginary [1]** 1330/8
**imagine [4]** 1267/8 1284/13 1327/3 1406/18
**immediate [1]** 1265/18
**immediately [3]** 1226/13 1290/18 1421/4
**immoral [1]** 1373/11
**impact [3]** 1222/18 1226/1 1239/11
**impeachment [1]** 1327/13
**implausible [1]** 1266/22
**implement [1]** 1317/5
**implemented [2]** 1199/18 1309/8
**implicated [1]** 1354/23
**Implicating [1]** 1355/9
**implication [1]** 1352/5
**implies [1]** 1351/11
**imploring [1]** 1358/3
**important [15]** 1243/10 1244/10 1277/14 1278/24 1279/2 1279/5 1292/9 1292/22 1311/21 1323/5 1374/19 1389/1 1389/6 1389/11 1424/14
**imposed [1]** 1310/19
**impression [5]** 1247/8 1330/5 1348/6 1348/15 1366/25
**improper [3]** 1356/20 1373/11 1375/14
**improperly [1]** 1432/3
**in -- in [1]** 1250/10
**in-depth [2]** 1421/9 1421/13
**inappropriate [3]** 1268/1 1332/2 1333/10
**Inc [1]** 1401/23
**incident [1]** 1213/3
**include [1]** 1327/15
**includes [1]** 1357/11
**including [5]** 1203/4 1204/2 1305/8 1424/20 1424/25
**income [1]** 1279/9
**inconsistent [1]** 1369/12
**increase [1]** 1201/22
**increased [2]** 1375/5 1375/23
**incredibly [1]** 1356/15
**indenture [2]** 1403/25

I

**indenture... [1]** 1404/12
**independent [3]** 1260/22 1310/20 1425/5
**India [50]** 1223/3 1223/22 1224/2 1225/3 1225/7 1225/20 1225/21 1225/24 1226/3 1226/7 1227/5 1227/7 1228/1 1228/13 1228/16 1228/21 1229/5 1229/8 1230/2 1230/11 1230/13 1230/25 1232/12 1232/16 1232/23 1256/18 1256/19 1256/25 1257/7 1257/8 1258/10 1258/18 1258/25 1259/2 1259/23 1260/14 1260/23 1260/24 1261/2 1261/12 1261/16 1261/20 1262/1 1262/5 1262/12 1265/22 1284/8 1284/21 1285/17 1305/9
**India's [4]** 1224/16 1258/23 1274/20 1305/4
**indicate [4]** 1354/20 1394/9 1398/6 1419/11
**indicated [6]** 1297/23 1337/9 1391/22 1392/2 1394/9 1413/21
**indicates [5]** 1347/8 1348/5 1349/7 1398/7 1422/2
**indicating [10]** 1236/13 1394/7 1394/23 1396/21 1397/5 1397/20 1401/19 1416/25 1418/19 1422/1
**indictable [1]** 1357/23
**indicted [1]** 1353/23
**indictment [2]** 1353/13 1357/22
**indirectly [1]** 1340/5
**individual [8]** 1345/20 1345/21 1400/12 1403/22 1403/25 1404/10 1404/13 1409/4
**individuals [2]** 1400/18 1421/8
**individuals' [1]** 1420/25
**inflammatory [1]** 1208/4
**influence [1]** 1330/11
**inform [1]** 1313/15
**informal [1]** 1341/16
**information [32]** 1212/4 1223/9 1223/16 1223/21 1227/10 1229/12 1229/25 1234/12 1234/17 1235/11 1235/15 1240/22 1241/2 1241/9 1241/11 1241/13 1243/2 1245/17 1249/15 1266/2 1282/16 1304/15 1324/6 1347/14 1347/15 1354/10 1354/21 1357/5 1365/14 1369/11 1424/21 1432/2
**initial [6]** 1309/3 1309/5 1317/9 1341/4 1347/2 1347/2
**initials [3]** 1410/20 1411/1 1412/22
**injustice [1]** 1281/17
**inmates [1]** 1351/13
**innocence [1]** 1214/14
**inordinate [1]** 1287/8
**input [3]** 1213/2 1278/12 1310/20
**inquire [2]** 1307/3 1384/11
**inquiry [5]** 1201/17 1201/19 1201/21 1202/2 1264/13
**insecure [1]** 1289/6
**inside [7]** 1272/22 1285/10 1398/20 1398/21 1399/4 1399/5 1413/23
**insisted [1]** 1332/11
**inspire [1]** 1356/10
**inspired [1]** 1359/5
**Instagram [1]** 1425/1
**instance [8]** 1313/18 1330/16 1332/11 1333/6 1354/4 1413/12 1413/13 1417/4
**instead [2]** 1293/16 1418/23
**institution [1]** 1333/9
**instruct [2]** 1208/11 1256/7
**instructed [2]** 1256/10 1268/24
**instructing [1]** 1338/22
**instruction [5]** 1221/4 1222/10 1224/6 1225/14 1239/1
**instructions [4]** 1367/21 1368/14 1368/15 1424/15
**instructors [1]** 1297/2
**instructs [1]** 1208/15
**insurance [2]** 1307/17 1314/15
**integrate [1]** 1202/4
**integrity [1]** 1374/15
**intelligence [2]** 1351/11 1356/16
**intend [1]** 1207/13
**intended [1]** 1300/21
**intending [1]** 1229/7
**intensely [1]** 1207/25
**intensive [5]** 1210/10 1218/7 1287/17 1287/19 1299/16
**intensives [1]** 1218/12
**intent [2]** 1214/6 1349/11
**intention [1]** 1429/7
**intentions [1]** 1266/20
**interacted [1]** 1391/4
**interactions [1]** 1286/3
**interest [9]** 1242/22 1329/23 1329/25 1387/3 1389/4 1389/10 1390/8 1395/10 1397/2
**interested [2]** 1232/16 1325/4
**interesting [1]** 1299/22
**intermittently [1]** 1303/3
**internal [1]** 1202/5
**international [2]** 1313/23 1313/24
**internationally [1]** 1313/25
**Internet [1]** 1424/20
**interpretation [1]** 1299/21
**interrupt [1]** 1327/2
**interrupted [1]** 1216/4
**intervene [2]** 1330/18 1332/16
**interview [1]** 1281/8
**interviewed [4]** 1266/17 1281/11 1309/23 1309/24
**interviewing [1]** 1311/5
**intrepid [1]** 1243/6
**introduce [3]** 1306/5 1323/23 1365/23
**introduced [1]** 1324/1
**introducing [1]** 1324/9
**invested [1]** 1310/17
**investigated [1]** 1251/22
**investigates [1]** 1385/16
**investigation [19]** 1332/20 1349/22 1363/13 1363/14 1384/23 1385/8 1386/9 1386/12 1386/22 1387/2 1388/22 1389/2 1389/9 1390/8 1391/8 1391/16 1410/6 1410/9 1425/5
**investigative [1]** 1386/21
**investigator [10]** 1383/24 1384/15 1384/20 1385/25 1389/1 1389/17 1390/3 1416/17 1417/9 1421/19
**Investigator Fontanelli [4]** 1389/17 1390/3 1417/9 1421/19
**investigators [3]** 1251/9 1251/12 1251/23
**investment [3]** 1310/11 1338/10 1339/3
**involve [3]** 1281/7 1281/16 1286/18
**involved [36]** 1223/5 1226/10 1226/16 1229/11 1229/15 1264/20 1264/25 1265/1 1278/17 1278/21 1281/9 1281/19 1282/17 1293/11 1293/19 1295/7 1296/2 1299/19 1300/8 1301/2 1319/19 1325/10 1339/10 1341/8 1342/21 1350/6 1353/19 1361/2 1362/9 1362/9 1364/1 1364/9 1364/16 1368/1 1373/22 1391/8
**involvement [4]** 1277/4 1287/5 1287/10 1340/18
**involving [4]** 1287/16 1324/16 1342/18 1369/16
**iPhone [1]** 1232/10
**Iranian [1]** 1352/19
**irrelevant [7]** 1208/6 1208/7 1264/17 1264/20 1264/25 1268/3 1268/6
**island [3]** 1304/7 1304/11 1415/7
**Israel [4]** 1318/11 1361/20 1423/11 1423/13
**issue [20]** 1207/23 1213/10 1213/11 1264/16 1286/12 1292/3 1292/5 1292/6 1309/7 1328/17 1329/12 1337/20 1340/8 1352/9 1356/21 1357/5 1368/6 1427/11 1431/5 1431/10
**issues [12]** 1206/13 1206/14 1213/12 1214/8 1288/8 1293/5 1319/20 1341/20 1353/5 1359/11 1373/22 1426/4

I

**item [4]** 1414/2 1417/5 1422/1 1422/3
**items [3]** 1327/16 1415/18 1424/2
**itself [2]** 1288/7 1390/11

J

**J.Z [12]** 1205/8 1205/17 1205/18 1205/20 1209/5 1209/6 1209/7 1209/10 1209/16 1209/20 1210/1 1210/14
**January [16]** 1198/23 1199/3 1212/15 1212/21 1213/22 1216/11 1275/23 1276/23 1308/8 1309/22 1317/21 1346/1 1346/9 1359/25 1361/11 1373/9
**January 19 [2]** 1346/9 1361/11
**January 2012 [1]** 1373/9
**January 2016 [2]** 1212/15 1213/22
**January 2017 [1]** 1216/11
**January 2018 [1]** 1276/23
**January 5 [2]** 1198/23 1199/3
**January 6 [1]** 1346/1
**January 6th [1]** 1359/25
**January of [1]** 1317/21
**Japan [2]** 1311/22 1311/25
**Japanese [1]** 1311/24
**jealousies [1]** 1214/9
**Jersey [4]** 1330/17 1331/21 1331/22 1331/24
**Jewish [25]** 1312/24 1313/3 1313/4 1313/10 1313/12 1313/13 1313/17 1313/25 1314/13 1316/14 1316/15 1317/10 1317/18 1317/23 1318/6 1318/15 1318/17 1319/2 1352/16 1361/18 1361/19 1361/22 1363/12 1363/14 1423/9
**Jews [1]** 1313/16
**Jness [1]** 1300/15
**job [5]** 1309/23 1311/5 1315/5 1317/20 1318/2
**jobs [1]** 1307/22
**Joe [3]** 1363/4 1363/4 1365/9
**join [3]** 1206/2 1208/18 1386/12
**joined [3]** 1279/2 1279/5 1337/6
**joining [4]** 1205/10 1337/11 1348/17 1385/21
**joint [7]** 1428/11 1428/14 1428/15 1428/19 1428/22 1429/14 1431/21
**Joseph [3]** 1353/14 1353/23 1424/7
**journalism [1]** 1278/22
**JUDGE [22]** 1193/9 1208/10 1208/13 1219/14 1222/23 1225/13 1244/5 1247/6 1249/4 1265/18 1301/18 1302/22 1350/7 1350/23 1375/10 1381/10 1383/14 1427/14 1427/18 1429/18 1429/20 1432/11
**Judge Scanlon's [2]** 1429/18 1429/20
**judgment [1]** 1319/24
**July [10]** 1250/11 1250/12 1251/7 1251/25 1252/2 1252/3 1253/2 1253/4 1340/3 1401/25
**July 2011 [1]** 1340/3
**July 26th [2]** 1252/3 1253/4
**July 30 [1]** 1401/25
**June [10]** 1238/11 1242/17 1250/11 1250/12 1311/17 1312/11 1318/1 1318/6 1318/18 1318/19
**June 2nd [1]** 1238/11
**Junto [4]** 1409/5 1409/6 1409/7 1409/12
**Junto's [1]** 1409/9
**jurors [2]** 1271/13 1424/17
**jury [58]** 1193/9 1198/1 1198/2 1198/3 1198/5 1199/11 1201/14 1201/19 1207/12 1208/8 1208/15 1213/10 1215/20 1222/11 1222/25 1223/17 1225/19 1229/4 1230/3 1239/3 1243/3 1244/17 1247/19 1247/23 1249/1 1264/6 1266/10 1267/17 1271/1 1271/16 1271/17 1303/13 1320/4 1320/5 1320/7 1321/3 1321/14 1321/15 1376/12 1376/13 1381/1 1381/5 1381/7 1381/9 1381/20 1383/17 1383/19 1383/20 1389/20 1389/22 1412/25 1417/10 1424/13 1425/4 1425/7 1425/16 1425/17 1425/19
**Justice [1]** 1265/2
**Juval [1]** 1423/17

K

**Karim [12]** 1252/1 1252/5 1252/7 1252/10 1252/12 1253/5 1253/10 1274/23 1274/24 1275/6 1275/16 1275/17
**Karner [7]** 1391/12 1407/3 1407/5 1407/6 1407/10 1407/16 1407/18
**Kayla [1]** 1221/5
**Keeffe [22]** 1240/21 1240/22 1241/2 1241/8 1241/17 1241/19 1243/2 1243/15 1244/11 1244/11 1244/20 1244/22 1244/24 1245/5 1245/7 1245/8 1245/13 1245/22 1245/23 1249/6 1249/18 1249/22
**keep [9]** 1200/6 1246/11 1247/18 1263/14 1281/5 1298/15 1370/7 1370/8 1382/11
**keeping [1]** 1248/21
**KEITH [19]** 1193/6 1212/21 1213/7 1215/2 1230/24 1231/5 1231/24 1254/10 1254/20 1292/22 1299/8 1303/15 1303/15 1303/20 1304/1 1359/7 1366/1 1372/23 1386/10
**kept [3]** 1315/2 1325/11 1325/12
**kicked [4]** 1204/6 1204/10 1204/11 1211/18
**killed [1]** 1314/15
**KIM [1]** 1193/13
**kinds [4]** 1268/21 1268/23 1269/12 1295/6
**kissing [1]** 1212/6
**kitchen [8]** 1414/14 1414/25 1415/3 1415/4 1415/8 1417/1 1418/8 1419/5
**Knight [15]** 1205/8 1205/17 1205/18 1205/20 1209/5 1209/6 1209/7 1209/10 1209/16 1209/20 1210/1 1210/14 1211/22 1212/8 1212/11
**knowledge [9]** 1206/12 1255/25 1339/25 1348/23 1351/21 1366/19 1368/25 1372/19 1400/17
**known [2]** 1365/7 1405/13
**knows [1]** 1365/5
**Knox [18]** 1392/6 1392/7 1392/16 1392/23 1392/25 1393/3 1393/5 1393/5 1393/11 1393/14 1393/20 1394/16 1395/6 1396/12 1397/10 1397/11 1398/6 1398/18
**Knox Woods [7]** 1392/16 1392/23 1392/25 1393/3 1393/5 1393/11 1393/14
**Kristin [21]** 1240/21 1240/22 1241/1 1241/8 1241/17 1241/19 1243/1 1244/11 1244/11 1244/19 1244/21 1244/24 1245/5 1245/7 1245/8 1245/13 1245/22 1245/23 1249/6 1249/18 1249/22
**Kundalini [2]** 1215/18 1215/21

L

**LA [10]** 1217/21 1219/25 1220/1 1275/24 1276/11 1364/2 1366/12 1366/19 1409/5 1409/6
**LA-based [3]** 1217/21 1219/25 1220/1
**labeled [2]** 1420/25 1421/7
**labeling [1]** 1421/25
**labelled [1]** 1420/20
**labels [1]** 1421/1
**lack [1]** 1351/11
**Lake [5]** 1275/24 1398/7 1398/8 1398/10 1398/20
**Lama [2]** 1358/20 1359/12
**land [1]** 1368/3
**Lane [7]** 1395/6 1395/9 1395/18 1395/21 1396/1 1396/7 1396/9
**language [3]** 1228/24 1230/7

