3649

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,    :   18-CR-204(NGG)
4
            Plaintiff ,          :
5                                    United States Courthouse
        -against-                :   Brooklyn, New York
6
    KEITH RANIERE, et al.,       :
7                                    June 6, 2019, Thursday
            Defendant.           :   9:30 a.m.
8
    - - - - - - - - - - - - X
9
                 TRANSCRIPT OF TRIAL
10        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
          UNITED STATES DISTRICT JUDGE, and a jury.
11
    APPEARANCES:
12
    For the Government:         RICHARD P. DONOGHUE
13                              United States Attorney
                                BY: MOIRA K. PENZA
14                                  TANYA HAJJAR
                                    MARK LESKO
15                              Assistant United States Attorneys
                                271 Cadman Plaza East
16                              Brooklyn, New York 11201

17  For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                                767 Third Avenue
18                              New York, New York 10017
                                BY: MARC A. AGNIFILO, ESQ.
19                                  TENY ROSE GERAGOS

20                              DEROHANNESIAN & DEROHANNESIAN
                                677 Broadway
21                              Albany, New York 12207
                                BY:  PAUL DerOHANNESIAN, II, ESQ.
22                                  DANIELLE R. SMITH, ESQ.

23  Court Reporter:  Michele D. Lucchese, RPR, CRR
                                Official Court Reporter
24                              E-mail:  MLuccheseEDNY@gmail.com
    Proceedings recorded by mechanical stenography; transcript
25  produced by Computer-Aided Transcription.

Proceedings                                                3650

1           (In open court; outside the presence of the jury.)

2           THE COURTROOM DEPUTY:  Case on trial.  Counsel,

3     please state your appearances.

4           MS. PENZA:  Moira Penza, Tanya Hajjar, and Mark

5     Lesko for the United States.  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MS. PENZA:  At counsel table is Special Agent

8     Michael Lever with the FBI this morning.

9           THE COURT:  Good morning, sir.

10          MS. PENZA:  And I expect that Teri Carby will be

11    joining us shortly.

12          MR. AGNIFILO:  Good morning, Your Honor.  Marc

13    Agnifilo, Teny Geragos, Paul der Ohannesian, Danielle Smith

14    for Keith Raniere, who is present with us this morning.

15          THE COURT:  Good morning, everyone.

16          Is there anything before we bring in the jury?  I

17    have one item.

18          Yes?

19          MS. PENZA:  I think Mr. Lesko has something.

20          MR. LESKO:  Two items related to the expert Dr.

21    Hughes:  Number one, I am inquiring in the court's preference

22    in terms of offering her as an expert.  Do you want me to do

23    that in front of the jury or should we proceed?

24          THE COURT:  Well, is there an objection to her as an

25    expert?

Proceedings                    3651

1          MR. der OHANNESIAN:  I will be objecting, yes.

2          MR. LESKO:  I think this has been litigated, Your

3    Honor.

4          THE COURT:  I know it has.  So there is a

5    continuing --

6          MR. der OHANNESIAN:  Yes.

7          THE COURT:  There is a continuing objection that you

8    should offer her as an expert and I think the jury needs to

9    know that the defense objects.  I don't want a speaking

10   objection.  What you can say is that based on prior

11   litigation, the defense continues to object.

12         MR. der OHANNESIAN:  Could I just refer to our

13   filing?

14         THE COURT:  You can reference, sure.

15         MR. der OHANNESIAN:  Also with respect to that

16   testimony, I gave Mr. Lesko a proposed limiting instruction

17   that I feel should be given with her testimony and he is

18   reviewing it.  I don't know if he has had a chance to review

19   it.

20         MR. LESKO:  I object to the specific language.  I

21   would just ask the Court -- the Court has heard many experts

22   at trial -- I would ask if the Court has a standard expert

23   instruction.  We will defer to the Court in terms of

24   instructing the jury in terms of how they should consider Dr.

25   Hughes's testimony.

Proceedings                          3652

1          THE COURT:  I will instruct the jury at the time

2     that I give the jury the instructions as to law.  That's the

3     instruction.  But I think the jury has a right to know that

4     the defense objected to the expert.  That's all.

5          MR. LESKO:  Very well.  Thank you.

6          THE COURT:  All right.  Anything else?

7          MR. der OHANNESIAN:  Can I make my, either as an

8     exhibit or on the record, what that proposed instruction is?

9          THE COURT:  You can submit it and it will be part of

10    the Court record.  But I'm not going to give a contemporaneous

11    instruction.  I will give the instruction at the end, the way

12    I always do.

13         MR. LESKO:  Thank you.

14         THE COURT:  Anything else?

15         MS. PENZA:  Not from the Government, Your Honor.  I

16    believe we will have a small thing at some point during

17    Nicole's testimony, but I don't think it needs to be taken up

18    right now.

19         THE COURT:  All right.  Now, we have consulted with

20    the jury and the jury has informed Mr. Reccoppa that they

21    cannot stay past five o'clock, but they suggested that we

22    begin at 9:00 a.m. and that we take a half hour for lunch.

23    The issue about 9:00 a.m. is how fast we can get the defendant

24    here in the morning and that's something that we need to take

25    up with the management and the marshal's office.  We will

Proceedings                              3653

1    either start at 9:00 or 9:15, but I would like to give the

2    jury a time so that we can rely on that time.  I'm not sure

3    that we can do lunch in 30 minutes.  45 is reasonable.  But if

4    we pick up half an hour at the beginning of the day and an

5    extra 15 minutes in the middle of the day, I think that will

6    help us.

7              One of the reasons that is now very important is

8    that three of the jurors have advised that they have travel

9    plans for the week of the 23rd of June.  So we have one juror

10   who has foreign travel plans beginning on the 23rd, one

11   beginning the 25th, and one beginning the 27.  Assuming we can

12   finish with the testimony by the beginning of the week after

13   next, if that's possible, this should not interfere with the

14   ability of the jury to hear the closing arguments, the charge

15   and to deliberate, and, of course, we have four alternates.

16   But we would like to move matters along.  This jury has been

17   very cooperative and I think we ought to cooperate with them.

18   That is where we are at the moment.

19             MR. AGNIFILO:  Very good.

20             THE COURT:  That's the update as of this time.  I

21   will let the jury know about the 9:00 a.m. idea after

22   consulting with the marshal service.  And the middle of the

23   day, I would like to stick to 45 minutes, because I think it

24   is just reasonable.  There is so much that has to be done at

25   lunch time, including having the jury go to have lunch and

Proceedings                                       3654

1    come back, and my experience is that the minimum is 45

2    minutes.

3              Anything from either side about any of the

4    scheduling issues raised by the jury?

5              MS. PENZA:  Your Honor, I think as long as it is 45

6    minutes.  The only concern I have is for testifying victims.

7    It is obviously a very long day.  So I think as long as they

8    have 45 minutes in the middle of the day, that should be okay.

9              THE COURT:  I understand that point as well.

10             MR. AGNIFILO:  Nothing from us.

11             THE COURT:  Okay.  Very good.  Let's bring in the

12   jury.  Let's bring in the witness and the jury.

13             (Witness resumes stand.)

14             (Jury enters.)

15             THE COURT:  I'd like everyone to remain standing for

16   a moment because today is a very significant day in the

17   history of our country.  It is the 75th anniversary of the D

18   Day invasion at Normandy, France and that event was the

19   beginning of the end of World War II when our country and the

20   British and Canadian forces attacked the forces of fascism in

21   Europe on that day, about 10,000 soldiers, sailors and Marines

22   were killed.  There are 9,380 graves in the American cemetery

23   in Normandy.  And between that day and August, when Paris was

24   liberated, a total of 73,000 allied troops lost their lives.

25   And this is something we need to remember when we think about

Proceedings                                          3655

1   our freedom and the gift that we were given by those young

2   soles back in 1944 and throughout World War II.

3          So I would like to ask for a moment of silence for

4   all those who gave their lives saving our freedom.

5          You may be seated.

6          Good morning, members of the jury.

7          THE JURY:  Good morning.

8          THE COURT:  When we complete the testimony of this

9   witness, I will go over some of the scheduling issues with

10  you.  We all appreciate that you have looked into some of the

11  questions that we have raised with you regarding the schedule

12  of the trial.

13         All right.  At this time, you may continue your

14  examination of the witness.

15         MS. HAJJAR:  Thank you, Your Honor.

16         Your Honor, at this time the Government offers

17  Government Exhibit 548 into evidence.

18         THE COURT:  I'm sorry, is the microphone on?

19         MS. HAJJAR:  Yes, Your Honor.

20         THE COURT:  Tell me again what the number is.

21         MS. HAJJAR:  Government Exhibit 548.

22         THE COURT:  548?

23         MS. HAJJAR:  Yes.  I believe without objection.

24         MR. AGNIFILO:  One second.

25         We have no objection.

Rees - direct - Hajjar                    3656

1          THE COURT:  Government Exhibit 548 is received in

2    evidence.

3          MS. HAJJAR:  Thank you, Your Honor.

4          (Government's Exhibit 548 received in evidence.)

5          MS. HAJJAR:  May we switch to the PowerPoint, Your

6    Honor.

7          THE COURT:  All right.  Here we go.

8          MS. HAJJAR:  Thank you.

9    MAEGAN REES,

10        called by the Government, having been previously

11        sworn, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MS. HAJJAR:

14   Q    Agent Rees, before we broke for the day yesterday, you

15   spoke -- you testified that as part of the photographs you

16   reviewed as part of the vicibabi@gmail.com account were

17   photographs of a pregnancy test and ultrasound?

18   A    That is correct.

19   Q    And there is metadata associated with those images?

20   A    Yes, there is.

21   Q    Now, I want to turn your attention to Government Exhibit

22   1191, and is this the metadata associated with another two

23   images?

24   A    Yes, it is.

25   Q    Okay.  And the pregnancy test, the ultrasound that you

Rees - direct - Hajjar                    3657

1   reviewed had metadata from a prior date than the date

2   reflected here?

3   A    That's correct.

4   Q    Can you read what the creation date is for the images

5   that will follow, the two creation dates here, please?

6   A    The first is May 30, 2016.  The second is May 31, 2016.

7   Q    And can you read the time as well?

8   A    Correct.  For the first day, May 30, 2016, the time is

9   1820 PST and for the 31st it is 131 PST.

10  Q    Okay.  And I'm going to turn to the images for which this

11  data is associated.  This is Government Exhibit 1189.  Is this

12  one of the images that you reviewed that relates to May 30th

13  date?

14  A    That's correct.

15  Q    And then turning to the following image, Government

16  Exhibit 1190?

17  A    That's correct.

18  Q    Agent Rees, can you just describe just for the record

19  what is depicted in Government Exhibit 1190?

20  A    In the picture there is a large brown table in the middle

21  of a room.  There are two lamps, one on a stepstool.  There's

22  a tripod that contains a camera.  There are blinds in the

23  background and on the right-hand side what appears to be dark

24  curtains sort.  There also appears to be a brown towel on the

25  floor, as well as a floral pattern rug.

Rees - direct - Hajjar                    3658

1   Q     And this is one of the images that were recovered from

2   the vicibabi@gmail.com account?

3   A     That's correct.

4          MS. HAJJAR:  At this time I would like to play

5   Government Exhibit 1103 in evidence.

6          (Video playing.) (Video stopped.)

7          MS. HAJJAR:  If you can go back just a few minutes,

8   Ms. Carby, if you can, pausing right there.

9          (Video paused.)

10  Q     Do you see at the top left-hand corner of this image,

11  Agent Rees?  It is a little hard to see but there are blinds

12  at the top left?

13  A     Yes.

14  Q     It may be difficult to see in this particular frame, but

15  is there a door handle?

16         MS. HAJJAR:  Can you just go back a little bit and

17  play.

18         (Video playing.) (Video stopped.)

19  Q     There is a door handle at the back?

20  A     That's correct.

21  Q     And blinds?

22  A     Yes.

23         (Video playing.)

24  Q     And a table in front of you, in the bottom left-hand

25  corner of the screen?

Rees - direct - Hajjar                    3659

1   A    Yes.

2   Q    Now, Agent Rees, is Government Exhibit 1103 part of a

3   series of video clips that you have reviewed?

4   A    Yes, it is.

5   Q    And did you see resemblances between objects depicted in

6   those series of video clips and Government Exhibit -- what's

7   in Government Exhibit 1190?

8   A    Yes.

9   Q    Can you describe some of those?

10  A    Some of the similarities would be the stepstool, the

11  lamp, the tripod, the table, the blinds, and the curtain.

12  Q    I am going to switch to the next slide, which is

13  Government Exhibit 1190.  Can you describe what's being

14  depicted, what these stills are?

15  A    These stills are screen shots from the other videos.

16  Q    So there are stills from 1106-A, 1106-B, and 1106 in

17  evidence?

18  A    That's correct.

19  Q    And can you describe the significance of these stills as

20  compared to 11:0090 for the jury, please?

21  A    The stills appear to be similar or the same items.

22  Q    Can you just describe -- so, for example, looking at

23  1106-A, what are some of the similarities between those two?

24  A    The similarities of the lamps, you can see the

25  similarities in the base, in the structure of the lamp, as

Rees - direct - Hajjar                          3660

1   well as the handle behind the actual light.

2   Q     Okay.  And as to 1106-B?

3   A     You can see similarities in the tripod, both in coloring.

4   There is a gray top part, as well a unique gray handle on the

5   left-hand side.

6   Q     1106-B is a still from the video that was -- a video that

7   you reviewed?

8   A     That's correct.

9   Q     There was no camera there on top of the tripod; is that

10  right?

11  A     That's correct.

12  Q     And 1106, the still that's on the right side of this

13  slide, was that in a closet?

14  A     Yes, it was.

15  Q     As well as the stepstool at the left-hand corner of the

16  screen?

17  A     That's correct.

18  Q     Now, turning to the next slide, which has 1190 and then

19  stills from the video that we reviewed, 1106, stills from

20  1106, can you describe what significance, if any, you see

21  between those two, the stills here in this slide?

22  A     The similarities in the blinds, as well as the dark

23  curtain.

24  Q     And, so, can you -- just indicating, I guess, where -- do

25  you see the handle, the door handle in 1106 at the top?

Rees - direct - Hajjar                                    3661

1   A    Yes, I do.

2   Q    And that's to the right most of the blinds in 1190?

3   A    That's correct.

4   Q    Now, in relation to the dining table that we just saw in

5   1106, where was that table?  Looking at the blinds, where was

6   that table located?  Was it to the right or to the left?

7   A    I'm sorry, can you ask the question again.

8   Q    Yes.  The dining table that we saw in the video clip --

9   A    Correct.

10  Q    -- looking at the blinds and the door handle here in

11  1106, where was the table?

12  A    It would have been to the right.

13           MS. HAJJAR:  May we switch to the ELMO, please, Your

14  Honor.

15  Q    Agent Rees, I am going to show you what's in evidence as

16  Government Exhibit 548.  Have you reviewed this exhibit?

17  A    I have.

18  Q    Is it medical records associated with Camilla?

19  A    It is.

20  Q    Okay.  Can you read at the top?  It says, "Patient

21  Camilla" here?

22  A    Yes.

23  Q    And DOB?

24  A    March 1, 1990.

25  Q    And can you read what's listed under examination and

Rees - direct - Hajjar                    3662

1  clinical history, please?

2  A    "Examination:  CT abdomen with contrast.  Clinical

3  history:  Patient with fever and sharp abdominal pain.  Recent

4  appendix surgery on January 9, 2007, where a non-perforated

5  gangrenous appendix was found."

6  Q    And here about post surgical changes, can you read this

7  and the following paragraph?

8  A    There are postsurgical changes in the right lower

9  anterior abdominal wall with a 1.5 centimeter defect of the

10  subcutaneous adipose tissues.

11         My apologize.  I'm not a medical examiner.

12  Q    That's fine.  There is a well-defined fluid collection

13  predominantly posterior and adjacent to the cecum with rim

14  enhancement.  That's the bottom?

15  A    That's correct.

16  Q    This is on page 2 of Government Exhibit 548.  And then

17  just turning to page 5 of the same exhibit, assessment and

18  plan.  Can you just read the first few sentences?

19  A    Successful drainage of intraabdominal abscess.  Catheter

20  no longer functional and minimal residue, so drain removed at

21  eight days.  Possibility of reaccumulation d/w pt and her

22  mother.  The wound is healing in nicely and packing can soon

23  be abandoned in favor of just cleaning it out with a Q-tip to

24  keep the edges apart.  They certainly know what to look for,

25  so I agreed to allow her f/u, follow up, to be on an as-needed

Rees - direct - Hajjar                3663

1   basis.

2   Q    Thank you, Agent Rees.

3        I'd like to show you one of the images that's in

4   evidence as 530-R.

5        Agent Rees, is this image one of the images that was

6   recovered from the vicibabi@gmail.com account?

7   A    Yes, it is.

8   Q    Okay.  It's difficult to see on this photograph, but can

9   you describe -- are there two significant things you notice

10  about this photograph?

11  A    Yes.

12  Q    Can you explain them to the jury, please?

13  A    At looking at the image on the left side of the lower

14  abdomen there is an appendectomy scar.

15  Q    Can you indicate that on the screen?

16       THE COURT:  You can circle it right on the screen.

17  Use your finger.

18  Q    Is that working, Agent Rees?

19       No, it's not working.  Is it around this area?

20  A    Yes.

21  Q    Is it difficult to see on this particular copy of this

22  exhibit?

23  A    Yes.

24       MS. HAJJAR:  Your Honor, I am going to ask that I be

25  able to provide a copy of the photograph to the jury in glossy

Rees - direct - Hajjar                                3664

1    form.  It is only one copy of it.  But I would ask that I show

2    it to the jury.

3              THE COURT:  You said unredacted?

4              MS. HAJJAR:  It is.

5              The two items that Agent Rees is describing is much

6    more clearly able to be seen in this photograph.

7              (Sidebar held outside the hearing of the jury.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                Sidebar - Sealed by Order of the Court          3665

