1584

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - X
3    UNITED STATES OF AMERICA,        : 18-CR-204 (NGG)
                                      :
4                   PLAINTIFF,        :
                                      : United States Courthouse
5         -against-                   : Brooklyn, New York
                                      :
6    KEITH RANIERE,                   :
                                      : Monday, May 20, 2019
7                   DEFENDANT.        : 9:30 a.m.
- - - - - - - - - - - - - - - X
8

9         TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
10       BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
          UNITED STATES DISTRICT COURT JUDGE.
11                  AND A JURY

12

13               A P P E A R A N C E S :

14   For the Government:        RICHARD P. DONOGHUE, ESQ.
                                United States Attorney
15                              Eastern District of New York
                                271 Cadman Plaza East
16                              Brooklyn, New York 11201
                                BY:  MOIRA K. PENZA, ESQ.
17                                   MARK LESKO, ESQ.
                                     TANYA HAJJAR, ESQ.
18                                   Assistant United States Attorneys

19   For the Defendant:         BRAFMAN & ASSOCIATES
                                767 Third Avenue
20                              26th Floor
                                New York, New York
21                              BY:  MARC A. AGNIFILO, ESQ.
                                     TENY T. GERAGOS, ESQ.
22
                                DerOHANNESIAN & DerOHANNESIAN
23                              677 Broadway
                                Suite 707
24                              New York, New York 10017
                                BY:  PAUL DerOHANNESIAN, ESQ.
25                                   DANIELLE SMITH, ESQ.

1585

1    APPEARANCES
     (CONTINUED)
2

3    Attorney for            QUARLES & BRADY, LLP
     Lauren Salzman:         One Renaissance Square
4                            Two North Central Avenue
                             Phoenix, Arizona 85004-2391
5                            BY:  HECTOR J. DIAZ, ESQ.
                                  ANDREA TAZOLI, ESQ.
6
                                        AND
7
                             QUARLES & BRADY, LLP.
8                            1701 Pennsylvania Avenue NW
                             Suite 700
9                            Washington, DC 20006
                             BY:  LUKE CASS, ESQ.
10

11

12

13   Court Reporter:         DAVID R. ROY, RPR
                             United States Courthouse
14                           225 Cadman Plaza East
                             Brooklyn, New York 11201
15                           Telephone:  (718) 613-2609
                             drroyofcr@gmail.com
16

17   Proceedings recorded by Stenographic machine shorthand,
     transcript produced by Computer-Assisted Transcription.
18

19

20

21

22

23

24

25

Proceedings                                    1586

1            P R O C E E D I N G S

2                    --oo0oo--

3

4          (In open court; outside the presence of the jury.)

5          THE COURT:  All right.  Everyone can be seated.

6     Good morning.

7          MS. PENZA:  Good morning, Your Honor.  Moira

8     Penza, Mark Lesko, and Tanya Hajjar for the Unites States,

9     and along with us is Special Agent Michael Weniger from the

10    FBI and paralegal specialist, Teri Carby.

11         THE COURT:  Good morning.

12         MR. AGNIFILO:  Good morning, Your Honor.  Marc

13    Agnifilo and Teny Geragos, also at Defense table is Mr. Paul

14    DerOhannesian and Danielle Smith for Mr. Keith Raniere, and

15    Mr. Raniere, who is with us this morning.

16         THE COURT:  Good morning.

17         All right.  Anything before we start?

18         MS. HAJJAR:  Your Honor, there's just one matter

19    before we begin.  The request for the return of collateral,

20    Your Honor ruled on one of those requests.  There are

21    e-mails that were sent by DOS members to, among others,

22    Lauren Salzman, members of the national executive board and

23    others, asking for their collateral back and saying the

24    collateral was obtained through fraud.

25              Those requests for collateral we do intend to

Proceedings                          1587

1   admit three of them through this witness because they

2   establish her -- the fact that she received these requests

3   and did not conspire with them, and that the requests

4   themselves involve a list of the collateral that has been

5   provided and she received them, was on notice that the fact

6   that they were request for collateral were provided to her,

7   you know, on the basis of fraud and ignored those requests

8   at NXIVM's direction and sent them to other members of

9   NXIVM, including Clare Bronfman.

10          That's an important and significant part of that

11  narrative and so we do expect to introduce those exhibits at

12  some point today.

13          MR. AGNIFILO:  And we object, Your Honor, on two

14  bases, Judge.

15          First, these are e-mails that a purported DOS --

16  persons in DOS sent to her lawyer after Keith Raniere was

17  arrested.  And in this e-mail, this woman is making specific

18  allegations of criminal conduct in regard to how her

19  collateral was obtained saying it was obtained by fraud,

20  without her consent and things like that.  And I think this

21  is *Heartland Crawford* material because it's being sent to

22  her lawyer, who is at the moment is a civil lawyer, but she

23  knows at the time she's sending it to her lawyer that

24  Mr. Raniere's been arrested.  She's preserving her version

25  of facts, and when Judge Scalia -- deceased Justice Scalia

Proceedings                        1588

1   wrote in the *Crawford* decision that the thing that he was

2   targeting in the Supreme Court of the United States was

3   targeting was prosecution through this sort of affidavit,

4   you know, written statements that are uncross-examinable,

5   this is precisely what the *Crawford* decision is talking

6   about, because I have no ability -- when this person says

7   this collateral was gained through fraud, I can't

8   cross-examine her.  She's not going to testify.  She

9   testifies, we're in a different ballpark, but if she doesn't

10  testify, I can't cross-examine her and here she is making

11  written, specific allegations of criminal conduct at a time

12  when there's a criminal action pending and at a time when

13  she has an attorney and she's forwarding them to her

14  attorney.

15         So I think in addition to it being hearsay, it's

16  *Heartland* Sixth Amendment.  We have a Sixth Amendment right

17  to confront our accusers.  If we can't confront this woman

18  on why she's making these allegations, I think we have a

19  Sixth Amendment confrontation problem and I object.

20         MS. HAJJAR:  Your Honor, just some factual

21  clarification.  I don't think that the e-mails were

22  provided to the -- the e-mails were sent directly to

23  Ms. Salzman, among others.  Ms. Salzman, they were forwarded

24  to the defendant, they were forwarded to Clare Bronfman, who

25  upon receipt, decided to promulgate a different narrative

Proceedings                    1589

1    about what had happened with DOS.  I don't believe it's

2    factually accurate that they were provided to counsel first.

3    These were requests for collateral which were the product of

4    extortion and that was the intent of sending those e-mails

5    request collateral back.  So it's significant.  It's part of

6    the act of extortion, part of the act of wire fraud to

7    request the materials that were the product of those funds,

8    and it's important to explain what Ms. Salzman did and why

9    she did it.  And the fact that other members of NXIVM knew

10   about what was being asked and knew about DOS at the

11   particular times these e-mail were sent.

12           THE COURT:  Well --

13           MR. AGNIFILO:  Judge, there's an e-mail sent by

14   someone named Carly, and I think Your Honor already ruled

15   that that was included under 403, if I'm not mistaken.  And

16   then, from what I understand, this application, there are

17   e-mails sent by, I don't know what we're calling this

18   person, K is her first initial of her first name and --

19           THE COURT:  Did you know about this before today?

20           MR. AGNIFILO:  Well, we know we got a list of

21   proposed exhibits yesterday afternoon and we've been

22   discussing it.  And we reached agreement on some and we

23   didn't reach agreement on some and these are some that we

24   didn't reach agreement on.

25           MS. HAJJAR:  These exhibits were provided some

Proceedings                          1590

1    time ago, Your Honor, and --

2              THE COURT:  May I see the exhibits?

3              MS. HAJJAR:  Yes.

4              THE COURT:  You can all sit down.  Thank you.

5              All right.  Take a short break and I'll take a

6    look at it.

7              MS. HAJJAR:  Thank you, Your Honor.

8              MR. AGNIFILO:  Your Honor, can I just remind the

9    Court, Your Honor deals with 1473 in Your Honor's May 14th

10   order on Page -- bear with me -- Page 5.

11             MS. HAJJAR:  And, Your Honor, at that time,

12   Your Honor left open the possibility that the Government can

13   establish the theory on which these exhibits are admissible.

14   This is that moment, Your Honor.

15             THE COURT:  All right.  Thank you.

16             (Recess taken.)

17             THE COURT:  All right.  Please be seated.  Of the

18   three documents, Government's Exhibit 418 --

19             MR. AGNIFILO:  I'm sorry, Your Honor.  I

20   apologize.  Can I interrupt you?

21             We're waiting for Mr. Raniere to come out.  I

22   don't mean to interpret you.  I apologize.

23             THE COURT:  No, no, that's fine.

24             All right.  I've reviewed the three documents,

25   Government's Exhibit 418, 428, and 1473, and I'm not going

Proceedings                          1591

1   to permit their introduction.  I mean, first of all, this

2   individual, if you want to produce the individual and have

3   the individual testify, that's one thing, subject to

4   cross-examination.

5         The other is that this witness, you can question

6   the witness on whether she received demands for the return

7   of collateral and if she doesn't remember, you can show them

8   to her to refresh her recollection.  And I'll give you a

9   wide opportunity to go into that.  But I'm going to -- I'm

10  barring the introduction of those three exhibits because

11  they are pretty specific in the accusations against

12  Mr. Raniere.  So let's move on.

13        Anything else?

14        MS. HAJJAR:  Yes, Your Honor.  Just on the

15  specificity of the allegations, these exhibits were sent to

16  not only Ms. Salzman, but others in July and September

17  of 2017.

18        THE COURT:  Okay.  On the NXIVM board?

19        MS. HAJJAR:  Yes.

20        And subsequent to that, Your Honor, members of the

21  NXIVM board and others, including the defendant, including

22  Ms. Bronfman put out public statements in support of DOS

23  saying that it was a women's organization.  That it was a

24  good thing.  That they didn't -- denying understanding that

25  there were -- that members were unhappy, that they sought

Proceedings                    1592

1   their collateral back and denying the content of these

2   letters.  So in the Government's view, these are significant

3   because of the timing of them.  These e-mails were sent to

4   Ms. Bronfman.  They were sent to members of the executive

5   board, all of whom were on notice about what was being said

6   by DOS and another one put out false statements regarding

7   DOS and regarding the defendant's involvement in it.  That's

8   significant in the Government's view, Your Honor.

9            THE COURT:  What am I supposed to be doing about

10  that?

11           MS. HAJJAR:  Your Honor, we offer them for -- even

12  for the purpose of establishing that they were sent for

13  that -- not for its truth of the content of the e-mail, but

14  for the fact that they were sent to the individuals in that

15  e-mail at the time they were sent.

16           THE COURT:  Are you trying to get in the e-mails

17  that were sent out by the DOS members?  By NXIVM?  What are

18  you trying to achieve?  I've already ruled on these.  I'm

19  not going to change my ruling on these.

20           MS. HAJJAR:  Then I think it's important,

21  Your Honor, to elicit that even if the exhibits themselves

22  are not admitted, that the content of the e-mail and to whom

23  they were sent, the fact that they were sent to the

24  executive board and to Ms. Bronfman in July, in September

25  prior to the public statement that NXIVM made.

Salzman - Direct - Hajjar                1593

1        THE COURT:  You can ask.

2        MS. HAJJAR:  Okay.  Thank you, Your Honor.

3        THE COURT:  Okay.  Anything else?

4        (No audible response.)

5        THE COURT:  Okay.  Let's bring in the witness,

6   first.

7        (The witness resumes the witness stand.)

8        (Pause in proceedings.)

9        (Jury enters the courtroom.)

10        (Jury present.)

11        THE COURT:  Please be seated.

12        Good morning, Members of the Jury.

13        ALL JURORS:  Good morning.

14        THE COURT:  All right.  At this time we're going

15   to continue with the direct examination of Lauren Salzman.

16        And I remind the witness that she is still under

17   oath.

18   **L A U R E N   S A L Z M A N**,

19        called as a witness, having been previously duly

20        sworn, was examined and testified as follows:

21        THE COURT:  Ms. Hajjar, you may continue.

22        MS. HAJJAR:  Thank you, Your Honor.

23   DIRECT EXAMINATION (CONTINUED)

24   BY MS. HAJJAR:

25   Q    Good morning, Ms. Salzman.

Salzman - Direct - Hajjar                    1594

1   A    Good morning.

2   Q    Ms. Salzman, you testified on Friday that you were a

3   first-line master in DOS?

4   A    Yes.

5   Q    Can you tell the jury what that means in terms of the

6   general structure of DOS?

7   A    Yes.  So first line meant that we were -- that Keith

8   was our master and we were enrolled directly under him.  So

9   we were considered slaves under him as our master.  And then

10  the second line would be the women that we enrolled who we

11  were their master and they were slaves under us and it went

12  down four lines.

13  Q    And aside from the defendant, who was at the top, was

14  everyone in DOS female?

15  A    Yes.

16  Q    Who initially recruited you into DOS in January

17  of 2017?

18  A    Keith with Rosa Laura.

19  Q    And is that Rosa Laura Junco?

20  A    Yes.

21  Q    I'm showing you what's already in evidence as

22  Government's Exhibit 363.  Does Government's Exhibit 363

23  depict the defendant and everyone who was a first line

24  master in DOS?

25  A    Yes, it does.

Salzman - Direct - Hajjar                    1595

1    Q    At the time you were recruited into DOS, were you aware
2    of the defendant's role as your master?
3    A    Yes, I was.
4    Q    Was that true of the other first -- of the other women
5    in the first line of DOS?
6    A    That they were aware that he was their master?  I
7    believe so.  I mean, they were all enrolled before me, so
8    they all had him as their master prior to my enrollment.
9    And when Rosa Laura enrolled me, she told me that he would
10   be my master wherein under normal circumstances, because she
11   was doing the enrollment, she would have been.  She
12   explained that my commitment would be with him.
13   Q    Prior to joining DOS, were you aware of the defendant's
14   sexual relationships with first-line DOS masters?
15   A    Some of them.
16   Q    Who?
17   A    Nicky, Loreta, and Monica.
18   Q    Did you later come to learn the defendant had sexual
19   relationships with other first-line DOS masters?
20   A    Yes.
21   Q    Who?
22   A    Everyone except Rosa Laura.
23   Q    I want to talk a little bit about the members in the
24   first line starting with Camila.  When did you first meet
25   Camila?

1  A    I met Cami in the early 2000s.  Her family had come to

2  New York.  Her sisters moved first and then the parents.

3  They rented an apartment, and the two younger siblings, Cami

4  and her brother joined soon after.

5  Q    How old was Camila when you first met her?

6  A    I'm not a hundred percent sure, but I want to say

7  around 14 -- 13, 14.

8  Q    And you testified that Camila was the sister of

9  Daniella and Marianna?

10  A    Correct.

11  Q    And she was the youngest sister?

12  A    Yes.

13  Q    Where did she live?

14  A    Initially the family rented an apartment in Cohoes,

15  which was like a town or two over from where the rest of us

16  lived in Clifton Park.  And then later they rented an

17  apartment in Knox Wood, the development where all of us

18  lived.

19  Q    What about after that?

20  A    Where Camila lived?  So she lived at 12 Wilton Court

21  with her family for a period of time and then eventually

22  moved to an apartment on Victory Way.  I'm not sure of the

23  number.

24  Q    How did you know that?

25  A    After I was in DOS she would ask me to give her rides

1  to the DOS house, so I would pick her up or drop her off

2  outside.

3  Q    Was there some secrecy as to where Camila was living at

4  the time?

5  A    Yes.

6  Q    Can you explain that further?

7  A    Well, for the period of time when I think she was still

8  living at the Victory Way house, there was a story about how

9  she was actually living with Karen Unterreiner so there

10  was -- there was some people who believed she was living

11  with Karen and -- but she wasn't.  And a lot of people

12  didn't know where she was.  I didn't know where she was

13  living.  I had asked Keith where she was living and he

14  didn't share with me.

15        But around 2015 I moved around -- about half a

16  mile away, and I had a personal assistant at the time named

17  Lucy who was good friends with Cami and she and her friends

18  had like a lot of, like, curiosity and speculation about

19  what was going on with Camila.  How come nobody could go to

20  the house?  Why they didn't feel the friendship was as open

21  as they all had with the rest of their group of friends.

22  And eventually Lucy told me that she figured out where Cami

23  lived because she saw Keith coming and going from Cami's

24  house.  And I wasn't permitted to know or nobody told me.

25  Keith didn't tell me.  And until -- until -- Keith never

Salzman - Direct - Hajjar                    1598

1   told me, and eventually Cami told me herself where she was

2   living after I was enrolled in DOS.

3   Q    What about Daniella Padilla Bergeron, can you tell the

4   jury a little bit about her background, where she was from?

5   A    Sure.  So I met Daniella in 2001 in Monterrey, Mexico,

6   at the first course that we taught down there.  And

7   Monterrey -- my understanding of Monterrey is that it's the

8   wealthiest city in Mexico.  It's a very conservative

9   Catholic city, and everybody kind of knows each other.  But

10  she's from like an upper-class family in that community.

11  Q    What was her rank in ESP?

12  A    She was a proctor.

13  Q    And is that a relativity high rank?

14  A    Yes.  It's the management level.

15  Q    Now, as to Nicky Clyne, can you tell the jury a bit

16  about her background?

17  A    Nicky came from Vancouver, Canada.  Her mom was a

18  teacher.  Her parents were divorced, and she was an actress.

19  So she comes, I think, more from a middle-class background

20  than -- you know, childhood experience in the entertainment

21  industry.

22  Q    Is she a Canadian citizen or an American one?

23  A    Canadian.

24  Q    What about Loreta Garza?

25  A    Loreta's family is from another city outside of

1  Monterrey, but her grandmother was from Monterrey.  I

2  understand she moved there as a teenager and went to high

3  school there, and then I believe studied abroad in Ireland

4  for a bit, came back.  And when I met her, she was working

5  for a telecommunication company in Monterrey in the early

6  2000s.  And then later, she moved to Albany and worked as my

7  mom's personal assistant for a bit and then eventually

8  Keith's assistant.

9  Q    Rosa Laura Junco, what was her background?

10 A    Rosa Laura also was from Monterrey.  Her family, as I

11 understand, owns a large part of the print media in Mexico.

12 They're a newspaper.  They own a reputable newspaper called

13 *The Reforma*.  And very wealthy family.

14 Q    Was she married?

15 A    Yes.  When I first met her she was married, had three

16 children.  Was later divorced and then remarried and had

17 another two children.

18 Q    Did she have a daughter?

19 A    She has a daughter, yes.

20 Q    And did the daughter have her name?

21 A    Yes.  Daughter -- her mother and her daughter and she

22 all had the same name.

23 Q    Is there a nickname version for Rosa Laura?

24 A    Laureis.  So sometimes, though, I called my friend

25 Rosa Laura, Laureis.  But her daughter was -- also was

1   Little Laureis.

2   Q     And what about Monica Duran?

3   A     I think Moni comes from Chihuahua or Tampico, Mexico.

4   I don't know much about her background.  But she joined ESP

5   early on and I think began her relationship with Keith

6   somewhere around, the time I did so I would say early 2000s,

7   like 2001 or 2002.  And she moved to Albany and, you know,

8   lived in Albany with us for a couple decades.

9   Q     And you called her Moni.  Was that a nickname for her?

10  A     Moni.  Yeah, short for Monica.

11  Q     What about Allison Mack?

12  A     Ali's from California near Los Angeles.  She was a

13  childhood actress, so she grew up in the entertainment

14  industry.  Her father was a professional opera singer and

15  her mother was her manager, as I understand, of her career.

16  Q     When you joined DOS, were these other DOS masters

17  already enrolled in DOS?

18  A     Yes.  Yes, they all were.

19  Q     And directing your attention to January or

20  February 2018, did you have a conversation with Nicky Clyne

21  about how she joined DOS?

22  A     Yes.

23  Q     What did she tell you?

24  A     She told me that originally she had this commitment

25  with Keith, and that she thought she was the only one who

1    had that relationship -- like she was his slave and he was

2    her master and that was a thing that she thought they were

3    just doing together just them.  And then later, she came to

4    learn that there were others that she hadn't, you know,

5    known about.

6    Q    Did she struggle in particular with one other

7    first-line DOS master?

8    A    With Allison.  I mean, she struggled coming to learn

9    Keith's relationship with Allison.

10   Q    Did Nicky Clyne get married while you were a member of

11   DOS?

12   A    Yes, to Allison.

13   Q    At the time, who did you believe Nicky Clyne to be in a

14   romantic relationship with?

15   A    Keith.

16   Q    Did you write a letter in support of Nicky Clyne and

17   Allison's -- their marriage?

18   A    I did.

19   Q    Ms. Salzman, you testified that there were other DOS

20   slaves under you --

21   A    Yes.

22   Q    -- you recruited them.  How many did you recruit?

23   A    Six in total.

24   Q    And what were their first names?

25   A    Sarah, Audrey, Jimena, Corolla, Amanda, and Charmel.

1  Q    Were you given instructions about what you could tell

2  recruits into DOS?

3  A    Yes, I was.

4  Q    What were those instructions?

5  A    That I was not to tell them about Keith's involvement.

6  Q    Anything else?

7  A    And that -- yes.  Well, kind of -- and in effect, not

8  to tell them about his initials and the brand.

9  Q    What were the requirements of being a DOS slave?

10 A    It -- it was total nondisclosure, so complete secrecy

11 about anything happening in the group and a lifetime vow of

12 obedience to your master.

13 Q    How were these requirements enforced?

14 A    Well, initially there was a whole enrollment process.

15 But the first thing that happened is that the person who

16 would approach you to enroll you or -- or -- and this

17 happened with me, this is what I did with others as well,

18 would ask for collateral.  And basically it was some sort of

19 either material possession or it could have been

20 information -- sensitive information, true or untrue.  But

21 the idea was that it was something valuable enough or

22 damaging enough that would ensure a total commitment to

23 secrecy; that you would rather -- that you would keep a

24 secret like until you died than have this information come

25 out or have this -- you know, lose this possession, whatever

1    it was.

2           Then once you gave that collateral, you were told

3    a certain number of things about the sorority, about the

4    lifetime vow of obedience, the concept of the master and

5    slave.  There was an idea of a collar which was, I was told

6    to be a chain -- a piece of jewelry that you would wear that

7    symbolized a chain to your master.  And ideally this would

8    be a piece of jewelry that you could and would never take

9    off.  And the brand.  And then if you decided you wanted to

10   go forward and do this, you would collateralize all areas of

11   your life.  So more material possessions, more damaging

12   information, as much as possible to secure your commitment

13   that you would never leave and you would never speak about

14   it.  So the idea -- so the question about how it was

15   enforced is the collateral backed it.  In essence, your fear

16   that if you were to go against what you had committed to,

17   that collateral would be subject to forfeiture or release.

18   Q    And throughout this process would the defendant

19   instruct you that his role was to be concealed?

20   A    Yes.

21   Q    Did you provide collateral to join DOS?

22   A    Yes.

23   Q    Were there additional practices associated with DOS?

24   A    Yes.  There were a number of different practices.

25   There was a practice of checking in last thing before you

1   went to bed and first thing in the morning.  So you would

2   say good night to your master before you went to bed, good

3   morning to your master first thing when you woke up.

4   Master -- you would call them master or M, but master was

5   always capitalized as were all pronouns.  So if you referred

6   to them as you, the Y would be capitalized.  He, she, they

7   were always capitalized when referring to the master.

8              Also we did a daily active self-denial or doing

9   something uncomfortable to build character, weekly acts of

10  care.  And then, of course, there were other tasks or

11  assignments given.

12  Q    Was readiness in DOS one of the practices as well?

13  A    Yes, readiness.

14  Q    So you talked about communication in the context of DOS

15  and good morning and good night.  Can you explain exactly

16  what you did and what others did in DOS?

17  A    In the communication?  Most of what we did took place

18  in the -- in encrypted applications that you would have on

19  your phone.  So mostly we used Telegram, and Telegram

20  allowed for you to have a locked chat thread and between

21  just two individuals.  The group chats were not locked, but

22  we used Telegram for everything.

23             So in a locked Telegram thread I can send you

24  encrypted messages, and you could send me back encrypted

25  messages, and it allows for the function that if I wanted to

Salzman - Direct - Hajjar                    1605

1   delete something in my chat, I could delete both my chat

2   from my -- my phone and your phone.  So this was the type of

3   communication and the type of capacity that app had.  But

4   those threads were locked so -- and encrypted so you would

5   have one with your master and then the same with any slaves

6   you had.  So we have individual chats, each of us.  I had

7   individual ones for each of my slaves, and then a group

8   chat, and one with me and Keith.

9               We also communicated on Signal which is another

10  encrypted app.  But then I had group chats with my circle.

11  So the eight first-line DOS women I had to chat with me and

12  I had one with the group of all my slaves together with me

13  and they had one individually without me.

14  Q    And what was the purpose of using Telegram or Signal as

15  opposed to just the normal SMS function or your phone?

16  A    That it was encrypted and more secrecy, more security.

17  Q    Did you receive notifications in Telegram or in

18  What'sApp if certain things happened?

19  A    Yes.  Well, specifically I mean, for readiness drills

20  we would -- we had special readiness threads.  So we would

21  receive an alert that we were having a drill.

22  Q    Can you describe what these drills were in the context

23  of readiness?

24  A    Yeah.  The readiness drill -- originally readiness was

25  something that we had done in SOP, which was the men's

1    organization, so it was unfamiliar to us.  But the way that

2    we did it in DOS was different.  So Keith would initiate a

3    readiness drill by sending a question mark in a group thread

4    to us and to the first line.  The first line had 60 seconds

5    to respond that we received the communication and transmit

6    the readiness drill down to the second line.  The second

7    line had 60 seconds to report it back to us and us to report

8    it to Keith and to get that communication down to the third

9    line and the same with fourth line.  So each line it was 60

10   seconds to get the communication down and back up that it

11   had been completed.

12   Q    Did your slaves know to whom you were reporting?

13   A    No.

14   Q    How often did you participate in these drills?

15   A    Frequently.  I mean, and -- and Keith wanted us to be

16   good at readiness, like effective and efficient at readiness

17   and so until we got readiness done, we couldn't move on to

18   certain other things.  And when we failed at readiness, he

19   wanted to know how we would fix it.  So we were taking

20   consequences for failing at readiness.

21           So what we started doing was practice readiness

22   drills.  So each -- he would initiate readiness drills, it

23   could be every day, it could be a couple times a week,

24   sometimes it was less.  But we started to want to practice,

25   and as we enrolled more and more people in readiness, it

1    became more and more complex and there were more and more

2    errors.

3              So at one point my group agreed -- when I say "my

4    group," my circle of first-line DOS masters, that each of us

5    you would initiate at least one practice drill throughout

6    the week.  So we were -- my group was running eight drills

7    just with us, and then my slaves under me, I was -- I was

8    duplicating everything that was going on with us.  So when

9    they had failures, similar to how Keith would ask us, what

10   are you going to do to fix the failure, I would say to them,

11   what are you going to do to fix the failure, so then they

12   started running practice drills as well.

13             So for some of the people lower in the chain,

14   there were a lot of drills.

15   Q    When did the defendant initiate these drills?

16   A    Whenever.  But frequently it was -- it was at times

17   that we wouldn't be ready.  Like I -- so that we would learn

18   to be ready all the time.  So it could be in the middle of

19   the night.  Sometimes it was concurrently at the same time

20   as the SOP readiness drill which increased the probability

21   that there would be failure because you're running drills

22   with two groups, and the complexity of DOS readiness was

23   there was a lot to do in a short amount of time in those

24   minutes.

25             But sometimes it just -- could be just random like

1    times you wouldn't expect.

2    Q    Did the defendant sometimes initiate these drills in

3    the middle of the night?

4    A    Yes.

5    Q    And did you make certain arrangements so you can be

6    ready for the drill?

7    A    Yeah.  Some people had several phones so that they

8    wouldn't miss the drill.  We had all -- our alerts on the

9    phone turned up to, like, the highest level volume and the

10   alert that would be most, like, most likely to wake you up

11   out of whatever sleep that you were in.  And then everybody

12   had the different phone numbers you could be reached at.  I

13   had a landline plus a cell phone.  And then we had a buddy

14   system as well so that if somebody was missing in readiness,

15   you would go looking for them, and that if they -- if they

16   were missing, you were also accountable for their buddy.  So

17   there was a lot that was involved.

18   Q    You said -- well, were readiness drills secret?

19   A    They were secret, which became very complex because

20   there's a lot that had to be done.  Sometimes people would

21   be missing or you would have go looking for them.

22        You know, there was the four minutes that

23   everything had to happen within tracking the time of that,

24   tracking the number of people and keeping it secret from

25   everybody else who was in NXIVM who you were spending a lot

Salzman - Direct - Hajjar          1609

1   of time with because we were teaching intensive.  So we were

2   in classes together for long periods of time or different

3   committees that we worked on together.  Our whole social

4   group of friends was within this community, so it was hard.

5   It started to become hard to keep it secret.  And also

6   because a number of people who were in DOS were supposed to

7   keep their enrollment or participation separate from each

8   other and then they would be in the same place and receive

9   the drill at the same time.  So they started to identity who

10  each other was and then report back that there had been

11  breaches of that security, so to speak.  And, you know, then

12  there were complexity surrounding that because nobody was

13  supposed to know who was in this group.

14  Q    Were there consequences for failing at readiness?

15  A    Yes, we took consequences.

16        MS. HAJJAR:  Your Honor, may I show something to

17  the witness for identification only?

18        THE COURT:  Sure.

19  Q    Ms. Salzman, I'm showing you what's marked for

20  identification as Government's Exhibit 359.

21  A    Yes.

22  Q    Do you recognize that?

23  A    I do, yeah.

24  Q    What is it?

25  A    This was the buddy system from my circle of first-line

Salzman - Direct - Hajjar          1610

1   DOS masters.

2   Q     Who created this?

3   A     Loreta Garza.

4   Q     Did you have a copy of this personally?

5   A     I did, yes.  This copy was, I think, from my -- I

6   believe from my cell phone.

7   Q     Why did you keep it on your cell phone?

8   A     Because I couldn't remember the buddy system and it

9   needed to be easily accessible.  It was complex because I

10  was accountable for Cami, but if she didn't come, I had to

11  go looking for her.  But I also had to make sure that Dani

12  was there.  And if Cami and Dani didn't show up, I had to

13  make sure Nicky was there.  So I -- you know, there's eight

14  of us, so to remember the order of them and make sure

15  everybody was there checking on all the people while making

16  sure the communication went up in under a minute and down,

17  you know, in each of the lines and tracking the time was

18  incredibly complex.  It was a lot of things at once.  So I

19  had it there on the phone so that I could reference it

20  easily to remember to do that part of it.

21          MS. HAJJAR:  Your Honor, the Government offers

22  Government's Exhibit 359.

23          THE COURT:  Any objection?

24          MR. AGNIFILO:  None, Your Honor.

25          THE COURT:  All right.  Government's Exhibit 359

Salzman - Direct - Hajjar                 1611

1    is received in evidence, publish to the jury.

2              (Government's Exhibit Number 359 so marked and

3    received in evidence.)

4              THE COURT:  I have a question.  Was it ever

5    explained to you by anyone why these readiness drills were

6    necessary in order to be part of this organization?

7              THE WITNESS:  Well, what I had understood from the

8    men's organization, from SOP, was that the readiness drills

9    were to help us build discipline and be responsive and to

10   create a very efficient responsive communications network to

11   disseminate information very quickly.  And in the context of

12   the men's organization, we had used those drills, for

13   example, somebody was kidnapped one time in Mexico, and so

14   the communication network was -- was utilized in that case.

15   Another person went missing in a foreign country, and so I

16   had had prior experience of having this official and

17   effective communication system.

18             But in DOS it was a little bit different where it

19   was a lot more aggressive and there was less leniency in

20   failures and more focus on us just being ready and

21   responsive in discipline all the time.  So I thought that it

22   was part of us learning to be disciplined to be aware and to

23   build these traits of characteristic in ourselves which we

24   come to learn that we didn't have and men did have.

25             THE COURT:  All right.  Thank you.

1    BY MS. HAJJAR:

2    Q    Looking back now, Ms. Salzman, do you have a view of

3    the point of readiness in DOS?

4    A    The point of it?  Like in part of the point of it was

5    Keith's vision of this would be a very big organization at

6    some point, and we would be able to -- to get communications

7    out and move a lot of people in a short amount of time to do

8    different objectives which were undefined, you know, in the

9    theorizing of what that would be.  But I think also there

10   was just having us always be prioritizing this above other

11   things and creating circumstances where we needed to choose

12   this again and again over other things, set aside other

13   things to make this the highest priority.

14   Q    And when you say move a lot of people, the people you

15   are referring to are DOS slaves?

16   A    DOS slaves, yeah.

17   Q    Looking at Government's Exhibit 359, can you

18   identify -- can you explain this to the jury and identify

19   the people listed?

20   A    Sure.  So Camila's at the top -- this is our buddy

21   system.  So Camila was at the top, and she was responsible

22   for Daniella and Daniella was responsible for Nicky, Nicky

23   was responsible for Loreta, Lola, as indicated in the chart.

