1830

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3  UNITED STATES OF AMERICA,      : 18-CR-204 (NGG)
                                   :
4              PLAINTIFF,          :
                                   : United States Courthouse
5       -against-                  : Brooklyn, New York
                                   :
6  KEITH RANIERE,                  :
                                   : Tuesday, May 21, 2019
7              DEFENDANT.          : 9:30 a.m.
   - - - - - - - - - - - - - - - X
8

9

           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
10       BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
           UNITED STATES DISTRICT COURT JUDGE.
11                    AND A JURY

12

13              A P P E A R A N C E S :

14 For the Government:        RICHARD P. DONOGHUE, ESQ.
                              United States Attorney
15                            Eastern District of New York
                              271 Cadman Plaza East
16                            Brooklyn, New York 11201
                              BY:  MOIRA K. PENZA, ESQ.
17                                 MARK LESKO, ESQ.
                                   TANYA HAJJAR, ESQ.
18                                 Assistant United States Attorneys

19 For the Defendant:         BRAFMAN & ASSOCIATES
                              767 Third Avenue
20                            26th Floor
                              New York, New York
21                            BY:  MARC A. AGNIFILO, ESQ.
                                   TENY R. GERAGOS, ESQ.
22
                              DerOHANNESIAN & DerOHANNESIAN
23                            677 Broadway
                              Suite 707
24                            New York, New York 10017
                              BY:  PAUL DerOHANNESIAN, ESQ.
25                                 DANIELLE SMITH, ESQ.

1831

```
1    APPEARANCES
     (CONTINUED)
2

3    Attorney for           QUARLES & BRADY, LLP
     Lauren Salzman:        One Renaissance Square
4                            Two North Central Avenue
                             Phoenix, Arizona 85004-2391
5                            BY:  HECTOR J. DIAZ, ESQ.
                                  ANDREA TAZOLI, ESQ.
6
                                       AND
7
                             QUARLES & BRADY, LLP.
8                            1701 Pennsylvania Avenue NW
                             Suite 700
9                            Washington, DC 20006
                             BY:  LUKE CASS, ESQ.
10

11

12

13   Court Reporter:        DAVID R. ROY, RPR
                             United States Courthouse
14                           225 Cadman Plaza East
                             Brooklyn, New York 11201
15                           Telephone:  (718) 613-2609
                             drroyofcr@gmail.com
16

17   Proceedings recorded by Stenographic machine shorthand,
     transcript produced by Computer-Assisted Transcription.
18

19

20

21

22

23

24

25
```

Proceedings                          1832

1          P R O C E E D I N G S

2                --oo0oo--

3       (In open court; outside the presence of the jury.)

4

5          THE COURT:  You may be seated in the back and

6     appearances in the front.

7          MS. PENZA:  Moira Penza, Tanya Hajjar and Mark

8     Lesko for the United States.  Good morning, Your Honor.

9     Also at counsel table is Special Agent Michael Weniger from

10    the FBI, and Teri Carby, our paralegal specialist in our

11    office.

12         THE COURT:  Good morning.

13         MR. AGNIFILO:  Good morning, Your Honor.  Marc

14    Agnifilo, Teny Geragos, Paul DerOhannesian, Danielle Smith

15    for Keith Raniere who is present with us this morning.  Good

16    morning, Your Honor.

17         THE COURT:  Good morning.

18         You may be seated.

19         MS. PENZA:  Thank you.

20         THE COURT:  I've reviewed the transcript from

21    yesterday and considered the defense and the Government's

22    arguments.  With respect to Ms. Salzman's testimony about

23    what Kristen and Carly wrote regarding the circumstances

24    under which they provided collateral and joined DOS, I find

25    that the probative value of these out-of-court statements,

Proceedings                          1833

1   which are not being offered for the truth of the matter

2   asserted, is substantially outweighed by the danger of

3   unfair prejudice.  I, therefore, am striking the testimony

4   on Page 1811 of the transcript Lines 1 through 9 and on 1814

5   of the transcript from the sentence beginning, "She was

6   saying she felt," on Line 7 through the words, "And then on

7   911."

8            The instruction that I will give the jury is as

9   follows:  Yesterday in late afternoon, Ms. Salzman testified

10  about what two people named Kristin and Carly wrote about

11  the circumstances under which they provided collateral and

12  joined DOS.  I am striking the testimony of Ms. Salzman

13  which repeats what Kristin and Carly said to her on that

14  topic, and you are instructed to disregard that portion of

15  the testimony.

16           MR. AGNIFILO:  Thank you, Your Honor.

17           THE COURT:  Are there any issues about privilege

18  coming up in the balance of this testimony?

19           MS. HAJJAR:  I don't believe so, Your Honor.

20  The Government hasn't received anything from Mr. Sullivan.

21  I don't know if he has written to the Court but --

22           THE COURT:  He's written to the Court, but Mr. --

23  he apparently contracted Mr. Boone who wanted to consult

24  with his attorney.  So this is work in progress.  I'll let

25  you know.

Proceedings                                    1834

1          MR. AGNIFILO:  Very good.

2          THE COURT:  Okay.

3          MR. AGNIFILO:  And we think we resolved the video

4   issue.  We're going to agree to a stipulation -- I'm going

5   to keep calling it a video.  They're audiotapes where these

6   audiotapes came from, I don't think Ms. Hajjar is going to

7   get to this until the afternoon so we can draft a

8   stipulation, we can read it to the jury and we can resolve

9   it.

10          THE COURT:  All right.  Well, let me know.

11          MS. HAJJAR:  We will, Your Honor.  Thank you.

12          THE COURT:  All right.  Let's bring in the witness

13   and let's bring in the jury.

14          (Pause in proceedings.)

15          (The witness resumes the witness stand.)

16          (Pause in proceedings.)

17          (Jury enters the courtroom.)

18          (Jury present.)

19          THE COURT:  Please be seated everyone.

20          Good morning, Members of the Jury.

21          ALL JURORS:  Good morning.

22          THE COURT:  Before we begin with the continuation

23   of Ms. Salzman's direct, let me give you an instruction.

24   Yesterday, in the late afternoon, Ms. Salzman testified

25   about what two people named Kristin and Carly wrote about

Salzman - Direct - Hajjar                 1835

1    the circumstances under which they provided collateral and

2    joined DOS.  I'm striking the testimony of Ms. Salzman in

3    which she repeats what Kristin and Carly said to her on that

4    topic, and you are instructed to disregard that portion of

5    the testimony.

6            So at this point, we'll continue with the direct

7    examination of Ms. Salzman.

8            Ms. Hajjar, you may continue.

9            And I remind the witness that she is still under

10   oath.

11           THE WITNESS:  Yes, Your Honor.

12   L A U R E N   S A L Z M A N,

13       called as a witness, having been previously duly

14       sworn, was examined and testified as follows:

15   DIRECT EXAMINATION (CONTINUED)

16   BY MS. HAJJAR:

17   Q    Good morning, Ms. Salzman.

18   A    Good morning.

19   Q    Ms. Salzman, you testified yesterday that there were

20   videos made of the branding ceremonies for your DOS slaves;

21   is that correct?

22   A    Yes, that's correct.

23   Q    And after DOS was publicly exposed, did you participate

24   in discussions about releasing any of these videos?

25   A    Yes, we did.  I did.

Salzman - Direct - Hajjar                    1836

1    Q    Can you explain that further?

2    A    Yes.  We discussed among first-line DOS masters and

3    Keith the idea of possibly releasing the branding video or

4    showing it to -- Keith was debating whether we should show

5    it to possibly reporters or release it publicly to discredit

6    from the allegations that were being made concerning what

7    took place during the branding ceremony.

8    Q    Were there discussions about editing the video?

9    A    Yes.

10   Q    Can you explain those?

11   A    Yes.  We edited out the -- Keith said that he was

12   considering whether we should show it to the media reporters

13   or release it publicly.  And I asked, What about, like, all

14   of it, all the dialogue back and forth?  And he said, Well,

15   that part could be edited out and the -- it could be

16   blurred.  The nudity parts of it could be blurred, and so he

17   instructed us to do that.  And in the fall of 2017, so like

18   around September, Nicki and I did that.  We edited out the

19   dialogue portions of the branding ceremony from Sarah's

20   branding video specifically.

21        Those were -- that dialogue that was edited out

22   were the things that we discussed yesterday in the book plus

23   other concepts, but things like that I'm committing my

24   labor, my material possessions, my body for unconditional

25   use to my master and that that's my highest priority.

Salzman - Direct - Hajjar            1837

1    Q      Those pieces of dialogue were removed from the tape?

2    A      Yes.

3    Q      Was one part of the dialogue kept in?

4    A      Yes.  The part that said, "Master, please brand me.  It

5    would be an honor, an honor I want to wear for the rest of

6    my life," which each DOS slave was instructed to say at the

7    start of each ceremony.

8    Q      And you testified, Ms. Salzman, that during your

9    branding ceremony your arms were held over your head?

10   A      Yes, they were.

11   Q      Was that something that was done with your DOS slaves

12   as well?

13   A      Yes.  I duplicated what was done with me.

14   Q      When this was discussed with the defendant and the

15   first-line DOS masters, were there concerns about showing

16   the video to press and others?

17   A      Yes, there were several concerns.  We thought that them

18   seeing it might things worse.  It looked weird.  Also some

19   people said it looked sexual in nature because everybody was

20   naked and holding each other down.  And so we thought it

21   might make things worse, not better.

22          Also even though it showed laughing and joking, it

23   still looked like what it was.  It looked -- I mean, the

24   branding ceremony is not a pretty process, and I don't think

25   it's -- it's a very mainstream or common process.  So I

Salzman - Direct - Hajjar                1838

1   think it was viewed that it would look badly if people saw

2   it, even if it showed inconsistencies.

3   Q    At some point did you assist in creating a transcript

4   of the video?

5   A    Yes, I did.  Keith discussed several options that we

6   could possibly show it to a reporter who could report on it.

7   We could release it publicly so the public could see it.  We

8   could play the audio of it so it could be heard or there

9   could be a transcript.  And so I was instructed to just

10  transcribe it and have all of these options ready.  And so I

11  did so taking out the same parts that we edited out of the

12  video and leaving in the part about, "Master, please brand

13  me.  It would be an honor that I want to wear for the rest

14  of my life."

15  Q    And why was a transcript considered as opposed to the

16  actual video?

17  A    Because the transcript was more neutral and they

18  wouldn't see the part that looked scary or odd.

19  Q    Are you aware if other branding ceremonies were

20  videotaped, the ones of DOS slaves that were not yours?

21  A    I believe they were -- all were.  That was part of the

22  protocol.

23  Q    Do you know where those videos are now?

24  A    I don't.  I assume they're either with the top of the

25  DOS masters or with Rosa Laura, who held all the collateral,

Salzman - Direct - Hajjar                 1839

1   as mine were with me, which is why I said that.

2   Q    Around this time, did the defendant draft a position

3   statement as to DOS?

4   A    Yes, he did.

5            MS. HAJJAR:  May I show something to the witness

6   alone, Your Honor?

7            THE COURT:  Go ahead.

8            MS. HAJJAR:  Okay.

9   BY MS. HAJJAR:

10  Q    Ms. Salzman, I'm showing you what is marked for

11  identification as Government's Exhibit 1321.

12            Do you see that?

13  A    Yes, I do.

14  Q    What is that?

15  A    This is a draft of thoughts, were Keith's position

16  statement that he e-mailed to the first-line DOS masters.

17            MS. HAJJAR:  Your Honor, the Government offers

18  Government's Exhibit 1321.

19            MR. AGNIFILO:  No objection, Your Honor.

20            THE COURT:  Government's Exhibit 1321 is received

21  in evidence.

22            (Government's Exhibit Number 1321 so marked and

23  received in evidence.)

24  Q    Who wrote this e-mail, Ms. Salzman?

25  A    Keith wrote the e-mail.

1  Q    And who was it sent to?

2  A    To Daniella Padilla, Monica Duran, Loreta Garza,

3  Allison Mack, Rosa Laura Junco, Nicki Clyne, myself, and

4  Camila.

5  Q    And what is the subject of this e-mail?

6  A    A quick draft of thoughts for a position statement.

7  Q    What is the date?

8  A    Wednesday, October 18, 2017.

9  Q    At around the time that this e-mail was sent, had there

10 been a *New York Times* article published?

11 A    Yes, there had, a few days before.

12 Q    Did it feature Sara?

13 A    It did.

14 Q    Can you read the text of this e-mail, please.

15 A    The shaming of these women, especially when men doing

16 similar more drastic activities (see the Omega Psi Phi

17 fraternity) are upheld -- is a primitive covertly

18 misogynistic strike against the rights of women and women

19 generally.  If women choose to brand, pierce, mark, tattoo,

20 or otherwise physically adorn themselves for any reason,

21 they should be allowed to do so without shame or scorn.  It

22 is the nature of a free society.

23          This campaign is not only a campaign against the

24 rights of women and alternative lifestyles, it is a campaign

25 against freedom itself.  Any society that upholds shaming

Salzman - Direct - Hajjar                    1841

1    people to comply with the norm -- it says "with," but I

2    think it means -- will likely not advance and fall into

3    despotism.  As important as freedom of speech is freedom of

4    expression.  This campaign seeks to destroy that freedom.

5    The women of the sorority chose to mark themselves as a

6    stand of solidarity and a symbol to each other of mutual

7    commitment.  Should that be punished or scorned?  Whether

8    NXIVM, Keith Raniere, or anyone else associated with them

9    likes or dislikes it, these women should have the freedom to

10   express themselves.  NXIVM, Keith Raniere and Associates

11   uphold this right beyond personal opinions.  Although this

12   group has nothing at all to do with NXIVM or related company

13   trainings, or corporate activities and many of the

14   individuals involved have never been associated with NXIVM,

15   Keith Raniere, or related companies at all, NXIVM, Keith

16   Raniere and Associates strong support, I think it's strongly

17   support their right to these consensual activities without

18   shame.

19            To be clear, this sorority is autonomous, separate

20   and distinct from NXIVM, Keith Raniere and Associates.

21   NXIVM, Keith Raniere and Associates, although having little

22   knowledge or authority in the issue, applaud the courage of

23   these women who stand in opposition to primitive social

24   norms and stand in solidarity with them in their right to

25   freedom.  The few women who undergo the rigorous consensual

1   screening and invitation process making multiple promises

2   and assertions in several stages, taking a life vow of

3   secrecy and pledging like the founders of the

4   U.S. Declaration of Independence, quote, their lives'

5   fortunes and their sacred honor, end quote, to be a member

6   of this group and then breaking such a vow is shameful.  It

7   is ultimately -- it ultimately reveals the character of the

8   person, the vow breaker, as a liar.  Any story based on the

9   few liars who seek to shame their sisters because of their

10  own dishonor is regretful.  Imagine if our forefathers had

11  done the same the moment times got difficult.

12  Q    Ms. Salzman, you testified yesterday that you lied

13  publicly within the NXIVM community about the defendant's

14  involvement in DOS.

15  A    Correct.  And outside the NXIVM community.

16  Q    Did you lie and tell others this similar account to

17  what's in this position statement?

18  A    I did, yes.

19  Q    What's your view of this position statement now?

20  A    I think the position statement is a misdirection of

21  what actually's going on.  The *New York Times* article was

22  not an attack on alternative lifestyles.  It was asserting

23  that the women have been coerced to do something against

24  their will.  And it wasn't even an attack on branding as a

25  practice, it was an attack on the circumstances under which

Salzman - Direct - Hajjar                1843

1    the women became branded within this organization and the

2    nonconsensual nature of that given the collateral that

3    established their lifetime view of obedience to obey

4    everything that we said, including getting branded.

5            And in addition, so making it this campaign

6    against freedom, we can all go, Oh, yeah, like let's fight

7    for our freedom to express ourselves however we want and

8    lose sight of what actually was going on, which is their

9    very valid concerns and allegations to be made and the

10   statements about Keith's involvement are not true.

11   Q    Do you have an understanding as to why the defendant

12   sent this e-mail to you and the other first-line DOS

13   masters?

14   A    Like he wanted us to write position statements as well

15   and instructed us to do that.  But I think it was setting

16   the precedence for how those position statements should go

17   and what those position statements should convey, which is

18   that he is separate, distinct, and aside from anything in

19   the sorority and had little knowledge of anything going on

20   there, even though he created the whole thing and had very

21   intimate knowledge and involvement in what was going on

22   there.

23           And in the position statement that we were

24   instructed to write, I brought my position statement over to

25   his house and he specifically edited it and added things to

1    it to make it clearer that he had nothing to do with it.

2    Q    The statement, The few women who undergo the rigorous

3    consensual screening and invitation process, what did you

4    understand that to be referring to?

5    A    The process of -- enrollment process basically where

6    they are told that we have something to tell them, that they

7    need to give collateral to keep it a secret, and that once

8    they give the collateral, they're told four things about it.

9    And then if they decide to join, that they then give more

10   collateral.  That all of that is a type of rigorous and

11   consensual participation between people.

12   Q    Do you agree with the characterization of this process

13   as in the position statement?

14   A    No, I don't.

15   Q    Can explain that?

16   A    Because once you have collateral over somebody's head,

17   then the way they interact with the situation is entirely

18   different.  As well, we all were put in positions where the

19   people who invited us into the sorority were people that we

20   trusted, people that we looked to and looked up to, to lead

21   us in ethical decision-making and in our growth and in a

22   situation where somebody's saying this is -- this is what

23   you need to do to grow.  If you're really committed to

24   growth, you would do this, you know.  And the really

25   committed people do this, and the people who are making the

Salzman - Direct - Hajjar          1845

1   evaluation of who the really committed people are, are the
2   people who are in the leadership roles to evaluate whether
3   you're really committed or whether you're really growing.
4   They're the people who put you up for promotions in the
5   organizations that you're working in, and they're the people
6   who either respect you or don't respect you, who take you
7   seriously or don't take you seriously within your community.
8   There was incredible pressure to make this choice.  Even
9   after the initial collateral was given and then more
10  collateral was given after we already had the collateral,
11  the first collateral.  And once they agreed to a vow of
12  obedience without knowing what they're going to have to
13  obey, asking for more collateral, continuing to ask for more
14  collateral, is something they feel they have to obey their
15  collateral is subject to be released.  So that is not
16  consensual in the way that it appears, as it's being
17  represented to be.
18  Q    At the time the defendant wrote this e-mail to you, was
19  he aware that DOS slaves had been recruited into DOS not
20  knowing that he was their grand master?
21  A    He instructed it, of course he knew.  And when asked to
22  tell them that he was their grand master we were told no, by
23  him.
24  Q    At around this time did NXIVM, the company, hire a
25  public relations firm?

Salzman - Direct - Hajjar                    1846

1  A    Yes.

2  Q    And did the firm reach out to a reporter to run a story

3  on DOS?

4  A    Yes.

5  Q    Do you know the name of that reporter?

6  A    Vanessa Grigoriadis, I think.

7  Q    Were you interviewed by that reporter?

8  A    Yes, I was.

9  Q    And what did you tell her?

10 A    Same thing I told everybody.  I -- mostly --  most of

11 the subject of my interview with Vanessa related to NXIVM.

12 But any statements that I would have made to her about the

13 sorority contained all the misrepresentations and untruths

14 that I've testified to so far.  And I even represented

15 things about Jness that I really have no experience or

16 knowledge about because I was sent in really to be the

17 spokesperson for both of these things, and I did that.

18 Q    You mentioned Jness earlier in your testimony.  Can you

19 just remind the jury what Jness is?

20 A    Jness was a women's organization and it had a very

21 specific gender focus, how are women, how are men, how do

22 they relate with each other?  That was the main curriculum

23 and subject of the entire education of Jness.

24 Q    What was your view of the Jness curriculum?

25 A    I really struggled with the Jness curriculum on a

1   number of levels.  I thought a lot of it was trying to

2   normalize and legitimize Keith's polyamorous lifestyle and

3   help lay a philosophical foundation for why we should all

4   get on board for that.  We should have these monogamous

5   relationships where men get to have all these polyamorous

6   relationships and that that's the nature of men and that

7   this is something to be understood, you know, and promoted,

8   and that was very difficult for me.

9           And there were also parts of the Jness curriculum

10   that seemed to be advocating for -- but it doesn't matter --

11   that the most ethical and the most open-minded non --

12   nonvested and nonissue perspective would be not that you

13   have your own children, but that you have the most

14   genetically fit children.  And so I thought that it was

15   advocating for people to want to have children specifically

16   with Keith because of his most genetically fit, you know,

17   high intellect, ethical, compassionate perception as a

18   human, that this was like how he was laying the foundation

19   for people to think that that was a good idea and accepts

20   that and want that.

21           I think a lot of -- you know, on retrospective, I

22   think a lot of the Jness and the SOP and DOS curriculum was

23   creating a community of people and kind of even an army of

24   people to insulate and protect Keith and his views and

25   legitimize and advocate for the lifestyle that he wanted to

Salzman - Direct - Hajjar                    1848

1    live.  And a lot of us had real problems with it, and we

2    were told that it was our issues and it was our

3    indoctrination and it was -- you know, that was problematic

4    and that had to go, but it was limited.  It was fear based

5    and, you know, it was incredibly restrictive and it was

6    creating damage and thwarting our objectives as an

7    organization and as a community.

8    Q    Notwithstanding your comments to the reporter, had

9    you had these feelings about Jness earlier when you first

10   took their curriculum?

11   A    Yes.  And I discussed them with different people.  I

12   went and had EMs about them with a number of people.

13   Q    Can you --

14   A    I went to Keith, too, and said, Is this what you're

15   advocating for?  Like, is this what you think that everybody

16   should be, polyamorous?  And he said, No, I'm not,

17   necessarily.  I was thinking about it more like if people

18   understood that men had these needs or whatever, there might

19   be places where they could go to get those needs met like

20   with prostitutes or something like that.  I was like,

21   Really?  That's like -- is that what we're advocating now

22   for?  That all the -- that all the couples in our community

23   now understand that men have these needs and they need to go

24   get them met in other places?  To me it was very difficult,

25   you know.

Salzman - Direct - Hajjar                    1849

1        And I -- and I chalked it up to obviously I'm

2   having a big reaction to this so I need to look at why it's

3   my issue, you know, and work it through and there's a lot

4   that I can learn, obviously.

5   Q    Ms. Salzman, you say, Obviously I had a reaction to

6   this.  It's obviously my issue.  What are you talking about?

7   Can you explain that?

8   A    Yeah.  That -- I mean, within our curriculum, within

9   the NXIVM curriculum, which was laid out first and then it

10  carried over into Jness and SOP, the women's and men's

11  curriculum and into DOS as well, that when we have emotions

12  and emotional reactions to things and the circumstances,

13  that that's a clue to something that's going on internally

14  with us.  But it's not the external circumstance that's

15  problematic.  It's our reaction to it, you know, that's

16  indicative of some limiting belief or fear that is an

17  opportunity for us to grow and that we should view it as

18  that.

19        So when I had strong emotions and reactions to the

20  things, I looked at it as I must be really limited.  And

21  when I went to go talk to other people about those things,

22  they were like, Well, this is exactly why Keith put it in

23  the curriculum, to give you this opportunity to grow through

24  it.

25  Q    Do you have that view now?

1  A    I think that there are things that are legitimately

2  objectively good or bad, and there are things that are

3  subjective.  But there are things that are subjectively good

4  or bad.  And that it's a hundred percent normal to feel

5  emotional about that.  Even if there are limiting beliefs or

6  whatever, it doesn't negate the fact that certain things are

7  not good and that certain things are criminal.

8  Q    Were other first-line DOS masters interviewed by the

9  same reporter?

10  A    Yes.  At least Allison, and I think possibly Nicki,

11  too.  But I'm not a hundred percent sure on that.

12  Q    Did you subsequently learn something about what Allison

13  Mack had said to the reporter?

14  A    Yes, I did.

15  Q    What was that?

16  A    There were a few things that I learned.  One, was that

17  she had said in -- she conveyed it as a moment of impulse.

18  She took credit for coming up with the idea of the brand and

19  then was like, I don't know why I did that.  You know, I

20  just felt special in the moment and I was, you know, and I

21  said -- I said it.  But that was false.

22          And that she also -- her accounting of it was that

23  she characterized it as this wonderful opportunity for women

24  to explore their sexuality and sensuality as women, which I

25  specifically disagreed with.

1  Q    Was Nicki Clyne interviewed by the reporter, to your
2  knowledge?
3  A    Either she was or she believed she was going to be and
4  we had discussions and made preparations for that.
5  Q    Did she ask you for anything before she met with the
6  reporter?
7  A    She did.  She -- she asked -- she thought that it would
8  be a good idea to have a visual representation of the brand
9  and to show how each of the lines of the brand could
10 legitimately represent the alternate story that we were
11 laying out, which was the seven chakras, the four elements,
12 Bar Alpha Mu, and there was another thing about triangles
13 descending and ascending triangles and lines.  And so I -- I
14 agreed to do -- to draw this out and I grafted, I drew it on
15 the graph paper where I just reproduced the brand each time
16 in its entirety but highlighting the element that I was
17 referring to and how it was each of the things, each of --
18 what it represented, the seven chakra or the four element or
19 the Bar Alpha Mu.  I highlighted how you could see -- each
20 of those could be interrupted from the brand.
21        MS. HAJJAR:  Can I show something to the witness
22 alone, Your Honor?
23        THE COURT:  Go ahead.
24        MS. HAJJAR:  Thank you.
25 Q    Ms. Salzman, I'm showing you what is marked as

Salzman - Direct - Hajjar                    1852

1   Government's Exhibit 436.

2           Do you see that?

3   A   Yes, I do.  This is the -- the drawing that I made for

4   Nicki to show Vanessa.

5           MS. HAJJAR:  The Government offers

6   Government's Exhibit 436 in evidence.

7           MR. AGNIFILO:  No objection.

8           THE COURT:  All right.  Government's Exhibit 436

9   is received in evidence.

10          Publish to the jury.

11          (Government's Exhibit Number 436 so marked and

12  received in evidence.)

13          (Government's Exhibit Number 436 is published to

14  the jury.)

15  BY MS. HAJJAR:

16  Q   Ms. Salzman, can you explain what you drew and why?

17  A   Yes.  So in each of the diagrams you can see that I

18  drew the brand as it exists.  So it has the K-A-R.  But I

19  highlighted specific sections of it to misrepresent what it

20  stood for.  So at the top, I highlighted the line across

21  which is the back of the K and showed how it was the bar.  I

22  showed the A in the subsequent one below and said that it

23  was an alpha.  And the R in the final one with the line at

24  the A -- sorry.  I didn't mean to draw on the screen -- I --

25  I represented as an M for Mu.

Salzman - Direct - Hajjar                    1853

1   Q    And this concept that the Bar Alpha Mu could be an

2   explanation for the brand, who gave you that idea?

3   A    Keith.

4   Q    And was this after DOS was publicly exposed?

5   A    Yes.

6   Q    I show you the second page of Government's Exhibit 436.

7        Can you explain what -- what's drawn here,

8   Ms. Salzman?

9   A    Yes.  This page is me representing the brand as the

10  four elements, so air, earth, water, and fire.  And I drew

11  the lines accordingly at the top.  The back of the K was the

12  horizon.  The triangle in the A was the earth, the mountain.

13  The R was the squiggly line representing the river or water

14  element.  And the brand itself because it was, you know,

15  burned on, it was to represent fire.

16  Q    And was this supposed to be another explanation for the

17  lines in the brand?

18  A    Yes, it was.

19  Q    Other than the defendant's initials?

20  A    Yes.

21  Q    Showing you the third page of Government's Exhibit 436.

22        Can you explain what you wrote here?

23  A    Yes.  I'm showing how there are seven lines in the

24  brand and that those seven lines could be interpreted to

25  represent seven chakras.  As well, below that the symbology

1    of lines and triangles and that straight lines could be seen

2    as representing an unwavering moral code, and triangles

3    representing male and female principles, which were not

4    actually part of the brand.

5    Q    And was this another false explanation for what the

6    lines in the brand stood for?

