**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| NXIVM CORPORATION, formerly known as EXECUTIVE SUCCESS PROGRAMS, INC. and FIRST PRINCIPLES, INC., | Civil No. 06-1051 (KSH) (CLW) |
| *Plaintiffs*, | |
| v. | **OPINION** |
| MORRIS SUTTON, ROCHELLE SUTTON, THE ROSS INSTITUTE, RICK ROSS a/k/a "RICKY" ROSS, STEPHANIE FRANCO, PAUL MARTIN, Ph.D. and WELLSPRING RETREAT, INC., | |
| *Defendants*. | |
| RICK ROSS, | |
| *Counterclaim-Plaintiff*, | |
| v. | |
| KEITH RANIERE, NANCY SALZMAN, KRISTIN KEEFFE, INTERFOR, INC., JUVAL AVIV, JANE DOE, and JOHN DOES 1-10, | |
| *Counterclaim-Defendants*. | |

INTERFOR, INC. and JUVAL AVIV,

          *Crossclaimants,*

      v.

NXIVM CORPORATION, KEITH
RANIERE, NANCY SALZMAN and
KRISTIN KEEFFE,

          *Crossclaim Defendants.*

**Katharine S. Hayden, U.S.D.J.**

## I.    **Introduction**

On June 19 and 20, 2017, the Court held a bench trial between crossclaimant Interfor, Inc. ("Interfor") and crossclaim defendant NXIVM Corporation ("NXIVM"). The trial arises from litigation that began in 2003, when NXIVM filed suit against several parties in the Northern District of New York. Interfor was brought into the action when defendant Rick Ross ("Ross") asserted a counterclaim against it and NXIVM for intrusion upon seclusion. (D.E. 70.) As a consequence, Interfor crossclaimed against NXIVM for contractual indemnification pursuant to an indemnity agreement (the "Indemnity Agreement") between the two, seeking the attorneys' fees and costs incurred in defending itself and enforcing the Indemnity Agreement. (D.E. 101 ("Crossclaim").) Interfor ultimately settled with Ross, and its crossclaim for contractual indemnification against NXIVM is the sole subject of this opinion.

Case 1:18-cr-00204-NGG-VMS   Document 841-4   Filed 11/22/19   Page 3 of 45   PageID #: 20379
Case 2:06-cv-01051-KSH-CLW   Document 841-4   Filed 08/26/19   Page 3 of 45   PageID:
11157

Pursuant to Fed. R. Civ. P. 52(a), which governs non-jury trials, the Court sets forth its findings of fact and, separately, its conclusions of law. The appendix to this opinion is a table of all documents admitted into evidence at trial.

Before proceeding with its opinion, the Court notes that NXIVM is no longer in operation. For their roles in the organization, Keith Raniere ("Raniere") and Nancy Salzman ("Salzman") were indicted in the Eastern District of New York. Salzman pled guilty to one count of racketeering conspiracy on March 13, 2019. On June 19, 2019, a jury convicted Raniere on seven counts, including charges related to sex trafficking, racketeering, and forced labor conspiracy. The racketeering charges against Raniere and Salzman included the underlying activity that they falsified evidence produced in this action. That evidence is unrelated to and has no bearing on Interfor's crossclaim for contractual indemnification.

## II.  <u>Findings of Fact</u>[1]

The Court finds the following facts as predicates for the parties' underlying dispute and the legal arguments advanced in their post-trial submissions. (D.E. 736-40,

---

[1] After the close of Interfor's case-in-chief, NXIVM moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). (D.E. 725.) Fed. R. Civ. P. 52(c) provides as follows:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the

742-43.)  The Court derives its findings of fact from the parties' stipulation of facts, the exhibits and depositions designations admitted at trial, and the credible trial testimony of Juval Aviv ("Aviv") and Robert J. Lack ("Lack").

### A.   NXIVM Retains Interfor's Investigatory Services

NXIVM, formerly known as Executive Success Programs, was a "human potential" company that offered seminars, executive training programs, and life coaching.  (D.E. 711, Final Pretrial Order ("PTO"), Stipulation of Facts ("SOF") ¶ 4; D.E. 733 ("6/19/17 Tr.") at 12:9-14; D.E. 734-1 Interfor's Deposition Designations of Nancy Salzman ("Salzman Dep.") at 11:17-19, 12:17-24.)   Its "conceptual" founder, Raniere, guided the overall direction and philosophy of the company.  (Salzman Dep. at 16:22-24; D.E. 734-1 Interfor's Deposition Designations of Keith Raniere ("Raniere Dep.") at 23:1-6; D.E. 734-1 Interfor's Deposition Designations of Barbara Bouchey ("Bouchey Dep.") at 156:25-157:3.)  Salzman owned NXIVM, served as its president,

---

> close of the evidence. A judgment on partial findings must
> be supported by findings of fact and conclusions of law as
> required by Rule 52(a).

"The rule's objective is to 'conserve[ ] time and resources by making it unnecessary for the court to hear evidence on additional facts when the result would not be different even if those additional facts were established.'"  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010) (alteration in original) (quoting 9 James Wm. Moore et al., *Moore's Federal Practice* § 52.50[2] (3d ed. 2010)).  The Court declined to render judgment until the close of all evidence.  Accordingly, its ruling on NXIVM's Fed. R. Civ. P. 52(c) motion and its opinion on the bench trial are itself identical and serve the same purpose. *See id.* ("Of course, the court may opt to reserve judgment until all the evidence is in or until the close of the non-movant's case-in-chief.").

and oversaw the development of its curriculum. (SOF ¶¶ 6-7.) In 2005 or 2006, Kristin
Keeffe ("Keeffe") was given the title "legal liaison" at NXIVM for her responsibilities
that had commenced in 2003. (SOF ¶ 10; *see also* D.E. 734-1 Interfor's Deposition
Designations of Kristin Keeffe ("Keeffe Dep.") at 25:14-25.) In that role, she
"facilitate[d] communication between NXIVM and its attorneys, as well as among
NXIVM's attorneys." (SOF ¶ 11; *see also* Keeffe Dep. at 26:2-7.)

Interfor "is a licensed international investigation and security consulting firm that
offers domestic and intelligence services to the legal, corporate, and financial
communities." (SOF ¶ 1.) Aviv is Interfor's President and CEO. (SOF ¶ 3.)

Sometime in 2004, Aviv first met NXIVM representatives Salzman, Keeffe, and
Joseph O'Hara ("O'Hara"), then outside counsel for NXIVM. (6/19/17 Tr. at 12:19-
13:15.) Aviv advised the three that if NXIVM wanted to retain Interfor, it would have
to be through counsel. (*Id.* at 12:24-13:1.) On September 2, 2004, O'Hara, acting on
behalf of NXIVM, formally retained Interfor's services. (SOF ¶ 16; P3-001.) Keeffe
served as NXIVM's "designated representative in conjunction with the services"
Interfor would be providing. (P3-001.)

Initially, the investigation that NXIVM retained Interfor to conduct focused on
a NXIVM member, Kristin Snyder, who had disappeared in Alaska. (P3-003 to P4-
004; 6/19/17 Tr. at 17:18-23.) NXIVM later expanded Interfor's assignment to include
an investigation of Ross. (6/19/17 Tr. at 24:7-18; Salzman Dep. at 29:21-30:5; at Keeffe
Dep. at 42:12-43:3.). In connection with Interfor's investigations, Aviv required that

5

NXIVM enter into an indemnity agreement, which he required from all Interfor clients. (6/19/17 Tr. at 40:13-21; Salzman Dep. at 49:4-20.)

On November 23, 2004, Salzman executed the Indemnity Agreement on NXIVM's behalf. (SOF ¶ 21; P5-002 to P5-003.) The Indemnity Agreement provides in full as follows:

> This agreement is between Interfor, Inc. ("Interfor"), an international investigation company headquartered in New York, New York and NXIVM Corporation dba Executive Success Programs ("NXIVM/ESP"), based in Albany, New York.
>
> Interfor is conducting an investigation for NXIVM/ESP. NXIVM/ESP agrees to indemnify Interfor for any claim, lawsuit, obligation, action, cause of action or cost or expense, of any amount and nature whatsoever incurred by or imposed upon Interfor as a result of, related to or in any way in connection with or arising out of its investigation, provided that such indemnity shall be limited to that part of such investigation, or any part thereof, which was requested and/or agreed to by NXIVM/ESP or disclosed to NXIVM/ESP by Interfor without any objection thereto by NXIVM/ESP.
>
> Should any claim, lawsuit, obligation, action, cause of action or cost or expense, of any amount and nature whatsoever be incurred by or imposed upon Interfor, NXIVM/ESP agrees to pay all costs and expenses immediately. Interfor shall not be required to pay its expenses itself and then seek compensation from NXIVM/ESP. Rather, NXIVM/ESP must pay all costs and expenses immediately. NXIVM/ESP agrees to consult Interfor regarding legal counsel.
>
> Costs and expenses, as the term is used herein, shall include but not be limited to, attorney fees and any other cost or expense imposed upon or incurred by Interfor in the

defense, investigation or settlement of any matter that is subject to this Indemnity Agreement.

