495

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
  UNITED STATES OF AMERICA,      :   18-CR-0204(NGG)
                                 :
                                 :
                                 :   United States Courthouse
       -against-                 :   Brooklyn, New York
                                 :
                                 :
                                 :   May 9, 2019
                                 :   9:30 a.m.
  KEITH RANIERE,                 :
                                 :
         Defendant.              :
- - - - - - - - - - - - - - X
```

REDACTED TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

```
For the Government:        RICHARD P. DONOGHUE, ESQ.
                           United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                      BY:  MOIRA KIM PENZA, ESQ.
                           TANYA HAJJAR, ESQ.
                           MARK LESKO, ESQ.
                           Assistant United States Attorneys

For the Defendant:         BRAFMAN & ASSOCIATES
                           767 Third Avenue, 26th Floor
                           New York, New York 10017
                      BY:  MARC A. AGNIFILO, ESQ.
                           TENY ROSE GERAGOS, ESQ.


                           Der OHANNESIAN & Der OHANNESIAN
                           677 Broadway, Suite 707
                           Albany, New York 12207
                      BY:  PAUL Der OHANNESIAN, ESQ.
                           DANIELLE SMITH, ESQ.

Court Reporter:            DENISE PARISI, RPR, CRR
                           Telephone: (718) 613-2605
                           E-mail: DeniseParisi72@gmail.com
```

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                    496

1          THE COURTROOM DEPUTY:  Case on trial.

2          Counsel, state your appearances, please.

3          MS. PENZA:  Moira Penza, Tanya Hajjar, and Mark

4    Lesko for the United States.  Good morning, Your Honor.  Also

5    at counsel table is Special Agent Michael Weniger and

6    Paralegal Specialist Teri Carby.

7          THE COURT:  Good morning.

8          Everyone may be seated in the gallery.

9          MR. AGNIFILO:  Good morning.  Marc Agnifilo, Teny

10   Geragos, Paul Der Ohannesian, Danielle Smith for Keith

11   Raniere, who is with us in court today.

12         THE COURT:  Good morning.  Please be seated,

13   everyone.  I have only one housekeeping matter before we bring

14   in the witness and the jury and that is that there's been a

15   request from the press to receive transcript of the sidebars.

16   I have no objection, as long as the sidebar is not sealed.

17         Is there any objection to the sidebars being

18   provided?

19         MR. AGNIFILO:  Not from us.

20         MS. PENZA:  Yes, Your Honor, we have no objection

21   generally, but we would like to just review the sidebars thus

22   far to make sure that we don't want to request that any of

23   them be sealed.

24         THE COURT:  All right.  Can you let me know by

25   tomorrow morning?

Proceedings                                          497

1          MS. PENZA:  Yes, Your Honor.

2          THE COURT:  Thank you.

3          All right.  And the list that's been admitted into

4     evidence of names, the Court would like to have a copy of that

5     for the bench.

6          MR. AGNIFILO:  And we have no objection to it being

7     in evidence, but obviously, unlike all the other evidence, it

8     won't go back to the jury at the end of the case.  I'm

9     assuming that's what the Court intends, but that would be our

10    request.

11         MS. PENZA:  I don't think that there is any need for

12    it to go back to the jury right now.

13         THE COURT:  All right.  Then we won't discuss it any

14    further.  Thank you.

15         MR. AGNIFILO:  Thank you.

16         THE COURT:  If there's nothing else, let's bring in

17    the witness, please.

18         MR. LESKO:  May I approach?

19         THE COURT:  Sure.

20         MR. LESKO:  (Handing.)

21         THE COURT:  Thank you.  Thank you very much.

22         MR. LESKO:  Thank you.

23         Your Honor?  Did Your Honor receive the list of

24    photograph exhibits we sent that --

25         THE COURT:  Yes.  Actually, I have it right here.

Proceedings                                                     498

1    Thank you so much.

2              And the other side received it as well?

3              MR. LESKO:  Yes, we sent it to the other side as

4    well.

5              THE COURT:  Okay.

6              (Witness takes the stand.)

7              THE COURT:  I take it you won't be providing any

8    photographic or video that would require the monitors to be

9    facing away from the public today; is that right?

10             MR. LESKO:  Actually, Your Honor, on that topic,

11   could we have a -- we don't necessarily have to deal with it

12   right now, but we would like a sidebar on that issue because

13   that will come up later.

14             THE COURT:  Okay.  Well, we can do it at a break.

15             MR. LESKO:  Very well.

16             THE COURT:  Okay.  Thank you.

17             I would just ask the witness to speak a little more

18   slowly.

19             THE WITNESS:  Yes, Judge.

20             THE COURT:  Thank you.

21             (Jury enters.)

22             THE COURT:  Please be seated, everyone.

23             Good morning, members of the jury.

24             THE JURY:  Good morning.

25             THE COURT:  At this time, we are going to continue

Vicente - direct - Lesko                          499

1   with the direct examination of Mark Vicente.

2           You may continue the examination of your witness,

3   sir.

4           MR. LESKO:  Thank you, Your Honor.

5           THE COURT:  I remind the witness that he is still

6   under oath.

7           THE WITNESS:  Yes, Your Honor.

8   DIRECT EXAMINATION

9   BY MR. LESKO: (Continued.)

10  Q    Good morning, Mr. Vicente.

11  A    Good morning.

12  Q    So, Mr. Vicente, when we left off yesterday afternoon,

13  you were describing the various modules of an intensive as you

14  understood them at the time; is that correct?

15  A    Yes.

16  Q    Do you have a different understanding of the nature of

17  the curriculum now?

18  A    I do.

19  Q    What is that understanding?

20  A    My understanding is, now, that in some ways it was a trap

21  of sorts.

22          MR. AGNIFILO:  I'm going to object to this, Your

23  Honor.

24          THE COURT:  Overruled.

25  A    You know, for example, I think in the -- one particular

1   module -- I think it was Pride and Prejudice -- there was

2   talking about speaking with honor, you know, that the most

3   important thing was speaking with honor and that if you were

4   unable to speak with honor, it suggested that you had a

5   problem with pride or that you were, what was termed,

6   "suppressive."  And what was interesting to me is that, I

7   found out in later years that, it seemed quite okay to speak

8   dishonorably about other people, but not Vanguard, not

9   Raniere.  One could never speak dishonorably about him because

10  then you would be considered to be prideful, so there was a

11  trap that seemed to be built in.

12          The other thing that I remember from -- I think it

13  was the fifth day in the mission module, is we were told that

14  this was to make a better world, et cetera, et cetera, and

15  they even brought up the word "cult" and said, Look, the word

16  doesn't exist, there's no definition for it, and anybody who

17  uses the word is clearly suppressive as well.

18          So, in essence, I began to realize that if you said

19  anything against the curriculum, against the educational

20  model, or against the founder, you were considered

21  suppressive.

22          There was also -- when you got to the end of the

23  five-day and continued on, I think it was a module called

24  persistence where you were being evaluated on how persistent

25  you could be, so one of the things you would do, you would

1    check in with your coach every single day and there became a

2    system of accountability that happened all the time; you

3    constantly had to be checking in with people.

4          There was also -- this was particularly disturbing

5    to me later -- there was also a module that taught you about

6    psychological projection; so, in essence, if I thought a

7    person was, you know, being mean or nasty or I thought they

8    had some bad intent, you were told basically, well -- given

9    the understanding in the methodology that anything you think

10   about somebody else is actually you, you were told:  Well,

11   actually, you're the problem.

12         And I recall the very beginning, I think it was

13   around my third day of the intensive, I remember going to

14   Nancy Salzman and saying:  I think you guys are up to

15   something.  I think there's something nefarious going on.

16   It's all this shiny outside.

17         And she listened to me and at the end finally said,

18   you know, You do understand that you've just told me about

19   yourself; that you're the one with nefarious intent, and what

20   if the problem is you can't accept that there's this much

21   goodness in the world and you're the one looking for badness,

22   you're the one looking for evil, you're the one looking for

23   these nefarious things, and what if that is your limitation?

24         And at the time I was very shocked and I thought,

25   oh, my god, is that true?  Is that what's going on?  Is this

1    the noblest organization that's ever existed?  Is this

2    indeed -- is the Vanguard the noblest man that has ever walked

3    the earth?  Am I really the problem?  And I -- the education

4    steered us to:  I have to become more like him.  And there

5    was, you know, constant feedback; and my concern later, not at

6    the time -- at the time I thought this was, wow, I want to be

7    this kind of person, but later I realized there were all these

8    things built into the system that if one had any issues, it

9    was pointed back at you and then you had to do, you know, a

10   lot of different methodologies with people to heal this

11   problem that you had.  And, in essence, all of these things, I

12   felt, became a trap where if you spoke out against -- excuse

13   me -- anything you thought was a problem, indeed this was an

14   indication of your issues that needed to be resolved and one

15   couldn't question the higher ranks and questioning the Prefect

16   or questioning the Vanguard was seen as a very, very bad

17   thing.  You know, if you questioned, you were clearly a

18   suppressive person.

19   Q    Was the curriculum manipulative?

20   A    I think so.  You know, in the end, I mean, I think that

21   there were -- there was also a coaching curriculum where you

22   were taught to deal with what people were saying to try and

23   turn it around.  You know, if somebody came to you with what

24   they thought was a legitimate concern about something, you

25   know, your job, for instance, as a coach, was to try to help

Vicente - direct - Lesko                503

1   them understand how this was actually their issue of

2   perception and their limitation and something to do with their

3   life; that, you know, as a coach, what we were doing was the

4   noble great thing, so clearly the issue must be yours,

5   therefore, you should have more EMs, you should talk to your

6   coach, you should do some Level 2 curriculum, you need more

7   curriculum.  You know, the issue is you are still what they

8   would term "disintegrated"; you need more curriculum.

9   Q    You mention that you and others, initially at the start

10  of an intensive, completed a psychological form or profile.

11        Do you remember that?

12  A    Correct.

13  Q    I think you mentioned specifically that it was modeled

14  after narcissistic personality disorder.

15  A    My understanding later, I stumbled upon a --

16        MR. AGNIFILO:  Your Honor, I object.  Can we have a

17  sidebar very quickly?  It will take 30 seconds.

18        THE COURT:  All right.  We can have a sidebar.

19        (Sidebar.)

20        (Continued on next page.)

21

22

23

24

25

Sidebar                                                        504

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          MR. AGNIFILO:  I have no objection to this witness

4    talking about his personal observations, but when he says

5    things like, I found out later or I read something, he's

6    starting to move into the expert area of being an expert.

7    He's not an expert.  He can talk about what he did.  I suppose

8    he can talk about how he felt and how he feels now, but he

9    can't tell the jury about the research he did or things he

10   found out later, we don't know what those sources are, and

11   that's what is in the nature of our --

12         THE COURT:  I understand your point.

13         Yes?

14         MR. LESKO:  Your Honor, the witness is allowed to

15   testify about his own understanding and that understanding

16   evolved and it may have been informed by what he learned

17   later, but we are not offering him as an expert to offer an

18   opinion on whether this questionnaire constituted some sort of

19   psychological survey.  It's his understanding of questions he

20   answered in the nature of the survey, that's what we're

21   offering.

22         THE COURT:  All right, well, let me just say this:

23   I think that it would be useful to have more of a foundation

24   as to the -- when he says he changed his mind, for instance,

25   you know, to inquire as to -- based on what did you change

Sidebar                                                        505

1   your mind, he's entitled to read.  Even if you are not an

2   expert, you are entitled to consider whatever else you do to

3   figure out what's really going on in your life, so you are not

4   barred from doing that as a fact witness about your

5   experience.  And certainly the defense will have an

6   opportunity to cross-examine the witness as to the foundation

7   of his knowledge, but I'm going to allow this to go forward

8   with the understanding that you will have broad ability to go

9   into how he reached those conclusions as a lay witness.  So,

10  you know, you will have your chance; you will have your

11  chance; the jury can evaluate based on the overall testimony.

12          Let's keep going.

13          MR. LESKO:  Thank you.

14          (Sidebar end.)

15          (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  All right.  Mr. Lesko, you may continue

3    your examination of the witness.

4          MR. LESKO:  Thank you, Your Honor.

5    BY MR. LESKO:

6    Q    So Mr. Vicente, how did you reach the conclusion that the

7    initial survey was akin to or like -- pardon me -- some sort

8    of questionnaire related to narcissistic personality disorder?

9    A    I was researching narcissistic personality disorder and

10   antisocial disorder and I came across a survey that was a -- I

11   believe a narcissistic personality disorder survey, and when I

12   looked at it, I realized, to my horror, that it was actually

13   the same survey that I had been filling out for 12 years.  I

14   was a bit surprised.  I was told originally that the survey

15   was an independent survey that was sent off to some

16   independent third party.  I was just surprised that it was

17   actually a narcissistic survey; I couldn't understand why.

18   Q    So, in essence, it was the same set of questions?

19   A    To my understanding, it was -- I can't be absolutely

20   precise, but almost exactly the same.

21   Q    So did you, yourself, complete that survey?

22   A    Many, many, many, many, many times.

23   Q    And did you include in your answers personal information?

24   A    I don't think the information in those surveys was

25   substantive because they were multiple choice types of things.

1  It was a very difficult survey to fill out because, you know,

2  both answers were not really correct, but one had to choose

3  one.

4  Q    Did the questions relate to you, however?  Did you have

5  to answer them about yourself?

6  A    I didn't have to -- well, it's difficult to answer that

7  because, for instance, you know, it would say things like:

8  Would you -- do you like to blend in, or do you like to be the

9  center of attention?  And so based on how you would answer

10  that, it would obviously reveal something about my nature.

11  Q    Did you complete other forms in connection with your

12  participation in NXIVM that revealed personal information?

13  A    Yes, I did.

14  Q    Confidential information?

15  A    Yes.  Sometimes very confidential.

16  Q    Do you know where that information is now?

17  A    I have absolutely no idea.  Many of these forms -- they

18  were called intake forms.  Generally they were called intake

19  forms.  There was one particular what's called a Level 2

20  intensive -- it was either 2C or 2D, that was the name of it,

21  compassion or civilization -- and they -- it was the -- an

22  intensive where you would share, you know, some of your

23  deepest, darkest secrets; and we were told it was completely

24  anonymous.  I have no idea if it was or not.  In retrospect, I

25  was worried that it's not.

Vicente - direct - Lesko                                    508

1         But yes, we -- our forms we would fill out, you

2    know, things like "what's the worst moment of your life," you

3    know, basically the -- you know, "what are you least proud

4    of," in essence, revealing all my shame, all my embarrassment,

5    all my -- all the secrets that I wouldn't want the general

6    public to know.

7    Q    Was there a privacy policy at NXIVM?

8    A    Well, we were told that it wouldn't be shared.  I don't

9    recall -- I don't recall ever signing a document that said,

10   you know, "we will never divulge to anybody what you've told

11   us"; I don't remember signing that.

12   Q    How do you feel today about having shared your deepest

13   darkest secrets in these various forms with NXIVM?

14   A    It's a combination of things:  I feel bamboozled; I feel

15   fooled; I feel that so much about myself was collected, and

16   many other people over the years that I was there; I feel

17   concerned that they built a psychological profile of what am I

18   ashamed of, you know, what makes me angry, what makes me

19   afraid, what am I embarrassed about, what's the most terrible

20   thing I can imagine happening.

21        So I feel exceedingly vulnerable about the

22   information that they have on myself and many, many, many

23   other people, but I feel also, honestly, stupid that I went

24   along with it assuming that it was, you know, all the best of

25   intent, and I'm not sure anymore if it was the best of intent.

Vicente - direct - Lesko                    509

1        But, you know, you have to understand that it was --

2   it was built -- it was built into the education.  There was a

3   module earlier on called Trust Invincibility, and the idea

4   was, you know, to truly be invincible, you should have no

5   fears about what anybody knows about you, so, in essence,

6   holding onto your secrets is not a good thing; holding onto

7   secrets you're actually vulnerable.  And the idea was letting

8   go of your secrets, you become invincible, which, at the time,

9   I thought, wow, that's a really unique perspective.  Now I

10  think it's just horrible.  It's a horrible twisted idea to

11  somehow make myself and others, like, give all kinds of

12  information about myself thinking that somehow this would make

13  me, what, more invincible, I guess, and I don't -- I don't

14  believe that's true anymore, but at the time in that

15  structure, I went along with it.

16  Q    I'm going to show you Government's Exhibit 1008 on the

17  ELMO.

18  A    Yes, this is the mission statement that was read at the

19  beginning of every Ethos class and the beginning of every

20  intensive day.

21  Q    So approximately how many times, if you can estimate,

22  have you read this out loud at various programs at NXIVM?

23  A    Anywhere from 500 to a thousand.

24  Q    Can you explain briefly, sort of, the process that

25  surrounded participants reading the mission statement?

                    Vicente - direct - Lesko                    510

1    A    Well, generally speaking, and it's been a while, but

2    generally speaking, you know, what would happen is, you know,

3    people would be wearing sashes at this point, sashes

4    indicating rank.  The highest ranking member would -- class

5    would be in session, the highest ranking member would hold

6    their hands up, the highest coach in the organization would

7    hold their hands up.  If I was the highest ranking member, I

8    would clap my hands, the coach and everybody else would then

9    clap their hands together, then they would bow to each other

10   and then do a huddle, like a football huddle, and then we

11   would say:  We are committed to our success.

12           And then after that, everybody would turn to either

13   that document on the back of their binder or, you know, if

14   there was a printed poster in the training room and begin

15   reading that whole statement, and once the statement was done,

16   we would all say, Thank you Vanguard, and we would begin the

17   session.

18   Q    How does looking at that mission statement and reading it

19   make you feel here today?

20           MR. AGNIFILO:  I object to the form of the question.

21           THE COURT:  Please rephrase the question.

22   BY MR. LESKO:

23   Q    Could you briefly read Government's 1008 to yourself.

24   Let me know when you need me to move it up.

25           (Pause.)

Vicente - direct - Lesko                    511

1    BY MR. LESKO:

2    Q    Mr. Vicente, what is your reaction here today to reading

3    that mission statement?

4    A    It's a fraud.  It's a lie.  It's -- it's this

5    well-intended veneer that covers horrible evil is how I feel

6    and I'm ashamed that I ever read it.  And honestly, this has

7    been -- my belief is this has been hurt -- been used to hurt a

8    great many people who -- well-intended people who wanted to

9    make a better world, who wanted to improve themselves, and

10   this thing's evil.

11   Q    Okay.  You ready to go forward?

12   A    (No verbal response.)

13   Q    Let's talk about EM, okay?

14   A    Yeah.  Just give me a second.

15   Q    Are you ready?

16   A    Yes.

17   Q    So you mentioned EMs.  Could you describe what an EM was?

18   A    So an EM is an exploration of meaning, and for instance

19   it's based on the understanding -- we were taught a lot about,

20   you know, things called Pavlovian links.  You know, for

21   example, you know, you see a -- I don't know, you see a bottle

22   of water and suddenly you're afraid, you know, it makes no

23   sense; or you see a spider and you have a terrible reaction,

24   and that was termed a -- you were having a physiological

25   response at an unconscious level to an external stimulus.

Vicente - direct - Lesko                                512

1           So in the five-day intensive when you got to day

2    four, you would be asked, you know, Could you bring us a

3    reaction you have to something, something simple, you know,

4    let's say it's a phobia, and let's say it seemed like it was a

5    phobia that didn't make sense, you know, like, a car driving

6    towards you about to hit you, there's a natural, you know,

7    flight response, but let's say it was one of those things

8    where, I don't know, you know, you saw a bottle of water and

9    you suddenly were terrified and you began sweating and, you

10   know, you were just shaking; and that's the kind of response

11   that doesn't really make a lot of sense and, you know, you

12   were taught that honestly that may not help you in life

13   because let's say you were at an important meeting and

14   suddenly somebody puts a bottle of water on the table and you

15   are terrified because there's the object of your terror, which

16   makes no sense whatsoever.

17          So an exploration of meaning was basically a

18   discussion to try and find out -- there's this external event

19   and then there's this -- my internal physiology, and, okay, so

20   we now understand that when I look at this thing, I have a

21   physiological response, you know, of getting hot and shaking

22   and being terrified and I suddenly have these thoughts.  And

23   it was explained to us that that happens at a very unconscious

24   level because, you know, we were told, for instance, you know,

25   how long -- you know, asked, like, How long have you had this

Vicente - direct - Lesko                    513

1    fear of -- whatever it was, you know -- and you'd say, Well,

2    years, and they'd say -- well, so they would begin a

3    discussion and -- to try and understand on a very -- this

4    wasn't a term that was used in the methodology, but this is

5    something I'm using -- at a very subconscious level, what are

6    you making that thing mean that's causing you to have this

7    response?  And if we can get you down to on a very, very deep

8    level to what that means, you may find that it doesn't make

9    any sense really but you've never examined it in your life.

10           And so during this process of questioning, what

11   was, at the time, really amazing to me and quite unique was

12   that you would be asked certain questions and eventually you

13   would -- it was almost like you slipped into a trance-like

14   state -- they termed it "deep structure," you are moving into

15   deep structure -- where you couldn't process intellectually

16   very well anymore.  It was almost like they said you were in,

17   like, a child-like state; and somewhere in there, as they kept

18   on asking you the questions, you would suddenly have this sort

19   of "uh-huh" realization, you know, maybe you would have

20   flashes of drowning in the pool, I think I'm drowning, but I

21   wasn't really drowning; oh, I'm actually fine; and you

22   suddenly have this, like, release -- you know, it could be

23   laughter, it could be crying, it could be a number of things.

24           And then the idea was once you had this release you

25   would go now and test it.  We were told this was a scientific

Vicente - direct - Lesko                          514

1    method and you would go test it and see.  Well, now how do you

2    feel when you look at the water?  And they'd say -- I'd say,

3    Okay, I feel fine.  They go, Well, what if we put it right

4    here, how do you feel now?  I go, I feel fine.  And they go,

5    Great, that's done.

6              Those were the kinds of things that were simple

7    things that were done on the fourth day, and honestly when I

8    saw that, I was like, this is incredible.  I definitely want

9    to learn how to do that because I had never seen anything that

10   was quite that effective.

11   Q    Who conducted EMs?

12   A    So EMs were conducted by people called EMPs, exploration

13   of meaning practitioners.  There were -- I found out later,

14   there were 12 levels of EMP or EM levels, I should say.  A

15   person who is an EM7 was allowed to -- for money -- do EMs.

16             In the trainings, people that were lower level could

17   EM people in the trainings, but you had to have training, you

18   couldn't just -- you couldn't just do it, there was a lot of

19   training involved.

20   Q    So lower level EMs, people who were on the 12-step

21   process --

22   A    Correct.

23   Q    -- could conduct EMs in intensives and similar trainings;

24   is that what you're saying?

25   A    Correct.

Vicente - direct - Lesko                    515

1   Q    And there were a certain group of EMPs who had achieved a

2   certain level of training who could do EMs for money?

3   A    Correct.

4   Q    So how would one arrange for an EM with an EMP for money?

5   A    Usually if you needed an EM, you would ask, you know, who

6   is available, you would sort of ask the other coaches who was

7   available, and they would tell you the following people.  And

8   then, you know, you might call them or you might also find

9   out, well, maybe that person is too expensive, maybe I will

10  try and go with this person, and then you would book an

11  appointment or -- you would book a single appointment or you

12  would book -- you would buy a package of appointments.  For

13  several hundred dollars, you would buy a package and you would

14  get a slight discount.

15  Q    How much did EMs cost?

16  A    My recollection is anywhere between, you know, at the

17  very lowest levels I think maybe 65 up to -- I think it was in

18  excess of 175.  I think I -- the most I ever paid was between

19  175 and 200 for an EM.

20  Q    So the EMPs that you were aware of, did any of them have

21  any formal medical training?

22  A    No.  My understanding -- no, but my understanding was

23  that Nancy Salzman had some training, I think, as a -- as a

24  nurse.  It was confusing because I was under the impression

25  that she had had some psychological training as well, but I'm

Vicente - direct - Lesko                          516

1    not sure if that's the case.

2    Q    Were any EMPs licensed therapists, to your knowledge?

3    A    Not to my knowledge, no.

4    Q    Were any licensed psychiatrists, to your knowledge?

5    A    No.  Psychiatrists and psychologists were --

6    psychiatrists and psychologists were usually not allowed to

7    attend the program.

8    Q    So the process for becoming an EMP, was there a baseline

9    requirement to be eligible to be trained to be an EMP?

10   A    Yes.  You had to be a coach, I believe it was a

11   two-stripe coach -- I will explain that later -- a two-stripe

12   coach in good standing, which meant fully paid dues; and at

13   that point, you were eligible to begin training and you would

14   start at what is termed, like, basically EMO and you would do

15   drills with other people and the drills were in the nature of

16   specific questions.

17           And over a number of years, you would -- you would

18   move up the ranks.  Many people on this path, you know, wanted

19   to get to the level that they could get paid for it.

20   Q    And the levels of training went from zero to twelve; is

21   that how that worked?

22   A    Yes, except I don't -- I mean, my understanding was that

23   Raniere was a 12.  I don't think anybody had ever got, you

24   know, above eight or nine.  I think that Nancy Salzman was

25   maybe a nine, I think.

1   Q    What was the level where an EMP could charge?

2   A    So my understanding was at a Level 7 an EMP could charge.

3   Q    Did you ever get to a certain level?

4   A    I got to what was termed "five plus."  That's five and --

5   it's between, I guess, five and six, five plus.

6   Q    Did you ever get to a level where you could charge for

7   EMs?

8   A    No.  What happened is I -- you know, I had worked very

9   hard to get to five plus, and we were all told that there was

10  something -- a miss in the system and that we all had to start

11  again, which upset me quite a bit because we had already paid

12  a lot of money to get there and then we were back at zero and

13  so I had just decided to never try and re-qualify.

14  Q    So you paid for the EM training?

15  A    Correct.

16  Q    Approximately how much did the EM training cost?

17  A    I don't recall.  It wasn't -- it wasn't tremendously

18  expensive that part of the training.  Maybe -- maybe 3- to

19  4,000.

20  Q    You mentioned the term "feedback."  What was feedback in

21  NXIVM?

22  A    So feedback was, you know, we were told, you know, things

23  like -- there are certain things about yourself you can't see,

24  so when you first come in as -- as -- as a student, you are

25  asked in the very beginning, you know, What's your feedback

Vicente - direct - Lesko                    518

1    number.  In other words, ten being you can tell me anything --

2    anything, I don't care; zero being don't ever talk to me.  And

3    basically the idea was, you know, How open are you to

4    feedback.  In other words, If we see something about you,

5    would you like us to tell you.

6             You know, for instance, if you have -- the metaphor

7    was if you have spinach in your teeth, wouldn't it be good if

8    somebody could share that with you.  So that's how feedback

9    began.

10            And then on the actual -- what's termed "the stripe

11   path," you know, as you move up the sashes and the colors, you

12   know, when you were a proctor you needed to really be able to

13   take feedback in.  When you got to what's called the green,

14   which is what I was, you know, you had to receive all feedback

15   with no resistance whatsoever.  So at -- when you were given

16   feedback, if you argued in any way, that was a problem.  You

17   know, once you were on the stripe path, once you were a

18   yellow -- not when you were a white, that was still

19   understandable, but once you were on the stripe path, it's

20   like talking back, you know, to an officer kind of thing.

21   It's -- you don't do that.  You take it in, and if you can't

22   take it in, clearly it's a pride problem, you know, perhaps

23   it's a tribute problem that you have, but you have a problem.

24   Q    So let's talk a moment about your first intensive, okay?

25            What year was your first intensive?

Vicente - direct - Lesko                    519

1   A     2005.

2   Q     And did you take an entire 16-day intensive?

3   A     I did.  I was intending to only do five days.  I was in

4   the middle of preproduction on some things, so I thought I

5   could only afford five days, but once I got to day four, I

6   was -- I was pretty blown away by the EMs and so I expressed

7   to Nancy Salzman -- and I think Barbara Bouchey -- that I

8   would like to stay and continue.

9   Q     Did you pay for that intensive?

10  A     I did not pay for that intensive.

11  Q     What was that -- how was that arranged?

12  A     They really wanted me to do it and I said, Look, I'm a

13  film maker, I just spent everything I have on this last film,

14  I don't have any money at this point; and they said, We'll

15  take care of it, you know, we'll figure something out type of

16  thing.  It was a very vague arrangement.

17  Q     I think you mentioned this, but who led your first

18  intensive?

19  A     Nancy Salzman taught my first intensive.  I was told --

20  well, she told me that the reason that she was teaching was

21  because I was very, very difficult and I needed somebody to

22  handle me.

23  Q     Did you meet the defendant during your first intensive?

24  A     I met -- I met him on the tenth day of the intensive.  I

25  actually was wanting to meet him earlier, but I was told I

1   wasn't ready yet, that I needed to have a certain amount of

2   the education before I was ready to meet him.  I believe it

3   was the tenth evening at the end of the day that I met him.

4   Q     Where did you meet the defendant?

5   A     I met him at Nancy Salzman's house.  I met him on Grant

6   Hill Drive or something like that where she lived at that

7   time.  He came over at the end -- you know, in the evening,

8   and I sat and spoke to him for a number of hours.

9   Q     And what did you discuss with the defendant?

10  A     There were a number of things.  I mean, there was a lot

11  of very sciency geeky-type things.  I remember we spoke about

12  dark matter, quantum mechanics.  We spoke about -- he was

13  talking to me about a certain kind of mathematics.  I said I

14  had never heard about it before, he said, well, actually I

15  invented this mathematics and I said, oh, that's amazing.  Not

16  being a mathematician, what do I know.

17           I was also with my girlfriend at the time, she was

18  there as well.  We spoke about rapport.  I asked him how is it

19  that you're able to -- to have so much insight into me,

20  because I was sharing a lot about what I wanted in my life.

21  And he described to me that, you know, he was -- he would be

22  with people in different ways.  Like, you know, if he was

23  talking to my girlfriend at the time, he would have a certain

24  physical aspect; when he spoke to me, he would change it and

25  he was explaining to me that there are ways to train you, and

1   others, as to how to really connect with people on their

2   levels so that those people really feel that you are

3   trustworthy.

4   Q     Did the defendant ask you to do anything during that

5   initial conversation?

6   A     He did suggest that I move to Albany, and I said I had no

7   desire to move to Albany, it was an ugly place, you know, I

8   enjoyed the West Coast.  And he said to me, well, you know,

9   it's dark out right now, I mean, who -- that could be LA out

10  there, you know, why do you need that?

11           And it was interesting because, at that point, you

12  know, during the training up to that point, you know, there

13  was a lot of -- having us understand that our -- a lot of our

14  issue was the things we thought we needed.  You know, you need

15  a certain place, you need a certain type of person to be with,

16  you need certain kinds of food, all these needs you have are

17  impediments to your -- and to your growth and self-fulness.

18  Why do you need LA to be out that window, we could be

19  anywhere.  So he said, you know, it would be good if you spent

20  time here, so he -- and that was a -- that continued for quite

21  -- quite a while.  A lot of people wanted me to move there.

22  Q     So you mentioned you participated in EMs in your initial

23  intensive --

24  A     Yes.

25  Q     Did you discuss a particular phobia that you have?

Vicente - direct - Lesko                    522

1  A    I did.  I talked about claustrophobia.  I had a

2  particular issue at the time which was when I was in traffic,

3  very, very heavy traffic and the traffic wasn't moving and

4  especially if I was in the middle lane, I would have a

5  complete panic attack and basically freak out.  And it was

6  difficult for me because, you know, I was -- I was in LA,

7  freeways are huge, and I was taking side streets every day to

8  get to work and it was really a problem for me, and I was

9  ashamed that I had this problem as well.

10 Q    Did you work on that phobia during your EMs?

11 A    I did.  I don't think it was the first, necessarily; it

12 may have been, but I worked on it with Nancy Salzman and I

13 felt an enormous, you know, freedom in that moment when I

14 thought about the traffic and I thought about me being stuck,

15 I felt suddenly like, wow, I think this is better.  And she

16 said to me, well, you know, we need to test this, this is a

17 scientific model.  When you leave, you know, you can report

18 back to me and then I did eventually report back to her.

19 Q    You discussed not having to pay tuition for your initial

20 intensive.  Did participants generally have to pay fees or

21 tuition to participate in intensive?

22 A    Generally, yes, but I found out later that there were

23 rare occasions when they did the same as they did with me with

24 other people.  But generally, yes, there was tuition involved.

25 Q    What was the tuition generally?

Vicente - direct - Lesko                      523

1  A    So in Albany, where I took it, there were tiers of

2  tuition.  In other words, the full price of the 16-day was

3  $7,500.  If you signed up outside of 30 days, you got a

4  discount, it was 6750 -- 6,750.  And then, if you were the

5  kind of person that, you know, when you first heard the pitch,

6  you know, somebody gives you the pitch for the first time and

7  within 48 hours you make the decision to pay, it was $6,000,

8  so it was a 20 percent discount.

9             THE COURT:  What did that include?

10            THE WITNESS:  That included basically attending --

11  attending the intensive.  I believe that it included breakfast

12  and a light dinner, and I think that we would pay for our own

13  lunch.  It was the privilege of, basically, having the

14  education and spending time in the space doing the education.

15            THE COURT:  And you made your own way with regard to

16  accommodations?

17            THE WITNESS:  Most people did, yes.  I cannot recall

18  if that particular time I flew myself or if they flew me.  I'm

19  not certain anymore.

20            THE COURT:  Thank you.

21            All right.

22            MR. LESKO:  Thank you, Your Honor.

23  BY MR. LESKO:

24  Q    So during your involvement, during the time when you were

25  involved with NXIVM, was new curriculum developed?

Vicente - direct - Lesko                    524

1   A     A great deal of new curriculum.  I mean, I think I was

2   told by the time I left that there were 2,000 modules, 2,000

3   two-hour modules, somewhere in that region.

4   Q     Can you describe how new curriculum was developed in

5   NXIVM?

6   A     Yes.  My first experience I didn't know how it was.

7   Nancy Salzman would describe that she would get what she

8   termed "a download" from Raniere.  The download was -- she

9   said him basically discussing a number of philosophical

10  concepts and asking her questions, and then she would record

11  it, transcribe it, and turn it into some piece of education.

12        Later, when I was shooting -- and by "shooting," I

13  mean with video cameras -- shooting Nancy Salzman and Raniere,

14  I would actually witness this.  I would witness the

15  discussions that she would have with him.  I also later

16  witnessed the discussions that he would have with the leaders

17  of Jness, the women of Jness, and that they would take his

18  words and these ideas and turn them into, you know, a written

19  format.  That was generally what happened.

20        And then, what I finally was privy to was what would

21  happen is, they would go into the intensive, generally they

22  would teach and then they would call him in between and he

23  would ask, you know, how are they responding, what's going on.

24  And then, apparently -- I mean, not apparently, I saw this, he

25  would -- he would modify things on the fly or add additional

1   things in to deal with the ways that people were responding to

2   the material.

3   Q    And who would typically conduct the first session of a

4   new program?

5   A    All first intensives -- in ESP, which was the 16-day, all

6   the Level 2 intensives, when they first started, my understand

7   wag that Nancy Salzman -- not only my understanding, that's

8   what I saw -- Nancy Salzman would teach the first intensive.

9   She may teach it one or -- once or twice, and then if she

10  wasn't going to teach it, usually like Lauren Salzman or Karen

11  Unterreiner would teach it.

12  Q    Did the defendant ever participate in the initial

13  sessions of new programs?

14  A    I was told, before my time, that he did and then, in

15  terms of my time there, he would train -- the first trainings

16  of the Society of Protectors, he would train those.

17  Q    Now, you mentioned break-out sessions during intensives

18  where questions were asked.  Do you know who created those

19  questions?

20  A    I believe Raniere created all those questions.

21  Q    During the debrief sessions, or I think the term you used

22  was disquisitions, were there strategies employed during those

23  debrief sessions?

24  A    There were strategies -- you mean in terms of the

25  facilitators of the sessions?

Vicente - direct - Lesko                    526

1   Q    Yes.

2   A    There were strategies.  I mean, one of the things we were

3   taught to do is to really help them understand that they

4   didn't have a clear definition of things.  They -- we would

5   talk about, you know, putting them sort of in what's called

6   their doughnut -- don't ask me to explain it, it's too

7   weird -- putting them in a state of, you know, uncertainty as

8   to, you know, what they thought about things, to show them

9   that they didn't have a clear definition.  And, in essence, I

10  later understood, you know, that by the time you came to

11  listen to the debrief or the disquisition it was almost a kind

12  of relief; like, okay, this makes sense, because I'm

13  thoroughly confused, but this seems to make sense.

14  Q    After an intensive, were there attempts to enroll

15  intensive participants in additional programs?

16  A    It was some -- yes.  It was something that was done

17  throughout the intensive.  We were trained to, you know, if

18  ever we saw a person struggling with, you know, let's say a

19  person we discovered, oh, this person really hates themself;

20  we would say, you know, you are eligible for a Level 2

21  intensive that takes care of this very thing.  You know, the

22  Möbius intensive will help you with self-love, and then you

23  can continue to characterization and human pain and it's

24  wonderful, wonderful, it will do wonders for your life.  So

25  that was one method.

Vicente - direct - Lesko                    527

1          And the other method was usually the last day, we --

2    we, all of us that were running the intensive, would do sort

3    of sales sessions to encourage people to take more intensives

4    to -- you know, maybe it's another 16-day or Level 2's, and

5    there was a strong focus towards the end to enroll people in

6    the next program to -- in essence, before they left -- left

7    the room, left the building, that there was an application

8    that was filled out.

9    Q    Was pressure put on participants to enroll in future

10   programs?

11   A    Yes.

12   Q    You mentioned Level 2 intensives.  What were Level 2

13   intensives?

14   A    Level 2 intensives were -- they were designed for

15   specific issues that people have.  There were groupings of

16   intensives.  These are just names, but there was 2A, anatomy

17   of minds and body; 2B, breaches; 2C, civilization; 2D

18   compassion.  There was a set called traps, patterns, the

19   cause.  Another was Möbius, characterization, human pain,

20   ascension.  They were intensives that began to help people

21   with what was termed "the deeper programming."

22          There was a commonality in all of those intensives

23   and the commonality was that you were being led to understand

24   that, in essence, you are -- you know, you are behaving

25   somewhat like a reactive animal.  You know, you are sort of

1   like this robot that keeps responding and you are not thinking

2   about things.  You just -- you have this -- what was termed

3   this viscera, this stuff in your guts, that is making all your

4   decisions and making very, very poor decisions.  So the idea

5   was, in Level 2s, is to help you figure out like what's going

6   on, like, in your coding, so to speak.  You know, it's like

7   trying to hack the computer in your coding, what is happening

8   in here beneath your conscious awareness that's causing you to

9   go astray.  The examples that we used in some of our sales

10  pitches was, you know, let's say you want to have love, true

11  love and it's the thing you want more than anything else, and

12  who here has a problem with love; like where you -- where you

13  want love and then you meet a person and now you have this

14  sudden feeling of intimacy and you are terrified and you just

15  run for the hills.  And a lot of people go, oh, yeah, that's

16  me.  And we go, well, Level 2's will help you with things like

17  that.  You know, there are almost animalistic responses you

18  are having to things and the idea was basically you need to

19  learn to think, you need to learn to override these -- these

20  viscera, these emotional things in you that are not helping

21  you.  And so emotions and instinct and those kinds of things

22  were minimized, you know, and you were told that's -- that is

23  less evolved than just using your intellect.

24  Q    Were two Level 2 intensives named compassion and

25  civilization?

1   A    Yes.

2   Q    Did you have any concerns about those two intensives?

3   A    I did, and I don't remember if it was civilization or

4   compassion, but one of those was the one I mentioned where --

5   we were told we had blind mentor groups and so, what would

6   happen is, you would -- he would write, you know, to your

7   mentors about this -- you know, some terrible secret you had,

8   which you would confess, and then, you know, they would write

9   back to you.  And there was -- there was education as well,

10  but that was part of the process, and that's what concerned me

11  later because I realized I had just believed that they were

12  indeed blind mentor groups, but somebody was arranging --

13           THE COURT:  And that "blind" meaning they didn't

14  know who you were?

15           THE WITNESS:  Correct.  Correct.

16           THE COURT:  Go on.

17  A    The thing that concerned me later, though, was that I had

18  no idea that was true.  And I -- I -- you know, although for

19  myself, it's certainly not information I divulged is not --

20  you know, it's not illegal, it's shameful.  And I assume many

21  people, you know, were divulging all kind of things, and I had

22  a concern about that.  And the thing is, it was under the

23  guise of unburdening yourself and recognizing, you know, well

24  everybody has these, you know, there's a certain freedom in

25  being able to unburden yourself.

Vicente - direct - Lesko                              530

1          MR. LESKO:  Your Honor, if we could -- oh, before I

2     get to that.

3     BY MR. LESKO:

4     Q     Do you have an understanding now of the Level 2

5     intensives, the purpose of the Level 2 intensives now that's

6     different than the understanding of them that you had while

7     you were involved in NXIVM?

8     A     I do.

9     Q     What is that understanding today?

10    A     It's my belief.  My belief is that there -- there is a

11    instinctual morality that most people with conscience have.

12    My belief is that the Level 2 intensives did a number of

13    things.  The one is it minimized that morality; that it in

14    essence played with our moral compass.  And also a lot of

15    things were introduced in terms of accountability, in terms

16    of, you know, vows, in terms of penance, you know, where in

17    order to correct something about you that was -- was shown to

18    be a problem that you would endure some kind of pain to

19    correct it.  You know, if you said, for instance -- and there

20    was an enormous focus -- the examples seemed to be a lot about

21    weight loss all the time, and diet and that kind of thing,

22    which I didn't understand until later.  You know, we were told

23    things like, you know, let's say you wouldn't eat the

24    chocolate cake and you do eat the chocolate cake, you know,

25    what's the thing you could do to try to remedy that; what's

Vicente - direct - Lesko                              531

1  this commitment you will make if you do that, if you fail.

2  You know, for instance, the person might take a cold shower,

3  they may reduce their calories, you know, walk barefoot in the

4  snow for an extended period of time, stand in the snow, that

5  kind of thing.  The whole idea was it was sort of a corrective

6  measure you did as a promise to yourself.

7          My concern was that it moved from a promise to

8  yourself to, in essence, like a promise to other people where

9  people would say, well, you need to do a penance for that,

10 whether you thought you should do it or not.  If you were told

11 by a higher ranking member or your coach or, you know,

12 somebody at the very top of the consideration that really you

13 should do this kinds of penance, you felt pretty compelled to

14 do that as a corrective measure.  And so there were those kind

15 of things in the level 2's that concerned me, and also the

16 hours were -- honestly, the hours were unbelievable.  They

17 were as long as if not longer than the days I would spend on

18 film sets; 16 hours, sometimes 18 hours, and we were

19 exhausted.

20 Q    Did the Level 2 intensives, did they involve tuition or

21 fees?

22 A    They did.  The fees were typically -- I believe it was

23 around $6,000 per intensive, I think, and there were packages.

24 You know, if you bought four intensives, you could buy four

25 intensives for $20,000.  The intensives were typically eight

1   days long, but yes, there was tuition.

2   Q    And getting back to the Judge's question, what did those

3   fees pay for?

4   A    Well, my understanding is you were paying for what is

5   termed "the tech."  You were paying for this information that

6   was -- we were told it was rare and unique.  You were paying

7   for the ability to be in the training to -- and I guess for

8   the -- you know, you're paying for the people that are working

9   with you and the trainers.

10  Q    Were there meals involved similar to the intensive

11  process that you described earlier?

12  A    There were.  There was usually some kind of a breakfast

13  that was part of the cost of the training and there was a

14  dinner that was part of the cost of the training.  Generally,

15  lunch you went out on your own or -- usually you went with

16  other people, but you paid for your lunch.

17  Q    You mentioned that vows were used in NXIVM.  Could you

18  explain how vows were used?

19  A    Well, many places, but I mean -- but in the Mobius

20  intensive, which is termed the self-love intensive, you know,

21  at the very end of the intensive, you would sit with your

22  mentor group.  You were in a mentor group.  So there were

23  break-out sessions, much like the other intensives, but in

24  Level 2's you had mentors, there were usually three other

25  people that mentored you.  And at the very end of Mobius, as

Vicente - direct - Lesko                    533

1  far as I recall, you were to vow something, you know, vow I'm

2  never going to do this or I'm always going to do this.  You

3  know, it's a promise you made to -- to the group.

4          As things went along in human pain, which is part of

5  that series, when you got to the end, you would form what was

6  called a penance group.  And basically, again, there was

7  something that you identified or they identified about you, or

8  your behavior, that needed to be amended and you would agree

9  or you would come up with it yourself.  And the penance group

10 was a group of people that were bonded together, such that you

11 made a promise to the rest of the group, you know, I'm going

12 to make sure I do this thing every single day and if I don't,

13 I'm going to, you know, have a cold shower for ten minutes,

14 I'm going to do 30 push-ups or whatever it is, and then they

15 also would have to do a penance for your failure.  So the idea

16 was that you were bonded with this group of people that if

17 anyone one of you failed, everybody had to do this, in

18 essence, punishment.

19          (Continued on the following page.)

20

21

22

23

24

25

*Vicente - Direct/Mr. Lesko*                         **534**

1  EXAMINATION BY

2  MR. LESKO:

3  (Continuing.)

4  Q    Did the vows ever concern you?

5  A    I think, honestly, early on less so.  Much later, yes.

6  But early on, I thought this was actually a great idea.  I

7  thought at first this is actually a cool way to be accountable

8  because, you know, I felt like I didn't want to let the other

9  people down, so I'm going to do to no matter what.  Later,

10  much later, the vows concerned me because I felt they were

11  very, very damaging and they were trapping people into

12  situations that I thought were not good.

13  Q    Okay, we're going to talk a little bit now about the

14  ranking system at ESP.

15          MR. LESKO:  Your Honor if I could only publish this

16  initially to the witness and by this I'm referring to

17  Government's 1010.

18          May I proceed?

19          THE COURT:  Yes, you may.

20  Q    Mr. Vicente, I'm showing you an exhibit that's marked for

21  identification as Government's Exhibit 1010.

22          Do you recognize that exhibit?

23  A    I do.

24  Q    What is that exhibit?

25  A    It is a photograph that I may have taken or somebody else

*Vicente - Direct/Mr. Lesko*          **535**

1  may have taken of the all the sashes on the training room

2  wall.  There was one wall for certain number of years that was

3  painted blue and this is all the sashes.  It was called a sash

4  display, and this was in Albany.  And this basically was a

5  description of the entire what was termed "The Stripe Path."

6  Q    And the training room was located in what room were you

7  now?

8  A    455 New Karner Road, Latham, New York.

9  Q    Okay.  Does this photo fairly and accurately depict the

10  sashes that were on the wall of the training room?

11  A    Yes, it does.

12         MR. LESKO:  We offer Government's Exhibit 1010.

13         MR. AGNIFILO:  No objection.

14         THE COURT:  Government Exhibit 1010 is received in

15  evidence and published to the jury.

16         (Government's Exhibit 1010 was received in evidence

17  as of this date.)

18  Q    So what was the ranking system -- was there a ranking

19  system at ESP?

20  A    There was, yes.

21  Q    And what was it called?

22  A    It was called The Stripe Path.

23  Q    And what was The Stripe Path?

24  A    The Stripe Path was a method of marking and measuring

25  one's growth and maturity and abilities in the company.

*Vicente - Direct/Mr. Lesko*                    536

1          Basically, when you came in, in your first training,
2    you would receive a white sash and there was an sash ceremony
3    that happened either the first day or the second day where you
4    would be given your sash.
5    Q    So let me stop you there.  Did the sashes signify
6    progression up The Stripe Path?
7    A    Correct, yes.
8    Q    All right.  So if you could direct me on the
9    Government's 1010, where is the white sash that you're
10   referring to?
11   A    The white sash I'm referring to is on the extreme left.
12          THE COURT:  You can circle it on your screen with
13   your finger.
14          THE WITNESS:  Oh.
15          THE COURT:  Can I ask a question?  You said, "The
16   Company."  What did you mean by that?
17          THE WITNESS:  That would be Executive Success
18   Programs/NXIVM.
19          THE COURT:  Okay.  Thank you.
20   Q    And right now we're talking about The Stripe Path as to
21   relates to ESP or Executive Success Programs?
22   A    That's correct.
23   Q    So what did the white sash signify?
24   A    The white sash you would be called a student or a
25   participant.  It was basically you were, you know, a brand new

1   person experiencing the methodology for the first time.  And

2   most people, well, everybody came at the beginning would

3   receive a white sash and then what would happen from that

4   point on there were certain achievements that they could make

5   and they would get stripes.  So in the case of the white sash,

6   they would get red stripes, up to four of them, before a jump

7   in rank.

8   Q    And what did those stripes signify?

9   A    In the very beginning, you would receive -- not in this

10  order -- but you would receive a one stripe for enrolling one

11  person, one stripe for enrolling another person, a stripe for

12  finishing the five-day and then a stripe for finishing the

13  16-day.  So that, you know, if you were very motivated you

14  would enroll two people during your time you could get all

15  four stripes in your first Intensive.

16  Q    What was -- after a person received all four stripes on

17  their sash, for instance, on a white sash, what was the next

18  step on The Stripe Path?

19  A    The next step was to -- what's called

20  "Provisional Coach," and that was your yellow sash.

21  Q    If you could circle a yellow sash.

22  A    Well, there's two of them.

23       THE COURT:  Just hold on.  All right.  Go ahead.

24  A    (Circling).  I've circled two of them because there is

25  what's called a Sash with Edge and a Sash without Edge.  A

1   Sash with Edge, you would get -- if you enrolled two people in

2   a 30-day period of time which indicated you were very

3   motivated and a very good enroller, you would get an Edge.  So

4   there's one Yellow with Edge and one Yellow without Edge.

5            And, basically, in order to get there you'd have to

6   do a Coach application.  You would fill out a document I think

7   it was probably ten pages of questions, very detailed

8   questions.  Those would be evaluated by the rank above you.

9   They would look for certain things in your intake form, so to

10  speak.  And then, if you were going to be awarded that sash at

11  the next Intensive you went to, you would then be given that

12  new yellow sash.

13  Q    And that was for initially Provisional Coaches?

14  A    If you had no stripe, you were termed a

15  "Provisional Coach."  Once you had your first stripe you were

16  termed an actual Coach.

17  Q    So yellow stripe --

18           MR. LESKO:  Strike that.

19  Q    Yellow sash, one stripe, was a full Coach.

20  A    A full Coach.

21  Q    If we could erase the circle.

22           MR. LESKO:  Thank you, your Honor.

23  Q    So after the yellow sash, what was the next step in The

24  Stripe Path?

25  A    (Circling).  That would be the orange sash.  That would

1   be the rank of Proctor.  And again, to get there, you would

2   have to achieve four red stripes on your yellow sash which

3   were related to a number of benchmarks:  Enrollments,

4   maturity, different things called Life Issue Write-Ups, Life

5   Issue Plans.  There were a series of things that you needed to

6   do to be able to become a Proctor and it was much stricter.

7   Q    I think one of us can clear the circle without having to

8   ask the Court.

9        THE COURT:  Yes, you can go to the lower-left corner

10  of the screen.  That's it.

11       MR. LESKO:  Figured it out.

12  Q    So after the orange sash, what was the next step on The

13  Stripe Path?

14  A    (Circling).  That would be a green sash, and that was

15  called a Senior Proctor.  That was the rank I achieved.  And

16  again, there were stripes on the orange sash.  They were white

17  stripes and there were benchmarks there as well.  Things

18  called Breach Write-Ups, Breach Plans that would then allow

19  you enrollment and maturity and ability to work with people

20  and lead people and then you could eventually get the green

21  sash.

22  Q    After the green sash, what was the next step on The

23  Stripe Path?

24  A    (Circling).  That would be blue.  The term was Counselor.

25  Again, you'd have to achieve four stripes on your white sash,

1   sorry, four stripes on your green sash.  I'm less aware of

2   what the requirements were, I only made it to one stripe and I

3   was rather confused about that left.

4   Q    All right.  So after the blue sash, Counselor level, what

5   was the next step on The Stripe Path?

6   A    That would be purple that was Senior Counselor.  Again,

7   my understanding was you needed four white stripes on the

8   green sash -- sorry -- four white stripes on the blue sash to

9   get to the Senior Counselor sash.  That was pretty much the

10  highest rank other than the Prefect and the Vanguard.

11  Q    So there are other stripes in between.  If you could

12  circle them all what did those other stripes signify, if you

13  know?

14  A    For the most part, I don't know.  I asked about the brown

15  sashes once and I was told they were speaker sashes.  My

16  understanding about the black sash was that you had to invent

17  something that fundamentally changed humankind.  That's as

18  much information as I know.

19  Q    To the best of your knowledge, did anyone attain those

20  levels, the sashes beyond purple?

21  A    Not that I'm aware of other than the Prefect who had a

22  gold sash, and then the Vanguard who had the white sash that

23  was double the length of the first white one.

24  Q    Can you circle the gold sash, please?

25  A    (Circling).  I think that is the one she would be.

*Vicente - Direct/Mr. Lesko*                               **541**

1    Q     She is who?

2    A     Nancy Salzman, also known as Prefect.

3    Q     And do you see the sash you mentioned, the long white

4    sash.  Could you circle that?

5    A     (Circling).  That was what Raniere wore, also known as

6    Vanguard.  And he termed himself "The Eternal Student."

7    Q     Did you ever actually see the defendant wearing that long

8    white sash?

9    A     I did see him wear that earlier in my time there during

10   appearances that he would make.

11   Q     Did you see Nancy Salzman wearing the gold sash?

12   A     She always wore the gold sash during ESP Intensives.

13   Q     Did you, yourself, wear your sashes including ultimately

14   your green sash?

15   A     I did at every Intensive, every Ethos class I did.

16   Q     Was anyone at ESP in charge of The Stripe Path?

17   A     My understanding, my recollection, I'm sorry, I'm just

18   referring to a document.  Lauren Salzman was the head of The

19   Stripe Path.  She was one of the people making the decisions

20   about promotion.

21   Q     And we'll get to it in a moment, but was there, from an

22   organizational standpoint, were Stripe Path -- was The Stripe

23   Path part of some committee in ESP?

24   A     It was part of what's called "The Committee Structure" or

25   "The Division Structure," yes.

1   Q    Okay.  We'll discuss that in a moment.  So what did

2   Coaches do at ESP?

3   A    Coaches were the people on the ground in the Intensive.

4   They were responsible for, you know, in essence, running the

5   Intensive, making sure the food available, making sure the

6   notes were where they needed to be, facilitating the students.

7   There were a series of roles they had in the Intensive and

8   they were sort of at the command of the Proctors or

9   Senior Proctors.  They had -- outside of the Intensive they

10  had other roles as well.  They had to be on a committee.  They

11  had to be, once they were actually an actual Coach, they had

12  to be coaching people.  They were required to take part in,

13  you know, community events and different events that would

14  happen.  They would be part of the workforce taking care

15  running those things.

16  Q    Were Coaches typically paid?

17  A    Coaches were not paid.

18  Q    Did being a Coach involve significant hours?

19  A    Many, many hours.  There was a system of measurements.

20  It was called, I think, The Coach Point System where the

21  understanding that I was told was that you pay anywhere from,

22  you know, let's say two to three thousand dollars a year to be

23  in the Ethos program.  You had to be in the Ethos program, you

24  had to pay that due.

25          And then you would work all these hours as well.

1  You had to work a certain number of hours I don't recall what

2  they were.  And what I was told at one point was, in essence,

3  you're working this system, you're learning how to be a CEO,

4  you're learning all the different things you need to have,

5  abilities you need to have to run a company.  And they said at

6  one point:  We're in essence giving you $24,000 of value for

7  all this work you're doing and you're paying us, you know, two

8  to three thousand dollars of membership.  But really, this is

9  something that will help you in your life.

10  Q    How many Coaches or yellow sashes were there in ESP?

11  A    I believe there was somewhere in excess of 200 yellows, I

12  believe.

13  Q    What did Proctors do at ESP?

14  A    Proctors were in charge of the Coaches.  Proctors

15  evaluated the Coaches' growth.  Proctors assigned Coaches to

16  different tasks.  But they would also, yes, they would Coach

17  them and they would basically shepherd them or mentor them

18  along The Stripe Path, give them feedback, EM them, have

19  coaching sessions, set them on their trajectory up The Stripe

20  Path and what they needed to accomplish in order to keep

21  moving.

22  Q    Did Proctors get paid?

23  A    Proctors were the first time you could actually make

24  money.  So there were different ways Proctors got paid.  When

25  you came in, in order to become a Coach, you would enroll

1   people and you would build an organization.  You know, let's

2   say I enroll two people, and they enrolled more people, and

3   they enrolled more people that was your organization.

4          Once you became a Proctor, as long as you were in

5   good standing, you were eligible for commission on any

6   financial activity in your organization.  So anybody that took

7   a prom that was in your organization, you would get something

8   called a Proctor override which was ten percent.  Proctors

9   could become head trainers if they wanted to be and those were

10  paid positions for, you know, could obviously be, you know,

11  EMPs as well.  Proctors could be Field Trainers.  I was a

12  Field Trainer.  Field Trainer is a person who trains the sales

13  force.  There were salespeople in the system and a

14  Field Trainer is the person who trains those salespeople.

15  That was another way to make money.

16          But people, in essence, wanted to get to Proctor

17  because that's when they could begin making money because, in

18  essence, they weren't making any money before then.

19  Q    And to attain the level of Proctor, did that involve

20  spending significant time as a Coach?

21  A    It did.  I mean, for myself, and I was told I moved very

22  quickly, I did a year full time.  That's pretty much all I did

23  for the entire year.  Other people, it could take a number of

24  years because of different things that they were doing.  But

25  it's a significant amount of education.

*Vicente - Direct/Mr. Lesko*                    **545**

1  Q    And, again, the time period when you were a Coach you

2  were not paid; is that correct?

3  A    I was not paid as a Coach, no.

4  Q    How many Proctors or orange sashes were there in ESP?

5  A    I'm a little fuzzy, it's been a while.  Somewhere between

6  30 and 40 Proctors, I believe.  Perhaps up to 50.  I don't

7  recall exactly.

8  Q    What did Senior Proctors or green sashes do at ESP?

9  A    Senior Proctors were -- they were in charge of the

10 Proctors and they were helping the Proctors shepherd the

11 Coaches.  Senior Proctors, Greens, were required to run a

12 Division either on their own or with somebody else.  They were

13 seen as, you know, it's a very respected position, a

14 high-ranking member of the company, to be involved in the

15 community events to being involved in something called

16 "V Week."

17         And, you know, Greens would meet once a week and, in

18 essence, go over, you know, all the Proctors in the entire

19 company.  This would take many, many weeks where we would

20 choose a certain city that there was a center and we would

21 evaluate every single Proctor, and then we would also help our

22 Proctors with their evaluations of the Coaches as well.

23 Q    Were there financial benefits associated with being a

24 Senior Proctor?

25 A    They were the same as Proctor.  There was one difference

1   in you could not open a center or run a center if you weren't

2   a green.  Other than that, it was pretty much the same.

3   Q    And what were the financial benefits associated with

4   being able to open and run a center?

5   A    So the way a centers work is you would start classes in a

6   certain area.  You wouldn't be a center yet at that point.

7   You would be, you know, a satellite or a provisional center.

8   And you would start to build your clientele.  And what you

9   were required to do is to have a hundred paying Ethos members

10  in order to have a center.  Once you could achieve that, and

11  we all tried to achieve that, because, in essence, up until

12  you reach a hundred, you were paying out of pocket for

13  everything:  You're paying for the rent and the electricity

14  and everything.  If you have a space which, of course, you

15  need to have to run these classes.

16         Once you achieved a hundred paying Ethos members,

17  you were then given a commission, so to speak, from head

18  office of ten percent of those fees.  You would also get ten

19  percent of the actual training of whatever the

20  training -- whatever money they were getting for the training,

21  you would get ten percent of that.

22         So that's basically how we would try and offset the

23  costs of actually having the center.

24  Q    And after those costs were paid, was any amount left over

25  for Senior Proctors?

1   A    Theoretically, that was the plan.  And in my case,

2   sometimes you would have excess, but then the next month you

3   would make less so.  We were always running close to red all

4   the time.

5   Q    You mentioned salespeople and Field Trainers.

6   Field Trainers oversaw the salespeople, is that how it worked?

7   A    That's correct, yes.

8   Q    Was there any sort of sales methodology at NXIVM, ESP?

9   A    It was, generally speaking, when I came in, when I came

10  in Barbara bra Bouchey was my Field Trainer, she taught me the

11  ropes.

12           Generally speaking, the person, the Field Trainer

13  that was responsible for bringing you in would teach you.  In

14  later years, many of us were taught by Raniere himself.  He

15  would teach us different methodologies, he wanted to formalize

16  these introductory presentations, so he would spend a fair

17  amount of time training us.  In fact, at one point, I think we

18  spent three weeks with him as he taught us how to best sell

19  the product.

20  Q    And we'll get into it in substance in a moment, but did

21  the training involve a sales pitch?

22  A    Yes, it did.

23  Q    Counselors at ESP.  What did counselors do?

24  A    Honestly that was a little fuzzy.  I didn't yet

25  understand what they did.  They seemed to be I think the grand

1  poobahs who had more wisdom and more knowledge and would

2  mentor the Greens in different ways.  This was a term that

3  wasn't used, but they were the elders that would teach us.

4  Q    Do you recall anyone who was a Counselor or blue sash?

5  A    Edgar Boone was a blue sash.

6  Q    Putting up on the screen Government's 4 which has been

7  previously admitted.

8  A    That is Edgar Boone.

9  Q    What did Senior Counselors do?

10 A    Similarly, the elder, elders.  They were seen as the wise

11 ones that would be able to help us, you know, deep issues in

12 our lives, that kind of thing.  The actual description of the

13 rank, honestly, to me, was always very fuzzy.

14 Q    Do you recall who was a Senior Counselor?

15 A    Pam Cafritz was a Senior Counselor, deceased.  And

16 Barbara Jeske was a Senior Counselor deceased.

17 Q    Deceased, meaning, they're both passed?

18 A    Both passed.

19 Q    I'm showing you what's been admitted as Government's 12.

20 A    That is Pam Cafritz.

21 Q    Who was Pam Cafritz?

22 A    Pam Cafritz, in my understanding, was one of Raniere's

23 closest confidantes.  She lived with him for, I believe, as

24 long as I was there.  She took care of him, she was with him

25 all the time.

1  Q    Do you recall whether Pam Cafritz was wealthy?

2  A    She was from a very wealthy, very notable Washington,

3  D.C. family.  So, yes, she came from enormous wealth.

4  Q    I'm showing you what's been previously admitted as

5  Government's 31.  Do you recall that photograph?

6  A    Barbara Jeske.

7  Q    And who was Barbara Jeske?

8  A    Barbara Jeske was somebody also very close confidante of

9  Raniere.  She was a Senior Counselor, she helped train a lot

10 of the sales force.  I mean, I came to understand later the

11 relationship with Raniere.  I wasn't clear at first but later

12 I found out.

13 Q    What was that relationship, if you know?

14 A    He described her as his, like, his wife.  When she died,

15 he said to me, you know, that was like I just lost my wife and

16 I was, I was taken aback.  I didn't realize they had that

17 relationship.

18 Q    I'm going to put Government's 1010 back on the screen.

19 What did the Prefect or Nancy Salzman do at ESP?

20 A    Well, she was seen as two things.  One as the CEO of the

21 company.  I wasn't clear if it was ESP or NXIVM or both.  I

22 think it was both.  She was seen as, you know, the mom of the

23 whole organization.  She was the person that was, in essence,

24 for many years the head of education.  You know, she was the

25 one getting all of Raniere's ideas recorded and then

1  transcribing it and then turning it into something that could

2  be taught.  She had a very, she was a very, very respected

3  position.

4  Q    And you mentioned that the defendant was known as the

5  Vanguard what was the role of the Vanguard in ESP?

6  A    There was -- he was considered the philosophical founder,

7  the driving ethical, moral, humanitarian force behind the

8  entire company.  He was seen as somebody who was very, very

9  wise because of the his reported accomplishments.  And also, I

10  learned pretty early on when I came in that, you know, people,

11  if there was a question that was too difficult, they would

12  have to consult him.  He would be consulted on all manner of

13  things I found out eventually.  He was seen as, in essence,

14  the wisest person in the organization.

15  Q    Was there something called The Five Pillars at NXIVM?

16  A    There was.

17  Q    What were The Five Pillars?

18  A    The Five Pillars were Raniere's theory on what you

19  required to build a civilized world.  The areas of endeavor

20  that you needed to have and needed to be operating to have a

21  civilized world and they were things like Commerce,

22  communication, ethics, education, humanities, and they were,

23  in essence, the divisions that made the company.  And then

24  these committees existed as well in every single center that

25  was operational.

1  Q    Okay.  So let's break that down a bit.

2         So The Five Pillars that you've identified

3  corresponded to divisions within ESP?

4  A    Yes, the Pillars were seen as the philosophical things,

5  so to speak.  The divisions were actually, you know, manned by

6  people.  The divisions operated out of Albany, out of the head

7  office.

8  Q    So who led -- what type of person led the divisions in

9  Albany?

10  A    So, generally, it was Senior Proctors, Greens.  Also,

11  sometimes Proctors.  And then everybody on the Executive Board

12  of which I was a member was also running a Division as well.

13  Q    Okay.  Did the Executive Board oversee the divisions?

14  A    That's correct, yes.

15  Q    Did you, yourself, ever oversee a Division?

16  A    I did.  The last few years I was overseeing

17  Communications before that it was Commerce.

18  Q    And, if I understand you correctly, you have the

19  Executive Board, the Divisions, and then were committees

20  within Divisions?

21  A    Yes.  So, in other words, let's say, let's say you have

22  the Executive Board and you have, let's say, the Commerce

23  Division.  Every single center had a Commerce Committee that

24  reported and every single center in different countries had a

25  Commerce Committee that reported to the Commerce Division in

1   Albany.  And the head of that Division would then report to

2   the Executive Board who would then report to Prefect and then

3   Vanguard.

4   Q    So, ultimately, all of these committees at the various

5   centers in different countries reported to Divisions who

6   reported to the Executive Board who reported to the Prefect

7   who reported to the Vanguard.  Was there any authority above

8   Vanguard?

9   A    There was nothing above Vanguard.

10  Q    Did NXIVM operate -- well, you mentioned this.  NXIVM

11  operated centers.  What were the centers called?

12  A    They were called centers.  They usually were termed,

13  like, the Mexico City Center, the Monterey Center, the

14  Vancouver Center, the Albany Center, the New York City Center.

15  It was usually by location.

16  Q    So you've explained that NXIVM was the umbrella

17  organization, and that ESP was one of the entities under that

18  umbrella.  Could you specifically explain the relationship

19  between ESP and NXIVM?

20  A    Other than NXIVM was the umbrella, the container in which

21  ESP was, the term was used interchangeably.  Sometimes it was

22  called an ESP center sometimes it was called an NXIVM center.

23  It was termed "NXIVM Civilization."

24          When I first came in, I believe the word NXIVM was

25  used much more.  I believe as the press got worse and worse

*Vicente - Direct/Mr. Lesko*                    **553**

1   over time, the preference was ESP Center or Executive Success

2   Programs.

3   Q    Why was that?

4   A    My understanding was to because there was so much, you

5   know, one of the issues that we had as salespeople and

6   Field Trainers is, you know, if we mentioned certain key words

7   to people they would go online and do a search so if we

8   mentioned NXIVM, or other terms like "rational inquiry," they

9   would go online, they would see all this negative press, and

10  they would get very scared and basically back away.  So there

11  was constant attempts to figure out what words could we use

12  that would not trigger them and make them run for the hills.

13  Q    So what were the centers used for?  What happened at the

14  centers?

15  A    Basically, to run the education.  They were also used as

16  community hubs.  People would come and do Ethos classes, they

17  would come and do classes called Origins which I hadn't

18  mentioned.  They would do intensives.  There would be

19  introductory evenings where presenters, I was one of them,

20  would do presentations.  They would hold events, you know, if

21  there were special events community events that would be held

22  there.  That's also where usually the educational materials

23  were kept in the center as well they were in a what's called a

24  Proctor Room locked behind a door or in a safe or something.

25  But it was the actual home in each place.

*Vicente - Direct/Mr. Lesko*                      **554**

1    Q     These materials that were locked away, what did that

2    consist of?

3    A     They consisted of facilitator notes, student notes, and

4    then different technological devices like an iPods and tablets

5    which would have the videos on them and those were locked as

6    well.  They would also have sashes and then we would have a

7    lot of student notes.  We would have the forms that they fill

8    out in the beginning.  And they would have student notes, each

9    participant that came we'd have a file with their name on it

10   and we would put their things in there.

11   Q     So you began doing this in Albany, but could you describe

12   may physical layout of a center?

13   A     Well, I can talk about, I mean, in the case of Vancouver,

14   which I was the co-owner of, you know, you walked into a front

15   lobby area, our offices, the actual Proctor offices, were just

16   around to the left.  And then there was -- there were three

17   smaller rooms that we termed "breakout rooms."  They were like

18   little lounges where we would send people for breakouts.  And

19   then we would have a larger training room which, in our case,

20   we could hold up to maybe 60 or 70 people.  There was a

21   television at one end and the room was filled with chairs.

22   And we had storage facilities and bathrooms and then a kitchen

23   as well.

24   Q     So the main room could hold quite a few people.

25   A     In our case, 60 to 70.  I think that Albany, the training

1    room, I believe, we had up to a hundred people in that

2    training room.

3    Q    So how many people would attend, for instance, a typical

4    Intensive?

5    A    Honestly, it depended on the area.  Anywhere from 20 to

6    maybe 40.  There were certain areas that would be a little

7    larger.  But a lot of trainers had to be flown in to do the

8    larger ones.  The preference was 30 to 40 if possible.

9    Q    How many attended your initial Intensive in Albany?

10   A    I'm thinking around 30 maybe.

11   Q    So how many centers were there?

12   A    I have to do this visually.  These are not full centers

13   necessarily, but there was in the U.S. we were in New York

14   City; Albany; Canada, Vancouver; Los Angeles; Orange County

15   and San Francisco were beginning; Seattle-Tacoma existed up

16   until 2009.  Moving south, Mexico City, Monterey.  Guadalajara

17   and Guatemala City in Guatemala.  And there were various other

18   attempts to start, they had hadn't really grown yet.  There

19   was an attempt in Miami, there was an attempt in London.

20   Q    And Monterey, is that Monterey, Mexico?

21   A    Monterey, Mexico.

22   Q    Getting back a moment to the salespeople.  Were there

23   certain requirements that potential salespeople had to reach

24   before becoming salespeople?

25   A    Yes.  I'm sorry, I'm searching my memory.  A salesperson

*Vicente - Direct/Mr. Lesko*                    **556**

1   had to be a Coach and they had to have enrolled, I'm not sure

2   if I'm correct about that, but they had to be a Coach.  I may

3   not be correct about that.  They had to have enrolled six

4   people and they had to have demonstrated that they could do

5   it.  In other words, they couldn't be ready to help to enroll

6   a person, they would to demonstrate they were able to do it

7   once they enrolled six people and they weren't paid for those

8   six.  Once they enrolled six, and they reached the

9   qualifications to be a salesperson, they then could earn

10  commissions.

11          So I said earlier only Proctors made money, I'm

12  realizing it's not true.  A Coach could, as a salesperson, and

13  they would earn ten percent commission on the people that they

14  enrolled directly.

15  Q    And how would one qualify to become a Field Trainer?

16  A    Becoming a Field Trainer meant building a certain number

17  of salespeople.  I think it was six, my memory is a little

18  foggy on that.  I think it was six.  You had to basically

19  build six salespeople, at which point or maybe it was less, at

20  which point you were then termed a Field Trainer.  A

21  Field Trainer was a jump from salesperson at.  As a

22  Field Trainer, you were earning a 20 percent commission and

23  then you were also negotiating with your salespeople and

24  commissions, you know.

25  Q    And you, yourself, was a salesperson?

*Vicente - Direct/Mr. Lesko*                               557

1    A    I was a salesperson and then I became a Field Trainer.

2    Q    And so, is it fair to say that the compensation structure

3    at NXIVM was based on commissions?

4    A    Commissions and also, in the case of trainers, it wasn't

5    commission based.  Trainer, it was based on the amount of

6    students you had in your Intensive which, I suppose, is kind

7    of.

8    Q    So if you had a certain number of students in your

9    Intensive, were you paid, like, an hourly rate or did you get

10   a percentage of that tuition?

11   A    No, as a trainer, you know, your job was you rented the

12   space.  You paid for, you know, the breakfast and lunches.

13   You had to pay for certain things.  And then you were given a

14   certain percentage of the gross.  There was an online payment

15   system and the company received the money from the clients.

16   You would receive a percentage of the gross.  I think it was

17   maybe 30 -- I was not a Head Trainer, so I don't know.  I

18   think it was around 30 percent that you would receive.  And

19   out of that, you had to pay all your bills.  And then, what

20   was left over was, in essence, yours as a Head Trainer.

21         THE COURT:  During what period of time were you

22   doing this work as a trainer?

23         THE WITNESS:  So I was never a Head Trainer but I

24   was a Field Trainer.  I became paper Field Trainer maybe 2007.

25   Up until the time that I left in 2012.

1          THE COURT:  So was all of this in Vancouver?

2          THE WITNESS:  The Field Trainer is a bit like you're

3   mobile.  You can go anywhere, make calls to anywhere.  So I

4   could enroll people into Vancouver or Los Angeles.  Pretty

5   much any center that I existed I could enroll people into

6   those trainings in those different cities or countries.

7          THE COURT:  Is this a full-time job?

8          THE WITNESS:  At times to became that.  So there

9   were many, many jobs.  So it was almost like there were many

10  full-time jobs.  I was doing a great many things

11  simultaneously, so it may have been a full-time job for a

12  month.  But generally, I was doing too many things to dedicate

13  all my time.

14         THE COURT:  All the jobs were for the company?

15         THE WITNESS:  They were all for the company.

16         THE COURT:  So you weren't working in any other

17  field at that time, you were simply working for company?

18         THE WITNESS:  At the beginning, I was still working

19  on another film, I was writing a book, but that began to fade

20  as I became more, in essence, overwhelmed with the tasks at

21  hand.

22         THE COURT:  All right.  Thank you.

23  EXAMINATION BY

24  MR. LESKO:

25  (Continuing.)

1    Q    As you described, Field Trainers were mobile?

2    A    Yes.

3    Q    Were salespeople also mobile?

4    A    Salespeople could, yeah, go anywhere, you know, make

5    phone calls anywhere.

6    Q    You mentioned the term "Suppressives" previously.  What

7    were Suppressives?

8    A    So just to clarify.  You were never taught to use

9    suppressive as a noun.  It was more a type of behavior or

10   strategy, you know, a person was doing a suppressive action.

11   But it bled over to, you know, a person is being suppressive,

12   a person is suppressive.

13          In essence, the idea that I initially learned was,

14   you know, somebody who is trying to destroy goodness, destroy

15   honor.  You know, anybody that wanted to destroy tribute.

16   They were described as having suppressive tendencies.  They

17   wanted to crush somebody else to feel better about themselves.

18          And so, the way I saw suppressive strategies was,

19   you know, somebody who basically can't handle goodness or they

20   can't handle somebody being better than them, so they had to

21   suppress other people.  That changed over time the way I saw

22   what suppressive was but that was how it was initially

23   explained to me.

24   Q    And what happened to people who were labeled as being

25   suppressive at NXIVM?

*Vicente - Direct/Mr. Lesko*          **560**

1   A    There were different consequences if you were considered

2   a suppressive person.  But you were still in the organization,

3   you know, maybe you had to go and fix it.  You were told, you

4   know, maybe you've committed a breach and you have to go fix

5   that preach.  Maybe you can't train Intensives anymore, or you

6   can't EM anymore.  There was maybe a dock in pay of some kind.

7           And there was also the disapproval of the entire

8   community that was a very, very powerful that went on.  If you

9   spoke out in any way against the company, against the

10  Vanguard, you know, it was more serious.  It was, you know,

11  you'd be shunned.  Everybody inside was told to shun that

12  person.

13  Q    What was shunning?

14  A    Shunning was basically you won't do business with that

15  person anymore.  You won't talk to that person anymore.  You

16  won't talk to people that that person talks to or talked to

17  other people to try and talk to that person.  Basically, you

18  try about isolate them completely and the idea being, you

19  know, you have to, you know, stand for what's right and in

20  essence, you know, indicate that that person is doing is a

21  real problem and it's event goodness.

22  Q    So is it fair to say a person who is being shunned it was

23  almost like they were dead to you and others at NXIVM?

24  A    Pretty much.  You know, because if anybody, you know, if

25  somebody was being shunned then you spoke to that person it

1    was very serious.  You had to act as though they just didn't

2    matter anymore.  You know, maybe there were things they could

3    do to fix it but I would never see that.

4    Q    Who decided who would be shunned?

5    A    Usually, it came from the upper ranks.  It was usually a

6    decision that was made very, very high up you know it would

7    have been, you know, Nancy Salzman or Lauren Salzman or

8    Raniere.  There were people, there were people that were

9    shunned that honestly I had no idea why they were being

10   shunned I was told they had done some kind of a breach I was

11   like, okay, but I don't know what this is but okay.

12   Q    Can you provide an example of someone who was shunned by

13   the NXIVM community?

14   A    Barbara Bouchey was shunned when she left in 2009.  She

15   was spoken very poorly of.

16   Q    Was someone related to Lauren Salzman shunned?

17   A    Her father.  She and her sister shunned her father.  I'm

18   not sure if that's still operational today but for many, many

19   years they were would not talk to him or interact with him in

20   any way.

21   Q    Was the defendant involved in the decision to shun Lauren

22   Salzman's father?

23   A    I can't say for sure that I was at a conversation where I

24   heard that.

25             MR. AGNIFILO:  I object.  I object.

*Vicente - Direct/Mr. Lesko*                    **562**

1      THE COURT:  Sustained.

2   Q    You've used the term "breach" or "ethical breach."  What

3   was an ethical breach at NXIVM?

4   A    Well, there were two levels to an ethical breach.  The

5   way it's described and the way it actually operated.  An

6   ethical breach, the theory, is that there is your true nature,

7   your true essence, your true goodness.

8          Let's say, you're a person that, you know, believes

9   yourself to be humanitarian and you say an unkind word to

10  somebody or you're violent in some way that's an example of

11  that's a breach.  You did -- a this is not the word that was

12  used -- but it's like you did a sin against your true nature.

13  You know, there is goodness and things you're trying to stand

14  for, and now you've gone against that.

15         But -- and you were told this breach you've done it

16  is really against other people to affects the entire world,

17  but it's also against yourself.  And so, at first, I remember

18  thinking, wow, this is really a profound idea that somehow I

19  have this -- these values that I espouse in the world, and if

20  I do something that goes against it, that is a problem.  But

21  what it seemed to turn into eventually is like anybody who

22  basically disagreed could be seen as a person who has now done

23  a breach.  And most of the people I would hear that breaches

24  were done against Raniere.  Somebody had done something

25  against him or had not supported him in some way.  There was

1   somebody years ago who had spoke in the press and didn't

2   support him the way that they believed they should have

3   supported him, a person was considered to have done a terrible

4   breach.  It became this mechanism of control and it was

5   mysterious.

6            MR. AGNIFILO:  Your Honor, I'm going to object.

7            THE COURT:  Anything from, "it became this method of

8   control," the jury will disregard.

9            You can ask your next question.

10  Q    Well, you've been describing sort of the evolution of

11  your thinking in terms of what an ethical breach actually was

12  at NXIVM over time did that understanding of what an ethical

13  breach was change?

14  A    It became more mysterious to me.  I understood it one

15  way.  It's this thing you do against civilization, against

16  yourself.  And then my understanding became more that, you

17  know, if you spoke out against the company, or if you spoke

18  against Raniere, that that was an ethical breach.  For the

19  most part, at the time, I didn't know what these breaches

20  were.  It was pretty mysterious.  It was this person had done

21  a bad thing and was being shunned by Raniere and other people.

22  Q    You mentioned a person who didn't support the defendant

23  in the press who was that?

24  A    That was Ed Kinnam.

25  Q    Who was Ed Kinnam?

*Vicente - Direct/Mr. Lesko*                          **564**

1   A     Ed Kinnam was a Proctor who was there the first few years

2   that I was there and then left.  And apparently, had done some

3   kind of interview in the press.  And I don't recall if he said

4   something explicitly negative or just wasn't supportive but

5   that was talked about as a huge problem.

6              MR. LESKO:  Your Honor, we're going to move into

7   another area.

8              THE COURT:  Let's take our midmorning break.  Let's

9   take a ten-minute break.  All rise for the jury.

10             (Jury exits courtroom at 11:29 a.m.)

11             THE COURT:  All right.  The witness may stand down.

12  Please to not discuss your testimony with anyone.

13             THE WITNESS:  Yes, sir.

14             (Witness leaves the witness stand.)

15             (Defendant exits from courtroom at 11:31 a.m.)

16             (A recess in the proceedings was taken.)

17

18

19

20

21

22

23

24

25

1         THE COURT:  All right.  Let's bring the witness

2   back.  (Pause.)

3         (Witness resumes the stand.)

4         THE COURT:  Ready?

5         MS. HAJJAR:  Yes.

6         (Jury enters courtroom.)

7         THE COURT:  Please be seated.

8         All right, Mr. Lesko, you may continue your

9   examination of the witness.

10         MS. HAJJAR:  Thank you.

11  DIRECT EXAMINATION (CONT'D.)

12  BY MR. LESKO:

13  Q    So, Mr. Vicente, let's get back to your -- to the

14  completion of your first intensive, okay.  What did you do

15  after your first intensive ended?

16  A    As I recall, I went back to Los Angeles, I had projects I

17  needed to work on and finish up and I had a number of

18  interactions with Nancy Salzman and I think Sara Bronfman who

19  were wanting me to come back and continue.  There was also

20  discussions about if you really would like to learn the tech,

21  you know, you should probably come back, you should try and

22  spend more time here.  So, there were a number of discussions

23  like that.

24         Then I did eventually come back, I think it was

25  within the year, it was less than a year, I came back to do

1   another 16-day and I applied to be a coach and I was awarded

2   the coach sash, the rank during my second 16-day intensive and

3   the idea being we were told that in order to really absorb the

4   material, you needed to do the intensive two and a half times,

5   so that would be two 16-days and a 5-day and that was also to

6   be eligible to do the Level 2 curriculum.

7   Q    At some point did you have a discussion with Nancy

8   Salzman about moving to Albany?

9   A    Yes, she recommended that -- I had shared with her, you

10  know, what I wanted in my life which was basically I wanted to

11  grow, I wanted to be noble, I wanted to be -- I wanted to be a

12  good man, a great man, I wanted to make films that would

13  change the world and she said to me, as well as others, in

14  order to be that kind of an artist, you have to clean up you

15  as a human being to be the kind of person that could create

16  those kinds of films that could move the world and what better

17  way than to come and spend time in Albany and, you know,

18  perhaps you could be mentored by Keith Raniere.

19         So, I was trying to figure out how to do that and

20  eventually when I did come back, I made a plan to basically

21  spend a year there, to take off from everything and spend a

22  year living there so I could learn as much as I possibly

23  could.  My idea was that I thought, well, if I can learn how

24  these EM-s actually work, I thought to myself, well, maybe I

25  can make films that could actually EM people and that was one

1    of the discussions I wanted to have with Raniere.

2    Q    So, did you actually move to Albany?

3    A    I did.  I was at that time living in Ashton, Oregon.  I

4    basically packed everything up and I moved across the country

5    and I went to live in an apartment in Knox Woods, which was a

6    development, with another person who was in ESP as well.

7    Q    When approximately was this?

8    A    My recollection is 2006.

9    Q    And what was Knox Woods?

10   A    Knox Woods was like a development, I assume the same

11   construction company developed the entire area, it was all the

12   same kinds of townhouses in essence; it was a development in

13   the city of Clifton Park, New York, just north of Albany, and

14   I found out that many of the people, especially the high

15   ranking people involved in the company actually lived there.

16   Q    In Knox Woods?

17   A    In Knox Woods, yes.

18   Q    Was there another development or location where people

19   associated with NXIVM lived?

20   A    There were a few different areas, people lived in

21   Halfmoon as well, there was a complex called like the Halfmoon

22   Heritage Homes; there was a residential area where Nancy

23   Salzman lived and a number of other people that was just next

24   to Knox Woods but it wasn't called Knox Woods, I don't recall

25   the name right now.

*Vicente - direct - Lesko*                                    568

1    Q    It was all in the same general proximity?

2    A    It was, yes.

3    Q    And this was all in Clifton Park?

4    A    In Clifton Park and Halfmoon, they were right next to

5    each other, it was in -- both areas, it was all walking

6    distance.

7    Q    Just to clarify, Clifton Park and Halfmoon are cities or

8    towns basically?

9    A    Yes, towns.

10   Q    And Knox Woods is a development within Clifton Park?

11   A    Correct.

12   Q    Okay.  And while you -- after moving to Albany did you

13   maintain a residence in Los Angeles?

14   A    Not at first but then later I did because I was wanting

15   to open up a center in Los Angeles so I had a residence in

16   both places.

17   Q    And the person you first lived with when you moved to

18   Clifton Park, what was that person's name?

19   A    That person was Omar Boone.

20   Q    I'm showing you what's been admitted as Government's 5.

21        Do you recognize that photograph?

22   A    Yes, Omar Boone.

23   Q    Who is Omar Boone?

24   A    Omar Boone, I don't know if he was a proctor at the time

25   but he certainly became a proctor.  He was from Monterey,

1    Mexico.  He was the brother -- is the brother of Edgar Boone

2    and he spent a lot of time between Albany and Monterey, Mexico

3    and he became a proctor and a friend.

4    Q    So, when you were residing in Clifton Park, where did you

5    actually live?

6    A    When I first moved there, actually my very first move

7    there I lived in a house, I'm forgetting the address, for just

8    a week or two; I moved to a townhouse on Monmouth Way, which

9    was in Knox Woods, for I think it was maybe up under a year,

10   and then I moved to 13 Twilight Drive which was a multi-

11   bedroom house a few exits north of Knox Woods, a few exits

12   north on the 87 freeway.

13   Q    I'm showing you Government's 132 which has been

14   previously admitted.

15         What does that photograph show?

16   A    Yes, that's the signs of Twilight Drive, that's the

17   entrance to Twilight Drive from one of the main roads.

18   Q    I'm showing you Government's 133 which has been admitted.

19         What does that photograph depict?

20   A    That is 13 Twilight Drive, the house that myself and a

21   number of other members of the community lived in for a number

22   of years.

23   Q    Did you ultimately move from 13 Twilight Drive?

24   A    Yes, I moved from 13 Twilight Drive to 7 Generals Way in

25   Knox Woods, perhaps 2013, I don't remember exactly.

*Vicente - direct - Lesko*                                            570

1    Q    I'm going to show you Government's 120 which has been
2    previously admitted.
3              Do you recognize that --
4    A    Yes.
5    Q    -- photograph?
6    A    Yes, that's 7 Generals Way.
7    Q    And is that also in Knox Woods?
8    A    That is in Knox Woods, yes.
9    Q    So, did the defendant reside at a location on Flintlock
10   Lane?
11   A    He did, it was -- when I first met him I asked him where
12   he lived and he indicated that he sort of couch surfed but I
13   did understand that it was -- number 2 Flintlock Lane was one
14   of the residences and then another place that he spent time
15   was 8 Hale Drive which was actually just across the road.  And
16   then much later he moved with two other people who were living
17   with him at Flintlock, moved to 21 Oregon Trail.
18   Q    And who were those two other people?
19   A    Sorry, I'm just referring to something.
20              (Pause.)
21              Marianna and Pam Cafritz.
22   Q    Showing you Government's Exhibit 26, and if you could
23   revisit the document you just reviewed; is that Marianna,
24   Government's 26?
25   A    That is, yes.

1   Q     We previously looked at Government's 12, is that Pam

2   Cafritz?

3   A     That is Pam Cafritz, yes.

4              MS. HAJJAR:  Your Honor, may we approach?

5              THE COURT:  Yes.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





*Sealed Sidebar*                                                                573

```
 1              THE COURT:  All right, let's continue.

 2              MS. HAJJAR:  Thank you, Your Honor.

 3   BY MR. LESKO:

 4   Q    You mentioned an address on 8 Hale Drive; is that

 5   correct?

 6   A    Correct, yes.

 7   Q    I'm going to show you what's been admitted as

 8   Government's 122.

 9              Do you recognize that exhibit?

10   A    Yes, that is 8 Hale Drive.

11   Q    I'm going to show you Government's Exhibit 123.

12              Is that another photograph of 8 Hale?

13   A    That is correct.

14   Q    And I'm going to show you Government's 123-A which has

15   been admitted.

16              Is that another photograph of 8 Hale?

17   A    It's the wider shot of the same building, yes.

18   Q    Was there a location within 8 Hale that had a certain

19   name?

20   A    Yes, the upstairs of 8 Hale Drive was termed when I first

21   came the executive library.

22   Q    Okay.  And on Government's 123-A, if you can, can you

23   circle where the executive library in that residence was

24   located?

25   A    (Indicating.)
```

1  Q    So, for the record, the witness has drawn a circle around

2  the left hand portion of the building and specifically the

3  second floor of that building.

4  A    Correct.

5            THE COURT:  Very well.

6  Q    So, you mentioned that members of the NXIVM community

7  lived in Clifton Park, correct?

8  A    Correct, a good deal -- a good number of them, yes.

9  Q    Approximately how many members of the NXIVM community

10  lived in Clifton Park?

11  A    I would say 30 to 40.

12  Q    Were there other NXIVM buildings in the Albany

13  area?

14  A    There was the head office, the headquarters which

15  was Latham, New York, 455 New Karner Road.

16  Q    Let me stop you there.

17  A    Yes.

18  Q    What occurred at 455 New Karner Road?

19  A    So, 455 New Karner Road was considered the head office or

20  the headquarters of ESP and I believe NXIVM, I was never quite

21  certain, but it's where the administration offices were, it's

22  where the cafeteria was, the training rooms, Nancy Salzman had

23  her office there as well; there was something called the

24  proctor room, it was the hub of where the education was done

25  at first.  That changed over time but at first that's where it

*Vicente - direct - Lesko*                                          576

1    was.

2    Q    Okay.  I'm going to show you what's been admitted as

3    Government's 164.

4          What does that photograph show?

5    A    That's the exterior of 455 New Karner Road.

6    Q    I'm going to now show you Government's 165 admitted into

7    evidence.

8          What does that photograph show?

9    A    That's one of the entrances to the same building and

10   specifically if you walked into that door that says Executive

11   Success Programs and you turned right, you'd be in the main

12   training room.

13   Q    For the record, what is the sign on the door?

14   A    Executive Success Programs.

15   Q    I should have asked you that with respect to 164, I

16   apologize.

17   A    I believe it had both -- I'm not able to see the smaller

18   writing but I believe it has both names on it from my

19   recollection of the bottom.

20   Q    What names?

21   A    So, NXIVM, N-X-I-V-M, and I believe that's Executive

22   Success Programs beneath it.

23   Q    And you're referring to the sign in front of the building

24   that's depicted on Government's 164?

25   A    The blue sign, the blue sign right there.

1   Q    Showing you what's been admitted as Government's 166.

2        What does that photograph show?

3   A    That is the parking plaque for Nancy Salzman.  There were

4   a few reserved parking spots in front of the building and she

5   held one of them.

6   Q    And was there a NXIVM building next door to 455 New

7   Karner Road?

8   A    Yes, I believe it was 457 New Karner Road, right next

9   door.  457 had in it the accounting department and at a

10  certain time it also had the IT, the computer technology

11  department as well.

12  Q    Showing you what's been admitted as Government's 170.

13       What does that photograph show?

14  A    That is 457 New Karner Road?

15  Q    Is that the front of the bidding?

16  A    That is the front of the building facing the parking lot,

17  yes.

18  Q    Showing you what's been admitted as Government's 169.

19       What does that photograph show?

20  A    That's the same building, just a wider image.

21  Q    I'm showing you Government's 167 which has been admitted

22  into evidence.

23       What does that photograph show?

24  A    It's a different angle of the same building, it's to the

25  right of the other two images that you showed me.

1  Q     And does that photograph show the building number on the

2  building?

3  A     Yes, 457.

4  Q     And who owned 455 and 457 New Karner Road, the two

5  buildings?

6  A     My understanding is it was owned by Sara Bronfman and

7  Clare Bronfman.

8  Q     Did NXIVM operate in a former restaurant in Clifton Park?

9  A     Yes, there was a restaurant that was renamed to Apropos.

10 I don't recall what it was before, I think it was an Italian

11 restaurant before.  It was on Route 9 in Clifton Park, but it

12 was renamed Apropos when I believe Clare Bronfman bought the

13 building and I believe that Clare Bronfman and Raniere named

14 it Apropos together I believe.

15 Q     This is going to be a quiz, could you spell Apropos for

16 the court reporter please?

17 A     A-P-R-O-P-O-S I think.

18 Q     I think that's right.

19       What occurred at Apropos?

20 A     A number of things, there were trainings at Apropos and

21 there were community events at Apropos.  It was also a

22 restaurant of sorts, people paid a membership to be members to

23 be able to come and eat there.  Certain trainings were run

24 there, Jness trainings were run there, the first SOP trainings

25 were run there, something called coach summits were run there,

*Vicente - direct - Lesko*                                        579

1  forums were held there, and then there were parties that were

2  held there as well, community parties.

3  Q     Showing you what's been admitted as Government's 157.

4         Do you recognize that photograph?

5  A     Yes, that's Apropos.

6  Q     Is that the entire building of Apropos?

7  A     That is the entire building -- well, the front of the

8  building, yes.

9  Q     Showing you what's been admitted as Government's 159,

10 what is that?

11 A     That is a closer image of the same building.

12 Q     Apropos?

13 A     Apropos.

14 Q     Did NXIVM properties, either residential or commercial,

15 have surveillance cameras?

16 A     Many of them did.  I know the ones that I was in --

17 well, specifically 7 Generals Way there was a surveillance

18 camera -- well, it was a camera of some kind on it.  There was

19 a company called Plugged In, Plugged In was some kind of a new

20 technology company and many of us were asked, you know, could

21 we install some equipment in your house and connect it to your

22 modem in your house and then, additionally, there was a camera

23 placed on our houses facing the driveway and the street.  I

24 was never clear what it was for but.

25 Q     Since you mention it, what was Plugged In?

1   A    So, Plugged In, in my understanding, was some brand new

2   tech company that Raniere had created and, you know, I'm not

3   sure if it was patented or what it was, the idea was to create

4   a -- the things I heard was to create a mesh network using

5   cell phones and devices to create a communication system that

6   wasn't necessarily connected to the rest of the internet.

7   Some of the ideas that I heard from Raniere were, you know,

8   during video conferencing together but, in essence, creating a

9   communication system and there were also a series of, I was

10  told, astounding things that this company would be able to

11  develop and create, I don't know what they were, I don't know

12  if they ever came to fruition.  I know that an enormous amount

13  of money was spent but I'm not sure what it really was.

14  Q    Do you have an understanding now or an opinion now as to

15  why all of these cameras and connectivity were established

16  through the Plugged In process?

17           MR. AGNIFILO:  I'm going to object, Your Honor.

18           THE COURT:  Sustained.

19  A    I'm sorry, was --

20           THE COURT:  Sustained means don't answer.

21           THE WITNESS:  Don't answer, thank you.

22  Q    Did your understanding regarding the installation and use

23  of surveillance cameras change over time?

24  A    Well, I could never make sense of why there were cameras

25  there so I -- I think I assumed that this is some brilliant --

*Vicente - direct - Lesko*                            581

1           MR. AGNIFILO:  I'm going to object.

2    A    -- at the beginning of it --

3           THE COURT:  Hold on, hold on.  Sustained as to what

4    he assumed.

5    Q    Did your understanding change as to what the cameras were

6    being used for?

7    A    Yes.

8    Q    What was your -- what is your understanding now?

9    A    My understanding is surveillance on us.

10          THE COURT:  "Us" meaning?

11          THE WITNESS:  Members of the community.

12   Q    Were there instances in NXIVM where participants could

13   not afford the tuition or fees?

14   A    Often; I mean there were people of means that could, you

15   know, pay any amount of money but there were a number of

16   people that came in that couldn't afford to pay the tuition.

17   Q    And are you familiar with the term "exchange"?

18   A    I am.

19   Q    What was exchange at NXIVM?

20   A    There were two kind of exchanges that I was aware of; the

21   one exchange was, you know, if you could not afford the

22   curriculum, you would in essence go into debt with the company

23   and then you would work in some fashion to pay that off over

24   time and you would have to pay the full amount, so you weren't

25   paying the discounted rate.  So, if you did a training that

1  was $7,500, that's how much you owed and then you would do

2  different jobs in the community, lower level jobs to try to

3  pay that off.  That was one method of exchange.

4          The other method of exchange I was aware of was, for

5  instance, if you wanted to do a Level 2 training but you

6  couldn't afford it, you would agree to a contract whereby you

7  would take that training which would involve also mentoring

8  other people and then you would still owe three more trainings

9  that you would have to attend to mentor others.  That was my

10  understanding of another form of exchange.

11  Q    Generally speaking, were participants who were in the

12  exchange program, we'll call it, at NXIVM able to actually pay

13  or satisfy their debt?

14  A    I don't know if they were able to satisfy it completely.

15  I know that people struggled, it took quite -- it took a

16  substantial amount of time.

17  Q    You have mentioned that people, participants were

18  encouraged to take additional trainings --

19  A    Correct.

20  Q    -- at NXIVM.

21          Were there consequences if people missed trainings?

22  A    I mean I certainly was given a hard time in the two

23  instances that I missed a high level training, I was called

24  and berated for not attending the training.  But it was pretty

25  common that if somebody was a high ranking person or wanting

1    to work their way up the stripe path, if they didn't take the

2    training it would be seen as a problem, you know, a lack of

3    commitment to their own growth.

4    Q    So, when new curriculum was created at NXIVM, were new

5    companies formed that corresponded to the new curriculum?

6    A    Often that was true, yes.  In the case of, you know,

7    Ultima was an umbrella company and there were a number of

8    other companies underneath.  I think Ethicist eventually had a

9    company called Ethicist.  Jness obviously had a company called

10   Jness LLC.  Society of Protectors had a company called LLC.  I

11   believe for the most part new curriculum, yes, did have new

12   companies.

13   Q    Was the defendant's name associated with those companies?

14   A    Not that I'm aware of, the companies were usually in

15   other people's names.

16   Q    What was the defendant's role with respect to all of

17   these companies?

18   A    He was seen as the creator of the educational model and

19   the company itself and he was the philosophy behind these

20   things, that's in essence how he was seen.

21   Q    Who had ultimate authority over all of these companies?

22   A    He had authority over all the companies.

23   Q    Who, as a legal matter, actually owned these companies?

24   A    Well, there were different people, you know, Pam Cafritz

25   owned one or two companies, I believe Jim Del Negro owned some

1   of the companies, I think Nancy Salzman owned some of them

2   but, as far as I know, he did not -- he was not on paper that

3   I can recall except potentially I think he was a signer on the

4   nondisclosure agreement for ESP I think.

5   Q    Did Clare Bronfman own any of these companies?

6   A    I believe so, I believe -- well, she owned the

7   foundations, as far as I can recall.  I don't recall at this

8   moment the other companies that she may have owned.

9   Q    You've mentioned a person named Jim Del Negro.  I'm

10  showing you what's been admitted as Government's 17.

11           Do you recognize that photo?

12  A    Yes, that is Jim Del Negro.

13  Q    Who is Jim Del Negro?

14  A    Jim is -- was, is a proctor in the organization.  He was

15  also one of the leaders of the Society of Protectors along

16  with me.  He also worked in the -- I suppose the de facto

17  legal department of the company as well and he also ended up

18  being one of the co-owners, overseers of the Albany center.

19  Q    You mentioned that the defendant had ultimate authority

20  over the NXIVM companies, how did he exercise that authority

21  or control over those companies?

22  A    Well, there was the -- I mean there was the -- any --

23  once he created something, if there were any changes that

24  needed to occur or that other people thought needed to occur,

25  he would have to be consulted.  He was pretty strict on once I

1    create something a certain way, this is the way it needs to

2    run.  If changes were requested, you know, we'd have to talk

3    to him about that.  He -- people reported in to him about the

4    different intensives and the different companies that were

5    going on.  He took a keen interest in what was happening with

6    every single intensive and every single company and then my

7    understanding was that he also received a certain --

8              MR. AGNIFILO:  I object, Your Honor.

9              THE COURT:  All right.

10             MS. HAJJAR:  Can --

11             THE COURT:  If you have another question that the

12   witness can address, go ahead.

13   Q    So, did the defendant receive any sort of compensation

14   from the companies?

15             MR. AGNIFILO:  If the witness knows the answer to

16   that question.

17   Q    If you know?

18   A    I do.  When I began working with him on certain film

19   projects, the arrangement we had was that 10 percent of net

20   would go to him.  He suggested it was for scientific research.

21   I know in the case of the Society of Protectors, that was the

22   same and it was my general understanding of how things worked.

23   Q    Did you have any understanding as to why the defendant

24   did not actually own all of the companies that he controlled?

25   A    My understanding at first was he was termed a renunciate

1    and a renunciate was the idea that -- or what I understood was

2    somebody who had no possessions and had no attachment to the

3    external world in any way.  I was taught that he had achieved

4    a certain level of, you know, something close to what was

5    termed unification, he didn't require external stimuli to be

6    joyful and he didn't require possessions.  So, any clothes

7    that he had were given to him, you know, food was given to

8    him.  He was -- I was told, he told me he didn't have a

9    driver's license, he was driven around.  So, that was my

10   understanding was that he did not want to be attached to the

11   world in any way and that was my understanding of his

12   reasoning.

13   Q    Did he ever have a discussion with you where he indicated

14   how this status would affect the establishment?

15   A    Well, I'm not totally clear on your question.

16   Q    His status as a renunciate, given how you've described

17   it, did he ever say that presented a problem for the

18   establishment?

19   A    I'll try to understand; one thing with respect to the

20   establishment that I understood from him was that he

21   considered himself to be a person of interest to many

22   different authorities, that they -- he was a threat to society

23   because of his ethical understanding of things, that because

24   of his IQ and intelligence and problem solving ability he was

25   being watched very carefully.  He would suggest to me on many

1  occasions that he had to be careful about his movements

2  because he told me he was being watched all the time and that

3  this -- I suppose my word -- conspiracy went to the highest

4  levels against him.

5  Q     Did the ESP sash system and stripe path apply to all of

6  the other NXIVM-related companies?

7  A     They were related in the sense that if somebody was

8  running another company, they were urged to be on the stripe

9  path as well and the stripe path was seen as a way to measure

10  somebody's leadership, their accountability, their loyalty,

11  their -- how grown up they were basically.  So, if somebody

12  was to run another company and they weren't on the stripe

13  path, that was seen as a problem and many of the things that

14  they would need to do to resolve issues in whatever company

15  they were working, you know, they may be told you should talk

16  to your coach about it or you should get an EM about it, you

17  should do some process that was in the ESP curriculum as well

18  related to the stripe path.  So, the stripe path was seen as

19  the foundation of how to become the kind of person you need to

20  to run a company ethically.

21  Q     Now, we've discussed a number of NXIVM-related companies;

22  were there other companies that you haven't named here during

23  your testimony?

24  A     Let's see, I've mentioned Source, XOSO, Reverence,

25  Ethicist, Rainbow.

*Vicente - direct - Lesko*                                            588

1    Q    It's not a quiz.  Are there other companies?  I don't

2    need you to mention them.  Are there other companies that

3    haven't been mentioned that were related to NXIVM?

4    A    Well, there are a host of other companies, I don't know

5    what they did, but there were a host of other companies.

6    Q    Approximately how many NXIVM-related companies were

7    there?

8    A    I need to make a distinction because there's what I

9    learned later --

10   Q    Well --

11   A    -- and what I knew at the time.

12   Q    As you sit here today, what is your understanding of

13   approximately how many NXIVM-related companies?

14   A    Over 60 companies.

15         THE COURT:  60?

16         THE WITNESS:  Over 60.

17   Q    Let's talk a bit about the executive board.  You

18   mentioned that the executive board led the NXIVM organization.

19   When you first became involved with ESP, who was on the

20   executive board?

21   A    My recollection is it was Barbara Bouchey, Lauren

22   Salzman, Edgar Boone, I think it was Karen Unterreiner.  I'm

23   blanking if there's anybody else.

24   Q    Was Nancy Salzman on the executive board?

25   A    She was but being the CEO, she wasn't exactly the

*Vicente - direct - Lesko*                                    589

1    executive board but she was considered to be above the

2    executive board.

3    Q    Was a person named Loreta Garza on the executive board?

4    A    Yes, that is correct.

5    Q    Showing you what's been admitted as Government's

6    Exhibit 50.

7              What does that photograph show?

8    A    That is Lauren Salzman.

9    Q    We've seen photographs of Nancy Salzman and Edgar Boone

10   and Barbara Bouchey.  I'm going to show you Government's

11   Exhibit 16.

12   A    That is Loreta Garza.

13   Q    Over time did the members of the executive board change?

14   A    Yes, there was change that occurred in 2009 where a

15   number of new people were brought on including myself to form

16   a new executive board.

17   Q    And who were members of the newly constituted executive

18   board in 2009?

19   A    So, the new board was Karen Unterreiner, Clare Bronfman,

20   myself, Alex Betancourt, Emiliano Salinas and then Lauren

21   Salzman rejoined a few weeks later.

22   Q    Okay.  I should have asked this earlier, I apologize.

23   Government's 16, I'll show it to you again, who was Loreta

24   Garza?

25   A    Loreta Garza, as I said, was on the executive board

1   earlier on.  She was the head of a company that -- the company

2   Rainbow Cultural Garden, RCG; she was also a green so she

3   oversaw a great number of people.  She also worked with a lot

4   of the clients and the staff in Mexico as well.

5   Q    All right.  So, getting to the new executive board in

6   2009; we've seen a photograph of Clare Bronfman.  I'm going to

7   show you what's been admitted as Government's 53.

8             Do you recognize that photograph?

9   A    Yes, that is Karen Unterreiner.

10  Q    Who is Karen Unterreiner?

11  A    Karen Unterreiner, again on the executive board, she was

12  a head trainer, she was a -- she held the rank of proctor.

13  She also worked in the finance/accounting department.  She was

14  the one that calculated all the commissions and she was --

15  Raniere told us that she was one of his oldest friends, that

16  they had gone to RPI together.

17  Q    What is RPI?

18  A    Rensselaer Polytechnic Institute, I hope.

19  Q    Did the defendant tell you that he had gone to RPI?

20  A    He did, yes.

21  Q    I'm going to show you what's been admitted as

22  Government's 49.

23            What does that photograph show?

24  A    That is Emiliano Salinas.

25  Q    Who is Emiliano Salinas?

1  A    Emiliano Salinas is -- was the head of the Mexico City

2  center, ESP center along with his business partner, Alex

3  Betancourt.  He comes from a very, very influential family in

4  Mexico.  He was also one of the members of the Society of

5  Protectors and he was also on the executive board with me and

6  the others.

7  Q    Who is Emiliano Salinas's father, if you know?

8  A    His father is Carlos Salinas, one of the ex-presidents of

9  Mexico.

10 Q    I'm going to show you what's been admitted as

11 Government's 3.

12 A    That is Alex Betancourt.

13 Q    Who is Alex Betancourt?

14 A    Alex Betancourt was the co-owner of the Mexico City

15 center.  I believe -- he was on the executive board as well.

16 I believe he was in the ethics division.  He was a

17 businessman, entrepreneur, had a number of businesses and he

18 was also one of the business owners of there was an island

19 that had been, not the whole island purchased but there was an

20 island in Fiji that he was involved, had some business

21 dealings with creating a business there.

22 Q    We will talk about that in a moment, but were properties

23 purchased in Fiji, the island?

24 A    Yes.

25 Q    By a NXIVM affiliated person?

1  A    My understanding is that he and Clare Bronfman and

2  Raniere were together in some kind of company to purchase

3  multiple properties on the island.

4  Q    How long did you serve on NXIVM's executive board?

5  A    From 2009 until May 22nd, 2017.

6  Q    Was there a group within NXIVM that handled its legal

7  matters?

8  A    It was loosely termed the legal department.  It wasn't --

9  I mean it wasn't actually lawyers, it was a group of people

10 that worked in what was called Legal.

11 Q    And who worked in Legal?

12 A    Clare Bronfman, Jim Del Negro, Kristin Keeffe, Lisa

13 Derks.  I'm blanking if there are others.

14 Q    And if you know, who were the decision makers in Legal?

15 A    The decision makers in Legal were Clare Bronfman and

16 Raniere.

17 Q    I'm going to show you Government's Exhibit 34.

18      What does that photograph show?

19 A    That is Kristin Keeffe.

20 Q    Who is Kristin Keeffe?

21 A    Kristin Keeffe was a member of NXIVM ESP long before I

22 arrived.  She was I believe a proctor and she was also a close

23 confidant of Raniere and she was one of the leaders of the

24 legal department.

25 Q    What sort of matters did the legal department handle?

1    A    They seemed to handle -- there was a lot of patent

2    applications that were going on and there were also a number

3    of lawsuits in process against various people.

4    Q    And who were those people?

5    A    There were suits in process against the Times Union,

6    against --

7                THE COURT:  The Times Union is what?

8                THE WITNESS:  The Times Union is a newspaper in

9    Albany, New York.

10               THE COURT:  The Albany Times Union?

11               THE WITNESS:  Albany Times Union.

12   Q    Let's not get into the subject matter of those lawsuits,

13   just who were they --

14   A    Sure, so Times Union; Jim Odato, one of the journalists.

15   There was lawsuits against, I believe it was Vanity Fair.  I'm

16   not -- I don't recall if there was one against Forbes.  There

17   was one against Rick Ross, somebody called Stephanie Franco

18   and later post-2009 against -- my understanding was against

19   people like Susan Dones and Barbara Bouchey.

20   Q    We'll talk about all those people a bit later.

21               Were you involved in the legal department?

22   A    Not -- I wasn't in the department.  I at one point did

23   something for them.

24   Q    And was -- I think you mentioned this -- was anyone in

25   Legal an attorney?

1   A    Not to my knowledge, no.

2   Q    You discussed Clare Bronfman and her role in Legal and

3   I'm going to put her photograph up, Government's 8; what

4   were -- along with the legal responsibilities, what were Clare

5   Bronfman's other roles at NXIVM?

6   A    She was on the executive board as well, she was a

7   proctor, she tended to be the direct liaison between the

8   executive board and Raniere.  There were a number of things

9   that the executive board were not really privy to that she was

10  with Raniere.  She also I believe financed a great number of

11  things in the company and she also was the person -- Raniere

12  was training her to be more legally minded.  He would explain

13  that, you know, lawyers don't know how to think so he was

14  teaching her how to think so she could help the lawyers think.

15  Q    Was she involved with the ethics division?

16  A    Yes, she was.

17  Q    In what way?

18  A    I believe she was one of the heads of the ethics

19  division.  She was also the -- in essence, she was like the

20  acting CFO of the company, she was responsible for how monies

21  were spent, she had to -- when I left she had to approve any

22  monies that were spent in any way.

23  Q    Was she involved in real estate projects, in investments

24  at NXIVM?

25  A    I believe she owned a number of complexes, houses, that

*Vicente - direct - Lesko*                                          595

1   kind of thing.  She was involved in a real estate development

2   in Los Angeles with a number of properties and then also

3   properties in the Albany area and also Fiji as well.

4   Q    Was she involved in enrolling anyone at NXIVM?

5   A    She would -- she worked on enrolling high net worth, you

6   know, high value people to come to take trainings.  She moved

7   in certainly different circles than I did for the most part.

8   Q    And I think you've mentioned this earlier but she also

9   provided a private jet for a period of time?

10  A    Correct.

11  Q    Did she have -- did she attain a rank on the stripe path?

12  A    She was a proctor, I don't recall the number of stripes

13  she had but she was a proctor.

14  Q    Did there come a time when Clare Bronfman got in trouble

15  at NXIVM?

16  A    From what I understand from her and from Nancy Salzman,

17  there was an incident that occurred with her father where she

18  did something that caused her father to get very upset at the

19  company and at Raniere and from what I've heard from Raniere

20  and others, her father then tried to destroy the company and

21  used his enormous wealth to try and destroy Raniere and the

22  company and it was spoke -- it was discussed about how the

23  thing she had done was a breach that she was trying to heal.

24  Q    And did she have a time frame for healing that breach?

25  A    I have no idea, I just recall that it was -- she had done

*Vicente - direct - Lesko*                                          596

1   something that was so bad that it really set things back.

2   Q    Do you recall approximately when this happened?

3   A    My recollection, it was just before I came in so it may

4   have been -- it may have been 2004, I'm not entirely certain.

5   Q    Did you specifically hear the defendant say that Clare

6   Bronfman was in breach?

7   A    I don't recall him saying those specific words.

8   Q    What did he say?

9   A    Generally the way he would talk about things is more

10  round about like, well, there are some things that she needs

11  to fix or heal, that kind of thing.  I don't believe he said

12  specifically a breach to me.

13  Q    Who was Clare Bronfman's father?

14  A    Edgar Bronfman, Sr., he was one of the heads of the

15  Seagram's fortune and he was also the head of the World Jewish

16  Congress.

17  Q    Was he a billionaire?

18  A    He was a billionaire.

19  Q    Were you aware of conflict between Clare and Sara

20  Bronfman and their father?

21  A    I was, I was.  They were unhappy that their father was

22  not as supportive as they'd liked about their involvement with

23  Raniere and with the company in general and there was a great

24  deal of conflict that happened that they were unhappy with.

25  Q    Was there conflict between Sara and Clare Bronfman and

*Vicente - direct - Lesko*                                        597

1  their father between 2005 and 2010?

2  A    Yes, during that time period there definitely was

3  conflict, yes.

4  Q    You mentioned that Clare Bronfman served as acting CFO;

5  were there other people within NXIVM who handled the financial

6  or accounting matters at NXIVM?

7  A    There were.  There was a whole accounting department that

8  was generally at 457 New Karner Road, you know, there was

9  financial and there was accounting and I sometimes wasn't sure

10 of the -- who was who but there was an accounting department,

11 yes.

12 Q    And who worked at the accounting department?

13 A    The accounting department was Kathy Russell, my mother

14 actually worked there as a low level bookkeeper for a number

15 of years, Karen Unterreiner had interface with the department,

16 and then my understanding was that Clare Bronfman was the

17 person in charge.

18 Q    And you mentioned that the accounting department was

19 located at 455 New Karner Road?

20 A    457.

21 Q    I'm sorry, 457.  Did you ever discuss NXIVM's finances

22 with the defendant?

23 A    I discussed finances of different sorts, I don't know

24 that I discussed NXIVM's finances.

25 Q    Were you able to -- would you ask him questions about the

1    finances related to NXIVM or a related company?

2    A    I did, I was trying to understand how certain things

3    worked.  I couldn't understand the financial structures of

4    things, I was trying to understand how they worked.  It was an

5    enormous mystery to me.  I once went to him with an issue that

6    came up because I couldn't get an answer from the accounting

7    department on a tax issue.  Eventually I went to him out of

8    frustration to please help sort it out.  So, we had

9    discussions of that nature as well.

10   Q    Were you able to get answers from the defendant regarding

11   your questions about NXIVM's finances?

12   A    I wasn't.  The entire thing seemed to be a complete

13   mystery.  My experience was there was a -- when we made

14   requests there was a certain kind of a wall that we couldn't

15   get past.  For instance, on the executive board we were told,

16   you know, that we're running at a loss all the time and then

17   myself and other members would say, well, can we see the books

18   so we can understand what this loss is and then we were told,

19   you know, yes, we'll get you the books, and that never

20   happened.  So, we never actually got access to the numbers, we

21   were just told we're just at a loss all the time.

22   Q    So, getting back to this 10 percent that was owed the

23   defendant, was this like a royalty payment type of payment?

24   A    I don't know what the exact -- I don't know if that was

25   the exact term but it was basically a 10 percent fee and he

*Vicente - direct - Lesko*                                        599

1   said for scientific research.

2   Q    And you mentioned you had this arrangement specifically

3   with the defendant?

4   A    I did, anything we created together and that was usually

5   in the nature of like film projects, that was the

6   understanding that I had with him.

7   Q    Did you actually pay the 10 percent to the defendant?

8   A    There was no profit ever in anything I did that would

9   allow me to pay him that.

10  Q    Did SOP have this same relationship with the defendant?

11  A    Yes, but I don't know, again, if those monies were ever

12  paid.

13  Q    You started SOP, right?

14  A    I was one of the founding members, yes.

15  Q    Who actually was the legal owner of SOP?

16  A    The legal owner of SOP was Pam Cafritz.

17  Q    How did that come about?

18  A    When we began the organization we would meet, you know,

19  very, very late at night and at one meeting Raniere asked

20  those of us who founded it with him, do you mind if Pam is the

21  signer, the legal owner of the company, and we said, no, of

22  course not, you know, you're the boss, whatever you want is

23  fine.

24  Q    Did Pam actually assist in operating SOP?

25  A    She did not.

*Vicente - direct - Lesko*                                           600

1    Q    Now, you mentioned that the 10 percent owed to the

2    defendant went to research; is that correct?

3    A    That was my understanding of where it was supposed to go.

4    Where it would have gone in actuality I have no idea.

5    Q    Now, what sort of research did the defendant conduct?

6    A    It was a wide range of things.  There were brain studies

7    going on that began a few years after I arrived.  Basically

8    the idea was to hook people up to their -- using one of those

9    skull caps with sensors running into a computer to assess what

10   was happening in their brains during intensives.  They had

11   recorders and different measuring devices attached to them.

12             There was also -- Raniere and I discussed, him and I

13   and other people as well, you know, studies about, you know,

14   psychopathy, sociopathy, people who didn't have conscience.

15   He'd use the term Luciferian and he had some kind of a patent

16   that he had developed to rehabilitate a Luciferian and I'm

17   assuming a Luciferian meant some kind of a person with no

18   conscience that's mal intended but he had some kind of patent

19   to rehabilitate someone like that.

20             And then there was, you know, a certain amount of

21   intake forms in the intensives that I believe were used in the

22   scientific research but his -- he told me that, you know, he

23   really wanted to -- what he'd really like to be doing with his

24   life is have a lab and be a lab scientist.

25   Q    You said psychopathy as one of the subjects of the

*Vicente - direct - Lesko*                                                    601

1   defendant's research, is that in essence the study of

2   psychopaths?

3   A     Yes, he had a definition of, you know, psychopath versus

4   sociopath and it was in a fair amount of the curriculum, there

5   was a lot of study of people with no conscience, of, you know,

6   people with, you know, narcissism.  There were intensives

7   dedicated to the best and the worst in humanity and the worst

8   being people that tortured other people and did some really

9   really dark things.

10  Q     Okay.  And you mentioned previously I believe that the

11  Rational Inquiry methodology was subject to a patent; is that

12  correct?

13  A     When I came in, my understanding is that it was patented

14  and then it changed to it was patent pending and later I

15  learned it had been rejected.

16  Q     So, there's no patent actually issued for Rational

17  Inquiry?

18  A     That's my understanding.  I think it was applied for but

19  my understanding is it wasn't what I thought at the beginning

20  that it was -- I mean I would go around selling this thing as,

21  you know, Rational Inquiry is patented in the Patent Office

22  under artificial intelligence because nobody knows what to do

23  with it it's so advanced because that's what I was led to

24  believe.

25  Q     And was that a lie?

*Vicente - direct - Lesko*                                                602

1    A     I believe so.

2    Q     These other patents, were they actually issued?

3    A     I recall there was a patent, the sash patent I believe

4    was issued; also I recall that at one of the V weeks -- I can

5    explain that later -- at one of the V weeks there was a lawyer

6    who was on stage with Raniere who had these large plaques that

7    were engraved with the actual, I think the patent page and

8    that those were presented to the community as, you know, these

9    are just, you know, five or six patents that, you know,

10   Vanguard has filed recently and also Clare Bronfman told me

11   that she was spending upward of 40,000 a month just on

12   patenting things.

13   Q     Are you familiar with the person named Brandon Porter?

14   A     I am.

15   Q     Who is Brandon Porter?

16   A     Brandon Porter is a doctor.  I actually coached him for a

17   number of years while he was in medical school.  He moved from

18   I'm going to say Ohio or Iowa, I'm not sure which one, to

19   Albany to basically do scientific research with Raniere.

20   Q     And what was that scientific research?

21   A     To the best of my knowledge, it was basically analyzing

22   all the data of all the brain scans and all the recording

23   devices and the different other measuring equipment, somehow

24   collating it.  There was just a lot of data gathering going

25   on.

*Vicente - direct - Lesko*                                      603

1          And then there were certain studies that they

2    were -- some psychological studies that they were involved in

3    that I -- I didn't know about them at first but I found out

4    later.

5    Q    And what was nature of some of those studies?

6              MR. AGNIFILO:  Your Honor, can we approach for a

7    second?

8              THE COURT:  You want to approach?

9              MR. AGNIFILO:  Yes.

10             THE COURT:  Yes, all right.

11             If you'd like to stand up and stretch, please do so.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                    604

1          (The following takes place at sidebar.)

2          THE COURT:  Yes.

3          MR. AGNIFILO:  So --

4          THE COURT:  Yes, sir.

5          MR. AGNIFILO:  Yes, Judge, so my concern is I think

6    what we're heading into is that Brandon Porter was doing a

7    study -- I think where Mark is going -- of people who observed

8    very macabre like violent episodes and I have two concerns

9    with it; one, I have a 403 concern that I don't know, it seems

10   unduly prejudicial if that's what he's about to testify to,

11   and second, I don't know what Mr. Vicente's base of knowledge

12   is.

13          So, my first concern is a 403 concern and then

14   there's a -- I guess a relevance concern.

15          THE COURT:  Let's start with the foundation concern.

16          MS. HAJJAR:  Your Honor, if we could, I mean to

17   answer Your Honor's question directly, these fright studies

18   involved exposing participants to very violent shocking films

19   primarily and gauging their -- I guess their electric reaction

20   in their brains among other things.

21          Mr. Vicente will testify, if allowed, that he

22   provided one of the films and that film involved the

23   decapitation and dismemberment of women in Mexico.

24          I would suggest that -- I can move on and we can

25   address this later perhaps at a break.  I can certainly

*Sidebar*                                                                605

1   revisit this later in Mr. Vicente's testimony.

2            THE COURT:  Why don't we do that.

3            MR. AGNIFILO:  All right.

4            THE COURT:  All right.  We'll take it up -- we can

5   take it up when we recess for lunch so we can get it dealt

6   with.

7            MS. HAJJAR:  Great.

8            MR. AGNIFILO:  Thank you, Judge.

9            THE COURT:  Okay.  Thank you.

10           (End of sidebar.)

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continued.)

2         THE COURT:  All right.  You may continue.

3    BY MR. LESKO:

4    Q    We'll move on for the moment, Mr. Vicente.

5    A    Understood.

6    Q    Getting back to the 10 percent fees, was there anyone at

7    NXIVM responsible for calculating those fees that were owed to

8    the defendant?

9    A    My understanding it would have been Karen Unterreiner

10   because she did all the calculations at the end of every

11   single month, so my understanding is that it would have been

12   her, the final calculator.  I know in the case of Society of

13   Protectors, Jim Del Negro was doing the calculations for

14   Society of Protectors, so, you know, he might have been

15   responsible for that.

16   Q    Did you understand those calculations, how they were --

17   how they were done?

18   A    It was a complete and utter mystery.  I tried many

19   times -- I asked, in the case of SOP, can you please explain

20   this to me and I -- it was never clear.

21   Q    In your experience, did the accounting department at

22   NXIVM run smoothly?

23   A    It was chaos.

24   Q    Would NXIVM employees receive checks?

25   A    NXIVM employees would receive checks except they weren't

1  considered employees.  They were considered, you know,

2  independent contractors, but yes, they would receive checks.

3  Q    Was it always clear what those checks involved?

4  A    It wasn't.  In fact, we used the term inside the company,

5  you know, we just got a check from the mysterious NXIVM gods.

6  We had no idea what they were for.

7  Q    Did anyone at NXIVM seem to know when individuals would

8  get paid at NXIVM?

9  A    The understanding was, generally, a few -- you know, a

10  number of days after the end of the month it was generally a

11  week to -- it was -- Karen Unterreiner, I think, for the most

12  part, was the one that knew when that would happen.  I had

13  asked her on occasion, you know, Do you know when, and she'd

14  say, you know, another two or three days kind of thing.

15  Q    Was a person named Kathy Russell involved in the

16  accounting department?

17  A    She was, yes.

18  Q    What was her role in the accounting department?

19  A    I'm actually not entirely certain, it was a bit of a

20  mystery.  She seemed to operate a little bit independently,

21  but I went to her on occasion -- I had a number of

22  altercations with her about some issues, one was related to

23  tax, and I went to her because I was told that's who I should

24  talk to.

25  Q    Did the defendant ever express concerns about bankruptcy?

Vicente - direct - Lesko                    608

1    A    Well, in the sense that when I asked him, you know, why

2    there are so many companies, he said to me in -- two things;

3    one was, in order to be bankruptcy remote, I wasn't entirely

4    sure what that meant, and he sort of clarified it as in order

5    to make sure -- we can't be destroyed.  There's too many

6    different companies that, even if one single company gets

7    destroyed, we can still live, be okay.

8    Q    And how would that -- what was your understanding about

9    how that destruction would occur?

10           MR. AGNIFILO:  I'm sorry, I object to the form of

11   the question, Judge.

12   BY MR. LESKO:

13   Q    Destroyed by what?

14   A    The forces against NXIVM and against Raniere.

15   Q    Did you ever discuss with the defendant or Nancy Salzman

16   their experience with the company before ESP?

17   A    It was -- yes.  It was -- there was a number of

18   companies, CBI was one.  There was something called National

19   Health something, I can't remember the exact name, but CBI was

20   one that was talked about quite a lot.

21   Q    What was discussed about CBI?

22   A    So CBI, I was told by numerous people, including them,

23   was the brainchild of Raniere; it was a buying club that

24   occurred -- I think it was in the '90s, and the idea was he

25   created a system where he could get people things for less

Vicente - direct - Lesko                              609

1   money.  In essence, you know, if he pooled everybody's

2   resources and requests, and let's say 50 people -- you know,

3   5,000 people wanted a DVD player -- a VHS machine, he would

4   try to get it for much less because there were so many people

5   willing to buy it, so it became a buying club and it was

6   membership based, and apparently it grew very large, it was

7   enormously successful.  He had said that he had made a number

8   of millionaires over this time, so he was very good at this

9   kind of thing, and then he and Nancy Salzman and others said

10  that it was basically destroyed by political forces.

11  Q    What political forces?

12  A    The story that I heard was that --

13           MR. AGNIFILO:  Your Honor --

14           THE COURT:  Sustained.

15  BY MR. LESKO:

16  Q    What was your understanding, based upon your discussions

17  with the defendant and Nancy Salzman, regarding what happened

18  to CBI?

19  A    Raniere told me that Bill Clinton's people asked for some

20  money because Raniere was doing business in -- I think it was

21  Arkansas, and he refused to give Bill Clinton's people money.

22  So, in retribution, they went after him and I think it was --

23  I can't remember the exact number, it was many, many attorney

24  generals went after him to destroy the company and, in

25  essence, he was run out of town and, you know, told he could

1    never have -- run an MLM again, multilevel-marketing

2    organization, and that he couldn't do business in -- in

3    Arkansas, and that -- Raniere also suggested to me that it had

4    to do with another more powerful company that was trying to

5    get rid of him that was doing the same kind of thing.

6                  THE COURT:  When was this?  Do you have a time frame

7    for this?

8                  THE WITNESS:  I think it was the '90s.  It was

9    before I came, so these were the stories that I was told.

10                 THE COURT:  I was just interested in with regard to

11   Clinton; was it before he was president, allegedly, or after

12   he was president?

13                 THE WITNESS:  I, unfortunately, don't remember.

14                 THE COURT:  All right.

15                 THE WITNESS:  I'm not certain.

16                 THE COURT:  Go ahead.

17   BY MR. LESKO:

18   Q    What is an MLM -- what is your understanding of what an

19   MLM or multilevel marketing is?

20   A    My understanding is that, instead of having a retail

21   store for things, you utilize a membership-based sales force

22   to sell something.  And my understanding of this, because I

23   have been involved in some of them, you know, let's say you're

24   selling soaps or essential oils or something, you become a

25   member and you work your way up the organization by selling,

Vicente - direct - Lesko                611

1   you know, and you get to become a certain level of distributor

2   and the higher level you are, the more commission you make.

3   You know, if you sell a bar of soap for let's say $20, you

4   know, if you are lower level maybe you make a dollar, if you

5   are higher level you make $5; so in essence, the more you sell

6   and the more of an organization you build, the more passive

7   income you're making, and if you build enough people, you can

8   kind of sit around eventually and just, you know, make money.

9   Q    Let's talk a bit about profits at NXIVM.  Did you have

10  any understanding as to how profits were handled within NXIVM?

11  A    My understanding is there's a whole commission structure

12  of how monies were dispersed.  The gross was coming in to head

13  office, it was generally paid into a computer system, and

14  then, you know, the sales force got a portion, proctors got a

15  portion, trainers got a portion, centers got a portion, and

16  then the remainder, which I recall was around 15 percent, I

17  believe, went back to the actual company itself.

18  Q    Was it ever clear to you as to how profits were handled

19  within the company?  Within NXIVM, I should say.

20  A    Other than that, I don't -- I don't know that I

21  understood the internal workings of things; I just understood

22  that that structure existed and I understood that I would get

23  a certain percentage based on what job I was doing.

24          MR. LESKO:  Your Honor, I'm about to move to another

25  area.

Vicente - direct - Lesko                612

1           THE COURT:  All right.  I think this is a good point

2    to recess for lunch.

3           All rise for the jury.

4           (Jury exits.)

5           THE COURT:  All right.  The witness may stand down.

6    Do not discuss your testimony with anyone.

7           Everyone may be seated.

8           (Witness excused.)

9           THE COURT:  There's an issue that's come up, let's

10   discuss it.

11          MS. PENZA:  Your Honor, may we just have two minutes

12   to discuss before we -- oh, is this the same issue we were

13   discussing?

14          THE COURT:  The same issue we were talking about.

15   Do you want two minutes to discuss it amongst yourselves?

16          MS. PENZA:  Yes, please.

17          THE COURT:  I'll wait.

18          MS. PENZA:  Thank you, Your Honor.

19          (Pause.)

20          MR. AGNIFILO:  Judge, I think we might have resolved

21   our issue.

22          THE COURT:  You might have resolved your issue?

23          MR. AGNIFILO:  I think we resolved the basis for the

24   sidebar and my objection; we resolved it.

25          MR. LESKO:  Yes, Your Honor --

Vicente - direct - Lesko                    613

1          THE COURT:  Well, share with me the outcome.

2          MR. LESKO:  Well, right now, we do not intend to

3   elicit testimony regarding the studies that we discussed at

4   sidebar, and I believe Mr. Agnifilo has indicated that he does

5   not intend to go into that area on cross-examination.  If that

6   situation changes, which is doubtful, but if it does, we will

7   provide Mr. Agnifilo with notice.  I imagine we will be

8   continuing with direct examination on Monday and we will -- if

9   we happen to change our minds, we will let Mr. Agnifilo know

10  and we will revisit the issue with the Court.

11         THE COURT:  Okay.  So your direct will go beyond

12  five o'clock tonight?

13         MR. LESKO:  I fully expect it will, yes.

14         THE COURT:  And then, on Monday, how much more --

15  you will let me know at the end of the day about how much time

16  you will need on Monday so that Mr. Agnifilo can advise me

17  about how long -- how much time to block out for the

18  cross-examination.

19         MR. AGNIFILO:  That's fine, Judge.  Yes.

20         THE COURT:  All right.  So those are the -- that's

21  the information that I need at the end of the day today.

22         All right, let's have lunch.

23         MS. PENZA:  Thank you.

24         MR. AGNIFILO:  Thank you.

25         (Defendant exits courtroom 1:05 p.m.; lunch recess.)

Proceedings                                              614

1                 A F T E R N O O N   S E S S I O N

2          (Time noted:  2:00 p.m.)

3          (In open court; Jury not present.)

4          THE COURT:  Sidebar, please.

5          (Continued on the next page.)

6          (Sidebar conference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



SEALED SIDEBAR                                                    615

Vicente - direct - Lesko                616

1          (In open court; Jury not present.)

2          THE COURT:  Let's bring in the witness, please.

3          Please bring in the jury.

4          The witness?  Here we go.

5          (Whereupon, the witness resumes the stand.)

6          (Jury enters the courtroom.)

7          THE COURT:  Please be seated.

8          Please continue with your examination of the

9  witness, Mr. Lesko.

10          The witness is reminded that he's still under oath.

11          THE WITNESS:  Yes, sir.

12  DIRECT EXAMINATION (Continued)

13  BY MR. LESKO:

14  Q    Mr. Vincente, after moving to Clifton Park, did you rise

15  up through the ESP rank?

16  A    I did, yes.

17  Q    Please describe your progression through the stripe path?

18  A    When I attended my second 16-day intensive in 2006, I was

19  awarded the coach stash.

20          A year later I became a proctor, which is the orange

21  sash.  So that would have been 2007.

22          And then somewhere in around 2009, I was awarded the

23  senior proctor sash, which was a green.  And I had that sash

24  until I left in the 2017.

25  Q    Did you perform other duties at NXIVM?

Vicente - direct - Lesko                    617

1    A    A great many.

2    Q    What were some of those duties?

3    A    So I was a green, obviously, which meant I oversaw a lot

4    of the proctors in general in the company.  And I also oversaw

5    the proctors in the centers I was involved in, which was

6    Vancouver and Los Angeles.

7              I was the co-owner of the Los Angeles and Vancouver

8    centers.  I was field trainer as well.  Executive board, as I

9    mentioned before.

10             And also I oversaw -- there was a company called

11   Moving Pixels which was, in essence, the video department.  I

12   oversaw that department as well.  So I was training people in

13   terms of shooting and editing, lighting, and sound and things

14   like that.

15             And I was also a -- one of the founding members of

16   the Society of Protectors as well as.  And then I was working

17   a number of film projects with Raniere.  And also some of my

18   own that I was trying to get to as much as I could.

19   Q    And as you previously mentioned, did you run the

20   communications division?

21   A    Yes.  I also ran the communications division, yes.

22   Q    And you I believe testified you participated in enrolling

23   others in ESP?

24   A    I did, yes.

25   Q    What types of people did you enroll in ESP?

Vicente - direct - Lesko                    618

1   A    Generally speaking, people in the entertainment industry.

2   I also went after people that were very influential.

3           One of the things that I did as much as I could was

4   I tried to enroll, you know, people in power positions in the

5   media as well.

6           I would try to get VIPs on board.  At times we would

7   run VIP intensives.  Some of them I would run.

8           Just, you know, general every day people as well,

9   but most of my network was, you know, the entertainment

10  industry, so those were most of the people that I enrolled.

11  Q    How many people did you specifically enroll, if you can

12  estimate, in NXIVM?

13  A    As I recall, somewhere around 50 or more personally.

14          And then because of -- you know, because not every

15  person, but generally people that enrolled would enroll other

16  people.  So my entire organization was in excess of 2,000 when

17  I left.  But I think personally I enrolled 50 plus.

18  Q    Have those people who were attributable to you in NXIVM,

19  have they all remained involved in NXIVM?

20  A    Many have left.  I -- I think there might be some that

21  still remained.  I think many of them have left.

22          Many of the people that I -- that I enrolled in that

23  organization of the 2,000 plus, many people just would come

24  and take the training and then they would leave.  And a small

25  percentage would want to become coaches and join the stripe

Vicente - direct - Lesko                          619

1    path, and get become more deeply involved.

2            No, I think there are a number of people that are

3    still, I believe, enrolled.

4    Q    When you recruited, how did you recruit?  What sort of

5    strategies did you use?

6    A    Well, it depended on the person.

7            You know, in the case of very, you know, very

8    wealthy or very powerful people, it's not like they wanted to

9    have, you know, oh, more success because they already had so

10   much.  So what I tended to do with them was talk about those

11   areas of their life that they were struggling.  You know,

12   perhaps it was relationships, or perhaps it was addiction, or

13   perhaps it was, you know, that they had everything and they

14   were still completely miserable.

15   Q    Let me stop you there.

16           So are you talking about the sales pitch now?

17   A    Yes.

18   Q    Okay.  Continue.

19   A    And so I would always try to figure out what was the

20   thing they were looking for, because I couldn't offer them the

21   thing that they already had, but, in essence, what was the

22   thing that was missing and try and find out what had they

23   tried to do up to that point to have that thing.

24           And usually, you know, if I said:  Well, how

25   successful have you been?  The answer was usually:  Not very

Vicente - direct - Lesko                 620

1  successful.  And that was usually my in to try to explain what

2  this particular methodology was and how it could perhaps help

3  them with that particular thing that they struggled with.

4  Q    So did you attempt to estimate the worth, the relative

5  worth of these issues?

6  A    Very much.  This was -- this was an idea that Raniere

7  taught myself and many --

8  Q    I'm sorry, go ahead.  Continue.

9         I want you -- why don't you sort of give a sales

10 pitch.

11 A    Oh.

12        Um, you know, in essence, if I was, you know,

13 talking to somebody, I'd want to figure out what is the thing

14 that the person wants.

15        And I think I mentioned before like, let's say the

16 person wants love.  And the thing they can't seem to get and

17 figure out, what's the thing you keep doing that you lose

18 love, or you run away from love.

19        And I try and establish, well, what's this true,

20 wonderful, amazing love that you want to have.  How do you get

21 in your way.  And then, you know, what's that like?  What's it

22 like for you not to have this dream that you ache for.

23        And usually what I was trying do is figure out

24 what's the thing they really ache for.  It could be love.  It

25 could be money.  It could be more connection with this, that

1    and the other.  What's the thing they really ache for.

2         And then try to figure out, well, what's the cost in

3    your life of not having that thing.  You know, what's the cost

4    in terms of hard ache and all the things you try to do to feel

5    better instead.  You know, all the vacations you take, and all

6    the things you drink, and people you sleep with or whatever to

7    try to feel better, what's the cost to your life in terms of

8    pain.  You know, it could be quantified, you know.

9         And it was playing with the idea of like what's this

10   thing worth to you?  What's this the eternal everlasting love

11   worth?  Like it is worth like ten bucks?  Is it worth a

12   thousand bucks?  Like a million?  Yeah.  It is worth like

13   10 million?  Oh, yes.

14        And then you kind of compare that, okay, this thing

15   is worth $10 million to you so like, if you compare that to

16   the, you know, $6,000 that you would spend taking the 16-day

17   intensive, that really could help you overcome this block you

18   have to having the thing you want, wouldn't that be worth it?

19   And naturally they would say, "Yes".

20        Or if they were resistant, you know, you talk about

21   the cost of, you know, this problem in your life.  How much is

22   it costing you?

23        And I would use an example, you know, like, for

24   instance, I used to have a lot of anger, I used to blow

25   meetings because I get upset with people and I told them once

1    it cost my millions of dollars of lost deals because I get

2    upset at somebody in the conference room.  Do you have

3    anything like that?  People say:  Yes, I have this and I've

4    done that.  We try to quantify what they've lost.

5              And I compare that very, very sizeable figure to

6    this very small figure; you know, be it $6,000; be it $10,000,

7    but that was much smaller and really cheaper than the thing

8    that, you know -- the loss you've had.

9    Q    This pitch, was it successful?

10   A    Not always.  There was a certain percentage of success.

11             Personally I found when I was working with people

12   one-on-one I was better at it than doing the introductory-type

13   evenings with people.

14             But I mean it was successful enough that, you know,

15   I was growing my organization and many people that were using

16   it were growing it as well.

17   Q    Was this a pitch that was commonly used in NXIVM?

18   A    There was a -- at some point it became more uniform.

19             When I first -- when I first came in, my field

20   trainer, Barbara Bouchey, would teach me the pitch.  That was

21   the job of a field trainer.

22             And at a certain point, Raniere made the decision

23   that he would try and formalize the pitch.  And so what he did

24   is he got a few field trainers together, and he did this

25   training, which ended up being, you know, many, many weeks

Vicente - direct - Lesko                     623

1    long where he explained the basic structure of, you know, what

2    you were to do, and then explaining like different -- like he

3    would do the different tricks to try to show the audience, you

4    know, this is how you do it.

5              And he -- we'd talk about his sales experience, and

6    we all felt he was clearly a pretty good salesperson, so we

7    could learn from him and apply those things as well.

8              And the general thing was to try to figure out

9    what's the thing the person wants and then try to really get

10   down to like how are they not having it, or how they are

11   sabotaging it, or what's the pain that they feel.

12             And then also showing them that because of the

13   nature of the way that they're programmed, you know, we have

14   these responses and reactions that we're not even aware of,

15   that really you're never going to get it until we take care of

16   that programming.  So as much as you think about it or you

17   want this thing, it's kind pointless.  We're like these -- you

18   know, we would talk about, you know, Pavlov's dogs and these

19   response-type things and talk about how dogs are responding.

20             You know, there's an experiment that was done by

21   Pavlov; you know, ring a bell, salivate; ring a bell,

22   salivate.  And we'd talk about, well, what's the difference

23   between dogs and human beings?  Well, it's the similarity.

24             Most people wouldn't know, and then we'd say:  Well,

25   the difference would be the human being and a dog is dog you

Vicente - direct - Lesko                    624

1   have to repeat the thing again and again and again, if you

2   train your dog.  A human being is a one-time learner.

3            So very often, especially when they're young, the

4   one time they experience something they learn, and that --

5   that gets trapped, in essence, in your body.

6            So as much as you want this perfect relationship, in

7   essence, you keep on sabotaging yourself, you keep on screwing

8   it up and like it's in your body in a fashion you can't get

9   to.  But our technology can get you there.

10           So it's sort of having them feel the pain of what

11  they're losing, they thing they really want and how nothing

12  else will work but this.  That was the general -- the general

13  pitch.

14  Q    And the defendant taught that pitch?

15  A    Yes, he did.

16  Q    Is it fair to say that when recruiting individuals to

17  participate in ESP, you were encounter concerns related to

18  cult allegations, costs, and other allegations?

19  A    Generally the objections --

20  Q    Yes or no.

21  A    Yes, yes, that's correct.

22  Q    Did the defendant teach you how to deal with those

23  concerns and allegations?

24  A    He did.

25  Q    What did he teach with regard to dealing with those

Vicente - direct - Lesko                    625

1    allegations?

2    A    Well, even before this formalized training, I would ask

3    him questions.  You know, one of the issues that I came up

4    with at the very beginning is because of the bad press that

5    already existed, people were afraid of the word "cult," and

6    they were afraid of the allegations, you know, in the media.

7              And then he would teach me certain tricks.  One of

8    the early ones that I remember is he would say somebody

9    approaches you and they're very afraid, you know, and they say

10   there's been a lot of bad press.  You could say to them:

11   Well, that's good, a lot of bad press.  Of course, the person

12   would say:  Why?

13             Well, because we want people that are critical

14   thinkers.  If somebody's going to get afraid because of some

15   cult that they read in the newspaper, we probably don't want

16   them because they can't think critically.  We want people that

17   can actually reason things through, not people that just

18   reactive.

19             So in some ways that was the bind for the person,

20   because given the setup you just gave them, they didn't way to

21   say, oh, I'm a non-critical, fearful, hysterical person.  No,

22   no, of course, I'm a reasonable person.  And so there were

23   little tricks like that.

24             In terms of, you know, money objections.  Similarly

25   to what I said; you know, there's -- everything has a cost.

1   There's a cost of buying the program, and there's a cost to

2   not buying the program.

3          And generally speaking, the cost of not buying this

4   program is so much greater to buying the program.  And you've

5   already told me -- I'm giving you the pitch again -- you

6   already told me all these things you're struggling with and

7   clearly that cost more than this.  Life costs, depends on how

8   successful you want to be.

9          And they were time objections.  You know, I don't

10  have time for this, I have to take care of my kids.

11         My response was saying, you know, what kind of

12  parent do you want to be?  Of course, the person says:  I want

13  to be an amazing parent.  I want to be loving, there for them.

14  And so, you know, you're not really there for them?  Not in

15  the way I want to be.  I'm not as loving as I want to be.

16         Well, doesn't it make sense then for five, maybe

17  even 16 days, to become that kind of parent so that when you

18  go back to your children, you will be a better parent.  You

19  will give them more of what they want.  Isn't it worth it to

20  the make this small investment for a lifelong of joy.  A

21  life -- lifetime of joy, I should say.

22         So there were all these kinds of different sales

23  tricks that we were taught to, in essence, almost bend the

24  person towards why this would be better than all the other

25  things that they were worried about.  Like this will relieve

Vicente - direct - Lesko                627

1   all those things.  Just give us 16 days of your life and, you

2   know, $6,000, which is meaningless in the face of, you know,

3   all these things you told me already that are so hard in your

4   life.  It's meaningless.

5   Q    Were you taught by the defendant how to deal with the

6   cult allegations specifically?

7   A    I was.  The fear thing I talked about is one.

8         He would -- in practice, he would practice examples

9   with us to help teach us; you know, he would say things like,

10  you know, if somebody came to you that was afraid of what they

11  were reading, he'd say something like, you know, look, these

12  things you're reading, do you know that they are actually

13  coming from like really two sources in the world?  You know,

14  you may be reading 20, 30 articles, are you aware that there's

15  two sources?

16        Are you aware that these journalists that write

17  these things have been paid to do this?  And don't you find it

18  strange that you would, in essence, believe the word of

19  somebody you've never met over me who you know.

20        Do I look like the kind of person that would get

21  involved in something dangerous?  In something nefarious?

22  Doesn't it seem strange that you would believe a journalist

23  you've never met who never even took the program.  You have to

24  understand, these people that are saying these things, they've

25  never taken the program.

Vicente - direct - Lesko                        628

1          So those are the kinds of pitches that he would

2   teach us to use.

3   Q    Did you address the definition of the word "cult"?

4   A    Not in those pitches.  We tried to, you know, in terms of

5   when you were talking to people, if somebody talked about the

6   word cult, you would say to them, Well what is a cult?

7   Q    So did participants ever raise cult concerns during the

8   intensive?

9   A    They did.

10  Q    And were you taught how to deal with that?

11  A    Well, some of it was actually built into the intensive.

12  And, again, some of the ways -- the things I just discussed is

13  the things that were talked about, if -- but on day five, and

14  I believe it was called the mission module, the world cult was

15  brought up.

16         And basically the mission module talked about how

17  what we're trying to do is build a more ethical and noble

18  civilization; you know, lots of beautiful quotes by beautiful

19  people and then talking about how people that are going

20  against this use the word cult to inspire fear.  There's no

21  clear definition to this word, they would say, and it's people

22  being suppressive.

23         So there were things already baked into the

24  intensive, but we would sometimes make light of it or, you

25  know, not make a big deal of it.  But if somebody in the

Vicente - direct - Lesko                    629

1    intensive, again getting very, very upset, again using the

2    cult word a lot, we might invite them to leave.

3    Q    Did that happen?

4    A    That did happen, yes.

5    Q    How often?

6    A    I would say there was at least one intensive -- one

7    person every intensive that there was some kind of issue with.

8         It may have been cult thing, it may have been a

9    press thing.  It may have been something else, but in Los

10   Angeles, I found it was usually one person per intensive that

11   we would agree that they should maybe leave.

12   Q    So getting back to Moving Pixels, that was a company?

13   A    Moving Pixels was a company.  I believe it was LLC.

14   Q    And who was the owner of that company?

15   A    The owner of that company was Nancy Salzman.

16   Q    Where was Moving Pixels located?

17   A    The -- on paper, it was located in Delaware.  In

18   actuality it was located at different residences.  You know,

19   one of mine, 13 Twilight Drive for a period of time, and 7

20   Generals Way.  Then a building called the Rome Plaza, right

21   next to Apropos.  And then eventually it moved again to an

22   address I've now forgotten.

23        MR. LESKO:  Let me now you what's been admitted as

24   Government Exhibit 120.

25        (Exhibit published.)

Vicente - direct - Lesko                           630

1    Q    Do you recognize that photograph?

2    A    That looks like 7 Generals Way.

3    Q    And that is a location where for a period of you lived?

4    A    Period of time, yes.

5              And I lived there, and also the basement of that

6    house was basically our postproduction facilities for Moving

7    Pixels.

8    Q    Now, when you ran the video department at NXIVM, did you

9    work alone or did you work with others?

10   A    No, I worked with a number of other people.

11   Q    Who did you work with?

12   A    I worked with --

13   Q    Let me ask you this:

14             Did you work with Chris Brooks?  Chris?

15   A    Yes.

16   Q    Meghan Mumford?

17   A    Yes.

18   Q    Scott Mumford?

19   A    Yes.

20   Q    Adrian?

21   A    Yes.

22   Q    Josh Elliott?

23   A    Justin.

24   Q    Justin?

25   A    Justin, yes.

Vicente - direct - Lesko                     631

1   Q    Ken Kozak?

2   A    Yes.

3   Q    Juan Lopez Fonz?

4   A    Correct, yes.

5   Q    Olivia Canan?

6   A    Olivia Cohn.

7   Q    Cohn, sorry.

8        Mike Baker?

9   A    Yes.

10  Q    Souki?

11  A    Yes.

12  Q    Dan Bratman?

13  A    Yes.

14  Q    And what were your responsibilities as head of the video

15  department?

16  A    There were numerous.  I mean basically I was, you know,

17  determining -- like the executive producer, I would oversee

18  everything.

19        I have the technical knowledge of, you know, what we

20  needed to do.  I would choose the team members to figure out,

21  you know, who is going to be shooting, who is going to be

22  editing.  I would liaise with different people in the

23  community that were requesting video materials to be shot.  I

24  was training, overseeing.  I would be involved in budgeting

25  things.  And then I also be involved in directing or shooting

Vicente - direct - Lesko                    632

1    things as well.

2    Q     Did you shoot forums?

3    A     Early on I shot them myself, and then I built a team that

4    shot them.  So I would just oversee the shooting of forums.

5    Q     Did you shoot activities at V week?

6    A     Yes, I oversaw -- I would shoot some of them myself, and

7    I would oversee a fairly large team.

8    Q     It is fair to say there was a quite bit of videotaping at

9    NXIVM?

10   A     A great deal.  There was a lot of things we were

11   capturing.  We, as much as possible, would capture Raniere

12   doing all the things he did.

13              V week, we would shoot pretty much everything.  All

14   the forums were shot.

15              And then intensives were generally always shot --

16   there was always a camera at the back of an intensive.  There

17   was always shooting what was going on.  A lot was shot and lot

18   of what recorded as well.

19   Q     Was anything not videotaped?

20   A     The only times things were not videotaped is if there was

21   some kind of a sensitive discussion.  You know, I might be

22   asked not to role camera or not record for some sensitive of

23   reason.

24   Q     What were forums?

25   A     Forums were an opportunity where the community and

Vicente - direct - Lesko                    633

1    students got to come and listen to Raniere's speak.

2           And he would speak, you know, usually in some form

3    of either Vanguard, or if we might appear at different

4    intensives and speak.

5           I mean it was basically as many people as could come

6    would, you know, be in the audience, and then he would come

7    in, people, of course, very excited, and then once they sat

8    down, he would open up with some kind of topic or

9    philosophical ideas that he would talk about that were on his

10   mind.

11          And then he would open the floor to questions.  And

12   those questions -- you know, it was said, you know, you can

13   ask whatever questions you want.  But they were carefully

14   tailored.  They would run them through some of the other ranks

15   to make sure this was an appropriate question.

16          And these could go on for, you know, anywhere from

17   an hour to five, five hours sometimes.  And then we recorded

18   this with multiple cameras.

19   Q    Were forums memorialized in any other manner?

20   A    So obviously video.  There may have been audio.  There

21   was also a -- it was called a forum review team.

22          And this was a group of people that made very, very

23   careful notes, and they were looking for -- to categorize

24   everything he said; you know, quotes he said or, you know,

25   things about certain topics.

Vicente - direct - Lesko                    634

1        There was a whole system of categorization being

2   used.  As I recall, they would have these fairly complex Excel

3   documents, and they would sit there and make notes about every

4   single thing he said.

5            And then when it was over, they would sit and meet

6   and go through every single point of the things he said.  It

7   was a method of memorializing, you know, his -- his

8   philosophical ideas.

9   Q    Was it your understanding -- well, strike that.

10           What was your understanding regarding whether or not

11  the defendant believed it was important that the forums be

12  videotaped?

13  A    He believed it was very important.  He wanted a

14  historical record of pretty much everything that was

15  happening.

16  Q    Do you recall an incident where you yourself stopped

17  recording a forum?

18  A    I do.

19  Q    What happened?

20  A    It was a forum, I think it was around 2014.  It was a

21  forum at Apropos, the building.  And there were two to three

22  cameras rolling, as there generally were, and I wanted to come

23  in to shoot some material.  In film terms we call it the

24  "B-roll".  It's sort of the little snippets of things.

25           You know, there's the main thing going on and little

Vicente - direct - Lesko                635

1   snippets of things you're catching.  That's B-roll.

2            And so I was going in to shot on a higher-end camera

3   some of those things, and I shot for maybe an hour.  And then

4   I decided to pull back and sat in the back for a while and

5   then I moved to the next room.

6            And I got a call from him later that night asking

7   me, you know, why I stopped shooting?  And I said:  Well, I

8   got what I needed for this piece that I was making about you.

9   So there was no need to keep shooting.  He was very concerned

10  that I stopped.  And I said I'm not clear, I don't understand

11  there were two to three other cameras that were rolling the

12  entire time that captured everything that you said.

13           And he said something to the effect, I'm just very

14  concerned you would do that because it sends a message.  And I

15  said:  What kind of message?  He said:  The message what I'm

16  saying is unimportant.  And I said:  Well, clearly it was

17  important because the other cameras were rolling.

18           And he couldn't let it go.  I apologized and I said:

19  I'm sorry, but what would you prefer I do?  He said:  I would

20  prefer if you're not going to shoot, just pretend you're

21  shooting, just lock shoot, which I thought was silly.

22           But I -- you know, him being, in essence, my boss, I

23  said:  Okay, I'm sorry, I apologize.  It won't happen again.

24  Q    Was there an event at NXIVM called "coffee talk"?

25  A    Coffee talk was, to some degree, similar.  The difference

Vicente - direct - Lesko                636

1    was that Nancy Salzman, when she spoke to groups, that was

2    termed a "coffee talk" to make a distinction between the forum

3    and her speaking.

4              Coffee talks were generally similar.  What she would

5    generally do is in a coffee talk she would talk about who she

6    was, her background.  You know, how she wasn't getting

7    anywhere with her particular methodology.  How she finally got

8    to meet Keith Raniere.  And how, you know, if you're going to

9    work with me, it's a lifelong commitment.  And she made a joke

10   about it.

11             She talked about how they began the company

12   together, and what an incredible human being he was.  And once

13   she went through that whole story, it was pretty much the same

14   every time.

15             She would open the floor to questions as well.  And

16   it was similar in some ways, except not as big a deal as a

17   forum.  Forums were very, very dig deals.

18   Q    Were the coffee talks videotaped?

19   A    They were videotaped, yes.

20   Q    What was Vanguard week or V week?

21   A    So it was a period of time to celebrate Raniere's

22   birthday, which I believe was August -- is August 26th.

23             And my understanding is before my time it was like a

24   day-long event, and then three days.  By the time I arrived,

25   it was seven days.  And by the time I left, it was 11 days.

Vicente - direct - Lesko                              637

1           It was basically -- what would happen -- it was like

2      a corporate retreat.  Everybody would go up to the Silver Bay

3      YMCA on Lake George in the Adirondacks, north of Albany,

4      pretty much take over the whole YMCA and --

5      Q    Let me stop you there.

6           Did the YMCA have places to sleep?

7      A    Yes, it was like a resort, it was like a rustic resort,

8      and there were -- it was like a hotel.  So there were rooms

9      all over the property.

10     Q    And were those rooms in cabins?

11     A    Some were cabins.  Some were -- there was like a main

12     lodge.  And then there were houses in the different peninsulas

13     close to the water.  It was a bunch of different lodging

14     situations.

15     Q    Okay.  Continue.

16     A    And during this, you know, eventually 10, 11 days, there

17     were all these activities that would happen.  You know there

18     was volleyball.  There was -- you know, different companies

19     would present what they were doing.  There was things called

20     objectives, you know, which was basically areas of interests.

21          There were like singing objectives, and dancing

22     objectives, drumming objectives.  And so you could

23     basically -- sort of like summer camp for adults, where you

24     could go and you had all these things you could choose from

25     that you wanted to do.  Drumming, dancing, singing.  There was

1  poetry.  It was a great number of things.

2          And there were also performances that were being

3  rehearsed throughout the week.  And at the very end, these

4  performances were put on.  Sometimes it was a play.  There was

5  informal evenings, you know, formal evenings.  There was a

6  triathlon; in essence, summer camp.

7          And then the entire thing was in celebration of him

8  and this civilization that he had built.

9          And he also would do forums.  Anywhere from two to

10  maybe five forums during that time.  It was a large

11  auditorium, and he would stand on the stage or sit on the

12  stage and, you know, it was fairly packed.  And similarly he

13  would do a forum there.

14  Q     Where did people come from to attend V week?

15  A     Everywhere.  I mean anywhere that there were people that

16  had taken the education that felt close to the community that

17  wanted to support the community.  Or, you know, were higher

18  ranking.

19          It was frowned upon if you were a member of a rank,

20  a coach or above, not to go.

21  Q     Were high-ranking members of NXIVM expected to attend?

22  A     Yes.

23          And also, you know, if you were a high rank also to

24  help run certain things.  You know, the high ranks were seen

25  as the people that are hosting this event.

Vicente - direct - Lesko                     639

1           So people from all over the world.  I mean a lot of
2    people would come from Mexico from Canada; of course, from the
3    U.S., from Europe.
4    Q    What was a coach's summit?
5    A    Coach summit began I think around 2009.
6           In the executive board, we had a discussion that the
7    coaches were not getting some of the skills that they needed
8    to get.  So we thought we should maybe hold some kind of a
9    gathering for coaches, because they're coming into town, maybe
10   for something else, so maybe we can create a three-day weekend
11   that coincides with that.
12          And it was to help build their skills and help build
13   the community.  And that eventually turned into -- we did four
14   of them per year.  And the executive board would generally
15   host these.  And we would meet with the executive board.  And
16   sometimes the greens would meet with Raniere before everybody
17   came into town to talk about the health of the company, what
18   we would need and he would give us suggestions.  Sometimes he
19   might give us curriculum.  And basically things to help the
20   coaches, you know, understand their role and, of course, there
21   was a huge focus on enrollment constantly.
22          It was team building, in essence, team building for
23   the higher ranks.
24          MR. LESKO:  Showing you what's been admitted as
25   Government Exhibit --

1          THE WITNESS:  Actually, I can see the monitor there.

2    I can see that.

3          MR. LESKO:  Here we go.  Showing you Government

4    Exhibit 159 in evidence.

5    Q    Do you have that?

6          (Exhibit published.)

7    A    Yes, that's Apropos.

8    Q    Do you recall something that happened when coaches missed

9    a coach summit?

10   A    Yeah.  Yes.

11         There was one particular coach summit, I don't

12   remember the year, when we were advised it might be a good

13   idea to really have those people that didn't attend understand

14   what it meant that they didn't attend.

15         So there was a letter writing campaign that was

16   begun where people would craft these letters and send it to

17   people that were not there, in essence, talking about, you

18   know, how much they were missed.  You know, what a huge hole

19   it was that they weren't there.  How much they cared about

20   them.

21         And it -- it -- I think it backfired pretty badly.

22   But it was a lot of pressure on the people that were not

23   there.

24   Q    Getting back briefly to V week.

25         What did the high-ranking people at NXIVM do at

Vicente - direct - Lesko                    641

1    V week?

2    A    They would run a lot of the objectives, the different

3    objectives that I mentioned; you know, singing, dancing, that

4    kind of thing.

5              They were also there to -- they -- we were told.

6    You're also responsible for these people, so, you know, people

7    having issues or having concerns or troubles, you know, it

8    would be good if you could be there as elders, so to speak, to

9    help people.

10             We were -- the idea was that we would run different

11   things at V week.

12   Q    Were those high-ranking people who ran things at V week

13   paid?

14   A    No, they weren't paid for that.  Generally -- it was --

15   you paid to go to V week.

16   Q    So the members, the high-ranking members themselves paid

17   to go to V week?

18   A    Yes, generally speaking, unless they were -- they were

19   doing some activity for which they had arranged an exchange.

20             In other words, so, you know, like if the cost was,

21   let's say, $2,000, they would work all of V week to, in

22   essence, offset that.

23   Q    Let me -- how much did it typically cost for a

24   high-ranking member to attend V week?

25   A    Depending on where you stayed, anywhere from -- it could

Vicente - direct - Lesko                    642

1   be -- if you were in the really rustic accommodations,

2   sharing, maybe it was like 14, 1500, up to 3,000-something

3   for, you know, the nicer digs, so to speak.

4   Q    Did everyone that attended V week pay for V week?

5   A    Everybody paid, except those people that may have been

6   working or had some kind of exchange.

7   Q    So it was either you paid or -- or you incurred a debt of

8   sorts?

9   A    Which you paid off with your work, yes.

10  Q    Sort of on the high end, how much did it cost to attend

11  V week?

12  A    If you were living in a nice house, maybe it was 3500 per

13  person, I think.

14  Q    So you paid to go work at V week?

15  A    Yeah.

16  Q    How often did you film the defendant?

17  A    Hundreds and hundreds and hundreds of times.  I mean in

18  the 12 years that I was there, I don't have a number.  It was,

19  I mean, tens of thousands of hours of material.

20  Q    Are you familiar with the community in Mexico named

21  LeBaron?

22  A    I am.

23  Q    What is LeBaron?

24  A    LeBaron --

25  Q    LeBaron.

Vicente - direct - Lesko                     643

1    A     -- is a small community in the north of Mexico in the

2    state of Chihuahua.  And I met them, I think it was maybe

3    2009, 2010 during the course of making a film about

4    non-violence in Mexico.  And I met them through one of my

5    producers who found the story in the newspaper about this

6    community.

7    Q    What did you learn about LeBaron?

8    A    So just in context of this film, when I was looking for

9    heroic stories in Mexico, people that stood up against

10   violence, and I learned about this community called LeBaron.

11           LeBaron's the name of a very, very large family

12   there.  It's a Mormon community.  So there's many, many, many

13   LeBarons, and there's also a place called LeBaron.

14           And I learnt that back in at least 2009, the --

15   there were kidnappers, I think as part of the cartel living in

16   the mountains, had kidnapped this young boy.  He was 16 years

17   old.  His name was Eric LeBaron.

18           And the spiritual leader of the community, his name

19   was Benjamin LeBaron decided -- they all got together and they

20   talked about, you know, we're -- they were farmers, we're

21   going to raise money, we're going to find a million dollars to

22   get Eric back.

23           And then he thought at a certain point, you know,

24   the problem is if we give these kidnappers a million dollars,

25   we just financed a bunch more kidnappings.

Vicente - direct - Lesko                    644

1          So what if we just, in essence, say screw you, you

2    know.  So the kidnappers called at the appointed time and they

3    said:  No deal, we're not paying.  They said:  We're going to

4    kill him.  And they said:  Okay, go for it.

5          And what they did instead, they didn't just wait,

6    they went to the Chihuahua city, to the government building

7    and began protesting around the building.

8          And I think it was around about the eighth day of

9    protesting, their theory was that the government -- that

10   particular government and the kidnappers were the same people.

11   They were all working together.

12         So they protested outside the building, and

13   miraculously around day eight, somewhere in the mountains,

14   Eric was released by the kidnappers.

15         And this is the story that I read.  And I was very,

16   very moved, so we sent a camera crew down there to interview

17   Benjamin, interview Eric, and all these people in the

18   community.

19         And, you know, I told Raniere about this thing that

20   we were going to follow --

21   Q    Let me ask you a couple more questions about the

22   community.

23         You mentioned it was a Mormon community.

24   A    Yes.

25   Q    Do you recall where the members of that community

Vicente - direct - Lesko                    645

1   originally came from?

2   A    Originally they came from Utah.  They were -- I don't

3   know if this is the correct word -- they were excommunicated

4   from a particular Mormon church or branch.  And they -- I

5   think they fled, actually, to Mexico, and they started a new

6   community there and -- it has a very troubled past but...

7   Q    Was it a monogamous community or a polygamist community?

8   A    No, it was polygamist.

9   Q    What does "polygamist" mean?

10  A    In essence, the man had multiple wives.  It was a sign

11  of -- I'm not sure what the word is exactly -- something -- to

12  have multiple wives, and many, many children.

13  Q    Did NXIVM start a program for girls from the LeBaron

14  community?

15  A    Yes.

16            My understanding is that there was a girls program,

17  and many of the young women from that community were in the

18  program.  I don't know the exact nature of the program.  It

19  was some kind of educational something.

20            I know that it was run by -- I'm sorry, checking --

21  by Rosa Laura Junco, in her house, as far as I recall.

22            MR. LESKO:  Let me show you Government Exhibit 3 in

23  evidence.

24            (Exhibit published.)

25  Q    Do you recognize that?

1    A    Yes.  That's Rosa Laura Junco.

2    Q    And Rosa Laura Junco ran this program for the girls in

3    the LeBaron community?

4    A    That's my understanding.

5    Q    Was there a name of the program?

6    A    I don't recall.

7         I just -- it was the term, I think the girls program

8    or something like that.

9    Q    Were the girls involved in, I think you had previously

10   mentioned, Rainbow Cultural Gardens?

11   A    Yes.

12        I think a number of them -- not I think, I mean, a

13   number of them were also what are termed "MDSs".  MDS is a

14   fancy word for nanny.  The idea -- I think they were called

15   multi-disciplinary specialists.  I think that's what MDS

16   stands for.

17        The idea was -- that program was to have people of

18   multiple nationalities that speak multiple languages spend

19   time with the kids.  So some of these were also associated

20   with Rainbow Cultural Gardens as well.

21   Q    And the educational program, did the girls who

22   participated, or probably more specifically their parents or

23   guardians, pay for them to participate in the program?

24   A    I actually don't know.

25   Q    I draw your attention to approximately 2007.

Vicente - direct - Lesko                           647

1          Did you work on a film concept with the defendant
2     about supposed lies involving the defendant?
3     A     Yes.
4     Q     Now, before we get to the actual project, how would you
5     work on film concepts with the defendant?
6     A     The way -- the way it began is we would start discussing
7     a concept of some kind.  He would share a lot of information
8     about the concept to try to make sure that I understood the
9     philosophical points, and then we might start discussing a way
10    to actually bring it to life.
11          You know, the very first thing I began working with
12    him on was a project we -- which the name was "Finding the
13    Carbon Crimes".  It was a -- he felt very strongly that global
14    warming was a complete myth and that, you know, Al Gore was
15    not being honest.  So he took me through the whole science of
16    debunking global warming; how it was not true, it was a huge
17    strategy just to make a lot of money.
18          And we discussed that for a long time, and then he
19    began suggesting, you know, maybe there are certain characters
20    that could be treated.  So a lot of it was him talking.  I may
21    ask questions if I wasn't clear on something.  I would record
22    everything.  I would then transcribe everything.  I would then
23    study the transcription, and I would then usually go back and
24    have another meeting.
25          Most of our meetings were walking meetings.  Where

1   if I didn't understand or I wasn't clear, or if I had an idea

2   of ways to expand it, I would talk about it and we would do

3   that process again and again.

4   Q    So this -- you would go back -- there was a back and

5   forth?

6   A    Yes.

7   Q    And you would write down what was the concept?

8   A    Yes.

9   Q    As it was shared with you from the defendant?

10  A    Correct.

11  Q    And you would go back to him and go through versions?

12  A    Exactly.

13        And then in that case, in the case of "Carbon

14  Crimes", I began to turn it into a narrative story; you know

15  were I presented treatments and then eventually write a

16  script.

17  Q    So this other project involving supposed lies, is it fair

18  to say the lies were primarily in the press, according to the

19  defendant?

20  A    Some were in the press, some were just stories of enemies

21  that had said certain things.

22        And the idea was to, in essence, debunk all these

23  enemies and explain how what they were saying was not true, it

24  was a lie.

25        So he would give me information about, you know,

Vicente - direct - Lesko                                    649

1    what was actually going on.  You know, there was the recorded

2    story, and then he would say, but this is what's actually

3    going on.

4              And the idea was to then figure out how to dramatize

5    it so in the end he could be revealed to be not the criminal

6    that they were suggesting he was, but in actuality a very good

7    man that's just misunderstood by society.

8    Q    You used the term "enemies".  Is that your term?

9    A    No, that was a term that was used in the community.

10   Q    Was it used by the defendant?

11   A    I mean I can't think of a -- I can't recall a specific

12   moment that's consistent with the kind of language we used.

13   Q    So this project involving supposed lies, who initiated

14   that?

15   A    Let me think for a second.

16             I think Nancy Salzman initiated that.  She would say

17   to me -- she once said -- a few times she said, you know, I

18   really would love it if Keith Raniere does not die a criminal

19   in the eyes of the world.  I think she was the first person,

20   and then from there I spoke to him about these ideas and a

21   number of others people.

22   Q    And so did you participate in the writing of this film

23   concept?

24   A    Some of it, yes, I did.

25   Q    Did one of the claims involve someone named Christian

1   Snyder?

2   A    Yes.

3   Q    And what was the film concept relating to Christian

4   Snyder?

5   A    The idea was basically to tell the story of what happened

6   to her that -- the -- his version of what actually happened.

7            This was somebody who took an intensive in Alaska,

8   who was very upset, who was a survival -- a survivalist kind

9   of person you know, very fit, took a canoe out into the bay

10  and, you know, disappeared, supposedly drowned, and left a

11  suicide note in her car.  And there was a police report, et

12  cetera, et cetera, about all this.

13  Q    Those are all allegations, right?

14  A    Yeah.  I think there's a police report that's printed

15  somewhere, I don't recall.

16  Q    Okay.

17  A    And then he said to me:  Look, there's a couple of things

18  that are wrong about the story.  One is, this woman is a

19  survival expert, and like she takes out -- she takes a canoe

20  that's actually a planter box out there, doesn't that same

21  strange to you?  That seems strange.

22           Then he said:  And also, the note that was left in

23  the car that said NXIVM something, something, something.

24  NXIVM didn't exist back then.  Wow.  Wow.  That's amazing.

25  That's clearly debunks that.

Vicente - direct - Lesko                    651

1          And then he said:  And also, we've had private

2    investigators try to find her, and we found her in a hotel

3    with her lover.  She's alive and well, and really the whole --

4    she made this whole thing up to try to get away from some kind

5    drug thing that she was involved in.

6            And, you know, at that point I -- I really saw him

7    as the source of everything coming out of his mouth was the

8    truth.  That's an amazing story, let's start writing this

9    story to debunk what they are saying that Raniere is somehow

10   responsible for this.  There's so many holes in the story,

11   let's rip it apart.

12   Q    Did the defendant share an idea going into this film that

13   involved the cult?

14   A    Yes.  There were a number of ideas that were floated over

15   the years.  One of the ideas -- we had discussions about, you

16   know, cult busting, trying to bust that concept of cult.

17           And at one point he said to me:  What would be very

18   interesting is, you know, what if we found a family and we

19   paid them a million dollars and basically we then figured out

20   how to creatively, using the media, turn them into a cult,

21   convince everybody that they were some kind of dangerous cult.

22   That would be a very interesting fila.  And at the very end,

23   we would show the world that we've been shooting the making of

24   this thing and that we fooled you all.  That it wasn't a cult.

25   That's how easy it is to fool people.

1           And I remember saying that that's interesting, but
2    like that's really dangerous, because what if somebody kills
3    someone or what if somebody hurts them?  No, no, it's just an
4    idea.
5    Q    Did you end up making that film?
6    A    No.
7    Q    So during the initial part of your involvement with ESP,
8    and let's start with the time period right when you moved to
9    Albany.  Did you actually interact personally with the
10   defendant?
11   A    I did.
12          Obviously, I told you the -- on the tenth day of my
13   first intensive.  And then the only way in the beginning that
14   I could actually talk to him, because I became somewhat
15   obsessed with talking to him about like, okay, this EM thing
16   you're doing that's so extraordinary, I want to learn how to
17   do that in film making.
18          Like, is there a way that I could have an audience
19   come into a movie and like 90 minutes later change their mind
20   completely about this thing that they believed.  I thought
21   this would be amazing.
22          And so I'd try and have conversations with him about
23   this, and the only way I had access to him at first was
24   volleyball games.
25          Volleyball games when I first went, were typically

Vicente - direct - Lesko                653

1   held three times a week.  They would run from around midnight

2   to 7 a.m.  And the only opportunity I had at that point, and

3   most people in the community had, was you had to go to

4   volleyball to actually see him, you wait for a period of time,

5   and maybe if you got lucky, you got to talk to him.

6           That's the access I had for quite a while.

7   Q    And did -- let me stop you there.  Where were these

8   volleyball games held?

9   A    When I first arrived, it was somewhere in Latham.  I

10  don't recall the exact gym.

11          Then it moved to Saratoga Springs that we held it in

12  a -- it was a Catholic girls school gym that we used at night.

13          And then finally we moved to Hayner's,

14  H-A-Y-N-E-R-S, Hayner's Sports Barn, in Halfmoon, New York,

15  and it was held there for a number of years.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. LESKO: (Continued.)

3    Q    Showing you what's been marked as Government's

4    Exhibit 172, do you recognize that photograph?

5    A    Yes.   That's Hayners Sports Bar.

6    Q    Is that the front of the building?

7    A    That's the front of the building, yes, taken from the

8    road.

9    Q    Showing you Government's 173 in evidence, do you

10   recognize that photograph?

11   A    Yes, that's the same building, a wider shot.

12   Q    And that's -- that building contained a volleyball court?

13   A    It contained -- yes, two volleyball courts and batting

14   cages and a number of other things.

15   Q    And who else played in these volleyball games?

16   A    There were -- the athletic members of the community:

17   There was an A team and a B team.   The A team was people like

18   Jim Del Negro, Ben Myers, Mike Baker -- stand by -- Adrian.

19   There were people that played with him a lot, and then there

20   was a B team that were learning, and then the rest of the

21   community would -- would sit on the benches and watch.

22   Q    And how big was the crowd generally?

23   A    You know, on a busy intensive night, it could be 30,

24   maybe even 40.   Generally speaking, though, it was probably

25   around ten to fifteen, maybe.

Vicente - direct - Lesko                                    655

1    Q    And did you occasionally talk with the defendant at
2    volleyball?
3    A    In the first few years, that was -- yes, that's where I
4    spoke to him.
5    Q    Did there come a time when you asked to meet with the
6    defendant?
7    A    I did.  Once I moved there, you know, I was trying to see
8    if I could get a meeting with him and I was going through
9    Nancy Salzman to get a meeting with him and it took quite a
10   while and I wanted to have a meeting with him away from the
11   gym, you know, and eventually -- I wasn't getting anywhere,
12   so, you know, I was receiving EMs on my overeagerness; my
13   insistence that I should meet him; you know, my attachment to
14   my career; you know, a whole bunch of things, and then finally
15   I said to Nancy Salzman one day, you know, I think I've -- I
16   think I'm now a little less attached to having a conversation
17   with him.  And then a few days later on June the 22nd, my
18   birthday, it was around 7:00 a.m. or maybe earlier, he called
19   me and he said, Would you like to take a walk, and of course I
20   was over the moon because this is what I've been waiting for
21   and, yes, I -- yes, I want to talk, and so we took our first
22   walk together, and --
23   Q    Was walking with the defendant significant in NXIVM?
24   A    It was.  It was seen as -- it was seen as a big deal that
25   you got to have time with him.  I mean, you have to

Vicente - direct - Lesko                656

1   understand, at this point, you know, he had been built up in

2   my mind and everyone else's mind as this, you know, genius

3   beyond geniuses, and an opportunity to walk with him was, you

4   know, walking with, you know, one of the top three problem

5   solvers in the world.

6   Q   Did you, in fact, walk with the defendant?

7   A   Yes.

8   Q   Did anyone comment on the fact that you had walked with

9   the defendant?

10  A   At that time, Pam Cafritz had commented, she said, you

11  know, That's really a big deal.  She had also said to me, you

12  know, He doesn't have very many male friends, maybe you could

13  with that person.  She pumped my tires about it.

14  Q   Did anyone suggest that the defendant would take you

15  under his wing?

16  A   Nancy Salzman had suggested that.  She said, you know,

17  Based on how things go, you know, if you're very fortunate, he

18  may actually decide to mentor you personally, and that would

19  be extraordinary, and I -- at the time, I believe I said

20  something like, That's -- I really would love that, that would

21  be very important to me.

22  Q   So after that initial walk with the defendant, did you

23  continue to walk with him?

24  A   I did.  We began a -- I would say it was more of a

25  working relationship working a number of projects.  I would

Vicente - direct - Lesko                    657

1    initially call him via somebody else's phone and then

2    eventually I had his phone number, and, you know, I would call

3    him or he would call me and we would walk usually very, very

4    late at night, some odd hour.

5    Q    And you would talk during the walks.

6    A    Yes, we would.

7    Q    So how often a week would you have these walk-and-talks

8    with the defendant?

9    A    I think in the first few years, I mean, it could be as

10   little as one maybe up to three.

11   Q    And in 2009, did your contact with the defendant change?

12   A    I -- yes, I think in -- 2009 was sort of a turning point

13   in the company.  There were a number of people that decided to

14   leave and --

15   Q    We will get into that a little bit later.  I'm just

16   asking about the volume and type of contact.

17   A    Oh, yeah, it was a great deal more.

18   Q    And how would you talk?  Would you still do the

19   walk-and-talks, or was there another way you would talk with

20   the defendant?

21   A    We would do walk-and-talks or we would do -- we would do

22   phone calls, a lot of phone calls.

23   Q    Did there come a time when you started contacting -- or

24   you had contact with the defendant every day?

25   A    Yes.  It was after one particular intensive -- I believe

Vicente - direct - Lesko                 658

1   it was human pain where -- I had discussed with Nancy Salzman

2   at one point, you know, because she was having me look at

3   what's one of the hardest things for me, and I said, Well,

4   actually, one of the hardest things for me is to talk to him.

5   I always find myself very nervous, and, you know, it was very

6   difficult and I felt like he could see right through me and it

7   was a terribly vulnerable experience.  And she said to me, you

8   know, You might want to figure out how to make that part of

9   something that you do.

10          And so when it came to human pain and we were

11  looking at, you know, what's the hardest thing in your life

12  that at this point that you would like to do, I made the

13  decision, all right, I'm going to call him every single day:

14  It could either be a call; if I can't reach him, then I'll

15  text him; if that doesn't work, I'll e-mail him, and I'll do

16  this every single day, and I pretty much kept that up until

17  towards the beginning of 2017, many, many years.

18  Q    Did your standing or your status within NXIVM within the

19  community at NXIVM increase or decrease after you began to

20  have daily contact with the defendant?

21  A    It increased.

22  Q    Why?

23  A    My sense is that people thought, okay, well if, you know,

24  he's having this much time with Raniere, that they're friends,

25  he's-a-big-deal-too kind of thing, so the best way I can

1  explain it, it's a bit like you're spending a lot of time with

2  a king and everyone else is going, ah, he's with the king, so

3  he must be all right, he must be important.  It was a bit like

4  that.

5  Q    Did the defendant share confidences with you during this

6  time period where you had daily contact with him?

7  A    Some confidences.  You know, some over the years he would

8  share, yes, certain personal information with me.

9  Q    Now, I apologize if you may have discussed this

10 previously, but let's talk for just a moment about tribute.

11 A    Yeah.

12 Q    Did members of the NXIVM community pay tribute to the

13 defendant?

14 A    Yes.  A lot.  A great deal.

15 Q    Was that taught in ESP?

16 A    Yes, it was.  It was -- it was part of the, you know,

17 when you -- when you ended a module or you ended an intensive

18 day, you were -- you did a clap, you said, you know, Thank you

19 Vanguard, thank you Prefect, so there was a lot of thanks

20 going on.

21           And tribute -- because he was seen as somebody who

22 produced more value than anybody else, it was suggested he

23 should get, you know, more tributes.  Nancy Salzman would say

24 to me things like, you know, Do you understand what it means

25 to spend an hour with him?  Do you understand that that -- you

1  know, his time is worth $100,000 per hour and that when you

2  are spending time with him the way you are, you are getting

3  millions of dollars, so there was this constant focus on,

4  like, what an extraordinary rare experience it was to be with

5  a mind like that.

6  Q    Did anyone ever question the defendant in NXIVM?

7  A    Nobody in the system.  I mean, I once saw somebody that

8  wasn't a student.  I never saw anybody else really question

9  him.

10  Q    Did you ever criticize him in front of others?

11  A    There was only one time that I can remember really

12  challenging him in front of others.  It was, I think, the end

13  of 2016 maybe, I challenged him quite strongly in front of

14  other people.

15  Q    Who were you with when you challenged him?

16  A    I was with Jim Del Negro and Anthony Ames.

17  Q    And after you challenged the defendant in front of

18  Anthony Ames and Jim Del Negro, what was their reaction, if

19  any?

20  A    They were shocked.  Jim Del Negro sort of laughed

21  uncomfortably and said, Oh, looks like you got a little riled

22  up there; and Anthony Ames was, like, I actually didn't know

23  that you could do that.  And I said, Well, I just did.

24  Q    Did Nancy Salzman ever discuss the defendant's power to

25  heal?

Vicente - direct - Lesko                    661

1  A     She did.  You know, generally speaking, and it wasn't

2  said publicly, but there were rumblings about, you know, these

3  abilities he had.  You know, people would talk about how he

4  could affect weather, how he would affect technology --

5  Q     Did you say "affect weather"?

6  A     I did say "affect weather."

7  Q     How would he affect weather?

8  A     I don't know what the mechanism was, but, you know,

9  Barbara Jeske would tell me about, you know, how he would

10  affect weather.  Other people would talk to me about how he

11  would affect technology.  He, himself, would tell me that

12  there was something about his energy field that seemed to

13  create problems with computers; that he went through many,

14  many computers because of his -- something about his energy.

15         So there was this kind of mystique that was floating

16  around, not so much with the general student populous, but

17  more, you know, in sort of more of the inner circle, you know,

18  talking in some hush tones about these things that he could

19  do.

20         And at one point -- I don't remember the exact

21  year -- Nancy Salzman said something to me about, you know,

22  there's a path to enlightenment through sexuality and that,

23  you know, Raniere understands this path; and I thought that

24  was really odd, but I, you know, kind of filed it away in --

25  there's a box in my mind I think I use, which is -- I don't

Vicente - direct - Lesko                          662

1  know, maybe it's above my pay grade or it's just too weird, so

2  I just file it away.

3  Q    Did ESP students at some point in time during their

4  involvement physically meet the defendant?

5  A    They did, but it was under certain set of circumstances.

6  In other words, if you were a brand new person coming through,

7  chance of you meeting him after five-day were very, very slim.

8  You had to be deep into your 16-day generally, and usually it

9  was at the end of your 16-day when you would get a field trip,

10 you know, and the field trip was, you know, We're going to

11 volleyball tonight.  It wasn't always at the very end, but

12 towards the end, and this was your opportunity to see the man

13 that created this incredible experience that you have been

14 having and all these wonderful tears you have shed and all

15 this likeness you are feeling and these issues that you now

16 feel resolved about, you know, let's go meet the man who

17 actually created all this.  But there was a certain amount of

18 preparation for new people.  They couldn't just meet him.

19 Q    How did they generally act when they first met the

20 defendant?

21 A    My general impression was awe.  I mean, certainly that's

22 kind of how I felt; I was kind of awestruck, and I was -- I

23 was awestruck by the -- kind of the -- what I saw as this

24 intellectual model.  I, you know -- it was -- some of it was

25 fairly new to me, but they were very deferential, very awkward

1    is the way people were.  There was a -- the respect and the

2    tribute for him was so built into the intensive that by the

3    time you saw him, it was a little bit like you were seeing,

4    you know, some kind of god, you know.

5    Q    I would like to now draw your attention to June of 2008

6    when you were in charge of the video department.  Did the

7    defendant ask you to do anything at around that time?

8    A    He did.  He -- I don't remember if it was a phone call or

9    in person, but he said to me, you know -- he asked me, Is

10   there a way to remove stuff from a videotape in such a way

11   that it doesn't look like it's removed?  And I wasn't clear at

12   first.  He's like, Is there a way to, like, do it where you

13   can almost -- it looks like a glitch or it looks like some

14   kind of a natural process to remove something?  And I thought

15   about it, and I said, Actually, there is.  You know, you can

16   move to the analog world, you can do a bunch of things there,

17   yeah, it can probably be done.  And he says, Oh, that's good.

18   There's some things we need removed.  The legal department has

19   some things that need to be removed from some tapes and it has

20   to do with a case where our methodology is being evaluated and

21   our patent is being looked at.  And my understanding from him

22   and then from some other people that were part of this project

23   is, you know, the patent was at risk if these things were in

24   that tape that were going to be handed over.

25            So I said, Okay, well, you know, I think I -- I

Vicente - direct - Lesko                    664

1    think I know how to do it and I have to think about it a bit

2    more.

3            And then my -- you know, myself and my department

4    began liaising with the legal department to figure out what

5    needed to be removed and what was the way that we would do it.

6    Q    During that conversation with the defendant, did you, as

7    a preliminary matter, indicate how you could create the

8    glitches in the videotapes?

9    A    I do recall saying something like, you know, If we move

10   to the analog world, there's all kinds of glitches that occur

11   with analog tape versus digital, especially with, like, VHS

12   tapes.  There are ways to create glitches that -- you know,

13   once you start a glitch, it takes a certain amount of time, a

14   few seconds, for the image to finally stabilize and that's --

15   that's a way to do it.  You know, where something's removed,

16   you can, in some ways, hide the removal with certain kinds of

17   glitches.

18   Q    And glitches are alterations to the tape, to the

19   actual --

20   A    Yes.  They are alterations.  They are creating a kind

21   of -- there's different ways, but creating a kind of

22   interference in the tape signal so that it looks like, you

23   know, maybe the thing was lying around too long or there was

24   some kind of damage to it or some high voltage thing happened.

25   Q    And so digital is -- is it fair to say digital format is

Vicente - direct - Lesko                                    665

1    sort of what we're all used to now; is that right?

2    A    Now it's all digital, yeah.

3    Q    So that's DVDs and alike?

4    A    Yeah, Blu-ray, et cetera, et cetera.

5    Q    When you use the term "analog," what are you referring

6    to?

7    A    In this case, I'm referring to VHS.  You know, digital

8    now is all ones and zeros, VHS was magnetic.  It's not the

9    same kind of format, so there were -- there were a series of

10   issues that happened with analog VHS that don't happen now.

11   It's much more stable now.

12   Q    For those of us who don't remember VHS, VHS is like a big

13   casette tape.

14   A    It's like a casette like that size (indicating),

15   magnetic.

16   Q    And the video is actually on a tape; is that right?

17   A    Yes.  Two spindles.  It runs through -- against a head

18   that reads it.  It's more complex; it's a spinning drum that

19   the tape wraps itself around, and the drum is spinning very,

20   very fast and reading the information on the tape.

21   Q    And this process that you discussed with the defendant,

22   did you describe it at all?  Did you mention that it had

23   involved steps or stages or anything like that?

24   A    I don't know that I mentioned specific stages and steps

25   because there was -- there was still some discovery that

Vicente - direct - Lesko                 666

1    had -- there was experimentation that had to happen, but I did

2    talk about that VHS was glitchy, which was an advantage that

3    also -- the advantage of VHS was that on -- in digital, you

4    can actually embed time code into digital formats, there's

5    time code information.

6            When you're in VHS, it isn't the same; you don't

7    have time code information in the same way.  So moving from

8    digital into analog, in some ways you can say it's almost like

9    you erase the digital information, and the reason -- the

10   reason that's important is because, you know, if you have --

11   time code is generally eight numbers, you know, and if you

12   have, you know, zero, zero, ten, ten, thirteen and, like, you

13   know, if you have that, you will see the seconds in the frames

14   or the minutes that are missing.  It will be very clear that

15   it's missing.

16           If you move into the VHS analog world, there's no

17   numbers in the same way, so you can't tell if anything's

18   missing.

19   Q    So just to be clear, the defendant asked you to alter

20   these videotapes?

21   A    Correct.

22   Q    By removing segments of them?

23   A    Correct.

24   Q    And he indicated that this was because they would be

25   produced in a case --

Vicente - direct - Lesko                    667

1   A    It was some case and that the -- there was some case and

2   that the patent would be at risk because of what was in the

3   tapes.

4   Q    Do you know specifically what was supposed to be removed

5   from the videotapes?

6   A    My best recollection now is that it had to do with the --

7   the -- you couldn't make health claims with this kind of

8   education.  You know, if you made health claims, that would be

9   a huge problem with somebody -- some department of the

10  government, I'm not sure which.  So the idea was to take out

11  anything that -- where a trainer -- and it was mostly Nancy

12  Salzman -- had said something that led people to believe, oh,

13  so she's saying that rational inquiry actually can heal you or

14  it can create some physiological change in your body, you

15  know, it can get rid of a disease or something like that.  The

16  idea was to remove that because in -- in this -- in this being

17  produced in this case, if that was seen, it would be clear

18  that, oh, well, these people are saying things that they

19  shouldn't be saying.

20  Q    Was there an understanding at NXIVM about claiming that

21  programs offered by NXIVM could result in health benefits?

22  A    Well, it was talked about -- it was generally accepted

23  that yes, that is what it did, but we were told, you know,

24  don't make those claims, be very, very careful that you don't

25  suggest that this thing will do that even though, you know,

Vicente - direct - Lesko                    668

1   the experience we had was that there was clear evidence that,

2   yes, it actually did do that, you know, yes, it removed

3   headaches, and it could change panic attacks and it could do

4   all kinds of things that actually did have a physical benefit,

5   but we were instructed to not make that claim.

6   Q    Did that type of claim -- was it your understanding that

7   that type of claim could lead to enforcement of regulatory

8   oversight by state authorities?

9   A    I think the way I saw it is that maybe this could be shut

10  down because I think -- I think I'm saying something similar

11  to you, I think.

12  Q    Was it your understanding that Nancy Salzman had made a

13  mistake by attributing health benefits to the NXIVM

14  curriculum?

15  A    That was my --

16          MR. AGNIFILO:  Objection.

17          THE COURT:  Sustained.

18  BY MR. LESKO:

19  Q    Did you have an understanding regarding what Nancy

20  Salzman had done when she made these health claims?

21  A    My understanding was that she said some things that she

22  wasn't supposed to say.  The -- it was generally known that --

23  that Nancy Salzman would get very excited and say a lot of

24  things and things that, in this case, were problematic.

25  Q    Did Nancy Salzman know about the editing of the

Vicente - direct - Lesko                     669

1   videotapes?

2   A    She was aware, yes.

3   Q    Was she punished for this?

4   A    I think so.  She was -- people spoke about her

5   negatively, and I think they admonished her for doing this,

6   and, you know -- the sense I got was that she was --

7          MR. AGNIFILO:  I'm sorry, I'm going to object.  If

8   the witness --

9          THE COURT:  It's a speaking objection.

10         MR. AGNIFILO:  I apologize.

11         THE COURT:  Sustained.

12         MR. AGNIFILO:  And I move to strike the answer.

13         THE COURT:  Yes, the jury will disregard the answer.

14         Go ahead.

15  BY MR. LESKO:

16  Q    Did you ever discuss with others at NXIVM consequences

17  that Nancy Salzman experienced as a result of making these

18  claims on the videotapes?

19  A    I don't recall specifics.

20  Q    Do you recall when the video tapes were originally

21  recorded?

22  A    The best of my knowledge, it was prior to when I arrived

23  in 2005, but I don't have the exact dates.

24  Q    So when the defendant asked you to alter the videotapes

25  removing portions of them so that they could be produced in

Vicente - direct - Lesko                    670

1    connection with a case, did you agree to do this?

2    A     I did.

3    Q     And when you said the word "case," was it your

4    understanding that that involved a lawsuit or a legal action?

5    A     I understood it was some kind of legal action; I wasn't

6    clear what it was.  It was spoken about in terms of, you know,

7    that we need to defend the tech.  I don't know what -- at that

8    time, I didn't know what the case was.

9    Q     Did you understand that the requested production of the

10   altered videotapes, you know, in a lawsuit or a case would be

11   illegal?

12   A     The answer is yes and no.

13   Q     Well, what's the "yes" answer?

14   A     The "yes" answer is yes.  By the -- by the laws of the

15   land, yes.

16          At the time -- I, myself, and I think other people,

17   had the impression that this methodology and Raniere's way of

18   thinking, you know, was superior to the ethics of the

19   governments and the ethics of courts and the ethics of pretty

20   much everybody, that this was the most advanced ethics, and

21   that he really had an understanding of what was truly ethical

22   moral.

23          So in this kind of environment, I believe I was --

24   this must be for a higher good.  Okay, so yes, it's this, but

25   it's for a higher good that in the end is better.  That's why

Vicente - direct - Lesko                    671

1    I say "yes" and "no."

2             MR. LESKO:  Your Honor, this may be a good time to

3    take a break.  I can continue, but --

4             THE COURT:  Yes.

5             Let me just ask you, at any time in your discussions

6    about altering the tapes, did you ask whether a legal opinion

7    had been obtained about the lawfulness of this particular

8    activity in connection with a patent application or a

9    litigation?

10            THE WITNESS:  I did not.  I was --

11            THE COURT:  "No" is the answer?

12            THE WITNESS:  No.

13            THE COURT:  Did you deal with lawyers at all when

14   you were engaged with your activities at --

15            THE WITNESS:  I did not.

16            THE COURT:  -- NXIVM.

17            THE WITNESS:  No.

18            THE COURT:  All right, let's take a ten-minute

19   break.

20            All rise for the jury.

21            (Jury exits.)

22            THE COURT:  All right.  The witness may stand down.

23   Do not discuss your testimony with anyone.  We'll take a

24   ten-minute break.

25            (Witness excused.)

Vicente - direct - Lesko                          672

1           (Defendant exits courtroom at 3:29 p.m.)

2           (A recess in the proceedings was taken.)

3           (Defendant enters courtroom at 3:40 p.m.)

4           THE COURT:  Let's bring in the witness, please.

5           (Witness resumes the stand.)

6           THE COURT:  Yes, did you want to say something?

7           MR. LESKO:  Yes, Your Honor -- you go first.

8           MS. PENZA:  I did not want to say something.

9           THE COURT:  Oh, you didn't?

10          MS. PENZA:  Sorry, I was just looking at you.

11          MR. LESKO:  If I can raise an issue --

12          MR. AGNIFILO:  Do you want to go to the side?

13          MR. LESKO:  Yes, sidebar, please.

14          THE COURT:  Please be seated, everyone.

15          (Sidebar.)

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

```
                            Sidebar                      673
```

1           (Sidebar conference held on the record out of the

2    hearing of the jury.)

3           THE COURT:  Yes, please.

4           MR. LESKO:  Thank you, Your Honor.  I expect that

5    we're going to get to four exhibits, and they're videotape

6    exhibits, by the end of the day, and the four exhibits are

7    examples of the videotapes that were produced in the lawsuit

8    and Mr. Vicente will review very short portions of them and

9    they are examples of the types of editing that he oversaw.

10   These videotapes ultimately will have to be introduced through

11   some sort of record custodian or representative of the law

12   firm that was involved in the lawsuit, so what I'm proposing

13   is that we just see -- I seek to admit the videotapes subject

14   to later connection and I'm asking -- and I believe the

15   defense agrees to that --

16          MR. AGNIFILO:  I have no problem with the subject to

17   connection.

18          I do have one question:  Can he say these are the

19   videotapes?

20          MR. LESKO:  No, he cannot.  He did not watch the

21   videotapes at the time, so he can't say they are the exact

22   videotapes.  He'll say that the edits are the types of edits

23   that were done to the videotapes.

24          MR. AGNIFILO:  Okay.  Okay.  So he's going to say

25   the editing that -- the hands-on editing that he did is

Vicente - direct - Lesko                    674

1    consistent with the editing that I'm seeing in this video.

2              MR. LESKO:  To be precise, the editing that he

3    directed others to do.

4              MR. AGNIFILO:  Okay.  And that's why he doesn't know

5    because he didn't actually see the finished product.

6              MR. LESKO:  Correct.

7              MR. AGNIFILO:  Okay.  All right.  I would imagine

8    that this issue is -- it's admissible and it goes to weight

9    and I'm going to get to cross-examine on it, obviously.  Okay,

10   that's fine.

11             MR. LESKO:  Your Honor, if I could ask, would there

12   be any instruction that the Court would be inclined to give in

13   terms of the subject of connection that may be confusing to

14   the jury, or should we just leave it there?

15             THE COURT:  I'll say something.

16             MR. LESKO:  Thank you.

17             THE COURT:  You'll make the offer and I will grant

18   your application and indicate to the jury that in order for

19   the jury to consider this evidence in its deliberations, it's

20   necessary for there to be an additional witness who will

21   provide the basis for them to consider it.

22             MR. AGNIFILO:  Fine.  Thank you, Judge.

23             MR. LESKO:  Thank you, Your Honor.

24             (Sidebar end.)

25             (Continued on following page.)

Vicente - direct - Lesko                    675

1              (In open court.)

2              THE COURT:  All right, let's bring in the jury.

3              (Jury enters.)

4              THE COURT:  Please be seated, everyone.

5              Mr. Lesko, you may continue your examination of the

6    witness.  The witness is reminded that he is still under oath.

7              THE WITNESS:  Yes, Your Honor.

8              MR. LESKO:  Thank you, Your Honor.

9    BY MR. LESKO:

10   Q    Mr. Vicente, when we took the break, you indicated when I

11   asked you if the request to alter videotapes was illegal, you

12   said "yes" and "no."  You described it "yes," it was illegal

13   under U.S. law, but "no," not according to some other

14   explanation.

15             As you sit here today, do you think that the

16   agreement and ultimate actual alteration of the videotapes

17   that were produced in the case was illegal?

18             MR. AGNIFILO:  I'm going to object to the form of

19   the question.

20             THE COURT:  Sustained.

21   BY MR. LESKO:

22   Q    As you sit here today, do you think that the alteration

23   of the videotapes was legal or illegal?

24             MR. AGNIFILO:  Same objection.

25             THE COURT:  You may answer.  You may answer.  Go

Vicente - direct - Lesko                    676

1   ahead.

2   A     Illegal.

3   Q     So can you just give us an overview of the process that

4   was used to alter the videotapes?

5   A     I'm just --

6   Q     Just a very high overview.  We will discuss the specifics

7   in a bit.

8   A     Okay.

9              Basically, there were a few stages.  The first stage

10  was that the people in legal -- legal department were to

11  determine what needed to be removed.  We were then -- the

12  video department was then given a list of, you know, remove

13  these things here from this number to this number.  We would

14  then use various processes to remove it and then processes to

15  create glitches to make it look like it was natural, that

16  nothing was actually removed.  Then a final master copy was

17  made, that was then duplicated a number of times to give it

18  the appearance of being older, multiple generations, then

19  labels were put on that would age the -- there was some

20  scuffing that occurred to make things look older, then that

21  was handed off to -- back to the legal department and then

22  went wherever it went.

23  Q     Did other members of NXIVM's video department work with

24  you on this project?

25  A     They did.

Vicente - direct - Lesko                    677

1   Q    Did those members include Ken Kozak, Megan Mumford, Chris
2   Scott Mumford, and Adrian?
3   A    Yes.
4   Q    Showing you what's been admitted as Government's 24, what
5   is that photograph?  Who is in that photograph?
6   A    Adrian.
7   Q    Did Adrian have a nickname?
8   A    He did.
9   Q    What was the nickname?
10  A    Fluffy.
11  Q    Now, Chris, who was Chris?
12  A    Chris was somebody who worked with me in the video
13  department.  They were, like, a production manager; they would
14  schedule things, they would help figure out who was available.
15  They would, in essence, manage a lot of the day-to-day
16  affairs.
17  Q    Adrian -- did Adrian work for you?
18  A    Yes.
19  Q    Was Adrian the brother of Cami and Dani and Marianna?
20  A    Yes.
21  Q    Who were Megan and Scott Mumford?
22  A    Megan Mumford was somebody that worked with me as well in
23  the video department and ended up managing it for a while
24  afterwards.  She was a coach in the organization, she was a
25  photographer, and her brother, Scott, worked with us for a

Vicente - direct - Lesko                    678

1    while.  He was, generally speaking, a shooter -- video

2    shooter -- and he did some sound and some editing.  I don't

3    recall if he was a coach.  He may have been a coach.

4    Q    And Ken Kozak, who was Ken Kozak?

5    A    Ken Kozak was somebody who worked in the video department

6    as well for a long time, pretty much the entire time I was

7    there.  He had a lot of high-tech skills and he loved editing,

8    shooting, audio.  I don't think that he was a coach; I think

9    he was always just a student.

10   Q    So did you and the people who assisted you in altering

11   the videotapes need anything from the legal department in

12   order to get started?

13   A    Well, we needed was a list of what needed to be removed

14   with specific time codes and also -- what you always do in

15   this situation is you don't just want the number, you want to

16   know what was the last few words before you make the cuts and

17   then on this side what are the first few words so that you

18   have a way to double-check so you're not just using numbers,

19   so we needed a list like that.

20   Q    And do you recall who in the legal department you worked

21   with on this project?

22   A    I believe it was Kristin, Keith, potentially Clare

23   Bronfman, and there were some others that were -- that were

24   involved with legal that I think did quality control.

25   Q    Did you receive those notes or the time codes and related

Vicente - direct - Lesko                              679

1    information that you needed from legal?

2    A    I believe so.  I recall seeing them on one of the editing

3    desks, they were handwritten, and they were used to make the

4    determination of what we should do.

5    Q    So what happened after you received the handwritten

6    information that you needed from legal?

7    A    Then it was a question of determining, you know, what

8    methods we would use to actually remove things.  It's a bit

9    complicated, but basically sometimes we would take the tapes

10   and move them into -- into a computer -- into a

11   computer-editing system and remove sections there and

12   sometimes put static in.

13          Sometimes we would go machine to machine -- doing

14   machine to machine dubbing, or sometimes we would also do

15   machine to machine -- you know, in the days before HDMI when

16   you had multiple cables, we'd go machine to machine with

17   multiple cables and we would jiggle the cables and push them

18   in and out which created all kinds of interference.

19          So that was the next step, and then it was just a

20   question of figuring out which one of those things we would do

21   and we would try to, to some degree, randomize it so it seemed

22   natural, you know, what we termed "organic."

23          We would also create glitches in areas where there

24   was no removal so that it didn't look like, oh, that thing was

25   removed.  It was like, oh, there seems to be a problem in this

Vicente - direct - Lesko                    680

1   tape in general to, in some ways, create a smokescreen to hide

2   the specific areas.

3   Q    Do you recall what type of digital tape was -- that was

4   dubbed -- the type of digital tape that was used to --

5   A    I believe it was MiniDV.  It may have been Hi8, but I

6   think it was MiniDV.

7   Q    What type of analog tape was used?

8   A    That was VHS.

9   Q    What was your role in this process?

10  A    My role was basically designing how it would happen.  You

11  know, I had the technical knowledge of what to do and

12  designing it and then working with the team to figure out,

13  okay, these are the methods that we'll use; and then the team

14  was basically implementing these different things all the way

15  down to final delivery.

16  Q    And where did the dubbing occur?

17  A    The -- most of the editing, as far as I recall, occurred

18  at 13 Twilight Drive in one of our editing rooms.  I believe a

19  lot of the dubbing -- the actual multiple generational dubbing

20  I believe happened at Apropos.

21  Q    So there were two steps in the process?

22  A    There were, yeah.

23  Q    So what was step one?

24  A    Step one was actually removing the material and

25  creating -- creating a master.  So, you know, you would start

Vicente - direct - Lesko                    681

1   in this digital realm, you would import it into, you know, a

2   computer or you would move to VHS, and you would do it -- one

3   of a number of different kinds of processes to remove things

4   and create glitches.

5           Then a master was created and then my recollection

6   was that the dubbing wasn't done on 13 Twilight.  There were

7   multiple machines that were set up, as far as I recall, in

8   Apropos.

9   Q    And is "dubbing" another word for "copying" basically?

10  A    Dubbing is copying, correct.

11  Q    Was the master tape after it was made that included the

12  edits, was it copied multiple times?

13  A    Yes.  In the VHS world -- I mean VHS world versus

14  digital, if you copy VHS again and again you basically degrade

15  the quality, so the idea was to degrade it further and further

16  as another method to hide the glitches so that it might look

17  like it had been sitting around for a very long time.

18  Q    Apart from the videotapes used for the copying, the

19  videotapes that were altered, were there multiple videotapes

20  that were altered?

21  A    There were -- yes, there were.  I mean, I -- I think -- I

22  mean, it was more than ten for certain -- for sure.

23  Q    And where did this copying process for each videotape

24  happen?

25  A    The copying, slash, dubbing?

Vicente - direct - Lesko                                      682

1   Q     Correct.

2   A     I believe that happened at Apropos, from what I remember.

3   Q     Was any equipment purchased in connection with this

4   project?

5   A     There were a number of VHS machines purchased.  I think

6   there was also a -- one or two maybe combo decks purchased as

7   well.  "Combo deck" being, you know, like a mini DVD player

8   and a VHS machine together.  I think it was somewhere between

9   eight and ten that were purchased for this project.

10          THE COURT:  Purchased for this project specifically?

11          THE WITNESS:  Yes.  And then they just lay around

12   for years.

13          THE COURT:  If you know, who selected the tapes that

14   would be altered?

15          THE WITNESS:  I don't actually know specifically.

16          THE COURT:  And who told you to alter the tapes?

17          THE WITNESS:  Well, it was a combination of Raniere

18   and the people in the legal team.  Once I -- once I agreed, I

19   did what was asked.

20          THE COURT:  None of whom were lawyers.

21          THE WITNESS:  None of them were lawyers, no.

22          THE COURT:  All right.  Go ahead.

23   BY MR. LESKO:

24   Q     So let's talk about step one, and that was the editing

25   process that resulted in the master edited tape.

Vicente - direct - Lesko                 683

1            Who participated in that process?

2    A    I recall Adrian participated in some of it.  I don't

3    recall exactly, you know, who was doing everything.  I know

4    Adrian was involved in some of it.  I think some of the other

5    members, like Ken Kozak, was involved in some of it.  The

6    exact -- like who was doing what process on what machine,

7    that, I don't recall very clearly.

8    Q    Did you give them direction in terms of what to do?

9    A    Yes.  There was a certain amount of experimentation and

10   then we decided on a basic game plan and then the idea was

11   just do -- do one of, you know, these number of different

12   things to make it look as natural as possible.

13   Q    And so on the completion of step 1, you move to step 2,

14   which was the copying -- multiple copying dubbing of the

15   tape -- the edited tape?

16   A    When you say "the step before" you mean the actual

17   editing and then moving to dubbing --

18   Q    Right.  You're editing is step 1 --

19   A    Yes.

20   Q    -- copying/dubbing is step 2.

21   A    Yes.

22   Q    Who participated in the copying/dubbing step 2 part of

23   the process?

24   A    I don't recall exactly.

25   Q    Okay.  Were there people at Apropos that were part of

Vicente - direct - Lesko                          684

1   that process?

2   A      Yes.  Yes.

3   Q      What part of the process, if any, was Chris involved

4   with?

5   A      Chris was involved with the schedule, making sure that

6   things were moving, and, you know, there were requests I was

7   making, you know, which is, in essence, where are things at

8   and, you know, I would like to get these machines, you know,

9   like, out of here because they were just sitting around for a

10  long time.  Scheduling, pretty much, and overseeing and making

11  sure that the team was doing the things that they were tasked

12  to.

13  Q      Do you ever recall actually watching the videotapes that

14  were being edited?

15  A      I recall watching some of the glitched portions.  I don't

16  believe that I watched the entire thing.  I was focused more

17  on, like, what kind of glitches would be used where.

18                (Continued on the following page.)

19

20

21

22

23

24

25

*Vicente - Direct/Mr. Lesko*                    **685**

1    EXAMINATION BY

2    MR. LESKO:

3    (Continuing.)

4    Q    You mentioned the time coding in the digital format is

5    another term for that, or is that sometimes called metadata?

6    A    Yes.  Metadata is a general term for the information that

7    is not visual about the material.  That's a general term.

8    Time code is a kind of metadata.  It's something you don't

9    see, but it's embedded in the material.

10   Q    So just so I understand.  The end result of step one, the

11   editing process, would have resulted or resulted in the

12   removal of portions of the original videotape; correct?

13   A    Correct.

14   Q    Other alterations of the videotape; correct?

15   A    Yes.

16            MR. AGNIFILO:  Your Honor, I'm going to object.

17            THE COURT:  Restate the question.

18   Q    So what was the end result of the editing part of the

19   process, step one?

20   A    The end result was some kind of master tape that could

21   then be copied.  And then, finally, you know, those

22   copies -- a final copy would be delivered back to Legal.

23   Q    And was the metadata or the time stamp information

24   removed as well?

25   A    It was removed in the process.  In the process from

*Vicente - Direct/Mr. Lesko*                    **686**

1    moving from digital to what I term the "analog world" of VHS

2    that information gets removed.

3    Q    Any members of the NXIVM community that I haven't named

4    participate in the copying or dubbing part of this process?

5    A    We haven't named any.  There was some quality control

6    that we there was a final check.  Once we had the master,

7    somebody had to evaluate everything was done according to

8    spec.  Specs means if you look at the sheet of paper, did this

9    tape that got produced match what was requested.  So that

10   quality control was done by Danny and Lisa Durst.

11   Q    Do you recall Clare Bronfman's specific role in the

12   editing of the videotapes?

13   A    My understanding was she was part of the legal team at

14   that point.  I don't know if she was involved in the actual

15   editing.  She was part of the legal team and was aware,

16   reading those e-mails, aware of what was going on.

17   Q    We can read those e-mails, your Honor, if I can show the

18   witness?

19        THE COURT:  Hold on.  Okay.

20   Q    Mr. Vicente, I'm going to show you for identification

21   purposes what's been marked as Government's 1396R?

22   A    Yes.

23   Q    Do you see that whole document?

24   A    I do.

25   Q    Do you recognize it?

1    A    I do, yes.

2    Q    What is that document?

3    A    It was sent by Chris to Nancy Salzman.  Clare Bronfman

4    was CC'd, I was CC'd, and Kristin Keeffe was CC'd and was

5    confirming the request.

6    Q    In the e-mail?

7    A    Yes, that's the e-mail.

8    Q    Do you recall receiving that e-mail?

9    A    Yes.

10            MR. LESKO:  Your Honor, we move Government's 1396R.

11            MR. AGNIFILO:  No objection.

12            THE COURT:  Government's 1396R is received in

13   evidence and you may publish it to the jury.

14            (Government's Exhibit 1396R was received in

15   evidence as of this date.)

16   Q    So that e-mail is from Chris?

17   A    Correct.

18   Q    To Nancy Salzman?

19   A    Directly to Nancy Salzman and then myself, Kristin

20   Keeffe, and Clare Bronfman are CC'd.

21   Q    Now, in the first sentence, you say, "Here is my

22   understanding of the request for the tapes of the 16-day

23   Intensive that Kristin would like for legal."

24            So the tapes were of a 16-day Intensive?

25   A    Yes, it was.  And I believe it was an example of an

*Vicente - Direct/Mr. Lesko*                    **688**

Intensive.  I think that was the thing that was being

requested was, you know, a 16-day Intensive on the tape.  And

there were claims in that Intensive that had to be removed.

Q     Okay.  And the e-mail was sent on June 21, 2008?

A     Correct.

Q     It indicates when it's needed by?

A     It's indicated that it's needed by Wednesday, June 25th.

Q     Under item two.  Item two mentions, edit one and edit two

stations.

        Do you know what that means?

A     Yes, there were two editing systems in 13 Twilight Drive

in the editing rooms.  There were two unique desks with

computers and monitors and that kind of thing and video

editing systems, in essence.

Q     Item three indicates that we will have, well, we will

have two people in there reviewing the tapes, end quote.

        Is that the quality control process that you

described?

A     I'm not certain if that was quality control or original

review, actually.

Q     And then item three goes on to state, quote "Either one

or two people helping to edit (probably me and someone else

ideally Megan if she can do it)."

        This e-mail is from Kristin.  So you recall that

Kristin had a role in the initial editing of the videotapes?

1  A    I don't recall.  I do know that she was helping me manage

2  it, but I don't remember if she had an actual role in editing.

3  Q    And Megan is Megan Mumford?

4  A    Correct.

5  Q    Item four discusses purchasing a new VCR; is that right?

6  A    Correct.  Actually, in the end, many more were needed.

7  Q    And then the last part deals with when to start the

8  project; correct?

9  A    Correct.

10        MR. LESKO:  Your Honor, if we could publish this

11  just to Mr. Vicente.

12        THE COURT:  Go ahead.

13  Q    I'm showing you what's been marked for identification as

14  Government's 1397R.

15        Do you recall that document?

16  A    Are you able to go wider?

17  Q    Wider?  Sure.

18  A    Yes, I do.

19  Q    And what is that document?

20  A    That is a memo that I wrote, looks like, June 30, 2008.

21  I do not recall if I e-mailed it or if I printed and hand

22  delivered, but that's a memo I wrote to the team.

23  Q    Either way, this memo was distributed to the team?

24  A    Yes.

25  Q    All right.  Was it in that timeframe of June 2008?

1    A    Correct.

2    Q    Okay.  And this is the actual memo that you drafted and

3    distributed to your team?

4    A    Correct.

5              MR. LESKO:  Your Honor, we move

6    Government Exhibit 1397R.

7              MR. AGNIFILO:  No objection.

8              THE COURT:  Government Exhibit 1397R is received in

9    evidence and published to the jury.

10             (Government's Exhibit 1397R was received in

11   evidence as of this date.)

12   Q    What was the title of this memo?

13   A    "The project That Never Seemed to End."

14   Q    Why did you use that title?

15   A    I had a low tolerance for things that started, that just

16   kept on going, and didn't have an end date.  And things were

17   lying around.  I recall a lot of machines lying around and I

18   wanted it wrapped up.

19   Q    So you -- the header indicates that this memo has to dos.

20             What did you mean by that?

21   A    My understanding is things that needed to happen and I

22   wanted to, you know, my style was to do a series of bullet

23   points of all the things that needed to be done to make sure

24   that things didn't, you know, fall through the cracks.  So

25   that's what I meant by to dos, all the different things that

*Vicente - Direct/Mr. Lesko*                    691

1   needed to be done to finish.

2   Q    Did you include to dos for Monday June 30, 2008?

3   A    Yes.

4   Q    What were they?

5   A    So new machines that were purchased need to be placed in

6   the small production office on the long way table which I'd

7   like moved there.  We will be making VHS and mini-DVD clones

8   which I would like moved in there temporarily.  We will be

9   making VHS and mini-DVD clones over the next week.

10  Q    You don't have to read the whole thing.  You can

11  summarize for us.

12  A    Basically, where the items were to be placed.  And also

13  that they were loaned TVs and VCRs that needed to be returned

14  to their owners.  And also, the next item was the legal team

15  needs to remove things from the house.  In other words, the

16  house had a great many -- the editing rooms had a great many

17  things in them already and I wanted to make sure that the

18  things that we didn't need were removed.

19  Q    And just to move quickly, the next couple items involve

20  house cleaning and Fluffy or Ken provided the bins and tool

21  boxes and the petty crash; correct?

22  A    Correct.

23  Q    And the next category of to dos involved Monday or

24  Tuesday; is that right?

25  A    Yes.

1   Q    Okay.  And why don't you briefly summarize what those to

2   dos were?

3   A    Yes.  It was basically the idea was to have a meeting

4   just to debrief on everything and what still needed to happen.

5   And I have an item, the list of things to discuss.

6   Q    So what was the first, I will point it out.  What was the

7   first item to discuss at this debrief meeting?

8   A    It says, "The duplication of tapes Keith has asked me

9   for."  Then it says, "The aging and weathering of the

10  masters."  "Everyone signing nondisclosure agreements for this

11  project."  "Everyone submitting their hours."  And "discuss

12  what to do with all the purchased equipment."

13  Q    All right.  Is there a to-do list for Friday?

14  A    Yes.  The final to-do list was putting all the purchased

15  VCRs in their boxes with all the things that came with it.

16            THE COURT:  What was the purpose of that?

17            THE WITNESS:  Just to put it away but rather than,

18  you know, in a jumble the way we got it, just put it back

19  somewhere that way.  My team had a habit of dumping things

20  everywhere.

21            MR. LESKO:  Your Honor, if we could just publish to

22  the witness for the next one.

23            THE COURT:  Okay.

24            MR. LESKO:  Thank you.

25  Q    I'm going to show you, Mr. Vicente, what's been marked as

1    Government's Exhibit 1395R for identification.

2            Do you recognize that exhibit?

3    A    Yes.  This is an e-mail from -- it's a response to an

4    e-mail from myself.  I sent an e-mail July 12, 2008, to Ken

5    and Fluff asking for a timeline on completion.  And this

6    e-mail above so Ken Kozak's response for my request for a

7    timeline.

8    Q    And Fluff is Adrian?

9    A    Correct.

10   Q    And the response from Ken Kozak is also dated July 12,

11   2008?

12   A    I can't see.  Yes.

13   Q    And who is CC'd on that response?

14   A    Adrian is CC'd, Chris is CC'd, and Dan Brotman is CC'd.

15           MR. LESKO:  Your Honor, if I could just have a

16   moment?

17           Could I have a moment to show Mr. Agnifilo something

18   very briefly.

19           THE COURT:  Sure.

20           (A brief pause in the proceedings was held.)

21           MR. AGNIFILO:  Can we have a quick sidebar.

22           (Continued on the next page.)

23

24

25

1    (Sidebar conference held on the record in the

2  presence of the Court and counsel, out of the hearing of the

3  jury.)

4    MR. AGNIFILO:  Is, Judge, I'm concerned these

5  exhibits pursuant to the Court's ruling is Kristin is blacked

6  out.  The true name of the person we are talking about is

7  Kristin is blacked out.  I don't know that there's going to be

8  evidence at this trial that Kristin is a sex trafficking

9  victim, but the jury now thinks that Kristin is a sex

10  trafficking victim which is bad, and it's even worse that

11  she's a sex trafficking victim in 2008 because of the

12  racketeering charge and the RICO conspiracy charge.

13    So the jury now knows that Kristin, just by virtue

14  of the fact that her true name is blacked out and Kristin is

15  put in there is a sex trafficking victim based on no evidence

16  at this trial, and that it's going to tie it, in my opinion,

17  to disparate parts of this case together in what seems to be a

18  RICO enterprise.

19    So I'm concerned that the ongoing prejudice of this

20  system that has been imposed on me is continuing to render

21  prejudicial fruits.

22

23    MR. LESKO:  Your Honor, Crystal Brooks was a second

24  line slave in DAS, she was branded.  And therefore we believe

25  qualifies as a -- clearly as a victim in this case.

*Sidebar*                                                              *695*

1           I would also note that there aren't two parts in

2    this case.  It's one enterprise.  DAS is part of that

3    enterprise, but we do not agree with the contention that there

4    were sort of two parts of the case one involving DAS and one

5    not involving DAS.  And but regardless Ms. Brooks was clearly

6    a victim as we've defined that.

7           MR. AGNIFILO:  Is there going to be evidence at this

8    trial of that?

9           MS. PENZA:  Your Honor, Mr. Agnifilo keeps trying to

10   make your ruling about sex trafficking and that was not your

11   Honor's ruling as to victims in this case.  Here the

12   Government believes that there is going to be humiliating

13   evidence about Ms. Brooks who may be a testifying witness in

14   this case; and so, it's totally appropriate to black out her

15   name and your Honor has already instructed the jury that

16   they're not to draw any conclusions from that.

17          THE COURT:  I'm going to allow it and you have your

18   exception if that's what it is.  Your continuing exception.

19          MR. AGNIFILO:  Yes.

20          THE COURT:  I haven't forgotten it, it's only been

21   two days.  And, you know, at least for the time being I do

22   remember two days before the event.

23          MR. AGNIFILO:  I understand the added component is

24   that I do believe there's a prejudicial aspect to the RICO and

25   the RICO conspiracy.

*Sidebar*                                                      *696*

1           THE COURT:  I see.  All right.  Well, you know,

2      there's more to come and we'll see where we are at the end of

3      the process.

4               Thank you.

5               MR. AGNIFILO:  Thank you, Judge.

6               (Sidebar discussion concludes.)

7               (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court.)

 2          THE COURT:  All right.  You may continue.

 3          For the witness only.

 4          MR. LESKO:  For the witness only.

 5   EXAMINATION BY

 6   MR. LESKO:

 7   (Continuing.)

 8   Q    Do you recognize those two e-mails, the ones you sent and

 9   the one sent in reply?

10   A    I do, yes.

11          MR. LESKO:  Your Honor, we'd offer

12   Government's 1395R.

13          MR. AGNIFILO:  Other than my remarks at sidebar, I

14   have no objection.

15          THE COURT:  I understand.  Government Exhibit 1395R

16   is received in evidence.

17          (Government's Exhibit 1395R was received in

18   evidence as of this date.)

19   Q    Okay.  Let's start with the e-mail you sent.

20   A    Yes.

21   Q    I don't think we have to read the whole thing, but

22   essentially are you asking for a timeline or a schedule for

23   when the project would be completed?

24   A    I am, yes.

25   Q    And are you also asking for a date when the bins would be

*Vicente - Direct/Mr. Lesko*                    **698**

1  received and where the bins would be obtained from?

2  A    Correct.

3  Q    And you want your basement cleaned?

4  A    Yes.

5  Q    Okay.  All right.  So the e-mail in response sent on

6  July 12, 2008, does it indicate -- does it address the issue

7  of timing?

8  A    Yes.  The response is there have been delays, and then a

9  projection of when it would be completed.

10 Q    Okay.  And in the second sentence, Mr. Kozak uses the

11 term "copies."  Does that reflect the second step we've

12 discussed, the dubbing, copying part of the process?

13              THE COURT:  I'm sorry.

14              MR. LESKO:  Withdrawn.

15 Q    Would the copies be the result of the second step of the

16 process, the dubbing and copying process?

17 A    Let me just read for a second.  I believe so.

18              THE COURT:  I'm sorry, Mr. Lesko, I haven't turned

19 on the monitors on the first part of it so do you want to go

20 over that?

21              MR. LESKO:  The bottom part.

22              THE COURT:  The bottom part that you showed first.

23 Just for the jury's benefit.

24              MR. LESKO:  Okay.  Sure.

25 Q    The bottom part is the e-mail that you sent, Mr. Vicente?

*Vicente - Direct/Mr. Lesko*                                699

1   A    Correct.

2   Q    And there you're basically asking for an estimate in

3   terms of timeline?

4   A    Correct.

5   Q    Okay.  Timeline for the project, timeline for the bins,

6   timeline to get your basement cleaned?

7   A    Correct.

8   Q    And discussing Mr. Kozak's response and the first

9   paragraph deals with when he estimates the copies would be

10  done; is that correct?

11  A    That's correct, yes.

12  Q    It indicates what does he say about when the copies would

13  be done?

14  A    As of later tonight, he said, so that would have been

15  July the 12th, the VHS copies will have been made and that he

16  says because of some other things that need to occur and the

17  machines that are not available including P's reviewing of

18  tapes is in reference to Nancy Salzman.  Her nickname was P.

19  Q    Why was her nickname P?

20  A    It was short for Prefect.  It was an affectionate term.

21  So based on that, it looks like he says he will have a

22  completed the next night.

23  Q    Okay.  And I don't know if we need to go into them in

24  detail, but the second paragraph deals with the bins and the

25  third paragraph deals with?

*Vicente - Direct/Mr. Lesko*                    700

1  A    The basement.

2  Q    Cleaning the basement?

3  A    Yes.

4  Q    Do you have an understanding as to who at NXIVM would

5  have authorized the purchase of the VHS machines that were

6  used in the copying process?

7  A    At that time, the two people authorizing those kinds of

8  things would have been Clare Bronfman and Nancy Salzman.  I

9  don't recall which one but they were the people that were

10 authorizing purchases at that point.

11 Q    Did that responsibility change from Clare Bronfman

12 to -- from Nancy Salzman to Clare Bronfman at some point in

13 time?

14 A    It did.  In the last few years that I was there, Clare

15 Bronfman was the only person that was approving purchases.

16 Q    So along with editing and removing parts of the

17 videotapes and other alterations to the videotapes, did your

18 team do anything to the exterior of the videotapes?

19 A    There was what I term the "aging process."  I don't

20 recall if it was, you know, the video team or legal or a

21 combination of both, but the there was a process whereby the

22 labels were aged and the actual cassettes were aged as well.

23 That would have consisted of scuffing, using sandpaper and

24 rocks and that kind of thing to age them further.  I don't

25 recall the exact nature of the aging of the labels.  In other

*Vicente - Direct/Mr. Lesko*          701

1    words, I don't recall the exact method we used to age the

2    labels.

3              THE COURT:  What is aged with the sandpaper.

4              THE WITNESS:  The actual cassettes, the plastic

5    cases, were to make to look like it had been jiggled around

6    for a long time, that kind of thing.

7    Q    So was that to make them look older than they actually

8    were?

9    A    Correct.

10   Q    And the same with the label?

11   A    Correct.

12   Q    So was the entire process completed at some point in

13   time?

14   A    I believe it was.  I don't have an exact recollection,

15   but I do recall at a certain point that there was a box of the

16   completed tapes that was handed off to Legal.  And by Legal I

17   mean this department.

18   Q    And was it your understanding that the altered videotapes

19   were produced in the case?

20   A    Much later, yes.  I don't think that I knew much more at

21   that point much later I found out, yes.

22   Q    Did you have discussions with the defendant about the

23   status of the videotape editing project?

24   A    I don't recall if I had an exact conversation like that.

25   Generally, in our process, I would, you know, I would report

1    on everything.  So I can only assume that I would have

2    reported.

3              MR. AGNIFILO:  I object.

4              THE COURT:  Sustained.

5    Q    In your experience with the defendant, when he asked you

6    to perform a task or complete a project, would he check on the

7    status of that project?

8    A    He was extremely precise about checking.

9    Q    Would that happen often?

10   A    Yes.

11   Q    And would he check on the status of the project until it

12   was completed?

13   A    He would.  Or even if it wasn't completed, whatever it

14   was he would keep checking.

15   Q    So when you agreed to alter the videotapes, which you

16   said was illegal.

17   A    Yes.

18   Q    Why did you do that, why did you agree to illegally alter

19   the videotapes?

20   A    I think it was to get his approval, to curry favor.  He

21   was a --you know, there were a bunch of terms on this like,

22   you know, Big Dog, that kind of thing.  Somebody you

23   respected.  I guess for approval.

24   Q    Let's go back over the types of edits that were done to

25   the videotapes.

1      And were the glitches or edits placed only in

2  connection with the portions that were removed or were

3  they -- were there glitches placed throughout the various

4  videotapes?

5  A    No, they were placed throughout the videotapes,

6  obviously, on the sections removed but then in other places to

7  strategically suggest, you know, some kind of general tape

8  problem.  We would put them at random intervals at different

9  places so it would like more natural.

10 Q    And the types of glitches that you manufactured, would

11 they have happened just in the normal course of transferring a

12 video from, say, DVD to VHS, just normally?

13 A    Perhaps at the very beginning or at the very end of a

14 transfer.  They wouldn't happen in the middle in the fashion

15 that we created.

16 Q    Why not?

17 A    Because there would be no signal loss, really, unless

18 there was a power failure of some kind and somebody had

19 restarted everything.  Once something starts, there is a

20 fairly consistent pattern.  It's usually when you start the

21 thing that there's usually a glitch of some kind or when you

22 end it.  But it tends to be the rest of the middle tends to be

23 more uniform.

24 Q    So some maybe all of us have experienced this, but if

25 there is a glitch resulting from a signal loss, it would be

1  like a little line or a line wavy.  It would continue

2  throughout the entire videotape?

3  A    So, for instance, if there was a large magnet near a

4  machine, you know, you'd see this like a bunch of interference

5  but it's consistent drops, it keeps on going throughout.

6            THE COURT:  Now, just remind here.  These recordings

7  were made on DVDs originally?

8            THE WITNESS:  Originally, I believe, they were made

9  on it was like Hi8 or mini-DVD originally.

10           THE COURT:  And so, you were transferring the sound

11  and images from DVD to VHS?

12           THE WITNESS:  Correct.  Or into an editing system

13  and then they would go to VHS.

14           THE COURT:  All right.

15  Q    So is it fair to say that there were four types of edits

16  that were used for these videotapes?

17  A    Yes.

18  Q    Okay.  Was one type something that you would call a

19  "static cut-in"?

20  A    Yes.  What you would do is you would -- the tape would

21  move from, you know, it's the tape world into the computer

22  world.  And, in essence, what you would do is you would remove

23  the section that had to be removed and in its case place you

24  would put static, a static signal, which generates on the

25  computer quite easily or copy static from some other tape and

*Vicente - Direct/Mr. Lesko*                    **705**

1   insert it in there.  That was generally one method.  We would

2   do other things as well, but sometimes it was just play, play,

3   play, suddenly static, and then it would start playing again,

4   and there was something missing in the middle.

5   Q    Was the second type of edit something called

6   "intermittent signal"?

7   A    Yes.  That was done machine to machine.  So, in essence,

8   you'd have two machines and you'd have, you know, you would

9   use the cable that have what are we 3 B and C connecters.   Red

10  and white for sound, yellow for video.  And what would happen

11  is you would play from one to the other and you would, in

12  essence, jiggle if you jiggled the video cables a bit or a lot

13  just sometimes even pull them out or put them back in, you

14  would get all kinds of, not artifacts, but you'd have glitches

15  that would occur, things would go black and come in out, and

16  that was another kind of glitch that we would create.

17  Q    Was a it third type of edit called a "straight cut"?

18  A    Yes.  In that case, we would play from one machine and

19  record on another.  So let's say this machine is playing, this

20  machine is recording, you'd look at the notes, and once it got

21  to that point you'd suddenly lid press pause on this machine,

22  this would keeping playing the offending section, and you

23  would unpause, and there would be a little glitch and it would

24  continue.  This was another method.

25  Q    The was a fourth, another form of straight cut?

*Vicente - Direct/Mr. Lesko*                706

1   A    That was, again, machine to machine.  But, in that case,

2   instead of pausing on this machine, you may actually stop the

3   machine and then keep this playing and then you would start

4   recording this machine again.  What that would do is, you

5   know, on those machines once you hit record it took, like, a

6   few seconds to sort of find the signal.  Then there were call

7   kinds of patterns that would occur until it stabilized.  So

8   that was more aggressive cut than the prior cut.

9   Q    So why don't we use this for shorthand.  There are four

10  methods.

11       Method one we'll call the "static method."  Method

12  two, we'll call the "jiggle method," okay with the cords.

13  Method three, we'll call the "pause cut" because it's a pause.

14  And method four, why don't we call it a "stop cut"?

15  A    Sure.

16  Q    For stop, okay?

17  A    Understood.

18  Q    Now one and two, the static and jiggle methods, could

19  they be done together?

20  A    Yes.  The idea was to introduce it, put the static in

21  there and also to put an additional problem in there, in that

22  case, we could do what I call the jiggling so it would hide

23  the static.  The issue with the static was it was a very clean

24  cut.  So if you jiggled, it would look messier and more

25  organic or more natural.

1   Q    Just generally, why would you use the jiggle method?

2   A    To suggest that there was some kind of issue with the

3   tape.  It wasn't, like, really a hard science it was just to

4   suggest because those kinds of things potentially could

5   happen, you know, perhaps in the training room.  So it was

6   just an idea that we came up with because it would create

7   intermittent signal loss and just it would hide some things.

8   Q    And do you recall these four types of edits being done to

9   the videos in 2008 being altered?

10  A    I do.

11  Q    Okay.  Now, I want to refer you to Government's Exhibit

12  605-A, B, C, and D.

13         You've reviewed short portions of videotapes that

14  include these four types of edits haven't you?

15  A    I have, yes.

16  Q    Okay.  And do they reflect in combination the four types

17  of edits that you just described?

18  A    I believe they do, yes.

19  Q    Okay.  And do you -- you testified that you didn't

20  actually watch the videotapes at the time in 2008?

21  A    Not the entirety.  I was more focused on the actual areas

22  that needed to be removed.

23  Q    Can you say that the four videos that you watched that

24  they were, in fact, the actual videotapes that were edited in

25  2008?

1   A    I believe they are.  They seem very consistent with the

2   methods I'm describing.  I don't recall the content of all the

3   tapes.  I know they were Intensives, but it seems very

4   consistent.

5          MR. LESKO:  Your Honor, we seek to admit

6   government's 605-A, B, C, D subject to connection.

7          THE COURT:  Subject to connection.

8          MR. AGNIFILO:  Can I have a minute to think about

9   something?

10          (A brief pause in the proceedings was held.)

11          MR. AGNIFILO:  Your Honor, could I have a brief voir

12   dire?

13          THE COURT:  Sure.

14          MR. AGNIFILO:  Thank you.

15   VOIR DIRE EXAMINATION

16   BY MR. AGNIFILO:

17   Q    Mr. Vicente, my name is Mark Agnifilo, I'm Keith

18   Raniere's lawyer.

19          The videotapes that you watched that the Government

20   is now seeking to admit in evidence, can you tell if the edits

21   were intentionally done on those videotapes?

22   A    Intentionally done?  They're done in areas where cuts

23   normally wouldn't occur.  In other words, generally speaking,

24   Intensives, once a person got to the end of a topic, the

25   trainer, somebody would cut the camera and then it would start

1  again as they got back in front to teach the class.  And these

2  were generally not at those times.  These were more when

3  people were talking they continued talking.

4  Q    But there's nothing about the edit itself that would lead

5  you to conclude that this was an intentional change to a

6  recording or an inadvertent something else to a recording.  Is

7  that fair to say?

8  A    The only thing that's -- it's inconsistent with what

9  would normally happen in an Intensive.  But because I don't

10 know what was specifically removed I couldn't say, oh, I know

11 that these words were removed or this sentence.  I can't tell

12 you that.

13 Q    And you don't know because you didn't -- you never looked

14 at the tapes that were allegedly altered at the time; correct?

15 A    I looked at them generally because I had to determine,

16 you know, what kind of sort of effects we would use.  But I

17 don't recall the exact, I mean, they were 16-day Intensive

18 tapes I believe.  I don't recall the exact Intensive, I don't

19 believe I was there when it happened.

20 Q    Do you know what year these Intensives were from?

21 A    I don't recall.

22 Q    Do you know what the subjects were that were being

23 discussed?

24 A    Well, it was the 16-day Intensive, so it was the

25 basically the content of the 16-day Intensive.  So it's, you

1  know, a huge, huge body of which it's actually all written

2  somewhere so it's easy to compare.

3  Q    And you have no specific recollection, you don't know

4  what tapes were altered at the end of the day through the

5  process you described this afternoon?

6  A    Specifically, no.  Not all these years later I can't say

7  with absolute certainty.

8          MR. AGNIFILO:  Your Honor, I object.

9          MR. LESKO:  Your Honor can we have a sidebar,

10  please?

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                        711

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4          MR. AGNIFILO:  I'm not trying to undo the to subject

5   to connection part.  My concern is even if a NXIVM

6   representative comes and says these were -- these are the

7   tapes that we gave over in discovery, he's still not able to

8   link those tapes that were given in discovery to anything that

9   he did.

10         MR. LESKO:  I think these arguments go to weight,

11  honestly.  The issue the witness is going to testify that the

12  glitches or edits that are reflected on the four exhibits are

13  the types of edits that he instructed his team to do with

14  respect to the edited videotapes.

15         You heard voir dire so you heard the answers in

16  terms of his personal knowledge of what was contained on the

17  videotapes, but I don't -- the other point I'll make is we're

18  talking about the admissibility now of the videotapes subject

19  to connection.  Just from an efficiency standpoint, these

20  videotapes are going to be admitted into evidence because

21  we're going to have a witness come, or a custodian or

22  something, and it may end up being a stipulation that the

23  videotapes themselves will come into evidence.  So we're going

24  to be in a position where I'm just going to have to recall

25  Mr. Vicente and ask him to offer this testimony.

*Sidebar*                                                712

1         MR. AGNIFILO:  See, my perspective is that it's not.

2    The problem of whether this was turned over in the lawsuit

3    because the first thing he said was it was related to a patent

4    and the lawsuit has nothing -- you agree the lawsuit has

5    nothing to do with patent.  So we don't know that he's talking

6    about these same videotapes because he's unable to say that

7    these videotapes that he saw them.  He doesn't know what the

8    videotapes are; in fact, that he might have altered videotapes

9    that were not turned over in the lawsuit.  There is no linkage

10   between what he did and the lawsuit.

11        MR. LESKO:  Your Honor, the dates, the linkage, and

12   he did testify that the papers were produced in a lawsuit.  It

13   doesn't -- all that's required is the tapes be produced in an

14   official proceeding; and so, he can specifically testify that

15   the tapes were produced in a lawsuit.

16        MR. AGNIFILO:  He said he learned that later.  He

17   learned that later.

18        MR. LESKO:  To be precise, he said "case," and then

19   he said he thought it was a case involving a patent and he

20   said specifically the later he learned it was a lawsuit.

21        MR. AGNIFILO:  So what he understood was that was in

22   relation to a patent ways in the the lawsuit.

23        MR. LESKO:  Your Honor if I could add just one small

24   point.  When he reviews the videotapes, he will say this:  The

25   edits that are included in those exhibits are exactly the same

1  type of edits that they -- that were done to the videotapes in

2  question in 2008.  I will say that these types of edits that

3  are reflected in the exhibits that are not naturally occurring

4  edits.  And maybe that's the follow-up question because these

5  edits would not have occurred as a result of a natural process

6  as a result of a power surge or something to that effect.  And

7  maybe I can add some foundational questions.

8            THE COURT:  See what you can do.

9            MR. LESKO:  Okay.

10            (Sidebar discussion concludes.)

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Vicente - Direct/Mr. Lesko*                714

1          (In open court.)

2          MR. LESKO:  May I proceed, your Honor?

3          THE COURT:  Yes, you may.

4          MR. LESKO:  Thank you.

5    EXAMINATION BY

6    MR. LESKO:

7    (Continuing.)

8    Q    So, Mr. Vicente, you described the four types of edits

9    we've gone through that were used in connection with the

10   videotapes in 2008.  And you've reviewed the exhibits that we

11   just discussed.  Were those exact types of edits those the

12   four that we described were those reflected on those portions

13   of videotapes that you watched?

14   A    They were.

15   Q    And do you recall that those specific types of edits were

16   actually the ones done it the videotapes back in 2008?

17   A    I do.

18   Q    And would those types of edits that are reflected on the

19   exhibits, would they have occurred naturally?  In other words,

20   would those types of glitches have occurred naturally on those

21   videotapes?

22   A    I don't believe so.  As I said, it would be at the start

23   or the stop of somebody pressing a camera.  But that's a

24   different effect.

25   Q    And I believe you also said, and you can correct me if

*Vicente - Direct/Mr. Lesko*                    715

1    I'm wrong, that it would be would be consistent throughout the

2    videotape if it was as a result of a natural occurrence?

3    A    I believe so, yes.

4    Q    Are the glitches that are reflected in the exhibits that

5    we're talking about, are they consistent throughout the

6    videotapes or are they --

7    A    They're not.  They're intermittent.

8    Q    And did you believe that those are the types of edits

9    that you and your team added to the altered videotapes?

10   A    I do.

11   Q    Okay.

12        MR. LESKO:  Again, your Honor, we offer the Exhibit

13   605-A, B, C and D subject to connection.

14        THE COURT:  I overrule the objection and the

15   videotapes are admitted subject to connection.  In other

16   words, that there will be a witness who will authenticate

17   these videotapes, the authenticity of the videotapes.  And

18   whether or not they should be considered by the jury during

19   your deliberations is not if the Court determines that they

20   should not be the Court will advise the jury.

21        So, otherwise, and until such time the videotapes

22   are admitted in evidence, add least as demonstrative of the

23   processes that are being testified to by the witness, but you

24   will be advised if for any reason the videotapes and the

25   testimony as to those tapes should not be considered by the

*Vicente - Direct/Mr. Lesko*                716

1    jury.

2              (Government's Exhibits 605-A, B, C, and D were

3    received in evidence as of this date.)

4              MR. LESKO:  Thank you, your Honor.  May we publish

5    beginning with Government's Exhibit 605-C?

6              THE COURT:  Yes, you may.

7              MR. LESKO:  I think we're going to play the video in

8    the courtroom.  If you could pull up 605-C and if you could go

9    to just maybe ten seconds before 26:35.

10             Actually, could we stop for one second.

11             Your Honor, would there be a way to dim the lights

12   in the courtroom just so...

13             (A brief pause in the proceedings was held.)

14             MR. LESKO:  Your Honor, we seem to be having some

15   technical issues, and given that it's very close to being

16   done, would it make sense to possibly leave a couple minutes

17   earlier today.  I don't want to get people's hopes up, sorry.

18             THE COURT:  Do you want to go forward?

19             MR. LESKO:  Yes.  Yes.  I think might as well make

20   use of the time.

21             THE COURT:  All right.

22             (Video file played in open court.)

23             (Video file concludes.)

24             MR. LESKO:  If you could pause that.  Keep going I'm

25   sorry.

1                    (Video file played in open court.)

2                    (Video file concludes.)

3             MR. LESKO:  If we could stop it.

4   EXAMINATION BY

5   MR. LESKO:

6   (Continuing.)

7   Q    Do you recognize some of those, or do you need to replay

8   it?

9   A    There was a pause before some kind of effect.  I need to

10  see it again.

11  Q    Let's go back to 26:30.

12                   (Video file played in open court.)

13                   (Video file concludes.)

14            MR. LESKO:  Okay.  We can stop it.

15  Q    So what does that excerpt reflect?

16  A    That there's no interruption in the actual dialogue, so

17  my belief is that that's an example of the jiggling of

18  probably only the yellow cable because you don't really hear

19  the sound cut out.  It seems to stay uniform and there doesn't

20  seem to be any time missing.  So my belief it would be the

21  second example or what I think we termed "cable jiggling."

22  Q    Okay.  If we could go forward to 27:30.

23                   (Video file played in open court.)

24                   (Video file concludes.)

25            MR. LESKO:  Okay.  We could stop.

*Vicente - Direct/Mr. Lesko*                     718

1   A    So it's an example of a few things.  The first example is

2   the cable jiggling.  Then there appears to be an insert, the

3   method one, static insert.  And then there appears to be some

4   additional cable jiggling at the -- towards the end of the

5   static insert to try and hide the static cut point.  That's

6   two methods.

7   Q    Thank you.  Let's now, turn to Government's Exhibit

8   605-D.  And if we could start at 12 minutes 30 seconds.

9              (Video file played in open court.)

10             (Video file concludes.)

11  A    There appeared to be actually three things going on

12  there.  The one is jiggling, static insert, and then there

13  appears to be the type three cut where it looks like the

14  second machine is paused and then unpaused because there's a

15  sudden change in time.  There's missing time in there.  There

16  appears to be one of those pause/unpause things on the

17  recording machine.

18  Q    That's type one, type two, and type three?

19  A    There appears to be, yes.

20  Q    If we could forward to 26:40.

21             (Video file played in open court.)

22             (Video file concludes.)

23  Q    Okay.  What was that?

24  A    That appears to be type three.  It appears to be the

25  pause/unpause.  You can see there's time missing in there.

1   Q     That's the pause cut?

2   A     Yeah.

3   Q     Okay.  If we could forward to 27:10.

4               (Video file played in open court.)

5               (Video file concludes.)

6   Q     Okay.  You could explain?

7   A     There was some what we call jiggling, static insert, but

8   also the type four where you actually stop the recording

9   machine and then begin recording again because you can see it

10  takes some time.  There was actually this field that seems to

11  go down until it resolves.  That's the actual machine trying

12  to get a stable signal that happens with VHS.  So that's how I

13  believe it's because it was actually stopped and then the

14  recording started again.

15  Q     Thank you.  If we could now turn to Government's Exhibit

16  605-A.  And if we could go to 30 minutes and 25 seconds.

17  Right, this is the one with the problem.  Let's go to

18  Government's Exhibit 605-B and if we could turn to 1 minute

19  and 45 seconds.

20              (Video file played in open court.)

21              (Video file concludes.)

22  Q     Okay.  What is that?

23  A     It is possible that something was done much later but it

24  appears to be an in-camera cut where the video camera is

25  actually stopped and then starts recording again.  And the

1    reason I also say that is because you look at the -- in every

2    cut, there's an A side and a B side.  So if you look at the

3    cut, it's like somebody pressed the button on the camera, then

4    they began recording again and that there's a jiggle that you

5    see in the frame which is usually when the person releases the

6    button, and when you release that button with a small camera,

7    every time you release the button it shakes.  If you notice on

8    the B side the camera image, it actually shakes.

9              This likely happened at the time.  It's not

10   impossible that it wasn't an additional thing wasn't done,

11   that is possible.  But my first though is I think this was

12   done at the time.

13             THE COURT:  At the time of the actual recording?

14             THE WITNESS:  At the time of the actual recording.

15             THE COURT:  All right.

16             MR. LESKO:  Okay.  Your Honor, I think it's probably

17   a good time to end for today?

18             THE COURT:  All right.  Members of the jury, we're

19   going to resume on Monday morning at 9:30.

20             If you're taking notes, please leave then in the

21   jury deliberation room.

22             Let me remind you that it is extremely important

23   that you follow my instructions; that you do not discuss the

24   case with anyone.  Not your family, your friends, or business

25   associates and not other jurors.

*Vicente - Direct/Mr. Lesko*          721

1        In addition, you must not read, listen to, watch or

2   access any accounts of this case in any form of media

3   including newspapers, TV, radio, podcasts or the Internet.

4   And you should not research or seek outside information about

5   any aspect case.

6        Do not communicate with anyone about the case on

7   your phone, whether through e-mail, text messaging, or any

8   other means; through any blog or website, or by way of any

9   social media including Facebook, Twitter, Instagram, YouTube

10  or other similar sites.

11       You may not consider anything you may have read or

12  heard anything about the case outside of this courtroom

13  whether you read it before or during, whether you read it

14  before or during jury selection or during the trial.

15       Do not attempt any independent research or

16  investigation about the case.

17       Do not visit any of the location action identified

18  during the course of testimony or in the questionnaire.

19       And we will see you on Monday morning.  Have a good

20  weekend.  All rise far the jury.

21       (Jury exits courtroom at 5:02 p.m.)

22       THE COURT:  All right.  The witness may stand down.

23  Do not discuss your testimony with anyone.  We'll see you

24  Monday morning, sir.

25       THE WITNESS:  Yes, your Honor.

*Proceedings*                                                    **722**

1          THE COURT:  All right.  Everyone may be seated.

2          So that I can understand this.  There will be a

3     witness who authenticates these videos as to what?  What is

4     going to be authenticated about the videos.

5          MS. PENZA:  Just that the videos are the ones that

6     were produced in the Ross Franco litigation.

7          THE COURT:  So that they are the videos that were

8     part of that litigation that was testified to by this witness.

9          MS. PENZA:  He has an -- I mean he testified to --

10         THE COURT:  About the video?

11         MS. PENZA:  General concept.  I'm sorry.

12         THE COURT:  What?

13         MS. PENZA:  I'm sorry.

14         I don't think that this witness has testified as to

15    what litigation these videos were produced in and I don't

16    think that he can.

17         THE COURT:  Right.  I understand that.  But the

18    witness that's going to testify as to the authenticity of the

19    videos will link these videos to the litigation that this

20    witness believes was the reasonable for the manipulation of

21    the videos.

22         MS. PENZA:  That's the part that I'm not sure the

23    testimony has shown and I don't think it needs to because the

24    time -- what this witness has testified to is that in or

25    around June 2008, he is tasked with editing videos.  He

*Proceedings*                                                723

1   believes it has something to do -- it clearly has to do with

2   the legal department.  The defendant has told him that they

3   have to be edited because there were claims made.

4        And so, then these other evidence in this case will

5   show that videos were, in fact, produced around that time in

6   the litigation.  Those videos show that the types of edits

7   that he has described and will have other evidence of the

8   motivation for this type of editing process.

9        THE COURT:  And your witness as to authenticity is

10  this witness going to testify that he or she believes that the

11  videos that we just showed the jury were produced at that

12  time.

13       MS. PENZA:  Were produced at that time, yes, your

14  Honor.  In that litigation at that time.

15       THE COURT:  In that litigation at that time.

16       MS. PENZA:  Yes, your Honor.

17       THE COURT:  All right.  Let's see what we get from

18  that witness before I let the jury consider the videos in

19  their deliberations.

20       MS. PENZA:  I think the videos on their own, your

21  Honor, just we would be able to -- if the videos were

22  admitted, and we showed those edits, I think it would be fair

23  to argue that those were, in fact, the edits they're done at

24  the time we have the e-mails, but I do think that his

25  testimony regarding the fact that in addition, these are the

*Proceedings*                                               *724*

1    exact types of edits that he directed to have happen at the

2    defendant's direction should be admissible.

3         THE COURT:  I know what you're arguing, but I just

4    want to be careful about what I let the jury consider.  That's

5    all.  So we can talk about it more once we have the testimony

6    of the custodian.

7         MR. AGNIFILO:  I think the cross-examination will be

8    helpful.  My opinion.

9         THE COURT:  Good of you to say.

10        MR. AGNIFILO:  Thank you, Judge.

11        THE COURT:  Okay.  So tell me about next week.  I'm

12   all ears.

13        MS. PENZA:  Your Honor, we intend to disclose to the

14   Court and defense counsel within 48 hours of our next witness

15   being called.

16        THE COURT:  How long will this witness be continuing

17   to be on direct on Monday?

18        MR. LESKO:  I would hope to be done by Monday.  I'm

19   about halfway done with my outline, but I believe the back

20   half will move quicker.  So I hope to be done by Monday

21   afternoon.  But the witness tends to give long answers.  So

22   I'll try to limit that.

23        THE COURT:  You have some sway over answers.  You

24   can ask for yes-or-no questions.  I know that sounds it's hard

25   on direct.

*Proceedings*                                                    **725**

1          MR. AGNIFILO:  We would love to know who the next

2    witness is.  We don't know.

3          THE COURT:  You don't know.

4          MR. AGNIFILO:  We have no idea.

5          MS. PENZA:  Your Honor, I believe that the

6    cross-examination -- if Mr. Lesko's direct examination is

7    going to go through Monday, I'm certain that Mr. Agnifilo's

8    cross-examination will at least last until the end of the day

9    on Monday.

10          MR. AGNIFILO:  Okay.

11          THE COURT:  What is 48 hours before Monday?

12          MS. PENZA:  Saturday.

13          THE COURT:  Yes.

14          MS. PENZA:  Yes, your Honor.  But I think we're

15    talking Tuesday morning.

16          THE COURT:  Tuesday morning.

17          MS. PENZA:  Yes.  I mean, we would let everyone

18    know.

19          THE COURT:  You have more than 15 minutes for this

20    witness?

21          MR. AGNIFILO:  I think so, yes.  I have more than

22    15 minutes.

23          THE COURT:  I think it'll go to -- let's be totally

24    forthright about this.  This witness will go to the end of

25    Monday based on the fact that he'll go to midway through

*Proceedings*                                    **726**

1    afternoon on Monday on direct wouldn't you think.

2            MR. AGNIFILO:  I would imagine.  What I interpreted

3    Mr. Lesko to say is he might go all of Monday on direct.

4            MR. LESKO:  It's possible.

5            THE COURT:  Yes, but I'm trying to think in a

6    positive way.

7            MR. AGNIFILO:  I understand.

8            THE COURT:  Not a negative way here.  Do you

9    understand?

10           MR. AGNIFILO:  Yes.  I wasn't factoring the Court's

11   influence into that calculus.

12           THE COURT:  I will give my best efforts here.  So

13   what we'll do is figure Tuesday morning.  So Tuesday morning

14   means Sunday.

15           MS. PENZA:  Yes, your Honor.

16           THE COURT:  Which means Sunday morning.

17           MS. PENZA:  And we will let you and defense counsel

18   know on Sunday morning.

19           THE COURT:  They will provide us -- your next

20   witness is as long as this witness.

21           MS. PENZA:  I'm not entirely sure who we are going

22   to call next.  So we're going to make that determination.

23   We'll make that determination before Sunday.

24           MR. AGNIFILO:  She's got us.

25           THE COURT:  Have a very nice weekend.

1          MR. AGNIFILO:  You, too, your Honor.

2          MS. PENZA:  Your Honor, if I may?  Maybe we respond

3     to defense counsel's Daubert motion by Monday morning.

4          THE COURT:  Yes.

5          MS. PENZA:  Thank you, your Honor.

6          THE COURT:  All right.  Thank you everyone.

7          MR. AGNIFILO:  Have a nice weekend.

8          (WHEREUPON, this matter was adjourned to May 13,

9     2019, at 9:30 a.m.)

10

11                         *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

728

<u>I N D E X</u>

<u>WITNESS</u>                                                <u>PAGE</u>

**MARK ANTHONY VICENTE** (Continued)

DIRECT EXAMINATION
BY MR. LESKO                                              499

VOIR DIRE EXAMINATION
BY MR. AGNIFILO                                          708

<u>E X H I B I T S</u>

Government's Exhibit 1010 was received in
evidence as of this date                                 535

Government's Exhibit 1396R was received in
evidence as of this date                                 687

Government's Exhibit 1397R was received in
evidence as of this date                                 690

Government's Exhibit 1395R was received in
evidence as of this date                                 697

Government's Exhibits 605-A, B, C, and D
were received in evidence as of this date                716

1

## $

**$10** [1] - 621:15
**$10,000** [1] - 622:6
**$100,000** [1] - 660:1
**$2,000** [1] - 641:21
**$20** [1] - 611:3
**$20,000** [1] - 531:25
**$24,000** [1] - 543:6
**$6,000** [5] - 523:7, 531:23, 621:16, 622:6, 627:2
**$7,500** [2] - 523:3, 582:1

'

**'90s** [2] - 608:24, 610:8

## 1

**1** [4] - 683:13, 683:18, 719:18
**10** [8] - 585:19, 598:22, 598:25, 599:7, 600:1, 606:6, 621:13, 637:16
**10017** [1] - 495:18
**1008** [2] - 509:16, 510:23
**1010** [8] - 534:17, 534:21, 535:12, 535:14, 535:16, 536:9, 549:18, 728:10
**11** [2] - 636:25, 637:16
**11201** [1] - 495:14
**11:29** [1] - 564:10
**11:31** [1] - 564:15
**12** [10] - 506:13, 514:14, 516:23, 548:19, 571:1, 642:18, 693:4, 693:10, 698:6, 718:8
**12-step** [1] - 514:20
**120** [2] - 570:1, 629:24
**122** [1] - 574:8
**12207** [1] - 495:21
**123** [1] - 574:11
**123-A** [2] - 574:14, 574:22
**12th** [1] - 699:15
**13** [9] - 569:10, 569:20, 569:23, 569:24, 629:19, 680:18, 681:6, 688:11, 727:8
**132** [1] - 569:13
**133** [1] - 569:18
**1395R** [5] - 693:1, 697:12, 697:15, 697:17, 728:15
**1396R** [5] - 686:21, 687:10, 687:12, 687:14, 728:12
**1397R** [5] - 689:14, 690:6, 690:8, 690:10, 728:13
**14** [1] - 642:2
**15** [3] - 611:16, 725:19, 725:22
**1500** [1] - 642:2
**157** [1] - 579:3
**159** [2] - 579:9, 640:4
**16** [6] - 531:18, 589:11, 589:23, 626:17, 627:1, 643:16
**16-day** [17] - 519:2, 523:2, 525:5, 527:4, 537:13, 566:1, 566:2, 616:18, 621:16, 662:8, 662:9, 687:22, 687:24, 688:2, 709:17, 709:24, 709:25
**16-days** [1] - 566:5

**164** [3] - 576:3, 576:15, 576:24
**165** [1] - 576:6
**166** [1] - 577:1
**167** [1] - 577:21
**169** [1] - 577:18
**17** [1] - 584:10
**170** [1] - 577:12
**172** [1] - 654:4
**173** [1] - 654:9
**175** [2] - 515:18, 515:19
**18** [1] - 531:18
**18-CR-0204(NGG** [1] - 495:2
**1:05** [1] - 613:25

## 2

**2** [18] - 503:6, 507:19, 525:6, 526:20, 527:12, 527:14, 528:24, 530:4, 530:5, 530:12, 531:20, 566:6, 570:13, 582:5, 683:13, 683:20, 683:22
**2's** [4] - 527:4, 528:16, 531:15, 532:24
**2,000** [4] - 524:2, 618:16, 618:23
**20** [4] - 523:8, 555:5, 556:22, 627:14
**200** [2] - 515:19, 543:11
**2004** [1] - 596:4
**2005** [3] - 519:1, 597:1, 669:23
**2006** [2] - 567:8, 616:18
**2007** [3] - 557:24, 616:21, 646:25
**2008** [16] - 663:5, 688:4, 689:20, 689:25, 691:2, 693:4, 693:11, 694:11, 698:6, 707:9, 707:20, 707:25, 713:2, 714:10, 714:16, 722:25
**2009** [12] - 555:16, 561:14, 589:14, 589:18, 590:6, 592:5, 616:22, 639:5, 643:3, 643:14, 657:11, 657:12
**2010** [2] - 597:1, 643:3
**2012** [1] - 557:25
**2013** [1] - 569:25
**2014** [1] - 634:20
**2016** [1] - 660:13
**2017** [3] - 592:5, 616:24, 658:17
**2019** [2] - 495:6, 727:9
**21** [2] - 570:17, 688:4
**22nd** [2] - 592:5, 655:17
**24** [1] - 677:4
**25** [1] - 719:16
**25th** [1] - 688:7
**26** [2] - 570:22, 570:24
**26:30** [1] - 717:11
**26:35** [1] - 716:9
**26:40** [1] - 718:20
**26th** [2] - 495:18, 636:22
**271** [1] - 495:14
**27:10** [1] - 719:3
**27:30** [1] - 717:22
**2:00** [1] - 614:2
**2A** [1] - 527:16
**2B** [1] - 527:17
**2C** [2] - 507:20, 527:17
**2D** [2] - 507:20, 527:17

**2s** [1] - 528:5

## 3

**3** [4] - 517:18, 591:11, 645:22, 705:9
**3,000-something** [1] - 642:2
**30** [15] - 503:17, 523:3, 533:14, 545:6, 555:8, 555:10, 557:17, 557:18, 575:11, 627:14, 654:23, 689:20, 691:2, 718:8, 719:16
**30-day** [1] - 538:2
**31** [1] - 549:5
**34** [1] - 592:17
**3500** [1] - 642:12
**3:29** [1] - 672:1
**3:40** [1] - 672:3

## 4

**4** [1] - 548:6
**4,000** [1] - 517:19
**40** [5] - 545:6, 555:6, 555:8, 575:11, 654:24
**40,000** [1] - 602:11
**403** [2] - 604:9, 604:13
**45** [1] - 719:19
**455** [8] - 535:8, 575:15, 575:18, 575:19, 576:5, 577:6, 578:4, 597:19
**457** [8] - 577:8, 577:9, 577:14, 578:3, 578:4, 597:8, 597:20, 597:21
**48** [3] - 523:7, 724:14, 725:11
**49** [1] - 590:22
**499** [1] - 728:4

## 5

**5** [2] - 568:20, 611:5
**5,000** [1] - 609:3
**5-day** [1] - 566:5
**50** [5] - 545:6, 589:6, 609:2, 618:13, 618:17
**500** [1] - 509:23
**53** [1] - 590:7
**535** [1] - 728:11
**5:02** [1] - 721:21

## 6

**6,750** [1] - 523:4
**60** [5] - 554:20, 554:25, 588:14, 588:15, 588:16
**605-A** [6] - 707:12, 708:6, 715:13, 716:2, 719:16, 728:16
**605-B** [1] - 719:18
**605-C** [2] - 716:5, 716:8
**605-D** [1] - 718:8
**613-2605** [1] - 495:24
**65** [1] - 515:17
**6750** [1] - 523:4
**677** [1] - 495:21
**687** [1] - 728:12
**690** [1] - 728:14

2

**697** [1] - 728:15

## 7

**7** [7] - 517:2, 569:24, 570:6, 579:17, 629:19, 630:2, 653:2
**70** [2] - 554:20, 554:25
**707** [1] - 495:21
**708** [1] - 728:6
**716** [1] - 728:17
**718** [1] - 495:24
**767** [1] - 495:18
**7:00** [1] - 655:18

## 8

**8** [8] - 570:15, 574:4, 574:10, 574:12, 574:16, 574:18, 574:20, 594:3
**87** [1] - 569:12

## 9

**9** [2] - 495:6, 578:11
**90** [1] - 652:19
**9:30** [3] - 495:6, 720:19, 727:9

## A

**a.m** [6] - 495:6, 564:10, 564:15, 653:2, 655:18, 727:9
**aback** [1] - 549:16
**abilities** [3] - 535:25, 543:5, 661:3
**ability** [4] - 505:8, 532:7, 539:19, 586:24
**able** [17] - 518:12, 520:19, 529:25, 539:6, 546:4, 548:11, 556:6, 576:17, 578:23, 580:10, 582:12, 582:14, 597:25, 598:10, 689:16, 711:7, 723:21
**absolute** [1] - 710:7
**absolutely** [2] - 506:19, 507:17
**absorb** [1] - 566:3
**accept** [1] - 501:20
**accepted** [1] - 667:22
**access** [4] - 598:20, 652:23, 653:6, 721:2
**accommodations** [2] - 523:16, 642:1
**accomplish** [1] - 543:20
**accomplishments** [1] - 550:9
**according** [3] - 648:18, 675:13, 686:7
**accountability** [3] - 501:2, 530:15, 587:10
**accountable** [1] - 534:7
**accounting** [12] - 577:9, 597:6, 597:7, 597:9, 597:10, 597:12, 597:13, 597:18, 598:6, 606:21, 607:16, 607:18
**accounts** [1] - 721:2
**accurately** [1] - 535:9
**ache** [4] - 620:22, 620:24, 621:1, 621:4
**achieve** [4] - 539:2, 539:25, 546:10, 546:11
**achieved** [4] - 515:1, 539:15, 546:16, 586:3
**achievements** [1] - 537:4

**act** [2] - 561:1, 662:19
**acting** [2] - 594:20, 597:4
**action** [4] - 559:10, 670:4, 670:5, 721:17
**activities** [3] - 632:5, 637:17, 671:14
**activity** [3] - 544:6, 641:19, 671:8
**actual** [25] - 518:10, 538:16, 542:11, 546:19, 548:12, 553:25, 554:15, 602:7, 611:17, 647:4, 664:19, 675:16, 680:19, 683:16, 686:14, 689:2, 690:2, 700:22, 701:4, 707:21, 707:24, 717:16, 719:11, 720:13, 720:14
**actuality** [1] - 600:4, 629:18, 649:6
**add** [4] - 524:25, 712:23, 713:7, 715:22
**added** [2] - 695:23, 715:9
**addiction** [1] - 619:12
**addition** [2] - 721:1, 723:25
**additional** [7] - 524:25, 526:15, 582:18, 674:20, 706:21, 718:4, 720:10
**additionally** [1] - 579:22
**address** [7] - 569:7, 574:4, 585:12, 604:25, 628:3, 629:22, 698:6
**Adirondacks** [1] - 637:3
**adjourned** [1] - 727:8
**administration** [1] - 575:21
**admissibility** [1] - 711:18
**admissible** [2] - 674:8, 724:2
**admit** [3] - 673:13, 708:5, 708:20
**admitted** [30] - 497:3, 548:7, 548:19, 549:4, 568:20, 569:14, 569:18, 570:2, 574:7, 574:15, 576:2, 576:6, 577:1, 577:12, 577:18, 577:21, 579:3, 579:9, 584:10, 589:5, 590:7, 590:21, 591:10, 629:23, 639:24, 677:4, 711:20, 715:15, 715:22, 723:22
**admonished** [1] - 669:5
**Adrian** [12] - 630:20, 654:18, 677:2, 677:6, 677:7, 677:17, 677:19, 683:2, 683:4, 693:8, 693:14
**adults** [1] - 637:23
**advanced** [2] - 601:23, 670:20
**advantage** [2] - 666:2, 666:3
**advise** [2] - 613:16, 715:20
**advised** [2] - 640:12, 715:24
**affairs** [1] - 677:16
**affect** [8] - 586:14, 661:4, 661:5, 661:6, 661:7, 661:10, 661:11
**affectionate** [1] - 699:20
**affects** [1] - 562:16
**affiliated** [1] - 591:25
**afford** [5] - 519:5, 581:13, 581:16, 581:21, 582:6
**afraid** [7] - 508:19, 511:22, 625:5, 625:6, 625:9, 625:14, 627:10
**afternoon** [4] - 499:12, 710:5, 724:21, 726:1
**afterwards** [1] - 677:24
**age** [3] - 676:19, 700:24, 701:1
**aged** [3] - 700:22, 701:3
**Agent** [1] - 496:5
**aggressive** [1] - 706:8

**aging** [3] - 692:9, 700:19, 700:25
**AGNIFILO** [73] - 495:19, 496:9, 496:19, 497:6, 497:15, 499:22, 503:16, 504:3, 510:20, 535:13, 561:25, 563:6, 580:17, 581:1, 585:8, 585:15, 603:6, 603:9, 604:3, 604:5, 605:3, 605:8, 608:10, 609:13, 612:20, 612:23, 613:19, 613:24, 668:16, 669:7, 669:10, 669:12, 672:12, 673:16, 673:24, 674:4, 674:7, 674:22, 675:18, 675:24, 685:16, 687:11, 690:7, 693:21, 694:4, 695:7, 695:19, 695:23, 696:5, 697:13, 702:3, 708:8, 708:11, 708:14, 708:16, 710:8, 711:4, 712:1, 712:16, 712:21, 724:7, 724:10, 725:1, 725:4, 725:10, 725:21, 726:2, 726:7, 726:10, 726:24, 727:1, 727:7, 728:6
**Agnifilo** [8] - 496:9, 613:4, 613:7, 613:9, 613:16, 693:17, 695:9, 708:17
**Agnifilo's** [1] - 725:7
**ago** [1] - 563:1
**agree** [7] - 533:8, 582:6, 629:11, 670:1, 695:3, 702:18, 712:4
**agreed** [2] - 682:18, 702:15
**agreement** [2] - 584:4, 675:16
**agreements** [1] - 692:10
**agrees** [1] - 673:15
**ahead** [8] - 537:23, 585:12, 610:16, 620:8, 669:14, 676:1, 682:22, 689:12
**aided** [1] - 495:25
**akin** [1] - 506:7
**Al** [1] - 647:14
**Alaska** [1] - 650:7
**Albany** [28] - 495:21, 521:6, 521:7, 523:1, 535:4, 551:6, 551:9, 552:1, 552:14, 554:11, 554:25, 555:9, 555:14, 566:8, 566:17, 567:2, 567:13, 568:12, 569:2, 575:12, 584:18, 593:9, 593:10, 593:11, 595:3, 602:19, 637:3, 652:9
**Alex** [5] - 589:20, 591:2, 591:12, 591:13, 591:14
**alike** [1] - 665:3
**alive** [1] - 651:3
**allegations** [7] - 624:18, 624:23, 625:1, 625:6, 627:6, 650:13
**allegedly** [2] - 610:11, 709:14
**allow** [4] - 505:7, 539:18, 599:9, 695:17
**allowed** [4] - 504:14, 514:15, 516:6, 604:21
**almost** [10] - 506:20, 513:13, 513:16, 526:11, 528:17, 558:9, 560:23, 626:23, 663:13, 666:8
**alone** [1] - 630:9
**alter** [7] - 466:19, 669:24, 675:11, 676:4, 682:16, 702:15, 702:18
**alteration** [2] - 675:16, 675:22
**alterations** [4] - 664:18, 664:20, 685:14, 700:17
**altercations** [1] - 607:22
**altered** [10] - 670:10, 681:19, 681:20,

682:14, 701:18, 707:9, 709:14, 710:4, 712:8, 715:9
**altering** [2] - 671:6, 678:10
**amazing** [7] - 513:11, 520:15, 620:20, 626:13, 650:24, 651:8, 652:21
**amended** [1] - 533:8
**AMERICA** [1] - 495:2
**Ames** [3] - 660:16, 660:18, 660:22
**amount** [14] - 520:1, 544:25, 546:24, 547:17, 557:5, 580:12, 581:15, 581:24, 582:16, 600:20, 601:4, 662:17, 664:13, 683:9
**analog** [9] - 663:16, 664:10, 664:11, 665:5, 665:10, 666:8, 666:16, 680:7, 686:1
**analyzing** [1] - 602:21
**anatomy** [1] - 527:16
**Angeles** [9] - 555:14, 558:4, 565:16, 568:13, 568:15, 595:2, 617:6, 617:7, 629:10
**anger** [1] - 621:24
**angle** [1] - 577:24
**angry** [1] - 508:18
**animal** [1] - 527:25
**animalistic** [1] - 528:17
**anonymous** [1] - 507:24
**answer** [17] - 507:5, 507:6, 507:9, 580:20, 580:21, 585:15, 598:6, 604:17, 619:25, 669:12, 669:13, 670:12, 670:13, 670:14, 671:11, 675:25
**answered** [1] - 504:20
**answers** [6] - 506:23, 507:2, 598:10, 711:15, 724:21, 724:23
**Anthony** [3] - 660:16, 660:18, 660:22
**ANTHONY** [1] - 728:3
**antisocial** [1] - 506:10
**apart** [2] - 651:11, 681:18
**apartment** [1] - 567:5
**apologize** [5] - 576:16, 589:22, 635:23, 659:9, 669:10
**apologized** [1] - 635:18
**appear** [1] - 633:3
**appearance** [1] - 676:18
**appearances** [2] - 496:2, 541:10
**appeared** [1] - 718:11
**application** [4] - 527:7, 538:6, 671:8, 674:18
**applications** [1] - 593:2
**applied** [2] - 566:1, 601:18
**apply** [2] - 587:5, 623:7
**appointed** [1] - 644:2
**appointment** [2] - 515:11
**appointments** [1] - 515:12
**approach** [4] - 497:18, 571:4, 603:6, 603:8
**approaches** [1] - 625:9
**appropriate** [2] - 633:15, 695:14
**approval** [2] - 702:20, 702:23
**approve** [1] - 594:21

**approving** [1] - 700:15
**Apropos** [18] - 578:9, 578:12, 578:14, 578:15, 578:19, 578:20, 578:21, 579:5, 579:6, 579:12, 579:13, 629:21, 634:21, 640:7, 680:20, 681:8, 682:2, 683:25
**APROPOS** [1] - 578:17
**area** [11] - 504:6, 546:6, 554:15, 555:5, 564:7, 567:11, 567:22, 575:13, 595:3, 611:25, 613:5
**areas** [10] - 550:19, 555:6, 567:20, 568:5, 619:11, 637:20, 679:23, 680:2, 707:21, 708:22
**argue** [1] - 723:23
**argued** [1] - 518:16
**arguing** [1] - 724:3
**arguments** [1] - 711:10
**Arkansas** [2] - 609:21, 610:3
**arrange** [1] - 515:4
**arranged** [2] - 519:11, 641:19
**arrangement** [3] - 519:16, 585:19, 599:2
**arranging** [1] - 529:12
**arrived** [5] - 592:22, 600:7, 636:24, 653:9, 669:22
**articles** [1] - 627:14
**artifacts** [1] - 705:14
**artificial** [1] - 601:22
**artist** [1] - 566:14
**ascension** [1] - 527:20
**ashamed** [3] - 508:18, 511:6, 522:9
**Ashton** [1] - 567:3
**aspect** [3] - 520:24, 695:24, 721:5
**assess** [1] - 600:9
**assigned** [1] - 543:15
**assist** [1] - 599:24
**Assistant** [1] - 495:16
**assisted** [1] - 678:10
**associated** [5] - 545:23, 546:3, 567:19, 583:13, 646:19
**associates** [1] - 720:25
**ASSOCIATES** [1] - 495:17
**assume** [3] - 529:20, 567:10, 702:1
**assumed** [2] - 580:25, 581:4
**assuming** [3] - 497:9, 508:24, 600:17
**astounding** [1] - 580:10
**astray** [1] - 528:9
**athletic** [1] - 654:16
**attached** [3] - 586:10, 600:11, 655:16
**attachment** [2] - 586:2, 655:13
**attack** [1] - 522:5
**attacks** [1] - 668:3
**attain** [3] - 540:19, 544:19, 595:11
**attempt** [4] - 555:19, 620:4, 721:15
**attempts** [3] - 526:14, 553:11, 555:18
**attend** [6] - 516:7, 555:3, 582:9, 638:14, 638:21, 640:13, 640:14, 641:24, 642:10
**attended** [3] - 555:9, 616:18, 642:4
**attending** [3] - 523:10, 523:11, 582:24
**attention** [3] - 507:9, 646:25, 663:5

**attorney** [2] - 593:25, 609:23
**Attorney** [1] - 495:13
**Attorneys** [1] - 495:16
**attributable** [1] - 618:18
**attributing** [1] - 668:13
**audience** [3] - 623:3, 633:6, 652:18
**audio** [1] - 633:20, 678:8
**auditorium** [1] - 638:11
**August** [2] - 636:22
**authenticate** [1] - 715:16
**authenticated** [1] - 722:4
**authenticates** [1] - 722:3
**authenticity** [3] - 715:17, 722:18, 723:9
**authorities** [2] - 586:22, 668:8
**authority** [5] - 552:7, 583:21, 583:22, 584:19, 584:20
**authorized** [1] - 700:5
**authorizing** [2] - 700:7, 700:10
**available** [5] - 515:6, 515:7, 542:5, 677:14, 699:17
**Avenue** [1] - 495:18
**awarded** [4] - 538:10, 566:1, 616:19, 616:22
**aware** [13] - 515:20, 540:1, 540:21, 581:20, 582:4, 583:14, 596:19, 623:14, 627:14, 627:16, 669:2, 686:15, 686:16
**awareness** [1] - 528:8
**awe** [1] - 662:21
**awestruck** [2] - 662:22, 662:23
**awkward** [1] - 662:25

## B

**B-roll** [1] - 635:1
**B-roll"** [1] - 634:24
**backfired** [1] - 640:21
**background** [1] - 636:6
**bad** [8] - 501:8, 502:16, 563:21, 596:1, 625:4, 625:10, 625:11, 694:10
**badly** [1] - 640:21
**badness** [1] - 501:21
**baked** [1] - 628:23
**Baker** [2] - 631:8, 654:18
**bamboozled** [1] - 508:14
**bankruptcy** [2] - 607:25, 608:3
**bar** [1] - 611:3
**Bar** [1] - 654:5
**Barbara** [12] - 519:7, 547:10, 548:16, 549:6, 549:7, 549:8, 561:14, 588:21, 589:10, 593:19, 622:20, 661:9
**barefoot** [1] - 531:3
**Barn** [1] - 653:14
**barred** [1] - 505:4
**base** [1] - 604:11
**Based** [1] - 656:17
**based** [14] - 504:25, 505:11, 507:9, 511:19, 557:3, 557:5, 609:6, 609:16, 610:21, 611:23, 694:15, 699:21, 725:25
**baseline** [1] - 516:8

**basement** [5] - 630:5, 698:3, 699:6, 700:1, 700:2
**basic** [2] - 623:1, 683:10
**basis** [2] - 612:23, 674:21
**bathrooms** [1] - 554:22
**batting** [1] - 654:13
**bay** [1] - 650:9
**Bay** [1] - 637:2
**beautiful** [2] - 628:18
**became** [18] - 501:1, 502:12, 544:4, 557:1, 557:24, 558:8, 558:20, 563:4, 563:7, 563:14, 563:16, 568:25, 569:3, 588:19, 609:5, 616:20, 622:18, 652:14
**become** [12] - 502:4, 509:8, 539:6, 543:25, 544:9, 556:15, 587:19, 610:24, 611:1, 618:25, 619:1, 626:17
**becoming** [3] - 516:8, 555:24, 556:16
**bedroom** [1] - 569:11
**BEFORE** [1] - 495:10
**began** [20] - 500:18, 512:9, 518:9, 527:20, 554:11, 558:19, 585:18, 599:18, 600:7, 636:11, 639:5, 644:7, 647:6, 647:11, 647:19, 648:14, 656:24, 658:19, 664:4, 720:4
**begin** [6] - 510:14, 510:16, 513:2, 516:13, 544:17, 719:9
**beginning** [16] - 501:12, 509:19, 517:25, 537:2, 537:9, 554:8, 555:15, 558:18, 581:2, 601:19, 625:4, 652:13, 658:17, 703:13, 716:5
**begun** [1] - 640:16
**behaving** [1] - 527:24
**behavior** [2] - 533:8, 559:9
**behind** [3] - 550:7, 553:24, 583:19
**beings** [1] - 623:23
**belief** [6] - 511:7, 530:10, 530:12, 717:17, 717:20
**believes** [5] - 562:8, 695:12, 722:20, 723:1, 723:10
**bell** [2] - 623:21
**Ben** [1] - 654:18
**bench** [1] - 497:5
**benches** [1] - 654:21
**benchmarks** [2] - 539:3, 539:17
**bend** [1] - 626:23
**beneath** [2] - 528:8, 576:22
**benefit** [2] - 668:4, 698:23
**benefits** [4] - 545:23, 546:3, 667:21, 668:13
**Benjamin** [2] - 643:19, 644:17
**berated** [1] - 582:24
**best** [10] - 508:24, 508:25, 540:19, 547:18, 601:7, 602:21, 658:25, 667:6, 669:22, 726:12
**Betancourt** [5] - 589:20, 591:3, 591:12, 591:13, 591:14
**better** [12] - 500:14, 511:9, 522:15, 559:17, 559:20, 566:16, 621:5, 621:7, 622:12, 626:18, 626:24, 670:25
**between** [16] - 515:16, 515:18, 517:5,

524:22, 540:11, 545:5, 552:19, 569:2, 594:7, 596:19, 596:25, 597:1, 623:23, 636:2, 682:8, 712:10
**beyond** [3] - 540:20, 613:11, 656:3
**bidding** [1] - 577:15
**Big** [1] - 702:22
**big** [7] - 628:25, 636:16, 654:22, 655:24, 656:11, 658:25, 665:12
**Bill** [2] - 609:19, 609:21
**billionaire** [2] - 596:17, 596:18
**bills** [1] - 557:19
**bind** [1] - 625:19
**binder** [1] - 510:13
**bins** [5] - 691:20, 697:25, 698:1, 699:5, 699:24
**birthday** [2] - 636:22, 655:18
**bit** [19] - 506:14, 517:11, 534:13, 551:1, 558:2, 588:17, 593:20, 607:19, 607:20, 611:9, 632:8, 657:15, 659:1, 659:3, 663:3, 664:1, 676:7, 679:8, 705:12
**black** [3] - 540:16, 695:14, 705:15
**blacked** [2] - 694:5, 694:7, 694:14
**blanking** [2] - 588:23, 592:13
**bled** [1] - 559:11
**blend** [1] - 507:8
**blind** [3] - 529:5, 529:12, 529:13
**block** [2] - 613:17, 621:17
**blog** [1] - 721:8
**blow** [1] - 621:24
**blown** [1] - 519:6
**Blu** [1] - 665:4
**Blu-ray** [1] - 665:4
**blue** [8] - 535:3, 539:24, 540:4, 540:8, 548:4, 548:5, 576:25
**Board** [6] - 551:11, 551:13, 551:19, 551:22, 552:2, 552:6
**board** [26] - 588:17, 588:18, 588:20, 588:24, 589:1, 589:2, 589:3, 589:13, 589:16, 589:18, 589:19, 589:25, 590:5, 590:11, 591:5, 591:15, 592:4, 594:6, 594:8, 594:9, 598:15, 617:8, 618:6, 639:6, 639:14, 639:15
**body** [5] - 527:17, 624:5, 624:8, 667:14, 710:1
**bonded** [2] - 533:10, 533:16
**book** [4] - 515:10, 515:11, 515:12, 558:19
**bookkeeper** [1] - 597:14
**books** [2] - 598:17, 598:19
**Boone** [9] - 548:5, 548:8, 568:19, 568:22, 568:23, 568:24, 569:1, 588:22, 589:9
**boss** [2] - 599:22, 635:22
**bottle** [3] - 511:21, 512:8, 512:14
**bottom** [4] - 576:19, 698:21, 698:22, 698:25
**Bouchey** [7] - 519:7, 547:10, 561:14, 588:21, 589:10, 593:19, 622:20
**bought** [2] - 531:24, 578:12

**bow** [1] - 510:9
**box** [3] - 650:20, 661:25, 701:15
**boxes** [2] - 691:21, 692:15
**boy** [1] - 643:16
**bra** [1] - 547:10
**BRAFMAN** [1] - 495:17
**brain** [2] - 600:6, 602:22
**brainchild** [1] - 608:23
**brains** [2] - 600:10, 604:20
**branch** [1] - 645:4
**brand** [3] - 536:25, 580:1, 662:6
**branded** [1] - 694:24
**Brandon** [4] - 602:13, 602:15, 602:16, 604:6
**Bratman** [1] - 631:12
**breach** [18] - 560:4, 561:10, 562:2, 562:3, 562:4, 562:6, 562:11, 562:15, 562:23, 563:4, 563:11, 563:13, 563:18, 595:23, 595:24, 596:6, 596:12
**Breach** [2] - 539:18
**breaches** [3] - 527:17, 562:23, 563:19
**break** [11] - 498:14, 525:17, 532:23, 551:1, 564:8, 564:9, 604:25, 671:3, 671:19, 671:24, 675:10
**break-out** [2] - 525:17, 532:23
**breakfast** [3] - 523:11, 532:12, 557:12
**breakout** [1] - 554:17
**breakouts** [1] - 554:18
**brief** [4] - 693:20, 708:10, 708:11, 716:13
**briefly** [5] - 509:24, 510:23, 640:24, 692:1, 693:18
**brilliant** [1] - 580:25
**bring** [9] - 496:13, 497:16, 512:2, 565:1, 616:2, 616:3, 647:10, 672:4, 675:2
**bringing** [1] - 547:13
**broad** [1] - 505:8
**Broadway** [1] - 495:21
**Bronfman** [27] - 565:18, 578:6, 578:7, 578:12, 578:13, 584:5, 589:19, 590:6, 592:1, 592:12, 592:15, 594:2, 595:14, 596:6, 596:14, 596:20, 596:25, 597:4, 597:16, 602:10, 678:23, 687:3, 687:20, 700:8, 700:11, 700:12, 700:15
**Bronfman's** [3] - 594:5, 596:13, 686:11
**Brooklyn** [2] - 495:4, 495:14
**Brooks** [4] - 630:14, 694:23, 695:5, 695:13
**brother** [4] - 569:1, 677:19, 677:25
**Brotman** [1] - 693:14
**brought** [3] - 500:15, 589:15, 628:15
**brown** [1] - 540:14
**bucks** [2] - 621:11, 621:12
**budgeting** [1] - 631:24
**build** [4] - 544:1, 546:8, 550:19, 556:19, 611:6, 611:7, 628:17, 639:12
**building** [30] - 527:7, 556:16, 574:17, 575:2, 575:3, 576:9, 576:23, 577:4, 577:6, 577:16, 577:20, 577:24, 578:1, 578:2, 578:13, 579:6, 579:7, 579:8,

579:11, 629:20, 634:21, 639:22, 644:6, 644:7, 644:12, 654:6, 654:7, 654:11, 654:12
**buildings** [2] - 575:12, 578:5
**built** [10] - 500:11, 502:8, 508:17, 509:2, 628:11, 632:3, 638:8, 656:1, 663:2
**bullet** [1] - 690:22
**bunch** [6] - 637:13, 643:25, 655:14, 663:16, 702:21, 704:4
**business** [8] - 560:14, 591:2, 591:18, 591:20, 591:21, 609:20, 610:2, 720:24
**businesses** [1] - 591:17
**businessman** [1] - 591:17
**bust** [1] - 651:16
**busting** [1] - 651:16
**busy** [1] - 654:23
**but..** [1] - 645:6
**button** [4] - 720:3, 720:6, 720:7
**buy** [4] - 515:12, 515:13, 531:24, 609:5
**buying** [6] - 608:23, 609:5, 626:1, 626:2, 626:3, 626:4
**BY** [31] - 495:15, 495:19, 495:22, 499:9, 506:5, 510:22, 511:1, 523:23, 530:3, 534:1, 558:23, 565:12, 574:3, 606:3, 608:12, 609:15, 610:17, 616:13, 654:2, 668:18, 669:15, 675:9, 675:21, 682:23, 685:1, 697:5, 708:16, 714:5, 717:4, 728:4, 728:6

## C

**cabins** [2] - 637:10, 637:11
**cable** [5] - 705:9, 717:18, 717:21, 718:2, 718:4
**cables** [4] - 679:16, 679:17, 705:12
**Cadman** [1] - 495:14
**cafeteria** [1] - 575:22
**Cafritz** [11] - 548:15, 548:20, 548:21, 548:22, 549:1, 570:21, 571:2, 571:3, 583:24, 599:16, 656:10
**cages** [1] - 654:14
**cake** [2] - 530:24
**calculated** [1] - 590:14
**calculating** [1] - 606:7
**calculations** [3] - 606:10, 606:13, 606:16
**calculator** [1] - 606:12
**calculus** [1] - 726:11
**calories** [1] - 531:3
**camera** [14] - 579:18, 579:22, 632:16, 632:22, 635:2, 644:16, 708:25, 714:23, 719:24, 720:3, 720:6, 720:8
**cameras** [10] - 524:13, 579:15, 580:15, 580:23, 580:24, 581:5, 633:18, 634:22, 635:11, 635:17
**Cami** [1] - 677:19
**camp** [2] - 637:23, 638:6
**campaign** [1] - 640:15
**Canada** [2] - 555:14, 639:2
**Canan** [1] - 631:5
**cannot** [2] - 523:17, 673:20

**canoe** [2] - 650:9, 650:19
**caps** [1] - 600:9
**capture** [1] - 632:11
**captured** [1] - 635:12
**capturing** [1] - 632:11
**car** [3] - 512:5, 650:11, 650:23
**Carbon** [2] - 647:13, 648:13
**Carby** [1] - 496:6
**care** [7] - 518:2, 519:15, 526:21, 542:14, 548:24, 623:15, 626:10
**cared** [1] - 640:19
**career** [1] - 655:14
**careful** [4] - 587:1, 633:23, 667:24, 724:4
**carefully** [2] - 586:25, 633:13
**Carlos** [1] - 591:8
**cartel** [1] - 643:15
**case** [48] - 496:1, 497:8, 516:1, 537:5, 547:1, 554:13, 554:19, 554:25, 557:4, 583:6, 585:21, 606:12, 606:19, 619:7, 648:13, 663:20, 665:7, 666:25, 667:1, 667:17, 668:24, 670:1, 670:3, 670:8, 670:10, 675:17, 694:17, 694:25, 695:2, 695:4, 695:11, 695:14, 701:19, 704:23, 705:18, 706:1, 706:22, 712:18, 712:19, 720:24, 721:2, 721:5, 721:6, 721:12, 721:16, 723:4
**cases** [1] - 701:5
**cassette** [2] - 665:13, 665:14
**cassettes** [2] - 700:22, 701:4
**catching** [1] - 635:1
**categorization** [1] - 634:1
**categorize** [1] - 633:23
**category** [1] - 691:23
**Catholic** [1] - 653:12
**CAUSE** [1] - 495:9
**caused** [1] - 595:18
**causing** [2] - 513:6, 528:8
**CBI** [5] - 608:18, 608:19, 608:21, 608:22, 609:18
**CC'd** [8] - 687:4, 687:20, 693:13, 693:14
**celebrate** [1] - 636:21
**celebration** [1] - 638:7
**cell** [1] - 580:5
**center** [22] - 507:9, 545:20, 546:1, 546:4, 546:6, 546:7, 546:10, 546:23, 550:24, 551:23, 551:24, 552:22, 553:23, 554:12, 558:5, 568:15, 584:18, 591:2, 591:15
**Center** [6] - 552:13, 552:14, 553:1
**centers** [12] - 546:5, 552:5, 552:11, 552:12, 553:13, 553:14, 555:11, 555:12, 611:15, 617:5, 617:8
**CEO** [3] - 543:3, 549:20, 588:25
**ceremony** [1] - 536:2
**certain** [61] - 513:12, 515:1, 515:2, 517:3, 517:23, 520:1, 520:13, 520:23, 521:15, 521:16, 523:19, 529:24, 535:2, 537:4, 538:9, 543:1, 545:20, 546:6, 553:6, 555:6, 555:23, 556:16,

557:8, 557:13, 557:14, 574:18, 575:21, 577:10, 578:23, 585:1, 585:7, 585:18, 586:4, 596:4, 598:2, 598:14, 600:20, 603:1, 607:19, 610:15, 611:1, 611:23, 622:10, 622:22, 625:7, 633:25, 638:24, 643:23, 647:19, 648:21, 659:8, 662:5, 662:17, 664:13, 664:16, 681:22, 683:9, 688:19, 701:15, 725:7
**certainly** [7] - 505:5, 529:19, 568:25, 582:22, 595:7, 604:25, 662:21
**certainty** [1] - 710:7
**cetera** [6] - 500:14, 650:12, 665:4
**CFO** [2] - 594:20, 597:4
**chairs** [1] - 554:21
**challenged** [3] - 660:13, 660:15, 660:17
**challenging** [1] - 660:12
**chance** [3] - 505:10, 505:11, 662:7
**change** [16] - 504:25, 520:24, 563:13, 566:13, 580:23, 581:5, 589:13, 589:14, 613:9, 652:19, 657:11, 667:14, 668:3, 700:11, 709:5, 718:15
**changed** [5] - 504:24, 540:17, 559:21, 575:25, 601:14
**changes** [3] - 584:23, 585:2, 613:6
**chaos** [1] - 606:23
**characterization** [2] - 526:23, 527:19
**characters** [1] - 647:19
**charge** [10] - 517:1, 517:2, 517:6, 541:16, 543:14, 545:9, 597:17, 663:6, 694:12
**cheaper** [1] - 622:7
**check** [6] - 501:1, 607:5, 678:18, 686:6, 702:6, 702:11
**checking** [4] - 501:3, 645:20, 702:8, 702:14
**checks** [4] - 606:24, 606:25, 607:2, 607:3
**Chihuahua** [2] - 643:2, 644:6
**child** [1] - 513:17
**child-like** [1] - 513:17
**children** [2] - 626:18, 645:12
**chocolate** [1] - 530:24
**choice** [1] - 506:25
**choose** [4] - 507:2, 545:20, 631:20, 637:24
**Chris** [11] - 630:14, 677:1, 677:11, 677:12, 684:3, 684:5, 687:3, 687:16, 693:14
**Christian** [2] - 649:25, 650:3
**church** [1] - 645:4
**circle** [10] - 536:12, 537:21, 538:21, 539:7, 540:12, 540:24, 541:4, 574:23, 575:1, 661:17
**circled** [1] - 537:24
**circles** [1] - 595:7
**circling** [6] - 537:24, 538:25, 539:14, 539:24, 540:25, 541:5
**circumstances** [1] - 662:5
**cities** [2] - 558:6, 568:7

**City** [7] - 552:13, 552:14, 555:14, 555:16, 555:17, 591:1, 591:14
**city** [3] - 545:20, 567:13, 644:6
**civilization** [7] - 507:21, 527:17, 528:25, 529:3, 563:15, 628:18, 638:8
**Civilization** [1] - 552:23
**civilized** [2] - 550:19, 550:21
**claim** [3] - 668:5, 668:6, 668:7
**claiming** [1] - 667:20
**claims** [8] - 649:25, 667:7, 667:8, 667:24, 668:20, 669:18, 688:3, 723:3
**clap** [3] - 510:8, 510:9, 659:18
**Clare** [27] - 578:7, 578:12, 578:13, 584:5, 589:19, 590:6, 592:1, 592:12, 592:15, 594:2, 594:4, 595:14, 596:5, 596:13, 596:19, 596:25, 597:4, 597:16, 602:10, 678:22, 686:11, 687:3, 687:20, 700:8, 700:11, 700:12, 700:14
**clarified** [1] - 608:4
**clarify** [2] - 559:8, 568:7
**class** [4] - 509:19, 510:4, 541:15, 709:1
**classes** [4] - 546:5, 546:15, 553:16, 553:17
**claustrophobia** [1] - 522:1
**clean** [2] - 566:14, 706:23
**cleaned** [2] - 698:3, 699:6
**cleaning** [2] - 691:20, 700:2
**clear** [20] - 526:4, 526:9, 539:7, 549:11, 549:21, 579:24, 586:15, 606:20, 607:3, 611:18, 628:21, 635:10, 647:21, 648:1, 663:11, 666:14, 666:19, 667:17, 668:1, 670:6
**clearly** [12] - 500:17, 502:17, 503:4, 518:22, 623:6, 626:7, 635:16, 650:25, 683:7, 694:25, 695:5, 723:1
**clientele** [1] - 546:8
**clients** [2] - 557:15, 590:4
**Clifton** [12] - 567:13, 568:3, 568:4, 568:7, 568:10, 568:18, 569:4, 575:7, 575:10, 578:8, 578:11, 616:14
**Clinton** [1] - 610:11
**Clinton's** [2] - 609:19, 609:21
**clones** [2] - 691:7, 691:9
**close** [7] - 547:3, 549:8, 586:4, 592:22, 637:13, 638:16, 716:15
**closer** [1] - 579:11
**closest** [1] - 548:23
**clothes** [1] - 586:6
**club** [2] - 608:23, 609:5
**co** [4] - 554:14, 584:18, 591:14, 617:7
**co-owner** [3] - 554:14, 591:14, 617:7
**co-owners** [1] - 584:18
**Coach** [18] - 537:20, 538:6, 538:15, 538:16, 538:19, 538:20, 542:11, 542:18, 542:20, 543:16, 543:25, 544:20, 545:1, 545:3, 556:1, 556:2, 556:12, 639:5
**coach** [22] - 501:1, 502:25, 503:3, 503:6, 510:6, 510:8, 516:10, 516:11,

516:12, 531:11, 566:1, 566:2, 578:25, 587:16, 616:19, 638:20, 640:9, 640:11, 677:24, 678:3, 678:8
**coach's** [1] - 639:4
**coached** [1] - 602:16
**coaches** [6] - 515:6, 618:25, 639:7, 639:9, 639:20, 640:8
**Coaches** [10] - 538:13, 542:2, 542:3, 542:16, 542:17, 543:10, 543:14, 543:15, 545:11, 545:22
**Coaches'** [1] - 543:15
**coaching** [3] - 502:21, 542:12, 543:19
**Coast** [1] - 521:8
**code** [5] - 666:4, 666:5, 666:7, 666:11, 685:8
**codes** [2] - 678:14, 678:25
**coding** [3] - 528:17, 528:7, 685:4
**coffee** [4] - 635:24, 636:2, 636:5, 636:18
**Coffee** [2] - 635:25, 636:4
**Cohn** [2] - 631:6, 631:7
**coincides** [1] - 639:11
**cold** [2] - 531:2, 533:13
**collating** [1] - 602:24
**collected** [1] - 508:15
**colors** [1] - 518:11
**combination** [4] - 508:14, 682:17, 700:21, 707:16
**combo** [2] - 682:6, 682:7
**coming** [5] - 611:12, 627:13, 639:9, 651:7, 662:6
**command** [1] - 542:8
**comment** [1] - 656:8
**commented** [1] - 656:10
**Commerce** [6] - 550:21, 551:17, 551:22, 551:23, 551:25
**commercial** [1] - 579:14
**commission** [4] - 544:5, 546:17, 556:13, 556:22, 557:5, 611:2, 611:11
**commissions** [5] - 556:10, 556:24, 557:3, 557:4, 590:14
**commitment** [3] - 531:1, 583:3, 636:9
**committed** [2] - 510:11, 560:4
**committee** [2] - 541:23, 542:10
**Committee** [3] - 541:24, 551:23, 551:25
**committees** [3] - 550:24, 551:19, 552:4
**common** [1] - 582:25
**commonality** [2] - 527:22, 527:23
**commonly** [1] - 622:17
**communicate** [1] - 721:6
**communication** [3] - 550:22, 580:5, 580:9
**communications** [2] - 617:20, 617:21
**Communications** [1] - 551:17
**community** [42] - 542:13, 545:15, 553:16, 553:21, 560:8, 561:13, 569:21, 575:6, 575:9, 578:21, 579:2, 581:11, 582:2, 602:8, 631:23, 632:25, 638:16, 638:17, 639:13, 642:20, 643:1, 643:6, 643:10, 643:12, 643:18, 644:18, 644:22, 644:23, 644:25,

645:6, 645:7, 645:14, 645:17, 646:3, 649:9, 653:3, 654:16, 654:21, 658:19, 659:12, 686:3
**companies** [32] - 583:5, 583:8, 583:12, 583:13, 583:14, 583:17, 583:21, 583:22, 583:23, 583:25, 584:1, 584:5, 584:8, 584:20, 584:21, 585:4, 585:14, 585:24, 587:6, 587:21, 587:22, 588:1, 588:2, 588:4, 588:5, 588:6, 588:13, 588:14, 608:2, 608:6, 608:18, 637:18
**company** [58] - 535:25, 543:5, 545:14, 545:19, 549:21, 550:8, 550:23, 557:15, 558:14, 558:15, 558:17, 560:9, 563:17, 567:11, 567:15, 579:19, 579:20, 580:2, 580:10, 581:22, 583:7, 583:9, 583:10, 583:19, 584:17, 585:6, 587:8, 587:12, 587:14, 587:20, 590:1, 592:2, 594:11, 594:20, 595:19, 595:20, 595:22, 596:23, 598:1, 599:21, 607:4, 608:6, 608:16, 609:24, 610:4, 611:17, 611:19, 617:4, 617:10, 629:12, 629:13, 629:14, 629:15, 636:11, 639:17, 657:13
**Company** [1] - 536:16
**compare** [4] - 621:14, 621:15, 622:5, 710:2
**compass** [1] - 530:14
**compassion** [4] - 507:21, 527:18, 528:24, 529:4
**compelled** [1] - 531:13
**compensation** [2] - 557:2, 585:13
**complete** [7] - 506:21, 507:11, 522:5, 598:12, 606:18, 647:14, 702:6
**completed** [8] - 503:10, 697:23, 698:9, 699:22, 701:12, 701:16, 702:12, 702:13
**completely** [5] - 507:23, 560:18, 582:14, 619:14, 652:20
**completion** [3] - 565:14, 683:13, 693:5
**complex** [3] - 567:21, 634:2, 665:18
**complexes** [1] - 594:25
**complicated** [1] - 679:9
**component** [1] - 695:23
**computer** [9] - 528:7, 577:10, 600:9, 611:13, 679:10, 679:11, 681:2, 704:21, 704:25
**Computer** [1] - 495:25
**Computer-aided** [1] - 495:25
**computer-editing** [1] - 679:11
**computerized** [1] - 495:25
**computers** [3] - 661:13, 661:14, 688:13
**concept** [8] - 647:1, 647:7, 647:8, 648:7, 649:23, 650:3, 651:16, 722:11
**concepts** [2] - 524:10, 647:5
**concern** [12] - 502:5, 502:24, 529:22, 531:7, 534:4, 604:5, 604:9, 604:13, 604:14, 604:15, 711:5
**concerned** [9] - 508:17, 529:10, 529:17, 531:15, 534:10, 635:9, 635:14, 694:4, 694:19
**concerns** [7] - 529:2, 604:8, 607:25,

624:17, 624:23, 628:7, 641:7
**conclude** [1] - 709:5
**concludes** [10] - 696:6, 713:10, 716:23, 717:2, 717:13, 717:24, 718:10, 718:22, 719:5, 719:21
**conclusion** [1] - 506:6
**conclusions** [2] - 505:9, 695:16
**conduct** [3] - 514:23, 525:3, 600:5
**conducted** [2] - 514:11, 514:12
**conference** [6] - 504:1, 614:6, 622:2, 673:1, 694:1, 711:1
**conferencing** [1] - 580:8
**confess** [1] - 529:8
**confidant** [1] - 592:23
**confidante** [1] - 549:8
**confidantes** [1] - 548:23
**confidences** [2] - 659:5, 659:7
**confidential** [2] - 507:14, 507:15
**confirming** [1] - 687:5
**conflict** [4] - 596:19, 596:24, 596:25, 597:3
**confused** [2] - 526:13, 540:3
**confusing** [2] - 515:24, 674:13
**Congress** [1] - 596:16
**connect** [2] - 521:1, 579:21
**connected** [1] - 580:6
**connecters** [1] - 705:9
**connection** [16] - 507:11, 620:25, 670:1, 671:8, 673:14, 673:17, 674:13, 682:3, 703:2, 708:6, 708:7, 711:5, 711:19, 714:9, 715:13, 715:15
**connectivity** [1] - 580:15
**conscience** [4] - 530:11, 600:14, 600:18, 601:5
**conscious** [1] - 528:8
**consequences** [3] - 560:1, 582:21, 669:16
**consider** [6] - 505:2, 674:19, 674:21, 721:11, 723:18, 724:4
**consideration** [1] - 531:12
**considered** [12] - 500:10, 500:20, 550:6, 560:1, 563:3, 575:19, 586:21, 589:1, 607:1, 715:18, 715:25
**consist** [1] - 554:2
**consisted** [2] - 554:3, 700:23
**consistent** [8] - 649:12, 674:1, 703:20, 704:5, 708:1, 708:4, 715:1, 715:5
**conspiracy** [3] - 587:3, 694:12, 695:25
**constant** [3] - 502:5, 553:11, 660:3
**constantly** [2] - 501:3, 639:21
**constituted** [2] - 504:18, 589:17
**construction** [1] - 567:11
**consult** [1] - 550:12
**consulted** [2] - 550:12, 584:25
**CONT'D** [1] - 565:11
**contact** [5] - 657:11, 657:16, 657:24, 658:20, 659:6
**contacting** [1] - 657:23
**contained** [3] - 654:12, 654:13, 711:16
**container** [1] - 552:20

**content** [2] - 708:2, 709:25
**contention** [1] - 695:3
**context** [1] - 643:8
**Continue** [3] - 619:13, 620:8, 637:15
**continue** [16] - 498:25, 499:2, 506:2, 519:8, 526:23, 565:8, 565:19, 574:1, 606:2, 616:8, 656:23, 671:3, 675:5, 697:2, 704:1, 705:24
**Continued** [14] - 503:20, 505:15, 533:19, 606:1, 614:5, 616:12, 653:16, 654:2, 672:16, 674:25, 684:18, 696:7, 713:11, 728:3
**continued** [9] - 499:9, 500:23, 521:20, 571:6, 603:12, 605:11, 693:22, 709:3, 710:11
**continuing** [4] - 613:8, 694:20, 695:18, 724:16
**Continuing** [6] - 534:3, 558:25, 685:3, 697:7, 714:7, 717:6
**contract** [1] - 582:6
**contractors** [1] - 607:2
**control** [8] - 563:4, 563:8, 584:21, 678:24, 686:5, 686:10, 688:17, 688:19
**controlled** [1] - 585:24
**conversation** [5] - 521:5, 561:23, 655:16, 664:6, 701:24
**conversations** [1] - 652:22
**convince** [1] - 651:21
**cool** [1] - 534:7
**copied** [2] - 681:12, 685:21
**copies** [6] - 685:22, 698:11, 698:15, 699:9, 699:12, 699:15
**copy** [5] - 497:4, 676:16, 681:14, 685:22, 704:25
**copying** [11] - 681:9, 681:10, 681:18, 681:23, 681:25, 683:14, 686:4, 698:12, 698:16, 700:6
**copying/dubbing** [2] - 683:20, 683:22
**cords** [1] - 706:12
**corner** [1] - 539:9
**corporate** [1] - 637:2
**correct** [62] - 499:14, 503:12, 507:2, 514:22, 514:25, 515:3, 517:15, 529:15, 530:17, 530:19, 536:7, 536:22, 545:2, 547:7, 551:14, 556:2, 556:3, 568:11, 574:5, 574:6, 574:13, 575:4, 575:7, 575:8, 582:19, 589:4, 595:10, 600:2, 601:12, 624:21, 645:3, 666:21, 666:23, 674:6, 681:10, 682:1, 685:12, 685:13, 685:14, 687:17, 688:5, 689:4, 689:6, 689:8, 689:9, 690:1, 690:4, 691:21, 691:22, 693:9, 698:2, 699:1, 699:4, 699:7, 699:10, 699:11, 701:9, 701:11, 704:12, 709:14, 714:25
**Correct** [2] - 631:4, 648:10
**corrective** [2] - 531:5, 531:14
**correctly** [1] - 551:18
**corresponded** [1] - 551:3, 583:5
**cost** [17] - 515:15, 517:16, 532:13, 532:14, 621:2, 621:3, 621:7, 621:21,

622:1, 625:25, 626:1, 626:3, 626:7, 641:20, 641:23, 642:10
**costing** [1] - 621:22
**costs** [4] - 546:23, 546:24, 624:18, 626:7
**couch** [1] - 570:12
**counsel** [6] - 496:2, 496:5, 694:2, 711:2, 724:14, 726:17
**counsel's** [1] - 727:3
**Counselor** [9] - 539:24, 540:4, 540:6, 540:9, 548:4, 548:14, 548:15, 548:16, 549:9
**counselors** [2] - 547:23
**Counselors** [1] - 548:9
**countries** [3] - 551:24, 552:5, 558:6
**country** [1] - 567:4
**County** [1] - 555:14
**couple** [4] - 644:21, 650:17, 691:19, 716:16
**course** [12] - 546:14, 599:22, 625:11, 625:22, 626:12, 633:7, 639:2, 639:20, 643:3, 655:19, 703:11, 721:18
**Court** [11] - 495:23, 497:4, 497:9, 539:8, 613:10, 674:12, 694:2, 711:2, 715:19, 715:20, 724:14
**COURT** [174] - 495:1, 496:7, 496:12, 496:24, 497:2, 497:13, 497:16, 497:19, 497:21, 497:25, 498:5, 498:7, 498:14, 498:16, 498:20, 498:22, 498:25, 499:5, 499:24, 503:18, 504:12, 504:22, 506:2, 510:21, 523:9, 523:15, 523:20, 529:13, 529:16, 534:19, 535:14, 536:12, 536:15, 536:19, 537:23, 539:9, 557:21, 558:1, 558:7, 558:14, 558:16, 558:22, 562:1, 563:7, 564:8, 564:11, 565:1, 565:4, 565:7, 571:5, 574:1, 575:5, 580:18, 580:20, 581:3, 581:10, 585:9, 585:11, 588:15, 593:7, 593:10, 603:8, 603:10, 604:2, 604:4, 604:15, 605:2, 605:4, 605:9, 606:2, 609:14, 610:6, 610:10, 610:14, 610:16, 612:1, 612:5, 612:9, 612:14, 612:17, 612:22, 613:1, 613:11, 613:14, 613:20, 614:4, 616:2, 616:7, 668:17, 669:9, 669:11, 669:13, 671:4, 671:11, 671:13, 671:16, 671:18, 671:22, 672:4, 672:6, 672:9, 672:14, 673:3, 674:15, 674:17, 675:2, 675:4, 675:20, 675:25, 682:10, 682:13, 682:16, 682:20, 682:22, 685:17, 686:19, 687:12, 689:12, 690:8, 692:16, 692:23, 693:19, 695:17, 695:20, 696:1, 697:2, 697:15, 698:13, 698:18, 698:22, 701:3, 702:4, 704:6, 704:10, 704:14, 708:7, 708:13, 713:8, 714:3, 715:14, 716:6, 716:18, 716:21, 720:13, 720:15, 720:18, 721:22, 722:1, 722:7, 722:10, 722:12, 722:17, 723:9, 723:15, 723:17, 724:3, 724:9, 724:11, 724:16, 724:23, 725:3, 725:11, 725:13, 725:16, 725:19,

725:23, 726:5, 726:8, 726:12, 726:16, 726:19, 726:25, 727:4, 727:6
**court** [17] - 496:11, 506:1, 578:16, 614:3, 616:1, 654:12, 675:1, 697:1, 714:1, 716:22, 717:1, 717:12, 717:23, 718:9, 718:21, 719:4, 719:20
**Court's** [2] - 694:5, 726:10
**Courthouse** [1] - 495:4
**COURTROOM** [1] - 496:1
**courtroom** [11] - 564:10, 564:15, 565:6, 613:25, 616:6, 672:1, 672:3, 716:8, 716:12, 721:12, 721:21
**courts** [2] - 654:13, 670:19
**covers** [1] - 511:5
**cracks** [1] - 690:24
**craft** [1] - 640:16
**crash** [1] - 691:21
**create** [17] - 566:15, 580:3, 580:4, 580:5, 580:11, 585:1, 639:10, 661:13, 664:7, 664:12, 667:14, 676:15, 679:23, 680:1, 681:4, 705:16, 707:6
**created** [12] - 525:18, 525:20, 580:2, 583:4, 584:23, 599:4, 608:25, 662:13, 662:17, 679:18, 681:5, 703:15
**creating** [6] - 580:8, 591:21, 664:20, 664:21, 680:25
**creatively** [1] - 651:20
**creator** [1] - 583:18
**crew** [1] - 644:16
**Crimes** [1] - 648:14
**Crimes"** [1] - 647:13
**CRIMINAL** [1] - 495:9
**criminal** [2] - 649:5, 649:18
**critical** [2] - 625:13, 625:21
**critically** [1] - 625:16
**criticize** [1] - 660:10
**cross** [7] - 505:6, 613:5, 613:18, 674:9, 724:7, 725:6, 725:8
**cross-examination** [5] - 613:5, 613:18, 724:7, 725:6, 725:8
**cross-examine** [2] - 505:6, 674:9
**crowd** [1] - 654:22
**CRR** [1] - 495:23
**crush** [1] - 559:17
**crying** [1] - 513:23
**Crystal** [1] - 694:23
**cult** [19] - 500:15, 624:18, 625:5, 625:15, 627:6, 628:3, 628:6, 628:7, 628:14, 628:20, 629:2, 629:8, 651:13, 651:16, 651:20, 651:21, 651:24
**Cultural** [3] - 590:2, 646:10, 646:20
**curriculum** [19] - 499:17, 500:19, 502:19, 502:21, 503:6, 503:7, 503:8, 523:25, 524:1, 524:4, 566:6, 581:22, 583:4, 583:5, 583:11, 587:17, 601:4, 639:19, 668:14
**curry** [1] - 702:20
**custodian** [3] - 673:11, 711:21, 724:6
**cut** [16] - 704:19, 705:17, 705:25, 706:8, 706:13, 706:14, 706:24, 708:25,

717:19, 718:5, 718:13, 719:1, 719:24, 720:2, 720:3
**cut-in** [1] - 704:19
**cuts** [2] - 678:16, 708:22

**D**

**D.C** [1] - 549:3
**daily** [2] - 658:20, 659:6
**damage** [1] - 664:24
**damaging** [1] - 534:11
**Dan** [2] - 631:12, 693:14
**dancing** [3] - 637:21, 637:25, 641:3
**dangerous** [3] - 627:21, 651:21, 652:2
**Dani** [1] - 677:19
**Danielle** [1] - 496:10
**DANIELLE** [1] - 495:22
**Danny** [1] - 686:10
**dark** [3] - 520:12, 521:9, 601:9
**darkest** [2] - 507:23, 508:13
**DAS** [4] - 694:24, 695:2, 695:4, 695:5
**data** [2] - 602:22, 602:24
**date** [12] - 535:17, 687:15, 690:11, 690:16, 697:18, 697:25, 716:3, 728:11, 728:12, 728:14, 728:15, 728:17
**dated** [1] - 693:10
**dates** [2] - 669:23, 712:11
**Daubert** [1] - 727:3
**day-long** [1] - 636:24
**day-to-day** [1] - 677:15
**days** [17] - 519:3, 519:5, 523:3, 531:17, 532:1, 607:10, 607:14, 626:17, 627:1, 636:24, 636:25, 637:16, 655:17, 679:15, 695:21, 695:22
**de** [1] - 584:16
**dead** [1] - 560:23
**deal** [19] - 498:11, 502:22, 524:1, 525:1, 575:8, 596:24, 624:22, 627:5, 628:10, 628:25, 632:10, 636:16, 644:3, 655:24, 656:11, 657:17, 658:25, 659:14, 671:13
**dealing** [1] - 624:25
**dealings** [1] - 591:21
**deals** [6] - 622:1, 636:17, 689:7, 699:9, 699:24, 699:25
**dealt** [1] - 605:5
**debrief** [5] - 525:21, 525:23, 526:11, 692:4, 692:7
**debt** [3] - 581:22, 582:13, 642:7
**debunk** [2] - 648:22, 651:9
**debunking** [1] - 647:16
**debunks** [1] - 650:25
**decapitation** [1] - 604:23
**deceased** [3] - 548:15, 548:16, 548:17
**decide** [1] - 656:18
**decided** [6] - 517:13, 561:4, 635:4, 643:19, 657:13, 683:10
**decision** [7] - 523:7, 561:6, 561:21, 592:14, 592:15, 622:22, 658:13
**decisions** [3] - 528:4, 541:19

**deck** [1] - 682:7
**decks** [1] - 682:6
**decrease** [1] - 658:19
**dedicate** [1] - 558:12
**dedicated** [1] - 601:7
**deep** [5] - 513:7, 513:14, 513:15, 548:11, 662:8
**deeper** [1] - 527:21
**deepest** [2] - 507:23, 508:12
**deeply** [1] - 619:1
**defend** [1] - 670:7
**defendant** [70] - 495:8, 519:23, 520:4, 520:9, 521:4, 525:12, 541:7, 550:4, 561:21, 563:22, 570:9, 584:19, 585:13, 585:23, 590:19, 596:5, 597:22, 598:10, 598:23, 599:3, 599:7, 599:10, 600:2, 600:5, 606:8, 607:25, 608:15, 609:17, 613:25, 624:14, 624:22, 627:5, 634:11, 642:16, 647:1, 647:2, 647:5, 648:9, 648:19, 649:10, 651:12, 652:10, 655:1, 655:6, 655:23, 656:6, 656:9, 656:14, 656:22, 657:8, 657:11, 657:20, 657:24, 658:20, 659:5, 659:13, 660:6, 660:17, 662:4, 662:20, 663:7, 664:6, 665:21, 666:19, 669:24, 672:1, 672:3, 701:22, 702:5, 723:2
**Defendant** [2] - 495:17, 564:15
**defendant's** [5] - 583:13, 583:16, 601:1, 660:24, 724:2
**defense** [5] - 505:5, 673:15, 724:14, 726:17, 727:3
**deferential** [1] - 662:25
**defined** [1] - 695:6
**definitely** [2] - 514:8, 597:2
**definition** [6] - 500:16, 526:4, 526:9, 601:3, 628:3, 628:21
**degrade** [2] - 681:14, 681:15
**degree** [2] - 635:25, 679:21
**Del** [10] - 583:25, 584:9, 584:12, 584:13, 592:12, 606:13, 654:18, 660:16, 660:18, 660:20
**Delaware** [1] - 629:17
**delays** [1] - 698:8
**deliberation** [1] - 720:21
**deliberations** [3] - 674:19, 715:19, 723:19
**delivered** [2] - 685:22, 689:22
**delivery** [1] - 680:15
**demonstrate** [1] - 556:6
**demonstrated** [1] - 556:4
**demonstrative** [1] - 715:22
**DENISE** [1] - 495:23
**DeniseParisi72@gmail.com** [1] - 495:24
**department** [39] - 577:9, 577:11, 584:17, 590:13, 592:8, 592:24, 592:25, 593:21, 593:22, 597:7, 597:10, 597:12, 597:13, 597:15, 597:18, 598:7, 606:21, 607:16,

607:18, 617:11, 617:12, 630:8, 631:15, 663:6, 663:18, 664:3, 664:4, 667:9, 676:10, 676:12, 676:21, 676:23, 677:13, 677:23, 678:5, 678:11, 678:20, 701:17, 723:2

**depended** [2] - 555:5, 619:6

**depict** [2] - 535:9, 569:19

**depicted** [1] - 576:24

**DEPUTY** [1] - 496:1

**Der** [4] - 495:20, 495:22, 496:10

**Derks** [1] - 592:13

**describe** [6] - 511:17, 524:4, 524:7, 554:11, 616:17, 665:22

**described** [14] - 520:21, 532:11, 549:14, 559:1, 559:16, 562:5, 586:16, 675:12, 688:18, 707:17, 710:5, 714:8, 714:12, 723:7

**describing** [3] - 499:13, 563:10, 708:2

**description** [2] - 535:5, 548:12

**designed** [1] - 527:14

**designing** [2] - 680:10, 680:12

**desire** [1] - 621:7

**desks** [1] - 679:3, 688:12

**destroy** [6] - 559:14, 559:15, 595:20, 595:21, 609:24

**destroyed** [4] - 608:5, 608:7, 608:13, 609:10

**destruction** [1] - 608:9

**detail** [1] - 699:24

**detailed** [1] - 538:7

**determination** [3] - 679:4, 726:22, 726:23

**determine** [2] - 676:11, 709:15

**determines** [1] - 715:19

**determining** [2] - 631:17, 679:7

**develop** [1] - 580:11

**developed** [4] - 523:25, 524:4, 567:11, 600:16

**development** [6] - 567:6, 567:10, 567:12, 567:18, 568:10, 595:1

**devices** [4] - 554:4, 580:5, 600:11, 602:23

**dialogue** [1] - 717:16

**die** [1] - 649:18

**died** [1] - 549:14

**diet** [1] - 530:21

**difference** [4] - 545:25, 623:22, 623:25, 635:25

**different** [47] - 499:16, 502:10, 520:22, 530:6, 539:4, 542:13, 543:4, 543:16, 543:24, 544:24, 547:15, 548:2, 551:24, 552:5, 554:4, 558:6, 560:1, 567:20, 577:24, 582:2, 583:24, 585:4, 586:22, 595:7, 597:23, 600:11, 602:23, 608:6, 623:2, 623:3, 626:22, 629:18, 631:22, 633:3, 637:12, 637:13, 637:18, 641:2, 641:10, 664:21, 680:14, 681:3, 683:11, 690:25, 703:8, 714:24

**difficult** [6] - 507:1, 507:6, 519:21,

522:6, 550:11, 658:6

**dig** [1] - 636:17

**digital** [15] - 664:11, 664:25, 665:2, 665:7, 666:3, 666:4, 666:8, 666:9, 680:3, 680:4, 681:1, 681:14, 685:4, 686:1

**digs** [1] - 642:3

**dim** [1] - 716:11

**dinner** [2] - 523:12, 532:14

**dire** [2] - 708:12, 711:15

**DIRE** [2] - 708:15, 728:5

**direct** [10] - 499:1, 536:8, 594:7, 613:8, 613:11, 724:17, 724:25, 725:6, 726:1, 726:3

**DIRECT** [5] - 499:8, 565:11, 616:12, 654:1, 728:4

**directed** [2] - 674:3, 724:1

**directing** [1] - 631:25

**direction** [2] - 683:8, 724:2

**directly** [3] - 556:14, 604:17, 687:19

**disagreed** [1] - 562:22

**disappeared** [1] - 650:10

**disapproval** [1] - 560:7

**disciplinary** [1] - 646:15

**disclose** [1] - 724:13

**discount** [3] - 515:14, 523:4, 523:8

**discounted** [1] - 581:25

**discovered** [1] - 526:19

**discovery** [3] - 665:25, 711:7, 711:8

**discuss** [20] - 497:13, 520:9, 521:25, 542:1, 564:12, 597:21, 608:15, 612:6, 612:10, 612:12, 612:15, 660:24, 669:16, 671:23, 676:6, 692:5, 692:7, 692:11, 720:23, 721:23

**discussed** [17] - 522:19, 587:21, 594:2, 595:22, 597:23, 597:24, 600:12, 608:21, 613:3, 628:12, 647:18, 658:1, 659:9, 665:21, 698:12, 709:23, 714:11

**discusses** [1] - 689:5

**discussing** [5] - 524:9, 612:13, 647:6, 647:9, 699:8

**discussion** [8] - 512:18, 513:3, 566:7, 586:13, 632:21, 639:6, 696:6, 713:10

**discussions** [10] - 524:15, 524:16, 565:20, 565:22, 567:1, 598:9, 609:16, 651:15, 671:5, 701:22

**disease** [1] - 667:15

**dishonorably** [2] - 500:8, 500:9

**disintegrated** [1] - 503:8

**dismemberment** [1] - 604:23

**disorder** [5] - 503:14, 506:8, 506:9, 506:10, 506:11

**disparate** [1] - 694:17

**dispersed** [1] - 611:12

**display** [1] - 535:4

**disquisition** [1] - 526:11

**disquisitions** [1] - 525:22

**disregard** [2] - 563:8, 669:13

**distance** [1] - 568:6

**distinction** [2] - 588:8, 636:2

**distributed** [2] - 689:23, 690:3

**distributor** [1] - 611:1

**DISTRICT** [3] - 495:1, 495:1, 495:10

**District** [1] - 495:13

**disturbing** [1] - 501:2

**Division** [7] - 541:25, 545:12, 551:12, 551:15, 551:23, 551:25, 552:1

**division** [5] - 591:16, 594:15, 594:19, 617:20, 617:21

**Divisions** [3] - 551:19, 551:20, 552:5

**divisions** [6] - 550:23, 551:3, 551:5, 551:6, 551:8, 551:13

**divulge** [1] - 508:10

**divulged** [1] - 529:19

**divulging** [1] - 529:21

**dock** [1] - 560:6

**doctor** [1] - 602:16

**document** [9] - 508:9, 510:13, 538:6, 541:18, 570:23, 686:23, 687:2, 689:15, 689:19

**documents** [1] - 634:3

**dog** [3] - 623:25, 624:2

**Dog** [1] - 702:22

**dogs** [3] - 623:18, 623:19, 623:23

**dollar** [1] - 611:4

**dollars** [8] - 515:13, 542:22, 543:8, 622:1, 643:21, 643:24, 651:19, 660:3

**done** [45] - 510:15, 514:5, 514:7, 526:16, 561:10, 562:15, 562:22, 562:24, 563:3, 563:20, 564:2, 575:24, 595:23, 595:25, 606:17, 622:4, 623:20, 663:17, 668:20, 673:23, 681:6, 686:7, 686:10, 690:23, 691:1, 699:10, 699:13, 702:24, 705:7, 706:19, 707:8, 708:21, 708:22, 713:1, 714:16, 716:16, 719:23, 720:10, 720:12, 723:23, 724:18, 724:19, 724:20

**Dones** [1] - 593:19

**DONOGHUE** [1] - 495:12

**door** [5] - 553:24, 576:10, 576:13, 577:6, 577:9

**dos** [5] - 690:19, 690:25, 691:2, 691:23, 692:2

**double** [2] - 540:23, 678:18

**double-check** [1] - 678:18

**doubtful** [1] - 613:6

**doughnut** [1] - 526:6

**down** [14] - 513:7, 534:9, 551:1, 564:11, 612:5, 623:10, 633:8, 644:16, 648:7, 668:10, 671:22, 680:15, 719:11, 721:22

**download** [2] - 524:8

**drafted** [1] - 690:2

**dramatize** [1] - 649:4

**draw** [3] - 646:25, 663:5, 695:16

**drawn** [1] - 575:1

**dream** [1] - 620:22

**drills** [2] - 516:15

**drink** [1] - 621:6

**Drive** [14] - 520:6, 569:10, 569:16, 569:17, 569:20, 569:23, 569:24, 570:15, 574:4, 574:10, 574:20, 629:19, 680:18, 688:11
**driven** [1] - 586:9
**driver's** [1] - 586:9
**driveway** [1] - 579:23
**driving** [2] - 512:5, 550:7
**drops** [1] - 704:5
**drowned** [1] - 650:10
**drowning** [3] - 513:20, 513:21
**drug** [1] - 651:5
**drum** [2] - 665:18, 665:19
**drumming** [1] - 637:22
**Drumming** [1] - 637:25
**dubbed** [1] - 680:4
**dubbing** [13] - 679:14, 680:16, 680:19, 681:6, 681:9, 681:10, 681:25, 683:14, 683:17, 686:4, 698:12, 698:16
**due** [1] - 542:24
**dues** [1] - 516:12
**dumping** [1] - 692:19
**duplicated** [1] - 676:17
**duplication** [1] - 692:8
**during** [33] - 513:10, 519:23, 521:4, 521:12, 522:10, 523:24, 525:17, 525:21, 525:22, 537:14, 541:9, 541:12, 557:21, 566:2, 580:8, 587:22, 597:2, 600:10, 628:7, 637:16, 638:10, 643:3, 652:7, 657:5, 659:5, 662:3, 664:6, 715:18, 721:13, 721:14, 721:18
**Durst** [1] - 686:10
**duties** [2] - 616:25, 617:2
**DVD** [7] - 609:3, 682:7, 691:7, 691:9, 703:12, 704:9, 704:11
**DVDs** [2] - 665:3, 704:7

**E**

**e-mail** [15] - 658:15, 687:6, 687:7, 687:8, 687:16, 688:4, 688:24, 693:3, 693:4, 693:6, 697:19, 698:5, 698:25, 721:7
**E-mail** [1] - 495:24
**e-mailed** [1] - 689:21
**e-mails** [4] - 686:16, 686:17, 697:8, 723:24
**Early** [1] - 632:3
**early** [4] - 534:5, 534:6, 550:10, 625:8
**earn** [2] - 556:9, 556:13
**earning** [1] - 556:22
**ears** [1] - 724:12
**earth** [1] - 502:3
**easily** [1] - 704:25
**East** [1] - 495:14
**EASTERN** [1] - 495:1
**Eastern** [1] - 495:13
**easy** [2] - 651:25, 710:2
**eat** [3] - 530:23, 530:24, 578:23
**Ed** [3] - 563:24, 563:25, 564:1
**Edgar** [6] - 548:5, 548:8, 569:1, 588:22,

589:9, 596:14
**Edge** [6] - 537:25, 538:1, 538:3, 538:4
**edit** [6] - 688:8, 688:22, 705:5, 705:17, 709:4
**edited** [6] - 682:25, 683:15, 684:14, 707:24, 711:14, 723:3
**editing** [32] - 617:13, 631:22, 668:25, 673:9, 673:25, 674:1, 674:2, 678:2, 678:7, 679:2, 679:11, 680:17, 680:18, 682:24, 683:17, 683:18, 685:11, 685:18, 686:12, 686:15, 688:11, 688:12, 688:14, 688:25, 689:2, 691:16, 700:16, 701:23, 704:12, 722:25, 723:8
**edits** [26] - 673:22, 681:12, 702:24, 703:1, 704:15, 707:8, 707:14, 707:17, 708:20, 711:12, 711:13, 712:25, 713:1, 713:2, 713:4, 713:5, 714:8, 714:11, 714:15, 714:18, 715:8, 723:6, 723:22, 723:23, 724:1
**education** [14] - 502:3, 509:2, 520:2, 523:14, 524:11, 529:9, 544:25, 549:24, 550:22, 553:15, 575:24, 638:16, 667:8
**educational** [5] - 500:19, 553:22, 583:18, 645:19, 646:21
**effect** [4] - 635:13, 713:6, 714:24, 717:9
**effective** [1] - 514:10
**effects** [1] - 709:16
**efficiency** [1] - 711:19
**efforts** [1] - 726:12
**eight** [5] - 516:24, 531:25, 644:13, 666:11, 682:9
**eighth** [1] - 644:8
**either** [9] - 507:20, 510:12, 536:3, 545:12, 579:14, 633:3, 642:7, 658:14, 689:23
**Either** [1] - 688:21
**elder** [1] - 548:10
**elders** [3] - 548:3, 548:10, 641:8
**electric** [1] - 604:19
**electricity** [1] - 546:13
**elicit** [1] - 613:3
**eligible** [5] - 516:9, 516:13, 526:20, 544:5, 566:6
**Elliott** [1] - 630:22
**ELMO** [1] - 509:17
**EM** [16] - 511:13, 511:17, 511:18, 514:14, 514:17, 515:4, 515:5, 515:19, 517:14, 517:16, 543:18, 560:6, 566:24, 566:25, 587:16, 652:15
**EM-s** [1] - 566:24
**EM0** [1] - 516:14
**EM7** [1] - 514:15
**embarrassed** [1] - 508:19
**embarrassment** [1] - 508:4
**embed** [1] - 666:4
**embedded** [1] - 685:9
**Emiliano** [5] - 589:20, 590:24, 590:25, 591:1, 591:7

**emotional** [1] - 528:20
**emotions** [1] - 528:21
**EMP** [6] - 514:14, 515:4, 516:8, 516:9, 517:1, 517:2
**employed** [1] - 525:22
**employees** [3] - 606:24, 606:25, 607:1
**EMPs** [5] - 514:12, 515:1, 515:20, 516:2, 544:11
**EMs** [14] - 503:5, 511:17, 514:11, 514:12, 514:15, 514:20, 514:23, 515:2, 515:15, 517:7, 519:6, 521:22, 522:10, 655:12
**encounter** [1] - 624:17
**encourage** [1] - 527:3
**encouraged** [1] - 582:18
**end** [46] - 497:8, 500:22, 501:17, 502:20, 505:14, 520:3, 520:7, 527:5, 532:21, 532:25, 533:5, 554:21, 605:10, 606:10, 607:10, 613:15, 613:21, 635:2, 638:3, 642:10, 649:5, 651:22, 652:5, 660:12, 662:9, 662:11, 662:12, 670:25, 673:6, 674:24, 685:10, 685:18, 685:20, 688:16, 689:6, 690:16, 696:2, 703:13, 703:22, 708:24, 710:4, 711:22, 718:4, 720:17, 725:8, 725:24
**End** [1] - 690:13
**endeavor** [1] - 550:19
**ended** [6] - 565:15, 584:17, 622:25, 659:17, 677:23
**endure** [1] - 530:18
**enemies** [2] - 648:20, 648:23
**enemies"** [1] - 649:8
**energy** [2] - 661:12, 661:14
**enforcement** [1] - 668:7
**engaged** [1] - 671:14
**engraved** [1] - 602:7
**enjoyed** [1] - 521:8
**enlightenment** [1] - 661:22
**enormous** [6] - 522:13, 530:20, 549:3, 580:12, 595:21, 598:5
**enormously** [1] - 609:7
**enroll** [13] - 526:14, 527:5, 527:9, 537:14, 543:25, 544:2, 556:5, 558:4, 558:5, 617:25, 618:4, 618:11, 618:15
**enrolled** [13] - 538:1, 544:2, 544:3, 556:1, 556:3, 556:7, 556:8, 556:14, 618:10, 618:15, 618:17, 618:22, 619:3
**enroller** [1] - 538:3
**enrolling** [5] - 537:10, 537:11, 595:4, 595:5, 617:22
**enrollment** [2] - 539:19, 639:21
**enrollments** [1] - 539:3
**enterprise** [3] - 694:18, 695:2, 695:3
**enters** [5] - 498:21, 565:6, 616:6, 672:3, 675:3
**entertainment** [2] - 618:1, 618:9
**entire** [18] - 519:2, 535:5, 544:23, 545:18, 550:8, 560:7, 562:16, 567:11, 579:6, 579:7, 598:12, 618:16, 635:12,

11

638:7, 678:6, 684:16, 701:12, 704:2
**entirely** [4] - 596:4, 607:19, 608:3, 726:21
**entirety** [1] - 707:21
**entities** [1] - 552:17
**entitled** [2] - 505:1, 505:2
**entrance** [1] - 569:17
**entrances** [1] - 576:9
**entrepreneur** [1] - 591:17
**environment** [1] - 670:23
**episodes** [1] - 604:8
**equipment** [4] - 579:21, 602:23, 682:3, 692:12
**erase** [2] - 538:21, 666:9
**Eric** [4] - 643:17, 643:22, 644:14, 644:17
**ESP** [39] - 525:5, 534:14, 535:19, 536:21, 541:12, 541:16, 541:23, 542:2, 543:10, 543:13, 545:4, 545:8, 547:8, 547:23, 549:19, 549:21, 550:5, 551:3, 552:17, 552:19, 552:21, 552:22, 553:1, 567:6, 575:20, 584:4, 587:5, 587:17, 588:19, 591:2, 592:21, 608:16, 616:15, 617:23, 617:25, 624:17, 652:7, 659:15, 662:3
**especially** [4] - 522:4, 567:14, 624:3, 664:11
**espouse** [1] - 562:19
**ESQ** [8] - 495:12, 495:15, 495:15, 495:16, 495:19, 495:19, 495:22, 495:22
**essence** [57] - 500:18, 501:6, 502:11, 506:18, 508:4, 509:5, 526:9, 527:6, 527:24, 530:14, 531:8, 533:18, 542:4, 543:2, 543:6, 544:16, 544:18, 545:18, 546:11, 549:23, 550:13, 550:23, 557:20, 558:20, 559:13, 560:20, 562:7, 567:12, 580:8, 581:22, 583:20, 594:19, 601:1, 609:1, 609:25, 611:5, 617:11, 619:21, 620:12, 624:5, 624:7, 626:23, 627:18, 635:22, 638:6, 639:22, 640:17, 641:22, 644:1, 645:10, 648:22, 677:15, 684:7, 688:14, 704:22, 705:7, 705:12
**essential** [1] - 610:24
**essentially** [1] - 697:22
**establish** [1] - 620:19
**established** [1] - 580:15
**establishment** [3] - 586:14, 586:18, 586:20
**estate** [2] - 594:23, 595:1
**estimate** [4] - 509:21, 618:12, 620:4, 699:2
**estimates** [1] - 699:9
**et** [6] - 500:14, 650:11, 650:12, 665:4
**Eternal** [1] - 541:6
**eternal** [1] - 621:10
**ethical** [11] - 550:7, 562:2, 562:3, 562:4, 562:6, 563:11, 563:12, 563:18, 586:23, 628:17, 670:21
**ethically** [1] - 587:20
**Ethicist** [3] - 583:8, 583:9, 587:25

**ethics** [8] - 550:22, 591:16, 594:15, 594:18, 670:18, 670:19, 670:20
**Ethos** [7] - 509:19, 541:15, 542:23, 546:9, 546:16, 553:16
**Europe** [1] - 639:3
**evaluate** [3] - 505:11, 545:21, 686:7
**evaluated** [4] - 500:24, 538:8, 543:15, 663:20
**evaluations** [1] - 545:22
**evening** [2] - 520:3, 520:7
**evenings** [4] - 553:19, 622:13, 638:5
**event** [6] - 512:18, 560:21, 635:24, 636:24, 638:25, 695:22
**events** [7] - 542:13, 545:15, 553:20, 553:21, 578:21
**eventually** [16] - 513:12, 522:18, 539:20, 550:13, 562:21, 565:24, 566:20, 583:8, 598:7, 611:8, 629:21, 637:16, 639:13, 648:15, 655:11, 657:2
**everlasting** [1] - 621:10
**Everywhere** [1] - 638:15
**everywhere** [1] - 692:20
**evidence** [34] - 497:4, 497:7, 535:15, 535:16, 576:7, 577:22, 640:4, 645:23, 654:9, 668:1, 674:19, 687:13, 687:15, 690:9, 690:11, 694:8, 694:15, 695:7, 695:13, 697:16, 697:18, 708:20, 711:20, 711:23, 715:22, 716:3, 723:4, 723:7, 728:11, 728:12, 728:14, 728:15, 728:17
**evil** [3] - 501:22, 511:5, 511:10
**evolution** [1] - 563:10
**evolved** [2] - 504:16, 528:23
**ex** [1] - 591:8
**ex-presidents** [1] - 591:8
**exact** [18] - 598:24, 598:25, 608:19, 609:23, 645:18, 653:10, 661:20, 669:23, 673:21, 683:6, 700:25, 701:1, 701:14, 701:24, 709:17, 709:18, 714:11, 724:1
**exactly** [8] - 506:20, 545:7, 569:25, 588:25, 645:11, 683:3, 683:24, 712:25
**Exactly** [1] - 648:12
**examination** [13] - 499:1, 499:2, 506:3, 565:9, 613:5, 613:8, 613:18, 616:8, 675:5, 724:7, 725:6, 725:8
**EXAMINATION** [13] - 499:8, 534:1, 558:23, 565:11, 616:12, 654:1, 685:1, 697:5, 708:15, 714:5, 717:4, 728:4, 728:5
**examine** [1] - 505:6, 674:9
**examined** [1] - 513:9
**example** [10] - 499:25, 511:21, 561:12, 562:10, 621:23, 687:25, 717:17, 717:21, 718:1
**examples** [5] - 528:9, 530:20, 627:8, 673:7, 673:9
**exceedingly** [1] - 508:21
**Excel** [1] - 634:2
**except** [5] - 516:22, 584:3, 606:25,

636:16, 642:5
**exception** [2] - 695:18
**excerpt** [1] - 717:15
**excess** [4] - 515:18, 543:11, 547:2, 618:16
**exchange** [9] - 581:17, 581:19, 581:21, 582:3, 582:4, 582:10, 582:12, 641:19, 642:6
**exchanges** [1] - 581:20
**excited** [2] - 633:7, 668:23
**excommunicated** [1] - 645:3
**excuse** [1] - 502:12
**excused** [2] - 612:8, 671:25
**Executive** [13] - 536:17, 536:21, 551:11, 551:13, 551:19, 551:22, 552:2, 552:6, 553:1, 576:10, 576:14, 576:21, 617:8
**executive** [26] - 574:21, 574:23, 588:17, 588:18, 588:20, 588:24, 589:1, 589:2, 589:3, 589:13, 589:16, 589:17, 589:25, 590:5, 590:11, 591:5, 591:15, 592:4, 594:6, 594:8, 594:9, 598:15, 631:17, 639:6, 639:14, 639:15
**exercise** [1] - 584:20
**exhausted** [1] - 531:19
**exhibit** [5] - 534:20, 534:22, 534:24, 574:9, 693:2
**Exhibit** [35] - 590:16, 534:21, 535:12, 535:14, 535:16, 570:22, 574:11, 589:6, 589:11, 592:17, 629:24, 629:25, 639:25, 640:4, 640:6, 645:22, 645:24, 654:4, 687:14, 690:6, 690:8, 690:10, 693:1, 697:15, 697:17, 707:11, 715:12, 716:5, 718:7, 719:15, 719:18, 728:10, 728:12, 728:13, 728:15
**exhibits** [11] - 497:24, 673:5, 673:6, 694:5, 711:12, 712:25, 713:3, 714:10, 714:19, 715:4
**Exhibits** [2] - 716:2, 728:16
**exist** [2] - 500:16, 650:24
**existed** [6] - 502:1, 550:24, 555:15, 558:5, 611:22, 625:5
**exits** [9] - 564:10, 564:15, 569:11, 612:4, 613:25, 671:21, 672:1, 721:21
**expand** [1] - 648:2
**expect** [2] - 613:13, 673:4
**expected** [1] - 638:21
**expensive** [2] - 515:9, 517:18
**experience** [12] - 505:5, 524:6, 598:13, 606:21, 608:16, 623:5, 624:4, 658:7, 660:4, 662:13, 668:1, 702:5
**experienced** [2] - 669:17, 703:24
**experiencing** [1] - 537:1
**experiment** [1] - 623:20
**experimentation** [2] - 666:1, 683:9
**expert** [6] - 504:6, 504:7, 504:17, 505:2, 650:19
**explain** [12] - 509:24, 516:11, 526:6, 532:18, 552:18, 594:12, 602:5, 606:19, 620:1, 648:23, 659:1, 719:6

12

**explained** [4] - 512:23, 552:16, 559:23, 623:1
**explaining** [2] - 520:25, 623:2
**explanation** [1] - 675:14
**explicitly** [1] - 564:4
**exploration** [3] - 511:18, 512:17, 514:12
**exposing** [1] - 604:18
**express** [1] - 607:25
**expressed** [1] - 519:6
**extended** [1] - 531:4
**exterior** [2] - 576:5, 700:18
**external** [4] - 511:25, 512:18, 586:3, 586:5
**extraordinary** [3] - 652:16, 656:19, 660:4
**extreme** [1] - 536:11
**extremely** [2] - 702:8, 720:22
**eyes** [1] - 649:19

# F

**face** [1] - 627:2
**Facebook** [1] - 721:9
**facilitating** [1] - 542:6
**facilitator** [1] - 554:3
**facilitators** [1] - 525:25
**facilities** [2] - 554:22, 630:6
**facing** [3] - 498:9, 577:16, 579:23
**fact** [12] - 505:4, 547:17, 607:4, 656:6, 656:8, 694:14, 707:24, 712:8, 723:5, 723:23, 723:25, 725:25
**facto** [1] - 584:16
**factoring** [1] - 726:10
**fade** [1] - 558:19
**fail** [1] - 531:1
**failed** [1] - 533:17
**failure** [2] - 533:15, 703:18
**fair** [11] - 547:16, 557:2, 560:22, 601:4, 624:16, 632:8, 648:17, 664:25, 704:15, 709:7, 723:22
**Fair** [1] - 593:15
**fairly** [6] - 535:9, 632:7, 634:2, 638:12, 662:25, 703:20
**fall** [1] - 690:24
**familiar** [3] - 581:17, 602:13, 642:20
**family** [5] - 549:3, 591:3, 643:11, 651:18, 720:24
**fancy** [1] - 646:14
**far** [8] - 496:22, 533:1, 584:2, 584:7, 645:21, 680:17, 681:7, 721:20
**farmers** [1] - 643:20
**fashion** [3] - 581:23, 624:8, 703:14
**fast** [1] - 665:20
**father** [12] - 561:17, 561:22, 591:7, 591:8, 595:17, 595:18, 595:20, 596:13, 596:20, 596:21, 597:1
**favor** [1] - 702:20
**fear** [3] - 513:1, 627:7, 628:20
**fearful** [1] - 625:21
**fears** [1] - 509:5
**fee** [1] - 598:25

**feedback** [11] - 502:5, 517:20, 517:22, 517:25, 518:4, 518:8, 518:13, 518:14, 518:16, 543:18
**fees** [8] - 522:20, 531:21, 531:22, 532:3, 546:18, 581:13, 606:6, 606:7
**felt** [12] - 502:12, 504:8, 522:13, 522:15, 531:13, 534:8, 534:10, 623:6, 638:16, 647:13, 658:6, 662:22
**few** [22] - 551:16, 554:24, 564:1, 567:20, 569:11, 577:4, 589:21, 600:7, 607:9, 622:24, 649:17, 655:3, 655:17, 657:9, 664:14, 676:9, 678:16, 678:17, 700:14, 706:6, 718:1
**field** [9] - 558:17, 617:8, 622:19, 622:21, 622:24, 661:12, 662:9, 662:10, 719:10
**Field** [19] - 544:11, 544:12, 544:14, 547:5, 547:6, 547:10, 547:12, 553:6, 556:15, 556:16, 556:20, 556:21, 556:22, 557:1, 557:24, 558:2, 559:1
**fifteen** [1] - 654:25
**fifth** [1] - 500:13
**figure** [20] - 505:3, 519:15, 528:5, 553:11, 566:19, 619:19, 620:13, 620:17, 620:23, 621:2, 622:5, 622:6, 623:8, 631:20, 649:4, 658:8, 664:4, 677:14, 680:12, 726:13
**figured** [2] - 539:11, 651:19
**figuring** [1] - 679:20
**Fiji** [3] - 591:20, 591:23, 595:3
**fila** [1] - 651:22
**file** [18] - 554:9, 662:2, 716:22, 716:23, 717:1, 717:2, 717:12, 717:13, 717:23, 717:24, 718:9, 718:10, 718:21, 718:22, 719:4, 719:5, 719:20, 719:21
**filed** [2] - 602:10, 661:24
**fill** [4] - 507:1, 508:1, 538:6, 554:7
**filled** [2] - 527:8, 554:21
**filling** [1] - 506:13
**film** [19] - 519:13, 531:18, 558:19, 585:18, 599:5, 604:22, 617:17, 634:23, 642:16, 643:3, 643:8, 647:1, 647:5, 649:22, 650:3, 651:12, 652:5, 652:17
**films** [5] - 566:12, 566:16, 566:25, 604:18, 604:22
**final** [6] - 606:12, 676:16, 680:15, 685:22, 686:6, 692:14
**finally** [7] - 501:17, 524:20, 636:7, 653:13, 655:14, 664:14, 685:21
**finance/accounting** [1] - 590:13
**financed** [1] - 594:10, 643:25
**finances** [5] - 597:21, 597:23, 597:24, 598:1, 598:11
**financial** [6] - 544:6, 545:23, 546:3, 597:5, 597:9, 598:3
**fine** [7] - 513:21, 514:3, 514:4, 599:23, 613:19, 674:10, 674:22
**finger** [1] - 536:13
**finish** [2] - 565:17, 691:1
**finished** [1] - 674:5
**finishing** [2] - 537:12

**firm** [1] - 673:12
**first** [67] - 517:24, 518:24, 518:25, 519:17, 519:19, 519:23, 522:11, 523:5, 523:6, 524:6, 525:3, 525:5, 525:6, 525:8, 525:15, 534:7, 536:1, 536:3, 537:1, 537:15, 538:15, 540:23, 543:23, 549:11, 552:24, 562:17, 564:1, 565:14, 565:15, 568:14, 568:17, 569:6, 570:11, 574:20, 575:25, 578:24, 585:25, 588:19, 603:3, 604:13, 622:19, 647:11, 649:19, 652:13, 652:23, 652:25, 653:9, 655:3, 655:21, 657:9, 662:19, 663:12, 672:7, 676:9, 678:17, 687:21, 692:6, 692:7, 698:19, 698:22, 699:8, 712:3, 718:1, 720:11
**fit** [1] - 650:9
**Five** [4] - 550:15, 550:17, 550:18, 551:2
**five** [18] - 500:23, 512:1, 517:4, 517:5, 517:9, 519:3, 519:5, 537:12, 602:9, 613:12, 626:16, 628:13, 633:17, 638:10, 662:7
**five-day** [4] - 500:23, 512:1, 537:12, 662:7
**fix** [4] - 560:3, 560:4, 561:3, 596:11
**flashes** [1] - 513:20
**fled** [1] - 645:5
**flew** [2] - 523:18
**flight** [1] - 512:7
**Flintlock** [3] - 570:9, 570:13, 570:17
**floated** [1] - 651:14
**floating** [1] - 661:15
**floor** [3] - 575:3, 633:11, 636:15
**Floor** [1] - 495:18
**flown** [1] - 555:7
**Fluff** [2] - 693:5, 693:8
**fluffy** [1] - 677:10
**Fluffy** [1] - 691:20
**fly** [1] - 524:25
**focus** [4] - 527:5, 530:20, 639:21, 660:3
**focused** [2] - 684:16, 707:21
**foggy** [1] - 556:18
**follow** [3] - 644:20, 713:4, 720:23
**follow-up** [1] - 713:4
**following** [6] - 505:15, 515:7, 533:19, 604:1, 674:25, 684:18
**Fonz** [1] - 631:3
**food** [3] - 521:16, 542:5, 586:7
**fool** [1] - 651:25
**fooled** [2] - 508:15, 651:24
**football** [1] - 510:10
**FOR** [1] - 495:9
**Forbes** [1] - 593:16
**force** [5] - 544:13, 549:10, 550:7, 610:21, 611:14
**forces** [3] - 608:14, 609:10, 609:11
**forgetting** [1] - 569:7
**forgotten** [2] - 629:22, 695:20
**form** [11] - 503:10, 510:20, 533:5, 538:9, 582:10, 589:15, 608:10, 633:2,

675:18, 705:25, 721:2
**formal** [2] - 515:21, 638:5
**formalize** [2] - 547:15, 622:23
**formalized** [1] - 625:2
**format** [4] - 524:19, 664:25, 665:9, 685:4
**formats** [1] - 666:4
**formed** [1] - 583:5
**former** [1] - 578:8
**forms** [8] - 507:11, 507:17, 507:18, 507:19, 508:1, 508:13, 554:7, 600:21
**forth** [1] - 648:5
**forthright** [1] - 725:24
**fortunate** [1] - 656:17
**fortune** [1] - 596:15
**forum** [7] - 633:21, 634:17, 634:20, 634:21, 636:2, 636:17, 638:13
**forums** [9] - 579:1, 632:2, 632:4, 632:14, 632:24, 633:19, 634:11, 638:9, 638:10
**Forums** [2] - 632:25, 636:17
**forward** [6] - 505:7, 511:11, 716:18, 717:22, 718:20, 719:3
**foundation** [4] - 504:23, 505:6, 587:19, 604:15
**foundational** [1] - 713:7
**foundations** [1] - 584:7
**founded** [1] - 599:20
**founder** [2] - 500:20, 550:6
**founding** [2] - 599:14, 617:15
**four** [27] - 512:2, 519:5, 531:24, 537:6, 537:15, 537:16, 539:2, 539:25, 540:1, 540:7, 540:8, 639:13, 673:5, 673:6, 689:5, 704:15, 706:9, 706:14, 707:8, 707:14, 707:16, 707:23, 711:12, 714:8, 714:12, 719:8
**fourth** [2] - 514:7, 705:25
**frame** [3] - 595:24, 610:6, 720:5
**frames** [1] - 666:13
**Francisco** [1] - 555:15
**Franco** [2] - 593:17, 722:6
**fraud** [1] - 511:4
**freak** [1] - 522:5
**freedom** [2] - 522:13, 529:24
**freeway** [1] - 569:12
**freeways** [1] - 522:7
**Friday** [1] - 692:13
**friend** [1] - 569:3
**friends** [4] - 590:15, 656:12, 658:24, 720:24
**fright** [1] - 604:17
**front** [13] - 554:14, 576:23, 577:4, 577:15, 577:16, 579:7, 654:6, 654:7, 660:10, 660:12, 660:13, 660:17, 709:1
**frowned** [1] - 638:19
**fruition** [1] - 580:12
**fruits** [1] - 694:21
**frustration** [1] - 598:8
**full** [9] - 523:2, 538:19, 538:20, 544:22, 555:12, 558:7, 558:10, 558:11, 581:24

**full-time** [3] - 558:7, 558:10, 558:11
**fully** [2] - 516:12, 613:13
**fulness** [1] - 521:17
**fundamentally** [1] - 540:17
**future** [1] - 527:9
**fuzzy** [3] - 545:5, 547:24, 548:13

# G

**gallery** [1] - 496:8
**game** [1] - 683:10
**games** [4] - 652:24, 652:25, 653:8, 654:15
**GARAUFIS** [1] - 495:10
**Garden** [1] - 590:2
**Gardens** [2] - 646:10, 646:20
**Garza** [4] - 589:3, 589:12, 589:24, 589:25
**gathering** [2] - 602:24, 639:9
**gauging** [1] - 604:19
**geeky** [1] - 520:11
**geeky-type** [1] - 520:11
**general** [16] - 508:5, 568:1, 585:22, 596:23, 617:4, 618:8, 623:8, 624:12, 661:16, 662:21, 680:1, 685:6, 685:7, 703:7, 722:11
**Generally** [3] - 618:1, 624:19, 641:14
**generally** [44] - 496:21, 507:18, 510:1, 510:2, 522:20, 522:22, 522:24, 522:25, 524:19, 524:21, 532:14, 547:9, 547:12, 551:10, 558:12, 582:11, 596:9, 597:8, 607:9, 607:10, 611:13, 618:15, 626:3, 632:15, 634:22, 636:4, 636:5, 639:14, 641:18, 654:22, 654:24, 661:1, 662:8, 662:19, 666:11, 667:22, 668:22, 678:1, 701:25, 705:1, 707:1, 708:23, 709:2, 709:15
**generals** [1] - 609:24
**Generals** [5] - 569:24, 570:6, 579:17, 629:20, 630:2
**generates** [1] - 704:24
**generational** [1] - 680:19
**generations** [1] - 676:18
**genius** [1] - 656:2
**geniuses** [1] - 656:3
**George** [1] - 637:3
**GERAGOS** [1] - 495:19
**Geragos** [1] - 496:10
**girlfriend** [2] - 520:17, 520:23
**girls** [7] - 645:13, 645:16, 646:2, 646:7, 646:9, 646:21, 653:12
**given** [14] - 501:8, 518:15, 536:4, 538:11, 546:17, 557:13, 582:22, 586:7, 586:16, 625:20, 676:12, 711:8, 716:15
**glitch** [6] - 663:13, 664:13, 703:21, 703:25, 705:16, 705:23
**glitched** [1] - 684:15
**glitches** [17] - 664:8, 664:10, 664:12, 664:17, 664:18, 676:15, 679:23,

681:4, 681:16, 684:17, 703:1, 703:3, 703:10, 705:14, 711:12, 714:20, 715:4
**glitchy** [1] - 666:2
**global** [2] - 647:13, 647:16
**god** [2] - 501:25, 663:4
**gods** [1] - 607:5
**gold** [4] - 540:22, 540:24, 541:11, 541:12
**goodness** [6] - 501:21, 559:14, 559:19, 560:21, 562:7, 562:13
**Gore** [1] - 647:14
**government** [4] - 644:6, 644:9, 644:10, 667:10
**Government** [11] - 495:12, 535:14, 629:24, 639:25, 640:3, 645:22, 690:6, 690:8, 695:12, 697:15, 708:19
**government's** [1] - 708:6
**Government's** [63] - 509:16, 510:23, 534:17, 534:21, 535:12, 535:16, 536:9, 548:6, 548:19, 549:5, 549:18, 568:20, 569:13, 569:18, 570:1, 570:22, 570:24, 571:1, 574:8, 574:11, 574:14, 574:22, 576:3, 576:6, 576:24, 577:1, 577:12, 577:18, 577:21, 579:3, 579:9, 584:10, 589:5, 589:10, 589:23, 590:7, 590:22, 591:11, 592:17, 594:3, 654:3, 654:9, 677:4, 686:21, 687:10, 687:12, 687:14, 689:14, 690:10, 693:1, 697:12, 697:17, 707:11, 716:2, 716:5, 718:7, 719:15, 719:18, 728:10, 728:12, 728:13, 728:15, 728:16
**governments** [1] - 670:19
**grade** [1] - 662:1
**grand** [1] - 547:25
**grant** [1] - 674:17
**Grant** [1] - 520:5
**great** [17] - 503:4, 511:8, 524:1, 534:6, 558:10, 566:12, 590:3, 594:10, 596:23, 605:7, 617:1, 632:10, 638:1, 657:17, 659:14, 691:16
**Great** [1] - 514:5
**greater** [1] - 626:4
**green** [12] - 518:13, 539:14, 539:20, 539:22, 540:1, 540:8, 541:14, 545:8, 546:2, 590:2, 616:23, 617:3
**greens** [1] - 639:16
**Greens** [4] - 545:11, 545:17, 548:2, 551:10
**grew** [1] - 609:6
**gross** [3] - 557:14, 557:16, 611:12
**ground** [1] - 542:3
**group** [12] - 515:1, 532:22, 533:3, 533:6, 533:9, 533:10, 533:11, 533:16, 592:6, 592:9, 633:22
**groupings** [1] - 527:15
**groups** [3] - 529:5, 529:12, 636:1
**grow** [1] - 566:11
**growing** [2] - 622:15, 622:16
**grown** [2] - 555:18, 587:11
**growth** [4] - 521:17, 535:25, 543:15,

583:3
**Guadalajara** [1] - 555:16
**guardians** [1] - 646:23
**Guatemala** [2] - 555:17
**guess** [6] - 509:13, 517:5, 532:7, 604:14, 604:19, 702:23
**guise** [1] - 529:23
**guts** [1] - 528:3
**guys** [1] - 501:14
**gym** [3] - 653:10, 653:12, 655:11

## H

**habit** [2] - 692:19
**hack** [1] - 528:7
**HAJJAR** [8] - 495:15, 565:5, 565:10, 571:4, 574:2, 585:10, 604:16, 605:7
**Hajjar** [1] - 496:3
**Hale** [7] - 570:15, 574:4, 574:10, 574:12, 574:16, 574:18, 574:20
**half** [2] - 566:4, 724:20
**Halfmoon** [5] - 567:21, 568:4, 568:7, 653:14
**halfway** [1] - 724:19
**hand** [3] - 558:21, 575:2, 689:21
**handed** [3] - 663:24, 676:21, 701:16
**Handing** [1] - 497:20
**handle** [5] - 519:22, 559:19, 559:20, 592:25, 593:1
**handled** [4] - 592:6, 597:5, 611:10, 611:18
**hands** [5] - 510:6, 510:7, 510:8, 510:9, 673:25
**hands-on** [1] - 673:25
**handwritten** [2] - 679:3, 679:5
**hard** [6] - 517:9, 582:22, 621:4, 627:3, 707:3, 724:24
**hardest** [3] - 658:3, 658:4, 658:11
**hates** [1] - 526:19
**Hayner's** [2] - 653:13, 653:14
**HAYNERS** [1] - 653:14
**Hayners** [1] - 654:5
**HDMI** [1] - 679:15
**he's-a-big-deal-too** [1] - 658:25
**Head** [3] - 557:17, 557:20, 557:23
**head** [15] - 541:18, 544:9, 546:17, 549:24, 551:6, 552:1, 575:14, 575:19, 590:1, 590:12, 591:1, 596:15, 611:12, 631:14, 665:17
**headaches** [1] - 668:3
**header** [1] - 690:19
**heading** [1] - 604:6
**headquarters** [2] - 575:14, 575:20
**heads** [2] - 594:18, 596:14
**heal** [5] - 502:10, 595:23, 596:11, 660:25, 667:13
**healing** [1] - 595:24
**health** [6] - 639:17, 667:7, 667:8, 667:21, 668:13, 668:20
**Health** [1] - 608:19
**hear** [3] - 562:23, 596:5, 717:18

**heard** [10] - 520:14, 523:5, 561:24, 580:4, 580:7, 595:19, 609:12, 711:15, 721:12
**hearing** [4] - 504:2, 673:2, 694:2, 711:2
**heavy** [1] - 522:3
**held** [16] - 504:1, 553:21, 577:5, 579:1, 579:2, 590:12, 653:1, 653:8, 653:11, 653:15, 673:1, 693:20, 694:1, 708:10, 711:1, 716:13
**help** [22] - 502:25, 512:12, 526:3, 526:22, 527:20, 528:5, 528:16, 543:9, 545:21, 548:11, 556:5, 594:14, 598:8, 620:2, 621:17, 627:9, 638:24, 639:12, 639:19, 641:9, 677:14
**helped** [1] - 549:9
**helpful** [1] - 724:8
**helping** [4] - 528:20, 545:10, 688:22, 689:1
**Heritage** [1] - 567:22
**heroic** [1] - 643:9
**Hi8** [2] - 680:5, 704:9
**hide** [6] - 664:16, 680:1, 681:16, 706:22, 707:7, 718:5
**high** [18] - 545:14, 561:6, 567:14, 582:23, 582:25, 595:5, 595:6, 638:21, 638:23, 638:24, 640:25, 641:12, 641:16, 641:24, 642:10, 664:24, 676:6, 678:7
**high-ranking** [6] - 545:14, 638:21, 640:25, 641:12, 641:16, 641:24
**high-tech** [1] - 678:7
**higher** [9] - 502:15, 531:11, 611:2, 611:5, 635:2, 638:17, 639:23, 670:24, 670:25
**higher-end** [1] - 635:2
**highest** [6] - 510:4, 510:5, 510:6, 510:7, 540:10, 587:3
**Hill** [1] - 520:6
**hills** [2] - 528:15, 553:12
**himself** [4] - 541:6, 547:14, 586:21, 661:11
**historical** [1] - 634:14
**hit** [2] - 512:6, 706:5
**hold** [10] - 510:5, 510:7, 537:23, 553:20, 554:20, 554:24, 581:3, 639:8, 686:19
**holding** [2] - 509:6
**hole** [1] - 640:18
**holes** [1] - 651:10
**home** [1] - 553:25
**Homes** [1] - 567:22
**honest** [1] - 647:15
**honestly** [11] - 508:23, 511:6, 512:12, 514:7, 531:16, 534:5, 547:24, 548:13, 555:5, 561:9, 711:11
**honor** [4] - 500:2, 500:3, 500:4, 559:15
**Honor** [70] - 496:4, 496:20, 497:1, 497:23, 498:10, 499:4, 499:7, 499:23, 503:16, 504:14, 506:4, 523:22, 530:1, 534:15, 538:22, 563:6, 564:6, 571:4, 574:2, 580:17, 585:8, 603:6, 604:16,

609:13, 611:24, 612:11, 612:18, 612:25, 671:2, 672:7, 673:4, 674:11, 674:23, 675:7, 675:8, 685:16, 686:17, 687:10, 689:10, 690:5, 692:21, 693:15, 694:23, 695:9, 695:15, 697:11, 708:5, 708:11, 710:8, 710:9, 712:11, 712:23, 714:2, 715:12, 716:4, 716:11, 716:14, 720:16, 721:25, 723:14, 723:16, 723:21, 724:13, 725:5, 725:14, 726:15, 727:1, 727:2, 727:5
**Honor's** [2] - 604:17, 695:11
**HONORABLE** [1] - 495:10
**hook** [1] - 600:8
**hope** [3] - 590:18, 724:18, 724:20
**hopes** [1] - 716:17
**horrible** [3] - 509:10, 511:5
**horror** [1] - 506:12
**host** [3] - 588:4, 588:5, 639:15
**hosting** [1] - 638:25
**hot** [1] - 512:21
**hotel** [2] - 637:8, 651:2
**hour** [5] - 524:3, 633:17, 635:3, 657:4, 659:25, 660:1
**hourly** [1] - 557:9
**hours** [15] - 520:8, 523:7, 531:16, 531:18, 542:18, 542:19, 542:25, 543:1, 633:17, 642:19, 692:11, 724:14, 725:11
**house** [12] - 520:5, 569:7, 569:11, 569:20, 579:21, 579:22, 630:6, 642:12, 645:21, 691:15, 691:16, 691:20
**housekeeping** [1] - 496:13
**houses** [3] - 579:23, 594:25, 637:12
**hub** [1] - 575:24
**hubs** [1] - 553:16
**huddle** [1] - 510:10
**huge** [8] - 522:7, 564:5, 639:21, 640:18, 647:16, 667:9, 710:1
**human** [10] - 526:23, 527:19, 533:4, 566:15, 623:23, 623:25, 624:2, 636:12, 658:1, 658:10
**humanitarian** [2] - 550:7, 562:9
**humanities** [1] - 550:22
**humanity** [1] - 601:7
**humankind** [1] - 540:17
**humiliating** [1] - 695:12
**hundred** [5] - 515:13, 546:9, 546:12, 546:16, 555:1
**Hundreds** [1] - 642:17
**hundreds** [2] - 642:17
**hurt** [2] - 511:7
**hurts** [1] - 652:3
**hush** [1] - 661:18
**hysterical** [1] - 625:21

## I

**idea** [46] - 507:17, 507:24, 509:3, 509:7, 509:10, 513:24, 518:3, 528:4, 528:18,

529:18, 531:5, 533:15, 534:6, 559:13, 560:18, 561:9, 562:18, 566:3, 566:23, 580:3, 586:1, 595:25, 600:4, 600:8, 607:6, 608:24, 620:6, 621:9, 640:13, 641:10, 646:14, 646:17, 648:1, 648:22, 649:4, 650:5, 651:12, 652:4, 667:10, 667:16, 681:15, 683:10, 692:3, 706:20, 707:6, 725:4

**ideally** [1] - 688:23

**ideas** [8] - 524:18, 549:25, 580:7, 633:9, 634:8, 649:20, 651:14, 651:15

**identification** [4] - 534:21, 686:20, 689:13, 693:1

**identified** [4] - 533:7, 551:2, 721:17

**illegal** [8] - 529:20, 670:11, 675:11, 675:12, 675:17, 675:23, 676:2, 702:16

**illegally** [1] - 702:18

**image** [4] - 577:20, 579:11, 664:14, 720:8

**images** [2] - 577:25, 704:11

**imagine** [4] - 508:20, 613:7, 674:7, 726:2

**impediments** [1] - 521:17

**implementing** [1] - 680:14

**import** [1] - 681:1

**important** [9] - 500:3, 512:13, 634:11, 634:13, 635:17, 656:21, 659:3, 666:10, 720:22

**imposed** [1] - 694:20

**impossible** [1] - 720:10

**impression** [3] - 515:24, 662:21, 670:17

**improve** [1] - 511:9

**in-camera** [1] - 719:24

**inadvertent** [1] - 709:6

**incident** [2] - 595:17, 634:16

**inclined** [1] - 674:12

**include** [5] - 506:23, 523:9, 677:1, 691:2, 707:14

**included** [4] - 523:10, 523:11, 681:11, 712:25

**including** [6] - 541:13, 589:15, 608:22, 699:17, 721:3, 721:9

**income** [1] - 611:7

**inconsistent** [1] - 709:8

**increase** [1] - 658:19

**increased** [1] - 658:21

**incredible** [3] - 514:8, 636:12, 662:13

**incurred** [1] - 642:7

**indeed** [3] - 502:2, 502:13, 529:12

**independent** [4] - 506:15, 506:16, 607:2, 721:15

**independently** [1] - 607:20

**indicate** [4] - 560:20, 664:7, 674:18, 698:6

**indicated** [7] - 538:2, 570:12, 586:13, 613:4, 666:24, 675:10, 688:7

**indicates** [4] - 688:6, 688:15, 690:19, 699:12

**indicating** [3] - 510:4, 574:25, 665:14

**indication** [1] - 502:14

**individuals** [2] - 607:7, 624:16

**industry** [2] - 618:1, 618:10

**influence** [1] - 726:11

**influential** [2] - 591:3, 618:2

**informal** [1] - 638:5

**information** [24] - 506:23, 506:24, 507:12, 507:14, 507:16, 508:22, 509:12, 529:19, 532:5, 540:18, 613:21, 647:7, 648:25, 659:8, 665:20, 666:5, 666:7, 666:9, 679:1, 679:6, 685:6, 685:23, 686:2, 721:4

**informed** [1] - 504:16

**initial** [9] - 506:7, 521:5, 521:22, 522:19, 525:12, 555:9, 652:7, 656:22, 688:25

**initiated** [2] - 649:13, 649:16

**inner** [1] - 661:17

**inquire** [1] - 504:25

**Inquiry** [3] - 601:11, 601:17, 601:21

**inquiry** [2] - 553:8, 667:13

**insert** [6] - 705:1, 718:2, 718:3, 718:5, 718:12, 719:7

**inside** [2] - 560:11, 607:4

**insight** [1] - 520:19

**insistence** [1] - 655:13

**inspire** [1] - 628:20

**Instagram** [1] - 721:9

**install** [1] - 579:21

**installation** [1] - 580:22

**instance** [14] - 502:25, 504:24, 507:7, 511:18, 512:24, 518:6, 530:19, 531:2, 537:17, 555:3, 582:5, 598:15, 621:24, 704:3

**instances** [2] - 581:12, 582:23

**instead** [4] - 610:20, 621:5, 644:5, 706:2

**instinct** [1] - 528:21

**instinctual** [1] - 530:11

**Institute** [1] - 590:18

**instructed** [3] - 668:5, 695:15, 711:13

**instruction** [1] - 674:12

**instructions** [1] - 720:23

**intake** [4] - 507:18, 538:9, 600:21

**intellect** [1] - 528:23

**intellectual** [1] - 662:24

**intellectually** [1] - 513:15

**intelligence** [2] - 586:24, 601:22

**intend** [3] - 613:2, 613:5, 724:13

**intended** [3] - 511:5, 511:8, 600:18

**intending** [1] - 519:3

**intends** [1] - 497:9

**intensive** [54] - 499:13, 501:13, 503:10, 507:20, 507:22, 509:20, 512:1, 518:24, 518:25, 519:2, 519:9, 519:10, 519:18, 519:19, 519:23, 519:24, 521:23, 522:20, 522:21, 523:11, 524:21, 525:8, 526:14, 526:15, 526:17, 526:21, 526:22, 527:2, 531:23, 532:10, 532:20, 532:21, 565:14, 565:15, 566:2, 566:4, 585:6, 616:18, 621:17, 628:8, 628:11, 628:24, 629:1, 629:6, 629:7, 629:10,

632:16, 650:7, 652:13, 654:23, 657:25, 659:17, 663:2

**Intensive** [21] - 537:15, 538:11, 541:15, 542:3, 542:5, 542:7, 542:9, 555:4, 555:9, 557:6, 557:9, 687:23, 687:24, 688:1, 688:2, 688:3, 709:9, 709:17, 709:18, 709:24, 709:25

**intensives** [29] - 514:23, 525:5, 525:6, 525:17, 527:3, 527:12, 527:13, 527:14, 527:16, 527:20, 527:22, 528:24, 529:2, 530:5, 530:12, 531:20, 531:24, 531:25, 532:23, 553:18, 585:4, 600:10, 600:21, 601:6, 618:7, 632:15, 633:4

**Intensives** [5] - 541:12, 560:5, 708:3, 708:24, 709:20

**intent** [4] - 501:8, 501:19, 508:25

**intentional** [1] - 709:5

**intentionally** [2] - 708:21, 708:22

**interact** [2] - 561:19, 652:9

**interactions** [1] - 565:18

**interchangeably** [1] - 552:21

**interest** [2] - 585:5, 586:21

**interested** [1] - 610:10

**interesting** [5] - 500:6, 521:11, 651:18, 651:22, 652:1

**interests** [1] - 637:20

**interface** [1] - 597:15

**interference** [3] - 664:22, 679:18, 704:4

**intermittent** [3] - 705:6, 707:7, 715:7

**internal** [2] - 512:19, 611:21

**Internet** [1] - 721:3

**internet** [1] - 580:6

**interpreted** [1] - 726:2

**interruption** [1] - 717:16

**intervals** [1] - 703:8

**interview** [3] - 564:3, 644:16, 644:17

**intimacy** [1] - 528:14

**introduce** [1] - 706:20

**introduced** [2] - 530:15, 673:10

**introductory** [3] - 547:16, 553:19, 622:12

**introductory-type** [1] - 622:12

**invent** [1] - 540:16

**invented** [1] - 520:15

**investigation** [1] - 721:16

**investigators** [1] - 651:2

**investment** [1] - 626:20

**investments** [1] - 594:23

**Invincibility** [1] - 509:3

**invincible** [3] - 509:4, 509:8, 509:13

**invite** [1] - 629:2

**involve** [7] - 531:20, 542:18, 544:19, 547:21, 582:7, 649:25, 691:19

**involved** [41] - 514:19, 522:24, 523:25, 530:7, 532:10, 545:14, 545:15, 561:21, 567:15, 588:19, 591:20, 593:21, 594:15, 594:23, 595:1, 595:4, 603:2, 604:18, 604:22, 607:3, 607:15, 610:23, 617:5, 618:19, 619:1, 627:21,

631:24, 631:25, 646:9, 651:5, 651:13, 665:23, 670:4, 673:12, 678:24, 683:4, 683:5, 684:3, 684:5, 686:14, 691:23
**involvement** [4] - 523:24, 596:22, 652:7, 662:4
**involving** [6] - 647:2, 648:17, 649:13, 695:4, 695:5, 712:19
**Iowa** [1] - 602:18
**iPods** [1] - 554:4
**IQ** [1] - 586:24
**island** [5] - 591:18, 591:19, 591:20, 591:23, 592:3
**isolate** [1] - 560:18
**Issue** [2] - 539:4, 539:5
**issue** [21] - 498:12, 503:1, 503:4, 503:7, 521:14, 522:2, 598:5, 598:7, 612:9, 612:12, 612:14, 612:21, 612:22, 613:10, 629:7, 672:11, 674:8, 698:6, 706:23, 707:2, 711:11
**issued** [3] - 601:16, 602:2, 602:4
**issues** [13] - 502:8, 502:14, 527:15, 548:11, 553:5, 587:14, 607:22, 620:5, 625:3, 641:7, 662:15, 665:10, 716:15
**IT** [1] - 577:10
**it'll** [1] - 725:23
**it)** [1] - 688:23
**Italian** [1] - 578:10
**item** [8] - 688:8, 688:15, 688:21, 689:5, 691:14, 692:5, 692:7
**items** [2] - 691:12, 691:19
**itself** [4] - 583:19, 611:17, 665:19, 709:4

## J

**Jeske** [5] - 548:16, 549:6, 549:7, 549:8, 661:9
**jet** [1] - 595:9
**Jewish** [1] - 596:15
**jiggle** [6] - 679:17, 705:12, 706:12, 706:18, 707:1, 720:4
**jiggled** [3] - 701:5, 705:12, 706:24
**jiggling** [7] - 706:22, 717:17, 717:21, 718:2, 718:4, 718:12, 719:7
**Jim** [12] - 583:25, 584:9, 584:12, 584:13, 584:14, 592:12, 593:14, 606:13, 654:18, 660:16, 660:18, 660:20
**Jness** [5] - 524:17, 578:24, 583:9, 583:10
**job** [6] - 502:25, 557:11, 558:7, 558:11, 611:23, 622:21
**jobs** [5] - 558:9, 558:10, 558:14, 582:2
**join** [1] - 618:25
**joke** [1] - 636:9
**Josh** [1] - 630:22
**journalist** [1] - 627:22
**journalists** [2] - 593:14, 627:16
**joy** [2] - 626:20, 626:21
**joyful** [1] - 586:6
**Juan** [1] - 631:3
**Judge** [10] - 498:19, 604:5, 605:8, 608:11, 612:20, 613:19, 674:22,

694:4, 696:5, 724:10
**JUDGE** [1] - 495:10
**Judge's** [1] - 532:2
**July** [4] - 693:4, 693:10, 698:6, 699:15
**jumble** [1] - 692:18
**jump** [2] - 537:6, 556:21
**Junco** [3] - 645:21, 646:1, 646:2
**June** [8] - 655:17, 663:5, 688:4, 688:7, 689:20, 689:25, 691:2, 722:25
**jurors** [1] - 720:25
**jury** [37] - 496:14, 497:8, 497:12, 498:23, 504:2, 504:9, 505:11, 535:15, 563:8, 564:9, 565:6, 612:3, 616:3, 669:13, 671:20, 673:2, 674:14, 674:18, 674:19, 675:2, 687:13, 690:9, 694:3, 694:9, 694:13, 695:15, 711:3, 715:18, 715:20, 716:1, 720:18, 720:21, 721:14, 721:20, 723:11, 723:18, 724:4
**Jury** [9] - 498:21, 564:10, 612:4, 614:3, 616:1, 616:6, 671:21, 675:3, 721:21
**JURY** [1] - 498:24
**jury's** [1] - 698:23
**Justin** [3] - 630:23, 630:24, 630:25

## K

**Karen** [9] - 525:10, 588:22, 589:19, 590:9, 590:10, 590:11, 597:15, 606:9, 607:11
**Karner** [11] - 535:8, 575:15, 575:18, 575:19, 576:5, 577:7, 577:8, 577:14, 578:4, 597:8, 597:19
**Kathy** [2] - 597:13, 607:15
**Keeffe** [6] - 592:12, 592:19, 592:20, 592:21, 687:4, 687:20
**keen** [1] - 585:5
**keep** [9] - 505:12, 543:20, 620:17, 624:7, 635:9, 702:14, 706:3, 716:24
**keeping** [1] - 705:22
**keeps** [3] - 528:1, 695:9, 704:5
**KEITH** [1] - 495:7
**Keith** [7] - 496:10, 566:18, 636:8, 649:18, 678:22, 692:8, 708:17
**Ken** [10] - 631:1, 677:1, 678:4, 678:5, 683:5, 691:20, 693:4, 693:6, 693:10
**kept** [4] - 513:17, 553:23, 658:16, 690:16
**key** [1] - 553:6
**kidnapped** [1] - 643:16
**kidnappers** [5] - 643:15, 643:24, 644:2, 644:10, 644:14
**kidnappings** [1] - 643:25
**kids** [2] - 526:10, 646:19
**kill** [1] - 644:4
**kills** [1] - 652:2
**KIM** [1] - 495:15
**kind** [81] - 502:7, 512:10, 518:20, 520:13, 523:5, 526:11, 529:21, 530:18, 530:21, 531:5, 531:14, 532:12, 548:12, 557:6, 560:6, 561:10,

564:3, 566:14, 566:15, 579:18, 579:19, 581:20, 587:19, 592:2, 595:1, 596:11, 598:14, 600:15, 600:17, 600:18, 607:14, 609:9, 610:5, 611:8, 621:14, 623:17, 626:11, 626:17, 627:20, 629:7, 632:21, 633:8, 635:15, 639:8, 641:4, 642:6, 645:19, 647:7, 649:12, 650:8, 651:4, 651:21, 658:25, 661:15, 661:24, 662:22, 662:23, 663:4, 663:14, 664:20, 664:21, 664:24, 665:9, 667:7, 670:5, 670:23, 684:17, 685:8, 685:20, 688:13, 700:24, 701:6, 702:22, 703:7, 703:18, 703:21, 705:16, 707:2, 709:16, 717:9
**kinds** [18] - 509:11, 514:6, 521:16, 528:21, 531:13, 566:16, 567:12, 626:22, 628:1, 664:10, 664:16, 668:4, 679:18, 681:3, 700:7, 705:14, 706:7, 707:4
**king** [2] - 659:2
**Kinnam** [3] - 563:24, 563:25, 564:1
**kitchen** [1] - 554:22
**knowledge** [14] - 505:7, 516:2, 516:3, 516:4, 540:19, 548:1, 594:1, 602:21, 604:11, 631:19, 669:22, 680:11, 711:16
**known** [4] - 541:2, 541:5, 550:4, 668:22
**knows** [4] - 509:5, 585:15, 601:22, 694:13
**Knox** [13] - 567:5, 567:9, 567:10, 567:16, 567:17, 567:24, 568:10, 569:9, 569:11, 569:25, 570:7, 570:8
**Kozak** [8] - 631:1, 677:1, 678:4, 678:5, 683:5, 693:10, 698:10
**Kozak's** [2] - 693:6, 699:8
**Kristin** [16] - 592:12, 592:19, 592:20, 592:21, 678:22, 687:4, 687:19, 687:23, 688:24, 688:25, 694:5, 694:7, 694:8, 694:9, 694:13, 694:14

## L

**LA** [3] - 521:9, 521:18, 522:6
**lab** [2] - 600:24
**label** [1] - 701:10
**labeled** [1] - 559:24
**labels** [4] - 676:19, 700:22, 700:25, 701:2
**lack** [1] - 583:2
**Lake** [1] - 637:3
**land** [1] - 670:15
**lane** [1] - 522:4
**Lane** [2] - 570:10, 570:13
**language** [1] - 649:12
**languages** [1] - 646:18
**large** [6] - 602:6, 609:6, 632:7, 638:10, 643:11, 704:3
**larger** [3] - 554:19, 555:7, 555:8
**last** [7] - 519:13, 527:1, 551:16, 678:16, 689:7, 700:14, 725:8
**late** [2] - 599:19, 657:4

17

**Latham** [3] - 535:8, 575:15, 653:9
**laughed** [1] - 660:20
**laughter** [1] - 513:23
**Laura** [3] - 645:21, 646:1, 646:2
**Lauren** [8] - 525:10, 541:18, 561:7, 561:16, 561:21, 588:21, 589:8, 589:20
**law** [2] - 673:11, 675:13
**lawfulness** [1] - 671:7
**laws** [1] - 670:14
**lawsuit** [13] - 670:4, 670:10, 673:7, 673:12, 712:2, 712:4, 712:9, 712:10, 712:12, 712:15, 712:20, 712:22
**lawsuits** [3] - 593:3, 593:12, 593:15
**lawyer** [2] - 602:5, 708:18
**lawyers** [6] - 592:9, 594:13, 594:14, 671:13, 682:20, 682:21
**lay** [2] - 505:9, 682:11
**layout** [1] - 554:12
**lead** [3] - 539:20, 668:7, 709:4
**leader** [1] - 643:18
**leaders** [3] - 524:16, 584:15, 592:23
**leadership** [1] - 587:10
**learn** [10] - 514:9, 528:19, 565:20, 566:22, 566:23, 623:7, 624:4, 643:7, 652:16
**learned** [9] - 504:16, 550:10, 559:13, 588:9, 601:15, 643:10, 712:16, 712:17, 712:20
**learner** [1] - 624:2
**learning** [3] - 543:3, 543:4, 654:20
**learnt** [1] - 643:14
**least** [6] - 508:3, 629:6, 643:14, 695:21, 715:22, 725:8
**leave** [8] - 522:17, 618:24, 629:2, 629:11, 657:14, 674:14, 716:16, 720:20
**leaves** [1] - 564:14
**LeBaron** [11] - 642:21, 642:23, 642:24, 642:25, 643:7, 643:10, 643:13, 643:17, 643:19, 645:13, 646:3
**LeBaron's** [1] - 643:11
**LeBarons** [1] - 643:13
**led** [7] - 519:17, 527:23, 551:8, 588:18, 601:23, 667:12
**left** [23] - 499:12, 524:2, 527:6, 527:7, 536:11, 539:9, 540:3, 546:24, 554:16, 557:20, 557:25, 561:14, 564:2, 575:2, 594:21, 616:24, 618:17, 618:20, 618:21, 636:25, 650:10, 650:22
**legal** [32] - 583:23, 584:17, 592:6, 592:8, 592:24, 592:25, 593:21, 594:4, 599:15, 599:16, 599:21, 663:18, 664:4, 670:4, 670:5, 671:6, 675:23, 676:10, 676:21, 678:11, 678:20, 678:24, 679:1, 679:6, 682:18, 686:13, 686:15, 687:23, 691:14, 700:20, 723:2
**Legal** [9] - 592:10, 592:11, 592:14, 592:15, 593:25, 594:2, 685:22, 701:16
**legally** [1] - 594:12
**legitimate** [1] - 502:24

**length** [1] - 540:23
**LESKO** [98] - 495:16, 497:18, 497:20, 497:22, 498:3, 498:10, 498:15, 499:4, 499:9, 504:14, 505:13, 506:4, 506:5, 510:22, 511:1, 523:22, 523:23, 530:1, 530:3, 534:2, 534:15, 535:12, 538:18, 538:22, 539:11, 558:24, 564:6, 565:12, 574:3, 606:3, 608:12, 609:15, 610:17, 611:24, 612:25, 613:2, 613:13, 616:13, 629:23, 639:24, 640:3, 645:22, 654:2, 668:18, 669:15, 671:2, 672:7, 672:11, 672:13, 673:4, 673:20, 674:2, 674:6, 674:11, 674:16, 674:23, 675:8, 675:9, 675:21, 682:23, 685:2, 687:10, 689:10, 690:5, 692:21, 692:24, 693:15, 694:23, 697:4, 697:6, 697:11, 698:14, 698:21, 698:24, 708:5, 710:9, 711:10, 712:11, 712:18, 712:23, 713:9, 714:2, 714:4, 714:6, 715:12, 716:4, 716:7, 716:14, 716:19, 716:24, 717:3, 717:5, 717:14, 717:25, 720:16, 724:18, 726:4, 728:4
**Lesko** [7] - 496:4, 506:2, 565:8, 616:9, 675:5, 698:18, 726:3
**Lesko's** [1] - 725:6
**less** [9] - 528:23, 534:5, 540:1, 547:3, 556:19, 565:25, 608:25, 609:4, 655:16
**letter** [1] - 640:15
**letters** [1] - 640:16
**letting** [1] - 509:7
**level** [22] - 511:25, 512:24, 513:5, 513:8, 514:16, 514:20, 515:2, 516:19, 517:1, 517:3, 517:6, 531:15, 540:4, 544:19, 582:2, 582:23, 586:4, 597:14, 611:1, 611:2, 611:4, 611:5
**Level** [19] - 503:6, 507:19, 517:2, 525:6, 526:20, 527:4, 527:12, 527:14, 528:5, 528:16, 528:24, 530:4, 530:5, 530:12, 531:20, 532:24, 566:6, 582:5
**levels** [8] - 514:14, 515:17, 516:20, 521:2, 540:20, 562:4, 587:4
**liaise** [1] - 631:22
**liaising** [1] - 664:4
**liaison** [1] - 594:7
**library** [2] - 574:21, 574:23
**license** [1] - 586:9
**licensed** [2] - 516:2, 516:4
**lid** [1] - 705:21
**lie** [3] - 511:4, 601:25, 648:24
**lies** [4] - 647:2, 648:17, 648:18, 649:13
**Life** [3] - 539:4, 626:7
**life** [19] - 503:3, 505:3, 508:2, 512:12, 513:9, 520:20, 526:24, 543:9, 566:10, 600:24, 619:11, 621:3, 621:7, 621:21, 626:21, 627:1, 627:4, 647:10, 658:11
**lifelong** [2] - 626:20, 636:9
**lifetime** [1] - 626:21
**light** [2] - 523:12, 628:24
**lighting** [1] - 617:13
**lights** [1] - 716:11
**likely** [1] - 720:9

**likeness** [1] - 662:15
**limit** [1] - 724:22
**limitation** [2] - 501:23, 503:2
**line** [3] - 694:24, 704:1
**link** [2] - 711:8, 722:19
**linkage** [2] - 712:9, 712:11
**links** [1] - 511:20
**Lisa** [2] - 592:12, 686:10
**list** [8] - 497:3, 497:23, 676:12, 678:13, 678:19, 692:5, 692:13, 692:14
**listen** [3] - 526:11, 633:1, 721:1
**listened** [1] - 501:17
**litigation** [8] - 671:9, 722:6, 722:8, 722:15, 722:19, 723:6, 723:14, 723:15
**live** [3] - 567:5, 569:5, 608:7
**lived** [14] - 520:6, 548:23, 567:15, 567:19, 567:20, 567:23, 568:17, 569:7, 569:21, 570:12, 575:7, 575:10, 630:3, 630:5
**lives** [1] - 548:12
**living** [5] - 566:22, 567:3, 570:16, 642:12, 643:15
**LLC** [3] - 583:10, 629:13
**loaned** [1] - 691:13
**lobby** [1] - 554:15
**located** [6] - 535:6, 574:24, 597:19, 629:16, 629:17, 629:18
**location** [6] - 552:15, 567:18, 570:9, 574:18, 630:3, 721:17
**lock** [1] - 635:21
**locked** [3] - 553:24, 554:1, 554:5
**lodge** [1] - 637:12
**lodging** [1] - 637:13
**London** [1] - 555:19
**look** [19] - 512:20, 514:2, 538:9, 627:11, 627:20, 658:2, 663:11, 676:15, 676:20, 679:24, 681:16, 683:12, 686:8, 701:5, 701:7, 705:20, 706:24, 720:1, 720:2
**Look** [3] - 500:15, 519:12, 650:17
**looked** [5] - 506:12, 571:1, 663:21, 709:13, 709:15
**looking** [9] - 501:21, 501:22, 510:18, 619:20, 633:23, 643:8, 658:11, 672:10
**looks** [8] - 630:2, 660:21, 663:13, 664:22, 689:20, 699:21, 718:13
**loosely** [1] - 592:8
**Lopez** [1] - 631:3
**Loreta** [4] - 589:3, 589:12, 589:23, 589:25
**Los** [9] - 555:14, 558:4, 565:16, 568:13, 568:15, 595:2, 617:6, 617:7, 629:9
**lose** [1] - 620:17
**losing** [1] - 624:11
**loss** [8] - 530:21, 598:16, 598:18, 598:21, 622:8, 703:17, 703:25, 707:7
**lost** [3] - 549:15, 622:1, 622:4
**loud** [1] - 509:22
**lounges** [1] - 554:18
**love** [15] - 526:22, 528:10, 528:11,

528:12, 528:13, 532:20, 620:16, 620:18, 620:20, 620:24, 621:10, 649:18, 656:20, 725:1
**loved** [1] - 678:7
**lover** [1] - 651:3
**loving** [2] - 626:13, 626:15
**low** [2] - 597:14, 690:15
**lower** [5] - 514:16, 514:20, 539:9, 582:2, 611:4
**lower-left** [1] - 539:9
**lowest** [1] - 515:17
**loyalty** [1] - 587:10
**Luciferian** [3] - 600:15, 600:16, 600:17
**lucky** [1] - 653:5
**lunch** [7] - 523:13, 532:15, 532:16, 605:5, 612:2, 613:22, 613:25
**lunches** [1] - 557:12
**lying** [3] - 664:23, 690:17

**M**

**macabre** [1] - 604:8
**machine** [27] - 609:3, 679:13, 679:14, 679:15, 679:16, 682:8, 683:6, 704:4, 705:7, 705:18, 705:19, 705:20, 705:21, 706:1, 706:2, 706:3, 706:4, 718:14, 718:17, 719:9, 719:11
**machines** [9] - 681:7, 682:5, 684:8, 690:17, 691:5, 699:17, 700:5, 705:8, 706:5
**magnet** [1] - 704:3
**magnetic** [2] - 665:8, 665:15
**mail** [16] - 495:24, 658:15, 687:6, 687:7, 687:8, 687:16, 688:4, 688:24, 693:3, 693:4, 693:6, 697:19, 698:5, 698:25, 721:7
**mailed** [1] - 689:21
**mails** [4] - 686:16, 686:17, 697:8, 723:24
**main** [5] - 554:24, 569:17, 576:11, 634:25, 637:11
**maintain** [1] - 568:13
**maker** [1] - 519:13
**makers** [2] - 592:14, 592:15
**mal** [1] - 600:18
**male** [1] - 656:12
**man** [7] - 502:2, 566:12, 645:10, 649:7, 662:12, 662:16
**manage** [2] - 677:15, 689:1
**manager** [1] - 677:13
**managing** [1] - 677:23
**manipulation** [1] - 722:20
**manipulative** [1] - 502:19
**manned** [1] - 551:5
**manner** [2] - 550:12, 633:19
**manufactured** [1] - 703:10
**Marc** [1] - 496:9
**Marianna** [3] - 570:21, 570:23, 677:19
**MARK** [3] - 495:16, 495:19, 728:3
**Mark** [4] - 496:3, 499:1, 604:7, 708:17
**marked** [5] - 534:20, 654:3, 686:21,

689:13, 692:25
**marketing** [2] - 610:1, 610:19
**marking** [1] - 535:24
**master** [7] - 676:16, 680:25, 681:5, 681:11, 682:25, 685:20, 686:6
**masters** [1] - 692:10
**match** [1] - 686:9
**material** [7] - 525:2, 566:4, 634:23, 642:19, 680:24, 685:7, 685:9
**materials** [3] - 553:22, 554:1, 631:23
**mathematician** [1] - 520:16
**mathematics** [2] - 520:13, 520:15
**matter** [8] - 496:13, 520:12, 534:9, 561:2, 583:23, 593:12, 664:7, 727:8
**matters** [3] - 592:7, 592:25, 597:6
**maturity** [3] - 535:25, 539:4, 539:19
**MDS** [2] - 646:13, 646:15
**MDSs"** [1] - 646:13
**meals** [1] - 532:10
**mean** [45] - 501:7, 502:20, 513:6, 516:22, 520:10, 521:9, 524:1, 524:13, 524:24, 525:24, 526:2, 532:19, 536:16, 544:21, 549:10, 554:13, 581:14, 582:22, 584:22, 592:9, 601:20, 604:16, 622:14, 631:16, 633:5, 638:15, 639:1, 642:17, 642:19, 645:9, 646:12, 649:11, 655:25, 657:9, 660:7, 662:21, 681:13, 681:21, 681:22, 683:16, 690:20, 701:17, 709:17, 722:9, 725:17
**meaning** [6] - 511:18, 512:17, 514:13, 529:13, 548:17, 581:10
**meaningless** [2] - 627:2, 627:4
**means** [9] - 513:8, 580:20, 581:14, 659:24, 686:8, 688:10, 721:8, 726:14, 726:16
**meant** [7] - 516:12, 556:16, 600:17, 608:4, 617:3, 640:14, 690:25
**measure** [3] - 531:6, 531:14, 587:9
**measurements** [1] - 542:19
**measuring** [3] - 535:24, 600:11, 602:23
**mechanics** [1] - 520:12
**mechanism** [2] - 563:4, 661:8
**media** [5] - 618:5, 625:6, 651:20, 721:2, 721:9
**medical** [2] - 515:21, 602:17
**meet** [16] - 519:23, 519:25, 520:2, 520:4, 528:13, 545:17, 599:18, 634:5, 636:8, 639:15, 639:16, 655:5, 655:13, 662:4, 662:16, 662:18
**meeting** [9] - 512:13, 599:19, 647:24, 655:8, 655:9, 655:10, 662:7, 692:3, 692:7
**meetings** [3] - 621:25, 647:25
**Megan** [6] - 677:1, 677:21, 677:22, 688:23, 689:3
**Meghan** [1] - 630:16
**member** [10] - 510:4, 510:5, 510:7, 531:11, 545:14, 551:12, 592:21, 610:25, 638:19, 641:24

**members** [26] - 498:23, 546:9, 546:16, 569:21, 575:6, 575:9, 578:22, 581:11, 589:13, 589:17, 591:4, 598:17, 599:14, 617:15, 631:20, 638:21, 641:16, 644:25, 654:16, 659:12, 676:23, 677:1, 683:5, 686:3, 720:18
**membership** [4] - 543:8, 578:22, 609:6, 610:21
**membership-based** [1] - 610:21
**memo** [6] - 689:20, 689:22, 689:23, 690:2, 690:12, 690:19
**memorialized** [1] - 633:19
**memorializing** [1] - 634:7
**memory** [2] - 555:25, 556:17
**mention** [4] - 503:9, 579:25, 588:2, 665:22
**mentioned** [41] - 503:13, 511:17, 517:20, 519:17, 521:22, 525:17, 527:12, 529:4, 532:17, 541:3, 547:5, 550:4, 552:10, 553:6, 553:8, 553:18, 559:6, 563:22, 574:4, 575:6, 582:17, 584:9, 584:19, 587:24, 588:3, 588:18, 593:24, 595:8, 597:4, 597:18, 599:2, 600:1, 601:10, 617:9, 617:19, 620:15, 641:3, 644:23, 646:10, 665:24, 685:4
**mentions** [1] - 688:8
**mentor** [8] - 529:5, 529:12, 532:22, 543:17, 548:2, 582:9, 656:18
**mentored** [2] - 532:25, 566:18
**mentoring** [1] - 582:7
**mentors** [2] - 529:7, 532:24
**mesh** [1] - 580:4
**message** [3] - 635:14, 635:15
**messaging** [1] - 721:7
**messier** [1] - 706:24
**met** [11] - 519:24, 520:3, 520:5, 570:11, 627:19, 627:23, 643:2, 643:4, 662:19
**metadata** [7] - 685:5, 685:6, 685:8, 685:23
**metaphor** [1] - 518:6
**method** [20] - 514:1, 526:25, 527:1, 535:24, 563:7, 582:3, 582:4, 634:7, 681:16, 701:1, 705:1, 705:24, 706:11, 706:12, 706:13, 706:14, 707:1, 718:3
**methodologies** [2] - 502:10, 547:15
**methodology** [9] - 501:9, 513:4, 537:1, 547:8, 601:11, 620:2, 636:7, 663:20, 670:17
**methods** [6] - 679:8, 680:13, 706:10, 706:18, 708:2, 718:6
**Mexico** [18] - 552:13, 555:16, 555:20, 555:21, 569:1, 569:2, 590:4, 591:1, 591:4, 591:9, 591:14, 604:23, 639:2, 642:20, 643:1, 643:4, 643:9, 645:5
**Miami** [1] - 555:19
**Michael** [1] - 496:5
**middle** [5] - 519:4, 522:4, 703:14, 703:22, 705:4
**midmorning** [1] - 564:8
**midnight** [1] - 653:1

midway [1] - 725:25
might [18] - 515:8, 531:2, 606:14, 612:20, 612:22, 618:20, 629:2, 632:21, 633:3, 639:19, 640:12, 647:9, 658:8, 681:16, 712:8, 716:19, 726:3
Mike [2] - 631:8, 654:18
million [6] - 621:12, 621:13, 621:15, 643:21, 643:24, 651:19
millionaires [1] - 609:8
millions [2] - 622:1, 660:3
mind [9] - 504:24, 505:1, 599:20, 633:10, 652:19, 656:2, 660:5, 661:25
minded [1] - 594:12
minds [2] - 527:17, 613:9
mine [1] - 629:19
mini [4] - 682:7, 691:7, 691:9, 704:9
mini-DVD [3] - 691:7, 691:9, 704:9
MiniDV [2] - 680:5, 680:6
minimized [2] - 528:22, 530:13
minute [5] - 564:9, 671:18, 671:24, 708:8, 719:18
minutes [10] - 533:13, 612:11, 612:15, 652:19, 666:14, 716:16, 718:8, 719:16, 725:19, 725:22
miraculously [1] - 644:13
miserable [1] - 619:14
miss [1] - 517:10
missed [4] - 582:21, 582:23, 640:8, 640:18
missing [8] - 619:22, 666:14, 666:15, 666:18, 705:4, 717:20, 718:15, 718:25
mission [7] - 500:13, 509:18, 509:25, 510:18, 511:3, 628:14, 628:16
mistake [1] - 668:13
misunderstood [1] - 649:7
MLM [3] - 610:1, 610:18, 610:19
mobile [1] - 558:3, 559:1, 559:3
Mobius [2] - 532:19, 532:25
model [4] - 500:20, 522:17, 583:18, 662:24
modeled [1] - 503:13
modem [1] - 579:22
modify [1] - 524:25
module [8] - 500:1, 500:13, 500:23, 501:5, 509:3, 628:14, 628:16, 659:17
modules [3] - 499:13, 524:2, 524:3
MOIRA [1] - 495:15
Moira [1] - 496:3
mom [1] - 549:22
moment [14] - 508:2, 518:24, 522:13, 541:21, 542:1, 547:20, 555:22, 584:8, 591:22, 606:4, 649:12, 659:10, 693:16, 693:17
Monday [18] - 613:8, 613:14, 613:16, 691:2, 691:23, 720:19, 721:19, 721:24, 724:17, 724:18, 724:20, 725:7, 725:9, 725:11, 725:25, 726:1, 726:3, 727:3
money [22] - 514:15, 515:2, 515:4, 517:12, 519:14, 543:24, 544:15,

544:17, 544:18, 546:20, 556:11, 557:15, 580:13, 581:15, 609:1, 609:20, 609:21, 611:8, 620:25, 625:24, 643:21, 647:17
monies [4] - 594:20, 594:22, 599:11, 611:12
monitor [1] - 640:1
monitors [3] - 498:8, 688:13, 698:19
Monmouth [1] - 569:8
monogamous [1] - 645:7
Monterey [7] - 552:13, 555:16, 555:20, 555:21, 568:25, 569:2
month [5] - 547:2, 558:12, 602:11, 606:11, 607:10
moon [1] - 655:20
moral [3] - 530:14, 550:7, 670:22
morality [2] - 530:11, 530:13
Mormon [3] - 643:12, 644:23, 645:4
morning [19] - 496:4, 496:7, 496:9, 496:12, 496:25, 498:23, 498:24, 499:10, 499:11, 720:19, 721:19, 721:24, 725:15, 725:16, 726:13, 726:16, 726:18, 727:3
Most [2] - 623:24, 647:25
most [17] - 500:2, 508:19, 515:18, 523:17, 530:11, 537:2, 540:14, 562:23, 563:19, 583:11, 595:7, 607:11, 618:9, 618:10, 653:3, 670:20, 680:17
mostly [1] - 667:11
mother [1] - 597:13
motion [1] - 727:3
motivated [2] - 537:13, 538:3
motivation [1] - 723:8
mountains [2] - 643:16, 644:13
mouth [1] - 651:7
move [27] - 504:6, 510:24, 516:18, 518:11, 521:6, 521:7, 521:21, 564:6, 566:16, 567:2, 569:6, 569:23, 604:24, 606:4, 611:24, 663:16, 664:9, 666:16, 669:12, 679:10, 681:2, 683:13, 687:10, 690:5, 691:19, 704:21, 724:20
moved [21] - 531:7, 544:21, 567:4, 568:17, 569:6, 569:8, 569:10, 569:24, 570:16, 570:17, 595:6, 602:17, 629:21, 635:5, 644:16, 652:8, 653:11, 653:13, 655:7, 691:7, 691:8
movements [1] - 587:1
movie [1] - 652:19
Moving [5] - 617:11, 629:12, 629:13, 629:16, 630:6
moving [11] - 513:14, 522:3, 543:21, 555:16, 566:8, 568:12, 616:14, 666:7, 683:17, 684:6, 686:1
MR [169] - 496:9, 496:19, 497:6, 497:15, 497:18, 497:20, 497:22, 498:3, 498:10, 498:15, 499:4, 499:9, 499:22, 503:16, 504:3, 504:14, 505:13, 506:4, 506:5, 510:20, 510:22, 511:1, 523:22, 523:23, 530:1, 530:3, 534:2, 534:15, 535:12, 535:13, 538:18, 538:22,

539:11, 558:24, 561:25, 563:6, 564:6, 565:12, 574:3, 580:17, 581:1, 585:8, 585:15, 603:6, 603:9, 604:3, 604:5, 605:3, 605:8, 606:3, 608:10, 608:12, 609:13, 609:15, 610:17, 611:24, 612:20, 612:23, 612:25, 613:2, 613:13, 613:19, 613:24, 616:13, 629:23, 639:24, 640:3, 645:22, 654:2, 668:16, 668:18, 669:7, 669:10, 669:12, 669:15, 671:2, 672:7, 672:11, 672:12, 672:13, 673:4, 673:16, 673:20, 673:24, 674:2, 674:4, 674:6, 674:7, 674:11, 674:16, 674:22, 674:23, 675:8, 675:9, 675:18, 675:21, 675:24, 682:23, 685:2, 685:16, 687:10, 687:11, 689:10, 690:5, 690:7, 692:21, 692:24, 693:15, 693:21, 694:4, 694:23, 695:7, 695:19, 695:23, 696:5, 697:4, 697:6, 697:11, 697:13, 698:14, 698:21, 698:24, 702:3, 708:5, 708:8, 708:11, 708:14, 708:16, 710:8, 710:9, 711:4, 711:10, 712:1, 712:11, 712:16, 712:18, 712:21, 712:23, 713:9, 714:2, 714:4, 714:6, 715:12, 716:4, 716:7, 716:14, 716:19, 716:24, 717:3, 717:5, 717:14, 717:25, 720:16, 724:7, 724:10, 724:18, 725:1, 725:4, 725:10, 725:21, 726:2, 726:4, 726:7, 726:10, 726:24, 727:1, 727:7, 728:4, 728:6
MS [36] - 496:3, 496:20, 497:1, 497:11, 565:5, 565:10, 571:4, 574:2, 585:10, 604:16, 605:7, 612:11, 612:16, 612:18, 613:23, 672:8, 672:10, 695:9, 722:5, 722:9, 722:11, 722:13, 722:22, 723:13, 723:16, 723:20, 724:13, 725:5, 725:12, 725:14, 725:17, 726:15, 726:17, 726:21, 727:2, 727:5
multi [2] - 590:10, 646:15
multi-disciplinary [1] - 646:15
multilevel [2] - 610:1, 610:19
multilevel-marketing [1] - 610:1
multiple [15] - 506:25, 592:3, 633:18, 645:10, 645:12, 646:18, 676:18, 679:16, 679:17, 680:19, 681:7, 681:12, 681:19, 683:14
Mumford [7] - 630:16, 630:18, 677:1, 677:2, 677:21, 677:22, 689:3
must [5] - 503:4, 659:3, 670:24, 721:1
Myers [1] - 654:18
mysterious [4] - 563:5, 563:14, 563:20, 607:5
mystery [4] - 598:5, 598:13, 606:18, 607:20
mystique [1] - 661:15
myth [1] - 647:14
Möbius [2] - 526:22, 527:19

N

name [16] - 507:20, 554:9, 567:25,

568:18, 574:19, 583:13, 608:19,
643:11, 643:17, 643:18, 646:5,
647:12, 694:6, 694:14, 695:15, 708:17
**named** [11] - 528:24, 578:13, 584:9,
587:22, 589:3, 602:13, 607:15,
642:20, 649:25, 686:3, 686:5
**names** [5] - 497:4, 527:16, 576:18,
576:20, 583:15
**Nancy** [49] - 501:14, 515:23, 516:24,
519:7, 519:19, 520:5, 522:12, 524:7,
524:13, 525:7, 525:8, 541:2, 541:11,
549:19, 561:7, 565:18, 566:7, 567:22,
575:22, 577:3, 584:1, 588:24, 589:9,
595:16, 608:15, 609:9, 609:17,
629:15, 636:1, 649:16, 655:9, 655:15,
656:16, 658:1, 659:23, 660:24,
661:21, 667:11, 668:12, 668:19,
668:23, 668:25, 669:17, 687:3,
687:18, 687:19, 699:18, 700:8, 700:12
**nanny** [1] - 646:14
**narcissism** [1] - 601:6
**narcissistic** [5] - 503:14, 506:8, 506:9,
506:11, 506:17
**narrative** [1] - 648:14
**nasty** [1] - 501:7
**National** [1] - 608:18
**nationalities** [1] - 646:18
**natural** [9] - 512:6, 663:14, 676:15,
679:22, 683:12, 703:9, 706:25, 713:5,
715:2
**naturally** [4] - 621:19, 713:3, 714:19,
714:20
**nature** [13] - 499:16, 504:11, 504:20,
507:10, 516:15, 562:6, 562:12, 598:9,
599:5, 603:5, 623:13, 645:18, 700:25
**near** [1] - 704:3
**necessarily** [4] - 498:11, 522:11,
555:13, 580:6
**necessary** [1] - 674:20
**need** [34] - 497:11, 503:6, 503:8,
510:24, 521:10, 521:14, 521:15,
521:16, 521:18, 522:16, 528:18,
528:19, 531:9, 543:4, 543:5, 546:15,
587:14, 587:19, 588:2, 588:8, 613:16,
613:21, 635:9, 639:18, 663:18,
663:19, 670:7, 678:11, 691:5, 691:18,
699:16, 699:23, 717:7, 717:9
**needed** [36] - 502:14, 515:5, 518:12,
519:21, 520:1, 521:14, 533:8, 539:5,
540:7, 542:6, 543:20, 550:20, 565:17,
566:4, 584:24, 631:20, 635:8, 639:7,
664:5, 676:11, 678:13, 678:19, 679:1,
679:6, 688:6, 688:7, 689:6, 690:21,
690:23, 691:1, 691:13, 692:4, 707:22
**needs** [5] - 521:16, 585:1, 596:10,
691:15, 722:23
**nefarious** [4] - 501:15, 501:19, 501:23,
627:21
**negative** [3] - 553:9, 564:4, 726:8
**negatively** [1] - 669:5
**negotiating** [1] - 556:23

**Negro** [10] - 583:25, 584:9, 584:12,
584:13, 592:12, 606:13, 654:18,
660:16, 660:18, 660:20
**nervous** [1] - 658:5
**net** [2] - 585:19, 595:5
**network** [2] - 580:4, 618:9
**Never** [1] - 690:13
**never** [24] - 500:9, 508:10, 513:9, 514:9,
517:13, 520:14, 533:2, 557:23, 559:8,
561:3, 575:20, 579:24, 580:24,
598:19, 598:20, 606:20, 610:1,
623:15, 627:19, 627:23, 627:25,
660:8, 709:13
**new** [24] - 523:25, 524:1, 524:4, 525:4,
525:13, 536:25, 538:12, 579:19,
580:1, 583:4, 583:5, 583:11, 589:15,
589:16, 589:19, 590:5, 645:5, 662:6,
662:18, 662:25, 689:5, 691:5
**NEW** [1] - 495:1
**New** [24] - 495:4, 495:13, 495:14,
495:18, 495:21, 535:8, 552:14,
555:13, 567:13, 575:15, 575:18,
575:19, 576:5, 577:6, 577:8, 577:14,
578:4, 593:9, 597:8, 597:19, 653:14
**newly** [1] - 589:17
**newspaper** [3] - 593:8, 625:15, 643:5
**newspapers** [1] - 721:3
**next** [39] - 503:20, 527:6, 537:17,
537:19, 538:11, 538:23, 539:12,
539:22, 540:5, 547:2, 563:9, 567:23,
568:4, 571:6, 577:6, 577:8, 603:12,
605:11, 614:5, 629:21, 635:5, 653:16,
672:16, 679:19, 691:9, 691:14,
691:19, 691:23, 692:22, 693:22,
696:7, 699:22, 710:11, 713:11,
724:11, 724:14, 725:1, 726:19, 726:22
**nice** [3] - 642:12, 726:25, 727:7
**nicer** [1] - 642:3
**NICHOLAS** [1] - 495:10
**nickname** [4] - 677:7, 677:9, 699:18,
699:19
**night** [6] - 599:19, 635:6, 653:12,
654:23, 657:4, 699:22
**nine** [2] - 516:24, 516:25
**noble** [3] - 503:4, 566:11, 628:17
**noblest** [2] - 502:1, 502:2
**nobody** [2] - 601:22, 660:7
**non** [2] - 625:21, 643:4
**non-critical** [1] - 625:21
**non-violence** [1] - 643:4
**nondisclosure** [2] - 584:4, 692:10
**none** [2] - 682:20, 682:21
**normal** [1] - 703:11
**normally** [3] - 703:12, 708:23, 709:9
**north** [5] - 567:13, 569:11, 569:12,
637:3, 643:1
**notable** [1] - 549:2
**note** [3] - 650:11, 650:22, 695:1
**noted** [1] - 614:2
**notes** [10] - 542:6, 554:3, 554:7, 554:8,

633:23, 634:3, 678:25, 705:20, 720:20
**nothing** [7] - 497:16, 552:9, 624:11,
676:16, 709:4, 712:4, 712:5
**notice** [2] - 613:7, 720:7
**noun** [1] - 559:9
**number** [62] - 513:23, 516:17, 518:1,
520:8, 520:10, 524:9, 530:12, 535:2,
539:3, 543:1, 544:23, 556:16, 557:8,
565:17, 565:22, 567:23, 569:21,
570:13, 575:8, 578:1, 578:20, 581:15,
583:7, 587:21, 589:15, 590:3, 591:17,
593:2, 594:8, 594:10, 594:25, 595:2,
595:12, 597:14, 602:17, 607:10,
607:21, 608:17, 609:7, 609:23,
617:17, 619:2, 630:10, 638:1, 642:18,
646:12, 646:13, 649:21, 651:14,
653:15, 654:14, 656:25, 657:2,
657:13, 676:13, 676:17, 678:15,
681:3, 682:5, 683:11
**numbers** [4] - 598:20, 666:11, 666:17,
678:18
**numerous** [2] - 608:22, 631:16
**nurse** [1] - 515:24
**NXIVM** [96] - 507:12, 508:7, 508:13,
509:22, 517:21, 523:25, 524:5, 530:7,
532:17, 547:8, 549:21, 550:15,
552:10, 552:16, 552:19, 552:20,
552:22, 552:23, 552:24, 553:8, 557:3,
559:25, 560:23, 561:13, 562:3,
563:12, 567:19, 575:6, 575:9, 575:12,
575:20, 576:21, 577:6, 578:8, 579:14,
581:12, 581:19, 582:12, 582:20,
583:4, 584:20, 587:6, 587:21, 588:3,
588:6, 588:13, 588:18, 591:25, 592:6,
592:21, 594:5, 594:24, 595:4, 595:15,
597:5, 597:6, 598:1, 606:7, 606:22,
606:24, 606:25, 607:5, 607:7, 607:8,
608:14, 611:9, 611:10, 611:19,
616:25, 618:12, 618:18, 618:19,
622:17, 630:8, 632:9, 635:24, 638:21,
640:25, 645:13, 650:23, 650:24,
655:23, 658:18, 658:19, 659:12,
660:6, 667:20, 667:21, 668:13,
669:16, 671:16, 686:3, 700:4, 711:5
**NXIVM's** [5] - 592:4, 597:21, 597:24,
598:11, 676:23
**NXIVM-related** [4] - 587:6, 587:21,
588:6, 588:13

# O

**o'clock** [1] - 613:12
**oath** [3] - 499:6, 616:10, 675:6
**object** [16] - 499:22, 503:16, 510:20,
512:15, 561:25, 563:6, 580:17, 581:1,
585:8, 608:10, 669:7, 675:18, 685:16,
702:3, 710:8
**objection** [14] - 496:16, 496:17, 496:20,
497:6, 504:3, 535:13, 612:24, 668:16,
669:9, 675:24, 687:11, 690:7, 697:14,
715:14

**objections** [3] - 624:19, 625:24, 626:9
**objectives** [6] - 637:20, 637:21, 637:22, 641:2, 641:3
**observations** [1] - 504:4
**observed** [1] - 604:7
**obsessed** [1] - 652:15
**obtained** [2] - 671:7, 698:1
**obviously** [8] - 497:7, 507:10, 544:10, 583:9, 617:3, 633:20, 674:9, 703:6
**Obviously** [1] - 652:12
**occasion** [2] - 607:13, 607:21
**occasionally** [1] - 655:1
**occasions** [2] - 522:23, 587:1
**occur** [9] - 584:24, 608:9, 664:10, 680:16, 699:16, 705:15, 706:7, 708:23
**occurred** [10] - 575:18, 578:19, 589:14, 595:17, 608:24, 676:20, 680:17, 713:5, 714:19, 714:20
**occurrence** [1] - 715:2
**occurring** [1] - 713:3
**Odato** [1] - 593:14
**odd** [2] - 657:4, 661:24
**OF** [3] - 495:1, 495:2, 495:9
**offending** [1] - 705:22
**offer** [7] - 504:17, 535:12, 619:20, 674:17, 697:11, 711:25, 715:12
**offered** [1] - 667:21
**offering** [2] - 504:17, 504:21
**office** [7] - 546:18, 551:7, 575:14, 575:19, 575:23, 611:13, 691:6
**Office** [1] - 601:21
**officer** [1] - 518:20
**offices** [3] - 554:15, 575:21
**official** [1] - 712:14
**offset** [2] - 546:22, 641:22
**often** [7] - 581:14, 583:6, 624:3, 629:5, 642:16, 657:7, 702:9
**OHANNESSIAN** [3] - 495:20, 495:22
**Ohannesian** [1] - 496:10
**Ohio** [1] - 602:18
**oils** [1] - 610:24
**old** [1] - 643:17
**older** [3] - 676:18, 676:20, 701:7
**oldest** [1] - 590:15
**Olivia** [2] - 631:5, 631:6
**Omar** [4] - 568:19, 568:22, 568:23, 568:24
**once** [34] - 510:15, 513:24, 518:17, 518:19, 519:5, 525:9, 538:15, 540:15, 542:11, 544:4, 545:17, 546:10, 546:16, 556:7, 556:8, 584:23, 584:25, 598:5, 621:25, 633:7, 636:12, 649:17, 655:7, 660:7, 664:13, 682:18, 686:6, 703:19, 705:20, 706:5, 708:24, 724:5
**one** [142] - 496:13, 499:25, 500:9, 500:25, 501:19, 501:21, 501:22, 502:8, 502:14, 507:2, 507:3, 507:19, 512:7, 515:4, 525:9, 526:25, 529:4, 530:13, 533:17, 535:2, 537:10, 537:11, 538:4, 538:19, 539:7, 540:2,

540:23, 540:25, 541:19, 543:2, 543:6, 545:25, 547:17, 548:22, 549:20, 549:25, 552:17, 553:5, 553:19, 554:21, 556:15, 563:14, 566:25, 569:17, 570:13, 576:9, 577:5, 581:21, 582:3, 583:25, 584:15, 584:18, 586:19, 590:14, 590:15, 591:4, 591:8, 591:18, 592:23, 593:14, 593:16, 593:17, 593:22, 594:18, 596:14, 599:14, 599:19, 600:8, 600:25, 602:4, 602:5, 602:18, 604:9, 604:22, 607:12, 607:22, 608:3, 608:6, 608:18, 608:20, 617:15, 622:12, 624:2, 624:4, 625:3, 627:7, 629:6, 629:10, 629:19, 640:11, 643:4, 649:25, 651:17, 655:15, 656:4, 657:10, 657:25, 658:2, 658:3, 658:4, 660:11, 661:20, 673:18, 679:2, 679:20, 680:18, 680:23, 680:24, 681:2, 682:6, 682:24, 683:11, 685:10, 685:19, 688:8, 688:21, 692:22, 695:2, 695:4, 697:9, 700:9, 704:18, 705:1, 705:11, 705:18, 706:11, 706:18, 712:23, 716:10, 718:3, 718:12, 718:16, 718:18, 719:17
**One** [4] - 618:3, 625:7, 650:18, 651:15
**one's** [1] - 535:25
**one-on-one** [1] - 622:12
**one-time** [1] - 624:2
**ones** [8] - 548:11, 555:8, 579:16, 625:8, 665:8, 697:8, 714:16, 722:5
**ongoing** [1] - 694:19
**online** [3] - 553:7, 553:9, 557:14
**open** [21] - 506:1, 518:3, 546:1, 546:4, 568:15, 614:3, 616:1, 633:8, 633:11, 636:15, 675:1, 697:1, 714:1, 716:22, 717:1, 717:12, 717:23, 718:9, 718:21, 719:4, 719:20
**operate** [3] - 552:10, 578:8, 607:20
**operated** [3] - 551:6, 552:11, 562:5
**operating** [2] - 550:20, 599:24
**operational** [2] - 550:25, 561:18
**opinion** [5] - 504:18, 580:14, 671:6, 694:16, 724:8
**opportunity** [5] - 505:6, 632:25, 653:2, 656:3, 662:12
**Orange** [1] - 555:14
**orange** [5] - 538:25, 539:12, 539:16, 545:4, 616:20
**order** [12] - 530:17, 537:10, 538:5, 543:20, 543:25, 546:10, 566:3, 566:14, 608:3, 608:4, 674:18, 678:12
**Oregon** [2] - 567:3, 570:17
**organic** [2] - 679:22, 706:25
**organization** [20] - 502:1, 510:6, 544:1, 544:3, 544:6, 544:7, 549:23, 550:14, 552:17, 560:2, 584:14, 588:18, 599:18, 610:2, 610:25, 611:6, 618:16, 618:23, 622:15, 677:24
**organizational** [1] - 541:22
**original** [2] - 685:12, 688:19
**Originally** [1] - 645:2

**originally** [6] - 506:14, 645:1, 669:20, 704:7, 704:8, 704:9
**Origins** [1] - 553:17
**otherwise** [1] - 715:21
**outcome** [1] - 613:1
**outline** [1] - 724:19
**outside** [6] - 501:16, 523:3, 542:9, 644:12, 721:4, 721:12
**overall** [1] - 505:11
**overcome** [1] - 621:17
**overeagerness** [1] - 655:12
**override** [2] - 528:19, 544:8
**overrule** [1] - 715:14
**Overruled** [1] - 499:24
**oversaw** [8] - 547:6, 590:3, 617:3, 617:4, 617:10, 617:12, 632:6, 673:9
**oversee** [5] - 551:13, 551:15, 631:17, 632:4, 632:7
**overseeing** [3] - 551:16, 631:24, 684:10
**overseers** [1] - 584:18
**oversight** [1] - 668:8
**overview** [2] - 676:3, 676:6
**overwhelmed** [1] - 558:20
**owe** [1] - 582:8
**owed** [4] - 582:1, 598:22, 600:1, 606:7
**own** [10] - 504:15, 523:12, 523:15, 532:15, 545:12, 583:3, 584:5, 585:24, 617:18, 723:20
**owned** [9] - 578:4, 578:6, 583:23, 583:25, 584:1, 584:6, 584:8, 594:25
**owner** [8] - 554:14, 591:14, 599:15, 599:16, 599:21, 617:7, 629:14, 629:15
**owners** [3] - 584:18, 591:18, 691:14

**P**

**P's** [1] - 699:17
**p.m** [5] - 613:25, 614:2, 672:1, 672:3, 721:21
**package** [2] - 515:12, 515:13
**packages** [1] - 531:23
**packed** [2] - 567:4, 638:12
**page** [16] - 503:20, 505:15, 533:19, 571:6, 602:7, 603:12, 605:11, 614:5, 653:16, 672:16, 674:25, 684:18, 693:22, 696:7, 710:11, 713:11
**PAGE** [1] - 728:2
**pages** [1] - 538:7
**paid** [31] - 515:18, 516:12, 516:19, 517:11, 517:14, 532:16, 542:16, 542:17, 543:22, 543:24, 544:10, 545:2, 545:3, 546:24, 556:7, 557:9, 557:12, 578:22, 599:12, 607:8, 611:13, 627:17, 641:13, 641:14, 641:15, 641:16, 642:5, 642:7, 642:9, 642:14, 651:19
**pain** [9] - 526:23, 527:19, 530:18, 533:4, 621:8, 623:11, 624:10, 658:1, 658:10
**painted** [1] - 535:3
**Pam** [3] - 548:15, 548:20, 548:21, 548:22, 549:1, 570:21, 571:1, 571:3,

583:24, 599:16, 599:20, 599:24, 656:10
**panic** [1] - 522:5, 668:3
**paper** [4] - 557:24, 584:2, 629:17, 686:8
**papers** [1] - 712:12
**paragraph** [3] - 699:9, 699:24, 699:25
**Paralegal** [1] - 496:6
**pardon** [1] - 506:7
**parent** [4] - 626:12, 626:13, 626:17, 626:18
**parents** [1] - 646:22
**PARISI** [1] - 495:23
**Park** [12] - 567:13, 568:3, 568:4, 568:7, 568:10, 568:18, 569:4, 575:7, 575:10, 578:8, 578:11, 616:14
**parking** [3] - 577:3, 577:4, 577:16
**part** [36] - 517:18, 529:10, 532:13, 532:14, 533:4, 540:14, 541:23, 541:24, 542:12, 542:14, 563:19, 583:11, 595:7, 607:12, 643:15, 652:7, 658:8, 659:16, 663:22, 683:22, 683:25, 684:3, 685:18, 686:4, 686:13, 686:15, 689:7, 695:2, 698:12, 698:19, 698:21, 698:22, 698:25, 711:5, 722:8, 722:22
**participant** [2] - 536:25, 554:9
**participants** [9] - 509:25, 522:20, 526:15, 527:9, 581:12, 582:11, 582:17, 604:18, 628:7
**participate** [6] - 522:21, 525:12, 624:17, 646:23, 649:22, 686:4
**participated** [6] - 521:22, 617:22, 646:22, 683:1, 683:2, 683:22
**participation** [1] - 507:12
**particular** [13] - 499:25, 507:19, 521:25, 522:2, 523:18, 620:2, 620:3, 636:7, 640:11, 644:10, 645:4, 657:25, 671:7
**particularly** [1] - 501:4
**parties** [2] - 579:1, 579:2
**partner** [1] - 591:2
**parts** [4] - 694:17, 695:1, 695:4, 700:16
**party** [1] - 506:16
**passed** [2] - 548:17, 548:18
**passive** [1] - 611:6
**past** [2] - 598:15, 645:6
**Patent** [1] - 601:21
**patent** [17] - 593:1, 600:15, 600:18, 601:11, 601:14, 601:16, 602:3, 602:7, 663:21, 663:23, 667:2, 671:8, 712:3, 712:5, 712:19, 712:22
**patented** [3] - 580:3, 601:13, 601:21
**patenting** [1] - 602:12
**patents** [2] - 602:2, 602:9
**path** [16] - 516:18, 518:11, 518:17, 518:19, 583:1, 587:5, 587:9, 587:13, 587:18, 595:11, 616:17, 619:1, 661:22, 661:23
**Path** [17] - 535:5, 535:22, 535:23, 535:24, 536:6, 536:20, 537:18, 538:24, 539:13, 539:23, 540:5,

541:16, 541:19, 541:22, 541:23, 543:18, 543:20
**pattern** [1] - 703:20
**patterns** [2] - 527:18, 706:7
**PAUL** [1] - 495:22
**Paul** [1] - 496:10
**pause** [1] - 565:2, 612:19, 693:20, 705:21, 706:13, 708:10, 716:13, 716:24, 717:9, 719:1
**Pause** [2] - 510:25, 570:20
**pause/unpause** [2] - 718:16, 718:25
**paused** [1] - 718:14
**pausing** [1] - 706:2
**Pavlov** [1] - 623:21
**Pavlov's** [1] - 623:18
**Pavlovian** [1] - 511:20
**pay** [24] - 519:9, 519:10, 522:19, 522:20, 523:7, 523:12, 532:3, 542:21, 542:24, 557:13, 557:19, 560:6, 581:15, 581:16, 581:23, 581:24, 582:3, 582:12, 599:7, 599:9, 642:4, 646:23, 659:12, 662:1
**paying** [11] - 532:4, 532:5, 532:6, 532:8, 543:7, 546:9, 546:12, 546:13, 546:16, 581:25, 644:3
**payment** [3] - 557:14, 598:23
**penance** [6] - 530:16, 531:9, 531:13, 533:6, 533:9, 533:15
**pending** [1] - 601:14
**peninsulas** [1] - 637:12
**PENZA** [30] - 495:15, 496:3, 496:20, 497:1, 497:11, 612:11, 612:16, 612:18, 613:23, 672:8, 672:10, 695:9, 722:5, 722:9, 722:11, 722:13, 722:22, 723:13, 723:16, 723:20, 724:13, 725:5, 725:12, 725:14, 725:17, 726:15, 726:17, 726:21, 727:2, 727:5
**Penza** [1] - 496:3
**People** [1] - 622:3
**people** [199] - 500:8, 501:3, 502:10, 502:22, 508:16, 508:23, 510:3, 511:8, 514:12, 514:16, 514:17, 514:20, 515:7, 516:15, 516:18, 520:22, 521:1, 521:2, 521:21, 522:24, 523:17, 525:1, 527:3, 527:5, 527:15, 527:20, 528:15, 529:21, 530:11, 531:8, 531:9, 532:8, 532:16, 532:25, 533:10, 533:16, 534:9, 534:11, 537:2, 537:14, 538:1, 539:19, 539:20, 541:19, 542:3, 542:12, 544:1, 544:2, 544:3, 544:16, 544:23, 550:10, 551:6, 553:7, 553:16, 554:18, 554:20, 554:24, 555:1, 555:3, 556:4, 556:7, 556:13, 558:4, 558:5, 559:21, 559:24, 560:16, 560:17, 561:8, 562:16, 562:23, 563:21, 566:25, 567:14, 567:15, 567:18, 567:20, 567:23, 570:16, 570:18, 578:22, 581:14, 581:16, 582:8, 582:15, 582:17, 582:21, 583:24, 584:24, 585:3, 589:15, 590:3, 592:9, 593:3, 593:4, 593:19, 593:20, 595:6,

597:5, 600:8, 600:13, 600:14, 601:5, 601:6, 601:8, 604:7, 608:22, 608:25, 609:2, 609:3, 609:4, 609:19, 609:21, 611:7, 617:12, 617:25, 618:1, 618:2, 618:4, 618:8, 618:10, 618:11, 618:15, 618:16, 618:18, 618:22, 618:23, 619:2, 619:8, 621:6, 621:25, 622:11, 622:13, 622:15, 623:24, 625:5, 625:13, 625:16, 625:17, 627:24, 628:5, 628:19, 628:21, 630:10, 631:22, 633:5, 633:7, 633:22, 638:14, 638:15, 638:25, 639:1, 639:2, 640:13, 640:16, 640:17, 640:22, 640:25, 641:6, 641:9, 641:12, 642:5, 643:9, 644:10, 644:17, 646:17, 649:21, 651:25, 653:3, 654:17, 654:19, 657:13, 658:23, 660:14, 661:3, 661:10, 662:18, 663:1, 663:22, 667:12, 667:18, 669:4, 670:16, 676:10, 678:10, 682:18, 683:25, 688:16, 688:22, 700:7, 700:9, 709:3
**people's** [2] - 583:15, 716:17
**per** [5] - 531:23, 629:10, 639:14, 642:12, 660:1
**percent** [15] - 523:8, 544:8, 546:18, 546:19, 546:21, 556:13, 556:22, 557:18, 585:19, 598:25, 599:7, 600:1, 606:6, 611:16
**percentage** [6] - 557:10, 557:14, 557:16, 611:23, 618:25, 622:10
**perception** [1] - 503:2
**perfect** [1] - 624:6
**perform** [2] - 616:25, 702:6
**performances** [2] - 638:2, 638:4
**perhaps** [5] - 518:22, 545:6, 566:18, 569:25, 604:25, 619:12, 619:13, 622:2, 703:13, 707:5
**Period** [1] - 630:4
**period** [2] - 531:4, 538:2, 545:1, 557:21, 595:9, 597:2, 629:19, 630:3, 636:21, 652:8, 653:4, 659:6
**persistence** [1] - 500:24
**persistent** [1] - 500:24
**person** [80] - 501:7, 502:7, 502:18, 514:15, 515:9, 515:10, 521:15, 523:5, 526:18, 526:19, 528:13, 531:2, 537:1, 537:11, 537:16, 544:12, 544:14, 547:12, 549:23, 550:14, 551:8, 556:6, 559:10, 559:11, 559:12, 560:2, 560:12, 560:15, 560:16, 560:17, 560:20, 560:22, 560:25, 562:8, 562:22, 563:3, 563:20, 563:22, 566:15, 567:6, 568:17, 568:19, 582:25, 584:9, 586:21, 587:19, 589:3, 591:25, 594:11, 597:17, 600:17, 602:13, 607:15, 618:15, 619:6, 620:14, 620:16, 623:9, 625:11, 625:19, 625:21, 625:22, 626:12, 626:24, 627:20, 629:7, 629:10, 642:13, 649:19, 650:9, 656:13, 662:6, 663:9, 694:6, 700:15, 708:24, 720:5

**person's** [1] - 568:18
**personal** [5] - 504:4, 506:23, 507:12, 659:8, 711:16
**personality** [4] - 503:14, 506:8, 506:9, 506:11
**Personally** [1] - 622:11
**personally** [4] - 618:13, 618:17, 652:9, 656:18
**perspective** [2] - 509:9, 712:1
**petty** [1] - 691:21
**philosophical** [6] - 524:9, 550:6, 551:4, 633:9, 634:8, 647:9
**philosophy** [1] - 583:19
**phobia** [4] - 512:4, 512:5, 521:25, 522:10
**phone** [7] - 559:5, 657:1, 657:2, 657:22, 663:8, 721:7
**phones** [1] - 580:5
**photo** [2] - 535:9, 584:11
**photograph** [28] - 497:24, 534:25, 549:5, 568:21, 569:15, 569:19, 570:5, 574:12, 574:16, 576:4, 576:8, 577:2, 577:13, 577:19, 577:23, 578:1, 579:4, 589:7, 590:6, 590:8, 590:23, 592:18, 594:3, 630:1, 654:4, 654:10, 677:5
**photographer** [1] - 677:25
**photographic** [1] - 498:8
**photographs** [1] - 589:9
**physical** [3] - 520:24, 554:12, 668:4
**physically** [1] - 662:4
**physiological** [3] - 511:24, 512:21, 667:14
**physiology** [1] - 512:19
**piece** [2] - 524:11, 635:8
**Pillars** [5] - 550:15, 550:17, 550:18, 551:2, 551:4
**pitch** [12] - 523:5, 523:6, 547:21, 619:16, 620:10, 622:9, 622:17, 622:20, 622:23, 624:13, 624:14, 626:5
**pitches** [3] - 528:10, 628:1, 628:4
**Pixels** [5] - 617:11, 629:12, 629:13, 629:16, 630:7
**place** [7] - 521:7, 521:15, 553:25, 570:14, 604:1, 643:13, 704:23
**placed** [6] - 579:23, 691:5, 691:12, 703:1, 703:3, 703:5
**places** [5] - 532:19, 568:16, 637:6, 703:6, 703:9
**plan** [3] - 547:1, 566:20, 683:10
**Plans** [2] - 539:5, 539:18
**planter** [1] - 650:20
**plaque** [1] - 577:3
**plaques** [1] - 602:6
**plastic** [1] - 701:4
**play** [7] - 638:4, 705:2, 705:3, 705:11, 705:18, 716:7
**played** [11] - 530:14, 654:15, 654:19, 716:22, 717:1, 717:12, 717:23, 718:9, 718:21, 719:4, 719:20
**player** [2] - 609:3, 682:7

**playing** [5] - 621:9, 705:3, 705:19, 705:22, 706:3
**Plaza** [2] - 495:14, 629:20
**Plugged** [5] - 579:19, 579:25, 580:1, 580:16
**plus** [5] - 517:4, 517:5, 517:9, 618:17, 618:23
**pocket** [1] - 546:12
**podcasts** [1] - 721:3
**poetry** [1] - 638:1
**point** [41] - 504:12, 510:3, 516:13, 519:14, 521:11, 521:12, 537:4, 543:2, 543:6, 546:6, 547:17, 556:19, 556:20, 566:7, 593:22, 612:1, 619:23, 622:18, 622:22, 634:6, 643:23, 651:6, 651:17, 653:2, 656:1, 657:12, 658:2, 658:12, 661:20, 662:3, 686:14, 692:6, 700:10, 700:12, 701:12, 701:15, 701:21, 705:21, 711:17, 712:24, 718:5
**Point** [1] - 542:20
**pointed** [1] - 502:9
**pointless** [1] - 623:17
**points** [2] - 647:9, 690:23
**police** [2] - 650:11, 650:14
**policy** [1] - 508:7
**political** [2] - 609:10, 609:11
**polygamist** [3] - 645:7, 645:8, 645:9
**Polytechnic** [1] - 590:18
**poobahs** [1] - 548:1
**pool** [1] - 513:20
**pooled** [1] - 609:1
**poor** [1] - 528:4
**poorly** [1] - 561:15
**populous** [1] - 661:16
**Porter** [4] - 602:13, 602:15, 602:16, 604:6
**portion** [2] - 575:2, 611:14, 611:15
**portions** [7] - 669:25, 673:8, 684:15, 685:12, 703:2, 707:13, 714:12
**position** [3] - 545:13, 550:3, 711:24
**positions** [2] - 544:10, 618:4
**positive** [1] - 726:6
**possessions** [2] - 586:2, 586:6
**possible** [6] - 555:8, 632:11, 683:12, 719:23, 720:11, 726:4
**possibly** [2] - 566:22, 716:16
**post-2009** [1] - 593:18
**poster** [1] - 510:14
**postproduction** [1] - 630:6
**potential** [1] - 555:23
**potentially** [3] - 584:3, 678:22, 707:4
**power** [4] - 618:4, 660:24, 703:18, 713:6
**powerful** [3] - 560:8, 610:4, 619:8
**practice** [2] - 627:8
**practitioners** [1] - 514:13
**preach** [1] - 560:5
**precise** [4] - 506:20, 674:2, 702:8, 712:18
**Prefect** [9] - 502:15, 540:10, 540:21, 541:2, 549:19, 552:2, 552:6, 659:19,

699:20
**prefer** [2] - 635:19, 635:20
**preference** [2] - 553:1, 555:8
**prejudice** [1] - 694:19
**Prejudice** [1] - 500:1
**prejudicial** [3] - 604:10, 694:21, 695:24
**preliminary** [1] - 664:7
**preparation** [1] - 662:18
**preproduction** [1] - 519:4
**presence** [2] - 624:2, 711:2
**present** [3] - 614:3, 616:1, 637:19
**presentations** [2] - 547:16, 553:20
**presented** [3] - 586:17, 602:8, 648:15
**presenters** [1] - 553:19
**president** [2] - 610:11, 610:12
**presidents** [1] - 591:8
**press** [13] - 496:15, 552:25, 553:9, 563:1, 563:23, 564:3, 625:4, 625:10, 625:11, 629:9, 648:18, 648:20, 705:21
**pressed** [1] - 720:3
**pressing** [1] - 714:23
**pressure** [2] - 527:9, 640:22
**pretend** [1] - 635:20
**pretty** [21] - 519:6, 531:13, 540:9, 544:22, 546:2, 550:10, 558:4, 560:24, 563:20, 582:24, 584:25, 623:6, 632:13, 634:14, 636:13, 637:4, 640:21, 658:16, 670:19, 678:6, 684:10
**previously** [10] - 548:7, 549:4, 559:6, 569:14, 570:2, 571:1, 601:10, 617:19, 646:9, 659:10
**price** [1] - 523:2
**Pride** [1] - 500:1
**pride** [2] - 500:5, 518:22
**prideful** [1] - 500:10
**primarily** [2] - 604:19, 648:18
**printed** [3] - 510:14, 650:14, 689:21
**privacy** [1] - 523:13
**private** [2] - 595:9, 651:1
**privilege** [1] - 523:13
**privy** [2] - 524:20, 594:9
**problem** [31] - 500:5, 501:11, 501:20, 502:3, 502:11, 502:13, 518:16, 518:22, 518:23, 522:8, 522:9, 528:12, 530:18, 560:21, 562:20, 564:5, 583:2, 586:17, 586:24, 587:13, 621:21, 643:24, 656:4, 667:9, 673:16, 679:25, 703:8, 706:21, 712:2, 719:17
**problematic** [1] - 668:24
**problems** [1] - 661:13
**proceed** [2] - 534:18, 714:2
**proceeding** [1] - 712:14
**Proceedings** [1] - 495:25
**proceedings** [5] - 564:16, 672:2, 693:20, 708:10, 716:13
**process** [42] - 509:24, 513:10, 513:15, 514:21, 516:8, 529:10, 532:11, 580:16, 587:17, 593:3, 593:5, 648:3, 663:14, 665:21, 676:3, 680:9, 680:21, 681:23, 682:25, 683:1, 683:6, 683:23,

684:1, 684:3, 685:11, 685:19, 685:25, 686:4, 688:17, 696:3, 698:12, 698:16, 700:6, 700:19, 700:21, 701:12, 701:25, 710:5, 713:5, 723:8
**processes** [4] - 676:14, 681:3, 715:23
**Proctor** [13] - 539:1, 539:6, 539:15, 544:4, 544:8, 544:16, 544:19, 545:21, 545:24, 545:25, 553:24, 554:15, 564:1
**proctor** [13] - 518:12, 568:24, 568:25, 569:3, 575:24, 584:14, 590:12, 592:22, 594:7, 595:12, 595:13, 616:20, 616:23
**Proctors** [24] - 542:8, 542:9, 543:13, 543:14, 543:15, 543:22, 543:23, 543:24, 544:8, 544:11, 545:4, 545:6, 545:8, 545:9, 545:10, 545:11, 545:18, 545:22, 546:25, 551:10, 551:11, 556:11
**proctors** [3] - 611:14, 617:4, 617:5
**produced** [17] - 495:25, 659:22, 666:25, 667:17, 669:25, 673:7, 675:17, 686:9, 701:19, 712:12, 712:13, 712:15, 722:6, 722:15, 723:5, 723:11, 723:13
**producer** [1] - 631:17
**producers** [1] - 643:5
**product** [2] - 547:19, 674:5
**production** [3] - 670:9, 677:13, 691:6
**profile** [2] - 503:10, 508:17
**profit** [1] - 599:8
**profits** [3] - 611:9, 611:10, 611:18
**profound** [1] - 562:18
**program** [22] - 516:7, 525:4, 527:6, 542:23, 582:12, 626:1, 626:2, 626:4, 627:23, 627:25, 645:13, 645:16, 645:18, 646:2, 646:5, 646:7, 646:17, 646:21, 646:23
**programmed** [1] - 623:13
**programming** [2] - 527:21, 623:16
**programs** [5] - 509:22, 525:13, 526:15, 527:10, 667:21
**Programs** [5] - 536:21, 553:2, 576:11, 576:14, 576:22
**Programs/NXIVM** [1] - 536:18
**progression** [2] - 536:6, 616:17
**project** [19] - 647:4, 647:12, 648:17, 649:13, 663:22, 676:24, 678:21, 682:4, 682:9, 682:10, 689:8, 690:13, 692:11, 697:23, 699:5, 701:23, 702:6, 702:7, 702:11
**projection** [2] - 501:6, 698:9
**projects** [6] - 565:16, 585:19, 594:23, 599:5, 617:17, 656:25
**prom** [1] - 544:7
**promise** [5] - 531:6, 531:7, 531:8, 533:3, 533:11
**promotion** [1] - 541:20
**properties** [5] - 579:14, 591:22, 592:3, 595:2, 595:3
**property** [1] - 637:9
**proposing** [1] - 673:12
**Protectors** [8] - 525:16, 583:10, 584:15,

585:21, 591:5, 606:13, 606:14, 617:16
**protested** [1] - 644:12
**protesting** [2] - 644:7, 644:9
**proud** [1] - 508:3
**provide** [4] - 561:12, 613:7, 674:21, 726:19
**provided** [4] - 496:18, 595:9, 604:22, 691:20
**providing** [1] - 498:7
**Provisional** [2] - 537:20, 538:13, 538:15
**provisional** [1] - 546:7
**proximity** [1] - 568:1
**psychiatrists** [3] - 516:4, 516:5, 516:6
**psychological** [6] - 501:6, 503:10, 504:19, 508:17, 515:25, 603:2
**psychologists** [2] - 516:5, 516:6
**psychopath** [1] - 601:3
**psychopaths** [1] - 601:2
**psychopathy** [2] - 600:14, 600:25
**public** [2] - 498:9, 508:6
**publicly** [1] - 661:2
**publish** [5] - 534:15, 687:13, 689:10, 692:21, 716:4
**published** [5] - 535:15, 629:25, 640:6, 645:24, 690:9
**pull** [3] - 635:4, 705:13, 716:8
**pumped** [1] - 656:13
**punished** [1] - 669:3
**punishment** [1] - 533:18
**purchase** [2] - 592:2, 700:5
**purchased** [10] - 591:19, 591:23, 682:3, 682:5, 682:6, 682:9, 682:10, 691:5, 692:12, 692:14
**purchases** [2] - 700:10, 700:15
**purchasing** [1] - 689:5
**purple** [2] - 540:6, 540:20
**purpose** [2] - 530:5, 692:16
**purposes** [1] - 686:21
**pursuant** [1] - 694:5
**push** [2] - 533:14, 679:17
**push-ups** [1] - 533:14
**put** [16] - 514:3, 527:9, 549:18, 554:10, 594:3, 638:4, 676:19, 679:12, 692:17, 692:18, 694:15, 703:8, 704:24, 705:13, 706:20, 706:21
**puts** [1] - 512:14
**putting** [4] - 526:5, 526:7, 548:6, 692:14

## Q

**qualifications** [1] - 556:9
**qualifies** [1] - 694:25
**qualify** [2] - 517:13, 556:15
**quality** [6] - 678:24, 681:15, 686:5, 686:10, 688:17, 688:19
**quantified** [1] - 621:8
**quantify** [1] - 622:4
**quantum** [1] - 520:12
**questioned** [1] - 502:17
**questioning** [3] - 502:15, 502:16, 513:10

**questionnaire** [3] - 504:18, 506:8, 721:18
**questions** [23] - 504:19, 506:18, 507:4, 513:12, 513:18, 516:16, 524:10, 525:18, 525:19, 525:20, 538:7, 538:8, 597:25, 598:11, 625:3, 633:11, 633:12, 633:13, 636:15, 644:21, 647:21, 713:7, 724:24
**quick** [1] - 693:21
**quicker** [1] - 724:20
**quickly** [3] - 503:17, 544:22, 691:19
**quite** [5] - 500:7, 513:11, 514:10, 517:11, 521:20, 521:21, 554:24, 575:20, 582:15, 608:20, 632:8, 653:6, 655:9, 660:13, 704:25
**quiz** [2] - 578:15, 588:1
**quote** [2] - 688:16, 688:21
**quotes** [2] - 628:18, 633:24

## R

**racketeering** [1] - 694:12
**radio** [1] - 721:3
**Rainbow** [4] - 587:25, 590:2, 646:10, 646:20
**raise** [3] - 628:7, 643:21, 672:11
**ran** [4] - 617:21, 630:8, 641:12, 646:2
**random** [1] - 703:8
**randomize** [1] - 679:21
**range** [1] - 600:6
**RANIERE** [1] - 495:7
**Raniere** [51] - 496:11, 500:9, 516:23, 524:8, 524:13, 525:20, 541:5, 547:14, 549:9, 549:11, 561:8, 562:24, 563:18, 563:21, 566:18, 567:1, 578:13, 580:2, 580:7, 590:15, 592:2, 592:16, 592:23, 594:8, 594:10, 594:11, 595:19, 595:21, 596:23, 599:19, 600:12, 602:6, 602:19, 608:14, 608:23, 609:19, 609:20, 610:3, 617:17, 620:6, 622:22, 632:11, 636:8, 639:16, 644:19, 649:18, 651:9, 658:24, 661:23, 682:17
**Raniere's** [7] - 548:22, 549:25, 550:18, 633:1, 636:21, 670:17, 708:18
**rank** [13] - 510:4, 537:7, 538:8, 539:1, 539:15, 540:10, 548:13, 566:2, 590:12, 595:11, 616:15, 638:19, 638:23
**ranking** [16] - 510:4, 510:5, 510:7, 531:11, 534:14, 535:18, 545:14, 567:15, 582:25, 638:18, 638:21, 640:25, 641:12, 641:16, 641:24
**ranks** [6] - 502:15, 516:18, 561:5, 633:14, 638:24, 639:23
**rapport** [1] - 520:18
**rare** [3] - 522:23, 532:6, 660:4
**rate** [2] - 557:9, 581:25
**rather** [2] - 540:3, 692:17
**rational** [2] - 553:8, 667:13
**Rational** [3] - 601:11, 601:16, 601:21

**ray** [1] - 665:4
**RCG** [1] - 590:2
**re** [1] - 517:13
**re-qualify** [1] - 517:13
**reach** [4] - 506:6, 546:12, 555:23, 658:14
**reached** [2] - 505:9, 556:8
**reaction** [5] - 511:2, 511:23, 512:3, 604:19, 660:18
**reactions** [1] - 623:14
**reactive** [2] - 527:25, 625:18
**read** [16] - 504:5, 505:1, 509:18, 509:22, 510:23, 511:6, 625:15, 644:15, 686:17, 691:10, 697:21, 698:17, 721:1, 721:11, 721:13
**reading** [9] - 509:25, 510:15, 510:18, 511:2, 627:11, 627:12, 627:14, 665:20, 686:16
**reads** [1] - 665:18
**ready** [6] - 511:11, 511:15, 520:1, 520:2, 556:5, 565:4
**real** [3] - 560:21, 594:23, 595:1
**realization** [1] - 513:19
**realize** [2] - 500:18, 549:16
**realized** [3] - 502:7, 506:12, 529:11
**realizing** [1] - 556:12
**really** [53] - 502:3, 505:3, 507:2, 509:9, 512:11, 513:9, 513:11, 513:21, 518:12, 519:12, 521:1, 521:2, 522:8, 526:3, 526:19, 531:12, 543:8, 555:18, 562:16, 562:18, 565:20, 566:3, 580:13, 594:9, 596:1, 600:23, 601:8, 601:9, 620:24, 621:1, 621:17, 622:7, 623:9, 623:15, 624:11, 626:14, 627:13, 640:13, 642:1, 649:18, 651:3, 651:6, 652:2, 656:11, 656:20, 660:8, 660:11, 661:24, 670:21, 703:17, 707:3, 717:18
**realm** [1] - 681:1
**reason** [7] - 519:20, 625:17, 632:23, 666:9, 666:10, 715:24, 720:1
**reasonable** [2] - 625:22, 722:20
**reasoning** [1] - 586:12
**receive** [14] - 496:15, 497:23, 518:14, 536:2, 537:3, 537:9, 537:10, 557:16, 557:18, 585:13, 606:24, 606:25, 607:2, 678:25
**received** [20] - 498:2, 535:14, 535:16, 537:16, 557:15, 585:7, 679:5, 687:12, 687:14, 690:8, 690:10, 697:16, 697:17, 698:1, 716:3, 728:10, 728:12, 728:13, 728:15, 728:17
**receiving** [2] - 655:12, 687:8
**recently** [1] - 602:10
**recess** [5] - 564:16, 605:5, 612:2, 613:25, 672:2
**recognize** [15] - 534:22, 568:21, 570:3, 574:9, 579:4, 584:11, 590:8, 630:1, 645:25, 654:4, 654:10, 686:25, 693:2, 697:8, 717:7
**recognizing** [1] - 529:23

**recollection** [10] - 515:16, 541:17, 567:8, 576:19, 588:21, 596:3, 667:6, 681:5, 701:14, 710:3
**recommended** [1] - 566:9
**record** [13] - 504:1, 524:10, 575:1, 576:13, 632:22, 634:14, 647:21, 673:1, 673:11, 694:1, 705:19, 706:5, 711:1
**recorded** [6] - 495:25, 549:25, 632:18, 633:17, 649:1, 669:21
**recorders** [1] - 600:11
**recording** [14] - 602:22, 634:17, 705:20, 706:4, 709:6, 718:17, 719:8, 719:9, 719:14, 719:25, 720:4, 720:13, 720:14
**recordings** [1] - 704:6
**recruit** [1] - 619:4
**recruited** [1] - 619:4
**recruiting** [1] - 624:16
**red** [4] - 537:6, 539:2, 547:3, 705:9
**reduce** [1] - 531:3
**refer** [1] - 707:11
**reference** [1] - 699:18
**referring** [8] - 534:16, 536:10, 536:11, 541:18, 570:19, 576:23, 665:5, 665:7
**reflect** [3] - 598:11, 707:16, 717:15
**reflected** [5] - 711:12, 713:3, 714:12, 714:18, 715:4
**refused** [1] - 609:21
**regard** [3] - 523:15, 610:10, 624:25
**regarding** [7] - 580:22, 598:10, 609:17, 613:3, 634:10, 668:19, 723:25
**regardless** [1] - 695:5
**region** [1] - 524:3
**regulatory** [1] - 668:7
**rehabilitate** [2] - 600:16, 600:19
**rehearsed** [1] - 638:3
**rejected** [1] - 601:15
**rejoined** [1] - 589:21
**relate** [1] - 507:4
**related** [16] - 506:8, 539:3, 561:16, 587:6, 587:7, 587:18, 587:21, 588:3, 588:6, 588:13, 598:1, 607:22, 624:17, 678:25, 712:3
**relates** [1] - 536:21
**relating** [1] - 650:3
**relation** [1] - 712:22
**relationship** [7] - 549:11, 549:13, 549:17, 552:18, 599:10, 624:6, 656:25
**relationships** [1] - 619:12
**relative** [1] - 620:4
**release** [4] - 513:22, 513:24, 720:6, 720:7
**released** [1] - 644:14
**releases** [1] - 720:5
**relevance** [1] - 604:14
**relief** [1] - 526:12
**relieve** [1] - 626:25
**remainder** [1] - 611:16
**remained** [2] - 618:19, 618:21
**remarks** [1] - 697:13

**remedy** [1] - 530:25
**remember** [21] - 500:12, 501:13, 503:11, 508:11, 520:11, 529:3, 562:17, 569:25, 608:19, 609:23, 610:13, 625:8, 640:12, 652:1, 660:11, 661:20, 663:8, 665:12, 682:2, 689:2, 695:22
**remind** [3] - 499:5, 704:6, 720:22
**reminded** [2] - 616:10, 675:6
**remote** [1] - 608:3
**removal** [3] - 664:16, 679:24, 685:12
**remove** [10] - 663:10, 663:14, 667:16, 676:12, 676:14, 679:8, 679:11, 681:3, 691:15, 704:22
**removed** [22] - 663:11, 663:18, 663:19, 664:5, 664:15, 667:4, 668:2, 676:11, 676:16, 678:13, 679:25, 685:24, 685:25, 686:2, 688:3, 691:18, 703:2, 703:6, 704:23, 707:22, 709:10, 709:11
**removing** [4] - 666:22, 669:25, 680:24, 700:16
**renamed** [2] - 578:9, 578:12
**render** [1] - 694:20
**Rensselaer** [1] - 590:18
**rent** [1] - 546:13
**rented** [1] - 557:11
**renunciate** [3] - 585:25, 586:1, 586:16
**repeat** [1] - 624:1
**rephrase** [1] - 510:21
**replay** [1] - 717:7
**reply** [1] - 697:9
**report** [7] - 522:17, 522:18, 552:1, 552:2, 650:11, 650:14, 701:25
**reported** [9] - 550:9, 551:24, 551:25, 552:5, 552:6, 552:7, 585:3, 702:2
**Reporter** [1] - 495:23
**reporter** [1] - 578:16
**representative** [2] - 673:11, 711:6
**request** [7] - 496:15, 496:22, 497:10, 675:11, 687:5, 687:22, 693:6
**requested** [4] - 585:2, 670:9, 686:9, 688:2
**requesting** [1] - 631:23
**requests** [3] - 598:14, 609:2, 684:6
**require** [3] - 498:8, 586:5, 586:6
**required** [5] - 542:12, 545:11, 546:9, 550:19, 712:13
**requirement** [1] - 516:9
**requirements** [2] - 540:2, 555:23
**research** [11] - 504:9, 585:20, 599:1, 600:2, 600:5, 600:22, 601:1, 602:19, 602:20, 721:4, 721:15
**researching** [1] - 506:9
**reserved** [1] - 577:4
**reside** [1] - 570:9
**residence** [3] - 568:13, 568:15, 574:23
**residences** [2] - 570:14, 629:18
**residential** [2] - 567:22, 579:14
**residing** [1] - 569:4
**resistance** [1] - 518:15

**resistant** [1] - 621:20
**resolve** [1] - 587:14
**resolved** [6] - 502:14, 612:20, 612:22, 612:23, 612:24, 662:16
**resolves** [1] - 719:11
**resort** [2] - 637:7
**resources** [1] - 609:2
**respect** [5] - 576:15, 583:16, 586:19, 663:1, 711:14
**respected** [3] - 545:13, 550:2, 702:23
**respond** [1] - 727:2
**responding** [4] - 524:23, 525:1, 528:1, 623:19
**response** [15] - 511:12, 511:25, 512:7, 512:10, 512:21, 513:7, 623:19, 626:11, 693:3, 693:6, 693:10, 693:13, 698:5, 698:8, 699:8
**response-type** [1] - 623:19
**responses** [2] - 528:17, 623:14
**responsibilities** [2] - 594:4, 631:14
**responsibility** [1] - 700:11
**responsible** [7] - 542:4, 547:13, 594:20, 606:7, 606:15, 641:6, 651:10
**rest** [4] - 533:11, 580:6, 654:20, 703:22
**restarted** [1] - 703:19
**restate** [1] - 685:17
**restaurant** [4] - 578:8, 578:9, 578:11, 578:22
**result** [9] - 667:21, 669:17, 685:10, 685:18, 685:20, 698:15, 713:5, 713:6, 715:2
**resulted** [3] - 682:25, 685:11
**resulting** [1] - 703:25
**resume** [1] - 720:19
**resumes** [3] - 565:3, 616:5, 672:5
**retail** [1] - 610:20
**retreat** [1] - 637:2
**retribution** [1] - 609:22
**retrospect** [1] - 507:24
**returned** [1] - 691:13
**reveal** [1] - 507:10
**revealed** [2] - 507:12, 649:5
**revealing** [1] - 508:4
**Reverence** [1] - 587:24
**review** [4] - 496:21, 633:21, 673:8, 688:20
**reviewed** [3] - 570:23, 707:13, 714:10
**reviewing** [2] - 688:16, 699:17
**reviews** [1] - 712:24
**revisit** [3] - 570:23, 605:1, 613:10
**RICHARD** [1] - 495:12
**Rick** [1] - 593:17
**RICO** [4] - 694:12, 694:18, 695:24, 695:25
**rid** [2] - 610:5, 667:15
**riled** [1] - 660:21
**ring** [2] - 623:21
**rip** [1] - 651:11
**rise** [5] - 564:9, 612:3, 616:14, 671:20, 721:20

**risk** [2] - 663:23, 667:2
**road** [2] - 570:15, 654:8
**Road** [11] - 535:8, 575:15, 575:18, 575:19, 576:5, 577:7, 577:8, 577:14, 578:4, 597:8, 597:19
**roads** [1] - 569:17
**robot** [1] - 528:1
**rocks** [1] - 700:24
**role** [11] - 550:5, 583:16, 594:2, 607:18, 632:22, 639:20, 680:9, 680:10, 686:11, 688:25, 689:2
**roles** [3] - 542:7, 542:10, 594:5
**roll** [1] - 635:1
**roll"** [1] - 634:24
**rolling** [3] - 634:22, 635:11, 635:17
**Rome** [1] - 629:20
**Room** [1] - 553:24
**room** [17] - 510:14, 527:7, 535:1, 535:6, 535:10, 554:19, 554:21, 554:24, 555:1, 555:2, 575:24, 576:12, 622:2, 635:5, 707:5, 720:21
**rooms** [8] - 554:17, 575:22, 637:8, 637:10, 680:18, 688:12, 691:16
**ropes** [1] - 547:11
**Rosa** [3] - 645:21, 646:1, 646:2
**ROSE** [1] - 495:19
**Ross** [2] - 593:17, 722:6
**round** [1] - 596:10
**Route** [1] - 578:11
**royalty** [1] - 598:23
**RPI** [3] - 590:16, 590:17, 590:19
**RPR** [1] - 495:23
**ruling** [3] - 694:5, 695:10, 695:11
**rumblings** [1] - 661:2
**run** [28] - 528:15, 543:5, 545:11, 546:1, 546:4, 546:15, 553:12, 553:15, 578:23, 578:24, 578:25, 585:2, 587:12, 587:20, 606:22, 609:25, 610:1, 617:19, 618:7, 620:18, 633:14, 638:24, 641:2, 641:10, 645:20, 653:1
**running** [8] - 527:2, 542:4, 542:15, 547:3, 551:12, 587:8, 598:16, 600:9
**runs** [1] - 665:17
**Russell** [2] - 597:13, 607:15
**rustic** [2] - 637:7, 642:1

## S

**sabotaging** [2] - 623:11, 624:7
**safe** [1] - 553:24
**sales** [12] - 527:3, 528:9, 544:12, 547:8, 547:21, 549:10, 610:21, 611:14, 619:16, 620:9, 623:5, 626:22
**salespeople** [13] - 544:13, 544:14, 547:5, 547:6, 553:5, 555:22, 555:23, 555:24, 556:17, 556:19, 556:23, 559:3, 559:4
**salesperson** [7] - 555:25, 556:9, 556:12, 556:21, 556:25, 557:1, 623:6
**Salinas** [5] - 589:20, 590:24, 590:25, 591:1, 591:8

**Salinas's** [1] - 591:7
**salivate** [2] - 623:21, 623:22
**Salzman** [55] - 501:14, 515:23, 516:24, 519:7, 519:19, 522:12, 524:7, 524:13, 525:7, 525:8, 525:10, 541:2, 541:11, 541:18, 549:19, 561:7, 561:16, 565:18, 566:8, 567:23, 575:22, 577:3, 584:1, 588:22, 588:24, 589:8, 589:9, 589:21, 595:16, 608:15, 609:9, 609:17, 629:15, 636:1, 649:16, 655:9, 655:15, 656:16, 658:1, 659:23, 660:24, 661:21, 667:12, 668:12, 668:20, 668:23, 668:25, 669:17, 687:3, 687:18, 687:19, 699:18, 700:8, 700:12
**Salzman's** [2] - 520:5, 561:22
**San** [1] - 555:15
**sandpaper** [2] - 700:23, 701:3
**Sara** [4] - 565:18, 578:6, 596:19, 596:25
**Saratoga** [1] - 653:11
**sash** [49] - 535:3, 536:2, 536:4, 536:9, 536:11, 536:23, 536:24, 537:3, 537:5, 537:17, 537:20, 537:21, 538:10, 538:12, 538:19, 538:23, 538:25, 539:2, 539:12, 539:14, 539:16, 539:21, 539:22, 539:25, 540:1, 540:4, 540:8, 540:9, 540:16, 540:22, 540:24, 541:3, 541:4, 541:8, 541:11, 541:12, 541:14, 548:4, 548:5, 566:2, 587:5, 602:3, 616:21, 616:23
**Sash** [2] - 537:25, 538:1
**sashes** [15] - 510:3, 518:11, 535:1, 535:3, 535:10, 536:5, 540:15, 540:20, 541:13, 543:10, 545:4, 545:8, 554:6
**sat** [3] - 520:8, 633:7, 635:4
**satellite** [1] - 546:7
**satisfy** [2] - 582:13, 582:14
**Saturday** [1] - 725:12
**saw** [14] - 512:8, 514:8, 524:24, 525:8, 526:18, 559:18, 559:21, 651:6, 660:7, 660:8, 662:23, 663:3, 668:9, 712:7
**scans** [1] - 602:22
**scared** [1] - 553:10
**schedule** [3] - 677:14, 684:5, 697:22
**scheduling** [1] - 684:10
**school** [2] - 602:17, 653:12
**science** [2] - 647:15, 707:3
**sciency** [1] - 520:11
**scientific** [7] - 513:25, 522:17, 585:20, 599:1, 600:22, 602:19, 602:20
**scientist** [1] - 600:24
**Scott** [4] - 630:18, 677:2, 677:21, 677:25
**screen** [4] - 536:12, 539:10, 548:6, 549:18
**screw** [1] - 644:1
**screwing** [1] - 624:7
**script** [1] - 648:16
**scuffing** [2] - 676:20, 700:23
**Seagram's** [1] - 596:15

**sealed** [2] - 496:16, 496:23
**search** [1] - 553:7
**searching** [1] - 555:25
**seated** [9] - 496:8, 496:12, 498:22, 565:7, 612:7, 616:7, 672:14, 675:4, 722:1
**Seattle** [1] - 555:15
**Seattle-Tacoma** [1] - 555:15
**second** [18] - 511:14, 536:3, 566:2, 575:3, 603:7, 604:11, 616:18, 649:15, 694:23, 698:10, 698:11, 698:15, 698:17, 699:24, 705:5, 716:10, 717:21, 718:14
**seconds** [8] - 503:17, 664:14, 666:13, 706:6, 716:9, 718:8, 719:16, 719:19
**secret** [1] - 529:7
**secrets** [6] - 507:23, 508:5, 508:13, 509:6, 509:7, 509:8
**section** [2] - 704:23, 705:22
**sections** [2] - 679:11, 703:6
**see** [39] - 511:21, 511:23, 514:1, 517:23, 518:4, 541:3, 541:7, 541:9, 541:11, 553:9, 561:3, 576:17, 587:24, 598:17, 640:1, 640:2, 653:4, 655:7, 658:6, 662:12, 666:13, 673:13, 674:5, 685:9, 686:23, 693:12, 696:1, 696:2, 704:4, 712:1, 713:8, 717:10, 718:25, 719:9, 720:5, 721:19, 721:23, 723:17
**seeing** [3] - 663:3, 674:1, 679:2
**seek** [3] - 673:13, 708:5, 721:4
**seeking** [1] - 708:20
**seem** [6] - 607:7, 620:16, 627:22, 708:1, 716:14, 717:20
**segments** [1] - 666:22
**selected** [1] - 682:13
**selection** [1] - 721:14
**self** [3] - 521:17, 526:22, 532:20
**self-fulness** [1] - 521:17
**self-love** [2] - 526:22, 532:20
**sell** [4] - 547:18, 610:22, 611:3, 611:5
**selling** [3] - 601:20, 610:24, 610:25
**send** [2] - 554:18, 640:16
**sends** [1] - 635:14
**SENIOR** [1] - 495:10
**senior** [1] - 616:23
**Senior** [15] - 539:15, 540:6, 540:9, 542:9, 545:8, 545:9, 545:11, 545:24, 546:25, 548:9, 548:14, 548:15, 548:16, 549:9, 551:10
**sense** [14] - 511:23, 512:5, 512:11, 512:16, 513:9, 526:12, 526:13, 580:24, 587:7, 608:1, 626:16, 658:23, 669:6, 716:16
**sensitive** [2] - 632:21, 632:22
**sensors** [1] - 600:9
**sent** [12] - 497:24, 498:3, 506:15, 644:16, 687:3, 688:4, 693:4, 697:8, 697:9, 697:19, 698:5, 698:25
**sentence** [3] - 687:21, 698:10, 709:11
**series** [6] - 533:5, 539:5, 542:7, 580:9, 665:9, 690:22
**serious** [2] - 560:10, 561:1
**serve** [1] - 592:4
**served** [1] - 597:4
**session** [3] - 510:5, 510:17, 525:3
**sessions** [8] - 525:13, 525:17, 525:21, 525:23, 525:25, 527:3, 532:23, 543:19
**set** [6] - 506:18, 527:18, 543:19, 596:1, 662:5, 681:7
**sets** [1] - 531:18
**setup** [1] - 625:20
**seven** [1] - 636:25
**several** [1] - 515:13
**sex** [5] - 694:8, 694:9, 694:11, 694:15, 695:10
**sexuality** [1] - 661:22
**shakes** [2] - 720:7, 720:8
**shaking** [2] - 512:10, 512:21
**shame** [1] - 508:4
**shameful** [1] - 529:20
**share** [7] - 507:22, 518:8, 613:1, 647:7, 651:12, 659:5, 659:8
**shared** [4] - 508:8, 508:12, 566:9, 648:9
**sharing** [2] - 520:20, 642:2
**shed** [1] - 662:14
**sheet** [1] - 686:8
**shepherd** [2] - 543:17, 545:10
**shiny** [1] - 501:16
**shocked** [2] - 501:24, 660:20
**shocking** [1] - 604:18
**shoot** [7] - 632:2, 632:5, 632:6, 632:13, 634:23, 635:20, 635:21
**shooter** [2] - 678:1, 678:2
**shooting** [13] - 524:12, 524:13, 617:13, 631:21, 631:25, 632:4, 632:17, 635:7, 635:9, 635:21, 651:23, 678:8
**short** [3] - 673:8, 699:20, 707:13
**shorthand** [1] - 706:9
**shot** [10] - 574:17, 631:23, 632:3, 632:4, 632:14, 632:15, 632:17, 635:2, 635:3, 654:11
**show** [34] - 509:16, 526:8, 569:15, 570:1, 574:7, 574:11, 574:14, 576:2, 576:4, 576:6, 576:8, 577:2, 577:13, 577:19, 577:23, 578:1, 589:7, 589:10, 589:23, 590:7, 590:21, 590:23, 591:10, 592:17, 592:18, 623:3, 645:22, 651:23, 686:17, 686:20, 692:25, 693:17, 723:5, 723:6
**showed** [4] - 577:25, 698:22, 723:11, 723:22
**shower** [2] - 531:2, 533:13
**showing** [20] - 534:20, 548:19, 549:4, 568:20, 569:13, 569:18, 570:22, 577:1, 577:12, 577:18, 577:21, 579:3, 579:9, 584:10, 589:5, 623:12, 654:3, 654:9, 677:4, 689:13
**Showing** [2] - 639:24, 640:3
**shown** [2] - 530:17, 722:23
**shun** [2] - 560:11, 561:21
**shunned** [11] - 560:11, 560:22, 560:25, 561:4, 561:9, 561:10, 561:12, 561:14, 561:16, 561:17, 563:21
**shunning** [2] - 560:13, 560:14
**shut** [1] - 668:9
**side** [8] - 498:2, 498:3, 522:7, 672:12, 678:17, 720:2, 720:8
**Sidebar** [8] - 503:19, 504:1, 505:14, 614:4, 614:6, 672:15, 673:1, 674:24
**sidebar** [16] - 496:16, 498:12, 503:17, 503:18, 604:1, 605:10, 612:24, 613:4, 672:13, 693:21, 694:1, 696:6, 697:13, 710:9, 711:1, 713:10
**sidebars** [3] - 496:15, 496:17, 496:21
**sign** [5] - 576:13, 576:23, 576:25, 645:10
**signal** [8] - 664:22, 703:17, 703:25, 704:24, 705:6, 706:6, 707:7, 719:12
**signed** [1] - 523:3
**signer** [2] - 584:3, 599:21
**significant** [4] - 542:18, 544:20, 544:25, 655:23
**signify** [4] - 536:5, 536:23, 537:8, 540:12
**signing** [3] - 508:9, 508:11, 692:10
**signs** [1] - 569:16
**silly** [1] - 635:21
**Silver** [1] - 637:2
**similar** [7] - 514:23, 532:10, 635:25, 636:4, 636:16, 668:10, 721:10
**similarity** [1] - 623:23
**similarly** [2] - 548:10, 638:12
**Similarly** [1] - 625:24
**simple** [2] - 512:3, 514:6
**simply** [1] - 558:17
**simultaneously** [1] - 558:11
**sin** [2] - 562:12
**singing** [3] - 637:21, 637:25, 641:3
**single** [15] - 501:1, 515:11, 533:12, 545:21, 550:24, 551:23, 551:24, 585:6, 606:11, 608:6, 634:4, 634:6, 658:13, 658:16
**sister** [1] - 561:17
**sit** [9] - 532:21, 588:12, 611:8, 634:3, 634:5, 638:11, 654:21, 675:15, 675:22
**sites** [1] - 721:10
**sitting** [2] - 681:17, 684:9
**situation** [2] - 613:6, 678:15
**situations** [2] - 534:12, 637:14
**six** [9] - 517:5, 556:3, 556:7, 556:8, 556:17, 556:18, 556:19, 602:9
**size** [1] - 665:14
**sizeable** [1] - 622:5
**skills** [3] - 639:7, 639:12, 678:7
**skull** [1] - 600:9
**slash** [1] - 681:25
**slave** [1] - 694:24
**sleep** [2] - 621:6, 637:6
**slight** [1] - 515:14
**slim** [1] - 662:7

**slipped** [1] - 513:13
**slowly** [1] - 498:18
**small** [7] - 618:24, 622:6, 626:20, 643:1, 691:6, 712:23, 720:6
**smaller** [3] - 554:17, 576:17, 622:7
**Smith** [1] - 496:10
**SMITH** [1] - 495:22
**smokescreen** [1] - 680:1
**smoothly** [1] - 606:22
**snippets** [2] - 634:24, 635:1
**snow** [2] - 531:4
**Snyder** [2] - 650:1, 650:4
**so..** [1] - 716:12
**soap** [1] - 611:3
**soaps** [1] - 610:24
**social** [1] - 721:9
**society** [2] - 586:22, 649:7
**Society** [8] - 525:16, 583:10, 584:15, 585:21, 591:4, 606:12, 606:14, 617:16
**sociopath** [1] - 601:4
**sociopathy** [1] - 600:14
**solvers** [1] - 656:5
**solving** [1] - 586:24
**someone** [6] - 561:12, 561:16, 600:19, 649:25, 652:3, 688:22
**something's** [1] - 664:15
**Sometimes** [2] - 638:4, 639:18
**sometimes** [17] - 507:15, 531:18, 547:2, 551:11, 552:21, 552:22, 597:9, 628:24, 633:17, 636:19, 679:9, 679:12, 679:13, 679:14, 685:5, 705:2, 705:13
**somewhat** [2] - 527:25, 652:14
**somewhere** [12] - 513:17, 524:3, 543:11, 545:5, 616:22, 618:13, 644:13, 650:15, 653:9, 682:8, 692:19, 710:2
**SOP** [7] - 578:24, 599:10, 599:13, 599:15, 599:16, 599:24, 606:19
**sorry** [21] - 540:1, 540:8, 541:17, 555:25, 570:19, 580:19, 597:21, 608:10, 620:8, 631:7, 635:19, 635:23, 645:20, 669:7, 672:10, 698:13, 698:18, 716:17, 716:25, 722:11, 722:13
**sort** [31] - 504:18, 506:7, 509:24, 513:18, 515:6, 526:5, 527:2, 527:25, 531:5, 542:8, 547:8, 563:10, 570:12, 585:13, 592:25, 598:8, 600:5, 608:4, 619:4, 620:9, 624:10, 634:24, 637:23, 657:12, 660:20, 661:17, 665:1, 673:11, 695:4, 706:6, 709:16
**Sort** [1] - 642:10
**sorts** [4] - 499:21, 578:22, 597:23, 642:8
**Souki** [1] - 631:10
**sound** [5] - 617:13, 678:2, 704:10, 705:10, 717:19
**sounds** [1] - 724:24
**source** [1] - 651:7
**Source** [1] - 587:24

**sources** [3] - 504:10, 627:13, 627:15
**south** [1] - 555:16
**space** [3] - 523:14, 546:14, 557:12
**speaker** [1] - 540:15
**speaking** [16] - 500:2, 500:3, 510:1, 510:2, 547:9, 547:12, 582:11, 618:1, 626:3, 636:3, 641:18, 654:24, 661:1, 669:9, 678:1, 708:23
**spec** [1] - 686:8
**special** [1] - 553:21
**Special** [1] - 496:5
**Specialist** [1] - 496:6
**specialists** [1] - 646:15
**specific** [10] - 516:16, 527:15, 596:7, 649:11, 665:24, 678:14, 680:2, 686:11, 710:3, 714:15
**specifically** [18] - 503:13, 552:18, 575:2, 576:10, 579:17, 596:5, 596:12, 599:2, 618:11, 627:6, 646:22, 667:4, 682:10, 682:15, 709:10, 710:6, 712:14, 712:20
**specifics** [2] - 669:19, 676:6
**specs** [1] - 686:8
**spell** [1] - 578:15
**spend** [9] - 531:17, 547:16, 565:22, 566:17, 566:21, 621:16, 646:18, 659:25
**spending** [5] - 523:14, 544:20, 602:11, 659:1, 660:2
**spent** [8] - 519:13, 521:19, 547:18, 569:2, 570:14, 580:13, 594:21, 594:22
**spider** [1] - 511:23
**spinach** [1] - 518:7
**spindles** [1] - 665:17
**spinning** [2] - 665:18, 665:19
**spiritual** [1] - 643:18
**spoken** [2] - 561:15, 670:6
**Sports** [2] - 653:14, 654:5
**spots** [1] - 577:4
**Springs** [1] - 653:11
**Sr** [1] - 596:14
**stabilize** [1] - 664:14
**stabilized** [1] - 706:7
**stable** [2] - 665:11, 719:12
**staff** [1] - 590:4
**stage** [4] - 602:6, 638:11, 638:12, 676:9
**stages** [3] - 665:23, 665:24, 676:9
**stamp** [1] - 685:23
**stand** [15] - 498:6, 531:4, 560:19, 562:13, 564:11, 564:14, 565:3, 603:11, 612:5, 616:5, 638:11, 654:18, 671:22, 672:5, 721:22
**standing** [3] - 516:12, 544:5, 658:18
**standpoint** [2] - 541:22, 711:19
**stands** [1] - 646:16
**start** [22] - 503:9, 516:14, 517:10, 546:5, 546:8, 555:18, 604:15, 645:13, 647:6, 647:9, 651:8, 652:8, 664:13, 680:25, 689:7, 697:19, 703:20, 705:3, 706:3, 708:25, 714:22, 718:8

**started** [7] - 525:6, 599:13, 645:5, 657:23, 678:12, 690:15, 719:14
**starting** [1] - 504:6
**starts** [2] - 703:19, 719:25
**stash** [1] - 616:19
**state** [7] - 496:2, 513:14, 513:17, 526:7, 643:2, 668:8, 688:21
**statement** [6] - 509:18, 509:25, 510:15, 510:18, 511:3
**STATES** [3] - 495:1, 495:2, 495:10
**States** [4] - 495:4, 495:13, 495:16, 496:4
**static** [16] - 679:12, 704:19, 704:24, 704:25, 705:3, 706:11, 706:18, 706:20, 706:23, 718:3, 718:5, 718:12, 719:7
**stations** [1] - 688:9
**status** [6] - 586:14, 586:16, 658:18, 701:23, 702:7, 702:11
**stay** [2] - 519:8, 717:19
**stayed** [1] - 641:25
**steered** [1] - 502:4
**stenography** [1] - 495:25
**step** [20] - 537:18, 537:19, 538:23, 539:12, 539:22, 540:5, 679:19, 680:23, 680:24, 682:24, 683:13, 683:16, 683:18, 683:20, 683:22, 685:10, 685:19, 698:11, 698:15
**Stephanie** [1] - 593:17
**steps** [3] - 665:23, 665:24, 680:21
**still** [17] - 499:5, 503:7, 518:18, 558:18, 560:2, 561:18, 582:8, 608:7, 616:10, 618:21, 619:3, 619:14, 657:18, 665:25, 675:6, 692:4, 711:7
**stimuli** [1] - 586:5
**stimulus** [1] - 511:25
**stipulation** [1] - 711:22
**stood** [1] - 643:9
**stop** [14] - 536:5, 575:16, 619:15, 637:5, 653:7, 706:2, 706:14, 706:16, 714:23, 716:10, 717:3, 717:14, 717:25, 719:8
**stopped** [5] - 634:16, 635:7, 635:10, 719:13, 719:25
**storage** [1] - 554:22
**store** [1] - 610:21
**stories** [3] - 610:9, 643:9, 648:20
**story** [11] - 609:12, 636:13, 643:5, 644:15, 648:14, 649:2, 650:5, 650:18, 651:8, 651:9, 651:10
**straight** [2] - 705:17, 705:25
**strange** [4] - 627:18, 627:22, 650:21
**strategically** [1] - 703:7
**strategies** [5] - 525:22, 525:24, 526:2, 559:18, 619:5
**strategy** [2] - 559:10, 647:17
**street** [1] - 579:23
**streets** [1] - 522:7
**stretch** [1] - 603:11
**strict** [1] - 584:25
**stricter** [1] - 539:6
**strike** [3] - 538:18, 634:9, 669:12

**Stripe** [17] - 535:5, 535:22, 535:23, 535:24, 536:6, 536:20, 537:18, 538:24, 539:13, 539:23, 540:5, 541:16, 541:19, 541:22, 543:18, 543:19
**stripe** [24] - 516:11, 518:10, 518:17, 518:19, 537:10, 537:11, 537:12, 538:14, 538:15, 538:17, 538:19, 540:2, 583:1, 587:5, 587:8, 587:9, 587:12, 587:18, 595:11, 616:17, 618:25
**stripes** [15] - 537:5, 537:6, 537:8, 537:15, 537:16, 539:2, 539:16, 539:17, 539:25, 540:1, 540:7, 540:8, 540:11, 540:12, 595:12
**strong** [1] - 527:5
**strongly** [2] - 647:13, 660:13
**structure** [7] - 509:15, 513:14, 513:15, 557:2, 611:11, 611:22, 623:1
**Structure** [2] - 541:24, 541:25
**structures** [1] - 598:3
**struggled** [2] - 582:15, 620:3
**struggling** [3] - 526:18, 619:11, 626:6
**stuck** [1] - 522:14
**Student** [1] - 541:6
**student** [8] - 517:24, 536:24, 554:3, 554:7, 554:8, 660:8, 661:16, 678:9
**students** [5] - 542:6, 557:6, 557:8, 633:1, 662:3
**studies** [7] - 600:6, 600:13, 603:1, 603:2, 603:5, 604:17, 613:3
**study** [4] - 601:1, 601:5, 604:7, 647:23
**stuff** [2] - 528:3, 663:10
**stumbled** [1] - 503:15
**stupid** [1] - 508:23
**style** [1] - 690:22
**subconscious** [1] - 513:5
**subject** [11] - 593:12, 601:11, 673:13, 673:16, 674:13, 708:6, 708:7, 711:4, 711:18, 715:13, 715:15
**subjects** [2] - 600:25, 709:22
**submitting** [1] - 692:11
**substance** [1] - 547:20
**substantial** [1] - 582:16
**substantive** [1] - 506:25
**success** [3] - 510:11, 619:9, 622:10
**Success** [6] - 536:17, 536:21, 553:1, 576:11, 576:14, 576:22
**successful** [6] - 609:7, 619:25, 620:1, 622:9, 622:14, 626:8
**sudden** [2] - 528:14, 718:15
**suddenly** [9] - 511:22, 512:9, 512:14, 512:22, 513:18, 513:22, 522:15, 705:3, 705:21
**suggest** [8] - 521:6, 586:25, 604:24, 656:14, 667:25, 703:7, 707:2, 707:4
**suggested** [5] - 500:4, 585:20, 610:3, 656:16, 659:22
**suggesting** [2] - 647:19, 649:6
**suggestions** [1] - 639:18

**suicide** [1] - 650:11
**Suite** [1] - 495:21
**suits** [1] - 593:5
**summarize** [2] - 691:11, 692:1
**summer** [2] - 637:23, 638:6
**summit** [4] - 639:4, 639:5, 640:9, 640:11
**summits** [1] - 578:25
**Sunday** [4] - 726:14, 726:16, 726:18, 726:23
**superior** [1] - 670:18
**support** [3] - 563:2, 563:22, 638:17
**supported** [2] - 562:25, 563:3
**supportive** [2] - 564:4, 596:22
**suppose** [4] - 504:7, 557:6, 584:16, 587:3
**supposed** [6] - 600:3, 647:2, 648:17, 649:13, 667:4, 668:22
**supposedly** [1] - 650:10
**suppress** [1] - 559:21
**suppressive** [14] - 500:6, 500:17, 500:21, 502:18, 559:9, 559:10, 559:11, 559:12, 559:16, 559:18, 559:22, 559:25, 560:2, 628:22
**Suppressives** [2] - 559:6, 559:7
**surfed** [1] - 570:12
**surge** [1] - 713:6
**surprised** [2] - 506:14, 506:16
**surrounded** [1] - 509:25
**surveillance** [4] - 579:15, 579:17, 580:23, 581:9
**survey** [11] - 504:19, 504:20, 506:7, 506:10, 506:11, 506:13, 506:14, 506:15, 506:17, 506:21, 507:1
**surveys** [1] - 506:24
**survival** [2] - 650:8, 650:19
**survivalist** [1] - 650:8
**Susan** [1] - 593:19
**sustained** [4] - 580:18, 580:20, 581:3, 669:11
**Sustained** [5] - 562:1, 609:14, 668:17, 675:20, 702:4
**sway** [1] - 724:23
**sweating** [1] - 512:9
**system** [20] - 501:2, 502:8, 517:10, 534:14, 535:18, 535:19, 542:19, 543:3, 544:13, 557:15, 580:5, 580:9, 587:5, 608:25, 611:13, 634:1, 660:7, 679:11, 694:20, 704:12
**System** [1] - 542:20
**systems** [2] - 688:11, 688:14

## T

**table** [3] - 496:5, 512:14, 691:6
**tablets** [1] - 554:4
**Tacoma** [1] - 555:15
**tailored** [1] - 633:14
**talks** [5] - 560:16, 636:4, 636:18, 657:7, 657:19, 657:21
**TANYA** [1] - 495:15

**Tanya** [1] - 496:3
**tape** [24] - 663:24, 664:11, 664:18, 664:22, 665:13, 665:16, 665:19, 665:20, 680:1, 680:3, 680:4, 680:7, 681:11, 682:25, 683:15, 685:20, 686:9, 688:2, 703:7, 704:20, 704:21, 704:25, 707:3
**tapes** [23] - 663:19, 664:12, 667:3, 669:20, 671:6, 679:9, 682:13, 682:16, 687:22, 687:24, 688:16, 692:8, 699:18, 701:16, 708:3, 709:14, 709:18, 710:4, 711:7, 711:8, 712:13, 712:15, 715:25
**task** [1] - 702:6
**tasked** [2] - 684:11, 722:25
**tasks** [2] - 543:16, 558:20
**taught** [18] - 501:5, 502:22, 511:19, 512:12, 519:19, 526:3, 547:10, 547:14, 547:18, 550:2, 559:8, 586:3, 620:7, 624:14, 626:23, 627:5, 628:10, 659:15
**tax** [2] - 598:7, 607:23
**teach** [15] - 524:22, 525:8, 525:9, 525:10, 525:11, 547:13, 547:15, 548:3, 622:20, 624:22, 624:25, 625:7, 627:9, 628:2, 709:1
**teaching** [2] - 519:20, 594:14
**team** [25] - 631:20, 632:3, 632:7, 633:21, 639:22, 654:17, 654:20, 680:12, 680:13, 682:18, 684:11, 686:13, 686:15, 689:22, 689:23, 690:3, 691:14, 692:19, 700:18, 700:20, 711:13, 715:9
**tears** [1] - 662:14
**tech** [5] - 532:5, 565:20, 580:2, 670:7, 678:7
**technical** [2] - 631:19, 680:11, 716:15
**technological** [1] - 554:4
**technology** [5] - 577:10, 579:20, 624:9, 661:4, 661:11
**teeth** [1] - 518:7
**Telephone** [1] - 495:24
**television** [1] - 554:21
**temporarily** [1] - 691:8
**ten** [18] - 518:1, 533:13, 538:7, 544:8, 546:18, 546:21, 556:13, 564:9, 621:11, 654:25, 666:12, 671:18, 671:24, 681:22, 682:9, 716:9
**ten-minute** [3] - 564:9, 671:18, 671:24
**tended** [2] - 594:7, 619:10
**tendencies** [1] - 559:16
**tends** [3] - 703:22, 724:21
**tens** [1] - 642:19
**tenth** [3] - 519:24, 520:3, 652:12
**Teny** [1] - 496:9
**TENY** [1] - 495:19
**Teri** [1] - 496:6
**term** [25] - 503:8, 513:4, 517:20, 525:21, 539:24, 548:2, 552:21, 559:6, 562:2, 581:17, 598:25, 600:15, 607:4, 646:7, 649:8, 649:9, 665:5, 685:5, 685:6,

**termed** [27] - 500:5, 511:24, 513:14, 516:14, 517:4, 518:10, 524:8, 527:21, 528:2, 532:5, 532:20, 535:5, 538:14, 538:16, 541:6, 552:12, 552:23, 554:17, 556:20, 574:20, 585:25, 586:5, 592:8, 636:2, 646:13, 679:22, 717:21

**terms** [19] - 525:15, 525:24, 530:15, 530:16, 553:8, 563:11, 617:13, 621:4, 621:7, 625:24, 628:4, 634:23, 670:6, 674:13, 683:8, 699:3, 702:21, 711:16

**terrible** [4] - 508:19, 511:23, 529:7, 563:3

**terribly** [1] - 658:7

**terrified** [4] - 512:9, 512:15, 512:22, 528:14

**terror** [1] - 512:15

**test** [3] - 513:25, 514:1, 522:16

**testified** [7] - 617:22, 707:19, 715:23, 722:8, 722:9, 722:14, 722:24

**testify** [8] - 504:15, 604:10, 604:21, 711:11, 712:12, 712:14, 722:18, 723:10

**testifying** [1] - 695:13

**testimony** [14] - 505:11, 564:12, 587:23, 605:1, 612:6, 613:3, 671:23, 711:25, 715:25, 721:18, 721:23, 722:23, 723:25, 724:5

**text** [2] - 658:15, 721:7

**THE** [214] - 495:10, 496:1, 496:7, 496:12, 496:24, 497:2, 497:13, 497:16, 497:19, 497:21, 497:25, 498:5, 498:7, 498:14, 498:16, 498:19, 498:20, 498:22, 498:24, 498:25, 499:5, 499:7, 499:24, 503:18, 504:12, 504:22, 506:2, 510:21, 523:9, 523:10, 523:15, 523:17, 523:20, 529:13, 529:15, 529:16, 534:19, 535:14, 536:12, 536:14, 536:15, 536:17, 536:19, 537:23, 539:9, 557:21, 557:23, 558:1, 558:2, 558:7, 558:8, 558:14, 558:15, 558:16, 558:18, 558:22, 562:1, 563:7, 564:8, 564:11, 564:13, 565:1, 565:4, 565:7, 571:5, 574:1, 575:5, 580:18, 580:20, 580:21, 581:3, 581:10, 581:11, 585:9, 585:11, 588:15, 588:16, 593:7, 593:8, 593:10, 593:11, 603:8, 603:10, 604:2, 604:4, 604:15, 605:2, 605:4, 605:9, 606:2, 609:14, 610:6, 610:8, 610:10, 610:13, 610:14, 610:15, 610:16, 612:1, 612:5, 612:9, 612:14, 612:17, 612:22, 613:1, 613:11, 613:14, 613:20, 614:4, 616:2, 616:7, 616:11, 640:1, 668:17, 669:9, 669:11, 669:13, 671:4, 671:10, 671:11, 671:12, 671:13, 671:15, 671:16, 671:17, 671:18, 671:22, 672:4, 672:6, 672:9, 672:14, 673:3, 674:15, 674:17, 675:2, 675:4, 675:7, 675:20, 675:25, 682:10, 682:11,

682:13, 682:15, 682:16, 682:17, 682:20, 682:21, 682:22, 685:17, 686:19, 687:12, 689:12, 690:8, 692:16, 692:17, 692:23, 693:19, 695:17, 695:20, 696:1, 697:2, 697:15, 698:13, 698:18, 698:22, 701:3, 701:4, 702:4, 704:6, 704:8, 704:10, 704:12, 704:14, 708:7, 708:13, 713:8, 714:3, 715:14, 716:6, 716:18, 716:21, 720:13, 720:14, 720:15, 720:18, 721:22, 721:25, 722:1, 722:7, 722:10, 722:12, 722:17, 723:9, 723:15, 723:17, 724:3, 724:9, 724:11, 724:16, 724:23, 725:3, 725:11, 725:13, 725:16, 725:19, 725:23, 726:5, 726:8, 726:12, 726:16, 726:19, 726:25, 727:4, 727:6

**themself** [1] - 526:19

**themselves** [4] - 511:9, 559:17, 641:16, 711:23

**theoretically** [1] - 547:1

**theory** [3] - 550:18, 562:6, 644:9

**therapists** [1] - 516:2

**therefore** [2] - 503:5, 694:24

**they've** [2] - 622:4, 627:24

**thing's** [1] - 511:10

**thinkers** [1] - 625:14

**thinking** [6] - 509:12, 528:1, 555:10, 562:18, 563:11, 670:18

**thinks** [1] - 694:9

**Third** [1] - 495:18

**third** [4] - 501:13, 506:16, 699:25, 705:17

**thirteen** [1] - 666:12

**thoroughly** [1] - 526:13

**thoughts** [1] - 512:22

**thousand** [4] - 509:23, 542:22, 543:8, 621:12

**thousands** [1] - 642:19

**threat** [1] - 586:22

**three** [21] - 532:24, 542:22, 543:8, 547:18, 554:16, 582:8, 607:14, 634:21, 635:11, 636:24, 639:10, 653:1, 656:4, 657:10, 688:15, 688:21, 706:13, 718:11, 718:13, 718:18, 718:24

**three-day** [1] - 639:10

**throughout** [8] - 526:17, 638:3, 703:3, 703:5, 704:2, 704:5, 715:1, 715:5

**tie** [1] - 694:16

**tiers** [1] - 523:1

**timeframe** [1] - 689:25

**timeline** [7] - 693:5, 693:7, 697:22, 699:3, 699:5, 699:6

**timing** [1] - 698:7

**tires** [1] - 656:13

**title** [2] - 690:12, 690:14

**to-do** [2] - 692:13, 692:14

**today** [13] - 496:11, 498:9, 508:12, 510:19, 511:2, 530:9, 561:18, 588:12, 613:21, 675:15, 675:22, 716:17,

720:17

**together** [15] - 510:9, 533:10, 578:14, 580:8, 590:16, 592:2, 599:4, 622:24, 636:12, 643:19, 644:11, 655:22, 682:8, 694:17, 706:19

**tolerance** [1] - 690:15

**tomorrow** [1] - 496:25

**tones** [1] - 661:18

**tonight** [3] - 613:12, 662:11, 699:14

**took** [14] - 523:1, 544:6, 548:24, 582:15, 585:5, 627:23, 647:15, 650:7, 650:9, 655:9, 655:21, 675:10, 706:5

**tool** [1] - 691:20

**top** [2] - 531:12, 656:4

**topic** [3] - 498:10, 633:8, 708:24

**topics** [1] - 633:25

**tortured** [1] - 601:8

**totally** [3] - 586:15, 695:14, 725:23

**towards** [6] - 512:6, 527:5, 626:24, 658:17, 662:12, 718:4

**town** [3] - 609:25, 639:9, 639:17

**townhouse** [1] - 569:8

**townhouses** [1] - 567:12

**towns** [2] - 568:8, 568:9

**traffic** [4] - 522:2, 522:3, 522:14

**trafficking** [5] - 694:8, 694:10, 694:11, 694:15, 695:10

**Trail** [1] - 570:17

**train** [6] - 520:25, 525:15, 525:16, 549:9, 560:5, 624:2

**trained** [2] - 516:9, 526:17

**Trainer** [17] - 544:12, 544:14, 547:10, 547:12, 556:15, 556:16, 556:20, 556:21, 556:22, 557:1, 557:17, 557:20, 557:23, 557:24, 558:2

**trainer** [9] - 557:5, 557:11, 557:22, 590:12, 617:8, 622:20, 622:21, 667:11, 708:25

**trainers** [6] - 532:9, 544:9, 555:7, 557:4, 611:15, 622:24

**Trainers** [5] - 544:11, 547:5, 547:6, 553:6, 559:1

**training** [43] - 510:14, 514:17, 514:19, 515:2, 515:21, 515:23, 515:25, 516:13, 516:20, 517:14, 517:16, 517:18, 521:12, 532:7, 532:13, 532:14, 535:1, 535:6, 535:10, 536:1, 546:19, 546:20, 547:17, 547:21, 554:19, 554:25, 555:2, 575:22, 576:12, 581:25, 582:5, 582:7, 582:23, 582:24, 583:2, 594:12, 617:12, 618:24, 622:25, 625:2, 631:24, 707:5

**trainings** [13] - 514:16, 514:17, 514:23, 525:15, 558:6, 578:20, 578:23, 578:24, 582:8, 582:18, 582:21, 595:6

**trains** [2] - 544:12, 544:14

**trajectory** [1] - 543:19

**trance** [1] - 513:13

**trance-like** [1] - 513:13

**transcribe** [2] - 524:11, 647:22

**transcribing** [1] - 550:1
**transcript** [1] - 496:15
**Transcript** [1] - 495:25
**TRANSCRIPT** [1] - 495:9
**transcription** [1] - 647:23
**Transcription** [1] - 495:25
**transfer** [1] - 703:14
**transferring** [2] - 703:11, 704:10
**trap** [3] - 499:20, 500:11, 502:12
**trapped** [1] - 624:5
**trapping** [1] - 534:11
**traps** [1] - 527:18
**treated** [1] - 647:20
**treatments** [1] - 648:15
**tremendously** [1] - 517:17
**trial** [5] - 496:1, 694:8, 694:16, 695:8, 721:14
**TRIAL** [1] - 495:9
**triathlon** [1] - 638:6
**tribute** [6] - 518:23, 659:15, 659:10, 659:12, 659:21, 663:2
**tributes** [1] - 659:23
**tricks** [4] - 623:3, 625:7, 625:23, 626:23
**tried** [6] - 546:11, 595:20, 606:18, 618:4, 619:23, 628:4
**trigger** [1] - 553:12
**trip** [2] - 662:9, 662:10
**trouble** [1] - 595:14
**troubled** [1] - 645:6
**troubles** [1] - 641:7
**true** [15] - 501:25, 509:14, 528:10, 529:18, 556:12, 562:6, 562:7, 562:12, 583:6, 620:19, 647:16, 648:23, 694:6, 694:14
**truly** [2] - 509:4, 670:21
**Trust** [1] - 509:3
**trustworthy** [1] - 521:3
**truth** [1] - 651:8
**try** [35] - 502:22, 502:25, 512:18, 513:3, 515:10, 517:13, 530:25, 546:22, 560:17, 560:18, 565:21, 582:2, 586:19, 595:21, 609:4, 618:6, 619:19, 619:22, 620:1, 620:19, 621:2, 621:4, 621:7, 622:4, 622:23, 623:3, 623:8, 623:9, 647:8, 651:2, 651:4, 652:22, 679:21, 718:5, 724:22
**trying** [17] - 528:7, 559:14, 562:13, 566:19, 595:23, 598:2, 598:4, 610:4, 617:18, 620:23, 628:17, 651:16, 655:7, 695:9, 711:4, 719:11, 726:5
**Tuesday** [5] - 691:24, 725:15, 725:16, 726:13
**tuition** [10] - 522:19, 522:21, 522:24, 522:25, 523:2, 531:20, 532:1, 557:10, 581:13, 581:16
**turn** [10] - 502:23, 510:12, 524:11, 524:18, 562:21, 648:14, 651:20, 718:7, 719:15, 719:18
**turned** [5] - 576:11, 639:13, 698:18, 712:2, 712:9

**turning** [2] - 550:1, 657:12
**TV** [1] - 721:3
**TVs** [1] - 691:13
**twelve** [1] - 516:20
**twice** [1] - 525:9
**Twilight** [10] - 569:10, 569:16, 569:17, 569:20, 569:23, 569:24, 629:19, 680:18, 681:6, 688:11
**twisted** [1] - 509:10
**Twitter** [1] - 721:9
**two** [56] - 516:11, 524:3, 528:24, 529:2, 537:14, 537:22, 537:24, 538:1, 542:22, 543:7, 544:2, 549:20, 562:4, 566:4, 566:5, 569:8, 570:16, 570:18, 577:25, 578:4, 581:20, 582:22, 583:25, 604:8, 607:14, 608:2, 612:11, 612:15, 627:13, 627:15, 634:21, 635:11, 638:9, 654:13, 665:17, 680:21, 682:6, 688:8, 688:11, 688:12, 688:16, 688:22, 695:1, 695:4, 695:21, 695:22, 697:8, 700:7, 705:8, 706:12, 706:18, 718:6, 718:18
**two-hour** [1] - 524:3
**two-stripe** [2] - 516:11
**type** [25] - 519:15, 520:11, 521:15, 551:8, 559:9, 598:23, 622:12, 623:19, 657:16, 668:6, 668:7, 680:3, 680:4, 680:7, 704:18, 705:5, 705:17, 713:1, 718:13, 718:18, 718:24, 719:8, 723:8
**types** [20] - 506:25, 617:25, 673:9, 673:22, 702:24, 703:10, 704:15, 707:8, 707:14, 707:16, 711:13, 713:2, 714:8, 714:11, 714:15, 714:18, 714:20, 715:8, 723:6, 724:1
**typical** [1] - 555:3
**typically** [6] - 525:3, 531:22, 531:25, 542:16, 641:23, 652:25

**U**

**U.S** [3] - 555:13, 639:3, 675:13
**ugly** [1] - 521:7
**Ultima** [1] - 583:7
**ultimate** [3] - 583:21, 584:19, 675:16
**ultimately** [4] - 541:13, 552:4, 569:23, 673:10
**umbrella** [4] - 552:16, 552:18, 552:20, 583:7
**unable** [2] - 500:4, 712:6
**unbelievable** [1] - 531:16
**unburden** [1] - 529:25
**unburdening** [1] - 529:23
**uncertainty** [1] - 526:7
**uncomfortably** [1] - 660:21
**unconscious** [2] - 511:25, 512:23
**under** [12] - 499:6, 515:24, 529:22, 552:17, 569:9, 601:22, 616:10, 656:15, 662:5, 675:6, 675:13, 688:8
**underneath** [1] - 583:8
**understandable** [1] - 518:19
**understood** [13] - 499:14, 526:10,

563:14, 586:1, 586:20, 606:5, 611:21, 611:22, 647:8, 670:5, 706:17, 712:21
**undo** [1] - 711:4
**unduly** [1] - 604:10
**unfortunately** [1] - 610:13
**unhappy** [2] - 596:21, 596:24
**unification** [1] - 586:5
**uniform** [3] - 622:18, 703:23, 717:19
**unimportant** [1] - 635:16
**Union** [6] - 593:5, 593:7, 593:8, 593:10, 593:11, 593:14
**unique** [4] - 509:9, 513:11, 532:6, 688:12
**UNITED** [3] - 495:1, 495:2, 495:10
**United** [4] - 495:4, 495:13, 495:16, 496:4
**unkind** [1] - 562:9
**unless** [2] - 641:18, 703:17
**unlike** [1] - 497:7
**unpause** [1] - 705:23
**unpaused** [1] - 718:14
**Unterreiner** [9] - 525:11, 588:22, 589:19, 590:9, 590:10, 590:11, 597:15, 606:9, 607:11
**up** [63] - 498:13, 500:15, 501:14, 510:6, 510:7, 510:24, 515:17, 516:18, 518:11, 521:12, 523:3, 533:9, 536:6, 537:6, 543:19, 545:6, 546:11, 548:6, 554:20, 555:1, 555:15, 557:25, 561:6, 565:17, 566:14, 567:4, 568:15, 569:9, 583:1, 584:17, 587:11, 594:3, 598:6, 600:8, 603:11, 605:4, 605:5, 610:25, 612:9, 616:15, 619:23, 622:25, 624:8, 625:3, 628:15, 633:8, 637:2, 642:2, 643:9, 651:4, 652:5, 656:1, 657:10, 658:16, 660:22, 677:23, 681:7, 690:18, 707:6, 711:22, 713:4, 716:8, 716:17
**upper** [1] - 561:5
**ups** [1] - 533:14
**Ups** [2] - 539:4, 539:18
**upset** [6] - 517:11, 595:18, 621:25, 622:2, 629:1, 650:8
**upstairs** [1] - 574:20
**upward** [1] - 602:11
**urged** [1] - 587:8
**useful** [1] - 504:23
**uses** [2] - 500:17, 698:10
**Utah** [1] - 645:2
**utilize** [1] - 610:21
**utter** [1] - 606:18

**V**

**vacations** [1] - 621:5
**vague** [1] - 519:16
**value** [3] - 543:6, 595:6, 659:22
**values** [1] - 562:19
**Vancouver** [7] - 552:14, 554:13, 555:14, 558:1, 558:4, 617:6, 617:7
**Vanguard** [18] - 500:8, 502:2, 502:16,

510:16, 540:10, 540:22, 541:6, 550:5, 552:3, 552:7, 552:8, 552:9, 560:10, 602:10, 633:3, 636:20, 659:19

**Vanity** [1] - 593:15

**various** [8] - 499:13, 508:13, 509:22, 552:4, 555:17, 593:3, 676:14, 703:3

**VCR** [1] - 689:5

**VCRs** [2] - 691:13, 692:15

**veneer** [1] - 511:5

**verbal** [1] - 511:12

**version** [1] - 650:6

**versions** [1] - 648:11

**versus** [3] - 601:3, 664:11, 681:13

**VHS** [27] - 609:3, 664:11, 665:7, 665:8, 665:10, 665:12, 666:2, 666:3, 666:6, 666:16, 680:8, 681:2, 681:13, 681:14, 682:5, 682:8, 686:1, 691:7, 691:9, 699:15, 700:5, 703:12, 704:11, 704:13, 719:12

**via** [1] - 657:1

**VICENTE** [1] - 728:3

**Vicente** [18] - 499:1, 499:10, 499:12, 506:6, 511:2, 534:20, 565:13, 604:21, 606:4, 673:8, 675:10, 686:20, 689:11, 692:25, 698:25, 708:17, 711:25, 714:8

**Vicente's** [2] - 604:11, 605:1

**victim** [6] - 694:9, 694:10, 694:11, 694:15, 694:25, 695:6

**victims** [1] - 695:11

**video** [26] - 498:8, 524:13, 580:8, 617:11, 630:8, 631:14, 631:23, 633:20, 663:6, 665:16, 669:20, 674:1, 676:12, 676:23, 677:12, 677:23, 678:1, 678:5, 688:13, 700:20, 703:12, 705:10, 705:12, 716:7, 719:24, 722:10

**Video** [16] - 716:22, 716:23, 717:1, 717:2, 717:12, 717:13, 717:23, 717:24, 718:9, 718:10, 718:21, 718:22, 719:4, 719:5, 719:20, 719:21

**videos** [18] - 554:5, 700:23, 722:3, 722:4, 722:5, 722:7, 722:15, 722:19, 722:21, 722:25, 723:5, 723:6, 723:11, 723:18, 723:20, 723:21

**videotape** [8] - 663:10, 673:5, 681:23, 685:12, 685:14, 701:23, 704:2, 715:2

**videotaped** [1] - 632:19, 632:20, 634:12, 636:18, 636:19

**videotapes** [62] - 664:8, 666:20, 667:5, 669:1, 669:18, 669:24, 670:10, 673:7, 673:10, 673:13, 673:19, 673:21, 673:22, 673:23, 675:11, 675:16, 675:23, 676:4, 678:11, 681:18, 681:19, 684:13, 686:12, 688:25, 700:17, 700:18, 701:18, 702:15, 702:19, 702:25, 703:4, 703:5, 704:16, 707:13, 707:20, 707:24, 708:19, 708:21, 711:14, 711:17, 711:18, 711:20, 711:23, 712:6, 712:7, 712:8, 712:24, 713:1, 714:10, 714:13, 714:16, 714:21, 715:6, 715:9, 715:15, 715:17, 715:21, 715:24

**videotaping** [1] - 632:8

**Vincente** [1] - 616:14

**violence** [2] - 643:4, 643:10

**violent** [3] - 562:10, 604:8, 604:18

**VIP** [1] - 618:7

**VIPs** [1] - 618:6

**virtue** [1] - 694:13

**viscera** [2] - 528:3, 528:20

**visit** [1] - 721:17

**visual** [1] - 685:7

**visually** [1] - 555:12

**voir** [2] - 708:11, 711:15

**VOIR** [2] - 708:15, 728:5

**volleyball** [9] - 637:18, 652:24, 653:4, 653:8, 654:12, 654:13, 654:15, 655:2, 662:11

**Volleyball** [1] - 652:25

**voltage** [1] - 664:24

**volume** [1] - 657:16

**vow** [2] - 533:1

**vows** [5] - 530:16, 532:17, 532:18, 534:4, 534:10

**vulnerable** [3] - 508:21, 509:7, 658:7

## W

**wag** [1] - 525:7

**wait** [3] - 612:17, 644:5, 653:4

**waiting** [1] - 655:20

**walk** [11] - 531:3, 655:19, 655:22, 656:3, 656:6, 656:22, 656:23, 657:3, 657:7, 657:19, 657:21

**walk-and-talks** [3] - 657:7, 657:19, 657:21

**walked** [4] - 502:2, 554:14, 576:10, 656:8

**walking** [4] - 568:5, 647:25, 655:23, 656:4

**walks** [1] - 657:5

**wall** [4] - 535:2, 535:10, 598:14

**wants** [3] - 620:14, 620:16, 623:9

**warming** [2] - 647:14, 647:16

**Washington** [1] - 549:2

**watch** [4] - 654:21, 673:20, 707:20, 721:1

**watched** [6] - 586:25, 587:2, 684:16, 707:23, 708:19, 714:13

**watching** [2] - 684:13, 684:15

**water** [5] - 511:22, 512:8, 512:14, 514:2, 637:13

**wavy** [1] - 704:1

**ways** [16] - 499:20, 520:22, 520:25, 525:1, 543:24, 548:2, 625:19, 628:12, 636:16, 648:2, 664:12, 664:16, 664:21, 666:8, 680:1, 712:22

**wealth** [2] - 549:3, 595:21

**wealthy** [3] - 549:1, 549:2, 619:8

**wear** [2] - 541:9, 541:13

**wearing** [3] - 510:3, 541:7, 541:11

**weather** [5] - 661:4, 661:5, 661:6, 661:7, 661:10

**weathering** [1] - 692:9

**website** [1] - 721:8

**Wednesday** [1] - 688:7

**Week** [1] - 545:16

**week** [25] - 545:17, 569:8, 607:11, 632:5, 632:13, 636:20, 638:3, 638:14, 640:24, 641:1, 641:11, 641:12, 641:15, 641:17, 641:21, 641:24, 642:4, 642:11, 642:14, 653:1, 657:7, 691:9, 724:11

**weekend** [4] - 639:10, 721:20, 726:25, 727:7

**weeks** [6] - 545:19, 547:18, 589:21, 602:4, 602:5, 622:25

**weight** [3] - 530:21, 674:8, 711:10

**weird** [2] - 526:7, 662:1

**well-intended** [2] - 511:5, 511:8

**Weniger** [1] - 496:5

**West** [1] - 521:8

**whatsoever** [2] - 512:16, 518:15

**whereby** [2] - 582:6, 700:21

**WHEREUPON** [1] - 727:8

**white** [22] - 518:18, 536:2, 536:9, 536:11, 536:23, 536:24, 537:3, 537:5, 537:17, 539:16, 539:25, 540:7, 540:8, 540:22, 540:23, 541:3, 541:8, 705:10

**whole** [12] - 510:15, 531:5, 549:23, 591:19, 597:7, 611:11, 634:1, 636:13, 637:4, 647:15, 651:3, 651:4, 655:14, 686:23, 691:10, 697:21

**wide** [1] - 600:6

**wider** [5] - 574:17, 577:20, 654:11, 689:16, 689:17

**wife** [2] - 549:14, 549:15

**willing** [1] - 609:5

**window** [1] - 521:18

**wing** [1] - 656:15

**wisdom** [1] - 548:1

**wise** [2] - 548:10, 550:9

**wisest** [1] - 550:14

**withdrawn** [1] - 698:14

**WITNESS** [39] - 498:19, 499:7, 523:10, 523:17, 529:15, 536:14, 536:17, 557:23, 558:2, 558:8, 558:15, 558:18, 564:13, 580:21, 581:11, 588:16, 593:8, 593:11, 610:8, 610:13, 610:15, 616:11, 640:1, 671:10, 671:12, 671:15, 671:17, 675:7, 682:11, 682:15, 682:17, 682:21, 692:17, 701:4, 704:8, 704:12, 720:14, 721:25, 728:2

**witness** [46] - 496:14, 497:17, 498:17, 499:2, 499:5, 504:3, 504:14, 505:4, 505:6, 505:9, 506:3, 524:14, 534:16, 564:11, 564:14, 565:1, 565:3, 565:9, 575:1, 585:12, 585:15, 612:5, 616:2, 616:4, 616:5, 616:9, 616:10, 669:8, 671:22, 672:4, 674:20, 675:6, 686:18, 692:22, 695:13, 697:3, 697:4, 711:11, 711:21, 715:16, 715:23, 721:22, 722:3, 722:8, 722:14, 722:18, 722:20,

722:24, 723:9, 723:10, 723:18, 724:14, 724:16, 724:21, 725:2, 725:20, 725:24, 726:20
**Witness** [5] - 498:6, 564:14, 612:8, 671:25, 672:5
**witnessed** [1] - 524:16
**wives** [2] - 645:10, 645:12
**woman** [1] - 650:18
**women** [3] - 524:17, 604:23, 645:17
**wonderful** [4] - 526:24, 620:20, 662:14
**wonders** [1] - 526:24
**Woods** [13] - 567:5, 567:9, 567:10, 567:16, 567:17, 567:24, 568:10, 569:9, 569:11, 569:25, 570:7, 570:8
**word** [19] - 500:15, 500:17, 552:24, 562:9, 562:11, 587:3, 625:5, 627:18, 628:3, 628:6, 628:20, 628:21, 629:2, 645:3, 645:11, 646:14, 670:3, 681:9
**words** [19] - 518:1, 518:4, 523:2, 524:18, 551:21, 553:6, 553:11, 556:5, 596:7, 641:20, 662:6, 678:16, 678:17, 691:15, 701:1, 708:23, 709:11, 714:19, 715:16
**wore** [2] - 541:5, 541:12
**workforce** [1] - 542:14
**workings** [1] - 611:21
**World** [1] - 596:15
**world** [25] - 500:14, 501:21, 511:9, 550:19, 550:21, 562:16, 562:19, 566:13, 566:16, 586:3, 586:11, 627:13, 628:14, 639:1, 649:19, 651:23, 656:5, 663:16, 664:10, 666:16, 681:13, 686:1, 704:21, 704:22
**worried** [2] - 507:25, 626:25
**worse** [3] - 552:25, 694:10
**worst** [3] - 508:2, 601:7
**worth** [12] - 595:5, 620:4, 620:5, 621:10, 621:11, 621:12, 621:15, 621:18, 626:19, 660:1
**wow** [4] - 502:6, 509:9, 522:15, 562:18
**Wow** [2] - 650:24
**wrapped** [1] - 690:18
**wraps** [1] - 665:19
**Write** [2] - 539:4, 539:18
**write** [5] - 529:6, 529:8, 627:16, 648:7, 648:15
**Write-Ups** [2] - 539:4, 539:18
**writing** [5] - 558:19, 576:18, 640:15, 649:22, 651:8
**written** [2] - 524:18, 710:1
**wrote** [2] - 689:20, 689:22

## X

**XOSO** [1] - 587:24

## Y

**year** [14] - 518:25, 542:22, 544:22, 544:23, 565:25, 566:21, 566:22, 569:9, 616:20, 639:14, 640:12,

661:21, 709:20
**years** [28] - 500:7, 506:13, 508:16, 513:2, 516:17, 535:2, 544:24, 547:14, 549:24, 551:16, 561:19, 563:1, 564:1, 569:22, 597:15, 600:7, 602:17, 642:18, 643:16, 651:15, 653:15, 655:3, 657:9, 658:17, 659:7, 682:12, 700:14, 710:6
**Yellow** [2] - 538:4
**yellow** [11] - 518:18, 537:20, 537:21, 538:12, 538:17, 538:19, 538:23, 539:2, 543:10, 705:10, 717:18
**yellows** [1] - 543:11
**Yes"** [1] - 621:19
**yes-or-no** [1] - 724:24
**yesterday** [1] - 499:12
**YMCA** [3] - 637:3, 637:4, 637:6
**YORK** [1] - 495:1
**York** [13] - 495:4, 495:13, 495:14, 495:18, 495:21, 535:8, 552:14, 555:13, 567:13, 575:15, 593:9, 653:14
**young** [2] - 624:3, 643:16, 645:17
**yourself** [18] - 501:19, 506:21, 507:5, 510:23, 517:23, 529:23, 529:25, 531:6, 531:8, 533:9, 541:13, 551:15, 556:25, 562:9, 562:17, 563:16, 624:7, 634:16
**yourselves** [1] - 612:15
**YouTube** [1] - 721:9

## Z

**zero** [5] - 516:20, 517:12, 518:2, 666:12
**zeros** [1] - 665:8