# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|   |   |   |
|---|---|---|
| SARAH EDMONDSON; TONI NATALIE; | : | |
| JANE DOES 1-13, JANE DOES 15-39, | : | |
| JANE DOES 41-60; MARK VICENTE; | : | |
| JOHN DOES 1-17, and JOHN DOES 19-20, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | NO. 20-CV-485 |
| v. | : | |
| | : | |
| | : | |
| KEITH RANIERE; NANCY SALZMAN; | : | |
| CLARE BRONFMAN; SARA BRONFMAN; | : | |
| LAUREN SALZMAN; ALLISON MACK; | : | |
| KATHY RUSSELL; KAREN UNTERREINER; | : | |
| DR. BRANDON PORTER; | : | |
| DR. DANIELLE ROBERTS; | : | |
| DANIELLA PADILLA BERGERON; | : | |
| ROSA LAURA JUNCO; LORETA J. GARZA | : | |
| DAVILA; MONICA DURAN; NICKI CLYNE; | : | |
| NXIVM CORPORATION; | : | |
| EXECUTIVE SUCCESS PROGRAMS, INC.; | : | |
| ETHICAL SCIENCE FOUNDATION; and | : | |
| FIRST PRINCIPLES, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------x

## COMPLAINT

Plaintiffs file this complaint pseudonymously against the Defendants for conspiring to operate, and for operating, a criminal Enterprise under the "NXIVM" umbrella (the "Enterprise"). Defendants also conspired to participate and participated in a "Venture" to commit sex trafficking, peonage, forced labor and human trafficking offenses in violation of Chapter 77 of Title 18. The central purpose of the conspiracy, Enterprise, and Venture was to entice Plaintiffs to join NXIVM, which functioned as both a Ponzi scheme and a coercive community. Defendants exerted power over the Plaintiffs; took their money; made it

{00207518 }

financially, physically and psychologically difficult, and in some cases impossible, to leave the coercive community; and systematically abused Plaintiffs physically and emotionally.  In doing so, the Defendants achieved a number of personal benefits including but not limited to enriching themselves; wielding power over others; advancing in the perverse social order they created; and enhancing their own feelings of self-esteem. Many of the Defendants also benefitted financially through the receipt of profits and substantial access to free labor, including personal assistants, housekeepers, drivers, personal shoppers and others.

In pursuit of both the Enterprise and the Venture, Defendants engaged in a variety of wrongdoing, some of it tortious and some of it criminal.  Each Defendant played a critical role in the conspiracy, and neither the Enterprise nor the Venture could have functioned without them – particularly Keith Raniere and Nancy Salzman who created NXIVM, as well as Clare and Sara Bronfman, who served in leadership positions and who invested their vast wealth – reportedly $150 million – to fund the operations and obstruct the ability of others to uncover the misconduct.  It was foreseeable that each of the Plaintiffs would be harmed by this conduct, and all conspirators are liable for the entire amount of the physical, emotional, psychological, and economic harm caused to the Plaintiffs.

## <u>SUMMARY OF THE ACTION</u>

1.      Plaintiffs' claims arise out of their involvement with NXIVM Corporation (pronounced /NEX-ee-um/), an organization based in Albany, New York and founded by Defendants Keith Raniere ("Raniere") and Nancy Salzman.

2.      NXIVM's principal business is the sale of personal improvement and professional development training programs through Defendant Executive Success Programs, Inc. ("ESP")

and other entities.[1] However, as described herein, NXIVM's insidious reach extended far beyond just ESP, and it was far more than simply a personal improvement program.

3.     Drawing from methods used in pyramid schemes and multilevel marketing, NXIVM induced students to recruit and form their own downstream sales organizations within NXIVM, so that the students might work their way up in the hierarchy, known as the "Stripe Path" (after the colored striped sashes members wore to indicate rank and recruitment achievements), to a level where they could earn commissions and build careers and income for themselves.

4.     However, few students ever qualified for commissions, because the Defendants continually manipulated the program requirements, expanded the required curriculum, and graded most of the students as failures who needed to work harder and take more of NXIVM's expensive courses.  Out of the more than sixteen thousand people who took NXIVM's courses, fewer than one hundred ever earned any income from NXIVM's businesses, and fewer than twenty-five received substantial earnings within NXIVM.  Most of the earnings were received by the small group collectively known within the organization as the "Inner Circle."

5.     Raniere claimed to be the conceptual creator of NXIVM's programs, and the various related legal entities themselves.  Defendants promoted NXIVM's programs in part by representing that Raniere was the world's smartest man, who allegedly had an IQ of 240 and was a child prodigy, speaking in complete sentences at age one, mastering college level mathematics in two days at age eleven, winning championship judo and track tournaments, and graduating college with three degrees.  None of this was true.

---

[1] Unless otherwise stated, "NXIVM" means NXIVM, ESP, First Principles and all other NXIVM-related entities identified as such herein.  Members of NXIVM were sometimes referred to as "Nxians" (pronounced "Nexians") and sometimes as "ESPians" (pronounced "Espians").

{00207518 }

6.      Before forming ESP with Nancy Salzman, Raniere ran another pyramid scheme called Consumers Buyline Inc. ("CBI") that was investigated by 25 state attorneys general and eventually shut down by New York's Attorney General Robert Abrams on September 3, 1996. Pursuant to the consent decree entered in that case, Raniere was permanently prohibited from "promoting, offering or granting participation in a chain distributor scheme in the State of New York."  Two years later he was back at it with ESP.

**Rational Inquiry**

7.      NXIVM's programs were based upon a system Raniere and Nancy Salzman labeled Rational Inquiry.  Defendants claimed this was a patent-pending technology for changing behavior and thinking. They claimed that it was based in science and could thus be replicated, producing empirically measurable results.  Defendants also claimed that NXIVM's system or "tech" could cure medical conditions, including Tourette's Syndrome and Obsessive-Compulsive Disorder.  None of this was true.

8.      Rational Inquiry had two primary components: (1) a self-esteem eroding curriculum designed to break down students' resistance to Raniere's and Nancy Salzman's radical reframing of ethics, morality, and gender roles and relations, among other things, and (2) an inherently dangerous form of psychotherapy called "Exploration of Meaning" ("EM"), which was administered by so-called EM Practitioners ("EMPs"), all of whom were unqualified to practice psychoanalysis, psychology or mental health counseling. Nancy Salzman, the principal therapist and head of this individual therapy branch of NXIVM, held a nursing license and claimed to have a background as a psychiatric nurse.  In fact, she worked as a nurse for only one year in a general practice and did not have a license to practice psychotherapy.

9.      Defendants intended, knew, or deliberately disregarded the fact that EM exposed

{00207518 }

4

its subjects to a high risk of injury, because over time it produced disturbing alterations in the subjects' thinking, behavior, and emotional experience.

10.     The longer someone was immersed in this system, the more likely it became that they would suffer moderate-to-severe psychological and emotional injuries, including post-traumatic stress disorder and complex post-traumatic stress disorder.  Many of the Plaintiffs in this action were injured in this way and still struggle with the effects of their time in NXIVM and exposure to Defendants' programs.

### Psychological Dependence and Coercion

11.     Through the continual and systematic application of the Rational Inquiry methods, Defendants obtained the complete trust of their victims, rendering them psychologically and emotionally dependent upon the Defendants.  On a near-daily basis, these victims were told that they were failing to advance on the Stripe Path and improve their careers, income and well-being, because they were not working hard enough on their "issues" and thus needed to take additional courses and receive additional EMs.

12.     Once Defendants had stripped members of their psychological defenses, they exploited these highly vulnerable people for advantage and gain.  This included coercing members into working for the Defendants on "exchanges" in which they would be severely undercompensated or even uncompensated for their labors, but for which they supposedly would earn credits toward the additional expensive courses and EMs that they were assured would improve their lives.

13.     Quitting was failure and would result in immense shame and humiliation. Further, it could expose the victim to malicious litigation, a common tactic of the Defendants, and would leave the defector shunned, declared a "suppressive" or "psychopath", and cut off

from the community of friends that had, as a direct and intentional result of Defendants' efforts, become his or her entire world.  Being shunned also meant losing one's livelihood, which for a community of people who were impoverished and in debt, having abandoned their former careers to devote their lives to NXIVM, made it impossible in many cases to simply walk away.

### Illegal Experimentation on Human Beings

14.     The Enterprise and Defendants were also responsible for conducting experiments on NXIVM members that strayed far beyond the bounds of what is acceptable in the medical and psychotherapeutic professions.  Indeed, these reckless experiments, sponsored, financed, and facilitated by Defendants Clare and Sara Bronfman, seriously damaged many people.

15.     For instance, at least forty members of the NXIVM community, trusting in Raniere, Nancy Salzman and Defendant Dr. Brandon Porter, M.D. ("Porter"), were subjected to a "human fright experiment," in which individuals were seated in front of a video display with electroencephalogram ("EEG") electrodes placed on their skulls to measure brainwaves.  These subjects believed they were going to watch a talk by Raniere, but instead were subjected to scenes of escalating violence including actual, extremely graphic footage of the brutal beheading and dismemberment of five women in Mexico.

16.     There were other so-called medical studies as well, which purported to prove that use of Rational Inquiry could cure illnesses, including Tourette's Syndrome and Obsessive-Compulsive Disorder.

17.     Because of the involvement of Porter, these "studies" attracted the attention of the New York State Board for Professional Medical Conduct.  Multiple hearings were held between June 2018 and April 2019, witnesses were heard, documents were reviewed.

18.     Ultimately, an opinion was issued, vilifying Porter and terminating his license to

{00207518 }

6

practice medicine in New York. It laid out in excruciating detail the many reckless, unethical experiments on human beings that Porter performed at the behest and with the complicity of his co-conspirators at NXIVM.

### DOS – The Subjugation and Exploitation of Women

19.     Beginning in or about 2015, the Defendants formed an organization within NXIVM called "DOS" (or the "Vow"), secretly headed by Raniere.  Defendants Allison Mack, Lauren Salzman, Rosa Laura Junco, Daniela Padilla Bergeron, Loreta J. Garza Davila, Monica Duran, and Nicki Clyne held high positions in DOS as "First Line Masters."

20.     First Line Masters were tasked with selecting attractive, trustworthy women who could become sexual partners for Raniere.  Recruits were told they were being invited to join a sisterhood, which would empower them to overcome the weaknesses that Raniere and the other Defendants taught held them back in life.  Recruits were told that DOS offered a unique opportunity to enter a one-on-one mentorship with women who had been elevated in stature within the community, and who thus were looked up to as role models.

21.     Recruits were also told that DOS was an all-female group in which no male had a role.  These features made DOS appear unique and desirable for women who, through subjection to Defendants' methods, had been primed to want precisely just such a once-in-a-lifetime "opportunity."

22.     In order to find out more about this sisterhood, prospective DOS recruits were required to provide "collateral" to prove their trustworthiness. The collateral could consist of assets, compromising confessionals, letters falsely accusing close family members or friends of unethical, immoral or illegal conduct, nude photos, videos, or other materials that would, if released, subject the recruits or their loved ones to loss, humiliation or shame.

{00207518 }

7

23.     After supplying collateral, which had to be approved by the First Line Masters and Raniere, DOS was revealed to the recruits. But to their surprise and dismay, they were told that now, before they could learn about the structure and nature of this sisterhood, they had to provide additional humiliating and damaging collateral.  Thus, before knowing anything about the internal workings of DOS, they were trapped, fearful that if they did not do precisely as instructed, the collateral that they had already provided would be released.

24.     Once that second collateral had been given and approved, the recruiter/master revealed a little more about DOS: that it was a pyramid of "master/slave" relationships, explained as no different from a guru and disciple or a mentor-mentee relationship, which would strengthen women by testing and challenging their boundaries but would require absolute trust and obedience by "slaves" to their "masters."  Shortly after being admitted into the group, slaves were commanded to provide additional collateral every month.

25.     Even after providing abundant collateral, however, the slaves were never told certain material facts: that Raniere created and ran DOS with the assistance of the First Line Masters (if asked, the First Line Masters denied Raniere's involvement); that the gathering of collateral was intended to coerce women into a lifetime of personal servitude; and that the ultimate objective of DOS was to recruit and groom women for sexual slavery under their "grandmaster" – Raniere.

26.     In exchange for developing and operating this pipeline of attractive young women for Raniere, the First Line Masters of DOS acquired personal servants or "slaves," garnered favor with Raniere and achieved elevated status, stature, and power within NXIVM.

27.     DOS "slaves" were subjected to a severely abusive environment, which included caloric deprivation, sleep deprivation, arduous physical labor, performance of menial tasks, and a

{00207518 }

variety of punishments for any failure to fully comply with their masters' commands.  They had to "check in" with their masters when they awoke and when they went to bed with text messages of "good morning M" and "goodnight M."

28.     Further, they had to be available to their masters twenty-four hours a day, because they were subjected to a stress-inducing sleep-deprivation technique referred to as "readiness drills," in which they would receive a message on their phones with a "?", to which they had a mere sixty seconds to respond "ready M."

29.     Failure to timely respond to their masters' calls resulted in punishments called "penances" or "consequences," which included long cold showers, extended periods during which they had to hold themselves in a physically demanding position known as a "plank," ridicule, extreme diets, being forced to strip naked and be paddled on the buttocks, and, if a master so chose, imposition of these same punishments on other "slaves."

30.     "Slaves" were also required to clean their masters' homes, shop for their groceries (at times with their own money), buy gifts for their masters, do their work for them and, for some "slaves," be available for sex with Raniere on demand.

31.     At all times, in addition to the continual threat of punishments within this highly regimented and abusive environment, "slaves" were acutely aware of the ultimate punishment hanging over their heads: the very real threat that their collateral would be released.  Thus, "slaves" were rendered fully compliant, striving to achieve extremely unhealthy weight loss goals, adhering to diets of as little as 500-800 calories per day, having to ask permission to eat, having to weigh their food and calculate calories precisely, even having to send photographs of everything they ate to their masters.

32.     "Slaves" were thus in a constant state of near-starvation, sleep deprivation, forced

to physically exert themselves and push themselves well beyond exhaustion, always anxious and fearful that anything they said or asked might be interpreted as rebellious and subject them to punishments, both mental and corporeal.

33.     Not a single DOS member understood when she gave that first collateral that she was signing up for a life of servitude and sexual slavery under a cruel grandmaster and his circle of mistresses.

### Branding

34.     Some DOS "slaves" were branded.  In a secret ceremony, they were forced to disrobe, read from a script stating they requested to be branded, lie down on a table, and submit to branding with a cauterizing iron in their pubic region.  No anesthesia was administered during this procedure, which was extremely painful.  The ceremonies were recorded, thereby creating an additional piece of collateral. They were told that the brand was a symbol representing the elements of nature.  Only later did they come to realize that they would be carrying Keith Raniere's initials around with them for the rest of their lives.

### Abuse of Foreign Nationals

35.     Defendants also recruited people from foreign countries, offering false promises of educational or financial gain. Ultimately, they left these recruits in compromised circumstances, without an immigration status, leaving them working for little or nothing, accumulating debt and fearful that if they left the NXIVM community they would be arrested and deported.

### Vexatious Litigation and Threats of Litigation

36.     In order to silence critics and witnesses, Defendants engaged in withering campaigns of abusive, vexatious litigation and the initiation of bogus criminal investigations, by

{00207518 }

10

falsely accusing people who left the community, going so far as to inject themselves into these victims' NXIVM-caused bankruptcy proceedings.  It has been reported that, with the involvement and backing of Defendant Clare Bronfman, NXIVM hired 50-60 lawyers from 30 or so law firms to pursue litigation or threats of litigation against actual or perceived potential NXIVM critics.

37.     These highly publicized *in terrorem* legal wars were financed in large part by Defendants Clare and Sara Bronfman.  Also, as part of a pattern of vexatious litigation, witness tampering, and retaliation, Defendants engaged in and directed unlawful activities including perjury, making false statements to law enforcement agencies, destroying or altering evidence, spying on victims and their attorneys, computer hacking, intercepting communications, and even attempts to unlawfully obtain financial account records and other private information about federal judges and other "enemies."

38.     These activities intimidated victims and witnesses, who were so fearful of ending up on the receiving end of a destructive legal onslaught that they were, in fact, silenced, prevented from asserting claims for their injuries, prevented from making statements in support of others who had been injured, and prevented from reporting to and/or cooperating as witnesses for law enforcement with respect to Defendants' unlawful activities.

39.     Numerous Plaintiffs suffered in silence for years, even avoiding cooperation with law enforcement authorities once it became known that the federal government was investigating Defendants.  Only now, after the guilty pleas and convictions of a number of the Defendants, do Plaintiffs feel safe enough to come forward and assert their claims.  So great was the fear generated by Defendants, that Plaintiffs believe there are still many victims and witnesses hiding in the shadows, frightened at the prospect of seeing their lives further destroyed if they come

{00207518 }

forward and assert their rightful claims in this or any other legal proceeding.

**Investigation, Indictments, Guilty Pleas, and Guilty Verdict**

40.     The United States Department of Justice ("DOJ") investigated NXIVM.

41.     On April 19, 2018, the first of several indictments was unsealed, charging Defendants Keith Raniere and Allison Mack with federal sex trafficking and conspiracy crimes based on with their operation of the Enterprise, Venture, and conspiracy.

42.     On July 23, 2018, a second indictment was unsealed, adding new charges and four more Defendants, Clare Bronfman, Nancy Salzman, Lauren Salzman, and Kathy Russell.

43.     On March 13, 2019, Nancy Salzman pled guilty to one count of Racketeering Conspiracy, admitting to predicate acts of identity theft and altering records for use in an official proceeding.

44.     On March 25, 2019, Lauren Salzman pled guilty to counts of Racketeering Conspiracy and Racketeering, admitting to predicate acts of Trafficking and Document Servitude, State Law Extortion, and Forced Labor.

45.     On April 8, 2019, Allison Mack pled guilty to counts of Racketeering and Racketeering Conspiracy, admitting to predicate acts of State Law Extortion and Forced Labor.

46.     On April 19, 2019, Clare Bronfman pled guilty to counts of Conspiracy to Conceal and Harbor Aliens for Financial Gain, and Fraudulent Use of Identification.

47.     On April 19, 2019, Kathy Russell pled guilty to Visa Fraud.

48.     These five women will be sentenced in the next few months.  Each is expected to be sentenced to terms of imprisonment ranging from 18 months to five years or longer.

49.     Defendant Keith Raniere, the commander-in-chief of the Enterprise, went to trial (the "Raniere Trial"), and on June 19, 2019, was convicted by a jury of Racketeering

{00207518 }

Conspiracy, Racketeering, Forced Labor Conspiracy, Sex Trafficking Conspiracy, Sex

Trafficking, Attempted Sex Trafficking, and Wire Fraud Conspiracy, all involving NXIVM.  He

faces possible life imprisonment.

50.     The Defendants benefitted from participation in the forced labor and trafficking

Venture within the Enterprise in several ways.  First, they received enhanced status, titles, and

power to wield over the rank-and-file members, as well as enhanced feelings of self-esteem and

worth, because they were deemed "successes" within the Enterprise.  Second, they benefitted

financially through the receipt of profits and substantial access to free labor, including personal

assistants, housekeepers, drivers, personal shoppers and others.  Third, the Defendants received

the satisfaction of believing that they were at the forefront of a new era in the history of human

civilization, and they were poised to benefit by gaining exceptional status within this remade

society they were setting out to create.  Indeed, for Defendants Clare Bronfman and Sara

Bronfman, the benefits they received, including perceived future benefits, warranted an

investment of a reported $150 million.

## Plaintiffs' Claims

51.     Each of the Plaintiffs in this action was a member of the NXIVM community.  As

set forth below, some Plaintiffs were recruited into DOS, others were subjected to one or more

medical experiments, and others were manipulated and coerced into servitude.  All Plaintiffs in

this action expended substantial sums of money for what they were led to believe were legitimate

courses in self-development.

52.     None of the Plaintiffs consented to be the subject of the unauthorized practice of

psychoanalysis, psychology or mental health counseling, and indeed none recognized that they

were psychotherapy subjects, because those elements were masked within the larger frame of

Rational Inquiry. Many of the Plaintiffs suffered emotional and psychological injuries as a result of their subjection to the Rational Inquiry methods and the highly abusive environment of the NXIVM community.

53.     Plaintiffs bring claims for compensatory and punitive damages, disgorgement and other equitable relief against Defendants for conspiring to and operating a criminal Enterprise and Venture, the objects of which were financial gain, self-aggrandizement, and psychological benefits through a continuing pattern of multiple acts of mail fraud; wire fraud; identity theft; unlawful interception of wire and electronic communications; unlawful accessing of electronic data storage devices; visa fraud; peonage; document servitude; forced labor and sex trafficking; negligence per se and negligence for engaging in, aiding and abetting, and acting in concert to engage in the unauthorized practice of psychoanalysis, psychology and/or mental health counseling; negligence per se for engaging in, aiding and abetting and acting in concert to engage in unauthorized and unlawful human medical experiments; malicious abuse of legal process; and claims arising under 18 U.S.C. § 1595(a) for peonage, forced labor, sex trafficking, and conspiring and attempting to engage in peonage; forced labor and sex trafficking in violation of 18 U.S.C. §§1581, 1589, 1590, 1591, 1592; and 1593A, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C §§ 1962(c) and (d).


## PARTIES

**Plaintiffs**

54.     Plaintiff Jane Doe 1 is a resident of Mexico. After taking an intensive[2] in Mexico, she traveled to the Albany, New York area, lured with promises of training and employment as a

---

[2] A several days' long NXIVM course.

{00207518 }

computer programmer and personal tutoring and mentoring by Raniere, so that she might advance what she understood to be NXIVM's humanitarian mission.  She was 16 years old at the time, and her parents gave her permission to forgo a year of study on a full scholarship to a prestigious Swiss academy, because they believed Raniere to be a great man working to build a better world.  Raniere assured Jane Doe 1 and her parents that he would provide her with a superior, university level education.

55.      Believing Defendants' bogus claims that Raniere was a brilliant scientist, mathematician, inventor and philosopher, who was developing a revolutionary system to advance humanity, Jane Doe 1 remained in the Albany, NY area and devoted all of her time to working for Raniere and several of his Inner Circle of co-conspirators, including Individual Defendants.  Jane Doe 1 believed Defendants' representations that Raniere had invented a scientific, patent-pending technology that would lead to greater success and fulfillment in her life and help solve many of humanity's most serious problems.  Jane Doe 1 was never informed that NXIVM's system involved the application of manipulative and coercive psychotherapeutic methods by persons unauthorized and unqualified to utilize such techniques, and she would not have moved to Albany and subjected herself to these methods had she known that she was risking serious emotional injury.  Nor was Jane Doe 1 aware of Raniere's history as a sexual predator with a lust for young women, or that he had designs for her as a sexual partner.

56.      Raniere and his Inner Circle spent two years grooming her, ultimately leading her to believe that having sex with Raniere was necessary for their relationship to evolve to a higher stage, which she continued to believe would lead to her partnering with Raniere in the development of his revolutionary technology and securing her the Ivy League university level education she had been promised.

{00207518 }

15

57.     For years, Jane Doe 1 worked for NXIVM entities and the Individual Defendants without ever receiving compensation, performing labor and services in: IT and cybersecurity; office administration; researching dense tomes on science, social science and other subjects in order to generate a series of book reports for Raniere so that he could maintain the appearance of being well-read and educated; creating, organizing, and maintaining archival recordings of Raniere whenever he spoke; organizing and maintaining Raniere's library of books; cleaning homes; and conducting research for Raniere, frequently under the supervision of Defendants Raniere, Karen Unterreiner, Nancy Salzman, and Lauren Salzman.

58.     After she briefly visited Mexico, Raniere instructed her to re-enter the United States via Canada, utilizing a false sheriff's identification card of another person procured by Defendant Kathy Russell on direction from Raniere.  Russell also traveled to Canada to personally escort her across the border into the U.S. and back into Raniere's clutches in Albany, with the assistance of another of Raniere's co-conspirators. From that point forward, Jane Doe 1 was frequently informed that if she left NXIVM she would be deported and cut off from her family, including in response to any requests she made to be compensated for her work.

59.     At some point, Jane Doe 1 informed Raniere that she was attracted to another man and was experiencing romantic feelings that she had never felt for him.  She informed Raniere that she would no longer have sex with him.  Thereafter, he and members of his Inner Circle, including Defendants Nancy Salzman, Lauren Salzman and Karen Unterreiner began a campaign of extreme isolation, harassment and other abuse that lasted years, culminating in her confinement to a room with virtually no human contact for nearly two years, during which her pleas to be let out were either rejected or ignored.  Defendants eventually sent her back to Mexico with almost no money and no identity papers (which they had taken and refused to give

back to her) and cut her off from all contact with her immediate and extended family.

60.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, and abuse, including her confinement, Jane Doe 1 was harmed.

61.     Also, as a part of Defendants' scheme, Jane Doe 1 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

62.     Plaintiff Sarah Edmondson is a resident of Canada.  Sarah Edmondson enrolled in and paid for NXIVM curriculum.

63.     Sarah Edmondson enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

64.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

65.     Sarah Edmondson became a NXIVM "Coach" and worked her way up the NXIVM Stripe Path, eventually becoming a "Proctor."  Sarah Edmondson also took five levels of NXIVM EMP training, believing that this would enhance her ability to work with NXIVM students and increase her income.

66.     However, while she was taking these trainings, the Defendants announced that all EMP students, no matter what level they had achieved, had to begin again at level 1 because of alleged changes in the curriculum, so Sarah Edmondson ceased pursuing that career path.

67.     Sarah Edmondson was recruited into DOS, then referred to only as "The Vow,"

{00207518 }

by Defendant Lauren Salzman, who presented the group as an all-female sorority that would be advance her personal growth.  Sarah was required to give Lauren Salzman collateral to learn about this group and was regularly required to submit additional collateral.  After giving several forms of collateral, Sarah was instructed to participate in an initiation ceremony where she would receive a small tattoo. While Lauren Salzman stood watch over her, Sarah was required to read from a script and request to be branded, creating a false appearance of consent, after which she was branded. She was told that this brand was a symbol of the five elements, but, in fact, it was Keith Raniere's initials.

68.     Sarah Edmondson believed that refusal to proceed with the branding would be considered an "indulgent act," a purported serious character flaw Raniere built into many of his teachings about the inferiority of women.  Sarah had also been told by Lauren Salzman and others that because of her high rank within NXIVM, she had an obligation to give the appearance of strength at all times, and she feared that if she refused to submit to the branding she would be perceived as weak and would be shamed and rejected by the other women present at the ceremony, with possibly broader repercussions given that her master was one of the highest ranking members of NXIVM and Raniere's Inner Circle.

69.     Sarah was so embarrassed by the brand that she hid it from her spouse for months. Eventually, he saw it, and around that time Sarah also learned that the brand was not a symbol of the elements, but Raniere's initials, reminding her daily that he would forever claim her as his "slave."

70.     The shame and humiliation of this experience was more than she could bear, and Sarah Edmondson requested that Lauren Salzman return her collateral, which she refused to do.

71.     After Sarah Edmondson stopped participating in all NXIVM programs, the

Defendants attempted to silence her.  Among other things, Clare Bronfman made false statements to the Vancouver Police Department that Edmondson had allegedly committed crimes against NXIVM. As a result of the police investigation, Sarah retained an attorney to defend her, incurring legal fees and other expenses.  The police department ultimately concluded there was no evidence to support Bronfman's allegations, and they closed the investigation.

72.     Sarah, a professional actress, was also refused meetings with casting directors and agents as a result of these allegations and lost opportunities for employment. Subsequently, after Sarah Edmondson filed a complaint about her branding with the NY State Department of Health, and spoke out publicly about her brand and DOS, Defendants retaliated against her by having one of their co-conspirators in Mexico hire an attorney to lodge false criminal charges against her and by sending her a "cease and desist" letter.  That letter has never been rescinded nor have the charges been withdrawn, and thus Sarah is still subject to this retaliation and, among other things, has been unable to travel to Mexico for business or personal reasons out of fear of arrest.

73.     Sarah Edmondson continues to suffer from her traumatic experiences in NXIVM, remaining personally and reputationally under assault by the Defendants, who personally and/or through their agents persisted in publicly accusing her of committing crimes against NXIVM that they knew to be false and, through other public statements, further attempted to harass and intimidate her through improper public statements about how their counsel intended to embarrass and humiliate her and her spouse if she testified at the criminal trial.  Defendants had also provided an edited video of Plaintiff being branded to the Mexican media and it was broadcast in Mexico during the criminal trial. The release of the video was in and of itself a criminal act of retaliation intended to further the purposes of Raniere and the Enterprise. The airing of the video triggered panic attacks, psychological breakdowns and major setbacks in Sarah's PTSD therapy.

{00207518 }

74.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Sarah Edmonson was emotionally and financially harmed.

75.     Jane Doe 2 is a resident of California.  Jane Doe 2 enrolled in and paid for NXIVM curriculum.

76.     Jane Doe 2 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

77.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

78.     Jane Doe 2 was recruited into DOS, then referred to only as The Vow, by a DOS "slave" acting under the direction of Defendant and First-Line Master Alison Mack.  Jane Doe 2 was required to provide collateral and do unpaid work for the DOS "slave" and Mack.

79.     Jane Doe 2 had frequent direct communications with Defendant Raniere, both in person when she visited Albany and through text messages, wherein among other things he promised that, if she moved to Albany, she could start an "ethical" t-shirt business with him (a ploy he had previously used on others to draw them closer to him).  The t-shirt company and all of its equipment was owned by Defendant Clare Bronfman.

80.     After Jane Doe 2 moved to Albany and gave collateral several times, Defendant Mack instructed her to have sex with Raniere, stating that this was a special assignment that would help her get over trauma from past abuse.   Mack further insisted that Jane Doe 2

{00207518 }

photograph the encounter, and she told Jane Doe 2 that she had Mack's "permission" to enjoy the experience.

81.     Eventually, the shame and humiliation of what she had to do as part of The Vow was more than she could bear, and Jane Doe 2 informed Mack that she was repudiating her Vow and requested that her collateral not be released.  Paralyzed by the dual fears of release of her collateral and the Defendants' infamous abusive legal tactics, Jane Doe 2 left the NXIVM community and kept silent about her experience.

