UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

KEITH RANIERE,

Defendant.

No. 18-cr-204 (NGG) (S-2)

**Date of service: March 9, 2020**

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KEITH
RANIERE'S MOTION FOR A NEW TRIAL DUE TO NEWLY
DISCOVERED EVIDENCE OF PERJURY THE GOVERNMENT KNEW
OR SHOULD HAVE KNOWN BY TWO KEY PROSECUTION
WITNESSES**

**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

Marc A. Agnifilo, Esq.
Teny R. Geragos, Esq.
*Of Counsel*

**DEROHANNESIAN &
DEROHANNESIAN**
677 Broadway, Suite 707
Albany, NY 12207
(518) 465-6420

Paul DerOhannesian II, Esq.
Danielle R. Smith, Esq.
*Of Counsel*

*Attorneys for Defendant Keith Raniere*

## Table of Contents

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ...................................................................................................3

     A.      Pretrial Proceedings ................................................................................3

     B.      Trial ........................................................................................................7

     C.      The Glazer Complaint.............................................................................14

         1.      Jane Doe 1 ...................................................................................14

         2.      Jane Doe 2 ...................................................................................16

         3.      Jane Doe 4 ...................................................................................17

III.    ARGUMENT: The Witnesses Perjured Testimony and the Government's Failure to Correct It and Indeed Prevent Further Questions on the Matter Requires a New Trial.....17

     A.      Legal Standard ........................................................................................18

         1.      Materiality of the Perjury to the Jury's Verdict...........................18

         2.      Prosecution's Awareness .............................................................19

     B.      Daniela and Nicole Committed Perjury ..................................................20

     C.      The Government Knew or Should Have Known of the Perjury ..............20

     D.      The Perjury Was Material .......................................................................22

     E.      The Government Demonstrated Willful Blindness and Failed to Investigate— or Worse, Objected in Order to Keep Material Information From the Jury ..........24

IV.     CONCLUSION.....................................................................................................25

## Table of Authorities

### Statutes

18 U.S.C. § 3500.........................................................................................................................5

18 U.S.C. § 1623.......................................................................................................................20

### Cases

Blumberg v. Garcia, 687 F. Supp. 2d 1074 (C.D. Cal. 2010).........................................24

Commonwealth of N. Mariana Islands v. Bowie, 243 F.3d 1109 (9th Cir. 2001).........................24

Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105 (1974) ............................................18, 23

Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431 (1986) ..................................23

DuBose v. Lefevre, 619 F.2d 973 (2d Cir. 1980) ...........................................................19

Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972) ...................................21, 22

Green v. McElroy, 360 U.S. 474, 76 S. Ct. 1400 (1959).................................................19

Mark Vicente, et. al. vs. Keith Raniere, et. al., 20-cv-485 (EK-SMG) (E.D.N.Y. Jan. 28, 2020) (Dkts. No. 1, 4) .........................................................................................1, 7

Morris v. Ylst, 447 F.3d 735 (9th Cir. 2006) ................................................................24

Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959)....................................19, 20, 24

People v. McFarley, 31 A.D.3d 1166 (N.Y. App. Div. 4th Dep't 2006)........................19

People v. Wallert, 98 A.D.2d 47 (N.Y. App. Div. 1st Dep't 1983) .................19, 21, 23

Perkins v. LeFevre, 691 F.2d 616 (2d Cir. 1982) ....................................................18, 22

Shih Wei Su v. Filion, 335 F.3d 119 (2d. Cir. 2003).......................................19, 22, 24

Stevens v. Bordenkircher, 746 F.2d 342 (6th Cir. 1984)................................................17

United States v. Agurs, 427 U.S. 96, 97 S. Ct. 2393 (1976) ....................................19, 21

United States v. Monteleone, 257 F.3d 210 (2d Cir. 2001) .......................................18, 24

ii

United States v. Sessa, Nos. 92-cr-351 (ARR) & 97-cv-2079 (ARR), 2011 WL 256330
(E.D.N.Y. Jan. 25, 2011) ........................................................................................................18

United States v. Stofsky, 527 F.2d 237 (2d Cir. 1975)...................................................................19

United States v. Wallach, 935 F.2d 445 (2d Cir. 1991) ......................................................... *passim*

United States v. Young, 17 F.3d 1201 (9th Cir. 1994) .................................................................23

Wheeler v. United States, 351 F.2d 946 (1st Cir. 1965) ...............................................................19

## Other Authorities

Fed. R. Crim. P. 33 ........................................................................................................................18

## I.     **INTRODUCTION**

Defendant Keith Raniere moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. On January 28, 2020, seven months after the guilty verdict in this case, four key witnesses (whose testimony was necessary to establish guilt on all counts in the Superseding Indictment), among many other plaintiffs, filed a civil suit against Raniere seeking monetary damages. See Mark Vicente, et. al. vs. Keith Raniere, et. al., 20-cv-485 (EK-SMG) (E.D.N.Y. Jan. 28, 2020). This Complaint shows that two of these witnesses, Daniela (Jane Doe 1 in the lawsuit), and Nicole (Jane Doe 4 in the lawsuit) committed perjury at the trial by knowingly lying about their intention, plan and role in bringing a civil lawsuit against Raniere and others for monetary damages. Moreover, the surrounding events clearly show that the government knew or should have known that these witnesses committed perjury at the trial, and that the government not only permitted perjured testimony to be elicited to the jury, but also obstructed counsel's efforts to reveal the motivations of these witnesses who have brought suit against Raniere. Accordingly, the recently filed civil lawsuit is material new evidence, within the meaning of Rule 33, demonstrating perjury by key government witnesses, perjury that the government knew, and should have known, was committed, as will be demonstrated below.

