2482

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2

  - - - - - - - - - - - - - X
3

UNITED STATES OF AMERICA,   :   18-CR-204(NGG)
4

        Plaintiff ,    :
5
                         United States Courthouse
    -against-       :  Brooklyn, New York
6

KEITH RANIERE, et al.,    :
7
                         May 28, 2019
        Defendant.    :  9:30 o'clock a.m.
8

  - - - - - - - - - - - - X
9

                 TRANSCRIPT OF TRIAL
10
      BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
      UNITED STATES DISTRICT JUDGE, and a jury.
11

APPEARANCES:
12

For the Government:       RICHARD P. DONOGHUE
13
                     United States Attorney
                     BY: MOIRA K. PENZA
14
                        TANYA HAJJAR
                        MARK LESKO
15
                     Assistant United States Attorneys
                     271 Cadman Plaza E, Brooklyn, NY
16

For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
17
                     767 Third Avenue, New York, NY
18
                     BY: MARC A. AGNIFILO, ESQ.
                        TENY ROSE GERAGOS
19
                     DEROHANNESIAN & DEROHANNESIAN
20
                     677 Broadway, Albany, NY 12207
21
                     BY:  PAUL DerOHANNESIAN, II, ESQ.
                        DANIELLE R. SMITH, ESQ.
22
Court Reporter:          Charleane M. Heading
23
                     225 Cadman Plaza East
                     Brooklyn, New York
24
                     (718) 613-2643
25
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

       CMH     OCR     RMR     CRR     FCRR

2483

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Everyone in the audience may be seated.

3          All right.  Appearances, please.

4          MS. PENZA:  Moira Penza, Tanya Hajjar and Mark Lesko

5    for the United States.  Good morning, Your Honor.  Also at

6    counsel table is Special Agent Michael Weniger with the FBI

7    and paralegal specialist Teri Carby.

8          THE COURT:  Good morning everyone.

9          MR. AGNIFILO:  Good morning, Your Honor.  Marc

10   Agnifilo, Teny Geragos, Paul DerOhannesian, Danielle Smith

11   with Keith Raniere at counsel table.

12         THE COURT:  Okay.  Good morning, everyone.  Please

13   be seated.

14         Does anyone have anything before we start?

15         MS. PENZA:  Just briefly, Your Honor, in response to

16   your question on the Daubert hearing?

17         THE COURT:  Yes.

18         MS. PENZA:  We expect on Friday to file a very brief

19   motion for reconsideration.  We believe that the need for the

20   Daubert hearing may be obviated by a brief supplemental report

21   that Dr. Hughes is putting together.  We'll submit that on

22   Friday, but we would be prepared to go forward with the

23   Daubert hearing next week otherwise.

24         THE COURT:  Well, that would be on Tuesday because

25   we don't have court on Tuesday.

2484

1          MS. PENZA:  Understood, Your Honor.

2          THE COURT:  So what I would like to do is by next

3     Monday at noon, I would like a response from the defense so we

4     can make a decision as to what to do.

5          MR. AGNIFILO:  That's fine, Your Honor.

6          THE COURT:  Is that all right?

7          MR. AGNIFILO:  Yes.

8          MS. PENZA:  Thank you, Your Honor.

9          THE COURT:  Okay.  Thank you very much.

10         All right.  Daniela is on direct, correct?

11         MS. PENZA:  Yes, Your Honor.

12         THE COURT:  All right.  Let's move forward.  Let's

13    bring the witness into the courtroom.

14         MS. PENZA:  Thank you.

15         (Witness resumes the stand.)

16         THE COURT:  Please bring in the jury.

17         (Jury enters.)

18         THE COURT:  Please be seated.

19         Good morning, members of the jury.

20         THE JURY:  Good morning.

21         THE COURT:  All right.  We will continue with the

22    direct examination of Daniela.

23         You may proceed, Ms. Penza.

24         MS. PENZA:  Thank you, Your Honor.

25

Daniela - direct - Penza                    2485

1    DANIELA    ,

2         called as a witness, having been previously duly

3         sworn, was further examined and testified as follows:

4    DIRECT EXAMINATION (Continued)

5    BY MS. PENZA:

6    Q    Good morning, Daniela.

7              THE COURT:  By the way, you are still under oath.

8    Do you understand?

9              THE WITNESS:  Yes.

10   A    Good morning.

11   Q    Daniela, last week, we ended by talking about your sister

12   Camila.  While your sister Camila was under 18, did she ever

13   have any medical issues?

14   A    Yes.

15   Q    Can you explain?

16   A    She had -- she had appendicitis.  She was, she had

17   appendicitis and she had to have a surgical, severe surgical

18   procedure when she was -- it was around 2007, early 2007.

19   Q    Do you remember how old Camila was at the time?

20   A    She would have been 16.

21   Q    You said it was appendicitis.  Do you remember what

22   actually happened?

23   A    Yes, I was with her.  We were together in the house and

24   she had pain.  She had pain and I, I remember at the time I

25   thought maybe it was because of laxatives or things she was

Daniela - direct - Penza                    2486

1    taking at the time because she was taking a lot of things to

2    lose weight and she had been complaining about pain.

3            I think I remember, like, my, my parents were in

4    town but they were at an intensive.  They were away from the

5    house.  We were alone all day, and she had been complaining

6    about very severe pain to the point where she could not stand

7    up straight, like she was bent with pain.  And I remember

8    talking to my mother and telling my mother and they took her

9    to the hospital.

10           When they took her to the hospital, as I remember,

11   they realized she had appendicitis but also that she had, she

12   had waited too long.  I remember thinking, wow, she went

13   through a lot of pain because there was already -- there was a

14   condition.  It's actually not only inflamed but it explodes

15   and it contaminates everything.  So she had that already.

16   That's what I remember.

17   Q    And you said she had surgery?

18   A    Yes.

19   Q    What do you remember from the, about the surgery?

20   A    I remember, I remember it was very expensive.  She didn't

21   have health insurance.  I remember it was long.  We were

22   worried and there was -- I remember her wound.  I remember

23   after the surgery, there was a big, like, a big hole in, in

24   the, and it needed to be, like, drained every certain period

25   of time like throughout the day.

```
                    Daniela - direct - Penza            2487
```

1  Q    Can you explain where on her body the wound was?

2  A    Yes.  It was in her, you know, in the lower -- I don't

3  know what that part is called.

4        THE COURT:  Abdomen.

5  A    In her lower abdomen.  In the --

6        THE COURT:  You can stand up and show on your body

7  where it was.

8  A    Okay.  So in her lower abdomen.  (Indicating.)

9        THE COURT:  On the right side, correct?

10        THE WITNESS:  Yes, as I remember, on the right side.

11  A    And like a big slit.  It was, like, a slit that was wide

12  open.  It was wide open.  I remember my mom used to take --

13  may I sit down now?

14        THE COURT:  Yes, you may sit.

15  A    It was very hard to see.  It used to be, like -- it had

16  white stuff and it was, like, blood-ish stuff and it had to be

17  drained constantly because it had become infected so they

18  would take, like, cotton and substances and, like, put it in

19  and, like, to drain it and take all this stuff out.  It was --

20  I remember Cami was in a lot of pain.  She was in a lot of

21  pain and my mom was able to do this.  My grandfather had been

22  a doctor and at some point in her life, she wanted to be a

23  nurse but, but I remember thinking it would be hard to help

24  her but it would be hard to be Cami with all that pain all the

25  time because it took weeks and weeks and weeks for that to

Daniela - direct - Penza                    2488

1    heal.

2    Q    Do you remember how wide the wound was?

3    A    I remember it at least an inch, if not a little more.

4    Q    And did that create a scar?

5    A    Yes.

6    Q    Had you seen -- have you seen Camila's abdomen recently?

7    A    Yes, I have.

8    Q    And does Camila still have that scar?

9    A    Yes, she does.

10   Q    So if there is an image of Camila and her abdomen and

11   that scar is not visible, how old would Camila have to be?

12             MR. AGNIFILO:  I object to the form of the question.

13             THE COURT:  Could you restate the question?

14   Q    How old would Camila be if there's a picture of her

15   abdomen and there's no scar showing?

16             MR. AGNIFILO:  I object to the form of the question.

17             THE COURT:  You'll have to ask it differently.

18   Q    Daniela, you've seen Camila's abdomen?

19   A    Yes.

20   Q    You saw it before she had the surgery?

21   A    Yes.

22   Q    And you've seen it after the surgery?

23   A    Yes.

24   Q    Do you know -- if you saw an image of Camila where there

25   is no scar on her abdomen, would you know how old she was?

Daniela - direct - Penza                    2489

1    A    Yes.

2    Q    How old would she be?

3    A    She would be 16 or younger.

4              MS. PENZA:  Your Honor, I'd like to move into

5    evidence Government's Exhibit 1529 which was on consent of the

6    defense.

7              MR. AGNIFILO:  No objection.

8              THE COURT:  I'm sorry.  The number again?  1629?

9              MS. PENZA:  1529.

10             THE COURT:  Without defense objection, correct?

11             MR. AGNIFILO:  Yes, Judge.

12             THE COURT:  All right.  Yes.  Government

13   Exhibit 1529 is received into evidence.  You may publish it to

14   the jury.

15             (So marked.)

16   Q    Daniela, I'm showing you what's in evidence as Government

17   Exhibit 1529.  Can you read the "from" and "to" lines on this

18   e-mail?

19   A    Yes.  This is from thegreathead@gmail.com on behalf of

20   Daniela, Dani, something, at gmail.com, to Flintlock,

21   kunterre@nycap.rr.com.

22   Q    When was this e-mail sent?

23   A    June 26, 2007.

24   Q    And we talked about this before, but whose e-mail address

25   is kunterre@nycap.rr.com?

Daniela - direct - Penza                    2490

1   A    That is an e-mail that Keith used.

2   Q    And in your e-mails, would that e-mail address sometimes

3   come up as "Flintlock"?

4   A    Yes, it would.

5   Q    Why is that?

6   A    I imagine that's how it was registered on the contact

7   information.

8   Q    And the subject line says, "About VC."  What is "VC"?

9   A    It stands for -- that's what Keith nicknamed my sister,

10  Virgin Camila.  Also, at times, he called her VC.

11  Q    Now, this e-mail was sent on June 26, 2007.  Last week

12  when you were testifying, you talked about certain milestones

13  in your relationship with the defendant.  When was -- where

14  does June 26, 2007 fit in?

15  A    This is after I had a fight with Keith and we didn't

16  speak any longer.

17  Q    Can you read this e-mail, please?

18  A    Yes.

19         I cannot tell VC because I technically don't know

20  what is going on but if you could find a way, please tell her

21  having an alarm set on her phone that reads PILL is not a good

22  idea.  Sorry to write to you about this, but with my parents

23  here and VC otherwise off meds I think it is an unnecessary

24  risk.  D.

25  Q    What did you mean in that e-mail?  Can you explain that

CMH     OCR     RMR     CRR     FCRR

Daniela - direct - Penza                    2491

1    e-mail?

2    A    Yes.  So my sister had an alarm on her phone to remind

3    her to take the pill, birth control pill, and I was worrying

4    for protecting Keith, my parents didn't know it was supposed

5    to be a secret.  I knew -- Cami didn't know I knew so that's

6    what that e-mail is about.

7    Q    Can you describe -- I'm sorry.  One more question,

8    Daniela.

9              This e-mail address, on June 26, 2007, how old was

10   Camila?

11   A    She was 17 in a few months, in a couple of months.

12   Q    Daniela, can you describe -- we've talked a little bit

13   about your legal status in the United States.  Can you

14   describe what your siblings' status in the United States was?

15   A    Yes.  So once they came, once they came in without my

16   parents, their status was that they were on a visitor's visa,

17   much like I had had before, and I believe at least once, they

18   renewed it the way I used to, going back after six months, but

19   after that, they overstayed their, their stay, their allowed

20   stay, and their status expired and there was a time when they

21   were in the country illegally in that way.

22   Q    The decision to stay illegally in the United States, was

23   anyone else in the NXIVM community ever involved in that as to

24   your siblings?

25   A    Yes.

Daniela - direct - Penza                    2492

1    Q    Can you explain?

2    A    Yes.  There were a few people involved but as I recall,

3    the way in which they ended up extending or, rather, their

4    stay expired is because they were offered help to extend, to

5    ask for an extension on their visa, and through Keith and

6    through a lawyer and through I remember at the time Kristin,

7    they said they had hired people who would file an extension

8    and that they were okay to stay.  That ended up not being

9    true.  Nothing had been filed.  So by the time that they

10   realized and we realized, they were already illegally in the

11   country.

12   Q    Was there ever an instance where your brother Adrian

13   planned to leave the United States because otherwise he was

14   going to be overstaying?

15   A    Yes.

16   Q    Can you explain what happened?

17   A    Yes.

18              MR. AGNIFILO:  Your Honor, I'm sorry, I object

19   unless the witness has personal knowledge of these things.

20              THE WITNESS:  I do have personal -- I'm sorry.

21              THE COURT:  No, don't answer.

22              MS. PENZA:  I can ask another question, Your Honor.

23              THE COURT:  Why don't you ask another question.

24   Q    Daniela, were you personally aware of the circumstance in

25   which your brother was encouraged to stay in the United States

Daniela - direct - Penza                    2493

1   once he was illegally here?

2   A    Yes.

3   Q    Can you explain, please?

4   A    Yes.  My brother wanted to leave so as not to break the

5   rules and he had a conversation with Keith.

6   Q    Were you present for that conversation?

7   A    Yes.

8   Q    Can you explain where this conversation took place?

9   A    Yes.  It took place at the gym during a volleyball night.

10  He had -- as I remember, he had a plane to catch, he had his

11  plane ticket and he wanted to leave, and Keith talked him out

12  of it.  He told him that he should stay, that it would be

13  harder to come back if he left, that they had ways and they

14  had people who could help him, you know, solve it without

15  having to leave.  And my, my brother presented quite a bit of

16  resistance but in the end, he listened to Keith.

17  Q    Was any of that night that you're talking about, was

18  anybody else involved in those conversations with your

19  brother?

20  A    Yes.  Pam was there and she also talked to my brother

21  about it at length.  My brother really liked Pam, we all

22  really liked Pam and listened to her.

23  Q    And how about your -- how about your sister Camila, at

24  what point were you aware that she was illegally in the

25  country?

Daniela - direct - Penza                           2494

1   A    I don't remember the exact timing of that.  I remember

2   that there was a lawyer, all of the sudden, there was a lawyer

3   involved and there was a big fuss about who had been at fault.

4   I remember that Loreta had been involved, a lawyer called

5   Jonathan had been involved and my parents got involved

6   because, you know, nobody intended for that situation to

7   happen.  Somebody had not done their job.  They had been

8   promised that extensions would be filed and they weren't or

9   they weren't done correctly, I don't know what the details

10  were, but they were now illegally in the country and they had

11  to figure that out.

12  Q    Did you -- later, when you were in touch with Camila,

13  when you were in touch with Camila later, did you later

14  understand her to be out of status in the United States?

15  A    Yes.  Yes.  In fact, Cami never did leave the country

16  again after that first overstay.  She was too fearful to leave

17  and not be able to come back and many strategies were devised

18  and a lot of help was offered but she never became regular

19  again with her status, legal status.

20       MS. PENZA:  Your Honor, may I have the ELMO just for

21  the witness, please?

22       THE COURT:  Go ahead.

23  Q    Daniela, I'm showing you what's been marked for

24  identification as Government Exhibit 1554.  I'm going to show

25  you the three pages to this document.

Daniela - direct - Penza                                2495

1              Are you familiar with this document?

2    A    Yes, I think so.  It's hard to see but I think I know.

3    Q    We can squeeze in the middle little bit?

4              MS. PENZA:  Your Honor, may I approach and show the

5    document?

6              THE COURT:  Yes, you may.

7              (Pause.)

8    Q    Do you recognize it generally?

9    A    Yes.

10   Q    And can you just explain generally what this document is?

11   A    Yes.  This is an exchange with lawyers and people from

12   ESP who were supposed to be helping in the status of my

13   siblings culminating with my father being aware that they're

14   out of status.

15             MS. PENZA:  Your Honor, the government offers

16   Government Exhibit 1554 into evidence.

17             MR. AGNIFILO:  One second, Your Honor.

18             THE COURT:  Sure.

19             (Pause.)

20             MR. AGNIFILO:  I have no objection.

21             THE COURT:  All right.  Government Exhibit 1554 is

22   received into evidence.

23             MS. PENZA:  Thanks, Your Honor.

24             (So marked.)

25   Q    Daniela, I'm showing you what is marked in evidence as

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2496

1   Government Exhibit 1554.  Turning to the -- turning to the
2   third page, the e-mail, the letter of the e-mail, the
3   signature block says Jonathan Ware, Esquire.  Do you know who
4   Jonathan Ware, Esquire is?
5   A    Yes.  He was the immigration lawyer.
6   Q    And turning to the second page, to the start of that
7   e-mail that ends with his signature block, can you see the
8   beginning of that e-mail?
9   A    Yes.
10  Q    And that's sent from Jonathan Ware.  And who is it sent
11  to?
12  A    To NSalzman, which is Nancy Salzman, @NXIVM.com,
13  kristinandkeith@gmail.com, and an e-mail at sagitta.com.
14  Q    What is sagitta.com?
15  A    That's the name of my father's business.
16  Q    And does your father have an e-mail address that ends in
17  that?
18  A    Yes.
19  Q    And the e-mail is addressed to Hector, Nancy and Kristin,
20  correct?
21  A    Correct.
22  Q    Can you read this e-mail?
23  A    Yes.
24         Hector, Nancy and Kristin, I hope you are all well.
25  I'm writing this message at Lisa's request to follow up on the

Daniela - direct - Penza                    2497

1   discussions I've had with her regarding the legal strategy for

2   mitigating any potential negative consequences to Adrian and

3   Camila in terms of their ability to return to the United

4   States in valid immigration status.  I want to make sure that

5   we are in alignment on our approach.

6          I see two distinct issues which I feel should be

7   approached separately.  The first issue is using NXIVM's

8   connections to people of influence in the government to assist

9   in documenting the fact that Adrian and Camila became out of

10  status because they did not timely receive notices of

11  approval/requests for additional evidence and, therefore,

12  should not be subject to any bar from returning to the U.S.  I

13  feel that this is an appropriate strategy.

14         There is a second issue of how to return Adrian and

15  Camila to valid immigration status.  In my professional

16  option, our best bet given the options available to us at this

17  time would be to seek USCIS approval for Adrian and Camila to

18  return to the U.S., with Hector as L-2 dependents provided

19  that we obtain a favorable adjudication of Hector's pending

20  L-1 petition.  Once Hector's petition is approved, we will be

21  able to submit dependent petitions on behalf of Adrian, Camila

22  and Adriana.  Given our present timeline and the fact that

23  USCIS requested additional evidence in connection with

24  Hector's case, we should expect a decision in Hector's case

25  sometime in early January.  If everything runs smoothly, we

1  could have Adrian and Camila back in the U.S. by the end of

2  February, 1st of March.

3  Q    So, at this time, Daniela, although it says "back in the

4  U.S.," are Camila and Adrian actually in the United States?

5  A    Yes, I believe they are.

6         I feel that it would be undesirable from a strategy

7  standpoint at this time for Adrian and Camila to seek

8  readmission to the U.S. in B-1 status and want to make sure we

9  are in alignment on this issue.  If they do so, based upon my

10  understanding of the family's immigration history, I felt they

11  will encounter significant difficulty which will be difficult

12  to overcome.

13         In 2004, Hector and Adriana were stopped at the

14  border, questioned by U.S. Customs and Border Protection

15  extensively and gave sworn statements to border protection

16  officers.  Their immigration file contains negative history

17  which indicates the children were enrolled at one time in

18  public school in New York.  If this is correct, the children

19  would have been in violation of their B-1 status.  As a

20  non-immigrant, one is not permitted to enroll in public school

21  in the U.S.

22         Given the overstay situation, the government will

23  scrutinize any attempt on their part to reenter the U.S.

24  extremely closely.  Both Adrian and Camila will likely be

25  subject to detailed examinations and extensive questioning at

Daniela - direct - Penza                    2499

1   the border about their prior activities in the U.S., Example,

2   did they go to public school, did they work, why are they

3   seeking re admission, et cetera.

4           In determining whether to readmit them to the U.S.,

5   USCIS will refuse to do so if it is determined that they

6   violated their prior status.  Provided Hector is admitted in

7   L-1 status, we will have additional public policy arguments

8   that the children should be admitted in order to keep the

9   family together.  We would not otherwise have these arguments

10  if they seek admission in B-1 status.

11  Q    Okay, Daniela.  At this time, had your brother and

12  sister, Adrian and Camila, had they been working for the NXIVM

13  community?

14  A    Yes, they had.

15  Q    Okay.  What had Adrian been doing?

16  A    I know he had been working for Clare and I think he was

17  at that point already part of the video team maybe.

18  Q    What did that mean, being part of the video team?

19  A    They worked to film trainings and events, mostly

20  trainings.

21  Q    Do you know how much he was working at that time?

22  A    He's a hard working guy, like, you know, like, a full

23  working day.

24  Q    How about Camila, what was she doing for work at this

25  time?

Daniela - direct - Penza                    2500

1   A     She had been working as a maid cleaning Nancy's house.

2   Q     Did she end up doing other work for the community as

3   well?

4   A     At some point, she started working for rainbow.  I don't

5   remember the exact transition date for that.

6   Q     Then there's another e-mail in the chain so the last

7   e-mail started there and there's another e-mail.  So I'm going

8   to move to the beginning of that e-mail and can you start

9   there.

10  A     Yes.

11        Hector, I hope you are well.  I am writing to you to

12  follow up my message of last week, which appears below.  When

13  I wrote this message last Friday, I was under the impression

14  that Adrian and Camila had already left the U.S.  I had a

15  conversation with Loreta Garza last night, and I learned that

16  they are still physically present in the U.S.

17        As a follow up to my conversation with Loreta, I

18  want to make sure we are in alignment on our strategy.  I also

19  want to make sure that you clearly understand my

20  recommendations and the potential implications for Adrian and

21  Camila if they continue to remain in the U.S.  I am

22  significantly concerned that if they do not make plans to

23  leave the U.S. immediately, it may have considerable long-term

24  effects of their ability to return in the future in another

25  valid status.

Daniela - direct - Penza                    2501

1            I want to reiterate this to make sure that you have

2    a full understanding of the situation in case it wasn't clear

3    from my earlier communications.  Because we know that Adrian

4    and Camila are now out of status, from a procedural

5    standpoint, the only way for them to return to proper status

6    is to have them leave the country and apply for reentry in

7    another valid status.  The longer they remain in the U.S.

8    without being in proper status, the more difficult it will be

9    for them to return.  If they accrue more than 180 days in

10   unlawful presence, which USCIS and State Department will most

11   likely assert began as of the expiration date of their last

12   B-1 extensions, they will be subject to a three-year bar from

13   returning to the U.S.

14           Although I have been in contact with Steve Pigeon's

15   office, who in turn has connections with Hillary Clinton,

16   please do not make the mistake of thinking we can return

17   Adrian and Camila to a valid status by appealing to these

18   political connections.

19   Q    Can I stop you for a second, Daniela.

20           Do you know who Steve Pigeon is?

21   A    I had heard his name but, no, I thought he was a lawyer

22   for NXIVM.

23   Q    Do you remember in what context you had heard his name?

24   A    Yes.  I had heard it from the conversations between Keith

25   and Kristin that were, you know, open cases, legal strategy.

Daniela - direct - Penza                      2502

1    Q     And then can you read -- did you have an understanding of

2    connections with the Clintons?

3    A     I heard a name mentioned.  I did have an understanding of

4    trying to gain, in gaining political connections and political

5    favors through those connections.

6    Q     And can you continue reading, please?

7    A     Yes.

8          In my professional opinion with 12 years of

9    immigration practice, I do not view this as a viable strategy.

10   These political connections can be very helpful to us,

11   however, in liaising with USCIS, where the issue of the three

12   year bar is concerned, if the USCIS asserts that Adrian and

13   Camila are subject to the same when they apply for

14   readmission.  I feel this is our best approach in asking for

15   Mr. Pigeon's assistance.

16         At this time, the best scenario for returning Adrian

17   and Camila to valid status is:

18         Bullet point:  Having them immediately return to

19   Mexico.  Another bullet point:  Obtaining approval of your

20   primary L-1 intracompany transferrer visa.  Another bullet

21   point:  Subsequent to obtaining approval of your L-1 visa,

22   filing for L-2 dependent visas on behalf of your children

23   under 21, Adrian and Camila, and Adriana.

24         As I mentioned in my message below, in determining

25   whether to readmit a non-immigrant to the U.S., a major factor

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2503

1   the USCIS relies on is whether the visa holder maintained

2   her/his prior immigration status, which would include

3   departing on time when her/his visa expires or if the visa

4   holder becomes aware that he or she is out of status.  In my

5   professional opinion, the best action Adrian and Camila can

6   take at this time is to show good faith in complying with the

7   terms of their earlier admittance in B-1 status by returning

8   to Mexico and seeking reentry in another valid status.

9              I would much appreciate if -- I would much

10  appreciate it if you could send me a return message just so I

11  know you understand my recommendations.  I will also be glad

12  to answer any questions you may have.  With warm regard,

13  Jonathan.

14  Q    And then did your father respond to the message?

15  A    Yes.  This is his response.

16  Q    And can you -- before we read the response, it's from

17  your father to Jonathan Ware, is that correct?

18  A    Yes, that's correct.

19  Q    And can you go through the e-mail addresses of the people

20  who are copied?

21  A    Yes.  So first one copied is my mother's e-mail address,

22  theinnerwitch@gmail.com, the second is my brother Adrian's,

23  dofito@gmail.com, the third is Camila's address, vcbaby@gmail

24  and the fourth and last is Lisa Derks, lderks@nycap.rr.com.

25  Q    Who is Lisa Derks?

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2504

1   A    Lisa Derks was a student in NXIVM who also ended up

2   working or at least was working at the time in the so-called

3   legal team with Kristin.

4   Q    Okay.  And then can you read your father's e-mail

5   address, your father's e-mail?

6   A    Yes.

7        It says:  Jonathan, I understood what you wrote.  I

8   asked Lisa about the kids' B-1 visa extension expiration and

9   no answer received yet.  I am aware of the issue and

10  forwarding this mail to the kids to immediately return to

11  Mexico if no other choice is workable for the time being.  I

12  am on the road but tonight I will send you what I have about

13  the USCIS request.  So please send me an e-mail tomorrow to

14  review USCIS request of info.  Sincerely, Hector.

15  Q    And was this e-mail then forwarded to anyone else?

16  A    Yes.

17  Q    Okay.  Who forwarded the e-mail?

18  A    My mother.

19  Q    And it was forwarded on the same day that the original

20  e-mail had been written?

21  A    That looks correct, yes.

22  Q    And who was it forwarded to?

23  A    It's forwarded to me, my personal e-mail address,

24  thegreathead@gmail.com, to my sister's Marianna's e-mail

25  address, themightyrunner@gmail, to Pam Arstakaitis' e-mail

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2505

1  address, vivajness@gmail.com, and to Keith's e-mail,

2  keithraniere@yahoo.com.

3  Q    Is that another e-mail address that the defendant used?

4  A    Yes.

5  Q    I'd like to go back to the time after you crossed over

6  illegally into the United States.

7         At that time, can you describe any changes in your

8  relationship with the defendant?

9  A    Yes.  I -- our relationship became much closer.  I was

10  fully immersed in the community around Keith, the inner

11  circle, and I didn't, I didn't realize fully at the time but I

12  was completely dependent.

13  Q    Can you explain what you mean by that?

14  A    Well, at first, it wasn't evident because there was -- it

15  just wasn't evident.  It was just, like, normal, it was just

16  spending more time together and while everything was going

17  well, there was no, there were no signs of the clear

18  dependency that I had, but as time progressed, it would be, to

19  put it mildly, brought to my attention, but more accurately

20  held over my head, the fact that they, they had brought me

21  into the country, that I was there illegally, that I was a

22  liability, and so it became a huge thing they held over me.

23  Q    So would the story of having brought you over illegally

24  come up frequently?

25  A    Yes, in -- yes.

Daniela - direct - Penza                    2506

1  Q    In what sorts of contexts?

2  A    In two different kinds of contexts.  One would be the

3  playful triumphant, like, we did this thing and we were

4  victorious context and that was sort of in the setting of

5  playful banter.

6  Q    And who would participate in that?

7  A    The people in the inner circle who were aware.  So

8  obviously Keith, Kathy Russell, Pam would be there, people who

9  were aware of what had happened and how it had gone down.  In

10  stark contrast would be a completely different context in

11  which it would come up.  It would come up on, when I wasn't

12  doing my program or I wasn't doing something that I, they

13  thought I should be doing when, you know, really as an act of

14  discipline, in any kind of act of discipline, it would be

15  brought up that I was there thanks to them bringing me into

16  the country.

17  Q    Now, when you first came back, I think you talked a

18  little bit about the fact that you were now spending a lot of

19  time at 3 Flintlock, is that right?

20  A    Yes, that's right.

21  Q    And can you describe what the day-to-day conversations

22  are like in 3 Flintlock?

23  A    In general, in the house, all right, so at the time in

24  3 Flintlock, there are several people living there.  So in one

25  room, it's Karen Unterreiner, in another room, it's Kristin

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2507

1   Keefe, in the third bedroom there, Pam Cafritz lived with my

2   sister Marianna, and Keith sort of lived downstairs in the

3   coach and like migrated around spending time with different

4   women, but that was, like, his control center.

