2693

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    :   18-CR-204(NGG)
4
            Plaintiff ,         :
5
                               :   United States Courthouse
        -against-              :   Brooklyn, New York
6
   KEITH RANIERE, et al.,       :
7
                               :   May 29, 2019
            Defendant.         :   9:30 o'clock a.m.
8
   - - - - - - - - - - - - - X
9
                   TRANSCRIPT OF TRIAL
10         BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
            UNITED STATES DISTRICT JUDGE, and a jury.
11
   APPEARANCES:
12
   For the Government:      RICHARD P. DONOGHUE
13                          United States Attorney
                            BY: MOIRA K. PENZA
14                              TANYA HAJJAR
                                MARK LESKO
15                          Assistant United States Attorneys
                            271 Cadman Plaza E, Brooklyn, NY
16
   For the Defendant:       BRAFMAN & ASSOCIATES, P.C.
17                          767 Third Avenue, New York, NY

18                          BY: MARC A. AGNIFILO, ESQ.
                                TENY ROSE GERAGOS
19
                            DEROHANNESIAN & DEROHANNESIAN
20                          677 Broadway, Albany, NY 12207

21                          BY:  PAUL DerOHANNESIAN, II, ESQ.
                                 DANIELLE R. SMITH, ESQ.
22
   Court Reporter:          Charleane M. Heading
23                          225 Cadman Plaza East
                            Brooklyn, New York
24                          (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

                  CMH      OCR      RMR      CRR      FCRR

2694

1          (In open court; outside the presence of the jury.)

2          THE CLERK:  Case on trial.

3          Counsel, state your appearances, pease.

4          MS. PENZA:  Moira Penza, Tanya Hajjar and Mark Lesko

5    for the United States.  Good morning, Your Honor.  Also at

6    counsel table is Special Agent Michael Weniger with the FBI

7    and paralegal specialist Teri Carby.

8          THE COURT:  Good morning, everyone.

9          MR. AGNIFILO:  Marc Agnifilo, Teny Geragos, Paul

10   DerOhannesian and Danielle Smith for Keith Raniere who is

11   present with us at counsel table.  Good morning, Your Honor.

12         THE COURT:  Good morning, everyone.  Please be

13   seated.

14         Are we ready for the witness?

15         MS. PENZA:  Yes, we are.  I'm sorry, Your Honor.

16         THE COURT:  Okay.  Let's bring in the witness.

17         (Witness resumes the stand.)

18         THE COURT:  All right.  Please bring in the jury.

19         (Jury enters.)

20         THE COURT:  Please be seated.

21         Good morning, members of the jury.

22         THE JURY:  Good morning.

23         THE COURT:  All right.  Ms. Penza, you may continue

24   your examination of the witness.

25         The witness is reminded that she is still under

1    oath.

2                MS. PENZA:  Thank you, Your Honor.

3    DANIELA        ,

4         called as a witness, having been previously duly

5         sworn, was further examined and testified as follows:

6    DIRECT EXAMINATION (Continued)

7    BY MS. PENZA:

8    Q    Good morning, Daniela.

9    A    Good morning.

10   Q    Yesterday, when we talked about the night when you had

11   the first, the falling out with the defendant, during the

12   night of that fight, you described feeling like you were in

13   the right?

14   A    Yes.

15   Q    Would you continue to feel that way over the next several

16   years?

17   A    No.  As time went by, in, through -- I, I was

18   increasingly confused.  It became a little foggy in my head

19   what the actual issue had been that I wanted.  Something very

20   clear, it was very clean what the issue at hand was and as

21   time progressed, and it was years, through the coaching,

22   through the EMs, through the disciplining, through the e-mail

23   communications, I became increasingly confused.  Like, it was

24   no longer clear what the issue was.  Like, my program, losing

25   weight, doing book reports, everything, it got melded together

1    in this, like, snowball of problem that was at some point for

2    me very hard to distinguish.

3    Q    And when you say it was hard to distinguish, what was

4    that effect like on you?

5    A    Well, that, that state of confusion, of lack of clarity,

6    made it so I didn't know how to tackle it and there were words

7    described to me and to describe what I was doing that I didn't

8    really understand because I couldn't ground them into

9    anything.  Like, you need to fix your ethical breach.  You

10   know, at some point, what is it, me losing weight?  Is it --

11   you know, you need to fix your pride.  It was no longer as

12   clean as, you know, I don't want to be with you, I want to be

13   with him.

14         It was -- that clarity was completely lost, and at

15   some, at some points, I would, I wouldn't say regain it, but I

16   would -- like, I think through the pushing, I would push back

17   and I would try to, to regain it, but there was, there was a

18   tightly controlled environment around me.  There were people

19   who were coaching me.  There were the communications.  There

20   was a constant nagging over I'm bad, I need to do things, that

21   were not related to the issue, but that were coupled all in

22   the concept of ethical breach, of pride.  And so it came to

23   the point where the effect on me, it was impossible for me to

24   dissect it and I felt that I was bad, that I had done

25   something wrong, that really I had something that I needed to

1   fix.

2          So that state of confusion was effective on me, so I

3   ended up getting confused and I would say being talked into

4   these notions of something that I had done that had not been

5   at the beginning.  At the beginning, I had been clear and now

6   I was confused.

7   Q    During this time period, so we have -- so the time period

8   after your fight with the defendant, there is over three years

9   where you are not in the room but you're estranged from the

10  defendant and there's about two years when you're in the room,

11  is that right?

12  A    Yes, that's right.

13  Q    During that time period, did you ever consider just

14  leaving?

15  A    Yes.

16  Q    So can you explain that?

17  A    Yes.  There were many times, many, many times, both right

18  after the falling out, throughout, before the room, during the

19  room, but for the sake of clarity.  So when I decided to go,

20  there were, there were several, I would call them fences.  I

21  would call them, like, walls.

22          At first, I would be talked out of it so I would

23  come to the conclusion, you know what, I don't want this, I

24  didn't sign up for this, this is not something -- I want to

25  study.  I want a life.  I did not sign up to be in isolation,

1    you know.  Even if I was confused at some point, I'm sorry

2    what I did was wrong but I don't want this.  So there would be

3    the first layer.

4            The first pushback that I would be was, like, with

5    my coach, like, through an EM, what does it mean that you're

6    willing to destroy something, you're not going to fix it.  So

7    it was, like, I would call it more like an EM or you could

8    even say, like, friendly.  Like, you're talking to someone who

9    you trust and they talk you out of it.

10           Sometimes that was sufficient for me to change my

11   mind, but sometimes, many times, I was determined, like, I

12   really was sick of that life and I would push further.  I

13   would be, like, there's no way, you cannot talk me out of

14   this, I don't want this life.  And then it would become, same,

15   still just talking to someone, like, it would be my coach.  It

16   would be with someone else who was at the time might be

17   handling my program.  But then it was, like, I would say,

18   like, a stronger, a more solid wall of you can't leave, you've

19   destroyed so much, you owe us, you know, we brought you here,

20   you can't leave, you're a liability for us.  And I thought at

21   the time, that that was true.  You know, I didn't know how it

22   worked.  So I thought that if I left, I am illegal, I wouldn't

23   be the one to get in trouble, that I could actually get Keith

24   and ESP in trouble because they're the ones who brought me

25   here illegally and here's where I've been living and here's

Daniela - direct - Penza                           2699

1   where I've been working without pay, here's where I've been

2   existing.

3          So it went beyond through an EM or a pep talk, like

4   you can do this, you can fix it, I believe in it, to, ah, you

5   can't leave, you can't, you can't leave without having fixed

6   your damage, that's not right.

7          THE COURT:  How would -- tell me, an EM is an

8   exploration of meaning, is that?

9          THE WITNESS:  Yes.

10         THE COURT:  How would that work during that period

11  of time?  Why don't you talk us through how an EM would work

12  in that period of time.

13         THE WITNESS:  Okay.  Yes.

14         So, for example, in a session with my coach, she

15  would have me work on my pride.

16         THE COURT:  And the coach would be?

17         THE WITNESS:  Karen Unterreiner was my coach.

18         THE COURT:  Karen.

19         THE WITNESS:  So she was the person who was working

20  more heavily with me during that period of time.

21         And, you know, even talking about EM and pride was a

22  euphemism because that wasn't the problem.  It was just your

23  pride and you think you're right, you think you know better,

24  we're going to work on your pride.  So then it would be, you

25  know, a specific -- it usually started with, like, a specific

Daniela - direct - Penza                    2700

1    event or a specific feeling.  Like, you did this, that was

2    bad.  You know, that's your pride.  What does that mean?  What

3    does that mean about you?  What does that mean to you?  And it

4    would be a series of EM questions that they usually do.

5            I was never really good with EMs because I, I --

6    basically I went very honestly about them.  So what I believe

7    the EM was trying to do is manipulate me to a certain

8    conclusion.  Well, you know, compared to what you want to see

9    in the world, isn't this destructive?  You know, is that

10   really what, how you want to be?  Do you think that's what's

11   right?  And it would be very confusing to me because they

12   would bring in concepts that were foreign to me, that I had

13   not explicitly said that I wanted, and through the EMs, they

14   would try, Karen would try to demonstrate, you know, the

15   damage to Keith and I needed to fix it.

16           So it was a very confusing process where it didn't,

17   it wouldn't end with the problem that I started because the

18   problem that she started with was confusing to begin with.

19           THE COURT:  Did you ever push back on her

20   assumptions?

21           THE WITNESS:  Almost always and that was called

22   prideful.

23           THE COURT:  That also was called prideful by whom,

24   by Karen?

25           THE WITNESS:  By Karen and by everyone that she

1  reported to and everyone found out I was defiant and prideful.

2  Me not wanting, not willing to be humble enough to go through

3  the EM process and admit that I was wrong and I didn't know

4  everything, that was pride.

5            THE COURT:  I see.  All right.  Thank you.

6            Go ahead.

7            MS. PENZA:  Thank you, Your Honor.

8  BY MS. PENZA:

9  Q    So you were explaining, I think, what you've termed as

10 these levels of fences.

11 A    Uh-huh.  Okay.  So that was -- I was on, like, the second

12 one.  And I mean that's still just words, right?  That's still

13 just -- I'm telling you you can't go because you owe us and

14 that was, at times, effective because I wanted to do the right

15 thing.  I didn't want to hurt anybody.  So it, at times was

16 effective.

17            That second fence was effective for me keeping from

18 leaving, but sometimes I wanted to leave more than that, you

19 know, and that was, like:  Okay, I am so sorry.  You know

20 what?  I'm going to go to Mexico.  I'll get a job.  I'll wire

21 you some money for everything that I've done.  I'll just, you

22 know, I'll figure it out.

23 Q    Who are you saying this to?

24 A    I told that, I believe, to Nancy.  I said that to Karen.

25 I tried to negotiate that with my family when they were taking

Daniela - direct - Penza                    2702

1   care of my program.  So, the people in charge of supervising

2   me at the time which weren't many.  I didn't have a lot of

3   interactions.

4   Q    This idea of wiring them the money, what was that about?

5   A    Well, I owed them, right?  I owed them and there was this

6   unspecified I owed, I destroyed so much, I destroyed, you

7   know, I took Keith's time and I never did anything so I owed

8   them.  I didn't do book reports on time so I owed them.  I

9   never did my program and he had so many plans for me so I owed

10  them.  Like, I owed them for everything that I hadn't done and

11  I had destroyed which, again, there was this mass -- it

12  wasn't, oh, you owe us because you wanted to be with Ben and

13  that's how it started.  No.  No.  It was now this big,

14  unidentified, you owe us so much.

15          So in my confusion, I would say, in all honesty,

16  because I did become confused and I felt, like, bad, oh, my

17  God, I did everything wrong, I don't want this lifestyle.  My

18  thinking was, hey, I'll go to Mexico, I'll work really hard

19  because I can, and I'll make money, currency.  That's the only

20  way I can measure, like, being able to, all right, I'll give

21  you something, but it wasn't like I owed a specific amount of

22  money.  It was the other way around.

23          So, that's how I would make it work in my head, but

24  then after that first fence, then it became, like, an actual,

25  like, physical, logistical issue to leave.  Like, where, even

Daniela - direct - Penza                    2703

1  if I wanted to leave, I was illegally in the country and I

2  didn't have any money.  So even to think, well, ask my

3  parents, can you please give me money to buy a bus ticket.

4  No.  I could not leave.

5          So even when I did want to leave, there was no

6  possibility and there came a time after, after he stopped

7  talking to me, stopped writing to me, when he stopped writing

8  to me, it was a rapid progression of them taking all my

9  property, everything I owned, including my papers which were

10 in that little corner of property that I had.  So at that

11 point, I didn't even have no money, no means to go, no papers,

12 no identification of any kind, so it was truly impossible for

13 me to leave.

14         So at many times, it was floated around me, like,

15 well, you know, you should do this and, like, oh, you could

16 have just left.  That door was never really opened.  You know,

17 when that was brought up to me, I was, like, when I've wanted

18 to leave, I'm not allowed to, they won't let me, it was never

19 an option for me.  I did want to.  I did have, I would say,

20 moments of clarity when I realized that everything was just

21 getting worse and worse and I couldn't see the way out and

22 even with all the confusion, I gained the clarity of I need to

23 leave and I could not.

24 Q    Looking back, do you have any thoughts on this process of

25 the talking you out of leaving and then ultimately you not

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2704

1   actually being able to leave?

2            MR. AGNIFILO:  I object to the question, Judge.

3            THE COURT:  I'll allow it.

4            Go ahead.

5   A    I think that what I went through, specifically, in that

6   aspect, I was without a doubt captive from the moment I

7   became, I was illegal in the country and it became evident

8   only when I pushed and that's, as time progressed, it was very

9   clear to me that I could not leave.  So I think that what

10  actually was going on, that was their way to control me.  They

11  had that on me.  They had my ability, my freedom essentially,

12  and so I needed to do what they wanted me to do.

13  Q    When you say you had no money, is that literally no

14  money?

15  A    Yes.

16  Q    What would you -- I know that there is a progression here

17  but during that progression, what would you be doing for food?

18  A    At the beginning of that progression, there were odd

19  jobs.  There was, like, one job that paid me really well, I

20  made it last, but after that, I, I just did not have any money

21  and no way to get food so I would get food from my parents'

22  house.  When it got really bad, and I, and that is -- it gets

23  bad as it progresses.  When it got really bad and I had

24  nothing, at times, I took food from the Flintlock house and

25  even took change to, and money to buy food, enough to buy

Daniela - direct - Penza                    2705

1    food, but there was no way for me to make money in any way.

2    Q    Throughout the course of this, all of these fences that

3    you've been describing where there's people talking to you or

4    doing various things, are there any conversations with you

5    about the defendant's involvement in those actions?

6    A    Yes.

7    Q    Can you explain?

8    A    Yes.  I mean, it was all about Keith, with respect to

9    Keith, from Keith, there's no question about that, even when I

10   would talk to my coach, and that was, that was evident to me

11   before.  So there was a small lapse of time after the falling

12   out where we were not e-mailing back and forth, but I

13   immediately had people who were working on me.

14            Now, this, I knew that it was from Keith because I

15   had been around for three years in his life and I knew how he

16   worked on women and how he would handle those situations.  So

17   I knew that people were coming to me not because they were

18   concerned and they wanted to know what was going on.  They

19   were being sent to me to work on specific things and to get me

20   to do specific things, namely, go back to Keith, apologize,

21   say this, you should write to him.  All of those came from

22   Keith.  That's how I know, because of my experience.  But once

23   we started an e-mail communication, it was clear from what was

24   exchanged that he was the one giving the instructions to Karen

25   to work with me on something specific.  So this was all coming

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2706

1  directly from Keith and it was all about my issues with Keith.

2  Q     How about later once your family gets involved?

3  A     Once my family gets involved, I mean it, it -- my parents

4  themselves told me they would, at the time -- like, when they

5  were meeting with me, we would have meetings, my mother, my

6  father, myself, and they would say, Well, we talked to Keith

7  and he said this, and they would say, Well, you know, he

8  really cares about you, he's trying to help you, you're

9  really -- so it was -- they told me it was Keith who was

10  instructing them.

11         Many times there would be a situation and they

12  wouldn't know what to do with me and they would wait for

13  instructions from Keith.  These sometimes -- I never saw them

14  meeting with Keith.  I wasn't allowed out of the house.  At

15  that point, I didn't have any freedom.  But they told me they

16  met with him, they told me they met with Nancy and with Karen,

17  and many, many times, it would be my sister Marianna who would

18  come into the house with instructions from Keith.  So it was

19  very clear to me.

20         In fact, there was -- I mean, the last communication

21  that I had with him, from him to me, before he stopped

22  e-mailing and my parents took over my program, it was very

23  clear that he was going to keep monitoring and supervising and

24  that I could only talk to people that he approved of because

25  he was going to be giving them the instructions.

CMH        OCR        RMR        CRR        FCRR

1          So there's no question about that.  It all came from

2   Keith.

3   Q    We were going to look at some of the e-mails in a second

4   and we talked about some of the categories of e-mails.  I

5   think you told us that there were e-mails about Ben that you

6   exchanged with the defendant?

7   A    Yes.

8   Q    Were there -- and that there were also other sexual

9   e-mails?

10  A    Yes.

11  Q    Can you explain that a little bit?

12  A    Sexual e-mails, in general?

13  Q    Yes, with the defendant.

14  A    Right.

15          So there were sexual e-mails clearly about Ben and

16  he wanted to know all my interactions with him.

17          There were also sexual e-mails and I would

18  categorize them like romantic, sexual e-mails from myself to

19  Keith, him prodding me for that information.  So where I would

20  say that I loved him, that I had fantasies about him, I just

21  had a dream about you and I would describe it.  I would say I

22  miss you, I miss, and something sexual, maybe, because the

23  nature of the sexual relationship had been almost strictly

24  oral sex, unilaterally, like, maybe something, like, I miss

25  the way you taste, something obviously sexual in nature.

Daniela - direct - Penza                    2708

1    Why was I doing that?  Keith -- in, in the, the

2    e-mails where I say that I loved him and I say things that are

3    sexual, that may be to someone who does not see the context of

4    the situation might seem, like, well, she really wants to be

5    with him, she really loves him, she's like really struggling

6    to get back, maybe, but the truth is that there's a huge

7    context to this and that was -- I mean, that, if anything,

8    exemplifies my confusion.

9         But first of all, and I think very importantly,

10   these are things that Keith asked for, like, outright asked

11   for.  You should fantasize about me.  You should tell me, you

12   know, that you miss me.  You should write incessantly.  You

13   should always write.  You're not writing enough.  You know,

14   you should treat me with love.  So it was almost like an

15   instruction manual, the instructions he was giving me, but

16   also the nature of our relationship had been romantic and

17   sexual from the start really and it had been a manipulation

18   from the start.

19        So for me, for me, from the moment he stole my first

20   kiss and he took my innocence in that way, I had no other, I

21   had no other thing to compare it to.  And even, like, all the

22   oral sex he had me give him, that was normalized.  I didn't

23   know -- like, I didn't know what it was to be a woman in a

24   relationship.  I didn't know -- I thought -- my idea of it is

25   the role of a woman in a relationship is I have, I give him

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2709

1   pleasure and so I didn't know that that was an inordinate

2   amount of pleasure and it was not reciprocal and that is not

3   normal.  I mean, I'm not a sex-crazed person who wants to give

4   oral sex all the time.  That's not who I am.  That's not what

5   I wanted.  All of that is a slow manipulation.

6           And once I didn't want that anymore and we stopped

7   talking and then the communication resumes via e-mail, it

8   doesn't resume in that strong way.  Then it's something that

9   is a part of the confusion and the prodding and the harassing

10  of you want to fix this, this unnamed thing, you need to be

11  like this to me, and it was spelled out in a very clear way.

12  And I think that -- and part of it was that I still, I

13  still -- part of me still idolized Keith.  I still thought,

14  not completely but in a way, in a part, highly of him, that I

15  lost, I felt like I was losing my entire world in that moment.

16  I had all my hopes in that world and it was a great deal of

17  dependency that I had on this man my entire life.  My hope for

18  an education, my relationship.  My best friend was Keith.  I

19  had stopped talking to my mother.  My best friend was my

20  sister Marianna.  We didn't talk anymore.  So I had no

21  reference point.

22          So all the tools that I was using to navigate that

23  situation, which was my interaction with Keith, is what he was

24  telling me to do.  And I knew I was expected to say that and I

25  knew I was expected to do that and so I did.

CMH      OCR      RMR      CRR      FCRR

Sidebar                                                    2710

1  Q     During the time --

2           MR. AGNIFILO:  Your Honor, can we have a side bar

3  for a second?

4           THE COURT:  Sure.

5           (The following occurred at sidebar.)

6           THE COURT:  Okay.

7           MR. AGNIFILO:  The objection is that the witness is

8  going on for, at times, 5 to 10 minutes, nonstop, with a

9  narrative that's not linked to time, that's not linked to

10  individual people, she's saying "they," she's moving back and

11  forth through time, and the objection is I want to return to

12  questions and answers.

13           THE COURT:  All right.

14           MR. AGNIFILO:  And this witness is going on and on

15  and on.

16           THE COURT:  All right.  I understand your point.

17           Yes?

18           MS. PENZA:  Your Honor, I think that she was

19  responding to the question.  I think that there are points in

20  time where this is a complex story and she obviously has

21  insights into what happened and I think it makes sense to

22  allow her to speak.  I do think this is the end of -- we're

23  going to be turning back to Q & A right now.

24           THE COURT:  Well, I think it's important that we

25  focus, I agree with that, that it be focused on specific

Sidebar                                                                                    2711

1   questions and answers to specific events and so let's try to,

2   you know, rein in the focus a little bit here.  All right?  I

3   think that is a point well made.

4              MR. AGNIFILO:  Yes, Your Honor.

5              THE COURT:  Okay?

6              MS. PENZA:  Understood, Your Honor.

7              THE COURT:  Thank you very much.

8              (Sidebar ends.)

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                          2712

1    BY MS. PENZA:

2    Q    Daniela, during the time period when you were having the,

3    when we think about the time period where it's after the fight

4    and you're having e-mail exchanges with the defendant, during

5    that time period, do you ever see the defendant?

6    A    See him?  I saw him a few times.  I saw him from afar

7    when he was walking.  I think that's pretty much it.

8    Q    Okay.  And during that time period, you were still

9    spending time at 3 Flintlock sometimes?

10   A    Yes.

11   Q    Did you ever have an interaction with the defendant while

12   you were at 3 Flintlock during this time period?

13   A    Yes.

14   Q    Can you explain what happened?

15   A    Yes.  There was, I mean -- well, over a year after we had

16   stopped talking and there was e-mail communication and I would

17   still go to Flintlock -- I was still going to Flintlock.  I

18   was being asked to still, like, organize things and I would be

19   coming back and forth again, always like notifying and

20   scheduling to make sure that Keith wasn't there or they would

21   tell me Keith is not there.  And one time I was working there

22   organizing and doing some stuff and I fell asleep on the

23   couch.

24   Q    What happened?

25   A    I fell asleep on the couch and Keith walked in.  And I,

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                            2713

1   you know, I -- well, we hadn't spoken in a really long time

2   and I didn't want to violate his privacy so I just pretended I

3   was asleep.  You know, I did wake up.  I heard him come in.  I

4   think I saw him and I just -- I was on the couch.  I pretended

5   I was asleep.

6   Q    What happened next?

7   A    I heard a few noises, he did a few things, and I was

8   pretending I was asleep.  You know, I was playing dead,

9   pretending I was asleep.  And he walks up closer to me,

10  towards me.  I don't wake up.

11  Q    By "don't wake up," you mean you continue to pretend

12  you're asleep?

13  A    I continue to pretend, yes.  I don't open my eyes.  I

14  continue to pretend I am asleep and he comes closer and closer

15  to me and he pulls his pants down and he puts his genitals on

16  my face and I continued to pretend I was asleep.

17  Q    For how long were the defendant's genitals on your face?

18  A    Easily about ten Mississippi's.

19  Q    Did he move himself around on you?

20  A    Yes.

21  Q    Did you -- go ahead.  I'm sorry.

22  A    He did.  Yeah, he touched my face with his genitals and I

23  did not stop pretending I was asleep.  I just continued to

24  pretend until it was over.  He pulled back.  He pulled his

25  pants back up.  I heard a little bit more noise and as he was

Daniela - direct - Penza                    2714

1  leaving, I remember -- like, he left.  So I get up and as he's

2  leaving, I remember we made eye contact and I pretended I was

3  asleep again.

4  Q    In that, in that moment, did you have any interest in

5  having a sexual encounter with the defendant?

6  A    No, I did not.

7  Q    Did you later exchange e-mail correspondence about that

8  encounter with the defendant?

9  A    Yes.

10 Q    And can you just explain generally that e-mail

11 correspondence?

12 A    In the e-mail correspondence, I continued to pretend that

13 I had been asleep.

14 Q    Did you -- at that point in time, were you also at points

15 in time communicating sexual interest in the defendant?

16 A    Yes.

17 Q    Why?

18 A    For the reason I explained before.  I thought that's

19 what's expected of me.  I thought that's what he -- I thought

20 that's what he wanted.

21 Q    Did you want the defendant's genitals in your face while

22 you were asleep?

23 A    If I had, I would have woken up or I would not have

24 continued to pretend I was asleep.  No, I did not want that.

25 Q    You mentioned earlier that there was, I think you

Daniela - direct - Penza                    2715

1    described an e-mail from the defendant that marks a point in

2    time for you, is that right?

3    A    There's a final e-mail, yes.

4    Q    And what is the significance of that point in time for

5    you?

6    A    Well, it's the end of our e-mail communication.  He's

7    ending things completely.  For me, it marks the point where --

8    like, I never actually have any more communication of any type

9    with Keith, but it also is very significant because he, he, in

10   that e-mail, which is a very long e-mail, he spells out a set

11   of instructions.  It's the last e-mail but it's not an e-mail

12   where it means -- it might be confused.

13           It's not an e-mail where it says, Okay, Daniela,

14   that's it, you've really messed up, it's over, you go your

15   way, I go my way.  It's not a final e-mail like that.  It's an

16   e-mail where it says, I'm going to withdraw completely, you

17   have no more communication from me, I want all my stuff back,

18   but I will continue to try to help you, meaning you can't

19   leave and these are the steps and he spells out a set of

20   instructions of everything that I need to do which is actually

21   a very nice condensed form of what he had been instructing me

22   on for a long time before that via e-mail.

23           And after that, he cuts off all communication, but

24   part of the instructions is, you know, I need to be working

25   with someone on my program, someone that he approves, someone,

Daniela - direct - Penza                    2716

1    you know, he can oversee, that I have to continue writing, and

2    writing incessantly, any variance and, you know, the world

3    would end.

4              So it was a very specific set instance.  That was

5    the last communication I had from him.  That was, like, the

6    only guiding post in me trying to figure out what it is I

7    needed to do.

8    Q    Okay.  So now we're going to walk through some of the

9    e-mails up until that point in time.

10             MS. PENZA:  And just for a frame of reference,

11   Your Honor, may I have the ELMO just for the witness, please.

12             THE COURT:  Yes, you may.  Go ahead.

13   Q    Daniela, I'm showing you what's marked for

14   identification --

15             THE COURT:  Let me try this again.

16             MS. PENZA:  Okay.  Thank you.

17             THE COURT:  Why don't you just show it to her.

18             MS. PENZA:  Yes, Your Honor.

19   Q    Daniela, I'm showing you what's marked for identification

20   purposes as Government Exhibit 1575.  Are you familiar with

21   this document?

22   A    Yes, I am.

23   Q    And is this the e-mail that you were describing from the

24   defendant?

25   A    Yes, it is.

Daniela - direct - Penza                    2717

1           MS. PENZA:  Your Honor, the government offers

2    Government Exhibit 1575 into evidence.

3           MR. AGNIFILO:  No objection.

4           THE COURT:  All right.

5           MS. PENZA:  Thank you, Your Honor.

6           (So marked.)

7           THE COURT:  How do you want to handle it while we

8    have this fixed?

9           MS. PENZA:  I'm just going to ask the witness a

10   date.  Is it working?  It's not just for the witness.

11          THE COURT:  Let me see if it works.

12          No.  It's having a -- there's an electronic problem

13   and they're coming to fix it from IT, but so try to do without

14   for the moment.

15          MS. PENZA:  Yes, Your Honor.  This portion will be

16   heavily e-mail dependent so I did -- if we want to take a few

17   minutes, I can first speak to defense counsel and maybe at

18   least we can be efficient in terms of some of the e-mails, I

19   think we will probably be able to agree on admissibility, and

20   while we try --

21          THE COURT:  Well, we can just take a short break and

22   then I will have it fixed hopefully and then we can continue.

23          MS. PENZA:  I think that would be ideal.  I

24   apologize, Your Honor.

25          THE COURT:  Okay.  Let's take a short break.

2718

1          All rise for the jury.

2          (Jury exits.)

3          THE COURT:  The witness may stand down.

4          Do not discuss your testimony with anyone.

5          (Witness steps down.)

6          THE COURT:  All right.  We will take a short recess.

7          MS. PENZA:  Thank you, Your Honor.

8          THE COURT:  Thank you, everybody.

9          (Recess taken.)

10          (Continued on next page.)

Proceedings                                    2719

1    (continuing.)

2                      (In open court.)

3             (The Hon. Nicholas G. Garaufis, presiding.)

4       (The following occurs outside the presence of the jury.)

5             THE COURT:  All right.  Let's bring in the witness.

6             The ELMO has been rebooted, but we are not aware of

7    what the problem is so it may occur again.  We just do not

8    know.

9             MS. PENZA:  Understood, Your Honor.

10            THE COURT:  Just wait for the defendant.

11            (Defendant enters.)

12            THE COURT:  Yes.

13            MS. PENZA:  With your permission, we'll put copies

14   of all the exhibits by the witness stand.  In case there's a

15   problem, we can use those.

16            THE COURT:  All right.  Thank you.

17            (Witness resumes the stand.)

18            THE COURT:  All right.  Let's bring in the jury,

19   please.

20            (Jury enters.)

21            THE COURT:  Please be seated, everyone.

22            Members of the jury, we were able to make a

23   temporary fix, but I am not sure how long it will last.  If

24   necessary, we will go back to the old system of paper, of

25   having the witness look at paper rather than look at a screen.

SN        OCR        RPR

Proceedings                                    2720

1  It takes longer.  We try to be more efficient than that these

2  days, but we will try to make a more permanent solution.  I

3  just wanted to share that with the jury.  Probably that effort

4  will be made at lunchtime or after we finish for the day, so I

5  just wanted to let you know.

6              Okay, let's continue.

7              MS. PENZA:  Thank you, Your Honor.

8              THE COURT:  Thank you.  Are we on Government Exhibit

9  1575?

