2914

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :   18-CR-204(NGG)
4
          Plaintiff ,        :
5                                United States Courthouse
      -against-               :  Brooklyn, New York
6
KEITH RANIERE, et al.,       :
7                                May 30, 2019
          Defendant.         :   9:30 o'clock a.m.
8
   - - - - - - - - - - - - X
9
          REDACTED TRANSCRIPT OF TRIAL
10      BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
        UNITED STATES DISTRICT JUDGE, and a jury.
11
APPEARANCES:
12
For the Government:          RICHARD P. DONOGHUE
13                           United States Attorney
                             BY: MOIRA K. PENZA
14                               TANYA HAJJAR
                                 MARK LESKO
15                           Assistant United States Attorneys
                             271 Cadman Plaza E, Brooklyn, NY
16
For the Defendant:           BRAFMAN & ASSOCIATES, P.C.
17                           767 Third Avenue, New York, NY

18                           BY: MARC A. AGNIFILO, ESQ.
                                 TENY ROSE GERAGOS
19
                             DEROHANNESIAN & DEROHANNESIAN
20                           677 Broadway, Albany, NY 12207

21                           BY:  PAUL DerOHANNESIAN, II, ESQ.
                                  DANIELLE R. SMITH, ESQ.
22
Court Reporter:              Charleane M. Heading
23                           225 Cadman Plaza East
                             Brooklyn, New York
24                           (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

          CMH       OCR       RMR       CRR       FCRR

2915

1          (In open court; outside the presence of the jury.)

2          THE CLERK:  Appearances, please.

3          MS. PENZA:  Moira Penza, Tanya Hajjar and Mark Lesko

4     for the United States.  Good morning, Your Honor.  Also at

5     counsel table is Special Agent Michael Weniger with the FBI

6     and paralegal specialist Teri Carby.

7          THE COURT:  Good morning.

8          MR. AGNIFILO:  Good morning, Your Honor.  Marc

9     Agnifilo.  Teny Geragos will be with us.  I apologize.  Paul

10    DerOhannesian and Danielle Smith and Keith Raniere with us

11    this morning as well.

12         THE COURT:  Good morning.

13         All right.  Please be seated.

14         Who are you going to call first?

15         MS. PENZA:  We are going to call the Google

16    custodian first.

17         There is one issue we would like to discuss with

18    Your Honor before Daniela's testimony continues but we can do

19    it after the custodian or now, whichever Your Honor prefers.

20         THE COURT:  Do you want to do it --

21         MS. PENZA:  At sidebar, please.

22         THE COURT:  Let's do it at sidebar now so we can

23    move right into the next step.

24         (Continued on next page.)

25







2919

1          (In open court; outside the presence of the jury.)

2          THE COURT:  All right.  Let's bring in the jury.

3          (Jury enters.)

4          THE COURT:  Please be seated.  Good morning, members

5     of the jury.

6          THE JURY:  Good morning.

7          THE COURT:  This morning, we are going to go briefly

8     out of order.  The witness who was on direct testimony will be

9     back but, first, for scheduling reasons, we are going to have

10    a brief witness on another subject and I am permitting, with

11    the agreement of the parties, to have this witness go forward

12    and testify and then we will go back to the prior witness who

13    is still on direct testimony.

14         So the government may call its witness.

15         MS. HAJJAR:  Thank you, Your Honor.  The government

16    calls Daniel O'Donnell to the stand.

17         THE CLERK:  Please raise your right hand.

18         (The witness is duly sworn/affirmed by clerk.)

19         THE CLERK:  Please have a seat.

20         THE WITNESS:  Thank you.

21         THE CLERK:  Please state and spell your full name

22    for the record.

23         THE WITNESS:  Yes.  Daniel O'Donnell, D-A-N-I-E-L,

24    O, apostrophe, D-O-N-N-E-L-L.

25         THE COURT:  You may inquire.

1           MS. HAJJAR:   Thank you, Your Honor.

2    DIRECT EXAMINATION

3    BY MS. HAJJAR:

4    Q     Good morning, Mr. O'Donnell.

5    A     Good morning.

6    Q     Where do you work?

7    A     I work at Google.

8    Q     What kind of company is Google?

9    A     Google is an internet-based company, provides a number of

10   free services such as search, e-mail, among others.

11   Q     Where is Google's headquarters located?

12   A     It's located in Mountain View, California.

13   Q     And what office do you work in?

14   A     I work in the San Francisco office.

15   Q     What do you do there?

16   A     I'm a custodian of records.

17   Q     And as a records custodian, what are your

18   responsibilities?

19   A     So I work on a team called legal investigations support.

20   We respond to legal requests for user data.  Usually these

21   come in the form of subpoenas, court orders and search

22   warrants.

23   Q     What is Gmail?

24   A     Gmail is an e-mail service provided by Google.

25   Q     And do your recordkeeping responsibilities extend to

1  Gmail as well?

2  A    Yes, they do.

3         MS. HAJJAR:  I'd like to show something to the

4  witness alone, Your Honor.

5         THE COURT:  Go ahead.

6         MS. HAJJAR:  Thank you, Your Honor.

7  Q    Mr. O'Donnell, I'm showing you what's marked as

8  Government Exhibit 1588-A.  Do you recognize this exhibit?

9  A    Yes, I do.

10 Q    How do you recognize it?

11 A    I see my initials and it's dated yesterday.

12 Q    And does Government Exhibit 1588-A contain data from the

13 Gmail account vicibaby@gmail.com?

14 A    Yes, it does.

15 Q    Did you review the records contained in Government

16 Exhibit 1588-A prior to your testimony today?

17 A    Yes, I did.

18 Q    And did the records that, the records on 1588-A, were

19 they kept in the regular course of business by Google?

20 A    Yes, they were.

21 Q    And have you reviewed account information for that

22 account, vicibaby@gmail.com?

23 A    Yes, I have.

24        MS. HAJJAR:  At this time, Your Honor, the

25 government offers Government Exhibit 1588, 1588-R, 1588-B and

O'Donnell - direct - Hajjar                2922

1    1588-C into evidence.

2         MR. AGNIFILO:  No objection, Your Honor.

3         THE COURT:  All right.  Government Exhibits 1588,

4    1588-R, 1588-B and 1588-C are received in evidence.

5         (So marked.)

6         MS. HAJJAR:  Thank you, Your Honor.  May I publish

7    1588-R at this time?

8         THE COURT:  Yes, you may.

9    Q    All right.  Mr. O'Donnell, you testified that you

10   reviewed Google subscriber information for vicibaby@gmail.com?

11   A    Yes.

12   Q    And showing you what's in evidence as Government

13   Exhibit 1588-R, is that the -- does that appear to be the

14   Google subscriber information for that account with certain,

15   certain things redacted, two things redacted?

16   A    Yes, it does.

17   Q    Can you describe what Government Exhibit 1588-R is, what

18   this information is?

19   A    Sure.  So this is subscriber records for that account.

20   This information is entered by the user upon the creation or

21   maintenance of the account.

22   Q    And what is the first name associated with that account,

23   vicibaby@gmail.com?

24   A    Camila, C-A-M-I-L-A.

25   Q    And is there a recovery e-mail provided that begins with

O'Donnell - direct - Hajjar                    2923

1   that first name?

2   A    Yes.

3   Q    When was this account created?

4   A    It looks like it was created on October 30, 2007.

5   Q    And the, is there an SMS number associated with this

6   account as well?

7   A    Yes, there is.

8   Q    Now, all of this information, who provides this

9   information to Google?

10  A    The user provides this information.

11  Q    I'm going to show you what's in evidence as Government

12  Exhibit 1588-B.  Mr. O'Donnell, have you reviewed this exhibit

13  before?

14  A    Yes.

15  Q    And does it appear to be application downloads associated

16  with vicibaby@gmail.com?

17  A    Yes.

18  Q    Can you explain what that is, app downloads?

19  A    Sure.  This is a record of applications downloaded from

20  the Google Play Store to an Android or Android-compatible

21  device.

22  Q    And so these are applications on someone's phone that

23  isn't some way linked to their Google account, is that right?

24  A    Yes, that's correct.

25  Q    So I want to direct your attention to the middle of the

O'Donnell - direct - Hajjar                    2924

1    first page of Government Exhibit 1588-B.

2              Do you see, do you see line 50 -- I'm sorry -- 54,

3    where it says Signal Private Messenger?

4    A    Yes.

5    Q    Now, the column next to it, that's says, Installed Date.

6    What does that refer to?

7    A    The acquisition date is the date that the application was

8    originally downloaded onto the phone.

9    Q    And so based on this information, at what, when was

10   Signal Private Messenger installed on this phone?

11             THE COURT:  Could you put a dot next to the line?

12             MS. HAJJAR:  Yes.

13             THE COURT:  It might help.

14             MS. HAJJAR:  Let me try to zoom in, Your Honor.

15   Q    Can you see that, Mr. O'Donnell?

16   A    Yes, I can.

17   Q    And so Signal Private Messenger, what is the date

18   associated with first acquisition of that application?

19   A    January 1, 2017.

20   Q    Do you know a what Signal Private Messenger is?

21   A    Yes, I believe it's a private messaging application.

22   Q    And G Data Secure Chat and Orbot, Proxy with Tor, what

23   are the dates of first acquisition in connection with those

24   applications?

25   A    May 21, 2017 and May 21, 2017.

O'Donnell - direct - Hajjar                    2925

1   Q    Now, I want to direct your attention to, do you see here,
2   Tinder?
3   A    Yes.
4   Q    Is that an application that's installed on this device?
5   A    Yes.
6   Q    When was it installed?
7   A    January 9, 2015.
8   Q    And what about Bumble?
9   A    It looks like August 13, 2016.
10  Q    Do you know what Tinder and Bumble are?
11  A    Dating applications.
12  Q    I'm just showing you -- do you see What'sApp Messenger?
13  A    Yes.
14  Q    When was What'sApp Messenger installed on that phone?
15  A    It looks like March 14, 2012.
16  Q    Now, the last column of Government Exhibit 1588-B, last
17  update, this device, can you explain to the jury what that
18  means?
19  A    Sure.  This just reflects the last date that the
20  application package was updated.
21  Q    Mr. O'Donnell, I'm going to show you what's in evidence
22  as Government Exhibit 1588-C.  Have you reviewed this exhibit
23  before?
24  A    Yes, I have.
25  Q    Can you explain what this is, what this appears to be?

CMH        OCR        RMR        CRR        FCRR

O'Donnell - direct - Hajjar                    2926

1   A    This is Google Plus profile data.

2   Q    What is Google Plus?

3   A    Google Plus is or was Google's internet-based social

4   network.

5   Q    And the information contained on the user profile for

6   Google Plus, is that something the user would provide to

7   Google?

8   A    Yes, that's correct.

9   Q    And what's the first name associated with this user's

10  Google Plus account?

11  A    Camila, C-A-M-I-L-A.

12  Q    The birthday that is March 1, 0000, does the user have to

13  input their own birthday?

14  A    I'm not sure.

15       MS. HAJJAR:  Your Honor, can I show something to the

16  witness alone?

17       THE COURT:  All right.

18  Q    Mr. O'Donnell, I'm showing you what's marked for

19  identification as Government Exhibit 1583-A.  Do you recognize

20  this exhibit?

21  A    Yes, I do.

22  Q    Have you reviewed the contents of this exhibit?

23  A    Briefly, yes.

24  Q    And does this exhibit contain data from the Gmail account

25  clarewbronfman@gmail.com?

O'Donnell - direct - Hajjar                    2927

1    A    Yes.

2    Q    Have you reviewed account information associated with

3    that account as well?

4    A    Briefly, yes.

5              MS. HAJJAR:  Your Honor, at this time, the

6    government offers Government Exhibit 1583 into evidence.

7              MR. AGNIFILO:  No objection, Judge.

8              THE COURT:  All right.  Government Exhibit 1583 is

9    received into evidence.

10   Q    Mr. O'Donnell, I'm going to show you the first page of

11   Government Exhibit 1583.  And does this appear to be the

12   Google subscriber information associated with the account

13   clarewbronfman@gmail.com?

14   A    Yes.

15   Q    What is the recovery e-mail associated with this account?

16   A    Clare, C-L-A-R-E, at nxian.net.

17   Q    And when was this e-mail account created?

18   A    It looks like September 8, 2011.

19   Q    Now, the list of items after services, are those Google

20   products that are associated with that account?

21   A    Yes.

22             MS. HAJJAR:  Your Honor, may I show one thing to the

23   witness alone?

24             THE COURT:  Go ahead.

25   Q    Mr. O'Donnell, I'm showing you what's been marked for

O'Donnell - direct - Hajjar                    2928

1  identification as Government Exhibit 1587-A.  Have you

2  reviewed this exhibit?

3  A    Yes.

4  Q    And have you reviewed this, the contents of this exhibit?

5  A    Yes.

6  Q    And is this, the contents of this exhibit include data

7  associated with the Gmail account, thebeacon2009@gmail

8  account?

9  A    Yes.

10 Q    And have you reviewed account information for

11 thebeacon2009@gmail.com?

12 A    Yes.

13        MS. HAJJAR:  Your Honor, at this time, the

14 government offers Government Exhibit 1587 into evidence.

15        MR. AGNIFILO:  One second, Your Honor.

16        Can I speak to the government for a second, Judge?

17        THE COURT:  Sure.

18        MR. AGNIFILO:  Thank you.

19        (Pause.)

20        MR. AGNIFILO:  Judge, we have no objection.

21        THE COURT:  Government Exhibit 1587?

22        MS. HAJJAR:  Yes, Your Honor.

23        THE COURT:  Received in evidence.

24        MS. HAJJAR:  Thank you.  May I publish it?

25        THE COURT:  Yes, you may.

O'Donnell - cross - Agnifilo                    2929

1  Q    Mr. O'Donnell, does this appear to be the Google

2  subscriber information for the account

3  thebeacon2009@gmail.com?

4  A    Yes, it does.

5  Q    And what is the name associated with this account?

6  A    Emiliano Salinas, E-M-I-L-I-A-N-O, S-A-L-I-N-A-S.

7  Q    Is there a recovery e-mail associated with this account?

8  A    Yes.

9  Q    And when was this account created,

10 thebeacon2009@gmail.com?

11 A    June 12, 2009.

12         MS. HAJJAR:  No further questions, Your Honor.

13         THE COURT:  Cross-examination?

14         MR. AGNIFILO:  Very briefly.

15         THE COURT:  Very well.

16 CROSS-EXAMINATION

17 BY MR. AGNIFILO:

18 Q    Good morning, sir.

19 A    Good morning.

20 Q    I just have a couple of questions.  My name is Marc

21 Agnifilo, first, and I represent Keith Raniere.  This really

22 is for my benefit just to see how some of this works so if I

23 ask you a question that doesn't make any sense, please don't

24 hesitate to tell me that.  Okay?

25 A    Okay.

O'Donnell - cross - Agnifilo                    2930

1   Q    All right.  Thanks.

2        Here's really my only, my only question.  You were

3   talking about that there was a Signal Private Messenger that

4   was sort of put on, on Government Exhibit 1588-B.  I'll show

5   it to you just so that, and I'll put a little -- right there.

6   Do you see that?

7   A    Yes, I see that.

8   Q    What is that?

9   A    I'm not very familiar, but I believe it's a secure

10  messaging application.

11  Q    Okay.  And do you know if it's possible if, to change

12  things in the messaging application before it's put on to the

13  e-mail?  Do you know?

14  A    What -- I'm not sure what you mean.

15  Q    So if it's a messaging application, what is that?  What's

16  a messaging application?

17  A    So it's an application that users download into their

18  phone or device that allows them to message other users or

19  other phone numbers.

20  Q    Okay.  And do you know if the person using that service

21  can, can edit one's own chats after making the chats, if you

22  know?

23  A    I'm not sure.

24  Q    Is this the first time you've ever testified?

25  A    No, it's not.

CMH     OCR     RMR     CRR     FCRR

                    O'Donnell - cross - Agnifilo                    2931

1   Q     Okay.  Well, congratulations.

2              MR. AGNIFILO:  I'm all done, Judge.  Thank you.

3              THE WITNESS:  Thank you.

4              MR. AGNIFILO:  Thank you very much.

5              MS. HAJJAR:  No redirect, Your Honor.

6              THE COURT:  The witness is excused.

7              THE WITNESS:  Thank you.

8              THE COURT:  You're welcome.  Have a good trip back

9   to San Francisco.

10             THE WITNESS:  Thank you.

11             (Witness excused.)

12             THE COURT:  All right.  At this time, we will

13  continue with the direct examination of Daniela.

14             MS. PENZA:  Thank you, Your Honor.

15             (Witness takes stand.)

16             THE COURT:  Please be seated.  All right.

17             Ms. Penza, you may continue your direct examination

18  of the witness.

19             The witness is reminded that she's still under oath.

20             THE WITNESS:  Yes.

21             MS. PENZA:  Thank you, Your Honor.

22             (Continued on next page.)

23

24

25

Daniela - direct - Penza                    2932

1   DANIELA    ,

2        called as a witness, having been previously duly

3        sworn, was further examined and testified as follows:

4   DIRECT EXAMINATION (Cont'd)

5   BY MS. PENZA:

6   Q    Daniela, yesterday when we talked about your time in the

7   room, was there a time -- can you -- was there a time when

8   your mother also went into a room?

9   A    Yes.

10  Q    Can you explain what happened?

11  A    Yes.  In fact, my mother -- for the time that my parents

12  were supervising my program, my mother had started taking on,

13  like, mimicking what I was doing in my program, I think, as a

14  way to incentivize me or a way -- I really wasn't sure.  It

15  very much upset me at the time.  So when, so when they

16  presented this room concept and I said I didn't want to do it,

17  she said that if I didn't go in, she was going to go in anyway

18  because it was part of the program.

19  Q    At that point in time before you went into the room, had

20  your mom gone into the room?

21  A    No.  We went in -- I went into the room they put me in

22  and she went into the room opposite at the same time.

23  Q    And was your mom, as far as you could tell -- so you're

24  in the room.  Did you have direct communication with your mom?

25  A    No, never.

Daniela - direct - Penza                    2933

1    Q    Okay.  So can you explain how the rooms were situated in

2    12 Wilton?

3    A    Yes.  So there was a room where I was sustaining at and

4    then there was a room next to it, but it was connected to the

5    next room as well.  So it was a shared bathroom.  We would

6    never be in at the same time or see each other.

7    Q    And how -- were you able to hear anything that gave you

8    an indication of what your mom's experience was versus your

9    experience?

10   A    Yes.  It was completely different and this is something

11   that I felt very, that angered me, it very much angered me

12   because I thought it was unfair.  I thought -- I was

13   completely isolated, completely isolated.  And, you know, the

14   excuse had been she would go into that, into that room and do

15   what I was doing and this was supposed to help me -- I'm not

16   sure how -- but she had constant companionship.

17          So I used to hear, you know, people.  That was the

18   only full bathroom in the house.  I think Cami was downstairs

19   so she would go and shower and see, like, just simple act of

20   seeing my mom, but they would chat.  I could hear the voices.

21   My father would go upstairs, have a meal with her.  So it

22   seemed to me she was geographically constrained to that room

23   like I, that I could hear.  I never heard her come out.  But

24   she saw people all the time, talked to people all the time,

25   had things.

Daniela - direct - Penza                    2934

1   Q    Were her meals done the same way as yours where you

2   would, where there would be a plate and a knock on the door

3   and then you would retrieve the food?

4   A    Sometimes but not always.

5   Q    Were there some meals that she, that you could tell were

6   being done differently than yours?

7   A    Many meals, yes.  I could hear my father's voice in her

8   room.

9   Q    And they would be eating together?

10  A    Yes.

11  Q    How did it make you feel being in the situation you were

12  in while your mom was having this different experience in the

13  other room?

14  A    It made me -- it was very complicated, a complicated

15  emotion.  I remember, I remember Cami was babysitting Gaelyn

16  and I could hear the voice of the child playing with my mom

17  and Cami upstairs and I hated them.  I hated them but I also

18  loved being able to hear them but I hated them.  I hated them.

19  They were right there having fun, living, and it was hard.  It

20  was, it was very difficult.  It felt very unfair.

21          I was very angry because -- I mean, part of the

22  reason -- I mean, my mom said she was going to do exactly what

23  I was going to say and here I was going through this

24  completely alone.  Nobody would visit me, nothing was

25  happening, I had all of this going on, and there's, like, a

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    2935

1   full life next to me.

2            So it, it was complicated.  I didn't have -- I liked

3   listening to those noises in a way that made me happy.  Being

4   able to hear the laughter and the noise and their voices, that

5   was, like, a small pleasure, but it made me very angry.

6   Q    At some point, did something happen with your mom?

7   A    Yes.

8   Q    Can you explain?

9   A    Yes.  There was a man she was very close to, very, very

10  close to, who died.  He was murdered.  And I remember I heard,

11  I heard people coming in, several people, and I heard people

12  coming up the stairs and going to my mom's bedroom.  And I

13  remember hearing a lot of crying and, like, sobbing.  And then

14  my mom opened the bathroom door, opened my door and came into

15  my room and hugged me and she told me, I don't want you to

16  feel bad, it's not your fault.  And I learned that this man

17  had died.  And it was, it was a very big deal because that --

18  it was a love, it was a love relationship they had.

19  Q    So at that point in time, are your parents essentially

20  separated?

21  A    Yes.

22  Q    So they remained being friends but your mom was

23  romantically involved with other people?

24  A    Yes.

25  Q    So this was somebody who died while she was in this other

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                          2936

1    room?

2    A    Yes.

3    Q    So then what happened?

4    A    So I think that everyone was very scared.  I didn't -- I

5    don't remember seeing anyone else.  I remember seeing my mom

6    and her telling me, almost trying to console me.  I remember

7    it being very emotional and feeling very guilty.

8    Q    Why were you feeling guilty?

9    A    Because she was in that room because of me.  I was -- she

10   was in that room because of me because she was trying to help

11   me do my program and then I had to do this thing to heal the

12   breach that was not working and as long as I didn't come out,

13   she didn't come out.  So, in a way, I was holding her there.

14   That's how I felt.  So she was -- she was already missing out

15   in this relationship she had but now, he had died and she lost

16   him forever and I think everybody was very, felt very guilty

17   about it.  I felt very guilty about it.  So she left.  She

18   left.  She -- I think she told me she was going to his funeral

19   and she left.

20             (Continued on next page.)

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                          2937

1    BY MS. PENZA:   (Continuing.)

2    Q    What happened after that?  Strike that -- were there --

3    did anyone come to you about an issue with your mother after

4    that?

5    A    Yes.  So, I remember -- I remember when my mom -- when

6    this happened with this man that died, I remember my mom -- I

7    remember my mom.  She looked very different and she looked

8    older.  She was beautiful and I remember she grabbed me by my

9    face like this and looked into my eyes and said, "You are

10   ready.  I can see it in your eyes that you're different and

11   you're ready," and I remember looking at her and thinking, I'm

12   going to come out.  She can see it, I'm going to come out.

13            So I remember being excited about that and she left

14   for the funeral and I remember sitting there thing thinking

15   any day she's going to come back and she's going to get me

16   because she saw it and I'm ready and I'm going to come out.

17   And my mom -- I remember my mom came back, but my mom came

18   back to get her stuff.  So my mom came back from, I guess, the

19   funeral, and she wasn't going back in the room.

20   Q    Do you remember that being an issue?

21   A    It was -- I remember -- I think it was Lauren -- I mean,

22   Lauren was the only one I talked to, telling me that -- that

23   my mother leaving and not wanting to go back into the room was

24   part of my ethical breach and that me convincing her to go

25   back in the room would be a way for me to heal my breach and I

Daniela - direct - Penza                    2938

1    remember I saw Cami because they also recruited Cami and we

2    EM'd with my mother together.  Cami and I -- I remember

3    sitting with my legs crossed in my room.  I could not come out

4    of my room, talking to my mom trying to convince her to stay

5    in the most horrible way.  I remember I was just happy to see

6    them and I remember thinking if I can do this and she can do

7    the right thing or they think I can do the right thing we can

8    both just come out because we're done, right?  We're done.

9    It's going to be --

10                 I remember thinking it was the last -- and I don't

11    remember how long I had been there at that point, but it had

12    been a long time and I thought it was, like, I thought it

13    would be the end.  But, you know, it was supposed to be like I

14    was -- I was fixated on I had to fix my mom now because that

15    was also my ethical breach now and my mom -- my mom did not --

16    my mom did not give in.  My mom did not want to -- my mom

17    didn't want to go back in the room.

18    Q    Was your mom legally in the country at that point?

19    A    I don't know.  I think so.  I don't know.

20    Q    Did she express any concerns about being illegally --

21    A    I think she was -- she was.  She, was, like a dependent

22    of my dad's visa.  I think I remember because she even had,

23    like, a permit to work.  So I think she was -- she had -- she

24    had legal status, yes.

25    Q    Now, that time, was that the only time for the entirety

Daniela - direct - Penza                    2939

1   that you were in the room that you saw Camilla?

2   A    Yes.

3   Q    So how -- how did you feel when your mom decided that she

4   wouldn't go back in the room?

5   A    I was kind of happy that she wasn't going back in the

6   room, I think because I thought it meant that I also didn't

7   have to stay in the room.  It was very confusing, but I -- I

8   was -- I was supposed to stay in the room now even longer, now

9   even more.  Because now it was my ethical breach that my mom

10  had done that, but I remember that even that second time that

11  she left and she said she wasn't going to do the room

12  anymore -- I don't remember the reasons.  It's a little hazy.

13  I remember thinking she's going to come back and get me.  She

14  doesn't want to be in the room because she knows it's bad and

15  she's going to come back and my mom is going to come back and

16  she's going to get me and I waited.  And I waited.  And she

17  never came back.

18  Q    Do you know approximately how much longer you were in the

19  room after your mom left?

20  A    A year, more than a year, years.  A long time.

21  Q    Did you say anything to your mom when she said she was

22  leaving?

23  A    We had a conversation and -- we had a conversation and

24  she came to my room to say goodbye and she said -- she said --

25  I don't remember the full conversation, but I remember this

SN        OCR        RPR

Daniela - direct - Penza                    2940

1  part because I remember I didn't care anymore and she asked me

2  point blank, did Keith have sex with you, and I never told

3  anybody, much less my mother and my parents or anybody.  And I

4  don't even know why she asked.  I don't know why she wondered.

5  I don't know why at that moment she -- and I said, yes.

6  Q    Why did you tell her at that point?

7  A    I didn't care anymore.  I was in a bunch of weird states

8  at different times and there were times when nothing mattered

9  and at that point nothing mattered.  What was the point?  Even

10 if she didn't know, she might believe it -- if she asked, I

11 didn't care.

12 Q    How did she respond?

13 A    I don't remember, but I thought maybe because she knew

14 that she would come back and get me, but she didn't.

15 Q    Did you ever have any medical issues while you were in

16 the room?

17 A    Yes.

18 Q    Can you describe them?

19 A    Yes many, many times I had digestive issues.  I had a

20 pretty severe, sorry, like, diarrhea.  I had other type of

21 indigestion.  Several times I had rashes all over my body,

22 like, rashes -- uncomfortable, concerning rashes and I also at

23 some point had a very bad toothache.

24 Q    When you had the rashes did anything happen?

25 A    I would ask -- I would -- my only form of communication

Daniela - direct - Penza                          2941

1    was I could, like, on the paper I would have, I would take

2    little pieces of paper and I would write notes and I would put

3    them under the door so that they would see them and I would

4    write notes saying that I didn't feel well or what was

5    happening with me or just ask straight up for things and I

6    remember -- I remember at least a few times I asked for

7    Benadryl which is what I thought would help the rash.

8    Q    How long do you think you asked for the Benadryl?

9    A    Days.

10   Q    Did you ever get it?

11   A    No.  In the end I got something but it wasn't Benadryl.

12   It was like some other thing that I can't remember, but I

13   didn't get Benadryl.

14   Q    Did you think you were having a severe allergic reaction?

15   A    Yes.

16   Q    You said there was a time you had a toothache.  Can you

17   explain?

18   A    I was in a lot of pain.  I -- as toothaches have -- are.

19   I remember not being able to eat very well and having to chew

20   and I remember being in constant pain.  I had a headache.  I

21   didn't feel good.  And I remember it lasted for a long time.

