3140

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,    :   18-CR-204(NGG)
4
              Plaintiff ,        :
5                                     United States Courthouse
         -against-               :   Brooklyn, New York
6
    KEITH RANIERE, et al.,       :
7                                    May 31, 2019
              Defendant.         :   9:30 a.m.
8
    - - - - - - - - - - - - X
9
                 REDACTED TRANSCRIPT OF TRIAL
10        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
          UNITED STATES DISTRICT JUDGE, and a jury.
11
    APPEARANCES:
12
    For the Government:          RICHARD P. DONOGHUE
13                               United States Attorney
                                 BY: MOIRA K. PENZA
14                                   TANYA HAJJAR
                                     MARK LESKO
15                               Assistant United States Attorneys
                                 271 Cadman Plaza E, Brooklyn, NY
16
    For the Defendant:           BRAFMAN & ASSOCIATES, P.C.
17                               767 Third Avenue, New York, NY

18                               BY: MARC A. AGNIFILO, ESQ.
                                     TENY ROSE GERAGOS
19
                                 DEROHANNESIAN & DEROHANNESIAN
20                               677 Broadway, Albany, NY 12207

21                               BY:  PAUL DerOHANNESIAN, II, ESQ.
                                     DANIELLE R. SMITH, ESQ.
22
    Court Reporter:              Charleane M. Heading
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

3141

```
1              (In open court; outside the presence of the jury.)
2              THE COURT:  All right.  Appearances, please.
3              MS. PENZA:  Moira Penza, Tanya Hajjar, Mark Lesko
4    for the United States.  Good morning, Your Honor.  Also at
5    counsel table is Special Agent Michael Weniger and our
6    paralegal specialist Teri Carby.
7              THE COURT:  Good morning to all.
8              MR. AGNIFILO:  Good morning, Your Honor.  Mark
9    Agnifilo, Teny Geragos, Paul DerOhannesian and Danielle Smith,
10   plus Keith Raniere who is with us in court this morning.  Good
11   morning, Your Honor.
12             THE COURT:  Good morning.
13             Please be seated.
14             For the government, let me just ask, the
15   supplemental issue on the Daubert issue?
16             MS. PENZA:  We expect to file that today.
17             MR. LESKO:  We are putting the final touches on it,
18   Your Honor.  We expect to file it over the lunch break.
19             THE COURT:  All right.
20             MR. AGNIFILO:  And you want our response on Monday?
21             THE COURT:  Monday at noon.
22             MR. AGNIFILO:  That's fine, Judge.
23             THE COURT:  Okay.  Thank you very much.  And if we
24   do go ahead with the Daubert hearing, I'm not quite sure when
25   we would do it, but we can talk about that.  I'm not sure,
```

3142

1  would you be available sometime Tuesday to do a hearing if we

2  need to have a hearing?

3  MR. LESKO:  Your Honor, we've asked Dr. Hughes to

4  block Tuesday afternoon if that's amenable to the Court.

5  MR. AGNIFILO:  We could do Tuesday afternoon.

6  THE COURT:  All right.  That's fine.  Let's see what

7  you submit and then I will let you know, but why don't you put

8  it down for 2:30 Tuesday afternoon tentatively.

9  MR. AGNIFILO:  Okay, Judge.

10  THE COURT:  All right.

11  MR. AGNIFILO:  There's one other issue --

12  THE COURT:  Right.

13  MR. AGNIFILO:  -- that I don't think we have to

14  resolve now but we have to resolve it at one point.

15  One of the government's witnesses today is a women

16  named Elizabeth Butler and I believe Elizabeth Butler worked

17  in a Planned Parenthood type of place and I'm concerned with

18  the hearsay.  Now, I can make the objections as they come up

19  if they appear to be hearsay, but what I wanted to do is sort

20  of flag the issue for the Court and then we can resolve it if

21  Your Honor wants to resolve it or preview the issue if that's

22  what Your Honor wants to do.

23  MS. PENZA:  Your Honor, I believe the issue has been

24  previewed for your Your Honor prior to, at least, in part,

25  prior to trial.  This is the issue where on Camila's records

1     there is an indication, I believe this is what Mr. Agnifilo is

2     referring to, there's an indication in her medical history

3     form that she has been sexually active with her partner for

4     five years.

5            Mrs. Butler is a nurse practitioner.  She is

6     prepared to testify that she actually developed the intake

7     form and that the information that is elicited on that form

8     from patients is pertinent to and necessary for medical

9     treatment, that this is an OB/GYN facility.  Knowing how long

10    someone has been with their partner and whether they have

11    changed partners is a necessity in order to adequately assess

12    whether they are at risk for new sexually transmitted

13    diseases, et cetera.  So that's the foundation that the

14    government expects to lay as to that.

15           There is another, I think, hearsay issue, I think

16    what Mr. Agnifilo would say is hearsay, is that at the time --

17    Mrs. Butler was the -- as well as seeing patients, she was

18    also the office manager at the time at McGinnis Women's Health

19    which provides -- it was an OB/GYN practice.  And at that

20    time, she was in charge of dealing with complaints from

21    clients and so she was the person who ultimately was assigned

22    to interface over the phone with Pamela Cafritz after Pamela

23    Cafritz expressed upset about this supposed HIPAA violation.

24           The government views Pam Cafritz's role there as a

25    co-conspirator.  We're not offering it for the truth of her

1    statements.  We're also -- we're offering it for the fact that

2    this was part of the means and methods of the conspiracy.

3          MR. AGNIFILO:  Your Honor, my concern is --

4    obviously, we've never spoken to Ms. Butler -- is that in her

5    3500 material, specifically 3500EB-3, she says, All

6    information regarding the sisters, whose last names she uses,

7    the last name we're not using in court but the sisters that

8    we're talking about, was relayed to her, Ms. Butler, by her

9    co-worker Judith Wilner.

10         So my concern is in light of that statement in the

11   3500 material, I don't know what she's going to say are things

12   that she did herself or things that were related to her by her

13   co-worker and that's the only reason I'm flagging the issue

14   now so that we don't have this sort of a wholesale hearsay

15   issue later.

16         MS. PENZA:  So, Your Honor, as to that, I believe

17   that Your Honor can give the instruction about whatever

18   Mrs. Wilner, who is also a nurse practitioner at the office,

19   relayed to Mrs. Butler -- but then Mrs. Butler is the person,

20   I think it is important to have that context, for her

21   follow-up conversation with Pamela Cafritz.  But I believe

22   that Your Honor can give the instruction that whatever Judy

23   Wilner told Mrs. Butler is hearsay and not being, that that

24   would not be admissible for the truth of those statements but

25   only for their effect on Mrs. Butler, but her own

1    communications with Pamela Cafritz are not hearsay.  And then

2    there are also the statements within the records that are not

3    hearsay because they were for the purpose of medical treatment

4    or diagnosis.

5         MR. AGNIFILO:  My concern with that approach, Judge,

6    is statements made to a medical practitioner are exceptions to

7    the hearsay rule because they are being offered for the truth.

8    When someone goes to a doctor and says, My left arm hurts, the

9    reason that's a hearsay exception is you tend to be more

10   truthful with a medical professional.  So I don't see how the

11   government can get around the clear import of this information

12   being offered for the truth by just saying it's not being

13   offered for the truth.  It's clearly being offered for the

14   truth or else it wouldn't be made to a medical professional.

15        I think we're getting into a 403 issue with this

16   approach that things that are admittedly hearsay and would not

17   be admissible because of the rule against hearsay are being

18   admitted but with this instruction to the jury that you're to

19   disregard it because it's relevant to the effect on the

20   listener.  I don't know that the effect on the listener raises

21   to such materiality that the clear hearsay of this information

22   somehow doesn't carry the day.

23        I mean, it seems like we've swallowed the hearsay

24   rule by an approach that the government has been encouraging

25   the Court to follow and here what we have is we have clear

3146

1    hearsay.  We have statements being made to another medical

2    professional which are clearly being offered for the truth and

3    I don't think that we can admit them without my ability to

4    cross-examine that medical professional just by saying, well,

5    we're not going to offer for the truth, it's because of the

6    effect on the listener.

7              MS. PENZA:  I think there's two categories here,

8    Your Honor.

9              So as to Camila's statements that she was five years

10   with her partner when she was 21 years old, that, Your Honor,

11   we are offering for its truth.  We expect that Mrs. Butler

12   will be able to say that these are true and correct copies of

13   Camila's medical records and that that statement that is

14   within here, five years with partner, is the exact type of

15   statement that one expects to get from an individual.  She put

16   together the form herself.  When you're trying to provide

17   OB/GYN treatment to someone, knowing how long they've been

18   with their partner, whether they're in a monogamous

19   relationship is critically important.  We are offering that

20   for its truth.

21             We are also offering this conversation between

22   Pamela Cafritz -- there is really no truth to that

23   conversation.  The conversation with Pamela Cafritz and

24   Mrs. Butler is all about the means and methods by which this

25   enterprise operated.

3147

1          THE COURT:  Meaning, what?  That Cafritz was trying
2     to do what?
3          MS. PENZA:  Meaning that Cafritz was trying to cover
4     up for the defendant and trying to conceal the fact that he
5     was having sexual relationships with three illegal women, one
6     of whom was very young at the time and who he had
7     previously -- he had been having sexual relationships with
8     when she was under age, but that part of the communication,
9     that's, there's no hearsay issue there.  There just is not.
10          THE COURT:  All right.  Thank you for previewing
11     this for me.  Thank you.
12          MR. AGNIFILO:  You're welcome.
13          MS. PENZA:  You're welcome.  Thanks to Mr. Agnifilo.
14     I won't take credit.
15          MR. AGNIFILO:  Everyone is welcome.
16          MS. PENZA:  I don't want to take credit.
17          THE COURT:  I'm afraid to ask if there is anything
18     else.
19          MS. PENZA:  I would like a very brief sidebar,
20     Your Honor.
21          THE COURT:  All right.
22          MS. PENZA:  That one I'll take credit for.
23          (Continued on next page.)
24
25



3149

1          THE COURT:  All right.  Let's bring in the witness.

2          (Witness resumes the stand.)

3          (Jury enters.)

4          THE COURT:  Please be seated.

5          MR. AGNIFILO:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7          Good morning, members of the jury.

8          THE JUROR:  Good morning.

9          THE COURT:  All right.  Let's continue with

10   cross-examination, Mr. Agnifilo.

11          I remind the witness that she is still under oath.

12          THE WITNESS:  Yes, Your Honor.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                           3150

1   DANIELA    ,

2        the witness, having been previously duly sworn,

3        resumed as follows:

4   CROSS-EXAMINATION (Continued)

5   BY MR. AGNIFILO:

6   Q    Good morning, Daniela.

7   A    Good morning.

8   Q    I'm going to ask you some questions this morning just

9   like yesterday.  If I ask you a question that you don't

10  understand or you want me to rephrase, just ask me to do that

11  and I'll be happy to do that.  Okay?

12  A    Okay.

13           THE COURT:  Check that your microphone is on.

14           MR. AGNIFILO:  It is not.

15           THE COURT:  All right.

16  Q    Okay.  Toward the end of yesterday, I had asked you

17  certain questions about e-mails that you had with Kristin

18  Keefe and who a particular friend of yours was.  Do you

19  remember me asking you those questions?

20  A    I yes.

21  Q    I'm just going to remind you.  This is already in

22  evidence as Defense Exhibit 607 and I asked you about this

23  yesterday.  Here's 607.  Let me try and get the whole thing

24  there.

25           All right.  The date of that e-mail is October the

Daniela - cross - Agnifilo                    3151

1    31st.  It's from Kristin Keefe to you and it says:  Hi, Danny.

2    Please let me know about your friend.  It's very important.

3              Do you remember that?

4    A    Yes.  It's off my screen now.

5              MR. AGNIFILO:  Judge, it's in evidence.

6              THE COURT:  It's rebooting.  Hold on.  Got it.

7              Do you have it now?

8              THE WITNESS:  Yes.  Thank you.

9    Q    All right.  So let's take it from the top.  So it's from

10   Kristin Keefe, it's to you, and it's dated October the 31,

11   2005.  It says:  Hi, Danny.  Please let me know about your

12   friend.  It's very important.

13             I asked you if you have a recollection of who the

14   friend was and I think you said yesterday you weren't sure

15   exactly who the friend was, right?

16   A    Yes, I don't remember.

17   Q    Okay.  I'm going to show you an exhibit that's already in

18   evidence.  It's Government's Exhibit 1514 in evidence and this

19   is an e-mail dated the same day, October the 31st, 2005, as

20   soon as that comes into focus.

21             And whose -- how do you pronounce the name of this

22   person that's sending this message to you?

23   A    Leonardo.

24   Q    And who is that?

25   A    That is an ex -- a student that I was going to school

Daniela - cross - Agnifilo                    3152

1  with in high school.

2  Q    And what was this person contacting you about?

3  A    This person was contacting me about not receiving an

4  e-mail from me.

5  Q    And why were you in touch with this person?

6  A    This is one of the people that I contacted to find out if

7  they knew someone who could get passwords.

8  Q    Okay.  So this is one of the people you were talking to

9  to see if they could get passwords so that you could hack into

10  computers, correct?

11  A    Yes.

12  Q    And this e-mail is dated October the 31st, 2005, right?

13  A    Yes.

14  Q    And just to complete the circle -- I'm sorry.  I showed

15  you the same e-mail twice.

16         What we just looked at, 607, that's the same date,

17  the e-mail from Kristin Keefe where she's asking about your

18  friend, right?

19  A    Yes.

20  Q    Is this the friend she's asking you?

21  A    I don't know for sure.  I don't know.

22  Q    But you agree with me that the same day that Kristin

23  Keefe is asking you about your friend, October 31, 2005, is

24  the same day that your friend contacts you in regard to

25  providing you with information so that you can hack into

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                           3153

1    computers, right?

2    A    What's the question?

3    Q    That's the same day?

4    A    It's the same date.

5    Q    Now, you said that you, you hacked into a number of

6    different people's e-mail accounts, correct?

7    A    Yes.

8    Q    And you said one of the people that you tried to hack

9    into was someone named Joe O'Hara, is that correct?

10   A    Yes.

11   Q    And who is Joe O'Hara?

12   A    He is, was a lawyer.  I don't know exactly who he was.  I

13   understood he was a lawyer for NXIVM at some point.

14   Q    I think you said on direct examination that you sent a

15   trojan e-mail?

16   A    Yes.

17   Q    Okay.  And just tell the jury what that is?

18   A    A trojan e-mail is an e-mail that is designed and

19   disguised to look like a regular e-mail, like perfectly

20   innocent but it hides some malware or some kind of spy

21   software that's supposed to download without the knowledge of

22   the user.

23   Q    And you sent this -- how did you go about trying to have

24   this put on Mr. O'Hara's computer?

25   A    You, do you mean like the actual process?

Daniela - cross - Agnifilo                    3154

1    Q     Correct.

2    A     Okay.  It started, if I recall correctly, with crafting

3    the, the actual e-mail I was going to send, masking the

4    address so it looked like it was coming from a, at least a

5    familiar e-mail or something that doesn't look suspicious.

6    Q     Let me stop you there for a second.

7              How do you go about masking the address?

8    A     There's, there's special ways to do that.  There are

9    special services and software to do that.

10   Q     And how did you learn how to do it?

11   A     I read it on the internet.

12   Q     Okay.  All right.  Go ahead.  I interrupted your process.

13   A     So, masking it is the first step at the same time as

14   crafting the actual content of the e-mail, which indicates the

15   method I was using was having a, again, a file that did not

16   seem like a virus or an infection or any kind of attack but

17   just an Excel sheet or an image and embedded in said file

18   would be the code that would deploy the software that would be

19   used to spy on the person.

20   Q     And how long did it take you to learn how to do all this?

21   A     I don't remember exactly.

22   Q     Days?  Weeks?  Months?

23   A     I think it was weeks.

24   Q     And you said that the, in the instance of Joe O'Hara, it

25   didn't work, correct?

Daniela - cross - Agnifilo                    3155

1   A    Yes.  I -- that's what I remember.  It didn't work.

2   Q    And do you know why?

3   A    No.

4   Q    Now, you said at one point, you, you tried to hack into

5   Edgar Bronfman's e-mail server, correct?

6   A    Yes.

7   Q    Okay.  And you prepared a key logger for that as well?

8   A    Part of it.

9   Q    And --

10            THE COURT:  Excuse me.  We're talking about the

11   father of Clare Bronfman?

12            MR. AGNIFILO:  Correct.

13            THE COURT:  Because there are several people named

14   Edgar Bronfman.

15            MR. AGNIFILO:  Yes.  Yes.

16            THE COURT:  Let's be specific.  All right?

17            MR. AGNIFILO:  Yes.

18   Q    So this is Clare Bronfman's father, Edgar Bronfman?

19   A    Yes.

20   Q    And did you something differently with that hack attempt

21   than you did with Joe O'Hara?

22   A    Yes.

23   Q    And what did you do differently?

24   A    As I said before, it was a, it was a hack that was

25   different for the single factor that it was going to be

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3156

1   perpetrated by Clare so not by me directly, therefore, the
2   method was a little simpler.  So the process, the actual
3   method is the same but shorter since the process of having to
4   mask and make it go through all the filters wasn't necessary
5   because Pam -- because Clare was going to be sending it to her
6   father and that's overwritten.
7   Q    Okay.  And do you regard -- do you remember, in regard to
8   that particular hack attempt, that you went to a place to use
9   the internet of a establishment called Mocha Lisa?
10  A    No, I don't remember that.
11  Q    Was there a retail outlet in the area called Mocha Lisa?
12  A    I don't remember exactly.
13  Q    Do you remember if you went with Fluffy, your brother,
14  and your sister Cami?
15  A    No, I don't remember.
16  Q    Do you remember going in Fluffy's car with both Fluffy
17  and Cami to a place specifically in the afternoon so that you
18  could try to hack into, use public WiFi to do this?
19  A    I don't.
20  Q    No?
21  A    No.
22  Q    How -- you said yesterday that you had used, Fluffy had
23  driven you on a number of occasions to different places where
24  you could use the public WiFi, right?
25  A    Yes.

Daniela - cross - Agnifilo                    3157

1  Q     And I asked how many.  Do you remember how many times he
2  drove you to places to use the public WiFi?
3  A     I don't.
4  Q     Describe to the jury what's the importance of using a
5  public WiFi when doing this?
6  A     Public -- the importance of using a public WiFi was so
7  that it could not be traced back to my WiFi.  So any kind of
8  internet connection can be traced to an IP address.  So,
9  obviously, if I'm going to connection from the same IP address
10 and it's my home address, that can be traced back.  So since
11 this was a hacking, I didn't want it to get back to me so I
12 was using either public WiFi or just similar WiFi even if it
13 wasn't public, say, for example, in a library where it takes a
14 password but just not my own.
15 Q     And what you would do is you wouldn't have to go into the
16 establishment, right?  You could pick the WiFi up if you were
17 able to park close enough to the place itself, correct?
18 A     That could be done, yes.
19 Q     And did you that a number of times, yes?
20 A     Yes.
21 Q     So, in other words, you would go in a car, you would go
22 near the establishment, in the parking lot or someplace close,
23 and you would get access to that place's WiFi, right?
24 A     Yes.
25 Q     And do you remember being in a car with Fluffy and Cami

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3158

1    when you did this?

2    A     No, I don't.

3    Q     Do you remember telling Fluffy or Cami that it was

4    important to try to do it in the afternoon when there were a

5    lot of people in the establishment?

6    A     No, I don't remember that.

7    Q     Do you recall doing this mostly in the afternoon when you

8    would go and use a public WiFi?

9    A     Actually, I don't.

10   Q     When would you do it?

11   A     I think later at night.

12   Q     And who did you go with?  Other than Fluffy, who else did

13   you go with?

14   A     I remember, I remember, at times, Kristin.  Again, I

15   remember Karen Unterreiner as well and I remember going by

16   myself.

17   Q     And do you ever remember being in the car with Cami?

18   A     I don't.

19   Q     No?  Not one single time?

20         MS. PENZA:  Asked and answered.

21   Q     Never, is your testimony?  You were never in a car with

22   Cami doing this?

23   A     Not that I remember.

24   Q     Now, you said at one point that you hacked into your

25   older sister Marianna's e-mail account, correct?

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3159

1   A    I, I don't think that's correct.

2   Q    Tell us what did you do with Marianna and hacking?

3   A    I don't -- I may have.  I don't remember if I actually

4   was able to get into her e-mail account.  I hacked into her

5   Facebook account as I said before.

6   Q    Okay.  So you hacked into her Facebook account?

7   A    Yes.

8   Q    And this is something that you discussed with Keith,

9   correct?

10  A    It was via e-mail communication with Keith discussed,

11  yes.

12  Q    Okay.  So you never discussed it in person with Keith

13  you're saying?

14  A    That's correct.

15  Q    You discussed it with Keith over e-mail?

16  A    Yes.

17  Q    All right.  And the concern was that Marianna was

18  essentially using Keith's password to do something, right?

19  A    No.

20  Q    Wasn't the concern that Marianna was accessing Keith's

21  e-mail account?

22  A    No.

23  Q    Well, when you hacked into Marianna's Facebook, did you

24  find that she was accessing Keith's e-mail account?

25  A    Yes.

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3160

1  Q    And that wasn't discussed beforehand that that was

2  specifically what you were looking for?

3  A    No.

4  Q    Now -- and you hacked into Marianna's Facebook account

5  when, exactly?

6  A    I don't remember the exact date.

7  Q    Okay.  All right.  This is already in evidence as

8  Government's Exhibit 1539.

9        All right.  1539 is an e-mail.  It's from, it's from

10 you, it's to Keith, right?  Do you see that there?

11 A    Yes.

12 Q    Okay.  Just so that everyone can see it, it's Government

13 Exhibit 1539.  And you say, November 1, 2008, you say:  I am

14 on my way to Flintlock now to check the computer.  Right?

15 A    Yes.

16 Q    What are you talking about?

17 A    I am talking about -- I think it's pretty

18 self-explanatory.  I'm going to go and check the log of the

19 infected computer.

20 Q    Okay.  And you sent an attachment.  This exhibit shows an

21 attachment.  It says:  OutlogFile.txt, T-X-T, right?

22 A    Yes.

23 Q    And the attachment I think you described on direct

24 examination --

25 A    Oh, yes.

Daniela - cross - Agnifilo                     3161

1    Q     -- is several pages but one of the pages is this,
2    correct?
3    A     Yes, I believe that is so.
4    Q     Okay.  And tell us, again, what is this?
5    A     Again, that is a raw file, output of a key logger.
6    Q     Okay.  And so this is the raw file of Marianna's Facebook
7    account, right?  This is data from Marianna's Facebook
8    account?
9    A     No.
10   Q     What is this?  Where is it from?
11   A     From the computer itself.
12   Q     Okay.  But you hacked into her Facebook account, correct?
13   A     Yes.
14   Q     And this is the material that you got from that hacking
15   effort, correct?
16   A     No.
17   Q     Go ahead, explain.
18   A     Okay.  So it's --
19              THE COURT:  Can you keep that up on the screen?
20              MR. AGNIFILO:  Sure.  Sure.  Absolutely.
21              THE COURT:  Please.
22   Q     Here you go.
23   A     So I think the causality is in reverse.  So the key
24   logger is installed in the computer.  The key logger will
25   actually log everything that happens in the computer.  So she

Daniela - cross - Agnifilo                    3162

1    could be logging into Facebook, she could be logging into the

2    e-mail, she could be logging into a local application, she

3    could be writing stuff, typing stuff, playing Solitaire.

4    Everything that happens in the computer is logged on that

5    file.

6            From that file, which as you asked me before, that's

7    when I went on to check, I was going to go check that file,

8    this is that file.  In this file is contained the information,

9    user name and password if she typed it which she did in order

10   to be able to access her Facebook account.  Then the hacking

11   occurs.  So first -- sorry.

12           THE COURT:  Go ahead.

13   A    First it's a key log intrusion so it's a log of the

14   computer.  And then from that, it's a hacking into whatever

15   other service I have obtained from that information.

16   Q    Okay.

17           THE COURT:  So let me just put a finer point on it.

18           MR. AGNIFILO:  Sure.

19           THE COURT:  So this document shows every key stroke

20   that the person at the computer struck on the keyboard.

21           THE WITNESS:  Yes, that's correct.

22           THE COURT:  And from that, you ascertained passwords

23   and so forth which you then could use to access Facebook or an

24   e-mail account or a bank account?

25           THE WITNESS:  That's correct.

Daniela - cross - Agnifilo                    3163

1            THE COURT:  Online?

2            THE WITNESS:  Yes.

3            THE COURT:  And so forth.

4            THE WITNESS:  Yes.

5            THE COURT:  That's what a key logger provides for

6    you.

7            THE WITNESS:  Exactly.

8            THE COURT:  So and that's what you installed with

9    malware in that computer, is that right?

10           THE WITNESS:  Right.  That's right.

11           THE COURT:  All right.  Let's keep going.

12           MR. AGNIFILO:  Right.

13   Q    And so you sent, you sent this data to Keith.  There's

14   several pages here and we looked at the first page.  This is

15   the second page.  Right?  You sent all this to Keith --

16   A    Yes.

17   Q    -- by e-mail.

18           Did you ever send him similar information from

19   anyone other than Marianna?

20   A    Via e-mail?

21   Q    Any way.

22   A    Yes.

23   Q    Well, let's start with e-mail.  Did you ever send him via

24   e-mail similar information of the key strokes for anyone other

25   than Marianna?

Daniela - cross - Agnifilo                    3164

1   A    No, I wouldn't, no.

2   Q    So you never sent him anything from the keystrokes of

3   James Loperfido's hack, correct?

4   A    Not via e-mail.

5   Q    I'm asking right now for e-mail.

6   A    Okay.

7   Q    So you didn't send him anything from James Loperfido,

8   that hacking from, by e-mail, correct?

9   A    And as I said, not via e-mail.

10  Q    And you didn't send him anything about the hacking of

11  Edgar Bronfman via e-mail, correct?

12  A    That's right, not via e-mail.

13  Q    So the only material you sent from hacking via e-mail

14  relates to your older sister, Marianna, correct?

15  A    I think so, yes.

16  Q    Now, it's fair to say that Keith never viewed the e-mail

17  accounts themselves?

18  A    For whom?

19  Q    For -- well, Marianna we established because you sent him

20  the keystrokes, correct?

21  A    So he did.

22  Q    For Edgar Bronfman or for James Loperfido or for -- he

23  also did Kristin Snyder, right?

24  A    Can I do it one by one?

25  Q    Sure.

CMH        OCR        RMR        CRR        FCRR

Daniela - cross - Agnifilo                    3165

1   A    So, for my sister Marianna, I believe he did.  I wasn't

2   there to presence it but I sent him the user name and password

3   and I didn't access it myself but, again, I wasn't there to

4   see it so I can't say for sure.  For Edgar Bronfman, no, I

5   don't believe he personally ever accessed the e-mail.  For

6   James Loperfido, I also don't think he ever accessed that

7   e-mail.

8        And you said Kristin Snyder?

9   Q    Yes.  Kristin Snyder.

10  A    Kristin Snyder, I never accessed that e-mail.  That was

11  obtained in a different way.  I recall him accessing that

12  e-mail but I can't say for sure.

13  Q    Okay, but you agree with me you never e-mailed him the

14  way that you did with Marianna's information; you never

15  e-mailed him anything from the Kristin Snyder hacking?

16  A    Again, I didn't do that hacking.  I -- no.  That wouldn't

17  be me.

18  Q    Okay.  Who did do the hacking?

19  A    I don't know.

20  Q    You didn't do it?

21  A    That is right.

22  Q    Okay.  And in regard to James O'Hara, that was not

23  successful, you never got access into the computer of James

24  O'Hara, correct?

25  A    I don't think that's a person.  James O'Hara?

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                                    3166

1   Q    Yes.  I'm sorry.  Joe O'Hara.

2   A    Yeah, no, I wasn't successful.

3   Q    Okay.  Now, is it fair to say that Marianna's key logger,

4   you put it on Pam Cafritz's computer?

5   A    I don't remember exactly which computer.  Marianna didn't

6   own anything so, I mean, Pam's computer is Marianna's

7   computers.  It was who was using it.

8   Q    Okay.  So do you recall it being Pam's computer?

9   A    Again, I don't know by which standard to label it, if who

10  bought it or who used it.

11  Q    Do you remember if they both used the same computers?

12  A    I don't remember.  Their personal computers, I don't

13  remember.  I was told just where to put it.

14  Q    Now, they were living together at the time at

15  3 Flintlock, correct?

16  A    Yes.

17  Q    Okay.  And the computer was at 3 Flintlock, right?

18  A    Yes.

19  Q    All right.  I want to talk for a moment about this Ben

20  Myers stuff.  You and Ben Myers started moving in the

21  direction of having a relationship at some point in 2006,

22  correct?

23  A    That's one way to put it, yes.

24  Q    How would you put it?

25  A    It's one way to put it, yes.

Daniela - cross - Agnifilo                          3167

1   Q     Is there a better way to put it?

2   A     That's a good way to put it.  Let's put it that way.

3   Q     Okay.  And you and he were having communications, written

4   communications with each other in October of 2006, correct,

5   among other times?

6   A     We had -- yes, I believe so.

7   Q     And who is Megan Mumford?

8   A     A student of ESP.

9   Q     And did Ben Myers and Megan Mumford have a relationship

10  of some sort?

11  A     Yes.

12  Q     And what was the nature of that relationship?

13  A     They were boyfriend and girlfriend.

14  Q     Were they engaged at some point?

15  A     I don't know.

16  Q     And were they, were they boyfriend and girlfriend at the

17  time that you started a relationship with Ben Myers?

18  A     No, not that I knew of.

19  Q     Did you find out later?

20  A     No, I don't think I found out later.

21  Q     At some point, while you were having a relationship with

22  Ben Myers, did you come to learn that Ben Myers was also

23  having a relationship with Megan Mumford?

24  A     I don't remember.

25  Q     You don't remember?  Wasn't this an issue?  Wasn't this a

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                                3168

1  big issue that was being discussed between you and Keith and

2  you and other people that Ben Myers had a girlfriend named

3  Megan Mumford?

4  A    Yes, it was discussed.

5  Q    And it was discussed over and over and over by Keith and

6  you and between other people and you, isn't that right?

7  A    By Keith and me and other people and me?  By Keith and me

8  mostly.

9  Q    Did you ever talk to anyone else other than Keith?  Did

10  you ever talk to Karen Unterreiner or Lauren or anyone else

11  about this?

12  A    Not in the way I talked about it with Keith, Keith with

13  me, not the same degree or intensity.

14  Q    Right.  But you spoke to Karen Unterreiner about it,

15  right?

16  A    I think so, yes.

17  Q    And did you speak to Nancy Salzman about it?

18  A    We're still talking about Ben Myers and Megan Mumford?

19  Q    Yes.

20  A    No, I don't think so.

21  Q    All right.  This is a document in evidence.  It is

22  Government's Exhibit 1559.  It's already in evidence.

23        This is Government 1559.  This is a series of

24  e-mails between yourself and Keith, correct?

25  A    Yes.

Daniela - cross - Agnifilo                    3169

1   Q    And this is just the first of several pages.  Let me zoom

2   out so you get a little more perspective:

3              Do you remember at one point, there was a discussion

4   between you and Keith of you going to a party and you end up

5   going to the party and you sent him a number of e-mails about

6   it?

7   A    Yes.  I believe it was, yes.

8   Q    And I think that you made -- what's "rosea" -- what is

9   this -- is it *rosca*?

10  A    It's the one I spoke about in my testimony?

11  Q    Yes.

12  A    Yes.  Yes, *rosca*.

13  Q    And what is it?

14  A    *Rosca* is a type of baked bread.  That's what it is.

15  Q    And you can put little toys in it or things like that?

16  A    Yes.  Yes.  As I said, one puts little figurines that

17  mean different things inside the bread.

