# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

## 18-cr-204 (NGG)

---

## UNITED STATES OF AMERICA

### -against-

## KEITH RANIERE,

### Defendant.

---

## SENTENCING MEMORANDUM ON
## BEHALF OF KEITH RANIERE

**BRAFMAN & ASSOCIATES, P.C.**
*Attorney for Defendant*
*Keith Raniere*
767 Third Avenue
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

MARC A. AGNIFILO
*Of Counsel*

**DEROHANNESIAN &
DEROHANNESIAN**
677 Broadway – Ste. 707
Albany, NY 12207
Tel: (518) 465-6420
Fax: (518) 427-0614

PAUL DEROHANNESIAN II
*Of Counsel*

1.    <u>Introduction</u>

Keith Raniere continues to assert his complete innocence to these charges.  He does, of course, recognize that a jury convicted him of very serious crimes, ironically crimes that he and others in NXIVM have been seeking to prevent others from committing for many years.  The jury's verdict, however, did not reflect the quality of the evidence, but rather was a product of a media campaign involving witnesses who were motivated to testify falsely, a heavy-handed prosecution that threatened potential defense witnesses and, most respectfully, an unfair trial where, we believe, the Court was not provided with full, candid information from the prosecution.  Therefore, Mr. Raniere objects to this Court moving this matter on to sentencing because of these significant violations of his due process rights, as well as perjury by critical witnesses[1] and threatening actions taken by the Government toward potential defense witnesses,[2] events that individually and in combination defeated his right to a fair trial.  For the reasons set forth on the record before and during the trial, including in the several mistrial motions and in the Rule 33 motion filed since the verdict, Mr. Raniere respectfully maintains that his trial was fundamentally unfair and in violation of the rights assured to him and to all defendants by the U.S. Constitution, and that he should be granted a new trial now due to the accumulation of prejudicial errors and due process violations, including those coming to light since the verdict, which in totality mandate the setting aside of the verdict and the awarding of a new trial, at a minimum.

---

[1] We recognize that the Court has now denied the Rule 33 motion for a new trial alleging that due to the post-verdict filing of a sweeping civil lawsuit with a number of prosecution witnesses as anonymous plaintiffs, that the trial witnesses denying their involvement in precisely such a lawsuit constituted perjury.

[2] We will submit further briefing regarding this point—alleging that the prosecution systemically threatened and intimidated potential defense witnesses so as to violate Raniere's Due Process rights.

Mr. Raniere not only maintains his innocence, he stands by ESP, NXIVM, DOS and all of the projects, curriculum and teachings to which he and many others have devoted their lives. He remains proud to have played a role in helping people achieve greater happiness and better lives. He remains proud to have been permitted to play a part in helping citizens and residents of Mexico strive to bring peace to a country beset by violent gangs, kidnappings and murders, a struggle that continues to the present and that will continue into the future. He also remains proud that he and others helped people with Tourette's syndrome to be able to minimize or eliminate the symptoms of this difficult condition. Simply put, he remains proud of his life's work. He also remains determined to fight this case, which he views as a terrible injustice and, respectfully, an affront to what should be one of the great systems of Justice to ever exist.

Mr. Raniere recognizes that on the very day that judgment will be caste upon him, he may be better-served to be contrite, and that his best hope for a sentence that permits him to one day walk the earth as a free man is for him to say he is sorry for all that he has done. The truth is that he is mindful of all the people that have been hurt by this process, and he experiences deep pain at the plight of the many good, innocent people hurt by the events of the last 30 months. He maintains that he did not harm anyone intentionally, yet he has seen how a once wonderful, loving, close-knit community of people genuinely motivated to bring about positive change in the world has been destroyed by a handful of people who have lied to newspapers, media outlets, prosecutors and juries, and have caused others to lie as well. To the extent that Mr. Raniere brought about a community of people that was vulnerable to such destruction, he is deeply sorry that he participated in this. This is not what he intended, but he is mindful of the people he has let down. He is mindful of the people whose lives have been upended by the events depicted at the trial. However, he is not sorry for the way in which he lived his life. He is not sorry for his

2

conduct or his choices. Rather, he maintains that he has lived mindfully and carefully and that he has made deliberate choices, often with the input of others, and that even on the day of judgment, he stands by the life he has chosen to live.

Indeed, the events of the last three years prove a point he has been making for over two decades. The institutions of society are not necessarily fair or good. Rather, they are fallible and try as they might to be the best versions of themselves, they do not always live up to the ideals that created them. None of this is new; indeed, our country was founded on this premise. Nonetheless, many of the worst offenses perpetrated on innocent people have been in the name of law and justice. Moreover, many of these transgressions were inspired by an inability to tolerate differences in people. As humans, we cling to beliefs that we think are necessary to order society, but these serve as limitations. When we see people living in a way that is at odds with our conceptions of how an ordered society should be, there have always been elements in every society that will eliminate the people challenging the social order. It is well-known that Raniere has read the author Ayn Rand, who in the Fountainhead wrote, "Throughout the centuries there were men who took first steps down new roads, armed with nothing but their own vision. Their goals differed, but they all had this in common: that the step was first, the road new, the vision unborrowed, and the response they received – hatred." This is so, perhaps even especially so, where, as here, the people challenging the social order are non-violent and are motivated by peace and humanity.

Keith Raniere maintains his innocence. Indeed, everything he has done since the moment of his conviction is consistent with his firmly-held belief that he is innocent, and with the anticipation that he, his life's work and the life's work of many others will one day be freed from the tyranny of the destructive forces showcased over the last several years. The prosecution, in

its sentencing memorandum, has criticized Mr. Raniere for not showing remorse. But this is because he believes he is innocent and so he has acted as an innocent man acts when he has been falsely-convicted. He has sought to create a podcast to increase awareness about his case because he is innocent. He has expressed frustration with the justice system and with certain people who work within it at times because he is an innocent man in prison. He has tried to get his message out to the world because he is innocent. He is an innocent man and for the last 30 months during which he has been held in jail against his will, he has acted precisely how an innocent man would act, shouting from every rooftop every waking hour that the system has wrongfully convicted him.

Moreover, because he maintains his innocence and because he believes he has been wrongly convicted, he feels a sense of duty to others similarly situated to speak out against injustice and about the tactics used by the prosecution, which he views as unfair and inconsistent with the duty of the sovereign in the discharge of its obligation to the people it serves. He is mindful of the fact that relative to others in the criminal justice system, he is one of the lucky ones, lucky to have been able to hire private counsel and lucky to have media interest in his case. Few defendants have access to these things. Nonetheless, he was subjected to the same unfairness and wrongful practices as are many defendants. As a result, he is compelled to address this unfairness directly as a way of bringing attention to these essential issues that impact so many people, many of whom are innocent.

In regard to his five co-defendants, Mr. Raniere's position is that each of them believed in him, trusted him and followed him and that they are no more blameworthy than are the 18,000 others who took NXIVM courses over 22 years. Mr. Raniere is not looking to be a martyr. In fact, he wants to be released from jail as soon as possible and believes he deserves to be released.

However, he recognizes that he was the leader of a community, and that the members of his community looked up to him and trusted in his motives and his good-will. If he acted recklessly while attempting to push people to be better versions of themselves (a notion that always concerned him but which he does not believe), no one else is as responsible as him. He understands that the Court may not want to hear his opinions on matters that are firmly within the sole discretion of the Court, but he also wants it said publicly that his co-defendants should not go to jail. If anyone is to be punished for his or her actions, that person should be Mr. Raniere alone.

The trial evidence shows that the NXIVM community was based primarily on trust and a belief that everything that was done, especially those things that were difficult, was for a higher purpose. Raniere trusted that others in the community would see his motives as genuine and pure because over the course of 22 years, he endeavored to earn that trust. Others in the community trusted that when Raniere or another person asked them to perform challenging tasks, that this was being done to help them and not for some darker reason. The evidence shows that a small group of people, motivated by their own personal circumstances, successfully poisoned the trust that hundreds if not thousands of people had developed over two decades. They did this by lying to others and claiming they knew things they did not in fact know. They did this by enrolling bloggers who threatened to publicize personal facts about people unless they joined the anti-NXIVM side.  They did this by lying to the <u>New York Times</u>, specifically that a woman was held down and branded against her will (when in fact she absolutely knew about the branding weeks ahead of time and that she actively told others she wanted to be branded) and causing a media firestorm based on false information. They did this by telling the mother of a young woman that her daughter was in grave danger when the daughter was living her life in peaceful

anonymity. They waged a campaign of hate and falsehood with the goal of burning down everything in its path. They joined forces with a federal prosecutor who, rather than seeking out the truth, quickly took the side of the Anti-NXIVM group. It must be remembered that this "case" was initially referred to the U.S. Attorney for the Northern District of New York (the District in which all of the relevant conduct took place) and a highly experienced AUSA in that office as well as the FBI in that area concluded that no crimes had occurred. However, in Brooklyn, a District in which none of the challenged conduct took place, the anti-NXIVM group found an ally. Potential defense witnesses were threatened with prosecution if they dared to testify in a manner inconsistent with the Government's theory. Ultimately, this combination led to the wholesale destruction of something that each of these people once loved: the very community they each helped nurture and create.

This complex situation of personal motives, individual regrets and life-choices has no place in a federal courtroom. Yet, the Government seeks a life sentence for Keith Raniere in a case that has no guns, no knives and no force. No one was shot, stabbed, punched, kicked, slapped or even yelled at. Despite the sex offenses, there is no evidence that any woman ever told Keith Raniere that she did not want to kiss him, touch him, hold his hand or have sex with him. On the contrary, the women who testified stated that they expressed to Raniere only that their intimate contact was altogether welcome and consensual. For instance, neither Sylvie nor Nicole ever stated or even suggested to Raniere that they did not want to be intimate with him.

Every single person making the decision to get branded or not get branded, to join DOS or not to join DOS, to write book reports or not, to participate in Pam Cafritz's memorial or not, or to make any one of a thousand other decisions was a free-thinking adult. Not only were they adults, they were adults of considerable means, success and options. Many of them had already

achieved some measure of success in their professional lives yet they viewed their lives as having insufficient meaning and content. Many wanted to have closer relationships with their parents, children, friends and colleagues. Many wanted clearer conceptions of what their purpose might be, who they really were and how they should devote their time and energies to this one life they have been given. They were successful people who specifically wanted to be pushed, to be challenged, to be inspired to do things differently than they had done. They joined NXIVM or DOS because they wanted to overcome fears and limitations and because they firmly believed that this was the best thing for them. The Government has no place in the realm of personal choices made by adults concerning these sorts of essential, private matters over how each person decides to live his or her life. Similarly, the Government should not transform regret over one's choices into federal crimes, much less seek a life sentence for them.

Keith Raniere will appear in Court at his sentencing hearing not as a man seeking forgiveness from the Court or the Justice System, but as one who will to his last breath defend the community and the ideals he created against the destructive forces that have for the moment burned them to the ground. He will also stand against unfairness in the criminal justice process for all people. Finally, he intends to fight this case with all of his might, confident that he will one day be vindicated.

    2.    <u>Childhood</u>

Keith Raniere was born in Brooklyn on August 26, 1960. His father, James Raniere,[3] was a successful advertising executive who often travelled and was away from the home. His mother, Vera Oschypko, was a beautiful, graceful woman who was a professional ballroom

---

[3] James Raniere died this Spring. Because of Raniere's incarceration, the two had not spoken and were unable to acknowledge the father's illness or his passing.

dancer and dance instructor. The small family did not have much money or material possessions. When Raniere was about six years old, the family moved from Brooklyn to Suffern, New York, in Rockland County.

About two years after moving, when Raniere was about eight years old, his parents separated and later divorced. In the years prior to the separation, the young Raniere recalls his parents arguing a great deal. It was apparent to Raniere that his frail family was about to fracture. Like many young children facing the prospect of divorced parents, he thought deeply about whether there was anything he could do to stop his parents from arguing and prevent his family from ending. Without brothers, sisters or a close extended family, the notion that his three-member family would cease to exist caused Raniere unrelenting sadness. After his father left the home, Raniere would typically see him a couple of times a week. Raniere's father took him to martial arts lessons and was as present in his life as possible. In the years following the separation, the father had begun a new relationship with a woman named Sydney Delisio, one that would extend to until the father's death. While Raniere's father made efforts to remain in his life despite the divorce, even at ten years of age, Raniere could see that his mother, who suffered from serious heart disease, would be the primary source of support, comfort and love.

About three years later, when Raniere was thirteen years old, his mother's heart condition grew worse and she had open heart surgery. In a sense, neither Raniere nor his mother ever recovered from the surgery. At thirteen years of age, Raniere confronted a reality where his mother could die at any moment, leaving him alone in the world.

For almost five years, Raniere spent a great deal of his time caring for his mother. He made sure she kept her medical appointments and urged her to take care of herself. But, he could see she was not taking care of herself. She was drinking heavily and slowly giving in to the

loneliness and sorrow she was evidently feeling all the time. But, he stuck by her, faithfully. Watching his mother, once a graceful dancer, experiencing such sorrow had a deep impact on the young Raniere.

During his High School years, with the exception of going to school, Raniere spent a great deal of time at home. He did not pursue friendships, he did not travel often, he did not have many of the carefree pleasures some children find in childhood. Rather, he was devoted to his sad, lonely mother, whom he knew was dying.

On many occasions during Raniere's adult life, he discussed what his life was like as a boy, caring for his mother, knowing all the while he might soon lose her. He discussed wanting to be a hero because a hero would save his mother, a hero would somehow transcend the self-evident reality around him and change it for the better. He would also discuss later in life how people who turned out to be heroes did not see their lives as great or special in the midst of the struggle but only saw this much later. Perhaps because of the difficult circumstances he was in, Raniere had something of a realization at a young age: that he could deliberately and mindfully make a choice to be a good, caring, considerate person at each moment for the rest of his life regardless of the hardships. He realized at twelve years old that the desire and ability to change reality for the better - in a sense, being a hero - was a matter of character, choices and practice. By developing and exhibiting this character, he could stand up to the reality that was pressing in on him. He started this discipline by committing himself to not harming animals or eating meat and to avoid being materialistic.

Despite his difficult circumstances at home, Raniere excelled academically in High School. He completed ninth grade at Suffern High School, transferred to the Rockland County Day School for tenth and eleventh grades, but left High School a year early. As stated in a letter

dated June 30, 1977 from the Headmaster of Rockland County Day School, Raniere was a "brilliant student of mathematics and science and certainly an adequate student of the humanities." As further reflected in the Presentence Investigation Report (PSIR), the letter from the Headmaster further indicates that Raniere applied for early college admission and adds that Raniere was "probably as well prepared for college academically, socially and emotionally" as any of the high school seniors." The letter goes so far as to state that Raniere had "outgrown all the school's learnings in math and science."

At the age of seventeen, and having misgivings over leaving his mother, he started at Rensselaer Polytechnic Institute ("RPI") in Troy, New York in August of 1977, pursuing a demanding course of study including many high level math and science classes. He returned home the following summer. Raniere was to return to RPI for his Sophomore year on Sunday, August 27, 1978. The previous day, Saturday, August 26, 1978, was Raniere's 18th birthday. For his birthday that year, he had a celebration for his mother, giving thanks to her for what she endured and for giving Raniere the opportunities he had. As he would say later in life, it was one of the times he saw beyond the day-to-day struggles and attained a perspective befitting the tireless effort his mother devoted to their lives together. The tradition of using the occasion of Raniere's birthday to take time to celebrate the efforts of others as well as the beauty and opportunity that life has presented continued throughout his adult life. At some point, after NXIVM was created, it became known as V-Week. As much as the Government tried to make V-Week a megalomaniacal party for Raniere, it was in truth a beloved, annual, end-of-summer celebration of all the people who made our lives possible and wonderful. It celebrated not only Raniere's birthday but those of everyone whose birthdays fall within the period of the celebration.

