UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| - v. - | No. 18-cr-204 (NGG) (S-2) |
| | **Date of service: October 19, 2020** |
| KEITH RANIERE, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KEITH RANIERE'S MOTION FOR A NEW TRIAL

Marc A. Agnifilo, Esq.
Teny R. Geragos, Esq.
   *Of Counsel*

Paul DerOhannesian II, Esq.
Danielle R. Smith, Esq.
   *Of Counsel*

**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

**DEROHANNESIAN & DEROHANNESIAN**
677 Broadway, Suite 707
Albany, NY 12207
(518) 465-6420

*Attorneys for Defendant Keith Raniere*

Table of Contents

Introduction ........................................................................................................................1

Statement of Facts ..............................................................................................................3

       A.      Counsel Stated From the Inception of this Case His Intent to Call Witnesses Formerly in DOS Who Would Undermine the Government's Theory ..................................................................................................3

       B.      The Prosecution's Tactics Before Trial ..................................................5

Argument ............................................................................................................................7

       A.      This Information Is Newly Discovered Within the Meaning of Rule 33 .................7

       B.      The Prosecution Has Demonstrated a Pattern of Intimidating Defense Witnesses That Has Violated Raniere's Fifth and Sixth Amendment Rights ..................................................................................................8

             1.      The Testimony of the Witnesses Was Material and Exculpatory ..............11

             2.      The Government Intended to Intimidate Witnesses ..................................12

             3.      The Government's Actions Prevented A Fair Trial ..................................13

Conclusion ........................................................................................................................14

i

## **INTRODUCTION**

Since the trial in this case, two witnesses, specifically Michele Hatchette and Nicole Clyne, who did not testify for the defense due to threats and intimidation by the prosecution, including the abuse or threatened abuse of legal process, have agreed for the first time to come forward and provide testimony in the form of the attached affidavits that would have challenged material elements of the prosecution's case and exculpated the defendant, Keith Raniere, of the most serious charges against him. This motion is fashioned as a Rule 33 motion based on new evidence not because the existence of these witnesses or the substance of their testimony was unknown to the defendant and his counsel prior to trial; we absolutely knew that these witnesses existed and we knew the essence of their testimony. Rather, this is properly fashioned as a Rule 33 motion based on new evidence because as a result of the Government's threats, coercion and intimidation, set forth in the attached affidavits, these witnesses were not willing to testify at the trial, nor were they willing to come forward and provide the accounts contained in the attached affidavits. With Mr. Raniere's sentence looming and as more time has passed since the threats have been made, these witnesses have now agreed to provide their accounts to the Court. We recognize that the Government will contend that because the defendant knew of these witnesses and their expected testimony that this is not in fact new evidence. (Dkt. 949, Government Response to Raniere Sentencing Memo at p. 2.) However, the Government should not be permitted to intimidate and coerce defense witnesses out of testifying and then later successfully argue that the defendant is without a post-trial remedy because the witnesses they intimidated should have testified or otherwise come forward.

As set forth in the attached affidavits of Michele Hatchette and Nicole Clyne—both former DOS participants—it is clear that the Government engaged in a widespread, systemic effort to

threaten potential defense witnesses and to prevent them from testifying. Because the Government's actions in this regard, specifically concerning potential defense witnesses, violated Mr. Raniere's right to a fair trial, he makes this motion for a new trial based on newly discovered evidence.

An accused's right to obtain witnesses in his or her favor is fundamental, is essential to a fair trial and is guaranteed in federal trials by the compulsory process clause of the Sixth Amendment and the due process clause of the Fifth Amendment. Webb v. Texas, 409 U.S. 95 (1972). The attached affidavits show that the prosecution engaged in a systemic effort to intimidate potential defense witnesses, to create a threatening atmosphere to potential witnesses who wished to testify in support of Raniere in Court and to misuse the Grand Jury process in the days leading up to trial with the specific purpose of frustrating the defendant's ability and constitutional right to call witnesses on the defense's direct case. As a result of the Government's actions, as set forth in detail below, Keith Raniere was deprived of material and exculpatory evidence that could only be secured through the truthful testimony of these witnesses. See Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990); United States v Pinto, 850 F.2d 927 (2d Cir. 1988). Accordingly, due to the fact that these witnesses were scared into silence by the efforts of the prosecution through the abuse and threatened abuse of the legal process and were unwilling to come forward, the defendant, Keith Raniere, moves this Court for a new trial under Federal Rule of Criminal Procedure 33(b)(1) as well as the Fifth and Sixth Amendments to the U.S. Constitution.

