UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

KEITH RANIERE,

Defendant.

No. 18-cr-204 (NGG) (S-2)

**AFFIDAVIT OF
MICHELE HATCHETTE**

MICHELE HATCHETTE, duly swears and affirms as follows:

1.      I am 33 years old.  I grew up in  Harlem, New York City; I graduated from Pitzer College in 2009. I live in Brooklyn, New York. I am represented by counsel, specifically Justin Greenblum, Esq, and I affirm that this affidavit is the truth, the whole truth and nothing but the truth.

2.      I took my first 5-day introductory intensive in Executive Success Programs (ESP) in June 2013 in New York City, New York.  I completed the remaining 11 days of the introductory intensive course in November 2013 in Albany, New York. Following the completion of this first course, between 2013 and 2018, I took intensives/curriculum with The Source, Jness, and Society of Protectors (SOP) and was a Multicultural Development Specialist (MDS)/ teacher for Rainbow Cultural Garden which was an early childhood education program. I became a coach in ESP in 2015 and in October 2015, I knowingly and enthusiastically accepted Allison Mack's invitation to join the sorority which is now known as DOS.

3.      At its core, I experienced DOS to be an organization for women who wanted to overcome their greatest fears to accomplish their goals. For me, it was a profound experience

whereby I gained more confidence and trust in myself. There were several practices I took on that helped me strengthen my character, expand my awareness of how my decisions impact others, and I became more disciplined - all of which I'd been seeking to build within myself prior to my invitation into the group because I knew growth in these areas would help me become a more compassionate human and effective leader in several areas of my life.

4.     I believe I would have been a critical defense witness at the trial in the matter of <u>United States v. Keith Raniere</u> as I was in a unique position to speak of my experience in DOS as another woman whom Ms. Mack invited into and mentored within the organization. However, as will be explained in detail later, I was threatened by the prosecution and feared an unfounded indictment if I did testify. Given that there was only one woman who testified that was mentored by Ms. Mack in DOS who testified at Mr. Raniere's trial (Nicole, one of the government's key witnesses related to the Sex Trafficking and Forced Labor charges), I believe my experiences of Ms. Mack's mentorship and my time within DOS would have offered an important perspective in the jury's understanding of the positive nature of the group which I received. Additionally, my close proximity and consistent communication with Nicole throughout the approximate nine months we were in DOS together made me privy to the practices Nicole experienced and an eye-witness to how Nicole reacted and interacted with others in the group, which were markedly different from Nicole's trial testimony.

5.     At Mr. Raniere's trial, Nicole was asked by the prosecutor if there were things, had she known prior to joining DOS, that would have affected her decision to join the group, to which she replied, "Yea, I guess the first one would be that apparently I was giving up my free will and that I couldn't make my own decisions. But that eventually there would have to be more collateral added on and that I would have no say in whether or not I gave it, like it would be

demanded. I mean there were so many things that were added on later once you were, like, sealed into this situation." (Tr. 3863)

6.    Though Nicole's statement about DOS supports the governments theory that women were giving up their free will, I would have testified that my experience of the reality was, in fact, the opposite. I experienced all of the practices within DOS as an opportunity to build the character and discipline I needed to achieve my goals. For example, prior to DOS I struggled at times to follow through on commitments I would make both professionally and within personal relationships. After communicating this to Ms. Mack, she recommended I journal for a few weeks on how my lack of follow through impacted those who were counting on me to deliver on my promises which motivated me to figure out how I could be more reliable such situations. As I worked towards this goal, I found more freedom and trust within myself and that I had a greater capacity to manage the increasing complexity of my career and personal responsibilities, which was exactly what I was hoping to gain from DOS.

7.    On the subject of collateral, Nicole testified that the process of submitting and offering collateral was problematic for her. In contrast, I would have testified that my experience of gathering and submitting collateral was not problematic for me as it was explained to me that the collateral was simply a way to demonstrate my commitment to keep the confidentiality of the group private while also affirming my voluntary membership into the group. Prior to my first conversation with Ms. Mack about DOS, I was already seeking opportunities that could help me challenge my fears and limitations that I perceived as roadblocks standing between me and my goals, so the arrangement of this mentorship was a welcomed invitation that I considered with great care over the course of a few weeks. My final decision to accept this invitation was ultimately driven by my desire to prioritize my personal

growth and development and I knowingly joined DOS because I trusted that Ms. Mack would do her best to guide and mentor me in the achievement of my goals, for life. Ms. Mack certainly followed through on this promise and commitment to me and I benefited greatly from her care and leadership during the entirety of my time in DOS. I can say with absolute certainty that I was provided with all the necessary information I needed to make such an informed choice and commitment and am grateful I did as I continue to see the positive impacts of the training and mentorship I received during that time.

