NS:TH/KMT
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                      Docket No. 18-CR-204 (S-2) (NGG)

KEITH RANIERE,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X


MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
KEITH RANIERE'S MOTION FOR A NEW TRIAL PURSUANT TO
FEDERAL RULE OF CRIMINAL PROCEDURE 33


SETH D. DUCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Tanya Hajjar
Mark J. Lesko
Kevin Trowel
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Keith Raniere's second motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, filed on October 19, 2020.  ECF Docket No. 956.  Raniere claims that "newly discovered evidence" relating to the government's alleged intimidation of two individuals—Michele Hatchette and Nicole Clyne—warrants a new trial.  Raniere claims that the government's intimidation prevented Hatchette and Clyne from testifying as defense witnesses at trial, thereby denying his right to present witnesses in his defense.

For the reasons set forth below, the government submits that Raniere's Rule 33 motion should be summarily denied because it is untimely and meritless.

## ARGUMENT

I.     Applicable Law

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Rule further provides that a motion for a new trial must be filed "within 14 days after the verdict or finding of guilty" unless it is "grounded on newly discovered evidence."[1] Fed. R. Crim. P. 33(b).  Where a motion is based on "newly discovered evidence," it must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1).

A motion for a new trial based on "newly discovered evidence" may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that

---

[1]     The Court extended the deadline for post-trial motions to July 10, 2019.

admission of the evidence would probably lead to an acquittal." United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007) (quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)). Evidence "that was known by the defendant prior to trial, but became newly available after trial," does not qualify as new evidence that may provide the basis for a Rule 33 motion. Owen, 500 F.3d at 89. "[W]here . . . a defendant knew or should have known[] that his codefendant could offer material testimony as to the defendant's role in the charged crime, the defendant cannot claim that he 'discovered' that evidence only after trial." Id. at 91; see also United States v. Forbes, 790 F.3d 403, 408 (2d Cir. 2015) ("[W]e hold that evidence is excluded from the meaning of 'newly discovered' under Rule 33 where (1) the defendant was aware of the evidence before or during trial, and (2) there was a legal basis for the unavailability of the evidence at trial, such as the assertion of a valid privilege.") (emphasis in original); United States v. Muja, 365 Fed. App'x 245, 246 (2d Cir. 2010) (summary order) (affirming denial of motion for new trial on the basis of affidavit submitted by co-conspirator about when the co-conspirator first met the defendant, which contradicted a trial witness's testimony, on the grounds that the defendant had the same awareness as the co-conspirator about when the co-conspirator and the defendant first met and thus the facts in the affidavit were not "newly discovered" under Owen).

In light of the deference owed to a jury's verdict, the Second Circuit has cautioned that district courts should exercise their Rule 33 authority only "'sparingly' and in 'the most extraordinary circumstances.'" United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). "For a district court to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013)

(internal quotation marks omitted) (affirming district court's denial of Rule 33 motion in light of "newly discovered evidence").

        Where, as here, a defendant claims that the prosecution intimidated potential defense witnesses from testifying for the defense, the defendant bears the burden of demonstrating "materiality, bad faith, and lack of fundamental fairness." Buie v. Sullivan, 923 F.2d 10, 12 (2d Cir. 1990). First, the defendant must show that "he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means." United States v. Williams, 205 F.3d 23, 29-30 (2d Cir. 2000); see also Buie, 923 F.2d at 12 (defendant must be "totally deprived" of the evidence). Second, the defendant must demonstrate "bad faith on the part of the government." Williams, 205 F.3d at 29. Third, the defendant "must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." Id. (quotation marks omitted).

II.    Facts Relevant to Raniere's Motion

        On May 22, 2018 and again on June 4, 2018, Michele Hatchette was interviewed by the government pursuant to a proffer agreement. See Exhibit A (report of May 22, 2018 interview).[2] On both occasions, Hatchette was represented by Justin Greenblum, Esq.

