UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES,

-against-

KEITH RANIERE,

               Defendant.

SENTENCING MEMORANDUM
18-CR-204 (S-1) (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

This sentencing statement concerns Defendant Keith Raniere. Following a six-week trial over which I presided, Mr. Raniere was convicted of racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking.

I. CACLULATION OF OFFENSE LEVEL & GUIDELINES RANGE

The Probation Department recommends that I calculate the Total Offense Level for Mr. Raniere's sentence as 52. (Presentence Investigation Report ("PSR") ¶ 292.) The Government agrees with the PSR's calculation. (*See* Gov't Sentencing Mem. ("Gov't Mem.") (Dkt. 914) at 36.) Mr. Raniere objects to numerous aspects of the PSR, and suggests that the correct Total Offense Level is 37. (Def. Sentencing Mem. ("Def. Mem.") (Dkt. 925) at 65-82.) For the following reasons, I find that the appropriate Total Offense Level is 49.

Let me begin by addressing Mr. Raniere's objections to the PSR's Guidelines calculations.

First, Mr. Raniere objects to the application of a four-point role enhancement under U.S. Sentencing Guidelines ("U.S.S.G.") § 3B1.1(a), which applies "[i]f the defendant was an organizer

or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Second Circuit has held, in *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009), that when calculating the Guidelines for a RICO offense, a § 3B1.1 role enhancement should be applied to the base offense level, "on the basis of the defendant's role in the overall RICO enterprise," rather than "on the basis of his participation in discrete racketeering acts." 568 F.3d at 99.

Mr. Raniere asks this court to distinguish the Second Circuit's holding in *Ivezaj* on the grounds that this case, unlike *Ivezaj*, does not involve a "traditional organized crime enterprise" engaging in violent criminal acts. (Def. Mem. at 66-67.) That argument lacks merit, because the Second Circuit's analysis in that case was not based on the "traditional" nature of the enterprise at issue or the violent nature of the predicate acts. Rather, the Second Circuit's conclusion that "it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted" based on his degree of participation in each predicate racketeering act applies with equal force in this case. *Ivezaj*, 568 F.3d at 99. Accordingly, I reject Mr. Raniere's objections to the application of the four-point role enhancement in paragraphs 181, 189, 197, 203, 209, 215, 221, 228, and 252 of the PSR.

Next, Mr. Raniere objects to two aspects of the calculation for Counts 1 and 2, Racketeering Act 2, which concerns the sexual exploitation of Jane Doe 2. First, he objects to the application of a two-point increase, subject to U.S.S.G. § 2G2.1(b)(2)(A), for an offense that involved the commission of a sexual act or sexual contact. He argues that the offense at issue involves the pornographic photographs that he took of Jane Doe 2 when she was a minor, and that because the *photographs themselves* do not depict a sexual act or sexual contact, the two-level increase is improper,

notwithstanding evidence that Mr. Raniere did engage in an illegal sexual relationship with Jane Doe 2 beginning when she was 15 years old. (Def. Mem. at 70-81.)

Both the Second Circuit and at least one other circuit court have determined that the Guidelines allow for a base offense level to be increased under § 2G2.1(b)(2)(A) on the basis of a defendant's sexual contact with the victim in grooming her for the offense, even where the photographs that are the subject of the offense depict no sexual contact. *See United States v. Weisinger*, 586 F. App'x 733, 739 (2d Cir. 2014); *United States v. Holt*, 408 F. App'x 229, 238 (11th Cir. 2010). Jane Doe 2 has made the courageous choice to speak up in connection with this sentencing, and her victim impact statement corroborates the ample evidence in the trial record that Mr. Raniere took these photographs in the context of an ongoing sexual relationship, through which Mr. Raniere groomed her for the offense of conviction. I therefore find that the two-point increase applies.