**L**

**language... [1]** 1329/13
**languages [2]** 1296/2 1296/24
**laptop [1]** 1343/7
**laptops [3]** 1343/8 1343/9 1343/19
**large [4]** 1414/3 1414/19 1416/1 1419/15
**larger [4]** 1265/12 1282/23 1332/6 1406/24
**largest [1]** 1310/10
**last-ditch [1]** 1259/22
**late [1]** 1286/11
**laterally [1]** 1311/9
**Laura [5]** 1409/5 1409/6 1409/7 1409/9 1409/12
**Lauren [3]** 1428/9 1431/1 1432/2
**law [10]** 1206/18 1231/13 1282/19 1308/1 1308/2 1308/5 1332/13 1338/24 1354/7 1387/1
**lawn [1]** 1402/2
**lawsuit [14]** 1340/16 1364/2 1366/8 1366/18 1366/19 1366/20 1367/2 1367/2 1367/11 1367/12 1367/13 1367/24 1368/2 1369/9
**lawsuits [6]** 1339/10 1340/1 1365/13 1369/3 1369/7 1369/14
**lawyer [6]** 1330/9 1355/2 1363/18 1364/5 1364/7 1365/15
**lawyers [6]** 1328/24 1329/11 1329/14 1354/25 1364/11 1430/21
**lead [2]** 1264/12 1415/5
**leader [1]** 1364/23
**leaders [1]** 1202/14
**leadership [3]** 1202/23 1202/25 1213/13
**leading [2]** 1291/25 1419/12
**leads [3]** 1354/1 1414/10 1419/6
**leap [1]** 1351/16
**learn [2]** 1308/1 1339/2
**learned [9]** 1201/25 1243/1 1339/17 1340/4 1363/24 1364/10 1366/11 1366/15 1366/23
**learning [1]** 1367/8
**least [3]** 1218/21 1250/13 1354/5
**leave [13]** 1211/18 1216/8 1216/23 1229/18 1237/11 1242/19 1272/20 1273/1 1273/2 1288/13 1288/15 1304/6 1311/13
**leaving [2]** 1211/16 1295/2
**LeBaron [2]** 1295/15 1296/18
**led [7]** 1216/13 1242/9 1242/9 1242/19 1300/23 1301/1 1419/23
**left [45]** 1200/19 1226/18 1228/6 1230/21 1232/12 1269/5 1272/8 1279/11 1283/6 1288/21 1288/22 1290/18 1291/3 1296/18 1302/3 1304/11 1308/5 1309/9 1312/11 1315/11 1316/1 1318/17 1318/18 1318/19 1318/19 1319/5 1339/14 1339/14 1339/15 1343/20 1350/5 1364/20 1365/13 1369/2 1369/7 1372/5 1372/11 1372/12 1391/7 1395/12 1395/14 1414/17 1418/10 1419/17 1420/14
**left-hand [2]** 1418/10 1419/17
**left-over [1]** 1350/5
**legal [10]** 1206/14 1231/13 1239/24 1240/9 1240/18 1243/15 1299/4 1299/23 1368/8 1368/11
**legs [3]** 1265/14 1295/23 1296/13
**leisurely [1]** 1314/8
**length [2]** 1244/4 1369/18
**lengthy [1]** 1254/4
**lens [1]** 1278/5
**LESKO [13]** 1193/14 1268/9 1271/7 1280/22 1282/8 1283/23 1307/6 1315/22 1316/10 1321/17 1433/4 1433/7 1433/8
**Lesko's [1]** 1327/3
**less [2]** 1245/24 1250/1
**letter [35]** 1198/24 1199/5 1199/7 1200/20 1202/6 1202/14 1203/2 1203/22 1203/25 1204/4 1204/7 1204/22 1207/11 1207/15 1207/17 1207/21 1210/20 1211/20 1211/22 1211/25 1212/15 1212/20 1213/21 1255/20 1294/8 1294/9 1294/13 1294/16 1294/18 1294/24 1295/7 1295/10 1430/6 1430/6 1430/7
**letters [1]** 1294/15
**level [1]** 1227/15
**liability [1]** 1404/3
**liaison [1]** 1314/19
**library [1]** 1414/22
**lick [1]** 1286/21
**lie [1]** 1360/19
**lieu [1]** 1296/8
**life [18]** 1208/17 1227/13 1228/16 1228/21 1229/1 1229/5 1266/18 1266/23 1266/25 1278/23 1281/21 1293/24 1314/8 1315/16 1371/11 1371/14 1373/21 1374/18
**light [1]** 1269/19
**likely [6]** 1236/14 1236/14 1250/1 1250/1 1252/11 1295/5
**limit [2]** 1248/13 1310/19
**limited [1]** 1404/2
**LINDA [1]** 1193/23
**LindaDan226 [1]** 1193/24
**line [6]** 1207/2 1219/18 1219/19 1219/20 1221/3 1268/9
**line 20 [1]** 1268/9
**lineage [1]** 1288/3
**lined [1]** 1392/14
**lines [4]** 1200/14 1200/15 1256/20 1356/12
**linking [1]** 1207/16
**list [7]** 1236/4 1333/17 1339/20 1402/18 1403/24 1405/5 1405/9
**listed [3]** 1405/10 1409/24 1413/9
**listen [7]** 1244/21 1245/24 1293/21 1323/6 1342/15 1424/18 1430/2
**listened [1]** 1340/13
**listening [2]** 1304/21 1359/18
**listing [2]** 1381/16 1405/3
**lists [1]** 1382/6
**literally [1]** 1372/7
**litigation [3]** 1300/8 1328/7 1342/18
**Llama [4]** 1324/20 1329/8 1329/25 1332/22
**LLC [9]** 1402/9 1402/19 1403/22 1403/25 1404/2 1404/10 1404/13 1409/21 1410/2
**loan [2]** 1354/21 1357/5
**located [47]** 1388/20 1388/21 1391/9 1391/10 1391/12 1391/20 1391/25 1392/10 1392/25 1393/1 1393/10 1393/13 1393/20 1393/23 1394/2 1394/16 1394/19 1395/5 1395/9 1398/2 1398/8 1398/17 1399/1 1399/16 1399/17 1399/21 1399/22 1400/1 1401/7 1406/5 1406/10 1406/12 1406/22 1407/17 1408/3 1411/12 1411/22 1416/2 1416/13 1419/9 1419/22 1419/25 1420/6 1420/6 1420/15 1421/22 1422/3
**location [8]** 1302/5 1305/4 1397/1 1399/10 1399/10 1407/9 1413/10 1418/23
**locations [16]** 1387/3 1388/14 1388/19 1388/21 1389/2 1389/13 1390/7 1390/12 1390/16 1390/17 1390/21 1390/24 1391/3 1391/19 1392/25 1425/6
**lodging [1]** 1218/10
**lodgings [1]** 1218/7
**logical [2]** 1333/15 1351/16
**looked [7]** 1303/11 1341/8 1400/23 1407/2 1414/1 1418/1 1421/24
**looks [5]** 1246/13 1247/12 1247/20 1259/12 1347/13
**loosely [1]** 1292/7
**Loreta [2]** 1295/24 1297/3
**Loreta Garza [1]** 1295/24
**Loretta [1]** 1203/20
**Los [7]** 1224/1 1225/3 1225/5

**L**

**Los... [4]** 1240/5 1240/6
 1252/7 1339/18
**loss [1]** 1214/13
**lost [4]** 1200/18 1339/2
 1340/17 1370/10
**lotions [1]** 1397/1
**love [2]** 1360/20 1360/23
**loved [1]** 1340/11
**lovers [2]** 1254/10 1254/20
**lower [4]** 1256/17 1256/17
 1257/21 1422/4
**lower-end [1]** 1257/21
**loyal [2]** 1257/1 1260/1
**Luke [1]** 1428/3
**lunch [9]** 1320/2 1320/10
 1320/10 1320/13 1320/18
 1322/20 1322/21 1353/6
 1425/10

**M**

**ma'am [36]** 1384/16 1384/22
 1388/5 1388/24 1390/13
 1390/18 1393/7 1395/3
 1395/22 1397/7 1398/1
 1398/21 1399/14 1401/5
 1401/19 1401/24 1402/4
 1402/14 1403/8 1403/12
 1403/20 1404/8 1404/19
 1405/7 1405/17 1406/19
 1409/15 1409/19 1410/11
 1410/14 1410/24 1412/9
 1413/1 1413/24 1414/19
 1417/24
**MacBook [4]** 1416/9 1416/19
 1416/21 1417/4
**Mack [3]** 1213/7 1214/8
 1214/11
**Mack's [1]** 1213/17
**magazine [2]** 1362/24 1414/5
**magazines [1]** 1414/3
**magnitude [1]** 1230/13
**mail [22]** 1342/23 1344/18
 1345/1 1345/4 1345/19 1346/8
 1346/21 1347/12 1348/4
 1348/11 1348/19 1349/3
 1349/4 1349/7 1354/16
 1354/17 1354/20 1355/5
 1409/24 1410/10 1410/15
 1424/23
**mailbox [2]** 1398/8 1399/3
**mails [5]** 1344/7 1344/8
 1344/10 1345/13 1346/24
**main [2]** 1411/24 1420/3
**maintain [3]** 1216/24 1317/4
 1319/16
**maintenance [1]** 1402/2
**major [1]** 1361/2
**Malcolm [3]** 1362/18 1362/21
 1423/19
**man [11]** 1208/9 1265/19
 1289/10 1298/10 1298/11
 1298/12 1311/3 1315/1
 1342/12 1353/19 1368/16
**manage [1]** 1386/7
**mandatory [2]** 1294/3 1294/4
**Mandela [1]** 1281/20

**map [2]** 1392/6 1392/13
**MARC [2]** 1193/17 1366/1
**March [11]** 1231/9 1231/10
 1253/20 1253/23 1254/4
 1254/19 1256/24 1257/6
 1263/10 1411/8 1413/7
**March 10th [1]** 1254/4
**March 27 [2]** 1411/8 1413/7
**March 27th [1]** 1257/6
**mark [8]** 1193/14 1198/13
 1199/1 1266/4 1266/9 1271/8
 1278/9 1424/5
**marked [6]** 1344/2 1344/13
 1344/21 1345/7 1345/16
 1416/22
**marriage [4]** 1322/1 1322/2
 1322/2 1322/3
**married [2]** 1214/23 1322/1
**master [2]** 1284/22 1291/13
**material [3]** 1201/18 1304/20
 1429/3
**materials [3]** 1299/25
 1327/14 1328/3
**matter [11]** 1212/23 1242/12
 1245/9 1245/12 1264/18
 1267/23 1268/3 1287/19
 1391/2 1392/12 1428/20
**matters [6]** 1221/8 1250/19
 1250/19 1252/12 1320/6
 1425/18
**May 17 [1]** 1432/17
**May 2017 [2]** 1222/6 1233/11
**May 22nd [1]** 1233/6
**May 23rd [2]** 1233/2 1233/5
**May 26th [6]** 1233/25 1234/3
 1234/22 1235/23 1236/7
 1236/11
**May 31st [1]** 1237/4
**May 7th [2]** 1231/8 1231/8
**MDS [1]** 1297/1
**MDSs [7]** 1295/17 1295/18
 1295/22 1296/13 1296/17
 1296/21 1297/6
**mean [31]** 1199/11 1201/14
 1201/20 1204/4 1211/17
 1215/21 1246/24 1247/13
 1252/23 1253/3 1257/3
 1261/13 1261/15 1269/9
 1269/14 1272/13 1278/2
 1278/19 1285/5 1285/21
 1288/16 1289/16 1327/2
 1347/23 1348/14 1348/21
 1354/2 1356/19 1371/12
 1373/7 1384/24
**meaning [2]** 1201/18 1277/6
**means [5]** 1207/21 1207/22
 1385/6 1416/11 1424/24
**meant [4]** 1200/4 1203/13
 1330/20 1359/10
**measurements [1]** 1209/23
**mechanical [1]** 1193/25
**medal [1]** 1352/11
**media [4]** 1350/17 1371/3
 1424/19 1424/25
**mediation [3]** 1358/5 1358/7
 1359/3
**meet [11]** 1261/14 1276/6
 1284/5 1323/8 1324/2 1324/2

 1349/18 1363/17 1427/10
 1427/21 1432/8
**meeting [12]** 1237/13 1240/2
 1276/3 1283/1 1283/4 1283/8
 1283/11 1313/2 1322/19
 1322/24 1323/1 1323/4
**meetings [3]** 1319/1 1319/3
 1340/7
**member [9]** 1205/9 1205/23
 1294/23 1308/22 1342/4
 1369/23 1404/18 1416/3
 1430/13
**members [9]** 1198/4 1225/19
 1239/3 1288/1 1293/4 1308/10
 1308/18 1391/3 1424/13
**memo [10]** 1298/25 1299/3
 1299/6 1325/22 1325/25
 1327/15 1327/17 1327/18
 1356/25 1357/1
**memorialized [1]** 1304/2
**memorize [1]** 1220/4
**memory [4]** 1217/12 1331/2
 1350/14 1368/12
**men [5]** 1243/19 1298/5
 1298/9 1298/9 1298/13
**mental [1]** 1223/5
**mentally [2]** 1374/4 1374/5
**mention [6]** 1264/11 1269/3
 1269/7 1329/15 1342/7 1366/8
**mentioned [14]** 1207/10
 1215/18 1297/17 1318/17
 1318/20 1338/20 1338/21
 1342/1 1357/22 1365/22
 1366/5 1398/23 1410/5
 1417/16
**mentioning [1]** 1359/3
**mentions [3]** 1349/14 1356/21
 1358/5
**mentoring [1]** 1286/25
**mentorship [1]** 1295/25
**mere [1]** 1243/11
**merits [1]** 1329/18
**mess [2]** 1258/17 1368/13
**message [1]** 1402/2
**messages [2]** 1338/21 1353/17
**messaging [1]** 1424/24
**met [10]** 1209/5 1209/6
 1223/11 1287/7 1322/17
 1324/17 1330/24 1337/18
 1355/3 1372/23
**metal [1]** 1285/13
**method [1]** 1351/14
**Mexican [1]** 1292/11
**Mexicans [1]** 1292/14
**Mexico [4]** 1291/19 1295/16
 1296/19 1302/7
**MICHAEL [4]** 1193/22 1390/15
 1412/4 1423/21
**Michel [1]** 1253/9
**microphone [1]** 1385/1
**mid [2]** 1264/4 1312/21
**mid-'80 [1]** 1312/21
**mid-morning [1]** 1264/4
**middle [5]** 1302/4 1392/24
 1401/2 1401/9 1415/8
**might [16]** 1208/19 1213/3
 1213/4 1223/6 1225/12
 1238/25 1271/9 1273/24