 1          (The following occurred at sidebar.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20          (Sidebar ends.)
21          (End of sealed portion.)
22          (Continued on the following page.)
23
24
25
```



Rees - direct - Hajjar                    3666

1  BY MS. HAJJAR:

2  Q    Agent Rees, is there another area of significance that

3  you noticed in this photograph, 530?

4  A    Yes, in looking at the photo, on the top of the right leg

5  there appears to be scarring.

6  Q    Can you indicate -- is it around this area?

7  A    That's correct.

8  Q    Okay.

9         THE COURT:  Actually, that's the left leg.

10        THE WITNESS:  I'm sorry.  But when looking at it.

11 So, yes, on --

12        THE COURT:  When looking at it, on the right?

13        THE WITNESS:  On the right-hand side of the body.

14        THE COURT:  But on the left leg?

15        THE WITNESS:  On the left leg.  Sorry for the

16 confusion.  On the left leg, but when looking at the image

17 from the right side of the body.

18 Q    And, so, two types of scarring, the scar over here?

19 A    Correct.

20 Q    And the scarring over here?

21 A    Correct.

22 Q    Is there anything significant about the scarring on this

23 side?

24 A    The shape is significant.

25 Q    What do you mean?

Rees - direct - Hajjar                3667

1  A     It's unique in shape in that it does not appear to -- the

2  scar on the abdomen looks -- appears to be more of a slice.

3  You can extrapolate that it would be a surgical scar.  The

4  scar at the top of the leg has a unique pattern.

5  Q     In other words, not the surgical slice?

6  A     Correct.

7          MS. HAJJAR:  At this time, Your Honor, I'm going to

8  ask if I can pass around that photograph to the jury just so

9  they can take a look at those areas that Agent Rees described.

10         THE COURT:  Go ahead.

11         All right.  You can retrieve it.

12 Q     Agent Rees, I'd like to show you what's in evidence as

13 Government Exhibit 1789.  Is this an e-mail from the

14 vicibabi@gmail.com account?

15 A     It is.

16 Q     And who is it from?

17 A     It's from Cami.

18 Q     And who is it to?

19 A     Keith Raniere at Yahoo.com.

20 Q     What is the date?

21 A     November 4, 2016.

22 Q     What is the subject line?

23 A     Bullet points.

24 Q     Can you read the text of the e-mail, please?

25 A     Winter of 2013, early 2014, Sam met Sasha Akira three

Rees - direct - Hajjar                3668

1   years ago at a seminar she attended.  She had been doing that

2   for question mark years and was well-known in that underground

3   community.

4          R arrived late May 2014.  I was tasked to find

5   someone repulsive and seduce them prior to his arrival.  He

6   was picked because he was the most repulsive person I could

7   find and he became the subject of my mission.

8          Sasha became Sam's master that summer and was one of

9   several.

10         I successfully seduced him on three separate

11  occasions but wanted to quit after just the first because of

12  how gross he was.  I tried negotiating with my master but was

13  sent back.

14         Things were broken off with R mid June because he

15  was just too repulsive and, off-putting.  I had never met

16  anyone who was so self-centered and view and treated women the

17  way he did.  I aborted my mission and took all the

18  consequences from my master for disobeying and not completing

19  my task.

20         Letting him think it was his idea to break things

21  off was his idea was part of my task because I was to learn to

22  take humiliation even from the worst people.  That was why I

23  didn't talk back even when he would say the stupidest nonsense

24  about me wanting to have his children.  It could not have been

25  farther from the truth, but I couldn't say anything back.

Rees - direct - Hajjar                                    3669

1           A couple of months later, in November, under orders

2      to complete the previous task, I started slowly trying to

3      seduce him by taking part in a training he was in.  I had to

4      play stupid and submissive because that is what he was into,

5      which I found disgusting, but that's what needed to be done.

6           In December of 2014, in two separate occasions, I

7      made him believe I was going out of my way to see him and

8      keeping it from other people.  All along I was being directed

9      by master.

10          Christmas 2014, I convinced his sister into inviting

11     me to their Christmas.  I knew he would be there.  I used it

12     to get closer to my target.

13          By February, my master was getting inpatient, so I

14     introduced texts.

15     Q    Agent Rees, you testified at length yesterday about R and

16     Robbie.  There are references to R as well in this e-mail?

17     A    That's correct.

18     Q    R arrived late May 2014 and this entire text is about R?

19     A    I believe so, yes.

20          MS. HAJJAR:  No further questions, Your Honor.

21          (Continued on the following page.)

22

23

24

25

MDL       RPR       CRR       CSR

Rees - cross - Agnifilo                              3670

1    (Continuing.)

2              THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. AGNIFILO:

5    Q    Good morning, Special Agent Rees.

6    A    Good morning, sir.

7    Q    My name is Marc Agnifilo.  I represent Keith Raniere.  I

8    only have a couple of questions for you.

9    A    Yes, sir.

10   Q    At the beginning of your testimony yesterday, you said --

11   you described WhatsApp to us, right?

12   A    That's correct.

13   Q    Okay.  And WhatsApp is a way of two people communicating

14   through this WhatsApp application, correct?

15   A    Two or more.

16   Q    Two or more?

17   A    Yes.

18   Q    And is it fair to say that WhatsApp has encryption

19   qualities to it?

20   A    That's correct.

21   Q    Okay.  And are you familiar with what those are

22   generally?

23   A    Generally speaking, yes.

24   Q    Okay.  Just tell the jury very briefly what your general

25   knowledge is of those?

Rees - cross - Agnifilo                              3671

1   A    My general understanding is WhatsApp differs from regular

2   SMS messaging which, without encryption, can be monitored.  In

3   encryption it means that the chat, itself, is protected so

4   that outside apps or technology may not be able to monitor the

5   communications.

6   Q    Okay.  And I think in the beginning of your testimony you

7   described how someone can export a WhatsApp chat to another

8   location, correct?

9   A    That's correct.

10  Q    All right.  And a lot of the materials you reviewed with

11  Ms. Hajjar had to do with these WhatsApp chats that were sent

12  to an e-mail, correct?

13  A    Yes, that's correct.

14  Q    All right.  So once the WhatsApp chat is exported to an

15  e-mail, it's no longer encrypted, correct?

16  A    That's correct.

17  Q    Okay.  So, the WhatsApp chat is basically just an

18  attachment that is sent out of the WhatsApp system and sent to

19  an e-mail, correct?

20  A    That's correct.

21  Q    All right.  And once it's in the e-mail, it's just

22  another attachment that anyone can look at, correct?

23  A    Correct.

24  Q    And it loses the encrypted qualities of the WhatsApp

25  application?

Rees - cross - Agnifilo                    3672

1    A    Correct.

2    Q    All right.  And, in this case, it went from the WhatsApp

3    on a phone to a computer, correct?

4    A    It went to an e-mail account.

5    Q    Right, an e-mail account, and I think what you said on

6    direct examination was that a search warrant was conducted and

7    the contents of this e-mail account were found, correct?

8    A    That's correct.

9    Q    So fair to say that Keith Raniere didn't intend to keep

10   these WhatsApp chats only in WhatsApp, correct?

11            MS. HAJJAR:  Objection.

12            THE COURT:  Sustained.

13   BY MR. AGNIFILO:

14   Q    Let me ask you a different question.

15            Keith Raniere exported the WhatsApp chats to another

16   location?

17            MS. HAJJAR:  Objection.

18            THE COURT:  You may answer that.

19   A    The WhatsApp chats that we reviewed were from the

20   vicibaby@gmail.com.

21   Q    So it would have been the vicibaby -- so that would have

22   been the source of the exporting, is that my understanding?

23   A    That's correct.

24   Q    Okay.  And it went to what e-mail address, do you know?

25   A    Vicibaby@gmail.com.

SAM      OCR      RMR      CRR      RPR

Rees - cross - Agnifilo                                    3673

1    Q    Okay.  So it went from WhatsApp -- I'm sorry.  Let me --
2    it went from the WhatsApp system to -- to the vicibaby e-mail?
3    A    Correct.
4    Q    Okay.  And it was found there?
5    A    Correct.
6    Q    Just give me one second.
7              (Pause.)
8    BY MR. AGNIFILO:
9    Q    As part of your investigation, did you check to see if
10   vicibaby e-mails were sent to Keith Raniere e-mail addresses?
11   A    If e-mails were sent from vicibaby to Keith Raniere, that
12   would have been included in the search warrant return, yes.
13   Q    Right.  Okay.  So, um -- so many of these e-mails were
14   sent to Keith Raniere-related addresses, correct?
15   A    That's correct.
16   Q    And they would have been on -- in Keith Raniere's
17   e-mail --
18              MS. HAJJAR:  Objection.
19              THE COURT:  You can finish your question.
20              MR. AGNIFILO:  Thank you.
21   Q    And many of them were recovered from Keith Raniere's
22   e-mail address, correct?
23   A    I'm not aware.  I don't know.
24   Q    Okay.  You didn't do the search?
25   A    That's correct.

Rees - redirect - Hajjar                    3674

1    Q    But as a matter of encryption, once it's in an e-mail

2    system, whether it be a vicibaby e-mail address or the Keith

3    Raniere e-mail address, they're no longer encrypted in either

4    event?

5    A    That -- that's correct, but it's actually the

6    communications exchange that's encrypted, not the app itself.

7    If that makes sense.

8    Q    Yes.

9    A    So, correct, once a communication is outside the app,

10   encryption is no longer -- it no longer exists.

11   Q    Right, there's no more encryption.  So if it's on -- if

12   it's in an e-mail, it's just -- and it's found, it can be

13   reviewed and shown in court, correct?

14   A    That's correct.

15              MR. AGNIFILO:  I have nothing else, Judge.

16              THE COURT:  Anything further?

17              MS. HAJJAR:  Just one question, Your Honor.

18              THE COURT:  Okay.

19   REDIRECT EXAMINATION

20   BY MS. HAJJAR:

21   Q    Agent Rees, the WhatsApp messages that we reviewed

22   yesterday, those were all from the vicibaby@gmail.com account?

23   A    Yes, I believe so.

24   Q    Yet, you have also reviewed separate WhatsApp messages

25   between Camila and Keith Raniere?

Rees - redirect - Hajjar                          3675

1   A     That's correct.

2   Q     And which account did those come from, the

3   KeithRaniere@yahoo.com account that you reviewed?

4   A     Correct.

5   Q     So you reviewed similar chats located in two addresses,

6   KeithRaniere@yahoo.com and vicibaby@gmail.com?

7   A     That's correct.

8                MS. HAJJAR:  Thank you, Your Honor.

9                THE COURT:  Anything else?

10               MR. AGNIFILO:  Nothing, Judge.

11               THE COURT:  All right, the witness is excused.  You

12  may stand down.

13               THE WITNESS:  Thank you, Your Honor.

14               THE COURT:  You're welcome.

15               (Witness steps down and exits the courtroom.)

16               THE COURT:  All right, members of the jury, first of

17  all, thank you for your consideration of certain logistical

18  and scheduling changes that we might use for the rest of the

19  trial.

20               I understand that the idea of going beyond

21  five o'clock would create some substantial problems for some

22  members of the jury, so that idea has been -- the parties have

23  agreed that that idea will not go forward.  But the jury has

24  indicated that we might start at nine o'clock in the morning

25  and we might take half an hour for lunch.

                SAM     OCR     RMR     CRR     RPR

Rees - redirect - Hajjar                                3676

1        With regard to lunch, for logistical reasons it's
2   hard to do less than 45 minutes for lunch, so we will have a
3   45-minute lunch break in the middle of the day.
4        With regard to the 9:00 a.m. start, there is some
5   logistical issues that we need to work through before we can
6   decide exactly what time we will attempt to start.  We don't
7   want to say one thing and then find out that it is not going
8   to work, so we will get back to you on that.
9        And as to how long the trial will continue, we
10  understand that some jurors have vacation plans and we have
11  the dates.  And what we are going to do, by the beginning of
12  next week, we will have a better idea of how long testimony is
13  likely to last, but it will certainly last through the end of
14  the week and we will let you know sometime early in the week
15  what our thoughts are about how long the trial will last,
16  understanding some of the deadlines that some of you have
17  regarding your vacation plans.
18        So, we are dealing with all of that and we
19  appreciate your cooperation and your attention throughout the
20  trial, and so I just wanted to fill you in on where we are at
21  the moment.
22        So, that having been said, the Government may call
23  its next witness.
24        MR. LESKO:  The Government calls Dr. Dawn Hughes.
25        (The witness enters the courtroom and takes the

Rees - redirect - Hajjar                           3677

1    stand.)

2              THE COURTROOM DEPUTY:  Please raise your right hand.

3              Do you solemnly swear the testimony you shall give

4    to the Court will be the truth, the whole truth, and nothing

5    but the truth, so help you God?

6              THE WITNESS:  I do.

7              THE COURTROOM DEPUTY:  Please have a seat and please

8    state and spell your full name for the record.

9              THE WITNESS:  Dawn Hughes, D-A-W-N, H-U-G-H-E-S.

10             THE COURT:  Very well, you may inquire.

11             MR. LESKO:  Thank you, Your Honor.

12             THE WITNESS:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Hughes - direct - Lesko                              3678

1   D A W N   H U G H E S,

2        called as a witness by the Government, having been

3        first duly sworn/affirmed by the Courtroom Deputy, was

4        examined and testified under oath as follows:

5   DIRECT EXAMINATION

6   BY MR. LESKO:

7   Q    Good morning, Dr. Hughes.

8   A    Good morning.

9   Q    Dr. Hughes, what is your profession?

10  A    I'm a clinical and forensic psychologist.

11  Q    And what is clinical psychology?

12  A    So, clinical psychology is the study of human behavior,

13  both normal and abnormal human behavior.  Clinical

14  psychologists are trained in the psychopathology and major

15  mental illnesses relating to having to diagnose and treat

16  individuals, but also in just problems in living and other

17  behavioral problems that individuals may have.

18  Q    And what is forensic psychology?

19  A    So, forensic psychology is just the application of the

20  science and principles of psychology to a particular issue, a

21  legal issue at hand.

22        So, the forensic is -- just comes from the Latin "of

23  the forum," where the courts were.  So it's really using what

24  we know in psychology to answer a particular legal question.

25  Q    And why did you decide to become a psychologist?

SAM     OCR     RMR     CRR     RPR

Hughes - direct - Lesko                      3679

1   A    So I was an undergraduate major in psychology like

2   probably 60 percent of undergrads and so I was just always

3   interested in why people do the things they do.  That first

4   got me in there, really just the curiosity.  And then when I

5   started working more, even as an undergrad really not knowing

6   much, but working in some social service agencies and fields,

7   I really felt like I wanted to understand them in order to

8   help the individuals and how can I have a helping role in some

9   of the difficulties that people find themselves in over their

10  life span.

11  Q    Thank you.

12       Please describe your educational background.

13  A    Sure.  So I received my Bachelor's Degree in psychology

14  at Hamilton College in upstate New York.  I received my

15  Master's Degree and PhD in clinical psychology at Nova

16  Southeastern University, which is in South Florida.

17       I then had to do -- in order to receive the doctoral

18  degree, one has to do a year internship training.  I did that

19  year at Yale University, the School of Medicine in the

20  Department of Psychiatry.

21       And then, in order to get licensed in all 50 states,

22  now you have to do a year post-doctoral fellowship, and I came

23  back to New York where I'm from and I did that at Weill

24  Cornell Medical College, New York Presbyterian Hospital in a

25  trauma-based program there.

Hughes - direct - Lesko                                  3680

1    Q     So you have a PhD?

2    A     Right.

3    Q     You're a doctor?

4    A     Correct.

5    Q     Okay.  Could you please describe your training and

6    experience in psychology and trauma?

7    A     Sure.

8          So my specialization is interpersonal violence and

9    traumatic stress.  Interpersonal violence is when one

10   individual is violent toward another, and that includes rape

11   and sexual assault, childhood abuse, childhood sexual abuse,

12   domestic violence, sexual assault, physical assault and things

13   of that nature, sexual harassment.

14         And then traumatic stress is the outgrowth of what

15   happens to individuals when they experience those type of

16   traumatic events.

17         So, my training is somewhat unique that, when I got

18   to graduate school, I started working immediately with very

19   sort of well-regarded esteemed professionals in the area of

20   trauma and violence.  So I worked in a domestic violence

21   program, which was a community-based program, that saw both

22   victims and perpetrators of domestic violence.  So I had to

23   assess and treat both victims and perpetrators of domestic

24   violence.

25         And then, after that, we had another program housed

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                    3681

1    within that community mental health center, which was called

2    the Child Sexual Abuse Survivors Program, and that program was

3    also geared for individuals who had childhood abuse histories

4    to come into treatment.  So my job was to really do lengthy

5    interviews, look at questionnaires, look at psychological test

6    data to really understand sort of not only what they

7    experienced, but what else did -- what are the psychological

8    outcomes from some of that abuse.

9            Then, as part of my graduate training, I also had

10   the opportunity and the honor to work in the Veterans

11   Administration Hospital.  So being able to see trauma, not

12   only from an interpersonal violence context, but also through

13   our combat veterans and what they have struggled with and

14   suffered with.  So I worked in the outpatient Veterans

15   Administration program and learned more, again, about PTSD and

16   trauma there.

17           And then, when I went on to internship at Yale, I

18   was at a substance abuse facility and was doing groups for

19   women who had childhood abuse and adult victimization

20   histories, but were also heroin abusers.  So they were in

21   recovery for opiate addiction, but also had, you know,

22   significant trauma.  So we were doing treatment in groups for

23   those individuals to really try to target both of the

24   significant issues that they had.

25           And then, when I came back to New York for my post

Hughes - direct - Lesko                    3682

1   doctoral fellowship at the Paine Whitney Clinic, which is the

2   psychiatric facility of New York Hospital, Cornell Medical

3   Center, we have an anxiety and traumatic stress program there.

4   And that program similarly saw individuals who had either

5   suffered an adult assault or a rape as an adult or some sexual

6   assault or violence also has a child, and we also saw

7   individuals who were in violent relationships as well.

8   Q    Thank you.  Let's talk about your current occupation.

9        What positions do you currently hold?

10  A    So I'm currently in independent practice with clinical

11  and forensic psychology.  I also hold a voluntary faculty

12  position.  I'm a clinical assistant professor of psychology in

13  the Department of Psychiatry at Weill Cornell, New York

14  Hospital.

15  Q    So you teach at Weill Cornell?

16  A    Right.  So, I'm on the teaching faculty and the

17  psychology faculty.  So one of the things that I do is I help

18  evaluate the interns that come through, that cycle through the

19  program every year, and review those applications.  And I also

20  do some ad hoc supervision.

21       I don't do weekly supervision anymore, but

22  supervision in terms of if an issue of violence, abuse, rape

23  comes up, I'm the one who gets called if the interns have

24  difficulties with that.  And then I also have been teaching --

25  probably for the last four or five years, I've run the ethics

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                    3683

1    seminar for the interns, so I teach the ethics seminars for

2    the interns.

3    Q    How many years have you practiced as a psychologist?

4    A    I started in 1998, so about 21 years now.

5    Q    Can you just briefly, for the jury, describe your private

6    practice?

7    A    Sure.  So I see individuals in therapy in my private

8    office.  I see men and women who -- probably about 75 percent

9    of my practice are individuals who have experienced some type

10   of violent event or abuse in their lives, whether it be, you

11   know, as a child or as an adult.

12          So part of my job, as a psychologist and a trauma

13   psychologist, is to really sort of help them heal from the

14   traumatic effects of victimization, sort of decrease their

15   symptomatology and increase their functioning, and also

16   increase their quality of life.

17          The other part I do in my practice is I do forensic

18   psychology, and that might be something like I'm doing here

19   testifying in court.  I also evaluate individuals who were

20   involved in court cases, either in civil court or in criminal

21   court.  So that's the forensic aspect.

22          And then I also have a lot of professional

23   activities that I am involved in.  I'm on several -- the

24   Governance Board of the American Psychological Association.  I

25   was president of a women's mental health consortium program,

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                    3684

1    which is a multidisciplinary organization in New York City;

2    psychiatry, psychology, social work, nursing, that really

3    looks at women's mental health throughout their life span.

4            So I'm engaged in a lot of professional activities

5    that take me to meetings and boards and things of that nature.

6    Q    In your private practice, have you treated patients who

7    are victims of sexual assault and sexual abuse?

8    A    Of course.

9    Q    You mentioned your specialization in interpersonal

10   violence.  Does interpersonal violence always involve physical

11   harm?

12   A    No.  As I said, there's multiple types of interpersonal

13   violence.  So some interpersonal violence can be a physical

14   assault, it can be a stranger physical assault; you can get

15   physically assaulted on the street by a stranger.  You can get

16   attacked on the street, that would be a physical assault.  You

17   can be sexually assaulted, you can be raped.  Certain

18   people can be -- I mean, there's certainly some belief that

19   sexual violence is a violent act even though it's not a

20   physical hit, slap.  You know, you can have sexual violence in

21   rape without being punched or hit or grabbed or attacked in

22   that way.

23           But then we have a lot of psychological aggression

24   and coercive control that has been found to be, you know,

25   incredibly damaging to the psychological well-being of

Hughes - direct - Lesko                                      3685

1   individuals, and that can also occur in the absence of

2   physical violence.

3   Q    Approximately how many victims of interpersonal violence

4   have you examined or interviewed in the course of your career?

5   A    Hundreds upon hundreds upon hundreds, probably in the

6   thousands at this point.

7   Q    Are you board certified?

8   A    Yes, I am.

9   Q    In what?

10  A    I am board certified in forensic psychology.

11  Q    And what does that mean?

12  A    So the board certification is somewhat analogous to what

13  medical doctors have.  In psychology, it's the highest level

14  that one can obtain and you have to go through a variety of

15  steps to get there.

16          You have to have been practicing for, you know, I

17  think five years after getting the doctoral degree, after your

18  post-doctoral fellowship.  You have to then basically apply to

19  be board certified and pass certain requirements that you've

20  done enough continuing education hours in the field, that

21  you've seen people working in the field of forensic

22  psychology.  You have to pass an ethics clearance.  You have

23  to then take a written test, a written board test.  Then you

24  have to submit two work samples that get critically reviewed

25  and examined and torn apart, and then you have to have an oral

Hughes - direct - Lesko                    3686

1   defense of those work samples.

2           And after you pass all of those pieces, then you are

3   board certified when you pass them all.

4   Q    How many board certified forensic psychologists are there

5   in the United States?

6   A    I believe there's a little less than 375 in the United

7   States.

8   Q    And how many in New York State?

9   A    And I think there's less than 25 in New York State.

10  Q    Are you licensed to practice psychology?

11  A    Yes, I am.

12  Q    Where?

13  A    I'm licensed to practice here in the State of New York

14  and I'm also licensed in the State of Connecticut and the

15  State of North Carolina.

16  Q    Have you published in your areas of specialization?

17  A    I have some publications.

18  Q    For example, have you published a book chapter entitled

19  "Rape and Sexual Assault Among Adult Women"?

20  A    Yes, I have.

21  Q    Have you given other trainings and presentations in the

22  area of trauma and abuse?

23  A    Yes, I have given a number of training and presentations

24  to both mental health professionals, as well as to attorneys

25  and to judges, on the area of what we know in the field about

Hughes - direct - Lesko                    3687

1  victimization, sexual victimization, intimate partner violence

2  and then the traumatic effects of that violence and abuse.

3  Q    What professional organizations do you belong to?

4  A    So I belong to the American Psychological Association,

5  which is the largest body of psychologists, professional body

6  of psychologists.  And because it's so large, there are --

7  it's broken up into subdivisions and I was one of the founding

8  members, about I guess it's 12 years ago now, of the Trauma

9  Psychology Division of APA, because recognizing that trauma

10  psychology also is, you know, a very unique field and has, you

11  know, a unique interest in the study of psychology.

12       So I've been part of that and part of that board

13  since, you know, off and on, twelve years serving on the

14  executive board and program chair and awards chair.  And now I

15  am the representative from the Trauma Division to the larger

16  body of APA and on the governance, meaning I have voting

17  powers in the APA representing that trauma division.

18       There are other divisions I do belong to; I belong

19  to the Psychology and Law Division.  I belong to Psychology of

20  Women Division.  And I also belong to the Psychologists in

21  Independent Practice Division.

22       Of organizations that I belong to, I belong to the

23  International Society For Traumatic Stress Studies.  As the

24  name connotes, it's an international society, but it's also a

25  multidisciplinary society.  So it's with psychiatry,

Hughes - direct - Lesko                    3688

1   psychology, social work, nursing, medicine.  So you really get

2   a good flavor for the different disciplines in the field of

3   psychology in trauma psychology.

4           I belong to the International Society for Study of

5   Trauma and Disassociation.  I belong to the New York State

6   Psychological Association, the Anxiety Disorders Association

7   of America.  I'm a fellow of the American Board of Forensic

8   Psychology.

9           I think that's most of them.

10  Q    Thank you.

11          Do you attend professional conferences?

12  A    I do.  Multiple times per year.

13  Q    Have you been qualified if the field of psychology as an

14  expert witness in interpersonal violence and traumatic stress?

15  A    Yes, I have.

16  Q    Approximately how many times?

17  A    I believe it's between 50 and 55 times now.

18  Q    In jurisdictions?

19  A    In the State of New York, in Pennsylvania, in

20  Connecticut, in New Jersey, in Federal Court in the Southern

21  District and also the Northern District of New York.

22  Q    Have you ever worked or testified for the prosecution?

23  A    Yes, I have.

24  Q    Have you worked or testified for the defense?

25  A    Yes, I have.

Hughes - direct - Lesko                    3689

1    Q    Are you being compensated for your work on this case?

2    A    Yes, I am.

3    Q    And what's your hourly rate?

4    A    My hourly rate is $500 per hour.

5    Q    Have you ever found that an individual that you evaluated

6    did not suffer from the effects of interpersonal violence?

7    A    Sure.

8    Q    Have you ever not been qualified as an expert?

9    A    No.

10        MR. LESKO:  Your Honor, we'd offer Dr. Hughes as an

11   expert in clinical and forensic psychology with a

12   specialization in interpersonal violence and traumatic stress.

13        THE COURT:  I'm sorry, just give me that one more

14   time.

15        (Record read.)

16        THE COURT:  All right.

17        MR. Der OHANNESIAN:  Yes, we renew our objections

18   both to the qualifications, the scope of the testimony, the

19   notice as set forth in our prior filing, ECF 633, and also

20   we'll present the Court with DX-807, which is what we believe

21   is a proposed limiting instruction for this witness.

22        THE COURT:  All right, the objection is noted and

23   overruled.  The witness is deemed by this Court as an expert

24   in clinical and forensic psychology with specialization in

25   interpersonal violence and traumatic stress.

Hughes - direct - Lesko                          3690

1           And you may continue your examination of the

2     witness.

3           MR. LESKO:  Thank you, Your Honor.

4     BY MR. LESKO:

5     Q     Dr. Hughes, do those specializations involve dynamics of

6     sexual assault, victim responses to sexual assault and the

7     impact of sexual assault on victims during and after being

8     assaulted?

9     A     Sure.  What we want to look at is the -- we don't only

10    look at the effects, the psychological effects of what

11    happened to someone, but we want to understand what went into

12    that and understanding the dynamics of that relationship or

13    that assaultive experience can be very informative in

14    understanding how the victim then sort of comes through that

15    and how they respond psychologically to it.  So it's really

16    important for us to know not only the dynamics, but also the

17    consequences.

18    Q     Have you reviewed any case materials specific to this

19    case?

20    A     I have not.

21    Q     Have you interviewed any victims or witnesses in this

22    case?

23    A     I have not.

24    Q     Have you read any police reports or statements specific

25    to this case?

Hughes - direct - Lesko                    3691

1   A    I have not.

2   Q    What do you know about this case?

3   A    I know very basically just that -- what was in the

4   popular media, that there was a self-help group upstate

5   New York in a fairly isolated community, and that the

6   defendant is alleged to have committed acts of coercive

7   control and sexual assault against some of the members in that

8   community.

9   Q    Have you read any of the trial transcripts?

10  A    I have not.

11  Q    What is your role here today?

12  A    So my role, as I understand it and that I agreed to

13  undertake, was to offer the knowledge and experience of what

14  we know in the field about coercive control and sexual assault

15  and abuse and violence, and understanding that there is a very

16  distinct body of literature that exists in this field and in

17  that there are also a lot of myths and misconceptions that

18  perhaps lay people have about being in abusive relationship,

19  leaving an abusive relationship, being sexually assaulted, how

20  they tell their story.

21       So I think it's important for me to be able to

22  impart what we know empirically and clinically in the field

23  about this topic.

24  Q    So is your testimony here today based on your experience,

25  training, education and work with victims and perpetrators of

Hughes - direct - Lesko                          3692

1   sexual assault?

2   A    Correct.

3   Q    So to put this issue in context, what percentage of women

4   experience some form of unwanted sexual contact during their

5   lifetimes?

6   A    Right.  So, we've had some very large-scale studies that

7   have helped us answer this question over the last really

8   twenty years, thirty years, but one of the more recent studies

9   indicated -- and this is a large-scale study sponsored by the

10  Centers for Disease Control, that continues to determine that

11  sexual violence is a prevalent public health problem.  And it

12  comes out -- depending on what year-span we're looking at,

13  it's an ongoing representative study of the American people,

14  between 1 in 4 and 1 in 5 women have experienced some form of

15  sexual assault in their lifetime.

16  Q    And is that study, the CDC study, called the National

17  Intimate Partner and Sexual Violence Survey?

18  A    Correct.

19  Q    Just generally, before we get into the more detailed

20  discussion, what are some of the most common myths and

21  misconceptions about sexual assault in abusive relationships?

22  A    Sure, there are numerous.  One of the myths is that a

23  victim is going to be pulled over in the dark, in an alley,

24  and sexually assaulted with a weapon, and that this person is

25  a stranger.  That is a myth because most of the perpetrators

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                     3693

1    of rape and sexual assault are someone known to the victim.

2           A myth is that the individual would have fought

3    back, she would have screamed, she would have yelled, she

4    would have told someone.  The majority of victims do not fight

5    back or scream or yell or tell someone.

6           A myth is that, if you were really raped you would

7    have went to the police, you would have went to law

8    enforcement.  The overwhelming majority of women do not report

9    rape and sexual assault.

10          The fact that you didn't -- you didn't cry or you

11   didn't say anything when this happened, you just looked stoic,

12   so you must not be affected; not true.  That is really

13   understood as the psychological coping of dissociation and

14   emotional numbing of responsiveness to an overwhelming

15   traumatic event.

16          So there are a number of myths that are just not

17   borne out in the data that sometimes lay people have and that

18   they think.

19   Q    Is there a single profile that fits all victims?

20   A    There is no single profile --

21          MR. Der OHANNESIAN:  Objection to this testimony,

22   Your Honor.

23          THE COURT:  You may answer.

24   A    It's really important, there is no single profile of a

25   rape victim or a victim of sexual assault.  How we understand

Hughes - direct - Lesko                3694

1    sexual assault and sexual violence are based on the acts that

2    are perpetrated upon the victim; that's how we define it and

3    that's how we understand it.  So it cuts across racial lines,

4    socio-economic lines, professional lines, intellectual lines,

5    intelligence; so anybody can be a victim of rape and sexual

6    assault.

7    Q    Is there a single profile of an abuser?

8    A    And similarly, there is no single profile of an abuser.

9    You know, what we know about men who use violent tactics

10   against women is we look at the tactics --

11            MR. Der OHANNESIAN:  I would object to profiling of

12   offender testimony.

13            THE COURT:  Overruled.

14   A    So there's no distinct profile.  We can't just pick out

15   by using a psychological test or a couple of criteria being

16   able to tell who is going to be a perpetrator of violence or

17   abuse and who is not.

18   Q    Now you mentioned that most victims of sexual assault

19   know their perpetrator.  Approximately what percentage of

20   victims of sexual assault know their perpetrators?

21   A    So a conservative estimate is about 80 percent.  So the

22   overwhelming majority, 80 percent.  Some studies have it at

23   15 percent.  You know, a recent New York City study had it at

24   10 percent.  So that means the smallest, you know, minority,

25   you know, 20 percent, you know, 20 out of a hundred women know

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                    3695

1    their perpetrators.  All of the others do not know their

2    perpetrators; it's a stranger rape, someone totally unknown.

3    The overwhelming majority know their perpetrator and that

4    perpetrator is either -- the biggest percent of those

5    perpetrators are a former or intimate partner, current or

6    former intimate partner.  It could be a family member or

7    someone known like a boss, a supervisor, a teacher, a coach, a

8    neighbor.  So in the majority of cases, these individuals who

9    have been victimized know who did it to them.

10   Q    And are those percentages reflected in your private

11   practice?

12   A    Oh, absolutely.

13   Q    Are sexual assaults oftentimes underreported?

14   A    Right.  And we also know through our -- not only our

15   social science data, but through the Department of Justice

16   data and the Uniform Crime Reports compiled by the FBI and the

17   Centers For Disease Control, the general consensus is that

18   crimes, sex crimes and crimes against women are the most

19   underreported crimes that we have.  And there's been a lot of

20   sort of agency and pull to try to figure out why that is and

21   what we can do to sort of increase a law enforcement response,

22   if that would be helpful.

23   Q    And do you know of an approximate percentage of sexual

24   assaults that are actually reported?

25   A    Again, some studies have it at 12 percent.  Some have it

Hughes - direct - Lesko                    3696

1    at 16 percent of actual reports to law enforcement.

2    Q    Are acquaintance sexual assaults, we'll call it, more or

3    less likely to be reported?

4    A    So, when the perpetrator is known to the victim, those

5    are the least likely types of cases that are going to be

6    reported to law enforcement.

7         When it is a stranger, when there may be a weapon

8    involved, when there is physical jury, those are the type of

9    cases that are more likely to generate a law enforcement --

10   for the person to seek out law enforcement for assistance.

11   But when it's someone known, when it's your ex-boyfriend, your

12   teacher, your coach, your boss, much more reluctant to go to

13   the police for assistance.

14   Q    Does the evaluation of the legitimacy of the sexual

15   assault depend on whether a victim reported the event to law

16   enforcement?

17        MR. Der OHANNESIAN:  Objection.

18   A    Right --

19        THE COURT:  Overruled.

20        You may answer.

21   A    So, absolutely not because you are more likely to not

22   report than to report.  So the reporting gives us information

23   about sort of this victim's psychology and the dynamics that

24   she is dealing with, what the obstacles are for her to report.

25   But just because a victim doesn't report, since we know that

Hughes - direct - Lesko                          3697

1    the overwhelming majority don't, that doesn't give us any data

2    about the legitimacy about whether a rape or a sexual assault

3    are occurred.

4    Q    So these victims who are assaulted in a relationship,

5    we'll call that relational sexual assault.  Do these victims

6    of relational sexual assault experience obstacles to making

7    formal reports to the police or law enforcement?

8    A    Right, and there are a number of obstacles and we sort of

9    sometimes think of them as the internal processing of:  Am I

10   going to report this?

11           When you know the perpetrator, you fear sort of

12   making that public.  You fear that it's going to change the

13   dynamic of the relationship.  If it's your neighbor, your

14   boss:  What's going to happen to me if I report this?  Getting

15   that person arrested might not see [sic] a viable option for

16   that individual.  They fear stigma and shame that we know

17   still does happen when people report sex crimes and crimes of

18   sexual violence.  They fear not being believed.  They fear

19   that they will be blamed for their sexual assault.  They fear

20   harsh treatment by law enforcement or people questioning them.

21   Sort of, you know, imposing some of the blame on them.

22           They fear that, in the disclosure, they may disrupt

23   their peer group.  They may disrupt sort of the status quo of

24   whether it's the organization, the workplace, the

25   relationship, the family, because when we do report things do

SAM      OCR      RMR      CRR      RPR

Hughes - direct - Lesko                    3698

1   get shooken [sic].  I mean, the whole sort of foundation of

2   what the person is involved in, does it get shaken up by that

3   report.  So they fear what that is going to look like and how

4   that may either damage them or their family.

5           They may fear retaliation.  Many victims have been

6   threatened to not report, either threatened with physical harm

7   or threatened with disclosure of personal information that

8   someone might have.  A lot of threats with, what we see now,

9   we call revenge porn where if you were in an intimate

10  relationship, pictures were taken of you, maybe those pictures

11  were consensual, maybe they weren't, but now they are being

12  held over your head.  So, if you report, there's going to be

13  an absolute contingency coming on you that's not going to be

14  positive.  That's going to impact an individuals' decision to

15  report.

16          And then, also, individuals are suffering, as I

17  mentioned before, from the psychological impact of having been

18  assaulted and having been violated in that way, so they have

19  trauma-based symptoms.  They may have this shock and

20  dissociation, and what you do when you feel that type of -- of

21  psychological sort of what we say dysregulation, D-Y-S, you

22  know, not being regulated internally, you try to do things to

23  calm yourself and not feel it, not think about it.  You avoid.

24  You push it down.  You get it out of your mind.

25          So if I'm going to report it, that means all this

Hughes - direct - Lesko                    3699

1    stuff has to come up now and I might not feel psychologically

2    capable to cope with it.

3

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              SAM      OCR      RMR      CRR      RPR

Hughes - Direct - Lesko                           3700

1   BY MR. LESKO (Continuing):

2   Q    You mentioned peer groups.  Do you see these sort of

3   concerns when victims are part of larger communities or

4   institutions?

5   A    That's correct.  I've seen this in the cases that I've

6   worked on with the Boy Scouts of America, where sometimes in

7   telling about the abuse, then sort of the whole group is going

8   to come down.  And, of course, the issue of fearing being

9   believed that somebody who's in high esteem, your Scout

10  Master, could do this to you.

11           I've seen this in the enormous work I've done in the

12  Catholic church and the clergy abuse, that how can I, the

13  victim, be believed and take down a priest?  How is that going

14  to work?  Now everybody who is involved in my school or my

15  religious instruction or my church and community, that is

16  going to have a ripple effect on that.

17           We have seen it in college campus rapes where a

18  woman would report.  You want to believe that your friends are

19  going to be there with you, your female friends and your male

20  friends, but now you're the one who's put the damper on the

21  party.  Now you said something and now we all can't have fun,

22  and that woman becomes ostracized.

23           So, there's a lot of fears about -- and,

24  regrettably, well-founded fears.  These are not fears that are

25  delusional.  This stuff happens and people see it in the media

LAM      OCR      RPR

Hughes - Direct - Lesko                    3701

1    and they see it, perhaps, in their own experience.  So, those

2    fears of reporting when it's going to effect a larger group

3    can be a significant deterrence to disclosing the abuse.

4    Q    Is that done in the present in situations where a assault

5    takes place in the context of employment relationship?

6    A    Absolutely.

7              If you're going to report sexual discrimination,

8    sexual harassment, or assault in the workplace and it's your

9    boss, someone who has clearly more power than you do, how is

10   that going to be believed?  You don't believe that people are

11   going to believe you.  People aren't going to believe that he

12   could do this and now I could lose my job, people aren't going

13   to want to talk to me, people aren't going to keep me on

14   projects, no one is going to want to work with me.

15             So, all of that starts circling through an

16   individual's brain while they're also, at the same time,

17   dealing with all the psychological consequences of the

18   assault.

19   Q    In your experience, is a victim's unwillingness to report

20   a sexual assault magnified when the perpetrator plays a

21   significant or senior leadership role in an institutional or

22   employment context.

23             MR. DER OHANNESIAN:  Objection.

24             THE COURT:  Overruled.

25             MR. DER OHANNESIAN:  The leading nature of the

                    LAM     OCR     RPR

Hughes - Direct - Lesko                3702

1    questions.

2              THE COURT:  Hold on.

3              The question is proper.  Please answer.

4              THE WITNESS:  Thank you.

5    A    Reporting is hard enough, right?  It's hard enough to

6    report when it's a neighbor that lives five blocks away, even

7    though you know who he is.  That's hard.  But when you have to

8    be in a situation that you have to remain in, right, it is

9    very difficult.

10             So, if you have to report against somebody who is in

11   high esteem, right, nobody believes that you're going to be

12   believed.  You don't believe you're going to be believed.  You

13   can't even believe that this happened to you.  How can a

14   priest abuse me?  How can my Scout leader abuse me?  How can

15   my coach abuse me?  How do I reconcile that someone who is

16   supposed to care for me, love me, teach me, guide me, sexually

17   abuse me in this way?

18             So, that psychological confusion with someone who is

19   in such high esteem, there's no belief that you can be the one

20   that's going to expose that.  So, for some of the victims and

21   my patients, it wouldn't even occur to them to report it

22   because it just seems to overwhelming.

23   Q    Let's talk a bit about how victims cope.

24             How do victims cope with sexual assault?

25             And let's talk about immediately after it happens.

Hughes - Direct - Lesko                    3703

A      So, in the immediate aftermath, it's usually met with a
lot of sort of shock and disbelief.  There's a lot of sort of
internal wrangling about what just happened?  What did he do?
Was it my fault?  Did I have a piece to blame in here?  Did I
do something to cause this to bring it on myself?  Maybe some
rationalization; you know, maybe he was drunk, maybe he wasn't
thinking right, maybe I misinterpreted.  There's a lot of sort
of rationalization and minimization of what just happened in
the immediate aftermath.

       And then there's a lot that sort of moves a little
to a lot of just shock of I can't believe this happened and I
don't know what to do about it.  So, there's powerlessness,
there's shock, there's psychological distress, a lot of