24   Lola was responsible for Rosa Laura, indicated as Laureis in

25   the chart.  Laureis responsible for Moni, Monica; Monica

1   responsible for Allison and Allison responsible for me.  So

2   if one of us didn't show up to readiness, this told you who

3   you were responsible to contact, to go looking for, to find

4   them to show up for the readiness drill.  But also you were

5   accountable to make sure that the person they were

6   accountable to in their absence was present, and if not, you

7   could end up -- you could end up being responsible for the

8   entire circle if you were the only one who showed up.

9   Q    Was it acceptable in the context of DOS to be

10  unavailable for a long period of time?

11  A    No.  The -- in -- in SOP, the men's organization, there

12  was the concept of being dark, so you could be dark or

13  unavailable for a certain period of time.  Some people would

14  go dark at night, some people, you know, during business

15  meetings, various family functions, do various things.  In

16  DOS the kind of tag line on it was that there was no dark in

17  DOS, no dark.

18          So there were circumstances where it was

19  acceptable, like if you are on an airplane and completely

20  unreachable or something, to have a buddy take

21  responsibility for your line.  But if you were absent, they

22  had to initiate their whole readiness drill plus your whole

23  line's readiness drill in your absence.  So it was -- for

24  some people who had a lot of people in their organization,

25  like I did, it was a sizable workload to off-load onto a

Salzman - Direct - Hajjar          1614

1  buddy, you know, and especially if they had larger

2  organizations, but there were times where that was

3  necessary.

4  Q   When you say you had a larger organization, are you

5  referring to the network of DOS slaves under you?

6  A   Yeah.  I had enrolled a number of people who had

7  enrolled a number of people who were enrolling a number of

8  people, so the group grew and readiness became more complex

9  as the group grew.

10  Q   Were there times that you reorganized your life or

11  changed your schedule in order to be available for readiness

12  drills?

13  A   Constantly.  And some of them were difficult because if

14  they came -- so you didn't want to go dark that often or I

15  didn't, and we were trying to succeed at this and do it

16  well.  Like sometimes it would come -- like one time it came

17  and I was driving and I had -- I crossed -- like be able to

18  pull over, I had to cross over like four lanes of traffic to

19  do it, and it wasn't safe to be doing all the time, not the

20  way we were doing it.

21  Q   As a DOS slave were you expected to ask permission of

22  your master, in this case, the defendant?

23  A   Yes, for different things.  But I already did that in

24  my life with Keith.  I mean, before I joined DOS I had

25  already asked Keith for permission for most things in my

Salzman - Direct - Hajjar                    1615

1    life.

2    Q    Did your DOS slaves ask permission of you?

3    A    Some of them asked for some things, yeah.

4    Q    Did you perform work for the defendant in DOS?

5    A    Yes.

6    Q    Can you explain what an active care was in the context

7    of DOS?

8    A    Sure.  We had -- we had had a community project in

9    Albany for the Albany NXIVM community and we had within that

10   community project guardians, and those guardians would do a

11   caring act once a week to help the person who you were the

12   guardian of.  So the concept was familiar to me beforehand

13   from this project of learning to care about somebody just

14   for the sake of caring, like building that trait in

15   yourself, not because you were going to receive anything

16   back for it.  So in DOS, that concept was brought and

17   employed in doing acts of care, things that would be caring

18   for your master every week.  So you were -- we were assigned

19   once we joined that -- that we would do the these weekly

20   acts of care to build caring in ourselves and with the

21   thought of contributing something that would help the master

22   somehow in their life, in their work.

23   Q    Were you required to perform acts of care?

24   A    Yes.

25   Q    And can you give some examples of what kind of acts of

Salzman - Direct - Hajjar                    1616

1    care were performed for the defendant?

2    A    So -- well, initially when I joined, I considered some

3    of the things that I did to work with people in his life to

4    help off-put his workload with those individuals, active

5    care.  So I would do counseling sessions with people or help

6    in some of the different companies that he had founded.  And

7    then sometimes, I -- like if I was going to the grocery

8    store, I would ask, Do you want -- I'm going to Whole Foods,

9    do you want something?  Later he would start to point out

10   things that we had done that were uncaring.  Like the time

11   he had left volleyball and walked to his car and found the

12   car cold.  And so then we rearranged our schedule to make

13   sure that somebody was always there in the middle of the

14   night when he left volleyball to warm up the car.  But I,

15   like, brought drinks to volleyball and things that I knew he

16   liked or wanted.

17            At one point I considered some of the other

18   project work I was doing for DOS acts of care, but then

19   later I was told that wasn't an act of care.  Daniella came

20   to the group at one point saying we were misunderstanding

21   acts of care and we should be doing things that were more

22   devotional in some way.  But I didn't really understand that

23   concept, and I didn't ever come to really understand what

24   she was bringing.

25   Q    What other work were you required to do for the

1  defendant?

2  A    Well, when I first joined, Keith said he wanted me to

3  help edit the book, the DOS book.  So the book was like the

4  philosophy behind the sorority.  So reading the whole book,

5  editing the transcripts of it, creating this book was

6  incredibly time-consuming, and I think one week I probably

7  spent 70 to 100 hours on this book, and it was something

8  very important.  He wanted it done in an expedited amount of

9  time and would consistently check to make sure I was making

10  progress and telling me that I was -- my work capacity was

11  low.  I wasn't getting it done in enough time.

12  Q    Were you reimbursed, for example, for the groceries you

13  purchased for the defendant?

14  A    No.

15  Q    Did you also purchase groceries for someone else?

16  A    Yes.  Well, if I called him and asked him if I -- if he

17  wanted me to get something from Whole Foods, he would say,

18  Ask Marianna.  So then I would call Marianna and get

19  Marianna's grocery list.  So I would buy groceries for him

20  and Marianna.

21  Q    Was that difficult for you?

22  A    Yeah, it was really difficult for me.

23         And then also when I was told that I could just

24  leave the groceries in the garage, that was also really

25  hard.  They were -- I mean, he was living with Marianna and

1  in many ways, I viewed that as who he chose to have a

2  relationship with instead of me, you know.  It wasn't to the

3  exclusion of other relationships or anything, but that was

4  like his main -- that was the person he lived with.  It was

5  a person I -- from my perspective, he spent most of his time

6  for and with, and it ended up being somebody that he

7  ultimately chose to have a child with, you know.  So, yeah,

8  it was really hard for me to get groceries for him and

9  Marianna and leave them in the garage without even coming in

10  to say, Hi, when they were both in the house.

11  Q     Did your slaves do work for you?

12  A     Yes.

13  Q     Did you discuss acts of care with the defendant at one

14  point?

15  A     Yes.  He came to -- well, he came to a meeting that I

16  was having at my house.  We were having a meeting to put --

17  to discuss ethics protocols for the sorority, and he came to

18  the meeting and shared that he thought -- he was thinking

19  that each week each slave would put in an hour of work, give

20  an hour of work to their master or an hour of work and --

21  and an hour of work to their grand master.  The concept was

22  so that if you had six slaves and at some point he decided

23  six -- there was something special about the number six.

24  Like if we each had six slaves who each had six slaves under

25  them, you would qualify for a special position and to

1   receive special privileges.  I don't recall specifically the

2   privileges.  But that if you had that you would have

3   40 hours, approximately 36, but approximately 40 hours of

4   work per week for life from these individuals.

5   Q    Did he discuss a monetary substitute for this work?

6   A    Yes.  He shared that if they didn't -- he was thinking

7   if they didn't want to do the hour, that they could pay

8   dues, like some menial amount of money like $15 a week or

9   $20 a week, something like that.  But it was preferable --

10  it was preferable for them to do the work.

11  Q    Ms. Salzman, when you said the sorority in the meetings

12  earlier, do you mean DOS?

13  A    Yes.  Whenever I say the sorority, I mean DOS.

14  Q    Or The Vow?

15  A    Yes.

16  Q    Those organizations, all the names are the same?

17  A    Yes, same thing.

18  Q    Was recruitment a focus in DOS?

19  A    Big focus.

20  Q    How so?

21  A    Keith wanted us to grow and he wanted us to grow

22  quickly.  He was checking in on how we were doing with

23  enrollment a lot, frequently, and wanted us to -- was

24  very -- pushing for us to get to 100 people, and then pushed

25  me specifically to get a hundred in my group alone in under

1  six weeks and was constantly asking like where -- how many

2  people do we have?  Where are they in each stage of

3  enrollment?  And, like, What are your projections and when

4  do you think we're going to get this number?  How many more

5  are we going to get in this period of time?  And so he

6  wanted us to be able to make those projections and have that

7  information readily accessible whenever asked.

8  Q    Did the defendant express a preference for enrolling

9  people into DOS that were not part of the NXIVM community?

10 A    Yes.  He wanted us to get new people.  Very much wanted

11 new people and people outside -- and people in positions of

12 power and influence.

13 Q    Was enrollment in DOS documented in some way?

14 A    Yes.  We kept track of it in Excel spreadsheet and a

15 DropBox folder.

16 Q    Did the defendant ever instruct you to make sure you

17 were tracking enrollment?

18 A    Yes.  Tracking it and tracking it down to like even the

19 minute that the person was enrolled and keeping track of the

20 order of everybody as they were enrolled.  The number and

21 order were very important.

22 Q    Were there certain stages of enrollment in DOS?

23 A    Yes.  There were four, but that ended up being five

24 stages of enrollment, which was somebody was a prospect.

25 Then they were -- they had submitted that first collateral

Salzman - Direct - Hajjar                    1621

1   so they had made the commitment to secrecy.  They were given

2   basically the pitch, you know, come to learn about lifetime

3   vow of obedience master/slave concepts, the collar and the

4   brand.  Then they had agreed to join after learning those

5   things and then they were fully collateralized.  So they

6   were not considered completely enrolled until they were

7   fully collateralized.

8   Q    What does it mean to be fully collateralized?

9   A    That they had provided substantial collateral in all

10  areas of their life of material possessions and information

11  on them.

12  Q    Was one requirement of DOS to get a brand?

13  A    Yes.

14  Q    Did you get branded?

15  A    I did.

16  Q    What was the brand of?

17  A    Keith's initials.

18  Q    Did you know that at the time?

19  A    I did, yes.

20  Q    And what about the slaves under you, did they know?

21  A    No.  We were not allowed to tell them.

22  Q    At any point did you or the other first-line DOS

23  masters express concern about the fact that the brand was of

24  the defendant's initials?

25  A    Yes, I did and others did as well.  Keith said that it

1   shouldn't matter.  It wouldn't make a difference that it

2   doesn't -- that nobody would know, and that we were being

3   like just making problems or focusing on being negative, you

4   know, about things that weren't really an issue.  He didn't

5   want to change it.  He wanted it to be this way, and

6   insisted, it would not be a problem, even though a number of

7   us did think it was a concern.

8   Q    At some point were you told about an additional tattoo

9   that would be made to the brand?

10  A    I was, yes.

11  Q    Can you explain that?

12  A    My understanding was that the tattoo was to be -- so

13  the brand is a scar.  The -- and that the tattoo would go

14  over the scar so it would be -- the initials would be

15  retattooed over the scar, but then there would be additional

16  parts of the tattoo.  Like Keith had an idea that he wanted

17  to have some kind of a nicer -- pretty design, but that it

18  would have in it a special symbol of the lineage.  So

19  everybody who was under me in line, each of the eight DOS

20  masters were considered a lineage.  So each one would have

21  their own unique special symbol that everybody in that line

22  would have.  There would be a special symbol, I think

23  between the master and slave.  So the girls that I enrolled

24  would have a special symbol that they shared just with me.

25  And then each of them would have a special symbol that they

Salzman - Direct - Hajjar          1623

1    shared just with the girls that they enrolled.  Our number

2    of enrollment was part of that and there may have been other

3    things that I can't recall possibly having to do with what

4    area you were from or something.  But I'm not a hundred

5    percent sure about that.

6    Q    Did you, in fact, get a tattoo over your brand?

7    A    No.

8    Q    Why not?

9    A    Because Keith never decided on the design.

10   Q    You testified, Ms. Salzman, about meetings that you had

11   with the first-line masters in DOS?

12   A    Yes.

13   Q    Where were those meetings held?

14   A    Initially they were held at -- at different people's

15   homes.  Usually the homes that were least likely to have

16   people notice that we were having meetings there and where

17   we could take our naked pictures and nobody would know that

18   we were doing that.  But then later we bought a home.

19   Rosa Laura bought it, that was the sorority house.  It was

20   on 9 Milltowne Drive in Halfmoon, and that was where we had

21   all our meetings after that.

22   Q    When the defendant was present at these meetings, were

23   they recorded?

24   A    Yes, generally.

25   Q    Who recorded them?

Salzman - Direct - Hajjar                    1624

1   A    Mostly Loreta, but if she wasn't present, somebody else

2   would.

3   Q    Loreta Garza?

4   A    Yes.

5   Q    Later did you access a drive with recordings of these

6   meetings?

7   A    Yeah, Loreta's drive.

8   Q    Can you explain that to the jury?

9   A    There was -- she had a video that I needed to get off

10  of her drive, and so I just saw that there were a number of

11  things cataloged on the drive.  Loreta was historian in

12  NXIVM for a while and she was very good at technology and

13  organizing information, and so I believe that drive was like

14  the repository of where all the information was.

15  Q    Did you have those recordings yourself?

16  A    I had access to recordings of the book, not all the

17  recordings.  The purpose of the recordings for the book was

18  that he had given -- we called them downloads, but like an

19  explanation of the concepts that were recorded and then

20  those recordings were transcribed and that transcription was

21  edited and it was becoming a book.  So I was given access to

22  the initial downloads, the initial recordings to be able to

23  go listen to them, to clarify concepts in the book that I

24  was editing.

25  Q    You mentioned naked photographs you were required to

1    take at DOS meetings?

2    A    Yes.

3    Q    Did the defendant impose requirements about what the

4    photographs should look like?

5    A    Yes.  Well, generally, I mean, we were supposed to be

6    uniform, so like all looking the same.  So one time, like,

7    Daniella had a baseball cap and we got feedback that either

8    we all had to wear hats or nobody had to wear hats.  Nobody

9    should wear hats.  So we were to be uniform, fully frontally

10   naked, the brand should show, and we should appear happy in

11   the pictures.  Like if we weren't happy, we got feedback

12   that we weren't happy and we needed to retake the picture.

13   Q    When you got feedback, who gave you the feedback?

14   A    Keith.

15   Q    Were the photographs sent to the defendant?

16   A    Yes.

17   Q    Who sent the photographs to the defendant?

18   A    Whoever took the pictures, I mean.

19   Q    Did he respond?

20   A    Sometimes.  Not always.

21   Q    When the defendant gave feedback on the photographs,

22   would you sometimes have to retake the photographs?

23   A    Yes.  Whenever there was feedback given on the

24   photographs, we incorporated the feedback and retook the

25   picture with the feedback incorporated.

Salzman - Direct - Hajjar                 1626

1    Q    What does that mean, when you incorporated the

2    feedback?

3    A    We made a change that was suggested.  If we didn't look

4    happy, we did a picture that was happier.  If our legs

5    weren't spread enough, we had to spread our legs more.

6    Whatever the feedback was, we did it.

7    Q    Did the defendant request explicit sexual photographs

8    from you and the other first-line DOS masters?

9    A    Yes.

10   Q    How often?

11   A    Sometimes -- I mean, from time to time, but it was

12   enough that everyone knew that he preferred those types of

13   pictures.  And so generally our focus -- a lot -- generally

14   we would tend to just take that picture at the onset like

15   because it was viewed as preferable to him that we took a

16   picture with our legs spread or up close vaginal pictures,

17   that he liked that better and everybody in the group knew it

18   enough that we would focus the pictures on that.

19   Q    Did the defendant ever give you or the other first-line

20   DOS masters feedback with regard to grooming of pubic hair?

21   A    Yes.  He wanted to know -- he looked at a picture

22   specifically of my vagina and said -- wanted to know why it

23   looked groomed.

24   Q    Were you aware based on your prior sexual relationship

25   with the defendant of his preference in that regard?

1   A     Yes.

2   Q     How did you feel about the photographs?

3   A     I had mixed feelings about the photographs.  I mean,

4   for me it was very uncomfortable.  Like the elephant in the

5   room for me was that he was having sex with a lot of these

6   people and he wasn't having sex with me anymore, and so I

7   felt very insecure about that, and I would have to, like,

8   consistently set that aside to be able to do what was being

9   done.  And I would tell myself that it wasn't sexual because

10  it was Keith's, and the reason that we were doing this was

11  just so that we would learn to become comfortable with our

12  bodies and that, you know.  It was just about vulnerability.

13  But I knew he liked certain things, and he was asking for

14  those things and he was asking for those things from people

15  he was having sexual relationships with, and as he had --

16  and when he had taken pictures of me when we were having a

17  sexual relationship.  So it was hard to keep that part of it

18  out of it.

19          But I wanted to believe that that wasn't part of

20  it.  And then at the same time, I went -- some of my best

21  friends in my hole life, and we're, you know, taking naked

22  pictures three times a week, eventually you get very

23  comfortable with everybody, you know, and I tried to make

24  jokes or make it fun or try to think of like fun themes that

25  we could do, like, to take the pictures which made it easier

1   for me to do it and to feel okay doing it.  And it made it

2   more comfortable between all of us.  But it was really

3   difficult, and I didn't want to be doing it.

4   Q    What was the effect on you of the requirement to look

5   happy in the photographs?

6   A    Well, it was just fortified that we should always --

7   like if we weren't happy with some of the things that we

8   were doing -- and this was true of anything, it wasn't just

9   this.  That it was -- that we had some issue and it was

10  indicative of our issue, that we could choose to be joyful

11  at any moment.  And if we didn't have -- if we weren't

12  choosing issues as the highest priority, then we would just

13  be joyful with anything that we were doing.

14          So the photographs specifically for the reasons I

15  just described were especially difficult.  So then I was

16  there pretending that I was happy taking sexual pictures

17  with the people he was preferring to have sex with instead

18  of me, and that -- it was -- sometimes it was very

19  difficult.  Like I tried to make it fun, and sometimes it

20  was fun and I could have fun doing it.  But a lot of times,

21  it was just very painful and hard to put on a happy face for

22  that.

23  Q    You testified that you provided collateral to join DOS?

24  A    Yes.

25  Q    At some point were you required to submit additional

1    collateral?

2    A    Yes.

3    Q    Can explain that to the jury?

4    A    Well, initially, I -- I provided -- I was told that I

5    need to provide something that would be, like, so

6    significant that I would, like, rather die than share this

7    information.  So I provided the account of -- of an actual

8    crime that I had been a party to and that implicated my

9    parents, Keith, and a number of my friends.  And I was --

10   that collateral was rejected, and so then I was asked to

11   provide naked pictures instead.

12   Q    And some time after that, after you had joined DOS,

13   were you required to commit collateral on a monthly basis?

14   A    Yes.  I was -- so after I -- I said I wanted to join,

15   the idea was that you collateralized all areas of your life.

16   So I had, you know, promised to -- all my material

17   possessions, all my finances, you know, all of that.  And

18   then Keith said -- came to a meeting or asked at the meeting

19   why we weren't submitting monthly collateral, as if it had

20   been a thing?  And I guess it had been before I came, but I

21   was unaware of it, and I learned that we were supposed to be

22   submitting monthly collateral.  He said that the idea of it

23   and the importance of it was to keep the collateral current.

24              So like if I -- and I think he gave an example of

25   a car.  I don't recall specifically, but like my impression

Salzman - Direct - Hajjar                1630

1   coming away from that was like that if I had a Toyota or

2   something now, maybe I'm not as successful in my life now or

3   that Toyota is not going to be as valuable to me in ten

4   years and maybe even in ten years I could afford a Mercedes

5   or something.  So the Toyota wouldn't have the same hold on

6   me and ensure my secrecy and commitment.  So we always had

7   to keep the collateral current so that it would always have

8   that influence, that effect that we would be unwilling to go

9   against our commitment or -- our commitment of staying

10  forever and being in total obedience and secrecy.

11  Q     Did you submit monthly collateral?

12  A     I did, yes.

13  Q     What were some of the things you submitted as monthly

14  collateral?

15  A     I mean, we were taking naked pictures, up close vagina

16  pictures three times a week.  So I was told that wasn't

17  consider collateral, but to me that was very weighty

18  collateral because it was not something I would ever want

19  anybody to see and there was a lot of it.  But then I

20  started promising more material possessions and things, but

21  we were running out of what to do, and so we were asking

22  each other and asking Keith for ideas of what you could do

23  and when everything is already collateralized and he had

24  suggested at one point like that, you know, we could get

25  creative and he shared -- he said you could even stage

1    crimes.  He told me a story of somebody who had staged a

2    break-in to make it look like they had, like, broken into

3    Clare's house and taken something which she wasn't home, but

4    really the whole thing was a sham.  But it was this idea

5    that we could have things like criminally -- you know,

6    implications, criminal implications to our collateral.

7    Q    So the defendant suggested that there would be videos

8    of these staged crimes?

9    A    Yes.

10   Q    And those videos were collateral?

11   A    Yes.

12   Q    Did the defendant express interest in a house that was

13   specific to DOS?

14   A    Yes.  He wanted us to get a house for the -- a sorority

15   house.

16   Q    Did he say anything about where it should be within --

17   what?

18   A    My belief was that it should be in walking distance.

19   He wanted -- my understanding from the group, and they were

20   looking for a house before I even joined, was that it needed

21   to be in walking distance.

22   Q    Did a house -- did someone purchase a house for this

23   purpose?

24   A    Yes.  Rosa Laura purchased the house that was in

25   walking distance right behind the development where he was

Salzman - Direct - Hajjar                    1632

1    living and we could walk there.

2    Q    Do you know who purchased the house and who paid for

3    it?

4    A    I think Rosa Laura did.  I mean, I haven't seen

5    documents about it, but that was my understanding, that she

6    purchased it and paid for it and put it in a trust.  And

7    that we -- we the eight first-line DOS masters were

8    accountable for the expenses of it.  So we paid monthly to

9    cover the mortgage and Internet, electricity, all those

10   things.

11   Q    Did you start meeting at that house afterwards?

12   A    We did.

13   Q    Okay.  I want to show you what's in evidence as

14   Government's Exhibit 126 and 127.

15        Do you recognize this exhibit?

16   A    (No audible response.)

17   Q    Do you recognize this photograph, Ms. Salzman?

18        THE COURT:  Hold on.

19   A    Nothing came up on the screen.

20        THE COURT:  I'm sorry.  Is this just for the

21   witness?

22        MS. HAJJAR:  No, Your Honor, it's in evidence.

23        THE COURT:  Okay.  Go ahead.

24   A    Yes.

25   BY MS. HAJJAR:

Salzman - Direct - Hajjar                    1633

1    Q    Do you recognize this?

2    A    Yes.  I believe that's 9 Millhouse Drive, which is

3    the -- or Milltowne, which was the sorority house.

4    Q    This depicts the sorority house?

5    A    Yes.

6    Q    And this photograph?

7    A    Same.

8              MS. HAJJAR:  May I have just one minute,

9    Your Honor?

10             THE COURT:  Sure.

11             (Pause in proceedings.)

12   Q    Ms. Salzman, I'm going to show you what's in evidence

13   as Government's Exhibit 851.

14             MS. HAJJAR:  I'm sorry, Your Honor.  One moment.

15             (Pause in proceedings.)

16   BY MS. HAJJAR:

17   Q    I'm showing you what's in evidence as

18   Government's Exhibit 853.  Have you ever seen the document

19   before?

20   A    No.

21   Q    Do you recognize this address?

22   A    Yes, 9 Milltowne Drive in Waterford.

23   Q    Was this an address that was associated with the DOS

24   house?

25   A    Yes.

Salzman - Direct - Hajjar                    1634

1    Q    Do you recognize that name, Alex Martin?

2    A    No.

3    Q    Do you recognize this name, Danielle Padilla?

4    A    Yes.

5    Q    Ms. Salzman, were there penitences or punishments in

6    DOS?

7    A    Yes, there were.

8    Q    Can you explain that to the jury?

9    A    So penitence was a concept that we learned in the NXIVM

10   curriculum, and it was the idea of taking on something

11   painful of difficult to remind yourself of the importance

12   and to build continuous self-awareness, in essence, of the

13   importance of various things, whatever the important value

14   was that you were seeking to uphold or actualize.  And some

15   of the penitences would be in line with, let's say, you

16   were -- you know, mindless or late a lot, you might take a

17   penitence of doing some sort of like a 15-minute reality

18   check, just 15 minutes, just come, be conscious of where you

19   are, what your time frame is, and build awareness so you

20   would stop being late.  But also maybe that you were late

21   and took on a penitence like taking a cold shower, for

22   example, standing barefoot in the snow, that would be so

23   uncomfortable that you would think twice before ever being

24   late again.

25              So when I joined the sorority, they had shared

Salzman - Direct - Hajjar                1635

1    with me that some of the penitence they had been doing was

2    for failure like waking up in the middle of the night and do

3    burpees.  But when we failed a readiness, they had been

4    taking paddlings.  So we were to paddle each other with a

5    piece -- a leather strap, you know, naked butt for our

6    readiness failures that we were doing.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L. Salzman - direct - Hajjar                                    1636

1  BY MS. HAJJAR:

2  Q    Did there come a time where the defendant discussed

3  paddling with you?

4  A    He called in to a meeting where we were paddling each

5  other for our failures and we were taking penances for the

6  readiness failures but then it became any item on our minute

7  list with any of our projects or any of the things that we had

8  committed to do that we were failing at we were taking

9  paddling for, so we would take our naked picture and then

10 everybody would take the number of whips that you -- that was

11 commensurate with your failures and he called in and wanted to

12 make sure that we were flicking our wrist hard enough or if

13 you flick your wrist a specific way or if you really get the

14 wrist into it, then it should really hurt and that's what the

15 paddling should be, it should be something that really hurts.

16 Q    Were taking penances or punishments optional in DOS?

17 A    No, because he -- I mean he was -- we're doing a vow of

18 obedience and he's saying what are you going to do to fix it

19 and you were required to fix it.

20 Q    And were some of these ways including paddling ways to

21 fix it?

22 A    Yeah, it was viewed as a way to fix it, to make sure it

23 never happens again; if you get hit hard enough, you start

24 thinking twice about screwing up readiness, not staying up all

25 night if you needed to get something done or whatever the

L. Salzman - direct - Hajjar                    1637

1   thing was.

2   Q    Did you come to learn that the first line had been

3   paddled by the defendant?

4   A    Daniella told me she had -- she told me that she had been

5   paddled by him and it was so painful and it was something I

6   hoped to never happen to me, it didn't sound like anything I

7   ever wanted.

8   Q    And this is Daniella Padilla?

9   A    Yeah.  I was concerned about it.

10  Q    Did Daniella Padilla tell you about another punishment

11  the defendant gave her?

12  A    She told me that she was in a prideful state and that he

13  was trying to help her break the state and she had been on the

14  floor and that he kicked her and that was also something that

15  I never wanted to be in the situation.  These things started

16  to become scary for me.  I was concerned about failing.

17  Q    And when you say "prideful state," what does that mean,

18  what do you understand that to mean?

19  A    Not being vulnerable, not being willing to acknowledge

20  failures or wrong -- like that she had failed or that she was

21  wrong, that instead she was trying to be right or be arrogant

22  and not be humble.

23  Q    You testified, Ms. Salzman, about a dungeon in the

24  context of DOS?

25  A    Yes.

L. Salzman - direct - Hajjar                              1638

1    Q    Did the defendant tell you about a dungeon?

2    A    Yes, and Daniella as well, that they were making a

3    dungeon in the basement and he spoke specifically about a

4    cage, that there would be a cage and he said it was for the

5    people who were the most committed to growth, they could go

6    and get locked in the cage and my understanding of it was it

7    was a type of surrendering, that to go in and to get locked in

8    and to not know when whoever was in charge of it was going to

9    let you out which also was something that I didn't want to do,

10   that was scary and that I was concerned that I would have to

11   do to demonstrate that I was one of the people who was

12   committed to growth or that it would become something that we

13   were taking on like as a penance for something.

14   Q    You say the basement?

15   A    Yes.

16   Q    Where is the basement?

17   A    Of 9 Milltowne Drive, of the sorority house.

18   Q    What did you picture the dungeon to contain, what did you

19   understand it to have?

20   A    Well, Daniella tell me at one point that she had ordered

21   a bunch of things for it and all the things that she described

22   were like BDSM sex torture things.

23   Q    Like what?

24   A    Like handcuffs, she described the cage, nipple clamps.

25   She talked about one thing that -- I didn't understand the

L. Salzman - direct - Hajjar                    1639

1   concept specifically -- but like tied your wrists and ankles

2   and had some kind of net or something, I don't -- you know,

3   all things that were sexual in nature.

4   Q     Did Daniella Padilla in fact order items for the dungeon?

5   A     She told me she did order them and that the weekend that

6   everything about DOS became public she told me that she had

7   ordered the things and she was going to cancel the order so it

8   didn't become public that we had a dungeon or we were having

9   the dungeon.

10  Q     Did you have a conversation with the defendant about what

11  would happen if you went in the cage or did you express to the

12  defendant a concern?

13  A     It wasn't specifically about what would happen much

14  beyond it was you were just in there until they let you out

15  but what I -- you know, you would just be in there

16  surrendering, it could be, you know, ten minutes, it could be

17  an hour, it could be days, like you didn't know how long it

18  would be and that was the whole point of surrender but what I

19  imagined was like being in there and having to go to the

20  bathroom or something and then having to go through like that

21  type of a humiliation which I think was the point of

22  surrender, being willing to go through things that were

23  vulnerable or humiliating or being willing to go through

24  whatever as an experience of complete surrender and so that's

25  what I imagined and, you know, obviously not the kind of thing

1    you're hoping to experience.  I wasn't.  I wasn't hoping to

2    experience that.  It wasn't something I wanted to do.  And the

3    fact that it was being linked with growth, like the most

4    committed people to growth, so it became like if I didn't want

5    to do it, then I was one of those people that wasn't committed

6    to growth and that was a very hard thing to get my mind around

7    and I didn't believe that you couldn't be most committed to

8    growth unless you were willing to do BDSM things.

9    Q    You testified about the game as well, the game as a

10   concept in DOS?

11   A    Yes.

12   Q    Can you explain what that was?

13   A    I wasn't as involved in the game as -- I worked on the

14   book so the game was a different project but my understanding

15   was that the game had different objectives.  One of the

16   objectives was like a screening process to find people who

17   would be -- who would want to have a lifetime vow of

18   obedience, that most people wouldn't want to have that but the

19   game would be a filtering system to find the people who would

20   want that but there might be other people who would want to be

21   involved in the group to lesser degrees and so they could play

22   at whatever level they wanted to play at but also it was a way

23   of getting a lot of information -- personal and private

24   information about people, as many people as possible was my

25   understanding because we wanted to recruit as many people as

1    possible but it would start out like a simple thing that I

2    could just say to you at a party or a bar or something like,

3    do you want to play a game, and then it would start out just

4    really simple like, you know, it could be something like I

5    dare you to do something and then you would do it and you

6    would get something for that.  So, it was a progressive thing,

7    the more you gave, the more you got and you could go up

8    different levels.

9    Q    You say it was intended as a screening process for DOS,

10   can you explain how that worked?

11   A    The people who wanted to go up the levels very quickly

12   and were on board for all of those levels would be the kind of

13   person who could be presented with the concept of this

14   lifetime vow of obedience to a master and would want that.

15   You could more quickly identify what kind of person would want

16   that based on how they were responding and what they were

17   willing to do in the game.

18   Q    You testified about the DOS book and your efforts with

19   the DOS book; can you explain what that was?

20   A    The book was, as I understood it, was the philosophy of

21   the concepts of why have a master, why be a slave, like what

22   are the benefits of doing that, why have a sorority or a group

23   all collateralized, you know, with each other -- with their

24   masters and with each other, why -- what it meant that you

25   were making this commitment to serve a master and ultimately

1  like that your master was supposed to your highest priority

2  and that your main job as a slave was to always be thinking

3  about them and thinking about how to move their life forward

4  and that should be the highest priority always above all other

5  things.

6  Q    Who created the context of the DOS program?

7  A    Keith created it.

8  Q    How did it become the actual DOS book, can you describe

9  that process?

10  A    Well, before I was in the sorority he gave the ideas for

11  it, so he would go to the meetings and share what the concepts

12  were and they would be recorded and then those recordings were

13  transcribed, I'm not sure by who but I assume the first line,

14  and then those transcriptions were edited to make a book and

15  when I came in Nicky and Rosa Laura most particularly were

16  working on editing the book and Keith asked if I would help

17  edit the book.

18  Q    Did you hear the original recordings in the process of

19  editing the book?

20  A    Some of them.

21  Q    At what point would you consult the original recordings?

22  A    When something that was written didn't make sense to me,

23  to hear how Keith said it gave me an understanding of what he

24  was talking about.

25  Q    So, for each -- did the book comprise chapters?

L. Salzman - direct - Hajjar                           1643

1   A    Yes.

2   Q    For each of those chapters were the original contents in

3   a recording that you could listen to of the defendant's voice?

4   A    Yes.

5   Q    Did the defendant ever tell you what his plans were for

6   the DOS book, what he intended for it?