7    A    Yes, all of them are.

8    Q    Prior to you meeting with the reporter, had the

9    defendant travelled to Mexico?

10   A    Yes.  He traveled to Mexico in October 2017, returned

11   back to Mexico in November 2017 and never came back to the

12   States until he was arrested.

13   Q    Did you spend New Year's Eve with the defendant in

14   Mexico?

15   A    I did, yes.

16   Q    Can you explain that to the jury?

17   A    Keith went back to Mexico like in November, middle

18   November, and within a short period of time cut

19   communications and I didn't speak to him for a period of

20   weeks.  I can't recall if it was four or five or six,

21   something like that, but was out of communication for some

22   time.  And at one point, he resurfaced and Loreta told me

23   that I could get a prepaid phone and that I could

24   communicate with him on the phone and through those

25   communications on the burner phones.  I -- he invited me to

Salzman - Direct - Hajjar                1855

1    come and spend New Year's in Mexico.

2    Q    And what is a burner phone, Ms. Salzman?

3    A    It's prepaid phone, basically, that you can buy in a

4    store that is not linked to your person.  So it's not

5    traceable to you in any way like your e-mail address or your

6    name or anything.  It's untraceable.  It's unlinkable to

7    you.

8    Q    What was the purpose of you buying a burner phone to

9    communicate with the defendant around that time, November

10   2017?

11   A    Because he wouldn't communicate with me otherwise.  He

12   was communicating on those phones, and I was told if I

13   wanted to communicate with him, I could communicate with him

14   if I were to get a phone like that.

15   Q    Did you subsequently learn the agents had visited the

16   NXIVM center in Monterey at around that time?

17   A    I did hear that, yes.

18   Q    What did they do that you heard?

19   A    That they had come to the NXIVM center in Monterrey

20   asking for Keith and that they left business cards.

21   Q    After you spent New Year's Eve -- well, while you spent

22   New Year's Eve with the defendant, did he tell you anything

23   when you were there?

24   A    Yes.  He told me that there were investigations in

25   three countries into our opposition, the people who were

Salzman - Direct - Hajjar                1856

1    oppositional to us, and making -- the allegations -- public

2    and private allegations against us, and that we were going

3    to win because the truth was on our side; and that he

4    communicated a number of ideas for the upcoming coach

5    summit.  He told me that I could speak to Clare about

6    getting a Proton mail address.

7    Q    What is Proton mail address?

8    A    It's an encrypted e-mail address that also is not

9    linked to you in any way, to your name, to your -- anything

10   about you.

11   Q    Where had you visited the defendant in Mexico?

12   A    On that trip I visited him in Punta Mita.  That's near

13   Puerto Vallarta, Mexico.

14   Q    Before the defendant left for Mexico that second time,

15   did you have an opportunity to observe him?

16   A    I did, yes.

17   Q    And what did he do before he left for Mexico?

18   A    I went to see him at 21 Oregon where he was living at

19   the time and he -- or he had lived, and he was baking up his

20   devices.  And he left some things behind, some money and

21   some letters and some -- possibly other things, but I knew

22   specifically about the money and the letters.

23   Q    Was there anything else that he did with respect to his

24   electronic devices at that time?

25   A    Yes.  He had Nicki forward him from one e-mail account

1    to another e-mail account a number of naked pictures and

2    collaterals.

3    Q    Which account to which account?

4    A    I had heard from Nicki that there was an account

5    that -- she called it the Stevie account.  I'm not sure of

6    the address on it, but that's what she referred to it as.

7    And she forwarded them from that account to Keith's Yahoo!

8    mail account.  She was sharing this because she was

9    concerned about it because she felt it was a breach of

10   security, and the idea had always been those things really

11   need to be locked down and not made public.

12            But he instructed her to do it and she did it.

13   Q    Was there anything else the defendant did before he

14   left for Mexico?

15   A    Not other than leaving the letters and the money.

16   Q    Can you explain the money?

17   A    The money was a Ziploc bag that appeared to be from

18   Dawn Morrison, that she had a company that Keith had given

19   her the idea for and he -- she paid him royalties as part of

20   the -- like the tribute for the idea of the business.  And

21   he had -- it wasn't that much money, but he had not

22   seemingly saved all the money that she had given him.  So

23   there were like little envelops of like $5, $10, $20.  So he

24   had saved it all in this Ziploc bag and it appeared to be

25   over many years.  And it was, you know, Dawn's handwriting

Salzman - Direct - Hajjar                    1858

1  and the dates and the amount on it.  And so he left it with

2  Nicki who then gave it to me.

3  Q    The fact that the defendant did these things, does that

4  give you any particular impression?

5  A    It gave me the impression he wasn't coming back or

6  coming back anytime soon.  If this is money that he had

7  saved over a number of years for Dawn or for whatever

8  reason, why now all of a sudden not keep that.

9  Q    After you visited with the defendant in Mexico, did you

10 return to the United States?

11 A    Yes, I did --

12 Q    Why?

13 A    -- come back.

14        Well, I just came home and I was still living at

15 home.  I had responsibilities in New York.  My family was

16 all here.

17 Q    Did you address the community after you returned to the

18 United States?

19 A    I did, yes.  And there was a coach summit that we ran

20 immediately after that as well.

21 Q    You testified --

22 A    A NXIVM coach summit.

23 Q    You testified yesterday that you lied in a community

24 meeting?

25 A    Yes.

Salzman - Direct - Hajjar                 1859

1    Q    Can you describe that to the jury?

2    A    Yes.  So Keith had been communicating since before the

3    holidays -- so it was before I even saw him in Mexico --

4    directly and through other people that he felt that we had

5    waited too long, we needed to address the community and

6    address their concerns.  And he didn't know why we had

7    waited so long, and this was really problematic.

8         And so before we were going to meet with Vanessa,

9    I heard through Clare several times and Nancy that Keith had

10   spoken to both of them and said the same thing that I just

11   said, like the community members needed to be met with, we

12   had taken too long do it already and that it was important

13   that they not read in the *New York Times* what we were going

14   to say before they heard it from us directly.

15        And so that we needed to address the community

16   first.  And it was unclear who was the best person to do it.

17   But the only two public people to speak about these things

18   were myself and Allison.  So Allison and I went before the

19   NXIVM community the night before we were interviewed with

20   Vanessa and communicated much of what Keith had communicated

21   at V Week, what was in his position statement, what he had

22   discussed with me in Punta Mita and answered questions that

23   they had.

24   Q    Where was the defendant at the time you addressed the

25   community?

Salzman - Direct - Hajjar                1860

1   A     Somewhere in Mexico.

2   Q     I'm sorry?

3   A     Somewhere in Mexico.

4   Q     During this community meeting, did you say anything

5   about having met with law enforcement?

6   A     Yes.  Yes, I --

7   Q     Can you explain that?

8   A     I can't recall my exact words.  But basically that law

9   enforcement or ex-law enforcement had vetted the situation,

10  you know, that they had come in and done a thorough review

11  of everything concerning the allegations, and found that

12  there was no need for concern and that this was a very good

13  thing.

14  Q     Was that true?

15  A     We had met with some ex-law enforcement but -- what we

16  told everybody -- it wasn't a thorough investigation because

17  we misrepresented and lied about all the same things that

18  I've been testifying for the last two days that we lied

19  about.  So it wasn't a thorough vetting or a thorough

20  investigation.

21  Q     So the individuals you described as law enforcement,

22  those were individuals retained by NXIVM?

23  A     Yes, ma'am.

24  Q     Were you honest with them?

25  A     No.

Salzman - Direct - Hajjar                1861

1   Q    What did you tell them?

2   A    I told them the same thing that I told everybody else,

3   that the brand wasn't Keith's initials, that Keith wasn't

4   involved.  I represented it similar to Jness that he had

5   come up with the tools and the curriculum and given us

6   permission to use them but was not involved in the inner

7   workings of anything and had little knowledge of what we

8   were doing.

9          I said that Rosa Laura was my master not Keith.

10  Test of Abraham, you know, that seduction assignments were

11  never meant to be carried out, they were all just dares,

12  that the women had come up with the idea for branding and

13  that Keith -- the -- the -- Keith's initials were only in

14  there as an afterthought as a tribute and not meant to be

15  interpreted that way at all.

16  Q    Did you provide these individuals with copies of the

17  collateral?

18  A    I provided them with the compiled materials, at least

19  one of them I provide the a compilation of the materials

20  that represented examples of positivity and consent but

21  leaving out anything that showed the opposite.  And some of

22  those pictures, as I testified yesterday, were pictures

23  where the girls were instructed to look happy and like they

24  wanted to be doing that.

25  Q    Did you show them the contract you signed with Audrey

Salzman - Direct - Hajjar                    1862

1    that you testified about yesterday?

2    A    Yes, I did, as an example of consent.

3    Q    Sitting here today do you believe that contract has any

4    force?

5    A    No.  And the contract -- it wasn't even complete.  I

6    think it was -- I don't know where -- where it came from.

7    But one of the things was only like valid in the State of

8    Maine, like it was -- it was -- in my opinion even with

9    Audrey a symbolic contract.

10   Q    At some point did the defendant release a public

11   statement addressed to the NXIVM community?

12   A    Yes, he did.  He released a statement on the NXIVM

13   website, I believe.

14   Q    And did -- what did that public statement contain?

15   A    It contained statements that he was not affiliated with

16   the sorority, that he had little knowledge of it and that we

17   had done a thorough review by ex-law enforcement and

18   forensic psychologists and others, and that they had found

19   that the women of the sorority were thriving and doing

20   better, that this was an overall really good thing.

21   Q    And these were the same things that you repeated at the

22   community meeting?

23   A    Yes.

24   Q    At some point had NXIVM retained a forensic

25   psychiatrist?

Salzman - Direct - Hajjar                    1863

1   A    Yes.

2   Q    Did you speak with him?

3   A    Yes.

4   Q    What was his name?

5   A    Park Dietz.

6   Q    Did you lie to Park Dietz as well?

7   A    Yes.  We lied to everyone.  The same story we told

8   everyone.  This was the party line on it.  Keith was putting

9   it out publicly.  We all put it out publicly.  It was all

10  the same.

11  Q    Are you aware if Clare Bronfman put out a similar

12  public statement?

13  A    Yes.

14  Q    Was Clare Bronfman involved in legal efforts relating

15  to DOS?

16  A    Yes.

17  Q    Did she ever ask you about DOS?

18  A    No.  I asked Keith what she knew and he told me that

19  she didn't want to know anything she didn't need to know.

20  Q    Can you describe the role that Clare Bronfman played in

21  defendant's life?

22  A    I think in some ways Clare was a benefactor.  I think

23  that she helped assist him in his legal initiatives.  She

24  was an NXIVM board member.  She had a personal, you know,

25  and I don't know totally the nature of their relationship,

Salzman - Direct - Hajjar                    1864

1   but I believe at one time at least you know, romantic

2   relationship with him.

3   Q    Was she dedicated to him?

4   A    Incredibly dedicated to him, incredibly loyal,

5   incredibly dedicated.

6   Q    At some point did the defendant discuss with you Clare

7   Bronfman's financial support of him?

8   A    Yes.

9        I raised concerns at one point in time about

10  things that were going on in the organization that I -- with

11  Clare that I wanted to raise with Clare and he asked me to

12  please not raise those things with Clare.  And he said at

13  some point we're going to be in a different place

14  financially, but right now basically she's paying for

15  everything, and please don't make a problem, don't raise it.

16  Q    At some point did you become aware that NXIVM sent

17  letters to certain DOS slaves in an effort to prevent them

18  from speaking publicly?

19  A    Yes.  I was aware that some cease and desist letters

20  had been sent, yes.

21  Q    Do you know who at NXIVM sent those letters

22  specifically?

23  A    I believe they came from Alex Betancourt as

24  representative of ESP Mexico.

25  Q    Ms. Salzman, at some point did you have another

Salzman - Direct - Hajjar                    1865

1    conversation with the defendant about Nicole?

2    A    Yes.

3    Q    Can you tell the jury about that.

4    A    Yes.  So Alex Betancourt, who was one of my closest

5    friends, came to me at one point in time, I think, in like

6    February 2018.  And said that Emiliano, who is another one

7    of our closest friends had come to him, had come to Alex and

8    was upset because a women who had been one of Allison's

9    former slaves had confided in him that she was tasked to

10   have sex with Keith and that she felt forced to do that.

11   And that Alex had suggested that Emiliano come and speak to

12   me about it.  And so Alex was giving me a heads-up that

13   Emiliano was going to come raise the subject with me so that

14   I was prepared to discuss it with him.

15            So I asked Alex, is it Souki, and he said no.  And

16   so I said, is it Nicole and he said yes.  And so then I went

17   to Keith to find out how to address this.

18   Q    Why did you ask if it was Souki or Nicole?

19   A    Because I wanted to understand -- well, because they

20   were the only two slaves of Allison's who had left and who

21   were speaking, who were raising concerns or bringing --

22   raising that there had been issues and everybody else -- it

23   could only have been attributed to them and I wanted to know

24   who it was, so I understood what kind of a conversation I

25   was walking into.

Salzman - Direct - Hajjar                    1866

1    Q    What happened after that?

2    A    I spoke to Keith and I told him about this, and asked

3    him what to do, what should -- what do I tell Emiliano?

4              (Continued on the next page.)

1  DIRECT EXAMINATION (Cont'd.)

2  BY MS. HAJJAR:

3  Q    What did he say?

4  A    He told me that there had been no sex between him and

5  Nicole and that he had given Nicole three trust tests and

6  cited at least one that he had shown her a place in 8 Hale

7  Drive which was the townhouse that was -- that he -- that was

8  his, that he lived in, the executive library at one time, that

9  he had shown her a bag of money and then left the money and

10 later counted the money and saw that she had taken money and

11 that he had given her three such tests and she had failed all

12 of the tests and that she knew the truth, that she was

13 misrepresenting the facts and that it would be good if

14 Emiliano or somebody would bring this to her that she was not

15 being truthful and urge her to tell the truth, change her

16 story.

17 Q    And how did you understand that direction to you, that it

18 would be good if someone spoke to her?

19 A    He was telling me to do that.  Keith's suggestions

20 weren't suggestions because if you didn't do the suggestion,

21 then there was feedback about why didn't you do the suggestion

22 and how you were making his life difficult and why this is

23 really problematic.  So, he wanted me to go talk to Emiliano

24 and get Emiliano to talk to Nicole and to get her to be on the

25 other side of this.

L. Salzman - direct - Hajjar                                    1868

1   Q     Did you meet with Emiliano Salinas?

2   A     I did, yes.

3   Q     What happened?

4   A     We did discuss it.  I mean most of the subject of my

5   meeting with Emiliano was he was leaving the organization and

6   didn't want to be affiliated with NXIVM anymore and he and I

7   were very close friends over many years and so that was very

8   sad for me in the context of our relationship, so most of what

9   we discussed was that but we discussed Nicole and what he

10  communicated with me was that Nicole told him that --

11              MR. AGNIFILO:  I'm sorry, I'm going to object to

12  this as hearsay.

13              THE COURT:  Sustained.  Sustained.

14              MS. HAJJAR:  Your Honor, may I just take one moment

15  to confer with my colleague?

16              THE COURT:  Sure.

17              (Pause while government counsel confer.)

18              MS. HAJJAR:  Thank you, Your Honor.

19              THE COURT:  Go ahead.

20  Q     Ms. Salzman, without going into what Emiliano Salinas

21  told you Nicole said, was whatever he said consistent with

22  what you heard from the defendant in terms of what Nicole was

23  saying?

24  A     More or less, yes, and I communicated to Emiliano that I

25  thought Keith would like it if somebody would talk to Nicole

L. Salzman - direct - Hajjar                    1869

1   and get her to change her story.

2   Q    These were instructions you conveyed to him that you got

3   from the defendant?

4   A    Yeah -- well, I told him that that's what I thought Keith

5   would want.  I didn't instruct him to do it and he wasn't

6   going to do it, he was leaving ESP, but I didn't want to go

7   back and tell Keith that I hadn't raised it so I communicated

8   that I thought Keith would want that.

9   Q    To your knowledge, did Emiliano Salinas approach Nicole?

10  A    No, not to my knowledge.

11  Q    At this time do you know whether Nicole had ever spoken

12  to the press or media?

13  A    I don't -- I don't know.  I don't have knowledge that she

14  spoke to the press or media.

15  Q    Did you have a later conversation with the defendant

16  about Nicole in Mexico?

17  A    I'm sorry, I was just trying to think if I had knowledge

18  that she had spoken to the media.

19  Q    Do you believe she did?

20  A    At one point I believe that there was something

21  attributed to her that was anonymous but I don't recall what

22  time period it was.

23  Q    But it was anonymous.

24  A    It was anonymous.  She was not publicly identifying

25  herself in the press.

1  Q    Did you have a subsequent conversation with the defendant
2  about Nicole in Mexico?
3  A    I did, I wanted to know who the woman was who had
4  performed oral sex on her while she was blindfolded and I had
5  asked if it was Allison and he said it was not Allison and I
6  asked who it was and he said it was Camila.
7  Q    How did he express this to you?
8  A    That it was something that Cami was interested in
9  exploring and -- I don't know if he thought it was -- I mean
10 he expressed it to me on a walk, he was like smiling and
11 laughing when he said it.
12 Q    Prior to this had you been told about this -- how did you
13 know to ask him that, when did you first learn --
14 A    Because Nicki had told me after interviewing India that
15 Nicki had had to do this, she had had a test.
16 Q    Let's back up, Ms. Salzman.
17 A    Yes.
18 Q    When did you first hear about what had happened with
19 Nicole?
20 A    It was in the summer following when DOS became public,
21 I'm not sure specifically what month, but Nicki went to
22 interview Allison's slaves to find out from a different
23 perspective than Allison's what had taken place in the group
24 because there were assertions of sexual relationships with
25 Keith and coercion coming out of that group, so Nicki -- we

1   all thought it was good but Nicki specifically went to find

2   out what the other women's perception was of what happened.

3   Q    What did you hear?

4             MR. AGNIFILO:  I object.

5             THE COURT:  Sustained.

6             THE WITNESS:  Okay.

7   Q    You testified, Ms. Salzman, that the defendant stated

8   that Camila had performed oral sex on Nicole?

9   A    Yes, he did.

10  Q    Did he express whether Nicole knew that Camila was -- had

11  performed or -- that Camila had performed oral sex on her?

12  A    He did not and I didn't ask.  I was more concerned with

13  whether it had been him.

14  Q    Did the defendant make an insulting comment about Nicole

15  at this time?

16  A    Yes, he did.

17  Q    What did he say?

18  A    I mean I had gone to him several times now about his

19  relationship with Nicole which he had continued to

20  misrepresent as non-sexual but then over time it started to

21  be, well, it's different than, you know, that it kind of was

22  sexual and then he said basically but she smelled funny which

23  I thought was derogatory and placating that he was trying to

24  somehow make me feel better that this is who he was choosing

25  to have a sexual relationship with instead of me because he

1    really didn't like it anyway.

2    Q    Did your conversation with the defendant disturb you?

3    A    Yes.  All of the things that I was learning were

4    disturbing me and at the same time I compartmentalized all of

5    them and I couldn't believe that these were the things and

6    that it was -- that it could be what I was hearing or

7    interpreting and at one point I even raised with him that I

8    could see why other people were upset about the seduction

9    assignments, like this was, you know, an upsetting thing and

10   he was -- I said if I did this, like if I -- if you found out

11   that I went and seduced some guy under a collateralized vow, I

12   think you would have a problem with it.  He was like, no, I

13   wouldn't because I trust you.  And I was like that's not

14   believable to me.  It wasn't believable to me what he was

15   saying and I still couldn't come to grips with all the

16   inconsistencies that I was seeing between what I -- what he

17   was representing he was doing and what I -- all the

18   information that I was getting about what was going on and I

19   could not come to grips with this and I just kept shoving it

20   aside and insisting that it's Keith, it's got to be good, it's

21   got to be ethical, it's got to be right and going forward but

22   it was -- it was starting to get to the point where I had real

23   concerns.

24   Q    Why did you stay?

25   A    It's a hard thing to explain but I mean I was with -- in

1  NXIVM and with Keith as my teacher, as my mentor and as the

2  person I looked to for how to be a good person and how to be

3  effective and successful at negotiating the world for

4  20 years, I mean like almost half of my adult life.  I never

5  worked outside of NXIVM or outside of a company that my mom

6  was the head of.  I had never been on my own outside of

7  this -- I had signed extensive noncompete agreements in my own

8  field, so I didn't know -- when I considered or entertained

9  the idea of leaving the relationship, I had to consider and

10  entertain the idea of leaving NXIVM because I didn't see how I

11  could leave the relationship and still exist in the same way

12  in NXIVM and so that was very difficult and I couldn't really

13  deal with the -- I couldn't figure out how I was going to make

14  that work.  I didn't want to be away from my mom or away from

15  my sister and I -- but more than anything I didn't -- I

16  wanted -- the things that I thought about Keith and all the

17  things that he promised me to be true, I wanted to believe

18  that all of this was for my growth and that this was -- that

19  the relationship that he was saying we were going to have

20  really was something that he meant and that he had promised it

21  legitimately, that all the things that I had traded to try to

22  prove to him that I was a good person and I was all the things

23  that he would want me to be to feel proud to call me his

24  partner and to have a child with me rather than saying that I

25  was so far below his ethical standard that I couldn't even

L. Salzman - direct - Hajjar                                    1874

1   understand how far below I was which was something he said to

2   me and like constant feedback about how I was responsible for

3   all the problems that we were having or the failures that we

4   were having and I needed to prove to him that I could be that.

5   I needed -- and I thought that if I could prove that to him,

6   then I could believe it about myself and I just couldn't

7   justify how I -- everything and all the choices that I made in

8   the last 20 years, if everything I was seeing was bad and so I

9   told myself it wasn't and went forward continuing to support

10  him and to try to prove that everything we did was not what

11  the allegations were and it was getting harder and harder to

12  think that what we had done was not what the allegations were.

13  Q    Did you believe that if you didn't support the defendant

14  that you would lose your contact with your family, your family

15  members?

16  A    I believed that if I left this vow that I would be seen

17  as somebody who was not -- who didn't keep their word and who

18  didn't hold growth above all other things and if that

19  happened, I couldn't maintain my role, my positions, my career

20  in NXIVM as it existed and I had already lost a lot of things

21  because he was saying that the leadership in NXIVM was

22  responsible for a lot -- for our lack of success or our

23  failures and so I had reason to believe that I would lose more

24  things and that would affect my relationship with my family.

25  Q    Did you believe that if you had spoken the truth about

1    DOS at that time, what that would have meant?

2    A    It would have meant leaving my entire life.  It would

3    have meant -- yeah, it would have meant leaving, becoming

4    somebody who was considered oppositional to NXIVM, on the

5    outside, not on the inside.

6    Q    What happened to people who were considered oppositional

7    to NXIVM?

8    A    People don't -- people shunned them, they don't talk to

9    them, you know, they speak about them saying that they're not

10   doing the ethical or honorable thing, that they've broken

11   their commitments and their vows, that they don't have good

12   character or principles, you know, and that the good moral,

13   noble thing is to uphold your word, uphold your commitments

14   and stay committed to this vision and mission, you know, in

15   the face of any adversities.

16   Q    Ms. Salzman, you testified yesterday that you had wanted

17   a child with the defendant?

18   A    Correct, I did.

19   Q    And around the time that DOS was publicly exposed did you

20   have renewed discussions with the defendant about having

21   children?

22   A    I did.  It was something I had wanted and had been

23   pushing for for 12 years.  It was something -- I mean I had

24   wanted it forever but 12 years specifically we had been

25   pushing for it.  I had given up other opportunities to have

1  children with other people who legitimately wanted to do that

2  with me and he asked me not to do that so that we could do it.

3  I was going to leave the relationship and he offered that if I

4  stayed, we would do this and all this time he didn't do any of

5  those things and then all of a sudden when DOS became public

6  and Allison and I were the only people who were publicly outed

7  and he was disaffiliating all connection with it, all of a

8  sudden he's ready to go through fertility treatments with me

9  which we did do and the entire focus during that time was

10 whether Marianna was going to know or find out.  It wasn't --

11 I said to him this is the one thing, the one thing of

12 everything, all the things, this is the one thing that should

13 be -- like I thought this would be the one thing that would be

14 just us and he said, I know, I'm sorry.  Basically it can't be

15 because the higher priority is Marianna, you know, and I just

16 find it -- and he didn't even finish the process of the

17 fertility treatments.

18 Q    Why not?

19 A    He needed to take a blood test and he didn't want to take

20 it, he didn't take it and so it -- they weren't even -- I view

21 it as a way of saying that he was going forward with his

22 promise without really going forward with his promise.  So,

23 it's taking another step to defer this over just longer but to

24 keep me doing what I was doing better than anybody else at

25 that time which was going out to the whole world and

L. Salzman - direct - Hajjar                    1877

1  legitimizing that this was good, that it wasn't what it was,

2  you know, and to all the people in the community who respected

3  me and trusted me and would believe me and to the press and to

4  anybody who questioned us, I was sent to talk to everybody and

5  I did it and I did it because I wanted to protect Keith and I

6  loved Keith and he was saying this was the ethical thing to

7  do, this was the noble thing to do and I couldn't believe that

8  Keith wouldn't be telling me the ethical or noble thing to do

9  and I was willing to put my own -- my own desires and my own

10 what I hoped for to have for myself above everything else.

11 Q    Did undergoing the process of the fertility treatments,

12 starting that process affect your decision as to whether to

13 stay?

14 A    Yes, and Rosa Laura and I had many conversations about it

15 where she was like, see, it was all worth it, like see, he

16 really was going to do it, all that doubt you had, all the

17 questions, he's only doing that with you, he's not doing that

18 with other people, like this is a special thing like and would

19 always reassure me like see.

20 Q    Did the defendant give you an explanation as to why he

21 refused to take the blood test?

22 A    No, and there were many different ways that they told me

23 that he could have taken the blood test, like he didn't even

24 have to go in, they could have sent somebody to his house, he

25 could have had whoever he wanted as his choice to do it, there

1    could have been anybody who did it and he was like, you know,

2    it's not even going to be an issue because at some point

3    I'm -- we're going to have our own fertility clinic; he wanted

4    to have a fertility clinic so it's not even going to be an

5    issue.  We weren't going to have a fertility clinic, he wasn't

6    going to have a fertility clinic for years, like that was

7    something that was so far in the future and he absolutely

8    100 percent knew when he made me the promise that if I stayed

9    in the relationship we would have children because I had

10   expressed it on many occasions that I was not interested in

11   having children in my 50's and 60's even if we could

12   legitimately get a surrogate to carry it, like that I didn't

13   want to be 65 years old when my kid graduated from high

14   school, that I wanted to have -- this was something I wanted

15   to do now, you know, not something to put off for some

16   imaginary fertility clinic that he was going to have in five

17   or ten years.

18   Q    How many times, Ms. Salzman, did you visit the defendant

19   in Mexico around this time?

20   A    I think five total, four after the original trip on New

21   Year's.

22   Q    And you testified the defendant did not return to the

23   United States during this period of time?

24   A    Correct.

25   Q    At some point were you invited to a recommitment

1  ceremony?

2  A    I was, yes.

3  Q    Can you explain that to the jury please?

4  A    Keith said that he wanted us to make some time, the first

5  nine DOS masters, not all of us, some of us but to come and

6  visit him alone without anybody else who had accompanied us on

7  the other trips like Clare, for example, or my mom or some of

8  the SOP guys or Marianna and so Daniella Padilla started

9  calling me and asking me about what the dates were of when

10  this was going to be and communicating that he was disturbed

11  that we weren't making it sooner, prioritizing it.

12  Q    You said some of the first line DOS masters?

13  A    Correct.

14  Q    Which ones?

15  A    Me, Allison, Nicki, Loreta -- me, Allison, Nicki, Loreta,

16  Daniella.

17  Q    Where were the others?

18  A    I don't know where Camila was, she went back to Mexico

19  and I didn't see her again, I don't know exactly where she

20  was.   Monica I think was in Tampico with her family caring for

21  her mother and Rosa Laura was in Albany.