As NXIVM/ESP is [responsible] for the payment of any settlement, NXIVM/ESP does not need to consult with Interfor regarding the amount of any such settlement. However, NXIVM/ESP cannot make any promises on behalf of Interfor, or incur future obligations on Interfor as part of any settlement.

In the event of any asserted claim, Interfor shall provide NXIVM/ESP reasonably timely written notice of same, and thereafter NXIVM/ESP shall at its own expense defend, protect and save harmless Interfor against said claim or any loss or liability thereunder.

In the further event that NXIVM/ESP shall fail to so defend and/or indemnify Interfor, then in such instance Interfor shall have full rights to defend, pay or settle any said claim on its behalf without notice to undersigned and with full rights to recourse against the undersigned for all fees, costs, expenses and payments made or agreed to be paid or discharge said claim.

Upon default, NXIVM/ESP further agrees to pay all reasonable attorney fees necessary to enforce this agreement.

This agreement shall be unlimited as to amount or duration.

This agreement shall be binding upon and inure to the benefit of the parties, their successors, assigns and personal representative.

(P5-002 to P5-003.)  Neither party disputes the validity of the Indemnity Agreement.[2]

(SOF ¶ 22.)

---

[2] NXIVM suggests in its response to Interfor's proposed findings of fact and conclusions of law that it was under duress when it entered into the Indemnity Agreement because Interfor pressured it by providing it with the contract and requiring

## B.  The Ross Investigation

As stated above, NXIVM first tasked Interfor with investigating the disappearance of Kristen Snyder.  (6/19/17 Tr. at 17:14-18:12.)  Soon after the investigation began, however, it evolved to focus "on ascertaining the basis for Rick Ross'[s] anti-NXIVM campaigning and related activities" (P20-012, Response No. 5), which NXIVM described as "vicious false and fraudulent misrepresentations" about it. (*id.*, Response No. 6).

Interfor provided NXIVM with an investigative report on Ross dated November 23, 2004, which included a biography of Ross, financial information, and a list of people with whom Ross communicated.  (P7.)  In collecting information for the report, Interfor analyzed Ross's garbage that had been left on the curb outside his residence. (6/19/17 Tr. at 30:17-31:3.)

NXIVM knew about and approved of Interfor collecting Ross's garbage as part of its investigation.  (*Id.* at 32:20-33:4, 34:6-8.)  Keeffe discussed the Ross report with Salzman (SOF ¶ 31; Keeffe Dep. 69:4-25), and O'Hara told Salzman that the report was

---

that it be executed shortly before a critical step in the Ross investigation.  (D.E. 740 at 2.)  NXIVM did not raise this argument in its pretrial papers or at trial.  The Court will therefore disregard it.  *See Sample v. Diecks*, 885 F.2d 1099, 1106 (3d Cir. 1989) ("It is well established that a trial judge possesses the discretion to prohibit parties from raising matters they have failed to advance during the pretrial proceedings."); *Militello v. Allstate Prop. & Cas. Ins. Co.*, No. 14-0240, 2016 WL 3254144, at *4 (M.D. Pa. June 14, 2016) ("It is well established that failure to raise an issue in the district court constitutes a waiver of that argument, and a trial judge has broad discretion to prohibit parties from raising matters which they have failed to pursue in pretrial proceedings." (citation and internal quotation marks omitted)).

"necessary and important" (Salzman Dep. at 42:19-21). No NXIVM representative objected to Interfor's preparation of the Ross report or its contents. (Salzman Dep. at 91:6-9; D.E. 734-1 Interfor's Deposition Designations of Joseph O'Hara ("O'Hara Dep.") at 135:9-13, 136:18-137:6; Bouchey Dep. at 201:24-202:6.) NXIVM forwarded the Ross report to its public relations firm, Sitrick & Co. ("Sitrick"), as part of its "damage control efforts in the wake of Rick Ross'[s] negative publicity campaign which targeted NXIVM and Keith Raniere." (SOF ¶ 32 (internal quotation marks omitted).)

On the same day NXIVM executed the Indemnity Agreement, Interfor attempted a "sting" operation meeting with Ross, which was attended by Aviv, Anna Moody ("Moody"), an Interfor case manager and attorney, Lynne Friedman, the head of Interfor's research department, and Ross. (SOF ¶ 24; 6/19/17 Tr. at 19:3-12, 37:11-15, 40:25-41:1.) Before the "sting," Aviv met with Raniere, Salzman, and Keeffe in Albany, New York to discuss the plan. (6/19/17 Tr. at 37:16-22, 39:3-5.) The meeting with Ross was recorded at NXIVM's insistence. (*Id.* at 42:9-20.) Subsequently, Keeffe informed Salzman, who later reported to Raniere, about what occurred at the meeting with Ross. (SOF ¶¶ 25-26.) No one at NXIVM objected to the meeting. (6/19/17 Tr. at 39:18-19; O'Hara Dep. at 138:12-139:9.) These events demonstrate the alignment of NXIVM and Interfor in the investigation of Ross; Interfor's transparency about what steps it was taking for the investigation; and NXIVM's acceptance of Interfor's undertakings.

NXIVM continued to use Interfor's services until at least May 2005, approximately six months after Interfor provided its written report on Ross.  (SOF ¶ 35.)  Earlier, in February 2005, Keeffe had authorized Sitrick to use Interfor for additional research and to contact it for source names, "including the identities of any individuals who had been 'de-programmed' by Ross."  (SOF ¶ 36; Keeffe Dep. at 97:7-99:12.)  And in the spring of 2005, NXIVM asked Interfor to conduct a background check on the Sutton family. (6/19/17 Tr. at 46:12-19.)  Stephanie Franco ("Franco"), an original defendant in this litigation, was a member of the Sutton family, and on April 19, 2005, NXIVM filed an amended complaint that added Franco's father Maurice Sutton and his wife Rochelle Sutton as defendants.  Amended Consolidated Complaint, *NXIVM Corp. v. The Ross Inst.*, No. 03-0976 (N.D.N.Y. Apr. 19, 2005), ECF No. 130.

## C.    The Litigation and Interfor's Crossclaim

When Interfor became involved with NXIVM, it had already sued Ross, Franco, and others in the Northern District of New York in 2003.  Complaint, *NXIVM Corp. v. The Ross Inst.*, No. 03-1051 (N.D.N.Y. Aug. 22, 2003), ECF No. 1; Complaint, *NXIVM Corp. v. The Ross Inst.*, No 03-0976 (N.D.N.Y. Aug. 6, 2003), ECF No. 1.  As part of that litigation, on July 11, 2006, Ross served a subpoena on Interfor, seeking documents related to the Ross investigation.  (SOF ¶ 38; P11.)  On August 11, 2006, in accordance with the Indemnity Agreement, NXIVM retained Friedman Kaplan Seiler & Adelman LLP ("FKSA") to represent Interfor in responding to and defending against the subpoena.  (SOF ¶ 41; P12.)  Salzman signed the FKSA retainer agreement (the

"Retainer Agreement") on NXIVM's behalf (SOF ¶ 41; P12) and inserted a handwritten addendum that stated:

> NXIVM retains the right to terminate its ongoing liability for all fees and expenses incurred pursuant to this retainer on three days written notice, without prejudice to any indemnification agreements that may exist between NXIVM and Interfor. Such termination shall not impair NXIVM's obligation under this retainer agreement to pay fees and expenses incurred before the effective date of such termination.

(P12-003; *see also* SOF ¶ 42). The addendum was initialed by Salzman and Lack, a partner at FKSA. (P12-003.) NXIVM paid FKSA a $25,000 retainer. (SOF ¶ 43.)

On January 11, 2007, after learning about Interfor's investigation of him, Ross filed a claim against NXIVM, Salzman, Raniere, Interfor, Aviv, and Moody for intrusion upon seclusion. (D.E. 70.)

Per the Indemnity Agreement, NXIVM made payments to FKSA from September 2006 through April 2007 totaling $165,619.18. (SOF ¶ 46.) On October 19, 2007, however, Paul Yesawich from Harris Beach, PLLC, NXIVM's then outside counsel, sent an e-mail to Heather Windt from FKSA informing her that "NXIVM will not continue to reimburse or indemnify Interfor for expenses or liabilities incurred in connection with this matter." (SOF ¶ 50; P15-001.) NXIVM based its revocation on its belief "that Interfor's conduct in connection with it's [sic] investigation went beyond what the parties intended would be done, and beyond what NXIVM authorized Interfor to do." (P15-001.) Consequently, it stated that it had "no further obligation to

indemnify Interfor for expenses or liabilities in this matter." (*Id.*) When the October 19, 2007 e-mail was sent, NXIVM owed FKSA approximately $64,000. (6/19/17 Tr. at 156:17-20.)

On November 7, 2007, FKSA filed crossclaims on behalf of Interfor, Aviv, and Moody asserting the following causes of action: (i) contractual indemnification by Interfor against NXIVM, (ii) common law indemnification by Interfor, Aviv, and Moody against NXIVM, Raniere, Salzman, and Keeffe, (iii) contribution by Interfor, Aviv, and Moody against NXIVM, Raniere, Salzman, and Keeffe, and (iv) defamation by Aviv against NXIVM. (SOF ¶ 51; Crossclaim.)