82.     Subsequent to her departure from NXIVM, Defendants Raniere and Clare Bronfman directed a co-conspirator to cause false criminal charges to be lodged against Jane Doe 2.

83.     Raniere and Clare Bronfman then instructed an attorney to send Jane Doe 2 a letter threatening legal action if she told anyone about what Defendants did to her.  That letter and the charges have never been rescinded, and thus Jane Doe 2 is still subject to this intimidation.

84.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 2 was emotionally and financially harmed.

85.     Also, as part of Defendants' scheme, Jane Doe 2 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

86.     Jane Doe 3 is a resident of the state of New York.  Jane Doe 3 enrolled in and paid for NXIVM curriculum.

87.     Jane Doe 3 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead her to a successful career and self-fulfillment.

{00207518 }

88.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

89.     Jane Doe 3 was recruited into DOS, then referred to only as The Vow, by a DOS "slave" to Defendant Allison Mack.  Jane Doe 3 was required to provide collateral and do unpaid work for the DOS "slave," Mack and others.  Throughout her time in DOS, Jane Doe 3 was given direction and commands directly from, and had to answer to, Defendant Mack.

90.     After Jane Doe 3 moved to Albany and gave collateral several times, she was instructed to have sex with Raniere. Jane Doe 3 acquiesced out of fear of punishment and release of her collateral.

91.     Eventually, the shame and humiliation of this abusive experience was more than she could bear, and Jane Doe 3 left DOS and the NXIVM community.  Paralyzed by the dual fears of the release of her collateral and the Defendants' infamous abusive legal tactics, Jane Doe 3 left the NXIVM community and kept silent about her experience.

92.     Subsequent to her departure from NXIVM, Defendants Raniere and Clare Bronfman directed a co-conspirator to lodge false criminal charges against her.

93.     Defendants Raniere and Clare Bronfman then wrote several letters threatening prosecution if she told anyone about what Defendants did to her, which they sent to an attorney, who printed them on his law firm's letterhead and then mailed them to her at an address in this judicial District, where she resided.  Defendants Raniere and Clare Bronfman subsequently directed another attorney to send an additional threatening letter to Jane Doe 3.  The letters

caused her to experience tremendous fear and intimidation, and instead of coming forward and speaking with an attorney or authorities, she went into hiding and avoided contact with authorities for a period, even after learning that the FBI was investigating the Defendants and others.  Those letters and charges have never been rescinded.

94.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 3 was emotionally and financially harmed.

95.     Also, as part of Defendants' scheme, Jane Doe 3 performed uncompensated labor, working many hours without compensation for the benefit of the Defendants.

96.     Jane Doe 4 is a resident of the state of New York.  Jane Doe 4 enrolled in and paid for NXIVM curriculum.

97.     Jane Doe 4 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

98.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

99.     Jane Doe 4 worked for The Source[3] and taught 2-hour long classes three times a week.

100.     Jane Doe 4 was recruited into DOS, then referred to only as The Vow, by Defendant Allison Mack.  Mack required Jane Doe 4 to provide collateral, initially justifying the

_____

[3] NXIVM's purported curriculum for actors.

{00207518 }

23

exercise as a method of demonstrating her loyalty and commitment to the group.  Only later did

Mack reveal that their relationship would be that of "master" and "slave," and that Jane Doe 4

was required to continue giving additional collateral, which Jane Doe 4 provided out of fear that

her previously provided collateral would be released if she did not comply with all of Mack's

demands.

101.    Defendant Mack assigned Jane Doe 4 to establish contact with Raniere and

acquiesce to his demands.  Mack informed her that if she failed, there would be punishment.

102.    Raniere demanded that Jane Doe 4 engage in sexual acts with him.  Out of fear of

punishment and release of her collateral, Jane Doe 4 unwillingly acquiesced to Raniere's

demands.  Eventually, the shame and humiliation of this abuse was more than she could bear,

and Jane Doe 4 left DOS.  Paralyzed by the dual fears of release of her collateral and NXIVM's

infamous abusive litigation tactics, Jane Doe 4 left the NXIVM community and kept silent about

her experience.

103.    As a result of Defendants' scheme, criminal acts, and misrepresentations and

omissions, Jane Doe 4 was emotionally and financially harmed.

104.    Also, as part of Defendants' scheme, Jane Doe 3 performed uncompensated labor,

working many hours without compensation for the benefit of the Defendants.

105.    Jane Doe 5 is a resident of California. Jane Doe 5 enrolled in and paid for

NXIVM curriculum.

106.    Jane Doe 5 enrolled in NXIVM curriculum based upon Defendants' false,

material representations that Rational Inquiry provided a scientific, patent-pending technology

that would lead to a successful career and self-fulfillment.

107.    Contrary to Defendants' representations, Rational Inquiry was neither scientific

{00207518 }

24

nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

108.    Jane Doe 5 was recruited into DOS by Defendant Lauren Salzman.  Lauren Salzman told Jane Doe 5 that she would need to provide three pieces of collateral at two intervals: first to hear the pitch, second as a commitment to joining. After giving several rounds of collateral, Jane Doe 5 was coerced into being branded. She later discovered the brand contained Raniere's initials.

109.    Eventually, Jane Doe 5 repudiated her Vow and left the NXIVM community. Paralyzed by the dual prospects of release of her collateral and NXIVM's infamous reputation for abusive litigation tactics, Jane Doe 5 went into hiding.

110.    Subsequent to Jane Doe 5's departure from NXIVM, Defendants Raniere and Clare Bronfman directed a co-conspirator to cause false criminal charges to be lodged against her.  Defendants Raniere and Clare Bronfman then directed an attorney to send a threatening letter to Jane Doe 5 at an address in this judicial District, where she had been hiding.  The letter, delivered to an address that was not hers, caused her to experience tremendous fear and intimidation, and she felt compelled to continue moving in order to avoid the Defendants' wrath. The letter and the charges have never been rescinded.

111.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 5 was emotionally and financially harmed.

112.    Also, as part of Defendants' scheme, Jane Doe 5 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

{00207518 }

113.    Jane Doe 6 is a resident of Mexico.  Jane Doe 6 enrolled in and paid for NXIVM curriculum.

114.    Jane Doe 6 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

115.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

116.    Jane Doe 6 was recruited into DOS, then referred to only as The Vow, by Defendant Padilla Bergeron ("Padilla"), a First Line DOS Master who created and ran DOS along with Raniere and other First-Line Masters.  Jane Doe 6 had frequent direct communications with Defendant Raniere about The Vow in which, among other things, he romantically seduced her, telling her she was his only love interest and that she was so special that he wanted her to bear a child for him.  However, Raniere conditioned any possibility of a full relationship with him on her agreeing to submit and become subservient to Padilla and to Raniere as her grandmaster.

117.    To comply with their demands, Jane Doe 6 provided multiple rounds of extremely embarrassing collateral that, if released, would bring harm to herself, her loved ones and her career. She was also required to wear a lock and chain to symbolize her submission.  Raniere insisted that taking these steps was important because a woman should experience humiliation to progress on the path.

{00207518 }

118.    At first, Jane Doe 6 complied, but she grew increasingly uncomfortable with the persistent fear that her collateral could be released, and that the demands would never cease. Jane Doe 6 asked Raniere to release her from The Vow, and he refused.  Eventually, the shame and humiliation of The Vow was more than she could bear, and Jane Doe 6 informed Raniere and Padilla that she was repudiating her Vow and she requested the return of her collateral, which they refused.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 6 severed her ties to the NXIVM community and kept silent about her experience.

119.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 6 was emotionally and financially harmed.

120.    Also, as part of Defendants' scheme, Jane Doe 6 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

121.    Jane Doe 7 is a resident of Mexico.  Jane Doe 7 enrolled in and paid for NXIVM curriculum.

122.    Jane Doe 7 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

123.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

124.    Jane Doe 7 was recruited into DOS, then referred to only as The Vow, by a

{00207518 }

"slave" in Defendant and First-Line Master Lauren Salzman's line.  She was told to provide property or finances as collateral; however, since she did not have either, she was told to provide a false video confession to having an affair.  Once the video was approved, she was required to sign a contract.  Jane Doe 7 agreed to this because she believed it was an extension of Raniere's philosophy and teachings on "collateralizing" one's word, and that the extreme nature of it was not something to be alarmed about.  Jane Doe 7 was not allowed to read the entire contract nor was she provided a copy.  Because she knew the woman who recruited her well and trusted her, and because she understood that the premise of this new women's-only empowerment group was deep trust, she accepted her recruiter's assurances that the collateral and contract were merely exercises in trust-building.

125.    Jane Doe 7 was then directed to participate in readiness drills and told that a failure to respond to messages within 60 seconds would result in punishments for the other women in her line in the Vow.  The stated purpose of these drills was to teach women accountability and build character.  She was also required to provide additional collateral in the form of nude photos on a regular basis.

126.    Jane Doe 7 was then instructed to attend a NXIVM event, where she was forced to participate in what turned out to be a branding ceremony.  Prior to the ceremony she was blindfolded and driven to a location where she was led upstairs to a room on the second floor. She was instructed to remove her blindfold and on doing so she saw a First-Line Master and another DOS "slave."  Something about the ritual was read, but Jane Doe 7 was terrified and could not understand.  The other woman volunteered to go first, and Jane Doe 7 was instructed to hold her feet while she was branded.  When it was Jane Doe 7's turn, she realized that she was being videotaped.  She was branded on her pubic region with a cauterizing pen in a process that

was extremely painful. The wound did not close for two months.

127.     Eventually, the shame and humiliation of The Vow was more than she could bear, and Jane Doe 7 repudiated her Vow and requested the return of her collateral, which was refused. Paralyzed by the dual fears of release of the release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 7 left the NXIVM community and kept silent about her experience.

128.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 7 was emotionally and financially harmed.

129.     Also, as part of Defendants' scheme, Jane Doe 7 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

130.     Jane Doe 8 is a resident of Canada and a professional actress.  Jane Doe 8 enrolled in and paid for NXIVM curriculum.

131.     Jane Doe 8 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

132.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

133.     Jane Doe 8 was also recruited into DOS, then referred to only as The Vow, by Defendant Nicki Clyne ("Clyne").  Defendant Clyne told Jane Doe 8 that she needed collateral in the form of nude photographs to tell her about it.  Clyne also required Jane Doe 8 to provide her

{00207518 }

29

with the email addresses of her colleagues at work as collateral and then revealed that Jane Doe 8 had entered into a "master-slave" relationship.

134.    Shortly thereafter, Clyne directed Jane Doe 8 to wear a chain as a symbol of slavery and to be branded at an upcoming NXIVM event.  Jane Doe 8 was also directed to provide additional collateral in the form of letters describing a false sexual attack by an actor. Clyne directed her to sign these letters and place them in envelopes addressed to casting directors.

135.    At some point Jane Doe 8 asked Clyne to release her from The Vow, and Clyne refused.  Eventually, the shame and humiliation of what she had to do as part of The Vow was more than Jane Doe 8 could bear, and she informed Defendant Clyne that she was repudiating her Vow and requested the return of her collateral, which Clyne refused.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 8 left the NXIVM community and kept silent about her experience.

136.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 8 was emotionally and financially harmed.

137.    Also, as part of Defendants' scheme, Jane Doe 8 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

138.    Jane Doe 9 is a resident of Canada. Jane Doe 9 enrolled in and paid for NXIVM curriculum.

139.    Jane Doe 9 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

140.    Contrary to Defendants' representations, Rational Inquiry was neither scientific

{00207518 }

nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

141.    Jane Doe 9 was recruited into DOS by a DOS member who was "slave" to one of the DOS First-Line Masters.  The DOS "slave" told Jane Doe 9 that she needed collateral to tell her more about it.  Defendant Mack also spoke directly with Jane Doe 9 as part of this recruitment effort.

142.    After agreeing to join what she had been told was a secret sorority run entirely by women, Jane Doe 9 was instructed to provide additional collateral that would destroy her life and the lives of those around her, if released publicly.  Jane Doe 9 was required to participate in 24/7 readiness drills, to send private messages to her master each morning and night, and to provide services to her master.

143.    Later, when another DOS "slave" told Jane Doe 9 that she was leaving NXIVM and showed Jane Doe 9 her brand, Jane Doe 9 quietly left DOS and NXIVM.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 9 severed her ties to the NXIVM community and kept silent about her experience.

144.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 9 was emotionally and financially harmed.

145.    Also, as part of Defendants' scheme, Jane Doe 9 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

146.    Jane Doe 10 is a resident of Canada. Jane Doe 10 enrolled in and paid for NXIVM curriculum.

{00207518 }

147.     Jane Doe 10 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

148.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

149.     Jane Doe 10 was recruited into DOS and told that she needed to provide collateral in the form of a humiliating video to learn more about it.  She was subsequently required to provide additional collateral, all of which, if released, would have caused herself and others to suffer humiliation, shame and damage to their reputations.

150.     Jane Doe 10 was required to provide services to her master, participate in 24/7 readiness drills, and send a private message to her master each morning and night.

151.     Eventually, the shame and humiliation of what she had to do as part of The Vow was more than she could bear, and Jane Doe 10 requested the return of her collateral from Defendants Alison Mack and Raniere, which she never received.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 10 severed her ties to the NXIVM community and kept silent about her experience.

152.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 10 was emotionally and financially harmed.

153.     Also, as part of Defendants' scheme, Jane Doe 10 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

{00207518 }

154.    Jane Doe 11 is a resident of California.  Jane Doe 11 enrolled in and paid for NXIVM curriculum.

155.    Jane Doe 11 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

156.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

157.    Jane Doe 11 was recruited into DOS, then referred to only as The Vow, by Allison Mack and another person.  On several occasions, Jane Doe 11 was required to provide collateral, which would destroy her family, business, and reputation, if released publicly.  Jane Doe 11 was required to participate in 24/7 readiness drills, send a private message to her master each morning and night, and provide services to her master.

158.    However, the shame and humiliation of what she had to do as part of The Vow was more than she could bear, and Jane Doe 11 requested that Mack return her collateral, which she refused.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 11 left the NXIVM community and kept silent about her experience.

159.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 11 was emotionally and financially harmed.

160.    Also, as part of Defendants' scheme, Jane Doe 11 performed uncompensated

{00207518 }

labor, working for many hours without compensation for the benefit of the Defendants.

161.    Jane Doe 12 is a resident of California.  Jane Doe 12 enrolled in and paid for NXIVM curriculum.

162.    Jane Doe 12 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

163.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

164.    Jane Doe 12 was recruited into DOS, then referred to only as The Vow, by Defendant Allison Mack.  Mack required Jane Doe 12 to provide collateral, initially justifying the exercise as a means of demonstrating her loyalty and commitment to the group.  Only later did Mack reveal that their relationship would be that of "master" and "slave," and that Jane Doe 12 was required to continue giving additional collateral, which Jane Doe 12 provided out of fear that her previously provided collateral would be released if she did not comply with all of Mack's demands.  Mack required Jane Doe 12 to obtain her permission to travel, meet with people and eat, and to report her whereabouts every hour. Mack put Jane Doe 12 on a restricted calorie diet which caused Jane Doe 12 to develop medical conditions including a hormonal imbalance. Mack gave Jane Doe 12 an assignment which required her to establish contact with Raniere and acquiesce to his demands.  Mack informed her that if she failed, there would be punishment.  Raniere demanded that Jane Doe 12 engage in sexual acts with himself on

{00207518 }

34

numerous occasions.  Out of fear of punishment and release of her collateral, Jane Doe 12 unwillingly acquiesced to Raniere's demands.  Mack also instructed Jane Doe 12 to recruit other women to DOS and told her that she would be punished if she did not.  After giving several rounds of collateral, Jane Doe 12 was coerced into being branded; she later discovered the brand contained Raniere's initials.  Eventually, the shame and humiliation of what she had to do as part of the Vow was more than she could bear, and Jane Doe 12 left DOS.  Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 12 severed her ties to the NXIVM community and kept silent about her experience.

165.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 12 was emotionally and financially harmed.

166.    Also, as part of Defendants' scheme, Jane Doe 12 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

167.    Jane Doe 13 is a resident of Canada. Jane Doe 13 enrolled in and paid for NXIVM curriculum.

168.    Jane Doe 13 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

169.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress. Defendants also attempted to recruit Jane Doe 13 into DOS.

{00207518 }

35

170.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 13 was emotionally and financially harmed.

171.     Also, as part of Defendants' scheme, Jane Doe 13 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

172.     Jane Doe 15 is a resident of California. Jane Doe 15 enrolled in and paid for NXIVM curriculum.

173.     Jane Doe 15 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

174.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress. Jane Doe 15 was also in DOS.

175.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 15 was emotionally and financially harmed.

176.     Also, as part of Defendants' scheme, Jane Doe 15 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

177.     Jane Doe 16 is a resident of Colorado.  Jane Doe 16 enrolled in and paid for NXIVM curriculum.

178.     Jane Doe 16 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

{00207518 }

179.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

180.    In 2014, Defendant Raniere invited Jane Doe 16 to be a member of NXIVM's Ultima committee tasked with developing the curriculum for programs including exo/eso, The Knife, Ethicist, and The Source.  Raniere assigned Jane Doe 16 to work with five other women, all of whom he personally selected with assistance from the Individual Defendants, to develop and run a program called exo/eso, work for which she was never fully compensated.  Jane Doe 16 was required to be available around the clock for this work, particularly to attend meetings with Raniere that were often held in the middle of the night.

181.    Eventually, Jane Doe 16 concluded she could no longer endure the hardships and coercion Defendants and others subjected her to, the abject poverty she had fallen into, and the psychological abuse inflicted upon her by Clare Bronfman whenever she tried to complain about her lack of compensation and her poor working conditions.  Paralyzed by the fear of retaliation by NXIVM, Jane Doe 16 quietly severed her ties to the NXIVM community, moved far away, and kept silent about her experience.

182.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 16 was emotionally and financially harmed.

183.    Also, as part of Defendants' scheme, Jane Doe 16 performed uncompensated labor, working for hours without compensation for the benefit of the Defendants.

184.    Jane Doe 17 is a resident of Canada.  Jane Doe 17 enrolled in and paid for

{00207518 }

NXIVM curriculum.

185.    Jane Doe 17 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

186.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

187.    In 2014 Raniere invited Jane Doe 17 to be a member of the Ultima committee tasked with developing and running exo/eso, which required meeting with Raniere, often in the middle of the night.  Raniere, Clare Bronfman and other Individual Defendants convinced Jane Doe 17 that she had a promising career waiting for her at NXIVM, and so she moved to the U.S. on a work visa based upon terms required by that visa and promised by Defendants, including Clare Bronfman who personally wrote a letter attesting to the terms of her employment.

188.    Once in the U.S. and immersed in the NXIVM system and community, Jane Doe 17 realized that Defendants had no intention of providing her with the kind of work or the level of compensation required by her visa. Raniere assigned her to help develop and run exo/eso, as one of six women he personally selected with assistance from Clare Bronfman and other Individual Defendants.  She was required to work enormous numbers of hours, including meeting with Raniere, often in the middle of the night. She was also required to continue performing other work for the Defendants.  Only after she complained to Clare Bronfman that she was in violation of her visa's terms, and thus in the U.S. without immigration status, did

{00207518 }

38

Clare Bronfman began to provide her with the funds required by her visa.  Later, however, Clare Bronfman informed Jane Doe 17 that the payments she received were not compensation, but rather a loan that she would have to repay, leaving Jane Doe 17 in mounting debt and with no real compensation.

189.    Eventually, she Jane Doe 17 was unable to keep up with the requirements of NXIVM. She was constantly fearful that if she was labeled as "defiant" by Raniere and the other Individual Defendants she could be reported to authorities for being and working unlawfully in the United States, and so she returned to Canada.

190.    After leaving the NXIVM community, Defendant Clare Bronfman harassed Jane Doe 17, demanding that she repay the "loan," threatening her with legal action for taking work as a yoga instructor, which they alleged was a violation of exo/eso. They insisted that she return to NXIVM and Albany and earn her way back into their good graces.  Paralyzed by the fear of even greater retaliation through NXIVM's infamous abusive litigation tactics, Jane Doe 17 quietly severed her ties to the NXIVM community and kept silent about her experience.

191.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 17 was emotionally and financially harmed.

192.    Also, as part of Defendants' scheme, Jane Doe 17 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

193.     Jane Doe 18 is a resident of California.  Jane Doe 18 enrolled in and paid for NXIVM curriculum.

194.    Jane Doe 18 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

{00207518 }

39

195.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

196.     At Raniere's direction, Jane Doe 18 also helped develop and run exo/eso, often working more than 18 hours per day on the project.  Ultimately, Defendants Raniere and Clare Bronfman refused her requests to be paid the full compensation promised to her for this work.

197.     Paralyzed by the fear of NXIVM's infamous abusive litigation tactics, the possibility of retaliation against her family who were still members of NXIVM, and traumatized by years of manipulation, coercion and abuse, Jane Doe 18 left the NXIVM community and went into hiding, where she remained for several years.

198.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 18 was emotionally and financially harmed.

199.     Also, as part of Defendants' scheme, Jane Doe 18 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

200.     Jane Doe 19 is a resident of Canada.  Jane Doe 19 enrolled in and paid for NXIVM curriculum.

201.     Jane Doe 19 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

202.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was

{00207518 }

actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

203.    At some point she was asked to participate in a study. Defendant Dr. Brandon Porter ("Porter") picked her up from her apartment and drove her to Apropos, a NXIVM facility, connected her to an EEG to record her physiological responses, and played a series of disturbing and graphically violent scenes from commercials, short films and movie clips. These clips included a video depicting the actual dismemberment of five women and movie scenes showing a gang rape and a racially motivated murder of an African American male. Porter also used a video camcorder to record her expressions. Jane Doe 19 experienced shock, disgust, fear and horror and showed visible signs of distress, including crying and asking Porter to turn it off. At no time did Porter inform her of the details, risks, benefits, the right to withdraw or plans for confidentiality protection and minimization of risks or obtain her voluntary informed written consent. Porter recommended that she undergo NXIVM "EMs" if she had an intense reaction to the study. Following the study, she was unable to sleep for 12 days.

204.    After Jane Doe 19 left NXIVM, Defendants filed a police report on July 5, 2017 with the Vancouver Police Department ("VPD"), falsely accusing Jane Doe 19 of illegally accessing NXIVM's main server in New York and deleting a number of client files, claiming that as a result, NXIVM could not process monthly payments from clients at a loss in excess of $100,000. On September 20, 2017 the VPD called her and advised her that she was named as a suspect by NXIVM for mischief and theft. Jane Doe 19 was shocked and afraid that NXIVM was using the VPD to harass her. Because the affected clients contacted by VPD stated that they had voluntarily left NXIVM, the VPD closed the investigation.

{00207518 }

205.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 19 was emotionally and financially harmed.

206.    Also, as part of Defendants' scheme, Jane Doe 19 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

207.    Jane Doe 20 is a resident of Canada.  Jane Doe 20 enrolled in and paid for NXIVM curriculum.

208.    Jane Doe 20 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

209.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

210.    Defendant Nancy Salzman was aware that Jane Doe 20 suffered from Obsessive Compulsive Disorder ("OCD") and told her that Defendants' system could cure her OCD, and that if Raniere approved, she would be eligible for this treatment, administered by Nancy Salzman and Porter.  Raniere subsequently approved this treatment, after which Jane Doe 20 was subjected to nightly 4-hour long EMs and periodic questioning by Porter, who had also instructed her to cease taking medications prescribed by a previous doctor.  Jane Doe 20 was subjected to extreme verbal abuse, and began to suffer severe physical and psychological problems, which Nancy Salzman and Dr. Porter insisted were a result of her failure to fully commit to Defendants' system.

{00207518 }

211.    Eventually, in addition to worsening physical ailments, Jane Doe 20 realized that she was in a serious psychiatric crisis, which included having persistent suicidal thoughts, and which Defendants dismissed and blaming on her own alleged failures.  Fearing that she would take her own life, Jane Doe 20 fled back to Canada, went into hiding, and delayed seeking medical treatment, out of fear that if she told anyone about her experience Defendants would retaliate.

212.    Jane Doe 20 eventually sought and obtained medical treatment and reported her experience to the New York State Department of Health, which refused to investigate her complaint.

213.    Jane Doe 20 also learned that Defendants had retaliated against two other former members of the NXIVM community residing in Canada by making false statements to law enforcement authorities in Vancouver, BC, which traumatized her and once again caused her to experience a mental health crisis.  Only after Defendant Clare Bronfman was indicted and arrested, and seeing that there were no reports of additional retaliatory actions by the Defendants, did Jane Doe 20 feel safe enough to take legal action through the instant lawsuit.

214.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 20 was emotionally and financially harmed.

215.    Also, as part of Defendants' scheme, Jane Doe 20 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

216.    Jane Doe 21 is a resident of the New York State. Jane Doe 21 enrolled in NXIVM curriculum.

217.    Jane Doe 21 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology

that would lead to a successful career and self-fulfillment.

218.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

219.    In October 2014, Defendants Porter and Nancy Salzman told Jane Doe 21 that she qualified to participate in a study of a NXIVM treatment for Tourette's syndrome, which was being conducted, sponsored and/or funded in whole or in part by the Ethical Science Foundation[4] ("ESF").  In November 2014 and December 2014, Jane Doe 21 was instructed to participate in a sleep study at a local hospital in Buffalo, conducted under the Defendants' direction.  The stated purpose of the sleep study was to record Jane Doe 21's tics and determine how NXIVM technology could cure her Tourette's.

220.    Jane Doe 21 was thereafter directed to move to Albany for the purpose of treating her Tourette's, and she took a semester off from college in order to participate in the study. When Jane Doe 21 moved to Albany, she was instructed to take curriculum, and Nancy Salzman provided her with purported medical treatment in the form of the 16-day intensive, which entailed daily group psychotherapy sessions for 12 hours per day over 16 consecutive days, and then another advanced level intensive for 8 additional consecutive days.  Nancy Salzman also practiced unauthorized psychotherapy on Jane Doe 21 in private EM sessions which were recorded on video.  Nancy Salzman also told Jane Doe 21 that she would be in a film about the Tourette's study produced and financed by Clare Bronfman.

---

[4] The non-profit arm of NXIVM, which funded unauthorized medical experiments.

{00207518 }

221.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 21 was emotionally and financially harmed.

222.    Also, as part of Defendants' scheme, Jane Doe 21 performed uncompensated labors, working for many hours without compensation for the benefit of the Defendants.

223.    Jane Doe 22 is a resident of Wisconsin. Jane Doe 22 enrolled in NXIVM curriculum.

224.    Jane Doe 22 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

225.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

226.    Defendant Nancy Salzman was aware that Jane Doe 22 suffered from Tourette's Syndrome and told her that Defendants could cure her Tourette's Syndrome with a treatment administered by Nancy Salzman and Porter, which Clare Bronfman would pay for. Thereafter, Jane Doe 22 was subjected to 16-day, on-camera interviews and EMs with Nancy Salzman. During these EMs, Nancy Salzman told her that having a child would ruin her life and when Jane Doe 22 became pregnant, Nancy Salzman cut off all contact with her.

227.    Jane Doe 22 was also subjected to extreme verbal abuse, and began to suffer severe psychological problems, which Salzman and Porter insisted were a result of her failure to fully commit to Defendants' system.  Jane Doe 22 continues to have nightmares and panic

attacks.

228.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 22 was emotionally and financially harmed.

229.    Also, as part of Defendants' scheme, Jane Doe 22 performed uncompensated labors, working for many hours without compensation for the benefit of the Defendants.

230.    Jane Doe 23 is a resident of Canada.  She enrolled in and paid for NXIVM curriculum. She was also the subject of a false criminal complaint that Clare Bronfman filed in Vancouver.

231.    Jane Doe 23 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

232.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

233.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 23 was emotionally and financially harmed.

234.    Also, as part of Defendants' scheme, Jane Doe 23 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

235.    Plaintiff Toni Natalie is a resident of the state of New York.  At one time she was Defendant Raniere's girlfriend and non-NXIVM business partner.  After she left him, Defendants Raniere and Nancy Salzman embarked on a campaign of vexatious abuses of the

{00207518 }

legal system by: improperly intervening in her bankruptcy proceeding and that of her mother; repeatedly filing baseless criminal complaints against her; hiring investigators to dig into her life and the lives of her family members; having lawyers send her threatening letters; and commencing meritless litigation against her, all of which drove her into poverty and severely traumatized her.

236.    Plaintiff Mark Vicente is a resident of the state of California and a filmmaker. Mark Vicente enrolled in and paid for NXIVM curriculum.

237.    Mark Vicente enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

238.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

239.    Defendants Nancy Salzman and Clare Bronfman began recruiting him by asking him to help them interview scientists previously featured in an award-winning film he made. They traveled on Defendant Clare Bronfman's private jet. Following the interviews, they invited him to come to Albany discuss how they could use NXIVM's resources to fund his film projects.

240.    Later, Mark Vicente became a NXIVM Coach[5] and worked his way up the Stripe Path to become a Procter.[6] As he did this, Mark began to have daily contact with Raniere, and

---

[5] To become a coach, a person completed curriculum, recruited three new members, and committed to work as an intern and advance on the Stripe Path.
[6] A Procter could earn commissions on recruitment and teach curriculum.

with the increased contact his status within the community increased.

241.    At some point, Raniere asked Mark to alter video tapes of an intensive so that it would appear less damaging in litigation. Mark was unaware of Raniere's purpose and agreed in order to gain Raniere's approval.

242.    Shortly after the successful completion of that editing project, he was asked to quell fears within the community after nine high-level members of NXIVM challenged Raniere and resigned. Thereafter, Mark was praised by the Inner Circle[7] for his loyalty to NXIVM and Raniere, and he was invited to become a member of the Executive Board.

243.    Mark Vicente was thereafter promoted to the rank of Senior Proctor and promised an opportunity to open his own NXIVM center. Vicente also took EMP training, believing that this would enhance his ability to work with NXIVM students and increase his income.  However, while taking these trainings, the Defendants announced that all EMP students, no matter what level they had achieved, had to begin again at level 1 because of alleged changes in the curriculum, so he ceased pursuing that career path.