Witness perjury can alone be sufficient to warrant a new trial. However, where, as here, the government had either actual knowledge of the perjury, or, at a minimum, should have known of it, reversal is virtually automatic. United States v. Wallach, 935 F.2d 445 (2d Cir. 1991). This perjury is all the more significant given the other errors defense counsel already raised during the course of this trial.[1] Therefore, this Court should order a new trial for Keith Raniere.

---

[1] Among other issues, over the defense's objection (a) the Court allowed several witnesses deemed victims by the government to testify under nicknames or partial names; (b) the Court terminated defendant's cross-examination of the sole cooperating witness; and (c) the Court permitted

As a starting point, the government knew or should have known that these witnesses together with Neil Glazer, as their lawyer, were intending to bring a civil lawsuit because they were on notice throughout the course of their investigation. First, ████████████████████. Second, Glazer attended at least thirty-three government proffer sessions[2] with at least fifteen different witnesses and potential witnesses interviewed by the prosecutors and agents assigned to this case. Third, prior to trial on April 27, 2019, the defense wrote in a motion that "many of these [purported victims] are contemplating a class-action case and have retained counsel in doing so…." (See Dkt. 595 at 4.) Fourth, the government's second witness, Mark Vicente, testified that he had retained Glazer as a civil lawyer for a potential future lawsuit (5/13/19 Tr. at 740-741), putting the prosecutors on actual notice that Vicente at least was contemplating a civil suit against Raniere. Fifth, on May 22, 2019, the day before Daniela took the stand, ████████████████████ further putting the government on notice of his role in bringing a civil action. By the time Daniela testified commencing on May 23, 2019, the government was well aware that she was contemplating a civil suit, along with Mark Vicente and Nicole and Jay.

Therefore, counsel had a good faith basis to explore Vicente's role in retaining Glazer for the other witnesses in this case—who are Jane Doe 1, Jane Doe 2 and Jane Doe 4 in the pending lawsuit. As set forth below, the prosecution obstructed the defense line of questioning to develop collusion among the witnesses—and instead the jury and counsel were left with the witnesses'

---

evidence of numerous abortions although the defense offered to stipulate to sex between Raniere and these women.

[2] This number does not include the number of preparation sessions that Glazer attended with his clients, as the defense did not receive notes of witness preparation sessions between the government and any witnesses.

false and misleading answers that they had no plans to file suit, when the government knew, or should have known, that was not the case.

If the jury had known about the perjury, demonstrating the witnesses' bias to testify against Raniere, their collusion with each other and their willingness to lie under oath, there is a significant chance that this would have undermined the credibility of these witnesses and permitted, together with other evidence elicited by the defense, the jury to disregard or doubt their critical testimony in whole or in part. This would have significantly undermined the strength of the government's case, which rested underlined entirely on these witnesses' corroborative testimony in the charges of Racketeering Act 1 (Daniela), Racketeering Act 5 (Daniela), Racketeering Act 7 (Daniela), Racketeering Act 8 (Daniela), Racketeering Act 9 (Nicole and Jay), Racketeering Act 10 (Nicole), Count 5 (Nicole), Count 6 (Nicole) and Count 7 (Jay). Given the essential role Daniela, Nicole and Jay's testimony played in this case, the evidence of Daniela and Nicole's collective perjury (with their lawyer approving of it) and the government's failure to correct it or meaningfully investigate it warrants a new trial. In addition, the Court should hold a hearing to allow Raniere to call witnesses, issue defense subpoenas and establish "the extent to which the prosecution was aware of the perjury" and yet "permitted the introduction of false testimony." Wallach, 935 F.2d 445.

## II.   **BACKGROUND**

Because the Court is thoroughly familiar with the factual background and procedural history of this case, Raniere provides only the facts pertinent to this motion.

### A. Pretrial Proceedings

On August 21, 2018, civil class-action lawyer Neil Glazer sent the government a letter to deliver to the Court in connection with co-defendant Clare Bronfman's bail hearing. The government obliged. Glazer notified the Court he represented "numerous individuals who were victims of and/or witnesses concerning crimes charged in the Superseding Indictment." (Ex. 1:

8/21/18 Ltr at 1 (undocketed).) He cautioned the Court against any "proposed modification to Defendant Clare Bronfman's bail conditions" (id.), which this Court had set at $100 million on July 24, 2018 (see Dkt. 62).

Neil Glazer works for the firm Kohn Swift & Graf in Philadelphia, PA, which according to their website, practices in the following areas: Antitrust, Human Rights/Anti-Terrorism, Consumer Protection, Intellectual Property and Securities. (See Ex. 2: Practice Areas.) Upon review of the firm's website, there is no mention of representation of individuals in a criminal investigation. The only mention of representation of a client in a criminal capacity is buried in a byline in Glazer's biography listed after two paragraphs of the numerous plaintiffs and defendants he has represented in his career. (See Ex. 3: Glazer Bio "Neil also represented corporate and institutional clients in criminal and regulatory proceedings and investigations") (emphasis added). It is clear from a review of Glazer's cases that he represents classes of individuals.

This is also true here. In his August 21st letter, he wrote numerous phrases indicating that he represented classes of individuals (without specifying names). This clearly put the government on notice that Glazer and several of the government's witnesses were intending to bring a lawsuit against Raniere and others.[3] For example, the following phrases in his letter are all indicative of a class-action lawyer gathering his plaintiffs for a future lawsuit:

- "Our clients, numerous individuals" (Ex. 1: 8/21/18 Ltr at 1);

- "Our clients—which number in the dozens" (Id. at 2);

- "[t]he direct victims…are our clients" (Id.)