5           The day-to-day was, so early in the morning,

6   usually, the first conversation as I remember would be

7   Kristin.  Kristin would be coming downstairs in her bathrobe,

8   rollers in her head, preparing the coffee, and would sit down

9   to report to Keith all of the things, the legal things that

10  were happening and he would give her instructions.  Like, that

11  was one of, like, the main events of the morning, he would be

12  there for that.  There were other times maybe throughout the

13  day she would stop by and they would talk about something, but

14  that was the allotted time they had to review this.

15          In the morning, he also did the stock market.  Keith

16  had, like, a lot of phone conversations doing stuff with the

17  stock market.  I remember "futures" and "OJ" and words like

18  that that were said over the phone and it sounded like the

19  person he was working with, like, they were very friendly.

20  Q    Were you able to hear from those conversations who he was

21  talking to?

22  A    Yes.  There was a man named Yuri.  He's the one that he,

23  he was talking to a lot and it seemed to be very friendly.

24  He'd ask him about his family and they would have very

25  friendly conversations.

Daniela - direct - Penza                                2508

1          Karen was kind of just like there briefly in the

2     morning and worked outside all day long at the center, came

3     back late at night, watched some TV, went to her room.  She

4     was pretty stealthy and didn't have a big presence in the

5     house.

6          Marianna and Pam were almost always upstairs.  He

7     would go up there when he wanted to sleep.  That's what I

8     understood.

9               (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2509

1    BY MS. PENZA:   (Continued.)

2    Q    What other types of -- I think you talked a little bit

3    about them last week, but the other types of categories of

4    conversations that would happen in the house.

5    A    There would be people that would come.  So I would say

6    there were times where there was, like, curriculums discussed

7    or trainings discussed and sometimes people would stop by and

8    talk about that, particularly when there was an intensive

9    going on or there was, like, a new release of, like, new

10   curriculum he would be, like, debriefing after, like, every

11   session.

12          That would happen -- he was around at the house to

13   receive phone calls from Nancy or from whomever.  It was

14   mostly Nancy who was releasing the new material and then at

15   the end of the day she would stop by and they would have a

16   big -- they called it debriefing.  These were the things about

17   curriculums.  As I said before there was either playful banter

18   or very -- very sexual, like, talk, which, you know, was only

19   when certain people were around that they could have that.

20   What else?  There were disciplining talks and arguments with

21   women.  I would say that's a whole separate category.

22          So, most of that happened on the phone.  At least

23   that's what I presenced (sic) that's what I could see of it.

24   It would be very long conversations, very rough conversations

25   to discipline someone, you know, what they're doing wrong and

Daniela - direct - Penza                    2510

1   you shouldn't say that, think that, just disciplining.

2   Q    So, the conversations are with the defendant and the

3   woman who needs discipline or with someone else who is going

4   to do the disciplining?

5   A    Actually, both.  So, when a person -- when a woman was

6   going off -- when a woman was having an issue, when something

7   was wrong, there was often, like disciplining one-on-one, so

8   it would be a conversation just with one-on-one, sometimes,

9   and I imagined always that if the issue was large enough or if

10  Keith could not handle it, he would call on other women.  So

11  Lauren or Pam or Nancy so that they -- he would have a

12  conversation with them about the issue that the woman was

13  having so that they would go and basically execute the

14  disciplining as opposed to him doing it personally.

15  Q    At this time what are you doing or work in the community?

16  A    At that time I was doing odd jobs here and there.  As I

17  mentioned before, my mom told me about a few jobs.  I found a

18  way to make a little money.  There was a point when I did a

19  website for Pam, for Jness, and I got paid a good amount of

20  money for that and it lasted a long time.

21  Q    How much was it?

22  A    $3,000.

23  Q    How did she pay it?

24  A    Cash.  That lasted me for a long time.  And somewhere in

25  there there was a transition because I had no way to make

1    money.  I had no job and I had no status that that's when the

2    book reports were presented to me as here, you can make money

3    doing this.

4    Q    Were you paid for any of those?

5    A    No.

6    Q    Were you doing other work around -- were you doing other

7    types of work?

8    A    Yes, I was doing a lot of activities, a lot of

9    not-for-pay work.  As I mentioned before, there was not only,

10   like, the executive library, the organizing, there were also

11   passing projects.  So, for example, there would be a video

12   that I needed to transcribe or there would be V Week coming up

13   and there was a video that needed to be edited and I would

14   spend days and days and hours and hours editing that.  So

15   there was always a project that needed, you know, to be worked

16   on and, so, I was doing all of those odd things.

17   Q    Other than the money for Jness website, were you paid for

18   any of that?

19   A    No.

20   Q    And then you mentioned, I think before, you also would do

21   cleaning and organizing?

22   A    Yes.

23   Q    I think you also talked about your recording of the

24   defendant; is that right?

25   A    Yes.

Daniela - direct - Penza                2512

1  Q    How would that actually take place while you were at

2  Flintlock?

3  A    Well, when I'm at Flintlock, it would be turning on and

4  off the recorder when things were happening.  Many times it

5  would be during walks.  It would be he's walking with somebody

6  else and I would go along and record.  That would be each

7  recording.  And then it became a little more formalized and

8  there was video recording and that was, more scheduled.  So if

9  someone was going to have a class or he was going to have a

10 specific interaction.  If I wasn't around -- if I was around I

11 would just go and do it.  If I wasn't around, they would call

12 me over to go and do that.

13 Q    Were you paid for any of that?

14 A    No.

15 Q    At Flintlock would you record the defendant the entire

16 time, like basically all day?

17 A    With some exceptions, but throughout the day, yes,

18 constantly.

19 Q    Okay.  So what were the exceptions?

20 A    The exceptions were anything related -- anything related

21 to legal stuff.  When there was, for example, the interactions

22 with Kristin.  At first, I would outright be instructed to

23 stop recording and eventually I got it.  Meaning if she's

24 around, that's the type of conversation that would happen and

25 I would stop recording.  Really, that was the one major

Daniela - direct - Penza                          2513

1    exception.

2    Q    Would anyone else have been present on these, what you're

3    calling legal conversations other than you with the defendant

4    and Kristin -- and that's Kristin Keefe?

5    A    Yes, Kristin Keefe.  Yeah, a few people would be around

6    that were allowed listen to that type of stuff or that

7    participated.  The only ones that I observed were Nancy

8    Saltzman -- Karen could be there if those conversations

9    happened, but she basically turned out -- but she was okay to

10   hear those things, but that would also participate Nancy.

11   Q    Now, just to go back to the stock market conversations

12   for a second, did you ever observe the defendant's reactions

13   to any of those conversations?

14   A    Yes.

15   Q    And was there a time when he was upset?

16   A    There was a time when I knew something, yeah -- yeah.

17   Q    And so what was he saying?

18   A    I remember, and it was not just on one occasion.  It was

19   some separate occasions.  Like, there would be, like, the

20   sense that what's -- almost like a conspiracy, that there was

21   a conspiracy going on like that something had gone wrong and

22   he was either speaking to Yuri about it or speaking to

23   somebody else about it as to this is strange; this should not

24   have gone wrong, there's something else there.  And I don't

25   remember specifically, like, what it was.  I wasn't paying

Daniela - direct - Penza                    2514

1   very much attention to it, but I did have a distinct

2   understanding of those exchanges.

3   Q    Did you understand anything about how much money the

4   defendant was making or losing?

5   A    No.

6   Q    Now, you talked about -- you've been using the word

7   "legal" and, like, these legal conversations.  Can you

8   describe in a little more detail what types of conversations

9   you would be there for between the defendant and Kristin

10  Keefe?

11  A    Yes.  So, when I say "legal," I mean a few different

12  things.  So -- and they were mostly with Kristin Keefe so

13  there were quite a few that it was, like, the three of them,

14  Nancy also; not just Nancy and Keith would talk about it.  But

15  mostly Kristin because she lived there.  So there were

16  different types.  One of the types was I knew they had a group

17  of lawyers.  So Kristin, as I understood, was in charge of,

18  like, making sure that filings were done for the different

19  cases that they had, different documentation -- just, like,

20  very procedural stuff.  And she would be working with Nxivm's

21  lawyers on that and she would report on the results.

22          And there was, like, an upper level of the lawyers

23  or just political figures, I wasn't sure, that they had.  But

24  that was more, like, almost, like -- almost like PR.  It was

25  almost like, they were -- as I understood, they were

1  lobbyists.  That's how I can describe what I understood at the

2  time; that they were there to gain them political favor.  To

3  get them to succeed in the cases they were bringing up or just

4  to lobby for the company.

5          A separate type of legal matter that they handled

6  was, I would say, quite the opposite from legal.  It would be

7  the illegal stuff.  And the illegal stuff would be they hired,

8  like, agencies, I don't know -- like agents do, or, like, a PI

9  agency or something like that.  And the discussion about that

10  would be what information to get from whom, how much it would

11  cost, if they got it, if she reviewed it, what that meant.

12  And, in that, get access to people's e-mails accounts, get

13  access to people's records.  So all of that -- all of that I

14  would clump under the legal part of legal.  And I think that's

15  it.

16  Q    Did you ever remember -- were there ever any discussions

17  about obtaining people's bank records?

18  A    Yes.

19  Q    What do you remember about that?

20  A    I remember they were going back and forth, Kristin asking

21  him who they should get stuff for -- like, on.  I remember --

22  I don't know why I remember.  I remember they were, like,

23  faxing the information back and forth.  I remember, like, a

24  fax.  And, I remember them discussing -- like, he would ask

25  how much is this, how much is that.  It was bank records and

Daniela - direct - Penza                    2516

1   it was, like, information, like personal, like, personal

2   records on different people, yes.

3   Q    Who was deciding -- in these conversations who was

4   deciding who there was -- who was going to be investigated?

5   A    Keith.

6              MR. AGNIFILO:  Object to the form of the question.

7              THE COURT:  Well, the answer is out.  So, overruled.

8   BY MS. PENZA:

9   Q    The defendant would?

10  A    Yes.

11  Q    And can you explain a little bit about how that back and

12  forth would work?

13  A    Yes.  So, the interactions were obviously Kristin, like,

14  was actually out in the field, like, doing the work.  Like,

15  she was is the one actually doing the things, but she would

16  also -- she would always be there going back to Keith and

17  reporting on what was happening.  So he was fully aware of

18  everything that was happening and he would be the one thinking

19  about the things.  And then when they interacted, clearly she

20  presented certain options and this is going on, this is going

21  on with so-and-so.  So it would be all of the specifics and

22  Keith would be the one do decide.  So he would have the last

23  say.

24              He would say, okay, I think you're right I think you

25  should do this or he would come up to the idea or he would

SN        OCR        RPR

Daniela - direct - Penza                    2517

1  tell her you should try to do this or you should try to get

2  that.  But it was very clear to me that it was Keith that was

3  making all of the decisions.

4             MR. AGNIFILO:  Your Honor, could we have a sidebar

5  for a second?

6             THE COURT:  Sure

7             (Sidebar held outside of the hearing of the jury.)

8

9             (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                              2518

1           (The following sidebar took place outside the

2   hearing of the jury.)

3           THE COURT:  Okay, go for it.

4           MR. AGNIFILO:  This general conclusion that she's

5   saying, well, Keith would do.  If she wants to refer to a

6   specific conversation in a specific point in time when she

7   claims she and Keith were speaking, that's one thing but for

8   her to just editorialize generally about her conclusions about

9   generic conversations without any specificity to time is

10  improper and I object to the entire line.

11          MS. PENZA:  Your Honor, I think that we have set the

12  stage of when the time period is.  She's discussing the time

13  period when she has come back from -- from crossing the

14  border.  She's laid the foundation that she's basically

15  sitting there day in and day out.  I don't think it's fair for

16  her to describe a specific conversation.  She's described this

17  is literally every day.  It's back and forth.

18          MR. AGNIFILO:  Keep it down.

19          MS. PENZA:  He reprimanded me.

20          MR. AGNIFILO:  I did not reprimand it.  I suggest

21  that we speak softly.

22          THE COURT:  Okay.  Anything else?

23          MS. PENZA:  No, Your Honor.

24          THE COURT:  Do you have anything more on this line

25  of questioning?

Sidebar                                                    2519

1          MS. PENZA:  There's a little bit more, Your Honor.

2     She's about to talk about her own involvement in these very

3     types of things.

4          THE COURT:  The point being made is that a general

5     discussion -- you've laid a foundation, but try to be as

6     specific as possible as to when certain things happened.  You

7     know, we have the general idea that she was taping, audio

8     taping, the discussions with Kristin and the general framework

9     of what they were discussing.  But, if you could, be specific

10    as to certain issues.  Try to get details as to when they

11    happened.  That would be helpful.

12         MS. PENZA:  I will do that, Your Honor.

13         MR. AGNIFILO:  Thank you.

14         THE COURT:  You're welcome.  Let's move on.

15         (Sidebar ends.)

16

17         (Continued on next page.)

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2520

1    (Continuing.)

2              THE COURT:  All right.  Let's proceed.

3              MS. PENZA:  Thank you, Your Honor.

4    BY MS. PENZA:

5    Q    The time frame that we were just talking about when you

6    would hear these back and forth conversations between the

7    defendant and Kristin Keefe, can you try and put a little

8    bit -- can you put bookends on that?

9    A    Yes.  So that would be when I was clearly still having a

10   talking conversation and relationship with Keith.  So that

11   would be before the fall of 2006.  That would be the top

12   bookend.  And the bottom bookend would be -- I mean, I started

13   hanging out at Flintlock before 2004.  But it really -- I

14   became more to be approved for everything after I crossed

15   illegally.

16             So, firm bookends I would say from late 2004 to late

17   2006.  A little bit -- I was still around before 2004, but I

18   don't have, a firm, like, lapse of time for that.

19   Q    Did you have an understanding of why Kristin was the

20   person who was out in the field?

21   A    Yes.

22   Q    Can you explain?

23   A    Well, she was very smart.  She was very loyal to Keith

24   and she -- she had conversations with me and Pam about it.  It

25   seemed to me at the time she considered herself, like -- like

SN        OCR        RPR

Daniela - direct - Penza                                    2521

1    she was fighting for the mission.  I remember she once told me

2    she would take a bullet for Keith.  Like she was a front line

3    of, like, everything that they were doing that she was -- so I

4    think she prided herself in -- in being able to help and --

5    but you know she also was very smart and very, very able.

6    That's what I saw.

7    Q    Did the defendant -- where would she go?  When you say in

8    "the field."  Did you have an understanding of where she was

9    going?

10   A    I had an understanding.

11   Q    What would she say?

12          MR. AGNIFILO:  Your Honor, I'm going to object to

13   this as hearsay.  Overruled.

14          MS. PENZA:  Thank you, Your Honor.

15   A    She -- I mean, she would go out and, like -- as I

16   understood it from the conversations that I heard and what she

17   would talk about it.  She would like recounting -- Kristin was

18   a great storyteller and when we were in the close circle and

19   mostly just when it was Pam, like, it was when it was that

20   hermetic, but those stories were obviously very sensitive.

21   She loved telling stories of what she would do and especially

22   when it was, like, borderline -- like getting illegal and

23   something she was trying to achieve and she would recount it.

24          As I understood, she used to go and see the lawyers

25   and she was present in the court things and all of that, like,

Daniela - direct - Penza                    2522

1   legal stuff.  There was also, like, as I said this other part

2   that wasn't just, you know, this strict procedural stuff.

3           So, as I understood it, she, like, went around, you

4   know, like, doing little missions to gather information, to

5   find out things.  She seemed to be very good at that and that

6   was part of what she was doing.

7   Q    Did she report on those missions to the defendant?

8   A    Yes.  He was the first person, like, she always went back

9   and, like, reported to him.  Even conversations she had with

10  Nancy she would go and report to him.

11  Q    Did the defendant ever go out into the field?

12  A    No.

13  Q    Did you have an understanding of why?

14  A    Yes.  Yes.  And this was with everything.  His name was

15  on nothing.  He would not ever be the one executing any of his

16  plans but with the legal stuff in particular there was --

17  like, there was a distinct awareness between everybody

18  involved so there was no mistake that some of what they were

19  doing was illegal.  There was the distinct awareness of that.

20  There was full --

21          MR. AGNIFILO:  Your Honor, I object.

22          THE COURT:  Sustained.  You will disregard the last

23  answer.

24  BY MS. PENZA:

25  Q    When you say -- Daniela, how did you come to the

SN        OCR        RPR

Daniela - direct - Penza                    2523

1  understanding that there was an awareness of what was

2  happening was illegal?

3          MR. AGNIFILO:  I object to the whole line, Judge.

4          THE COURT:  Well, you can answer that.

5  A    There would be a focus on protecting Keith and him not be

6  the one to -- to be, like, that's where conversations with

7  Kristin about she would take a bullet for Keith.  She was the

8  one who would take the fall if something happened, like, and

9  she was willing to do all of that for the mission and Keith.

10 That's how it was so clear that she knew that -- they knew

11 what they were doing -- that some of what they were doing at

12 least was not kosher.

13 Q    Did you, yourself, have conversations with the

14 defendant -- and we'll go into the details in a minute, but

15 did you, yourself, have conversations with the defendant about

16 illegal activities?

17 A    Yes.

18 Q    You mentioned other types of information that the

19 defendant and others were trying to gather on people and you

20 mentioned passwords.  Can you explain that a little bit more?

21 A    Yes.  So there was a time when they were trying to get

22 access to a woman's e-mail address.  I remember who this

23 person was and her name was Kristin Snyder and Keith wanted to

24 gain access to her e-mail account because something happened

25 and he had a theory and he was trying to disprove it, like,

Daniela - direct - Penza                    2524

1    disprove what had happened.

2          And, as I remember, Kristin had found a service

3    where they could pay a certain very large amount and they

4    could obtain the password for any e-mail address so I remember

5    that attempt.

6    Q    What do you remember about those discussions

7    specifically?

8    A    I remember the -- about those discussions specifically, I

9    remember it was a very large amount of money they were willing

10   pay for a password.

11   Q    Do you remember the amount?

12   A    $24,000 was the amount.  I remember -- that was the

13   shocking part for me.  I remember the situation was that --

14   and it was going all around, like, ESP the center because this

15   woman had taken some ESP classes and what I remember, what I

16   understood this woman was a student from Alaska or had come

17   from Alaska and she had disappeared and she had left a note

18   attributing, I think, like a suicide or something like that to

19   the company and that was obviously very destructive to the

20   company.

21         And I think Keith believed this was a plot to create

22   negative publicity for ESP and that she was alive, so they

23   were trying to gain access to her e-mail to prove that she was

24   alive.

25   Q    When you say the defendant believed that, did the

Daniela - direct - Penza                    2525

1   defendant actually say that to you?

2   A    Yes.

3   Q    And he would be saying that in these conversations with

4   Kristin as well?

5   A    Yes.

6   Q    How long was -- how long was the time period of this back

7   and forth about Kristin Snyder and her password?

8   A    It was very short.  It was a matter of days, weeks.

9   Q    Now, do you remember anyone else that the defendant was

10  trying to gather information on?

11  A    Information in general, it was a long list of people.  I

12  was a long list of people.

13  Q    Who stands out?

14  A    Who stands out?  Okay.  Rick Ross.

15  Q    Who was Rick Ross?

16  A    Rick Ross was a person who had -- I believe he, like, was

17  the programmer and had zoned in on ESP and had gotten his

18  hands on some of the curriculum and was, like, publishing it

19  and they had a case, like, a big case.  I think I remember

20  like on copyright or something against him.  There was Toni

21  Natalie who understood had been in business with Keith, had

22  been part of, like, an older CBI and either another business

23  and on that business he had stolen from Keith so I don't know

24  who was suing who, but they had some legal stuff open with

25  her.  There was a lawyer who at first was working with them

SN        OCR        RPR

Daniela - direct - Penza                    2526

1   who then became part of the list of enemies, of people they

2   were trying to get information on and his name was Joe O'Hara.

3           So, Joe O'Hara, like, first was on ESP's side and

4   was working with them and then I don't even remember the

5   transition point, but all of a sudden he had done something

6   bad and he was out to get them so he was also part of that

7   group.  Later on there would be other people in that similar

8   situation.

9   Q    Do you remember a specific conversation -- do you

10  remember the specific conversation between the defendant and

11  Kristin Keefe, when there was a discussion about the paying

12  the $24,000?

13  A    Yes.  I remember -- I remember those conversations.  I

14  remember Keith saying it was worth it.  You know, like, and

15  that maybe if they could get that and it was good, you know,

16  there was a risk of not being able to -- you send the wire

17  into oblivion and obviously these people are doing illegal

18  things and so maybe you will get it and maybe you won't.  I

19  remember him saying it was, like, worth the amount and, like,

20  maybe if it worked it would be a good thing because they could

21  get more and that was a conversation that they had.

22  Q    So, was somebody -- was the defendant -- was there

23  discussion about how the $24,000 would actually be

24  transferred?

25  A    There was.  I don't remember how it was actually

SN        OCR        RPR

Daniela - direct - Penza                    2527

1    transferred, but, there was.

2    Q    So after you were present for this conversation about

3    obtaining -- and did they actually obtain that password?

4    A    Yes, they were successful and they obtained that password

5    as I remember.

6    Q    After that incident where they obtained this password and

7    you heard these conversations, did you have a conversation

8    with the defendant about it?

9    A    Yes.

10   Q    And can you explain what that conversation was?

11   A    That first conversation was firmly centered on the large

12   amount that they were willing to pay for a password and that I

13   thought it was a lot of money.

14   Q    Why were you focused on the amount of money?

15   A    Many reasons.  I mean, it was -- well, because of my

16   particular position at the time, that was a lot of money, but

17   also how easily they were to willing to spend it versus how

18   easy I think it would be to get somebody to do it for less

19   money.  So it was a lot of money for that.  And that's what

20   the conversation centered around.  And he asked if maybe I

21   could find somebody who could do it and that first

22   conversation went like that and -- and I looked for someone

23   who might do it.

24   Q    How did you -- can you explain the process of you trying

25   to find someone to do it?

Daniela - direct - Penza                                    2528

1   A    Well, yeah, well the reason he thought I may have someone

2   was because I had been in a life where I had a group of

3   friends who were very smart and it's people at that level tend

4   to gravitate towards computers.  And so maybe I knew someone

5   who knew someone who could do it.  So I contacted two of my

6   friends that I knew who were very proficient in computers that

7   I knew from high school that were, like, the really smart

8   guys.  So I contacted two of them.  One of them told me, no.

9   I really don't know.  I don't know anybody.  I can't do it and

10  I don't know anybody.  And my other friend, he put me in touch

11  with someone who could do it.

12  Q    Who did he put you in touch with?

13  A    The Dark Lord was his nickname.  So I contacted The Dark

14  Lord and I sent him the e-mail address that I needed the

15  password for.

16  Q    Who gave you the e-mail address?

17  A    The e-mail address, Keith.  And then -- I actually got

18  the correct typing of the e-mail address from an e-mail from

19  Kristin, but these were the people that Keith had said he

20  would like the passwords on.  I sent one of the addresses to

21  the Dark Lord and he wrote back asking me if that was my -- if

22  that e-mail address belonged to me and I told him very

23  honestly, I said no.  And he said, Then I can't help you.

24  Q    Did you report -- did you report this back-and-forth with

25  your other friend who knew the Dark Lord to the defendant?

Daniela - direct - Penza                                    2529

1    A    Yes.

2    Q    And how did the defendant respond?

3    A    It became, like, a main topic of conversation between us,

4    it would become even more.  So, after I had no success finding

5    someone who could do it, he floated the idea of, well, do you

6    think you could do it?  Well, how hard can it be?  And -- and

7    I took it as a challenge.

8    Q    So, what were the next steps that you took?

9    A    I started researching and started thinking how I would do

10   it and I started discussing my ideas and I started discussing

11   it with Keith and looking online.  Different methods, reading

12   forums, reading threads and I advanced very rapidly.  I

13   downloaded a few pieces of software.  I played with them and I

14   started testing and pretty quickly I zoned in on a strategy

15   that I thought would be successful and I thought I could, in

16   all likelihood, get a password -- hack a computer and get a

17   password.

18   Q    So once you felt you had reached that stage, did you

19   discuss that with the defendant?

20   A    Well, yes.  For the period of my research where I was,

21   like, figuring out how do I solve this.  If I needed to do

22   this how would I do this.  It was very animated.  It was a

23   very exciting subject to tackle.  It had an end point.  Once I

24   knew I could do it I had -- I had a lot of reservations; some

25   of which I had brought up in the past with Keith, but now it

SN        OCR        RPR

Daniela - direct - Penza                    2530

1    was -- I was faced with, okay, I can hack someone and what

2    that meant for me, what that meant for him.  What that meant

3    in general.

4           So I had extreme reservations about it and I

5    talked -- you know, what I'm trying to say is, okay, now I

6    know how to do this and now I have -- I have, you know,

7    specific people that he wants to hack, that they want to hack.

8    Like, that was a big jump for me.  The one thing figuring out

9    how to do it and then actually doing it.

10          So I had a big conversation with him about that and

11   my conversation was very specifically, this is wrong, right.

12   This is what was way, way -- what held more weight at time was

13   this is illegal.  This is unethical.  I'm like, this is not

14   okay.

15   Q    You're saying this to the defendant?

16   A    To him.  Right, this is my concerns this is unethical,

17   this is illegal.  This is wrong.  ESP is supposed to teach

18   ethics and, you know, bring good things in the world and you

19   are the leader of this organization, like, how come?  How do

20   we get to do this?  Why are we breaking the rules?  Like, I

21   didn't understand, you know.  It didn't seem, like, okay to me

22   and then I had that conversation with him.

23   Q    And how did the defendant respond?

24   A    He gave me a very specific, very convincing response.

25   This is what he told me at the time.  He said it's like

Daniela - direct - Penza                    2531

1  something out of game theory.  So you have ESP, us, the good

2  guys.  We are doing good things.  We're going to go by the

3  rules.  We're going to be good people and there are certain

4  things that we're not willing to do because they're wrong and

5  they're unethical.  So we have a certain number of options of

6  choices we can take.

7          And then you have these bad people, the

8  suppressives; the people who are out to get us and destroy the

9  good things in the world and these people have no ethics and

10  these people don't care.  These people are going to do

11  everything we're going to do and then more.  They're going to

12  break the rules and do illegal things and destroy.  These bad

13  people have all the options in the world and we have only

14  these options.

15          So the bad people are always going to win so you

16  have to believe that what we're doing here, what we're doing

17  here is trying to build a better world and we're going to do

18  unethical things ethically because we, we're good.  We want to

19  do good.  Ultimately this is to do good.  So we're going to

20  have to break some rules in order to make that happen.

21  Q    So after you had that conversation with the defendant --

22  did you push back at all?

23  A    That made sense to me and I believed, like, he was doing

24  something good and ESP was trying to defend itself from the

25  bad guys.  That made sense to me.

Daniela - direct - Penza                    2532

1   Q    After that conversation with the defendant, what

2   happened?

3   A    After that conversation with the defendant, Keith, I

4   proceeded.  I -- I -- I tried first to hack into Joe O'Hara's

5   e-mail address.

6   Q    Who gave you the e-mail address?

7   A    There were two e-mail addresses.  There were two targets.

8   Keith had told me those targets and -- and I needed to get

9   right.  So they were in writing.  The actual e-mail with the

10  writing came from Kristin.  And the first one that he told me

11  was Joe O'Hara.  So it was Joe O'Hara and then there was

12  another one, Kim Snyder, was the second e-mail that I was

13  given.  The first target was Joe O'Hara and I started -- you

14  know, I had devised an entire method and I proceeded to

15  attempt.

16  Q    What computer were you using?

17  A    So, once it was settled, both the method and my ethical

18  stand with regard to it, then I planned and I was very

19  cautious and so I told Keith I needed a computer, a dark

20  computer, one that was not linking me to anybody.  He told me

21  that I could get the money from Pam and she gave me $500 and

22  bought a refurbished computer from an independent story in

23  Troy.  It was a Dell laptop computer.  So that computer had

24  self-everything, not linked to me and not linked to anybody

25  and in that computer, I installed the software that I needed.

Daniela - direct - Penza                    2533

1    From that computer using WiFi that was not my local network or

2    anybody in the company.  I set up servers for the purposes of

3    the methods that I had devised.

4    Q    So we're going to go very slowly.  So, first with the --

5    you said you didn't use your local WiFi.  What do you mean by

6    that?

7    A    So, right.  So an internet network, WiFi, either, like,

8    landline or WiFi is identifiable.  You know, there's an IP

9    address, a specific number assigned to it so I was very

10   cautious not to use any internet connections that might be

11   traced back to me or back to ESP.

12   Q    And, so, what internet connections would you use?

13   A    I would use public ones.  At the time, WiFi was not as

14   pervasive as it is now.  It would be public libraries, parking

15   lots of hotels.  Sometimes I could pick up a connection from

16   the side of the street and see if the connection was open and

17   I would use that.

18   Q    Would you go to these locations yourself?

19   A    No, sometimes they would drive me.

20   Q    When you say "they," who is they?

21   A    Kristin would drive me.  I remember Kristin would drive

22   me.  At other times I remember other people, but mostly it

23   would be Kristin because I was aware of it.

24

25            (Continued on Following page.)

1  EXAMINATION CONTINUES

2  BY MS. PENZA:

3  Q    Just as an aside, did the defendant drive?

4  A    In general?

5  Q    Yes.

6  A    I never saw him drive, no.

7  Q    Now, did you have a car in the Albany area?

8  A    Not for that period of time.

9  Q    So when did you -- just, I know we're going off topic for

10  a second, but when did you have a car and when didn't you?