10             MS. PENZA:  Yes, I believe I moved it in.

11             THE COURT:  It's been moved into evidence

12 successfully.  Go ahead.

13             MS. PENZA:  Thank you, Your Honor.

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2721

1    **DANIELA**,

2         called as a witness, having been previously duly

3         sworn, was examined and testified as follows:

4    BY MS. PENZA:

5    Q    Daniela, I'm showing you what's in evidence as Government

6    Exhibit 1575 and we'll go back to this e-mail in a little bit

7    bus this the e-mail that you were describing as the last

8    e-mail?

9    A    Yes, it is.

10   Q    And it is from the defendant, Keith Raniere@yahoo.com?

11   A    Yes.

12   Q    To you?

13   A    Yes.

14   Q    Subject line is "Final"?

15   A    Yes.

16   Q    And the date is July 22, 2009?

17   A    That is correct.

18   Q    So at that time how long has it been since you've seen

19   the defendant in person -- I mean, spoken to the defendant in

20   person?

21   A    Almost -- well, it was -- in person?  November, 2006 to

22   July 2009, almost three years.

23   Q    Okay.  So now we'll go backwards in time to earlier

24   e-mails.

25            MS. PENZA:  Your Honor, may I approach the witness?

Daniela - direct - Penza                      2722

1          THE COURT:  Yes, you may.

2          (Counsel approaches.)

3          THE COURT:  You have shared this with the other

4  side?

5          MS. PENZA:  We have, yes.

6  BY MS. PENZA:

7  Q    Daniela, I'm showing you what have been marked for

8  identification purposes Government Exhibits 1593, 1594, 1595

9  and 1596.  Can you take a look at those documents?

10 A    (Reviewing.)

11 Q    And are those all e-mails from your e-mail account that

12 you've sent to various people that we've been talking about?

13 A    Yes.

14         MS. PENZA:  Your Honor, the Government offers

15 Government Exhibits 1593, 1594, 1595 and 1596 into evidence.

16         MR. AGNIFILO:  No objection.

17         THE COURT:  Government Exhibits 1593, 1594, 1595 and

18 1596, are received in evidence.

19         (Government Exhibits 1593, 1594, 1595 and 1596

20 received in evidence.)

21         MS. PENZA:  Thank you, Your Honor.

22 BY MS. PENZA:

23 Q    Daniela, I'm showing you what's in evidence as Government

24 Exhibit 1593.

25         (Exhibit published.)

Daniela - direct - Penza                    2723

1   Q     Can you see the e-mail?

2   A     Yes.

3   Q     And can you read this -- can you start at the bottom

4   first?  I think there's a forwarded message.  So can you read

5   the original e-mail first, please, beginning with the From

6   line?

7   A     Yes.  That's from me, my personal e-mail address, on

8   February 19, 2007.  Subject line "Update-O" and it's directed

9   to Karen Unterreiner, my sister and Lauren Saltzman.

10  Q     And what do you write?

11  A     I say, "Hello, everyone.  Reality check" and there's a

12  link.

13  Q     And what is a reality check?

14  A     Reality check is the practice of writing down everything

15  that one is doing, every determined amount of time.  The one

16  implemented with me was a 15-minute reality check.

17  Q     And can you read the next line?

18  A     "Book report" and it has a Google docs link to it.

19  "Consequences:  Things that go:  1, sweets; 2, walking; 3,

20  internet; 4, music; 5, life.  I finished my list of what I

21  want as well.  Monkey, please forward this to Puchi.  I don't

22  have her e-mail address (vivajness@gmail?)  All right.  That's

23  all for now.  Dani."

24  Q     Who is -- again Monkey is Mariana; is that right?

25  A     Yes, that's my sister.

SN        OCR        RPR

Daniela - direct - Penza                              2724

1   Q    Who is Puchi?

2   A    Puchi is a nickname that Mariana had for Pam Cafritz.

3   Q    What does this mean "by consequences"?

4   A    Consequences.  When I did something that I shouldn't have

5   or I didn't do my program, then that would mean I would lose

6   those things.

7   Q    And then so this e-mail is sent February 19, 2007 -- the

8   original e-mail, February 19, 2007 at 3:05 a.m.; is that

9   right?

10  A    Yes.

11  Q    And it's forwarded?

12  A    Yes, it is.

13  Q    And who is it forwarded to?

14  A    To Keith and Pam.  And Keith is the

15  kunterre@nycap.rr.com.  And Pam's address is

16  vivajness@gmail.com?

17  Q    I show you what's in evidence as Government Exhibit 1594

18  and at the bottom, is this the e-mail-- is this the original

19  e-mail that we just looked at that you wrote at 3:05 a.m. on

20  2/19/2007?

21  A    Yes, that's what it looks like.

22  Q    And then is there a response from Lauren Saltzman?

23  A    Yes.

24  Q    What does she write?

25  A    "Hi Bo.  I don't know if this is a potential list of

Daniela - direct - Penza                    2725

1  consequences, but I would tend to think" --

2          THE COURT:  You have to read more slowly so we can

3  get you the down.

4  A    "Hi Bo.  I don't know if this is a potential list of

5  consequences, but I would tend to think that walking is

6  something that is good for you.  To take it away as a

7  consequence would seem another breach.  I might consider

8  coming up with something else.  Also, not sure I understand

9  the life one, but I'm assuming you mean going back to Mexico?

10  Just wondering.  Hope you are well.  Call me later to say hi

11  and let me know how you are.  Love you, L."

12  Q    What was your understanding from this e-mail?

13  A    Well, to begin with, I -- you know, like, I had been

14  coached into setting these set of consequences so that there

15  would be an opposite of an incentive for me -- like a fear for

16  me to do my program.  And my understanding of this e-mail is

17  she is editing that.  She's giving me her opinion on the

18  consequences that I have set.

19  Q    Okay.  This idea, this sentence, "I might consider coming

20  up with something else," is that type of language something

21  that you're familiar with?

22  A    Yes.

23  Q    Can you explain?

24  A    Well, that looks like a pretty innocent sentence, but

25  that's a directive.

Daniela - direct - Penza                    2726

1   Q     And, here do you then respond to her?

2   A     I do.

3   Q     Lauren?

4   A     Yes.  I say, "Hey dude.  Thanks for your," I believe

5   that's misspelled, "suggestion.  I thought about it and shared

6   it with Gozer and we both" --

7   Q     Let me stop you for a second.  Who is Gozer?

8   A     Gozer -- that's a nickname for Karen Unterreiner.

9   Q     Was that a commonly used nickname?

10  A     It was commonly used only between Keith and the inner

11  circle and myself for Karen, yes.

12  Q     Okay.

13  A     Yes.  "I thought about it and shared it with Gozer and we

14  both think in my case walking is a big indulgence, but more

15  importantly it something I really would not like to lose so it

16  is a good motivation, I think.  Yes, the fifth is going back

17  to Mexico, ha ha.  I will call you this afternoon.  Bobi."

18  Q     So can you describe this dialogue at this point in time

19  about going back to Mexico?

20  A     Yes.  So, the set of consequences is anything that I

21  might indulge in, which is walking you might argue it's

22  something good, but it's something bad because I enjoy it.

23  And the dialogue about going back to Mexico is because there

24  is great meaning placed in me having all of my life in Clifton

25  park, in ESP, with the community in a future with Keith so

Daniela - direct - Penza                    2727

1   that the worst thing that would happen to me would be going

2   back to Mexico under a certain set of circumstances.

3   Q    And then Lauren continues back to you?

4   A    Yes.

5   Q    Now, you said earlier that you -- when something would be

6   said to you like "I might consider coming up with something

7   else" that that was taken as a directive.  Here how did you --

8   is it evident from this e-mail how you responded to what you

9   considered Lauren's directive?

10  A    Yes.  Yes.  So very clearly her directive is something

11  that I acted upon immediately and discussed it with someone

12  else, in this case Gozer.  So, yes.

13  Q    And she was your coach -- and Karen was your actual coach

14  at that point in time?

15  A    Yes, she was.

16  Q    And during this time period that we're talking about, you

17  continued to do book reports?

18  A    Yes, I did.

19  Q    I'll show you a few examples.  I show you what's in

20  evidence as Government Exhibit 1595.

21          (Exhibit published.)

22  Q    And this is -- is this an e-mail from you to you?

23  A    That is correct.

24  Q    At two different e-mail addresses that you were using?

25  A    Yes, I was.

Daniela - direct - Penza                    2728

1   Q    And do you remember this book report?

2   A    Yes, I do.

3   Q    And can you just -- can you give just a very brief

4   synopsis of this one?

5   A    Yes.  So this is a great book.  Also, it's a really big

6   work, Stephen Wolfram had a background in cellular automata.

7   So from this book same a very dense research into everything

8   that he was talking about because it was very innovative.  I

9   remember for this book I actually did a little bit of cellular

10  automata.

11  Q    What does it mean that you did it yourself?

12  A    Well, this book was in line with the systems books, but a

13  little bit newer, and many of the theories discussed involved,

14  like, self-organizing systems.  And, so, I actually ran the

15  coding in the, like, in a live demo to see how different

16  systems would organize themselves.

17  Q    And just quickly glance at this one.  I think you said it

18  was -- you said it was a big book?

19  A    I think it was over 1,000 pages.

20  Q    Okay.  And this is a 17-page, single-spaced book report?

21  A    Yes, it is.

22  Q    And were you paid for this?

23  A    No, I wasn't.

24  Q    Showing you what's in evidence, Daniela, as Government

25  Exhibit 1596.

SN        OCR        RPR

Daniela - direct - Penza                    2729

1              (Exhibit published.)

2    A    Yes.

3    Q    Are you familiar with this e-mail?

4    A    Yes.

5    Q    And can you -- can you begin reading this e-mail?

6    A    Yes, this is an e-mail from me.  My personal e-mail

7    address via my other than personal e-mail address.  To Karen

8    Unterreiner, who used the e-mail address mind4u@earthlink.net

9    on May 4, 2008 and there's an attachment, "O'Connor, Joseph"

10   and the subject line is "check in," smiley face.

11   Q    And then can you continue reading?

12   A    Yes.  "Hey, you are probably at the Jness module so I

13   will call you later.  BR" book report "is in the attachment.

14   Also, I am still detoxing.  Weight today stayed the same,

15   134.8.  In fact, look at the funny way my weight has been

16   changing through this fast.

17   Q    Were you -- and then -- I will let you continue.  Is

18   there then a list of weights?

19   A    Yes.

20   Q    And, do you know what increments -- is this daily?

21   A    This is daily.  So, at the time part of my program was

22   doing a fast.  I believe that was one called the master

23   cleanse where there's only, like, lime juice and pepper and

24   maple syrup in the water and that's all one can drink.

25   Q    Were you eating anything along with the drink?

SN        OCR        RPR

Daniela - direct - Penza                    2730

1   A    I was not.

2   Q    Are there any other aspects to the master cleanse?

3   A    Yes.  There's -- and how it -- yes.

4   Q    Can you explain how the fast works?

5   A    Yes.  So it's a very -- it's a very radical, I would say,

6   way to lose weight.  I think more commonly used to so-called

7   detox in alternative medicine.  So, the master cleanse works

8   you can only have one type of nutrient which is a drink where

9   you put lime juice and cayenne pepper and maple syrup.  That's

10  all one can have.  It lasts for 40 days.  Another very

11  important part of the detox is because when you're not eating

12  any fiber, my understanding is that your system gets messed

13  up, so one must drink in the morning, like, a big glass with,

14  like, I think, like, Epsom salts or something like that.  You

15  drink that and it's immediate laxative, but it's very -- or an

16  enema.

17  Q    So, can we just -- can you just walk down your -- can you

18  just read your weights off, please?

19  A    Sure.  Starting at 154.8, 151.6, 149.6, 148.8, 147.6,

20  146, 145.8, 147.4, 147.4, 147, 144.8, 144, 145, 144, 145.4,

21  145.4, 145.4, 142.4, 141.6, 141.6, 140.6, 141.4, 141.6, 140.2

22  141.2, 140.4, 140.2, 139.2, 138.8, 137.6, 136.6, 137.2, 135.6,

23  134.6, 134.8, ending with 134.8.

24  Q    And so does each one of these correspond to a number of

25  days?

1   A     To a day.  Yes.  Each weight is one day.

2   Q     So, can you just count how many days is this?

3   A     Sure.  36.

4   Q     In 36 days how much weight had you lost?

5   A     20 pounds.

6   Q     Turning to the second page of Government Exhibit 1596,

7   can you read the rest of the e-mail?

8   A     Yes.  "Weird, huh?  So I am hoping by tomorrow it will go

9   down again.  I will go out for another light job a little

10  later to try and speed things up.  I have only four days left

11  of this cleanse and then juices.  I will text you later

12  tonight.  Maybe, if you have time, I would like to talk to you

13  about the other thing.  Don't know what to call it, but have

14  been thinking about it a lot.  Talk to you later, D."

15  Q     Do you know what you were talking about in that last

16  sentence?

17  A     I don't remember.

18  Q     Okay.  During this time period, how much of a focus --

19  how much of a focus of the coaching is on your weight?

20  A     A lot of it.  I wouldn't say all of it because there was

21  pride and other things, but it was always a main focus.

22  Q     How was that explained to you?  How was its importance

23  explained to you?

24  A     At that point in time, it was explained as indulgence and

25  satiation.  So I was not losing weight because I was

Daniela - direct - Penza                     2732

1    indulging, I was satiating, but it had already morphed so much

2    over time where I did not sign up for the weight loss program

3    when I, you know, decided to be in a relationship with Keith

4    or went to ESP.  That's not what I had signed up for.

5              So it slowly morphed from Keith wanting me to lose

6    weight for sexual reasons and it stayed part of my program --

7    and that was -- that was justified, you know, because of

8    the -- not the mystical part, which I did not buy into, but,

9    yes, people who are not indulgent, you know, I guess, are

10   skinny and since then it just became, you know, affixed to my

11   goals program at all times.

12   Q    How often were you weighing yourself?

13   A    Several times a day.  I become ridiculously attuned to

14   when I drank water, how much I would gain weight, when I went

15   to the bathroom how much I would lose.  I was trying to time

16   my weigh-ins so it would be the lowest possible.  It was

17   obsessive.

18   Q    Could your weight be asked of you basically at any time?

19   A    Yes.

20   Q    By whom?

21   A    By Keith, by my coach.

22   Q    Attached to that same e-mail was another book report; is

23   that right?

24   A    Yes.

25   Q    Okay.  What book report was this?

SN      OCR      RPR

Daniela - direct - Penza                           2733

1  A     The Art of Systems Thinking.  This is a much simpler one.

2  This was easy to digest.

3  Q     Five, single-spaced pages?

4  A     That's what it looks like, yes.

5  Q     And were you paid for this?

6  A     No.

7           THE COURT:  Were you ever paid for a book report.

8           THE WITNESS:  No.

9           MS. PENZA:  One second Your Honor, please.

10          (Pause in proceedings.)

11          MS. PENZA:  Your Honor, the Government moves into

12  evidence Government Exhibits 1532, 33, 34, 35, 36, 37, and 38

13  as well as Government Exhibit 1530, all on consent of the

14  defendant.

15          MR. AGNIFILO:  That's correct.

16          THE COURT:  All right.  Government Exhibits 1530,

17  1532, 1533, 1534, 1535, 1536, 1537, and 1538 are admitted into

18  evidence on consent.

19          (Government Exhibits 1530, 1532, 1533, 1534, 1535,

20  1536, 1537, and 1538 received in evidence.)

21          MS. PENZA:  Did you say to continue, Your Honor?

22          THE COURT:  Please continue, yes.

23  BY MS. PENZA:

24  Q    Now, Daniela, at some point after those e-mails that we

25  just looked at you began corresponding with the defendant?

SN        OCR        RPR

1    A    Yes.

2    Q    I'm going to show you what's in evidence as Government

3    Exhibit 1532.

4         (Exhibit published.)

5    Q    And is this an e-mail chain that ends on June 10, 2008 at

6    10:28 a.m.?

7    A    Yes, it is.

8    Q    And it's an e-mail chain between you and the defendant?

9    A    Yes, it is.

10   Q    Starting with the last e-mail in the chain it starts at

11   the very bottom of this page on June 10, 2008 at 5:40 a.m. is

12   that an e-mail that is from you to the defendant?

13   A    Yes.

14   Q    And can you begin reading it for us?

15   A    Yes.  "Keith, I am sending this only to you because there

16   is content weaved all over which I don't want to involve Karen

17   into.  I understand this is a big load, which you don't have

18   to take.  If this is too much, I understand.  I don't mean to

19   push this on you in any way.  I can try to figure it out on my

20   own.  I hate that I have put you in a situation where you need

21   to break the ethical boundaries you have set.

22        "Much of this plan I have been setting up for a long

23   time now.  I understand now there are many ways in which I

24   totally missed, two ways specifically, telling Ben my feelings

25   for you and disclosing all about what I was going through.  I

Daniela - direct - Penza                          2735

1    did the first one because it felt right, because I wanted to

2    honor your position in my life all I could.

3          "I choose to go the way of full disclosure for two

4    reasons; one completely wrong and the other I thought right at

5    the time.  1, a way to bond with him (indulging in forming a

6    relationship with him, get attention which is my problem).

7    And, 2, it seemed to me the only way for me to help him

8    understand where I was at so he wouldn't make incorrect

9    judgments of you and the people helping me."

10   Q    Do you have an understanding of what prompted you to

11   write this e-mail?

12   A    Yes.

13   Q    Can you explain?

14   A    Yes.  On this, and I hear so much words in here, I've

15   been heavily coached already.  So already people have been

16   intervening and telling me, for example, ethical boundaries.

17   I would say, well, why won't Keith talk to me.  After the

18   fight why won't he talk to me?  We're not finished.  He's

19   setting an ethical boundary.  So that's already me being

20   heavily coached and the disclosure, the encouragement to reach

21   out to him, to write.  That's also something that I was

22   coached into, you know.  I had been working on this plan for

23   very long.  I wasn't working on that plan alone.  That was a

24   plan that was pushed on me.  You need to work on this.  You

25   need to do that.  You need to set up a plan.  You need to

SN        OCR        RPR

Daniela - direct - Penza                    2736

1    address these things.

2            So all of this is a culmination of a period of time

3    where I wasn't talking to Keith, but Karen was coaching me

4    through that.  Pam was talking to me about it so this is --

5    this is not -- you know, a voluntary spontaneous, I've been

6    thinking what happened.  I'm going to send you this e-mail.

7    The mere act of sending of the e-mail is coached and every

8    content of this has already been gone through with me by

9    people before many, many times.

10   Q    This idea that you -- you missed by telling Ben your

11   feelings for the defendant, what is that concept?

12   A    Totally missed is I totally failed at and that I should

13   not have told Ben what was going on and that -- that became,

14   later on, part of my ethical breach and part of what I needed

15   to fix and so even at that point it had been made evident to

16   me that I should not have done that.

17   Q    What is it -- when you say that you made some -- you

18   provided some information to Ben, how full was your disclosure

19   to Ben?

20   A    Not full, enough.  It was very -- we didn't have a lot of

21   interactions to begin with and it was just very -- it

22   wasn't -- it wasn't -- it wasn't thorough at all.  I may have

23   let him see something or told him something, but it wasn't --

24   it wasn't a big -- I didn't give a big rundown of what had

25   been happening.  It may have been just a comment.

Daniela - direct - Penza                    2737

1   Q      And then you go on to provide four categories?

2   A      Right.  "Anyway, here it is in four categories:  1, my

3   relationship with Ben.  Given the amount of knowledge Ben has

4   about my issues, I think following the current path of

5   near-full disclosure I have with him is best.  I can talk to

6   him about my decision not to indulge such behavior in general

7   and more specifically in my interactions with him.  This, of

8   course, coupled with a radical change in my behavior I will

9   not indulge in any interaction where the desire to indulge or

10  get attention is present.  Of course I think this will

11  eliminate most of the stuff we share now.  I can only think of

12  two exceptions:  1, where there is true caring desire to

13  share.  2, technical stuff (programming type stuff.)  I think

14  he cares enough about me that he will understand and respect

15  that.  This I can handle from my side (meaning I think myself

16  capable of doing the necessary work to be able to distinguish

17  between indulgent interactions and non-indulgent

18  interactions ).  I have thought about the fact that his

19  interpretation of our interactions, even if carefully selected

20  in my end, is beyond my control.  There may be a good reason

21  to stop all interaction.  Only I am not sure he will interpret

22  such a thing in the way I mean it, even if I talk to him.  I

23  imagine it would seem extremely contradictory to him (this is

24  the part where it is extremely difficult for me as well.  I

25  don't want to lose my friendship with Ben and I don't want to

Daniela - direct - Penza                    2738

1    hurt him.  It seems this way to go would cause both things yet

2    in some ways it seems the only way to stop all damage ).

3            "Now, I know Karen said that a radical change in the

4    opposite direction might be just as damaging to both you and

5    Ben."

6    Q    Let me ask you to stop there.  What does that mean?

7    A    That means -- I mean, Karen is the one who has been

8    talking me about all of this and what I need to do and I'm

9    damaging Ben and I'm damaging Keith and I'm damaging everyone

10   and this is my ethical breach which is precisely why I'm

11   writing all of this and that there is such an absurd

12   dissection of the small parts of who knows what and knows who

13   should do what.

14   Q    So can you continue reading, please?

15   A    "I know that Karen said a radical change in the opposite

16   direction might be just as damaging to both you and Ben for he

17   might interpret it as an order coming from elsewhere (possibly

18   you) not me."

19   Q    What is that concept?

20   A    Well, it's obviously not come from me.  It's coming from

21   Keith through Karen.  So, like, there was a very intense focus

22   on precisely making it look like it wasn't that way.

23   Throughout the time that was going to come, part of my breach

24   is that people saw me as a victim.  You know, so I was

25   crossing that so I needed to make it seem like I wanted to do

SN        OCR        RPR

Daniela - direct - Penza                    2739

1  that.  They needed to make it seem like I was bad.  You need

2  to make people think that because otherwise they're going to

3  think that it's coming from me.

4  Q    All right.  Continue, please.

5  A    Not me.  I am inclined to think this doesn't apply now

6  that you are aware of the amount of disclosure I have had with

7  him.  Also, quite honestly, I do not think Ben is interested

8  in a relationship with me at this time.  I think he is aware

9  of his participation in my issues and aware of his own

10  deficiency and his feelings towards me.  (He likes my

11  attention) and has decided to take care of this in himself and

12  I have made it clear I want to fix my side of things.

13          "Number 2, Ben's image of you.  He may not know the

14  details of the situation that got me in the present state but

15  I have told him the disclosable destructive things I have

16  done.  He knows about all the indulgence and the lying, the

17  sneaky behavior, the anger, the meanness and the pride, the

18  entitlement, the list goes on.  So I hardly" --

19  Q    Can I stop you for a second?  That list of words, what is

20  that?

21  A    Those are all the -- that's all that's -- I have no --

22  that's all that has been hammered into me about who I am, what

23  I did and what this was.  That's the only way and clear way I

24  can say it.

25  Q    You can continue.

Daniela - direct - Penza                          2740

1  A    "The list goes on, so I hardly think he would consider me

2  a victim (and you a victimizer)."  And there it is again.

3  That's a constant example of the focus on, that people think

4  what I do might get back to it being an instruction from him.

5  "To be more specific, this idea of how things have developed

6  (based on what I have told him and he perceives from other

7  sources) is.  I was pretty close to you at some point in my

8  life but I fucked up royally.  You tried to help me, but I

9  pushed you away.  So, fuck up after fuck up and pushing people

10 away every time (which he has witnessed) I ended up where I

11 am, where you are, still trying to help me get through my

12 issues through other people, if from afar and I have made much

13 progress (considering) recently thanks to that help.

14        "I have also shared some of my experiences with you

15 and it is my perception he thinks extremely highly of you.  I

16 have been making a very conscious effort to make sure he has

17 the right idea about you for a long time now.  If he is weird

18 around you, the only reason I can think of, and I doubt it is

19 a real reason, is if he thought you were competition.

20 Q    Can you -- can you explain why you're including this --

21 this paragraph about your perception of Ben's perception of

22 the defendant?

23 A    Yes.  So this is -- this is centered around the idea of

24 thought object and fixing someone's thought object.  So this

25 looks like a well-hammered in plan of all the things I've

SN        OCR        RPR

Daniela - direct - Penza                    2741

1    caused damage in and how I'm going to approach all of them and

2    this one is specifically is regarding how Ben might now see

3    Keith.  That's why it says, "I've been trying to build you up

4    and tell him that you're good, and also the thought object of

5    what he thinks about him so I may address those damages."

6    Q    And then number three?

7    A    "Ben's image of you and me as an us.  He is not aware we

8    had a romantic relationship.  Unfortunately for me, I don't

9    think there is anything I can do to save this.  I dishonored

10   our relationship and I think it is best for him not to know

11   any of it.  So, in his mind I was never with you plus I never

12   dishonored us.  He does know I have feelings for you and that

13   I am not interested -- and that I am not interested in a

14   relationship with him.  These two are not necessarily related.

15   I think in his mind I don't stand a chance with you.  If he

16   feels you are competition (which I don't think he does, I may

17   be wrong) it is because I expressed my feelings towards you.

18   That may have been a big mistake, but I also want him to know

19   where my heart is.  I don't think I can reverse this.  I don't

20   think I want to."

21

22              (Continued on the following page.)

23

24

25

SN        OCR        RPR

Daniela - direct - Penza                    2742

1  EXAMINATION CONTINUES

2  BY MS. PENZA:

3  Q    And then number 4?

4  A    Four:  Dishonor to Ben and Megan's relationship.  It's

5  terrible, but I think if she doesn't know anything about what

6  happened, I think it is best to keep it that way.  I didn't

7  think of this before at all, but perhaps the best and only

8  thing for me to do is to talk to Ben about it, ask him if he

9  wants -- if he was with her at the time, let him know I regret

10  participating in dishonoring that relationship and point out

11  that he should look at that himself.  That is all.  Dani.

12  Q    Who is Megan?

13  A    Megan had been Ben's girlfriend.

14  Q    To your knowledge, was she with Ben at the time that you

15  and Ben were interacting?

16  A    To my knowledge she was not, but that didn't stop them

17  from putting it in the file of my ethical breaches.

18  Q    So what do you mean by that?

19  A    Well, clearly, part of the dishonor that I needed to fix,

20  an ethical breach that I needed to fix now was, even though I

21  wasn't sure and I'm clearly saying here I could ask him if he

22  was with her, but I thought he wasn't.  I knew he wasn't.

23  But -- so I don't know if I have emphasized this enough, but

24  this is a product of coaching.  These words are not my own to

25  begin with; they're written by me, but I remember sitting in a

SAM        OCR        RMR        CRR        RPR

Daniela - direct - Penza                      2743

1    diner with Karen, the 78 Diner -- the 79 Diner, and going over

2    it night after night and her telling me:  You know it's really

3    bad.  You know Ben has said things.  You know, now the

4    competition things, he will see he's that competition.  You

5    know, you need to -- how are you going to fix this, and maybe

6    I sat there saying, well, I don't even know how to approach

7    this, this is not something I want to fix in this way.  It was

8    so clear to me:  Oh, no, no, no, now she thinks ill of Keith,

9    you know you need to fix that, that ethical breach and the

10   dishonor.  Then what about Megan, what about this?  So a plan

11   starts taking shape and that coaching, that's how it works.

12   And then culminating with you should write your plan, you

13   know, you should -- you should -- you should communicate it to

14   Keith.  You know, you have to start fixing it.

15   Q    Okay, so you -- we looked at -- you had written that

16   e-mail on June 10th at 5:40 a.m., and then do you have a

17   follow-up e-mail at 6:02 a.m.?

18   A    Yes, that's what it looks like.  It says, from me to

19   Keith, at Flintlock:  I will be checking my computer every ten

20   minutes just in case.

21   Q    Do you have a recollection of why you were saying that?

22   A    I mean I think that I was encouraged to write that e-mail

23   and I knew I was to expect an e-mail back.

24   Q    And then, the next one, is that an e-mail back from the

25   defendant?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                          2744

1    A    Yes, it is.

2    Q    Can you read it?

3    A    Yes.  It says:

4              I think you have missed a lot.  I think you are

5    still trying to balance things.  I think until you understand

6    the true nature of your relationship with Ben and its values,

7    and what it has destroyed, you cannot really understand the

8    thought object basis of the destruction.  In this situation

9    balancing hurts, it's a cover-up.  Do you understand what you

10   have destroyed?  What sort of hurt is this?  Was/is this in

11   the name of not hurting Ben?  Although this might seem

12   disjoint, when was the last time you were with Ben kissing?

13   More?  Have you ever had an orgasm with him?  Do you feel you

14   should support dishonor?  How should Ben honorably repair what

15   happened with Megan?

16   Q    Here, this e-mail from the defendant, what is your

17   understanding of his response?

18   A    Well, first thing to notice is that it's completely in

19   line with what I have already been coached into thinking and

20   saying, so it's in the exact same line of thought.

21   Q    What do you mean by that?

22   A    Well, all of the notions that he gets back to me with

23   here are notions I already presented in my initial e-mail,

24   which were notions I had been working on with Karen, which

25   were clearly coming from him.

Daniela - direct - Penza                              2745

1    Q    So what are examples of that?

2    A    An example of that -- well, the thought object is a very

3    clear one.

4    Q    So that's right here (indicating)?

5    A    Uh-hum.  You cannot really understand the thought object

6    basis of the destruction.  And in a general term, that I have

7    to understand the true nature of my relationship with Ben,

8    which is something that I mentioned in the e-mail prior.

9              Then there is a series of questions about

10   destruction, destruction to me; do you understand what I have

11   destroyed, which is, you know, important to note is that there

12   is a hurdle that's been jumped here already and it's no longer

13   a discussion about, oh, you want to be with Ben.  Now it's

14   just bad.  It's bad you wanted to be with Ben.  It's bad what

15   you feel about Ben.  You're destroyed by the mere act of just

16   being interested in him.

17             So that hurdle might seem subtle, but that's already

18   been jumped through all the coaching and all the sessions, and

19   now I'm thinking all I did was bad.  I destroyed -- I

20   destroyed what?  So now in the path of being coached through

21   understanding what I have destroyed.

22             And I mean, at the very end, it's just the beginning

23   of what would become a nightmare of questions about incessant

24   detail, about the actual relationship with Ben and details

25   about what happened, what we said and what, you know, what was

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2746

1    experienced.

2    Q    And then -- and would you continue to give responses to

3    the defendant's e-mails like this?

4    A    Yes.

5    Q    And then, here -- we are going to move on to another

6    e-mail chain in a second, but your response to that e-mail

7    from the defendant, it starts June 10th, 2008, at 6:42 a.m.?