22   Q    Did you speak to anybody about the fact that you had this

23   toothache?

24   A    Yeah, I told Lauren and I also I think I wrote about it

25   quite a bit.  I was in constant pain.  A toothache, at least

Daniela - direct - Penza                    2942

1   for me, I think it is the way it is, it's a pain that doesn't

2   go away.  So it's not like it flares up and it goes.  It was

3   just a bad toothache like something happened in my tooth and

4   it was very painful.  So I told her and I also, you know,

5   wrote about it.

6   Q    When you say you wrote about it, what do you mean?

7   A    Well, nobody has any way of knowing what's going on with

8   me.  It's not like -- and Lauren, I remember at that time and

9   as time passed and quickly she just wouldn't show up for

10  weeks.  And I mean, it's hard to even represent what that

11  feels like but to see nobody for weeks.  I could not -- so I

12  would have to write, so I was writing this daily letter to

13  Keith.  I'm sure I wrote something there but I also would put

14  notes so they would know that I was -- that I was in pain.

15  Q    Daniela, I'm showing you what's in evidence as Government

16  Exhibit 907.

17             (Exhibit published.)

18  Q    Are you familiar with this?

19  A    Yes.

20  Q    Do you know what that is?

21  A    It's a letter.

22  Q    Is it -- is this a stack of letters that you have written

23  to the defendant?

24  A    It is.

25  Q    Prior to this week, when is the last time you had seen

Daniela - direct - Penza                    2943

1   those letters?

2   A    I've never seen them in a stack.  The last time I saw any

3   of those was when I wrote them.

4   Q    Have you read all of those letters again?

5   A    No.  And I don't want to.

6   Q    When you talk about the incessant writing, was that part

7   of it?

8   A    That is it.

9   Q    Why did you keep writing while you were in the room?

10  A    There was nothing else I could do.  That was the only

11  clue I had been given and I had been instructed quite clearly,

12  not only was the last instruction from Keith to write

13  incessantly like spelled out, write incessantly, and also

14  before going into the room, what am I going to do to heal my

15  breach.  Write.  You need to write to Keith and I needed to

16  write to Keith and to see if I was healing and when I could

17  come out.  That was my understanding.  So the one thing I

18  would not stop doing was my writing because that was my only

19  way out.

20  Q    What did you think would happen if you stopped writing?

21  A    I thought that they would -- I thought that they would,

22  like, send me back to Mexico.

23  Q    And how -- what would that look like?  Because you had

24  talked earlier about envisioning a life, where you wanted a

25  life, in Mexico.  So how was what you're envisioning there,

SN        OCR        RPR

Daniela - direct - Penza                          2944

1   different?

2   A    It's completely different.  I mean, the only thing that

3   is the same about that is going in Mexico, but they were very

4   clear it was not going to Mexico on my terms, which to me was,

5   okay, so I'm illegal, so drive me where I need to go because I

6   can't.  Give me some money, set me up, I need my ID, I need my

7   things.  I need my life in Mexico, to start a life in Mexico.

8              What would happen to me if I came out of the room or

9   if I stopped writing is they would send me back to Mexico

10  without any money, without any papers -- nothing, with

11  nothing.  So -- with nothing.

12  Q    And you said without money and without your papers?

13  A    Yes.

14  Q    Did you know how they would get you to Mexico in that

15  situation?

16  A    No.

17  Q    And what were you afraid of if you were in Mexico with no

18  money and no papers?

19  A    Well, aside from maybe the softer blow of losing

20  absolutely all of my life and my family, I was also very

21  afraid of -- in the -- I hadn't been to Mexico in close to a

22  decade, seven years, eight years?  Even what was going on at

23  the time around me, I wasn't involved in it, but it was like

24  antiviolence movement that were happening in ESP because

25  Mexico was such a violent place and a violent country so I was

SN        OCR        RPR

Daniela - direct - Penza                    2945

1   afraid.  I was going to go to Mexico all by myself.  I never

2   have really been all by myself with nothing and Mexico it was

3   really -- it was truly violent at the time, especially the

4   north of the country where I'm from.  It was kidnapping and

5   murders and drug wars.  It was truly violent.

6           So I was afraid of going to this place, this

7   dangerous place, all by myself, could not contact anybody.  I

8   would have no help, I would have no money, I would have none

9   of my papers, none of my things.  It was the end of the world.

10  Q    And I think we talked about this yesterday, but even just

11  the act of leaving the house at that point in time, you also

12  had concerns about immigration?

13  A    Yes.

14  Q    And can you articulate what those fears were?

15  A    Yes.  I was -- I mean, I was very paranoid and I think

16  justifiably so.  At the time I fully believed and understood

17  that I could be stopped at any time and my papers would be

18  requested of me and that if I didn't have them and I didn't

19  have them, I would end up in jail.  And this is something

20  that -- I mean, this was very -- it was aggravated with time

21  because I was fully illegal, but even when my status was still

22  good, I was very respectful of the immigration system in the

23  U.S.  It's always been something --

24          I mean, maybe for an American, but I think that -- I

25  mean for any foreigner in the U.S., in particular with my

SN        OCR        RPR

Daniela - direct - Penza                    2946

1  experiences, even before being out of status of how strict the

2  immigration system is, of how vigilant the U.S. system is

3  of -- of people and even when you are on status that you are

4  up-to-date, that you are up to rule.

5          And even the way I was treated at the border, it's

6  very -- it's very strong.  It's very rough.  So, I -- I think

7  I said it before, like even seeing the lights in a cop car

8  would make me jump.  It was something I was extremely aware of

9  and I was very afraid of being caught.

10 Q    When you finished to write all of these letters were all

11 of these fears in your mind?

12 A    They were all in the background all the time.  It's not

13 something that stopped.  It's not fully in my front awareness

14 all the time.  That would be very difficult, but it's all part

15 of who I am and what I am and I'm fully aware that that's the

16 state I'm in.

17 Q    I'm just going to show you a few of the letters.  Showing

18 you what's in evidence as Government's Exhibit 907-105.

19          (Exhibit published.)

20 Q    Is this your handwriting?

21 A    Yes.

22 Q    This is dated September 30, 2010?

23 A    Yes.

24 Q    And just showing you in the middle the paragraph, "Very

25 early this morning, I made a quick sketch of all the things so

Daniela - direct - Penza                2947

1   far I plan to do to fix my breach."

2   A     Yes.

3   Q     "And today I have been thinking" --

4   A     "Will I really."

5   Q     -- "will I really been fixing any of my effects by doing

6   all of this"?

7   A     Yes.

8   Q     And you write that you only have a pen and paper at your

9   disposal?

10  A     Yes.

11  Q     And at the end you write "With love, Bobi"?

12  A     Yes.

13  Q     Would you regularly sign things like that to the

14  defendant?

15  A     "With Bobi" or "with love"?

16  Q     "With love."

17  A     "With love"?  Yes.  I -- yes.  And at times I think also

18  elaborated on the love and what I wanted to feel for him or

19  what I feel for him.  This is all a continuation.  The time in

20  the room and what I was doing in the room is not an

21  isolated -- it's not an isolated situation.  It's a

22  continuation of everything that has happened before, including

23  the falling out, including all the time he wrote to me and I

24  wrote back and all the instructions I received there and all

25  the beatings I received there and then the even more stricter

Daniela - direct - Penza                    2948

1    part of the program, where I was like beaten up with all of

2    these concepts and all of that, going into the room even

3    without any further input, that's the only thing that I know

4    that he expects of me.  I quite clearly know he expected it of

5    me because he has distinctly written to me, you need to feel

6    love for me.  I need to be your whole life.  You need to tell

7    me your fantasies and every detail.  You need to tell me all

8    the disclosure.  And a lot of it must be rehashing of things

9    that happened and things -- how many different ways can I stay

10   I love you and, really, I ran out of material very fast

11   because I was completely isolated.

12           He told me, I need to be your whole life.  You need

13   to think about me in this way and only me.  So as I'm sitting

14   there in that room completely alone, trying to figure out what

15   to do to fix my breach to get out and I'm just going over all

16   of those things over and over and just trying to find the

17   combination of words that is the correct combination of words

18   that is healing my breach.

19   Q    And at the very end -- and Bobi was a nickname for you?

20   A    Yes, he had nicknamed named me Bobo and my family called

21   me Bobi so I named myself as Bobi.

22   Q    And then you write, "P.S. a copy of the referenced

23   sketched plan attached"?

24   A    Yes.

25   Q    And is this the sketched plan?

Daniela - direct - Penza                    2949

1   A    It looks like it, yes.

2   Q    And you include -- so, this is -- this is September 30,

3   2010?

4   A    Yes.

5   Q    And you send the defendant a plan?

6   A    Yes.

7   Q    You include a plan for a job?

8   A    Yes.

9   Q    A plan for a program of personal growth?

10  A    Yes.

11  Q    And a plan for fixing your ethical breaches.

12  A    Yes.

13  Q    Let's look at some of the things.  You offered to sell

14  your stuff on the internet and ask your dad to borrow his

15  credit card for a small percent of the profit?

16  A    Yes.

17  Q    You talk about working to pay for your rent and paying

18  your breaches?

19  A    Yes.

20  Q    "Possibilities:  Web programming, cleaning, cooking"?

21  A    Yes.

22  Q    "Work for Gozer to pay for her time."  What was that?

23  A    Yes.

24  Q    Do you remember?

25  A    Yes.  Well, many times -- so, many times in the past it

SN       OCR       RPR

Daniela - direct - Penza                    2950

1    had been brought to my attention that even all the coaching

2    that I was receiving, I was receiving for free.  And, you

3    know, that was another debt and another ethical breach that I

4    needed to fix.

5    Q    And then you have for your personal program of growth you

6    have weight and exercise, 115 pounds, healthy, fit triathlon,

7    marathon?

8    A    Yes.

9    Q    And you have a steady -- you had "coach" and then you

10   crossed it out and wrote "proctor"?

11   A    I thought the goalpost should be higher.

12   Q    Part of the plan is you're going to make proctor; is that

13   right?

14   A    Yes.

15   Q    "Go to Ethos, coaching, classes, EMs."  Then you have

16   "Fix ethical breaches, Keith, talk to all people/Ben"?

17   A    Yes.

18   Q    That was the first item?

19   A    Yes.

20   Q    Book reports?

21   A    Yes.

22   Q    Digital archives?

23   A    Yes.

24   Q    Video storing projects, movie filming?

25   A    Yes.

Daniela - direct - Penza                    2951

1    Q    What was that?

2    A    It seems like part of the documenting him, making it into

3    some thing that would exalt him and make him look good.

4    Q    Okay.  "Research, inventory of stuff"?

5    A    That inventory of stuff, I don't know but research

6    explains itself.

7    Q    And then for Nancy.  "Work for $5,000 worth of time."  Do

8    you know what that is?

9    A    I don't know whether -- it's the thing that the working

10   time is the same concept of paying for Karen's time.  The

11   coaching they were giving me was for free, so I also owed

12   that.

13   Q    You go on and you list lots of other people to whom you

14   have ethical breaches?

15   A    Who I was told I had ethical breaches, yes.  They weren't

16   actual ethical breaches.

17   Q    Thank you, yes.  But were these all people that when you

18   were having conversation with Lauren she would be describing

19   ethical breaches?

20   A    Yes.

21   Q    Did you come up with multiple plans like this?

22   A    Yes.

23   Q    And who would you share them with?

24   A    In the room?

25   Q    Uh-huh?

Daniela - direct - Penza                                    2952

1    A    Either with Lauren verbally or I would write to Keith

2    about them.

3    Q    Were any of these plans ever enough?

4    A    Never.

5    Q    And September 30, 2010, how much longer were you in the

6    room?

7    A    After this?

8    Q    Yes.

9    A    Over a year.

10   Q    I'm gist going to --

11   A    Some of these plans were not only never enough.  I never

12   even heard back on them.

13   Q    How did that make you feel?

14   A    I think very rapidly I began to feel like I was just

15   being punished.  Like there was no end to it.  I was just

16   being punished.  There was no way out.  I was just being

17   punished.

18   Q    I'm just going to show you -- I have one more.  October

19   5, 2010.  You say, "Today I feel like inside this room I'm in

20   a kind of trance and I only come out of the trance when I feel

21   the desperation to come out"?

22   A    Yes.

23   Q    "I think being in here is completely insane.  Spending my

24   life like this is insane and any time I am okay with it, I am

25   simply insane"?

Daniela - direct - Penza                    2953

1    A    Yes.

2    Q    You wrote that to Keith on October 5, 2010?

3    A    Yes.

4    Q    The second page.  "I let the hours go by.  I hate that.

5    I hate when I do that.  I will regret all of my time here

6    forever.  I will look back and wish I had not spent seven

7    months of my life at 24 in a room.  Do you realize how insane

8    this is?"  You wrote that in capital letters?

9    A    Yes.

10   Q    "What is wrong with all of you?"

11   A    Yes, "What is wrong with all of you."

12   Q    "How is this good for me, no help, no nothing?  I am

13   hereby myself, stupid.  I just want this to be over."

14   A    Yes.

15             (Exhibit published.)

16   Q    It's a little hard to see.  October 17, 2010?

17   A    Yes.

18   Q    "Please, Keith, I don't want to be here anymore.  Please,

19   please"?

20   A    Yes.

21   Q    I'm only going to show you a couple more.

22             (Exhibit published.)

23   Q    October 29, 2010.  "Can I come out of this room please,

24   please, please.  I don't want to be here.  I don't want this."

25   A    Yes.

SN        OCR        RPR

Daniela - direct - Penza                    2954

1                (Exhibit published.)

2   Q    October 30, 2010, "Keith, I think I've made myself clear

3   I want to come out of this room.  I think you've gotten the

4   message and understood it.  So I'm not going to keep drilling

5   on it, escalating such emotions.  Obviously you don't want me

6   to come out.  I really don't understand what you're doing to

7   me."

8   A    Yes.

9   Q    I just want to look at a couple of e-mails about -- a

10  couple of the letters regarding your tooth?

11  A    Okay.

12  Q    January 20, 2011?

13  A    Yes.

14  Q    You start with your weight, 119?

15  A    Yes.

16  Q    You say at the end, "Anyway, that is it today.  All else

17  is usual except my toothache is growing more painful to a

18  point it's painful 24/7, only when in use."

19           Do you remember your toothache getting progressive

20  and more painful?

21  A    Yes.

22  Q    So that was January 20th.  March 19, 2011.

23                (Exhibit published.)

24  A    Yes.

25  Q    "Bad news, today is my tooth is doing bad"?

SN        OCR        RPR

Daniela - direct - Penza                    2955

1   A    "Badly."

2   Q    "I thought it was not so bad, but after the first meal it

3   turned I was very wrong it hurts and is very sensitive.  A

4   piece fell and I have this huge hole, ew and ouch.  I'm hoping

5   for Lauren to come and figure this out.  I hope she will come.

6   She said she would, but she is very late"?

7   A    Yes.

8   Q    And then March 25, 2011.

9            (Exhibit published.)

10  Q    Did you actually visit the dentist?

11  A    Yes.

12  Q    What happened when you visited the dentist?

13  A    Lauren came and got me.  I think she gave -- I don't --

14  what I remember that day is being thrilled to see the outside.

15  I remember it was a lot to take in, but I was thrilled.  I was

16  excited.  I was very excited.  I don't remember if I had

17  instructions from Lauren to, like -- I don't know if I would

18  have needed them, honestly, to, like, not scream, not run out,

19  not call out for help, not tell someone.  She may have given

20  them to me again, but they would not have been necessary.  I

21  knew.  I had been warned.

22  Q    Did she accompany you the entire time?

23  A    The entire time.

24  Q    When you were discussing your toothache with Lauren, did

25  the defendant come up in your conversation at all?

Daniela - direct - Penza                    2956

A     Like in previous instances?  Like as part of the

toothache, I don't remember.  But Keith would be a part of the

conversation all the time.  It was all about when is it going

to be enough, you know?

Q     But -- sorry.  You said -- you said earlier that before

you went in the room there was -- your parents would describe

conversations with the defendant; is that right?

A     Yes.

          MS. PENZA:  Your Honor, the Government would like to

read a stipulation at this time and the stipulation is:  "It

is hereby stipulated and agreed by and between" -- this is

marked for identification as Government Exhibit 251.

          "It is hereby stipulated and agreed by and between

the United States of America by Assistant United States

Attorneys Moira Kim Penza, Tanya Hajjar and Mark Lesko and by

the defendant Keith Raniere by the undersigned counsel that on

or about April 20, 2018, Adriana Aguilar provided the

Government with a thumb drive containing Government Exhibit

910.  Government Exhibit 910 is admissible in evidence.  This

stipulation marked as Government Exhibit 251 is admissible in

evidence."

          Your Honor, the Government moves into evidence

Government Exhibit 251.

          MR. AGNIFILO:  No objection.

          THE COURT:  Government Exhibit 251 is received in

Daniela - direct - Penza                    2957

1    evidence.

2                (Government Exhibit 251 received in evidence.)

3                MS. PENZA:  And the Government also moves into

4    evidence Government Exhibit 910.

5                MR. AGNIFILO:  No objection.

6                THE COURT:  Government Exhibit 910 is received in

7    evidence.

8                (Government Exhibit 910 received in evidence.)

9

10               (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Daniela - direct - Penza                    2958

1           MS. PENZA:  Your Honor, we are going to play a

2    recording, so we have some transcripts for the jury.

3           THE COURT:  Have you provided the transcript to the

4    defense?

5           MS. PENZA:  We have, Your Honor.  And it will only

6    be as an aid to the jury.

7           THE COURT:  Right.  All right.  I am going to remind

8    the jury in connection with the playing of this recording you

9    are being provided with copies of a transcript of the

10   recording.  As I said the last time, the evidence is the

11   recording itself.  The transcript is just being provided as an

12   aid to the jury.  If there is any difference between what you

13   hear and the recording and what is found on the transcript, it

14   is the recording that is the evidence.

15   DIRECT EXAMINATION

16   BY MS. PENZA:  (Continuing)

17   Q    Daniela, I'm showing you what's in evidence as Government

18   Exhibit 910.

19   A    Yes.

20   Q    Do you recognize this CD?

21   A    Yes.

22   Q    How do you recognize it?

23   A    It's my initials.

24   Q    And is that today's date?

25   A    Yes, it is.

Daniela - direct - Penza                            2959

1   Q    And have you listened to the recording on this CD?

2   A    Yes, I have.

3   Q    And is this a recording that is labeled Bobo 3_3_10 at

4   1:53 a.m.?

5   A    I don't see that.

6   Q    I'm sorry.  Let me show you an aid to the jury, which is

7   Government Exhibit 910-T.  Do you remember that --

8   A    Yes.

9   Q    -- file name?

10  A    Yes.

11  Q    And are you -- who is Adriana ██████?

12  A    My mother.

13  Q    And had you listened to this recording before listening

14  to it with the Government?

15  A    Yes.

16  Q    Had you listened to it with your mother?

17  A    Yes.

18  Q    Recently?

19  A    Yes.  Fairly recently, yes.

20           MS. PENZA:  Your Honor, we would like to now play

21  the recording.

22           THE COURT:  Okay.

23           MS. PENZA:  Your Honor, may I just give a copy of

24  the transcript to the witness?

25           THE COURT:  Yes.  All set?

Daniela - direct - Penza                    2960

1           MS. HAJJAR:  Yes.

2           THE COURT:  Go ahead.

3           (Audio playing.) (Audio stopped.)

4           MS. PENZA:  I'm sorry, Your Honor, we are going to

5     test to see if it starts a little later.

6           THE COURT:  I'm sorry.

7           MS. PENZA:  We are going to test the recording for

8     one second to see if it starts a little later.

9           THE COURT:  All right.

10          (Audio playing.) (Audio stopped.)

11    Q    Who are those voices that we just heard saying thank you

12    so much and what's up?

13    A    That was my mother and Keith.

14          (Audio playing.)

15          MS. PENZA:  Can you pause.

16          (Audio paused.)

17    Q    Another voice in the background?

18    A    Yes, that's my sister Marianna.

19    Q    What is your sister Marianna doing in the background?

20    A    She is translating what Keith is saying into Spanish for

21    my mother.

22    Q    How would you describe your mother's level of English?

23    A    I would describe it as intermediate, not proficient.

24    Q    It would have been necessary for her to have a translator

25    to have --

Daniela - direct - Penza                           2961

1   A    A full understanding, yes.  She doesn't have an extensive

2   vocabulary.

3            MS. PENZA:  Please continue.

4            (Audio playing.) (Audio paused.)

5   Q    Did you at some point talk about training for a

6   triathlon?

7   A    Yes.

8   Q    And why were you going to train for a triathlon?

9   A    That was one of the few things I thought I could do.  I

10  was being pushed to heal my breach, but I had no freedoms

11  whatsoever, I didn't have any other things, nothing to work

12  on, and I thought that, you know, getting fit and losing

13  weight and training hard would be a way to do that.

14  Q    Was it relayed to you that that was not a way -- that you

15  should not be training for the triathlon?

16  A    I was heavily disciplined, yes.  I was not allowed to do

17  that.

18            (Audio playing.) (Audio paused.)

19  Q    Club there?

20  A    Gym.  Stopped.

21  Q    At that time, did you want to go back to Mexico?

22  A    Yes.

23  Q    Okay.  And was that the going back to Mexico in the way

24  that you had described it to us earlier?

25  A    I was asking my parents to help me and I just wanted a

                    Daniela - direct - Penza                    2962

1    simple life, yes.

2            (Audio playing.) (Audio paused.)

3    Q    Dani, had you killed a child?

4    A    No.

5    Q    What had you done?

6    A    I kissed Ben Myers.

7            (Audio paused.)

8    Q    Daniela, this language from the defendant of I have

9    reservations about telling you my thoughts, is that something

10   that you were familiar with?

11   A    Yes.

12   Q    Can you explain?

13   A    He is saying I really don't tell you what to do, but I'm

14   about to tell you exactly what to do.

15   Q    And how were those things handled in the NXIVM community?

16   A    Well, especially from him, who is the Vanguard,

17   obviously, my family, but everybody listened to his every word

18   and it didn't matter.  It never came -- I guess I was an

19   exception.  It didn't really come as a set of instructions but

20   a set of questions.  I mean, I don't know, maybe the best

21   thing would be to do this.  I don't know, maybe it would be

22   that.  So that would be taken immediately as the next step.

23   Q    And people would take those next steps?

24   A    Yes.

25   Q    And the defendant would see that?

Daniela - direct - Penza                    2963

1    A     Yes.

2          MS. PENZA:  Please continue.  Thank you.

3          (Audio playing.)  (Audio paused.)

4    Q     What does that mean, do you know, for her postulates?

5    A     Postulates was a concept in ESP that they taught in some

6    of the higher levels of training and it was like postulates,

7    your patterns of belief, what you believe the world can be.

8    So you reaffirm postulates with your behavior, so you were

9    supposed not to -- you know, not to affirm the bad ones and

10   affirm the good ones.

11         (Audio playing.) (Audio paused.)

12         MS. PENZA:  Can you pause it.

13   Q     That word monster, was that used with you?

14   A     Yes.

15         MS. PENZA:  Please continue.

16         (Audio playing.)

17         (Continued on following page.)

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2964

1    BY MS. PENZA:   (Continuing)

2    Q     Who is Hector?

3    A     My father.

4            (Audio played.)  (Audio stopped.)

5    Q     Is there your mom talking about a -- what is your

6    understanding of what your mom is saying there?

7    A     That my father is not sure he wants to participate.

8    Q     And is it -- is he talking about meeting with Nancy and

9    Karen?

10   A     Yes.  There's a meeting, there's going to be a meeting

11   that's going to take place and he said he's not going.

12   Q     And Nancy and Karen are Nancy Salzman and Karen

13   Unterreiner?

14   A     Yes.

15            (Audio played.)

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                          2965

1    (audio continues.)

2              (Audio ends.)

3              MS. PENZA:  Your Honor, I think that's all we're

4    going to play of the recording.  I think this is a good time

5    for a break.

6              THE COURT:  All right.  We will take our morning

7    break.  All rise for the jury.

8              (Jury exits.)

9              (In open court.)

10             THE COURT:  The witness may stand down.  Do not

11   discuss your testimony with anyone.

12             (Witness stands down.)

13             THE COURT:  Everyone may be seated and we will take

14   a sidebar briefly

15             (Sidebar held outside of the hearing of the jury.)

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

SEALED SIDEBAR                                    2966

1          (The following sidebar took place outside the

2     hearing of the courtroom.)

3     

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          (Sidebar ends.)

19          (Continued on next page.)

20

21

22

23

24

25

SN        OCR        RPR

Daniela - direct - Penza                    2967

1    (Continuing.)

2            THE COURT:  We'll take a ten-minute break.

3            (Recess taken.)

4            MS. PENZA:  Your Honor, I accidentally used the last

5    name of Daniela's mother.

6            THE COURT:  I know.

7            MS. PENZA:  I would just ask that it be sealed from

8    the transcript.

9            THE COURT:  All right.

10           Any objection?

11           MR. AGNIFILO:  No objection.

12           THE COURT:  It will be sealed, expunged, whatever

13   needs to be done.

14           MS. PENZA:  Thank you.

15           THE COURT:  How much more do you have of this

16   witness?

17           MS. PENZA:  I expect to be done before lunch.

18           THE COURT:  How much before lunch?  Before lunch

19   meaning what?

20           MS. PENZA:  I will be about an hour.

21           THE COURT:  All right, okay.  And if it is close to

22   1, we will just recess for lunch and come back for cross.

23           MR. AGNIFILO:  I think I'm going to be less than

24   four hours.  Four hours is an outside estimate.

25           THE COURT:  Which means we will still go into

Daniela - direct - Penza                      2968

1    tomorrow morning.

2              MR. AGNIFILO:  Right.  There's only three hours in

3    the afternoon.

4              THE COURT:  That is fine.  Bring in the witness,

5    please.

6              (Witness resumes stand.)

7              (Jury enters.)

8              THE COURT:  Please be seated.

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2969

1   DANIELA,

2        called as a witness, having been previously duly

3        sworn, was examined and testified as follows:

4             THE COURT:  All right, Ms. Penza, you may continue.

5             The witness is reminded she is still under oath.

6             MS. PENZA:  Thank you, Your Honor.

7             May I approach the witness?  May I approach?

8             THE COURT:  Yes, you may.

9             MS. PENZA:  Thank you.

10            (Counsel approaches.)

11  CONTINUED DIRECT EXAMINATION

12  BY MS. PENZA:

13  Q    Daniela, I'm showing you what are marked for

14  identification as Government Exhibit 905, 906 and 924.  Can

15  you just take a look at those?  Are you familiar with those?

16  A    Yes.

17  Q    Are 904 -- is 905 the copy of the Wilton Times that you

18  had described earlier in your testimony?

19  A    A translation, yes.

20  Q    905?

21  A    That's a copy of it.

22  Q    And 906 is a translation?

23  A    Yes.

24  Q    And what is, just general, in 924?

25  A    It's parts of my journal.

Daniela - direct - Penza                      2970

1   Q     From what time period?

2   A     From before the room, it looks like.

3             MS. PENZA:  Your Honor, the Government moves

4   Government Exhibits 905, 906 and 924 into evidence.

5             MR. AGNIFILO:  We have no objection to 905 and 906.

6   924, I do have an objection to coming into evidence.

7             THE COURT:  Sidebar?

8             MS. PENZA:  Yes, please, Your Honor

9             (Sidebar held outside of the hearing of the jury.)

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    2971

1          (The following sidebar took place outside the

2     hearing of the jury.)

3              MR. AGNIFILO:  Judge, I don't object.

4              THE COURT:  Okay, thank you very much.

5              (Sidebar ends.)

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - direct - Penza                    2972

1    (Continuing.)

2            THE COURT:  All right the objection to 924 has been

3    withdrawn; correct?

4            MR. AGNIFILO:  That's correct, Judge.

5            THE COURT:  Government Exhibits 905, 906 and 924 are

6    received in evidence.

7            (Government Exhibits 905, 906 and 924 received in

8    evidence.)

9    BY MS. PENZA:

10   Q    Daniela, I'm showing you what's in evidence as Government

11   Exhibit 924?

12           (Exhibit published.)