18  Q    Okay.

19  A    And when it's sliced, different attendees get the prizes.

20  Q    And you, you and Keith were having discussion.  -- let me

21  go to the first e-mail about this.  And you covered this on

22  direct.

23              I'm looking at the e-mail here from January 7, 2009,

24  3:53 a.m.  let me zoom in on it a little bit.  Sorry.

25              Keith says:  So what did you do?  I hoped you did

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3170

1   not just go to sleep.  If I were in such a situation I would

2   find it impossible to sleep, possibly for days.  Also, you

3   also did not tell me what happened at the party.  I heard B

4   got a ring.

5            "B" is Ben, right?

6   A    Yes.

7   Q    And you write:  No, I don't know what, I don't know what

8   to do.  I keep thinking.  Didn't know about the ring.  I guess

9   I didn't stay that long.

10           Right?  Did you write that?

11  A    I did write that, yes.

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3171

1   EXAMINATION CONTINUES

2   BY MR. AGNIFILO:

3   Q    And then you write:  There was nothing significant about

4   the party except when I was explaining to Megan -- that's

5   Megan Mumford, right?

6   A    Yes, I believe so.

7   Q    When I was explaining to Megan what the little toys she

8   might get in the Rosca meant, she said, Oh, I want the

9   thimble.

10        And you write:  I quite automatically responded, oh,

11  no, you want the ring.

12        Right?

13  A    That's what I wrote, yes.

14  Q    Is that a reference to the fact that she wants to marry

15  Ben?

16  A    What?  No, and may I -- I'm not familiar -- I mean I read

17  what you just read to me, but is it possible to read the

18  beginning of the e-mail.

19  Q    Sure, absolutely.

20  A    Because I am not familiar with it.

21  Q    That's fine.

22        Here, let me give it to you in order.  So this is --

23  and we can look at any part you want.

24  A    I would like to be able to read the full --

25        MR. AGNIFILO:  You know, what I can do, I can give

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3172

1   the witness the hard copy.  Maybe that's easier.

2              THE COURT:  Sure.

3              MR. AGNIFILO:  Let me give you the whole thing.

4              May I approach, Your Honor?

5              THE COURT:  Yes, you may.

6              THE WITNESS:  I'm sorry.

7              MR. AGNIFILO:  No, no.

8              (Pause.)

9              THE WITNESS:  Okay, I read the relevant part.  What

10  was the question again?

11  BY MR. AGNIFILO:

12  Q    So the question is, when she said I want the thimble, you

13  said to Megan Mumford, no, you want the ring, right?

14  A    Yes.

15  Q    That's what you wrote to Keith that you said?

16  A    Yes.

17  Q    Did you say that to her?

18  A    I don't remember, but that's what I wrote.

19  Q    Okay.  And what was that a reference to?

20  A    I believe, I hope I'm not wrong, the thimble meant you

21  are going to be single.  Like if you got the thimble, like

22  you're gonna be single for the rest of the year.  If you get a

23  ring it means that you're going to get married that year,

24  so...

25  Q    And what did you say after -- if you still have the

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3173

1   document in front of you, after you said no, you want the

2   ring, what did you go on to say after that?

3   A    I said -- do you want me to read it?

4   Q    Sure.

5   A    Sure.  I'll read the excerpt.  So I said:

6              There was nothing significant about the party,

7   except when I was explaining to Megan what the little toys she

8   might get in the Rosca meant.  She said, oh, I want the

9   thimble.  So she wants to be single.  I quite automatically

10  responded:  Oh, no, you want the ring.  Ben was standing

11  nearby, not really a part of the conversation, don't know if

12  he heard or what it meant to either of them.

13  Q    All right.  Now, one of the things that Keith said to you

14  was that he believed that it was wrong for you to start a

15  relationship with Ben when he was with Megan Mumford, correct?

16  A    I -- that may have been among the ocean of things he

17  said, yes.

18  Q    Right.  And he was upset about it for other reasons as

19  well, correct?

20  A    I think that's -- that's accurate, yes.

21  Q    I think you described on direct examination, at one point

22  when you told him, he ran into the bathroom of his house and

23  he locked himself in, right?

24  A    Yes.

25  Q    That was all -- that was all over -- over Ben Myers,

Daniela - cross - Agnifilo                                3174

1    right?

2    A    Yes.

3    Q    Okay.  And this is inside 3 Flintlock?

4    A    That part was inside 3 Flintlock, yes.

5    Q    Okay.  And he's locked himself in the bathroom and you're

6    trying to get in, right?

7    A    Yes.

8    Q    Okay, so he was upset about it, right?

9    A    Yes.

10   Q    And he expressed to you many different times, in many

11   different ways, that he was upset about it, right?

12   A    Yes.

13   Q    And then he asked you to try to make amends for doing

14   this, correct?

15   A    That's one way to put it, yes.

16   Q    He asked you to fix it, fix the problem that you've

17   created, that was his -- that's what he said to you, right?

18   A    Yes.

19   Q    And what did you understand that to mean?

20   A    What did I understand that to mean?

21        Well, what I understood -- and it's because he very

22   plainly spelled it out -- was that I needed to not like Ben,

23   stop liking Ben.  Like him, love him.  Go back to him.  You

24   know?  So, in the full scope of things I think that this is

25   quite minor.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                     3175

1   Q    No, I understand, but my point is this is an issue that

2   existed in several different ways; one way was that Keith was

3   hurt and expressed hurt to you over this situation with Ben

4   Myers, right?

5   A    Yeah, that's -- that was part of it, I guess.  Yes.

6   Q    Okay.  Another part of it is that Ben Myers had a

7   relationship of some sort with Megan Mumford, correct?

8   A    No.

9   Q    Didn't you and Keith -- and you reviewed the e-mails on

10  direct examination -- have discussion about how you had

11  dishonored the relationship between Megan and Ben?

12  A    What was the question?

13  Q    Wasn't one of the things that you discussed with Keith,

14  and you discussed this on direct examination, these

15  communications between the two of you of the fact that you had

16  dishonored the relationship between Megan Mumford and Ben

17  Myers?

18  A    Yes.

19  Q    Okay.  And did you feel that you had dishonored the

20  relationship?

21  A    No.

22  Q    And is that because you didn't think they had a

23  relationship?

24  A    That's right.

25  Q    But you found out later that they had had a relationship,

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                          3176

1   didn't you?

2   A     Yes.

3   Q     And did you do anything -- did you think that you should

4   have done something in light of that?

5   A     No.

6   Q     And wasn't that precisely, wasn't one of the things that

7   Keith was urging you to rethink, that you should take it upon

8   yourself to try to rectify in whatever way you saw fit the

9   fact that Megan and Ben had a relationship and that you had

10  pursued a relationship with Ben simultaneous to that?

11  A     I'm sorry, that was a really long question.  Can I have

12  it again?

13  Q     Absolutely.

14        Wasn't one of the things that Keith talked to you

15  about the fact that Ben and Megan had a relationship and that

16  while their relationship was going on you also had a

17  relationship with Ben Myers?

18  A     No, I don't think that's representative of what was -- of

19  what was going on with that particular issue.

20  Q     Don't you remember having e-mail -- I mean we can go back

21  and look at it, but I'm just trying to see you if you

22  remember, e-mail communication with Keith about that you had

23  dishonored the relationship between Megan and Ben?

24  A     Yes, there is communication; but again, I don't think

25  that's what was going on.

SAM       OCR       RMR       CRR       RPR

Daniela - cross - Agnifilo                    3177

1   Q    Why were you having that conversation with him?  Why were

2   you saying that you, yourself, have dishonored the

3   relationship between Megan and Ben?  Why did you say that?

4   A    Okay, I think I explained it before, but I can explain it

5   again.

6         I believe in that particular issue, as far as the

7   relationship with Ben and Megan, Ben and Megan had a

8   relationship before I had the very brief -- I guess you could

9   call it a relationship with Ben, and I believe they had a

10  relationship after that, not for the few times that I was with

11  Ben.  So the issues that were being discussed with Keith --

12  again, they were all overblown  exaggerations of what he

13  attributed to be my ethical breach which was just piling on to

14  like all the damages he wanted to put on me.

15        But why was I having that conversation, which was

16  precisely your question?  Because I was increasingly confused

17  and beaten up, both by his communications and the isolation

18  and the coaching that I was receiving.  So I, you know, was

19  trying to at times humbly to find out what I need to do and

20  what I had done wrong, but the truth is I hadn't done anything

21  wrong in that regard.

22  Q    And Keith's point to you is, just like you said here now,

23  you didn't -- you weren't taking response -- whether you were

24  wrong or whether you weren't wrong, Keith wanted you to own

25  whatever it is that you did, correct?  That's what he kept

Daniela - cross - Agnifilo                    3178

1   saying to you?

2   A    I don't think that's -- no, I don't think that's what he

3   wanted.

4   Q    He -- let me ask you another question.

5            Did you have conversations with anyone other than

6   Keith, specifically Karen Unterreiner, about the fact that you

7   had a relationship with Ben Myers at a time when Ben Myers was

8   having a relationship with someone else?

9   A    I don't remember that.

10  Q    You don't remember having that conversation with Karen?

11  A    I really don't.

12  Q    You think you only discussed it with Keith?

13  A    I think that may be so.  But, again, I don't remember.

14  Q    Do you remember having a discussion at all with your

15  father about this?

16  A    With my father?

17  Q    Yes.

18  A    No.

19  Q    No?  With anyone else in your family, any of your

20  siblings?

21  A    No.

22  Q    Just with Keith?

23  A    That's what I remember, yes.

24  Q    And based on what you remember, one of the things Keith

25  said to you is what you had done, in his estimation, was

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3179

1  wrongful because you started a relationship with someone who

2  was in a relationship, right?  That's what he would say to

3  you, in sum and substance, right?

4  A    He said it a few times, yes.

5  Q    And you, in written communication, agreed and said that

6  you had to restore honor to Ben's relationship with Megan?

7  A    Yes.

8  Q    Why did you say that?

9  A    Because I didn't want to be shunned anymore, I wanted to

10 get back some sort of life.  I was trying to do whatever it

11 took to get my life back.

12 Q    And these are discussions that you're having with Keith

13 in what year?

14 A    I mean, it was a span of many years with lots of

15 communications, so I can't pinpoint it exactly when.

16 Q    This is well before you entered the room, correct?

17 A    "Well before" is similarly vague.

18 Q    Two years before, one year before?

19 A    The whole span of time before the room was all

20 communications about Ben, so it's hard for me to tell when we

21 were discussing what.

22 Q    Now, you say that it's all about Ben, but there were a

23 number of things that were being discussed in the year or so

24 before you entered the room; isn't that right?

25 A    There were a few more things, yes.

Daniela - cross - Agnifilo                    3180

1   Q    What were the few more things that you can recall?

2   A    My weight.  There was distinct obsession over my weight.

3   There were -- my program.

4   Q    And what was your program, what's your understanding of

5   what your program was?

6   A    My program, at that point, was to lose weight and to do

7   book reports and to fix my ethical breach.

8   Q    Your ethical breach being what?

9   A    My ethical breach as a -- as a -- as he portrayed it to

10  me, like as he was -- was ever evolving.  It wasn't a static

11  thing.  It really started with me kissing Ben Myers.

12  Q    Didn't it really start with you stealing $6,000 in cash

13  from Karen Unterreiner's drawer?  Isn't that really when it

14  started?

15  A    No, that is not.

16  Q    Wasn't there a great deal of discussion about the fact

17  that you kept taking things that didn't belong to you?

18  A    No.

19  Q    Wasn't that a topic of discussion between you and Keith

20  and you and other people?

21  A    No.

22  Q    Wasn't that a topic of conversation between you and your

23  father?

24  A    When it came to the food, yes.

25  Q    When it came to the food and when it came to -- just food

SAM    OCR    RMR    CRR    RPR

Daniela - cross - Agnifilo                    3181

1    or other things as well?

2    A    Food.

3    Q    And what food exactly had you taken that got you in

4    trouble with your father?

5    A    I don't remember.

6    Q    Your father was angry about this, right?

7    A    Probably hummus.

8    Q    Say it again.

9    A    Probably hummus.  I remember hummus as the only kind of

10   food that I remember.

11   Q    So your father was this angry at you because you had

12   taken hummus?

13   A    My father -- I -- I don't believe that.  I don't believe

14   he was angry because I was taking hummus, no.

15   Q    Because you had taken things from stores, that's what you

16   and he talked about?

17   A    No.

18   Q    So what did you take that made your father so angry?

19   A    Again, I don't think that's an accurate representation,

20   but I remember I took stuff from the fridge repeatedly.  I

21   took food from -- from the house that wasn't mine.

22   Q    And your father and you had discussions only about the

23   fact that you had taken food from the house?

24   A    You mean in general?

25   Q    Just about -- did you and your father have discussions

SAM       OCR       RMR       CRR       RPR

Daniela - cross - Agnifilo                    3182

1   where your father said you keep taking things that don't

2   belong to you and you don't stop, you keep doing it?

3   A    Yes, about the food.

4   Q    Only the food?

5   A    Yes, that's what I remember.

6   Q    And you took food and you remember it being hummus?

7   A    That's one of the foods I remember.

8   Q    From where?

9   A    From the refrigerator in Wilton at the condo.

10  Q    Where your family lived?

11  A    Yes.

12  Q    And so you're telling us that you were in trouble for

13  taking food from the refrigerator where your family lived?

14  A    Yes.

15  Q    And that's it, you didn't do anything else?

16  A    I kissed Ben Myers, that's how it started.

17  Q    So when we looked at that little list of things yesterday

18  and you said that you were going to pay back things that you

19  had taken from Wal-Mart and Marshalls, and places like that,

20  you made that up?  You didn't take anything from those places?

21  A    I don't remember that.  I don't and -- I don't know.  I

22  don't know what that is.

23  Q    I mean, we talked about it yesterday, you wrote that

24  though, right?

25  A    Yeah.

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3183

1   Q     Why did you write it?

2   A     I don't know.

3   Q     You wrote that you were going to pay back specific stores

4   in the area and you don't know why you wrote it?

5   A     I don't.

6          MS. PENZA:  Objection.

7   BY MR. AGNIFILO:

8   Q     Did anyone force you to write it?

9          MS. PENZA:  Objection, Your Honor.

10         THE COURT:  Sustained.

11  Q     You chose to make a list of things --

12         MS. PENZA:  Objection, Your Honor.

13  Q     This is what we were looking at yesterday, it's

14  Government Exhibit 907, page 109.

15         (Exhibit published.)

16  Q     Right, we looked at this yesterday?

17  A     May I look at the entire sheet?

18  Q     Absolutely.  I'll give it to you.

19  A     Thank you.

20         MR. AGNIFILO:  May I approach, Your Honor?

21         THE COURT:  Yes, you may.

22         (Pause. )

23         THE WITNESS:  Okay.

24  Q     So what did you write there, and you can read it there

25  under stores.  What did you write?

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                     3184

1   A    I wrote stores, pay back what taken, and it's a list.  It

2   says Hannaford, Wal-Mart, Arlene's, Marshalls, Cohoes.

3   Q    And why did you write those particular stores?

4   A    I don't know.

5   Q    Are those stores that you're familiar with?

6   A    Not all of them.  There's two I'm not familiar with.

7   Q    Which ones?

8   A    Arlene's and Cohoes.  Cohoes is a city.

9   Q    Right.  Wal-Mart you're familiar with; you called Ben

10  Myers once from Wal-Mart, right?

11  A    Yes.

12  Q    So that was a place where you went, right?

13  A    Yes.

14  Q    Did you take anything from Wal-Mart that didn't belong to

15  you?

16  A    No.

17  Q    Marshalls is a store you're familiar with, right?

18  A    Yes.

19  Q    You didn't take anything from Marshalls?

20  A    No, not that I remember.

21  Q    Now, when you wrote that sheet of paper, what is that?

22  A    This is -- this is a plan to fix damage that I've done.

23  Q    Okay.  If you still need to see it, we can do that,

24  otherwise I would do it so --

25          MR. AGNIFILO:  Actually, do we have another copy?

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                     3185

1   We might not have another copy.

2   A    It's okay.

3   Q    But if you need it, that's fine.

4            So -- and you wrote that -- you wrote that while you

5   were in the room, correct?

6   A    Aah --

7   Q    There's a letter that goes with it.

8   A    I believe that was so, I just don't remember exactly.

9   Q    Why did you write it?

10  A    I don't know.

11  Q    Who had you intended to give it to?

12  A    This plan?

13  Q    Yes.

14  A    It's -- wasn't this an attachment for something else?

15  Q    Right, it was attached to one of your letters.  It was to

16  Keith.

17  A    To Keith then.

18  Q    Right.  And so this was a plan to do what exactly?

19  A    This is a plan to, again, fix ethical breaches, an

20  ethical breach plan.

21  Q    So what's the first entry there?

22  A    It's -- it's -- from the fix ethical breaches or from the

23  full list?

24  Q    Just it might be easier if we can all look at it

25  together.  Is that possible?

SAM      OCR      RMR      CRR      RPR

1    A    Of course.

2    Q    Okay.

3            THE COURT:  Can we get a date on this, on the cover?

4            MR. AGNIFILO:  Yes, one second, Judge.

5            It says September 30, 2010.

6            THE COURT:  September?

7            MR. AGNIFILO:  30.

8            THE COURT:  2010?

9            MR. AGNIFILO:  Yes.  Let's just put the whole thing.

10           THE COURT:  Thank you.

11           MR. AGNIFILO:  Okay.

12           (Exhibit published.)

13   BY MR. AGNIFILO:

14   Q    This is -- it says Keith, September 30, 2010.  That's

15   your handwriting, right?

16   A    Yes.

17   Q    And you wrote this?

18   A    (No response.)

19   Q    I am going to the last page of this letter.

20   A    So for context, that's four months I've been in the room.

21   Q    Right.  And then at the bottom, you say, "with love,

22   Bobi".  Right?

23   A    Yes.

24   Q    And then you say, "PS:  A copy of the referenced sketched

25   plan attached."  With a smiley face, right?

SAM    OCR    RMR    CRR    RPR

1    A    Yes.

2    Q    And then attached to this letter is this plan that we've

3    been talking about, correct?

4    A    Yes.

5    Q    All right.  Now, these are things that, you know, where

6    it says "fix ethical breaches," I'm looking right here

7    (indicating.)

8    A    Uh-hum, yes.

9    Q    You have next to it:  Talk to all people/Ben.  Right?

10   That's one of the things that Keith wanted you to do, right?

11   A    Yes.

12   Q    Book reports, you have that; that's one of the things

13   that Keith wanted you to do, right?

14   A    Yes.

15   Q    Digital archive, what is that?

16   A    That is also one of the things Keith wanted me to do,

17   which is an archival list documenting -- documenting his life.

18   Q    Okay.  Video forum project, movie filming; is that

19   another thing Keith wanted you to do?

20   A    Yes, I believe so.

21   Q    Then for Nancy, it says:  Work, $5,000 worth of time.  I

22   think you discussed this on direct examination.  Was there

23   some idea that you might owe money for certain services that

24   Nancy had rendered to you?

25   A    I wouldn't phrase it that way.

Daniela - cross - Agnifilo                3188

1   Q    How would you phrase it?

2   A    I would say that the coaching that I was -- the coaching

3   that she gave me later became part of what they said my breach

4   was, so I think I was trying to quantify it.

5   Q    Okay.  And then it says:  Gozer.  And Gozer is who again?

6   A    That is the nickname used for Karen Unterreiner.

7   Q    What is the entry under Gozer to the right?

8   A    It says:  Work?  Raw food (unprompted).  Frozen food.

9   Chores?  Progr, which is I understand programming, question

10  mark.  Community?  Personal assistant?

11  Q    Why did you write those things next to Gozer?

12  A    I think those are things I could do for her to try and,

13  again, repair my ethical breaches against her.

14  Q    Okay, and then the next entry is Pam.  And then to the

15  right what does it say?

16  A    It says:  Work?  Be available and call often to offer

17  help.  Clean Jness?  Build friendship to support.

18  Q    And clean Jness is reference to the Jness room?

19  A    I don't know.  It could be several things.

20  Q    What could it be?

21  A    Clean Jness could be clean the Jness website.  It could

22  be clean the Jness facility.  Those are two things I can think

23  of.

24  Q    All right, and so there are all these different entries

25  for different people.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                         3189

1          We have Papa, this is a reference to your father,

2     correct?

3     A     Papa.

4     Q     Right.  And what does it say next to him?

5     A     It says:  Make food daily or once, twice per week and

6     freeze.  Do his chores, clean, do laundry, take out trash, et

7     cetera.  Sagitta.com website to pay 500 debt and more -- don't

8     know what that is.  Keep contact with often his family and at

9     least one time a week.  When out of here explain absence.  Pay

10    for watch repair.

11         Oh, that -- take out the trash, et cetera, for seven

12    months.

13    Q     Why did you write those things next to Papa?

14    A     Taking responsibility.  Those were things I thought I

15    could do to fix that ethical breach, I guess.

16    Q     Okay.  And then under Papa is Marvy, Marianna, right?

17    A     (No response.)

18    Q     And what did you write for her?

19    A     We skipped a bunch.  I wrote for her have time with her

20    one time per week, go out or something.

21    Q     And then for your brother Fluffy, what did you write for

22    him?

23    A     It says:  400 for stolen food.  In parentheses, stereo.

24    Business needs website?  Clean office?  Make food for

25    freezing.  Make sandwich on way to the office every day,

Daniela - cross - Agnifilo                              3190

1   smiley face, heart.

2   Q    Why did you write that for Fluffy?

3   A    I think I thought those were things I could do for him to

4   fix my breach with him.

5   Q    Okay.  And then for all family you wrote certain things.

6   What did you write for them?

7   A    I said family dinner on Wednesdays and family breakfast

8   on Sundays.

9   Q    Then under all family, it says:  All animals, and you

10  say:  Convert three people to vegetarianism.  Correct?

11  A    All -- yes, I don't know what that is.

12  Q    Then it says:  Musicians and authors, buy original

13  material of illegal downloads.

14          Right, that's what you wrote?

15  A    Yes.

16  Q    Had you downloaded music or other material illegally?

17  A    E-books, I think.  I remember that now.

18  Q    And you did it without paying for it?

19  A    Yeah, I think so.

20  Q    Okay.  And then stores, you write:  Pay back what taken.

21  Hannaford, Wal-Mart, Arlene's, Marshalls, Cohoes.  Right?

22  A    Yes.

23  Q    Now, Arlene's is an art supply store in Colony, New York;

24  isn't it?

25  A    I -- I don't know that store.

Daniela - cross - Agnifilo                    3191

1   Q     You never bought art supplies there?

2   A     Not that I remember.

3   Q     And why did you --

4   A     Art supplies?

5   Q     Why did you put Arlene's among the stores there where you

6   write pay back what taken from those particular stores?

7   A     I already said I don't know.

8   Q     And you agree with me that the other entries, you know

9   why you wrote all of them?

10  A     No, that's not true.  I said some of them I don't know.

11  Q     Who's Daniel Brown?

12  A     I don't know.  Daniel Brown was a student of ESP.

13  Q     And what did you write for him?

14  A     I wrote down:  Pay 80 for Mexi-bike.

15  Q     Why did you write that?

16  A     Because I owed him $80 for my bike, which -- his bike.

17  Q     Why do you owe him $80?

18  A     Because, as I remember, he -- he went there I think to

19  take an intensive, or to live, and he bought a bike.  And then

20  he was gonna leave and I was gonna buy his bike and he left

21  the bike with me and I never paid for it.

22  Q     So that's something that you wrote because it

23  corresponded to something that actually happened, right?  You

24  owed him $80 for the Mexi-bike, right?

25  A     Yes.

Daniela - cross - Agnifilo                              3192

1   Q    But there is nothing you can tell us about why you wrote

2   pay back what taken from these particular stores, nothing?

3   A    I don't remember.

4   Q    Okay.  Now, did you discuss with your father the fact

5   that your father wanted you to stay in a room in the family's

6   house until you did certain things?

7   A    No.

8   Q    Who did you talk to about that?

9   A    That -- that was not at all the proposal, so I talked to

10  nobody about that.

11  Q    What did you talk to your father about?

12  A    In general?

13  Q    In regard to the room.  In regard to you staying in a

14  room in your family's house, what did you and your father talk

15  about that?

16  A    I did not have any discussions with only my father about

17  that.

18  Q    It was your father and who else?

19  A    It was -- I remember it was my father, my mother, Lauren

20  Salzman and Karen.  Those are the people I remember.

21  Q    Unterreiner, okay.  And what was discussed during that

22  discussion?

23  A    That I -- that I needed to go in that room under the

24  terms I already described, or else.  That was the actual

25  discussion.

Daniela - cross - Agnifilo                    3193

1   Q    Did they say that you could do certain things and leave
2   the room?
3   A    Certain things to leave the room -- no, I wasn't given an
4   actual path to go outside of the room.  I was given a very
5   vague idea of the activity, which was I should write and I
6   should fix my ethical breach.
7   Q    So you were told to write and to fix your ethical
8   breaches, correct?
9   A    Yes.
10  Q    And what ethical breaches did you understand those to be?
11  A    At that point, as I said, my ethical breach had morphed
12  into ethical breaches and it was a snowball of ethical
13  breaches.  And what I understood was -- was very little.  I
14  was very confused and pretty broken already.  I had been
15  isolated from people for a long time, and I -- I -- I think I
16  thought I was bad and to some degree all the beat-ups had
17  worked, but also I was very angry because I knew that really
18  there was nothing that I could do because for so long I had
19  been trying and everything was shut down and everything was
20  just disregarded.
21        So you ask me now what I thought then what was my
22  ethical breach, I would tell you I had no clue which was why
23  the idea of the room and going in it until I fixed it was
24  incredibly frightening.
25  Q    How old were you -- when you went into the room, how old

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3194

1    were you?

2    A    I believe I was 24.

3    Q    And you had chosen to be in this country illegally, that

4    was your choice, right?

5    A    I came in the country illegally, yes.

6

7                   (Continuing on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3195

1   (Continuing)

2   Q    No one forced you to do that.

3   A    No, no one forced me to do that.

4   Q    You did that because that was your choice to come into

5   this country illegally and to live here illegally; right?

6              That's what you wanted.

7   A    I wanted to come into the country, yes.

8   Q    And when this country took away your visa, rather than

9   waiting a year and reapplying, you decided to come into the

10  country illegally; right?

11  A    Yes.

12  Q    Knowing that once you came in to the country illegally,

13  you would be here illegally; correct?

14  A    Yes.

15  Q    You didn't make any efforts while -- after you snuck in

16  over the border from Canada, you didn't make any efforts to

17  make yourself legal; did you?

18  A    No.

19  Q    Did you speak to anybody about trying to become legal?

20              THE WITNESS:  Thank you very much.

21  A    I don't remember.  I remember something vaguely, but I

22  don't really remember.

23  Q    You made no efforts that you can recall to make yourself

24  legal in this country.

25  A    That's accurate, yes.

Daniela - cross - Agnifilo                    3196

1          THE COURT:  I am sorry.  Was this once she

2    re-entered the country illegally?

3          MR. AGNIFILO:  Yes.

4    Q    Once you entered on Christmas Eve 2004, you entered

5    illegally, you made no efforts to try to be here legally;

6    correct?

7    A    I made no efforts to try to be here legally; that's

8    correct.

9    Q    Yes.  Because to do that, you would have had to -- it was

10   your was it your understanding you would have had to have left

11   the country and gotten a visa to come back; right?

12   A    I don't know what the -- what -- what -- what it would

13   have taken.  I don't know if I have to leave or stay.  I don't

14   know.

15   Q    Because you didn't explore that possibility at all;

16   right?

17   A    Of staying -- of -- of -- of becoming legal while I was

18   in the country?

19   Q    Right.

20   A    No, I didn't.

21   Q    So did you talk to your parents about this?

22   A    About what again?

23   Q    About trying to be in the country legally; to try to make

24   your illegal status not illegal.

25   A    I don't remember.

VB        OCR        CRR

Daniela - cross - Agnifilo                3197

1   Q    And you don't recall if you spoke to any lawyers about

2   this?

3   A    I don't recall.

4   Q    Now, at some point you -- when you're in the room, you

5   write -- you write to Keith pretty much every day?

6   A    Yeah, I think so.  Yes.

7   Q    And you -- and I think you covered this on direct

8   examination.  You're writing him, you're telling him that you

9   love him; right?

10  A    Yes.

11  Q    And did you love him?

12  A    No.

13  Q    So you're telling him something that's not true; right?

14  A    Yes.

15  Q    You're telling him that you look up to him; that you

16  think he is a good man with good morals; correct?

17  A    I -- I -- I don't know all those -- all those words that

18  actually write, I don't know, maybe.

19  Q    We can go through them, there are hundreds and hundreds

20  of letters.

21  A    Okay.

22       What's the question?

23  Q    You wrote in addition to telling him that you loved him,

24  that you thought he was a good man and had good morality;

25  words to that effect.

Daniela - cross - Agnifilo                    3198

1    A    I -- I -- I don't know.

2    Q    You're you were saying positive things about Keith, to

3    Keith?

4    A    Yeah.  Yes.

5    Q    Okay.  And did you feel those things at the time?

6    A    What I felt at the time was very complex.

7    Q    Okay.  All right.  I'm going to show you what's in

8    evidence.  It's Government's Exhibit 907, page 4.

9         (Exhibit published.)

10        MR. AGNIFILO:  It's already in evidence as

11   Government's Exhibit 907.

12   Q    All right.  This is January 1st, 2010.  Now, is this

13   before or after you go in the room?

14   A    That is -- that is before.

15   Q    Right.  Okay.  And you had started writing to Keith

16   before you went in the room, correct, on a regular basis?

17   A    I had started -- I had been writing to Keith for years,

18   as instructed.

19   Q    I didn't ask you about the instructed.  I just asked you,

20   you have been writing to Keith.

21   A    Yes.

22   Q    Okay.  And what you write here is:  My dear love, just a

23   few hours ago I was still getting ready to go down to Mexico.

24   Probably never to see you or any of the people I love ever

25   again.

Daniela - cross - Agnifilo                    3199

1          Is that true?  Were you thinking about going to

2   Mexico at this point in time?

3   A    Could I finish reading the letter?

4   Q    You can read the whole thing.

5          MR. AGNIFILO:  Let me see if I can get the whole

6   thing on the page, hold on.

7          There you go.  Let me see if I can get it a little

8   bit bigger; okay?

9   Q    Can you see that okay?

10  A    That's hard to read for me.

11         MR. AGNIFILO:  Okay.  Here, I'll give it to you.

12         May I approach?

13         THE COURT:  Yes, you may.

14         (Pause in the proceedings.)

15  A    Okay.

16  Q    You wrote at that letter to Keith; correct?

17  A    Yes.

18  Q    Okay.

19         MR. AGNIFILO:  Do you need it in front of you or if

20  we put it on the machine so everyone can see it?  If you can't

21  see it, I will zoom in for you.

22         (Exhibit published.)

23  Q    Okay.  So, you wrote:  Just a few hours ago I was still

24  getting ready to go down to Mexico probably to never see you

25  or any of the people I love ever again.

VB       OCR       CRR

Daniela - cross - Agnifilo                          3200

1              Is that true?

2    A    I wrote that.

3    Q    Do you remember if it was true?

4    A    There were many times I wanted to go down to Mexico, so

5    it could have.  But I don't remember this particular instance.

6    Q    Okay.  Then you say:  From my love for you and what is

7    unfinished between us, I gather the strength to something

8    against my own momentum and be honest with myself.

9    A    To go against my own momentum.

10   Q    To go against my own momentum and be honest with myself.

11   I express my determination to stay and fix things and my

12   desire to all that is necessary.

13              Was that true?

14   A    This is a complex situation.  I could provide context to

15   it, if you like.