As it turns out, Raniere's celebration on his 18th Birthday for his mother would be the last time he would see her alive in their home. On December 13, 1978, the week before Fall Semester final exams, Raniere's mother died.

3.     <u>Consumers Buyline</u>

In 1990, Raniere started a business called Consumers' Buyline, which sold groceries and consumer goods at a discount to people who became members of the organization. The premise was that through membership in the entity, a person could acquire the buying power of hundreds or thousands of people and command better prices for household items. In addition, the company served as a sort of agent for the consumer, putting the consumer more on par with the large corporation selling the goods. The idea, in a nutshell, was that whenever a consumer enters a Walmart or a Target, the consumer is at the mercy of a large corporation's pricing structure as well as other protocols designed to benefit the corporation at the expense of the consumer. Consumers' Buyline was created to level the playing field, giving consumer's greater leverage, which in turn led to lower prices and the availability of consumer goods that better met their needs.

However, by standing up to some of the largest corporations in the United States, Consumers' Buyline ruffled feathers and disrupted the hold these corporations had on the American consumer. This resulted in investigations by several government entities, the expense of which served to strain the company economically. Significantly, however, there has never been a factual finding by any court that the company engaged in fraudulent conduct of any sort. Nonetheless, due to the investigations, the company was being run out of business by the large corporations whose unfettered control over the consumer was being challenged.

On September 3, 1996, Raniere, Karen Unterreiner and Pamela Cafritz, each of whom had executive positions with the company, entered into a Consent Order and Judgment with the New York State Attorney General, stipulating that the representatives of Consumers' Buyline deny improper conduct and that no finding had been made of any such conduct, and that Consumers' Buyline will pay the Attorney General $40,000 to resolve all claims. Similar settlements were made with other states. However, not only has there never been a finding of fraud, on those occasions where a court was asked to pass on the merits, there has never been a factual finding adverse to the company.

To this extent, where the Pre-Sentence Investigation Report falsely states that Consumers' Buyline was shut down because of fraud, this is simply not true. There was never a finding of fraud nor an admission by anyone associated with the company that a fraud or other crime took place. Rather, the company agreed to modest fines and to cease conducting business in a number of states as a way of ending expensive civil litigation. Ultimately, the company sold its book of business, paid its creditors and was administratively dissolved.

4.     Raniere's Personal Life

Unfortunately, a great deal of the Government's evidence, and seeming ire, relates to Raniere's personal life. Through a series of legal slights of hand, mostly related to encouraging the Court to adopt an errant and prejudicial jury instruction on commercial sex, objected to by defense counsel, and then focusing the jury on the errant instruction during summation, the Government managed to  transform lawful, consensual, intimate relationships among adults into sex trafficking and racketeering.

Raniere has never been married. Instead, throughout his adult life, he has maintained several long-term intimate relationships with different women. As the evidence reflects, in regard

to several of these women, Raniere has made a lifetime commitment, meaning that for the entirety of his life, he is committed to being with this person. Some of these intimate relationships involve a sexual connection between Raniere and the woman, and some do not. As Lauren Salzman explained, she and Raniere had a lifetime relationship, but at some point, the sexual component of that lifetime relationship stopped or, as she described it, was put on hold. But the commitment continued, even as she testified against him at the trial.

Some of these intimate, sexual relationships involve consensual encounters with more than one woman at a time, and some do not. The Government time and again focused the jury on occasions where Raniere would be with more than one woman at the same time. Other than to prejudice him in the eyes of the jury, there is simply no relevance to these activities, which are both completely legal and, in this case, pursued by consenting adults. Some of the relationships that start off sexual change to intimate, but non-sexual relationships, while others remain sexual in nature throughout. A few of the women Raniere has been with were interested in pursuing types of sexual practices or roleplaying involving bondage, discipline, dominance and submission ("BDSM"), but most were not. While the Government was quick to claim that these sexual relationships with adult women were deviant and not in keeping with its notions of decorum, the evidence of actual sexual contact in this case involved grown women who consented to have intimate relations with Mr. Raniere.

As the trial testimony showed, each woman starting an intimate relationship with Raniere was fully aware that he had multiple intimate partners, and that he always did and presumably always would. Yet, despite knowing this, each woman commencing such a relationship did so knowingly, voluntarily and eagerly.

The Government focused on a handful of Raniere's female partners, asserting that because they were intimate with him, they are therefore members of an "inner circle" and, as alleged, members of the charged enterprise. Since 1977, Raniere has been in a relationship with Karen Unterreiner, a woman whom Raniere met in college. This relationship, from Raniere's perspective, continues to the present, though Raniere's incarceration has made this difficult. From 1990 through 2014, Raniere was in a relationship with Barbara Jeske, who passed away from brain cancer.

From about 1990 until 2014, Raniere was in a relationship with Kristin Keeffe. On October 5, 2006, Ms. Keefe gave birth to their son. In 2014, Ms. Keefe and their son left the community. Following their departure of Ms. Keefe and their son, Raniere spent a great deal of time, energy and money searching for them. At one point, he found them living in Florida, and for a while, paid their rent so that they could live in a decent home befitting a mother and son.

From 1990 through about 2000, Raniere was in a relationship with Toni Natalie. Natalie has made outlandish claims against Raniere including in a book she has recently written entitled "The Program: Inside the Mind of Keith Raniere and the Rise and Fall of NXIVM." Mr. Raniere hopes she has profited from their life together.

From 1990 through the time of her death in 2016 from cancer, Raniere was in a relationship with Pam Cafritz. Several witnesses testified that Raniere's relationship with Pam Cafritz was perhaps the most significant of his life. The trial evidence focused on a memorial service for Ms. Cafritz, who was a beloved and missed member of the community and a friend to virtually everyone. Aspects of the forced labor charges amazingly relate to the efforts, performed by many, to make the memorial service special and befitting who Pam was to each of the people participating in the memorial.

As the evidence made clear, over a period of only a few years, Raniere lost the companionship of several of his closest lifetime partners: Ms. Keefe, who left with their son in 2014; Barbara Jeske who died of cancer in the same year; and Pam who was diagnosed with cancer in 2014 and passed away two years later. Just as he lost his mother at a young age after a long difficult illness, Raniere experienced the same thing later in life as one by one, his closest female companions left him in different ways, several after painful, protracted illnesses.

     5.     <u>DOS Was Not Created for the Purposes of Sex</u>

At the time that DOS was created in 2015, Raniere had been in intimate relationships with six of the eight first-line DOS members, many of them for many years. He certainly did not need DOS to have sex partners. As his personal history to this point made clear, there were many women who took an interest in Raniere in various ways, including wanting to pursue an intimate relationship.

Moreover, membership as a first-line DOS member did not necessarily entail having such a relationship with Raniere. Rosa Laura Junco was a first-line DOS member and the evidence is uncontroverted that Raniere was not in a sexual relationship at any time with her. Indeed, of the first-line members, the only person who started a sexual relationship with Raniere <u>after</u> the creation of DOS was Allison Mack. As will be discussed below, Ms. Mack had her own reasons for pursuing this relationship as a way of her achieving certain goals that were unique and private to her. Therefore, the notion that Raniere created DOS to have sex partners is flatly contradicted by the actual evidence as well as by common sense. Moreover, the disingenuousness of the Government's position that DOS was for the purpose of rendering sex partners is demonstrated by several things.

First, it is significant that this prosecution was in no way initiated by someone who once had an intimate relationship with Keith Raniere. If the Government is right and DOS was created to have sex with unsuspecting women, one would expect that at least one such woman would be the person to blow the whistle on such widespread, clearly illegal conduct. However, this never happened. Rather, as the trial evidence showed, this prosecution was initiated by Mark Vicente and Sarah,[4] whose Vancouver Center was failing economically and who, partly because of their own relationships, wanted to leave NXIVM. While each of them made allegations that DOS was created for purposes of sex, the evidence is uncontroverted that Raniere never had, tried to have, or made any overture whatsoever to have, any physical relationship with Sarah. So, when Sarah tells the world that DOS was created for Raniere to have sex, this report, bold and untrue as it is, is not based on first-hand information. Ironically, Sarah's own report is proven untrue by the fact that she herself was in DOS and never had sex with Raniere. Yet, it was a sufficiently incendiary allegation that it started to turn people against Raniere and led to a wild media campaign based on fundamentally false information.

Second, Jay, Nicole and Sylvie, each of whom testified, expressed uniformly positive and loving sentiments in the form of emails, text messages, handwritten notes and letters to Raniere and others about their experiences in DOS and with Raniere himself. This is so even after the events they testified to at trial that they now characterize as crimes. It simply doesn't make sense that if these women were victims of unwanted predation by Raniere that they would say the specific things they said in the days, weeks and months after. By this point, we are all familiar

---

[4] While the Court directed counsel to refer to her as Sarah in order to protect her anonymity as "a victim," this same person appears prominently under her full name and likeness every Sunday night at 10 pm on HBO's "The Vow." She also appeared under her full name and likeness previously on the front page of the <u>New York Times</u>, as well as in countless other media appearances.

with the complex psychological consequences that people go through when they are the survivors of sexual predation and assault. There are certainly times when a crime victim falsely says positive things about a person who assaulted him or her. However, there are also times where there was no assault and where the person is saying positive things because that is what the person actually believes at the time. The defense maintains that the evidence shows that the statements of Jay, Nicole and Sylvie that are positive and loving toward Raniere are genuine and authentic statements of their belief at the time they made these statements. Therefore, the question becomes why did they change? Why did they go from viewing Raniere positively and lovingly to testifying at the trial that while they expressed consent to Raniere, they only did so because they were worried about their collateral being released? This brings us to the third reason.

Third, several of the women testifying against Raniere were pressured, coerced and otherwise convinced to testify that what happened to them with Raniere was without their consent. For example, Nicole was threatened, according to her own testimony, by Frank Parlato and the prospect of Parlato releasing her name and even her collateral, which he claimed to have, to the public solely because she was seen as a NXIVM sympathizer. The reason Parlato felt the need to threaten Nicole with the release of her collateral is because Nicole had no intent, if left to her own volition, to report anything to law enforcement. It was not until she was threatened by a blogger with the ability to widely publicize whatever information he saw fit that she for the first time spoke with law enforcement. By the time she spoke with the FBI, her account had been heavily influenced by several people.  She was solicited by Mark Vicente and Sarah (whom we now know to be her co-plaintiffs in the civil action against Raniere and others). She met with India's mother at a location in lower Manhattan and she was exposed to a battery of

psychologists and cult deprogrammers all lined up to "help" her appreciate that she was victimized by Raniere and Allison Mack and others. This resulted in Nicole developing a narrative of events that is completely at odds with a wealth of written material from her time in DOS.

In regard to India, Mark Vicente testified to his efforts to bring India from being a NXIVM sympathizer to an NXIVM opponent, including appearing at her family's home in California and yelling at her, and then appearing at her place of business in Brooklyn with a movie camera and crew. If these women had truly been subjected to unwanted sexual advances by Raniere, no one would have had to go to such lengths to coopt them to the anti-NXIVM side.

Fourth, the Government divided the world of DOS members into two types: the perpetrators and the victims. However, this division proved to be entirely artificial and false, precisely because the truth is there were no victims and no perpetrators. For instance, in the original complaint that led to Raniere being abducted in Mexico, India was co-conspirator number 2. This is because at the time, she refused to align herself with the "camp" led by Vicente and Sarah. However, the pressure campaign instituted against her apparently worked, at least to a certain extent, and she at one point abandoned the pro-NXIVM "camp." When she stopped being seen as a NXIVM supporter and became a NXIVM detractor, at least in part, her status in the case magically changed, even though there were no new facts developed, and she became a victim. This dynamic - that if a person actively renounces Raniere and NXIVM, the Justice Department would view that person as a victim - was well known to all potential witnesses and was used strategically by the prosecution to gather witnesses.

The trial evidence failed to show that DOS was created for the purposes of sex. Indeed, this was never something passed upon by the jury. So, even at this stage, there has been no

affirmative finding that Raniere created DOS for the purposes of sex. Rather, as shown below, DOS was a natural, if somewhat more intense, outgrowth of NXIVM teachings that were familiar to many. This is not to say that DOS was known to anyone not in DOS. The evidence was very clear that DOS was a secret organization and was only known to its members and to Raniere. However, the precepts of DOS were familiar, as discussed further below.

      6.      <u>The Business of ESP and NXIVM</u>

Before examining the teachings of ESP and NXIVM, there are several issues to be addressed as the Presentence Investigation Report contains information about ESP and NXIVM that requires correction. Specifically, the report states that "Nxivm operated largely in secrecy." (¶ 31). This is, most respectfully, not true. Nxivm was a thriving, well-advertised business with offices and websites and all the components of a going concern very much open to the public and looking for new members. However, like many businesses that develop and maintain intellectual property, the business had a policy that people could not steal or misappropriate the intellectual property. This policy was reflected in non-disclosure agreements. As described further below, Nxivm developed what it believed to be valuable and novel curricula that was the life-blood of the company. As was made clear in the trial evidence, the curriculum, lessons, forums, modules and all the intellectual content of NXIVM and ESP were created by Keith Raniere. It was largely this intellectual property that people were paying for when they signed up for classes. Accordingly, students receiving this material agreed to not use it inconsistent with its purpose. However, just as the Google algorithm, the secret spices used by Kentucky Fried Chicken and the recipe for Coca-Cola are secret, those companies, just like NXIVM, are very much public and subject to scrutiny.

The report errantly states that "members were recruited via promise of payments or services for enrolling others into the scheme." This is inaccurate and misleading. As an initial matter, members were not recruited via promise of payment or services for enrolling others. Rather, people took NXIVM curriculum on their own for the same reasons people join other human potential organizations. What's more, the approach developed by Raniere and others in ESP and NXIVM was novel and highly effective. The testimony of every witness, even those highly negative toward Raniere and NXIVM, was that the curriculum was potent and brought about positive changes in people. Moreover, to the extent that the report uses the word "scheme" in connection with the NXIVM teachings, there is no evidence in the record or anywhere else that students did not get their money's worth from the programs. To the contrary, the record is consistent that people taking the programs were impressed and satisfied with their results.

7.    The Intellectual Content of ESP and NXIVM

In 1998, Raniere helped create Executive Success Programs (ESP), a series of intense, demanding workshops designed to actualize each person's full potential. The focus of the program was to allow people who believe they are hampered in the way they think, react, and make decisions to eliminate whatever is holding them back. A premise of the program is that people learn how to react to stimuli and to make decisions when they are children. However, the perception, intelligence and experience of a child are very different than those of an adult. Nonetheless, we bring into adulthood many of the same thought patterns, reactions and decision-making-tendencies that we developed as children, ones that we never revisited to update and change as we grew. The idea behind ESP, and later NXIVM, was to revisit those thought processes and, where appropriate, to update them to better reflect who we are as adults, rather than who we once were as children.

As part of ESP, Raniere created something called Rational Inquiry, the premise of which is that the more consistent a person is in their thinking, the happier and more successful the person will be. Rational Inquiry is the vehicle that allows us to revisit the beliefs and mental processes we formed in childhood, to essentially dissemble them, and then to reassemble them consonant with adult life and experience. At the most elemental level, the theory is that people develop fears, limitations and reactions to certain events that serve as triggers and that these fears, limitations and reactions are non-rational and based on a sort of conditioning that is then reinforced as we continue in this mindset. The challenge is how do we focus on the triggering event and come to realize that we are free to react to it any way we want, and not only in the way we have been conditioned.

One of the differences between childhood and adulthood, which should be reflected in how a person reacts to a situation or makes decisions, is that adults tend to have clearer conceptions of their place in the world and are more stable and grounded than are children, who are still growing and changing, and therefore less certain of who they are and where they fit in. Accordingly, one of the goals of the ESP or NXIVM program is to help each person develop the clear, honest knowledge and awareness of one's place and value in the world. Another goal is to acknowledge one's own responsibility for the way one reacts to a situation. As a person develops an awareness of her place in the world, refines her reactions and thought processes consistent with that awareness, and embraces the responsibility for her reactions, that person becomes more ethical. By being more ethical, more consistent and more responsible for one's own actions and reactions, one will also be more joyful.