This motion focuses on two people (Michele Hatchette and Nicole Clyne), who would have been defense witnesses had it not been for the threats and intimidation of the Government. For the reasons set forth below, it is clear that the Government used the Grand Jury subpoena process, not as a good faith mechanism to secure Grand Jury testimony, but as an instrument to threaten and

intimidate someone the Government knew was a likely trial witness. In addition, as set forth below, the Government threatened Ms. Hatchette with perjury if she appeared as a trial witness without first coming to the U.S. Attorney's Office for a third proffer session. The misuse of the Grand Jury subpoena and the threats of a perjury indictment comprise a clear pattern of intimidation that violated Mr. Raniere's constitutional right to call witnesses on his behalf and to a fair trial with due process of law.

## STATEMENT OF FACTS

This Court, having sat through a six-week trial and having ruled on pre-trial and post-trial motions is familiar with the facts underlying Mr. Raniere's conviction. Counsel here recites only the facts pertinent to this motion.

A. <u>Counsel Stated From the Inception of this Case His Intent to Call Witnesses Formerly in DOS Who Would Undermine the Government's Theory</u>

Since the inception of this case, counsel stated both in open court and in filings that this "is a case about witnesses." (9/13/2018 Transcript ("Tr.") at 15.) Counsel repeatedly moved this Court to compel the prompt production of <u>Brady</u> material because we believed that some witnesses that the Government interviewed "have represented that the tenets of DOS—including collateral, acts of care and completion of assignments---was a *choice* that they made on their own without any coercion, threats or manipulation." (Dkt. 197: 11/16/2018 Agnifilo Affirmation ¶ 5.) Moreover, many witnesses "have represented that if they engaged in a sexual relationship with Keith Raniere, that relationship was entirely consensual, unrelated to their involvement in DOS, and oftentimes kept secret from other members of DOS." (<u>Id.</u>) Moreover, it was counsel's belief that witnesses stated to the Government:

> that it was immaterial that DOS members may not have told them about Raniere's involvement in the sorority. Moreover, the witnesses have informed the Government that they did not feel manipulated. When asked if the witnesses knew

3

that Raniere was involved in DOS (i.e., the originator, or the conceptual founder of many of the tenants of the sorority, as alleged in the Complaint) and whether his involvement would deter them from their participation, witnesses have stated that Raniere's involvement in the sorority was irrelevant to their participation.

((¶ 13); see also ¶ 17: "Witnesses have informed the Government that the purpose of continuing to give collateral was to build their word and build their commitment to each other, not out of fear that their collateral would be released.")) Accordingly, the defense moved for this material, as it "directly contradicts the motive theory testified to by prosecution witnesses." (Dkt. 198 at p. 20 quoting Mendez v. Artuz, 303 F.3d 411, 413-14 (2d Cir. 2002).) The defense wanted access to this material so that we could call witnesses to testify as to the true nature of DOS and its practices.

The Government repeatedly denied it was in possession of Brady material and declined to disclose any of these witness statements to the defense until they provided 3500 material to the defense.[1] At oral argument on the Brady motion, the prosecution argued to the Court:

> Your Honor, what we would say to that is while we do not believe that there is exculpatory material here, the question in all of the Brady cases isn't could this assist the defendant. It's are they being denied exculpatory evidence that's preventing them from adequately preparing for trial and that's simply not the case here. The defendants know every person who is in DOS. They are perfectly capable of interviewing those people. They, from their very statements to Your Honor, are clearly having conversations with certain people who the Government has also interviewed and so there is no loss to the defendants that the courts are concerned about in the Brady context that the defendants are going to be unfairly surprised at trial or not have had the proper opportunity to be preparing their defense. This is not -- the Government doesn't need to be doing the Pretrial investigation for competent defense counsel who are sitting there and they know everybody who was involved and they are equally able to interview people. And, so, that's what the Government's position is.