8.     At the time Ms. Mack invited me to join DOS, she informed me that if I accepted this invitation, I would be agreeing to have her as my master and I her slave. After asking Ms. Mack what the nature of our relationship would be under titles, I understood that within this context, as stated above, that Ms. Mack would be committing her life to help me achieve my greatest goals and that someday I would mentor other women in the same way. Therefore, I felt comfortable enough with that arrangement to move forward.

9.     At Mr. Raniere's trial, the prosecutor asked Nicole to explain what her understanding of DOS was prior to joining, to which she replied, "A woman's mentorship where Allison would mentor me in life and that was going to like push me into my fears..." (Tr. 3862) She then added, "So, then I was told that, like, the way the mentorship was communicated, it was a master-slave relationship." (Tr. 3863) Nicole's testimony that she was told of the master/slave relationship within DOS only after joining is, I believe, false. I was enrolled into DOS before Nicole and as just mentioned above, was informed prior to joining that the relationship would have this "master/slave" dynamic. Additionally, Ms. Mack explained to me, Nicole and the two other women she'd invited into DOS, in several group conversations when we discussed the process of inviting women we knew into the group, that all women must be informed that they

would be entering into a master/slave relationship, that there will be a brand, that they must wear some type of jewelry as a symbol of their commitment to their growth, and that it would be a lifetime vow sealed with collateral. My account of Ms. Mack's leadership within our group would have shown the unliklihood that Ms. Mack would have withheld the master/slave dynamic from Nicole. My testimony regarding the enrollment process into DOS would have stood in stark contrast to the government's theory, supported by Nicole's referenced statement, that women were somehow misinformed and deceived into joining the group. Again, my experience was that I was presented with all the necessary information to evaluate whether or not I wanted to join DOS *before* making the decision and I made sure to communicate these same critical points to women I later invited into the group so they too had this information. It was my desire to share this testimony with the courts because I believed it would help clarify what I perceived as the inaccurate theory purported by the government that women were deceived and forced into joining DOS. However, after being threatened by the prosecutors on this case, which I will explain in further detail below, I feared they would follow through on their stated threat to punish me for my simple desire to share my experiences with the jury.

10. The invitation process into DOS is further supported by Lauren Salzman's testimony when she explained the enrollment protocol that all women were supposed to follow when inviting others to learn about and potentially join the group. Ms. Salzman stated, "They were given basically the pitch, you know, come to learn about lifetime vow of obedience master/slave concepts, the collar and the brand. Then they had agreed to join after learning those things and then they were fully collateralized. So they were not considered completely enrolled until they were fully collateralized." (Tr. 1621)

11.     It is also important to note that many women who were invited to DOS and chose not to join. For example, I would have testified that there were several women I invited into DOS, who voluntarily gave collateral to learn about it, yet once they learned about the organization and what it entailed, they declined. They all remained friends with me and some expressed gratitude for the invitation, even though they felt it was not for them.

12.     When I accepted the invitation to join DOS, I was mostly focused on using the process to achieve my goals.  However, I also had an opportunity to build deep, meaningful friendships with other women, especially the additional three (Nicole, India and Danielle) who were also being mentored by Ms. Mack in DOS (note: the four of us referred to ourselves as a "circle" and I will use this term moving forward in reference to this group).  Within our circle, we formed a unique bond with one another and over time, I considered these women to be both dear friends and sisters.  While Ms. Mack was still mentoring each of us individually, the four of us built a trust and reliability with one another which at times inspired us to mentor each other and even initiate the development of practices that were unique to our circle because we were inspired by the process and training we were experiencing in DOS. For example, there was a series of practices that Nicole, India and Ms. Mack created together that involved things like walking meditation and watching or reading something inspirational each day. After doing the practices for over a month, Nicole, India and Ms. Mack shared their experience with me and Danielle. Nicole, in particular, expressed great enthusiasm for how meaningful and beneficial the practices were.

13.     At some point, Nicole, India, Danielle and myself, independent from Ms. Mack, decided to create a special written commitment with one another in what we  called our "creed."

In the process of carefully crafting this document over a period of weeks, Nicole sent an unsolicited email to the group describing her thoughts, feelings, and ambitions (See Exhibit A).

14.     This email flatly contradicts Nicole's claim that she was motivated throughout her time in DOS solely out of fear of her collateral being released. This was an unsolicited email expressing her unfiltered thoughts about the nature and benefit of the "readiness" practice and her choice to join DOS, "I chose to join the vow to push through my fears and live the life experience that I want to. To live a full life. I chose to join the vow to understand and experience that freedom and joy come from the inside, from the internal and not from the external." Nicole demonstrates her understanding of the purpose and intent of DOS and speaks very positively, which is in stark contrast to her testimony where she paints a negative picture of the same subjects.