        As trial preparation began, the government received information that Nicole Clyne was in control of DOS-related materials, including collateral and other records, which

---

[2]    The report and notes of interviews, as well as the proffer agreement, were disclosed to Raniere on April 6, 2019 as 3500-MH-1 to 3500-MH-5. Because Exhibit A contains victim names and descriptions of collateral and other sensitive topics, the government respectfully requests that it be filed under seal.

were in the possession of her attorney, Edward Sapone, Esq.  Specifically, the government

learned that after the existence of DOS became known within the Nxivm community, Clyne

instructed DOS "slaves," including Michele Hatchette and India, to transfer DOS-related

digital materials, including collateral, to hard drives that Clyne provided.  After the materials

were saved to the hard drives, Clyne instructed the group of DOS "slaves" to delete the DOS

materials from their own computers.  Months later, Clyne told India that she had given the

hard drives and other DOS-related materials to Clyne's attorney.

       As a result, on April 9, 2019, the government served Clyne, through counsel,

with a grand jury subpoena seeking "any and all records in your possession, custody or

control related to 'DOS,' 'the Vow,' or 'the Sorority,' including but not limited to (1) audio

or video recordings of Keith Raniere and DOS 'slaves'; (2) records identifying current or

former members of DOS;  (3) 'collateral' provided by any current or former member of

DOS; and (4) electronic devices containing such records."  Exhibit B-001.[3]  An

accompanying letter advised Clyne that she was a target of the grand jury's investigation.

See Exhibit B-002.  Later that day, Mr. Sapone acknowledged receipt of the subpoena and

sent an email to the government "confirm[ing] that if called to testify" before the grand jury,

Clyne would invoke her Fifth Amendment right against self-incrimination.  Exhibit B-004.

       At the request of counsel, later that day, the government provided Mr. Sapone

with a letter granting Clyne act-of-production immunity with respect to the production of the

requested materials.  The letter advised that, among other things:

> Nicole Clyne's act of producing documents pursuant to the
> subpoena will be not used against her by the Office in any

---

[3]    By ex parte Order dated October 22, 2020, the Court authorized disclosure of grand jury information related to Nicole Clyne in connection with this motion.

> subsequent federal criminal proceeding, except that her act of
> producing those documents could be used against her in a
> prosecution for obstruction of justice if she intentionally takes
> any criminal actions with respect to the production (including,
> but not limited to, altering documents or intentionally
> withholding documents).

Exhibit B-006.  In a letter dated April 10, 2019 and emailed to the government, Mr. Sapone

stated:

> I have explained to Ms. Clyne her Constitutional rights and
> privileges as they relate to the subpoena.  On the advice of
> counsel, if Ms. Clyne were compelled to appear before the
> grand jury to give testimony, she would respectfully assert her
> 5th Amendment privilege against compelled self-incrimination.

Exhibit B-007.  Nicole Clyne herself signed the letter, confirming its accuracy.  Id.  On April

15, 2019, Mr. Sapone sent a letter to the government stating that Clyne was "asserting her act

of production privilege with respect to the documents and other materials sought by the April

9, 2019 grand jury subpoena" and requested that the government seek formal act-of-

production immunity from the Court.  Exhibit B-010.  Mr. Sapone noted that he and Clyne

were in the process of "collecting and logging documents and other materials responsive to

the subpoena" and that Clyne may seek to raise "additional potential 5th Amendment

arguments" in response to the subpoena.  Id.  Ultimately, the government did not seek an

order of statutory act-of-production immunity for Clyne and did not obtain the subpoenaed records.[4]