I agree with Mr. Raniere's objection to a two-level enhancement on Racketeering Act 2 subject to U.S.S.G. § 2G2.1(b)(5), which applies if the defendant was the minor's parent, relative, or legal guardian, or if the minor was otherwise in the defendant's custody or care. While Jane Doe 2 was living in Nxivm-affiliated housing with adults other than her parents in November 2005, she was not living with Mr. Raniere. (Raniere Trial Tr. ("Tr.") at 2465-73.) This enhancement seems to be aimed primarily at situations in which the defendant is either the victim's parent or guardian or else plays an analogous custodial role. While Jane Doe 2 was entrusted to the care of the Nxivm community, led by Mr. Raniere, I do not think the record demonstrates that Mr. Raniere took on the kind of custodial role contemplated by the Guidelines. I therefore decline to apply this enhancement.

I also agree with Mr. Raniere that the record does not support a two-level enhancement on Racketeering Acts 9(a) and 9(b),

which concern the trafficking of Jane Doe 4, on the grounds that she suffered serious bodily injury. *See* U.S.S.G. § 2H4.1(b)(1)(B). While the circumstances of Jane Doe 4's confinement clearly had a serious adverse impact on her physical health, including the denial of medical care for a severe toothache, and on her mental health, I find that the bodily injury she suffered was not of the type or severity contemplated by the Guidelines in providing for this enhancement.

I disagree with Mr. Raniere's objection to the cross-reference to the sex trafficking Guidelines on Counts 1 and 2, Racketeering Act 12(b), and Count 6, which concern the forced labor of Jane Doe 5. Mr. Raniere argues that the cross-reference creates a problem of "double counting," because Mr. Raniere is also being sentenced for sex trafficking of Jane Doe 5. But as the Second Circuit has made clear, the Guidelines sometimes allow the court to "apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission." *United States v. Maloney*, 406 F.3d 149, 152 (2d Cir. 2005). In this case, the so-called "double counting" that Mr. Raniere objects to is contemplated by U.S.S.G. § 2H4.1(b)(4)(B), and is a Guidelines calculation that "involve[s] 'double counting' in a literal sense, [but] do[es] not involve[] *impermissible* double counting." *Maloney*, 406 F.3d at 152.

I agree with Mr. Raniere that the Government has not established, by a preponderance of the evidence, that either Sylvie or Additional DOS Victim 1 were victims of sex trafficking or a conspiracy to commit sex trafficking. I therefore decline to include those acts in the Guidelines calculations.

I disagree with Mr. Raniere that he is entitled to a three-point reduction under U.S.S.G. § 2X1.1(b)(1) with respect to his conviction of attempted sex trafficking of Jane Doe 8. (*See* PSR ¶¶

4

279-284.) Section 2X.1(b)(1) provides for a three-point reduction in the case of attempt convictions, "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." For the offense of conviction of sex trafficking, that exception would therefore apply if Mr. Raniere completed all the acts he believed necessary to "recruit[], entice[], harbor[], transport[], provide[], obtain[], maintain[], patronize[], or solicit[]" Jane Doe 8 for the purposes of engaging in commercial sex acts, regardless of whether Jane Doe 8 actually performed those acts. *See* 18 U.S.C. § 1591.

I find that the preponderance of the evidence supports such a finding. The evidence at trial established that, in approximately November 2016, Jane Doe 8 was recruited into DOS, which she was told was a "women's-only organization." (Tr. at 4324.) Her recruitment followed a pattern in which Mr. Raniere directed "first line" DOS slaves to recruit their own slaves, and instructed them to conceal from the recruits that he was involved with DOS in any way. Shortly after being recruited, Jane Doe 8 was given a "special assignment" by her "masters" to "seduce" Mr. Raniere, and to allow Mr. Raniere to take a photograph to prove she had completed the "assignment." (Tr. at 4416-20.) I find Jane Doe 8's testimony credible, and reject Mr. Raniere's contention that she somehow "misunderstood the assignment to sleep with Raniere." (Def. Mem. at 80.) Thus, while Jane Doe 8 ultimately refused to engage in a sex act with Mr. Raniere, I find that the preponderance of the evidence establishes that Mr. Raniere "completed all the acts [he] believed necessary for successful completion of the substantive offense." Accordingly, a three-point reduction under § 2X1.1(b)(1) is not warranted.