**M**

**might... [8]** 1277/24 1291/6 1295/9 1305/11 1333/8 1352/2 1353/7 1360/21
**mile [3]** 1391/20 1391/25 1393/1
**military [1]** 1309/16
**million [8]** 1339/5 1339/6 1339/7 1339/7 1366/21 1366/21 1366/24 1366/24
**Milltowne [13]** 1399/20 1400/1 1400/2 1400/23 1401/8 1401/9 1401/12 1401/14 1402/5 1402/17 1403/21 1404/3 1404/9
**Milltowne Drive [13]** 1399/20 1400/1 1400/2 1400/23 1401/8 1401/9 1401/12 1401/14 1402/5 1402/17 1403/21 1404/3 1404/9
**mind [12]** 1221/6 1222/15 1222/19 1225/22 1226/1 1239/6 1239/11 1242/5 1242/9 1299/10 1330/15 1431/24
**minded [1]** 1337/25
**mine [4]** 1206/19 1238/23 1323/7 1349/12
**ministers [2]** 1313/1 1318/24
**minority [1]** 1364/23
**minute [5]** 1271/8 1372/4 1376/22 1388/8 1399/24
**minutes [14]** 1244/3 1267/7 1270/7 1271/5 1271/5 1271/6 1272/5 1353/1 1353/5 1366/4 1370/2 1370/4 1370/5 1374/11
**miscellaneous [2]** 1423/25 1424/3
**Miss Salzman [3]** 1428/17 1430/13 1431/18
**mission [1]** 1298/19
**misunderstood [1]** 1210/14
**mitigate [1]** 1201/6
**mix [2]** 1313/4 1313/11
**model [1]** 1211/15
**modification [1]** 1303/18
**MOIRA [1]** 1193/13
**Molatore [1]** 1263/8
**moment [6]** 1257/16 1285/25 1285/25 1306/1 1306/5 1358/25
**moments [1]** 1321/23
**Monday [4]** 1299/6 1315/15 1425/13 1427/5
**money [11]** 1288/7 1297/14 1297/18 1297/21 1308/2 1310/17 1314/16 1316/17 1341/3 1361/5 1373/22
**monies [2]** 1340/17 1359/6
**monster [2]** 1227/2 1227/5
**months [13]** 1217/4 1217/6 1240/4 1261/22 1269/5 1311/25 1315/17 1316/19 1317/9 1317/11 1318/3 1318/18 1330/16
**Montpelier [2]** 1263/20 1273/6
**morality [1]** 1354/8
**Mormons [1]** 1296/18
**morning [20]** 1198/4 1198/6 1198/18 1198/19 1198/20 1244/6 1244/7 1264/4 1271/4 1272/3 1272/4 1286/11 1327/15 1376/19 1425/13 1425/21 1428/16 1428/25 1430/25 1432/8
**most [8]** 1272/12 1292/9 1313/24 1341/18 1369/5 1389/9 1392/10 1392/15
**mostly [1]** 1393/24
**mother [1]** 1322/12
**motive [1]** 1360/23
**Mountain [2]** 1263/9 1273/3
**mouth [1]** 1374/14
**move [12]** 1244/14 1246/10 1282/7 1317/14 1319/25 1327/11 1339/24 1344/15 1354/12 1354/14 1383/16 1398/23
**moved [5]** 1276/11 1318/8 1337/20 1394/8 1397/13
**movie [16]** 1211/4 1211/10 1257/13 1257/14 1265/25 1265/25 1266/3 1266/18 1273/15 1274/10 1276/24 1277/7 1277/10 1278/7 1278/8 1419/7
**moving [3]** 1357/8 1391/22 1406/14
**Mr. Agnifilio [3]** 1198/8 1207/24 1327/14
**Mr. Agnifilo [12]** 1242/11 1244/15 1245/6 1248/16 1267/21 1271/20 1283/24 1284/7 1285/17 1298/23 1373/3 1428/17
**Mr. Agnifilo's [1]** 1281/11
**Mr. Bronfman [4]** 1311/5 1312/10 1321/25 1322/7
**Mr. Carlato [3]** 1239/5 1239/10 1239/13
**Mr. Diaz [5]** 1427/17 1428/12 1428/17 1430/6 1431/7
**Mr. Herbits [6]** 1307/7 1307/12 1307/14 1327/16 1327/23 1344/1
**Mr. Lesko [2]** 1268/9 1321/17
**Mr. Lesko's [1]** 1327/3
**Mr. Parlato [2]** 1243/13 1243/14
**Mr. Raniere [1]** 1267/18
**Mr. Raniere's [1]** 1428/12
**Mr. Vicente [18]** 1198/18 1221/7 1222/3 1222/15 1222/19 1225/23 1226/2 1239/7 1239/12 1242/19 1243/18 1245/5 1245/7 1245/11 1268/5 1272/3 1280/23 1303/9
**Mr. Vicente's [7]** 1221/6 1222/14 1222/18 1225/22 1226/1 1239/6 1239/11
**Ms. Bronfman [2]** 1328/4 1328/21
**Ms. Decrescenzo [1]** 1404/21
**Ms. DiCrescenzo [1]** 1400/22
**Ms. India [1]** 1225/21
**Ms. Keeffe [1]** 1243/15
**Ms. Knight [3]** 1211/22 1212/8 1212/11
**Ms. Oxenberg [5]** 1222/14 1222/20 1223/1 1223/8 1232/15
**Ms. Oxenberg's [1]** 1222/16
**Ms. Penza's [1]** 1381/15
**Ms. Salzman [4]** 1428/3 1428/4 1428/5 1428/9
**Ms. Salzman's [1]** 1429/7
**multidisciplinary [1]** 1295/19
**multifamily [1]** 1392/17
**multifamily-residences [1]** 1392/17
**multiple [15]** 1307/24 1311/4 1312/8 1318/25 1318/25 1324/12 1328/9 1339/10 1372/15 1372/16 1393/25 1394/20 1396/25 1397/17 1414/23
**music [1]** 1296/4
**musical [2]** 1302/6 1302/7
**must [4]** 1294/20 1294/20 1424/18 1425/2
**MV [2]** 1237/18 1240/14
**mystical [2]** 1287/9 1331/7
**mysticism [1]** 1215/25

**N**

**N. [1]** 1403/15
**N. Clyne [1]** 1403/15
**name [44]** 1201/22 1205/16 1259/14 1282/1 1295/19 1295/20 1295/21 1306/25 1322/13 1322/14 1322/14 1323/21 1331/3 1338/18 1338/20 1338/23 1342/12 1362/18 1363/23 1364/1 1364/4 1364/12 1364/21 1364/25 1365/9 1365/22 1366/1 1366/5 1366/11 1367/18 1384/7 1400/13 1402/7 1405/12 1409/10 1422/13 1422/16 1422/19 1422/21 1422/23 1422/25 1423/2 1424/4 1424/6
**named [5]** 1238/12 1251/25 1257/25 1318/11 1322/10
**names [5]** 1359/6 1362/16 1420/25 1421/5 1421/7
**Nancy [19]** 1203/21 1256/6 1256/8 1256/11 1287/10 1288/23 1289/4 1294/17 1322/21 1322/25 1359/7 1382/25 1399/7 1399/9 1411/12 1411/15 1416/20 1418/7 1421/23
**nannies [2]** 1295/17 1295/22
**nanny [2]** 1295/19 1295/21
**narrative [2]** 1244/23 1281/18
**Natalie [3]** 1364/12 1364/13 1423/15
**national [2]** 1312/24 1352/20
**nature [3]** 1215/6 1269/6

N

**nature... [1]** 1429/2
**near [8]** 1207/3 1258/24 1261/11 1262/2 1262/6 1262/13 1337/7 1388/10
**nearby [1]** 1388/23
**necessarily [3]** 1252/18 1276/9 1295/3
**necessary [1]** 1308/12
**need [16]** 1206/22 1207/20 1207/21 1214/12 1243/8 1243/9 1246/9 1248/4 1306/1 1313/10 1315/7 1315/8 1328/15 1329/12 1337/25 1354/9
**needed [7]** 1287/9 1295/8 1314/25 1347/14 1347/15 1357/21 1402/2
**needs [3]** 1233/18 1356/9 1357/24
**nefarious [1]** 1282/19
**negative [1]** 1342/6
**negatively [1]** 1354/8
**negotiated [2]** 1363/11 1363/14
**negotiation [1]** 1317/1
**Nelson [1]** 1281/20
**nervousness [1]** 1337/9
**never [22]** 1207/9 1211/21 1229/19 1273/11 1294/4 1303/23 1325/20 1330/24 1333/13 1338/23 1338/23 1351/13 1353/6 1353/18 1353/19 1353/20 1368/16 1368/18 1368/24 1369/14 1373/14 1374/16
**nevertheless [1]** 1323/5
**New Karner Road [3]** 1407/3 1407/5 1407/16
**New York [20]** 1275/21 1312/8 1388/4 1388/6 1388/7 1388/10 1388/12 1388/23 1391/12 1392/8 1403/5 1404/4 1406/13 1406/16 1406/22 1406/23 1408/4 1409/13 1410/4 1413/11
**news [1]** 1365/5
**newspaper [1]** 1424/20
**newspapers [1]** 1332/17
**next [69]** 1220/22 1221/15 1224/18 1241/25 1243/23 1247/15 1282/2 1288/21 1288/22 1305/24 1315/18 1320/19 1321/11 1326/4 1333/21 1341/9 1341/23 1348/4 1349/25 1350/20 1352/2 1353/11 1354/12 1355/13 1357/15 1368/6 1368/17 1375/17 1376/14 1376/18 1376/19 1376/25 1383/22 1387/5 1391/17 1392/1 1392/21 1393/8 1393/12 1393/17 1393/21 1394/8 1394/14 1394/14 1394/18 1395/7 1395/16 1395/25 1396/1 1396/8 1396/8 1396/11 1396/14 1397/13 1398/6 1398/7 1398/16 1398/24 1399/12 1399/15 1399/25 1406/9 1406/14 1406/20 1413/22 1414/24 1416/11 1420/16 1427/24
**NGG [1]** 1193/2
**NICHOLAS [1]** 1193/8
**Nicole [4]** 1402/25 1403/14 1404/17 1404/18
**night [3]** 1286/10 1327/15 1432/13
**night's [1]** 1425/14
**nine [1]** 1400/2
**Nixon [2]** 1308/3 1308/20
**no -- there [1]** 1253/13
**None [1]** 1367/21
**nonprofit [2]** 1316/17 1361/18
**noon [1]** 1425/10
**normal [1]** 1293/17
**north [1]** 1388/8
**Northern [5]** 1236/19 1236/20 1236/21 1249/11 1249/13
**notable [1]** 1301/10
**notation [1]** 1238/9
**note [3]** 1413/25 1414/2 1416/22
**noted [1]** 1321/2
**notes [5]** 1254/24 1255/7 1255/25 1256/3 1340/13
**nothing [17]** 1199/18 1277/1 1280/17 1298/17 1305/15 1333/1 1338/15 1339/1 1340/12 1348/20 1355/3 1359/21 1365/17 1370/24 1372/25 1376/3 1430/18
**notice [1]** 1265/10
**notified [1]** 1327/8
**noting [1]** 1383/7
**November [8]** 1344/11 1344/19 1347/5 1347/19 1348/4 1349/3 1355/5 1355/6
**November 10 [2]** 1347/5 1348/4
**November 11 [1]** 1349/3
**November 20 [1]** 1355/5
**November 2008 [1]** 1344/19
**November 24 [1]** 1355/6
**number [72]** 1214/17 1217/13 1217/18 1219/5 1219/12 1219/14 1219/20 1219/25 1220/2 1220/3 1234/5 1234/6 1235/25 1254/5 1283/5 1287/13 1289/13 1292/25 1293/7 1294/15 1294/16 1296/16 1298/3 1307/22 1339/13 1348/2 1355/3 1389/21 1391/3 1393/14 1393/15 1395/15 1395/16 1395/17 1395/20 1396/1 1396/2 1396/5 1396/7 1396/9 1396/10 1397/3 1397/7 1399/2 1399/17 1399/18 1400/2 1402/16 1405/5 1407/21 1410/10 1412/23 1412/24 1413/8 1413/20 1413/21 1414/3 1415/21 1415/23 1416/10 1416/11 1416/13 1416/14 1416/19 1416/24 1416/25 1417/5 1417/7 1417/23 1420/20 1422/1 1422/3
**Number 1 [2]** 1395/15 1395/20
**Number 13 [4]** 1416/14 1416/19 1416/24 1416/25
**Number 2 [5]** 1395/16 1396/1 1396/5 1396/7 1405/5
**Number 21 [1]** 1399/17
**Number 3 [7]** 1395/17 1396/9 1396/10 1399/2 1399/18 1413/20 1413/21
**Number 4 [1]** 1422/3
**Number 457 [1]** 1407/21
**Number 7 [2]** 1393/14 1393/15
**Number 8 [2]** 1397/3 1397/7
**Number 9 [1]** 1400/2
**Numbered [1]** 1401/1
**numbers [7]** 1217/17 1219/4 1219/10 1220/4 1293/4 1293/7 1395/13
**numerous [2]** 1236/24 1357/23
**NXIVM [85]** 1200/10 1202/14 1204/6 1204/10 1205/10 1210/21 1216/8 1233/3 1233/8 1239/24 1240/18 1241/13 1242/9 1242/19 1243/6 1243/15 1251/11 1251/23 1254/5 1257/1 1257/4 1265/5 1265/6 1265/7 1266/5 1267/15 1267/20 1268/10 1268/11 1269/6 1277/17 1277/21 1279/5 1279/9 1280/11 1281/22 1282/17 1293/4 1293/10 1293/11 1299/24 1300/15 1301/2 1302/9 1330/2 1330/3 1330/14 1332/25 1333/1 1339/14 1340/8 1340/18 1342/7 1342/18 1359/7 1359/12 1360/15 1364/9 1364/17 1364/18 1364/20 1365/10 1365/11 1365/13 1369/2 1369/4 1369/11 1369/12 1369/24 1369/24 1370/12 1391/4 1391/13 1400/19 1407/7 1414/6 1421/8 1428/24 1428/25 1429/2 1429/4 1430/13 1430/14 1430/21 1432/3
**NXIVM's [6]** 1299/25 1349/12 1430/4 1430/7 1431/24 1432/1

O

**O'Hara [3]** 1353/14 1353/23 1365/9
**oakhaven.haven [1]** 1411/5
**oath [5]** 1198/10 1206/23 1271/23 1321/19 1338/19
**object [18]** 1207/2 1259/15 1264/11 1280/3 1282/4 1283/19 1284/14 1286/15 1301/13 1301/18 1302/21 1339/22 1350/7 1350/7 1350/15 1350/22 1350/22 1350/23
**objected [4]** 1207/1 1382/24

## O

**objected... [2]** 1383/2 1383/8
**objecting [4]** 1207/5 1221/2 1251/16 1264/18
**objection [39]** 1208/24 1214/19 1215/4 1219/21 1220/8 1220/19 1224/5 1231/2 1231/16 1231/22 1241/3 1241/20 1251/15 1251/20 1252/15 1255/2 1255/4 1255/8 1255/18 1256/1 1262/3 1263/12 1263/21 1263/23 1264/1 1265/12 1268/4 1302/25 1306/9 1340/20 1346/13 1373/18 1376/1 1381/12 1382/20 1382/23 1383/7 1383/9 1383/13
**objections [1]** 1382/14
**obligation [2]** 1216/17 1340/14
**obscuring [1]** 1395/20
**observe [1]** 1371/8
**observed [2]** 1214/24 1284/12
**obvious [1]** 1360/16
**obviously [2]** 1207/11 1350/17
**occasions [3]** 1307/24 1318/25 1318/25
**occur [1]** 1242/16
**occurred [6]** 1242/1 1242/15 1242/16 1300/20 1320/6 1425/18
**October [7]** 1279/18 1279/18 1279/19 1279/19 1386/13 1386/16 1404/14
**odds [1]** 1314/10
**offenses [1]** 1297/6
**offer [4]** 1213/20 1234/19 1311/11 1346/11
**offered [4]** 1222/16 1225/23 1239/7 1268/11
**offering [2]** 1243/17 1243/20
**office [14]** 1193/11 1240/6 1322/19 1343/6 1343/13 1352/1 1353/20 1385/14 1416/3 1417/7 1419/22 1419/23 1419/25 1420/2
**officer [6]** 1384/22 1384/24 1385/6 1385/11 1385/22 1411/24
**offices [1]** 1391/13
**official [1]** 1277/11
**Officially [1]** 1337/5
**officials [2]** 1330/14 1357/23
**often [5]** 1250/10 1298/17 1357/24 1375/19 1375/25
**oil [2]** 1310/12 1310/13
**old [19]** 1203/6 1203/7 1203/10 1203/13 1204/1 1205/21 1208/2 1208/18 1209/11 1209/17 1209/21 1210/1 1215/22 1215/24 1280/1 1307/12 1308/6 1311/22 1315/6
**older [1]** 1315/7
**one-on-one [2]** 1319/3 1319/3
**one-sided [1]** 1265/16
**ongoing [3]** 1241/11 1249/14 1250/6
**oops [1]** 1390/9
**open [12]** 1198/1 1209/1 1222/1 1244/16 1249/1 1271/1 1321/3 1329/1 1337/1 1381/1 1422/6 1423/6
**opened [2]** 1323/7 1375/11
**operations [1]** 1360/14
**opportunity [2]** 1228/4 1430/20
**opposed [1]** 1293/10
**opposite [3]** 1368/11 1415/3 1415/4
**option [1]** 1233/1
**optional [1]** 1294/2
**order [2]** 1242/12 1247/22
**ordered [1]** 1383/16
**orders [2]** 1298/7 1300/22
**Oregon [13]** 1398/18 1398/23 1399/1 1399/2 1399/13 1399/16 1399/17 1409/13 1411/12 1412/3 1413/10 1413/18 1422/4
**organization [22]** 1205/1 1205/17 1207/18 1211/1 1313/16 1313/23 1313/24 1316/22 1329/18 1329/21 1329/25 1330/1 1333/4 1350/21 1351/1 1351/1 1361/4 1361/5 1361/14 1361/15 1361/17 1421/8
**organizations [8]** 1265/10 1282/18 1313/18 1314/1 1316/20 1332/17 1360/14 1362/8
**orient [3]** 1316/11 1357/10 1361/9
**original [3]** 1242/20 1304/20 1345/4
**originally [1]** 1339/17
**otherwise [1]** 1431/18
**ourselves [1]** 1405/23
**outflanked [1]** 1244/11
**outlet [1]** 1371/3
**outside [9]** 1271/1 1320/6 1355/4 1398/17 1417/10 1424/21 1425/3 1425/18 1427/18
**overcoming [1]** 1286/22
**overflow [1]** 1427/8
**overruled [5]** 1282/6 1301/19 1350/16 1350/24 1383/9
**overview [5]** 1393/5 1407/1 1407/23 1408/7 1408/13
**own [13]** 1207/16 1208/17 1261/3 1266/9 1292/10 1310/15 1310/21 1318/9 1323/8 1337/25 1340/18 1367/1 1367/4
**owned [2]** 1310/18 1310/24
**owner [2]** 1288/13 1349/25
**Oxenberg [27]** 1217/9 1217/24 1218/9 1218/20 1218/23 1220/14 1221/8 1222/5 1222/12 1222/14 1222/20 1223/1 1223/8 1225/20 1225/21 1225/24 1226/3 1226/7 1228/9 1232/13 1232/15 1237/3 1237/7 1238/15 1250/22 1265/22 1305/9
**Oxenberg's [4]** 1220/3 1222/16 1223/15 1224/1