confusion about how do I now understand this dynamic?  How do
I understand now my relationship with this person who, because
they're known, chances are they have to see again, they have
to interact with again.  There's a lot of sort of internal
cognitive processing.

       But then there's a lot of anxiety.  This is trauma.
PTSD used to be characterized as an anxiety-based disorder.
We've moved it to its own category now, but there's a lot of
anxiety around this.  You know how you feel -- I know how I
feel when I come to testify.  You get those butterflies.  They
feel that all over their bodies with such intensity that then
interferes with their ability to concentrate, their ability to

Hughes - Direct - Lesko                                    3704

1  attend, their ability to focus.

2          So, what they try to do is what we all do when we

3  feel something that we don't want:  We try to avoid it, we try

4  to push it down, not think about it, directed forgetting, try

5  to compartmentalize it, try to suppress it.

6          And then there are other techniques, which one is

7  called dissociation.  Dissociation is mostly an involuntary

8  process where we sort of separate ourselves from the pain.

9  And what we hear victims talk about is during the assault,

10  they will say, I left my body.  I wasn't there.  I was

11  watching myself from the ceiling.  I was just going to leave

12  my body because I couldn't stand the pain, I couldn't stand

13  what was going on.  I was just waiting for it to be over.

14          There's that emotional disconnection from what she's

15  feeling that carries through also in the aftermath of that

16  sexual assault and they may find themselves zoning out,

17  spacing out, not really being in touch with what's going on,

18  sort of having that glossy look to them, a numbing of

19  responsiveness; not really being attached to feelings of anger

20  or sadness, just sort of numb and blah.

21  Q    In the immediate aftermath of a sexual assault, if a

22  victim discloses it or talks about it, typically who does the

23  victim report this to?

24  A    So, we talked about formal reporting.  Formal reporting,

25  right, very, very minimal, amount maybe less than 15,

Hughes - Direct - Lesko                    3705

1   20 percent.  That would be to law enforcement or even medical

2   or a rape crisis center.  Very small percentage.

3            But what a lot of victims do do is because it's so

4   psychologically overwhelming, is they will usually tell a

5   friend, they'll tell their roommate, they might tell their

6   ex-partner if they had a good relationship, they might tell

7   their mother.  So, they usually try to tell someone really

8   because the overwhelming feelings that they're having are just

9   too much to bear on their own and they need some support.

10  Q    In these initial disclosures, do victims have difficulty

11  actually discussing the facts related to the sexual assault?

12  A    Absolutely, I mean, because we're talking about a

13  psychological traumatizing event that overwhelms normal

14  people's capacity to cope.  So, if I'm going to talk about the

15  details, that means that trauma is going to come right up

16  centerfold, right here, and that's going to be too

17  overwhelming to talk about.

18           Even patients who I have in treatment over the

19  long-term spend a lot of efforts trying to talk around it, not

20  wanting to talk about the details, not wanting to sort of

21  address it head-on, because it's too psychologically

22  threatening.  So, we see when they tell, they might say some

23  smaller pieces and that sort of disclosure, depending on the

24  response they get, can unfold over time.  It's not a

25  dichotomous I-told-I-didn't-tell-and-it's-over, it's a process

Hughes - Direct - Lesko                          3706

1    that unfolds over time.

2    Q    These coping strategies, what do they accomplish for the

3    victim?

4    A    Well, they try to accomplish some sense of safety, some

5    sense of control, some sense of feeling not so helpless, and,

6    really, a way of sort of managing in a -- we say in a

7    primitive way, in a very primitive way, that psychological

8    distress, that anxiety, that depression, that shame, that

9    humiliation.  There's a lot of efforts to try to manage that

10   and keep it in a box.

11   Q    Are these strategies, these coping strategies,

12   consciously or unconsciously employed?

13        In other words, does the victim know she's doing it?

14   A    Both.

15        Sometimes they are.  We do -- when we talk about

16   avoidance efforts, there are conscious avoidance efforts.

17   Something will come into your mind, it's like, I'm not going

18   to think about that, I'm not going to talk about it, I'm going

19   to do something else and distract me.

20        But what we know about sort of trauma is we say it's

21   a cue-based disorder, meaning that something in the

22   environment can trigger also us thinking about it.  So, you

23   could be walking down the street and see someone wearing the

24   same khakis as your perpetrator, you can smell a perfume, you

25   can smell an alcohol, you can see anything on TV these days.

Hughes - Direct - Lesko                    3707

1           And when that gets triggered, there can be the

2   voluntary response, conscious, shut off the TV, but there can

3   also the unconscious response, and that's the dissociative

4   response where all of a sudden they find themselves staring in

5   a room, missing time, not aware of what's really going on,

6   feeling kind of disconnected and having no feeling.  And that

7   would be an example of an unconscious process that could

8   happen.

9   Q    Do these coping strategies sometimes interfere with the

10  victim's abilities to recover from an assault?

11  A    Absolutely.

12          You know again, the first thing that we do is we

13  avoid, we suppress, we deny, we push it out, we have some

14  dissociative responses.  So, the more that we do that, the

15  less likely we are to allow it to come into our sort of

16  conscious awareness and integrate the trauma, right,

17  understand what happened.

18          And that can be dangerous because if the person is

19  in an ongoing chronic abusive situation, normal response to

20  trauma is to sort of bury it, avoid it, not think about it,

21  and that puts her at risk for further abuse because she's not

22  able to accurately identify what's going on.  She's too much

23  in the forest, not able to see the trees, and then she gets

24  abused again and now we have more trauma and she gets abused

25  again.

Hughes - Direct - Lesko                          3708

1        So, it's this cyclical pattern that keeps happening

2   where the individual never really gets to integrate and

3   understand what's going on.  And that leads to more profound

4   helplessness, hopelessness, shame, embarrassment, humiliation,

5   which makes it very difficult for her to extricate herself

6   from that abusive situation or relationship.

7   Q    Victims who are utilizing these coping strategies, do

8   they often appear normal?

9   A    So, we talk about it's the appearance of normalcy.  And I

10  talk about that with my patients all the time because

11  sometimes my patients will say, People say to me you look so

12  calm, you're so put together; meanwhile, they're stoic and

13  freaking out inside.

14       So, one of the things we know about psychology is

15  the outside doesn't always match the inside.  And if somebody

16  is traumatized, you're not necessarily going to see them

17  running around screaming and crying and yelling.  They're

18  really trying to use everything that they can to feel control

19  because this internal trauma process is making them feel very

20  out of control because it's coming out of control; they're not

21  trying to think about this stuff, but it's coming.

22  Q    In your experience, is it common for sexual assault

23  victims to deny that the assault has occurred as the incident

24  passes in time?

25  A    So, there's two types of denial.

Hughes - Direct - Lesko                    3709

1        There's psychological denial, where we engage in

2   that denial and minimization and rationalization of the abuse.

3   Like I said before, maybe he didn't mean it, maybe he was

4   drunk and it couldn't have really been that way, maybe I was

5   to blame.  So, there's some bits of denial that go in there.

6        And then denying sort of the factual elements of it

7   happened when somebody is queried about did this happen and

8   the person feels too threatened to say the truth is yes, and

9   they deny and say that it didn't happen.

10  Q    Do victims sometimes redirect their distress towards

11  someone else or something else?

12  A    In general, we all do when we are incredibly distressed

13  or angry or anxious or upset and we can't sort of in a

14  meaningful way address the person who caused that distress,

15  sometimes we displace that anger on someone else.  Maybe we

16  yell at someone on the street who was getting in front of us

17  on the subway or we yell at our mom because she's easier to

18  yell at, but we can't be mad at the person that really the

19  anger should be directed to.

20        So, displacement of anger is a very common

21  psychological phenomena.

22  Q    While we're discussing disclosure of sexual assaults,

23  does that process unfold over time?

24  A    Yes, it unfolds over time.

25        And that's part of the readiness of the individual

Hughes - Direct - Lesko                3710

1   to talk about this stuff.  There are times when people have

2   come into my office who have never told anyone.  It would be

3   erroneous for me to assume that in that first session I'm

4   going to say, okay, tell me everything.  That's not going to

5   happen.

6            So, when you bury things, things have to come out

7   sort of a little more in a piecemeal fashion, sort of gauging

8   the person's psychological stability to handle it and their

9   willingness to talk about it.  So, it's a process that unfolds

10  over time.

11  Q    You were saying there are factors that impact a victim's

12  decision to report a sexual assault?

13  A    You mean a later assault or at the time of the assault.

14  Q    Later on.

15  A    Later on, I mean, that's what we see when we talk about a

16  delayed disclosure, that the individual might not report the

17  rape or sexual assault at the time of occurrence, within the

18  immediate aftermath of the rape.  But we do see a lot of

19  reporting, and it may not be to law enforcement; it may be a

20  therapist, a parent, in the media, as just circumstances

21  change.

22           So, sometimes it's just the passage of time, where

23  some of those trauma-based incidents have had an opportunity

24  to abate and not cause so much havoc in the person's life.

25  Sometimes there's just age and maturity, where the person

LAM      OCR      RPR

Hughes - Direct - Lesko                    3711

1   feels like they have a better sense and handle on what

2   happened and they can report.  Sometimes there's a change in

3   their dynamic with the perpetrator; so, if you've moved, if

4   you've gotten a different job, if you're no longer under that

5   coach, if you've left your boyfriend or girlfriend, those are

6   situations that now have changed that dynamic that you may

7   feel sort of strong enough and ready to report.

8            Certainly, there are external factors that happen.

9   We know that when there are media reports of sexual assault in

10  a variety of communities, that increases individuals going

11  into therapy, calling rape crisis centers, and, also, reports

12  to law enforcement.  And that's because what they do is they

13  see themselves in another victim who has come out.

14           Because this experience is often so isolating,

15  people don't talk about it.  So, they stay in their own world

16  with their shame and humiliation, but then they see something

17  in *The New York Post* or *The New York Times* and they say, Hey,

18  that kind of looks like me and that story kind of sounds like

19  me.  Maybe I can deal with this now.  Maybe I can talk about

20  this now.

21           So, we do see with the media reports people are more

22  likely to come into treatment or report to others.

23  Q    Do all victims ultimately report their sexual abuse?

24  A    Formally report or report in therapy?

25  Q    Either one.

Hughes - Direct - Lesko                    3712

1   A    Again, those who don't report, we probably couldn't

2   assess them because we wouldn't know because they wouldn't

3   report it either in our studies or to law enforcement.

4         But there have been countless times where people

5   have come into my office because of some external event that

6   says I have to deal with this now, I've been burying this for

7   20, 30, 40 years sometimes, and have told me, I was going to

8   go take this to my grave.  I was never going to talk about

9   this ever again.  I was never going to do this.

10        And they expend a lot of psychological effort to not

11  talk about it, but that system eventually breaks down.  The

12  distress and the difficulties that come from that become too

13  overwhelming so they have to deal with it and they come in the

14  office.

15  Q    Are the factors that impact a victim's decision to report

16  a sexual assault, are they sort of uniform or are they unique

17  to each specific victim?

18  A    Well, clearly, they are unique to each specific victim.

19        We know that there's this host of factors out there,

20  but they're really going to be mediated by the individual

21  victim, her relationship with this perpetrator, the type of

22  abuse that was perpetrated upon her.  Was it a single

23  incident?  Was it multiple incidents?  Was there other

24  elements of psychological aggression and coercive control?

25        Is this person a person of authority?  Does she have

LAM        OCR        RPR

Hughes - Direct - Lesko                    3713

1    sort of tangible resources that she can do this?  If she needs

2    to extricate herself, can she do that?  Does she have funds?

3    Does she have a job?  Does she have money?

4            And there's also, what we say, preexisting

5    vulnerabilities that people have before the assault, the rape,

6    or sexual assault.  They may have had a previous sexual

7    assault.  We know that there's a high degree of

8    revictimization, that individuals who suffered childhood abuse

9    will be victimized later in life.  That could get activated

10   and now we have a double trauma someone's trying to deal,

11   which could impact her.

12           They could have mental health issues without

13   victimization.  They could be suffering from depression or

14   anxiety or other types of mental health issues, which lead to

15   vulnerability to the abuse which impact her post rape

16   adjustment and ability to disclose.

17   Q    In your experience, is there a particular way victims of

18   sexual assault remember their assaults?

19   A    Well, the memory for assaults comes in many different

20   ways.  We do know that, for the most part, clinicians and

21   researchers alike, that most people remember what happened to

22   them, they remember their assault; however, when we have

23   chronic assault and repeated assault, sometimes the details

24   tend to blend together.  And to sort of extricate what

25   happened on what day becomes much more difficult because there

Hughes - Direct - Lesko                3714

1    have been successive and so many abusive incidents.

2           And the way that sometimes trauma is remembered,

3    especially if someone is employing dissociation during the

4    event, the way the memories get encoded sort of like

5    flashbulbs, I have something here, I have something here, I

6    have something here, and something here, but they don't feel

7    linear, it's not A then B then C then D.  It's not always a

8    coherent narrative.

9           And over the course of therapy and time, those

10   pieces tend to then eventually come in place.  And sometimes

11   they never come in place, but they know that these things have

12   happened to them.

13   Q    Thank you.  Let's talk a moment about consequences.

14          What sort of empirical psychological consequences

15   can victims experience as a result of being sexually

16   assaulted?

17   A    So, the empirical data is quite clear and quite robust on

18   the psychological outcome of having been raped or sexually

19   assaulted.  What we see is anxiety, we see depression, we se

20   post traumatic stress disorder, other trauma-based disorders;

21   we see other associated symptoms of shame, of humiliation, of

22   self-blame, of self-loathing; we see sexual problems; we see

23   trust difficulties, especially if the perpetrator was someone

24   in authority; we see interpersonal difficulties sort of just

25   being able to relate with another person; we sometimes see

LAM      OCR      RPR

Hughes - Direct - Lesko                    3715

1   other sort of health-related problems, like eating disorders,

2   sexual problems, substance abuse problems.

3            So, it's a whole host of consequences that

4   individuals experience in the aftermath of rape and sexual

5   assault.

6   Q    Do sexual assault victims oftentimes experience confusion

7   or ambivalence?

8   A    All the time.

9            Even when they are in treatment -- you know, I had a

10  patient the other day tell me, you know, I know -- he was

11  abused by his Boy Scout leader, and he said, I know it wasn't

12  my fault, but I can never know it wasn't my fault.

13           He still believe it's his fault.  Well-accomplished

14  individual.  That stays with him.

15           There are things that stay with individuals that

16  continue to be difficulties for them to overcome this abuse.

17  Q    Do victims of sexual assault engage in sort of an

18  internal bargaining about whether or not to report the

19  assault?

20  A    Sure.

21           As I said before, for some victims, because when the

22  perpetrator is somebody of high esteem and regard by others --

23  not just them, but by others -- it never even occurs to them

24  that they would report.  It doesn't even enter their awareness

25  that that was a possibility.

Hughes - Direct - Lesko                    3716

1          For those who think that they might report, if it
2     enters some cognitive process in their brain, they go through
3     this cost-benefit analysis, like how is this going to work?
4     What is going to happen to me if I report?

5          And, as I said, usually in the cases in a relational
6     dynamic, there are a lot of other elements of psychological
7     aggression, coercive control, and threats that the sexual
8     assault is one piece, but now you have all of this other sort
9     of threatening behavior that, you know, if I tell then
10    something bad is going to befall me or my family or my
11    friends.  That cost-benefit analysis seems too high.

12         So, what victims do is say, well, I'm going to deal
13    with this myself.  I'm going to deal with this within the
14    confines of this relationship or this situation.

15    Q    Do victims of sexual assault maintain their relationships
16    with their close perpetrators?

17    A    Yes, they do.

18         And that's one of the things we talked about
19    initially, that the majority, overwhelming majority, know
20    their perpetrators.  So, if you're in a relational dynamic, if
21    it's a neighbor down the street, a rape victim might say, Hey,
22    Bob.  They might still say that.

23         If it's your boss, you have to go in every day and
24    work and have a relationship.  If it's your partner, if you're
25    not able to, for a variety of reasons, extricate yourself from

Hughes - Direct - Lesko                    3717

1    that abusive relationship, you still have to have a

2    relationship with that person.  So, that becomes also very

3    psychologically confusing for the individual, and that's why

4    those other defense mechanisms when you have to stay in that

5    relationship, the avoidance, the denial, the minimization, the

6    rationalization, are all of those psychological defense

7    mechanisms that allow you to maintain the status quo until you

8    can get out.

9    Q    So, in addition to the defense mechanisms, are there

10   obstacles that women in abusive relationships face in deciding

11   whether to leave that relationship?

12   A    Sure, there are a number of obstacles.

13        There are certainly, as I said, tangible resources,

14   finances.  Do you have a job?  An apartment?  Money so that

15   you can live on your own?  Do you have housing and food?  Do

16   you have sort of the internal resources that you believe that

17   you can do it on your own?

18        One of the outgrowths of chronic abuse is that

19   belief you've been so diminished, that you've been so

20   degraded, that you don't even have a sense of your only

21   self-worth and your own competencies.  If you don't believe

22   that, how are you going to get out?

23        Women who have children involved feel very big

24   obstacles to get out of that relationship; fear that near the

25   individual will take custody of the children or prevent them

LAM      OCR      RPR

Hughes - Direct - Lesko                3718

1    from seeing the children.  A very big issue of getting out.

2          There's also love and attachment towards these

3    individuals, towards your partner.  People get into these

4    relationships for all the right reasons.  They don't get into

5    them and say, oh, that's an abusive relationship, I want to go

6    there.  They get in because they want love and hope and

7    companionship, like we all do, but then it turns and the

8    tables start to turn and they turn suddenly and they turn in

9    insidious ways that aren't just readily available and then,

10   before you know it, you're knee-deep in and you can't get out.

11         So, that's what they want.  They want the love and

12   the companionship that -- that's why they got there in the

13   first place, the good things, but they don't know how to get

14   out of it now that they're been so battered and beaten over

15   the course of time.

16   Q    So, let's talk about this coercive dynamic.

17         Does that dynamic exist in certain types of

18   relationships?

19   A    Yes.

20   Q    What types?

21   A    So, an abusive relationship.  When we talk about coercive

22   control, it's not an incident-specific thing, it's a pattern

23   of behavior that functions to first gain and then maintain

24   power and control over another individual.  And the way that

25   it's obtained is through a variety of tactics that the

Hughes - Direct - Lesko                    3719

1   perpetrator will use.

2          So, there will be physical abuse, there can be

3   sexual violence, there can be psychological aggression, there

4   can be stalking and surveillance behaviors, there can be

5   economic abuse, there can be the shaming and the humiliation,

6   the isolation.  It's all of these tactics that function to

7   entrap a woman in this relationship -- typically a woman --

8   entrap her in this relationship and then prevent her efforts

9   and resistance and escape to get out of the relationship.

10  Q    Let's talk about those moments, those behaviors.

11         But before I get to that, does age differential play

12  a role in a coercive dynamic?

13  A    It certainly can when the person is much older and then

14  having sort of more esteem, more power either in the family or

15  the community, more access to funds than you will.  But we've

16  certainly also see coercive dynamics in people who have had

17  similar ages as well.

18  Q    Let's talk about the types of behaviors you just

19  mentioned.  Let's start with physical abuse.

20         This coercive dynamic, can it result in control

21  without actual physical violence?

22  A    Right, absolutely.

23         And that has also been studied, that if you have a

24  perpetrator who is able to control, manipulate, entrap you

25  verbally; where you go, who you see, who you talk to, what you

Hughes - Direct - Lesko                    3720

1   watch on TV, who you look on Instagram, who you check on

2   Facebook, who you answer a text to, when you use the bathroom,

3   when you eat.  Perpetrators use a lot of these sort of

4   micromanaging, controlling aspects of an individual's own

5   autonomy and liberty.  When they do all of that, they don't

6   need to hit them.

7   Q    So, let's talk about psychological abuse for a moment.

8           Are you familiar with the term "gaslighting"?

9   A    Yes.

10  Q    What is gaslighting?

11  A    The Gaslighting term originated out of a movie of the

12  same name, Gaslighting.  What it is is a behavior that

13  functions to make you think you're crazy by telling you up is

14  down and left is right.

15          And it is very crazy-making when somebody says, you

16  know, Well, I wouldn't have to do have this if you only did A,

17  B, and C.  You know this is your fault.

18          Or, I told you to move the car.  You didn't move the

19  car.

20          And she says, But I did move the car.

21          No, you didn't.

22          That vest is blue.

23          No, it's not.  It's green.

24          Like, sort of turning everything upside down where

25  when that happens repetitively and over time in conjunction

LAM      OCR      RPR

Hughes - Direct - Lesko                    3721

1   with all these other abusive behaviors, it functions to make

2   the victim not trust her own perceptions, not trust her own

3   judgment, and not really have a sense of what really is going

4   on because she's continually told that she is to blame for

5   what her perceptions are, are not accurate.

6   Q    Do the perpetrators use negative information about the

7   victims as leverage?

8   A    Yes, absolutely.

9         You know, it comes in variety of forms.  And these

10  are -- threats are a very pivotal part of this coercive

11  dynamic because what you want to establish if you're the

12  perpetrator is you want to establish that there's negative

13  consequences for noncompliance with me.  There's going to be

14  negative consequences if you don't do this.

15        So, there has to be a threat contingency in that

16  negative compliance.  So, often what we have is threats to

17  call immigration services, threats to call the police or child

18  services on you, threats to tell your mother this deep, dark

19  secret; some of the naked photos, I'm going to send it to your

20  work, I'm going to send an e-mail blast to everyone in your

21  contacts.

22        So, those are things that obviously the victim does

23  not want to happen, so it becomes a very real threat.  Now,

24  especially when that perpetrator has instituted sexual

25  violence, he's demonstrated not only a willingness to talk

LAM        OCR        RPR

Hughes - Direct - Lesko                    3722

1    about these threats and an ability to do it but he does it.

2    So, when that threat has been seen and felt, the verbal

3    threats now take on greater weight and greater salience.

4    Q    And have you seen this in your private practice?

5    A    Yes, very much so.

6    Q    Let's talk about some of the manipulation techniques that

7    you mentioned.  Let's start with isolation.

8          What role does social isolation play in this

9    coercive dynamic?

10   A    Isolation functions to keep the abuse a secret and stop

11   the victim from getting help.

12         So, if you don't allow the victim or you minimize

13   the relationships of the victim that were once important, then

14   they get taken off the table as a potential help-seeking

15   resource.

16         You can't call your mother because she doesn't

17   really understand what we are doing here, she doesn't really

18   get us.

19         You can't call your sister because she just doesn't

20   like me, she's going to say bad things about me.  Maybe you

21   shouldn't call her.

22         Now you're diminishing that victim's social network

23   to sort of help her make sense of this dynamic that she finds

24   herself embroiled in, so it functions to not allow the victim

25   to have help-seeking and also to keep this abuse a secret.

LAM      OCR      RPR

1   Q     Now let's talk about indoctrination.

2         Does indoctrination play a role in this coercive

3   dynamic?

4   A     Yes.

5   Q     How so?

6   A     So, in indoctrination we think of -- also, we say

7   psychological manipulation.  So, making sure that the

8   perpetrator is establishing dominance, that my views are the

9   views and those are the views that you're going to accept.

10  So, any other view doesn't have value here, there's no respect

11  for your point of view, and there's no reason for you to offer

12  anything independent of yourself.

13        And what that does is that continues to sort of chop

14  away and diminish an individual's own sense of their

15  independence, own sense of their individual capacity, their

16  sense of their own autonomy and freedom of thought, the

17  ability to have independent thought, comes to -- sort of

18  erodes away at that.  And, again, that will interfere with her

19  ability to extricate herself from that relationship.

20  Q     Let's talk about subjugation.

21        What role does subjugation play in a coercive

22  dynamic?

23  A     So, subjugation we see a lot in these cases of intimate

24  partner violence and coercive control.  Subjugation is really

25  treating someone like a servant, treating someone like they're

Hughes - Direct - Lesko                    3724

1    less than, treating someone like their job is to serve you,

2    and you're continuing to put someone in a one-down position

3    who doesn't have the same rights, responsibilities, as you do.

4    Q    How about reporting?

5         Does reporting play a role in the coercive dynamic?

6    A    Reporting to authorities?

7    Q    Reporting information to the perpetrator.

8    A    Oh, so, surveillance.

9         So, what we talk about is surveillance techniques

10   that are a very integral part of these coercive control

11   relationships in that they want to know, sort of really

12   micromanage, all aspects of the victim's life:  Where you go;

13   who you see; what it says on the odometer; if the store was

14   only five miles away and you went six miles, where did you go;

15   you stopped at the store, you should have been in there five

16   minutes for milk, how come you were ten minutes; where's the

17   receipt; let me see your phone; who were you talking to; how

18   long were you talking to this person; why are you talking to

19   this person.

20        These are things that are normal things that if

21   we're not in an abusive relationship we go through without

22   second thought.  I can go to store and buy milk and talk to

23   someone for ten minutes and come home without being

24   scrutinized.

25        And what that does is it creates the sense of the

Hughes - Direct - Lesko                    3725

1   omnipotence, the omnipresence of the perpetrator, that it

2   crosses time and space barriers, that they are wherever you

3   are.

4              I've had clients, You have to pick up your phone on

5   second ring.  And if you don't, well, you know what's going to

6   happen.  You better answer.

7              You better answer this e-mail.  You better text me

8   right away when you're back.

9              I had a woman who was a nurse.  She would have to

10  run down the hall because he would call the nurses' station.

11  If she didn't get there within ten seconds, he'd hang up, and

12  then she'd get a beating later.

13             So, really trying to micromanage the individual's

14  day where you feel like you have no escape.  So, whether

15  you're with the individual or not, they're using surveillance

16  as a control tactic, permeating your existence.

17

18             (Continued on the following page.)

19

20

21

22

23

24

25

LAM      OCR      RPR

1    DIRECT EXAMINATION

2    BY MR. LESKO:   (Continuing)

3    Q    How about secrecy, does secrecy play a role?

4    A    Well, secrecy is a pivotal role because if other people

5    knew about the abuse presumably they would help get you out of

6    that abusive situation.  So, there are often many tactics to

7    -- not to tell, to be told not to tell.  But, you know, this

8    is what happens here in our family or this happens here in our

9    organization and this is what people do, and this is normal,

10   trying to normalize the behavior, and this is what teachings

11   are like, and also other minimizing behaviors and blaming

12   behaviors that, you know, if you didn't act this way and if

13   you weren't so incompetent and stupid, I wouldn't have to

14   check your phone, I wouldn't have to check your texts.  So

15   these demeaning behaviors that are meant to sort of reinforce

16   the perpetrator's use of control but are also demeaning

17   towards you.

18   Q    And how about intimidation, does intimidation play a

19   role?

20   A    Intimidation is huge because it creates that contingency.

21   Right?  You intimidate someone with the presence of a threat,

22   with the presence of a credible threat of what will happen if

23   A then B.  If you tell someone about this, or if you try to

24   leave, you know, I'm going to send that to everybody in your

25   G-mail.  So that really is a way of keeping the victim in the

Hughes - direct - Lesko                    3727

1    relationship.  And it's also a way of, again, continuing to

2    establish dominance.  Right?  That is the goal, to maintain

3    power and control over another partner, over another

4    individual and that's how they do it.

5    Q    How about stalking, does stalking play a role in the

6    coercive dynamic?

7    A    Right.  So, stalking is part of the surveillance

8    behavior.  Stalking is when that person ends up showing up at

9    your work, showing up at the bus stop, making sure you're

10   getting on the bus on time, showing up at your mom's house or

11   your friend's house because you said you were going to be

12   there.  So, again, no sense of that individual autonomy that

13   you can't go anywhere without sort of found and attacked and

14   berated by this individual.

15   Q    In your experience, do perpetrators assert control over

16   the victims bodies?

17   A    Right.  So that's another element of these severe

18   elements of coercive control that they really try to

19   micromanage the person's sort of physical health, their

20   physical hygiene, their eating habits, when they can use the

21   bathroom, what kind of menstrual products they can use, they

22   inspect their bodies for signs of sexual infidelities, looking

23   at their undergarment, examining their vagina to see if they

24   had sex, all of these very invasive type of procedures to sort

25   humiliate, degrade, and then trap a woman in that situation.

Hughes - direct - Lesko                    3728

1   Q    How about shame and humiliation, do they play a role in

2   the coercive dynamic?

3   A    So, clearly all of those other things that I talked about

4   are very shameful and humiliation, and the more that you can

5   sort of shame a person, the worse that they feel about

6   themselves.  So, you have, you know, sort of a victim who

7   starts here and we're in this happy relationship and now

8   you're controlling her, you're isolating her, you're

9   surveilling her, you're stalking her, you're checking her

10  body, you're threatening her with form, you're sexually

11  assaulting her, you're telling her when she can eat, when she

12  can go out, who she can talk to, who she can talk on her phone

13  with, and on the now she's down here, but I need her to be up

14  here to leave.  And that's the problem, it has a cumulative

15  detrimental effect on the psychological functioning of the

16  individual.

17  Q    How about emotional abuse or degradation?

18  A    Again, another way to keep the victim in that one-down

19  position and that's offensive comments, constant criticism,

20  belittling her thoughts or feelings or ideas or actions,

21  saying a lot of sometimes slurs, racial slurs, gender-based

22  slurs to the individual, you know, attacking something that

23  they may hold dear, whether it is their parenting capacities

24  or their work, something that they did have some esteem about,

25  and, again, continues to just chip away at things that, you

1  know, were once positive for this individual.  And one of the

2  things we know is, you know, the more someone tells you you're

3  stupid, eventually you begin to believe it.

4  Q    In your experience, what do all of these behaviors or

5  techniques, what do they accomplish?

6  A    Well, the goal is to maintain that power over that

7  individual.  The goal is entrapment.  The goal is accomplished

8  when you get to run the rules the way you want them, when you

9  want them with no regard for the impact on the victim.  So

10  it's a very self-serving selfish accomplishment that these

11  tactics attained.

12  Q    And does this dynamic happen over night?

13  A    No.  Absolutely not.  As I said, it is insidious.  It

14  happens over time.  So, in the beginning, the good might be

15  more than the bad and then all these tactics start happening

16  and all of a sudden the bad is absolutely outweighing the

17  good.  The problem is now the victim is psychologically

18  comprised that how is she going to have the psychological

19  resources to have active resistance efforts to this abuse and

20  figure out a plan to extricate herself from the abuse.

21  Q    Let's talk a bit about economic issues.  What sort of

22  behaviors can be described as economic abuse?

23  A    So economic abuse can be where the person who has the

24  power and control manipulates the finances, has control over

25  the finances, doesn't allow you to have access to a debit

Hughes - direct - Lesko                                    3730

1    card, to a slush fund, to money for things.  It's all dictated

2    about what he would like to give, when he would like to give

3    it.

4            You know, it doesn't allow for the individual

5    sometimes to have a job.  Sometimes people have a job that

6    they have to come home and give the check right to their

7    partner who will control it.  So it takes away that real

8    tangibility to have resources to leave that relationship and

9    also as a way of just sort of demeaning and demoralizing the

10   victim as if she has no independent agency, that she can have

11   her own job and own money without being dictated to every

12   second of every day.

13   Q    In coercive relationship with this dynamic in place, is

14   the sexual abuse typically isolated to one incident or does it

15   occur over a number of times, over a period of time?

16   A    In a relational dynamic where there is some sort of

17   ongoing contact in sort of either a relation or organizational

18   contact with that individual, usually we're going to see

19   multiple and repeated sexual assaults.  It's typically not a

20   single incident in that coercive control dynamic.

21   Q    So, why does a victim remain in that relationship?

22   A    All right.  So I always say that, you know, that's the

23   number one question that's those of us who work in this field

24   get asked and one of the things that we know is that, you

25   know, it's not that victims remain because they're unconcerned

Hughes - direct - Lesko                3731

1    about what happened.  It's not that they remain because they

2    are unconcerned about being assaulted and about being abused.

3    Of all of the hundreds and hundreds of individuals that I have

4    evaluated I have not met one woman who was not concerned about

5    the violence and the sexual violence and the coercive control.

6    But what they do have is this sense of powerless, this sense

7    of passive resignation that nothing I do works, there's

8    nothing that I can do that can get me out of this situation.

9    And that belief is maintained by all of these abusive

10   behaviors that I just talked about:  If you're stupid, if

11   you're less than, you're not competent, you don't know what

12   you're doing, I have to dictate everything.  You lose that

13   sense of your own individual decision-making.

14           So when we do look at what the studies have shown us

15   and in my clinical experience, we know that women do

16   something.  It just doesn't stop the violence and the abuse

17   and the coercive control.  We know that, even from our work

18   with the perpetrators, the only person who can stop that

19   violence and abuse and sexual assault is the perpetrator.

20   He's the one who determines whether he wants to be

21   controlling, if he wants to be manipulative, if he wants to

22   sexually assault.  The onus rests on him.  So, the efforts

23   that the woman uses sometimes are not effective.  So what we

24   try to do is try to figure out what else can she do in that

25   relationship to help get out.

Hughes - direct - Lesko                3732

1          In the beginning, what women often end up doing is

2     these informal strategies, these placating strategies.  They

3     try to placate their abuser.  They try to anticipate demands

4     because they're getting to know the run of the show at this

5     point.  They comply with expectations even before asked

6     because they think that's going to keep things calm.  They try

7     to talk with their abuser and say this isn't working, I don't

8     want this, you know, and sort of have moments where they can

9     have some autonomy and agency about what's going on.

10         So they do a lot of things within the confines.

11    Some women fight back physically, some people fight back, sort

12    of passive resistance fighting back.  Some people curse and

13    yell at their abuser, like everyone would in a relationship,

14    if you're angry about things.

15         So all of those things happen, but they happen

16    within the confines of the relationship and they're not geared

17    in the beginning toward getting out of the relationship.

18    Q    And is that conclusion also present in situations with a

19    power imbalance, like a boss or a priest or a boy scout

20    leader?

21    A    Right.  So they do -- victims often are going to adapt to

22    these compliance strategies, these strategies that sort of on

23    their face makes it look like nothing's wrong, that

24    everything's fine, right.  And there's a benefit for the

25    victim to make it seem like nothing's wrong because

Hughes - direct - Lesko                          3733

1   confronting the perpetrator is a very dangerous proposition

2   because of those threats and you don't know what else he is

3   capable of.

4            We do see that, you know, saying the same things

5   and, you know, after having been sexually assaulted, you know,

6   a perpetrator might get a text later in the day oh, it was so

7   nice to see you earlier.  Well, it wasn't nice to be raped,

8   but I'm going to keep you happy because I know that's what you

9   want to hear because that's going to try to keep me safe.

10           MR. LESKO:  Your Honor, now would be a good time for

11  a break.

12           THE COURT:  All right.  Let's take our morning

13  break.  All rise for the jury.

14           (Jury exits the courtroom.)

15           THE COURT:  All right.  You may stand down.  We are

16  going to take a 10-minute break.

17           THE WITNESS:  Thank you.

18           (Witness steps down.)

19           (Recess taken.)

20           THE COURT:  Just a minute.  I have a question on the

21  limiting instruction.  Any problems with the limiting

22  instruction?

23           MR. LESKO:  Well, I mean --

24           THE COURT:  Yes.

25           MR. LESKO:  Is Your Honor still considering?

Hughes - direct - Lesko                     3734

1          THE COURT:  I thought I might just give it.  It is

2     plain vanilla, as far as I'm concerned.  We give it all the

3     time.

4          MS. PENZA:  May we have a moment?

5          THE COURT:  Yes.  I am not going to give it before I

6     hear from the parties.

7          MR. LESKO:  If we could have one second.

8          THE COURT:  Yes.  Of course.

9          MR. LESKO:  Your Honor, this is fine with the

10    exception of we do object to the second paragraph, second

11    sentence.  The sentence reads "It's offered for you to

12    consider in evaluating the complainant's behavior before,

13    during, or after the alleged commission of a crime.  We

14    actually think it would be appropriate to modify that sentence

15    and have it include victims and perpetrators and not

16    complainant because we're not in a situation where there is a

17    single complainant here.

18         THE COURT:  Why do we need that sentence at all?

19    The witness has already indicated that she hasn't looked at

20    any of the materials.

21         MR. LESKO:  I agree.  Actually, to be precise, I

22    think the more appropriate -- I mean, I think it is

23    appropriate to instruct the jury that they can consider Dr.

24    Hughes' testimony in evaluating the behavior of victims and

25    perpetrators in the context of sexual assaults.  But you are

Hughes - direct - Lesko                    3735

1    right.  She is not opining on the specific alleged crimes.

2    She is not opining on any particular complainant's behavior.

3    She is offering very general testimony.

4           So, Ms. Penza corrects me, and it shouldn't just be

5    isolated or focused on sexual assault because the expert is

6    opining on coercive relation and dynamics.  That obviously is

7    a technical term, so if we can make that into a layperson's

8    term.

9           MR. der OHANNESIAN:  Judge, if I could be heard, but

10   I would like to do it outside the witness' presence.

11          THE COURT:  We will take it up at lunch time again.

12   I am not going to do it now.

13          How long do you have for the witness?

14          MR. LESKO:  Five, maybe ten more minutes.

15          (Jury enters the courtroom.)

16          THE COURT:  Please be seated.

17          You may continue your examination of the witness.

18          I remind the witness that she is still under oath

19   by.

20          MR. LESKO:  Thank you, Your Honor.

21   BY MR. LESKO:

22   Q    So, Dr. Hughes, when we left off, I believe you were

23   discussing this coercive dynamic involving perpetrators and

24   victims.  And in these relationships, are the abusive acts

25   that you have discussed often interspersed with times of

Hughes - direct - Lesko                    3736

1    normalcy or positive moment?

2    A     Yes.   Absolutely.   What we know is nothing happens

3    100 percent of the time, but you see overarching dynamic of

4    the coercive control and the sexual violence that typifies any

5    relationship, and what we do see is times where there isn't

6    abuse, where there are times when the individual is kind, when

7    there's time when the individual is giving some loving and

8    caring sort of behaviors and emotions to that individual.   So

9    that is very common.   And what that does is it makes the

10   victim sort of yearn for and want that piece of that

11   individual, right.   That's why they got into this situation in

12   the first place, for the love, the kindness, the teaching, the

13   camaraderie, the family.

14          Those are the reasons that they get into the

15   relationships.   So when those resurface, it creates a very

16   sort of conditioned response, almost like a slot machine,

17   that, you know, I want to keep going because maybe I'm going

18   to get more of this and maybe it really wasn't so bad and

19   maybe he didn't really mean to do the things he did.   But then

20   the abuse starts again.   So it's a sort of cyclical pattern

21   that happens.   But normalcy is why individuals want to remain

22   in the relationship and the abuse is why they want to leave.

23          (Continued on following page.)

24

25

Hughes - direct - Lesko                    3737

1   EXAMINATION CONTINUES

2   BY MR. LESKO:

3   Q    Is that confusing to victims?

4   A    It's confusing for us to talk about, just imagine how

5   confusing it is for someone who has to live it.  It's

6   incredibly psychologically confusing because you're trying to

7   really assimilate two diametrically opposed parts of an

8   individual.  Someone who is going to hurt you, abuse you,

9   micromanage you and, you know, demand obedience over you is

10  someone who is now, you know, loving and fine and listening to

11  what you have to say and telling you you're beautiful, and how

12  do you reconcile two really irreconcilable differences?

13  Q    So, in your experience, does the victim's inability to

14  leave this sort of coercive relationship indicate that she

15  actually wants to be abused?

16  A    Absolutely not.  Some of those theories came out with

17  Freud back in the 18th Century, the beginning of the 19th

18  Century, that individuals who are victimized or abused are

19  masochistic, meaning that they wanted it to come upon

20  themselves.  Those theories have been steadfastedly [sic]

21  debunked.  As I said before, I've never met one woman who

22  wanted that.

23           So, the fact that they are in the relationship and

24  having a hard time to get out is just really emblemic [sic] of

25  the strategies that the perpetrator is using to keep them in

SAM      OCR      RMR      CRR      RPR