7   A    I think he wanted it to be like a -- like what was -- he

8   compared it to some of the other things that existed in like

9   the field of like yoga, so it could be something like that,

10  like understanding how to have a relationship with your guru

11  or, you know, those type of yoga practices but the book would

12  be very pretty and it would outline the philosophy, people

13  could go and they could study the book but the book was

14  supposed to be secret and that he had envisioned that it would

15  be kept in like a secret location and that people could go but

16  they would have to be like basically checked that they

17  wouldn't record anything, they wouldn't copy it, they wouldn't

18  take any pictures of it, you know, like screens to be able to

19  go in and that the book could be like maybe chained to the

20  wall or something, it would be secure so they couldn't take

21  it, they couldn't copy it, there would be no evidence of it

22  but they could go to these places and they could study this

23  book.

24  Q    Where would the -- did you have an understanding of where

25  the book would physically be?

L. Salzman - direct - Hajjar                    1644

1    A    We talked about the idea of getting bigger and having

2    different areas that would have chapters of the sorority, that

3    each chapter might have a book.

4            MS. HAJJAR:  May I show something to the witness for

5    identification only, Your Honor?

6            THE COURT:  Yes.

7    Q    Ms. Salzman, I'm showing you what's marked for

8    identification as Government Exhibit 1403.

9            Do you recognize this exhibit?

10   A    Yes, I do.

11   Q    What is it?

12   A    It's an email that I sent to Keith of edits that I made

13   in Chapter 1 of the book for his review.

14   Q    Showing you what's marked for identification as

15   Government Exhibit 426.

16           Do you recognize this exhibit?

17   A    Yes, I do.

18   Q    What is it?

19   A    Keith sent back his comments about my edits, he edited it

20   a little to show me the right path to be on and then this

21   email is me forwarding his comments to Nicki and Rosa Laura.

22   Q    I'm showing you what's been marked for identification as

23   Government Exhibit 427.

24           Do you recognize this exhibit?

25   A    That's the email that Keith sent back to me with his

L. Salzman - direct - Hajjar                          1645

1    edits.

2    Q    Did each of these emails have attachments?

3    A    Yeah, they had Chapter 1 edited, my edits and then his

4    edits and then that forwarded on.

5    Q    I'm showing you what's marked for identification as

6    Government Exhibit 1404.

7            Do you recognize this exhibit?

8    A    That's the book.

9            MS. HAJJAR:  Your Honor, the government offers

10   Government Exhibits 1403, 426, 427 and 1404.

11           MR. AGNIFILO:  Can I have a second to talk to the

12   prosecutor?  There's two exhibits that are the same.

13           THE COURT:  You want to talk to the prosecutor?

14           MR. AGNIFILO:  Yes, yes.

15           THE COURT:  Go ahead.

16           (Pause while counsel confer.)

17           MR. AGNIFILO:  The mystery has been solved.  No

18   objection.

19           THE COURT:  All right.  Government Exhibits 1403,

20   426, 427 and 1404 are received in evidence.

21           (Government's Exhibits 1403, 426, 427, 1404 so

22   marked in evidence.)

23           MS. HAJJAR:  Thank you, Your Honor.  May I publish

24   them?

25           THE COURT:  Yes, you may.

L. Salzman - direct - Hajjar                              1646

1    Q    So, first showing you Government Exhibit 1403, who sent

2    this email?

3    A    I did.

4    Q    And when was it sent?

5    A    On February 9th, 2017.

6    Q    What's the subject of the email?

7    A    Chapter 1, Word-By-Word, LS edit 4.

8    Q    And is there an attachment to this email?

9    A    Yes.

10   Q    Can you read the text of the email please?

11   A    M -- which stands for master -- M, please find my

12   stripped down version of Chapter 1, the word by word section.

13   Please let me know if you think I am in the ballpark.  Thank

14   you, L.

15   Q    Why are certain -- why did you capitalize the "Y" in You?

16   A    Because we capitalized all pronouns referring to our

17   master.

18   Q    And your master was the defendant?

19   A    Correct.

20   Q    Showing you the subsequent pages, what is this, what is

21   the attachment to this email?

22   A    This is Chapter 1 of the book.

23   Q    I'm showing you Government Exhibit 426 -- 427.

24        Who sent this email?

25   A    Keith sent it back to me.

L. Salzman - direct - Hajjar                              1647

1    Q    What date?

2    A    February 10th, 2017.

3    Q    And what is the text of this email back to you?

4    A    What is the text, he said that he edited it a little, he

5    edited my edits a little but that I'm on the right path he

6    thinks.

7    Q    And looking at the attachment, can you explain the edited

8    text here?

9    A    He took out some words, added some words and what -- his

10   edits are highlighted to give me an idea of how to carry that

11   type of editing forward through the rest of the book.

12   Q    And showing you what's in evidence as Government

13   Exhibit 426.

14   A    This is an email that I sent to Nicki and Rosa Laura

15   February 10, 2017 saying:  Here's what I sent him and some

16   comments he sent back.  Let's discuss.

17   Q    What do you forward?

18   A    His edited version.

19   Q    When you say, "what I sent --

20              MR. AGNIFILO:  I think our monitors are dark.  I

21   think the government's monitors are dark too.

22              THE COURT:  We'll get it fixed.

23              MR. AGNIFILO:  Thank you, Judge.  I apologize.

24              THE COURT:  That's all right.  Thanks for letting me

25   know.

Case 1:18-cr-00204-NGG-VMS  Document 802  Filed 10/08/19  Page 65 of 246 PageID #: 10742

1   Q    And when you say, "what I sent him," who were you

2   referring to?

3   A    Keith and it's capitalized because he's our master, he

4   and him.

5            MS. HAJJAR:  Your Honor, may we activate the

6   PowerPoint?

7            THE COURT:  Sure.

8            (Pause.)

9            THE COURT:  You're not picking it up, are you?

10           MR. AGNIFILO:  Not yet, Judge.

11           THE COURT:  This is in evidence?

12           MS. HAJJAR:  Yes, it's in evidence as Government

13  Exhibit 1404.

14           THE COURT:  Okay.

15  Q    Do you see that, Ms. Salzman?

16  A    I do, yes.

17  Q    And remind us what Government Exhibit 1404 is?

18  A    It's Chapter 1 of the book.

19  Q    Can you read the first text that appears under

20  Furtherance, Honor and Gratitude?

21  A    Your sole highest desire must be to further your master

22  from whom all good things come and are related.  You must

23  honor and hold your master and lineage above all others in

24  every way.

25  Q    And can you explain how these chapters were broken up;

L. Salzman - direct - Hajjar                              1649

1  what does it mean to be -- the lesson 1, Understanding

2  Word-By-Word, what does that mean?

3  A    Each of the words in that sentence were defined so that

4  we would totally understand the meaning of the sentence and it

5  couldn't be misconstrued or misinterpreted in any way.

6  Q    Can you read the highlighted text, Ms. Salzman?

7  A    I believe something must be so, I allow for no excuses.

8  It is the ultimate foundation.

9  Q    Was this concept, the concept of no excuse in DOS, a

10 common one?

11 A    Yes.

12 Q    Can you explain that?

13 A    Well, the concept came -- I mean came first from I think

14 SOP, the men's curriculum, and possibly also Jness, the

15 women's curriculum within our NXIVM umbrella but the idea was

16 in any circumstance because of the way that men are brought UP

17 and raised they have life experiences and certain cause and

18 effect -- a relationship to cause and effect that women don't

19 have and so that in any circumstance men have two options,

20 they can either do the thing that's required or take a

21 consequence for it but that women because of the way that we

22 are raised and coddled by society and by men in particular, we

23 have a third option, we can do the thing, take the consequence

24 or victimize ourself, make an excuse and get off the hook and

25 so this idea that women need to get rid of the third excuse

1  was something that was -- we had already been spending time

2  interacting with in -- within our community and curriculums.

3  So then the idea that we wanted to become these women who were

4  self-reliant and who were willing to be able to do what it

5  took to be responsible, participating, contributing members of

6  society that the men in our lives felt they could depend on

7  and count on and respect, we wanted that and so the idea of no

8  excuses was like get rid of that third option and learn to do

9  whatever it takes to show up and do the job.

10 Q    Do you have a view on that concept now?

11 A    Well, it started to become problematic when there were

12 things that were valid concerns that were being raised and

13 then we were told it was us making excuses and so things that

14 were valid and of concern were turned back around and we were

15 told it was our issue, you know, and that this is -- we're

16 just being women, you know, and largely -- I mean in part

17 there was this idea that we were having some kind of

18 democratic process but the truth was if we had objections to

19 different viewpoints, it was always because we were being

20 women or we were having issues because men wouldn't have

21 objections, they would just do it but that's not a democratic

22 process and so that became difficult.

23 Q    Turning to paragraph 10 in the book, can you read the

24 highlighted portion?

25 A    Seeing how I can't move the object is blame.  It's what

1   we do internally with excuses.  Women in particular are

2   miraculous excuse finders.  Why?  Because it works.  If a

3   woman goes out in public and there's some sort of problem, she

4   needs a bag carried or something terrible is happening, she

5   has more options in our western culture to find excuses than

6   men do.

7           And then -- continue?

8           If you find you cannot do something or you can't do

9   something, that's not an excuse not to do it.  Saying you

10  can't do something is an immediate denial of potency.  That is

11  a practice you want to not do.  You want to practice the

12  opposite.  You want to ask how can I do things in a way that I

13  didn't think I could do?

14  Q    And the phrase "women in particular are miraculous excuse

15  finders," is that the same concept you were alluding to

16  previously?

17  A    Yes.

18  Q    This is under the chapters -- the paragraphs with numbers

19  11, 12 and 13; can you read the highlighted portion?

20  A    The most important lineage is, if you will, your slaves,

21  your slaves's slaves, etc, and your master, your master's

22  master, your master's master's master all the way up like

23  that.  They would say what would my master's master's master

24  say.  So, actually -- it is actually importing what your

25  master and the lineage would say into all of your decisions,

L. Salzman - direct - Hajjar                    1652

1    it's holding them above.  Well, actually everyone is related,
2    everyone is in my lineage.  I could extend my lineage to every
3    single person.  So I don't have to hold anyone above anyone
4    else.  Everyone is equal, everyone is perfect, everyone is the
5    same, we're all new age.  Let's eat some crystals and all be
6    happy.  But that's not what this is saying, there are people
7    who are in your lineage and directly of your concern and
8    people that are not.  People of the lineage and that lineage
9    just like the master becomes internalized and you hold that
10   above all others.
11   Q    What is lineage in DOS, what does that mean?
12   A    Lineage is -- so, there are eight lines for the eight
13   first line masters and anybody we enrolled under us.  So,
14   Keith at the top, then me, the women I enrolled, the women
15   they enrolled, the women they enrolled, that makes one
16   lineage.  So, there are eight of them.
17   Q    And the phrase, "What would my master's master's master
18   say," for everyone in DOS who is that person?
19   A    Ultimately all the way up is Keith is the master's
20   master's master's master.
21   Q    So, these practices that come after the -- there are
22   lessons and there are practices beneath it, what are the
23   practices?
24   A    There were suggestions of something that you could do to
25   build your internalized experiential understanding of the

1    concept that was presented in -- the philosophical and

2    theoretical concept that was illustrated in the chapter.  Then

3    there was a practice you could do so it could become practical

4    and you could learn to be that and live that.

5    Q    Can you read that second practice please?

6    A    Contemplate why your master is better than all other

7    people, why they should be held above all others.

8    Q    And was that put into practice in DOS, the concept of

9    your master being better than all other people?

10   A    Yes.

11   Q    So, this is under Lesson 10, What Does Master Mean, can

12   you read the highlighted portion?

13   A    It is a conscience of fear, it is not the highest but

14   ultimately they should be able to make a vow and it should be

15   so distasteful to break the vow that they'd rather die than

16   break their vow and that's a vow for everything.  This is very

17   physical manifestation of the vow with the brand, with all of

18   this stuff that might really be the first and only thing that

19   represents a forever until your last breath collateralized and

20   on an ongoing basis more collateral is put into this thing so

21   we have an example to build all other things from.

22   Q    What is this describing?

23   A    It's describing that your collateral should be so

24   distasteful that you would rather die than break your promise

25   and that initially you're going to have this conscience,

L. Salzman - direct - Hajjar                                        1654

1   you're going to be so afraid that your collateral might be

2   released that you will build a conscience about it, that

3   you'll remember not to break it because you couldn't live with

4   yourself if you did, you couldn't live with the consequences

5   of that because it is so scary.

6   Q    So, the practice under Lesson 10:  Do one act of

7   self-denial every day in honor of your master.

8            The act of self-denial, are those the self-denial

9   acts you described earlier?

10  A    Yes.

11  Q    So, under Lesson 16:  Nature of Commitment, Nature of the

12  Vow.  What's the underlying principle, vision, motivation of

13  the whole thing, what's the nature of the commitment.

14           Can you read the highlighted portion please?

15  A    That's why the master-slave relationship works so well,

16  you submit, you surrender yourself to a master but it's the

17  deeper principle that is symbolized through that person.  This

18  vow is more than that.  When you make a vow to your master or

19  when someone makes a vow to you, this is the deepest vow you

20  can do, maybe as close a vow as being in the military where if

21  you try to go AWOL they kill you which happens but even that,

22  if you are a soldier out on war and you tried to escape and

23  they kill you, that death is not necessarily as harsh a

24  collateral as what we ask as collateral because people should

25  say death isn't even a way out, it's how strong this

L. Salzman - direct - Hajjar                    1655

1   commitment is -- that's how strong this commitment is.

2   Q    And did you consider your commitment to be this strong,

3   as strong as described in the DOS book?

4   A    Yes.

5   Q    In that same section:  Discipline is correction and

6   obedience to that correction; can you explain -- was

7   correction a concept in DOS?

8   A    Yes.

9   Q    Could you explain that?

10  A    If we did something and we are given feedback that it was

11  not caring or loving or considerate or mindful, we were to fix

12  it.  Anything that was pointed out should be corrected.

13  Q    And underneath that:  Obedience, it doesn't matter what

14  the command is, it matters that you obey.  It doesn't matter

15  if you understand the command, it matters that you obey.

16  A    Yes.

17  Q    Was that a concept in DOS?

18  A    Yes.

19  Q    This highlighted text:  Making excuses about it, you can

20  suffer about it, you can practice interpersonal games in a way

21  that you get around it; what is this describing?

22  A    It is describing making excuses not to just obey, not to

23  stay and uphold your word to keep everything completely

24  confidential and be in this vow of obedience.

25  Q    Are these the same excuses that you were describing

L. Salzman - direct - Hajjar                    1656

1    earlier?

2    A    Yes.

3    Q    Can you read what's under Chapter 2?

4    A    Your greatest joy is to surrender completely all things

5    in all ways without reservation completely exposed to your

6    master and master's will.  The best slave derives the highest

7    pleasure from being her master's ultimate tool independent of

8    use.  By joyously offering all your decisions to be made or

9    used by your master, you surrender your life -- my screen went

10   black -- your life, mind, body and possessions for

11   unconditional use.

12   Q    Did this text under Chapter 2 have a role in the ceremony

13   involving the branding that you described earlier briefly?

14   A    Yes, we specifically said that in the branding ceremony,

15   that I -- that my greatest joy is to surrender completely all

16   things in all ways, almost word for word this whole thing we

17   read; I surrender my life, mind, body and possessions for

18   unconditional use.

19   Q    And this practice underneath that chapter of asking your

20   master for permission with the greatest feeling of joy,

21   challenge yourself to do that, the most valuable decisions

22   would be the ones you're most afraid they'll say no to; was

23   that also a concept in DOS?

24   A    Yes, regarding like asking for permission for something

25   and you should ask permission about the stuff that you feel

1  most specifically attached to, so that if they say no, you

2  know, you were willing to surrender it even if they said no.

3  That's how you know it was really particularly committed and

4  obedient and surrender, that is the hardest thing and you're

5  willing to give it up.

6  Q     In Lesson 4, Without Reservation Completely Exposed, the

7  text under that reads:  So completely exposed means completely

8  vulnerable without hiding anything, that there are no closets

9  that are unopened, no little boxes, nothing unexposed, truly

10 an open vessel.

11 A     Yes.

12 Q     What did you mean by those words, "an open vessel"?

13 A     An open vessel, like totally open to be able to serve any

14 purpose or any function no matter what it is without

15 evaluating the function, without judging the function, without

16 reacting to the function, just being willing to do the

17 function.

18 Q     Is that the DOS slave?

19 A     Yes.

20 Q     Under the practices under this chapter there's a practice

21 involving sharing deepest fears, fantasies, secrets and

22 thoughts; was that part of DOS?

23 A     Yes, some parts.

24 Q     Can you explain that?

25 A     That practicing sharing, that is a type of rooting out of

1   pride or finding areas of fear and so exposing those would in

2   theory being freeing and so that was a practice done to

3   confess something, to be vulnerable and to be willing to be

4   totally exposed to your master.

5   Q    And looking back now, do you have a different view of

6   this practice of confession, of sharing deepest fears?

7   A    Well, I think it -- I mean it makes you particularly

8   vulnerable, you know, in situations.  It makes you specific --

9   I think specifically vulnerable and more susceptible to be

10  taken advantage of if abuses of power happen but also I

11  mean some of those things too go back to the -- a lot of the

12  things -- it didn't always have to but I think in general too

13  that also it took a sexual connotation at different times.

14  Q    What do you mean?

15  A    Your fantasies, like sometimes took a -- what are your --

16  like sexual fantasies component.

17  Q    Okay.  Lesson 8 is titled A Tool --

18            THE COURT:  Can we take a break now?

19            MS. HAJJAR:  Yes, Your Honor.

20            THE COURT:  All right.  Let's take the mid-morning

21  break.

22            All rise for the jury.

23            (Time noted:  11:30 a.m.)

24            (Jury leaves courtroom.)

25            THE COURT:  All right.  The witness may stand down.

L. Salzman - direct - Hajjar                    1659

1   Do not discuss your testimony with anyone.

2           (Witness steps down.)

3           THE COURT:  All right.  We'll take a ten-minute

4   break and we'll try to fix the screens.

5           Thank you.)

6           (Recess taken.)

7

8

9           THE COURT:  Bring in the witness please.

10          (Witness resumes the stand.)

11          THE COURT:  Bring in the jury.

12          (Pause.)

13          (Jury enters courtroom.)

14          THE COURT:  Please be seated.

15          Okay, Ms. Hajjar, you may continue your examination

16  of the witness.

17          The witness is reminded that she is still under

18  oath.

19  BY MS. HAJJAR:

20  Q   Ms. Salzman, before the break we were talking about some

21  of the concepts including the concept of collateral in the DOS

22  book.  Were these concepts conveyed to your DOS slaves?

23  A   Yes.

24  Q   Did you have occasion to ask them to read the DOS book as

25  well?

L. Salzman - direct - Hajjar                      1660

1   A    I read portions of it to them.

2   Q    Now, before the break we were at Lesson 8, A Tool.  The

3   tool doesn't have a want.  The tool doesn't look at its use.

4   The tool is just a good tool.  The nature of being a sharp

5   knife is to be sharp, it's not to care if it's being used as a

6   murder weapon or being used for surgery.

7            In this context, what is the tool, what does that

8   refer to?

9   A    The slave is the tool.

10  Q    And the moment you start to care about the use, now you

11  have your pride.  To be a tool in a sense is saying no

12  excuses.

13           What does that mean in the context of DOS?

14  A    It meant that whatever use your master had for you was to

15  be done joyously and if you cared about what you were being

16  asked to do or the why, it was your pride, your issues

17  interfering with your success, effectiveness at being a good

18  slave.

19  Q    Were these principles just abstract or were they applied

20  every day in DOS?

21  A    They were applied.

22  Q    Lesson 10:  Joyously offering all your decisions to be

23  made or used by your master.

24           Under Lesson 10 there are these practices; can you

25  read the practices please?

L. Salzman - direct - Hajjar                                    1661

1   A     Spent time thinking of how you can proactively further

2   your master with the current capacities you have.  Choose to

3   act on one thing that you would not have acted on otherwise.

4               And then number two is:  What other capacities can

5   you build to be able to further the master more.  Make a plan

6   on building those capacities and how that will further the

7   master.

8   Q     Can you explain that in the context of DOS, what that

9   means?

10  A     That ideally you're looking to always make your master

11  more successful, more effective, more potent in the world and

12  so you should be always looking at how to proactively be doing

13  that and if you're limited in your capacity to do that, then

14  you should make a plan of how you can become unlimited so that

15  you can further them even more.

16  Q     Under the same lesson:  You offer this as an opportunity

17  for your master to use you as a tool.  If you see yourself as

18  a tool, the greatest door to opportunity, the greatest door

19  for you is to be the tool, for you to be the vessel.

20              Can you explain what this means?

21  A     That the greatest -- that you should always be looking

22  for these opportunities for your master to be able to employ

23  you as a tool and that somehow in doing that, being like the

24  vessel or the most open to that and the most willing to do

25  that, to be the tool in any way or whatever it is and derive

L. Salzman - direct - Hajjar                     1662

1  the greatest joy from that is the greatest opportunity for

2  growth in yourself.

3  Q    Was a DOS slave permitted to question the motives or the

4  reasoning behind an order?

5  A    No.

6  Q    Lesson 11:  Surrender your life, mind, body and

7  possessions for unconditional use.  What goes on within my

8  body is personal to me and that too is the use of that as much

9  as I can give over I do.

10          What does that mean?

11 A    It means that anything they want, your goal is to be able

12 to serve them regardless of what it is and as much as you can,

13 whatever goes on with your thoughts, your emotions, your body,

14 your capacities, your work product, whatever it is, it is just

15 all to serve them and to do that -- as much as you can do

16 that, that's the goal.

17 Q    And "them" is who?

18 A    The master.

19 Q    Turning to Chapter 3, can you read the text at Chapter 3?

20 A    The joy of obedience is far greater than the distaste of

21 any command.  The harder the task required, the greater joy to

22 complete.  The harder the task completed, the greater proof to

23 your master and yourself of your strength and commitment.

24 Q    What does this mean?

25 A    It means that ideally you should be able to build joy in

L. Salzman - direct - Hajjar                          1663

1  obeying and that that joy is far greater than anything you
2  could be asked to do no matter how hard or distasteful it is,
3  the joy should be better and the fact that it is harder or
4  distasteful should make that joy more because you're proving
5  to your master and yourself that you're that committed that
6  you'd be willing to do anything, even really difficult and
7  awful or distasteful ugly things, whatever they are.
8  Q    Here's some examples of requests or commands here:  If
9  the master were to command you and say, at the bottom, take
10 off all your clothes, run outside and jump up and down and say
11 everyone, look at me, look at me, look at me, you would be
12 taking off your clothes already and seeking to understand
13 that, you're not worried that it's cold out, you're not
14 worried that there's a public, you're not worried that the
15 police might come, none of that is involved, that is your
16 evaluation of it.
17 A    Yes.
18 Q    What does that mean to you?
19 A    It means that you should be doing the command before you
20 even question the command and that the objective is just to
21 seek -- to understand how to do that command best, not to
22 question why that command or any consequences of the command.
23 Q    Did you convey these, the concepts expressed in the book,
24 did you convey this concept to your slaves as well?
25 A    Essentially, yes.  I don't know that I specifically read

1   this part but, yeah, the concept of it, their job was to do

2   that.

3   Q    So, under Lesson 11, Pushing Beyond Indoctrination.  You

4   believe certain things are good and bad and that constrains,

5   that circumscribes your life and they're just not true.

6               What does that mean?

7   A    It's a statement of our indoctrination, that like

8   basically the way we're raised we come to believe certain

9   things that are limiting, that certain things are bad which

10  may not be bad or certain things are good which may not

11  necessarily be good, getting hung up on the goodness or

12  badness of it is constraining because we should be able to

13  transcend our indoctrination because it can be limiting.

14  Q    Was this a concept that was taught in NXIVM more broadly,

15  this idea of social indoctrination?

16  A    Yes.

17  Q    Was this a concept the defendant taught?

18  A    Yes.

19  Q    In this concept, the social indoctrination, that certain

20  things are good and bad, is that something you are intended to

21  get out of?

22  A    I don't understand.

23  Q    Is a social indoctrination a bad thing in this concept?

24  A    Well, that certain aspects of social indoctrination can

25  be limiting and so to transcend that would be to evolve beyond

L. Salzman - direct - Hajjar                    1665

1   those limitations.

2   Q     Can you give an example?

3   A     Sure.  Like -- I don't know, you can think of like in any

4   social custom but let's say, for example -- well, I don't know

5   if you've ever had the experience where like as a child

6   growing up you go over to eat at somebody else's house and

7   their family does something like completely different than

8   what your family does, so it just feels kind of awkward or

9   uncomfortable, that's just like a simple example of you're

10  indoctrinated in a certain way in your family and you may find

11  as you come to grow that there are other ways to do things but

12  there may be something that like maybe your religion says is

13  bad, like getting divorced for example, you know, or your

14  culture may say that that's really bad where another culture

15  may not think that's bad; so, to realize that it is not bad in

16  itself, it serves a function, you might be able to take

17  advantage of that function where you didn't perceive it as an

18  option before.  That's just like a simple neutral example.

19  Q     Did the defendant in the defendant's -- as he explained

20  this concept, did it go further than that, did it go to things

21  that were assessed as good and bad?

22  A     Yeah, I mean when we started getting into things more

23  along the lines of like Jness curriculum when it was first

24  introduced or SOP, then you start getting into more I guess

25  you could call them like heated subjects, like people have

1    more investment around, like having monogamous relationships,

2    for example, like and in Jness then we started to introduce

3    like the concept of men being more naturally polyamorous and

4    women being more naturally monogamous, so somehow transcending

5    our -- as women, our belief that we need to own our men and

6    own the sex that they have as just as our own somehow this

7    limiting belief and that if we could come to understand their

8    more biological nature and some of the social constraints that

9    have been put on them, them being men, in general that as

10   women we would not be so fearful or controlling and we would

11   come to accept and be really grateful for the things that they

12   give us and not need to own them or put constraints on them to

13   feel secure in our relationships.

14   Q    Do you have a view on that concept now?

15   A    Well, I mean certainly through the curriculum it

16   legitimized the lifestyle that I think Keith wanted to live

17   and had a whole community of people who could understand that

18   and support it or even defend and protect it against criticism

19   or other consequences.

20   Q    Is this the same concept, the same section, Unique

21   Experience Breaking Through Your Indoctrination, is that the

22   same social indoctrination concept you explained?

23   A    Yes.

24   Q    Chapter 4 is titled Quality; can you read the text under

25   Quality?

L. Salzman - direct - Hajjar                    1667

1  A     You must give your master your very best at all times.

2  All things done for your master must be of the highest quality

3  you can offer.

4  Q     And under Chapter 5 titled Aliveness, can you read that

5  chapter?

6  A     As such, a good slave actively seeks to give her master a

7  competitive advantage over all other people and in all

8  situations.  Always make your master increasingly more

9  powerful, influential and capable through your actions and

10  thoughts.

11  Q     And this concept, did that take -- did that have

12  practical applications in the context of DOS?

13  A     Yes.

14  Q     Can you explain that?

15  A     Well, we were always looking to be able to uphold our

16  master, I mean in my case Keith, to help him, to edify him,

17  you know, and help others see that -- like his good

18  contributions and in essence we were -- I mean specifically in

19  DOS, I mean not just the edification, I mean tribute was very

20  prevalent and pervasive in ESP; in DOS especially we were

21  seeking to find influential people to bring in to help

22  increase the potency and the influence of the group and

23  ultimately the group's objectives which were, you know, Keith

24  was at the helm of that, they were his goals and objectives,

25  his vision for the group.  And in NXIVM it was part of that

L. Salzman - direct - Hajjar                    1668

1    too, having powerful and influential people.  It wasn't as

2    much the objective but, you know, certainly you become more --

3    you have more capacity if you have more power and influence.

4    Q    And by recruiting people of influence or power into DOS,

5    did you see that as by extension making the defendant more

6    powerful or influential?

7    A    I didn't think of it that way at the time but I do think

8    that, I do think it is that.

9    Q    Lesson 5 is Good Versus Bad and under that section I just

10   want to -- I'll just read this paragraph to you, a little bit

11   above that there's a highlighted phrase:  The strongest bond

12   that we can have as being for the good is a new bond that's

13   created which is the vow.  Criminals won't turn each other in

14   because they're scared of being killed.  The reason why people

15   of the vow won't turn each other in, you can say that they are

16   scared of the collateral but it is a collateral that they put

17   up to certify that their bond is as good as any criminal bond,

18   any bad bond.

19             What's the criminal bond, what's the bad bond?

20   A    The criminal bond is that if you -- it's like in -- I

21   guess you could look at like criminal organizations or mafia

22   organizations, why you don't rat on the people in the group,

23   because you get killed if you do that.

24   Q    So, criminals won't turn each other in because they're

25   scared of being killed, that's the criminal bond, the bad

1   bond?

2   A    That's the concept, yeah.  I mean it says it, right,

3   they're scared of being killed, that's the criminal bond.

4   Q    So, the collateral that they put up to certify that their

5   bond is as good as any criminal bond, any bad bond; what do

6   you understand that to mean?

7   A    That the collateral is as scary as that or even more

8   scary than that and we -- I mean we looked at it in the part

9   we read before, where you're supposed to see it that death is

10  not even a way out of it, so it's supposed to be stronger than

11  even the fear of being killed if you were to violate the vow,

12  that's how strong the collateral is supposed to be.

13  Q    This is under Lesson 12, Powerful and Influential; if

14  you're not always making your master, the time when you're not

15  always, you're a minion for the bad, you're a minion for evil.

16  Always make your master increasingly more powerful which means

17  they're at a certain level of power, is that enough.

18           What does that mean?

19  A    Well, there are some concepts that were laid out a little

20  bit before in the book that talk about that fear and comfort

21  basically are vehicles for tools of hate or for evil because

22  ultimately the reason we're being hateful is to be more

23  comfortable or we're being hateful to get things that we

24  haven't earned and so -- and that -- so, laziness, comfort,

25  fearfulness breeds hate, these are the concepts that we lay

L. Salzman - direct - Hajjar                    1670

1   out in the book before this but also that we've been taught

2   within NXIVM.  So, it's saying like that ideally you know that

3   you're not breeding that by always being disciplined, always

4   being vigilant, always working and so it links it up with the

5   master in this context, if you're not always making your

6   master, you know, increasingly more powerful, then you're

7   being a minion for evil because you're being lazy about it or

8   the only reason you wouldn't do it is either laziness or

9   issues, fear, so somehow that breeds evil, you know, doing

10  this is good and not doing this becomes evil.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continued):

2    BY MS. HAJJAR:

3    Q     Chapter 6 is titled "Creation."

4          Can you read the text under production potency and

5    power?

6    A     That your master has your time and labor allows for more

7    production.  That your master has your vote allows for more

8    potency.  By recruiting others within your power you honor and

9    increase your master's power.

10   Q     Was the concept of time and labor associated with -- as

11   to the DOS slaves, an important component of DOS?

12   A     Yeah, I mean the idea that's being communicated through

13   this is that if you're putting in, let's say, 70 percent of

14   your effort towards moving something forward, in this case

15   moving the master forward.  And then you take 30 percent off

16   to be lazy, you just undermined all your own efforts.

17          So it starts to talk about that it has to be full

18   time.  It's a full-time commitment to be always making your

19   master more potent.

20          And it ties directly to things -- so that was

21   supposed to be the general mindset.  And then there's specific

22   time dedicated to furthering the master.  And labor dedicated

23   to furthering the master.

24   Q     Under Lesson 2, Labor and Production.  And maybe above

25   that as well.

Salzman - Direct - Hajjar                    1672

1          If you're serving the master at 49 percent of the

2    time, you're not serving the master.  It needs to be a

3    hundred percent.  It certainly has to be over 51 percent

4    otherwise you're knocking yourself out, and the other half of

5    the time, when you're not severing the master, you're serving

6    other things.  So the nature of this time is something you

7    really have to value.

8          Is this a concept you conveyed to your slaves as

9    well?

10   A    Essentially.  I don't know if I laid it out exactly like

11   that, but it's just like it says here.  If you're undermining

12   your own efforts, then you're not moving forward.  So you

13   should always move it forward.

14   Q    Labor you might say are work.  All that we do with the

15   outside world, with our bodies, our emotions, and our

16   thoughts.  So most people who say, I can't do more, they're

17   not looking correctly.  There are a series of excuses.

18         The master shows you where you fail, which is the

19   most important thing to increase your production, increase

20   your net results to get you out of the 30-hour a week

21   low-labor, low-wage job.

22         So that by having the outside perspective and the

23   outside person, it can help you overall do so much more for

24   the ultimate master, which is your ultimate purpose on this

25   world, which is ultimately also being forced by the defendant.

1          The concept of productivity and that first stages of

2  DOS was linked to slave productivity, was that something you

3  conveyed to your DOS slaves?

4  A    Yes.

5  Q    Can you explain that?

6  A    That ideally they should be seeking to provide the most

7  value in the time and the labor that they're providing.  They

8  should do the highest value of jobs, basically, and that that

9  contributes the most.

10 Q    Can you give an example of that with respect to your DOS

11 slaves in terms higher capacity worked?

12 A    Sure.

13         Like at one point I think I had a conversation with

14 Audrey and she relayed she often would -- would -- she'd be

15 grocery shopping so she would ask if I wanted anything or pick

16 up some groceries, while she was out.  Which I would pay her

17 for the groceries but not the time she spent shopping.