22  Q    Did you want to participate -- did you want to recommit

23  to DOS at this time?

24  A    No, I didn't want to start with DOS again.   Honestly I

25  was relieved when we stopped doing it, when we stopped taking

L. Salzman - direct - Hajjar                                    1880

1   the naked pictures and at some point he said I don't know why

2   you guys stopped that, you should be doing it, and Nicki and I

3   had discussions about it like this is crazy, we don't want to

4   be doing it and especially right now, everything is going

5   public, we had reason to believe that there were going to be

6   indictments or there was investigation into what was going on

7   and we were incredibly concerned about it.  He kept reassuring

8   us there's nothing to be concerned about, this is going to go

9   our way.  It started sounding crazier and crazier that

10  anything was going to go our way in this situation and I

11  didn't want to and I didn't feel that that was really an

12  option to not go forward.

13  Q     You said you received a call from Daniella Padilla?

14  A     I received a few calls from Daniella Padilla initially

15  for scheduling but then I was teaching an intensive in Mexico

16  City and I received a call from Daniella and she said in that

17  call basically that the reason that she was calling was

18  because she wanted to talk about the recommitment ceremony and

19  that she wanted to make sure that any reactions that anybody

20  was going to have, any upset was handled now before we got

21  there and then she communicated -- so, that was why she was

22  calling, so that I could get upset now and not be upset later

23  but that basically she thought that it would be really nice

24  for us to do something special for Keith during the

25  recommitment ceremony and basically the concept that she laid

1    out, and I can't remember the words, I interpreted as group

2    sex and I said to her -- I had an extreme emotional reaction

3    and I said absolutely -- like no, I don't -- I do not think

4    that part of my vow and part of my commitment with Keith to my

5    growth has to do with having sex with you and she said, oh,

6    no, that's not my understanding of it, my understanding is

7    that it's going to be us pleasuring him and so I said

8    absolutely not and I got off the phone with her and I started

9    texting Keith and I said, is this what you want from me, this

10   is what you think -- and I specifically called it our marriage

11   even though I did not -- I perceived that we had an incredibly

12   strange relationship, he kept referring to it like this is a

13   life partnership and at one time he had said, you're going to

14   be my wife, and I specifically referred to it that way because

15   of what that meant; this is what you want our marriage, our

16   relationship to be, and he said, no, this is not and our

17   marriage will remain intact.

18          And then he called me and he said Daniella is crazy,

19   that's why I didn't even talk to her for ten years, I don't

20   know where this is coming from, but then he said, you know,

21   you could -- look, you could be a junior member of the

22   sorority like Rosa Laura or you can be really committed like

23   Daniella, and I said, you think Daniella is more committed to

24   me -- than me, you think Daniella is more committed than me,

25   and he said, well, you're more committed to me but Daniella is

1    more committed to growth, and I said, Daniella is committed to

2    getting attention from you and having sex with you, and he

3    said, well, she can use that to grow.  And then he said, look,

4    you -- you're -- you have control issues and they interfere

5    with so many things that you do and your need to understand

6    everything really thwarts things in a way that you can't even

7    understand how much that thwarts things and then -- as if my

8    asking about why this is something I need to do for my growth

9    is a control issue and my need to understand and that that's

10   thwarting and inappropriate to my growth.

11            And then he communicated a completely nonsensical

12   sentence, the words of it did not make sense in a sentence and

13   I said, I don't understand the words that you just used, the

14   sentence that you said doesn't make any sense, and he said, I

15   know and I should talk to you about this all the time -- like

16   this all the time, like basically because my control is so bad

17   he should never buy into any of my control and not answer any

18   of the questions that I have, you know, and so -- and

19   basically unless like you're going to be -- you're going to be

20   willing to surrender to anything and everything, you're never

21   going to get through this issue, and I said, there has to be a

22   way that I can grow that isn't this, and he said, there isn't.

23            And in my mind I was like you just wrote a DOS

24   manual that said you can choose anything to grow, like the

25   master and surrendering is just one way, like you could study

1  baseball and make that your life work and you could still get

2  enlightened studying baseball, so how come all of a sudden if

3  you can get enlightened doing anything including studying

4  baseball, I have no way of growing except surrendering to a

5  group blow job, and I left very disturbed and he said when we

6  got off the phone -- he said right before I got off, he was

7  like, so you're -- and then he cut himself off and he said,

8  never mind.  And I thought that he was going to say, so you're

9  on board, like to go forward with whatever the recommitment

10  ceremony is for the sex recommitment ceremony but I got off

11  the phone and I called Daniella back and I was like --

12  Q    Ms. Salzman, I'm just going --

13  A    I'm sorry, I'm sorry.

14  Q    I'm going to go back and go through this a little bit.

15            When Daniella Padilla called you initially --

16  A    Yes.

17  Q    -- you said she used the words "us pleasuring him"?

18  A    Correct.

19  Q    Is that what you understood to be the sex act you were

20  describing --

21  A    Yes.

22  Q    -- which you envisioned the recommitment ceremony to be?

23  A    Correct, yes, this special thing we were going to do for

24  him in the recommitment ceremony that we needed to discuss now

25  so I didn't have an emotional reaction when the time came to

L. Salzman - direct - Hajjar                    1884

1  do it.

2  Q    You said you texted the defendant after that?

3  A    Yes, I did.

4  Q    What phone were you using to text him?

5  A    I had another prepaid phone that a friend had bought me

6  in Mexico to use to communicate with him.

7  Q    What phone was the defendant using, if you know?

8  A    I don't know specifically what phone it was, it was

9  another I think prepaid phone, it had a 34 country code I

10  believe.

11  Q    You testified the defendant said you can be a junior

12  member or you can be really committed like Daniella, is that

13  Daniella Padilla?

14  A    Yes, correct.

15  Q    What did you understand that to mean?

16  A    I understood it to mean that Daniella was on board for

17  anything and in this case anything sexual and that that was

18  the marker for whether you're really committed to growth and

19  that if I wanted to be seen as somebody who is really

20  committed to growth, that's what I needed to do to prove that.

21  Q    What is what you needed to do to prove that?

22  A    Anything including group sex or anything else that was

23  asked.

24  Q    You said after this conversation you spoke again to

25  Daniella Padilla?

1   A    Correct.

2   Q    What did you -- what was that conversation?

3   A    I said to Daniella, Keith said that that was not what was

4   asked or that he didn't instruct that, and Daniella said, I

5   told you that he didn't instruct that, and I said, but then

6   every other assumption that you made in the conversation

7   including that you had an understanding from somewhere outside

8   yourself implied that he did, and she said, you're right, I'm

9   sorry, that's my mistake, and she fell on the sword basically

10  for it, took responsibility for the whole thing.

11  Q    Did you believe her?

12  A    No, absolutely not.

13  Q    Did you speak to Nicki Clyne as well about the

14  recommitment ceremony?

15  A    I did because I was very upset, so I left the phone call

16  with Daniella and I called Nicki and Nicki said basically,

17  look, this is something you're really upset about and

18  obviously it's bringing up something for you and it would be

19  good to just focus on getting through your issues, like don't

20  think about what you don't know or any imaginary things that

21  may not happen, just focus on getting through your issues, and

22  I calmed down a little bit.  And then she said, maybe it's not

23  that you just have to do this -- that this is going to be --

24  because I was like this is the new thing, this is the new vow,

25  this is what we do.  She was like, maybe it's not a new thing,

1  maybe it's just something you have to do once, you know, and

2  once you do it, then you may never have to do it again, you

3  don't know.  And I was like I'm not going to think about it

4  but I went back to going, okay, what's the bite size piece

5  that I can deal with right now is just focusing on getting

6  through my issues regardless of what happens in any other

7  circumstance but in my mind I was going to the recommitment

8  ceremony to find out the truth if this really was what it was

9  supposed to be.

10 Q    Did Nicki Clyne frame the fact that you didn't want to

11 participate in this sex act as something -- as an issue you

12 had?

13 A    Yes, clearly an issue that I had because I was having

14 such an emotional reaction to it.

15 Q    So, what did you decide to do after this conversation

16 with Nicki Clyne?

17 A    I decided to believe Keith, hope that this was not what

18 it was and go to the recommitment ceremony.

19 Q    Where was it to be held?

20 A    It was in Chacala which is a small fishing village about

21 an hour and a half outside of Puerto Vallarta and we stayed in

22 a gated community there.

23 Q    In Mexico?

24 A    In Mexico, yes.

25 Q    Can you describe the trip; were there additional people

1   present there besides the defendant and the first line DOS

2   masters?

3   A    Initially there were, it was kind of like a -- Keith had

4   invited a number of different people to come so there were --

5   some of our friends and their families were there but it was

6   kind of like a work -- work vacation and a lot of the focus of

7   it was on marketing and enrollment strategies for NXIVM given

8   that most of our company had been effectively destroyed at

9   that point.

10  Q    So, what happened during the course of the trip?

11  A    So, a week before Easter they -- everybody left,

12  everybody who had been on the trip left except myself, Loreta,

13  Daniella, Nicki and Allison and we stayed to -- for this

14  recommitment ceremony and we moved from the separate houses

15  that we had all been living in into one house with Keith.

16  Q    Had Clare Bronfman and Marianna, among others, been some

17  of the people who had been present previously?

18  A    Yes.

19  Q    Were they aware of what was to take place?

20  A    No.  Clare was aware that we stayed or she was aware at

21  least some people were staying, I don't know if she knew

22  exactly who, but Marianna was not aware of any of it.

23  Q    So, what happened after that?

24  A    So, right before we had moved over to the house, to the

25  new house, I went over to talk to Keith and he wasn't there or

1  I couldn't find him and I couldn't find him anywhere and I

2  couldn't find Daniella anywhere and there was -- his room to

3  his bedroom door (sic) was closed so I assumed that they were

4  together and I was feeling very upset about this and talking

5  to Nicki about it and then we moved our stuff over to the new

6  house and when we came over to the new house he asked me if I

7  wanted to -- that he wasn't feeling well and he wanted to know

8  did I want to take a nap.

9         So, we laid down and took a nap and I calmed down a

10  little bit and felt a little bit better and a little bit

11  better with him and when we woke up he wasn't feeling well, he

12  communicated he wasn't feeling well and asked if I would bring

13  him some food and I went to the kitchen and I had brought him

14  some food.  I went back to the kitchen to make myself a

15  smoothie and Loreta came running into the kitchen and said the

16  police are at the door, they're here for Keith.

17  Q    What happened next?

18  A    I ran immediately to Keith's room and closed us in and

19  tried to protect Keith and basically I tried to get him to

20  leave, I was like you need to leave and I wanted him to get

21  out -- I wanted him to go out a window and he didn't do that

22  and he told me to call Jack and --

23  Q    Who is Jack?

24  A    Jack Levy, a mutual friend of ours, and I didn't have a

25  phone and I didn't know how to work his phone so I

1   communicated that and he was in the phone trying to find how

2   to call Jack and I was like -- honestly I just went into one

3   mode which is like protect Keith and I put us on lockdown in

4   this suite which was kind of ridiculous but I locked closed

5   all the doors, all the blinds and I could see outside the

6   window that federal police with machine guns and bulletproof

7   vests, some of them wearing masks were like surrounding the

8   property basically and I saw some of the women sitting across

9   on a patio and --

10  Q    When you say, "the women," who are you referring to?

11  A    Daniella and Allison and Nicki and basically they

12  surrounded the whole property and they searched the whole

13  property until they found that the only place they weren't

14  able to search was the room that we were in and they came to

15  the door and they were banging on the door and Keith was going

16  to leave to go into -- there was like a walk-in, another room

17  like a walk-in closet and he was going into the other room and

18  I was like I don't -- I don't know what to do and he said, ask

19  them if they have a warrant, and then he disappeared and went

20  into the other room.

21          And so I went to the door and I asked them if they

22  had a warrant and they said, open the door and we'll show it

23  to you, and I said, if you show it to me, I'll open the door,

24  like do that first, and we went back and forth a few times and

25  they said, look, you know -- they were asking me if there were

1   any other people with me and they were asking me if we had

2   weapons and the whole time I just kept thinking like they

3   could just shoot in this door and so I kept walking away from

4   the door but then going back like to talk to them but I just

5   kept considering that really like legitimately I might get

6   shot right now and I kept interacting with them because my

7   higher priority was making sure that Keith was okay.

8           And eventually they kicked down the door and they

9   held me on the floor with four machine guns pointed at me and

10  they were asking me is there anybody else in -- is there

11  anybody else here with you, like are you alone, who else is

12  here and I wasn't answering them and I expected -- this did

13  not happen but I was expecting that they were going to start

14  becoming aggressive, like I thought they were going to kick me

15  and when I thought that was going to happen I called out

16  Keith's name and at the same time in the room that he was in,

17  the walk-in, there was a door on the other side and they were

18  kicking down the door of that side but I called out -- I

19  wasn't aware of that completely right then, so I called out

20  his name and then he came out of the room and like for months

21  after that I just like always felt like that was such a

22  failure in myself that I hadn't been strong enough to not call

23  out his name, you know, like that I didn't have the character

24  to just protect him at all costs and I felt like I had let him

25  down and then -- but they -- basically he came out, they put

L. Salzman - direct - Hajjar                                   1891

1   him on the floor too, they handcuffed him and then when he

2   got -- they let him stand up and they let him see the piece of

3   paper and basically he called out to me what the allegations

4   were, that they were out of the Eastern District of New York,

5   that he was being accused of sex trafficking and I can't

6   remember what else and then they took him.

7   Q    Were you surprised, Ms. Salzman, that the defendant went

8   into the walk-in closet when Mexican law enforcement arrived?

9   A    I was so surprised.  I -- because the whole -- like my

10  whole -- everything we had done, like everything that I was

11  teaching in NXIVM, everything that I was -- that I believed

12  that I -- that I was learning in Jness and SOP and everything

13  that I joined DOS to build all centered around the fact that

14  we can live this principled life and that the highest

15  principles that you can live are principles of love and love

16  is when you do something lovingly without getting anything

17  back and that you can die in many ways in your life but dying

18  for a principle is like the most noble thing that you could do

19  and I always wondered like in a moment where there was a

20  situation, like if ever I was in, you know, this life or death

21  situation or something would I be able to uphold my principles

22  or would I just totally be a coward or would I forget and

23  choose myself over somebody else, you know, but like in a

24  situation -- like this was the most life or death situation

25  that I was in, I mean they didn't obviously hurt me but I

1    considered that they might.  I chose what I believed we had

2    been training for this entire time which was to choose love

3    over everything including the possibility of losing my life

4    and it never ever crossed my mind that if Keith and I were in

5    the situation that he wouldn't choose the exact same thing, it

6    never occurred to me that I would choose Keith and Keith would

7    choose Keith because they were there for Keith, they weren't

8    there for me and we all knew they were there for Keith so

9    there was no need to send me to shield him or negotiate with

10   them, he could have just protected all of us and just gone if

11   he was going to not go out the window.  Why, why would he do

12   that, and it was -- yeah, it was shocking and then I put it

13   aside, beat myself up over my lack of character and spent the

14   next three months focusing on how to help Keith but when I was

15   indicted and I had initially like three months very alone, you

16   know, with a lot of time to think, it was one of the things I

17   just kept going back to.

18              (Continued on next page.)

19

20

21

22

23

24

25

L. Salzman - direct - Hajjar                    1893

1   DIRECT EXAMINATION

2   BY MS. HAJJAR: (Continued.)

3   Q    What do you mean?

4   A    I mean that everything he taught us was this:  Society of

5   Protectors; this is what men are; this is what men do; this is

6   what is noble; this is when women don't do; this is what women

7   can't do, and then he didn't do it and I did it, and I was

8   like, I cannot -- I can't even -- I could not make sense of

9   how that could even be in any universe where he was who I

10  believed he was.

11            MS. HAJJAR:  Your Honor, I'm moving to a different

12  topic.  I know it's early, but it may be the right time for a

13  break.

14            THE COURT:  All right, let's take our midmorning

15  break.

16            All rise for the jury.

17            (Jury exits.)

18            THE COURT:  All right, witness may stand down.

19  Please do not discuss your testimony with anyone.

20            (Witness excused.)

21            THE COURT:  Please be seated.

22            Ms. Hajjar, about how much more do you have with

23  this witness?

24            MS. HAJJAR:  A few more hours.  I believe the direct

25  will continue after lunch, Your Honor.

Proceedings                    1894

1          THE COURT:  You are going to go beyond lunch, in

2   other words.

3          MS. HAJJAR:  Yes.

4          THE COURT:  All right.

5          And then the whole afternoon and perhaps --

6          MR. AGNIFILO:  Yes, I would think so --

7          THE COURT:  -- tomorrow?

8          MR. AGNIFILO:  Yes, I would think the rest of the

9   day and into tomorrow.  Probably not until lunch.  It

10  depends -- well, I shouldn't say that.  I would imagine about

11  three or four hours.

12         THE COURT:  All right.  And then you know who the

13  next witness is?

14         MR. AGNIFILO:  We do.

15         THE COURT:  And so just give me an idea since we're

16  already going to be at Wednesday, how long is your next

17  witness expected to take on direct?

18         MS. PENZA:  Your Honor, I believe she'll be about a

19  day and a half on direct.

20         THE COURT:  A day and a half?

21         MS. PENZA:  Yes, Your Honor.

22         THE COURT:  Let me then ask this:  Do you still

23  anticipate that this is about a six-week trial, or are we

24  working on something more robust?

25         MS. PENZA:  We are making all efforts to stick to

L. Salzman - direct - Hajjar                1895

1    our original estimate.

2              THE COURT:  All right, okay.  Thank you.  We'll take

3    ten minutes.

4              (Defendant exits the courtroom at 11:15 a.m.)

5              (A recess in the proceedings was taken.)

6              THE COURT:  All right, let's bring in the witness,

7    please.

8              (Witness resumes the stand.)

9              (Defendant enters the courtroom at 11:30 a.m.)

10             THE COURT:  All right, please bring in the jury.

11             (Jury enters.)

12             THE COURT:  Please be seated, everyone.  You may

13   continue your direct examination of the witness, Ms. Hajjar.

14   DIRECT EXAMINATION

15   BY MS. HAJJAR:  (Continued.)

16   Q    Ms. Salzman, you testified that at some point while you

17   were at DOS, you had been told a story about how DOS began.

18   A    Yes.

19   Q    What did that involve?

20   A    That I had understood that DOS began surrounding Cami's

21   suicide attempt and that as part of ensuring that she would

22   never do that again, she was asked to collateralize her life

23   and that that was especially effective, and what I had

24   understood was that Daniella, who was helping her, made the

25   decision to do that as well and then they invited friends.

L. Salzman - direct - Hajjar                 1896

1    Q    Daniella Padilla?

2    A    Yeah, that's what I had thought.

3    Q    As you understood it, was Camila the first DOS slave?

4    A    Yes.

5    Q    You testified, Ms. Salzman, that Camila was the youngest

6    sister of Daniella and Marianna, right?

7    A    Correct, yes.

8    Q    You testified that you were upset to hear of Marianna's

9    pregnancy.  Do you know what Camila's reaction to the

10   pregnancy was?

11   A    It was very -- it was especially upsetting and

12   devastating to Cami.  She told me that -- that she had shared

13   with -- that she told Keith --

14         MR. AGNIFILO:  I will object to this, Your Honor.

15         THE COURT:  Sustained.

16   BY MS. HAJJAR:

17   Q    Did you have a conversation with the defendant about his

18   relationship with Camila?

19   A    I had a discussion with Keith about Cami's reaction to

20   Marianna's pregnancy.

21   Q    And what did the defendant say about Camila's reaction to

22   Marianna's pregnancy?

23   A    That she always knew this was an option.  When she made

24   the vow, he had told her this was always a possibility.

25   Q    That what was always a possibility?

L. Salzman - direct - Hajjar                    1897

1   A    That Marianna might have a baby -- that he might have a

2   baby with Marianna.

3   Q    And before she made the vow, what did you understand him

4   to be referring to?

5   A    To DOS.  Like, when she agreed to be his slave and be

6   fully collateralized in this vow, she had known ahead of time

7   that there was a possibility that he might have a child with

8   Marianna and that she said she wanted to do this anyway.

9   Q    Did Camila become aware of the pregnancy after you did?

10  A    Yes, after.

11  Q    Did you continue to see Camila at meetings of the first

12  line DOS masters after this announcement?

13  A    To me or to her?

14  Q    Did you continue to see her at meetings?

15  A    After -- after when?

16  Q    Well, why don't you describe your observations of her at

17  meetings as time progressed in DOS.

18  A    I think in the early days when I -- when I -- my early

19  days of my enrollment in DOS -- and I had heard that Cami was

20  kind of new to being a part of that group, but I found her

21  much more engaged and enthusiastic, she was more connective

22  with me and happier; and then after she found out about

23  Marianna, it was very hard and she was not the same and she

24  started talking about wanting to go back to Mexico and wasn't

25  sure she wanted to stay.

L. Salzman - direct - Hajjar                    1898

1    Q    Did she, in fact, at some point, go to Mexico?

2    A    She did, yes.

3    Q    At some point after January 2017, did you have a

4    conversation with the defendant about a successor?

5    A    I did, yes.

6    Q    What did he tell you?

7    A    He told me that as long as he had been alive he had

8    always had something called a successor and a witness, and

9    this was the first time in his life that he didn't have people

10   in those roles because Pam had died and, for some reason, Cami

11   wasn't the successor.  My understanding -- I thought it was

12   because of the suicide attempt, and he didn't know if he was

13   going to be living, like, that he -- he didn't know if he had

14   a purpose anymore, like, he might -- his life purpose might

15   have ended without this.

16   Q    When the defendant said he had two roles, the witness and

17   the successor --

18   A    Yeah.

19   Q    -- what did you understand that -- him to be referring

20   to?

21   A    I didn't know what they meant and I didn't really ask any

22   questions about them.  I just thought that it was some kind

23   of, you know, mystical or energy thing that I didn't

24   understand, and even for me it seemed very out there, but I

25   didn't have any way to prove that it wasn't true, and if that

L. Salzman - direct - Hajjar                    1899

1   was something that he believed in, I wanted to respect that he

2   believed that this was a valid thing.

3   Q    You mentioned two --

4   A    It was weird for me.  I didn't understand it, but...

5   Q    You mentioned Pamela Cafritz and Camila.  What roles did

6   those two individuals occupy in this concept as it was

7   explained to you?

8   A    That Pam had been the witness and Cami had been the

9   successor.

10  Q    Do you have any understanding as to what that meant?

11  A    I really don't know what the witness was.  I mean, it was

12  never explained to me, but later my first-line DOS masters

13  communicated that the successor was somebody who -- had to be

14  somebody who was a virgin and that they were looking to find a

15  replacement for Cami, and then Nicki later shared that Cami

16  had had another relationship and that was why she wasn't the

17  successor anymore.

18  Q    What was the purpose of the virgin successor?

19  A    Honestly, I don't really understand.  Rosa Laura tried to

20  explain something to me once that I didn't understand.

21            MR. AGNIFILO:  Objection.

22            THE COURT:  Yes, the jury will disregard the answer.

23  BY MS. HAJJAR:

24  Q    Did you speak to the first line DOS masters about efforts

25  to find a successor for the defendant?

L. Salzman - direct - Hajjar                    1900

1    A    Yes.  They told me that there had been efforts to find a
2    successor.
3    Q    Who told you that there had been efforts to find a
4    successor?
5    A    I believe Daniella and Loreta and Rosa Laura.
6    Q    That was Daniella Padilla and Loreta Garza?
7    A    Yes.
8    Q    From the other first-line DOS masters, did you learn more
9    about what those efforts entailed?
10   A    That Daniella and -- or Loreta were exploring possibly
11   bringing or trying to get, like, sisters or cousins or people
12   they knew in Mexico to come to Albany.
13   Q    To do what?
14   A    To possibly fill that role.
15   Q    To fill what role?
16   A    The successor role.
17   Q    Did you learn from them what the requirements to fill the
18   successor role were?
19   A    Nothing beyond that they were a virgin.
20   Q    Did Rosa Laura Junco explain what the point of a
21   successor was to you -- the purpose?
22              MR. AGNIFILO:  I'm going to object, Your Honor.
23              THE COURT:  You may answer that.
24   A    That she thought somehow it was, like, a person that
25   would be so close to Keith that he would be able to, like,

L. Salzman - direct - Hajjar                    1901

1   experience things through them, and I didn't know if she

2   meant -- I couldn't conceptualize what she was talking about,

3   whether she meant experience things through them currently or

4   experience things through them, like, if he were to die, he

5   would be able to still experience things through them while

6   they were still here, and I couldn't make sense of what she

7   was saying.

8   Q    Did Rosa Laura express concern to you at any point about

9   these efforts to find a successor?

10  A    Yes.

11  Q    Can you explain what her concerns were?

12  A    She was concerned that -- she ran a girls' program for

13  teenage girls, an educational program, and she was concerned

14  that communications she had with Keith about the successor may

15  somehow link the girls' program to that.

16  Q    Can you explain what you knew about the girls' program?

17  A    That it was a school for girls that -- I think it started

18  for Rosa Laura's daughter and then other girls from Mexico

19  were brought, mostly from the Le Baron community, to

20  participate in an educational program that Rosa Laura was

21  running.

22  Q    Brought where?

23  A    To Albany where they came, you know, they were enrolled.

24  Q    What were they supposed to do here?  What were they

25  supposed --

L. Salzman - direct - Hajjar                    1902

1  A    Study.  Study.  It was school.  It was -- it was a girls'

2  school.

3  Q    Affiliated with NXIVM?

4  A    Yes.

5  Q    Ms. Salzman, I now want to direct your attention to the

6  early 2000s when you testified that you first met Camila and

7  her sisters.

8  A    Yes.

9  Q    Can you describe NXIVM's initial expansion into Mexico?

10  A    Yes.

11        I was involved in teaching a course in Michigan and

12  Edgar Boone took that course, he was a Mexican man from

13  Monterrey, and he had run a human potential school in

14  Monterrey before prior to taking our course and said that if

15  he liked the course he would want to close down his school and

16  work with us and bring our course to Mexico, which he did.

17  Q    And can you describe where you first met Daniella?

18  A    I met Daniella in Monterrey, Mexico in 2001 and I taught

19  an intensive down there at a museum, and she was one of the

20  students in my -- in my course.

21  Q    Where in Mexico was that?

22  A    It was in Monterrey.

23  Q    And do you recall approximately when that was?

24  A    It was sometime in 2001.  I just can't recall the

25  specific date.  It was after September.

L. Salzman - direct - Hajjar                    1903

1  Q     How old was Daniella when you first met her?

2  A     Seventeen or eighteen.

3  Q     What were your first impressions of her?

4  A     She was very bright and she, like, grasped the concepts

5  that was teaching in the course very quickly comparatively to

6  others, and most of the people -- I think almost all of the

7  team that I had taught or most of the people I had taught up

8  to that point had been adults, so she took to it much faster

9  and more enthusiastically than most of my students.

10         MS. HAJJAR:  Your Honor, may I show something to the

11  witness.  Mr. Reccoppa, may do that?

12         THE COURT:  Fine.  Go ahead.

13  BY MS. HAJJAR:

14  Q     Ms. Salzman, I'm showing you what has been marked as

15  Government's Exhibit 366.

16         Do you recognize this?

17  A     Yes, I do.

18  Q     What is it?

19  A     It's a picture of myself and the staff who worked at that

20  intensive that Daniella took at the museum.

21  Q     I'm also showing you what's been marked as Government's

22  Exhibit 367.

23         Do you recognize this photograph?

24  A     Yes.  It's a photograph of the students and the staff

25  from the intensive, same intensive, and Daniella is in the

L. Salzman - direct - Hajjar                    1904

1    photograph.

2              MS. HAJJAR:  Your Honor, the Government offers

3    Government's Exhibit 366 and 367.

4              MR. AGNIFILO:  No objection, Your Honor.

5              THE COURT:  All right, Government Exhibits 366 and

6    367 are received in evidence, published to the jury.