In September 2008, defended by its insurance carrier, Interfor settled Ross's counterclaim for intrusion upon seclusion for $25,000 without admitting liability. (6/19/17 Tr. at 57:24-58:12, 174:16-21; P17-003 ¶ 9.) Interfor paid $5,000 of the settlement itself and its insurer paid the balance. (6/19/17 Tr. at 58:13-15.) By stipulation, Ross's counterclaims against Interfor, Aviv, and Moody were dismissed with prejudice and without costs on September 23, 2008. (D.E. 194.) By the time of this bench trial, NXIVM owed Interfor, not including interest, $1,392,432.18 for FKSA's fees and costs. (6/19/17 Tr. at 166:24-167:5.)

In 2012, Interfor filed a motion for summary judgment on its crossclaim for contractual indemnification. (D.E. 462; D.E. 467.) NXIVM opposed and cross moved for summary judgment on various grounds, including that it objected to Interfor's investigation of Ross, relieving it of its responsibility to pay legal fees and costs under

Case 1:18-cv-00204-NGG-VMS   Document 81-1   Filed 11/22/19   Page 13 of 45 PageID #:
11167
Case 2:06-cv-01051-KSH-CLW   Document 841   Filed 08/26/19   Page 13 of 45 PageID: 20389

the Indemnity Agreement.  (D.E. 478; D.E. 481.)  On June 26, 2013, the Court denied

the motions, finding in its summary judgment opinion that "a genuine issue of material

fact exists [] whether Interfor's actions with regards to the Ross investigation were

approved by NXIVM."  (D.E. 504 at 4.)  The Court identified the following facts as

being "hotly disputed": "whether NXIVM personnel never objected to Interfor's

work[;] whether NXIVM requested the Ross investigation; whether NXIVM suggested

the *ex parte* contact with Ross; whether Interfor conducted a raid of Ross's garbage;

whether NXIVM ratified Interfor's conduct; whether Interfor delivered a report on

Ross that reported on Ross's activities; and whether Interfor engaged in illegal activity."

(*Id.* at 4-5 (footnotes omitted).)

The Court's written summary judgment opinion of 2013 (*see generally id.*)

establishes that up until the bench trial, NXIVM's consent (or lack thereof) to the Ross

investigation was a driving force behind the dispute between these parties, generating

the attorneys' fees and costs Interfor seeks to recover.  Close to the bench trial,

however, NXIVM—without any prior indication—abandoned its avowed position,

conceding and even emphasizing that it had consented to the Ross investigation.  In its

brief supporting a motion under Fed. R. Civ. P. 52(c) seeking judgment on Interfor's

claim (D.E. 725), NXIVM advanced a new legal theory that shifted the focus from

NXIVM's consent to Interfor's intent.  NXIVM went so far as to state: "[t]he more

NXIVM cheered on and endorsed those intentional acts [by Interfor], the less likely any

New York court would ever permit Interfor to be indemnified for its own intentional

13

actions." (*Id.* at 1.) Post trial, in its response to Interfor's proposed findings of fact and conclusions of law, NXIVM takes the position that it "matters not how much assent Aviv claims NXIVM gave him." (D.E. 704 at 6.)

In its post-trial submissions, Interfor objects to NXIVM's about-face, correctly pointing out that:

> During most of the 10 years of litigation between Interfor and NXIVM, NXIVM argued vigorously that it never asked Interfor to investigate Rick Ross (*see, e.g.*, NXIVM Trial Br., June 5, 2017, at 5 ("NXIVM had no idea Interfor had been investigating Ross prior to November 23, 2004")) and that it did not breach the Indemnity Agreement because it objected to Interfor's investigative work—both when that work was done in 2004, and again in October 2007, after it stopped paying Friedman Kaplan's bills (*id.* at 6, 17-18; *see also* D.E. 481, at 14-15 ("every single thing that Ross complains against Interfor is an action to which, at some point, NXIVM objected")). Indeed, NXIVM's alleged objections were the primary basis upon which in early 2013, NXIVM opposed Interfor's motion for summary judgment. (D.E. 481, at 11-12, 14-15.) In an opinion dated June 26, 2013, Judge Cavanaugh denied Interfor's motion, finding "that a genuine issue of material fact exists in whether Interfor's actions with regards to the Ross investigation were approved by NXIVM." (D.E. 504, at 4.) That order necessitated the trial that occurred in this case four years later.

(D.E. 739 at 1 (footnote omitted).) As a result, Interfor asks the Court to find that judicial estoppel bars NXIVM from taking its current position that it consented to the Ross investigation. (D.E. 736 ("Interfor Proposed Findings") ¶¶ 161-177.) The Court, however, does not have the option to ignore its fact-finding role. In any event, as discussed below, NXIVM failed to offer any proof at trial to support its argument that

Interfor may not enforce the Indemnity Agreement.  It is therefore unnecessary for the Court to address whether judicial estoppel applies.[3]

## III.  **Conclusions of Law**

The trial and the parties' post-trial submissions reveal that there are very few relevant facts in dispute.  Rather, the parties primarily rely on legal theories as to why or why not NXIVM is obligated to indemnify Interfor under the Indemnity Agreement.

Interfor is seeking a judgment of $1,369,157.51, plus not-yet-calculated trial fees and expenses.  This amount consists of (i) the attorneys' fees and costs Interfor incurred in efforts to enforce the Indemnity Agreement , (ii) the attorneys' fees and costs Interfor incurred in defending against claims arising out of the investigations that it undertook for NXIVM, and (iii) Interfor's $5,000 contribution to the settlement payment to Ross.[4] Interfor also maintains that it is entitled to prejudgment interest at a rate of 9% under New York law.

---

[3] After this litigation was transferred to the undersigned (D.E. 533), counts 2 (common law indemnification) and 3 (contribution) of Interfor, Aviv, and Moody's crossclaims against NXIVM, Raniere, Salzman, and Keeffe were dismissed by stipulation.  (D.E. 581.)  As trial approached, Aviv dropped his defamation crossclaim against NXIVM. Thereafter, the Court entertained and ruled on various summary judgment motions filed by NXIVM and the other parties to this litigation regarding causes of action that were not asserted by or against Interfor.  (D.E. 603-04, 606-08, 610, 614, 622, 625-26; D.E. 643 (ruling).)

[4] The amount sought by Interfor excludes the attorneys' fees and costs attributable to the dismissed common-law contractual indemnification and contribution claims ($23,274.67) and defamation claim ($68,643.17).  (*See* D.E. 736-1.)

NXIVM makes three overarching arguments in defense: (1) New York public policy prohibits Interfor from enforcing the Indemnity Agreement because the acts it committed in the course of the Ross investigation were intentional torts, active negligence, inequitable, and/or illegal; (2) Interfor failed to mitigate damages; and (3) the attorneys' fees and costs sought by Interfor are unreasonable.

### A. New York Public Policy Does Not Bar Interfor's Crossclaim for Contractual Indemnification

The parties aver that New York law governs Interfor's crossclaim for contractual indemnification. (*See* Interfor Proposed Findings ¶ 219 ("[B]oth parties agree, New York law governs Interfor's contractual indemnification claim."); D.E. 737 ("NXIVM Proposed Findings") ¶ 56 ("New York law applies to this dispute, as the indemnity agreement provides.").) The Court agrees.

The Court noted in a prior opinion that this action was transferred from the Northern District of New York pursuant to 28 U.S.C. § 1404(a). (D.E. 642 at 11.) Following transfer, when "[f]aced with a choice-of-law question, federal courts in the district to which the case has been transferred under § 1404(a) must apply the law of the transferor state," *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)), including its choice-of-law rules, *see De Puy Inc. v. Biomedical Eng'g Tr.*, 216 F. Supp. 2d 358, 382 (D.N.J. 2001) (Lechner, J.) (concluding that the transferor court's choice-of-law rules governed the defendant's counterclaim), *aff'd, Pappas v. DePuy Orthopaedics, Inc.*, 33 F. App'x 35 (3d Cir. 2002). This is so even for

16

claims asserted after transfer, such as Interfor's crossclaim here.  *See Ghorbanian v. Guardian Life Ins. Co. of Am.*, No. 14-1396, 2016 WL 4467941, at *4 (W.D. Wash. Mar. 2, 2016) (applying the choice-of-law rules of the transferor court to determine whether allowing the defendant to amend its answer to assert a counterclaim after transfer would be futile); *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1157 (N.D. Cal. 2003) (explaining that, pursuant 28 U.S.C. § 1404(a), the choice-of-law rules of the transferor court "appl[y] not only to the transferred claims but also to any counterclaims, even if the counterclaims are asserted after the case has been transferred"); *De Puy*, 216 F. Supp. 2d at 382 (concluding that the transferor court choice-of-law rules governed the defendant's counterclaim that was asserted after transfer).  Thus the Court must apply New York choice-of-law rules to determine which state's law governs Interfor's crossclaim for contractual indemnification.