244.    In his role of overseeing video production for NXIVM, he spent hours shooting footage of intensives, V-week[8] and forums, and training people to work in the video department.

245.    Mark Vicente also had a position in NXIVM's men's group, Society of Protectors ("SOP"), through which he was entitled to receive commissions for enrollments and trainings. However, Raniere would often refuse to conduct the trainings and refuse to pay Mark his commissions.

---

[7] The highest-ranking members of the NXIVM committee or those who had close personal relationships with Raniere.
[8] V-week or "Vanguard Week" was an annual multi-day celebration of Raniere (the Vanguard's) birthday.

{00207518 }

48

246.    Mark Vicente began to notice the effect of NXIVM's insidious, misogynistic curriculum on its students; for example, many women were put on strict diets and forced to lose weight, and Raniere was having sexual relationships with many students and members of the Executive Board. Then, Vicente found out about DOS.

247.    Thereafter, Mark resigned from his positions in NXIVM and the companies and left the NXIVM community. Paralyzed by the fear of NXIVM's infamous abusive litigation tactics, he went into hiding for several years.

248.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Mark Vicente was emotionally and financially harmed.

249.    Also, as part of Defendants' scheme, Mark Vicente performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

250.    John Doe 1 is a resident of Canada.  John Doe 1 enrolled in and paid for NXIVM curriculum.

251.    John Doe 1 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

252.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

253.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 1 was harmed.  He suffered serious emotional trauma as a result of being

{00207518 }

49

counselled by untrained and unlicensed individuals as part of the Defendants' scheme.  John Doe 1 also spent thousands of dollars on curriculum and EMs .

254.    Also, as part of Defendants' scheme, John Doe 1 performed uncompensated labor. John Doe 1 worked for many hours without compensation for the benefit of the Defendants.

255.    John Doe 2 is a resident of California.  John Doe 2 enrolled in and paid for NXIVM curriculum.

256.    John Doe 2 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

257.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

258.    In retaliation against John Doe 2 for raising concerns about NXIVM and to intimidate and silence him, Clare Bronfman directed persons working for NXIVM to file a false criminal complaint against John Doe 2 in Mexico. As a result of the criminal complaint, John Doe 2 retained an attorney to defend him and incurred substantial legal fees and other expenses. The experience also left John Doe 2 extremely traumatized.

259.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 2 was emotionally and financially harmed.

260.    Also, as part of Defendants' scheme, John Doe 2 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

{00207518 }

261.    John Doe 3 is a resident of the state of North Carolina.  John Doe 3 enrolled in and paid for NXIVM curriculum.

262.    John Doe 3 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.  At Defendants' urging, John Doe 3 also spent substantial sums to enroll his children in Defendants' Rainbow Cultural Garden ("RCG"), relying on Defendants' false representations that it was staffed by qualified teachers trained in both child education and NXIVM's system.[9]

263.    Contrary to Defendants' representations, NXIVM's system was neither scientific nor patentable. Defendants also failed to disclose a material fact – that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

264.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 3 was emotionally and financially harmed.

265.    Also, as part of Defendants' scheme, John Doe 3 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

266.    John Doe 4 is a resident of New York State. John Doe 4 enrolled in and paid for NXIVM curriculum.

267.    John Doe 4 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

---

[9] The Rainbow Cultural Garden was an unlicensed children's school for NXIVM members.

{00207518 }

268.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

269.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 4 was emotionally and financially harmed.

270.     Also, as part of Defendants' scheme, John Doe 4 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

271.     Jane Doe 24 is a resident of Canada. Jane Doe 24 enrolled in and paid for NXIVM curriculum.

272.     Jane Doe 24 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

273.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

274.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 24 was emotionally and financially harmed.

275.     Also, as part of Defendants' scheme, Jane Doe 24 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

276.     Jane Doe 25 is a resident of Maryland. Jane Doe 25 enrolled in and paid for NXIVM curriculum.

277.     Jane Doe 25 enrolled in NXIVM curriculum based upon Defendants' false representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

278.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

279.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 25 was emotionally and financially harmed.

280.     Also, as part of Defendants' scheme, Jane Doe 25 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

281.     Jane Doe 26 is a resident of Canada. Jane Doe 26 enrolled in and paid for NXIVM curriculum.

282.     Jane Doe 26 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

283.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of

serious psychological injury and emotional distress.

284.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 26 was emotionally and financially harmed.

285.    Also, as part of Defendants' scheme, Jane Doe 26 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

286.    John Doe 5 is a resident of Mexico. John Doe 5 enrolled in and paid for NXIVM curriculum.

287.    John Doe 5 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

288.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

289.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 5 was emotionally and financially harmed.

290.    Also, as part of Defendants' scheme, John Doe 5 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

291.    Jane Doe 27 is a resident of California. Jane Doe 27 enrolled in and paid for NXIVM curriculum.

292.    Jane Doe 27 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology

{00207518 }

that would lead to a successful career and self-fulfillment.

293.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

294.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 27 was emotionally and financially harmed.

295.    Also, as part of Defendants' scheme, Jane Doe 27 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

296.    Jane Doe 28 is a resident of Canada. Jane Doe 28 enrolled in and paid for NXIVM curriculum.

297.    Jane Doe 28 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

298.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

299.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 28 was emotionally and financially harmed.

300.    Also, as part of Defendants' scheme, Jane Doe 28 performed uncompensated

{00207518 }

labor, working for many hours without compensation for the benefit of the Defendants.

301.     Jane Doe 29 is a resident of New York State. Jane Doe 29 enrolled in and paid for NXIVM curriculum.

302.     Jane Doe 29 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

303.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

304.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 29 was emotionally and financially harmed.

305.     Also, as part of Defendants' scheme, Jane Doe 29 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

306.     John Doe 6 is a resident of Canada. John Doe 6 enrolled in and paid for NXIVM curriculum.

307.     John Doe 6 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

308.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by

{00207518 }

unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

309.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 6 was emotionally and financially harmed.

310.    Also, as part of Defendants' scheme, John Doe 6 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

311.    Jane Doe 30 is a resident of Canada. Jane Doe 30 enrolled in and paid for NXIVM curriculum.

312.    Jane Doe 30 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

313.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

314.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 30 was emotionally and financially harmed.

315.    Also, as part of Defendants' scheme, Jane Doe 30 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

316.    Jane Doe 31 is a resident of Canada. Jane Doe 31 enrolled in and paid for NXIVM curriculum.

317.    Jane Doe 31 enrolled in NXIVM curriculum based upon Defendants' false,

{00207518 }

material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

318.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

319.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 31 was emotionally and financially harmed.

320.    Also, as part of Defendants' scheme, Jane Doe 31 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

321.    John Doe 7 is a resident of Canada. John Doe 7 enrolled in NXIVM curriculum.

322.    John Doe 7 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

323.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

324.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 7 was emotionally and financially harmed.

325.    Also, as part of Defendants' scheme, John Doe 7 performed uncompensated labor,

working for many hours without compensation for the benefit of the Defendants.

326.    Jane Doe 32 is a resident of Canada. Jane Doe 32 enrolled in and paid for NXIVM curriculum.

327.    Jane Doe 32 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

328.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

329.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 32 was emotionally and financially harmed.

330.    Also, as part of Defendants' scheme, Jane Doe 32 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

331.    Jane Doe 33 is a resident of New York State. Jane Doe 33 enrolled in and paid for NXIVM curriculum.

332.    Jane Doe 33 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

333.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by

unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

334.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 33 was emotionally and financially harmed.

335.    Also, as part of Defendants' scheme, Jane Doe 33 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

336.    John Doe 8 is a resident of New York State. John Doe 8 enrolled in and paid for NXIVM curriculum.

337.    John Doe 8 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

338.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

339.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 8 was emotionally and financially harmed.

340.    Also, as part of Defendants' scheme, John Doe 8 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

341.    Jane Doe 34 is a resident of Canada. Jane Doe 34 enrolled in and paid for NXIVM curriculum.

342.    Jane Doe 34 enrolled in NXIVM curriculum based upon Defendants' false,

{00207518 }

60

material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

343.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

344.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 34 was emotionally and financially harmed.

345.    Also, as part of Defendants' scheme, Jane Doe 34 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

346.    John Doe 9 is a resident of Canada. John Doe 9 enrolled in and paid for NXIVM curriculum.

347.    John Doe 9 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

348.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

349.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 9 was emotionally and financially harmed.

{00207518 }

350.     Also, as part of Defendants' scheme, John Doe 9 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

351.     Jane Doe 35 is a resident of Canada.  Jane Doe 35 enrolled in and paid for NXIVM curriculum.

352.     Jane Doe 35 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

353.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

354.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 35 was emotionally and financially harmed.

355.     Jane Doe 36 is a resident of New York State who resides in this Judicial District. Jane Doe 36 enrolled in and paid for NXIVM curriculum.

356.     Jane Doe 36 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

357.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of

{00207518 }

serious psychological injury and emotional distress.

358.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 36 was emotionally and financially harmed.

359.     Also, as part of Defendants' scheme, Jane Doe 36 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

360.     John Doe 10 is a resident of Canada. John Doe 10 enrolled in and paid for NXIVM curriculum.

361.     John Doe 10 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

362.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

363.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 10 was emotionally and financially harmed.

364.     John Doe 11 is a resident of Canada. John Doe 11 enrolled in and paid for NXIVM curriculum.

365.     John Doe 11 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

366.     Contrary to Defendants' representations, Rational Inquiry was neither scientific

{00207518 }

nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

367.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 11 was emotionally and financially harmed.

368.    Also, as part of Defendants' scheme, John Doe 11 performed uncompensated labor, working many hours without compensation for the benefit of the Defendants.

369.    Jane Doe 37 is a resident of Canada. Jane Doe 37 enrolled in and paid for NXIVM curriculum.

370.    Jane Doe 37 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

371.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

372.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 37 was emotionally and financially harmed.

373.    Also, as part of Defendants' scheme, Jane Doe 37 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

374.    Jane Doe 38 is a resident of Canada. Jane Doe 38 enrolled in and paid for

{00207518 }

64

NXIVM curriculum.

375.    Jane Doe 38 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

376.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

377.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 38 was emotionally and financially harmed.

378.    Also, as part of Defendants' scheme, Jane Doe 38 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

379.    Jane Doe 39 is a resident of New York State. Jane Doe 39 enrolled in and paid for NXIVM curriculum.

380.    Jane Doe 39 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

381.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

{00207518 }

382.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 39 was emotionally and financially harmed.

383.     Also, as part of Defendants' scheme, Jane Doe 39 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

384.     John Doe 12 is a resident of Canada. John Doe 12 enrolled in and paid for NXIVM curriculum.

385.     John Doe 12 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

386.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

387.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 12 was emotionally and financially harmed.

388.     John Doe 13 is a resident of Canada. John Doe 13 enrolled in and paid for NXIVM curriculum.

389.     John Doe 13 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

390.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was

actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

391.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 13 was emotionally and financially harmed.

392.    Also, as part of Defendants' scheme, John Doe 13 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

393.    John Doe 14 is a resident of California. John Doe 14 enrolled in and paid for NXIVM curriculum.

394.    John Doe 14 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

395.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

396.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 14 emotionally and financially harmed.

397.    Also, as part of Defendants' scheme, John Doe 14 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

398.    Jane Doe 41 is a resident of Canada. Jane Doe 41 enrolled in and paid for NXIVM curriculum.

{00207518 }

399.     Jane Doe 41 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

400.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

401.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 41 was emotionally and financially harmed.

402.     Also, as part of Defendants' scheme, Jane Doe 41 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

403.     Jane Doe 42 is a resident of New York State. Jane Doe 42 enrolled in and paid for NXIVM curriculum.

404.     Jane Doe 42 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

405.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

406.     As a result of Defendants' scheme, criminal acts, and misrepresentations and

{00207518 }

omissions, Jane Doe 42 was emotionally and financially harmed.

407.    Jane Doe 43 is a resident of Canada. Jane Doe 43 enrolled in and paid for NXIVM curriculum.

408.    Jane Doe 43 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

409.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

410.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 43 was emotionally and financially harmed.

411.    Also, as part of Defendants' scheme, Jane Doe 43 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

412.    John Doe 15 is a resident of Canada. John Doe 15 enrolled in and paid for NXIVM curriculum.

413.    John Doe 15 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

414.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by

{00207518 }

69

unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

415.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 15 was emotionally and financially harmed.

416.    Also, as part of Defendants' scheme, John Doe 15 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

417.    Jane Doe 44 is a resident of Canada. Jane Doe 44 enrolled in and paid for NXIVM curriculum.

418.    Jane Doe 44 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

419.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

420.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 44 was emotionally and financially harmed.

421.    Also, as part of Defendants' scheme, Jane Doe 44 performed uncompensated labor working for many hours without compensation for the benefit of the Defendants.

422.     John Doe 16 is a resident of Canada. John Doe 16 enrolled in and paid for NXIVM curriculum.

423.    John Doe 16 enrolled in NXIVM curriculum based upon Defendants' false,

{00207518 }

material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

424.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

425.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 16 was emotionally and financially harmed.

426.    Also, as part of Defendants' scheme, John Doe 16 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

427.    Jane Doe 45 is a resident of Canada.  Jane Doe 45 enrolled in and paid for NXIVM curriculum.

428.    Jane Doe 45 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

429.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

430.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 45 was emotionally and financially harmed.

431.    Jane Doe 46 is a resident of Canada.  Jane Doe 46 enrolled in and paid for NXIVM curriculum.

432.    Jane Doe 46 enrolled in NXIVM curriculum based upon Defendants' false representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

433.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

434.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 46 was emotionally and financially harmed.

435.    Also, as part of Defendants' scheme, Jane Doe 46 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

436.    Jane Doe 47 is a resident of California.  Jane Doe 47 enrolled in and paid for NXIVM curriculum.

437.    Defendants' falsely represented that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

438.    Contrary to Defendants' representations, Rational Inquiry was not scientific. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

{00207518 }

439.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 47 was emotionally and financially harmed.

440.     Also, as part of Defendants' scheme, Jane Doe 47 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

441.     Jane Doe 48 is a resident of West Virginia. Jane Doe 48 enrolled in and paid for NXIVM curriculum.

442.     Jane Doe 48 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

443.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

444.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 48 was emotionally and financially harmed.

445.     Also, as part of Defendants' scheme, Jane Doe 48 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

446.     Jane Doe 49 is a resident of Mexico.  Jane Doe 49 enrolled in NXIVM curriculum.

447.     Jane Doe 49 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

{00207518 }

448. Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

449. As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 49 was emotionally and financially harmed.

450. Also, as part of Defendants' scheme, Jane Doe 49 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

451. Jane Doe 50 is a resident of California. Jane Doe 50 enrolled in and paid for NXIVM curriculum.

452. Defendants falsely represented that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

453. Contrary to Defendants' representations, Rational Inquiry was not scientific. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

454. Jane Doe 50 was recruited into DOS, then referred to only as The Vow, by a DOS "slave" acting under the direction of Defendant Lauren Salzman. Jane Doe 50 was required to provide collateral and perform unpaid work for the DOS "slave" and Lauren Salzman, who pressured and coerced Jane Doe 50 into giving additional damaging collateral, even as Jane Doe 50 pleaded not to. Lauren Salzman also lied to Jane Doe 50 about Raniere's involvement with

{00207518 }

The Vow.

455.    At some point, Jane Doe 50 asked Lauren Salzman to release her from The Vow, and Lauren Salzman refused.  Eventually, the shame and humiliation of what she had to do as part of The Vow was more than she could bear, and Jane Doe 50 informed Defendant Lauren Salzman that she was repudiating her Vow and requested the return of her collateral, which Lauren Salzman refused.  Jane Doe 50 then wrote to NXIVM leaders, including Defendants Clare Bronfman and Karen Unterreiner, informing them that she had been recruited into The Vow through lies and manipulation and that she had been coerced into giving extremely humiliating and potentially damaging collateral, which she described in her letter.  Jane Doe 50 asked them to direct the return or destruction of her collateral, which they refused to do. Paralyzed by the dual fears of release of her collateral and NXIVM's infamous abusive litigation tactics, Jane Doe 50 left the NXIVM community and kept silent about her experience.

456.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 50 was emotionally and financially harmed.

457.    Also, as part of Defendants' scheme, Jane Doe 50 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

458.    Jane Doe 51 is a resident of Vermont. Jane Doe 51 enrolled in and paid for NXIVM curriculum.

459.    Jane Doe 51 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

460.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was

actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

461.    Jane Doe 51 also enrolled her child in the Defendants' RCG, relying on Defendants' false representations that it was staffed by qualified teachers trained in both child education and NXIVM's system.  Jane Doe 51 was also told that enrolling her child in RCG was a condition of remaining part of the NXIVM community.  Jane Doe 51 spent substantial sums of money to keep her child enrolled in RCG.

462.    Eventually, Jane Doe 51's health began to suffer, and Defendants and others in the NXIVM community blamed her for not working on her "issues" and for not healing her "ethical breaches."  Specifically, she set up a web page on Go Fund Me to raise money for her expensive medical treatments and was told to take it down; Defendants told other members of the community not to contribute money because Jane Doe 51 was "being a parasite" and merely seeking attention.  Paralyzed by the fear of retaliation against her herself and her family, Jane Doe 51 quietly ceased her participation in NXIVM programs but remained in the NXIVM community to stay close to family, keeping silent about her experience in order to avoid drawing attention to herself.

463.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 51 was emotionally and financially harmed.

464.    Also, as part of Defendants' scheme, Jane Doe 51 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

465.    John Doe 17 is a resident of Canada. John Doe 17 enrolled in and paid for NXIVM curriculum.

{00207518 }

466.     John Doe 17 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

467.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

468.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 17 was emotionally and financially harmed.

469.     Also, as part of Defendants' scheme, John Doe 17 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

470.     Jane Doe 52 is a resident of Canada. Jane Doe 52 enrolled in and paid for NXIVM curriculum.

471.     Jane Doe 52 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

472.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

473.     As a result of Defendants' scheme, criminal acts, and misrepresentations and

{00207518 }

omissions, Jane Doe 52 was emotionally and financially harmed.

474.    Also, as part of Defendants' scheme, Jane Doe 52 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

475.    Jane Doe 53 is a resident of California. Jane Doe 53 enrolled in and paid for NXIVM curriculum.

476.    Jane Doe 53 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

477.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

478.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 53 was emotionally and financially harmed.

479.    Also, as part of Defendants' scheme, Jane Doe 53 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

480.    Jane Doe 54 is a resident of Canada.  Jane Doe 54 enrolled in and paid for NXIVM curriculum.

481.    Jane Doe 54 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

482.    Contrary to Defendants' representations, Rational Inquiry was neither scientific

nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

483.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 54 was emotionally and financially harmed.

484.    Jane Doe 55 is a resident of California. Jane Doe 55 enrolled in and paid for NXIVM curriculum.

485.    Jane Doe 55 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

486.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

487.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 55 was emotionally and financially harmed.

488.    Also, as part of Defendants' scheme, Jane Doe 55 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

489.    Jane Doe 56 is a resident of Canada. Jane Doe 56 enrolled in and paid for NXIVM curriculum.

490.    Jane Doe 56 enrolled in NXIVM curriculum based upon Defendants' false,

material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

491.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

492.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 56 was emotionally and financially harmed.

493.    Also, as part of Defendants' scheme, Jane Doe 56 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

494.    Jane Doe 57 is a resident of Massachusetts. Jane Doe 57 enrolled in and paid for NXIVM curriculum.

495.    Jane Doe 57 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

496.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a hodgepodge of pseudo-scientific psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

497.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 57 was emotionally and financially harmed.

{00207518 }

498.    John Doe 19 is a resident of Canada. John Doe 19 enrolled in and paid for NXIVM curriculum.

499.    John Doe 19 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

500.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

501.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 19 was emotionally and financially harmed.

502.    Also, as part of Defendants' scheme, John Doe 19 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

503.    John Doe 20 is a resident of Canada. John Doe 20 enrolled in and paid for NXIVM curriculum.

504.    John Doe 20 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

505.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of

{00207518 }

serious psychological injury and emotional distress.

506.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, John Doe 20 was emotionally and financially harmed.

507.    Jane Doe 58 is a resident of California. Jane Doe 58 enrolled in and paid for NXIVM curriculum.

508.    Jane Doe 58 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

509.    Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a pseudo-scientific hodgepodge of psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

510.    As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 58 was emotionally and financially harmed.

511.    Also, as part of Defendants' scheme, Jane Doe 58 performed uncompensated labor.  Jane Doe 58 worked for many hours without compensation for the benefit of the Defendants.

512.    Jane Doe 59 is a resident of Canada. Jane Doe 59 enrolled in and paid for NXIVM curriculum.

513.    Jane Doe 59 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

{00207518 }

514.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a hodgepodge of pseudo-scientific psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

515.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 59 was emotionally and financially harmed.

516.     Also, as part of Defendants' scheme, Jane Doe 59 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

517.     Jane Doe 60 is a resident of Canada. Jane Doe 60 enrolled in and paid for NXIVM curriculum.

518.     Jane Doe 60 enrolled in NXIVM curriculum based upon Defendants' false, material representations that Rational Inquiry provided a scientific, patent-pending technology that would lead to a successful career and self-fulfillment.

519.     Contrary to Defendants' representations, Rational Inquiry was neither scientific nor patentable. Defendants also failed to disclose a material fact—that Rational Inquiry was actually a hodgepodge of pseudo-scientific psychotherapeutic methods which, when practiced by unlicensed and unqualified lay-people, subjected its participants to an unreasonable risk of serious psychological injury and emotional distress.

520.     As a result of Defendants' scheme, criminal acts, and misrepresentations and omissions, Jane Doe 60 was emotionally and financially harmed.

521.     Also, as part of Defendants' scheme, Jane Doe 60 performed uncompensated labor, working for many hours without compensation for the benefit of the Defendants.

{00207518 }

**Defendants**

522.    Defendant Keith Raniere is a life-long resident of New York State, currently residing at the Metropolitan Detention Center in Brooklyn, New York.  He is the co-founder and *de facto* head of NXIVM, ESP and all other ESP-related entities, including DOS.  Raniere was the co-creator of Rational Inquiry, the system of curriculum employed by ESP, and its Exploration of Meaning psychotherapy program.  He was also the co-creator of the pseudo-scientific medical experiments performed on non-consenting participants.

523.    Among the many benefits Raniere received from the Enterprise was ten percent of the income of each NXIVM-related entity, and a community of people committed to serving his every need, desire and whim.  In exchange, Raniere bestowed upon select persons, including each of the Individual Defendants and co-conspirators discussed herein, opportunities to enjoy a share of the income, along with elevated status and power within the NXIVM community, and beyond.

524.    Defendant Nancy Salzman is a resident of New York State, co-founder of NXIVM with Raniere, co-founder and President of Defendant ESP, and a member of the executive boards of NXIVM and ESP.  Nancy Salzman co-created and co-directed the ESP curriculum and the Exploration of Meaning psychotherapy program, both of which were central to the NXIVM system and to the perpetration of innumerable injurious acts described herein.  She shared in the income generated by NXIVM and its related entities.

525.    Nancy Salzman, along with Raniere, helped design, recruit subjects for and oversee the pseudo-scientific medical experiments described herein, including the "Tourette's Study," the "OCD study," and the "Human Fright Study."  She was a member of the Inner Circle.

{00207518 }

84

526.     Defendant Clare Bronfman is a resident of New York State, currently residing in Manhattan under home confinement.  She is a member of the executive boards of NXIVM and ESP, Vice President of Operations of ESP, and the sister of Defendant Sara Bronfman. Clare Bronfman is the Trustee and Chief Operating Officer of Defendant Ethical Science Foundation ("ESF").  She was a member of the Inner Circle.

527.     As part of the operation of the Enterprise, Clare Bronfman, Raniere, and other co-conspirators directed and participated in a decades-long pattern of vexatious, ruinous, and meritless abuse of the civil and criminal justice system in order to harass, intimidate, silence, retaliate against, and destroy the lives of witnesses and persons critical of NXIVM and Raniere. Clare Bronfman and her sister and co-defendant, Sara Bronfman, expended millions of dollars to finance these abuses.  In part due to her position as the person responsible for overseeing and handling legal matters in NXIVM, Clare Bronfman also took advantage of many members of the NXIVM community by misrepresenting the law to them in order to induce them to act or refrain from acting in accordance with her desires and those of her co-defendants.

528.     Clare Bronfman, along with Raniere and other co-conspirators, also directed and participated in efforts and attempts through unlawful means to spy upon and acquire information from and/or about perceived critics, enemies and potential witnesses, including the hacking of her own father's computer and email account.

529.     Clare Bronfman also owned and directed the activities of several of the "Ultima[10]" group of companies, including exo/eso, which was designed and used to procure, groom and provide sexual servants for Raniere.

530.     Defendant Sara Bronfman is a resident of the New York State, a member of

---

[10] The Ultima group included exo/eso, The Source, The Knife, and Ethicist.

{00207518 }

NXIVM and former NXIVM trainer, head of Defendant Rainbow Cultural Garden, and the sister

of Clare Bronfman.  Sara Bronfman was on the NXIVM board and at one time was "Master of

Humanities."  Sara Bronfman contributed millions of dollars of her own assets to finance the

campaign of legal terror Defendants waged against critics and witnesses.  She also financed other

aspects of the operation, including the acquisition of the three commercial properties that served

as the headquarters, administrative offices and center for operations of NXIVM, and she was

directly involved in promoting NXIVM, using her social status as a recruitment tool.

531.    Defendant Lauren Salzman is a resident of New York State and is the daughter of

Nancy Salzman. Lauren Salzman was Director of Education for ESP and worked directly with

Raniere to create and run DOS.  Within the DOS structure, Lauren Salzman was a First Line

Master, where Plaintiffs Edmondson, Jane Doe 5, Jane Doe 7, Jane Doe 9, and Jane Doe 50 were

"slaves" in her line. She was a member of the Inner Circle.[11]

532.    Defendant Allison Mack is a resident of California, and worked directly with

Raniere to create and run DOS. Within the DOS structure, Mack was a First Line Master, where

Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 11, Jane Doe 12 and Jane Doe 15 were "slaves" in

her line.  She was a member of the Inner Circle.

533.    Defendant Kathy Russell resides in New York State.  Kathy Russell was the

Enterprise's bookkeeper, and she worked directly with Raniere, Nancy Salzman, and the other

top people within the Enterprise.  She was a member of the Inner Circle.

534.    Defendant Karen Unterreiner resides in Clifton Park, New York.  Karen

Unterreiner was a member of the Inner Circle and sat on the NXIVM executive board.  She was

---

[11] Lauren Salzman testified for several days in the Raniere Trial, and her testimony is sometimes quoted herein.

{00207518 }

a Proctor and Head Trainer of ESP curriculum.  She was also involved in NXIVM's finances; she was responsible for calculating commissions payable, including the 10 percent of everything that was received by Raniere.

535.    Defendant Brandon Porter is a physician formerly licensed to practice medicine in New York.  He resides in Waterford, NY.  At all times relevant hereto, Porter was regularly engaged in the practice of medicine in New York State.  Porter was paid by and acted as an agent of ESF, under the direction of Raniere, Clare Bronfman, and Nancy Salzman.  Porter, along with Nancy Salzman and others, conducted experiments on human beings within the NXIVM community, including the "Human Fright Experiment," and the Tourette's and OCD "studies," all without voluntary informed consent or professional oversight.

536.    Defendant Danielle Roberts, M.D. is a physician licensed to practice medicine in New York State, who maintains a professional address in Plainview, New York and resides in Port Jefferson Station, New York.  At all times relevant hereto, Roberts was regularly engaged in the practice of medicine in New York.  Roberts used a cauterizing iron to brand numerous DOS members in their pubic areas, without their informed consent and without anesthesia.

537.    Defendant Daniela Padilla Bergeron resides in Laredo, Texas.  Until recently, she lived for many years in New York state.  Padilla worked directly with Raniere to create and run DOS. Within the DOS structure, Padilla was a First Line Master, where Plaintiff Jane Doe 6 was a "slave" in her line.  She was a member of the Inner Circle.

538.    Defendant Rosa Laura Junco resides in Austin, Texas.   Until recently, Junco lived for many years in New York State, where she still owns two residences, one in Waterford and one in Clifton Park.  Junco worked directly with Raniere to create and run DOS. Within the DOS structure, Junco was a First Line Master, where Jane Doe 10 and Jane Doe 13 were

"slaves" in her line. She was a member of the Inner Circle.

539.    Defendant Loreta J. Garza Davila resides in Waterford, New York and worked directly with Raniere to create and run DOS. Within the DOS structure, Garza was a First Line Master, where Jane Doe 25 was a "slave" in her line. She was a member of the Inner Circle.

540.    Defendant Monica Duran maintains two New York State residences, in Halfmoon and Clifton Park.  Duran worked directly with Raniere to create and run DOS. Within the DOS structure, Duran was a First Line Master.  She was a member of the Inner Circle.

541.    Defendant Nicki Clyne resides in Brooklyn, New York.  Clyne worked directly with Raniere to create and run DOS. Within the DOS structure, Clyne was a First Line Master and Jane Doe 8 was a "slave" in her line.  She was a member of the Inner Circle.

542.    Defendant NXIVM Corporation is a corporation organized and existing under the laws of the state of Delaware with a principal place of business in Albany, New York.  NXIVM Corporation was one of as many as one-hundred legal entities set up by various Defendants to function as instrumentalities through which to carry out unlawful acts in furtherance of the Enterprise, Venture and conspiracy described and defined herein.

543.    Defendant Executive Success Programs, Inc. is a corporation organized and existing under the laws of the state of Nevada with a principal place of business in Albany, New York  ESP was one of as many as one-hundred legal entities set up by various Defendants to function as instrumentalities through which to carry out unlawful acts in furtherance of the Enterprise, Venture and conspiracy described and defined herein.

544.    Defendant Ethical Science Foundation is a Section 501(c)(3) exempt private foundation founded and funded by Clare Bronfman and Sara Bronfman as an instrumentality through which to carry out unlawful acts in furtherance of the Enterprise, Venture and

{00207518 }

conspiracy described and defined herein.  ESF was the funding vehicle for NXIVM/ESP projects, with its principal place of business in Clifton Park, New York.  Among these projects were dangerous medical experiments on human subjects without proper safeguards, oversight or informed consent.