- "Current and former members of the NXIVM community assisted Ms. Bronfman and Mr. Raniere" (Id.); and

---

[3] At the time of filing the letter, Glazer, unbeknownst to the defendant, had already participated in at least twenty-seven government interviews with his clients.

- "there are a significant number of persons" (Id. at 3).

Beginning on November 11, 2017—when the DOJ's investigation began—Glazer brought in "numerous individuals" into the U.S. Attorney's Office for interviews or proffers. (Ex. 1 at 1; see also 3500-KK-2). Counsel was unaware of the sheer amount of witnesses he represented until counsel began receiving materials pursuant to 18 U.S.C. § 3500 on April 2, 2019. This material made clear that Glazer represented at least fifteen individuals[4] and was expending countless hours of time on this matter—which included travel to New York City from Philadelphia, PA—over two years despite representing to this Court that his clients became "impoverished" by Bronfman and Raniere. (Ex. 1 at 2.) In other words, it would have been clear to the government that Glazer's work and time expenditure was in contemplation of an impending civil suit. From the information counsel received in § 3500 material and at trial, Glazer represented at least sixteen witnesses interviewed by the government.[5]

1. Mark Vicente (Named Plaintiff in the lawsuit)
2. Toni Natalie (Named Plaintiff in the lawsuit)
3. Sarah[6] (Named Plaintiff in the lawsuit)
4. Daniela (Jane Doe 1)
5. Nicole (Jane Doe 4)
6. Jay (Jane Doe 2)
7. Audrey (Jane Doe 5)
8. Jennifer Kobelt (Jane Doe 19)

---

[4] Counsel was unaware that Glazer represented Mark Vicente until the government elicited this testimony on direct examination. Glazer's representation of Vicente was not reflected in any FBI 302s or raw notes. Nonetheless the prosecution's obligation to provide Brady information extends to all statements made by witnesses to law enforcement officials, whether such statements were memorialized or not. United States v. Rodriguez, 496 F.3d 221, 225-26 (2d Cir. 2009).

[5] Though the government represented that they produced all § 3500 material relating to any DOS member the government interviewed, they never represented that they produced § 3500 material as to every witness the government interviewed. Accordingly, we believe there are many FBI 302s and raw notes relating to witness interviews that we do not have. The government's Brady obligations extends to information communicated to its agents whether reduced to writing or not. See supra n. 4.

[6] Although Sarah is proceeding with her full name in the lawsuit, we are using her first name only pursuant to this Court's May 4, 2019 Order that DOS members only be referred to by first name.

9.  Adrienne (Jane Doe 16)
10. Sallie Brink (Jane Doe 51)
11. Hector (John Doe 8)
12. Carly (Jane Doe 10)
13. Crystal
14. Rebecca
15. Kristin Keeffe
16. James ███ [7]

From the 3500 material that the government produced, Glazer was present for at least thirty-three interviews with potential witnesses from the government.[8] It appears that many witnesses were contemplating a lawsuit. For example, both the raw notes and the 302 ███ ████████████████████████████████████████████████████ without detail, an impending lawsuit.

- 3500-N█-1 states: "████████████████████████████████████████████████ ███████████████████████" (Ex. 4 at p. 4.)

- 3500-N█-2 states: ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████. After the government produced this material, they filed a motion *in limine* asking the court to shield alleged victims' identities by requiring the parties to refer to them by their first names only. (See Dkt. 567 at 2-9.) Defendant Raniere objected to the motion, for among other reasons that "many of these [purported victims] are contemplating a class-

---

[7] Counsel has not identified Crystal, Rebecca ███, Kristin Keeffe or James ███ as Jane or John Does in the lawsuit. However, there is every reason to believe they may be plaintiffs.
[8] The exhibits that reflect Glazer's presence at government interviews are as follows: ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

action case and have retained counsel in doing so, another measure that will bring media attention."

(Dkt. 595 at 4.) The Court granted the government's motion. (Dkt. 622.)

### B. Trial

At trial, Glazer and typically one of his associates,[9] were present for the testimony of the following clients—Daniela, Nicole and Jay. Though Glazer was not present for the testimony of Mark Vicente, Vicente testified that he was represented by Glazer in connection with civil matters related to Raniere:

| | |
|---|---|
| LESKO: | Do you have another attorney that's representing you? |
| VICENTE: | Ah, yes. Neil Glazer. N-E-I-L. |
| LESKO: | And it's -- why don't you spell the last name. |
| VICENTE: | G-L-A-Z-E-R. |
| LESKO: | And who is Neil Glazer? |
| VICENTE: | Neil Glazer is civil attorney with a firm in Philadelphia. |
| LESKO: | And is this civil attorney representing you in civil matters relating to Mr. Raniere? |
| VICENTE: | In potential civil matters, correct. |

(5/13/19 Tr. at 740-741.)

With the Vicente testimony, the government and their agents were plainly on notice that some group of potential plaintiffs were contemplating a civil lawsuit against Raniere and others.[10] This knowledge on the part of the government became even more pronounced one week later, on May 22, 2019, ███████████████████████████████████████████████████████

---

[9] Glazer's associate, Zahra R. Dean, was present during several trial days, even approaching counsel Teny Geragos on one day regarding her testifying client, Daniela. She has also entered a notice of appearance in the civil action (see Vicente, et al. v. Raniere, et. al., Dkt. 4.) Both Glazer and Dean are licensed to practice in New York State and are required to adhere to New York Rules of Professional Conduct.