11  A    When I first went to Albany, I did not have a car for the

12  first period.  I would say loosely, six months.  I was --

13  Loreta was driving me around when I needed to.

14        Then I believe it was when my sister Marianna moved

15  in with me, I bought a used Ford Explorer and I used that

16  until it broke.  It was very, very old, it was $800.  And I

17  had to -- couldn't even find a signal of how much gas was in

18  it, and one day it just broke down on the highway.

19        After that I had a Honda Civic, and that was all of

20  my driving or all of my possession of a car would have been

21  before I crossed over illegally.  After I was illegally in the

22  country, I didn't have a car.  I didn't drive.  Nothing was in

23  my name.  I never, ever exposed myself in any way.

24  Q    When you say you never exposed yourself, what do you

25  mean?

Daniela - direct - Penza                          2535

1    A     I mean I had no bank accounts, no e-mail going to my

2    house in my name.  Absolutely nothing with my name on it.  I

3    would even be very aware and careful if I was walking, walking

4    alone where I was walking so I wouldn't be, I imagine,

5    stopped, you know, asked -- so I was invisible.

6    Q     What was your fear, what were you worried about?

7    A     I was -- I was -- immigration.  For -- I mean, even since

8    I was younger, I knew that immigration in the U.S. is very

9    strict.  Then I completely confirmed it.  I was stopped, you

10   know, at the airport, my visa was drawn.  I was -- I was -- I

11   had a very healthy fear for -- for -- for immigration in the

12   law.  It was just something I was always very aware.

13   Sometimes it would just be like a police car, like driving

14   past me when I was alone, my heart would jump.  It was just

15   something I was very aware that I was illegal in the country.

16   Q     So going back to once you're -- you're making the

17   attempts regarding Joe O'Hara, can you walk us through all of

18   the other steps you took regarding that first e-mail account?

19   A     Yes.  So I'll just say it generally, and then I'll say

20   the steps.

21              So the general idea was to send an infected e-mail

22   to the user, to the target, that would be embedded with --

23   like in a Trojan way, would be embedded with software that

24   would record all the key strokes, sometimes screenshots, and

25   send it to a server that I had access to so that I could gain

              SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                          2536

1   access to everything being typed and from there retrieve the

2   password, user name and password.

3          More specifically, I started by first having an

4   application that could mask an e-mail address, so that it

5   would bypass any spam filters and so that it would entice the

6   user to open it, so it didn't look like -- like a bunch of

7   garbage at a bunch of garbage.com.  So, first I'd have to mask

8   the e-mail address and I'd have to make sure it bypasses spam

9   folders.  And I also, at the time it was possible, I would

10  code it in a way that it would self-destroy if it wasn't

11  opened in a certain amount of time, so that there would be no

12  evidence sitting there in someone's inbox of any attempt to

13  break into their privacy.

14         So, the second step would be actually grabbing the

15  software that logs the key strokes.  It's called a key-logger,

16  and any other surveillance software that I was going to use,

17  and embed it onto a regular-looking file, which would be an

18  Excel spreadsheet.  It could be an image.  It could be

19  anything.  Once it's embedded, then the e-mail is created and

20  then I send it to the targets and --

21  Q    Can I ask -- I just wanted to ask you one question.

22         So, when you -- the software, itself, where do you

23  get the software?

24  A    The software I got from the Internet and I manipulated it

25  myself.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2537

1    Q    What does that mean?

2    A    I changed the code so that it does what I want it to do.

3    So, yeah, I -- I used different software at different times.

4    For the first time, as I remember, I was looking -- I was

5    using both a key-logger and screenshot capture so that I could

6    have two points of information.

7    Q    And so then, once you have the software the way you want

8    it, then you embed it in a normal-looking file?

9    A    Yes.

10   Q    And so what is the point of that?

11   A    The point of that is to -- for the target to open it when

12   they receive the e-mail.  At the moment one clicks on the

13   infected file in a way that doesn't show, if I did my job

14   correctly, to the user, it installs itself in a stealth way.

15   So that also means that the infected file needs to bypass any

16   anti-virus software, which is also a difficult thing to do and

17   it's a multistep process, but that's the idea.  Once the

18   target has clicked on it and it's installed, it doesn't do

19   anything else.  On your computer you see nothing else.  You

20   click on it, then nothing happens, and it's just like a bad

21   file.

22            And from that moment, once the computer -- the

23   software has been deployed, the software, what it will do is,

24   it will be recording everything you type on your keyboard, and

25   in some cases it will take a screenshot of the computer every

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                          2538

1   once in a while and save it on the local memory.  And the

2   software I had -- I had used and I had coded -- what it did is

3   it was like every hour, for example, it would open that

4   communication to the server and upload all that information to

5   a remote server and delete it from the -- you could delete it

6   from the local computer.  What I would be checking would be

7   not the actual computer infected but the server where the

8   information was being uploaded.

9   Q    And are you paying for access to that server?

10  A    No.  All the services that I decided to use were free,

11  therefore, anonymous.  So I created a set of e-mail accounts

12  that are the ones that I opened those services for, so

13  everything I was very cautious.

14  Q    Along the way, as you're developing these steps, are you

15  discussing them with anyone?

16  A    With Keith.  It was our little project.

17  Q    Did the defendant contribute anything specific to these

18  discussions?

19  A    Yes.  I mean specifically -- I think remember at least

20  the self-destroy was his idea.

21  Q    And so what is the point of the self-destroy?

22  A    It's so evidence doesn't sit on an inbox.  So if I send

23  an e-mail and it's infected and either it doesn't work or it's

24  not opened or it goes without notice, then it's just sitting

25  there and it's, you know, it's a risk.  So for it to be able

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                          2539

1    to just disappear or destroy itself, it's very convenient so

2    that you don't have that open risk there.

3    Q    Any of the work that you're doing, are you doing any of

4    it at 3 Flintlock?

5    A    Yes, the testing.  I mean I was spending almost every

6    waking moment I had there.  So I would be testing offline, so

7    I would not be connected to wifi.  But a lot of the testing,

8    for example, infecting myself with a key-logger and then

9    testing it, see how it worked, see how it looked like, all of

10   that I was doing mostly there.

11   Q    And as you're testing it, are you communicating the

12   results of your testing to the defendant?

13   A    Yes.

14   Q    And what's his reaction?

15   A    I -- I -- I thought he was pleased with me.

16   Q    So what were the actual steps you took for this first --

17   so you described generally the process; are those steps you

18   took for this first e-mail account?

19   A    They were exactly those, yes.

20   Q    And what happened?

21   A    I was unsuccessful.

22   Q    So what exactly?  So what did you -- you end up sending

23   these e-mails?

24   A    I end up sending a series of mails with infected files

25   and it never worked.  It never works.  I don't know why.  I

Daniela - direct - Penza                    2540

1   can imagine why.  Either it went to a spam folder or maybe

2   Mr. O'Hara caught on to it and went, oh, no, this is an

3   infected file.  Or maybe he did get it, did click on it and

4   maybe his anti-virus software stopped it.  It could be any of

5   those things.

6   Q    Apart from the conversations that you would hear between

7   the defendant and Kristin Keeffe and Nancy Salzman about Joe

8   O'Hara, did you personally have any involvement with Joe

9   O'Hara?

10  A    No, I did not.

11  Q    Did you ever meet him?

12  A    No.  I remember having seen him, so I remember he had

13  like white hair and a white beard.  He looked like Santa Claus

14  to me.  He was like a big guy.  I remember having seen him at

15  the center, maybe in a meeting with them when he was like

16  doing work with them, but I never actually was introduced

17  before.

18  Q    So what happened -- when you would have the discussions

19  with the defendant, where were most -- most of these

20  conversations would take place at 3 Flintlock?

21  A    Or during walks around 3 Flintlock and back.

22  Q    So what happened after that?

23  A    Well, I was clearly unsuccessful and Keith came up with a

24  plan.  I don't remember exactly how it came about, but he told

25  me that there was this guy who worked with Joe, or for Joe,

Daniela - direct - Penza                              2541

1   who they had access to, I -- I believe he was doing -- he was

2   working for Joe and maybe like was also doing some work in the

3   accounting of ESP.  It was something like that.  So he says --

4   so he came up with this plan where Kathy Russell, who was a

5   person who was working with this man whose name was James

6   Loperfido, she -- he talked to Kathy.  So Kathy would make an

7   appointment with him at the 455 New Karner Road center, which

8   is where the ESP center was.  And for me to take that

9   opportunity to infect his computer, like, live, like right

10  there.

11          So, yeah.

12  Q    What would be the strategic difference or the -- is the

13  likelihood of success different if you're going to do what the

14  defendant had now planned for Mr. Loperfido?

15  A    If one has physical access, it's infallible.  Like the

16  success rate is a hundred percent because the main problem in

17  infecting a computer remotely is gaining the access.  So,

18  whether it be via e-mail or you're gonna like, you know,

19  through the wifi, it's something very sophisticated.  So if I

20  have access to a computer, all I have to do is plug in a USB

21  and deploy it myself.  And in the event -- in the event that

22  an anti-virus would try to stop it, I can also disable it

23  right then and there.  So there is no failing with that.

24  Q    Before that day had you ever heard of James Loperfido?

25  A    No.  Never.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                2542

1    Q    So what happened after the defendant communicated this

2    plan to you?

3    A    Kathy did exactly as it was planned and I did exactly as

4    it was planned.  So --

5    Q    Go through it slowly.

6    A    Yes.  So, Kathy made an appointment with Mr. Loperfido at

7    the center.  He attended.  I remember I drove in with Kathy

8    and I was just in a separate room, a separate person, just

9    hanging out at the center.  And they were working and she was

10   communicating with me and she was supposed to tell me when she

11   was gonna take him away and distract him from his laptop.  He

12   had a laptop and he was working in one of the rooms with

13   Kathy.

14        So, she would take him away for what should be a

15   considerable amount of time so I would have enough room to

16   deploy, install and get out of there, and she did exactly so.

17   She gave me a sign, took him out of the room to like a

18   separate wing of the center, and I went to his computer.  I

19   had a USB prepared with all the software and I deployed it.

20   Q    When you say you had a USB prepared with all the

21   software, can you describe that?

22   A    Yes.  So for each different attack that I would do, I had

23   specific software, but also I had a specific server account

24   set up.  Again, very cautious, so that this particular

25   computer would upload the information I was gathering to a

Daniela - direct - Penza                    2543

1   specific server.

2              So all of that had to be set up in advance, which I

3   did.

4   Q    And what do you remember about this specific software?

5   A    This specific software was log the key strokes and also

6   took a snapshot of the screen every, like, minute or

7   30 seconds.  It would just take a snapshot of the screen and

8   save it.

9   Q    Logging the key strokes, what exactly is the point of

10  that?

11  A    The point of logging the key strokes is -- other than,

12  you know, writing whatever you write on your computer, it is

13  necessary to access an e-mail account or any other kind of

14  account for one to type the password.

15             So, the point of the key log is exactly that, to be

16  able to at some point where the person is going to log into

17  their e-mail address or is going to log into some kind of

18  anything that requires a login, to capture that user name and

19  password so that, for example, if they've got an external

20  account, for example, Gmail, Hotmail, AOL, then a lot of

21  people maybe have Outlook on their computers or some other

22  kind of server where they're used to accessing it, but it can

23  also be accessed directly going to Gmail.com or Hotmail.com or

24  AOL.com.

25             So gaining simply their user name and password

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2544

1  allowed me to then be accessing their e-mail in other forms.

2  Q     So was it successful with James Loperfido?

3  A     Yes.

4  Q     So what happened right afterwards?

5  A     Right afterwards, I -- I remember I gave the good news to

6  Keith and then I proceeded to go and check the first uploads

7  to the server just to make sure that it was, indeed,

8  successful.  And it was.

9  Q     And how did the defendant react?

10  A     I thought he was pleased.

11  Q     So you checked the server -- you checked the server that

12  night?

13  A     That afternoon, yes.

14  Q     And eventually -- eventually, what happened?

15  A     So eventually, I started gathering more information and I

16  got e-mail -- user names and passwords to virtually everything

17  he was signing into and including his e-mail address.  And so

18  I had access now to his e-mail address.

19            Eventually, what happened is I -- I killed the

20  entrance to, you know, to the -- from the computer to the

21  server because this attack, in particular, was designed to be

22  getting all the screenshots from his computer and they were

23  accumulating very rapidly and, I believe, making his computer

24  very slow.  So it had become a risk, so I just shut that down

25  remotely and just kept the access to his e-mail address, which

Daniela - direct - Penza                    2545

1    is what I was checking periodically.

2    Q    When you say it became a risk, what do you mean?

3    A    Well, that he might find that he had been hacked.  So if

4    your computer is slow, what do you do?  You might take it to a

5    technician or you might run, like, another anti-virus because

6    you think there is something going on and you might discover

7    that you have been hacked.

8            So anything that creates that risk, I eliminated.

9    Q    So, after some period of time, you did get his user name

10   and password?

11   A    Yes.

12   Q    And so what would -- what was the process then?

13   A    The process was to access his e-mail address.  I --

14   again, with all the precautions I had spelled out before,

15   which was I would go to -- with my -- the computer that was

16   anonymous, I would go to a wifi network that was public and I

17   would check his e-mail address.  I would try to do it at times

18   where I thought people would not check their e-mail address.

19   Because, essentially, what I would do is I would go into the

20   e-mail and I would read -- click on one e-mail, read it, see

21   if it was relevant.  If it was relevant, I would copy/paste it

22   into a text file, a separate text file in my computer, and

23   then I would mark it as unread and then I would read the

24   following one.  And so on and so on and so on.

25            So at the end of any time where I went and checked

Daniela - direct - Penza                    2546

1   for information into the e-mail address, I would have like a

2   series of text files with different relevant e-mails.

3   Q    What was the point of marking the e-mails as unread?

4   A    So that he wouldn't notice that I was -- that somebody

5   else was checking his e-mail.

6             There is two reasons.  The person might be checking

7   their e-mail address directly, in which case they will clearly

8   know that there is an e-mail that they haven't read, which had

9   been read.  That's extremely suspicious.

10            In a different instance, if a person is using an

11  application like Outlook, then those applications tend to have

12  rules.  Like, they will check your e-mail server and if any

13  e-mails are new, like marked as unread, then it will download

14  those e-mails and those are the ones you're gonna get.  If

15  something is marked as read, then those applications typically

16  will not download it because they think that those have

17  already been downloaded.  So then what the user would -- would

18  keep getting is:  I'm not getting e-mails, I'm not getting

19  e-mails, and that might be suspicious and, again, might lead

20  to him realizing that he's been hacked.

21  Q    What time of day would you typically go through this

22  process of reading the e-mails?

23  A    Late at night.

24  Q    Why is that?

25  A    Outside working hours, which is when I think people are

Daniela - direct - Penza                    2547

1    checking their e-mails or I thought people were checking their

2    e-mails.

3    Q    So you said you would copy, paste and create text files?

4    A    Yes.

5    Q    What would you do then?

6    A    I would bring them to Keith.

7    Q    How would you bring them to Keith?

8    A    In a USB drive.

9    Q    And did you ever observe the defendant reviewing those?

10   A    Yes.  He would use the little laptop computer that he had

11   at the coffee table on the stack of books in front of his

12   couch and he would plug it in and he would review the e-mails.

13   Q    Did you ever give -- was it always the same process of

14   putting the e-mails onto a USB?

15   A    To a USB, yes, but there were times where I handed them

16   to Kristin and sometimes they would just be handed to Kristin.

17   Sometimes, you know -- yeah, it would actually be that way or

18   for Kristin needs to see it; many times he would see it first

19   and then she would keep it.  So -- but it was just a tool

20   though.

21   Q    Do you remember for how long you surveilled James

22   Loperfido?

23   A    Not exactly.  But it was, I would say, not weeks, not

24   months, I would say a year or years.

25   Q    Did you ever access anyone else's e-mail account?

Daniela - direct - Penza                    2548

1   A    Yes.

2   Q    When was that?

3   A    I think that was -- wait, I don't remember the exact

4   date.  I think 2005 or 2006.

5   Q    Was this in relation to the time that you accessed James

6   Loperfido?

7   A    After.  So after James Loperfido I accessed somebody

8   else's account.  Yes.

9   Q    Whose account was that?

10  A    Edgar Bronfman.

11  Q    Who was Edgar Bronfman?

12  A    Clare's father.

13  Q    And what did you know about Edgar Bronfman at that point

14  in time?

15  A    Hum, I knew -- I knew vaguely who he was.  I knew he was

16  a rich, powerful man.  I also knew he had taken ESP classes

17  and Nancy was coaching him.  So, for a little while there, he

18  was like a star student of sorts, like they were very proud

19  that Edgar was in ESP, was being coached by Nancy.  Like it

20  was like a big name, right, and it was a big deal.  And then,

21  all of a sudden -- I don't know exactly what happened, but

22  then Edgar Bronfman was not -- no longer on the ESP side, he

23  was in the ESP enemy side.

24        I remember vague details, but, you know, I wasn't

25  very keyed into that.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2549

1   Q     Do you remember were there any concerns about anything

2   Edgar Bronfman had said?

3   A     Yes.  I mean there was something very specific he said to

4   media outlets.

5   Q     What you do you remember about that?

6   A     I remember there was a <u>Forbes</u> article that came out where

7   he said:  It's a cult.  And I don't remember if that was the

8   breaking point, but certainly that was a big deal also.

9   Q     Does that -- does the -- do you remember what publication

10  that was in?

11  A     <u>Forbes</u>.

12  Q     And do you -- does that -- do you actually have a memory

13  of that article coming out?

14  A     When that article came out, yes, I remember they bought a

15  lot of those magazines, like boxes.  Like there were like --

16  it was -- it was -- it was weird because it was -- it was -- I

17  wasn't sure if it was a negative or positive article from

18  reading it.  It seemed really -- but he was on the front page

19  and everybody was like very enthusiastic about it.

20  Q     Who was on the front page?

21  A     Keith was.

22  Q     But that was the article where there was the statement

23  from Edgar Bronfman?

24  A     Yes, that's what I remember.

25  Q     And you said, at some point, Edgar shifted to the enemy

Daniela - direct - Penza                    2550

1    side; is that what you said?

2    A    Yes.

3    Q    What is this concept of the enemy side, what was your

4    understanding from the defendant?

5    A    Yes.  There were -- there was this series of people that

6    can be listed, there was a series of people who were out to

7    destroy Keith, out to destroy ESP.  And I make that

8    distinction because, to me, it was clear that Sir Rick Ross

9    wanted to destroy ESP, Toni Natale wanted to destroy Keith.

10   You know like -- some of it seemed like, you know, like,

11   that's my -- that's my understanding of it.

12            And so like Joe O'Hara, I didn't know what had

13   happened, but he wanted to destroy ESP, and I understood it

14   was the same for Edgar Bronfman.

15   Q    And so how were you approached about Edgar Bronfman's

16   e-mail account?

17   A    It was Keith who -- I mean, Keith was the one who I was

18   working with.  I did not have a relationship with Clare and,

19   in fact, did not have a lot of interaction with her about

20   that.  It was Keith who asked me and --

21   Q    What did he say?

22   A    That, you know, I don't remember the exact words, but,

23   you know, that it would be good if they, you know, had access

24   to his e-mail address.

25            MS. PENZA:  Your Honor, would this be a good time to

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2551

1   take a break?

2           THE COURT:  All right, let's take our mid-morning

3   break.

4           All rise for the jury.

5           (Jury exits.)

6               (In open court - jury not present.)

7           THE COURT:  The witness may stand down.  Do not

8   discuss your testimony with anyone.

9           (Witness steps down.)

10          THE COURT:  Everyone else may be seated.

11          Ms. Penza, about how much more time on direct do you

12  have?

13          MS. PENZA:  I think it's at least through the end of

14  the day, Your Honor.

15          THE COURT:  At least through the end of the day?

16          MS. PENZA:  Yes.

17          THE COURT:  And?

18          MS. PENZA:  I'll be able to judge much better by our

19  mid-afternoon break, but probably no later than the morning

20  tomorrow.

21          THE COURT:  All right, just let me know.

22          MS. PENZA:  Absolutely, Your Honor.

23          THE COURT:  All right, we will take our ten-minute

24  break.  Thank you, everyone.

25          MS. PENZA:  Thank you.

Daniela - direct - Penza                    2552

```
 1              (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

 2              (Recess taken.)

 3              (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

 4              (In open court - jury not present.)

 5              THE COURT:  All right, let's bring in the defendant,

 6      please.

 7              Bring in the witness, please.

 8              (Defendant entered the courtroom.)

 9              THE COURT:  Please bring in the jury.

10              (Witness resumed the stand.)

11              (Jury enters.)

12              THE COURT:  Please be seated.  I remind the witness

13      she is still under oath.

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Ms. Penza, you may continue your direct

16      examination.

17              MS. PENZA:  Thank you, Your Honor.

18      EXAMINATION CONTINUING

19      BY MS. PENZA:

20      Q    Daniela, we were talking about Edgar Bronfman's e-mail

21      account.

22              What were the next steps you remember after his

23      e-mail account was mentioned to you?

24      A    The advantage with that attack was that it was Clare's

25      father, so I did not have to send any e-mails myself or take
```

Daniela - direct - Penza                    2553

1    care of that part myself.  I did have contact with Clare

2    because I was gonna set up the file to the server and give her

3    a file for her to send to her father.

4    Q    Can you describe those interactions with Clare Bronfman?

5    A    I don't remember them very clearly.  I -- I think they

6    were just brief; me handing over a USB with a file in it so

7    she would attach it and send it to her father.

8    Q    Do you remember how you actually -- how you embedded the

9    software?

10   A    Yes.  I remember this particular instance it was an

11   image, like an image of her choice.  Like I said, the

12   advantage was that I didn't have to worry about bypassing spam

13   or masking the e-mail address so it seemed familiar because it

14   was gonna come from his daughter.  So, she picked the image.

15   She knew what, you know, he would open, something that was

16   familiar I imagine, and if that e-mail -- in that image she

17   gave me I embedded the software that was gonna be deployed.

18   Q    Did you embed the same software that you had used for

19   James Loperfido's account?

20   A    It was a different one.

21   Q    Why?

22   A    I had learned.

23   Q    So what did you do differently this time?

24   A    It wasn't a -- a -- it wasn't gonna generate the very

25   heavy files.  It was, I believe, much more stealthy and so it

Daniela - direct - Penza                    2554

1    had higher -- you know, it would have higher rate of success.

2    Q    So you give the image to Clare Bronfman?

3    A    Right.

4    Q    And then what happens?

5    A    What I learned happened was that she -- she sent the

6    e-mails to her father.

7    Q    She told you this?

8    A    I don't know if she told me that or Keith told me that.

9    Q    Okay.

10   A    I don't remember exactly.  But that she sent e-mails, I

11   understood several ones, and they were not -- I remember the

12   point was that it wasn't that it hadn't been successful, but

13   rather that he wasn't opening them.  So that was an issue and

14   so there was nothing really for me to do.  The point there

15   was, you know, to get him to actually open it so that it would

16   infect the computer.

17            And I believe so what ended up happening is, and

18   again I wasn't there for that, but from the stories afterwards

19   that I heard from -- I believe from Kristin and from talking

20   to Keith, what she did is actually she visited her father and

21   did, essentially, what I had done with the attack on James

22   Loperfido's computer, which is physically go and like plug it

23   in, click on it and infect the computer locally.

24   Q    And so you said you learned that from the defendant or

25   Kristin Keeffe, but did you actually gain access at that

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                              2555

1   point?

2   A    Yes.

3   Q    So what happened?

4   A    So what Clare did worked and I started getting the

5   information.  I checked it.  There was like success reported

6   that she had done it.  So I checked the server and, indeed, I

7   am receiving information.  So I start monitoring the -- the

8   uploads to the server with the key strokes, everything that's

9   being logged.

10           And very rapidly, as I remember, I get the user name

11  and password that I'm looking for, which was, as I remember,

12  his AOL account.  And -- I mean, this was a high profile

13  person as I understood, so immediately after I had that access

14  I killed the back door.  So I just -- I just deleted the rest.

15  I didn't need to have more key logs being uploaded, nothing.

16  Once I had the user name and password, I killed that entrance.

17  Q    Were you able to -- do you remember anything from his

18  user name or password?

19  A    I do.  I remember it was an AOL account and I remember

20  the password was miles75.

21  Q    Did you discuss the fact that you had been able to --

22  once you got his user name and password, what would you do?

23  A    As I did before, I would access in this case his AOL

24  account directly via AOL, and I would read all of his

25  correspondence.

Daniela - direct - Penza                          2556

1   Q     And did you discuss the fact that you had accessed his --

2   had accessed Edgar Bronfman's e-mail account with anyone?

3   A     Yes, with Keith.

4   Q     And what was his reaction?

5   A     I thought he was pleased.

6   Q     And so what happened after that, what is the process of

7   you monitoring?

8   A     The process of me monitoring is -- it wasn't on a

9   schedule.  I would check it regularly, mostly at the request

10  of Keith.

11          So, all of this, you know, was as I understood and

12  as it was told to me at the time, it was, you know, for -- for

13  the legal battles, for the legal cases.  It was to aid them in

14  whatever problems it is they were facing from these people.

15  So there were -- most of the times, I would be asked by Keith:

16  Is there anything new on the -- on the key-loggers?  You know,

17  have you found something?  Have you checked?  When was the

18  last time you checked?

19          So I would, you know -- it wasn't like -- what I'm

20  trying to say, it wasn't every Friday afternoon or it wasn't

21  no periodic way, but rather it was constantly and often at the

22  request when something important was happening, it's happening

23  and they needed it.

24

25          (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2557

1  BY MS. PENZA:  (Continuing)

2  Q    And how -- for how long did you continue this process of

3  monitoring Edgar Bronfman's e-mails?

4  A    I don't remember exactly but, again, it wasn't days or

5  weeks or months.  It was a really long time.

6  Q    Why did you stop monitoring Edgar Bronfman's e-mail?

7  A    I remember suspecting that he had found something was

8  wrong and I got a little bit scared and I stopped, you know, I

9  stopped checking.

10  Q    At any point in time, did anyone ask you about the fact

11  that you had stopped checking?

12  A    Yes.

13  Q    Who?

14  A    Keith.

15  Q    And what did you tell him?

16  A    I told him precisely that, that I had stopped checking

17  and that -- I believe I told him I had lost access.

18  Q    What do you remember from reading Edgar Bronfman's

19  e-mails?  Would you copy and paste all of them?  How would it

20  work?

21  A    No, I would check and maybe I also misstated that part

22  before because it was the same for James Loperfido.  So I

23  always checked the e-mails coming in but also I want to make

24  clear, I was also checking all the e-mails in the Outlooks,

25  everything in the sent folder which is everything relevant

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2558

1    because most, if not all, services log every e-mail going out

2    as well.

3            So I would be -- I would check, methodically check

4    e-mail by e-mail all of the e-mail coming in and all of the

5    e-mail going out for the last period since I had last checked

6    which I just, you know, kept in memory.  And I would not save

7    every e-mail.  I mean, a lot of the e-mail is, as I'm sure, as

8    I get, a little bit spam, some of it is, like, news, some of

9    it is newsletters that he signed up for.  So those, almost

10   right away I knew what they were, but all the personal or

11   business e-mails, I would go through all of them, and not all

12   of them were relevant.

13           So there were communications between him and his

14   family.  There were a lot of e-mails about scheduling, whether

15   he was going to travel to this place or that place.  There was

16   a great deal of, like, political e-mails.  I noticed he was a

17   very -- he was a man with very good manners.  It seemed he

18   always sent, like, thank you e-mails after, like, meeting

19   someone or, like, having an event and running into someone.

20   Like, he followed up on things like that at a very personal

21   level.  I remember that.

22           And there was, you know, some -- there was, like,

23   some degree of legal strategizing but from reading his

24   e-mails, I became aware he was involved with the WJC, World

25   Jewish Congress.  So that, there was a lot of those e-mails

Daniela - direct - Penza                    2559

1   going back and forth amongst a group of people.  I did not

2   consider those relevant to, you know, the ESP cases, but there

3   was a big volume of communications.

4   Q    And how would you transmit these -- would you transmit,

5   would you transmit the information that you learned from Edgar

6   Bronfman's account to the defendant?

7   A    Yes.

8   Q    And how would you do that?

9   A    In the same manner.  I would save them in text files

10  which I would then save into USB drive and I would, you know,

11  I would -- at one point, and I would give it to him and he

12  would check it.

13          The transition of me having a fight with him when we

14  stopped talking to each other happened somewhere in between.

15  And so there was -- as of that cutoff point, there was a time

16  where he was still requesting for me to check on all these

17  accounts and, obviously, since we weren't talking and we

18  weren't seeing each other, I stopped handing the USB drive to

19  him and I would be handing it to Kristin who would hand it to

20  him.

21  Q    And were some of those communications about continuing to

22  check, would those sometimes come through Kristin as well?

23  A    Yes.

24  Q    Did there come a time when you ever accessed, when you

25  ever used the type of software you're describing to gain

Daniela - direct - Penza                    2560

1   information on anyone else?

2   A    Yes.

3   Q    When was that?

4   A    That was after 2006.  It could have been 2007, '8, maybe

5   even '9.  I hacked my sister's computer, my sister Marianna.