8    A    Yes.

9    Q    And can you just --

10   A    Yes.

11   Q    -- read the beginning?

12   A    I need to think more deeply about the first paragraph.

13   So I will answer your last questions first:

14              Last time I was with Ben kissing was many months

15   ago, it was 2007.  Not really sure even what month, but I

16   think towards the end of the year, maybe October.  It was in

17   his car and it was just kissing.  I never had an orgasm with

18   him.  He put his hand on me twice in separate occasions.  I

19   would say we got physical about seven times total.  I did not

20   want to support dishonor in any way, but having dishonored so

21   many things already, it is hard for me to think of the best

22   way to move forward honorably without destroying more.  I

23   guess -- I guess I have to decide if honor at all times under

24   any circumstances is always best.

25              If I wasn't part of the situation, I would think

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2747

1   what Ben should do is come clean with Megan, be honest about

2   what he has done and how he feels about it.  I think her being

3   his partner, he owes her that.  Of course, being in the

4   situation, I feel I would rather she didn't know, but perhaps

5   this is selfish on my part.

6   Q    And then, fair to say you and the defendant continued to

7   go back and forth on these honor concepts?

8   A    Yes.

9   Q    And then I just want to go -- we'll just move on, just in

10  this same e-mail chain, moving to some e-mails between 8:52

11  a.m. and 9:42 a.m.

12              (Exhibit published.)

13  BY MS. PENZA:

14  Q    Starting here (indicating.)

15  A    Uh-hum.  The e-mail from Keith to me?

16  Q    The question that's kind of back and forth --

17  A    Uh-hum.

18  Q    -- relating -- ending with the defendant saying:  When

19  did this happen?

20  A    Uh-hum.

21  Q    And you responding:  A couple months ago.

22  A    Yes.

23  Q    Can you -- can you just look at that and explain

24  what's -- what's going on there?

25  A    Yes.  So he writes to me, like, doubting that I can fix

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                      2748

1   the dishonor, which is what I'm writing to express.  I'm

2   writing to express I want to fix what I've destroyed, figure

3   out what I've destroyed, this is what I want to do.  And he

4   writes back:  Well, you know, you've said this.  You know, how

5   will you do it?  So he puts it in doubt.

6           And then I reply and I say -- it's actually quite

7   unclear.

8   Q    Well, let me move on then to -- let me move to 9:20 a.m.;

9   in this e-mail from you to the defendant, you are responding

10  to an e-mail at 9:17 a.m. --

11  A    Right.

12  Q    -- from the defendant?

13  A    Right.

14  Q    He says:  Explain what happened on this day?

15  A    So the gist of it is he's saying, well, why -- why are

16  you gonna fix this?  How are you going to fix this now, if

17  you've never done anything before?

18          Then he asks me specifically, you know, when I

19  decided that.  And I -- he asked me for the date, you know,

20  when I made that decision, just a long question, and then to

21  explain what happened on that date, which is this last e-mail.

22  Q    Can you read this e-mail starting with "I"?

23  A    Yes.

24          I had a sourcing, a pride sourcing, I was told.  I

25  don't know what else to explain that was particular to this

Daniela - direct - Penza                                    2749

1    day, but if what you're wondering about is the origin of this

2    understanding or how it came about, then the journey is much

3    longer than the simple events of that day.

4    Q    What is a sourcing?

5    A    A sourcing is like a special type of exploration of

6    meaning that, as I understood it, was so an EM, exploration of

7    meaning.  It's a series of intellectual questions; what does

8    this mean to you, what if you didn't have it, what it means in

9    your life.  So it's a series of questions.

10            In a sourcing, as I understand, what differs is that

11   it's about feeling.  So this is a very interesting exploration

12   because sometimes they will grab -- they will grab into a

13   memory and would ask questions like -- like, you know, oh,

14   it's just that I feel fear.  Where do you feel the fear?  I

15   don't know, I feel it -- like I shake everywhere.  Well,

16   describe it, like where exactly; and they would zone in.  I

17   feel it in my shoulder, it feels sharp.

18            Well, what memories does it elicit?  So it was like

19   very feely, unexplored; to me, a very illogical process where

20   it was just arbitrary and random.

21   Q    Do you remember having sourcing?

22   A    Yes.

23   Q    And who would perform those?

24   A    Karen.

25   Q    And do you have any -- what was the point, in your mind,

Daniela - direct - Penza                2750

1   of the sourcing?

2   A    The point was to arrive to an understanding.  The point,

3   as I understood, was to resolve something.  There's something

4   wrong and you need to resolve it.  So the pride sourcing, I

5   remember very vaguely -- but there was new curriculum coming

6   out all the time, so the pride sourcing was a very specific

7   type of sourcing directed at, you know, I guess resolving

8   pride and so that's what it was.

9   Q    So now, this e-mail chain, this ended on June 10th, 2008

10  at about 10:30 a.m., is that right?

11  A    Yes.

12  Q    I am showing you what's in evidence as Government

13  Exhibit 1535.

14           (Exhibit published.)

15  BY MS. PENZA:

16  Q    Is this an e-mail chain that ends on June 11th, 2008 at

17  8:54 p.m.?

18  A    Yes, it is.

19  Q    I am going to turn to the first e-mail in the chain.

20           And is this an e-mail written from you to the

21  defendant in the evening of June 10th?

22  A    Yes, it is.

23  Q    So this is the same day that we were just looking at on

24  the other chain?

25  A    Yes.

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2751

1   Q    And here, can you just explain generally what you're

2   doing in this e-mail?

3   A    This -- this looks like -- like an ethical breach plan.

4   Like a plan to fix all the things that I'm accused of

5   destroying.

6   Q    And can you start reading it for us?

7   A    Sure.  Keith, this is the plan that I think results in

8   the least amount of damage --

9            THE COURT:  You have to read more slowly.

10  A    Keith, this is the plan that I think results in the least

11  amount of damage, as far as I can see.  I have a very hard

12  time finding a way around the most straight-forward honorable

13  thing to do with respect to the issue with Megan.  I think at

14  this point that, given the way my relationship with Ben was

15  formed and continued for a long time, there is no way I can

16  continue the kind of interactions that exist without

17  propagating implicit support of the thought objects that were

18  present and involved in its formation and existence.  And this

19  is dishonorable for every one of us; you, me, him and everyone

20  else.

21  Q    So what thought objects are being talked about there?

22  A    The thought object -- the ones that I think were

23  mentioned in the first e-mail; the thought objects of Keith

24  and the thought objects of him and me and -- Keith's really.

25  Q    Okay.  Continue, please?

Daniela - direct - Penza                    2752

1    A    So the way I see there are two options.  One, stop all

2    communication/interaction.  This effectively stops all

3    destructive behavior, but doesn't fix much.  It also makes me

4    dishonorable and a liar, in parenthesis, possibly a victim,

5    end of parentheses, in his eyes, for I have expressed my fear

6    for his well-being to him, and this action would be

7    contradictory to him since I don't think he understands how

8    this would actually be healthier for him than keep interaction

9    with me in the way we do.

10              Additionally, he would probably attribute my actions

11   to some kind of external control, parenthesis, you, which

12   would destroy his image of you and which he would then spread

13   around.

14              Also, it leaves me with no influence over his

15   perception of you -- which I may not have at all in that

16   direct verbal way, but I do think that in having direct

17   interaction with me there is a better chance he can interpret

18   my actions and their context more accurately.

19              In general, this option feels a little like a

20   hit-and-run.  I got him into this, I can't just run away from

21   it as soon as I see it isn't best for me and the way I think

22   things should be.  I feel I should try and help him out of it.

23   Also, I cannot think of a single way in which he would

24   interpret this in a nondestructive way with respect to you.

25              The second way is far more delicate in its

Daniela - direct - Penza                    2753

1  execution, but much better if I succeed at it.  In this
2  situation the focus/goal I have is to act honorably towards
3  myself, you and him.  I think my only shot at doing this is
4  not by ending all interaction with Ben, but rather by changing
5  the form of the interaction completely.  This would require
6  for me to be completely clear on the behaviors and completely
7  consistent in the way I act from this point on towards him.

8         I think that, in seeing a change in me, I can see
9  now in more detail why you were asking about his
10 representation of what sparked this change.  He may be able to
11 see me as a completely different person, and thus not expect
12 the types of things he must still expect from me based on the
13 relationship we have had in the past.  Also, if I change in a
14 way that he considers positive, right in front of his eyes, he
15 may also begin to repair the image of you and what you have
16 done for me.  This is very much up to him and it seems all I
17 can do to help this happen is this very thing; change
18 positively.
19 Q    And, Daniela, are these concepts the same type of
20 concepts you described earlier?
21 A    Yes.
22 Q    And we won't go through every line of it, but then you
23 provide a third option where you would make yourself
24 completely undesirable to Ben?
25 A    Uh-hum.

Daniela - direct - Penza                    2754

1    Q    In every way, is that right?

2    A    Yes.

3    Q    And this is all a back-and-forth about how you are going

4    to act with Ben, is that right?

5    A    Yes.

6    Q    At this point in time, what are your concerns about this

7    plan as to Ben?

8    A    At that point in time -- I mean, at that point in time I

9    care about Ben.  I -- I never intended to be disingenuous

10   about that or dishonest, and I think I'm very explicit

11   throughout.  I think I lost it as time progressed.  I lost

12   that clarity, but I -- I -- you know, I cared about him.  I

13   was -- I was working very heavily with Karen in all these

14   things about how I had damaged Keith and how I had damaged --

15   and I was buying into it.  I think one can read the e-mails

16   and can clearly see how I was buying into it, and I was buying

17   into how destructive I was and even that the relationship I

18   had with Ben had been destructive, but I -- I still very much

19   cared about him.

20   Q    Okay.  I want to move on to an e-mail from 8:06 p.m.,

21   from the defendant responding to your e-mail.

22             (Exhibit published.)

23   BY MS. PENZA:

24   Q    And the defendant writes:  As you know, eighteen months

25   ago we spoke of these strategies.

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2755

1    A    Uh-hum.

2    Q    Do you know what he means there or what is your

3    understanding of what --

4    A    Yeah, I think that when I had that, like, almost kiss

5    with Ben, yeah, like he told me I needed to fix it and I

6    needed to, like, do certain things and that's the part I may

7    have just completely ignored.

8    Q    And then it goes on:  This is the one we had decided upon

9    eighteen -- there is a strategy that is mixed between 2 and 3:

10   This is the one we had decided upon eighteen months ago, and

11   you executed the opposite of this.

12              Do you know what that means?

13   A    That I continued my relationship with Ben.

14   Q    And then:  It depends on your real opinions and feelings

15   for Ben.

16   A    Yes.

17   Q    And so what is -- I think you may have described this

18   earlier, but there is a concept that you are choosing your

19   feelings for Ben?

20   A    Yes.

21   Q    Is that right?

22   A    So -- and that gets to like the core of it, that what I

23   felt for Ben was -- was my pride and indulgence manifesting,

24   in so many words.  That it wasn't real, that one decides those

25   things, and that I was deciding to be indulgent.  That I

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2756

1  didn't like Ben; I liked the attention that he gave me.  So

2  there was an effort to deconstruct every single thing that I

3  had liked about him to disprove that it was real.

4  Q    And then, continuing the e-mail, defendant continues on?

5  A    Uh-hum.

6  Q    And then can you read, starting with this paragraph

7  (indicating) beginning with "with"?

8  A    With respect to Ben and others, I think you underestimate

9  this damage by a great deal.  I suspect you ignore what has

10 happened with your brother and others.

11 Q    Can you stop there.

12       What was your understanding of what that meant?

13 A    That their thought objects had been affected.

14 Q    Their thought objects of the defendant?

15 A    Of Keith, the perception of Keith.

16 Q    Can you continue?

17 A    For the future, as I said in the past, the most damaging

18 thing is Ben's belief or knowledge of your feelings for him or

19 that you did have feelings for him.  The existence of this

20 leads to the biggest most damaging problems of all.

21 Q    What is your understanding of that?

22 A    I mean, my understanding of that then and now is

23 different.

24 Q    Can you explain what your understanding was then first?

25 A    Yes.  So my understanding then was actually more a desire

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2757

1   to understand.  I wondered what damage and I earnestly

2   embarked on trying to figure it out.

3           My understanding of it now is that he didn't like

4   that I liked Ben and that I had liked him, that Ben knew and

5   liked me back, and that people knew that that was going on.

6   Q    And then can you read the last couple sentences?

7   A    Why did Ben put his hand, in parentheses, question mark,

8   between your legs if not to make you have an orgasm?  Did he

9   put his fingers inside you?  Does he think you're a virgin?

10  Q    How did you feel about the defendant asking you those

11  types of questions?

12  A    It was -- I would call it invasive.  It seemed -- it

13  seemed like it had nothing to do with this, even at the time.

14  Q    Turning -- I am going to turn to an e-mail in the same

15  chain, June 10th, 2008 at 8:30 p.m.

16          (Exhibit published.)

17  BY MS. PENZA:

18  Q    You respond to the defendant on a few other things, but

19  then can you read what you write here (indicating)?

20  A    Excuse my ignorance, or perhaps naiveness, but what is

21  the relevance of the small distinctions in the physical stuff?

22  Q    And what did you mean by that?

23  A    I meant why do you want so much detail about how he

24  touched me.

25  Q    And then the defendant responds:  Does this upset you?

Daniela - direct - Penza                    2758

1    A    Yes, that's what he responds.

2    Q    Then you respond to the defendant?

3    A    I do.

4    Q    Okay.  And can you read your response to the defendant?

5    A    Yes.

6            Reason I asked is to know if there was something

7    relating to it that I was not considering.  It upsets me to

8    know I did it, but it does not upset me that you ask.  I want

9    you to know.  If I could I would have it played back to you --

10   however shameful.  I feel like I want to bring you through the

11   understanding of every little thing that happened, so that it

12   is not private to me and Ben.  I want you to not be a stranger

13   to any part of my life.

14   Q    Why are you writing this in response to the defendant,

15   given what you've just explained?

16   A    There's two reasons.  The first one is about the nature

17   of the relationship and Keith's standing in my life.  When he

18   asks:  Does this upset you?  I clearly do not want to pick a

19   fight and I want to please him.  After all, I am trying to fix

20   some damage that they're telling me I did.  And why the -- I

21   mean, it goes beyond me just saying no, it doesn't upset me,

22   here it is.

23            It's almost like worshipping, the way I replied to

24   him with all this, no, not at all, I want you, I want you to

25   have everything, I want you to know everything.  That is the

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2759

1    full disclosure that he always asked for.

2            So at this point, I know exactly what I'm expected

3    to say and how I'm expected to approach it.  It's not only

4    that I should tell him everything, but that I should want to

5    tell him everything.

6    Q    And then moving to the defendant's response, what does

7    the defendant say?

8    A    He says:  Yes, if you want to try to heal, it is -- if

9    you want to try to heal it, this is essential.  There are also

10   things you are not considering, including motivations,

11   representations and thought objects.  Did Ben go under your

12   clothing and touch you?  Where?  How?  Did you stop him?

13   Q    And you responded and you gave details about the way that

14   Ben touched you; is that fair?

15   A    That's fair.

16   Q    And then the defendant responds again?

17   A    Yes.

18           Did he touch you between your legs under your

19   clothing?  Yes.

20   Q    And then you respond back, and say:  Yes.  Yes, he did do

21   that.

22   A    Yes.

23   Q    And then you talk about a different concept?

24   A    Yes.

25   Q    Fair enough?

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2760

1   A    Fair enough, yes.

2   Q    And then how does the defendant respond?

3   A    He says:  Why did you leave that out if you really want

4   me to know everything?  See what you wrote below.

5   Q    And what did you understand him to mean by that?

6   A    He wants -- that he needs more.  He wants me to tell him

7   more.

8   Q    If you read that and -- well, we'll read the next e-mail.

9   And then do you respond:  I'm sorry, it wasn't my intention to

10  leave it out.

11  A    Yes.

12  Q    And then you refer back to his question about did he

13  touch you between your legs under your clothing?

14  A    Yes.

15  Q    And then you provide details as to the way that Ben

16  touched you and that you misunderstood the defendant's

17  questions?

18  A    Yes.

19  Q    Then does the defendant respond at the bottom?

20  A    Yes.

21  Q    And does he ask more questions?

22  A    Yes.

23  Q    What does he ask?

24  A    He says:  How many times did he touch you there?  How

25  long did he touch you each time?  Did you stop him each time?

Daniela - direct - Penza                    2761

1    Q    And then did you respond?

2    A    I did.

3    Q    And read your response.

4    A    As I said before, two times.  My perception of time isn't

5    very good, but I would say for entire minutes.  I did always

6    end up stopping him, although I think after that long a time

7    it is not so much interpreted as stopping, but rather just a

8    mild ...  okay, off now.

9    Q    And then the defendant responds here (indicating)?

10   A    Yes.

11            I do think it is more curious than inadvertent that

12   you left this out considering the level of detail in your past

13   response.  What do you think?  You still do not provide

14   details on how he handled your vagina.  Quoting, he did go

15   under my clothing.  He touched my breasts, chest, my neck.  He

16   would squeeze my breasts and he pulled my nipples a few times,

17   which I reacted to by saying ouch, and he laughed.  End of

18   quote.

19   Q    And at this point it is now midnight, is that right?

20   A    Yes.

21   Q    And you respond again?

22   A    Yes.

23   Q    And you provide more details about the way he was

24   touching you?

25   A    Yes.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2762

1   Q    And fair to say very specific details about the way he's

2   touching you sexually?

3   A    Yes.

4   Q    And then how does the defendant -- so you write that at

5   12:14 a.m.?

6   A    Yes.

7   Q    And how does the defendant respond?

8   A    At 12:20, he says:  You need to be able to tell me the

9   hardest things completely or else you have no foundation to

10  remove certain obstacles.

11  Q    And you respond, 12:24 a.m., with:  The hardest thing for

12  me is to tell you the things he did that I liked.

13          And then you go on to provide some details?

14  A    Yes.

15  Q    And then -- let me just ask you there, why are you

16  telling the defendant all -- why are you telling the defendant

17  these details, in general?

18          I'll ask you that question first.

19  A    These details in general?  Ah -- ah, sorry, these are

20  like a little hard to read, in that mindset and just going

21  back there.  It's a little upsetting.

22          I mean, you read the progression.  It is -- it is --

23  first of all, it's not isolated to this -- to this incident in

24  this instance, so I'll give some context there, but just in

25  this e-mail exchange, it's -- like Keith says, you left it

Daniela - direct - Penza                    2763

1   out -- you said you want to tell me everything, you left it

2   out of the last.  But I didn't want to tell you the last, you

3   asked for the last one, now you're asking for more and now

4   you're telling me I can't fix things until I give you more.

5          So it's -- it's a manipulation in a what you have

6   to, but it has -- I don't believe it has anything to do with

7   fixing any damage whatsoever.  This is just a perverted

8   curiosity or I don't know what other type of manipulation and

9   control, but I am telling him why am I telling him this,

10  because I think this is what I need to do to fix whatever I

11  think it is I have broken.

12  Q    And --

13  A    And I trust that he's guiding me without malice.

14  Q    And what about telling him -- at this point, do you think

15  he -- well, how do you think the defendant is going to react

16  if you tell him that there are things that happened with Ben

17  that you liked?

18  A    I think that -- I mean, at this point I am trusting him

19  with the healing of my breach.  Right?

20         I'm being told and coached and told all these

21  different things, and given all these different clues and -- I

22  don't know, he seems beyond, say, jealousy.  Like the normal

23  response here is, if I tell someone like an ex-boyfriend that

24  I did this and now I go and say, oh, I liked all these things;

25  of course, my normal response would be, well, he's gonna be

Daniela - direct - Penza                    2764

1    upset, he's gonna get jealous.  But he wasn't supposed to be

2    that being and this wasn't supposed to be that situation.  I

3    am, in this particular exchange, completely enrolled in the

4    idea that I have committed an ethical breach and damage by

5    liking Ben and that he is almost clinically going to help me

6    undo that.

7    Q    Okay.  Yesterday, when we talked about the day of the

8    fight, you talked about a change in perception you had on that

9    day.  Was that fixed in one point in time so you have this

10   change in perception the day of the fight?

11   A    Uh-hum.

12   Q    Did that stay steady throughout?

13   A    No.

14   Q    So can you explain that?

15   A    Yes.  Just like the issue at hand, which was just my

16   relationship with Ben became fussy and muddled up into a bunch

17   of issues, the same with my perception of Keith.

18          So at that moment it was very clear what I saw in

19   the fight, but in the same manner, with the same control

20   structures around me with people coaching me, it was:  You

21   know, Keith, you dishonored him.  You are bad, but he's good.

22   You know, all he ever tried to do was help you.  You know, oh,

23   but I want to be -- that's your pride talking.  I want to be

24   with Ben; that's your pride talking.  All he wanted to have

25   was for you to succeed.  He really wanted to teach you.  He

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2765

1    really wanted to help you.  You didn't do it, but he's great.

2           And I mean, in the -- in the 15 seconds that it took

3    me to just say this, it seems like very unconvincing, but try

4    months and months of being coached by the same people with the

5    same set of instructions with the same notions, and with no

6    malice on my part, so I was a very soft mind to mold.

7    Q    So you respond back and say:  It's hardest to say the

8    things that you liked?

9    A    Yes.

10   Q    And how does the defendant respond?

11   A    He says:  Those, of course, because of your opinion -- or

12   memory thereof -- are the most destructive and forever

13   damaging to us.  But you did not like the vagina thing, yet

14   you avoided to tell us that also -- and your touching him.

15   Q    And then you respond?

16   A    Right.  Is that where it starts?

17          Forever -- forever, as is in there is no possible

18   way to reverse them or even neutralize them?  Wouldn't being

19   aware of a true nature or origin of them neutralize them?  The

20   vagina thing and me touching him are, I feel, a different

21   level of boundary crossing.  A higher level of loyalty, if you

22   will.  I don't know if this makes sense to you, but I think

23   that the simple fact that they mean that to me and that I

24   crossed them anyway is what I feel very ashamed about.

25   Q    And then the defendant responds?

SAM     OCR     RMR     CRR     RPR

Daniela - direct - Penza                    2766

1    A    He responds:  Yes, you can, but even your description has
2    emotion spliced onto sensation.  This made things more
3    difficult.  Why did you cross them anyway?
4    Q    What is your understanding of the first sentence there?
5    A    That my description of emotions spliced onto sensation?
6    That is -- so what that means, that is the aspects of it that
7    I described as almost in the clinical way.  So that rests on
8    the notion that what I experienced with Ben is all part of a
9    thought object and now -- and that is a destructive thought
10   object, and so now I have to go and dissect it and separate
11   what I felt, that it's just feeling and my emotions that I am
12   attaching to it that are the damaging part.
13   Q    And then you respond.
14   A    I respond:  I think in the end it comes down to how I
15   felt.  I felt good or I thought it would feel good, in
16   parentheses, maybe not just physical, but in the sense of
17   meaning, end of parentheses, and that is why I crossed them.
18   I made up a bunch of stories to justify this, of course.  None
19   of them worth getting into perhaps.
20
21            (Continued on the following page.)
22
23
24
25

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2767

1   BY MS. PENZA:   (Continuing)

2   Q     And how does the defendant respond?

3   A     He replies:  How will you fix this with you, us and me?

4   I am going for a walk.  I will leave in five minutes.  Be back

5   in 2-4 miles.

6   Q     What's your understanding of what's happening there?

7   A     Of what's happening?  I think it's pretty

8   self-explanatory.  So, he's going to come back and check his

9   computer in whatever amount of time that is but he's asking me

10  for, he's asking me for, for a course of action.

11  Q     And this is at 1 o'clock in the morning?

12  A     Yes, it is.

13  Q     Did the defendant -- do you know whether the defendant

14  frequently would go for walks in the middle of the night?

15  A     Yes.

16  Q     At 2:07 a.m. --

17  A     Yes.

18  Q     -- do you respond?

19  A     I do.

20  Q     Can you start reading the beginning?

21  A     With me, I am going to unravel my internal

22  representations of everything that happened.  I don't think I

23  can go back to being pure, but I can move forward to be aware.

24  If it can be done I am going to try to do it.

25  Q     Can I stop you for a second, Daniela.

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2768

1      Can you talk a little bit about this idea of being

2 pure?

3 A    Yes.  The idea of being pure was brought up since, you

4 know, I was, because I had been a virgin and I had never been

5 with anybody before so he always acted very proud of that and

6 when my relationship with Ben started, took place, that was

7 one of the main things that he brought up, that I was no

8 longer pure, and I believe it took a sense more than the

9 sexual one since that's just, I mean, just a sexual part.

10 Also, pure in that I had never liked another man before, had

11 never taken an interest in another man before.  So, again,

12 with the notion of the thought object and then turn over

13 presentation.  So I was not only not pure in my body anymore

14 but also I was no longer pure in the sense that Keith was the

15 only one.

16 Q    Fair to say you go on and talk a lot about trying to fix

17 this?

18 A    Yes.

19 Q    Same on the second, on the next page?

20 A    Yes.

21 Q    Now, at this point in time, do you know whether -- is

22 this an e-mail where you're aware that there were multiple

23 threads that start, "Beginning"?

24 A    Yes.

25 Q    Okay.  So we'll continue looking at this e-mail chain but

Daniela - direct - Penza                    2769

1    then we'll look at some others from the same date as well.

2    A    Very good.

3             THE COURT:  Let me just ask the jury, would the jury

4    like to take a short break?  Anybody?  Or can we go through to

5    lunch.  I'm not seeing any hands.  Are you sure?

6             Let's keep going.

7             MS. PENZA:  Thank you, Your Honor.

8    Q    So I'm just going to go back to the page we were just

9    looking at for a second.  How does the defendant respond?

10   A    On June 11th, at 1:50 p.m.:  What -- I believe

11   misspelled -- is the chronology of your interactions with Ben

12   over the past 18 months?  Why did it stop?  Why does he think

13   it stopped?  What was the last physical interaction?  Have you

14   come to any other conclusions?

15   Q    And you say you're writing a response to this e-mail, I

16   will be sending it soon?

17   A    Yes.

18   Q    Then you write a long response?

19   A    Yes.

20   Q    And is it fair to say you go through all the different

21   physical interactions with Ben?

22   A    Yes.

23   Q    Okay.  I'm just going to have you read the end.  You talk

24   about the, why the interaction stopped, and then can you read

25   at the end from "all along"?

Daniela - direct - Penza                    2770

1    A    All along, because of the times where he stopped the

2    interaction, my interpretation has been that he also wanted it

3    to stop, so it was okay with him when it -- I did it -- when

4    it did it -- when it did.  My impression has been that we both

5    kind of stopped it.  It was just me who put the last period on

6    it.  Not so sure how to interpret it now that I can see a

7    little more.  I think that he usually followed my lead to

8    avoid rejection, maybe this is what happened.

9    Q    And then can you read the defendant's response?

10   A    At 3:04:  I suspect there are other interpretations of

11   this.  I don't find your interpretation consistent with human

12   nature and the way Ben and others are toward me, et cetera.  I

13   think you need to figure out what was going on.  That will

14   give you insight into more of the damages.  Who else has seen

15   you together where you have been affectionate?  There was also

16   a time when Ben came to your house and you acted shy to see

17   him.  Why?

18   Q    And you respond?

19   A    I respond.

20   Q    And you ask a question:  How is Ben and others towards

21   you?

22   A    Yes.

23   Q    Then how does the defendant respond?

24   A    He responds:  Okay but only okay.  I hear more about when

25   I am not around.  There are some people who perceive Ben,

Daniela - direct - Penza                    2771

1   Fluffy -- my brother -- and some other people around them are

2   quite disrespectful of me.  It appears your situation and Ben

3   affected Fluffy and they affected others.  Even someone as

4   remote as Mia changed as she started dating Fluffy -- in

5   parentheses -- others were not aware she was dating Fluffy but

6   noted the change -- end of parentheses.

7   Q    Fair to say then you, you respond twice --

8   A    Yes.

9   Q    -- with varying levels of apology?

10  A    Yes.

11  Q    And then the defendant responds.  Can you read the

12  defendant's response?

13  A    Yes.

14        Part of the problem is a perception that

15  consequences had to be imposed or suggested to you.  It should

16  never be a consequence has to be suggested or imposed.

17  Because you allowed this, any changes are likely to be seen as

18  imposed.  Only you can change this and it is very difficult.

19  Somehow all of the past perceptions of suggestions/impositions

20  need to be charged also, or else it will be seen as affecting

21  the present.  What are the specifics of what you have observed

22  with Fluffy?

23  Q    Can you explain your understanding of that e-mail from

24  the defendant?

25  A    Yes.  So here he is trying -- he's been imposing things

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2772

1   on me and he's trying to get me to, one, admit that that is my

2   fault and, two, to make it look like none of it has been

3   imposed.

4   Q    And then you respond starting at the bottom.  Can you

5   read your response?

6   A    Yes.

7             There have been many incidents with Fluffy, which I

8   attributed to issues he may also have about you and his

9   sisters -- in parenthesis -- us.

10  Q    What did you mean there?

11  A    Well, that Fluffy had shown a lot of, in many different

12  instances, that something about Keith and that I attributed to

13  the fact that Keith was sleeping with the three of us.

14  Q    And you go on to explain other times when you've seen

15  your brother talking about Keith, is that fair?

16  A    Yes.

17  Q    Can you continue?

18  A    Yes.

19            We were driving by, saw you walking alone.  There

20  was an incentive going on so I knew you were most likely all

21  alone.  I got concerned, asked him to drop me off and drive

22  over and offer a ride, company walking, the ability for ride

23  in the future.  He refused with quite a bit of anger.  I asked

24  why but couldn't get a rational answer out of him.

25  Q    And continue.

Daniela - direct - Penza                          2773

1    A    Yes.

2         This is from Keith --

3    Q    No, sorry.  Continuing your e-mail here at the bottom.

4    So you have the first bullet point.

5    A    Right.  Sorry.

6         Few times we were at restaurants and the idea of

7    bringing back food to you occurred to me and he got very

8    upset, all of a sudden there was no time to be waiting to or

9    something else.  He said he wasn't going to be using his time

10   to do things like that.  If we wanted to do that it was okay,

11   but it was his time and his car and you were not his priority.

12        Similar one time we needed to move faster because

13   Cami wanted to bring something back to you.  He took his time

14   and refused to move faster.  Same reasons as above.  He is not

15   my priority.

16        There are other incidents, all pretty much of the

17   same nature.

18   Q    Now, at that point in time, had you confirmed to your

19   brother that you had had a sexual relationship with the

20   defendant?

21   A    No, not -- I have never confirmed it to him and to my

22   knowledge, he didn't know about Cami and Marianna.

23   Q    So when you say, "which I attributed to issues he may

24   also have about you and his sisters," at that point in time,

25   what do you mean?