13   Q    Do you recognize this?

14   A    Yes.

15   Q    And can you just explain what this is?

16   A    That's a little sketch I made.

17   Q    And what time period was this sketch made?

18   A    Sometime before the room.  I did not have colors in the

19   room.

20   Q    And are these -- are these pages -- where are these pages

21   from?  I'm going to show you a number of pages from Government

22   Exhibit 924.

23   A    I think they're from a journal, a single journal.

24   Q    That you had prior to being in the room?

25   A    Yes.

SN        OCR        RPR

Daniela - direct - Penza                                    2973

1    Q     And is this something that you had written?

2    A     Yes.

3    Q     "You're out of your mind" and it goes on?

4    A     Yes.

5    Q     Is this another page that you had written?

6    A     Yes, it is.

7    Q     And on this page did you write -- this is Government

8    Exhibit 924-3, had you written "I don't want to be alone

9    anymore.  I want to kill myself"?

10   A     Yes.

11   Q     Were you having those periods of darkness prior to the

12   room as well?

13   A     Yes, I was.

14   Q     Is this another drawing of yours as well?

15                (Exhibit published.)

16   A     Yes, it is.

17   Q     Who is being depicted here?

18   A     That's me.

19   Q     And you wrote "stupid, stupid"?

20   A     Yes.

21   Q     Is this also yours?

22                (Exhibit published.)

23   A     Yes, it is.

24   Q     Who is that supposed to be?

25   A     Me.

Daniela - direct - Penza                    2974

1    Q     And you wrote, "Is this the end?  Yes."

2    A     Yes.

3              (Exhibit published.)

4    Q     Is this also you?

5    A     Yes.

6    Q     And you wrote horror story of failure?

7    A     Yes.

8              (Exhibit published.)

9    Q     This one, "Also, at what point is it time to give up?"

10   This is also you?

11   A     Yes.

12   Q     "And sometimes I want to hide my thoughts from myself"?

13   A     Yes.

14             (Exhibit published.)

15   Q     Can you explain what this image is?

16   A     That is a writing of a letter I was drafting for Keith,

17   for him I was dissecting.  It was one of those back and

18   forths.

19   Q     And, so, all of the scratching out and writing different

20   lines, is that how you would write when you were writing to

21   Keith?

22   A     No, I -- I mean, that's not how I would write.  I tend to

23   be organized in my head and I can put it out.  This is

24   actually a visual example of the confusion in my head of the

25   going back and forth and rewriting and scratching and

Daniela - direct - Penza                    2975

1   confused.  It's actually pretty visual.  That's my confusion

2   in my head.

3   Q    I'm now showing you what's in evidence as Government

4   Exhibit 905.

5              (Exhibit published.)

6   Q    Can you explain what this is?

7   A    That's the newsletter I was writing from the room.

8   Q    And this is the newsletter you described you wrote for a

9   short period of time?

10  A    Yes.

11  Q    Is this al handwritten by you?

12  A    Yes.

13  Q    Hand-drawn?

14  A    Yes.

15  Q    There are a few editions.  There's November 11, 2010?

16  A    Yes.

17  Q    And then November 15th, 2010?

18             (Exhibit published.)

19  A    Yes.

20  Q    On all of them, you would have your weight and calories;

21  is that right?

22  A    Yes.

23             (Exhibit published.)

24  Q    And November 16, 2010?

25  A    Yes.

SN      OCR      RPR

Daniela - direct - Penza                    2976

1          (Exhibit published.)

2    Q    November 17, 2010?

3    A    Yes.

4          (Exhibit published.)

5    Q    And November 23, 2010?

6    A    Yes.

7          (Exhibit published.)

8    Q    There's translations of those as Government Exhibit 906;

9    is that right?

10   A    Yes, that is right.

11   Q    Just to look at a few.  This image on the very first

12   page, what was this about?

13   A    That's when I cut my hair, before and after.

14   Q    And did you write, "I think that by cutting my beautiful

15   hair in the state that I was in and so impulsively was

16   definitely a serious mistake"?

17   A    Yes.

18   Q    "The only thing I can do now is learn from the mistake"?

19   A    Yes.

20         (Exhibit published.)

21   Q    Sorry, looking at the same page at the bottom, you have a

22   section on general health and wellbeing?

23   A    Yes.

24   Q    That's the translations down here?

25   A    Yes.

SN        OCR        RPR

Daniela - direct - Penza                    2977

1   Q     And you have your weight 120 and your calories

2   approximately 940?

3   A     That's right.

4   Q     You wrote, "No change in weight from yesterday to today.

5   The resident's belly is 100 percent recovered from the

6   indigestion and discovered that occurred when she decided to

7   play Tarzan and eat the rotting spinach in yesterday's salad

8   which she also enjoyed because it tasted like cooked char"?

9   A     Yes.

10  Q     Do you remember the food sometimes being rotten?

11  A     Sometimes.  And sometimes there was a long period of time

12  when -- I was just being brought raw food.  It was a raw diet

13  and so I craved the taste of cooked food or just any other --

14  I had a food obsession.  I just wanted different flavors.  I

15  didn't want the same thing every day.  So sometimes I would

16  put the lentil sprouts, which were raw, in hot water or I

17  would let the food that they gave me to dry for it to taste

18  different.

19  Q     And then you -- there's a little drawing that you did

20  here?

21  A     Yeah, I think that was my sister's Marianna's birthday

22  day.

23  Q     So you drew a little cartoon.

24  A     Yes.  It's a little strip.  It represents that I'm

25  sending her my love since I'm far away.  I'm putting a kiss on

Daniela - direct - Penza                                    2978

1  it and sending it through the window.  The little paper plane

2  flies and gets to her house and she opens it and she feels my

3  kiss.

4  Q    And, so then at the bottom "Special edition, the resident

5  reports consequences"?

6  A    Yes.

7  Q    *The Scream*?

8  A    Yes.

9  Q    And you wrote, "In one fell swoop, the visitor busted my

10 little boat and redirected it towards a much more intensive

11 and important focus in the process and the act of deciding and

12 carrying out consequences for my harmful actions.  With this

13 clarity I am now moving in that specific direction.  According

14 to me, I had already made a good decision about the actions I

15 needed to take as a consequence of the recent blunders.  I

16 would let my hair grow back to it's pre-blunder length and for

17 all of that time, I would write one letter every day.  I

18 innocently thought that the hair would repair the physical

19 damage and the writing took such a long time, something so

20 difficult for me and makeup for the fact that I broke my word

21 and continued compliance with this other promise, but it seems

22 I fell really, really short.  The action of cutting my hair is

23 much more serious than I wanted to see -- to see and think.

24 To give you an idea, it has been suggested to me as a

25 necessary consequence that I stay in this room until my hair

Daniela - direct - Penza                    2979

1   grows back to its original length," three exclamation points.

2   "This seems really unreasonable to me and I'm still in shock

3   about it, but the understanding that did seem really clear to

4   me is the meaning of my action, the true impact and the depth

5   of which it is a symptom."

6           What are you referencing there?

7   A    I am the resident and the visitor is Lauren and I'm

8   writing an article about Lauren's visit, which was that

9   cutting my hair was a huge ethical breach and probably gave me

10  a whole lecture on it and that I needed to stay there until it

11  grew back.

12  Q    We don't go through all of these, but were there only a

13  few editions of the Wilton Times?

14  A    Yes.  After a short time, Lauren told me that it was an

15  ethical breach to be doing that; that it was indulgent and I

16  needed to stop.

17  Q    Okay.  So, now I want to go back to where we left off

18  yesterday.

19  A    Okay.

20  Q    And you're at the volleyball?

21  A    Yes.

22  Q    To confront Keith, to confront the defendant?

23  A    Yes.

24  Q    And what happens then?

25  A    So, I wasn't able to talk to him at all.  They drive me

Daniela - direct - Penza                    2980

1    back to the house.  I don't remember who.  I think it was my

2    brother.  I don't remember.  And -- but I had made the

3    decision and, so, I think over the next day or couple of days

4    there were arrangements made and I was just waiting because I

5    needed to figure out how they were going to, you know, get me

6    back.  And I was not -- I really didn't have any say in that.

7            So all I was allowed to do is pack a few things and

8    they weren't really my things because I didn't have access to

9    my things, but in a little backpack.  I put some clothes.  I

10   grabbed my journal and that was just -- and they -- I was

11   told -- I remember, I -- I was downstairs and Cami was crying.

12   I hadn't seen her in a long time and -- I mean, all of that

13   time.  And I think Lauren was there.  It's all really fuzzy.

14   It's all hazy that time.  And Kristin was there and I had

15   known Kristen an even longer time and it was explained to me,

16   my father and Kristin would drive me to the border and -- and

17   that would be it.

18   Q    Did anyone give you your papers back?

19   A    No.

20   Q    What else did you take with you?

21   A    I took with me -- I remember taking with me some, like --

22   like I didn't own a lot, but some jewelry that I had, like

23   some earrings or something because I was thinking -- then I

24   started thinking.  Oh my God, how am I going to survive?

25   What's going to happen?  So the shock did not wear off but I

SN        OCR        RPR

Daniela - direct - Penza                    2981

1   was thinking oh my God -- now I'm like, oh my God.  I'm

2   allergic to most metals except gold.  So I thought, okay, so

3   I'll pawn it.  This is money and I was trying to think of

4   what -- of what -- of what I was going to be doing.

5           I remember going into my dad's wallet and taking

6   some money and thinking as soon as I get to Mexico I'll work

7   and I'll repay him, but I need to have something, so I'm not

8   without a cent in Mexico.

9   Q    Do you know how much you took?

10  A    It was about 1,000 pesos, I think.

11  Q    Do you know how much that is in U.S. dollars,

12  approximately?

13  A    It's about $50.

14  Q    Why did you not ask for the money?

15  A    I -- I think it was -- I don't remember asking or not

16  asking.  It was a condition that I was going to be without

17  nothing.  They were going to give me nothing.  I don't know

18  that it ever even occurred to me because that's what it was

19  going to be.  You know, they're not going to give me anything.

20  Q    How big was this backpack?

21  A    It was, like, a normal, like -- it was a school backpack.

22  Q    And other than that did you have anything with you?

23  A    The clothes on me.

24  Q    Did you take anything else?

25  A    I had a pair of shorts, the clothing there.  No.

Daniela - direct - Penza                    2982

1    Q    Did you take any electronics with you?

2    A    Oh, I had -- I think I had the PSP that I had had -- no,

3    I took the disk, not the PSP, I don't think.  Maybe I took it

4    and I think I gave it back.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN       OCR       RPR

Daniela - direct - Penza                    2983

1   DIRECT EXAMINATION

2   BY MS. PENZA:   (Continuing)

3   Q    So let's -- this is the time period before you were

4   driven, you're packing and things like that.

5   A    Yes.

6   Q    Then what happens?

7   A    We started -- I was in the car.  I was in the back seat

8   of the car.

9   Q    And it's your father and Kristin Keefe?

10  A    Yes.

11  Q    How long had it been since you had spoken to Kristin

12  Keefe?

13  A    I mean, even before the room, it had been a long time.

14  So, years.

15  Q    Did you have an understanding -- did you have an

16  understanding of why she was there?

17  A    I didn't ask, but I imagined.

18  Q    What did you think?

19  A    She was there like a -- to make sure that I didn't do

20  anything crazy.  I mean, she was Keith's right hand, I imagine

21  to keep me in line, to make sure what needed to happen was

22  going to happen.  I understood myself to be a liability.

23  Q    What do you mean by that?  Why were you a liability?

24  A    I think that if -- I mean, now I see it even more

25  clearly.  I could have gone to the cops and said these people

Daniela - direct - Penza                    2984

1   have been keeping me in a room for three years.  These people

2   done all of this to me.  They brought me into the country

3   illegally and then this is all that's happened.  I could have

4   done that.  You know, I could have done a lot of crazy things.

5   Well, not crazy things.  Actually that will be the sane thing.

6   But I think she was there to keep that from happening.

7   Q    At that point in time were you also aware of other crimes

8   that the defendant had committed?

9   A    Yes, I knew of -- I knew of the hacking.  I knew at least

10  the broad strokes of the -- on the legal side the things that

11  he had done.  I knew that he had slept with Cami and she was

12  underage.  So I knew a lot of things.

13  Q    So what happened?  Tell us about the trip.

14  A    The period when I came out of the room, it was a weird --

15  it was a weird experience.  So what I remember, aside from the

16  weird sensations, I remember we stopped at a hotel at some

17  point.

18  Q    So how long -- so you're in the Albany area?  You're in

19  Clifton Park?

20  A    Yes.

21  Q    And what is the destination?

22  A    It's Laredo.  I think it was Laredo crossing, Laredo

23  which is --

24  Q    What state is that?

25  A    Texas.  That's one of the crossings that I actually knew

Daniela - direct - Penza                    2985

1   from my past.  We used to go shopping to the U.S. when we were

2   very young.  There is a path where people can just cross back

3   and there's no -- there's no actual checking because people

4   who live at the border they come and go.  At least that's how

5   it was at that time.  And the -- so the trip was to go from

6   New York to Texas.

7   Q     And how long does that trip take approximately?

8   A     I remember it was days, maybe two, three days, but I only

9   remember one night in one hotel.  There must have been more

10  because it's a long trek.

11  Q     What do you remember from the hotel?

12  A     I remember going gym to exercise.

13  Q     Why do you put exercise in --

14  A     I wasn't there to exercise.  I went there to sit on the

15  treadmill and watch the news.  You know, I just wanted to know

16  what was going on.  It felt so -- it was like a violent -- all

17  of a sudden it's the real world and everything happened, is

18  going, you know, without me.  And all of a sudden, I'm

19  introduced to like -- and there's so much going on.  I wanted

20  to know.  So I remember doing that.  I'm going to go to the

21  gym and exercise, whatever.  I didn't know even like, you know

22  -- and I remember just sitting on the treadmill looking at the

23  news.

24          And I also went to the -- like they have like a work

25  center, as they do in some of the business hotels.  And I was

MDL      RPR      CRR      CSR

Daniela - direct - Penza                          2986

1   Googling and I was Googling.  And I Googled where I was going

2   to go.  I was Googling.  And I remember I Googled safest city

3   in Mexico, because I was so afraid that, you know, I wanted to

4   go somewhere safe.  I wasn't allowed to go to my hometown or

5   anywhere anybody knew me.  And I was very afraid.  So I

6   remember I looked that up and there was like a top five and I

7   picked the top one.  And after I picked that top one, I

8   started like looking -- went to that place to see.  I didn't

9   know how much the pesos were worth.  I didn't know how much it

10  was going to be.  I had no idea.  Like my sense of, like, the

11  money, or whatever.  So I was -- I looked up really quickly to

12  see what I was going to -- you know, once I was there, I was,

13  you know, on my own, you know.  So I remember doing that.  I

14  don't remember what else I looked up.

15        And I also remember it was at that hotel I think I

16  remember -- I felt -- I remember like Kristin wouldn't let me

17  have alone time with my dad.  Like, I remember, like, I wanted

18  to stay with my dad and hug him and, like, spend time with

19  him, you know.  I was so happy.  I was -- I mean, happiness is

20  a weird description of that, but I liked seeing him in the

21  middle of everything that was going on, you know, and I wanted

22  to -- and I don't think -- I remember wanting to stay in the

23  same room as him.  I don't think I was allowed to do that.

24        And I remember -- I remember at some point -- I

25  think it was about as we were about to, like, go out of the

MDL        RPR        CRR        CSR

Daniela - direct - Penza                    2987

1  hotel, I had this like feeling of I don't -- I don't want to

2  do things wrong and telling my dad that, you know, I took some

3  money from you, I just am really scared, I'm really sorry.

4  And I gave him back the money.  And I think I had the PSP with

5  me and I was, like, hiding it, like, I wanted to have it.  And

6  I think I gave it back then.  And I just wanted to be clean.

7  I just wanted to be clean.  And I remember doing that.

8  Q    Did anyone say -- did either of them say anything to you

9  when you gave those things back?

10 A    Kristin said -- Kristin said that they already knew that

11 I had those things.

12 Q    And did they tell you how they knew?

13 A    I imagine they had gone through my things.

14 Q    And what happened when you got to the border?

15 A    At some point during the trip it was revealed to me,

16 because it wasn't a surprised, there was going to be someone

17 waiting for me at the other side of the border and that other

18 person was my father's accountant.  And he was going to be

19 there because it was very violent in Mexico.  And, indeed, it

20 was very dangerous.  So -- especially the northern area.  And

21 I was able to observe it, because it was desolate and there

22 were like bullet marks all across the highway, like, along the

23 highway, and it was completely empty.  So I believe my father

24 arranged that so I wouldn't go through that period of very

25 dangerous -- you know -- that trek of very dangerous highway

Daniela - direct - Penza                    2988

1    alone or -- I don't know.  I considered it an act of kindness.

2            So he was going to -- before I crossed the border, I

3    did have a moment with my dad.

4    Q    And what happened?

5    A    There was the only -- and he hugged me and he gave me

6    some money.

7    Q    How much did he give you?

8    A    It was 1,500 pesos.  And he gave me his watch and he

9    cried and I cried.  And he said, "Please do everything you

10   need to do to get back to us.  It's going to be hard, but you

11   can do it.  Please do everything you need to do to get back to

12   us."  And it felt -- it was so beautiful, because it felt

13   real.

14           And after that, I walked across the border and this

15   accountant person received me and got in the car.  I don't

16   remember talking to him about anything.  And we drove and

17   drove.  And I remember driving past Monterey, which is like

18   the first major city to cross.  I remember details about

19   Monterey.  I don't remember if we stopped there or not.  I

20   also remember driving past my hometown.

21   Q    Is Monterey where you had gone to --

22   A    School, yes.  So, I'm somewhat familiar with the city and

23   streets.

24           I remember driving past my hometown and the highway

25   goes past my hometown.  I could see my childhood home from

MDL        RPR        CRR        CSR

Daniela - direct - Penza                    2989

1    afar.  I remember it felt very weird, like a different world

2    and we just drove right past it.  I wasn't allowed to see

3    anybody or be anywhere where people knew me.

4              And he dropped me off in the capital of that state,

5    of my home state.  And he bought a ticket to where I wanted to

6    go, which was the south of the country.  So the remaining of

7    the trip was going to be also a few days by bus.  So he bought

8    a one-way ticket for me from the capital of the state to the

9    city where I was heading to and that was it.

10   Q    How long was the bus ride?

11   A    It was days.  It was really long.  It's really long.  I

12   mean, it's opposite sides of the country and Mexico is quite

13   large too.

14   Q    Did you -- did you stop at any hotels along the way?

15   A    No, no.  I wasn't spending any money.  I just slept in

16   the bus station sometimes or I slept somewhere.  I slept on

17   the bus.  I was trying not to buy any food, as little as

18   possible.  I was very scared of running out of money and what

19   am I going to do when I get there.  So I was just planning

20   what I was going to do when I got there.  But I wasn't -- no,

21   I wasn't spending anything.

22   Q    Did you have a phone or a computer?

23   A    No.

24   Q    Did you shower along the way?

25   A    No.

Daniela - direct - Penza                    2990

Q    So when you arrived at the city, had you ever been there
-- had you ever been to that city before?

A    No, never.

Q    So what happened when you arrived?

A    I mean, I was in -- when I arrived, I wasted no time.  I
mean, I wasted no time.  There was a wonderful of part of
being in the outside world and the sensation.  It felt really
overwhelming, like, all of a sudden, like, a whole wide open
world.  It was frightening at the same time.  I wasted no
time.

          As soon as I got off the busy, I asked someone to
direct me where the center of the town was, like the main
plaza, and I went there.  And I started asking where are some
hostels that I -- because I needed to figure out, okay, so
what am I doing tonight, I need to settle, I need to get the
newspaper, I need to look for a job, I need to look for a
place to live.  I wasted no time.

          So I just went there.  I remember I ran in -- I met
one man who was very kind to me and, like, he said, you know,
this is a good hostel to stay at.  It was a very safe city, by
the way.  And I said, well, what can I -- like, is there a
pawn shop?  And he guided me through it, took me there, a very
nice guy.

          And that first day I was sleeping at a hostel and I
was getting ready to, you know, go and look for a job the next

Daniela - direct - Penza                    2991

1    day first thing in the morning.

2    Q    The hostel where you stayed, do you remember how much it

3    was?

4    A    It was like 180 pesos a night.  It was like eight people

5    in one room, one bathroom.  So it was very cheap.  Still, I

6    didn't have a lot of money.  I remember I used to count the

7    days that I could afford and I was against the clock of

8    finding a job and finding a place to live.

9    Q    At this point, do you have any identification?

10   A    None.

11   Q    Did you -- you said you went to the pawn shop.  Did you

12   pawn your jewelry?

13   A    Yes.

14   Q    So, then, what happened?

15   A    So that was my little budget.  So what I did is I went in

16   the -- in Mexico, we have these job applications that are like

17   standard formats and I bought a few.  I couldn't afford a lot

18   of them.  I took some pictures of myself to put on the

19   applications and I filled them out with as many as skills as I

20   thought I had.

21   Q    What type of skills did you put on there?

22   A    I can use Office, Word Excel, PowerPoint.  I remember,

23   you know -- I mean, I wasn't looking for anything high level.

24   I was looking for --I went to hotels to be like a cleaning

25   staff.  I was, you know -- I was looking for -- because I

Daniela - direct - Penza                    2992

1    didn't have -- I didn't have an education, one; and second, I

2    didn't have papers.  So, even in Mexico, to find a formal job,

3    like everybody's going to ask for a list of, you know, your

4    ID, your -- you know -- your official ID in Mexico is an IFE,

5    back then INE -- and a list of requirements.  You have to have

6    that.  How is someone going to hire you?  They don't know who

7    you are.  They can't check on you.

8           So, I was looking for a very basic jobs that would

9    make me money like right away.  Like I couldn't wait for a

10   long interview process, nor did I think I was qualified for

11   any of those jobs.  So there was, like, the annual carnival at

12   the time in that town, which made it very difficult because

13   the whole downtown was closed during the day and the carnival

14   was going on.  So, I ended up going to malls and finding

15   anything that was opened.  I would give them my job

16   application.  They would look at it.  A lot of them would say

17   no, no, but you can leave us the application in case we need

18   someone.  I would say no, no, can I have my application back

19   because I need to reuse it.  I didn't have a lot of them.  I

20   had like three or four, you know.  I was just asking for a

21   job.

22          Even if there were no vacancies, I was just going --

23   I ended up going to stand to stand at the malls just, you

24   know, asking do you need some help?  Do you need this?  Is

25   there anything I can do?  Do you have a job?

Daniela - direct - Penza                    2993

1           And I ended up finding a job.

2    Q    Where?

3    A    At a computer store, a store that sold computers.  And I

4    got really lucky because the owner -- and I was very honest.

5    I was very -- every time I say the only -- I don't have ID and

6    I'm looking for something temporary.  So it was a hard sell, I

7    think.  But I wanted to be very straightforward.  And this man

8    told me, oh, it must be my lucky day, because his main person

9    who was like the main cashier, she was on leave because she

10   was pregnant, so she had something -- he said he had something

11   temporary and when can you start?  I can start tomorrow.  So I

12   started work within a few days.

13          After I found a job, then I was looking for a place

14   to stay that was nearby.  And also within a few days I found

15   this place.  I would look for a room, not an apartment,

16   because I also didn't want to be alone.  I was scared.  I

17   thought even though I found out this was a very safe place, I

18   felt very unsafe.  So there were these ads that were for like

19   a room.  In Mexico, they tend to specify, I don't know if

20   here, if it's for a man or a woman.  And, so, I would look for

21   those.  And I ended up staying at a house with a very nice

22   lady was living with her three sons and they had the main room

23   that they were renting out and I stayed there and I felt very

24   safe.  I -- she shared some of the food she was preparing.

25   They treated me like I was -- you know, they took me in a way.

MDL       RPR       CRR       CSR

Daniela - direct - Penza                    2994

1  So, it was a fast transition.

2  Q    During that time, were you still in communication with

3  anyone -- with your family about getting your documents?

4  A    Yes.  And, also -- yes.  And, also, like, one of the

5  first things I did when I got to the city was I went to the

6  public library to get a library card to get a book, because

7  part of what I needed to do -- they had given me, like, a

8  deadline and, like, tasks.  I still needed to do book reports

9  to get back and I didn't have books to do book reports on.

10 Q    Were doing the book reports tied to getting your papers?

11 A    Yes.

12 Q    To getting your birth certificate?

13 A    It was conditional.  Like, they were going to help me as

14 long as I did those things.  And also part of the condition

15 was and you need to work towards fixing your legal status and

16 getting your visa.  So, for that I needed my papers.  So it

17 was a very weird conditional.  So it was all, like, based on,

18 you know -- I needed to keep writing and I needed to keep

19 doing book reports and sending them.

20 Q    And specifically, was your birth certificate one of the

21 things you were asking for?

22 A    Very specifically because my birth certificate -- a birth

23 certificate in Mexico is the one piece of paper that you need

24 in order to get your official ID, the IFE, or even get a

25 passport.  So it's like the basis of the identity.

Daniela - direct - Penza                          2995

1   Q      So you were going to the library.

2   A      Uh-hum.

3   Q      And what happened?

4   A      At the library -- well, everything -- everything was hard

5   because I didn't have an ID for anything and I didn't have,

6   like, at that time a place to live.  So you need to -- you

7   need proof of address, you know, the usual, whatever a normal

8   person has.  So even getting a library card was hard.  And the

9   person in charge of the library actually ended up -- he told

10  me you need a guarantor, a guarantor, like someone who will

11  sign for you, like, usually it's like -- so you don't take the

12  books.  And I remember telling him I didn't have that and I

13  didn't have an ID.  And he said I'll sign for you, not enough

14  people read these days.  And he gave me a card and I was able

15  to get books.

16          So things were going well for me, I think.  And I

17  wasn't -- I wasn't writing and I wasn't doing book reports

18  because I didn't have a computer, so for me to even like get

19  on a computer, I needed to go to a cyber cafe and pay per the

20  hour.  And I didn't have money and I couldn't spend money.  I

21  was busy surviving and trying to survive.  You know, I didn't

22  have anything.  And I needed my papers to even be able to

23  start building what I needed to build in order to do the

24  things they had told me I needed to do and they had given me

25  deadlines.  There was some number of months' deadline to get

Daniela - direct - Penza                    2996

1  my visa, which was insane, you know.  But I felt -- you know,

2  even that last interaction with my father where I felt again

3  the pool of my family of please get back to us.  You know,

4  like -- so, I think I wanted to, but most of the time I just

5  couldn't.

6  Q    So did you continue to work at the computer store for

7  some period of time?

8  A    Yes.

9  Q    And then did you end up having any other jobs?

10 A    Yes.  So I had that job at the computer store.  Then I

11 was an English language teacher for a special emergent program

12 for, pilot program, for the Secretary of Education, so for a

13 public school.  So, like, first, second, and third grade of

14 elementary school, I was a teacher there.

15        I worked as a manager at a restaurant and a bar.  I

16 organized events.  I was doing websites and fixing websites

17 for people, setting up WiFi networks and printing networks.

18        I think that at some point I had four jobs at the

19 same time and I was just, you know, trying to save, trying to

20 make sure I was stable.  I always was panicking not to have

21 enough money.  So I was just hoarding the money.

22        In Mexico, the first job I had, it paid less than

23 4,000 pesos a month.  That's about $200 a month.

24 Q    At some point did you get your birth certificate?

25 A    Yes.

Daniela - direct - Penza                    2997

1   Q     Can you explain how?

2   A     Yes.  So I had tried to get my birth certificate, but

3   because I was living in a different state, you could only get

4   your birth certificate in the state that you were born in,

5   like you have to go there to the civil registry and you get

6   your birth certificate.  And there's a service for foreigners,

7   for people who are living far away, but it was extremely

8   expensive.  I remember it was more than 5,000 pesos.  So I

9   didn't have money to get that.