16   Q    You can provide context.

17   A    Okay.

18              So at this point, I have been -- I had been talking

19   to Keith for years via e-mail.  I think you got a little bit

20   of a taste of that.  I haven't gone through all of them, but

21   that was the nature of the back and forth.

22              Then he sends me a final letter with this big

23   instruction of what I need to do.  Then my parents and Karen

24   are on my program, and if this is so, this is a familiar

25   situation, though again, I don't remember what this exactly

Daniela - cross - Agnifilo                    3201

1    was tied to.

2         I wanted to go to Mexico it sounds like and then I'm

3    talked out it.  And then it's heavily coaching.  And then it's

4    a lot of just and you need to fix this, and you need to fix

5    this, and then I probably write that after all of that.

6         The truth of the matter is, this letter,

7    January 1st, 2010, I'm already very isolated from everybody.

8    I have no possessions.  I have nothing.  I am very confused.

9    I'm very angry.  I'm pretty broken.  So all of this is part of

10   what I know I'm expected to say, I know I'm expected to feel,

11   but also what I'm directly being told.  You should fix your

12   breach.  You should write to Keith.  You should stay here and

13   do this.  I think I explained most of that already.  But this

14   is a context to what I'm saying here.

15        So you asked me, oh, well, did you write this?  Did

16   you mean it?  It's not completely disingenuous in that I'm

17   thinking, I'm sitting there and thinking, well, I don't really

18   want to do this, but I'm going to write that I do.  It's not

19   that simple.

20        It's a pretty complex situation where I am getting

21   drilled from all sides about what I should be doing, what I

22   have done, how bad I am.  And then what I do with myself, and

23   sometimes I went, you know, I gasped for air and maybe I

24   wanted to leave; but there's a tightly controlled environment

25   around me.  What you see this letter is a product of all of

Daniela - cross - Agnifilo                    3202

1   that.  It's not just a simple meditation by myself in complete

2   freedom in deciding what to do.

3   Q    You could have left.  You were 24 years old.  No one was

4   forcing you to stay in Clifton Park.  You could have left.

5   A    What's the question?

6   Q    You could have left.  Couldn't you have just left?

7   A    No.

8   Q    You couldn't leave.  Were you locked someplace?

9   A    No.

10  Q    Were you threatened with something happening to you if

11  you left?

12  A    Yes.

13  Q    What were you threatened with?

14  A    I had no money, no papers.  And I was threatened with

15  both being sent that way back to Mexico and also complete

16  cutoff of communication with everybody I knew.  That was the

17  threat.

18  Q    And you say no papers, whose fault is that?  Whose fault

19  is it that you had no papers?

20  A    The person that took them.

21  Q    And who is that?

22  A    I don't know.  They took all my stuff overnight.

23  Q    Who?

24  A    I don't remember.  They just took all my stuff.

25  Q    You don't remember who took all your stuff?

1  A     No, sometimes stuff would just disappear.  My iPod

2  disappeared.  My computer was just taken.  I don't know who

3  has my stuff.  To this day, I don't know who has my stuff.  I

4  never got my stuff back.

5  Q     What stuff are we talking about?  You keep saying my

6  papers.  What papers?

7  A     My papers.

8  Q     Like what?

9  A     I believe I described already.

10  Q     Go ahead.

11  A     In my things I had my birth certificate, which is really

12  the most important part of it.  And some other personal

13  papers.  I had the little possessions that I had.

14  Q     So when you snuck over from Canada, you brought your

15  birth certificate with you?

16  A     I don't -- I don't know that.  Maybe it was already

17  there.  I don't know that.

18  Q     So -- and where was your birth certificate before they

19  came in, in the middle of the night and took everything?

20  A     It was in -- as I remember, I had a series of, like,

21  folders that a long time before I had purchased at Office Max.

22  It was one of these like accordion, I think, like file folders

23  with more folders inside.  And there were a few other things

24  in there.  But that is where I had my, you know, my personal

25  identification stuff.

Daniela - cross - Agnifilo                              3204

1   Q    Did you ask your father and your mother for your birth

2   certificate?

3   A    When?

4   Q    At any time?  January 1st, 2010?  Any time in

5   January 2010?  February 2010?  Did you ask your father or your

6   mother for your birth certificate?

7   A    In January -- which -- which -- which period exactly?

8   Q    January 2010.  As you're writing this letter, rather than

9   writing a letter, did it occur to you to say, hey, mom, hey,

10  dad, can I have my birth certificate?

11  A    Again, I don't remember exactly this situation.  So I

12  don't remember.

13  Q    Did you ever ask while you were -- either before you went

14  in the room or while you were in the room, your mother or your

15  father, for your birth certificate?  Did you ask them for it?

16  A    Before I was in the room, or while I was in the room, did

17  I ask for my birth certificate.

18       I don't think I asked -- can I ask and answer it

19  separately?  Those are two different instances.

20       I don't think I asked for it, or I would have asked

21  for it while I was in the room, though, I don't remember.  I

22  don't see what the use would have been.  I really just wanted

23  to get out of the room.

24       And before, I did ask for their help, which -- I

25  don't remember exactly if I would have asked point-blank for

Daniela - cross - Agnifilo                    3205

1    that, but implied that I needed my ID and I needed some money

2    and I needed some help to get out of the country.

3    Q    I am not asking if you implied.

4         Did you ask --

5    A    I don't remember.

6    Q    -- before you went into the room, did you ask your

7    parents, I would like my birth certificate?  Please give it to

8    me.  I'm 24 years old.  I'm your daughter.  I would like my

9    birth certificate.

10   A    I don't remember.

11   Q    The next thing you say is:  I never really wanted to

12   leave.  And that is the truth.  It is, however, also true that

13   I am stuck in my healing process, which is the reason such a

14   deadline and consequence was imposed on me to the end of the

15   year.

16        Do you remember there being something that you were

17   supposed to do by the end of the year, presumably the end of

18   2009?

19   A    I don't.

20   Q    Now, at this point, do you want to go to Mexico?

21        January, early January 2010, do you want to go to

22   Mexico?

23   A    Again, I'm reading this, but I don't remember the

24   situation tied to this.  And I believe I already said that.

25   Q    No, I'm not talking about the letter.  I'm saying in

Daniela - cross - Agnifilo                          3206

1    January of 2010, did you want to go to Mexico or did you want

2    to stay in Clifton Park?

3    A    I don't remember exactly what I was thinking then.

4    Q    Okay.

5            MR. AGNIFILO:  Okay.  This is Government's

6    Exhibit 907, page 67.

7            (Exhibit published.)

8    Q    If you can see it on the screen, we can do it on the

9    screen.  If not, I'm happy to bring the document to you.

10           Here's the whole page.  If there's a second page to

11   this, I will show you that as well.

12           (Exhibit published.)

13           MR. AGNIFILO:  Okay.  Do you want me to give it to

14   you and then you can take a look at it and then I will ask you

15   some questions about it?

16           THE WITNESS:  Yes.

17           MR. AGNIFILO:  May I approach the witness?

18           THE COURT:  Yes, you may.

19           THE WITNESS:  Thank you.

20           (Pause in the proceedings.)

21           THE COURT:  If you have a conversation, you have to

22   leave the room and not come back.  I do not want any

23   discussions of anything in the gallery.  If I see it again,

24   you will be barred from the courtroom.

25           (Pause in the proceedings.)

Daniela - cross - Agnifilo                     3207

1           THE WITNESS:  Okay.

2   BY MR. AGNIFILO:

3   Q     You read the whole letter?

4   A     Yes.

5   Q     Okay.  And what are you writing to Keith in that letter?

6   A     A lot of things.  I'm writing -- it starts off telling

7   him that I borrowed a camera and I -- and I never gave it back

8   and that Pam was going to bring it back.

9           I keep going about how -- on and on about why I --

10  when I tried to understand my breaches, I tell him about a

11  little tree, a little seedling, a little sprout that my father

12  brought me and a little avocado plant that I have in my room

13  and I go on and on about that.

14          And I tell him I feel I miss my family.  I tell him

15  I wouldn't want to be in that room.  I tell him that I'm

16  trying to be patient.  I tell him some reasons that I think

17  maybe it's not so bad in there.  And I tell him I want to fix

18  everything.

19          And that -- and that I -- I'm wondering if maybe I

20  haven't done everything because I am not coming out, but I'm

21  just reporting all of that to him.  And my weight.

22  Q     So you said that you told him it's not so bad in the

23  room?

24  A     I did.

25  Q     And what did you write specifically?

Daniela - cross - Agnifilo                    3208

1  A    I wrote -- hold on.  I miss my family more than ever.  I

2  want to go and talk to and apologize to all the people I love

3  and have hurt more than ever and perhaps as sincerely as ever.

4  I want to come out of this room, but also I want to heal my

5  breaches and people are being kind enough to guide me in doing

6  this right.  I have decided to be humble and learn to do it.

7        So right now I'm building my inner world and I

8  continue thinking and I am being patient at a cost.  So being

9  here isn't so bad.  I know there are people who love me and

10 care for me, guiding me, and I have decided not to trust -- I

11 have decided that not to trust would be prideful.  Thinking I

12 know when I am ready would be prideful too.  The truth is I

13 suck at healing my breaches and fixing my mistakes and that is

14 quite an understatement.

15       You will agree I am sure, in fact, I am not very

16 good at creating what I want in my life at all.  So I am here

17 to learn.  My most recent lesson was the importance of my word

18 and right now it seems to me that would fix everything.  But I

19 am still here, so maybe it isn't.  Or maybe I am supposed to

20 stay in here until I build it some.  I don't know.  But I have

21 decided to be patient and grow, so here I am.  This is me now.

22 Love BoBo.

23 Q    And these are the letters -- you can take a look at them.

24 These are the letters that you wrote to Keith both right

25 before you went in the room, but mostly while you were in the

Daniela - cross - Agnifilo                    3209

1    room?  These.

2    A    Okay.

3    Q    You wrote him a lot of letters.  And you say in these

4    letters some of the things you just read from that letter, in

5    different ways at different times.

6              Do you remember writing all of those things?  I

7    mean, day in, day out?

8    A    I remember writing a lot.

9    Q    Right.  Sometimes you said you didn't want to be in the

10   room.  You wanted to leave.  You didn't want to stay; right?

11   You would write him that many times; fair to say?

12   A    Yes.

13   Q    And then sometimes you would say this is the best thing

14   that could happen to me because it's hard, but I do have

15   something to learn.  You would say that in different ways at

16   different times; fair to say?

17   A    Yes.

18   Q    You often expressed that you missed your family, right,

19   in these letters?

20   A    Yes, I think so.

21   Q    Just like you read in the letter that you just read;

22   right?

23   A    Yes.

24   Q    But you also said that maybe this is for the best and

25   you'll have better relationships with everybody once you get

Daniela - cross - Agnifilo                           3210

1   out; right?

2   A     Maybe, yes.  Yes, I think so.  Yes.

3   Q     Yes.  And you wrote him pretty much every day for the

4   entire time you were in the room; correct?

5   A     Yes.

6   Q     Now, at one point you said that your mother came in the

7   next room in the other bedroom upstairs; correct?

8   A     Yes.

9   Q     And if you had to estimate, how long after you started

10  being in your room was your mother in the other bedroom

11  upstairs?

12  A     I don't know.  It's my sense of time, so fuzzy while I

13  was there.  I don't know.

14  Q     Okay.  And who was living in the house?  It was your

15  mother, your father; right?

16  A     I actually don't know exactly who was living there.  I

17  know -- I can tell you what noises I heard.

18  Q     Okay.  And what did you hear?

19  A     I heard Cami downstairs.  If I had to say, I would say

20  she was living downstairs, but I don't know.

21        I heard my father downstairs and he would come up

22  with my mom, too.  And if I had to bet, I would say he was

23  also living downstairs, but I don't know how that would have

24  worked.

25        And I thought maybe them, the rest of the people I

Daniela - cross - Agnifilo                    3211

1    think were just coming in and out.

2    Q    Because Fluffy was living sort of nearby.  So he wasn't

3    living in the house at the time; right?

4    A    He was living nearby?

5    Q    Was Fluffy living in the house at the time?

6    A    I don't know.

7    Q    Well, you didn't stay in the room the whole time; right?

8    A    Yes, I did.

9    Q    You went downstairs from time to time.  You moved around

10   the house from time to time; didn't you?

11   A    That's not an accurate statement, no.

12   Q    So go ahead, tell me what's accurate.

13   A    I stayed in the room for almost two years.  I went out of

14   the room a handful of times during two years.  So I wouldn't

15   say from time to time is accurate.

16   Q    Did you ever go out the room through the window?

17   A    No.

18   Q    Never?

19   A    Never.

20   Q    You always went out the door and down the stairs?

21   A    Yes, that's what I remember.

22   Q    Yes?  And by handful, you mean less than five times

23   during the entire two years you were in the room?

24   A    I would say -- I would say around five times, yes.

25   Q    And where did you go?

Daniela - cross - Agnifilo                    3212

1   A    I went -- a couple of times I went outside.  So where --
2   outside, fresh air outside; plants.
3            The other times was just going out of the bedroom
4   and into an area of the house.
5   Q    You went to the dentist at one point?
6   A    I went to the dentist, yes.
7   Q    All right.  And in addition to that, you went outside a
8   number of times?
9   A    No, in addition to that, no.
10  Q    No?
11  A    No.
12  Q    You never met anybody?  Never went outside and met
13  anyone?
14  A    No.
15  Q    No?  Never met Ben?
16  A    No.
17  Q    Never?  Not one time?
18  A    No.
19  Q    And you never went outside and sort of walked around the
20  house?
21  A    No.
22  Q    Not -- never, not once?
23  A    Can you be more specific about walked around the house?
24  Q    You went outside.  You left the house.  You were outside.
25  A    Yes, I already said yes.

1  Q    Yes, but how many times?

2  A    A couple?  Two?

3  Q    And what would cause you to choose to do that when you

4  did it?

5  A    Desperation.

6  Q    And at any point did you -- you never asked your parents

7  for your birth certificate?

8  A    Sorry.  Not that I remember.

9  Q    At some point you made a decision you wanted to leave the

10  room; right?

11  A    Yes.

12  Q    Because by this point your mother had left the room;

13  correct?

14  A    Yes.

15  Q    And you recall your mother leaving the room around in

16  July, July 9th, 2011?  Do you remember that being around the

17  time that your mother left the room?

18  A    I'm sorry.  Again, my sense of time in there is very

19  fuzzy.  I don't -- I don't remember exact dates of periods of

20  time.

21  Q    Okay.

22            MR. AGNIFILO:  Your Honor, we're going to be on this

23  for a while, so if you want to take a break now, we can take a

24  break.

25            THE COURT:  Yes.  That is fine.  It is probably the

Daniela - cross - Agnifilo                    3214

1    right time.

2            All rise for the jury.

3            THE COURTROOM DEPUTY:  All rise.

4            (Jury exits.)

5            (In open court; outside the presence of the jury.)

6            THE COURT:  All right.  The witness may stand down.

7    Do not discuss your testimony with anyone.

8            (Witness excused.)

9            THE COURT:  Anything before we break?

10           MR. AGNIFILO:  Nothing from us.

11           MS. PENZA:  No, Your Honor.

12           THE COURT:  Okay.  Ten minutes, thank you.

13           (Recess taken.)

14

15           (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

3215

1          (In open court; jury not present.)

2          THE COURT:  Okay.  Anything before we start?

3          MS. PENZA:  No.

4          MR. AGNIFILO:  Nothing, Judge.

5          THE COURT:  All right.  Let's bring in the witness,

6     please.

7          (Witness resumes the stand.)

8          THE COURT:  Please bring in the jury.

9          (Jury enters.)

10         THE COURT:  Please be seated.

11    You may continue your cross-examination, sir.

12         MR. AGNIFILO:  Thank you.

13         THE COURT:  The witness is reminded she is still

14    under oath.

15         THE WITNESS:  Yes, Your Honor.

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                          3216

1  DANIELA    ,

2       the witness, having been previously duly sworn,

3       resumed as follows:

4  CROSS-EXAMINATION (Continued)

5  BY MR. AGNIFILO:

6  Q    Daniela, on occasion you'd leave the room and you would

7  go to a Stewart's shop that was not far from the house at

8  Wilton, correct?

9  A    I don't remember exactly where I went.

10 Q    All right.  Do you remember, do you remember being

11 interviewed by the FBI in the presence of your lawyer,

12 Mr. Glazer, on June 22, 2018?

13 A    I, I don't remember that date, that exact location, no.

14 Q    I can show it to you.  You were interviewed by the FBI a

15 number of times, correct?

16 A    Yes.

17 Q    Maybe 15, 16 times, if not more?

18 A    No, I don't think that's -- I don't think that's

19 accurate.

20 Q    Well, one of the times -- I can show this.

21       MR. AGNIFILO:  This is just for the witness, Judge.

22 This is 3500DF-12.

23 Q    Let me just get it so you can see it.  This is 3500DF-12.

24 A    Okay.

25 Q    And it relates to an interview of by agents from the

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                3217

1   Federal Bureau of Investigation on two different dates,

2   June 22nd and June 24th of 2018.  Do you see that there?

3   A    I see a date but I see it's 8/10/18.  Is that right?

4   Q    That's the date that this report was made but if you see

5   at the bottom, it says, Investigation on 6/22/2018.  Do you

6   see that?

7   A    Yes.

8   Q    Okay.  And do you recall on this particular day telling

9   the FBI and people from the U.S. Attorney's Office that you

10  left the room on occasion and went to a Stewart's shop near

11  12 Wilton?  Do you remember saying that?

12  A    I don't remember.

13  Q    I'm going to show you page five of the report where we

14  just saw the front page.  And this is just for you, okay, and

15  I'll point.  I'm looking right here.

16          Just read it to yourself.  Don't read it out loud.

17  Just read it to yourself.

18          (Pause.)

19  A    Okay.

20  Q    And do you recall telling the FBI on at least one of

21  these occasions, you went to a Stewart's shop at 12 Wilton

22  Court?  Do you remember telling the FBI that?

23  A    No.

24  Q    And do you remember also telling the FBI that you went to

25  a Walmart?

Daniela - cross - Agnifilo                     3218

1    A    No.

2    Q    Are you saying you didn't say those things to the FBI?

3    A    What you just said, I don't remember saying that.

4    Q    Okay.  What do you remember saying to the FBI about going

5    to a Stewart's shop or to a Walmart?

6    A    I remember saying that I remember, as it says, going out

7    on a couple of occasions, that I didn't exactly remember where

8    I went, that I remember places and that I remember having also

9    traced, in my imagination, going places so I had a hard time

10   really remembering.  And I remember places like Walmart, I

11   remember places like the Stewart's, I remember places like the

12   Pirates' Hideout, and I remember certain roads, but I don't

13   have full certainty of where exactly I went that couple of

14   times other than walking around.

15   Q    Do you remember having certainty when you were speaking

16   to the FBI and telling the FBI that you went to a Stewart's

17   shop near 12 Wilton Court?  Do you remember telling them that?

18   A    No, and that's not what it says.

19   Q    On at least one of these occasions, Daniela went to a

20   Stewart's shop near 12 Wilton Court --

21            MS. PENZA:  Objection, Your Honor.

22            THE COURT:  Sustained.

23   Q    What did you say to the FBI?

24   A    I told them --

25            MS. PENZA:  Objection, Your Honor.

Daniela - cross - Agnifilo                3219

1      THE COURT:  You may answer.

2      THE WITNESS:  I'm sorry.  I may answer?

3      THE COURT:  Yes, please.

4      THE WITNESS:  Okay.

5   A    I remember telling them exactly what I remember which is,

6   and what I don't remember, which is I remember, again, going

7   out on a couple of occasions, I remember.  I don't know

8   exactly where I went but I remember certain places and, you

9   now, my memory of that is not exact and that's what I told

10  them.

11  Q    Did you mention specifically Stewart's shop?  Did you

12  mention that specific place to the FBI?

13  A    Yes, as well as Walmart.  I mentioned that.

14  Q    Okay.  And what else?  What other places did you mention?

15  A    I don't remember.

16  Q    Okay.  Is it true then that on one occasion, you went out

17  but before going out, you stole money from your father's

18  wallet while you were in the room?

19  A    I don't remember.  I -- no, I don't remember.

20  Q    Do you remember leaving the room, stealing money from

21  your father's wallet and then going to local businesses to

22  purchase food?

23  A    I don't remember.

24  Q    Do you remember telling the FBI that you did that?

25  A    I remember telling them that I didn't remember.

Daniela - cross - Agnifilo                    3220

1   Q    Do you remember an interview at the FBI on March the 4th,
2   2019?  We're only talking a couple of months ago.
3   A    I -- no, I don't have that kind of recall.
4   Q    Okay.
5   A    Sorry.
6   Q    I'm going to show you 3500DF-21.  This is just for you to
7   see.  Let me show you the bottom.  This is an investigation on
8   3/4/19.  It relates to an interview of you on March the 4,
9   2019.  Do you see that?
10  A    I'm sorry.  I'm seeing the date of entry again.
11  Q    So that's the day that they made the report but the
12  interview, the interview date, as you can see on the bottom,
13  the interview date is March the 4th, 2019?
14  A    Right.
15  Q    But they made this report four days later?
16  A    Yes.
17  Q    Okay.  And just read to yourself the underlined portion.
18  Just read it to yourself.
19          (Pause.)
20  A    Okay.
21  Q    So my question is did you tell the FBI that you had taken
22  money from your father's wallet and that you would use that
23  money to go to food establishments in the area?
24  A    No.
25  Q    What did you tell the FBI?

Daniela - cross - Agnifilo                    3221

1   A     Okay.  I told the FBI that I remember going out and I

2   remember certain places and I remember, like -- I remember but

3   I wasn't sure I remember, like, if I bought something there

4   and I remember thinking, well, but if I had, then I would have

5   had to have gotten some money so I would have had to have

6   gotten it from, no one else but my dad.  I don't even know if

7   my dad was living there at the time.  So I remember musing how

8   that would have worked out.  So in the end, I wasn't sure if

9   that's something that I just imagined or -- because I don't

10  know how it would have actually happened since I didn't have

11  any money to by anything.

12          So I just was trying to remember.  I was

13  recollecting and trying to remember but, again, I don't

14  remember with certainty which is, in the end, what I told

15  them.

16  Q     What you told the FBI is that you purchased food --

17              MS. PENZA:  Objection.

18              THE COURT:  Sustained.

19  Q     Did you tell the FBI that you --

20              THE COURT:  Wait.  Please.  Please.  Please don't

21  read from --

22              MR. AGNIFILO:  I'm not, Judge.  I'm not.

23              THE COURT:  Excuse me.  I'm not finished.

24              MR. AGNIFILO:  I apologize.

25              THE COURT:  Please.  Please don't read from the

Daniela - cross - Agnifilo                    3222

1  documents that are not in evidence.  Okay?

2          MR. AGNIFILO:  I won't do that, Judge.

3          THE COURT:  Thank you.  Go ahead.

4  Q    Did you tell the FBI that you were taking money from your

5  father's wallet?

6  A    Again, no.

7  Q    You didn't tell the FBI that you took money from your

8  father's wallet and went to local stores?

9          MS. PENZA:  Objection.

10          THE COURT:  That's sustained.  Next question.

11 Q    Did you tell an agent named Charles Fontanelli --

12 remember?  Do you know who that is?

13 A    I do, yes.

14 Q    And a Michael Weniger, do you know who that is?

15 A    Yes.

16 Q    And do you remember speaking to them several times?

17 A    Yes.

18 Q    They interviewed you many, many times before you

19 testified here today, correct?

20 A    I don't know how to quantify "many, many."

21 Q    Like maybe 15, 16 times?

22 A    Actually, I don't know how many times.

23 Q    And you spoke to them, you spoke to them about times that

24 you left the room, correct?

25 A    Yes.

Daniela - cross - Agnifilo                    3223

1    Q    And what you just said on direct examination is you don't

2    recall taking money from your father's wallet but you're

3    imagining you must have because you had money to go to local

4    stores.  Isn't that what you just said?

5    A    No.  I don't, I don't believe I spoke about it in direct

6    examination as you just stated.

7    Q    No, no, not direct.  Just before, what you just said to

8    the jury a few minutes ago when I first asked you if you had

9    taken money from your father's wallet.  What do you recall

10   about that?

11   A    I'm sorry.  I'm a little bit confused.  What is the

12   question?

13   Q    My question is you left the room on more than one

14   occasion, correct?

15   A    Yes, that's what I remember.

16   Q    And on at least one occasion, you took money from your

17   father's wallet before going outside?

18   A    Again, no.

19   Q    You're denying that?

20   A    Yes.  I already did.  I don't remember that.

21   Q    All right.  So that's not true?

22   A    I don't remember that.  I don't remember doing that, no.

23   Q    And do you remember saying that to the FBI?

24             MS. PENZA:  Objection, Your Honor.

25             THE COURT:  That's sustained.

Daniela - cross - Agnifilo                    3224

1    Q    Do you remember telling the FBI how many times you left?

2    A    No.

3    Q    And do you remember specifically how many times you did

4    leave?

5    A    I don't.

6    Q    Now, at some point, you decide you want to leave the

7    room, correct?

8    A    Yes.

9    Q    And who did you talk to?  Who is the first person you

10   talked to after you made a decision that you wanted to leave

11   the room?

12   A    I don't remember.

13   Q    At some point, did you speak to your father about it?

14   A    At some point, yes.

15   Q    And when?  When?  In regard to when you made the decision

16   to leave the room, how soon after did you speak to your father

17   about it?

18   A    I don't remember.

19   Q    And at some point, your father drove you toward the

20   border, correct?

21   A    Yes.

22   Q    With Kristin Keefe, right?

23   A    Yes.

24   Q    And do you remember anything about the discussion between

25   you and your father that led from you being inside the room to

Daniela - cross - Agnifilo                    3225

1   you being in a car headed south?

2   A    No.

3   Q    You don't remember anything about any discussions?

4   A    No.

5   Q    Did you have discussions with your father before you left

6   the room and got in a car?

7        It was his car, right?

8   A    What, what's the question?  The one before?

9   Q    The question, I'm talking about when you were driven from

10  Wilton Court to Mexico.

11  A    Uh-huh.

12  Q    What car was it?

13  A    I don't remember exactly.

14  Q    Does was your father driving a Mercedes-Benz at the time?

15  A    He owned one, yes.

16  Q    Is that the car you went in?

17  A    I don't remember.

18  Q    And is there anything you can tell me about any

19  interaction with your father at all between the time you're in

20  the room and the time you're in a car with your father and

21  Kristin Keefe heading toward Mexico?

22  A    What was the question again?

23  Q    Is there anything you can tell me about any interaction

24  at all between you and your father between the time you left

25  the room and you got into a car to head to Mexico?

Daniela - cross - Agnifilo                    3226

1  A      What I can tell you is it was an extremely traumatic
2  period coming out of the room and the circumstances surround
3  it.  I felt like the world was palpitating around me and I
4  remember being drowned by the sensations and I remember just
5  saying do whatever it is you are going to do, but I don't
6  remember.  I don't remember specifics, like, even, like, the
7  trip.  At one point, I was in one place and the next one, I
8  was in another.  So it was just a complete -- I mean, I think
9  it's understandable given the circumstances.
10 Q      You can't remember anything, not a single conversation
11 with your father, not one?
12 A      I remember -- as I said before, I remember a hotel.  I
13 remember, I remember what I wanted happening.  I remember
14 wanting him to hug me.  I remember telling him that I had
15 taken some money from him.  I remember wanting to feel clean.
16 Q      Tell me about taking money from him.  Where were you when
17 you took the money from him?
18 A      I think I was in the house.
19 Q      Tell us what happened?
20 A      I think I was -- I think I was in the house and I think I
21 was preparing to leave and I was between confused and panicked
22 and I was, like, I was in a rush deciding what to take with me
23 and I knew they were going to leave me with nothing.  And I
24 don't remember exactly where I took it from, but I definitely
25 took it, I definitely gave it back, and that's what I

CMH        OCR        RMR        CRR        FCRR

Daniela - cross - Agnifilo                          3227

1   remember.

2   Q    But he, he was going to give you money.  You say you knew

3   that he wasn't going to give you money.  He gave you money.

4   A    No.

5   Q    He bought you a bus ticket?

6   A    No, that's not accurate.

7   Q    He gave you money.  Before you got out of the car, he

8   gave you money, isn't that right?

9   A    Yes, that's right.

10  Q    In addition to the money you took, he gave you money,

11  right?

12  A    No.

13  Q    He didn't give you any extra money?

14  A    Not extra money, no.

15  Q    How much money did he give you?

16  A    He gave me 1,500 pesos.

17  Q    And how much did you take from his wallet?

18  A    I don't remember exactly.  I thought it was about a

19  thousand pesos.

20  Q    And he had you meet his accountant on the other side of

21  the border, correct?

22  A    Yes.

23  Q    So you could be driven someplace safely, right?

24  A    Yes.

25  Q    And he paid for a bus ticket for you to go to where you

CMH       OCR       RMR       CRR       FCRR

Daniela - cross - Agnifilo                    3228

1    chose to be, correct?

2    A    Yes.

3    Q    And he gave you his watch, correct?

4    A    Yes.

5    Q    And at some point, you were out, you were in Mexico.

6    Correct?

7    A    Yes.

8    Q    And you started writing Keith e-mails every day or every

9    other day, correct?

10   A    I wouldn't say started.  I would say continued.

11   Q    Okay.  Continued.

12   A    Yes.

13   Q    You're now -- you're not in the room, right?

14   A    Yes.

15   Q    You're in Mexico, right?

16   A    Yes.

17             MR. AGNIFILO:  I'm going to show just for the

18   witness Defense 620.  It's a two page e-mail for

19   identification, Defense 620.

20   Q    This is an e-mail from you to Keith Raniere, correct?

21   A    Yes, that's what it looks like, yes.

22   Q    It's from June 7, 2012, correct?

23   A    Yes.

24   Q    And it's -- that's the first page and this is the second

25   page, right?

Daniela - cross - Agnifilo                          3229

1   A     That's what it looks like, yes.

2               MR. AGNIFILO:  Your Honor, we offer it.

3               MS. PENZA:  No objection.

4               THE COURT:  All right.  Defense Exhibit 620 is

5   received in evidence.

6               (So marked.)

7   Q    So what you write to Keith is you say:  Hi Keith.  I'd

8   like to catch you up on everything that has been going on.

9   Mostly I wish that what is going on wasn't going on at all.  I

10  almost want to pause life and don't continue it until I can

11  share it with someone meaningful.  Otherwise I feel like I am

12  building a way or building apart at least.  You know how I

13  feel.  Marvy and I are so close.  I think it is in part

14  because we experienced life together so we are kind of made of

15  the same fabric.  I don't want to thread my life with other

16  people, to experience things alone that I won't relate to

17  anyone else, that I can't enjoy all by myself.  I struggle

18  with this because I know I should be okay all by myself.  And

19  in a way I think I am okay all by myself.

20               And it goes on and on.

21  A    Okay.  May I read it?

22  Q    Of course.  Let me see if I can get the whole thing

23  there.  I'll tell you.  You tell me when you want to move it

24  down and I'll see if I can get it big enough for you.  You

25  tell me when you want to move it.

Daniela - cross - Agnifilo                        3230

1    A    Okay.

2              (Pause.)

3    A    Okay.

4    Q    You want me to move it?

5    A    Please.

6    Q    Okay.  That's the end of the first page.

7              (Pause.)

8    Q    Tell me when you're ready to go to the second page.

9    Whenever you're ready.

10             (Pause.)

11   A    I'm ready.

12             (Pause.)

13   A    Okay.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3231

1    EXAMINATION CONTINUES

2    BY MR. AGNIFILO:

3    Q    So, among other things, you write to Keith:  I feel like

4    I want to tell you every little thing -- I'm

5    here (indicating.)

6            I feel like I want to tell you every little thing I

7    have done and I'm doing.  I feel torn because on one side it

8    is stupid, why would I bother you with that.  On the other

9    side I feel I don't want to grow apart from you.