However, ESP and NXIVM were not just looking to help each person improve in these areas. They also sought to make a better, kinder, more ethical world. The idea was that as each

person made herself more ethical, that person should likewise endeavor to similarly influence those around her. The teachings were that as society came to be increasingly controlled by ethical people, who were free from envy, greed and insecurity, the world would become more peaceful and generous. Poverty, wars, killing and the other ways in which people were inhumane to each other would all be reduced. Ghandi famously said, "it is possible to live in peace." Raniere and the others of NXIVM were helping people live up to that ideal.

Just as the twelve-year-old Keith Raniere was determined to stand up to the reality that he would lose his mother, the adult Keith Raniere devoted his life to creating a community that could bring peace and joy to a world so full of violence, grief and unhappiness.

8.      ESP and NXIVM in Practice

While the goals of ESP and NXIVM are admittedly lofty, and while achieving those goals requires an immense amount of work, in the estimation of countless people, these goals were met. On or before October 9, 2020, pursuant to the Court's scheduling order, the defense will be submitting letters from people who experienced first-hand the NXIVM curriculum and whose lives were improved as a result. As but a few examples of the letters we expect to submit, Jim Del Negro, a mechanical engineer working in the insurance business, will advise that he was introduced to Executive Success Programs at a one-day seminar hosted by the Saratoga Springs, NY Chamber of Commerce back in 2002 and that he experienced a profound deepening in his understanding of morality and ethics in the seminar and how these values would help him in his life. He will explain that Raniere's teachings helped him develop greater empathy for others which helped him in every area of his life.

Brian Elliot echoes these thoughts, explaining that as an entrepreneur interested not only in business but in helping people that he has started several nonprofits. He was introduced to

Executive Success Programs (ESP) while he was running an LGMT advocacy organization that he founded in NYC to help win marriage equality in New York. Having recently graduated with an MBA and MPA from Harvard University, he took the ESP course because he was struggling to manage the day-to-day stresses and demands involved in leading an organization. His first ESP intensive was transformational in a lasting way. His stress level plummeted and his confidence and ability to fundraise dramatically increased, and he became more compassionate with others with whom he disagreed. He attributes this to Raniere and his teachings.

In explaining why she wanted to be close with Raniere, Lauren Salzman (who would later become the Government's only cooperating witness) said she formed opinions about him based on his teachings, specifically that "he was humanitarian, that he had this vision for how we could all be, the word we used was interdependent but worked as a team as kind of a collective humanity and learned to be compassionate and care for each other and support each other in non-violent ways with ethics, and I wanted that." (2080) There is value in highlighting Ms. Salzman's testimony on this point because when the Court fashions an appropriate sentence for Raniere, we ask the Court, most respectfully, to start from the premise that NXIVM and the core teachings and curriculum that Raniere created were undoubtedly meant to be positive. Indeed, the vast amount of information that the Court has received – in the form of testimony, letters and otherwise – all consistently provides that people joined NXIVM because of their belief that it was a humanitarian organization that could help them achieve their personal goals as well as contributing to the improvement of society in general. This fact by itself distinguishes this case from virtually all other RICO cases, and we ask that the Court consider this unrefuted premise in arriving at an appropriate sentence.

Other government witnesses testified along these same lines. Daniela, for instance, said she was so impressed with Raniere's teachings that she decided to forego boarding school in Switzerland to be part of what she called "the mission," which was to change the course of human events. (3063.) It's worth mentioning that at the time Daniela made this decision, there was no sexual activity between her and Raniere. In fact, her early impressions of Raniere were that he was geeky, soft spoken, "odd but in a good way," and with a "sweet presence." When asked what she meant by "a sweet presence," she said it was his attentiveness and soft spokeness. (3065). Her position that she wanted precisely what NXIVM was offering was informed wholly by her experience taking the intensive in Mexico and her familiarity with the NXIVM program.

Doctor Brandon Porter, MD, PhD, a man with a great deal of education and real-world experience, maintains that NXIVM was an organization that valued people and helped to serve as an example for a humanitarian organization. Christopher Pearson-Smith, an MBA from Dartmouth's Tuck Business School, states that his ESP trainings put him through the intellectual and emotional ringer, and that he was introduced to the most valuable education he had ever had. He explains that he learned how to connect and communicate with people from all walks of life, which has brought him cherished new acquaintances and deepened existing friendships. Linda Chung, graduate of Dartmouth College, Cornell Law School and Columbia Business School, explains that she has taken many of Raniere's trainings and she believes they were more valuable to her than all of her formal education at three Ivy league schools. It bears noting that while several of the Government witnesses complained that the coursework was too demanding and that it even amounted to some sort of abuse, Doctor Porter, Mr. Pearson Smith and Ms. Chung, each of whom were accustomed to the rigor of top echelon educational institutions, appeared to thrive in this intellectual environment, as did many others.

Nicole Clyne, a 36 year old woman who has been associated with NXIVM and DOS, writes about the profound impact her experiences had on her, saying:

> Perhaps most significant for me, I learned to be a loving daughter before, during and after the death of my father. My dad had made a lot of questionable choices in his life, especially as a father, but thanks to NXIVM's introspective tools, the support of my friends in the community, and my personal relationship with Keith, I was able to forgive my dad for his shortcomings, see his struggle as a human being, and become his best friend in the final years of his life. Its possible that my relationship with my father, despite whatever other successes I have in life, will remain one of my proudest achievements.

The above sentiments are but illustrative examples of the endless ways in which the ESP and NXIVM curriculum helped people with the most important, difficult and defining challenges of their lives. The trial evidence showed that without contradiction everyone who took the NXIVM courses believed they were effective. This is important because the Government maintains that many of the people in NXIVM remained committed to the group because they were motivated to participate in a criminal organization designed to render sex partners for Raniere. Even given the jury's verdict, this is simply not what the trial evidence and other sentencing information shows at all. Rather, it is clear that people pursued and remained in NXIVM because they genuinely believed that they were involved in something positive, something that would help society and help themselves.

At the trial, the Government questioned many of the practices that NXIVM followed – the handshake, the sashes, the paying tribute to people with longevity in the organization. While the Government has recast the notion of paying tribute to Raniere and Nancy Salzman, the creators of ESP, as a form of oppression, the notion of being actively grateful for the gifts and blessings one has in life is as old as civilization itself. Virtually every discipline, whether it be the military, martial arts, sports, dance, musicianship, or education is structured in a way where the less experienced members show due respect to the more experienced members charged with

teaching or guiding them. Showing respect to our teachers, elders, judges, generals, and leaders is one of the great pillars of civility and one of the most important aspects of being a person of good character. Far from reflecting weakness, acknowledging and demonstrating respect for those guiding us is a gesture of supreme strength and confidence. In a society that has strayed from notions of honor and respect in favor of personal aggrandizement, popularity and being "liked" on social media, NXIVM's teachings, vilified as they were by the government, are more timely and important than ever.

The teachings of NXIVM have been applied in different contexts and circumstances. Due to the popularity of the program in Mexico, the particular challenges faced by many of the Mexican citizens were addressed by Raniere and several others in NXIVM.

## 9. The Mexican Peace Project

Several of the trial witnesses, other trial evidence, letters to be submitted to the Court and other information conclusively demonstrate that Raniere was instrumental in creating a grassroots peace initiative in Mexico that permitted law-abiding Mexican citizens who had been preyed upon by cartel members and other violent criminals to start to reclaim their lives, their towns and their peaceful existence. Raniere and many other members of NXIVM worked tirelessly to conceive of and create a sustainable peace movement that was joined and expanded by countless people in Mexico who had suffered kidnappings, murders and extortion at the hands of organized criminals. The movement referred to here as the Mexican peace project has numerous aspects, encompassing meetings between key leaders of different Mexican communities with Raniere and others, strategies and tools that Raniere provided to the Mexican people who were victims of the violence, NXIVM members leaving their comfortable lives and living in villages that had been taken over by the violent groups, and ultimately a film, entitled

Encender el Corazon, directed by Mark Vicente and featuring Raniere, members of the LeBaron family and many others.

The challenges faced by many of the Mexican NXIVM members became matters of concern for Raniere and others. Mark Vicente and Lauren Salzman testified that paramount for many of the Mexican members were issues of safety and personal security in a county afflicted with violent drug cartels which profit from, among other illegal pursuits, kidnapping.

Enrique Moreno, a Mexican National, states that during the end of summer celebration known as V-Week in 2008, there was a discussion about how NXIVM could help the people living in Mexico better contend with the escalating violence impacting citizens throughout the country, but particularly in the north. As was widely reported, on June 4, 2008, about ten weeks before V-Week that year, a fourteen year old son[5] of a family owning a well-known sporting goods company, was kidnapped by armed men wearing the uniforms of Mexico's Federal Investigations Agency (equivalent of the FBI). Even though the $400,000 ransom was paid, the boy's dead body was found in the trunk of an abandoned car almost two months later, on August 1, 2008. While this particular kidnapping received widespread attention, by the Summer of 2008, Mexican citizens had become aware of the growing popularity of kidnappings as a way for the drug cartels and other armed violent groups to make money.

As noted by Victor Manuel Sanchez Valdes,[6] a research professor at the Autonomous University of Coahuila, Mexico, beginning in about 2006, criminal groups began to use kidnappings – and the ransom money they got from desperate families – to help fund those

---

[5] Even though this kidnapping received widespread media attention, including the identity of the fourteen-year-old who was kidnapped, we will not include his name here.
[6] Mr. Sanchez Valdes is a highly regarded expert in Mexican organized crime and the author of several reports and papers on the structure and activities of the cartels.

activities. Professor Valdes is quoted as saying, "they had to find other sources of income, which gave the hit men in these groups carte blanche to participate in activities like kidnapping and extortion." Between 2000 and 2006, there were about 400 kidnappings per year in Mexico. After 2007, as organized crime groups fragmented and faced more competition from rivals[7], kidnappings increased by almost 200 percent. Also, the people targeted by the kidnappers changed. Prior to 2006, the kidnappers targeted wealthy business people and commanded large ransom payments. After 2006, the people kidnapped were more commonly from the middle class, and the ransom demands far lower. Javier Hernandez, an official with the United Nations Office of Drugs and Crime in Mexico, observed "there are cases now where the rescue of a victim only costs $500."

This horrific problem, while seemingly a world away from Raniere and others in Albany, became a real and immediate concern to Raniere and others in NXIVM. There was trial testimony, for instance, about the kidnapping of Eric LeBaron, and the measures taken by the LeBaron family in the days afterward. As was widely reported, 16-year-old Eric and his younger brother were kidnapped on Saturday, May 2, 2009 by a band of men with guns in the mountains near Colonia LeBaron. The younger brother was promptly released to inform the family of the kidnappers' demands, which was a ransom in the amount of $1,000,000 U.S. The next day, a second person was kidnapped near Nuevo Casas Grandes. As Vicente and Salzman testified, and as was stated in press reports, the LeBaron family, a large extended family consisting of Menonites and members of the Church of Latter Day Saints, traveled *en masse* in the days

---

[7] According to the group Mexico United Against Organized Crime, the "Kingpin Strategy" of former President Felipe Calderon, focusing on the arrests of the leaders of the six large cartels caused fragmentation of the established groups and unfortunately increased violence and kidnappings.

following the kidnappings to the regional governor in Chihuahua, Mexico and staged a peaceful protest to move the government into action. Vicente testified that when news of the kidnapping and the family's reaction reached Raniere in Albany, Raniere caused NXIVM to become involved.

As Wayne LeBaron, a member of the LeBaron family who lived through these horrifying and tragic events, states in his letter to be submitted, he first heard of Keith Raniere one week after Eric was kidnapped. Wayne LeBaron further states that following the kidnappings, Raniere sent people to interview the LeBaron family, and that he invited Wayne and other family members to Albany. Raniere and the NXIVM community provided the LeBaron family with support and encouragement, assuring them that the only way the people in Mexico could stop the violence of the drug cartels and armed gangs was through peaceful protest. This is, in part, because sectors of the Mexican government, especially on the local level, were corrupted by the powerful cartels, such that the people had nowhere to turn. During this difficult time, Wayne LeBaron stated that "Keith taught us much about violence, fear and apathy. My experience of him was truly a bright, intelligent man who understands people and the world and its problems. I was especially moved at how deeply he wants to help the world be a better place." He further explained that "Keith along with his team of people took us in and spent many many days, much work and effort to teach us for 4-5 weeks what he believed would help us deal without safety issues in an area of the country of Mexico that is overtaken by criminals and do it in a nonviolent but firm way."

Wayne LeBaron continues that after Raniere provided the family with advice on how to address the Mexican kidnappings, Wayne's "older brother, Benjamin, formed an organization called SOS Chihuahua (Sociedad Organizada Segura de Chihuahua), Secure Organized Society

of Chihuahua in English."  By providing a sort of blueprint for how law-abiding citizens could

work with their government in peacefully but forcefully resisting the violent drug gangs who

preyed on them, Raniere inspired and led meaningful change in these areas infected with

violence. As Wayne LeBaron observed, "the Mexican people were amazed that we were able to

get the government to react so quickly and with so much zest to resolve our problem.  They came

to us dozens of families every day to ask us how we managed such a reaction, per Keith

Raniere's advice."  He further stated that his older brother, "Benjamin and other family members

came up with a model to organize communities against organized crime, this had tremendous

success, members from all neighboring communities joined SOS Chihuahua and in 2 weeks

gained 4,200 members."

Undoubtedly, the violent cartel members noticed that Benjamin LeBaron had gained

influence and popularity as an anti-crime activist and community leader. It was critical,

therefore, for the armed cartels, whose currency is terror, to instill fear and to re-establish control

over the peaceful villagers and farmers. On July 7, 2009, a little over two months after the

kidnapping of Eric LeBaron, a group of armed cartel members surrounded Benjamin's home,

took him to a remote location and murdered him. They also murdered Benjamin's brother-in-

law, Luis Widmar, who tried to come to his aid.[8]

It was apparent that the government of Mexico was unable to keep the people safe.

Raniere realized that he could teach the people how to keep themselves safe.  Raniere presented

four options of addressing the fear created by the criminals. The first was denial; the Mexican

people could simply deny they were being terrorized and were in fear. The second was to

---

[8] It is impossible to ignore the fact that the only commentary offered by the prosecutors at the trial about the plight of the LeBaron family was that they were polygamists.

embrace the fear, but this would mean giving into the fear. The third was to fight back, but this would lead to more violence. The fourth option was to meet the fear with a form of character, a strong compassion that is resistant to fear. The fourth option, which Raniere advocated, involved the Mexican people refusing to participate in the violence being used against them. This included a decision to not pay the ransom money demanded. If people stopped paying ransom, the kidnappings would stop.

Accepting the consequences of standing up to the Mexican kidnappers, Raniere once said, "people have been killed for my beliefs and their beliefs." His point was that while making the decision to not pay ransom may help the Mexican situation in the long run, it could lead to killings in the short run. However, in what has become a typical perversion of Raniere's words, his quote has been taken out of context in countless media sources to suggest that he himself caused harm to people.

In addition to the assistance provided to the LeBaron family and the kidnapping issue, NXIVM members left the security of their homes and lived in a dangerous, run-down shanty-town called Santiaguito on the outskirts of Mexico City. In particular, Enrique Moreno lived in this location for 18 months. Moreno was trying to instill in the people of this very poor village a sense of community, that they could unite with each other and stand up to the criminal elements that otherwise would dominate this area. While Moreno was there for the full 18 months, during that time other people in NXIVM came and left. Moreno began to notice that the residents became welcoming of him and that they developed a sense of unity as the time passed. In one particular example of the community they all became, at one point a young child was choking in the street. His mother was too overcome with fear to react. But, people left their homes and rushed to the aid of the child and the child was saved. People said to Moreno that they had never

before seen the community come together in the assistance of someone for the simple reason that there had previously never been a community. The actions of Moreno and the others in NXIVM show the power that the people have when they form a community with common goals and unity.