(1/09/2019 Tr. at 62-63.)

---

[1] The Government began producing 3500 material to the defense on April 2, 2019 – a couple weeks prior to the May 2019 trial start date.

4

As the defense hoped to call these witnesses at trial, counsel wanted to be in possession of these statements in order to "effectively present [Raniere's] defense at trial." (Dkt. 198 at p. 22.) This included the ability to present witnesses with a countervailing narrative to the Government's. So the record is clear, the Government NEVER provided ANY Brady material early enough for counsel to conduct any defense investigation. Rather, the Government provided witness statements of all witnesses interviewed by the Government on a rolling basis pursuant to the timetable set for 3500 material.

B. The Prosecution's Tactics Before Trial

The prosecution produced FBI 302 statements from interviews with many former DOS participants, including Michele Hatchette on April 6, 2019.[2] At about this time, the Government contacted Ms. Hatchette's lawyer, Justin Greenblum. Ms. Hatchette describes these events in her affidavit as follows:

> Shortly before the trial, the prosecutors contacted my lawyer, Justin Greenblum, to attempt to interview me for a third time. Because almost ten months had passed since the second interview and because it was apparent that I had refused to adopt the government's inaccurate views and the false narrative it had imposed upon me, I did not see a reason to spend more time meeting with the government, as I believed I had already told them everything about my experience. By this point, the government had shown that it was not interested in hearing my authentic account.
>
> * * *
>
> When my attorney told Ms. Penza it was unlikely that I would meet with them again, Ms. Penza told Mr. Greenblum that they were interested in having me prep with them for trial because they were planning to call me as one of their witnesses and were prepared to subpoena me to testify if I declined their request. Ms. Penza advised Mr. Greenblum to encourage me to meet with them prior to taking the stand or else they would be likely to charge me with perjury.

---

[2] The Court had ordered the Government to begin production of 3500 material on April 1, 2019.

5

(Hatchette Affidavit ¶¶ 39-40.) As stated in her affidavit, Ms. Hatchette understood this as a clear threat that if she was a defense witness, she would be indicted for perjury. (Hatchette Affidavit ¶ 41 ("The threat of such an unjust, unsubstantiated, and retaliatory indictment was a great weight in my consideration of testifying for the defense or not.").) Significantly, the prosecutor expressed this as a certainty, that if Ms. Hatchette testified without first coming into the U.S. Attorney's office for a third time, they would likely charge her with perjury. A reasonable person who heard the Government's statement would understand it as a serious expression of an intent to cause legal harm and lead a defense witness to decline testifying to avoid the harm.

Simultaneously, as Nicole Clyne affirms, the Government served Ms. Clyne with a grand jury subpoena after jury selection had commenced in April 2019. (Clyne Affidavit ¶5.) Defense counsel submitted a letter alerting the Court and all parties, in an opposition to one of many Government requests to adjourn the trial. As a basis for opposing the Government motion to adjourn the trial, counsel stated as follows:

> Second, the government is <u>improperly</u> using this time (after the Court handed out jury questionnaires) to gather trial evidence by use of Grand Jury subpoenas. "The law is settled in this circuit and elsewhere that it is improper to utilize a Grand Jury for the sole or dominant purpose of preparing an already pending indictment for trial." <u>In re Grand Jury Subpoena Duces Tecum Dated Jan 2, 1985</u> (<u>Simels</u>), 767 F.2d 26, 29 (2d Cir. 1985).… The government is preparing for this trial by using the Grand Jury to cut subpoenas for documents and witnesses. This is clearly improper, and the defense will not contribute to the improper use of the Grand Jury by allowing the government additional time to engage in this conduct.

(Dkt. 523 at 2-3.)