15.     It is important to note that this email was sent on January 3, 2017. On January 4, 2017, Nicole, Danielle and myself received an email from India (forwarded from Sylvie) asking for help transcribing audios for Ms. Cafritz's memorial (See Exhibit D). According to her testimony, Nicole spent about five hours transcribing these audios and the government used this to substantiate the Forced Labor charge against Mr. Raniere.

16.     I would have also been able to provide the jury with a comprehensive account of the relationship between the women in my circle and our relationship with Ms. Mack. The four of us were in regular communication with each other via text and email, co-mentoring one another in the pursuit of our personal goals.  As well, India, Danielle and I all lived in the Albany area and often spent time with one another socially to grab coffee, go for walks, attend events, etc. Although Nicole lived in Brooklyn, she would meet with us and Ms. Mack each week via

video chat for our weekly check-in. Nicole also visited Albany at times and we would make an effort to all get together in person while she was in town.

17. Our weekly check-in was a time for us to share whatever was on our minds, our struggles, our wins, and ask for guidance and help from everyone present. We shared openly and vulnerably about anything we wished and began to hold each other accountable to the standards each woman wanted for herself, all of this without the direction of Ms. Mack. These check-ins built a foundation for the four of us to continue to take initiative in ways that had nothing to do with Ms. Mack or Mr. Raniere, and we did so because we were inspired by how much we were benefiting from our shared commitment to these practices.

18. At trial, Nicole testified that her relationship with India was used against her to make Allison "happy" for the "benefit" of Mr. Raniere (p.3951: 18-25 & p.3952: 1-5). I would have been able to offer a critical perspective on Nicole's claim, as it was not my experience that Ms. Mack "used" the women against each other as Nicole described. On the contrary, I remember several times that Ms. Mack shared her excitement when someone achieved a goal and that Ms. Mack was always contemplating how she could be of more support to us. My experience of Ms. Mack is that she would do anything to help us achieve our goals and I cannot recall a single moment in the three years I was in DOS that Ms. Mack did anything to compromise the well-being of me, Nicole, Danielle, or India. Similarly, not once in three years did Nicole, Danielle or India ever indicate to me that they felt used against one of the others. If India, Danielle or Nicole had at any point expressed to me that they were feeling forced or coerced in some way, I would have taken action immediately to cease its continuation.

19. Furthermore, had I not been threatened and intimidated by the prosecution, I would have explained to the jury how and why DOS members would sometimes take on some

act of discomfort, like a cold shower, when one of us would fail at a commitment we'd set for ourselves. For example, I could have referenced a WhatsApp conversation I had with India which demonstrates my offering to take on a consequence for India if she thought it would help her move through a failure she was consistently struggling to overcome (See Exhibit B). It is evident in this chat that India and I, on our own, initiated and created an action plan together and Ms. Mack did not force this upon us because she was not involved.

20.     Nicole's testimony gave, in my opinion, a false and misrepresented perspective of what DOS was like for all the women who were mentored by Ms. Mack because her description of several events and the nature of DOS in general, do not match my experience. I believe this was undoubtedly influenced by the government, which advanced a theory that the women who Ms. Mack mentored, in particular, were there only to serve as "sex slaves" for Mr. Raniere. This is absolutely false based on my experience. I would have been able to testify to an experience in DOS that would have been the opposite of being sex trafficked. Me and the other women in my circle, including Nicole, were adults with our own financial resources who lived independently, and had all the liberties and privileges that any educated woman from a supportive family would have. Most importantly membership into DOS was voluntary and any woman at any point in her process of evaluating her decision to join, was free to decline the invitation. I was never asked or "commanded" by Ms. Mack to have sex with Mr. Raniere or any person for that matter as a requirement of my membership in DOS. Furthermore, I firmly attest that I never advised, encouraged, nor required women I later mentored in DOS, to have sex with Mr. Raniere or anyone else as a requirement of their membership in DOS. The government took Nicole's accounts of her experiences in DOS as though that was the universal experience of DOS. But Nicole's description of DOS could not be more opposite to my time spent in the group where I

learned to become more grounded and confident which has helped me succeed in my career and flourish in my personal relationships. My account of my time in DOS is shared among several other women who were in DOS who still feel they benefited greatly from their experience.

21.     It was a central tenet of the government's theory that the collateral was an ever-present factor that compelled women in DOS to do certain things they did not want to do. This is absolutely false based on my experience.  In the almost two years that I was in communication with the other women in my circle in DOS, we failed several times (individually and collectively) at different practices and our collateral was never released, threatened to be released nor was this even a fear of mine, or a fear anyone in our circle, including Nicole, ever expressed. Within DOS, my experience was that consequences were created and agreed-upon by the women in the circle and were not imposed by Ms. Mack or Mr. Raniere.  The only time I ever felt coerced or threatened, as it related to my involvement in DOS, was by the government when they were conducting their investigation and tried to persuade me to adopt their understanding of the situation and their theories (more on this later).