III.    Raniere's Motion Should Be Denied As Untimely

As a preliminary matter, the contents of the affidavits submitted by Hatchette and Clyne do not constitute "newly discovered evidence" under Rule 33. As Raniere's motion concedes, Raniere clearly knew, prior to trial, of Hatchette and Clyne's involvement in DOS and the substance of Hatchette's statements to the government. Def. Mem. at 5; see, e.g., Agnifilo Aff. ¶ 5, ECF Docket No. 197 ("I believe at least some . . . witnesses [interviewed by the government] have represented that the tenets of DOS—including collateral, acts of care and completion of assignments—was a choice they made on their own without any coercion, threats or manipulation."). In addition, the government provided disclosures of statements of DOS members to Raniere under the Jencks Act, 18 U.S.C. § 3500, including statements made by Michele Hatchette, a month prior to the start of trial.[5] Raniere was also made aware that a grand jury subpoena was served on Nicole Clyne in

---

[4]    The cache of DOS materials, including collateral, in Clyne's possession is the product of fraud and extortion, as was demonstrated at trial. The government has not "press[ed]" Mr. Sapone for these materials not because it used the subpoena to "instill" a "sense of fear" in Clyne, Def. Mem. at 7, but because the government did not seek or obtain permission to petition the Court for statutory act-of-production immunity. See 18 U.S.C. § 6003(b) (providing that a United States attorney, with the approval of the Attorney General, may seek a court order granting immunity when, in his judgment, "the testimony or other information from such individual may be necessary to the public interest").

[5]    Raniere's claim that the government "NEVER provided ANY Brady material early enough for counsel to conduct any defense investigation," Mem. at 5 (emphasis in original), is meritless. As an initial matter, as set forth below, Hatchette's statements to the government were not exculpatory and did not constitute Brady. In any event, Hatchette's statements were provided to Raniere a month before the start of a six-week trial, permitting ample time for Raniere's counsel to seek to subpoena Hatchette as a defense witness or to seek an adjournment of trial.

6

April 2019 because on April 11, 2019, counsel for Raniere filed a letter opposing an adjournment of the trial date and alleged that the government was "improperly using this time . . . to gather trial evidence by use of Grand Jury subpoenas." See ECF Docket Entry No. 523.

Because Raniere "knew or should have known" that Hatchette and Clyne "could offer material testimony as to [Raniere]'s role in the charged crime, [he] cannot claim that he 'discovered' that evidence only after trial." Owen, 500 F.3d at 91; see also Forbes, 790 F.3d at 408. Since Raniere cannot argue that he did not know that Hatchette or Clyne would have information about DOS, he claims instead that the witnesses "refused to come forward earlier" and that "[i]t is only now that these people are willing to come forward[.]" Def. Mem. at 7-8. But this is an argument that the alleged evidence is newly available, not newly discovered. The unavailability of evidence prior to or during trial based on the assertion of a valid legal privilege—here, the contemplated assertion of a Fifth Amendment privilege—is not grounds for a Rule 33 motion. See Forbes, 790 F.3d at 410–11 ("Where, as here, a defendant knew that a witness could offer testimony as to the defendant's role in the charged crime, his inability to procure that testimony before or during trial because of the witness's invocation of [her] Fifth Amendment privilege cannot be redressed by granting the defendant a new trial simply because the testimony later becomes available as a result of the mere passage of time.").

The Court should reject Raniere's attempt to circumvent the requirements of Rule 33. Forbes, 790 F.3d at 408 (observing that the Supreme Court has recognized that the "privilege" accorded to a defendant in permitting "more time in which to file a motion for a new trial based on newly discovered evidence" might "lend itself for use as a method of