I disagree with Mr. Raniere's objection to a five-level enhancement under U.S.S.G. § 4B1.5(b)(1) for engaging in a "pattern of activity involving prohibited sexual conduct." Under the Guidelines, a defendant engages in a pattern of activity involving

5

prohibited sexual conduct "if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." Application Note 4(B)(i); *see also United States v. Broxmeyer*, 699 F.3d 265, 284 (2d Cir. 2012). The evidence establishes that Mr. Raniere began a sexual relationship with Jane Doe 2 in or about September 2005, when she was fifteen years old. The evidence also establishes that, on at least two occasions, Mr. Raniere took photographs of Jane Doe 2 constituting child pornography. (*See* PSR ¶¶ 60-64; *see also* Oct. 27, 2020 Camila Victim Impact Statement ("Camila Statement") (Dkt. 965-1).) That is sufficient to establish a "pattern of activity involving prohibited sexual conduct," and the enhancement under § 4B1.5(b)(1) is therefore warranted.

Having addressed Mr. Raniere's objections to the PSR's Guidelines calculation, I will now calculate the Guidelines range for Mr. Raniere's sentence, using the 2018 Guidelines Manual. (*See* U.S.S.G. § 1B1.11.)

On Count 1(a), for Visa Fraud, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2L2.1, 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 1(a) and 1(b), for Conspiracy to Commit Identity Theft and Unlawfully Possess Jane Doe 1's Identification, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2L2.1, 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 2 and 4, for Sexual Exploitation of Jane Doe 2 on November 2, 2005, the base offense level is 32. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2G2.1).) I apply a two-level increase because Jane Doe 2 was older than 12 but younger than 16, a two-level increase because the offense involved sexual contact, and a four-point increase for the defendant's leadership role, for an adjusted total of 40. (*See* U.S.S.G. §§ 2G2.1(b)(1)(B), (b)(2)(A), 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 3 and 4, for Sexual Exploitation of Jane Doe 2 on November 24, 2005, the computation is the same as the one I just described, with an adjusted offense level of 40. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2G2.1, (b)(1)(B), (b)(2)(A), 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 5(a) and 5(b), for Conspiracy to Commit Identity Theft of James Loperfido, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B1.1, 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 5(a) and 5(c), for Conspiracy to Commit Identity Theft of Edgar Bronfman, Sr., the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B1.1, 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 6, for Conspiracy to Alter Records for Use in an Official Proceeding, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2J1.2, 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 7, for Conspiracy to Commit Identity Theft of Jane Doe 3, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B1.1, 3B1.1(a).)

On Counts 1 and 2, Racketeering Acts 9(a) and 9(b), for Trafficking and Document Servitude of Jane Doe 4, the base offense level is 22, and I apply a three-level increase because the victim was held in peonage or involuntary servitude for over a year, and a four-level increase for the defendant's leadership role, for an adjusted total of 29. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2H4.1, (b)(3)(A), 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 10, for Extortion, the base offense level is 19 and a four-point role enhancement applies, for

an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B3.2, 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 12(a), and Counts 8 and 9, for Sex Trafficking of Jane Doe 5, the base offense level is 30 and a four-point role enhancement applies, for an adjusted total of 34. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2G1.1, (c)(1), 2A3.1(a)(2), 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 12(b), and Count 6, for Forced Labor of Jane Doe 5, the base offense level is 32 and a four-point role enhancement applies, for an adjusted total of 36. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2H4.1, (b)(4)(B), 3B1.1(a).)