## P

**P-A-R-L-O-T-O [1]** 1239/16
**p.m [3]** 1321/2 1425/11 1432/16
**pace [1]** 1375/22
**Pacific [1]** 1310/12
**Padilla [1]** 1405/14
**page 1 [1]** 1357/16
**page 667 [1]** 1268/9
**pages [1]** 1357/8
**paid [7]** 1241/10 1297/21 1304/9 1304/12 1325/20 1342/18 1366/24
**panic [1]** 1268/20
**paper [2]** 1308/10 1308/16
**paperback [1]** 1308/18
**paragraph [7]** 1200/13 1204/17 1351/25 1353/11 1353/11 1354/16 1354/17
**PARALEGAL [1]** 1193/22
**parameters [2]** 1411/25 1428/13
**pardon [3]** 1289/16 1358/8 1365/24
**pardoned [1]** 1352/1
**paren [2]** 1359/6 1359/8
**parents [2]** 1251/14 1251/19
**Park [16]** 1253/22 1388/3 1388/7 1388/8 1388/11 1388/23 1391/9 1391/10 1392/7 1405/8 1406/6 1406/12 1406/16 1408/3 1410/4 1411/13
**parking [4]** 1407/13 1407/14 1407/15 1411/22
**Parlato [34]** 1238/12 1238/19 1239/15 1239/19 1239/23 1240/8 1240/17 1240/21 1241/1 1241/7 1241/8 1243/13 1243/14 1250/7 1250/14 1338/22 1338/23 1339/17 1365/22 1366/6 1366/14 1366/18 1367/5 1367/10 1367/12 1367/20 1367/24 1368/9 1368/14 1368/15 1368/18 1368/21 1368/23 1423/1
**part [48]** 1200/25 1201/1 1202/8 1202/9 1248/19 1253/14 1258/6 1266/7 1270/4 1274/16 1277/25 1282/25 1286/22 1287/12 1296/1 1299/5 1299/6 1299/18 1303/14 1305/13 1314/6 1314/6 1314/11 1317/15 1324/9 1331/9 1340/18 1341/5 1344/3 1347/13 1349/3 1350/21 1350/25 1351/1 1351/4 1354/6 1373/12 1386/4

P

**part... [10]** 1386/4 1386/22 1388/10 1388/14 1388/22 1410/6 1410/9 1415/24 1427/5 1429/14
**partial [1]** 1279/11
**participants [2]** 1264/14 1288/4
**participate [3]** 1295/16 1296/7 1411/9
**participated [3]** 1386/21 1386/23 1411/11
**particular [37]** 1200/21 1202/8 1202/9 1210/9 1242/13 1300/1 1389/9 1390/8 1390/10 1391/7 1393/9 1393/13 1393/19 1394/15 1395/10 1396/13 1396/15 1397/12 1399/10 1402/19 1406/15 1407/15 1410/21 1411/21 1412/4 1412/20 1414/1 1414/3 1415/19 1416/14 1417/3 1417/7 1418/19 1419/6 1420/12 1420/18 1422/2
**parties [2]** 1328/9 1366/16
**partly [2]** 1278/18 1331/10
**party [9]** 1228/3 1228/10 1228/11 1228/12 1229/8 1230/21 1302/6 1302/10 1349/13
**passage [1]** 1210/23
**passed [8]** 1371/12 1371/18 1372/1 1372/8 1372/9 1373/4 1374/3 1375/25
**passing [1]** 1227/10
**past [2]** 1276/14 1286/23
**patent [8]** 1201/22 1201/24 1201/24 1202/1 1299/17 1300/3 1300/6 1300/6
**patent-type [1]** 1299/17
**pattern [1]** 1347/13
**Patti [3]** 1350/2 1350/13 1352/1
**PAUL [1]** 1193/20
**Pause [3]** 1271/11 1271/15 1306/3
**pave [1]** 1329/19
**Pavilion [1]** 1263/19
**paying [1]** 1243/14
**payments [1]** 1362/10
**payroll [1]** 1315/2
**pays [3]** 1240/21 1241/1 1241/8
**Pentagon [13]** 1307/24 1308/10 1308/25 1309/4 1309/4 1309/6 1309/13 1309/17 1314/22 1314/23 1314/24 1315/19 1315/20
**PENZA [4]** 1193/13 1421/18 1422/11 1433/10
**Penza's [1]** 1381/15
**per [1]** 1296/16
**perceives [1]** 1431/11
**percent [2]** 1310/18 1429/11
**perceptions [1]** 1266/9
**perfectly [1]** 1256/21
**perhaps [3]** 1201/25 1210/1 1224/5
**perhapses [1]** 1322/18
**period [24]** 1232/24 1233/7 1250/22 1283/15 1283/16 1307/22 1307/25 1314/14 1315/25 1317/8 1319/11 1329/6 1330/15 1337/8 1337/14 1337/18 1338/1 1341/11 1341/16 1352/6 1369/24 1370/12 1371/9 1374/24
**periodically [1]** 1386/17
**perjury [2]** 1338/25 1368/19
**permission [4]** 1206/20 1271/7 1271/9 1349/17
**permit [1]** 1239/3
**permitting [2]** 1222/11 1225/19
**person [37]** 1202/4 1208/16 1214/7 1220/15 1222/4 1223/13 1231/14 1242/24 1246/12 1263/4 1288/13 1288/14 1288/21 1290/23 1291/6 1291/14 1292/9 1293/17 1304/9 1304/11 1304/11 1304/12 1304/13 1304/16 1304/22 1317/12 1318/11 1318/11 1322/3 1341/6 1342/11 1351/10 1351/23 1365/6 1365/7 1365/10 1369/13
**personal [7]** 1313/4 1329/23 1333/1 1333/5 1352/23 1355/2 1355/2
**personally [5]** 1324/1 1338/5 1343/17 1370/23 1386/23
**personnel [1]** 1274/19
**perspective [3]** 1293/9 1293/10 1293/13
**Peter [1]** 1413/9
**philosophies [1]** 1211/11
**philosophy [1]** 1292/12
**phone [26]** 1193/23 1217/8 1217/13 1217/17 1217/18 1217/24 1218/17 1219/4 1219/20 1219/24 1220/6 1230/24 1231/6 1231/10 1231/14 1231/25 1232/5 1232/7 1233/10 1235/25 1236/13 1250/16 1252/9 1283/25 1332/7 1424/23
**phones [1]** 1232/10
**phonetic [1]** 1290/15
**photo [21]** 1259/19 1393/16 1395/11 1399/2 1406/15 1407/18 1407/20 1408/6 1408/11 1408/16 1413/8 1413/16 1413/22 1414/25 1418/10 1419/11 1419/17 1420/18 1420/21 1420/22 1421/1
**photograph [13]** 1284/24 1285/6 1285/16 1285/21 1289/21 1290/10 1290/24 1302/2 1398/8 1412/7 1412/12 1413/6 1417/14
**photographer [2]** 1412/5 1413/9
**photographing [1]** 1412/7
**photographs [5]** 1390/11 1390/14 1412/14 1412/24 1413/16
**photography [1]** 1419/7
**photos [9]** 1412/10 1412/11 1412/16 1412/20 1413/6 1413/14 1419/19 1420/24 1421/13
**phrased [1]** 1323/22
**physical [1]** 1268/24
**physically [5]** 1261/13 1371/13 1371/17 1373/5 1374/3
**piano [3]** 1414/18 1414/19 1419/1
**pick [1]** 1277/14
**picked [1]** 1226/21
**picture [26]** 1302/8 1305/11 1394/19 1395/25 1396/1 1396/3 1396/6 1398/6 1398/7 1398/16 1398/25 1399/1 1399/25 1401/12 1408/1 1414/8 1414/9 1414/18 1415/7 1416/7 1416/8 1416/21 1419/16 1420/4 1420/8 1420/12
**pictures [2]** 1297/4 1305/14
**pie [1]** 1225/16
**piece [6]** 1416/12 1416/14 1417/3 1417/8 1417/10 1422/3
**pieces [2]** 1381/11 1381/16
**pies [10]** 1225/9 1225/9 1226/21 1227/18 1228/2 1229/7 1230/21 1232/12 1261/21 1284/9
**pillar [2]** 1413/21 1418/20
**pillars [1]** 1415/1
**pilot [1]** 1233/17
**place [10]** 1237/10 1237/16 1238/11 1305/4 1305/9 1328/16 1382/10 1401/22 1412/7 1424/10
**placed [2]** 1234/20 1410/21
**placing [1]** 1230/24
**Plaintiff [1]** 1193/4
**plan [1]** 1308/25
**plane [4]** 1275/24 1276/15 1276/17 1276/18
**planned [1]** 1329/7
**planning [1]** 1312/2
**plans [2]** 1276/3 1276/6
**Plant [1]** 1261/11
**Plantmade [3]** 1261/8 1261/9 1261/10
**plaque [2]** 1413/5 1413/16
**plaques [1]** 1413/13
**play [2]** 1277/9 1277/12
**played [2]** 1297/8 1347/22
**playing [2]** 1213/7 1296/4
**Plaza [2]** 1193/12 1406/12
**pleasure [2]** 1248/9 1248/10
**plenary [1]** 1317/18
**plight [1]** 1312/16
**Plyam [6]** 1363/23 1366/20 1367/11 1367/12 1367/14 1367/14
**PM [1]** 1376/23

**P**

**podcasts [1]** 1424/20
**point [63]** 1200/21 1200/22 1203/6 1206/3 1206/5 1207/3 1207/5 1213/5 1213/11 1216/8 1216/25 1218/23 1231/11 1232/9 1235/5 1236/5 1240/1 1240/23 1241/16 1244/13 1246/14 1246/18 1247/20 1247/25 1251/1 1251/25 1252/18 1252/20 1253/10 1253/17 1253/18 1255/17 1255/22 1259/25 1260/20 1260/22 1261/4 1261/6 1262/16 1262/22 1269/18 1269/18 1272/15 1273/23 1288/10 1292/15 1300/5 1310/23 1310/24 1315/23 1325/4 1328/22 1340/2 1340/13 1340/14 1347/9 1349/16 1352/15 1353/17 1427/10 1427/17 1430/17 1431/2
**pointing [1]** 1213/13
**points [3]** 1247/22 1295/7 1295/10
**police [8]** 1384/18 1385/18 1385/21 1385/22 1386/2 1386/4 1386/6 1386/19
**policy [3]** 1307/20 1352/19 1362/25
**political [5]** 1330/6 1330/23 1357/24 1365/2 1365/3
**politicians' [1]** 1421/7
**politics [2]** 1307/19 1353/5
**polygamous [1]** 1296/17
**poor [1]** 1294/25
**Pops [1]** 1360/23
**popular [1]** 1362/23
**portfolio [1]** 1341/8
**portfolios [1]** 1312/8
**position [6]** 1233/3 1233/8 1298/23 1317/9 1353/4 1353/18
**positions [4]** 1311/18 1312/6 1312/22 1330/7
**positive [2]** 1265/15 1277/10
**possibility [2]** 1324/19 1329/13
**possible [17]** 1218/6 1218/7 1218/13 1231/9 1231/11 1232/3 1232/4 1232/7 1234/5 1235/10 1249/8 1252/4 1280/5 1296/6 1304/25 1354/24 1360/11
**possibly [2]** 1244/11 1429/13
**Post [1]** 1303/23
**postdate [1]** 1242/17
**potentially [3]** 1217/19 1230/10 1429/24
**PowerPoint [13]** 1389/15 1390/2 1390/4 1390/5 1390/7 1390/11 1390/19 1390/23 1404/20 1405/21 1413/2 1416/6 1418/3
**PR [2]** 1323/8 1357/1
**praxes [1]** 1369/5
**pre [1]** 1332/22
**pre-Dalai [1]** 1332/22
**precise [5]** 1284/11 1300/4 1345/4 1368/10 1371/15
**precisely [3]** 1267/21 1311/25 1330/11
**Prefect [2]** 1203/22 1204/1
**prejudice [2]** 1349/11 1351/17
**prejudicial [1]** 1208/3
**premise [1]** 1243/23
**preparation [1]** 1430/20
**prepared [1]** 1381/15
**preposterous [1]** 1332/3
**presence [5]** 1271/1 1320/6 1338/8 1359/13 1425/18
**present [13]** 1193/22 1198/1 1216/21 1216/22 1249/1 1271/17 1321/3 1322/21 1381/1 1381/7 1411/15 1429/5 1432/9
**presentation [2]** 1327/3 1390/19
**presented [1]** 1328/19
**presenting [1]** 1230/17
**presidency [1]** 1308/5
**president [19]** 1308/4 1308/23 1312/7 1312/7 1312/23 1313/6 1313/22 1314/12 1317/20 1318/1 1318/3 1318/5 1318/7 1318/8 1349/19 1352/7 1352/15 1352/15 1362/24
**Presidential [3]** 1314/12 1352/8 1352/13
**Presidents [1]** 1314/2
**press [7]** 1281/25 1332/17 1337/8 1342/6 1342/8 1352/18 1352/20
**pressure [5]** 1265/20 1265/21 1266/16 1266/19 1294/22
**pressure-filled [1]** 1266/16
**pressuring [1]** 1374/24
**prestigious [1]** 1287/25
**pretty [10]** 1205/1 1207/19 1210/23 1288/15 1291/9 1301/4 1301/5 1352/13 1352/21 1415/18
**prevent [1]** 1237/10
**previous [4]** 1279/17 1318/8 1391/19 1396/19
**previously [5]** 1198/13 1226/19 1306/7 1356/18 1392/2
**primarily [1]** 1329/24
**primary [3]** 1245/17 1309/25 1355/4
**prime [1]** 1244/10
**principle [1]** 1221/9
**print [1]** 1394/13
**printed [1]** 1403/15
**printout [1]** 1401/16
**priority [1]** 1262/18
**prison [1]** 1351/15
**prisoner [1]** 1351/12
**private [2]** 1251/9 1251/11
**privilege [25]** 1325/16 1327/5 1327/9 1327/19 1327/25 1328/7 1328/15 1328/18 1328/21 1328/22 1354/23 1427/11 1428/10 1428/18 1428/23 1429/3 1429/3 1429/13 1429/17 1430/3 1430/4 1430/11 1430/14 1431/14 1431/25
**privileged [3]** 1327/7 1426/4 1431/18
**privileges [1]** 1328/5
**privy [4]** 1215/13 1215/14 1216/5 1304/15
**Pro [1]** 1417/4
**problem [17]** 1207/15 1212/12 1216/20 1245/2 1304/16 1304/19 1308/9 1309/7 1325/12 1328/17 1329/9 1333/3 1333/4 1354/7 1354/7 1360/12 1368/20
**problematic [1]** 1355/10
**problems [7]** 1280/16 1304/22 1308/12 1316/20 1341/9 1341/10 1375/3
**procedure [2]** 1411/17 1412/6
**proceed [2]** 1222/22 1308/24
**proceeding [2]** 1206/23 1338/10
**proceedings [5]** 1193/25 1271/11 1271/15 1306/3 1432/16
**process [8]** 1243/7 1260/11 1297/1 1297/3 1409/24 1415/25 1416/4 1425/8
**processes [1]** 1417/17
**produced [3]** 1193/25 1328/3 1328/4
**professed [2]** 1214/17 1215/9
**profession [1]** 1400/15
**professional [1]** 1319/16
**proffer [1]** 1207/7
**proffered [1]** 1244/15
**profit [1]** 1341/15
**program [15]** 1212/10 1232/3 1232/10 1287/20 1287/21 1287/23 1288/4 1288/7 1288/24 1295/22 1295/23 1295/24 1296/2 1329/17 1337/6
**programming [1]** 1298/16
**programs [4]** 1268/11 1300/15 1300/17 1407/10
**project [26]** 1253/11 1258/3 1260/14 1260/15 1260/16 1260/18 1260/19 1273/24 1274/2 1274/2 1274/3 1274/16 1274/17 1275/6 1275/10 1276/25 1277/2 1277/4 1281/7 1299/3 1299/4 1299/12 1303/23 1304/3 1315/18 1338/22
**promise [1]** 1317/4
**promises [1]** 1370/8
**promote [1]** 1263/3
**prompting [2]** 1266/25 1266/25
**proper [4]** 1292/3 1317/17 1348/24 1353/13
**properties [8]** 1391/15