```
                    Hughes - direct - Lesko              3738
```

 1   the relationship, to keep that dominance, to prevent her from

 2   leaving, imposing those threats, and then her own sort of

 3   psychological confusion and difficulty trying to problem solve

 4   and actualize a way out.

 5   Q    So, Dr. Hughes, when this coercive dynamic is in full

 6   effect, when sex happens is it consensual?

 7   A    I mean, sometimes it can --

 8        MR. Der OHANNESIAN:  Objection.  That's leading.

 9        THE COURT:  You may answer.

10   A    So, it's complicated and you have to really look at the

11   unique factors of each situation.

12        Sometimes it is consensual because the person is

13   looking for that love and that care and that sort of positive

14   regard that they really wanted, but other times it's not.  And

15   when I speak to individuals who I'm treating or I'm

16   evaluating, and I say, you know, Well, why didn't you just say

17   no?  And they look at me like I have five heads.  Like, that

18   is not even a possibility, I can't say no.

19        So if no is taken off the table, then consent is not

20   freely and knowingly given.  If you feel that because there

21   will be negative consequences for you saying no, or refusing,

22   then that's not consent.

23   Q    Now we talked about the coping strategies of compliance

24   and submission and I think peace-making, you may have

25   mentioned, that all -- that sort of group of strategies.

Hughes - direct - Lesko                    3739

1            Can those strategies, those coping strategies,

2     result in behavior that appears to be consensual?

3     A     Sure, absolutely.

4            As I said before, if you see somebody who is acting

5     in a kind way toward their partner and being -- trying to be

6     loving and trying to engage them, and trying to sort of pull

7     out and pull for that emotional attachment which they are sort

8     of desperately wanting after being so abused and berated, you

9     know, it may seem that it's consensual.  So we need to sort of

10    step back and make sure we're evaluating, you know, all of the

11    circumstances to really determine sort of where does the

12    consent lie here and where is her power and her autonomy to

13    say no.

14    Q     So how are you able to determine whether that

15    relationship was actually consensual or not?

16    A     So, what I do is I am able to sort of sit and I go

17    through all of these type of behaviors.  I look at the

18    isolation.  I look at the shaming and the humiliation.  I look

19    at the control and the micromanaging.  I look at the degrading

20    behaviors.  I look at, you know, the surveillance and stalking

21    behaviors.  And then I say, If all of this wasn't here, would

22    you have had sex with him?  And I get almost a resounding,

23    Nope.

24    Q     In your experience after extricating themselves from a

25    coercive relationship of the type you've described, how do

Hughes - cross - der Ohannesian                    3740

1    victims feel about having remained in that relationship?

2    A    It's a really, really tough time.  They often feel a

3    tremendous amount of shame, a tremendous amount of self-blame

4    and self-loathing.  They often say to me, I was so stupid.

5    How could I have been so stupid?  How did I not see it?  How

6    did I not know all of this was going on?

7              So there's really a lot of that sort of unpacking of

8    understanding the full breadth of what the person experienced

9    and then sort of helping them to work through those initial

10   responses of just that, you know, utter shame and sort of

11   self-blame about the abuse that was perpetrated on her.

12             MR. LESKO:  No further questions, Your Honor.

13             THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. Der OHANNESIAN:

16   Q    Good afternoon -- good morning.

17   A    I think it's afternoon.  Good afternoon.

18   Q    Good afternoon, Dr. Hughes.  My name is Paul

19   der Ohannesian and I represent Keith Raniere in this matter.

20             I will give you a chance to answer my questions, but

21   if you don't understand them, please tell me.  And if I

22   haven't given you a chance to answer, please tell me also.

23   A    Okay.

24   Q    I want to understand a little bit about what you do now.

25             I think you said you see clients in a private

Hughes - cross - der Ohannesian                    3741

1   practice; is that correct?

2   A    That's correct.

3   Q    You also do consulting work, such as you're doing in this

4   case, correct?

5   A    Correct.

6   Q    Then you have a third thing that you do at Weill; is that

7   correct?

8   A    At Weill Cornell Medical Center, yes.

9   Q    In terms of the income that you make, what percentage

10  would you say derives from your clinical work seeing patients?

11  A    Of my total?

12  Q    Yes.

13  A    Probably have to ask my accountant.  Probably around 35,

14  40 percent.

15  Q    And what percentage of your income derives from doing

16  consulting work as you're doing in this case?

17  A    That would be the remainder.  So...

18  Q    So about 35 percent from seeing clients and about

19  65 percent from seeing -- or doing forensic and consulting

20  work, correct?

21  A    And sometimes 60/40.  I mean it varies and fluctuates,

22  although the clinical tends to stay more steady and the

23  forensic stuff comes and goes.

24  Q    Now, at Weill Medical College here in New York City, in

25  your position, do you have a research requirement to fulfill?

Hughes - cross - der Ohannesian                    3742

1   A    I do not.

2   Q    In your position as this -- in some type of assistant

3   professor, you said?

4   A    Clinical assistant professor of psychology in the

5   Department of Psychiatry.

6   Q    Okay.  And is there any type of writing requirement, in

7   terms of having to submit articles to professional jurors to

8   maintain that position?

9   A    You mean professional journals?

10  Q    Yes.

11  A    Okay.  There is no requirement for that.  We are required

12  to submit what our professional activities are over the course

13  of the year and in those questions are, have you presented at

14  a conference?  Have you done a journal?

15       So they do tally that information, but it's not a

16  requirement of -- of the position.

17  Q    And, again, the requirement I'm discussing is having to

18  publish peer-reviewed articles; that is not part of your

19  requirement at Weill?

20  A    That is not.

21  Q    There are individuals who are on the faculty who must do

22  that, that is submit professional articles, correct?

23  A    Individuals who have full-time faculty positions;

24  typically, in those positions you are required to publish

25  papers in your field of specialization.  My position is what

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                3743

1    we saw as a voluntary faculty position, so we do not get paid

2    actually for the work that we do, but we are not required to

3    publish and conduct research.

4    Q    And so your title is voluntary clinical assistant

5    professor?

6    A    I think my title is clinical assistant professor of

7    psychology in the Department of Psychiatry.  I'm just

8    elucidating for the jury that that's a voluntary position,

9    meaning I'm not receiving an income from that position.

10   Q    But Weill specifically has the title "voluntary" next to

11   your name on the website, correct?

12   A    I haven't gone on the website, but perhaps.

13   Q    And the faculty handbook specifically states that

14   voluntary is a specific title at the medical college, correct?

15   A    Right, we're part of the voluntary faculty, we're part of

16   the voluntary faculty Listserv.

17   Q    So just so we're clear here in the courtroom, you don't

18   get any money for doing anything at Weill Medical College?

19   A    That's correct.

20   Q    And, right now, about how many clients would you say that

21   you are actively treating?

22   A    About 20 to 25 clinical hours per week.

23   Q    Hours or patients?

24   A    Hours.  Some people I see twice a week.

25   Q    So about how many clients are you currently attending to

Hughes - cross - der Ohannesian                    3744

1    in your practice?

2    A    Well, I have some people who come once a month.  Some

3    people who come, you know, once every other week.  So, again,

4    it's about 25 people who I would say are on my active roster,

5    and then I see about 25 clinical -- between 20 and 25 clinical

6    hours a week.

7    Q    So those 25 folks you're saying may not be there each

8    month?

9    A    I mean it's hard to assess.  I mean some might be

10   traveling and not be there a perfect month, but they're still

11   on my -- under my clinical care and on my caseload.  I have

12   not closed them out.

13   Q    Okay.  How many folks would you say you've seen in the

14   last 30 days in your practice, different individuals?

15   A    Again, I see about 20 to 25 clinical hours per week.

16   Q    Those are hours.  How many --

17   A    Patients, right.

18   Q    Patients?

19   A    I have one patient per patient hour, yes.  But some

20   patients may come twice, so there may be some duplicates.

21   Q    And for how many years have you been doing what might be

22   concerned courtroom or forensic work?

23   A    Since the very beginning, since I was licensed.  So since

24   1998, at the same time I had opened my private practice.

25   Q    And have you ever testified on behalf of an individual

Hughes - cross - der Ohannesian                3745

1   who has been accused or alleged to have engaged in an act of

2   sexual assault?

3   A    I have not.

4         As part of the defense?

5   Q    I didn't ask -- I said, have you ever testified on behalf

6   of an individual who's been accused of a criminal act of

7   sexual assault?

8   A    As part of the defense, no.  I've testified as part of

9   the prosecution in those matters, but not the defense.

10  Q    In other proceedings?

11  A    Correct.

12  Q    Not on behalf of someone who's ever been accused of a

13  sexual assault, correct?

14  A    Correct.

15  Q    In your practice, do you currently treat or see anyone

16  who has been accused of sexual assault?

17  A    I do not.  I do not treat offenders.

18  Q    And would it be fair to say that, in your entire

19  practice, you have never treated or met an offender in the

20  course of your professional work?

21  A    That's not correct.

22  Q    In the course of your treating individuals in your

23  office, have you ever treated an individual accused of sexual

24  assault?

25  A    So I have treated, as I stated earlier, in the family

            SAM     OCR     RMR     CRR     RPR

Hughes - cross - der Ohannesian                3746

1  violence program, male batterers who were court ordered for

2  treatment.  I've also consulted and treated individuals, men,

3  who have been in violent relationships and doing protocolized

4  [sic] treatment with them to help them to stop their violent

5  behavior.

6  Q    Was your statement a few minutes ago that you do not

7  treat offenders?

8  A    Sex offenders.

9  Q    Correct.  And I believe you indicated that, in this

10 matter, you told Mr. Lesko you're getting $500 an hour; is

11 that correct?

12 A    Correct.

13 Q    And you keep track of your hours in this case?

14 A    I do.

15 Q    And how many hours have you spent to date on this case?

16 A    Well, I haven't tallied it up to this point, but probably

17 around 20, not including today.

18 Q    Is there any --

19 A    More or less.  I haven't tallied up the hours, so I am

20 sort of making a best estimate.

21 Q    So is that a guess or is that an estimate?

22 A    I guess it's a guesstimate.

23 Q    Okay.

24         And is there any agreement in terms of an amount

25 that you could be compensated in this case?

Hughes - cross - der Ohannesian                    3747

1    A    I think there was -- in the contract that was sent to me,

2    there was -- which is what often happens with agencies, what

3    the -- the most that was allowed or was admitted and I don't

4    actually recall what that was, though.

5    Q    You don't recall what that was?

6    A    I don't recall what that was.

7              MR. Der OHANNESIAN:  Could I show the witness a

8    document?

9              THE COURT:  Okay.

10   BY MR. Der OHANNESIAN:

11   Q    First of all, do you recognize what this is?

12   A    I think I have seen it before.  It's part of the contract

13   that was e-mailed to me from the U.S. Attorney's office.

14             THE COURT:  DX-815.

15   Q    Is this the contract that you were referring to?

16   A    It's one piece of the contract.  It's not the entire

17   contract.

18   Q    Does this refresh your recollection as to what that

19   amount was in your contract with the Government?

20   A    Yes.

21   Q    Okay.  And what is that amount?

22   A    The total amount allowed is $19,000.

23   Q    Thank you.

24             And when were you first contacted in this case?

25   A    In the beginning of March.

Hughes - cross - der Ohannesian                    3748

1   Q    Of this year, 2019?

2   A    Correct.

3   Q    And I think you said you received some information on

4   this case from -- you didn't receive any information from the

5   Government, correct?

6   A    Correct.

7   Q    And you received information from outside sources?

8   A    Well, I didn't receive information.  I do read The New

9   York Times daily and I had seen some of the headlines.  So I'm

10  quite busy, I didn't have time to read all the articles, but I

11  saw, you know, a couple of the snippets and the opening

12  paragraphs of some Times articles.

13  Q    Other sources also besides The New York Times?

14  A    Maybe the New York Post.

15  Q    Do you believe everything you read in the newspaper?

16  A    Well, that's why I qualified it.

17  Q    In fact, I think you said one thing you knew about this

18  case was that Mr. Raniere was from an isolated community in

19  New York State.  Do you recall making that phrase?

20  A    I do.

21  Q    Okay.  And when you say isolated community, what do you

22  mean by that phrase?

23  A    I think I was referring to the self-help community, sort

24  of in that -- encapsulation of that group, not necessarily

25  that Albany is an isolated town in New York State.

Hughes - cross - der Ohannesian                    3749

1    Q    Well, do you know whether it was in Albany or someplace

2    else?

3    A    I believe it was outside of Albany, but again I'm not

4    well-versed in sort of the intricacies of all of that.

5    Q    Do you have any reason to doubt that Clifton Park,

6    New York, is a very suburban, middle class community?

7    A    If that's true, I have no reason to doubt that.

8    Q    Have you ever been there?

9    A    I don't believe I have.

10   Q    You've been to Albany?

11   A    I have been to Albany.

12   Q    To testify?

13   A    I have.

14   Q    Any other professional associations with upstate

15   New York?

16   A    I've testified in various counties in upstate New York.

17   Q    Most recently what county?

18   A    In upstate New York?

19   Q    Yes.

20   A    I guess Erie County.  I've been in Oneida County.  I've

21   been in Dutchess County.

22   Q    And Dutchess is where Poughkeepsie is?

23   A    Correct.

24   Q    That's where you testified most recently?

25   A    Correct.

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                    3750

1   Q    Just to verify, in this case you've received -- excuse
2   me, you've met no individual who has been identified as a
3   witness in this case; is that fair to say?
4   A    That's correct.  I've met no one, I've seen nothing.
5   Q    And I think you said you've reviewed no testimony in this
6   case, correct?
7   A    Correct.
8   Q    And you've reviewed no statements from any individual,
9   correct?
10  A    Correct.
11  Q    And that's true with respect to your online work that you
12  may have come in contact with; is that fair to say?
13  A    Correct.
14  Q    In your practice you do rely on what you see and hear
15  from individuals face-to-face, right?
16  A    In my clinical practice?
17  Q    Yes.
18  A    Yes.
19  Q    And you use the face-to-face direct contact to form
20  impressions and opinions, correct?
21  A    Correct.  I mean certainly that can be buttressed by
22  other information; I mean, sometimes we talk to family
23  members.  Sometimes I'll review their medical records or prior
24  treatment records.  So, if I need more information, I will get
25  those third-party information.

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                    3751

1   Q    And in fact, it is helpful to you to have third-party

2   information in evaluating individuals and what happened to

3   them, correct?

4   A    Right.  So when I do a forensic evaluation, it's much

5   different than what a clinical evaluation is.  So the forensic

6   evaluation is much more comprehensive, much more complex, in

7   that I am looking at a variety of sources and witness reports

8   and police reports and medical records and witness statements,

9   and doing psychological testing and talking to people.  So

10  it's a much more comprehensive evaluation than in a clinical

11  practice.

12  Q    In this case, are you making a forensic evaluation?

13  A    I am not.

14  Q    And in this case, you are not testifying to an opinion on

15  the psychological characteristics of any particular

16  individual, correct?

17  A    Correct.

18  Q    And you agree that a psychologist, such as yourself,

19  cannot give an opinion on psychological characteristics of an

20  individual when he or she has not assessed that person?

21  A    That's a generally fair statement.

22  Q    Is that a state -- or is that a principal required by

23  your Code of Ethics of the American Psychological Association?

24  A    Well, you can't diagnose an individual.  I mean,

25  certainly some psychologists or psychiatrists can talk about

Hughes - cross - der Ohannesian                    3752

1    characteristics they see in a person on TV, that does happen.

2    I, you know, try not to do that.

3    Q    You would agree that the American Psychological

4    Association, which you are a part of, states that a

5    psychologist should only render an opinion of an individual

6    after an examination of the individual adequate to support the

7    statement or conclusion?

8              MR. LESKO:  Objection.

9              THE COURT:  You may answer.

10   A    Correct.  I agree with that.

11   Q    I think this morning we've heard the phrase "in your

12   experience."  Right?  You were -- you were asked many

13   questions about your experience, correct?

14   A    I don't know if it was many, but I'm sure I used the

15   phrase.

16   Q    You heard -- I think Mr. Lesko used the phrase in asking

17   you the questions.  And you are coming here today giving us an

18   opinion based on your experience, correct?

19   A    Based on my experience, but also my read and my knowledge

20   of the empirical literature in the field I've been part of for

21   over twenty years.

22   Q    Let's talk about your experience.

23              So you said twenty years you have been in clinical

24   practice, correct?

25   A    Twenty-plus, so twenty-one.

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                3753

1   Q    Okay.  And among the individuals that you see in your
2   practice, do each of them present with a history of sexual or
3   intimate violence?
4   A    Not each one of them.
5   Q    Do you treat people with anxiety disorders?
6   A    Yes.
7   Q    Okay.  And the people that you're treating with anxiety
8   orders do not necessarily have anything to do with the
9   dynamics of sexual assault complaining?
10  A    Right, I have some people in my practice who do not have
11  a trauma history.
12  Q    And when individuals come to you in a clinical setting --
13  can we call that a clinical setting?
14  A    Correct.
15  Q    Is that fair?
16  A    Yes.
17  Q    And a clinical setting could be in the psychologist's
18  office, correct?
19  A    Correct.
20  Q    It can also be in a clinic setting in a hospital,
21  correct?
22  A    Correct, or a community-based program.  There is a
23  variety of, you know, venues where we can do clinical
24  practice.
25  Q    It's fair to say a clinical setting is a term of art that

Hughes - cross - der Ohannesian                3754

1   psychologists use?

2   A    I guess so, yeah.  I -- using clinical work being a

3   clinical psychologist.

4   Q    I mean you could talk to people who say they've been

5   traumatized outside of a clinical setting, correct?

6   A    In what capacity?  As a layperson?

7   Q    Yes.  Just talk to them and hear what they've got to say.

8   A    For the purpose of what?

9   Q    Let me put it --

10  A    Okay.

11  Q    Let me try to narrow it.  I think it's simpler than you

12  and I are making it.

13        In your office, that's what's called a clinical

14  setting, correct?

15  A    I differentiate the clinical setting as opposed to,

16  perhaps, the example you're giving me as talking to someone in

17  the grocery line about a trauma or rape.

18  Q    And that does happen, because of your job, people come to

19  you and ask you a question about a psychological matter?

20  A    It does.

21  Q    That happens to professionals?

22  A    It does.

23  Q    Now, when you speak to an individual in your practice,

24  these are individuals who claim they were sexually abused,

25  correct?

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                    3755

1    A    Again, some percentage of my patients, yes.

2    Q    Right, and that's important, not a hundred percent of

3    your clients are claiming to be sexually abused.  There can be

4    other forms of trauma that you deal with, correct?

5    A    Correct.

6    Q    And I think that's what you told us, that you're dealing

7    in your experience with different forms of trauma?

8    A    Correct.  But mostly interpersonal violence trauma.  I

9    mean, the other forms of trauma are -- like I did a lot of the

10   work on the 9/11 terrorist attacks and that -- that has sort

11   of died down.  People who have been in a motor vehicle

12   accident would be a traumatic event.  Someone who lost someone

13   suddenly to suicide or a traumatic event.

14          But that's not the bulk of -- my practice is really

15   more the interpersonal violence type of events.

16   Q    Interpersonal violence could be domestic violence, for

17   example?

18   A    Yes.

19   Q    Without any sexual assault involved?

20   A    Yes, but the data shows there's a tremendous amount of

21   sexual assault in these domestic violence situations.

22   Q    May or may not, correct?

23   A    Right, I'm just saying that's what the data shows.  So it

24   has to be assessed and it has to be examined.

25   Q    And when you speak to individuals in your practice, you

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                    3756

1  assume that they have been sexually assaulted when they report

2  that to you?

3  A    I don't assume.  I -- I do a comprehensive evaluation to

4  understand the facts that they're bringing to the treatment.

5  Q    And do you go to third parties to verify the information

6  they give you about their alleged victimization?

7  A    No, not in a clinical setting.

8  Q    Exactly, because in a clinical setting, it would not be

9  expected that you would go out to verify the claim, correct?

10  A    Correct.

11  Q    And you have used your interactions with individuals

12  presenting to you with their stories of interpersonal issues

13  to give opinions today, correct?

14  A    To sort of elucidate some of the facts and to talk more

15  sort of real about some of the things that we see in our

16  clinical practices, yes.

17  Q    And when individuals come to you -- and again you take

18  their word for it, as a clinical setting, and you deal with

19  what their complaint is to you, correct?

20  A    Well, I certainly make an assessment as to what they're

21  telling me; does it make sense?  Does it sort of fall in, you

22  know, what I have listened to and learned over the course of

23  all of my training.

24        If it doesn't, then I might be askance and do

25  something else, but I don't just sit blindly back and say

SAM      OCR      RMR      CRR      RPR

Hughes - cross - der Ohannesian                    3757

1  okay.  I mean, I certainly do a comprehensive assessment of

2  the individual.

3  Q    And do you engage in psychological testing of those

4  individuals?

5  A    Sometimes.

6  Q    And sometimes not?

7  A    And sometimes not.

8  Q    And the psychological testing may or may not be helpful

9  to you in assessing what happened to them, correct?

10 A    Correct.  It's more to assessing their current

11 symptomatology as they're coming in the door.

12 Q    And if someone came to you with a complaint of

13 interpersonal violence, as a therapist, you have to deal with

14 what they are telling you, correct?

15 A    Correct.

16 Q    It's not your job to interrogate them or challenge them,

17 is that fair to say?

18 A    Well, certainly not interrogate them.  I mean, if --

19 we -- we challenge the cognitive distortions.  We challenge

20 the denial.  We challenge the avoidance.  So there is gentle

21 challenging in moving through --

22 Q    Yes.

23 A    -- their understanding and unpacking the trauma that they

24 experienced.

25 Q    But it would be fair to say you don't challenge the

Hughes - cross - der Ohannesian                3758

1    underlying facts of what the individual has reported to you?

2    A    I mean, in general, no.  I mean there could be a

3    situation where it doesn't make sense and I try to sort of

4    understand it better.

5    Q    Would you agree that when you assess a clinical

6    population, that -- excuse me, would you agree that assessing

7    a clinical population is different from assessing a

8    nonclinical population?

9    A    And by nonclinical, you mean?

10   Q    Outside those who present in a clinical setting.

11   A    Again, you'd have to be more specific.  I don't know why

12   I would assess someone outside of a clinical setting, other

13   than a forensic setting.

14   Q    Well, you would agree that when evaluating individuals

15   who present with a history of abuse, that findings in a

16   clinical setting may be dramatically different from a

17   nonclinical setting?

18   A    Again, I really don't know what you're trying to say.

19

20              (Continued on the following page.)

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1   BY MR. DER OHANNESIAN (Continuing):

2   Q    Would you agree that the extent of abuse experienced in

3   a nonclinical setting may be different from what you observe

4   in a clinical setting?

5   A    I'm not trying to be difficult, but I don't know what you

6   mean by "nonclinical setting" and what would be different.

7   Q    Would you agree that interviewing individuals in a

8   clinical setting cannot be generalized to nonclinical

9   populations?

10  A    So, what do you mean by a "nonclinical population"?

11       Do you mean, like, research?

12  Q    People --

13  A    I don't really know what you mean.

14  Q    When we discussed people who may have some history of

15  some sort involving whatever issues of violence or trauma,

16  then what you see in a clinical setting, they will be

17  different from what happens in a nonclinical setting.

18  A    Again, I don't know what you mean by a "nonclinical

19  setting."

20       Do you mean on the street?

21       You have to be a little more clear.

22  Q    You have written about the differences between clinical

23  and nonclinical settings, correct?

24  A    About clinical and forensic.

25  Q    How about nonclinical?

Hughes - Cross - der Ohannesian                3760

1   A     In what context?

2         You have to give me more information so I can

3   properly help you out.

4         MR. DER OHANNESIAN:  This is for the witness, DX800.

5         Can you see this?

6   A     Yes.

7   Q     Do you recognize what this is?

8   A     Yes, this is an article that was published from my

9   master's thesis in 1996.

10  Q     That's when you were attending what school?

11  A     NOVA Southeastern University.

12  Q     Inn where is that?

13  A     In South Florida.

14  Q     This is an article that was submitted under your name,

15  correct?

16  A     As one of three authors, yes.

17  Q     And usually the first author is the lead author; is that

18  the way it works --

19  A     Yes.

20  Q     -- in your field?

21        But it's certainly an article that you list on your

22  resume when you go to court, right?

23  A     Correct.

24  Q     And if you look at Page 333, can you read that okay or

25  should I make it a little larger?

LAM      OCR      RPR

Hughes - Cross - der Ohannesian                3761

1   A     Where are you wanting me to read, the last paragraph?

2   Q     Yes.

3         And if you read the last paragraph, the first

4   sentence?

5   A     Would you like me to read it out loud.

6   Q     No --

7         THE COURT:  No.

8   Q     -- read it to yourself.

9   A     Okay.  So, I know what I'm seeing, and now I perhaps can

10  help you out.

11  Q     You've used the word "nonclinical settings," correct?

12  A     So, what this is referencing is referencing nonclinical

13  groups in large epidemiological studies.  So, when we're

14  looking at nonclinical groups, that means we're calling

15  someone from random digit dialing on a phone or we're doing a

16  mail survey and asking what are the symptoms of abuse or

17  symptomatology.

18        What I'm saying here is that we know when we look at

19  that and compare them to clinical groups, people in treatment,

20  they have higher degrees of symptomatology.  That's all that's

21  saying.

22        So, when they say "nonclinical groups," that's a

23  research population.

24  Q     So, there are differences in data received in a clinical

25  context versus a nonclinical context.

Hughes - Cross - der Ohannesian                    3762

1   A    Again, based on some of the studies, there certainly can

2   be.

3   Q    You've used the phrase "nonclinical settings" in

4   evaluating information about individuals and their

5   psychological backgrounds, correct?

6   A    I don't know.  Maybe I have.

7   Q    What about in this article; did you use it in this

8   article?

9   A    But you're not using it the way I'm using it.

10  Q    Okay.

11  A    You're using it incorrectly.

12  Q    You said epidemiological studies --

13  A    What this is saying, when you're looking at nonclinical

14  groups, you're looking at information derived from individuals

15  who have had abuse experiences who are not in treatment.

16  That's all that's saying.

17  Q    And you also wrote another article called:  Degrees of

18  memory of child sex abuse among women survivors in therapy.

19  A    Correct.

20  Q    You weren't the lead author on that.

21  A    Right.  That was my dissertation.

22  Q    But there was an article published with that title,

23  correct?

24  A    Correct.

25  Q    And would you agree that you indicated that when talking

Hughes - Cross - der Ohannesian                    3763

1   about child sexual abuse, that interviewing individuals in a

2   clinical setting cannot be generalized to nonclinical

3   population?

4   A    Correct.

5   Q    And I think you also told Mr. Lesko that you don't know

6   when someone doesn't present.

7   A    For treatment, yeah.

8   Q    That's because people who you're not seeing in your

9   practice may be undergoing different experiences than what you

10  exhibit, correct?

11  A    Than what I exhibit?

12  Q    What you experience.  Let me rephrase that.

13  A    Yeah.

14  Q    You agree that when you use the phrase you don't know

15  when the person doesn't present means you don't know if the

16  experiences of those individuals who you're not seeing is

17  consistent with what you're seeing in your clinical setting.

18          Is that a fair statement?

19  A    It could be fair, yeah.

20  Q    Would you agree that an empirical study is one where the

21  information can be replicated?

22  A    Certain studies can be replicated, not all studies, but

23  sure.

24          An empirical study is one that rests on sort of

25  solid scientific methodology and principles and statistical

Hughes - Cross - der Ohannesian                    3764

1    analysis.

2    Q    How about in your 20 years of clinical practice, have you

3    ever collected any data on your clients and submitted it for

4    review in a professional journal?

5    A    I have not.

6    Q    As a psychologist, do you use a phrase or are you

7    familiar with a phrase called "secondary gain"?

8    A    Sure.

9    Q    Is that a term of art for psychologists?

10   A    It's a term used more in the forensic realm than in the

11   clinical realm, but it has been used in both, sure.

12   Q    In the "forensic realm," you mean in a courtroom setting?

13   A    Correct.

14   Q    Because the courtroom setting may add a different

15   dimension to someone who presents to you; is that fair to say?

16   A    Sure.

17        It may be different motivating factors of why

18   someone may present in some kind of symptomatology or

19   narrative to you if they are trying to get off of criminal

20   charges, if they are in a civil case trying to get monetary