18         And I conveyed to her that helping me -- or she

19 offered to do things similar to that, like personal assistant

20 work.  And I communicated to her I have personal assistants,

21 who do this low lever work, you should do the highest level of

22 jobs.

23         So providing things like executive level assistance,

24 you know doing -- and then later some of my slaves helped with

25 that.  Like Audrey helped do administrative type -- executive

1  level administrative type work for DOS, or Jimena was helping

2  with the sales process for DOS.

3         They're doing higher level, not just basic things my

4  housekeeper can do.

5  Q    In terms of labor you received in the context of DOS, was

6  some of that labor qualified, like qualified in as specialized

7  profession?

8  A    Yeah.  I mean we reviewed legal contracts and did legal

9  research, so in that sense.

10  Q    And was -- was that work in the context of a requirement

11  in DOS?

12  A    Well, it was her active care.  She did it as her active

13  care.  So, yes.

14  Q    You said that your master has your vote and allows for

15  more potency.  The holy trinity of time, labor, and vote.

16         What are each these things, the time, labor, and the

17  vote in the context of DOS?

18  A    Well, your time, that you're contributing your time

19  towards moving your master forward, and your efforts, your

20  labor, and services.

21         The way that vote was used was actually

22  self-referential that it was what you vote with or the way

23  that you spent your time.

24         So as we, you know, just reviewed that, if you're

25  spending, it has to be at least 51 percent of commitment or

1   your undermining your own efforts.  You have to be voting.

2   Your vote has to be more than 50 percent for you to actually

3   be voting for moving the master forward.  That was how vote

4   was used.

5           But I think there are more reliant obligations of

6   voting we talked about.  We won't have influence in the world,

7   but there's way more votes for in the world and that could be

8   worthy of, you know, a shock to who you elected in office.

9   Q   If you're highest value is the master, by spending your

10  moments doing things for the master, around the master, by the

11  master, makes you purposeful, makes you annealed, makes your

12  moments close to a hundred percent in a given direction highly

13  effective, and it's a gift to your master and a highly

14  effective slave.

15          That is this concept of being highly effective, a

16  good thing in DOS?

17  A   Yes.

18  Q   To your master?

19  A   Yes.

20  Q   Ms. Salzman, you testified that enrollment was a focus in

21  DOS.

22          This part of the book reads:  Every person who

23  becomes a slave should make a whole list of names of all the

24  people they know, mother included, and who should be enrolled.

25          Is that enrolled in DOS?

Salzman - Direct - Hajjar                    1676

1   A    Yes.

2   Q    The moment you recruit someone, you take your master's

3   position into your own and you become one with the master

4   because you are the master.  So when you recruit someone, you

5   give your master a gift.

6           Is this gift, in the context of that sentence, a

7   reference to the DOS slave that you recruited?

8   A    I didn't see it -- I hadn't seen it that way.  I thought

9   it was the gift of becoming a master yourself.  But, in

10  essence, that slave is their slave, too.  So it is can seen in

11  that way.

12  Q    So you when recruit someone, you give your master a gift.

13          How do you understand that sentence?

14  A    I had understood it by becoming a master yourself.  But,

15  in essence, it's a gift either way.

16          Because it makes them more potent, especially if you

17  look at they're going to give an hour towards the -- you know,

18  if my master has an objective and my hundred percent is to

19  serve that objective, any slave I have serving me is serving

20  that objective.

21          So whether they're serving my objective to serve

22  that objective, or that objective directly, it's a gift.  It

23  goes to them any way.

24  Q    Chapter 7 is Connection.

25          Can you read what's under secrecy?

1  A    Always make your master look good and be powerful and

2  capable.  Intelligently utilize the secrecy of your

3  relationship with your master to be a confederate and to move

4  your master forward.

5  Q    What does that mean?

6  A    As it was explained to me, a confederate is somebody who

7  is in on the secret but doesn't appear to be in on the secret.

8            So if you have like a magician who's performing an

9  act and gets a volunteer from the audience, oftentimes that

10 volunteer appears to be just like an audience member but

11 actually they're part of the act and it's been planned ahead

12 of time.

13           So the idea of using that in this case is two people

14 who seemingly seem unrelated but who actually have the secret

15 relationship where one of them is actively trying to move the

16 other forward, it can be used as a powerful tool because a

17 seemingly innocuous person is advocating for somebody who

18 seems unrelated to.  And so sometimes that carries more worth

19 or for credibility than somebody who publicly has an

20 allegiance to that person.

21 Q    Is this something that you experienced with the

22 defendant?

23 A    Yes.

24 Q    Can you give some examples of that?

25 A    So in -- yes, in ESP, in intensives, for example, you

Salzman - Direct - Hajjar                1678

1   might have somebody who is running a mentor group, which is a

2   mentor group you would have like a specific person who is

3   there to help you and process you through your issues to

4   resolve whatever you bring to the group that you want to work

5   through.  But behind the scenes, that person could be given a

6   whole bunch of information about you that you wouldn't have

7   known ahead of time.

8           So sometimes I would be sent in to mentor certain

9   people and be given information about them that they didn't

10  know that I had.

11          And in particular, before I knew about DOS, there

12  was a DOS -- someone I came to learn was a DOS slave, who I

13  was asked to mentor in the intensive, who I was told was felt

14  that breaking their commitment was freedom, and that it would

15  be good if I could be their mentor, which is an unusual thing

16  because I was a very-high level person in NXIVM.  So I didn't

17  mentor very many people.

18          So I was asked to go in and mentor this person and

19  help them learn that through commitment is where you really

20  experience freedom.

21          So in that case I became a confederate, and that's

22  something I wasn't even privy to, I believed to help get them

23  to stay in DOS, and they ended up leaving.

24  Q    Did the defendant task with approaching this?

25  A    Mentoring them through an issue about surrounded

1   commitment.

2   Q     And you later learned that at that time the person you

3   were tasked to approach was, in fact, a DOS slave or had been?

4   A     And was -- and was deciding whether to leave DOS.  And I

5   was sent in to advocate for commitment is freedom not leaving

6   the commitment is freedom.

7   Q     So can you just explain how that relates to the concept

8   of being a confederate?

9   A     In a sense I was advocating for their relationship with

10  Keith and with DOS without even understanding it.

11        Had I had known, I would have been a known

12  confederate, but I was an unknown confederate in that case.

13        But there -- I mean during the time of DOS, we had

14  other companies.  You know, a Keith started number of

15  different companies and he began very publicly advocating for

16  Daniella Padilla very publicly.

17        And then later I came to learn -- and it was

18  questionable to me even at the time why is he advocating for

19  her so publicly?  And later I became to learn her DOS was

20  going on during that time and at that time he was teaching her

21  what confederacy was.

22  Q     This concept of a confederate and confederates are very

23  powerful strategically.

24        Are these the same concepts you described and

25  performed?

1  A    Yes.  Let's say, for example, like somebody would -- one

2  of my slaves would say, why don't you go talk to Lauren?  She

3  would be a really good person to talk to.  If you could see

4  Lauren as a client, like my slaves or their slaves' slaves

5  could even refer me business or something like that without

6  even knowing that those people are doing that specifically to

7  further my own career.

8  Q    And that was part of --

9  A    It could be seen that they thought, yeah, yes, it could

10 just be seen as them being -- having had a bit of experience

11 with business.  And so I'm a good person to go to for that

12 business versus the secret relationship we had where they're

13 committed to actually moving my business forward.

14 Q    So in this lesson through a connection there's a

15 paragraph:  People of The Vow are reliable to people in The

16 Vow.  If there's a vow, and you're connected to them in some

17 sort of task, you know they will execute if collateralized.

18 Their word is collateralized ultimately by whatever

19 collateral.

20         And do you know the collateral intent?  How do you

21 know?  Because your collateral intent?  So everyone of The Vow

22 will act to a great degree reliable.

23         What does that mean?

24 A    It means that you can count on the trust of the people

25 not to violate the commitment to secrecy and to the group

1  because their collateral is so intense and you know it's so

2  intense because your collateral is so intense, and you're

3  afraid of the consequences of breaking your vow so you

4  understand what kind of confidence you can have in them

5  because you can imagine what it must be like for them because

6  it's like that for you.

7  Q    And the people here being DOS slaves?

8  A    DOS slaves.  You can look at any other DOS slave and know

9  how much you can trust them to stay and keep your secret to do

10 whatever because they would never leave because it's so -- it

11 would be so horrendous if they did, and you know that because

12 it would be so horrendous if you did.

13 Q    Where the text reads:  You know you will execute.

14      What does that mean?

15 A    You know they'll come through no excuses because that

16 what they're commanded to do, that's what their vow is about.

17 Q    Chapter 8 under needs:  Always be attentive to your

18 master and your master's needs.  Any hints to which you can

19 attend, any need you can find should be met and satisfied

20 without request or command.  During everyday hour and moment,

21 you must be actively moving your master forward personally and

22 in the world.

23      Was that part of DOS as well?

24 A    Yes, all of this was.

25 Q    Under attentive, again, these lessons break down the

1    concepts in the first -- in the first part of the chapter; is

2    that right?

3    A    Yes.

4    Q    And under attentive, the text reads:  So you focus your

5    awareness on the master.  Ever see a hungry dog?  Someone

6    walks in the room with food, that dog sees nothing else.  That

7    is how you should he be a hungry dog for your master.  Your

8    master's voice, when the master's in the room.  Your master's

9    object.  Anything of the master that you perceive.  Master

10   leaves a crumb on table, it's all about that.

11           What do you understand that to mean?

12   A    That you should be always paying attention to what they

13   are, and anything they do, you should be aware of it.

14           And always looking to make it better, easier, more

15   effective, more efficient, more productive, more influential,

16   everything.  They're the highest priority.  Everything.

17   Q    Ms. Salzman, did the defendant discuss an idea or any

18   ideas about DOS in the future, the form it would take?

19   A    To a degree at times.  I mean, I think he envisioned that

20   it would have, you know, thousands or, you know, a million --

21   millions of people in it.  That there would be actors, you

22   know, so there would be different areas.

23           He spoke a little bit about having like an area have

24   somewhere in the neighborhood of like 300 members.

25           And there were ideas for group meetings and how to

Salzman - Direct - Hajjar                    1683

1    conceal identities during group meetings.  So that you could

2    maintain the secrecy and the type of silent-ism of the group,

3    but still have interaction with people who weren't part of the

4    group.

5    Q    Can you describe that further in terms of concealing

6    their identity, what does that mean?

7    A    Like if you're going to attend a meeting and you would

8    have a group meeting but everybody might be in masks, or you

9    might have a pseudonym, or you might -- like the first line

10   DOS members had different brands than everybody else.  So that

11   those brands you might possibly cover with something that

12   looked more uniform to everyone else.

13   Q    Did the defendant ever talk about effects DOS might have

14   in the larger world?

15   A    Possibly that we might be able to have a candidate -- you

16   know, a DOS candidate in like a high-level political office.

17   Q    The DOS candidate needs -- in a collateralized vow?

18   A    Yes.

19   Q    Ms. Salzman, I want to go back to discuss your initial

20   recruitment into DOS.

21        You testified that was in January 2017?

22   A    Yes.

23   Q    Who first approached you about DOS?

24   A    Keith first approached me.

25   Q    And what did he say to you?

Salzman - Direct - Hajjar                    1684

1    A    He said that he wanted to make our relationship closer.

2    He wanted to bring our relationship closer.  And he asked me

3    what I was willing to do for my growth and for my commitment

4    to him.

5    Q    What did you say?

6    A    Anything.  Anything.  I'm fully committed to my growth

7    and fully committed to you.

8    Q    What did he say?

9    A    He told me that there was something that some of the

10   other girls were doing.  He was not specific about who the

11   girls were and -- but that they wanted to invite me to

12   something and that they were going to be approaching me.

13          He and I had conversations over the next like 24, 36

14   hours, so I'm not sure exactly in which they took place in

15   which conversation.  But we had a number of conversations

16   concerning my enrollment over the next two days.

17   Q    At the time, were you responsible for running a NXIVM

18   Coach Summit?

19   A    I was, yes.

20   Q    Just very briefly, what is a Coach Summit?

21   A    A Coach Summit is an opportunity for the coaches and the

22   higher-level NXIVM ranks.

23          So the people who run the programs, who work with

24   the students, who come in, who participate in the educational

25   programs and who run those.  Who run -- who work in the

1    centers.  Those are our coaches and proctors and senior

2    proctors.  These are the high ranks.

3          This was an opportunity for us to come together and

4    we would put on a retreat once a quarter, but basically we had

5    centers in three different -- mostly in three different

6    countries.  So it's a lot of people from a lot of different

7    areas coming all together and setting their vision for what

8    they wanted to do or achieve the next quarter.  And how they

9    could work together to overcome some of the limitations they

10   were having or support each other better.

11   Q    What was your role at this Coach Summit?

12   A    Well, I was an executive board member so the summits in

13   recent years were run by the executive board.  And I was

14   bringing ESP to a higher level, like what you might consider

15   like a vice president or a higher upper-level management

16   position.

17         But in this case, two of our highest ranks and close

18   personal friends had passed away, so they were the highest

19   ranks in ESP so they were no longer with us.  And then the

20   next highest rank was inactive.  And so this was the first

21   Coach Summit where I was the highest active rank.

22         So it was very important to me to run it well and do

23   a good job and have people feel I was the leader that they --

24   that they didn't feel that I had gotten my position through

25   default because everybody died or went interactive, but

1  actually that they felt confident in my leadership and felt

2  glad that I was the leader.  So it was -- it was especially

3  important for me.

4  Q    Were one of those individuals who passed away Pam

5  Cafritz?

6  A    Yes.

7  Q    So what happened after that initial discussion with the

8  defendant?

9  A    Rosa Laura approached me, and we had a meeting in her car

10 where she introduced the concept of collateral and me

11 committing my first collateral.  So for secrecy.

12 Q    Did you have subsequent conversations with the defendant

13 around this time too?

14 A    I did.

15 Q    What did he say?

16 A    He told me that he had started a sorority.  That there

17 were seven members of founding members, and that they were

18 going to invite me to be a founding member.

19         He told me that the intent was that -- which I

20 believe I later found out was not true, but that they had

21 always intended that I would be a founding member.  And that

22 he asked me if I could guess who the other members were.

23         He told me that the sorority had started because of

24 a personal struggle that Camila had had surrounding a suicide

25 attempt.

1           And I can't quite recall.  But definitely those

2     things.

3     Q     You said he asked you to guess.

4           Did you guess?

5     A     I did guess.  I wouldn't have guessed Rosa Laura.  But

6     once I knew Rosa Laura, I guessed the others.

7           Because there had just been a series of events of

8     things going around me that I had been aware of with the other

9     members, that once I understood there was a sorority, they

10    made sense.  So I was able to guess who was in it.

11    Q     And those individuals, those were the women you've

12    identified as the first line of DOS?

13    A     Correct, yes.

14    Q     Did you propose -- did Rosa Laura, when she approached

15    you, discuss collateral at that time?

16    A     Yes.

17    Q     Okay.  And what happened after that?

18    A     I went home to come up with my collateral, and I came up

19    with the collateral that I submitted to her.  That was

20    rejected.

21    Q     Okay.  So what form did that collateral take?

22    A     It was -- I sent it in a WhatsApp message.

23    Q     And you said it was an account of a crime.  You described

24    that earlier?

25    A     Yes.

1   Q      Was this true?

2   A      Yes.

3   Q      When had this occurred?

4   A      In the fall of 2002.

5   Q      Can you explain what it was that you -- that happened and

6   that you wrote down as part of your collateral?

7   A      That there had been a woman from Mexico who had come to

8   take an ESP course, and in the -- in the days of the course

9   she had what I would characterize as a psychotic episode, like

10  a psychotic break.

11          And she -- in my opinion, she should have been

12  hospitalized.  But this was something that we hadn't -- we

13  didn't see, we hadn't seen in this way to this extent and

14  didn't know what to do about it.

15          So we started seeing bizarre things with her

16  throughout the day.  And then she showed up at volleyball

17  where Keith was and became very agitated and physically

18  violent to the people around her.

19          And he suggested that we should take her -- he told

20  us to take her out of volleyball and that we can drive around

21  in the car and try to calm her down, and then eventually told

22  us to take her to a friend's house.

23          And so we took her a place where she could be safe

24  and wouldn't hurt herself.  Which we did.

25          And then he was communicating through my mom to me.

1  And later he said it would be good if she could sleep.  That

2  he thought if she slept that she could have like a -- she

3  would be able to -- she was overprocessing.  She would be able

4  to process and become lucid again.  But that this was some

5  type of like a spiritual crises or something.  If she could

6  get through, it could be very progressive for her.

7          And so we couldn't get her to calm down or to sleep.

8  And he told my mom -- he told my mom that if she took Valium

9  she could sleep.

10          And so my mother had a prescription of Valium that

11  she had gotten from my father, which she gave to me, and in --

12  we wanted her to take the Valium, and she didn't take the

13  Valium.

14          And then at one point she became physically violent.

15  And two men who were there, one man restrained her so that she

16  would stop hitting and kicking other people.  And the other

17  one basically pilled her like I pill my cat.  I just took the

18  Valium and put it right down her throat.

19          And then -- and she was expressing at the time that

20  she felt hurt, like she was being hurt being held down, didn't

21  want to be held down, and she wasn't liking what was going on.

22  She wasn't -- most of what she was saying was pretty

23  incoherent.  That was not incoherent.

24          And then she slept for a little while, but then was

25  up again.  And there was concern that she wouldn't -- we were

1   concerned that she would still be psychotic.  So somebody put

2   another Valium in some scrambled eggs and fed them to her for

3   breakfast.  And so eventually she did calm down and reset and

4   went back to what would be considered normal.

5           But my collateral basically was laying all this out

6   that this women had been administered prescription medicine

7   against her will.  That it implicated Keith, my mom, my dad,

8   and all the friends who were there in this.

9           And it was the most damaging thing that I could

10  think of that hurt the most important relationships in my

11  life, and I thought would be the most -- and was true, and

12  that would be the most weighted collateral.  And it would hurt

13  me, you know, so I thought it was the most substantial thing

14  that I could come up with was this.

15  Q    At any point was that women taken to a hospital?

16  A    She was not, no.

17  Q    Did she know that she was being administered Valium in

18  the morning?

19  A    I don't know.  I never told her she was and she and I

20  never discussed it, and no one ever told me she was, so I

21  believe no.

22  Q    Was there a concern about taking her to the hospital?

23  A    I believe there was a concern that if she went to the

24  hospital, it would make NXIVM look bad.  Like somehow we

25  caused her to have that.  That we have done that to her

Salzman - Direct - Hajjar                    1691

1    somehow.

2    Q     You testified you chose this as your collateral because

3    it was particularly damaging to you.

4               Why?  Why was that?

5    A     Because it was criminal that I had done.  And also

6    because it was -- or that I participated in, and I was

7    complicit, and it implicated the people who the most important

8    to me in the same way.

9    Q     And at the time was defendant one of the most important

10   people to you?

11   A     Yes.

12   Q     Did Rosa Laura Junco accept that collateral?

13   A     No, she rejected it.

14   Q     Did she tell you why?

15   A     She told me that she rejected it because it would be a

16   conflict of interest for Keith to release the collateral,

17   because he would be implicated in the collateral.

18              So if I were ever to leave The Vow, he wouldn't be

19   able to use it, because it would hurt him, so she didn't

20   accept it.

21   Q     And at that time, did you believe your collateral would

22   be released if you violated The Vow?

23   A     Yes.

24              And to me that -- that whole thing speaks to if he's

25   planning on releasing the collateral, but this one he couldn't

1  release because it would hurt him, so I would be able to get

2  off the hook.  So I needed to submit something that wouldn't

3  hurt him so he would be sure to feel good releasing it, if I

4  ever break my vow.

5  Q     Did Rosa Laura suggest something else as collateral?

6  A     She suggested naked pictures.

7  Q     Did you ask her if she had taken any?

8  A     I did.

9        Because that wouldn't be something I normally would

10 do.  And it was just an unusual request and I felt very

11 vulnerable doing something like that.  Is that something you

12 had done?  Just so I know where it came from.

13       The only time I had ever done it was when Keith took

14 pictures of me and I was very uncomfortable about that even

15 with him.

16       So she said, yes, that she had done that.  And for

17 me that made a big difference because Rosa Laura was very

18 conservative and came from a very conservative background.

19       So when she -- if she had done it, then I was like,

20 well, okay, I mean if you've done it, you feel confident.

21       And I asked her, too, like what's going to happen to

22 the pictures?  And she said, Don't worry, they're going to be

23 safe and secure.  She was going to keep it in a box safe in

24 her house and nobody was going to ever see it.

25       And I was like, okay, and so then I did that.  I

1    took, I believe, three pictures of myself that I put on a USB

2    drive and I gave them to her.

3    Q     After you gave Rosa Laura Junco the drive with the naked

4    photographs, what did you do next, what happened next?

5    A     Then once I did that, she told me -- she gave me the DOS

6    pitch.  She explained to me the concept of the vow of

7    obedience.  That this is a lifetime vow of obedience.

8              I asked if it was to her, and she told me it was to

9    Keith.  And that -- she explained the concept that he would be

10   my master and I would be his slave, and the idea that having a

11   master in your life is to help you learn to become a master in

12   your own life, and that we're all slaves of something.  That

13   we serve something in our life.

14             And we could learn to serve our issues, or we could

15   learn to serve our principles.  So that this was about

16   learning to -- how to serve our principles with the highest

17   value.

18             And she told me that there would be a collar, which

19   initially I did interpret to mean like a BDSM collar.  But

20   then she told me that was not what she meant, that she meant a

21   piece of jewelry that I wouldn't take off that symbolized my

22   chain to my master.

23             And she explained that there would be a brand.  And

24   that the brand -- the idea of the brand was to memorialize on

25   our body our promise to ourselves that we made for this

1    lifetime commitment to our growth and to our master.

2              And this idea that to serve our highest principles

3    ultimately at some point, if you're going to be noble in your

4    life, if you look at people who have been noble in life, like

5    they've gone against tremendous adversity.  You know, it's not

6    just everybody that we can say that amazingly noble person,

7    there's just a few people, and most of us know who they are

8    that walk the earth that we look at and pulled out as these

9    respectable people who are upheld, incredible noble principles

10   against adversity.

11             And they did so in the face of being sometimes

12   murdered or persecuted or these types of things, and that to

13   become that type of a person you have to go through

14   experiences that are difficult or that are painful.

15             And this is something that we had studied in ESP and

16   something I taught in my curriculum.  I was very familiar with

17   the concept.  I was very enrolled in that idea of doing hard

18   things to become somebody who could do hard things when it was

19   most important in doing hard things to uphold your most --

20   your highest ideals.

21             And that going through the branding was an

22   experience of overcoming pain for this principle.  And the

23   principle was this principle of love and of a sense of self.

24             And I was concerned about the brand, like I -- that

25   was not something that I ever, you know, thought of.  But when

Salzman - Direct - Hajjar                     1695

1    she gave me that explanation for it, like I don't have any

2    tattoos, it was -- I would never have gotten something like

3    that.

4              But when she explained it like that, the idea of

5    overcoming pain for a principle was compelling to me.

6    Q    You mentioned that you were enrolled in that idea.  What

7    does that mean?

8    A    Yeah.  Yeah, you could say -- or I came to agree with it

9    and support it.  And I wanted to go forward with that.  So I

10   said, yes.

11   Q    Was Rosa Laura branded at the time?

12   A    Yes, and she showed me her brand.  And she asked me if I

13   knew what it was and I couldn't -- I didn't know what it was

14   and she pointed out it was Keith's initials.

15   Q    But when you looked at it at first, you couldn't tell

16   what it was?

17   A    Correct.

18   Q    At some point later, did Rosa Laura Junco tell you

19   anything about whose idea the brand was?

20   A    Yes.  I mean I had -- my understanding was that the women

21   had decided that they wanted to be -- some women who were

22   not -- I was never told who the women were, but that the women

23   had decided, like somebody wanted to get a tattoo at some

24   point and then another person said that we should get a brand

25   because even tattoos could be erased or there's some

1   impermanence now.  So a brand would be more permanent.  And

2   that the women had decided this.

3           And after Keith was indicted and arrested, arrested

4   and indicted, I said something to Rosa Laura about it, and she

5   said the women didn't choose it, why would we ever choose

6   something like that?  Who would choose that?  And she

7   basically said, you know, no, Keith wanted us to do it.

8   That's why we did it.  None of us would have ever come up with

9   the idea that we would brand ourselves.  That's crazy.

10  Q    Initially were you told about the existence of other

11  women in DOS aside from this initial group?

12  A    I believe I was told there were some but I wasn't told

13  who they were.  But not that I was being invited as a founding

14  member, which is different.

15  Q    And beyond the naked photographs, did you have to submit

16  additional collateral?

17  A    Yes.

18  Q    And what kind of things did you submit as collateral?

19  A    Basically everything material I owned; my finances, my

20  investment accounts, my two homes, two cars, all my art,

21  anything that I owned.  And then I believe I also made

22  commitments that I, you know, would resign from my positions,

23  these types of things.  It was -- it was I would give up

24  everything that I held dear to me --

25  Q    And did you --

Salzman - Direct - Hajjar                    1697

1    A    -- in my life.

2    Q    -- in a document list all these things?

3    A    I did.  I believe I sent it in a Telegram initially.

4    Yeah, that's what I believe that.

5    Q    Did you, in fact, get branded?

6    A    I did, yes.

7    Q    And how soon after you agreed to join DOS were you

8    branded?

9    A    Within like 48 or 72 hours.  It was very quick.

10   Q    When was your branding ceremony scheduled for?

11   A    January 10th, 2017.

12   Q    Did it coincide with something in particular?

13   A    It was -- it coincided with the first night of Pam's

14   memorial.

15   Q    This is Pam Cafritz, the woman to who died a few months

16   prior?

17   A    Yes.

18   Q    Did you have a discussion with the defendant at the

19   memorial service?

20   A    I did, yes.  Yes.

21   Q    Can you explain what happened?

22   A    He was asking me about the branding ceremony, like, so

23   tonight is the night we're going to do?  And he was like very

24   excited about it.

25            And he was similarly excited like when he told me he

1    started a sorority, he laughed about it.  Like this was some

2    really strange and unusual funny thing or -- but to me it

3    wasn't because everything that we had done in 20 years were

4    all things that Keith had started.  So it wasn't a different

5    type of thing in my mind.  He started everything.  So him

6    started this was not unusual.

7              And I had been in a sorority in college that was

8    cofounded by a man.  So it wasn't like even to me that a man

9    might found a women's organization.  But his reaction to it

10   was unusual.  Because he wasn't usually emotionally expressive

11   in that way about the different things.

12             And his enthusiasm and excitement about the brand

13   also stood out, because it was -- like it stood out in

14   contrast to -- we were at some memorial service, it was very

15   somber and sad and serious.  So his excitement and enthusiasm

16   especially stood out to me.

17   Q    Looking back now, do you see any significance as to the

18   timing of your recruitment into the DOS?

19   A    Yes, I do.

20   Q    Can you explain that?

21   A    So, yeah, I mean there's a lot of background to it.  So

22   it's hard to explain it just concisely, but that -- I mean,

23   Keith and I had a relationship, we had a -- prior to all of

24   this.  We had a romantic and sexual relationship for a period

25   of time that tapered off slowly and it stopped at some point

1   in time.

2          And so for the ten years prior, or almost ten years

3   prior to my being invited into this, we hadn't had any

4   relationship like that.  And around -- there were things that

5   happened around 2009, and I think on Friday when I was here I

6   had talked about Barbara Bouchey left at some period of time

7   and I thought it was a little bit later, but 2009 the Dalai

8   Lama dame came to Albany, and Barbara left right at that time,

9   so like around 2009.

10         And there was a lot of -- like Keith would

11  frequently say that -- and his relationship with Barbara was

12  very involved and very tumultuous in certain ways.  And when

13  she left she was very vocal and did a lot of like press.  She

14  did interviews about the things going on in ESP but she --

15  that were concerning to her.

16         And frequently Keith would say that if we had gotten

17  our act together sooner this never would have happened.  And

18  specifically he said my mom was very problematic.

19         So there were a lot of things that happened that

20  were stressing in the companies and in the community on the

21  heels of this that he frequently would say that we didn't

22  understand how important this stuff was and he told us and we

23  weren't listening.

24         And so I, coming out of that time period, 2009, and

25  during the time that he and I didn't have a romantic or

1   physical relationship, I was trying to prove myself, you know,

2   and make up for the failures of the past.

3           And around 2012 he -- somewhere in there he told me

4   that at some point he had decided -- he had made the decision

5   to put our relationship on hold five years prior.

6           And that was very difficult for me to understand

7   because when he taught us things of having to do with

8   agreements with other people, he always said that if you

9   wanted to change the nature of an agreement with somebody you

10  should go to the person and discuss it with them.

11          So the fact that he had made the decision to change

12  our relationship five years prior and had never discussed it

13  with me was something that I had never -- I couldn't even

14  understand how that could have been.

15          And then I was like, well, if he made this decision

16  to put our relationship on hold and I wasn't even aware of it,

17  then I must be doing a very bad job.  And so a lot of what I

18  was doing was trying to compensate for these types of things.

19          And the -- when Barbara left, she was very vocal

20  about feeling that there was nepotism within the high ranks of

21  ESP and that the executive board was primarily made up of

22  women who either were or had been in sexual relationships with

23  Keith, and that this was of specific concern to her.

24          And that -- about a year before she left, Keith told

25  the executive board that if we didn't get our act together, he

Salzman - Direct - Hajjar                    1701

1  was going to basically just fire us all and replace us with a

2  new board.

3         So I went to Mexico and I started working to build

4  our business in Mexico and every like probably six to eight

5  weeks I was running a course fulfilling these Level 2

6  intensives, and I did this for a year, year and a half leading

7  up to the Dalai Lama and trying to prove that I could keep my

8  leadership role, was worthy of having this role, was making up

9  for the failures of the past.

10         So then when it became some of the things --

11  Barbara's concerns were being expressed vocally among our

12  membership and in the media, Keith fired the entire executive

13  board and replaced it with new business.  So lost my position

14  anyways.

15         Within six months, I was back on the executive

16  board, because nobody in ESP had did my role.  And the new

17  business building board had no connection to the product,

18  which was the education or the people, which were our members,

19  and the people who were buying the product.  And that I

20  performed a unique function.  So then I got back on the

21  executive board.

22         Fast forward a little bit to 2014.  2013 I wanted to

23  leave the relationship.  We weren't having a relationship any

24  more in that way.  But I was told I might be able to have it.

25  He asked me if I would stay.  He said he would invest in our

1   relationship.  If I did stay and we would have children within

2   five years.

3           2014 he started Ultima, which was a new company, and

4   that new company had a series of companies within it.  And he

5   took the ethics curriculum.  And I was the head of the ethics

6   board in NXIVM and one of only two people who taught that

7   curriculum as it had existed prior.  He took it and put it in

8   the new company, Ultima.  And he made Daniella the head,

9   Daniella Padilla, the head of this new ethics curriculum.

10          So he took the ethics curriculum out of ESP, out of

11  where I taught, and put it in the new thing and now Daniella

12  was the head of it.

13          So by the time -- so Pam got sick in 2015, and

14  around this time, you know, we took two trips to Fiji and --

15  because Pam wanted to see Fiji before she died and those trips

16  were very Marianna centric.  It was whatever Marianna wanted.

17  The trip centered around Marianna.

18          And he told me on the trip that he was going --

19  thinking of having a child with Marianna to balance things

20  out.

21          And to me this was like completely crazy because so

22  much was centering around Marianna and I didn't understand how

23  given Marianna more was going to balance everything out.

24          And in those two years that Pam was sick, I found

25  myself very much on the outside.  And when he told me Marianna

1  was pregnant, or when he told me Marianna was -- he thinking

2  of having a child with Marianna, on that same trip he asked me

3  to agree to stay with no child and no relationship.

4          So I have now been 12 years waiting for a

5  relationship and a child that we were -- by the time DOS came

6  that never came.  I had been cut out of several leadership

7  roles in the organization.  And in the two years Pam was sick,

8  all of a sudden Keith was surrounded by a new group of people

9  and had this new inner circle.

10         And in January, at New Years, I -- we did this New

11 Year's process where we would get together and share all of

12 our goals, and we did -- like what were the highs and lows of

13 the last year.  And I was in a group with Monica, Daniella

14 Padilla and Loreta Garza and I shared that.  At some point

15 I -- and I don't know when it happened, all of a sudden I

16 found myself on the outside of my group of friends.  That like

17 I don't -- that everything changed and now I wasn't part of

18 the inner group any more.

19         And there had also been this vacation, this -- in

20 December, so I'm going back -- I'm sort of jumping around a

21 little, just a lot of things happened to inform why I think

22 it's significant.

23         Keith and Marianna rented a house in Woodstock at

24 Christmas time and they invited a bunch of us to go.  And it

25 was the most bizarre trip to me.  It was like the coming out

Salzman - Direct - Hajjar                    1704

1    in a public forum of Keith and Marianna's relationships.

2              So it was like Keith and Marianna sharing a bedroom.

3    Her dad was there.  Her brother and his wife were there.  And

4    a bunch of my girlfriends, me and my mom, and Jim and Esther.