7              MS. HAJJAR:  Thank you, Your Honor.

8              (Government's Exhibit 366 and 367 received in

9    evidence.)

10             THE COURT:  Where was this again?

11             THE WITNESS:  This was in Monterrey, Mexico.

12             THE COURT:  Monterrey, all right.

13   BY MS. HAJJAR:

14   Q    And are you in this photograph, Ms. Salzman?

15   A    I am, yes.  I am second from the right in red.

16   Q    And where are you in -- where are you at this intensive?

17   Like, where this photograph was taken.

18   A    It was at a museum that we rented to space from to run

19   the course.

20   Q    What's the red object in the middle of this photograph?

21   A    It's an apple.  It was an art piece that was in the

22   museum, which I especially liked because of New York, and so

23   we all just took our picture in front of the apple.

24   Q    The individuals you've testified about, are any of them

25   depicted in this photograph?

L. Salzman - direct - Hajjar                    1905

1   A    Yes.

2   Q    Can you indicate them?

3         THE COURT:  You can circle.

4   A    Loreta and myself, obviously (indicating).

5   Q    And that's the person that's directly to the right of

6   that apple looking at the photograph?

7   A    Correct.

8   Q    I'm going to show you now what's in evidence as

9   Government Exhibit 367.

10        (The above-referred to exhibit was published.)

11  BY MS. HAJJAR:

12  Q    Can you tell the jury what this exhibit depicts?

13  A    This is the students and staff that were present in that

14  intensive, including Daniella.

15  Q    And, Ms. Salzman, we didn't cover this in great detail,

16  but what are the sashes around some individuals that are shown

17  in this photograph?

18  A    White sashes indicate the students in the course; yellow

19  sashes indicate coaches; orange sashes indicate proctors --

20  the proctors lead the curriculum and work running the programs

21  in the different centers; and my sash was green, which was a

22  senior proctor, so we were the higher level managers.

23  Q    Can you indicate where you are in this photograph?

24  A    Yes.  I'm down here at the bottom with Loreta

25  (indicating).

L. Salzman - direct - Hajjar                    1906

1    Q    And you are wearing a green sash?

2    A    Yes.

3    Q    Is Daniella depicted in this photograph?

4    A    Yes, she is.  Do you want me to --

5    Q    Yes.  Can you indicate where she is?

6    A    Sorry.  Wait, sorry, is there a way to erase that?

7    Q    Yes.

8    A    It didn't --

9              THE COURT:  Go ahead, try again.

10   A    Above.  The one above (indicating).

11   Q    Who is the man that's directly to her left?

12   A    Omar Boone.

13   Q    What is he wearing?

14   A    An orange sash.  He's a proctor.  And the man next to him

15   is Edgar Boone, who also had a green sash at that time.

16   Q    Can you describe what's hanging in the leftmost side of

17   this photograph?

18   A    In the back?

19   Q    Yes.

20   A    In the back was a wall indicating the progression of

21   ranks of the sashes, and it's on the right, too.  It's just

22   not as clear in the photo.  So it shows the progression,

23   lowest rank to highest rank, from left to right.

24   Q    Who was the highest rank at this intensive?

25   A    Edgar.

L. Salzman - direct - Hajjar                 1907

```
 1   Q    And after that?
 2   A    Myself.
 3   Q    Did there come a time where Daniella's parents proposed
 4   having Daniella stay or go to the community -- to the NXIVM
 5   community?
 6   A    Yes.
 7   Q    Can you describe how that happened?
 8   A    Sorry.  Her father called me and basically said that she
 9   was supposed to go to Switzerland to study abroad for a year
10   but wanted to know if she could come to Albany to study with
11   us instead.
12   Q    What was her father's first name?
13   A    Hector.
14   Q    And her mother?
15   A    Adriana.
16   Q    And the first names of her siblings?
17   A    Marianna, Camila, and Adrian.
18   Q    Was Marianna the oldest sibling?
19   A    Marianna is the oldest, yes.
20   Q    And Daniella was the second oldest?
21   A    Yes.
22   Q    And the third and fourth sibling, what orders were they?
23   A    Adrian and then Camila was the youngest.
24   Q    What happened after you spoke to Daniella's father?
25   A    Well, what he was proposing was something we had never
```

L. Salzman - direct - Hajjar                    1908

1    had.   There wasn't a work study program for students in that

2    way, so I brought the request -- I told him I didn't know that

3    that would be possible, that I brought the request to Pam

4    Cafritz to bring to Keith, and I heard back that that was

5    something that they were willing to do and that Keith wanted

6    to meet her.

7    Q    How did Daniella arrive at the intensive in the first

8    place?  What was her introduction to NXIVM?

9    A    Her parents enrolled her.

10   Q    And her parents had attended intensives before that?

11   A    Correct.

12   Q    How many?

13   A    At least one.  I remember seeing them on two occasions,

14   but it could have been that they took a five-day and came back

15   for the second half, or they could have been repeating, but I

16   saw her parents on a few occasions before I met her.

17   Q    Were Daniella's parents enthusiastic about NXIVM and ESP?

18   A    Yes.  Very.

19   Q    Were her parents enthusiastic about Daniella moving to

20   the community?

21   A    Yes.

22   Q    Did Daniella, in fact, come to live in the NXIVM

23   community?

24   A    Yes, she did.

25   Q    How old was she at the time?

L. Salzman - direct - Hajjar                1909

1   A      Seventeen or eighteen.

2   Q      At some point, did her siblings join her?

3   A      They did, yes.  Marianna first and then the other two.

4   Q      And where did her family live within the NXIVM community?

5   A      They had an apartment in Cohoes, which is a town, like,

6   just one or two towns over from where the rest of us lived in

7   Clifton Park.

8   Q      Did she eventually move?

9   A      They did.  They eventually moved to Clifton Park into

10  Knox Woods, the development where a number of us were living

11  at the time.

12  Q      How old were Adrian and Camila at the time that they

13  moved to the community?

14  A      I'm not a hundred percent sure, but I think Camila was

15  maybe 14 and Adrian 16.

16  Q      Did Adrian have a nickname?

17  A      Fluffy.

18  Q      Were they in high school?

19  A      Yes.  I believe they were in high school.  I think

20  originally they enrolled in Cohoes High School.  I'm not sure

21  if they transferred or not.  I think Adrian graduated and Cami

22  didn't.

23  Q      Did Camila stay in high school, as far as you knew?

24  A      I don't think she stayed in high school, no.

25  Q      What was your understanding of what Daniella was to be

L. Salzman - direct - Hajjar                    1910

1    doing in the NXIVM community?

2    A    Initially what I thought she was going to be doing was

3    coming to do, like, an internship with us or similar to, like,

4    what her work -- her study abroad would be, that she would

5    come and study with NXIVM instead, so I thought that she would

6    become a coach and study the ESP curriculum, similar to the

7    way everybody else did but maybe in a more condensed or

8    expedited version -- like, version of it, so that she would

9    have, like, full-time school like she would have had abroad.

10   Q    Is that what happened?

11   A    No.

12   Q    What happened?

13   A    I'm not sure exactly what happened, but she started

14   spending a lot of time with Keith and working with him.

15   Q    Working with him how?

16   A    She was doing research for him and helping him by reading

17   books on a variety of different subjects and summarizing

18   them -- like, distilling them down to the most relevant or

19   valuable aspects of the books to save him the time of having

20   to read the whole book to get what the information was out of

21   it.

22   Q    So she distilled the concepts in the book to a more -- to

23   an easier format or something?

24   A    That's what I understood she was doing.

25   Q    Was this for the defendant, these reports of these books?

L. Salzman - direct - Hajjar                    1911

1   A    Yes.  She was helping him, was my understanding, in doing

2   research for him.

3   Q    What kind of subjects were these books on?

4   A    I don't know all of the subjects.  I remember one in

5   particular, she was doing research on cryogenics because she

6   had learned some interesting things about it that she shared

7   with me, but I know, like, she -- at one point she was doing

8   calculus problems -- I don't know if she was doing that on her

9   own or for him, I know she later did that on her own -- but I

10  think there were a variety of different subjects that she was

11  studying.

12  Q    And the output, the thing she was creating, was that so

13  that the defendant didn't have to read the book?

14  A    Yes.  And that he could use the information for whatever

15  he was working on.

16  Q    Did she spend time with the defendant, as you observed

17  her?

18  A    Yes.  I observed that she was spending time, and it

19  seemed like she was spending more time than I had observed

20  because there was a familiarity and comfortability [sic] that

21  I didn't know when it happened.

22  Q    Can you describe that?

23  A    Yeah.  I mean, in the early days of, like, when I first

24  met Keith and he was living at 3 Flintlock, I experienced it

25  to be more of like an open-door policy where people were

L. Salzman - direct - Hajjar                    1912

1  always coming and going there was a lot -- we spent a lot of

2  group time together; and around the time that Dani came and

3  Marianna, I think there were other things surrounding it, but

4  it became less and less like that, and Dani started hanging

5  around a lot and it became -- or -- I started seeing her when

6  I would go over to Flintlock to see Keith, she would be there,

7  and it became clear to me that they were spending a lot of

8  time together.  She started to lose weight and wear more

9  revealing clothing.  I remember she was wearing, like, a lot

10  of miniskirts and things like that, so I started to assume

11  they were -- they were or at some point they would have a

12  relationship.

13  Q    What was Marianna doing at this time?

14  A    I'm not sure exactly about the time frame of everything,

15  but Marianna, when I met her, wanted to be a professional

16  tennis player and Pam befriended her and the two of them were

17  spending a lot of time together doing athletic stuff, and I

18  think Keith was advising them or coaching them on how to coach

19  Marianna to improve her tennis.

20  Q    And this was Pamela Cafritz?

21  A    Yes.

22  Q    What about Adrian?  What was he doing within the

23  community?

24  A    Adrian went to high school at first, and then at some

25  point he went to live with Mark Vicente and some other men in

L. Salzman - direct - Hajjar                1913

1   the community -- Ben Myers and Jim Delnegro -- but he was

2   studying to be part of Mark's video team so he was learning

3   filming and video editing.

4   Q    And what about Camila?

5   A    Camila came to work in the rainbow program, which was the

6   multicultural children's educational program and she was a

7   Spanish teacher there.

8   Q    Daniella and her siblings, did you have an

9   understanding -- were they Mexican nationals?

10  A    That was -- yes.

11  Q    Did you have an understanding of their visa status within

12  the United States?

13  A    Initially, I didn't, but during this time, there were --

14  we had started teaching classes in Mexico and a lot of

15  Mexicans were coming to the United States and taking a lot of

16  courses with us, and so I started to learn that there's a

17  certain amount of time that the Mexicans had to spend in

18  Mexico to be able to qualify for their visa, so they were

19  allowed to come to the states but only for a certain amount of

20  time and there were restrictions.

21        So all the Mexicans that I was interacting with

22  besides these -- Daniella and her siblings -- were having visa

23  constraints that I didn't see them having, they never went

24  back; and so I started asking Keith, like, What's going on

25  with their visas, and he said, Don't worry about it, it's

L. Salzman - direct - Hajjar                    1914

1   being taken care of.  And then I went and asked Pam about it

2   and Pam said, Well, they are getting visas through the

3   father's, it's coming, so I thought that they were doing that

4   or in the process of doing that.

5   Q    Did you later learn anything about Daniella's status in

6   the United States?

7   A    Yeah.  There was some sort of incident where Marianna was

8   upset about something and I was called and asked to help and I

9   think Karen Unterreiner was involved and Karen called Daniella

10  over to speak to Monkey -- to speak to Marianna, and Marianna

11  basically was saying, I don't want to talk to any of you, and

12  threatened that she was going to call the police if Dani

13  didn't leave, and she did end up calling the police but

14  hanging up.  And I can't remember if they called back or they

15  came, but we ended up having to deal with the fact that she

16  had made the call, but I learned that the reason that call was

17  threatening was because it put -- Daniella was not

18  legitimately there; she was -- her status was illegal.

19  Q    Did you become aware at some point that Daniella had made

20  a land border crossing?

21  A    Yes, I did.  There was a party that I attended at my

22  mom's old house at 7 Grandhill Road in the early 2000s -- I

23  can't quite recall the date, but at the party, I was there, my

24  mom, Keith, Kristin Keefe, Kathy Russell, Daniella, and there

25  were others, I just can't quite recall who, but Kristin Keefe

L. Salzman - direct - Hajjar                    1915

1    shared that she and Kathy had brought Dani into the U.S.

2    through a border -- a Canadian border -- the Canadian border.

3    Q    Between approximately 2004 and 2006, did Daniella do work

4    for the defendant?

5    A    I think so.  Along the lines of what I was saying -- what

6    I was sharing.

7    Q    And did there come a time where the defendant stopped

8    speaking to Daniella?

9    A    Yes.  Somewhere between 2008 and 2010.  I'm not exactly

10   sure when -- the exact time.

11   Q    And can you explain what happened?

12   A    He told me that they had had a fight, she had come into 3

13   Flintlock -- so into his house without being invited, just

14   walked in -- and he closed himself in the bathroom and they

15   were, I guess, arguing or something through the door and that

16   at one point he had given her -- she wanted to know something

17   and he said to her:  If I tell you this information, I'm never

18   going to speak to you again.  Do you want to know this?  And

19   she insisted that yes, she did want to know this and so he

20   wasn't speaking to her.

21   Q    At some point, were you approached about meeting with

22   Daniella to coach her in some way?

23   A    Yes.  A few separate times.  Closer to 2008, Karen had

24   asked me if I would help her to meet with her --

25   Q    Who is Karen?

L. Salzman - direct - Hajjar                          1916

1   A     Karen Unterreiner.

2         -- and so I had had a few meetings with her in those

3   years; and then again later Karen approached me as well,

4   closer to 2010, to help her again; and then Keith approached

5   me finally to help her.

6   Q     Did you learn anything about Daniella's relationship with

7   the defendant?

8   A     I did.

9         So closer to 2008, I recall two times that she came

10  over to my house and was upset and communicated that she was

11  asking Keith whether they would have a relationship in the

12  future and he wouldn't give her an answer about it and he

13  wanted her to go work that out with somebody else, and that

14  she had asked him if he felt good with her sexually and that

15  he had told her no, and she asked him, did he feel good with

16  anybody sexually and he had told her yes, and so she was --

17  this was upsetting to her.

18        And then another time she told me about Keith had

19  invited her -- or told -- he wanted her --

20        MR. AGNIFILO:  Your Honor, I'm going to object to

21  this, Your Honor.

22        THE COURT:  Yes, let's go to the next question.

23        MS. HAJJAR:  Your Honor, may we have a sidebar on

24  this issue?

25        THE COURT:  Sure.

L. Salzman - direct - Hajjar                    1917

1          THE WITNESS:  Your Honor, may I step out briefly to

2    use the bathroom?

3          THE COURT:  Yes, of course.

4          (Witness excused.)

5          (Sidebar.)

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Sealed Sidebar                                              1919





L. Salzman - direct - Hajjar                    1921

1          (In open court.)

2          (Witness resumes the stand.)

3          THE COURT:  All right, you may ask your question.

4   BY MS. HAJJAR:

5   Q    Ms. Salzman, how old was Daniella when she told you about

6   her relationship with the defendant, approximately?

7   A    She was in her 20s.  I'm not sure, 22, 24.

8   Q    And when she told you these things about her

9   relationship, was that prior to when the defendant approached

10  you about a plan regarding Daniella?

11  A    Yes.

12  Q    And what did Daniella tell you just before the break?

13  What did Daniella tell you about her relationship with the

14  defendant?

15  A    The question that I --

16  Q    Yes.

17  A    That Keith had wanted her and Marianna to both take a nap

18  with him, and she -- this was upsetting, and I had understood

19  that -- it to be, like, a naked nap, was how I interpreted it.

20  Q    Did you understand, then, there to have been some sexual

21  interaction with Daniella and the defendant at this time?

22  A    Yes.

23  Q    After that point, did the defendant approach you with a

24  plan regarding Daniella?

25  A    Yes, he did.

L. Salzman - direct - Hajjar                    1922

1   Q    Okay.  And what was the plan as to Daniella?

2   A    So this was later, like, in two thousand -- closer to

3   2010.  He called me on the phone and said that there was a

4   project and I should only take it if I really wanted it, and

5   he told me that there were various problems with Daniella;

6   that she had been -- among other things, she had been stealing

7   from the family -- she wasn't working, didn't do the work that

8   she had committed to do, she had said that she was going to

9   lose weight but instead she had gained 40 pounds, and that she

10  was stealing from the family -- stealing food and locking the

11  family out of the house, these various things -- and so what

12  he proposed was that Dani be given an ultimatum that she go in

13  her room with no distractions and come up with a plan for how

14  to fix this or -- and that -- or be sent back to Mexico.

15  Q    These issues the defendant raised to you, those were

16  things that he communicated to you?

17  A    Yes.

18  Q    And when the defendant approached you about this project,

19  as you described it, was this after he had stopped speaking to

20  her for some period of time?

21  A    Yes.

22  Q    As you understood it, if Daniella didn't stay in the

23  room, she would be sent back to Mexico.

24  A    Yes.  That if she didn't meet the conditions of

25  satisfaction to come out of the room and came out of the room,

L. Salzman - direct - Hajjar                1923

1   she would be sent back to Mexico.

2   Q    Did you understand what the conditions of satisfaction

3   were, as you put it?

4   A    I understood that it was a plan that -- to rectify what

5   she had done, but when I asked specifically, like, what her

6   breach was, Keith told me she knew what she did, she knew what

7   it was.

8   Q    When you say "breach," do you mean an ethical breach,

9   like the concept you talked about before?

10  A    Yes.

11  Q    Did the defendant acknowledge a relationship with

12  Daniella?

13  A    No.  We never discussed it.

14  Q    Did you want to participate in this project?

15  A    I told him, no, I didn't want to take the project, but I

16  asked him, Why do you think that I should take the project?

17  Q    What did he say?

18  A    And he said that, Someday you might have a child --

19  which, in my mind, was someday we might have a child, because

20  that was the whole plan that we were going to have children,

21  and at the time also I was working in Mexico and kidnapping

22  was a thing.  Like, we knew a number of people who had been

23  kidnaped or knew family members who were kidnaped, so he said,

24  Someday you might have a child and somebody may call you on

25  the phone and say to you, I have your child, like, basically I

L. Salzman - direct - Hajjar                    1924

1   kidnaped your child and I'm going to kill them if you don't

2   give me a million dollars and you're not going to know what to

3   do, so you can learn to work with that personality now or you

4   can deal with it then.

5   Q    In the context of what he was telling you, who was the

6   personality that he was describing?

7   A    Daniella, that Daniella is this type of personality

8   that's manipulative to this degree and has, like, a

9   sociopathology, and you can learn to work with that now or you

10  may someday be in a situation where you are not going to be a

11  good mom to our kid basically.

12  Q    Did you believe him?

13  A    Yes, I did.

14  Q    What happened after that conversation --

15  A    And especially at that time, too, it was -- I thought

16  that Keith understood everything about people's

17  psychodynamics; if Keith observed something and I couldn't see

18  it, it was because I didn't understand and needed to learn

19  something.

20  Q    So you have a different perspective now?

21  A    Well, I didn't observe directly the things that he was

22  describing from Daniella, and I don't think that the things

23  that were listed -- that she didn't complete book reports;

24  that she gained weight instead of losing it; and that she was

25  stealing food from her family when she was completely

L. Salzman - direct - Hajjar                    1925

1  dependent on her family and an illegal alien in a country

2  where she couldn't legitimately work -- raise to the level of

3  going back to Mexico if she doesn't address them.

4  Q    You mentioned book reports.  Are these the distilled

5  concepts from books that you described earlier?

6  A    Correct, yes.

7  Q    In other words, it's not a high school book report where

8  the purpose is for the student.

9  A    Correct.  It was her helping Keith, like, as a research

10  assistant.

11  Q    Did you meet with the family after this conversation with

12  the defendant?

13  A    I did.  He told me -- Keith told me that he was going to

14  call me back -- I agreed to take the project based on what he

15  laid out, he told me he was going to call me back, and then he

16  called me back and told me that the family wanted to go

17  forward with this plan and the parents came over to my house

18  and met with me.

19  Q    The defendant told you that the family wanted to go

20  through with this plan?

21  A    Yes.

22  Q    What happened when you met with the family?

23  A    Hector and Adriana came to my house and they told me that

24  they felt that this was a good option because Daniella -- they

25  didn't know how to handle her, basically; that they felt that

L. Salzman - direct - Hajjar                1926

1    it had gotten to the -- it had gotten out of control and they

2    felt responsible for her being this way, and so they thought

3    that this was a good option and that they were going to

4    present her, basically, with the ultimatum that she would go

5    into her room until she came up with something that was

6    acceptable to them and -- or go back to Mexico.

7            And then there was an additional conversation that I

8    had with Keith before they actually presented the plan to her

9    that he said the family was concerned that she might extend

10   the time in the room or view it as a type of vacation; and so

11   in order to make it less comfortable and to inspire her to

12   want to get out of the room quickly, they were going to remove

13   anything comfortable from the room.

14           So the idea was that she would go into a room with

15   nothing in the room except her bed -- like, bed on the floor,

16   paper and pencil, and nothing else -- her clothes, you know,

17   and not come out until she had met these conditions of

18   satisfaction.

19   Q    The defendant told you that the family had that concern?

20   A    Yes.

21   Q    What was the family's -- the members of -- what was their

22   demeanor as they were discussing this with you?

23   A    That they seemed sad and ashamed about their

24   participation, but that they felt that this was an important

25   thing to go forward with, but there was trepidation; they

L. Salzman - direct - Hajjar                    1927

1  weren't -- they were going to go forward with it, but they

2  didn't seem -- they did not come across to me as super

3  confident and secure in the choice or understanding of how

4  their actions really related to what was going on with her and

5  how this would fix that.

6  Q    Did the defendant appear confident and secure in that

7  choice?

8  A    Yes.

9  Q    Did the defendant ask you to keep this project a secret?

10 A    Yes.  He told me not to tell anybody about it, not to

11 discuss it with anyone.

12 Q    What about your communications with him about it?

13 A    When I would check in with him about it, he would suggest

14 I come over and check in in person.  He told me to:  Better

15 not talk on the phone, come over.  Do you want to come over?

16 Q    As to the initial plan, how long was Daniella supposed to

17 stay in the room?

18 A    Keith told me initially he thought it would be, like, a

19 weekend but that she might extend it to a week or ten days.

20 Q    And what happened?

21 A    She stayed there for 18 to 24 months, somewhere in there,

22 a year and a half to two years.

23 Q    Can you describe how Daniella entered the room?

24 A    Yeah.  Well, she -- so the parents gave her this option,

25 she decided she did want to go -- that she didn't want to go

L. Salzman - direct - Hajjar                    1928

1   back to Mexico, so she agreed to go into the room, and I think

2   she also seemed sad about what was being presented, but she

3   did go in.

4   Q    Was it your understanding that if she went to Mexico, she

5   would no longer be able to have contact with her family?

6   A    At some point, that became what my understanding was and

7   hers.  I think initially it wasn't, but I think it became

8   that; that if she went back, she believed that they would --

9   she would lose her relationships with her family, and she was

10  very concerned about that, losing their love, which to her was

11  both the relationship with them and the love of their

12  relationship and their support, which she had never lived

13  without -- their financial support.  She had never lived on

14  her own without that.

15  Q    What was in the room?

16  A    A bed on the floor and that's it.  I mean, she had paper

17  and -- access to paper and pen, pencil, and she was brought

18  food three times a day.  She was told that she was allowed

19  to -- she could request food from her family members and they

20  might honor those requests or not; she could communicate with

21  them through notes; and the family said they were not going to

22  communicate with her -- later some of them did, but that was

23  it.

24  Q    Was any furniture in the room?

25  A    No.  Just the bed on the floor, mattress on the floor.

L. Salzman - direct - Hajjar                    1929

1    Q    Was Daniella permitted to leave the room?

2    A    Only -- she was permitted to go in her room and the

3    bathroom, which was a shared bathroom with the family.

4    Q    Aside from her room and the bathroom, was she allowed to

5    leave?

6    A    No, not if she wanted to stay in the United States.

7    Q    And did you tell her that she would be -- that she would

8    have to go to Mexico if she left?

9    A    Yes.  I told her that, This was the agreement that you

10   made, that you would complete this.  If you want to stay, you

11   complete this.

12   Q    And did the defendant tell you that?

13   A    Yes.  And he told me to tell her that she didn't have to

14   stay in the room, she could just go back to Mexico.

15   Q    Did Daniella have any human contact during the time that

16   she was in the room?

17   A    Only with me and then later with some -- with her

18   siblings at the end, only towards the very end.

19   Q    What did she do during the day?

20   A    Different things:  She -- she wrote to Keith every day,

21   sometimes multiple times a day; she did exercise; she cleaned

22   her room and the bathroom; she thought.  Sometimes she did

23   propose things that she thought could rectify whatever her

24   infractions were that she had, you know, done or allegedly

25   done, and that she -- and a lot of times she watched her

L. Salzman - direct - Hajjar                    1930

1   sister outside the window, but sometimes she told me she
2   wasn't doing anything and she had various -- there were
3   different things she was going through in the room.  She had
4   different health struggles in the room, and emotionally it was
5   very difficult for her at times.  Sometimes she was more
6   resolute about being there.
7   Q    The things that Daniella proposed, did you bring them to
8   the defendant?
9   A    Yes.
10  Q    What did he say?
11  A    It depended on the thing, but, I mean, there were
12  different times where I would spend with her and I thought
13  that we had made progress and he told me that she had just
14  been manipulating me for hours and I couldn't see it.  Other
15  things that were proposed he said she was trying to get around
16  having to really do what it took to fix it.  Certain things
17  she was expressing he told me were temper tantrums, but that a
18  lot of this was just game-playing and that it was very
19  difficult for him, basically, that I wasn't able to negotiate
20  this or figure this out and that the family also was not able
21  to negotiate this.  You know, so I felt that somehow I was
22  screwing it up in my ineptitude and my failure to be able to
23  see what was going on, which he seemed to think was so obvious
24  was thwarting the process somehow.
25  Q    The things that the defendant said about Daniella

L. Salzman - direct - Hajjar                1931

1  game-playing, did that correspond to what you were observing?

2  A    It didn't initially, and then I came to see everything

3  she was doing as game-playing, and I -- it's my experience

4  that the family did, too.

5         At some point, almost everything that initially we

6  had thought were her efforts and we had raised as her making

7  legitimate attempts to meet the requirements, later, all of

8  us, almost everything she said, we were like, No, no, that's

9  not the measurable thing; no, you're not doing what's

10  required, no, and we saw everything that she was doing at the

11  end as game-playing.

12  Q    You said that Daniell's siblings brought her her food.

13  A    Yes.

14  Q    Could they interact with her when they did that?

15  A    No.  The agreement was that they were not supposed to

16  interact with her.

17  Q    When you say "the agreement," what are you talking about?

18  A    They made an agreement with Dani that she was going to go

19  in and they weren't going to communicate with her until she

20  came out, but when Adriana, the mom, was communicating with

21  her, Keith would tell me that that was not what was agreed

22  upon and that Adriana was going back on what she said and that

23  she was thwarting the process.

24  Q    So when you say "the agreement," are you referring to the

25  fact that if Daniella left the room, she would have to go back

L. Salzman - direct - Hajjar                          1932

1    to Mexico?

2    A     Yes, and the conditions of that, which were that she was

3    to go into the room with no contact with anybody but me.

4               (Continued on the following page.)

Salzman - Direct - Hajjar                    1933

1    BY MS. HAJJAR:

2    Q    Was Daniella sad?

3    A    Often she was sad, yes.  It was really -- it was

4    really -- those relationships were very important to her,

5    and she -- it was very hard for her to not have

6    communication with her family during that time.  She

7    expressed that she didn't know how to heal things if she

8    wasn't interacting with them, and so she felt like she

9    didn't know how to make things better without the

10   relationships, and she didn't know if she could be okay or

11   survive without the relationships emotionally or materially.