New York choice-of-law rules dictate that New York contract law controls because it is the state with the most significant relationship to the Indemnity Agreement.  *See Matter of Allstate Ins. Co.*, 613 N.E.2d 936, 939-40 (1993) (finding that courts should use the "center or gravity" or "grouping of contacts" test to determine what state's law governs a contract cause of action).  The Indemnity Agreement was executed in New York, the parties are located in New York, and the subject matter of the contract's performance was in New York.  *See J.R. v. E.M.*, 997 N.Y.S.2d 669, 669 (N.Y. Sup. Ct. 2014) ("To determine which law governs under the grouping of contacts theory of conflict of laws, the court must look to the following factors: []the place of

17

contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." (citing *Allstate*, 613 N.E.2d at 940).)

Turning to the parties' substantive arguments, NXIVM contends it violates New York public policy for a party to obtain indemnification for damages and costs arising from claims that allege intentional torts or active negligence, such as Ross's counterclaim for intrusion upon seclusion. Interfor responds that New York public policy does not preclude a party from seeking indemnification if the trier of fact never found an intent to injure another, including—as is the case here—a situation where the party settles without admitting liability.

Under New York law, "indemnification provisions are invalid on public policy grounds 'only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury.'" *Marolf v. Rapid Response Monitoring Servs. Inc.*, 89 N.Y.S.3d 496, 497 (N.Y. App. Div. 2018) (quoting *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985)); *accord Goodman v. Port Auth. of New York & New Jersey*, 850 F. Supp. 2d 363, 390 (S.D.N.Y. 2012). "But the public policy exception for intentionally harmful conduct is a narrow one, under which it must be established not only that the [indemnitee] acted intentionally but, further, that it acted with the intent to harm or injure others." *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1081 (N.Y. 2013). Stated differently, New York public policy only prohibits indemnification when the fact finder determines that the indemnitee intended to cause

harm.  *See CBS Corp. v. Eaton Corp.*, No. 07-11344, 2010 WL 1375169, at *2 (S.D.N.Y.

Mar. 30, 2010) ("New York courts have held that so long as the indemnity contract's

terms would apply to intentional conduct, an indemnified party is entitled to legal

defense fees in cases alleging intentional or fraudulent wrongdoing until the indemnified

party is found by the finder of fact to have acted intentionally or fraudulently."); *Pub.*

*Serv. Mut. Ins. Co. v. Goldfarb*, 425 N.E.2d 810, 814 (N.Y. 1981) (explaining that an insurer

would be obligated to pay a judgment against the insured if the trier of fact determined

that he caused unintentional injury); *Live Invest, Inc. v. Morgan*, 64 N.Y.S.3d 466, 471

(N.Y. Sup. Ct. 2017) ("However, where no finding of an intent to injure has been made,

nothing in the public policy of this State precludes indemnity for compensatory

damages flowing from a defendant's volitional act.").   It therefore follows that it is not

violative of New York public policy for a party to obtain indemnification for costs

arising from a claim it settled without an admission of liability or wrongdoing.   *See*

*Gibbs-Alfano v. Burton*, 281 F.3d 12, 21 (2d Cir. 2002) (observing that there was no legal

authority that would preclude a party from seeking indemnification for claims it settled

without admitting liability); *In re Residential Capital, LLC*, 524 B.R. 563, 596 (Bankr.

S.D.N.Y. 2015) ("RFC settled the claims for which it seeks indemnification without

admitting liability.  Thus, the Court concludes that the Plaintiff's indemnity claims may

proceed under New York law . . . .").

　　*Gibbs-Alfano*, on which Interfor relies, is particularly instructive.  There, a boat

club operated pursuant to several license agreements granted by the local government,

19

Case 1:18-cr-00204-NGG-VMS Document 841-1 Filed 11/22/19 Page 30 of 45 PageID #:
11174
Case 2:06-cv-01051-KSH-CLW Document 841-1 Filed 03/26/19 Page 20 of 45 PageID: 20396

one of which contained "a broad indemnification clause" pursuant to which the boat club agreed to indemnify the local government for any liability arising out of the performance of the license agreement and for any costs or expenses related to defending any claims. *Gibbs-Alfano*, 281 F. 3d at 15. An African American woman and her husband sued the boat club and the local government for discrimination. *Id.* at 15-16.

The local government settled with the plaintiffs and pursued indemnification from the boat club. *Id.* at 18. The district court declined to enforce the indemnification provision in the license agreement on the ground that the settlement was evidence that the local government was to some degree responsible for the alleged discrimination. *Id.* The Second Circuit reversed, holding that "in the absence of a judgment of intentional conduct . . . , we do not find any reason under New York public policy to hold the Indemnification Clause unenforceable." *Id.* at 21. Indeed, the Second Circuit emphasized that the boat club did "not cite[] any case, and we found none, where a New York court declined to enforce an otherwise valid indemnification agreement between parties where the party seeking indemnification settled, without admitting liability, claims against it alleging intentional wrongdoing." *Id.*

As counter, NXIVM points to *Barbagallo v. Marcum LLP*, No. 11-1358, 2012 WL 1664238 (E.D.N.Y. May 11, 2012), in which a former employee argued that an indemnification provision in his employment contract was void as against New York public policy because its broad language encompassed intentional torts. *Id.* at *4. The

court agreed without considering whether the former employee would have a duty to indemnify if the fact finder determined that the employer acted without intending to injure another. *Id.* at *4-5. In reaching that conclusion, the court disregarded contrary authority applying New York law that had held that broadly worded indemnification provisions, which could plausibly cover intentional tort claims, should be enforced insofar as the indemnitee is not found to have acted with an intent to harm a third party. *See, e.g.*, *Gibbs-Alfano*, 281 F.3d at 21 ("[I]n the absence of a judgment of intentional conduct on the part of the Town Defendants, we do not find any reason under New York public policy to hold the Indemnification Clause unenforceable."); *CBS Corp.*, 2010 WL 1375169, at *2 ("New York courts have held that so long as the indemnity contract's terms would apply to intentional conduct, an indemnified party is entitled to legal defense fees in cases alleging intentional or fraudulent wrongdoing until the indemnified party is found by the finder of fact to have acted intentionally or fraudulently."). Indeed, the New York Court of Appeals in *Public Service Mutual Insurance Co. v. Goldfarb*—a case cited by the *Barbagallo* court—found an insurer's duty to indemnify an insured in defending against civil claims turned on whether, despite the insured having been convicted criminally for the same alleged conduct, the fact finder determined in a civil trial that he intended to commit injury. *Goldfarb*, 425 N.E.2d at 814. The Court of Appeals first observed that:

> Whether such coverage is permissible [sic] depends upon whether the insured, in committing his criminal act, intended to cause injury. One who intentionally injures another may

21

> not be indemnified for any civil liability thus incurred.
> However, one whose intentional act causes an unintended
> injury may be so indemnified.

*Id.* Thus the Court of Appeals concluded that "the insurer would be obligated to pay any judgment against [the insured] for compensatory damages only, assuming, of course, that the trier of fact determined, in a special verdict, that such unintended injury occurred." *Id.*[5]

NXIVM cites other cases that purportedly echo the court's conclusion in *Barbagallo.* To the contrary, those decisions are inapposite for following reasons: (i) the party was seeking indemnification for any future liability it would incur if the fact finder determined that it intended to commit injury[6]; (ii) the alleged intentional conduct fell squarely within an express exclusion in the indemnification provision/contract or statute at issue[7]; (iii) the party's indemnification claim was brought under New York

---

[5] NXIVM also cites *Aldridge v. Brodman*, 954 N.Y.S.2d 359, 362 (N.Y. App. Div. 2012), as in accord with *Barbagallo*, but the court in *Aldridge* failed to even consider *Goldfarb*, which is controlling authority for that court.

[6] *See, e.g., Goodman*, 850 F. Supp. 2d at 389 (concluding that the defendant was not entitled to indemnification for any potential future liability if the plaintiff proved the defendant's intent to harm at trial); *In re Green*, 207 B.R. 762, 763-64 (S.D.N.Y. 1997) (granting judgment on the pleadings to the third-party defendants because New York public policy precluded the third-party plaintiff from seeking indemnification "for any liability he may have" for defrauding plaintiffs); *Aquilio v. Manaker*, No. 90-45, 1991 WL 207473, at *16 (N.D.N.Y. Oct. 10, 1991) (dismissing the defendants' counterclaims for negligence and contribution on the ground that they sought payment if trier of fact found them liable on plaintiffs' complaint that alleged intentional torts).