545.    Defendants also used ESF to sponsor student visas for foreign nationals brought to the United States under false pretenses.  Many of these foreign nationals were put to work in other entities controlled by Defendants, including Rainbow Cultural Garden, and to provide labor and services to individual Defendants.

546.    In order to disguise these unlawful schemes, Defendants falsely recorded compensation paid to such foreign nationals as "scholarship" grants on ESF's books, and at times Defendants coerced foreign nationals into providing labor and services without compensation, or required them to pay back or forfeit compensation, knowing that such persons would not complain or leave, out of fear of retaliation, including being arrested due to their compromised or lost immigration status.

547.    Defendant First Principles ("First Principles") is a corporation organized and existing under the laws of the state of Delaware with a principal place of business in Albany, New York.  Ostensibly created by Defendants to hold and administer intellectual property rights, First Principles was an instrumentality by which Defendants moved funds among and between various other NXIVM-related entities, and through which Defendants channeled funds to be held in various accounts and used for Raniere's benefit.

## JURISDICTION AND VENUE

548.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of the United States, including 18 U.S.C. §

{00207518 }

89

1595 and 18 U.S.C. § 1964. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1337.

549.    Venue is proper in this Judicial District pursuant 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including without limitation recruitment of residents of this District to (among other groups) DOS and The Source, and that some of the Plaintiffs and Defendants reside in this District. Defendants also knowingly and purposely availed themselves of and made use of airports within this District as part of the course of conduct at issue in this action, including the transport of foreign nationals to the Albany area, where Defendants conspired to, attempted to, and committed racketeering acts of peonage, forced labor, document servitude, and sex trafficking against such foreign nationals.

550.    Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3), insofar as Defendants Raniere, Mack, Clare Bronfman, Lauren Salzman and Nancy Salzman are presently subject to the personal jurisdiction of this Court and Defendant Raniere currently is in custody of the Federal Bureau of Prisons at the Metropolitan Detention Center in Brooklyn, New York, all with respect to the same matters that are the subject of this Complaint.

551.    Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965, insofar as Defendants Raniere, Mack, Clare Bronfman, Lauren Salzman and Nancy Salzman are presently subject to the personal jurisdiction of this Court and Defendant Raniere currently is in custody of the Federal Bureau of Prisons at the Metropolitan Detention Center in Brooklyn, New York, all with respect to the same matters that are the subject of this Complaint.

{00207518 }

**STATEMENT OF FACTS**

**NXIVM**

552.    NXIVM is the brainchild of Defendants Keith Raniere and Nancy Salzman.  Prior to forming NXIVM in 1998, Raniere's background was in multilevel marketing, through a company he owned named Consumers Buyline, Inc. ("CBI").  In the mid-1990s, CBI was investigated as an unlawful pyramid scheme by 25 attorneys general. CBI was ultimately shut down in 1996 by the attorney general of New York.  As part of his settlement with the state, Raniere consented to an order barring him from ever running another chain distribution scheme in the State of New York.

553.    Multilevel marketing, often referred to as pyramid schemes, uses manipulative techniques to suppress doubt and increase acceptance of the marketer's false representations of reality.  Promoters of these schemes are masters in the use of hyperbole to recruit people and keep them highly motivated to continue participating, often long after it would be apparent to a neutral observer that the participants were not achieving anything close to expected returns on their investments of money and time.

554.    Such organizations typically have a small number of "producers" – persons held out as achieving high income levels – who are offered as confirmation that participation can be profitable and as motivation to work hard toward that goal.  The presence of successful producers also generates excitement, enhancing group dynamics and recruitment of new participants, the lifeblood of multilevel marketing.  Without continuous recruitment, the pyramid is unsustainable.

555.    Raniere understood this.  Pyramid promoters, like all con artists, tailor their

misrepresentations to make them plausible to the target audience.  However, unlike the typical

con involving intense planning to accomplish one transaction, pyramids plan to operate over long

periods of time.  Consequently, pyramid promoters learn how to recruit new members to pursue

ever more elusive goals, while retaining existing members with the belief that they are making

progress.

556.    Raniere honed his skills at CBI, and when that was shut down, he turned his

attention to the so-called "human potential movement," an area he considered ripe for application

of these skills.  He studied similar schemes to learn how their perpetrators recruited and gained

control over people, and how they eventually convinced people to part with their money,

disconnect from their families and friends, and devote their lives to the perpetrators and their

organizations.

557.    In the late 1990s, Raniere met Nancy Salzman, a nurse who claimed to have

previously practiced psychotherapy, but whose actual background was in alternative

psychological therapies such as neurolinguistic programming, a widely discredited form of

psychotherapy, but which was used as a behavior modification technique by NIXVM and the

Defendants to control members.  At the time, Nancy Salzman was running motivational

programs.  Together, they founded NXIVM/ESP in 1998.

**Rational Inquiry – Creation and Fraudulent Marketing**

558.    Raniere and Nancy Salzman collaborated in the creation of what they called

"Rational Inquiry," a synthesis of psychotherapy and the teachings, methods and practices of the

human potential movement groups that Raniere had studied.

559.    Rational Inquiry used verbal and behavioral methods of intervention in

interpersonal relationships to modify attitudes, thinking, effects, and behaviors which NXIVM

taught were intellectually, socially, and emotionally maladaptive.  NXIVM taught that the root causes of even physical illnesses and psychiatric disorders were these supposedly maladaptive traits, and that therefore NXIVM's methods could cure medical conditions.

560.    Raniere and Nancy Salzman falsely claimed that Rational Inquiry was scientific – that it was based on science, were empirically measurable, and could be consistently replicated. They referred to Rational Inquiry as "technology" or "tech."

561.    In order to create and advance the illusion that Rational Inquiry was scientific, they also falsely claimed that it was "patent-pending," when, in fact, Raniere's patent applications for Rational Inquiry had been repeatedly rejected worldwide, because, among other things, Raniere's claims were found to have been unoriginal, unscientific, incapable of empirical measurement, and incapable of consistent replication.

562.    Among the reasons why Rational Inquiry was considered unoriginal is that it was merely an adaptation of cognitive behavioral therapy and other psychotherapeutic methods that were well-documented in the existing literature, with changes in nomenclature invented by Raniere to give it the sound of something new and different.

563.    Additionally, Rational Inquiry was not eligible for patent protection, because it was designed to cause mental, emotional, and behavioral changes, which are inherently subjective and not "inventions" under applicable patent laws.  In a desperate attempt to keep his bogus patent applications alive, at some point Raniere added the incorporation and use of computers and electronic interfaces to apply the methods of Rational Inquiry.  This did not advance his application in any country.

564.    The claim that Rational Inquiry was "patent-pending" was a false, misleading, deceptive statement that was intended to, and did, induce, entice, and persuade people to spend

{00207518 }

93

vast sums of money to unwittingly subject themselves to unlicensed and risky psychotherapy performed by untrained practitioners, in order to be cured of non-existent maladies that were supposedly the root cause of all their troubles and suffering.  Thousands of people were bilked out of substantial sums of money in the process – leading in many cases, to financial devastation, impoverishment, and bankruptcy.

565.    The NXIVM sales pitch also claimed that Raniere was the "world's smartest man," a person with an astonishing IQ of 240, who was also the world's greatest humanitarian and ethicist.  Defendants presented him as the genius who generated the conceptual foundations of ESP, the corporate entity through which Rational Inquiry was promoted, sold, and applied to individuals who enrolled in its programs.

566.    Compounding the fraud, Defendants also promoted Raniere as a virtual ascetic, a monk-like figure who had no wants, needs or attachments to material things, an extraordinarily disciplined man who practiced celibacy, spent most of his time in contemplation, and owned no possessions or wealth of any kind.

567.    Raniere was such a humanitarian, claimed the Defendants, that he had given away all his intellectual property rights in ESP's curriculum to a related entity, Defendant First Principles, which administered those rights and, perhaps, any licensing fees generated by them. Upon information and belief, First Principles is a related entity to NXIVM/ESP and is part of the Enterprise described herein. First Principles, Inc. is a Delaware Corporation in which Raniere had a 10% interest in the assets, proceeds, and property and from which he received royalties.[12]

568.    In fact, no consequential decisions were ever made by anyone in the Enterprise without consulting and obtaining approval from Raniere, who directed the management and

---

[12] U.S. v. Raniere et al., ECF 794, filed 09/09/19.

{00207518 }

operation of ESP and all other NXIVM-related entities from the comfort of his home, out of sight but never out of the minds of the many students who became ensnared in ESP's web.

569.    Even the sales pitch for ESP courses was formalized by Raniere.  As Mark Vicente testified at the criminal trial of Raniere, "at a certain point, Raniere made the decision that he would try and formalize the pitch . . . like he would do the different tricks to try to show the audience, you know, this is how you do it. **Q.** And the defendant taught that pitch? **A.** Yes, he did."[13]

### **Rational Inquiry – The Courses**

570.    Rational Inquiry presupposed that most people suffered from mental, nervous, emotional, and behavioral dysfunctions or disorders resulting from what Raniere calls "dis-integrations."  According to Raniere, only through systematic immersion in and application of the methods of Rational Inquiry could a person be cured of those dis-integrations, become "integrated," and thus heal or overcome their mental, nervous, emotional, and behavioral dysfunctions or disorders.

571.    Rational Inquiry's "integration" process was identical to the reframing that occurred as a result of cognitive behavioral therapy, which, in fact, Rational Inquiry applied to its subjects.  Defendants never disclosed to ESP students that they were being subjected to psychotherapy, let alone unlicensed psychotherapy.

572.    The students were also taught to apply NXIVM's methods to one another, a fundamental aspect of Defendants' effort to systematically subdue and achieve increasing levels of control over their subjects.

573.    The control that Defendants desired could not be obtained through casual

---

[13] May 9, 2019, p. 620.

{00207518 }

exposure.  Thus, Rational Inquiry was taught largely through "intensives;" classes of five to sixteen consecutive and grueling fourteen-hour days.  Participants were confined to a classroom in which lectures were given and individual and group exercises undertaken.

574.   Recruitment was based upon personal pitches by existing participants to people they knew and others with whom they might have had connections.  Prospective new participants were invited to a session where more seasoned recruiters would run through a sales pitch scripted by Raniere.

575.   To enroll in these courses, prospective students had to first complete an application.   Upon arrival, each enrollee then had to complete a number of forms and questionnaires, some of which elicited deeply personal information about the students' aspirations, fears, and self-perceived problems. Defendants falsely represented that they were simply gathering data that would be used to empirically measure the effectiveness of the program.

576.   Prior to commencing the intensive, recruits were required to complete a "Program Goal Sheet," "Personal Emotions Inventory," and "Opinion Questionnaire." This intake packet elicited information on the participant's goals; intense, high, low, positive and negative emotional responses and the situations that elicited the responses; situations that made them healthy or unhealthy and why; positive and negative relationships; wealth and career experiences; and their views on competition/free market, socialism, science, religion, having children, wealth, pay scales, charities, and theft.

577.   This exercise, which required thoughtful reflection on and scrutiny of one's goals, experiences, emotional responses, and opinions, elicited highly personal information and primed participants to be receptive to the content of the intensives, because each question had a

corresponding module that provided an ESP-approved explanation of the alleged root causes of participants' problems and how the ESP "tech" could resolve them.

578.    In the initial paperwork process, mental health professionals were filtered out – because they would be qualified to recognize and understand that what was taking place was the unauthorized practice of something that took them years to learn and a professional license to undertake: mental health counseling, psychology, and psychoanalysis.  This was a deliberate act of concealment by the Defendants.

579.    Additionally, students were forbidden from seeing therapists or undertaking any form of outside psychotherapy.  Students were admonished if Raniere or other NXIVM leaders found out they were contemplating seeking any form of therapy, or even taking meditation lessons.  Students were required to exclusively apply NXIVM's "tech" to resolve all of their emotional, psychological, psychiatric, and behavioral problems, no matter how deeply rooted or severe they may have been.

580.    Furthering the concealment, enrollees were also required to sign confidentiality agreements asserting that the courses contained proprietary trade secrets or assets acquired at great time and expense, supporting the false representation that the courses were original and valuable, while also reinforcing the secrecy surrounding the curriculum. Defendants also sued students and others who obtained copies of curriculum materials and posted them online.

581.    NXIVM intensives cost thousands of dollars.  They were led by persons who had achieved the rank of "Proctor," assisted by those who had attained the lower rank of "Coach." Live presentations and individual and group exercises were interspersed with videotaped presentations by Raniere and Nancy Salzman.

582.    Intensives were composed of "modules," and every aspect of modules and

intensives was highly orchestrated and taught at a pace that allowed for no self-reflection or evaluation.  At the end of these fourteen-hour days, students would go home exhausted and depleted, and even if they were inclined to recount their experiences and seek input from friends or loved ones, they could not under the terms of the confidentiality agreement.

583.    Participants were also taught that disclosing concepts or materials would be equivalent to theft, because the recipient would get value without compensating the authors of the concepts and materials for the benefit they received. This inflated what Defendants presented as the value of the program and resulted in the stricture that disclosure of what students were learning and experiencing was dishonorable and unethical.

584.    Prior to the opening of additional centers, the 16-day intensive was only available in Albany.  Members who did not live in the area had to travel there and either slept in the houses of other members or at hotels in the vicinity of NXIVM's center. They had no outside contact for the duration of these intensives.  Advanced curriculum or "Level 2," 8-day intensives were taught in Albany.  Additionally, "Coach Summits" were also held every quarter in Albany, with one immediately following V-week every year. Thus, students who wished to advance on the Stripe Path periodically traveled to Albany at personal expense to receive these teachings.

585.    Raniere and Nancy Salzman later began offering ESP-branded and related programs and seminars under the umbrella of NXIVM Corporation.  As Defendants spawned new programs, they frequently created new companies to offer them, some of which were legal entities, some of which were not.  Corporate formalities were typically disregarded, in large part because the ever-expanding universe of companies was merely a growing set of interchangeable instrumentalities through which Defendants could move funds, sponsor visas, and perpetrate the wrongdoing set forth herein.

{00207518 }

586.    NXIVM's programs shared features with other multi-level marketing pyramid schemes, with Raniere and Nancy Salzman at the top. Membership in NXIVM was by invitation only, with new members recruited through word of mouth. Recruits were initially provided with only limited introductory information about NXIVM in order to identify recruits who seemed open to NXIVM, while weeding out potential skeptics.

587.    For example, the introductory 5-day intensive "ESP program," which cost up to $3,000, was essentially a recruitment tool designed primarily to sell a follow-up 11-day intensive that cost $7,500, with part of the sales pitch being that the 5-day intensive was actually just the first part of the 16-day program.

588.    The introductory 5-day intensive opened with a module entitled "Rules and Rituals."  Participants were introduced to the Stripe Path, which was presented as a career path, a supposedly "ethical" alternative to working within conventional businesses and institutions.

589.    The Stripe Path was so-called because NXIVM placed heavy emphasis on rank, and members wore colored sashes with stripes designating where they were situated in the hierarchy and how many members they had enrolled.  Participants were taught on the first day of their first intensive that, because people with higher rank were more accomplished in NXIVM's system, they always had to be honored.

590.    Photos of Raniere and Nancy Salzman were displayed in the meeting centers, and the hierarchy was reinforced through special handshakes, use of titles, and bowing or standing when members of a higher rank entered or departed a room.  This was justified by use of examples where uniforms, titles, and rituals were used, such as in a military or judicial system, and the recitation of ESP's Mission Statement was compared to the pledge of allegiance.

591.    Honoring, in the NXIVM system, meant deference, which in practice meant

{00207518 }

99

submission to all who had attained a higher rank than oneself.  Raniere – or "Vanguard" as the people in the ESP community were required to call him – was to be given absolute deference; students were required to completely and unquestioningly submit to his authority.  Failure to be appropriately submissive could and often did lead to devastating consequences.

592.    Raniere and his Inner Circle also frequently tested longstanding members of the community, sometimes with extreme demands like licking a mud puddle, running head-first into a tree, or becoming somebody's "slave."

593.    During a participant's first intensive, he or she was assigned a Coach with whom to speak regularly. Among other things, this enabled members who were already invested in the program to influence new recruits and pressure them into continued participation.

594.    This also systematized and normalized a means by which NXIVM's leadership could continually monitor the behavior, thoughts, and emotional experiences of each member of the community, which in turn enabled the leadership to enforce conformity with NXIVM's rules and norms.

595.    Participants were taught that people alter information in a way that is not consistent with reality.  Therefore, an individual's "internal representation" of the world is made up of information that has been distorted, deleted, synthesized, fabricated, or generalized.

596.    Participants were also taught that Rational Inquiry created a self-awareness that would cause discomfort and avoidance patterns, but that they should view this discomfort as an opportunity for growth and success. This preempted members who might have questioned their instinctively negative reactions to some of the more radical aspects of the teachings, while suggesting that feelings of resistance to this reframing of values were a positive sign that the member was about to break through a major limitation.

{00207518 }

100

597.    One of the key concepts introduced in Rational Inquiry was "at cause."  Raniere taught that being "at cause" was synonymous with taking responsibility for one's choices and their consequences.

598.    NXIVM students were taught that they alone were responsible for their emotions – they chose them and generated them because of vested interests or in order to manipulate and exert control over others.  This concept was employed to convince members who were unable to meet their individual goals or NXIVM commitments that they had failed to use the Rational Inquiry tools correctly, and that this failure was a consequence of their own choices.

599.    Because of their supposed failures, they were taught that they must immerse themselves even more deeply within the NXIVM system in order to succeed.  In cases where victims of abuse sought NXIVM's tools to deal with trauma, they were taught that victims of abuse were the real abusers. This teaching, reinforced through many intensive EM sessions, caused those victims to experience severe re-traumatization.

600.    At its peak, NXIVM offered programs at NXVIM-operated locations throughout North America, including the United States, Canada, and Mexico.

**The Stripe Path – The Illusion of Upward Mobility**

601.    NXIVM pressured current members to purchase additional intensives, recruit new members, and perform uncompensated "coaching" services for junior members, to unlock ever-increasing "goal levels" within NXIVM. The goal levels were supposed to correspond to increased levels of status, responsibility, and privilege within NXIVM, including the potential to earn substantial commissions on sales at the Proctor level. The level system, the Stripe Path, was enforced through colored sashes that NXIVM members wore around their necks to signify their rank within the organization.

{00207518 }

602.    All students were strongly encouraged from their first intensive to attain the rank of Coach.  Indeed, the only offered path to a career within NXIVM was to first become a Coach, and one could only become a Coach if she or he made a commitment to work the Stripe Path all the way to the rank of Proctor.

603.    To earn the rank of Coach, students participated in a screening process; they had to apply, participate in an unpaid "internship," and recruit three new students, all within 6 months.  To become a Proctor, they had to facilitate inquiries, provide coaching to members assigned to them, and work on committees, for a minimum of 10 hours per week without pay, until they were awarded the rank of Proctor, which they were falsely told would take 9-24 months.

604.    In fact, some students became Coaches without completing the requisite curriculum, so long as they had recruited enough new students.  All along the Stripe Path, recruitment was a far more significant contributor to advancement than was successful completion of the curriculum.

605.    Participants were taught the process of "scripting" in the very first module of the very first intensive.  "Scripting," as taught by NXIVM, meant creating a script for recruitment. On day 2, the lesson on scripting was reinforced with exercises that instructed participants on building excitement, appearing enthusiastic, and establishing rapport.

606.    In a community that placed a high value on rank, rewarding recruiters with promotions incentivized people to devote time and energy to the task.  Another incentive offered to recruiters was the ability to earn credits that could be applied to expensive curriculum courses and programs.

607.    Unlike recruitment, completing curriculum was rarely rewarded, if ever, despite

{00207518 }

students being told they needed to take Rational Inquiry (49 modules) three times and certain other intensives more than once or twice to advance.  Yet continually, new modules were introduced, new courses and intensives were added, and there was no end – no student ever did or could complete the NXIVM program.

608.     To a member immersed in the Stripe Path, the program generated an appearance of progress and the sense that one was overcoming obstacles and "integrating," but it was all a scheme to get people to keep spending money on NXIVM courses forever.  No one graduated, no one ever achieved their initially stated goals or objectives,[14] and no one ever became an executive or a success as a result of NXIVM's teaching.

### The Process of Becoming Indentured to Raniere and the Inner Circle

609.     NXIVM's program content and internal culture were designed to foster complete devotion and obedience to Raniere.  Nxians (as they were called) were expected to refer to Raniere as "Vanguard," pay "tribute" to him, and to attend an annual  "Vanguard Week" ("V-Week") celebrating Raniere's birthday, which was held every August in Silver Bay, New York.

610.     Raniere also had his "Inner Circle" of advisors, all highly placed on the Stripe Path with most of the NXIVM membership subservient to them.  As Lauren Salzman testified in the criminal trial of Raniere:

> **Q:** . . . did the defendant have a special relationship of trust with certain individuals?
> **A:** Yes.
> **Q:** Did the defendant rely on those individuals to run organizations he created, like NXIVM or DOS?
> **A:** Yes.
>      . . . . .
> **Q:** And at times was this group referred to as the "inner circle"?

---

[14] In fact, members were trained to reevaluate the goals with which they entered the program and replace those "shallow" goals that could never bring them happiness with NXIVM goals—achieving "integration" to help create a more ethical society.

{00207518 }

**A:** Yes.

. . . . .

**Q:** Miss Salzman, what distinguishes the members of [the inner circle] from others in the NXIVM community?

**A:** I think their relationship with Keith, their belief in him, and their commitment to him and to helping him and his objectives.[15]

611.    Members were also taught to consider the exchange of money as a form of trust and tribute, and that they should therefore make a conscious effort to feel good about giving money, the product of their honest efforts, for something worthy of it.  Since Rational Inquiry was the toolkit members needed to achieve their goals and create a more ethical society, they would get the most value for their money if they spent it on the NXIVM curriculum.

612.    NXIVM also pressured members to purchase classes they could not afford, and many members incurred substantial personal debt to continue purchasing courses in hopes of climbing within the ranks of NXIVM.  Members also became indebted to NXIVM, other NXIVM-related entities, and to persons including Individual Defendants, and were induced to take additional courses and intensives that they were told they could pay for through an otherwise uncompensated labor "exchange," which was claimed to be an "ethical" transaction in the NXIVM world.

613.    NXIVM members who could no longer afford to pay cash or accrue more debt to pay for courses, or to pay off their mounting debts to NXIVM, were pressured into performing labor for NXIVM and providing personal services for the Individual Defendants and for other NXIVM members.  In these "exchanges," members' labors were devalued, regardless of their skills, and/or they were assigned menial tasks, in exchange for which they were credited a small hourly rate toward the cost of their intensives, or perhaps paid a nominal amount of money on

---

[15] May 17, 2019, pp. 1564, 1571.

which they were expected to live.

614.    Members accepted these conditions of employment, because they were taught in the first 5-day intensive that only actions that produce tangible results can be classified as work and actions that do not are merely "virtual work."

615.    The concept of "slavery" was also defined by NXIVM as the right to the product of someone's efforts.  Applied to Rational Inquiry, however, because members were allegedly getting something of extraordinary value, the free labor they provided to NXIVM was not considered slavery.

616.    NXIVM also introduced levels of value, purportedly to ensure that members placed appropriate values on the services they provided and to ensure a fair exchange.  In fact, this system undervalued members' labor and put higher levels of value out of members' reach by describing them in abstract terms, with the result that members would be unable to participate in profit sharing or earn commissions.

617.    NXIVM also instructed that anyone who did not produce value was a "Parasite," coercing members into providing their labor for fear of being characterized as a Parasite and being excommunicated.  By characterizing complaints as suffering, and suffering as attention-seeking behavior, NXIVM discouraged criticism of the NXIVM-taught concepts and decisions by individuals of higher ranks.

618.    Criticism was also discouraged through the concept of "speaking with honor." Members were taught that it was unethical and immoral to speak about other another person in his or her absence, because he or she was unable to defend him or herself to a speaker who had the potential to impact the way the audience perceived the absent person.

619.    Concern with the success, or lack thereof, of another was labelled as a suppressive

{00207518 }

105

tendency and EMs were recommended to members who had such tendencies.  Members were taught that blame was avoidance of responsibility and an attempt to be a victim, and that the inability to resolve conflict was a result of failing to consider information and understand the issue.

620.    Effectively, when members challenged Raniere and high-ranking members directly, this gave the latter the opportunity to rationalize or justify the actions being challenged, label the criticism a dis-integration, and prescribe additional curriculum or punishment for the member in a fashion that discouraged any future challenges.

621.    Due to the high cost of the courses and the constant pressure to take more classes and achieve higher goal levels in the program, many members became stuck in a cycle of indebtedness and personal servitude to NXIVM and the Individual Defendants.  The pressure to conform within this system was intense, and complaining or questioning resulted in social ostracism, the very real threat of being shunned from what had become the only community these members had, and in EMs to fix a "fear" of being broke or "pride." Pride was considered a dangerous, destructive force that had to be controlled at all cost.  Ostracism and potential shunning also caused members to fear losing their positions in the Stripe Path, which would mean losing the ability to earn money and cover living expenses.

622.    When a member was in "breach," other members would approach her or him to offer "feedback," which members were taught to think of as helpful critique, not understanding that as a function of the overall NXIVM system, feedback was an abusive technique, diminishing self-esteem and eroding self-confidence.  "Feedback" as practiced in the NXIVM system reinforced the constant message that one was a failure, that any "breach" was his or her fault, that if he or she failed it could imperil the community, and that he or she had to heal this

"breach," no matter what it took or the personal cost, because the only other option was to leave. The very thought of leaving crippled members with unfathomable shame, along with the very real fear that he or she would be permanently cut off from the community that he or she had likely devoted years to becoming part of, in which he or she had made a significant financial investment, and on which he or she was dependent to earn a living.

### Programs for Defined Sub-Groups

623.    In addition to ESP, NXIVM offered specialized programs, targeted at specific subgroups of NXIVM's membership, through a variety of NXIVM-affiliated companies.[16] Indeed, in her testimony at the criminal trial of Raniere, Lauren Salzman described two of them—Jness and Society of Protectors ("SOP") (see below)— as "within our NXIVM umbrella."[17]  These affiliated programs drew from the ESP curriculum and Rational Inquiry concepts.

### JNESS – Paving the Way for the Subjugation of Women

624.    Jness was a program created and headed by Defendant Raniere, along with several co-conspirators, for women, and with a curriculum focused subjugating women.  For example, members were led to examine their relationships and conclude that they women entered relationships because of a dependency on another person, and that they had been imposing unwritten contracts on the relationship because of their inner deficiencies. This led members to terminate their personal relationships in attempts to seek independence/rid themselves of supposed dependencies.

625.    Some of the other teachings of Jness included: (i) that a women's expectation of

---

[16] http://www.nxivm.com/companies/
[17] May 20, 2019, p. 1649.

{00207518 }

equal pay was untenable, because it cost businesses money to train new employees when women quit their jobs to have children and because women could rely on their husbands to provide for them; (ii) that women did not have to compete for work because they could rely on their partners or families for support, whereas men would be criticized for doing so; (iii) that men should be paid to do men's jobs, women paid to do women's jobs, and that these gendered jobs were not interchangeable; and (iv) women were not entitled to equal rights, because women were protected and sheltered from the consequences of their actions by men.

626.   The stated purpose of these teachings was to understand the underpinnings of the reality women and men face in order to transcend it.  These teachings were intentionally justified by comparisons to male and female roles in primitive times to make the contents appear to be science based.

627.   Ultimately, the curriculum lowered women's self-esteem, created distrust in relationships, and legitimized polygamy and abusive conduct by men.

628.   For example, one member began believing that her partner wanted to have sex with other women but did not want to tell her the truth because he was protecting her.  Raniere eroded resistance to these ideas by acknowledging that there were injustices to women, but that considerations of equal treatment for women were outweighed by the injustices suffered by men.

629.   Additionally, the content about women's jobs and the pay they deserved served to enable the Defendants to obtain unpaid work from women.

630.   Women were taught, in expensive 8-day intensives, that they were inferior, dishonest, untrustworthy, and genetically and evolutionarily predisposed to subservient roles.  In this warped natural order, women were monogamous while men, by nature's design, were polygamous.  This led to domestic abuse, destroyed marriages and relationships, and a

{00207518 }
108

community in which women were particularly traumatized.

631.     The subjugation of women in the NXIVM community served another purpose for Raniere: it prepared select women to be groomed as his sexual partners and Raniere reserved his cruelest punishments for any woman who, after being manipulated into a relationship with him, wanted to end it.

632.     For example, with the assistance of other Defendants, Raniere's response to Plaintiff Jane Doe 1 telling him that she no longer wanted to have sex with him was to subject her to several years of harassment and abuse, after which she was confined to a room for nearly two more years with virtually no human contact and threatened with losing contact with her family if she escaped.  In fact, when she finally did leave that room after becoming suicidal, she was driven to the Mexican border in Texas, sent across with almost no money and no identity papers, and cut off from all contact with her family for years.

633.     In another example, Raniere "tested" Jane Doe 18's unquestioning fealty by instructing her to lick a mud puddle and to run face first into a tree.  When Jane Doe 18 "failed" the test by not smashing her face into a tree, Raniere instructed her to restrict her food intake to 800 calories per day.  She informed Raniere that she had low blood sugar issues, and that because he had her working 20 hours per day, she needed her strength and thus could not so severely restrict her caloric intake.  Later, Raniere asked Jane Doe 18 to go for a walk with him. She had not eaten in some time and informed Raniere that she needed to eat before meeting him. When she showed up at the meeting point, Raniere berated her, saying that she should have skipped the meal, met him when he demanded, and if the lack of food weakened her, then, he said, she should have let herself "pass out."

### Society of Protectors

{00207518 }

634.    The Society of Protectors (or "SOP") program, founded by Raniere, promoted men and masculinity.  SOP taught that masculinity, power, and aggression were positive traits.

635.    Men, SOP taught, inherited a code of conduct at birth.  According to these teachings, men were taught restraint and to think about the consequences of their actions from childhood, making men inherently honorable and ethical.