[10] The agents ████████████████████████████████████████████, and the government as a whole knew that Mark Vicente also planned on bringing a lawsuit.



---

[11] This sidebar was sealed by Order of the Court.



(5/22/19 Tr. at 2149-2151.)

Therefore, as of May 22, 2019, the Court, the government and their agents and the defense were well aware that (i) Glazer represented Mark Vicente in "potential civil matters" (5/13/19 Tr. at 740-741); (ii) Glazer represented ████████████████████████ ); and (iii) ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ).

The very next day, on May 23, 2019, the prosecution called Daniela as a witness. Daniela was on direct examination until May 30th, when counsel began cross-examination in the afternoon. (See 5/30/19 Tr. at 3047.) On May 31, 2019, counsel questioned Daniela on her connection to Glazer, Glazer's representation of her, and whether she was introduced to Glazer through Vicente. The witness either lied or her answers were cut short by the government's objections, which the Court sustained. The relevant questioning is as follows:

> AGNIFILO:  How many times have you spoken to Mark Vicente in the last three years?
>
> DANIELA:  About, I would say two or three times.
>
> AGNIFILO:  And did you call him or did he call you?
>
> DANIELA:  I don't remember exactly.
>
> AGNIFILO:  You have a lawyer named Neil Glazer, correct?

████████████████████████████████

DANIELA:      Yes.

AGNIFILO:     Because you are going to bring a civil lawsuit, aren't you?

DANIELA:      No.

AGNIFILO:     You have no intention of bringing a civil lawsuit against Keith
              Raniere or NXIVM or anyone else?

DANIELA:      That's not something that I have done or decided, no.

AGNIFILO:     I know you haven't done it but you plan on doing it,
              Don't you?

DANIELA:      No.

AGNIFILO:     Why do you have Neil Glazer as your lawyer?

DANIELA:      I, initially -- I needed counsel to handle the precarious situation
              with my little sister Camila and after that, I needed counsel to
              interact with officials from the government.[13]

AGNIFILO:     Mr. Glazer is not a criminal lawyer, right?

DANIELA:      I don't know.

AGNIFILO:     Do you know that he's Mark Vicente's lawyer too?

PENZA:        Objection.

COURT:        Sustained.

AGNIFILO:     Did you get Mr. Glazer from Mark Vicente?

PENZA:        Objection.

COURT:        Sustained.[14]

---

[13] This is a lie. Daniela did not need Glazer's services to interact with the government concerning
a "precarious situation with [her] little sister Camila" for the simple reason that Daniela did not
inform the government that she created a false identification card to get Camila into Mexico until
she admitted this for the first time on cross examination. (See 5/30/19 Tr. at 3047-3048 (admitting
telling it for the first time on cross-examination); see also 5/30/19 Tr. at 3050 (testifying that she
didn't "remember exactly" when she thinks she told the government about this fake identification
card).) Notably, Camila is not even one of Glazer's Jane Does or clients. The truth is that Daniela
got Glazer from Vicente to sue Raniere.
[14] In light of the fact that Vicente had previously testified that he had hired Glazer for potential
civil matters against Raniere, challenging Daniela's false testimony by reference to how she came
to hire Glazer, an absolutely appropriate, non-privileged question, would have put the lie to her
testimony. However, the government actively assisted Daniela in concealing the truth from the
jury by objecting to this question and having that objection sustained.

AGNIFILO:    Your Honor, can we approach?[15]

COURT:        No. Next question.

AGNIFILO:    How did you find Mr. Glazer as your lawyer?

PENZA:        Objection, Your Honor.

COURT:        Sustained.

AGNIFILO:    So as you sit here today, you have no intention of bringing a civil
             lawsuit?

DANIELA:     That's right.

AGNIFILO:    And you haven't had any discussions with anyone about bringing a
             civil lawsuit?

PENZA:        Objection.

COURT:        Sustained.

(5/31/19 Tr. at 3275-3276.) Counsel was forced to accept her lies as the truth, and the jury had

been misled.

On June 7, 2019, Glazer returned to court again, this time with his testifying client, Nicole.

Just as during Daniela's testimony, Glazer was present behind counsel during direct and cross-

examination of Nicole. Like Daniela, Nicole repeatedly denied any intention to bring a civil

lawsuit. Counsel first asked:

AGNIFILO:    Was there talk about a civil lawsuit against NXIVM and Keith
             Raniere?

NICOLE:      No.

(6/10/19 Tr. at 4269.) Counsel then cross-examined Nicole about the statement she made to the

FBI ███████████████████████████████████████████████████████████████

████████████████████████:

---

[15] Refusing counsel's request to address this issue out of the jury's presence further ensured that
the truth about Daniela's motivation and the truth about how she came to hire this attorney would
be kept from the jury.

AGNIFILO:   And did he [Parlato] pressure you to be involved in a lawsuit?

NICOLE:   In like a civil lawsuit?

AGNIFILO:   Yes.

NICOLE:   No.

AGNIFILO:   Do you remember telling that to the FBI?

PENZA:   Objection.

NICOLE:   No.

COURT:   You may answer that.

NICOLE:   Can you repeat the question?

AGNIFILO:   Sure, do you remember telling the FBI that Frank Parlato pressured you to join a lawsuit against NXIVM?

NICOLE:   No.

AGNIFILO:   Okay, I'm just going to show you something. I'm just going to show you one page and have you read it to yourself. This is 3500-N, number one, its page 4 of that document.

COURT:   All right.