6   Q    How did that happen?

7   A    My sister was having issues, I was told.  I believe it

8   was Pam who told me.  And she was throwing a big tantrum,

9   like, it had been, I remember it had been days and it was

10  obviously an issue with Keith and he was asking for me.  What

11  she told me is they, they, Pam and Keith, suspected that she

12  was, like, rekindling, like, having a relationship with one of

13  her ex-boyfriends and they wanted to monitor her

14  communications and, and they asked me to, to hack into her

15  computers so I could give them access to, I remember, her

16  Facebook account and her e-mail address.

17  Q    And so what were the actual logistics and how was it

18  explained?  Who explained it to you?

19  A    Pam, Pam explained it to me.  I remember talking to her.

20  There was a degree of follow-up with Keith via e-mail at the

21  time.  So it was direct communications from both of them and

22  it was quite specific because they needed to give me access to

23  go to Flintlock and infect the computers that she was using

24  and they needed to tell me which computers she was using and

25  the computers that I would infect for her instructions, I

Daniela - direct - Penza                    2561

1   would encourage her to use those computers so the key

2   logger -- I was going to use just a simple key logger --

3   would, you know, capture her user name and password and

4   everything she was doing.

5   Q    Do you remember what the computers were?

6   A    I think one of them was a Mac computer and the other one

7   was a big PC computer that was in the house.

8   Q    And do you -- did you actually go over and do this?

9   A    Yes.

10  Q    And were there specific steps taken so that you would be

11  able to go over there?

12  A    Yes.  Well, as any other times I would visit Flintlock,

13  because I was not talking to Keith, he was not talking to me,

14  then, you know, he needed to make sure he wasn't there.  So

15  there was a very logistical aspect of making sure it was okay

16  for me to go to Flintlock and Keith wasn't going to be there.

17  And also they told me which computers it was that they wanted

18  infected that she was going to be using and that all happened.

19  Q    You did that?

20  A    Yes.

21  Q    How did you feel about doing that?

22  A    I felt and feel really bad.

23  Q    Why?

24  A    Because I breached my sister's privacy.  I mean, back

25  then, I thought, and I really thought, I was helping her.

Daniela - direct - Penza                    2562

1  Like, you know, the way I understood it then, it was presented

2  to me was she was having an issue and there was, like, an

3  issue she needed to overcome and, you know, knowing what they

4  were going to know, they were going to be able to help her out

5  of that issue which was destructive.  Everything that I heard,

6  that's what it was.  And even then, knowing that, I felt bad

7  because, you know, it's a person I love and I never thought I

8  was going to, you know, breach into someone's privacy.  Now I

9  feel even worse.

10  Q    Do you remember, were you having any interaction -- you

11  weren't speaking to the defendant in person at the time.  Were

12  you having any interactions with Marianna at the time?

13  A    Yes, there were some.  I mean, I spoke to my sister.  I

14  didn't see her very often but there were interactions, yes.

15  Q    Around that time, was there a specific incident that

16  involved you?

17  A    Yes.

18  Q    Can you explain what happened?

19  A    I don't remember exactly what the circumstances were but

20  she became really mad at me.  I don't remember if it was

21  jealousy or it was something else, but she -- I was, I think,

22  in Flintlock and she called the police on me.  Like, it was

23  really -- it was, it was a big deal and I remember not

24  understanding why she was so upset at me and what had happened

25  but it was like big, yeah.

Daniela - direct - Penza                    2563

1   Q    Did the defendant ever talk to you about that incident or

2   did anyone else -- did they e-mail you about the incident?

3   A    We were having e-mail communications at the time.  I, I

4   think I remember mention of it, like that it was really bad

5   and that it was, it was just really bad, but I don't remember

6   exactly the direction where he was guiding it.

7   Q    Did you discuss it with anyone else at the time?

8   A    With Pam.

9   Q    Did Pam have any thoughts about it?

10  A    The general idea that I had was that my sister was going

11  through, like, a really hard time and that she was having a

12  lot of issues and that we needed to help her.

13  Q    And so did you, did you actually gain access to your

14  sister's computers?

15  A    Yes.

16  Q    And what happened?

17  A    I sent that access to Keith as requested.

18  Q    Did you continue to access her computer once -- did you

19  do the same thing you had done with Edgar Bronfman and James

20  Loperfido where you would monitor and send the information to

21  the defendant?

22  A    No, I did not want to surveil her.  I did not want to

23  read her personal communications.  I -- that's not something I

24  wanted to do.  So all I did is I, I sent the, you know, the

25  user names and passwords, what was needed to access to Keith

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2564

1    and said I'm not going to read, I'm not going to read what's

2    going on.  I don't want to read my sister's private life.

3    Q    Looking back, how do you feel about the other e-mail

4    accounts that you accessed?

5    A    I know what I did was wrong.  I mean, it's, it's plain

6    and simple illegal.  I feel bad for that reason.  I am -- I

7    regret that I bought Keith's story about the mission and the

8    good and, you know, means justify the end or whatever excuse

9    he had.  About my sister's, however, I felt bad at the time.

10   I could not justify it at the time and now I feel even worse

11   because I know that those issues are not what I thought they

12   were, much like mine, so I feel bad that I contributed to the

13   abuse and manipulation of my own sister.

14   Q    I'm going to switch topics in a second but you mentioned

15   a little bit ago various legal cases that they were involved

16   in, the defendant and others were involved in.

17             Did you ever hear the name Stephanie Franco?

18   A    Yes.

19   Q    Can you describe what was going on with Stephanie, what

20   you would hear from the defendant and others about Stephanie

21   Franco?

22             MR. AGNIFILO:  Objection as to others, Your Honor.

23             THE COURT:  Sustained.

24   Q    What would you hear from the defendant?

25   A    What I heard from Keith was that -- so Stephanie Franco

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                          2565

1   was somehow related to, I think, Michael Sutton.  They were

2   both students of ESP and Stephanie Franco had been the one who

3   had leaked or given the information to Rick Ross and that was

4   the core of the lawsuit and legal battle that ensued.  I also

5   knew that in, that they couldn't find her signed

6   confidentiality agreement.

7   Q    When you say "they," who do you mean?

8   A    They -- I, I -- okay.  "They," I would mean Nancy, Keith,

9   Kristin, upper management, I did.  I say they because we spent

10  hours on end going through the filing room looking for that

11  confidentiality agreement and to my knowledge, it was never

12  found.

13  Q    What was your understanding of the importance of finding

14  the confidentiality agreement?

15  A    What I understood was that, you know, I like, I didn't

16  have then -- I don't have very much now but, you know, that's

17  where the person signed -- we all signed it.  I signed one.

18  You signed that you're bound now by confidentiality and that's

19  your actual signature.  So this person went through the ESP

20  program, had the materials, they had a case that was open.

21  And they couldn't find this critical piece of paper which is

22  where she had signed the confidentiality of all that material.

23  So it was, like, a key piece that pulled all of it together.

24  Q    How long did you and the people that you named spend

25  looking for this piece of paper?

Daniela - direct - Penza                    2566

1    A    .  I think a few weeks.  It was a long period of time.

2    It was several weeks but every -- the filing room was a mess

3    but after that, new procedures were instituted, but at the

4    time -- I mean, I never, I never learned or found out that

5    confidentiality agreement had been found.

6    Q    Okay.  During the time period when you, before you had

7    the falling out with the defendant, we talked a little bit

8    about your access to 8 Hale Drive.

9    A    Yes.

10   Q    Can you just describe what you would do at 8 Hale Drive?

11   A    Yes.  Eight Hale Drive was also interchangeably called

12   the executive library.  This is the place where all of Keith's

13   media, books, CD's and videos were stored.  They were all

14   arranged and stored there.  I was the one who personally

15   brought all of the books from Flintlock that were there at the

16   time to the executive library and once they had all been

17   migrated to the executive library and he kept ordering books

18   online, I would go and grab them from Flintlock and I would

19   bring them to the executive library and I would organize them,

20   books, media, videos.

21         At the executive library, I did the catalog for the

22   books which in time became a little more sophisticated than

23   the Excel spreadsheet.  I had special software and I would

24   grab relevant information and summaries and, like, a cover of

25   the books so one can virtually go through the library.  I

Daniela - direct - Penza                    2567

1   devised, like, a special system to organize it and with the

2   music and the videos, I would do something different.

3           So with the music, I was digitizing the music so

4   that it could be played not only on a CD player which was the

5   most popular medium at the time, but, like, on an iPod.  And

6   there was a very specific thing that I did because when I

7   discussed it with Keith -- so Keith liked music very much and

8   it was very important to him that it was stored in, like, a

9   high fidelity format.  This is something he wanted.  So I did

10  some research and I found this, it's call FLAC format.  So

11  it's, like, a very high fidelity format and I was going

12  through the process of taking, it was hundreds, maybe a

13  thousand albums and one by one, digitizing them in FLAC

14  format.

15  Q    Other than that, what else would you be doing at 8 Hale?

16  A    What else would I be doing at 8 Hale?

17  Q    Did you ever have access to 8 Hale for any other reasons?

18  A    Yes.  When I was with Keith, there were other activities

19  that I was there for.  When he had a class, so, like, a piano

20  lesson or a singing lesson, I would be called over to

21  videotape it, like record it.  Same if he had a meeting but

22  those were a little rare, like to have a meeting at Hale, but

23  it did happen.  And also, a couple of times, we had sexual

24  encounters there.

25  Q    Do you know who decided who would have access to 8 Hale?

Daniela - direct - Penza                    2568

1    A     Yes.

2    Q     Who was that?

3    A     Keith.

4    Q     Did you yourself have to ask permission to go to 8 Hale?

5    A     Every time.

6    Q     Did you ever observe anyone else ask permission to go to

7    8 Hale?

8    A     Yes.

9    Q     Did the defendant have any electronics at 8 Hale?

10   A     Yes.

11   Q     Can you describe what those electronics were?

12   A     Yes.  There was a PC.  So a computer.  One of the --

13   well, back then, there was an older one but it was one where

14   there's like a screen and it's all separated.  It was like a

15   tower processor.  It was a Dell computer.  That was, like, the

16   main computer there.  There were a couple of hard drives.

17   Those were the ones I was using for the digitizing and they

18   were connected to the computer.

19           So there was, like, dark with a blue LED, if I

20   remember correctly, WD, Western Digital dark hard drive, and

21   there was, like, a C drive.  They were rare at the time.  They

22   were very expensive.  Like, over one terabyte was a very

23   expensive storage device and they were needed for the music.

24   There were also a camera.  There was a big camera.  It was a

25   big professional camera that he had gotten before that was

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2569

1    stored at 8 Hale at the time and --

2    Q    Had you ever -- the camera that you're describing, the

3    big professional camera, had you ever seen that camera before?

4    A    Yes, it was the same camera that he had taken pictures of

5    me with.

6    Q    And had you seen the defendant with that camera any other

7    times?

8    A    Around the time that he took pictures of me, yes.  After

9    that, no.

10   Q    What else was there, what other electronics?

11   A    Strictly speaking, electronics?  There were devices that

12   were placed on the top of the white board that were set up to

13   digitize whatever was written on the white board.

14   Q    And other than the large professional camera, were there

15   any other cameras?

16   A    I think there was, like, a smaller, not professional,

17   like, Canon Shot or something like that, camera.  I think that

18   was also there.

19   Q    You may have already said this but do you remember the

20   brand of the computer?

21   A    Yes.  It was a Dell computer.

22   Q    Do you remember what types of FLAC files, what some of

23   the FLAC files that you actually converted?

24   A    Like the actual music?

25   Q    Uh-huh.

Daniela - direct - Penza                    2570

1   A     It was a ton of music.  Yes.  So, I mean, I would guess

2   more than a thousand albums, easy, easy.  A lot of classical

3   music, full compositions.  All of Beethoven's symphonies,

4   various versions.  There was Bach, various versions.  There

5   were Mozart for Babies, Chopin for Babies, Debussy for Babies.

6   There was a lot of jazz, Keith Jarrett, A Melody At Night With

7   You, Live at La Scala.

8            I would indulge in listening to all these albums

9   while I was digitizing them so I would -- when I was working

10  at the executive library, digitizing them takes a long time

11  because it's a very heavy file format.  That type of file

12  contains the most data one can get from a CD so it's rather

13  heavy files and it takes a long time for the computer to

14  process it.  So, you know, I listened to a lot of these albums

15  and read a lot of books while I was doing that at the

16  executive library.  And it was some of his favorite music

17  which was Yes and Genesis, he had several albums of that, and

18  there was some, like, I think a few collections of speeches.

19  So there's what a wide variety of music that I was digitizing

20  and sound.

21  Q     Do you know whether the defendant ever used the computer

22  and hard drives himself?

23  A     Yes.

24  Q     Can you explain?

25  A     Well, I, saw him use them, like access the library and

Daniela - direct - Penza                    2571

1    the information.  But there was also a time where I, like, I

2    went through the computer and I found some of his personal

3    files.

4    Q    Why were you going through his computer?

5    A    He had told me that he had noticed, like, something

6    funky.  I don't remember exactly but the gist of it is, like,

7    he thought there was something wrong with the computer and

8    maybe it was a virus, maybe it was something because the

9    computer had done something funky.  So, I mean, I was the one

10   who took care of the networking computers and that stuff.  So

11   I -- he gave me his password.  There was a password.

12          I had to scan the computers and so I went into --

13   and I never understood this, into anybody's files, into his

14   files but this time, I actually needed to go through all of

15   their computers and I found the set of files in the scan that

16   were -- I don't remember exactly if they were, like, in the

17   trash or they were in a hidden folder, not in the normal

18   structure of my PC, My Documents, like, not visible.  Like it

19   was a backup or a trash.  It was, like, a separate file

20   structure that it was under and I, and I -- you know, I

21   clicked through it and I quickly realized what it was and this

22   was.  I clicked on, I think, a few, like -- I vaguely remember

23   and there was pictures of naked women, women that I knew Keith

24   was with.  I, you know -- so that's it.  So I didn't use that.

25   Q    Did any of them stand out to you?  Did any of the women

Daniela - direct - Penza                    2572

1    stand out to you?

2    A    There was one that I distinctly remember because I didn't

3    know Keith was having sex with her.

4    Q    And who was that?

5    A    Monica Duran.

6    Q    Now, when you did this scan, this was on the computer

7    itself, not the hard drive?

8    A    Yes, the computer itself.

9    Q    And you mentioned backups.  Is that something that you

10   had -- did you set up backups?

11   A    I was one, yes.  So I was the one in charge of the

12   computers and I, I'm very cautious with backups especially

13   because it housed, you know, so much information, some

14   information easy to -- I mean, hard to replicate.  So, yes,

15   there were backups set up.  I believe actually one of those

16   hard drives I set up specifically for backups at some point,

17   yes.

18   Q    And you would communicate with the defendant about

19   everything you were doing with his computer?

20   A    Yes.

21   Q    Where was the -- so after you saw those folders, what did

22   you do next?

23   A    Well, I'm sorry?  I couldn't hear you.

24   Q    After you saw those folders, what did you do?

25   A    I, I went to Keith and I talked to him about them.

Daniela - direct - Penza                    2573

1    Q     Why?

2    A     I had a couple of concerns.  I mean, finding them was

3    alarming and my reasons were, first of all, I, I knew had

4    taken pictures of me so I asked him to delete my pictures.

5    You know, I didn't click through it so I don't remember having

6    seen myself.  I remember that -- I mean, I don't want to see

7    pictures of naked women, but I remember going to him and I

8    also remember, my approach when I went and told him was almost

9    like in a I'm-looking-out-for-you kind of way, like, you

10   really shouldn't have that there, you know, you really should

11   be more careful.  You know, I found it.  Anybody else could

12   find it.  You shouldn't have that.

13   Q     Do you know whether the defendant deleted your pictures?

14   A     I don't.  I asked him to but I don't know for sure.

15   Q     Did you ever look on the computer to see if they had been

16   deleted?

17            You have to --

18            THE COURT:  You have to answer yes or no.

19   A     No, not that I remember.

20   Q     I'm going to go back for a second to the topic we were

21   talking about, the various legal matters and the passwords

22   that you had talked about accessing.  That category of

23   information -- and we'll look at some e-mails.

24   A     Okay.

25            MS. PENZA:  May I have the ELMO just for the

                    Daniela - direct - Penza                    2574

1   witness, Your Honor?

2           THE COURT:  Yes, you may.  Go ahead:

3   Q    Daniela, are you familiar with this e-mail?

4   A    Yes.

5   Q    Okay.  And is this an e-mail from Kristin Keefe to you

6   copying Nancy Salzman on August 29, 2005?

7   A    Yes, it is.

8           MS. PENZA:  Your Honor, the government offers

9   Government Exhibit 1590 into evidence.

10          MR. AGNIFILO:  No objection.

11          THE COURT:  All right.  Government Exhibit 1590 is

12   received in evidence.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                          2575

 1  BY MS. PENZA:  (Continuing.)

 2          (Exhibit published.)

 3  Q     Daniela, can you read this e-mail?

 4  A     Yes.  It says, "Hi Danny.  I figure you are the most

 5  likely of the gang to check your e-mail first.  Can you report

 6  to Keith and Nancy on the following for me:  Nothing new on

 7  our legal fronts.  Some suspicious car activity around the

 8  house Friday night, but nothing else since.  I've conferred

 9  with Judd yesterday and today on the missing data on why

10  Joe has done -- why Joe has done what he has done."

11  Q     Sorry, Daniela, do you have an understanding of who Joe

12  is?

13  A     Joe O'Hara.

14  Q     Do you know who Judd is?

15  A     I don't remember.

16  Q     You can keep reading.

17  A     "Judd does not think Doug is blackmailing Joe."

18  Q     Do you know who Doug is?

19  A     I imagine Doug Rudnick.  "He thinks Joe is a crook who

20  just could not keep up the facade anymore, and he thought he

21  could bully his way out of what he did to us.  Judd is still

22  thinking on it.  I made the point that I don't think Joe is

23  that stupid and he is acting like someone who wants to get

24  caught.  Judd said he thinks Joe is just crazy.  The judge

25  will be setting the hearing date today or (probably) Friday or

SN      OCR      RPR

Daniela - direct - Penza                          2576

1    next Tuesday.  (Nancy especially will want to know this.)
2    Judd expects to settle with Joe this week before the hearing.
3    Otherwise there will be no way to avoid Keith being deposed or
4    called as a witness in the Ross case short of settling the
5    case.  He thinks trying to fight that is tricky at best, but
6    will think of it some more.  I referred him to Nancy to
7    discuss it in more detail.  I have spoken to Nardello Schwartz
8    on the newswire data and I'm waiting to hear back on a time to
9    conference with them today.  I will be going to the Albany
10   airport at 5 to check on a suspicious flight and I'm following
11   up on some other leads today too.  Neither of the suspicious
12   trips have been cancelled yet and communications evidenced.
13   Heidi is returning to AK on September 6th in spite of keeping
14   the flight arrangements to FL on the 10th.  On a different
15   note, my mother called yesterday and told me she had a massive
16   heart attack and could go at any time.  She wants to see me
17   before she dies.  I was planning on coming to Silver Bay for
18   the day yesterday, but was on the phone with -- for two or
19   three hours yesterday and I'm trying to block the conversation
20   and decide what to do.  I've decided not to go down
21   immediately and I'm following up on everything we are working
22   on today, but may go tonight after my airport adventure.
23   Depending on what happens, I plan to be at Silver Bay tonight
24   or tomorrow after I come back.  Love to all.  Hope you are
25   having fun.  If I miss the triathlon tomorrow, good luck to

SN        OCR        RPR

Daniela - direct - Penza                    2577

1    you Mariana and Dan.  Love, Kristin."

2    Q    August 29, 2005 do you have an understanding of where you

3    are?

4    A    Yes.  So what I remember is we're all at V Week.  We're

5    at V Week and at V Week there used to be really spotty, rare

6    WiFi reception.  So one needed to really be connected to the

7    internet to check the e-mail and -- so we were Silver Bay.

8    Q    Do you have an understanding of why this is being sent to

9    you?

10   A    Yes.

11   Q    Can you explain?

12   A    So, I am one of the very few people who's aware or

13   approved to, like, be present for all of these types of

14   conversations and communications.  Kristin is trying to get a

15   message to Keith and Nancy and it's unlikely that they would

16   check their e-mail as often I would be checking my e-mail so

17   she's reporting through me.

18   Q    Do you understand the details of everything that's being

19   discussed here?

20   A    No, not everything.

21   Q    So what would your role have been upon reading this?

22   A    To print it and hand it to Keith or Nancy or just tell

23   them Kristin wrote something important.

24        MS. PENZA:  Your Honor, may I have one moment to

25   confer with defense counsel?

Daniela - direct - Penza                    2578

1           THE COURT:  Sure.

2           (Pause in proceedings.)

3           MS. PENZA:  Thank you, Your Honor.  On consent of

4  the defense, the Government moves into evidence Government

5  Exhibit 1514, 1514-A, 1515, 1516, 1517, 1518, 1519, 1520,

6  1521, 1522, 1523, 1525, and 1525-A.

7           MR. AGNIFILO:  We do consent, Your Honor.

8           THE COURT:  All right.  Government Exhibits 1514,

9  1514-A, 1515, 1516, 1517, 1518, 1519, 1520, 1521, 1522, 1523,

10  1525 and 1525-A are received in evidence.

11          (Government Exhibits 1514, 1514-A, 1515, 1516, 1517,

12  1518, 1519, 1520, 1521, 1522, 1523, 1525 and 1525-A received

13  in evidence.)

14          MS. PENZA:  Thank you, Your Honor.

15          (Exhibit published.)

16  BY MS. PENZA:

17  Q    Daniela, I'm showing you what's in evidence as Government

18  Exhibit 1514.  Do you recognize this e-mail?

19  A    Yes.

20  Q    And underneath -- I'm going to put what's in evidence as

21  Government Exhibit 1514-A.

22          (Exhibit published.)

23  Q    Is Government Exhibit 1514-A a translation of Government

24  Exhibit 1514?

25  A    Yes.

Daniela - direct - Penza                    2579

1  Q    Can you read Government Exhibit 1514-A?

2  A    Yes.  So this is -- just the in-line text or the from and

3  to as well?

4  Q    The from and to as well.

5  A    This is from Leonardo Icaza.  E-mail leomcho@gmail.com to

6  my both of my e-mail addresses.  The subject line is, "What

7  e-mail?  1, I did not receive the e-mail.  2, 3, I don't think

8  they apply since I didn't receive the e-mail.  Ha ha.  P.S., I

9  like your saying on messenger" and a smiley face.

10 Q    Can you explain what's happening in this e-mail?

11 A    Yes, so I have contacted this friend to find out if he

12 can or knows someone who can obtain a password for an e-mail

13 account and I contacted him via messenger or via e-mail and he

14 didn't receive my e-mail.  That's what I think is happening.

15 Q    Is this one of the people you described earlier as one of

16 your early attempts to find someone else could get passwords

17 for an e-mail account?

18 A    Yes, yes.

19 Q    I'm showing you what's in evidence as Government Exhibit

20 1515.

21        (Exhibit published.)

22 Q    Do you know what this is?

23 A    Yes.

24 Q    Can you -- can you read it, please?

25 A    Yes.  This is an e-mail to me from Kristin Keefe that

SN       OCR       RPR

Daniela - direct - Penza                    2580

1    contains the two e-mail addresses that are the targets to

2    obtain the passwords for these accounts.

3    Q    What is the date on this e-mail?

4    A    It's November 3, 2005.

5    Q    And did you have an understanding of who Kim Snyder was?

6    A    Not completely.  I imagine she was related to Kristin

7    Snyder.

8    Q    Showing you what's in evidence as Government Exhibit

9    1516.

10             (Exhibit published.)

11   A    Yes.

12   Q    Can you read this?

13   A    Yes.  This is an e-mail from me to myself with a subject

14   line "Retrieve lost password" and it contains a series of

15   links.  This is when I was doing research online to figure out

16   how to hack into those e-mail addresses.

17   Q    And when you -- what are the three different types of

18   e-mails that you have?

19   A    So, they're grouped.  This is the key logger which is the

20   software that logs the key scripts.  And there's one that says

21   "Crack AOL" which seems to be like a specifically -- a

22   specific software to attack AOL accounts through, it says

23   remote password cracker.  So maybe it's like a brute force

24   type attack and then there's two -- two links under the

25   headline "Paid services."  And if it's self-explanatory, then

Daniela - direct - Penza                           2581

1  I would imagine it's paid software."

2  Q    So what is going on here?

3  A    So sending e-mails to myself is something I tended to do.

4  This is the product of my research.  So what's happening is

5  I'm looking up online all of these different things, looking

6  up different threats and isolating the different methods that

7  I think would work.

8  Q    I'm showing you what's in evidence as Government Exhibit

9  1517.  Can you -- and I'm sorry, the e-mail we just looked at,

10 that was on November 4, 2005; correct?

11 A    Yes.

12        (Exhibit published.)

13 Q    Looking at the next e-mail can you read the top part?

14 A    Yes.  This is an e-mail from myself to myself again on

15 November 6, 2005, subject line "Test 2" and there's an image

16 attachment.

17 Q    Why -- what is your understanding of this language "test

18 2"?

19 A    It's -- I'm sending myself a test and that is an image

20 that I recognized.  That's an image that I had in my computer

21 so what I'm doing is I'm maybe testing the embedding of the

22 software.

23 Q    The subject is Test 2 and in the body Test 2 and there is

24 there's an attachment that's titled white dress JPEG?

25 A    Yes.

                    Daniela - direct - Penza              2582

1   Q    And this is the image that you recognize?

2   A    Yes.

3   Q    Would you actually embed software in this image like you

4   were describing before?

5   A    Yes, yes.

6         (Exhibit published.)

7   Q    Showing you what's in evidence as Government Exhibit

8   1518, you read this e-mail?

9   A    Yes.  This is an e-mail from me to Keith at his address

10  kunterre@nycap.rr.com.  And, so this has some more about some

11  key log software.

12  Q    And the subject line is Magic Lantern?

13  A    Yes.

14  Q    And was that a type of software?

15  A    Yes.

16  Q    And if we look at the second paragraph it says, "Magic

17  Lantern Keystroke Logging Program is one of the several

18  enhancements to Carnivore discovered by the public in

19  mid-November 2001"?

20  A    Yes.

21  Q    And then it goes on to provide more information about --

22  about the key logger?

23  A    That's correct.

24  Q    And why are you sending this to the defendant?

25  A    Because this is what we're discussing at the time, all

                    SN      OCR      RPR

Daniela - direct - Penza                    2583

1    the time.  So, I mean, this is one example of written

2    communication where I'm sending that to him, but really our

3    conversations in the house and on walks it's all surrounding

4    this topic at the moment.

5                (Exhibit published.)

6    Q    I'm showing you what's in evidence as Government Exhibit

7    1519.  Are you familiar with this e-mail?

8    A    Yes.

9    Q    Okay.  Can you explain what's going on in this e-mail?

10   A    Yes.  It's an e-mail sent to me by some service, it seems

11   to me.  I registered for a special service that masks the

12   sender.  So it would be to use as a complementary to one of my

13   methods to send an e-mail.

14   Q    And this is on November 7, 2005?

15   A    That's right.

16   Q    Showing you what's in evidence as Government Exhibit

17   1520 --

18               (Exhibit published.)

19   Q    Did you receive this e-mail?

20   A    Yes.

21   Q    And this is also from November 7, 2005?

22   A    That is correct.

23   Q    And can you describe what this e-mail is?

24   A    Yes.  This is another e-mail from myself to myself with

25   subject line "E-Mail Services."  So this looks to be a list of

Daniela - direct - Penza                    2584

1    links resulting of my research to complete the part of the

2    attack that is the sending of the e-mail.  So this is some --

3    self-destructing-email.  So e-mail -- remailers.  That's the

4    one that masks the sender.  Fakemail also masks the sender.

5    Trashmail, that deletes it.  So this is the product of

6    research on trying to bypass spam, trying to get the target to

7    believe it's a familiar sender and possibly destroy the e-mail

8    once it's not being used.

9    Q    Showing you what's in evidence as Government Exhibit

10   1521.

11              (Exhibit published.)

12   Q    This is an e-mail from November 20, 2005.  Are you

13   familiar with this e-mail?

14   A    Yes.

15   Q    Starting at the bottom, can you explain what's happening?

16   A    Yes.  So this is an e-mail from a person named Ankit

17   Fadia to Edgar Boone, eboone@nxivm.com.  That is his personal

18   e-mail address with the subject line "Hello" and -- I mean,

19   it's just an e-mail to Edgar making contact at the bottom it

20   says, "Hackingmobilephones.com."

21   Q    And the next e-mail?

22   A    The next e-mail it's -- it's Edgar Boone writes, "Ankit

23   just a reminder for the software.  Thank you, Edgar Boone."

24   So I imagine there's been a request for software from Ankit.

25   Q    And does Ankit respond?

Daniela - direct - Penza                    2585

1    A    Ankit responds to Edgar Bloom on November 19th, "Go to

2    lostpassword.com and download, yes, like a set of

3    instructions.

4    Q    And does that end up getting forwarded to you?

5    A    This next one is forwarded to Loretta and then Loretta

6    forwards it to me, yes.

7    Q    And is Loretta, Loretta Garza?

8    A    That is right.

9    Q    Showing you what's in evidence as Government Exhibit

10   1522.

11              (Exhibit published.)

12   Q    Are you familiar with this e-mail?

13   A    Yes.

14   Q    And what is this?

15   A    This is another e-mail from me to myself on November 24,

16   2005 with another product of my research.  It seems another

17   utility to recover a password.