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2774

1  A     I mean just because he didn't know or have confirmation,

2  which I believe is true, doesn't mean that we were all acting

3  extremely weird around him.  Every woman who was with Keith --

4  and I will speak now just exclusively about my sisters or even

5  myself -- the degree of loyalty that was demanded was immense.

6  So many times, there were issues where maybe, like, I made a

7  commitment to go to a party and last minute, Keith didn't want

8  me to go or wanted me to stay for a walk, plans would get

9  canceled, or there was this fixation with, you know, like I

10  just described in the e-mail, bringing him something back to

11  eat, making sure he's okay.

12         So our lives were, I can imagine, from looking at

13  the outside, from my brother, just extremely dedicated to this

14  man to the point of, to him, it seemed clearly absurd and he

15  was very clear about that.  You know, that, you guys make him

16  your priority but that's, that's you.  You know, leave me

17  alone and there was a degree of upsetness about that.

18  Q     Okay.  And then the defendant responds.  Can you read his

19  response?

20  A     Yes, at 4:15.

21         Somehow you should have a talk with him for even if

22  it was not me, some of the things you mentioned are things we

23  should look to do for any other human.  For example, if I am

24  in a car and I perceive a stranger may need a ride or help, I

25  do something.  It's part of being on the human team.

Daniela - direct - Penza                         2775

1    Q     And then you respond.  Can you read that?

2    A     Yes.

3          I will talk to him with this new perspective.  Thank

4    you.  I have many times considered sitting down with him to

5    talk about this issues but I haven't yet acted on it for I do

6    not see if it would be of any help or do more damage,

7    specially coming from me, who he may see as a victim of you.

8    I thought that he saw me as a victim -- in parentheses --

9    abused, in our relationship before, when things were normal.

10   And I attributed to a reaction of a jealous/concerned brother.

11   Now, I have started to see how natural it would be for him and

12   others to think of me as a victim due to my actions and

13   situation in this past months.  By natural, I mean, it's not

14   their fault.  My behavior is reasons for them to think this.

15   This is my fault.

16   Q     Can you explain what you're describing in this concept at

17   the end of this e-mail?

18   A     The concept I am describing is I am now confirming I am

19   convinced that the imposition on me is all my fault, that I am

20   a victim but it is my fault because I have made it so.

21   Q     And then the chain continues.  I just want to turn

22   your -- okay.

23          So just looking at this same exhibit, 1535, I just

24   want to note, you see the e-mail on June 11, 2008 at

25   2:53 p.m.?

Daniela - direct - Penza                    2776

1    A     Yes.

2    Q     So now I'm going to show you, Daniela, what's in evidence

3    as Government Exhibit 1534.  And right here, is this, is this

4    a thread that continues from that e-mail that we just looked

5    at?

6    A     Yes, it is.

7    Q     On June 11, 2008 at 2:53 p.m.?

8    A     Yes.

9    Q     And you respond, you respond but you have a few more

10   thoughts and then the defendant responds?

11   A     Yes.

12   Q     Can you read the defendant's response?  I'm sorry.  Give

13   me one second.

14   A     It says, 3:25 p.m.:  Your fears of hurting Ben with your

15   beliefs of friendship and intent will likely prevent you from

16   being subtly "cruel" and constructively destructive which are

17   necessary repeated actions to minimize damage.  Unfortunately,

18   I believe it is impossible to not have damage.  So your

19   experiencing being a damaging influence is to circumvent

20   greater damage and make things right.  Sometimes it is

21   necessary to destroy.  I do not know you to be able to do such

22   things especially if it goes against satiation and is repeated

23   over a prolonged period of time and to make one mistake

24   destroys such an endeavor.

25   Q     And do you understand what he's saying there?

1   A    Yes.

2   Q    What is your understanding?

3   A    He's telling me that I need to manipulate Ben, I need to

4   be a certain way.  In a sense, he's telling me to be cruel and

5   to be manipulative, and I cannot falter in that I still have

6   feelings of friendship about him might keep me from being able

7   to enact this manipulation that he's saying is necessary, he's

8   saying it's necessary to destroy in order to fix what I have

9   done.

10  Q    And you respond.  Can you read your response?

11  A    Yes.

12          Everything you wrote below makes perfect sense to

13  me.  In regards to this "I do not know you to be able to do

14  such things especially if it goes against satiation and is

15  repeated over a prolonged period of time and to make one

16  mistake destroy such an endeavor."

17          I think this is true of me before.  My motivations

18  and intent were in the exact opposite place of where they

19  needed to be in order to be able to fix this.  Right now, my

20  motivation and intent, I believe, is where it needs to be.  My

21  tendencies, disintegrations and inner honesty, I still need to

22  work harder to clean up completely, but if this is all it

23  takes, I do believe I can do it.

24  Q    And then the defendant responds.  Can you read the

25  defendant's response?

Daniela - direct - Penza                    2778

1    A     Yes.

2          At 3:44 p.m., he says:  As you say, "Right now my,"

3    also "I think I can do" is not nearly the strength presented

4    at the onset to do it.  This is something that cannot be

5    "attempted."  It must be executed without hesitation

6    flawlessly.  Already the damage to the organization and what I

7    am trying to do in the world is bad.

8          Ben and Fluffy have fed into the cult stuff and the

9    cult stuff feeds back into them.  They have even affected

10   people like Mark.  The likely loss of Ben within the

11   functioning of the organization will also set us back.

12   Depending on the timing, it also affects our legal cases.  We

13   have also lost 18 months of documentation of me we will never

14   get back.  The systems studies are too late for a number of

15   applications and some of our political agendas.  Right now,

16   with the viability of myself and the organization at a low,

17   this is not to be taken lightly.  Last time your pride

18   permanently destroyed so much.  Now it may just finish it off.

19   Q    We're going to go line by line but can you give, do you

20   have an explanation of what your understanding was of this

21   e-mail from the defendant as a whole?

22   A    I mean, my understanding of it is that this is all I have

23   destroyed.  All of this is my fault.  The company, ESP, he

24   might be destroyed.  Everything I've done has affected

25   everything and everyone.  That's, I believe, my ethical

Daniela - direct - Penza                    2779

1    breach.

2    Q    At this time, did you believe this?

3    A    I was -- I mean, reading these e-mails is hard for me

4    because I was throwing myself into this process honestly and

5    earnestly.  I didn't have malice.  I'm being completely honest

6    about what I still feel about Ben, not to make him jealous

7    because I'm being honest, because I think that if there's

8    something I need to fix, I will fix it, and because whatever

9    desire I have to do that, I've been manipulated into and I

10   stopped seeing clearly but I had no ill intent.  So when he

11   told me all of this and knowing what I know about thought

12   objects and the entire build up, yes, I believed it, I

13   believed it to a great degree.

14   Q    So let's just walk through some of the lines here.

15         "Ben and Fluffy," and you said Fluffy is your

16   brother?

17   A    That's my brother, yes.

18   Q    Ben and Fluffy have fed into the cult stuff and the cult

19   stuff feeds back into them.

20         What was your understanding of what that meant?

21   A    That the way they were perceiving ESP and Keith, you

22   know, was, you know, in a cult like manner and that them

23   seeing it that way only reaffirmed it.  Now they were thinking

24   that's what it was, they reaffirmed it by what they saw,

25   meaning I am a victim, this is happening.

Daniela - direct - Penza                    2780

1   Q    They have even affected people like Mark.

2        Who's Mark?

3   A    I believe that refers to Mark Vicente.  They lived all

4   together in the same house.

5   Q    At that point in time, what was your understanding of

6   mark Vicente's role within the organization?

7   A    Mark I knew was, like, a high-ranking individual.  He was

8   enrolling a lot of people.  He had connections in Hollywood

9   and he was working on a few projects with Keith, had also

10  taken over some of, like, obviously professional level

11  documenting.

12  Q    Do you know whether the defendant considered Mark Vicente

13  important in the organization?

14  A    Yes.  And one thing that's also clear from this e-mail is

15  that Mark, even, like, why he's commenting "which is a likely

16  loss of Ben within the functioning," people are pawns in the

17  organization that have a purpose and need to be used for

18  something, and I think Mark was a very important pawn.

19  Q    The likely loss of Ben within the functioning of the

20  organization will also set us back.

21       Do you have an understanding of what that means?

22  A    Not exactly but whatever projects he was working on and

23  the fact that he would see what ESP was actually, you know,

24  about and to see what was happening, that he would leave the

25  organization and that they would no longer count on him.

Daniela - direct - Penza                2781

1  Q    Depending on the timing, it also affects our legal cases.

2        Do you understand that?

3  A    Not really.  I know that there were a lot of legal cases

4  going on.  I don't know if that refers to, like, Ben was maybe

5  involved in some of the legal cases so then that's what might

6  happen.  I don't know if he thought that some of what I was

7  doing would, like, affect legal cases.

8  Q    We have also lost 18 months of documentation of me we

9  will never get back.

10       What's that referring to?

11 A    That was referring to my role.  This, this -- the

12 documentation, the systems studies, as much as they kept

13 repeating how much I had wasted everybody's time and I had

14 never done anything and how I was lazy and that was my ethical

15 breach, the truth is that I had a function and that there were

16 things that they expected me to do and now he's holding it

17 over me.  I did all of that 24/7, never got paid for it, and

18 now he's saying, Oh, we've lost all this documentation.

19 Q    And then I think you started talking about the system

20 studies.

21       The systems studies are too late for a number of

22 applications and some of our political agendas.

23       Do you know what that means?

24 A    For a number of documentations, I was always moving in

25 the science.  That's what I thought it was.  For the political

Daniela - direct - Penza                    2782

1    agendas, I have no idea.

2         I mean, what I read from that is it's just

3    overdramatizing.

4    Q    Do you know whether the defendant had any intent of using

5    the book reports or the analysis you were doing of system

6    studies to advance political agendas?

7    A    I did not know.  It may have been.

8    Q    Do you know whether the defendant had political agendas?

9    A    Yes.

10   Q    And then the end:  Right now, the viability of myself and

11   the organization.

12        Can you explain what that means?

13   A    That means the viability of myself -- that he might, I

14   mean, basically, that he's not viable.  That means that he

15   might die.  Like, he won't be around.  Likewise, it sounds

16   like for the organization.  And this is something that wasn't

17   too foreign to me because it was in the same time that I had

18   heard him say, Oh, I'm hurting.  I -- this may kill me.  Not

19   only with me, but with other people, so the viability of

20   myself was not a completely foreign notion.

21   Q    And then:  Last time your pride permanently destroyed so

22   much, now it just may finish it off.

23   A    I mean that's a huge jump because the last time my pride

24   destroyed something was when I decided I wanted to be with Ben

25   and now it was the destruction of the entire world.  So, I

Daniela - direct - Penza                    2783

1    mean, that's just a biggie.

2    Q    This type of language, what type of -- how old were you

3    at the time when this e-mail is being written?

4    A    2008, I'm 23.

5    Q    And you had been in ESP since you were --

6    A    Sixteen.

7    Q    At this time when you're receiving these types of

8    messages, what is the impact on you?

9    A    It had a great impact but I need to explain a little more

10   about that because it's not only that I've been there since

11   I'm 16.  It's also Keith is the Vanguard, is the organization.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                      2784

1    BY MS. PENZA:   (Continuing.)

2    Q    Let me ask you another question.

3    A    Okay.

4    Q    So it had a big impact.  Why?  Why does a message like

5    this at that point in time have a big impact on you?

6    A    In that moment, I even feel grateful he's writing me back

7    because he had cut off communication.  So it was like a push

8    and a pull.  So now I'm going to push you away, I'm going to

9    send people to work on you.  And there was this little nugget

10   I'm going to throw you.  And everything he's telling me is,

11   oh, thank you.  It's a guiding light to how I'm supposed to

12   get back to things and in that moment I am fully dependent on

13   what he's saying and in the community around him.

14   Q    And you said -- you said that there was context in

15   addition to you having been there since you were 16?

16   A    Yes.

17   Q    What other context is there?

18   A    Well, there was the relationship I had had with Keith.

19   He still held a promise of an education for me.  So my future

20   was -- was in all of -- in his hands and I still trusted him.

21   I still trusted him to -- to be well-intended and to want what

22   was best for me.

23   Q    You respond to the defendant and say you can assure him

24   you don't take this lightly; is that right?

25   A    Yes.

Daniela - direct - Penza                    2785

Q     You respond -- you quote him and then you say, "Do you
perceive pride is holding me back in this situation?  If so,
can you please point out to me what/where/how clearly?  If
this is not something that you can/should do, can you at least
point me in the right direction?"

          Can you explain those questions that you are asking?

A     Yes.  Well, I clearly don't understand what he is saying
or -- like, so, the questions I'm asking is because for me I'm
trying to translate what he's saying into action.  There's
something I need to do to chang my situation so I need
details.  I need to understand.  I need to know what to do.
So that's what those questions are about, so I can digest them
and when I ask if this is not something you can/should do,
that's just a degree of gratefulness and reverence for --
well, I know you're breaking your ethical boundaries by even
replying to me, so if you don't absolutely have to, you know,
like point me just in the right direction, I will do the work.

Q     And can you read the defendant's response.

A     He says at 4:08, "If I hadn't stepped in this would have
been a much worse disaster.  You have now had extensive
communication with me.  In a sense, your pride won.  So it
feels good.  If I hadn't stepped in the pain would then
probably would have continued.  Certainly the mode of
friendship would have, causing more damage.  I do not know how
you are going to prove yourself that pride should lose and you

Daniela - direct - Penza                    2786

1   can remain constant and loyal without entertainment for at

2   least 18 months.  You now know if you play games and deceive,

3   you can wait out unethical imposition.  This time it took 18

4   months.  I don't know if you understand this."

5   Q    Now go to Government Exhibit 1533.  One second, please.

6   I'm showing you what's in evidence as Government Exhibit 1533.

7   I'm just going to show you starting in the middle again is

8   this one of the e-mails that we have looked at before in the

9   same chain?

10  A    Yes.

11  Q    So is this Government Exhibit 1533 the continuation of --

12  different threads of the same June 11, 2008 chain?

13  A    Yes, it is.

14  Q    I'm just going to refer you back to Government Exhibit

15  1535 for a second where we looked at -- we looked at the

16  e-mail where the defendant talked about the perception that

17  consequences had to be imposed or suggested to you.  Do you

18  remember that?

19  A    Yes.

20  Q    And that was at 3:59 p.m.?

21  A    Yes.

22  Q    So, turning to Government Exhibit 1533, looking at e-mail

23  from the defendant at 5:02 p.m.

24  A    Yes.

25  Q    Can you read what the defendant says there?

Daniela - direct - Penza                    2787

1   A      Yes.  Keith wrote, "Not only what I said with my last

2   e-mail but think about the movie *The Mission*.  Why didn't

3   anyone think conditions were being imposed on Rodrigo when he

4   was resolving his ethical breach.

5   Q      Do you remember the movie *The Mission*?

6   A      Yeah, there was a movie *The Mission*.

7   Q      How many times would you say you've seen the movie, *The

8   Mission*?

9   A      Easily over a dozen times.

10  Q      Can you just explain the role of the movie *The Mission* in

11  the NXIVM -- with -- to the defendant?

12  A      It was put out by him and then by people who were

13  overseeing my program as an example of someone's ethical

14  breach, in healing of the ethical breach.

15  Q      Do you remember the details of that movie now?

16  A      Not really.

17  Q      Okay.  But you remember it in the context of --

18  A      Yeah, I mean, yeah, the music haunts me.

19  Q      And then there is a response from you.

20         (Exhibit published.)

21  Q      There's a response and then the defendant says, "Your

22  awareness of it is good but others seeing it even once gives

23  them an excuse.  What about *The Mission* question?

24  A      Yes.

25  Q      You then respond, "I assume *The Mission* question this

Daniela - direct - Penza                    2788

1   one, unless I missed another e-mail."

2          So this is the kind of talking on two different

3   threads --

4   A    Yes.

5   Q    -- that you talked about?

6   A    Yes, it is.

7   Q    You say, "I assume *The Mission* question this one, unless

8   I missed another e-mail," but then you go on to quote the

9   e-mail we looked at on the other chain; is that right?

10  A    Yes, it is.

11  Q    Okay.  How did you respond to -- to that e-mail from the

12  other chain, the one about the -- that included the "Ben and

13  Fluffy have fed into the cult stuff and the cult stuff feeds

14  back into them"?

15  A    I reply, "Some of this is the practical aspect of my plan

16  (ethical breach healing plan) and it all depends on my ability

17  to work at the speed and level which is necessary which I

18  haven't yet achieved due to my issues of indulgence (the

19  extent of these I was not/may not be fully aware of yet, but I

20  will be).  So much of this is completely irreversible.  All I

21  can do and will do right now is move and move fast."

22  Q    Okay.  I'm looking at the first page of Government

23  Exhibit 1533.

24          (Exhibit published.)

25  A    Okay.

Daniela - direct - Penza                    2789

1    Q    The defendant -- what does the defendant say?

2    A    It says, *The Mission* question from below, think about

3    the movie *The Mission*.  Why didn't anyone think conditions

4    were being imposed on Rodrigo when he was resolving his

5    ethical breach?"

6    Q    And how did you respond?

7    A    I respond, "He was so intensely focused he had his

8    attention on nothing else.  There was no suffering, hence no

9    indication of unwillingness against an imposition.  And it

10   showed there was true commitment which can only come from

11   within.  Also, he took the decision of when to stop on his

12   own, what was right for him."

13   Q    And then did the defendant respond?

14   A    He responds, "He was the leader in the resolution of the

15   breach."

16   Q    Look in the chain what's in evidence as Government

17   Exhibit 1536.  Is this an e-mail chain from June 12, 2008?

18   A    Yes.

19   Q    And it's an e-mail chain between you and the defendant?

20   A    Yes, it is.

21        (Exhibit published.)

22   Q    And this one starts on -- this e-mail exchange starts on

23   June 11, 2008 at 10 p.m.?

24   A    Yes.

25   Q    And just going back for a second to Government Exhibit

SN        OCR        RPR

Daniela - direct - Penza                    2790

1   1533, there was an e-mail chain that ended at 9:48 p.m.?

2   A    I'm sorry, I can't see.

3   Q    I'm sorry, can you see?

4   A    Yes.

5   Q    And this 1533 ends with --

6   A    Yes.

7   Q    -- a writing project; is that right?

8   A    Yes.  So he's saying I should itemize and focus on each

9   one of these things that we're talking about.  I say, I am

10  doing this.  That's what I have in mind.  That's where it

11  ends.

12  Q    June 11, 2008, 10:10 p.m.  You send an e-mail to the

13  defendant?

14  A    I check in, I say, "I have been working.  I still have a

15  few more hours to go."

16  Q    How does the defendant respond?

17  A    He writes, "The musical *Into the Woods* by Stephen

18  Sondheim has a song *Children Will Listen*.  Some of the lyrics

19  may apply."

20  Q    And then did you send him back the lyrics from that song?

21  A    I sent the lyrics and the question mark at the end, yes.

22  Q    Did you understand that?

23  A    Not -- not, a little bit.  That's the question mark.

24  Q    What did you -- I mean if you had an understanding at the

25  time, what was it?

Daniela - direct - Penza                    2791

1   A      I think what he meant to explain to me is that everything

2   is tied into -- the same thing we were talking about, *The*

3   *Mission* and how things should not be, you know, imposed,

4   should not look imposed, you know.  So everything that I did

5   and said and acted should show that I'm happy to heal my

6   breach and this is not being imposed on me because people are

7   like children.

8   Q      Who are the children in this analogy?

9   A      Oh, I think the ESP community, the people that they were

10  trying to manipulate, Ben and everyone else.

11  Q      Can you read the lyrics from that song?

12  A      Sure.  Careful the things you say.  Children will listen.

13  Careful the things you do.  Children will see and learn.

14  Children may not obey, but children will listen.  Children

15  will look to you for which way to turn, to learn what to be."

16  Q      And so you send a question mark?

17  A      Uh-huh.

18  Q      And then the defendant responded?

19  A      Yes.

20  Q      How did the defendant respond?

21  A      He writes, "For you to understand the message you give to

22  Ben, think of what it means for you to sneak away or meet

23  secretly.  This implies oppression.  How do you counter that

24  message?  Do you tell him you are telling him everything?"

25  Q      Is this the concept that you just explained?

Daniela - direct - Penza                    2792

1    A    Yes.

2    Q    And how do you respond?

3    A    I write, "I am thinking about how I would counter the

4    message of oppression I have clearly transmitted.  I do tell

5    him pretty much everything.  I have told him that I tell him

6    everything, although there are certain things he knows I don't

7    share the details of, like the origin of the situation I am

8    in.  He knows I did something bad.  He does not know what.

9    Q    And continuing back and forth between you and the

10   defendant about Ben?

11   A    Yes.

12   Q    The defendant writes, "It's obviously a problem that he

13   thinks you tell him so much.  His response of I knew it, is

14   also problematic coupled with your sneaking away.  All of this

15   and Ben's behavior equation does not bode well for his image

16   of me."

17            Is that the thought object again?

18   A    Yes.

19   Q    "His willingness to engage physically when you stated

20   your feelings for me is also an indication of his operating

21   ethics."

22            What does that mean?

23   A    Now he's trying to say that even though he knew I had

24   feelings for Keith, he did not respect that, so he is -- it's

25   unethical about even knowing that or engaging.

Daniela - direct - Penza                     2793

1    Q    And then you respond, "Does he think I know your feelings

2    for me?  I'm not sure.  I haven't said anything to him about

3    it.  I would think given we are very aware of your

4    extraordinary perceptive ability, he might think you sensed it

5    but I don't think he thinks I told you directly since I acted

6    shy about it."

7             What are you explaining there?

8    A    I think it's pretty self-explanatory.  But I think -- I'm

9    telling him I think Ben can figure it out, you know, like --

10   he can figure out the e-mail, he can assume safely that, you

11   know, but -- really it's a dissecting of what Ben thinks Keith

12   thinks.

13   Q    All right.  And then fair to say a lot more of this

14   back-and-forth analysis?

15   A    Yes.

16   Q    And we've got this part of the chain.  You say, "I've

17   unraveled my feelings for Ben" and you continue on and then

18   the defendant responds?

19   A    Yes.

20   Q    Can you read the defendant's response?

21   A    Yes.  He says, "It sounds contradictory.  I suspect you

22   don't know Ben and even what you know is distorted.  Consider

23   the following:  If you knew a cocaine addict who was told they

24   would die if they had any cocaine" --

25             THE COURT:  Any?

SN        OCR        RPR

Daniela - direct - Penza                    2794

1    A    "More cocaine.  You should also know the addict does not

2    want to die.  You also work for an anti-cocaine organization

3    and supposedly believe in the mission against the atrocities

4    of cocaine.  What would you think would motivate you to

5    secretly give you cocaine to these addicts so that you could

6    be entertained or have sex?  This is what Ben has done.  Do

7    you know Ben by his values?  If you don't like the values, how

8    can you like the person except as an entertainment center.

9    Q    Okay.  I'm going to stop you, Daniela.  Thank you.

10          Do you have an understanding here of the analogy

11   that the defendant is making?

12   A    Yes.

13   Q    What is it?

14   A    So he's trying to equate cocaine to attention, I think,

15   or any kind of bad type of affection or attention or, like,

16   disintegration.  So he's equating the anti-cocaine

17   organization to ESP, an organization that's trying to get rid

18   of disintegration and the need for attention and he's trying

19   to say that Ben -- you know, why would I think highly of Ben

20   if Ben is clearly willing to give me the attention that I want

21   even though it's not good for me and he knows that and that he

22   wants me only for entertainment and sex.

23   Q    I'm going to ask you to read here.  Can you read this

24   sentence?

25   A    "Ben appears to have demonstrated a disregard for all I

Daniela - direct - Penza                    2795

1  have built, what I am about, the people who tried to help you

2  and you as a person.  He has also totally disregard what you

3  will go through in the future.  All in the name of power and

4  attention.  Instead of either raising his concerns to the

5  people he affected (if he did not agree with them or you), or

6  inspiring you to respect these things (if he believed in them)

7  He did neither one of these things.  He disregarded everyone's

8  efforts and futures and dishonorably took advantage.  Could he

9  ever find his way to respect me or what I do?  His actions

10  have dishonored everything I do and people I care about.

11  Additionally he has inspired others to not respect the same.

12  I don't understand.

13          "The only way I can wrap my mind around your

14  conclusions is to believe you don't really love me at all and

15  would sacrifice me and us for entertainment as you have done

16  in the past.  Your conclusions do not bode well for us.  I

17  don't know what else to think.  I don't know if I can believe

18  you.  I am sorry.

19  Q    Okay.  And do you remember what --

20          (Exhibit published.)

21  BY MS. PENZA:

22  Q    Let me show you the end of your -- so the e-mail where

23  you have written that you unraveled your feelings for Ben, you

24  had written you cared about him in two distinct ways; is that

25  right?

SN        OCR        RPR

Daniela - direct - Penza                          2796

1   A    Yes.

2   Q    So it's fair to say that the conclusions that the

3   defendant is responding to here are conclusions about your

4   level of care for Ben?

5   A    Yes.

6   Q    And, again, June 2008, your -- sorry, June 2008, your

7   relationship with Ben is limited to the interactions that

8   you've already told us about?

9   A    Yes.

10              (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2797

1  EXAMINATION CONTINUES

2  BY MS. PENZA:

3  Q    You respond to the defendant:  You talk about Ben and his

4  actions as a victim of you.  Is that right?

5  A    Yes.

6  Q    How does the defendant -- the defendant responds:  I'm

7  having trouble believing you at this point.  Ben is not a

8  victim of you nor you of him.

9           Then he goes on:  This is a very, very dangerous

10  situation for me; for my life, for my purpose, for my

11  reputation and for my creations.  It is possible none of these

12  things will survive this.

13           I will be gone for a while.  I am sad I had to tell

14  you this stuff instead of your deriving it.  It will be so

15  much harder to know if you are just repeating back what you

16  think I need to hear instead of really feeling it, but time is

17  slipping away.  Maybe you will see for yourself some of these

18  things.  I do not feel you have seen very much of the damages

19  or implications.  This is kept in place by underestimating Ben

20  and his participation.  You have not addressed the issues and

21  damages I raised.

22           Is this -- was this the same -- did you receive a

23  lot of this type of e-mail?

24  A    Yes.

25  Q    And how did this type of language affect you?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2798

1   A    It threw me into a spin.  I mean, this is -- this is

2   obviously completely blown out of proportion, that, you know,

3   my relationship with Ben or what I feel about him might

4   destroy everything that he just listed.  It's completely blown

5   out of proportion, but it affected me very much and, you know,

6   the things he said there, like, oh, I should not have to

7   derive it for you.  But that's what he did -- what he did

8   every time, that's how he would present what he wanted me to

9   do and continue doing.

10          So, I -- I took it to heart and I analyzed it and I

11  moved forward taking that into account.

12  Q    I'm showing you what's in evidence as Government

13  Exhibit 1537.

14          (Exhibit published.)

15  BY MS. PENZA:

16  Q    And is this an e-mail chain between you and the

17  defendant?

18  A    Yes.

19  Q    On June 18th, 2008?

20  A    Yes.

21          (Exhibit published.)

22  Q    The first e-mail in the chain, June 17th, 2008, at 12:59

23  a.m., can you read that e-mail?

24  A    Yes.

25          I say:  Up again, down again soon... maybe.  I have

Daniela - direct - Penza                          2799

1    a few not as important questions for when you have time and if

2    you consider appropriate to answer them.  Or at least for you

3    to consider.

4          Do you know how Pam knows I am working on my breach?

5    I haven't said a word to anyone other than you and Karen, not

6    even Monkey -- my sister -- and Cami, and she mentioned

7    something today that revealed she knows that at least I am

8    doing that.  Does she know I have had communication with you?

9    What does Karen know?  How much does she know?  She knows

10   nothing from me, I have only checked in with her a couple of

11   times and all I have said is:  Still going back and forth with

12   Keith, will send him something soon; things like that.

13         Is she aware that this is almost completely about

14   Ben?  From the information I gave her in the past, she was

15   under the impression this was a more general indulgence issue.

16   What should I tell her?  Has she said anything to Ben?  Is she

17   aware not to act strange around Ben or say anything to him?  I

18   can imagine Ben would start to get suspicious very soon, if

19   not already...  So I would like to move quickly on this, if

20   that is okay.  At least an initial communication.

21   BY MS. PENZA:

22   Q    Can you explain what is happening in this e-mail?

23   A    Yes, I am trying to ascertain how much people know, what

24   he has told people, or what people know and if they are aware

25   that everything that I am going through is about Ben.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2800

1    Q     Did there come a point in time where there were

2    discussions with the defendant about your actual

3    communications with Ben and you proactively doing things in

4    your communication with Ben?

5    A     Yes.

6    Q     And is that something that also starts to come up in your

7    communication with the defendant, in your e-mail communication

8    with the defendant?

9    A     Yes.  It's outright reporting what we're talking about,

10   like verbatim, and then him scripting me on what to say to

11   him, me doing that, and then reporting back with the results.

12   Q     And then the rest of this e-mail, this idea, the

13   defendant responds:  Yes, there are things you need to

14   consider and know.  You need to have the Ben plan laid out

15   completely ahead of time with talk points, et cetera, and this

16   is not done yet.

17             What was the Ben plan and the talk points?

18   A     That is a full layout of what I'm trying to achieve and,

19   basically, a manipulation strategy, so what I'm trying to get

20   Ben to think and do, and the talk points are the specific

21   conversation points that I should bring out -- up with him as

22   to achieve that manipulation.

23             (Exhibit published.)

24   BY MS. PENZA:

25   Q     The e-mail continues talking about your looking for next

Daniela - direct - Penza                    2801

1   steps, is that right?

2   A    Yes.

3   Q    The defendant says:  It's hard for me to understand not

4   being able to think of next steps?

5   A    Yes.

6   Q    Ultimately, does this chain conclude with you coming up

7   with a plan that you propose?

8            (Exhibit published.)

9   A    Yes.

10  Q    Over time, would there be a number of different plans

11  that you go back and forth with the defendant about?

12  A    Yes.

13  Q    Showing you what's in evidence as Government's

14  Exhibit 1538.

15           (Exhibit published.)

16  BY MS. PENZA:

17  Q    An e-mail chain from June 21st -- or ending on June 21st,

18  2008.  Is that right?

19  A    That's right.

20  Q    This is between you and the defendant?

21  A    Yes.

22  Q    If I move to the middle of the chain, looking for a set

23  of e-mails from June 19, 2008 at 5:47 p.m.

24  A    Yes.

25  Q    And the defendant writes:  You should not speak to Ben

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2802

1   until the course is firmly decided.