10              So, at some point -- another one of my jobs, I was a

11   tennis teacher, so, like, a tennis -- you know, that gives

12   lessons to kids.  And I was teaching these kids, and their

13   mother, I became friends with their mother and I actually

14   started teaching them English too, like, by the hour.  So I

15   was a tutor.  And this woman, she was a lawyer with the Human

16   Rights Commission and we became friends.  And in one of our

17   conversations, I told her, you know, just in passing, you

18   know, that I was struggling because, you know, I didn't have

19   papers.  And she said having an identity is a human right.  I

20   will get you your birth certificate.  And through the Human

21   Rights Commission, I got my birth certificate for free.

22              (Continued on following page.)

23

24

25

Daniela - direct - Penza                                   2998

1    BY MS. PENZA:   (Continuing)

2    Q    How did your life change once you had your birth

3    certificate?

4    A    Having an identity is everything.  I, I mean other than

5    the, logically, what one can do, the jobs one can apply for,

6    having bank accounts, having credit cards, having like an

7    official place where I can live, the sense of identity and the

8    lack of dependency, my life changed completely.

9    Q    Were you able to take on different types of jobs as well?

10   A    Yes.

11   Q    What do you do now?

12   A    Plant manager and general director at a manufacturing

13   company.

14   Q    How many people do you supervise?

15   A    About 250.

16   Q    Do you have plans to purchase this business?

17   A    Yes, I do.

18   Q    Very successful now?

19   A    Yes, and I get to travel a lot.

20   Q    Is that a job that you would be able to have if you

21   didn't have your papers?

22   A    No.  I am the legal representative for the company.  I

23   have a lot of responsibilities that require me to have not

24   only a identity, but a very stable identity.

25   Q    And what types of -- what's your day to day like?

Daniela - direct - Penza                    2999

1  A    My day-to-day is I mostly work at the factory so I get to

2  travel to different parts of the world, Hong Kong, Italy, to

3  different shows related to the industry.  I start early in the

4  morning, I supervise the entire factory and the entire

5  production.  We are dedicated to import/export, so it's hectic

6  and it's a lot of work but it's, it's very exciting work.

7  It's a full day, but I have a great team and they do a great

8  job and I very much enjoy working with my people, my

9  community.

10        I think at some point, I realized that I was not

11  going to change the world and that was a sad thing, that was a

12  very real thing.  I had childish dreams to change the world

13  and do something really important and now I feel I have -- my

14  domain in the world is smaller but it's big enough for me.  I

15  have 250 families who depend on me and I'm very proud to do

16  that work.

17  Q    During the time period when you were in Mexico, did you

18  ever communicate with the defendant?

19  A    I, I, I know I did.  I don't remember, I don't really

20  remember it very distinctly.  I don't know if it was both ways

21  so I don't know if that was communication.  I know that I sent

22  him e-mails.  And I know that at one point, I called my sister

23  number, my sister's number, and he picked up so that was a

24  communication, yes.

25  Q    You talked at that time?

Daniela - direct - Penza                3000

1    A    Yes.

2    Q    How -- why, why did you continue to send the defendant

3    e-mails sometimes?

4    A    When I left the U.S., when I escaped the room, obviously,

5    it's a before and after, and it was a huge decision but it by

6    no means stopped everything, wiped everything inside me, wiped

7    the abuse, wiped the manipulation and made me new.  That's not

8    how it worked, that's not how it worked with me.  That's also

9    how -- I don't think human nature is like that.  So even after

10   I left, all of this, all of the beatings, all of it was still

11   inside of me.  I mean, all of it remained with me.

12        My circumstances had changed and I tried to make the

13   best of that but all of that, all of the expectations, all of

14   beatings, all of the, I'm a monster, I'm all these things,

15   those continued with me and as I spent more and more time in

16   the real world, they, I wouldn't say faded, but as I built a

17   world for myself, as I had friends, as I had a job, as I had

18   an identity, that was huge, as I had a boyfriend and I loved

19   him and he loved me back, as I had all these things, as I

20   built a world, it was only after that that I was able to look

21   back and look at the world I had been and realized the

22   monstrosity that this happened but it wasn't immediate.

23        So a lot of the things -- it took years.  It really

24   was a long process of rebuilding every part of my existence

25   that had been destroyed.  So the way I see it is like residual

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    3001

1  damage, you know, that stayed with me.  Still in my head, oh,

2  I need to fix it, still in my head, oh, I still owe them, and

3  still in my head, oh, I did something bad.  And with time, it

4  went away but it wasn't immediate.  So that writing, that's

5  how I understand it.

6  Q    Was there a point when it did go away?

7  A    Yes.

8  Q    And after that point, did you ever speak to the defendant

9  again?

10 A    No.

11 Q    Communication with your family.

12 A    Yes.

13 Q    Did you eventually talk to your mother again?

14 A    Yes.

15 Q    How was the process of rebuilding that relationship?

16 A    My mother found me so she found out where I was living

17 through the maid, my father's maid.  She got my information

18 and she went looking for me and I didn't want to see her.  I

19 was trying to build my new world and I hated her.  I did not

20 want her.

21         So, the first visit was horrible and I remember

22 screaming at her, You left me, you didn't come, you didn't get

23 me, you didn't come and get me, and I remember letting it all

24 out.  I remember her just taking it and apologizing.  That was

25 the first visit.  Very similar, the second.  She was living in

Daniela - direct - Penza                3002

1   Mexico City at the time so she would come visit for days and I

2   didn't even like that.  I felt like she was contaminating my

3   brand new world.  You know, she was part of that -- I didn't

4   even want to think about that.  Like I remember, I didn't want

5   to think about it.  It's not something I wanted to be thinking

6   of.  But it took, like, three visits and, I mean, a mother is

7   a mother and, eventually, I was just happy to have my mom and

8   we talked things out and I could understand what she had done

9   and she's human just like me.

10  Q    Your other family members, can you describe what the

11  process was, like, of communication after, after the room?

12  A    Yes.  So for, for my brother, I attempted on and off to

13  send him messages or call him.  He never picked up.  He never

14  replied to any of my messages like ever, any single time.

15  Q    You are now in communication with your brother, is that

16  right?

17  A    Yes.

18  Q    We'll talk about your brother in a moment.  How about

19  your father?

20  A    My father, my father -- one time, I was contacted, after

21  years really.  After years, my father had someone from my

22  hometown who was going to get married and his girlfriend at

23  the time was part of that family so I knew that the wedding

24  party was going to be in Merida.  So I remember trying to

25  contact him to see, you know, he was going to be in my town

Daniela - direct - Penza                    3003

1   so, hey, can you, can we meet.  I remember getting an answer

2   in the negative but it was an answer.  And shortly after that,

3   I remember being contacted by him and my sister Marianna.

4   That they were both going to come and visit me.

5   Q     Was that surprising to you?

6   A     Completely, but I was thrilled.  I mean, that was

7   fantastic.  I wanted to see him.  Of course, I wanted to see

8   them.  I wanted to see both of them.

9            So they made plans and they're like, Oh, we're going

10  to go there, and they went to visit me and they were in my

11  hometown.  They didn't stay at my place.  They didn't even ask

12  which is weird because we're family.  They stayed at some

13  hotel and they arrived and it was a bizarre experience.  I

14  mean, all of this is a bizarre experience and, obviously,

15  we're a very dysfunctional family after ESP and Keith, but,

16  you know, it was, "Oh, the weather is so nice here" or my

17  sister, "Oh, look at my new designer something-something," and

18  it was all, like -- like, there was not a word about what had

19  happened.  And I was -- I wasn't going to touch it, you know,

20  because, like, they were there and I was happy to see them and

21  I wasn't going to risk them.  All I wanted was that contact.

22           But I remember I took them to visit, to tour my

23  factory.  My father took some interest in it.  My sister

24  Marianna said she was tired and slept at the front office the

25  entire time.  So there was no interest in my life.  We visited

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    3004

1    a museum.  It was an odd visit, to say the least.

2    Q    Was that an outlier in terms of contact with your father

3    and your sister Marianna?

4    A    I'm sorry, what do you mean by "outlier"?

5    Q    Was that the only time that happened?

6    A    Yes.

7    Q    Looking back, did you have any thoughts about what had

8    happened?

9    A    Yes.  I had many theories.  In fact, I discussed them

10   with my mother.  It was a very -- it was a very odd situation.

11   And I remember at the time Marianna was in Mexico, she had

12   been in Mexico City for, like, months and had not called my

13   mother and then all of a sudden, you know, she had made an

14   appearance and I asked to meet with her and then she was

15   asking to meet with me which was also very odd.  And I

16   remember my mom and I just talking about that and just talking

17   about how weird all of this was and what might be happening.

18   Yes, it was, it was -- we had some theories.

19   Q    Okay.  So her, Marianna being in Mexico for a long period

20   of time, did that strike you as unusual?

21   A    I mean, it was unusual.  We had some information of what

22   was going on.

23   Q    So what did you know was going on?

24   A    She told my mom that she was having issues with her

25   immigration and also she was rebuilding Jness or building

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza 3005

1  Jness and opening some centers there which my mom thought was

2  BS, but that was what she was told. And so, I mean, my mom

3  and I came to the conclusion that they were trying to --

4        MR. AGNIFILO: Object to the conclusion, Judge.

5        MS. PENZA: I'll ask another question, Your Honor.

6        THE COURT: Go ahead.

7  Q    When you were on your visitor's visa, your B-1 visa --

8  A    Yes.

9  Q    -- did you know the, did you have an understanding of the

10 various conditions that were part of that?

11 A    Yes.

12 Q    And did you have an understanding that you needed to not

13 have an intent to remain in the United States?

14 A    Yes.

15 Q    And so is it important to show that you had a real

16 contact, a real life in Mexico?

17 A    Yes.

18 Q    Did that factor into why you thought your sister and your

19 father were visiting at that time?

20 A    Yes.

21 Q    After that contact with your father and your sister, did

22 you have any other contact with your sister at all, your

23 sister Marianna?

24 A    No. After that, like, the ice had been broken because,

25 really, there was no contact whatsoever prior and there were,

CMH    OCR    RMR    CRR    FCRR

Daniela - direct - Penza                           3006

1   like, a few exchanges in texts but just as, you know, just as

2   cold, and they would go, like, weeks, if not months, and then

3   maybe she would reply, but there was nothing.

4   Q    Was there ever any contact from your sister Marianna that

5   felt strange to you?

6   A    Yes.

7   Q    Can you tell us?

8   A    At one point, I was contacted and Marianna said, I think

9   she asked me, like, right off, like, has Kristin Keefe

10  contacted you.

11  Q    Had Kristin Keefe contacted you?

12  A    No.  And I was, like -- and I didn't follow, you know, I

13  didn't follow what was going on with ESP or NXIVM or anything

14  at the time.  I was busy living my life.  So I was, like, I

15  don't know what's going on.  It's very important that you let

16  us know if she does or something like that.  Just, like, very,

17  like, okay, okay, fine, you know, what happened.  You know,

18  like, who knows.  And, yeah, I think that after that, the only

19  other relevant communication she had with me is when she told

20  me she was pregnant and that was when she was, like, eight

21  months pregnant.

22  Q    Kristin Keefe, did you ever see her again after you got

23  to the border?

24  A    No.

25  Q    Did you ever speak to her again?

Daniela - direct - Penza                    3007

1    A    No.

2    Q    Your, did you ever have -- did you ever speak in person

3    to anyone else from the NXIVM community while were you in

4    Mexico?

5    A    Yes.

6    Q    Can you tell us what happened?

7    A    Yes.  One of the NXIVM members had their wedding in the

8    city I was living.

9    Q    Who is that?  What's the name?

10   A    Emiliano Salinas.

11   Q    And is he a powerful person in Mexico?

12   A    He is the son of an ex-president, yes, and they still

13   hold a lot of power.

14   Q    So this was a wedding at the hotel that you were at?

15   A    Yes.

16   Q    Was this a fancy hotel?

17   A    Yes.  I was working at a boutique hotel, I was the

18   manager of the restaurant, and part of the wedding party was

19   going to stay there and they were going to have some sort of a

20   reception there.  My luck.  And one day, like, I'm managing

21   the restaurant, you know, doing my thing, and, "Oh, my God,

22   Emiliano."  And he has, like, a famous wife or he was going to

23   get married to a famous person and there was a celebrity and

24   as soon as I hear the name, I just want, I just wanted to

25   disappear.  So this was, like, before the wedding.  They were

Daniela - direct - Penza                    3008

1    planning and they were doing -- they were there with the

2    wedding planner.  And so I saw him.  I had a brief interaction

3    with him and the other NXIVM that was there.  And then I don't

4    remember how, I don't know if I contacted her or she contacted

5    me, but I ended up seeing Lauren when the wedding actually

6    happened.

7              Because -- a few weeks later, the wedding actually

8    happened and I read from the news, like, the local news that

9    all of, like, the people for, high-ranking people from ESP

10   were there.  Like, there were pictures in my city that I

11   escaped to.  And I ended up meeting with Lauren.  I remember

12   it was a bizarre experience.  I remember being -- and the

13   fountain in front of the hotel I worked in which was, like,

14   two worlds clashing, just they do not belong together, my

15   brand new beautiful world and, like, this old thing.  And I

16   remember it being this old thing, like, you know, how are you

17   doing in your program and how you have to fix things.  I

18   remember just listening.  I don't remember all the details.

19   I'm, like, I'm busy living.  You know, I don't know exactly

20   what went on there, but I remember there was an interaction.

21   I don't think I followed up very much on it.  At least I don't

22   remember.  And I remember having seen Nancy Salzman and

23   Adriana Nino, I remember, of ESP from Mexico from afar, like,

24   walking by.

25             And a few days after the wedding, I was walking with

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                    3009

1    my best friend on the main avenue of the city I live in and I
2    ran into the Mexican contingent of the ESP, Loreta and I think
3    it was Omar Boone, and it was another bizarre experience.  I
4    was just, it was just late at night, I think, on a weekend
5    walking to a coffee shop with my best friend and there they
6    were, like, everybody I had known from my past life, my
7    horrible past life.  And I remember, that was a bit more
8    casual.  I had a little bit of fun with it.  Oh, hi, how are
9    you doing?  We haven't seen you for a long time.  I was, like,
10   Oh, just hanging out.
11   Q    Did -- is it possible that you reached out to Lauren?
12   A    Yes, it's possible.
13   Q    During that time period where there was, were some
14   efforts on communication, had you had real meaningful contact
15   with your family?
16   A    No.
17   Q    Did you view your contact with anyone at NXIVM as
18   important in trying to gain that access to your family back?
19   A    Yes.  I mean, I very clearly thought and felt that -- I
20   can't even say Lauren because it was always Keith.  Like,
21   Keith held the access to my family still.  I mean, everything
22   was funneled, you know, through Keith.  You know, if I did
23   what I had to do, then I would have access to all of that.
24   Again, that faded with time because I stopped meeting them and
25   at some point, I really just gave up on my family.  Not

Daniela - direct - Penza                                    3010

1   really, but I thought, you know, like, I'm building my own

2   life.  I let go and I didn't need, I didn't need -- it was

3   huge -- I didn't need my papers anymore.  You know, so the

4   beauty of life and living the life just took over and I was

5   able to, like, move on but, yes, I very distinctly felt Keith

6   held access to my family.

7   Q    Going to --

8            MS. PENZA:  Your Honor, I probably have about 15

9   more minutes or so.  Is it okay if we go past 1 o'clock?

10           THE COURT:  Only if you want the pizza to get cold.

11           MS. PENZA:  Oh, I definitely don't want the pizza to

12  get cold.

13           THE COURT:  Why don't you go to 1 o'clock.

14           MS. PENZA:  Understood, Your Honor.  I'll find a

15  good stopping point.

16           THE COURT:  All right.  Go ahead.

17  Q    So at the point in time when you are -- so when do you

18  start working at the plant where you are now working?

19  A    July 2014.

20  Q    By that point in time, is that a point in time where you

21  kind of viewed this old world and new world where you felt

22  solid and, you know, the defendant no longer held any sort of

23  power over you at that point?

24  A    A little bit after that, yes.

25  Q    A little bit after that?

Daniela - direct - Penza                    3011

1   A    Uh-huh.

2   Q    So taking that, right around that time frame, are you in

3   communication with your brother Adrian?

4   A    No.

5   Q    Are you in contact with your sister Camila?

6   A    No.

7   Q    At some point later, did you end up having more

8   communication with Camila?

9   A    Yes.

10  Q    About when was that?

11  A    I think it must have started, like, 2016 or 2017.

12  Q    And how did that communication begin?

13  A    I started texting her and she texted me back and then we

14  just took it from there.

15  Q    And what type of communications were you having with

16  Camila at that point?

17  A    I remember the first communication she, my sister is,

18  like, a very -- she's an honest girl.  If she has to lie,

19  she'd rather not say and she tends to be very clear.  And so I

20  remember she told me, you know, she wanted to have a

21  relationship with me but, you know, like, her -- like, Keith

22  was also very important to her or something like that.  So,

23  you know, it was important for her that those did not collide.

24  And I said we can have our relationship, it can just be you

25  and me, sisters.  And we started talking under that basis.

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                                    3012

1   But the truth is that the reason and the way the contact

2   started is because by the time that I started talking to Cami,

3   I was done understanding.  I understood what had happened to

4   me.  I understand what had been done to me and I wanted to

5   help her out of there.

6   Q    So did you continue to talk to Cami?

7   A    Yes.

8   Q    And how does the communication continue?  What type of

9   conversations are you talking with her?

10  A    Oh, we're going through texts and we send each other

11  pictures and we're, like, video calling and we're, like,

12  calling via WhatsApp.  And I remember the situation from the

13  media, like, there was, like, a lot of stuff on the media

14  happening at some point and it started escalating.  So I was

15  trying to, you know, talk to her about, Hey, listen, you

16  really need to fix your immigration status, you know, you

17  can't live like that.  And I started to find out things like

18  she had no money, she was working but had no money.  Well,

19  familiar situation.  So I sent her a credit card, like a cash

20  card that I could refill from afar and make sure she had

21  money.

22  Q    So let me stop you for a second.  When you say there

23  started being stuff in the media, what do you mean?

24  A    At some point, there was like a big, I think, there was,

25  even before the articles, there was an article in the New York

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                           3013

1   Times and before that, it started boiling up.  It had started

2   boiling up for a while and there was this thing about DOS.

3   Q     Have you heard -- have you heard DOS also referred to as

4   DOS?

5   A     Yes.  DOS.  DOS.

6   Q     You can use DOS?

7   A     I mostly read it.  I mostly read it.  And I remember

8   because my mom did keep up with the media quite a bit and I

9   remember she was sending me links and I was, like, Mom, don't

10  worry about that, it's so made up, don't worry about that.

11  Q     Why did you think it was so made up given --

12              MR. AGNIFILO:  I'm going to object to this whole

13  line of what she read in the media.

14              THE COURT:  Sustained.

15              THE WITNESS:  All right.

16              THE COURT:  Go ahead and ask the question.

17  Q     So, DOS, there's media about DOS and you have concerns

18  for your sister?

19  A     They were not related to DOS, my concerns.  I actually

20  didn't believe any of that, but it was centered around NXIVM

21  and I knew my sister was there illegally.  By talking to her,

22  I realized that she was very isolated.  I knew --

23              MR. AGNIFILO:  I object.  This is all hearsay,

24  Judge.

25              MS. PENZA:  Your Honor, this is very important to

CMH      OCR      RMR      CRR      FCRR

3014

1   show what happens, what comes next in the story.  It can be

2   not for its truth.

3           MR. AGNIFILO:  Can we have a sidebar?

4           THE COURT:  Why are we having this debate in front

5   of the jury?

6           MR. AGNIFILO:  I agree.

7           THE COURT:  Well, you are a part of it and so are

8   you.  We will take lunch.

9           All rise for the jury.

10          (Jury exits.)

11          THE COURT:  All right.  You may stand down.  Do not

12  discuss your testimony with anyone.

13          THE WITNESS:  Yes, Your Honor.

14          (Witness steps down.)

15          THE COURT:  Everyone in the back may be seated.

16          There is an objection --

17          MS. PENZA:  Yes, Your Honor.

18          THE COURT:  -- to this line of questioning, right?

19          MR. AGNIFILO:  Yes, Judge.

20          THE COURT:  Okay.

21          MS. PENZA:  Yes, Your Honor.  So Camila's

22  conversations with her sister are --

23          THE COURT:  Can you sort of speak into the

24  microphone?  It would make it a lot easier for certain people

25  to hear.

3015

1           MS. PENZA:  Yes, Your Honor.

2           THE COURT:  Thank you very much.

3           MS. PENZA:  So Camila, Camila's conversations with

4  her sister are very important for the next, to understand

5  what -- they're not being offered for their truth and so

6  they're not hearsay, and they are important for understanding

7  the context in which Daniela takes the next steps that she

8  does take in terms of helping her sister leave Clifton Park

9  and come to Mexico.  And then there, there may be portions

10 that are important -- I think that's enough, Your Honor.

11          So I think if there is a concern, the way it would

12 be appropriately handled is with an instruction that Camila's

13 statements are not being offered for their truth.

14          MR. AGNIFILO:  First of all, I think they're very

15 much -- the witness said that she reached a conclusion that

16 Camila had been isolated and then said that's sounds familiar.

17 So that's clearly for its truth.  That's how the witness

18 intended it.  It's an utterly inappropriate line.

19          I don't understand why this witness' state of mind

20 is relevant to this trial whatsoever.  It doesn't matter.  It

21 it's not relevant what this witness did with Camila.  It

22 couldn't matter less.  It's not charged.  It's not part of the

23 narrative.  It has nothing to do with anything and they're

24 trying to bootstrap.  They call this person.  If they want to

25 call her, they can call her.  They call the witness.  They're

3016

1   trying to backdoor it by making statements how important this

2   is for the next stage of evidence which is inappropriate also.

3   I object to the whole thing.

4           MS. PENZA:  Your Honor, Mr. Agnifilo made the

5   speaking objection, but the point here is that when Daniela

6   said that she was concerned about her sister's isolation,

7   Daniela is speaking about her own feelings, her own concerns

8   at that point in time, and they are relevant.  They are very

9   relevant to the rest of the story.  Camila is the number one

10  DOS slave.  That is the, that is the defendant's stated

11  purpose and stated reason for why DOS exists.  And so the

12  following part of this narrative, of Daniela extricating her

13  sister from Clifton Park, bringing her back to Mexico, then

14  having the defendant's associates try and take her away again

15  and then bringing her back yet again is a very important

16  conclusion to this narrative.  It's all part of the

17  conspiracy, Your Honor.

18          MR. AGNIFILO:  This witness' feelings about her

19  sister are not relevant.  They're not relevant.

20          THE COURT:  All right.  What happened is relevant.

21  What Camila said to her sister is hearsay but it is not being

22  offered for the truth and I will give an instruction.

23          MS. PENZA:  Thank you, Your Honor.

24          THE COURT:  We will take an hour for lunch.

25          (Luncheon recess.)     (Continued on next page.)

CMH     OCR     RMR     CRR     FCRR

3017

1                    AFTERNOON SESSION

2           (In open court; outside the presence of the jury.)

3           THE COURT:  Please be seated in the back.

4           Did you want to --

5           MS. PENZA:  Yes, Your Honor.  Could we have a

6    sidebar, please?

7           THE COURT:  Sure.

8           (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25













3024

1          THE COURT:  All right.  Let's bring in the witness.

2          (Witness resumes the stand.)

3          (Jury enters.)

4          THE COURT:  Please be seated.

5          We are continuing your direct examination.  The

6   witness is reminded she is still under oath.

7          THE WITNESS:  Yes.

8          MS. PENZA:  Thank you, Your Honor.

9          Your Honor, I believe where we are going to pick

10  back up is in the conversations between Camila and Daniela so

11  I think this would be the appropriate --

12          THE COURT:  Yes.

13          Members of the jury, the witness is testifying in

14  answer to some questions about her conversation with her

15  younger sister in which she identifies certain statements made

16  by her younger sister.  Those statements are not being

17  admitted for the truth of the matters asserted in the

18  statements but only the effect that those statements had on

19  the witness.

20          So the jury should not accept the assertions being

21  made as to the statements of Camila except as to how that

22  affected the witness and not for the truth of the matters

23  asserted by those statements.

24          So let's move on.

25          MS. PENZA:  Thank you, Your Honor.

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                          3025

1    DANIELA     ,

2          the witness, having been previously duly sworn,

3          resumed as follows:

4    DIRECT EXAMINATION (Continued)

5    BY MS. PENZA:

6    Q    Daniela, before we broke, you mentioned that you had

7    concerns about your sister's money situation?

8    A    Yes.

9    Q    And she told you that there were difficulties with money?

10   A    Yes.

11   Q    And so what did you do in response to that?

12   A    I sent her money.

13   Q    How did you do it?

14   A    I sent her a book with a card inside it that could be

15   refilled from Mexico by me and she could use in the ATM to

16   withdraw money or to pay for things.

17   Q    And how much money did you put on the card?

18   A    A thousand dollars.

19   Q    Did you end up refilling that as well?

20   A    Yes, I believe with another thousand dollars.

21   Q    Were you able to tell how she was spending the money?

22   A    Yes.  Yes.

23   Q    How?

24   A    I could see the card was not -- I didn't open the card in

25   her name.  It was in my name.  So I had the user name and

CMH     OCR     RMR     CRR     FCRR

Daniela - direct - Penza                    3026

1   password to check on the cash card.

2   Q    And so what types of purchases would she make?

3   A    I saw that she withdrew large amounts, like, 300, 300,

4   and 400, so that -- because I told her to.  I wanted her to

5   have cash in case she needed it.  And I know that she bought

6   food with it.

7   Q    At some point, did you, did you have further -- did you

8   continue to have these communications with Camila?

9   A    Yes.

10  Q    And did you become increasingly concerned about Camila?

11  A    Yes.

12  Q    Why?

13  A    Well, first of all, even sending her the card was

14  difficult because she wouldn't tell me where she lived so I

15  wasn't able to -- I was going to Fed Ex it overnight and she

16  just wouldn't tell me where she lived and I never found out

17  where she lived.  I had to send it to a friend of hers, that

18  she gave me her address and she was going to intercept it.

19         And she -- we started, the communication increased

20  so that we actually would have conversations and I would be on

21  the phone with her for hours.  And I could tell that she was

22  having emotional ups and downs, and I knew from before that

23  she had downs, so I would ask her about that and I would ask

24  her about how she was doing.  We spoke about her job, about

25  how much she was being paid.  She thought it was unfair the

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                3027

1   way they were paying her and how much, the things that she was

2   allowed to do, not to do with regard to her job in Rainbow as

3   an MDS.  She didn't think she was receiving enough.  She was

4   doing too much.  And then I remember she was going to go to

5   V Week and was in charge of a big project, but they had only

6   given her, like, the exchange of going to V Week as payment.

7   We talked about that and she wasn't happy about it.

8   Q    Did she ever -- were there any other times where she

9   expressed fear?

10  A    Yes.  Our conversations also went in the way of her

11  relationship with Keith and my relationship with Keith that I

12  had had.  And from what we talked about, I learned that she

13  had tried to break up with him before and this really

14  concerned me because I went through something similar.  And

15  she was trying -- she was very upset that Marianna was having

16  a baby and had had a baby.  It was that transition point.  And

17  she was trying to break up with him and it really seemed like

18  she was getting nowhere and that was the point where I decided

19  to tell her everything that happened to me from the beginning

20  to the end.

21  Q    And what was your purpose in telling her that?

22  A    I wanted her to know that she wasn't crazy, that she

23  wasn't alone.  Some of the things that she was telling me

24  Keith told her were exactly the same things he told me.  So I

25  was trying to be there not as a sister, but as a woman for my

Daniela - direct - Penza                    3028

1    sister so that she could make a decision with all the

2    information, you know, that she knew what she was into and

3    make her own decision.  I just wanted her to know the truth.

4    Q    Did she ever indicate to you that she had to hide her

5    communications with you?

6    A    Yes.

7    Q    And what was -- how did that affect you?

8    A    Really fearful, I mean, the fact that she had to hide

9    them.  And there was a point in the text exchange, it was,

10   like, Keith walked in but he didn't notice, you know,

11   something like that.  And I, I don't know, maybe it was

12   irrational but I was frightened that something might happen to

13   her, that they might make her disappear or she would be put in

14   the room and disappear out of my site.