10           Did you mean that when you wrote it?

11   A    No.

12   Q    You go on to say:  I want you to know everything about me

13   so that if maybe one day we meet again there will be no gaps,

14   no doubts.

15           You wrote that, right?

16   A    Yes.

17   Q    Did you mean it?

18   A    No.

19   Q    You write, right here (indicating):  I don't think this

20   is a time to lose myself in suffering or self-pity.  I am

21   aware how close this line of thinking is to that.  And it is,

22   in the end, irrelevant, it is no excuse.  I could always fix

23   what I did and then disappear.  But I first need to make

24   things ok.

25           Did you mean that when you wrote it?

SAM      OCR      RMR      CRR      RPR

                    Daniela - cross - Agnifilo                3232

1    A    No.

2    Q    You sent him --

3              MR. AGNIFILO:  This is 641 for identification.

4    Q    You sent him an e-mail six days later.

5              MR. AGNIFILO:  I am going to show it just to the

6    witness.

7              THE COURT:  Okay.

8              MR. AGNIFILO:  Yes, thank you, Judge.

9    BY MR. AGNIFILO:

10   Q    This is an e-mail from you to Keith Raniere dated

11   June 12, 2012, correct?

12   A    Yes.

13   Q    And that's the whole e-mail, it's all on that page.

14             MR. AGNIFILO:  We offer it as 641, Your Honor.

15             MS. PENZA:  No objection, Your Honor.

16             THE COURT:  All right, Defense Exhibit 641 is

17   received in evidence.

18             (Defense Exhibit 641 was received in evidence.)

19             (Exhibit published.)

20   Q    Do you want a second to read that over?

21   A    Thank you.

22             (Pause.)

23             THE WITNESS:  Okay.

24   Q    So you write:  I feel like a Hitler in a Gandhi suit.

25             What was that supposed to mean?

Daniela - cross - Agnifilo                    3233

1   A     Yes.  Ooh, this means the trauma inflicted on me over the

2   last ten years or seven years, to be more fair, is something

3   that I could not shed as soon as I crossed the border.  It

4   wasn't immediate, the change.  I think I explained that

5   before, but I can explain it again.

6           This is such a painful e-mail because it is true, I

7   was trying to be good and I was trying to build a life, but it

8   wasn't immediate.  All of the garbage, all of the abuse, all

9   of the manipulation was still inside me.  All of the words he

10  had said, all of the expectations I had of myself, that I

11  thought others had of me traveled with me to my new

12  destination and I don't lose context of it.  I have just been

13  through years of intense abuse.

14          This is -- this is not -- none of these are

15  complex -- none of these are simple, just what an average

16  person would read, oh, I've been thinking about you.  This is

17  the product of a small lifetime of manipulation.  And here I'm

18  fresh off the boat, I'm fresh into a new life and it carried

19  with me.

20          So it's so sad, all of this.  I feel like a Hitler

21  in a Gandhi suit.  That means I am in this brand new life.  I

22  am doing all the right things.  I'm treating people nicely,

23  I'm getting a job, I'm doing all the things I want to do and I

24  feel horrible.  That is the lasting effect of what he did to

25  me.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3234

1   Q    You don't say any of those things.  You agree with me,
2   that's not what you're saying?
3   A    I agree with you.
4   Q    What you're saying is:  Hi, I have been thinking about
5   you and about what I write to you.  Also about my life and
6   what I show of it to different people.  I feel out of place
7   everywhere except here writing to you.  I am not completely
8   absent as I live my days, I am just not all there with anyone.
9   I have decided who I want to be and I am that.  I consciously
10  behave in line with that better vision of myself.
11             That's the words that you actually wrote are the
12  words here, all the things you just said to the jury is not
13  what you're writing in this e-mail to Keith on June 12th,
14  2012; you agree with me?
15  A    What was the question again?  That was really long.
16  Q    What you're writing, the words that you're writing --
17  A    Is what you just read?
18  Q    Is what I just read.
19  A    Yes.
20  Q    You wrote him two days later on June 14th, 2012.
21             MR. AGNIFILO:  This is identification -- 642 for
22  identification.
23  A    Okay.
24  Q    That's an e-mail from you to Keith Raniere on June 14th,
25  two days after the e-mail we just looked at, right?

Daniela - cross - Agnifilo                3235

1    A    Okay.

2            MR. AGNIFILO:  We offer 642.

3            MS. PENZA:  No objection, Your Honor.

4            THE COURT:  All right, Defense Exhibit 642 is

5    received in evidence.

6            (Defense Exhibit 642 was received in evidence.)

7            (Exhibit published.)

8    A    I am going to read it.

9    Q    Take your time.  I will make it big for you.  There you

10   go.

11           (Pause.)

12           THE WITNESS:  Okay.

13   BY MR. AGNIFILO:

14   Q    Were you working at the time?

15   A    It sounds like it from the e-mail, yes.

16   Q    And do you remember what job you had in the middle of

17   June 2012?

18   A    I think I was working at the computer store.

19   Q    And do you know how long you had been working there?

20   A    I think since March.

21   Q    And you talk about -- you talk about your family.  You

22   said that I'm going to start writing to my dad, right?

23   A    That's what I write, yes.

24   Q    Right.  Did you start writing to your dad?

25   A    I don't remember.

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3236

1  Q     And then you talk about your dad, Cami, Fluffy and Marvy,
2  right?

3  A     Yes.

4  Q     Were you writing to any of them?

5  A     I don't remember.

6  Q     But you do remember you were writing to Keith, very, very
7  often?

8  A     Actually, I don't remember.  I remember from seeing these
9  e-mails.

10  Q     Alright, so this is another e-mail from June 26th, 2012.

11         MR. AGNIFILO:  It is Exhibit 621 for identification.
12  I'll show the witness.

13  BY MR. AGNIFILO:

14  Q     It's an e-mail from you to Keith Raniere from June 26th,
15  2012, correct?

16  A     That's right.

17         MR. AGNIFILO:  We offer it as Defense 621.

18         MS. PENZA:  No objection.

19         THE COURT:  All right, Defense Exhibit 621 is
20  received in evidence.

21         (Defense Exhibit 621 was received in evidence.)

22         (Exhibit published.)

23  BY MR. AGNIFILO:

24  Q     Take a chance, read it to yourself.

25  A     (Witness complies.)

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3237

1         THE WITNESS:  Okay.
2    BY MR. AGNIFILO:
3    Q    Okay.  So you say:  I've been a mess in these last few
4    days.  I'm sorry I didn't write.  You just went into a black
5    hole and it was difficult getting out.
6         That's what you say, correct?
7    A    Yes.
8    Q    And then you say:  I have bad news about my Social
9    Security.  I need a series of original papers, which I do not
10   have and will take me a while to get.
11        What papers did you need?
12   A    For Social Security I think I need -- it's a long list.
13   I don't know all of the list.  I think it's either official
14   Mexican ID or a birth certificate or just the ID for which you
15   needed the birth certificate.  You need the corp.  You need
16   proof of address.  You need I think a health check.  And I
17   think there's a few more.  I don't know the exact list one
18   needs to get the Social Security up-to-date.
19   Q    And did you contact your father about any of this, did
20   you seek help from your father in June of 2012?
21   A    In June 2012 -- I don't remember in June 2012.  I
22   remember at the time I was constantly asking for my papers.  I
23   don't know the exact range of times.
24   Q    And when you asked for your papers, you were asking your
25   father, right?

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3238

1   A    When I asked -- I remember asking him.  I don't know if

2   he was the only one, but that's what I remember, yes.

3   Q    Okay, you're not asking Keith in this e-mail for your

4   papers, right?

5   A    I am making him aware, but I'm not asking him; no.

6   Q    Okay.  July 7th you write Keith another e-mail.

7            MR. AGNIFILO:  It's Defense 622, I'm sorry, for

8   identification, Judge.

9            THE COURT:  All right.

10  BY MR. AGNIFILO:

11  Q    Okay, this is from yourself to Keith, July 7th, 2012,

12  correct?

13  A    Yes.

14  Q    And take a chance --

15           MR. AGNIFILO:  We offer this, Your Honor, as 622.

16           MS. PENZA:  No objection.

17           THE COURT:  All right, Defense Exhibit 622 is

18  received in evidence.

19           (Defense Exhibit 622 was received in evidence.)

20           (Exhibit published.)

21  BY MR. AGNIFILO:

22  Q    Take a chance to read it to yourself.

23           THE COURT:  Just one moment.  Okay.

24  A    (Witness complies.)

25           THE WITNESS:  Okay.

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                    3239

1   BY MR. AGNIFILO:

2   Q    Okay, so in this e-mail you refer to the fact that you

3   have written to your father asking for the papers that you

4   need, correct?

5   A    Yes.

6   Q    And you say that you need to find employment again, legal

7   this time, for which you need your birth certificate.

8        Right, that's what you write here?

9   A    Yes.

10  Q    Right.  And does this refresh your recollection if, in

11  fact, you wrote to your father around this time?

12  A    It doesn't refresh my recollection, but from what I'm

13  writing, I must have.  I'm not sure.

14  Q    Okay.  And you said, you made reference to finishing a

15  project.  You say down here (indicating):  Right now I have a

16  little money from a project I finished a few days ago.

17       Do you remember what that was?

18  A    That particular project, I don't know which one I was

19  referring to; no.

20  Q    What sort of projects were you working on, you know, in

21  the summer of 2012?

22  A    I was working, I had been working at the computer store

23  and sometimes the people who went there had needs for their

24  website, the need for a website, so I was doing some

25  programming.  That's what I remember.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3240

1   Q    All right, we are going to go to the next one.

2          MR. AGNIFILO:  This is Defense Exhibit 644.  This is

3   from July 15th.  It is for identification as 644, Defense 644.

4   BY MR. AGNIFILO:

5   Q    Let me see if I can get that a little clearer for you.

6   Hold on.

7   A    Okay.

8   Q    It is an e-mail from you to Keith on July 15th, 2012,

9   correct?

10  A    Yes.

11         MR. AGNIFILO:  We offer it, Your Honor, as Defense

12  644.

13         MS. PENZA:  What number was it?

14         MR. AGNIFILO:  644, Defense 644.

15         MS. PENZA:  No objection.

16         THE COURT:  All right, Defense Exhibit 644 is

17  received in evidence.

18         (Defense Exhibit 644 was received in evidence.)

19         (Exhibit published.)

20         (Pause.)

21         THE WITNESS:  Okay.

22         MR. AGNIFILO:  Okay.

23  BY MR. AGNIFILO:

24  Q    So you say to Keith that:  I just want to make this

25  really clear for you, you have been and are the light in my

Daniela - cross - Agnifilo                3241

1   life.  And then you end this paragraph by saying:  I do have

2   feeling and moments that I cherish and will always hold in a

3   special place.

4          Did you mean those things?

5   A    Again, there are very, very complex situations behind all

6   of that.

7   Q    And you said in the second line here, right here

8   (indicating):  Whatever else I made negative relating to you

9   didn't come from you, it came from me.

10         Did you mean that?

11  A    In that moment, again there's a lot of complexity behind

12  that.

13  Q    But you agree with me you wrote those words?

14  A    I wrote those words, yes.

15  Q    Alright.

16         MR. AGNIFILO:  We are going to look at about six

17  days later, Defense 665, this is very short, for

18  identification.

19  Q    It is a short e-mail from you to Keith Raniere from

20  July 21st, 2012.  Correct?

21  A    Correct.

22         MR. AGNIFILO:  We offer it as 665, Your Honor.

23         MS. PENZA:  No objection.

24         THE COURT:  Alright, Defense Exhibit 665 is received

25  in evidence.

Daniela - cross - Agnifilo                    3242

1              (Defense Exhibit 665 was received in evidence.)
2    BY MR. AGNIFILO:
3    Q    And all this says is there is a heart sending you my
4    love, right?
5    A    Yes.
6    Q    And you sent a lot of e-mails like this, short e-mails, I
7    love you or sending you my love, things like that, on
8    sometimes two or three times a week?
9    A    I -- I don't know actually.  I don't remember.
10   Q    And but you agree you sent this particular e-mail on this
11   date, July 21st, 2012, correct?
12   A    Yes.
13   Q    All right, July 31st, so it's a few days later.
14              MR. AGNIFILO:  Sorry, Judge, this is 645 for
15   identification.
16   BY MR. AGNIFILO:
17   Q    This is from you to Keith on July 31st, 2012, right?
18   A    Yes.
19   Q    Okay.
20              MR. AGNIFILO:  We offer it as 645, Your Honor.
21              MS. PENZA:  No objection.
22              THE COURT:  I'm sorry, I didn't hear?
23              MS. PENZA:  No objection.
24              THE COURT:  All right, Defense Exhibit 645 is
25   received in evidence.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3243

1              (Defense Exhibit 645 was received in evidence.)

2              (Exhibit published.)

3    BY MR. AGNIFILO:

4    Q    Take whatever time you need to read it over.

5    A    I read it.

6    Q    Okay.

7              So you say:  Hi again, heart, I just want to tell

8    you I am running toward you, unafraid.  I am attached to you.

9    I am aware I know theoretically I could free myself of

10   attachments and exist at a higher level of consciousness.  But

11   that is not my job here.  I don't feel that is what I need to

12   master this time around.  I need love.  I need to learn how to

13   do that.  I need to learn to respect and be kind and do what

14   is right regardless.  I want to love you.  I want to be better

15   for you and yes, be loved by you.  But I can't control that.

16   I can only run towards you and that's what I will do.  The

17   rest will unfold and it has to.

18              That's what you write, correct?

19   A    Yes.

20   Q    Okay.  Now, at some point do you meet someone in Mexico

21   named, is it PJ?

22   A    No, not PJ.

23   Q    JP.

24   A    (Nodding.)

25   Q    Hold on.

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                    3244

1   A    I think I know who you're talking about.

2   Q    Hold on, we just lost our signal.

3        MR. AGNIFILO:  We'll have to wait for a second,

4   Judge.  I apologize.

5        (Pause.)

6        MR. AGNIFILO:  We'll go on, I'll catch up.

7   BY MR. AGNIFILO:

8   Q    So until we're waiting for this to reboot, do you

9   remember in September of 2012 you were fired from a job?

10  A    I remember being fired from a job, I don't remember the

11  exact date.

12  Q    What job was that?

13  A    I remember being fired from a job as an executive

14  assistant to a hotel manager.

15  Q    Okay, and what happened?

16  A    What happened is I believe we didn't have similar working

17  styles, so he said, Thank you very much, but no thank you.

18  Q    And you told Keith about this?

19  A    I now know I have, yes.  I did.  I now know I did, yes.

20  Q    And why, why did you tell Keith that you were fired from

21  a job?

22  A    Why did I -- why did I tell Keith anything?  Why did I

23  tell him that I loved him?  Why did I share what was going on

24  in my life?  Why did I do all of that?  Why did I share with a

25  man who destroyed my life --

SAM      OCR      RMR      CRR      RPR

Daniela - cross - Agnifilo                 3245

1    Q    My question is why did you tell him you were fired?

2    A    Why did I tell him I -- I was telling him a lot of things

3    from what I can read.  I -- I mean I'm not an expert, in

4    general --

5    Q    But you made a choice, you made a choice --

6    A    Wait.

7              THE COURT:  Are you finished?

8              THE WITNESS:  I'm not.

9              THE COURT:  Finish.

10             THE WITNESS:  Thank you.

11   A    I am not an expert in the subject, I can only speak to

12   what my experience was.

13             I think after everything that I went through, as I

14   said already, and just a little bit ago, it didn't disappear

15   entirely.  In fact, that was all of me.

16             I mean I didn't -- that's all I lived for years and

17   I don't know how else to just verbalize that and explain that.

18   And coupled with carrying all of that inside me, which didn't

19   fade immediately, it took for me to live a full life to be

20   able to change that.  Coupled with that, still in the back of

21   my mind, in the back of my feeling I knew that it was Keith

22   that held access to my family.  So I think there was still an

23   inkling to want to please him, to want to meet the

24   expectations, to want to say the right things.  Again,

25   continued as before.  I mean it's not -- I'm not trying to

SAM     OCR     RMR     CRR     RPR

Daniela - cross - Agnifilo                3246

1  explain something very complex, it was just more of the same.

2  That didn't go away immediately.  I mean I still didn't have

3  my papers, so I still couldn't even form an identity.  I

4  wasn't able to rebuild my life entirely because of him.

5          Now, I didn't understand that with the clarity that

6  I understand it right now in front of you, so I couldn't

7  verbalize it.  So, indeed, my words are not the words that I'm

8  speaking now.  I wish they would have, but it's not how it

9  worked for me.  I don't know if that's how it works.  Clarity

10  came to me, and it took a long time and a lot of building.

11          So I am telling him right now that I got fired and

12  I'm telling him all these things that seem absurd in light of

13  the massive, traumatic abuse.  I think just as a continuation

14  of that manipulation.  So I'm just sharing things as I feel

15  them, and that's what I understand of what I was doing then.

16

17          (Continuing on the following page.)

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3247

1    (Continuing)

2    Q    You wrote him about everything that you're doing in

3    Mexico; right?

4          When you got fired, you wrote him that I got fired;

5    right?

6    A    Yes.

7    Q    When you met somebody that you had an interest in, you

8    told him you met someone that you had an interest in; right?

9    A    That I don't remember.

10   Q    Do you remember -- who's DJ Padamadan, P-A-D-A-M-A-D-A-N?

11   Who is that?

12   A    Another abusive man, was my luck.

13   Q    And you met him in Mexico; right?

14   A    Yes.

15   Q    And you told Keith about aspects of a situation with

16   yourself and this person.  How do you say his name?

17   A    I actually don't know how to say his name.  I called him

18   DJ.

19   Q    Okay, with you and DJ; right?

20   A    All right.

21   Q    And DJ said some very negative things about you; correct?

22   A    Yes.

23   Q    About the state of your mental health?

24          MS. PENZA:  Objection, Your Honor.

25          THE COURT:  Sustained.

VB        OCR        CRR

Daniela - cross - Agnifilo                    3248

1   Q     You shared these messages with Keith; didn't you?

2   A     Yes.

3   Q     You -- now, what was the nature of your relationship

4   between you and DJ?

5   A     I thought we were friends.

6   Q     There's no romantic component to it?

7   A     Not for me.

8   Q     Okay.  So you thought you and he were friends.  And you

9   and he got into a disagreement about certain things that you

10  did or did not do; correct?

11  A     Disagreement... we -- we got into a disagreement, yes.

12  Q     What was the disagreement about?

13         MS. PENZA:  Objection.

14         THE COURT:  Sustained.

15  Q     How did you meet this person?

16  A     I don't remember.

17  Q     Where did you meet him?

18  A     I don't remember exactly.

19  Q     How long did you and he know each other?

20         MS. PENZA:  Objection.

21         THE COURT:  You may answer.

22  A     I don't know exactly.

23  Q     Was it a week?  Was it six months?  Is there anything you

24  can tell us?

25  A     I would say somewhere between a week and six months.  Not

VB      OCR      CRR

Daniela - cross - Agnifilo                      3249

1   sure.

2   Q    And you forwarded Keith chats that you and this person

3   had; correct?

4   A    Yes.

5   Q    Knowing that these chats were very derogatory toward you;

6   correct?

7   A    Yes.

8   Q    Why did you send them?

9   A    I believe I already answered that question.

10  Q    So you won't answer it?

11  A    I can answer it again.

12        I was sending all sorts of things about my life.

13  Pretty indiscriminately.  I think it was still some sort of

14  dependency and very, very factually it was actually

15  dependency, since I believe he still held access to -- to my

16  family and for me to get what I want, my papers, and the kind

17  of life that I wanted.

18        And I think, again, that it was residual of the

19  abuse and the residual of the trauma and the residual of that.

20  So I was just doing what I had been doing for a long time and

21  I thought -- I actually don't know.  I was -- I was pretty

22  broken, in fact.  The point in rebuilding.

23        So, again, that's -- that's my understanding of why

24  I was writing all of those things to him.

25        MR. AGNIFILO:  We're going to go forward, 628 for

VB        OCR        CRR

Daniela - cross - Agnifilo                    3250

1   identification it's January 14th, 2013.  So now we're in 2013.

2   This is for identification.

3   Q    This is from you to Keith, January 14th, 2013; correct?

4   A    Yes.

5        MR. AGNIFILO:  All right.  We offer it as 628,

6   Your Honor.

7        THE COURT:  All right.

8        MS. PENZA:  No objection, Your Honor.

9        THE COURT:  628 is received this evidence.

10       (Defendant's Exhibit 628 received in evidence.)

11       (Exhibit published.)

12       THE WITNESS:  Okay.

13  BY MR. AGNIFILO:

14  Q    Do you recall you tried to call him; right?  You tried to

15  call Keith?

16  A    I don't recall now.

17  Q    You write here that you tried to call him.

18       I tried calling you last night and this morning;

19  right?  That's what you wrote.

20  A    Yes.

21  Q    Do you know if you had been trying to call him

22  periodically during the time you were in Mexico?

23  A    I don't remember.

24  Q    Now, you say here, down here:  I'm going to apply for my

25  visa by the end of February.  I am so scared.  I do not have

Daniela - cross - Agnifilo                    3251

1  all the papers I need or the profile that I know they look

2  for, but I know this person.  And then there's a website

3  there, who is coming to town in a few weeks.  And I will see

4  if I can hire them.

5          Do you remember if you hired that person?

6  A    I don't remember, no.

7  Q    How did you get your -- you ended up -- what documents

8  did you get?  You were saying yesterday that you got documents

9  from somebody.  Someone who worked for a human rights division

10  or something like that?

11  A    Yes.

12  Q    And who was that?

13  A    That is a lawyer friend of mine.

14  Q    Okay.  And this lawyer got you what documents exactly?

15  A    My birth certificate.

16  Q    Okay.  And applied new; right?  Got a new birth

17  certificate?

18  A    Yes.

19  Q    Okay.  And do you know how that was done?  How does one

20  get a birth certificate in Mexico?

21  A    Those are two different questions.

22  Q    Okay.  Let me ask you the first one.

23          How does one get a birth certificate in Mexico?

24  A    A birth certificate in Mexico works differently in every

25  state.  Actually, it works similar in every state, but it

Daniela - cross - Agnifilo                    3252

1   works differently if you are out-of-state, from your home

2   state.  I hope that makes sense.

3              So -- and I believe now it has changed.  It was a

4   long time ago.

5              At the time I was trying to get my birth

6   certificates are -- you can get from the -- the *Registro*

7   *Civil*, civil registry.  That's an office, like a physical

8   office.  You go there, you pay.  It takes a little while.  You

9   have to, you know, bring some kind of confirmation and you get

10  your birth certificate.

11             When you are not living or you're not applying in

12  the state that you are -- you are not from the state where you

13  are applying, then there's a whole process of having to

14  request it from the state you're from.  And that is a much

15  lengthier process with some applications, because you're not

16  going to be there, you know, like, yourself, present.

17             And so that process, at least from my home state for

18  the state that I was in, included filling out some

19  application, paying a special fee, and then also paying for

20  special shipment fee for it to go over and I remember it took

21  like about a month.

22             That's the process for, like, a normal birth

23  certificate in Mexico.

24  Q    Okay.  And you did this through a lawyer?

25  A    No.

Daniela - cross - Agnifilo                    3253

1   Q     How did you get it done?

2   A     I didn't get it the regular way.

3   Q     How did you get it?

4   A     So my friend who was a lawyer at the *Commission de*

5   *Derechos Humano,* Commission of Human Rights, she -- I know

6   that she, -- that like, there's a special process within her

7   organizations to ask for it.  So she put in whatever process

8   there was in place, and through the Human Rights Commission.

9   My -- my -- my -- my birth certificate was acquired and sent

10  to me.

11  Q     Now, you had access to lawyers back when you were living

12  in the United States with your family that could have helped

13  you with your immigration situation; isn't that true?

14  A     No, that is not true.

15  Q     Okay.

16         MR. AGNIFILO:  I'm going to show you what's already

17  in evidence as Government's Exhibit 1554.

18         (Exhibit published.)

19  Q     This is already in evidence.  I think we discussed this.

20  I think the Government discussed this with you on your direct

21  examination.

22  A     I think that's right.

23  Q     Who was Jonathan Ware?

24  A     He was an immigration lawyer.

25  Q     Okay.  And let's look at this exhibit starting from the

Daniela - cross - Agnifilo                    3254

1    beginning.

2         I'll zoom in a little bit so you can see it better.

3    A    Is there a page, like is there yet another page?

4    Q    There is.  I'm we're going to go e-mail by e-mail.

5    A    Got it, okay.

6    Q    So this is from Jonathan Ware.  It's to Nancy Salzman, to

7    Kristin Keeffe and to your father at the sagitta e-mail

8    address; correct?

9    A    Yes.

10   Q    And it says:  Hector and Nancy and Kristin, I hope you

11   are all well.  I'm writing this message at Lisa's request.

12        Is that Lisa Derks?

13   A    Yes, I believe so.

14   Q    And who's Lisa Derks?

15   A    Lisa Derks is an ESP student who, I understood at some

16   point, I don't know on this point, but at some point was

17   working in the legal department.

18   Q    Okay.  And it says:  At Lisa's request, a follow-up to

19   discussions I've had with her regarding the legal strategy for

20   mitigating any potential negative consequences to Adrian and

21   Camila in terms of their abilities to return to the

22   United States, invalid immigration status.

23        He's referring here to your brother and your sister;

24   correct?

25   A    Yes.

VB        OCR        CRR

Daniela - cross - Agnifilo                    3255

1   Q    I want to make sure that we are in alignment on our

2   approach.  I see two distinct issues which I feel should be

3   approached separately.  The first issue is using NXIVM's

4   connections with people of influence.

5            And he goes through that.  I am going to continue on

6   to the next page here.  He talks about that paragraph;

7   correct?

8   A    Let me just see.

9            Yes.

10  Q    Right.  And then it says:  There's a second issue of how

11  to return Adrian and Camila to valid immigration status.  In

12  my professional option, our best bet, given the options

13  available to us at this time, would be to seek USCIS approval

14  for Adrian and Camila to return to the U.S. with Hector as L2

15  dependants, provided we obtain a favorable adjudication of

16  Hector's pending L1 one petition.

17           You see that, right?

18  A    Yes.

19  Q    Okay.  Now, eventually all of these e-mails are forwarded

20  to you.

21           MR. AGNIFILO:  If we look at the first page.

22           (Exhibit published.)

23           MR. AGNIFILO:  Right?  You're there.

24           THE WITNESS:  Yes.

25  Q    Okay.  That top e-mail, that's from your mother, right?

1  A    Yes.

2  Q    Her e-mail address is TheInnerWitch@gmail, correct?

3  A    Yes.

4  Q    It's to you.  It's to your sister Marianna, it's to Pam

5  Cafritz and it's to Keith, correct?

6  A    Yes.

7  Q    And it forwards an e-mail that is from your father to

8  Jonathan Ware, copying your mother, Fluffy, Cami and Lisa

9  Derks, correct?

10  A    Yes.

11  Q    And it says:  Jonathan, I understand what you -- I

12  understood what you wrote.  I asked Lisa see about the kids' B

13  visa extension expiration and no answer received yet.  I am

14  aware of the issue and forwarding this e-mail to the kids to

15  immediately return to Mexico if no other choice is workable

16  for the time-being.  I am on the road tonight but I will send

17  you what I have about the USCIS request.

18          So, you get this e-mail, correct?

19  A    Yes.

20  Q    And your father is saying in this e-mail, I am forwarding

21  this e-mail to the kids, including you, right?

22  A    No.

23  Q    This is not forwarded to you?

24  A    Not the one from my father.

25  Q    The whole series of e-mails is forwarded to you from your

Daniela - cross - Agnifilo                    3257

1   mother, right?

2   A    Yes, from my mother.

3   Q    So, you received this, right?

4   A    I received it.

5   Q    And you don't go back to Mexico in 2008 to make yourself

6   potentially legal to return to the United States, correct?

7   A    Correct.

8   Q    You now know that there's a lawyer who's working with

9   your brother and your sister in regard to their immigration

10  status.

11       You know this because you have received this e-mail,

12  correct?

13  A    Yes.

14  Q    And do you do anything to follow-up on this?  Do you call

15  Jonathan Ware?  Do you speak to your father about trying to

16  make it so that you would be legal in the United States?

17  A    No.

18  Q    You don't do anything.  You just continue to live

19  illegally in Clifton Park, right?

20  A    Yes.

21       MR. AGNIFILO:  Your Honor, I have more but maybe

22  this would be a good time for a break.  I'm about to move to

23  another topic.

24       THE COURT:  All right, we will take our lunch break

25  now.

Daniela - cross - Agnifilo                    3258

1          All rise for the jury.

2          THE COURTROOM DEPUTY:  All rise.

3          (Jury exits.)

4          (In open court; outside the presence of the jury.)

5          THE COURT:  The witness may stand down.  Do not

6  discuss your testimony with anyone.

7          (Witness excused.)

8          THE COURT:  Anything before lunch?

9          MS. PENZA:  No, Your Honor.

10          MR. AGNIFILO:  Nothing from us, Judge.

11          THE COURT:  All right, we will take an hour for

12  lunch, thank you.

13

14          (Continued on following page with AFTERNOON

15  SESSION.)

16

17

18

19

20

21

22

23

24

25

Daniela - cross - Agnifilo                    3259

1                    AFTERNOON SESSION:

2              (In open court.)

3              (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

4              THE COURT:  The defendant has not been brought up

5    yet.

6              (Defendant enters the courtroom.)

7              THE COURT:  Please, bring in the witness.

8              (Witness resumes stand.)

9              THE COURT:  Please bring in the jury.

10             (Jury enters.)

11             THE COURT:  Please, be seated.

12             All right, Mr. Agnifilo, you may continue your

13   cross-examination.

14             The witness is reminded she is still under oath.

15             THE WITNESS:  Yes, sir.

16   CROSS EXAMINATION (Continuing)

17   BY MR. AGNIFILO:

18   Q    Good afternoon, Daniela.

19   A    Good afternoon.

20             MR. AGNIFILO:  I am only going to show you one more

21   e-mail and this particular e-mail is from 2015 and it's marked

22   Defendant's Exhibit 636 for identification.

23             THE COURT:  Hold on.

24             All right.

25             MR. AGNIFILO:  So, 636, I'll show you the top of it.

VB     OCR     CRR

Daniela - cross - Agnifilo                    3260

1   Q    It's a series of e-mails between yourself and Keith

2   Raniere with the last e-mail being February 18th, 2018;

3   correct?

4   A    Yes.

5   Q    All right.  And I'll show you, it's a two-page Exhibit.

6   So, that's the first page.  You see that it's Defendant's

7   Exhibit 636.  And I'll show you the second page.

8          Right.  And it starts with an e-mail from you to

9   Keith on February 17th, 2015; correct?

10  A    Yes.

11         MR. AGNIFILO:  All right.  We offer it as 636,

12  Your Honor.

13         MS. PENZA:  Your Honor, may I just have a brief

14  moment, please?

15         THE COURT:  Sure.

16         (Pause in the proceedings.)

17         MS. PENZA:  The Government objects.

18         THE COURT:  Side-bar.

19         (Side-bar conference held on the record out of the

20  hearing of the jury.)

21

22         (Continued on following page.)

23

24

25

VB       OCR       CRR

Side-Bar                                                  3261

1          (Side-bar.)

2          MR. AGNIFILO:  Here, Your Honor.

3          THE COURT:  Thank you.

4          MS. PENZA:  Sorry, I didn't see this e-mail.

5          THE COURT:  Go ahead.

6          MS. PENZA:  I'm sorry, I hadn't seen this e-mail

7   before.  They did give it to me, but I hadn't seen it.