In addition, Raniere inspired the Mexican people to join together in other ways. Every day, thousands of people would recite a peace pledge. They sang songs and became unified as a form of peaceful resistance against the country's violent elements. While pledges and songs might not seem like much in the face of cartels, machineguns and violence, what the people developed in the process was unity, and that could prove mightier than the cartels. Raniere was one of very many who devoted time, effort and help to the peaceful citizens of Mexico, several of whom will be submitting letters to the court.

10.     Tourette Syndrome

One of the most dramatic applications of the NXIVM curriculum came in the treatment of Tourette syndrome. Gilles de la Tourette syndrome[9], more commonly known as Tourette syndrome or in some publications, Tourette's syndrome, is a neurodevelopment disorder that commonly begins in childhood and is characterized by movement (or motor) tics and at least one vocal (phonic) tic.  See Diagnostic and Statistical Manual of Mental Health Disorders (DSM-5). A highly-regarded study of the disorder found that it effects about 1% of children.  Stern JS (August 2018), "Tourette's syndrome and its borderland," Pract. Neurol., (https://pubmed.ncbi.nlm.nih.gov) (hereinafter "Stern JS"); see also American Academy of Neurology, Practice Guideline: The Treatment of Tics in People with Tourette Syndrome and

---

[9] The French neurologist, Jean-Martin Charcot, developed the name of the condition based on his intern, Georges Gilles de la Tourette, who published a paper of his study of nine patients suffering from a convulsive tic disorder, which had been unnamed.

Chronic Tic Disorders, Neurology, May 7, 2019 (hereinafter "American Academy of Neurology"). The condition is "difficult to manage," (Stern, JS) and "first-line (treatment) options include neruoleptics," a drug tending to reduce nervous tension by depressing nerve functions. (Stern, JS). Certain antipsychotic drugs are also commonly used. These types of drugs bring limited, if any, success and carry severe side effects, including suicidal ideation, depression, lethargy etc.[10] In cases of severe Tourette's, doctors conduct deep brain stimulation where a surgeon implants an electrode in the brain to alter the activity of the brain's circuitry. Obviously, for people suffering from the effects of Tourette syndrome, treatment regimes other than brain surgery or potentially dangerous drugs would be welcome options.

At some point, Raniere and Nancy Salzman realized that the techniques they had been using for years as part of NXIVM could prove useful in helping people suffering from Tourette syndrome to alleviate or mitigate their symptoms. The approach was unique in that it helped the participants see that their tics were often related to how they reacted to certain outside or self-imposed stimuli, rather than the condition being solely a function of one's biology. The techniques helped them bring a semi-conscious decision to tic into consciousness, allowing the person to make new decisions about whether or not to tic. The process also helped make this decision easier by decreasing the negative feelings people had when they didn't tic.

To be clear, this is not to suggest that NXIVM was the first group to use talk or behavioral therapy in the treatment of Tourette syndrome. However, the tangible, provable, objective results that NXIVM has caused in helping people diminish or decrease the symptoms

---

[10] Marc Elliott, who will be submitting a letter, was prescribed different antipsychotic drugs to manage his severe symptoms. These included Clonidine (a powerful sedative), Risperidone (an antipsychotic), among others. The drugs made him contemplate suicide, caused depression, fatigue and lethargy. The literature in this area corroborates Mr. Elliot's experience, as set forth herein.

of their Tourette syndrome are beyond reproach. Prior to its destruction at the hands of the U.S. Department of Justice, NXIVM helped about a dozen people suffering from Tourette syndrome to dramatically improve, and could have helped countless more. Several of these people – Marc Elliot, Matthew Calo, Jose Ospino – will submit letters. Two people appearing prominently in the film "My Tourette's," produced by Clare Bronfman and featuring the work and dedication of Nancy Salzman, Keith Raniere and others in NXIVM have turned against the people who helped them with their symptoms and are not being named here. In addition, two people who were suffering from Tourette's syndrome and were helped by NXIVM wish to remain anonymous and are likewise not being named here.

Marc Elliot, one of the people who gives full credit to Raniere, Nancy Salzman and NXIVM for helping him overcome his Tourette syndrome, states that he "struggled with a severe case of Tourette's syndrome for 20 years of my life starting at the age of five years old. Mr. Elliot credited Executive Success Programs, created by Keith Raniere and Nancy Salzman, with helping him overcome his Tourette's symptoms and significantly improving his quality of life. Speaking of Mr. Raniere, Mr. Elliot states, "through the education that he created, I finally found a set of tools that I had desperately been searching for my entire life to help me get rid of Tourette's. After taking a bunch of courses and even getting personal mentorship at times from Keith, I can finally say I no longer life with Tourette's syndrome." Prior to his association with ESP/NXIVM, Mr. Elliot explained that he "tried almost everything to get rid of it, including but not limited to medications, biofeedback, hypnosis, habit reversal, and botox injections. Everything I tried seemed to only deal with the effects of my Tourette's." He explained that it wasn't until he learned about the ESP/NXIVM curriculum that he started to focus on a different issue: "what is causing my Tourette's?" Mr. Elliot explained that as he "continued to take more

and more education and combined that with my strong will and hard work ethic, I eventually beat Tourette's completely using mind over body." Marc Elliot has two brothers, Justin and Brian, each of whom will also submit letters attesting to how Marc overcame the debilitating effects of his Tourette's.

Mr. Elliot stated that in addition to helping him, NXIVM helped other people as well. He said, "Keith Raniere lead a team of us in working with other people with Tourette's syndrome. With his insight and leadership, a team of others and I went on to help 10 other individuals beat their Tourette's syndrome. In 2017 a documentary titled "My Tourette's" debuted in film festivals around the world, allowing others to witness these incredible transformations."

Jose Manuel Ospino Veana, a 46 year old English teacher from Costa Rica, will submit a letter, sharing his experience with Tourette's syndrome. In particular, he states that he "came to know Keith about 5 years ago," and that he "had heard from several friends that had taken courses at ESP that they had been taught how to manage their emotions in better ways; they told me as well that …ESP was attempting to treat people who have Tourette's syndrome with a new technique." He further explained that ESP's technique "involved only speaking to the person who had the syndrome and attempting to acquire the root causes for the emotions that generated the nervous tics…" "To this day," as he wrote, "the teachings and the tools that I was provided with changed my life all together….So today I go to bed and have no muscle pain no joint pain no throat aches no headaches that used to be very common because of my condition."

Matthew Calo, a Senior at the University of Colorado, Boulder, shares that he has been suffering from severe Tourette's syndrome since the First Grade. During the summer of his Freshman year, he worked with NXIVM. He explained that he was skeptical because he had worked with the best medical professionals to no avail. Mr. Calo credits both the tools developed

by NXIVM and the strength of the community that Raniere created with helping him overcome his Tourette's syndrome. He explains that the problem for him was the "misleading beliefs I built up in my mind," and when those collapsed, "the empathy, love and guidance" Mr. Calo received from the community gave him the "courage to face the root of my condition."

The common thread of the experiences of Mr. Elliot, Mr. Veana and Mr. Calo is that NXIVM focused each of them on their systems of belief. Rather than treating the condition as a medical matter beyond their control, Raniere and Nancy Salzman taught them that they were in fact in complete control over their reactions. Once those reactions were isolated and once the source, or root (to borrow Mr. Calo's term), of those reactions was understood, the person looking to overcome Tourette's is able to detach, or disengage, his reactions from its cause.

Esther Carlson, a lifelong teacher, shared her perspective on Tourette's, saying "I worked with Tourette syndrome children as a special education teacher in an elementary school and saw the abuse the children experienced from the public and the toll their malady took on their little second grade bodies." She continued, "people could and did heal themselves from Tourette's with THIS curriculum."

That NXIVM was so successful with helping people manage their Tourette's syndrome is critical for several reasons. First, it is good in and of itself that people with this difficult condition can manage their symptoms without resort to dangerous drugs.

Second, it is as close as possible to an objective demonstration that the curriculum is effective. Most aspects of personal improvement are difficult or impossible to measure. Joy and happiness, for instance, central as they are to human existence, are immeasurable. The tics associated with Tourette's syndrome, however, are observable events. They can be counted for instance. Also, their severity can be seen. Therefore, when people experiencing tics undergo

intensive therapy using the NXIVM tools, and when there is no other variable, and where those people experience fewer tics in the course of a few days, it becomes apparent that the NXIVM tools stopped the tics.

The efficacy of the NXIVM tools to Tourette's syndrome is also relevant because it corroborates the experiences so many people had with the curriculum in their own lives. The letters that people plan to submit reflect how the intensives and other aspects of the teachings positively impacted people.  But, as noted, these improvements are largely personal in nature and, as mentioned above, difficult to measure. However, when the objectively measurable impact the curriculum has on Tourette's syndrome is seen alongside the subjective changes people experienced in their lives, the value of the curriculum is further underscored.

Also, the effort of many people in NXIVM in the area of Tourette syndrome is but one of many projects bringing positive change to people.  The jury should have been provided with the opportunity to more fully see the good that NXIVM did so it could evaluate for itself whether people stayed with the group to ply Raniere with concubines, as the Government contends, or instead to do demonstrably wonderful things in the world, which the evidence shows with unmistakable clarity.

11.    Other NXIVM Projects and Curricula

In addition to the Mexican peace project and the Tourette's study, NXIVM promoted and created other innovations that its members firmly believed were positive, and even wonderful, additions to the world. There were dozens of programs that people in NXIVM started, many of which were discussed at the trial.  Only a handful are reviewed here.

### 11A.  Rainbow Cultural Garden

Guided by the principles of NXIVM, Raniere started a number of programs specifically intended to foster tolerance and peace.  One of these was Rainbow Cultural Garden. Several witnesses testified about Rainbow, including Mark Vicente, who conveyed that Raniere believed children were able to learn things at a young age, and that if children were taught languages and about cultures, they would be multicultural and multi-linguistic throughout their adult lives. (1091.) Vicente further testified that Rainbow had instructors that spoke to and taught the children Arabic, Spanish, Russian, Mandarin, German, Japanese and other languages.  Vicente agreed that the children learning about these cultures and speaking in these languages "would have a greater appreciation for the cultures of the people who spoke those languages because they themselves also would come to speak those languages." Lauren Salzman further elaborated, testifying, "the children would have very early experiences and thus experiential reference points to people – people of different cultures and experiences of the cultures themselves through the people and, thus, when they became older they would be – I think Keith called them like 'citizens of the world'."  (2161.) The testimony of these two Government witnesses alone illustrate what Raniere and the other good people working with him were trying to accomplish, specifically building tolerance and peace in a society that increasingly lacked these attributes.

### 11B.  Jness

The trial evidence and letters from several people discuss Jness. Many of the trial witnesses and many of the people who will be submitting letters to the Court state that Jness was a positive and productive undertaking that allowed women to create an environment for discussion that was devoid of men and any male presence. In hindsight, several of the trial witnesses displayed opinions about Jness that have grown negative. However, the emails and text

messages that they shared with others at the time they were attending Jness meetings tell an entirely different story, one of kinship with other women and a sense of belonging in a strong community created by and for women.

### 11C. SOP

The significance of SOP (the men's group) in terms of the issues examined during the trial is that many of the concepts later found in DOS originated, among other places, from SOP. In the recordings submitted into evidence, Raniere speaks at length about the power of commitment, that one's level of commitment should be as high as possible, even to the point of making that person's life seem more difficult due to the high level of that person's commitment. This is important because the Government sought to portray DOS as being cruel to women due to the level of commitment expected of its members. However, the SOP recordings show that Raniere is demanding the same thing from the male members of SOP, and that he is demanding this level of commitment not as a way of being cruel but rather as a way of strengthening each person's resolve and character.

### 12. DOS

Raniere created DOS in the spirit in which he created Jness: as a women's-only group where women can decide the direction in which the group goes and where women can agree on the pursuits and content of the group. As the audio recordings admitted into evidence made clear, Raniere created DOS by speaking with certain women who would later be known as first-line members. In one particular recording, Raniere says to one of the women that the women can come up with their own ideas of what DOS should be or they could "rent" Raniere's brain and he would help them. He goes on to say, however, that he would prefer if the women came up with

their own ideas. This section of the Memorandum discusses aspects of DOS, including Raniere's role in creating it as well as certain of its practices that formed the centerpiece of the trial.

### 12A.    Raniere's Creation Of DOS

DOS was the kernel of this case. While DOS was a completely separate thing from NXIVM, ESP and other parts of the program, and was indeed unknown to many people in other parts of the program, it represented an intense version of different well-established precepts that were familiar to many in NXIVM.[11] The defense at trial accepted and in fact embraced the fact that Raniere created DOS and was its conceptual founder.  Lauren Salzman, for example, testified that Keith "created every part of the NXIVM curriculum," "was behind every creative idea in NXIVM," that he created the women's group, Jness, that he created the Jness room, that he created every module, every piece of coursework, all of the various companies within NXIVM, that, in sum, he created absolutely everything having anything to do with the community in which Ms. Salzman and the others lived.  (2163.) It is therefore nonsensical for anyone to believe that Raniere did not create DOS. Ms. Salzman testified that there was no precedent within the group for someone to create something that wasn't Raniere.  (2163.) This is especially true considering that DOS bore the hallmarks of the teachings, ideas, coursework and content of Raniere's other creations, including, among others, "readiness," "collateral," "commitment" and "ethical breaches".  (2164.)

Sylvie echoed Salzman's testimony, testifying that she believed "all the curriculum of Jness…came from Keith," and that "all the curriculum in NXIVM came from Keith."  (339.)

---

[11] The trial evidence was clear that unless a person was in DOS, that person did not know of the group's existence. Accordingly, co-defendants Clare Bronfman, Nancy Salzman and Kathy Russell did not, to Mr. Raniere's knowledge, know about DOS nor of its practices until after these matters became public.

Indeed, Sylvie testified that she has never heard of "curriculum being created by someone other than Keith." (339.) Accordingly, she reasoned that if there was something curriculum-related in the NXIVM world, she would assume Keith Raniere created it. (Id.)

The trial evidence was clear that Raniere created DOS to benefit women by inspiring a secret society of women, led by women and comprised of women that could be an "influential force" and "possibly something that influenced policy one day." (2188.) Similar to secret societies created and dominated by men, such as the Freemasons, Salzman testified that DOS was created to one day influence elections. (2188.) In keeping with these goals, Salzman testified that Raniere wanted powerful, influential women in DOS. (2189.) Salzman further testified that she was in DOS because she wanted to do "something that was good and important," and because she wanted to grow as a person. (2190.) She testified that she chose very capable women to be in DOS. (2190.) Salzman's testimony makes it clear that Raniere did not create DOS for the purposes of having sexual partners, and that she only became familiar with Raniere having sex with any of the women in DOS from the discovery.

The PSI Report errantly states that "(w)hen identifying prospective slaves, masters often targeted women who were experiencing difficulties…" (¶ 35). This is an untrue statement. Women were not targeted in the Sisterhood, Vow or DOS. Other than the first-line members, all women were brought in by other women solely based on whether DOS could be helpful to a certain woman at a particular period in her life. The trial evidence showed that for the most part a woman would bring a very close, or often a best, friend into the group because of a genuine belief that participation in DOS would be helpful.

There is no dispute that Allison Mack, due to personal and private issues, saw the value to her in pursuing an intimate relationship with Raniere. She described this relationship in

positive terms and explained that it helped her grow as a person. Therefore, when she perceived other women facing issues with some degree of similarity to the ones she was facing, there were times when she shared her own experience with Raniere and suggested to another person that an intimate relationship with him could be helpful. This was not done with the slightest element of malice toward anyone. It was not done to secure romantic partners for Raniere, and there is no meaningful evidence in the record to the contrary. Rather, it was done with a genuine belief that Raniere could, and often did, help different people with various problems, some of which at times related to sex and intimacy.