Through this letter, counsel put the Court on clear notice that the Government was using Grand Jury subpoenas to prepare for trial. However, the Government's use of a Grand Jury subpoena to prepare for trial, improper in its own right, was in fact part of an effort to threaten and intimidate defense witnesses. In addition to serving a Grand Jury subpoena on a potential defense

6

witness after the jury selection process had begun, the lead prosecutor made an explicit threat to Ms. Clyne's lawyer, Edward Sapone, stating: "first, we are going to cut the head of the snake off[3] and then we're coming for the body. This is not going away for her." (Clyne Affidavit ¶5.) The threat and message the Government delivered was received loud and clear: <u>testify for the defense and be prosecuted; remain silent and you will not be prosecuted.</u> The potential witnesses heard the Government's message loud and clear. They did not testify and indeed they were not prosecuted. In regard to the Grand Jury subpoena to Ms. Clyne, despite the passage of time since the trial, the Government has not pressed for her documents, nor has it offered Grand Jury immunity to continue some investigation. Rather, the Grand Jury subpoena was simply an instrument to instill in her a sense of fear that she was actively being investigated by the Grand Jury and to prevent her trial testimony.

## ARGUMENT

A. <u>This Information Is Newly Discovered Within the Meaning of Rule 33</u>

The prosecution successfully and effectively silenced Ms. Hatchette and Ms. Clyne, as well as others, through the use of threats of a perjury prosecution and the misuse of the Grand Jury process. It is only now that these people are willing to come forward, divulge their names (which is something that not even the most important Government trial witnesses had to do) and give an account of how the Government intimidated them. Accordingly, because these witnesses were threatened and intimidated into silence by the purposeful actions of the prosecution, the information is newly discovered within the meaning of Rule 33. Simply put, the witnesses refused to come forward earlier and this is due solely to the actions of the prosecution specifically designed to prevent them from coming forward prior to trial and conceal their actions from defense and jury.

---

[3] This was a reference to Mr. Raniere.

7

The prosecution should certainly not benefit through the successful and effective silencing of defense witnesses through the abuse and threatened abuse of the legal process. Therefore, this is a proper mechanism for the consideration of this important issue in advance of the defendant's sentence.

- B. The Prosecution Has Demonstrated a Pattern of Intimidating Defense Witnesses That Has Violated Raniere's Fifth and Sixth Amendment Rights

"It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." United States v. Williams, 205 F.3d 23 (2d Cir. 2000). The Supreme Court described this fundamental right as follows: "the right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to prepare a defense, the right to present the defendant's version of the facts as well as the prosecution' to the jury so it may decide where the truth lies." Taylor v. Illinois, 484 U.S. 400, 409 (1988), *quoting* Washington v. Texas, 388 U.S. 14, 19 (1967). "The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments 'founded on a partial or speculative presentation of the facts.'" Williams, 205 F.3d at 29, *quoting* Taylor, 484 U.S. at 411.

Appellate courts have reversed convictions where a prosecutor threatened a potential witness with perjury or used a subpoena for the purpose of preventing or dissuading that person from appearing as a defense witness. United States v. Emaugbunam, 268 F.3d 377 (6th Cir. 2001); United States v. Golding, 168 F.3d 700 (4th Cir. 1999); United States v. Lord, 711 F.2d 887 (9th Cir. 1983); United States v. Morrison, 535 F.2d 223 (3d Cir. 1976). Significantly, the prosecution's efforts in the instant case to intimidate potential defense witnesses through threats and the misuse of the Grand Jury process after the commencement of jury selection amount to a clear pattern.

First, the prosecution attempted to change the testimony of Michele Hatchette by inappropriately showing her materials (the so-called Camila written messages) for the purposes of changing her perspective of Raniere, changing her testimony and prompting her to testify against him, rather than potentially for him. The prosecution demonstrated its true purpose in showing her these communications when one of the AUSAs asked Ms. Hatchette what she thought about the messages she read, and one of the agents asked her if the written messages made her angry. This feeding of information to a potential witness under the guise of a proffer interview is clearly not designed to render a truthful account of the witness' own story, but to manipulate the witness into testifying the way the prosecution wants.

Second, when it became clear that the prosecution could not manipulate Ms. Hatchette truthful accounts of her experiences of her time in DOS and with Raniere, and when it was apparent that she may in fact be a defense witness, the prosecution then threatened that if she did not return to the U.S. Attorney's office for a third interview, they would likely charge her with perjury. This statement of the prosecutor is far from an idle observation. Rather, it is a threat that if Ms. Hatchette denied the prosecution's request for a third interview and testified, would indict her with perjury out of retaliation. The AUSA left no room for doubt or uncertainly. Indeed, the AUSA conveyed to her that the AUSA had already made up her mind that Ms. Hatchette would commit perjury on the witness stand prior to hearing her testimony in court.