22.     Moreover, the exposure of collateral, as I recall, was never factored into our group activities or practices.  Although Nicole testified at trial that she was in constant fear of her collateral being released and stated that, "[I]f we didn't obey, then the fist collateral would be released," (4017: 23-24) I witnessed on a several occasions Nicole freely "disobey" as she states and opt out of activities or conversations which never resulted in the exposure of her collateral.

23.     Furthermore, and in connection with the Forced Labor charges,  18 U.S. Code § 1589 defines one aspect of Forced Labor as "knowingly provides or obtains the labor or services of a person (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person

would suffer serious harm or physical restraint. One of the acts qualified as forced labor, according to the government, as supported by Nicole's testimony, was when she read and reviewed a series of articles written by Mr. Raniere. I also read and reviewed these articles and did not fear I would "suffer serious harm or physical restraint". I would have been able to provide testimony that Nicole expressed that she enjoyed reading the articles and wanted to re-read some of the articles when she had more time (See Exhibit F). This information, I believe, would have dismantled and rendered incredible Nicole's claims on this point, ultimately serving to drastically undermine the government's presented evidence of forced labor.

24. The government also claimed that Nicole was a victim of Forced Labor when she transcribed audios for Pamela Cafritz's. However, I also transcribed some of the audios for the service and attest that doing so was completely voluntary and driven by my desire to support memorializing Ms. Cafritz. I would have provided testimony that the memorial service was coordinated by a small group of people, including Sylvie and India, who reached out to several other people within the community for help in the planning process. Nicole and I were asked by India to transcribe these videos so it was not a directive from Mr. Raniere or Ms. Mack. Contrary to the government's claims, this effort was not part of DOS and if I or Nicole felt we did not have enough time to complete the transcriptions of the audios (provided by Sylvie), there were several people within the community we could have reached out to as replacements for the task.

25. Additionally, I would have offered insight into the testimony of Sylvie, another one of the government's witnesses at the trial of Keith Raniere. Sylvie was my coach in ESP for approximately three years. As my coach, she and I checked in weekly on the progress of my goals and she would often reach out and check in with me outside of those standing meetings.

Throughout the three years she coached me, we also became close friends and she was a positive support in my life and helped me achieve many things I wanted to accomplish, most notably in helping me train for my third half marathon where I finally broke my fastest time.

26.     Given that much of Sylvie's direct testimony focused on the alleged emotional damages Sylvie claims she incurred as a result of her time in Jness, my relationship with Sylvie would have been critical information for the jury to show that my experience of Sylvie was that she was an enthusiastic leader within ESP and Jness who helped many men and women, including myself.

27.     In 2015, Sylvie invited me to join a social media/marketing company and our first client was Jness. Through working together on a Jness marketing campaign, I was inspired by Sylvie's leadership and her ability to communicate the humanitarian values and goals of the company. Sylvie's enthusiasm about Jness is further evidenced by an email Sylvie sent on September 8, 2015 where she expresses her excitement about a proposal for a social media campaign (See Exhibit E).

28.     Additionally, a year later, on September 20, 2016, Sylvie wrote a description of her skills and why they demonstrated that she was a good fit to lead social media and marketing initiatives for Jness (See Exhibit C). As the project manager and leader of the rebranding strategy for Jness, Sylvie demonstrated to me that she had a deep understanding of the concepts taught in Jness and was thus entrusted to convey the values of the company publicly, through their online presence. Sylvie, to me, embodied so much of the great aspects of Jness. My experience of Sylvie's enthusiasm for Jness and being a leader in the social media company that helped celebrate women, would have been important as a contrast to Sylvie's description of Jness as the reason she began to feel negatively about herself and other women (p.291: 15-25 & 292: 1-3).

29.     When the prosecution asked Sylvie how the Jness curriculum impacted the way she made decisions, Sylvie replied, "I just felt like I couldn't trust myself in what I thought was going on and what was right and wrong." (Tr. 307-308) Had I not been intimidated and threatened by the prosecution, I would have offered testimony that I believed Sylvie was a strong coach and I trusted Sylvie's ability to guide me in making decisions because I'd witnessed her grow and become more seemingly confident in herself in the three years she coached me. Moreover, she was compassionate, consistent, and confident in coaching me.

30.     In sum, my trial testimony would have seriously undermined the testimony of Nicole, and would have been wholly inconsistent with the government's core premise of the Forced Labor and the Sex Trafficking charges. My testimony would have been significant to this case: I was identically situated to Nicole within DOS and would have provided critical information to the jury about the nature of the events and many of the experiences to which Nicole and Sylvie testified. Additionally, I would have provided critically important information about the genuine nature and goals of DOS from as I understood them based on my perspective lived experience.  However, Mr. Raniere and the jury were denied this perspective through the actions of the government who demonstrated to me that they were not open to my account of what did and did not happen.