delaying enforcement of just sentences") (quoting United States v. Johnson, 327 U.S. 106, 112 (1946)).  The government's timely objection to the filing of this Rule 33 motion, both in this submission and in its letter response to the defendant's sentencing memorandum, see ECF Docket No. 929, "assure[s]" the government of the relief it seeks, that is, denial of the defendant's Rule 33 motion.  United States v. Abad, No. 01-CR-831 (GBD), 2005 WL 3358480, at *1 (S.D.N.Y. Dec. 7, 2005) ("Where the government properly objects to an untimely Rule 33 motion, it is assured of relief.  Because the government did so object in this case, the motion must be dismissed.") (internal citations and quotation marks omitted), aff'd, 514 F.3d 271 (2d Cir. 2008); see also United States v. Casiano, No. 05-CR-195 (MRK), 2008 WL 1766576, at *1 (D. Conn. Apr. 11, 2008) ("[W]hile the Government may waive a timeliness objection by failing to raise the issue, the Court is obligated to grant relief to the Government provided it properly raises such an objection.").  The contents of the affidavits submitted by Hatchette and Clyne are not "newly discovered evidence," and Raniere's Rule 33 motion should be denied as untimely.

    IV.   Raniere's Motion Does Not Provide a Basis for a New Trial

        Applying the standard set forth by the Second Circuit in Williams, Raniere falls well short of establishing any one of the three requirements necessary to establish the government violated his right to present a defense.  Raniere has failed to show that he was deprived of material, exculpatory evidence.  He has also failed to demonstrate that the government acted in bad faith.  Lastly, Raniere has failed to show that his trial was fundamentally unfair.

i.   Raniere Has Failed to Demonstrate That He Unsuccessfully Sought the Testimony of Michele Hatchette or Nicole Clyne

Raniere has failed to allege that he sought the testimony of either Michele Hatchette or Nicole Clyne as defense witnesses.  Nowhere in Raniere's motion does he claim that counsel for Raniere ever attempted to subpoena either Hatchette or Clyne to testify as witnesses for the defendant.  Nor is there any suggestion that counsel for Raniere ever communicated any request to Hatchette or Clyne to testify as a defense witness.  The affidavits submitted by Michele Hatchette and Nicole Clyne are silent as to whether they ever received a request by counsel for Raniere to testify on his behalf at trial.  This deficiency alone is grounds to deny Raniere's motion.  Cf. Hatchette Aff. ¶ 43 ("I decided I was unwilling to testify [and a]s a result, the defendant . . . was deprived of my material, exculpatory witness testimony"); Clyne Aff. ¶ 5 ("At this point, although I desired to testify, due to what I perceived as a retaliatory threat, coupled with their Grand Jury subpoena, my lawyer advised me not to testify and I complied.").

Courts have denied motions predicated on claims that the government "denied [the defendant] a fair trial by harassing and intimidating several potential witnesses for his defense" where the defendant failed to produce any evidence that he unsuccessfully sought the witness's testimony at trial.  Harris v. United States, 9 F. Supp. 2d 246, 277-78 (S.D.N.Y. 1998), aff'd, 216 F.3d 1072 (2d Cir. 2000).  In Harris, the district court denied the defendant's motion for a new trial where the defendant claimed that the government prevented potential defense witnesses from testifying at his trial after the witnesses testified in a subsequent civil deposition that they felt intimidated and harassed by law enforcement agents.  Id.  The court explained that the defendant "failed to allege governmental behavior

9

that amounts to a denial of rights" because counsel for the defendant "never attempted to subpoena [the witness] to testify; counsel for [the defendant] did not call any witnesses at all." Id. The court further noted that another potential defense witness "was in contact" with the defendant and "there was no reason to think that her failure to testify on [the defendant's] behalf was due to government intimidation rather than a decision by counsel for [the defendant] that she would not be a useful witness." Id.

Here, as in Harris, there is every reason to believe that counsel for Raniere was in contact with counsel for Hatchette and Clyne. Counsel for Raniere was apparently aware of Clyne's receipt of a grand jury subpoena days after it was served. In addition, the legal fees of both Mr. Greenblum and Mr. Sapone were paid by an irrevocable trust to which co-defendant Clare Bronfman was the primary contributor.