On Counts 1 and 2, Racketeering Act 14, for Conspiracy to Commit Identity Theft of Jane Doe 7, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B1.1, 3B1.1(a).)

On Counts 1 and 7, for Wire Fraud Conspiracy, the base offense level is 19 and a four-point role enhancement applies, for an adjusted total of 23. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2B1.1, 3B1.1(a).)

On Counts 1, 8, and 10, for Attempted Sex Trafficking of Jane Doe 8, the base offense level is 34, and a four-point role enhancement applies, for an adjusted total of 38. (*See* U.S.S.G. §§ 2E1.1(a)(2), 2G1.1, 3B1.1(a).)

I then compute the multiple count adjustment, which requires that I assign one unit to the group with the highest offense level, and one additional unit to each group that is equally serious or 1-4 levels less serious. The two groups related to sexual exploitation of Jane Doe 2 have the highest adjusted offense level, at 40. I assign one unit to each of those groups, one unit to the group covering sex trafficking and forced labor of Jane Doe 5, and one unit to the group covering attempted sex trafficking of Jane Doe 8. That yields a total of four units. (*See* U.S.S.G. § 3D1.4.) I then

take the greater of the adjusted offense levels, which is 40, and increase the level by 4 points, based on the unit calculation. (*Id.*) That would yield a Total Offense Level of 44.

Finally, because the offense of conviction is a covered sex crime, the defendant engaged in a pattern of activity involving prohibited sexual conduct, the defendant is not a career offender, and § 4B1.5(a) of the Guidelines does not apply, I increase the offense level by five points, to a total of 49. (*See* U.S.S.G. § 4B1.5(b)(1).) The Total Offense Level is therefore 49.

Having determined the Total Offense Level, I will now calculate the Guidelines Range. The defendant is in Criminal History Category I, and his Total Offense Level is 49. Using the Guidelines table, I calculate that the applicable Guidelines range is life imprisonment.

## II. SENTENCE

Having calculated the Guidelines range, I now turn to the factors outlined in 18 U.S.C. § 3553(a). Under § 3553(a), I must consider several factors in imposing a sentence, including the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence; and the need to protect the public.

Before turning to an analysis of the § 3553(a) factors, it is important to say a word about what I will be considering in that analysis. First, I have reviewed the parties' sentencing submissions. I have read the 56 letters submitted in support of Mr. Raniere. Many of these letters express the genuine belief that Nxivm and Mr. Raniere played a positive role in people's lives. Of course, I have also reviewed the many victim letters that have been submitted, and I have listened carefully to the victim statements made here today in court. I have heard and considered

counsel's arguments. And I have also considered the testimony adduced at Mr. Raniere's trial.

After a six-week trial over which I presided, a jury found Mr. Raniere guilty of Racketeering Conspiracy, in violation of 18 U.S.C. §§ 1962(d), 1963(a); Racketeering, in violation of 18 U.S.C. §§ 1962(c), 1963(a); Forced Labor Conspiracy, in violation of 18 U.S.C. § 1594(b); Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1349, 1343; Sex Trafficking Conspiracy, in violation of 18 U.S.C. §§ 1594(c), 1591(b)(1), and two counts of Sex Trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1). Mr. Raniere was convicted of all eleven racketeering acts submitted to the jury, to wit: (1) Conspiracy to Commit Identity Theft and Unlawfully Possess Identification of Jane Doe 1; (2) two acts of Sexual Exploitation of a Minor, Jane Doe 2; (3) Possession of Child Pornography; (4) Conspiracy to Commit Identity Theft; (5) Conspiracy to Alter Records for Use in an Official Proceeding; (6) Conspiracy to Commit Identity Theft of Jane Doe 3; (7) Trafficking and Document Servitude of Jane Doe 4; (8) State Law Extortion; (9) Sex Trafficking and Forced Labor of Jane Doe 5; and (10) Conspiracy to Commit Identity Theft of Jane Doe 7. (*See* PSR ¶¶ 4-22.)