**P**

**properties... [7]** 1391/23 1391/24 1392/2 1393/1 1404/22 1404/24 1405/24
**property [15]** 1338/10 1364/2 1367/21 1369/8 1392/11 1393/3 1397/9 1402/15 1402/18 1402/19 1405/6 1405/9 1409/3 1411/10 1412/8
**propping [1]** 1292/8
**proprietary [2]** 1369/7 1369/11
**prosecute [3]** 1332/8 1332/12 1332/14
**prosecution [1]** 1331/16
**prosecutors [4]** 1332/5 1332/6 1332/8 1332/13
**protect [4]** 1316/22 1337/16 1431/14 1431/14
**protective [1]** 1299/17
**Protectors [1]** 1289/9
**prove [1]** 1245/12
**provide [2]** 1400/22 1404/21
**provided [4]** 1219/4 1361/23 1410/16 1411/5
**proximity [7]** 1388/17 1389/10 1390/20 1400/3 1407/17 1411/20 1420/2
**public [14]** 1310/6 1316/2 1323/2 1323/3 1323/9 1323/23 1324/10 1329/17 1337/19 1372/19 1428/7 1428/21 1429/5 1432/9
**publication [1]** 1337/12
**publish [2]** 1343/23 1389/20
**published [3]** 1349/16 1349/17 1389/21
**publisher [1]** 1332/18
**puddle [2]** 1286/18 1286/22
**pulled [1]** 1395/2
**punish [1]** 1354/25
**punishing [5]** 1203/7 1203/11 1203/16 1203/23 1204/1
**punishment [1]** 1201/6
**puppet [3]** 1348/20 1348/25 1349/8
**purchase [3]** 1402/11 1402/21 1405/4
**purchased [2]** 1338/13 1368/3
**purely [2]** 1319/17 1330/22
**purpose [3]** 1323/1 1323/11 1342/14
**pursuant [1]** 1410/16
**pursue [1]** 1356/25
**pushing [1]** 1348/3
**put [15]** 1219/9 1257/17 1257/20 1265/14 1265/16 1267/11 1270/5 1289/8 1292/16 1292/19 1297/14 1308/21 1317/4 1381/4 1381/6
**putting [3]** 1246/13 1327/22 1374/14

**Q**

**qualified [3]** 1296/22 1296/24 1333/16
**quantify [1]** 1209/8

**questionable [1]** 1308/14
**questioning [1]** 1221/3
**questionnaire [1]** 1425/7
**questions [32]** 1198/20 1199/25 1202/4 1204/19 1243/24 1243/25 1244/8 1244/13 1244/16 1244/24 1246/15 1247/19 1272/5 1281/1 1282/10 1285/24 1286/3 1287/2 1287/13 1291/18 1292/25 1294/9 1295/12 1297/8 1300/25 1301/22 1303/4 1303/9 1365/21 1366/2 1374/6 1430/17
**quick [2]** 1206/10 1359/2
**quickly [2]** 1210/23 1354/12
**quieter [1]** 1337/14
**quietly [1]** 1311/13
**quit [1]** 1324/5
**quite [4]** 1203/21 1230/5 1414/2 1415/23
**quote [8]** 1347/22 1354/1 1354/1 1354/16 1358/14 1358/16 1359/4 1360/8
**quoted [2]** 1284/12 1371/2

**R**

**race [1]** 1352/13
**races [1]** 1352/13
**radio [1]** 1424/20
**radius [3]** 1391/20 1391/25 1393/1
**rah [2]** 1200/7 1200/7
**Rainbow [6]** 1253/7 1253/8 1295/12 1295/16 1296/7 1296/10
**raise [3]** 1313/9 1328/17 1384/1
**raised [5]** 1226/25 1329/12 1381/12 1382/14 1430/5
**raises [2]** 1354/22 1430/4
**raising [1]** 1383/6
**Raleigh [2]** 1404/24 1405/7
**Rampantly [1]** 1211/2
**Ramtha [22]** 1205/4 1205/5 1205/7 1205/9 1205/16 1206/2 1206/11 1206/11 1207/4 1207/13 1207/14 1209/25 1211/8 1211/11 1211/16 1212/10 1212/16 1279/2 1279/23 1287/2 1287/6 1287/11
**ran [4]** 1226/19 1295/24 1295/24 1362/24
**ranch [1]** 1206/9
**range [1]** 1430/24
**RANIERE [27]** 1193/6 1212/21 1213/7 1213/17 1214/3 1214/11 1215/2 1215/10 1215/17 1230/24 1231/5 1231/24 1232/25 1238/20 1238/23 1241/13 1267/18 1284/22 1292/15 1294/17 1295/25 1297/4 1298/11 1301/10 1366/1 1372/23 1386/10
**Raniere's [3]** 1254/10

1254/20 1428/12
**rank [1]** 1293/8
**ranking [1]** 1294/24
**ranks [5]** 1256/17 1292/6 1292/20 1294/19 1302/9
**rapidly [1]** 1353/12
**rather [3]** 1235/3 1411/9 1414/6
**rational [4]** 1201/17 1201/19 1201/21 1202/2
**reach [6]** 1209/13 1209/25 1210/4 1232/23 1246/14 1430/10
**reached [4]** 1223/8 1246/18 1430/9 1432/1
**reaching [1]** 1246/14
**read [42]** 1199/20 1199/24 1200/20 1202/7 1202/10 1204/18 1210/23 1237/24 1238/1 1325/17 1325/21 1338/14 1338/16 1360/8 1367/16 1368/16 1369/6 1369/14 1371/6 1399/19 1402/7 1422/13 1422/16 1422/19 1422/21 1422/23 1422/25 1423/2 1423/4 1423/8 1423/10 1423/14 1423/16 1423/18 1423/20 1423/24 1424/3 1424/6 1424/8 1424/18 1425/2 1425/4
**readiness [1]** 1298/14
**reading [6]** 1246/11 1338/15 1338/15 1338/18 1357/3 1367/6
**reads [2]** 1357/20 1365/5
**ready [6]** 1298/16 1298/18 1321/11 1376/14 1381/3 1427/16
**real [11]** 1308/12 1322/14 1338/17 1339/2 1340/16 1367/24 1400/16 1400/17 1402/12 1402/21 1405/4
**reality [2]** 1202/5 1202/5
**realization [1]** 1215/9
**realized [4]** 1210/11 1233/1 1311/20 1416/1
**really [19]** 1200/3 1209/24 1229/15 1232/16 1244/5 1259/12 1264/18 1279/25 1294/21 1294/23 1341/17 1357/11 1367/17 1368/5 1373/14 1374/18 1431/5 1431/23 1432/1
**rear [3]** 1414/13 1418/8 1419/22
**reason [14]** 1245/21 1261/19 1263/2 1265/5 1267/2 1273/20 1289/5 1312/25 1328/10 1339/18 1340/6 1364/11 1376/2 1431/4
**reasonable [1]** 1256/21
**reasons [2]** 1264/22 1337/24
**Rebecca [2]** 1291/1 1291/2
**recalling [1]** 1342/7
**receive [1]** 1400/14
**received [8]** 1294/6 1306/11 1306/13 1327/14 1346/15 1346/17 1346/19 1400/12

**R**

**receiving [1]** 1294/2
**recently [3]** 1275/12 1275/22
1365/7
**recess [4]** 1270/8 1320/18
1376/23 1427/23
**recognize [24]** 1220/2 1259/9
1289/20 1344/8 1344/16
1344/23 1345/11 1345/17
1346/3 1346/6 1360/2 1362/16
1362/18 1364/4 1364/12
1364/21 1364/25 1365/9
1402/24 1402/25 1403/13
1403/14 1412/21 1421/5
**recognized [2]** 1353/2 1421/5
**recollect [3]** 1237/17
1259/19 1350/1
**recollection [10]** 1214/4
1219/2 1223/2 1235/14 1237/9
1237/15 1240/12 1259/17
1295/4 1304/19
**recommended [1]** 1363/25
**reconstruct [1]** 1254/17
**record [11]** 1219/10 1231/6
1231/14 1231/24 1247/1
1247/9 1306/25 1381/4 1381/6
1384/8 1428/21
**recorded [4]** 1193/25 1231/15
1231/21 1232/8
**recording [6]** 1231/1 1231/11
1231/12 1231/19 1231/25
1232/2
**records [3]** 1236/13 1250/16
1342/19
**recovered [5]** 1415/22
1417/25 1420/5 1420/11
1422/8
**Recross [3]** 1303/6 1303/7
1374/8
**RECROSS-EXAMINATION [2]**
1303/7 1374/8
**redacted [3]** 1423/7 1424/2
1429/23
**Redirect [3]** 1280/19 1280/21
1373/1
**reentered [1]** 1373/23
**reentering [1]** 1373/21
**refer [2]** 1323/17 1356/24
**reference [9]** 1200/6 1212/16
1256/18 1256/19 1257/7
1262/22 1287/20 1303/14
1369/1
**referenced [1]** 1207/15
**referencing [2]** 1256/6
1408/25
**referred [5]** 1206/3 1323/18
1323/19 1361/14 1362/22
**referring [10]** 1297/19
1299/11 1299/12 1299/14
1332/25 1350/4 1353/8 1367/4
1370/6 1420/19
**refers [1]** 1299/15
**reflected [1]** 1347/17
**refresh [4]** 1217/12 1219/2
1219/3 1259/17
**refreshes [1]** 1240/12
**refusal [1]** 1348/25

**refused [2]** 1332/15 1349/18
**regard [1]** 1428/10
**regarding [9]** 1213/13 1221/5
1288/10 1292/3 1294/8
1300/16 1354/21 1391/22
1409/21
**regardless [4]** 1220/13
1240/25 1348/23 1348/24
**regards [1]** 1387/1
**regional [2]** 1313/21 1405/3
**regions [1]** 1313/21
**regular [5]** 1233/10 1233/13
1249/10 1250/21 1250/24
**regularly [1]** 1250/18
**rejected [1]** 1202/1
**related [6]** 1211/11 1250/19
1300/17 1400/22 1402/5
1404/21
**relates [1]** 1313/17
**relating [1]** 1327/9
**relation [3]** 1258/18 1367/24
1389/5
**relations [8]** 1323/2 1323/3
1323/9 1323/24 1324/10
1329/17 1337/19 1372/17
**relationship [20]** 1233/19
1234/9 1319/12 1319/13
1319/15 1319/16 1325/9
1333/11 1337/4 1337/5 1338/2
1340/5 1341/24 1347/25
1348/1 1352/23 1369/19
1372/13 1374/15 1374/23
**relay [1]** 1365/13
**release [3]** 1297/17 1297/18
1314/16
**relevant [5]** 1222/14 1225/22
1239/6 1265/1 1266/5
**reliability [1]** 1383/3
**relied [1]** 1327/16
**relinquished [1]** 1278/14
**rely [2]** 1208/16 1357/1
**remain [2]** 1257/4 1311/16
**remember [61]** 1199/17 1200/9
1202/3 1213/3 1213/8 1213/25
1216/14 1217/8 1217/23
1218/3 1218/4 1218/14 1219/2
1225/9 1227/9 1229/1 1229/4
1229/6 1229/13 1229/16
1229/19 1234/1 1236/23
1236/24 1236/24 1237/1
1240/17 1240/19 1240/23
1252/6 1254/12 1254/15
1254/23 1256/22 1257/12
1259/22 1286/1 1286/2 1293/1
1294/11 1295/13 1297/3
1297/10 1298/25 1301/2
1324/1 1330/18 1331/3
1338/12 1338/14 1339/4
1342/8 1342/23 1348/12
1350/17 1363/5 1364/5 1364/5
1367/16 1367/18 1368/5
**remembered [1]** 1367/8
**remembering [2]** 1240/2
1368/2
**remind [5]** 1198/10 1302/2
1321/19 1331/19 1424/14
**reminded [1]** 1271/22
**remoteness [1]** 1269/6

**remove [2]** 1256/8 1256/11
**removed [3]** 1268/20 1288/20
1373/9
**reorient [1]** 1405/23
**reparations [1]** 1359/6
**rephrase [3]** 1198/22 1283/22
1350/9
**replace [1]** 1306/7
**replaced [1]** 1318/11
**report [6]** 1240/20 1242/10
1312/15 1312/17 1318/14
1337/23
**reported [1]** 1308/23
**reporter [3]** 1193/23 1349/23
1427/21
**reports [1]** 1332/19
**represent [6]** 1342/16 1366/1
1391/18 1391/18 1413/4
1413/5
**representative [1]** 1307/25
**Representatives [2]** 1307/23
1308/8
**represented [2]** 1311/24
1367/20
**representing [2]** 1331/11
1333/4
**representor [1]** 1363/5
**represents [2]** 1391/19
1391/24
**reputation [2]** 1359/13
1374/18
**reputations [1]** 1349/12
**request [5]** 1238/23 1318/2
1329/22 1332/2 1416/2
**requests [2]** 1337/17 1337/20
**required [1]** 1332/12
**requires [1]** 1371/15
**requited [1]** 1360/23
**reread [1]** 1367/17
**research [3]** 1308/16 1424/21
1425/5
**researched [1]** 1308/9
**resentment [1]** 1342/3
**reservations [2]** 1238/17
1238/19
**reserved [2]** 1366/22 1407/15
**residence [31]** 1393/13
1393/14 1395/14 1395/16
1396/1 1398/15 1399/1 1399/3
1399/5 1399/6 1399/7 1399/16
1400/1 1401/7 1408/14
1408/17 1411/12 1411/18
1411/20 1411/21 1411/23
1412/9 1412/10 1412/11
1412/12 1413/18 1414/10
1414/13 1416/2 1418/7 1422/4
**residences [11]** 1389/3
1391/7 1392/15 1392/15
1392/17 1394/20 1395/9
1395/10 1395/11 1396/16
1399/23
**residing [1]** 1409/12
**resign [2]** 1211/18 1242/9
**resigned [6]** 1204/12 1204/14
1233/2 1233/8 1242/14 1308/3
**resolve [3]** 1348/6 1368/6
1428/20
**resolved [2]** 1213/18 1213/18