21   remuneration for something that happened to them.

22        So, that maybe there.  We have to assess for it and

23   look at it and rule it out, but it's a possibility and we need

24   to look at it and assess for it.

25   Q    Let me go back to what you just said because that was a

Hughes - Cross - der Ohannesian                    3765

1    long answer --

2    A    Right.

3    Q    -- with some important points.

4         In other words, a person can be motivated in a

5    forensic setting by a desire to avoid responsibility.

6    A    As a criminal defendant, sure.

7    Q    Or any individual may want to avoid responsibility for

8    their conduct, correct?

9    A    In general, that can be true.

10   Q    That's part of what secondary gain seeks to address,

11   right?

12   A    Secondary gain in the forensic context really is talking

13   more about the litigant and what they have to do, not the

14   other individuals.  But there's secondary gain for people

15   wanting to get emotional attachment or wanting to get feelings

16   of adulation, and that can be, in general, a psychological

17   principle as well.

18   Q    I think you indicated money can also be what's called

19   secondary gain.

20   A    Uh-huh.

21   Q    Right?

22   A    Or motivating factor, sure.

23   Q    Another way of saying motivating factor for why the

24   person is presenting, correct?

25   A    Correct.

Hughes - Cross - der Ohannesian                    3766

1   Q     And that is something you would want to try to assess if

2   you can.

3   A     Correct.

4   Q     You may or may not be able to assess that, correct?

5   A     Correct.

6   Q     And secondary gain can be reason to, in short, fabricate

7   an allegation, correct?

8   A     It could.

9   Q     Secondary gain can also involve revenge, correct?

10  A     I don't know if I'd call it secondary gain, but revenge

11  could be a motive that an individual has, of course.

12  Q     As well as retaliation, correct?

13  A     Correct.

14  Q     And as a forensic psychologist, your concern in a

15  forensic setting is if an individual you're working with in a

16  forensic setting may be feigning psychological difficulties.

17  A     Correct.

18         And we have methods and methodology to assess for

19  that, and that is a very integral part of a forensic mental

20  health or psychological evaluation.

21  Q     I'll ask you about that in a second.

22         So, there's a word that is used by psychologists

23  called "malingering"?

24  A     Correct.

25  Q     And that's a way of saying someone is intentionally

Hughes - Cross - der Ohannesian                3767

1   producing symptoms or a complaint.

2   A    Well, malingering is the false production of

3   psychological symptoms.

4   Q    And avoiding military duty could be a reason to malinger,

5   correct?

6   A    I think you're equating malingering with lying and they

7   are not the same thing.

8   Q    Malingering is focusing on the false psychological

9   symptoms, correct?

10  A    Correct.

11  Q    You are concerned, though, that in a forensic context a

12  motivation may exist to falsely report or distort

13  symptomology.

14  A    Sure, that's one factor that I want to make sure I'm

15  looking at and I'm assessing.

16  Q    And that's why psychologists do have techniques, you

17  said, to assess that, correct?

18  A    Correct.

19  Q    And those techniques involve certain psychological tests,

20  correct?

21  A    Correct.

22       And, also, the examination of third-party

23  information and medical records and psych records and health

24  records and military records.  So, you're looking for

25  consistency across data points.

Hughes - Cross - der Ohannesian                    3768

1   Q    And there are several psychological tests that you have

2   used to assess clients that you've worked with who do bring

3   lawsuits, correct?

4   A    Forensic clients.

5   Q    "Forensic" because they're involved in a courtroom

6   setting?

7   A    Correct.

8   Q    And certainly in this case, you haven't done any of that

9   testing that may seek to determine whether people are faking

10  good or faking bad, for example.

11  A    Right.  This was, as I stated, an opportunity to provide

12  general testimony in the field of sexual assault and coercive

13  control.

14  Q    When I say "faking good" and "faking bad," does that have

15  a specific meaning to you?

16  A    Sure.

17  Q    That's something -- it's one of the scales on one of the

18  psychological tests --

19  A    Correct.

20  Q    -- that you use?

21  A    Correct.

22  Q    And there are different ways that people are assessed in

23  terms of not telling the truth about their experiences or

24  conditions; fair to say?

25  A    There's sort of a variety of things that a person can do;

Hughes - Cross - der Ohannesian                    3769

1   a person can exaggerate, a person can minimize, a person can

2   confabulate.  And it doesn't necessarily mean that they are

3   not telling the truth, so you really have to examine all the

4   external data.

5           And, certainly, we know that individuals who also

6   malinger usually do have bona fide mental illnesses as well.

7   So, it's really important to sort of tease out what's going

8   on, and the psychological testing gives us one tool to help do

9   that.

10  Q   And in addition to the tests that you use to evaluate the

11  reliability of information by clients, in your clinical

12  setting you would want to have a full psychiatric history.

13          MR. LESKO:  Your Honor, I'll object.

14          May we have a sidebar, please?

15          THE COURT:  All right.

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

Sidebar                                                     3770

1        (The following occurred at sidebar.)

2        MR. LESKO:  Your Honor, I have not objected for

3   about 20 minutes, but this area of cross-examination is

4   extremely misleading and beyond the scope of direct.

5        Dr. Hughes has testified repeatedly she conducted no

6   evaluations, no examinations, she did not do any assessments,

7   and I think this cross-examination is confusing the jury

8   because it's detailed questions about all sort of aspects of

9   evaluations and assessments.  It has nothing to do with the

10  general testimony that the expert has offered.  So, we're

11  going to object to continuing this line of cross-examination.

12       MR. DER OHANNESIAN:  I don't have much more, but I

13  think it goes to her experience and how to evaluate

14  individuals who presented to her as opposed to individuals who

15  present in a forensic setting.  But I am actually almost done

16  with this point.

17       THE COURT:  What other questions do you have?

18       MR. DER OHANNESIAN:  There was maybe one other

19  question along the same lines, about what a complete

20  psychiatric history would be.

21       THE COURT:  That is outside the scope of the direct,

22  so it's out.  Okay, that's it.

23       Do you have anything else for her?

24       MR. DER OHANNESIAN:  I do.

25       (Continued on the following page.)

LAM        OCR        RPR

Hughes - Cross - der Ohannesian                    3771

1              (Sidebar ends; in open court.)

2    BY MR. DER OHANNESIAN:

3    Q    Have you discussed this case with any attorneys other

4    than the prosecutors in this case?

5    A    I don't believe so.  I mean, people knew I was testifying

6    in the case.

7    Q    Specifically, any attorneys?

8    A    An attorney on the defense team knew that I was

9    testifying in this case.

10   Q    What attorney is that?

11   A    I don't remember the name, not -- one of the other

12   defendants.  And then an e-mail was sent to me that I was

13   testifying.  The letter that was presented.

14   Q    Are you saying an attorney for Keith Raniere or someone

15   else?

16   A    I believe it was for someone else.

17   Q    Another defendant?

18   A    Correct.

19   Q    And did you discuss the case with that attorney?

20   A    No.

21   Q    That attorney contacted you?

22   A    Forwarded the letter that someone forwarded him, yes.

23   Q    Do you know the name of that attorney?

24   A    Who forwarded the letter?

25   Q    Yes.

Hughes - Cross - der Ohannesian                    3772

1          MR. LESKO:  Objection.

2          THE COURT:  Sustained.

3     Q    Mr. Lesko questioned you and asked you about the

4     incidence of unwanted sexual contact; do you recall that?

5     A    Sure, we talked a lot about that.

6     Q    An unwanted sexual contact is not a legal term, correct?

7     A    I don't believe so.  I'm not qualified to tell you that.

8     Q    "Unwanted sexual contact" could include sexual

9     harassment, correct?

10    A    Correct.

11    Q    It can include a variety of contact which is not criminal

12    in nature; do you agree?

13    A    If somebody is grabbing -- do you mean unwanted

14    noncontact forms of abuse or do you mean contact forms of

15    abuse?

16    Q    The phrase "unwanted sexual contact" includes many

17    actions which are not necessarily criminal, correct?

18    A    My belief is that some probably could rise to the level

19    of a criminal offense.

20    Q    And some don't.

21    A    Agreed.

22          MR. LESKO:  Objection.

23          THE COURT:  I'm sorry, this is beyond the scope.

24    She's not a legal expert.

25    Q    When you use the phrase "unwanted sexual contact," do you

1  have a specific definition for that?

2  A    So, unwanted sexual contact could be voyeurism, making

3  the individual stand nude, making her wear lingerie, making

4  her have sex with other people, it could include forcing her

5  to have sex, forcing her to engage in certain positions.

6             It's unwanted.  So, by virtue of me saying unwanted

7  sexual activity, it's coercive.

8  Q    It could be someone saying something of a sexual nature

9  that you don't want to hear?

10  A    It would depend on the degree of that, but yes.

11  Q    There's no recognized psychological definition of

12  unwanted sexual contact; would you agree?

13  A    Probably.

14  Q    You probably would agree?

15  A    I would think so.  It's been defined in a variety of

16  studies.  Certainly in the large-scale National Intimate

17  Partner and Sexual Violence Survey they talk about other forms

18  of sexual contact.  So, that definition has been used in a

19  variety of contexts.

20  Q    And there's many different definitions of "unwanted

21  sexual contact," correct?

22  A    I would agree with that.

23  Q    I think you said that many perpetrators know their

24  victims, correct?

25  A    Correct.

Hughes - Cross - der Ohannesian                3774

1    Q    Some don't?

2    A    Small percentage, correct.

3    Q    And I think you said that there's many reasons that

4    individuals may not report, correct?

5    A    Correct.

6    Q    And there's many reasons that individuals may report,

7    correct?

8    A    Correct.

9    Q    Some individuals do report right away, correct?

10   A    Some do.

11   Q    Some do and some don't, correct?

12   A    We're looking at the percentage.  What is clear is that

13   the overwhelming majority of victims do not report.

14   Q    And how victims disclose, you said, based on your

15   clinical experience, can vary tremendously.

16   A    And, also, based on the research in the area of

17   disclosure, yes, it can.

18   Q    There's a wide variety of possibilities, correct?

19   A    There are many different ways that are unique to that

20   individual.

21   Q    Some individuals disclose their traumatic event at one

22   time, correct?

23   A    At one time, like, in their life span?

24   Q    When they report it.

25   A    At the time of the event?

Hughes - Cross - der Ohannesian                    3775

1   Q     Soon after the event or when they do report it, they

2   report it in its completeness.

3   A     Again, in my experience, in my review of the literature,

4   the completeness, I would not agree with.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hughes - cross - der Ohannesian                    3776

1   CROSS-EXAMINATION (Continuing)

2   BY MR. der OHANNESIAN:

3   Q    Do some people report their traumatic experience at one

4   time?

5   A    Is that possible?

6   Q    Yes.

7   A    Sure.

8   Q    And in terms of the impact, I think you were asked

9   questions about the impact of alleged sexual assault; is that

10  correct?

11  A    Well, it would be the impact of the sexual assault if

12  there is an impact.  It wouldn't be an alleged.  But, yes, the

13  impact.

14  Q    And that some people are more resilient than others;

15  correct?

16  A    That's true.

17  Q    One again, individuals vary in how they respond to

18  various traumas in their life; correct?

19  A    Correct.

20  Q    Individuals vary in how they respond to an interpersonal

21  situation; correct?

22  A    You mean in a violent or abusive situation?

23  Q    Or even non-violent situations.

24  A    Sure.  We're very unique individuals and our responses

25  are going to be based on a variety of factors.

Hughes - cross - der Ohannesian                3777

1   Q     And how someone responds to someone approaching them in a
2   social setting can vary from individual to individual;
3   correct?
4   A     Sure.
5   Q     And when someone is interested in someone sexually, how
6   that response is reciprocated can vary from individual to
7   individual; correct?
8   A     Correct.  If it's wanted and consensual, sure.
9   Q     And individuals, even when there is a coercive dynamic
10  are still capable of consenting to a sexual act?
11  A     Again, that's where you go it depends.  It depends on the
12  contingency.  It depends on the threat.  It depends on the
13  sort of the severity of that coercive control.  So if the
14  individual feels that they don't have the capacity to say no,
15  then that's not concept.
16  Q     So it does happen; correct?  Even in the presence of a
17  coercive dynamic, there can be a consensual relationship?
18  A     What's the "it does"?  What's the "it"?
19  Q     Even in the context of some type of what you have defined
20  as a coercive dynamic, there can still be a consensual, mutual
21  relationship?
22  A     There can be, as I stated, times of normalcy that are
23  interspersed in that overarching coercive environment.
24  Q     And that's something you need to evaluate on an
25  individual basis to make an assessment; correct?

Hughes - cross - der Ohannesian                3778

1    A    Yes.  We'd want to know the unique factors of that

2    particular situation to better understand that.

3    Q    Some people in what you call a traumatic relationship

4    maintain the relationship; correct?

5    A    In an abusive relationship, yes.

6    Q    And some don't know; correct?

7    A    Correct.

8    Q    Again, there's a lot of variables that go into that;

9    correct?

10   A    Correct.

11   Q    I think you said that individuals can report because of a

12   secondary gain; correct?

13   A    Well, I think you said that.

14   Q    Would you agree with that?

15   A    Reporting an actual assault?

16   Q    Yes.

17   A    I mean, I don't know if I agree as a flat reason of

18   secondary gain.

19        I think, as we've just identified, there are

20   multiple reasons that people report their abuse.

21   Q    But there can be secondary gain; correct?

22        MR. LESKO:  Objection.

23        THE COURT:  You may answer.

24   A    There can.

25   Q    And someone can fail to report abuse because there is no

Hughes - cross - der Ohannesian                    3779

1   abuse; correct?

2   A    I mean, it's a negative.  You can't fail to report

3   something that didn't happen.

4   Q    That's right.  So if something didn't happen, it's not

5   going to be reported; correct?

6   A    Correct.

7   Q    People can fail to report because the allegation is

8   false; correct?

9   A    Fail to report to law enforcement?

10  Q    To anyone.

11  A    If something didn't happen, then there's no reason for

12  someone to report it, and there's no reason for them to fail

13  to report it or to have an obstacle to report it if it didn't

14  happen.

15          THE COURT:  Could we identify what the source of an

16  allegation that didn't happen and the failure to report?  It

17  sounds like semantics to the Court.  Could you explain your

18  question in a way that I understand it?

19          MR. der OHANNESIAN:  Did you say fail to report?

20  What was the other phrase?  I didn't hear.

21          THE COURT:  Read back what I said, please.

22          (Record read.)

23  Q    Let me back up.  Are you familiar with a study in the

24  archives of sexual behavior concerning 57 documented false

25  allegations of abuse?

Hughes - cross - der Ohannesian                     3780

1   A    Do you recall the author?

2   Q    Yes.  Andre De Zutter.

3   A    De Zutter?

4   Q    Yes.

5   A    I'm familiar with some of those articles.

6   Q    It's a Dutch study?

7   A    Correct.  I believe so.

8   Q    That involved confirmed reports of false allegations;

9   correct?

10  A    I don't have the study in front of me, but I know that

11  there was a study by him that confirmed -- or that reported

12  false reports.

13  Q    And there were multiple motivations for false reporting;

14  correct?

15  A    Correct.

16  Q    And the number one reason was emotional regret?

17  A    For having had sex.

18  Q    Yes.

19  A    Correct.

20  Q    In addition, to coverup other behavior was another reason

21  for those falls reports; correct?

22  A    Correct.

23  Q    And if there is no assault, there is no reason for a

24  person to make a report of assault, would you agree?

25              MR. LESKO:  Objection.

Proceedings                                          3781

1             THE COURT:  You may answer.

2    A    Of course.

3             MR. der OHANNESIAN:  I have nothing else.  Thank

4    you.

5             MR. LESKO:  One moment, Your Honor.

6             THE COURT:  Sure.

7             MR. LESKO:  We have nothing further, Your Honor.

8             THE COURT:  All right.  The witness may stand down.

9    You are excused.

10            THE WITNESS:  Thank you, Your Honor.

11            THE COURT:  You're welcome.

12            (Witness is excused.)

13            THE COURT:  All right.  At this time we will take

14   our lunch break until two o'clock.  All rise for the jury.

15            (Jury exits the courtroom.)

16            THE COURT:  All right.  Please be seated.

17            We were discussing an instruction about expert

18   testimony and the defense wanted to make a point outside the

19   hearing of the witness.  So what was that point?

20            MR. der OHANNESIAN:  One of the statements that Mr.

21   Lesko made was that the instruction should cover offender

22   behavior.  This witness was never offered, qualified, nor was

23   she accepted by the Court to testify about offender behavior.

24   So I don't believe that that should be part of any

25   instruction.  I just don't think that's what she was presented

Proceedings                                    3782

1    for.

2          The other part of what he indicated that she was

3    offered as a witness was for coercive relationships.  That was

4    not what the notice was submitted for.  It was to the best

5    that it can be divined it was sexual assault victims and

6    coercive relationships was a much broader category and I don't

7    believe that's what was submitted to the Court.  I don't

8    believe that's what the Court allowed.  So that's why I would

9    object to those two areas being part of it and I don't think

10   her testimony should be considered for that.

11         I do not object to -- you know, if you want to

12   eliminate that sentence that they feel is not appropriate,

13   that's okay also.

14         MR. LESKO:  Your Honor, we didn't limit -- Dr.

15   Hughes was not accepted as an expert in a limited fashion just

16   to focus on victims.  She was an expert on interpersonal

17   violence, interpersonal involve two people:  A victim and

18   perpetrator, as well as traumatic stress.

19         I also noticed that in our notice, I believe it is

20   item No. 6, that opinion involves a, quote, dynamic between

21   the victim and the perpetrator, including whether the victim

22   and the perpetrator are in intimate or work relationships

23   characterized by abuse, coercion and/or dependence.  So I

24   think this dynamic was specifically referenced in our notice.

25         THE COURT:  So as to second paragraph, how would you

Proceedings                                3783

1    want that second paragraph to be revised, if at all?

2              MR. LESKO:  Well, I would just say -- I would

3    suggest, off the top of my head, it is offered for you to

4    consider in evaluating the behavior of victims and

5    perpetrators in the context of coercive relationships or

6    dynamics.  We may just want to leave it there as opposed to

7    being specific about sexual assault.

8              THE COURT:  In evaluating the behavior of victims

9    and perpetrators, and then what?

10             MR. LESKO:  Evaluating behavior of victims and

11   perpetrators in the context of coercive relationships, and

12   then continue on before, during, or after.  I don't like the

13   alleged commission of the crime language.

14             MR. der OHANNESIAN:  Again, we don't feel this

15   witness, who has no experience with offenders, was ever

16   qualified in that area and it gets into profiling testimony if

17   it's going to be considered that and there's a wide body of

18   law that doesn't permit to say because someone engaged in

19   certain behaviors they are an offender.  That's exactly the

20   problem with the grooming testimony that was rejected and she

21   really didn't talk about -- her experience was based on victim

22   behaviors and that's the clear import of the notice.  I don't

23   think the notice is great, but it certainly didn't say it's

24   going to talk about the phrase coercive relationships.

25             MR. LESKO:  Your Honor, it would be misleading to

Proceedings                                         3784

1   just talk about victims without perpetrators, particularly

2   since we have just heard testimony and Dr. Hughes discussed

3   perpetrator conduct repeatedly.  And she did not offer any

4   specific opinions regarding the defendant's conduct in this

5   case, or she did not offer a profile and opine that somehow

6   the defendant's conduct fit some sort of profile.

7           THE COURT:  Well, I'm not sure that we ought to go

8   into it at all.  We can just leave that whole second sentence

9   out.  The expert testimony is not offered as proof that the

10  crime charged occurred.  You should evaluate the expert

11  testimony just as you would the testimony of any other

12  witness.

13          MR. LESKO:  We're fine with that, Your Honor.

14          THE COURT:  Without going into any details.

15          The jury knows the designation of the witness'

16  expertise and to the extent that it would be helpful to the

17  jury, you can argue about it on closing as to whether it has

18  of any value at all.

19          MR. der OHANNESIAN:  As we indicated, we are fine if

20  you take out that sentence if that's the solution.

21          THE COURT:  Well, I think that is my solution.

22          MR. LESKO:  Thank you, Judge.

23          THE COURT:  Anything else?

24          MS. PENZA:  Your Honor, I would like a few minutes

25  before Nicole, so whether you would like to do it now or

MDL       RPR       CRR       CSR

Proceedings                                    3785

1   before the lunch.

2          THE COURT:  Do we need a sidebar on this?

3          MS. PENZA:  Yes, please.

4          THE COURT:  Let's have a sidebar.

5          (Sidebar held outside the hearing of the jury.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25









Sidebar - Sealed by Order of the Court          3790



17   (Sidebar ends.)

18   (End of sealed portion.)

19   (Lunch recess.)

MDL        RPR        CRR        CSR

Proceedings                                              3791

1                         AFTERNOON SESSION

2              (In open court; jury not present.)

3              (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

4              THE COURT:  Please be seated.

5              Anything before we get started?

6              MS. PENZA:  Just a reminder to any sketch artist

7    that they are not to sketch this witness.

8              THE COURT:  Yes.  I just want to remind the sketch

9    artist that the face of the witness is not to be sketched.

10             About how long is the direct of this witness?

11             MS. PENZA:  I'm hoping to finish by lunch time

12   tomorrow.

13             THE COURT:  All right.  Let's bring in the witness.

14             (Witness takes stand.)

15             THE COURT:  Let's bring in the jury.

16             (Jury enters the courtroom.)

17             THE COURT:  The witness should remain standing.

18   Everyone else may be seated.

19             The Government may Presbyterian its next witness.

20             MS. PENZA:  Thank you, Your Honor.  The Government

21   calls Nicole.

22             THE COURTROOM DEPUTY:  Please raise your right hand.

23             (Witness sworn.)

24   **NICOLE**,

25        called by the Government, having been duly

Nicole - direct - Penza                          3792

1      sworn, was examined and testified as follows:

2            THE COURTROOM DEPUTY:  Please have a seat.

3            THE COURT:  You may inquire of Nicole.

4            MS. PENZA:  Thank you, Your Honor.

5   DIRECT EXAMINATION

6   BY MS. PENZA:

7   Q    Good afternoon, Nicole.

8   A    Good afternoon.

9   Q    How old are you?

10  A    31.

11  Q    Where did you grow up?

12  A    In Northern California.

13  Q    Can you describe what your childhood was like?

14  A    Yeah, it was -- I grew up somewhere that was very much

15  like outdoors, so it was pretty lucky.  I got to be outdoors

16  all the time and go skiing and bike riding.  I have an older

17  sister and a younger brother and my mom and dad.  And, yeah, I

18  loved school and I loved acting.

19  Q    So let's talk about your family for a second.  You said

20  you have an older sister and a younger brother?

21  A    Yeah, three years older and three years younger.

22  Q    So you are in the middle?

23  A    Right.  In the middle.

24  Q    And you said -- were you close to your family growing up?

25  A    Yes.  Very much.

Nicole - direct - Penza                3793

1  Q     Now, you mentioned acting.  Is that something you

2  developed a love of early on in your life?

3  A     Yes.  I think the first time that I was ever on stage I

4  was four and that was in like Hanz Christiansen Andersen

5  story.

6         And when I was nine, I played Charlie Brown, which I

7  still remember my speech from.  And when I was in fist grade,

8  I did the *Wizard of Oz* and I played Dorothy and that's kind of

9  when I knew that acting was what I wanted to do.

10 Q     Were your parents supportive of your acting when you were

11 growing up?

12 A     Very supportive.  Like after that, after that show with

13 the *Wizard of Oz*, I had told my mom this is what I wanted to

14 do and they didn't want me to go like a performing arts high

15 school because I would have had to go pretty far from home,

16 but every summer I would go to like a different place around

17 the United States and do a summer program for acting, dancing,

18 whatever it was.

19 Q     Now, did you continue acting through high school?

20 A     Yes.

21 Q     And when you were in high school, did anything happen

22 that made it more difficult to keep up the acting?

23 A     Yes.  So, my freshman and sophomore year of high school,

24 we had like an amazing drama program at my school, and then it

25 got cut because of California budget cuts.  So I had to drive

Nicole - direct - Penza                              3794

1    like an hour one way and hour back to go to rehearsals.  And
2    sometimes at community college I did a play at.  And then also
3    they were putting on a really big performance at, like, one of
4    the bigger cities, so I would just drive very far to those
5    rehearsals.
6    Q    That bigger performance, what show was that?
7    A    I played *Cinderella* in the musical version on stage.
8    Q    Was there any effect on your social life in high school
9    having to commute so far for rehearsals?
10   A    So, originally, when they offered me the part, I was kind
11   of bummed because it would mean that I would have to miss
12   every Saturday football game to go to rehearsals, but it was
13   100 million percent worth it.
14   Q    And after high school, did you continue on to college?
15   A    I did.  I applied to NYU, UCLA, and Loyola Marymount
16   University, to their acting programs, and I ended up going to
17   Loyola Marymount University, which is in Los Angeles.
18   Q    And how far did you go in college at that point?
19   A    I just did one year.  And then after my freshman year, I
20   was kind of trying to decide what I wanted to do.  I had an
21   agent at the time and I had started auditioning and I was --
22   was not sure if I should stay in school getting a theater
23   major or just go study with acting coaches in Hollywood and I
24   decided to take some time off from school.
25   Q    Did you move to Hollywood?

Nicole - direct - Penza                3795

1    A    I did.

2    Q    How did you like Hollywood?

3    A    Hollywood would be like an overwhelming place sometimes.

4    I liked it, but it was also -- being 19 and kind of thrown

5    into that world was a lot.

6    Q    Did you -- after you moved to Hollywood, were you

7    studying acting at that point?

8    A    Yeah, with a lot of different -- not a lot, but, like,

9    you try out different classes and you might click with one

10   teacher or like the way they teach or you might try another

11   one or you might go to someone for strictly commercials and

12   then someone else for more stage work.  I was always -- I was

13   always taking classes.

14   Q    At some point did you take up an acting program in

15   London?

16   A    Yes.  So after my first year in Hollywood I was -- I just

17   kind of needed a break and I asked my parents if I could go

18   study Shakespeare in London.  So I went to London Academy of

19   Dramatic Arts and Music and I studied -- I did their summer

20   Shakespeare course.

21   Q    How did you like that?

22   A    It was awesome.

23   Q    Did you develop a love of theater versus some of the

24   other work that you were doing?

25   A    Well, I -- I mean, I love all of acting.  But they have

Nicole - direct - Penza                              3796

1  their different things.  Like, you know, film and television

2  is great, but there's something about being on stage that I

3  just really loved and I found it easier.  When you're on

4  stage, you, like, can -- you take a character through the

5  whole story, right.  Like every night you're taking this

6  character through the whole story and you're kind of like

7  living it and it's a little bit different each night because

8  you don't know how the audience will react to things.  Whereas

9  in film and television, it's a lot of stop and go.  The final

10  product is wonderful, but, like, the actual process of doing

11  it is a lot of stop and go and I found that harder.  For me,

12  it's like hard being in a certain -- I don't know.  Like,

13  you're sitting around all day and it's okay, go do this

14  insanely emotional scene and you're like wait, what?  So, I

15  just like the free line of being on stage.

16  Q    So you were in -- how long were you in Hollywood at that

17  point?

18  A    When I got back from London, I was in Hollywood for

19  another eight years, I think, seven and a half, eight years.

20              (Continued on following page.)

21

22

23

24

25

Nicole - direct - Penza                                        3797

1    EXAMINATION CONTINUES

2    BY MS. PENZA:

3    Q    And what type of work did you do just generally during

4    that time?

5    A    A little bit of everything.  I mean I -- I -- off and on

6    I also waited tables and had other side jobs, but I worked.  I

7    modeled.  I worked in commercials.  I did web series and

8    television and some smaller movies.  Majority of what I

9    started to kind of get really good at was the commercial --

10   was commercials.

11   Q    So you had success doing commercials?

12   A    Yeah.

13   Q    Now, at some point did you make a decision that you

14   wanted to refocus things?

15   A    Yeah.  I -- I had been in LA for, you know, including

16   college, almost ten years and I kinda just wanted a change.  I

17   really love how people view acting in New York, or I like the

18   work ethic of actors in New York and I'd always wanted to move

19   to New York, but it's very easy to make up an excuse of why

20   you can't go or why it's complicated to get there.  And I

21   thought, you know, I'm almost 28 and I -- you know, eventually

22   I'm gonna have a family and settle down, so, like, if I'm

23   gonna move to New York and, like, try to do some stage work, I

24   better do it now.  And so I decided to.

25   Q    Okay, so when approximately was that that you made the

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                    3798

1   decision to move?

2   A     It was like, maybe like -- like really made the decision,

3   it was probably like Novem -- like end of November, maybe