5    It was such a weird group of people.  But the whole thing was

6    like Keith and Marianna as a couple, and everybody else there

7    happy about it.  But I didn't feel happy about it.  And it was

8    confusing to me.  And I -- and it was upsetting to me, and I

9    didn't understand it.

10             And then later -- so then he tells me all of a

11   sudden, after 12 years, all of sudden I want to bring our

12   relationship closer, gets me in a collateralized vow for like

13   committed to growth.

14             I'm the head of the growth program of ESP, now I'm

15   in a collateralized life vow backing my word for growth, and

16   ten days later he tells me Marianna's pregnant, which he had

17   known for three months.

18             And so I was -- I was like this -- oh, my God, like

19   there's no way -- like he got me to stay because he thought I

20   would leave if Marianna was pregnant.  And he stole from me

21   and himself the ability to know if I would have stayed no

22   matter what without being a hundred percent collateralized

23   vow.

24   Q    How did he get you to stay?

25   A    By getting me to promise that through a collateralized

1  vow -- my entire life was collateralized in this.  And also I

2  was -- I'm the head of the growth program of ESP.  I said I

3  would do anything for growth.  I'm a hundred percent committed

4  to growth.  I collateralized my entire life and now all of a

5  sudden I'm saying I don't want to do this with you because

6  Marianna's pregnant?  My life couldn't have existed intact any

7  more.  It couldn't -- it couldn't have.  I couldn't have

8  maintained the integrity of my whole life if I all sudden gone

9  I don't want to do this.

10         And I hundred percent think that the timing on it is

11  because of that.

12  Q    Any significance to the fact that Rosa Laura Junco was

13  the one that approached you?

14  A    Hundred percent significance.

15         Because when he told me, when we were in Fiji a year

16  prior, and he told me Marianna -- that he was thinking of

17  having a baby with Marianna and I was incredibly upset and

18  distressed over it, I asked -- he told me he didn't want me to

19  speak to my mom about it.  And I didn't know who to talk to

20  about it.  And he said how about Daniella Padilla?  And I did

21  not want to talk Daniella Padilla about it.  And he said who

22  do you want to talk?  And I said Rosa Laura.

23         And Rosa Laura was the person who a year earlier

24  reenrolled me in staying in a relationship with him when he

25  was choosing to have a baby with a Marianna and telling me I

Salzman - Direct - Hajjar                    1706

1    was going to stay with nothing.

2              So she had already been the one I wanted to go to,

3    and the one I trusted and the one who had successfully

4    reconvinced me that this was the best path for me because of

5    my growth, because of the opportunity to be able to gain

6    things through having her as my mentor and my teacher, staying

7    in this relationship with him.  That I would never be able to

8    have him the whole rest of my life ever if I left.

9              And so she was hundred percent, I think related

10   to -- a hundred percent related to why she was chosen to be to

11   the one to ask me, and at the time when Marianna actually was

12   pregnant.

13   Q    At the time you learned of Marianna's pregnancy, did you

14   question the defendant's motives in enrolling you into DOS?

15   A    Yes.  And that I couldn't handle it.  I was like there's

16   no way he could have done that.  And I stuffed it, I

17   compartmentalized it, and hundred percent went full force

18   forward with my conviction that DOS was not bad, that it was a

19   growth program, that it was amazing, that this was for women,

20   and for me to get through my issues, and I just did that.

21   Q    You did tie your continued employment, your work with

22   ESP, to staying committed to the defendant?

23   A    I did, yes.

24   Q    Can you explain that?

25   A    Because I gave my word, which is a huge thing in our

Salzman - Direct - Hajjar                1707

1  company, that I would be a hundred percent committed to my

2  growth, and my growth was this collateralized vow of

3  obedience.

4          So I left it, I would be breaking my word to commit

5  to growth.  How could I stay in the position I was in as the

6  head of the growth program that taught the concept of

7  collateral -- of discipline of word, of all these things if I

8  was the person who didn't do it.

9  Q    Looking back now, do you see significance about when DOS

10 was created as to -- as related to Pam Cafritz, the woman you

11 were describing earlier?

12 A    Yeah, I do.

13 Q    Can you explain that?

14 A    Because I think Pam -- Pam facilitated all Keith's

15 objectives, whatever Keith wanted in many of his personal

16 relationships, and especially my relationship with Keith was

17 facilitated by Pam, you know, I -- that she reenrolled me in

18 my relationship with Keith time and time again throughout the

19 duration of my relationship with Keith.  And at the time she

20 died, I think she left, from her illness and her subsequent

21 death, left a big hole of people who were that and would do

22 that for him and DOS was doing that.

23         MR. LESKO:  Your Honor, I'm moving to another topic

24 now.

25         THE COURT:  All right.  We'll take our lunch break.

Salzman - Direct - Hajjar                    1708

1          All rise for the jury.

2          (Jury exits the courtroom.)

3          THE COURT:  All right.  The witness may stand down.

4          (Whereupon, the witness steps down.)

5          THE COURT:  Please do not discuss your testimony

6   with anyone.

7          We'll take an hour for lunch.  Thank you.

8          (Whereupon, a recess was taken at 1:00 p.m.)

9          (Continued on the next page.)

Proceedings                                                    1709

1        A F T E R N O O N   S E S S I O N

2

3                          --oo0oo--

4           THE COURT:  Here we go.

5           All right.  How much more do you have on direct of

6   this witness?

7           MS. HAJJAR:  Some time, Your Honor.  It would

8   likely be the end of the day.

9           THE COURT:  To the end of the day --

10          MS. HAJJAR:  On direct examination, yes.

11          THE COURT:  -- at least.

12          MS. HAJJAR:  At least.

13          THE COURT:  Okay.

14          All right.  Let's bring in the witness, please.

15          (The witness resumes the witness stand.)

16          THE COURT:  And let's bring in the jury.

17          (Pause in proceedings.)

18          (The Jury enters the courtroom.)

19          (The Jury present.)

20          THE COURT:  Please be seated, everyone.

21          All right.  Ms. Hajjar, you may continue your

22   examination of the witness.

23          I remind the witness that she is still under oath.

24

25

Salzman - Direct - Hajjar                    1710

1    DIRECT EXAMINATION (CONTINUED)

2    BY MS. HAJJAR:

3    Q    Ms. Salzman, you testified that you did get the

4    brand --

5    A    Yes.

6    Q    -- that the defendant told you about.  When was that?

7    A    It was on January 10th, 2017.

8    Q    And at that time did you have an opportunity to meet

9    the entire first line that you described earlier?

10   A    I did, yes.

11   Q    Who branded you?

12   A    A woman named Danielle.

13   Q    Was she a doctor?

14   A    Yes.

15   Q    At the time, did you have an understanding as to

16   whether Danielle was a member of DOS?

17   A    Well, Danielle got excited that I was getting branded

18   and she showed me her brand, so I learned she was a member

19   of DOS.

20   Q    Did you later learn something about the fact that she

21   had shown you her brand?

22   A    Yeah.  She was disciplined for it because it was an

23   indiscretion.  She wasn't -- she was supposed to keep it

24   secret.

25   Q    Was Danielle, as you understood it, under you in rank

1    in DOS?

2    A    Yes.

3    Q    Can you explain that?

4    A    Danielle was enrolled by Allison, so she was

5    second-line DOS and I was first-line DOS.  So I was higher

6    rank.

7    Q    Can you describe the branding ceremony to the jury?

8    A    Sure.  So we went to Allison's house.  She was out of

9    town, but we did it there.  And when I arrived I saw -- this

10   was the first time that I was together with all of the

11   first-line DOS masters.  So Rosa Laura told me that the

12   first thing that they did was take a naked picture.  So

13   everybody removed their clothes and we took the naked

14   picture.  And then she read to me basically the concepts

15   that are in the banding ceremony first, and they're similar

16   concepts to what are also in the book.  So basically about

17   you're making the vow of obedience to the master, that

18   you're surrendering your body, your property, all these

19   things, all the concepts that we reviewed earlier and that

20   there were responses that I was to say back.  So she would

21   read something to me and I would -- and tell me the response

22   and I would say the response back.  So we went through it

23   once before the branding ceremony.

24           Then Danielle arrived and helped me put a stencil

25   on where the brand would be, which is on the hip like in the

1   bikini line, and then we went into a room where there was a

2   massage table, and first I knelt down and there's a line

3   that you read that she instructed me to read and that she

4   instruct everybody who is getting branded to read, Master

5   please brand me.  It would be an honor, an honor that I want

6   to wear for the first of my life.  So that's how it starts.

7   And then you get up and lay on the table, and my arms were

8   held above my head.  Then I had like all my circle around

9   me, holding my legs and touching different parts of my body.

10  I was clothed because I was above Danielle in rank, but

11  normally everybody would be nude.

12  Q    And the words you were -- the words you said, Master,

13  please brand me.  It would be an honor.  Was that part of a

14  script that was shown to you at that time?

15  A    Yes, it was.  Yes.

16  Q    Did the branding itself hurt?

17  A    Yeah, it was really painful.

18  Q    Can be describe what it is exactly?

19  A    What it is?  It's an -- it's electricity, but it's like

20  a pen.  It cauterizes the skin.  So basically it -- it

21  makes -- it does like a third-degree burn, so it creates a

22  scar, ultimately creates a scar.  Immediately it just burns

23  the skin in a line.  Once it goes across, the skin is dead

24  so you don't feel it afterwards.  It's only when it's making

25  the line that it hurts, but it's incredibly painful.  It's

Salzman - Direct - Hajjar                    1713

1    the most painful thing I've ever experienced.

2    Q    Does it look -- in the branding ceremony does it feel

3    like a burn; does it look like a burn?

4    A    It looks like a third-degree burn after you get it,

5    yeah.  I mean, it's -- it's raw skin that then becomes

6    scabbed over and the scab falls off and then it scars.  But

7    it -- it's electricity so it shocks the skin as it goes

8    across and it -- it feels -- it feels like what it is.  It

9    hurts a lot.

10   Q    How long did the branding take?

11   A    It took -- it was -- the actual branding of the burning

12   of the skin only took a few minutes, but the whole process

13   took about like half an hour, 45 minutes to go through

14   the -- the actual branding plus the script, the reading back

15   and forth.

16   Q    Was it videotaped?

17   A    Yes.

18   Q    Who videotaped it?

19   A    Loreta.

20   Q    And after you were branded, did you then regularly meet

21   with that first line?

22   A    Yes.

23   Q    After you were branded, did you have a conversation

24   with Allison Mack about having joined DOS?

25   A    Yes, I did.  Yes.

1    Q     What was that discussion?

2    A     Allison was very excited that I joined, and she -- she

3    felt, like, excited to share everything that she had never

4    been able to share that came with DOS.  And her experience

5    with DOS was a little bit different than mine, but what --

6    what she shared with me is that she never had a relationship

7    with Keith until she joined DOS.  So when Daniella enrolled

8    her into DOS, she enrolled her also into a relationship with

9    Keith or it happened contemporaneously, as I understood it.

10   So Allison didn't really understand and I have never

11   discussed with her what my relationship with Keith was, so

12   she was very excited and enthusiastically -- like, Isn't

13   this great?  Like now not only do you have this master, but

14   you have, you know, all these new sister wives and she was

15   like so excited about that.  And I was like, Number 1, I've

16   had sister wives for 20 years; Number 2, this is not -- it's

17   something that's -- it's been something that's been

18   incredibly difficult for me, and then I'm -- I didn't know

19   about some of these relationships, including Allison's,

20   which I just learned about then.

21          So for me, it wasn't as exciting as it was for

22   her.  But she was -- I didn't share that with her because I

23   didn't want her to not be enthusiastic or feel happy about

24   her experience and I didn't want her to feel like she

25   couldn't share things with me.  But for me, it was really

1    hard.

2    Q    Did she mention children in this conversation?

3    A    I'm not sure if it was this conversations or after, but

4    she was like, yeah, we're going to raise our babies together

5    and we're going to do all these things.  And I came to learn

6    that she believed she was having children with Keith,

7    Daniella also now is believing she was having children with

8    Keith and for me, this was just a lot to learn.

9    Q    And when you say, Daniella, this is Daniella Padilla?

10   A    Correct.

11   Q    Did you have a subsequent conversation with Daniella

12   Padilla?

13   A    Yes.  Well, I went to Keith and was like, You're having

14   babies with Allison and Daniella and he said no, not

15   necessarily, you know, that's not -- and actually he acted

16   like he didn't know really quite where they got that idea.

17   And then I had a subsequent conversation with Daniella where

18   Daniella was describing that she and Keith had discussed how

19   they were going go about doing this because they were going

20   to -- Daniella was going go to Marianna and ask Marianna for

21   permission for Keith to be the donor.  So to make it like to

22   Marianna that it wasn't a relationship, that he was just

23   going to be the donor.  So then I went back to Keith and was

24   like, we have to ask Marianna for her permission to have

25   kids, to have you be the donor?  And so then he acknowledged

Salzman - Direct - Hajjar                    1716

1   that he had had that conversation with Daniella which

2   negated the first conversation where he said he wasn't

3   discussing having children with them, and then didn't seem

4   to understand why it would be a problem for me to ask

5   Marianna this, why, you know, if he could be the donor.

6   Q     Did you have discussions about recruitment of other

7   slaves in these meeting with the DOS first line?

8   A     Yes.

9   Q     And you testified that you recruited slaves?

10  A     Yes.

11  Q     Who did you discuss potential recruits with?

12  A     With the first line and with Keith.

13  Q     Were any prospects rejected?

14  A     Some.

15  Q     Can you give us some examples?

16  A     Audrey wanted to enroll Siobhan and I discussed it with

17  Keith, and he said he wasn't sure that that was a good idea.

18  Clare's name was raised a bunch and he wanted to keep that

19  separate.

20  Q     Clare Bronfman?

21  A     Yes.

22        Christina was another one he was thinking about if

23  it was a good idea.  I mean, these are ones that came up

24  directly with me.  I'm sure there are others, but these are

25  ones that either myself or people who I enrolled wanted to

1    enroll.

2    Q    Who had the final say about who could be enrolled and

3    who couldn't?

4    A    Keith.

5    Q    Did the defendant ever ask you for photographs of

6    potential recruits?

7    A    Yes.

8    Q    Did the defendant say anything about the marital status

9    of the person that you should recruit for DOS?

10   A    Not that I should, but that he said initially it was

11   going to be sorority for only people who were not married.

12   And then eventually they decided or at some point they had

13   decided to let in people who were married.

14   Q    And when you recruited your DOS slaves, did you lie to

15   them about the defendant's role in DOS?

16   A    Yes.

17   Q    And what about the brand?

18   A    Yes.  Well, I didn't tell them anything about the

19   brand.  They asked what it was, and I said it was a symbol,

20   you know, and then during the branding ceremony, Carola saw

21   the stencil and was like, KR, like she knew.  She realized

22   that it was Keith's initials, and I asked her to please not

23   share that with other people.

24   Q    Who did you recruit first?

25   A    Sarah.

1   Q     And where did you initially approach Sarah about

2   enrollment into DOS?

3   A     I approached her in Vancouver.  I was staying in her

4   home there.

5   Q     Why were you in Vancouver at that time?

6   A     I was teaching intensive in her center.

7   Q     About how soon after your enrollment into DOS were you

8   recruiting Sarah?

9   A     Five days.

10  Q     Was Sarah married?

11  A     Yes.

12  Q     And can you describe to the jury what the process was

13  for recruiting her?

14  A     Sure.  It was -- it was the same process that

15  Rosa Laura did with me, that I approached her and told her

16  that I was doing something I was very excited about.  I

17  wanted to share it with her.  And that this might sound

18  weird, but I needed a guarantee from her that she wasn't

19  going to speak about this to anybody else, and I introduced

20  the concept of collateral, which she provided me.  And then

21  when she provided it, I went through the four aspects of it,

22  lifetime vow of obedience to me; master/slave concept;

23  collar, which was the necklace; and branding, and she

24  decided she wanted to go forward and provided more

25  collateral.

1    Q    Did you characterize DOS as a sorority for women?

2    A    I did, as a sorority for women.

3    Q    What was the first piece of collateral that Sarah gave

4    to you?

5    A    She gave me like a confession that she had written on a

6    piece of paper basically confessing to things that would be

7    embarrassing for her reputation if they were to be

8    disclosed, things along the lines of sexual experiences or

9    substance use.

10   Q    What did you do after Sarah gave you that collateral?

11   A    I checked it with Rosa Laura.

12   Q    What happened?

13   A    Rosa Laura didn't think it was strong enough and

14   suggested naked pictures as well.

15   Q    So what did you do after that?

16   A    I went back to Sarah and told her about the naked

17   pictures and she agreed to take them, and we took them

18   together, meaning I was with her in the room when she took a

19   naked picture of herself.  And Rosa Laura then said that I

20   could go forward after that.

21   Q    Did you tell her anything about whether you had taken

22   similar photographs?

23   A    I did.  I told her I had done it as well.

24   Q    Did Sarah express any reservations about the branding?

25   A    Yes.  Very similar to mine, that she had shared as well

1    she had never gotten a tattoo and she had certain views

2    about her body and caring for her body, and this kind of

3    went against that.  But I -- re-enrolled her in the idea

4    that I shared with her the idea of paying for a principle

5    and the memorializing your promise, and the -- the, you

6    know, on your body forever was a promise forever.  And so

7    she agreed to do it.

8    Q    When you say reenrolled her in that idea, you persuaded

9    her to go along with it?

10   A    Yeah.

11   Q    Did Sarah then agree to join DOS?

12   A    She did.

13   Q    Did she provide additional collateral to you?

14   A    Yes.

15   Q    What different collateral did she give you?

16   A    We filmed a bunch of videos together, that the idea of

17   them was to make it look like it is candid, like she didn't

18   know that she was being recorded.  But she was speaking

19   negatively about family members, like, you know, saying

20   things like that she only had a relationship with them to

21   get her inheritance or that her husband, you know, was

22   abusing her and her son.  False statements, but that would

23   have damaged those relationships were they to be released

24   and also would damage the people in the video saying things

25   about them that would have hurt their reputations.

Salzman - Direct - Hajjar                    1721

1    Q    Why was it made to look candid?

2    A    Just because if it were to ever be released, it

3    wouldn't be believable that somebody would have just looked

4    at a camera and made a video of themselves doing that, but

5    it was more believable that she could have just shared it

6    with a friend who happened to be recording it unbeknownst to

7    her.

8    Q    Did she give the videos to you?

9    A    I filmed them on my phone, so they were always in my

10   possession.

11   Q    Were these videos sufficient collateral?

12   A    No.

13   Q    Why not?

14   A    Because she had to fully collateralize all of the areas

15   of her life to be considered fully in.  So she never, in

16   theory, completed the enrollment process.

17   Q    Did the defendant discuss your recruitment of Sarah

18   with you?

19   A    Yes.

20   Q    What did he say?

21   A    Oh, when I came back he was excited that I had enrolled

22   someone, and he said, like, she's your slave now.  And I

23   said yes.  And he said that means like -- and he had told me

24   that before -- that that meant that she had to choose that

25   relationship above all the other relationships in her life,

1    like above her husband, above her child, and I had even

2    discussed that with her.  But I came back and he said that

3    means if you tell her she has to have sex with another man,

4    meaning another man not her husband, she had to do that.

5    And if you tell her she has to have another man's child,

6    that means she has to do that.  And at the time I was like,

7    yeah, I get it.  Like you just need her really committed.

8    She's committed.  That was how I viewed it, but it doesn't

9    look the same right now.

10   Q    How do you feel now about it?

11   A    Well, I don't -- like why would that be the thing that

12   would indicate commitment as opposed to anything else?  Like

13   if you told her she had to walk across hot coals, you know,

14   she would have to do it.  Like why sleeping with somebody or

15   having their children, and given the fact that later I came

16   to find out he was having sexual relationships with other

17   people's slaves and some of those slaves were being -- that

18   was planned before he met them or anything that they wanted

19   to do.  It was like known to other people that it was going

20   to go in that direction and also that he was discussing

21   having children with slaves, and it just was different.  It

22   looks different, like, given their assignments to seduce him

23   and all of these things that came out later that I found out

24   later, it looks different knowing all of those things.

25   Q    You said that you also recruited Audrey?

1   A    I did.

2   Q    How soon after Sarah was recruited did you recruit

3   Audrey?

4   A    Like three weeks.

5   Q    Where did you first approach Audrey?

6   A    Audrey was in Albany taking a course and she came to me

7   and told me that she felt like she was losing her belief in

8   herself to be able to grow and get through her issues and

9   could I help her.  And so I asked her -- I -- this was how I

10  decided to help her.  I offered her this option.

11       So I went through the same process.

12  Q    Can you -- can you describe your rank in ESP and your

13  role in ESP as it related to Sarah and Audrey?

14  A    Sarah and I were the same rank but I had more stripes

15  so I was a higher rank in the same sash level.  But Sarah

16  was a green, I was a green.  Audrey was a coach, so she was

17  two ranks below and I was her center head as well.

18  Q    What does that mean?

19  A    I was co-head of the San Francisco ESP center, so she

20  was a coach in my center.

21  Q    And did Audrey -- what happened after you approached

22  Audrey?  What did she do?

23  A    Audrey submitted naked pictures as her collateral and

24  additional collateral as well.

25  Q    Can you describe generally the additional collateral

Salzman - Direct - Hajjar                    1724

1   she provided?

2   A     Initially she provided a letter accusing a past

3   relationship -- former relationship, a former romantic

4   partner of violence, domestic violence basically and it was

5   untrue but wrote it in a way that would have gotten him or

6   could have -- most likely gotten him fired from his job

7   which was a very good job.  And then additionally she

8   provided -- we filmed a number of videos similar to Sarah's

9   videos where she told various stories that would discredit

10  people who were important to her of alleged affairs that she

11  had had with coworkers who were married saying that that's

12  how she achieved the level of position in the company she

13  was working.  Things that would have been embarrassing or

14  humiliating to other former boyfriends and also that she

15  was -- she worked in a humanitarian organization and that

16  basically saying that she was posing as a humanitarian to

17  try to scam people out of money.

18  Q     And before --

19  A     And then afterwards, too, Audrey provided a bunch of

20  assets.  She promised her car and she provided bank account

21  information as well, investment accounts.

22  Q     And before Audrey provided all this collateral did you

23  lie about the defendant's role in DOS?

24  A     I would tell -- yes.

25  Q     Did you give Audrey the impression that this was a

```
                    Salzman - Direct - Hajjar              1725
```

1   women's group?

2   A    Yes.

3   Q    Were you at any point told you needed to enter into a

4   contract with your both DOS slaves?

5   A    Yes.  But -- at one meeting -- one DOS meeting right

6   before I enrolled Audrey, Keith asked why the contracts

7   weren't being used so I didn't know that there were

8   contracts, so I came to learn that there was a contract and

9   Rosa Laura said she had been trying to work on it with an

10  attorney but it wasn't finalized.

11       So then my -- but my understanding was he wanted

12  us to be using the contract.  So with Audrey I used the

13  contract but then later we were told we shouldn't use it

14  until it was finalized.  So Audrey and I did sign a contract

15  but I don't think it's -- I don't know.  Whatever stage it

16  was in, we did -- she did fill out a contract.

17  Q    Did you present her with a contract?

18  A    I did, yeah.

19  Q    Okay.

20  A    Yeah.

21       MS. HAJJAR:  Your Honor, may I approach the

22  witness?

23       THE COURT:  Yes, you may.

24       Does the defense have one.

25       MS. HAJJAR:  They have each of the exhibits, yes.

1        THE COURT:  I'm sorry.

2        MS. HAJJAR:  Yes, they have each of the exhibits

3   in this binder.

4        THE COURT:  Okay.  Thank you.

5   Q    Ms. Salzman, I just handed you a binder.  Can you flip

6   to what has been marked for identification as

7   Government's Exhibit 356 and 356R.

8   A    Yes.

9   Q    Do you recognize this exhibit?

10  A    Yes.  This is a contract with me and Audrey.

11  Q    And is Government's Exhibit 356R a redacted version of

12  Government's Exhibit 356?

13  A    It is, yes.

14       MS. HAJJAR:  Your Honor, the Government offers

15  Government's Exhibit 356 both --

16       MR. AGNIFILO:  No objection.

17       MS. HAJJAR:  -- 356 and 356R.

18       MR. AGNIFILO:  No objection to either one.

19       THE COURT:  All right.  356 and 356R are received

20  in evidence.

21       (Government's Exhibit Numbers 356 and 356R so

22  marked and received in evidence.)

23       MS. HAJJAR:  Thank you, Your Honor.  May I publish

24  it?

25       THE COURT:  Yes, you may.

Salzman - Direct - Hajjar                    1727

1          MS. HAJJAR:  This is Government's Exhibit --

2          Thank you, Your Honor.

3          THE COURT:  Sure.

4    Q    Ms. Salzman, I'm showing you Government's Exhibit 356R.

5    And can you explain what this exhibit is, what this

6    agreement is.

7    A    So there are different parts of the agreement.  As I

8    understood it, one part of the agreement is a nondisclosure

9    agreement saying that -- and -- and saying that if Audrey

10   speaks anything about this to anybody she owes me $1 million

11   in damages, and then there's also that she was rightfully

12   transferring her property to me so -- and gave me the right

13   to release her collateral publicly.  And a waiver that if

14   she's damaged at all during the process of her participation

15   in DOS for through her participation in DOS, that I have no

16   liability, and then was also some noncompete part of it that

17   I don't understand exactly what that is, but if she had

18   learned any material or secrets or valuable information in

19   the process of DOS that she wouldn't use that to earn an

20   income or benefit herself.

21   Q    And what is the date of this agreement?

22   A    February 10, 2017.

23   Q    So turning to page, numbered Page 7.

24         Is that your signature?

25   A    Yes.

1   Q    Is that Audrey's signature?

2   A    Yes.

3   Q    And this paper that's titled nondisclosure/noncompete

4   agreement, is that -- is that you and your address and

5   Audrey?

6   A    Yes.

7   Q    And this page, that says assignment and transfer

8   agreements --

9           THE COURT:  You have to just push it down.

10          MS. HAJJAR:  Okay.

11          THE COURT:  Well.

12          MS. HAJJAR:  It gets cut off, Your Honor, in the

13  copy.

14          THE COURT:  All right.

15  Q    What is the date of that agreement?

16  A    February 10, 2017.

17  Q    Turning to the last page, whose signatures do you see

18  there?

19  A    Mine and Audrey's.

20  Q    And under Exhibit 1A, can you read some of the things

21  that are listed under Exhibit A property?

22  A    Sure.  2017 Toyota, a Prius, all assets in Wells Fargo

23  checking, all assets in Wells Fargo savings, all assets in

24  Capital One account.  There are three Vanguard Roth IRA

25  accounts that she transferred and personal home furnishes.

1  Q    And your understanding of this contract was an

2  assignment of this property to you in the context of DOS?

3  A    Correct.

4         THE COURT:  Where did you receive this contract?

5         THE WITNESS:  From Rosa Laura.

6         THE COURT:  Rosa Laura.

7         THE WITNESS:  Uh-huh.

8  Q    At one point, Ms. Salzman, did you give instructions to

9  Audrey about assigning one of these accounts to another of

10 your DOS slaves?

11 A    I did.  I didn't want to personally take position of

12 her property because I thought that it was a conflict of

13 interest and I didn't want her to think that I had made a

14 lifetime commitment to her to get anything, so I asked

15 Charmel to hold it but essentially it's the same thing

16 because Charmel is a collateralized slave under me so in

17 essence if I wanted to take the property I could have taken

18 the property.

19 Q    Can you flip to what's been marked for identification

20 as Government's Exhibit 414 and 414R?

21 A    (Witness complies.)

22 Q    Do you recognize these exhibits?

23 A    Yes.  This is the paperwork to add Charmel as a signer

24 on Audrey's Vanguard account.

25         MS. HAJJAR:  Your Honor, the Government offers

Salzman - Direct - Hajjar                    1730

1    both of those Exhibits, Government's Exhibit 414 and 414R

2    into evidence.

3              MR. AGNIFILO:  No objection.

4              THE COURT:  All right.  Government's Exhibits 414

5    and 414R are received in evidence.

6              (Government's Exhibit Numbers 414 and 414R so

7    marked and received in evidence.)

8              MS. HAJJAR:  May I publish it, Your Honor.

9              THE COURT:  Yes, you may.

10   Q    Showing you, Ms. Salzman, what's in evidence as

11   Government's Exhibit 414R.  Is this the authorization you

12   were referring to?

13   A    Yes.

14   Q    And did this have the effect of adding a signatory to

15   this account?

16   A    Yes, that's my understanding.

17   Q    Were you a witness to this?

18   A    Yes.

19   Q    And what's here under aged acknowledgment?

20   A    That's --

21   Q    Is that --

22   A    Charmel.

23   Q    You said, Ms. Salzman, that you also recruited Jimena

24   and Carola into DOS.

25   A    Yes.

Salzman - Direct - Hajjar                    1731

1    Q    How did that happen, can you explain that process?

2    A    Jimena and Carola were in Mexico, so I did the same

3    process with them that I did with the others just over

4    Skype, so over video conference.  Exactly the same way, I

5    told them that there was something I wanted to tell them.  I

6    asked for collateral to keep the secret, they provided the

7    collateral, and then I shared the for four elements of

8    enrollment and they decided to join and submitted further

9    collateral.

10   Q    And what did they give you as collateral?

11   A    One of them gave me a video speaking about a family

12   member having an addiction problem that would have been very

13   damaging, hurtful to the family, the whole family.

14        Another one gave a video of an alleged affair that

15   they had had on their spouse.  And then later they gave

16   additional collateral.  I think one gave naked pictures,

17   another one signed over part of their business to me if they

18   were to default on their agreement.  There were other

19   things, I can't recall what those were among them.

20   Q    How did they give these items to you?

21   A    Some they gave in person some they gave over Telegram.

22   Q    Did you send those further along, did you send those

23   on?

24   A    No, I held on to them.

25   Q    Did you check the sufficiency of the collateral with

1    anyone?

2    A      No.  I asked -- you know what, at least one of two or

3    them were in Spanish and so I asked Loreta if she would

4    evaluate it for the weight and like to see if it was

5    sufficiently meaningful that it would secure the agreement.

6    And it was Loreta's sister so she -- I felt she would know

7    so I sent it to Loreta to check.

8    Q      Who else did you recruit into DOS?

9    A      Amanda and Charmel.

10   Q      And who is Amanda, what was her background?

11   A      Amanda's an attorney in California.  I don't know as

12   much about her background but...

13   Q      Did she provide collateral to you?

14   A      She provided collateral to me, yes.  She was also a

15   coach in my center in San Francisco as well.

16   Q      What kind of collateral did she provide you?

17   A      She provided an account of alleged abuse in her family

18   and then additionally sexually explicit photographs, a video

19   accusing her partner of abuse and that could have gotten --

20   I think something that could have gotten him fired from his

21   job and as well as something -- when later that could have

22   gotten her disbarred.

23   Q      Were you under particular pressure to recruit Amanda?

24   A      Well, I had scheduled the branding ceremony for the

25   first four that I had enrolled, so I wanted to give Amanda

1   the opportunity to be part of that.  So I enrolled Amanda in

2   an expedited fashion to try to get her to be part of that

3   and she wanted to and so her enrollment was similar to mine,

4   it took place in like 2 or 3 days from enrollment to

5   branding.

6   Q    And for each of these DOS slaves that you recruited did

7   you conceal the defendant's role in DOS?

8   A    Yes, all of them.

9   Q    Did your slaves --

10            THE COURT:  Excuse me.  What did you do with all

11   this paperwork when you received it?

12            THE WITNESS:  I kept it for a period of time and

13   then -- but the -- the intent was that it would be held by

14   someone who was in charge of securing the collateral, which

15   was Rosa Laura, so eventually I transferred most of it to

16   Rosa Laura either in person or on a locked hard drive and

17   then at one point my hard drive was given back to me and the

18   last I saw it was in Mexico.  I had it last in Mexico

19   with -- after Keith was arrested and then I came back to the

20   States without it.

21            THE COURT:  How did you end up having a hard copy

22   of it on paper?

23            THE WITNESS:  Went to Rosa Laura.

24            THE COURT:  And to your knowledge where did she

25   keep it?

Salzman - Direct - Hajjar                1734

1           THE WITNESS:  In her safe, but then I don't know
2    what she did with it after that.
3           THE COURT:  The safe --
4           THE WITNESS:  In her home.
5           THE COURT:  -- in Albany?
6           THE WITNESS:  Yes, in Albany was, understanding,
7    but then at some point she left Albany, went back to Mexico,
8    so I don't know if she took it with her or where it ended
9    up.
10          THE COURT:  Go ahead.
11          THE WITNESS:  I think the intent was that it would
12   be secure so that nobody would know where it was, so that it
13   wouldn't be released.
14          THE COURT:  Or who had it?
15          THE WITNESS:  Correct.
16          THE COURT:  Go ahead.
17          MS. HAJJAR:  Thank you, Your Honor.
18   Q    Ms. Salzman, did your slaves recruit their own slaves?
19   A    They did, yes.
20   Q    And did they provide -- did their recruits provide
21   collateral to them which was shown you?
22   A    Yes.  Given to me ultimately.
23   Q    Did Audrey recruit a slave?
24   A    She did, yes.
25   Q    And did any DOS slaves express concerns about the

Salzman - Direct - Hajjar                1735

1    collateral they submitted?