12   So that all was very upsetting to her.

13   Q    Did she tell you she wanted to leave?

14   A    Yes.

15   Q    Did she tell you she was afraid?

16   A    Yes.

17   Q    Of what?

18   A    She was afraid of losing the relationships and she was

19   afraid of what would happen if she went back to Mexico.  She

20   was afraid if she went back to Mexico, that she would lose

21   the relationships.  And she was afraid that she wouldn't --

22   didn't know how to survive without her family.  And also

23   she, I think, viewed failing, this is -- as she didn't want

24   to lose the relationship with Keith either and she still

25   very much wanted that.

Salzman - Direct - Hajjar                    1934

1   Q    Did you threaten her that if she left she would be sent

2   to Mexico?

3   A    Yes, I did.

4   Q    And during this period of time, did you report to the

5   defendant?

6   A    Yes.  Every time I interacted with her, I did report to

7   him.

8   Q    And what did he tell you in these reports?

9   A    Similar to what I said before.  I mean, that, you know,

10  sometimes he would be thinking about what -- what should be

11  done.  And sometimes I would ask him for direction.  Often

12  he would say that I couldn't tell her what to do, but that

13  there were these markers we needed to look for and

14  everything that we presented as a marker was not a marker

15  and not being a marker and was just more game playing.

16  Q    Can you explain what that means?

17  A    Yeah.  That there were measurable things that we were

18  supposed to be looking for.  And like at one time he was

19  like, Well, if I was in the room I would be writing letters

20  to everybody, you know, and doing things.  But she was

21  writing letters and she was also told that she wasn't

22  supposed to be communicating with anybody.  So there are

23  contradictory signals, but she was writing him every day,

24  sometimes multiple times a day.  And often he didn't even

25  read those letters.  He asked me to hold the letters.

1              So I don't know how he would have known if there

2      were markers if what I was communicating were not markers

3      and there were these markers that could have been seen.  And

4      she was trying to write to him consistently, and he wasn't

5      looking at what that was, how he would know if really she

6      met the markers.

7      Q    What happened to the letters that Daniella wrote to the

8      defendant while she was in the room?

9      A    Well, initially, me or her family members would

10     photocopy them for her to keep a copy and then I would take

11     a copy to Keith, but he asked me to hold them.  So I held

12     most of them.  And he gave some to Nicky after he was -- or

13     after he left -- or when he left for Mexico.  And then after

14     he was arrested, I photocopied and made them available.

15     Q    Were some of those letters unopened?

16     A    Most of them were unopened.  So I opened them, you

17     know, and provided them as material.

18     Q    How long did Daniella stay in the room?

19     A    More than 18 -- around -- or more than 18 months.  It

20     could have been up to two years.  She was in there

21     forever -- I mean, a really long time.

22     Q    How often did you visit her?

23     A    At first I visited her every day.  And then I went

24     less, once a week.  And there were times, you know, and then

25     less and less and there were times where I didn't go,

1   honestly for -- for a month or more.  Like I -- I was really

2   mad at her for not figuring out whatever she was supposed to

3   be doing to end this for herself and for all of us, and I

4   was mad because I thought she was playing games and being

5   manipulative with me and I couldn't figure that out.  And I

6   felt mad that now I was in a position to fail again and be

7   the reason that nothing can move forward, or that I'm blamed

8   for the bad things that are happening in the community or

9   for the fact that we can't have a relationship or kids.  And

10  honestly, I was very incredibly discompassionate with her

11  and I was unkind often.  At time I punished her.  You know,

12  it was terrible.

13  Q    How do you feel about participating in this now?

14  A    I think it's horrendous.  I -- of every -- of all the

15  things that I did in this case and the crimes that I

16  committed, too, I think that this is the worst thing that I

17  did.  I -- I don't know what to say.  I kept her in her room

18  for two years, and I didn't even go visit her most of the

19  time.  And I wasn't that nice to her and it's awful.

20         And the family, they were close as a family when

21  they came to us.  And those relationships were incredibly

22  severed through this and other things that happened.  And I

23  don't know how you can ever recover from that.  And I

24  don't -- it's something I really struggle to come to grips

25  with and figure out how to fix.  I think it's terrible.

1   Q    Did the defendant give you instructions about what you

2   were permitted to tell Daniella?

3   A    I wasn't permit to tell her anything.  He told me not

4   to tell her.  I couldn't tell her what to do.  I wasn't

5   supposed to give her any information about what was going

6   on, on the outside with anybody.  She asked a lot of

7   questions and he told me not to answer them.

8   Q    Did the defendant ever tell you that Daniella should

9   remain in the room for longer?

10  A    Yes.  They had an agreement that they both told me

11  about, that -- I don't know what the condition of the

12  agreement was, but that she was not going to cut her hair,

13  and this was like an agreement that they had.  And she cut

14  her hair while she was in the room.  And he told me that she

15  should come up with a way to fix that, and that a way to fix

16  that was staying in the room until the hair grew back.

17  Q    How long was her hair?

18  A    Long.  Like down her back.  I mean, maybe close to her

19  butt and cut it up to shoulder length.  She -- I mean, and

20  she told me that that meant staying in room for three years,

21  like that had taken three years to grow her hair that long,

22  and she didn't want to stay in the room for three years, you

23  know.  And of course she didn't want to stay in the room for

24  three years, but...

25  Q    Did the defendant tell you to tell Daniella that she

Salzman - Direct - Hajjar                    1938

1   was to stay in the room until the hair grew back?

2   A    Yeah, as an option, that that was a way to fix that.

3   Q    Did you tell her that?

4   A    I did.

5   Q    What did she say?

6   A    She didn't want to do that.

7   Q    Did the defendant ask you to take photographs of

8   Daniella at any point?

9   A    Yes.  He asked me to take photographs twice.  Once when

10  she cut off the hair because he wanted her to know that he

11  was going to see it, and he thought that she would feel bad

12  if he saw it and that would somehow inspire her to change

13  something.  And another time he thought she was lying about

14  her weight loss, and so he wanted me to take a picture to

15  see if she was.

16       MS. HAJJAR:  Can I show to the witness alone,

17  Your Honor?

18  Q    Ms. Salzman, I'm showing you what has been marked for

19  identification as Government's Exhibit 1244.

20       Do you recognize this exhibit?

21  A    I only see the e-mail -- the e-mail subject.  I don't

22  know if there's something attached.

23       Yes.

24  Q    What is it?

25  A    It's the e-mail that I sent.  It's an e-mail that I

Salzman - Direct - Hajjar                 1939

1   sent to Keith and a picture of Dani after she cut her hair.

2          MS. HAJJAR:  Your Honor, the Government offers

3   Government's Exhibit 1244 into evidence.

4          MR. AGNIFILO:  No objection.

5          THE COURT:  All right.  Government's Exhibit 1244

6   is received into evidence and published for the jury.

7          (Government's Exhibit Number 1244 so marked and

8   received in evidence.)

9          (Government's Exhibit Number 1244 is published to

10  the jury.)

11  BY MS. HAJJAR:

12  Q    Ms. Salzman, who wrote this e-mail?

13  A    I did.

14  Q    And who is it to?

15  A    To Keith.

16  Q    When was it sent?

17  A    January 15, 2011.

18  Q    And what's the subject?

19  A    The subject is BoBo, which is Dani's nickname.

20  Q    Daniella's nickname?

21  A    Yes.

22  Q    Is there a photo attachment to this?

23  A    Yes.

24  Q    And is this that photograph of Daniella that you said

25  you took?

1   A    Yes.

2   Q    Why did you send this to the defendant?

3   A    Because he asked for it and he told me that he thought

4   that if she did this process that she could have like some

5   kind of breakthrough, like she would be able to have this

6   new experience of herself, and this like rich, joyful, inner

7   world that she couldn't experience as long as her whole

8   focus was like entertainment and manipulation.  And so I

9   wanted her to be able to have that and I didn't want to be

10  responsible for doing something that would screw that up or

11  that I would be blamed for later.  And I wanted him to feel

12  there was somebody who was willing to do what it took to

13  become somebody who could be a responsibile parent.  But

14  this was really -- I mean...

15  Q    How often did you check in with the defendant about

16  Daniella?

17  A    Whenever I went to see her.  But there were times where

18  I wasn't seeing her a lot.

19       THE COURT:  Was Daniella living alone in this

20  house?

21       THE WITNESS:  No.  Her family was there at

22  different times.  Her sister, Camila, was there almost the

23  whole time.  Her mother was there and actually went in the

24  room next door for a number of months as well.  And her

25  father came and went.  And Marianna was living with Keith

1    and Pam, so she wasn't around a lot.  And Adrian was living

2    with Mark, so he wasn't around a lot either.

3    Q    Did the defendant express concern about the family

4    interfering with the project at any point?

5    A    Yes.  He thought that they were interfering with the

6    project.

7    Q    How so?

8    A    Because Adriana was talking to her and sending her

9    notes through the bathroom.  And also at one point -- again,

10   I was told that -- Keith told me that the family decided

11   that Adriana would go into the second room.  It was a

12   two-bedroom condo, and Adriana and the -- the idea or the

13   logic behind it was that Adriana was going to go in the

14   second room under the same conditions as Dani so that

15   Dani -- and Dani would know that her mother was in the room

16   next door, which was supposed to inspire her to want to get

17   out quickly to end the discomfort that her mother felt,

18   which she should have known what it was like because she

19   herself was experiencing discomfort.

20            So Adriana went into the room next door and --

21   Q    Adriana is Daniella's mother?

22   A    Daniella's mother.  And originally it was that she was

23   going to go into her room with the same conditions as Dani.

24   So she was going to be in a room without anything, like just

25   with the bed and -- and nothing.

1        But within a short period of time, Adriana

2   situation was very different than Dani's and Dani knew about

3   this.  So Adriana within a short period of time had many

4   things in the room like exercise equipment or art supplies.

5   At one point she had a pet fish, and she had -- she -- she

6   was making Kombucha and like sprouting vegetables that she

7   wanted to make for herself but also to take responsibility

8   to feed herself and Dani so the family didn't have to do it.

9   But she had candles and things.  And so Keith called me and

10  said that Adriana was supposed to be in the room under the

11  same conditions as Dani and wanted me to address this with

12  Adriana and ultimately enforce that Adriana go back to the

13  conditions like Dani.

14  Q    What happened with that -- what happened after that?

15  A    Well, I went and talked to Adriana about it, but I

16  didn't enforce that she change it.  But all of these things

17  were viewed as thwarting the program.  And Adriana would

18  have -- the family had -- there was only one full bathroom

19  in the house and the full bathroom was in between the two

20  bedrooms that Dani and Adriana occupied.  So the family if

21  they wanted to use the bathroom, like to take a shower or

22  something, had to go through one of the bedrooms.  So they

23  all went through Adriana's bedroom.  And initially I was

24  told they weren't going to be speaking to Adriana, but then

25  eventually they would go and talk and so Dani could hear

1  them all talking, so she knew that the family would visit in

2  Adriana's room and these things.

3          So all of that was viewed as thwarting.

4  Q    Ms. Salzman, the point of Daniella's mother being put

5  in a room next to her, was what?

6  A    So that Dani would feel that her being in the room --

7  her extending her stay in the room or staying in the room

8  not either going back to Mexico or getting done whatever she

9  was supposed to be getting down there, was directly

10  affecting other people and that she should care about that,

11  you know, and do whatever needed to be done to either get

12  back to Mexico or get her work done.

13  Q    Care about that, meaning care about the fact that her

14  mother was also in a room next to her?

15  A    Yes.  That she was hurting somebody else's life with

16  her actions.

17  Q    What happened with Adriana?

18  A    Well, while Adriana was in the room, somebody that she

19  was very close with and -- and up-close personal

20  relationship of hers that was important to her, that person

21  was killed and she left the room to go to the funeral.  And

22  then I can't remember if she came back to the room or she

23  just came back to Albany or she went back to Mexico.  But I

24  do remember speaking to her again after that, and she didn't

25  want to return to the room and she felt that she had a

1    purpose that was not in a room.  She wanted to go and be

2    part of another organization that she felt like a

3    consciousness raising human potential type of program.  She

4    wanted to go work with this group of people, something

5    called The Book of Knowledge and do that.

6    Q     After Daniella's mother left, did you tell Daniella

7    anything about the length of time that she should stay in

8    the room?

9    A     Yes.  Well, then Keith started telling me that there

10   was now an ethical issue, that Adriana had broken her

11   commitment and that Adriana's broken commitment is exactly

12   why Dani believed that she can behave however she wants and

13   never have any consequences for her action and that Dani

14   should take an ethical stance against the mother leaving and

15   Dani should stay in the room until Adriana comes back.  And

16   at that time, then Camila and Marianna were permitted to go

17   have meetings with Dani to decide what should be done about

18   the situation with Adriana.

19   Q     What did Daniella say when this was conveyed to her

20   that she should stay in the room until her mother got back?

21   A     Well, at some point Dani thought that that was a good

22   idea.  But I find it incredibly problematic now because a

23   lot of the time -- there were a number of occasions where

24   Keith said to me, Cami feels very strongly about this.  And

25   Cami and Marianna were the ones interacting with Dani to

1    make this ethical decision about what Adriana should do.

2    And both Cami -- which I didn't know at the time -- but Cami

3    and Marianna were both in a sexual relationship with Keith.

4    So they're sent -- they're -- now all of a sudden, they're

5    allowed to go speak to Dani to advise her about how long she

6    should stay in the room, which they really don't know much

7    about because they're not Dani in the room.

8              Marianna hadn't been interacting almost at all

9    with the situation because she was just living with Keith,

10   and Pam and none of them were interacting at the actual

11   house.  Cami was there, but those perspectives were highly

12   influenced by Keith's perspective.  All of our perspectives

13   were highly influenced by Keith's perspective and all of us

14   were in relationships with Keith where we wanted him to

15   think that we would do the hard thing, the ethical thing and

16   wanted him to see us as people who were willing to do that,

17   which we were constantly getting feedback from him that we

18   were failing at and advice about how we could do it better.

19   Q    During this period of time, Marianna was living with

20   the defendant?

21   A    Yes, she was.

22   Q    And Adrian, where was he?

23   A    He was at the Twilight house.  I can't remember the

24   number, but with Mark Vicente.

25   Q    Did Daniella tell you that she would watch Camila

1    sometimes?

2    A    Yes, she did.  She told me she would watch her outside

3    the window.  I think Cami had a garden or a bunch of plants

4    that she would tend to outside and Keith's son Gaelyn would

5    come over to the house, Cami was his teacher, so she would

6    watch them or listen to them.

7    Q    Camila was at that time taking care of the defendant's

8    son?

9    A    Yes, correct.

10         MS. HAJJAR:  Your Honor, may I show the witness an

11   exhibit marked for identification?

12         THE COURT:  Go ahead.

13   Q    Ms. Salzman, I'm going to show you what has been marked

14   for identification as Government's Exhibit 1238.

15         Do you recognize this exhibit?

16   A    Yes, I do.

17   Q    What is it?

18   A    It's a chain of e-mails between Keith and myself in

19   October 2010 concerning Daniella's birthday and whether the

20   family could send her notes or communicate with her to

21   acknowledge her birthday.

22   Q    I'm going to show you what has been marked for

23   identification as Government's Exhibit 1241.

24         Do you see that e-mail, that -- that exhibit?

25   A    Yes.

1  Q     What is it?

2  A     This is an e-mail that I wrote to Keith in

3  November 2010 about Daniella writing a letter saying, Let me

4  out of the room.  I'm coming undone.  And Camila

5  intercepting the letter and me interpreting it as -- well,

6  deciding when I was going to go interact with her, how I was

7  going to handle it and asking his opinion.

8  Q     I'm showing you what has been marked for identification

9  as Government's Exhibit 1242.

10             Do recognize this e-mail?

11 A     Yes.  This is Keith's response to the former e-mail.

12             MS. HAJJAR:  Your Honor, the Government offers

13 Government's Exhibit 1238, 1241, and 1242 into evidence.

14             MR. AGNIFILO:  No objection.

15             THE COURT:  Government's Exhibits 1238, 1241, and

16 1242 are received in evidence.

17             (Government's Exhibit Numbers 1238, 1241 and 1242

18 so marked and received in evidence.)

19             MS. HAJJAR:  Thank you, Your Honor.

20 Q     Ms. Salzman, as to Government's Exhibit 1238, starting

21 at the bottom of this chain, who was that first e-mail from?

22 A     The first e-mail is from me to Keith.

23 Q     And when was it sent?

24 A     It was sent on October 25th, 2010.

25 Q     What's the subject line?

                    Salzman - Direct - Hajjar                1948

1    A     BoBo.

2    Q     What was BoBo?

3    A     BoBo's Daniella's nickname.

4    Q     And can you read the text of that e-mail?

5    A     Sure.  It says, Doomp, which was a nickname that I

6    called Keith, tomorrow is BoBi's birthday, and Hector is

7    asking if the family can write her letters.  I tend to think

8    no but I wanted check with you.  I know it's an important

9    day for her and her family usually ignores it, which is

10   usually upsetting for her.  I think she has been working to

11   heal her relationships with them and has been working, so

12   I'm not sure if the feedback from them is positive or it's a

13   suspension of the ethic of the process she's going through.

14             Can you share your perspective?

15   Q     Tomorrow is BoBi's birthday, is that Daniella's

16   birthday?

17   A     Yes, Daniella's birthday.

18   Q     And are you asking the defendant permission for the

19   family to acknowledge her birthday in some way?

20   A     Yes.

21   Q     What is the defendant's response?

22   A     I think you have to figure it out.  Value ethic it.

23   There are several options.  It is not just black or white.

24   Q     And when was that e-mail sent?

25   A     The same day, October 25th, later in the day, 2010.

1    Q    And what did you send back to the defendant?

2    A    I tend to think that if they were to communicate in a

3    way that didn't make it a special day with the suspension of

4    cause and effect, it could be okay and potentially a rebirth

5    of sorts.  I'm not sure if they're capable of doing that.

6    Q    Can you explain what that means, just plainly?

7    A    Yeah.  I thought that there was a way that -- because

8    what was going on in the family was something the entire

9    family participated in, not just Dani, and that I thought

10   there was a way that maybe they could acknowledge their --

11   her birthday and maybe set an example by taking

12   responsibility for how they participated in the relationship

13   that could be good for her and helpful for the process they

14   were going through.  Like it didn't have to just be that any

15   communication thwarted the process and that she's entirely

16   alone, feeling abandoned and forgotten again in the

17   situation where she's already very isolated from them.

18   Q    And so when you say, I tend to think that if they were

19   to communicate in a way, it could be okay.  Are you telling

20   the defendant that your view would be that they could

21   communicate with her on her birthday?

22   A    Yeah.  He's saying you have to figure it out, and I'm

23   saying this is what I think about it, yes.  This is what I

24   offer and believed could be good.

25   Q    And what did the defendant respond?

Salzman - Direct - Hajjar                1950

1   A    Or they could not communicate, at least at first, and

2   then some measurements and markers could be examined.

3   Q    And what did you understand that to mean?

4   A    No, that your idea of communication is not what should

5   be done in this situation and you need to look for

6   measurements and markers, and when you see the measurements

7   and markers, then maybe we can talk about communicating.

8   Q    What were the measurements and markers?

9   A    I don't even know at this point, because everything she

10  did was shot down and viewed as thwarting the process.

11  There were a lot of things that she did propose, but I don't

12  know what he was looking for, honestly, because he didn't

13  read even a lot of the letters where she was making the

14  proposals.

15  Q    I'm going to show you what is in evidence as

16  Government's Exhibit 1242.

17          Can you just describe what the bottom e-mail is

18  from, what the bottom e-mail is?

19  A    Yes.  Describe it or read it?

20  Q    Well, who sent it?

21  A    I sent it to Keith on November 8, 2010.  Daniella wrote

22  a letter saying, Let me out.  I'm coming undone.  And Camila

23  intercepted the letter and didn't show it --

24  Q    I'm sorry, Ms. Salzman.  Just before that.  The subject

25  is what?

1   A     BoBo/Cami.

2   Q     And BoBi is Daniella?

3   A     BoBi, yes, BoBi/Cami.  BoBi is -- I call Daniella BoBi,

4   like just an iteration on BoBo.

5   Q     And Cami is Camila?

6   A     Camila.

7   Q     And what e-mail address are you using to communicate

8   with the defendant?

9   A     Lauren@NXIVM.com.

10  Q     Okay.  Can you read the text of the e-mail?

11  A     Doomp, I'm going to sleep, but apparently BoBo wrote a

12  letter that said, Let me out.  I'm coming undone.  Camila

13  intercepted it and didn't show it to the parents because

14  they are so reactionary.  She instead texted me asking for

15  permission to speak to BoBo.  I told her no and explained I

16  thought it was bad on a postulate level.  I'm not going

17  there tonight because of the letter, but I will stop by in

18  the morning probably around 8:00 a.m. I plan to explain to

19  BoBi that I think she's had a huge setback and this focus of

20  letting me out of the room is totally in the opposite

21  direction of healing the breach.

22         If there's anything that you think I should add or

23  do differently, please let me know.  If not and you're okay

24  with what I'm planning, I will just report in afterwards.

25         I will call you before I go over there in the

Salzman - Direct - Hajjar                    1952

1  morning, but I have not been able to reach you mornings this

2  week.  If possible I would like to sleep through the night

3  tonight, but if there's anything urgent you need to tell me

4  about, best you can wake me up.  If not, I'll be up around

5  6:30 a.m.

6           Love you.

7  Q    And Doomp, what is that?

8  A    It's a nickname that I called Keith.

9  Q    And when you write, Apparently, BoBo wrote a letter

10 that said, Let me out.  I'm coming undone.  Camila

11 intercepted it and didn't show the parents because they're

12 so reactionary?

13 A    Uh-huh.

14 Q    What was, Let me out.  I'm coming undone?

15 A    That Dani was having -- was feeling emotionally not

16 okay in the room and didn't -- and wanted permission to come

17 out.

18 Q    Let me out of the room?

19 A    Let me out of the room.

20 Q    And when you write, Camila intercepted it and didn't

21 show the parents because they are so reactionary, who is

22 they?

23 A    The parents.

24 Q    And when you say, they're so reactionary, what does

25 reactionary mean as you meant it?

Salzman - Direct - Hajjar                    1953

1    A    That they would take action on getting the letter by

2    communicating with her in some way that would again be

3    viewed as thwarting the process.

4    Q    So in other words, that they would want to contact

5    their daughter?

6    A    Yes.

7    Q    And thwart the defendant's project?

8    A    Yes.

9    Q    And so when you write, She instead texted me asking for

10   permission to speak to BoBo, who is she in that sentence?

11   A    Cami.

12   Q    So Camila asked you for permission to speak to her

13   sister?

14   A    Yes.

15   Q    And when you write, I told her no, and explained why I

16   thought it was bad on a postulate level?

17   A    Uh-huh.

18   Q    What did that mean?

19   A    It meant that similar to the birthday, that the

20   decision was that she was not -- that the family was not to

21   speak to her and that if they did speak to her, she would

22   learn that she could get upset and get things that she

23   wanted.

24   Q    And on a postulate level, that phrase, is that a term

25   used in ESP?

Salzman - Direct - Hajjar                    1954

1    A    Yes, it's an ESP term.  Basically it means -- postulate

2    is like your belief about how the world works.  So if like

3    she feels upset and then her parents communicate with her,

4    then she has a belief that if she gets upset, they will

5    communicate with her and that's how a postulate is formed.

6    Q    When you write, I plan to explain to BoBi that I think

7    she's had a huge setback and this focus of let me out of the

8    room is totally in the opposite direction of healing a

9    breach.

10              Just very plainly, what are you conveying to the

11   defendant?

12   A    I'm conveying to him that similar to the way I

13   described it before, she's having an emotional reaction and

14   focusing on what she wants to get out of the experience

15   instead of what she was trying to earn through the

16   experience.

17   Q    And so you're connecting her desire, her statement, let

18   me out of the room to not being helpful to healing her

19   breach, whatever that meant?

20   A    Yes.

21   Q    Did the defendant respond?

22   A    Yes.

23   Q    When?

24   A    The next day in the morning.

25   Q    November 9, 2010?

1   A    Yeah, I'm sorry.

2   Q    And what did the defendant write?

3   A    Hi, Honey.  You do not want to buy into BoBo's tantrum

4   or externalization.  Likewise, you do not want to tell her

5   what to do or how to be.  You might try asking her the

6   difference between being in the room for a day, dot, dot,

7   dot, or as long as she has.  From a present time perspective

8   there is no difference except suffering and entitlement,

9   dot, dot, dot, dot.  Hope this helps.

10          Keith.

11  Q    And when the defendant wrote, You don't want to buy

12  into BoBo's tantrum or externalizations, what did that mean?

13  A    It meant that she wasn't -- that she was that her

14  emotional reaction and communication that she was coming

15  undone is a temper tantrum -- is simply a temper tantrum and

16  her focus on what she wants to get from the outside world is

17  her, you know, blaming that on the outside world or looking

18  to the outside world to get something that's going to change

19  how she's going to feel on the inside.  And if you give her

20  things or change the circumstances outside, then she won't

21  be able to have this experience of being complete on the

22  inside.  So you shouldn't do that.

23  Q    And by BoBo's tantrum, is he referring to fact that

24  she's expressing, Let me out.  I'm coming undone?

25  A    Yes.

Proceedings                                    1956

1   Q     After this, after Daniella said, Let me out.  I'm

2   coming undone --

3   A     Uh-huh.

4   Q     -- how much longer did she stay in the room?

5   A     I believe at least three more months, maybe four.

6   Q     When was this e-mail written?

7   A     November 9, 2010.  I think she came out in

8   February 2011 -- oh, no.  She came out in February 2012.

9   Q     So how much time had it been after she wrote --

10  A     Like a year -- no like, over a year and almost a half.

11  I'm sorry.

12              THE COURT:  All right.  All right.

13              MS. HAJJAR:  Yes, Your Honor.

14              THE COURT:  We'll take our lunch break.

15              All rise for the jury.

16              (Jury exits the courtroom.)

17              (The following matters occurred outside the

18  presence of the jury.)

19              THE COURT:  The witness may stand down.  Please

20  don't discuss your testimony with anyone.

21              (The witness exits the witness stand.)

22              THE COURT:  All right.  I have a matter here at

23  1:00 so if you want to have a conversation, just take it

24  into the hall.  Thank you.

25              One hour for lunch.

Proceedings                    1957

1          (Lunch recess taken at 1:01 p.m.)

2          (Continued on the next page.)

Proceedings                                         1958

```
 1        A F T E R N O O N   S E S S I O N

 2                        --oo0oo--

 3

 4        THE COURT:  Do we have a witness?

 5        (The witness resumes the witness stand.)

 6        THE COURT:  And bring in the jury.

 7        (Pause in proceedings.)

 8        (Jury enters the courtroom.)

 9        (Jury present.)

10        THE COURT:  All right.  Please be seated.

11        All right.  Ms. Hajjar, you may continue your

12   examination of the witness.  The witness is reminded that

13   she is still under oath.

14   BY MS. HAJJAR:

15   Q    Ms. Salzman, did there come a time where Daniella

16   requested medical care?

17   A    Yes.

18   Q    Can you explain that to the jury?

19   A    She requested that she needed to go to the dentist.

20   She started complaining that she was having a problem and

21   wanted to go.

22   Q    What happened after that?

23   A    I went to Keith to ask if I could take her -- or if she

24   could go to the dentist and he said he would think about it.

25   And it took six weeks for him to decide that she could go
```

1    and, I mean, part of her tooth broke off before it was okay

2    to take her.

3    Q    During those six weeks did Daniella tell you that she

4    was in pain?

5    A    Yes, she was telling me that she needed to go to the

6    dentist.

7    Q    Why did you wait six weeks before she went?

8    A    Because I wouldn't take her unless Keith said that it

9    was okay for her to go.

10   Q    Was she eventually permitted to go to the dentist?

11   A    Yes, I did take her.

12   Q    Was she permitted to go alone?

13   A    No, I took her.  I picked her up, I took her to the

14   dentist, I waited while she saw him, I took her to my family

15   dentist.  And then I drove her home and she went back in the

16   room.