[7] *See, e.g., Goodman*, 850 F. Supp. 2d at 389 (denying the defendant's claim for contractual indemnification because the agreement "expressly excludes from indemnification 'risks occasioned solely by affirmative willful acts'"); *Willard v. Preferred Mut. Ins. Co.*, 662 N.Y.S.2d 342, 343 (N.Y. App. Div. 1997) (finding that the plaintiff's conduct fell within

common law—as opposed to a contract—which bars indemnification when there are mere allegations of intentional wrongdoing[8]; and (iv) the question presented to the court was whether federal—not New York—public policy prohibited indemnification for violations of federal securities law.[9]

Alternatively, assuming a trier of fact must first find that a party intended to commit injury before a claim for contractual indemnification will be denied, NXIVM contends that such a rule only applies to regulated insurers. Not so. Courts have found that principle equally applicable to non-insurers as well. *See, e.g.*, *Gibbs-Alfano*, 281 F.3d at 21 (finding that, "in the absence of a judgment of intentional conduct," there was no basis under New York public policy to invalidate an indemnification clause in a contract between two non-insurers); *CBS Corp.*, 2010 WL 1375169, at *2 (granting summary judgment to plaintiff on its claim for contractual indemnification against a non-insurer because it "was never found liable of intentional misconduct and was never assessed punitive damages").

---

the intentional act exclusion of an insurance policy); Memorandum Opinion, *Shaw v. Spitzer*, No. 400845/2004 (N.Y. Sup. Ct. Sept. 9, 2004) (concluding that the government did not have a duty to indemnify the plaintiff because the statute at issue expressly excluded intentional acts committed outside the scope of employment, such as plaintiff's alleged sexual harassment).

[8] *See, e.g.*, *Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.*, No. 02-453, 2002 WL 1870243, at *6 (S.D.N.Y. Aug. 13, 2002) (dismissing claim for common-law indemnification because the underling claims were all intentional torts).

[9] *See, e.g.*, *In re Livent Sec. Litig.*, 193 F. Supp. 2d 750, 754 (S.D.N.Y. 2002); *Ades v. Deloitte & Touche*, No. 90-4959, 1993 WL 362364, at *22-23 (S.D.N.Y. Sept. 17, 1993).

Here, Interfor and Ross settled without an admission of liability or wrongdoing on Interfor's part, and it was never established that Interfor acted with an intent to harm Ross.  (6/19/17 Tr. at 57:24-58:12, 174:16-21; P17-003 ¶ 9.)   That alone eviscerates NXIVM's trial position and obligates it to indemnify Interfor pursuant to the Indemnity Agreement.  *Gibbs-Alfano,* 281 F.3d at 21.  But, even had Interfor and Ross not settled, NXIVM has failed to put forth one scintilla of evidence showing that Interfor intended to injure Ross.  Instead NXIVM offers one conclusory proposed finding of fact: "Interfor required NXIVM to sign the indemnity agreement minutes before the *ex parte* meeting with Ross."[10]  (NXIVM Proposed Findings ¶ 65.)  The Court is asked to draw the weak inference that Interfor intended to harm Ross by insulating itself against any litigation damages prior to meeting with him.

This argument fails for two reasons.  First, NXIVM has conceded that the Indemnity Agreement is valid.  (SOF ¶ 22.)  Second, indemnity agreements are commonly included in contracts, particularly in industries such as Interfor's that run the

---

[10] NXIVM also points to statements by Magistrate Judge Randolph F. Treece in a related case in the Northern District of New York and Magistrate Judge Mark Falk in this action that it claims establishes that the Interfor committed common law fraud (an intentional act).  To the contrary, Magistrate Judges Treece and Falk made no such findings.  Rather, Magistrate Falk, in resolving a discovery dispute, but '[w]ithout deciding the issue," posited that there was a reasonable basis to vitiate the attorney-client privilege under the crime-fraud exception because "Ross presented the Court with a sufficient basis to conclude that a common law fraud itself occurred."  (D.E. 71 at 111:1-3.)  And Magistrate Judge Treece reached a similar conclusion in the matter before him.  *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 134–37 (N.D.N.Y. 2007).

risk of legal claims. Simply procuring insurance prior to acting does not indicate that one intends to harm another.

The only factual evidence presented at trial concerning Interfor's intent was Aviv's testimony. He stated that neither he nor Interfor intended to injure Ross. (6/19/17 Tr. at 37:2-4.) Because NXIXM established no facts to the contrary, the Court finds no impediment to Interfor's entitlement to enforce the Indemnity Agreement.

## B.   Interfor Has Not Failed to Mitigate Damages[11]

NXIVM argues that it presented evidence at trial that shows Interfor could have mitigated damages by (i) informing its insurance carrier earlier that Ross had asserted the counterclaim for intrusion upon seclusion against it, and (ii) invoking an arbitration provision in the Retainer Agreement to compel NXIVM to arbitrate this dispute as soon as it settled with Ross.[12]

---

[11] In the PTO, NXIVM also raised defenses of unclean hands, waiver, repudiation, laches, and that it does not have a duty to indemnify Interfor for fees and costs it incurred after settling with Ross. (PTO, Legal Issues, ¶¶ 8, 10, 11, 14, 15.) NXIVM, however, neglected to address these defenses in its pre-trial brief or during trial. It has therefore waived them. *See Porter v. NationsCredit Consumer Disc. Co.*, No. 03-3768, 2007 WL 674709, at *2 (E.D. Pa. Feb. 28, 2007) ("The Third Circuit has held that a party waives an affirmative defense when it does not attempt to establish the defense before or at trial and that merely raising the defense in an answer is insufficient to avoid waiver."), *aff'd, Porter v. Nationacredit Consumer Disc. Co.*, 285 F. App'x 871 (3d Cir. 2008); *Kilbarr Corp. v. Bus. Sys., Inc., B.V.*, 679 F. Supp. 422, 427 (D.N.J. 1988) (Bissell, J.) ("A defendant's decision not to raise a defense in the trial of a particular action is a waiver of that defense . . . ."), *aff'd*, 869 F.2d 589 (3d Cir. 1989).

[12] In its pre-trial brief, NXIVM also argued that Interfor failed to mitigated damages because it did not seek to bifurcate is contractual indemnification claim for trial earlier.

"In a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs." *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010). Nevertheless, "it is not required that the injured party actually mitigate its damages. Rather, 'if plaintiff takes such [mitigating] action within the range of reason,' the breaching party remains liable if such reasonable attempts at mitigation fail." *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010) (alteration in original) (quoting *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 290 (2d Cir. 1961)). "The party alleging a failure to mitigate bears the burden of proving that the injured party failed to make reasonable efforts to mitigate its damages." *Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.p.A.*, No. 09-601, 2009 WL 3757054, at *4 (E.D.N.Y. Nov. 9, 2009). Critically, a court examining a plaintiff's efforts to mitigate damages must "determine whether the mitigation efforts actually chosen in those unaccustomed shoes were reasonable, not whether hindsight suggests that an objectively better choice was available." *APL*, 592 F.3d at 112.

As an initial matter, NXIVM's mitigation arguments ask the Court to examine hypothetical steps Interfor could have taken to reduce FKSA's attorneys' fees and costs. It is not appropriate for the Court to engage in such an inquiry. *See Smith v. Positive*

---

NXIVM did not offer any evidence regarding this alleged shortcoming at trial. In addition, NXIVM contends that Interfor could have mitigated damages by having Aviv drop his defamation claim earlier. Interfor, however, is not seeking attorneys' fees or costs associated with Aviv's defamation claim. (*See* D.E. 734 ("6/20/17 Tr.") at 18:22-24.) Thus whether or not Aviv should or could have dropped his defamation claim earlier is beside the point.

*Prods.*, 419 F. Supp. 2d 437, 449–50 (S.D.N.Y. 2005) ("The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.").  Furthermore, NXIVM failed to offer any evidence at trial showing the amount by which Interfor's damages would have been reduced had it informed its insurer earlier or invoked the arbitration provision in the Retainer Agreement.  This alone dooms NXIVM's mitigation defense.  *See Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429, 444 (S.D.N.Y. 1996) ("[D]efendant has failed both in demonstrating that the measures taken by plaintiff did not constitute a reasonable effort [to mitigate damages] and in showing the portion of the loss caused by plaintiff's failure to take additional steps."), *aff'd*, 122 F.3d 1057 (2d Cir. 1997); *Eskenazi v. Mackoul*, 905 N.Y.S.2d 169, 171 (N.Y. App. Div. 2010) ("A party seeking to avail itself of the affirmative defense of failure to mitigate damages must establish that the injured party failed to make diligent efforts to mitigate its damages, and the extent to which such efforts would have diminished those damages.").  In any event, the facts that were established at trial demonstrate that Interfor could not have mitigated its damages by taking the steps NXIVM suggests.

First, that Interfor could have mitigated damages by notifying its insurer earlier is not supported by evidence showing how those efforts "would have diminished [Interfor's] damages."  *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 899

N.Y.S.2d 15, 17 (N.Y. App. Div. 2010).  This argument presumes that Interfor's insurer

would have paid FKSA's fees and costs, but both Aviv's and Lack's unrebutted

testimony established that Interfor's insurer would not defend it against claims arising

from its investigations or pursue its crossclaim against NXIVM.  (6/19/17 Tr. at 60:9-

61:4; 6/20/17 Tr. at 16:24-17:7.)  To be sure, if Interfor contacted its insurer earlier,

the Ross counterclaim may have been settled sooner, thereby eliminating some of the

work for which FKSA billed.  But, Interfor had a reasonable basis not to do that

because, as Lack credibly explained, NXIVM initially had honored its obligation under

the Indemnity Agreement.  (6/20/17 Tr. at 16:3-21.)  Accordingly, the Court will not

speculate about whether Interfor contacting its insurer at an earlier date would have

been an "objectively better choice" in "hindsight."  *APL*, 592 F.3d at 112.