636.    SOP was a bootcamp that purported to build character through taking responsibility and confronting adversity.  This concept was also linked to members' commitments to SOP and ESP such that breaking a commitment for any reason signified a lack of character.  SOP was framed as NXIVM's equivalent to joining the military, requiring members to submit to abusive tactics to supposedly teach them to work harder to become more "noble."  This involved doing penances, disciplines, and readiness drills that would build character.

637.    These exercises broke participants down and distorted their perceptions of healthy masculinity.  SOP instilled in men the belief that they must follow orders from higher ranking individuals without hesitation or question.  Raniere was never questioned.  SOP members referred to him as "Big Dog," followed his commands, and accepted his decisions and explanations on all matters.

638.    Raniere and his co-Defendants also created "Society of Protectors Complete," which was an arm of SOP aimed at women.  This group was also referred to in military terms, with women told they would be training to become NXIVM's "navy seals," a pretext used by Raniere and others to subject them to ridicule, humiliation and dehumanizing experiences that the women were told were necessary to toughen them up and help them overcome inherent weaknesses in the female character.

{00207518 }

## One Asian

639.    Raniere also created a group just for women of East Asian heritage, called "One Asian."  He and others working under his direction recruited several women as leaders, including Jane Doe 28, all chosen because, in addition to their leadership potential, and unknown to the women, they met Raniere's criteria for potentially suitable sexual partners.  The women traveled to the Albany area to meet one-on-one with Raniere, who subsequently offered to help them create a new company and be their mentor.  They agreed and, ultimately, over one-hundred women of Asian heritage were recruited to this "women's empowerment" group, including Jane Doe 31 and Jane Doe 39.

640.    One Asian offered a special curriculum that Raniere tailored to what he characterized as women raised with more "masculine values" than Western women.  According to Raniere, this combination of female genetics and "masculine attributes," such as discipline and self-denial, made them virtually "perfect humans," who needed special adjustments to the ESP curriculum to maximize the benefit.

641.    One of the women selected by Raniere to lead One Asian was Jane Doe 28.  After she agreed to lead One Asian, Jane Doe 28 was frequently summoned to Albany for meetings with Raniere.  Often, she would have to wait until late at night for Raniere, with their meetings not starting until 1 or 2 a.m. and continuing for hours.  Raniere began to require Jane Doe 28 to call him every day.  When she traveled to Albany, Raniere would greet her with kisses on the lips and would try to hold her hand during business meetings.  Raniere pressured her to move to Albany so they could begin a romantic relationship.  Members of Raniere's inner circle also pressured Jane Doe 28 to move to Albany to be closer to Raniere.  Clare Bronfman took Jane

{00207518 }

Doe 28 on walks, once telling her that Jane Doe 28's biggest obstacle in life was that she had "too many options," and that moving to Albany and working more closely with Raniere would help her focus on her growth.  On one visit, Defendant Loreta Garza delivered orchids to Jane Doe 28 from Raniere, a reference to a personal essay Jane Doe 28 had written in tribute to her grandmother that, Raniere said, brought him to tears.  When Jane Doe 28 traveled to Albany, she would frequently stay at the home of Defendant Allison Mack, who on one occasion commented to her that sex was "no big deal," and that it was "just like playing tennis."

642.    Eventually, the mounting pressure to move to Albany became overwhelming, and Jane Doe 28 decided she could not continue meeting with Raniere and members of his inner circle and resigned from One Asian.  Approximately six months later, Jane Doe 28 left NXIVM altogether.  Around the same time, One Asian ceased operations.

## TEN C

643.    Raniere, along with Defendants Nancy Salzman, Allison Mack and Nicky Clyne, created another group called "TEN C," which was aimed at procuring young women from college sororities for Raniere.  The young women were promised opportunities to build character through NXIVM curriculum and programs, and to develop a sisterhood or sorority of women in their age group within NXIVM, mentored by Mack, Clyne, and Raniere.  The Defendants also offered these female students jobs working at a t-shirt company, which was owned by Raniere and Clare Bronfman (an offer also made later to persuade at least one DOS recruit to move to Albany in order to be closer to Raniere).  Privately, with sexual partners, Raniere referred to himself as "TEN C," which stood for "The Emperor has No Clothes."  Ultimately, this effort to procure young women for Raniere failed.  Subsequently, Mack and Clyne created and ran DOS with Raniere.

{00207518 }

## The Conducting of Unlicensed Psychotherapy

644.    Among other things, the NXIVM curriculum taught that the principal means of overcoming "dis-integrations" was through "Exploration of Meaning" sessions ("EMs"), the NXIVM code word for individual psychotherapy.  Like everything else in NXIVM, EMs were expensive, costing hundreds of dollars.

645.    Persons who conducted EMs were called EM Practitioners, or EMPs, although students also gave EMs to each other in order to become EMPs, and to work on their own "issues."

646.    One's "issue," as identified in an EM session, was supposedly a root psychological cause of her or his mental, nervous, emotional and behavioral dysfunctions or disorders.  In an EM session, the subject was asked seemingly open-ended questions and encouraged to find the answers through free association.

647.    Often, the EMP aimed to facilitate the uncovering and disclosure of some past trauma and connect it to a contemporaneous emotional experience.  Rather than help the subject explore and process the trauma, however, the EMP would encourage the subject to disconnect the emotion from the trauma.

648.    As the session progressed, the EMP would plumb the depths of the subject's psyche, until identifying an "issue."  Common issues were fear, pride, and anger.

649.    Members of the NXIVM community believed these sessions would benefit them, but in fact EMs had little to do with mental health and everything to do with rendering participants increasingly dependent upon NXIVM and its leadership for all aspects of their lives.

650.    In the EMs, a subject was taught to always be open and compliant, even if that

{00207518 }

meant revealing his or her innermost secrets, fears, and shames.  All of this was recorded by the EMP for use in later sessions, and for use by other high-ranking people in NXIVM for other purposes, including persuading people that they needed to take additional intensives lest they be hung up on their issue forever.

651.    EMPs used EMs as a means of control and even punishment.  Knowing deeply personal, intimate details of a person's inner life allowed the EMPs to manipulate the subject with devastating effects.

652.    In true psychotherapy, the relationship between subject and psychotherapist is cooperative and based on trust.  Over time, a subject might become dependent on a therapist. As a result, the psychotherapy profession places a high premium on scrupulous ethics and objectivity.

653.    In contrast, EMPs hold high ranks within NXIVM, and thus the relationship between subject and EMP is based on deference.  The EMP's loyalty is to NXIVM and is unconstrained by ethical obligations to the subject.

654.    Also, unlike a true psychotherapist, the EMP is an absolute authority figure to his subject, and abuse of this power differential was easily and frequently accomplished.  In fact, abuse of power is a known risk in legitimate psychotherapy and is a reason why licensed practitioners must satisfy strict educational and in-service requirements and remain subject to stringent ethical rules.

655.    Because the EM process was designed to steer a subject toward a pre-determined conclusion, the subject perceived that conclusion as his or her own discovery.  As a result, subjects never questioned their diagnoses, and continued to work on their issues.

656.    Developing a plan to resolve an issue was also required to become a Coach and

{00207518 }

therefore required to be on the Stripe Path.  Because this plan needed to be approved by the member's Coach and Proctor, it was subject to their manipulation.

657.    For example, a person who questioned authority might be led to conclude that his "issue" was pride, and that he should adopt behaviors and attitudes designed to "heal" this "ethical breach."  These behaviors might include resolving not to ask questions anymore, punishments, and additional EMs.  All of these actions would make him a "humbler person," but in actuality made him more deferential to his superiors in NXIVM/ESP.

658.    In the same way, a person who voiced concern or complaints about the high cost of intensives, perhaps by saying she could not afford them, would be told that her issue was "fear." An EMP might tell this individual that the only way to overcome this fear would be to face it – by emptying her bank accounts, going deeper into debt, and agreeing to work on an "exchange" for more curriculum. If the subject questioned the EMP, she was told that her need for information was an "attachment" and part of her issue.

659.    That a person was working on an issue was not a secret.  Unlike the confidentiality that is mandated ethically in true psychotherapy, EMPs talked, Coaches talked, Proctors talked, and virtually everyone knew what a person's issues were.

660.    This resulted in immense peer pressure, as community members often criticized one another for failing to work hard enough on an issue, characterizing such a failure as a detriment to the community.

661.    A person was deemed a failure for experiencing a problem, voicing a concern, or even suffering from an illness and that was attributable to that person's failure to work on an issue.

662.    Despite the promise of success working on issues like fear, pride, and anger,

nobody could really succeed.  Nobody was healed and nobody got better.  The deeper and longer someone was immersed in NXIVM's system, the more completely that person internalized the fundamental NXIVM-inculcated notion that he or she was broken due to his or her own failings, and that all of his or her problems were self-generated.

663.    Failure exacerbated guilt because failure to work on an issue brought the entire community down and jeopardized the whole NXIVM mission. This lowered the "failure's" self-esteem. The only hope for this a person became complete immersion in the NXIVM system, to work on the issue harder, take intensives, join every group, participate in every program, and live the NXIVM experience all day every day.

664.    Nowhere was this complete immersion possible except in the Albany, New York area, where NXIVM was based and where hundreds of members resided, including most of high rank and Raniere's Inner Circle and harem. Visits to Albany were required for someone to progress within NXIVM, because certain events and programs only occurred there, and opportunities to interface with Raniere and the other high-ranking members were much more likely. Raniere insured that the location was insular and hidden, so that it would be difficult for any member to leave.

665.    Students eventually reached a point along the Stripe Path where their progress slowed or stalled, and for those who were determined to succeed, relocating to Albany was the next logical step.  To someone who had been immersed in the NXIVM system for several years, it was the only step, because NXIVM's system eliminated choice, creating an appearance of autonomous persons exercising free-will, when in fact those persons' reality was increasingly bounded and constrained.

### The Bronfman Sisters Join NXIVM

{00207518 }

666.    In 2001, Defendant Sara Bronfman, then 25, the daughter of Canadian billionaire Edgar Bronfman, Sr. and heiress to the Seagram's fortune, was introduced to NXIVM by a family friend.  Sara quickly became sold on the program.

667.    In time, she urged Defendant Clare Bronfman, her younger sister, to become involved.  Clare attended her first sessions at the NXIVM branch in Monterrey, Mexico in 2004. Sara and Clare became committed followers and relocated to upstate New York to work as NXIVM trainers.

668.    The presence of two heiresses in the fold did not escape the notice of Raniere, and their ascent up the Stripe Path was rapid.  They became two of NXIVM's biggest funders, reportedly giving as much as $150 million.  This money was used for bogus experiments on NXIVM members, hiring investigators to dig up dirt on "enemies" including defectors, critics, former employees, and consultants (as well as federal judges presiding over the many legal proceedings spawned by Defendants), and terroristic legal campaigns.

669.    Sara Bronfman became a senior executive in ESP, and founded the company's VIP Programs, which were supposedly targeted towards "distinguished individuals" selected by Raniere.  She spent large sums of money from her fortune to promote and elevate Raniere and NXIVM as exemplars of humanitarianism and ethical living, one time spending at least $1 million to induce the Dalai Lama to speak at a NXIVM event.  That event was subsequently used to falsely promote Raniere and NXIVM as having been endorsed by the Dalai Lama. Eventually, she rose to become a member of the Executive Board of ESP and Director of Humanities, Regional Vice President, Professional Coach, and Head Trainer.

670.    Clare Bronfman rose to become NXIVM's Director of Operations and a member of its Executive Board.  She eventually took charge of the Enterprise's legal matters.  For

{00207518 }

117

example, Mark Vicente testified at the Raniere criminal trial that "Clare Bronfman told me that she was spending upward of $40,000 a month just on patenting things."[18]

671.    Mark Vicente also testified: "**Q.** Did Clare have access to the defendant, Clare Bronfman? **A.** She did. . . She also was – she ran the – what is termed the 'legal department.' She was also overseeing finances.  She was overseeing admin and accounting."[19]

### The Ethical Science Foundation – Unethical and Dangerous Experimentation on Human Subjects

672.    Facilitating their ascent up the Stripe Path, Sara and Clare Bronfman established two non-profits: first, the Ethical Culture Foundation, and subsequently the Ethical Science Foundation ("ESF"), an ostensibly charitable vehicle through which the sisters financed the Enterprise and various NXIVM ventures.

673.    For instance, Defendants used ESF to sponsor foreign nationals for educational "scholarships," so that they could get visas to come to the United States.  Many of these foreign nationals were then put to work in NXIVM's unlicensed, uncertified, unaccredited Rainbow Cultural Garden, operated by Sara Bronfman and Loretta Garza, thereby causing these foreign nationals to lose their student immigration status.  Sara Bronfman also opened Rainbow "schools" in other locations including London.  After the arrest of Raniere and her sister, Sara opened a new children's school and daycare center in France, employing NXIVM's Rainbow methods but under a different brand name.

674.    These practices placed unsuspecting foreigners in jeopardy of arrest and deportation if caught, making them highly dependent on NXIVM for their safety and sustenance. In this way, the Bronfmans obtained for NXIVM very low-cost labor with no taxes, because the

---

[18] May 9, 2019, pp. 601-02.
[19] May 9, 2019, p. 760.

{00207518 }

payments went on the books as scholarships.

675.     The Bronfmans also used ESF to provide funding for a series of medical experiments using Nxians as subjects, seeking among other things to prove Raniere's longstanding claim that the Rational Inquiry methods could be used to treat certain physical maladies.  Designed by Raniere and Nancy Salzman, these experiments were conducted and overseen by Defendant Brandon Porter, a former medical doctor whose license was revoked by New York State.

676.     Defendants Raniere and Clare Bronfman were advised by a person with experience in medical and human research that there were scientific protocols they were required to follow in their "studies," but they disregarded that advice.

677.     On April 24, 2018, the State of New York Department of Health, State Board for Professional Medical Conduct filed a Statement of Charges against Porter and subsequently conducted a yearlong investigation of Porter's work at NXIVM.  The Board issued its findings in an opinion issued on August 16, 2019.

678.     The Board found, among other things, that:

   a.  Between 2010-2017, as part of ESP, Porter performed human subject research on approximately 200 subjects participating in courses through ESP.

   b.  As part of the research, Porter used an EEG to record the subjects brain activity, galvanic skin resistance (GSR) to measure their physiological responses, and a video recorder to record their facial responses.  The claimed purpose of this exercise was to evaluate the subjects' brainwave and emotional responses to the ESP curriculum.

   c.  Between 2012-2017, as part of ESP, Porter performed human subject research on ten subjects diagnosed with Tourette's Syndrome.  Once again, he used EEG, GSR and a video recorder, this time to measure tic responses before and after EM sessions with Nancy Salzman.  The claimed purpose of this exercise was to look for improvement after the EM session.

d.   Similarly, between 2012-2017, as part of ESP, Porter performed human subject research on two subjects diagnosed with Obsessive-Compulsive Disorder.  Once again, he used EEG, GSR and a video recorder, this time to measure severity of OCD symptoms before and after EM sessions with Nancy Salzman.

e.   Between 2016 and August 2017, as part of NXIVM's Ethicist program, Porter performed human subject research (the "Human Fright Experiment") on approximately 40 subjects by showing them happy or inspirational and disturbing or graphically violent scenes from commercials, short films and movie clips.  These clips included a video depicting the actual murders and dismemberments of five women and movie scenes showing a gang rape and a racially motivated murder of an African American male.  Once again, Porter used the EEG, GSR and video recorder to record the subjects' brainwaves, physiological responses and facial expressions.

679.   The Board concluded that none of these studies followed established scientific or medical protocols, none were peer reviewed or published, and voluntary informed consent – the *sine qua non* for medical testing on human subjects – was not obtained.  There was never an official oversight body, even though one is required under the law for every experiment on human beings.

680.   The Board found that, by performing these studies, Porter was morally unfit to practice medicine, and they revoked his license to practice in the State of New York.

681.   Jane Doe 19 was subjected to the Human Fright Experiment, which haunts her still today.  In response to her screams, all Dr. Porter asked her was how the scenes made her feel.  Although she was obviously in distress, he had no concern for her well-being, matter-of-factly playing scene after scene of escalating violence, traumatizing Jane Doe 19 so severely that she could not speak.  Then he sent her on her way.

### Rainbow Cultural Garden

682.   Another project operated and financed by the Bronfman sisters as part of the Enterprise was Rainbow Cultural Garden ("RCG"), NXIVM's school and daycare for children,

{00207518 }

which was founded in 2006.  Like every other NXIVM program, RCG was promoted in sweeping superlatives, as "a revolutionary child development program promoting children's cultural, linguistic, emotional, physical and problem-solving potential."

683.    RCG provided children with seven foreign babysitters, who spoke to the children only in their native languages, Spanish, English, Mandarin, Arabic, Hindi, German, and Japanese.

684.    The seven babysitters watched each child alternatively for a total of about 90 hours per week, most of the child's waking hours.

685.    The babysitters were called Multi-Cultural Development Specialists ("MDS"), but RCG did not require them to have any background in teaching or child development, nor were they tested to determine their proficiency in their native language.  Nor did the Defendants provide any training. Most of the MDS were simply foreign recruits, brought to the United States under false pretenses and paid minimally for their labor.

686.    During the twelve or so years that RCG was in operation in the U.S., it was never licensed as a daycare provider.  The RCG "school" in Miami was shut down after authorities began inquiring into its lack of proper credentials.

687.    Defendant Loretta Garza ("Garza") ran RCG.  Garza, a Mexican national, had entered the U.S. on a visa specifically to work for Defendant ESF.  Instead, she became the titular head of RCG, responsible for its day-to-day operations, under the direction of Raniere and Sara Bronfman.  Garza instructed RCG employees to maintain multiple sets of books, which served two purposes: to hide the existence of foreign nationals working for RCG without the proper visas and to mask RCG's finances.

688.    Sara Bronfman's sister, Defendant Clare Bronfman, also funneled money to RCG

through ESF, which ensured that funds would be available to pay MDS workers.  At times, these funds were falsely designated on RCG's books as tuition payments for children.

## Defendants' Exploitation of Foreign Nationals

689.    Defendants repeatedly took advantage of the vulnerabilities of foreign nationals, whose entry into and immigration status while in the U.S. was conditioned upon their strict adherence to the terms of the visas granting them entry.

690.    In addition to the false representations made to MDS workers when they were recruited and sponsored to enter the U.S., Defendants intentionally compromised other NXIVM community members' immigration statuses, and took advantage of foreign nationals who had lost their status.

691.    For instance, as part of their scheme to entice foreign nationals to come to the U.S. to work for RCG, NXIVM offered B, a foreign national, a scholarship to attend school in the U.S.  Her student visa was sponsored by the non-profit ESF, which had been created and funded by Defendants Clare and Sara Bronfman.  Once in the U.S., B was told that in order to receive the tuition money to attend school, she would have to work as an MDS for RCG, under by Defendant Loretta Garza.  Although this violated the terms of her visa, B was already in the U.S., her child was enrolled in RCG, and she was able to attend college part-time.  However, B was concerned about violating the terms of her visa, which did not permit her to work, and she had believed her scholarship would pay for her to attend school full-time.  She discussed this with Defendants Garza and Clare Bronfman and expressed her desire to take more classes each semester, after which she was informed that she no longer had a job at RCG, and that she would no longer be eligible for the scholarship.  She was frightened; if she left the community, she would have no means to support herself and her child, and she would be at risk of retaliation by

{00207518 }

Defendants, who could report her to the authorities and cause her arrest and deportation.  She shared this concern, and Clare Bronfman offered her an alternative: B and her child would live in a house owned by Clare Bronfman and B would work for her as a "personal assistant."  The work was menial and the pay barely covered weekly groceries, but so long as she was compliant, Clare Bronfman kept her and her child invisible to the authorities.  Terrified of Defendants' well-known propensity for retribution, B accepted these terms and remained in Clare Bronfman's house and employ until Defendants' indictments and arrests made her feel safe enough to leave.

692.    John Doe 8 was a foreign national who lived and worked in the NXIVM community since his teens.  Defendants rarely compensated him for the innumerable hours he toiled at the various jobs they assigned to him.  Eventually he complained that he was unable to support himself and could not stay.  To convince him otherwise, Raniere offered him an "opportunity" to build his own company with Raniere as his mentor.  Clare Bronfman and Pamela Cafritz, one of Raniere's long-time girlfriends and financial supporters, owned the equipment for a dormant t-shirt company, and they offered John Doe 8 a chance to get the company up and running by making and selling t-shirts, in exchange for which he would receive a substantial share of the net revenues.  John Doe 8 worked tirelessly and built an operating business that sold thousands of t-shirts, generating substantial revenues.  Although the company was profitable, Raniere, Bronfman and Cafritz refused to compensate him (or reimburse him the money he had invested).  They explained to him that he was like a CEO, and that as CEO he was not entitled to any compensation until investors were paid off.  There were no investors, and the company had no debt, but Defendants knew that John Doe 8 would continue working for them so long as he believed he was indebted to the Defendants.  As Defendants also knew and intended, because John Doe 8 did not have the proper immigration status to be operating the company, he

was unable to do anything about their refusal to pay him, since taking any action would put him at risk of arrest and deportation.  In another instance, John Doe 8 informed Defendants Raniere and Clare Bronfman that he was going to return to his home country, wait the requisite period, and then apply to renew his visa.  Defendants Raniere and Clare Bronfman, along with Defendant Padilla, Pamela Cafritz, and others, pressured him into staying, persuading him that there was no need to leave the U.S. and reenter because their lawyers could take care of the issue.  He relied on these assurances and remained in the U.S., working for Defendants, even after losing his immigration status.  Eventually, Clare Bronfman worked out a plan with the owner of a business in Mexico that she assured John Doe 8 was perfectly legal: the owner of the Mexican business established a U.S. subsidiary and that subsidiary sponsored a work visa for John Doe 8.  After that, on the rare occasions when Clare Bronfman wished for John Doe 8 to be paid for any work, she would have funds transferred from a NXIVM entity to the U.S. bank account of the Mexican company's U.S. subsidiary, under the false pretext that the money was being paid for services rendered to NXIVM by the U.S. subsidiary.  The U.S. subsidiary would then pay John Doe 8.

693.    In other instances, Raniere and Clare Bronfman lured unsuspecting women from other countries to enter the U.S. to work with them on developing exo/eso.  Defendants assured them that they would be gainfully employed.  Clare Bronfman sent letters on behalf of NXIVM supporting their applications for visas, falsely stating that they would be working for NXIVM as "business consultants," and that they would be paid set salaries.  When these women arrived, they realized that this was untrue.  They worked around the clock, at the beck and call of Clare Bronfman and Raniere, but were not paid what had been promised and at times not paid at all.  When they complained, they were told in typical NXIVM fashion that it was their fault, that they

{00207518 }

were not entitled to earn compensation until they overcame their "issues," took more curriculum, or paid back supposed debts to Defendants.

694.     Defendants also took advantage of community members' fears of failing and being separated from the community by pressuring them to enter into fraudulent marriages.  For example, when Jane Doe 43 found herself this exact circumstance, Defendants forced her to seduce a member of the NXIVM community and marry him so that she might obtain a green card.  In this way, Defendants supposedly "saved" her from having to leave the community, for which she would be forever indebted to the Defendants.  However, after a visit home, Jane Doe 43 realized how badly the marriage would complicate her life and, instead of filing an application for permanent resident status, ended the marriage and remained in her home country.

### Clare Bronfman's NXIVM Propaganda Film – "My Tourette's"

695.     In addition to underwriting the Enterprise's human experiments, Clare Bronfman sponsored individual students (including two Plaintiffs), on the condition that they agreed to be subjects in a film that one of her companies produced called "My Tourette's."  The film has never been released commercially, but it has been shown at several film festivals.  Although the film was intended as pro-NXIVM propaganda, it was also utilized to advance Defendants' interests in developing bogus cures for medical ailments.

### Abusive and Vexatious Litigation

696.     In support of the Enterprise, and in furtherance of its objectives, Defendants grossly misused legal systems in the United States, Canada, and Mexico to conceal their wrongdoing, silence critics of NXIVM, punish defectors, and terrorize current NXIVM members with the omnipresent threat of defending against frivolous lawsuits and spurious criminal complaints if they left the program.  Clare Bronfman paid for the lawyers NXIVM hired to wage

{00207518 }

the Enterprise's reign of legal terror.  She also drafted threatening letters that were supplied to NXIVM's lawyers to transpose onto law firm letterhead and then sent to the targets of the Enterprise's wrath.

697.    Defendants' legal abuses included filing false criminal complaints with law enforcement authorities, bringing and maintaining baseless civil litigation, vexatious and sanctionable litigation tactics, perjury, manufacturing evidence, and witness tampering.  The message these abuses sent to those inside NXIVM was clear: cross us, and this will happen to you.

698.    In about 2009, Defendant Clare Bronfman began directing the formulation, funding, and execution of the Enterprise's legal strategy, subject only to Defendant Raniere's ultimate approval.  With her limitless resources, almost anything Raniere wanted could be accomplished, and examples of their litigation abuses abound.  In the criminal trial of Raniere, Mark Vicente testified that "The decision makers in Legal were Clare Bronfman and Raniere."[20]

699.    One tactic they employed was to intervene and interfere in the bankruptcy proceedings of members who had exhausted their life savings and become deeply indebted to NXIVM, either in pursuit of the Stripe Path or in unsuccessful attempts to open their own NXIVM centers, and who then filed for personal bankruptcy in order to discharge their debts.

700.    In several cases, Defendants asserted baseless fraud claims or objections to the debtors' financial disclosures, seeking to deny the member a discharge.  Defendants also employed abusive discovery tactics designed to prolong the proceedings and increase the expense to the former member, all to prevent the member from receiving a discharge and the "fresh start" that the bankruptcy laws afford.

---

[20] May 9, 2019, p. 592.

{00207518 }

701.     For example, NXIVM intervened in the bankruptcies of Susan Dones and Kim Woodhouse, two former high-ranking members who operated the NXIVM center in Spokane, Washington by filing a baseless adversary proceeding to forestall their discharge.  Rejecting NXIVM's complaint, the bankruptcy court found that, "NXIVM's claims and litigation tactics were disproportionate and largely lacking in merit."

702.     As to Woodhouse in particular, the bankruptcy court found that her only "sin" was attempting to leave NXIVM, and that NXIVM's conduct in subjecting Woodhouse "to protracted litigation from two large law firms and a phalanx of attorneys … was, in a word, deplorable" *In re Dones*, 2011 WL 5079585, at *18 (Bkrtcy. W.D. Wash. 2011).

703.     In another example, NXIVM brought two adversary proceedings to interfere with the bankruptcies of Barbara Bouchey, a former NXIVM leader and executive board member with extensive knowledge of NXIVM and its operations.

704.     NXIVM also tried to have Bouchey, a certified financial advisor, prosecuted in New York for extortion and sought regulatory enforcement proceedings against her for nonexistent financial crimes.  In that action, Defendants hired a private investigator who was later charged by New York State regulatory authorities with intimidating witnesses in the case.

705.     NXIVM also targeted Raniere's former girlfriend, Plaintiff Toni Natalie, for over eight years in an unsuccessful attempt to deny her a bankruptcy discharge. The judge rejected NXIVM's meritless objections as nothing more than "a jilted fellow's attempt at revenge or retaliation against his former girlfriend, with many attempts at tripping her up along the way." Defendants even interfered with Natalie's mother's bankruptcy proceeding to punish her for helping to pay for Natalie's legal fees.

706.     In 2003, Defendants launched a legal crusade against cult deprogrammer Rick

Ross and the Ross Institute for publishing highly critical articles about NXIVM technology, including excerpts from NXIVM's course materials.  Over the next fourteen years, the Defendants engaged in relentless scorched-earth litigation, bringing parallel proceedings in multiple courts to destroy both Ross and the Ross Institute.

707.    Defendants employed a private investigator to obtain Ross's confidential banking and telephone records, which one court observed could only have been obtained in "improper and probably illegal manner." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 116 n.29 (N.D.N.Y. 2007).

708.    During discovery in the Ross litigation, Raniere directed others in NXIVM to conceal evidence by altering videotaped recordings of NXIVM classes, in which Nancy Salzman made false statements about the ability of Rational Inquiry to cure physical and mental illness, because Raniere knew this was damaging to NXIVM's litigation position.

709.    In *Raniere v.  Microsoft Corp.,* Nos. 15-0540 & 15-2298, 2016 WL 4626584 (N.D. Tex. Sept. 2, 2016), Raniere sued Microsoft Corporation for infringement of a patent that he did not own (the "GTI patent").  After two years of discovery, Raniere was still unable to document his ownership.

710.    The Court dismissed the case for lack of standing and awarded attorney's fees and costs to Microsoft, sanctioning Raniere for his "clear history of delay and contumacious conduct" and acting in "bad faith to vexatiously multiply these proceedings and avoid early dismissal." 2016 WL 4626584, at *5.  The court characterized Raniere's conduct in the litigation as "deplorable," finding that Raniere "made false and misleading representations to Defendants and the Court," gave testimony that was "wholly incredible and untruthful," that he "engaged in a pattern of obfuscation, offering inconsistent theories and arguments and promising to produce

{00207518 }

128

evidence that never materialized," and that he "made false and misleading representations to

Defendants and the Court that resulted in, among other things, prejudice to Defendants in the

form of significant legal fees incurred in defending the action." Id. Id. at 4-5. The sanctions were

affirmed on appeal. *Raniere v. Microsoft Corp.*, 887 F. 3d 1298 (Fed. Cir. 2018).

711.    In the *Microsoft* litigation, the district court specifically found that Raniere did not

own any rights to enforce the GTI patent because he did not own any interest in or have any right

to direct or act on behalf of GTI, the company with sole ownership rights to the patent. In fact,

as Raniere knew, GTI was majority owned and controlled by his former girlfriend, Toni Natalie,

who therefore held or controlled all rights to the patent. Nevertheless, Raniere commenced a

meritless lawsuit against her in the State of Washington, asserting, once again, that he owned the

rights to the GTI patent. Natalie challenged the Washington court's personal jurisdiction.