AGNIFILO:   I'm just going to have you read this to yourself.

NICOLE:   Okay.

AGNIFILO:   Do you remember telling the FBI – this is your first interview with them, so it would have been on November 9, 2017, that Frank Parlato was pressuring you to join a lawsuit against NXIVM and also speak with law enforcement regarding NXIVM?

PENZA:   Objection, Your Honor.

COURT:   I will allow it.

NICOLE:   Yeah, he was. He was scaring me.

AGNIFILO:   All right, so tell us –

NICOLE:   But not a lawsuit. Sorry. I'm sorry. He was pressuring me to talk to people and to tell him information. He said at one point he had my collateral. It was like – I was – oh my god. It was incredibly – it was

12

like again? I have to go through this again? Like are you kidding me right now? And at that point I got a lawyer, because I was like I cannot do this again. Someone else can not be telling me that they have my collateral, like this is unbelievable. So I got scared.

(6/10/19 Tr. at 4269-4271.) The Court then held a sidebar, after which, counsel asked again:

AGNIFILO:    And your lawyer, Mr. Glazer is here today, right? He is the gentleman, my colleague here to my left, right?

NICOLE:    Yes.

AGNIFILO:    Are you intending to bring a civil suit?

NICOLE:    No.

AGNIFILO:    No?

NICOLE:    No.

AGNIFILO:    You have no intentions of bringing a civil suit?

NICOLE:    Like me, personally?

AGNIFILO:    You and other people.

NICOLE:    Not me, personally.

AGNIFILO:    Do you intend to be part of a class-action lawsuit?

NICOLE:    No.

AGNIFILO:    I'm not -- I am going to ask you the question, I'm not asking you for anything that you and Mr. Glazer discussed, okay, so when I ask you this question, it is not conversations between you and Mr. Glazer, okay?

NICOLE:    Okay.

AGNIFILO:    Have you discussed with anybody else the prospect of bringing a class-action lawsuit against NXIVM?

NICOLE:    No.

AGNIFILO:    You haven't discussed with Jay, for instance?

NICOLE:    No. No.

(6/10/19 Tr. at 4276-4277.) Glazer was present for Nicole's three days of testimony, which ended on June 10th.

13

He returned to Court on June 11th for Jay's testimony. On direct examination, the government brought out that Jay retained Glazer.

| LESKO: | Did you end up retaining an attorney? |
|--------|---------------------------------------|
| JAY: | Yes. |
| LESKO: | And is that the attorney referenced on the e-mail, Neil Glazer? |
| JAY: | Correct. |

(6/11/19 Tr. at 4452.) Counsel did not address Jay's plans to file a lawsuit during cross-examination. By this point, it was apparent that the Court would not permit the defendant to explore whether Jay found Glazer from one of the other witnesses or ask probing questions tending to unearth the clear collusion among the witnesses or their intention to bring a civil suit.

**C. The Glazer Complaint**

On January 28, 2020, seven months after the jury rendered their verdict, Glazer, on behalf of three publicly-named individuals, Jane Does 1-13, Jane Does 15-39, Jane Does 41-60, John Does 1-17 and John Does 19-20 filed suit against Keith Raniere, his co-defendants, and others. (See Ex. 6: Vicente v. Raniere Glazer Complaint.) Jane Does 1, 2 and 4 were trial witnesses.

1. Jane Doe 1

Glazer's lead plaintiff—indeed, the first Plaintiff listed in the Parties section of the Complaint—is Jane Doe 1, Daniela. The Complaint describes Jane Doe 1 as

> a resident of Mexico. After taking an intensive in Mexico, she traveled to the Albany, New York area, lured with promises of training and employment as a computer programmer and personal tutoring and mentoring by Raniere, so that she might advance what she understood to be NXIVM's humanitarian mission. She was 16 years old at the time, and her parents gave her permission to forgo a year of study on a full scholarship to a prestigious Swiss academy, because they believed Raniere to be a great man working to build a better world.

\*      \*      \*

14

Raniere instructed her to re-enter the United States via Canada, utilizing a false sheriff's identification card of another person procured by Defendant Kathy Russell on direction from Raniere. Russell also traveled to Canada to personally escort her across the border into the U.S. and back into Raniere's clutches in Albany, with the assistance of another of Raniere's co-conspirators.

*     *     *

At some point, Jane Doe 1 informed Raniere that she was attracted to another man and was experiencing romantic feelings that she had never felt for him. She informed Raniere that she would no longer have sex with him. Thereafter, he and members of his Inner Circle, including Defendants Nancy Salzman, Lauren Salzman and Karen Unterreiner began a campaign of extreme isolation, harassment and other abuse that lasted years, culminating in her confinement to a room with virtually no human contact for nearly two years, during which her pleas to be let out were either rejected or ignored.

(Ex. 6 ¶¶ 54, 58, 59.) These allegations in the Complaint exactly match Daniela's direct testimony

at trial, excerpts of which follow:

- Daniela took her first 16-day intensive at "16" (5/23/19 Tr. at 2280). The intensive was "a farewell gift" from her father before her "upcoming trip to Switzerland" (Id. at 2301) where she "was being granted the only scholarship that [the school] gave out a year." (Id. at 2296). In Albany, Raniere said "he could teach" her which was "massive" because she "had taken a year off to help save the world" (Id. at 2337).

- Raniere "came up with a plan….to bring me back [from Mexico]." (Id. at 2409.) "Keith wanted me back so bad that he was plotting this—this strategy." (Id.) "[H]e was figuring out maybe you can come through Canada and…like he was going to have someone have an ID for me, so his plan was this." (Id.) Daniela flew to Canada, where she "met with Kathy Russell" who gave Daniela "my fake ID." (Id. at 2411.) They crossed the border from Canada into the United States and left. (Id. at 2413.)