18   Q    Showing you what's in evidence as Government Exhibit

19   1523?

20              (Exhibit published.)

21   A    This is an e-mail from myself to myself on December 17th,

22   2005 with the subject line misspelled "Software" with two

23   links that respond to -- to software and then to hack

24   passwords.

25   Q    I'm showing you what's in evidence as Government Exhibit

SN        OCR        RPR

Daniela - direct - Penza                          2586

1    1525?

2             (Exhibit published.)

3    Q    Do you see that?

4    A    Yes.

5    Q    And then 1525-A.

6             (Exhibit published.)

7    A    Yes.

8    Q    Is 1525-A a translation of 1525?

9    A    Yes.

10   Q    Starting at the bottom can you read this chain?

11   A    Yes.  This is an e-mail from Farouk.

12   Q    Who is Farouk?

13   A    Farouk Rojas was an ESP student and member of the

14   community.

15   Q    And can you read what it says?

16   A    Yes.  It says -- Farouk wrote, "And why haven't you

17   downloaded the demo?  It appears that it doesn't have any use

18   restrictions?"

19   Q    Do you know what he means there?

20   A    Yes.  As I remember, I was trying to have access to a

21   certain piece of software and I was trying to get his help to

22   obtain, like, a cracked version of it so I wouldn't have to

23   purchase this so that it wouldn't be traceable and when I

24   asked that, it seems he's not understanding why I want it to

25   be untraceable.

Daniela - direct - Penza                    2587

1    Q    Okay.  And then does the e-mail -- do you continue to

2    communicate with him about this?

3    A    Yes.  It appears that way.  So.  He writes, "Again it

4    seems --- I'm writing back okay, okay.  Now all of that is

5    done.  The problem isn't in the restrictions on the program

6    itself, but in fact the legal restrictions in general.  In

7    fact, I'm not worried read about the company that created the

8    software wanting to track it.  The only risk is if anybody

9    wanted to, the transaction can be traced to the person owning

10   f the credit card.  That's all.  In fact, even that is quite

11   difficult, but it is a possibility.  Understand this.  The

12   software would be installed and directed from an anonymous

13   computer but if it was ever detected, the only information

14   they would have would be the product ID number (embedded in

15   the program) and from that, the history of the transaction.  I

16   hope this is clear enough.  If you have any problem with that

17   or have any kind of difficulty please let me know.  I can find

18   otherwise.  Danny.

19   Q    So what are you communicating to Farouk?

20   A    That I need the software to not be traceable.

21   Q    And then there is a continuing communication back and

22   forth?

23   A    Yes.

24   Q    And ultimately you say, "Farouk, I still haven't received

25   anything.  Send it to me as soon as you can," and he says, "I

Daniela - direct - Penza                    2588

1    had resent it to you.  I don't understand why you are not

2    receiving my messages"?

3    A    Yes.

4    Q    Do you know anything else about this interaction?

5    A    No, I don't.

6    Q    I'm showing you what's in evidence as Government Exhibit

7    1526?

8            (Exhibit published.)

9    Q    Are you familiar with this document?

10   A    Yes.

11   Q    Can you explain what this is?

12   A    So, this is an e-mail from myself to myself, e-mailing me

13   the results of a successful deployment.  So the subject line

14   is "Testing self extract.  Current user:  Administrator" and

15   there's an attachment key log to ESP.  And I believe this must

16   have been a computer I tested and infected successfully and

17   the file that is the outcome of the log.

18   Q    Turning to the second page is this the only information

19   that's on the text file?

20   A    Yes.  So then this may be an infected file for testing.

21   Like a text file that's infected.  That would be all.

22            MS. PENZA:  Your Honor, I think Mrs. Carby has

23   informed me that I may have missed two exhibits to move in on

24   consent.  I think the one I just showed, 1526, and also

25   Government Exhibit 1527.

1        THE COURT:  Any objection to those two?

2        MR. AGNIFILO:  One second, Judge.

3        THE COURT:  Sure.

4        (Pause in proceedings.)

5        MR. AGNIFILO:  No objection.

6        THE COURT:  All right.  Government Exhibits 1526 and

7   1527 are received in evidence.

8        (Government Exhibit 1526 and 1527 received in

9   evidence.)

10       MS. PENZA:  Thank you, Your Honor.

11  BY MS. PENZA:

12  Q    Daniela, I'm showing you what's in evidence as Government

13  Exhibit 1527.

14       (Exhibit published.)

15  Q    Are you familiar with this document?

16  A    Yes, I am.

17  Q    And can you -- this is from you to you on January 16,

18  2006?

19  A    Yes.

20  Q    The subject line is D-1.  Do you know what that means?

21  A    I -- no.  I would suspect it's -- not exactly, but the

22  attachment is called Downloads 1 so maybe it's just shorthand

23  for that.

24  Q    And then these letters that are in the body of the e-mail

25  FSDVSDF, does that mean anything?

Daniela - direct - Penza                    2590

1   A     That means nothing.  That is a habit I have of typing

2   something on the in-line text because I know that if I don't,

3   the computer will prompt me, ask me, are you sure you want to

4   send without anything in the body.  But it's more work to not

5   put anything in the in-line text, but it means nothing.

6   Q     Then turning to the second page, can you explain what

7   this attachment is?

8   A     Yes.  This is a compendium of all the information

9   retrieved from the James Loperfido hack.  This is a very

10  clean, cleaned up, file.  So I have it here organized by

11  the -- it seems the date and maybe even time of the capture

12  and the -- and then there's information that the key log

13  captures automatically, like the IP address, and the key

14  strokes pertaining to that and what I remember about this file

15  is typically files that is the output of a key logger is a

16  very noisy file.  It has all the key strokes including spaces,

17  delete, backwards.

18        So I had to go and clean it up and retrieve only

19  what's really important.  In this case there's different

20  websites that are accessed and different passwords are

21  captured.  So, for example, in line two, there is a password

22  captured Cinefile, in line three.

23  Q     Can you circle that for us?

24  A     Yes.  It's right there.  The second line there's another

25  password captured.  It's quality and on the different line

SN        OCR        RPR

Daniela - direct - Penza                    2591

1   that's a different capture altogether, cinefile, and so on.

2   So, like, the first part of the line will -- will tell you

3   which application it was captured in so the first few lines

4   are all in Explorer.  So these are passwords and user names

5   for specific websites.  Further along we can see that there's

6   one for Quickbooks.  I can try and -- there.  And it has some

7   instant messenger applications.  So it seems like some AOL

8   services there and then again in Explorer, there is more

9   passwords captured here.  Whoops.  Here.  And here.  And

10  there's the e-mail address and there's user names.  So this is

11  what this particular software rendered from what I retrieved

12  from the server.

13

14           (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Daniela - direct - Penza                    2592

1   EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    Okay, so here we have you circled another password that

4   was captured, loper?

5   A    Yes.

6   Q    And you captured another one down here, and are these

7   all -- cinefile, is that --

8   A    Yes, they are repetitive.  A lot of people use the same

9   passwords for many different applications, which is a big

10  mistake.  But if one observes carefully you will see that

11  there are many different services accessed with the same

12  password, but they're all different.

13  Q    So just going down further, there is a payroll service

14  and there is a password captured?

15  A    Yes, XVCJGA9Z.

16  Q    Another cinefile and another one that plays on loper,

17  right?

18  A    Yes, that's loper3.

19  Q    And the next page, another page the same type of

20  information?

21  A    Yes.

22  Q    And then there is another password; is that right,

23  ecv5180?

24  A    That's correct.

25  Q    That appears again here (indicating)?

Daniela - direct - Penza                    2593

1    A     Yes.

2    Q     Now, would you always e-mail yourself these types of

3    files?

4    A     No.  In fact, that was a big mistake.  That's not

5    something I ever did.  I thought I was very cautious.  I was

6    very cautious, like nothing was on my personal e-mail address,

7    nothing was on my personal network.  And those types of files

8    would be just handed over in a USB, not e-mailed.  I would

9    never e-mail those.

10              MS. PENZA:  Your Honor, I think the next -- I think

11   it may be a good time to break for lunch.

12              THE COURT:  All right, it is about time for lunch,

13   so we will take one hour for lunch.

14              All rise for the jury, please.

15              (Jury exits.)

16                  (In open court - jury not present.)

17              THE COURT:  The witness may stand down.  Please do

18   not discuss your testimony with anyone.

19              (Witness steps down.)

20              THE COURT:  We will take an hour for lunch.

21              (In open court - jury not present.)

22              (The defendant exited the courtroom.)

23              (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

24

25              (Luncheon recess now taken.)

Proceedings                                     2594

1            **A F T E R N O O N   S E S S I O N**

2

3            (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

4            (In open court - jury not present.)

5            THE COURT:  Let's bring in the witness, please.

6            MS. PENZA:  Your Honor.

7            THE COURT:  Before we bring in the witness?

8            MS. PENZA:  Yes.

9            THE COURT:  Let's wait for the defendant.

10           Please be seated in back.

11           (Defendant entered the courtroom.)

12           THE COURT:  All right, yes.

13           MS. PENZA:  Yes, Your Honor.  I understand that

14   defense counsel has an objection to two of the exhibits that

15   were ones I plan on using, basically right now with the

16   witness.

17           THE COURT:  Well, maybe I should see them then.

18   What are they?

19           MS. PENZA:  They are two e-mails that copy log

20   files, so the same type of file that Daniela testified to

21   regarding James Loperfido.  There were two additional log

22   files sent later in 2008 that are the log files of the key

23   strokes from her sister, Marianna, and that she was sending to

24   the defendant.  So, in the Government's view, this is the

25   *actus reis* of the crime, this is the crime, and so it

                    SAM     OCR     RMR     CRR     RPR

Proceedings                                                    2595

1   absolutely should come into evidence.

2           THE COURT:  Yes.

3           MR. AGNIFILO:  Our position, I don't -- the *actus*

4   *reis* of the crime is that the crime occurred and that they got

5   content.  As she said, with the other witnesses, the --

6   putting the key strokes of this person into evidence is, A,

7   it's -- it's -- it's elicit.  I mean, they're basically

8   putting in something that this person never intended the world

9   to see, so I think that there could be privacy implications

10  for this person.  I don't know --

11          THE COURT:  I'm sure there are privacy implications,

12  yes.

13          MR. AGNIFILO:  I'm not sure why they're picking this

14  one person to put her key logs in, into evidence.

15          THE COURT:  Okay.  Good to know.

16          Yes?

17          MS. PENZA:  Well, Your Honor, I think that obviously

18  there is tons of privacy implications all over this case.

19  This is no more -- this is certainly nowhere close to other

20  things that are being entered in this case, and these are the

21  actual log files.  This is the exact product that the

22  defendant asked her to get and that she is then sending to the

23  defendant.  This is the exact most -- this is the most perfect

24  evidence of this crime being committed and the defendant's

25  involvement in it.

Proceedings                                    2596

1          THE COURT:  Anything else?

2          MR. AGNIFILO:  We are not saying that they didn't

3    get content.  We're conceding they got content.  I don't think

4    that they should be able to put the content in, it's -- it's

5    hacked material, and I just don't think that there is any

6    reason for it to come in.  I think it's unduly prejudicial to

7    put the content in.  It's secret words of someone who has --

8          THE COURT:  I understand.

9          MR. AGNIFILO:  -- never wanted this to be public.

10         THE COURT:  Well, all right, I am going to overrule

11   the objection.  You may place those.

12         What are the numbers of those?

13         MS. PENZA:  This is Government Exhibits 1539 and

14   1540.

15         THE COURT:  15 --

16         MS. PENZA:  1544, excuse me, Your Honor.

17         THE COURT:  1539 and 1544 will be admitted -- oh,

18   you can object at the time --

19         MR. AGNIFILO:  That's fine.

20         THE COURT:  -- in front of the jury, just the way

21   that you now objected.

22         MR. AGNIFILO:  Sure.

23         THE COURT:  If that's what you wish to do.

24         MR. AGNIFILO:  It doesn't matter.  I mean, Your

25   Honor knows I've objected, I preserved the issue.  If you want

Proceedings                                    2597

1    me to object --

2            THE COURT:  You've preserved.  Of course, everything

3    is preserved.

4            MR. AGNIFILO:  That's fine.  Thank you, Judge.

5            MS. PENZA:  Thank you, Your Honor.

6            THE COURT:  All right.

7            Please bring in the witness.

8            (Witness entered the courtroom resumed the stand.)

9            THE COURT:  Please bring in the jury.

10           (Jury enters.)

11           THE COURT:  Please be seated.

12           I remind the witness that she is still under oath.

13           You may continue your examination of your witness,

14   Ms. Penza.

15           MS. PENZA:  Thank you, Your Honor.

16           (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2598

1    **DANIELA**,

2         called as a witness by the Government, having been

3         previously duly sworn/affirmed was examined and testified

4         further as follows:

5    DIRECT EXAMINATION CONTINUING

6    BY MS. PENZA:

7    Q    Good afternoon, Daniela.

8    A    Good afternoon.

9    Q    Now, when we last left off we were looking at some

10   e-mails that you had exchanged in the 2005-2006 time period

11   regarding the key logging you described earlier.  Correct?

12   A    Yes.

13   Q    Did you also have e-mail correspondence regarding the

14   key-logging you described as to your sister, Marianna?

15   A    Yes.

16   Q    And can you just describe generally what type of e-mails

17   you exchanged about that?

18   A    Yes.  The exchange included she's asking me for status,

19   she's asking me if I was able to gain access to her computer,

20   and my replies were replies with the status, whether I had

21   been able to get something.  It was coordinating and reporting

22   whether she was using the computer where I had installed it

23   and that they needed to encourage her to use that computer so

24   I could capture something, as well as the actual information

25   that I retrieved from the computer.

Daniela - direct - Penza                    2599

1   Q    Daniela, November 2008, what is -- at that time, what is

2   the status of your relationship with the defendant?

3   A    I have not talked to him in about two years and all of

4   our communications are via e-mail.

5   Q    I am showing --

6             MS. PENZA:  Your Honor, may I have the ELMO --

7   actually, Your Honor, may I just approach the witness?

8             THE COURT:  Yes, you may.

9   BY MS. PENZA:

10  Q    Daniela, I am showing you what are marked for

11  identification purposes as Government Exhibit 1539, 1540,

12  1544, 1591 and 1592.

13            Can you just take a look at those for a second?

14  A    Yes.  (Witness complies.)

15  Q    Are those all documents you are familiar with?

16  A    Yes.

17  Q    Are those all e-mail chains between you and the defendant

18  in early November 2008?

19  A    Yes, they are.

20            MS. PENZA:  Your Honor, the Government offers

21  Government Exhibits 1539, 1540, 1544, 1591 and 1592 into

22  evidence.

23            MR. AGNIFILO:  One second, Judge.

24            (Pause. )

25            MR. AGNIFILO:  Judge, can we just go to the side for

1    a second?  We will just take a second.

2              THE COURT:  Yes, sure.

3              (Sidebar held.)