2           So you are still going back and forth about Ben?

3   A    Yes.

4   Q    And then -- well, actually, you know, hang on one second,

5   please.

6           (Pause.)

7   BY MS. PENZA:

8   Q    I am just going to go back, I am going to start with

9   June 19th, 2008 at 3:38 p.m.

10          You are sending an e-mail to the defendant, is that

11  right?

12  A    Yes.

13  Q    And you talk about Ben here?

14  A    Yes.

15  Q    And you also say:  I broke my fast.  Is that right?

16  A    That's right.

17  Q    An e-mail that we were looking at and the defendant

18  wrote:  I do not know how long you were fasting, but now of

19  all times?

20          Is that right?

21  A    That's right.

22  Q    And then, a little while later, the defendant writes:

23          How much do you weigh?  What is the lowest you have

24  weighed?  Are you back on the fast right now?

25  A    Yes.

Daniela - direct - Penza                2803

1   Q    And you respond?

2   A    I do not know how much I weigh right now.  The lowest has

3   been 126.4.  I am back on fast as of this morning.

4   Q    And then does the defendant respond?

5   A    How much did you eat?  When were you 126.4?

6   Q    And then can you read your e-mail?

7   A    I write:  I was 126.4 when I began to unravel this issue

8   of mine so well represented in Ben... days ago.  Sorry, I have

9   lost all sense of time in my life.  I have eaten quite a lot.

10  I got out of control for a few days and then managed to stop,

11  then again for a few days until this morning.  The last time I

12  pulled something like this on myself I was 131.4 and ate for

13  one day, and the next one I was 142.0.  I was afraid to look

14  on the scale this morning.

15  Q    Moving to June 19th, 2008 at 10:06 p.m.

16  A    Yes.

17          He writes:  I don't know yet.  One possibility is

18  for you to briefly communication to Ben that, as you started

19  to think, you broke your fast.  You want to get back to where

20  you were before you do anything else or just -- or it is just

21  replacing one indulgence for another.  You will contact him

22  when you back -- when you're back to where you were and

23  stable.  I am currently attempting to preserve Ivy's father's

24  life.  I also need to sleep...  You keep working...  I'm not

25  sure when I write next.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                2804

1   Q    Do you have any idea what he's talking about when he says

2   "preserve Ivy's father's life"?

3   A    No, but it sounds important.

4   Q    This leaving an e-mail with:  "I'm not sure when I write

5   next," is that something the defendant would do?

6   A    Yes.

7   Q    Can you explain what the effect of that was on you?

8   A    Yes.  Well, and he tells me to keep working.  So I

9   would -- I would, you know, I thought that it was up to me and

10  to keep doing, you know -- I would reread the last e-mails and

11  try to figure out what I needed to do next and would keep

12  working incessantly and just wait, just wait for him to write

13  back.

14  Q    Okay, and then here there is -- in fact, there is an

15  e-mail from you at 10:19 p.m.:  By the way, I can save the

16  message history of the chat for your evaluation if you'd like,

17  although I might be a little embarrassed for you to see (read)

18  that part of me, it might be a good idea.  It gets pretty

19  stupid sometimes.  It's up to you.

20         Was there a discussion about your communications

21  with Ben?

22  A    Yes.  And as a general -- I know as a general way, but in

23  a very specific thing I discussed the matter with Ben.  Full

24  disclosure was a thing that I -- just like it was with like

25  all the sexual details -- that I should be willing and I

Daniela - direct - Penza                2805

1   should be wanting to tell him everything.  So...

2   Q    And the defendant -- how does the defendant respond?

3   A    Are you still working on this?  Also, would you show me

4   all past history of chats?

5   Q    And then the next e-mail.

6         So I am just showing you from you to the defendant.

7   A    At 10:10 a.m.  I say:  I -- I don't know what you mean --

8   oh, I don't know what you mean still working on this.  I am

9   still thinking about how to do this, the best way, is this the

10  only way, the specific steps, the timing, et cetera, et

11  cetera.

12        I would show you the logs if there were any.  I

13  automatically saved the chat history of all my Internet

14  conversations in the past.  I am psycho that way.  Then the

15  first time I had decided to leave I wiped my computer clean

16  (since it is not really my computer.)  After that, I disabled

17  any message logging fearing someone would find them (like

18  Karen) if they went through my computer.

19  Q    And then the defendant responds.

20  A    He responds:  Depending on how you wiped your computer

21  you can resurrect at least some of them.  Try your best, you

22  may be surprised.

23  Q    Did you then go on to try and recover a chat history with

24  you and Ben?

25  A    Yes.

Daniela - direct - Penza                                          2806

1    Q    Ultimately, would you send those to the defendant?

2    A    Yes.

3    Q    A lot of these e-mails -- is it fair to say that there is

4    a lot of back-and-forth about that and finding it on your

5    computer?

6    A    Yes.

7    Q    Same chain, June 21st, 2008 at 12:31 p.m., defendant

8    writes to you?

9    A    So what's your weight?  How much have you set yourself

10   back?

11   Q    And you respond.

12   A    148.6, sad face.

13   Q    And what does the defendant say to you?

14   A    He says:  In a way it seems more like you were losing

15   wait for Ben and not for me.

16   Q    How did -- what was your reaction when the defendant

17   would say things like that?

18   A    I don't remember the specific instance, but there was a

19   clear competition.

20   Q    Daniela, I'm showing you what's in evidence as Government

21   Exhibit 1530.

22            (Exhibit published.)

23   A    Yes.

24   Q    Are you familiar with this document?

25   A    Yes.

                        Daniela - direct - Penza              2807

1    Q     Can you read this cover e-mail?

2    A     Yes.  It's from me to Keith, June 22nd, 2008 at 2:14 p.m.

3          I say:  So here is a big chunk of conversation

4    history.  It is extremely organized, so you should have no

5    problem sorting through it.  You can also do ALT+F if you want

6    to do a search.

7          I didn't read it all myself, but towards the end I

8    did find a few highlights.  I am sure there is much more.

9          Then there is a list of dates and time stamps for

10   the corresponding conversations, I imagine, which is May 22nd,

11   May 25th, May 27th.

12         I am right now trying to piece together the very

13   last few conversations we had (including the last one when I

14   told him I would disappear.)

15         There is much more I can piece together.  I am going

16   to do it because I think it is what you want.

17         I have to tell you, these last few months have

18   probably seen the most innocent conversations, so this isn't

19   as bad as some of the other stuff, which is pretty destroyed.

20   I only found a couple of snippets from 2007, but I will look

21   in another one of my computers I was using more back then and

22   which I haven't used as much since.

23   Q     And there is an attachment?

24   A     Yes.

25   Q     Can you explain what type of attachment that is?

                SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2808

1  A     Oh, yes.  So that's an xml format, a file in xml format,

2  which is like a -- I would say like a crossover data format.

3  It can be easily imported and exported for different

4  applications, so many applications share that format, and this

5  one is named UpSector and a number, which is when you recover

6  certain parts from a drive, it's from sectors.  So that's what

7  that is.

8  Q     And I don't know exactly how many pages, but about 50

9  pages of chat history, is that what's here?

10 A     Yes.

11 Q     And so how would somebody actually be able to read this

12 legibly?

13 A     You can probably import it into, like a -- into like an

14 MSN chat, which was at the time what I was using, or a plain

15 text file with a little bit of --

16 Q     So the defendant could have imported it into MSN chat and

17 it would have looked more like a traditional back-and-forth

18 between you and Ben?

19 A     Yes.

20 Q     And over -- over the next period of time, would you

21 continue to send the defendant your conversations with Ben?

22 A     Yes, to send them in this custom.

23 Q     Excuse me?

24 A     To send them in this custom with him.

25 Q     And would the defendant also talk to you about what you

Daniela - direct - Penza                    2809

1    should be saying to Ben?

2    A    Yes, he would give me instructions.

3         MS. PENZA:  Your Honor, I think this would be a good

4    time to break.

5         THE COURT:  All right, we will break for lunch for

6    an hour.

7         All rise.

8         (Jury exits.)

9            (In open court - jury not present.)

10        THE COURT:  The witness may stand down.  Do not

11   discuss your testimony with anyone.

12        (Witness steps down and exits the courtroom.)

13        THE COURT:  About how much more do you have with

14   this witness?

15        MS. PENZA:  Through the end of the day, Your Honor.

16        THE COURT:  Through the end of the day.  All right,

17   we will take an hour for lunch.

18        Thank you, everybody.

19        (The defendant exited the courtroom.)

20        (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

21

22        (Luncheon recess now taken.)

23

24

25

SAM      OCR      RMR      CRR      RPR

2810

                          AFTERNOON SESSION

1

2              (In open court; outside the presence of the jury.)

3              THE COURT:  Are we all set?

4              MS. PENZA:  Yes, Your Honor.

5              THE COURT:  All right.  Let's bring in the witness,

6       please.

7              (Witness resumes the stand.)

8              THE COURT:  All right.  Let's bring in the jury,

9       please.

10             (Jury enters.)

11             THE COURT:  Please be seated.

12             Ms. Penza, you may continue your examination of the

13      witness.

14             The witness is reminded she is still under oath.

15             THE WITNESS:  Yes.

16             MS. PENZA:  Thank you, Your Honor.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2811

```
 1   DANIELA     ,
 2        called as a witness, having been previously duly
 3        sworn, was further examined and testified as follows:
 4   DIRECT EXAMINATION (Continued)
 5   BY MS. PENZA:
 6   Q    Good afternoon, Daniela.
 7   A    Good afternoon.
 8   Q    Before we turn back to some of the e-mails, I want to
 9   switch focus for a second.
10        Going back to before your fight with the defendant,
11   was there a time when Kristin Keefe who your discussed before
12   became pregnant?
13   A    Yes.
14   Q    When was that?
15   A    That was late 2006.
16   Q    Did she end up having a baby?
17   A    Yes.
18   Q    Do you remember the baby's birthday?
19   A    The baby's birthday?  Yes.
20   Q    What is it?
21   A    It's October 2006.
22   Q    And that child's name, what's the child's name?
23   A    Gaelyn.
24   Q    Do you remember when -- when did you first learn that
25   Kristin Keefe was pregnant?
```

Daniela - direct - Penza                    2812

1  A    I first noticed she might be pregnant in -- I noticed on

2  two separate occasions.  Again, I was spending a lot of time

3  in Flintlock.  At one time, I noticed her belly was very

4  swollen, like, very, very swollen, and I thought it was

5  strange.  And the second time I noticed that, I mentioned it

6  to Keith.  And I told him, you know -- I asked him if Kristin

7  was pregnant and he said no and something, that he had talked

8  about that with her but no.

9  Q    What happened?  Do you remember the day that Gaelyn was

10  born?

11  A    Yes.

12  Q    Can you explain what happened?

13  A    What I remember happened is Kristin was upstairs in her

14  room and, like, she hadn't come out of her room or she just --

15  like, she was just not around and someone found her.  I think

16  Keith found her, like went looking for her, and she was in,

17  like, a pool of, like, blood.  And so they took her to the

18  hospital immediately and at the hospital, they were checking

19  to see what was wrong with her, you know, that she was, like,

20  bleeding so much.  And it was like a very serious situation.

21  And Keith hadn't gone, Keith had stayed back, and I think that

22  Pam went with her.  It was some women or woman that went with

23  Kristin.

24        What I remember is that I was in Flintlock and Keith

25  got a phone call about how Kristin was doing and turns out

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2813

1    that what had happened was that Kristin was pregnant.  That's

2    what the doctors found, that she was pregnant.  And I

3    remember, I think, Keith was talking to Kristin, but I

4    remember the conversation being, like, well, how pregnant,

5    like, how, how, like how late in the term, like how many

6    months pregnant.

7    Q    And did she end up having the baby?

8    A    Yes.

9    Q    What happened after -- was anything else wrong --

10   obviously she had the baby.  Do you know whether she was

11   having any other medical issues at the time?

12   A    Yes.  I think they discovered she also had cancer.

13   Q    And so she was very far along at that point in time?

14   A    Yes.

15   Q    After the baby was born, were you present for any

16   conversations about what would happen with this baby?

17   A    Yes.

18   Q    Can you explain?

19   A    Yes.  There were a lot of conversations but it was a

20   specific meeting where there was, like, a very small circle of

21   people, of women who knew this was Keith's baby, this was

22   Keith's and Kristin's baby.  And it was plotted and planned,

23   you know, that this baby was going to be in Barbara Jeske's

24   home, that she would say -- and that was a cover story, that

25   she had adopted him, that Kristin would be living there

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2814

1  because, obviously, she's the mother but as a coverup.  And

2  there was, like, different, like, situations for, like, who

3  would care for the baby, because Kristin was still undergoing

4  treatment, a community meeting of how everyone is going to

5  help and what story is going to be told to the community.

6  Q    Is the defendant being the father of that baby going to

7  be disclosed to that community?

8  A    No.

9  Q    Was there a discussion of why not?

10 A    Yes.

11 Q    Can you explain?

12 A    Because to the community, Keith was celibate.  Keith

13 didn't -- like, Keith's relationships with everyone were

14 secret.  Nobody knew.  This was part of Keith's image in the

15 NXIVM community so it would completely counter all they knew

16 about him.  If he had a baby, it means he had a relationship,

17 and all of that would have to be explained.

18 Q    Now, Gaelyn was born very close to the time you had the

19 fight with the defendant, is that right?

20 A    Yes.

21 Q    Did you -- nevertheless did you end up having

22 interactions with Gaelyn?

23 A    Yes.

24 Q    Can you just describe generally the level of involvement

25 of Gaelyn?

Daniela - direct - Penza                    2815

1    A    Yes.  I participated very much in visiting him in the

2    NICU.  He was a premature baby, a premie baby, so he spent a

3    lot of time in intensive care.  And then for a time, Kristin

4    and the baby were residing in Barbara Jeske's home.  I wasn't

5    present for a lot of that, but there was a falling out of

6    sorts between them so Kristin ended up moving to 1 Flintlock

7    Lane and taking care of Gaelyn all by herself.  So I was

8    essentially babysitting for her constantly, like, I would stay

9    overnight.  She would go on trips, she would go on treatments,

10   and I would stay with Gaelyn and take care of him.

11   Q    Were you paid for that?

12   A    No.

13   Q    During that time period when you would be watching

14   Gaelyn, did you observe the defendant interacting with Gaelyn

15   at all?

16   A    On counted times, there were a few times I saw him

17   interact.

18   Q    Your sister Camila, did she also interact with Gaelyn?

19   A    My sister Camila interacted with Gaelyn a lot more than I

20   did.

21   Q    Can you explain that?

22   A    Yes.  Camila, I even came to see her as, like, Gaelyn's

23   second mother.  She was so present in his life.  She really

24   was the one who take care of him since he was like very, very

25   little.  She would go to the NICU too and she was doing a lot

Daniela - direct - Penza                    2816

1   more of the babysitting.  And, in fact, around the time that

2   Gaelyn was born is what I believe propelled the formation of

3   what would be called Rainbow Cultural Garden, the system of

4   education for kids that Keith developed over time.  And my

5   sister Cami was the first teacher in that program.  They

6   called them MDS's, multi-cultural development specialist.  So

7   she, she was the, like, the pilot of that.

8   Q    I'm going to turn back to the e-mails that we were

9   looking at.  From the time period after you've had your fight

10  with the defendant, there's a period of time and you have a

11  period of e-mail correspondence with the defendant?

12  A    Yes.

13  Q    Okay.  And so the e-mails that we looked at this morning,

14  can you just describe how representative those are of other

15  e-mails that you had with the defendant?

16  A    I mean, that's, that's -- that's pretty much how the

17  communication went about so that's how most of the

18  communication was.  That's a very small sample.  It was -- it

19  is a very high volume.  So just like the e-mails that I looked

20  at a little while ago, the communication was constant.  So

21  over a period of, like, 24 hours, it would be one after the

22  other and, and in the -- and the content was in the same way.

23  It was his instructions, his, you know, why I destroy what I

24  did, making capricious plans in me to, trying to do

25  everything, was telling me to disclose everything, to say all

Daniela - direct - Penza                    2817

1   the right things, to say all the things I thought I was

2   expected to say, and to, like, honestly trying to looking at.

3          So that was the nature of the exchange.  There was a

4   lot of, you know, asking and reporting my weight.  There would

5   be a little more, further on, some of the sexual requests

6   escalated but that's the gist of it.  That's a good sample of

7   what the exchanges were like.

8          MS. PENZA:  Your Honor, without objection, the

9   government moves into evidence Government Exhibits 1555, 1556,

10  1557, 1559, 1562, and 1563.

11         MR. AGNIFILO:  Yes, Judge.

12         THE COURT:  All right.  Government Exhibits 1555,

13  1556, 1557, 1559, 1562 and 1563 are received in evidence

14  without objection.

15         (So marked.)

16         MS. PENZA:  Thank you, Your Honor.

17  Q    Daniela, I'm showing you what's in evidence as Government

18  Exhibit 1555.  Do you see that?

19  A    Yes.

20  Q    And just turning to one of the last e-mails on that page,

21  does the defendant write to you on November 27, 2008:  I just

22  heard you joined Facebook.  Do you really want to do that?  I

23  can't see any upside and lots of irreversible downside.  Even

24  the fact that you joined has problems that need to be

25  repaired.  What are you doing?

Daniela - direct - Penza                    2818

1              Do you see that?

2    A    Yes.

3    Q    Do you remember when you joined Facebook?

4    A    I can read from the e-mail.  Like, I place it shortly

5    before that probably.

6    Q    But do you remember -- do you remember what happened

7    after you joined Facebook?

8    A    Yes.

9    Q    Can you explain?

10   A    I was not allowed to join Facebook.

11   Q    And why was that, not allowed -- when you say "not

12   allowed," what do you mean?

13   A    Well, those series of questions -- of course, they don't

14   say that in so many words.  They don't say, Daniela, do not --

15   close your Facebook account.  But that's how, that's exactly

16   how he works, so that was an instruction.  This is not good,

17   this is damaging, this is destructive, this has to be

18   repaired.  So I think I put up a bit of a fight but in the

19   end, I closed my Facebook account.

20   Q    Turning to -- let me just ask one overview question.

21   Were there times where you would write to the defendant and

22   then the defendant would answer underneath?

23   A    Yes.

24   Q    And is that something you would sometimes do to the

25   defendant as well in your exchanges?

Daniela - direct - Penza                    2819

1    A     I think so, yes.

2    Q     So turning on, also on Government Exhibit 1555,

3    12:07 a.m., The defendant writes to you:  Gosh, maybe if you

4    can feel good enough you will never decide to do the hard

5    things.  Life will be quite fun without ever having to fix

6    anything or have me in it.  Need I go on.  What are you doing,

7    multiple question marks.

8              Do you see that?

9    A     Yes.

10   Q     And then here on November 28, 2008, at 12:19 a.m., I want

11   to -- I'm going to ask you if I understand what's happening

12   here.

13             The non-highlighted portions, is that an e-mail that

14   you wrote back to the defendant?

15   A     Yes.

16   Q     And you -- that would have been on November 28, 2008 at

17   12:19 a.m.?

18   A     Yes.

19   Q     And then if we look on November 28, 2008 at 1:06 a.m.,

20   does the defendant write:  I am going to write under each

21   sentence?

22   A     Yes.

23   Q     And so the first line, the original e-mail, would have

24   just been your language without the highlights, is that

25   correct?

Daniela - direct - Penza                    2820

1    A    That is correct.

2    Q    So let's just read through it.  So you wrote:  I

3    understand all you say.  And he says:  Evidently, you don't or

4    else we would be back together.

5    A    Yes.

6    Q    And you say:  And although I don't consider myself to be

7    at the level of a Rodrigo, I would like to be.

8    A    Yes.

9    Q    Is that another reference to the mission?

10   A    Yes, it is.

11   Q    Okay.  And he writes back:  This demonstrates you do not

12   understand.  If this were true, you certainly would not be

13   moving in the wrong direction right now.  Even if you were not

14   a monk, you would at least not be disrespectful.

15        This idea of being a monk, can you explain that?

16   A    Yes.  The idea of being a monk is something that would

17   surface several times because I didn't want to be a monk.  I

18   felt like my life was becoming extremely isolated and many

19   times expressed that I did not sign up to be a monk, that I

20   did not want to be monk, that I was a reluctant monk, that I

21   really didn't want to live that isolated life.

22   Q    Okay.  And then you say:  Why do you ask this of me?  Why

23   not of others?

24   A    Yes.

25   Q    And he responds:  This is certainly a self-pitying

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                                          2821

1    assumption.  I guarantee many others question why I bend so

2    far for you, to my detriment.  You have also done far more

3    damage.

4              Do you see that?

5    A    Yes.

6    Q    And then the next one, can you read what you wrote?

7    A    Yes.

8              What makes you so sure I will ever finish walking

9    this path and not just continue on a life of, I don't know

10   what to call it, endless monk-like seclusion, mystery.

11   Q    And he responded:  This is full of suffering and lack of

12   conscience.  You do not live a monk-like life because you are

13   told to do so.  You do it because it is the best alternative.

14   The happiest alternative.  You cannot stomach the hypocrisy,

15   dishonor and disrespect of any other life.  To seek fun,

16   entertainment, feeling good through any mechanism other than

17   fixing the breach is to destroy conscience and dishonors me.

18   Need I see even more.

19             Do you see that?

20   A    Yes.

21   Q    And then there's more after that?

22   A    Yes.

23   Q    I'm showing you what's in evidence as Government

24   Exhibit 1 -- Government Exhibit 1556.  Excuse me.

25             So here, also on November 28th and here at

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                          2822

1    2:37 a.m., do you see that?

2    A    Yes.

3    Q    And the defendant is writing, again, in response to an

4    e-mail, this e-mail back and forth that we have looked at.  Do

5    you see that?

6    A    Yes.  Yes.

7    Q    And so -- and you've written back as well by this point?

8    A    Yes.

9    Q    So I'd like to look at the "you do not live a monk life."

10   A    I'm sorry, but I can't see it.

11   Q    Oh, I'm sorry.  Thank you.

12   A    Yes.

13   Q    Do you see?

14   A    Yes.  It says:  All right.  So you do not live a

15   monk-like life, which is what we already read.

16   Q    So that's the part he had written in response to you?

17   A    Yes.

18   Q    Right?  And so that part had ended, "Need I say even

19   more?"

20   A    Yes.

21   Q    And then you write -- what do you write?

22   A    Yes, please say more.  I do not follow.  Are you saying I

23   have been living the last two years in the manner I have

24   because it is nice?  The easiest?  If you are, you are wrong.

25   Maybe the easiest, not the best of alternatives as far as

Daniela - direct - Penza                    2823

1    happy goes.

2    Q    And then the capital letters that follow, did you have an

3    understanding of what the defendant meant when he wrote in

4    capital letters?

5    A    It was very important, very loud, as capital letters

6    mean.

7    Q    Okay.  And what -- and this is the defendant writing to

8    you?

9    A    Yes.

10   Q    Okay.  Can you read that?

11   A    Yes.

12        He writes:  This is the source of all the problems.

13   The last two years your reason for living as you did should

14   have been because it was the only, nicest, bearable way to

15   live.  The only way one could possible imagine to continue and

16   you should be grateful there was a way for you to continue to

17   undo the wrong.  Not only should have this been the easiest,

18   it should have been the only.  The other stuff you raise is

19   really crap.  I think for you to finally care, you should

20   explain to me why what you wrote above, point by point, is

21   crap.  Please do this now.

22   Q    You responded to the defendant?

23   A    Yes.

24        If I thought what I wrote was crap, I would not have

25   written it in the first place.  Actually I didn't want to

Daniela - direct - Penza                    2824

1   write it for this precise reason -- parenthesis -- that in the

2   event of having to make it go away, I won't know how to -- end

3   of parenthesis.  It is crap in that it may not be relevant to

4   me feeling my breach or not but it is not crap to me.  In a

5   very real way, it is the very reason I started the argument

6   that ended our relationship.  I could lie to you and perhaps

7   even convince myself for a little while, and come up with good

8   arguments for why this is all crap.  But it will come up again

9   later.  Probably sooner than later.  I know it because it has

10  many times before.  It isn't crap to me and it directly

11  affects the way I feel.  So, I am sorry.  No.

12  Q    And how did the defendant respond?

13  A    He wrote:  It is crap and a lie.  As long as you convince

14  yourself as you are, we can go nowhere.  I was giving to

15  opportunity to grow up.  You have no concept why you started

16  the argument that ended our relationship.  Although you are

17  good at retrofitting excuses.

18  Q    Okay.  Thank you, Daniela.  The rest is similar to what

19  we've looked at before?

20  A    Yes.

21  Q    Showing you what's in evidence as Government

22  Exhibit 1557, do you see that?

23  A    Yes.

24  Q    And this is another, this is another -- is this another

25  place where you went off on different threads with the

Daniela - direct - Penza                    2825

1    defendant?

2    A    Yes, it is.

3    Q    It starts at the beginning with:  I heard you just joined

4    Facebook?

5    A    That is right.

6    Q    And so just, if you could just read the final e-mail on

7    that thread?

8    A    Yes.  That's from Keith.

9         He writes:  If your family were to ever understand

10   your seriousness and the seriousness of what you have done --

11   parentheses -- they are part of your upbringing -- end of

12   parentheses -- you would have gone into something like a

13   speechless, monk-like seclusion.  Anyone with a deep

14   conscience does not look to make things okay or better until,

15   and not before, the breach has been resolved.  Your doing as

16   you describe below demonstrates the opposite of caring

17   conscience.  It also has the exact opposite effect you would

18   ultimately want on Camila, Fluffy, your mom, your dad and

19   Monkey.  This also extends to B and many others.  I guess now

20   that I am communicating with you everything is great, time to

21   get back to the good life, time to let your family know you're

22   back to normal.  Wow, isn't it great everything is so good?

23   Q    So what was your understanding of the defendant, that

24   e-mail from the defendant?

25   A    Can you put it back on?

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2826

1    Q    Oh, yes.  Sorry.

2    A    Thank you.

3         The part where he says, The seriousness with what I

4    have done, if my family were to understand, if I were to

5    understand the seriousness of what I have done, really that's

6    me only choosing Ben but it's blown out of proportion and now

7    he's describing that all of this has very damaging effects on

8    all of my family and that I am pretending or indulging or that

9    it must be so great to have some contact with him that makes

10   everything okay as that is a full life, e-mail communication

11   life.

12   Q    At this point in time, was the defendant also upset about

13   you communicating over Facebook with people?

14   A    Having any visibility, that people know I'm alive, that

15   people know I am there, yes.

16   Q    I'm showing you what's in evidence as Government

17   Exhibit 1559.  And this is an e-mail chain ending on

18   January 7, 2009 at 9:00 p.m.?

19   A    Yes.

20   Q    And that is another e-mail chain between you and the

21   defendant, is that right?

22   A    Yes, it is.

23   Q    So January 6, 2009, you are writing an e-mail to the

24   defendant?

25   A    Yes.

Daniela - direct - Penza                    2827

1    Q    And you say:  I wish you could respond right away so I

2    would make the right decision.  And then it goes on:  I am

3    going to make a super quick appearance at the party.  It has

4    become a thing the fact that I am not going for everyone knows

5    Bobo is making --

6              I don't want to puncture -- what's your

7    pronunciation?

8    A    "*Roscas*."

9    Q    -- *roscas* and now she isn't going.  Weirdo.  Et cetera.

10   Et cetera.  Anyway I will avoid any personal interactions with

11   anyone, especially B.  Mom is going to take me in and out very

12   quickly.  I will say I have work I need to do.  Maybe I am

13   fasting and so I have to go.  I am here five more minutes.

14             Can you explain what's happening in this e-mail?

15   A    Yes.  So there's a festivity in Mexico and for Catholics

16   for, like, the Three Kings that come in early January and

17   there's a special thing we eat called *roscas*.  So it was a

18   community event in ESP for this precise holiday and I was

19   making *roscas* and there was a party and I was making the

20   *roscas* for all of the community and I was going to go and I

21   was asking for permission.

22   Q    Okay.  *Roscas*, can you explain what that is?

23   A    Yes.  *Rosca* is a big baked bread with a little bit of

24   sugar and dried fruit.

25   Q    And is there something special that happens with it?

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2828

1   A     Yes.  So we put little, like, baby Jesus and, like, a

2   ring and, like, different things get hidden under the bread.

3   And so every person at the party takes his slice of bread and

4   if they get like one of the little gifties (sic), it signifies

5   something different.  So if you get the ring, this means that

6   you are going to get married that year.  If you get the baby,

7   it means that you have to throw a party in February for the

8   *tamales*.  It means all different things.

9   Q     So you're asking for permission to go to the party?

10  A     Yes.

11  Q     And then, so you write that at 9:38 p.m.  At 9:45 p.m.,

12  what do you write?

13  A     I wrote:  I just tried calling Pam.  This doesn't feel

14  100 percent right.  Not going doesn't feel 100 percent right

15  either and I don't know which one to default to.  I don't want

16  to screw things up further.

17  Q     Did you try to call Pam?

18  A     I did.

19  Q     Why?

20  A     To get approval.  At this point, I live scared that

21  anything I might do might be the wrong thing, just like

22  anything I might do my be the wrong thing that breaks

23  everything so I want to get permission to make sure that I'm

24  not breaking something.

25  Q     Okay.  Turning to the next set of e-mails, these are all

Daniela - direct - Penza                      2829

1    e-mails from you, is that right?

2    A    Yes.

3    Q    Okay.  So that was at -- you said you were leaving at

4    5 minutes after 9:38.

5    A    Uh-huh.

6    Q    So then you write another e-mail at 9:45?

7    A    Yes.

8    Q    And you have an e-mail at 10:03?

9    A    Yes.

10   Q    And then you have an e-mail at 10:12?

11   A    Yes.

12   Q    And in that e-mail, you say you are going to go, is that

13   right?

14   A    Yes.

15   Q    And you say:  I think I am going.  It doesn't feel

16   completely right, but the alternative feels even less so.

17   Maybe because I think I can avoid the damage.

18             And it goes on:  So I think this is what I will do.

19   Mom is going now, she will take me.  I will go in, say hi to

20   everybody and tell them I just wanted to make an appearance

21   but can't really stay.  Won't even take my coat.  I want to

22   make so it does not at all satisfy the desire I had to be at

23   that party, but also it avoids the damage of not going at all.

24   I hope you agree with this.  I will write as soon as I am

25   back.

Daniela - direct - Penza                    2830

1          What would be the damage of not going at all?

2    A    That people think that I am a victim or prisoner of sorts

3    because they expect me.  They know I made the *roscas* and I'm

4    not going so I'm kind of captive.