15            So at some point we came up -- I told her, I'm

16   concerned about you, you're illegally in the country, not

17   doing great, so if I text you and you don't text me back in

18   eight hours -- and this is word on words -- I will go full

19   psycho on them.  And that meant, I mean, I wasn't going to be

20   able to go to the country, but I would send people, I would go

21   and search for her and get her, because there were times where

22   she wouldn't answer the phone for the entire day.  Then she

23   would finally answer and say, I'm just having a really rough

24   day, and I knew what that meant.

25            So I was very, very afraid that in the middle of all

Daniela - direct - Penza                    3029

1   this media that was being focused on NXIVM, they might hide

2   her in an effort to, you know -- I saw her as a liability.

3   She was a liability.  Hide her and, like, do something with

4   her where I wouldn't be able to reach her.

5   Q    Did you put any further plans into place?

6   A    Yes.

7   Q    So what happened next?

8   A    I talked to her about fixing her immigration status.  I

9   said, Listen, if you, if you -- if we fix your immigration and

10  you want to go right back where you are, that's fine, you just

11  need to have the freedom, so if you wanted to do something

12  different, you can.  If you want to work for Rainbow, that's

13  fine, but you need to be legal because right now, you can't do

14  anything if you're illegal.  So we started planning on that

15  and I started planning with her to come back to Mexico.

16  Q    And what happened next?

17  A    It was really difficult.  I would have conversations with

18  her and she would have conversations with Keith and would tell

19  me, no, you know, he's telling me that I really, you know,

20  I've been here long enough, that, you know, I should wait for

21  the DACA thing and that they have connections and it would be

22  a waste if I don't go, if I go back now, I should really wait

23  for that.

24  Q    Do you know what DACA is?

25  A    I researched it and hired an immigration lawyer to find

Daniela - direct - Penza                    3030

1   out what that was and see if that was viable for my sister and

2   it wasn't.  It was just a way -- they would tell her that they

3   had lawyers, that Clare's lawyers would help her, and so it

4   was, like, a huge back and forth.  You know, she would talk to

5   me and tell me, Okay, yes, I want to do this.  And she would

6   talk to Keith and then it would be, like, she would have

7   another idea.  And there would be a few more conversations,

8   where I would like just logically tell her, Okay, so how much

9   do you have, just break it down and see what her decision was,

10  not just the manipulation.

11          So it took a while, but she made a decision and it

12  was her decision.  She made a decision.  I was just there to

13  just keep the reason in place of and I mapped it out and she

14  was very afraid.  I had given her enough money.  There were

15  times she was very scared about what was going on and I told

16  her to go to New York City maybe for the weekend so she

17  wouldn't have to be exposed to anything going on.  She was

18  afraid of going to the bus station and getting on a bus.

19  She's just frightened.  I think she's naturally paranoid,

20  that's her tendency, but she was full on paranoid, justifiably

21  so.

22          So I realized there was no way she was going to be

23  able to get to the bus station or to New York City.  I was

24  going to set up for an aunt that I have to go and pick her up,

25  someone that she knew.  I couldn't go.  I didn't have status

Daniela - direct - Penza                    3031

1   to go and get her.  So, but she was so frightened.  So what

2   ended up happening is I, I saw no way out and I, the only

3   person we could think of, and I was talking to my mother, was

4   my brother.  And at that time, my brother wasn't talking to

5   me, had not talked to me in seven years.  He talked to my

6   mother on and off just to fight.  And my brother had been

7   suspecting or had been experiencing a lot of things in NXIVM

8   that did not make sense to him including that my mother

9   having, my mother -- my sister having Keith's baby.

10              MR. AGNIFILO:  I'm going to object.

11              THE COURT:  Sustained.

12              THE WITNESS:  Sorry.

13   Q    So at that point in time, let just go to the point in

14   time -- you haven't been speaking to your brother in seven

15   years, you said?

16   A    Yes.

17   Q    At that point in time, what happens?

18   A    My, my brother calls my mother and they fight again and

19   he says --

20              MR. AGNIFILO:  Objection.

21              THE COURT:  Sustained.

22              MS. PENZA:  Your Honor, if I may, I think we could

23   give the same instruction.

24              THE COURT:  Is there going to be a follow up with

25   this witness about --

Daniela - direct - Penza                    3032

1          MS. PENZA:  What happens?

2          THE COURT:  Yes.

3          MS. PENZA:  Yes.

4          THE COURT:  All right.

5          Members of the jury, the conversation between the

6    witness' mother and her brother is not to be accepted for the

7    truth of the matter asserted, but only for the impression that

8    it placed on the mind of the witness and the witness' behavior

9    at that point.  So just as I said before, it is hearsay and it

10   cannot be considered for the truth of the statements being

11   made by either the mother or the brother, only the impression

12   that was created in the mind of the witness.

13          Go ahead.

14          MS. PENZA:  Thank you, Your Honor.

15   Q    So what happened?

16   A    So my brother insists to my mother and asks, which he was

17   doing at the time repeatedly, said nobody tells me anything,

18   there are things happening that don't make sense to me but

19   nobody will give me information, nobody gives me the data.

20   Please tell me, like, if there's something, just tell me

21   because I've asked.  And he told her that he had approached

22   Keith and he had approached other people and he was desperate.

23   And so my mother said call your sister, me, Daniela.

24          And so, for the first time in seven years, and I

25   remember because I was in my office and my mom was talking to

Daniela - direct - Penza                                3033

1    my brother like almost right next to me and they hang up, my

2    phone rings and it's my brother.  And we said hi very briefly

3    as if we never stopped talking and I said, Listen, there's no

4    time so I'm just going to tell you everything that happened.

5    And in about 30, 40 minutes, I just gave him -- I said, I'm

6    sorry, this is all very strong stuff but here it is.  And I

7    just told him beginning to end what had really happened, that

8    I had a relationship with Keith, I had a fallout, the

9    isolation, what actually had happened in the room, all of it.

10            And he was in shock.  And he says, listen, I, I'm

11   not saying that I don't believe you, but do you have any proof

12   of all of this that you're telling me?  And so that night, I

13   forwarded him some of the e-mails between Keith and me that

14   had taken place in the years prior and that's all it took.

15   And in that conversation, I said, Listen, this is not about

16   me.  You and I are fine.  You don't need to apologize.  I

17   don't blame you for anything.  We need to get Cami out.

18            MS. PENZA:  Your Honor, may I approach the witness?

19            THE COURT:  Yes, you may.

20   Q    Daniela, I'm showing what you are marked for

21   identification purposes as Government Exhibits 1570, 1571,

22   1572, 1577, 1610 and 1614.

23            Can you just take a look at those?

24            (Pause.)

25   Q    Daniela, are these copies of e-mails that you forwarded

Daniela - direct - Penza                          3034

1    to your brother Adrian in the conversation that we're

2    discussing or after the conversation we just discussed?

3    A    Yes.

4              MS. PENZA:  Your Honor, the government moves

5    Government Exhibits 1570, 1571, 1572, 1577, 1610 and 1614 into

6    evidence.

7              MR. AGNIFILO:  One second, Judge.

8              THE COURT:  Sure.

9              (Pause.)

10             MR. AGNIFILO:  No objection.

11             THE COURT:  All right.  Government Exhibits 1570,

12   1571, 1572, 1577, 1610 and 1614 are received in evidence.

13             MS. PENZA:  Thank you, Your Honor.

14             (So marked.)

15   Q    Daniela, I'm showing you what's in evidence as Government

16   Exhibits, Government Exhibits 1614, 1572, 1571 and 1610.

17             Are these all e-mails you sent to your brother

18   Adrian on October 19, 2017?

19   A    Yes.

20   Q    And some of these e-mails are e-mails that we looked at

21   yesterday?

22   A    Yes, they are.

23   Q    This is the one we had looked at that he responded to

24   with the brackets?

25   A    Yes.

Daniela - direct - Penza                    3035

Q     The defendant responded to?

A     Yes.

Q     And then just looking quickly at Government Exhibit 1570 and 1577, those are e-mails you're sending Adrian on October 23, 2017?

A     Yes.

Q     And they're just forwards again of the e-mails that we looked at yesterday?

A     Yes.

Q     So what happened after this conversation with your brother?

A     He didn't hesitate, which was something I had been afraid of, that if I ever told anybody they wouldn't believe me.  My brother did, which was a great relief.

          And so quickly after, we arranged for my brother to be the one who would drive Cami and I hired, I hired a person, a lawyer.  Obviously, there were a lot of concerns because she had been out of status for a long time.  I didn't want her to be deported or in jail or in any way at risk.  So my brother was also struggling with money quite a bit at the time and so I wired him a certain amount so that they would have -- they could drive from Clifton Park all the way to Austin, Texas. And there I arranged for my brother to hand her off to a trusted counsel that I have so that she could be brought over the border safely without being stopped or being in any kind

Daniela - direct - Penza                                    3036

1    of risk.

2    Q    And did that happen?  Was she brought over the border?

3    A    Yes.

4    Q    And did you meet her?

5    A    I met her in Mexico City, yes, I went and got her in

6    Mexico City.

7    Q    What was that like?

8    A    It was strange.  It was as if time had not passed.  It

9    was very emotional.  I was so happy to see her.  I was

10   relieved.  And she looked very skinny, she looked frail, but I

11   was happy to hold her.  I was very happy to hold her.

12   Q    What happened next?

13   A    I took her to the city where I live which is further down

14   south and she was with -- and I took her to the doctor.  And,

15   you know, just for the first, for the first week, it was, you

16   know, we, we had -- she had gotten rid of her phone and left

17   it behind, left it behind.  We had gotten a burner phone, they

18   call it, but really it's just a disposable phone, and

19   throughout the way, she had started using it, like, on the way

20   from Clifton Park to the border.  So she he started using it.

21          She kept checking in with people at NXIVM and they

22   kept trying to convince her not to leave for all these series

23   of reasons, Oh, that Brandon Porter was going to go to jail

24   because of you, oh, bad things are going to happen to Keith

25   because of you, oh, you are going to throw away the

CMH        OCR        RMR        CRR        FCRR

Daniela - direct - Penza                         3037

1   opportunity to take advantage of DACA, all of these reasons.

2   At some point midway, she actually wanted to stop and I

3   remember I had to talk to her for about two hours and I said,

4   Listen, baby, I'm not here to control you, I'm here to do

5   whatever it is you want to do, so if you want to head back,

6   Fluffy is going to turn around right now and take you back.

7   But she decided to keep going.

8           After she was in Merida, she was, like, desperate to

9   get a phone and there was a big fuss about this and then there

10  were messages that were being received.  I think we got her

11  like a SIM card and she was able to connect with people and

12  she was being asked to check in.

13          At some point, there was this woman called Rosa

14  Laura that was checking on her all the time and I remember my

15  brother contacting my mother saying, Rosa Laura keeps calling

16  me telling me that Cami needs to give the code.  What code?

17  That she's safe.  They came up with a code that she's safe?

18  What?  She's with family.  And I remember our conversation

19  about they thought we were going to do an intervention on her

20  and we were going to help -- we were going to hold her

21  captive.  And there was this huge, to me, it felt like

22  harassment, Cami needed to do this, Cami needed to do that,

23  but I promised her I wasn't going to control her.

24          So she had her phone and she had her communication.

25  And at one point the first week, she broke down and she

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                3038

1    started screaming at me.  And I remember we were in my car and

2    she was in the back and she said, You don't want me to,

3    ba-ba-ba, you want to control me like everybody else, you

4    treat me like I'm an idiot.  And she, like, went crazy.  And I

5    remember going, Whoa, whoa, Cami, I'll take you to the bus

6    station, I'll give you any amount of money you want right now,

7    you can do whatever you want, I'm not here to control you, I'm

8    not here to tell you what to do.  And so she was crying and

9    she was screaming.  Like, it was very dramatic.  She was --

10   something was going on.  And but I didn't want to push her.

11            So I remember, we were driving.  We stopped by the

12   drugstore to get something and she was crying hysterically.

13   So I got out of the car and I hugged her, and I, like, got her

14   out and I hugged her.  And she was so mad at me and she hugged

15   me so hard.  Don't let go.  Please don't ever let go.  Don't

16   leave me alone again.  So she wasn't -- she wasn't well, like,

17   she wasn't well but I was there to take care of her.

18            So she was in my home sleeping with me in my bed for

19   that first couple of weeks and then she was getting better, I

20   think.  I took her to the doctor.  She was okay.  I, you know,

21   was, like, trying to feed her proper food.  And then she told

22   me my father wanted to visit her and my father was going to

23   come and, like, visit her where we were at in the city where I

24   live.  But, of course, my father doesn't talk to me so he was

25   just going to visit her so he wasn't going to come home.  They

Daniela - direct - Penza                3039

1    were going to meet and my father had asked her to book a room

2    and they booked a room and they were just going to spend some

3    time together, like a day or two.

4    Q    And are you present while Cami is making these

5    arrangements for the room and other things?

6    A    With my dad?  Yes, so much so, that I knew which hotel

7    they were going to stay at.  My dad wanted to stay at a very

8    nice hotel.  So I helped her choose the hotel.  She chose the

9    hotel and I went to drop her off at the airport where they

10   were going to meet and they were just going to spend a couple

11   of days together.  Beautiful city, so that made sense.

12   Q    Daniela, at that point in time, was your understanding

13   that your father was still loyal to the defendant?

14   A    Yes.  Yes.

15   Q    Did that leave any concerns with you about having Camila

16   go with him?

17   A    I mean, at that point, I thought he was just visiting so

18   it wasn't, it was not a concern.  I thought, no, she's back in

19   Mexico and he wants to see her.

20   Q    At that point in time, do you know where the defendant

21   was living?

22   A    Yes, he was, he was in Clifton Park, I believe.

23   Q    Okay.

24   A    So my father -- was it -- yes.  My father came and

25   visited.  And I remember the first day, I even remember Cami,

Daniela - direct - Penza                    3040

1  like, talking to me before meeting him and saying, you know,

2  you know, My dad really doesn't get that, basically that

3  you're good and you're not bad, so I'm going to talk to him,

4  you know, maybe he can understand.  It was, it was nice.  It

5  was friendly.

6          So, the first day, you know, I text her.  How's it

7  going?  Good.  We went and visited this and that.  There was a

8  bit of exchange.  Same the next day.  But then I stopped

9  hearing from her.  And I'm, like, Okay, Cami where are you?

10  Cami, how's it going?  Hey Cami.  Hey Cami.  And a day goes by

11  and then I was, like, what is going on?  And I thought I was

12  being irrational because I was super paranoid, super

13  protective of Cami at the time, but I got really paranoid and

14  she wouldn't answer the phone and she wouldn't answer the

15  phone.

16          So I called the hotel where they were staying at and

17  they tell me, No, no, they checked in yesterday -- they

18  checked out yesterday.  And so I was, I was furious.  My dad

19  had taken my sister from right under me.  I had just gotten

20  her back and she was gaining some freedom and he just took her

21  right from under me.  And nobody would answer the phone.  He

22  wouldn't answer the phone.  Cami wouldn't answer the phone

23  and, like, a couple of weeks went by and we're all trying to

24  find out.  Like, Fluffy's calling my dad's home and talking to

25  the maid there and she says she's not here.  I would tell her

CMH      OCR      RMR      CRR      FCRR

Daniela - direct - Penza                    3041

1    I love her.  She's not here.

2         We're calling family to see if she's in my hometown.

3    Maybe he took her back to my hometown.  Nothing.  I don't know

4    where she went.  To this day, I don't know where she was

5    because a couple of weeks, she actually made contact and we

6    had made plans.  You know, she was going to be with us for, I

7    think it was, at that point, it was for, like, for

8    Thanksgiving or Christmas, for end of year.  We had made

9    plans.  And she told me, Oh, I just, I had, I had, you know --

10   I had this stomach flu and so my dad decide, you know, he was

11   going to take care of me, he took me with him.  I said?  That

12   makes no sense.  You got the stomach flu.  You don't want to

13   be on the plane.  You don't want to be away.  I said:  Where

14   are you?  She said she was in my hometown, in my childhood

15   home, but everybody else said she wasn't there.

16        So, basically, she made it back to Merida and she

17   was very little.  She was wearing sunglasses.  She was even

18   skinnier.  She had, like, this big, like, infection in her

19   eyes.  I, I know I was very paranoid at the time and, again,

20   all of this made me completely -- I thought maybe she could

21   have been poisoned or could have had something, like, really

22   serious because she looked -- I took her to the doctor

23   immediately and she had all sorts of infections and it had

24   been just a couple of weeks.  Like, you know, it wasn't a very

25   long span of time and to this day, I don't know where my dad

Daniela - direct - Penza                    3042

1    took her.

2          She spent a little bit, like, a few more weeks with

3    us with, with me, and but she already talked to some people

4    because she had some plans.  Oh, the Rainbow Center in

5    Guadalajara offered her a job and was going to pay me $10,000.

6    Q    10,000 U.S.?

7    A    10,000 US was the job offer that she received from

8    Rainbow.

9          (Continued on next page.)

Daniela - direct - Penza                    3043

1    DIRECT EXAMINATION (Continuing)

2    BY MS. PENZA:

3    Q    Did you get concerned when you heard that it was $10,000

4    U.S.?

5    A    Yes.

6    Q    Why?

7    A    Because it's absurd.  It's an absurd amount, even for

8    what she was getting paid when she was in the U.S.  To me, it

9    was just bait for her not to -- her not to have her freedom

10   basically.

11          And sure enough -- you know, and there were people

12   calling, this man called Jack Levy kept calling my brother and

13   telling him how bad it was that Cami wasn't there, and then

14   this Jack Levy was the one involved in this job offer, that he

15   was the one who arranged for her to have a chauffeur all the

16   way from the south.

17          MR. AGNIFILO:  Your Honor, it is all hearsay.

18          Objection.

19          THE COURT:  Yes.  Yeah, that is sustained on this

20   discussion about this individual.  Let's just move on to the

21   next question.

22   Q    So at that point in time -- but you have concerns about

23   this job offer?

24   A    Yes.

25   Q    Does Cami leave?

Daniela - direct - Penza                           3044

1    A    Yes.

2    Q    And did you understand her to be going to Guadalajara?

3    A    Yes.

4    Q    How did she get there?

5    A    She got there, I understand -- she told me that she got

6    to Cancún by bus and then a chauffeur drove her all the way

7    from Cancún to Guadalajara.  That's what she told me.

8    Q    Did you -- after that, when did you speak to your sister

9    Camilla next?

10   A    After that, the communication was really erratic.  It was

11   a while after I spoke to her next and not as fluid.

12   Q    At some point did you visit your sister Camilla in

13   Guadalajara?

14   A    Yes.

15   Q    Can you describe what that was like?

16   A    Yes.  I went to an industry show there and I visited her

17   and she didn't talk a lot about what she was doing in Rainbow,

18   though she told me she was still working there.  But she was

19   struggling with money still, clearly, so I asked her point

20   blank if she had gotten paid and she just like went around the

21   subject.

22   Q    Did you continue to be concerned about Camilla then?

23   A    Yes.

24   Q    At some point, did your communication with Camilla pick

25   up again?

Daniela - direct - Penza                    3045

1    A    Yes.

2    Q    When was that?

3    A    Well, it was recently again -- I mean, we have been in

4    communication throughout.  I mean, one of the things that I

5    received her with was her birth certificate.  I had already

6    gotten her her birth certificate, so what I was trying to do

7    is get her ID, get her health insurance, just get her set up

8    so she could do something.  And, so, I mean, maybe a few

9    months ago, I -- and throughout, I know -- I learned she got

10   her ID and I think she even got a passport, and she still was

11   working at Rainbow, but she had no money.  So she's -- like no

12   money, like I could see -- like I visited again and she had no

13   money and I learned that, you know, she -- like at some point

14   I asked her, you know, what she had needed or something, and

15   she said oh, that's not a luxury I can afford now.  Okay, so

16   we're back to square one.

17   Q    Did you take any steps at that point?

18   A    Yeah.  Yeah.  Similar steps.  Also, she had been promised

19   that they were going to help her get into school, because she

20   really wanted to go to school, and the semester went by, a

21   year went by.  That was part of the plan of her going to

22   Guadalajara is she was going to be able to work there, at this

23   awesome salary, and through contact they were going to get her

24   in school.  Did not happen.

25                So I kept asking her about that, just following up,

Daniela - direct - Penza                    3046

1    making sure that she could get to school.  And I did take

2    steps about, again, money, making sure she has money, making

3    sure she has what she needs and pushing for her to go to

4    school.

5    Q    At some point did -- at some point the defendant was

6    arrested?

7    A    Yes.

8    Q    Did that have any impact on the change in communication

9    with you and Camilla?

10   A    Yes, she went silent.

11   Q    And then it picked back up again more recently?

12   A    Yes.

13   Q    When is the last time you spoke to Camilla?

14   A    Last night.

15   Q    And have you -- is she still working for Rainbow?

16   A    I think so.

17   Q    Do you have -- have you spoken to her about any plans for

18   her future?  Have you been helping arrange anything?

19   A    Yes.  The plan is for her to travel for a bit and then go

20   to school and do -- study what she wants.

21   Q    And how is -- what is her lifestyle like right now?

22   A    I think she's a bit secluded because of everything that's

23   going on.  I know that the media has been reporting quite a

24   bit about it and that's heavy on all of our lives.  But, you

25   know, she has friends.  She has some friends.  I don't know

Daniela - cross - Agnifilo                    3047

1    how many friends, but she has friends.  She changed her look.

2    She has, I would say, a more normal life.

3    Q    When you say she changed her look, what did she do?

4    A    She cut her hair, dyed it blonde.

5    Q    And she has been in communication with you the past few

6    days?

7    A    Yes.

8    Q    Has she told you that she loves you?

9    A    Yes.

10             MS. PENZA:  No further questions, Your Honor.

11             THE COURT:  Cross-examination.

12             MR. AGNIFILO:  Thank you, Judge.

13   CROSS EXAMINATION

14   BY MR. AGNIFILO:

15   Q    Good afternoon, Daniela.

16   A    Good afternoon.

17   Q    My name is Mark Agnifilo.  I am Keith Raniere's lawyer.

18   I am going to ask you a few questions.  If I ask you a

19   question that is not clear, feel free to ask me to rephrase it

20   and I am happy to do that.

21   A    Okay.  Thank you.

22   Q    Did you make Camilla a fake identification card for her

23   to leave the United States?

24   A    Yes.

25   Q    You didn't tell us about that on direct examination, did

Daniela - cross - Agnifilo                    3048

1   you?

2   A    No.

3   Q    Okay.  So tell us about it now.

4   A    Well, I made a fake ID.

5   Q    Okay.  How did you do that?

6   A    I -- I didn't make it myself.  I had somebody else make

7   it.

8   Q    Go ahead.  Tell us who, how did you do it, why did you do

9   it?

10  A    So, I had a person in Mexico City make the ID and they

11  made it and I got it.

12  Q    Did you make one fake ID card or more than one?

13  A    I made one.

14  Q    Yeah.  And what was it?

15  A    It was -- it was a -- a Mexican ID.

16  Q    From -- like a national Mexican identification card?

17  A    Yes.

18  Q    Okay.  And this was a contact that you had through your

19  mother?

20  A    It was -- yes.

21  Q    Okay.  And whose idea was it to make Cami a fake ID so

22  that she could leave the United States?

23  A    Could I clarify that?  It wasn't to leave the United

24  States.

25  Q    What was it for?

Daniela - cross - Agnifilo                    3049

1    A    It was so she could travel by plane within Mexico.

2    Q    Okay.  And whose idea was it to make this fake Mexican

3    national identification card for your sister?

4    A    It was mine.

5    Q    And did you speak with anybody before you decided to have

6    this fake identification card made?

7    A    Yes.

8    Q    Who's that?

9    A    I spoke to a lawyer.

10   Q    A Mexican lawyer or an American Lawyer?

11   A    A Mexican lawyer.

12   Q    Based where?

13   A    Out of Mexico.

14   Q    And who suggested the idea of the fake ID card, you or

15   the lawyer?

16   A    I think it was my idea.

17   Q    And you told the lawyer you were going to make a fake

18   Mexican national identification card for your sister?

19   A    I think so, yes.

20   Q    And the lawyer was okay with that?

21   A    I mean, I suppose.

22   Q    But you told the lawyer?

23   A    He was aware.

24   Q    Was he aware of it because you told him?

25   A    Yes.

Daniela - cross - Agnifilo                        3050

1    Q    What's Tepito?

2    A    It's an area within Mexico City.

3    Q    And does the area Tepito have any relevance in you

4    creating this fake identification card?

5    A    I don't know.  I think that's where the person who made

6    it was at, but I am not sure.

7    Q    And who made it?

8    A    I don't know.

9    Q    Who did you speak to in order to get it made?

10   A    I didn't speak to anybody directly.

11   Q    How did you go about doing it?

12   A    It was, as I remember -- as I remember, it was my mom who

13   spoke to someone.

14   Q    Did you tell the Government that you had made a fake

15   Mexican national identification card for Cami to be able to

16   fly in Mexico?

17   A    I think I did.

18   Q    Yeah?  When do you think you told them?

19   A    I don't remember exactly.  I think it was -- I don't

20   remember exactly.

21   Q    Now, you talked a lot about situations that developed

22   that led to you being in that room for almost two years,

23   right?  On direct examination?

24   A    I'm sorry, can you repeat that.

25   Q    Sure.  Let me ask you a different question.

Daniela - cross - Agnifilo                    3051

1   A    Okay.

2   Q    You had stolen many different things from many different

3   people over the course of many years while you were in Clifton

4   Park; isn't that right?

5   A    No, I don't think that's right.

6   Q    No?  So you stole the $6,000, right, you talked about

7   that?

8   A    Yes.

9   Q    You stole from stores, didn't you?

10  A    I'm sorry, I don't -- I don't know what you're talking

11  about.

12  Q    Did you ever steal anything from a store in and around

13  Clifton Park?

14  A    I don't remember.

15  Q    You don't remember?

16  A    I don't.

17  Q    Did you steal things from people's houses?

18  A    I -- as I said, I took money from Flintlock for food.

19  Q    Okay.  Other than Flintlock, did you ever steal anything

20  from a house other than 3 Flintlock?

21  A    No, not that I remember.

22  Q    Okay.  Did you ever steal a stereo from your brother

23  Fluffy?

24  A    No, not that I remember.

25  Q    No?  You are not saying no; you are just saying not that

Daniela - cross - Agnifilo                     3052

1    you remember?

2    A    Yes.

3    Q    You are not saying it didn't happen?

4    A    I don't think it happened.  I don't remember it.

5    Q    Did you steal from a Walmart?

6    A    No, I don't think so.

7    Q    Did you steal from any store?

8         MS. PENZA:  Your Honor, I just want to make sure --

9    Your Honor, may we have a sidebar?

10        THE COURT:  All right.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                3053

1          (Sidebar held outside the hearing of the jury.)

2          THE COURT:  What's the problem?

3          MS. PENZA:  I want to make sure Mr. Agnifilo has a

4    good faith basis for his questions, because there is a lot of

5    stuff that the defendant has said that has happened that are

6    just untrue.  And if it's just the defendant's fantasy, I

7    don't want her being harassed on cross-examination about it.

8          THE COURT:  Well, that's fair enough, but --

9          MR. AGNIFILO:  I will make out what the good faith

10   basis is, I will go to the next question.  I will go right to

11   it.  She wrote it herself and I will confront her with what

12   she wrote.

13         THE COURT:  Okay.  Go ahead.

14         (Sidebar concluded.)

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3054

1    BY MR. AGNIFILO:

2    Q    Ms. --

3             MR. AGNIFILO:  One second.

4    Q    So let me ask you some specific questions.

5    A    Okay.

6    Q    Did you steal -- you said you did not steal anything from

7    a Walmart?

8    A    No.

9    Q    Is there a store called Arlene's in the area of Clifton

10   Park?

11   A    I don't know.

12   Q    Marshals?

13   A    That I do know, yes.

14   Q    Did you steal from Marshals?

15   A    No.

16   Q    All right, I'm going to show you what -- it's already in

17   evidence.  It is Government Exhibit 907, page 109.

18             This is -- I think you reviewed this with Ms. Penza

19   on direct examination?

20   A    Yes.

21   Q    I think it was attached to an e-mail as part of your

22   breach plan?