8          I believe, this is all hearsay, this entire e-mail

9   and I think it's particular -- they want -- I think the

10  Defense wants it in for this statement from the defendant.

11         In particular, she, referring to Kristin Keeffe, has

12  been silent for a year.  Then 48 hours ago she starts a

13  vigilant campaign contacting several people.  Then you call.

14  Are you sure she has it.

15         This is all hearsay.  I don't think that there's

16  any -- I don't think it's admissible.

17         MR. AGNIFILO:  I'll let Your Honor read it and

18  whenever you're ready.

19         (Pause in the proceedings.)

20         THE COURT:  I am sorry, what is the problem with it

21  in terms of what Mr. Raniere is saying?

22         MS. PENZA:  It's hearsay.  It's hearsay.  It's being

23  offered for its truth.  It's not an admission by a party

24  opponent, it's his own admission.  He wants that statement in

25  for its truth.

VB          OCR          CRR

Side-Bar                               3262

1          THE COURT:  Is that right?

2          MR. AGNIFILO:  No, I really don't.  And you can even

3     give the admonition we've been giving for other hearsay

4     statements, as far as I'm concerned.

5          MS. PENZA:  There's a 403 problem.

6          THE COURT:  What is the significance of this because

7     I am not sure about that.

8          MS. PENZA:  So, Your Honor, this is, I'm sorry to --

9     the significance of this is that Mr. Agnifilo is trying to

10    build a case about Kristin Keeffe without calling Kristin

11    Keeffe, and this is the defendant's statement about Kristin

12    Keeffe.  So, I think this is a 403 problem.  I think it is

13    being offered for its truth.  I don't think there's any other

14    purpose for it.  If it's not being offered for its truth, then

15    I think there's a risk of juror confusion under Rule 403.  I

16    don't know what the proffered reason for the admissibility of

17    this e-mail at all is.  It's all hearsay.

18         MR. AGNIFILO:  I have no interest in the truth of

19    that statement.  I'm interested in the fact that in 2015 that

20    Mr. Raniere and this witness are having this exchange.

21         If Your Honor wants to give the warning in regard to

22    hearsay, as you have with many of the Government witnesses, we

23    wouldn't be opposed to that because I'm not interested in the

24    truth of that statement.

25         MS. PENZA:  I think Mr. Agnifilo can ask about

Proceedings                                          3263

1   conversations that she had at that time, but this is, on its

2   face...

3            THE COURT:  You can ask about it.  I am not letting

4   it in.

5            If she does not know the answers, you can present it

6   to her to help her recall it.

7            MR. AGNIFILO:  All right.

8            THE COURT:  Thank you.

9            (Side-bar end.)

10

11           (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

Daniela - cross - Agnifilo                        3264

1          (In open court.)

2          THE COURT:  All right.  The objection is sustained.

3    BY MR. AGNIFILO:

4    Q    I'm just going to show this to you.

5          THE COURT:  Go ahead.

6    Q    Do you recall if you sent Keith Raniere an e-mail on or

7    about February 17, 2015?

8    A    I don't.  I'm looking at something but I don't.

9    Q    So I'm going to ask you.  You can look at it.  Look at it

10   and then read this to yourself and then I'll ask you some

11   questions.

12   A    Could you center it?

13   Q    Sure.  Absolutely.  I apologize.  Thank you.  Is that

14   better?

15   A    Yes, thank you.

16          (Pause.)

17   A    Okay.  What's the question?

18   Q    Okay.  So did you send Keith an e-mail around this time

19   telling him that you never hacked into his computer or his

20   account?

21   A    I don't remember sending this.  I can see it but I don't

22   remember.

23   Q    Okay.  Do you remember sending him an e-mail in or around

24   February 17, 2015?

25   A    No.

Daniela - cross - Agnifilo                    3265

1   Q    Do you remember speaking to him on the phone?

2   A    No.

3   Q    Do you remember telling him that you had hacked into your

4   father's e-mail account in an e-mail?

5   A    No, I did not remember that.

6   Q    Okay.  You had, in fact, hacked into your father's

7   Facebook account, correct?

8   A    I don't think that's accurate.

9   Q    Okay.  What is accurate?

10  A    I had guessed my father's password and then I had used

11  his account.

12  Q    Did he give you permission to do that?

13  A    No.

14  Q    And did you use the PSP, we've referred to a PSP in

15  different points in your testimony.  Right?

16  A    Yes.

17  Q    What's a PSP?

18  A    It's a little device, like a Nintendo, but it has more

19  functionalities than just a simple Nintendo.

20  Q    And did you use the PSP to gain access to your father's

21  Facebook account without his permission?

22  A    I didn't use it to get access.  It was through the PSP

23  that I accessed.

24  Q    What exactly did you do?

25  A    I went on Facebook, logged in with his user, and guessed

Daniela - cross - Agnifilo                          3266

1    his password.

2    Q    Okay.  And by doing that, you were able to access your

3    father's Facebook account?

4    A    Yes.

5    Q    And do you recall telling Keith that in or around

6    February of 2015?

7    A    I don't.

8    Q    Do you recall you and Keith having conversations about

9    Kristin Keefe?  Hold on.  Let me -- and the only question is

10   whether you recall.

11   A    I don't.

12            MS. PENZA:  Objection, Your Honor.

13            THE COURT:  You may answer.

14   A    Sorry?

15   Q    I think you answered the question.  I asked you if you

16   had conversations with Keith around this time period about

17   Kristin Keefe?

18   A    I don't remember.  I don't remember exactly.  I cannot

19   narrow it down to a time period and I don't remember those

20   conversations, no.

21   Q    When was the last time you spoke to Kristin Keefe?

22   A    When she drove me to the border with my father.

23   Q    You haven't spoken to her since then?

24   A    No.

25   Q    Now, speaking of your father, you said that you you've

Daniela - cross - Agnifilo                    3267

1    only seen your father once?  How many times have you seen your

2    father since you've been in Mexico?

3    A    The last question?

4    Q    Yes.  How many times have you seen your father since

5    you've been in Mexico?

6    A    About I would say three times, four times.

7    Q    Okay.  And do you remember when those were?

8    A    Not all of them, no.

9    Q    When was the last time you saw him?

10   A    I don't remember exactly.  I think it was at New Year's,

11   around New Year's, maybe 20, maybe 2015.  I don't remember

12   exactly.  Sorry.

13   Q    That's okay.  Do you remember a time when Marianna and

14   your father came down to see you in July of 2015?

15   A    I remember when they visited.  I don't remember the exact

16   date.

17   Q    Okay.  All right.  I'm going to show you a picture.

18        Just for identification for the moment, Your Honor.

19        THE COURT:  All right.

20   Q    Of Defense 600.

21        That's a picture of you and who?

22   A    This is picture of my sister Marianna on the left and I'm

23   on the right.

24        MR. AGNIFILO:  Okay.  Your Honor, we offer

25   Defense 600.

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                3268

1          MS. PENZA:  No objection.

2          THE COURT:  All right.  Defense Exhibit 600 is

3    received in evidence.

4          (So marked.)

5    Q    Do you know where you are there and what that is in the

6    background?

7    A    Yes.

8    Q    What is it?

9    A    In the background is a hotel.

10   Q    Is that a hotel where you went to work?

11   A    Yes.

12   Q    And do you recall this picture being from July of 2015?

13   A    Again, I don't remember an exact date.

14   Q    Okay.  And I'm going to show you --

15         MR. AGNIFILO:  For identification, Judge.

16   Q    -- another picture.  This is 601 for identification.

17         That's a picture of you and Marianna?

18   A    Yes.

19         MR. AGNIFILO:  I offer 601, Your Honor.

20         MS. PENZA:  No objection.

21         THE COURT:  All right.  Defense Exhibit 601 is

22   received in evidence.

23         (So marked.)

24   Q    And that's -- is that you and Marianna inside that same

25   hotel?

Daniela - cross - Agnifilo                    3269

1   A    Yes.

2   Q    The hotel that we just saw from the outside, that sort of

3   reddish, pinkish building in the background, that's the hotel?

4   A    Yes.

5   Q    And this is you and Marianna on the inside, correct?

6   A    In the inside, yes.

7         MR. AGNIFILO:  Your Honor, I'm going to move for

8   identification Defense 603.

9         THE COURT:  Go ahead.

10  Q    Who is that in Defense 603?

11  A    That would be me.

12        MR. AGNIFILO:  Your Honor, we offer 603.

13        MS. PENZA:  No objection.

14        THE COURT:  All right.  Defense Exhibit 603 is

15  received in evidence.

16        (So marked.)

17  Q    Do you recognize where you are there?

18  A    Yes.

19  Q    Is that a restaurant that you like in the town where you

20  were living at the time?

21  A    Yes.

22  Q    Okay.  And you recall that you were there with Marianna

23  and your father?

24  A    Yes.

25  Q    I'm going to show you for identification 604.  That's

CMH      OCR      RMR      CRR      FCRR

Daniela - cross - Agnifilo                    3270

1   you, your father and Marianna?

2   A    Yes.  It's a good picture.

3            MR. AGNIFILO:  We offer 604.

4            MS. PENZA:  No objection.

5            THE COURT:  All right.  Defense Exhibit 604 is

6   received in evidence.

7            (So marked.)

8   Q    So that's Marianna, your father and yourself moving left

9   to right, correct?

10  A    Yes.

11  Q    And they had come to your town where you were living to

12  visit you, correct?

13  A    Yes.

14  Q    And is this, is that -- is this the same hotel where you

15  and Marianna were outside and then you and Marianna were

16  inside?  Is this the same place?

17  A    Yes.

18  Q    Now, at a certain point, did you run a marathon in

19  October of 2015?

20  A    I ran a marathon, yes.  I don't remember the exact date.

21  Q    Okay.

22  A    I don't know if that's the right date.

23  Q    And do you remember if your father came down for that?

24  A    He did not, no.

25  Q    No?

Daniela - cross - Agnifilo                    3271

1   A    No.

2   Q    Did your father come down at all in October of 2015?

3   A    He did.  It wasn't for a marathon.

4   Q    Okay.  Why did he come down?

5   A    It was a race.

6   Q    A race?

7   A    But it was, it's a 16K race.

8   Q    I see.

9   A    Yes.

10  Q    Okay.  I'm going to show you --

11            MR. AGNIFILO:  Just for identification, Judge.

12            THE COURT:  Go ahead.

13  Q    -- 598.  A little more scaled down.  There we go.  Okay.

14  598.  Who is that in the picture?

15  A    That's me.

16            MR. AGNIFILO:  Your Honor, we offer 598.

17            MS. PENZA:  No objection.

18            THE COURT:  All right.  Defense Exhibit 598 is

19  received in evidence.

20            (So marked.)

21  Q    That's you running, you said a 16K race?

22  A    Uh-huh, yes.

23  Q    And your father came down for that?

24  A    Yes.

25  Q    Did he come with anybody else or just himself?

CMH       OCR       RMR       CRR       FCRR

Daniela - cross - Agnifilo                3272

1    A    I remember just himself.

2    Q    Okay.  And when we started this, you say that you

3    remember him being down for a New Year's Eve, correct?

4    A    Yes.

5    Q    And you remember that being New Year's Eve, 2016 into

6    '17?

7    A    No.

8    Q    I'm going to show you a photograph --

9    A    Okay.

10   Q    -- for identification, 597.

11        That's you and your father?

12   A    Yes.

13        We offer it, Your Honor, as 597.

14        MS. PENZA:  No objection.

15        THE COURT:  All right.  Defense Exhibit 597 is

16   received in evidence.

17        (So marked.)

18   Q    That's you and your father at the beach?

19   A    Yes.

20   Q    And do you have any recollection seeing this photograph,

21   that's when he was down for New Year's?

22   A    Seeing the photograph when he was there?

23   Q    Yes.  In other words, do you remember going to the beach

24   with him when he was down for New Year's and having this

25   picture taken?

Daniela - cross - Agnifilo                              3273

1   A    Okay.  I remember him going for New Year's and I remember

2   a location at the beach.  I don't know if they're the same.  I

3   remember that.

4   Q    Okay.  But when he was down for New Year's, you do

5   remember going with him to the beach?

6   A    No, I don't.

7   Q    Oh, you don't?

8   A    No.

9   Q    Okay.  Do you remember -- what did you do with him when

10  he came down for New Year's?

11  A    For New Year's, we went to Hace Note --

12  Q    To where?

13  A    We visited some, it's a vacation place.  And I remember

14  we went to Valla -- we visited around but we didn't go to the

15  beach.

16  Q    You didn't go to a place with beaches?

17  A    No, I don't remember.

18  Q    Do you know someone named Mark Vicente?

19  A    Yes.

20  Q    Who is he?

21  A    He was an ESP student.

22  Q    When was the last time you spoke to him?

23  A    About -- I don't remember exactly but a long time ago.

24  Q    Did he tell you at one point that there was going to be a

25  law enforcement raid?

Daniela - cross - Agnifilo                    3274

1    A    No.

2    Q    Did he tell you at some point that you should try to get

3    Cami out of the United States?

4    A    No.

5    Q    What did you and he talk about?

6    A    He -- I remember he asked me, he said he read and knew

7    things that had happened to me and he asked me if it was true.

8    Q    Do you remember him telling you that Frank Parlato was

9    threatening to write about you?

10             MS. PENZA:  Objection.

11             THE COURT:  Sustained.

12   Q    Did you call Frank Parlato?

13   A    Yes.

14   Q    Why?

15   A    To ask him to take my name out of his posts.

16   Q    Okay.  How many times did you call Frank Parlato?

17   A    I don't remember.

18   Q    More than once?

19   A    I remember once.

20   Q    And did you call Frank Parlato after you had a

21   conversation with Mark Vicente?

22   A    Not that I remember, no.

23   Q    Do you recall when -- did you speak to Mr. Parlato and

24   Mr. Vicente about the same time period?

25   A    No, not that I remember.

Daniela - cross - Agnifilo                 3275

1   Q    How many times have you spoken to Mark Vicente in the
2   last three years?
3   A    About, I would say two or three times.
4   Q    And did you call him or did he call you?
5   A    I don't remember exactly.
6   Q    You have a lawyer named Neil Glazer, correct?
7   A    Yes.
8   Q    Because you are going to bring a civil lawsuit, aren't
9   you?
10  A    No.
11  Q    You have no intention of bringing a civil lawsuit against
12  Keith Raniere or NXIVM or anyone else?
13  A    That's not something that I have done or decided, no.
14  Q    I know you haven't done it but you plan on doing it,
15  don't you?
16  A    No.
17  Q    Why do you have Neil Glazer as your lawyer?
18  A    I, initially -- I needed counsel to handle the precarious
19  situation with my little sister Camila and after that, I
20  needed counsel to interact with officials from the government.
21  Q    Mr. Glazer is not a criminal lawyer, right?
22  A    I don't know.
23  Q    Do you know that he's Mark Vicente's lawyer too?
24           MS. PENZA:  Objection.
25           THE COURT:  Sustained.

Daniela - cross - Agnifilo                3276

1   Q    Did you get Mr. Glazer from Mark Vicente?

2              MS. PENZA:  Objection.

3              THE COURT:  Sustained.

4              MR. AGNIFILO:  Your Honor, can we approach?

5              THE COURT:  No.  Next question.

6   Q    How did you find Mr. Glazer as your lawyer?

7              MS. PENZA:  Objection, Your Honor.

8              THE COURT:  Sustained.

9   Q    So as you sit here today, you have no intention of

10  bringing a civil lawsuit?

11  A    That's right.

12  Q    And you haven't had any discussions with anyone about

13  bringing a civil lawsuit?

14             MS. PENZA:  Objection.

15             THE COURT:  Sustained.

16  Q    You're not being prosecuted for anything that you've

17  spoken about over the last five days, correct?

18  A    No, I don't think so.

19  Q    You admitted that you entered the United States illegally

20  in 2004, correct?

21  A    Yes.

22  Q    You admitted on cross-examination for the first time that

23  you made an identification, a fraudulent identification card

24  for your sister Camila, correct?

25  A    Yes.

Daniela - cross - Agnifilo                3277

Q     And you're saying you told the government about that
beforehand?

A     Yes.

Q     When did you tell him?

A     I don't remember exactly.

Q     And you're sure you told him?

A     I think so.  I think so.  I don't know for sure.

Q     It's a pretty big thing, isn't it?  I mean that you made
a fraudulent identification card, a Mexican national
identification card for your little sister and you can't
remember if you told him or not?

A     That's right.

Q     You hacked into the e-mail accounts of several people,
correct?

A     Yes.

Q     And you know you're never being prosecuted for any of it?

A     I know that -- can you repeat that, please?

Q     Yes.  All the things --

          MS. PENZA:  Objection.

          THE COURT:  You may ask your question.

Q     You're not being prosecuted, you're not going to be a
criminal defendant in a criminal prosecution for all of the
things that you have said that you did in this courtroom over
the last five days, correct?

A     Those are two different questions.

CMH       OCR       RMR       CRR       FCRR

Daniela - cross - Agnifilo                    3278

1   Q     Answer whichever one you think you want to answer.

2           MS. PENZA:  Objection.

3           THE COURT:  Well, no, we don't --

4           MR. AGNIFILO:  All right.

5           THE COURT:  Ask a specific question.

6           MR. AGNIFILO:  Okay.

7   Q     In the course of your testimony over the last five days,

8   you have said, you have told this jury, you have told this

9   court, that you've committed a number of crimes, right?

10  A     I have spoken about what I've done, yes.

11  Q     Okay.  And do you understand that it's a crime to hack

12  into someone's computer?

13  A     Yes.

14  Q     And you admitted that you hacked into several different

15  people's computers, correct?

16  A     Yes.

17  Q     You admitted that you came over the Canadian border

18  illegally with a fake identification card in 2004, correct?

19  A     Yes.

20  Q     You admitted that you created a fake Mexican national

21  identification card for your sister Camila, correct?

22  A     Yes.

23  Q     Do you expect that you are going to be prosecuted for

24  anything that you've testified to in this courtroom?

25  A     I don't know.

Daniela - redirect - Penza                    3279

1    Q     Has anyone told you they're going to prosecute you?

2    A     No.

3               MR. AGNIFILO:  Your Honor, I have nothing else.

4               THE COURT:  Redirect?

5               MS. PENZA:  Very briefly, Your Honor.

6    REDIRECT EXAMINATION

7    BY MS. PENZA:

8    Q     Good afternoon, Daniela.

9    A     Good afternoon.

10   Q     Daniela, when you met with the government the first time,

11   did you do so voluntarily?

12   A     Yes.

13   Q     And have you met with the government voluntarily every

14   time that you've spoken to the government?

15   A     Yes.

16   Q     And were you subpoenaed to testify?

17   A     No.  No.  I don't think so.

18   Q     You're testifying voluntarily today?

19   A     Yes.

20   Q     And has the government made any promises to you in

21   exchange for your testimony?

22   A     No.

23   Q     Has the government made any promises to you at any time?

24   A     No.

25   Q     Why are you -- why did you choose to cooperate with the

CMH      OCR      RMR      CRR      FCRR

Daniela - redirect - Penza                3280

1   government and to tell your story to the government?

2   A    Justice.  Justice for me and my family.

3            MS. PENZA:  Thank you.  No further questions.

4            MR. AGNIFILO:  Nothing else, Judge.

5            THE COURT:  All right.  The witness may stand down.

6   You are excused.

7            THE WITNESS:  Thank you.

8            THE COURT:  You're welcome.

9            (Witness excused.)

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                      3281

1          THE COURT:  Let's have a sidebar please.

2          (Sidebar conference.)

3          THE COURT:  Who is your next witness?

4          MS. PENZA:  Elizabeth Butler.

5          THE COURT:  All right.

6          On the issue which the defendant brought before the

7   Court, the defendant seeks to exclude Elizabeth Butler's

8   testimony regarding conversation between Pam Cafritz and

9   Ms. Butler that concerns medical care provided to Daniela and

10  her sister.

11         This conversation is admissible as evidence of means

12  and methods of the charged enterprise, specifically, the

13  actions of Pam Cafritz, an alleged co-conspirator.  This

14  evidence's probative value is not substantially outweighed by

15  its danger of unfair prejudice so Rule 403 does not require

16  its exclusion.  The Court will provide the jury with a

17  limiting instruction on that.

18         And also, on the medical record, after the

19  government lays a foundation regarding the notation as to the

20  amount of time that Camila had been sexually active, I will

21  give a limiting instruction, if necessary.

22         MS. PENZA:  That won't be -- so that won't be

23  admissible for its truth?

24         THE COURT:  It will be admissible.  I'm sorry.

25  That's right.

CMH        OCR        RMR        CRR        FCRR

3282

1          MS. PENZA:  Thank you, Your Honor.

2          MR. AGNIFILO:  Your Honor.

3          THE COURT:  Yes, you have your objection.

4          MR. AGNIFILO:  Right, but I don't see how they

5   defeat both layers of hearsay.  I mean, because it's not a

6   statement made to this witness.  It's a statement made to

7   another person.  I mean, so there's -- so it defeats the first

8   layer of hearsay because Cami said it to a medical

9   professional, but it's not this medical professional.

10         MS. PENZA:  It is within the medical records.

11         THE COURT:  It's part of a medical record.  I am

12  going to allow it.

13         (In open court; sidebar ends.)

14         THE COURT:  Tell me when you are ready.

15         Are we ready?

16         MS. PENZA:  Yes, Your Honor.  I'm sorry.  The

17  government calls Elizabeth Butler.

18         THE COURT:  Please raise your right hand.

19         (The witness is duly sworn/affirmed by the Court.)

20         THE COURT:  Please be seated.  And please state and

21  spell your full name for the record.

22         THE WITNESS:  My full name is Elizabeth A. Butler,

23  B-U-T-L-E-R.

24         (Continued on next page.)

25

CMH      OCR      RMR      CRR      FCRR

Butler - direct - Penza                                  3283

1    (Continuing.)

2    **E L I Z A B E T H   A.   B U T L E R**,

3         called as a witness by the Government, having been

4         first duly sworn/affirmed by the Court, was examined and

5         testified under oath as follows:

6    DIRECT EXAMINATION

7    BY MS. PENZA:

8    Q    Good afternoon, Mrs. Butler.

9    A    Good afternoon.

10   Q    Where do you currently live?

11   A    Saratoga County.

12   Q    How long have you lived in Saratoga County?

13   A    About 35 years.

14   Q    Are you familiar with a town called Clifton Park?

15   A    Yes.

16   Q    Approximately how far from where you live is Clifton

17   Park, New York?

18   A    About six-and-a-half miles.

19   Q    Do you currently work?

20   A    No.

21   Q    Are you retired?

22   A    I'm retired, yes.

23   Q    What is the last place you worked before you were

24   retired?

25   A    McGinnis Women's Medical Care.

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                3284

1    Q    How long did you work there?

2    A    I worked there for eleven years.

3    Q    What did you do there?

4    A    I actually had two roles at the office.  I was a women's

5    health care nurse practitioner, so I saw patients.  And then I

6    was also the office manager for eleven years.

7    Q    And so you are a nurse practitioner?

8    A    Yes.

9    Q    Can you walk us through your educational background?

10   A    Yes.  I attended Ellis Hospital School of Nursing to

11   obtain my RN.  And then I continued with school through SUNY

12   Utica Rome Institute of Technology and obtained my Bachelor's

13   degree in nursing.  And then from there I went to -- I

14   attended and graduated from University of Pennsylvania.  They

15   had a joint program with PPFA, the Planned Parenthood

16   Federation of America, for women's health care nurse

17   practitioners.

18   Q    Now, what is the -- what is that program that you took at

19   UPenn, can you explain that a little bit?

20   A    Yeah, it's a program for nurse practitioners -- for

21   nurses to became nurse practitioners with the general focus in

22   just women's health care, which was everything from menarche

23   all the way through the life span, all the way through

24   menopause, pregnancies.  Its focus was women's health.

25   Q    Now can you explain what a nurse practitioner is?

Butler - direct - Penza                                    3285

1    A     Yes.  A nurse practitioner is a -- we're advanced

2    clinical practice nurses.  Nurse practitioners start out as

3    RNs and then you continue your education and your clinical

4    skills, develop new clinical skills.  It's an advanced level.

5    It's also referred to as a mid-level practitioner.  Same as a

6    PA, but the difference between -- there are some differences

7    between PAs and nurse practitioners, but it's on that level

8    where we work --

9              THE COURT:  PA is?

10             THE WITNESS:  Oh, I'm sorry, physician assistant.

11   A     The main differences are that nurse practitioners can

12   actually practice autonomously in New York State.  So we can

13   actually own our own practice.  We don't have to work under

14   the supervision of a physician, we just have to have a

15   collaborating physician, so we can own our own office.  We

16   can, you know, run our own practice.

17   Q     And why did you want to become a nurse practitioner?

18   A     That's going back.  I wanted to become a nurse

19   practitioner because when I was young I really wanted to be a

20   physician.  I wanted to be a doctor and I never had the

21   opportunity, so as an adult I went back to school and started

22   with my RN, and then went on to be a nurse practitioner.  And

23   thought I would continue to get my Doctorate, but I was very

24   happy doing what I was doing.  I was very happy in my current

25   job setting and I was very happy just being a nurse

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                                    3286

1   practitioner.  I had plenty of time to spend with patients and

2   deal with the women.

3   Q    Now, where did you start working after you graduated?

4   A    When I first graduated, I took a position with Dr. Grace

5   Jorgensen at Bellevue Woman's Hospital in Niskayuna.

6   Q    And how long did you work there?

7   A    I worked there until Dr. Joyce -- Mary Joyce McGinnis

8   left that practice to start her own practice and I left with

9   her.  So we both left.

10   Q    And is that where you then continued to work until you

11   retired?

12   A    Yes.  Yes.

13   Q    Do you still do some work for McGinnis Women's Health?

14   A    Yes.

15   Q    What type of work do you do?

16   A    Well, I volunteer my time and I will take phone calls and

17   actually talk to them if they're having issues with

18   management, or some issues in the office, but every month I do

19   balance their books for them.  So I do stay in contact with

20   them.

21   Q    Now, can you describe what the practice at McGinnis

22   Women's Health was focused on?

23   A    McGinnis Women's Health it's an OB/GYN office, obstetrics

24   and gynecology, so women's health.  Again, in my field where

25   it was young women at menarche all the way through their life

SAM        OCR        RMR        CRR        RPR

Butler - direct - Penza                    3287

1    span.  Pregnancies -- we did everything from well care for

2    women, taking care of them through their teenage years,

3    through their pregnancies, through menopause.  We performed

4    terminations.  We did the entire scope of women's health.

5    Q    And you said that you had two roles in the office.

6    A    Yes.

7    Q    Is that right?

8    A    Yes.

9    Q    Can we talk first about your role with patients and can

10   you describe --

11   A    Okay.

12   Q    -- what you did in that way?

13   A    With patients I did -- I did a lot.  I actually would

14   perform exams, order diagnostic testing, laboratory testing.

15   I would diagnose patients, prescribe the right course of

16   treatments or prescribe medications for them and see them

17   through that.  I also took care of prenatal, did prenatal care

18   for patients.  Took care of them throughout their entire

19   pregnancies.  Did menopausal care, did medical terminations,

20   performed minor surgical procedures in the office.

21   Q    And then what was -- in terms of your office manager

22   role, what was your role in that respect?

23   A    In the office manager role I pretty much ran the office.

24   I did everything from managing the staff and overseeing the

25   staff, payroll, monitoring expenses and supplies, handled all

Butler - direct - Penza                    3288

1  the patient problems or, you know, any type of conflict in the

2  office.

3  Q    Now, you mentioned terminations.  Is that another word

4  for an abortion?

5  A    Yes.

6  Q    And you mentioned medical abortions.

7        Can you just explain, just generally, what the

8  difference is between a medical abortion and a surgical

9  abortion?

10 A    Yeah, a medical abortion is done with medications.  It's

11 done with two different types of medications that are given at

12 48-hour intervals.

13       Surgical abortion involves either a clinic setting

14 or a hospital setting where a patient actually has to go in

15 and be anesthetized and have a surgical procedure done to

16 remove the pregnancy.

17 Q    If someone doesn't have insurance, what is the cost

18 difference between a medical abortion and a surgical abortion?

19 A    Now, I've been retired a few years, but when I was still

20 working, a medical termination in the office, we usually

21 charged $750.  And that covered everything, their medication,

22 the initial ultrasound -- excuse me, the initial ultrasound

23 they needed for dating, and it required at least three office

24 visits.  And so the 750 covered that entire procedure.

25       Surgical abortions that are done in the hospital

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                              3289

1   setting, if we had to book a patient at the hospital to have a

2   surgical abortion, the cost there, because of the involvement

3   of the operating room, the recovery room and the hospital

4   stay, it could be as high as 8,000, $10,000.

5   Q    And with a medical abortion, you said that there are

6   multiple -- multiple office visits, is that right?

7   A    Yes.

8   Q    And can you explain the reasoning behind the multiple

9   office visits?

10  A    Well, usually, we had a set protocol, so that when

11  somebody called and said that they wanted a termination or

12  said that they were pregnant and not sure what they wanted,

13  the first appointment when they came in, we usually -- you

14  know, we'd run a pregnancy test, sometimes an ultrasound the

15  same day, because we needed to know whether or not they truly

16  were pregnant, how far along they were.  We needed to

17  discuss -- we always needed to discuss, you know, what their

18  options were with the pregnancy.  Did they want to consider

19  continuing the pregnancy and being a single parent?

20         In a lot of cases they might want to continue the

21  pregnancy and put the baby up for adoption.  That's always

22  another option for them; or were they sure they wanted to

23  terminate.

24         So we would do all of that in the first visit and

25  try to get a grasp on things, but we'd never do -- we would

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                    3290

1    never do the termination the first day we saw the patient just

2    because they said they wanted one.  We always had to be sure

3    they were confident in that decision.

4          Appointment number two, they could come back and,

5    you know, review all the risks and benefits again and sign

6    paperwork saying that that's what they wanted to do.  And then

7    they would take their first dose of medication at that visit.

8          THE COURT:  Can I just ask a question?

9          Where someone was unsure as to what she wanted to

10   do, did you ever refer patients to social services

11   organizations where they could discuss adoption or --

12         THE WITNESS:  We have --

13         THE COURT:  -- or some other alternative than a

14   termination or abortion?

15         THE WITNESS:  Yes.  Yes.  There have been cases

16   where we have had somebody who was really unsure, and they

17   come back for the second visit and they still show some signs

18   that they're not really sure, then we withhold the medication.

19   We say, you know, maybe you need to think about this some

20   more.  Maybe you should talk to somebody at the adoption tree.

21   Maybe we should, you know, explore other options.

22         THE COURT:  I see.

23         THE WITNESS:  And then often patients will still

24   come back, will call and say:  No, I'm sure about my decision,

25   I really want to go through with this.  But we would always

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                    3291

1   refer them or withhold the medication until they were sure

2   that's what they wanted.

3            THE COURT:  All right, thank you.

4            THE WITNESS:  We had to -- we felt like we had to

5   see that confidence in their decision.

6   BY MS. PENZA:

7   Q    These back-and-forth questions that you're asking at the

8   beginning, did you consider those pertinent to the medical

9   treatment that you were providing to these individuals?

10  A    Would you repeat that?

11  Q    Yes.

12           This kind of -- this questioning or this dialogue

13  that you're describing, or counseling I actually think is the

14  word you used, that you're describing with patients who come

15  in for a medical abortion, is that dialogue, that counseling,

16  that conversation, do you consider that part of the medical

17  treatment?

18  A    Yes.

19  Q    Why is that?

20  A    Well, it's -- it's a pretty major decision to make,

21  number one.  You know, there's such a psychological impact

22  with it.  And we just really feel that they really need to

23  know what they're -- what the outcome of their decision is,

24  you know.  There's always those pros and cons with everything

25  you do.  You know, you can't -- we don't want them

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                    3292

1    second-guessing what they're doing.

2           So it's -- it's also very important in that

3    counseling session to -- I'm trying to -- I'm trying

4    to psychologically make sure they're prepared for that.