The PSI Report errantly states that "several DOS slaves were directed to have sex with Raniere to maintain membership." The evidence does not show this at all. While Jay did testify that she believed that India, her master, asked her to have sex with Raniere, the evidence shows very clearly that this was a misinterpretation on Jay's part. ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ As Jay testified, after India gave her the assignment, Jay ceased her affiliation with the group and suffered no negative consequences.

When she left Albany, Jay wrote a note to Raniere, saying the following:

I don't know what to say except "thank you." You are an incredible human being who has given so much to so many people, including me. You directly and inadvertently have profoundly changed my life and perspective. You have helped me find my way back to me and to my love for humanity. My path and journey has truly begun. I'm feeling more Bliss and carrying a sense of myself in my experience. I'm headed back to California to spend some much needed healing and bonding time with my family…then who knows where. I plan on sitting in nature…alone…to write…writing, poetry is where my heart is calling me at the moment. It has been for a while, but I wasn't listening…until now. I am very excited to see how my journey unfolds, embracing the struggle and surrender. I'll be back. How could I ever forget you? You are unforgettable. With Love. J.

Jay testified that she wrote this note as a way of fooling Keith into thinking she was not unhappy with her experience. But, the level of detail she uses and her specific language suggest otherwise. This note was written by someone who genuinely is expressing gratitude to Raniere, whom she believes had her best interests in mind, which he did. These are simply not the words of a person who believed at the time she was being forced against her will to have sex with someone. In any event, the evidence is clear that there was no intimate relationship between Jay and Raniere and this is because there was never going to be such a relationship.

It is the defense's contention that the sentiments expressed in this note reflect Jay's true feelings before being subjected to the exhortations of the anti-NXIVM group. Indeed, the trial evidence is replete with emails, text messages and hand-written notes expressing joy, gratitude and happiness on the part of women upon leaving NXIVM who, after being subjected to the anti-NXIVM group and the prosecutors, later testified to a far darker opinion of Raniere.

### 12B. Branding

Lauren Salzman testified that her five slaves (one of whom was Sarah) were branded on the same day. Ms. Salzman was clear that her slaves absolutely knew they were about to be branded, that they appeared at the ceremony expecting this, and that the branding was a knowing and voluntary decision by adult women after being told precisely what was about to happen. (2198.) In fact, the only issue concerning the branding was whether the women knew that the initials "KR" were part of the image that would be branded on to them. However, even as to this, one of the women, Carola, noticed the initials in the brand because of the stencil prior to the brand being administered. (2200.)

Ms. Salzman testified that when Sarah went to the media, she made false statements concerning the branding. (2200.) Specifically, Sarah misrepresented to the media, including the

New York Times, that "she was held down against her will," and that "she didn't know she was going to be branded." (2201.) These statements, according to Ms. Salzman, were false. The truth, of course, is that Sarah, as well as each of the women branded that day, knowingly and voluntarily agreed to be branded.

In fact, Ms. Salzman testified that during the branding ceremony, there was a break, during which one of the women went home to breast-feed an infant, and that the brandings resumed after the 45-minute to one-hour break. (2197.) Clearly, had any of the women changed her mind as to being branded, there was ample time to leave the situation. Therefore, any suggestion in the Presentence Report or anywhere else that the branding was anything but fully voluntary is flatly contradicted by the trial evidence, as testified to by the Government's cooperator, Ms. Salzman.

12C.    Readiness Drills

The trial evidence does not show that the readiness drills employed by DOS members or by NXIVM resulted in severe sleep deprivation nor that this was the purpose. Lauren Salzman testified that readiness drills were not meant to punish people, nor to make them exhausted or weak. (2177.) She testified that readiness was about preparedness, about being responsive and being "part of a well-oiled team that could mobilize quickly on literally a moment's notice." (2178.) She explained that because many members of both DOS and NXIVM lived in Mexico and because some of them had been personally impacted by kidnappings and other acts of violence that the concept of "readiness" was "an important principle, important practice so that people could mobilize on a moment's notice and be able to respond to situations that could be emergent." (2179.)

On this point, Ms. Salzman was asked the following questions and gave the following answers:

| | |
|---|---|
| Agnifilo: | It was meant to make people stronger, correct? |
| Salzman: | That was the theory, yes. |
| Agnifilo: | Right, and readiness was all about preparedness, correct? |
| Salzman: | That was my understanding. |
| Agnifilo: | And being responsive, right? |
| Salzman: | Yes. |
| Agnifilo: | Being part of a well-oiled team that could mobilize quickly on literally a moment's notice? |
| Salzman: | Yes, and about making this the highest priority. |

The questioning then transitioned to the background of the principle of readiness. By the time Ms. Salzman's testified, other witnesses, including Mark Vicente, had already testified to the horrible problem facing the Mexican members of NXIVM related to kidnappings and violence at the hands of drug cartels. On this point, Salzman was asked the following questions and gave the following answers:

| | |
|---|---|
| Agnifilo: | And DOS and NXIVM existed in parts of the world that weren't always safe, like parts of Mexico? |
| Salzman: | Yes, that's true. |
| Agnifilo: | And both DOS and NXIVM had strong presences in Mexico, right? |
| Salzman: | Yes. |
| Agnifilo: | And you testified on direct examination that kidnappings were a very real concern for the folks living in Mexico? |
| Salzman: | That's true. |

| Agnifilo: | And, in fact, some of the people in DOS were personally impacted by the kidnappings? |
|---|---|
| Salzman: | Yes. |
| Agnifilo: | And readiness was an important principle, important practice so that people could mobilize on a moment's notice and be able to respond do situations that could be emergent? |
| Salzman: | That's what it was meant to do, yes. |

(2178-2179.)

Readiness, like many of the DOS teachings, was intended to create strength, commitment and discipline, qualities that the women enrolling in DOS were specifically looking to develop and grow.

### 12D.  Acts of Care

The trial evidence showed that acts of care fell into two categories.  Either they were character-building exercises for the benefit of the person performing the act or they were for the good of the community. Lauren Salzman testified that the purpose of the acts of care was "to learn to care for someone other than yourself."  (2186.) In addition, there were times when members of the community performed acts of service for the community in general.  An example of this is when Nik participated in a memorial celebration for Pam Cafritz by transcribing video footage. As the trial evidence showed, Pam Cafritz was known to and loved by virtually the entire NXIVM community, and scores of people participated in her memorial after she died of cancer in 2016.

### 12E.  The Assignment

This may be the most controversial aspect of DOS. The Assignment involves a female master assigning a slave to seduce Raniere. The particulars of the assignment are that the slave is to bring about an encounter between her and Raniere. She is to bring with her a cell phone.

When she and Raniere are alone, she is to disrobe, while Raniere remains clothed, give the phone to Raniere and permit him to take a photograph of her, which is sent to her master. The point of the assignment is not for Raniere to have sex with the women. Rather the assignment tests the women's resolve to undertake a task that is difficult and challenging.

It is easy and even perhaps natural to see that this is a highly controversial practice and one that can easily lead to serious misunderstandings. This is precisely what happened between India and Jay when India gave Jay the assignment to seduce Raniere and Jay, somewhat understandably, misinterpreted the assignment as being a directive to sleep with Raniere, something she simply did not want to do. As noted herein, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

### 12F.    Conclusions On DOS

Raniere maintains that he created DOS to be a positive force for women. While it has controversial elements, that does not make it bad. It makes it difficult and demanding, which is what the women joining DOS were signing up for. DOS is not for everyone. It is, rather, for those women who believe that they would benefit from a serious challenge and from developing greater discipline. DOS is serious medicine and it is appropriate only in certain circumstances. However, in a world where Americans spend trillions of dollars on anti-depressant and anti-anxiety drugs, where the suicide rate among young people is higher than ever and where there is a general malaise felt by many people, it is impossible to say that a highly demanding, regimented protocol like DOS should be forbidden.

## The Government's Contention That Raniere Lacks Contrition

The Government devoted a great deal of its Sentencing Memorandum to showing examples of Raniere not being sufficiently contrite, of Raniere complaining that he is about to be sentenced to life in prison for crimes he did not commit and of Raniere expressing frustration with the Government's tactics and how his trial was conducted. Mr. Raniere firmly believes his current incarceration is the product of several things. First, that there was a well-orchestrated campaign by people looking to leave NXIVM for their own personal reasons to intimidate others into aligning with an anti-NXIVM, anti-Raniere group. Second, that instead of exposing this biased group of witnesses and seeing them as incredible, the prosecutors furthered this campaign of falsity, even to the point of scaring away potential defense witnesses. Third, that his trial was fundamentally unfair.

The Government has provided the Court with audio recordings of a total of five out of hundreds of phone calls that Raniere had from prison with different people. In connection with one call, the Government excerpted part of a statement where he stated, "the judge needs to know he's being watched." This clearly seems to be a menacing statement and something possibly worthy of an enhanced sentence. This purportedly menacing statement found its way into several newspapers including the front page of the <u>New York Law Journal</u> because it is obviously inappropriate for a defendant to say such things about a trial judge. However, when the whole statement is considered, its meaning changes dramatically. The whole statement is this: "the judge needs to know he's being watched…<u>by someone wise</u>." When the whole statement is considered, we see that rather than Raniere seeking to menace a judge, he is expressing the need for a good lawyer, "someone wise," to monitor his case. If there was any doubt about what Raniere meant by the phrase "someone wise," his next sentence makes this

abundantly clear, "So. Now we gotta figure out the next step with Dershowitz." He's talking about having an experienced lawyer, someone wise like Alan Dershowitz to scrutinize the fairness of his trial, including decisions of the trial judge. This is obviously a vastly different statement than what was depicted in the Government's sentencing memorandum.

The question then arises of why would Raniere say that he wanted someone wise, someone like Alan Dershowitz, to watch over his case? His reason for making this statement and many of the other statements, he has made to others from his prison cell is that he genuinely believes he has not received a fair trial. He has at least several reasons for his conclusion that his trial was not fair, four of which will be mentioned here.

13. <u>The Government's Threatening of Witnesses</u>

Raniere was aware that the prosecutors threatened several of his potential defense witnesses. As will be set forth in subsequent submissions, the Government told one potential defense witness, Michele Hatchette, that if she refused to come to the U.S. Attorney's office for a third proffer session that she would be indicted for perjury. In regard to a second witness, Nicole Clyne, even after preliminary jury selection for the trial had begun, the Government served Nicole Clyne with a grand jury subpoena. (<u>See</u> Dkt. 523.) These were tactics employed by the Government with the purpose of scaring and intimidating potential defense witnesses so that they would not testify on the defense case. Raniere views these tactics as fundamentally unfair and he firmly believes that as a result of such tactics, he did not receive a fair trial.

14. <u>The Government Showed Witnesses Information Solely to Influence Their Testimony</u>

Raniere was aware that the prosecutors showed Michele Hatchette purported written communications between Raniere and Camila during Hatchette's first proffer session with the Government. When the Government saw that Hatchette's experiences with Raniere and in DOS

were positive and that she did not identify as a crime victim, the Government sought to change her mind. It did this by showing her the written communications between Raniere and Camila where Raniere discusses a "fuck toy." There was no reason to show this to Hatchette other than to prejudice her against Raniere. Raniere views these tactics as fundamentally unfair and he firmly believes that he did not receive a fair trial.

15.     Witnesses Testifying With Nicknames or First Names Violated Due Process

Raniere was present in Court when, even the prior to the trial commencing, his lawyers were ordered to refer to crime victims by nicknames and first names whereas perpetrators can be referred to by their true names. He believes that this order by the court destroyed the presumption of innocence that the jury was supposed to give him. He saw his lawyers' objections to this procedure be overruled and he believes his trial was unfair as a result.

16.     Terminating Cross Examination of the Government's Sole Cooperator Violated Raniere's Right to Due Process and Right to Confront Witnesses

Raniere was concerned that the Government would use Lauren Salzman's guilty plea as a form of evidence that Raniere was guilty of racketeering and extortion. He also believed that Ms. Salzman did not engage in wrongdoing, despite her plea of guilty. Therefore, when he saw his lawyer's cross examination of Salzman terminated in the middle of the witnesses' answer and without any warning, just as counsel was challenging the merits of her guilty plea, he believed that his right to cross examine the government's sole cooperator had been violated and that he did not receive a fair trial.

The defense does not raise these issues to show any disrespect to the Court nor do we do so gratuitously. Rather, we do so because the Government devoted a substantial amount of its Sentencing Memorandum to comments that Raniere made over recorded prison calls in which he is expressing a certain level of concern as to the fairness of his case. Our response to the

Government, therefore, is that he did say these things precisely because he is concerned that he did not receive a fair trial.

17.    The "Change in Perspective"

Several critical witnesses in DOS or NXIVM stated that he or she had a radical change in perspective after being provided with information by the Government. Now that Michele Hatchette and Nicole Clyne have agreed to come forward and provide information of how the Government intimated them from testifying, and that Ms. Hatchette provided the information about what the Government did in an effort to change her story, it is small wonder that most of the important government witnesses testified to a radical change in perspective after speaking with the prosecution. This change in perspective was the function of two things. First, the pressure and threats of the anti-NXIVM group, which included not only former NXIVM members but a team of psychologists, "cult deprogrammers" and bloggers working in coordination to recruit people to testify against as well as to sue Keith Raniere.  Second, the pressure and threats of the prosecution which in essence became an advocate for the anti-NXIVM group.

The changes in perspective by the Government witnesses are possible solely because of the uncertain nature of the conduct if viewed without knowledge of the actor's intention.  One of the many things that are virtually unique about this case is the fact that a person could view Raniere's actions toward her as either good faith efforts at helping her grow as a person, on the one hand, or as manipulative, bad-intentioned crimes, on the other. The sole issue in determining which reality is correct is Raniere's intention. Why did Raniere do what he did?  Was he motivated to help people, or was he motivated to use people for his own ends?  In answering this all-important question, each witness was exposed to a steady drumbeat from different people that

Raniere had bad intentions. This started with the Anti-NXIVM group who sought to convince everyone that Raniere was a criminal and had bad intent. The anti-NXIVM group told people they were in a cult, that Raniere meant to hurt them and that they needed psychological help and "cult deprograming."

The Government picked up this theme and reinforced the anti-NXIVM group by likewise telling potential witnesses that Raniere had bad intent. Why else, for instance, would the prosecutors show Michele Hatchette written communications purportedly between Raniere and Camila where there is reference to a "fuck toy" other than to actively change her mind and recruit her to the anti-NXIVM side? This plainly is not the prosecution seeking the truth in Michele's account. Rather, this is the prosecution playing favorites, where they use information having nothing to do with this particular witness to actively change this witnesses mind.

What the prosecutors did with Michele, they did to numerous others. Knowing Lauren Salzman was in love with Raniere, the prosecutors had her listen to and transcribe conversations Raniere had with other women. The conversations Lauren listened to were of essentially Raniere forming close relationships with women other than her. What purpose could this have other than further turning Salzman against Raniere so she would be a "better" prosecution witness?

When it was apparent that the Government would not be able to change the person's mind, as was the case with Nicki Clyne, the Government served the potential defense witness with a grand jury subpoena after jury selection had commenced as a way of scaring the witness from testifying.

17A. Sylvie's "Sixth Sense" Change in Perspective

Describing her own change in perspective from her time in NXIVM and DOS to time on the witness stand years later, Sylvie stated, "I think a lot of it, in retrospect, I look back and its

almost like watching *The Sixth Sense*…" (393.)[12]  When shown emails from 2012 and 2013,

Sylvie testified that "you will probably find lots of positive statements from me from that time."

(323)  The reason there are so many positive emails and other writings from Sylvie from her

time in NXIVM and DOS is because the evidence is overwhelming that both Raniere and Clare

Bronfman devoted a tremendous amount of time and attention to Sylvie's wellbeing in almost

every area of her life.