The pattern continued with Nicole Clyne when, even after jury selection began, the prosecution served her with a Grand Jury subpoena. The message the Government was delivering to this potential defense witness was clear: we and the Grand Jury continue to investigate you and if you dare testify, you will be indicted. The prosecutors had already informed Ms. Clyne that she was a target of the investigation. Serving a Grand Jury target with a Grand Jury subpoena after

9

jury selection began as a way of ensuring that the witness will not testify at a trial is a brazen act of witness intimidation. Counsel has found no decision of any Court that condones tactics such as these, and we are sure the Government cannot locate one either. The only question is whether the tactics employed rise to the level of mandating reversal of the conviction, especially in light of the issues raised in the defendant's Rule 33 motions. We contend that the specific tactics here meet the standard of requiring a new trial.

The Government may argue that it has the right to warn witnesses of perjury. However, that argument will not serve them well under these facts. See United States v. Blackwell, 694 F.2d 1325, 1334 (D.C. Cir. 1982) ("It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. [citation omitted] But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify."). The Second Circuit has endeavored to strike a balance between the defendant's right to present a defense, on the one hand, and the right of prosecutors to appropriately warn a potential witness of the consequences of perjury, on the other. In Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990), the Second Circuit stated, "[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to countervailing public interests." In Williams, the Circuit indicated that "such countervailing interests include preventing perjury and investigating past criminal conduct." Williams, 205 F.3d at 29.

In determining whether the actions of a prosecutor rise to the level of a due process violation, the Second Circuit has focused on three elements. First, whether the defendant was deprived of material and exculpatory evidence that could not be reasonably obtained by other

10

means. Id. at 29. Second, whether the prosecution acted in bad faith. Id. Third, whether the actions of the prosecution are of such quality as necessarily prevents a fair trial. Id. at 29-30.

1. The Testimony of the Witnesses Was Material and Exculpatory

The Government successfully scared away witnesses who would provide an alternative narrative to the one the Government maintained, specifically that Mr. Raniere used DOS, and the collateral obtained when one joined DOS, to generate potential sex partners. There was no issue more hotly contested than this one. The Government maintained in its opening, its closing and throughout the trial that DOS was created by Mr. Raniere to supply him with sex partners. The Government denied any suggestion that DOS was created for the benefit of its participants. In fact, when defense counsel attempted to cross examine Lauren Salzman on precisely this point, the Government objected to virtually every question.

The Government plainly did not want any viewpoint competing with the one it portrayed: that DOS was an instrument of evil, was created to coerce women into having unwanted sex with Mr. Raniere, and was created for Mr. Raniere's sexual benefit. The truth, however, could not be more different from this. And, the defense had interviewed and sought to call potential witnesses—in the form of Michele Hatchette and Nicole Clyne—to testify to the true nature of DOS from their first-hand perspectives. Not only is such testimony material and exculpatory, but it is also game-changing in every way. Ms. Clyne was a participant in DOS and would have been able to speak to its enrollment mechanisms, its "notable and worthy purpose" and that she never witnessed "any crimes such as sex trafficking."" (Clyne Affidavit ¶¶ 6).  Moreover, Ms. Hatchette, who was invited to DOS along with Nicole (one the Government's key witnesses) by Ms. Mack, would have been a critical witness to overcome the Government's theories and would have provided direct

11

first-hand knowledge and a critical counter experience of what it was like to be in DOS further discrediting Nicole's testimony. (Hatchette Affidavit ¶¶ 4-24.)

The testimony of these two witnesses, if credited by the jury, is the difference between a conviction and an acquittal on the Sex-Trafficking, Wire Fraud and Forced Labor charges, at a minimum. Because of the importance those charges played in the pattern of racketeering, acquittal of those charges would also mean an acquittal of the RICO Counts. For the jury to have been denied this testimony through the efforts of the Government to scare these witnesses out of testifying cuts at the heart of a fair trial and is the difference between conviction and acquittal on all of the substantial charges. On this point, it must be remembered that with the absence of a viable RICO charge, all of the conduct taking place wholly outside of the Eastern District of New York would have to be dismissed. The testimony of these two witnesses, therefore, impacted on each and every count of conviction.