31.     I was approached by the FBI on or about March of 2018, at which time I declined to speak with the agents in the absence of an attorney. I hired an attorney named Justin Greenblum, Esq., who at the time was a partner at Carter Ledyard & Milburn LLP in New York City. The prosecution explained to me, through my attorney, that I was a witness. The government never identified me as a target or a subject, rather as merely a witness. As a result, Mr. Greenblum and I decided to accept the government's proposal for a proffer interview.

32.     On May 22, 2018, my attorney and I appeared for a proffer interview at the U.S. Attorney's Office, attended by, among others, AUSA Moira Kim Penza and FBI Special Agents Michael Weniger and Michael Lever. Based on the actions and statements of the government representatives, it was apparent to me that the prosecution was not interested in hearing or accepting my account of the relevant events.  Instead, the prosecution attempted to convince me to agree with the government's view of the events.

33.     For instance, the prosecution told me that the only reason I engaged with assignments in DOS was because I feared my collateral would be released. I disagreed with the government's assertion because I was fully aware from the moment I joined DOS that my collateral was for the purpose of solidifying my commitment to myself to push into my fears as a means to achieve my goals. The collateral I chose and offered willingly did not extend nor apply in any situations where I may have failed to uphold a commitment or complete an assignments. I had to reiterate this truth several times to the prosecutors and agents, but they were not open to the truth. The government maintained that I felt pressured, threatened or coerced into completing assignments and that collateral was "held over my head" throughout my time in DOS.  The government repeatedly told this to me, as if they knew something about my own life that I did not know.  I countered multiple times that based on my experience the collateral was not intended to be used as force or coercion, that it was never used in this way, and that I was not afraid, concerned or worried that it would be used this way.  Had any woman shared with me that she felt the collateral was being used in this way or had I felt that it was being used against me personally, I would have addressed it with Ms. Mack because it would have been of great concern to me.

34.      I had believed the government sought to speak to me so they could hear my perspective, but instead it seemed their goal was to tell me my perspective. I explained repeatedly that the purpose of the collateral was to strengthen my commitment to my growth through my lifetime vow within DOS. I further explained that I had a very positive experience when I gathered and submitted my first batch of collateral to learn about the existence of DOS as a guarantee that I would keep the existence of the group confidential (whether I joined the group after learning about it, or not). The collateral I gave to Ms. Mack during this time and in the years following were all of my choosing.   I expressed to the government that this first step, which took almost two weeks to complete, was a fluid process which I embarked upon with the consistent support of and communication with Ms. Mack. Once I learned about DOS from Ms. Mack and expressed I wanted to join the group, Ms. Mack explained that additional collateral would be required to make my voluntary membership official. Given my desire to prioritize my growth under the guidance of Ms. Mack, and whom I trusted implicitly, I knowingly, willingly and enthusiastically accepted her invitation into the sisterhood and solidified my commitment and word to uphold my lifetime vow with further collateral. The prosecutor, however, continued to display incredulity to what I was explaining. At one point, the prosecutor raised her voice in disbelief of my ownership of my decisions, insisting instead that I only acted out of fear because I felt threatened. The prosecutor even went to the extent of saying things to me that I felt were accusatory, sexually graphic and out of line to try to further persuade me. It seemed clear to me that the government was trying to manipulate me into saying that my decision to join DOS and anything I did thereafter, including any contact I had with Mr. Raniere, was without my consent and I was in constant fear that Ms. Mack would expose my collateral. What the government continually refused to acknowledge or allow was that I actively and voluntarily accepted my

invitation to DOS because it was in full alignment with my aspirations to grow and become the best version of myself. As the prosecutor continued to push me to adopt her/the government's narrative that I felt coerced by Ms. Mack and Mr. Raniere, I felt this prosecutor, Moira Kim Penza, was the one in fact trying to coerce me into adapting my experience for her/their benefit and gain. I was unwilling to state anything outside of the truth as far as I understood it and that did not seem to satisfy Ms. Penza.

35. When I refused to adopt the government's view of my experience with Mr. Raniere and my time in DOS, the government continued to press me to change my account of events by showing me communications that Mr. Raniere appeared to have with another person. The prosecutor said there was something they wanted me to see because they thought it might "help" me and stated "this isn't something we normally do." The government then brought into the interview room a number of pages of written communications purportedly between Mr. Raniere and Camila.

36. In particular, the government asked me to read the passages where Mr. Raniere makes reference to a "fuck toy." As directed, I read the portions of these passages. It is worth highlighting that these communications had nothing to do with me, and that the government had no purpose in showing me these communications other than to, I believe, to compel me to change my mind. I believe the only purpose the government had in showing these communications to me was to cause me to view Mr. Raniere in an unfavorable light and my interactions with him to have been crimes committed against me without my consent. After I read the communications, the prosecutor asked what I thought of reading them and I responded in substance that they were interesting. This prompted one of them to state, "that's all you thought after reading that?" Ms. Penza and the agents seemed surprised and disappointed that the

effort to manipulate me into changing my account was unsuccessful. At one point, an agent asked me, "aren't you angry about this?"