The government strongly disputes the factual assertions set forth in the Hatchette and Clyne affidavits.[6] But even assuming, arguendo, their truth—that a prosecutor "advised Mr. Greenblum to encourage [Hatchette] to meet with [the government] prior to taking the stand [as a government witness] or else they would be likely to charge [her] with perjury," Hatchette Aff. ¶ 40, Hatchette was represented by able counsel. Even assuming such a statement had been conveyed to him, Mr. Greenblum would have been obligated to advise Hatchette that she could not be convicted of perjury if she testified truthfully at trial. In any event, counsel for Raniere made no attempt to subpoena Hatchette or to compel her testimony.

---

[6] While the government disputes the allegations in the Hatchette and Clyne Affidavits, it does not address those disputes here because, as set forth herein, resolution of these factual disputes is not necessary for the Court to deny the defendant's Rule 33 motion.

The far more likely reason Michele Hatchette did not testify on Raniere's behalf was a decision by counsel for Raniere that Hatchette would not be a useful witness at trial. As reflected in the notes of the interview with Hatchette provided to Raniere's counsel before trial, Hatchette confirmed many of the details about DOS proved at trial, including that (1) Raniere's participation in DOS was initially concealed from DOS "slaves," including Hatchette; (2) Hatchette, like other DOS "slaves," provided sexually explicit photographs and letters accusing family members of abuse as collateral to her DOS master, Allison Mack; (3) Hatchette was assigned to "seduce" Raniere; (4) DOS "slaves," including her, were required to participate in "readiness drills" and required to adhere to strict calorie-restricted diets; and (5) DOS "slaves" were branded. Exhibit A-003-Exhibit A-013.

For instance, Hatchette provided the following statements to law enforcement, among others:

- For her first collateral, Hatchette provided Mack with naked photographs and several letters about family members. Hatchette stated the letters contained accusations of abuse. Specifically, Hatchette alleged her brother and sister both abused their children. The letters were addressed to local police departments. . . . Hatchette described the experience of writing and releasing the letters to Mack as intense. Still, Hatchette believed the experience was good because she knew the letters ensured that she would never disclose information related to DOS.

- Hatchette stated that she was uncomfortable, and, at times, afraid to ask Mack about the location and status of her collateral. Hatchette explained the relationship between Hatchette and Mack was of complete servitude. Hatchette stated there was a certain level of respect that she was expected to maintain with her Master. Hatchette stated personal questions and certain questions about DOS were off limits when she conversed with Mack.

- At the time Hatchette was given the assignment to seduce Raniere, Hatchette really wanted to please Mack. While Hatchette did not consider the possibility of her collateral being released if she failed to complete the assignment, Hatchette did believe the vow of servitude to Mack required her to undertake

11

the assignments given by Mack.  Hatchette stated this vow was almost absolute.

- Hatchette stated collateral served the purpose of solidifying her commitment of servitude to Mack and participation in DOS.  Hatchette was obedient to Mack because of this commitment.  Hatchette stated there were times when she wanted to leave DOS.  These feelings were prominent during the beginning of Hatchette's involvement in DOS, particularly when Hatchette received the assignment to seduce Raniere.  Hatchette stated without the existence of collateral, Hatchette would have left DOS.

- Hatchette was not aware of other members of DOS having sexual relations with Raniere or being given the assignment to seduce Raniere.  Still, Hatchette occasionally wondered if other women from her DOS circle were sexually involved with Raniere.  Hatchette stated Mack prohibited her Slaves from speaking about their relationships with Raniere.

Exhibit A-003-Exhibit A-013.  Notwithstanding Hatchette's claim that she would have characterized these experiences as ones that "helped [her] strengthen [her] character, expand [her] awareness of how [her] decisions impacted others and be[come] more disciplined," Hatchette Aff. ¶ 3, it was an eminently reasonable strategic decision by counsel for Raniere not to subpoena Hatchette as a defense witness, as the jury would likely have considered her testimony inculpatory as to Raniere.