The context in which Mr. Raniere committed these egregious crimes is by now well known. Mr. Raniere is the founder of an organization called Nxivm, a self-styled executive coaching and self-help organization that functioned as a pyramid scheme in which members paid thousands of dollars for various "workshops" and new members were recruited via the promise of payments or services for enrolling others into the scheme. (PSR ¶¶ 29-34.) Mr. Raniere made members of Nxivm call him "the Vanguard," and he maintained a rotating group of fifteen to twenty female Nxivm members with whom he had sexual relationships. (*Id.*) These women were not permitted to have sexual

relationships with anyone but Mr. Raniere or to discuss with others their relationship with Mr. Raniere. (*Id.*)

In 2015, Raniere created a secret society called "DOS" or "the Vow." (*Id.* ¶ 35.) As the PSR explains:

> DOS was comprised of all female masters (who were Nxivm members) who recruited and commanded groups of all female slaves. When identifying prospective slaves, masters often targeted women who were experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement in Nxivm. Each DOS slave was expected to recruit slaves of her own, who in turn owed service not only to their masters but also to masters above them in the DOS pyramid. Raniere alone formed the top of the pyramid as the highest master. Other than Raniere, all participants in DOS were women. Raniere's status as head of the pyramid was concealed from all newly recruited slaves, other than those directly under Raniere. DOS masters persuaded slaves to join DOS by falsely describing it as a secret women's empowerment group and that the goal of DOS was to eradicate weaknesses in its members. Prospective slaves were required to provide collateral to prevent them from leaving the group or disclosing its existence to others. Collateral included sexually explicit photographs and videos of themselves, rights to financial assets, and videos or letters of (true or untrue) confessions that would be damaging to the prospective slave's family members and friends. After joining DOS, slaves were required to provide additional collateral, including sexually explicit photographs, and to pay tribute to their masters, including by performing tasks that would otherwise be compensable. In addition, several DOS slaves were directed to have sex with Raniere to maintain membership.

(*Id.*)

In other words, DOS operated to abuse and exploit young women for sex, labor, and financial gain.

I now turn to the § 3553(a) factors. The nature and circumstances of Mr. Raniere's conduct, as well as his history and characteristics and the need for his sentence to reflect the seriousness of the offense, all warrant a significant sentence. The evidence before me makes clear that Mr. Raniere's conduct was particularly egregious because he targeted and exploited girls and young women. He continued this abuse over the course of many years. And his abuse inflicted unimaginable trauma and damage on his victims.

Take, for instance, his sexual exploitation of Camila (Jane Doe 2). Mr. Raniere first met Camila when she was 13 years old—in their first conversation alone, they spoke about how Camila had just placed second in her eighth grade spelling bee contest. (Camila Statement at 1.) Mr. Raniere began a sexual relationship with Camila two years later, when he was 45 and she was 15. (PSR ¶¶ 60-64; Camila Statement at 1.) He took naked pictures of 15-year-old Camila, something she describes as being "seared into my memory." (Camila Statement at 1-2.) Years after they met, Mr. Raniere told Camila he knew she was "special" ever since they first met each other when she was 13. (Camila Statement at 1.)

Mr. Raniere exerted control over this child in every way imaginable. As she puts it, "[h]e used my innocence to do whatever he wanted with me—not just sexually but also psychologically. He manipulated me into what he wanted, for his own reasons [and] for his own pleasure." (*Id.* at 2.) Mr. Raniere directed Camila to overstay her visa, thereby giving him additional leverage over her, and he put her up in an apartment where he would, "come in the house, have sex, and leave." (*Id.*) He controlled and manipulated her in every way. He told her he needed a "vow of absolute obedience," and that she had "to be happy whenever

you are with me because my time means that much." (Gov't Ex. A. (Dkt. 914-1.) at 239.) In one message, Mr. Raniere wrote her:

> If you want me to come tonight, I will under these conditions: there will be no talking. You will meet me at the door in the outfit you think I would find sexiest. You will arouse me, we will make love for my satisfaction and pleasure. You will do everything you can to provide that. I will finish and leave. Do you agree yes or no?