R

**resolving [1]** 1358/13
**resourceful [1]** 1356/15
**respect [3]** 1221/4 1328/7 1357/21
**respond [2]** 1358/8 1359/14
**responded [1]** 1416/4
**responding [1]** 1349/4
**response [13]** 1212/19 1216/18 1274/1 1274/22 1279/10 1347/17 1347/19 1348/13 1353/25 1354/17 1355/6 1355/9 1356/24
**responsibilities [7]** 1216/25 1373/13 1386/1 1386/7 1386/7 1386/18 1386/25
**responsibility [2]** 1317/15 1340/9
**rest [1]** 1418/9
**restaurant [10]** 1258/20 1258/21 1258/23 1258/24 1260/2 1261/3 1261/10 1262/8 1262/13 1265/23
**restoring [1]** 1359/6
**result [3]** 1268/11 1291/21 1428/11
**results [1]** 1357/21
**resume [1]** 1432/16
**resumed [1]** 1372/5
**resumes [2]** 1271/12 1321/6
**retain [1]** 1325/15
**retained [1]** 1316/18
**retired [3]** 1314/4 1314/6 1318/2
**retreat [1]** 1210/9
**retrospect [1]** 1209/18
**return [4]** 1241/21 1411/5 1425/13 1425/21
**reverse [1]** 1313/8
**review [1]** 1421/9
**reviewed [3]** 1340/2 1418/14 1418/18
**reviewing [7]** 1199/23 1200/16 1202/12 1204/20 1237/23 1238/2 1238/5
**revolutionize [1]** 1351/15
**rewrote [2]** 1316/20 1413/15
**Rick [17]** 1299/24 1324/17 1337/16 1342/20 1353/12 1353/13 1353/22 1354/6 1356/13 1358/13 1360/14 1360/16 1362/1 1362/10 1369/9 1369/16 1422/22
**ridiculing [1]** 1298/13
**right-hand [1]** 1407/22
**rights [3]** 1328/24 1385/16 1432/3
**rise [5]** 1264/5 1320/4 1321/4 1376/12 1425/16
**risk [2]** 1300/6 1311/11
**Rita [1]** 1322/14
**Road [20]** 1391/10 1391/12 1398/7 1398/8 1398/10 1398/20 1406/16 1406/18 1407/3 1407/5 1407/6 1407/10 1407/16 1407/18 1408/8 1408/10 1408/12 1408/18 1409/1 1410/3
**robberies [1]** 1351/5
**Rogato [1]** 1342/12
**Roger [3]** 1364/25 1365/5 1422/20
**role [16]** 1213/7 1260/10 1266/4 1267/20 1277/9 1277/12 1278/18 1291/12 1308/6 1309/4 1317/14 1317/25 1339/17 1367/16 1368/5 1412/2
**roll [1]** 1376/18
**rolling [1]** 1272/11
**Rome [1]** 1406/11
**room [29]** 1206/18 1206/19 1210/12 1368/24 1412/12 1414/12 1414/17 1414/19 1417/1 1418/8 1418/25 1419/2 1419/3 1419/6 1419/10 1419/15 1419/21 1419/22 1420/1 1420/2 1420/3 1420/4 1420/5 1420/6 1420/8 1420/9 1420/13 1421/22 1427/8
**rooms [1]** 1415/6
**Rosa [5]** 1409/5 1409/6 1409/6 1409/9 1409/12
**Rosa Laura [3]** 1409/5 1409/6 1409/9
**ROSE [1]** 1193/18
**Ross [22]** 1299/24 1324/17 1331/18 1337/16 1342/20 1353/12 1353/13 1353/23 1356/8 1356/13 1357/22 1357/23 1358/14 1359/4 1360/14 1360/17 1361/5 1362/2 1362/10 1369/9 1369/16 1422/22
**Ross' [1]** 1354/6
**roughly [2]** 1313/19 1330/15
**Route [3]** 1406/5 1406/11 1406/22
**row [4]** 1290/23 1291/2 1394/4 1394/22
**royalty [2]** 1288/1 1288/2
**RPR [1]** 1193/23
**rude [1]** 1304/23
**ruled [3]** 1381/13 1382/22 1383/6
**ruling [2]** 1242/20 1264/17
**rumor [2]** 1281/12 1281/13
**Rumsfeld [2]** 1309/10 1315/21
**Rumsfeld's [1]** 1315/3
**run [8]** 1206/10 1209/23 1216/16 1276/7 1286/13 1286/14 1295/22 1312/3
**run-down [1]** 1206/10
**running [2]** 1272/22 1310/5
**Russia [1]** 1318/24

S

**S-T-E-P-H-E-N [1]** 1307/1
**safe [1]** 1238/21
**safety [3]** 1229/13 1262/18 1411/24
**Sahajo [3]** 1290/14 1290/16 1290/17
**Sahaka [1]** 1290/15
**sake [3]** 1247/1 1354/14 1361/18
**sale [4]** 1310/17 1402/11 1402/21 1405/4
**Sally [4]** 1283/4 1283/8 1283/10 1284/5
**Salt [1]** 1275/24
**Salzman [26]** 1203/21 1256/7 1256/8 1256/11 1287/10 1288/23 1289/4 1294/18 1322/21 1322/25 1398/15 1399/7 1407/15 1411/12 1411/15 1416/20 1428/3 1428/4 1428/5 1428/9 1428/9 1428/17 1430/13 1431/2 1431/18 1432/2
**Salzman's [5]** 1382/25 1399/9 1418/7 1421/23 1429/7
**sanctions [1]** 1352/19
**Sara [7]** 1358/16 1360/6 1360/15 1361/10 1362/6 1366/18 1367/25
**Sarah [50]** 1218/15 1218/16 1233/11 1234/4 1234/7 1234/12 1234/20 1235/1 1235/3 1235/8 1235/14 1235/24 1236/7 1237/3 1237/6 1237/12 1282/11 1283/4 1283/8 1283/10 1283/25 1284/1 1284/5 1301/22 1301/23 1302/3 1302/19 1302/24 1322/11 1322/17 1322/20 1322/25 1323/16 1324/9 1324/14 1329/23 1330/5 1330/13 1332/4 1332/16 1333/11 1337/3 1339/9 1340/17 1341/25 1345/20 1346/8 1349/12 1362/12 1366/14
**Sarah's [6]** 1233/13 1233/19 1235/10 1237/3 1237/7 1302/17
**Saratoga [1]** 1388/21
**Saratoga County [1]** 1388/21
**sat [1]** 1340/3
**save [3]** 1262/19 1312/1 1313/15
**saw [6]** 1229/9 1230/25 1339/20 1341/8 1353/2 1375/16
**scale [1]** 1282/23
**scan [1]** 1199/21
**Scanlon's [2]** 1429/18 1429/20
**scared [3]** 1210/18 1226/23 1232/20
**scene [2]** 1413/6 1416/4
**school [4]** 1205/9 1296/8 1296/10 1338/25
**Schumer [4]** 1364/19 1364/21 1364/22 1422/24
**scientific [2]** 1209/19 1351/21
**scientifically [1]** 1351/12
**scientist [1]** 1209/23
**scientists [1]** 1209/22
**scope [1]** 1267/15
**screaming [2]** 1288/17 1289/8
**screen [3]** 1265/25 1344/1

S

**screen... [1]** 1391/14
**screened [1]** 1297/6
**screening [4]** 1263/18 1266/3 1274/8 1297/1
**Seagram's [9]** 1310/1 1310/4 1310/9 1310/15 1310/21 1311/16 1311/19 1314/5 1314/24
**Seagram's Corporation [1]** 1310/4
**sealed [3]** 1248/23 1248/23 1248/25
**search [20]** 1386/23 1386/24 1399/11 1410/17 1411/4 1411/10 1411/11 1411/18 1411/19 1411/25 1412/3 1412/8 1412/13 1412/14 1412/21 1413/19 1415/17 1415/19 1415/22 1416/12
**search warrant [9]** 1399/11 1410/17 1411/4 1411/10 1411/11 1411/19 1411/25 1413/19 1416/12
**searched [1]** 1310/13
**searches [2]** 1410/7 1410/9
**seat [3]** 1306/22 1384/6 1418/19
**seated [8]** 1198/4 1264/10 1271/18 1321/16 1383/21 1425/24 1428/1 1428/6
**second [41]** 1201/9 1202/6 1202/7 1227/19 1236/22 1237/2 1237/8 1237/14 1237/21 1238/4 1259/10 1262/9 1262/10 1287/18 1291/2 1291/2 1299/6 1314/8 1315/4 1322/1 1344/6 1344/15 1344/22 1345/9 1345/10 1348/18 1351/25 1354/12 1356/3 1357/10 1358/5 1370/5 1370/6 1373/8 1390/11 1400/4 1403/24 1408/20 1409/9 1413/15 1423/6
**secondary [1]** 1399/16
**seconds [1]** 1370/11
**secret [3]** 1223/4 1234/18 1325/12
**secretary [10]** 1309/10 1309/10 1309/12 1309/14 1311/8 1315/3 1316/3 1317/12 1317/19 1317/22
**Secretary Rumsfeld [1]** 1309/10
**section [1]** 1200/12
**secured [2]** 1412/21 1417/1
**security [2]** 1272/18 1312/24
**seek [2]** 1349/15 1424/21
**seem [2]** 1199/15 1430/11
**segue [1]** 1225/15
**seized [1]** 1416/20
**select [3]** 1297/1 1412/23 1412/24
**selection [2]** 1425/4 1425/8
**selective [1]** 1308/13
**self [2]** 1293/22 1310/19
**self-imposed [1]** 1310/19
**seller [7]** 1402/18 1402/19 1402/22 1403/6 1403/11 1405/9 1405/10
**selling [2]** 1311/1 1403/21
**Senate [2]** 1307/24 1352/12
**senator [1]** 1364/23
**sending [1]** 1294/15
**sends [1]** 1358/9
**senior [2]** 1193/9 1309/16
**sense [15]** 1199/16 1210/5 1210/6 1210/7 1223/20 1230/17 1266/10 1277/24 1293/22 1293/22 1293/23 1300/18 1300/22 1317/13 1359/12
**sent [7]** 1203/25 1212/20 1256/14 1256/16 1308/16 1311/21 1312/1
**sentence [3]** 1352/2 1353/11 1358/17
**sentences [1]** 1349/10
**separate [1]** 1382/10
**September [1]** 1318/19
**sequence [3]** 1214/1 1229/6 1260/8
**serial [1]** 1417/4
**series [9]** 1202/4 1202/20 1209/22 1209/23 1213/15 1214/9 1346/5 1361/8 1392/8
**series 1496R [1]** 1361/8
**serious [2]** 1208/16 1269/21
**seriously [1]** 1292/23
**serpent [1]** 1216/1
**served [2]** 1317/20 1400/13
**service [2]** 1315/18 1405/3
**session [1]** 1317/18
**set [2]** 1382/6 1412/24
**settle [1]** 1359/5
**seven [3]** 1307/13 1325/22 1342/4
**seven-member [1]** 1342/4
**seven-page [1]** 1325/22
**seventies [1]** 1316/7
**Seventy [1]** 1307/13
**Seventy-seven [1]** 1307/13
**several [5]** 1202/15 1292/9 1309/25 1320/14 1349/17
**sex [4]** 1282/2 1297/6 1301/11 1301/16
**shaking [1]** 1303/2
**Shall [1]** 1383/17
**shape [1]** 1360/18
**share [4]** 1216/15 1229/8 1238/18 1360/13
**shareholders [1]** 1310/6
**shares [2]** 1310/7 1311/1
**sharing [1]** 1226/9
**shelves [1]** 1414/1
**shift [1]** 1348/17
**shoot [1]** 1258/25
**shop [1]** 1226/19
**shopping [1]** 1406/10
**short [5]** 1201/16 1237/20 1308/2 1314/24 1411/23
**shot [8]** 1233/17 1393/23 1394/11 1396/15 1396/20 1397/15 1397/16 1398/5
**shoulder [2]** 1257/17 1257/20
**shoulder-type [1]** 1257/20
**shown [4]** 1263/9 1263/19 1284/24 1299/5
**shutdown [1]** 1315/16
**sic [1]** 1318/1
**side [8]** 1206/24 1208/4 1267/23 1269/9 1278/5 1398/2 1418/10 1419/17
**side-show [1]** 1208/4
**sidebar [11]** 1208/25 1221/1 1221/14 1241/24 1242/1 1326/2 1327/1 1328/25 1333/19 1376/24 1428/19
**sided [1]** 1265/16
**sides [2]** 1319/3 1368/11
**sidetracked [1]** 1307/19
**sign [24]** 1311/12 1392/22 1393/9 1394/15 1395/5 1395/6 1396/2 1396/11 1396/12 1396/13 1397/10 1397/11 1397/12 1398/17 1398/23 1399/19 1399/20 1406/15 1407/12 1407/13 1407/14 1408/2 1408/10 1408/11
**signal [1]** 1328/14
**signature [8]** 1402/22 1402/24 1402/25 1402/25 1403/10 1403/13 1403/14 1405/19
**signed [9]** 1308/18 1317/5 1369/13 1403/16 1404/16 1404/17 1405/16 1405/17 1405/18
**significance [1]** 1390/24
**significant [1]** 1391/15
**similar [3]** 1207/19 1356/17 1425/1
**simply [4]** 1349/1 1351/22 1360/17 1375/21
**Singer [1]** 1318/12
**Singers [1]** 1423/13
**single [1]** 1392/15
**single-family [1]** 1392/15
**sister [1]** 1359/7
**sisters [1]** 1228/14
**sit [3]** 1199/5 1276/19 1418/17
**sites [1]** 1425/1
**sitting [4]** 1415/1 1418/8 1418/15 1418/18
**situation [20]** 1230/8 1230/9 1230/11 1230/17 1232/11 1262/17 1265/23 1272/19 1277/17 1277/20 1281/24 1282/21 1337/9 1348/7 1350/1 1350/12 1358/14 1360/12 1363/15 1375/15
**six [4]** 1217/4 1312/5 1312/16 1315/1
**sixth [1]** 1385/24
**skip [1]** 1413/3
**slandering [1]** 1329/13
**slanderous [1]** 1355/10
**slave [1]** 1291/13
**slaves [8]** 1254/11 1254/20 1254/21 1289/23 1290/1 1290/3 1301/12 1301/17
**sleep [1]** 1425/14