4   December of 2014.  Is that right?

5   Q     Do you remember?

6   A     'Cause -- 'cause I moved -- yeah, it would have been the

7   very, very end of 2014 because then I think I moved in 2015,

8   if I'm correct.  So it obviously, like, takes a little bit of

9   time to plan all those things, and I had a lot of logistical

10  things to plan.

11  Q     So, you said something about the work ethic of actors in

12  New York.

13          What did you mean by that?

14  A     Just like New York is -- is a tougher place than Los

15  Angeles, in a positive way, how I viewed it.  So, like, if --

16  New York actors, I think it's very common, New Yorkers in

17  general I think it's very common for them to have more than

18  one job or to, like, be like really focused on whatever craft

19  they're doing.  But they might do more than one thing because

20  it's really hard to live in New York.

21          And there's just more of a -- I'm totally

22  generalizing because I know some incredible actors in Los

23  Angeles as well, they just take their -- they take their craft

24  very seriously and I appreciated that.  I wanted to be around

25  that.

Nicole - direct - Penza                3799

1   Q    Was there -- was there also something to the fact that in

2   New York there's -- did you find that in New York there was a

3   certain level of respect for actors, even if they have

4   other -- other jobs?

5   A    Yeah, like you can -- you can wait tables and be an actor

6   in New York and they're just like, Oh, yeah, you haven't

7   broken through yet or You just need to pay your rent or

8   whatever.  It's not looked down upon.

9            Whereas, in LA it's a little more like, Oh, no,

10  you're a waitress, not an actress.

11           And it's kinda like, alright, you don't get as much

12  respect even though you may be working just as hard at both

13  jobs.

14  Q    Now, did you have to -- did you have to put any plans in

15  motion in order to be able to move to New York?

16  A    Yeah.  When I moved Los Angeles my parents had purchased

17  the apartment that I lived in and I paid the mortgage, so we

18  had to decide what we were going to do if I wasn't living

19  there.  Either it was going to be rented out, or it ended up

20  that my dad came down and remodeled it and they decided to

21  sell it.

22           So I was -- and I -- I lived there for pretty much

23  the whole time I was in LA.  So it was the only other home I'd

24  really had aside from where I grew up.  So it was really hard

25  to -- it was a big decision to leave that and -- and have it

Nicole - direct - Penza                    3800

1   sold.  Like, I couldn't come back to it.  And, you know, I --

2   I gave up kind of everything in order to move to New York.

3   The house that I lived in, the car that I was driving, and all

4   of my things because I just thought, no, like I want to -- I

5   want to live in New York.

6   Q    And did you have -- did you have a job that lined up in

7   New York?

8   A    I did not have a job lined up yet.  I was planning on

9   finding a restaurant job when I got to New York, which I

10  figured would not be too difficult.  But I also had just

11  luckily, it was -- excited because my commercial agents in Los

12  Angeles were opening an office in New York.  So I was like,

13  oh, this is -- this is perfect.  Like, I'll have -- I'll at

14  least have that, so I can immediately start auditioning

15  commercially.

16          And then you kind of can sometimes work your way up

17  from if you enter in on the commercial level, work your way up

18  at an agency.  And then I figured I would get a job.

19  Q    Now, just a little bit.

20          In terms of doing commercial work, when you've done

21  a commercial, how do you end up getting paid?  Like, do you

22  sometimes get checks after?

23  A    Yeah.  So it's -- it's similar to movies in the sense

24  that you get paid for the day that you're shooting.  And then

25  every time -- if -- if the commercial goes national and if

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                                    3801

1    it's a SAG commercial, which were the ones that -- well, that

2    was all I did because I was SAG at that point, you get paid

3    how many times the commercial plays.

4    Q    And what if --

5             THE COURT:  I'm sorry.  SAG, I am going to ask what

6    SAG is.

7             THE WITNESS:  What's SAG?

8             THE COURT:  What SAG?

9             THE WITNESS:  Oh, sorry.  The Screen Actors Guild.

10   BY MS. PENZA:

11   Q    Is that a union for actors?

12   A    Yeah, it's the union that controls, like helps what

13   actors -- helps protect actors, what they're paid and kind

14   of -- they -- it -- the union keeps track of how many times a

15   commercial is paid -- played and how much you get and how --

16   you know, you pay dues each year.  And it's a union.

17   Q    Now, when you were -- when you were about to move to

18   New York, was anything -- was there something else that was

19   proposed to you before you would actually move to the city?

20   A    Yes.  Yes.  When I was contemplating moving or, like,

21   figuring out the logistics of moving, the -- I guess he wasn't

22   my boyfriend at the time, we weren't dating.  But my ex -- one

23   of my exes had mentioned this acting program that was

24   happening in upstate New York called The Source.

25   Q    And what was the name -- what was the name of your ex-

                SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                                    3802

1    boyfriend?

2    A    Mark Hildreth.

3    Q    And who is Mark Hildreth?

4    A    He's an actor.

5    Q    Is he a successful actor?

6    A    Yeah, he's been pretty successful.  I mean that's how he

7    makes his living and he's done a lot of different television

8    shows and voiceover, I think, as well.

9    Q    But he makes his living working full-time as an actor?

10   A    Yeah, a hundred percent.

11   Q    And what was the name of the program he mentioned to you?

12   A    It was called The Source.

13   Q    Was The Source affiliated with any other organization?

14   A    It was affiliated with the organization NXIVM, but also

15   ESP.

16   Q    Had you heard of NXIVM/ESP prior to The Source -- prior

17   to Mark Hildreth mentioning The Source to you?

18   A    Yes.  Mark had mentioned to me, when we first started

19   dating Mark had mentioned or had told me about this program

20   that he was interested in called ESP.  And that was 2013.

21   Q    And what did he tell you at that time?

22   A    I think it came up because we were like talking, like,

23   character and scripts.  We met in -- in an acting class.  We

24   had the same acting coach, who is wonderful.  She's a casting

25   director/acting coach, she's amazing.  We -- we met through

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                           3803

1    that.

2            So I think we were like talking about character work

3    or something of that sort and he -- which then got into, like,

4    a deeper conversation and then he said that he was part of

5    this program that, like, worked on, like, making yourself a

6    better person and was a really interesting way to kind of like

7    understand humanity and psychology.

8            And I was like:  Oh, that sounds interesting.  It

9    kinda sounded like something that I had done when I was a kid

10   called Landmark.  And so I was like:  Oh, interesting.  Like,

11   cool.  You know, you're talking about character stuff.  And I

12   don't know, I was like:  Well, that's great.

13   Q    Did he encourage you to get involved in NXIVM at that

14   point?

15   A    Not at that particular conversation, but yeah, eventually

16   down the line he said that he really thought it would help me.

17           You know, I was -- for me, acting in LA I was

18   always, like, you're trying to figure out how you can become

19   better.  You know, acting is tough and sometimes your own

20   fears get in the way of being in the audition room.  Like, I

21   would get really nervous in the audition room.  I was always

22   trying to, like, better myself in any way.  And you also want

23   to always try and understand different characters because

24   that's part of your job.

25           So he said that he thought it might help.  And --

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                                    3804

1   Q    Did he tell you -- did he tell you anything about the

2   people who were involved in NXIVM?

3   A    Yeah.  The first person I remember him bringing up was

4   Clare Bronfman.

5   Q    And what did he tell you about Clare Bronfman?

6   A    Just that she was a heiress.  I guess the heiress to --

7   at the time he just said she was the heiress to the Seagram's

8   fortune and that she was -- that she was like a huge fan of

9   the curriculum.  And -- and he mentioned a couple other --

10  other people.  Oh, Mark Vicente.

11  Q    And who was Mark Vicente?

12  A    He was -- he was a director and he directed a movie that

13  I had seen called What the Bleep?  And I think he mentioned --

14  Q    Did he mention any other actors to you?

15  A    Well, I knew -- I had known that his -- his ex Kristin,

16  who was an actress from Smallville, was -- had done the

17  program with him and then their other friend Allison.

18  Q    So Kristin, what's Kristin's last name?

19  A    It's like K-R-E-U-K, I think.  I don't know how to

20  pronounce it correctly.  Kreuk -- Kristin Kreuk.

21  Q    Was she one of the stars of Smallville?

22  A    Yes, she was.  I think she was the star of Smallville.

23  Q    And what is Smallville?

24  A    It's like a superhero show, sort of.  It's like a play on

25  Superman.  I don't really watch the show, but from what I

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                3805

1    understand it's a play on Superman.

2    Q    Was it a popular television show?

3    A    Yeah, very.  Very, yeah.

4    Q    And did it run for a long time?

5    A    Yeah, a long time, like ten years, I think.

6    Q    And so you said he also mentioned Allison Mack?

7    A    Yeah, because they had all started around the same time.

8    They were all really good friends.

9    Q    And Allison Mack had also been on Smallville?

10   A    Yes, I think she played Kristin's best friend, if I

11   remember correctly.

12   Q    Is being on a television show that lasts ten years, is

13   that considered pretty successful among actors?

14   A    Yeah, absolutely.  Oh, my gosh.  It's like a steady great

15   job for ten years.  Yes, that was very, yes, lucky.

16   Q    Before you took the first NXIVM class, was anyone else of

17   prominence mentioned to you?

18   A    I think Emiliano, but -- at some point Emi was mentioned.

19   Q    And when you say Emi, do you mean Emiliano Salinas?

20   A    Yes.

21   Q    And who was he?

22   A    He is -- his dad was one of the former presidents of

23   Mexico.

24   Q    At some point was Richard Branson mentioned to you?

25   A    Oh, yeah, I forgot about that.  Yes, so I -- what Mark

Nicole - direct - Penza                    3806

1    said was that there had been a -- like, so basically what he

2    was at was -- was suggesting that I do is the first five-day.

3    And he said that they had held a five-day curriculum on one

4    of -- or on Richard Branson's island.  So that sounded cool.

5    Q    Who is Richard Branson?

6    A    He's the English billionaire, I believe now.  I don't --

7    I don't know, but he's pretty cool.

8    Q    So what was the effect on you of Mark Hildreth mentioning

9    these people?

10   A    Just sounded legitimate.  Like this -- that this was a --

11   a program that a lot of successful and, you know, both

12   business-minded and successful actors were a part of.

13   Q    And so did you end up taking the first five-day

14   intensive?

15   A    Yes.  I -- so, when he -- when he told me how much it was

16   I was a little bit like, I can't --

17   Q    Well, let me ask you that.

18   A    Okay.

19   Q    That was going to be my next question.

20        So, did he -- before you took it, did Mark Hildreth

21   tell you how much it would cost?

22   A    Yes.

23   Q    How much did he tell you?

24   A    So he said it was 3,000, but if I, like, signed up in

25   a -- in a certain amount of time, I think it was like five

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                          3807

1    days, that then it would be 2500.

2    Q    Was the amount of the course concerning to you?

3    A    Well, yes, I did not have $2500 at the time.

4    Q    So what did you do, did you discuss that with Mark

5    Hildreth?

6    A    I did, and he said that he believed in it so much that he

7    would pay -- pay for me and I could pay him back as I could.

8    Q    And so did you end up taking it?

9    A    I did.

10   Q    Before you took the five-day intensive, did you do any

11   research yourself about NXIVM?

12   A    No.  So, Mark said that the best way to go into -- into

13   the five-day was to go in completely open-minded and -- and to

14   not really, like, have any expectations.  So to not -- to not

15   Google anything because it was better if you just went in,

16   like, very open-minded.

17           And that's fine, I -- I know how to do that.  I

18   can -- I can do that.  But I think I asked something like,

19   okay, you know, like maybe showed some hesitation because he

20   said that some people didn't really like -- some people didn't

21   understand what they were doing and so had, like, written

22   negative things.  And, like, I just didn't need to pay

23   attention to those because sometimes when people don't

24   understand something, they judge it.

25           And I was like, alright.  Again, I can -- I can

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                          3808

1   try -- try to understand that.

2   Q    Okay.  So when you said they don't understand, Mark --

3   correct me if I'm wrong, but Mark Hildreth is saying to you,

4   some other people --

5   A    Yeah, like some people that had wrote articles or

6   something.

7   Q    Let me just finish the question.

8   A    Sorry.

9   Q    It's okay.

10            -- that some other people who have written things

11   online had gotten it wrong about NXIVM and ESP?

12   A    Yes.

13   Q    And that he didn't want you to be influenced by that?

14   A    Right.  That it was just better if I went in with an open

15   mind and had my own experience.

16   Q    And so, did you agree not to research it?

17   A    Yeah, I trusted him.

18   Q    So you did take the five-day?

19   A    I did.

20   Q    And what did you think about it?

21   A    I thought it was -- I thought it was okay.  Like I

22   learned some cool, like interesting things.

23            Yeah, I mean I like to learn and I can kind of get

24   something out of anything.  Just -- I like to learn, but,

25   yeah, I thought it was -- it was interesting for a lot of

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                    3809

1    reasons.

2    Q    What do you mean by that?

3    A    There was just -- there was a few things that I was not

4    the biggest fan of or just kind of seemed like, I don't know

5    if it was -- if the right word is off or just unnecessary.

6    Q    So what were those things?

7    A    I think the biggest thing to me was that there was a very

8    big secrecy aspect.  Like you couldn't talk about what you

9    were learning.  And I think that felt weird to me because if

10   you're learning something cool, why would you not want to

11   share it with other people is how I felt.

12            And also, I like to -- you know, when I learn

13   something cool I like call my little brother and I'm like,

14   Guess what I learned today?  Or, Dude, you won't believe what

15   I learned today; and they were basically saying you can't do

16   that, which seemed really weird to me; or I just wasn't a big

17   fan of it because I wanted to call and tell my brother.

18   Q    Was there anything else that made you -- that made you

19   uncomfortable or that you found, I don't want to put words in

20   your mouth, I forget which exact words you used.

21   A    Yeah, just unnecessary, I guess, is the word I used.

22            But there was this whole thing with sashes and

23   bowing when you went in and out of the room.  I don't know,

24   you're learning -- you're supposed to be learning about

25   business and humanity.  I just didn't really see why we needed

SAM        OCR        RMR        CRR        RPR

Nicole - direct - Penza                    3810

1   to bow when we went in and out of the room.  Just a personal

2   thing, but that was like -- and then the way that they

3   explained it was that it was similar to, like, karate or like

4   entering a I believe it's called a dojo or -- in martial arts

5   or karate, that that was why the sashes were different colors

6   and that's why you had to bow in and out of the room.

7   Q    Did you have a background in karate?

8   A    I did.

9   Q    And yet you still found this unnecessary?

10  A    Well, yeah.  I'm not in karate.  I'm like in a class for

11  five days.  Like, I don't know, that was just my personal

12  opinion.

13  Q    Were there any aspects -- did you grow up religious?

14  A    I did not.

15  Q    Were there any aspects that made you feel uncomfortable

16  in that regard?

17  A    At that point, I mean they seemed to idolize, like there

18  was the whole Prefect/Vanguard thing, but I had never heard --

19  the only way I knew what prefect was was from the Harry Potter

20  books, which just meant like you're kind of in charge of like

21  the -- underclassmates.  So that was the only time I'd ever

22  heard of that word.  So I was sort of like, I don't know, what

23  does that mean?

24          But later on it was kind of like the idolization of

25  the person -- Keith, who created everything, that felt weird

Nicole - direct - Penza                          3811

1   to me, but at this point it didn't really even register.

2   Q    Now, after you took the five-day intensive, did you --

3   obviously you take The Source later on, but between the

4   five-day intensive and taking The Source, did you take any

5   additional curriculum?

6   A    No.

7   Q    Was there any encouragement by anyone for you to take

8   additional curriculum?

9   A    Yeah.  I mean when -- when this ended they, like, pitch

10  you on the next.

11  Q    Sorry, I just want to make sure, when the five-day ended?

12  A    Yes, when the first five-day ended they -- I think they

13  had like two different things.  You could either go into the

14  middle five-day or you could pay for the middle five-day and

15  the last five-day, or I think you had to pay for both at the

16  same time.

17         I don't totally remember, but it was a lot of money

18  whatever it was.  And -- or you could do, like, ESP ongoing,

19  which I think were like weekly meetings, something of that

20  sort.  But they pitch you on a few different things when you

21  finish.

22  Q    Okay.  And you did not take any additional curriculum

23  between those two?

24  A    No, sorry.

25  Q    Would Mark Hildreth ever talk to you about taking

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                    3812

1   additional curriculum?

2   A    Yeah, he used to drive me nuts because we'd be in like

3   acting class, we weren't even necessarily -- we weren't dating

4   anymore, but we'd be -- we were still in acting class together

5   and I'd be struggling with something and he'd been like, You

6   know -- you know, the ongoing ESP would really fix this

7   problem; like ongoing ESP.

8              And I'd be like:  Shut up, like don't care.  Like

9   don't -- I don't know, it just -- it drove me nuts.

10  Q    At this point in time did you have any understanding of

11  how the compensation structure of NXIVM/ESP worked?

12  A    Not really.

13  Q    Did you understand whether Mark Hildreth would receive

14  any commission or anything from you taking courses?

15  A    I think, like, yeah.  Like I was aware that there was

16  some kind of way that it -- that it worked, like if you signed

17  people up.  But you also had -- you had to sign people up to

18  get to, like, the next level.  But I believe that, yeah, I was

19  kinda aware of it, but I don't remember thinking about it too

20  much.

21  Q    Later on would you -- not to skip ahead -- but given your

22  later involvement in NXIVM, did you become more aware of kind

23  of this -- the role of the focus on enrollment?

24  A    Yeah.

25  Q    And so just very generally, what is the -- what is the

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                    3813

1   import of enrolling within the NXIVM organization?

2   A    I'm not even sure I could tell you 'cause I -- I -- all I

3   remember is that you have to -- you have to enroll two people

4   if you want to go to the next color.

5   Q    And no, no, I'm sorry.  I'm not asking you to give any

6   details, but in general, are people looking to enroll other

7   people?

8   A    Oh, yeah.  Yeah, yeah, you're always like looking to

9   enroll or enroll other people, either -- yeah.

10  Q    Now, let's go back to this The Source that you end up

11  taking, and you take that in April 2015?

12  A    Yes.

13  Q    Why did you decide to take The Source at that point in

14  time?

15  A    So, right when I was planning my whole move to New York,

16  actually like Mark and I had been paired up together for -- to

17  do like a scene in class.  So we were like rehearsing a lot

18  and he was like, you know -- I think he actually said:  It

19  doesn't have to do with ESP, so like don't get mad at me, but

20  he was like, there -- there's -- there's another course that

21  they were working -- that they were working on that was about

22  psychology and acting.  Like it was -- it was psychology and

23  acting mixed together, and they had been working on this

24  program for a while and it was supposed to be like really cool

25  and tailored to artists.  And -- and I -- and I felt that

1    sounded really interesting.

2    Q    Did the timing seem like it was going to work out as

3    well?

4    A    Well, that was the other thing is the timing was like

5    perfect.  So, it was supposed to be a five-week or it was a

6    five-week course.  And I was, like, moving out of my apartment

7    in LA and I hadn't gotten a job yet in New York and I hadn't

8    found an apartment yet in New York.  So, like, when in your

9    life do you have kind of five weeks where you don't have to

10   also pay rent, you know, while you're staying somewhere else?

11   Because it was going to be in upstate New York.

12           So I wasn't going to have to pay for going to this

13   camp and -- or this program and pay for my rent at the same

14   time, and it just kinda like worked out really well.  So I

15   thought, great.  Like, what a cool way to start really, like,

16   digging into acting in New York would be to, like, go to this

17   psychology and acting program.  And then right when it was

18   done, move into New York City.

19   Q    So the program was five weeks long, is that right?

20   A    Yes.

21

22           (Continued on the following page.)

23

24

25

Nicole - Direct - Penza                              3815

1    BY MS. PENZA (Continuing):

2    Q    And how much did it cost?

3    A    It was, again, 8,000.  And then if you signed up within a

4    certain amount of time, it was 6,000.

5    Q    And how did you pay for that?

6    A    I borrowed the money from my mom and dad.

7    Q    Did you eventually pay them back?

8    A    Yes, although I'm still paying them back for certain

9    things.  They've helped me a lot.

10   Q    Now, when you were -- where was -- you said it was held

11   in Upstate New York?

12   A    Yes.

13   Q    Do you remember the town that it was held in?

14   A    Albany.

15   Q    So, it was in Albany.

16        And had you been to Albany before?

17   A    No.

18   Q    Who taught The Source class?

19   A    Allison Mack.

20   Q    And had you met her before then?

21   A    I had not, no.

22   Q    Where were you staying while you were taking The Source?

23   A    So, The Source was in, like, a little building that was

24   kind of separated from everything else, sort of in the middle

25   of nowhere, and there were four rooms and a kitchen underneath

Nicole - Direct - Penza                    3816

1  it. So, it kind of looked like a ballet studio and then

2  underneath was, like, four rooms and a kitchen. So, I slept

3  down there.

4  Q    Did you have a car with you?

5  A    I did not.

6  Q    Was it difficult to do anything other than be in --

7  A    Yeah, I didn't realize, like, quite how isolated it would

8  be. Like, there wasn't a grocery store you could walk to. I

9  mean, you couldn't do anything except run, which I did; like

10 not like "run," but, yes, exercise run, running.

11 Q    So, what did you do?

12      Just generally, what would your days be like while

13 taking the five-week Source?

14 A    So, I thought it was going to be, like, all day. That's

15 sort of how prior things like this I had been to, you had

16 classes, like, all day long. In this, it ended up only being

17 the afternoon. They had, like, a different course going on in

18 the morning.

19      So, we would go from, like, noon 'til four or five,

20 and then we might have some homework and stuff. So, in the

21 mornings, I would journal or think about kind of what I wanted

22 my life in New York City to look like or I'd go on a run and

23 go to class in the afternoon.

24 Q    So, this was during The Source, this was the first time

25 you met Allison Mack?

LAM        OCR        RPR

1    A    Yes.

2    Q    What did you think of her?

3    A    I thought she was really passionate about The Source.

4    She was nice and she just seemed, like, very -- The Source

5    seemed like her baby.  And she was, like -- and she was very

6    passionate.  She seemed like she was a very passionate

7    actress.

8           Obviously, she had been on this television show for

9    ten years, but she was really interested in stage as well.  We

10   talked about Shakespeare sometimes.  But she just seemed like

11   a serious actress, or she wanted to be; whether or not she was

12   taken seriously yet she wanted to be a serious actor.

13   Q    Was Keith Raniere mentioned during The Source?

14   A    Yeah.  He taught most of the videos.

15   Q    At this point in time, had you met Keith Raniere?

16   A    No.

17   Q    Would you later meet Keith Raniere?

18   A    Yes.

19   Q    Do you see Keith Raniere in the courtroom today?

20   A    Yes.

21   Q    Can you identify him by an article of clothing?

22   A    Blue button-up.

23          MS. PENZA:  Your Honor, I'd ask that it be noted

24   that the witness has identified the Defendant.

25          THE COURT:  Yes, the witness has identified the

1    Defendant.

2            MS. PENZA:  Thank you, your Honor.

3    Q    Had Keith Raniere been mentioned in the first class that

4    you took as well?

5    A    The first five-day?

6    Q    Yes?

7    A    Yes.

8    Q    So, when you're taking -- Mark Hildreth, before you took

9    it, before you took The Source, told you that The Source had

10   nothing to do with NXIVM, ESP.

11           Did you come to learn that that wasn't true?

12   A    Yeah, yeah, I don't -- I don't know that he said it had

13   nothing to do with it, it was just, like, a different program.

14   Yeah, it was a different program that they were working on.

15   Q    Was there a lot -- during The Source, you said that the

16   Defendant appeared in a number of videos.

17   A    Uh-huh.

18           THE COURT:  You have to say yes or no.

19           THE WITNESS:  Sorry.

20   A    Yes.

21   Q    Now, during the -- while you were taking The Source, did

22   you have any impressions of Allison Mack's relationship to the

23   Defendant?

24   A    Yeah, they seemed very close.  Like, he had kind of

25   mentored her in creating The Source, is the impression I got

Nicole - Direct - Penza                          3819

1   at that time.

2   Q    Would Allison Mack talk about the Defendant during The

3   Source?

4   A    Yeah, a lot.

5   Q    Can you just kind of describe a little bit what that was

6   like?

7   A    Just about how they had created together -- I mean, he's

8   in all The Source videos, which are what we would discuss in

9   class, and she would just talk about -- you know, like, for

10  The Source, he was referred to as Mr. Raniere.  So, she would

11  be Mr. Raniere said this and Mr. Raniere kind of helped us

12  come up with this.

13       It was a few actors that had worked with him to make

14  The Source, was my understanding, or build The Source.

15  Q    I think earlier on you mentioned that at some point you

16  noted that there was an idolization of the Defendant.

17  A    That became the most clear to me when I was at the first

18  V-Week.  Before that, it just -- it didn't register to me as

19  much until the first V-Week.

20  Q    So, we'll talk about that in a minute.

21       Did you spend any time socially with Allison Mack

22  during The Source?

23  A    Not really.  She was just -- she was more like the

24  teacher.  I met, like, a few other people in Albany, but I

25  didn't really hang out with Allison outside of classes.

Nicole - Direct - Penza                    3820

1    Q    Now, after you finished The Source, did you move down to
2    the city?
3    A    I did.
4    Q    And can you tell us a little bit about what your life was
5    like when you moved down?
6    A    Yeah.  So, for the first three weeks, three, three and a
7    half weeks, I slept on a couch while I was trying to find an
8    apartment.  And that was -- you know, it's exciting because
9    you're in New York City, but it's also really hard to sleep on
10   a couch for three and a half weeks and I sort of overestimated
11   my ability to do that.
12   Q    Did you end up finding a job?
13   A    Yeah.  So, then the whole time I was doing that, I was
14   just looking for a job.  And, yeah, I ended up finding a
15   restaurant job waiting tables.
16   Q    How was the audition scene in New York?
17   A    It was different than I had anticipated.
18   Q    How so?
19   A    Well, like, in LA you could go to as many as, like, three
20   different commercial auditions in one day.  And sometimes it
21   would be slower, but there's just a lot going on commercially
22   in Los Angeles.
23            And in New York, it was -- I just would have, like,
24   maybe one audition a week.  And I was kind of asking people is
25   this just how it is in New York?  And they were like, well,

Nicole - Direct - Penza                              3821

1   it's -- yeah, it's just not as busy commercially in New York,

2   which was kind of a bummer in that a lot of the commercial

3   jobs in New York are nonunion, which is also a bummer because

4   that is -- you just make a lot less money, so...

5   Q    Now, was there also -- did anything also happen with the

6   agency that you had been involved with in LA?

7   A    Yeah.  So, my agency in LA, which is a phenomenal

8   commercial agency in LA, they opened their office in New York,

9   and then, like, the main commercial agent decided that she

10  didn't want to do it and moved back to Texas.  And I was like,

11  okay.  And then they decided that maybe, like, commercially in

12  New York wasn't the best, so they started just doing musical

13  theater.

14            So, now that company still does commercials and

15  everything in Los Angeles, but they only do musical theater in

16  stage productions in New York, which didn't really help me

17  because I wasn't pursuing musical theater.

18  Q    Now, while you were in New York, did you keep in touch

19  with Allison Mack?

20  A    I did.

21  Q    And how did that happen?

22  A    So, part of what was pitched to me about The Source by

23  Mark -- and I remember because I was -- I told my parents

24  because I was excited about this possibility -- was like,

25  okay, so what Mr. Raniere had been trying to create was this

Nicole - Direct - Penza                    3822

1  acting program that mixed psychology and acting and that,

2  also, it could be something that you could teach while you

3  were pursuing your career.  So, like, basically taking the

4  place of waiting tables.  Like, I would be teaching acting and

5  auditioning and doing jobs simultaneously, which sounded

6  really cool to me.  Then you get to be, like, not only working

7  on your craft but helping other people and not have to wait

8  tables anymore.

9  Q    So, it was pitched as a way to make money?

10 A    Yes, sorry, it was pitched as a way to make money.

11        Allison had talked to me about that as well.  So, we

12 had stayed in contact concerning, like, the ongoing program of

13 The Source and, like, possibly doing that.

14 Q    And, so, did you continue doing work with The Source once

15 you were in the city?

16 A    I did.

17 Q    In what respect?

18 A    We had, like, a weekly class.

19 Q    And were you just taking those classes or at that point

20 were you --

21        At that point, you were not teaching?

22 A    No, just taking.

23 Q    Just before I move on, was there also this idea, was

24 there ever a discussion from Mark Hildreth that taking The

25 Source would give you a sense of community in New York?

Nicole - Direct - Penza                    3823

1    A    Yeah.  Allison and Mark were really big on that when I