2    A    Yes.  Her -- yes, in particular the slaves that she

3    enrolled did.

4    Q    Can you explain that further?

5    A    She submitted something that she felt went against

6    something that she believed in, so she wanted to get it

7    back.  And she specifically said I would like to -- please

8    don't turn it t in, I do want to have it back.  There were

9    other -- I mean, Amanda enrolled somebody, too, who

10   submitted something and she afterwards was very upset that

11   she had submitted it and really struggled with that.

12   Q    Ms. Salzman, did you ever review a spreadsheet in

13   connection with DOS enrollment?

14   A    Yes.

15   Q    Who prepared it?

16   A    Rosa Laura kept track of the -- the enrollment and at

17   some point in time Loreta helped put it in Excel for us.

18   Q    Where did you see it?

19   A    I saw it in the -- we shared a DropBox folder, so it

20   was in an Excel Spreadsheet in the DropBox folder.

21   Q    Can you look at what's marked for identification in

22   your binder as Government's Exhibit 357 and 357R, and 358.

23   A    (Witness complies.)

24   Q    Do you recognize this exhibit?

25   A    Yes.  This is -- it's an Excel Spreadsheet that has a

1   list of everybody who was enrolled at the time it was made.

2   Q    And is Government's Exhibit 357R a redacted version of

3   Government's Exhibit 357?

4   A    Yes.

5           MS. HAJJAR:  I offer them, Your Honor,

6   Government's Exhibit 357, 357R and 358.

7           MR. AGNIFILO:  Can we have just one second, Judge.

8           THE COURT:  357 -- yes, I will.

9           But 357 and 307R.

10          MS. HAJJAR:  And 358.

11          THE COURT:  Okay.

12          (Pause in proceedings.)

13          THE WITNESS:  I don't see 358.

14          THE COURT:  There --

15          MS. HAJJAR:  May I show something to the witness

16  for identification only, Your Honor?

17          THE COURT:  Go ahead, yes.  Go ahead.

18          MS. HAJJAR:  Thank you, Your Honor.

19  Q    Do recognize this exhibit?

20  A    Yes.

21  Q    What is it?

22  A    It's a list of the first-line DOS masters and how many

23  enrollments they had in each line below them that we used

24  for readiness drills.

25          THE COURT:  L1 is your line?  Could you put that

Salzman - Direct - Hajjar                    1737

1    back.

2              MS. HAJJAR:  Yes, of course.

3              THE WITNESS:  Yes, L1 is my line.  L1 is all

4    the --

5              THE COURT:  It's the master.

6              THE WITNESS:  The masters yes.

7              THE COURT:  On your level.

8              THE WITNESS:  Correct.

9              THE COURT:  Is there an objection?

10             MR. AGNIFILO:  I don't know that we have the exact

11   one that the Government's offering.

12             THE COURT:  Well, here, wait.

13             (Pause in proceedings.)

14             MR. AGNIFILO:  No objection.

15             THE COURT:  All right.  Government's Exhibits 357,

16   357R and 358 are received in evidence.

17             (Government's Exhibit Numbers 357, 357R and 358 so

18   marked and received in evidence.)

19             MS. HAJJAR:  Thank you, Your Honor.  May I publish

20   them?

21             THE COURT:  Yes, you may.

22   Q    So showing you, Ms. Salzman, what's in evidence as

23   357R.

24             So this is one of the charts you reviewed?

25   A    Correct.

Salzman - Direct - Hajjar                    1738

1    Q     Past enrollment?

2    A     Correct.

3    Q     Okay.  And does this -- does this spreadsheet reflect

4    some of the participants in DOS?

5    A     Yes.

6    Q     And can you just -- can you explain what these columns

7    are starting with first that column that says, First?

8    A     Sure.  First it shows that it's the first line, so it

9    lists the first-line masters, Cami, Dani, Nicky, Loreta.

10   And then on the subsequent pages are the rest of the first

11   line.  Rosa Laura, Monica, Allison, and myself.

12              (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

L. Salzman - direct - Hajjar                    1739

1    BY MS. HAJJAR:

2    Q    And each of the names you read are the names of the first

3    line DOS masters that we discussed before?

4    A    That's correct.

5    Q    So, Cami in that column refers to Camila and Dani refers

6    to?

7    A    Daniella Padilla.

8    Q    Can you explain what this ID number column reflects, this

9    one here?

10   A    ID number is the, in theory, it's the number of -- it's

11   the order that they were enrolled.  I was grandfathered in as

12   number 8 so it's not completely in the order but I believe

13   other than myself it's in order of the order of enrollment.

14   Q    So, Camila has -- the number next to her is 1.

15   A    Yes.

16   Q    And then Rosa Laura is 5?

17   A    Correct.

18   Q    And you're 8?

19   A    Correct.

20   Q    And does this reflect the slaves that are under you in

21   DOS?

22   A    Yes, it does.

23   Q    And which column is that in?

24   A    The slaves that are under me are the column listed --

25   titled Second.

L. Salzman - direct - Hajjar                    1740

1  Q    What about the numbers in red that are at the top of the

2  column, the 8, 38, 43, 13, what does that reflect?

3  A    It reflects the number of people who are enrolled in that

4  line at that time.

5  Q    Can you explain that; so, what does the 8 signify?

6  A    The eight of us first line and then 38 shows that we have

7  collectively enrolled 38 people under us, and those 38 people

8  in the next column had enrolled 43 people under them, and

9  those 43 people had collectively enrolled 13 people under them

10 in the column labeled Fourth.

11 Q    So, at the time this spreadsheet was prepared what is the

12 total number that the spreadsheet reflects?

13 A    102.

14 Q    The dates on the far left side, what do those dates

15 reflect?

16 A    The date that the person was enrolled into DOS.

17 Q    And so, looking at the names below you for Sarah and

18 Jimena, do those roughly correspond to the dates in which

19 Sarah and Jimena were recruited into DOS?

20 A    Sarah's column is blank but next to her name on the right

21 is the date that she was enrolled.

22 Q    Right here, right next to her name?

23 A    Oh, yes, correct, and Jimena as well and, yes, that's

24 roughly the date they were enrolled.

25 Q    What does the yellow highlighting mean, the asterisk at

1   the top that says two asterisks means second payment is not

2   complete?

3   A    It means they're not fully collateralized.

4   Q    What does that refer to, second payment?

5   A    It refers to the collateral, that they haven't given the

6   second collateral.  So, they gave the first collateral for

7   secrecy but not fully collateralized in the vow.

8   Q    And is it right that Camila has only one slave under her?

9   A    Yes.

10  Q    According to this spreadsheet?

11  A    Yes.

12  Q    I'm going to show you what's in evidence as Government

13  Exhibit 358.

14            Can you explain what this spreadsheet reflects?

15  A    Yes, this spreadsheet reflects the number of individuals

16  in readiness, in the readiness drill.  On the left it says M's

17  readiness, these are the people who are in the formal

18  readiness that was run by Keith.  Our readiness reflected the

19  people who were in our readiness.  So, when we ran our drills

20  we had additional people who were not formally in Keith's

21  readiness because we were preparing them to be part of the

22  formal readiness so the numbers sometimes were different.

23  Q    Can you break this down a little bit?

24  A    Sure.

25  Q    What does it mean that there are different numbers listed

L. Salzman - direct - Hajjar                    1742

1    in M readiness versus R readiness and what do the numbers and

2    letters mean here?

3    A    So, when there was readiness each line was required to

4    check in.  So, Keith would initiate readiness with a question

5    mark and the first line, what we would respond, RM, ready

6    master.  So, he would list it with a question mark, we would

7    respond RM.  When the entire first line had checked in, there

8    were eight of us in total in that line, so it was eight ready.

9    Okay.  So, in each line there was a number of people who were

10   enrolled in that line and then there's how many are ready at

11   the time that the readiness drill is elicited, right, so -- or

12   initiated.

13             So, Cami when she would -- she'd check in, if you

14   see here it says 2R 1M, it is line 2, 2 ready, 1 slave

15   checking in master.

16             So, then if you go down, I drew over it, but if you

17   look at Loreta's it says 2R8M, that means second line ready

18   eight slaves master, eight slaves are ready in the second

19   line.  So, each of us was accountable for each of our lines.

20   So, Cami only had one line so she would check in the second

21   line just one person.  Daniella had two lines so she would

22   check in the second line five are ready, the third line looks

23   like six are ready and subsequently.

24             So, I checked in second line six were ready, third

25   line seven ready, fourth line two ready, that's how many I

L. Salzman - direct - Hajjar                        1743

1   should be checking in on each readiness drill.

2   Q    And the chart on the right, on the top right, do these

3   reflect the total numbers attributable to each of the DOS

4   masters?

5   A    At that time, yes.

6   Q    How many slaves do you have at that time?

7   A    I had five.  Oh, wait, I had six.

8   Q    And what about their -- what about the total number under

9   you?

10  A    Six plus nine, 15 at that time.

11  Q    Sorry, Ms. Salzman, is there a 6 -- does L3 refer to the

12  slaves under them, if I zoom in on this?

13  A    Oh, I see, the total; so, at this time -- oh, it's funny,

14  okay, sorry.  I was looking on the left and counting.  Based

15  on this column on the right it looks like I have 22 in my

16  group and then -- 22 total in my group under me.

17  Q    How many does Cami have in contrast?

18  A    Cami had herself and one, I had 21 plus myself.

19  Q    So, although you were the last to join the first line,

20  your -- the slaves -- you had the most slaves under you at

21  this particular time?

22  A    Yes.

23  Q    Right?

24  A    I did.

25  Q    Can you explain why that was?

L. Salzman - direct - Hajjar                              1744

1  A     I think some of it was the way that I was enrolled in
2  such a quick amount of time, I had that was my understanding
3  of how the process worked and how easy the process could be.
4  I had the least experience and the least objections at the
5  time so I was the most enthusiastic when -- at that time when
6  Keith started pushing readiness and I think I have good
7  capacity to enroll other people in my ideas.  So, all of that
8  kind of worked in my favor to be able to get a lot of people
9  quickly.
10 Q     What about in contrast, Camila or Nicki, can you describe
11 their enrollment efforts?
12 A     I think they're different for each person.  Cami was not
13 very public in the community much at all and didn't have a lot
14 of relationships, so when you're talking about going out and
15 enrolling people that you're close with, she didn't have that
16 many people that she was close with.  Also, she wasn't in a
17 leadership role or a coaching role or any of those things so I
18 don't know that a lot of people would have looked -- and she
19 was younger, I don't know that a lot of people would have
20 looked to her for somebody who they felt could help them the
21 most with their growth for their life.
22        And I'm not sure if that's the same exactly for
23 Nicki but Nicki wasn't as high in the organization -- in ESP
24 as me but generally my enrollment skills were better and I was
25 more enthusiastic about bringing more people.

1  Q     When you say growth in this context, do you include as

2  part of advancing within ESP?

3  A     Well, your -- enrollment in your growth and your capacity

4  to enroll others in your ideas usually was reflective in how

5  far you were in ESP.  So, there's growth -- there's your

6  growth and how that relates to your promotions in ESP but

7  particularly with the vow, it was a lifetime commitment of a

8  vow of obedience for the purpose of growth.

9         So, if Cami was going to enroll somebody and say I'd

10 like to be your master and help you with your growth, I don't

11 know that people would have seen her as being the person who

12 would be in that role or that they would look to and respect

13 to help them with that because she hadn't demonstrated that

14 she had that capacity.

15 Q     At some point did you have your DOS slaves branded?

16 A     Yes, the five of them.

17 Q     And can you describe their branding ceremony?

18 A     Yes.  They had not known about each other.  They knew

19 there were other slaves but they didn't know who the other

20 slaves were so I wanted to do an initiation ceremony for them

21 where they met each other and learned who their sisters were

22 in their circle.

23        So, I did that first, I invited them to my home and

24 I had told -- Rosa Laura told me when I joined the sorority

25 that there would be nudity as part of the sorority and I knew

1    that in advance and I had told them that as well.  So, they

2    came to my house, I asked them to come in staggered times so

3    they wouldn't know who each other were and I put them in

4    different rooms of my house and I asked them to remove their

5    clothes and blindfold themselves and then I led them

6    downstairs to my living room where they sat in a circle and

7    then they were able to take off the blindfold and see each

8    other, who each another were, and I did a candle lighting

9    ceremony with them, you know, to initiate them into their

10   circle.

11          Then they got dressed.  We all had dinner and we

12   went over to Allison's house to do the branding.  They took

13   about an hour putting on their stencils, figuring out where

14   they wanted the brands, etc., and then we went from there and

15   their branding ceremony was similar to what I described in

16   mine except they were fully naked all of them except me and

17   Danielle.

18   Q    What did you tell them about the brand?

19   A    I told them it was a symbol, an abstract symbol.

20   Q    What about the size?

21   A    I had told them originally my understanding was the brand

22   was supposed to be one inch by one inch and that's what I

23   believed it would be.  When I was branded there had been an

24   error that was made somewhere and my brand is much larger than

25   that, it's probably like two and a half inches by three inches

L. Salzman - direct - Hajjar                    1747

1  and it was supposed to have been corrected by the time my

2  girls were to be branded but it wasn't and so their brand is

3  larger than that as well, I'm not sure exactly the

4  measurements but it is bigger than an inch by an inch, but I

5  told them it was going to be an inch by an inch believing

6  that's what it was, that's the size that all the sisters in my

7  circle, the first line DOS masters all have an inch by an inch

8  and myself and only a few have a much bigger one and then

9  Sarah and Audrey's was much bigger and the others in their

10 circle were bigger than the inch by the inch?

11 Q   Who was the first to be branded?

12 A   Jimena.

13 Q   And was the branding filmed?

14 A   Yes, they all were filmed.

15 Q   Who filmed Jimena's branding?

16 A   I don't recall specifically who filmed Jimena but I think

17 it was Sarah because Keith texted me in the middle of it and

18 she saw the text so after that they weren't filmed on my phone

19 anymore or soon after that they weren't filmed on my phone

20 anymore.

21 Q   And the text you received, what was that regarding?

22 A   It was regarding a meeting of the first line DOS masters

23 that Keith held in the middle of the branding ceremony, so I

24 had to stop the branding ceremony to go to that meeting and

25 then come back.

1  Q    How did Jimena react?

2  A    Jimena, it was really very overtly emotionally

3  expressive, like she responded very expressively to the pain.

4  Q    What does that mean?

5  A    Like she was squealing and screaming and it looked

6  horrendous.  It was -- she demonstrated what she felt and her

7  reaction was particularly intense.

8  Q    At some point did she ask for some kind of cloth?

9  A    Yeah, she asked for or somebody offered her something to

10 bite down on.

11 Q    Did it look scary?

12 A    It looked really scary.  What Jimena was demonstrating

13 looked very scary.  It was frightening to see, it scared the

14 other girls.

15 Q    You said that ceremony was interrupted at some point;

16 what happened?

17 A    I had to leave to go to the first line meeting so, and

18 Carola wanted to leave to go feed her daughter, her baby and

19 so Carola and I left.  I went -- I dropped her off to feed her

20 daughter and then I went to the first line DOS meeting and

21 then like an hour later we went back.

22 Q    Who was next to be branded after Jimena?

23 A    Audrey went second.

24 Q    And after that?

25 A    Sarah.

1  Q    Your DOS slaves, were each of their branding ceremonies

2  filmed?

3  A    Yes.

4  Q    What was Sarah's branding like, can you describe that?

5  A    Sarah was -- like Sarah did and told the other girls as

6  well to use like yoga breathing to help through the process so

7  she was much quieter, she did her yoga breathing, she handled

8  it I mean comparatively much better than the other girls did

9  and I was very proud of her at the time.  In all of the

10  branding ceremonies there was, you know, some degree of

11  laughing and joking and different things to try to make it

12  seem a little less awkward and -- but I was, you know, I

13  coached them all through the process.  So, there was that in

14  the branding ceremony, me encouraging her, touching her,

15  helping her through the process.

16  Q    Who did the branding?

17  A    Danielle.

18  Q    How do you feel about participating in the branding

19  ceremony now?

20  A    I mean I feel like it was the start of the end of all of

21  my relationships with these people, like it -- I don't feel

22  good that I was dishonest about Keith's involvement or the

23  initials, like I don't think it was right to brand his

24  initials on people without them knowing that that's what it

25  is -- what it was and at the time I didn't view it as -- that

1   they were doing it only because I told them to do it or that

2   they felt that they had to do it but ultimately they were my

3   slaves and they were under a collateralized vow of obedience

4   to me and if they didn't obey, their collateral was subject to

5   be released, that was the agreement, and so had they decided

6   they didn't want to do it or there was something about it that

7   wasn't for them anymore, the notion that they really could

8   have chosen out of it I think is really one that I hadn't

9   considered at the time; like at the time I thought it was

10  consensual and they wanted to do it but even if they didn't, I

11  was their master and I told them to and you don't get to

12  say if you tell them they have to have sex with somebody or

13  have somebody else's child they have to do it but somehow they

14  don't have to get branded if they decide they don't want to.

15  Q    At the time that the defendant told you that about Sarah,

16  about having sex with someone or having someone else's child,

17  had she provided collateral?

18  A    Yes.

19  Q    Was she recruited into DOS at that point?

20  A    Yes.

21  Q    What happened after the branding ceremony?

22  A    We went back to my house and I took a group picture and

23  then they went home.

24  Q    Were photographs taken of the group?

25  A    Yes, I took a group photograph -- I took a group picture

1  of them that night immediately following their branding and

2  then later that week they met a few times and I asked them to

3  take naked pictures of themselves and send them to me similar

4  to what we did in my circle at every one of our meetings.

5  Q   Did you give them any instructions about the photographs

6  they were to take after the branding?

7  A   Yes, we had -- my group was meeting three times a week

8  and we were taking these pictures and there was -- when we got

9  feedback about changing it, we incorporated that feedback and

10 sometimes we had left the meeting and had to rearrange our

11 schedules to make it possible to get back together again and

12 retake the picture and the girls that I had enrolled all lived

13 in separate areas so specifically I wanted them to have that

14 experience so I told them, I mean initially that they were to

15 be fully frontally nude, the brand should show, you know, and

16 they should appear happy in the pictures or I may not have

17 told them happy initially but I corrected them and they had to

18 get together later and rearrange their schedules to retake the

19 picture and look happy.

20 Q   When you say you thought it was important for them to

21 have that experience, do you mean to replicate that, retaking

22 the photograph if you didn't look happy?

23 A   To incorporate feedback that your master gave you and

24 that was the feedback that I gave them, specifically to look

25 happier.

L. Salzman - direct - Hajjar                    1752

1   Q    Can you explain what incorporating feedback means, what

2   that phrase means?

3   A    It means you're told something that you didn't perceive

4   or you would have already done it, that's important, and so

5   you fix it.  Incorporate it is you make that change.

6   Q    So, what was the change you requested for this

7   photograph?

8   A    I requested them to look happy.

9   Q    And did they retake the photograph looking happy?

10  A    Yes.

11  Q    Did you require them to rearrange their schedules for

12  this?

13  A    Yes.

14  Q    Can you explain that?

15  A    Well, we had done that several times in my first line

16  group based on feedback and requests that Keith had made or

17  instructions we had been given and so my group had done that a

18  number of times and I thought that he must have been doing it

19  for a reason, that it was somehow important to prioritize this

20  over other things as we had done and because they lived in the

21  other outlying areas they wouldn't have that opportunity to do

22  that, to make that choice or to have that experience again for

23  another three or four months, so I wanted them to have that

24  experience at least once so I required them to do that.

25  Q    Again, when you say, "have that experience," what are you

L. Salzman - direct - Hajjar                          1753

1   referring to?

2   A    Of prioritizing my request over everything else they were

3   doing.

4   Q    To make them rearrange their schedule in order to do it?

5   A    Yeah.

6   Q    After your DOS slaves were branded did you ask them to

7   continue taking photographs of the brand?

8   A    Yes, the instruction was that they would take photographs

9   every day and send them to me and I sent those photographs to

10  Danielle who was in charge of keeping all of the brand

11  photographs.

12  Q    You gave them instructions to send you the photographs

13  every day?

14  A    I did every day and then after six weeks I told them they

15  could do it once a week and eventually they stopped sending

16  them.  I think when things became public we stopped doing

17  that, possibly earlier.

18          MS. HAJJAR:  Your Honor, can I show something to the

19  witness for identification only?

20          Thank you.

21  Q    Ms. Salzman, I'm showing you what's marked for

22  identification as Government Exhibit 429.

23          Do you recognize this exhibit?

24  A    I believe it's Audrey's brand.

25  Q    And does it comprise many photographs of the brand?

L. Salzman - direct - Hajjar                1754

1  A     Yes, it comprises the photographs from her branding

2  through the initial six weeks.

3         MS. HAJJAR:  Your Honor, the government offers

4  Government Exhibit 429.

5         MR. AGNIFILO:  We have no objection, Judge.

6         THE COURT:  Government Exhibit 429 is received in

7  evidence.

8         MS. HAJJAR:  Thank you, Your Honor.

9         (Government's Exhibit 429 so marked in evidence.)

10 Q     So, the images in this exhibit, Ms. Salzman, what are

11 they?

12 A     This is Audrey's brand which is Keith's initials.

13 Q     And are there a number of photographs in this exhibit?

14 A     Yes, there are.

15 Q     What does it reflect over time?

16 A     It reflects how the brand healed over time.

17 Q     Can you show the members of the jury so -- where is the

18 brand, Audrey's brand located physically on the body?

19 A     On her bikini line.

20 Q     Can you show the members of the jury where the

21 defendant's initials were on Government Exhibit 429?

22 A     Yes, so this is K and then that triangle is the triangle

23 of the A with the A and then the line, the middle line of the

24 A becomes the back of the R and the R is reversed, it's

25 backwards (indicating.)

L. Salzman - direct - Hajjar                    1755

1   Q    And what initials does that stand for, KAR?

2   A    KAR, Keith Alan Raniere.

3   Q    Now, does your brand and the brand of the other first

4   nine slaves look like this?

5   A    Mine is upside down, mirror image of that.

6   Q    Why?

7   A    Because it was the first line, you could see that it was

8   his initials in all the first line masters and everybody below

9   the first line had it flipped upside down and reversed I think

10  to conceal it.

11  Q    To conceal what?

12  A    The initials.

13  Q    So, in your brand the fact that it contains the

14  defendant's initials is more visible, more readily apparent

15  than here?

16  A    More visible, yeah, if you're just looking at it directly

17  but I always thought that that was suspicious because if you

18  have the backwards one and you look at in the mirror, which is

19  how you look at yourself all the time, it's the right way so I

20  thought for sure they were going to see it but...

21  Q    But they didn't?

22  A    No, and that was also why I was raising questions to

23  Keith about it but, yes, correct, they didn't.

24  Q    And did you ever ask permission to explain the initials,

25  did you ask permission from Keith to disclose to your slaves

L. Salzman - direct - Hajjar                    1756

1   the brand?

2   A    Not to explain the initials but I did -- I found out

3   later that some people's slaves did know about his involvement

4   and I wanted mine to know and I did ask for permission and he

5   said maybe at some point but didn't give the permission so I

6   couldn't tell them.  So, I mean -- but I did have permission

7   to read from (sic) them the book and so I told them that the

8   supreme master had written the book for us and also that if we

9   succeeded in our enrollment goals, we would qualify for

10  additional curriculum and I was hoping that they would be able

11  to connect the dots on that because it is almost exactly how

12  the other organizations work and Jimena did.  So, Carola knew

13  about the initials and the brand and Jimena knew about Keith's

14  involvement.

15  Q    Did the others?

16  A    No.

17  Q    Ms. Salzman, these photographs depict the brand over time

18  as it healed?

19  A    Yes, correct.

20  Q    And for what period of time was Audrey sending you these

21  photographs?

22  A    I think these reflect the first six weeks.

23  Q    Did she send these every day to you?

24  A    Yes, they all did.

25  Q    Did you send them anywhere else?

1    A    To Danielle.

2    Q    Why?

3    A    I was told Danielle was the one who kept track of them.

4    Q    This is the last image in that series.

5              About how long after the initial branding was this

6    image sent to you?

7    A    This is probably up to six weeks.

8    Q    You testified about acts of care?

9    A    Yes.

10   Q    And work that your slaves performed for you?

11   A    Yes.

12   Q    Was their work considered part of the vow of obedience to

13   you?

14   A    Yes.

15   Q    And the monthly collateral, you testified that you

16   submitted it and your slaves did, was that considered part of

17   the vow as well?

18   A    It was considered part of keeping collateral current but,

19   yes, when I told them to keep it current it was under the vow

20   of obedience.

21   Q    Did your slaves also track enrollment in DOS in some

22   form?

23   A    They did, yes.

24   Q    Can you explain that?

25   A    There were a number of things that I asked them to keep

1  track of, who they were enrolling and in which stage of

2  enrollment each of the candidates were, when they expected

3  that those candidates would each move to the next stage of

4  enrollment and be fully collateralized in the vow and then

5  there were other things I asked them to track; their acts of

6  care, I asked them to track that they were doing their daily

7  act of self-denial, their good morning-good night and anything

8  else they were checking in on I asked them to keep track of.

9  I didn't necessarily need to see it but I wanted them tracking

10  it.

11         MS. HAJJAR:  Your Honor, may I show the witness

12  something for identification only?

13         THE COURT:  Go ahead.

14  Q    Ms. Salzman, I'm showing you what's marked for

15  identification as Government Exhibit 425-R.

16         Do you recognize this?

17  A    I don't recognize this specific page but this is -- the

18  subsequent pages are things that Audrey put together to track

19  the things that I just said and the first page indicates the

20  different stages of enrollment.  So, likely it was Audrey

21  tracking all of those stages of enrollment.

22  Q    And the initials on the left-most side, did those

23  initials correspond to the first initial of your slaves?

24  A    Yes, they did.

25         MS. HAJJAR:  Your Honor, the government offers

L. Salzman - direct - Hajjar                    1759

1    Government Exhibit 425-R into evidence.

2            MR. AGNIFILO:  One second, Judge.

3            (Pause.)

4            MR. AGNIFILO:  Judge, may we approach for a second?

5            THE COURT:  All right.  You may approach.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                    1760

 1              (The following takes place at sidebar.)

 2         MR. AGNIFILO:  So, we got this this morning and we

 3    haven't really had a chance to look at it.  My concern is if

 4    this witness didn't make it, I don't know whether the witness

 5    looked at it in some official capacity, otherwise it seems

 6    like it is a document made by Audrey.

 7              I don't -- I mean since I haven't really had a

 8    chance to look at it because we've been on direct all morning,

 9    we just got it this morning, what I'd like, maybe the timing

10    contributes to this, if I could have ten minutes to look at it

11    over the break?  I'm not going to stand on ceremony about it,

12    I want to make sure there's no hearsay in here or something

13    that's problematic.

14         MS. HAJJAR:  I have no objection to taking ten

15    minutes.  This was provided to Ms. Salzman by her slave as a

16    requirement of tracking enrollment within that circle.  She's

17    identified who these initials correspond to and what's in the

18    chart and she can do so with more detail.

19         THE COURT:  Well, we'll take our break and we'll

20    come back.

21         MR. AGNIFILO:  I mean if you want to bring -- I just

22    don't know what -- what I heard her say, maybe I'm looking at

23    the whole picture, this is something Audrey made and she

24    wasn't fully familiar with it.  If you have other questions to

25    ask her, that's fine.

*Sidebar*                                                                      1761

1          MS. HAJJAR:  That's fine, I can ask her more

2    questions about what are the circumstances were under which

3    she reviewed this.

4          THE COURT:  We're going to take a break in 10

5    minutes anyway.

6          MR. AGNIFILO:  Do you have anything -- I don't want

7    to mess your schedule up.  Do you want to -- what do you want

8    to do?  Do you want to take our break now?

9          THE COURT:  Would you like to take the break?

10          MS. HAJJAR:  I'm fine to take the break now.  Thank

11    you, Your Honor.

12          THE COURT:  That's fine, sure.

13          (End of side-bar.)

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1762

1        THE COURT:  All right.  We'll take our mid-afternoon
2   break now.
3            All rise for the jury.
4            (Jury leaves courtroom.)
5        THE COURT:  The witness may stand down.  Please do
6   not discuss your testimony with anyone.
7            (Witness steps down and leaves courtroom.)
8        THE COURT:  All right.  We'll take a ten-minute
9   break.  Thank you.
10           MR. AGNIFILO:  Thank you, Judge.
11           (Time noted:  3:25 p.m.)
12           (Recess taken.)
13           (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

Proceedings                                1763

1          (Defendant enters the courtroom.)

2          THE COURT:  What's that?

3          MR. AGNIFILO:  I haven't had a chance to read it.

4          THE COURT:  All right, thank you.  Let's call the

5     witness back in.  And we'll get the jury.

6          And so you are going to go until the end of the day,

7     Ms. Hajjar?

8          MS. HAJJAR:  Yes, Your Honor.

9          THE COURT:  Okay.

10         Let's get the jury, please.

11         (Whereupon, the witness resumes the stand.)

12         (Jury enters the courtroom.)

13         THE COURT:  Please be seated.

14         All right, Ms. Hajjar, you may continue the direct

15    examination of the witness.

16         The witness is reminded she is still under oath.

17         Is there any objection to Government Exhibit 425R?

18         MR. AGNIFILO:  No, Your Honor.

19         THE COURT:  All right, Government Exhibit 425R is

20    received in evidence.

21         (Government Exhibit 425R, was received in evidence.)

22         MS. HAJJAR:  Thank you, Your Honor.

23         If I could publish it to the jury.

24         THE COURT:  All right.  Go ahead.

25         (Exhibit published.)

Salzman - Direct - Hajjar                    1764

1    DIRECT EXAMINATION (Continued)

2    BY MS. HAJJAR:

3    Q    Ms. Salzman, I'm showing you what's in evidence as

4    Government Exhibit 425R.

5              This is a spreadsheet to track the stages of

6    enrollment and how much time they anticipated each person

7    would be in each stage of enrollment.

8              And so at the top when it says:  Prospect's first

9    guarantee approach, Pitch to saying yes, Why first said yes,

10   what does that mean?

11   A    That means the prospect is who do you have in mind to

12   approach to join.

13             First guarantee means that they submitted the

14   initial collateral for secrecy.

15             Pitch to saying yes is the -- when you're in the

16   process of telling them about the four aspects to the vow.

17             That the lifer said yes, which is the stage four

18   column, means that they've heard the four aspects of joining,

19   which is The Vow of obedience, the master slave concept, the

20   collar and branding and they said, yes, that they want to join

21   after hearing that.

22             And then stage five is they have fully

23   collateralized.

24   Q    And they are six rows underneath those headers.

25             What do each of those -- those rows each a DOS slave

Salzman - Direct - Hajjar                    1765

1    of yours?

2    A    Yes.

3    Q    Did Audrey prepare this at your direction?

4    A    Audrey offered to come up with a way to help track it,

5    and I said, yes, that would be helpful to me.

6    Q    Did you instruct that there needed to be tracking?

7    A    Yes, I asked him to track a number of different things.

8    Q    And so what is -- what does this page of Government

9    Exhibit 425R show, the second page, it says enrollment status

10   tracking, what does this reflect?

11   A    It shows the different people that each of my slaves had

12   in the stages of enrollment and when they anticipated each --

13   the dates that they would be moving through the different

14   stages.

15   Q    And are those dates reflected at the top?

16   A    Yes.

17   Q    At the bottom where it says:  Totals lifer, all including

18   M, what does that mean?

19   A    It meant how many people that we would have fully

20   collateralized in The Vow by each of those dates, including

21   myself.

22          So it was how many we would have in our entire

23   group; myself included, my slaves included, and their

24   enrollments, and anyone below them included.

25   Q    So at 45, the lower right-hand column would be by

1   July 3rd that corresponds to dates, in other words?

2   A    That's what they were striving for, yes.

3   Q    Can you describe what this page reflects in group

4   accountability and the chart that's underneath that?

5   A    I believe this is -- these are the different things that

6   they were tracking.  So they were tracking their enrollment, a

7   discipline that they were doing.  I don't know if that was

8   daily acts of self-denial or weekly active care.

9            I had asked them to notify me, so that was they were

10  tracking.  They were updating their goals, sending pictures

11  and brands, doing their active care, and being accountable to

12  the data in the spreadsheet, and they were adding their

13  penances as a personal list.

14           And then for June, when they said "weight," weight

15  was another word that we used for collateral.

16           So where they're saying monthly guarantee, that

17  means the monthly collateral.  And that they were reporting to

18  me that they had submitted it.  That they were fully

19  collateralized and that were ready.  So those were the things

20  they were checking on.

21  Q    And the "M" refers to you as master?

22  A    Yes.

23  Q    The highlighted box here, take one spoon per person who

24  fails.

25           Do you know what that refers it?

Salzman - Direct - Hajjar                    1767

1   A    Audrey called it a spoon, but I think she was taking

2   paddle penances if they failed for all the failures of the

3   people in her group.

4        She had brought it to me and asked me -- she told me

5   she wanted to do it and asked me if I was okay with her to do

6   that and I said, yes.