17   Q    Did she show you her tooth before she went to the

18   dentist?

19   A    Yes.

20   Q    And could you see that it was broken?

21   A    Yes.

22   Q    Do you know who paid for the dentist, the dental care?

23   A    I don't recall.

24   Q    Did there come a time where Daniella was permitted to

25   use a cell phone for a period?

Proceedings                                1960

1   A     Yes.

2         When we went to Vanguard week, the whole family

3   left and went up to Lake George and I left as well.  So she

4   was permitted to have a phone to communicate with me while I

5   was gone in case of an emergency.

6   Q     Was she left alone during that period of time?

7   A     Yes.  But her family came home periodically throughout

8   the trip.

9   Q     And you said it was for V Week.  Is that the

10  celebration -- the annual celebration of the defendant's

11  birthday?

12  A     Yes.

13  Q     How did -- did you communicate with Daniella while you

14  were away?

15  A     I did, yes.

16  Q     How?

17  A     Via e-mail or texting through at phone.

18  Q     Do you know what e-mail address she used to communicate

19  with you during that period of time?

20  A     She used an e-mail address called Happy Monk.  I think

21  it was Happy Monk 55, but there was a number.  Happy Monk

22  something.

23        MS. HAJJAR:  Your Honor, may I show the witness

24  something for identification?

25        THE COURT:  Go ahead.

Proceedings                                    1961

1           MS. HAJJAR:  Thank you.

2     Q    Ms. Salzman, I'm showing you what has been marked for

3     identification as Government's Exhibit 908R.

4           Do you recognize this exhibit?

5     A    Yes.

6     Q    And there's many pages.  There are 80 pages of this

7     exhibit.

8     A    Yes.

9     Q    What is it?

10    A    They're e-mails that I exchanged with Dani.  And I

11    can't see the first page, but I believe the Happy Monk

12    e-mail address.  Yes, happymonk55@gmail.

13          MS. HAJJAR:  Your Honor, the Government offers

14    Government's Exhibit 908R into evidence.

15          MR. AGNIFILO:  No objection.

16          THE COURT:  Government's Exhibit 908R is received

17    in evidence.

18          (Government's Exhibit Number 908R so marked and

19    received in evidence.)

20    Q    Now, Ms. Salzman, looking a one of the pages of

21    Government's Exhibit 908, so Page 2, what period of time was

22    Daniella communicating with you using the Happy Monk 55

23    e-mail address?

24    A    I think it started during that V Week and may have

25    continued through after that.

Proceedings                                           1962

1    Q    Is that around August of 2011?

2    A    Yes.

3    Q    And when Daniella -- is that Daniella that writes to

4    you from Keith I have once again taken his time and

5    resources with the problems I create, essentially in taking

6    your time?

7    A    Yes.

8    Q    And what e-mail address of yours was that sent to?

9    A    To Lauren@NXIVM.com.

10   Q    Are there many similar e-mails in this collection of

11   e-mails?

12   A    Yes, there are.

13   Q    Can you describe just generally what the content of

14   these e-mails were to the jury?

15   A    This one she was lifting the effect that -- the

16   negative effect that she had created on the people in her

17   life, her family, myself, Keith.  She was also suggesting

18   ways to address those problems.  And I was responding,

19   communicating with her.

20   Q    Okay.  Just looking at Pages 77 and 78 of

21   Government's Exhibit 908, the bottom e-mail, Ms. Salzman,

22   when was that sent?

23   A    On October 1, 2011.

24   Q    What time was it sent?

25   A    3:22 in the morning.

Proceedings                    1963

1    Q    Who sent that e-mail?

2    A    Daniella sent it.

3    Q    Can you read --

4    A    Can I read the e-mail?

5    Q    One moment.

6              (Pause in proceedings.)

7    Q    Actually read the -- can you read the e-mail, just tell

8    me what the e-mail is on the top.  Who sent that e-mail?

9    A    I did.  I sent it to Dani.

10   Q    Okay.  Can you read the text of your e-mail?

11   A    Yes.  The whole e-mail you sent this morning was very

12   prideful.  If you don't turn this around immediately I will

13   cut contact with you for 24 hours.  I refer you to my

14   previously e-mail from September 19th.  If the next time you

15   communicate with me you demonstrate any blame, any more

16   gameplaying or any further prideful, bratty or

17   self-indulgent behavior, I will cut contact with you for

18   24 hours.  If after the 24-hour period is up and upon

19   re-establishing contact, you must demonstrate a massive

20   turnaround of attitude and behavior or I will make a formal

21   recommendation to Keith that you go back to Mexico.  If

22   there's any infraction beyond that point, I have the

23   authority to end this entire program and you will just go

24   back to Mexico.  I am being generous in giving you an extra

25   chance to rectify this.  By 7 p.m. today send a

Proceedings                                    1964

1    responsible/nonprideful answers to my questions and

2    measurable output of work in the vein that I am requesting.

3    If you do not do this, I will cut contact with you in

4    response to your prideful behavior and gameplaying of this

5    morning.

6    Q    When you write, If there's any infraction beyond that

7    point I have the authority to end this entire program and

8    you will just -- you will just go back to Mexico --

9    A    Yes.

10   Q    -- was that true?

11   A    No.

12   Q    Why were you writing that to her?

13   A    Because whatever had happened earlier in the morning I

14   checked it with Keith and he told me to tell her that.  Tell

15   her that you have the authority to end the whole thing and

16   that you're going to make a formal recommendation to me that

17   you just go pack to Mexico.

18   Q    Why?

19   A    Why what?

20   Q    Why did you convey that to her?  What was the purpose

21   of saying that to her?

22   A    To address whatever she had done and get her to turn it

23   around.

24   Q    What were you trying to get her to do?

25   A    I was trying to get her to do -- to not demonstrate

Proceedings                                    1965

1  whatever was being perceived as blame, gameplaying or being

2  prideful or self-indulgent.

3  Q    Were these things that the defendant told you --

4  A    Yes.

5  Q    -- about her behavior?

6  A    Yes.  And things that through my interaction with him I

7  came to see as that.

8  Q    The e-mail below that, that you read earlier, can you

9  just read Paragraph 2?

10  A    I don't have an answer for this.  It is not laziness, I

11  just have nothing else to do.

12  Q    And turn to Page 79 of Government's Exhibit 908.  Can

13  you read the e-mail you sent?

14  A    Yes.  I am cutting communication with you.  At the

15  point in time when I reestablish it, I expect a dramatic

16  turnaround with all items I've requested complete, including

17  you list of effects and how to you plan the address and

18  rectify each one and also how you plan to structure your

19  days to make healing a higher priority than laziness and

20  comfort.  If you do not have this complete, I will make a

21  formal recommendation to Keith that you go back to Mexico.

22  If I see any further evidence of pride, blame, abnegation of

23  responsibility, setting boundaries on what you will and will

24  note do or any gameplaying, I will discontinue your program

25  and you will no longer be permitted to stay here.

Proceedings                                          1966

1    Q    Can you explain this e-mail?

2    A    Yes.  I discussed it with Keith and he told me to tell

3    her that if she didn't do a dramatic turnaround with all the

4    items that were requested and structure her day to make

5    healing a higher priority than laziness and comfort, then I

6    would make the recommendation to Keith that she would go to

7    Mexico and she wouldn't be permitted to stay here.

8    Q    What does it mean that you would make a formal

9    recommendation to Keith?

10   A    It doesn't really mean anything, but it was what he

11   said to tell her.  Like that somehow if I recommended to

12   Keith formally or informally but in this case formally that

13   she should go back to Mexico that Keith would know -- would

14   listen to me and that would be what would happen.

15   Q    Did you believe you had the authority to determine when

16   and if Daniella would be sent to Mexico?

17   A    No, absolutely not.

18   Q    Who had that authority?

19   A    Keith.  And I don't believe Daniella believed that I

20   had the authority.

21   Q    At some point, Ms. Salzman, was a surveillance camera

22   installed?

23   A    Yes.

24   Q    Can you explain that?

25   A    Keith called me and told me that Daniella was sneaking

Proceedings                                        1967

1   out of the room or there was reason to believe she was and

2   that I should call Adrian to help set up a security camera.

3   And so I did call Adrian and the who of us went over to the

4   house together and set up a security camera.

5   Q     And prior to the defendant telling you so, did you have

6   reason to believe that Daniella was leaved the room?

7   A     No.

8   Q     What happened when you contacted Adrian?

9   A     He came and he brought -- Adrian was part of the video

10  team, so he had, I guess, the technology or the know-how to

11  get the technology to install a camera.  And I went with him

12  over to the house and while he set it up, I went into the

13  room and talked with Dani and then I came out and the two of

14  us found a place where we wanted to set it up or we thought

15  would be a good place for it.

16  Q     Was the surveillance camera footage checked?

17  A     Adrian checked it and he showed me parts of it one

18  time.  He said that he didn't find anything on it.

19  Q     What does that mean?

20  A     No evidence of Dani leaving the room.

21  Q     Are you aware if Adrian spoke to the defendant about

22  the surveillance footage?

23  A     I believe his did, but I don't recall specifically.

24  Q     Do you recall how the surveillance -- where the

25  surveillance camera was and how it was positioned?

Proceedings                                    1968

1   A    Well, I was reminded through the -- through this case

2   that we put it behind a clock.

3   Q    Ms. Salzman, you testified about letters that were

4   written by Daniella while she was in the room?

5   A    Yes.

6   Q    Did you keep some of those letters?

7   A    Yes.

8   Q    Can you explain that?

9   A    She wrote Keith letters throughout the whole time she

10  was in the room.  And he asked me to keep them.  And I did.

11  Q    What did you do with them?

12  A    I kept them and then after he was arrested, I

13  photocopied them and they became part of materials of the

14  case.

15  Q    Prior to that, had you read them?

16  A    No.

17  Q    At some point did you receive additional letters?

18  A    Yes.  Nicki gave me letters that he had given to her

19  when he left -- when he left to go to Mexico.

20  Q    And what happened to those letters?

21  A    Nicki gave them to me and I combined them with the

22  letters I already had.

23  Q    Were some of those letters unopened?

24  A    I don't recall whether Nicki's were unopened but many

25  of mine were unopened.

Proceedings                                              1969

1  Q    When you say they became part of the case, what do you

2  mean by that; did you provide them to the Government?

3  A    Yes.  And I send them through my counsel to Keith's

4  counsel.

5  Q    Did you eventually read the letters?

6  A    Some of them.

7            MS. HAJJAR:  Your Honor, may I show something to

8  the witness for identification?

9            Your Honor, may I approach the witness?

10           THE COURT:  Yes, you may.

11 Q    Ms. Salzman, I handed you a stack of papers which is

12 marked for identification as Government's Exhibit 907.  Do

13 you recognize that exhibit?

14 A    Yes, these are Dani's letters to Keith.

15 Q    Are these the letters that you provided to the

16 Government?

17 A    Yes.

18           MS. HAJJAR:  Your Honor, the Government offers

19 Government's Exhibit 907 into evidence.

20           MR. AGNIFILO:  No objection.  1 through 522, the

21 Pages 1 through 522?

22           MS. HAJJAR:  I believe so.

23           THE COURT:  All right.  Government's Exhibit 907

24 is received in evidence.

25           (Government's Exhibit Number 907 so marked and

Proceedings                                1970

1  received in evidence.)

2  Q    And, Ms. Salzman, before the defendant was arrested did

3  you have occasion to read those letters?

4  A    Yes.  I mean, I -- I -- I didn't -- I don't understand

5  the word, the use of the word occasion.

6  Q    Did you read them?

7  A    No, I didn't read them.

8  Q    You just maintained them?

9  A    I just maintained them.

10  Q    Prior to Daniella being in the room, were you aware of

11  a romantic relationship between Daniella and someone other

12  than the defendant?

13  A    No.

14        MS. HAJJAR:  May I show something to the witness

15  alone, Your Honor?

16        THE COURT:  Go ahead.

17  Q    I'm showing you what's marked for identification as

18  Government's Exhibit 43.

19        Do you recognize this photograph?

20  A    Yes.

21  Q    Who is it?

22  A    It's as photograph of Ben Myers.

23        MS. HAJJAR:  Your Honor, the Government offers

24  Government's Exhibit 43 into evidence.

25        MR. AGNIFILO:  No objection.

Proceedings                              1971

1       THE COURT:  All right.  Government's Exhibit 43 is

2  received in evidence.

3       (Government's Exhibit Number 43 so marked and

4  received in evidence.)

5       MS. GERAGOS:  Your Honor, I think I just need to

6  talk to Ms. Hajjar about the exhibit.

7       (Pause in proceedings.)

8       That's fine, Your Honor.

9  Q    Who is the person depicted in Government's Exhibit 43?

10 A    Ben Meyers.

11 Q    At any point did the defendant express negative views

12 towards Ben Myers to you?

13 A    Yes.

14 Q    Can you explain that?

15 A    Ben later -- so after Dani went back to Mexico I

16 learned from Karen Unterreiner that Ben and Dani had had a

17 relationship.  And after that time Ben started dating my

18 sister, and frequently -- and later became her husband but

19 frequently, Keith would tell me that he thought that the

20 relationship between Ben and my sister was destructive or

21 that the two of them would never grow because it was too

22 dependent and that my mother was promoting this relationship

23 and it was bad for my sister, bad for Ben, bad for my

24 mother, and that ultimately, Keith was going to be the one

25 who was going to end up supporting Ben and Michelle's

Proceedings                                          1972

1   children if they ever had any because Ben and Michelle would

2   not be capable of doing that on their own.

3   Q    At some point, Ms. Salzman, did Daniella leave the

4   room?

5   A    Yes, she did.

6   Q    Can you explain what happened?

7   A    I believe that Cami called me and told me that Dani had

8   come out of the room and that she said she that wanted to go

9   back to Mexico.  And I don't recall all the things that

10  followed, but I did go over to the house to see her before

11  she left and say good-bye to her.

12  Q    What happened after that?

13  A    Her father and Kristin Keeffe drove her down to Mexico

14  and Kristin said that she watched her cross the border and

15  that she had been given an assignment that if she completed

16  it during a certain period of time, which was relatively

17  soon after she was dropped across the border with only --

18  with like $200 and with her father's accountant if she

19  completed the assignment, which was to do book reports, that

20  is she would have her immigration documents sent to her so

21  that she could return to the U.S.

22  Q    What was the assignment?

23  A    It had to do with doing a book report of a book of a

24  certain amount of length within a certain amount of time and

25  the book report, I think, had to do -- it may have had to be

Proceedings                                          1973

1    a certain number of pages but the book had to be a certain

2    of number of pages and the report had to be within a certain

3    period of time and then the date was changed and -- the due

4    date was like -- was bumped up.

5    Q    Can you explain to the jury what you knew of what

6    happened to Daniella when she was --

7    A    When she went to Mexico?

8    Q    Yes.

9    A    My understanding is that they drove her down to Mexico,

10   that she crossed the border and her father had given her a

11   certain number of Pesos that were like 200-ish dollars,

12   maybe, give or take.  And that they had left her with the

13   father's accountant and that the accountant drove her to a

14   city where -- I think she chose to city, but where she

15   wanted to go.  And they left her and initially that when her

16   dad left he said that he would help her in any way that he

17   could to -- to do whatever was needed to come back as long

18   as she was willing do the work, he would support her.  And

19   then later that plan changed.  And he didn't provide the

20   documents, the document -- providing the documents and we

21   all weighed in on it basically, but she was down there

22   because she didn't have her documents, she didn't have, I

23   think, her birth certificate, she didn't have a passport,

24   she didn't have what she needed to be able to establish a

25   work situation or get a visa or do any of the things she

Proceedings                                    1974

1    needed to come back.  And so a lot of her time was being --

2    she was reporting that it was taking her so much time to be

3    able to try to find work and find a place to live without

4    the papers that she needed to do that.  It was taking too

5    much time to get what she needed to get the papers that she

6    didn't have time -- she was so busy trying to survive that

7    she didn't have time to do the book report and all of us

8    interrupted it as her making up stories, being unwilling to

9    do what she needed to do, and lying about what was going on.

10            And at one point she had like said that she -- you

11   know, had gone to a festival or something and we all jumped

12   on it like, well, instead of healing she was just going to a

13   party but she had just spent two years in a room and lost

14   her whole family and got shipped across the border with no

15   papers and almost no money, I don't think it's -- for her to

16   take time to process what happened and figure out what she

17   was going to do I don't think is the way we were

18   interpreting it at the time and I think at that point almost

19   anything she would have done we were like, no, no, no.

20   Nothing she did was -- was meeting the requirements.

21   Q    Did she have the financial support of her family?

22   A    No.  Her father withdrew the financial support and she

23   was writing e-mails saying I don't understand why you said

24   you would do this and I don't know why you changed and I

25   don't -- I can't -- there's nothing I can do in the

Proceedings                    1975

1   circumstance that I'm in to be able to meet the requirements

2   that you're imposing without the papers to be able to even

3   get a job to pay for what I need to pay for to get what is

4   being asked.

5   Q    And were her identification documents being withheld

6   from her?

7   A    Yes.

8   Q    Do you know what documents they were?

9   A    I don't.  She mentioned a birth certificate at least in

10  one e-mail that I remember, but I don't...

11  Q    What about the other family members, were they

12  permitted to contact Daniella, Marianna and Camila?

13  A    I don't believe so.  I mean, I don't think anybody --

14  she was communicating to or through, I believe, her father

15  and I don't think anybody else was speaking to her.  They

16  took a stand against it.

17  Q    Who was the book report for?

18  A    For Keith.

19  Q    How did -- you said Kristin Keeffe and Daniella's

20  father took her across the border?

21  A    Yes.

22  Q    How?  Can you describe what you know of that?

23  A    I know that they drove by car.

24  Q    From New York?

25  A    From New York down to, I believe, Texas and then

Proceedings                                      1976

1   crossed at a border down there.  I don't recall which border

2   or what city.  And Kristin watched her cross, as I

3   understand.  And along the way Kristin said that she

4   searched Dani's things and found that Dani had stolen some

5   money and things and then later Kristin reported that Dani

6   had hacked into e-mail and Facebook accounts, but I don't

7   know about that other than what Kristin said about it.  So

8   they were also asking her to turn over all passwords to all

9   accounts.

10  Q    Were you aware if Kristin Keeffe was in contact with

11  the defendant on the way to Mexico?

12  A    Yes.  I heard she was but I can't remember if Keith

13  told me or Cami told me.

14         MS. HAJJAR:  Your Honor, can I show something to

15  the witness for identification?

16         THE COURT:  Go ahead.

17  Q    Ms. Salzman, I'm showing you what is marked for

18  identification as Government's Exhibit 1484R.

19         Do you recognize this exhibit?

20  A    Yes, I do.

21  Q    What is it?

22  A    This is a letter from Hector, Dani's father, to the

23  family members just the siblings so Marianna, Adrian and

24  Cami and Kristin and I are cc'd on the e-mail and it's --

25  the subject is Dani update, so it's an update about Dani.

Proceedings                                    1977

1   Q    What's the date of Government's Exhibit 1494R?

2   A    February 27, 2012.

3   Q    I'm going to show you what's marked for identification

4   Government's Exhibit 1484 -- 1485R.

5            Do you recognize this exhibit?

6   A    Yes.

7   Q    What is it?

8   A    It is an e-mail that I sent to all the people listed in

9   the prior e-mail.  So Adrian, Kristin and cc'd Hector,

10  Marianna and Cami.  And I -- in response to the Dani update.

11  Q    Showing you what is marked for identification as

12  Government's Exhibit 1486R.

13           Do you recognize this exhibit?

14  A    Yes.

15  Q    What is it?

16  A    It's an e-mail from Kristin Keeffe to all the same

17  people that I listed prior and it -- the subject is RE:

18  Important.

19  Q    I'm showing you what's marked for identification as

20  Government's Exhibit 1488R.

21           Do you recognize this exhibit?

22  A    Yes.  This is an e-mail from Hector, Dani's father, to

23  all the same people listed before, the subject RE:

24  Important.

25  Q    And showing you what's marked for identification as

Proceedings                          1978

1   Government's Exhibit 1489R.

2           Do you recognize this exhibit?

3   A   Yes.  It's an e-mail from me to all the same people,

4   subject RE:  BoBi.

5           MS. HAJJAR:  Your Honor, the Government offers

6   Government's Exhibits 1484R, 1485R, 1486R, 1488R, and 1489R

7   into evidence.

8           MR. AGNIFILO:  No objection.

9           THE COURT:  All right.

10  Government's Exhibits 1484R, 1485R, 1486R, 1488R, 1489R are

11  received in evidence.

12          (Government's Exhibit Numbers 1484R, 1485R, 1486R,

13  1488R and 1489R so marked and received in evidence.)

14  Q   Ms. Salzman, I'm going to show you now what's in

15  evidence as Government's Exhibit 1485R.

16          Who was this e-mail from?

17  A   Mr. Hector, Dani's father.

18  Q   And what is the date of this e-mail?

19  A   February 27, 2012.

20  Q   And what is the subject?

21  A   Dani update.

22  Q   And do you see where it says she had ten weeks to do

23  three tasks while in Mexico?

24  A   Yes.

25  Q   Can you read those three -- the three things?

Proceedings                              1979

1   A     One earning her living down there.  I just gave her

2   1660 Pèsos cash, around 128 US dollars and I paid the bus

3   ticket to Merida; two, deliver book report results; three,

4   getting her USA visa.  I would pay the fees but Dani needed

5   to do all the paperwork.

6   Q     Showing you the bottom part of this exhibit.  Can you

7   just read the text that you see right here (indicating)?

8   A     Yes.  She said she chose a book in Spanish called

9   Sensations and Perceptions to start book report.  KK, which

10  is Kristin Keeffe thinks that she is still playing games

11  with little or no conscience.  KK has proof that Dani hacked

12  the great head account.  KK had changed the password

13  previously.

14  Q     Now these book reports, are these the assignments that

15  you were referring to before?

16  A     Yes.

17  Q     Do you know what the great head account is?

18  A     It was an e-mail account of Dani's.

19  Q     I'm showing you what is in evidence as

20  Government's Exhibit 1488R.  This is a series of e-mails.

21  Can you read the bottom e-mail?

22  A     Dear Dani, The family no longer has the heart to keep

23  calling you out on your destructiveness and playing your

24  games.  Please send a book report and all the e-mail

25  accounts and passwords you had access to in the last year to

Proceedings                                    1980

1    me within 48 hours.  This report needs to based on a book

2    that is 250 pages or more and must be a minimum of 10,000

3    word.  Thereafter you will need to send one new book report

4    by midnight Eastern Standard time every seven days.  If you

5    do not complete these tasks without exception or excuse it

6    will demonstrate to us a lack of care for the family and

7    therefore we cannot support such difference in values.

8    Additionally you need to legitimately return to Clifton Park

9    by Wednesday, April 4, 2012, unfortunately we cannot

10   consider sending you any of your requested documents.  With

11   Love, Papa, Marvy, Fluffy, and Cami.

12   Q    What did you understand any of her requested documents

13   to be?

14   A    That they weren't going to send her, her immigration

15   documents, her birthday certificate or -- and whatever else

16   they had.

17   Q    Do you recall if this e-mail had been drafted

18   previously?

19   A    Yes, I recall that Kristen Keeffe had drafted the

20   letter previously.

21   Q    This report needs to be based on a book that is 250

22   pages or more and must be a minimum of 10,000 words.

23              What is that describing?

24   A    The book that she would do the book report on.

25   Q    That e-mail was sent on February 29, 2012?

1    A    This one in front of me?

2    Q    The one that Daniella's father sent that you just read.

3    A    Yes, correct.

4    Q    And did Daniella respond?

5    A    She did respond.

6    Q    And can you read her response?

7    A    Papa, I don't have a book report now, I will not have

8    it ready in 48 hours.  I started working on the one I told

9    you and it is about 600 pages long and in a large textbook

10   like format so it doesn't fit my measurements and I started

11   it just on Saturday.  Also I have sent you all the accounts

12   I had access to.  There's nothing more I can send you.  I

13   didn't open a Facebook or Skype account yet as I said I

14   would because it would be pointless since I have no money to

15   pay the cyber to use them.  Without my papers I cannot do

16   anything about my visa at all.  I'm so sad, I cry every time

17   I'm alone.  You haven't answered my constant questions about

18   being able to write Keith and Cami and Fluffy and Marvy.  I

19   have so much I need to say to each of you, this really seems

20   impossible now.  Why won't you send me my papers?  You said

21   on the last talk you and Kristin had with me that you would

22   help with me with my visa in every way you could.  Sending

23   me what I needed even economically and I'm not asking for

24   anything but my papers.  I will pay you for sending them if

25   that is what you want.  There is nothing I can do without

Proceedings                         1982

1   them.   I cannot renew my passport yet because I have no

2   money.   I cannot open a bank account to begin building the

3   basis for a tourist visa because I have no proof of address.

4   I cannot begin applying at Au Pair institutes because I have

5   no proof of any education.   I can do nothing.   What is this?

6   What did I had do?   I have been trying to survive and just

7   as I'm getting started what am I supposed to do?   What do

8   you want me to do?

9   Q    When Daniella writes you have not answered my constant

10  questions about being able to write Keith and Cami and

11  Fluffy and Marvy, what did you understand her to mean?

12  A    That she was asking for permission to do that because

13  she had been told she couldn't.

14  Q    And what reference to her papers, what did you

15  understand that to mean?

16  A    Whatever the immigration documents she had or that --

17  that her father had in his possession that she was asking

18  for.

19  Q    Now, on February 29, 2012, did Kristin Keeffe respond?

20  A    Yes.

21  Q    And can you just read the first paragraph?

22  A    Hi All, I think this is total fabrication.   Dani has

23  been stealing in mind about book reports since before Gaelyn

24  was born.   In all these years, she has never produced one

25  book report that was adequately done and submitted in a

Proceedings                                1983

1    straightforward fashion.  Does she really expect us to

2    believe that after all these years of not producing and now

3    when she had a full time -- oh, I'm sorry, my screen went

4    black -- now when she has a full-time job for the first time

5    in her life, allegedly, she chose to do a book report on a

6    book that is the three times the minimum length, a 30,000

7    word report?  She is such a liar, it takes my breathe away.

8             Continue?

9    Q    When -- at the bottom of the e-mail Kristin Keeffe

10   writes, Whatever we decide to do I think it's really

11   important everyone stay strong and holds the line.  What did

12   you understand that holding the line to be?

13   A    Not giving her what she was asking for and not changing

14   the conditions under which she could have what she was

15   asking for.

16   Q    On February 29, 2012, did you respond?

17   A    Yes, I did.

18   Q    Can you read your e-mail?

19   A    I'm in agreement with all of you.  Not one apology to

20   anyone since she left.  I think this is all gameplaying.  In

21   the least, she could send a well-formed outline of the steps

22   it would take for her to legitimately get her papers and ask

23   for an extension as needed.  That's what a responsible

24   person would do, figure out the data, make a proposal, keep

25   everyone apprized of progress.  Saying I can do nothing is a

Proceedings                    1984

1    lie.

2         Also if is she wants to write people she could

3    just write a letter, send it to Hector and request that he

4    forward it.  Victimizing herself when she's been totally

5    passive other than to make requests and demands is not the

6    behavior of someone who is making a proactive effort in any

7    forward moving direction.

8    Q    What did you mean by this e-mail?

9    A    Well at the time, I was looking at it that what she was

10   saying was not as it was and that if she really was

11   committed to come back and really committed to healing, she

12   would be doing the things that I listed.

13   Q    What was the steps it would take for her to

14   legitimately get her papers?  What did you mean by that?

15   A    Well, she did lay out the steps that it would take for

16   her to list the demands -- we got per papers in the first

17   e-mail.

18   Q    What -- what does that mean?

19   A    Well, so there's two things.  There's her getting the

20   papers back from her father by doing his steps, which she

21   was explaining why she wasn't able to do because she was

22   laying out the legitimate steps it would take her in the

23   circumstance she was in not being able to meet the deadline

24   to get the request from her father.