As for the arbitration provision in the Retainer Agreement, contrary to NXIVM's

contention, it does not afford Interfor the right to compel NXIVM to arbitrate this

dispute.  The arbitration provision provides as follows:

> In the event of a fee dispute, NXIVM or Interfor may have
> the right to seek arbitration; we will provide the necessary
> information regarding arbitration in the event of a fee
> dispute or upon request.  Our obligations to each other shall
> be governed by the internal laws of the State of New Jersey.

(P12-002.)  This provision makes clear that either NXIVM or Interfor may request

arbitration to resolve a dispute with FKSA over any fees that it billed.  It does not,

however, permit Interfor to compel NXIVM (or vice versa) to arbitrate a dispute

between them.  Indeed, as Interfor points out, the arbitration provision reflects the

procedures set forth in the then-current version N.J. Ct. R. 1:20A-3(a)(1), which governs arbitration between attorneys and clients or third parties in the event of a fee dispute.[13]  Moreover, if the Court were to accept NXIVM's argument that Interfor could seek arbitration, then NXIVM also had that right.  Yet NXIVM never invoked it.

The trial evidence established that Interfor made reasonable efforts to mitigate its damages.  Lack testified that (i) Interfor contacted NXIVM about a potential settlement in October 2008, but NXIVM did not respond (6/20/17 Tr. at 28:8-20); (ii) on behalf of Interfor FKSA attended only 14 of the 39 deposition days in the case (6/19/17 Tr. at 168:18-21); and (iii) Interfor elected not to participate in a mediation that only involved the other parties' claims (*id.* at 168:23-169:7).  Those steps were aimed at and accomplished mitigation, and the Court need not question whether Interfor could have done more.

**C.    Interfor's Request for Attorneys' Fees and Costs is Reasonable**

**1.    New York Law Governs the Court's Reasonableness Analysis**

While the parties agree that New York law applies to Interfor's crossclaim for contractual indemnification, they disagree on whether New York (Interfor) or New Jersey (NXIVM) law governs the Court's analysis of the reasonableness of the attorneys' fees and costs Interfor seeks.  Pursuant to New York choice-of-law rules, which the

---

[13] The Retainer Agreement has a New Jersey choice-of-law provision.  (P12-002.)

29

Court must apply for the reasons discussed above, New York law controls any issues regarding the reasonableness of the attorneys' fees sought by Interfor. *See Manheim Auto. Fin. Servs., Inc. v. Fleet Funding Corp.*, No. 09-435, 2010 WL 1692954, at *6 (E.D.N.Y. Mar. 22, 2010) ("New York law governs the procedural issue of attorneys' fees and costs in this breach of contract action."), *adopted by*, No. 09-4357, 2010 WL 1688565 (E.D.N.Y. Apr. 22, 2010).

### 2.    FKSA's Fees and Costs are Reasonable

Before proceeding to its reasonableness analysis, the Court must first address Interfor's threshold argument that the Indemnity Agreement does not impose a reasonableness requirement on the attorneys' fees and costs it incurred in defending against the claims arising from its investigations because, while the clause providing for fees and costs associated with enforcing the Indemnity Agreement states that those expenses must be reasonable, there is no such limitation in the clause pertaining to defense costs. (*See* P5-002.)  From a solely textual standpoint, this argument has appeal, but it is well settled under New York law that a court must infer that a contract providing for attorneys' fees and costs—whether through indemnification or fee shifting—contains a reasonableness requirement.  *See Diggs v. Oscar De La Renta, LLC*, 94 N.Y.S.3d 574, 577 (N.Y. App. Div. 2019) ("An award of attorney's fees, whether pursuant to agreement or statute, must be reasonable and not excessive."); *Solow Mgmt. Corp. v. Tanger*, 797 N.Y.S.2d 456, 457 (N.Y. App. Div. 2005) ("Before ordering one

party to pay another party's attorneys' fees, the court always has the authority and responsibility to determine that the claim for fees is reasonable.").

In New York, factors considered by a court when evaluating whether attorneys' fees are reasonable "include the time and labor expended, the difficulty of the questions involved and the required skill to handle the problems presented, the attorney's experience, ability, and reputation, the amount involved, the customary fee charged for such services, and the results obtained." *In re Estate of Dessauer*, 946 N.Y.S.2d 760, 761 (N.Y. App. Div. 2012); *accord Diaz v. Audi of Am., Inc.*, 873 N.Y.S.2d 308, 311 (N.Y. App. Div. 2008).

NXIVM first takes issue with FKSA's rates, while failing to suggest what a reasonable rate should be. "As a general rule, the 'reasonable hourly rate [for an attorney] should be based on the customary fee charged for similar services by lawyers in the community with like experience and of comparable reputation . . . .'" *Gamache v. Steinhaus*, 776 N.Y.S.2d 310, 311 (N.Y. App. Div. 2004) (alteration in original) (quoting *Getty Petroleum Corp. v. G.M. Triple S. Corp.*, 589 N.Y.S.2d 577, 578 (N.Y. App. Div. 1992)). In the Retainer Agreement, NXIVM expressly agreed to the rates billed by FKSA.

> [FKSA] will bill NXIVM at our regularly hourly rates as in effect from time to time, which currently range from $250 per hour to $750 per hour for our attorneys, and from $115 per hour to $200 per hour for our legal assistants. My [Robert J. Lack] current rate is $650 per hour, and that of my associate Heather Windt is $360 per hour.

(P12-001.)  NXIVM did not object to and paid FKSA's invoices at those rates from August 2006 through January 2007.  (SOF ¶¶ 46-48; 6/19/17 Tr. at 154:14-22.)  The fact that NXIVM agreed to and paid FKSA at the rates in the Retainer Agreement is *prima facie* evidence that they are reasonable.  *See Melodrama Publ'g, LLC v. Santiago*, No. 12-7830, 2015 WL 2380521, at *5 (S.D.N.Y. May 19, 2015) ("The fact that Melodrama paid the Firm these rates for legal services strongly suggests that they are fair and reasonable."), *adopted by*, 2015 WL 7288639 (S.D.N.Y. Nov. 16, 2015); *Diplomatic Man, Inc. v. Nike, Inc.*, No. 08-139, 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009) (finding that the hourly rates charged by counsel were reasonable because the client had paid at those rates).

After NXIVM's attempted repudiation, the rates billed by FKSA increased with changes in the market and experience of the attorneys working on the matter.  (6/19/17 Tr. at 153:12-24.)  By the time of trial, Lack's rate had increased to $995 per hour, and the rates for associates, such as Heather Windt, increased to $495 per hour.  (*Id.* at 153:19-24.)   Increased hourly rates were expressly contemplated by the Retainer Agreement where it states FKSA "will bill NXIVM at our regularly hourly rates in effect *from time to time*." (P12-001 (emphasis added); *see also* 6/19/17 Tr. at 153:8-10 (Lack testified that "the agreement provided that the rates would be charged as our regular hourly rates as i[n] effect[] from time to time.  Which means they are subject to periodic adjustment.").)  Interfor offered evidence demonstrating the experience and expertise of the FKSA attorneys that worked on the matter as a basis for the fees they billed.

(P90; P91; P92; P93.)   By contrast, NXIVM offered no trial evidence about an alternative reasonable New Jersey rate.[14]   Moreover, it is disingenuous for NXIVM to argue that FKSA's rates are unreasonable when, according to Lack, it likely paid higher rates for Latham & Watkins LLP's representation of Keeffe.   (6/20/17 Tr. at 7:24-8:23.)   The Court accepts Lack's testimony as truthful and adequate to support its finding that the rates billed by FKSA are reasonable.

NXIVM argues that Interfor may not recover for the majority of the entries in the FKSA invoices because the descriptions of the work are too vague and duplicative; the invoices reflect block billing and contain minor redactions; or the invoices involve work that should have been delegated to associates or paralegals.[15]   In general, courts assess whether entries are sufficiently detailed to permit a conclusion about the reasonableness of the hours claimed.  *See Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co.*, No. 11-4308, 2013 WL 6171660, at *5-6 (S.D.N.Y. Nov. 25, 2013) (explaining that redacted entries need only be "sufficiently detailed" so as to allow the court to ascertain the number of hours spent and that, with respect to block billing, "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to

---

[14] While the diversity of the New Jersey bar makes a hypothetical reasonable rate difficult to establish, NXIVM's failure to make any attempt significantly weakens its position.