Backed by unlimited Bronfman funds, Raniere's high-priced lawyers demanded jurisdictional

discovery, fighting hard to require Natalie to travel across the country to sit for a deposition,

even after being notified that due to a severe traumatic stress disorder, Natalie had difficulty

traveling. Appreciating her circumstances, the court ordered Natalie's deposition to be taken

near her home in New York State. The lawsuit was dismissed for lack of personal jurisdiction,

and the court-imposed sanctions on Raniere and his counsel.

712.    At the time of these events, Raniere was hiding from law enforcement authorities

in Mexico. Through the attorney who handled all intellectual property matters for Raniere, Clare

Bronfman, NXIVM, and Raniere offered Natalie a small payment to settle the Washington State

lawsuit in exchange for all rights to the GTI patent. Unbeknownst to Natalie, Microsoft had

commenced an action before the U.S. Patent Trial and Appeals Board ("PTAB"), seeking to

invalidate the GTI patent. In order to oppose this action by Microsoft, Raniere and his counsel

{00207518 }

appeared on GTI's behalf and represented that Raniere controlled GTI.  That attorney did not notify Natalie of the pendency of that proceeding and never sought permission from her to appear on behalf of GTI, even while he attempted to negotiate a settlement of the Washington State lawsuit on Raniere's behalf.  By the time Raniere's counsel notified Natalie that he had represented GTI without her permission, it was too late – Natalie was unable to secure qualified patent counsel to represent her *pro bono* (only qualified patent lawyers can practice before the PTAB), default was entered and the patent was invalidated.

### New Companies – The Institutionalization of Sexual Abuse of Women

713.    In or around 2014, Defendants created yet another set of new programs.  Partly as a way to keep existing members on the hamster wheel of endless curriculum, and partly to induce certain members or new recruits to join supposedly exciting new business ventures, Defendants established the Ultima companies – businesses tailored to appeal to a particular audience.

714.    Among the Ultima companies were The Source and exo/eso.  The most insidious aspect of these two new programs was known only to Raniere and his Inner Circle: that they would be used to recruit and groom suitable female candidates for sexual servitude to Raniere.

715.    Raniere and Clare Bronfman personally oversaw all aspects of the development and operation of exo/eso, NXIVM's bodywork program that was marketed to athletes, fitness enthusiasts, yoga practitioners, and others with an interest in physical health and well-being.  To staff exo/eso, Raniere selected six people who fit his criteria: female, young, attractive, thin, and interested in devoting their time to a career within NXIVM.

716.    Among these six were Jane Doe 16, Jane Doe 17, and Jane Doe 18.  All were honored to have been selected by the Vanguard to work closely with him on this program and

were excited by the prospect of earning thousands of dollars monthly and substantially more over the first few years.

717.    To work closely with Raniere, exo/eso members had to meet with him when and where he commanded.  Often this would be in the middle of the night – 3 a.m. meetings were not unusual – which resulted in perpetual sleep-deprivation. Exo/eso participants were, therefore, physically weak and easy to manipulate in accordance with Raniere's needs and desires.

718.    During often hours-long meetings, Raniere would dictate the supposed exo/eso curriculum to these women.  While there was some physical component, it was not particularly challenging or innovative, though the women were told it was a work in progress that Raniere would continue to develop, even as students were recruited and the first trainings were held.

719.    Exo/eso allowed Raniere to captivate and manipulate an audience predisposed to searching for meaning in his every word. But he was making the whole thing up as he went along.

720.    Still, members of the NXIVM community signed up, and the prospect of this radically new and transformative bodywork system attracted new recruits, who were told that once properly trained they would be among the first to go out and open their own exo/eso centers around the U.S. and the world.

721.    In fact, this business was a farce, never intended by Defendants to be a viable company.  People paid substantial sums for a program that they thought would change their lives and careers for the better.  To keep the women motivated, Raniere and Clare Bronfman created a costly event where wealthy NXIVM supporters traveled to Clare Bronfman's private island resort in Fiji for a week-long exo/eso intensive.

722.    Although, as in all things NXIVM, the women were never paid what they were

promised, this event generated revenues that were in part used to compensate the women just enough to keep them on the hook, believing better days were just around the corner. Back in Albany, the early exo/eso seminars were well-attended, filled with members of the community dutifully taking yet another addition to the curriculum.

723.    Once the initial interest waned, however, the company slowed and then stalled. No exo/eso centers were ever opened. Nobody graduated or obtained a certification to own, operate, or teach in such centers. No resources were made available to promote and market the company and its services.

724.    Exo/eso was starved of resources, as Defendants through self-dealing caused the company to become indebted to the Defendants' many other entities, as well as to Defendants themselves, including most prominently Clare Bronfman.

725.    Exo/eso was ultimately a means for Clare Bronfman to assist Raniere with recruiting women whom Raniere considered desirable. Clare Bronfman helped Raniere groom these women, going so far as to manipulate foreign nationals into positions where their immigration status was compromised, they were completely broke, and thus completely dependent on Clare Bronfman and Raniere.

726.    When exo/eso women complained about the lack of compensation, Raniere and Clare Bronfman told them that they did not deserve to be paid. Defendant Lauren Salzman also became involved. Salzman scolded the women for having a sense of "entitlement," claiming that they had "ethical breaches," and that until those breaches were "healed," they had no right to be compensated. The women were required to attend a private teaching of NXIVM's "tribute" module, where they were told that they needed to learn how to work for free willingly.

727.    To generate interest in these programs, Raniere announced that The Source – an

Ultima program for actors and other public speakers – would also include exo/eso training as an integral component. This kept the women trying to build exo/eso busy with more teaching but added nothing to their revenues or incomes, because they had no "ethical" claim to The Source revenues.

728.    Over time, as Raniere worked closely with the women whom he and Clare Bronfman had selected and recruited to "own" exo/eso, Raniere and Clare Bronfman used his position of authority – the tremendous power differential he had built into NXIVM – to identify which women would be most susceptible to his grooming methods and sexual advances. The experience was traumatic for all of the women Bronfman and Raniere "worked with" in developing exo/eso.

729.    In the case of Jane Doe 17, Defendants' grooming efforts failed, but not before she was threatened, subjected to sleep-deprivation, EMs, and caused to suffer self-blame, self-doubt, and the stress of being lured into an illegal immigration status trap. Initially, Clare Bronfman had helped her secure a business consultant's visa under what Jane Doe 17 did not know were false pretenses.

730.    Jane Doe 17 traveled to the U.S. to further her progress within the NXIVM system, to have an opportunity to work directly with Raniere, and most importantly, to earn a respectable wage providing services described in detail in a letter from Clare Bronfman, written to support her visa application.

731.    None of it was real. To Jane Doe 17's horror, the sophisticated business consulting work she was promised turned out to be a job in exo/eso and a job providing services to Clare Bronfman as a personal assistant.

732.    When Jane Doe 17 complained or asked questions, she was reprimanded. After

{00207518 }

133

several months of persistently reminding Clare Bronfman that she had been promised a certain income, Clare Bronfman begrudgingly began to pay her the promised sums.  Later, however, Clare Bronfman informed Jane Doe 17 that those funds were not salary but a loan, and that she was obligated to continue providing services until she paid it back.

733.     Jane Doe 17 did not feel safe challenging Defendants about her circumstances, because she realized that she had been lured into the country on a fraudulent visa, that she had no valid immigration status, and that she faced serious trouble if Defendants turned her over to authorities.

734.     Jane Doe 17 was vulnerable and traumatized.  Recognizing that her circumstances were not going to improve, that exo/eso was not what had been promised, and that working so closely with Raniere was discomfiting, Jane Doe 17 left Albany and returned to Canada, hoping that distancing herself from NXIVM would allow her to recover and heal.

735.     Raniere, Clare Bronfman, and the other Individual Defendants refused to accept Jane Doe 17's exit, knowing that it would draw attention to the flaws inherent in exo/eso as both a business and a bodywork system.

736.     Consequently, Clare Bronfman hounded Jane Doe 17 even after she had left, demanding that she repay the funds Jane Doe 17 was entitled to as a condition of her visa.  When Jane Doe 17 informed Defendants that she was seeking employment as a yoga instructor, Defendants threatened her with legal action under Jane Doe 17's non-compete agreement with NXIVM, which prohibited her from teaching any form of exercise.

737.     Her only choice, Defendants argued, was to return to the U.S. and resume her duties with NXIVM.  Jane Doe 17 did not return, and she still struggles to recover from the experience of being trapped in servitude to the NXIVM system.

{00207518 }

738.   Similarly, Jane Doe 18 was tasked with developing exo/eso and two other Ultima projects. She was expected to be on call for Defendants twenty-four hours a day, and she was punished if she was not available at times when she was called upon. She was not paid for her first nine months of work, and when she finally began receiving some compensation, the payments soon stopped. She was told that she had not rightfully earned the payments, needed to work on her issues, and needed to pay tribute to Raniere.

739.   Jane Doe 16 was also a founding member of exo/eso reporting to Clare Bronfman. Exo/eso was so demanding that she quit her job. She was not compensated for the first year of work, and when she was, the payments soon stopped. Jane Doe 16 was forced into debt. Also suffering physical injuries from the job, Jane Doe 16 could not afford health insurance and treatment.

**The Knife of Aristotle – Drawing the Curtain Between NXIVM and Reality**

740.   Another of the Ultima Companies was the Knife of Aristotle ("The Knife"), founded in 2014 as a purported news outlet.  The key officers of The Knife included Defendants Allison Mack, Rosa Laura Junco and Nicki Clyne.

741.   Raniere's stated purpose for creating The Knife was the scientific analysis of existing media, including fact checking, so that subscribers could cut through abundant fake news and get to the truth.  The truth, of course, meant Raniere's spin on everything, and the Knife was just one more way in which Raniere isolated his followers from outside influences.

742.   It also enabled him to shield members from bad press about NXIVM because members of the NXIVM community received their news solely from The Knife.  To get news from anywhere else meant that one was rebellious and jeopardizing the community.

743.   Jane Doe 3, Jane Doe 6, Jane Doe 13, Jane Doe 21, Jane Doe 41, Jane Doe 43,

{00207518 }

135

Jane Doe 51, Mark Vicente and John Doe 16 worked for the Knife.

### Collateral

744.    NXIVM used a concept known as "collateral," to enforce what the creators considered "ethical" conduct.  Under Raniere's teachings, a person who was honorable and who intended to "uphold his word" should be happy to "collateralize" his word in a demonstration of good faith.

745.    However, once someone provided such collateral, he or she would be subject to extortive demands and coerced into doing things he or she would not otherwise freely do.  As Lauren Salzman stated in her testimony in the Raniere Trial, "your collateral should be so distasteful that you would rather die than break your promise."[21]

746.    The concept of collateralizing one's word arose out of the NXIVM teaching that people failed to keep their commitments and achieve their goals because they were weak; however, people could train themselves to honor their commitments by undertaking an unpleasant task or punishment if they failed.

747.    For example, a member might set a goal of running one mile a day to achieve her weight goals, commit to attending committee meetings on a weekly basis, and promise to take a cold shower as punishment if she failed to keep those commitments.  The concept was analogized to providing collateral on a loan and therefore appeared innocuous.

748.    Collateral was reinforced by a module that described punishment as the use of rational judgment and critical thinking to uphold ethics. Punishment was a method of increasing self-esteem by "confronting" cause and effect.  In fact, NXIVM taught that forgiving someone with integrity required that person to submit to the appropriate punishment, or "penance."

---

[21] May 20, 2019, p. 1654.

{00207518 }

136

749.    Penances were applied ruthlessly. If a DOS slave failed a task, the entire pod or the master would be required to undertake a penance.  In one instance, an entire slave pod was filmed being paddled naked as a result of one individual's supposed failing. With the creation of Jness and SOP, the concept evolved as a punishment for failure to meet demands of the program, such as responding to readiness drills.

750.    Most importantly, collateral was the key to gaining admission into DOS: recruits were required to provide deeds to property and confidential information about themselves, family members, or employers, or were encouraged to lie if the information provided was not scandalous enough to merit Raniere's approval.

### DOS

751.    Existing within NXIVM was a highly secret organization known as "DOS," which, upon information and belief, was an acronym for a Latin phrase concocted by Raniere ("*dominus obsequious sororium*") roughly translating to "lord over the obedient female companions." DOS was also sometimes referred to internally as "the Vow."

752.    DOS was based on and utilized NXIVM course materials, created by Raniere and Nancy Salzman, which taught that women have certain "weaknesses" or tendencies, such as being over-emotional or reveling in victimhood, that interfered with their professional advancement and personal satisfaction. NXIVM's curriculum, particularly Jness and SOP Complete, also taught that women must remain monogamous and subservient to men, while men needed and should have multiple sexual partners.

753.    Like NXIVM, DOS had a pyramid structure with Raniere alone at the top level as "grandmaster." Below Raniere were several women who served as "First-Line Masters," taking direction from Raniere in organizing and operating DOS.  All other participants in DOS were

women "slaves."

754.    Each woman "slave" was expected to recruit and master her own "slaves," who were required to serve not only the women who recruited them, but the masters at higher levels, including Raniere.  For example, Defendant Mack was a First Line Master within DOS who reported directly to Raniere as her master.  In turn, Mack recruited her own "slaves," who were required to recruit their own, as well.  All the women in Mack's line of slaves were obligated to serve her and comply with her directions.  This was true of each First-Line Master's line of slaves.

755.    As Lauren Salzman testified in the Raniere trial, describing a message of encouragement she sent to one of her own slaves, "if [you] had six 'slaves' who had six . . . each had six 'slaves,' [you] would have weekly time committed to [you] for life. . . Any efforts you put in here will come back exponentially."[22]

756.    In addition to Defendants Lauren Salzman and Allison Mack, Defendants Daniela Padilla Bergeron, Rosa Laura Junco, Loreta J. Garza Davila, Monica Duran, and Nicki Clyne were also First-Line DOS masters with their own "pods" of women "slaves," some of whom had been coerced into recruiting their own "slaves" as well. The purpose was to provide a greater labor pool for Raniere and the First Line Masters, as well as to expand his supply of sexual partners.

757.    DOS members recruited women from the ranks of NXIVM, often focusing on prospective recruits who were perceived to be more open to trying new things, in search of a stronger identity within the group, in need of female mentors, and/or frustrated with the pace of their improvement and advancement within NXIVM.

---

[22] May 20, 2019, p. 1787.

{00207518 }

758.    DOS recruitment was cloaked in extreme secrecy.  Initially, women were told only they had an opportunity to join a highly exclusive, secret "sorority," which would transform their lives.  Raniere's involvement was concealed from recruits (if asked, DOS members trying to recruit other women were instructed to deny any involvement by Raniere), as were the organizing concepts of "master" and "slave."

759.    If a recruit expressed interest, she was required to provide collateral as a condition of learning more details about the organization. The sole purpose of the collateral was to provide the First Line Masters with material that they could use to coerce recruits into obedient service and silence about DOS.

760.    To satisfy the collateral requirement, recruits were required to turn over highly sensitive or incriminating information or materials that would devastate the reputations of the recruits or persons close to them if publicly exposed. Such collateral included sexually explicit or otherwise embarrassing photographs or videos, written or videotaped confessions about the recruit or people close to her, or other compromising information.

761.    If the offered collateral was insufficiently scandalous, the recruit was instructed to provide something more damaging, even though her purportedly inadequate collateral was never returned in exchange.  In some cases, the master and recruit collaborated on ideas for fabricated photos or confessions that were sufficiently extortionate for Defendants' purposes.  In other cases, recruits were directed to provide assets as collateral, including titles to real and personal property and access to bank and credit card accounts.

762.    Once a recruit supplied initial collateral, her prospective master would disclose only general details about DOS − that it was a supposedly woman-centered, woman-only organization focused on overcoming the personal weaknesses that, according to NXIVM

{00207518 }

139

teachings, were likely to hold women back personally and professionally.

763.    Upon the submission of additional collateral, recruits were introduced to the concepts of "master" and "slave" as central parts of the DOS program, but not to the expectation that "slaves" would subject themselves to sexual and personal servitude.  That information was saved until the recruit's collateral had become so damaging that the recruit was virtually bound to their master.

764.    The terms "master" and "slave" were explained away as substitutes for concepts like guru-disciple, or sensei-student.  If recruits expressed discomfort with the concepts, the recruiter would use standard NXIVM techniques to persuade the recruit that their discomfort and reticence were manifestations of their weaknesses and fears, which only reinforced the need for the DOS program to transform her life.

765.    Recruits who expressed interest in joining DOS were again required to submit collateral to become members. Once they became members, the "slaves" were routinely required to provide more collateral with the understanding that, if they ever attempted to leave DOS, disclosed or discussed DOS publicly, or failed to comply with the expectations of them as "slaves" – including the demands for more collateral – the collateral already provided would be released and used against them.

766.    Women experienced the weight of this threat even before formally joining DOS, because they submitted their first collateral without knowing anything about the program.  By the time they found out the truth, they were trapped, because the disclosure of their first collateral was already threatened.

767.    Once admitted to DOS, "slaves" were required to perform personal services known as "acts of care" for their masters and the First-Line Masters, and "assignments," which

{00207518 }

typically involved mundane chores and errands requested by the master, but also anything a master commanded, including that lower-level "slaves" instruct their own "slaves" to provide services for higher-level masters.  Such demands could be and often were required at any time, day or night and without notice.

768.    Masters also directed their "slaves" to perform services for Raniere. The stated objective for each DOS master was to recruit enough "slaves," who in turn would be instructed to recruit their own "slaves," enough to obtain the labor equivalent of at least one full-time working employee per "pod" of "slaves." For  First Line Masters, this would result in the development of a significant labor force over time.

769.    The personal service system was enforced through a combination of NXIVM manipulation techniques and the ever-present threat of releasing collateral.  DOS "slaves" were also required to perform work for NXIVM, such as reviewing and editing course materials or transcribing the numerous videotaped presentations featuring Raniere and other NXIVM leaders.

770.    DOS leaders rigidly controlled the sex lives of their "slaves" by reinforcing NXIVM's teachings, particularly those found in the Jness and SOP Complete curriculum. "Slaves" were prohibited from masturbating or from having any sexual activity or gratification at all, and some were assigned to seduce and have sex with Raniere.

771.    Because Raniere was known to prefer thin women, some "slaves" were forced to comply with subsistence diets as low as 500 calories, meticulously record their food intake and even send photographs of everything they ate to their masters.  Failures to rigidly comply with these regimens would result in the imposition of penances or consequences, such as reducing caloric intake even further or fasting.

772.    Another common penance for DOS "slaves" was paddling.  Paddling was

{00207518 }

expressly recommended and described by Raniere to his First Line Masters.  As First Line Master Defendant Lauren Salzman testified in the Raniere Trial: "Keith told us . . . how we [should] paddle each other. . . three hard whacks.  If you snap the wrist right, it should really hurt."[23]

773.    First Line Masters directed their "slaves" to have sex with Raniere in order to curry favor with him and obtain other economic and non-economic benefits, including increased status both within DOS and NXIVM.

774.    First Line Masters also benefitted from receiving continued and expanded personal services from other "slaves," and opportunities to create and run businesses, or otherwise participate financially in NXIVM programs.  Only women who had such favor with Raniere were chosen to serve him as First Line Masters. With time, each First Line Master was rewarded with a leadership role in one or more of NXIVM's various groups and companies.

775.    Raniere often promised similar financial and non-economic benefits within NXIVM to DOS "slaves" who were assigned to have sex with him, or whom Raniere sought to groom and have groomed for sex with him.

776.    In addition to personal service and sexual requirements, DOS "slaves" were subjected to methods of behavioral control that ensured their obedience to Raniere and the First Line Masters, and which further isolated them from the outside world.  For example, "slaves" had to check in with their masters as soon as they awoke and when they went to bed.

777.    Additionally, "slaves" were required to be accessible and responsive by cell phone or text message at all hours of the day and night. Randomly timed "readiness drills" required "slaves" to immediately respond to text messages and accept assignments within 60

---

[23] May 20, 2019, p. 1785.

{00207518 }

seconds of being sent.

778.    As a result, many "slaves" suffered from sleep deprivation, and the "drills" gave rise to heightened stress and "fight or flight" responses/states, which in turn made the "slaves" even more compliant. "Slaves" were also assigned seemingly senseless acts of physical endurance, humiliation or self-deprivation as purported character-building exercises, but also as "penances" or "consequences" for failures to comply with their masters' instructions.  All requirements were enforced through the threat of releasing collateral.

### The Branding of DOS "Slaves"

779.    In what was surely the peak of Raniere's depraved cruelty (and that of the Enterprise), he required his DOS "slaves" to be "branded" in their pubic area.  This was done by burning a pattern into their skin with a cauterizing instrument.

780.    The brandings were performed by Defendant Dr. Danielle Roberts, M.D.  She is currently the subject of an investigation by the State of New York's Health Department's Office of Professional Medical Conduct (the "OPMC").

781.    The OPMC filed a court case in 2018 against eight people associated with NXIVM, including Nancy Salzman and Lauren Salzman.  The complaint in that case alleged that Roberts "participated in an initiation ceremony for a secret society, which involved the branding of female initiates with a cautery pen without anesthesia and under duress."

782.    The brand itself was a stylized monogram of Raniere's initials "KAR."  The brandings were administered in private videotaped ceremonies as a "tribute" to Raniere, after which the videos were held as further collateral against the now-branded "slaves."

783.    Images of a brand are depicted below.  Raniere's initials were mirrored and rotated 90 degrees in order to conceal the fact that the brand was composed of his initials from

{00207518 }

DOS members.



784.    Defection or attempted defection from DOS resulted in swift and severe

retaliation.  Women leaving DOS were shunned and disparaged not only by fellow DOS

members, but by the entire NXIVM community.

785.    Lauren Salzman testified in the criminal trial of Raniere: "**Q.** What happened to

people who were considered oppositional to NXIVM?  **A.** People don't – people shunned them,

they don't talk to them, you know, they speak about them saying that they're not doing the

ethical or honorable thing, that they've broken their commitments and their vows, that they don't

have good character or principles, you know, and that the good, moral, noble thing is to uphold

your word, uphold your commitments and stay committed to this vision and mission, you know,

in the face of any adversities."[24]

786.    Desperate requests for return of collateral were denied or ignored.  In some cases,

Defendants Clare Bronfman and Raniere directed the hiring of attorneys to send cease and desist

letters (some of which were authored by Clare Bronfman herself) to defecting DOS "slaves,"

threatening them with criminal complaints and vexatious litigation if they failed to remain silent.

---

[24] May 21, 2019, p.1875.

{00207518 }

144

787.    Raniere and Clare Bronfman filed or directed followers to file baseless criminal charges against defectors in Canada and Mexico to punish them and pressure them into silence. To this day, some former DOS "slaves" are subjects of false criminal charges in Mexico.

### The Beginning of the End

788.    The creation of DOS was the beginning of the end for the Defendants' long-standing conspiracy.  In or around May 2017, several high-ranking members of the NXIVM community defected and spoke out.

789.    Plaintiff Sarah Edmondson, who had been lured into and trapped in DOS, learned to her horror that the scar she bore was not the symbol of the natural elements she had resigned herself to live with, but rather Raniere's initials.  Her husband, Plaintiff Anthony Ames, immediately confronted Defendant Lauren Salzman in a fruitless effort to extract an admission about the true evil of DOS.  Edmondson – in fear for her safety – quietly fled Albany.

790.    Around the same time, Plaintiff Mark Vicente, then a member of NXIVM's executive committee, learned of DOS, confronted Raniere, defected and began to tell people the truth to persuade them to escape.

791.    These high-level defections, along with a stream of defections of DOS "slaves," shook the NXIVM community to its core.  Many DOS defectors began writing to Defendants, including Allison Mack, Lauren Salzman, Nancy Salzman, and Clare Bronfman, pleading for their collateral to be returned or destroyed.  Lauren Salzman testified at the Raniere trial that she would pass such pleas along to Defendant Clare Bronfman.  No collateral was ever returned or destroyed.

792.    In fact, at least one DOS member's collateral was released in retaliation for her speaking out against Defendants, NXIVM and DOS.  That collateral had been edited by Lauren

{00207518 }

Salzman and Allison Mack, at Raniere's direction, to make it appear as if the DOS "slave" had asked to be branded. Indeed, Raniere directed the branding ceremony to include the recitation of a statement that Raniere told Defendant Mack would create the appearance that the brandings were consensual.

793. After the branding of women became public, and news began to emerge about the possibility or existence of government investigations, Clare Bronfman tried to pressure people – including several Plaintiffs – into agreeing to be represented by her counsel of choice. She sought to obstruct these investigations by retaining attorneys whom she knew would advise NXIVM members not to cooperate the government. Witnesses were informed that representation by counsel paid for by Clare Bronfman was conditioned upon the witness's refusal to answer any questions by investigators and in any proceedings. Not having any funds to retain independent counsel, at least several witnesses acceded to those demands. In addition, Clare Bronfman tried to pressure defectors into disclosing the identities of all persons to whom they had disclosed anything relating to NXIVM and the content of those disclosures. This was part of Clare Bronfman's efforts to intimidate and silence NXIVM's critics, including defectors who were witnesses to wrongdoing by the Defendants and others.

794. In September and October 2017, Raniere, Clare Bronfman (identified by Lauren Salzman in her testimony at the Raniere trial as "heading up our legal initiatives"),[25] and certain co-conspirators caused false charges to be lodged against a number of DOS defectors and others speaking or threatening to speak publicly about DOS in Mexico. Working on behalf of the Defendants, two attorneys sent letters to these victim-witnesses, threatening them with legal action and arrest on criminal charges if they did not remain silent about what they knew.

---

[25] May 20, 2019, p. 1805.

{00207518 }

795.    Among the recipients of these threatening letters were Plaintiffs Jane Doe 2, Jane Doe 3, and Jane Doe 5, all of whom left their residences and went into hiding upon receiving these letters.  The outspoken mother of Plaintiff Jane Doe 12 also received a letter – a calculated move intended to intimidate and silence her daughter, who was still in the grips of Raniere and his DOS First-Line Masters.  In fact, it was many months before Jane Doe 12 mustered the courage necessary to leave.

796.    Shortly after the wave of threatening letters were delivered, when it became known that NXIVM was under investigation by the FBI, Raniere, Clare Bronfman, Lauren Salzman, Allison Mack, and several others fled the United States and went into hiding in Mexico.  In March 2018 the Mexican Federal Police captured Raniere and turned him over to the FBI.

797.    Understanding the potential criminal culpability that the exposure of DOS and other of the NXIVM's inner secrets posed to Defendants, in July 2018, Clare Bronfman tried to silence Edmondson and the growing number of defectors by giving false statements concerning alleged hacking of computers and theft of NXIVM property to the Vancouver Police Department, thereby instigating a criminal investigation of Edmondson and two other people, which Clare Bronfman and the other Defendants intended to prevent and obstruct them and other defectors from speaking to authorities and others.

798.    However, Edmondson and Vicente refused to be cowed, and DOS "slaves" were escaping; the end of the Enterprise was coming.

### Criminal Investigation and Charges

799.    The U.S. Department of Justice conducted a criminal investigation into NXIVM.

800.    On April 19, 2018, a three-count indictment was unsealed in this District,

{00207518 }

charging Defendants Raniere and Mack with (i) sex trafficking in violation of 18 U.S.C. §§ 1591(a)(l), 1591(a)(2) and 1591(b)(1), (ii) sex trafficking conspiracy in violation of 18 U.S.C. §§ 1589 (a)(2) and 1589 (a)(4), and (iii) conspiracy to commit forced labor in violation of 18 U.S.C. §§ 1589 (a)(2) and 1589 (a)(4).

801.    On July 23, 2018, a superseding seven-count indictment was unsealed in this District, charging Defendants Raniere, Clare Bronfman, Mack, Kathy Russell, Nancy Salzman and Lauren Salzman with (i) racketeering conspiracy in violation of 18 U.S.C. § 1962 (c), (ii) forced labor conspiracy in violation of 18 U.S.C. § 1589 (a), (iii) wire fraud conspiracy in violation of 18 U.S.C. § 1343, (iv) sex trafficking conspiracy in violation of 18 U.S.C. 18 U.S.C. §§ 1591(a)(l) and 1591(a)(2), (v) sex trafficking in violation of 18 U.S.C. §§ 1591(a)(l), 1591(a)(2) and 1591(b)(1), (vi) attempted sex trafficking in violation of 18 U.S.C. §§ 1591(a)(l) and 1591(a)(2), and (vii) conspiracy to commit identity theft in violation of 18 U.S.C. § 1028(a)(7).

802.    On March 13, Defendant Nancy Salzman pled guilty to one count of racketeering conspiracy, admitting to two predicate acts of conspiracy: (i) to commit identity theft, and (ii) to alter records for use in an official proceeding.

803.    At the Plea Hearing, the government explained that if the criminal case were to proceed to trial, the DOJ would prove beyond a reasonable doubt that (i) between 2003 and March 2018, in this District and elsewhere, an enterprise existed, being an ongoing organization created for the common purpose of promoting Keith Raniere and recruiting others into the pyramid organizations he created, (ii) the enterprise so created engaged in various types of conduct that affected interstate and foreign commerce, (iii) Defendant Nancy Salzman was associated with or employed by the enterprise, and (iv) Defendant Nancy Salzman agreed to

participate in the enterprise through a pattern of racketeering activity with the knowledge and intent that she and the other co-conspirators would commit at least two predicate acts in furtherance of the enterprise.

804.    In making her guilty plea, Nancy Salzman stated:

> Between 2005 and 2018, I agreed to join an enterprise comprised of people close to Keith Raniere and agreed to participate in its affairs through a pattern of racketeering activity.  While doing so I was aware of and participated in some of the criminal objectives of the enterprise which were jointly undertaken by its members, including me, and I agreed that a conspirator would commit at least two acts of racketeering in furtherance of the objectives of the enterprise.
>
> Such objectives included agreeing that others would commit improper and, at times, illegal invasions of privacy against perceived critics of NXIVM, the company of which I was president, including computer hacking in their email accounts and other acts of improper prying for the purpose of either trying to achieve success in court litigation against those individuals or trying to stop them from continuing to publicly criticize the organization.  Such objectives also included agreeing during discovery proceedings in a District of New Jersey civil case to which NXIVM and I personally were parties, to have others alter videotapes memorializing NXIVM classroom proceedings that we were required to turn over to our adversaries.  We agreed together that the recordings would be edited to remove certain sections we did not want to turn over and to do so without revealing our editing plans to such adversaries in knowing violation of the Court's rules.