- When Daniela kissed someone else, she felt a "brand new feeling…of attraction" (5/28/19 Tr. at 2650). She described it as "very exciting" because she "never had those feeling before for men [sic]…and it felt wonderful." (Id. at 2651.) She told Raniere and they fought. (Id.) She testified that after the fight until "they put me in the room, there was a progression and in that whole lapse, which was a number of years, there was Karen, there was Nancy…there was some Lauren and my whole family…" (Id. at 2674.)

- She would plea to be let out of a room, where she was allegedly confined where two years. For example, on October 29, 2010, she wrote "Can I come out of this room please. please, please" (5/30/19 Tr. at 2953).

2.  Jane Doe 2

Jane Doe 2 is indisputably Jay. Jane Doe 2 was, according to the Complaint, "recruited into DOS, then referred to only as The Vow, by a DOS 'slave' acting under the direction of Defendant and First-Line Master Allison Mack. Jane Doe 2 was required to provide collateral and do unpaid work for the DOS 'slave' and Mack." (Ex. 6 ¶ 78.) Raniere "promised that, if she moved to Albany, she could start an 'ethical' t-shirt business with him." (Id. ¶ 79.) Jane Doe 2 did move to Albany, where eventually "Mack instructed her to have sex with Raniere, stating that this was a special assignment that would help her get over trauma from past abuse. Mack further insisted that Jane Doe 2 photograph the encounter, and she told Jane Doe 2 that she had Mack's 'permission' to enjoy the experience." (Id. ¶ 80.)

This is completely consistent with Jay's direct testimony at trial. She testified that she was recruited into a women's only secret society by India Oxenberg (6/10/19 Tr. at 4324) who was Mack's "slave" and acting under Mack's direction. Raniere messaged her that "if you're serious about starting this t-shirt company, the sooner you come back [to Albany], the better." (Id. at 4342.) Mack called Jay to give "this special assignment" (6/11/19 Tr. at 4416) "and she said that the assignment is for me to seduce Keith and have him take a naked picture of me and send it to India to prove that I did it" (id. at 4417). Jay "was pushing back and then [Mack] said, well, don't you still feel like you have disintegrations around your sexual abuse and around me? And so for me I just said—I said, yeah, I guess. She said, well, this is how you're going to get rid of all of those." (Id. at 4418.) "[B]efore she ended the call she said, And I give you permission to enjoy it." (Id. at 4419.)

There is no other DOS member in the 3500 or otherwise that fits the description or profile of (i) a DOS grand-slave to Mack; (ii) who Raniere asked to start an ethical t-shirt business with;

(iii) was given the assignment by Mack to help her get over her "past abuse"—an assignment that Mack gave "permission to enjoy."

### 3. Jane Doe 4

Jane Doe 4 is indisputably Nicole. According to the Complaint, Jane Doe 4 was an actor who "worked for The Source and taught 2-hour long classes three times a week" (Ex. 6 ¶ 99) and "was recruited into DOS, then referred to only as The Vow, by Defendant Allison Mack" (id. ¶ 100). Mack "assigned Jane Doe 4 to establish contact with Raniere and acquiesced to his demands." (Id. ¶ 101.) "Raniere demanded that Jane Doe 4 engage in sexual acts with him. Out of fear of punishment and release of her collateral, Jane Doe 4 unwillingly acquiesced to Raniere's demands." (Id. ¶ 102.) This description is consistent with Nicole's direct testimony at trial.

Nicole testified that she was an actor (6/6/19 Tr. at 3797), who took Source curriculum (id. at 3813) then later taught it (id. at 3842). She was recruited into a group where "a woman mentors another woman" by Mack (id. at 3824-25) and provided collateral to join DOS (id. at 3848). Mack gave Nicole an assignment "[t]o reach out to Keith Raniere" and establish contact (Id. at 3880, 3883.) Nicole engaged in sexual acts with Raniere (6/7/19 Tr. at 3956.) Counsel is not aware of any other DOS member who fits this description from the 3500 material or otherwise.

## III.   ARGUMENT

### THE WITNESSES PERJURED TESTIMONY AND THE GOVERNMENT'S FAILURE TO CORRECT IT AND INDEED PREVENT FURTHER QUESTIONS ON THE MATTER REQUIRES A NEW TRIAL

Defendants are constitutionally entitled "reasonable latitude to develop facts which tend to demonstrate that the testimony in chief is biased and [if] sufficient independent evidence of bias is not available to the jury." Stevens v. Bordenkircher, 746 F.2d 342 (6th Cir. 1984). Here, where counsel sought to develop from multiple witnesses—all represented by Glazer—their collective motive, bias and prejudice to testify so that they could assure a conviction and more easily bring a

civil suit in the future, the witnesses all lied under oath. The government knew or should have known the testimony was false, yet it went uncorrected. These witnesses' testimony certainly could have and did affect the jury's judgment, and their testimony alone led to convictions on counts that carry mandatory minimum sentences. The government's failure to stop it and suborning further perjury demands a new trial.