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                          2601
```

1              (The following sidebar occurred outside the hearing

2      of the jury.)

3              THE COURT:  Yes.

4              MR. AGNIFILO:  This wasn't the stuff on your list,

5      so we don't have copies of it.

6              MS. PENZA:  These were, I think, on last week's

7      list.  So these have been -- if you don't -- you don't have

8      copies of these?

9              MS. GERAGOS:  We just got copies of these from

10     Mrs. Carby.

11             MR. AGNIFILO:  All right.  All right, that's fine.

12     No objection.  No objection.

13             THE COURT:  Except the objection you have already

14     stated?

15             MR. AGNIFILO:  That's right, the objection already

16     stated.  Nothing new.

17             THE COURT:  So let me just, 1539, 1544, 1540, 1591

18     and 1592 are admitted into evidence.  1539 and 1544 over the

19     objection of the defense?

20             MR. AGNIFILO:  Yes, thank you, Judge.

21             THE COURT:  Thank you very much.

22             (Sidebar concluded.)

23

24             (Continued on the following page.)

25

1           (In open court - jury present.)

2           THE COURT:  All right, Government's Exhibit 1539,

3    1544, 1540, 1591, 1592 are received in evidence.

4           (Government's Exhibits 1539, 1540, 1544, 1591 and

5    1592 were received in evidence.)

6           THE COURT:  You may publish.

7           MS. PENZA:  Thank you, Your Honor.

8    EXAMINATION CONTINUING

9    BY MS. PENZA:

10   Q    One more question before we look at some of the e-mails,

11   Daniela.

12          At this time -- we will go into more detail later,

13   but what is the general nature of the back and forth you're

14   having with the defendant at this time, aside from the key

15   logging?

16   A    Aside from the key logging?

17   Q    In November 2008.

18   A    In November 2008, well, the nature of our conversations

19   were instructions from him to me about what to do about what

20   he said was my ethical breach.

21   Q    Okay.

22   A    And I --

23   Q    So, is it fair to say that, interspersed within the

24   conversation about the key-logging in November of 2008, there

25   is more back and forth about the falling out that you and the

Daniela - direct - Penza                    2603

1    defendant had later on in time?

2    A    Yes.

3    Q    Okay.  So for now, when we go through these e-mails, I am

4    just going to point you to the portions about the key-logging.

5    A    Understood.

6    Q    So I am showing you what is in evidence as Government

7    Exhibit 1539.

8              (Exhibit published.)

9    A    Okay.

10   Q    And if we go to the -- just looking at the front page of

11   that e-mail.

12   A    Yes.

13   Q    Saturday, November 1st, 2008.

14   A    Yes.

15   Q    Is that an e-mail from the defendant?

16   A    Yes, that's an e-mail from Keith to me.

17   Q    On November 1st, 2008?

18   A    That is correct.

19   Q    And starting -- can you read the second and third

20   sentences?

21   A    Yes.

22              Did you find out yesterday what's up computer-wise

23   from your key-logger?  Additionally, whatever happened to the

24   other accounts?

25   Q    What do you understand the defendant to be saying there?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                2604

1    A    He's asking me here about the key-logger on my sister.

2    And then asking me about the other two hacks that I had done

3    and what the status is on those.

4    Q    And who are those other, the other accounts, what is your

5    understanding of who those other?

6    A    That would be Edgar Bronfman and James Loperfido's

7    accounts.

8    Q    And this "what's up computer-wise from your key-logger,"

9    that's what you understand to be Marianna's?

10   A    That is correct.

11   Q    And then you respond, can you read your response?

12   A    Yes.  I respond:  The first -- the first -- there's two

13   responses, sorry.  Saturday November 1, 2008 at 10:22 a.m.?

14   Q    Yes.

15   A    I am on my way to Flintlock right now to check my

16   computer.  The other accounts, I haven't check in a long time.

17   I stopped checking them when I became aware they were

18   suspecting of a hacker.  And although it end up it wasn't my

19   work, but I never did go back.  I could check if I still have

20   access ultra-carefully (in parentheses, question mark close

21   parentheses).

22   Q    So what are you conveying to -- so that first sentence,

23   I'm on my way to Flintlock right now to check the computer,

24   what does that mean?

25   A    That means I am about to go and check the key-logger on

Daniela - direct - Penza                    2605

1    the computer I implanted on my sister's.

2    Q    And then the second paragraph, what are you conveying

3    there?

4    A    The second paragraph is referring to James Loperfido's

5    and Edgar Bronfman's accounts, and I am telling him that I

6    have not been checking them in the fear that I had that they

7    had been compromised.

8    Q    Is that what you explained to us earlier today, that you

9    did have that fear?

10   A    That's right.

11   Q    Okay.  And then can you read the top e-mail?

12   A    Yes.

13        It's an e-mail from me to Keith, with an attachment

14   named out_log file dot txt.

15        It says:  I am cleaning up the text file from Pam's

16   computer for you.  I am attaching it to you in its raw state

17   if you'd like to give it a go.  Seems Monkey has been using

18   the big computer more.  Pam must have forgotten to encourage

19   Monkey to use the little one.

20   Q    Who is Monkey?

21   A    Monkey is the nickname we used for my sister, Marianna.

22   Q    And did you actually attach the raw-state file to this

23   e-mail ?

24   A    Yes.

25   Q    And is this what a raw-state log file looks like?

1    A    Yes.

2    Q    So can you walk us -- can you walk us through what we're

3    seeing here?

4    A    Yes.  So, more or less, this is a funky one.  So some of

5    it is self-explanatory.  Some of it -- sorry, isn't.  So first

6    line it's just the first initial log, I think.  The next --

7    the second one is noise, third one noise, fourth one noise.

8    Then you can see she's typing pamelarunner, and then the next

9    one is -- it may be an enter logKext.  Then, on the seventh

10   line, it's a good example of just the user repeatedly pressing

11   the arrow key down, down, down, down, down.

12   Q    Here (indicating)?

13   A    Yes.  So it's kind of visually self-explanatory to a

14   degree.

15          The next line it seems she's just clicking away.

16   The next line I see, with some information, is not here.  This

17   is just a bunch of noise.

18   Q    Okay.  So, sorry, Daniela, I have one question.

19   A    Yes.

20   Q    At the very top, what is this first line?

21   A    Daemon starting up.

22          I would imagine that's the initiation of the log.

23   And these things are usually time stamped and date stamped.

24   Q    And so this one is time stamped -- sorry, this one is

25   time stamped October 30th, 2008?

Daniela - direct - Penza                     2607

1   A    That seems correct, yes.

2         The rest of the information on this file, except for

3   the very bottom, seems to be a lot of just motions on the

4   keyboard that are not actual typing.  Could be mistakes, could

5   be noise, or it could be someone just playing around with the

6   keyboard, which is most likely what happened.

7         There is a little bit of typing by the end and it

8   says:  Hardware electrolog, electrologfreihofer, pamelarunner,

9   www.my, and then a key stroke down.  So that may be someone

10  typing a domain name.

11  Q    And then if we go to the next page.

12  A    Okay.  Okay, so here we have some actual information.

13  Here is -- this is -- this is a password in an e-mail address.

14  In this case I know the password because this -- I know this

15  was a password that Keith used for another one of his

16  computers.

17            THE COURT:  Just circle it.

18  A    Sorry.

19            THE COURT:  Go ahead.

20  A    Wait.

21  Q    I don't think it's --

22  A    This.  (So marked.)  Alyxa1a.

23  Q    So here where it says alyxa1a?

24  A    That would be the password where it ends, and then

25  kunterre@nycap.rr.com is the e-mail address.

Daniela - direct - Penza                                    2608

1    Q      So over here where it has that, that's the e-mail

2    address?

3    A      Yes.

4    Q      Whose e-mail address is that again?

5    A      That's Keith's e-mail address.

6    Q      And this is a password that you were familiar with from

7    other places?

8    A      Yes.  Then it continues:  Themightyrunner, and the small

9    imtheonlymonkey.  I know that mightyrunner was her user name

10   for her Gmail account, so maybe what's following is the

11   password.  And, again, it's imtheonlymonkey, then the another

12   domain starts being typed www.f and then again -- key-loggers

13   are not precise.  Like the way everything is logged is very

14   noisy.  So that's why it needs to be cleaned up.

15         Then again, themightyrunner# delete at Gmail.com.

16   Again, imtheonlymonkey, so that my might be a password because

17   it's being repeated now three times after e-mail addresses.

18   Then pamela cafritz, that's actually just typing, and again

19   domain www.g-o-t-o-s-c-a, gotosca, command, some

20   unintelligible, RECONDITAA ARMONIA.

21         And here there's a few more lines that I recognize

22   as opera arias:  CVISSI D"ARTE, LUCEVAN LE STELLE -- lyrics.

23   She's looking for lyrics.  There's tosca.  Tosca again.

24   Again, pamelarunner, I believe that was maybe Pam's e-mail

25   address or one of her user names.

Daniela - direct - Penza                              2609

Q     And is this so -- if you were at -- when you are actually

gathering this type of information and you see a raw file like

this, what is it that you're trying to extract from it?

A     In this case, because I am trying to gain access to a

specific account, basically her Gmail, I'm just looking for

user names and passwords.


         (Continued on the following page.)

Daniela - direct - Penza                                2610

1   BY MS. PENZA:   (Continuing)

2   Q    Okay.  So, in this case, you're not looking for access to

3   the defendant's account?

4   A    Well, Keith's?

5   Q    Right.

6   A    No.

7   Q    So this first one where you see an e-mail address and a

8   password, would that -- that's not what you're looking for at

9   this point in time?

10  A    No.  I'm looking for Marianna's.  So I can see that

11  Marianna is gaining access to his account or trying to type in

12  his user name and password and I didn't know if she had access

13  to it.  She's certainly trying, but that's not what I was

14  looking for.  I was looking for Marianna's user names and

15  passwords.

16  Q    Okay.  And then if we go down further, can you walk us

17  through -- so then there's more lyrics, is that right?

18  A    That's what it looks like, but then there's some actual

19  typing.

20        So it seems like she's typing a letter and it says,

21  after Pamela Runner:  Tosca, how well you know the art of

22  capturing women's hearts.  Let her eyes be black once.

23  Jealous?  It may be misspelled.  Yes, yes, I feel you, I

24  commend you incessantly, Tosca.  I know you would forgive me

25  if you knew my grief.

2611

1          So that may be just lyrics.

2          Your storming anger and your pulsing love.

3          Then, again, there's an attempt to -- or -- it could

4   be an attempt.  It could be a successful entry into the e-mail

5   account kunterre@nycap.rr.com, which is Keith's e-mail

6   address.

7   Q    That's here?

8   A    Yes, and the password Alex A1A again.

9          And then three times in a row, Keith, Keith,

10  Keith -- with exclamation marks at the end -- I'm sorry.

11  Q    And so in between, as the writing continues, there's a

12  lot of, like, what appear to be deletes?

13  A    Yes.

14  Q    What is happening?  Can you tell what's happening there?

15  A    Yes.  And, again, it's not 100 percent accurate so

16  sometimes it can be off, but when looking at a file, it's

17  helpful if one imagines, like, live what is going on on the

18  keyboard.

19          So when I'm reading this, I'm seeing what the person

20  is doing on the keyboard.  So you might mistype something.

21  You type delete and you type it again.  That's going to be

22  recorded as one activity, each one, and that's why the file

23  tends to be very noisy.  It's not the final output.  It's just

24  recording each and every keystrokes.

25          Sometimes an application can kind of interact with

2612

1   the key log application in a negative way and it generates

2   more noise than it needed.  So, for example, and this is

3   probably not the best example, but maybe the mouse motion

4   creates part of a log so that it will be more noisy than

5   actually it is just from the keystrokes and sometimes an

6   application might create some additional noise.  So not

7   everything is necessarily 100 percent accurate so it's

8   spliced.

9   Q    Okay.  Would you -- would something like this appear --

10  if I'm typing a letter and I'm going back and typing again, is

11  this, is that something that would show up as well?

12  A    Yes.  Like here right now, just from this page, I can

13  imagine she was going to the browser, looking at domains,

14  maybe, like, getting a lyric, maybe moving on, like, to a

15  different application, maybe in Word and then started typing a

16  letter and, you know, moved on back to the internet

17  application.  So one can do several things at a time but you

18  will just see one plain string of characters.

19  Q    Okay.  And then the language continues?

20  A    Yes.

21       So it continues after Keith, Keith, Keith, with

22  delete, delete, delete, I'm sorry.  Thank you for your letter.

23  I L-O -- delete, delete, delete, delete -- won't, sorry,

24  won't -- many deletes -- wanted to send you -- many deletes.

25  I hope -- no.  Hope you are feeling B-R-Y, delete, T, delete

2613

1  E-T-T-E-R.  Continues unintelligible.

2          Wanted you to know that.  I think -- maybe

3  misspelled.  I'm thinking of you, your health, my P -- delete,

4  delete, delete -- my part here.  I'm sorry.  I hope we can get

5  you out of this one sooner rather than later.  I apologize for

6  all the pain I case -- maybe "cause" -- you on a daily basis.

7  Q    And so fair to say it goes on and she's continuing to

8  write in this way of writing, deleting, writing?

9  A    Yes, and -- yes.  Let's see.  Literature here.

10         So this seems like a letter she's writing to Keith.

11  It says:  So you took it and ran with it?  What about all the

12  times I said I didn't want you to have those relationships.  I

13  hope you start feeling better soon.  It -- question mark.

14  What about all the times I expressed to you my opposition to

15  the situation?  What a -- delete -- what about when you ask me

16  about starting a relationship with Camila and I said no --

17  delete -- question mark -- delete, delete -- you don't feel

18  well and things are worse that I can imagine and, again --

19  delete strokes.  Thank you for taking the time and your energy

20  to write me.  I keep the good part in my heart.  More deletes.

21  As usual, I'll choose to only keep the good part in my heart.

22  I pro -- delete, -- I liked heart, for myself to recite very

23  close to my heart.  The other parts, I don't know what to do

24  with them.

25  Q    All right.  And then fair to say it continues the same,

2614

1   the same kind of letter writing?

2   A    Yes.  Yes.  It continues and, again, there's another

3   attempt on the top to enter that account.

4           Once beautiful.  I want you to know.  Delete.  Don't

5   care to have the conversation with you anymore.  Forgive me.

6   That paralyzed of the watercolor paints.  I'm staying for

7   three months so Pam can get stronger to what -- deletes --

8   have some time to -- delete -- less dependent and more stable.

9   I'll -- delete -- be working on myself too.  Three months is

10  a -- maybe "long time" misspelled.  Bunch of characters.  I'm

11  leaving doors opens.  The door open to the possibility I might

12  like life again.  As per tonight, all I see is darkness, a

13  dark and ugly cold night.  Us, and I -- us get involved with

14  the -- delete -- was that shelping (sic) you heal all, yes,

15  struggle with myself.  Just -- parentheses -- pointless.  And

16  parentheses, cold.

17  Q    Okay.  If we move -- so this continues.

18  A    Yes.  It says I --

19  Q    Then if we look at the end.

20  A    At the end, at the very end.  They are -- so there's

21  another attempt to access Keith's account.

22           Then there is later, pamelacafritz@gmail.

23  Q    So is this the other attempt on the defendant's account?

24  A    Yes.

25  Q    And then there is --

2615

1    A    There seems to be a log-in on pamelacafritz@gmail.com.

2    Q    Is that where the pen is?

3    A    Yes.   That's one.

4         There's also one on themightyrunner.   That one, the

5    one that's next to themightyrunner.   Oh my one god.   That

6    looks to be a password.   So those two are repeated.   That

7    looks to be a password.

8    Q    And so when you see this type of information, what is

9    that?   When you are engaging in this process, what is that

10   type of information?

11   A    That most likely means that that is a user name and

12   password just from my experience.

13   Q    And that was -- that was your sister Marianna's gmail

14   account?

15   A    Yes.

16   Q    Themightyrunner@gmail.com?

17             THE COURT:   And which exhibit is that that you were

18   showing?

19             MS. PENZA:   Your Honor, that is the attachment to

20   Government Exhibit 1539.

21             THE COURT:   All right.   Thank you.

22             MS. PENZA:   You're welcome.

23   Q    And that e-mail, that ends on, that's November 1, 2008 at

24   4:27 p.m.   Is that right?

25   A    That's correct.

CMH      OCR      RMR      CRR      FCRR

2616

Q     When you would communicate with the defendant over
e-mail, were there occasions where you and he would respond to
different e-mail chains?

A     Yes, in a different thread.

Q     So can you explain what that means?

A     Yes.  So there was a high volume of e-mails.  So
sometimes there would be a conversation.  You know, like, I
send an e-mail, he replies.  I send an e-mail, he replies.
Sometimes he would initiate, like later on, grab onto one of
the older threads and reply on that, grab one of the previous
ones and reply again or even like the same one and reply once
from this last e-mail and then reply from it again so it would
generate two threads.

Q     So is it fair to say sometimes you will be having an
e-mail conversation with the defendant but then there will be
an answer or something else on a different e-mail thread?

A     Yes.

Q     And sometimes you'll be talking about the same topics on
two different e-mail threads?

A     Yes.  Yes.  When one is e-mailing live, it makes a little
more sense, but trying to read it is a bit difficult.

Q     Looking at Government Exhibit, Government Exhibit 1540,
and going to the middle of page two of this e-mail, and I'm
going to ask you to look at Sunday, November 2nd, at
12:39 p.m.

2617

1   A    Yes.

2   Q    Okay.  So this is -- so the e-mail we just looked at was

3   November 1st.  This was the next day.  And what does the

4   defendant, does the defendant write to you?

5   A    He writes to me:  Happy anniversary.  Tell me anything

6   you haven't.  Did you get any key log info?  Love.

7   Q    Now, when you -- when he says "happy anniversary" there,

8   can you explain what that means?

9   A    Yes.  "Happy anniversary" refers to the anniversary,

10  refers to the first time that we had sex.  November 2nd is the

11  Day of the Dead.  And that's the, you know, that was the

12  anniversary of our relationship.

13  Q    And that's the day you described at Rome Plaza?

14  A    Yes.

15  Q    As I recall -- you don't have the exact date but that was

16  the date you settled on?

17  A    My birthday is October 26th and it happened more or less

18  a week after so that's the date, yes, that I settled on.

19  Q    Okay.  Now, you then respond.

20  A    Yes.

21  Q    You respond at 7:48 p.m. on November 2nd?

22  A    Yes.

23  Q    And we'll not go through the whole e-mail but, again, on

24  page two of Government Exhibit 1540, can I have you read from,

25  "Now, change of subject"?

2618

1  A    Yes.

2         Now, change of subject.  Key log info I sent

3  contains a few passwords.  I tried them on Gmail and Facebook

4  with no success.  Heads up, she typed your e-mail at

5  nycap.rr.com, and the A, asterisk, asterisk, asterisk, A,

6  password of yours several times.  The rest of the info in the

7  file is a letter for you she typed which I assume you've

8  gotten, and a few Google searches for opera arias, perhaps

9  looking for advice from fellow psycho girlfriend Tosca.

10 Question mark.  I cleaned up the file halfway not knowing

11 whether you'd still want it or not.  Let me know if you do.

12 Q    Can you explain how that e-mail relates to the log file

13 we just looked at?

14 A    Yes.  This is a description of what the log file was

15 which is precisely there were several user names and

16 passwords.  I am saying that none of them actually give me

17 access.  I am warning him that she's accessing his personal

18 e-mail address and I described some of the content of the rest

19 of the key log, like the searches.

20 Q    How do you feel looking back at that e-mail?

21 A    My loyalty was misplaced.  I -- Marianna -- okay.  How do

22 I feel looking at this e-mail?  I helped Keith spy on my

23 sister and I even mock her a little bit here and I kept my

24 loyalty to Keith even against my very own sister and at this

25 point, I haven't even talked to Keith in two years and, I

2619

1    mean, I haven't talked to my sister in many more years than
2    that, but this is, this is an unforgivable breach of privacy.
3    Q    Why do you think you were willing to do that at that
4    time?
5                   MR. AGNIFILO:  Object, Your Honor.
6                   THE COURT:  Overruled.
7    A    I was trying to, like, even in keeping e-mailing Keith,
8    keeping on checking on key loggers, everything I was doing is
9    I was trying, I was trying to -- I was still very dependent,
10   my entire life was very dependent on Keith.  You know, he held
11   the access for everything that I wanted and I didn't have and
12   I thought, like, doing things like that for him, you know,
13   would relieve the situation that I was in.
14   Q    Okay.  I'm showing you now what's in evidence as
15   Government Exhibit 1544.  I'm going to start on the eighth
16   page of that document.  November 2nd, 10:47 p.m.
17           This is from, this is from the defendant to you?
18   A    Yes.  This is an e-mail from Keith to me.
19   Q    Okay.  And, again, let's concentrate on the key log here
20   parts.  Can you read the second paragraph, please?
21   A    Yes.
22           It says:  BTW -- which stands for "by the way" --
23   WRT -- "with regard to" -- key log, is there any additional
24   ones?  You gave me one file.  The, is at least one viable
25   password change in that file.  The new gmail account.

2620

1   Additionally, I changed my other passwords.  What about the
2   other key log from the past?  There are some potentially
3   important things recently.
4   Q    Can you explain what you understood by that e-mail?
5   A    Yes.  So it seems like here, like, he's looking for,
6   like, more information since this is just the one file.  He is
7   reporting back that he did change all these passwords so I
8   suppose that was a concern and he's asking me about James
9   Loperfido and Edgar Bronfman's accounts, explaining that there
10  are some things they're interesting in, he's interested in
11  recently.
12  Q    And then --
13  A    I mean, specifically what I understood from that, as I
14  understood from the past, is that there was something going on
15  with a case or some development and he was asking me, like,
16  that was the timing of it.
17  Q    Now, then there's a response from you, November 3, 2008,
18  8:46 a.m.
19  A    Okay.
20  Q    And there's a response.  Can you start where this is?
21  A    Yes.
22       KLG -- "key log" -- for our close friend, I will
23  check later today.  Will let you know.  KLG -- "key log" --
24  for our not so close friend I will also check today, will also
25  let you know.

2621

1    Q     So what did you mean there?

2    A     The key log for our close friend would be Marianna, my

3    sister.  That was an intrusion that was local.  I directly

4    went on her computer.  It was closer.  And our not so close

5    friend I believe referred to Edgar Bronfman.

6    Q     Okay.  And then moving to the first page of Government

7    Exhibit 1544.

8    A     Yes.

9    Q     This is from you to the defendant on November 3, 2008 at

10   11:19 p.m., is that right?

11   A     Yes.

12   Q     Okay.  And if you could start reading at "My."

13   A     My sister's Facebook info.  U -- which stands for

14   "user" -- name, e-mail as always, P -- which stands for

15   "password" -- oh my 8 god.  I don't really want to look into

16   it.  This is between you and her.  I have the latest raw text

17   file I am attaching.  I don't read through it, just look to

18   find user password zones.  I haven't found the one for gmail.

19   There's a bunch of combos I need to try.  I will let you know.

20   Didn't find anyone to drive me to a distant location today to

21   try other KLGS -- "key loggers" -- D.

22   Q     Can you explain what's happening there?

23   A     Here, it seems I've succeeded in gaining access to my

24   sister's Facebook account and I'm handing it to Keith.  I am

25   telling him that I wasn't going to, I wasn't going to surveil

2622

1    her.  I was just giving him the user name and I was giving him

2    the access.  And I attached the file and he was asking, I

3    think, before for the gmail which I wasn't able to get at that

4    time and also the other key loggers, I needed -- it seems I

5    didn't find anyone to go drive me to find the WiFi to check.

6    Q    Turning now to Government Exhibit 1591, then turning to

7    the third page of that document, starting here, is there an

8    e-mail from the defendant to you?

9    A    Yes.

10   Q    Okay.  And this is November 5, 2008 at 4:30 p.m.?

11   A    Yes, that's correct.

12   Q    And what did the defendant write?

13   A    It says:  Where are you?  Did you get any KYLG -- "key

14   log" -- stuff?  What else is hanging?

15   Q    And can you read your response?

16   A    I reply seven minutes later.

17        I am at home.  Bad news about the KYLG -- "key

18   logger."  I can no longer get through.  Kristin will give you

19   the details and options.  The one in closer proximity I have

20   not checked.  Apparently the machine is not being used.

21   Already talked to Pam but I do not think she will make it

22   happen.

23   Q    What did you mean there?  Can you explain that?

24   A    Yeah.  I mean the part about the key logger on Edgar

25   Bronfman which is what we're talking about, I am reporting I

2623

1   have no access to it and that I've given all the details to

2   Kristin to report to him because it was more than I would

3   write.  Then I referred to the one in closer proximity which

4   was my sister Marianna's accounts and I'm reporting I haven't

5   checked but that the computer that was infected is not being

6   used so I cannot keep checking it.

7   Q    Okay.  And then the defendant, does he respond to you,

8   November 5, 2008 at 5:05 p.m.?

9   A    Yes.

10  Q    And can you just read the second sentence?

11  A    Yes.

12         The closer proximity machine I think is in use.

13  Q    And is that in response to what you were, what you had

14  said regarding the computer you had infected on Marianna?

15  A    Yes.

16  Q    And then you respond at 5:11 p.m., is that right?

17  A    Yes.

18  Q    Okay.  And what do you say?

19  A    I talked to Pam an hour ago.  She said machine has not

20  been used.

21  Q    Okay.  And then at 5:14 p.m., what does -- how does the

22  defendant respond?  All right.  You can start at "With regard

23  to."

24  A    With regard to key log, can't you get the downloads

25  anymore?

2624

1  Q    Okay.  And then moving to the bottom of the second page,

2  is this your response at 5:19 p.m.?

3  A    Yes.

4  Q    Okay.  And then back to the third page, did you respond

5  to the defendant's question?

6  A    Yes.

7        It says:  And that is right.  I can get no

8  downloads.  Never did get those safely.  I had a normal way

9  in.

10        That one?

11 Q    Yes.

12 A    Yes, that's exactly right.

13 Q    So what were you saying there?

14 A    I was -- well, he asked the downloads which I never -- to

15 be precise, for the hacked into Edgar Bronfman's account, I

16 never really did get downloads.  After the first download, I

17 got the user name and password and I killed the upload, which

18 would be the download, entry.  I would just be surveilling his

19 e-mail address directly.

20 Q    And then?

21 A    Oh, there --

22 Q    And does the defendant respond?

23 A    Yes.  He asked --

24 Q    And is this within a minute of your e-mail to him?

25 A    Within minutes, yes, it seems like.

2625

1        He asks:  Why no downloads?

2   Q    And how do you respond?

3   A    I replied right way.

4        Killed that entrance as soon as I got the info I

5   needed since it was very visible and thus very vulnerable.

6   Q    And so what were you conveying there?

7   A    I was refreshing his memory that there were never any

8   downloads after the first intrusion.

9   Q    And now I'm showing you what's in evidence as Government

10  Exhibit 1592.  And if you look at the time, if you look --

11  first, going back to 1591, can you describe the subject line?

12  A    Yes.  It seems to be replying and it has, in characters,

13  a little kissy mouth emoji face, like an X in the mouth.

14  Q    Okay.  And then looking at Government Exhibit 1592, is

15  that the same subject line?

16  A    Yes, it is.

17  Q    Is this an example of one of the places where you and the

18  defendant are speaking on two different threads?

19  A    Yes, it is.

20  Q    And just looking on November 4, 2008 at 7:35 p.m., can

21  you read the second part of this sentence from the defendant?

22  A    Yes.

23        It says -- well, it says:  Please tell me them.

24  Also any more on our friend's key log or the other?

25  Q    Okay.  And then how did you respond?

2626

1    A     Key logs, no more on our friends but I should actually be

2    there checking right now.  The other I haven't found a way to

3    do it.  My limited contact with people outside my little

4    circle leaves me very few choices and I need help getting to a

5    relatively far away location for safety.  Was planning on

6    asking Kristin tomorrow to help me arrange it.

7    Q     And so what are you conveying there to the defendant?

8    A     I am conveying that I haven't done it and the reasons

9    why.

10   Q     Just going back very briefly to Government Exhibit 1544,

11   did this exhibit have an attachment?

12   A     Yes.  The name of the attachment is "out_logfile.2.txt."

13   Q     And this was the e-mail we looked at before where you

14   said you were attaching the latest raw text file, is that

15   right?

16   A     That's right.

17   Q     Just look at that very quickly and showing you the last,

18   last ten pages of Government Exhibit 1544, is this the log

19   file you sent the defendant?

20   A     Yes, it looks like it.

21   Q     And the same type of information that we saw last time?

22   A     Yes, it is.

23              (Continued own next page.)

24

25

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2627

1   BY MS. PENZA:

2   Q    And was this a document where you obtained her Facebook

3   password from?

4   A    Yes, I believe so.

5   Q    So going back now to before you had your falling out with

6   the defendant, did there ever come a time -- you told us last

7   time that you had an early discussion with the defendant about

8   conception; is that right?

9   A    Yes.

10  Q    At any point while you were having sex with the

11  defendant, did you use any kind of contraception?

12  A    No.

13  Q    Why not?

14  A    Well, he had said that about going on the pill and he

15  wasn't using any other kind of contraception.

16  Q    At that time when you were having sex with the defendant,

17  would he ask you where you were on your menstrual cycle?

18  A    Yes.

19  Q    And did you have an understanding of what his purpose in

20  doing that was?

21  A    I thought that he was asking precisely -- you know,

22  there's a thing in Mexico called the rhythm.  And he would

23  ask -- he would ask, you know, when is the last time you had

24  your period, you know, but he also knew that I was very

25  irregular, but I thought that that's the reason why he was

SN        OCR        RPR

Daniela - direct - Penza                    2628

1    asking and that he was, you know, sort of gauging that.

2    Q    Did there ever come a time when you became pregnant?

3    A    Yes.

4    Q    When was that?

5    A    That was in 2006.  The second semester of 2006.

6    Q    What do you mean by second semester?

7    A    Well, the second part of the year.  Like, the later part

8    of the year.  It wasn't early 2006.  It was later in 2006.

9    Q    And how did you realize you were pregnant?

10   A    I -- I felt different and maybe I just knew, but it

11   jumped into my head what if I'm pregnant.

12   Q    So what did you do?

13   A    I went to Wal-Mart and I bought a pregnancy test and I

14   used it and I confirmed it.

15   Q    How did you feel?

16   A    Terrified.  I panicked.  I was scared.

17   Q    How old were you at the time?

18   A    I was 20 -- 20 -- somewhere around my 20s.  Maybe 20 or

19   21.

20   Q    What were you terrified of?

21   A    Having a baby with Keith.  I didn't want to have a baby

22   and I didn't want to have a baby with Keith.

23   Q    Why?

24   A    And he had -- he had in the past always, like, joked

25   about it.  Oh, we'll have babies.  We'll have babies with

Daniela - direct - Penza                    2629

1    really big heads, really smart babies.  There was a point in

2    conversations with him -- I even researched eugenics because

3    he would mention things like that, but I didn't want to -- my

4    relationship with Keith was not something I -- I liked Keith.

5    I thought -- I idolized him.  I thought he was a great man,

6    but he was with a lot of other women and he was with my

7    sisters and that was not something that I wanted the world to

8    know.  You know, that was something that caused me a lot of

9    shame.

10            So I could not imagine having a baby with him.  I

11   could not -- and I also was very young and I didn't feel ready

12   but mostly I didn't want to have a baby with Keith.

13   Q    Did you tell anyone?

14   A    No.  Well, I told Keith.

15   Q    Did you tell your parents?

16   A    No.

17   Q    Why not?

18   A    The fact that I was having sex with him was a secret.  I

19   could not tell them that I was pregnant.

20   Q    What about your sisters?

21   A    We didn't talk about anything related to that.

22   Q    So, you told the defendant?

23   A    Yes.

24   Q    And can you describe what state you were in when you

25   conveyed this to the defendant?

Daniela - direct - Penza                          2630

1  A    Well, I was -- I was, as you would imagine, very
2  emotional.  And I was -- I was, I would say panicky and it was
3  a big -- I mean it's big -- it's huge -- it's a huge thing and
4  so I went to tell him and -- and -- and he was very -- and he
5  was very calm and collected.  Like, to him it was not like --
6  I was not like what it felt like for me.
7         He didn't react to it.  He was -- his response was
8  very surprising to me.  I'm sure he asked me a few questions.
9  I don't remember those exactly, but I do remember he said,
10 well, we've already talked about this.  We've already talked
11 about what you do if this happens.  And we had never talked
12 about that before, never.  I would have known.
13        So he very matter of factly (sic) stated that we
14 already talked about that if I got pregnant, I would have an
15 abortion.  So that interaction was very shocking to me and I
16 was very emotional and I was very scared but it's also what I
17 wanted.  I could not imagine having a baby.  So I didn't push
18 back.  Even though I knew we did not have that conversation.
19 I did not want to have the baby so it was right in line with
20 what I wanted in that moment, but it was surprising to hear
21 him say that.
22 Q    What else did the defendant say?
23 A    Well, we talked about it.  He, you know, calmed me down a
24 little bit but he said.  You know, he normalized it.  He
25 calmed me down and he told me it's -- sort of like it's not

Daniela - direct - Penza                    2631

1   the end of the world.  He shared with me other women who had

2   had abortions in an effort to make it normal.

3   Q     Who did he mention?

4   A     He mentioned Pam.  He mentioned my sister Mariana and

5   with the intended effect to make it seem, I believe, like more

6   normal, which it wasn't.  I mean, I come from a different

7   place with different values, so it didn't help but my decision

8   had been made any ways.

9   Q     Did he talk through any logistics with you?

10  A     Yes.  So he -- he -- he told me that, you know, this was

11  no big deal.  Pam was going to take care of it.  He was going

12  to pay for it.  That -- it was very smooth.  Like, you're

13  going to do this, this is going to happen and everything is

14  going to be fine.  The logistics were that he was going to

15  tell Pam and nobody else would know except Pam, himself,

16  Keith, and me.  And Pam was going to take me to the doctor and

17  Pam was going to accompany me throughout that and she was

18  going to, you know, get it done.

19  Q     What happened next?

20  A     It went exactly as he had told me.  I went to -- I went

21  to the gynecologist with Pam.  I believe that was the

22  gynecologist that she had been to before.

23  Q     Before you got to the gynecologist, did you have any

24  conversations with Pam?

25  A     Yes.

1    Q    Okay.  Can you describe those?

2    A    Yes.  It was kind of like -- yeah, like, they were going

3    to ask me a series of questions and we had a conversation of

4    what I should answer.

5    Q    When you say "they were going to ask me a series of

6    questions," what do you mean?

7    A    At the clinic.  You know, there would be a questionnaire

8    that I needed to fill out and they were going to ask some

9    standard questions that she seemed very familiar with.  So it

10   was like crafting a cover story.  Okay, so this is what you're

11   going to say and, I mean, at this time, you know, there are

12   issues as to -- as technical as my status in the country and

13   what I should say about that and also I remember about, you

14   know, they're going to ask about the father.  You know, what

15   do I say about that so it was talked out before and I remember

16   being a little nervous going in.

17   Q    Had you ever been to a gynecologist before?

18   A    No.

19   Q    Did Pam tell you what to say in response to the questions

20   that you were expecting?

21   A    Yes.

22   Q    What did she tell you to say?

23   A    There's parts of it I don't remember, but it was

24   something like for -- for, like, my status that I was in the

25   country temporarily, that I wasn't a resident, that there was

Daniela - direct - Penza                                    2633

1   something technical about that and regarding them asking about
2   the father of the child, that I was in a long-term stable
3   relationship.  It was something like that.
4   Q    Was there a discussion about what you would say about the
5   age of the father of your child?
6   A    There wasn't so much a discussion about, like, the
7   specifics of they asked me that, it was just very clear that,
8   you know, under no circumstances was to be named Keith or to
9   be told those details.
10  Q    Was there discussion about what you would say Pam's role
11  in your life was?
12  A    Yes.  She was a family friend.  That's like, you know,
13  that she was a friend of the family.  It was something like
14  that.
15  Q    Do you remember where the doctors office was?
16  A    Yes.  It was on the same exit as the center except
17  instead of taking a right turn there, you take a left and go
18  straight.  I remember the name of the doctor and the clinic.
19  It was Dr. McGuiness.
20  Q    How did you feel when you walked into the clinic office?
21  A    I remember I was very nervous and I was scared.  I mean,
22  there was -- I was scared in general.  I mean, I -- it's no
23  small thing.  For me it's no small thing.  It's not a small
24  thing and on top of it I was nervous for the things I had to
25  say and what was going to happen and that seemed risky.

Daniela - direct - Penza                    2634

1    Q     When you went in, did Pam stay with you?

2    A     Yes.

3    Q     So what happens?

4    A     So as I remember, first, like I walk in and I had to fill

5    out the questionnaire and she's there with me, that happens.

6    And then I go in and for the period where there's like --

7    there's like a nurse or a technician.  There's someone there

8    that's asking me questions.  Pam was there for that and --

9    yeah, she was there for that.

10   Q     Were they the same types of questions that Pam had

11   coached you on?

12   A     Yes.

13   Q     So did the -- was this a medical abortion where you used

14   pills?

15   A     Yes.

16   Q     And did the process start that day?

17   A     I don't think so.  I don't remember that it started that

18   day.  I remember having to go back to the clinic at least once

19   and I think what actually happened is they gave me the

20   prescription or the medicine and the instructions to take it

21   at a certain date and then that would begin something and that

22   first date they did do an ultrasound and other things.  They

23   had to do some things first.  And, yes, they had to do an

24   ultrasound because there was a device that was very invasive

25   and then I think they needed to wait for those results to

SN        OCR        RPR

Daniela - direct - Penza                    2635

1   determine what was going to be done.

2   Q    Okay.

3   A    And then that proceeded.

4   Q    Okay.  When you were prescribed the medication, were

5   there P instructions given about who should stay with you?

6   A    Yes.  So, I remember because I was scared about that.

7   There were risks about, you know, the pain and the bleeding

8   needed to be monitored so the instruction was that I -- like I

9   needed to be with someone.  I needed to have company

10  throughout to make sure that I was okay and there were, like,

11  pain patches that were prescribed and those pills and the

12  instruction was that I needed to be monitored, that I needed

13  to have -- throughout the entire process because things could

14  go wrong.

15  Q    Was Pam present when that conversation took place?

16  A    Yes.

17  Q    Okay.  When you did go through the process, were you --

18  were you with anybody?

19  A    No.  I was -- I was alone.

20  Q    Can you just describe generally what that was like for

21  you?

22  A    Yes.  So I took the medicine and there was a lot of pain

23  and I was incredibly emotional.  I was incredibly emotional

24  and I remember those days as horrible because I was in

25  physical pain, I was scared, I was, like, really troubled by,

Daniela - direct - Penza                    2636

1   you know, by what I was doing.  I knew my decision but it

2   wasn't an easy decision and it's -- it's just not an easy

3   concept for me and I was completely alone.  You know, Keith

4   didn't visit me, not once.  Pam wasn't there with me.  Nobody

5   knew about it.  I was all alone in -- I was all alone

6   throughout it.  I was checking in with Pam on the phone and

7   I'm sure with Keith too but I was alone throughout the entire

8   process.

9   Q    Once you were -- once the abortion had happened, did you

10  talk to the defendant any further about it?

11  A    Yes.  I mean, that was eventually over and I quickly

12  recovered.  It was just, like, a lot of intense pain and a lot

13  of process but I quickly recovered but I remember just a few

14  days after, a few days after we were on a walk and he told me

15  this was a great opportunity for me to lose weight and get

16  fit.  I was like -- I said what do you mean.  He said when a

17  woman gets pregnant, their hormones and their metabolism

18  change so that it's easier for a woman to lose weight and to

19  get fit, muscle mass and all of this.  He said, in fact, there

20  are Olympic athletes get pregnant on purpose just to have

21  abortions as part of their training.  He said that to me.

22  Q    How did you feel when the defendant said that to you?

23  A    Shock.

24  Q    Did you ever learn that either of your sisters got

25  pregnant again -- sorry.  Did you ever learn that Mariana got

SN        OCR        RPR

Daniela - direct - Penza                          2637

1    pregnant again?

2    A     Yes.

3    Q     How did you learn that?

4    A     I learned that from Pam.

5    Q     Can you describe the conversation.  I remember learning

6    from Pam and telling her what's going on.  Like why is she

7    pregnant again.  I knew at the time that Mariana was taking

8    birth control.  How is it possible that she's pregnant again?

9    I was upset.  You know, like, that was the second time she was

10   going to be pregnant and she was going to have an abortion and

11   it was ver, she's going to have an abortion.  And I remember

12   she told me --

13              MR. AGNIFILO:  Your Honor, I'm going to object.

14              THE COURT:  Sustained.

15              MS. PENZA:  Your Honor, may we approach?

16              THE COURT:  Sure

17              (Sidebar held outside of the hearing of the jury.)

18              (Continued on next page.)

19

20

21

22

23

24

25