5    Q    So can you read -- is the next e-mail from the defendant?

6    A    Yes.

7    Q    Okay.  And can you read this, please?

8    A    Yes.

9          It says:  I just received your e-mails.  I think you

10   made the wrong decision.  I think your going then leaving

11   quickly risks looking subtly like you are sneaking out of

12   confinement instead of being staying away because you cannot

13   ethically stomach going.  If Rodrigo were asked if he wanted

14   to go to a party, would say, what are you crazy?  The fact you

15   even would want to go to such a thing means you have no

16   understanding.  Of course, going and saying is even worse.

17   This situation arises because you do not uphold me or my

18   ethical position.  During volleyball, Fluffy kept on implying

19   I needed to give you permission to go.  I told him it was up

20   to you in a puzzled fashion.  This belief of your imprisonment

21   is your direct doing.  If you said or had said something like

22   I can't stand anything until I fixed myself, no one would

23   bother you.  What you do promote is I love the social life, I

24   love parties, I love the limelight, I love the, but I can't

25   go, I just can't.  The translation, the evil ogre Keith is

Daniela - direct - Penza                    2831

1    keeping me in the castle.  None of you really know.  Wink.

2    Wink.  I will get in so much trouble if I come.  I will make

3    cameo appearances so you know I'm still alive and still want

4    to.

5    Q     What is your understanding of that paragraph?

6    A     That I am supposed to stay isolated and like it.  I'm

7    supposed to stay completely isolated, not go anywhere, not see

8    anyone, and I'm supposed to say that I love it.

9    Q     Okay.  And this line:  During volleyball, Fluffy kept on

10   implying I needed to give you permission to go, I told him it

11   was up to you in a puzzled fashion, what does that mean?

12   A     I mean, right there, he has manipulated my brother.  He

13   knows exactly we're having all of this communication, Keith, I

14   mean.  Keith knows he is giving me instructions in this way.

15   It's up for him to go somewhere or not go somewhere clearly

16   and he's the one telling my brother, I don't know, it's up to

17   her.

18   Q     And then 11:30, he writes:  I am here.

19   A     Yes.

20   Q     11:31:  Oh, no.  I am infinitely sorry.  And not too much

21   in an apology to you fashion but just sorry.  Shit.  Shit.

22   Shit.

23   A     Yes.

24   Q     And then the defendant replies:  I just heard you went to

25   the party from two different people.

Daniela - direct - Penza                    2832

1    A    Yes.

2    Q    And you asked, What does that mean?

3    A    Yes.

4    Q    And then you write back:  At this precise moment, more

5    than ever before I understand the why of being monk-like.

6    This going to the party was my effort to mitigate effects of

7    my other non-monk-like actions.

8    A    Yes.

9    Q    Is that the same concept we've been talking about?

10   A    Yes.

11   Q    And 12:02 a.m., the defendant writes:  How can you repair

12   at least in part this now tonight?  I do not know but I tend

13   to always believe there are ways.  This is really going to

14   hurt the situation as is.

15   A    Yes.

16   Q    More back and forth, is that right?

17   A    Yes.

18              (Continued on next page.)

19

20

21

22

23

24

25

Daniela - direct - Penza                    2833

1   BY MS. PENZA:  (Continuing.)

2   Q    You send your last e-mail -- you send an e-mail at 12:51?

3   A    Yes.

4   Q    It says, "I know my love and I hate myself for it"?

5   A    Yes.

6   Q    3:53 a.m. the defendant writes, "So what did you do?  I

7   hope you did not just go to sleep.  If I were in such a

8   situation I would find it impossible to sleep possibly for

9   days.  You also did not tell me what happened at the party.  I

10  heard B got a ring."  And it's 3:55 and you respond?

11  A    Yes.

12  Q    And then you respond to the defendant at 4:02 a.m.; is

13  that right?

14  A    Yes.

15  Q    4:06 a.m. you say, "You didn't even really say hi to B"?

16  A    Yes.

17  Q    When you just are writing B, is that Ben?

18  A    Yes.

19  Q    And then the defendant writes at 4:12 a.m., "What were

20  people's reaction to your being there, including your

21  mother's"?

22  A    Right.

23  Q    Did you have an understanding of why the defendant was

24  asking you that?

25  A    I mean, I thought maybe he was looking -- he's already

Daniela - direct - Penza                    2834

1  told me that this is really bad and this is really damaging so

2  probably going to go through the exercise of dissecting

3  everyone's reactions and figuring out their thought objects

4  and giving me instructions to make plans to fix every one of

5  them.

6  Q    Okay.  And then do you go on to explain all the people at

7  the party and their reactions?

8  A    Yes.

9  Q    That was at 4:18 a.m.?

10  A    Yes.

11  Q    Okay.  I'm showing you what's in evidence as Government

12  Exhibit 1563.  Is this another continuation on a different

13  thread of the e-mail we were just looking at?

14  A    Yes, it is.

15  Q    "I just heard you went to the party from two different

16  people"?

17  A    Yes.

18  Q    Can you read the top e-mail from -- so we had seen this

19  e-mail, "At the precise moment more than ever before.  I

20  understand the why of being monk-like.  Going to the party was

21  my effort to mitigate the effects of my other non-monk-like

22  actions?"

23  A    Yes.

24  Q    What does the defendant write?

25  A    He writes, "By showing you proving you are non-monk-like,

Daniela - direct - Penza                    2835

1   this proves in the future, monk-like actions or coerced and

2   not genuine; implicating me as an ogre even more so if you do

3   the right thing."

4   Q    And this is about a year before you are put in the room?

5   A    Yes.

6   Q    Showing you what's in evidence as Government Exhibit

7   1562.

8        (Exhibit published.)

9   Q    Is this another part of this chain?

10  A    Yes.

11  Q    And here the defendant is asking about -- at 4:25 a.m.

12  the defendant is asking about the damages from each person's

13  reaction; is that right?

14  A    Yes, yes.

15  Q    And then there's more of a back and forth and then the

16  defendant writes on January 7, 2019 at 4:36 a.m.?

17  A    Yes.

18  Q    Can you read that e-mail, please?

19  A    Yes.  Keith writes, "If Rodrigo walked into a party, I

20  would think something is wrong.  Your past suffering has

21  created quite a fan club and with the help of B, Fluffy and

22  others, I'm an ogre and your escape is hailed as with

23  celebration.  These are times when I feel I may not be able to

24  do much more for much longer.  I am boycotting certain things

25  by necessity.  People currently look at my boycotting as

Daniela - direct - Penza                    2836

1  wrongful or extreme because of you.  This makes what I need to

2  do almost impossible.  I am running out of time.

3  Q    And there's a back and forth and then can you read the

4  e-mail from the defendant at 9:44 a.m. on January 7, 2009?

5  A    Yes.  He writes, "So why would they think I am not

6  speaking to you?  Why do I imprison you and forbid to you to

7  go out.  Why did you have to escape from me.  This is what a

8  number of people think."

9  Q    Your Honor, I believe without objection the Government

10  moves into evidence government exhibits 1600, 1600-A and 1601.

11             MR. AGNIFILO:  That's correct, Judge.

12             THE COURT:  Government Exhibits 1600, 1600-A and

13  1601 are received into evidence without objection.

14             (Government Exhibits 1600, 1600-A and 1601 received

15  in evidence.)

16             MS. PENZA:  I'm sorry, Your Honor, can I have one

17  moment to confer with Mrs. Carby.

18             THE COURT:  Sure.

19             (Pause in proceedings.)

20             MS. PENZA:  I'm sorry, Your Honor.  Government's

21  Exhibit 1600 does not have an A, so it's Government's Exhibit

22  1600 and 1601.

23             THE COURT:  Correction made.

24             (Government's Exhibit 1600 and 1601 received in

25  evidence.)

Daniela - direct - Penza                    2837

1           THE COURT:  Let's go on.

2    BY MS. PENZA:

3    Q    Daniela, I'm showing you what's been marked in evidence

4    as Government's Exhibit 1600.

5               (Exhibit published.)

6    A    Yes.

7    Q    And is this a back and forth between you and the

8    defendant on December 9, 2008?

9    A    Yes, it is.

10   Q    So a little bit earlier than the e-mail chains we just

11   looked at?

12   A    Yes.

13   Q    Earlier in the month?

14   A    Yes.

15   Q    I'm just showing you an e-mail on December 9, 2008 at

16   4:35 a.m. and here is this another example where the defendant

17   is responding to things that you have written?

18   A    Yes.

19   Q    And, so, I just want to turn your attention to the middle

20   of this page and here had you written, "I'd much rather be

21   your friend than nothing at all and if it can be I will take

22   it"?

23   A    Yes.

24   Q    And how did the defendant respond?

25   A    He writes, "You have no understanding of caring.  If you

Daniela - direct - Penza                    2838

1    loved me you would do so whether I hated you or loved you.

2    Friendship?  You mean everything else all the shared values

3    except the content of sex?  How backwards is this?"

4    Q    Were there various times when you asked the defendant to

5    just be his friend?

6    A    Yes.

7    Q    And how would the defendant respond?

8    A    In the negative.

9    Q    What does that mean?

10   A    Well, there was no concept of any relationship where

11   there was no sex.

12          MS. PENZA:  Your Honor, the Government moves into

13   evidence Government Exhibits 1603, 1612, 1604, 1605, 1589,

14   1609, 1608 and 1613.

15          MR. AGNIFILO:  That's fine, Judge, yes.

16          THE COURT:  That is it?

17          MS. PENZA:  Thank you, Your Honor.

18          THE COURT:  All right, Government Exhibits 1603,

19   1612, 1604, 1605, 1589, 1609, 1608 and 1613 are received in

20   evidence without objection.

21          (Government Exhibits 1603, 1612, 1604, 1605, 1589,

22   1609, 1608 and 1613 received in evidence.)

23   BY MS. PENZA:

24          (Exhibit published.)

25   Q    Daniela, I'm showing you what's in evidence as

SN        OCR        RPR

Daniela - direct - Penza                    2839

1    Government's Exhibit 1612?

2    A     Yes.

3    Q     Are you familiar with this?

4    A     Yes.

5    Q     And is this a letter -- is this an e-mail that you wrote

6    to the defendant on March 1, 2009?

7    A     Yes, it is.

8    Q     Can you read -- can you read this, please?

9    A     Yes.  I wrote, "Okay.  I started off by saying I had some

10   issues about you and my sister Mariana.  However, this is not

11   what all this below is about.  And I was careful not to delve

12   into that train of thought any further, but it did make me

13   realize that I no longer see you in the same way I used to.  I

14   do not think you have changed and if you have, I wouldn't

15   know.  I have changed.  The things I want or think I want,

16   what is the difference really, are not the same.  I lean

17   towards thinking I can see things more clearly now having been

18   in the inside of a life with you and now observing from the

19   outside.  Yet, I still can't help but think maybe I am just

20   out of touch.

21         "Lately, I have been thinking more and more about

22   creating a life for myself, one that does not necessitate your

23   presence.  I think this comes from the thought that I have so

24   far put all of my marbles on a future life with you, which I'm

25   not only not sure, but in fact rather non-optimistic will ever

SN        OCR        RPR

1  happen.  And I know I'm nothing al by myself without the

2  possibility of a future like that with you, the meaning of my

3  life amounts to nothing special."

4           I have here referenced two asterisks in the first

5  part of the e-mail.

6           "I feel very trapped/cornered by the way things are

7  right now.  I would like to be able to at least sustain

8  myself, pay my rent, pay for my food, pay for my health, et

9  cetera, but with the restraints imposed on me, I can't work on

10  anything else.  I can't make money unless I do book reports.

11  I feel hopeless most of the time.  I know I could potentially

12  take this cornering as a force.  It is the only way out, so do

13  the bloody reports.  But in a more realistic way going on

14  three years, come on, I think I need to be able to bootstrap

15  myself into it, balance one side as I balance the other, yet

16  every single thing that has motivated me in some way has been

17  taken away and, yes, I have allowed it.  That is the point

18  here and I don't know.  Scratch that.  I know for a fact the

19  amount of times I feel motivated to do things because they are

20  right.  It's incredibly small in comparison.

21           "There must be a better way to work up to that and I

22  think that would be first, being able to do something,

23  anything at all, then maybe I can work on my reasons.  I just

24  don't want to keep doing this.  I am a child.  I don't pay for

25  my own existence and I don't know how to do anything.  My life

Daniela - direct - Penza                    2841

1   as it is right now, has no value and I can't seem to motivate

2   myself with the tools I am given here.  The point is, I

3   realize it is up to me.  I choose to be in this position, to

4   live in this country where because of my status, my capacity

5   and choice of work, it's up to other people to decide on.  I

6   feel that I am caught in an impossible cycle.

7           I want to go to school, learn to shape my ideas into

8   actual things that I can use.  I want to do something with my

9   life.  I want to work.  I want to make money, be

10  self-sufficient.  Now, see all of the above?  I'm not sure,

11  but I think that is some form of pride.  Is that bad?  The

12  thing is, I think this is my only reason to move.  It is the

13  most real and powerful kind of motivation that I can tap into.

14  I hesitate to tell you because I predict that, as before, it

15  is going to be shut down and my legs will be put off again and

16  I don't know that I will be very willing to let it go this

17  time.

18          "So to reference back to the first paragraph, I

19  think I am able to think in this way because, one, I have a

20  grip on the fact that getting real here I have no motivation

21  to do the right thing because it is the right thing and at

22  this point I just want to do something or I am going to end up

23  losing myself.  And, most importantly, too, I don't see you in

24  the same way I used to.  I don't miss you anymore.  Sure, I

25  think about you pretty much all the time, but my insides don't

Daniela - direct - Penza                    2842

1   shrink when I think of you.  I feel tied to you, but not as

2   before.  Before, I desperately wanted to have you back.  Now I

3   almost feel I want to break away and now as before when it was

4   a possibility for me, it seems it may be.  The truth is, I

5   don't really remember me with respect to you.  I have been to

6   Flintlock a few times and I think what upset me so much is

7   that I didn't feel anything.  I wanted to feel nostalgic but I

8   didn't.  I remember your conversations, your voice, but not

9   the feeling of you or look into your eyes.  I can imagine it,

10  but I can't get into it.  I don't remember that me.  It's hard

11  to explain.

12          I think, as you have said, we are shaped by the

13  people in our lives and you are no longer part of mine.  I

14  think this little trip I have taken with you has been half

15  dream, half nightmare.  The first part held all the

16  possibilities but it was a fantasy.  The second part, this

17  time apart from you, I can't even describe.  The point is, I

18  believe I am the wrong person for the job.  I don't have the

19  ethical strength you do and no desire to grow it.  We're

20  similar in some minor details and extremely different in the

21  most important qualities.

22          So I think what is going on with me is I am going

23  back to what I wanted before I met you, to the motivations I

24  had before I jumped into this ride with you, a decent life at

25  least; school, job, do something productive that at the very

Daniela - direct - Penza                    2843

1   least doesn't harm anyone.  I would settle for that.  These

2   are the thoughts that have been plaguing my mind and when I

3   think all the things about you and my sister and I think of

4   your life, and I think to myself maybe I'm better off without

5   you.  Even writing to you now, I feel I do not know the person

6   sitting in front of that screen.  I feel lost because I have

7   made you the center of my world.

8           Now I feel like the illusion has been shattered.

9   Also, I don't think relationships of the romantic kind are

10  anything I was designed to ever be a part of.  I was never

11  good and completely happy while in it with you and it hurt

12  like a mother F when we split and for a long time afterward.

13  I never want to go through that again.  So I am at this point

14  pretty sure I don't want a relationship of that kind with you

15  ever again.  Or anyone else.  I just don't want that.  Nothing

16  good comes from it.  These are my thoughts on my future, but I

17  think I first have to fix things here with you the most I can.

18          "Of course, given the above, the healing exercise

19  would be quite superficial.  In other words, if healing means

20  the dropping of the pride, changing in a fundamental way that

21  would be a contradiction with my honest motivations.  Well, I

22  added some things.  There is more, but I think I am starting

23  to get very dramatic so I will leave it out.  D."

24  Q    What are you trying to convey to the defendant in this

25  e-mail?

Daniela - direct - Penza                    2844

1   A    I am, right there, having a moment of lucidity.  I'm

2   sorry.  I think it was -- I think it was rare because I became

3   so crazy and confused with everything that I was being told

4   and lost sight of things and that was an instance, a moment,

5   when I saw it clearly and I knew what I wanted and I saw it

6   clearly and I wanted it with all of my heart and it wasn't

7   with hate it wasn't with hate towards Keith or what happened.

8   It was giving up that ride, I say, and moving on.

9   Q    Did the defendant respond to you?

10  A    Yes.

11  Q    I'm showing you what's in evidence as Government's

12  Exhibit 1603?

13            (Exhibit published.)

14  A    Yes.

15  Q    At the bottom, the defendant -- you have your e-mail, on

16  March 1, 2009 at 12:23 p.m. and then the defendant responds,

17  "Comments in brackets below"; right?

18  A    Yes.

19  Q    And the next page the portion in brackets are what the

20  defendant wrote in response?

21  A    Yes.

22  Q    And they were not highlighted in the original e-mail?

23  A    No, just in brackets.

24  Q    But this is the same e-mail absent that, except for that

25  highlight?

Daniela - direct - Penza                    2845

1   A     Yes, it is.

2   Q     So, paragraph one of your e-mail, you said.  "Okay.  I

3   started off by saying I had some issues about you and my

4   sister, Mariana.  However, this is not what all of this below

5   is about and I was careful not to delve into that train of

6   thought any further, but it did make me realize that I no

7   longer see you in the same way I used to.  I do not think you

8   have changed and if you have, I don't know.  I have changed

9   the things I want, I think I want or know I want.  What is the

10  difference really?  Are not the same.  I lean towards thinking

11  I can see things more clearly now having been on the inside of

12  a life with you and now observing from the outside.  Yet I

13  still can't help but think that maybe I'm just out of touch."

14          And the defendant responds:  "Yes, you are out of

15  touch.  You have never really be on the inside because of the

16  other things and your pride at the time.  By the way, life

17  could have been so wonderful had you just cared.  You are very

18  incorrect about how things would have been.  We do really have

19  more in common than just being geeks.  Apathy is the worst

20  ethical breach in life.  It is said the apathetic should be

21  condemned to the lowest level of hell.  The key is, in order

22  for you to make this right and for you to be right within

23  yourself, you need to restore and even intensify your feelings

24  towards and about me.  You have made this very hard for, as

25  all prideful people do, you let the time go by trying to do it

Daniela - direct - Penza                    2846

1   your way and now you use the resulting problems of your pride

2   as an excuse not to do the right thing.  This will also

3   fortify your pride.  That is why people with a deep conscience

4   go to the extreme of discomfort with the repair of an ethical

5   breach.  They're not there just listening to the same bad

6   advice of pride which got them into the breach in the first

7   place."

8           Do you mind just reading again the paragraph and

9   then I will read the response?

10  A    Yes.  "Lately, I have been thinking more and more about

11  creating a life for myself, one that does not necessitate your

12  presence.  I think this comes from the thought that I have so

13  far put all of my marbles on a future life with you, which I'm

14  not only not sure, but in fact rather non-optimistic will ever

15  happen.  And I know I'm nothing al by myself without the

16  possibility of a future like that with you, the meaning of my

17  life amounts to nothing special."

18  Q    "Easy way out?  Excuse created by pride.  You should

19  reject this thinking at all costs.  It needs to be

20  all/everything with me or else you will always let yourself

21  off the hook.  This is the biggest mistake of your life."

22  A    "I feel very trapped, cornered by the way things are

23  right now.  I would like to be able to at least sustain

24  myself, pay my rent, pay for my food, pay for my health, et

25  cetera, but with the restraints imposed on me, can't work on

Daniela - direct - Penza                    2847

1  anything else that can make money unless I do book reports, I

2  feel hopeless most of the time.  I know I could potentially

3  take this cornering as a motivational force.  It is the only

4  way out so do the bloody book reports, but in a more realistic

5  way going on three years, come on, I think I need to be able

6  to bootstrap myself into it.  Balance one side as I balance

7  the other."

8  Q    He wrote, "Lazy, out of cause, pride, feels trapped and

9  has created a lot of really bad effects.  Conscience feels

10 intensely focused and convicted.  Bootstrapping yourself into

11 it is what has taken two-plus years, the sick pride of doing

12 it your way in resolving ethical breach.  This must be

13 destroyed."

14 A    I say, "Yet every single thing that has motivated me in

15 some way has been taken away and, yes, I have allowed it.

16 That is the point here and I don't know.  Scratch that.  I

17 know for a fact the amount of times I feel motivated to do

18 things because they are right.  It's incredibly small in

19 comparison.  There must be a better way to work up to that and

20 I think that would be first; being able to do something,

21 anything at all, and then maybe I can work on my reasons.

22 Q    He says, "Your feelings for me should have been

23 motivation, the initial pain.  Instead you used your pride to

24 feel comfortable.  As I explained, motivation comes from

25 discomfort.  You need to not be able to live without me to

SN        OCR        RPR

Daniela - direct - Penza                    2848

1  best do this.  Your apathy and comfort is awful.  I have said

2  this many times.  You need to rebuild your feelings of extreme

3  pain over my loss."

4  A    I say, "I just don't want to keep doing this.  I am a

5  child.  I don't pay for my own existence and I don't know how

6  to do anything.  My life as it is right now, has no value and

7  I can't seem to motivate myself with the tools I am given

8  here.  The point is, I realize it is up to me.  I choose to be

9  in this position, to live in this country where because of my

10 status, my capacity and choice of work, it's up to other

11 people to decide on.  I feel that I am caught in an impossible

12 cycle."

13 Q    "It needs to be worse.  You are too comfortable but the

14 pain must come from feelings for me, otherwise you will remain

15 a con artist."

16 A    I say, "I want to go to school, learn to shape my ideas

17 into actual things I can use.  I want to do something with my

18 life.  I want to work.  I want to make money, be

19 self-sufficient."

20 Q    Keith says, "Run and skip in the fields and press wild

21 flowers?"

22 A    I say, "Now, see all of the above, I am not sure but I

23 think that is some form of pride.  Is that bad?  The thing is

24 I think this is my only reason to move.  It is the most real

25 and powerful kind of motivation I can tap into.  I hesitate to

SN        OCR        RPR

Daniela - direct - Penza                    2849

1    tell you because I predict that, as before, it is going to be

2    shut down and my legs will be put off again and I don't know

3    that I will be very willing to let it go this time."

4    Q    He says, "You need more pain.  Maybe we should consider

5    cutting off your arms too!"

6    A    I write, "So to reference back to the first paragraph, I

7    think I am able to think in this way because, one, I have a

8    grip on the fact that, getting real here, I have no motivation

9    to do the right thing because it is the right thing and at

10   this point I just want to do something or I am going to end up

11   losing myself and, most importantly, 2, I don't see you in the

12   same way I used to.  I don't miss you anymore.  Sure, I think

13   about you pretty much all the time but my insides don't shrink

14   when I think of you.  I feel tied to you but not as before.

15   Before I desperately wanted to have you back.  Now, I almost

16   feel I want to break away and, so, whereas before this was

17   never a possibility for me, it seems now it may be."

18   Q    He said, "This is absolutely the opposite of what you

19   should accept, understanding what I have said would mean this

20   thought would disgust and terrify you."

21        I'm just going to read the remainder of the portions

22   that the defendant responded.

23   A    Thank you.

24   Q    To your next paragraph.  Your next paragraph, the

25   defendant responded, "You need to not only make me part of

SN        OCR        RPR

Daniela - direct - Penza                    2850

1   your life, I need to be your whole life.  This is the only

2   way.  Whatever ethical thing you need to be obsessed with me

3   and feel me, you must."

4          The next part, this is the paragraph where you wrote

5   "I think this little trip I have taken with you has been half

6   dream and half nightmare," and where you said that you wanted

7   a decent life, school, job and to do something productive that

8   at the very least doesn't harm anyone.

9          The defendant said, "The first part was real.  The

10  second part sick, delusional, your way, pride.  Maybe besides

11  pressing flowers you could catch a few fairies?"  And then he

12  sends you an Amazon link to Coddington's Pressed Fairies.  Do

13  you know what that is?

14  A    Yeah.  I mean, I think I saw it.  It's, like, a joke of a

15  book with, like, pressed fairies.

16  Q    Where you would press flowers, but instead it looks like

17  smushed fairies?

18  A    Smushed fairies, yes.

19  Q    More of the above, "I can say how convenient," and then

20  there's -- and you talk about the romantic relationship.  The

21  defendant says "Same as above, only getting worse by letting

22  yourself off the hook with more specificity."  And then to

23  your final paragraph the defendant says, "It's good you're

24  honest.  If you actually built a conscience from here it would

25  be important for you.  I think I might be leaving soon.  I am

SN        OCR        RPR

Daniela - direct - Penza                    2851

1   preparing in case.  I guess this writing is a last-ditch

2   effort to help, although it continues to hurt me.  I do not

3   have the strength to carry you anymore.  This might be more

4   final than you can imagine.  Sorry."

5              How did you feel when you read the defendant's

6   response to your e-mail?

7   A    He cut my legs off.

8   Q    How do you feel now reading it?

9   A    It's still very difficult.  He would not let me go.  Even

10  when I wanted to go and I was at peace and mind my own

11  business.  He would not let me go.  It was an impossible

12  situation and it was hard for me to verbalize it because so

13  many times it would be put into compartments and I was lazy

14  because I wasn't doing something or I was bad because I was

15  doing something that was deemed my ethical breach and when I

16  put it together, I had that the clarity.  It was shut down in

17  this way.  So that's what this is also about.

18  Q    And then you respond to the defendant, "I'm afraid you

19  lost me in the last paragraph.  I think I might be leaving

20  soon.  I am preparing in case.  I guess this writing is a

21  last-ditch effort."  That's the paragraph we just read.  You

22  say, "This confuses me.  Why do you ask me to make my whole

23  life about you and then tell me you're leaving?"

24             What are you explaining there?

25  A    Well, I truly -- I think I didn't understand because he

SN        OCR        RPR

Daniela - direct - Penza                    2852

1   says, "this might be more final than you can imagine."  I'm

2   leaving, I can't carry you anymore, this might be more final.

3   I'm asking him why -- he asked me repeatedly, you need to just

4   love me or just think about me.  Your whole life should be me.

5   You can't go.  You can't go build something else.  It should

6   be about me and at the same time he says that this is more

7   final than I can imagine.  He can't help me anymore.  He can't

8   have anything with me.  So it's a complete contradiction.

9   Q    Did you continue to communicate with the defendant after

10  this?

11  A    Yes.

12  Q    Showing you what's in evidence as Government's Exhibit

13  1604, it's an e-mail chain between you and the defendant in

14  May 2009?

15  A    Yes.

16  Q    I show you a few e-mails.  Starting in the middle here

17  you wrote to the defendant that -- this is May 25, 2009 at

18  5:03 p.m.  You wrote to the defendant, "I broke my fast last

19  night after our exchange.  I wasn't going to tell you thinking

20  I would just not do it again and repair it, but I ate again

21  this morning twice.  I feel like crap in every possible way."

22  And it continues on, "At this moment I am feeling kind of

23  powerless" and then it continues.

24          And then the defendant responds, "You are too

25  accepting of your condition.  Stop it now.  This is the only

Daniela - direct - Penza                          2853

1   way out.  I hate to mention I told you, but now you need to

2   stop.  Affirm you have stopped now, tubby," and then you

3   responded?

4   A    Yes.

5   Q    And you responded "Tubby," question mark?

6   A    Yes.

7   Q    Why did you respond like that?

8   A    Because I wasn't sure what that meant or why he had

9   called me that.

10  Q    Did you actually not know what that word meant at that

11  time?

12  A    I didn't know.  I actually didn't know.

13  Q    The defendant responded, "Is that an affirmation?  Don't

14  play games on this one even if I'm trying to keep it a little

15  light"?

16  A    Yes.

17  Q    And how did you respond?

18  A    I say, "No, that was not an affirmation that was a

19  question because the dictionary just told me what it means.

20  This is an affirmation, I have stopped.  I won't eat anymore

21  food.  I promise you."

22  Q    So "the dictionary just told me what it means."  Did you

23  actually go look up the word "tubby"?

24  A    Yes.

25  Q    And later on are you -- the defendant writes to you,

SN        OCR        RPR

1    "Good.  How much did you eat and what is your weight?"

2    A    Yes.

3    Q    And you respond and provide him with your weight?

4    A    Yes.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2855

1    EXAMINATION CONTINUES

2    BY MS. PENZA:

3    Q    And then May 25th, 2009 at 9:07 p.m.?

4    A    Yes.

5    Q    Now, you e-mailed the defendant:

6              Sorry, I just finished reading them.  I'm unable to

7    stay awake because of the Benadryl medicine.  I'm a little

8    zombie-like.  I enjoyed them both very much.  I am going to

9    read them again and then write some comments for you, is that

10   okay?

11             I think he had sent you some lyrics earlier, is that

12   right?

13   A    Yes.

14   Q    And then the defendant responded:

15             You did not need a foreign substance to form the

16   rash... Why do you need one to get rid of it?  Or did you use

17   this medication for your other condition, namely

18   hypochondriasis?

19   A    Yes.

20   Q    And then you wrote back and said:  I had this type of

21   reaction once before and it only worsened with time --

22   explaining why you took the Benadryl.

23             And then you said:  Bad decision, you think?

24             And then the defendant responded:  Probably... the

25   thing that generated the rash is the real problem you need to

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2856

1   address:  Fix your breach, you lazy shit.

2         And then you responded:  !!!  I don't know what to

3   say... you are right?

4         And then the defendant wrote:  That's the lazy shit

5   answer:  Never having to worry about consequences, therefore

6   never building a conscience; therefore, no urgency.  You could

7   have said something like, yes, I will, and proceeded to write

8   about and been very constructive.

9         Okay, Daniela, I am going to show you -- well,

10  before I show you the next set of e-mails, did there come a

11  time when you were sending naked pictures to the defendant?

12  A    Yes.

13  Q    How did that end up happening?

14  A    He asked me for naked pictures.

15  Q    And did you want to send naked pictures?

16  A    No.

17  Q    Why?  Why were you sending them?

18  A    Ah, because he was asking for them.  You know, I thought

19  that I was -- I took it as a good sign, in some way.  He asked

20  for them on separate occasions and separate times, sometimes

21  very insistingly, and I remember there was a time where there

22  was like good progress in the e-mails, like I thought like I

23  was getting somewhere, like I was doing what I needed to do to

24  fix things.

25        And he asked for those pictures, so I happily

Daniela - direct - Penza                    2857

1    obliged, you know, much like I did with, you know, saying that

2    I loved him or sending him fantasies or any of the other

3    details.

4    Q    Would the defendant instruct you on what types of poses

5    that he wanted?

6    A    Yes.

7    Q    And can you just explain generally what the defendant was

8    focused on?

9    A    He was -- yes, very focused on getting a shot of my

10   genitals.