23   A    An e-mail?

24   Q    No, I'm sorry.  It was attached to a letter as part of a

25   breach plan that you had sent to Keith, if I'm not mistaken.

Daniela - cross - Agnifilo                    3055

1   A    Right.

2   Q    Okay.  It says stores; it says:  Pay back what taken,

3   Hannaford, Walmart, Arlene's, Marshals, and then it says

4   Cohoes.

5        You wrote this; right?

6   A    Yeah, I think so, yes.

7   Q    This is your handwriting?

8   A    Yes, it is.

9   Q    Why did you write it?

10  A    I don't remember.  I mean, honestly, at that point, I was

11  trying to, one, grasp what the ethical breach was and try to

12  do everything I could to fix it, but I also was in a very kind

13  of broken state, like a lot of things had already happened.

14  And I don't remember this in particular, so I will say that,

15  but a lot of the things, even in this very list, are

16  completely exaggerated, overblown things that I wanted to just

17  make a grand thing.  I did all this bad and now I'm going to

18  do everything to fix it.  Like a lot of the things on this

19  list are like that.  Perhaps that is some of it.

20  Q    I just want to focus you on stores.

21  A    Okay.

22  Q    This is something you wrote and you decided to put an

23  entry for stores; right?

24  A    Yes.

25  Q    And you then decided, next to stores, to put pay back

MDL        RPR        CRR        CSR

Daniela - cross - Agnifilo                    3056

1   what taken, and then you mention a number of particular

2   stores; right?

3   A     Yes.

4   Q     And why did you choose these stores?

5   A     I don't know.

6   Q     Are you saying that you put them on the list but you

7   didn't take anything from those stores?

8   A     That may be.  I don't remember.

9   Q     You don't remember?

10  A     I don't.

11  Q     Do you remember writing this?

12  A     I don't.

13  Q     No?  You don't deny that you wrote it?

14  A     No, I'm pretty sure this is my writing and that's my

15  letter, yes.

16  Q     You said that when your father and Kristin Keeffe was

17  taking you -- were taking you to Mexico, you stole money out

18  of your dad's wallet; right?

19  A     Yes.

20  Q     That's in addition to the money he gave you; right?

21  A     He hadn't given me any money yet.

22  Q     So you stole the money and then he gave you some extra

23  money; correct?

24  A     Again, it wasn't extra and I didn't keep what I had

25  taken.  I had given it back, yes.

Daniela - cross - Agnifilo                    3057

1   Q     Hadn't your father and you had conversations in the past,
2   before that time, about you stealing things?
3   A     Yes.
4   Q     And didn't your father express disappointment with you
5   over the fact that you had stolen things?
6   A     Yes.
7   Q     All right.  I want to ask you a few questions about your
8   father.
9   A     Okay.
10  Q     You talked about your father on direct examination.  He
11  went to college; right?
12  A     Yes.
13  Q     And you said he attended college on a scholarship?
14  A     Yes, he did.
15  Q     He was a good student; is that true?
16  A     That's what he told me, yes.
17  Q     And he was a good athlete from what you were able to even
18  observe of him at a fatherly age; correct?
19  A     I thought so, yes.
20  Q     And he placed value on your education; right?
21  A     Yes, he did.
22  Q     He placed a value on education, in general, for all of
23  his four children; correct?
24  A     Yes.
25  Q     And he place a value on sports and competition?

Daniela - cross - Agnifilo                    3058

1    A    Yes, I think that's fair to say.

2    Q    I think you said your father said it was important for

3    you and your siblings to devote time and energy to sports;

4    correct?

5    A    Yes.

6    Q    And he wanted you to be successful and competitive, fair

7    to say?

8    A    You mean in sports?

9    Q    Yeah.

10   A    Yes, I think so.

11   Q    You played tennis; correct?

12   A    Yes.

13   Q    And some of your siblings played tennis?

14   A    Yes.

15   Q    He didn't just want you to play tennis, he wanted you to

16   play tennis well, fair to say?

17   A    Fair to say, yes.

18   Q    He also placed value on achievement; is that right?

19   A    Yes.

20   Q    Yeah, I mean, achievement in education; he wanted you to

21   get good grades, right?

22   A    Yes.

23   Q    He wanted your siblings to get good grades, right?

24   A    Yes.

25   Q    He wanted you to do well in the world; right?

Daniela - cross - Agnifilo                    3059

1    A    Yes.

2    Q    And he, himself, was a successful businessman?

3    A    I thought so, yes.

4    Q    You said he worked for a manufacturing company that made

5    tools for drilling?

6    A    He owns that, yes.

7    Q    Right, and at some point he owned it; correct?

8    A    Yes.

9    Q    Okay.  And he made a decent income, you had -- I think

10   you described your childhood as very positive, not wanting for

11   things; is that fair to say?

12   A    That's fair to say.

13   Q    He was a good provider as a father?

14   A    Yes.

15   Q    And I think you said at one point that your parents did a

16   good job at filling you and your siblings' free time with

17   activities?

18   A    Yes.

19   Q    English lessons; right?

20   A    Yes.

21   Q    Did you play the piano?

22   A    Briefly.

23   Q    Okay.  Now, you said at one point that you took the

24   16-day intensive in Mexico; correct?

25   A    Yes.

Daniela - cross - Agnifilo                    3060

1   Q    Okay.  And Lauren taught it, Lauren Salzman taught it?

2   A    Yes, that's what I remember.

3   Q    And I think that you described -- at this point, you had

4   decided you were going to go to Switzerland and go to school

5   in Switzerland; correct?

6   A    Yes.

7   Q    And this was sort of like your farewell gift before you

8   went off to Switzerland, fair to say?

9   A    Yes.

10  Q    And you said that Lauren was bubbly and enthusiastic?

11  A    Yes.

12  Q    What did you mean by that, describe what you remember.  I

13  know it's a long time, but you said she was bubbly and

14  enthusiastic.  Just tell us more about how she was and how she

15  impressed you?

16  A    She had a very -- well, she had a very, like, cheerful

17  presence.  She is very energetic.  She was young.  She looked

18  very -- she looked successful to me.  She looked like someone,

19  you know, successful.

20  Q    And many of the other people who were taking the course

21  were successful people in Mexico; correct?

22  A    Yes.  That's what I could gauge.

23  Q    Right, one was the child of the former president of

24  Mexico, I think we talked about him, Emliano?

25  A    Yeah.  I don't know if it was that intensive, but he was

Daniela - cross - Agnifilo                    3061

1    part of ESP later I learned, yes.

2    Q    And someone named Loreta Garza was there, right?

3    A    Yes.

4    Q    Who is the Garza family?

5    A    How do you mean?

6    Q    Were they someone of any note in Mexico?

7    A    I don't know.

8    Q    And Rosa Laura, do you remember if she was there?

9    A    No, she wasn't there.

10   Q    She wasn't at that one, okay.

11        And the Boone brothers, Omar and Edgar?

12   A    Yes.

13   Q    Now, was the mission module part of the 16-day intensive

14   in your first intensive, do you remember?

15   A    Yeah.  Yes, I think so.

16   Q    Okay.  And I think you said, on direct examination, that

17   you recall there being some mathematical equation about the

18   end of the world?  Am I remembering this right?

19   A    Yes.

20   Q    Are you clear about that?

21   A    Yes.

22   Q    Yeah?  Do you remember that the discussion in the mission

23   module was more around the fact that the earth's resources are

24   becoming more scarce as time goes on, was that part of the

25   class?

Daniela - cross - Agnifilo                    3062

1   A     I'm sorry, what resources?

2   Q     The earth, natural resources.

3   A     I'm sorry, I don't remember that.

4   Q     Okay.  And that humans have taken a great toll on the

5   planet in different areas, do you remember that being part of

6   that class?

7   A     Not exactly, no, I don't remember.

8   Q     Do you remember there being sort of a graph done that if

9   things continue to -- along the current path that we would be

10  sort of running out of resources and things like that down the

11  road without a specific fixed time?

12  A     I don't remember that.

13  Q     Do you remember the math equation -- you said there was a

14  math equation, do you remember what it was?

15  A     There was a math equation mentioned.  It wasn't

16  presented.

17  Q     Okay.  And mentioned in what context?

18  A     In the context that Vanguard had done a calculation, a

19  math equation, taking into account all that was going on in

20  the world and all the destruction, at the pace that it was

21  going, the world was going to be -- like to end, to be

22  irreversible at some period of time.

23  Q     Irreversible, meaning that things were going to get so

24  far gone that it would be hard to reverse the effects; right?

25  A     Yes, that is what I remember.

Daniela - cross - Agnifilo                3063

1   Q    Now, you decided not to go to school in Switzerland;
2   right?
3   A    That's correct.
4   Q    And your parents let you make this decision?  This was
5   effectively your decision as to what you wanted to do with
6   your education; correct?
7   A    Yes.
8   Q    And you decided you wanted to go to Clifton Park and
9   pursue NXIVM's teachings; correct?
10  A    May I clarify?
11  Q    Please.
12  A    Yes, it wasn't to pursue the teachings but to be able to
13  help the mission.
14  Q    Okay.  Okay, fair enough.  So rather than going to school
15  in Switzerland, you wanted to come to Clifton Park, that area,
16  and promote the mission?
17  A    Yes.
18  Q    Okay.  And just remind us, what's your vision of what the
19  mission is?
20  A    My vision of -- at that point?
21  Q    Yeah.
22  A    I thought that ESP and, you know, the text that it had
23  created and this great man was going to in some way help
24  change the course of things.  So that was the general idea.
25  Q    And you wanted to be a part of it?

MDL       RPR       CRR       CSR

Daniela - cross - Agnifilo                     3064

1    A    I wanted to help, yes.

2    Q    At some point, you said that you remember first meeting

3    Keith Raniere?

4    A    Yes.

5    Q    Okay.  I think you said, on direct examination, the first

6    time you met him you realized he wasn't normal?

7    A    I'm sorry?

8    Q    What you said on direct examination is when you first met

9    him you realized he wasn't normal?

10   A    Yes.

11   Q    What do you mean by that?

12   A    Not in a bad way.

13   Q    That's okay.  However you meant it.

14   A    I meant he wasn't a regular guy, that he had -- you know,

15   I felt he was like -- I thought I could tell he was smart from

16   the way he behaved and the way he looked, that he was a little

17   odd but in a good way, so that he wasn't like everybody else,

18   he was like someone special.

19   Q    Okay.  I think you said he was geeky?

20   A    Geeky, yes.

21   Q    I think you described him as soft spoken?

22   A    Yes.  Soft spoken, yes.

23   Q    Attentive?

24   A    Yes.

25   Q    And that he had a sweet presence?

1  A    Yes.

2  Q    What made you think he had a sweet presence?

3  A    I think, in part, the characteristics aforementioned; the

4  attentiveness, the soft-spokeness.  I think I interpret that

5  as sweet.

6  Q    Do you remember the first time that you actually had an

7  interaction with him?

8  A    I think that was the first time, yes.

9  Q    And where were you exactly?

10  A    I remember at the -- at the V week location, like the --

11  I forget now.  It's not Silver Lake.  Pyramid Lake.

12  Q    So you were at Pyramid Lake for V week, so we are talking

13  about late August or so; right?

14  A    Yes, I think so.

15  Q    And do you remember where you and he were the first time

16  you met?

17  A    Not exactly, no.

18  Q    And do you remember -- what do you remember about that

19  first conversation, if anything?

20  A    I remember that interaction, I remember what I said

21  before.  I remember that my parents were there.  I remember --

22  that's what I remember.

23  Q    All right.  So your parents were there and you were

24  there; right?

25  A    That's what I remember, yes.

Daniela - cross - Agnifilo                    3066

1   Q     None of your other siblings?

2   A     No.

3   Q     So you were the first of your siblings to be in the

4   Albany area?

5   A     Yes.

6   Q     And, at one point, you said that your older sister

7   Marianna was back in Mexico and she was kind of struggling,

8   fair to say?

9   A     Yes.

10  Q     And Marianna, you said, was in trouble with your parents?

11  A     Yes.

12  Q     And that she had been grounded?

13  A     Yes.

14  Q     Do you remember how long a period of time Marianna had

15  been grounded?

16  A     No.

17  Q     Do you remember what she did to get grounded?

18  A     Yes.

19  Q     What did she do?

20  A     I remember it was -- it was an instant where they broke a

21  piñata in a supermarket, that's what I remember.

22  Q     And she was grounded for a number of days; correct?

23  A     I don't remember.  I don't think I knew that, that piece

24  of information.

25  Q     By grounded, she wasn't permitted to leave the family

Daniela - cross - Agnifilo                    3067

1   home; right?

2   A     No.  No, that's not what grounding is.

3   Q     Go ahead, what's grounding?

4   A     At least in my home, how it worked is, you know, not

5   allowed to go to parties, in her case.

6   Q     So, for a period of time, she -- there were certain

7   things she couldn't do?

8   A     Yeah.  I think strictly going to parties.

9   Q     Just going -- she could do everything else?

10  A     Yeah, I think so.

11  Q     I think you said, on direct examination, you were worried

12  about her though?

13  A     Yes.

14  Q     She had been acting out so much, you were worried about

15  her?

16  A     Yes.  Amongst other things, the acting out.

17  Q     And you told her that she should come and stay with you

18  in Clifton Park; correct?

19  A     Yes.

20  Q     And she did.  So how long were you in Clifton Park before

21  Marianna got there, if you had to estimate?

22  A     I don't remember exactly.  It may have been -- I don't

23  remember exactly.

24  Q     Okay.  And I think you said that Marianna and Pam Cafritz

25  became very friendly very quickly?

Daniela - cross - Agnifilo                    3068

1    A     Yes.

2    Q     And what was your relationship with Pam?

3    A     As I remember, nonexistent.

4    Q     No?  Did Pam ever leave you money places?

5    A     I'm sorry?

6    Q     Would Pam ever leave you money; like in a car, would she

7    sort of leave you things from time to time?

8    A     No.

9    Q     No?  Okay.

10         Pam and Marianna, how -- how -- they started living

11   together; correct?

12   A     Yes.

13   Q     So it was Keith, it was Pam Cafritz, it was Kristin

14   Keeffe, it was Karen Unterreiner, and then it was your older

15   sister Marianna; correct?  All living together at one point in

16   time?

17   A     At one point in time, yes.

18   Q     And I think you said when Marianna got to Clifton Park

19   she started playing tennis again?

20   A     Yes.

21              (Continued on following page.)

22

23

24

25

Daniela - cross - Agnifilo                              3069

1  (Continuing)

2  Q    And she was sort of doing better than she was back in

3  Mexico?

4  A    I thought so, yes.

5  Q    When she was in Mexico, before she ever came to

6  Clifton Park, she had an eating disorder; is that fair to say?

7  A    Yes.

8  Q    Okay.  She suffered from bulimia?

9  A    Yes, she did.

10 Q    Okay.  Now, you were working in the administration

11 office, correct, when you first got there in 2003?

12 A    Yes.

13 Q    And you were bored there.  That's not what you came --

14 this wasn't the part of the mission you wanted to do.  You

15 thought that your talents were being wasted there; fair to

16 say?

17           I can ask you a different question.

18           You didn't want to be working there.

19 A    Yes.

20 Q    Why not?

21 A    I think that's correct.

22           It's not at all what I -- I -- I thought it was

23 going to be.

24 Q    Okay.  What did you think it was going to be?

25 A    I thought they were going to do as they said.  I thought

VB        OCR        CRR

Daniela - cross - Agnifilo                    3070

1    that they were going to teach me the programming language that

2    they were using, and that I was going to be able to program

3    and work, and that I was going to have an experience of a

4    self-sufficient life for that year, and that I would be able

5    to contribute to the mission.

6    Q    Okay.  And when you say program, you mean computer

7    programming?

8    A    Yes.

9    Q    And you had a conversation with Keith about this; right?

10   A    Yes, I did.

11   Q    And you approached Keith and you said, I'm working in the

12   administration office and this isn't what I want to be doing.

13   I want to do more than this.  Something along those lines,

14   right?

15   A    Yes.

16   Q    And Keith was attentive to what you were saying to him;

17   fair to say?

18   A    Yes.

19   Q    Okay.  He listened to you; correct?

20   A    Yes.

21   Q    He asked you some questions.  He asked you, tell me what

22   you want to do with your life; right?

23   A    Yes, as I remember.

24   Q    He asked you what you had done so far in different areas

25   of your education; right?

Daniela - cross - Agnifilo                    3071

1   A    Yes.

2   Q    He asked what your plans were for the future; right?

3   A    Yes.

4   Q    And he asked you specifically about math, what background

5   you had in math and, you know, trying to gauge sort of what

6   your aptitude was in math; fair to say?

7   A    Yes, that's what I remember.

8   Q    All right.  And you said he wrote some equations on a

9   board.

10  A    Yes.

11  Q    And you -- this is what you're describing, sort of brain

12  teasers?

13  A    Yeah, those were not it.

14  Q    Okay.

15  A    With that, also.

16  Q    Okay.  All right.  Let's stick with the equations.

17       The equations he wrote on the board, was it just you

18  and him?

19  A    Yes.

20  Q    And where were you exactly?

21  A    We were at the Center.

22  Q    All right. And the Center -- what's the Center?  When you

23  say the Center, what happens at the Center?  What different

24  things are at the Center?

25  A    Oh, the Center -- I'm sorry.

Daniela - cross - Agnifilo                    3072

1  Q    That's okay.

2  A    Was a place where intensives would be held.  Those

3  classes would be held there.  Origins classes would be held

4  there.  There was a little, like, cafe area and there were

5  different meeting areas in, like, for people to go and work

6  and spend time.  And sometimes during the intensives, there

7  would be forums and there would also be community events being

8  held there.

9  Q    Okay.  So he writes this equation on the board and you

10 solve the equation; right?

11 A    No.

12 Q    No?  You didn't solve the equation?

13 A    No.

14 Q    Do you remember what did happen?

15 A    Yes.

16 Q    Go ahead.

17 A    When he wrote those things on the board, he just was

18 asking me if I knew what those were.

19 Q    Okay.  And did you?

20 A    I think the first one I did.  And then the other ones, I

21 didn't.  It's -- I think they were part of, like, higher level

22 calculus.

23 Q    Okay.  And so said at one point, before this -- did you

24 steal the $6,000 before or after this exchange with Keith?

25 A    I don't remember exactly.

Daniela - cross - Agnifilo                    3073

1   Q    So at one point you said you steal the $6,000; right?

2   A    Yes.

3   Q    Okay.  And it's cash in Karen Unterreiner's drawer?

4   A    Yes.

5   Q    And it's just sitting there and you take it and you walk

6   out with it; right?

7   A    Yes.

8   Q    And then you said you felt guilty about it and you put it

9   back.

10  A    Yes.

11  Q    All right.  And you told Keith what you had done; right?

12  A    Yes, I did.

13  Q    And why did you tell Keith?

14  A    As I said before, I -- I was conflicted in myself.  I --

15  I knew what I had done was really wrong and beyond just

16  putting it back.  I was having a very hard time understanding

17  why; how I had been capable of even doing that.

18           I think that, as I said, part of it was like a

19  desire to -- to confess in a way and so that was -- that

20  speaks to my desire to say it.  Why to him?  In particular?

21  Q    Sure.

22  A    Because I -- I -- I think because I trusted him and

23  because I saw him as a -- well, essentially as a man who knew

24  more than me, maybe knew more about human nature.  So that

25  might help me understand, yes.

Daniela - cross - Agnifilo                    3074

1   Q     Did you -- do you remember telling him that you took it

2   because you were bored?

3   A     No.

4   Q     Do you remember telling him you took it just to see if

5   you could take it and get away with it?

6   A     No.

7   Q     What's the reason you told him you took it?

8   A     I was struggling to understand the reason.

9   Q     And you and he talked about that; correct?

10  A     Yes.

11  Q     He didn't yell at you; right?

12  A     No, he did not.

13  Q     He didn't take a harsh tone with you; right?

14  A     No, he didn't.

15  Q     He didn't reprimand you or say you were a bad person or

16  anything like that; right?

17  A     No.

18  Q     He treated it as sort of an exploration, really, why did

19  you do it; right?

20  A     In part.

21  Q     And he said at one point when you're talking about this,

22  that a moral -- immoral decisions last forever.

23        Do you remember him saying that?

24  A     I don't remember him saying that.

25  Q     And that these decisions sort of define us.  You know, we

VB        OCR        CRR

Daniela - cross - Agnifilo                    3075

1  define ourselves by these moral decisions that we make?

2  A    I don't remember that.

3  Q    Well, what do you remember about the conversation between

4  you and him?

5  A    What I remember about that conversation was mostly like

6  his reaction to it.

7  Q    Which was what?

8  A    I felt it was one of understanding.  Like, he understood;

9  a receptiveness.  It was stern.  It was stern.  Definitely, it

10 was a serious subject, but it wasn't taken lightly.  But it --

11 it was one of, I felt, understanding.

12 Q    Understanding.  On Keith's part?

13 A    Yes.

14 Q    Okay.  But then he told other people in the community;

15 right?

16 A    Yes.

17 Q    And he told your father.

18 A    I don't know if he was the one to tell my father, but my

19 father ended up knowing; yes.

20 Q    Okay.  And your father and you had discussions about

21 this; correct?

22 A    Yes, we did.

23 Q    Okay.  And your father expressed disappointment

24 specifically about this act; correct?

25 A    Yes, he did.

Daniela - cross - Agnifilo                3076

1    Q    All right.  And do you ever -- there was a kind of an

2    honor cup, right, in one of the cafes where people would put

3    money if they took something to eat or to drink.  Was there

4    such a thing?

5    A    I'm sorry.  An honor cup?

6    Q    Yeah, just a cup, like, you know, rather than giving the

7    money to somebody, a cashier, there would be like a little jar

8    and you put the money in the jar and you take the granola bar

9    or the bottle of water, or whatever it is that you want.

10   A    I don't remember the cup, no.

11   Q    Did you ever steal money other than the money from Karen

12   Unterreiner's drawer?

13   A    No.

14   Q    Nothing else?

15   A    No.  There was -- as I said before, I -- I -- I took

16   several times money from Flintlock.

17   Q    Okay.  But other than taking money from Flintlock and

18   taking money from Karen Unterreiner's drawer, you never took

19   money from the little cup where people put the cash?

20   A    No.

21   Q    And how did your father react when you told him about the

22   $6,000?

23   A    He was disappointed.

24   Q    What did he say?

25   A    I don't remember.  I just remember the emotion.

Daniela - cross - Agnifilo                    3077

1   Q    Now, I think you said in 2003 your parents' marriage was

2   not doing so well; fair to say?

3   A    Yes.

4   Q    Okay.  And you had discussions with Keith about what that

5   was like, to have your parents' marriage not doing to well;

6   right?

7   A    Yes.

8   Q    Okay.  I mean, one of the things you discussed with Keith

9   was that topic; right?

10  A    Yes.

11  Q    And was he -- do you remember any of those discussions?

12  I don't need the specifics, but I mean, you know, were you

13  able to sort of tell him what was going on and what that was

14  like, and did he share his thoughts with you?

15  A    Yes.

16  Q    Okay.  So I'm just going to follow up, and I apologize

17  for asking about this subject.

18       On direct examination you talked about the first

19  time you and Keith Raniere had sexual contact.  So I'm just

20  going to ask you a few questions about that, if that's okay.

21       Your birthday is October 26th, 2003; correct?

22  A    2003?  No.

23  Q    I'm sorry.  No.  No, not the day of your birth, your

24  birthday, like your 18th birthday, in this case.

25  A    Yes, I think so.

Daniela - cross - Agnifilo                    3078

1  Q    Right.  And you said that Keith performed oral sex on you
2  about a week later or so.
3  A    Yes.
4  Q    Okay.  And I think you said that he had his clothes on
5  the whole time; is that right?
6  A    No.  I don't think so.
7  Q    Okay.  So let me see if I have this right, because I
8  really do want to understand this.
9  A    Sure.
10 Q    When he was performing oral sex, he had his clothes on.
11 A    That's what I remember, yes.
12 Q    Okay.  And then at some point he took his clothes off and
13 you guys hugged?
14 A    He -- yes.
15 Q    Okay.  But there was no intercourse.
16 A    I did not feel it.  So I don't think so, no.
17 Q    Right.  You weren't drinking or anything; right?  I mean,
18 you remember these events.
19 A    Yes.
20 Q    Okay.  You remember them clearly.
21 A    Parts of them I remember clearly.
22 Q    Okay.  And the only reason you think that there might
23 have been intercourse is because he said so after the fact;
24 correct?
25 A    Yes.

VB        OCR        CRR

Daniela - cross - Agnifilo                    3079

1    Q    Okay.  But in terms of what you experienced, you didn't

2    experience that.

3    A    That's right.

4    Q    Okay.  And I think you even said on direct examination

5    there was no -- there was no evidence of it.  There was no

6    evidence that there had been intercourse; right?

7    A    Right.

8    Q    Okay.  So -- and I think what you said on direct

9    examination is what you believe, and I think you even said I'm

10   sticking to my guns to this day, is that it was oral sex

11   without intercourse; right?

12   A    Yes.

13   Q    Okay.  But that day was your anniversary.  The day that

14   this happened, you guys, you decided it was going to be The

15   Day of the Dead; right?  It was going to be November 2nd?

16   A    Yes.

17   Q    Because you weren't sure of the exact date, but you

18   estimated and you thought it fitting that it be The Day of the

19   Dead; right?

20   A    Yes.

21   Q    Okay.  And so that's the day that you and Keith had the

22   oral sex.  When you say anniversary, that's the day that

23   you're talking about.

24   A    Yes.

25   Q    Now, after -- this happened at Rome Plaza; correct?

Daniela - cross - Agnifilo                    3080

1   A    I'm sorry?

2   Q    This happened at Rome Plaza?

3   A    Yes.

4   Q    Now, after that, Keith discussed his other romantic

5   relationships with you; fair to say?

6   A    At some point after, yes.

7   Q    Okay.  And am I right that after what happened at Rome

8   Plaza, you and Keith did not have any other sexual contact for

9   another six months?

10  A    I -- give or take, yes.  That's what I remember.

11  Q    Okay.  And you knew that he had -- he had long-term

12  girlfriends --

13  A    I am sorry.  May I correct?

14  Q    Yes.

15  A    Sexual contact of -- I have to correct that.  That's not

16  right.

17  Q    That's okay.

18  A    The sexual contact that happened like -- like, six months

19  after was of, like, intercourse.  Like, so, it was reciprocal.

20  Q    Right.

21  A    But there was sexual contact before that and just -- just

22  oral sex.

23  Q    Okay.  So when -- because you said on direct that there

24  wasn't sexual contact for six months after Rome Plaza, but

25  what you're saying is that there was oral sex before -- during

Daniela - cross - Agnifilo                    3081

1    that period of time.

2    A    Right.  I -- I believe that's what I said on direct, yes.

3    Q    Okay.  All right.  So the first time -- tell me if this

4    is right.

5              The first time that you and he had intercourse would

6    have been six months, about, after the Rome Plaza incident.

7    A    If I am right, and I think I am, yes.

8    Q    Okay.  Now, at some point you found out that your older

9    sister Marianna was also having sex with Keith; correct?

10   A    Yes.

11   Q    And how did you find that out?

12   A    I don't remember exactly.  I don't know if she told me or

13   I asked.

14   Q    But you found out from her.

15   A    I think so.  Again, I don't remember exactly.

16   Q    Okay.  Now, what was your relationship like --

17             MR. AGNIFILO:  I'm sorry, let me ask it again.

18   Q    What was your relationship with Marianna like at this

19   point in time when she told you?

20   A    At this point in time -- so we had been best friends

21   growing up.  I would say we were very close still when she

22   came to Albany with me.  And then since she had started her

23   friendship with Pam, we were almost like spending no time

24   together.  And that was like a period of months.

25             So I would say we were best friends, but had been

Daniela - cross - Agnifilo                3082

1    distanced for a little while.

2            MR. AGNIFILO:  Judge, we're going to be in this area

3    for a little while, so if you want to take our break now, we

4    can do that

5            THE COURT:  All that.  That is fine.

6            We will take a ten-minute break.  All rise for the

7    jury.

8            THE COURTROOM DEPUTY:  All rise.

9            (Jury exits.)

10           (In open court; outside the presence of the jury.)