5    Q    Now, you mentioned that the second visit, that's when you

6    would actually -- they would actually get the first dose of

7    the medication?

8    A    Yes.

9    Q    And do they actually have to take the medication in front

10   of a nurse?

11   A    Yes.  Yes, they actually have to take it in front of the

12   practitioner, the first dose of medication.  The first dose of

13   medication is a very expensive dose of medication, number one.

14   And number two, we want to see them take it without

15   hesitation.  We want to see that they've actually taken the

16   pills and swallowed them.  It's not the type of medication you

17   want to prescribe to somebody and let them just go home and

18   take it.  You don't want it in anybody else's hands.

19   Q    Why is that?

20   A    Well, the original name of the drug was RU-486 and it

21   does have its consequence.  It interrupts the pregnancy is

22   what it does, so letting that medication fall into the wrong

23   hands of somebody else who is pregnant, or somebody who is not

24   pregnant, you know, it -- the side effects or the consequences

25   of the medication are not good.

Butler - direct - Penza                              3293

1           Once they take that medication, they have to
2    proceed.  They sign a paper saying they know they have to
3    proceed with the next dose.
4    Q    Okay.
5           Now, when the medical abortion -- is there -- are
6    there risks to that, are there medical risks?
7    A    Yeah, there are.  There are risks to the medical
8    abortion.  They can -- we go over all those risks with them.
9    The major risk is bleeding or hemorrhaging, so we go over the
10   signs and symptoms of hemorrhaging.
11          We usually make sure that they know that they can
12   call the office twenty-four hours a day and get a practitioner
13   to talk to them or talk them through to see if they need to
14   proceed and go to the hospital.  There is always that chance
15   that they would hemorrhage and need to go to a hospital.
16          There is severe pain involved with the medical
17   termination, but we always warn them.  And I used to tell my
18   patients that it would be like the worst period they could
19   ever have in their life; that they could be curled up in a
20   ball in pain; that they're going to bleed a lot; that it's
21   going to be -- I don't know how graphic you want me to get,
22   but --
23   Q    I don't think we need to be more graphic.
24          But it's a painful --
25   A    It can be a painful procedure.

Butler - direct - Penza                    3294

1    Q    Do you actually prescribe painkillers?

2    A    Yes, we do.  We offer them to patients.  Some patients

3    will refuse them, and then we have them take high doses of

4    Motrin.  Other patients, they know their pain threshold is

5    lower and they need them, yeah.

6    Q    And do you talk to patients about having somebody with

7    them?

8    A    Yes.

9    Q    Can you explain that?

10   A    Yes.  Because of the potential side effects of the

11   medication and because it can come on suddenly and they can

12   start bleeding very heavy and passing large clots and things,

13   they may get lightheaded, dizzy, we always ask that they have

14   another person with them that knows what's going on because

15   if, you know, any of these things happen, they could

16   potentially stand up, fall.  It's just not safe to be by

17   yourself during that timeframe.

18   Q    And just one more question.

19        The questions that you -- would sometimes people

20   have -- would patients sometimes have someone else with them

21   when they would be talking to a practitioner?

22   A    Yeah.  Yes, they would.  Not always, it's not required.

23   It's something that some patients come in and bring somebody

24   for moral support, or just for that extra emotional support,

25   and that was up to them.

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                                    3295

1    Q    But it wouldn't be -- is it fair to say it wouldn't

2    uncommon or unusual --

3    A    No.

4    Q    -- that someone else would be in the room when there is a

5    back-and-forth --

6    A    No.

7    Q    -- When there's this back-and-forth?

8    A    No, not uncommon at all.

9    Q    Now, I want to talk more -- in terms of your general, the

10   forms that would be used at McGinnis -- McGinnis Women's

11   Health?

12   A    McGinnis Women's Medical Care, yeah.

13   Q    Now, did you help actually design any forms in your

14   role --

15   A    Yes.

16   Q    -- at McGinnis?

17   A    I did.

18   Q    Can you explain?

19   A    I actually designed the annual health form and another

20   form that was called The Problem Visit.

21        Well, I also did registration forms, but they were

22   revised forms from our previous practice, but I did do the

23   annual exam form and The Problem Visit form, which The Problem

24   Visit form was for anything that was not an annual visit.

25             MS. PENZA:  Your Honor, may I have the ELMO just for

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                          3296

1    the witness, please?

2              THE COURT:  Go ahead.

3    BY MS. PENZA:

4    Q    Can you see this form in front of you, Mrs. Butler?

5    A    Yes.

6    Q    And is this the annual form that you helped design?

7    A    Yes, it is.

8    Q    And can you just explain -- and this one is filled out,

9    but without going into any of the details about this

10   particular patient, can you just explain the form and what the

11   importance of the various sections are?

12   A    Yeah, we divided the form -- I say we, I did consult with

13   the doctors that I worked with, with what we needed on the

14   form.  We divided the form up so that we could cover every

15   aspect that we needed to properly diagnose the patient, treat

16   the patient or, you know, maintain their health.

17             Do you want to know about each section?

18   Q    Well, let me just -- maybe we can just take them in

19   quadrants.

20   A    Okay.

21   Q    I guess it's three main areas.  So let's start just with

22   this medical history/family history.  There is a question

23   about illnesses and surgeries.

24             How is that pertinent to your treatment of a

25   patient?

Butler - direct - Penza                    3297

1    A    Well, you know, if a patient comes in and has scars on

2    their body anywhere, of course we want to know what they had

3    done, what type of surgery they've had done.  In the GYN

4    setting, there could be certain surgeries that may be related

5    to female health or developmental -- or the development of the

6    female organs.  But surgeries and illnesses, you really need

7    to know what a patient has had in the past or currently has

8    because any type of medication can affect current or previous

9    medical history.

10   Q    And then, just moving down, you ask about medications?

11   A    Uh-hum.

12   Q    That's also --

13   A    Also the same thing because if we need to prescribe

14   something, we need to know what they're currently on so we

15   don't cause any interactions between medications.

16   Q    And then there is a series of check boxes?

17   A    Yes.

18   Q    Smoking?

19   A    Yes.

20   Q    What's E --

21   A    These are habits.  ETOH is alcohol use.

22   Q    Ah; what does that stand for?  That's an abbreviation

23   for --

24   A    Yes, that's an abbreviation for that.  But all of those

25   things are habits that can be changed.  It tells us whether or

SAM     OCR     RMR     CRR     RPR

Butler - direct - Penza                     3298

1  not they have a healthy lifestyle, whether or not there's

2  other things to -- you know, somebody who checks off alcohol,

3  you know, then we have to investigate how much they're using

4  every day.

5  Q    There is a box here for abuse, is that right?

6  A    Yes.

7  Q    What is -- how is that pertinent to your medical

8  treatment of someone?

9  A    Well, we always screen to make sure that somebody doesn't

10  have a history of any type of abuse, whether it's physical

11  abuse, sexual abuse, whether it's verbal, physical, whatever,

12  you know, any type of abuse because that may require

13  additional counseling.  We may refer them for more counseling.

14  We may -- it can effect their long-term healthcare or their

15  lifestyles.

16  Q    And then the next -- the next part says sexually active?

17  A    Uh-hum.

18  Q    And then there is a -- there is a yes or no check box.

19  What is the import of that?

20  A    Well, whether or not somebody is sexually active

21  certainly does pertain a lot to what we're doing in the

22  office, as far as prescribing and contraceptive care and

23  counseling.  How -- whether or not they're sexually active

24  then it leads on to, you know, how many partners they have

25  had, how old they were when they became sexually active.

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                    3299

1            All of those things are pertinent because we need to

2       know do we need to talk about contraception; do we need to

3       talk about, you know, if they've been sexually active a long

4       time and had, you know, 10, 20 partners; we need to talk about

5       their risk for STDs, whether or not they're at risk for

6       sexually transmitted diseases, HIV.  You know, it all comes

7       into the same category, and they need to be counseled with all

8       of that.

9            It also tells us that -- you know, sometimes we

10      might see -- we might see somebody who has been sexually

11      active for a number of years, and when you look at different

12      things like ages or whatever, you have to start -- you start

13      questioning -- okay, if somebody comes in and they're twenty

14      years old, but they became sexually active at thirteen, then

15      you go back to the previous question of was there any abuse.

16      You know, it kind of -- it all ties in together with their

17      psychological and their physical health.

18      Q     Okay.

19      A     And that's why those questions are on there and that's

20      why we elaborate and put how many partners and how old they

21      were when they became sexually active.

22      Q     And would that have been a routine question that would be

23      asked, how long you've been --

24      A     Yes.

25      Q     -- with the same partner?

Butler - direct - Penza                    3300

1   A    Yes.

2   Q    And that's for the reasons --

3   A    Yes.

4   Q    -- that you've described?

5           MS. PENZA:  Your Honor, may I approach the witness?

6           THE COURT:  Yes, you may.

7   BY MS. PENZA:

8   Q    Mrs. Butler, I'm handing you what are marked for

9   identification purposes as Government Exhibit 539 and

10  Government Exhibit 540.  I am just going to ask you to take a

11  look at those.

12  A    (Witness complies.)  Okay.

13  Q    Have you had a chance to look at those?

14  A    Yeah.  I haven't read every page.

15  Q    But are you familiar with those documents?

16  A    Yes.

17  Q    And is Government Exhibit 539 a copy of Camila

18  ███████     medical records from McGinnis Women's Medical

19  Care?

20  A    Yes, it is.

21  Q    And is Government Exhibit 540 a copy --

22          (Sidebar held.)

23

24          (Continued on following page.)

25

SAM      OCR      RMR      CRR      RPR

Sealed Sidebar - By Order of the Court 3301

Case 1:18-cr-00204-NGG-VMS   Document 885   Filed 06/18/20   Page 163 of 246 PageID #: 14582



Butler - direct - Penza                          3303

1              (In open court - jury present.)

2    EXAMINATION CONTINUING

3    BY MS. PENZA:

4    Q    And, Mrs. Butler, turning to Government Exhibit 540, is

5    this a copy of a woman named Daniela's medical records?

6    A    Yes.

7    Q    And Government Exhibit 540 and Government Exhibit 539,

8    are those both accompanied by a certificate of authenticity

9    from Lori Clark?

10   A    Yes.

11   Q    Do you know Lori Clark?

12   A    Yes, I do.

13   Q    Who is Lori Clark?

14   A    Lori Clark is the manager that I trained to replace me

15   when I retired.

16   Q    And --

17   A    And she is still currently the manager.

18   Q    And these records are certified by her?

19   A    Yes.

20   Q    And you've now reviewed them?

21   A    Yes.

22   Q    And they appear to be the records of these individuals?

23   A    Yes, they do.

24   Q    I am just going to show you the same --

25              MS. PENZA:  Still just for the witness, Your Honor.

SAM      OCR      RMR      CRR      RPR

Butler - direct - Penza                    3304

1          THE COURT:  Yes.

2          MS. PENZA:  Thank you.

3   BY MS. PENZA:

4   Q    Showing you the notation in the upper left quadrant,

5   without saying what the actual notation is on Government

6   Exhibit 539-18 --

7   A    Uh-hum.

8   Q    -- is there -- is there a notation in that box under

9   sexually active?

10         If you turn to Government Exhibit 539 Page 18, it

11  should be on your screen as well.

12         THE COURT:  Is your screen working?

13         THE WITNESS:  Yes, it is.

14  Q    Do you see where I'm pointing?

15  A    Yes, there is.

16  Q    And is that notation of the same type that you already

17  described?

18  A    Yes.

19  Q    And is that a notation that would have been pertinent to

20  Camila's medical treatment at that time?

21  A    Yes, it would.

22         MS. PENZA:  Your Honor, at this time the Government

23  offers Government Exhibit 540 and Government Exhibit 539 into

24  evidence.

25         MS. GERAGOS:  Over our previous argument, Judge, we

SAM      OCR      RMR      CRR      RPR

```
                    Butler - direct - Penza              3305
```

1   object, but we understand.

2           THE COURT:  Very well.  Over objection, Government

3   Exhibits 539 and 540 are received into evidence.

4           (Government's Exhibits 539 and 540 were received in

5   evidence.)

6           MS. PENZA:  Thank you, Your Honor.  It just may take

7   me a moment to shuffle the two versions that I have.

8           THE COURT:  Yes, all right.

9

10          (Continuing on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Butler - direct - Penza                                    3306

1    (Continuing)

2    Q    Looking a Government's Exhibit 539, page 1 and page 2,

3    this is the appointment history for Camila; is that right?

4    A    Yes, it is.

5              THE COURT:  Did you want this...?

6              MS. PENZA:  Oh, yes, Your Honor.  May I publish this

7    to the jury.  This is a redacted version.

8              THE COURT:  Okay.

9              (Exhibit published.)

10             THE COURT:  All right.  Go ahead.

11   Q    So Mrs. Butler.

12   A    Yes.

13   Q    Is this the appointment history for Camila?

14   A    Yes, it is.

15   Q    This and the page following?

16   A    Yes.

17   Q    And looking at this page, there are various notes.

18             Do you see that?

19   A    Yes, I do.

20   Q    How do the notes get entered on to the appointment

21   history?

22   A    When somebody called to make an appointment and it's put

23   in the computer system, under that particular patient's name,

24   the provider name, all of that stuff, this is

25   computer-generated.  This is the information that's been in

Butler - direct - Penza                    3307

1    the computer system.  So you can just go in and print out an

2    appointment history for any particular patient in the practice

3    and it will come out and it will tell when their appointment

4    was scheduled, who it was scheduled with, what the appointment

5    was for.

6    Q    Okay.

7    A    And then where it says notes, the receptionist usually

8    types in anything that's kind of unusual for the appointment

9    scheduling.

10            For instance -- do you want me to say?

11   Q    Sure.  Go ahead.

12   A    Okay.  For instance, on this particular one, most or all

13   of these appointments were made, not by the patient

14   themselves.  And that's kind of unusual.  Usually we try to

15   encourage the patients to make their own appointments.

16            In this case, all of these appointments look like

17   they say:  Friend Pam made the appointment.

18   Q    And that's true of every single one of these

19   appointments?

20   A    Yes.

21   Q    And Pam, friend Pam, friend Pam?

22   A    Yes.  Yes, on both pages.

23   Q    And then I think there -- would there often be multiple

24   registration forms in the same set of medical records?

25   A    Yes.

Butler - direct - Penza                                    3308

1   Q     Why is that?

2   A     Because they're typically updated every year.

3   Q     Okay.

4              MS. PENZA:  I'm showing you Government

5   Exhibit 539-11.

6              (Exhibit published.)

7   Q     Is this a registration form?

8   A     Yes.

9   Q     Okay.  And is this the typical registration form from

10  McGinnis Women's?

11  A     Yes, it is.

12  Q     And is one of the things that is asked for an emergency

13  contact?

14  A     Yes.

15  Q     And here, who is Camila's emergency contact?

16  A     Pamela Cafritz.

17  Q     It has a phone number for her as well?

18  A     Yes, it does.

19  Q     And the date of this was 5/14/08?

20  A     Yes.

21  Q     This is -- do you know -- are you familiar with this

22  form?

23  A     Yes, I am.

24  Q     Can you explain what this form is?

25  A     Okay.  This form, it's actually a version of a older form

1   that we had, that we used to use.  We don't use this one too

2   much anymore, but it's basically a problem visit, or a

3   follow-up visit.

4   Q    Okay.  And is this -- would this have been the form that

5   corresponds to Camila's pregnancy confirmation?

6   A    Yes, this would have been her first visit to discuss

7   possible termination.

8   Q    And it says:  Moved here from Mexico three years ago.

9   Status:  Finished school in Mexico?

10  A    Yes.

11  Q    And it says:  No medical insurance?

12  A    Right.  No medical insurance.

13  Q    And it says:  Pregnancy confirmation, wishes to

14  terminate?

15  A    Yes, it does.

16  Q    Patient was told in Mexico she was unable to conceive?

17  A    Yes.

18            MS. PENZA:  Showing you Government Exhibit 539, page

19  18.  This is the one I showed you before.

20  Q    This is annual gynecological exam form?

21  A    Yes.

22  Q    And this is a form for Camila?

23  A    Yes, it is.

24  Q    Okay.  And it's filled out on -- but are the dates on the

25  top right sometimes -- are there sometimes issues with the

Butler - direct - Penza                    3310

1    dates on the top?

2    A    Yes, there are.  Yes.

3    Q    Can you explain?

4    A    Okay.  What happens sometimes -- and it looks like this

5    form is one of them.  Charts are prepared ahead of time when

6    patients are coming.  So the nurses will pull the charts

7    sometimes, you know, 4 or 5 days ahead of time, sometimes the

8    day before, and they get the charts ready and they get them

9    ready by filling in the patient's name, filling in any medical

10   allergies, things that don't typically change, and they date

11   the form.

12          So this one looks like it was dated, and the

13   appointment was probably changed.  And then -- so when they

14   went to prep the chart for the visit, again, instead of

15   replacing that page, they just changed -- the nurses changed

16   the date on it.

17          Does that make sense?  They just changed the date on

18   it?

19          So if you look in the computer system, you know,

20   sometimes it will show in the computer system on the

21   appointment history, it will show up as an appointment that

22   was either like 10/12 -- 10/12/10 was probably rescheduled, no

23   show.  It was probably something where the patient didn't come

24   in.

25   Q    Okay.  And so if we look at the very bottom, there's a

VB        OCR        CRR

Butler - direct - Penza                        3311

1   date here.

2           Is that an accurate date?

3   A    That's the date that I would consider accurate, yes.

4   Q    Okay.

5   A    That's the date that that particular nurse practitioner

6   saw that patient.

7   Q    And if we look briefly at the appointment history for

8   Camila.

9           (Exhibit published.)

10  Q    Fair to say that --

11  A    Right.

12  Q    -- that was -- there had been like an appointment of some

13  sort of 10 --

14  A    10/12.  And it would have been an annual, which is that

15  particular form.

16          And then if you look past 30 minutes, it says no

17  show.  The patient didn't show up that day.  So that's why the

18  date was crossed off and this one was reused.

19  Q    This one, okay.

20          So just looking at the top left, it says Camila.

21  And it has a date of birth of March 1st, 1990?

22  A    Yes.

23  Q    She lists an allergy to hydrocodone?

24  A    Hydrocodone, yes.

25  Q    Is that a painkiller?

1    A     Yes, it is.

2    Q     And then if we look in her medical history, family

3    history, it says:  Appendectomy, age 16; is that right?

4    A     Yes.

5    Q     Okay.  And then she lists medications.  One of them is

6    Seasonique.  Do you know what that is?

7    A     That's a birth control pill.

8    Q     Do you know what the other things that are on here are?

9    A     Yes.  Yes.  She was taking Seasonique, which is a birth

10   control pill.  CA, is calcium, magnesium, vitamin C, kelp and

11   fennel.  Those are all vitamins and herbs or supplements.

12   Q     And then under sexually active, yes is checked?

13   A     Yes.

14   Q     And then underneath that, it says five years with

15   partner?

16   A     Yes.

17   Q     And that would been in response to the sexually active

18   question?

19   A     Yes.  She would have been asked how old she -- or she was

20   when she became sexually active or how long she's been

21   sexually active and how many partners she's been with.

22   Q     Okay.  And so this would indicate that she had been for

23   five years with the same partner?

24   A     Same partner.

25   Q     And was that important, given the fact that she is here

Butler - direct - Penza                          3313

1  for an annual exam?

2  A    Yes.

3  Q    And she's on -- does -- she appears to be on birth

4  control pills?

5  A    Yes.

6  Q    If somebody has multiple partners, is that something

7  where -- and is on birth control pills, would you want to

8  discuss other options for protection from sexually transmitted

9  diseases?

10 A    Yes.  We would still discuss the use of condoms to

11 prevent sexually transmitted diseases, yes.

12 Q    Okay.

13          MS. PENZA:  Turning to Government Exhibit 540,

14 540-1.

15          (Exhibit published.)

16 Q    We said this is Daniela's medical records; is that right?

17 A    Yes, it is.

18 Q    And she only had three appointments at McGinnis?

19 A    Yes.

20 Q    And would these have been the three appointments that

21 correspond to a medical termination?

22 A    Yes, the first one, a confirmation.  The second one, the

23 medication was given.  And then the third one was just

24 follow-up to make sure that everything turned out okay.

25          MS. PENZA:  Showing you Government Exhibit 540-3.

Butler - direct - Penza                          3314

1            (Exhibit published.)

2    Q    Is this the initial visit form for Daniela?

3    A    Yes.

4    Q    Age 20?

5    A    Yes.

6    Q    Date of birth 10/26/85?

7    A    '85, yes.

8    Q    And the date of this initial visit is October 3rd, 2006?

9    A    Yes.

10   Q    And name and address of nearest relative.  And it lists

11   Pamela Cafritz, 3 Flintlock Lane, Clifton Park, New York?

12   A    Yes.

13            MS. PENZA:  This is 540-7.

14            (Exhibit published.)

15   Q    And this is a problem visit form; is that right?

16   A    Yes.

17   Q    It says:  Is not currently sexually active but plans to

18   see boyfriend soon?

19   A    Yes.

20   Q    And claims to have Mexican OCs.  Is that oral

21   contraceptives?

22   A    Yes, it is.

23            MS. PENZA:  And turning to page 549.

24            (Exhibit published.)

25   Q    It says:  Unintended pregnancy.  Desires medical, if

Butler - direct - Penza                                3315

1   possible.  That is a medical abortion?

2   A    Yes.

3   Q    State -- well, can you read what it says?

4   A    Then it says:  States has support of friend of partner.

5   Has desire for pregnancy.

6   Q    Has no desire?

7   A    Has no desire.  Has no desire.  That's what that symbol

8   means.  Has no desire for pregnancy at this time.

9   Q    And then what does it say?

10           Lives in --

11  A    Lives in Mexico.  Maybe I can see better up there.

12           Lives in lives in Mexico.  Visiting her -- okay.

13  I'm sorry.  Can I just repeat that?

14  Q    Sure.

15  A    Okay.  Has no desire for pregnancy at this time.  Lives

16  in Mexico.  Visiting here times two to three months.

17  Considering college.

18  Q    Does it say:  Considering college in U.S.A.?

19  A    In U.S.A., yes.

20           THE COURT:  I am sorry.  What was the date of that

21  particular page?

22           MS. PENZA:  10/3/08.

23           THE COURT:  All right.  Thank you.

24  BY MS. PENZA:

25  Q    Mrs. Butler, were you familiar with Pam Cafritz?

VB      OCR      CRR

Butler - direct - Penza                      3316

1   A    Yes.

2   Q    How did you become familiar with Pam Cafritz?

3   A    I became familiar with Pam because of a phone call made

4   to the office.

5   Q    Do you remember when that was?

6   A    I don't remember the exact date.  It was a couple of days

7   after one of the girls had came in for termination.

8           MS. PENZA:  And I'm going to show you what's in

9   evidence, Government Exhibit 549-68.

10          And -69.

11          (Exhibit published.)

12  Q    Are these notes from a call with Pam Cafritz?

13  A    Yes.  This is a telephone sheet.  The receptionist took

14  the phone call prior to me speaking to Pam.

15          Pam called the office upset.

16          THE COURT:  All right.

17          MS. PENZA:  Sorry.  I was using the wrong one.  I'm

18  switching over to the --

19          THE COURT:  Are you inquiring about a phone

20  conversation?

21          MS. PENZA:  I was just going to first get the date,

22  for her.

23          THE COURT:  All right.  Go ahead.

24          MS. PENZA:  I'm sorry, Your Honor.  I have to switch

25  back to the other set of -- I started using the wrong set the

Butler - direct - Penza                    3317

1    documents again.

2              THE COURT:  That is fine.

3              (Pause in the proceedings.)

4              MS. PENZA:  So just showing you the date.

5              (Exhibit published.)

6    BY MS. PENZA:

7    Q    Do you remember that it was on 5/21/08?

8    A    Yes.

9    Q    That there was a phone call?

10   A    There was a phone call, yes.

11   Q    Okay.  And then there's more back and forth on 5/22/08?

12   A    Yes.

13             MS. PENZA:  We are going to talk about the

14   conversation, Your Honor, so now may be an appropriate time.

15             THE COURT:  All right.

16             Members of the Jury, the witness is about to give

17   testimony about a conversation she had with Pam Cafritz.  You

18   may only consider this testimony as it relates to the means

19   and methods of the charged criminal enterprise.  You are not

20   to consider this testimony for the truth of the matters

21   asserted in the conversation.

22             MS. PENZA:  Thank you, Your Honor.

23             THE COURT:  You are welcome.

24   BY MS. PENZA:

25   Q    So how did you come to have a conversation with Pam

Butler - direct - Penza                    3318

1  Cafritz?

2  A    It started with Pam calling the office and called the

3  office very upset, talked to the receptionist and demanded to

4  talk to Dr. Mary Jo McGinnis.  She wanted to talk to

5  Dr. McGinnis and she didn't want to settle for anything else.

6  Didn't want to talk to the nurse practitioner.

7           So, in our office, I was the office manager and the

8  policy was Dr. McGinnis didn't handle anything unless she was

9  directly involved in it, and my job as office manager was to

10  handle these kinds of problems and smooth over phone calls

11  with either irate patients or a lot of times husbands,

12  whatever.  And so the phone call was passed from Dr. McGinnis

13  to myself.

14           And I returned Pam's phone call and we didn't touch

15  base the first time I called her.  And then I believe it was

16  the next day again -- I don't have it in front of me, but I

17  believe it was the next day again that I tried to call her and

18  I did reach her.

19  Q    And what happened?

20  A    Pam was -- Pam was very upset.  She was pretty much

21  yelling and saying that -- she was actually accusing our

22  office of breaking HIPAA laws, violating HIPAA laws.

23           THE COURT:  What are HIPAA laws?

24           THE WITNESS:  HIPAA laws, Health Information Privacy

25  Act.  It's to protect the patient's privacy and not releasing

Butler - direct - Penza                    3319

1    personal health information.

2    A    So, she was -- she was --

3    Q    What was she saying specifically?

4    A    Specifically, she got into -- and it really doesn't have

5    a whole lot to do with the health information privacy laws.

6    She got into that the nurse practitioner, Judy, who saw this

7    patient, she felt that Judy was accusing the girls or putting

8    information into the girls' head that there was some type of

9    abuse or something going on, because Judy had questioned about

10   nonconsensual sex.  She had questioned them about abuse; if

11   there was any potential abuse or anything going on because of

12   this unintended pregnancy.

13          And Pam was upset about that and felt that these

14   ideas were being put into their heads.

15   Q    And how did you respond?  How did you handle the

16   situation?

17   A    Well, there was no -- when I took the phone call, I made

18   it perfectly clear to Pam that she could vent all she wanted

19   and that she could, you know, just speak her peace, tell me

20   what she needed to tell me, but I couldn't speak to her

21   directly about any specific information related to the patient

22   because there was no signed consent in the chart.

23          If a patient comes in and they give us permission to

24   talk to an outside person, they actually have to sign for

25   that.  They have to sign a form telling us that we can talk

Butler - direct - Penza                    3320

1   to -- like if they wanted to us talk to Pam, they could sign

2   the form saying that we could talk to Pam about whatever.  We

3   could talk to her about birth control pills, but not about

4   pregnancy.

5          We could talk to her about her sexually transmitted

6   disease, but not the number of partners.  You know, we -- we

7   make them get very specific about what we can and can't say.

8          In this case, there was no signed form in the chart.

9   So I told Pam I couldn't speak anything specific to that

10  particular patient, but I could tell her that these questions

11  are questions that we ask everybody.  These are general

12  questions to protect somebody's health and to protect their

13  privacy and that person.  And it helped us to care for the

14  person.

15         I basically couldn't tell her much of anything.

16         THE COURT:  Which patient was she calling about, if

17  you recall?

18         THE WITNESS:  No.  I have to be honest, I do not

19  remember which -- I believe it was Camila, but I'm not sure.

20  Q    And did she provide you any information about her role

21  with --

22  A    Yes.  She told me that she was responsible.  She had been

23  responsible for this -- this girl for the last two years, and

24  that it was her responsibility.  And I still explained to her

25  that I still couldn't release the information.  It didn't

Butler - direct - Penza                              3321

1    matter.

2             MS. PENZA:  Your Honor, no further questions.

3             THE COURT:  Why don't we take our break and then we

4    will have cross-examination.

5             MR. AGNIFILO:  Very good.

6             THE COURT:  All rise for the jury.

7             THE COURTROOM DEPUTY:  All rise.

8             (Jury exits.)

9             (In open court; outside the presence of the jury.)

10            THE COURT:  Ms. Butler, you can step down now.

11   Please don't discuss your testimony with anyone.

12            We are going to take a ten-minute break.

13            THE WITNESS:  Okay.

14            THE COURT:  Thank you.

15            About how much?

16            MS. GERAGOS:  A few questions.

17            THE COURT:  Okay.

18            All right.  We will take a ten-minute break.

19            (Recess taken.)

20

21            (Continued on following page.)

22

23

24

25

3322

1           (In open court; outside the presence of the jury.)

2           THE COURT:  Let's bring in the witness.

3           MS. PENZA:  We're going to do our absolute best but

4   we have two more out of town witnesses who we believe will be

5   very short and so we are wondering, Your Honor, if necessary,

6   if we can, could stay an extra 15 minutes or so.

7           THE COURT:  Let's check with the jury.

8           Just tell the jury we have exactly that.

9           MS. PENZA:  Thank you, Your Honor.

10          THE COURT:  Mr. Geragos, are you going to be

11  questioning?

12          MS. GERAGOS:  Yes.

13          (Pause.)

14          THE COURT:  Yes.  The word back from the jury is,

15  yes, only 15 minutes.

16          MS. PENZA:  Yes.  Yes, Your Honor.

17          THE COURT:  And I second that motion.

18          All right.  So let's bring in the jury, please.

19          (Jury enters.)

20          THE COURT:  All right.  Please be seated, everyone.

21          Ms. Geragos, you may cross-examine.

22          The witness is reminded that she is still under

23  oath.

24          MS. GERAGOS:  Thank you, Your Honor.

25

1    CROSS-EXAMINATION

2    BY MS. GERAGOS:

3    Q    Good afternoon, Mrs. Butler.  My name is Teny Geragos and

4    I represent Keith Raniere.  Nice to meet you.

5    A    Nice to meet you.

6    Q    So when we left off with Ms. Penza, you spoke about a

7    conversation you had with Ms. Cafritz on I think May 21, 2008,

8    is that correct?

9    A    Yes.

10   Q    I'm going to show you what's in evidence as Government

11   Exhibit 539-22.  I'll zoom in.  This is written on May 19,

12   2008, correct?

13   A    Yes.

14   Q    And it states here, she's not a smoker, correct?

15   A    Yes.

16   Q    There's no alcohol or drug abuse?

17   A    Yes.

18   Q    There's no emotional problems with Camila, correct?

19   A    Yes.

20   Q    No domestic violence?

21   A    Yes.

22   Q    And no STD or HIV risk, correct?

23   A    Yes.

24   Q    And that she's sure of her decision to terminate the

25   pregnancy, right?

Butler - cross - Geragos                    3324

1   A     Yes.

2   Q     And that's two days before your conversation with

3   Ms. Cafritz?

4   A     Yes.

5   Q     Okay.  I am showing you what's in evidence as Government

6   Exhibit 539-24.  And that's May 14, 2008, correct?

7   A     Yes, it is.

8   Q     And similar to the one we saw a few days later, it

9   indicates she's not a smoker, correct?

10  A     Correct, yes.  Correct.

11  Q     No alcohol or drug abuse?

12  A     Yes.

13  Q     No emotional problems?

14  A     Yes.

15  Q     No domestic violence?

16  A     Yes.

17  Q     And she's not at risk for STD or HIV, correct?

18  A     Yes.

19  Q     And that she wishes to terminate?

20  A     Yes.

21  Q     And that's about a week before your conversation, right?

22  A     Yes.

23  Q     Because you stated on direct examination that you have

24  about, was it four meetings with somebody who wishes to

25  terminate or two visits with somebody who wishes to terminate?