Sylvie testified at length about many of the positive things Clare Bronfman and Keith

Raniere did for her over the years.  She explained that she wanted to be a professional horse rider

and to ride at the highest level of competition.  She came to the United States from England in

2005 and lived at Ms. Bronfman's farm near Clifton Park, New York.  Although Ms. Bronfman

paid Sylvie to take care of Ms. Bronfman's horses, Sylvie admitted she did not always do a good

job, stating "I don't think that I did my best job all the time."  Regardless of the care Sylvie

showed the horses, however, Ms. Bronfman continued to pay her.

Sylvie testified that she (Sylvie) brought up to Ms. Bronfman that Sylvie was interested

in taking the five-day NXIVM course.  Sylvie explained, "I wanted to overcome my fears and it

sounded like it could be something good for me."  Explaining further, she said, "I wasn't very

confident in myself and I wanted to be an elite show jumping rider and I wanted to be a strong

person to be able to do that."  She also testified that she wanted to have a better relationship with

John, her current husband, explaining that she believed she was not a good partner in that

---

[12] Toward the beginning of the movie, Malcolm (played by Bruce Willis), a child therapist, is shot by one of his former patients. It is not until the final scene of the movie when Malcolm's wife asks in her sleep why he left her and drops his wedding ring on the floor that we realize, and that Malcolm realizes, for the first time that he has been dead for virtually the entire movie.  Sylvie's point was that one can have a certain perspective while living through certain events and have that perspective radically change after the fact.

relationship. When Sylvie expressed to Ms. Bronfman that she wanted to take the five-day course, Ms. Bronfman volunteered to pay for it, and did pay for it. This would be a recurring theme in Sylvie's testimony: Sylvie wanted something, and Ms. Bronfman paid for it.

Sylvie testified to all the things Ms. Bronfman did for her over the years. She said that other than a period toward the end, Ms. Bronfman allowed her to live in her home without paying rent. Ms. Bronfman also paid for most of Sylvie's NXIVM courses; she also paid for Sylvie to transport her horse from England to upstate New York by airplane and trailer; Ms. Bronfman also paid for Sylvie's medical care as well as other things. Ms. Bronfman never demanded money from Sylvie for these acts of love and generosity.

Similarly, Sylvie testified that Raniere was likewise supportive of her aspirations. She testified that Raniere believed in her, believed in her abilities as a runner, believed she could be world-class, and that he was willing to "put the time in trying to coach (Sylvie) and to help (her) to that goal." Sylvie testified that she emailed Raniere every day with the details of her training and her progress.

Sylvie testified that from the very first class, "NXIVM tells people who are thinking about joining NXIVM or doing their classes that they have rituals." The rituals of the program are there for all to see in the literature and are discussed at the earliest stages. Among the many rituals are the different colored sashes, a concept that several witnesses said was borrowed from Marshal Arts. She also testified that no one was forced to rise up the ranks of NXIVM, agreeing that one can remain a student as long as one wants to without having to become a coach.

Sylvie testified that she sent WhatsApp messages to Raniere on a regular basis, and that some of these messages included partially naked photographs that Sylvie took of herself. She also testified that there was a single episode of sexual contact between her and Raniere when

Raniere performed oral sex on her. Her testimony was clear that she never stated, suggested, indicated or acted in such a way to communicate to Raniere that this was not welcome. The Court likely recalls her testimony on direct examination about how she reacted, and there is no need to mention it again here. The point is that if she was privately not consenting to this encounter, she certainly never conveyed that in the slightest to Raniere. As a result, he would have no reason to believe the encounter was anything other than it appeared to be: a fully consensual, welcome sexual encounter.

Sylvie testified that even after the encounter with Raniere she continued sending him warm and loving messages and telling him that she loved him. While her trial testimony indicates that she appears to have regrets about the decisions she made with Raniere, there is not the slightest bit of evidence she did not fully consent to this one episode.

### 17B. Lauren Salzman's "180 degree" Change in Perspective

Lauren Salzman characterized her change in perspective as being "180 degrees." (2174.) She also testified about the things the Government did to cause her to view Raniere in a negative light. In particular, she testified that the Government had her transcribe a number of audio recordings (GX 494-497) of Raniere speaking with other women about the creation of DOS in June of 2016. Salzman testified that she was not present for these conversations and was not aware of them until the Government had her listen to the recordings. Salzman testified that the audio tapes she reviewed were conversations between Monica Duran, Dani Padilla, Loreta Garza, Allison Mack and Rose Laura Junco, and with the exception of Rosa Laura Junco, that Raniere had slept with each of these women. Salzman testified as follows:

| Agnifilo: | And, with the exception of Rosa Laura, Keith slept with all of these women? |
|---|---|
| Salzman: | Yes, correct. |

Agnifilo:     So here you are, listening to Keith talk to these women about DOS and the creation of DOS, you're not there, and you're listening to these recordings, correct?

Salzman:     Yes.  Correct.

That the Government played on Salzman's jealousy that Raniere was having secret meetings with other women is apparent by her testimony that as of June 2016, the time Raniere was meeting with these other women, Salzman was still hoping to rekindle her intimate relationship with Raniere

Agnifilo:     So you were still holding out hope, as of June 2016 when these conversations are taking place, these meetings between Keith and these other women, you are still holding out hope that you might end up with Keith?

Salzman:     Yes.

Salzman testified that she was "surprised" by the recordings and that she "didn't know he was with them (the other women) at those times."  (2260.)   It is fair to ask: why would the Government have Ms. Salzman listen to these recordings other than to prejudice her against Raniere and make her a "better" cooperating witness in the Government's eyes?

She further explained that her change in perspective occurred due to several facts she learned from the Government either directly or through discovery in the case.  She specified that she came to learn about a "secret sex portion of DOS." (2174.) Because she testified that her experience with Raniere and DOS did not involve sex or sexual contact in any manner, this information that she learned wholly through the discovery or otherwise from the Government caused her to see DOS and Raniere's involvement in DOS in an entirely different way.

The problem with this is that there is not a secret sex portion of DOS, that this was the Government's interpretation of DOS, informed by the members of the anti-NXIVM group who were pushing the investigation.  However, it makes sense that Ms. Salzman, who even in 2017

was still in love with Raniere and hoped to one day have a child with him, would come to see Raniere in a different light once she "learned" that he was involved in a secret sex portion of DOS rather than being with her.

17C.   Nicole's Change in Perspective

A comparison of the written communications of Nicole during her time in DOS and the Source with her trial testimony show yet another witness who had been significantly influenced by the anti-NXIVM group including being threatened by Frank Parlato with the release of her collateral if she did not join the investigation and sue Raniere.

Nicole testified she was interested in "The Source," an acting program created by Raniere that was a "mix between psychology and acting." (4115.)  She explained that "if you want to be a good actor, you have to understand the character's psychology…"  (4116.)  Nicole testified that Allison Mack was her teacher in "The Source" and that she mentored Nicole.  (4122.)  She said she identified with Ms. Mack because they were both hard workers and wanted to be good actresses.  (4122.)  During V Week in 2015, she and Ms. Mack stayed together.  Nicole said that she enjoyed V Week.  She got to know Ms. Mack better and she enjoyed the outdoors and being by a lake.  (4126.)

As part of "The Source" curriculum, Nicole kept a Source journal.  Using the Source journal as a reference, she testified that she "went into a slider on fear," explaining that this was allowing yourself to feel fear and then moving the fear around your body.  This was a way, she said, of "broadening your understanding of your emotions."  (4129.) A central aspect of "The Source" curriculum, as is true with many of the NXIVM programs, is helping one expand the range of emotions one feels and is comfortable feeling.  Just like an athlete stretches her muscles, an actress may want to expand her emotional bandwith so as to find and develop a more

expansive range of feeling with which to animate a character. Accomplishing this, however, involves bringing a person out of her emotional comfort zone, especially when the limitations facing the person relate to that person's fear of certain emotions.

In addition to The Source journal, Nicole also kept a personal journal, where she reflected on her feelings and her life experiences. In her personal journal, she indicated that she was struggling with her sense of identity and she was worried that she had made a career mistake moving to New York. (4132.) She also wrote that she was going through a depression and that she felt really down. (4133.) She testified that she shared her Source journal entries and her personal entries with Allison Mack. Upon receiving these journal entries, Mack responded, "I will be in NYC tomorrow. What's your timeframe? We need to spend some time together. I am sorry I have not been there for you. Let me know. I will prioritize you." (4133.) Nicole explained that the next day, she saw Ms. Mack and that Ms. Mack made her feel better.

The exchange between Ms. Mack and Nicole illustrates that Ms. Mack was trying to help and comfort Nicole. Ms. Mack made spending time with Nicole a priority and explicitly told Nicole that as a way of assuring her she was not going through this difficult period alone. The idea is that on the one hand, Ms. Mack and later Raniere would bring Nicole out of her emotional comfort zone, allowing her to overcome fears and limitations, and on the other hand, Ms. Mack would provide steady and loving emotional support so that her being outside of her comfort zone was tolerable.

When shown a copy of the email she wrote to Ms. Mack on June 20, 2017 (D. Ex. 936 for identification),[13] Nicole testified she wrote this to Ms. Mack when she was leaving DOS. In

---

[13] The defense offered the email in evidence; the prosecution objected on hearsay grounds, and the objection was sustained. The email of the witness was clearly an exception to the hearsay rule because it showed her beliefs and intentions at the time. By objecting to the admissibility of the

the email, she said that she was leaving DOS because she was told and believed her collateral would not be released. (4261.) She expressed thanks to Ms. Mack and to Keith, specifically thanking Allison for the unconditional love that Ms. Mack showed her. (4262.) At this point in her testimony, she volunteered, "I was completely misguided as to what had actually happened." (4262.) This is a very telling statement on her part. It is obvious that at the time, Nicole believed she was dealing with people, specifically Raniere and Allison Mack, who had her best interests at heart. So long as that was true, she was not misguided at all. What happened, however, is that other people convinced her that Raniere and Mack did not have her best interests at heart and that is why she testified at the trial that she "was completely misguided as to what had actually happened."

### 17D. Mark Vicente's Apocalyptic Awakening and Change in Perspective

Vicente is different than Sylvie, Lauren and Nicole because he both experienced a change in perspective himself and was also the agent of changes in perspectives in others.

After three days of direct testimony and claims that he was afraid for his and his family's lives, Mark Vicente testified for the first time on cross examination that he had been paid for film that he shot, "mostly of himself", that would be used in an HBO film. (1040.) So, on the one hand, Vicente is claiming he's afraid for his life and on the other hand, he is filming himself for a movie about the very people of whom he's allegedly terrified. This is not to say Vicente is making up his fears. After all, he testified at the trial that for many years, while a member of a group called Ramtha, he actually believed that a 30,000 year old warrior was speaking through a

---

witness' own email from June 20, 2017, the Government was able to have the witness deny her beliefs at the time, which were decidedly pro-Raniere and Mack, and simply testify to her version of her current feelings, which were flatly contradicted by the email that the Court refused to allow the jury to see.

woman named J.Z. Knight, who was the leader of this group. So, Vicente's own history demonstrates that the fervency of his belief can be at odds with its being remotely true.

Vicente provided a basis for concluding that his change in perspective also has a financial component. Vicente created a Limited Liability Company called Insight Industries LLC and took NXIVM income through this LLC. (1052.) Vicente testified to the fact that as the years passed, he took less and less income through his LLC: $79,557 in 2012; $63,325 in 2013; $52,573 in 2014; $46,000 in 2016. (1053.) He explained that the Vancouver Center, which he ran with Sarah, made considerably less money than it did beforehand, and that he and Sarah had to put $70,000 of their own money into the center to keep it afloat. (1054, 1055.)

For his own reasons related to family, money and possibly other things, Vicente made a complete turnaround as to NXIVM and went from being one of its strongest supporters to one of its strongest detractors. However, Vicente went further, taking it upon himself to "save" people from the clutches of what he now believed was a very dangerous organization. The problem is that many people liked and trusted Vicente and so when his opinion of the group went from being positive to negative, he exerted an oversized influence. The other problem is that between him and Sarah, the two of them were peddling information that simply was not true. For instance, Sarah was not forced down and branded against her will and without her knowledge. But that is a catchy and memorable sound bite and it had the desired effect. Before too long, Sarah and Mark had disenrolled – through a variety of means – many from NXIVM and were looking to influence people like India, Nicole and others in what they should think about their experiences in the group.

18.     The Genesis of this Case

As noted previously, the genesis of this case was not a woman who claimed she had been sexually assaulted or trafficked or harmed in any way.  Nor was the genesis of this case a person who claimed to have been the victim of any crime whatsoever.  Nor was the genesis of this case a government agency that discovered tax fraud or immigration fraud or fraud in any form or fashion.  Rather, the genesis of this case was people who had been at the very top of NXIVM for many years but who left NXIVM for reasons related to their financial interests or changes in their personal goals.  The genesis of this case is largely one particular woman who lied to the New York Times about the circumstances surrounding a brand on her body and created a press storm that got the attention of law enforcement.  It is revealing that this case started with a lie.  It could start no other way.

The trial evidence shows the interconnection of the various people who would be witnesses at the criminal trial as well as plaintiffs in the civil matter.  In April and May 2017 as well as at other times, Mark Vicente had discussions with Sarah about Sarah's experiences in DOS. He further explained that he was having regular discussions with Sarah's husband during this time. (1233.)  Also, in April and May 2017, Vicente spoke with Catherine Oxenberg.

In addition, during the first week of May 2017, Vicente went to the Oxenberg home in Los Angeles and met with India.  (1224.)  When asked if he yelled at India, Vicente explained that he was upset.  (1226.) He did not remember calling her a monster or telling her that she was spreading hate. (1227.) He also did not recall India saying that she's never been happier, but he testified "that is consistent with a lot of the – the DOS women said."  (1229.)

On May 26, 2017, Vicente called an FBI office in the Northern District of New York for the first time. He was asked if on that same date, May 26, 2017, he called or was called by Sarah 18 times, and he responded that it was possible.

On May 31, 2017, he spoke with a Northern District FBI agent for the second time. (1236.) On that same day, there were five calls between Vicente and Catherine Oxenberg, 11 calls between Vicente and Sarah, and four between him and Sarah's husband. When asked why he had so many phone calls with these people, Vicente said that "there was a branding ceremony about to take place." However, when confronted with the FBI 302 Report of the May 31, 2017 telephone interview, Vicente stated that there was no notation of an impending branding ceremony in the report. He testified, "I don't specifically recollect if I said that," referring to the branding. (1237.)

On June 2, 2017, Vicente placed a call to, and had a long conversation with, Frank Parlato, a well-known blogger who was an antagonist of Raniere and NXIVM. (1238.) As was well-established at the trial, Parlato once worked for NXIVM, had a falling out, and published pieces on his websites, including The Frank Report, concerning different people associated and formerly associated with NXIVM, DOS and related groups. Vicente testified that Catherine Oxenberg had already spoken with Parlato and that she asked Vicente to call him. During the call, Parlato said he had a source in the NXIVM legal department.[14] Vicente specifically stated that Parlato said that he (Parlato) pays Kristin Keeffe, who had done a great deal of legal work for NXIVM, for information. Vicente testified that during June and July, he spoke with Parlato at least once a week and that he was speaking with Catherine Oxenberg regularly. (1250)

---

[14] Vicente testified that Parlato may have said this during a later conversation.

On June 4, 2017, two days after Vicente's first call with Parlato, Sarah and two others started illegally accessing NXIVM's computer server and stealing, deleting and manipulating confidential, proprietary data. Between June 4 and June 8, 2017, the login credentials of Sarah and the two other people were used 58 times. Once they gained unlawful access to the system, they deleted information, stole student profiles, and cancelled over $100,000 worth of credit card payments. On June 5, 2017, one day in to her five-day computer theft scheme, Sarah called the FBI for a second time. She obviously did not mention that she had illegally hacked the NXIVM database.