        2. <u>The Government Intended to Intimidate Witnesses</u>

Based on the totality of circumstances, it is clear that the Government sought to intimidate Ms. Hatchette and Ms. Clyne and scare them out of testifying. The Government was plainly not acting with the wellbeing of these witnesses in mind. The Government may claim that it had an obligation to warn the witness of the implications of her testimony. However, this is simply not what the prosecutor said. The prosecutor wanted to exert complete control over a potential defense witness, which is why she said that unless the witness comes in for a third proffer interview, the witness would commit perjury. Simply put, the Government did not want her on the witness stand and it threatened her with indictment if she were to testify. Moreover, the Government wanted Ms. Hatchette to return to the U.S. Attorney's office a third time, and when she declined the invitation, the Government threatened her with perjury unless she came for a proffer interview. When it came

to Ms. Clyne, the Government misused its GrandJury power to exact a threat on her, even as Mr. Raniere was selecting a jury and about to start the trial, that if she testified, she would be investigated by a Grand Jury, indicted and punished; and conversely, if she did not testify, she would not be the subject of continued investigation, indicted or punished.

The prosecution's true motivation is revealed by what the lead prosecutor said to Ms. Clyne's counsel. By referring to NXIVM as a "snake," Mr. Raniere as the head of the snake, and Ms. Clyne as part of the snake's body in her conversation with Ms. Clyne's attorney, the lead prosecutor was demonstrating her intent and her animosity against anyone associated with NXIVM in any regard. She was signaling to Ms. Clyne's lawyer that she was not looking for evidence, or for Ms. Clyne's account of events. Rather, the prosecutor's mind was closed, and her conclusion was that Ms. Clyne is part of a snake that she (the prosecutor) was going to kill.

However, this prosecutor is not making an idle comment. She is a prosecutor who has been gifted the full power of the federal government. Yet, she indicated time and again that she was not searching for truth. She was using her unmatched power as a federal prosecutor, including the power to use Grand Jury subpoenas seemingly at will, to shore up a side, the side of the opponents to NXIVM. The prosecutor through the abuse and threatened abuse of the legal process denied the defendant access to material witnesses and testimony. She demonstrated her true and sole intent: to win the trial at all costs, even if she had to violate Mr. Raniere's right to call witnesses to do so.

### 3. The Government's Actions Prevented A Fair Trial

The Supreme Court in <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967) described the danger of judgments "founded on a partial….presentation of the facts." The Supreme Court was noting a truth that is timeless in our justice system: that sound verdicts can only be attained when both sides have the complete, unfettered opportunity to present evidence, the fullness of which is then

13

weighed by the jury. The precise danger voiced in the Supreme Court's decision in <u>Washington v. Texas</u> has now come to pass. The jury did not hear all of the relevant evidence available to the parties. Rather, it heard only from those witnesses who had been mobilized by the anti-Raniere movement and from witnesses who admitted having pronounced changes in their perspectives. Mr. Raniere, through the threats of the Government, was denied the ability to call witnesses who would have testified that their first-hand experiences in DOS were utterly inconsistent with the Government's core premise and with the testimony of the Government witnesses on the same point. Eliciting defense testimony of this sort is at the very heart of a fair trial.

Even more troubling is that the evidence shows that the Government's plan all along was to keep these women off the stand, at all costs. The prosecution used threats, misused Grand Jury subpoenas cut even after jury selection started in this case, as well as the full complement of Governmental power to ensure a brutally one-sided and unfair trial, one whose outcome was preordained by the fact that only the Government's side would ever be portrayed to the jury.

## **CONCLUSION**

For these reasons, the Court should grant Mr. Raniere's Rule 33 motion and order a new trial.

Respectfully submitted,

/s/
Marc A. Agnifilo, Esq. *Of Counsel*
**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

/s/
Paul DerOhannesian II, Esq.
Danielle R. Smith, Esq.
**DEROHANNESIAN & DEROHANNESIAN**
677 Broadway, Suite 707
Albany, NY 12207