37.    It was apparent to me that the point of this proffer interview was not to investigate nor seek the truth about the actual nature of DOS, NXIVM, and the events that occurred. Rather, the prosecution's point was clearly to recruit me to the side of the prosecution and to manipulate my view of my relationship with Mr. Raniere as well as my view of DOS and my involvement in it.

June 4, 2018 Meeting

38.    On June 4, 2018, my attorney and I sat for another proffer at the U.S. Attorney's Office. The interview, which was attended by two prosecutors and several agents, was shorter than the first meeting and focused on my relationship with my DOS "slave" Souki. At the end of this second meeting, there was no indication that the government intended to call me as a government witness, nor was there an interest expressed in continuing to meet with me, as it was readily apparent that my truthful account of my experience was wholly inconsistent with the government's view, preconceived notions and limited understanding of NXIVM and DOS.

The government's Demand for a Third Meeting

39.    Shortly before the trial, the prosecutors contacted my lawyer, Justin Greenblum, to attempt to interview me for a third time. Because almost ten months had passed since the second interview and because it was apparent that I had refused to adopt the government's inaccurate views and the false narrative it had imposed upon me, I did not see a reason to spend more time meeting with the government, as I believed I had already told them everything about my experience. By this point, the government had shown that it was not interested in hearing my authentic account.

40.     When my attorney told Ms. Penza it was unlikely that I would meet with them again, Ms. Penza told Mr. Greenblum that they were interested in having me prep with them for trial because they were planning to call me as one of their witnesses and were prepared to subpoena me to testify if I declined their request. Ms. Penza advised Mr. Greenblum to encourage me to meet with them prior to taking the stand or else they would be likely to charge me with perjury.  Given that I had met with the government twice and stated the truth as far as I knew it, based on my experience, it didn't make sense that they would pre-meditate such a charge before I even took the stand.  This threat of perjury only came after my attorney informed them that I would most likely refuse to meet with them again or willing testify on their behalf. Again, I was unwilling to adhere to the wants of the government and in response, they tried to manipulate me into doing what they wanted for their own gain and agenda.

41.     This was a clear threat, understood as such by both myself and my attorney, Mr. Greenblum, that if I took the stand as a defense or government witness, without first coming into the U.S. Attorney's Office a third time and further proffering with the prosecution, the government would charge me with perjury. The threat of such an unjust, unsubstantiated, and retaliatory indictment was a great weight in my consideration of testifying for the defense or not. Despite believing that testifying for the defense would be the right thing to do, I faced enormous risks, based on Ms. Penza's threat, to not only myself, but to my family as well. Therefore, by the government threatening me with a perjury indictment, it was seeking to frighten me so that I would not provide truthful testimony to the jury, testimony that was inconsistent with the government's errant views and, as noted above, inconsistent with at least one critical government witness.

42.      Because of the government's threat to me that if I testified without engaging in a third proffer interview, my potential to be a witness for the defense carried the risk of a baseless indictment which only served to try to manipulate and coerce me into heading to the demands of the government. Had I testified, I would have provided material, relevant testimony about DOS and the fact that the collateral was not meant to be used extortionately or coercively, but rather to give weight to my vow, as the defense maintained in the opening and closing statements and as was reflected in the cross examination of the government's DOS witnesses. I would have testified also to the means used the government used to try to get me to change my account.

43.      However, the government's threats were both powerful and effective. Although I was available to testify as a defense witness, the risk of arrest and indictment was one I did not want to take and therefore I decided I was unwilling to testify. As a result, the defendant, Mr. Raniere, was deprived of my material, exculpatory witness testimony. Without my testimony, the jury lacked a critical account different from that provided by Nicole. The jury was denied a genuine perspective of DOS that was wholly inconsistent with that provided by the prosecution.

44.      I truly believe that the government had two goals in mind.  The first was to get me to change my account.  It pursued this goal by telling me that I had been coerced, that I was in fact not acting of my free will and that a crime was committed against me.  When those tactics did not work, the government showed me the written communications between Mr. Raniere and Camila, evidently hoping that they would cause me to see Mr. Raniere differently and that I would agree to testify against him.  But the government's version of the "facts" were not consistent with my experiences, and I was unwilling to give in to their pressure to change my story just to match theirs.

45.     The second goal was that once the government saw that it could not recruit me onto the side of the prosecution, they would threaten and intimidate me to ensure I would not testify for the defense. This is why they threatened to indict me with perjury. The threat worked. Rather than risk indictment, I decided that I would not testify.