As for Nicole Clyne, the communications appended as Exhibit B reflect that Clyne would have invoked her Fifth Amendment right against self-incrimination in connection with any anticipated testimony concerning her involvement in DOS.  Not, as Clyne suggests, because she was "frightened" by an alleged statement made to her attorney by the prosecutor, Clyne Aff. ¶ 12, but because she was Raniere's co-conspirator, a first-line DOS "slave" under Raniere, and a target of the government's investigation.  As the Second Circuit has observed, "when a witness 'invokes [her] privilege against self-incrimination and refuses to testify, the defendant is denied the benefit of any potentially exculpatory testimony

12

the [witness] might have provided.  This is one consequence of the Fifth Amendment

privilege.'"  Forbes, 790 F.3d at 410 (quoting Owen, 500 F.3d at 91)).  Raniere made no

attempt to subpoena Clyne as a defense witness or to compel her testimony, but, even if he

had unsuccessfully sought her testimony due to her invocation of the Fifth Amendment,

Raniere's "inability to procure [her] testimony before or during trial because of the witness's

invocation of [the] Fifth Amendment privilege cannot be redressed by granting the defendant

a new trial simply because the testimony later becomes available as a result of the mere

passage of time."  Forbes, 790 F.3d at 410-11.

      ii.   The Proffered Testimony Is Neither Material Nor Exculpatory

      Raniere has also failed to demonstrate that he was deprived of material,

exculpatory evidence that could not be reasonably obtained by other means.  Raniere argues

that the testimony of Hatchette and Clyne would have supported the defense theory that DOS

had a "notable and worthy purpose" and that they "never witnessed 'any crimes such as sex

trafficking.'"  Def. Mem. at 11.  The testimony proffered by Hatchette and Clyne is neither

material nor exculpatory.

      Hatchette claims that her "experiences of Ms. Mack's mentorship and my time

within DOS would have offered an important perspective in the jury's understanding of the

positive nature of the group which I received."  Hatchette Aff. ¶ 4.  She states, for instance,

that although "Nicole testified that the process of submitting and offering collateral was

problematic for her," Hatchette "would have testified that my experience of gathering and

submitting collateral was not problematic for me as it was explained to me that the collateral

was simply a way to demonstrate my commitment to keep the confidentiality of the group

private while also affirming my voluntary membership into the group."  Id. ¶ 7.  Hatchette

similarly contends that she would have testified that DOS provided her with an "opportunity to build deep, meaningful friendships with other women," id. ¶ 12; that she did not perceive that Mack "did anything to compromise" her wellbeing, id. ¶ 18; and that she was not directed to "have sex with" Raniere "as a requirement of [her] membership in DOS," id. ¶ 20.

Hatchette's proffered testimony is not exculpatory, nor is it material to the charged offenses against Raniere. Evidence that Hatchette did not find the requirements of DOS to be "problematic for [her]" or that she did not perceive an assignment to "seduce" Raniere to be a "requirement" of her membership in DOS has no bearing whatsoever as to Raniere's actions as to the DOS "slaves" who were the victims of the charged offenses. See, e.g., United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."); see also United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (evidence that the defendant did not engage in drug activity during particular trips to Jamaica not relevant to whether defendant engaged in drug activity on other trips to Jamaica). That Hatchette did not feel compelled to engage in sexual activity with Raniere and believed her experiences in DOS to be "very positive," Hatchette Aff. ¶ 34, is neither material nor exculpatory.

Clyne claims that she would have testified, at trial, that "women chose to participate in DOS voluntarily and benefitted greatly from its practices" and that she would have "provided [her] own personal experience" of certain events, including a "vastly different perspective on DOS and the complex and nuanced relationships that were the focus of Mr. Raniere's trial." Clyne Aff. ¶¶ 6, 8, 11. Clyne's proffered testimony does not come

close to constituting material or exculpatory evidence as to the charged offenses. Had Clyne testified at trial, she would have had to acknowledge that she was a "first-line" DOS "master" who lied about Raniere's involvement in DOS in order to recruit women as her "slaves." Clyne's characterization of these actions as being in furtherance of DOS's "notable and worthy purpose," Clyne Aff. ¶ 6, is irrelevant and does not negate Raniere's guilt as to the offenses of conviction.