(Gov't Ex. A. at 96.) When Camila had a relationship with another man, Mr. Raniere "punished [her] emotionally, psychologically, and sexually." (Camila Statement at 3.) He branded her. As Camila tells the court:

> I hold scars on my body from him that can never be erased. They carry immense emotional and psychological pain. They are a reminder of his cruelty and manipulation. He knew exactly what he was doing, even asking me at some point if having his initials on my body would keep me from being with other people. He drew pleasure from knowing he had marked me—I was his. Even when I got a tattoo to cover his mark, it was not enough to disguise the pain and shame it reminds me of.

(*Id.*)

Mr. Raniere's abuse of Camila was cruel to the point of inhumane. He made her ask his permission for almost everything, including to contact her family and to cut her hair. (Gov't Mem. at 43.) At one point, Camila messaged Raniere, "I feel like I have a gun pointed at me and I'm [] just trying to say what you want to hear so you won't shoot but I don't know what it is you want to hear." (*Id.* at 45.) Simply put, the harm he inflicted upon her is incalculable.

Mr. Raniere had many other victims. Mr. Raniere, along with others, trafficked Daniela (Jane Doe 4) into the United States, and

she began working for Raniere. (PSR ¶ 66.) Mr. Raniere initiated a sexual relationship with Daniela when she was 18 years old; as he did with many of the girls and women he had sexual relationships with, Mr. Raniere instructed Daniela to keep their relationship a secret. When Daniela developed feelings for another man, Mr. Raniere told her parents that she had committed an "ethical breach." (PSR ¶ 67.) To punish Daniela, Mr. Raniere ordered that she be confined to a room in her parents' home without human contact. At Mr. Raniere's instruction, Lauren Salzman, one of the "First Line" DOS members, threatened Daniela that if she left the room, she would be sent to Mexico without any identification documents. *Id.* Like his treatment of Camila, Mr. Raniere's treatment of Daniela was particularly cruel because of the psychological harm he inflicted on her at such a young age. Forced to remain in her room for months and months on end, Daniela testified that one of the worst aspects of her kidnapping was the feeling that, "I'm in a world where nobody cares that I'm losing my life," and thinking that "it was clearly never [going to] end." (Tr. at 2905.)

It is necessary for me to mention at this juncture a letter submitted in support of Mr. Raniere that I received from Hector, the father of Daniela and Camila. I am frankly baffled why anyone thought this letter would help Mr. Raniere. In the letter, Mr. Fernandez waxes nostalgic about how Mr. Raniere helped him run a marathon, before turning to slandering his own daughter, Daniela, calling her a liar and a thief, and implying she had no one but herself to blame for what happened to her. Let me be clear: I find Mr. Fernandez's letter, in support of the man who abused his own daughters, a disgrace. And, to Daniela, who is here today in the courtroom, let me also be clear: what happened to you is not your fault, and I am deeply impressed with your courage and resilience. And that goes for all the victims who have spoken today, either in-person or by video or audio.

Turning back to Mr. Raniere, his operation of DOS to exploit women was ruthless and unyielding. One "slave" was ordered to "seduce" Mr. Raniere by sending him naked photographs of her every day. (PSR ¶ 101; Tr. at 219.) She was later taken to his house where he performed unwanted oral sex on her and took more photographs of her. Mr. Raniere blindfolded another "slave," and tied her down to a table while a third person performed unwanted oral sex on her. (Tr. at 3921-29.) Several former DOS "slaves" testified that they were terrified to leave or speak out against DOS out of fear that their "collateral" would be released. All the while, Mr. Raniere also benefitted financially, as DOS "slaves" were coerced into providing labor and services for their "masters" and Mr. Raniere. (PSR ¶¶ 84-96.) Mr. Raniere perpetrated these crimes over the course of many years, and his conduct harmed a great many people. More than 90 individuals have submitted victim impact statements to the court in coneection with this sentencing, describing the harm that his criminal conduct inflicted on them.