S

**slide [41]** 1390/9 1390/10 1391/6 1391/7 1391/11 1391/17 1391/22 1391/22 1391/24 1392/1 1392/1 1392/21 1392/22 1392/24 1393/8 1393/8 1393/9 1393/12 1393/13 1393/17 1393/21 1394/8 1394/8 1394/14 1394/15 1394/18 1395/7 1396/14 1396/15 1396/22 1397/14 1398/24 1399/12 1399/15 1406/9 1406/14 1407/1 1407/23 1413/17 1416/5 1420/16
**slides [3]** 1413/3 1413/4 1413/5
**slightly [1]** 1212/25
**slower [2]** 1316/5 1316/6
**slowly [1]** 1311/10
**small [4]** 1310/11 1394/13 1415/5 1419/5
**smaller [1]** 1392/3
**smiling [3]** 1302/11 1302/13 1302/19
**SMITH [1]** 1193/21
**Soares [1]** 1423/3
**social [4]** 1319/17 1319/17 1319/17 1424/25
**society [3]** 1223/4 1234/18 1289/9
**sold [3]** 1310/13 1402/15 1405/6
**solving [2]** 1200/8 1316/19
**someway [1]** 1211/10
**somewhere [1]** 1401/2
**son [5]** 1341/17 1360/25 1362/19 1362/20 1362/22
**Son's [1]** 1373/18
**sons [7]** 1323/19 1341/2 1341/12 1341/13 1341/25 1373/15 1373/24
**Sony [1]** 1257/18
**soon [2]** 1375/25 1426/25
**soon-to-be-passed-away [1]** 1375/25
**SOP [10]** 1297/9 1297/14 1297/18 1297/23 1297/24 1300/10 1300/11 1300/13 1300/15 1300/16
**sort [13]** 1214/17 1243/4 1243/5 1243/19 1267/18 1278/7 1289/7 1295/7 1310/9 1341/20 1351/2 1358/3 1367/25
**sought [1]** 1337/15
**sound [2]** 1273/4 1273/9
**sounds [2]** 1237/5 1256/20
**source [10]** 1213/12 1239/24 1240/9 1240/18 1243/14 1244/10 1245/17 1249/15 1339/4 1367/1
**sources [2]** 1243/3 1362/8
**south [4]** 1205/1 1206/4 1207/19 1210/23
**speaking [14]** 1208/12 1208/12 1212/21 1218/23 1220/5 1230/3 1238/19 1241/16 1241/19 1249/22 1250/18 1250/24 1338/19 1408/17
**special [8]** 1193/22 1307/25 1309/14 1390/15 1412/4 1415/15 1415/24 1417/16
**SPECIALIST [1]** 1193/22
**specialists [1]** 1295/19
**specialize [1]** 1385/15
**specific [23]** 1200/22 1203/18 1213/3 1228/24 1235/13 1241/14 1242/8 1252/8 1256/18 1256/19 1273/15 1273/20 1279/22 1288/13 1291/23 1314/25 1323/21 1337/20 1339/4 1362/7 1385/13 1412/2 1429/3
**specifically [18]** 1200/4 1203/17 1204/4 1227/24 1228/18 1235/7 1237/17 1240/19 1249/8 1252/6 1273/13 1294/18 1305/2 1329/24 1332/18 1363/6 1369/5 1417/2
**specificity [1]** 1227/15
**specifics [4]** 1273/14 1330/18 1354/4 1354/5
**spectrum [1]** 1295/9
**spell [2]** 1306/24 1384/7
**spend [6]** 1314/1 1316/19 1321/23 1361/19 1361/20 1375/20
**spending [1]** 1373/25
**spent [9]** 1209/7 1287/7 1296/15 1308/9 1311/24 1319/14 1339/7 1341/9 1371/13
**spied [6]** 1226/15 1251/22 1285/18 1285/19 1305/5 1305/6
**spies [2]** 1251/14 1251/19
**spine [1]** 1216/2
**spirits [1]** 1310/10
**spiritual [2]** 1205/7 1215/6
**Spitzer [5]** 1316/23 1363/9 1363/16 1363/20 1424/9
**spoken [18]** 1207/9 1218/22 1236/7 1236/11 1238/15 1243/11 1254/10 1254/18 1254/19 1255/16 1255/22 1276/22 1324/17 1353/19 1353/20 1360/10 1368/21 1428/8
**Sports [2]** 1406/21 1406/24
**spot [1]** 1407/15
**spreading [2]** 1227/7 1229/11
**spreadsheet [1]** 1401/4
**spring [4]** 1218/15 1220/14 1273/9 1316/1
**spying [1]** 1305/12
**squad [4]** 1385/13 1385/14 1385/15 1385/16
**squeaky [1]** 1216/19
**stabbing [1]** 1212/2
**staff [12]** 1218/8 1218/11 1289/13 1304/17 1307/23 1309/11 1309/15 1309/16 1309/18 1314/20 1319/3 1363/19
**stage [2]** 1370/24 1419/9
**stairs [1]** 1419/15
**stairway [1]** 1419/12
**stand [13]** 1198/12 1264/7 1271/12 1305/19 1305/22 1306/18 1306/19 1320/8 1321/6 1353/3 1376/7 1384/2 1426/1
**Standard [1]** 1405/3
**standby [1]** 1298/15
**standing [2]** 1353/3 1431/4
**stands [1]** 1423/8
**staring [1]** 1246/22
**start [14]** 1207/5 1214/25 1218/23 1241/19 1251/1 1253/10 1311/9 1312/9 1344/14 1345/8 1346/21 1353/25 1389/1 1391/6
**started [5]** 1241/16 1253/18 1304/3 1311/20 1367/7
**starting [3]** 1204/17 1266/10 1312/21
**starts [6]** 1254/6 1268/9 1347/3 1356/5 1357/11 1357/15
**state [33]** 1206/8 1221/6 1222/15 1222/19 1223/5 1225/22 1226/1 1239/6 1239/11 1242/4 1306/24 1313/2 1316/23 1318/24 1352/10 1363/5 1363/7 1363/8 1363/10 1363/20 1364/24 1384/7 1384/18 1385/18 1385/21 1386/2 1386/4 1386/6 1386/19 1403/5 1409/20 1409/21 1409/24
**statement [5]** 1207/20 1224/10 1245/6 1342/9 1342/15
**statements [16]** 1222/14 1222/16 1222/17 1222/20 1225/21 1225/24 1225/25 1226/2 1239/5 1239/8 1239/9 1239/12 1242/5 1242/17 1248/5 1367/19
**states [16]** 1193/1 1193/3 1193/3 1193/9 1193/11 1193/15 1307/24 1312/3 1314/1 1314/13 1314/19 1332/12 1352/9 1352/10 1405/7 1407/14
**station [1]** 1241/21
**status [1]** 1320/14
**stay [8]** 1228/5 1228/7 1228/8 1230/20 1265/10 1304/13 1315/4 1384/25
**stayed [10]** 1217/2 1217/4 1261/2 1265/5 1312/8 1315/17 1315/25 1317/5 1317/6 1352/13
**steadily [1]** 1352/21
**stealing [4]** 1316/17 1317/2 1317/13 1369/7
**stenography [1]** 1193/25
**step [1]** 1425/20
**Stephanie [1]** 1299/24

## S

**Stephen [5]** 1305/25 1306/17 1306/20 1307/1 1422/15
**steps [3]** 1264/9 1386/21 1388/16
**Steve [4]** 1360/10 1362/21 1362/22 1362/22
**Stevenson [4]** 1362/18 1362/21 1362/21 1423/19
**stick [1]** 1219/1
**Stinka [1]** 1404/13
**Stinka, [8]** 1402/9 1402/19 1403/22 1403/25 1404/2 1404/10 1409/21 1410/2
**Stinka, LLC [8]** 1402/9 1402/19 1403/22 1403/25 1404/2 1404/10 1409/21 1410/2
**stint [1]** 1308/3
**Stoll [1]** 1355/1
**Stone [3]** 1364/25 1365/5 1422/20
**stop [9]** 1212/21 1215/20 1247/3 1248/19 1300/2 1317/8 1331/18 1332/21 1424/11
**stopped [5]** 1340/7 1342/10 1342/21 1342/21 1367/6
**store [1]** 1392/10
**stories [4]** 1281/20 1332/21 1349/14 1393/25
**story [6]** 1292/14 1292/18 1292/24 1354/3 1358/15 1364/16
**straight [3]** 1203/7 1203/10 1414/13
**straightaway [1]** 1284/23
**strained [1]** 1333/16
**strategy [2]** 1202/18 1357/1
**street [27]** 1257/12 1285/14 1392/22 1393/9 1393/10 1393/18 1393/19 1394/15 1394/16 1395/4 1395/5 1395/6 1396/11 1396/12 1396/13 1397/10 1397/11 1397/12 1398/17 1398/17 1398/23 1399/19 1399/20 1406/15 1408/2 1408/10 1408/11
**streets [1]** 1392/15
**strength [1]** 1315/8
**stricken [1]** 1286/16
**strictly [1]** 1325/2
**strong [1]** 1281/20
**structural [1]** 1316/4
**structure [2]** 1260/1 1285/10
**structures [1]** 1317/4
**struggling [4]** 1218/3 1218/4 1252/21 1289/12
**stuck [2]** 1244/25 1342/15
**studied [1]** 1307/17
**studio [3]** 1419/7 1419/7 1419/8
**Studios [1]** 1310/21
**study [1]** 1308/21
**stuff [4]** 1286/23 1325/1 1327/23 1351/22
**style [1]** 1295/11
**subject [10]** 1252/12 1268/3 1277/5 1277/6 1278/21 1287/19 1381/11 1381/18 1382/20 1429/13
**subjects [1]** 1212/24
**subpoena [4]** 1327/21 1327/23 1327/24 1400/13
**subsequent [1]** 1358/9
**subsequently [6]** 1264/14 1337/8 1339/6 1339/16 1366/23 1371/5
**subset [1]** 1405/1
**subsidiaries [1]** 1310/16
**substance [4]** 1232/15 1248/5 1250/23 1327/11
**substantial [2]** 1325/21 1359/5
**substantially [2]** 1375/5 1422/7
**suburban [1]** 1392/14
**Success [1]** 1407/10
**successful [1]** 1351/13
**successfully [2]** 1314/9 1352/10
**sudden [1]** 1266/17
**suddenly [3]** 1289/6 1373/17 1373/20
**sued [4]** 1206/17 1367/3 1368/4 1369/2
**suggest [4]** 1268/17 1297/4 1325/23 1329/16
**suggested [12]** 1216/17 1283/24 1285/17 1323/6 1325/14 1329/5 1329/8 1329/10 1331/9 1361/4 1373/21 1428/10
**suggesting [1]** 1260/4
**suggestion [1]** 1362/3
**suing [6]** 1329/5 1329/8 1339/14 1339/14 1339/16 1366/14
**suit [3]** 1290/11 1290/19 1366/20
**Suite [1]** 1193/19
**suits [1]** 1369/6
**summarize [2]** 1325/24 1354/14
**summarized [1]** 1223/16
**summary [1]** 1329/3
**summation [1]** 1267/9
**summer [4]** 1214/16 1215/1 1215/7 1285/25
**Summit [1]** 1242/14
**summits [1]** 1200/7
**Sundance [1]** 1276/5
**Sunoco [1]** 1310/13
**supervise [1]** 1313/20
**support [1]** 1358/16
**supported [1]** 1352/12
**supporting [1]** 1360/16
**supportive [1]** 1337/7
**suppose [3]** 1266/12 1431/6 1432/5
**supposed [1]** 1242/16
**surprise [1]** 1352/17
**surprised [3]** 1265/2 1366/3 1426/10
**surrounded [1]** 1296/6
**surveillance [2]** 1386/24 1406/7
**sustain [1]** 1263/14
**Sustained [19]** 1214/20 1215/5 1231/3 1231/18 1231/23 1251/18 1251/21 1255/5 1255/9 1255/19 1256/2 1262/4 1263/24 1284/18 1292/2 1301/15 1302/23 1339/23 1340/21
**Sutton [1]** 1359/4
**switch [1]** 1410/5
**switched [1]** 1232/10
**sworn [4]** 1198/14 1306/21 1384/4 1385/9
**sworn/affirmed [3]** 1198/14 1306/21 1384/4
**system [11]** 1199/9 1199/10 1199/11 1199/12 1201/22 1212/12 1212/13 1293/14 1293/19 1297/21 1351/15

## T

**table [6]** 1214/6 1418/11 1418/12 1418/13 1418/15 1420/13
**tactics [1]** 1365/4
**tag [1]** 1422/2
**TANYA [1]** 1193/14
**tape [7]** 1231/1 1231/6 1231/19 1231/21 1260/14 1260/24 1267/1
**tapes [6]** 1299/8 1299/16 1303/15 1303/19 1303/19 1303/20
**targeting [2]** 1332/9 1332/10
**task [6]** 1214/11 1384/22 1384/24 1385/6 1385/11 1421/11
**taught [2]** 1287/21 1385/23
**tax [3]** 1279/18 1279/18 1362/25
**taxi [1]** 1261/14
**Tazoli [1]** 1428/5
**teach [2]** 1296/22 1296/24
**teacher [1]** 1385/23
**teaching [2]** 1296/2 1385/24
**team [2]** 1287/12 1416/4
**teased [1]** 1298/10
**teasing [1]** 1287/8
**tech [1]** 1201/16
**technically [1]** 1388/15
**techniques [2]** 1300/19 1415/16
**technology [8]** 1200/10 1201/4 1201/8 1201/11 1201/14 1201/15 1201/16 1201/17
**telephone [1]** 1283/13
**teller [1]** 1364/14
**temporary [1]** 1318/8
**ten [11]** 1205/14 1205/15 1270/7 1271/5 1271/5 1271/6 1271/8 1272/5 1315/7 1370/11 1376/22
**ten-minute [2]** 1271/8 1376/22
**tend [1]** 1276/9
**tensions [1]** 1373/16

**T**

**tenure [3]** 1309/3 1309/3 1309/5
**TENY [1]** 1193/18
**TERI [1]** 1193/22
**term [6]** 1207/3 1216/3 1273/24 1292/7 1323/16 1375/14
**terminal [1]** 1289/7
**terms [5]** 1202/25 1249/15 1338/2 1354/7 1354/8
**terrible [1]** 1210/11
**terrified [3]** 1204/22 1207/18 1210/21
**testified [7]** 1198/14 1242/25 1266/21 1267/5 1293/3 1306/21 1384/4
**testify [4]** 1222/11 1225/20 1239/4 1431/19
**testimony [10]** 1221/6 1243/12 1243/17 1246/13 1264/8 1267/14 1320/9 1399/9 1425/22 1428/16
**tests [1]** 1209/23
**Texas [1]** 1310/12
**text [1]** 1424/23
**that the [1]** 1272/18
**theater [4]** 1272/14 1272/16 1272/18 1272/21
**thebeacon2009 [1]** 1410/16
**theme [1]** 1281/21
**themselves [3]** 1222/17 1239/8 1293/4
**then brief [1]** 1426/17
**theory [2]** 1268/3 1331/11
**therefore [5]** 1207/25 1222/17 1225/24 1239/9 1361/6
**they didn't [1]** 1296/10
**thinking [2]** 1203/20 1245/18
**thinks [1]** 1208/17
**third [13]** 1193/16 1240/14 1248/18 1259/13 1289/17 1289/20 1322/2 1322/3 1322/9 1328/9 1341/14 1344/6 1345/10
**third-parties [1]** 1328/9
**thoroughly [1]** 1341/22
**thousand [3]** 1210/10 1210/12 1210/16
**thousands [1]** 1300/25
**threat [1]** 1230/14
**threatened [2]** 1210/7 1210/8
**threatening [2]** 1230/9 1230/11
**three [15]** 1200/15 1243/23 1243/25 1244/13 1318/3 1329/16 1341/9 1341/23 1344/5 1353/17 1395/10 1395/11 1396/16 1396/20 1396/21
**three-page [1]** 1344/5
**threshold [1]** 1354/6
**throughout [7]** 1218/15 1233/11 1247/7 1252/9 1278/23 1392/11 1416/12
**throw [1]** 1271/7
**tie [1]** 1324/18
**timeline [2]** 1242/8 1242/17
**tired [2]** 1282/1 1314/6
**title [1]** 1384/19
**titled [1]** 1403/5
**titles [1]** 1331/4
**today [4]** 1199/5 1230/4 1241/23 1276/20
**together [14]** 1235/1 1248/17 1261/6 1261/14 1275/7 1276/1 1276/13 1276/15 1294/16 1327/22 1348/1 1371/12 1371/13 1432/5
**tomorrow [10]** 1315/15 1376/19 1425/9 1425/21 1428/9 1428/16 1428/25 1430/1 1430/24 1432/8
**tone [2]** 1230/3 1284/12
**Toni [3]** 1364/12 1364/13 1423/15
**tonight [1]** 1429/8
**Tons [1]** 1360/23
**tool [1]** 1270/1
**top [7]** 1240/15 1298/24 1354/15 1358/6 1401/3 1402/11 1405/2
**topic [3]** 1244/1 1267/6 1320/1
**totally [1]** 1268/1
**touch [1]** 1373/15
**tough [3]** 1311/25 1315/9 1347/2
**Tourette's [15]** 1263/10 1263/19 1264/12 1264/13 1265/9 1266/3 1267/13 1267/16 1267/20 1269/3 1269/7 1269/11 1269/21 1269/23 1270/3
**toward [2]** 1233/15 1283/17
**towards [4]** 1210/3 1234/1 1286/13 1375/4
**town [17]** 1218/11 1265/20 1266/15 1266/15 1301/10 1388/3 1388/11 1391/9 1398/9 1405/8 1406/6 1406/12 1406/16 1406/22 1408/3 1410/3 1411/13
**townhomes [2]** 1392/18 1393/23
**townhouses [1]** 1392/8
**towns [3]** 1388/10 1388/16 1388/23
**track [2]** 1251/10 1251/12
**trade [3]** 1278/2 1307/25 1308/5
**Trail [12]** 1398/18 1398/23 1399/1 1399/13 1399/16 1399/17 1409/13 1411/13 1412/3 1413/10 1413/18 1422/4
**train [1]** 1370/10
**training [1]** 1300/20
**trainings [1]** 1300/20
**trance [1]** 1262/17
**transaction [2]** 1308/4 1367/25
**transactions [1]** 1400/18
**transferring [1]** 1409/3
**transition [3]** 1315/3 1315/11 1318/3
**translated [1]** 1308/17
**travel [4]** 1312/20 1312/23 1318/21 1361/18
**traveled [9]** 1205/15 1275/19 1275/24 1276/1 1318/20 1343/6 1343/7 1343/8 1343/19
**traveling [1]** 1266/1
**travelling [1]** 1274/14
**treated [1]** 1238/23
**treating [1]** 1199/13
**tree [5]** 1286/7 1286/9 1286/14 1392/14 1395/19
**tree-lined [1]** 1392/14
**trees [1]** 1406/17
**trial [9]** 1193/8 1247/7 1248/7 1269/19 1278/18 1351/2 1425/4 1425/8 1430/7
**trials [1]** 1246/16
**tribute [1]** 1292/3
**trigger [1]** 1359/2
**trip [7]** 1273/19 1289/1 1289/2 1304/14 1313/1 1343/21 1361/23
**trips [3]** 1287/13 1287/16 1319/4
**Tropicana [1]** 1310/23
**trouble [5]** 1242/3 1291/21 1291/23 1311/23 1333/2
**true [19]** 1233/16 1236/12 1255/1 1255/12 1256/10 1257/2 1257/3 1265/3 1280/1 1280/6 1280/8 1280/9 1329/12 1330/9 1330/11 1351/24 1360/17 1367/22 1411/4
**truly [2]** 1293/19 1351/14
**Trump [1]** 1365/6
**trust [8]** 1208/21 1319/21 1341/1 1341/7 1341/20 1347/9 1373/13 1373/16
**Trust's [1]** 1355/2
**trusted [2]** 1319/22 1341/6
**trustworthy [2]** 1208/9 1208/9
**truth [16]** 1212/7 1221/7 1222/16 1222/20 1225/23 1226/2 1239/7 1239/12 1242/12 1245/9 1245/10 1245/12 1245/16 1255/14 1267/19 1360/21
**truthteller18 [1]** 1251/2
**Tuesday [1]** 1299/6
**turn [8]** 1202/6 1314/9 1348/7 1353/25 1391/17 1395/7 1404/20 1405/15
**turned [3]** 1211/1 1253/16 1337/19
**turning [14]** 1393/21 1398/5 1398/16 1398/22 1399/15 1399/25 1402/20 1403/9 1403/9 1403/24 1406/9 1409/9 1413/17 1420/16
**Turnings [1]** 1399/12
**TV [1]** 1424/20
**Twilight [5]** 1303/23 1391/8 1407/24 1408/3 1408/6
**Twitter [1]** 1424/25