2    first moved, like, You're so lucky because now you have, like,

3    a built-in community when you get to New York.  Like, you

4    won't be -- you'll know people.  And, so, we're going to

5    introduce you to people in the New York center.

6              And so that was very, very big on that, like, that I

7    would have a community in New York already.

8    Q    Moving to August 2015, did you attend V-Week that year?

9    A    Yes, I did.

10   Q    Had you ever attended a V-Week before?

11   A    No.

12   Q    Did you pay for that?

13   A    Yes, I did.

14   Q    About how much was that?

15   A    I can't exactly remember.  I think it was somewhere

16   between $1,800 and $2,200, would be my guess.

17   Q    Now, how did you end up attending V-Week 2015?

18   A    Allison had said -- Allison and Mark had told me that

19   there was to be Source things going on at V-Week and, so, I

20   could, like -- during V-Week, I could take a Source class with

21   other actors and meet people and meet more of the ESP

22   community.  And, also, it was in Upstate New York by a lake, I

23   think it's called lake George, and it reminded me of home.

24   Q    Who did you room with at V-Week 2015?

25   A    So, Allison ended up messaging me that her and Rebecca

Nicole - Direct - Penza                      3824

1   were getting, like, a three-person room and would I like to go

2   in on that with them, which I think would have been cheaper

3   than me paying for my own private room, so I said yeah, sure.

4   Q     And, so, Allison set up the rooms?

5   A     Yeah.

6   Q     Where did you actually physically sleep?

7   A     There were only two beds, so I slept in the same bed as

8   Allison.

9   Q     Did it seem -- at that point, did it seem strange to you

10  that you were sharing a bed with Allison?

11  A     I mean, I didn't know her that well, but I don't know, I

12  had to -- you know, there's five people in my family, so

13  someone's got to share something with someone if you're only

14  getting one hotel room.  I could sleep on the floor or, like,

15  I wasn't really big on -- I can sleep anywhere, so fine.

16  Q     During V-Week, did you have any conversations with

17  Allison?

18  A     Yeah, I mean, a few different ones while we were all in

19  the same room, her, Rebecca, and I.

20        But one day she brought up that she had -- that she

21  was part of this really cool women's mentorship where, like, a

22  woman mentors another woman.  And it was just that it was this

23  really cool thing for, like, women who wanted to be serious

24  about being strong women, and she thought that I might be

25  interested in it.  And that's all she was going to tell me

LAM      OCR      RPR

Nicole - Direct - Penza                    3825

1   because it was kind of a new thing, but -- that's all she was

2   going to tell me.

3   Q    Did she actually use, like, a specific phrase?

4   A    Like, I'm just going to, like, plant that seed in your

5   mind, but that's all I'm going to say for now.

6   Q    Did it plant a seed in your mind?

7   A    Yeah.  I thought cool, like, well -- yeah, being mentored

8   by another woman, being mentored by anyone is I think, in my

9   mind at that time, was a privilege.  I mean, that's the whole

10  point of a mentorship, that they help you -- they help you.

11  Q    In particular, given what you were doing or seeking to do

12  for a living at that point in time, did the fact that Allison

13  Mack was proposing this mentorship idea have special

14  significance?

15  A    Yeah, I mean, I think I looked up to her because, you

16  know, she had a lot of discipline and she had gotten to a

17  certain level in her career and had a certain amount of

18  success in her career but also was, like, very serious about

19  becoming a great actress.  And that was what I cared so much

20  about.  Like, I didn't want to just be an actress, I wanted to

21  be great at it.

22          And, so, yeah, she had kind of taken on the role of

23  mentoring me in The Source already, so I thought, well, that

24  would be really cool.

25  Q    Now, while you were rooming with Allison and Rebecca at

Nicole - Direct - Penza                    3826

1   V-Week 2015, did you observe anything that seemed unusual to
2   you?
3   A    Just there was a lot of, like, drills going on, people
4   running in and out of the room at night.  It was really hard
5   to sleep.
6   Q    What do you mean by that?
7   A    Well, I don't really even understand what was going on
8   because I was never part of -- there's, like, another course
9   called SOP Complete, and they were having kind of -- I don't
10  know.  I don't know if there was readiness or something along
11  those lines, but they were doing some type of drills that
12  people would be running in and out of the room and -- I don't
13  know.
14  Q    In the middle of the night?
15  A    Yeah.
16  Q    Did individuals actually have alarms set to wake up?
17  A    Yeah.
18        I always felt like Rebecca was so exhausted with
19  everything she was trying to do that she would set her alarm
20  and then sleep through it.  And it would be going on and on
21  for, like, 15 minutes.  And you're trying to sleep and you're,
22  like, okay, I don't know this person well enough to be, like,
23  yo, wake up or, like, to actually turn off her alarm.  So, I
24  would just kind of be like, okay, just try to go back to
25  sleep, just try to go back to sleep.

Nicole - Direct - Penza                    3827

1              But it was very -- yeah.

2    Q    Were you able to observe anything about Allison's diet?

3    A    Not really then.  It was -- that was more during the

4    first Source.

5              But she did bring all her own food to V-Week.

6    Q    Did she mention how many calories she was eating a day?

7    A    Yeah, I think at that point it was 500.

8    Q    Did you find it surprising that she was eating

9    500-calories a day?

10   A    She seemed really intense about, like, what she was

11   doing, so you just kind of, like, backed off of it.

12             It was she was eating 500 calories a day, she would

13   make her salads during The Source, like, at lunchtime, and she

14   was training for a half-marathon or marathon, I don't remember

15   which.  She was just -- yeah, I thought it was a little

16   intense, but she seemed serious about it so I didn't really

17   question it.

18   Q    At that point in time, did you know anything about

19   whether Allison had a sexual relationship with the Defendant?

20   A    No.

21   Q    Later on, and we can talk about it more later, but did

22   you come to realize that she did have a sexual relationship

23   with the Defendant?

24   A    Yes.

25   Q    How about Rebecca?

LAM      OCR      RPR

Nicole - Direct - Penza                              3828

1   A    Same.  Like, at that point, no, but later on, yes.

2   Q    Later on you learned that she also had a sexual

3   relationship with the Defendant?

4   A    Yes.

5   Q    Now, did you meet the Defendant at V-Week 2015?

6   A    No.

7   Q    What was your impression of the way Keith Raniere was

8   treated at V-Week 2015?

9   A    Well, this was the first time that it really kind of

10  struck me as being -- "odd," I guess is the best word.  But it

11  just seemed like they very much put him on a pedestal and

12  idolized him.

13          And I just -- maybe it was because we were at V-Week

14  and it's, like, ten days that are dedicated to his birthday

15  and you would go into these, like -- they weren't seminars,

16  but they kind of had meetings, during V-Week they had meetings

17  where Nancy Salzman would speak, and she would always refer to

18  Keith as the smartest man in the world, which, like, I just

19  kind of -- it just strikes me as weird because how would you

20  know who the smartest man in the world is?  And anyone who

21  says that -- it just sounds like bullshit to me.

22          THE WITNESS:  Sorry.

23  A    Because how do you know?  You might not know someone

24  who's really smart in the world.  It just seems like a very

25  arrogant thing to say.

LAM        OCR        RPR

Nicole - Direct - Penza                        3829

1          THE COURT:  Next question, please.

2    Q    Did you end up looking up whether he was --

3    A    Yeah, I Googled it.  He wasn't on there.

4    Q    But now do you actually -- do you have any memory of

5    actually --

6          You didn't actually meet the Defendant at V-Week?

7    A    No.  I don't even remember seeing him.

8    Q    Did you become close with anyone else at V-Week 2015?

9    A    Yeah.  That's where I became good friends with Emiliano.

10   Q    And who introduced you to Emiliano?

11   A    Mark did.

12   Q    Tell us a little bit, just briefly, about the development

13   of your friendship over V-Week 2015.

14   A    Well, Emi really liked to run as well.  I think we

15   started, like, just kind of running in the morning and

16   chatting.  I don't know, it started out as a conversation, and

17   then we went on a run, and he asked me -- there's, like, a 5K

18   that's done at V-Week.  They have a little 5K race, and I --

19   Emi was like, Why don't you run the 5K?

20         I was like, I don't race.

21         He's like, It's the same as if we would do a

22   three-mile run.

23         So I was like, Okay, I guess.

24         So, we ran the 5K.

25   Q    How did you do in the 5K?

LAM        OCR        RPR

Nicole - Direct - Penza                    3830

1  A    Good.  I got first for girls -- women.

2  Q    How did other people react to you getting first?

3  A    Fine.  I just remember, like, a couple of, like, guys

4  that I knew being, like, I can't believe you beat us.

5        Sorry.

6  Q    So, the men and the women ran at the same time?

7  A    Yeah, but, also, there was a triathlon going on at the

8  same time.  There was a lot of things going on.

9        And Emi barely beat me and he was like -- I wish I

10  would have beat him.

11  Q    During that time, did you express any concerns to Emi

12  about what you were seeing at V-Week 2015?

13  A    Yeah.  I just I kind of told him one day when we were

14  running, I don't know, it seems a little weird to me.  Like,

15  I'm not -- I don't really like situations where someone is

16  idolized.  It just feels weird.

17        And he said, Yeah, but, you know, Keith doesn't want

18  that.  That's not what he's looking for.  Like, people project

19  that on to him.  And, you know, sometimes people just want to

20  believe in something more.

21        Okay, but -- yeah, he was, like, Sometimes people

22  just want to believe in something more and sometimes people

23  project those things on to Keith.  And it's not something that

24  he wants, but it's just something that happens.

25        And he also said that I didn't need to worry about

Nicole - Direct - Penza                                    3831

1   it because -- I really wasn't that involved in the ESP

2   community, but he was, like, It's not like you have to.

3            I was like, Okay, fair enough.

4   Q    Did that conversation have any impact on you?

5   A    Absolutely.  I really trusted -- I trusted Emiliano's

6   guidance.  I mean, he obviously comes from a respectable

7   family, but he's like super -- he's very smart, he's

8   well-educated, he went to Harvard.  He's not an idiot.  And we

9   formed a good friendship, so I trusted him.

10           And I thought, Okay, like, you know, you really look

11  up to this person but don't idolize him as far as I could

12  tell, so okay.

13  Q    All right.  So, turning -- moving on from August 2015,

14  did you end up taking additional curriculum for The Source?

15  A    Yes.

16  Q    When was that?

17  A    The next October.

18  Q    So, October 2015.

19  A    Yes.

20  Q    And what was the point of taking that course in October?

21  A    So, if I took the course again and also took the Teachers

22  in Training part of the course, then it would be, like,

23  partway to becoming certified to teach.

24  Q    And that's -- before, when we talked about this pitch of

25  you can teach The Source and continue doing your auditions,

LAM        OCR        RPR

Nicole - Direct - Penza                      3832

1   this is something you would need to do in order to have that?

2   A    Yes.

3   Q    So, you would need to take this program in order to

4   actually make money teaching The Source?

5   A    Yes, yes.

6   Q    And, so, who -- did anyone in particular encourage you to

7   take it?

8   A    Allison, yeah.

9   Q    And what did she say?

10  A    Well, again, she was -- what felt like, to me, was she

11  was mentoring me a bit in becoming a teacher and this was

12  going to be like a really great group of people that were

13  coming up for the October training, and, so, it would be a

14  good time for me to retake it.  And they had someone that

15  wasn't her that was teaching the Teachers in Training part.

16  Q    And how much was it going to cost?

17  A    So, to redo the course was supposed to be half-price, and

18  then also the Teachers in Training, the, like, extra Teachers

19  in Training part was another thousand dollars.  So, at first I

20  thought that the -- because my course had been $6,000 at

21  first, I thought it was going to be $3,000, then maybe plus

22  the extra thousand.  But they had raised the prices, so now it

23  ended up that it was going to be $6,000.

24

25            (Continued on the following page.)

Nicole - direct - Penza                    3833

1   DIRECT EXAMINATION

2   BY MS. PENZA:  (Continuing)

3   Q    So had they raised the price to $10,000?

4   A    Yes.

5   Q    And, so, this would have been half --

6   A    Half price, plus the $1,000, yeah, so 6,000.

7   Q    How did you pay for that?

8   A    I paid for 2,000 and Allison lent me -- Allison said she

9   would lend me the rest, which was $4,000.

10  Q    Did you eventually pay her back for that?

11  A    Absolutely.

12  Q    Was this a lot of money for you at the time?

13  A    Yes.

14  Q    Were you told -- did Allison tell you how much you'd make

15  teaching The Source if you became certified?

16  A    Yeah.  So, I believe that it was you would make 50

17  percent of every student that was in the course, which, like,

18  if it's $10,000 per student, which, you know, I thought was

19  very expensive, like way too expensive, if that's the case, it

20  is $5,000 per student.  So you could make a decent amount of

21  money if you had like good groups of people.

22  Q    Did you -- did you have concerns about the financial

23  viability of The Source?

24  A    Yeah.  Well, I remember talking about some of the

25  concerns with my mom and dad because, you know, I think my dad

Nicole - direct - Penza                                3834

1  asked me well, are you responsible for finding all these

2  students, like how exactly does this all work?  And, also, for

3  me personally, $10,000 -- well, $10,000 is a lot of money.

4  And when you're trying to pitch to actors that don't have a

5  lot of money, that's -- you know, not that actors don't have a

6  lot of money.  Actors are kind of in two different places:

7  They're either doing really well and they have money or

8  they're struggle and they're barely making it work and working

9  from job to job.  So $10,000 can be a lot of money for the

10 type of person that, like, I'm around that I would be pitching

11 it to.

12 Q   Did you discuss those specific concerns about Allison?

13 A   Yes.

14 Q   And what did she say?

15 A   Well, there was a few different answers that I got at

16 different times.  But one would be like people make things

17 work when they want to make it work or how valuable has it

18 been to you, is it worth that much money?

19       They were working on kind of setting up an ongoing

20 version.  So instead of $10,000 for -- I think it was like

21 only three weeks at that point, then it would be like $400 a

22 month, which is not too different from a normal acting class.

23 Q   Did Allison also specifically talk to you about teaching

24 you how to enroll other people?

25 A   Yeah, they say they help you.  They have classes or they

Nicole - direct - Penza                    3835

1   help you to like learn how to enroll people so that you would

2   have students to teach.

3   Q    So how long was the October 2015 class?

4   A    It was four weeks, but because of work I could only go up

5   there for three.

6   Q    And who taught that course?

7   A    Allison taught it again.  And I think that Mark helped,

8   was like an assistant teacher.  It was either that one or the

9   one after.  I don't remember.

10  Q    And did you end up staying in the same place you had

11  stayed for the first time you took the course?

12  A    I did.  It was the cheapest option.  But I stayed under

13  the -- in like the basement house area, but in a different

14  room.

15  Q    During that course, did you end up having a conversation

16  with Allison Mack about life?

17  A    Yeah.  One day we -- she asked me if I wanted to go on a

18  walk and we went walking.  It was like October.  So it was

19  fall.  So we were like walking through the leaves and there

20  was like one road around this area.  So we were walking down

21  the road and she was kind of just asking me like what I wanted

22  in my life and how much I cared about growth and questions

23  like at that.

24  Q    Okay.  And did she ask you anything about your desire to

25  have a family?

MDL        RPR        CRR        CSR

Nicole - direct - Penza                    3836

1    A    Yeah.  She asked me if I wanted to have a family some day

2    and I said absolutely.  She asked me about how much my family

3    meant to me, which is obviously a lot.  My family means a lot

4    to me.  And then she asked me if I was willing to like -- I

5    don't remember how she phrased it exactly, but willing to let

6    go of my attachment to my family or push hard enough to let go

7    of my attachment to having a family.

8    Q    And what did you say?

9    A    No.  Why?  Like, why would I need to do that?

10   Q    So as of October 2015, how were you doing in New York?

11   A    I mean, okay.  Not great.  Like I kept telling myself

12   that things take time.  You know, I lived in Los Angeles a

13   long time.  Sometimes it takes time to build a life in a new

14   city.  But it was -- I was working really long hours at the

15   restaurant.  I was working and like -- and just barely being

16   able to pay my bills and my commercial agents were obviously

17   not -- everything was falling apart there.  So, you know, I

18   was like -- I liked being in New York, but sometimes I would

19   be just like what did I do.

20   Q    Did things start to worsen for you?

21   A    Yeah.  In January and February, it was really hard.

22   Because it -- I mean, it was my first winter in New York, so I

23   think there were just like a lot of things going on.  Sorry.

24   So there were -- there was a lot going on.  I would -- winter

25   can be tough.  People don't go out to eat at restaurants as

Nicole - direct - Penza                    3837

1  much, so you're not making as much as money.  And I was just

2  feeling really lonely and unsure of how to move forward with

3  my career in New York and just kind of, like, thinking about

4  everything that I left behind in L.A. and being like why?  Why

5  did you do this?  What were you thinking?

6  Q    So drawing your attention to February 2016, can you

7  describe what your mental state was like at that time?

8  A    Yeah, I -- I was really depressed.  I -- up until that

9  point I don't think I had -- I didn't really know what to do.

10  I was so depressed.  I was really struggling.

11  Q    At some point around then, did you consider yourself

12  suicidal?

13  A    Yes.  Yes.

14  Q    Did you discuss that with anybody?

15  A    But I think it was -- yeah, also more just -- I don't

16  know.  I was just in a lot of pain.

17  Q    Did you discuss that pain with anyone?

18  A    Yeah, I sent Allison an e-mail.  I mean, yeah, I sent

19  Allison an e-mail saying that I was -- I think I said I was

20  suicidal, but I was calm because I didn't think that that was

21  really what I wanted to do.  I just wanted to know that I had

22  a way out.  I mean, yeah.  It's not really something I wanted

23  to do.  It's just I was feeling like really low.

24          MS. PENZA:  Your Honor, I think if we want to take

25  an afternoon break, I think this is a good time.

1           THE COURT:  We will take a break now.  All rise for

2    the jury.

3           (Jury enters the courtroom.)

4           THE COURT:  The witness may stand down.

5           (Witness steps down.)

6           THE COURT:  Anything before we take the break?

7           MS. PENZA:  No, Your Honor.

8           THE COURT:  All right.  We will take a 10-minute

9    break.

10          (Recess taken.)

11          THE COURT:  Bring in the witness, please.

12          MR. LESKO:  We have a very minor issue, but I don't

13   think -- it's not really an issue.  We just wanted some

14   guidance.

15          THE COURT:  Can we do it in the open?

16          MR. LESKO:  In the open.

17          THE COURT:  Let's wait for everyone to be here.

18   Okay.  All right.  Yes.  You may be seated in the back.

19          We have an issue.

20          MR. LESKO:  Your Honor, we are trying to predict

21   tomorrow's schedule.  I think it is highly likely that Nicole

22   will remain on the stand throughout the day.  We have a

23   witness who will be the next witness who will have to come in

24   from out of town tonight to be ready in case we have a few

25   minutes at the end of tomorrow.  We would prefer not to have

Nicole - direct - Penza                           3839

 1   that witness travel to the city for that purpose because it
 2   would be unlikely he would be called.  I have raised this with
 3   the defense.  I just wanted to raise it with the Court because
 4   if Nicole goes quickly, we may have a few minutes of extra
 5   time at the end of the day and I wanted to get some guidance
 6   from the Court as to how you wanted to handle that.
 7             MR. AGNIFILO:  So what I believe to be the case is
 8   the Government believes they will have Nicole on direct
 9   through lunch tomorrow.
10             THE COURT:  Right.
11             MR. AGNIFILO:  If that ends up being the case, I
12   would think I would come close to finishing the day on cross.
13   Now, I could come up 20 minutes short or a half hour short.
14             THE COURT:  That's fine.  We are not going to worry
15   about that.  Let me understand this, how long is your next
16   witness?
17             MR. LESKO:  Less than an hour.
18             THE COURT:  I don't want to take a chance.  Why
19   don't we plan on that witness being here on Monday morning if
20   that's the case.  If we adjourn 20 minutes early or half an
21   hour early, we can't stay past 5:00 because the jury doesn't
22   want to stay past 5:00, so I think that resolves the issue
23   really.  Thank you for letting me know.
24             MR. LESKO:  Thank you.
25             MR. AGNIFILO:  Thank you, Judge.

Nicole - direct - Penza                    3840

1          THE COURT:  Let's put on the witness, please.

2          (Witness takes the stand.)

3          (Jury enters the courtroom.)

4          THE COURT:  All right.  Please be seated, everyone.

5    I think I covered this at the beginning of the trial, but just

6    let me make mention of it, if anyone on the jury or counsel's

7    table or the witness needs to take a bathroom break while we

8    are not taking a break, just raise your hand, the person can

9    leave and come back and we will wait.  We don't want anyone to

10   be uncomfortable.  We want you to be concentrating on the

11   case.  Just let us know.  Mr. Reccoppa, my clerk, Mr. Haddad,

12   and I will try to keep an eye on things.  Also, if anyone

13   notices that, just let me know.

14          All right.  You may continue your examination of the

15   witness.  The witness is reminded that she is still under

16   oath.

17          MS. PENZA:  Thank you, Your Honor.

18          May I have the ELMO just for the witness?

19          THE COURT:  Sure.  One moment, please.

20          Okay.

21   Q    Nicole, I'm showing you what has been marked for

22   identification as Government Exhibit 651.  Are you familiar

23   with this document?

24   A    Yes.

25   Q    And is this an e-mail that you sent to Allison Mack on

Nicole - direct - Penza                    3841

1    February 10, 2016 at 1:19 a.m.?

2    A    Yes.

3              MS. PENZA:  Your Honor, the Government offers

4    Government Exhibit 651 into evidence.

5              MR. AGNIFILO:  We have no objection.

6              THE COURT:  Government Exhibit 651 is received in

7    evidence.  Published to the jury.

8              MS. PENZA:  Thank you, Your Honor.

9              (Government's Exhibit 651 received in evidence.)

10             (Exhibit published.)

11   Q    Nicole, can you -- I guess let's start at the top.  So

12   the subject line of this e-mail is dancing in the dark; is

13   that right?

14   A    Yes.

15   Q    How do you come up with the titles for your e-mails?

16   A    I just kind of like to entertain myself with how I title

17   my e-mails.  So, usually, like, they have some kind of

18   reference to what's going on.  But I also just like to be

19   creative.  So, my guess in here would be that I was feeling

20   pretty dark but, like, trying to somehow make light of it.

21   Q    Is it fair to say that if we look at other ones of your

22   e-mails we will see like --

23   A    Yeah.  Yes, like every e-mail.

24   Q    -- has like different turns of phrase in the subject

25   line?

MDL        RPR        CRR        CSR

Nicole - direct - Penza                    3842

1    A    Yeah.

2    Q    And it is from you and your e-mail address is redacted;

3    is that right?

4    A    Yes.

5    Q    And it is to Allison Mack?

6    A    Yes.

7    Q    And is that Allison Mack's e-mail address?

8    A    Yes.

9    Q    Scout82@gmail.com?

10   A    Yes.

11   Q    Now, looking at this document, there appears to be two

12   sections.  It says Source journal and personal journal.  Can

13   you explain what that is?

14   A    At some point Allison asked me to start journaling to her

15   about kind of what was going on, kind of for mentoring with

16   The Source, was what I thought it was for, and then she asked

17   me to start writing -- so once I started teaching Source

18   classes, she wanted me to include what went on in class that

19   day, if like -- yeah, what happened in class that day, if I

20   learned anything or noted anything, or what we worked on in

21   class.  So, the top one, it looks like it is from the day

22   before.  I usually taught classes on Tuesdays.

23   Q    Okay.  So the top part is about The Source, the acting

24   class that you're teaching?

25   A    Yes.

MDL        RPR        CRR        CSR

Nicole - direct - Penza                3843

1    Q    How do you end up writing the personal journal part two

2    to Allison Mack?  How did that end up happening?

3    A    I don't remember how it first started, but -- she asked

4    me if I wanted to start journaling to her to work on these

5    exercises.  Like, she would ask -- for a while I journaled

6    like what are you feeling?  Is it real or is it not real?  Let

7    me think about how to explain it.  She would ask me questions

8    of being like okay, if I got scared about something, to kind

9    of look at what my body was feeling and whether I really

10   needed to be scared or not, or if -- stuff like that.  That's

11   kind of how the personal journal started and then they --

12   yeah.

13   Q    So can I ask you to read from the personal journal

14   portion?

15   A    Yes.  Well, tonight was brutal.  I haven't felt this low

16   in a very long time.  I haven't felt suicidal like this in a

17   long time.  It hurt and I was scared.  But I was also oddly

18   calm about it.  Be calm about -- oh, I guess I should have

19   said being.  Be calm about suicide scared me in a way as well.

20   But I guess knowing that it was an option felt nice.  Not

21   making the option bad, but just genuinely having it as a real

22   option.

23            (Continued on next page.)

24

25

                     Nicole - direct - Penza                3844

1   EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    I'll read it.  I'll read the rest.

4         I called my brother and I cried on the sidewalk in

5   the streets of New York City for a long time.  Matthew said I

6   was having an ego-collapse.  And I think he might be right.  I

7   have no identity to hold onto at the moment.  I don't know who

8   I am or what I want.  I no longer have what defined me in LA

9   and I no longer just moved.  I even convinced myself that I

10  screwed everything up -- screwed up everything because I've

11  changed my name a few times.

12        I don't even have a name to define me.  Am I Nicole?

13  Who am I?  Who do I want to be?  Have I fucked it all up

14  already?  It's a long dark and exhausting rabbit hole to go

15  down.  I'm just tired and I'm sick of feeling this way.  I

16  have been feeling better the last few days coming out of my

17  haze, and then tonight at work I sunk even lower than I've

18  been before, than I can remember being in a very long time.

19  I'm tired.

20        Was that an accurate reflection of how you felt

21  then?

22  A    Yes.

23  Q    And you sent that to Allison Mack on February 10th, 2016?

24  A    Yeah, and I -- I remember calling my brother.

25  Q    After you -- after you sent that journal article,

                  SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                                3845

1    eventually did Allison Mack respond to you?

2    A      Yes.

3    Q      Did she respond to you on February 11th, 2016?

4    A      I think so.  The next day.

5    Q      How did she respond?

6    A      She said that she was -- that she was sorry she hadn't

7    been more, like, attentive, I think, and that she wanted to

8    make time for me.  And she was going to come down to New York

9    City.

10   Q      And did she come down to New York City?

11   A      Yeah, I mean -- I think she was already coming down for

12   an audition, but she was just gonna make time to, like, check

13   in.

14   Q      Was that basically on February 12th?

15   A      Yeah, it was like the next day.

16   Q      And so what happened when she -- where did you meet when

17   she came down?

18   A      We met at the Ace Hotel in Manhattan.

19   Q      At this point in time, where were you living?

20   A      I was living in Brooklyn.

21   Q      So what happened when you met at the Ace Hotel?

22   A      She told me about this -- she brought up the Women's

23   Organization -- the mentorship again, the Women's

24   Organization, and she said it was -- she had this -- sorry.

25   She said that she had something that she thought would fix how

Nicole - direct - Penza                    3846

1    I was feeling; that that mentorship that she had mentioned to

2    me before was this really cool thing and that it would make

3    everything better.  That it was -- it was gonna make me feel

4    better.  It would be -- it would be exactly what would help me

5    get out of where I was mentally right then.

6    Q    How did it -- how did it make you feel when she said that

7    to you?

8    A    Hopeful.

9    Q    So what else did she tell you?

10   A    She said that if I wanted to get more information on this

11   mentorship, that I had to provide collateral.

12   Q    Did she -- we'll talk about collateral in a second.

13        Did she mention anything about this -- during that

14   conversation, did she ever mention anything about the

15   structure of the mentorship?

16   A    Yeah, so she said it was, like, a woman would be above

17   you that would mentor you and then eventually you would have

18   a, like, mentee, and you would mentor someone underneath you

19   as well.  So, yeah.

20   Q    Was that appealing to you?

21   A    Yeah, because -- yeah.  Again, I -- I always thought it

22   would be cool to have a mentor, especially, you know, in

23   acting.  And also, I really enjoy working with people and, you

24   know, if someone helps me get somewhere, I absolutely would

25   want to repay that and help somebody else.  I mean that's --

Nicole - direct - Penza                    3847

1    yeah.

2    Q    Did she say anything about whether this organization had

3    anything to do with NXIVM?

4    A    She said it did not have anything to do with NXIVM.

5    Q    Was she clear about it being a group of women?

6    A    Yeah, absolutely.

7    Q    Now, you said she mentioned collateral.

8              What did she say about collateral during that

9    meeting?

10   A    She said that to find out more information, there was

11   like a -- a secrecy quality to -- to the women's group.  And

12   so to find out more information, I needed to provide

13   collateral.

14   Q    Had you heard the term "collateral" before?

15   A    No -- I mean, maybe I've heard it in passing, but I did

16   not understand.  Like, I didn't know what she meant.

17   Q    Did she explain it -- did she -- did she give you an

18   explanation?

19   A    Yes.

20   Q    What did she say?

21   A    So I think I asked what the collateral was for, and she

22   said it was for, like, saying that you wouldn't speak about

23   what you heard.  So then the collateral was supposed to -- to,

24   like, stand for your word.

25              So, basically, like you would give someone, like,

Nicole - direct - Penza                    3848