7   Q    Was that something you suggested?

8   A    I suggested that they take -- that they figure out how

9   they wanted to deal with the readiness failures, and that I

10  was taking on penances for their failures.

11       So when they had failed at readiness, I shared -- I

12  was taking on penances for them.  So they suggested that they

13  would take the same penance I was taking.  So once I

14  suggested -- I told them I was taking paddlings for all of

15  their failures, then they wanted to take that as their penance

16  as well.

17       And then Audrey in this case was taking additional

18  paddlings for the failures of her group members.

19  Q    Did you continue to recruit other DOS slaves after the

20  branding ceremony?

21  A    One more.

22  Q    Who?

23  A    Charmel.  I recruited her the week after the branding

24  ceremony.

25  Q    And did you recruit -- was the process of recruiting her

Salzman - Direct - Hajjar                1768

1    similar to the recruitment process for the other slaves?

2    A    Yes, always the same.

3    Q    What did Charmel submit as collateral?

4    A    Charmel submitted a letter to her children that would

5    have effectively severed their relationship.

6    Q    How did you communicate with your DOS slaves?

7    A    Through Telegram chats, program, the app -- it's the app

8    on the phone.

9    Q    Miss Salzman, can you flip in your binder to Government

10   Exhibit 432 and 432R.

11   A    Yes.

12   Q    Do you recognize these exhibits?

13   A    Yes, these are my Telegram chats with Audrey.

14   Q    And is 432R is a copy of Government Exhibit 432 with

15   certain names redacted?

16   A    432R is 432 with names redacted.

17   Q    Does it appear to be the same, those exhibits?

18   A    They appear to be the same, yes.

19           MS. HAJJAR:  Your Honor, the government offers

20   Government Exhibit 432 and 432R.

21           MR. AGNIFILO:  We have no objection.

22           THE COURT:  All right, Government Exhibit 432 and

23   432R are received in evidence.

24           (Government Exhibit 432 and 432R, were received in

25   evidence.)

Salzman - Direct - Hajjar                    1769

1              (Exhibit published.)

2    Q    Miss Salzman, I show you the first page of Government

3    Exhibit 432R.

4              Are these are your Telegrams chat with Audrey.

5              Are they screenshots of that chat?

6    A    Yes.

7    Q    The Telegram chat is something on your phone?

8    A    Yes.

9    Q    Is that right?

10   A    Correct.

11   Q    And whose phones are these screenshots from?

12   A    Audrey's.

13   Q    And how can you tell?

14   A    Because they're conversations between me and Audrey that

15   only existed on my phone and her phone.

16             And as evidenced by my picture in the right-hand

17   corner, I'm the one who is speaking to the recipient.  So

18   these are on the recipient phone, which is Audrey's.

19   Q    Can you tell based on the color of the messages which

20   messages were sent and which ones were received?

21   A    Yes.  Always the person who is -- on your own phone the

22   message is green, and the person writing to you is white.

23             So I'm writing to her in white, and she's writing

24   back to me in green.

25   Q    So the first message:  Amanda and I want to do our,

Salzman - Direct - Hajjar                    1770

1   quote, mega penance from our readiness failure while we are in

2   San Diego with you.  Can you advise on what method instrument

3   we should use.

4            That's Audrey to you?

5   A    Correct.

6   Q    And your response, can you just read your response,

7   please?

8   A    Go to the sex store and get a paddle, which is what my

9   group did.  And they have leather ones.  I sent Jimena a

10  picture.

11           There's one in the mission by your house, I think.

12  Mission is just an area of San Diego.  I mean San Francisco.

13  Sorry.

14  Q    Did you send a photograph of the paddle?

15  A    I did.

16  Q    Can you explain the context for this chat?  Why were you

17  in San Diego?

18  A    I was in San Diego -- I was invited, Allison was in a

19  play in San Diego, and I went to see her in the play.  And I

20  invited Audrey and Amanda to come with me.

21  Q    And when was this approximately?

22  A    In April of 2017.

23  Q    Audrey uses -- capitalizes the "Y" in you?

24  A    Correct.

25  Q    Why does she do that?

1  A     Because I'm her master and we capitalize all the

2  pronouns.

3  Q     And what was this paddling of penance for?

4  A     Failure of readiness.

5  Q     Which meant what exactly?

6  A     That they failed to get all of the people in their line

7  reporting in for readiness in the one-minute time from.

8  Q     To your knowledge, did Audrey, in fact, get a paddling

9  penance for failing?

10  A     Yes, she did.

11  Q     How do you know that?

12  A     Because I saw her take it.  I was in the room with her.

13  Q     Were there other times where -- that Audrey was paddled

14  or paddled others?

15  A     Yes.

16        Audrey and Charmel took a paddling penance that I

17  was unaware that they were going to take it at the time, but

18  they sent me videos of it.

19  Q     So on page 2 of Government Exhibit 432, this is Audrey's

20  text:  We are here at the garden, whenever you're ready, we're

21  happy to meet you, whenever it is most convenient.

22        And your response is:  Are you rushing me?

23  A     Correct.

24  Q     Can you explain the context for this chat?

25  A     Yes.

1         So we had arrived in San Diego, and Allison started

2    pointing out areas where my slaves were failing that would be

3    acceptable to her in her with her slaves were failing at.

4         So I was getting a lot feedback from Allison that I

5    was not doing a good job as a master.  And so when I received

6    the text from Audrey about at being at the garden, whenever

7    they're ready, Allison told me that she would have said are

8    you rushing me, so I wrote:  Are you rushing me?

9         I wanted to show Allison that I was a good master

10   and willing to discipline my slaves and teach them how to be

11   good slaves.

12   Q    And the next message you write back:  The stories and

13   justifications need to stop.  You believe your own BS and it

14   makes and keeps you weak.

15   A    Uh-huh.

16   Q    Sorry, master.

17        Is this the tone you would use with you DOS slaves?

18   A    At times.

19        And those are things, too, that Keith would say to

20   us.  You know, so that we needed to stop making stories and

21   stop making excuses and stop making justifications.  That we

22   were making things harder and more difficult for him and -- by

23   not being better at things.

24        And as time progressed that I was in DOS, it was

25   more and more strict in those ways, and so I was more and more

1    strict with them as well.  Feeling that he felt that we were

2    making things harder for him, and I would go and relay they

3    were making things harder for me with him.  But I didn't tell

4    them about him.

5    Q    Looking at page 3 of Government Exhibit 422.

6              Spoke too soon.  She's having another freak out.

7    Asked me to not submit her collateral and to back out.  I

8    talked her down.  She's processing through their reactions

9    faster.  I think she's coming around.

10             What is -- this is Audrey's message to you?

11   A    Yes.

12   Q    And when she says that this person's having another freak

13   out, asked me not to submit her collateral, what does that

14   mean?

15   A    The person -- this person joined, and then would say I

16   don't -- I don't want to be a member any more, but then would

17   say that she did.  She did want to stay.  She just had a

18   reaction that she was over it now and she wanted to stay.  And

19   that happened a few times.

20             So when she said she's having another freak out, it

21   was her having an emotional reaction and not want to stay.

22   And also she had submitted an additional collateral and she

23   wanted it back.

24   Q    Did she ask for it back?

25   A    Yes, she asked Audrey for it back.

Salzman - Direct - Hajjar                    1774

1    Q    Was she given it back?

2    A    No.

3    Q    This text on page 4 of Government Exhibit 432.

4         Secondly, she made a life commitment.  The fact that

5    she thinks she can back out because she is it uncomfortable is

6    exactly the reason we are asking her to do this assignment.

7         Who sent this message?

8    A    I did.

9    Q    And are you referring to the DOS slave that was just

10   being discussed?

11   A    Yes, I am.

12   Q    You mentioned before that the -- that weight was used as

13   collateral sometimes.

14   A    Yes.

15   Q    So looking at page 6 of Government Exhibit 432.

16        The idea of weight is to leverage your capacity to

17   stick to your growth program.  The fact that you got scared

18   immediately and want to quit is exactly the reason for the

19   weight.

20        What does "weight" mean in this context?

21   A    The collateral.

22        It means the idea of collateral is to leverage your

23   capacity to stick to the program.  The fact that you got

24   scared immediately and want to quit is exactly the reason for

25   the collateral so that you don't quit, you can't quit.

Salzman - Direct - Hajjar                    1775

1   Q    On page 8 of Government Exhibit 432 you write:

2            As far as I'm concerned with Kristin, she is in.

3   She already decided.  Telling her herself she's still deciding

4   is a type of way she keeps the back door open.

5            What does that mean, "the back door open"?

6   A    The back door open is the third option I was talking

7   about with the women earlier.  That women feel that they can't

8   get out of things.  And we call that having back door.

9   Q    And what was the purpose in this context when you say,

10  She keeps the back door open.  What's the purpose of the

11  collateral?

12  A    So that there is no back door option any more.

13  Q    There's no way to get out of it?

14  A    No.

15  Q    The second message on this page:  This is a type of

16  tantrum.

17           Is that word used frequently?

18  A    Yes.

19  Q    And can you explain how and why you use that word?  That

20  word "tantrum"?

21  A    Yeah.  Because -- well, Keith taught us that these were

22  types of emotional tantrums.  That we could throw a tantrum,

23  that we could have an overt emotional reaction to something

24  and then get off the hook for that thing because of the

25  emotional reaction.  That people would let us off the hook for

Salzman - Direct - Hajjar                    1776

1    that.

2         And so we came to see those things, somebody having

3    an emotional reaction to something and wanting to not do it as

4    a type of tantrum to try to get off the hook.

5    Q    In this context, the emotional -- when you say emotional

6    reaction, in this context, are you referring to someone not

7    wanting to -- their collateral -- not wanting to submit their

8    collateral?

9    A    Yes, and them wanting to leave.

10   Q    This is on page 9 of Government Exhibit 432.  You say:

11   So I recommend when you get here talking to her about that.

12   Don't mention the guarantee.

13        What did you mean?

14   A    I meant that to discuss with her the fact that she said

15   she wanted to do something and then she's trying to get off

16   the hook for it.  And then wanting to do it again.  Like I

17   want to, I don't; I want to, I don't.  Discuss that with her

18   but don't get into the collateral yet.  Get her through that

19   part and then we'll discuss what happens to the collateral.

20   Q    Why?

21   A    Because it -- it was kind of a one step at a time thing.

22   But get her through the first part, then you get her through

23   the second part.

24   Q    Explain that further, one step at a time thing?

25   A    Like that she was having emotional reaction not want to

Salzman - Direct - Hajjar                    1777

1   go do this, which she had had before, independent of the

2   collateral.  And was also having a reaction of wanting the

3   collateral back.

4         And I saw it as a two-step process.  Like first

5   let's help her understand why she wanted to do this in the

6   first place, or connect with what she wanted out of it in the

7   first place.

8         And then talk to her about the collateral, which is

9   precisely what she put down because she wanted that thing in

10  the first place.

11  Q    Why defer mentioning collateral?

12  A    I thought it was too much at once.  She was having

13  reaction and it was progressive.

14         But it was inductive as well.  I said to Audrey:

15  Give me the collateral any way.  Turn it in any way.  She said

16  she doesn't want it, but she gave it with the intent -- at the

17  time she gave it, she gave it with the intent to give the

18  collateral, we're going to uphold that part.

19         Like sometimes she says yes; sometimes no; sometimes

20  yes; sometimes no.  We're going to honor the part that's yes.

21  She gave the collateral when she meant yes.  Give it to me and

22  we're going to hold it and talk to her and see if she wants to

23  we're stay or not.  But ultimates the collateral is not

24  subject to be released.  But see if she wants to say first.

25  Q    So it could be released back to her?

Salzman - Direct - Hajjar                    1778

1  A    I'm sorry, it wasn't going to be given back.  It wasn't

2  going to be given back.

3  Q    On page 10 of Government Exhibit 432, Audrey writes she

4  writes -- that this person had asked whether her final

5  collateral was submitted.

6          And on the following page you say:  But turn in her

7  collateral any way.

8  A    Yes.

9  Q    I believe she's staying, but even if she doesn't, she

10  shouldn't get it back.

11  A    Exactly.

12  Q    Given with the intent to stay.

13          Is that what you're referring to?

14  A    That's what I'm referring to, yes.

15  Q    The bottom of the following page, page 12, you say:

16  She's asking because she's run by her viscera, but she knows

17  it's bad to back out.  She's just feels scared.

18          What's her viscera?

19  A    She wants to do what's more comfortable.  Viscera is what

20  feels better.

21  Q    And when she's asking, because she's run by her viscera.

22  In plain English, what does that mean?

23  A    It means I was looking at it like this:  That she -- that

24  she had this ideal that she wanted to grow, but it may not

25  always be comfortable to grow.

1          And so you put down the collateral so that you'll

2    grow even when not it's comfortable.  But right now she's

3    feeling uncomfortable, so she's saying I don't want this.

4          But that was the whole reason we did it in the first

5    place.  We joined this organization in this collateralized vow

6    to help us when we felt uncomfortable push through and stay

7    consistent.

8          So I was looking at it like that; like, so right now

9    she's in the uncomfortable part saying I don't want this, but

10   when she's not feeling uncomfortable, she's this is something

11   that I want.

12         And so I was saying she's -- right now she's asking

13   because she's feeling uncomfortable, but she knows it's bad to

14   back out because we discussed it several times, and she agreed

15   that she didn't want to be the kind of person who backed out

16   when she got uncomfortable.  So she's feeling scared right now

17   and that's what's going on, and that's how I was framing it to

18   Audrey.

19         And that's why I was making the decision to continue

20   to keep the collateral because when she wasn't in the moment

21   of feeling uncomfortable, she kept say she did want to stay.

22   Q    Do you have a different view of this exchange now?

23   A    Yes.  And also because subsequently she said every time

24   she talked to me she felt like I kept talking her back into

25   things she didn't want to.  I thought that she was agreeing

1    because she did want to do it not because I was pushing her in

2    an area she didn't want to be pushed, and she didn't feel

3    strong enough to say, no, or felt afraid because of her

4    collateral.  Because I had substantial collateral on her.

5    Q     Turn to page 16.  Is this the message you sent?

6          In theory, each act should be doing about an hour of

7    work per week for their M as a normal contribution or act of

8    care.

9          Is that something you considered?

10   A     Yes, after Keith came to a meeting and shared that that

11   was what he thought should be, I communicated it to Audrey.

12   Q     And what does that mean?

13   A     That means each slave should be doing about an hour per

14   week of work for the master as in moral act of care, which

15   should be going on any way.

16   Q     And the following message:  What generally helps me most

17   is you considering where you can bring the most and highest

18   level of skills you have to my life and objectives at the

19   highest standard possible.  I have an assistant.  I have a

20   cleaning lady.  So that doesn't really help me that much and

21   it's lowering the value of what you could be attributing to

22   furthering me.

23   A     Correct.

24   Q     Can you explain what you meant by that?

25   A     Yes.  And this was a concept that we looked at earlier in

1    the book, which is that ideally you want be to be providing

2    most value at all times that you can to your master to be

3    furthering them in the most valuable contribution way.

4    Q    So what did that mean with respect to Audrey, as you were

5    conveying this to her?

6    A    The highest skills that she could bring, she should

7    bring.  The work that she could do, she should do.

8    Q    Turning to page 20.  This is Audrey message to you:

9    Master, may I eat extra today calories today.  I felt really

10   hungry for past two days since I got my period.  Much stronger

11   than usual.  I have tried to pace my calories throughout the

12   day; 100, 200 at a time, as you suggested, but I'm still

13   feeling very hungry.  Last night I had trouble falling asleep

14   because of it.  My period also stopped after one day.  I don't

15   know if this is related, but I think it might be.

16              Were these types of requests for -- was Audrey on a

17   restricted diet in terms of her calories?

18   A    Audrey -- when Audrey first joined, she communicated that

19   she didn't feel that she was meeting her health and fitness

20   goals, and I asked her to track her calories to see how much

21   she was eating.  So she did that.  And then I suggested -- or

22   I told her to go down 100 calories.  So she was on 1500

23   calories a day diet, I believe.

24   Q    Did she have to ask you permission to eat more than that?

25   A    I did.

1  Q    Did you refuse her?

2  A    I did.

3  Q    And so the next message when you say:  No, I don't think

4  you need this, I believe your calories are already high.

5  A    Yes.

6  Q    She was not permitted to eat the remaining calories she

7  wanted?

8  A    Correct.

9  Q    Turning to page 21.  Are these three messages your

10  messages to Audrey?

11  A    Yes.

12  Q    Can you read them, please?

13  A    I am pushing you on this because you're doing a very

14  weenie version of a program that you think is a big deal.

15  Your capacity for discomfort and self-denial is super low and

16  this limits your capacity to even vision an ideology beyond a

17  very low level of morality.  You need to push against this to

18  gain a sense of self.

19         Part of the masturbation denial is also denying the

20  fantasy shit you link with it, which is counter growth for you

21  overcoming self victimization and suffering.

22         I'm telling you this not as your master but as a

23  green in ESP and head of stripe path.  If you want to get a

24  proctor, you must evolve this and the long circuitous road is

25  not a good option.

Salzman - Direct - Hajjar                    1783

1   Q     The second message refers to masturbation denial.

2         Did you require Audrey to refrain from masturbation?

3   A     She suggested it as an option, and I said that she should

4   take that option, that would be good.

5   Q     In what context did she raise it as an option?

6   A     The context of -- I don't recall specifically, but

7   absence of self-denial in getting over being led to the body.

8   Q     Was that something you suggested?

9   A     Yes.

10        Yes, I mean I was -- at the time looking at it as

11  she needed to overcome is exactly what I said.  She didn't

12  have a good capacity to do this and she should be doing this

13  if she wanted to grow and if she was really committed to

14  growth she would be doing this.

15  Q     When you say:  I'm telling you this not just as your M

16  but as a green in ESP and head of the stripe path.  If you get

17  a proctor, you must evolve this?

18  A     Yes.  I shouldn't have said that, but, yes.

19  Q     What does that mean?

20  A     That I'm telling her as a green in ESP and as head of the

21  stripe path, these are the requirements that we look for to

22  see that you'll qualify to evolve.  So if you're not getting

23  passed it, you're not going to meet those requirements for

24  promotion.

25        So she's saying she wanted to get promotion in ESP

Salzman - Direct - Hajjar                1784

1  and she wasn't meeting the promotion and I wanted her to know

2  that if she got through this, she would get that.

3  Q    So by saying that, you are linking promotion in ESP --

4  professional promotion to her being a good DOS slave?

5  A    Yes.  And it shouldn't have been linked.

6  Q    What does that mean, it shouldn't have been linked?

7  A    More important, DOS was never a requirement for promotion

8  in ESP and it should not have been factored into promotion in

9  ESP, but I linked them in this conversation.

10 Q    Why?  Why did you do that?

11 A    Because I knew she wanted to get to proctor and I wanted

12 her to get to proctor.  I knew what was required for her to

13 get to proctor.

14         So I thought if I told her this was important it

15 would help connect it with a goal that she had, and help

16 motivate her to do it.

17 Q    Was your input important in terms of who was promoted

18 within ESP?

19 A    Yeah, I was head of the promotion program.

20 Q    What about the defendant?

21 A    Yes, ultimately I mean he did reject or override -- he

22 could reject or promote anybody, whether we had suggested or

23 denied promotions.

24 Q    Turning to page 23 of Government Exhibit 432.  You write:

25 If you want to use that again for failure, penance should be

1   modified to three hard whacks.  If you snap the wrist right,

2   it should really hurt.  That's how you know you're doing it

3   right.  Please relay to all.

4           What are you talking about there?

5   A    I'm talking about what Keith told us should be how we

6   paddle each other.

7           And I left the meeting where he told us how to

8   paddle each other, communicate to Audrey specifically how they

9   should be paddling each other.

10  Q    Was that a direction?

11  A    Yes.

12  Q    Turning to page 26, you write:  I don't think everyone

13  handed in monthly guarantees.  I didn't get anything from

14  Charmel or Sarah for anyone below our line.  Can you follow up

15  with everyone?  Audrey refers to bank accounts for May.  And

16  after that:  What's your take of Amanda's.

17          What are you talking about here, you and Audrey?

18  A    Amanda submitted -- we're talking about monthly

19  collateral that she submitted, which she said she -- the bank

20  accounts were for May.

21          And that her take on Amanda's was Amanda had

22  submitted a video and I wasn't able to watch the whole thing,

23  but Audrey made the video with Amanda, so I wanted Audrey's

24  take on it, whether Audrey thought it was strong enough.  And

25  I told Audrey to assess that without me watching the video.

Salzman - Direct - Hajjar                    1786

1    Q    So when you Audrey replied:  It's good, I think.  She

2    basically says she's only marrying him to use him for his

3    money because he had no other options.

4             What does that refer to?

5    A    What she said about her fiance in the video.

6    Q    Amanda?

7    A    Correct.

8    Q    And "it's good, I think" refers to strengthening the

9    collateral?

10   A    Yeah.

11            That it should be sufficiently damaging to their

12   relationship were it to come out.

13   Q    Turning to page 29, you write:  We haven't really started

14   training you guys get.

15            What are you talking about?

16   A    Keith said that he hadn't really started disciplining us

17   yet and so we didn't know -- we weren't doing things as we

18   needed to be doing with the slaves because we hadn't been

19   disciplining them yet.  So I relayed that as well, that we

20   hadn't started discipline.  I hadn't started training them in

21   disciplining them yet.

22   Q    The next message down, you say:  I have so much on my

23   plate that I cannot keep up and I have not had time to

24   discipline you guys properly.

25            Is that something the defendant told you and the

1    other first line slaves as well?

2    A    Yes.  And I did have so much on my plate that I wasn't

3    able to keep track of what was going on with them.

4          And A lot of what I had on my plate were the things

5    that we were doing in DOS.

6    Q    Turning to page 48, you write:  Good morning, with

7    respect to your check in last night.

8          And then the message continues:  Any efforts you put

9    in here will come back exponentially.  And once you build your

10   organization here, you will have six Ss, plus however many

11   brand Ss will devote time weekly, moving your life and

12   projects forward.

13         What are you telling Audrey here?

14   A    I'm telling her that -- she was concerned that she didn't

15   have enough time and obviously because of the things she was

16   doing here, and I was telling her if she had six slaves who

17   had six -- each had six slaves, she would have weekly time

18   committed to her for life of help and support that would save

19   her time with her life.

20   Q    So when you write:  Any efforts you put in here will come

21   back exponentially.

22         What does "here" refer to?

23   A    In DOS.

24   Q    The next page you write:  Imagine if you have six people,

25   who each have six, so 36 people, who each devote one hour of

1    time per week to moving your life forward.  That's a full-time

2    employee's amount of work times for life?

3    A    Yes.

4    Q    What are you referring to here?

5    A    I'm referring to the same thing, that active care that

6    Keith said, if you had everybody who you enrolled in one hour

7    for their master and grandmaster, everybody would have almost

8    40 hours of week of full-time work.

9    Q    And what's the point of telling this to Audrey at this

10   moment?

11   A    Because she was upset she didn't have a lot of time

12   because of the things she was doing in DOS.

13   Q    And you're telling her she will benefit from being in DOS

14   and having slaves to work for her?

15   A    Yes.

16   Q    You write:  Do you want to be a proctor?  This is

17   page 52.  Do you see how you're antihumanitarian,

18   anti-interdependence.

19        What are you talking about here?

20   A    That she was being -- that she was communicating things

21   that were not humanitarian in nature or of a team perspective.

22        And she's saying she wanted to be a proctor in a

23   humanitarian organization where the whole idea was that the

24   hole is bigger than the sum of the parts.  It was a whole team

25   environment.  And if she wanted to become a proctor in a

Salzman - Direct - Hajjar                1789

 1   humanitarian organization that was focused on -- on being part

 2   of a larger team, she needed to overcome the issues that made

 3   her not want to be around people and the antihumanitarian in

 4   the way she related with them.

 5   Q    Were you connecting her progress in terms of making

 6   proctor to her performance in DOS?

 7   A    I didn't mean to, but I did it.  Yes.  It wasn't my

 8   intent, but I did that, yes.

 9   Q    Looking at page -- on page 53, you write:  You will never

10   be a proctor in this organization as long as you believe that

11   helping others is not a high priority.

12           And Audrey says:  No, I'm sorry, master, that is not

13   what I'm intending to say.

14           Did Audrey want to be a proctor?

15   A    Yes, she did.

16   Q    And then the following page, page 56:  I just talked to

17   KT.  She had a full throttle tantrum about the guarantee.

18   Flatly refused to do it and is painting this whole thing as

19   bad in her mind.

20           What is she talking about there?

21   A    That Kristin doesn't want to submit her collateral.  And

22   that she is refusing to submit collateral.  And believes that

23   DOS is bad and that the whole collateralization is bad.

24   Q    How did you respond to that?

25   A    I don't recall specifically, but I -- I likely told

1    Audrey to just help her try to work with her and see if she

2    can get her through it.

3    Q    Miss Salzman, you testified that prior to joining DOS you

4    were aware of the defendant's sexual relationships with the

5    first -- with certain first line DOS slaves?

6    A    Yes, I was.

7    Q    When you were first recruited into DOS, did you believe

8    that DOS was sexual in nature?

9    A    No.

10   Q    Did you come to learn that there was a sexual component

11   in DOS?

12   A    Yes.

13   Q    Can you give some examples of that?

14   A    Well, naked pictures.  Specifically up-close vagina

15   pictures that I think are sexual in nature.  Paddling, I

16   thought was sexual, it had a BDSM component.  The dungeon was

17   all BDSM equipment that I was told about.  Seduction

18   assignments I think are sexual in nature.  And having sexual

19   relationships or interactions with a slave is certainly sexual

20   in nature.

21   Q    Did there come a time where you learned that other first

22   line DOS masters had assigned their slaves to interact with

23   the defendant?

24   A    Yes, I did.

25            I went to -- we were having a first line DOS

Salzman - Direct - Hajjar                    1791

1  meeting, and we were talking about where in each of the

2  enrollment stages the five enrollment stages that we reviewed

3  here each of the slaves were, or everyone in our -- where

4  everyone in our organization was and our projections.

5         And Allison shared not only where everybody was in

6  each of the five stages but that she had tasked a number of

7  people to do something she called the assignment.  And I had

8  never heard about the assignment.

9         And so I was like, What's the assignment?  And that

10 she -- it turned out the assignment was that she had tasked

11 them to seduce Keith was the assignment.

12 Q    Did you understand "seduce Keith" to be a sexual act?

13 A    I interpreted it that way, yes, I did.

14 Q    Was there more conversation about this assignment at that

15 time?

16 A    Not right then, but later we had more discussions about

17 it.

18 Q    Did you have a conversation with the defendant about it?

19 A    I did.  I went to him and asked him about it.  And he

20 told me that the purpose of the assignment was that they --

21 for women to be able to have an experience with a man where

22 the man could abuse power but didn't, and that he thought that

23 that would be a good experience for them to have, a growthful

24 experience for them to have.

25 Q    And how did you take that?

1  A    I felt -- I felt concerned about it, and I still felt

2  that it was a type of abuse of power.  Because I couldn't

3  imagine being a man and having a woman come and do things to

4  try to seduce you and you not having some sort of experience

5  of power in that situation.

6           But also if I imagine going to try to seduce a man

7  who I didn't have any sexual relationship with, especially if

8  that man didn't take me up on the offer, I would then have

9  feelings toward that man.  I would have feelings towards them

10  once I tried to seduce them, even if didn't have those

11  feelings before, especially if he didn't take advantage of the

12  situation, I would like him more.

13           So I couldn't imagine that not changing the

14  interaction he was having with the slaves.  But then I needed

15  to believe also that he would never do that and that it was

16  just him not abusing power and giving them a good experience

17  and so then I --

18  Q    What does that mean?

19  A    -- compartmentalized it and move forward believing this

20  is all good, and DOS is good and it can't be anything or what

21  I'm imagining they are, because it's just my fears that are

22  running and...

23  Q    Did you believe the defendant when he said that there

24  would be -- no sexual interaction would take place?

25  A    I wanted to believe him.  I wasn't sure.

1  Q    Did you have a later conversation with Allison Mack in
2  San Diego?
3  A    I did.
4           Allison and I -- I can't recall the specific words
5  that she said in those -- in the conversations we had in San
6  Diego.  But it came away from the conversations with her
7  believing that Keith was having sex with all her slaves, based
8  on all the assumptions that she was using and the way she was
9  talking about things during the time we were there.
10 Q    What happened after that?
11 A    I came home and said to Keith:  Are you having sex with
12 Allison's slaves?  And he said:  No.
13          And I said:  Why does she think you are?  And he
14 said:  Because I didn't correct her.
15 Q    What did you understand that to mean?
16 A    I understood it to mean that he was trying to be truth --
17 like be right on the technicality.
18          Because in my mind the next question was:  Well, how
19 did she get that impression in the first place?  So I didn't
20 ask it, because I believe he knew what I was asking and
21 specifically chose not to tell me truth about it.
22          And so I believed that either he was lying to me in
23 that moment or he was lying to Allison, but in either case he
24 was lying to somebody about this.
25 Q    So what did you after you spoke to the defendant?

Salzman - Direct - Hajjar                          1794

1   A      I went back to Allison.

2   Q      And what did you say?

3   A      Is he fucking your slaves, is what I said.

4   Q      What did she say?

5   A      She said:  Just Nicole and Suzy.  But we're going to

6   start working with India and Jay.

7           And I said to her:  When you say working, do you

8   mean fucking?  And she said:  Yes.

9                   (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. HAJJAR (CONTINUED):

2    Q    What did you do after that?

3    A    I suppress my feelings about it and continued forward.

4    Q    Did you later come to learn that Allison's slaves were

5    not the only ones to get the seduction assignment?

6    A    Yes.  I can't remember the time frame, but at one

7    first-line DOS meeting, I said something but -- along the

8    lines that Allison had been the only one who had assigned

9    people this assignment, and Nicky said no, she's not.  And

10   then I learned that other people have been tasking their

11   slaves to do assignment.

12   Q    At some point did you learn that Nicky's slaves had

13   been tasked to that assignment?

14   A    Yes, I just contact recall when.  But yes, I did.

15   Q    Did you subsequently raise Nicole's name with the

16   defendant again?

17   A    Yes, I did.

18   Q    What was your conversation with him?

19   A    What he had said when I -- also when I had asked him

20   about the seduction assignment, was that it wasn't always

21   going to be him doing the seduction assignment; that at some

22   point, somebody else was going to be doing the seduction

23   assignment.  And Cami and I had a conversation about it at

24   one point in time and I went to him and said Camila and I

25   were talking about who was going to be run the seduction

Salzman - Direct - Hajjar                    1796

1    assignment, and he said Nicole was going to be heading that

2    testing.

3    Q    Now, at some point after these conversations was the

4    existence of DOS publicly exposed?

5    A    Yes, in June 2017.

6    Q    How did that happen?

7    A    Sarah's husband, Nippy, came and confronted myself and

8    Jim Del Negro at coach summit in a very public way.  And

9    then a series of rumors about -- or allegations surrounding

10   DOS started circulating through the West Coast community and

11   so we were hearing back about that.  And within a few days a

12   blogger started blogging about everything very publicly,

13   obviously the blog is public.

14   Q    When you say rumors and allegations, were they true?

15   A    Yes.

16   Q    And when you say Sarah's husband approached you, was he

17   angry?

18   A    Yes, he appeared angry.  He was yelling at me and Jim.

19   Q    Did the aspects of DOS after that become publicly --

20   publicly discussed --

21   A    Yes.

22   Q    -- within the NXIVM community?

23   A    Yes.

24   Q    Did members of the community raise concerns to you?

25   A    Yes, they did.

Salzman - Direct - Hajjar                1797

1  Q    Did you try to reach the defendant after Sarah's
2  husband confronted you?
3  A    I did.  I ws sending him 911 text messages and trying
4  to call him and call anybody I thought he might be with to
5  try to find him.
6  Q    What were the 911 text messages?
7  A    It was like, I need to talk to you now and I was
8  sending literally 911, which in 20 years I never sent a 911
9  text message, but like that this is important, this isn't
10  just if you're busy don't get back to me now, it's serious.
11  Q    I you eventually reach him?
12  A    I did.
13  Q    And what was the conversation you had with him?
14  A    I told him that Nippy was really upset and that he had
15  said, My wife had Keith's initials branded next to her
16  vagina, you know, like this is not okay and basically
17  resigned from all his positions within our community and
18  didn't want to speak to me ever again, didn't want to speak
19  to Keith ever again, so I relayed that.
20  Q    And how did the defendant respond?
21  A    He responded saying, Well, Nippy found out that my
22  initials were branded next to his wife's vagina, how do you
23  think I feel learning that this wife branded my initials
24  next to her vagina.
25  Q    How did you -- what did that mean to you?

1  A    Well, it was Keith's initials and Keith knew it was his

2  initials and I knew it was his initials and I knew he knew

3  that it was his initials, so I interpreted it as him acting

4  out how I should respond to Nippy, like Keith didn't know

5  this, how do you think he's feels learning this.  That was

6  the party line on it, like Keith just learned this, you

7  know, how do you think he feels knowing that a bunch of

8  women went around and did this?

9  Q    Were there subsequently meetings with the defendant and

10  the first line of DOS?