25   Q    What's your view now of this response?

Proceedings                                    1985

1    A    I think that we were being incredibly abusive.  Like

2    the circumstances that she was left in were horrendous.  She

3    was describing to us what they were and everything she

4    said -- and the whole time that she had been in the room she

5    was writing things she could do.  She wrote a letter to her

6    mom or she wrote a letter to Keith or she wrote proposals to

7    me.  Everything that she did we told her -- we shot down and

8    we told her it was manipulative or it was gameplaying or it

9    was just trying to get something.  So after you beat that

10   into somebody until they finally submit and now they're

11   asking permission of what's okay to do, all of a sudden

12   saying, well, why are you asking for permission to

13   everything?  Why don't you just do it?  Because everything

14   that she had already done, we were saying, no, no, this is

15   an example of a problem.  This is an example of why you're

16   in the room.  This is bad behavior.  So like at some point,

17   nothing she could do was the right thing, and she got no

18   help and was just cast out of the family.

19   Q    Who told you her behavior was manipulative and

20   gameplaying?

21   A    Keith consistently told me that until we all started to

22   see it that way.

23              (Continued on the next page.)

24

25

L. Salzman - direct - Hajjar                          1986

1   A    (Cont'g.)  When I look back and read the things she was

2   writing there were legitimate attempts to do the things that

3   were being asked, that we were saying no, no, no at the time.

4   Q    After Daniella went to Mexico were her family members

5   instructed to shun her; is that a concept that you're familiar

6   with, shunning?

7   A    Yes, shunning is a concept that I am familiar with and

8   they did shun her.  I'm not sure how they came to shun her

9   specifically but there were discussions, Keith did raise the

10  idea that they not speak to the mother or Dani, Adriana or

11  Dani until they healed these things and that they should

12  discuss it and the result of their discussions was that they

13  took that position.

14  Q    What was your understanding of the concept of shunning,

15  what role did it play in the community?

16  A    The concept of shunning was introduced into the community

17  after a number of people had left the NXIVM organization and

18  were publicly speaking to the media and making allegations of

19  improper conduct within the community and Keith released a

20  community project and this idea of shunning as this nonviolent

21  way to deal with unethical behavior, that people could take a

22  stand against it by boycotting it through shunning.

23  Q    Were you ever asked to shun family members of yours?

24  A    Yes.

25  Q    Can you explain that to the jury?

1   A      During this same time frame of the community project, and

2   I was head of the ethics division at the time, my father would

3   not take a stand against the community members who left the

4   community and were saying what was considered at the time

5   disparaging things, making assertions of improper conduct

6   against Keith and the community, and my dad wouldn't take a

7   stand against that and for Keith and for NXIVM and Keith told

8   me that he thought that my father didn't love me and if he

9   really loved me, he would do this and that he -- he really

10  thought about it and he thought he didn't ever love me and

11  that, you know, to take an ethical stand against this through

12  not speaking to him and cutting off the relationship was what

13  was right.

14  Q      When you say your father didn't stand up for the

15  defendant, what do you mean, what did he do?

16  A      A number of people had left the community and written a

17  letter saying basically if you don't give us certain things,

18  we're going to go to the media and this was -- I was told it

19  was an extortionate letter and that it was, you know, an

20  extortionate act and that one of the women who was on the

21  letter was not withdrawing her support from the letter and she

22  was a good friend of my stepmother and my dad hired her to

23  work in his medical spa and he didn't fire her.

24  Q      And so --

25  A      Or -- he didn't fire her or get her to change her

1   perspective and withdraw her support from the other women.

2   Q    And so, the not standing up for the defendant was not

3   firing this woman?

4   A    Correct, and at the same time as well or similar time my

5   father had just started a medical spa and Keith had said that

6   he -- at some point he wanted to have a medical spa and that

7   he felt that my dad should have waited because if -- to do it

8   with him and didn't know why my dad wouldn't do that because

9   it was going to be a conflict of interest later.

10  Q    You testified about letters that were sent to former DOS

11  slaves at one point.  Are you aware of other legal efforts

12  that NXIVM took against those who spoke out publicly about

13  NXIVM?

14  A    Yes.

15  Q    Can you describe some of those efforts?

16  A    Well, in the earlier days there was a lawsuit against a

17  cult deprogrammer and one of our former members for theft of

18  intellectual property but they were speaking out about the

19  organization saying that we brainwash people and that our

20  organization was harmful and a cult.

21  Q    Who was that person's name, the cult deprogrammer?

22  A    Rick Ross.

23  Q    Did you hear disparaging things said about Rick Ross in

24  the wake of that?

25  A    Yes.

*L. Salzman - direct - Hajjar*                                    1989

1   Q     What kind of things?

2   A     That Rick Ross was a criminal and that he had kidnapped a

3   boy out of a Pentecostal religion.

4   Q     Were these things being said within the NXIVM community?

5   A     Yes.

6   Q     Do you know what the basis for the lawsuit was?  You

7   mentioned a lawsuit.

8   A     That one of our members, Stephanie Franco, had taken our

9   course materials which she had signed confidentiality

10  agreements against or confidentiality agreements with respect

11  to and she gave them to Rick Ross and he published them on the

12  website.

13  Q     So, the lawsuit was about the publication of NXIVM

14  materials on a website?

15  A     Yes, that was my understanding.

16  Q     Are you aware of a time where Kristin Keeffe was demoted

17  from proctor to coach?

18  A     Yes.

19  Q     Can you describe that?

20  A     I don't recall specifically why she was demoted from

21  proctor to coach but she came to coach class in Albany which

22  was a specific class for our higher ranks and she publicly

23  demoted herself a rank from the proctor rank, the orange sash

24  to a yellow sash for some failure of misconduct.

25  Q     And what happened at that meeting?

L. Salzman - direct - Hajjar                    1990

1   A    Keith came to the meeting with a scale and he put the

2   scale under his chair and he told me laughing that he wanted

3   Kristin to think that she might have to publicly weigh

4   herself.

5   Q    Were you ever asked to make contributions to a political

6   campaign?

7   A    Yes.

8   Q    Can you explain that?

9   A    Yes, I was told that we were making a campaign

10  contribution and that I was asked if I would write a check for

11  the campaign contribution and I would be reimbursed for it.

12  Q    Were you reimbursed for it?

13  A    I believe so, yes.

14  Q    Ms. Salzman, you testified at another point that you had

15  a private nickname with the defendant, the defendant called

16  you something specific?

17  A    Yes.

18  Q    Can you remind us what that was?

19  A    Forlorn.

20  Q    I'd like to show you what's been marked for

21  identification as Government Exhibit 1498.

22       Do you recognize this exhibit?

23  A    Yes.

24  Q    What is it?

25  A    It's a letter that I wrote to my mom and to Keith about

1    an EM -- one of -- about a work project basically in our

2    company that I was working on.

3              MS. HAJJAR:  Your Honor, the government offers

4    Government Exhibit 1498.

5              MR. AGNIFILO:  No objection.

6              THE COURT:  Government's 1498 is received in

7    evidence.

8              (Government's Exhibit 1498 so marked in evidence.)

9              THE COURT:  You may publish it to the jury.

10             MS. HAJJAR:  Thank you, Your Honor.

11   Q    Who is this email from, Ms. Salzman?

12   A    From me at my proctorinfo email address, so that was a

13   work email address.

14   Q    Who was it sent to?

15   A    My mother at her nycap address and Keith when he used to

16   use Karen Unterreiner's old nycap email address.

17   Q    So, the prefect@ e-mail address, is that your mother's

18   email address?

19   A    Yes, correct.

20   Q    And the other email address is the defendant's?

21   A    Yes, kunterre, it's Karen Unterreiner, he used that email

22   address for a number of years.

23   Q    Did you frequently communicate with the defendant using

24   that email address?

25   A    Yes, I did.

L. Salzman - direct - Hajjar                                    1992

1   Q    And you addressed the email Vanguard and Prefect?

2   A    Correct.

3   Q    Is that the defendant and your mother?

4   A    Yes.

5   Q    At the end did you sign that email with your nickname?

6   A    Yes, Forlorn.

7   Q    Were you aware if Barbara Bouchey had a nickname?

8   A    Yes.

9   Q    What was her nickname?

10  A    It was Ja.

11  Q    J-A?

12  A    J-A, Ja.

13  Q    Ms. Salzman, you testified about various members of the

14  defendant's inner circle?

15  A    Yes.

16  Q    Did they live in the same general geographic area?

17  A    Yes, all within a few miles of each other.

18  Q    Where was that?

19  A    In Clifton Park, New York; Clifton Park, Halfmoon,

20  Waterford, all right around, like mostly a three-mile radius

21  but in some cases extending a little beyond that, all within

22  ten minutes of each other.

23  Q    I'm showing you what's in evidence as Government

24  Exhibit 176.  Are you familiar with this area, Ms. Salzman?

25  A    Yes, I am.

*L. Salzman - direct - Hajjar*                                      1993

1   Q     And as to certain individuals that you've been

2   discussing, I'd like to just go over where they lived in

3   relation to each other.

4              Pamela Cafritz, do you know where she lived

5   initially?

6   A     Initially Pam lived at 3 Flintlock Lane.

7   Q     Is that depicted on Slide 6 of Government Exhibit 176?

8   A     Yes.  Do you want me to mark it up?

9   Q     Note it please.

10  A     Note -- it's there.

11  Q     Where did she move after that?

12  A     She moved to 8 Hale Drive in Halfmoon.

13  Q     And after that?

14  A     To 2 Flintlock Lane in Halfmoon.

15  Q     And after that?

16  A     To 21 Oregon Trail in Waterford.

17  Q     And when Pamela Cafritz lived at 3 Flintlock, who did she

18  live with?

19  A     Keith, Karen and Kristin and then later Marianna moved in

20  there.

21  Q     And that's Karen Unterreiner an Kristin Keeffe?

22  A     Yes, correct.

23  Q     What about Barbara Jeske, where did she live?

24  A     Barbara Jeske lived in another development at

25  1 Brigantine.

L. Salzman - direct - Hajjar                                    1994

1    Q    Was that nearby?

2    A    Yeah, it's like a mile away.

3    Q    And Dawn Morrison, where did Dawn Morrison lived?

4    A    Dawn Morrison, -- I can't remember the name of her street

5    but she lived in the same development as this, so she lived

6    like a quarter of a mile from 3 Hale Drive.

7    Q    Within Knox Woods?

8    A    Yeah, within Knox Woods, just around the corner from

9    where I lived at 3 Hale Drive.

10   Q    Showing you Slide 34 of Government Exhibit 176, where did

11   your mother live?

12   A    My mother lived at 3 Oregon Trail.

13   Q    Is that depicted on this slide?

14   A    Yes.

15   Q    Where did you live between 2004 and 2015?

16   A    I lived at 3 Hale Drive.

17   Q    Is that in Knox Woods?

18   A    Yes, in Knox Woods.

19   Q    What about Barbara Bouchey, where did she live?

20   A    Barbara Bouchey lived almost right across the street from

21   Flintlock Lane on -- I think the street was called Washington

22   Court or Washington Drive but it was just -- it was literally

23   across the street.

24   Q    Was that in Knox Woods as well?

25   A    All in Knox Woods, yeah.

L. Salzman - direct - Hajjar                    1995

1    Q    What about Kathy Russell, where did she live?

2    A    Kathy Russell lived two or three miles away in an

3    apartment complex, I think it's called Mohawk Terrace

4    Apartments where Barbara Jeske had originally lived and then

5    Kathy moved into her old apartment when Barbara moved to

6    Brigantine, all within a three-mile radius.

7    Q    And Daniella, Marianna and Camila, where did they live?

8    A    They lived at 12 -- well, originally they all lived at

9    12 Wilton Court, then Marianna moved into 3 Flintlock and then

10   subsequently 8 Hale, 2 Flintlock and then 21 Oregon with Keith

11   and Pam; Dani stayed at 12 Wilton Court and eventually Cami

12   moved to 120 Victory Way, all in Knox Woods.

13   Q    When Daniella was in the room what address was she at?

14   A    12 Wilton Court.

15   Q    What about Camila, where did she live?

16   A    Cami lived at 12 Wilton Court until she moved to

17   Victory Way.

18   Q    Monica Duran, where did she live?

19   A    Monica Duran lived on a street called Minuteman Court,

20   it's right behind Hale Drive where I lived.  It's in --

21   literally just right across the street in Knox Woods.

22   Q    And Ivy Nevares?

23   A    Ivy Nevares lived on Grenadier Court, so half a mile away

24   in the same development.

25   Q    And Loreta Garza, where did she live?

L. Salzman - direct - Hajjar                    1996

1   A    Loreta Garza lived in 9 Hale Drive for a period of time

2   and then she moved to a development right behind Knox Woods,

3   so still a mile away.

4   Q    Where did Clare Bronfman live?

5   A    Clare had a house on Button Road, so within five minutes

6   drive.

7   Q    And Jim Del Negro, where did he live?

8   A    I'm not sure the address specifically but I think it was

9   in an apartment complex that was like within a mile or two of

10  Knox Woods.

11  Q    Emiliano Salinas, did he live in the same area generally?

12  A    Emiliano, yes, he bought a -- he lived in a condo that I

13  owned on Minuteman Court, so near Monica, in Knox Woods for a

14  number of years and then he moved to the same development as

15  Loreta, like one mile away.

16  Q    Where did Mark Vicente live?

17  A    Mark Vicente lived at the Twilight House, I can't

18  remember the number, but then he moved closer to the same

19  apartment complex I think as Jim Del Negro.  Oh, and he lived

20  for a period of time as well at 7 Generals Way.

21  Q    Where did Nicki Clyne live?

22  A    Nicki Clyne lived on Hancock Way originally which was

23  right next to Wilton Court, so similarly in Knox Woods over by

24  Dani, and then she moved to the other side, I think she was on

25  a street called Yorktown which was near Ivy, all in Knox

L. Salzman - direct - Hajjar                    1997

1    Woods.

2    Q    Did she eventually move to 9 Milltowne?

3    A    She did, she eventually moved to 9 Milltowne; when Rosa

4    Laura bought the house for the sorority house, Nicki lived in

5    it.

6    Q    Where did Rosa Laura Junco live?

7    A    Rosa Laura Junco lived ten minutes away -- let me see --

8    Q    Showing you Slide 34.

9    A    Yeah, I can't recall the name of the street, it's not on

10   this one.

11   Q    Okay.

12   A    But it took me ten minutes to get to her house.

13   Q    And Daniella Padilla, where did she live?

14   A    Daniella Padilla lived over by Wilton Court, so over by

15   where Dani lived and Nicki originally.

16   Q    Where did Allison Mack live?

17   A    Allison Mack lived in 7 Generals Way and then she moved I

18   think to Grenadier Court, I'm not sure if 127 was the number.

19   I believe it was.  Yes, 127 Grenadier.

20   Q    And Alex Betancourt, where did he live?

21   A    Alex lived over by Rosa Laura, so within ten minutes.

22   Q    And Jack Levy, where did he live?

23   A    Jack rented an apartment right across the street from

24   Knox Woods just on the other side, so one mile away.

25   Q    Were you aware of an instance in which someone outside

*L. Salzman - direct - Hajjar*                              1998

1  the defendant's inner circle attempted to move into Knox

2  Woods?

3  A    Yes, there was a man named Ed Kinnam who moved into

4  Knox Woods and my mother -- Keith directed my mother to tell

5  him that it was a security risk to be there for Keith and so

6  he was asked to move out.

7  Q    Did he move out?

8  A    Yes, he did.

9  Q    Were you aware if the defendant attempted to stop a

10  member of the inner circle from moving out of Knox Woods?

11  A    Yes.

12  Q    Can you describe that to the jury?

13  A    Nicki rented an apartment outside of Knox Woods about

14  maybe a mile and a half, two miles away and she had told me

15  that Keith called her and told her that it was a breach and

16  she should live closer.  She moved back into Knox Woods.

17  Q    She moved back into the community?

18  A    Yes.

19  Q    Into Knox Woods?

20  A    Yes, back into the development.

21  Q    Did there come a time where you became aware of certain

22  allegations against an individual named Robbie Chiappone?

23  A    Yes.

24  Q    Who first alerted you to these claims?

25  A    Keith.

L. Salzman - direct - Hajjar                                    1999

1    Q    Were these claims reported to law enforcement right away?

2    A    Not right away, within six weeks.

3    Q    And who reported them eventually?

4    A    I did with Alex and Robbie.

5    Q    At some point after that were you tasked with checking in

6    with Robbie every day?

7    A    Yes, tasked to assign Robbie to check in with me

8    everything he was doing.

9    Q    Can you explain that?

10   A    That because of Robbie's conduct he was a potential

11   liability to the community and if he was going to be allowed

12   to continue to live near us all, he needed to be reporting in

13   to me about everything he was doing and everybody he was with

14   while he stayed in the community and before he left to join

15   the military.

16   Q    Did Robbie check in with you?

17   A    Yes, he was checking in with me.

18   Q    What did the defendant tell you about what Robbie was

19   telling you in his check-ins?

20   A    That he thought that Robbie was not being honest, was

21   lying to me about what he was doing or who he was with and

22   that it would be good to set something up to be able to catch

23   him so that Robbie would know that we knew he was lying.

24   Q    What did you understand that to mean, set something up so

25   we could test him?

L. Salzman - direct - Hajjar                                  2000

1   A    Well, he proposed that we arrange a meeting.

2   Q    When you say, "he," Ms. Salzman, who are you --

3   A    Keith told me to arrange a meeting between -- to have

4   Robbie -- Robbie and I went to the Shenendehowa track which

5   was the high school track and walked around and staged a

6   meeting that seemed accidental to Robbie but it was planned

7   between Robbie and Nicole except that he didn't know that

8   Nicole was Nicole, she used a false name, and Keith told me to

9   do this, to have Robbie there so that he could have this

10  meeting with Nicole that appeared to be accidental.

11  Q    What was the purpose of the staged meeting?

12  A    To see if Robbie reported it to me.

13  Q    And what happened?

14  A    I brought Robbie to the track, Nicole was there, I spent

15  some time with him there and when I left I saw her approach

16  him and the two of them have a conversation and I left.

17  Q    Did you prearrange this meeting with Nicole?

18  A    I did, yes.

19  Q    Is this the same Nicole who was the DOS slave you spoke

20  about earlier?

21  A    Yes.

22  Q    And around what period of time was this?

23  A    This was -- I think it was in the fall of 2015.

24  Q    What happened after you left Robbie and saw Nicole at the

25  track, what happened after that?

L. Salzman - direct - Hajjar                    2001

1   A    I'm sorry, I think it was 2016.

2   Q    So, in 2016?

3   A    2016.

4   Q    What happened?

5   A    What happened after the track?

6   Q    Yes?

7   A    Keith alerted me that there had been subsequent

8   communications and meetings between the two of them, that

9   Nicole was with Robbie and a friend of his and asked me if

10  Robbie was -- told me about it.

11  Q    Did you interact with Robbie and Nicole together?

12  A    No, I did not.

13  Q    And did the defendant tell you that Nicole was going to

14  use a false name?

15  A    Yes, he did and that she set up a false Facebook account.

16  Q    Did you have a subsequent conversation with the defendant

17  about this?

18  A    I did because I was concerned based on the allegations

19  that had been made against Robbie and based on my

20  conversations with Keith that he was a liability and might be

21  a danger to people within our community, I was concerned about

22  Nicole spending time with him and so I was asking Keith does

23  she know about Robbie and like is she -- I mean is she going

24  to have sex with him or what's going to happen.

25  Q    You asked him this because the allegations you had heard

L. Salzman - direct - Hajjar                        2002

1   involved -- involved sex in some way?

2   A    Yes.

3   Q    What did the defendant tell you?

4   A    That she was not going to have sex with him but that she

5   would if he asked her to, that she would if Keith asked her

6   to, he said she would if I asked her to.

7   Q    And at the time did you understand -- were you in DOS at

8   the time?

9   A    I was not.

10  Q    Did you understand what he meant?

11  A    No.  It seemed strange to me and I didn't know that they

12  had had any relationship, so that alerted me that they had

13  some relationship where if he had asked her to have sex with

14  another person, she would have done it.

15  Q    At some point after that did you ask Mark Vicente to

16  remove a video of Nicole somewhere?

17  A    Yes, I did.

18  Q    Can you explain that and why you did that?

19  A    Yeah.  So, for the same reason that -- my understanding

20  was that Robbie was a potential danger to people -- to women

21  within our community and Nick had interacted -- Nicole had

22  interacted with Robbie using a false name and he didn't know

23  that she had any connection to our community, I was afraid

24  that if he found out that she had a connection to our

25  community, that might put her in danger, that he might feel

1    tricked and upset and do something to her that could be

2    potentially detrimental to her.

3             THE COURT:  Can we just take a -- keep that thought,

4    we're just going to -- one of the jurors needs to leave the

5    room briefly so why don't we just wait.

6             A JUROR:  Thank you.

7             THE COURT:  Take your time.

8             (Pause in the proceedings.)

9             THE COURT:  If you want to stand and stretch, you

10   can.  I do.  (Pause.)

11            (Juror reenters the courtroom.)

12            THE COURT:  All right, let's continue then.

13   BY MS. HAJJAR:

14   Q    Ms. Salzman, you were explaining why you asked Mark

15   Vicente to remove a video of Nicole.

16   A    Yes, so my understanding was that the allegations against

17   Robbie and the circumstances surrounding Robbie were a

18   potential liability and danger to women within our community,

19   women in general but women within our community at this time

20   and that Nicole had engaged with him under a circumstance

21   where he didn't know who she was and that was on purpose she

22   had given a false name and he didn't know that she was part of

23   our community and I thought that if he saw her -- she was in a

24   V Week promotional video, if he saw her in V week video it

25   might alert him to the fact that it had not been accidental,

L. Salzman - direct - Hajjar                                2004

 1   their meeting, and that she had lied about who she was and I

 2   thought it could put her at risk so I asked Mark to please

 3   remove her from the video in the unlikely but possible event

 4   that Robbie might see the video and recognize her.

 5   Q     All right.  Ms. Salzman, I'm going to direct your

 6   attention to July 24th, 2018, were you arrested on that date?

 7   A     Yes, I was.

 8   Q     What charges were you arrested for?

 9   A     I was arrested for harboring, trafficking forced labor,

10   wire fraud, an extortion and as part of a racketeering

11   conspiracy.

12   Q     And directing your attention to March 2018, did there

13   come a time where you asked for a meeting with the government?

14   A     I did, yes.

15   Q     Did you later meet with FBI agents and people from the

16   U.S. Attorney's Office?

17   A     Yes, I did.

18   Q     Were you represented by a lawyer?

19   A     Yes, I was.

20   Q     And at some point after that did you decide to start

21   cooperating with the government?

22   A     I did, yes.

23   Q     When did you first start meeting with the government?

24   A     I believe in March.

25   Q     And in the --

L. Salzman - direct - Hajjar                          2005

1   A    I don't recall the date specifically.

2   Q    And in the weeks and months that followed did you meet

3   with federal agents and prosecutors again?

4   A    I did, yes.

5   Q    And what types of things did you talk about in these

6   meetings?

7   A    All the things that I've spoken about here in the last

8   couple of days, the crimes that I participated in and ones

9   that I knew about, some of them that the government was aware

10  of and some additional ones that they weren't.

11  Q    Did you tell the government about all the crimes that you

12  committed or had knowledge of?

13  A    Yes, I did.

14  Q    And about crimes that other individuals committed?

15  A    Yes, I did.

16  Q    Including the defendant?

17  A    Yes.

18  Q    Did you tell the government about crimes committed by

19  people you cared about?

20  A    Yes, I did.

21  Q    Did you ultimately plead guilty?

22  A    Yes, I did.

23  Q    What crimes did you plead guilty to?

24  A    I pled guilty to racketeering and racketeering

25  conspiracy.

L. Salzman - direct - Hajjar                    2006

1    Q    Did that involve admitting participation in certain other

2    crimes as well?

3    A    Yes, it did.

4    Q    Where did you plead guilty?

5    A    Here in the Eastern District in this courtroom.

6    Q    Before a judge?

7    A    Before Judge Garaufis.

8    Q    And was that in March of 2019?

9    A    Yes, it was.

10   Q    I may have misspoken, did you start meeting with the

11   government prior to that?

12   A    Yes, I did.

13   Q    In that year, 2019?

14   A    Yes, correct.

15   Q    After you pleaded guilty did you continue to meet with

16   the government?

17   A    Yes, I did.

18   Q    In your indictment was there an enterprise alleged?

19   A    Yes.

20   Q    And did you plead guilty to being part of that

21   enterprise?

22   A    Yes, I did.

23   Q    That enterprise was the defendant's inner circle?

24   A    Yes.

25   Q    When you pled guilty did you do so pursuant to a written

L. Salzman - direct - Hajjar                    2007

1    agreement?

2    A    Yes.

3    Q    Was that a cooperation agreement?

4    A    Yes, it was a cooperation agreement.

5         MS. HAJJAR:  Your Honor, may I show the witness

6    what's marked for identification as 3500 LS-6.

7         THE COURT:  Yes, you may.

8         MS. HAJJAR:  Thank you, Your Honor.

9         THE WITNESS:  This is my cooperation agreement.

10   Q    And turning to page ten of this agreement, is this your

11   signature?

12   A    Yes, it is.

13        MS. HAJJAR:  Your Honor, the government moves to

14   admit 3500 LS-6.

15        MR. AGNIFILO:  No objection.

16        THE COURT:  All right, Government Exhibit 3500 LS-6

17   is received in evidence.

18        (Government's Exhibit 3500 LS-6 so marked in

19   evidence.)

20   Q    As part of this agreement, Ms. Salzman, did you make

21   certain promises to the government?

22   A    Yes, I did.

23   Q    What were those promises?

24   A    To provide truthful and complete testimony and to assist

25   with any aspects of the investigation that I was able to.

L. Salzman - direct - Hajjar                    2008

1   Q    What do you hope to get in return?

2   A    A letter saying that I provided truthful testimony and

3   helped in the way that I just described.

4   Q    Did the government agree to do anything else aside from

5   writing that letter in your cooperation agreement?

6   A    No.

7   Q    Do you know the maximum sentence that you face?

8   A    My understanding is it is up to twenty years.

9   Q    On each --

10  A    On two counts.

11  Q    Who decides your sentence?

12  A    Judge Garaufis.

13  Q    Will the government recommend a specific sentence to the

14  judge?

15  A    No.

16  Q    Has the government promised you anything about what your

17  sentence will be in this case?

18  A    No.

19  Q    Do you know if your sentence depends on what happens in

20  this particular trial?

21  A    I was told it does not, it's not, it's outcome

22  independent.

23  Q    What's your understanding of what happens if you fail to

24  tell the truth today?

25  A    That all the agreements that I made are forfeit.

L. Salzman - direct - Hajjar                          2009

1    Q     What happens to your cooperation agreement?

2    A     It's forfeit.

3    Q     What does that mean?

4    A     It means that it is -- that I won't get the letter and

5    that all of the things that -- all the additional crimes and

6    things that I confessed to and shared with the government,

7    told the government about, I could be prosecuted for in

8    addition to the original crimes that I pled guilty to.

9    Q     Are you hoping the judge will give you a lower sentence

10   because of your cooperation?

11   A     Yes, of course.

12   Q     Do you know when you'll be sentenced?

13   A     Right now I'm scheduled to be sentenced on

14   September 11th.

15   Q     As you sit here today, do you know what your sentence

16   will be?

17   A     No.

18   Q     Ms. Salzman, you testified that at some point in the fall

19   of 2017 there were efforts to aggregate DOS related materials?

20   A     Yes, correct.

21   Q     The original copies of physical collateral and DOS

22   materials, do you know where those are?

23   A     I don't, no.  I had some materials, some collaterals on a

24   hard drive that I left in Mexico with Nicki Clyne that I

25   believe she left with Jack Levy and that I've requested to

L. Salzman - direct - Hajjar                    2010

1   have back and have not been returned to me.

2         There were additional materials, collateral that I

3   gave to Rosa Laura that I don't know what she did with, and I

4   am not sure if all the DOS masters gave their collateral and

5   materials to Rosa Laura or they have them themselves somewhere

6   or what happened to them when they left Albany.