[15] NXIVM lets loose a scattershot of other grounds why it claims FKSA's fees are unreasonable, including that work was unnecessary, completed by unidentified attorneys or staff, or unrelated to claims arising from Interfor's investigations.   As explained below, Lack's testimony at trial adequately addressed these concerns.

which each hour was devoted nor the specific attainments of each attorney" (citation and internal quotation marks omitted)); *Raniola v. Bratton*, No. 96-4482, 2003 WL 1907865, at *4 (S.D.N.Y. Apr. 21, 2003) ("Although some of the entries are fairly general, terms such as 'case preparation' or 'meeting' by one attorney with another are sufficiently concrete, when viewed in context, to permit the court to make a judgement about the reasonableness of the total hours claimed."); *Bonnie & Co. Fashions v. Bankers Tr. Co.*, 970 F. Supp. 333, 342 (S.D.N.Y. 1997) ("[W]here an attorney's time entries are vague, courts may attempt to decipher them by reference to the context in which these entries occur [to determine] what work was involved." (alteration in original) (citation and internal quotation marks omitted)); *Freidman v. Yakov*, 30 N.Y.S.3d 58, 60 (N.Y. App. Div. 2016) (explaining that block billing does not render the amount of attorneys' fees sought "per se unreasonable"); *J. Remora Maint. LLC v. Efromovich*, 960 N.Y.S.2d 27, 29 (N.Y. App. Div. 2013) (finding that block billing did not make the requested attorneys' fees unreasonable because "the evidence before the special referee adequately presented him with the opportunity to assess the reasonableness of the fees"). Further, a court should not second guess staffing decisions where the work reflects the collaborative process between attorneys or the reasonable delegation of tasks. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) ("[P]revailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist."); *Barbour v. City of White Plains*, No. 07-3014, 2013 WL 5526234, at *6 (S.D.N.Y. Oct. 7,

2013) ("[I]t is not uncommon for parties to recover attorney's fees for the collaboration of multiple attorneys on a case, when the district court decides that such collaboration is appropriate given the scope and complexity of the litigation."); *Lilly v. Cnty. of Orange*, 910 F. Supp. 945, 951 (S.D.N.Y. 1996) ("The proper test is an ex ante, not ex post, inquiry whether or not certain tasks should have been assigned to more junior level attorneys.").

FKSA's invoices for its legal work through May 31, 2017, are sufficiently detailed for the Court to ascertain the type of work completed and hours billed. The entries reflect appropriate staffing decisions and delegation of work to associates and paralegals—indeed, NXIVM has little basis to complain when associates and paralegals billed 79% of the work performed. (6/20/17 Tr. at 11:14-16.) The Court had the benefit of Lack's trial testimony, approximately 121 transcript pages in length, much of which reflects his effective push back against cross examination. Lack testified that FKSA staffed the case "leanly" with only himself and one or two associates working on the matter at a time (6/19/17 Tr. at 168:9-15) and limited its role in parts of the case that were not "germane to Interfor's claims" (*id.* at 168:16-18). He reviewed and "trimmed" excess work from bills before they were sent to Interfor. (*Id.* at 169:8-12). Lack further testified that FKSA took care in ensuring that it only billed Interfor for compensable work because it knew NXIVM would scrutinize the bills:

> Q.  I guess that comes back to my question. When there's
> no client really taking responsibility for checking and

35

> question your bills, isn't that sort of a risky invitation to—
> for a blank check basically?
>
> A.  No.  Actually in this context it is quite the contrary.  We
> knew, while Mr. Aviv did not question our bills, that
> NXIVM would do so in the context of this litigation.  And
> so we fully expected each and every one of our bills to be
> put under the microscope by your client [NXIVM] and
> yourself.

(6/20/17 Tr. at 55:19-56:2.)

In sum, the Court finds that the Interfor is entitled to recover reasonable fees
and costs totaling $1,369,157.51, which includes the $5,000 contribution Interfor paid
toward the Ross settlement.[16]  The parties shall file supplemental submissions in
accordance with the accompanying order to address the attorneys' fees and costs
Interfor is entitled to recover for FKSA's work from after May 31, 2017.[17]

### D.   New York Law Governs the Calculation of Prejudgment Interest

The parties disagree about whether prejudgment interest should be calculated
under New York (Interfor) or New Jersey (NXIVM) law.  Under New York choice-of-
law rules, "the law of the jurisdiction that determines liability governs the award of pre-

---

[16] This sum excludes the amounts that Interfor reasonably allocated to pursuing Aviv's
defamation claim, and that Interfor reasonably identified as attributable to the
common-law (non-contractual) indemnification and contribution claims briefly
pursued on behalf of Interfor, Aviv, and Moody.  (*See* D.E. 736-1.)

[17]  Interfor submitted a declaration on September 8, 2017, attaching unpaid FKSA
invoices for the months of June, July, and August 2017.  (D.E. 746.)  For ease of
reference, the Court directs Interfor to resubmit these invoices so that there is one all-
inclusive catalog reflecting the attorneys' fees and costs it seeks to recover from after
May 31, 2017.

judgment interest." *Am. Trucking & Transportation Ins. Co., RRG v. Liberty Mut. Ins. Co.*, 765 F. App'x 571, 573 (2d Cir. 2019). As such, because Interfor's contractual indemnification claim was governed by New York law (a matter NXIVM does not dispute), New York law thus controls the award of prejudgment interest. *See Culwick v. Wood*, 384 F. Supp. 3d 328, 350 (E.D.N.Y. 2019) (finding that, under New York choice-of-law rules, because New Jersey law controlled a breach of contract claim, it also governed any award of prejudgment interest); *Cohen Lans LLP v. Naseman*, No. 14-4045, 2017 WL 477775, at *9 (S.D.N.Y. Feb. 3, 2017) (applying New York's prejudgment interest rate to a contract claim governed by New York law).

In New York, CPLR § 5001(a) provides that prejudgment "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." It is calculated using a non-compounding 9% annual rate from the time the cause of action accrued, or "[w]here such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR § 5001(b); CPLR § 5004. The parties shall include a calculation of prejudgment interest on all damages in their supplemental submissions.

37

## IV.  Conclusion

For the foregoing reasons, the Court enters judgment in favor of crossclaim plaintiff Interfor against NXIVM for contractual indemnification.  An appropriate order will follow.

/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

Dated: August 26, 2019

# APPENDIX

## Exhibits Admitted Into Evidence

| Ex. | Description of Exhibit |
|---|---|
| P2 | "Tragic death linked to New York 'cult'" by Rick Ross, January 28, 2004 |
| P3 | Interfor/O'Hara Retainer Agreement and Cover Letter, September 1, 2004 |
| P4 | Email Chain Between Keeffe/O'Hara/Barasch, November 5, 2004 |
| P5 | Interfor/NXIVM Indemnity Agreement (with fax cover sheet), November 23, 2004 |
| P6 | Printout from Interfor Conference Room Scheduling System |
| P7 | Interfor Status Report re: Rick Ross, November 23, 2004 |
| P8 | Email Chain Between J. Lloyd & R. Emmers, February 22, 2005 |
| P9 | Interfor Payment Register for NXIVM |
| P10 | "Stress in the Family" by Chet Hardin, Metroland Online |
| P11 | Ross Subpoena to Interfor, July 11, 2006 |
| P12 | FKSA/NXIVM Retainer Letter, August 11, 2006 |
| P13 | Ross Counterclaim Against Interfor, January 11, 2007 |
| P14 | ESP Check No. 15083 for Payment to FKSA, April 20, 2007 |
| P15 | Email from P. Yesawich to H. Windt, October 19, 2007 |
| P16 | Interfor Crossclaim Against NXIVM, November 7, 2007 |
| P17 | Confidential Settlement Agreement and Release between Ross and Interfor/Aviv/Moody, September 9, 2008 |
| P19 | Keeffe Declaration in Support of NXIVM Motion to Quash (with Exs. A, B, excerpt from C), August 7, 2006 |
| P20 | Keeffe Responses/Objections to Ross's First Set of Interrogatories to NXIVM, February 1, 2008 |

| Ex. | Description of Exhibit |
|-----|----------------------|
| P21 | NXIVM First Amended Responses to Ross's Second Set of Interrogatories to NXIVM, February 1, 2008 |
| P22 | Notice of Rule 30(b)(6) Deposition, June 3, 2009 |
| P23 | Excerpt from NXIVM's Opposition to Motion for Partial Summary Judgment by Interfor, Inc., January 18, 2013 |
| P25B | Unpaid Interfor Legal Bills, Ross Settlement, and Prejudgment Interest Thereon as of June 9, 2017 |
| P26 | FKSA Invoice No. 1718, dated Mar. 8, 2007, for the period covering February 1-28, 2007 (summary version) |
| P27 | FKSA Invoice No. 1718, dated Mar. 8, 2007, for the period covering February 1-28, 2007 (full version) |
| P28 | FKSA Invoice No. 1741, dated Apr. 6, 2007, for the period covering March 1-31, 2007 |
| P29 | FKSA Invoice No. 1768, dated May 7, 2007, for the period covering April 1-30, 2007 |
| P30 | FKSA Invoice No. 1783, dated June 7, 2007, for the period covering May 1-31, 2007 |
| P31 | FKSA Invoice No. 1831, dated August 8, 2007, for the period covering June 1-July 31, 2007 |
| P32 | FKSA Invoice No. 1863, dated November 14, 2007, for the period covering August 1-October 31, 2007 |
| P33 | FKSA Invoice No. 1890, dated January 17, 2008, for the period covering November 1-December 31, 2007 |
| P34 | FKSA Invoice No. 1911, dated March 6, 2008, for the period covering January 1-31, 2008 |
| P35 | FKSA Invoice No. 1913, dated March 21, 2008, for the period covering February 1-29, 2008 |
| P36 | FKSA Invoice No. 1936, dated May 20, 2008, for the period covering March 1-April 30, 2008 |