805.    On March 13, 2019, a Second Superseding Indictment was unsealed in this District, with an attached letter from the U.S. Attorney for this District outlining for the Court how this Second Superseding Indictment differed from the prior one.  These differences included some minor adjustments to the counts and the dismissal of Nancy Salzman as a result of her guilty plea.

806.    Three differences, however, were quite significant: (i) Defendants Raniere, Clare Bronfman, Allison Mack, Kathy Russell, and Lauren Salzman were charged with racketeering conspiracy, and Raniere, Clare Bronfman, Mack, and Lauren Salzman were charged with racketeering; (ii) four additional predicate racketeering acts were added, including two acts of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a); one act of possession of child

{00207518 }

pornography, in violation of 18 U.S.C. § 2252(a); and one act of visa fraud, in violation of 18 U.S.C. § 1546; and (iii) three additional counts were added, including two counts charging sexual exploitation of a child, and one count of possession of child pornography.

807.    On March 25, 2019, Defendant Lauren Salzman pled guilty to Counts 1 and 2 of the Second Superseding Indictment, *i.e.* (i) racketeering conspiracy, and (ii) racketeering.  She admitted committing racketeering acts 9, 10, and 13 of the Second Superseding Indictment, *i.e.,* (9) trafficking and document servitude; (10) state law extortion; and (13) forced labor.

808.    In making her guilty plea, Lauren Salzman stated:

I committed the following acts.

On or about March 2010 through April 2012, I knowingly and intentionally harbored Jane Doe 4, a woman whose identity is known to me, in a room in the home in the Northern District of New York and threatened to deport Jane Doe 4 back to Mexico if she did not complete labor requested by myself and others.

On or about January 2017 through June 2017, within the Northern District of New York and elsewhere, I was a member of a secret organization developed by Nexium [*sic*] members that has been identified in the indictment as DOS.

Pursuant to my association in DOS, I knowingly and intentionally took and withheld property from Jane Doe 6 and Jane Doe 11, two women who are known to me and who were enrolled as lower-ranking DOS members.

This property was referred to by members in DOS as "collateral" which consisted of material or information that belonged to these lower-ranking DOS members and which such lower-ranking DOS members would not want revealed because it could be personally damaging or ruinous.

I induced Jane Doe 6 and Jane Doe 11 to deliver this collateral to me by instilling in them a fear that if the property was not delivered, I could expose this collateral which could have been embarrassing and personally damaging to themselves or others if released.

From January 2017 to June 2017, within the Northern District of New York and elsewhere, I knowingly and intentionally obtained the labor and services in the form of acts of care from Jane Doe 6 and Jane Doe 11 who were lower-ranking DOS members.

{00207518 }

Acts of care included having these women perform services for me that would have otherwise been compensable.  I obtained these labor and services from Jane Doe 6 and Jane Doe 11 by causing them to believe that if they did not perform requested acts of care, then they could suffer serious harm.  The serious harm in this case would be the threat of the release of their collateral.

From January 2017 to June 2017, within the Eastern District of New York and elsewhere, I knowingly and intentionally worked with others and devised a scheme to make materially false representations and omissions regarding DOS in order to obtain property from lower-ranking DOS members.  Specifically, I concealed Keith Ranieri's [*sic*] role as the head of DOS and characterized DOS as a women's organization knowing that Keith Ranieri [*sic*] was the head of this organization.

The property obtained which was considered collateral included credit card authorizations, sexually explicit photos and videos, and rights to assets and property.  Such property was transmitted in interstate and foreign commerce via e-mail, telephone, text messages and telegram.

809.    On April 8, 2019, Defendant Allison Mack pled guilty to Counts 1 and 2 of the

Second Superseding Indictment, *i.e.* (i) racketeering conspiracy, and (ii) racketeering.  She

admitted committing racketeering acts 10, and 13 of the Second Superseding Indictment, *i.e.,*

(10) state law extortion; and (13) forced labor.

810.    In making her guilty plea, Allison Mack stated:

The goal of the enterprise that I joined was to further and promote the objectives of Keith Raniere.  Between August 2015 and April 2018, I was aware of and participated in some of the criminal objectives of the enterprise, and I conspired and agreed with others to commit certain racketeering in furtherance of this enterprise.

Specifically, from in or about August 2015 through June 2017, within the Northern District of New York, Eastern District New York and elsewhere, I was a member of [a] secret society founded by, developed by, and ultimately led by Raniere.  At Raniere's direction, I and other women sought to recruit other women to join DOS.  As part of my association in DOS, I knowingly and intentionally took and withheld property from Jane Doe 5 and Jane Doe 8, two women who were known to me and who were involved as DOS members.

This property was referred to as collateral, which consisted of material or information that belonged to these DOS members and which those DOS members would not want revealed because it would be personally damaging or ruinous.

{00207518 }

151

I encouraged Jane Doe 5 and Jane Doe 8 to deliver this collateral to me, through my participation in a scheme that was designed to instill in them a fear that if the property was not delivered, we would expose collateral previously given to the organization, which could have been embarrassing and personally damaging to themselves or others, if released.

From in or about October 2015 to June 2017, within the Northern District of New York, the Eastern District of New York, and elsewhere, I knowingly and intentionally obtained the labor and services in the form of so-called acts of care from Jane Doe 5 and Jane Doe 8.

Acts of care included having these women perform services for me. I obtained these labor and services from Jane Doe 5 and Jane Doe 8 through, among other things, being part of a scheme, namely DOS, designed to make them believe that if they did not perform the requested acts of care, they could suffer serious harm. The serious harm in this case would be the specter of the release of their collateral, which they had pledged in order to join the organization.

From October 2015 to June 2017, within the Eastern District of New York and elsewhere, I knowingly and intentionally worked with others and devised a scheme to make materially false representations and admissions regarding DOS in order to obtain property from DOS members. Specifically, I concealed Keith Raniere's role as the head of DOS and characterized DOS as a women's only organization, knowing that Keith Raniere was the head of the organization.

The property obtained, which was considered collateral, included credit card authorizations, false accusations against family members and friends, explicit photos and videos, and rights to … assets and property. The collateral that I just described was transmitted in interstate and foreign commerce via e-mail, telephone text messages, and telegram.

811.    On April 19, 2019, Defendant Clare Bronfman pleaded guilty to two counts contained in an accompanying superseding information, (i) conspiracy to conceal and harbor illegal aliens for financial gain, and (ii) fraudulent use of identification.

812.    In making her guilty plea, Clare Bronfman stated:

Between approximately October 2015 and January 2018, along with others, I did harbor an individual who I knew had remained in the United States in violation of the law. I substantially facilitated her to live and work in our country in a way that would be undetected, and I was wrong. She did work for me and businesses I was affiliated with, so her work was a financial benefit to me.

{00207518 }

Additionally, I was wrong to facilitate the use of someone's credit card who had passed away.

Between approximately November 2016 and March 2018, I knowingly facilitated the use by another person of a deceased person's credit card, and the use of that person's bank account to the pay the bills for the credit card which were more than a thousand dollars.

My office and I handled the logistics of payment of the credit card bill from the bank account, and the person using the credit card did not intend to pay taxes on the income received in the form of payment for goods purchased on the credit card.

813.     On April 19, 2019, Defendant Kathy Russell pleaded guilty to one count contained in an accompanying superseding information, Visa fraud.

814.     In making her guilty plea, Kathy Russell stated:

On or about February 2014, I knowingly and intentionally presented a document to the United States Consulate in Mexico that contained false statements, specifically in support of a TN visa . . . [f]or Loretta Garza Davila.

I submitted the document that I knew contained materially false statements regarding Miss Garza's job description and salary.

This document, which I signed, described Miss Garza's job title to be a management consultant at NXIVM Corporation and stated she would provide advice on strategic marketing needs of NXIVM.

While Miss Garza did perform some of the duties described in the letter, she spent most of her time developing and running a separate company called Rainbow Cultural Gardens.

*       *       *

I knew Miss Garza worked for Rainbow Cultural Gardens, but I submitted a letter on her behalf that intentionally omitted that fact.

I also knew that Miss Garza was not keeping the full amount of the salary listed in that letter.  The letter that I submitted was required to be filed by the immigration laws.

815.     The criminal case against Defendant Keith Raniere, the commander-in-chief of the Enterprise, began on May 7, 2019.  Defendant Sara Bronfman attempted to obstruct or

{00207518 }

153

interfere with the trial by employing false pretenses and promises of money to entice a critical witness, John Doe 8, to leave the United States and remain outside of it during Raniere's criminal trial.  The witness refused to comply with Sara Bronfman's scheme.

816.    After a six-week trial, on June 19, 2019 the jury delivered its verdict in under five hours.  It convicted Raniere on all seven counts: (i) racketeering conspiracy, (ii) racketeering, (iii) forced labor conspiracy, (iv) wire fraud conspiracy, (v) sex trafficking conspiracy, (vi) sex trafficking, and (vii) attempted sex trafficking, all involving actions taken in his capacity as the head of NXIVM and its affiliated entities.  He faces possible life imprisonment.

817.    The jury also found that Raniere was guilty of perpetrating the following RICO predicate acts:

> a.    <u>Racketeering Act 1A</u>: Conspiracy to Commit Identity Theft #1
>
> b.    <u>Racketeering Act 1B:</u> Conspiracy to Unlawfully Possess Identification Document
>
> c.    <u>Racketeering Act 2:</u> Sexual Exploitation of a Child #1
>
> d.    <u>Racketeering Act 3:</u> Sexual Exploitation of a Child #2
>
> e.    <u>Racketeering Act 4:</u> Possession of Child Pornography
>
> f.    <u>Racketeering Act 5A:</u> Conspiracy to Commit Identity Theft #2
>
> g.    <u>Racketeering Act 5B:</u> Identity Theft #1
>
> h.    <u>Racketeering Act 5C:</u> Identity Theft #2
>
> i.    <u>Racketeering Act 6:</u> Conspiracy to Alter Records for Use in an Official Proceeding
>
> j.    <u>Racketeering Act 7:</u> Conspiracy to Commit Identity Theft #3
>
> k.    <u>Racketeering Act 8A:</u> Trafficking for Labor and Services
>
> l.    <u>Racketeering Act 8B:</u> Document Servitude

{00207518 }

m.   <u>Racketeering Act 9:</u> Extortion

n.   <u>Racketeering Act 10A:</u> Sex Trafficking

o.   <u>Racketeering Act 10B:</u> Forced Labor

p.   <u>Racketeering Act 11:</u> Conspiracy to Commit Identity Theft #4

818.   All the defendants in the criminal proceeding are awaiting sentencing.

{00207518 }

## CLAIMS UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### COUNT I

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) - 18 U.S.C. § 1962(c) (against all Individual Defendants on behalf of all Plaintiffs)

819.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

820.    The Individual Defendants conspired to operate and operated a racketeering Enterprise. Through this racketeering Enterprise, they operated a pyramid scheme, physically and psychologically abused people, and engaged in, among other criminal acts: (i) mail fraud and wire fraud, bilking Plaintiffs and others out of large sums of money, (ii) forced labor and trafficking in forced labor, and (iii) forced sexual slavery and trafficking in sexual "slaves."

821.    Over time, Defendants established dozens of entities and groups through which the Enterprise could affect its scheme, achieve its objectives, and engage in the myriad predicate racketeering acts and other wrongdoing alleged herein.  The Enterprise was separate and apart from any one or group of these entities, each of which had a separate legal existence and served an independent business purpose.

822.    Defendants knew they were managing and operating a racketeering Enterprise that destroyed hundreds of lives while Defendants enriched and aggrandized themselves, maintaining a highly abusive environment that enabled Defendants to manipulate and coerce members into doing as Defendants commanded, for both financial and psychological gain.

823.    Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

824.    Each Individual Defendant is a person within the meaning of 18 U.S.C. § 1961(3)

{00207518 }

who conducted or participated, directly or indirectly, in the conduct, operation, and management of the Enterprise's affair through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

825.    The Individual Defendants and their named and unnamed co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961 (4) and l962 (c), referred to in the Complaint as the Enterprise or NXIVM.  Each of the Individual Defendants participated in the operation or management of the Enterprise.

826.    The Enterprise's purpose was to enrich the Individual Defendants (both monetarily and psychologically) at the expense of Plaintiffs and many other victims.  The scheme was accomplished through the commission of numerous and continuous acts of racketeering activity targeting Plaintiffs and many other people.

827.    The Individual Defendants committed and conspired to commit multiple, related acts of racketeering activity that spanned decades in order to fulfill the purpose of the Enterprise, to hold dominion over the members of NXIVM for both financial and psychological gain.

828.    The Individual Defendants committed and conspired to commit the following racketeering activity: (i) conspiring to and subjecting Plaintiffs and other people to a condition of peonage in violation of 18 U.S.C. § 1581; (ii) conspiring to and providing and obtaining the services of Plaintiffs and other people by means of force, threats of force, physical restraint, and threats of physical restraint in violation of 18 U.S.C. § 1589; (iii) conspiring to and recruiting, harboring, transporting, providing, or obtaining by various means the labor or services of Plaintiffs and other people in violation of 18 U.S.C. § 1589; (iv) conspiring to and recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, or soliciting Plaintiffs and other people, knowing or in reckless disregard of the fact that force, threats of force, fraud or

{00207518 }

coercion were used to have them engage in commercial sex acts in violation of 18 U.S.C. § 1591;

(v) extortion; (vi) tampering with a witness, victim, or an informant in violation of 18 U.S.C. §

1512; (vii) retaliating against a witness, victim, or an informant in violation of 18 U.S.C. § 1513,

and (viii) conspiring to and by carrying out an ongoing scheme to defraud or to obtain money or

property by means of false or fraudulent pretenses, representations or promises through an

unlawful pyramid scheme in which it was reasonably foreseeable that the mails and wires would

be used to execute and further the scheme and which were in fact used to further and execute the

scheme, or would be used incidental to an essential part of the scheme, in violation of 18 U.S.C.

§§ 1341 and 1343.

829.   As described in the foregoing paragraphs of this Complaint, the Enterprise was

operated through the racketeering acts described above and fraud, blackmail and intimidation, to

(i) obtain tens and even hundreds of thousands of dollars from Plaintiffs and other people for an

ever-proliferating universe of programs and alleged business or career opportunities as part of a

high-pressure, unlawful pyramid scheme, (ii) coerce, intimidate, and fraudulently induce

Plaintiffs and others into performing unpaid labor for NXIVM and/or unpaid personal services

for the Individual Defendants, including commercial sex acts, and (iii) harass, threaten, extort,

and blackmail victims in order to prevent the reporting, disclosure, or prosecution of the

members of the Enterprise and their  activities.

830.   The Individual Defendants and their co-conspirators organized their Enterprise

into a cohesive group with specific and assigned responsibilities and a command structure,

operating in the United States, Canada and Mexico, funded primarily from the United States,

directed mainly from the United States, with proceeds of the racketeering acts directed to and

paid in the United States. Over the years the Individual Defendants grew their scheme and the

{00207518 }

158

Enterprise, recruiting new members to their operation, and expanding the scope and nature of their activities. While the organization and scope of the Enterprise has evolved over time, and its members may have held different roles at different times, the Enterprise has been structured by the Defendants to operate as a unit in order to accomplish the goals of their criminal scheme.

831.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343**

832.    As alleged above, the Individual Defendants engaged in an illegal pyramid scheme in order to defraud Plaintiffs and others into paying for programs that were falsely represented as being scientific, patent-pending technology that would lead to a more lucrative and satisfying career path and fulfillment in life and would solve many of humanity's most serious problems.  In fact, unlike what was falsely represented, the programs were not scientific, patent-pending technology that would lead to a more lucrative and satisfying career path and fulfillment in life and would not solve many of humanity's most serious problems.  Instead, the money obtained from the Plaintiffs and others was intended to and was in fact used for unlawful purposes including to illegally enrich the Individual Defendants, the unauthorized practice of psychotherapies, dangerous human experiments, and trafficking in persons in violation of U.S. criminal laws.  Defendants' fraudulent pyramid scheme caused each Plaintiff to suffer economic losses in the form of money they paid in exchange for what they were intentionally misled to believe was a scientific, patent-pending technology program that would lead to a more lucrative and satisfying career path and fulfillment in life and would solve many of humanity's most serious problems.

833.    In furtherance of their scheme or artifice to defraud, and as described herein, the

{00207518 }

Individual Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.  Individual Defendants either used the mails and wires in furtherance of the scheme or artifice to defraud, instructed others to do so, understood that use of the mails and wires would follow in the ordinary course of business, or could reasonably foresee that the mails and wires would be used.  The use of the mails and wires included, but were not limited to, the following:

        a.      emails and text messages incorporating false and misleading statements regarding NXIVM and the programs;

        b.      wirings and/or mailings between and among the Individual Defendants concerning NXIVM;

        c.      the transfer of money from Plaintiffs and others to, for example, pay for programs promoted, operated, or managed by the Enterprise and the Individual Defendants;

        d.      the transfer of funds between and among the Individual Defendants, with the intent that the funds be used to promote the activities of the Enterprise;

        e.      communications directed toward U.S. state and federal government officials and regulators incorporating false and misleading statements; and

        f.      electronic filing and service of court papers containing false and misleading statements.

        834.    The Individual Defendants participated in the scheme or artifice to defraud knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiffs into paying for NXIVM programs. The Individual Defendants knowingly and intentionally caused

{00207518 }

statements that they knew to be false or misleading to be disseminated to the Plaintiffs and others who paid for the programs, the general public, to the media, and to multiple state and federal agencies and federal courts, with the intent that those statements be believed.

835.  Plaintiffs were injured in their business or property by the Individual Defendants' violations of 18 U.S.C. § 1962(c).  Plaintiffs reasonably relied on false and misleading statements regarding the programs in providing money directly or indirectly to the Enterprise and the Individual Defendants and in addition false statements have been relied on by U.S. courts and U.S. state and federal government agencies that caused monetary injury to Plaintiffs.

**COUNT II**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) CONSPIRACY - 18 U.S.C. § 1962(d)**
**(against all Individual Defendants on behalf of all Plaintiffs)**

836.  Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

837.  Each of the Individual Defendants agreed to conduct or to participate in the conduct of the affairs of the Enterprise and that they or others would commit at least two racketeering acts within a ten year period as set forth above, which included: (i) conspiring to and subjecting Plaintiffs and other people to a condition of peonage in violation of 18 U.S.C. § 1581; (ii) conspiring to and providing and obtaining the services of Plaintiffs and other people by means of force, threats of force, physical restraint, and threats of physical restraint in violation of 18 U.S.C. § 1589; (iii) conspiring to and recruiting, harboring, transporting, providing, or obtaining by various means the labor or services of Plaintiffs and other people in violation of 18 U.S.C. § 1589; (iv) recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, or soliciting Plaintiffs and other people, knowing or in reckless disregard of the fact

that force, threats of force, fraud or coercion were used to have them engage in commercial sex acts in violation of 18 U.S.C. § 1591, (v) extortion; (vi) tampering with a witness, victim, or an informant in violation of 18 U.S.C. § 1512; (vii) retaliating against a witness, victim, or an informant in violation of 18 U.S.C. § 1513, and (viii) conspiring to and by carrying out an ongoing scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises through an unlawful pyramid scheme in which it was reasonably foreseeable that the mails and wires would be used to execute and further the scheme and which were in fact used to further and execute the scheme, or would be used incidental to an essential part of the scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

838.   Plaintiffs were injured in their business or property by the Individual Defendants' violation of 18 U.S.C. § 1962(d).  Plaintiffs reasonably relied on false and misleading statements regarding the programs in providing money directly or indirectly to the Enterprise and the Individual Defendants and in addition false statements have been relied on by U.S. courts and U.S. state and federal government agencies that caused monetary injury to Plaintiffs.

## CLAIMS UNDER 18 U.S.C. § 1595

## COUNT III

### THE 18 U.S.C. § 1595 VENTURE, INCLUDING:

**(A) SEX TRAFFICKING—18 U.S.C. § 1591, CONSPIRACY TO VIOLATE 18 U.S.C. § 1591, and 18 U.S.C. § 1593A, BENEFITTING FROM SEX TRAFFICKING (against all Defendants on behalf of Plaintiffs Jane Doe 1, Sarah Edmondson, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, Jane Doe 10, Jane Doe 11, Jane Doe 12, Jane Doe 13, Jane Doe 15, Jane Doe 16, Jane Doe 17, Jane Doe 18, Jane Doe 19, Jane Doe 20, Jane Doe 21, Jane Doe 23, Jane Doe 25, Jane Doe 26, Jane Doe 27, Jane Doe 28, Jane Doe 29, Jane Doe 30, Jane Doe 31, Jane Doe 32, Jane Doe 33, Jane Doe 34, Jane Doe 36, Jane Doe 39, Jane Doe 41, Jane Doe 42, Jane Doe 43, Jane Doe 44, Jane Doe 45, Jane Doe 47, Jane Doe 48, Jane Doe 50, Jane Doe 51, Jane Doe 52, Jane Doe 53, Jane Doe 54, Jane Doe 55, Jane Doe 56, Jane Doe 58, Jane Doe 59 and Jane Doe 60);**

**(B) FORCED LABOR—18 U.S.C. § 1589, CONSPIRACY TO VIOLATE 18 U.S.C. § 1589, and 18 U.S.C. § 1593A, BENEFITTING FROM FORCED LABOR (against all Defendants on behalf of all Plaintiffs);**

**(C) HUMAN TRAFFICKING—18 U.S.C. § 1590, CONSPIRACY TO VIOLATE 18 U.S.C. § 1590, and 18 U.S.C. § 1593A, BENEFITTING FROM FORCED LABOR (against all Defendants on behalf of all Plaintiffs);**

**(D) PEONAGE —18 U.S.C. § 1581, CONSPIRACY TO VIOLATE 18 U.S.C. § 1581, and 18 U.S.C. § 1593A, BENEFITTING FROM PEONAGE (against all Defendants on behalf of all Plaintiffs); and**

**(E) UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS IN FURTHERANCE OF TRAFFICKING, PEONAGE, OR FORCED LABOR —18 U.S.C. § 1592, CONSPIRACY TO VIOLATE 18 U.S.C. § 1592, and 18 U.S.C. § 1593A, BENEFITTING FROM UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS (against Defendants Keith Raniere, Clare Bronfman, Lauren Salzman, Nancy Salzman, Karen Unterreiner and Kathy Russell on behalf of Plaintiff Jane Doe 1 )**

839.   As set forth in this Complaint, the Individual Defendants, through the NXIVM

Venture, Enterprise, and conspiracy, perpetrated crimes and other illegal actions against

Plaintiffs, who suffered injuries and damages as a result.  Among the crimes were those for

which 18 U.S.C. § 1595 provides the victims a private right of action against the perpetrators of

violations of 18 U.S.C. §§ 1591, 1589, 1590, 1581 and 1592, those who joined with them in the

{00207518 }

Venture and conspiracy to engage in such violations, and those who, in violation of 18 U.S.C. § 1593A, participated and knowingly benefitted from the Venture and conspiracy, knowing or in reckless disregard of the fact that the Venture had engaged in such violations.  Defendants' commission of these crimes also constitute predicate acts of racketeering in connection with the Defendants operation of the RICO Enterprise.

### (A)   Sex Trafficking

840.   Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

841.   In connection with the 18 U.S.C. § 1595 conspiracy and Venture/Enterprise, the Defendants engaged in, participated in, and conspired with each other and with their unnamed co-conspirators, both known and unknown, to engage in violations of 18 U.S.C. §§ 1591 and 1593A.  Each Defendant joined the conspiracy and Venture/Enterprise knowing and agreeing that at least one co-conspirator would engage in at least one overt act in furtherance of the conspiracy and Venture/Enterprise.

842.   The Defendants, individually and together, affecting interstate or foreign commerce and within the territorial jurisdiction of the United States, conspired to and recruited, enticed, harbored, transported, provided, obtained, maintained, and solicited Plaintiffs, knowing or in reckless disregard of the fact that force, threats of force, fraud, and/or coercion were used to cause Plaintiffs to engage in commercial sex acts.

843.   Defendants and their co-conspirators engaged in overt acts taken in furtherance of the conspiracy and Venture/Enterprise reasonably foreseeable to each Defendant, including: causing Plaintiffs to become severely sleep-deprived; imposing severe caloric restrictions on Plaintiffs' diets; creating and operating an environment of fear in which Plaintiffs would be

{00207518 }

punished if they failed to follow directives; verbal and physical abuse; the collection of collateral, the release of which would cause a victim and/or persons close to the victim to experience serious shame, embarrassment, humiliation or other harm; falsely and intentionally misrepresenting to the DOS Plaintiffs that they were joining a women's-only group in which Raniere had no role when, in fact, Raniere created and ran DOS; falsely and intentionally misrepresenting to the exo/eso Plaintiffs that exo/eso was a bona fide income-generating career path when, in fact, it was not and one of the primary purposes of exo/eso was to recruit and groom women for Raniere's harem; and acts of intimidation, tampering and retaliation to prevent victims and witnesses from reporting or cooperating in investigations into Defendants' sex trafficking.

844.    The Defendants, individually and together, obstructed and attempted to obstruct, and interfered and attempted to interfere, with the enforcement of 18 U.S.C. § 1591.  Specifically, Defendants Raniere, and Clare Bronfman, along with others in the United States and Mexico, by false pretenses caused certain law enforcement agencies to open investigations on, and caused certain attorneys to send letters to, victims and witnesses including Plaintiffs Sarah Edmondson, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 19, Jane Doe 23, John Doe 2 and Toni Natalie, threatening them with criminal prosecutions and civil legal actions in order to silence and intimidate them so that they would not report to or cooperate with authorities concerning Defendants' violations of 18 U.S.C. § 1591.

845.    Additionally, Defendant Sara Bronfman attempted to further obstruct or interfere with the enforcement of 18 U.S.C. § 1591 by using false pretenses and promises of money to entice a critical witness, John Doe 8, to leave and remain outside of the United States during the period of the Raniere Trial, in violation of 18 U.S.C. § 1591(d).

{00207518 }

165

846.     The Defendants, individually and together, participated in the conspiracy and Venture/Enterprise, knowing or in reckless disregard of the fact that the conspiracy and Venture/Enterprise was engaged in violations of 18 U.S.C. § 1591, and they benefitted from their participation in the conspiracy and Venture/Enterprise financially and by receiving other things of value including personal services, enhanced status and power within the community, and they further believed that by perpetrating the acts alleged herein that they would achieve greater status and power worldwide, and psychologically, from their participation in the conspiracy and Venture/Enterprise and their myriad illegal acts in connection with the sex trafficking activity alleged herein.

847.     As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1591 and 1593A, Plaintiffs have suffered damages recoverable under 18 U.S.C. § 1595.

### (B)     Forced Labor

848.     Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

849.     In connection with the 18 U.S.C. § 1595 Venture, the Defendants engaged in, participated in, and conspired with each other and their unnamed co-conspirators, both known and unknown, to engage in forced labor in violation of 18 U.S.C. §§ 1589 and 1593A.  Each Defendant joined the conspiracy and Venture/Enterprise knowing and agreeing that at least one co-conspirator would engage in at least one overt act in furtherance of the conspiracy and the Venture/Enterprise.

850.     The Defendants, individually and together, conspired to and knowingly provided and obtained the labor and services of Plaintiffs by any one of, or by any combination of, the following means: by means of force, threats of force, physical restraint, and threats of physical

restraint; by means of serious harm and threats of serious harm, including psychological, financial, and reputational harm to Plaintiffs or persons close to Plaintiffs, sufficiently serious to coerce Plaintiffs into performing and continuing to perform the labor and services; by means of abuse or threatened abuse of law or legal process including the use of, and threats of, fraudulent criminal complaints, vexatious civil litigation, and immigration fraud; and by means of a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if that Plaintiffs did not perform such labor or services, that Plaintiffs or other persons would suffer serious harm or physical restraint.

851.    The Defendants, individually and together, participated in the conspiracy and Venture/Enterprise, knowing or in reckless disregard of the fact that the conspiracy and Venture/Enterprise was engaged in violations 18 U.S.C. § 1589, and they benefitted from their participation in the conspiracy and Venture/Enterprise financially and by receiving other things of value including valuable personal services, enhanced status and power within the community, and they further believed that by perpetrating the acts alleged herein that they would achieve greater status and power worldwide, and psychologically, from their participation in the conspiracy and Venture/Enterprise and their myriad illegal acts in connection with the forced labor activity alleged herein.

852.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1589 and 1593A, Plaintiffs have suffered damages recoverable under 18 U.S.C. § 1595.

### (C)    Human Trafficking

853.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

854.    In connection with the 18 U.S.C. § 1595 Venture, the Defendants engaged in, participated in, and conspired with each other and their unnamed co-conspirators, both known

and unknown, to engage in human trafficking in violation of 18 U.S.C. §§ 1590 and 1593A. Each Defendant joined the conspiracy and Venture/Enterprise knowing and agreeing that at least one co-conspirator would engage in at least one overt act in furtherance of the conspiracy and Venture/Enterprise.

855.   The Defendants, individually and together, knowingly conspired to and recruited, harbored, transported, provided, or obtained by various means, Plaintiffs for labor or services in violation of 18 U.S.C. §§ 1581, 1589 and 1595, which is itself a violation of 18 U.S.C. § 1590. The Defendants, individually and together, obstructed and attempted to obstruct, and interfered and attempted to interfere, with the enforcement of 18 U.S.C. § 1590.  Specifically, Defendants Raniere  and Clare Bronfman, along with others in the United States and Mexico, by false pretenses caused certain law enforcement agencies to open investigations on, and caused certain attorneys to send letters to, victims and witnesses including Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 5, Jane Doe 19, Sarah Edmondson and Toni Natalie, threatening them with criminal prosecutions and civil legal actions in order to silence and intimidate them so that they would not report to or cooperate with authorities concerning Defendants' violations of 18 U.S.C. § 1590.

856.   Additionally, Defendant Sara Bronfman attempted to further obstruct or interfere with the enforcement of 18 U.S.C. § 1590 by using false pretenses and promises of money to entice a critical witness, John Doe 8, to leave and remain outside of the United States during the period of the Raniere Trial.