### A. Legal Standard

A trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant's motion for a new trial based on newly discovered evidence must be filed within three years after the verdict. Fed. R. Crim. P. 33(b)(1). When a new trial is sought based perjury by the government's witnesses, the defendant must "first demonstrate that the witness in fact committed perjury," meaning the witness intentionally gave false testimony on a material point. United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001). To carry that burden, the defendant need only prove perjury by a preponderance of the evidence. United States v. Sessa, Nos. 92-cr-351 (ARR) & 97-cv-2079 (ARR), 2011 WL 256330, at *44 (E.D.N.Y. Jan. 25, 2011). Second Circuit case law holds that the introduction of perjured testimony requires a new trial if the perjured testimony was material to the jury's verdict and the prosecution was aware of the perjury. Wallach, 935 F.2d at 456. Where the prosecution knew or should have known of the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. (quoting Perkins v. LeFevre, 691 F.2d 616, 619 (2d Cir. 1982).)

### 1. Materiality of the Perjury to the Jury's Verdict

The Confrontation Clause and the cases that construe it hold that "[c]ross examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105 (1974). The Supreme Court has held

that "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Id. at 316-317 (citing Green v. McElroy, 360 U.S. 474, 496, 76 S. Ct. 1400, 1413 (1959).) It is material for the jury to know that a witness' testimony was motivated or influenced by expectation or hope of monetary damages. See Wheeler v. United States, 351 F.2d 946 (1st Cir. 1965) (error to not permit a defendant to cross-examine witness in a tax evasion case as to his financial interest in the outcome); People v. McFarley, 31 A.D.3d 1166 (N.Y. App. Div. 4th Dep't 2006) (holding it was reversible error for the trial court to restrict cross-examination of a prosecution witness who had information concerning the victim's "profit motive" in accusing the defendant of rape);  People v. Wallert, 98 A.D.2d 47 (N.Y. App. Div. 1st Dep't 1983) (holding that the prosecutor's failure to disclose the fact that the complainant was contemplating a civil action, which was indeed filed post-conviction, violated due process and demanded a reversal as the prosecutor has a duty to disclose material evidence) (emphasis added).

　　　2.　Prosecution's Awareness

Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic." Wallach, 935 F.2d at 456 (citing United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (citing Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, cert. denied, 429 U.S. 819, 97 S. Ct. 66 (1976).) It is well-settled that the government's "knowing use of perjured testimony deprives the defendant of due process, violating the Fourteenth Amendment and requiring a new trial." DuBose v. Lefevre, 619 F.2d 973 (2d Cir. 1980). "[T]he Supreme Court has made clear that prejudice is readily shown in such cases, and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Shih Wei Su v. Filion, 335 F.3d 119, 127 (2d. Cir. 2003) (citing United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2393 (1976).)  The jury's determination

19

"of the truthfulness and reliability of a given witness may well be determitative of guilt or innocence." <u>Napue</u>, 360 U.S. at 269.

### B.  Daniela and Nicole Committed Perjury

Perjury under Title 18, United States Code, Section 1623 is committed when a witness under oath in a federal court knowingly provides false testimony on a material matter. Daniela (Jane Doe 1) and Nicole (Jane Doe 4), were under oath and they both knowingly gave false testimony on a matter related to their bias toward the defendant, namely whether they were planning to sue him. Both witnesses testified that they were not planning on bringing civil lawsuits, yet both women are front and center in the lawsuit filed just seven months after the verdict. The same lawyer who represented Daniela during at least ten meetings with the government, during all five days of her testimony and represented Nicole during at least three meetings with the government and during all two days of her testimony is the attorney representing the Plaintiffs. This is clearly intentional false testimony. Notably, during this questioning, both Glazer and associate Dean were directly behind counsel.

### C.  The Government Knew or Should Have Known of the Perjury

The government knew the witnesses committed perjury because (i) they elicited from Mark Vicente (their second witness) on direct examination that he engaged Glazer as an attorney for "potential civil matters" meaning that the government knew that for at least Mark Vicente, Glazer was planning on bringing a lawsuit—a fact which was concealed from the defendant until his testimony; (ii) Glazer also accompanied at least fifteen other witnesses to multiple different interviews with the government in connection with the matter; and (iii) the government colluded with civil lawsuit's attorney as his messenger of a letter to the Court on behalf of "numerous individuals" in support of continuing to restrain $100 million of Ms. Bronfman's wealth in bail.

Yet, the government succeeded in preventing counsel from challenging Daniela's false testimony through a series of sustained objections that would have shed light on her true motivations. And counsel was forced to accept her lies as the truth. The truth, of course, is that she absolutely had an intention of bringing a civil lawsuit. The truth is that she, like Vicente, retained Glazer as her lawyer for the same purpose: to bring a civil lawsuit against Raniere.

The same is true for Nicole. ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████ And, while she denied that fact while testifying and claimed she did not recall saying that to the FBI, the FBI 302 alone firmly put the government on notice that a civil action against NXIVM was afoot███████████████████████████████ It is "well settled that a prosecutor is under an affirmative duty to disclose to the defendant material evidence which is exculpatory in nature and such material may include evidence which impeaches the credibility of a prosecution witness." Wallert, 98 A.D.2d at 50 (citing United States v. Agurs, 427 U.S. 97; Giglio v. United States, 405 U.S. 150). The prosecution violated that duty with respect to Keith Raniere.

Even if the government can conceivably fashion and argument that it did not know that Nicole and Daniela were committing perjury, they clearly should have known. They were on notice from meeting with Glazer dozens of times during the course of their investigation and from their own questioning of Mark Vicente that Vicente hired Glazer for "potential civil matters." The government should have known that Glazer, who appeared for at least thirty-three other interviews—despite maintaining an office in Philadelphia and servicing "impoverished" clients— was likely representing Daniela and Nicole in "potential civil matters" as well.