```
                            Sidebar                        2638
```

1           (The following sidebar took place outside the

2     hearing of the jury.)

3           THE COURT:  Yes.

4           MS. PENZA:  Yes, Your Honor.  Your Honor, the

5     statement that Daniela -- that I was about to elicit from

6     Daniela is about Mariana's eating disorder and their awareness

7     of the fact that Mariana had bulimia and she was throwing up

8     the pill and this -- this environment where Daniela is being

9     held by Pam and the bulimia and eating disorders and total

10    obsession about her weight is part of the means and methods.

11    It's one sentence and then we're going to be moving on from

12    that.

13          MR. AGNIFILO:  My objection is a hearsay objection.

14    I have a standing objection to all of the abortion stuff and

15    we'll get back into that.  If she wants to call Mariana, she

16    can call Mariana.

17          MS. PENZA:  No, this is about Pam.  Pam is the

18    co-conspirator.

19          THE COURT:  If it's something that Pam told her, you

20    can put it in.

21          MS. PENZA:  Thank you, Your Honor.

22          (Sidebar ends.)

23          (Continued on next page.)

24

25

1    BY MS. PENZA:  (Continuing.)

2    Q    Daniela what did Pam tell you?

3    A    She told me that her thought that she had thrown up the

4    pill because she was still throwing up and she was bulimic.

5    So that's how she had gotten pregnant.

6    Q    Did you have a further conversation at that time with Pam

7    about Mariana's bulimia?

8    A    Yes.

9    Q    What was the response?

10   A    It was too light for my taste.  It just what was

11   happening.  So, she wasn't taking it very seriously.

12              THE COURT:  I am sorry, who wasn't taking it

13   seriously?

14              THE WITNESS:  Pam was not taking it very seriously.

15              THE COURT:  Okay.

16              MS. PENZA:  Thank you, Your Honor.

17   BY MS. PENZA:

18   Q    Did you ever learn that your sister Camilla was pregnant?

19   A    Yes.

20   Q    Do you remember how you found out?

21   A    I don't remember exactly who told me.  I don't recall if

22   it was Cami.  I don't remember if it was Pam.

23   Q    And when was it that you found out that Camilla was

24   pregnant?

25   A    I -- it was after I had had my pregnancy and it was --

Daniela - direct - Penza                    2640

1   Cami was a few months over 18.  It was 2008.

2   Q    At that time when Camilla gets pregnant, what is your

3   relationship with the defendant?

4   A    I'm -- we're not talking.  It's been since 2006, late

5   2006.  So that was, like, mid 2008 so we hadn't talked for a

6   long time.

7   Q    So what happens after you find out that Camilla is

8   pregnant?

9   A    I find out she's pregnant and I want to be there for her

10  and it's -- I'm recruited to help.

11  Q    Who recruits you?

12  A    Pam.

13  Q    And what is your conversation with Pam?

14  A    That, you know, she's going to have an abortion.

15  Q    That Camilla is going to have an abortion?

16  A    Uh-huh.

17       THE COURT:  Just say yes or no.

18  A    Yes, yes.  And I remember -- you know, I'm recruited to

19  be part of the process.  I'm brought along and I want to be

20  there for my sister, too.  I think that I can relate and I

21  love my sister.  So -- and I don't know how it happens or who

22  has a conversation but she's okay without -- with me knowing

23  and me being there for her so, you know, it starts and it's

24  similar to what I went through.

25  Q    So what do you mean by that?  What are the similarities?

SN        OCR        RPR

Daniela - direct - Penza                    2641

1   A     The similarities is, you know, it's the same clinic.  Pam

2   is going to see it through and I know that Cami is talking to

3   Keith about that, but I'm not present for any of that.  I just

4   want to give her her space and be there for her and make sure

5   she's not going through it alone the way I went through it

6   alone.

7   Q     Did you actually go to the doctor's office with Camila?

8   A     Yes, I remember.  I think I remember I did, yeah.

9   Q     And was anyone else with you as well?

10  A     Yeah, Pam.

11  Q     Before going there, the way you described before, the

12  discussion you had with Pam in advance of going for your

13  abortion, was there any similar discussion with Camilla?

14  A     Yes, there was also a crafting of a cover story, but this

15  one seemed a lot more sensitive because my sister, you know,

16  was very young.  So, it seemed a little more -- I mean, I was

17  nervous again, but it also seemed -- you know, it was -- it

18  was clear that it was important that those things, you know,

19  we got right.

20  Q     Were you able to observe anything about Pam's demeanor in

21  this situation?

22  A     Yeah.  I thought she was nervous too.  You now.  I don't

23  know if because this time I was paying attention.  Last time I

24  was in a terrified state and when I was with her she was

25  smooth and knew her way around, but this time she seemed a

Daniela - direct - Penza                    2642

1   little nervous.

2   Q    So then what happened?

3   A    So went to the clinic and, you know, there's the same

4   type of concerns, the same type of talk about what she should

5   say and what should she do and all of these things and it was

6   tense.  It was a tense environment and we all went into the

7   examination room.  I remember that.  So I went in with Cami,

8   Pam was with us and the nurse or technician was there and sure

9   enough, you know, she started asking all of these questions

10  and -- and there was something that caused some alarm in this

11  person, I don't remember who it was, but that was asking the

12  questions.

13           And I don't remember exactly what it was, but I

14  remember feeling like she's asking -- she's asking a lot of

15  questions now and in this -- in this examination that they're

16  conducting something happened, like, they pulled up a file or

17  maybe the technician -- if something happened, I don't

18  remember what, but this person mentioned that, you know, I

19  remember that I had had an abortion, not somebody else's

20  abortion but it was my abortion, and it was raising all kinds

21  of flags.

22  Q    I want to stop you for a second.

23  A    Yes.

24  Q    So while you're there for the process of Camilla's

25  abortion, someone in the office mentions that you had had an

Daniela - direct - Penza                    2643

1    abortion?

2    A    Not saying straight up, but as cause for concern.  That's

3    how I remember it and as I remember it, it happened -- I mean,

4    there was all of these questions which is exactly what we

5    should have prepared for that Pam was preparing us for that or

6    for that not to happen and I remember I mentioned to Pam,

7    "Should she have disclosed that?"  And Pam snapped and said

8    no, she shouldn't.  And she made a big fuss about it; that

9    no, she shouldn't and she pushed back against what was

10   happening.  No, she shouldn't have done that.  It's very bad.

11   It's against the rules.

12

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                          2644

1    EXAMINATION CONTINUES

2    BY MS. PENZA:

3    Q    Was Pam doing that at the office?

4    A    Yes.

5    Q    That happened at the clinic on that visit?

6    A    I remember her raising her voice by the counter, even as

7    we were leaving.

8    Q    Do you remember her saying anything else?

9    A    I just remember her being very upset and that -- and when

10   Pam got really upset, she just would go over the same thoughts

11   over and over again.  Keith used to call it she was looping.

12   She was looping and looping and looping out loud.  So I

13   remember she just kept repeating those things, and she -- that

14   fuss she made was very effective, so that the technician went

15   like, ah, she really should not have said anything.  There was

16   something about like patient confidentiality that she was

17   talking about that she should not have disclosed in front of

18   one patient somebody else's -- you know, some other patient's

19   information.  And she had been right about that.

20        And so, you know, kind of diffused, you know, the

21   tense situation that was going the other way in questioning

22   Cami and what she was doing and what was going on.

23   Q    What happened after that?

24   A    We left, Cami, Pam and myself all in the same car the way

25   we arrived.  And I think they dropped me off and I went to --

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                        2645

1    they dropped me off and they went to Flintlock and I was just

2    trying to give my sister her space to process all that.

3    Q    In the car did Marianna discuss what had happened with

4    anyone else?

5    A    I'm sorry, Marianna?

6    Q    I'm sorry, excuse me.  Did Pam discuss what had happened

7    with anyone else?

8    A    Yes.  I remember she called Keith and I remember that

9    happened, like -- like before she drove because she couldn't

10   be driving and talking, you know, because she was looping.  So

11   it was a quick phone call and it was something like:  We'll

12   talk about it.  Like, okay, we'll talk about it when I get

13   back.  Just, it's done, calm down; just, you know,

14   everything's gonna be okay.  And the rest of the conversations

15   I didn't hear because I wasn't present for them.

16   Q    Were you with Camila during the process of her abortion?

17   A    Yes.

18   Q    How was that for Camila?

19   A    It was hard.  I remember she was in a lot of pain.  I

20   remember there were limitations to the type of pain medicine

21   she could have, so I remember her just being in a lot of pain

22   and not being able to like really take something to make it

23   feel better.  And --

24   Q    Did you have a frame of reference for her pain tolerance

25   at that point?

Daniela - direct - Penza                    2646

1   A    Yes, so I -- I knew she had gone through the awful

2   appendix thing and I remember thinking, oh my gosh, she can

3   take a lot of pain.  And so seeing her in pain, I knew that

4   she was not exaggerating.  I mean she could take a lot of

5   pain, so she's in pain, it's a lot -- a lot of it.

6          And also, I think that I mean all I can do is

7   compare it to me, right, my experience.  So I think that for

8   her it was harder, like in an emotional way.  I don't think

9   she was very clear on whether -- or at least that's what I

10  sensed, on whether, you know, like the decision to keep the

11  baby or not keep the baby, like maybe that wasn't so easy for

12  her.  Like for her it wasn't as clearcut as maybe it had been

13  for me.  So, I think she struggled emotionally and physically

14  a lot.

15  Q    Looking back, what is your impression of Pam's role in

16  this process of your abortion?

17              MR. AGNIFILO:  I object.

18              THE COURT:  Overruled.  You may answer that, and

19  then we are going to take a break.

20  BY MS. PENZA:

21  Q    Looking back, what is your impression of Pam's role in

22  the process of your abortion and Camila's abortion?

23              THE COURT:  Can we take that in two questions?

24  Q    Looking back, what is your view of Pam's role in your

25  abortion?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                              2647

A     I -- I -- I -- I think she was there to facilitate it.
She was the -- she seemed very well-versed in it and -- and,
you know, she was like a handler.  You know, like -- like she
knew what needed to be done and to, like, make sure it was
done right.

So, and -- you know, at the time I thought it was --
it felt like she was taking care of me, but really now looking
back I think she was making sure that there were no
liabilities; that there was -- like the risk was minimized,
you know, in the different sense on the exposure of the -- of
the, you know, of the status, for example, in my -- in my
instance, or that there would be too many questions about, you
know, who's the father, who's this, who's that.  So she was
there to make sure that didn't happen.

Q     What about her role -- looking back what's your
impression of her role vis-à-vis Camila's?

A     Well, when I went through the process with Cami and Pam
was there, that was confirmed.  You know, that -- that -- that
her -- that her role was to facilitate having those abortions.
That her role was to make sure that it went well, that it
didn't get back to Keith, in a way.  You know, like that she
would shield Keith, you know, in this activity that went on,
you know.

Here you have two sisters, one that is really young,
and the other one that, you know, like -- and I actually don't

Daniela - direct - Penza                    2648

1   know about how the process was like for Marianna, I don't know

2   if it was the same clinic, but at least talking about Cami and

3   me, a lot of questions are raised from that.  So Pam -- Pam's

4   role was very clear in that she told us what to say, told us

5   what to do.  And yes, cared for us and, you know, made sure we

6   had the medicine, but really it was to make sure that

7   everything went according to plan.

8   Q    Thank you.

9        THE COURT:  All right, we are going to take our mid-

10  afternoon break.

11       All rise for the jury.

12       (Jury exits.)

13       (In open court - jury not present.)

14       THE COURT:  The witness may stand down.  Please do

15  not discuss your testimony with anyone.

16       We will take a ten-minute break.

17       (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

18       (Recess taken.)

19       (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

20          (In open court - jury not present.)

21       THE COURT:  Let's bring in the witness, please.

22       (Defendant entered the courtroom.)

23       (Witness entered the courtroom and resumed the

24  stand.)

25       THE COURT:  Please bring in the jury.

Daniela - direct - Penza                          2649

1          (Jury enters.)

2          THE COURT:  Please be seated.

3          All right, Ms. Penza, you may continue your

4    examination of the witness.

5          The witness is reminded she is still under oath.

6          MS. PENZA:  Thank you, Your Honor.

7    EXAMINATION CONTINUING

8    BY MS. PENZA:

9    Q    Daniela, we've talked a number of times about the fact

10   that at some point you had a falling-out with the defendant?

11   A    Yes.

12   Q    When was that?

13   A    That was late 2006.

14   Q    How did the falling out happen?

15   A    I -- I kissed Ben Myers.

16   Q    Who is Ben Myers?

17   A    Ben Myers was a student at ESP, was also an employee of

18   ESP.  He worked in the IT Department under Karen and with

19   Steve Ose.

20   Q    What was your level of interaction with Ben Myers?

21   A    It was just friendly.  I would see him at community

22   events, when there were some.  He went to all the volleyball

23   games, so I would see him there, and that was it, or in some

24   kind of work setting, which there weren't many of them.  To

25   make a contrast, we never, like, did any activities apart from

Daniela - direct - Penza                    2650

1    that together.  Like there wasn't coffee, there wasn't a party

2    that -- so it was just friendly in the community interactions.

3    Q     Do you know how old Ben was at that time?

4    A     Yeah, he was just a few years older than I was.

5    Q     And did you have things in common with Ben Myers?

6    A     Yes, computers.  And -- yeah, like the geeky thing of the

7    computers and at that time I was trying to get into Star Trek.

8    So he was part of the Star Trek club.

9    Q     What was the Star Trek club?

10   A     So one of the community events, and it was, I think,

11   strictly for like geeks, because really it was Karen, Steve

12   Ose, Ben and myself, we would get together be like once a week

13   and watch Star Trek.

14   Q     Now, you said you kissed Ben Myers.  What happened --

15   what happened before that?

16   A     Right, so -- so I -- it happened one night at Star Trek.

17   I had never felt attracted to him before.  It was really just

18   like a friendly relationship, like with anybody else at ESP,

19   and one night at Star Trek everybody left and we were the only

20   ones there and we were talking.  And we were like next to each

21   other and -- and we almost kissed.  I felt -- felt something.

22   I -- like I felt something for him and I think he felt

23   something for me and there was this, like, brand new feeling

24   for me of attraction, which was -- it was new.  That's all I

25   can say.  And -- and it was an intense moment.  It was an

Daniela - direct - Penza                          2651

1    intense night.  Nothing happened.  We didn't even kiss, but it
2    was like really close.  So there was like this tension that --
3    that build up and that happened there that night.
4    Q    So what were your thoughts about that feeling that you
5    were having?
6    A    Ah, I don't know that I had any thoughts.  It was all
7    feeling.  It was -- honestly, it was very exciting.  I never
8    had those feeling before for men, for a woman, for a man in my
9    case it turned out to be.  And it felt wonderful.  It felt --
10   it felt -- it just felt really nice.  You know, like this
11   tingly thing that happened inside my body and this like wild
12   attraction, very -- very physical and at the same time like
13   very lovely.  So I was very -- I was very surprised and very
14   happy by it, yeah.
15   Q    Did you -- after that first night, did you tell anybody
16   about this feeling that you experienced?
17   A    Yes.
18   Q    Who did you tell?
19   A    Keith.
20   Q    Why did you tell the defendant?
21   A    I guess in all my innocence I, you know, I -- I was -- he
22   was my best friend.  I think that's pretty much it.  I had
23   nobody else to tell, and I -- it never crossed my mind to hide
24   it.  It was this brand new discovery I thought I had made, you
25   know, like this thing for a long time before that I thought I

Daniela - direct - Penza                    2652

1   was kind of asexual.  Like, you know, I wasn't -- you know, I

2   obviously was doing things to Keith and I was doing things

3   with Keith, but even before him, like it was not something

4   that I ever had felt before.  So it was like this lovely

5   discovery in myself and it was about me.  I didn't even

6   consider, you know, what it meant, you know, about him or

7   anything else.

8           So I was just there to tell him, I -- this happened

9   and this is how I felt.  And kind of like, you know, more like

10  as a friend, kind of like, you know, share it.  Figure it out.

11  Q    Did you -- was that -- did you tell him that night?

12  A    Yes.

13  Q    When you described it to the defendant, did you describe

14  it the way you've just described it to us?

15  A    Yeah, I believe so.

16  Q    And how did the defendant react?

17  A    It was clear to me that it was not good.  Like it was

18  a -- it was a bad thing.  I had done something bad.  It was --

19  in like complete contrast with what I was feeling was his

20  reaction to it.

21          And I remember feeling like, oh, you know, like it

22  was a huge -- like, oh, shit, you know.  And there was --

23  there was a conversation about it, and maybe even a couple of

24  conversations after that where he said:  I -- you know, I

25  caused those feelings, that I could choose who to have them

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2653

1    for and I wasn't having them for him, for Keith.  So there was

2    like this -- this -- this drift.  So I didn't -- I really

3    didn't push back much at all that I remember.  It was like I

4    understood that he didn't think it was something good and I

5    just, like, stepped back for a little bit.

6    Q    How did you feel about how the defendant reacted to what

7    you had shared?

8    A    I felt -- hmm, I felt -- hmm, I wouldn't say

9    disappointment.  I felt -- I felt a little bit confused, I

10   think.  I think it would be fair to say I felt confused.  I

11   felt -- so it didn't help me at all to understand what was

12   happening, which is kind of what I was seeking, but he put up

13   a wall of:  Don't go there, that's not good.  Like that's how

14   I feel his reaction was.

15          So, you know -- but this that I just felt was

16   like -- I mean it was amazing to me.  Like, I was like --

17   probably like at the time it was the most amazing thing I had

18   ever felt like inside of me, in my young adult like.  It was

19   like a huge -- you know, like this huge thing and he's like,

20   no.  His reaction shouldn't have, but it surprised me, I

21   guess, like totally surprised me.

22   Q    After that conversation with the defendant, did the

23   defendant say anything to you about Ben Myers?

24   A    Yes.  I mean he said more about him in the -- in the

25   conversations that would follow, but honestly in that first

Daniela - direct - Penza                    2654

1    conversation, in the string of conversations after we almost
2    kissed, what I can remember is just what he told me about me
3    that, you know, because for me it was like this wonderful
4    thing and maybe this is love, maybe this is like -- what is
5    this wonderful thing?
6            And his -- his direction was:  No, no, no, no, no,
7    that's not what it is.  You are making it up.  You cause every
8    single feeling you have and you should have that for me, not
9    for him.  But I didn't pay much attention as to what he was
10   saying about him.  I was still very much focused in what I was
11   feeling and what I thought of it.
12
13           (Continued on the following page.)
14
15
16
17
18
19
20
21
22
23
24
25

Daniela - direct - Penza                    2655

1    BY MS. PENZA:   (Continuing)

2    Q    So what happened next?

3    A    I mean I listened to Keith.  He -- I listened to

4    everything he had told me, but this had not gone away.  And I

5    think it was, like, the next week and the next Star Trek, I

6    saw Ben again and I was very curious about it and I was very

7    excited honestly to see him and -- I remember I even, like,

8    not exactly dressed up but dressed nice.

9    Q    Do you remember what you were wearing?

10   A    Yes.  I was -- it was, like, fall so it was a little

11   chilly and I was wearing a long sleeve top, white top,

12   crewneck, and I was wearing a Ralph Lauren, like, long skirt

13   with two buttons on the side.  I thought I looked nice.

14          And I went to Star Trek and I was looking forward to

15   it and I was looking forward to seeing him and just like the

16   week prior.  I saw Ben there and we were the last ones to

17   leave and we stayed for a while and we talked and we got

18   closer and he kissed me.  And we kissed and, you know, we were

19   on the couch where we used to watch Star Trek and we, I think

20   the slang word is we made out.  But, you know, it was -- it

21   was very -- it was very nice.

22          So that night, we kissed, we made out, and I

23   realized that all of this that I was feeling was something

24   that I wanted, you know -- it made me feel, oh, it made me

25   feel so many wonderful things.  And it was, it -- it felt

Daniela - direct - Penza                    2656

1   real.  It felt true.  It felt nice.  So, and I liked the way,

2   I liked the way I felt with him and I liked what happened.  I

3   mean, granted, I was, what, 21 years old maybe?  Maybe old for

4   that first experience but I, I was feeling it and I really

5   liked it and I think I realized what that was and I'm, like, I

6   want this.

7   Q    So what did you do?

8   A    So that night, I went straight to Keith to talk to him,

9   to tell him about what happened.  It was never my intention to

10  hide anything or to, you know, make it seem like something

11  else, and to, like, to figure out -- like, to me, it was,

12  like, all right.

13          So, obviously, I have this relationship with Keith,

14  I have promised to be with him forever, and, you know, now

15  I've discovered this thing and I want to be with, with Ben.

16  And, you know, I'm not sure that I would say, the exact word

17  to say, oh, I was in love with Ben.  I had this huge crush and

18  he had awoken this thing in me and I had feelings for him and

19  I wanted more of that.  And, you know, in my mind, it was kind

20  of simple.  It was, well, I'm going to talk to Keith and,

21  like, like, almost, like, negotiate, like, okay, so I want to

22  be with Ben and began, you know -- be friends and everything.

23  We have, we can still have -- and, you know, I remember, like,

24  all the things I was thinking I was going to say and I did end

25  up saying.  And so I went to him to have this honest

Daniela - direct - Penza                    2657

1   conversation with him and I didn't think it was going to be

2   easy but that's what I went to tell him.

3   Q    You went directly after this second Star Trek night?

4   A    Yes.

5   Q    And where did you go?

6   A    To 3 Flintlock.

7   Q    So what happened?

8   A    My universe exploded.  When I told Keith, that moment is

9   the moment when my life went -- and I didn't even -- he, he

10  was, he was angry.  I had never seen him angry.  He was -- it

11  was dramatic.  It was irrational.  It was illogic.  I remember

12  that night and I remember there was no reasoning with him.

13          And I was -- I thought what I was trying to say,

14  what I was trying to get through to him was something simple,

15  you now, maybe not easy.  You know, maybe like now, looking at

16  it from now, like, I'm breaking up with him.  Like, let's be

17  friends.  You know, like -- not like something that's the end

18  of the world, but it was this huge, huge fight.  It was, like,

19  loud.  I had never seen Keith that way.  And, you know, the

20  actual conversation, which escalated to argument than

21  conversation over the course of the night, he said things

22  like, you know, I wasn't pure anymore and I had been this

23  specialist thing and, you know, I held so much promise for him

24  and I had destroyed everything, that I had destroyed the

25  thought object of him.

1  Q    What is a thought object?

2  A    A thought object is an ESP term.  It's a little

3  complicated to explain, but the thought object is basically,

4  as I understand it -- so I had an idea.  There's a world that

5  we all share and we live in the reality of things.  And then

6  we have the way we see the reality, all of us, and that

7  includes this, particular people, particular things, how we

8  have it in our minds and how we perceive it which is not

9  necessarily the same as reality.

10         So, for example, so I have a certain idea of what,

11  you know, Moira is like.  I'm sorry to use your first name.

12  But, and everybody has an idea of what that person is like

13  and it's not the same as reality because that's constructed

14  based on our perceptions, right?  And every person has the

15  ability to change that inner, inner Moira in their head based

16  on their thoughts about the real Moira.

17         So the thought object is this construct that is not

18  necessarily linked to reality and the concept in ESP is one

19  must be honorable because one can't destroy the thought object

20  of someone simply by your thoughts about them and your

21  feelings about them.  And so that's how it works.

22         So, for instance, if I think ill of you and you

23  haven't done anything to, for me to think ill of you, then

24  it's dishonorable for me to be thinking those thoughts because

25  I'm changing my thought object of you.  Likewise, if I go and

Daniela - direct - Penza                2659

1   tell, gossip to someone about you and it's not true, it's

2   dishonorable, and they change the way, oh, you know, they

3   think about that person, then their inner Moira, their thought

4   object changes and that's dishonorable.  So the concept of

5   thought object in ESP was tightly related to, you know,

6   damaging and ethical breaches because something you did could

7   affect the thought object of somebody else and now you had to

8   go and reconstruct that in every person because you did

9   something that caused everybody to think ill of someone else

10  so now you have to go and repair that.

11          So in this case, when I'm talking to Keith, he is

12  telling me that the way I think of him, I've changed forever

13  and I've destroyed it and that is my fault and that is an

14  ethical breach for me and that's what he's referring to.

15  Q    And is that -- we'll go back to the fight that night, but

16  is that something that would become something that the

17  defendant was focused on later on, this idea of the thought

18  object of him in your mind and in others' minds?

19  A    It was, yes.  It was very heavily the focus of, of a lot

20  of what would happen in the coming years, yes.

21  Q    So back to that night, what else is happening?

22  A    Well, I remember it was a very intense back and forth and

23  I used, to the best of my understanding, you know, the

24  relationship as I knew it to make him understand.

25          So, for example, I had -- so the way I saw it, Keith

Daniela - direct - Penza                    2660

1    didn't really love me.  Keith loved my sister Marianna.  Keith

2    loved Pam.  He spent a lot of time with them.  He spent time

3    with me but it wasn't romantic, it wasn't sexual.  I mean he

4    had me give him oral sex but that was very robotic and

5    mechanical.  He never napped with me, slept with me, never

6    kissed me, fondled me, had affection for me.  So it was clear

7    to me and I saw him do it with other women and I saw he loved

8    other women and that's how I felt it.

9            So now I had found someone felt something like that

10   about me and I felt it about them so I could have love too and

11   I was trying to explain that to him and tell him, You don't

12   love me anyway.  Like, why are you -- why can't we just be

13   friends?  You can still teach me.  We can still do science

14   together.  We can still do great things together.  And he,

15   like -- there was just no reasoning with him.  He would not

16   let it go.  It was: No, you can't, you're destroying me, I've

17   done everything for you and you are now damaging me, you're

18   hurting my heart, you're hurting me, you know, you are going

19   to kill me.  Like, all these, like, huge, huge dramatic things

20   that I was trying to -- and obviously it wasn't happening.

21           I'm talking about it very calmly now.  It was a very

22   heated exchange and I am, to the best of my ability, to the

23   best of my logical understanding of things, trying to, like --

24   basically, it felt like a battle where I'm trying to make him

25   understand my point and there's just no getting through to

Daniela - direct - Penza                    2661

1   him.

2   Q    Did the defendant make any threats towards you?

3   A    Yes.  Well, of, of conditional things that I wouldn't

4   have if I didn't, you know, basically -- he wanted me to

5   reverse all of that, to walk it back.  And, you know, he, he

6   said that I -- like, everything that I have built so far that

7   was going to happen was going to disappear.  Like, I wouldn't

8   have any of that.  That -- I mean, it was all very

9   conditional.  It was, and I couldn't understand why, and I

10  couldn't -- he couldn't tell me why it was not possible to

11  have a relationship with him without the sex and the romance

12  and that -- sex, really, because there was no romance --

13  without the sexual part of it.  And, you know, he said a lot

14  of things that didn't make sense to me.

15  Q    You mentioned he said that you were hurting him.  Can you

16  describe that the part of the fight?

17  A    Yes.  So, and I even remember I mentioned that back then.

18  He would often use this, which, to me, is a mystical notion,

19  the fact that when someone that he was having sex with was

20  doing something bad with respect to him, he would hurt.  Like,

21  he would often say his heart is what hurt, like, physically,

22  and he was hurting and he had the chills and he was hurting

23  and he was ill because I was causing it.

24           And I remember in that conversation, I remember

25  telling him, because here I am having this argument with him

1   and I thought that, I thought I understood what my role was in

2   his life and I thought he was my best friend and I thought I

3   was his best friend, you know, like, we shared a lot of time

4   together, we talked about a lot of things.  I saw his life

5   with all these other women.  And during the course of this

6   argument, he's using with me all the, all the same techniques

7   that he uses to discipline all of his women.

8          I remember standing there telling him, Hey, don't

9   use that on me.  I'm your friend.  I've seen you use this with

10  everybody else, you know.  Like, you're trying to make me

11  crazy.  You're saying something to me that isn't.  You're

12  telling me this, I'm hurting, you're using all these acts of

13  discipline that I've seen you use.  It's me.  I'm your friend.

14         I couldn't get through but I, I was trying.  You

15  know, that's just, that was the negotiation that I was failing

16  to, to, you know, that I was attempting to get at and he, he

17  was very dramatic about it.  So he was, like, everything is

18  going to be over, which scared me because I -- well, I wanted

19  to, I wanted -- he still held everything.  I still idolized

20  him.  He was still very important.  I cared about him.  I

21  cared about him but I, with this interaction with Ben, I had

22  realized that, you know, there's care and there's sexual

23  attraction and that's not something I had for Keith, you know.

24         So, I was trying to make sense so that's still

25  myself and I was trying to make sense of it with him in the

Daniela - direct - Penza                    2663

1    most, you know, if you will, honorable way, like

2    straightforward, honest, like, this is how I feel, this is

3    what it is, but there was no getting anywhere with him.

4    Q    Did the defendant use any specific words to describe you

5    during that, during that interaction?

6    A    Yes.  So anything that was related to me backing down or

7    me hanging onto the idea that I liked Ben and that that was a

8    reason, he would say I was prideful.  He would say, That's

9    your pride, you know, that's your pride talking, that's your

10   ugly pride, you're hanging onto that and you're choosing your

11   pride as opposed to us, which is, you know, not something --

12   it's precisely what I was trying to explain to him.  But he,

13   he called me prideful, you know, destructive.  He told me

14   about my soul and that, you know, my soul would, like, I will

15   lose my soul, essentially, which is not something that I

16   subscribe to so it didn't -- it wasn't very transcendental for

17   me.

18          And, you know, during the course of this discussion,

19   this argument, at some point, we moved, we walked over to

20   Hale.  So we were at Hale discussing some more and it wasn't

21   getting anywhere.  He was just trying to, he was trying to --

22   by calling me prideful and by, like, obscuring things with,

23   like, You're being destructive and you never really did your

24   program and all these different things, trying to obscure what

25   me, what for me was, initially, like a very simple matter that

Daniela - direct - Penza                2664

1    I wanted to resolve with him.  And so it got escalated and

2    escalated more and more and we got, we were at Hale and

3    that's --

4                THE COURT:  Where were you?  I'm sorry.

5                THE WITNESS:  Hale, 8 Hale Drive, so the other

6    property.

7                THE COURT:  Hale Drive?

8                THE WITNESS:  Yes.  It was a few meters away so it

9    was a short walk from Flintlock.

10   A    And we continued discussing -- I remember discussing by

11   the piano.  That's where I told him, Don't treat me like --

12   don't do the things you do to your women.  It's me.  It's me.

13   You can talk to me.  You know, we can figure this out in a

14   logical way.

15              But he was making no sense to me.  And, you know, he

16   was managing to confuse me with some of the things but I

17   thought I had a very clear idea of what I wanted to get at and

18   I didn't want to walk out of there without an answer, you

19   know.

20   Q    Why not just back down and leave it alone?

21   A    I mean, like, say, Okay, fine, I'll do whatever you want?

22   Q    In that moment.  Why not?

23   A    Because, because I was -- I was very clear about what I

24   felt and about what I wanted and, I mean, honestly, I

25   trusted -- Keith was like a logical, rational person.  Like,