11   Q    Fair to say, very up-close pictures?

12   A    Yes.

13   Q    Were there -- was there a progression in the types of

14   pictures the defendant wanted?

15   A    Yes.

16   Q    At some point, was there a specific type of picture that

17   you did not want to provide?

18   A    Yes.

19   Q    Can you explain?

20   A    Yes.  So, I had sent pictures where it showed only my

21   parts, and then he asked for pictures where it showed more of

22   me in the same shot, you know, like where it showed like both

23   my face and my private parts.  And suggested even, like,

24   taking a shot -- I think I remember -- I believe it was like

25   where he was, like, having sex with me, even though we hadn't

SAM        OCR        RMR        CRR        RPR

Daniela - direct - Penza                    2858

1  had interactions for a very long time, but he was like

2  floating the idea of taking pictures of that.  And I remember

3  putting up some resistance to that.

4  Q    The pictures, why did you specifically not want to take

5  the pictures where both your face and your private parts were

6  shown?

7  A    I -- I mean, at least to me, it's a lot more -- I mean

8  it's personal, it's identifiable.  Like to a certain degree,

9  in my mind -- maybe it's just me -- like a close-up shot of my

10 private parts, like it's almost very clinical.  That was like,

11 you know, like detached, isolated.

12            But to take pictures of myself with my face on them,

13 with my full body on them, I felt very self-conscious about

14 that.

15            MS. PENZA:  Your Honor, the next exhibit is

16 sensitive and if we could just have it published to the jury

17 and to counsel.

18            Thank you, Your Honor.

19            THE COURT:  Well, is it admitted?

20            MS. PENZA:  It is, Your Honor.  It's Government

21 Exhibit 1589.

22            THE COURT:  Okay.  This is just for the jury and

23 just point your screens toward the bench, a little more toward

24 the bench.

25            Okay.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2859

1          MS. PENZA:  Thank you, Your Honor.

2          THE COURT:  Got it.

3   BY MS. PENZA:

4   Q    Daniela, I'm showing you what's in evidence as Government

5   Exhibit 1589.

6          Is this an e-mail chain with the defendant from

7   December 2008?

8   A    Yes.

9   Q    Oh --

10         THE COURT:  Did you turn off your screen?

11         MS. PENZA:  I did just turn it off.  Thank you, Your

12   Honor.

13         THE COURT:  Thank you.

14   Q    So, Daniela, just let me know if you can't see because I

15   only have a small monitor to look at.

16         Is this an e-mail chain between you and the

17   defendant in December 2008?

18   A    Yes, it is.

19   Q    And is this an e-mail chain that ended up attaching

20   certain pictures?

21   A    Yes.

22   Q    So starting at the end of the e-mail --

23   A    Yes.

24   Q    -- relating to the December 4th, 2008 at 1:56 p.m., you

25   are explaining to the defendant that you're studying with Cami

Daniela - direct - Penza                      2860

1   and Adrian this morning?

2   A    Yes.

3   Q    Do you remember what you were studying with them for?

4   A    Yes, I was preparing them for the GED.

5   Q    Did they end up getting their GEDs?

6   A    Yes.

7   Q    Was there ever -- was that ever an issue, was there ever

8   an issue between you and the defendant about helping them

9   study for the GEDs?

10  A    Yes.

11  Q    Can you explain that?

12  A    Yeah, he accused me of that being an indulgent thing and

13  an ethical breach.

14  Q    Eventually, in the middle of this paragraph, the

15  defendant says:  Tell me, show me more.

16  A    Yes.

17  Q    And did you have an understanding of what he meant by

18  that?

19  A    No, not -- not really.

20  Q    Okay, and so then you wrote back:  "Show you more?"

21  A    Yes.

22  Q    And then the defendant sent you this image here, is that

23  right?

24  A    Yes.

25  Q    And you responded.  Did you know -- did you understand

Daniela - direct - Penza                      2861

1   what this image was?

2   A    I -- I -- I saw it and I wrote about it, which is exactly

3   what I write there.

4   Q    So --

5   A    It's -- it's a woman's, you know, reproductive parts.

6   Q    Made out of different keyboard characters, is that right?

7   A    Yes.

8   Q    And you recognized it -- you used two phrases, "hairy

9   patch," you used that phrase?

10  A    Yes, with the ampersand.

11  Q    And then you said camel tow; is that right?

12  A    Yes, with a W.

13  Q    Were those two things something that the defendant was

14  particularly focused on in his conversations with you over the

15  years?

16  A    Yes.

17  Q    So pubic hair, in particular?

18  A    Yes.

19  Q    And then I think you've also described that he would

20  point out when he thought he could view what he was describing

21  as a camel tow on women?

22  A    Yes, which is why I knew to use the term.

23  Q    Okay.  And then the defendant writes back:  All ways and

24  all angles?

25  A    Yes.

Daniela - direct - Penza                    2862

1    Q    And then you say:  Love, a kiss and some attitude, and

2    attach some pictures?

3    A    Yes.

4    Q    Can you explain, given how you just described the process

5    of sending pictures, why you were writing in this manner as

6    you send the pictures?

7    A    The process why I'm writing --

8    Q    Why you're writing love, a kiss and some attitude?

9    A    Like in a playful way?

10   Q    Yes.

11   A    Because, at that point, I was in a good standing in our

12   relationship, even if it was just via e-mail with Keith, and I

13   thought it was what I had to do.

14   Q    And at this point, fair to say there you wanted the

15   defendant to be happy with you?

16   A    Yes.

17   Q    Okay, I am going to show you the pictures that were

18   attached.

19         Are these the same pictures -- are these the same

20   pictures, except that they have been pixilated?

21   A    Yes.

22   Q    So I am just going to -- there's one, the second.

23         So these are very up-close pictures, fair to say?

24   A    Yes.

25   Q    And then is that you?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2863

1   A    That's me.

2   Q    And then another picture of you?

3   A    Yes.

4   Q    How do you feel seeing these pictures?

5   A    Uncomfortable.

6   Q    I'm sorry.

7          The pictures, those pictures, were those the types

8   of pictures that you knew the defendant to like?

9   A    Yes.

10  Q    How did those pictures compare to the pictures you

11  remembered him taking of you?

12  A    I -- I -- the pictures he took of me, I really don't

13  remember, like, really very well.  And so I don't know if I

14  remember from that particular occasion or if there were

15  occasions prior to this one, or in between, but I was fully

16  aware that he was -- that he -- like he liked -- like full up

17  close, like just genital pictures that way.

18  Q    When the defendant wanted pictures of you, were there

19  ever any specific terms he would use?

20  A    For the pictures?

21  Q    Yeah, when he would be asking you to express yourself in

22  a certain way, were there any words that he would use?

23  A    I don't remember.

24  Q    Okay.  We will keep going through some of the e-mails.

25          I am just showing you what's in evidence as

Daniela - direct - Penza                    2864

1  Government Exhibit --

2            MS. PENZA:  Your Honor, we can publish now publicly.

3            That's it for the images.  Thank you.

4            THE COURT:  Thank you.

5  BY MS. PENZA:

6  Q    Showing you what's in evidence as Government

7  Exhibit 1609.

8            (Exhibit published.)

9  A    Yes.

10 Q    And is this -- this last e-mail, is this an example of

11 the defendant asking you for pictures in June 2009?

12 A    Yes, it is.

13 Q    Okay.  Probably in the pictures and now with meaning

14 behind them?

15 A    Yes.

16 Q    Do you know what he meant by "with meaning behind them"?

17 A    I don't remember.  That may be when he asked for -- like

18 for me to be in the picture.

19 Q    Okay.  Showing you what's in evidence as Government

20 Exhibit 1608.

21            Is this an e-mail from the defendant?

22 A    Yes, it is.

23 Q    Can you read this e-mail?

24 A    He writes:  It is also about if you can be totally

25 vulnerable to me, as you promised.  In that case, where love

Daniela - direct - Penza                    2865

1  triumphs over pride, things can truly change... You wished you
2  made a different decision.  I wished you loved me enough to
3  give all the pictures.
4  Q    And can you explain what you understood this e-mail to
5  mean?
6  A    That -- what I understood that e-mail to mean is that, if
7  I wanted things to get better, I needed to love him and -- and
8  to show the love I needed to send the pictures.
9  Q    And this total -- being totally vulnerable, is that
10  something that was tied to the pictures?
11  A    That was something that was tied to the pictures and to
12  other things as well; to expose myself completely, to expose
13  my thinking, my -- my fantasies, everything.  It was
14  vulnerability, complete vulnerability.
15          It was also tied to -- to when they would work on my
16  pride, and we would come to a point where it was just my
17  experience of the world versus what they thought it should be,
18  that was a point where I needed to be completely vulnerable
19  and humble and give up and be completely willing to let go.
20  So that sense of vulnerability applied in those two senses.
21  Q    And this is June 24th, 2009?
22  A    Yes, it is.
23  Q    And June 27th, 2000 -- showing you what's in evidence as
24  Government Exhibit 1613.
25          (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                                    2866

1   BY MS. PENZA:

2   Q    June 27th, 2009.

3   A    Yes.

4   Q    You write to the defendant:  Notice I have sent you

5   explicit pictures before, but my face and my, um, explicitness

6   never make it in the same frame.

7   A    Yes.

8   Q    Is that what you were explaining before?

9   A    Yes.

10  Q    So was the defendant pushing to have pictures that would

11  have both your face and your private parts in the same

12  picture?

13  A    Yes.

14       MS. PENZA:  Your Honor, I think it would be a good

15  time for an afternoon break.

16       THE COURT:  All right.  We are going to take our

17  ten-minute break.

18       All rise for the jury.

19       (Jury exits.)

20           (In open court - jury not present.)

21       THE COURT:  All right, the witness may stand down.

22  Do not discuss your testimony with anyone.

23           (Witness steps down and exits the courtroom.)

24       THE COURT:  Everyone may be seated.

25       What is your current outlook?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                              2867

1           MS. PENZA:  I am going to try and move along.  I

2    think we will probably go into tomorrow morning on direct.

3           THE COURT:  All right.  Okay.

4           MS. PENZA:  Oh.

5           THE COURT:  Yes?

6           MS. PENZA:  Your Honor, we do have one custodian

7    from Google, who I think his testimony will only be a few

8    minutes -- or a few minutes may be a bit conservative, but I

9    think we would ask that he be able to go on first thing

10   tomorrow morning.

11          THE COURT:  Is that all right with you?

12          MR. AGNIFILO:  That's fine with us.

13          THE COURT:  All right, then we will first take the

14   custodian from Google, and then we will return to the

15   completion of the direct testimony of this witness and then

16   move on to the cross.

17          MS. PENZA:  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you, everyone.  Ten

19   minutes now.

20          (The defendant exited the courtroom.)

21          (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

22          (Recess taken.)

23          (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

24           (In open court - jury not present.)

25          THE COURT:  All right, please bring in the witness.

Daniela - direct - Penza                    2868

1           (Defendant entered the courtroom.)

2           (The witness entered the courtroom and resumed the

3    stand.)

4           THE COURT:  Please bring in the jury.

5           (Jury enters.)

6           THE COURT:  Please be seated.

7           All right, Ms. Penza, you may continue your

8    examination of the witness.

9           The witness is reminded she is still under oath.

10          MS. PENZA:  Thank you, Your Honor.

11          Your Honor, the Government moves into evidence

12   Government Exhibits 1606 and 1607, I believe without

13   objection.

14          MR. AGNIFILO:  That's correct.

15          THE COURT:  All right, Government Exhibits 1606 and

16   1607 are received in evidence without objection.

17          (Government's Exhibits 1606 and 1607 were received

18   in evidence.)

19   BY MS. PENZA:

20   Q    Daniela, earlier this morning we talked about there being

21   a bookend in your e-mail communication with the defendant

22   having sent you a long e-mail?

23   A    Yes.

24   Q    I'm showing you what's in evidence as Government

25   Exhibit 1575.

Daniela - direct - Penza                    2869

1                (Exhibit published.)

2   A    Yes.

3   Q    And I think you said in that e-mail the defendant said

4   that you were going to be required to give full disclosure --

5   A    Yes.

6   Q    -- in order to continue on?

7            What were some of the other things that you

8   understood were necessary at that point?

9   A    As I remember, I needed to start working with some

10  specific people.  I needed to focus on my program.  I needed

11  to -- which included my weight and everything else.  I needed

12  to continue writing, like incessantly writing.  And --

13  basically, that's what I remember.  There were a lot more

14  instructions to fix it.

15  Q    Okay.  So just looking at the very end of Government

16  Exhibit 1575.

17               (Exhibit published.)

18  BY MS. PENZA:

19  Q    Is this from the defendant's e-mail?

20  A    Yes.

21  Q    And there is discussion about full disclosure?

22  A    Yes.

23  Q    Guidelines of what needs to be done if you are really

24  moved to transformation by this final letter?

25  A    Yes, it says so right there:  Honest, completely detailed

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2870

1  physical and emotional and thought disclosure of all past,

2  present and future events.  Yes.

3  Q     And then obsessive consumptive communication?

4  A     Yes.

5  Q     Continue to read what you write until you vary.

6          And so this -- this concept of writing to the

7  defendant incessantly, is that something that happened?

8  A     Yes.

9  Q     And would you continue to write to him continuously?

10 A     Yes.

11 Q     And then there are some other things here and then

12 helpers, is that right?

13 A     Yes.

14 Q     Then it says:  Today you need to find one or more people

15 of whom I would approve; Karen, Nancy, Lauren, et cetera, to

16 whom you will report?

17 A     Yes.

18 Q     You will need to convince them separately from me of your

19 sincerity and your purpose.

20 A     Yes.

21 Q     And just showing you what's in evidence as Government

22 Exhibit 1606.

23          (Exhibit published.)

24 BY MS. PENZA:

25 Q     July 22nd, 2009.  Can you just explain what this is?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2871

1   A    Yes.  Those are all my conversations with Ben.

2   Q    And so what is the purpose in sending all of this to the

3   defendant?

4   A    I am following on the instructions of his last e-mail

5   with full disclosure of all communications, past, present,

6   future.

7   Q    And this included -- and so if we just flip through,

8   these are all your exchanges with Ben?

9   A    Yes.

10  Q    Daniela and Ben?

11  A    Yes.

12  Q    And you also sent the defendant screenshots; is that

13  right?

14  A    Yes.

15  Q    Okay.  And what was the point of sending those?

16  A    Full, complete disclosure of everything that was

17  happening.

18  Q    So when you and Ben would communicate, sometimes is it

19  fair to say you would have like a video-chat going?

20  A    Yes.

21  Q    And is that Ben on top with you on the bottom?

22  A    Yes, that's us.

23  Q    And at the back, is this actually, was there actually

24  like an MP3 attached?

25  A    Yes, it was like a live feed that I had recorded where we

Daniela - direct - Penza                    2872

1    were both online, and I sent him that too.

2    Q    And showing you what's in evidence as Government

3    Exhibit 1607.

4              (Exhibit published.)

5    BY MS. PENZA:

6    Q    Is this the same type of thing?

7    A    It's more disclosure, yes.

8    Q    And more correspondence between you and Ben?

9    A    Yes.

10   Q    So, at this point in time, July 22nd, 2009, I think you

11   said there was then a shift in your program and things became

12   more intense?

13   A    Yes, force.

14   Q    Sorry?

15   A    Force.

16   Q    Force.

17             You described the process of things being taken away

18   from you?

19   A    Yes.

20   Q    Can you explain what things were taken away from you?

21   A    Yes.  Well, everything one by one.

22             Every time something was considered an indulgence,

23   and we saw some of those examples, they would take it from me.

24   So, it was -- I didn't possess very many things.  So, you

25   know, my iPod, my computer, my cell phone, my books, my

Daniela - direct - Penza                    2873

1    things, ran out of those very quickly.  And then it was my

2    freedom, my ability to go outside.  I could not go outside of

3    the house without permission.  I could not do -- I could not

4    sleep without permission.  I could not, you know, eat without

5    permission.

6    Q    At that point in time, who was enforcing those things?

7    A    At that point in time, my family has been recruited into

8    helping me.  What happened was -- I don't know exactly at

9    which point, I think shortly after that letter, my parents

10   were told -- or that's what they told me -- you know, you --

11   you're in -- you're bad and you've destroyed a lot of things

12   in the community and it is our responsibility, too, because we

13   raised you.  So, it's our responsibility to, you know, help

14   you through this, to -- and so they took over.  And also I was

15   at that point completely dependent on them.  So, my house, my

16   rules.

17   Q    And when you -- so there was a period of time before you

18   were in the room where you were in the house, is that right?

19   A    Yes.

20   Q    And you said they took away -- your computer was taken

21   away?

22   A    Yes.

23   Q    And your music was taken away?

24   A    Yes.

25   Q    Your books were taken away?

Daniela - direct - Penza                    2874

1   A    (Nodding.)

2   Q    Your bed was taken away?

3   A    My bed was taken away, yes.

4   Q    Can you explain how that happened?

5   A    I don't remember the exact circumstances where I lost my

6   bed, but I know I lost my bed and my bookshelf with my things

7   where all my personal documents were.  I lost my bed somewhere

8   before the winter, because I already remember sleeping in the

9   living room in a sleeping -- you know, like a blanket.

10           That's a foggy period for me in some ways, like

11  there's not a lot of different bookmarks I can use.  It was

12  just increasingly horrible.  And sometimes the things that

13  were deemed indulgent I didn't understand, so I don't exactly

14  remember what I did that was wrong, it was just deemed wrong.

15  Q    Throughout this whole time period are you writing letters

16  to the defendant?

17  A    Incessantly.

18  Q    And are you also still receiving coaching?

19  A    Incessantly.

20  Q    And from your parents and your coaches, everyone, how

21  often is the defendant being discussed in these coaching

22  sessions or in the instructions that your parents are giving

23  you?

24  A    All the time.  So, I mean to describe the focus of these

25  things in my daily life, every waking hour it was about my

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2875

1   ethical breach.  I didn't have anything else to do.  I didn't

2   have any things, so if I was not doing my 15-minute reality

3   check and checking in on my program and doing that, I was

4   being coached, or I was writing to Keith, which was part of

5   the program.

6          And much like it can be seen in the letters,

7   everything was Keith-centric.  Not only all the conversations

8   were about Keith said you should do this; in your last thing,

9   Keith said you should do that.  We spoke to Keith and it would

10  be good if you did this.  We spoke to Keith and this is very

11  damaging.  But also it would be about fixing things with

12  Keith.  So everything in my life was centered around Keith

13  still.

14  Q    At that point in time, did your parents know that you had

15  a sexual relationship -- had had a sexual relationship with

16  the defendant?

17  A    No, they did not.

18  Q    Why didn't you tell them?

19  A    Well, at that point, I didn't think they would believe

20  me.

21  Q    Can you explain that?

22  A    My reasons for not telling them before were not that.

23  Before I was keeping a secret, but at that point, which is a

24  point where I felt completely trapped in my life in every

25  single way possible, I -- I mean I wasn't -- I wasn't acting

Daniela - direct - Penza                    2876

1   normal.  You know, I don't know how I could explain it, but I
2   was a person who had been through a few years of constant
3   harassment, of constant confusion, of constant:  You're bad,
4   you're bad, you're bad, and trying to leave and can't, and
5   believing things that were not true.
6           And so, at this point, I am -- I'm really broken.
7   You know, I -- I -- I believe I have an ethical breach that I
8   don't understand.  I am very angry.  I remember being really
9   angry.  I remember getting really angry all the time and
10  telling everybody, you don't understand.  Telling my parents:
11  You don't understand anything.  You don't understand anything
12  about this.
13          But at the same time there were a few things that
14  happened that made it very clear for me that anything I told
15  my parents, they were not gonna believe me.  Like they were
16  not gonna be on my side.  Like now they were on Keith's team.
17  So, at that point, it wasn't an option anymore.  If anything,
18  it would just cause me to get lost even more.
19  Q    At that point in time, did anyone mention to you the fact
20  that you had stolen money many years ago, back when you were
21  17 and had first come to the community?
22  A    There was that reunion I had with my parents because I
23  would constantly tell them, why are you treating me this way?
24  Why am I the one who is being punished?  Because everything
25  felt -- everything was a punishment.  So everything felt like

Daniela - direct - Penza                    2877

1    a punishment.

2              And in one of those conversations, I had been asking

3    them and asking them:  Well, like tell me what I did.  Like

4    why am I such a monster that I'm treated this way, you know.

5              And they said:  Well, Keith told us you stole from

6    him.  You don't remember you stole from that -- and they

7    brought it back into the picture.

8              And I remember being enraged, like all of a sudden

9    this like all past, completely settled, never brought up again

10   issue was:  Oh, everything that's happened in this last few

11   years and now and the reason why we're taking it, it's because

12   of this old issue.  It was enraging.

13   Q    And why -- why was it so enraging?

14   A    Because it wasn't -- it was about Ben.  It was about Ben

15   covered in pride, covered in indulgence, covered in a bowl of

16   confusion.  It was very confusing, but it had never been about

17   that.

18             I mean, I stole that money back then.  I had a

19   three-year relationship with Keith where it never came up.

20   Then we had a falling-out, never came up.  Then they need a

21   reason to tell my parents -- I think that they had a very hard

22   time.  I think Keith had a very hard time explaining to my

23   parents why he was punishing me so much and the only thing he

24   could come up with is:  Oh, she stole.

25   Q    You used the phrase "monster."  Is that something you

Daniela - direct - Penza                    2878

1   would actually be called?

2   A    Yes.

3   Q    Any other words that would be used?

4   A    At that time they used monster.  They used suppressive.

5   They used destructive.  Prideful.  All of them under the same

6   umbrella.

7            Later my brother told me that they were telling them

8   something else about me that I never found out until later.

9   Q    During this time period are you -- is your weight still

10  something that's a focus?

11  A    Very much so.

12  Q    Okay.  And was there actually like a weight given to you

13  that you were supposed to be?

14  A    I think I was supposed to be under 120, that was like the

15  goal, but it was very much a focus.  Fasts were a focus.

16  Juicing was a focus.  Weighing in every day was a focus.

17  Q    And you mentioned at some point there was a lock put on

18  your refrigerator, is that right?

19  A    Yes.

20  Q    I think you briefly described a time when you were locked

21  out of your house?

22  A    Yes.

23  Q    Can you -- can you walk through -- is that during this

24  time period that we're talking about?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                              2879

1    Q     Can you describe -- can you walk through that slowly,

2    please?

3    A     Yes.  Again, I don't remember what I did, but I did

4    something that was deemed bad.  And they told me I need a

5    consequence because I spent my entire life being very

6    indulgent and destructive without consequences.  So, it was

7    winter and they locked me out of the house.  And at first I

8    couldn't believe it, so I kept knocking on the door because it

9    was cold outside.  I didn't have anything on me.  I had no

10   money.  I had no food.  I have nothing.

11          And, you know, it was my parents.  So like this

12   was -- this was my parents.  And the door was locked, the back

13   door was locked, and so I just started walking to keep warm.

14   And I kept coming back to the house, you know, thinking that

15   they would let me back in; and they wouldn't.  So I started

16   becoming -- like it's my parents.  You know, it was my

17   parents.  And I was cold and I didn't have anything to eat.

18          And I understand consequences and all that, but it

19   got -- it got really real, you know.  It got -- I know it had

20   been real for a long time since I started losing everything,

21   but now I was out in the cold, starving.  It was -- and so I

22   started walking around the neighborhood, trying to keep warm

23   and I would like crawl -- like curl up into a ball and just

24   try to keep the warmth.

25          I remember I went to a laundromat and a man thought

SAM       OCR       RMR       CRR       RPR

Daniela - direct - Penza                    2880

1    that I was a homeless person and he gave me a $5 bill, and

2    with that I bought the cheapest snacks that I could find so

3    they would last a long time.  And just kept walking and

4    checking back into the house to see if they would let me in.

5    And I think it was a couple of days and they didn't let me in.

6    Q    So during those couple of days where did you sleep?

7    A    Outside.  I think I napped at the laundromat, and the

8    rest of the time I kept moving.  I was so afraid the police

9    would pick me up.  I felt so afraid because I knew that I was

10   illegal and I was afraid of everything that was going on, and

11   I was -- I was afraid of what was going on.  But I was also

12   afraid that someone might get suspicious of, like, this girl

13   walking around and that they might pick me up and they would

14   take me to jail because I'm illegal in the country.

15           So I tried to keep moving.  You know, it's not like

16   I could just pick a place and just be there because I thought

17   someone is gonna to notice and they're gonna to call the

18   police.  It's a small neighborhood.  You know, I've lived

19   there for a while now.  So I just tried to keep moving.

20

21           (Continued on the following page.)

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                2881

1    BY MS. PENZA:   (Continuing)

2    Q    You said it was a few days?

3    A    I remember it was so long.  I think it was a couple of

4    days, yes.

5    Q    Did you shower during that time?

6    A    No, I didn't.

7    Q    And you kept coming back and you weren't allowed in?

8    A    I wasn't allowed in.

9    Q    What happened after that?

10   A    At some point, he let me back in.  I don't even remember

11   how.  I remember being very grateful and saying that I was

12   very sorry and saying all the right things.

13   Q    Did there come a point when you were asked to go visit

14   the defendant?

15   A    Yes.

16   Q    And was that around the same time?

17   A    Yes.  It was a part of the coaching that I was receiving

18   and there was a period, I remember, a few days where the focus

19   was you're prideful, you're not humble, you need to say you're

20   sorry.  And I had said I'm sorry many, many times before, in

21   many, many ways, but all of them were deemed fake and

22   insufficient and, like, it was deemed fakery and game playing.

23   So, it was this focus on you need to be, you need to be sorry,

24   you need to say that you're sorry.  So I was closed through

25   this entire, like, you know, buildup, you need to say you're

Daniela - direct - Penza                    2882

1   sorry, it's so important to apologize.

2          I remember my mom saying, you know, if it's an

3   apology and it's a sincere one, that's healing your breach

4   because that's where it starts if it's really sincere.  And I

5   remember that being drilled in to me and getting into that

6   state through all that coaching.  And at some point one day,

7   it was arranged that I would go and apologize to Keith.  And

8   it was coordinated because Keith -- because they told me where

9   to go.  They told me Keith was going to be at 8 Hale and you

10  need to go there and apologize to him.  And I went to Hale and

11  sure enough, he was expecting me.

12         So I walked all by myself.  I was allowed because I

13  was going to go and apologize to Keith.  And I remember, I

14  knocked on the door and Keith opened the door.  Like, after

15  all these years, all this madness, it was Keith right there.

16  Door wide open.  And I knew what I had to do.  And I looked at

17  him and it was a lot of seconds and I'm just looking at him.

18  I just -- I just could not apologize.  I just had nothing to

19  apologize about.  So he closed the door and I left.

20  Q    What happened after that?

21  A    Well, that was a confirmation that I was all the horrible

22  things that they thought I was.  It was hard to explain it to

23  anybody and I couldn't and I didn't.  I don't remember.  I

24  think I was punished more.

25  Q    And you said at some point, your personal documents were

Daniela - direct - Penza                    2883

1    taken away?

2    A    Yes.

3    Q    Can you explain that?

4    A    My documents were -- I had very few possessions and very

5    few documents, but they were all together with my set of

6    things.  And, you know, I had, you know -- I had my birth

7    certificate.  I had the fake ID with which I had come into the

8    country.  The visa I know was there.  I had a printout of the

9    ultrasound of, when I was pregnant.  I had named the baby

10   "Baby G" after baby Godzilla because they called me Godzilla.

11   So I had a few personal things there.

12            When they took my things and took everything, they

13   just took it.  It was just gone.

14   Q    So you had none of those things at that point?

15   A    I didn't have them.

16   Q    Did you ever get any of those things back?

17   A    No.

18   Q    At some point, was there an additional escalation in your

19   punishment?

20   A    Yes.

21   Q    What do you remember from that, the room concept being

22   introduced to you?

23   A    I remember, I remember the days leading up to it.  I was

24   begging to go back to Mexico.  I had given up.  It had gotten

25   so bad.  It was so bad.  Every time it was worse and worse and

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2884

1    worse and I remember I told my parents I just want a simple

2    life.  I just want a simple life.  I want to go back to Mexico

3    and I want a simple life.  And they seemed -- my mom seemed to

4    think it was a good idea.  So I thought it was, like, that's

5    what I wanted, that's what I was working for, I'm done with

6    it, this is no life, I am done, I want to go to Mexico, I want

7    a simple life.

8    Q    At that point in time, what would you have needed in

9    order to facilitate that happening?

10   A    I would have needed for -- I think I would have needed

11   for someone to drive me back because I was illegally in the

12   country so I couldn't board a plane, I couldn't board a bus, I

13   couldn't take public transportation, so I needed help to get

14   out.

15   Q    And you had no money at this point either?

16   A    None whatsoever.

17   Q    And so you conveyed this to your parents and what

18   happened?

19   A    And in one of those conversations, what they get back to

20   me with, and I think it was just not only my parents but it

21   was -- I remember my parents and I remember Karen and I

22   remember Lauren.

23          And they presented me this horrifying, not an idea,

24   but they just present me with this horrifying thing.  They

25   say:  Listen, you can't go back to Mexico.  If you got back to

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    2885

1    Mexico, it's on our terms.  This is the choice that you have.

2    You need to go and -- you are going -- that wasn't my room,

3    you need to go to this room and heal your ethical breach.  You

4    need to go in this room because in this room, you'll have no

5    possibility of indulgences which is what has stopped you now

6    all this time.  So you are going here with a, with paper and

7    pen and nothing else until you heal your breach.  That's your

8    opportunity.  If you are not willing to do that, if you're not

9    willing to do that, then you go back to Mexico but not on your

10   terms.  You lose your family.  You go with nothing.

11           And I said no, no way, there's no way I was going

12   into that room, because I had no idea what I had to do to heal

13   my ethical breach.  I had been trying to heal my ethical

14   breach for years.  And I remember I asked how long.  As long

15   as it takes you to heal your ethical breach.  Then there's no

16   way I'm going in because I haven't figured it out in years.

17   Now I'm going to go in there completely trapped and I have --

18   what do I have to do?  You know.  You know what you have to

19   do.  If we tell you that, you know what you have to do.  So I

20   said, No, I did not want to go into that room, there's no way

21   I was doing that.

22           So they were talking to me about it and then it was

23   really clear that my parents were on board and that I was

24   going to lose my family.  They were -- I was -- I could not

25   talk to anybody.  I was going to leave and just go into

Daniela - direct - Penza                    2886

1    nothingness.  And at that point, I had nothing except my

2    family and even that was horrible but that's the only link

3    that I had to anything.  Like, that was my only reason to even

4    keep living.  It sounds dramatic but it was very dramatic.  It

5    was the only thing that I had.