11           THE COURT:  All right.  The witness may stand down.

12   Do not discuss your testimony with anyone.

13           THE WITNESS:  Okay.  Thanks.

14           THE COURT:  All right.  We will take a ten-minute

15   break.

16           (Recess taken.)    (In open court.)

17           (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

18           THE COURTROOM DEPUTY:  All rise.

19           (Side-bar conference held on the record out of the

20   hearing of the jury.)

21

22           (Continued on following page.)

23

24

25

VB        OCR        CRR

none



Proceedings                                              3085

1              (In open court.)

2              THE COURT:  Ms. Penza, tomorrow when this witness

3    completes her testimony, who would be next?

4              MS. PENZA:  Your Honor, we intend to call James

5    Loperfido, followed by Elizabeth Butler, followed by Sheila

6    Jelonek.

7              THE COURT:  All right.

8              How long will the next witness' direct be?  About

9    how long?  Who is doing the direct?

10             MR. LESKO:  Forty-five minutes, tops.

11             THE COURT:  I see.  All right.

12             MR. AGNIFILO:  A short cross.

13             THE COURT:  Okay.

14             MR. AGNIFILO:  Fifteen, twenty minutes.

15             THE COURT:  So we might get to two witnesses

16   tomorrow.

17             MR. LESKO:  Probably three.  In addition to --

18             THE COURT:  Well, we will see.  It depends on how

19   long the cross goes.

20             MR. AGNIFILO:  I think if we have the whole

21   afternoon, I mean, these are not long witnesses, I don't

22   believe.

23             THE COURT:  I see.

24             MR. AGNIFILO:  We might be able to get all three.

25             THE COURT:  Okay.  Well, we will see.  I just want

Daniela - cross - Agnifilo                3086

1    to get a sense of this.

2             MR. AGNIFILO:  Right.

3             THE COURT:  All right.

4             So are we now ready to move forward?

5             MR. AGNIFILO:  We are.

6             MS. PENZA:  Yes, Your Honor.  Thank you.

7             THE COURT:  All right.  Let's bring in the witness,

8    please.

9             (Witness resumes stand.)

10            (Jury enters.)

11            THE COURT:  Please be seated, everyone.

12            All right.  Mr. Agnifilo, you may continue your

13   cross-examination.

14            MR. AGNIFILO:  Thank you, Your Honor.

15            THE COURT:  The witness is reminded that she is

16   still under oath.

17   CROSS EXAMINATION

18   BY MR. AGNIFILO:

19   Q    Good afternoon, Daniela.

20   A    Good afternoon.

21   Q    At one point your older sister Marianna told you that she

22   was in love with Keith; is that right?

23   A    Yes.

24   Q    And when she told you that she was in love with Keith,

25   you told her that you wanted to be with Keith, also.

Daniela - cross - Agnifilo                          3087

1    A     Yes.

2    Q     So, at this point in time, you had made a decision that

3    even though Marianna was in love with Keith and was going to

4    be with Keith, you, too, wanted to be with Keith, correct?

5    A     Yes.

6    Q     And you told Marianna that you thought Keith was a great

7    man.

8    A     Yes.

9    Q     And so, you and Marianna had a conversation about what

10   you were going to do about this situation, correct?

11   A     Yes.

12   Q     Because it was apparent to you that Marianna intended to

13   continue to have a romantic relationship with Keith, correct?

14   A     Yes.

15   Q     And you knew that you intended to continue to have a

16   romantic relationship with Keith, correct?

17   A     Yes.  We were working that out, yes.

18   Q     And so, you and Marianna had a conversation about how you

19   were going to handle this, right?

20   A     Yes.

21   Q     And you didn't want to break up with Keith after finding

22   out that Marianna was in love with him, right?

23   A     No.

24   Q     And you didn't want to break up with him even after you

25   knew that he and Marianna had been together romantically in

VB        OCR        CRR

Daniela - cross - Agnifilo                    3088

1    the past, right?

2    A    Right.

3    Q    And you didn't want to break up with him even though you

4    knew Keith and Marianna intended to be together romantically

5    in the future?

6    A    Yes.

7    Q    So, the two of you, you and Marianna, had a discussion

8    about the ground rules that you and she would follow in both

9    of you having a relationship with Keith, fair to say?

10   A    No.

11   Q    No?

12         Did you have a meeting at some point on New Garner

13   Road?

14   A    Yes.

15   Q    And what was the purpose of this meeting between you and

16   Marianna?

17   A    To sit and discuss those ground rules.

18   Q    Okay.  And what were the ground rules that you and

19   Marianna -- well, let me ask.

20         From your perspective, what did you want to

21   accomplish from this conversation with Marianna about the

22   ground rules of both of you having a relationship with Keith?

23   A    I, I don't know.  We never got to it.

24   Q    Okay.  You got to -- did you get to the location?

25   A    I'm sorry?

VB        OCR        CRR

Daniela - cross - Agnifilo                            3089

1   Q    Did you get to New Garner Road, you and Marianna?

2   A    Yes.

3   Q    Okay.  But before, the way you recall it, is before you

4   and she could have the discussion about the ground rules of

5   each of you being in a relationship with Keith, Keith shows

6   up?

7   A    Yes, that's what I remember.

8   Q    Yeah.  And was the plan that you were going to actually

9   write down these ground rules?

10  A    Yeah.  I remember that.

11  Q    All right.  Now, in advance of this New Garner Road

12  meeting that you're saying never happened, what discussions

13  did you have with Marianna about how to handle this situation?

14           I know we're going back a ways.  Whatever you can

15  remember.

16  A    I, I don't remember discussions prior to that one.

17  Q    Okay.  But you remember that at least in your mind, you

18  were going to write these ground rules down.

19  A    Yes, that's what I remember.

20  Q    Did you and Marianna ever use the name Peppy to refer to

21  Keith?

22  A    I don't remember.  No.  No, I don't remember.

23  Q    Did you and she pick a name for Keith that was not Keith

24  so that when you and she were discussing Keith in public,

25  people wouldn't know you were talking about Keith?

Daniela - cross - Agnifilo                3090

1   A    No, I, I, no, I don't think so.

2   Q    So, when Keith shows up at New Garner Road, you and

3   Marianna are there, right?

4   A    Yes.

5   Q    Okay.  And he says something along the lines of, he

6   doesn't like the fact that -- well.

7        Tell me what do you remember him saying.

8   A    I remember, I remember him asking what we were doing.

9   And I don't remember exactly what he said, but I, I remember

10  distinctly getting the clear idea that we were not supposed to

11  be doing that.  Like, he asked a series of questions.

12  Q    Did he say to you, you're not to be doing this?

13  A    Not in those words, no.

14  Q    Okay.  Do you remember the questions he asked?

15  A    I don't.  Not exactly.

16  Q    All right.  Now, at the time Keith was living with

17  Marianna at 3 Flintlock, correct?

18  A    Not that I remember, but I'm not sure.  I don't think at

19  that time, no.

20  Q    Not yet?

21  A    I don't think so, but I don't remember exactly.

22  Q    Okay.  And just to be clear, when Marianna came up to the

23  Albany area, you guys lived for a while at a Howard Johnson's?

24  A    Yes.

25  Q    Okay.  And did you live for a while with one of the

Daniela - cross - Agnifilo                    3091

1    Boones?

2    A    No.

3    Q    Who did you live with, when you first, when you and

4    Marianna first lived together, who did you live with?

5    A    It was a woman's -- in a woman's house who was a student

6    of ESP.

7    Q    Okay.  And so when you and Marianna sat down at New

8    Garner Road to have this discussion, do you remember where

9    each of you were living?

10   A    I think we were living, I'm not sure, but I think we were

11   living at River Walk.  River Walk apartments.

12   Q    Okay.  And then, at some point, Keith -- Marianna moves

13   into 3 Flintlock with Keith and Kristin Keeffe and Karen

14   Unterreiner, right?

15   A    And Pam Cafritz.

16   Q    And Pam Cafritz.

17         And where were you living when Pam moved into

18   3 Flintlock?

19   A    I'm sorry?

20   Q    Where were you living?  When Pam -- I'm sorry.  Let me

21   ask a different question.

22         When Marianna moved into 3 Flintlock, where were you

23   living?

24   A    I don't remember.  It was, I remember it was like, a

25   quick transition, but I don't remember exactly if I was -- I

Daniela - cross - Agnifilo                    3092

1   don't think I was at River Walk.  I remember Wilton, she was

2   living there, but it may have happened in between.  So, it was

3   in between those two locations.

4   Q    Okay.  And did you feel any form of anything over the

5   fact that Marianna moved in with Keith and you didn't?

6   A    Not at that particular time no.

7   Q    Okay.  Did you ever feel that Keith treated Marianna

8   better than he treated you?

9   A    He treated her differently, yes.

10  Q    Okay.  Differently in what way?

11  A    I felt, I felt, well, he treated her, for example, in a

12  more romantic sexual way.  Sometimes we would go to volley

13  ball together, all in Pam's car and he would sit Marianna on

14  his lap and put his hand in her pants, in front of me, with me

15  in the car.  And do sexual things to her.  That was pretty, I

16  mean, that was, that was, that was something.  I always

17  wondered why he did that.  So, I was more upset at things like

18  that.

19        He would always be very sexual with her.  I know

20  they spent a lot of time together.  I thought, I thought, I

21  felt he loved her.  That's what I saw from the interactions.

22  So, it was very different because I didn't feel that was the

23  case with me.

24        There was also, you know, and I think I said

25  something like this, but I'll be specific.  There was

Daniela - cross - Agnifilo                    3093

1   preferential treatment, which was in stark contrast for the

2   teachings of ESP where, you know, everything's supposed to be

3   integrity, and cause and effect.  And so, she would be treated

4   in a different way than me when circumstances were similar.

5   And that was, that was a topic of, of, of confusion for sure,

6   yes.

7

8                (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3094

1  BY MR. AGNIFILO:   (Continuing)

2  Q     You said on direct examination that you thought that

3  Keith was especially hard on you?

4  A     Yes.

5  Q     Keith said from the very first time that he ever met you,

6  he thought you were very, very smart, right?

7  A     He did say that to me, yes.

8  Q     Unusually smart?

9  A     I don't if he said unusually but I got the idea.

10 Q     Did he say to you at one point that you're one of the few

11 people that he can have discussions of certain concepts with?

12 A     Yes, I believe he said something like that.

13 Q     That of all the people in the ESP and NXIVM, he felt that

14 there were certain things, intellectual things, things that

15 are difficult to grasp that he could only discuss with you?

16 A     Yes.

17 Q     And did he ever say to you that he thought that you could

18 be his successor if he stopped being the Vanguard?

19 A     To be the next Vanguard?

20 Q     Just to be his successor if he stopped being the

21 Vanguard.

22 A     Not, not in those terms.  I did -- he did use "successor"

23 and the way I understood it was differently, that I remember.

24 Like, it was -- he did mention several times I would be, that

25 I could be his successor, like in an intellectual type way.

Daniela - cross - Agnifilo                    3095

1   So as I understood it, it wasn't like I would be the next

2   Vanguard.  That would be frightening.  But he did mention the

3   word and I understood something from it.

4   Q    So what did you understand him to be saying to you?

5   "Intellectual successor," what did that mean to you?

6   A    It's not very specific.  He had promised he would teach

7   me.  So I -- what I thought he meant was that I would be

8   taught and that all of this knowledge and all these teaching,

9   I, I would, you know, move forward with.  In fact, at some

10  point, he thought of the idea of me being the head of the

11  Ethical Science Foundation, notions like that.

12  Q    And what was the Ethical Science Foundation?

13  A    It wasn't formed yet or it was taking shape so I don't

14  know what it was.  I just had an idea of what it would be.

15  Q    Okay.  Now, at one point, you had come to the Albany area

16  initially in, what year, was it 2003 or 2004?

17  A    No.  I think that's 2002.

18  Q    Okay.  And then at some point, you went to Mexico, right?

19  A    At some point, yes.

20  Q    And then you -- tell me if this is right.  Was it your

21  birthday in 2004, October 26, 2004, that Customs stopped you

22  and your father in Atlanta?

23  A    Yes.

24  Q    Just remind the jury about what happened.

25  A    I traveled back to Mexico weeks or days prior and on my

Daniela - cross - Agnifilo                3096

1  way back to the U.S., I was doing a transfer out of Atlanta to

2  New York and we were stopped by Immigration.  Initially, they

3  suspected -- like, I remember my father, I remember vaguely

4  that my father may be working in the U.S. so they stopped us

5  and asked us a bunch of questions and that culminated in our

6  visas being withdrawn.  As I remember, there was something

7  that I signed and we headed back to Mexico.

8  Q    And you had, you had a valid visa, correct?

9  A    Valid, yes.

10  Q    And your father had a valid visa to the extent that you

11  knew, correct?

12  A    Yes.

13  Q    And the customs officials in Atlanta withdrew your

14  completely valid visas, right?

15  A    Yes.

16  Q    And as a result, you had to go back to Mexico, correct?

17  A    Yes.

18  Q    And do you recall what kind of visa you had at the time,

19  that being October 26, 2004?

20  A    We had, I believe it was a regular visitor's visa.

21  Q    And do you remember what your father had?

22  A    I think it was also a regular visitor's visa.

23  Q    And you were upset because you wanted to, you wanted to

24  go to be in the community near Albany, right?

25  A    Yes.

Daniela - cross - Agnifilo                3097

1   Q    But you weren't granted access into the country and you

2   had to go back to Mexico, correct?

3   A    Yes.

4   Q    And did you understand that you would have to go back to

5   Mexico for some period of time before you could reapply for a

6   new visa?

7   A    Yes.

8   Q    And what was your understanding of what that period of

9   time was?

10  A    I remember it was a year.

11  Q    Okay.  And you didn't want to do that?

12  A    No, I didn't.

13  Q    You didn't want to be in Mexico for a year, correct?

14  A    No, I didn't.

15  Q    All right.  And you wanted to come back, you wanted to be

16  in Albany?

17  A    Yes, I did.

18  Q    So you had conversations with Kristen Keefe about how it

19  is you could come back into the country, correct?

20  A    I don't remember conversations with Kristin.  I remember

21  conversations with Keith.

22  Q    Did you know who Kristin Keefe was in 2004?

23  A    Yes.

24  Q    The two of you worked in the administration office,

25  right?

Daniela - cross - Agnifilo                3098

1   A    Yes.

2   Q    And you knew she was the head of the legal department,

3   correct?

4   A    At that point, I don't, I don't think so.

5   Q    No?  Was she in the legal department?

6   A    I don't know if that was the legal department at that

7   point.  I don't remember.

8   Q    And at that point, you knew who Kathy Russell was too,

9   right?

10  A    Yes.

11  Q    She also worked in the administration office with you and

12  Kristin Keefe, right?

13  A    She -- yes.

14  Q    And she did the bookkeeping work for NXIVM at the time?

15  A    I understood she was an accountant.

16  Q    All right.

17  A    An accountant.

18  Q    And did you know Siobhan?

19  A    Yes.

20  Q    You knew her back then?

21  A    Yes.

22  Q    How did you know her?

23  A    She had -- she was around a lot and she had, she was a

24  person who taught me, had a few sessions with me to teach me

25  HTML and she showed me a few tricks.

Daniela - cross - Agnifilo                    3099

1  Q     What's HTML?

2  A     HTML is, it's not a code, but the formatting of web

3  pages.

4  Q     Okay.  Now, you said that you flew from Mexico to Canada

5  in or around, in December of 2004, correct?

6  A     Yes.

7  Q     And who paid for that flight?

8  A     I, I think it was my father.

9  Q     Okay.  And now, to your knowledge, did your father have a

10 plan to get back into the United States or was he going to

11 wait the year and apply for a new visa?

12 A     I think he was going to wait a year.

13 Q     Okay.

14 A     But I, I mean, that's what I thought.  I don't know for

15 sure.

16 Q     And you said that the plan was that you would meet

17 Kristin Keefe and Kathy Russell in Canada and then drive over

18 the border together?

19 A     No.

20 Q     All right.  Didn't you say on direct that that was the

21 plan but then Kristin Keefe chickened out at the last minute?

22 A     No.

23 Q     So tell me what your understanding of the plan was.

24 A     The plan was that Kristin would meet me in Canada and she

25 would take me to Albany.

Daniela - cross - Agnifilo                    3100

1   Q    Okay.

2   A    I don't think Cathy was ever a part of that plan.

3   Q    So, and you discussed this with Kristin?

4   A    No, I discussed it with Keith.

5   Q    So Keith told you that Kristin was going to meet you in

6   Canada?

7   A    Yes, that's what I remember.

8   Q    All right.  And you flew, you flew to Toronto, right?

9   A    I flew, yes.

10  Q    Okay.  And it was -- did you fly on Christmas Eve?

11  A    No.  It was a few days prior or a day prior.

12  Q    So you fly right before Christmas Eve?

13  A    Yes.

14  Q    And flew into Toronto?

15  A    Yes.

16  Q    And who do you meet up with?

17  A    At some point, I met up with Kathy Russell.

18  Q    Do you remember where you met up with her?

19  A    I don't remember exactly where we met initially.

20  Q    So at this point, it's just you and Kathy Russell, but

21  you're both in Canada?

22  A    Yes.

23  Q    And Kathy Russell gives you an ID card, correct?

24  A    Yes.

25  Q    And what kind of ID card was it?

Daniela - cross - Agnifilo                    3101

1    A    I remember it was a sheriff's ID.

2    Q    A sheriff from some county in New York State?

3    A    Yes.  I didn't know what it was, what that was, if it was

4    valid or what it was.

5    Q    So it was a law enforcement ID card, a sheriff's ID card

6    that had another person's name but your photograph, correct?

7    A    Yes.

8    Q    And I think what you said is that the ID card was very

9    poorly done, is that right?

10   A    Yes.

11   Q    I think you described it on direct as amateur hour?

12   A    Yes.

13   Q    Okay.  And why was it so poorly done?

14   A    I don't know.

15   Q    No.  I mean, what makes it poorly done?  Why would you

16   refer to it as amateur hour?

17   A    I thought, like, like, like, printed in a home printer

18   maybe.  Like, even, I remember feeling all the plastic.  I

19   don't know, just a perception thing.

20   Q    Okay.  So Kathy Russell hands you this very fake looking

21   sheriff's identification card, right?

22   A    Right.

23   Q    And you're expected to show this to a United States

24   border patrol agent at the border, correct?

25   A    Yes.

Daniela - cross - Agnifilo                    3102

1   Q    And that's what you did, right?

2   A    Yes.

3   Q    You and Cathy drove in a car, right?

4   A    Yes.

5   Q    Do you remember whose car it was?

6   A    I think it was Cathy's.  I don't remember exactly.

7   Q    And you approached the United States border, correct?

8   A    Yes.

9   Q    And you have your ID card and you give your ID card to

10  the border patrol agent, correct?

11  A    Yes.

12  Q    And I think what you said on direct is the border patrol

13  agent's staring at this, what you're describing as a very fake

14  looking sheriff's identification card, correct?

15  A    Yes.

16  Q    And you're getting nervous, right?

17  A    I was nervous throughout, yes.

18  Q    And you say to the border patrol agent, "What's the

19  weather like ahead," right?

20  A    Yes.

21  Q    Because you wanted to distract him, right?

22  A    Yes.

23  Q    You wanted to see if you could fool the border patrol

24  agent, who's looking at your very fake, amateur hour looking

25  sheriff's identification card, and somehow distract him so you

1    could get into the country, right?

2    A    Yes.

3    Q    Because you wanted to enter the United States; that's

4    what you wanted, correct?

5    A    Yes.

6    Q    You didn't want to wait a year; you wanted to enter the

7    United States when you wanted to enter the United States,

8    correct?

9    A    Yes.

10   Q    And if it means giving a U.S. border patrol agent a very

11   fake looking sheriff's identification card, that's what you

12   were willing to do, correct?

13   A    Yes.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          3104

1    Q    And when it came to the point where this border patrol

2    agent is really going to study that card, you didn't say, Sir,

3    I have something I have to confess, I don't really work in the

4    sheriff's office, that's --

5                MS. PENZA:  Objection, Your Honor.

6                Can I have a sidebar, please?

7                THE COURT:  Yes.  Sidebar.

8                (Sidebar conference.)

9                THE COURT:  So what is the objection?

10               MS. PENZA:  Your Honor, this is misleading.  A

11   sheriff's ID is actually a personal ID that people get from a

12   sheriff's office with the equivalent -- it's as if you got a

13   driver's license but from a county.  I don't know the exact

14   details.  I'm not sure that Daniela does either, but the idea

15   that it is, like, some sort of law enforcement ID, as if she

16   is pretending to be a sheriff --

17               THE COURT:  Is that your claim, it's law

18   enforcement?

19               MR. AGNIFILO:  It's a sheriff's ID card.  That's

20   what she said and that's what I believe it to be.

21               MS. PENZA:  No, that is not, that is not true.  It

22   is just not true.  It is -- the idea is you can get -- can you

23   go into the local sheriff's office and get an ID for yourself,

24   the same way New York City has ID cards now that don't, that

25   require less information.  That's why I don't think there's a

Sidebar                                                    3105

1   good faith basis to assert that it is somehow pretending to be

2   a law enforcement officer.

3          THE COURT:  I understand.  The defense is going to

4   ask the question of whether she understands how a sheriff's ID

5   card is issued.

6          MR. AGNIFILO:  Okay.

7          THE COURT:  I think that's reasonable.  She's going

8   to say no, obviously, because she has no idea, and then we

9   move on, but the idea that it is a sheriff's ID, like an

10  employee's ID card, you know, is not part, was not discussed

11  on direct.  So let's just try to straighten it out that way.

12         MR. AGNIFILO:  All right.

13         (Side bar ends.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Daniela - cross - Agnifilo                              3106

1   BY MR. AGNIFILO:

2   Q    Daniela, do you know where this identification card came

3   from?

4   A    Not exactly.

5   Q    And did it say on it sheriff's office from some county?

6   A    I don't remember exactly what it said.  I remember it was

7   a sheriff's ID.

8   Q    And my question just before the sidebar was as you're

9   presenting this identification card to the border patrol agent

10  and he's staring at it and you're concerned because it's not a

11  very well done fake identification card, you don't say to him,

12  Hey, I'm sorry, that's not me, that's a false identification

13  card, you don't say that, right?

14  A    No.

15  Q    No.  You say "What's the weather ahead" not because

16  you're really interested in what the weather is, right?

17  A    Right.

18  Q    You're saying "What's the weather ahead" to get his mind

19  off your bad ID card so you can illegally enter the United

20  States, correct?

21  A    Yes.

22  Q    And it worked, you tricked him; you got in, right?

23  A    Yes.

24  Q    Did you meet with Kristin on the United States side of

25  the border?

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3107

1    A    I don't remember.

2    Q    You don't remember if it was just you and Kathy Russell

3    driving from -- it was Niagara Falls, right?

4         When you entered the United States, where did you

5    enter the United States?

6    A    Oh, I don't remember.

7    Q    Do you remember how long the drive was from where it was

8    that you entered the United States to Clifton Park?

9    A    It was hours.  I don't remember how many.

10   Q    And you don't remember if you were in the car with, with

11   just Kathy Russell or if you were in the car with Kathy

12   Russell and Kristin Keefe?

13   A    I don't remember, no.

14   Q    Do you remember what you talked about?

15   A    No.

16   Q    You were happy that you got into the country, right?

17   A    Yes.

18   Q    Now, you said you were expecting to see Kristin Keefe in

19   Canada, correct?

20   A    Yes.

21   Q    But you saw Kathy Russell instead?

22   A    Yes.

23   Q    And did you ask Cathy what happened to Kristin?

24   A    I think I did.

25   Q    And do you remember what happened to Kristin?

Daniela - cross - Agnifilo                    3108

1    A    I don't remember exactly, no.

2    Q    Now, I think you said that when you got back to

3    Clifton Park, you went to a Christmas Eve party?

4    A    It was some kind of gathering.

5    Q    Do you remember where it was?

6    A    I don't.

7    Q    And do you remember, I think you described on direct

8    examination something that happened between you and Marianna

9    and Keith at this Christmas Eve party?

10   A    Not at the party, but I know, yes.

11   Q    Was it that night?

12   A    Yes.

13   Q    And it was at -- where was it?

14   A    Three Flintlock.

15   Q    And at the time, was Keith living there with Marianna?

16   A    Marianna lived there with Pam, and Keith, you know, was

17   there downstairs as he always had been.

18   Q    Right.

19   A    So maybe, yes, yes.

20   Q    Okay.  Did you consider this Keith's home?

21   A    His space, yes, yes.

22   Q    Okay.  Because I think what you said on direct, tell me

23   if this is right, is that it was Pam, Pam Cafritz lived there,

24   Kristin Keefe lived there, Marianna lived there and then you

25   said Keith stays downstairs?

CMH        OCR        RMR        CRR        FCRR

Daniela - cross - Agnifilo                           3109

1    A    Yes.

2    Q    Okay.  And did he stay in other places?

3    A    Yes.

4    Q    Okay.  What other places did he stay around that time

5    period?  So we're talking Christmas Eve 2004, if you remember.

6    A    In maybe a wider range of time because I don't remember

7    exactly, but he used to stay at Edie's house overnight.  He

8    used to stay at, I think, at Barbara's house.

9    Q    Barbara, which Barbara?

10   A    Barbara Bouchey.  I think it was a little more frequent.

11   He also stayed with other people but that was a little more

12   sporadic.

13   Q    Now, do you remember at this, at 3 Flintlock, Keith and

14   Marianna were trying to go upstairs and you followed them?

15   A    No.

16   Q    That's not what happened?

17   A    No.

18   Q    You don't remember following Keith and Marianna up the

19   stairs?

20   A    No.

21   Q    And do you remember Keith and Marianna left 3 Flintlock

22   and went to 8 Hale which is nearby?

23   A    Later that night, yes.

24   Q    And they didn't leave 3 Flintlock and go to 8 Hale

25   because you were following them?

Daniela - cross - Agnifilo                      3110

1   A    No.

2   Q    You were happy to be back and you were happy to see

3   Keith, right?

4   A    Yes.

5   Q    You had come back, in part, because you wanted to see

6   Keith, right?

7   A    Yes.

8   Q    You wanted to come back and, you know, be taught by Keith

9   and be part of the mission like you had originally come to

10  NXIVM to do, correct?

11  A    Correct.

12  Q    All right.  I want to talk to you for a little bit about

13  book reports.  You talked about book reports for quite some

14  time on direct examination.

15           Did Keith ever say that he would pay you for book

16  reports?

17  A    I'm sorry?

18  Q    Did Keith say he would pay you for book reports?

19  A    That I would get paid for book reports.

20  Q    Okay.  And the books that he gave you, I think you talked

21  on direct examination a lot of them had to do with systems

22  theory, correct?

23  A    Yes.

24  Q    And some of the books were very complicated, right?

25  A    Yes.

CMH        OCR        RMR        CRR        FCRR

Daniela - cross - Agnifilo                    3111

1   Q     And it would take you long time to do some of these book

2   reports, fair to say?

3   A     Yes.

4   Q     Sometimes it would take you up to a year to complete a

5   book report, isn't that true?

6   A     I would -- not, no.  I mean --

7   Q     Okay.  I'm going to show you government, this is

8   Government's Exhibit 1504.  It's already in evidence.  It's a

9   long exhibit but I'm just going to show you the cover page if

10  I can get this off.

11        Okay.  So this is -- let's see if I can get this and

12  read it.  All right.  Okay.  This is Government Exhibit 1504.

13  This is an e-mail from yourself to yourself, correct?

14  A     I'm sorry.  I don't --

15        THE COURT:  I'm sorry.

16        MR. AGNIFILO:  Your Honor, the screen?

17        THE COURT:  Yes, here it goes.

18        (Continued on next page.)

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                          3112

1   CROSS EXAMINATION

2   BY MR. AGNIFILO:  (Continuing)

3   Q    So this is an e-mail from yourself to yourself; right?

4   A    Right.

5   Q    On June the 5th, 2005; correct?

6   A    Yes.

7   Q    All right.  And you attach a number of attachments to

8   this e-mail.  One of them is this systems theory by Ludwing

9   von Bertalanffy?