CMH      OCR      RMR      CRR      FCRR

Butler - cross - Geragos                    3325

1    A    Three.

2    Q    Three meetings.  And at the first meeting, you have to

3    make sure they understand what they're doing, right?

4    A    Yes.

5    Q    That they're sure of their decision and you never give

6    them the medical termination on the first visit, correct?

7    A    Correct.

8    Q    I'm just going to turn the page, the second page of what

9    we were looking at, Government Exhibit 539-25.

10             This is written in doctor handwriting, it's a little

11   bit difficult to read, but does it say:  States significant

12   other aware of pregnancy, denies nonconsensual?

13   A    Yes.

14   Q    Is that what that says:  Would like to terminate the

15   pregnancy?

16   A    Yes.

17   Q    Options reviewed at length?

18   A    Yes.

19   Q    Correct?  And that's on 5/14, right?

20   A    Yes.

21   Q    All right.  So that same day, May 14, 2008, you filled

22   out this form, the patient history form, right?

23   A    Yes.

24   Q    Or someone filled it out.  Probably not you.  And it

25   says, What is your present method of birth control, right?

Butler - cross - Geragos                         3326

1   A    Yes.

2   Q    And it says None there?

3   A    It says, None.

4   Q    An that's on May 14, 2008?

5   A    Yes.

6   Q    Okay.  I believe we talked a little bit about with

7   Ms. Penza 539-18.  This form, annual gynecological exam, that

8   says, Five years with partner.  Correct?

9   A    Correct.

10  Q    You didn't make this notation, right?  This was

11  Ms. Fuller?

12  A    Fuller, yes.

13  Q    So when you said the questions that would have been asked

14  or may have been asked as to whether she was sexually active,

15  you didn't ask them, right?

16  A    No, I did not.

17  Q    One last question.  We spoke a little bit about the

18  annual gynecological exam sheet.  And can you just one more

19  time tell us what the point of this sheet is that you made

20  with the quadrants, this one?

21  A    The point of the sheet is to be as concise as possible

22  and to be as accurate as possible with gathering the

23  information from the patient that we would need to diagnose or

24  treat any potential problems, to prescribe and to handle any

25  health issues that they may have.

CMH      OCR      RMR      CRR      FCRR

Butler - cross - Geragos                    3327

1   Q    Because you want the patient to be truthful with you and

2   honest, right?

3   A    We want them to be, yes.

4   Q    Okay.  So I'm just going to show you Government

5   Exhibit 549, page 9, and this part about problems.  And this

6   was Daniela's annual gynecological exam, correct?

7   A    Yes.

8   Q    And here, can you just read one more time what it says

9   here?  Lives, what does that say?

10  A    Lives in Mexico.  Visiting here times two to

11  three months.  Considering college in USA.

12  Q    And can you just read the date of that?

13  A    10/3/2006.

14  Q    Okay.  And then here, what does it say?  One lifetime

15  partner?

16  A    One lifetime partner.

17  Q    Under whether or not it says she's sexually active?

18  A    Yes.

19         MS. GERAGOS:  No further questions, Your Honor.

20         MS. PENZA:  No redirect.

21         THE COURT:  Very well.  The witness is excused.  You

22  may stand down.

23         THE WITNESS:  Thank you.

24         THE COURT:  You're very welcome.

25         (Witness excused.)

3328

1          THE COURT:  All right.  The government may call its

2     next witness.

3          MS. HAJJAR:  Thank you.  The government calls Sheila

4     Jelonek.

5          THE CLERK:  Please raise your right hand.

6          (The witness is duly sworn/affirmed by clerk.)

7          THE CLERK:  Please have a seat and please state and

8     spell your full name for the record.

9          THE WITNESS:  Sheila Jelonek, S-H-E-I-L-A,

10    J-E-L-O-N-E-K.

11         THE COURT:  You may inquire.

12         MS. HAJJAR:  Thank you, Your Honor.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Jelonek - direct - Hajjar                    3329

1   DIRECT EXAMINATION

2   BY MS. HAJJAR:

3   Q    Good afternoon, Ms. Jelonek.

4   A    Hi.

5   Q    Where do you currently live?

6   A    South Florida, Palm Beach, West Palm Beach.

7   Q    And what do you do for work?

8   A    I'm a leasing agent at an apartment complex.

9   Q    What did you do before that?

10  A    Writer.

11  Q    How long have you lived in Florida?

12  A    Just since the end of last year.

13  Q    Where did you live before that?

14  A    In Clifton Park, New York.

15  Q    And do you own property in Clifton Park, New York?

16  A    I do.  I own two condominiums.

17  Q    Is one -- is one of those condominiums at 120 Victory

18  Way?

19  A    Yes, it is.

20  Q    Can you describe that property to the jury, please?

21  A    It's a two bedroom, one bath on the first floor.  It's

22  about 900 square feet in the development of Knox Woods.

23  Q    How long have you owned 120 Victory Way?

24  A    Since 2003.

25  Q    Ms. Jelonek, I'm going to show you what's in evidence as

Jelonek - direct - Hajjar                    3330

1    Government Exhibit 147?

2              THE COURT:  It's on the screen right by you.

3              THE WITNESS:  Yes.

4    Q    Can you see that?

5    A    Yes.

6    Q    Do you recognize what's depicted in this photograph?

7    A    Yes.

8    Q    What is it?

9    A    That's 120 Victory Way, my condominium.

10   Q    And showing you what's in evidence as Government

11   Exhibit 148.  Do you recognize what this depicts?

12   A    Yes, that's the front door.  120 Victory Way.

13   Q    Have you rented 120 Victory Way?

14   A    Yes.

15   Q    When did you start renting it?

16   A    2007.

17   Q    And directing your attention to 2011, were you contacted

18   by a woman who was interested in renting 120 Victory Way?

19   A    Yes.

20   Q    Can you explain to the jury how that happened?

21   A    Advertised on Craig's List.  She came to see it.  The

22   tenant I was renting to at the time was still living there.

23   So it was full of furniture, it looked very nice.  They worked

24   at Rent-A-Center so they had great furniture and she really

25   liked it, the way it looked, and she wanted to rent it.

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                    3331

1    Q    How did the woman identify herself?

2    A    Her name was Kathleen O'Sullivan.

3    Q    What did the woman look like?

4    A    She had long blond hair, very long blond hair.  She was

5    petite.

6    Q    Ms. Jelonek, I'm going to show you what's in evidence as

7    Government's Exhibit 148.  Do you recognize the woman in this

8    photograph?

9    A    Yes.

10   Q    And who do you know her as?

11   A    Kathleen O'Sullivan.

12   Q    Did you ever ask for identification from this woman?

13   A    No, I did not.

14   Q    Did you eventually enter into a lease with her with

15   respect to 120 Victory?

16   A    Yes.

17   Q    Did you ask her for references for employment

18   verification?

19   A    I did but she didn't work.  She said that she had been

20   married and her husband died.  She had a lot of money and so

21   she was just going to pay for the condominium, the rent up

22   front for a year.

23   Q    Did she tell you how she was going to pay you up front

24   for a year?

25   A    She didn't, no.  She just said she could pay up front for

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                    3332

1   a year so she didn't have an employer.  She just said she had

2   received a lot of money after her husband died so she could

3   pay for it that way.

4   Q    Did you take any other steps to verify her identity prior

5   to entering into a lease with her?

6   A    No.

7   Q    At any point, did this woman give you a phone number?

8   A    Yes.

9   Q    And did you enter it into your phone?

10  A    I did.

11       MS. HAJJAR:  Your Honor, if I can show the witness

12  something that's been marked for identification only.

13       THE COURT:  Go ahead.

14  Q    Ms. Jelonek, I'm showing you what's been marked for

15  identification as Government Exhibit 1199-A.  Do you recognize

16  this photograph?

17  A    Yes.

18  Q    What is it?

19  A    That's my phone with her number.

20       MS. HAJJAR:  Your Honor, the government offers

21  Government Exhibit 1199-A into evidence.

22       MR. AGNIFILO:  No objection.

23       THE COURT:  All right.  Government Exhibit 1199 is

24  receive -- A?

25       MS. HAJJAR:  Yes.  1199-A.

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                    3333

1          THE COURT:  1199-A is received in evidence.

2          MS. HAJJAR:  Thank you, Your Honor.

3          (So marked.)

4          THE COURT:  Go ahead.

5    Q    Ms. Jelonek, is this a photograph of your phone?

6    A    Yes.

7    Q    And is this -- can you read the mobile number associated

8    with the woman that you rented 120 Victory Way to?

9    A    518-859-5004.

10   Q    Did you continue to contact the woman on this phone

11   number?

12   A    Yes.

13   Q    Now, I want to show you what's in evidence as Government

14   Exhibit 361.  I'll show you the front page of it.

15          Have you ever seen this document before?

16   A    No.

17   Q    I'm going to turn to item 604 in this document.  Do you

18   see that item number 604 here?

19   A    Yes.  Yes.

20   Q    Can you just read the phone number that's next to this

21   item?

22   A    518-859-5004.

23   Q    Now, what happened after you initially met the woman

24   interested in renting out 120 Victory Way?

25   A    Then we met again to sign the lease and for her to pay

Jelonek - direct - Hajjar                    3334

1    for the rent.

2    Q    And did you enter into a written lease agreement with

3    her?

4    A    Yes.

5    Q    Was the lease renewed?

6    A    Yes.

7    Q    For how many years?

8    A    Seven.

9         MS. HAJJAR:  Your Honor, I'm going to show something

10   to the witness for identification only.

11        THE COURT:  Go ahead.

12   Q    Ms. Jelonek, I'm showing you what's been marked for

13   identification as Government Exhibit 1101.  It's a number of

14   pages.

15        Do you recognize this exhibit?

16   A    Yes.

17   Q    And what is this?

18   A    Those are leases.

19   Q    Are they the leases between you and the woman who

20   identified herself as Kathy O'Sullivan?

21   A    Yes.

22        MS. HAJJAR:  Your Honor, the government offers

23   Government Exhibit 1101 into evidence.

24        MR. AGNIFILO:  No objection.

25        THE COURT:  All right.  Government Exhibit 1101 is

Jelonek - direct - Hajjar                    3335

1    received in evidence.

2              (So marked.)

3    Q    Ms. Jelonek, I just want to direct your attention to the

4    first rental lease agreement, that's the first page of

5    Government Exhibit 1101.

6              When was this lease made?  Can you read the first

7    date at the top?

8    A    June 28, 2011.

9    Q    And is that your name and your handwriting, Sheila

10   Jelonek?

11   A    Yes.

12   Q    And this is between you and Kathy O'Sullivan with respect

13   to 120 Victory Way?

14   A    Yes.

15   Q    How long was the term of this rental lease agreement?

16   A    Twelve months.

17   Q    And beginning August 1, 2011?

18   A    Yes.

19   Q    Was there any agreement with respect to the method by

20   which the woman identified as Kathy O'Sullivan would pay you

21   for the property?

22   A    Not, not in advance, no.  When I met her and we signed

23   the lease, she paid me in cash.

24   Q    Did she pay you the full amount of the yearlong lease?

25   A    Yes.

```
                    Jelonek - direct - Hajjar              3336
```

1   Q     In cash?

2   A     Yes.

3   Q     And so what was the monthly rent associated with 120

4   victory in, when you leased it in 2011?

5   A     $925 a month.

6   Q     And this lease is signed, the second page of this lease

7   is signed in 2011 as well?

8   A     Yes, by both of us, yes.

9   Q     Now, you said Ms. Jelonek that the lease was renewed.

10  And turning to page three of Government Exhibit 1101, is this

11  the lease renewal for the following year, 2012?

12  A     Yes.

13  Q     And what is the monthly rent for 2012?

14  A     $955.

15  Q     And, again, for 2012, how were you paid with respect to

16  the rent for 120 Victory?

17  A     In cash.

18  Q     In full?

19  A     Yes.

20  Q     And turning to the next page, was the lease renewed again

21  for 2013?

22  A     Yes.

23  Q     And the rent was 950 per month?

24  A     Yes.

25  Q     And for 2013, was this again paid in cash?

Jelonek - direct - Hajjar                    3337

1   A    Yes.

2   Q    In full?

3   A    Yes.

4   Q    Now, is Government Exhibit 1101 missing a lease for 2014?

5   A    Yes.

6   Q    Do you know why that is?

7   A    No.  That's probably my paperwork.

8   Q    Did you try to find the lease?

9   A    Track it, yes.

10  Q    For 2014?

11  A    I found six out of seven.

12  Q    Okay.  But you, but she leased, this woman leased the

13  120 Victory for that period of time.  You just can't find the

14  lease, is that right?

15  A    Yes.

16  Q    And then for 2016, did the rent increase slightly?

17  A    Yes.

18  Q    And what was the monthly rent for 2016?

19  A    $995.

20  Q    And, again, was this paid in cash in full at the

21  beginning of the lease term?

22  A    Yes.

23  Q    Can you describe how that happened?  How you were paid in

24  cash in full for the year?

25  A    We would -- I would call her in June and ask if she

Jelonek - direct - Hajjar                3338

1    wanted to renew and for seven years in a row, she said yes and

2    then we would set a date to meet in July and, to sign the

3    lease and, for her to pay and we would generally meet at a

4    Starbucks and she would sign the lease and give me the cash up

5    front for a year.

6    Q    How would she give you the cash up front for the year?

7    A    In a big bag.

8    Q    What kind of bag?

9    A    Paper bag with a handle.

10   Q    And what denominations was the cash in?

11   A    Hundreds, fifties.

12   Q    And so for 2016, the monthly rent is 995 and so I think

13   the math there is 11, nearly 12,000?

14   A    Yes.

15   Q    Were you paid $12,000 in cash?

16   A    Yes.

17   Q    At the Starbucks?

18   A    Yes.

19   Q    And this is the last rental lease that's part of this

20   exhibit.  This is in 2017?

21   A    Yes.

22   Q    And, again, for $995 per month?

23   A    Yes.

24   Q    Did the woman who identified herself as Kathy O'Sullivan

25   tell you anything about her life?

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                3339

1   A     No.

2   Q     I think you mentioned that she said she had a husband who

3   died?

4   A     Oh, yes, when we first met, yes, and before she rented,

5   she said he passed away and left her money.

6   Q     Did you communicate with her often?

7   A     No.  No, not really.  Once a year in June and then we had

8   a couple of issues.  The woman upstairs, her hot water heater

9   went and it decimated my furnace and closet.  So we

10  communicated at that point and also when there was a leak,

11  another leak from upstairs, and then when the hot water heater

12  went and that was, you know, we communicated on those issues.

13  I think I checked up with her in the winter once or twice

14  because I wanted to make sure the outside water supply was

15  turned off, you know, because it gets cold, I didn't want it

16  to freeze and cause a problem.  That was about it.

17  Q     At one point, was a new furnace installed at 120 Victory

18  Way?

19  A     Yes.

20  Q     And did you at any point receive a proof of warranty with

21  respect to the furnace?

22  A     Yes.

23  Q     Did the warranty list an unfamiliar, any kind of

24  unfamiliar information on it?

25  A     Yes.

Jelonek - direct - Hajjar                3340

1   Q    Can you describe that to the jury?

2   A    Uh-huh.  It had been installed when I was in Florida so

3   the warranty, they must have asked the person who was at the

4   rental, at the apartment when they installed it for their

5   phone number and e-mail address so the warranty had my name,

6   the address, and an unfamiliar phone number and e-mail

7   address.

8   Q    Did you write down the phone number and e-mail address?

9   A    I e-mailed it to one of your colleagues.

10  Q    Sitting here today, do you recall the phone number and

11  e-mail address?

12  A    I don't recall them off the top of my head.

13  Q    Would looking at the e-mail you wrote refresh your memory

14  about that?

15  A    Yes.  Yes.

16       MS. HAJJAR:  Your Honor, may I show this just to the

17  witness?

18       THE COURT:  Yes, you may.  Go ahead.

19  Q    Ms. Jelonek, is this the e-mail that you were just

20  referring to?

21  A    Yes.

22  Q    Just take a moment and can you just refresh your memory

23  about the phone number and e-mail address?

24  A    Yes.  The phone number is 518-429-1096.  And the e-mail

25  is danirla@nxian.net.

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                    3341

1        MS. HAJJAR:  Your Honor, I would like to show

2   something that's in evidence to the witness.

3   Q    I'm showing you again Government Exhibit 361.  And

4   directing your attention, Ms. Jelonek, to 273 in this exhibit,

5   do you see that?

6   A    Yes.

7   Q    Can you just read the phone number associated with that

8   entry?

9   A    518-429-1096.

10  Q    And can you read the e-mail that appears just above it?

11  A    Daniela@nxian.net.

12  Q    At some point, Ms. Jelonek, did you become aware that

13  another woman besides the woman that you knew as Kathy

14  O'Sullivan was spending time at 120 Victory Way?

15  A    Yes.

16  Q    Can you explain that?

17  A    When the hot water heater upstairs leaked into the closet

18  and I was -- my closet at 120, I was alerted to it.  I was in

19  Florida at the time so I sent a friend up to take a look and

20  see if there was damage.  And when he went up, he went in,

21  took some pictures for, to send to the woman upstairs, her

22  insurance company, and at that point, he was referring to

23  someone named Danielle and I, -- that was the first time I had

24  heard her name and then Kathy referred to her as her house

25  sitter.

CMH        OCR        RMR        CRR        FCRR

Jelonek - direct - Hajjar                    3342

1    Q     Did you ever interact with someone other than Kathy

2    O'Sullivan at 120 Victory?

3    A     I did.  I was -- actually, when the hot water heater

4    went, I was in Florida again, but I was coming back the next

5    day.  So I went to check it out, met a repairman there and at

6    that time, there was another woman there other than Kathy.

7    Kathy O'Sullivan.

8    Q     Was that woman introduced to you?

9    A     No.

10   Q     What did the woman look like?

11   A     She had dark hair.

12   Q     Did you ever see another woman at 120 Victory Way?

13   A     When the hot water heater repairman -- he said he could

14   fix it, I think, the next day or the day after that, and the

15   woman who was there said she couldn't be there but she could

16   have someone there.  So on that day, he went to repair it and

17   I went to check and make sure he was, you know, doing okay,

18   didn't need anything, if everything was going well, and at

19   that point, there was another woman there while he was there

20   doing the work.

21   Q     Can you describe the second woman?

22   A     She had dark hair as well.

23   Q     Did she identify herself to you?

24   A     No.

25   Q     Did you try to engage the second woman in conversation at

Jelonek - direct - Hajjar                3343

1   any point?

2   A    I don't know that I tried to engage her but she was

3   just -- didn't say anything.  So I, I didn't really -- I

4   probably said something but she didn't say anything back so I

5   just checked on the hot water heater guy and then I left.

6   Q    You testified that Kathy O'Sullivan said that, told you

7   that there was a house sitter at any point.  Did she identify,

8   of these two women, which was a house sitter and who the other

9   woman was?

10  A    No.

11  Q    Did Kathy O'Sullivan ever express interest in buying

12  120 Victory Way from you?

13  A    Yes.

14  Q    Were you interested in selling it?

15  A    No.

16  Q    Did she ever tell you that she needed a key made?

17  A    Yes.

18  Q    Can you explain that to the jury?

19  A    When I went to deliver a 30-day notice and no one was

20  there, hadn't heard from her, it was unlocked.  When I left I

21  locked it and then when she needed to go back in to move the

22  contents of the condo out, she needed a key to get in.  So I

23  met her at Walmart, made another key and gave it to her.

24  Q    Now, I want to direct your attention to June 2018.  Did

25  you -- at that time, did you attempt to contact Kathy

CMH      OCR      RMR      CRR      FCRR

Jelonek - direct - Hajjar                    3344

1    O'Sullivan again to renew the lease?

2    A    Yes.

3    Q    And what happened?

4    A    She didn't call me back.

5    Q    And so what happened after --

6    A    I called her again and she didn't call me back again.

7    So, usually, she would call me back and we would meet in July

8    and it was approaching, we were approaching the end of June

9    and I hadn't heard from her.  So I needed to -- I wasn't sure

10   what was going on so I decided to exercise my option not to

11   renew and I dropped off a 30-day notice.  I went to the

12   apartment to knock on the door and deliver a 30-day notice

13   that the lease would end in the end of July and I would expect

14   her to be out.

15            MS. HAJJAR:  Your Honor, may I show something to the

16   witness that's marked for identification?

17            THE COURT:  Okay.

18   Q    Ms. Jelonek, I'm showing you what's marked for

19   identification as Government Exhibit 1102.  Do you recognize

20   this?

21   A    Yes.

22   Q    What is it?

23   A    It's the letter, the 30-day notice that I delivered.

24            MS. HAJJAR:  Your Honor, the government offers

25   Government Exhibit 1102 into evidence.

CMH        OCR        RMR        CRR        FCRR

Jelonek - direct - Hajjar                    3345

1          MR. AGNIFILO:  No objection.

2          THE COURT:  All right.  Government Exhibit 1102 is

3    received in evidence.

4          (So marked.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jelonek - direct - Hajjar                    3346

1              (Exhibit published.)

2      EXAMINATION CONTINUES

3      BY MS. HAJJAR:

4      Q     Ms. Jelonek, is this the letter that you -- is this the

5      notice that you were just referring to?

6      A     Yes.

7      Q     Okay.  And so what happened with this notice, how did

8      you -- how did you deliver it to the woman you knew as

9      Kathleen O'Sullivan?

10     A     I knocked on the door -- on the door, no one answered.  A

11     friend of mine went with me, so wasn't sure, was concerned, so

12     I went in.  Opened the door, it was unlocked.  And looked in

13     the apartment and then, ultimately, left, locked the doors and

14     left the notice on the door.

15     Q     When you entered the premises, did you walk around?

16     A     Yes.

17     Q     What did you observe?

18     A     It was dark.  There were dishes on the counter that

19     looked like they just had been washed and left in that -- the

20     drain, whatever, and there was -- we walked in.  We went

21     through the kitchen.  There was a bulletin board in the

22     kitchen with some pictures and pushpins, and we went down the

23     hall.  In the second bedroom was a treadmill, a big treadmill.

24     Then went to the back -- to the back bedroom.  There is was a

25     bed.  There was a TV.  There was a stand.  There was a tripod.

1   There was a few things in the closet.  There was -- it was

2   dark.

3           There were heavy velvet curtains and blackout

4   curtains on the windows.  It was very dark.  There were a lot

5   of boxes in the corner and the living room looked like someone

6   had packed and they were either coming or going.  They were

7   all packed with kind of personal items.  There was a bike

8   and -- leaned up against the counter.  There were a lot of

9   cobwebs, a lot of cobwebs.

10  Q    The treadmill, can you describe where that was?

11  A    It was in the first bedroom, smaller bedroom, in the hall

12  just taking up most of the room in the bedroom.

13  Q    Was there a bed in the bedroom?

14  A    No.

15  Q    And the tripod, could you describe where that was?

16  A    It was like the corner of the bed, it was like a bed and

17  the tripod was in the corner.

18  Q    At some point after that did you re-enter the property?

19  A    Yes.

20  Q    Why?

21  A    Because I still hadn't heard from her, so we thought we

22  might have to -- well, first of all, clean out the

23  refrigerator because there was food and I'm concerned about

24  rodents.  And also, we're concerned that we would have to

25  remove the contents and put it in storage if I didn't hear

Jelonek - direct - Hajjar                    3348

1   from her because it was getting to the end of the lease and

2   I -- I needed to rent it because it's -- it's income for me.

3   Q    At that time did you take a video of the interior of the

4   120 Victory Way?

5   A    Yes, I did.

6            MS. HAJJAR:  Your Honor, may I show something to the

7   witness for identification?

8            THE COURT:  Yes, you may.

9   BY MS. HAJJAR:

10  Q    Ms. Jelonek, I am showing you will a disk that's been

11  marked Government Exhibits 1103 to 1107.

12           Do you recognize this?

13  A    Yes.

14  Q    And what is it?

15  A    It's a disk with a couple of videos that I had taken on

16  the disk.

17  Q    Did you review the contents of this disk?

18  A    Yes.

19  Q    And have you initialed it?

20  A    Yes.

21  Q    I am also going to show you what's been marked for

22  identification, Ms. Jelonek, as Government Exhibit 1106-A.

23           Do you recognize this?

24  A    Yes.

25  Q    Is this a still from that video that you just referred

SAM      OCR      RMR      CRR      RPR

to?

A     Yes.

Q     And showing you what's marked for identification as 1106-B.

        Do you recognize this?

A     Yes.

Q     Is this a still from the video that you just referred to as well?

A     Yes.

        MS. HAJJAR:  Your Honor, the Government offers Government Exhibits 1103 to 1107, as well as 1106-A and B.

        MR. AGNIFILO:  No objection, Your Honor.

        THE COURT:  All right, Government Exhibits 1103 through 1107 and 1106-A and B are received into evidence.

        (Government's Exhibits 1103 through 1107, and 1106-A and 1106-B were received in evidence.)

        MS. HAJJAR:  Thank you, Your Honor.  And at this time we would like to play those clips.

        THE COURT:  Go ahead.

        MS. HAJJAR:  So now playing Government Exhibit 1103.

        (Video played.) (Video stopped.)

BY MS. HAJJAR:

Q     Ms. Jelonek, is this one of the videos that you took?

A     Yes.

Q     And just going back to the beginning for a moment and

Jelonek - direct - Hajjar                    3350

1   pausing it.

2            (Video played.)  (Video stopped.)

3   Q    Did you notice this arrangement of magnets on the fridge?

4   A    Yes.

5   Q    Did this surprise you given what you'd observed of Kathy

6   O'Sullivan?

7   A    Yes.

8   Q    Why?

9   A    Just a lot of profanity, kind of juvenile.  She didn't

10  strike me as being juvenile.

11           MS. HAJJAR:  Play the next clip.  So we are going to

12  play Government Exhibit 1104.

13           (Video played.) (Video stopped.)

14  BY MS. HAJJAR:

15  Q    Ms. Jelonek, did you recognize the person that's depicted

16  in this part of the video?

17  A    Yes.

18  Q    How?

19  A    From newspaper pictures.

20           (Video played.) (Audio/Video stopped.)

21  Q    Ms. Jelonek, just looking at the chalkboard, what looks

22  like a chalkboard in the upper left-hand corner of this still,

23  do you see what reads, it looks like:  Tapioca pudding 130,

24  Jello 80, soup 50 calories a cup?

25  A    Yes.

SAM     OCR     RMR     CRR     RPR

```
                    Jelonek - direct - Hajjar                3351

1              (Video played.) (Video stopped.)
2              MS. HAJJAR:  And let's play the next clip,
3    Government Exhibit 1105.
4              (Video played.)
5    BY MS. HAJJAR:
6    Q    Who is that, Ms. Jelonek?
7    A    That's my boyfriend, Lonnie.
8              (Video played.)  (Video stopped.)
9    Q    When you entered the premises, were the shades drawn and
10   the curtains down as well?
11   A    Yes.
12   Q    You testified it was very dark?
13   A    Yes, I was trying to get light there, that's what he was
14   doing.
15             MS. HAJJAR:  Let's play Government Exhibit 1106.
16             (Video played.)
17   BY MS. HAJJAR:
18   Q    Were those curtains drawn as well, Ms. Jelonek, these red
19   velvet curtains?
20   A    Yes.
21             (Video continues playing.)
22             MS. HAJJAR:  Pause here.
23             (Video stopped.)
24   BY MS. HAJJAR:
25   Q    Ms. Jelonek, is this the tripod you were referring to?
```

Jelonek - direct - Hajjar                3352

1    A    Yes.

2    Q    Was it positioned near the bed in this bedroom?

3    A    Yes.

4              (Video resumed playing.) (Video stopped.)

5              MS. HAJJAR:  Playing the last Government

6    Exhibit 1107.

7              (Video played.) (Video stopped.)

8    BY MS. HAJJAR:

9    Q    Is that the closet at 120 Victory Way, Ms. Jelonek?

10   A    Yes.

11   Q    And is there a stepstool at the end of that closet?

12   A    Yes.

13   Q    Why did you take this video or these videos?

14   A    Well, I was concerned about the property.  We were also

15   trying to figure out how we were gonna get all the stuff out

16   of there into storage.  So it was partly for inventory

17   purposes.

18   Q    And at some point after you entered the property and took

19   these videos, did you communicate again with Kathleen

20   O'Sullivan?

21   A    Yes.

22   Q    Can you describe what happened?

23   A    I was -- I -- I didn't hear from her and it was getting

24   to the end of the lease, so I began to think about moving on

25   to rent to someone else and I thought I might have to do some

SAM     OCR     RMR     CRR     RPR

Jelonek - direct - Hajjar                3353

1    work painting, ceiling work.  There was popcorn ceiling that I

2    wanted to remove.  Anyway, so I had called someone about

3    looking at that and giving us a price.  And my -- I made an

4    appointment about 5:30 to meet the person there and on the way

5    home I gave her one more call.  And that time, the third time

6    I think it was, she picked up the phone.  She answered the

7    phone.

8    Q    Did she want to extend the lease?

9    A    Yes, she did.  Yes.

10   Q    Did she again offer to pay the rent in full up front?

11   A    She offered to pay six months.  She said she couldn't do

12   the twelve full months, but she could do six months.

13   Q    Did you agree to extend the lease?

14   A    No, by that point I had decided to move on, exercise my

15   option to not renew the lease.  I was -- I didn't -- you know,

16   it was late in the lease.  If it had been earlier I might

17   have, but I decided not to.

18          She was concerned because she only had a couple

19   weeks left before the lease ended to remove the contents of

20   the condo.  She didn't think she could do it on time, so

21   she -- so I told her that I would extend it a month, and --

22   and so that's what we did.  And I met her and she paid me for

23   August then, that month in cash again.  And -- and then signed

24   a note to that -- to that agreement, for that agreement, and

25   then, ultimately, extended it through the end of August.  And

SAM      OCR      RMR      CRR      RPR

Jelonek - direct - Hajjar                    3354

1    at that point she had moved out.

2    Q    And just showing you again what's in evidence as

3    Government Exhibit 1102.

4              (Exhibit published.)

5    BY MS. HAJJAR:

6    Q    Ms. Jelonek, what we previously looked at, that notice,

7    did you subsequently write something at the bottom that

8    memorialized this agreement?

9    A    Yes.  Yes, that we would extend it for one month.

10             MS. HAJJAR:  Okay.  Thank you, Your Honor, no

11   further questions.

12             THE COURT:  Cross-examination.

13             MR. AGNIFILO:  We have no questions, Your Honor.

14             THE COURT:  Very well, the witness is excused.  You

15   may stand down, ma'am.

16             THE WITNESS:  Thank you.

17             (Witness steps down and exits the courtroom.)

18             THE COURT:  You are very welcome.

19             All right, you may call your next witness.

20             MR. LESKO:  The Government calls James Loperfido.

21             (The witness enters the courtroom and takes the

22   stand.)

23             THE COURTROOM DEPUTY:  Sir, please raise your right

24   hand.

25             Do you solemnly swear the testimony you shall give

Jelonek - direct - Hajjar                3355

1    to the Court will be the truth, the whole truth, and nothing

2    but the truth, so help you God?

3                THE WITNESS:  Yes.

4                (Witness sworn.)

5                THE COURTROOM DEPUTY:  Please have a seat, and

6    please state and spell your full name for the record.

7                THE WITNESS:  James Loperfido, L-O-P-E-R-F-I-D-O.

8                THE COURT:  All right, you may inquire.

9                MR. LESKO:  Thank you, Your Honor.

10

11               (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Loperfido - direct - Lesko                3356

1   J A M E S   L O P E R F I D O ,

2        called as a witness by the Government, having been

3        first duly sworn/affirmed by the Courtroom Deputy, was

4        examined and testified under oath as follows:

5   DIRECT EXAMINATION

6   BY MR. LESKO:

7   Q    Good afternoon, Mr. Loperfido.

8   A    Good afternoon.

9   Q    It's late on a Friday, so I am going to try to move

10  quickly.  If I go too fast, slow me down.  It's your

11  testimony, okay?