On or about July 26, 2017, Vicente called a film-maker named Karim, and the two discussed a film project. (1252.) Vicente testified that Vicente had been paid by the people making the film project for footage that Vicente took of himself and others. Now that the HBO documentary has aired four episodes, we see that Vicente's testimony that the NXIVM footage he took was mostly of himself is not true. He stole a wide variety of footage of NXIVM including images of people who have never been connected with the organization in a public setting including children.

In late August 2017, Mark Vicente's wife, Bonnie, sent Nicole a text asking how she was. (4267.) At some point around October 31, 2017, Nicole spoke with Catherine Oxenberg and then met her in New York City. (4267.)

On March 10, 2018, Vicente wrote a long email to a number of people in which he stated that he had spoken with over 20 women who were Raniere's lovers and slaves and that "these 20 women are all talking to each other and comparing notes." (1254.) Vicente specified that he wrote that because he believed it was true. (1255.) In the March 10, 2018 email, Vicente made

specific reference to India because India was still loyal to NXIVM, or, as Vicente put it, "she was still a true believer." (1257.)

On March 27, 2018, 17 days after the email referring to India, Vicente, and a film crew working on the HBO project went to India's place of employment to film her. (1257.) Vicente explained that he brought a film crew with a movie camera to India's workplace in order to convince her to "go to the authorities." (1259.) Vicente explained he wanted to document this event. Vicente did not explain how his bringing a film crew and a movie camera to the workplace of an unsuspecting India would further his stated objective, nor how he would expect India to react to such an event.

The only fair interpretation of Vicente bringing a crew to film India at work without warning or explanation is that Vicente was planning to make India's life unbearable unless she left NXIVM and joined his group. In addition to filming India, Vicente and a film crew went to Vermont in March 2018 to film the screening of the film My Tourette's at a film festival. Vicente testified that he and his film crew, with a rolling camera, wanted to gain access to the screening of the film.

The upshot of this is that two trusted, beloved members of NXIVM, Mark Vicente and Sarah told many people false information about Raniere and his intentions. They, and others, then set in motion a well-organized effort, complete with psychologists, cult-deprogrammers and others, to convince people that they had been in a cult and had been victimized by Raniere. When the federal government then deemed NXIVM sympathizers as co-conspirators and threated potential defense witnesses with prosecution, the people who once seemed to genuinely value NXIVM or DOS had virtually no choice but to see themselves as both the Government and the anti-NXIVM group saw them. The end result of this arduous process is what we saw of

many of the trial witnesses on the stand, testifying that while they were in DOS and NXIVM they believed wholeheartedly in the program but now, years later, they had a radical, 180 degree, change in perspective.

19.    Objections to The Guideline Calculation

Raniere makes the following objections to the calculation of the United States Sentencing Guidelines set forth by the U.S. Probation Department. The objections are listed in the following manner: (1) by reference to the paragraphs in the PSR; (2) by reference to the Count and/or Racketeering Act, including, where appropriate, a sub-predicated Racketeering Act; and (3) the name of the Act or Count as set forth in the Verdict Sheet.

A.    PSR ¶¶ 178 – 181: Counts 1 and 2, **Racketeering Act 1A** - Conspiracy to Commit Identity Theft and Unlawfully Possess Identification Document of Ashana Chenoa)

Even in a light most favorable to the Government, Raniere contends there is no evidence that he organized or led this criminal activity that involved five or more participants or was otherwise extensive. Accordingly, the four-level upward adjustment under USSG ¶ 3B1.1, set forth at Paragraph 181 should not apply.[15]

The trial evidence is clear that the person who arranged this conduct and who stood to benefit from it the most was Daniela. The evidence is that Daniela wanted to come into the U.S.,

---

[15] As set forth under each Racketeering Act and Count under consideration, Raniere objects to what has been the application of a four-level enhancement to each episode of criminal activity. It appears that because Raniere is the conceptual founder of NXIVM and of other groups, and because he generally played a leadership role in the community that he is being given a four-level role enhancement across the board, without regard to the particular conduct under consideration. We respectfully disagree with this approach. Rather, we maintain that only where the evidence demonstrates that Raniere played a supervising or leadership role in regard to the precise conduct at issue can a role adjustment validly apply. As a result, we have objected to the four-level role enhancement in the majority of the acts and crimes listed.

that she flew to Canada with a plane ticket paid for by her father, and that she then coordinated with others to get a bogus identification card.

However, Raniere maintains that the credible evidence is that Daniela created her own or arranged for her own identification card. As an initial matter, Daniela admitted, for the first time on cross examination, that she herself arranged for a fake identification card for Camila when Camila crossed the border from the U.S. to Mexico. After not testifying to this at all on direct examination, Daniela was confronted with this information for the first time on cross and she admitted specifically that she caused a bogus Mexican national identification card to be created for her sister in 2017 so she could travel around Mexico. She explained that her mother had a contact in a particular city in Mexico where one could get a fake identification card and that she (Daniela) arranged to make a bogus identification card for Camila.

Her testimony about getting across the Canadian/U.S. border is that when she was stopped by U.S. border agents, and was having her identification card scrutinized, she attempted to distract the agent by asking what the weather was ahead. Once she distracted the agent and was permitted entrance to the U.S., she and another person (not Raniere) drove to the area of Clifton Park. There is testimonial evidence surrounding this event that shows that Daniela, Kathy Russell and Kristin Keeffe (three people) were the three people most intimately involved in the effort to help Daniela enter the U.S. unlawfully. We therefore oppose a four-level enhancement as not being based on the trial evidence.

As the Court is aware, counsel objected to the four-level enhancement applying to this racketeering act as well as several others, to be outlined below. The Government and the Probation Department responded to counsel's objection by pointing out that the Second Circuit decision in United States v. Ivezaj, 568 F.3d 88 (2d Cir. 2009) has held that in a case involving a violent

criminal organization, in the nature of a traditional organized crime enterprise, that a defendant's role in any particular racketeering act can be determined by his role in the overall RICO enterprise. However, the Ivezaj decision is distinct from the facts here due to the nature of the RICO enterprises alleged in the two cases. In this regard, we ask the Court to find that the holding in Ivezaj is limited to traditional racketeering enterprises, and that it not apply here.

Moreover, the holding in Ivezaj conflicts with the general rule that racketeering acts are treated as separate counts of conviction. Specifically, U.S.S.G. 2E1.1 provides that "(w)here there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for purposes of subsection (a)(2)." Subsection (a)(2) is the provision that holds that the base offense level for a RICO offense is "the offense level applicable to the underlying racketeering activity," if such is more than level 19. This language suggests that each racketeering act be analyzed independently, as would a separate count of conviction, to determine, among other things, what the defendant's role was in that particular offense. To this extent, Ivezaj breaks with the general rule of how racketeering acts are scored for purposes of sentencing. While that may be appropriate in instances where, as in the case of Ivezaj, by virtue of the defendant's position in an organized crime enterprise, he is invariably going to make decisions about and supervise the ongoing criminal activity of the group, it is not appropriate here. Rather, the specific facts surrounding Daniela's decision to enter the U.S. illegally for her own reasons, with financial assistance from her family, and with the physical assistance of people other than Raniere, should not result in Raniere receiving a four-level role enhancement under these facts.

If Raniere is not given the four-level enhancement for role, the Adjusted Offense Level for this offense is a Level **19**, not a Level 23.

B.    PSR ¶¶ 184 – 191: Counts 1 and 2, Racketeering Act 2 - Sexual
      Exploitation of Camila

It is important to note at the outset and as a general matter that it appears Camila has chosen not to participate with the Government or the Probation Officer in the development of the purported offense conduct. Accordingly, any enhancements based on perceived facts are inherently unreliable due to her lack of participation and her unwillingness to be a source of information in connection with the sentencing. It is also significant that it appears that the Government has knowledge of her whereabouts and has the ability to speak with her if it so chooses. During Daniela's testimony, she stated that she is in contact with Camila and suggested that Camila was supportive of Daniela's decision to testify at the trial.  However, the Government has not provided any investigation reports or notes of any interviews with Camila, leading to the conclusion that the Government has not interviewed her.  This is either because the Government has not attempted to interview her or that the Government has attempted to interview her and she has refused.  Either of these possibilities is significant given the fact that the Government is now pushing for Raniere to be sentenced based on its contention, unsupported by first-hand information provided by Camila, that Raniere was involved in an intimate relationship with her when she was fifteen years old.  It goes without saying that the Government bears the burden of proving these facts by a preponderance of the evidence and we contend that the Government cannot meet this burden given the trial record as developed.

Camila has not appeared as a trial witness; she has not spoken with the Government; she has not spoken with Probation; she has not submitted a victim impact letter and she has not agreed to be a plaintiff in the civil action against Raniere and others. This is so despite the fact that her sister, Daniela, was a trial witness, is a civil plaintiff and has actively participated in the trial at every meaningful step.  Because of Camila's decision to not participate in the trial process, the

Government has directed the court's attention to a number of statements it attributes to her. However, the statements allegedly made by Camila in her diary and in written communication allegedly with Raniere are hearsay and are unreliable. The reason hearsay is generally inadmissible is because prior out of court statements are historically unreliable when offered for the truth of the statements. This is so for several reasons. First, where, as here, the person does not testify, there is no mechanism to determine what the person meant by his or her prior statement, and even whether the person was intending to recite facts or was instead writing down thoughts, aspirations or fiction. Second, there is no way of determining the person's basis of knowledge even it is it determined - which it cannot be – that the person was intending to impart facts. Before a statement is deemed to be admissible, the rules of evidence require that it have some indicia of reliability, which are roughly reflected in the exceptions to the hearsay rule. There is no exception to the entries in a diary purportedly written by a person who has refused to be interviewed by the Government or to come before the court. Moreover, given Camila's reticence to be involved in the trial, there is virtually no doubt that she herself did not give her diary to the Government. So, one should wonder where the Government got this most private of things from a woman who seeks to maintain her privacy. The Court also has no assurance, given the fact that the diary seems to have been purloined against Camila's will, what entries are hers and which are entered by the person who presumably took it and gave it to the Government. The bottom line is that the Diary entries are wholly unreliable for a host of reasons and should not be given provenance by this Court.[16]

---

[16] The Government has never indicated how it came into possession of Camila's diary. If the Government is in possession of information that the diary was taken from Camila against her will or without her knowledge by someone who testified as a Government witness, such would be the type of information the defense should have been told in time to use it to cross examine the person who stole it. The Government has made no such disclosure.

The Government's proffered information fails to prove that Raniere was in an intimate relationship with Camila when she was fifteen years of age. In light of this and other facts, we lodge the following objections to Racketeering Act 2.

As an initial point, the Probation Department awarded Raniere two points "[s]ince the offense involved the commission of a sexual act, which occurred during grooming." PSR ¶186. We have two objections to the two-level increase awarded on this basis.

First, we object to a two-level enhancement for so-called "grooming." (¶ 186.) Specifically, Raniere objects to any assertion that he engaged in "grooming." At trial, Raniere objected to the admission of "grooming" testimony, and the government's expert witness was not permitted to testify as to grooming. Accordingly, the trial record is absent of any testimony supporting this enhancement on this basis alone. The paucity of evidence regarding grooming, combined with the unwillingness of Camila to provide information as part of this process, renders an insufficient factual basis to conclude that "grooming" occurred under 2G2.1(b)(2)(A).

Second, we object to a finding of a sexual act and to a finding that the particular photographs at issue can give rise to the "sexual act" enhancement.[17] The plain language of the Sentencing Guidelines requires the "sexual act" to be depicted in the photograph. USSG §2G2.1(b)(2)(A). The term "sexual act" in the Guidelines refers to the definition contained at 18 USC Sec. 2246, which includes different forms of sexual touching set forth in the statute. The photographs of Camila involve her being photographed while naked and also involve close up photographs of certain parts of her body. However, there are no photographs of any sexual act of any sort as defined by Section 2246. Therefore, the two-level enhancement for a sexual act that

---

[17] Raniere was never charged with engaging in a sexual act with a minor.

occurred during grooming does not apply because none of the photographs comprising the offense conduct depict a sexual act.

To the extent that the Probation Department and the Government are attempting to apply this enhancement to these photographs because of a contention that Raniere was involved in a sexual relationship with Camila - while admittedly there is no photograph of any sexual contact - we believe the Probation Department and the Government, most respectfully, misunderstand the scope of the enhancement. As noted, the plain language of the Sentencing Guidelines requires the "sexual act" to be depicted in the photograph. USSG §2G2.1(b)(2)(A). On this point, the Government cites to an unpublished Second Circuit decision called United States v. Weisinger, 586 Fed. Appx. 733 (2d Cir. 2014). However, Weisinger does not stand for the proposition that a sexual relationship generally can be used to establish sexual contact in a visual image. Rather, in that case, the court found that masturbation is sexual contact because the definition of sexual contact includes "intentional touching" of the genitalia. However, none of the alleged Camila photos involve any such touching, Therefore, the unpublished decision in Weisinger is inapplicable. There is no other decision cited by the Government in this Circuit that would apply the two-level enhancement under these circumstances.

Raniere further objects insofar as the Government and Probation are basing the enhancement on an alleged sexual relationship between Raniere and Camila while she was a minor. (PSR ¶¶137, 138.) For reasons stated above, the evidence has failed to establish by a preponderance that Raniere engaged in an illegal sexual relationship with Camila surrounding the production of the photographs. Accordingly, the Government has not met its burden by establishing this two-level increase by a preponderance of the evidence.

Raniere also objects to a two-level enhancement for Camila being a minor entrusted to Raniere's care and dependent upon him for housing. In particular, the Government and Probation awarded Raniere two points "[s]ince (Camila), a minor, was entrusted to the defendant and dependent on him for housing." (PSR ¶187.) According to the PSR, "in November 2005, (Camila) was living in a Nxivm-affiliated home with at least one DOS first-line master; (Camila) was isolated from her siblings who were living at other Nxivm affiliated homes, and her parents lived in Mexico in November 2005." (PSR ¶¶137, 138.) The Government and Probation have not met the burden of establishing by a preponderance of evidence that Raniere was aware of, let alone responsible for, Camila's housing in November 2005. Simply put, there is no evidence Raniere arranged for, paid for, or was even knowledgeable about, the monetary source of her housing. It is nowhere in the trial record, and indeed, the trial record establishes that her parents were traveling to Clifton Park from Mexico quite frequently.

To the extent that the Probation Department relies on DOS and Raniere's role in DOS to impute knowledge of Camila's housing situation in 2005, it must be recalled that DOS was not created until 2015, a full decade after the allegations concerning Raniere's involvement with Camila in 2005. Therefore, Raniere objects to any reliance on DOS or any individual who would later become a "first-line master" of DOS as that organization was not created until a decade later.

Insofar as probation is basing this enhancement on Raniere's alleged role as her "teacher" (PSR ¶¶137, 138), Raniere objects to that characterization. Raniere was never a teacher in the traditional sense and Camila was not his student. Camila's housing and employment were arranged by her family and by people other than Raniere.

Finally, Raniere objects to an aggravating role enhancement. The conduct in the light most favorable to the Government is that Raniere took photographs of Camila and that for the better

part of fifteen years they remained electronically-stored but NEVER shown to anyone or viewed by anyone. In either event, there is no information that Raniere acted with anyone else in taking or keeping these photographs or that any other party played any role in this conduct. Therefore, there is no basis for any role enhancement.

Once the "sexual act/grooming" enhancement (¶186), the "minor entrusted and dependent for housing" enhancement (¶187) and the Role enhancement (¶189) are eliminated, Raniere submits the proper offense level for Racketeering Act Two is **34.**

> C. PSR ¶¶ 192 – 199: Counts 1 and 2, Racketeering Act 3 - Sexual Exploitation of Camila

The objections to Racketeering Act 3 are identical to Racketeering Act 2, and are directed at Paragraphs 194, 195 and 197. Accordingly, the proper offense level for Racketeering Act Three is **34**.