46.     I have made this Affidavit knowingly, intentionally and of my own free will.


Dated:          October 14, 2020                    Respectfully,
                New York, NY

                                                    Michele Hatchette


STATE OF *Massachusetts*          )
COUNTY OF *Berkshire*             )

I, *Michelle Laramee-Jenny*, a Notary Public, do hereby certify that on this 14th day of *October*, 2020, personally appeared before me *Michele Hatchette*, known to me to be the person whose name is subscribed to the foregoing instrument, and swore and acknowledged to me that she executed the same for the purpose and in the capacity therein expressed and that the statements contained herein are true and correct.


NOTARY PUBLIC

MICHELLE LARAMEE-JENNY
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
October 16, 2020

# EXHIBIT A



**Michele Hatchette** ███████████████████

---

## Creed.
1 message

---

**N**█████████████████                                          Tue, Jan 3, 2017 at 3:17 PM
To: Michele Hatchette ███████████████    India Oxenberg ████████████    Danielle@exoeso.com

Notes from 3AM contemplation...

Readiness is important as a reminder that there are things more important to uphold than my own comfort. A reminder that I want to value LOVE more than I value my own comfort.

Readiness represent the act of always being ready. Ready and connected to myself and connected to the vow, which for me represents being and becoming the best version of myself.

Readiness is a piece of the puzzle in making us bad ass's. Women to be reckoned with. It helps build quickness, efficiency and skill. All under pressure.

I chose to join the vow to push through my fears and live the life experience that I want to. To live a full life.

I chose to join the vow to understand and experience that freedom and joy come from the inside, from the internal and not from the external.

I chose to join the vow to build awareness and to build love within myself so that I can share it with the world around me.

I chose the vow to stay connected to the woman I want to be. To be the woman I want to be.

I found this quote to really resonate with me and what we are doing...
"She is quick and curious and playful and strong." Kate Spade.

A simple quote but so full for me.
She is...
Quick- Readiness
Curious- Emotional exploration and daily exercise. Impressed state.
Playful- (thinking of something to fill this... practicing joy works though)
Strong- Morning cold shower and 12 hour fasting...

Gave some purpose and why to what we are doing...  :)

# EXHIBIT B



Not working  11:26 PM

:(  11:26 PM

Let me see how I can fix it  11:26 PM

There's no where I can go that has privacy and service 😫  11:27 PM

Unfortunately  11:27 PM

But I feel really anxious and I've already indulged a bunch I think I just need to break the enercia And sleep or something  11:28 PM

Our check in is Sunday night also  11:28 PM

I just keep failing and then saying what ever like what we talked about on our call today 😳 but this happens when I start to feel bad with myself. Like my little do struggle around anxiety  11:30 PM

OK love, we can check in tomorrow and you can write whenever. Remember, you're stronger than you think  11:30 PM

Don't buy your bs  11:30 PM

 

Don't buy your bs  11:30 PM

Thanks. Right now I feel like an ass but I'll try and remember that  11:30 PM

I ate like 3 PB and j San twitches and 3 hit chocolate I want to barf  11:31 PM

I can't even write I'm drunk  11:31 PM

Ahahhahah  11:31 PM

Not really but i do feel like I don't have my back right now. But I also think im entertaining myself  11:31 PM

The tantrum is covering up whatever ur feeling, remember the exercises in sop when they talked about real strength? Think about the kind of India you want to be. Even if you fuck up, how would your best self deal with it?  11:32 PM

Hmm. Okay. Right  11:32 PM

Would it help you if I take on a penance?  11:32 PM

Hmm I think yes.  11:33 PM




And we do it to help each other    11:33 PM

And the same for me.    11:33 PM

Cuz lord knows imma have my moments too!    11:33 PM

I think that will help keep is both in check    11:33 PM

The only thing that stopped me in sop was knowing my conscience group would need to walk an hour at midnight    11:33 PM

Damn    11:33 PM

Ok, let's do this    11:33 PM

But the parameters need to be clear.    11:34 PM

Propose a plan by tomorrow am?    11:34 PM

    11:34 PM

# EXHIBIT C

 Gmail

**Michele Hatchette** ██████████████████████

---

# Rough ideas on roles..
1 message

---

**Sylvie** ██████████████████████████                          Tue, Sep 20, 2016 at 6:40 PM
To: Michele Hatchette ████████████████████

I think we also need:

Video media manager
Writers
Photographers
Strategists
People who can just post for minimal hourly rate.