### iii.   Raniere Has Failed to Show the Government Acted in Bad Faith

Raniere has also failed to demonstrate the government acted in bad faith, since, even assuming the truth of the allegations in Hatchette and Clyne's affidavits, neither Hatchette nor Clyne claims to have first-hand knowledge of any alleged "threat" communicated to counsel for Hatchette and Clyne. Hatchette claims that in a conversation between a prosecutor and her attorney Mr. Greenblum, the prosecutor told her attorney to "encourage" Hatchette to meet with the government prior to testifying as a government witness or the government would "be likely to charge [her] with perjury." Hatchette Affidavit at ¶ 40. Similarly, Clyne claims that in a conversation between prosecutors and her attorney Mr. Sapone, the prosecutor allegedly told Mr. Sapone that the government was "coming for" Clyne and that this is "not going away for her." Clyne Affidavit at ¶ 5.

Tellingly, neither Mr. Greenblum nor Mr. Sapone have submitted affidavits in connection with Raniere's motion, even though they were the intermediaries of the purported threats from the government. But even if Mr. Greenblum and Mr. Sapone had submitted sworn affidavits that prosecutors in fact made such statements to them, Raniere would still have failed to show that there was violation of his due process rights. Raniere's claim that the government threatened Mr. Greenblum that if Hatchette "did not return to the U.S.

15

Attorney's office for a third interview," the government "would indict her with perjury out of retaliation," Def. Mem. at 9, is nonsensical.  As Mr. Greenblum would no doubt have advised Hatchette if such a threat had in fact been issued, the government cannot "indict" an individual "with perjury out of retaliation."  To the extent Mr. Greenblum understood the government to be attempting to convey a warning to Hatchette of the consequences of committing perjury, courts have held that a due process violation does not arise.  See Williams, 205 F.3d at 29.  This is so even if the government's warning about the risks of perjury is "carried out in a caustic manner[.]"  Id.; see also United States v. Polanco, 510 F. App'x 10, 12 (2d Cir. 2013) (summary order) (finding the government's engagement with a witness did not "amount to bad faith" where prosecutor warned defense witness of consequences of perjury and witness had opportunity to consult with counsel).

> iv.   Raniere Cannot Show that His Trial Was Unfair

Lastly, even if Raniere were able to demonstrate that he was denied the right to present the testimony of Hatchette or Clyne (which he cannot), he has failed to establish that it denied him a fair trial.  Williams, 205 F.3d at 29.  The evidence of Raniere's guilt as to the sex trafficking, forced labor, and extortion related to DOS—which included the testimony of three victim-witnesses who were DOS "slaves," a first-line DOS "master," and corroborating records, emails and recordings—was overwhelming, and there is no reason to believe that the testimony of Hatchette or Clyne would have affected the verdict.  At trial, Raniere's counsel cross-examined each of these witnesses at length about their involvement in DOS.  The jury's verdict was not "founded on a partial or speculative presentation of the facts," Williams, 205 F.3d at 31, and there is no basis for concluding that the testimony of

16

Hatchette or Clyne regarding their "positive" experience in DOS would have affected the judgment of the jury.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the Court should deny Raniere's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.

Dated:      Brooklyn, New York
               October 22, 2020

                                      Respectfully submitted,

                                      SETH D. DUCHARME
                                      ACTING UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201


                        By:    <u>/s/ Tanya Hajjar</u>
                                      Tanya Hajjar
                                      Mark J. Lesko
                                      Kevin Trowel
                                      Assistant United States Attorneys
                                      (718) 254-7000

cc:     Clerk of Court (NGG) (by ECF)
          Defense Counsel (by ECF and E-mail)