What is clear to me, from all of this, is that the offenses of which the jury convicted Mr. Raniere are cruel, perverse, and extremely serious. They targeted the most vulnerable among his community, and they inflicted untold damage. As one of Mr. Raniere's victims wrote:

> I can never fully explain how much damage Keith Raniere has caused me and so many others. The psychological impact of his twisted teachings permeate my brain even after 2+ years of consistent therapy. His sexual abuse and humiliation of me, lives in my body and wreaks havoc with my soul if I am not completely diligent. Nightmares fill my head almost weekly, and the things he taught me to think about myself have made me neglect my health and cause myself undue pain on countless occasions.

(Sylvie Supp. Victim Impact Statement.) Taking account of the nature of the offenses of conviction, as well as Mr. Raniere's history and characteristics and the seriousness of his offenses, makes abundantly clear that a significant sentence is not just appropriate, but necessary.

In determining an appropriate sentence, I also consider the need for the sentence that I impose to reflect the seriousness of the offense, promote respect for the law, and provide general and specific deterrence. I find that a review of these factors also counsels in favor of a significant sentence. Despite everything that has happened and despite the countless victims who have given voice to their great pain, Mr. Raniere remains unmoved. Indeed, he maintains his innocence. (*See* Def. Mem at 1 ("Keith Raniere continues to assert his complete innocence to these charges.")). To him, the brave victims who have spoken out about the abuse suffered at his hands—including those who spoke today—are liars. (*Id.* at 5.) The women who have courageously testified to his sexual exploitation of them are liars, too; in fact, they all just wanted to be with him. (*Id.* at 13-15.) And the six-week trial he was afforded before a jury of his peers was simply inconsequential.

Mr. Raniere has therefore not only failed to demonstrate remorse for his conduct, but he also maintains to this day that he has done nothing wrong. As recently as November 2019, he described DOS as "good—not just good and even noble, but great—and vitally important for women and humanity." (Gov't Mem. at 51.) Having presided over his trial, and having sat here today and listened to Mr. Raniere's victims, I find it deeply troubling that he thinks of DOS in those terms. To make matters worse, he and his counsel, funded by an unlimited war chest courtesy of co-conspirator Clare Bronfman, are engaged in a public relations campaign to cast doubt on the integrity of the judicial system and the jury verdict. Ultimately, Mr. Raniere's lack of remorse, coupled with his

view that the conduct for which he was convicted was actually "noble," strongly suggests the need for a significant sentence.

The need to promote respect for the law and for deterrence warrants a significant sentence in yet another respect. In his attempts to silence his critics and maintain control of his criminal enterprise, Mr. Raniere repeatedly obstructed justice and demonstrated a disregard for the rule of law. In one instance, he worked to alter videotapes that were produced in discovery in a federal lawsuit. (PSR ¶¶ 80-83.) When DOS victims began to speak out publicly, Mr. Raniere worked to silence them, including orchestrating a threatening letter to be sent to the victims through counsel in Mexico. (Gov't Mem. at 19-21.) In every aspect of his conduct, Mr. Raniere has acted as though the law does not apply to him. Unfortunately for him, that is not the case.

I have considered the range of sentences that are available, and the range suggested by the Sentencing Guidelines. I have also considered the need to avoid unwarranted sentence disparities between Mr. Raniere and other defendants who have been convicted of similar conduct.