**T**

**two [44]** 1201/6 1211/7 1214/23 1225/10 1227/16 1234/10 1237/20 1257/10 1257/14 1258/20 1258/23 1260/6 1261/8 1262/7 1274/20 1274/23 1275/17 1275/17 1288/22 1315/18 1322/9 1322/10 1324/5 1332/6 1343/1 1343/8 1344/14 1357/11 1359/14 1360/20 1381/12 1385/12 1385/22 1391/7 1392/10 1393/25 1395/17 1396/6 1413/3 1413/4 1413/5 1413/12 1413/13 1413/13
**two-page [2]** 1237/20 1344/14
**type [11]** 1215/18 1215/21 1216/18 1257/20 1287/22 1299/17 1343/13 1343/14 1404/12 1419/6 1421/25
**types [4]** 1339/12 1339/13 1339/19 1386/21
**Typical [1]** 1348/13
**typically [1]** 1418/17

**U**

**U.S [3]** 1314/12 1406/5 1406/10
**ultimate [1]** 1298/11
**ultimately [4]** 1230/20 1309/1 1310/17 1312/7
**unbalanced [1]** 1308/14
**unbeknownst [1]** 1352/17
**uncertainty [1]** 1299/10
**uncover [1]** 1282/22
**underneath [1]** 1351/2
**understood [11]** 1198/21 1214/24 1215/10 1215/19 1216/6 1226/13 1252/21 1300/4 1300/7 1431/12 1431/22
**undertaking [1]** 1349/23
**unduly [1]** 1208/3
**uneven [1]** 1338/2
**unfamiliar [1]** 1388/6
**unfeeling [1]** 1288/18
**Union [4]** 1332/19 1342/13 1349/14 1351/17
**unit [2]** 1397/3 1417/16
**UNITED [12]** 1193/1 1193/3 1193/3 1193/9 1193/11 1193/15 1307/24 1312/3 1314/13 1314/19 1332/12 1352/9
**United States [4]** 1307/24 1312/3 1314/13 1314/19
**units [3]** 1392/10 1393/25 1396/25
**Universal [3]** 1310/21 1310/22 1311/1
**unkind [2]** 1256/8 1256/12
**unless [3]** 1270/4 1429/17 1429/18
**unlikely [1]** 1235/12
**unpleasant [1]** 1374/25
**unusual [1]** 1341/4
**unwanted [1]** 1265/21
**upcoming [1]** 1358/6
**updated [1]** 1343/11
**upper [3]** 1292/20 1294/19 1407/22
**upset [3]** 1226/23 1332/8 1354/22
**upstate [1]** 1388/6
**urgency [2]** 1230/6 1230/18
**urgent [1]** 1230/8
**use/do [1]** 1357/25
**Utah [4]** 1275/22 1275/23 1276/4 1296/18

**V**

**vacation [1]** 1319/6
**vague [1]** 1368/12
**vaguely [1]** 1368/2
**valued [1]** 1213/1
**values [2]** 1216/16 1351/10
**various [17]** 1205/13 1218/11 1243/2 1314/10 1328/5 1385/23 1388/14 1388/16 1389/4 1389/12 1390/7 1390/12 1390/21 1410/7 1419/19 1420/25 1421/6
**Vega [2]** 1409/5 1409/6
**vehicle [2]** 1395/15 1408/2
**venue [1]** 1272/23
**verifiable [1]** 1209/24
**Vermont [22]** 1253/21 1262/24 1263/1 1263/20 1263/25 1263/25 1265/25 1266/1 1266/20 1266/23 1269/5 1272/9 1272/11 1273/6 1273/19 1274/6 1274/8 1274/10 1274/14 1275/3 1275/9 1275/21
**version [3]** 1215/22 1215/23 1429/23
**versions [1]** 1324/5
**versus [1]** 1209/14
**vice [3]** 1312/6 1312/7 1313/5
**VICENTE [21]** 1198/13 1198/18 1221/7 1222/3 1222/15 1222/19 1225/23 1226/2 1239/7 1239/12 1242/19 1243/18 1245/5 1245/7 1245/11 1266/9 1268/5 1272/3 1278/9 1280/23 1303/9
**Vicente's [8]** 1221/6 1222/14 1222/18 1225/22 1226/1 1239/6 1239/11 1266/4
**Victory [5]** 1397/12 1397/14 1397/16 1397/17 1398/1
**video [4]** 1256/7 1256/10 1257/21 1418/18
**videos [1]** 1418/14
**videotape [5]** 1299/3 1299/11 1301/4 1301/11 1301/16
**videotaping [1]** 1301/1
**view [17]** 1202/15 1281/22 1325/18 1327/6 1397/6 1397/21 1397/24 1399/12 1406/24 1413/23 1414/11 1414/12 1414/15 1414/24 1415/3 1415/4 1418/22
**violated [1]** 1374/16
**violation [1]** 1338/19
**violations [1]** 1385/16
**violent [1]** 1211/23
**VIP [1]** 1287/16
**VIPs [2]** 1287/21 1287/22
**Virtually [1]** 1319/5
**visible [2]** 1396/2 1415/10
**visit [6]** 1329/7 1329/19 1332/22 1389/2 1389/3 1425/6
**visited [3]** 1387/3 1388/22 1390/17
**visiting [1]** 1329/25
**visits [3]** 1375/5 1375/22 1375/23
**voice [4]** 1226/25 1230/3 1281/5 1303/2
**volume [1]** 1416/1
**volunteer [3]** 1308/6 1308/20 1309/7

**W**

**waiting [2]** 1248/22 1426/21
**walk [7]** 1266/17 1286/10 1352/25 1393/3 1400/25 1414/22 1418/5
**walk-through [1]** 1418/5
**walked [2]** 1261/15 1276/14
**wall [1]** 1419/20
**wants [7]** 1207/13 1225/14 1264/22 1265/13 1265/19 1267/24 1381/14
**war [2]** 1315/13 1351/13
**warrant [11]** 1399/11 1410/17 1411/4 1411/10 1411/11 1411/19 1411/25 1412/8 1412/21 1413/19 1416/12
**warrants [2]** 1386/23 1386/24
**Warren [1]** 1398/15
**warrior [8]** 1205/21 1208/18 1209/11 1209/17 1209/21 1210/2 1212/1 1280/1
**Washington [7]** 1206/7 1206/8 1307/20 1315/16 1330/7 1331/8 1365/1
**watch [1]** 1424/18
**watched [1]** 1374/22
**watching [2]** 1208/23 1370/7
**Waterford [7]** 1388/12 1398/9 1399/21 1399/22 1404/4 1409/13 1413/10
**ways [3]** 1225/15 1298/10 1330/12
**wealthy [2]** 1287/24 1311/3
**wear [1]** 1258/16
**wearing [1]** 1258/13
**Weaver [2]** 1390/15 1412/5
**Webb [2]** 1322/15 1322/16
**website [1]** 1424/24
**weeding [1]** 1402/3
**week [7]** 1223/25 1230/25 1250/13 1311/25 1327/23 1376/18 1425/12
**weekend [1]** 1206/5
**weekly [1]** 1250/10
**weeks [3]** 1275/17 1301/8 1315/1
**weight [1]** 1223/6
**weird [1]** 1292/13

**W**

**welcome [6]**   1262/1 1262/5 1262/12 1305/21 1320/12 1376/9
**WENIGER [1]**   1193/22
**Westerner [1]**   1311/23
**whatsoever [2]**   1267/21 1269/7
**wheel [1]**   1216/19
**Whisper [2]**   1200/17 1200/19
**white [7]**   1292/11 1293/6 1308/3 1309/11 1357/23 1408/2 1419/25
**whole [10]**   1200/20 1202/10 1211/3 1213/14 1289/12 1292/12 1293/14 1293/18 1304/13 1314/14
**wide [4]**   1393/23 1396/15 1397/15 1397/16
**widely [1]**   1328/20
**wider [3]**   1396/20 1398/5 1406/24
**wife [31]**   1213/6 1213/13 1213/16 1214/9 1214/13 1214/16 1214/22 1215/3 1215/7 1216/8 1216/23 1223/10 1252/7 1252/23 1257/23 1259/11 1260/1 1260/8 1260/17 1261/3 1261/4 1261/18 1276/2 1276/16 1285/25 1286/6 1286/25 1319/14 1322/3 1322/8 1322/9
**Wilton [6]**   1394/16 1394/19 1394/21 1394/22 1394/24 1394/25
**win [2]**   1339/7 1366/24
**winding [3]**   1244/5 1244/6 1244/7
**window [2]**   1285/11 1285/13
**wine [3]**   1254/6 1310/10 1312/3
**wise [1]**   1367/9
**wishes [2]**   1272/25 1272/25
**Withdrawn [1]**   1219/21
**withhold [1]**   1347/9
**witness [80]**   1198/8 1198/10 1198/12 1198/12 1198/13 1199/2 1199/23 1200/16 1202/12 1204/20 1206/21 1207/9 1222/11 1225/20 1237/23 1238/2 1238/5 1239/4 1242/14 1243/2 1243/4 1244/9 1264/7 1264/9 1267/14 1267/25 1271/2 1271/12 1271/12 1271/22 1283/20 1285/1 1290/5 1291/11 1305/18 1305/22 1305/22 1305/24 1306/12 1306/16 1306/19 1306/19 1306/20 1320/8 1321/5 1321/6 1321/7 1321/11 1321/18 1321/19 1343/23 1376/6 1376/10 1376/14 1376/19 1381/17 1383/5 1383/22 1384/2 1384/2 1384/3 1415/13 1416/15 1417/11 1421/16 1425/20 1426/1 1426/1 1426/5 1426/13

1426/16 1426/17 1426/20 1426/23 1427/4 1427/9 1427/11 1428/20 1429/25 1433/2
**witness' [1]**   1242/8
**witnesses [1]**   1267/12
**wives [5]**   1321/24 1322/5 1372/16 1372/16 1372/22
**WJC [2]**   1423/5 1423/8
**woman [8]**   1205/8 1205/16 1205/17 1207/25 1208/19 1211/25 1279/25 1290/18
**women [16]**   1229/22 1237/10 1254/10 1254/15 1254/15 1254/20 1254/23 1255/1 1255/6 1255/16 1255/22 1282/3 1282/20 1283/5 1298/5 1298/8
**won [5]**   1339/5 1366/18 1366/19 1366/21 1367/1
**wonderful [5]**   1248/2 1267/8 1280/11 1280/15 1358/14
**wondering [1]**   1328/14
**Woodin [2]**   1406/15 1406/18
**Woodin Road [1]**   1406/18
**Woods [17]**   1392/6 1392/7 1392/16 1392/23 1392/25 1393/3 1393/5 1393/11 1393/14 1393/20 1394/16 1395/6 1396/12 1397/10 1397/11 1398/6 1398/18
**word [5]**   1201/16 1202/15 1208/7 1282/2 1372/14
**words [13]**   1199/18 1202/21 1227/8 1227/12 1229/13 1235/17 1235/19 1235/20 1246/5 1277/15 1293/15 1304/2 1374/14
**wore [1]**   1297/23
**works [1]**   1206/18
**world [23]**   1294/20 1310/11 1310/16 1312/24 1313/3 1313/12 1313/13 1313/15 1316/14 1316/15 1317/10 1317/18 1317/19 1317/23 1318/6 1318/15 1318/17 1319/2 1319/2 1352/16 1363/12 1363/14 1423/9
**World Jewish Congress [10]**   1312/24 1313/3 1316/14 1316/15 1317/10 1317/18 1317/23 1318/6 1318/15 1318/17
**worlds [1]**   1386/4
**worried [5]**   1229/14 1238/24 1340/8 1349/22 1370/24
**worry [1]**   1328/23
**worse [1]**   1247/3
**worth [1]**   1288/7
**wrangling [1]**   1299/23
**write [8]**   1204/23 1210/21 1212/14 1255/7 1294/18 1295/10 1325/17 1343/21
**writer [1]**   1302/7
**writing [6]**   1204/7 1207/18 1254/4 1254/23 1256/22 1295/7
**written [2]**   1202/3 1294/4

**wrongdoing [1]**   1349/11
**wrote [13]**   1198/23 1201/3 1202/21 1211/20 1211/22 1213/21 1254/19 1255/6 1255/10 1255/14 1256/3 1308/10 1325/22

**X**

**XOSO [1]**   1287/20

**Y**

**year [36]**   1204/14 1205/21 1208/2 1208/18 1209/11 1209/17 1209/21 1210/1 1212/1 1218/1 1253/6 1253/23 1273/9 1273/12 1273/12 1276/9 1276/10 1279/11 1279/18 1279/18 1279/20 1280/1 1300/1 1308/25 1309/18 1310/14 1314/21 1314/21 1315/1 1315/18 1317/1 1317/2 1317/5 1329/17 1373/8 1385/19
**years [27]**   1204/4 1205/12 1205/14 1205/15 1209/12 1212/17 1233/22 1252/24 1279/17 1307/20 1311/22 1312/6 1312/16 1315/7 1318/23 1337/17 1340/10 1341/9 1341/23 1343/9 1353/18 1353/18 1367/16 1373/17 1385/12 1385/22 1385/23
**yell [2]**   1227/5 1227/7
**yelling [1]**   1226/22
**yellow [1]**   1391/14
**Yelm [1]**   1206/7
**yes-or-no [1]**   1273/16
**yesterday [4]**   1233/24 1279/8 1304/1 1304/3
**yesterday's [1]**   1410/20
**YORK [55]**   1193/1 1193/4 1193/12 1193/13 1193/17 1193/17 1193/20 1275/21 1312/8 1313/7 1316/23 1322/22 1322/23 1330/17 1331/20 1331/22 1331/24 1341/14 1363/7 1363/8 1363/11 1363/21 1364/7 1364/8 1364/24 1384/18 1385/14 1385/18 1385/21 1385/22 1386/2 1386/6 1386/19 1388/4 1388/6 1388/7 1388/10 1388/12 1388/23 1391/12 1392/8 1399/21 1403/5 1404/4 1406/13 1406/16 1406/22 1406/23 1408/4 1409/13 1409/20 1410/4 1411/13 1413/11 1416/3
**young [1]**   1361/19
**younger [1]**   1315/8
**youngest [2]**   1308/22 1322/10
**Your Honor [28]**   1271/9 1271/24 1280/17 1280/20 1282/5 1283/20 1284/14 1284/25 1286/15 1291/25 1303/4 1305/25 1306/4

**Y**

**Your Honor... [15]** 1306/15 1389/15 1400/5 1405/22 1408/21 1413/2 1416/15 1416/22 1418/4 1421/16 1422/10 1424/10 1426/8 1426/15 1427/6
**yourself [19]** 1199/25 1202/11 1203/4 1203/16 1204/2 1204/18 1238/1 1257/22 1258/8 1292/16 1292/19 1292/21 1317/22 1345/20 1360/6 1361/9 1365/23 1388/22 1390/17
**YouTube [1]** 1425/1
**Yuri [3]** 1363/23 1367/14 1367/14

**Z**

**zealous [1]** 1210/16
**zoom [2]** 1259/6 1303/12