```
 1   the deed to your house or your car and if you broke your word
 2   they would get your house or your car was what I understood
 3   that to be.
 4   Q    At that point in time, did you have a house or a car?
 5   A    No.  No.
 6   Q    Did you discuss that with Allison?
 7   A    Yes.
 8   Q    And so did she say you could give something else?
 9   A    Yes.  She said that I could -- she said that I could make
10   a, like, video, like sort of like a sexual video, or write
11   letters that -- that would hurt my family.
12   Q    How did you react when she suggested this?
13   A    I -- I don't think I -- I didn't quite know how to react,
14   at first, because it sounds -- it sounded intense.  But she
15   was just like, this is -- it's such a cool program and it's
16   such a cool thing and I really think that it is exactly what
17   you need right now.  And so, I think I said -- I think I said
18   I would think about it -- or think about the collateral.
19   Q    Now this conversation you're having with Allison, this is
20   two days after the e-mail that we just looked at?
21   A    Yes.
22   Q    Did you end up moving forward with providing collateral?
23   A    Yes.
24   Q    Looking back, why do you think you were willing to do
25   that?
```

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                              3849

1  A    I think because I wanted to -- I wanted something to be

2  hopeful for and I thought that maybe what she was talking

3  about would -- would be what I -- what would help.

4       Looking back, it's -- I don't think I was thinking

5  rationally because -- yeah, I don't think I was thinking very

6  rationally.

7  Q    At that point, did you feel that you could trust your own

8  decision-making process?

9  A    No.  I think I said that in an e-mail that I just, like,

10 didn't know.  I was so up and down that I was, like -- yeah, I

11 was not thinking very rationally.

12 Q    At that point in time, did you feel that you could trust

13 Allison?

14 A    Yeah.  She had been -- she had been mentoring me in The

15 Source for a while now, like -- in a way.  It wasn't like a --

16 like we didn't call it a mentorship, but like she had kind of

17 been taking me under her wing and I -- I trusted her.

18 Q    So over the next few days did you prepare your

19 collateral?

20 A    Yes.

21 Q    Throughout the process, were you in communication with

22 Allison about that?

23 A    Yes.

24 Q    You were in Brooklyn at the time?

25 A    Yes, in Brooklyn.

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                              3850

1  Q    And describe the back and forth about preparing your

2  collateral?

3  A    Well, I didn't know what -- so the letters were supposed

4  to be letters that hurt your family, and you were supposed to

5  write them, but I couldn't write anything.  Like, my family

6  is -- is amazing.  Like, I love my family.  So I was having

7  trouble writing something that would -- would hurt them.

8  Like, even thinking of things.  Like what could I -- no one's

9  ever broken the law.  No one's ever done anything that, like,

10 I can put in there that's -- that would be like she explained

11 collateral to be, so I didn't really know what to do.

12 Q    And did you express that to Allison?

13 A    Yeah.

14 Q    And did Allison tell you what she had written?

15 A    Yeah.  She said you could lie and she said that she had

16 written that, like, her father had sexually abused her.

17 Q    And so was that -- did you end up writing a letter that

18 was similar to that?

19 A    Yes.

20          (Pause.)

21 A    Sorry, sorry.

22 Q    Are you okay?

23 A    Yeah, I'm okay.

24 Q    And -- are you okay?

25 A    (Nodding.)

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                                    3851

1   Q     Did you write -- did you write letters about other family

2   members as well?

3   A     Yes, yes.

4   Q     Did Allison also talk to you about doing something that

5   would ruin your career?

6   A     Yeah, she said to write a letter about one of my ex's,

7   who's like prominent in the -- in the industry and -- I mean,

8   also the sex tape would do that as well, so...

9   Q     But as to the -- as to your ex who's prominent in the

10  industry, was that specifically Allison's suggestion?

11  A     Specifically, yes.

12

13             (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Nicole - Direct - Penza                    3852

BY MS. PENZA (Continuing):

Q    Did you communicate to Allison that this was a difficult process for you?

A    Yes.

Q    And what would she say?

A    That it was an exercise in trust and that -- well, first she said no one is ever going to see any of this.

        What I said was, Why would I do this?  Like, why would I hand over something that could hurt my family even -- like, even if I never broke my word?

        Because I wasn't -- I know how strong my word is.  I wasn't going to break my word, but, like, what if someone found these letters someday and I couldn't explain that, like, they're not true?  What if, like, I died and someone found the letters and I couldn't explain that it wasn't true?

        Like, I was sort of -- I was just -- that's what I was thinking about.

        And she said, No one is ever going to see these letters.  They're going to be locked in a box and that box is going to be, like, underground and no one is ever going to see them.  Like, this is an exercise in trust.  Don't you want to be the type of person that trusts someone?

Q    In terms of the collateral, what was more difficult for you, the sex tape or the --

        I'm sorry, I want to just be clear, the tape, that

LAM      OCR      RPR

Nicole - Direct - Penza                    3853

1    was only you in the video, right?

2    A    Yeah.

3    Q    But it was sexually explicit?

4    A    Yeah.

5    Q    -- that or the letters?

6    A    Like, the letters were so much, so much harder for me.

7    Q    And have you reviewed some communications back and forth

8    between you and Allison about the collateral process?

9    A    Yeah.

10   Q    And in some of those communications, do you express kind

11   of in comparison that the sex tape portion was fun?

12   A    Yeah, I think I just -- again, I'm not sure I was

13   thinking very clearly, but I think I just said that, like,

14   making the video was kind of, like, freeing, again, under the

15   circumstances that I thought no one was ever going to see it,

16   ever.  So, that was, like, easier for me.

17            And I think I just said that I had to sort of, like,

18   separate from my body to write the letters because that was so

19   hard for me.

20   Q    Were there specific instructions about the form of the

21   letters, like how they were supposed to be?

22   A    Yeah, they had to be signed and put in an envelope and

23   addressed to wherever they would be sent to if I -- you know,

24   where they would be sent to to, like, hurt that person if I

25   broke my word.

LAM        OCR        RPR

Nicole - Direct - Penza                          3854

1   Q     This would be the way the release of the letter would

2   have some power?

3   A     Yes.

4   Q     Who were they addressed to?

5         Where was the letter about your father addressed to?

6   A     Like, the local newspaper from where I grew up.

7   Q     How about your mom?

8   A     To the people that she worked for at the art center.

9   Q     And then the letters about your ex, where were those?

10  A     I think about my ex was, like, *The LA Times*.

11  Q     Did you eventually provide your collateral to Allison?

12  A     Yes.

13  Q     How did you actually provide it?

14  A     Like, all in an envelope and I gave it to her.

15  Q     And where did you give it to her?

16  A     At the Ace Hotel again.  They have, like, a coffee shop

17  at the hotel.

18  Q     And, so, what happened after you gave it to her?

19  A     Then we went to Angelica's and --

20  Q     What's Angelica's?

21  A     It's a -- it was, it doesn't exist, actually, anymore,

22  but it was a restaurant in the East Village in New York City.

23  Q     You went to Angelica's and what happened?

24  A     She told me more about this women's empowerment group.

25  Q     And did she call it a women's empowerment group?

1   A     Yeah.

2   Q     Did she give the group a name?

3   A     Yeah.  It was called "The Vow" at the time.

4   Q     And did you know it as The Vow for a long time?

5   A     Yeah.

6   Q     Eventually, did you come to learn that it was also called

7   DOS?

8   A     Yes.

9   Q     If I use "The Vow" or "DOS," we're talking about the same

10  thing?

11  A     Yeah.  It is the same thing.

12  Q     So, what else did she tell you about this women's

13  empowerment group?

14  A     Well, some of the same stuff.  That you had, like, a

15  mentor above you and then that you had -- that you would

16  eventually mentor another woman as well, but that it was,

17  like, a very -- that it was an intense, growing kind of

18  empowerment group, where women were, like, pushing each other

19  to be, like, stronger, like, physically, mentally,

20  intellectually, so that they could live the kind of life that

21  they wanted to; either like have the career that they wanted

22  or build the business that they wanted, but that it would be a

23  group of women that was, like, making you stronger so that you

24  could live the kind of life that you wanted to.

25  Q     And did she specifically say those things, like make the

Nicole - Direct - Penza                      3856

1  career that you wanted or the business that you wanted?

2  A    Yeah, "Build the life that you want" I think is what she

3  said exactly.

4  Q    At that point, did she tell you how long the commitment

5  would be?

6  A    Yeah.  So, she said, like, that The Vow that you would

7  make to this women's organization would be a lifetime

8  commitment.

9  Q    Did she mention anything about -- did she mention any

10  other details?

11  A    She said that, like, all of the women that were involved

12  in this, and, like, there were some really amazing women

13  involved in this, like, everyone did or would have a matching

14  necklace and, like, a small, like, brand, like a tattoo.

15  Q    Did she actually use that phrase, "a small brand like a

16  tattoo"?

17  A    Yeah.

18  Q    What was your impression at that time about the brand?

19  A    That it would be like a small little, like, tattoo.  Like

20  my mom and my sister have little matching tattoos.  It's kind

21  of just what I pictured.

22  Q    So, what did you think about what Allison was telling

23  you?

24  A    The lifetime commitment was a little bit scary to me, but

25  everything else was, like, sounded good, like, interesting.

LAM      OCR      RPR

1        I don't know, as an actor, you always want to be

2   physically, mentally, and intellectually stronger.  You want

3   to play those kind of characters, you want to be that kind of

4   woman.  You want to be the kind of woman that, like, can build

5   a career that she wants or can play those kind of women on

6   screen.

7            So, it sounded -- compared to where I was at

8   mentally, yeah, it sounded pretty good.

9   Q    Did she give you a time frame in which to join?

10  A    Twenty-four hours.

11  Q    And, so, did you join?

12  A    Yes.

13  Q    How did you communicate that to Allison?

14  A    Well, again, the biggest thing that freaked me out was

15  the lifetime commitment because, like, I don't know, even in

16  marriage, it's like if you make that commitment, like, you

17  can -- I mean, just -- I take that very seriously and it kind

18  of scared me because I had -- I don't know, I just --

19  anyway...

20           So, I wanted to call her and tell her that because

21  she was back up in Albany and I was in Brooklyn.  I wanted to

22  call her and tell her that I accepted.  And she didn't pick up

23  the phone, but she texted me back and said, you know, Do you

24  have an answer?

25           And I was kind of like, Well, yeah, but I figured,

Nicole - Direct - Penza                    3858

1    like, a call was a better way to communicate a lifetime

2    commitment than a text.

3              But, yeah, so, it was over text message.

4    Q    Now, looking back, do you have a view as to why you

5    joined?

6    A    Yeah.  I think it's a couple different reasons.

7              I mean, I think at the time, like, I was really

8    looking for something to be hopeful for and something to kind

9    of, like, ground me and to, like, working towards rebuilding

10   my career, because I was just obviously, like, at such a low

11   point.

12             And I also -- you know, I think it -- it's easy as

13   an actress to just -- it's kind of like -- I wanted to be like

14   Wonder Woman, I wanted to play that role, and it's kind of

15   what it sounded to me like.  And I wanted to be mentored by

16   another actress that was trying to become a great actress as

17   well.  I thought that that would help me build that for my

18   life.  And to have, like, a group of women that helped you

19   accomplish that, it sounded good.

20             But I also think I was just at a place in my life

21   where, yeah, that sounded really good.

22             MS. PENZA:  Your Honor, may I have the Elmo just for

23   the witness, please?

24             THE COURT:  Go ahead.

25   Q    Nicole, I'm showing you what's marked for identification

LAM      OCR      RPR

Nicole - Direct - Penza                    3859

1   as Government Exhibit 657.

2          Do you see that?

3   A    Yes.

4   Q    And is this a continuation of the e-mail chain we had

5   looked at before, that was "dancing in the dark"?

6   A    Yes.

7   Q    And this is a continuation of the chain and it ends on

8   February 13, 2016 at 8:52 a.m.?

9   A    Yes.

10         MS. PENZA:  Your Honor, the Government offers

11  Government Exhibit 657 into evidence.

12         MR. AGNIFILO:  No objection.

13         THE COURT:  Government Exhibit 657 is received in

14  evidence and you may publish to the jury.

15         MS. PENZA:  Thank you.

16         (Government Exhibit 657 so marked.)

17         (Exhibit published to the jury.)

18  Q    Nicole, I'm going to start at the end of this document.

19         So, looking at the second to last page, is this the

20  e-mail that we read before?

21  A    Yeah, yes.

22  Q    So, you had sent that e-mail to Allison on February 10?

23  A    Uh-huh, yes.

24  Q    And then I'm just going to show you the second page.

25         On February 11, had you sent another journal

1    article -- I'm sorry, do you see where it says -- can you

2    see -- no, you can't.

3              Can you see where it says February 11?

4    A    Yes.

5    Q    And, so, continuing on to the next page, was that another

6    e-mail that you had sent to Allison?

7    A    Yes.

8    Q    And this was another one where you discussed your

9    depression?

10   A    Yes.

11   Q    And then February 11, Allison Mack writes back to you:  I

12   will be in New York City tomorrow.  What's your time frame?

13   We need to spend some time together.  I'm sorry I have not

14   been there for you.  Let me know.  I will prioritize you.

15   A    Yes.

16   Q    And then you write back, and if we look up at the top the

17   arrangements are made to meet at the Ace Hotel; is that right?

18   A    Yes.

19   Q    And then this is, if you look here, February 12, 2016.

20   Again, you have a Source portion of it.

21              But then on February 11, there's -- you have an

22   e-mail:  Today was much better.  Woke up calmer and more

23   settled.  Went for a run, went to class, and then went to meet

24   Allison.

25   A    Yes.

Nicole - Direct - Penza                    3861

1   Q    And:  The meeting with Allison was wonderful.

2   A    Uh-huh, yes.

3   Q    Cozy and comfortable and has got my brain thinking.

4   A    Yes.

5   Q    So, that was the meeting that was in response to the

6   e-mails you had sent about your depression?

7   A    Yes.

8   Q    And is this referencing the first conversation you had

9   with her about the -- the first meeting that you had about the

10  women's mentorship group, the one where she -- I'm sorry, I

11  know you had a few conversations.

12           The one where she mentioned the collateral to you?

13  A    The first time, yes.

14  Q    And then February 13, you send another e-mail saying that

15  you feel a bit lost and unfocused again.

16           And then February 13, Allison Mack writes back:  I'm

17  so excited to share with you what I am doing.  I think this is

18  exactly what you need.  Trust me, you will be okay.  Is your

19  collateral finished?

20  A    Yes.

21  Q    And did you complete the collateral within a couple days

22  of that?

23  A    Yes.

24  Q    So, based on the conversations you had had -- at the

25  point at which you joined DOS, based on what Allison had told

LAM      OCR      RPR

Nicole - Direct - Penza                         3862

1   you, what was your understanding of what this group was going

2   to be?

3   A    A women's mentorship where Allison would mentor me in

4   life and that was going to, like, push me into my fears so

5   that I could build the kind of career that I wanted and become

6   the kind of woman that I wanted to be; that it was a secret, I

7   wasn't supposed to talk about it, but that it was -- like, it

8   was a women's organization that also -- that the women were

9   pushing through their fears to be strong and build the life

10  they wanted to build so that they could help people.

11  Q    During any of the conversations you had with Allison Mack

12  about DOS before you joined, did she tell you that the

13  Defendant was involved in the group?

14  A    No.

15  Q    How would knowing that information have affected your

16  decision about whether to join?

17  A    Well, it's a women's empowerment group.  So, if a man had

18  been running the whole thing, I wouldn't -- it doesn't even

19  make sense.  I would not have been interested.

20  Q    You were looking for women's mentorship?

21  A    Absolutely.  Especially in, like, that structure, yes.

22  Q    We'll talk about some of these things going forward, but

23  at that point in time and now looking back, looking back are

24  there other things you later learned that would have affected

25  your decision to join DOS?

Nicole - Direct - Penza                    3863

1           MR. AGNIFILO:  I'm going to object to the form of

2    the question.

3           THE WITNESS:  Can I answer?

4           THE COURT:  Overruled.

5           You may answer.

6    A    Yeah, I guess the first one would be that apparently I

7    was giving up my free will and that I couldn't make my own

8    decisions, but that eventually there would have to be more

9    collateral added on and that I would have no say in whether or

10   not I gave it, like, it would be demanded.

11          I mean, there were so many things that were added on

12   later once you were, like, sealed into this situation.

13   Q    At that point in time when you joined, when you joined

14   DOS, did you believe that there would be any sexual component

15   to it?

16   A    No.

17   Q    Would knowing that have affected your decision to join?

18   A    Yeah.  I don't know how that has anything to do with

19   mentorship.  So, yes, it absolutely would have.  I wouldn't

20   have been interested because I wasn't -- that's not what I was

21   looking for.

22   Q    Now, while you were in DOS, how would you communicate

23   with Allison?

24   A    So, then I was told that, like, the way the mentorship

25   was communicated, it was a master-slave relationship, and, so,

1    I was told to say, Good morning, Master, and, Good night,

2    Master, every night to Allison.

3    Q     How did you feel about that?

4    A     Not great.  I mean, it's like I tried to, like, wrap my

5    head around it in the sense of thinking of, like, I don't

6    know, like, great artists, like Michelangelo, they had, like,

7    masters that taught them.  So, I tried to think about it in my

8    head.

9            But it feels really weird and I don't like answering

10   to people in particular, in general.  So, having to do that

11   every morning and every night was, like, not my favorite.

12

13            (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Nicole - direct - Penza                    3865

1    DIRECT EXAMINATION

2    BY MS. PENZA:  (Continuing)

3    Q    Now, in terms of forms of communication, what types of

4    forms of communication would you have with Allison?

5    A    Like all sorts, so either text message or WhatsApp or

6    e-mail.

7    Q    Later on, did you end up using something called Telegram?

8    A    Yes.

9    Q    And was it explained to you the importance of using

10   Telegram at some point?

11   A    Yes.

12   Q    Who explained it to you?

13   A    Allison explained that like in Telegram I guess you could

14   lock the -- like chains, so no one could read -- basically it

15   was like a more secretive way of communicating.  So you could

16   lock the back and forth, so no one else could read it.

17   Q    Eventually, did you also use something called Sideline?

18   A    Eventually, yes.

19   Q    What is Sideline?

20   A    It's this -- so, basically, you get another phone number,

21   but it still goes to your phone, but you have like -- so I

22   would give -- it's another phone number that still comes back

23   to your phone, but it is a completely different phone number

24   from your phone number.  It's a side line.

25   Q    And did Allison have a Sideline as well?

Nicole - direct - Penza                    3866

1    A    I believe so.

2    Q    Now, what were your initial experiences with DOS like?

3    A    Immediate, like right away, Allison was very loving and

4    like she came down to New York City and like set it up for us

5    to have lunch and go to a museum and she was very

6    communicative and checking in on me and seeing how I was

7    feeling.  Like she was nice.

8    Q    Did she also do anything to actually -- at that point,

9    did she do anything that made you feel like there was a career

10   ventureship [sic] happening?

11   A    Yes.  So she set up my first off-Broadway audition for a

12   really great play and also set me up with a meeting with her

13   agency, which was a really good agency for commercials,

14   theater, and film and TV.

15   Q    At some point, did Allison give you an assignment, your

16   first assignment?

17   A    Yes.

18   Q    What was the first assignment?

19   A    We were talking and the first assignment was for me -- so

20   Mark, my ex that had introduced me to ESP, had also moved to

21   New York after I moved to New York and, so, we had sort of

22   still been off-and-on dating.  That wasn't really my priority

23   when I was in New York, but we had been off-and-on dating.

24   And she -- my first assignment was to not sleep with him any

25   more.

Nicole - direct - Penza                    3867

1  Q    And did she explain why she was giving you that

2  assignment?

3  A    That it was -- that it was better for me.

4  Q    Did she actually tie it to your career?

5  A    Yeah, that it was like my back and forth with Mark was

6  distracting from my career, from me focusing on my career, and

7  that it just wasn't a healthy situation.

8  Q    At the time, how did you feel about that first

9  assignment?

10 A    Fine, because I kind of like agreed with her.  I was

11 like, yeah, you're right, it's not really -- I shouldn't keep

12 doing this.  So, I thought, oh, wow, she's like really looking

13 out for me.

14 Q    I think you already said this, but at that point in time,

15 were you prioritizing at all having an intimate relationship?

16 A    No.  I really wanted to figure out my career and I felt

17 like once I figured out -- like was more on my feet

18 financially, and just like had more of a groove in my career,

19 then I would think about dating.  But, right now, I wanted

20 just to -- that's why I had moved to New York, so I really

21 just wanted to focus.  Not that I -- you know, if I met

22 someone, great, wonderful, but I wasn't going out on dates all

23 the time or anything like that.

24 Q    At some point did Allison give you further direction

25 about your sex life?

Nicole - direct - Penza                    3868

1    A    Yeah.  The second assignment was to be celibate for three

2    months.

3    Q    And how did you interpret that assignment?

4    A    I thought it meant you couldn't have sex for three

5    months.

6    Q    Did something happen after that that gave you concern?

7    A    Yes.  So -- and I didn't think that that was that weird

8    either, at first, because I thought, okay, I mean, I don't

9    particularly want do this, but I've never done this, so okay.

10   Like, I'll try it.

11   Q    Try being celibate?

12   A    Yes.  Try being celibate, yeah, for three months.

13        I also started a new job at that time and, one of

14   the nights at my new job, I met a really cute boy and I -- and

15   I wrote about it in my journal and Allison kind of like

16   flipped out and that concerned me.

17   Q    So when you say you wrote about it in your journal, is

18   this another one of these e-mails journals?

19   A    Yes, another part of the like back and forth was, yeah,

20   now I had to journal every night to Allison.  And, so, I wrote

21   in my journal that I met a really cute boy and I had given him

22   my phone number.

23   Q    And I think you said she flipped out?

24   A    Yeah, eventually, yes.

25   Q    What did that look like?

Nicole - direct - Penza                    3869

1  A    Well, she answers me back, well, did you give it to him?

2  And I was like, oh, shoot, what did I do wrong?

3          And so I wrote, yeah, yeah, but like don't worry,

4  I'm still going to be celibate.  I can go on a date and like

5  get to know him, and like I'm not saying I'm about to sleep

6  with him.  Jesus, I just met him.

7          So I kind of just explained, I was like, yeah, like

8  I did, but like these are the reasons why.  I'm not -- and...

9  Q    Did you actually explain to her that you thought this

10 would be a good way to test this?

11 A    Yeah, I did.  I thought it would be a good way to like

12 challenge that, where you like have to get to know someone for

13 a full three months before like anything intimate happens, you

14 know.  And so I thought what a cool way to use this first

15 challenge.

16 Q    And so, how did Allison respond?

17 A    She said that I, like, violated my word, that I -- what

18 did she say?  She like wrote a whole long thing about how like

19 I -- what I did was not good, and I was not keeping like my --

20 my side of the bargain and I needed to fix it.

21          I was just, like, what?

22 Q    So when -- at this point in time, when Allison has this

23 reaction to you giving your number to this boy, how do you

24 feel?

25 A    Super unnerved, because it seems like such an extreme

1   reaction and I was like, man, I don't know what I just signed

2   up for, but like I don't think that this is for me because

3   this is just -- it was just the intensity of her response like

4   really unnerved me.

5   Q    At that point in time, were you also -- were you doing a

6   little bit better in New York?

7   A    Yeah, I had gotten myself a new job.  So, basically, I

8   had just finally admitted that I wasn't making enough money at

9   where I was working.  I had tried to avoid going into

10  nightlife, because working in nightlife in New York City can

11  be a bit tough, but that seemed like a really good solution

12  for the moment to being able to pay all my bills.  So I

13  reached out to a friend and I got a job working at a really

14  nice nightclub that had like a rooftop club.  It was a whole

15  new experience and world, and I was up until -- so, basically,

16  I worked from 9:30 until 5:00 a.m.  But I was starting to be a

17  little -- I could pay all my bills myself, at this new job, so

18  I wasn't as stressed about money, and I started to meet other

19  girls in New York City that I worked with, so I was starting

20  to meet people.  So I think I was feeling a lot more like,

21  okay, I can do this, I can figure this out.

22  Q    And so approximately when is this?

23  A    I started that job maybe the last week of February, first

24  week of March.  So maybe this would be the middle of March,

25  end of March.

Nicole - direct - Penza                                    3871

1  Q    Okay.  Now, did getting this new job also have a positive

2  impact on your ability to go to auditions?

3  A    Yes, so as long as I wasn't too exhausted.  I was working

4  nights, so I could actually audition during the day, so it

5  really felt like a pretty good situation.  It was hard to stay

6  up all night, but it felt like a good situation, yeah.

7  Q    So at this point in time, after Allison has this reaction

8  about you giving out your phone number, do you actually make a

9  decision about DOS?

10  A    Yeah.  I was scared, but I -- because I didn't really

11  fully understand like what the -- what she was going to say or

12  how she was going to react, but I had decided that like this

13  just wasn't for me.  My mom had just come into town and --

14  and, you know, I had really decided that it wasn't -- this

15  wasn't the right thing for me.

16  Q    And did you decide you were going to tell Allison that?

17  A    Yes.

18         MS. PENZA:  Your Honor, may I have the ELMO just for

19  the witness, please?

20         THE COURT:  One moment.  Go ahead.

21  Q    Nicole -- oh.

22         MS. PENZA:  Excuse me.  One moment, Your Honor.

23  Q    Nicole, I'm showing you what's marked for identification

24  purposes as Government Exhibit 1356.

25  A    Yes.

Nicole - direct - Penza                        3872

1   Q    Are you familiar with this document?

2   A    Yes.

3   Q    And is this an e-mail from you to Allison Mack on March

4   28, 2016 at 2:41 a.m.?

5   A    Yes.

6   Q    And is this basically a schedule of your day on that day?

7   A    Yes.

8   Q    Was that something that you would typically have to do is

9   tell Allison your schedule?

10  A    Yeah, at some point that got introduced when -- yeah, I

11  had to tell her like what I was doing, what my whole next day

12  plan was.

13  Q    And, so --

14             MS. PENZA:  Your Honor, the Government moves

15  Government Exhibit 1356 into evidence.

16             MR. AGNIFILO:  We have no objection.

17             THE COURT:  Government Exhibit 1356 is received in

18  evidence.  Publish to the jury.

19             (Exhibit published.)

20             (Government's Exhibit 1356 received in evidence.)

21             (Continued on next page.)

22

23

24

25

Nicole - direct - Penza                          3873

1    EXAMINATION CONTINUES

2    BY MS. PENZA:

3    Q    Don't mind my redactions.

4         So this is -- you said this would be a schedule that

5    you would send to Allison?

6    A    Yes.

7    Q    And is this just an example of one of many, many daily

8    schedules that you would send to Allison?

9    A    Yeah.

10   Q    Now, this one in particular, March 28, 2016, says:  Get

11   house ready for mom's arrival, 1:30 to 2:30?

12   A    Yeah.

13   Q    And is that actually the visit from your mom that you

14   were --

15   A    Referring to?

16   Q    Yes.

17   A    Yes.

18   Q    Okay.  Now, did Allison come down and meet your mom?

19   A    Yes.

20   Q    What was that like?

21   A    There is a lot -- I had a lot of feelings going on

22   because she had bought tickets to -- for my mom and I -- her,

23   my mom and I, to go see Blackbird on Broadway.

24   Q    Allison, what is Blackbird about?

25   A    It's about a next-door neighbor who ends up -- an older

                SAM    OCR    RMR    CRR    RPR

Nicole - direct - Penza                    3874

1    guy next-door neighbor who ends up, like, falling in love with

2    his neighbor's daughter.  So it's about a relationship between

3    like a young girl and her being kind of seduced by the older

4    next-door neighbor.

5    Q    And then they actually --

6    A    Have a relationship, yeah.

7    Q    But she actually grows up and then they --

8    A    Yeah, they have a relation --

9    Q    -- and then they meet again when she's an adult?

10   A    Yes, yeah, yeah.  It's a very intense play and I believe

11   Jeff Daniels was playing that lead in that time, but -- yeah,

12   I think so.

13   Q    And Allison bought the tickets for that?

14   A    Yes.

15   Q    So you had tickets for a play?

16   A    Uh-hum, yes.

17   Q    Was this the same time period when you were going to have

18   this conversation with Allison about not wanting to be in DOS?

19   A    Yeah, and it was -- the -- the -- one of the harder

20   parts, too, is my mom kept asking me about this like cute guy

21   that I had given my phone number to, and I was like, yeah, but

22   I don't -- yeah, like, I don't know.

23        It was just so uncomfortable because Allison is

24   sending me these e-mails that are like super intense about

25   what I did wrong, and then my mom is kind of asking me about

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                              3875

1   what's going on and where's -- and then Allison's coming down

2   to meet her.  And it -- it -- there was just a lot going on.

3   Q    So around that time, within those couple days, did you

4   end up having a conversation with Allison where you intended

5   to tell her you were going to leave DOS?

6   A    Yes.

7   Q    What happened?

8   A    She told me that that wasn't an option, and she told me

9   like did I want to give up my whole career for a boy, and my

10  future and my growth for a boy and -- and that -- like that's

11  not the way this worked, and it was a lifetime commitment and

12  it was like an arranged marriage.  And I started crying and

13  she -- she seemed upset, too, but she said that she couldn't

14  let me out no matter how hard I cried because it would show me

15  that I -- if I cried hard enough -- if I cried hard enough I

16  could get out of anything.

17  Q    And in that same -- in that same time period, did Allison

18  have a discussion with you about collateral?

19  A    Yeah, she told me that -- like we were driving in her car

20  to, like, find a parking spot in the city and she said she had

21  been really struggling with something and her master had said

22  they were going to release her collateral -- or her sex tape,

23  that particular piece of collateral, if she didn't get her act

24  together and she said she got her act together really quick.

25  Q    At that point, did you know who Allison's master was?

Nicole - direct - Penza                    3876

1   A    No.

2   Q    Did you eventually come to learn who Allison's master

3   was?

4   A    Yes.

5   Q    Who was it?

6   A    Keith Raniere.

7   Q    In that conversation with Allison, did she tell you what

8   she had done to -- what had happened that caused her master to

9   mention releasing the sex tape?

10  A    No.

11  Q    After that conversation with Allison about the

12  collateral, and the other conversation you had, did anything

13  change about the way you viewed DOS?

14  A    Yeah, it seemed scary now.  And I felt like -- like --

15  it's like I was just starting to feel stronger now, like

16  gotten myself a good job and I just thought, like, what did I

17  do?  Like, what did I -- what did I get myself into?  What --

18  what -- what did I do?

19  Q    Now, in terms of the collateral, specifically, did the

20  conversation change what you felt about the collateral?

21  A    Yeah.  It seemed like somewhere in that mix the

22  collateral went from something that was, like, supposed to be

23  just you won't talk about this and you're just giving me more

24  information to -- so basically, it's like to your -- your

25  word, your commitment to Allison, all of a sudden sealed the

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                          3877

1    collateral.  So now if I ever broke that commitment, I was

2    breaking my word, which meant the collateral would be

3    released.  And so you were like -- or I was, what?  Like what?

4    Q    You were in DOS for a little more than a year after that

5    conversation, is that fair?

6    A    Yeah, like a year and two and three months.

7    Q    During that period of time, and after that conversation,

8    what was your -- what were your thoughts about the collateral

9    as you moved forward in DOS?

10   A    That -- that if I ever left I would -- they would be

11   released.

12          MS. PENZA:  Your Honor, may I have the ELMO just for

13   the witness?

14          THE COURT:  Go ahead.

15          MS. PENZA:  Thank you.

16   BY MS. PENZA:

17   Q    Nicole, I'm showing you what's marked for identification

18   purposes as Government Exhibit 1357.

19          Do you see that?

20   A    Yes.  Yes.

21   Q    And is this an e-mail chain with the subject line:  "A

22   rare reflection," and is it between you and Allison ending on

23   March 31st, 2016?

24   A    Yes.

25          MS. PENZA:  Your Honor, the Government offers

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                    3878

1    Government Exhibit 1357 into evidence.

2              MR. AGNIFILO:  We have no objection.

3              THE COURT:  Government Exhibit 1357 is received in

4    evidence.

5              (Government's Exhibit 1357 was received in

6    evidence.)

7              THE COURT:  You may publish to the jury.

8              (Exhibit published.)

9    BY MS. PENZA:

10   Q    So, Nicole, on -- looking at the middle of the top page,

11   you write in your personal journal that you're so happy for

12   being present and loving with your mom and happy that you had

13   a wonderful time together.

14             And then you go to the middle paragraph and say:

15             The rest of my life I feel a bit like Alice in

16   Wonderland falling down the rabbit hole.  I'm filled with this

17   intense anxiety that everything is moving too quickly around

18   me and that I am losing hold of my life, my ability to choose

19   and think for myself.

20             And then it goes on to say:  But I also realize that

21   I can choose how to look and experience things and then for a

22   bit things feel better and more clear, more vibrant.  And then

23   I slip back into the anxiety and I want to run away.

24             So this e-mail is sent on March 31st, 2016.

25             Is this after your conversation with Allison about

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                    3879

1   the collateral?

2   A     Yes.

3   Q     And this concept of:  But I also realize that I can

4   choose how to look at and experience things, was that a

5   concept that Allison spoke to you about?

6   A     Yes.

7   Q     Can you explain that a little bit?

8   A     I mean, it's a theme throughout the entire time I was

9   in -- like, worked with The Source and was also in DOS that,

10  like, you can choose how you look at a situation.

11          So I could either look at what I was -- what was

12  happening and like my relationship with, like, with Allison as

13  a positive thing or I could choose to experience it as a scary

14  and terrible thing, but it was my choice.  So I could choose

15  to suffer or I could choose to make this into something good.

16  Q     And Allison responded to you?

17  A     Yes.

18  Q     And she said:  Why are you scaring yourself?  I want to

19  remind you that you made a commitment, you can't go back.

20  It's not an option, like an arranged marriage.  Why waste time

21  contemplating changing your mind?  Take that energy and move

22  into the choice you made.  You don't get to question.  It's

23  the choice you made.  Now, what are you going to do about it?

24  You will find freedom in the commitment you already made.

25  Don't question, it wastes time.  Just do.

Nicole - direct - Penza                                3880

1             Is that what she wrote to you?

2    A    Yes.

3    Q    Nicole, within one week of this e-mail, did you get

4    another assignment from Allison?

5    A    Yes.

6    Q    And what was that assignment?

7    A    To reach out to Keith Raniere.

8    Q    At that point, had you ever met Keith Raniere in person?

9    A    No.

10   Q    Did Allison explain to you why you were being assigned to

11   reach out to Keith Raniere?

12   A    No.

13   Q    Did you find the assignment strange?

14   A    I think she said it was my first, like, secret spy

15   assignment to reach out to him.  Yeah, I mean -- yes, I found

16   it strange.  I didn't really know what to say.

17   Q    This idea of secret spy assignments, was that something

18   that Allison talked to you about?

19   A    That -- this was the first time she had mentioned it.

20   Q    And what was the idea behind that?

21   A    I think that, like, you know, it was supposed to be a

22   secret society of like women that were, you know, going to be

23   like empower -- empowering each other to be strong, to then

24   like help -- I don't -- I don't know, help the world.

25             So there was like a secrecy to it, which like I

Nicole - direct - Penza                    3881

1    think is 'cause Allison and I were both actors, it was like

2    secret spy thing.

3    Q    How did you get the defendant's e-mail address?

4    A    Well, Allison wouldn't give it to me, so she said I had

5    to find it.  So I only really, like, was close to two people

6    that I thought might have it.  So I asked Mark and I asked

7    Emi, or Emiliano, for the e-mail address.

8    Q    Who gave it to you?

9    A    Mark did.

10   Q    Before giving it to you, did he do anything?

11   A    Yeah, he asked Keith's permission.

12            MS. PENZA:  May I have the ELMO just for the

13   witness, please?

14            THE COURT:  Yes.

15   BY MS. PENZA:

16   Q    Nicole, I'm showing you what's marked for identification

17   as Government Exhibit 1271.

18            Are you familiar with this document?

19   A    Yes.

20            MS. PENZA:  Your Honor, the Government --

21   Q    Is this an e-mail, the first e-mail that you wrote to the

22   defendant?

23   A    Yes.

24            MS. PENZA:  Your Honor, the Government offers

25   Government Exhibit 1271 into evidence.

Nicole - direct - Penza                              3882

1            MR. AGNIFILO:  No, objection, Judge.

2            THE COURT:  All right, Government Exhibit 1271 is

3    received in evidence and published to the jury.

4            (Government's Exhibit 1271 was received in

5    evidence.)

6            (Exhibit published.)

7    BY MS. PENZA:

8    Q    Nicole, is this the first e-mail that you wrote to the

9    defendant?

10   A    Yes.

11   Q    And it's from you to KeithRaniere@yahoo.com?

12   A    Yes.

13   Q    And it says:  A quick hello, with a smiley face?

14   A    Uh-hum, yes.

15   Q    And did you -- how did you -- I'm sorry.

16        And it's sent on April 6th, 2016?

17   A    Yes.

18   Q    So that's within one week of the e-mail that we just

19   looked at where Allison said:  Why are you scaring yourself?

20   A    Yeah, and -- yes.

21   Q    Okay.

22

23            (Continued on the following page.)

24

25

SAM      OCR      RMR      CRR      RPR

Nicole - Direct - Penza                    3883

1   BY MS. PENZA (Continuing):

2   Q    Now, in this e-mail, is it fair to say you write about

3   The Source?

4   A    Yeah.  I asked her what I should say to him, like, and

5   she said, I don't know, talk about The Source.  Like, he

6   created it, so say, like, thank you for creating it.

7            And I was like, Okay.

8   Q    And, so, did you follow her directions?

9   A    Yeah.

10  Q    Did the Defendant write back to this e-mail?

11  A    No.

12           MS. PENZA:  Your Honor, may I have the Elmo again

13  just for the witness?

14  Q    I'll ask you a couple questions first.

15           After you sent that e-mail, was there -- after you

16  sent that e-mail, was there a new assignment that was given?

17           Sorry, was there another step to the same

18  assignment?

19  A    Yeah.

20  Q    So, the Defendant didn't write back to you.

21  A    No.

22  Q    Was Allison asking whether the Defendant had written back

23  to you?

24  A    Yes.

25  Q    Did she seem concerned about it?

LAM      OCR      RPR

Nicole - Direct - Penza                          3884

1    A     Yeah, she just said I had to -- she just kept asking me.

2    And then I think at one point she said I was, like, slow as

3    molasses doing things.

4              Because I didn't know what to write.  He didn't

5    respond, so, like, what was I supposed to do?

6    Q     And at some point close to then, did Allison send you

7    another message about what you should be doing?

8    A     Yeah.  She said to keep reaching out to him until he

9    responds.  And she said:  How do you get the attention of the

10   smartest man in the world?

11   Q     I'm showing you what's been marked for identification as

12   Government Exhibit 650.

13             Are you familiar with this?

14   A     Yes.

15   Q     And is this a screenshot of your Facebook account?

16   A     Yes.

17   Q     And is this a message from Allison Mack on April 16,

18   2016?

19   A     Yes.

20             MS. PENZA:  Your Honor, the Government offers

21   Government Exhibit 650 into evidence.

22             MR. AGNIFILO:  No objection, Judge.

23             THE COURT:  Government Exhibit 650 is received in

24   evidence and published to the jury.

25             (Government Exhibit 650 so marked.)

LAM      OCR      RPR

Nicole - Direct - Penza                    3885

1          (Exhibit published to the jury.)

2     Q     Nicole, is this the message you were referring to as

3     having received from Allison Mack?

4     A     Yes.

5     Q     And it says:  Oh, and if you haven't heard back from

6     Keith before the end of the night, you may wanna reach out

7     again.  Continue to pursue until he responds.  Stage two of

8     your assignment, how do you get the attention of the smartest

9     man in the world, question mark, question mark.  April 16,

10    2016.

11          MS. PENZA:  Your Honor, I think we should end for

12    the day.

13          THE COURT:  We're going to recess for the night.

14    The witness is excused for the evening.

15          Do not discuss your testimony with anyone.  You may

16    leave now.  I'll see you tomorrow morning at 9:30.

17          THE WITNESS:  Thank you.

18          (Witness excused.)

19          THE COURT:  Just two things for the jury.

20          You recall that the prior witness was designated as

21    an expert witness.  I just want to advise you that ordinarily,

22    a witness is limited to testifying about facts and is not

23    permitted to give an opinion.  Where, however, specialized

24    knowledge may help the jury understand evidence, a witness

25    with expertise in a specialized field may render opinions

Proceedings                                                    3886

1    about such matters.  The expert's testimony is not offered as

2    proof that the crimes charged occurred.

3                You should evaluate the expert's testimony just as

4    you would the testimony of any other witness.  You may accept

5    or reject such testimony, in whole or in part, just as you may

6    with respect to the testimony of any other witness.

7                I'm going to remind you that it's very important

8    that you follow my instruction not to discuss the case with

9    anyone; not your family, friends, business associates, and not

10   your fellow jurors.

11               In addition, you must not read, listen to, watch, or

12   access any accounts of this case in any form of media, such as

13   newspapers, television, radio, podcasts, or the internet, or

14   reach or seek outside information about any aspect of the

15   case.

16               Please do not communicate with anyone about the case

17   on your phone, whether through e-mail, text messaging, or any

18   other means; through any blog or website; or by way of any

19   social media, including Facebook, Twitter, Instagram, YouTube,

20   or other similar sites.

21               You must not consider anything you may have read or

22   heard about the case outside of the courtroom, whether you

23   read it before or during jury selection or during the trial.

24               And do not visit any of the locations identified

25   during the course of jury selection or the trial.

Proceedings                                            3887

1          Tomorrow morning, we'll begin at 9:30, and I'll

2    advise you tomorrow about the schedule for next week.

3          Thank you very much.  Thank you for your attention.

4          All rise for the jury.

5          (Jury exits.)

6          THE COURT:  You may be seated.

7          I'm going to meet with the Marshal Service about the

8    schedule for next week.  The difficulty is in transporting the

9    Defendant to the courthouse, I would imagine, but we will see

10   what we can do about that.  And we'll implement the 45-minute

11   lunch break beginning on Monday.

12         Now, is there anything else for us for tomorrow?

13         MS. PENZA:  I don't believe so, your Honor.

14         MR. AGNIFILO:  Nothing from us, your Honor.

15         THE COURT:  All right.  Well, it would seem that

16   we're going to get pretty much to the end of the day tomorrow

17   with this witness, so I'm not going to worry about that short

18   period of time that we may have, we'll just deal with it.

19         All right.  We'll see you tomorrow morning, 9:30.

20   Thank you very much.

21         (A chorus of thank yous.)

22

23         (Matter adjourned until Friday, June 7, 2019, at

24   9:30 a.m.)

25

LAM       OCR       RPR

3888

1                                I N D E X

2

3    WITNESS                                          PAGE

4

5      MAEGAN REES

6          DIRECT EXAMINATION BY MS. HAJJAR            3656

7          CROSS-EXAMINATION BY MR. AGNIFILO           3670

8          REDIRECT EXAMINATION BY MS. HAJJAR          3674

9    DAWN   HUGHES

10         DIRECT EXAMINATION BY MR. LESKO             3678

11         CROSS-EXAMINATION BY MR. Der OHANNESIAN     3740

12   **NICOLE**

13         DIRECT EXAMINATION BY MS. PENZA             3792

14

15

16

17

18

19

20

21

22

23

24

25

3889

1                              **E X H I B I T S**

2

3        Government's Exhibit 548                        3656

4        Government's Exhibit 651                        3841

5        Government Exhibit 657                          3859

6        Government's Exhibit 1356                       3872

7        Government's Exhibit 1357                       3878

8        Government's Exhibit 1271                       3882

9        Government Exhibit 650                          3884

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25