11  A    Yes.

12  Q    And can you describe those meetings?

13  A    That we went to the DOS house and were trying to figure

14  out how to deal with everything that was happening.  And

15  everybody's questions and upsets surrounding it and

16  basically, you know, Keith directed that we were not going

17  to tell anybody about his involvement, it was going to be

18  secret, that he didn't know anything about it, that he

19  wasn't associated with it, that the brand was not his

20  initials and he gave several options for how we could

21  address the concerns that were being raised to make it look

22  like they were all things that were not the truth.  Which is

23  that the brand instead of being his initials could be

24  explained that it had seven lines so it was the seven

25  chakras or it was the four elements or it was bar alpha mu.

1   It wasn't Keith and Allison's initials because there were

2   assertions that it was Allison's initials, too, which it

3   wasn't bit those were going around as well.  And then things

4   about the seduction assignment which he said could be

5   described as a dare or a test of Abraham, that it was a test

6   to see if the slave was committed enough that they would

7   carry out the act but that they didn't -- it was never

8   intended that they actually would follow through on the act,

9   that it was just a test to see -- a trust test.

10  Q    What did the test of Abraham, that phrase, what did

11  that mean to you?

12  A    My understanding of test of Abraham is in the Bible,

13  God tasked Abraham to sacrifice his son on the alter.  It's

14  a test of faith and loyalty and Abraham was willing do it

15  and then at the end God said you didn't have to do it, I

16  just wanted to see if you were willing to do it.

17         And so that's how we went out and described it,

18  that the women had been tasked to seduce Keith but the

19  intent was that it was never carried out and that Keith

20  don't know anything about it.

21  Q    The -- how did the defendant -- what did the defendant

22  instruct you to say regarding the brand?

23  A    That it was the seven chakras and the four elements or

24  it was bar alpha mu but that it was not his -- but it was

25  not intended to be his initials but that when the design was

1   being created somebody noticed that it looked like his

2   initials and so it was refashioned to include -- incorporate

3   them as tribute.

4   Q    Now, these explanations of seven chakras, the four

5   elements or bar alpha mu, had you ever heard of these things

6   before to explain the brand or refer to the brand?

7   A    No.

8   Q    You testified earlier that the DOS meetings where the

9   defendant attended were recorded?

10  A    Yes.

11  Q    After DOS was publicly disclosed were your meetings

12  recorded?

13  A    No.

14  Q    How was bar alpha mu going to be an explanation of the

15  brand?  Can you explain that?

16  A    Yeah, because it looked like the brand, like if you

17  look at the K facing downward, you know, with an A under it,

18  it could have been a bar like a line with an alpha, you

19  know, which is a Greek letter.  And the R, the squiggle for

20  the R actually did look like an M, which is why people

21  thought it was Allison's initials.  So it was like making it

22  like it was Greek letters, like the bar is a mathematical

23  symbol but it was the bar and then an alpha Mu, so it was

24  like logical that it could have been Greek letters because

25  we were a sorority and all the sororities had Greek letters.

Salzman - Direct - Hajjar                    1801

1    Q    And who came up with this idea of bar alpha mu?

2    A    Keith.

3    Q    Okay.  I'm showing you what's in evidence as

4    Government's Exhibit 429.  Can you just explain with

5    reference to the brand as it actually looked what the story

6    was about bar alpha mu?

7    A    To show the bar alpha mu.

8    Q    Yeah.

9    A    The bar, the alpha and the Mu.

10   Q    Were there other steps that you were to take with

11   represent to bar alpha mu to make it seem as though that's

12   what DOS had been?

13   A    Yes.  Keith wanted us to make a website and so we did

14   and that the formal name of the sorority was going to be Bar

15   Alpha Mu, we decided that, after, like in the fall.

16   Q    And some point after that did you communicate with

17   Monica Duran?

18   A    I did.

19   Q    What did you say?

20   A    She had gone back to Mexico.  Her mother was ill and

21   she was caring for her and so she wasn't present and so I

22   was texting her saying, you know, I miss you and FYI the new

23   name of the sorority is Bar Alpha Mu and she said since

24   when?  And I said since always.

25   Q    What did you mean -- what did you mean by that?

1  A     That the party line, the story on it was this was

2  always the name.

3  Q     And do you understand that Monica got that?

4  A     Yeah.  She said okay, got it.  Yeah, yeah, she

5  understood what I was saying which is that it was always Bar

6  Alpha Mu, it was never Keith's initials.

7  Q     Did you follow the defendant's instructions about what

8  to tell people about DOS?

9  A     Yes.

10  Q     And did you deny the defendant's involvement in DOS?

11  A     Yes.

12  Q     Did you lie to your mother about the defendant's

13  involvement in DOS?

14  A     I did.  I lied to everybody about it.

15  Q     How did your mother react?

16  A     Horribly.  My mother -- well, I mean, this going public

17  and all of the allegations and everything that we've been

18  talking about, inspired a massive like de-enrollment from

19  NXIVM.  People were scared, people were leaving and my mom

20  felt -- and the only people whose names had been public were

21  mine and Allison's.  So my mom felt that basically a group

22  of women impulsively didn't think things through and decided

23  somehow that it was a good idea to go give tribute to Keith

24  be branding his initials next to their vaginas and giving

25  seduction assignments.  And she was like how could you do

1  this?  How could you be so impulsive and not think and put

2  our whole company, everything that we've worked for, for 20

3  years in jeopardy?  Like I just don't even understand how

4  you could do this.  She was like so upset, so upset, and she

5  blamed me and my friends, I mean, Allison she knew of, there

6  were others she suspected but basically she blamed us for

7  destroying her company.

8  Q    Was it difficult for you not to tell your mom the truth

9  about the defendant's role as your master?

10 A    Yes, it was so hard.  And she said, I went to Keith and

11 he told me he had -- he knew nothing of this.  And so I was

12 like, yes, it was me.

13 Q    Who else did you lie to?

14 A    I lied to everybody.  I lied to the entire community

15 about it.  I lied to the media about it, I lied to everybody

16 about it.

17 Q    Did you address the community publicly?

18 A    I did.

19 Q    Did you lie about the defendant's involvement then?

20 A    Yes.

21 Q    Did your DOS slaves learn more information about DOS

22 during and after this period of time when DOS went public?

23 A    Yes.

24 Q    What happened?

25 A    Well, Sarah left the initial weekend and then Audrey

1  started to learn more and she started bringing concerns to

2  me and she had a discussion with Danielle who knew that

3  Keith was involved and Danielle told her that Keith was

4  involved and so Audrey came back to me and said, I'm very

5  troubled to learn that Keith's involved, you know, and

6  basically you lied to me, you know, and that's troubling and

7  as well like I just really think that there's a big ethical

8  issue and an incredible -- like a situation where abuse --

9  like she was very concerned about abuse of power and she was

10  like this is an incredible abuse of power and I think that

11  there's no ethical checks on Keith and this is very

12  concerning to me.

13  Q    I'll show you what's evidence as

14  Government's Exhibit 432.  Again, this is Page 60.  This

15  is -- are these messages with Audrey in the immediate wake

16  of public disclosure of DOS?

17  A    Yes, they are, yes.

18  Q    And where you write, Do you understand that I didn't

19  know any of the stuff I shared with you the other night and

20  also that Keith didn't know any of this, he just found this

21  out when we did.

22         Was that truthful?

23  A    No.

24  Q    What were you telling her there?

25  A    I was telling her that everything we were learning

Salzman - Direct - Hajjar                    1805

1    about Keith's initials and seduction assignments was

2    something that I just found out and that Keith also didn't

3    know.

4    Q    At around this time, and subsequently, did you receive

5    requests for return of collateral?

6    A    Yes.

7    Q    Who asked for their collateral back?

8    A    Audrey and Kristin did but many other people did, too.

9    People who I didn't enroll and other people below me in line

10   and in my lineage.

11   Q    Did you personally receive requests for collateral

12   back?

13   A    I did, yes.

14   Q    And what did you when you received those requests?

15   A    I forwarded them to Clare.

16   Q    Why?

17   A    Because Clare was heading up our legal initiatives.

18   Q    Do you recall when Audrey requested her collateral back

19   from you?

20   A    Not the specific date, but I recall that she did.  I

21   remember that she did.

22   Q    Would there be something that would refresh your memory

23   about that?

24   A    I believe she sent me an e-mail.

25          MS. HAJJAR:  Your Honor, may I show the witness

1    what's marked as Government's Exhibit 418?

2         THE COURT:  Go ahead.

3    A    So she sent this on July 10th, 2017.

4    Q    Just take a moment to read this, Ms. Salzman.

5    A    To myself?

6    Q    Yes.

7    A    (Witness complies.)  I see.  She sent me this on

8    July 7th and then requested it to the executive board on

9    July 10th.  The executive board of NXIVM.

10   Q    What was the content of the request for collateral

11   back?  What did she want?

12   A    She wanted to know that her collateral basically would

13   be destroyed.  She wanted the collateral -- all the

14   collateral back and she listed it and she said that if I

15   didn't respond to it she was going forward the request to

16   the executive board.

17   Q    Did she list out the collateral she had --

18   A    Yes.

19   Q    -- she had given you?

20   A    Yes, specifically she listed it.

21   Q    What was the list that she requested the return of?

22   A    It was the naked pictures she had given me, the videos

23   that we had made together disparaging people in her life,

24   the letter accusing her boyfriend of domestic violence, two

25   videos or a paddling video and some pictures that she had

Salzman - Direct - Hajjar                    1807

1   taken with -- naked pictures that she had taken with her

2   circle.

3            (Continued on next page.)

L. Salzman - direct - Hajjar                                    1808

1   A    (Cont'g.)  I recall -- I mean her bank accounts were part

2   of the collateral but I don't recall specifically what was to

3   be done with that.

4   Q    Did she say anything about the circumstances under which

5   the collateral had been taken?

6   A    Yes, that she believed that it was under false pretenses,

7   that we had lied about Keith's involvement and gained it based

8   on misrepresentations.

9   Q    You testified that Audrey sent this request for

10  collateral to you on July 7th?

11  A    Yes.

12  Q    Was it then forwarded onward?

13  A    Yes.

14  Q    Why?

15  A    Why did I forward it or why did Audrey?

16  Q    Had Audrey said that she would forward it if you didn't

17  respond?

18  A    She did, she said if I didn't respond she was going to

19  forward it to the executive board --

20  Q    And did she?

21  A    -- of NXIVM.

22       Yes, she did.

23  Q    Who did she send it to?

24  A    She sent it to all members of the board.  The initial

25  request came to Keith, Allison and myself.  Then she forwarded

L. Salzman - direct - Hajjar                                          1809

1   it to I believe the executive board at the time which was

2   myself, Karen Unterreiner, Clare Bronfman, Alex Betancourt,

3   Omar Boone, I can't remember if Emiliano Salinas was still

4   part of the board or not and I don't recall if my mom was on

5   it as well.

6   Q    Was it forwarded to the defendant?

7   A    Yes, it was sent to him.  I think initially it was sent

8   to just me, Keith and Allison but it was sent to Keith, yes.

9            MS. HAJJAR:  Your Honor, I'm just going to show this

10   to the witness to refresh her memory on this.

11            THE WITNESS:  I see.  Initially she sent it to me

12   and then she forwarded it to myself, Keith Allison and cc-d

13   Nancy, Karen, Omar, Alex Emiliano and Clare.

14   Q    What was the date on which the email was forwarded?

15   A    It on July 10th, 2017.

16   Q    Did Audrey get her collateral back?

17   A    No, nobody their collateral back.

18   Q    Did Kristin make a similar request for the return of her

19   collateral?

20   A    She did, yes.

21   Q    When was that?

22   A    Around the same time, a little bit later than Audrey.

23   Q    Did she send it to you -- what form did that request

24   take?

25   A    It was an email as well.

L. Salzman - direct - Hajjar                    1810

1    Q    Who did she send the email to?

2    A    I don't recall but it was at least me and if I saw the

3    email I could tell you.

4    Q    I'm going to show you what's marked as Government

5    Exhibit 428-R.  Just take a minute to look that over.

6              (Pause in the proceedings.)

7    A    Yes.

8    Q    Around when was this email sent to you?

9    A    The end of September in 2017.

10   Q    And who else was it sent to?

11   A    It was sent to the entire executive board.

12   Q    To include?

13             Would you like to see it again?

14   A    Yes, yes, can I look at it again?

15             (Pause.)

16   A    It was sent to Alex, Emiliano, Clare, Karen, Omar, and

17   myself.

18   Q    And in the email what did Kristin request the return of?

19   A    She requested the return of a video about her business

20   and religion, a letter to her sister, a false journal entry

21   about her parents and a photo of a letter denouncing her

22   religion.

23   Q    And were these all items of collateral that had been

24   committed?

25   A    Yes, they were.

L. Salzman - direct - Hajjar                    1811

1  Q    Did Kristin express anything about the circumstances

2  under which this collateral -- she had given the collateral?

3            MR. AGNIFILO:  I'm going to object to this, Your

4  Honor.

5            THE COURT:  You may answer. (Pause.)  You may

6  answer.

7  A    That she felt that they were false pretenses and that she

8  was lied to on multiple occasions in the enrollment process

9  about the brand and specifically the obtaining of collateral.

10 Q    Why wasn't their collateral returned to them or

11 destroyed?

12 A    I mean in the end because Keith said not to but, you

13 know, the theory behind it was that it had been given to hold

14 a promise and that promise was still valid even if they broke

15 their promise, it was given for something in exchange for

16 something, there was an agreement and so that agreement still

17 existed at least in theory.

18           THE COURT:  Are you discussing the written contract?

19           THE WITNESS:  No, their agreement, they gave

20 collateral in exchange for information about DOS as access and

21 it was to secure the privacy and secrecy of the group and also

22 for them to stay forever.  So, even if they chose to leave,

23 that that collateral was subject for forfeiture which was the

24 agreement.

25           THE COURT:  It was an oral agreement?

L. Salzman - direct - Hajjar                1812

1     THE WITNESS:  Oral agreement.  Audrey signed a

2 contract but the contract was never finalized but it was an

3 oral agreement.

4     THE COURT:  I see.

5 Q    Did a woman named Carly also request -- make a request in

6 connection with DOS?

7 A    Yes.

8 Q    And when was that?

9 A    I don't recall specifically but if I saw the email again

10 I could tell you.

11 Q    Just to refresh your memory I'm going to show you what's

12 been marked as Government Exhibit 1473, just take a moment to

13 read this.

14     (Pause.)

15 A    Okay.

16     THE COURT:  Could I see the top of that please?

17     MS. HAJJAR:  Yes.

18     THE COURT:  All right.

19 Q    Ms. Salzman, when was this email sent to you?

20 A    On the 4th of July, 2017.

21 Q    And who did Carly send this email to?

22 A    She sent it to the executive board, the greens and the

23 admin team and then cc-d all of the leadership in Vancouver

24 where she was a member of the ESP center.

25 Q    Can you name the individuals who are the executive board

1    please?

2    A    Myself, Clare, Alex, Emiliano and Karen and then she also

3    sent it to the greens and Pam who is -- I'm not sure which Pam

4    that is but she sent it to the greens who are myself, Esther,

5    Emiliano, Alex, Sara Bronfman, and then included in that group

6    as part of the leadership council was Sara and Mark Vicente.

7    Then she sent it to the admin team which included my sister.

8    She also sent it to Rosa Laura, whose line she was in in DOS,

9    and to my mother, Nancy Salzman; and then additionally to

10   Lucas Roberts, Leah Mottishaw, Chris, Wendy, Rosen, Ariella

11   Subalewski (ph), Anthony Ames and she said this is her formal

12   resignation.

13   Q    And what did she ask for in this request, what did she

14   want?

15   A    She wanted outstanding refunds that she was waiting for

16   from NXIVM and V Week and I believe she was also asking for

17   her collateral back.

18   Q    What collateral did she request back?

19   A    A pornographic style video and a video about her business

20   as well as some photographs.

21   Q    And this request for her collateral, a pornographic video

22   and the video about her business, was sent to the entire

23   executive board?

24   A    Yes.

25   Q    And --

1    A    It was sent to the entire leadership base of NXIVM and in

2    her area.

3    Q    In July of 2017?

4    A    Correct.

5    Q    Did Carly express negative views about her experience in

6    DOS?

7    A    She was, she was expressing that.  She was saying she

8    felt she had been lied to, that Keith's identity was withheld

9    as well as other information that she felt was withheld until

10   she gave collateral and then she learned about the brand and

11   the collar and then she was upset about the way that the

12   leadership was handling it and felt that we were all lying to

13   her which we were.

14          MR. AGNIFILO:  Your Honor, I'm sorry, can we have a

15   sidebar?

16          I object and I respectfully move to strike that for

17   the reasons that we talked about this morning.

18          THE COURT:  Next.

19   Q    Around this time, Ms. Salzman, were there efforts to

20   aggregate and to secure collateral?

21   A    Yes, there were.

22   Q    And at this point was it your understanding that

23   collateral would be released if a DOS slave left or spoke out

24   publicly about DOS?

25   A    Initially it was and when it became public there were

L. Salzman - direct - Hajjar                          1815

1   discussions where Keith wasn't sure that we should release the

2   collateral.

3   Q    Were there discussions with the defendant where he

4   considered whether or not to release collateral?

5   A    Yes.

6   Q    Did the defendant express a concern about releasing

7   collateral at that point after it had been made public?

8   A    Yeah, that it would validate the allegations being made

9   against us and also wouldn't serve any purpose because the

10  purpose that it was given for was already broken.

11  Q    At this time were there efforts to discredit the

12  allegations that were made by former DOS slaves including

13  Sarah?

14  A    Yes.

15  Q    What were those efforts?

16  A    We made efforts to show that -- to discredit her

17  accounting of her branding ceremony and pointing to

18  inconsistencies in her statements as well as sharing alternate

19  hypotheses about why she had actually left that wasn't this.

20  Q    And were there other statements or efforts you made to

21  discredit those allegations?

22  A    Well, in conjunction with creating the website, Keith

23  wanted us to write like position statements.  We didn't ever

24  release those but we all wrote position statements as well as

25  securing testimonials that DOS was a positive experience and

1   women -- and a consensual experience that many women would

2   attest to.

3   Q    And did you gather materials that would assist you in

4   making and putting forth that position?

5   A    I did, yes.

6   Q    What did you do?

7   A    I asked all of the first line DOS masters for examples

8   that showed consent and positivity about positive experiences

9   about DOS.

10  Q    Did that include photos where DOS slaves appeared to look

11  happy?

12  A    Yes.

13  Q    You've discussed the requirements of the photographs in

14  the context of DOS; do you have a view on photographs where

15  DOS slaves appeared happy now?

16  A    Yes, well, some of the photographs that I included in

17  this compilation were photographs that I had instructed them

18  to retake specifically to look happy and it wasn't -- I mean

19  it wasn't a thorough representation, a full representation of

20  like the positives and the negatives, it was just cherry-

21  picking the positive, the things that looked positive.  There

22  were also I mean within my group concerns that were negative

23  and allegations of extortion going on before, before this

24  happened and during this time, so they were left out.

25  Q    Who else was involved in these efforts with you?

L. Salzman - direct - Hajjar                    1817

1    A    All of the first line DOS and Keith.

2    Q    At some point in August of 2017 did the defendant address

3    the NXIVM community?

4    A    He did, yes.

5    Q    When was that?

6    A    He addressed the leadership at V Week, so proctors and

7    above, and he also wrote a statement on the website.

8    Q    And V Week is the abbreviation for Vanguard Week?

9    A    Vanguard Week, yes.

10   Q    Which is a celebration of his birthday?

11   A    Yes.

12   Q    What did the defendant say?

13   A    He said he wasn't affiliated with DOS, that he had very

14   little knowledge about it but he advocated for the group and

15   he said some of the things in the group were a little racy and

16   could be seen as, you know, alternative but that ultimately he

17   thought they were good and essential.

18   Q    Was that true?

19   A    No.  No, he created DOS and was very involved in all the

20   aspects of it and I think what was going on in the group was

21   more than just a little racy or alternative.

22   Q    Was there --

23   A    Or he said edgy, edgy was the word he used.

24   Q    Was there a coach summit that took place shortly after?

25   A    Yes.

L. Salzman - direct - Hajjar                    1818

1   Q    What was the subject of that coach summit?

2   A    The entire coach summit focused on basically the

3   difference between using the media versus the legal system to

4   address disputes and laid out that our adversaries basically

5   were using the media which was vigilante justice and this was

6   not considered to be honorable or ethical and that we thought

7   that the more honorable or ethical means would be to use the

8   legal system and that we believed in the justice system of

9   this country and so that was what we were going to do.

10  Q    What do you think of that coach summit now?

11  A    Well, I think generally when there were valid concerns

12  being raised in the organization at different times throughout

13  the organization there was always curriculum that was released

14  about that specifically helped reframe your perspective about

15  how to look at it and who to look at as the good guys and the

16  bad guys, you know, so to speak and who was being honorable

17  and who was being noble and so everybody who wanted to believe

18  this was good was given a lot of information about how

19  specifically to view it as good and why it was good but there

20  were very real and very valid allegations being made about

21  things that were true and we were lying about them so, you

22  know, and here we are so I don't --

23              THE COURT:  I think we should break now.

24              THE WITNESS:  Yeah.

25              MS. HAJJAR:  Yes, Your Honor.

*Proceedings*                                                                    1819

1      THE COURT:  All right, members of the jury, we're

2   going to recess for the evening.

3          Let me remind you that it is very important that you

4   follow my instruction not to discuss the case with anyone, not

5   your family, your friends, your business associates or your

6   fellow jurors.

7          In addition, you must not read, listen to, watch or

8   access any accounts of the case on any form of media such as

9   newspapers, TV, radio, podcasts or the internet, nor should

10  you research or seek outside information about any aspect of

11  the case.

12         Please do not communicate with anyone about the case

13  on your phone, whether through email, text messaging or any

14  other means, through any blog or website or by way of any

15  social media including Facebook, Twitter, Instagram, YouTube

16  or other similar sites.

17         You must not consider anything you may have read or

18  heard about the case outside of this courtroom, whether you

19  read it before, during jury selection or during this trial and

20  do not attempt any independent research or investigation of

21  the case or visit any of the locations identified on the

22  questionnaire or discussed during the course of jury selection

23  or during the trial.

24         We'll see you tomorrow morning at 9:30.  Thank you

25  very much for your attention.

*Proceedings*                                                      1820

1          All rise for the jury.

2          (Jury leaves courtroom.)

3          THE COURT:  All right.  The witness may stand down.

4  Please do not discuss your testimony with anyone.  We'll see

5  you tomorrow morning at 9:30, ma'am.

6          THE WITNESS:  Thank you.

7          (Witness steps down.)

8          THE COURT:  Everyone else may be seated.

9          I want to take up the issue that you raised at the

10 end.  I know what you're talking about and it's the issue

11 about Carly and the Crawford issue, isn't that right?  Is that

12 what you're talking about?

13         MR. AGNIFILO:  The Crawford issue, yes.

14         THE COURT:  The Crawford issue.

15         MR. AGNIFILO:  In regard to Kristin and Carly.

16         THE COURT:  Well, the reason -- I don't have

17 realtime here because for some reason it didn't work this

18 afternoon so what I'd like to do is take a look at the

19 realtime and if you have a proposed instruction to the jury,

20 you can provide it to me and I'll deal with it first thing in

21 the morning.

22         MR. AGNIFILO:  Very good.  I'll do that, Judge.

23         THE COURT:  And it's about both Kristin and Carly.

24         MR. AGNIFILO:  Right.  The testimony now is that

25 Kristin and Carly both said in words and substance that they

*Proceedings*                                                    1821

1   were lied to to join DOS, they joined DOS under false

2   pretenses and my concern is that's precisely a count of the

3   indictment that my client is charged with and I don't think

4   either of those people are going to testify so I'm never going

5   to have the opportunity to cross-examine them and I think we

6   have a Sixth Amendment confrontation issue.

7              THE COURT:  I understand your argument.

8              And the government's position on this is, just so

9   that we put a finer point on it?

10             MS. HAJJAR:  Your Honor, the timing of when these

11  claims were made and to whom they were made is critical to

12  understanding what happens afterwards.  There are public

13  positions statements that are put out by NXIVM, efforts to

14  discredit these particular victims and NXIVM itself engages in

15  some -- in efforts to present a counter-narrative and so the

16  fact that Ms. Bronfman, the entire executive board,

17  Ms. Salzman is on notice of what the requests are and what's

18  being said about DOS and these people's experience in DOS is

19  important to establish why they did what they did and that

20  when they put out statements later saying DOS was a good

21  thing, that they were supportive of it, that no one got hurt,

22  that those statements were made with the knowledge that there

23  had been claims, specific claims made about and requests for

24  collateral back.

25             THE COURT:  So, but are these representations being

*Proceedings* 1822

1  made for the truth of the matter asserted which is exactly

2  what the defense is claiming here, that the argument is being

3  made and that because they are and because these individuals

4  are not appearing and being available for cross-examination,

5  that creates a Crawford issue.  That's what I'm trying to get

6  down to here.

7       MS. HAJJAR:  They're being offered for their effect

8  on Ms. Salzman and the executive board and for the fact that

9  they were made at the specific time, not the contents of the

10  email itself but the fact that that was the content of the

11  email that someone had been -- that these former DOS slaves

12  had talked about DOS, had said that their experiences were

13  negative and said that these materials were taken from them

14  under false pretenses and from fraud and nevertheless certain

15  actions were taken by the company and by the individual

16  recipients and so the timing of that communication and what

17  happened afterward is critical to explaining what NXIVM does

18  and what the defendants do in this period of time.

19       MR. AGNIFILO:  The problem, Judge, is that the un-

20  cross-examinable factual assertions are precisely the content

21  of their charge on the wire fraud so I think it rings hollow.

22  I'll follow the Court's instruction, I'll give a proposed

23  instruction.  I don't think we can instruct our way out of

24  this problem.  I mean factual detailed assertions have been

25  made by people who I can never cross-examine that are

*Proceedings*                                                              1823

1  precisely the content of the charge.  So, they can say it's

2  for the effect on the listener but it just so happens that

3  precisely what Carly and Kristin have now said through hearsay

4  to this jury and cannot be cross-examined on perfectly

5  reflects their wire fraud count.

6          THE COURT:  Well, first of all, I kept the documents

7  out.  It's impossible to -- we can't rewind the video here and

8  edit this out.  I'm looking for a way if it's a problem, and

9  I'm not sure that it is frankly, if it's a problem, to give an

10 instruction and to do what you ask, to strike the testimony in

11 answer to that question and this happens all the time and if

12 it's done promptly, it doesn't create a problem should there

13 be a conviction and an appeal, in my view.  So, this is the

14 way trials work.  So, I don't want to hear about that this

15 can't be rectified if it's a problem, it's a small piece of a

16 large story and what I'm going to do is take a look at the

17 testimony, take a look at your arguments and then figure out

18 what to do and we'll roll right along from there.

19          Speaking of rolling right along, how much more do

20 you have for this witness?

21          MS. HAJJAR:  I think at least half a day if not

22 more, Your Honor.

23          THE COURT:  At least half a day.

24          MS. HAJJAR:  But probably a little bit more than

25 that, going well into tomorrow.

*Proceedings*                                                    1824

1          THE COURT:  Okay.  And on cross-examination do you

2    have an estimate?

3          MR. AGNIFILO:  A third of the direct.

4          THE COURT:  I don't know what that means.

5          MR. AGNIFILO:  I don't either.

6          THE COURT:  Give me hours.

7          MR. AGNIFILO:  It sounded nice.

8          THE COURT:  Hours, I'm not good at fractions.

9          MR. AGNIFILO:  Either am I.  Four hours,

10   three hours, I don't know.

11         THE COURT:  So, we're going to go into Wednesday on

12   this?

13         MR. AGNIFILO:  I would think we are.  I would think

14   we are.

15         THE COURT:  Wednesday.  All right.  And do we know

16   who's next?  I'm always hoping for the future.

17         MR. AGNIFILO:  They told us and we appreciate them

18   telling us.

19         MS. PENZA:  We can also notify the Court, Your

20   Honor.

21         THE COURT:  I'd appreciate that.  It would be nice

22   to know what you all know.

23         MS. PENZA:  Yes.

24         THE COURT:  Okay.

25         MR. AGNIFILO:  I'm not sure it always is but I

1    understand.

2              THE COURT:  Yes, thank you.  Okay.

3              MS. HAJJAR:  Your Honor, may I just raise one more

4    thing?

5              THE COURT:  Oh, sure.

6              MS. HAJJAR:  I'm sorry.  There are four recordings

7    that the government intends to admit tomorrow through this

8    witness.

9              THE COURT:  Yes.

10             THE CLERK:  Mr. Agnifilo has represented that he

11   objects to their admission on the basis I think that this

12   witness, this cooperating witness was not physically present

13   during these recordings.  We have -- we can notify the Court

14   as to which recordings they are should the Court want to

15   listen to them or identify which ones are the disputed

16   portions prior to tomorrow but we just wanted to let the Court

17   know that this was something that the parties did not agree

18   on.

19             MR. AGNIFILO:  One of the things I was going to talk

20   to the government about when we were done today is I think

21   there's something in the direct examination where Ms. Salzman

22   listened to certain recordings in making certain

23   memorializations.  What I don't know is whether any of the

24   four recordings they intend to play tomorrow are any of those

25   recordings.  My concern is I don't know how she can

*Proceedings*                                                      1826

1   authenticate a conversation she wasn't present for.  I mean

2   there are a number of women present for a conversation,

3   Ms. Salzman wasn't one of them and so I don't know how we can

4   say that this was certainly the conversation that took place

5   if she's not there to say I was present for the conversation,

6   I remember it, these are the people talking, that is what was

7   said and she can authenticate the audiotape.

8               THE COURT:  Who were the people in the conversation?

9               MS. HAJJAR:  These were recorded conversations of --

10  between the defendant and the first line of DOS, Your Honor.

11              THE COURT:  Well, she was on the first line of DOS.

12              MS. HAJJAR:  She was but these recordings took place

13  prior to her joining DOS.  Nevertheless, she can identify the

14  content and explain it and identify all of the participants

15  and the government can also seek to introduce the testimony of

16  a law enforcement agent that recovered these recordings but

17  Ms. Salzman can explain the recordings and identify the voices

18  and we would ask that Your Honor consider the recordings

19  themselves.  They're very clear as to what's happening, there

20  are no breaks, there's no reason to believe that they're not

21  authentic in some way.  Ms. Salzman testified that the

22  recordings of the meetings of the first line were kept and

23  maintained and there's no reason to think that these

24  recordings are inauthentic in some way or doctored and she can

25  identify what's being said and by whom.

*Proceedings*                                                    1827

1          THE COURT:  Well, do you want to take a break from

2    her testimony and put on a witness who can authenticate them

3    that they were received, you know, the law enforcement

4    officer?  I'll allow that if it means that we just have to

5    take a small break.  I mean is that preferable?

6          MR. AGNIFILO:  No, no, what I think the better

7    course is let's -- I have a question that could possibly

8    resolve this because if she listened to these recordings in

9    doing something as part of her official duties, I think they

10   fall under one category; if she's never listened to them -- I

11   mean all we've heard in this case so far about the reliability

12   of recordings should cause us to have no confidence that a

13   recording is absolutely reliable, I mean the head of the video

14   department just talked about the four ways that he plays with

15   plugs and he does things and he does other things.  So,

16   there's nothing in this record to suggest that just because a

17   video or audio was once made, it's absolutely 100 percent that

18   way for the rest of time.  The state of the record is not that

19   at all, it is quite different.

20          But let's do this so maybe we can take this off Your

21   Honor's plate, we will talk, if we still have an issue we'll

22   tell Your Honor and we'll resolve the issue.

23          MS. HAJJAR:  I suspect we will still have an issue

24   and I think --

25          THE COURT:  Well, talk and let me know at 9:00

*Proceedings*                                                          1828

1    tomorrow morning, I'll be here.

2              MS. HAJJAR:  Thank you, Your Honor.

3              MR. AGNIFILO:  Thank you.

4              THE COURT:  So will you.

5              MR. AGNIFILO:  Yes, we will.

6              THE COURT:  Thank you.

7              MR. AGNIFILO:  Thank you, Judge.

8              THE COURT:  Have a good night.

9              (Time noted:  5:20 p.m.)

10             (Matter adjourned to Tuesday, May 21, 2019 at

11   9:00 a.m.)

12                            -oo0oo-

13

14

15

16    *I (we) certify that the foregoing is a correct transcript*
      *from the record of proceedings in the above-entitled matter.*
17
       */s/ David R. Roy*                *20th day of May, 2019*
18        *DAVID R. ROY*                       *Date*

19

20

21

22

23

24

25

INDEX                                    1829

I  N  D  E  X

W  I  T  N  E  S  S

**L A U R E N   S A L Z M A N**

DIRECT EXAMINATION (CONTINUED)
BY MS. HAJJAR                                      1593

E  X  H  I  B  I  T  S

Government's Exhibit Number 359                    1611

Government's Exhibits 1403, 426, 427, 1404        1645

Government's Exhibit Numbers 356 and 356R          1726

Government's Exhibit Numbers 414 and 414R          1730

Government's Exhibit Numbers 357, 357R and 358     1737

Government's Exhibit 429                            1754

Government Exhibit 425R                             1763

Government Exhibit 432 and 432R                     1768