7   Q    That hard drive that had DOS related materials?

8   A    Yes.

9   Q    Was there something written on it to indicate it was

10  yours?

11  A    Skylar (ph).

12  Q    What's Skylar?

13  A    It was a combination of Keith and my initials.

14  Q    You mentioned that you purchased burner phones to

15  communicate with the defendant?

16  A    Yes.

17  Q    Where are those now?

18  A    I left those phones in Mexico with Nicki when I left so I

19  assume that Jack has them.

20  Q    This is Jack Levy?

21  A    Yes.  I also requested for them back.

22  Q    Did Jack Levy at any point acknowledge that he had your

23  electronic devices?

24  A    At one point in time he did or at least had access to

25  them.

L. Salzman - direct - Hajjar                    2011

1   Q    And you had made a request through your lawyers for the

2   return of this material?

3   A    Yes, correct.

4   Q    Have you received these devices back?

5   A    I have not, no.

6           MS. HAJJAR:  Your Honor, I believe we're getting to

7   the point where there will be recordings shown so it may be a

8   good time for a break so we can --

9           THE COURT:  All right, we can take our mid-

10  afternoon break at this time.

11          All rise for the jury.

12          (Jury leaves courtroom.)

13          THE COURT:  All right, we'll take our break.  You

14  may step down.  Do not discuss your testimony with anyone.

15          (Witness steps down.)

16          THE COURT:  All right, we'll take a break.

17          (Time noted:  3:25 p.m.)

18          (Recess taken.)

19          (Continued on next page.)

20

21

22

23

24

25

Proceedings                                    2012

1    (continuing.)

2             (In open court.)

3             (Defendant enters the courtroom at 3:35 p.m.)

4             THE COURT:  All right.  Is there a stipulation or --

5             MR. AGNIFILO:  We reached a stipulation.

6             THE COURT:  And so are you going to put it in

7    evidence?

8             MS. HAJJAR:  Yes, Your Honor.

9             THE COURT:  Okay, before we hear the tapes.

10            MS. HAJJAR:  Yes.

11            THE COURT:  Okay, let's ask the witness to come

12   back.

13            Are we providing transcripts for the jurors?

14            MS. HAJJAR:  Yes, Your Honor.  We have put the

15   binders on their desks.

16            THE COURT:  Okay.

17            (Witness takes the stand.)

18            THE COURT:  All right, please bring in the jury.

19            About how long will these tapes take to play?

20            MS. HAJJAR:  I think about 45 minutes in total, Your

21   Honor.

22            THE COURT:  And you have more for the witness after

23   that?

24            MS. HAJJAR:  Very little, if anything.  That should

25   be about it.

Proceedings                                      2013

1             THE COURT:  All right.  Well, if we end a few

2    minutes early, we will start cross tomorrow morning.

3             MR. AGNIFILO:  That's fine, Judge.  That would be

4    great.

5             THE COURT:  All right.

6             MS. PENZA:  If we are ending earlier, Your Honor, we

7    would ask to keep the direct open until tomorrow morning just

8    because there are a couple exhibits that we may just seek to

9    admit.

10            THE COURT:  All right.

11            MS. PENZA:  But we don't expect anything tomorrow.

12            THE COURT:  You don't expect any further testimony

13   on direct.

14            MS. PENZA:  Correct.

15            THE COURT:  All right.

16            (Jury enters.)

17            THE COURT:  Members of the jury, there are looseleaf

18   binders on your seats.

19            THE JUROR:  Missing one.

20            THE COURT:  You are missing one?

21            THE PARALEGAL:  (Handing.)

22            THE COURT:  All right, you may be seated.

23            Ms. Hajjar you may continue your examination of the

24   witness.

25            I remind the witness that she is still under oath.

Proceedings                                              2014

1              MS. HAJJAR:  At this point, Your Honor --

2              THE COURT:  I'm sorry?

3              MS. HAJJAR:  Your Honor, may I read the stipulation

4    that's been marked as Government's Exhibit 250?

5              THE COURT:  Yes, you may do so.

6              MS. HAJJAR:  The stipulation reads:  It is hereby

7    stipulated and agreed by and between the United States of

8    America, by Assistant United States Attorneys Moira Penza,

9    Tanya Hajjar, and Mark Lesko, and by the defendant, Keith

10   Raniere by the undersigned counsel, that on or about

11   October 18th, 2018, India Oxenberg provided the Government

12   with thumb drives containing Government's Exhibits 494, 495,

13   and 496, and on or about April 4th, 2019, Allison Mack

14   provided the Government with a thumb drive containing

15   Government's Exhibit 497.

16             Government's Exhibits 494, 495, 496, and 497 are

17   admissible into evidence.

18             Your Honor, we would offer Government's Exhibits

19   494, 495, 496, 497, and the stipulation itself, which is

20   Government's Exhibit 250, into evidence.

21             MR. AGNIFILO:  We agree, Your Honor.

22             THE COURT:  All right, Government's Exhibit 250 --

23             MS. HAJJAR:  250, Your Honor, yes.

24             THE COURT:  -- and Government's Exhibits 494, 495,

25   496, and 497 are all received in evidence.

L. Salzman - direct - Hajjar                    2015

1          (Government's Exhibits 494, 495, 496, and 497

2     received in evidence.)

3          THE COURT:  You may proceed.

4          MS. HAJJAR:  Thank you, Your Honor.

5     DIRECT EXAMINATION

6     BY MS. HAJJAR: (Continued.)

7     Q    Ms. Salzman, you testified that you participated in

8     meetings of the first line in DOS that were recorded.

9     A    Yes, that's correct.

10    Q    And these recordings were of the defendant and the

11    first-line DOS masters at the time?

12    A    Yes.

13    Q    In these recorded meetings, did you discuss matters

14    relating to DOS such as branding and enrollment?

15    A    Yes, we did.

16    Q    Did you have an understanding as to who maintained these

17    recordings?

18    A    It was my understanding that Loreta Garza maintained the

19    recordings.

20    Q    You testified that you personally reviewed some

21    recordings relating to the DOS book.

22    A    Correct.

23    Q    In those recordings, did you hear the defendant's voice?

24    A    Yes, I did.

25    Q    After you decided to cooperate and after you pleaded

L. Salzman - direct - Hajjar                    2016

1   guilty in this case, did there come a time that you reviewed

2   certain recordings?

3   A    Yes.

4   Q    And were those recordings of the defendant and other

5   first-line DOS masters?

6   A    Yes, they were.

7   Q    Were these recordings recorded prior to your recruitment

8   into DOS?

9   A    Yes, they were.

10  Q    And were the content of these recordings about DOS?

11  A    Yes, they were.

12  Q    Now, Ms. Salzman, were transcripts made of these

13  recordings?

14  A    Yes.

15  Q    And in the binder in font of you, there are transcripts

16  that are marked Government's Exhibit 494T, 495T, 496T, and

17  497T.

18  A    Yes.

19  Q    And for each of those exhibits, there's a transcript with

20  the letter T attached.

21  A    Correct.

22  Q    Did you review these transcripts?

23  A    Yes, I did.

24  Q    And to show that you reviewed them, did you sign and date

25  them?

L. Salzman - direct - Hajjar                    2017

1  A    Yes.  Those are my initials and the date that I wrote.

2  Q    And are these transcripts fair and accurate

3  transcriptions of the recordings?

4  A    Yes, they are.

5  Q    When you were preparing these transcripts, were you able

6  to make out every single word that was said?

7  A    Not every single word.

8  Q    Did you indicate "UI" in these transcripts where words

9  were unintelligible?

10  A    Yes.

11        MS. HAJJAR:  Your Honor, the Government offers 494T,

12  495T, 496T and 497T as aids to the jury.

13        MR. AGNIFILO:  No objection.

14        THE COURT:  All right.  494T, 495T, 496T, 497T are

15  received in evidence as aids to the jury.

16        (Government's Exhibit 494T, 495T, 496T, 497T

17  received in evidence.)

18        THE COURT:  Let me just give you an instruction

19  about these transcripts.  You will be listening to the voice

20  recordings and these transcripts are intended to aid you in

21  understanding what's being said, but if there's any difference

22  between what you hear and what you see on the transcript, the

23  evidence is what you hear, so just bear that in mind.  So if

24  you hear a word and sounds like one thing on the recording and

25  something else on the transcript, the evidence is the

L. Salzman - direct - Hajjar                    2018

1   recording.

2            So having said that, let's move ahead.

3            MS. HAJJAR:  Thank you, Your Honor.

4            I would like to play Exhibit 494, and I will direct

5   the jury's attention to 494T.

6            THE COURT:  Very well.

7            (Audio played.)

8            (Audio paused.)

9   BY MS. HAJJAR:

10  Q    Ms. Salzman, who is speaking?  Can you recognize that

11  voice?

12  A    Yes.  That's Keith.

13  Q    That's the defendant?

14  A    Yes, correct.

15  Q    Did you hear the other voice that was -- that you heard

16  briefly?

17  A    I heard Daniella Padilla and Loreta Garza.

18           (Audio played.)

19           (Audio paused.)

20  BY MS. HAJJAR:

21  Q    Rosa Laura, who is that?

22  A    Rosa Laura Junco.

23           (Audio played.)

24           (Audio paused.)

25  BY MS. HAJJAR:

L. Salzman - direct - Hajjar                    2019

1   Q    Ms. Salzman, who are the other participants on this

2   recording?  Can you recognize their voices?

3   A    Yes.  Loreta Garza, Monica Duran, and Daniella Padilla.

4   Q    And the discussion of crafts, is that something you are

5   familiar with in the context of DOS?

6   A    Yes, it is.

7   Q    What is that --

8   A    A craft is almost like a committee.

9   Q    And what were these committees doing?

10  A    They were heading up the different DOS objectives.

11  Q    Can you explain that further?

12  A    Sure.  Like, the collateral craft -- Rosa Laura was head

13  of the collateral craft, so, like, the committee that dealt

14  with collateral, so she was responsible for reviewing and

15  cataloging and storing and rating the effectiveness or

16  legitimacy of each of the collaterals.

17          (Audio played.)

18          (Audio paused.)

19  BY MS. HAJJAR:

20  Q    This recording, Ms. Salzman, is this a recording of the

21  defendant and other first-line DOS masters?

22  A    Yes, it is.

23  Q    Were you involved in any DOS crafts?

24  A    I was going to be part of the ethics craft of putting in

25  ethics protocols.

1   Q     What were the other crafts?

2   A     I actually don't know.

3   Q     Was one of the crafts collateral?

4   A     Yes.  I knew of the collateral one, which I mentioned.

5           MS. HAJJAR:  Your Honor, I would like to play

6   Government's Exhibit 495 and direct the jury's attention to

7   495T.

8           THE COURT:  Very well.

9           (Audio played.)

10          (Audio paused.)

11  BY MS. HAJJAR:

12  Q    Ms. Salzman, do you recognize the voices on this

13  recording?

14  A     Yes, I do.

15  Q     And who is speaking?

16  A     Keith, Loreta Garza, Nicki Clyne, and Monica Duran.

17  Q     And the prefatory language, June 12, 2016, Keith, Nicki,

18  Moni, Laureis, Dani and Lola, who said that line?

19  A     Loreta.

20          (Audio played.)

21          (Audio paused.)

22  BY MS. HAJJAR:

23  Q    Ms. Salzman, you testified about the word "lineage" in

24  the context of DOS.  What did that mean?

25  A     Lineage was each of the lines of subsequent women who are

L. Salzman - direct - Hajjar                    2021

1    enrolled under a first-line DOS master, so my lineage

2    included -- it was Keith and myself, and then the women I

3    enrolled, the women they enrolled, the women they enrolled,

4    and all the way down, that would be one lineage.

5    Q    And the series of components that go with the brand, what

6    does that refer to?

7    A    It refers to what I was describing before as the tattoo,

8    the different elements that were going to accompany it, the

9    individual symbols between master and slave, the symbol that

10   indicated each line, possibly the enrollment number, those

11   things.

12   Q    You testified yesterday that there would be a number

13   accompanied with the brand in some way?

14   A    Yes.

15   Q    Was that to be tattooed?

16   A    Yes.  All of it was to be tattooed on top of the brand or

17   around the brand, as I understood.

18            (Audio played.)

19            (Audio paused.)

20   BY MS. HAJJAR:

21   Q    Ms. Salzman, one out of the each of seven of you, how

22   many first-line DOS masters were there prior to your joining

23   DOS?

24   A    Seven.

25   Q    And you were the eighth?

L. Salzman - direct - Hajjar                    2022

1    A    Correct.

2              (Audio played.)

3              (Audio paused.)

4    BY MS. HAJJAR:

5    Q    Ms. Salzman, do you know what's being discussed in this

6    section of the recording?

7    A    The brand.

8    Q    And when the defendant says, It's actually K-A-R --

9    A    His initials are -- the brand is his initials, K-A-R.

10             (Audio played.)

11             (Audio paused.)

12   BY MS. HAJJAR:

13   Q    Ms. Salzman, "the common brand as a scarification," do

14   you know what that refers to?

15   A    I think it just refers to the brand that everybody got.

16   Not the brand that the first line got, the brand that everyone

17   else got, so the inverted upsidedown brand.

18   Q    You testified earlier that the first line got a slightly

19   different brand.

20   A    Yes.

21   Q    And a grandmaster has certain things.  What did you

22   understand a grandmaster to be in the context of DOS?

23   A    Someone who has a slave who has enrolled a slave.

24             (Audio played.)

25             (Audio paused.)

L. Salzman - direct - Hajjar                2023

1   BY MS. HAJJAR:

2   Q    Ms. Salzman, "the machine and figure out how to duplicate

3   it," do you know what the defendant is referring to?

4   A    A machine to do the branding and being able to duplicate

5   the branding process.

6   Q    When the defendant says, "there's also the issue of Cami

7   being in that or not," do you understand what he's referring

8   to?

9   A    Whether Cami would join the group in learning how to do a

10  brand.

11  Q    And this is Camila?

12  A    Yes.

13          (Audio played.)

14          (Audio paused.)

15  BY MS. HAJJAR:

16  Q    Ms. Salzman, you testified about this, but SOP, was that

17  the men's organization the defendant created?

18  A    Yes.  Society of Protectors.

19  Q    And this "different areas of people who are field

20  operatives, informational operatives," do you know what the

21  defendant is referring to?

22  A    I do not.

23          (Audio played.)

24          (Audio paused.)

25  BY MS. HAJJAR:

L. Salzman - direct - Hajjar                    2024

1    Q    Ms. Salzman, you testified about the size of the brand.

2    How large was your brand?

3    A    My brand is probably almost two and a half inches by

4    three inches.

5    Q    And were you --

6    A    There was a mistake.  I was told it was supposed to be an

7    inch by an inch.  There had been a mistake, so it ended up

8    being not only larger, but skewed from the square to a

9    rectangle.

10              (Audio played.)

11              (Audio paused.)

12   BY MS. HAJJAR:

13   Q    Ms. Salzman, when the defendant says, "She knows her

14   master, she knows a grandmaster, which is someone up in the

15   lineage," do you have an understanding of what that means?

16   A    That she may be told that they are grandmaster is not who

17   it is.

18   Q    When the defendant says, "she probably doesn't know the

19   full lineage, it's better not to" --

20   A    That they -- that she -- that everyone may not know

21   everyone who is involved in the entire line.

22   Q    Did you know everyone who was involved in DOS in

23   different lines, in other words, recruited by different

24   first-line DOS masters?

25   A    At some point, I had access to all of them, but when I

L. Salzman - direct - Hajjar                    2025

1   was sharing with my slaves -- like, when I let them know who

2   each other were enrolling, I was corrected and told that they

3   were not to know that.

4             (Audio played.)

5             (Audio paused.)

6   BY MS. HAJJAR:

7   Q    Ms. Salzman, the circles the defendant is referring to,

8   what are those referred to in the context of DOS?

9   A    A circle is your sister slave.  So the women who shared

10  the same master as you can be put in a circle of sisters.

11  Q    And are the individuals on this recording, except for

12  defendant, part of the same circle?

13  A    Yes, correct.

14  Q    That's the first line of DOS?

15  A    Yes, correct.

16  Q    And you joined that circle as the eighth member?

17  A    Yes, correct.

18            (Audio played.)

19            (Audio paused.)

20  BY MS. HAJJAR:

21  Q    Ms. Salzman, when the defendant is talking about the Knox

22  Woods Homeowners Association, do you know what he's referring

23  to?

24  A    What he's referring to as the Homeowners Association?

25  Q    This incident he's referring to.

L. Salzman - direct - Hajjar                    2026

1    A    Yes.

2    Q    Can you describe it to the jury?

3    A    Yes.  There was a project or an organization called

4    Plugged In, and they wanted to put -- that Keith founded and

5    they wanted to install these -- I think they were satellites,

6    but also could have video cameras on -- outside some of the

7    homes that we owned in Knox Woods and asked some of us who

8    owned homes in Knox Woods, Keith asked, and the guys who ran

9    Plugged in asked if we could put them up in our homes.  So I

10   had one, like, at 3 Hale Drive, and the other condo that I

11   owned, 7 Minuteman, but the Homeowners Association complained

12   about it and didn't want us to have them.

13           And so at this time, we remember Keith talking about

14   possibly wanting us to go to the Homeowners Association

15   meeting.  He said me -- he said he might ask me to go.

16   Q    And when the defendant says, "might be able to just vote

17   them out," what is he referring to?

18   A    I think the Homeowners Association.

19   Q    Do you have an understanding of what Plugged in was, the

20   defendant's company?

21   A    Some, not really an extensive understanding of it, but

22   there were some concepts that I understand, like, that it

23   would be a secure network so you could be online and have your

24   phone in some kind of secure or encrypted type of

25   communication with the other people who are in the network and

1   also that there was an opportunity that you could, like, be

2   plugged in, be online at all times, always be online with

3   other people who were online, either, like, in an ear piece or

4   have access to them on a consistent basis.

5   Q    Was this actually developed?

6   A    Some of it was.  It was a process, I don't think they

7   ever finalized it.

8              (Audio played.)

9              (Audio paused.)

10             (Continued on the following page.)

1   BY MS. HAJJAR (CONTINUED):

2   Q    Ms. Salzman, is this exchange about Camila?

3   A    Yes.

4   Q    And her enrollment into DOS?

5   A    About her becoming part of the circle versus being

6   separate.

7   Q    And the -- the person who says, I think out of everyone

8   I'm the one that has the most doubt resistance about it.

9        Who said that?

10  A    Loreta.

11  Q    Are you aware of Loreta's views about Camila?  Did she

12  express them to you?

13  A    Yes.

14  Q    Can you describe them to the jury?

15  A    Loreta owned and ran Rainbow Cultural Garden which was

16  the children's educational program and Cami was a teacher in

17  the program and Loreta felt that whenever there was some

18  issue or disagreement concerning Cami that Keith always took

19  Cami's side.  And that Cami wasn't held to the same level of

20  standards or requirements as other people, and it was

21  upsetting and difficult for Loreta.

22       (Audio plays.)

23       (Audio stops.)

24  Q    Ms. Salzman, when the defendant says or when Monica

25  says readiness, penitences, contract, are these all concepts

1   you discussed in the context of DOS?

2   A    Yes.

3              (Audio plays.)

4              (Audio stops.)

5   Q    Ms. Salzman, the defendant says, Maybe if I were a

6   different type of master I could tell you to just suck it

7   up, what did you understand that to mean?

8   A    That he wants a certain objective and he's trying to

9   get them to agree that they want the objective, too, yet

10  they don't want the objective but he wants them to want the

11  objective and he's saying, Well, if I were a different type

12  of master I would tell you to just suck it up, but I'm the

13  kind of master that lets you choose, except there isn't

14  really much of a choice because when they're saying they

15  don't want to do it, it doesn't really stop and it starts to

16  go into, well, it's all really hard for me.  This is really

17  hard for me and maybe I'm just not good enough as a master,

18  you know, being the good kind of master that everybody wants

19  is really, you know, just something that can't work.  And

20  everybody goes no, no, we want you to be bad, you know,

21  no -- and they're saying if you want us to do it, just tell

22  us and we'll do it, but you're asking us what we want and we

23  don't want this.

24  Q    So what's the objective in this context?

25  A    To get Cami into the group and into the branding class

Proceedings                                    2030

1    that's going to take place the following day.

2              (Audio plays.)

3              (Audio stops.)

4    Q    Ms. Salzman, when the defendant says, There's a certain

5    democratic process of sorts and then this is an order.  This

6    isn't is democracy, what do you think him to be referring

7    to?

8    A    He's making a distinction between a democratic process

9    where everybody gets to weigh in and decide together versus

10   an order and he's saying that he's not giving the order

11   right now but this is a democratic process, but the

12   democratic process is a problem because they're being

13   resistive and having problems and not being like men and

14   just sucking it up.  And if you were in the Army like a man

15   you would just suck it up and do it because I'm expressing

16   the want for it and I shouldn't have to give the order.

17             MS. HAJJAR:  Your Honor, it's past 5:00.  There is

18   some more to the recording, but it might make sense to break

19   here for the day.

20             THE COURT:  Yeah, I think it would be worthwhile

21   to break for the day because there's a substantial amount in

22   this particular recording and you can start with it first

23   thing in the morning and finish the other two recordings

24   after that.

25             MS. HAJJAR:  Thank you, Your Honor.

Proceedings                                           2031

1          THE COURT:  All right.  Members of the Jury, we're

2    going to break for the day.  I'm going to remind you that

3    it's extremely important that you follow my instructions

4    that you not discuss this case with anyone.  You know, you

5    can sit down.  I have more to say.  Now come on.

6          Do not discuss the case with anyone, not your

7    family, friends or business associates and not your fellow

8    jurors.  In addition, you must not read, listen to, watch or

9    access any accounts of this case in any form of media such

10   as newspapers, TV, radio, podcasts, the Internet or research

11   or seek outside information about any aspect of the case.

12   And even though I say this every day I don't want you to

13   think this is ordinary.  Each day it's important that I

14   remind you.  So I just want you to understand that this is

15   as important as anything else that you hear or read or see

16   in this courtroom during this trial.  Because what we're

17   trying to do here is to have a fair trial and that you not

18   be impeded by some outside influences.  So even though it's

19   rote, it's essential and I just wanted you to know that.

20   And I feel very strongly about it.  I've been doing this

21   over 19 years now and this is a very important part of any

22   trial.

23          So do not communicate with anyone about the case

24   on your phone, whether through e-mail, text messaging or any

25   other means, through any blog or website or by way of any

Proceedings                    2032

1   social media, including Facebook, Twitter, Instagram,

2   YouTube or other similar sites.  Do not consider anything

3   you may have read or heard about the case outside of this

4   courtroom, whether you read it before or during the jury

5   selection process or during the trial and do not attempt any

6   independent research or investigation on the case and do not

7   visit any of the locations, again, defined on the

8   questionnaire or discussed during the course of the jury

9   selection process or during the trial.

10          So again, on behalf of the parties, I want to

11  thank you for your attention today and every day.  Have a

12  good night's seep.  We'll see you tomorrow morning at 9:30.

13          All rise for the jury.

14          (Jury exits the courtroom.)

15          (The following matters occurred outside the

16  presence of the jury.)

17          THE COURT:  All right.  The witness may stand

18  down.  Please do not discuss your testimony with anyone.

19          (The witness exits the witness stand.)

20          THE COURT:  All right.  Everyone may be seated.

21          Is there anything else from the Government?

22          MS. HAJJAR:  Not for today, thank you, Your Honor.

23          THE COURT:  Anything from you, sir?

24          MR. AGNIFILO:  Yes, Judge.  We -- we cannot reach

25  agreement on the admissibility of one particular exhibit

1   which relates to pages from a journal that Camila maintained

2   and so what we're going to do, Your Honor, is we're probably

3   going to submit a short, we'll keep it very short, short

4   letter brief by hand in a couple of hours.  The

5   Government --

6           THE COURT:  All right.  That's fine, I'll look at

7   it.

8           MR. AGNIFILO:  All right.

9           THE COURT:  And take it up tomorrow morning if we

10  need to.

11          MR. AGNIFILO:  And there's one other thing.

12          THE COURT:  You said one thing.

13          MR. AGNIFILO:  Well, that was the first thing.

14          THE COURT:  Oh, there are two things.

15          Go ahead.

16          MR. AGNIFILO:  There's still going to be more on

17  this sort of abortion question that we couldn't resolve, so

18  we'll raise that as well.

19          MS. PENZA:  So we gave 48 hours notice,

20  Your Honor, regarding the next witness who does intend to

21  offer testimony regarding various abortions for probative

22  value in this case.

23          THE COURT:  Abortions that the witness had or

24  abortions that others had that she knew about?

25          MS. PENZA:  Your Honor, I would rather not say on

Proceedings                           2034

1   the record unless there's --

2           THE COURT:  All right.

3           MS. PENZA:  Until there's a ruling, so I'm happy

4   to have a sidebar if that would be helpful.

5           THE COURT:  No, no.  Let's not do anymore on it.

6   There's going to be a submission.

7           MR. AGNIFILO:  Yes.

8           THE COURT:  And then there's going to be a

9   submission.  When is your submission?

10          MS. PENZA:  I did not know we were writing on

11  this, but I'm happy to respond to it.

12          THE COURT:  Well, you don't have to write on it.

13          MS. PENZA:  No, we well but if they were not

14  getting that until tonight.

15          THE COURT:  Tomorrow.

16          MS. PENZA:  We'll do it tomorrow.

17          THE COURT:  All right.  Well, we can all --

18          MS. PENZA:  It sounds like we might -- I don't

19  know where we're actually going to get in the next witness'

20  direct tomorrow, so I think we can probably -- I'll speak to

21  Mr. Agnifilo regarding how many hours he know expects

22  with -- maybe he knows how, but I think we will probably be

23  going into the afternoon with Ms. Salzman.  And so if that's

24  the case, then I don't think there's any need to resolve

25  those issues until Thursday.

Proceedings                          2035

1          MR. AGNIFILO:  If we go into the afternoon I don't

2     think we'll go deep into the afternoon.  I'm still thinking

3     3 to 4 hours.

4          THE COURT:  All right.  So you'll have your next

5     witness ready to go tomorrow afternoon.

6          MS. PENZA:  Yes, Your Honor.

7          THE COURT:  All right.  And we'll try to deal with

8     the questions that are being raised in your submission

9     sometime tomorrow.

10         MR. AGNIFILO:  Thank you, Judge.

11         THE COURT:  Okay.  Anything further?

12         MS. PENZA:  Not from the Government.

13         THE COURT:  Okay.  Thank you everybody.

14         MR. AGNIFILO:  Thank you, Judge.

15         THE COURT:  See you tomorrow.

16         (Matter adjourned to Wednesday, May 22, 2019 at

17     9:30 a.m.)

18                          -oo0oo-

19

20

21

22    I (we) certify that the foregoing is a correct transcript

      from the record of proceedings in the above-entitled matter.

23

          /s/ David R. Roy            21st Day of June, 2019

24        DAVID R. ROY                     Date

25

David R. Roy, RPR, CSR, CCR
Official Court Reporter

INDEX                                                  2036

I N D E X

W I T N E S S E S


L A U R E N   S A L Z M A N

DIRECT EXAMINATION (CONTINUED)
BY MS. HAJJAR                                          1835



E X H I B I T S

Government's Exhibit Number 1321                       1839

Government's Exhibit Number 436                        1852

Government's Exhibit Number 436                        1852

Government's Exhibit 366 and 367                       1904

Government's Exhibit Number 1244                       1939

Government's Exhibit Numbers 1238, 1241 and 1242       1947

Government's Exhibit Number 908R                       1961

Government's Exhibit Number 907                        1969

Government's Exhibit Number 43                         1971

Government's Exhibit Numbers 1484R, 1485R,            1978
1486R, 1488R and 1489R

Government's Exhibit 1498                              1991

Government's Exhibit 3500 LS-6                         2007

Government's Exhibits 494, 495, 496, and 497          2015

Government's Exhibit 494T, 495T, 496T, 497T           2017