| Ex. | Description of Exhibit |
|---|---|
| P37 | FKSA Invoice No. 1954, dated June 16, 2008, for the period covering May 1-31, 2008 |
| P38 | FKSA Invoice No. 1957, dated July 11, 2008, for the period covering June 1-30, 2008 |
| P39 | FKSA Invoice No. 1986, dated August 18, 2008, for the period covering July 1-31, 2008 |
| P40 | FKSA Invoice No. 2006, dated September 25, 2008, for the period covering August 1-31, 2008 |
| P41 | FKSA Invoice No. 2047, dated November 10, 2008, for the period covering September 1-30, 2008 |
| P42 | FKSA Invoice No. 2048, dated November 10, 2008, for the period covering October 1-31, 2008 |
| P43 | FKSA Invoice No. 2076, dated December 8, 2008, for the period covering November 1-30, 2008 |
| P44 | FKSA Invoice No. 2094, dated January 9, 2009, for the period covering December 1-31, 2008 |
| P45 | FKSA Invoice No. 2121, dated February 9, 2009, for the period covering January 1-31, 2009 |
| P46 | FKSA Invoice No. 2138, dated March 17, 2009, for the period covering February 1-28, 2009 |
| P47 | FKSA Invoice No. 2167, dated April 13, 2009, for the period covering March 1-31, 2009 |
| P48 | FKSA Invoice No. 2183, dated May 8, 2009, for the period covering April 1-30, 2009 |
| P49 | FKSA Invoice No. 2206, dated June 8, 2009, for the period covering May 1-31, 2009 |
| P50 | FKSA Invoice No. 2250, dated July 21, 2009, for the period covering June 1-30, 2009 |
| P51 | FKSA Invoice No. 2269, dated August 17, 2009, for the period covering July 1-31, 2009 |

| Ex. | Description of Exhibit |
|---|---|
| P52 | FKSA Invoice No. 2279, dated September 9, 2009, for the period covering August 1-31, 2009 |
| P53 | FKSA Invoice No. 2296, dated October 21, 2009, for the period covering September 1-30, 2009 |
| P54 | FKSA Invoice No. 2313, dated November 20, 2009, for the period covering October 1-31, 2009 |
| P55 | FKSA Invoice No. 2331, dated February 1, 2010, for the period covering November 1-December 31, 2009 |
| P56 | FKSA Invoice No. 2346, dated February 26, 2010, for the period covering January 1-31, 2010 |
| P57 | FKSA Invoice No. 2359, dated March 18, 2010, for the period covering February 1-28, 2010 |
| P58 | FKSA Invoice No. 2382, dated May 11, 2010, for the period covering March 1-April 30, 2010 |
| P59 | FKSA Invoice No. 2401, dated August 5, 2010, for the period covering May 1-July 31, 2010 |
| P60 | FKSA Invoice No. 2414, dated September 13, 2010, for the period covering August 1-31, 2010 |
| P61 | FKSA Invoice No. 2425, dated October 21, 2010, for the period covering September 1-30, 2010 |
| P62 | FKSA Invoice No. 2446, dated January 18, 2011, for the period covering October 1-December 31, 2010 |
| P63 | FKSA Invoice No. 2474, dated April 13, 2011, for the period covering January 1-March 31, 2011 |
| P64 | FKSA Invoice No. 2501, dated July 18, 2011, for the period covering April 1-June 30, 2011 |
| P65 | FKSA Invoice No. 2510, dated August 8, 2011, for the period covering July 1-31, 2011 |
| P66 | FKSA Invoice No. 2518, dated September 9, 2011, for the period covering August 1-31, 2011 |

Case 1:18-cv-00204-NGC-WS Document 84-1 Filed 11/22/19 Page 43 of 45 PageID #
Case 2:04-cv-01512-KSH-CLW Document 841-1 Filed 03/26/13 Page 43 of 45 PageID: 20419
11197

| Ex. | Description of Exhibit |
|-----|----------------------|
| P67 | FKSA Invoice No. 2527, dated October 10, 2010, for the period covering September 1-30, 2011 |
| P68 | FKSA Invoice No. 2531, dated November 7, 2011, for the period covering October 1-31, 2011 |
| P69 | FKSA Invoice No. 2551, dated December 5, 2011, for the period covering November 1-30, 2011 |
| P70 | FKSA Invoice No. 2557, dated January 5, 2012, for the period covering December 1-31, 2011 |
| P71 | FKSA Invoice No. 2608, dated April 13, 2012, for the period covering January 1-March 31, 2012 |
| P72 | FKSA Invoice No. 2632, dated July 9, 2012, for the period covering April 1-June 30, 2012 |
| P73 | FKSA Invoice No. 2675, dated December 5, 2012, for the period covering July 1-November 30, 2012 |
| P74 | FKSA Invoice No. 2687, dated January 14, 2013, for the period covering December 1-31, 2012 |
| P75 | FKSA Invoice No. 2700, dated February 26, 2013, for the period covering January 1-31, 2013 |
| P76 | FKSA Invoice No. 2703, dated April 12, 2013, for the period covering February 1-March 31, 2013 |
| P77 | FKSA Invoice No. 2752, dated January 8, 2014, for the period covering April 1-December 31, 2013 |
| P78 | FKSA Invoice No. 2777, dated August 7, 2014, for the period covering January 1-June 30, 2014 |
| P79 | FKSA Invoice No. 2792, dated January 7, 2015, for the period covering July 1-December 31, 2014 |
| P80 | FKSA Invoice No. 2856, dated January 5, 2016, for the period covering January 1-December 31, 2015 |
| P81 | FKSA Invoice No. 2885, dated July 6, 2016, for the period covering January 1-June 30, 2016 |

Case 1:18-cv-00204-NGG-VMS Document 84-1 Filed 11/22/19 Page 44 of 45 PageID #:
11198
Case 2:04-cv-01014-KSH-CLW Document 841-1 Filed 03/26/13 Page 44 of 45 PageID #:20420

| Ex. | Description of Exhibit |
|---|---|
| P82 | FKSA Invoice No. 2938, dated February 8, 2017, for the period covering January 1-31, 2017 |
| P83 | FKSA Invoice No. 2952, dated April 5, 2017, for the period covering February 1-March 31, 2017 |
| P84 | FKSA Invoice No. 2963, dated May 10, 2017, for the period covering April 1-30, 2017 |
| P85 | FKSA invoice for the period covering May 1-31, 2017 |
| P87B | Allocation of Interfor Legal Fees Among Defense of Ross Counterclaim, Enforcement of Indemnification Claim, and Defamation Claim as of May 31, 2017 |
| P88B | Interfor Legal Bills by Year, by Level of Timekeeper through May 31, 2017 |
| P89B | Summary of Legal Services Rendered through May 31, 2017 |
| P90 | FKSA website biography: Robert J. Lack |
| P91 | FKSA website biography: Robert S. Landy |
| P92 | FKSA website biography: Heather J. Windt |
| P93 | FKSA website biography: Andrew M. Englander |
| P94 | Declaration of Robert D. Crockett in Support of Motion for Admission Pro Hac Vice, January 26, 2017 |
| P97 | October 8, 2008 letter enclosing Interfor check re: Ross Settlement |
| P104 | Exhibits B-I to NXIVM Trial Brief |
| D7 | September 1, 2004 Terms of Engagement Letter between Interfor and O'Hara; signed by O'Hara on September 2, 2004 |
| D8 | September 20, 2004 (first date) Activities Log |
| D17 | June 6, 2005 letter from Aviv to Judd Bernstein of Law Office of Judd Bernstein |
| D19 | September 22, 2008 Stipulation & Order Dismissing Counterclaim as to Interfor, Inc., Juval Aviv, and Anna Moody |
| Court 1 | June 22, 2017 Stipulation re: Plaintiff's Exhibit 104 |

## Deposition Designations

| Ex. | Description of Exhibit |
|-----|------------------------|
| P99 | Interfor Deposition Designations for Salzman |
| P100 | Interfor Deposition Designations for Raniere |
| P101 | Interfor Deposition Designations for Keeffe |
| P102 | Interfor Deposition Designations for O'Hara |
| P103 | Interfor Deposition Designations for Bouchey |
| D21 | NXIVM Deposition Designations for Keeffe[18] |
| D22 | NXIVM Deposition Designations for O'Hara |

---

[18] The Court sustained a hearsay objection raised by Interfor to lines 133:21-134:2 for NXIVM's designations from Keeffe's deposition. (6/20/17 Tr. at 96:15-21.)