857.   The Defendants, individually and together, participated in the conspiracy and Venture/Enterprise, knowing or in reckless disregard of the fact that the conspiracy and Venture/Enterprise was engaged in violations 18 U.S.C. § 1590, and they benefitted from their participation in the conspiracy and Venture/Enterprise financially and by receiving other things

of value including valuable personal services, and enhanced status and power within the community, and they further believed that by perpetrating the acts alleged herein that they would achieve greater status and power worldwide, and psychologically, from their participation in the conspiracy and Venture/Enterprise and their myriad illegal acts in connection with the human trafficking activity alleged herein.

858.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1590 and 1593A, Plaintiffs have suffered damages recoverable under 18 U.S.C. § 1595.

**(D)    Peonage**

859.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

860.    In connection with the 18 U.S.C. § 1595 Venture, the Defendants engaged in, participated in, and conspired with each other and their unnamed co-conspirators, both known and unknown, to engage in peonage in violation of 18 U.S.C. §§ 1581 and 1593A.  Each Defendant joined the conspiracy and Venture/Enterprise knowing and agreeing that at least one co-conspirator would engage in at least one overt act in furtherance of the conspiracy and Venture/Enterprise.

861.    The Defendants, individually and together, conspired to and held Plaintiffs in a condition of peonage in violation of 18 U.S.C. § 1581.

862.    The Defendants, individually and together, obstructed and attempted to obstruct the enforcement of 18 U.S.C. § 1581.

863.    Additionally, Defendant Sara Bronfman attempted to further obstruct or interfere with the enforcement of 18 U.S.C. § 1581 by using false pretenses and promises of money to entice a critical witness, John Doe 8, to leave and remain outside of the United States during the

period of the Raniere Trial.

864.    The Defendants, individually and together, participated in the conspiracy and Venture/Enterprise, knowing or in reckless disregard of the fact that the Venture/Enterprise was engaged in violations 18 U.S.C. § 1591, and they benefitted from their participation in the conspiracy and Venture/Enterprise financially and by receiving other things of value including valuable personal services and enhanced status and power within the community, and they further believed that by perpetrating the acts alleged herein that they would achieve greater status and power worldwide, and psychologically, from their participation in the conspiracy and Venture/Enterprise and their myriad illegal acts in connection with the peonage activity alleged herein.

865.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1581 and 1593A, Plaintiffs have suffered damages recoverable under 18 U.S.C. § 1595.

**(E)    Unlawful Conduct With Respect to Documents in Furtherance of Trafficking, Peonage, or Forced Labor**

866.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

867.    In connection with the 18 U.S.C. § 1595 Venture, the Defendants engaged in, participated in, and conspired with each other and their unnamed co-conspirators, both known and unknown, to engage in an unlawful conduct with respect to documents in furtherance of the trafficking, peonage, and forced labor conspiracy and Venture/Enterprise in violation of 18 U.S.C. §§ 1582 and 1593A.  Each Defendant joined the conspiracy and Venture/Enterprise knowing and agreeing that at least one co-conspirator would engage in at least one overt act in furtherance of the conspiracy and Venture/Enterprise.

868.    The Defendants, individually and together, conspired to and knowingly destroyed,

{00207518 }

170

concealed, removed, confiscated, or possessed an actual or purported passport or other immigration document in the course of a violation 18 U.S.C. §§ 1581, 1589, 1590, or 1591, with intent to violate 18 U.S.C. §§ 1581, 1589, 1590, or 1591, or to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel in order to maintain the labor or services of that person.

869.    The Defendants, individually and together, obstructed and attempted to obstruct the enforcement of 18 U.S.C. § 1581.

870.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1592 and 1593A, Plaintiff has suffered damages recoverable under 18 U.S.C. § 1595.

## STATE LAW CLAIMS

### COUNT IV

**NEGLIGENCE PER SE - Unauthorized Practice of Counseling Professions/Aiding and Abetting the Unauthorized Practice of the Counseling Professions and Conspiracy/Acting in Concert
(against all Defendants on behalf of all Plaintiffs)**

871.    New York State law imposes on all persons a legal duty to obtain a license from the State before engaging in the practices of psychology, psychoanalysis and mental health counseling, or to be otherwise authorized by the State to engage in such practices (the "Licensed Professions").  (NY Education Law ss. 7601, 8405 [2], 8402 [2]).  Engaging in the unauthorized practice of psychology, psychoanalysis or mental health counseling (collectively, "counseling therapies"), or aiding and abetting others to engage in such unauthorized practices, is a felony.  (NY Education Law s. 6512).  The laws that govern the Licensed Professions were enacted to protect the safety and welfare of persons seeking help to overcome psychological and emotional difficulties and disorders.

872.    Prior to 2003, New York law regarding psychology was a "certification" statute,

{00207518 }

meaning that the law restricted the use of the title "psychologist" to persons qualified and licensed by the state, but did not address the practice of psychology, thereby implicitly permitting persons to practice psychology so long as they did not use the title of psychologist. There was also a proliferation of persons engaged in other counseling therapy practices that did not neatly fit within traditional definitions of psychology.  These raised grave concerns that existing laws were failing to protect persons within the State from the safety risks posed by untrained, unqualified and unscrupulous counselors and therapists.  In 2003, the New York State legislature amended the Education Law in two respects relevant to this action: (i) it expanded the statute governing psychology to prohibit not only the unauthorized use of the title of "psychologist," but also to prohibit any person from engaging in the practice of psychology without a license or other authorization, irrespective of what title that person adopted; and (ii) it further expanded the scope of the law to cover persons engaged in a wide range of other counseling therapy practices, imposing on them a similar duty to refrain from engaging in those practices without first receiving the education, training and licensure required by the new statute.

873.    Thus, starting in 2003, every person engaged in counseling therapy practices, including without limitation the practices of psychology, psychoanalysis and mental health counseling in New York, must be authorized by the State.  Such persons must satisfy rigorous, detailed education criteria, complete thousands of hours of training, and pass an official examination, among other things.  Applicants for licensure must be persons of high moral character, and upon award of a license they must register with the State and submit to State oversight and regulations, violations of which will lead to disciplinary actions including suspension or revocation of their license, thereby losing their privilege to practice counseling therapies.

{00207518 }

874. This statute thus protects persons seeking help with psychological and emotional difficulties by ensuring that they will receive that counseling or therapy from qualified, authorized persons. The statute also ensures that no person will unwittingly be subjected to such practices, because licensees are prohibited from practicing on any person absent fully informed consent, and persons lacking a license are prohibited from engaging in such practices at all. The statutes delegate responsibility for protecting the public to three interrelated bodies: the Department of Education's Board of Regents, which ensures that only qualified persons engage in these practices through administration of examinations to applicants who demonstrate satisfaction of educational, training and other criteria prior to awarding licenses; the Commissioner of Education's Office of the Professions, which promulgates and administers regulations governing these practices; and profession-specific boards, composed of persons experienced in the Licensed Professions who further oversee practitioners.

875. To further protect the public, these statutes extend beyond practitioners, and also govern (among others): (i) persons who and entities that provide education for counseling therapy; (ii) persons who and entities that provide training in counseling therapy; (iii) persons who and entities that supervise or oversee trainees; (iv) persons who and entities that employ practitioners or contract for their services; and (v) persons who and entities that offer or provide such services.

876. While there are exemptions from application of the licensing requirements available to certain persons and entities, those exemptions are restricted to persons and entities subject to oversight and regulation by other state-recognized bodies that impose duties of care similar to those imposed by the Education Laws and the rules and regulations associated with those laws. Such exemptions include, for example, licensed medical professionals and qualified

{00207518 }

pastoral counselors.  However, even exempt persons are subject to many of these laws, rules and regulations, including prohibitions on training, supervising or overseeing persons learning to practice or practicing these professions unless all criteria are met concerning those providing the training, supervision or oversight and those receiving such training, supervision and oversight.

877.    Thus, every person who is engaged in the practice of counseling therapies, or in the education, training, supervision, oversight, employment or contracting for services of such Licensed Professions, has a statutory duty of care to members of the public.

878.    Defendants intentionally, knowingly, willingly, wantonly, recklessly, maliciously or negligently breached this statutory duty of care, aided and abetted, and acted in concert with respect to the breach, because they engaged in the aforementioned practices, and at no time were they licensed or otherwise authorized by the State to do so.  Defendants, directly and indirectly, engaged in the unauthorized practice of psychology, psychoanalysis and/or mental health counseling, subjecting thousands of unwitting people, including many Plaintiffs in this action, to such practices, knowing or recklessly disregarding the risks of injury such practices presented to Plaintiffs and others.  Defendants not only directly engaged in the unauthorized practice of psychology, psychoanalysis and/or mental health counseling, but they also created and taught a detailed curriculum, trained students in Defendant's methods, and authorized, encouraged, supervised, oversaw, facilitated and provided an organizational structure within which unwitting NXIVM members practiced psychology, psychoanalysis and/or mental health counseling on other unwitting members.

879.    Defendants disguised the true nature of their undertaking, claiming to prospective members and members that they were merely offering a comprehensive system for ethical living and proclaiming that the system was scientific, replicable, and that the results were empirically

{00207518 }

174

measurable and had been so measured.  Defendants knew that none of this was true.  Defendants intentionally disqualified for NXIVM membership persons who practiced or were trained to practice counseling therapy, because such persons would recognize the true nature of Defendants' system, Defendants' widespread violation of statutorily imposed duties of care, and the risks inherent in such violations, and they could report or draw the attention of authorities delegated with the responsibility of overseeing and enforcing laws, rules and regulations governing such practices.

880.    Defendants' system – the so-called NXIVM "technology" or "tech" – consists of observing, evaluating, interpreting and modifying behavior for the purpose of preventing or eliminating what Defendants persuade and manipulate NXIVM members into believing to be symptomatic, maladaptive or undesired behavior.  Defendants claim that their "tech" will improve behavioral health and/or mental health.  The "tech" employed by Defendants includes psychological testing and counseling; psychoanalysis; and psychotherapy.  Defendants diagnose and purport to treat mental, nervous, emotional, cognitive or behavioral disorders, disabilities, ailments or illnesses, disorders of habit or conduct, and the psychological aspects of physical illness, accident, injury or disability.  Defendants treat NXIVM members through techniques including counseling, psychotherapy, psychoanalysis, and other psychological interventions, including verbal and behavioral means and methods.

881.    Defendants' "tech," including without limitation the exploration of meaning, also includes the observation, description, evaluation and interpretation of dynamic unconscious mental processes that contribute to the formation of personality and behavior in order to identify and resolve unconscious psychic problems which affect interpersonal relationships and emotional development, to facilitate changes in personality and behavior through the use of

verbal and nonverbal cognitive and emotional communication.

882.    Defendants' "tech" included engaging in the evaluation, assessment, amelioration, treatment, modification or adjustment to disabilities, problems or disorders of behavior, character, development, emotion, personality or relationships by the use of verbal or behavioral methods with individuals, couples, families or groups in private, group and/or organized settings.

883.    Defendants' "tech" employed the treatment of mental, nervous, emotional, behavioral or addictive disorders, and ailments, by the use of both verbal and behavioral methods of intervention in interpersonal relationships with the intent of assisting the persons to modify attitudes, thinking, affect and behavior which Defendants diagnosed as being intellectually, socially and emotionally maladaptive.

884.    Defendants were required to be licensed by the State of New York in order to engage in the above-described practices, and they were required to be authorized by the State of New York to train, direct and supervise others who they in fact trained, directed and supervised to engage in such practices, despite having no licenses or other State authorization.  In so doing, Defendants successfully evaded layers of comprehensive protections expressly intended by the legislature to increase public safety and welfare.  By masquerading as philosophers and ethicists, adopting misleading and confusing terminology, employing a range of manipulation tactics, binding students with onerous non-disclosure agreements, and enforcing secrecy through pressure tactics and destructive abuses of the legal system, Defendants avoided detection for years, perversely convincing NXIVM members that their emotional struggles, psychological difficulties, disorders and even physical ailments were due to those members' own ethical failings and that only by persevering within the NXIVM system—no matter how painful it was or how much they suffered—would they ever find relief from their suffering.

{00207518 }

885.    Far from providing relief, however, Defendants inflicted tremendous suffering on Plaintiffs and other NXIVM members.  Defendants systematically abused and traumatized members, employing manipulative methods intended to prevent members from recognizing that they were suffering injuries, that those injuries were worsening over time and that Defendants' system was causing, and not curing, their injuries, including without limitation traumatic stress disorders that can—and did—take months, years, and even decades, after cessation of the source of the trauma to recognize, diagnose and begin to treat.

886.    Emotional and psychological injuries arising out of traumatic experiences can result from single events, experiences in relatively compressed time periods, or more temporally diffuse experiences.  Therapeutic failures – unsuccessful applications of psychotherapeutic modalities – can traumatize clients, and one component of the intensive education and training prerequisites to licensure prepares counselors and therapists to be vigilant in identifying early warning signs because they are obligated to cease applying a method if a client begins to show indications of trauma.  That therapy-induced trauma can then be addressed before determining if another treatment modality is more appropriate, and/or if the client should find another counselor or therapist.  Therapists have tremendous responsibility in this regard because the process of traumatization can be subtle, temporally diffuse, and cumulative, and persons experiencing such traumatization cannot recognize that they are being injured while immersed in the experience, and often for many years after.  The intimacy of the therapist-client relationship results in shifting interpersonal dynamics, with clients transferring to their therapists increasing authority and power; they place great trust in their therapists and rely on them to guide them through a process that can be extremely difficult and painful at times, understanding that they have given their consent to a person they believe to be experienced in applying methods that have been

{00207518 }

177

carefully explained to them, including truthful information concerning how well-tested, accepted and successful such methods are for assessing, evaluating and treating conditions and disorders.

887.    Clients thus trust their therapists to do them no harm.  They trust that no matter how painful and difficult the experience, they are being guided by capable hands on a path to wellness, enhanced well-being, happiness, healthier interpersonal relationships, improvements in problematic behaviors, reductions in self-doubt and unhealthy thoughts and thought patterns, increased self-esteem, and perhaps even greater success in life.  They trust that even when they recall and recount past traumas, the process of which can itself cause re-traumatization, they are working within a safe space with a safe person whose only agenda is the careful application of tested methods, within the bounds of strict ethical constraints, vigilant to any signs of therapeutic failure, to help the clients heal.

888.    The statutory duty of care imposed on persons who engage in the practice of counseling therapies thus includes, among other things, informed consent, application of tested methodologies in which the counselor or therapist has been educated, trained and qualified, acute sensitivity to shifting power dynamics and the increasing responsibility to be vigilant to signs of therapeutic failure, traumatization, re-traumatization, and cascading traumatic injuries, and strict adherence to rules designed to constrain potential and actual abuses of these intimate trust relationships.  Licensure and oversight are the linchpins of the State's rigorous system established to protect the public from the tremendous risks inherent in failures of practitioners to comply with their duties of care.

889.    Defendants completely failed to comply with these statutory duties, intentionally designing and employing a perversely abusive psychotherapeutic system, knowing or consciously disregarding the high probability that members subjected to these abuses would be

injured as a result.  And many members, including Plaintiffs, were so injured, and their injuries were caused by Defendants' conduct.  But for their subjection to Defendants' "tech," Plaintiffs would not have suffered those injuries.  But for their reliance on Defendants' intentionally false misrepresentations that the "tech" was based in sound science, empirically proved, Plaintiffs would not have agreed to increasingly immerse themselves in Defendants' system.  But for Defendants' elaborate ruse by which they convinced students that they suffered from non-existent maladies and disorders caused by psychic "disintegrations," which students were told also were root causes of, exacerbating or impeding the healing of ailments students did recognize (including Tourette's Syndrome, Obsessive Compulsive Disorder, and even cancer), and that Defendants' Rational Inquiry "tech" was the only way to wholeness and wellness.  But for Defendants' insistence that students accept that victimhood is self-inflicted, and that therapeutic failures were likewise caused by failure to fully dedicate oneself to "working their issues," that it was necessary to endure their pain and suffering – and even to self-inflict more – in order to achieve the cathartic breakthroughs Defendants labeled "integrations," and other falsehoods calculated to deceive unwitting members into continuing to subject themselves to deeper and deeper levels of systematic abuse, Plaintiffs would not have continued on that course, and they would have avoided or mitigated their injuries.  But for the fact that the traumatic injuries suffered by Plaintiffs were of a nature that does not fully manifest in a recognizable and diagnosable form for lengthy periods of time after the source of the trauma is removed, Plaintiffs would have sooner discovered both their injuries and their cause.  But for the fact that Defendants escalated one step too far, branding women's pubic regions with Raniere's initials as if they were mere chattel, spurring waves of news reporting and a massive federal criminal investigation that finally brought to light the true nature of NXIVM, Plaintiffs would not have

{00207518 }

179

understood the true nature of NXIVM, and would not have had reason to investigate whether they had been injured and, if so, whether NXIVM's methods were the cause.  Defendants knowingly took advantage of the fact that temporally diffuse traumatic experiences can rarely be recognized while in the midst of those experiences in order to subject Plaintiffs and countless others unknowingly to a grand and malicious experiment in human psychology, and they successfully concealed their true designs for two decades before it all finally came to light.

890.    But for Defendants' violations of their statutory duty of care, Plaintiffs would not have suffered the injuries caused by Defendants' conduct.

891.    Defendants' violations of their statutory duties of care (or aiding or abetting or conspiring or acting in concert to violate such duties) constitute negligence per se, for which they are liable to Plaintiffs for their injuries caused by Defendant's conduct.  Because Defendants' violations of their statutory duties of care were intentional, knowing, willful, wanton, reckless and/or malicious, they are additionally liable to Plaintiffs for punitive damages, in amounts to be set by a jury.

### COUNT V

**MALICIOUS ABUSE OF LEGAL PROCESS**
**(against Defendants Raniere, Clare Bronfman, Sara Bronfman, and Nancy Salzman**
**on behalf of Plaintiffs Natalie, John Doe 2, Edmondson, Jane Doe 2, Jane Doe 3,**
**and Jane Doe 5)**

892.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

893.    Defendants commenced dozens of meritless and frivolous civil actions against Plaintiffs.  Defendants actions entirely lacked probable cause, and each action was terminated in Plaintiffs' favor.

894.    Defendants went so far in some instances as to insert themselves and their co-

{00207518 }

180

conspirators into Plaintiff Natalie's bankruptcy proceeding, commencing a series of adverse proceedings, each of which was ultimately dismissed on the merits.  Defendants then proceed to interfere in a similar manner in Plaintiff Natalie's mother's bankruptcy proceeding, which bankruptcy was brought on because Plaintiff Natalie's mother spent all of her money and went deep into debt to help pay her daughter's legal fees so her daughter could continue to defend herself against Defendants' relentless onslaught of abuses of the legal system.

895.    Defendants also instigated the initiation of criminal investigations and proceedings against Plaintiffs by making false or misleading statements to law enforcement authorities, knowing and intending that such statements would cause those authorities to open investigations into Plaintiffs, and further intending that Plaintiffs be prosecuted by those authorities.

896.    Defendants acted with malice throughout the course of their two decades reign of legal terror.  Their objective was not to vindicate any legitimate legal interest, but instead to silence and destroy witnesses, victims and critics of their ongoing unlawful, tortious and injurious activities.

897.    Defendants Raniere, Clare Bronfman and Nancy Salzman directed these abuses of the legal system, including directing and interacting with attorney and private investigators, with substantial assistance from a co-conspirator who provided substantial assistance to them in perpetrating these abuses and investigations.  Defendants Clare Bronfman and Sara Bronfman financed these efforts, spending millions of dollars on lawyers, private investigators and to cover other related expenses.

898.    Plaintiffs suffered special injury as a result of Defendants' malicious abuses of legal process.

{00207518 }

## COUNT VI

### BATTERY (against Defendant Danielle Roberts on behalf of
### Plaintiffs Sarah Edmondson, Jane Doe 4, Jane Doe 5, Jane Doe 7 and Jane Doe 12)

899.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

900.    Defendant Dr. Danielle Roberts engaged in: (i) bodily contact; (ii) made with intent; (iii) that was offensive in nature by branding Sarah Edmondson and Jane Does 4, 5, 7 and 12 with Defendant Raniere's initials as part of an outrageous DOS initiation ritual conducted as part of the Enterprise.

901.    Plaintiffs suffered lasting physical and emotionally injuries as a result of Defendant's commission of battery upon their persons.

## COUNT VII

### AIDING AND ABETTING , ACTING IN CONCERT, AND CONSPIRING WITH
### RESPECT TO BATTERY (against Defendants Raniere, Lauren Salzman,
### Allison Mack, Nicky Clyne, Rosa Laura Junco, Loretta J. Garza Davila, Monica Duran,
### and Daniella Padilla Bergeron on behalf of Plaintiffs Sarah Edmondson, Jane Doe 4,
### Jane Doe 5, Jane Doe 7 and Jane Doe 12)

902.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

903.    Defendant Dr. Danielle Roberts engaged in: (i) bodily contact; (ii) made with intent; (iii) that was offensive in nature by branding Sarah Edmonson and Jane Does 4, 5, 7 and 12 with Defendant Raniere's initials as part of an outrageous DOS initiation ritual conducted as part of the Enterprise.

904.    Defendants Raniere, Lauren Salzman, Allison Mack, Nicky Clyne, Rosa Laura Junco, Loretta J. Garza Davila, Monica Duran, and Daniella Padilla Bergeron aided and abetted and acted in concert with respect to the battery described above by either requesting that it be

{00207518 }

done or by participating in the outrageous ceremony with knowledge and intent that the Plaintiffs were, unbeknownst to them at the time, going to branded and were branded with Defendant Raniere's initials.

905.    Plaintiffs suffered lasting physical and emotionally injuries as a result of the commission of battery upon their persons that Defendants acted in concert with respect to and which they aided and abetted.

## COUNT VIII

### NEGLIGENCE PER SE - Unauthorized Human Research (against Defendant Porter on behalf of Plaintiffs Jane Doe 19, Jane Doe 20, Jane Doe 21 <u>and Jane Doe 22</u>)

906.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

907.    In support of twisted notions about the power of NXIVM's "principles" the Defendants embarked on "studies" and medical experiments that included psychological investigation, utilized human subjects and involved physical or psychological intervention by the researcher upon the body of the subject and was not required for the purposes of obtaining information for the diagnosis, prevention, or treatment of disease or the assessment of medical condition for the direct benefit of the subject and thus constituted "human research" under N.Y. Pub. Health Law § 2441.

908.    Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 were exposed to the possibility of injury, including physical, psychological or social injury, as a consequence of participation as a subject in the research, development, and related activity, which departed from the application of those established and accepted methods necessary to meet their needs or which increased the ordinary risk of daily life, including the recognized risks inherent in a chosen

{00207518 }

occupation or field of service and were thus "human subjects" under N.Y. Pub. Health Law § 2441.

909.     Defendant Porter failed to qualify as a researcher by obtaining a license under Title VIII of the Education Law to perform diagnosis, treatment, medical services, prescription or therapeutic exercises with regard to or upon human beings, or be deemed appropriately competent and qualified by a human research review committee as provided by § 2444 and thus his human research on human subjects violated N.Y. Pub. Health Law § 2443.

910.     Porter also failed to obtain voluntary informed consent subscribed to in writing by Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 in violation of § 2442.  Porter did not obtain the required legally effective knowing consent of Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 while they were able to exercise free power of choice without undue inducement or any element of force, fraud, deceit, duress or other form of constraint or coercion.

911.     Porter also failed to provide Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 with the information necessary to such consent including: (i) a fair explanation of the procedures to be followed, and their purposes, including identification of any procedures that are experimental; (ii) a description of any attendant discomforts and risks reasonably to be expected; (iii) a description of any benefits reasonably to be expected; (iv) a disclosure of any appropriate alternative procedures that might be advantageous for Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22; (v) an offer to answer any inquiries by Jane Doe 19, Jane Doe 20, Jane Doe 21 or Jane Doe 22 concerning the procedures; and (vi) an instruction that Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 were free to withdraw their consent and to discontinue participation in the human research at any time without prejudice to them.

912.     ESP and ESF also failed to establish a human research review committee in

violation of N.Y. Pub. Health Law § 2444.

913.    As a result of Defendants' violation of New York law, Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 sustained significant injuries.

## COUNT IX

**AIDING AND ABBETING, ACTING IN CONCERT, AND CONSPIRING With Respect to Unauthorized Human Research (against Defendants Raniere, Nancy Salzman, Lauren Salzman, Clare Bronfman, and Sara Bronfman**
**(on behalf of Plaintiffs Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22)**

914.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of this Complaint.

915.    Defendant Porter failed to qualify as a researcher by obtaining a license under Title VIII of the education law to perform diagnosis, treatment, medical services, prescription or therapeutic exercises with regard to or upon human beings, or be deemed appropriately competent and qualified by a human research review committee as provided by § 2444 and thus his human research on a human subject violated N.Y. Pub. Health Law § 2443.

916.    Defendant Porter also failed to obtain informed voluntary informed consent subscribed to in writing by Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 in violation of § 2442. Defendant Porter did not obtain the required legally effective knowing consent of Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22, while they were able to exercise free power of choice without undue inducement or any element of force, fraud, deceit, duress or other form of constraint or coercion. Defendant Porter also failed to provide Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 with the information necessary to such consent including: (i) a fair explanation to Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 of the procedures to be followed, and their purposes, including identification of any procedures that are experimental; (ii) a description of any attendant discomforts and risks reasonably to be expected; (iii) a

{00207518 }

185

description of any benefits reasonably to be expected; (iv) a disclosure of any appropriate alternative procedures that might be advantageous for Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22; (v) an offer to answer any inquiries by Jane Doe 19, Jane Doe 20, Jane Doe 21 or Jane Doe 22 concerning the procedures; and (vi) an instruction that Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 were free to withdraw their consent and to discontinue participation in the human research at any time without prejudice to them.

917.    Defendants had actual knowledge that Porter was conducting unauthorized human research on human subjects in violation of N.Y. Pub. Health Laws §§ 2442 and 2443.

918.    Defendant Raniere conceived the study protocol that was used to conduct the unauthorized human research on Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22, substantially assisting Defendant Porter.

919.    Nancy Salzman identified and recruited subjects for the unauthorized human research, substantially assisting Defendant Porter.

920.    Defendants Clare Bronfman and Sara Bronfman provided the funds for the rent of the premises and the purchase of the equipment used in the unauthorized human research through ESF, substantially assisting Porter.

921.    By providing substantial assistance to Defendant Porter, each of the Defendants aided and abetted and acted in concert with Porter in unauthorized human research on Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22.

922.    As a direct and proximate result of the Defendants' aiding and abetting, Defendant Porter performed unauthorized human research on Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22, which caused Jane Doe 19, Jane Doe 20, Jane Doe 21 and Jane Doe 22 to sustain significant injuries.

{00207518 }

186

## COUNT X

### GROSS NEGLIGENCE and RECKLESSNESS (against Defendants Raniere, Porter, Nancy Salzman, Clare Bronfman and Sara Bronfman on behalf of <u>Plaintiffs Jane Doe 20, Jane Doe 21 and Jane Doe 22)</u>

923.    Raniere assumed a duty of care to Jane Doe 20, Jane Doe 21 and Jane Doe 22 when he directed Porter and Nancy Salzman to use ESP curriculum and EMs to treat Jane Doe 20, 21 and 22's OCD and Tourette's Syndrome, and directed Clare Bronfman and Sara Bronfman to fund ESF and finance the treatment.  Raniere breached this duty of care by causing Jane Doe 20, Jane Doe 21 and Jane Doe 22 to suffer i) post-traumatic stress disorder, ii) physical pain, iii) mental anguish, iv) additional medical bills, and v) lost work and lost earning capacity.

924.    As a Medical Doctor, Porter had a duty to uphold the accepted standard of care in his treatment of Jane Doe 20, Jane Doe 21 and Jane Doe 22.  Porter breached this duty by failing to provide a standard of care that a reasonably prudent and careful doctor would provide under similar circumstances, which caused Jane Doe 20, Jane Doe 21 and Jane Doe 22 to suffer injury.

925.    As a Registered Nurse, Nancy Salzman had a duty to uphold the accepted standard of care in her treatment of Jane Doe 20, Jane Doe 21 and Jane Doe 22.  Nancy Salzman breached this duty by failing to provide a standard of care that a reasonably prudent and careful registered nurse would provide under similar circumstances and her use of psychotherapy as a treatment for OCD and Tourette's Syndrome caused Jane Doe 20, Jane Doe 21 and Jane Doe 22 to suffer to suffer injury.

926.    That as sponsors of Jane Doe 20, Jane Doe 21 and Jane Doe 22's treatment, Clare Bronfman and Sara Bronfman had a duty of care to supervise Defendants Porter and Nancy Salzman's treatment of Jane Doe 20, Jane Doe 21 and Jane Doe 22.  They breached this duty by failing to ensure that the treatment provided met the standard of care that a reasonable doctor and

registered nurse would provide in similar circumstances, causing injury to the Plaintiffs.

927.    Defendants' treatment plan for Jane Doe 20, Jane Doe 21 and Jane Doe 22's OCD and Tourette's Syndrome was such an extreme departure from the standards of ordinary care, that the danger to the subject was either known to Defendants or so obvious that Defendants must have been aware of it , and each Defendant deliberately proceeded to act, or failed to act, in conscious disregard or indifference to that risk.

928.    As a direct and proximate result of Defendants' gross negligence, Jane Doe 20, Jane Doe 21, and Jane Doe 22 sustained significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court find the Defendants liable on all Counts of the Complaint applicable to them and that judgment be entered on Plaintiffs' behalf for amounts to be determined.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 28, 2020

                                              */s/ Neil L. Glazer*
                                              Neil L. Glazer
                                              William E. Hoese
    Steven M. Steingard
    Stephen H. Schwartz
    Craig W. Hillwig
    Zahra R. Dean
    Aarthi Manohar
    KOHN, SWIFT & GRAF, P.C.
    1600 Market Street, Suite 2500
    Philadelphia, PA 19103
    (215) 238-1700

    Aitan D. Goelman
    ZUCKERMAN SPAEDER
    1800 M Street NW, Suite 1000
    Washington, DC 20036
    (202) 778-1800

{00207518 }