### D.  The Perjury Was Material

Because the government knew or should have known of the perjury, "the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Wallach, 935 F.2d at 456 (quoting Perkins v. LeFevre, 691 F.2d 616, 619 (2d Cir. 1982).) This element is easily met. Daniela, Nicole and Jay's testimony were "to say the least, critical to the government." Id. at 455. Because both Daniela and Nicole's testimony were indispensable to numerous elements of the charged crimes of RICO and Sex Trafficking respectively, the jury's knowledge of their perjury and financial motives could have easily changed the verdict. See Shih Wei Su v. Filion, 335 F.3d at 127 (quoting Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763 (1972) ("A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.").)

Simply put, Daniela and Nicole lied to the jury, the Court and the parties. The lie was material because it directly went to both witnesses' bias to testify falsely against Raniere. The truth was that they were motivated by money the whole time, motivated by the prospect of a pay-day following the conviction of Raniere and how such a conviction would greatly increase the chances of a civil recovery. It was material for the jury to know that the witnesses were tailoring their testimony together—with the help of the same lawyer—to ensure a conviction thereby providing an easier avenue towards a civil judgment. The fact of these witnesses' untruthfulness is itself relevant to the analysis of prejudice. See Wallach, 935 F. 2d at 458.

Moreover, both Daniela and Nicole's testimony were critical to charges that both carry potential life sentences—RICO (Daniela) and Sex Trafficking (Nicole). Daniela was the only witness the government called to support Racketeering Act 1 (conspiracy to commit identity theft, conspiracy to unlawfully possess identification document), Racketeering Act 5 (conspiracy to

commit identity theft), and Racketeering Act 7 (conspiracy to commit identity theft).[16] In Nicole's case, her testimony <u>alone</u> supports the sex trafficking count, which carries a mandatory minimum sentence of fifteen years imprisonment. She and Jay's testimony support Count Three, the Forced Labor Conspiracy.[17] And, attacking the credibility of these witnesses was crucial for the defense. As counsel argued during summation: "I think a lot of the witnesses actually came here and told the truth. I don't know that [Daniela] did. I don't. I think there's ample basis to believe that she wasn't fully honest with you. About everything because to conclude that she wasn't fully honest." (6/17/19 Tr. at 5452.) Here, given that the government relied solely on these witnesses for charges that carry mandatory minimum potential life-sentences, "it was fundamentally obvious that the [witness'] credibility and motive for testifying would be a crucial issue." Wallert, 98 A.D.2d at 50.

Therefore, counsel "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431 (1986) (quoting Davis, 415 U.S. at 318). The facts warrant a new trial. See, e.g., United States v. Young, 17 F.3d 1201, 1204 (9th Cir. 1994) (reversing guilty verdict based on evidence that detective's testimony was false even though the government presented the false evidence unwittingly); Wallach, 935 F.2d at 459. Indeed, these witnesses' testimony alone served to convict the defendant on counts which ensure he serves at least fifteen years in prison. Therefore, Raniere

---

[16] With respect to Racketeering Act 8 (trafficking Daniela for Labor and Services and Document Servitude of Daniela), the government called Lauren Salzman to testify about this as well as Daniela.

has established that the witnesses intentionally gave false testimony on a material point. United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001).

### E. The Government Demonstrated Willful Blindness and Failed to Investigate—or Worse, Objected in Order to Keep Material Information From the Jury

The government allowing false testimony, failing to correct it or at a minimum conduct an appropriate investigation when they were plainly on notice that some group of potential plaintiffs were contemplating a civil lawsuit against Raniere and others requires a new trial. Due process prohibits the government from obtaining a conviction by intentionally allowing false testimony to go uncorrected. Napue v. Illinois, 360 U.S. at 269. The government's duty to correct false testimony applies when the false testimony concerns only the credibility of a witness because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." Id.

The government's duty to correct false testimony "is not discharged by attempting to finesse the problem by pressing ahead without a diligent and a good faith attempt to resolve it." Commonwealth of N. Mariana Islands v. Bowie, 243 F.3d 1109, 1117-18 (9th Cir. 2001). As a result, when a prosecutor suspects or has reasons to suspect perjury, due process requires the prosecutor to investigate those suspicions. See Morris v. Ylst, 447 F.3d 735, 744 (9th Cir. 2006); see also Blumberg v. Garcia, 687 F. Supp. 2d 1074, 1126 (C.D. Cal. 2010) (finding that the prosecution breached its duty under Napue when it had abundant reason to question the witness's veracity but failed to investigate). Not only did the prosecutors sit idly by while key government witnesses committed perjury, but the prosecution also actively assisted their perjury. The truth is that the government knew full well that Vicente, Daniela and Nicole had the same lawyer for the purpose of potential civil matters, yet "the testimony went uncorrected." Shih Wei Su, 335 F.3d at 127. The government's failure to correct Daniela and Nicole's testimony (indeed objecting to

questions about the impending suit) and its refusal to conduct a meaningful investigation here thus amounts to a violation of due process and requires a new trial. See Morris, 447 F.3d at 744.

## IV.    **CONCLUSION**

For the foregoing reasons, this Court should grant Raniere a new trial. In addition, the Court should order a hearing and grant defense subpoenas to fully develop the factual record.

Dated:          March 9, 2020
                New York, NY


                                          /s/
                                          Marc A. Agnifilo, Esq., *Of Counsel*
                                          Teny R. Geragos, Esq.
                                          **Brafman & Associates, P.C.**


                                          /s/
                                          Paul DerOhannesian II, Esq.
                                          Danielle R. Smith, Esq.
                                          **DerOhannesian & DerOhannesian**