1    in my mind, there had been no space for, you know, the notion

2    that I was on this unbreakable relationship.  I thought it was

3    something that could be, you know, worked out.  So, you know,

4    why not?  You know, he's perfectly reasonable.  I'm perfectly

5    reasonable.  This is not like a huge, like, super complicated

6    issue.

7             You know, things needed to be talked out and -- but

8    there was no resolving it, not one way or another.  It wasn't,

9    like, okay, fine, you want this, then you can't have anything.

10   That wasn't an option.  It was just a grilling of, you know,

11   you have to stop wanting that.  No, you have to stop saying

12   that, that's prideful.  No, you're wrong.  You say you feel

13   that about Ben but you're wrong.  You don't even know what you

14   feel.  You're not honest with yourself.  You don't feel that

15   about Ben.  So they were trying to make me crazy about feeling

16   what I was not feeling.  So, honestly, maybe I was stubborn

17   but I couldn't let it go.  I was very clear what I felt and

18   what I thought about it.

19            So the argument continued.  We walked back to

20   Flintlock and he still, you know, wasn't giving me an answer.

21   There was no resolution to it and it was still very illogical,

22   still very pushing against what I knew was real versus, you

23   know, Oh, that's just your pride, that's your pride talking.

24   So there was a point where he wanted the conversation to stop

25   and I didn't want to stop.  I would not let it go.  And I

Daniela - direct - Penza                    2666

1   remember, back at Flintlock, Karen was there and Pam was

2   there.  I remember Karen was there and Pam was there.  I only

3   remember because she later repeated part of the conversation

4   because she overheard it from the top of the stairs.  She

5   would do that sometimes.  She would eavesdrop on the

6   conversations.

7          So, you know, I was insisting to get some kind of a

8   resolution.  He kept calling me prideful and destructive, even

9   for just doing that and he locked himself up in the bathroom.

10  There's a front bathroom in Flintlock and just -- which I

11  thought was very childish, you know, like, he locked himself

12  up.  I want to talk to you.  We're having a conversation.  You

13  know, let's just finish this.  Give me an answer.  I want to

14  know.  I want to resolve this.  It wasn't even I wanted to

15  know.  It was I wanted to not feel crazy because it was

16  supposed to be much more simple.

17         So he locked himself up in the bathroom.  I remember

18  Karen asked me to leave and I was like, No, I, you know, this

19  is -- I want to figure this out.  This still makes no sense to

20  me.  And I remember he stayed there in the bathroom locked in

21  for, like, a little while and then he, like, sneaked out and

22  ran upstairs and I ran right after him.  Like, you know, I

23  ran, like, I chased him still wanting to just finish that, you

24  know, to just come to a conclusion, whatever that was.

25         I remember we were in Pam's room where I approached

CMH       OCR       RMR       CRR       FCRR

Daniela - direct - Penza                    2667

1   him and he grabbed me.  Like, he grabbed me by the arm or

2   something and like threw me over the air like onto the floor

3   and there was like a mattress on the floor.  And I remember,

4   like, he had never been violent with me and I just remember,

5   like, I landed on the mattress, you know, and it's, like -- it

6   was, like, a thin -- I just land on the mattress and that

7   was -- and he just walked out, ran out, and that was the end

8   of that argument.

9        You know, I just stayed there, like, okay, and

10  that's how, that's how it ended.

11        (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2668

 1  BY MS. PENZA:   (Continuing.)

 2  Q    When was the next time you spoke to the defendant in

 3  person again?

 4  A    I've never.

 5  Q    In addition, you mentioned that you cared for the

 6  defendant at that point in time?

 7  A    Yes.

 8  Q    In addition to your affection for the defendant, what

 9  other roles did the defendant have in your life at that point?

10  A    Roles?  Keith's role in my life was very large.  He

11  occupied a very big space.  He -- he was the one person I most

12  looked up to.  I thought he was a great man.  You know, I was

13  documenting him.  That's the degree of greatness that I

14  thought he held.  I thought in my life he held a position of

15  power.  He was the person I most listened to, but also the

16  person who exerted the most power in my life.  I was highly

17  dependent on him and his community which he controlled and he

18  was also my only friend.  Like, there was nobody else for me

19  to talk to at that point.  I had a coach.  I didn't talk to my

20  mother anymore.  My relationships was secret and, therefore, a

21  large part of my life was.

22          My best friend, who was my sister Mariana, wasn't my

23  best friend anymore.  We didn't have any of those

24  conversations so he was basically my entire life.  You know,

25  he still held the promise of teaching me.  He still held the

Daniela - direct - Penza                                    2669

1   promise of doing science together, whatever I think that is

2   now but that was the promise of me moving in that direction

3   with him so his role in my life was all-encompassing.

4   Q    Looking back, what is your thought of the defendant's use

5   of the word "pride" during that fight?

6   A    During that fight and I think for the remaining of any

7   other communications in the future, my pride was a catchall

8   phrase for me liking Ben, for what I felt for Ben and

9   intermittently also just to -- to, like, name anything I would

10  do that he didn't like I was doing, it would just be called

11  pride.  You want to eat ice cream, that's your pride.  You

12  want to be with Ben, that's your pride.  You think you're

13  right, that's your pride.  That's a catchall word conveniently

14  enough.

15  Q    Did your impression of the defendant change after that

16  night?

17  A    Yes.

18  Q    How so?

19  A    There were a few key things that were -- that were very

20  shocking for me about that -- about that final argument,

21  fight, if you will.  And that completely contradicted the idea

22  that I had about Keith.  One of them is throughout he

23  basically -- basically -- I don't know how else to say it, but

24  he was talking shit about Ben and, you know, it wasn't that he

25  was talking ill about Ben but rather than Keith was speaking

SN        OCR        RPR

Daniela - direct - Penza                    2670

1   with dishonor which was a concept in ESP where you don't speak

2   with dishonor about other people and he was like -- it was

3   just flowing out of him.  He was angry; like, visibly

4   red-in-the-face angry.  I have never seen him have a strong

5   emotion like that and he was irrational and illogical in our

6   arguments.  Perhaps that's what surprised me the most and the

7   way he treated me.

8           You know, the kind of -- some of it, it would take

9   me a while to process and look back and like -- but right then

10  and there was a shift in the way he was talking and the way he

11  was thinking and his emotional state.  Like the drama that

12  he -- it was a very dramatic response that he had.  So, my --

13  my perception of him definitely shifted.

14  Q    You mentioned him speaking dishonorably about Ben.  Is

15  that during the course of that fight?

16  A    Yes.

17  Q    And what sorts of things was he saying about Ben?

18  A    Basically that he was lesser than him.  He was saying --

19  not even between the lines just straight up that he was, like,

20  mediocre.  That he was, like, nothing much.  And, again, it

21  wasn't so much that I felt protective of Ben which I'm sure I

22  did a little bit, like, okay, that's not necessary, but I was

23  hearing Keith, the Vanguard, like talking shit about someone

24  else.  Yeah, so it was surprising.

25  Q    So what was it that was so surprising about that?

SN        OCR        RPR

Daniela - direct - Penza                    2671

1   A    I think, and I can say this now but I didn't grasp it

2   fully then, I want to make it clear, that Keith was a regular

3   man, a fallible human and all of those characteristics that I

4   attributed to him of, like, a better being in a way, wasn't

5   true.

6   Q    So what happened after you left?

7   A    So, I left.  And about a day went by and I remember,

8   like, Pam attempted to talk to me, but, you know, I was very

9   upset about everything that had happened and I remember that

10  later, like, the next night Pam called me and she said -- she

11  said -- she asked me, You know, he's going to teach you a

12  lesson at Hale.  You need to come and videotape it.

13  Q    Who was going to be teaching a lesson at Hale?

14  A    Keith.  Keith is going to be teaching a lesson at Hale.

15  You need to come videotape it and I was like, no, I just had

16  this huge fight with him.  Nothing is resolved and what

17  happened is very disturbing to me and Pam I knew was the

18  master appeaser of situations.  So I kind of understand what

19  her role is.  So she keeps asking me and I refused and she

20  said, Dani, are you really going to throw it all away.  You

21  know, just, you know -- basically, like, you know, swallow

22  your pride and come do this and everything will get back to

23  normal and you'll resolve it.  And I said, no, she said why

24  not and I told her.  I told her that Keith is not the man that

25  I thought he was.

Daniela - direct - Penza                    2672

1  Q    So at that point in time, how old was the defendant,

2  approximately?

3  A    45, 40-something, 50?  I'm not sure.

4  Q    And you said you were how old?

5  A    21, I think.

6  Q    And Ben is approximately how old?

7  A    I would say 27, 28, I think.

8  Q    And after that night and this phone call with Pam, what

9  happens?

10  A    People are working on me.

11  Q    What does that mean?

12  A    People -- I mean, I've seen this happen before.  To me

13  it's no -- there's no question about it.  You know, now I'm

14  the person having a problem as I have seen before and my

15  coach.  Mainly my coach, Karen, is, like, working on me.  You

16  know, you need to fix this with Keith, you need to do this.

17  So it's like a big push for me to -- like I've done something

18  bad, I need to fix it.  That's the clear narrative there and

19  it's not that simple for me.

20          At the time, I remember after the fight with Keith,

21  I -- I thought about what I wanted to do because this was

22  certainly, you know, a before and after and I thought about

23  going back to Mexico at times and I even went as far as to --

24  you know, packing my stuff, wiping my computers and but people

25  were sent to work on me and discouraged me from doing that, so

1   talked me out of leaving; No, you can't leave things the way

2   you are.  You destroyed so much.  You need to fix it.  You

3   know, when you burn someone's house down you are supposed to

4   repair it.  You're not supposed to just leave.

5           There would be a lot of -- they called it coaching,

6   but really it was this -- they were working on me to, you

7   know, do the right thing but really it was to apologize; it

8   was my fault, make it better, get back to Keith.

9   Q    So you mentioned Karen as someone who is working on you?

10  A    Yes.

11  Q    Anyone else working on you?

12  A    For that early stage which is, like, right after the

13  fight, I mean, I had talks with Pam, but Pam was not like, as

14  I said before, I believe she wasn't, like, a tekkie -- she

15  wasn't going to EM me and set a goals program.  It was more,

16  like, appeasing, but mostly it was Karen.  Mostly it was

17  Karen.

18  Q    Later on down the road would other people become involved

19  in this working on you?

20  A    Yes.

21  Q    As you describe it?

22  A    Yes.  I'm sorry?

23  Q    I was using your phrase.  Were other people involved in

24  this concept of working on you?

25  A    Yes.

Daniela - direct - Penza                    2674

1   Q     Who else?

2   A     From the period that I had the fight with Keith to the

3   period before they put me in the room, there was a progression

4   and in that whole lapse, which was a number of years, there

5   was Karen, there was Nancy -- very little, but there was some

6   Lauren and my family became involved in the latest stage.

7   Q     Was there -- Karen was in the house when you had the

8   fight with Keith; is that right?

9   A     Yes.

10  Q     And when you were talking to Karen would she -- was it --

11  would she discuss Ben with you?

12  A     Not -- not -- no, not in the clear way, no.

13  Q     And, so, what -- how would she communicate these things

14  to you?

15  A     She worked on me and she worked on my pride.  It was like

16  a euphemism that was used for you chose Keith over Ben -- you

17  chose Ben over Keith.  It was never spoken of that clearly.

18  It was never like, so you don't want to be with Keith, let's

19  work on that.  It was never clear.  Not even with Keith was it

20  clear.  It was always, well, you're very destructive.  You

21  need to work on that.  You're very prideful.  Let's EM that.

22  What about your pride.  Oh, you think you're right.  Let's

23  work on that.  So it was very confusing, all of that.

24  Q     Was -- did you have explicit conversations with the

25  defendant about Ben?

Daniela - direct - Penza                    2675

1    A     Prior to the fight?

2    Q     After the fight.

3    A     After the fight?  E-mail conversations, yes.  I mean, we

4    never had a conversation again.  I think that's a bit of an

5    understatement.  I would say that the entire communication

6    over the following year that was via e-mail, it was all about

7    Ben.  It was all about, like, to a level of terrifying detail

8    it was about Ben; everything that happened with Ben, what I

9    felt about Ben; what he felt about Ben, what I should do about

10   Ben.  It was all about that.

11   Q     So, after the fight, just taking a step back, how does

12   your life change?

13   A     My life changed completely overnight.  Just like sex with

14   Keith meant access, just not being with Keith meant just loss

15   of access, isolation.  The -- it was very clear that it was

16   not only Keith but it was Keith's community.  So overnight I

17   couldn't go to the volleyball games.  Overnight I couldn't go

18   to the community events.  Overnight I couldn't be anywhere

19   that Keith was but also not with the community.  So it was

20   like immediate isolation or like a shunning of sorts.  It was

21   overnight.

22             And that's just as far as the actual, like, physical

23   state of me, but also it was my daily life changed.  I used to

24   spend every waking moment working on this, working on that,

25   documenting him and all of these things.  Funny enough I was

Daniela - direct - Penza                    2676

1  still expected to go work to the executive library.  Funny
2  enough I was still expected to provide the information from
3  the key loggers, but everything else in my life was completely
4  different.
5  Q    Were there other jobs that you continued to have to do?
6  A    Yeah, I think there was -- other than the ones I
7  mentioned, the book reports.
8  Q    That's something that continued while you were having
9  this -- while you were in this period of not speaking in
10 person to the defendant?
11 A    Yes.
12 Q    And how would -- how would this work be communicated to
13 you, these things you were supposed to be doing?
14 A    Well, the ones where it required, like, access to
15 Flintlock or to Hale, then Pam, Kristin, Karen who lived at
16 Flintlock would call me over or communicate with me, Hey,
17 Daniela there's books here.  Hey, Daniela there's things to be
18 done here.  They would coordinate, Keith is not around; come
19 at this time come, at that time.  But if I knew I had to do
20 it, I would call and coordinate that.  The same with the work
21 that I was doing at the executive library.
22 Q    Over that time period you said that there were periods of
23 e-mail communication with the defendant?
24 A    Yes.
25 Q    Can you just explain generally what that was?

Daniela - direct - Penza                    2677

1    A    Yes, so a few months -- so it was a good number of

2    months.  I don't even remember exactly when, but after the

3    fight I was encouraged to write to Keith, to write an e-mail

4    to Keith and he -- and he replied and so an e-mail exchange

5    started.  So -- and then we started communicating via e-mail.

6    Q    And over that time period how many e-mails -- can you

7    estimate how many e-mails you think you exchanged with the

8    defendant?

9    A    Thousands.  Thousands and thousands and thousands.

10

11              (Continued on the follow page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

1  EXAMINATION CONTINUES

2  BY MS. PENZA:

3  Q    And what -- were there specific things that were

4  discussed in these e-mails?

5  A    Yes.  So, I mean, the main topic was Ben in excruciating

6  detail.  And -- and, you know, he gave me specific

7  instructions of what to do, what to say, what not to do, where

8  to go, where not to go, you know, and -- but acts of

9  discipline.  Many times it was just like you should not have

10  done that, you should have done this, based on what I had

11  reported.  So it was constantly me reporting and asking what I

12  should do.

13  Q    You mean in your own interactions with Ben?

14  A    Yes.

15  Q    So after this fight with the defendant, did you continue

16  to see Ben?

17  A    For a little bit.

18  Q    Approximately how many times did you interact

19  romantically with Ben?

20  A    A handful more.

21  Q    And, I'm sorry, did you go beyond making out?

22  A    No, there was beyond making out.  Strictly speaking,

23  there was some touching, but there was nothing else.

24  Q    So that's as far as it got with Ben?

25  A    Yes.

Daniela - direct - Penza                    2679

1    Q    Compared to what actually happened with Ben, how would

2    you compare what happened with Ben to the level of discussion

3    that you had with the defendant over the next two years about

4    what happened with Ben?

5    A    I would describe it as being an absurd disproportion.

6    The amount of -- the amount of detail he requested from me --

7    and I mean just ridiculous detail -- was absurd, and he would

8    constantly ask me, did you tell me everything?  Tell me more.

9    Tell me where -- tell me what happened.  Tell me what he said.

10   Send me the conversations that you had over Chats.  Tell me

11   where he touched you and what -- what he touched, how many

12   times, what you felt, how you felt it, when you -- every

13   single thing.

14   Q    And would he repeat the same questions over --

15   A    Over and over.  Over and over, over the course of those

16   years.

17   Q    What was his purported reason for asking these types of

18   intimate details over and over again?

19   A    He said what -- and, again, these were his reasons --

20   that I needed to fix my thought object of everything that had

21   happened and he was gonna help me do that.  That was like the

22   general.  So under the guise of he's gonna help me fix this,

23   there is this, I don't know, harassment of all these

24   excruciating details.  Kind of parallel to it, there was like

25   the constant demand for:  You need to be vulnerable.  You need

Daniela - direct - Penza                    2680

1    to have full disclosure with me.  The only way you're gonna

2    get through this is if you tell me everything.  Tell me your

3    fantasies.  Tell me your fantasy -- like just everything.

4    Just tell me everything.  Every single -- and write to me all

5    the time.  You don't write enough.  It's never enough.  You

6    haven't written.  It's been so many hours, you haven't

7    written.

8            And when it was about Ben, it was just the same

9    questions:  I thought you told me everything.  Why haven't you

10   told me everything?  Have you told me everything?  Why don't

11   you -- tell me more.  Tell me something you haven't told me

12   before.  It was constant.

13   Q    During this -- during this time period, was there -- so

14   taking the time period from fall 2006 to when you are put in

15   the room, when was it that you were put in the room?

16   A    It's March 9th, 2010.

17   Q    So during that time period of over two years, you told us

18   about some of the initial things that happened.

19           Can you give an overview of what the next two-plus

20   years would be like for you?

21   A    Yes.  So -- so it was like three-plus years.

22   Q    Sorry.

23   A    Right?  It's a long time.

24           No, I remember because I remember at some point

25   coming to the realization, and I think even writing Keith

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2681

1    saying, wow, I've now spent more time having an e-mail

2    relationship with you than an actual relationship.  So it was

3    longer than the three years that I actually had a relationship

4    with him.

5            So the progression, again, what happened.  There was

6    -- after the fight, there was a period of like no

7    communication with him.  It was -- I was being coached,

8    coached to like not leave.  Coached to stay.  Coached to do

9    the right thing.  Coached to work on my pride, work on my

10   program, get back on track.

11           Then the e-mail communication starts with Keith and

12   that is, I mean that's -- I mean by no means that's like an --

13   like an easy -- it's like, to me it's a roller-coaster, you

14   know, of -- of -- you know, there was like -- through the

15   coaching and through the grilling and through like the beating

16   me up with all these people working on me.  There were times

17   when I was, you know, completely confused and like bought into

18   the:  Oh, this is my pride.  I'm just so destructive.  I'm so

19   bad, My God, I've hurt Keith so bad, you know, I need to make

20   this right.  And I would go like into overdrive, like I to

21   need to do my program.  I need to lose weight.  I need to do

22   book reports.  I need to do all these things.  And I could get

23   in the groove of that, but, you know, that was a complete -- I

24   mean, that was unfounded.  You know, that -- so, eventually,

25   it would be like down again.  Like no, I don't want this life.

Daniela - direct - Penza                    2682

1    You know, what am I doing here?  What, am I like in e-mail
2    communication with this guy that doesn't care about me?  This
3    is not about this; you know, this is about what I felt and
4    this is about I have dreams.  You know, I want to study.  I
5    want to have a life.  I want to have friends.  I feel
6    isolated.  I did not sign up for a monk life.  You know, I
7    don't want to be reporting my weight.  And they would say I
8    get really defiant.

9           And -- you know, and Keith would like, through his
10   e-mails, he would essentially like beat me up, you know, into
11   submission, basically.  Like, you know:  No, that's bad.  You
12   shouldn't do that.  You shouldn't think that.  You should
13   be -- you know, you should be loving to me.  You should be --
14   you should be writing me more.  You should be reporting all
15   the time.  You should be working on this.

16          And, you know, and then I would like, my coach:  You
17   should be humble; that's, you know, like you shouldn't be
18   prideful.  So I would say:  Well, maybe I'm not right, maybe
19   they're right.  Maybe they do want to help me, maybe I'm crazy
20   and I don't want to be helped.  And so it would be like a
21   constant roller-coaster.

22          Like the e-mails with Keith were crazy, you know,
23   like they were crazy, incessant requests for information, but
24   also for me to do things and -- and like instructions for me
25   to -- you know, I wasn't allowed -- at some point I remember

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2683

1  thinking, well, my weight never stopped being like a main

2  focus of everything.  So every e-mail, what's your weight?

3  What's your weight?  What did you -- are you fasting?  Are you

4  still fasting?  Did you break your fast?  What's your weight?

5  How much have you weighed?  What's the last, you know, you've

6  ever weighed?

7            You know, like all these incessant questions.  And I

8  remember at some point amongst all these years I thought it

9  would be a very good idea if I started running and I trained

10  for a race.  Huge ethical breach.  That's indulgent, Dani, you

11  know, that -- if you have an ethical breach, you need to fix.

12  You can't be indulging on running.  You know.  And I remember

13  like getting very defiant and then they would come and EM me,

14  because I'd be like:  But that's part of my program, like

15  isn't that how I'm gonna fix it?

16            And certainly, during the progress of those years,

17  it became very clear that everything I did, everything I did,

18  was considered indulgent and an act of pride.  Basically,

19  anything I did that was not, you know, like pleasing Keith

20  was:  You're being indulgent.  It's an act of pride.  You --

21  you know, you want to go out and have a cup of coffee; that's

22  indulgent, that's an act of pride.  You want to help your

23  siblings pass the GED test; that's indulgent, that's an act of

24  pride.  With someone who is really focused on fixing a

25  mistake, it would be doing anything but fixing that mistake.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2684

1        So all of this, I was very confused at the time.

2   You know, between the EMs and between these e-mails and

3   between what I felt, it was, like I said, a roller-coaster of

4   emotions.  And so those -- that escalated.  And coupled with

5   the fact that I had given no avenue to make any money, I was

6   illegally in the country.  I had no way to make money.  I had

7   at some point, I believe, like given some kind of ultimatum;

8   you can only make money doing book reports.  You cannot do

9   anything else for money.

10        So I was like cornered and I couldn't do anything

11  else, and so I started having issues with what do I eat?  Like

12  as simple as that.  You know, what do I do for, you know, like

13  I can't possibly pay rent, you know, that was very quickly --

14  I mean, very early on.  So just the way I would describe those

15  years leading up to being put in the room, it's like my world

16  closed in on me.  Like every -- like -- and as it got closer

17  and closer, like as time progressed, like there was like Nancy

18  working with me and then:  You're indulgent about this.  You

19  can't go run.  You're indulgent about this, you cannot go to a

20  community event.  You're indulgent about this, you can't

21  have -- you know, you can't go out and have like something to

22  eat.

23        And then at some point things got really bad, I

24  guess, and my family became involved.  And it was like this

25  big ultimatum and my family became involved, and then my world

Daniela - direct - Penza                    2685

1    closed in even more.  They took my iPod.  They took my

2    computer.  They took my phone.  They took my -- everything I

3    owned, my books, everything I had in my shelf, my papers,

4    everything.  To the point where I was sleeping in a sleeping

5    bag on the floor of my living room and having to do 15-minute

6    reality checks to report in -- and that is every 15 minutes I

7    had to write what I was doing.  Every 15 minutes.  Every 15

8    minutes, this was a thing.  And I had to do that.

9          I woke up, I was like, I guess earning my keep in my

10   father's condo, which was 12 Wilton Court, by cleaning the

11   bathroom, by cleaning the kitchen, by making juices, and I had

12   to, like, do my program and I needed to do book reports and I

13   needed to do a fast and I couldn't eat.  And even if I could,

14   you know, like what would I eat?  And everything got -- just

15   every single degree of freedom that I had I lost.  Every

16   single one.  And everything I did was bad.  Everything I did

17   was indulgent.  Everything I did was an act of pride.

18         And when I raised my voice to say:  I can't

19   understand, I don't do this.  That's your pride.  That's your

20   pride talking.  You know, shut that down.  So it was an

21   impossible situation that I could not get out of.  And at the

22   point towards the end of this, this lapse of years, and the

23   e-mails are still coming and all of that, it's very -- before

24   I lost my computer and it just, you know, came to the point

25   where I was like -- I was, I mean honestly, I was -- I was by

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2686

1    no means like rational at that point.  I was going crazy.

2            And I remember at some point I was hungry and I ate

3    some food from the refrigerator at the house, my -- the house

4    where I was living, you know, from my parents' house.  And

5    that was really bad.  They said consequences.  They put a lock

6    on the refrigerator so I couldn't even eat anymore, and I had

7    nothing that I could eat and I had no way to make money.  And

8    this was -- at some point I did something, I don't even

9    remember what it was.  I'm sure it was something indulgent and

10   prideful, and they locked me out of the house for -- during

11   winter.  Like, for a few days, I don't even remember how many.

12           But -- so things escalated so much and they

13   escalated, they recruited my family to work on me.  My family

14   had no idea what had happened.  You know, they didn't know,

15   oh, this was about Keith versus Ben.  They didn't have that

16   clarity at all, they were just told:  Your daughter is

17   prideful and destructive.  You didn't teach her cause and

18   effect.  You're the parent, it's your responsibility.  You

19   should help fix her.  In fact, it's your ethical breach too

20   because she's destroying our community.  So they were involved

21   to like come fix me.  And, so, they were like setting all

22   these consequences and having these meetings with, like, Keith

23   and, like getting these messages through my sister Marianna

24   about what to do with me.

25           So those few years are a progression of -- of

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                                    2687

1  confusion for me, yes; but also, a loss of every single one of

2  my freedoms until I had no choice.

3          MS. PENZA:  Your Honor, I think this a good place to

4  stop.

5          THE COURT:  All right, members of the jury, we are

6  going to recess for the evening.

7          Let me remind you that it is very important that you

8  follow my instruction that you not discuss this case with

9  anyone, not your family, your friends or business associates

10 and not with your fellow jurors.

11         In addition, you must not read, listen to, watch or

12 access any accounts of this case on any form of media, such as

13 newspapers, TV, radio, podcasts or the Internet, and you

14 should not research or seek any outside information about any

15 aspect of the case.  Do not communicate with anyone about the

16 case on your phone, whether it's through e-mail, text

17 messaging or any other means, through any blog or website or

18 by way of any social media, including Facebook, Twitter,

19 Instagram, YouTube or other similar sites.  You must not

20 consider anything you may have read or heard about the case

21 outside this courtroom, whether you read it before or during

22 jury selection, or during this trial.  And do not attempt any

23 independent research or investigation about the case.  And do

24 not visit any of the locations identified on the questionnaire

25 or discussed during the course of the jury selection process

Daniela - direct - Penza                          2688

1    and this trial.

2            I want to thank you for your attention today.  As I

3    have said before, please leave your notes in the jury

4    deliberation room and pick them up in the morning.

5            Have a good evening, get some rest.  We will see you

6    tomorrow at 9:30.

7            All rise for the jury.

8            (Jury exits.)

9            THE COURT:  The witness may stand down.  Please do

10   not discuss your testimony with anyone.  We will see you

11   tomorrow morning at 9:30 a.m.

12           (Witness steps down and exits the courtroom.)

13           THE COURT:  Everyone may be seated.

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

2689

1          THE COURT:  All right.  Ms. Penza?

2          MS. PENZA:  Yes, Your Honor.  I believe we will go

3     into the early afternoon on Daniela's direct.

4          THE COURT:  Until the early afternoon?

5          MS. PENZA:  Yes.

6          THE COURT:  All right.  Okay.  About how long do you

7     think, at this point, not putting any pressure on you to give

8     me an exact answer, Mr. Agnifilo?

9          MR. AGNIFILO:  Three or four hours.

10         THE COURT:  All right.  So we will go into the

11    following day.  We will go into Thursday.

12         MR. AGNIFILO:  Can I throw out a proposal?

13         THE COURT:  You want to throw out a proposal?  Yes,

14    of course, you may always throw out an idea.  Have you got an

15    idea?

16         MR. AGNIFILO:  It's an idea.

17         I'm getting the sense that this trial seems on the

18    long end and I'm wondering what options there would be in

19    terms of the workday to try to keep it at six weeks because

20    we're in the fourth week.

21         THE COURT:  This is the fourth week.

22         MR. AGNIFILO:  Yes.  So if the government tells me

23    they're going to rest in two weeks, I'll withdraw my idea and

24    sit back down, but that's not the sense I get.

25         MS. PENZA:  I think we've spoken to Mr. Agnifilo

2690

1  about this.  If it changes at all, it's going to change

2  moderately.  We are still on relatively the same estimate that

3  we were before.  Obviously, the fact that we have a few

4  shorter weeks affects that, but we certainly don't think we

5  should be going longer trial days.

6           THE COURT:  Well, next week, we have only three

7  days.

8           MS. PENZA:  Yes, Your Honor.

9           THE COURT:  But here is what I suggest.  What I

10  suggest is we see this week out and then decide whether we

11  ought to elongate the day after I speak to the jury because

12  this is a very attentive jury.  They are always here on time

13  and they are always ready to come out whenever we are ready

14  for them so I want to be respectful of the jury but I also

15  understand that we are trying to get this trial done before

16  the last week of June.  Right?

17           MS. PENZA:  Your Honor, we are going to be finished

18  well before that.

19           THE COURT:  Well, no, no, I'm not worried about you

20  being finished.  I am worried about should there be a defense

21  case and also importantly, there are a lot of issues that you

22  are placing before this jury and there is a lot of testimony

23  and so there's no, I have no way of assessing whether the

24  deliberations will take a short period, a medium period or a

25  long period and so I think that's the basic concern, that the

2691

1    defense has, you now, beyond the testimony and beyond the

2    closings, you know, what kind of a deliberation period are we

3    going to have.  I think that's, I think that's a reasonable

4    concern.

5          So let's do that.  You know, I'll keep, let's keep

6    the issue open until next week and then we will see.

7          MR. AGNIFILO:  Very good.  Thank you.

8          THE COURT:  All right.

9          Okay.  Anything else from the government for today?

10          MS. PENZA:  No, Your Honor.

11          THE COURT:  Anything else from the defense?

12          MR. AGNIFILO:  Nothing from us, Judge.

13          THE COURT:  All right.  I have another matter so

14    when you leave, please leave quietly.  Thank you.

15          (Matter adjourned to May 29, 2019 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

2692

                        I N D E X

WITNESSES:


        DANIELA

        DIRECT EXAMINATION (Continued)              2485

        BY MS. PENZA


                        EXHIBITS:

        Government Exhibit 1529                  2489
        Government Exhibit 1554                  2495
        Government Exhibits 1514, 1514-A,        2578
        1515, 1516, 1517, 1518, 1519, 1520,
        1521, 1522, 1523, 1525 and 1525-A
        Government Exhibit 1526 and 1527         2589
        Government Exhibits 1539, 1540,          2602
        1544, 1591 and 1592

                    *     *     *     *