6           So they gave me a period, I remember, like, they

7    told me one day and I had to go in the next day.  Like,

8    that's -- and so it was, like, You think about it.  You think,

9    you think about it but those are your choices.  And I was not,

10   I was not on board.  I was not doing that.

11          And I remember that night, I was so scared and I

12   felt desperate and I knew stuff had been getting worse and

13   worse so I knew, I knew it was going to be awful, and I went

14   to Walmart.  I remember I walked to Walmart with a few cents

15   and from a pay phone, I called Ben.

16   Q    Did you --

17   A    And Ben will take me out of here.  It was that final.  I

18   called Ben and I hadn't talked to him since -- I mean, they

19   had taken my phone.  They had taken my computer.  I didn't

20   have anybody in the world except my family.  I thought Ben,

21   Ben will get me out of here.

22          And I called the cell phone which I knew by heart

23   and he did not pick up.  And so I waited and I waited and I

24   waited and I tried again and he did not pick up.  And then I

25   just had to leave.  And I went back home and I slept on it and

Daniela - direct - Penza                    2887

1    the next day, I realized I had no choice.  I had no choice.

2    Q    So then what do you, what was -- you did the room the

3    next day?

4    A    Yes, I did.

5    Q    What are your last memories before going into the room?

6    A    I remember going, looking down the stairs and seeing some

7    faces.  I don't remember who.

8    Q    And do you remember saying anything?

9    A    I remember saying I didn't want to do that.  It was

10   not -- it wasn't without a fight.  I was trying to convince

11   everybody that that was not necessary and nobody listened.

12   Q    Okay.  So this was a room that was on the top floor of

13   12 Wilton?

14   A    Yes, on the second floor.

15   Q    And there were two bedrooms?

16   A    Yes.

17   Q    And can you describe the room?

18   A    The room?  Four walls.  There was one door right next to

19   the staircase and it has a small closet, I think, and then

20   there was a shared bathroom.  So it was a door to a bathroom

21   that was separate.  There were two doors, one, you know, to go

22   downstairs and one to a shared bathroom.  And in the room,

23   there was a mattress, like a foam, like a two inch, one and a

24   half inch foam mattress.  It was a NASA mattress, the ones

25   with the memory.  And there was a window and the window was

Daniela - direct - Penza                    2888

1   blacked out.  The window was -- it had, like, paper with tape

2   on it so you could not look outside and from outside, you

3   could not look inside.

4           And they gave me a bunch of paper because I needed

5   to keep writing to Keith.  I need to keep writing to Keith and

6   I needed to work on my ethical breach and a pen, a Bic pen,

7   one of the cheap pens.

8   Q    So other than what you've described, was there anything

9   else in the room?

10  A    No, not that I remember.

11  Q    Did you have clothes?

12  A    I had what was on me.

13  Q    How many days would you wear the same clothes?

14  A    For weeks at a time.

15  Q    Did you have clean underwear?

16  A    No, I would clean it myself.

17  Q    Can you describe what your day to day was like in the

18  room?

19  A    Yes.  It was a long time I spent in that room so it was

20  different at different times.  With all due respect, I don't

21  think anybody, very few people -- nobody in this room might

22  understand what it's like to imagine spending one hour alone

23  in a room, two hours, five hours, ten hours, one day

24  completely alone in a room.  Then a day and a week at first.

25          I remember the next day, I think Lauren came over

Daniela - direct - Penza                    2889

1    and lectured me about my ethical breach and what I was

2    supposed to do and mostly gave me no answers.  And I was

3    trying to find clues, you know, to get out of there and asking

4    how long it was going to be.  And I think the next time she

5    came, like, maybe two days after and then it was very erratic.

6    Sometimes she would take three days to come.  Sometimes she

7    would come in, like, a week.  A whole week.  Like, a whole

8    week of seeing no one.  Like, not a human being, not a face,

9    not a nothing, just a whole week.  And time passed and there

10   was a point where I didn't see her for up to three months.  I

11   remember counting days, granted my sense of time was a little

12   bit -- but I could count days.  And my day to day was I -- I

13   would get -- most days, I would get three meals a day and

14   they, like, pretty consistent times.

15   Q    How would the meals get to you?

16   A    The meals were brought to me by someone in my family and

17   there would be, like, a plate with the food, the plate with

18   food would be put on the floor outside the bedroom door,

19   outside the bedroom.  I could hear.  They would knock on the

20   door and they would leave.  So I would have to open the door,

21   get my food.  So I would never see anybody.

22          I never saw the faces of my family.  I didn't hear

23   their voices when talking to me.  I got really good at hearing

24   the noises in the house and I would spend hours next to the

25   bed trying to catch somebody's voice I think because I missed

Daniela - direct - Penza                                2890

1    them but also because I wanted to just hear something.  And

2    meals would be brought, as I said, most, on most days, three

3    times a day, though there were times where there were no meals

4    but I became very food obsessed.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. PENZA: (Continuing.)

2    Q    What does that mean?

3    A    I was waiting for the next meal and I was wanting very

4    specific things and I was very food obsessed and if my food

5    was a little bit late, I would go crazy.  I was, like, timing

6    my day through the food at the beginning -- and throughout it

7    was, like, a huge obsession the food, the next meal, the next

8    meal, the time for the next meal.  I would count the hours

9    until the next meal.  It was very -- I mean, I was writing

10   every day.  My state was very -- I think I broke pretty

11   quickly.

12   Q    When you say you broke, what do you mean?

13   A    I mean that after I spent a certain amount of time alone,

14   there were times when, like, I think I went crazy.  You know,

15   and, like, it's hard to describe the emotional state.  It was

16   hard to describe the emotional state, but there were cycles.

17   When I went -- I would go crazy.  It's just like I would

18   lose -- the perception of things gets funky and the perception

19   of time gets funky.

20            And then maybe after one of those episodes I would

21   be completely numb for days.  Like, I would feel nothing and I

22   learned to avoid those, like, those states where I got really

23   crazy and really dark.  And so a lot of what I did when I was

24   in the room after some time, I started applying some routines

25   and none of it was normal, but, you know, I started -- food

Daniela - direct - Penza                    2892

1    was brought to me, sometimes a salad was brought to me in the

2    original case for the organic spinach and there's words there

3    and they're translated into French and the shampoo and the

4    soap in the bathroom, there's also words there.

5          I had no books.  I had nothing to read.  Nothing to

6    listen to or nothing to grab onto or somebody else's words to

7    grab on to.  So I would take all of these materials and I

8    would write all the words in English and all the translations

9    into French and I would make a dictionary and I would start --

10   I was just trying to keep myself busy and I was trying to have

11   a schedule.  And I was trying to do things.

12         And I would sometimes just go through memories in my

13   head and I would be like, okay, I'm going to have breakfast

14   and I'm going to go to Wal-Mart and in my head I would

15   fantasize me stepping out of the house, opening the door.

16   Yes, it's asphalt.  It's black.  There was a rock here or a

17   street here or garbage in front.  I'm going to go around.  How

18   many steps and I would trace every memory.  And I went to the

19   Wal-Mart, remember, the first aisle has this and I would try

20   to think of the music.  And I would have -- and I would try to

21   obstruct something inside my head so I wouldn't go crazy

22   because sometimes when I went crazy, I lost it, and -- and

23   that was a scary state to get into and I was trying to avoid

24   it as all costs.

25   Q    When you say you lost it or you got into this scary

Daniela - direct - Penza                      2893

1   state, what do you mean?

2   A    There were times where I just -- I would just get into

3   this uncontrolled -- I would lose control of myself.  I would

4   lose control of myself, which is not something that feels

5   nice.  So, there were times where I just remember being --

6   like laying on the carpet and scratching my arms and wanting

7   to scream but I know I wasn't allowed to.  And just wanting to

8   die and wanting to, like, stop feeling or sometimes want to

9   feel something and just lost control of what I was -- and I

10  would just wait until I fell asleep.

11          Sometimes I would make myself asleep -- go to sleep

12  in the middle of the day just so I could avoid that, but it

13  always built up to that.  But it always built -- like I was

14  trying to and I think my natural state was also always to, you

15  know, try to keep going, but I think there were entire days

16  where I would just sit against the wall.  Sometimes -- I mean

17  there's a lot of hours in the day and sometimes I just

18  wouldn't even want to write.  You know, there was also a lot

19  of that.  I was also just without a care.  Almost breathing

20  was too -- it was -- none of that was normal, and I know that,

21  and there was this --

22          When Lauren would come and visit, I hated her.  I

23  hated Lauren.  I hated Lauren all the time, every time she was

24  in there I hated her -- what is she doing that's more

25  important than this?  And when she would go there, she was

1   really mean to me.  Like, she was really mean to me, but I was

2   so happy to see her, just happy to see her face and I remember

3   her hands and I wanted to, like, touch her and it was -- but

4   it's a crazy thing.

5          This woman here was -- I hated her all the time, all

6   the time, but even after she left, she told me all of these

7   things that would leave me in horrible states, but it was the

8   only human being that I was seeing.  So in the moment when she

9   was in front of me, I just loved her and I didn't want her to

10  ever leave.  I just wanted her to keep talking.  I loved

11  listening to her voice.  And there was a point in the room

12  where, it's just so difficult to tell time.  I can't

13  differentiate one season from another.

14         At some point I took down what was blocking out the

15  window and I could see out the window and I would keep busy

16  trying to count things and imagine.  You know, seeing the same

17  bird every day.  Just trying to find a routine, just trying to

18  find something that made sense.  And all the while I was

19  writing every day.  I was writing, I think, a letter every

20  day.  And I was trying to find the code.  I was trying to find

21  the words because I was supposed to be there until I fixed my

22  ethical breach and, I mean, by using reason.

23         So there's nothing I can do about it, right, because

24  there's nothing I can do because I can't come out of here.  So

25  there must be something that I can write.  So it's a

1    combination of words that means something.  So I would use all

2    of the words that I could find and I remembered what the last

3    instructions were and what the last few years had been.  So I

4    would write love letters:  Keith, I love you, I am so sorry I

5    did this to you.  I would try to make my apology the most

6    sincere possible because I knew that's what had been expected

7    of me.  I was trying to find -- but none of it worked.

8           And there was a point where I -- I figured, okay, so

9    I have a pen and a paper, I have to fix my breach and it's

10   destroyed everything, but I will start with my family and I

11   started to -- instead of letters, I started drafting, like, a

12   newsletter that I would send to every member of the family.

13   Q    Did the newsletter have a name?

14   A    Yes.  I named it the Wilton Times, and I saw it -- it

15   would be -- it would be a way.  I don't know what I was

16   thinking.  Honestly, a lot of the things that I was doing in

17   there were not rational.  But, I did that, I think for a few

18   days, maybe weeks even, and it was shut down as a huge

19   indulgence and ethical breach.

20          But it was around that time that I had -- I had one

21   of those crazy states.  I had a breaking point and I just

22   decided to cut my hair.  Somebody left scissors in the

23   bathroom.

24   Q    Were there typically scissors around?

25   A    No.  Somebody left a pair of scissors in the bathroom

1   and, you know, I thought I wanted to cut my hair.  My hair was

2   something I was not allowed to cut because Keith liked long

3   hair and I had asked before in the past that I wanted to cut

4   my hair and I wasn't allowed to and here I was in this room

5   and nothing mattered, nothing mattered.  Everything was going

6   to shit.  Half the time I didn't know who I was or what I was

7   feeling.  And I cut my hair.

8           I grabbed the scissors and it felt great.  And I

9   remember it was something I could control, something I could

10  do, cut my hair because it's mine.  I grabbed my hair and I

11  cut it.  I remember I made a braid.  I was wearing a blue

12  shirt.  I was wearing a blue shirt.  I remember looking in the

13  mirror and looking at my short hair and being satisfied.

14  Q    What happened after you cut your hair?

15  A    I must have written about it because by the time Lauren

16  came to visit me the next time, which I imagine was a week

17  later or some weeks later or some whatever later, she came

18  with the big news that that was a huge ethical breach.

19  Cutting my hair was a huge ethical breach.  And, I mean, I was

20  semi-despondent a lot of the time I was there -- I mean, I'm

21  here she is fixing my ethical breach.

22          But then the scary, scary part, the frightening

23  part, the horrible part, was -- I'm like, well, then I'll fix

24  it this way or the other.  Uh-uh, no.  The only way to fix

25  this ethical breach because you are here to fix your ethical

Daniela - direct - Penza                    2897

1   breach, you haven't fixed it yet, so you're making it worse
2   and now you cut your hair?
3          So now it's a new ethical breach so you're going to
4   stay in this room until your hair grows back to where it was.
5   And that was the actual first deadline of the sense of time of
6   how long I was going to spend there because so far it had just
7   been pushed to whenever you will heal your ethical breach and
8   now this random thing that happened just set a date which I
9   remember I kept calculating, oh my God, it's going to be years
10  because my hair is as long as it is now and I had cut it,
11  like, this short.
12  Q    So, for the record, Daniela, your hair is down to
13  approximately your waist, is that --
14  A    Yes, a little bit below my waist.
15  Q    And you're indicating that you cut it approximately to
16  where your chin is?
17  A    Yes.
18  Q    And you estimated how long you thought that it would --
19  A    It would be years.  That would be years.
20  Q    In this conversation with Lauren did she discuss the
21  defendant?
22  A    Yes.  Every conversation with Lauren.  I don't remember
23  every conversation with Lauren, to tell you the truth, but it
24  was all about Keith.  It was about that's why I was writing
25  letters to Keith, because Keith, through my letters, was going

Daniela - direct - Penza                    2898

1   to know when I was ready.

2   Q    Is that what Lauren told you?

3   A    Yeah.  Nobody else was going to know when I was ready.  I

4   wasn't going to know when I was ready.  My parents weren't.

5   It was Keith.  Keith was the one who was going to determine

6   when I had healed my ethical breach.

7   Q    Were there times when you asked Lauren to let you out?

8   A    Yes.

9   Q    What would happen?

10  A    I remember asking to be let out very early and I was told

11  that I -- I was told that me saying that was the exact

12  opposite direction of me healing my breach; that the first

13  thing I needed to do to start healing the breach is to want to

14  be in the room.  I needed to want to be in the room.  I needed

15  to want to heal my ethical breach that way.  And so I'm sure I

16  wrote many times, I want to be in this room and heal my

17  ethical breach to see if that was the trick.

18          And I needed to -- and, I mean, it's the same thing

19  that had happened before, just in an extremely radical way,

20  except now I'm completely isolated, completely.  But it was

21  the same notion that I am supposed to want this.

22

23          (Continued on the following page.)

24

25

Daniela - direct - Penza                                    2899

1   EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    How did you feel after Lauren told you that your hair --

4   that you would have to stay in the room until your hair grew

5   back?

6   A    I went crazy.

7   Q    What do you mean by that?

8   A    I couldn't believe it.  I -- I was enraged and I was -- I

9   felt impotence and I felt -- I felt it was so unfair.  What

10  did that have to do with me -- what did that have to do --

11  that made no sense.

12           The reasoning she had given me is postulates

13  because, Daniela, you're a person who is very destructive and

14  you think that you can get away with destruction.  So if you

15  go ahead and destroy this, then your postulate is going to be

16  that it's okay to do it.  So the only way to fix it is now you

17  have to feel the effects of, you know, being here while it

18  grows back.

19           It made no sense to me.  It -- it made no sense to

20  me.  That made no sense.  I don't think it can make sense to

21  anybody.  It made no sense.

22  Q    At some point did you become aware of any measures that

23  were in place to make sure you didn't leave the room?

24  A    Yes.

25  Q    Can you explain?

Daniela - direct - Penza                    2900

1   A     Yes.  I remember it was around, I think it was around the

2   first V Week, I don't know, but at some point I remember

3   hearing noises in the house.  And, again, I became -- I was

4   like so -- I was looking for any kind of -- any kind of input

5   of any kind, whatever it was.  So every sound of the house I

6   would -- I would -- I would spend like a lot of time right

7   next to the crack in the door listening if something was going

8   on; or like there was a vent underneath the window, I think,

9   and I would just lay there, curl up, just listening, trying to

10  catch anything.  And it was very, very faint.  Very, very

11  faint.  But sometimes I would catch it and I remember this

12  time there was someone, and I could recognize it was Steve

13  Ose, and they were talking about setting up cameras.

14  Q     Who's "they"?

15  A     He was talking with someone in my family about setting up

16  cameras, and then there was noise and there was like things,

17  like someone was moving something in.  And so I'm pretty sure

18  that there were cameras out there watching me, surveilling me.

19  Q     Was there a lock on your door?

20  A     There was a doorknob.

21  Q     But was the door locked?

22  A     No, it wasn't.

23  Q     Did you feel that you could leave the room?

24  A     No.

25  Q     Were there a few occasions where you did leave the room?

Daniela - direct - Penza                    2901

1    A    Yes.

2    Q    Can you describe those?

3    A    Yes.  There were a few times where, and I think there

4    was, again I think there was V Week, but that must have been

5    into the second year because the house was all alone.  Like I

6    knew there was nobody there.  And I gathered the courage and

7    I -- I stepped out, just went out downstairs.  There was

8    nobody there.  And I went out through the front door and I

9    remember -- I remember the sensations.  I remember the crisp

10   air.  I remember the brightness.  I remember the feeling.  I

11   remember the feeling.  And I remember I walked around.  I

12   don't remember for how long, but I came right back into the

13   room before no -- anybody noticed.

14            So it was just like my -- I don't know, like my

15   sneaky way, maybe, to get some reality and it felt great.  It

16   was great.

17   Q    Why not just stay out?

18   A    I couldn't, and nobody could find out that I had breached

19   that because I would lose everything.  I would lose

20   everything.  I -- I -- I couldn't.

21   Q    Were there ever instances when you went outside the door

22   of your room?

23   A    Yes.

24   Q    Okay.  How many times?

25   A    A handful of times.  Early on I remember I wanted to read

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2902

1   something.  I was desperate to just be able to read something,

2   and I remember that I opened the door.  There was nobody

3   around, and there was some bankers boxes and I knew that that

4   was, like, some kind of -- like they had some -- some stuff,

5   personal stuff and amongst them were books.  So I just grabbed

6   a couple books and I read them and reread them and reread them

7   and reread them and reread them.  And then eventually, as I

8   usually did, I confessed:  I took a book and I shouldn't have

9   taken a book.  I'm very sorry.

10          I also reached out one time and got my mother's --

11  it was like a -- like a PSP, like a Play Station, something.

12  She used it, I remember, for like games to keep the mind

13  active, so when you get older you do like puzzles so that it

14  doesn't deteriorate and she had that for that reason.  And so

15  I remember I took that for a while and I remember -- and I

16  remember what period of time it was, but it was later.  It was

17  like later.  Like it was like a year in, probably more, maybe

18  a year-and-a-half.  It was a long time.  And I remember there

19  must have been nobody in the house because I went downstairs

20  to reset the router so that I could access the wifi because

21  all I wanted was to see what's going on in the world.  I

22  wanted to see the news.  Like what's happening out there?

23  Like I haven't seen what's happening out there for a year-

24  and-change.  And so I had -- I wanted to know what was

25  happening, you know, like I don't -- I wanted to know what was

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2903

1  happening and I wanted -- and it was the saddest thing because

2  I -- I remember I was able to check my e-mail, I think, from

3  that PSP and I remember nobody had written me.  Like nobody

4  missed me.  There was one e-mail from Ben on my birthday the

5  year prior with like a happy birthday exclamation mark, but I

6  was gone from the world and nobody noticed.  I remember I

7  cried for days and days and days.

8            It's very hard to see that the world can go on

9  without you.

10  Q    At some point did you access a Facebook account?

11  A    Yes, yes.

12  Q    Can you explain?

13  A    Yes.  I -- on that same PSP I guessed my father's

14  password.  It's very easy.  I'm not going to say here, but

15  it's very easy, because he may still use it.

16            I wanted to see pictures of my family.  I -- I just

17  wanted to see them.  I just wanted to see -- I just wanted to

18  see them.  And it was great seeing them.  It's like it seems

19  like nothing, but it was such a huge thing for me.  It felt

20  like so much, it was overwhelming.  And those were the

21  little -- little few times where I had the opportunity to see

22  a little bit from the outside throughout that period of time.

23  Q    Other than those few occasions you've told us about, for

24  the rest of the two years, were you following the rules that

25  had been put in place?

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2904

1  A    Yes.

2  Q    And these ups and downs with your mind, would they

3  continue to happen?

4  A    Yes, they worsened.

5  Q    Can you explain what you mean by they worsened?

6  A    It was harder and harder to keep the darkness at bay.

7  Like there was not a lot more -- like I was losing my

8  strength.  And when I say I'm losing my strength, I was like

9  losing like the sense of myself.  I don't know if that makes

10  sense because I don't mean it in the -- like I know I would

11  look at my body and I would think, it would make no sense.

12  Like what's that world out there?  What is -- what is this?

13  Like what is this?  What is this sensation?  What is this?  I

14  would be lost.

15          And I -- the more and more I would have just -- I

16  would find no reasons.  And more and more I would get like

17  really crazy, like really lose control of myself, of my mind.

18  It really was losing my mind that really frightened me.

19  Q    Do you have specific reference points for that?

20  A    Hard to explain.  It's hard to explain, but it's like --

21  it's like nothing makes sense.  For a long time for nothing to

22  make sense, it's like -- it's like floating in nothingness and

23  then second-guessing everything that I've been and everything

24  that I've wanted and that gets diluted into nothing.  But

25  there's pain because there is the awareness that nobody cares

SAM      OCR      RMR      CRR      RPR

Daniela - direct - Penza                    2905

1   about me.  There wasn't just I was alone, it's nobody came and

2   got me.  My own family didn't come.  They didn't say:  Enough,

3   it's our daughter.  My mom didn't say:  Hey, I made her, maybe

4   she deserves to live her life.  They didn't come.  They didn't

5   get me.  Even if I was bad, even if I was a monster, nobody

6   cared, nobody came and said:  Enough, it's my sister.  Not a

7   single soul.  Nobody.  I was hoping.  I was -- I was hoping.

8   I was like somebody get me.  Somebody should get me.  Somebody

9   come get me.

10          And sometimes I would beg:  Please let me out.  I

11  don't know why, just -- just let me out.  Nobody cared.  My

12  family didn't.  Nobody cared.  So, it was also -- it was also

13  knowing that nobody wanted me.  I'm in a world where nobody

14  cares that I'm losing my life.  Nobody cares.

15          So I was going more and more -- it was harder and

16  harder to keep myself from going in that direction because it

17  just didn't seem to be a point.  Because it was clearly never

18  gonna end.  I mean the hair thing was so ridiculous, to me it

19  seemed like a game.  Like, tomorrow I'll do something else and

20  they're gonna extend it eight years.

21  Q    When you say going in that direction, what do you mean?

22  A    I -- I just wanted it to end.

23  Q    Did you contemplate killing yourself?

24  A    Yes.

25  Q    And did you take steps in that direction?

SAM      OCR      RMR      CRR      RPR

1    A    Yes.

2    Q    Can you explain what those were?

3    A    I started accumulating cleaning supplies and I thought,

4    as soon as I have enough, I'll just drink everything and it

5    will be over soon.

6    Q    For how long did you accumulate those cleaning supplies?

7    A    I don't remember, but it was -- it had been a while

8    because there wasn't a lot available.

9    Q    And then what happened?

10   A    I made my decision and -- and it was a specific moment.

11   It was a specific moment, there was one day, and I don't

12   remember much about that day, which was rest -- you know, it

13   was just like every other day.  And, you know, it wasn't like

14   I was just I'm just gonna kill myself, it wasn't like a big

15   deal.  It was just gonna be over.  It was gonna be over, you

16   know.  I wasn't afraid, I was just gonna do it.

17             And I remember -- I remember I -- that day I looked

18   out the window and just, you know, no connection whatsoever,

19   but I looked out the window and there was a bird that I'd been

20   watching.  I had seen this family of birds like over a few

21   years.  And it was a red bird, and I later identified it as a

22   cardinal.  It had babies.  It had nested in front of my

23   window.  I had seen it.  And I think like for the winter he

24   had disappeared for a while and this day he came back.  It was

25   a he, according to me; and I remember it flew and post itself

Daniela - direct - Penza                    2907

1    on the tree.  And I don't know what it was about that bird,

2    but in that moment I remember thinking:  I want to live.  I

3    want to live.  You know, and in that moment I thought:  If I'm

4    gonna die, then it doesn't matter how bad I fuck it up.  I

5    remember thinking ridiculous things.  I remember thinking I

6    can be a drug addict, I can be a prostitute, I can do anything

7    because I'm gonna die anyway and there was a sense of freedom.

8    And that's the moment I decided I want to live.

9           Fuck everybody.  Fuck you, Mom.  Fuck you, Dad.

10   Fuck you every -- fuck everybody.  I give up.  It's true, I'm

11   defeated.  I can't do this.  I give up.  Never gonna see you

12   again.  Fuck you all.  Go fuck yourselves, but I'm gonna live.

13   And it was done.  Sorry.

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                                    2908

1    BY MS. PENZA:  (Continuing)

2    Q     And so what did you do?

3    A     So it's foggy but I remember I wanted to go and tell

4    Keith because he was the one who put me there.  He was the one

5    who did all of this.  There was really nobody else.  I wanted

6    to just be, like -- I remember I wanted to know why.  I

7    remember, but I remember it just being the final thing, and I

8    went to volleyball.

9            I walked out of the house like it was my house.  I

10   walked out of the room, I walked out of the house, and I went

11   to see Keith.  And I walked into volleyball and it was, I

12   think, a place called the red barn or something like that.

13   And it's been like almost two years.  And the look in

14   everybody's faces was amazing.  But I was just looking for

15   Keith.  And he was there and I remember seeing him.  And the

16   people around, I remember being, like, I didn't think that was

17   shocking, that was normal, it all was, like, what the hell.

18   And I remember Keith running to hide, like, to dodge, like,

19   amongst other people.  And I could not get through those

20   people.  Someone pulled me aside and Keith was out of reach.

21   Keith would not face me.  I think it was my brother -- it was

22   one of my relative, someone in my family, pulled me aside.  I

23   remember some netting.  I remember some netting.

24           And they grabbed me and they put me in the car and

25   they drove me back to Wilton but the decision had been made.

CMH        OCR        RMR        CRR        FCRR

2909

1    I didn't care if Keith didn't want to talk to me.  I tried.

2    It was just, I am at your mercy, you said you were going to do

3    something with me, do it.

4            MS. PENZA:  Your Honor, I think this would be a good

5    place to end for the day.

6            THE COURT:  All right.

7            Members of the jury, we are going to recess for the

8    afternoon now.

9            I remind you that it is very important that you

10   follow my instruction, that you not discuss the case with

11   anyone, not your family or friends or business associates and

12   not your fellow jurors.

13           In addition, you must not read, listen to, watch or

14   access any accounts of this case on any form of media,

15   including newspaper, television, radio, podcasts or the

16   internet, nor should you research or seek outside information

17   about any aspect of the case.

18           Please do not communicate with anyone about the case

19   on your phone, whether through e-mails, text messaging or any

20   other means or to any blog or website or by way of any social

21   media including Facebook, Twitter, Instagram, YouTube or any

22   similar sites.

23           You must not consider anything you've read or heard

24   about the case outside this courtroom, whether you read it

25   before or during jury selection or during the course of this

2910

1  trial and as I said, do not attempt any independent research

2  or investigation of the case or visit any of the locations

3  identified on the questionnaire or discussed during the course

4  of jury selection or during the trial.

5          We will resume tomorrow morning at 9:30.  Have a

6  good night.

7          All rise for the jury.

8          (Jury exits.)

9          THE COURT:  The witness may stand down.

10         Please do not discuss your testimony with anyone.

11         (Witness steps down.)

12         THE COURT:  All right.  Everyone may be seated.

13         Has the government provided the names of the

14  witnesses that follow this witness?

15         MS. PENZA:  Yes, Your Honor, and we can send a list

16  to the Court as well.  Yes.

17         THE COURT:  Well --

18         MS. PENZA:  I can provide them right now on the

19  record --

20         THE COURT:  Sure.

21         MS. PENZA:  -- if that would be helpful.  We intend

22  to call the custodian from Google at some point tomorrow and

23  then James Loperfido, Sheila Jelonek and Elizabeth Butler.

24         THE COURT:  And that will take us to the end of the

25  week?

2911

1          MS. PENZA:  We may also call an agent if we have

2    time, Your Honor.

3          THE COURT:  All right.  About how much more do you

4    have on direct of this witness?

5          MS. PENZA:  Under two hours.

6          THE COURT:  Two more hours?  Okay.

7          MS. PENZA:  I will try to keep it to less than that

8    but I just want to --

9          THE COURT:  All right.  If you have two more hours,

10   you have two more hours.

11         And then the defense, an estimate?

12         MR. AGNIFILO:  Four hours, tops.

13         THE COURT:  So we should finish with this witness

14   tomorrow, in other words?

15         MR. AGNIFILO:  With two hours and four hours, we'll

16   get close to the end of the day.  It might spill over.

17         THE COURT:  All right.  But we have to have the

18   custodian from Google at the beginning of the day, right?

19         MS. PENZA:  Yes.

20         THE COURT:  I don't want to -- I'd rather start with

21   the Google custodian and then finish Daniela's testimony and

22   cross-examination.

23         MS. PENZA:  Understood, Your Honor.

24         THE COURT:  All right?

25         MS. PENZA:  Yes.

2912

1          THE COURT:  Anything else for this evening?

2          MS. PENZA:  No, Your Honor.

3          THE COURT:  Anything else from the defense?

4          MR. AGNIFILO:  No, Your Honor.

5          THE COURT:  All right.  Tomorrow morning, 9:30.

6     Thank you.

7          MS. PENZA:  Thank you.

8          (Matter adjourned to May 30, 2019 at 9:30 a.m.)

2913

1                          I N D E X

2

3    WITNESSES:

4            DANIELA                                    2695

5                DIRECT EXAMINATION (Continued)         2695

6                BY MS. PENZA

7

8

9                          EXHIBITS:

10

11           Government Exhibits 1603, 1612, 1604,      2838
             1605, 1589, 1609, 1608 and 1613
12
             Government Exhibit 1575                     2717
13           Government Exhibits 1593, 1594, 1595        2722
             and 1596
14           Government Exhibits 1530, 1532, 1533,       2733
             1534, 1535, 1536, 1537, and 1538
15           government Exhibits 1555, 1556, 1557,       2817
             1559, 1562 and 1563
16           Government Exhibits 1600, 1600-A and        2836
             1601
17           Government's Exhibit 1600 and 1601          2836
             Government Exhibits 1603, 1612, 1604,       2838
18           1605, 1589, 1609, 1608 and 1613
             Government's Exhibits 1606 and 1607         2868
19

20

21                       *      *      *

22

23

24

25

CMH      OCR      RMR      CRR      FCRR