10  A    That's right.

11  Q    And the other is *The Art of Systems Thinking* by Joseph

12  O'Connor; right?

13  A    Yes.

14  Q    Now, I just want to show you the cover page of Exhibit

15  511.  So, we have *The Art of Systems Thinking*.  You're sending

16  that to yourself on June 5, 2005.  And then if we look at

17  Government Exhibit 511, we have *The Art of Systems Thinking*

18  and you are sending this to Nancy Salzman, April 24, 2006.  So

19  11 months later; right?

20  A    That's what it looks like, yes.

21  Q    What's the purpose of sending this to yourself, just so I

22  understand?

23  A    My outlines would be in different degrees of completion.

24  So, I think what I was doing is I was sending myself the most

25  updated versions.  So, I'd be working on them and sending them

Daniela - cross - Agnifilo                    3113

1  to myself when I updated them.

2  Q    The other one here, we have the General Systems Theory

3  from -- I'm not going to get it right the second time -- Von

4  Bertalanffy, Ludwing von Bertalanffy.  You send that to

5  yourself, as we said, on June 5, 2005.  And then if we look at

6  Government Exhibit 1510, you send that to Nancy, May 1st.  So

7  about 11 months later; correct?

8  A    Yes.

9  Q    Because these were very lengthy, complex books that you

10  were reading; correct?

11  A    Yes.

12  Q    Did you ever have an understanding that part of the

13  reason that Keith wanted you to read these books is so that

14  you would have read them?

15  A    I'm sorry, can you --

16  Q    Sure.  He wanted you to know this material?  In this

17  case, he wanted you to know the material on systems theory?

18  A    And what is the question?

19  Q    Did -- was part of the reason why you were given these

20  books to read so that you yourself could become acquainted

21  with this information?

22  A    Yes, I guess.

23  Q    Because he would talk to you about it, wouldn't he?

24  A    Yes.

25  Q    He would have you read these somewhat complicated books

Daniela - cross - Agnifilo                    3114

1  and then he would discuss them with you; right?

2  A    Sometimes.

3  Q    Didn't he say to you on more than one occasion there's

4  really no one else I can give books like this for someone to

5  read because they're very hard to understand?

6  A    That I don't remember.

7  Q    Do you remember him telling you that you were smart

8  enough that you could understand these books, or something

9  along those lines?

10 A    Maybe something along those lines.

11 Q    Now, all the books that were in that one e-mail, 1504,

12 all had to do with Systems Theory; correct?

13 A    Yes.

14 Q    And you read them all; right?

15 A    Yes.

16 Q    Sometimes you didn't understand a certain chapter, but

17 you endeavored to read all of that material that he gave you;

18 correct?

19 A    Yes.

20 Q    And the idea was that Systems Theory could translate into

21 how people act in society; right?

22 A    No.  That's not an accurate statement in general.

23 Q    All right.  Let me ask you more specific questions.  One

24 of the books had to do with how bees operate in a beehive;

25 right?

Daniela - cross - Agnifilo                    3115

1    A    Yes.

2    Q    And that same book discussed how ants operate in an ant

3    hill?

4    A    Yes.

5    Q    Didn't that same book and other of the books discuss how

6    humans operate in a state or in a country or on the earth?

7    A    Yes.

8    Q    And were analogies made between how bees do things in a

9    beehive and how people can do things in society?

10   A    Yes.

11   Q    And all of this is part of Systems Theory, because you

12   were describing Systems Theory on direct examination and part

13   of the idea is how do these complex systems operate and how do

14   they operate more efficiently or less efficiently depending on

15   different factors; correct?

16   A    Yes.

17   Q    And I think that you said on direct examination one of

18   the important principles is that the system achieves some sort

19   of homeostasis, right?  Do you remember talking about that on

20   direct?

21   A    It's one of the principles, yes.

22   Q    A stability?  There has to be a stability?

23   A    Yes.

24   Q    A beehive has to have a stability of how the bees work,

25   ants have a stability of how the ants work, people have a

MDL       RPR       CRR       CSR

Daniela - cross - Agnifilo                    3116

1    stability of how the people work; right?

2    A    Yes.

3    Q    And Keith was studying these things?

4    A    I don't know.

5    Q    Keith would have these -- part of the reason that Keith

6    was having you read these books is that so you and he could

7    discuss this stuff?

8    A    I really don't remember us discussing them.

9    Q    He would just give you these book reports -- I'm sorry.

10   He would give you these books, you would give him a book

11   report and that would be it?

12   A    Yes.

13   Q    Did you ever completely finish the book reports for these

14   books?

15   A    Yes.

16   Q    You did?

17   A    Yes.

18   Q    And who did you send them to?

19   A    I sent them to -- I believe some I sent to Nancy.  I

20   believe I sent them to -- I don't remember if to Keith.  I

21   think to Keith.  And the people in my program, yes.

22   Q    Did you ever send Nancy -- let me show you what so far in

23   evidence.

24   A    Karen.  I send them to Karen, yes.

25   Q    Going back to 1510.  This is the one you sent to Nancy

Daniela - cross - Agnifilo                    3117

1   from the General System Theory.  And I'm not being the least

2   bit critical.  You're saying three of the chapters of the book

3   are beyond you?

4   A     Yes.

5   Q     And you lay that out?

6   A     Yes.

7   Q     And do you recall that it would take you a long time to

8   do some of these book reports and you had a hard time

9   finishing them?

10  A     Yes.

11  Q     Now, I think you said that in 2006, you were aware that

12  Keith was having sex with a number of different women;

13  correct?

14  A     Yes.

15  Q     And I think that the list that you gave was Pam Cafritz;

16  right?

17  A     Yes.

18  Q     Karen Unterreiner; right?

19  A     Yes.

20  Q     Marianna, your sister?

21  A     Yes.

22  Q     Barbara Jeske?

23  A     Yes.

24  Q     Barbara Bouchey?

25  A     Yes.

Daniela - cross - Agnifilo                    3118

1   Q    Ivy Nevares?

2   A    Yes.

3   Q    Dawn Morrison?

4   A    Yes.

5   Q    Kristin Keefe?

6   A    Yes.

7   Q    Lauren Salzman?

8   A    Yes.

9   Q    And Kathy Russell?

10  A    Yes.

11  Q    Now, I think you said yesterday that at some point Keith

12  had a child with Kristin Keefe; correct?

13  A    Yes.

14  Q    And I think you said that the community kind of kept

15  quiet the fact it was Keith's child because there was some

16  perception in the community that Keith was celibate?

17  A    Yes.

18  Q    He's having sex with all of these women; right?

19  A    Yes.

20  Q    And you knew he was, didn't you?

21  A    Yes.

22  Q    And, so, who thought he was celibate?

23  A    Everyone outside the inner circle.

24  Q    Everyone thought Keith was celibate other than the women

25  he was having sex with?

```
                   Daniela - cross - Agnifilo              3119
```

1  A    The inner circle.

2  Q    And you considered yourself to be in the inner circle?

3  A    Yes.

4  Q    Did you ever make a dollar for being in the inner circle?

5  A    No.

6  Q    No?  Right?  I didn't hear you.

7  A    No.

8  Q    What you mean by the inner circle is you get to hang

9  around Keith?

10 A    Amongst other things, yes.

11 Q    But the big thing is you got to hang around 3 Flintlock;

12 right?

13 A    In part, yes.

14 Q    Now, at some point you learned that Kristin was willing

15 to pay a great deal of money for an e-mail password; correct?

16 A    Not Kristin.

17 Q    No?

18 A    It wasn't Kristin's money.

19 Q    No, no.  That Kristin talked to -- you and Kristin had a

20 discussion about the fact that NXIVM, whoever it was, was

21 willing to pay $24,000 for an e-mail password; correct?

22 A    No.

23 Q    No.  Tell me what you remember.

24 A    I -- Kristin and Keith were talking and I was hearing

25 them.  That's how I learned.

Daniela - cross - Agnifilo                    3120

1  Q    And where were the three of you when this discussion was

2  taking place?

3  A    At 3 Flintlock.

4  Q    And who else was there?  Do you remember?

5  A    I don't remember.  I think -- I don't remember.

6  Q    And you realized that there could be a lot of money in

7  getting computer passwords; correct?

8  A    No.

9  Q    No?  Had you ever hacked into a computer before you heard

10 that conversation?

11 A    No.

12 Q    And after hearing that conversation, you had hacked into

13 a lot of computers; right?

14 A    A number of computers, yes.

15 Q    I'm going to show you --

16      MR. AGNIFILO:  This is just for the witness for the

17 time being, Judge.

18      THE COURT:  All right.  Just a moment.

19      Go ahead.

20      MR. AGNIFILO:  This is Defense Exhibit 605 for

21 identification.  Let me scan it a little bit.  605 for

22 identification.

23 Q    This is an e-mail from yourself to Kristin Keefe;

24 correct?

25 A    Yes.

MDL        RPR        CRR        CSR

Daniela - cross - Agnifilo                    3121

1          MR. AGNIFILO:  Your Honor, we offer 605.

2          MS. PENZA:  No objection.

3          THE COURT:  Defense Exhibit 605 is received.

4          (Defendant's Exhibit 605 received in evidence.)

5          MR. AGNIFILO:  I'm not sure the jury can see.

6          THE COURT:  Okay.

7   Q    Just so it's clear, it is 605.  There is not a lot of

8   content in this e-mail.  Let me zoom in on it.  This is an

9   e-mail from July 20, 2005; right?

10  A    Yes.

11  Q    It's from yourself; it is to Kristin Keefe; correct?

12  A    Yes.

13  Q    And it says Metacafe link; right?

14  A    Yes.

15  Q    And then it says, there is a web address for Metacafe.

16  What's going on here?

17  A    I am sending Kristin a link.

18  Q    And why are you sending that link?

19  A    I don't remember the exact context of it, but I imagine

20  for fun.

21  Q    For fun?

22  A    Yes.

23  Q    Didn't you use public places to access the WiFi?

24  A    At some point, yes.

25  Q    And is that why you are sending this link to Kristin?

Daniela - cross - Agnifilo                3122

1    A     No.

2    Q     No?  All right.  At some point -- I want to show you

3    Defense Exhibit 606.

4          MR. AGNIFILO:  This is not in evidence, Judge.

5          THE COURT:  Go ahead.

6          MR. AGNIFILO:  606.  It is for the witness to see.

7          THE COURT:  All right.

8    Q     This is an e-mail from Kristin to you; correct?

9    A     Yes.

10   Q     It's August 9, 2005; right?

11   A     Yes.

12         MR. AGNIFILO:  Your Honor, we offer Exhibit 606.

13         MS. PENZA:  Is there an attachment?

14         MR. AGNIFILO:  There is an attachment.  I was just

15   going to do this first.

16         MS. PENZA:  May I see the attachment?

17         MR. AGNIFILO:  Of course.

18         MS. PENZA:  I don't think I received it.

19         No objection, Your Honor.

20         THE COURT:  Defense Exhibit 606 is received in

21   evidence.

22         (Defendant's Exhibit 606 received in evidence.)

23   Q     I am going to show you the first page.  It is 606.  The

24   first page is -- it's an mail from Kristin.  It's to you.

25   It's from August 9, 2005.  And it says, "Here it is.  I left

Daniela - cross - Agnifilo                    3123

1    the old entries in so you could see how they work.  Most of my
2    current expenses will be similar.  If you're not sure how to
3    describe a service, guesstimate.  And can you do a new
4    spreadsheet for each month."  From Kristin Keefe; right?
5    That's what it says?
6    A    That's what it says, yes.
7    Q    Do you know what this is?
8    A    I don't remember.  No.
9    Q    Do you remember that you were going to have some
10   expenses, you were going to be working and you were going to
11   have expenses and Kristin was teaching you how to go about
12   dealing with the expenses that you might incur?
13   A    No.
14   Q    No?  Do you remember getting this e-mail?
15   A    I don't.
16   Q    Okay.  All right.  This is also in evidence.  Do you
17   remember her sending you an expense reimbursement form, this
18   expense reimbursement form?
19   A    Not this one, no.
20   Q    Do you remember her sending you a different one?
21   A    I remember this form but from other people even.  It's a
22   reimbursement form that ESP used.
23   Q    And did you use an expense reimbursement form for
24   yourself?
25   A    No.  I wasn't spending or getting reimbursed.  No.

Daniela - cross - Agnifilo                    3124

1    Q    So you don't remember getting this mail from Kristin at

2    all?

3    A    No, not this e-mail, no.

4    Q    Just so we're clear, that's your e-mail address; right?

5    A    Yes.

6    Q    Okay.  And that was your e-mail address in August of

7    2005?

8    A    Yes.

9    Q    At some point you were talking to Kristin about having

10   someone who could get passwords, e-mail passwords; correct?

11   A    I was talking to Keith.

12   Q    I'm going to show you Exhibit 607.  This is just for you.

13   It's not in evidence yet.

14           All right.  So this is Defense Exhibit 607 for

15   identification.  It is from Kristin.  It's to you.  It's dated

16   October 31, 2005; correct?

17   A    Yes.

18           MR. AGNIFILO:  Your Honor, we offer it.

19           MS. PENZA:  No objection.

20           THE COURT:  All right.  Defense Exhibit 607 is

21   received in evidence.

22           (Defendant's Exhibit 607 received in evidence.)

23   Q    This is Exhibit 607.  It's from Kristin.  It's to you.

24   It is from October 31, 2005.  It says, hi, Dani.  Please let

25   me know about your friend.  It's very important.  Also, I

MDL      RPR      CRR      CSR

Daniela - cross - Agnifilo                    3125

1    noticed you are not keeping up with the book inventory and

2    boxes as you promised."  What's the friend that she's talking

3    about there?

4    A    I don't know.

5    Q    Wasn't this the time period when you were looking to get

6    people to help you with e-mail passwords?

7    A    Yes.  I think so.

8    Q    And is this the friend that she's talking about?

9    A    I don't know.

10   Q    And what's the deal?  She says, "Also, I notice you're

11   not keeping up with the book inventory and boxes as you

12   promised."  Do you remember that?

13   A    I don't remember the exact e-mail, but I do remember the

14   circumstances.

15   Q    Because she goes on to say, "You agreed to do it daily

16   and the current load has been on the couch for four days now.

17   What's going on?  Do you still want to talk about it?  How do

18   you think we should handle this with you so that everyone

19   feels good about it," signed Kristin, or not signed Kristin,

20   but Kristin's name; right?

21   A    Yes.

22   Q    Do you remember why she is sending you this e-mail?

23   A    Not this e-mail, no.

24   Q    Let's look at another e-mail, look at 608.

25            MR. AGNIFILO:  This is just for the witness.  It is

Daniela - cross - Agnifilo                    3126

1   for identification, Defense Exhibit 608 for identification.

2   Q    This is from Kristin to you dated November 2, 2005;

3   correct?

4   A    Yes.

5              MR. AGNIFILO:  Your Honor, we offer 608.

6              MS. PENZA:  I'm sorry, Your Honor no objection.

7              THE COURT:  All right.  Defense Exhibit 608 is

8   received in evidence, publish to the jury.

9              (Defendant's Exhibit 608 received in evidence.)

10  Q    This is two days later, after the last e-mail.  It is

11  Exhibit 608 and it's from Kristin, it's to you.  It says,

12  "Hey, you.  Have you talked to your friend today?  I am

13  ignoring about the books.  Love K"; right?

14  A    Right.

15  Q    Okay.  What friend is she now talking to you about for a

16  second time?

17  A    I don't know.

18  Q    Are you saying that -- do you recall that it wouldn't

19  have been the friend who's going to help with the e-mail

20  passwords?

21  A    I'm recalling that I don't know.

22             MR. AGNIFILO:  All right.  We are going to look at

23  609 for identification, just for the witness.

24             THE COURT:  Okay.

25  Q    609 is from you to Kristin.  It is that same day,

MDL       RPR       CRR       CSR

Daniela - cross - Agnifilo                    3127

1    November 2nd; right?

2    A    Yes.

3            MR. AGNIFILO:  We offer it, Judge.

4            MS. PENZA:  No objection.

5            THE COURT:  609 is received in evidence.

6            (Defendant's Exhibit 609 received in evidence.)

7    Q    This is a continuation of the first e-mail and you say,

8    "No, I haven't heard back from my friend.  They're doing some

9    work at Hale and have everything covered in plastic for a

10   couple days now, so the books are staying then until the job

11   is done.  Sorry, Dani"; right?

12   A    Yes.

13   Q    And do you know what friend you're talking about now

14   here?

15   A    I don't.

16   Q    So we are going to look at an e-mail from the next day.

17   This is actually already in evidence I think as Government

18   Exhibit 1515.

19   A    Okay.

20   Q    So this is the day after the friend e-mail and this is

21   from Kristin to you, November 3, 2005, and there's two e-mail

22   addresses there; right?

23   A    Yes.

24   Q    What do those e-mails addresses mean to you?

25   A    Those are the e-mail addresses that were the targets for

1    hacking.

2    Q    All right.  Now, does any of this refresh your

3    recollection as to what Kristin was talking about when she was

4    sending you these repeated e-mails about your friend?

5    A    It doesn't, no.

6    Q    And is this the first time that Kristin is conveying to

7    you the target e-mails for the hacking?

8    A    I don't know if it's -- they had already been conveyed to

9    me by Keith.  I don't know.  I think this is the first time I

10   had -- yeah, I think it's the first time that she sent me

11   that, I think.  I don't remember.

12   Q    Did you ever get any e-mails from Keith about the target

13   e-mail addresses?

14   A    Not that I remember, no.

15   Q    You're saying that Keith told you; right?

16   A    Yes.

17   Q    But here's an e-mail from Kristin with the target

18   e-mails; correct?

19   A    Yes.

20   Q    And after Kristin sent you this e-mail with the target

21   e-mails on it, what did you do?

22   A    Right after, I don't remember.

23   Q    This is already in evidence as Government Exhibit 1516.

24   It is a two-page exhibit.  I will show you the first page.  It

25   is already in evidence.  All right.  This is the -- this is

Daniela - cross - Agnifilo                    3129

1    three days later.  So the Kristin e-mails with the target

2    e-mails was November 3rd.  This is now November 6th and it's

3    an e-mail from yourself to yourself with an attachment white

4    dress JPEG; right?

5    A    Yes.

6    Q    And that is the image of a woman playing a cello; right?

7    A    Yes.

8    Q    Remind the jury what this is.

9    A    I remember this is an image that I had that I liked and I

10   used to embed some code on to it and send it as a test to

11   myself.

12   Q    And when you say -- what's the process you went through?

13   I mean, you have this image that you liked and you said you

14   embedded something in it.  Just tell the jury exactly what you

15   did.

16   A    Okay.  I would -- it's a technical process, but

17   essentially I would grab some code and with a special

18   application one can embed it, so, to direct it that when it's

19   clicked on, the coding will run.

20   Q    And how did you learn how to do that?

21   A    By reading on the internet.

22   Q    Reading on the internet?

23   A    Yes.

24   Q    And what did you read on the internet and learn how to

25   hack a computer?

Daniela - cross - Agnifilo                    3130

1    A     The internet's a large place.  There are forums.  There

2    are treads.  There is like entire groups where one can do

3    that.

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3131

1    (Continuing)

2    Q    And what did you find in particular that taught you how

3    to do this hacking?

4    A    I -- what did I find?

5    Q    Yeah.

6    A    I found a lot of resources.  I don't remember them all

7    exactly right now.  But I found a lot of resources and I

8    tested them and that's how I learned.

9    Q    And what's the first computer that you had?

10   A    In my life?

11   Q    Yeah.

12   A    I think it was -- you know what?  I don't remember.  I

13   think it was -- I think it was -- you mean like in my life?

14   Q    In your life.

15   A    It was like a PC that my father brought home and I think

16   it was brandless.  I think it was like an assembly, you know,

17   how I can like put it together; the CPU with the desk -- it

18   was like way back.

19   Q    And how old were you the first time you hacked a

20   computer?

21   A    Hacked, oh.  When, I was, whatever that age is.

22   Q    Okay.  So what were you talking about with the computer

23   your father brought home?

24   A    When my father brought a computer home, I learned how to

25   open it.  It was still DOS and you had to -- I just -- it was

VB       OCR       CRR

Daniela - cross - Agnifilo                    3132

1   the first computer I had ever had.

2   Q    So you figured -- you went into the computer.  You opened

3   the computer up and figured out how it worked; is that what

4   you are saying when you say opened it?

5   A    Yes.

6   Q    Okay.  But you're saying the first time you ever hacked a

7   computer, an e-mail account, was -- were these -- the ones

8   that you talked about on direct examination.

9   A    Yes.

10            MR. AGNIFILO:  Now, this is already in evidence.

11   It's Government's Exhibit 1527.  I'll show you the first page

12   first.  There is an attachment to it.

13            (Exhibit published.)

14            MR. AGNIFILO:  Here we go.

15   Q    All right.  This is from yourself to yourself; right?

16   A    Yes.

17   Q    Okay.  And it says -- attachments or downloads; correct?

18   A    The attachments, downloads, one RTF, yes.

19   Q    And then we go to the first page.  We go to first the

20   attachment.

21            What are these things?

22   A    These are -- so these are excerpts of a key logger file,

23   like a raw file.  So these are excerpts, copy, pasted onto a

24   text-friendly type and organized.

25   Q    And where did you get this from?

Daniela - cross - Agnifilo                           3133

1   A    I got this from the log, from the key log intrusion, from

2   the hack on James Loperfido's computer.

3   Q    Okay.  So just take this very briefly.  What's the

4   process by which this document is created?

5   A    Okay.  So I grab the logs from the server.  They're very

6   noisy.  I select the relevant parts.  I copy and I paste it

7   onto a text file, which would be this one.

8            And I do that, you know, methodically until I have

9   all the relevant information.

10  Q    Okay.  And then how -- and then who makes this actual

11  printed document?

12  A    The print, I have no idea.

13  Q    All right.

14           MR. AGNIFILO:  Now, I want to show you Defendant's

15  Exhibit 612, still for identification.  612, it's an e-mail

16  from Kristin to you.

17  Q    And it says -- the subject is wi-fi spots.  And it's from

18  January the 12th, 2006; correct?

19  A    Yes, it's blurry.  Yes.

20  Q    Is that a little better?

21  A    Yes.

22           MR. AGNIFILO:  Okay.  We offer it, Your Honor.

23           MS. PENZA:  No objection.

24           THE COURT:  All right.

25           Defendant's Exhibit 612 is received in evidence.

Daniela - cross - Agnifilo                    3134

1           (Defendant's Exhibit 612 received in evidence.)

2           MR. AGNIFILO:  Okay.

3           (Exhibit published.)

4  BY MR. AGNIFILO:

5  Q    So it's 612, it's from Kristin Keeffe.  From Kristin

6  Keeffe, it's to you.  It says:  Wi-fi spots, and it's from

7  Thursday, January 12th, 2006; correct?

8  A    Yes.

9  Q    All right.  What is she sending you here?

10  A    It says:  Hey... it looks like -- I don't know.  I'd have

11  to open that site.

12           But just from the name of it, it looks like it would

13  be a list of free wi-fi spots.  It looks like in New York,

14  maybe.

15  Q    Okay.  And you and Kristin had a discussion about you

16  finding free wi-fi spots where you could do your hacking?

17  A    I don't think we had a discussion.  I just knew that I

18  had to do that, because that was my -- I mean, that was my --

19  that was what I had devised.

20  Q    Had you ever discussed it with her?

21  A    Not -- maybe, yes.  I'm guessing yes.  I don't remember

22  exactly when, but yes.

23  Q    When she sent you this e-mail that says wi-fi spots and,

24  hey D, here's the link, and then there's a link, you weren't

25  surprised she sent it to you.

VB      OCR      CRR

Daniela - cross - Agnifilo                    3135

1    A    Right.  So if it is what I think it is, then there may

2    have been a discussion, yes.

3    Q    And do you remember that discussion?

4    A    I don't.

5    Q    You remember the ones with Keith pretty clearly, though;

6    don't you?

7    A    Some of them.

8    Q    Yeah.  But you don't remember any discussions with

9    Kristin, not one?

10   A    I remember some.

11   Q    Okay.  Tell me.

12   A    The ones what I remember?

13   Q    Yeah.

14   A    Sure.  I remember sometimes I would ask her to drive me

15   to some of the wi-fi spots.  So there was that discussion.

16        Sometimes -- later -- later on, I would hand her the

17   USB drive with the files.  So there was certainly discussions.

18        And so, yeah, I remember that.

19   Q    How many times did she drive you to the place where you

20   would do the hacking from the wi-fi?

21   A    Oh, I don't remember that.

22   Q    Three times?  Five times?  Ten times?

23   A    I mean, several times.  Many times.

24   Q    Did you have a car?

25   A    Yeah.

Daniela - cross - Agnifilo                    3136

1   Q    And when you went, it was just you and her?

2   A    Yes.

3   Q    Did you ever go with anybody else?

4   A    Not with her.

5   Q    Did you ever go with anybody else without her?

6   A    Yes.

7   Q    Who is that?

8   A    I think -- I think Karen.  I think my brother.  Sometimes

9   I would walk.

10  Q    How many times did you go with your brother?

11  A    I don't remember.  I don't remember that.

12  Q    And when your brother went, who else went?

13  A    Just my brother and I.

14  Q    That's it?  No one else?

15  A    Not that I remember, no.

16          MR. AGNIFILO:  Your Honor, this is as good a time as

17  any.

18          THE COURT:  All right.  That is fine.

19          We are going to adjourn for the day, Members of the

20  Jury.  I am reminding you that it is very important that you

21  obey my instructions that you not discuss the case with

22  anyone, not your family, your friends or business associates

23  and not fellow jurors.

24          Do not read, listen to, watch or access any accounts

25  of this case, and any form of media such as newspapers, TV,

Daniela - cross - Agnifilo                    3137

1    radio, podcasts or the internet.

2              Please do not research or seek out any information

3    about any aspect of the case, and do not communicate with

4    anyone about the case on your phone, whether through e-mail,

5    text messaging or any other means, or through any blog or

6    website, or by way of any social media, including Facebook,

7    Twitter, Instagram, YouTube or other similar sites.

8              If you are taking notes, please leave them in the

9    jury deliberation room.

10             We will see you tomorrow morning at 9:30.  Have a

11   good evening.

12             All rise for the jury.

13             (Jury exits.)

14             (In open court; outside the presence of the jury.)

15             THE COURT:  All right.  The witness is excused.  You

16   may stand down.

17             Do not discuss your testimony with anybody.

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             (Witness excused.)

21             THE COURT:  About how much time do you think you

22   will be taking tomorrow on your cross?

23             MR. AGNIFILO:  If I can get my act together, I will

24   finish before lunch.  But it might spill over maybe

25   45 minutes.

Proceedings                                                     3138

1              THE COURT:  All right.

2              Anything else from the Government?

3              MS. PENZA:  No, Your Honor.

4              THE COURT:  Anything else from the defense?

5              MR. AGNIFILO:  Nothing from us, Judge.

6              THE COURT:  All right.  We will see you tomorrow

7     morning, 9:30.

8              Thank you.

9

10             (Matter adjourned to Friday, May 31st, 2019 at

11    9:30 a.m.)

12

13                              ooo0ooo

14

15

16

17

18

19

20

21

22

23

24

25

3139

1                          I N D E X

2    WITNESSES:

3

4        DANIEL O'DONNELL

5            DIRECT EXAMINATION BY MS. HAJJAR          2920

6            CROSS-EXAMINATION BY MR. AGNIFILO         2929

7        DANIELA

8            DIRECT EXAMINATION (Cont'd) BY MS. PENZA  2932

9            CROSS EXAMINATION BY MR. AGNIFILO         3047

10

11

12                          EXHIBITS:

13

14          Government Exhibits 1588, 1588-R,      2922
            1588-B and 1588-C
15          Government Exhibit 251                 2957
            Government Exhibit 910                 2957
16          Government Exhibits 905, 906 and       2972
            924
17          Government Exhibits 1570, 1571,        3034
            1572, 1577, 1610 and 1614
18          Defendant's Exhibit 605                3121
            Defendant's Exhibit 606                3122
19          Defendant's Exhibit 607                3124
            Defendant's Exhibit 608                3126
20          Defendant's Exhibit 609                3127
            Defendant's Exhibit 612                3134
21

22

23
                    *       *       *       *
24

25