12  A    (No response.)

13  Q    Where do you live, sir?

14  A    I live in Auburn, New York.

15  Q    And what's your profession?

16  A    I'm a business consultant.

17  Q    How long -- do you prepare taxes?

18  A    Yes.

19  Q    Okay.  How long have you been a business consultant and a

20  tax preparer?

21  A    Since the early '80s.

22  Q    I'd like to draw your attention to late, approximately

23  late 2004 or early 2005.

24        At that time were you introduced to a company named

25  NXIVM?

SAM    OCR    RMR    CRR    RPR

Loperfido - direct - Lesko                    3357

1   A    Yes, sir.

2   Q    Who introduced you?

3   A    Joe O'Hara.

4   Q    Who was Joe O'Hara?

5   A    He was a client that I had.

6   Q    And what business was Mr. O'Hara in?

7   A    He was an attorney.

8   Q    Did he work with NXIVM?

9   A    Yes.

10  Q    In a attorney capacity or in a --

11  A    I believe as a consulting capacity.

12  Q    Who did you initially meet with at NXIVM?

13  A    I met with Kathy Russell and Nancy Salzman.

14  Q    Who was Nancy Salzman?

15  A    Nancy Salzman ran the day-to-day company.

16  Q    And who was Kathy Russell?

17  A    She was in charge of accounting.

18  Q    And did you begin to work for NXIVM?

19  A    Yes.

20  Q    And what was the nature of the work that you performed

21  for NXIVM?

22  A    I did a lot of basic business consulting work, looking at

23  business structures, helping them organize some corporations

24  that they wanted to -- that they wanted to start.  I did tax

25  work for them and accounting work.

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                    3358

1  Q    Did you work for NXIVM from approximately late 2004 to
2  approximately late 2006?
3  A    I believe so, yes.
4  Q    Did you have a written contract with NXIVM?
5  A    No.
6  Q    So how did the relationship -- how was it finalized?
7  A    I was billed hourly -- I -- I billed them hourly for work
8  that I performed for them.
9  Q    Did you have to meet with anybody before you were hired?
10 A    Yes, I met with Nancy Salzman and Kathy Russell.
11 Q    So you were interviewed?
12 A    Yes.
13 Q    And would you consider this relationship sort of a
14 handshake relationship with NXIVM?
15 A    Yes, sir.
16 Q    And what was NXIVM?
17 A    It was a self-help company.
18 Q    Was it --
19 A    Among -- among other -- among other things.  It owned
20 property.  It -- it owned different companies.  They -- what
21 they would do is as they were building, as they were growing
22 their company -- their base operation, they would form new
23 corporations to -- for -- for things like a rec center that
24 they had that sold food and things like that and an exercise
25 center and the like.

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                      3359

1  Q    So was it fair to say NXIVM was sort of like an umbrella

2  organization?

3  A    Seemed so.

4  Q    And there were a number of related entities to NXIVM?

5  A    Yes.

6  Q    And did you work for NXIVM, itself?

7  A    Yes.

8  Q    And did you work for some of these other related

9  companies?

10 A    Well, I billed -- I billed everything to NXIVM, but, yes,

11 I guess so, I did that.

12 Q    Did NXIVM during the time period you worked with the

13 company, did it create a number of companies?

14 A    Yes.

15 Q    Did you have an understanding as to why these companies

16 were created?

17 A    My understanding mostly was that they -- they were for

18 basic litigious reasons.  You know, you protect -- you break

19 up your company, protect it from -- from lawsuits and to take

20 advantage of tax circumstances if they arose.

21 Q    Had you ever worked with a company that created so many

22 related companies in your career?

23 A    No, sir.

24 Q    Are you familiar with an entity named First Principles?

25 A    Yes.

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                3360

1   Q    What was First Principles?

2   A    I believe First Principles held the Rational Inquiry

3   license -- no actually -- yes, I believe so.

4   Q    And what was Rational Inquiry?

5   A    Rational Inquiry was a -- a -- it was what Mr. Raniere

6   set up that was the basis of all of the self-help programs

7   that NXIVM oversaw.

8   Q    And so would First Principles license out that Rational

9   Inquiry concept to other NXIVM-related entities?

10  A    No, I believe just to NXIVM.

11  Q    Just to NXIVM, itself?

12  A    Yes.

13  Q    Okay.  And you mentioned Mr. Raniere, do you see him in

14  court here today?

15  A    Yes.

16  Q    Can you identify him by an article of clothing he's

17  wearing?

18  A    He's wearing a sweater and a collared shirt.

19         MR. LESKO:  Indicating the defendant, Your Honor.

20         THE COURT:  Yes, let the record indicate that the

21  witness identified the defendant.

22  BY MR. LESKO:

23  Q    And who was Mr. Raniere?

24  A    Mr. Raniere is the -- was the fellow that pretty much ran

25  NXIVM.

Loperfido - direct - Lesko                          3361

1    Q      Was he the decision-maker at NXIVM?

2    A      Yes.

3    Q      Was he the leader of NXIVM?

4    A      Yes.

5    Q      Now, during the time period you worked with NXIVM, did

6    you discuss the issue of paying taxes with Kathy Russell?

7    A      Often.

8    Q      And what did she say?

9    A      Our -- our job was to look at everything and -- with a

10   goal to mitigate as much tax as possible for all of the

11   companies that -- that NXIVM was associated -- NXIVM and NXIAN

12   was associated with.

13   Q      What does the term mitigate mean in a tax context?

14   A      For me it means finding a way to lower the tax liability,

15   either by lowering sales, raising expenses, or finding tax

16   credits.

17   Q      And they were concerned about mitigating tax liabilities,

18   basically?

19   A      Yes.

20   Q      Did they have an ultimate goal with respect to all the

21   related companies?

22   A      Zero tax.

23   Q      And when you worked for NXIVM, were the companies,

24   related companies and the individuals involved with NXIVM

25   paying taxes to the best of your knowledge?

                SAM     OCR     RMR     CRR     RPR

Loperfido - direct - Lesko                      3362

1    A    I don't think they were.

2              MR. AGNIFILO:  I object, Your Honor.  If he has

3    personal knowledge.

4              THE COURT:  Yes, I am going to strike the answer.

5    You can ask the question differently.

6    BY MR. LESKO:

7    Q    Did some of your work at NXIVM involve dealing with

8    situations where NXIVM-related companies had not paid taxes?

9    A    Yes.

10   Q    Okay.  And is the same true for individuals involved in

11   NXIVM?

12   A    Yes.

13   Q    Now, this tax research you discussed, what sort of tax

14   issues did you research?

15   A    Things such as nexus issues with -- with -- with the

16   state of Washington.  Pretty much -- I'm sorry, I don't

17   remember a lot of it, but there was a lot of tax research that

18   was done.

19   Q    Were you part of a task force set up to research tax

20   issues?

21   A    Yes.

22   Q    And who was on that task force?

23   A    Joe O'Hara, Kathy Russell and myself.

24   Q    And when you say nexus, that means tax issues related --

25   connected to Washington state, is that what you mean?

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                    3363

1   A    Yes, sir.

2   Q    Okay.  And did you actually prepare tax returns for

3   NXIVM-related companies?

4   A    I did, yes.

5   Q    Did you prepare tax returns for NXIVM?

6   A    Yes.

7   Q    Did you prepare tax returns for individuals associated

8   with NXIVM?

9   A    Yes.

10  Q    Who were some of those individuals?

11  A    Nancy Salzman and Pam Cafritz come to mind.  There may

12  have been others.

13  Q    Was Nancy Salzman a high ranking person in NXIVM?

14  A    Yes.

15  Q    Where did she rank in your opinion?

16  A    I believe she was Number 2.

17  Q    And who was Pam Cafritz?

18  A    She -- I wasn't quite sure.  I still am not quite sure

19  what part she played in NXIVM.  I know she was a high ranking

20  person within -- within the company.

21  Q    And did she have a relationship with anybody within the

22  company to the best of your knowledge?

23  A    I believe she had a relationship with Mr. Raniere.

24  Q    Was NXIVM an easy or difficult client to work with?

25  A    They were a difficult client to work with.

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                          3364

1    Q    You mentioned you were paid an hourly rate?

2    A    Yes.

3    Q    Were you required to do anything before you began working

4    for NXIVM?

5    A    Yes, I was required to take the five-day course.

6    Q    Was it called an intensive?

7    A    Yes.

8    Q    And who ran that intensive?

9    A    Nancy ran it.  Nancy Salzman ran it, but there are others

10   that were involved as well.

11   Q    During this first five-day intensive did you ever hear

12   the term suppressive?

13   A    Yes.

14   Q    And how was that term used during the intensive?

15   A    A suppressive, as I understood it, was someone that

16   would -- was ultimately out to hurt you, and -- and it was

17   important to stay away from those folks.

18   Q    During the time you worked for NXIVM, did you take

19   another intensive?

20   A    Yes, an eleven-day intensive.

21   Q    And did that complete the sixteen-day intensive?

22   A    Yes.

23   Q    After you took the five-day and the eleven-day

24   intensives, did you take any additional NXIVM intensives or

25   classes?

SAM      OCR      RMR      CRR      RPR

Loperfido - direct - Lesko                              3365

1    A    No.

2    Q    Why not?

3    A    By then I -- I should -- I really enjoyed the five- and

4    the eleven-day, but by then it was getting to be a little too

5    much.  A little just -- it was like a well that was never

6    ending and it just wasn't to my liking.

7    Q    When you say a well that was never ending, what do you

8    mean?

9    A    I mean there was always something to take.  There was

10   always something to be involved with, and it was all about --

11   speaking personally -- about me and my relationships with

12   people.  For me it was just too much.

13   Q    Were you pressured to take these classes?

14   A    Yes.

15   Q    And you declined it every time?

16   A    Yes.

17   Q    Okay.  And when you worked for NXIVM, did you travel to

18   the Albany region to work for the company?

19   A    Yes.

20   Q    And did you use a laptop computer at that time?

21   A    Yes, sir.

22   Q    Did you bring your laptop computer to Albany when you

23   went there to work for NXIVM?

24   A    Every time.

25   Q    Did you use any particular computer programs in

Loperfido - direct - Lesko                    3366

1  connection with your work for NXIVM?

2  A    I'd use QuickBooks, Microsoft Excel and Microsoft Word.

3  Q    And when you traveled to Albany to work for NXIVM, where

4  would you go?

5  A    I would stay at a hotel not far from there, and then I

6  would go to the New Karner Road location, their -- the

7  headquarters to work there.

8  Q    Is that 455 New Karner Road?

9  A    Yes.

10  Q    Who was your point of contact at NXIVM?

11  A    Kathy Russell.

12  Q    Did she have an office?

13  A    Yes.

14  Q    Did you visit her office?

15  A    Yes.

16  Q    And what was office called?

17  A    It was the accounting office.  It was a small room with

18  two or three people in it, including Kathy, that did the

19  accounting and bookkeeping for the company.

20  Q    Could you explain, when you visited NXIVM's offices could

21  you explain where you actually physically worked when you were

22  there?

23  A    At times I would work in the accounting office, itself.

24  And other times I would work just outside of the accounting

25  office, which was a large social room where you can get coffee

SAM     OCR     RMR     CRR     RPR

Loperfido - direct - Lesko                           3367

1    and -- and light -- light foods.  And -- and those are the two

2    main places.

3    Q    Okay.  And was there a rec room in the --

4    A    That's what I'm talking about, yes, it's a rec room type

5    of place.

6    Q    Did you ever meet in like a therapy-type room?

7    A    Yes.

8    Q    And who met --

9    A    The task force met in a -- in a -- in a therapy-type

10   room.  Those were the first maybe six months or so that I

11   was -- that I was working there.  The task force, Joe O'Hara,

12   Kathy and myself, sometimes Nancy would join us.  I don't

13   believe anybody else did.  I don't remember anybody else

14   anyway.

15

16              (Continuing on the following page.)

17

18

19

20

21

22

23

24

25

Loperfido - direct - Lesko                3368

1   (Continuing)

2   Q    So you worked at various spaces at 455 New Karner Road;

3   right?

4   A    Yes.

5   Q    And you worked on your laptop?

6   A    Most all the time.

7   Q    Okay.  You plug it in, put it on the table, work --

8   A    Yes.

9   Q    -- various locations.

10        Did you ever leave your laptop unattended while you

11   visited and worked at NXIVM?

12   A    Sure, a few times.

13   Q    And explain the circumstances when you would leave the

14   laptop unattended.

15   A    There are times that Kathy would want to leave the --

16   the -- that headquarters.  We'd go for lunch or one time we

17   went for an ice cream cone.  And I think that was it.  And it

18   was maybe four or five times, maybe six times we would do

19   that.

20   Q    Okay.  Was the ice cream cone trip, was that unique?

21   A    It was a bit unique, yes.

22   Q    And strike you as odd?

23   A    Yeah, I was never asked to do that before.

24   Q    Did the laptop have a password?

25   A    I believe it did.

Loperfido - direct - Lesko                    3369

1   Q    Did anyone other than yourself know the password to your

2   laptop computer?

3   A    Not that I'm aware of.

4   Q    Did you give anyone at NXIVM the password to your laptop

5   computer?

6   A    No.

7   Q    While you were working at 455 New Karner Road, did other

8   people enter the office during the day?

9   A    Often, yes.

10  Q    Describe the in-and-out of the office in terms of people

11  coming in.

12  A    Sure.  Some people came in to get paid.  Other people

13  came in to ask questions.  There are people that were actually

14  doing bookkeeping there as well, in and out, on a part-time

15  basis.  So it was a pretty busy place.

16  Q    Okay.  When you visited the office, NXIVM's office

17  between 2004 and 2006 with your laptop computer, did you give

18  anyone at NXIVM permission to place a device on or in your

19  laptop computer?

20  A    Definitely not.

21  Q    Did you observe anyone placing a device in or on your

22  laptop computer during that time period?

23  A    No.

24  Q    Do you know what a key logger is?

25  A    I do now, yes.

Loperfido - direct - Lesko                3370

1   Q    What is a key logger?

2   A    It's something that keeps track of all your keystrokes.

3   Q    Did you give anyone at NXIVM permission to put a key

4   logger in or on your laptop computer at any time?

5   A    No.

6   Q    Do you know if a key logger was placed on your laptop

7   while you were working for NXIVM?

8   A    I was told, yes.

9   Q    Did you know it at the time?

10  A    No.

11  Q    Were you told much later?

12  A    Yes.

13  Q    Did you ever meet with the defendant?

14  A    Yes.

15  Q    Did you ever learn whether or not the defendant made any

16  income?

17  A    No.

18  Q    No, you --

19  A    No, I met with the defendant.  Whether he made income is

20  a debatable issue.

21  Q    How is that debatable?

22  A    The question of whether he, in fact, owned the company or

23  not, was always in question.  While most of the companies were

24  in Nancy's name, it was pretty clear that Keith was running

25  them and making the big decisions.

VB       OCR       CRR

Loperfido - direct - Lesko                    3371

1  Q     Did anyone ever tell you, though, that he actually didn't
2  make income?
3  A     Often.
4  Q     Who told you that?
5  A     Kathy Russell.
6  Q     Did you recall learning about a situation where the
7  defendant lost a lot of money?
8  A     Yes.
9  Q     Who told you that?
10 A     Kathy Russell.
11        MR. AGNIFILO:  I object, hearsay.
12 Q     I just repeat, who told you this?
13        THE COURT:  I'm overruling that.
14        Go ahead.
15 A     Kathy Russell.
16 Q     What did she say?
17 A     She said -- it was part of one of our task force meetings
18 in that Mr. Raniere had been trying to develop an algorithm
19 for commodities trading and he had lost a great deal of money
20 in his effort to learn it and understand it.
21 Q     What sort of -- what was a great deal of money?
22 A     Tens of millions.
23 Q     And do you -- did you learn where the defendant received
24 those millions of dollars that he lost?
25 A     Yes.  From, I believe, Clare Bronfman and possibly her

Loperfido - direct - Lesko                    3372

1    sister as well.  I'm not sure.

2    Q    And who were they?

3    A    They were his -- they were in the NXIVM clan.  They -- I

4    don't know what their role was or -- at that time.  What they

5    were involved with, but they were very involved in NXIVM and

6    especially as it related to money.

7    Q    Do you recall attending a meeting where -- with the

8    defendant and others were where a possible investment was

9    discussed?

10   A    Yes.

11   Q    Who was at that meeting?

12   A    That meeting was all the folks that were the higher

13   command in NXIVM; Kathy Russell, Mr. Raniere, Pam Cafritz,

14   Nancy Salzman.

15            There was, I think a woman by the name of Barb Jeske

16   was there, and a few others.

17   Q    What was discussed?

18   A    It was -- it was -- a fellow was making a presentation

19   regarding an investment in metals.  Gold, I believe.

20   Q    Okay.  Do you recall attending a NXIVM event where you

21   watched a movie?

22   A    Yes.

23   Q    What was that event?

24   A    That was part of the Vanguard Week up in -- north of

25   Lake George.

VB        OCR        CRR

Loperfido - direct - Lesko                    3373

1   Q    Who was the vanguard at NXIVM?

2   A    Mr. Raniere.

3   Q    And at that, was it called V week?

4   A    Yes.

5   Q    At that V week, did you assist in playing that movie?

6   A    Yes, I was a projectionist.

7   Q    Are you involved in the film industry?

8   A    Somewhat, yes.

9   Q    Are you familiar with a term cinephile?

10  A    Yes.

11  Q    What is a cinephile?

12  A    Cinephile is a film enthusiast.

13  Q    Would you consider yourself a cinephile?

14  A    Yes.

15  Q    Okay.  What was the movie that you showed at the NXIVM

16  V Week?

17  A    It was a documentary by a fellow that had believed that

18  it was -- it was -- that it was un-Constitutional to -- that

19  taxes were un-Constitutional.  I'm sorry I'm not explaining

20  that well.

21       And the documentary was about that issue.

22  Q    Okay.  Did that concern you?

23  A    Very much.

24  Q    Did you ask to do anything, based upon your concern?

25  A    I asked if I could -- at the end of movie, once I

Loperfido - direct - Lesko                          3374

1  understood what the film was about, if I could address the

2  audience, and I was worried that the documentary was showing a

3  one-sided slant on this idea of not having to pay taxes

4  because of Constitutional issues.

5  Q    Were you allowed to address the crowd?

6  A    No.

7  Q    Okay.  Did anyone at NXIVM express concerns about people

8  coming after them?

9  A    All the time.

10 Q    Who did that?

11 A    Nancy and -- I had a very short number of people that --

12 that I was in contact with, but Nancy and Kathy.  It was a

13 regular topic.

14 Q    Do you recall any specific people who were allegedly

15 coming after NXIVM?

16 A    There was a fellow by the name of Rick Ross that was of

17 great concern when I was there.

18 Q    Who is Rick Ross, if you know?

19 A    I don't.  I don't recall.

20 Q    Okay.  Anyone else?

21 A    I know there were.  I just can't remember any names.

22 Q    Okay.  Okay.  Did NXIVM pay legal fees --

23 A    Yes.

24 Q    -- to the best of your knowledge?

25        Would you say -- estimate, were they small amounts,

Loperfido - direct - Lesko                    3375

1    large amounts?

2    A     Pretty large amounts.

3    Q     Did these legal expenses have an effect on NXIVM's

4    finances?

5    A     Certainly.  It affected cash flow.  When you have legal

6    costs that are mounting into the millions, it's going to

7    affect the cash flow.

8    Q     Did anyone at NXIVM ask you to move to Albany?

9    A     Yes.

10   Q     Who?

11   A     Nancy Salzman and Kathy Russell.

12   Q     Did you agree to move to Albany?

13   A     No.

14   Q     Why not?

15   A     I didn't want to.  I saw myself as an oversight, a person

16   that was -- that was outside of that NXIVM accounting

17   department.

18          Number two, I didn't -- I had decided I did not want

19   to be involved in the day-to-day life of a Nexian.  And

20   therefore, I didn't want to move.

21   Q     Why didn't you want to be involved with NXIVM?

22   A     It was too much of everything for me.

23   Q     Did you have any concerns?

24   A     Yes.

25   Q     What were your concerns?

Loperfido - direct - Lesko                3376

1   A     My concerns were that they were, at times, inconsistent.

2   They were -- what they preached was this idea of consistency

3   and integrity.  I really liked that.

4           But they did not, in my opinion, often follow that

5   rule.

6   Q     Did you have an impression as to --

7           MR. LESKO:  Strike that.

8   Q     Did you observe how the defendant was viewed within

9   NXIVM?

10  A     Yes.  He was revered.  He was very well respected.

11  Q     At some point, did NXIVM have a conflict with Mr. O'Hara?

12  A     Yes.

13  Q     What was the nature of the conflict?

14  A     By then I can only speak as an observer, but by then,

15  Mr. O'Hara was having problems with his relationship with

16  NXIVM.  He told me he wasn't getting along with Mr. Raniere

17  and he wasn't getting along with Ms. Salzman and he was

18  thinking of leaving.

19          At the same time, he had asked Ms. Salzman to help

20  broker a loan transaction for him.

21  Q     How much was the loan for?

22  A     I believe it was $2 million.

23  Q     And what was it used for?

24  A     For a land development.

25  Q     Was it for a vineyard?

Loperfido - direct - Lesko                3377

1   A    Among other things, yes.

2   Q    And did Mr. O'Hara end up not paying the payments due on

3   that loan?

4   A    It's my understanding that's correct.

5   Q    Okay.  And did Nancy Salzman and Mr. O'Hara -- did Nancy

6   Salzman attempt to broker an arrangement with Mr. O'Hara

7   related to that loan?

8   A    Yes.  My understanding is the agreement was that if Nancy

9   was able to get Mr. O'Hara a $2 million loan, that he would

10  work for NXIVM at no charge.

11  Q    Did he agree to that?

12  A    I believe he did.

13  Q    Okay.  And ultimately there was a dispute?

14  A    Yes.

15  Q    Did anyone associated with NXIVM take any action against

16  Mr. O'Hara?

17  A    The -- the -- yes.  Clare Bronfman, who loaned the money,

18  took action against Mr. O'Hara.

19  Q    What type of action?

20  A    She sued him.

21  Q    And was that in approximately 2006?

22  A    Sounds right.

23  Q    And during this time, were you still visiting and working

24  at NXIVM with your laptop computer?

25  A    Yes.

Loperfido - direct - Lesko                    3378

1    Q    Did this conflict with Mr. O'Hara put you in an awkward
2    position or situation?
3    A    Yes.
4    Q    How so?
5    A    Well, Nancy and Kathy were both pressuring me to walk
6    away from Mr. O'Hara.
7              At first, they were -- they wanted me to actually
8    give them a lot of information about Mr. O'Hara's activities,
9    and which I refused to do, in my own way.  And then they just
10   wanted me to get away from him.
11   Q    Did Nancy Salzman ever say anything negative about
12   Mr. O'Hara?
13   A    Yes.
14   Q    What did she say?
15   A    That Mr. O'Hara was a suppressive, he was dangerous, and
16   that I would be dragged into a lawsuit that I did not want to
17   do.
18   Q    And did you ultimately agree to take sides in this
19   dispute?
20   A    No.
21   Q    Did you participate in depositions as part of a lawsuit
22   against Mr. O'Hara?
23   A    Yes.
24   Q    How many?
25   A    Two.

Loperfido - direct - Lesko                    3379

1    Q    Did anything happen in your office in connection with

2    this lawsuit against Mr. O'Hara?

3    A    The depositions happened in my office.  They were -- they

4    were difficult depositions.  The attorneys for Ms. Bronfman

5    were very strong, very, very difficult.

6    Q    Okay.  Did anything happen with your office computers?

7    A    Yes.  They were -- they received -- were able to get a

8    court order to copy all of the hard drives in my -- in my

9    office to look for information about Mr. O'Hara.

10   Q    Were you concerned that you were going to be sued as a

11   result of this?

12   A    Without a doubt, yes.

13   Q    At some point did your employment with NXIVM get

14   terminated?

15   A    Yes, sir.

16   Q    How did that happen?

17   A    I was asked to sit in a meeting in my office with an

18   attorney for NXIVM.  I believe he was an attorney for a firm

19   called Proskauer Rose.  I agreed to do that.

20        He spent the day with me and I -- they stopped --

21   the next day -- well, while he was there, he told me that he

22   would be -- that NXIVM had agreed to pay my legal fees if I

23   was caught up in the battle with Mr. O'Hara.

24        The next day he called back and said he would not.

25   NXIVM has now declined to pay any legal fees that might

Loperfido - direct - Lesko                    3380

1  develop from -- from what was going on with Mr. O'Hara.  And

2  all ccommunication with NXIVM and all of its -- all the

3  companies I had worked for had stopped --

4  Q    Okay.

5  A    -- on that day.

6  Q    Now, it's late so now we're going to do a speed round

7  through an exhibit.

8           MR. LESKO:  So I'm going to show you what's in

9  evidence.  Your Honor, if we can publish this.  It's in

10  evidence as Government's 1527.  If we could show that on the

11  ELMO.

12           (Exhibit published.)

13           MR. LESKO:  Okay.  Everybody can see that.  1527 in

14  evidence.

15  BY MR. LESKO:

16  Q    I'm going to ask you a few questions about some of the

17  items in this exhibit.

18           Okay.  Let's start with Universal Collectibles.  Do

19  you recognize Universal Collectibles?

20  A    Yes.  It's an auction house I did business with.

21  Q    And was that online?

22  A    Yes, sir.

23  Q    Okay.  Quality Inn, Albany.  Do you recognize that?

24  A    Yes, that's where I stayed when I was visiting NXIVM.

25  Q    ThumperNet.  Do you recall what ThumperNet was?

Loperfido - direct - Lesko                    3381

1   A    My service provider.

2   Q    Cinephile.  Could you have used cinephile as a password

3   at one time?

4   A    I may have.

5   Q    QuickBooks.  Did you use QuickBooks?

6   A    Yes, sir.

7   Q    Disc Care Bulk Products.  Do you recognize that?

8   A    Yes.

9   Q    What's that?

10  A    That's a company that -- that sells IT software and

11  supplies.

12  Q    Okay.  Strategic Government Solutions, do you recognize

13  that name?

14  A    Yes, that's Mr. O'Hara's company.

15  Q    Bank of America.  Do you recognize -- do you bank at Bank

16  of America?

17  A    Credit card.

18        MR. LESKO:  The third page of Government's 1527.

19        (Exhibit published.)

20  Q    Providian, do you recognize that word?

21  A    That's my credit card.  It's now Chase Bank.

22  Q    Abraham, do you recognize that word?

23  A    He was the office manager at Mr. O'Hara's office.  He's

24  also Mr. O'Hara's son.

25  Q    Okay.  Eagle Cove Properties.  Do you recognize that

VB        OCR        CRR

Loperfido - direct - Lesko                    3382

1   name?

2   A    Yes, sir.  That's the company that Mr. O'Hara set up to

3   operate the vineyard that he was planning.

4   Q    That's the company that got the loan from the Bronfmans?

5   A    I think Mr. O'Hara got the loan, but it was a company

6   that Mr. O'Hara set up.  That's what he spent money on.

7   Q    That was funded by the loan proceeds; is it fair to say?

8   A    Yes, sir.

9   Q    Lastly, W.W. Hodkinson, do you recognize that name?

10  A    Yeah, I do.  That is a film -- it's a film-based site.

11  Hodkinson was -- was the founder of Paramount.

12  Q    And you're a fan?

13  A    Yes.

14       MR. LESKO:  No further questions, Your Honor.

15       THE COURT:  About how much do you have?

16       MR. AGNIFILO:  I have more than seven minutes, I

17  know that.

18       THE COURT:  Well, you are going to have to come

19  back, sir.  Wednesday.

20       THE WITNESS:  I see.

21       THE COURT:  I am sorry we could not finish today.

22       THE WITNESS:  Okay.

23       THE COURT:  All right.  We will not go forward then

24  with cross-examination.

25            You may stand down.  You are excused for the day.

Proceedings                                                  3383

1          (Witness excused.)

2          THE COURT:  All right.

3          Members of the Jury, I am going to remind you that

4    it's very important that you follow my instruction and not

5    discuss the case with anyone; not your family, friends or

6    business associates, and not your fellow jurors.

7          In addition, you must not read, listen to, watch or

8    access any accounts of this case on any form of media,

9    newspapers, TV, radio, podcasts, or the Internet, nor research

10   nor seek out information about any aspect of the case.

11         Please do not communicate with anyone about the case

12   on your phone, whether it's through e-mail, text messaging or

13   any other means, through any blog or website or by way of any

14   social media, including Facebook, Twitter, Instagram, YouTube

15   or other similar sites.

16         You must not consider anything you may have read or

17   heard about this case outside of this courtroom, whether you

18   read it before or during jury selection or trial.

19         Do not visit any of the locations identified during

20   the course of jury selection or trial.

21         We are adjourning now until next Wednesday at

22   9:30 a.m.  And for those of you who are celebrating the

23   religious holiday, we all wish you the very best on your

24   celebration.

25         All rise for the jury.

Proceedings                                                      3384

1              THE COURTROOM DEPUTY:  All rise.

2              (Jury exits.)

3              (In open court; outside the presence of the jury.)

4              THE COURT:  Anything further for today?

5              MS. PENZA:  No, Your Honor.

6              MR. AGNIFILO:  Nothing from us, Your Honor.

7              THE COURT:  All right.  Have a good weekend.

8              See you on -- well, we may see you Tuesday afternoon

9     at 2:30.

10             MR. AGNIFILO:  Okay.

11             THE COURT:  We will be in touch with your offices.

12             MR. AGNIFILO:  Very good.  Thank you, Judge.

13             MS. PENZA:  Thank you, Your Honor.

14             MR. AGNIFILO:  Oh, Your Honor, I'm not sure, would

15    that affect the order to produce timing?  I guess we would

16    have to do it early enough -- this is more a question for the

17    Government, Your Honor, I apologize.

18             It's about producing the defendant, depending on

19    when we know we're going to go forward on Monday.  We will

20    work it out.

21             THE COURT:  Okay.  Thank you.

22             Thank you very much.

23             (Matter adjourned to Wednesday, June 5th, 2019 at

24    9:30 a.m.)

25                           oooOooo

3385

1                        I N D E X

2    WITNESSES:

3        DANIELA

4            CROSS-EXAMINATION BY MR. AGNIFILO (Cont'd)   3150

5            REDIRECT EXAMINATION BY MS. PENZA           3279

6        ELIZABETH A. BUTLER

7            DIRECT EXAMINATION BY MS. PENZA             3283

8            CROSS-EXAMINATION BY MS. GERAGOS            3323

9        SHEILA JELONEK

10           DIRECT EXAMINATION BY MS. HAJJAR            3329

11       JAMES LOPERFIDO

12           DIRECT EXAMINATION BY MR. LESKO             3356

13

14                        EXHIBITS:

15           Government's Exhibits 539 and 540      3305
             Government Exhibit 1199-A              3332
16           Government Exhibit 1101                3334
             government Exhibit 1102                3345
17           Government's Exhibits 1103 through     3349
             1107, and 1106-A and 1106-B
18
             Defendant's Exhibit 641                3232
19           Defendant's Exhibit 642                3235
             Defendant's Exhibit 621                3236
20           Defendant's Exhibit 622                3238
             Defendant's Exhibit 644                3240
21           Defendant's Exhibit 665                3242
             Defendant's Exhibit 645                3243
22           Defendant's Exhibit 628                3250
             Defendants' Exhibit 620                3229
23

24

25                    *     *     *     *


              CMH      OCR      RMR      CRR      FCRR