> D. PSR ¶¶ 192 – 199: Counts 1 and 2, Racketeering Act 4 - Possession of Child Pornography

Raniere agrees that the same Guideline Section, specifically 2G2.1 applies to this Racketeering Act. Therefore, he raises the same objections as in Sections 3 and 4 above. Accordingly, the proper offense level for Racketeering Act Four is **34**.

> E. PSR ¶¶ 200 – 205: Counts 1 and 2, Racketeering Acts 5A and 5B – Conspiracy to Commit Identity Theft and Identity Theft of James Loperfido

Raniere contends that the trial evidence, even in a light most favorable to the Government, does not support a four-level role enhancement. Daniela testified that this involved herself, Raniere, Kristin Keeffe and Kathy Russell (4 people). Therefore, the appropriate Adjusted Offense Level is Level **19**.

> F. PSR ¶¶ 206 – 211: Counts 1 and 2, Racketeering Act 5C – Identity Theft of Edgar Bronfman, Sr.

As with Racketeering Acts 5A and 5B, Raniere contends that a four-level role enhancement does not apply to this conduct.  Therefore, the appropriate Adjusted Offense Level is Level **19**.

G. PSR ¶¶ 212 – 217: Counts 1 and 2, Racketeering Act 6 – Conspiracy to Alter Records for Use in an Official Proceeding

The evidence does not demonstrate that Raniere was a leader or organizer in this conduct. Rather, the evidence shows that others, who played a far more direct role in the conduct, were giving orders and appearing on the emails and other communication.  In particular, it is established by the email traffic that Vicente was engaging in this conduct with Keeffe and others. Therefore, the appropriate Adjusted Offense Level is Level **19**.

H. PSR ¶¶ 218 – 223: Counts 1 and 2, Racketeering Act 7 – Conspiracy to Commit Identity Theft of Marianna

The evidence does not demonstrate that Raniere was a leader or organizer in this conduct. Moreover, viewing this in the light most favorable to the Government, Daniela testified that only she, Raniere and one other person were aware of this, for a total of 3 people. Therefore, the appropriate Adjusted Offense Level is Level **19**.

I. PSR ¶¶ 224 – 230: Counts 1 and 2, Racketeering Acts 9A and 9B – Daniela

Raniere objects to the two-level enhancement because Daniela allegedly "suffered the protracted impairment of a bodily member (she was denied medical attention for 6 weeks for her tooth) and mental faculty (she contemplated suicide due to her detention)." PSR ¶225. Racketeering Acts 8(a) and 8(b)[18], the only acts referencing Daniela, do not reference any issue with her tooth or that she considered suicide. Her tooth (for which she received treatment) and her

---

[18] While this conduct was originally charged as Racketeering Acts 9A and 9B, due to changes before the trial, they were submitted to the Jury in the Verdict Sheet as Racketeering Acts 8A and 8B.

contemplation of suicide (of which there is no evidence other than her say so), do not rise to the level of "serious bodily injury." USSG §1B1.1 (Application Notes); USSG §2H4.1(b)(1)(B) (Application Notes). Accordingly, Raniere objects to this enhancement as probation has failed to meet its burden of establishing the two-point increase by a preponderance of evidence.

Raniere objects to the four-level role enhancement. The trial evidence, including emails and other documents, demonstrates that Jane Doe 4's father was the principal actor in handling his adult daughter whom, the evidence demonstrates, committed theft repeatedly against different members of the community as well as a number of area stores. In addition, she hacked into her father's Facebook account, a fact that her father was greatly displeased about. So, the evidence as a whole shows that Jane Doe's time in her family home with her family providing basic necessities for her was not led or supervised by Raniere.

In addition to these technical objections, Raniere asserts that the evidence shows that Daniela was not held against her will, that her staying in the room was a function of her free will and that she was never prevented from leaving. This is shown by the fact that when she wanted to leave the room, she did so, and was driven to Mexico by her father and another person. Also, the fact that she lacked her birth certificate was the result of a decision by her father and also a choice by Daniela herself to not pursue avenues available to her to be in this country legally. As the trial evidence showed, there was a lawyer available to her, specifically one made available to her by her father. However, the trial evidence showed that she willfully did not avail herself of the lawyer's services, and instead chose to remain in the U.S. without pursuing lawful residence. Raniere rejects any contention that he is responsible for her decision in regard to either staying in a room in her family's home or leaving when she chose to leave.

Therefore, the appropriate Adjusted Offense Level is Level **25**.

J. PSR ¶¶ 231 – 236: Counts 1 and 2, Racketeering Act 10 – Extortion

While Raniere objects to the facts as to this offense, we concede that in the light most favorable to the Government, the Guidelines are correctly calculated at an offense level of **23**.

K. PSR ¶¶ 237 – 242 Counts 1 and 2, Racketeering Act 12A, Count 8 & Count 9 – Sex Trafficking of Nicole

While Raniere objects to the facts as to this offense, we concede that in the light most favorable to the Government, the Guidelines are correctly calculated at an offense level of **34**.

L. PSR ¶¶ 243 – 248: Counts 1 and 2, Racketeering Act 12B & Count 6 - Forced Labor of Nicole

Raniere objects to cross referencing to the Guideline for Sex Trafficking and adding two points, pursuant to 2H4.1(b)(4). This produces the result that the Guideline for Involuntary Servitude is a base level of 32, which is two levels higher than Sex Trafficking. Because Raniere is being already sentenced for Sex Trafficking for this same conduct, the cross-referencing from the Involuntary Servitude Guideline, with a base offense of either 22 or 18, to the Sex Trafficking Guideline, with a base offense of 30, amounts to double counting. In other words, Raniere is being punished for the Sex Trafficking of Jane Doe 5 twice: once in connection with Racketeering Act 10A and, due to the cross referencing, he's being punished for the same conduct again in Racketeering Act 10B. Therefore, because Raniere will already be sentenced pursuant to the Sex Trafficking Guideline, the cross reference should not apply, and he should be sentenced at a base level of **22**.

M. **PSR ¶¶ 249 – 254: Counts 1 and 2, Conspiracy to Commit Identity Theft of Pam Cafritz**

Raniere maintains that he did not steal the identity of his long-time romantic partner. He further states that he should not receive a four-level increase for his role in this offense. Therefore, the appropriate Adjusted Offense Level is Level **19**.

N. **PSR ¶¶ 261 – 266: Count 1 & Count 8(A) Sex Trafficking of Sylvie**

Because the Jury was not asked to make any factual finding based on the testimony of Sylvie, we contend that her testimony does not establish sex trafficking or conspiracy to commit sex trafficking. The testimony of Sylvie is included above and we submit that based on that testimony, there is no basis for find that she was a victim of sex trafficking so as to be included in the guidelines calculation.

O. **PSR ¶¶ 267 – 278: Count 1 & Count 8(A) Sex Trafficking of India**

The first question that should be asked in determining whether the Government has proven that India was a victim of sex trafficking is the following: when exactly did India go from being co-conspirator 2 in the complaint that was used to commence this case to a sex trafficking victim. The Government, not surprisingly, avoids answering this eminently self-evident question. The truth is that she is neither a co-conspirator of sex trafficking nor a victim of it, as there is no sex trafficking.

Raniere continues to object to including India in a calculation of his offense conduct, as the Government has not proven by a preponderance of the evidence that she was a victim of sex trafficking. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



These are but a few examples of how this individual plainly did not believe she was a victim of any offense whatsoever, much less of Sex Trafficking, ███████████████████ ███ Accordingly, it is the defense's contention that not only has the Government not proven sex trafficking as to this person, ████████████████████████████████████████ she was not a sex trafficking victim or a victim of any crime. At a minimum, ███████████████ ████████████████████████ the Court cannot find by a preponderance of the evidence that she is a sex trafficking victim without the defense being permitted ███████████████████ ████████████████████████████████████████████████████████████

████

Because there will be no <u>Fatico</u> hearing and because ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████, there is no factual basis to conclude she is a victim of sex trafficking. Therefore, there should be no scoring for the events concerning Additional DOS Victim 1.

P.      PSR ¶¶ 279 – 284: Count 1, Count 8, & Count 10 – Attempted Sex Trafficking of Jay

Raniere asserts that the crime of conviction, Attempted sex trafficking, has a three-point reduction under USSG §2X1.1(a) that should apply under the specific facts here. Significant to this calculation, Additional DOS Victim 1 is the person who gave Jay the assignment to seduce Raniere. As set forth in detail above, ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Therefore, it is not the case that Raniere "completed all of the acts (he) believed necessary for successful completion of the substantive offense" for the simple reason that Jay was never supposed to have sex with Raniere, ████████████████████████████████████████ Accordingly, the appropriate base level for the attempted sex trafficking of Jane Doe 8 is **31**.

Q.      PSR ¶ 286: Offense Level Table

Under the defense calculation, the group with the highest offense level is 34. There are two groups with a total of 34, specifically the offenses involving Camila, which comprise one group, and a second group concerning one of the sex trafficking offenses, which is also level 34. Therefore, these two groups result in two units as they are equally serious.

The next most serious group involves the attempted sex trafficking offense at a level 31. Since that is three levels less than 34, that results in an additional unit, for a total of 3 units.

The next most serious group involves the offenses concerning Daniela at a level 25. Because that is 9 levels less than the most serious offense, at a level 34, this does not result in an increase of any units. Therefore, the total number of units remains at 3.

In regard to the rest of the offenses, each are more than 9 levels less than a level 34 and therefore are not counted as part of the overall calculation. Therefore, the total number of units is 3. Therefore, the highest offense level of 34 is added to 3 for a total offense level after all Chapter 1, 2 and 3 adjustments of a level **37**.

R.      PSR ¶ 290 – Chapter Four Adjustments

The Government and the Probation Department have concluded that Raniere's conduct meets one particular Chapter Four adjustment, specifically that he is a repeat and dangerous offender against minors. Raniere objects to this finding. If the Government is correct, this would result in a five-level Chapter 4 enhancement. If the defense is correct, the total offense level would remain at a level **37**.

U.S.S.G. 4B1.5(b) provides, in part, as follows: "In any case in which the defendant's instant offense of conviction is a covered sex crime, neither 4B1.1 (Career Offender) nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct: (1) the offense level shall be 5 plus the offense level determined under Chapters Two and Three…(2) the criminal history category shall be the criminal history category determined under Chapter Four, Part A. In this regard, this guideline requires two essential elements. First, it requires that the offense of conviction be a "covered sex crime." Second, it requires that the defendant engaged in a "pattern of activity" involving "prohibited sexual conduct."

As to the first element, the term "covered sex crime" is defined in the Application Notes as "(A) an offense, perpetrated against a minor, under (i) chapter 109A of Title 18…(ii) chapter 110 of such title, not including trafficking in, receipt of, or possession of, child pornography…". There are no offenses of conviction falling into Chapter 109A of Title 18. The crime of Sexual Exploitation is set forth in chapter 110 and therefore would be a "covered sex crime" for purposes of the guideline.

The defense asserts, however, that under the particular facts here, Raniere's conduct would not comprise a pattern of activity under the Application Notes. It is worth noting that shortly before the alleged commission of these crimes, the Application Notes to this Guideline changed the requirement of a pattern from being two or more victims to one victim. However, there is no indication in the Notes as to what a pattern means in terms of the temporal relationship between two events. Based on the history of the pattern requirement, it appears that more is required than photographs taken on two separate occasions only days apart, especially where, as here, the evidence shows that the photographs were never displayed, printed, emailed, put on the internet or shown to anyone ever. Rather, even in the light most favorable to the Government, the photographs were taken and they were never accessed, sent or seen by Raniere or anyone else for that matter. Therefore, the defense contends that under these facts, the Government has not proven a pattern of activity sufficient to justify a five-level enhancement.

Given the analysis set forth above, Raniere's final level would be level 37 in Criminal History I for a guidelines range of 210 to 262 months of incarceration.

20. <u>Under Title 18, United States Code, Section 3553, This Court Should Not Impose More Than A Fifteen-Year Sentence</u>

Keith Raniere is 60 years old. In the over two years since he was kidnapped by Mexican government officials who forcibly entered a private home with guns in the absence of an arrest

warrant or any legal process from either a U.S. or Mexican court, unlawfully seized him and took him across the border to the United States, Mr. Raniere has continued to be subject to unusually cruel detention conditions. By the time of sentencing, he will have been in the MDC for over thirty months. During that time, he was subjected to sub-freezing conditions for days and weeks on end during the Winter of 2019 as well as the Covid pandemic commencing in March 2020.

Pursuant the Court's scheduling order, the Court and the Government will be receiving many letters, parts of which have been previewed in this Memorandum, from people who give credit to Raniere for changing their lives for the better, for helping them improve their relationships with their parents, their children, their spouses and other loved ones in their lives. For all the people who said negative things in Court about their experiences with Raniere, there are many more people who have had the most positive of experiences with him and from the programs and teachings he has created.

Also, even though the Court will undoubtedly be mindful of the jury's verdict that the alleged inner circle was an enterprise, we ask the Court to view the conduct here on the spectrum of other cases with which this Court is familiar. One of the aspects of RICO that frustrates defense attorneys is its malleability and how it can stretch and contort to fit so many (perhaps too many) situations involving groups who allegedly engage in criminal conduct. But, considering the testimony in this case from the Government witnesses as well as the cooperator, Ms. Salzman, we ask: how many organized crime cases have featured all of the Government witnesses saying that they joined a group because they believed its mission was to make the world better? No one has ever testified that he or she joined a drug gang or the Genovese Family or a cartel because they thought that by doing so, they could make the world better or bring a higher level of humanity to themselves and others. Rather, they joined such groups to be able to

commit serious crime on a higher, more efficient level. That is simply not the case here, and the witnesses are uniform in saying so. This is not a typical RICO case. This is not a case where the people joining the group were motivated by stealing or violence or bad motives. The unrefuted evidence is the opposite. Every person – the people writing letters to the Court, the prosecution witnesses, the people submitting victim impact statements – tells the court the same thing: they joined NXIVM or ESP because they genuinely believed that by doing so they could make the world better. We ask the Court to commence its sentencing analysis from that premise.

Just as this is not a typical RICO case, it is not a typical child pornography case either for the simple reason that the images were never sent anywhere nor were they even viewed. The child pornography statute is broad. It is broad so as to capture within its purview a wide variety of conduct that Congress deems appropriate under that statute. But, when a statute is broad, it provides the Court with the ability to make critical distinctions between the different ways the offense can be committed. The evil of child pornography is that a child was victimized by an image being published and seen by different people. That simply did not happen here. There is no dispute the images at issue never left the camera or the device onto which they were stored. They were not sent to anyone. No one ever saw them. To say that this particular case is outside the heartland of child pornography cases is an understatement for the simple reason that the photographs were never published, never sent anywhere, never shared.

The trial evidence showed that Raniere and Camila had a relationship well into Camila's mid and late 20s. This relationship was close and loving and, at times, showed signs of turmoil, much like any relationship. Much has been speculated about Camila, but only one thing is known for sure: she hasn't come forward to tell us what she thinks of all of this. And, she certainly could have. The FBI knows where she is, her sister, Daniela, knows where she is; and

if Camila wanted to speak with the FBI, the prosecutors, the Court or Probation, she could have done so. So, while we understand that the Court will view this conduct as very serious, we also hope that the Court will see how this case is vastly different than many of the child pornography cases coming before it.

21.   Conclusion

This Memorandum summarizes a very complex human life. We hope we have shown the Court the good that Keith Raniere has done and has tried to do, and we respectfully ask for a sentence of fifteen years of incarceration.


Dated:        September 19, 2020
              New York, New York

                                            Respectfully submitted,

                                             /s/
                                            Marc A. Agnifilo, Esq., *Of Counsel*
                                            Brafman & Associates, PC
                                            767 Third Avenue, 26th Floor
                                            New York, NY 10017

                                              /s/
                                            Paul DerOhannesian II
                                            DerOhannesian & DerOhannesian
                                            677 Broadway – Ste. 707
                                            Albany, NY 12207


cc:      Counsel for the government (via ECF and email)