---

📄 **Team - Roles & Responsibilities S█ docx**                              ▪
   95K

| Name | Sylvie's description | Current Role |
|---|---|---|
| *Michele* | Creative and expressive with a sensitivity to human nature, Michele can create soulful written pieces, and digital communications needed to deliver instructions or internal/external comms. | Scripting intros for Social Media<br><br>Internal/External official communications<br><br>Interviewing for Women of Jness<br><br>Blog posts |
| *Marisa* | A real nurturer and mother; Marisa is diligent, committed, precise and caring. She will bring care and wisdom to the writing team, and holds the capacity to make it safe for women to share their true selves vulnerably, then put those experiences into words. | Take over the blog; specifically Women of Jness project and be responsible for ensuring that all current blogs are re-worked and ready for site.<br><br>I think she can also write more extended pieces for external clients. |
| *Chelsea* | As both a Data and Spin Expert in the Knife, Chelsea is a digital thinker and able create precise, concise documents and as well as bringing a fun, young and playful energy to the Social Media realm. She has a lot of empathy and is sensitive. She is also pretty open to feedback. Writer, creater, ideas machine. | She tried doing a blog series about Women she was inspired by and that she thought represented Jness.<br><br>Brainstorming with Social Media teams.<br><br>Worked with Michele to try to help her take on Pam's profile, she wasn't really there yet writing wise. |

**Social Media**

| Name | Sylvie's description | Current Role |
|------|----------------------|--------------|
| Rosa | A hidden gem; Rosa has a vast resume in the corporate realm which includes leadership roles in sales and communications. She is diligent, reliable and keen to bring fresh ideas, discipline and commitment to the team. Head of strategy, data collection/transforming data into strategy. | Manages communications@jness.com<br><br>Brainstormer for clients and campaigns<br><br>Manages and tracks Instagram for Nxivm and Jness |
| Chelsea | | Brainstorming with Social Media teams. |

| Name | Sylvie's description | Current Role |
|------|---------------------|--------------|
| *Veronica* | An expert in the field of Illustration and Design, beautiful visuals with a Jness flair are provided by Veronica. For example; logos, illustrations and templates for websites, Social Media campaigns and PR Manuals. | *Illustration*<br><br>*Template creation*<br><br>*Brand design*<br><br>*Website imagery* |
| *?* | *I think we need more here..* | |

| Name | Sylvie's description | Current Role |
|---|---|---|
| **Sylvie** | I have Knife Analyst skills in Logic, Spin as well as project management experience, a rank of 3 Stripe Coach in ESP and professional experience in corporate world. I have experience with project management, quality control, leadership and follow through. I have marketing experience, communications experience, people management experience and a willingness to take on responsibility (and all that comes with it!). I am extremely loyal. My heart is in this and with all of you. | *Oversight of team/Project Manager*<br><br>*Writing editing/quality control*<br><br>*Client pitches/interface & relationship with client*<br><br>*Approve strategies/ideas/facilitate brainstorms* |

# EXHIBIT D

 **Gmail**

**Michele Hatchette** ████████████████████

## Fwd: Please Transcribe ASAP

2 messages

---

**India Oxenberg** ████████████████        Wed, Jan 4, 2017 at 11:25 AM
To: ████████████████████ Danielle Roberts <danielle@exoeso.com>, Michele Hatchette
<H

Here you go! Let's split it up on the chat.

Sent from my iPhone

Begin forwarded message:

> **From:** Sylvie ████████████████
> **Date:** January 4, 2017 at 11:19:04 AM EST
> **To:** India Oxenberg ████████████████
> **Subject: Please Transcribe ASAP**
>
> Hey you!
>
> Please
>
> To save time on the back end, please have you/your transcribers follow this formatting guide:
> Testimonial Formatting
>
> It should end up looking something like:
> Testimonial - EDGAR
>
> Let me know if you have any questions!
>
> xo

---

**India Oxenberg** ████████████████ >        Wed, Jan 4, 2017 at 3:27 PM
To: Michele Hatchette ████████████████ >
Cc: Danielle Roberts <danielle@exoeso.com>

> India Oxenberg
>
> ████████████████
>
>
>
> Begin forwarded message:
>
> **From:** Sylvie ████████████████
> **Subject: Please Transcribe ASAP**
> **Date:** January 4, 2017 at 11:19:04 AM EST
> **To:** India Oxenberg ████████████████
>
> [Quoted text hidden]

# EXHIBIT E



**Michele Hatchette** █████████████████

---

# Jness - Campaign Calendar
1 message

---

**Sylvie** ████████████████████                      Tue, Sep 8, 2015 at 1:11 PM
To:  Pamela Cafritz ████████████████
Bcc: █████████████████

Pam & Marianna,

We had an awesome first meeting! Thank you so much for this opportunity.. I am very excited!

This is the campaign calendar we are proposing. We have come up with the abstract concept (at the top of each box) and then the ideas that fall into that category (smaller text underneath.)

We are now meeting weekly on Tuesdays at 12pm.

Before our next meeting, would you be willing to give us feedback on this calendar? We would like to start working with the first quarter, and define a clear next step, for our next meeting a week today!

Sylv xo

---

📄 **Jness Campaign Ideas Sept 9.docx**
106K