Finally, I have considered the appropriateness of imposing a fine, as I am obligated to do subject to 18 U.S.C. § 3571, unless I find that Mr. Raniere is unable to pay. Section 3571(b) permits me to impose a fine on each count of up to $250,000, for a total of $1,750,000. In addition to the factors I noted already, § 3572(a) sets out additional factors that I must consider in determining whether to impose a fine and, if I do, what the amount should be. These factors include Mr. Raniere's ability to pay and the financial burden that a fine will impose on him or anyone else. They also include the expected cost to the Government of his sentence. The Guidelines fine range for Mr. Raniere's offenses is between $50,000 and $250,000. (*See* U.S.S.G. § 5E1.2(c)(3); PSR ¶ 359.) I find that Mr. Raniere has the ability to pay a significant fine. As I have already explained, I find the seriousness of

17

Mr. Raniere's conduct and the extreme harm he has caused justify a serious sentence. As one aspect of that sentence I am imposing the statutory maximum fine of $1,750,000 payable immediately. I direct the Government to place a lien on the estate of Pamela Cafritz, to which Mr. Raniere is alleged to be the sole inheritor, to secure payment of the fine.

## III. CONCLUSION

Applying the statutory factors to this case, I find a significant sentence to be plainly justified. As I have explained, each of the § 3553(a) factors counsel in favor of such a sentence. Though I have highlighted today particularly egregious aspects of Mr. Raniere's campaign of manipulation, exploitation, and abuse, no words can adequately communicate the lasting pain, trauma, and hardship he has caused so many.

I therefore sentence Mr. Raniere as follows:

- On Count 1, for Racketeering Conspiracy, 40 years (480 months) in the custody of the Attorney General, to be served concurrently with the sentence on Count 2 and consecutively with all other sentences imposed;

- On Count 2, for Racketeering, 40 years (480 months) in the custody of the Attorney General, to be served concurrently with the sentence on Count 1 and consecutively with all other sentences imposed;

- On Count 6, for Forced Labor Conspiracy, 20 years (240 months) in the custody of the Attorney General, to be served consecutively with all other sentences imposed;

- On Count 7, for Wire Fraud Conspiracy, 20 years (240 months) in the custody of the Attorney General, to be served consecutively with all other sentences imposed;

- On Count 8, for Sex Trafficking Conspiracy, 40 years (480 months) in the custody of the Attorney General, to be served concurrently with the sentences on Counts 9 and 10, and consecutively with all other sentences imposed;

- On Count 9, for Sex Trafficking of Jane Doe 5, 40 years (480 months) in the custody of the Attorney General, to be served concurrently with the sentences on Counts 8 and 10, and consecutively with all other sentences imposed;

- On Count 10, for Sex Trafficking of Jane Doe 8, 40 years (480 months) in the custody of the Attorney General, to be served concurrently with the sentences on Counts 8 and 9, and consecutively with all other sentences imposed.

To summarize, I am imposing 40-year concurrent sentences on Counts 1 and 2, a 20-year sentence on Count 6, a 20-year sentence on Count 7, and 40-year concurrent sentences on Counts 8, 9, and 10, for a cumulative sentence of 120 years.

I also impose sentences of supervised release, to be served concurrently with one another, as follows:

- On Count 1, 5 years of supervised release.
- On Count 2, 5 years of supervised release.
- On Count 6, 3 years of supervised release.
- On Count 7, 3 years of supervised release.
- On Count 8, a lifetime term of supervised release.
- On Count 9, a lifetime term of supervised release.
- On Count 10, a lifetime term of supervised release.

Additionally, I impose a $250,000 fine on each count of conviction, for a total of $1,750,000, payable immediately; a $700

Special Assessment, also due immediately; and a $15,000 assessment pursuant to the Justice for Victims of Trafficking Act of 2015. Any claims of restitution under 18 U.S.C. § 3664(d)(5) must be submitted within 90 days of today's order.

SO ORDERED.

Dated:    Brooklyn, New York
             October 27 2020

                                                  /s/ Nicholas G. Garaufis
                                                 NICHOLAS G. GARAUFIS
                                                 United States District Judge