4096

1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      :   18-CR-204(NGG)
4
            Plaintiff ,        :
5                                  United States Courthouse
      -against-                :   Brooklyn, New York
6
KEITH RANIERE, et al.,         :
7                                  June 10, 2019, Monday
            Defendant.         :   9:00 a.m.
8
   - - - - - - - - - - - - X
9
                  TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
            UNITED STATES DISTRICT JUDGE, and a jury.
11
APPEARANCES:
12
For the Government:          RICHARD P. DONOGHUE
13                           United States Attorney
                             BY: MOIRA K. PENZA, ESQ.
14                               TANYA HAJJAR, ESQ.
                                 MARK LESKO, ESQ.
15                           Assistant United States Attorneys
                             271 Cadman Plaza East
16                           Brooklyn, New York 11201

17 For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                             767 Third Avenue
18                           New York, New York 10017
                             BY: MARC A. AGNIFILO, ESQ.
19                               TENY ROSE GERAGOS, ESQ.

20                           DEROHANNESIAN & DEROHANNESIAN
                             677 Broadway
21                           Albany, New York 12207
                             BY:  PAUL DerOHANNESIAN, II, ESQ.
22                               DANIELLE R. SMITH, ESQ.

23
Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
24                        Official Court Reporter
                         E-mail:  SMaceRPR@gmail.com
25 Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

Proceedings                                         4097

 1              (In open court - jury not present.)

 2              (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

 3              (Defendant entered the courtroom.)

 4              THE COURT:  Appearances.

 5              MS. PENZA:  Moira Penza, Tanya Hajjar and Mark Lesko

 6    for the United States.

 7              Good morning, Your Honor.

 8              Also at counsel table is Special Agent Michael Lever

 9    and paralegal specialist Teri Carby.

10              MR. AGNIFILO:  Good morning, Your Honor.

11              Mark Agnifilo and Teny Geragos will be here in a

12    minute.  We have Paul der Ohannesian and Danielle Smith for

13    Keith Raniere, who is with us in court this morning.

14              Good morning, Judge.

15              THE COURT:  Good morning, everyone.  Please be

16    seated.

17              About how much more do you have on direct for

18    Nicole?

19              MS. PENZA:  About five minutes, Your Honor, but I

20    haven't received any materials for cross-examination at this

21    point and so I would like the opportunity to review before

22    cross-examination begins.

23              MR. AGNIFILO:  We are going to provide them when the

24    direct is done.  When we provided them before the direct was

25    done on the witness before, the prosecutor showed our

Proceedings                                           4098

1   cross-examination materials to the witness, and as I put on

2   the record, I thought that took the sting out of my

3   cross-examination.  So when the direct is done, we will give

4   over the materials.

5              MS. PENZA:  Your Honor, the Government's concern is

6   that, as to this witness, again, the defendant has secreted

7   his phones and his devices in Mexico and so the Government is

8   operating with less information at this point.

9              And so what happened with Sylvie is that defense

10  counsel, essentially, read hearsay statements into the record

11  and the Government doesn't want that happening with Nicole.

12  If there are materials, if there are text messages, if it is

13  not proper impeachment, then the defense counsel cannot read

14  in messages into the record.  And we want to make sure that's

15  not going to happen and that we don't have to make those

16  objections in front of the jury if there is going to be

17  improper material.

18             And as to -- we had the sidebar, Your Honor, about

19  the other -- the other witness.  The witness was still on

20  direct and they were the same sort of materials that we had,

21  of course, prepared the witness to expect during

22  cross-examination.  They were her own e-mail statements, so I

23  don't think that there was any prejudice to the defendant.

24  And, in fact, the one e-mail that was at issue Your Honor

25  precluded the part that would have been particularly

Proceedings                                    4099

1   prejudicial, and Mr. Agnifilo still tried to get in the

2   statement from the part that Your Honor had precluded on

3   cross-examination.

4           So the Government just wants to make sure that these

5   witnesses are treated fairly, and I am concerned that if we

6   don't have adequate time to review the materials in advance,

7   that there could be -- there could be that problem.

8           THE COURT:  Well, how much time do you think you

9   need?

10          MS. PENZA:  Depends upon the quantity of the

11  material.

12          THE COURT:  Well, let's see.

13          MS. PENZA:  So maybe Mr. Agnifilo can, at least,

14  proffer how much material there is.  If it's years of text

15  messages and it's screenshots where we don't know what's been

16  deleted, what hasn't been deleted, I think that's highly

17  improper, Your Honor, and we should be able to make an

18  appropriate record as to that.

19          MR. AGNIFILO:  Your Honor, I don't think it's

20  improper.  I mean, I think -- I think there's a strong

21  indication that the witness might have not provided these text

22  messages to the Government.  That's -- that will be a subject

23  of cross-examination.  That's why they don't have them.

24          But that being said, we have several months of text

25  messages.  The vast majority -- and quite frankly, I think

Proceedings                                      4100

1   that's probably going to be a total of maybe ten minutes of

2   cross-examination, probably very late in the

3   cross-examination.

4          We have e-mails, many of them are Government

5   exhibits, so we're -- and also there's -- the Court's ruling

6   is that if something is classic impeachment material, there is

7   no obligation to give it to the Government beforehand, and

8   this is -- this is classic impeachment material.

9          MS. PENZA:  Your Honor, the last -- with the last

10  witness, Mr. Agnifilo provided the materials to the Court in

11  advance, and that was the understanding.  I don't believe

12  Mr. Agnifilo has provided any materials as to this witness for

13  in camera review to determine whether it is, in fact, proper

14  impeachment material.

15         I am also concerned, and I want to flag this now,

16  that to the extent Mr. Agnifilo intends to try to seek to put

17  into evidence Nicole's own e-mails, Allison Mack's e-mails,

18  the Government is going to have a hearsay objection as to

19  those things.  The state of mind exception is limited and we

20  just want to make sure that, and we can obviously do it at the

21  time, but we are going to have -- I expect there's going to be

22  a lot of objections, and so I think we could streamline this

23  if the Government is aware of what the defense is anticipating

24  using.

25         MR. AGNIFILO:  As Your Honor knows, it's not

SAM       OCR       RMR       CRR       RPR

Proceedings                                          4101

1    required under the rules; it's impeachment material.  We have

2    the right to impeach every witness who is a Government witness

3    with materials that are not Rule 16 materials.  We litigated

4    this before the trial began, and I don't understand the

5    concern; hearsay is hearsay on both sides.  I mean we have --

6    we have thousands of e-mails in the record between different

7    Government witnesses and different people, and they're

8    admissible because they're not offered for the truth, and I

9    expect the same thing will happen with this witness.

10          MS. PENZA:  Your Honor, that's just frankly not

11   true.  Things are admissible for their truth for the

12   Government because there are a lot of co-conspirator

13   statements or statements by a party opponent in our case, so

14   that's why -- what we have been offering, Your Honor.

15          Additionally, I think what is very notable about

16   Nicole's testimony is that she has testified that she texted

17   kind, loving messages to the defendant.  She was in this

18   complicated relationship where there was this period where she

19   tried to separate it from what was going on with DOS, that it

20   was very confusing to her.  That -- so I don't think there is

21   going to be significant impeachment on that, so I don't think

22   that Mr. Agnifilo gets to read into the record any -- like

23   those sorts of messages that one might be -- that one might be

24   expecting.  That's not impeachment.  She's already testified

25   truthfully as to that.

Proceedings                                    4102

1          And so what I think Mr. Agnifilo wants to do is

2     embarrass her, read through message after message, and that is

3     pure hearsay and it's improper, and I don't want it happening.

4          THE COURT:  Well, if we get --

5          MR. AGNIFILO:  Your Honor, can I just --

6          THE COURT:  Yes.

7          MR. AGNIFILO:  The fact that I would be out to

8     embarrass a witness, I take personal offense to this.

9          THE COURT:  Oh, really?

10         MR. AGNIFILO:  I do, Judge.  And that is not going

11    to help my client, for one.  And for two, it doesn't help the

12    jury get to the job that it wants to do.

13         What I -- what is my job is to establish from this

14    witness what the relationship was like at the time; not

15    looking back at it, not years later, what it was like at the

16    time in sufficient detail so that this jury can understand

17    what it was like at the time.  There is not going to be

18    anything embarrassing about it.  I am not looking to embarrass

19    anyone.

20         Judge, and I don't think it's a nice thing -- it's

21    not an appropriate thing to say and it's not a fair thing to

22    say.

23         THE COURT:  Well, there is a line of demarcation

24    that we need to avoid crossing, that is what I am saying.  So

25    we will see.  If you ask questions that do not meet the

Proceedings                                          4103

1    standard for impeachment, I will sustain the objection.  If

2    they do meet the standard, I will overrule the objection.

3    That is the way we are going to do it.  And then, when we get

4    to the next witness, you may have a better sense of where I am

5    on this.  I am not going to debate it with you.

6                Bring in the jury, please.

7                Oh, first bring in the witness.

8                (Whereupon, the witness entered the courtroom and

9    resumed the stand.)

10               (Jury enters.)

11               THE COURT:  Please be seated.

12               Good morning, members of the jury.

13               THE JURORS:  Good morning.

14               THE COURT:  All right, you may continue your

15   examination of the witness.

16               The witness is reminded that she is still under

17   oath.

18               MS. PENZA:  Thank you, Your Honor.

19

20               (Continued on the following page.)

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1    **N I C O L E ,**

2         previously called as a witness by the Government, having

3         been previously duly sworn/affirmed by the Courtroom

4         Deputy, was examined and testified further under oath as

5         follows:

6    DIRECT EXAMINATION

7    BY MS. PENZA:

8    Q    Good morning, Nicole.

9    A    Good morning.

10   Q    Nicole, while you were in DOS, did Allison Mack have any

11   nicknames?

12   A    Madame Mack.

13   Q    And while you were -- while you were in DOS, were you

14   familiar with a girls' school?

15   A    Yeah -- yes.  When I -- I did a Jness weekend one --

16   once, and I met some of the young girls who had come in from

17   Mexico to go to -- go to school, like in the community, like

18   Rosa Laura had set it up.  I think they were staying with Rosa

19   Laura, but there were like four or five girls in the Jness

20   training that were, like, between 15 and 17 that had come in

21   from Mexico.

22   Q    And did you meet some of them?

23   A    Yes.

24   Q    Do you remember the first name of any of the girls?

25   A    The little one that sat next to me, her name was Cece,

Nicole - direct - Penza                           4105

1    which I believe is short for Cecilia.

2            MS. PENZA:  Your Honor, may I have the ELMO just for

3    the witness, please -- or actually, Your Honor, may I approach

4    the witness quickly?

5            THE COURT:  Yes.

6            MS. PENZA:  Thank you.

7    BY MS. PENZA:

8    Q    Nicole, I am showing you what's marked for identification

9    purposes as Government Exhibit 667.

10           Can you just look through that for a second?

11   A    (Witness complies.)

12   Q    Are you familiar with this document?

13   A    Yes.

14   Q    Can you just explain very generally what it is?

15   A    So, this --

16   Q    Is this --

17   A    Yeah, it's the contract.

18   Q    This is the contract that you described on direct being

19   asked to sign?

20   A    Yes.

21           MS. PENZA:  Your Honor, the Government offers

22   Government Exhibit 667 into evidence.

23           MR. AGNIFILO:  No objection.

24           THE COURT:  Government Exhibit 667 is received in

25   evidence.

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                    4106

1           (Government's Exhibit 667 was received in evidence.)

2           (Exhibit published.)

3  BY MS. PENZA:

4  Q    Nicole, I am showing you what's in evidence as

5  Government's Exhibit 667.

6           Is this the series of contracts that you were asked

7  to sign by Allison Mack?

8  A    Yes.

9  Q    And can you -- can you remind us approximately when you

10 were asked to sign these?

11 A    It would have been around March or April of 2017 because

12 it was right when Allison was going to do the play.

13 Q    And you didn't end up signing them?

14 A    No, just by like a very, very lucky something, it like

15 slipped through the cracks of -- we were supposed to sign it

16 as our collateral for that month, but Allison had to leave and

17 so there was just, like, something happened that we didn't end

18 up signing it, which I was, like, eternally grateful for.

19 Q    And just right on this very first page, the part that is

20 in bold, do you remember reading this part that was in bold

21 when you were provided this contract?

22 A    Yes.

23 Q    And I am going to read it out loud:

24           I am voluntarily participating in the aforementioned

25 activity and I am participating in the activity entirely at my

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                    4107

1    own risk.  I am aware of the risks associated with traveling

2    to and from, as well as participating in this activity, which

3    may include, but are not limited to, physical or psychological

4    injury, pain, suffering, illness, disfigurement, temporary or

5    permanent disability including paralysis, economic or

6    emotional loss and death.  I understand that these injuries or

7    outcomes may arise from my own or others' negligence,

8    conditions related to travel, or the condition of the activity

9    locations.  Nonetheless, I assume all related risks, both

10   known or unknown to me, of my participation in this activity.

11              And were you concerned when you read that?

12   A    Yes.

13   Q    When you joined DOS, did you believe there to be any

14   physical or psychological or emotional risks to you?

15   A    No.

16   Q    I am just going to go through a couple other pages.

17              The third page --

18              THE COURT:  Just read slowly.

19              MS. PENZA:  Yes, Your Honor.  Sorry.

20              THE COURT:  Thank you.

21   BY MS. PENZA:

22   Q    Looking at the third page of Government Exhibit 667,

23   there was also a Publishing Agreement, is that right?

24              (Exhibit published.)

25   A    Yes.

Nicole - direct - Penza                    4108

1   Q     And it says -- and this was about publishing formal or

2   informal work that you had provided?

3   A     Yes.

4   Q     And there was a Non-Disclosure and Non-Compete Agreement

5   as well?

6         (Exhibit published.)

7   A     Yes.

8   Q     And an Assignment and Transfer Agreement related to

9   property, is that right?

10  A     Yes.

11  Q     So turning back to after you did leave DOS, did there

12  come a point in time where you ever requested your collateral

13  back?

14  A     Yes.

15  Q     How did that happen?

16  A     So, right after I left I was just, like, obviously trying

17  to trust that Allison said she wouldn't release it, but that

18  was hard to do.

19         So I was also just trusting that, like, the company

20  was, you know, imploding from the inside out, so they didn't

21  really have -- if they released my collateral, it would just,

22  like, at that -- at that point, like, I felt that they

23  couldn't really do that and it would be a lot easier for me

24  to, like, explain what happened and go to authorities.

25         But, like, I was still scared, so I was trying to

Nicole - direct - Penza                                          4109

1  just stay away from everything.  Like, I didn't speak to

2  anyone.  I really didn't speak to anyone really in the

3  community afterward.  I tried to stay away from everything and

4  just get -- start to, like, put my life back together.  And I

5  was with one of my best friends and, you know, like, I like

6  very, very slowly started to talk about things.  But, again, I

7  was like scared.  She said that I should ask for my collateral

8  back and so, we, like, called -- I had been thinking about

9  maybe getting a lawyer to help me with that, but we just

10  called one of her friends who's a lawyer and asked what the

11  proper thing to say was above the e-mail.  And then I sent

12  Allison an e-mail just asking if I could physically have it

13  back.  And that was end of September/October, so I had been

14  out for, like, four months by that point.

15            MS. PENZA:  Your Honor --  oh, I'm sorry.

16  BY MS. PENZA:

17  Q    I am going to show you what's already in evidence as

18  Government Exhibit 664.

19            (Exhibit published.)

20  Q    And is Government Exhibit 664, the bottom of this e-mail,

21  is this the e-mail that you wrote to Allison?

22  A    Yes.

23  Q    And you write:

24            Hey, Allison, I haven't heard back from the last two

25  e-mails I have sent you.  I was disappointed not to hear back

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                              4110

1   from you about the deposit money, but India helped me to get

2   the last EM payment to Dani, so I have settled that.

3         Can you just explain what that was about?

4   A    Yes.  So I think I mentioned in direct that Keith had

5   said, like, from that point on that he wanted to do -- or,

6   like, that it was better for him to do an exchange with Dani

7   for the EMs versus paying money for them.  And so -- but I was

8   not comfortable with that.  I didn't want -- I just -- I

9   wasn't comfortable with that.  I didn't want Dani to think

10  that I was, like, getting some kind of special treatment.

11        I didn't want repercussions with that, so I had

12  gotten just one more EM from Dani before I left, and I just

13  paid for it with my own money.  I sent it to India and had

14  India give it to Dani so that -- I didn't want to owe anyone

15  anything.  I wanted to make sure that I left with clean...

16  Q    And so, you write that you've had time to reflect on the

17  situation:

18        I'm in a very good place and want to move forward

19  with my life.  I wanted to reach out concerning my collateral.

20  I would like you to securely send me all my initial and all my

21  hard copy collateral you have back to me immediately, the

22  letters about my family, as well as my original video.  I

23  would like to peacefully and quietly remove myself from

24  everything.  I do not want any drama.  I have no intention of

25  talking about things to anyone positively or negatively.  I

SAM     OCR     RMR     CRR     RPR

Nicole - direct - Penza                                    4111

1   don't have any intention of talking about anything associated

2   with ESP or Albany, I just want to tie up my loose ends and

3   move on with the things I care about.

4           Nicole, did you ever -- did you ever speak to the

5   media about what happened?

6   A    No.

7   Q    As you know, my family is the most important thing to me,

8   so I want to know that I safely have those letters back in my

9   possession.  I don't want to worry about my collateral being

10  exposed and I absolutely have that right.

11          I would like you to destroy and delete any and all

12  photos and Dropbox collateral you received over that year.  I

13  hope that you respect this and if you were my friend at all

14  and the person I thought you were, I hope this is something

15  that you will do for me without hesitation.

16          Again, I do not want any drama.  I simply want to

17  completely remove myself from the situation and any

18  association, and I want to protect myself and my family.

19          Please get back to me on this when you can or I will

20  be forced to take a different course of action if I don't hear

21  from you in the near future.

22          What did you mean by the last sentence there?

23  A    That I would contact a lawyer to help me figure out what

24  my rights were.

25  Q    And you titled this e-mail Without Prejudice?

Nicole - direct - Penza                      4112

1    A    Yeah, that's what -- that's what the lawyer said to put.

2    Q    And then --

3    A    So, like, my friend's friend.

4    Q    And I know you are not on this top part of the e-mail,

5    but Allison then forwarded that e-mail to Clare Bronfman, and

6    are you familiar with John?

7    A    Yeah, that's -- that's what Keith was in Allison's phone,

8    as John.

9    Q    And so you sent this e-mail on October 20th to -- October

10   20th, 2017, and then she forwarded it to Clare Bronfman and

11   the defendant on October 20th, 2017?

12   A    Yeah, I guess it looks like it.

13   Q    You hadn't seen that before today?

14   A    No.

15   Q    Nicole, can you just tell us what you've been doing since

16   you left DOS?

17   A    Yes.  I -- so right after I went back to work where I was

18   working, but then I got a really cool job opportunity that

19   came up and I started a new job working for this incredible

20   woman who is a -- a functional medicine doctor.  She's a

21   nutritionist and a cognital [sic] behavioral therapist and she

22   works in the City.  And she's amazing, and she is like -- she

23   built her own company, so it's actually very cool to -- to

24   learn from her.

25             It's not acting, but, you know, in acting you

SAM      OCR      RMR      CRR      RPR

Nicole - direct - Penza                                    4113

1   also -- I just was really excited to learn more about, like,

2   nutrition and cognital [sic] behavioral therapy is very

3   interesting to me.

4              So I have been working for her for a little over a

5   year now, like 14 months.  And I also applied to go back to

6   school.

7   Q    And have you been in school?

8   A    I have.

9   Q    And what are -- are you in school in the City?

10  A    Yes.  I am studying psychology at NYU.

11  Q    And how has this last year compared to the time you were

12  in DOS?

13  A    I mean, there's no comparison.  It's just I feel like I'm

14  actually living my own life and moving towards my future and

15  building the things that I wanted to build.  I said to my

16  brother -- and I felt like this was very important -- where

17  it's like once I had gotten enough separation from -- from

18  this situation and, like, started to kind of, like, put my

19  head back on straight, like there has not been one moment,

20  one, like, single second that I am not grateful that, like, I

21  am not in that situation anymore and that I can make my life

22  into what I want my life to be; which still includes being a

23  strong woman and, like, being full of integrity and, like,

24  doing this and ideally having a positive impact on the world

25  and the future.

SAM        OCR        RMR        CRR        RPR

1    Q    Thank you.

2              MS. PENZA:  No further questions.

3              THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. AGNIFILO:

6    Q    Good morning, Nicole.

7    A    Good morning.

8    Q    My name is Mark Agnifilo.  I represent Keith Raniere.  I

9    am going to ask you some questions this morning.

10   A    Sure.

11   Q    If I ask you a question that you don't understand, or you

12   want me to rephrase it, just ask me to do that and I'm happy

13   to do that.  Okay?

14   A    Great.

15   Q    Going back to, I think, the beginning of your testimony

16   on direct examination, you said that Mark Hildreth introduced

17   you to The Source?

18   A    Yes.

19   Q    And do you remember exactly how did he do that; was that

20   a conversation that you two of you had?

21   A    Yes.

22   Q    And do you remember, generally, where you were when you

23   had the conversation?

24   A    Yeah, at my house.

25   Q    Okay.  And just tell the jury basically what Hildreth

Nicole - cross - Agnifilo                    4115

1   said about The Source?

2   A    That it was an acting program that was a mix between

3   psychology and acting, and that they had been developing it

4   for a while.  That, like, a bunch of actors up in Albany had

5   been helping develop it and that it was a five-week program,

6   that -- I don't know, that was the general gist of it.

7   Q    Right.  And Hildreth was a working actor at the time?

8   A    Yes.

9   Q    And you viewed him as successful as an actor?

10  A    Absolutely.

11  Q    Okay.  And did you trust his insights at that time?

12  A    I did.

13  Q    Okay.  And -- and did you speak to anybody else in

14  addition to Hildreth about The Source prior to your taking The

15  Source?

16  A    I don't think so.  Once I was signed up, Allison called

17  to say, like, hi, and she was looking forward to me coming to

18  The Source, but I believe I just talked to Mark.  I didn't

19  know anyone else personally that was involved.

20  Q    Right.  And I think you said at the time Allison was also

21  a working actress, correct?

22  A    Uh-hum, yes.

23  Q    And you viewed her as being somewhat successful?

24  A    Yes.

25  Q    All right.  And was it interesting to you, kind of the

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                4116

1   premise of The Source, sort of this mixture of psychology and
2   acting?
3   A    Of course.
4   Q    Okay.  And why was that interesting to you?
5   A    Because, as an actor, you have to understand the
6   character's psychology -- or, if you want to be a good actor,
7   you have to understand the character's psychology to know how
8   to portray them and bring their life to life.  If you don't
9   understand how people's minds work, you -- it makes acting a
10  bit hard.
11  Q    Understood.
12       And before being exposed to The Source, had you ever
13  taken acting classes?
14  A    Of course.
15  Q    And just give us very briefly -- you don't have to go
16  into each one, but just give us a general idea of sort of what
17  type of acting classes you took and when in your life you took
18  them?
19  A    Sure.  Oh, my goodness.  So I've taken a lot of different
20  acting classes, but my -- my favorite teacher taught Stella
21  Adler, which she works a lot with imagination and, like, back
22  story and really -- she -- like, really caring about the
23  writer.  So you take, like, the writer's words and you bring
24  them to life.  Like, she's very much like you need to know
25  playwrights, you need to know all these different things.

Nicole - cross - Agnifilo                    4117

1              But every acting class is different.  I mean, you

2      could take an acting class on commercials or you could take an

3      acting class just for film and television because there's

4      different, like, idiosyncrasies that you use for film and

5      television than theater.  And every acting teacher kind of has

6      their, like, outlook.  So I sort of learned that you take what

7      you -- what you want from each class and then you, like, leave

8      what you don't want because no one kind of knows everything,

9      like, and you are the actor so you make it into -- into your

10     own.

11     Q    And did you take acting classes throughout your childhood

12     and then teenage years?

13     A    Yes.

14     Q    And consistently during that whole period of time?

15     A    Pretty much.  I always liked to be doing something

16     artistic.

17     Q    And I think you said on direct examination you started

18     acting when you were about four?

19     A    Yes.

20     Q    And you did something with Charlie Brown?

21     A    That was when I was nine.

22     Q    Oh, when you were nine.  Okay.

23              And you played Dorothy in The Wizard of Oz?

24     A    I did.

25     Q    And how old were you then?

SAM     OCR     RMR     CRR     RPR

Nicole - cross - Agnifilo                                        4118

1   A     Ten.

2   Q     And you played Cinderella in Cinderella?

3   A     Uh-hum.

4   Q     You know what, it would be easier if you would say yes or

5   no, she will have an easier time writing it down.

6   A     Sorry, yes.

7   Q     That's all right.  And how old were you for that?

8   A     Seventeen.

9   Q     Okay.  And in all the acting classes that you had taken,

10  had you ever taken any that focused on this connection between

11  psychology and acting the way The Source did?

12  A     Well, the closest thing would have been my other teacher

13  that I -- where I met Mark, because she was really big on

14  understanding the psychology of the character.  But the way

15  that it was presented in this class where it was like

16  psychology, not only of the character, but also kind of an

17  aspect of like working on your own psychology, that was

18  interesting to me.  And that was, like, a little -- a little

19  bit different than the other acting class.

20  Q     Right.  So was one of the tie-ins when Mark -- you said

21  you had met Mark in an acting class?

22  A     Uh-hum.

23        THE COURT:  You have to answer yes or no.

24        THE WITNESS:  I'm sorry.

25  A     Yes.

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4119

1  Q    And do you recall about how old you were when you met
2  Mark -- and this is Mark Hildreth, in the acting class?
3  A    Twenty-five.
4  Q    All right.  And do you remember where you were living at
5  the time, like what city?
6  A    Yeah, Los Angeles.
7  Q    And you said that there was sort of a psychological
8  tie-in to the acting class that you took with Mark Hildreth
9  when you were twenty-five?
10 A    Yes.
11 Q    Okay.  And so when Mark Hildreth bought it up to you
12 again -- when he brought up The Source to you --
13 A    Yes.
14 Q    -- did he reference back to that other class and say,
15 This is like a continuation of the other class we did
16 together, or something along those lines?
17 A    I don't know if it was in that conversation, but later on
18 he said that it -- that The Source, like, builds on what --
19 what we had worked on with that acting teacher.
20 Q    Okay.  And do you recall where the -- so when you started
21 The Source classes, it was five days?
22 A    The Source -- five weeks.
23 Q    I'm sorry, five weeks, okay.
24      And where was that , that was in Albany?
25 A    In Albany, yes.

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4120

1    Q    At some point, did you take a series of courses at Mark
2    Vicente's house?
3    A    I don't think so.
4    Q    No?  Have you ever been to Mark Vicente's house?
5    A    No.
6    Q    No?
7              MR. AGNIFILO:  Just give me one second.
8              (Pause.)
9    BY MR. AGNIFILO:
10   Q    Do you remember speaking to the FBI on November 9th,
11   2017, I think it was the first time you might have spoken to
12   them?
13   A    I don't remember the exact date.
14   Q    All right.
15             MR. AGNIFILO:  I am just going to show, just the
16   witness for the sake of her recollection, this is 3500-N.
17             I am just going to let the Government find it.
18             (Pause.)
19             MR. AGNIFILO:  In the meantime, Judge, I am just
20   going to show it to the witness and the parties.
21             This is 3500-N4 -- N1.
22   Q    And what I am going to ask you to do, Nicole, just for a
23   second, I am going to direct your attention to something.  I
24   just want you to read it to yourself.  Don't read it out loud,
25   okay?

Nicole - cross - Agnifilo                    4121

1      And what I'm directing you to is that little

2  paragraph right there (indicating.)  Just read it to yourself.

3  A    (Witness complies.)  Yes.

4  Q    Does that refresh your recollection?

5  A    Yes.

6  Q    Okay, what's your recollection now?

7  A    Sorry, I was confused.  I thought you were talking about

8  Albany.

9  Q    That's all right.

10 A    When I did the first five-day in Los Angeles that I --

11 what I was told was that Mark Vicente had rented the house,

12 like was renting the house that it was held in, but I -- I

13 don't think he lived there.  I think it was just a house

14 rented for -- for that five-day, but yes.

15 Q    And do you remember if you met him, Mark Vicente, at that

16 general time period?

17 A    Yeah.  I -- Mark Hildreth and I ran into him at -- in

18 like a charity event that we went to and I met him.

19 Q    All right.  Now, I'm going -- I'm going to refer you,

20 this is an e-mail that's already in evidence as Government

21 Exhibit 651.  And I think this is already in evidence.  I've

22 highlighted certain portions.

23      (Exhibit published.)

24 BY MR. AGNIFILO:

25 Q    Now, this is an e-mail from you to Allison Mack on

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                                    4122

1   February 10th, 2016.

2              Do you see that there?

3   A    Yes.

4   Q    You can read it on your -- can you see it okay?  I can

5   make it a little bigger.

6   A    Yeah.  No, I can see it fine.

7   Q    Okay, great.  Thanks.

8              So at this point, in February of 2016, how long had

9   you known Allison Mack?

10  A    Ten months.

11  Q    Okay.  And what was the nature of your relationship over

12  that period of time?  I mean, how did it develop?  How would

13  you characterize it as sort of you -- you know, over that ten

14  months?

15  A    First, it started out just she was my teacher for The

16  Source, and then she sometimes taught the ongoing classes when

17  I continued taking those.  And then she sort of took on a bit

18  of a, like, Source mentorship, like sort of took me over her

19  wing because I was interested in -- we have this similar work

20  ethic, but she sort of was mentoring me a little bit.

21  Q    And she is a hard worker?

22  A    Yeah.

23  Q    And you're a hard worker?

24  A    Yes.

25  Q    Okay.  So when you say you have a similar work ethic, I

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                              4123

1    mean in addition to --

2    A    We both -- from what I understood from her, like we both

3    very much cared about being good at -- good actresses.

4    Q    Right.  You wanted to be not just an actress, you wanted

5    to be a good actress, an effective actress, someone who really

6    could kind of get into the character on a deep level, correct?

7    A    Yes.

8    Q    And the actresses you admired were actresses who really

9    could kind of get into characters at a deep level, fair to

10   say?

11   A    Of course.

12   Q    And so, just working backwards, do you recall when your

13   Source class was in Albany, ballpark?

14   A    May -- May 2015.

15   Q    Okay, and you said Allison taught it.  Did she teach all

16   of the classes, is that how it works?

17   A    Yeah.  For ours, yes.

18   Q    Okay.  And give us sort of a feeling for what the class

19   is like; you know, how many hours a day, what does the

20   coursework consist of when you're in the class?

21   A    Sure.  I think I said on my direct, like, I thought it

22   would be all day, but it ended up just being, like, the second

23   half of the day.  So I had the morning to, like, do homework

24   or do the work from the night before or go for a run.

25            So it would be like four hours, we would watch a

Nicole - cross - Agnifilo                    4124

1  video, and then do some exercises or, like, some kind of

2  exploration after that.

3  Q    Okay.  And we are going to come back to this, I can take

4  it off, we can just talk for a minute.

5  A    Sure.

6  Q    And how many other students were in the class when you

7  took it with Allison about?

8  A    Oh, gosh, I don't remember.

9  Q    But like five, ten, twenty?

10 A    Between ten and twenty, between ten and fifteen,

11 somewhere around there.

12 Q    Okay.  And you said there was homework associated with

13 the courses?

14 A    Yes, sometimes there would be like questions to

15 contemplate.

16 Q    And did you and Allison sort of start to get close as a

17 result of you taking the course with her as your teacher?

18 A    Not necessarily the first time, but when I decided to

19 take an ongoing, like we -- yeah, we started to get a little

20 closer.

21 Q    Okay.  And just tell us how did your relationship

22 develop?  I mean, you know, she was your teacher first, you're

23 her student; how does it progress from there?

24 A    Well, I think The Source was -- was like supposed to be

25 created with, like, by actors, for actors.  So her being my

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4125

1    teacher wasn't so much like her being my teacher, like Mark

2    was working on teaching as well, Mark Hildreth, and they're

3    like my -- they're a few years older than me, but I looked at

4    them as like comrades or, you know, equals.  So we would talk

5    about acting.

6    Q    Okay.  But in addition to talking about acting, how much

7    time were you spending with Allison, you know, say through the

8    summer of 2015 into the fall of 2015 after you took the

9    course?

10   A    Not a lot.  We would e-mail, but it was pretty much just

11   if she was teaching an ongoing class, which is once a week or

12   twice a week sometimes, then she might be on that, but she

13   didn't always teach those, and then at V Week we ended up

14   staying together.

15   Q    Okay.  So this is V Week 2015?

16   A    Two -- yes, 2015.

17   Q    And just give us an idea, at V Week, were there like

18   performances and different presentations at V Week, is that

19   right?

20   A    Yeah.  They had some like drummers come in and they had

21   -- Mark and Allison were in a single group and they -- they

22   sang.  There was like a lot of different things going on at

23   V Week.

24

25            (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

1    BY MR. AGNIFILO:

2    Q    Were you in any performances yourself?

3    A    No.

4    Q    Were you in any performances in any V Week?

5    A    The next year, yes.

6    Q    In 2016?

7    A    Yes.

8    Q    And is it fun?  Is V Week fun?

9    A    Yeah, I mean, yeah -- for me.  It's by a lake and I

10   always like being out in nature.  So, I enjoyed that part.

11   Q    Okay.  And you got to meet other people, right?  You got

12   to meet -- you got to know Allison a little bit better; right?

13   A    Yes.

14   Q    And who would you say your better friends were kind of

15   in, you know, NXIVM ESP now going into the fall of 2015?

16   A    Yeah, so, it would have been Emiliano.

17   Q    And where did you meet Emiliano?

18   A    I met him, like, super briefly at Claire's house.  I

19   don't know, they were having some kind of a lunch thing there

20   and when I actually got to know him was at V Week 2015.  Mark

21   introduced us.

22   Q    Mark Hildreth?

23   A    Yes.

24   Q    Okay.  And you guys became friendly, you and Emiliano?

25   A    Yes.

Nicole - cross - Agnifilo                          4127

1   Q    And that friendship extended throughout your period of
2   time through NXIVM and DOS and all of that; correct?
3   A    Yes.
4   Q    You never told Emiliano that you were in DOS?
5   A    No, not until after I left.  I wasn't allowed to tell
6   anyone.
7   Q    My question is --
8   A    Sorry.
9   Q    That's okay.  So not until you left did you tell Emiliano
10  you were in DOS; correct?
11  A    Correct.
12  Q    Are you still in touch with him or no?
13  A    Kind of under the circumstances we can't really talk.
14  Q    So I want to fast forward to this e-mail which is already
15  in evidence as Government Exhibit 651.
16            (Exhibit published.)
17  Q    So at this point I think you explained on direct
18  examination you were making journal entries pretty much every
19  day; is that fair to say?
20  A    I think so.  At this point I was trying to, but it was
21  wasn't -- I didn't have to.
22  Q    And your journal entries are broken into two parts;
23  there's a source journal and then a personal journal; correct?
24  A    At this point, yes.
25  Q    And The Source journals -- I want to go through The

SN        OCR        RPR

Nicole - cross - Agnifilo                    4128

1   Source journals at this point which is the top part and you

2   covered some of this on direct.  It says, "Class was okay

3   today.  For a while it was only Britta."

4            Was that a student?

5   A    Yes.

6   Q    "It was great to catch up with her, but it didn't really

7   feel like class.  I felt a bit ashamed that only one person

8   was there, making it mean more than it necessarily does, maybe

9   I'm not a good teacher."  Now why are you writing here you

10  feel you weren't a good teacher?

11  A    Because only one person showed up to my class.

12  Q    So what exactly are you teaching here?

13  A    It would be more, like, you're just holding, like --

14  you're kind of running an exercise, or, like, a student would

15  bring something that they wanted to work on to class and, so,

16  at this point these classes are very catered to, like, who

17  shows up and what they want to work on.  But I was -- I liked

18  doing a, kind of a little bit of a meditation to start, like

19  get everyone in their body and then work on whatever they

20  wanted to work on.  It was -- it kind of depends on that.

21  Q    Now were these classes held in Albany?

22  A    No.  If I was up in Albany sometimes I would, like, hold

23  them in person, but Britta lives in Germany, which I thought

24  was kind of cool, but, like, we would do it over Zoom.

25  Q    Okay.  And then you want to say -- I'm looking down on

Nicole - cross - Agnifilo                              4129

1    the fourth line, "We went into a slider on fear."  Do you see

2    there?

3    A     Yes.

4    Q     What's a slider?

5    A     So, the way that worked was, like, you feel certain

6    emotions in your body, right?  Like, before I came up here,

7    you feel fear in your body and you just kind of, like, know --

8    you would know, like, where the fear is in your body and be,

9    like, huh, that's interesting.  And then, like, what -- let me

10   think of the best way to explain this.  You would just feel

11   the different -- like, can you intensify it, can you lessen it

12   can you move it around.

13          It was just an understanding of how fear felt in

14   your body and what -- because fear is different to every

15   person what kind of, like, comes up in your -- in your mind

16   when you feel fear.  And then you would sort of ask the

17   student like what came up for you when you feel fear and then

18   if you kind of, like, examine fear a little further, or, like

19   add joy to it, can it become excitement.  It was sort of,

20   like, broadening your understanding of your emotions was how I

21   understood it.

22   Q     And here you are saying -- you went into a slider on fear

23   and then you say, "And then Dolores and Jocelyn jumped on."

24   Are those two other students?

25   A     Yes.

SN        OCR        RPR

Nicole - cross - Agnifilo                    4130

1   Q    And then you say, "I'm getting more comfortable at

2   sliders."  So you're reporting this back to Allison; correct?

3   A    Correct.

4   Q    And then there's a personal journal part.  We covered

5   this on direct examination.  You say here, "Tonight was

6   brutal.  I haven't felt this low in a very long time."

7             Is part of -- is part of what you're working through

8   with Allison here -- there's the part that is related to The

9   Source and then there's the part just related to what is going

10  on inside of you; correct?  And that's the personal part; is

11  that fair to say?

12  A    Can you repeat that?  Sorry.

13  Q    Yeah.  So what you're saying is, in your personal

14  journal, you're talking about how you feel, right?  You're

15  being honest with Allison about how you feel, right?

16  A    Correct.

17  Q    And so what you say here is you -- you were scared about

18  certain things that you were feeling; right?

19  A    Yes.

20  Q    And then -- and we're going down here.  It says, "Matthew

21  said I was having an ego collapse."

22  A    Yes.

23  Q    Who was Matthew?

24  A    My little brother.

25  Q    And then you write, "I think he might be right.  I have

Nicole - cross - Agnifilo                    4131

1   no identity to hold on to at the moment.  I don't know who I

2   am or what I want."  What's -- when you say -- you wrote it

3   very clearly so maybe it's a silly question --

4           MR. AGNIFILO:  Give me one second, Judge.

5           (Pause in proceedings.)

6   Q    And we're talking about -- I'm not going to ask you any

7   particular place of where you've lived, okay?  So if I ask you

8   something -- I'm not asking you where -- specifically where

9   you have lived?

10  A    Sure.

11  Q    You say, "I no longer have what defined me in," two

12  places where you have lived.

13  A    Yeah.

14  Q    It's blacked out.  So you're struggling.  Tell me if this

15  is right I don't want to dwell on it.  You're struggling with

16  your sense of identity.  You're saying I have no identity at

17  the moment, right?  That's what you're saying to Allison?

18  A    Yes.  I think when you just move somewhere new and I had

19  given up everything in Los Angeles, like, part of my brain

20  knew that it just, like, takes time because it had taken me

21  time to build my life in L.A. as does anywhere when you first

22  move somewhere new, but I was, yeah -- I was working and I

23  wasn't auditioning that much or I wasn't really auditioning at

24  all at that point and I just felt like I don't know -- how to

25  quite move forward.

Nicole - cross - Agnifilo                          4132

1   Q    A little bit further down you express concern, "Have I

2   F'd it all up already?"  What are you writing about there?

3   A    Have I screwed up my career, was it the wrong move to

4   move to New York City like I was so --

5   Q    Another e-mail that's in evidence Exhibit 657.  It's a

6   four-page e-mail and we're going to look at page three.  It's

7   already in evidence.

8          (Exhibit published.)

9   Q    That's what you had sent to Allison previously?

10  A    Yes.

11  Q    And then you're journaling later on February 10th and

12  you're saying, "Today was another rough day but it ended up

13  being okay.  I cried most of the day, but talked to my coach,

14  my brother, my mom and my dad."  Now, who is your coach?

15  A    I don't know who I'm referring to at that point.

16  Q    Okay, but not -- not Allison?

17  A    No.

18  Q    Because this is to Allison?

19  A    Right.

20  Q    And you make -- you refer to your brother, your mom and

21  your dad.  You have a supportive family; correct?

22  A    I do.

23  Q    And you had a supportive family then as well; right?

24  A    Yes.

25  Q    They've always been supportive?

SN        OCR        RPR

Nicole - cross - Agnifilo                4133

1    A     Yes.

2    Q     And you go on to say, "And was straight up and honest

3    with everybody one around me.  Yo, I'm going through a

4    depression.  It actually felt really good not to suffer in the

5    depression, but to be straight up about it and not ashamed to

6    say I feel really down right now."

7              Okay.  So one of the things you're doing here with

8    Allison, correct me if I'm wrong, is you're telling Allison

9    exactly how you feel, in writing in this case; right?

10   A     Yes.

11   Q     And is that one of the things that you and Allison were

12   working on generally there, rather than keeping these dark

13   feelings to yourself just putting them out in the world

14   because maybe you'll feel better or getting on the road to

15   feeling better if you do?

16   A     I don't remember what, like, the goal was.  Before she

17   had me doing, like, a specific exercise, I don't really

18   remember when it switched into more journaling, but I don't

19   know that there was any specific goal with this.

20   Q     All right.  Now, I think later that same day Allison

21   writes you back.  Now we're looking at page two and we're at

22   the bottom here and she writes, "I will be in NYC tomorrow.

23   What's your timeframe?  We need to spend some time together.

24   I am sorry I have not been there for you.  Let me know.  I

25   will prioritize you."  Right?  That's what she writes to you?

SN        OCR        RPR

Nicole - cross - Agnifilo                    4134

1   A    Yes.

2   Q    So fair to say you're expressing these fears to Allison

3   and Allison is specifically saying I will prioritize you;

4   correct?

5   A    Yes.

6   Q    And then -- we don't need to go through it in detail, but

7   guys make plans.  It looks like you have a plan to meet at

8   4:15 the next day at the Ace Hotel; right?

9   A    Correct.

10  Q    Up on top here you say, "Today was a much better day.

11  Woke up calmer and more settled.  Went for a run, went to

12  class and then went to see Allison."  Do you recall if Allison

13  did, in fact, help you, you know, feel better?  Was talking to

14  her -- did talking to her make you feel better or help you

15  feel better?

16  A    It looks like I say it did.

17  Q    And then you say magnificence was hard for me in class.

18  What's magnificence?

19  A    An emotion.  Magnificence, whatever that means to you.

20  Q    Okay.  And I was exhausted, exhausted by all of this

21  emotion but, again, better.  And meeting with Allison was

22  wonderful; cozy and comfortable.  Has gotten my brain

23  thinking."  At this point in time how much time were you

24  spending with Allison?

25  A    Not -- not a lot.  It was mostly, like, e-mail

SN        OCR        RPR

Nicole - cross - Agnifilo                    4135

1   communication.  As she said, that was the first time she had

2   kind of come down to the city to -- and we had met up, but

3   before that it was just, like, if I saw her in class or if I

4   e-mailed her.

5   Q    Okay.  At some point did she -- did Allison e-mail you

6   something about a book called *At the Feet of the Master*?

7   A    It was, like, a passage it was a few pages.  It's not a

8   book or what I got from it, it was like a little booklet and

9   that was already when I was in DOS.

10  Q    Okay.  And what was your understanding of why she sent

11  this passage to you?

12          MS. PENZA:  Objection.

13          THE COURT:  Sustained.

14          MR. AGNIFILO:  I can't ask the witness her

15  understanding?

16  BY MR. AGNIFILO:

17  Q    Had you and Allison been talking about *At the Feet of the*

18  *Master* at the time she sent it to you?

19  A    No.  She -- she came down to the City and she gave it to

20  me to read.

21  Q    Okay.  And what were the two of you talking about around

22  the time that she gave this to you to read?

23  A    Well, I was already in The Vow at this time -- sorry, it

24  was called The Vow at that time, but then they changed it to

25  DOS.  So at the time when she gave me that it was still

SN        OCR        RPR

Nicole - cross - Agnifilo                    4136

1    referred to as The Vow.

2    Q    And do you recall what the passage was about?

3    A    I recall the part that I thought was interesting to me

4    which was that, like, you take care of your body so that you

5    can kind of, like, live a -- be the best version of yourself;

6    which for me had always been, like, I had taken a lot of pride

7    is when I go on stage.  I very much like to take care of my

8    body before, like run or meditate or eat very healthy before I

9    go on stage because it's important for me to be at my best so

10   I can give that to the audience is how I felt.  Kind of like

11   an athlete.

12            But I remember it talked a little bit about that in

13   *At the Feet of the Master* of kind of, like, taking care of

14   your body and your mind so that you can serve, like, your life

15   better.  In this passage it said -- I believe it said, like,

16   serve your master better, but Allison would explain to me

17   that -- that what it actually was actually just serve yourself

18   better; so that the word "master" was really more just, like,

19   a reflection -- like she's reflecting back myself.  I don't

20   know if it makes total sense, but that's how I looked at it so

21   I thought that that was interesting.

22   Q    Okay.  And in the -- in the early part of 2016, do you

23   remember if you were communicating a lot with Allison that you

24   were feeling badly -- you were feeling badly about your

25   choices, you were feeling badly about yourself; that this was

1  a real theme that you were talking to Allison about at this

2  time?

3  A    I don't know that I would call it a theme, but, like,

4  obviously that was two messages where I was, but I don't think

5  it was too many -- it was, like, pretty concentrated to that

6  beginning of February.

7  Q    And do you recall if Allison said one of the things that

8  she wanted you to do was to sort of take better care of

9  yourself?

10        MS. PENZA:  Objection, Your Honor.

11        THE COURT:  You may answer that.

12 A    Are you referring to before I was in The Vow?

13 Q    I'm talking about around the time that she sent you

14 the -- the snippet from *At the Feet of the Master*.  Around

15 that period of time, so February, March, 2016.

16 A    I don't remember her saying that.

17 Q    Okay.

18 A    But -- sorry, I'm just getting confused if I'm in The Vow

19 because the relationship changed once I was in The Vow, so --

20 Q    So tell us about that.  Tell us about that.  Tell us

21 about the relationship.  This is your relationship with

22 Allison; right?

23 A    Yes.

24 Q    How did it change?  What was it like before you were in

25 The Vow and what was it like after you were in The Vow?

Nicole - cross - Agnifilo                    4138

A     Well, it changed quite a lot throughout.  Before the
change it was just two people that cared about acting.  I felt
I looked up to her as an actress.  Afterward -- it started,
like, I said on direct, she was really kind at first and sort
of acting at times like a mentor and then -- but then, like,
kind of as we got a lit little bit further into it then she
would be super strict sometimes and then kind and then cruel
and then -- but the way that it changed at first was just that
I had to -- I had to speak to her every day after that and I
had to, like, take -- I was supposed to be trusting her and
taking in her advice.

Q     Right, okay.  So I want to direct your attention again to
657 which we talked about a minute ago which is in evidence.

         (Exhibit published.)

Q     So one of the continuations of one of the e-mails that we
looked at is this e-mail that you sent to her on February 13,
2016 at 1:52 a.m.  And you say, "Today was okay, not as good
as yesterday but maybe that is because I was not as easy with
myself today.  I expected to be really productive and berated
myself for it getting enough done, but I think I still need to
be easy.  I'm not at 100 percent yet.  I definitely need to be
focused and moving forward but easy with myself as well.  I
don't know.  I feel a bit lost and unfocused again.  I also in
a way feel on right track although I need to start living the
life I want and not just thinking about living it."

Nicole - cross - Agnifilo                           4139

1           So that's what you write to Allison; correct?

2   A     Sure.

3   Q     And this is now Allison to you, from February 13, 2016 at

4   8:52 a.m., "I am so excited to share with you what I am doing.

5   I think it is exactly what you need.  Trust me, you will be

6   okay."  We're going to get to the last line in a minute, but

7   the first three.  Was this Allison sort of -- at this point

8   were you in The Vow?

9   A     No, not yet.

10  Q     Okay.  Did you take this to be Allison -- let me ask it a

11  different way.  Was -- at this point when Allison says to you,

12  "I'm so excited to share with you what I am doing," that ends

13  up being The Vow; correct?

14  A     Yes.

15  Q     So in response to what you're saying about you struggling

16  and you're berating yourself and you want to be focused and

17  you want to move forward and you're lost and you want to be on

18  the right track.  When you say that to Allison, Allison

19  introduces The Vow to you; correct?

20  A     Yeah, yes.

21  Q     All right.  Now, the last line here, "Is your collateral

22  finished yet?"  What is she talking about there, do you know?

23  A     Yes, I do no.

24  Q     What is it?

25  A     It was the collateral that she said I needed to do to

Nicole - cross - Agnifilo                     4140

1    find out more about what she was doing which was exactly what
2    I needed.
3    Q    Okay.
4    A    So I trusted her.
5    Q    So you and Allison had already had a conversation about
6    The Vow before she sends you this e-mail; is that right?
7    A    Yes.  At the Ace Hotel, the e-mail you just showed.
8    Q    A few days earlier?
9    A    Yes.
10   Q    So, at the Ace Hotel she said you're going to have to
11   provide collateral; right?
12   A    Yes.
13   Q    And here she is following up with you that she's excited
14   to share more with you; right?
15   A    Correct.
16   Q    And -- and fair to say that prior to Allison coming down
17   and meeting with you at the Ace Hotel you're expressing other
18   thoughts to Allison about your frustration with yourself and
19   your career and where you're going and being unfocused; right?
20   A    Yes.
21   Q    So I think I interrupted you.  You were talking about the
22   difference between Allison before and Allison after you were
23   in The Vow.  I want to focus on Allison before you were in The
24   Vow.  What was your connection to Allison before you were in
25   The Vow.  In other words, how often would you speak to her or

Nicole - cross - Agnifilo                              4141

1   how often would you see her?

2   A     I wouldn't say that I saw her very often at all, but, as

3   I have said, we -- I would see her at a source class.  She

4   kind of started to take me under her wing in terms of working

5   with The Source.  Obviously they want -- like, she wanted

6   people to work with The Source.  She was -- it was, like, her

7   baby.  So she was definitely interested in having me teach for

8   The Source.  So she kind of took me under her wing.

9          And then at some point she gave me a couple of

10  exercises to do outside of source stuff which was the first

11  journaling exercises she asked me to do; like, what's

12  happening with your body, is this real or not real.  Am I just

13  stressing out about something that's not real.  So, it started

14  to, like -- the relationship started to grow a little bit, but

15  I didn't see her very often.

16  Q     Now, this is another -- this is another e-mail that's in

17  evidence.  It's Government Exhibit 1356.

18         (Exhibit published.)

19  Q     I think you talked about this on your direct examination.

20  And this is from you to Allison on March 28, 2016 and it sets

21  out your schedule; right?

22  A     Yes.

23  Q     And is this something that you would do on a, you know,

24  regular basis, send Allison your schedule?

25  A     No.  I was really bad at that but that was one thing that

SN        OCR        RPR

Nicole - cross - Agnifilo                    4142

1   she wanted me to start doing.  Once I was in The Vow it was
2   one thing that she wanted me to start doing, write down what I
3   was doing to do all the next day and e-mail it to her, but I
4   wasn't always good about it.
5   Q    Okay.  And here you're anticipating the arrival of your
6   mother a couple of days later or maybe later that same day;
7   correct?
8   A    Correct.
9   Q    All right.  And you have that in your schedule to Allison
10  as well as other things; correct?
11  A    Yes.
12  Q    Do you remember one of the things that Allison and you
13  discussed was you trying to be more open with members of your
14  family?
15  A    Not so much open, but, like, more present.  I think
16  everyone -- well, I can't speak for everyone.  I was always
17  interested in being more present with people in general.  So
18  you want to be more present with your family, like, when you
19  have time -- when you have time with them, so absolutely.
20  Q    And that's something that you and Allison would discuss;
21  correct?  That you wanted to be more present with your family;
22  right?
23  A    Yeah.
24  Q    And you went to Allison and you asked, not asked her help
25  but you discussed this with her; correct?

SN        OCR        RPR

Nicole - cross - Agnifilo                           4143

1  A    I -- I don't know.

2  Q    All right.  1357.

3            MR. AGNIFILO:  Is 1357 in evidence?  Do you guys

4  know?  I think it is.

5  Q    I'm going to show you 1357 which is already in evidence.

6  And we're going to look at a few pages, but we'll start with

7  the first page.

8            (Exhibit published.)

9  Q    Here is you journaling to Allison.  You send it to her on

10 March 31, 12:29 a.m. but it's your journal entry for March

11 30th.  You write in your journal, I'm so proud of myself for

12 being present and loving to my mom and I am so happy that we

13 had such a wonderful time together."  So you write that to

14 Allison, right?

15 A    Yes.

16 Q    And is that because that's something you and Allison had

17 been discussing?

18 A    I don't know.  It looks that way, but -- yeah, I mean,

19 but --

20 Q    I'm going to show you -- I don't want to cut you off.  If

21 you're finished I'll move on.  If not I'll wait for you.

22 A    I'm just trying to remember my head space at that time,

23 which was all over the place.  At that time I was already

24 getting a little bit scared and nervous about The Vow, but

25 trying to rationalize in my head how it could be a good thing.

Nicole - cross - Agnifilo                    4144

1   So if you keep reading, that sentence is like I was, like,

2   great I'm able to be present with my mom right now, but, like,

3   even more so because I feel like I'm on quick sand in the rest

4   of my life it's like -- I was trying to -- in my head I was

5   trying to rationalize how I hadn't ruined everything by

6   joining The Vow and, like, okay, I was present with my mom.

7           It was already starting to be, like, a little bit

8   chaotic, but the one thing I could do throughout the entire

9   situation that I was in, was, like, focus in on being, like,

10  present with my family when I was with them.  So that was

11  something that Allison could, like, turn around and say, like,

12  look didn't your relationships with your family get better?

13  And I'm like, yeah, but that's because I was so focused with

14  just being with them and listening to them because I couldn't

15  talk about what was going on with me.

16          So I became really good at being present and

17  listening and caring more about my family because technically

18  with the situation with The Vow they could take my family away

19  from me at any point.

20  Q    You agree with me that your life was pretty chaotic

21  before you were in The Vow; right?

22  A    I was struggling emotionally.  It wasn't chaotic, but it

23  was a little bit hard.  I was just having a hard time

24  building -- getting settled in New York the way that I -- the

25  way before you anticipate how hard a move can actually be.

Nicole - cross - Agnifilo                    4145

1   Q    Some of the e-mails we looked at before you were in The

2   Vow had some fairly dark thoughts in them, fair to say?

3   A    Yes, yes.

4   Q    Fairly dark thoughts about yourself; things that you

5   could do to yourself?

6   A    Absolutely.

7   Q    And that's before you were in The Vow?

8   A    Yeah.

9   Q    This is the third page of that same exhibit which is

10  already in evidence.  And we're looking at the top and you

11  write, "Today was good.  I did a lot of contemplating and even

12  though I was feeling a lot, I was able to feel myself separate

13  and still enjoy the day as well and even more so still be

14  present and loving with my mom which is one of my biggest

15  goals.  I'm so happy my mom is visiting New York City and I

16  want so much to be present for her.  In the past I've always

17  been so is wrapped up in my own life and so easily frustrated

18  and flustered when my mom has visited me, so I truly want to

19  be present for this trip and tonight I did and it was

20  wonderful."  You wrote that; correct?

21  A    Yes.

22  Q    And you wrote something below it where you talk about

23  men.  Do you see that here?  It starts here (indicating.)

24  A    Yes, I did.

25  Q    I'm not going to read it all, but a couple of sections.

1   Starting on the third line here you write, "Men also happen to

2   be where I'm the most defiant."  What do you mean by that?

3   A    That I want to be able to love who I want to love.

4   Q    And but why use the term "defiant"?

5   A    I think I'm relating it to when I was 16 years old right

6   there and I was slightly defiant about my first boyfriend.

7   Q    And then sort of towards the end here you write I don't

8   know that answering to a master for the rest of my life is

9   what will serve my soul and journey best.  Maybe it's standing

10  on my own two feet trusting my own instincts, enjoying and

11  living fully this life that is right before me."

12           When did you write this?

13  A    That was to the reaction when, I believe, if I am

14  correct, that this was around when I told her about giving out

15  the phone number and then she wrote me back and -- and I was

16  really trying to think through everything because I wanted to

17  be sure that when I went and told her that this was not the

18  path for me, that I was, like, very clear on -- on -- on what

19  I was thinking but it's a little bit of a mind game that --

20  that they play.

21           But I think that that actually says it -- that's

22  exactly how I felt the entire time.  Like, it's not -- it

23  doesn't actually serve me best and I would rather stand on my

24  own two feet and trust my instincts and that's -- I mean, it

25  says it kind of perfectly to me.  And then Allison would say,

1  like, talk about Mother Teresa or Gandhi or people that had

2  completely given up their lives to uphold this principle --

3  not that I don't absolutely respect Mother Teresa and Gandhi,

4  but I was like I just kind of want to live my life.  I want to

5  positively impact the world, but I'm not --

6          Some of this stuff that Allison said was what made

7  me uncomfortable.  I was, like, you are talking about, like,

8  answering to someone else for the rest of your life.  I was

9  trying to process this.  I was like I don't think this is the

10 right thing for me and that's what was going on at the time.

11 Q    And you were very outspoken with Allison time and again

12 about some of your hesitation about The Vow; correct?

13 A    Yes.

14 Q    You -- you very often would say to her I don't think this

15 is the right path for me.  I don't think this is something

16 that I'm interested in doing or words to that effect; correct?

17 A    Yes, that I was unsure and that it all felt overwhelming

18 and, yeah.

19 Q    And then there were times when you said to Allison that

20 you think it is helping you; you think that The Vow is helping

21 you?  You said both things; right?

22 A    Yes.  I have a different point of view now, but at the

23 time I confused certain, like, growth aspects to thinking that

24 it was maybe the work that I was doing with Allison.  But I

25 don't feel that way now.

Nicole - cross - Agnifilo                    4148

1   Q     But I'm going to be asking you mostly about what you did.

2   A     Okay.

3   Q     What you did at the time?

4   A     No problem.

5   Q     And so what you did at the time is you would often write

6   to Allison or say to Allison that, at times, you thought The

7   Vow was very good for you and was helping you.  That's what

8   you did; correct?

9   A     Yes.

10  Q     And then just to complete the thought, there were also

11  times when you wrote to Allison and said to Allison that you

12  were uncomfortable with The Vow and you were unsure about it

13  and you didn't think it was for you, words and substance;

14  correct?

15  A     Yes.

16  Q     Now, this is already in evidence at 1271.

17        (Exhibit published.)

18  Q     This is the first time you reached out to Keith Raniere,

19  April 6, 2016, right?

20  A     Yes.

21  Q     Remind us, had you ever spoken to Keith Raniere?

22  A     No.

23  Q     Had you seen him?

24  A     No.

25  Q     So at this point you had never met him?

SN        OCR        RPR

1    A    I had seen him in videos, but that's it.

2    Q    Okay.  And what you say here is, and I'm looking down

3    here sort of that second small paragraph, "I am sure I will

4    have plenty of questions come up in the future and hope to one

5    day join you for one of these wisdom walks and talks that I

6    hear so much about from Emiliano.  I think you said on direct

7    examination that at one point you were having a conversation

8    with Emiliano about how people say that Keith is the smartest

9    man in the world and things along those lines; correct?

10   A    Yeah, I thought that they idolized him or put him on a

11   pedestal.

12   Q    And you said on direct examination that Keith doesn't

13   want that.  It's just people talking about him like that?

14   A    That's what Emiliano said.

15   Q    Did Keith ever tell you that he was the smartest man in

16   the world?

17   A    No, maybe not in those exact words but he would talk to

18   me about how children prodigies has a hard time -- often

19   children prodigies had a hard time integrating into the real

20   world later on in life but because of his childhood he was

21   able to do that more successfully.

22   Q    Now, so, you send this first e-mail and nothing happens,

23   right?  You don't get a response?

24   A    No.

25   Q    And 1272, this is also in evidence?

Nicole - cross - Agnifilo                    4150

1            (Exhibit published.)

2    Q    This is your second e-mail; right?  Take a look.

3    A    (Reviewing.)

4         Yes.

5    Q    So here starting on the second paragraph it says, "The

6    biggest question on my mind, "How do I constantly challenge my

7    fears and be joyful at the same time?"  You write that; right?

8    A    Yes.

9    Q    What fears are you talking about?

10   A    Fears of failure, probably.  I don't know.

11   Q    And then the last sentence of that paragraph says, "How

12   does one grow and learn to face their fears and be joyful and

13   enjoy their life at the same time?"  Is that a question that

14   you genuinely had when you wrote that?

15   A    Yeah, part of that was because of The Vow.  I was getting

16   nervous about The Vow.  It seemed so intense and I was, like,

17   I do want to push on my fears, that is something that I wanted

18   to do in my life, but, like, I also want to be joyful and be

19   able to enjoy my life.  So I was kind of, like, you know --

20   it's not that I don't want to always be growing, it's still

21   something that's important to me, but I don't want it to be

22   scary and it sort of was starting to feel scary.

23   Q    All right.  And at the beginning of the next paragraph

24   you say, "I love the work that I'm doing with The Source."  Is

25   that true?

1    A    Yeah, I really liked teaching.

2    Q    And then you say, "I'm about to start the five-day in New

3    York City with Lauren."  That's Lauren Saltzman; correct?

4    A    Yes.

5    Q    And you took the five-day with Lauren Saltzman; right?

6    A    I did.

7    Q    And what was your relationship with Lauren Saltzman over

8    the years?

9    A    Not much.  The first -- that five-day was kind of the

10   first time where we had talked, but it was just very briefly

11   in terms of the five-day and then when I did the play up in V

12   Week she helped with that doing EMs or stuff before the play

13   or she was involved in the play, but I was never very close to

14   Lauren.

15   Q    And then going to this second-to-last paragraph, you say,

16   I hope that I am simply missing something.  I hope that this

17   is an instance where I am proven wrong.  In all of the videos

18   I've seen and things I've heard about you, you are very joyful

19   and playful."  You write that; correct?

20   A    Yes.

21   Q    And one of the things, tell me if this is right, that you

22   were struggling with is you -- you didn't want all of the hard

23   work of The Vow and all the pressure of that, you envisioned

24   it being somewhat joyful and playful; correct?

25   A    If I was -- at this point, yeah.  At this point Allison

Nicole - cross - Agnifilo                    4152

1   had already sent me the e-mail saying, like, there's no option

2   there's no out, you've made this decision.  So I was, yeah,

3   trying to find a way where, like, I could also be joyful and

4   handle the situation at the same time.  Absolutely.

5   Q    And you go on to say, "Thinking about pushing on my fears

6   for the rest of my life doesn't make me feel playful.  It

7   makes me feel scared and heavy hearted.  It makes me want to

8   run away."  That's honestly how you felt; correct?  That's one

9   of the things you honestly felt?

10  A    Yes.

11  Q    And you're telling that to Keith in this letter; correct?

12  In this e-mail rather?

13  A    Yeah, but he doesn't have anything to do with The Vow or

14  as far as I understood -- yeah.

15  Q    But your telling -- this isn't just a positive, feel-good

16  letter; you're saying honest things to him; correct?

17  A    Yeah.

18  Q    And one of the things that you're saying that's honest is

19  that you feel the scared and heavy-hearted and it makes you

20  want to run away; that's what you're writing to him; right?

21  A    Yes.

22  Q    And I don't think you -- you don't get a response from

23  this letter either; correct?

24  A    No.  I don't.  No -- no.

25  Q    Okay.  Then you send another letter and this is

Nicole - cross - Agnifilo                    4153

1    Government Exhibits 1273.  It's already in evidence.

2              (Exhibit published.)

3    Q    I think this is the next day, yeah.  The first we looked

4    at was April 17th, this is April 18th.  And you write, "So

5    here is the thing, I'm out of my element.  I have no idea how

6    to befriend someone that I have never met."  And then you

7    basically tell him that Allison is sort of behind this;

8    correct?

9    A    Yes.

10

11             (Continued on the following page.)

SN        OCR        RPR

Nicole - cross - Agnifilo                              4154

1   CROSS-EXAMINATION (Continuing)

2   BY MR. AGNIFILO:

3   Q    You say:

4         Allison told me to be honest with you and the truth

5   is is that Allison is trying to push me, or I assume push

6   against my fears, and is going to stand in a cold shower if I

7   don't figure how to hear back from you at 3:00 a.m.  Yeah,

8   that's happening.

9         So, you're telling him that Allison is behind this;

10  right?

11  A    Yes.

12  Q    And you're also saying, if I don't get you to respond to

13  me, Allison's going to have to take a cold shower; correct?

14  A    Yes.

15  Q    All right.  And then your P.S. at the bottom:

16        I'm at this moment trying to find what's funny about

17  this situation as opposed to cringe-worthy.  I must admit I'm

18  finding a lot of humor in this desperate 1:15 a.m. e-mail.

19  So, yay, gross.  Smiley face.

20        Whatever that is.  All right.

21        So you're -- you're basically -- you've never done

22  this before, you've never had to send an e-mail to someone you

23  didn't know before at the request of another person; correct?

24  A    Oh, yeah, in this way.  I'm like an assignment.  Of

25  course not.

MDL       RPR       CRR       CSR

Nicole - cross - Agnifilo                    4155

1    Q    Right.  And you're basically saying that, you know, that
2    this is cringe-worthy; right?
3    A    Yeah.
4    Q    And you don't get a response from this one either?
5    A    No.
6    Q    All right.  Then you send him Government Exhibit 1274
7    that makes reference to a TED Talk with the subject polka dots
8    and moonbeams.
9         Do you remember what the TED Talk was about?
10   A    Yeah, it says right there:  J.K. Rowling, the Fringe
11   Benefits of Failure.
12   Q    Right, but I mean what were the fringe benefits of
13   failure?  Why are you sending this e-mail?
14   A    So -- well, I like this TED Talk.  I'm a massive Harry
15   Potter fan.  So, this TED Talk talks about how, when she was
16   writing Harry Potter, she had been kind of been in a really
17   low place, had nothing.  I mean, I think a lot of people are
18   familiar with J.K. Rowling's story, but, if not, she had been
19   in like a really low place and she talked about the things she
20   learned when she was working a job that was just really sad
21   and heavy, because it was talking about people who had been --
22   people overseas and their families were being threatened and
23   stuff, and just like it had taught her a lot about life, and
24   the heaviness of life, and she brought a lot of that into her
25   work in writing Harry Potter and just, like, she felt like a

Nicole - cross - Agnifilo                    4156

1  complete failure and then what she created out of that was the

2  Harry Potter series.

3          So I thought -- so it's just a TED Talk that I

4  really liked and Allison had given me some, like, you know,

5  send him something that you care about, tell him thank you for

6  The Source, ask him a question.  Like, she was -- you know, so

7  I thought okay, I'll send him one of my favorite TED Talks.

8  Q    Okay.  And this one kind of does it and then he responds

9  to you in Government Exhibit 1275; correct?

10 A    I don't know if that did it or the other e-mail.  I'm not

11 sure.

12 Q    So just -- your e-mail was the subject Polka dots and

13 Moonbeams, the one with the TED Talk; right?

14 A    Yes.

15 Q    And, then, just so it's clear, is that the -- the other

16 one was subject Fish out of Water; right?

17 A    Yes, I liked to entertain myself.

18 Q    I know.  So he responds to the polka dot and moonbeams

19 one; correct?

20 A    Yes.

21 Q    And he writes:

22          Oh, dear, how far do you want me to go?  Also, the

23 thing with Allison in the shower, is not a good lever for me

24 but more about ethics later.  How committed are you to working

25 to get this answer?  It's a scary, difficult journey to

Nicole - cross - Agnifilo                    4157

1    experiencing existence with the lightness of true freedom,

2    with the depth of love.  Thank you for persisting.  I just got

3    your three e-mails long after Allison just have started her

4    refreshing shower.

5              And that's what he writes to you; correct?

6    A    Yes.

7    Q    And then --

8              MR. AGNIFILO:  I don't think this is in evidence,

9    1378?  Is it?  It is in evidence.

10             THE COURT:  1378?

11             MR. AGNIFILO:  1378, I think it is in evidence

12   already.

13             THE COURT:  All right.

14   Q    Okay, this is what we just saw.  This is Keith's response

15   in the other e-mail and then you respond to him.  And you

16   write:

17             Yeah, I wasn't sure about that lever, but I got

18   scared and panicked.  Thank you for the feedback on that.  I

19   have much to learn about ethics.  And I am very committed to

20   getting the answer.

21             Now, what answer?  You're committed to getting what

22   answer?

23   A    Well, I believe that my first question was how to grow

24   and be joyful at the same time.

25   Q    All right.  So what you're telling him here is that you

Nicole - cross - Agnifilo                    4158

1   are committed to getting that answer.  Was that a truthful

2   statement; were you committed to getting that answer?

3   A    Well, yeah, I was already in The Vow, so, I was being

4   told that I had committed.  So, yeah, I was committed to

5   figuring out how to be joyful during this, like, crazy

6   process.

7   Q    Were you trying to get the answer as to how to be joyful

8   in your life before you entered The Vow?

9   A    Yeah.

10  Q    So the notion of you wanting to have a joyful life didn't

11  start with The Vow; you were trying to be joyful before you

12  were in The Vow?

13  A    Yes.

14  Q    And you say:

15        Very committed to getting the answer, terrified,

16  excited, curious, feeling all sorts of contradicting emotions

17  about it, but I am committed.  It feels similar to acting for

18  me.  I get frustrated and I get scared and I throw a tantrum

19  and I want to quit.

20        Right, you write that?

21  A    Yes.

22  Q    And sometimes you did want to quit; correct?

23  A    Yes.

24  Q    And sometimes you wrote that you didn't want to quit; you

25  wanted to stick it out because you thought it would be

Nicole - cross - Agnifilo                          4159

1   genuinely better for you?

2   A    Sometimes I felt like I must be missing something.  They

3   were telling me to trust all the time and I just thought maybe

4   I'm missing something, like, maybe this really is, like -- I

5   don't know.  I just thought maybe I'm missing something

6   because to me this feels very scary and often, like, not at

7   all what I want, but, like, maybe I'm missing something.

8   Like, I was supposed to be trusting Allison.  So I was

9   constantly thinking that like trying to understand what I

10  might not be understanding or where I might be wrong.  So,

11  yes.

12  Q    Okay.  Then you continue on the next page:

13              The exploration and journey to experiencing

14  existence with the lightness of true freedom, with the depth

15  of love, scary and difficult as it may be, is what I want to

16  experience.  I can't even comprehend what the lightness of

17  true freedom or the depth love are at the moment, but I want

18  to answer that question, I want to live a full life.  I know

19  I'll hate moments of it.  I know I'll fight against the fear

20  and challenges.

21              That's what you write; correct?

22  A    Yes.

23  Q    And then Keith writes you back, on the first page of this

24  e-mail, and Keith writes in response to that:

25              Well, okay.  Here's some quick thoughts to start.

Nicole - cross - Agnifilo                    4160

1   Feel free to ask questions for I'm jumping a lot and

2   compressing.  Freedom comes in two forms:  Freedom by denial.

3   This causes damage and also destroys conscience.  Two, freedom

4   of the unencumbered self.  This is the complete opposite of

5   number one.

6            As children, we experience one and feel great

7   because it appears we can do anything without effect.  This

8   feels like a lightness of being, but it is delusional,

9   nilpotent, and irresponsible.  As we grow and evolve, we find

10  every attachment to the external role limits us.  Some people

11  believe that they satisfy all of theirs attachments, then they

12  will achieve freedom.  In actuality, they lose a true sense of

13  self.  The only way to true freedom and full sense of self is

14  to fight through attachments.  This is a long, hard, scary

15  fight and can only be one through dedication, discipline, and

16  commitment to something beyond ourselves and our excuses.

17           True freedom in the physical world comes from

18  absolute commitment to a principle, with no tolerance for

19  excuses or an out/escape.  Only then do we find our freedom

20  does not depend on being able to do what we want.  It depends

21  on not being able to do what we want yet still experiencing

22  self.  Love is only measured through pain.  Our ability to

23  feel human pain determines the depth and strength of our love.

24           That is what he writes to you; correct?

25  A    Yes.

Nicole - cross - Agnifilo                    4161

1   Q    Right.  And then at the bottom, the last thing he says

2   is, surprisingly, it's -- let me get the whole thing:

3              I hope this doesn't scare you away.  For most

4   people, becoming deeper and creating a deep meaning for life

5   threatens to interfere with fine social norms and freedom.

6   Surprising, it's the exact opposite but really scary shit.

7              Correct?

8   A    That's what he wrote, yes.

9   Q    Were you interested in this sort of dynamic, you know,

10  the idea you might be able to be happier and find greater

11  freedom through commitment to a principle?

12  A    I mean, maybe I thought that for a moment before I

13  realized what this principle actually was, that I was

14  supposedly committed to, but not really.  I mean, I didn't

15  grow up religious, so I never had that kind of, like -- I am

16  spiritual in my own way, but I never sort of had that outlook

17  on things, I just kind of did my only thing.

18  Q    You --

19              MR. AGNIFILO:  1277.

20  Q    All right.  You respond to Keith's e-mail on April 21st,

21  2016, and I'm just going to show --

22              MR. AGNIFILO:  This is not yet in evidence, Judge,

23  so I am just going to show it to the witness and the parties.

24  BY MR. AGNIFILO:

25  Q    So you can see it's an e-mail from you -- hold on.

Nicole - cross - Agnifilo                    4162

1      MR. AGNIFILO:  Hold on, one second.  Actually, it
2  might be easier if I show it to the witness and then ask her a
3  couple questions without putting it into evidence.
4      THE COURT:  Go ahead.
5  Q    So this is -- just for reference, it is Government
6  Exhibit 1277 and it is -- and this is not being shown to the
7  jury, just so you understand.
8  A    All right.
9  Q    It is from yourself and it is to Keith Raniere; correct?
10  A    Yes.
11  Q    All right.  And do me a favor, just take a few minutes to
12  read it and I'm just going to ask you some questions about
13  what you were thinking at the time.
14      And when you want me to move it, just ask me.
15  A    I'm sorry, I'm not a fast reader.
16  Q    No, no, take as much time as you want.
17  A    Can you move it?
18  Q    Sure.  There you go.
19  A    Yes.
20  Q    So basically, when it comes time to respond to Keith, you
21  tell him it's going to take a lot more than that to scare you
22  away; correct?
23  A    Yes, but you have to understand that I was like already
24  in The Vow at this point, so I wasn't going anywhere.
25  Q    I'm asking you -- I'm really just going to ask you --

Nicole - cross - Agnifilo                    4163

1   A    I'm sorry.

2   Q    No, no, no, don't be sorry.  I'm really going to focus on

3   things that you did, okay?  I understand you have a viewpoint

4   now and I will ask you about that at some point.

5   A    Okay.

6   Q    I'm really just going to focus on things you did.

7        So what you did is you wrote to him that it was

8   going to take more than this to scare you away; correct?

9            MS. PENZA:  Objection, Your Honor.

10           MR. AGNIFILO:  All right, we will offer this as

11  1277.

12           MS. PENZA:  We object, Your Honor.

13           THE COURT:  Sustained.

14           MR. AGNIFILO:  May we approach, Your Honor?

15           THE COURT:  Next question.

16           MR. AGNIFILO:  I'm sorry, could we approach?  I

17  asked to approach.

18           THE COURT:  Next question.

19  Q    Had you been pondering these concepts?

20  A    Like concepts of life?

21  Q    No, concepts of, you know, how best to achieve joy and

22  whether you can achieve joy through -- how best to do that,

23  whether it be adherence to a principle or, you know, just by

24  living your life without adherence to a principle?

25  A    Yes, of course, Allison had been asking me to contemplate

Nicole - cross - Agnifilo                    4164

1   that a lot recently.  So, had I thought about that before The

2   Vow?  No.

3   Q    Now -- but before The Vow, you hadn't -- since you were

4   in The Vow, had you ever expressed to anyone that you were

5   suicidal, after being in The Vow?

6   A    No, I kept that to myself because I would have had to

7   explain why and I wasn't allowed to talk about The Vow.

8   Q    Okay.  But you agree with me, in terms of what you did,

9   in terms of things that you wrote, before you were in The Vow,

10  you did express that you had those thoughts, you expressed

11  those things in writing; correct?

12  A    Yes.

13  Q    Okay.  And after you joined The Vow, you didn't ever

14  express that you were feeling suicidal?

15  A    I don't know.

16  Q    Some of the e-mails that we read, you expressed a desire

17  to sort of understand what it is that could bring you a joyful

18  life; correct?

19  A    Yes.

20  Q    And part of what you were talking about is whether these

21  teachings, you know, adherence to a principle, you know,

22  commitment, things like that, could bring you a joyful life,

23  that is one of the things that you were writing about and that

24  you and Allison were talking about; correct?

25  A    Yes.

Nicole - cross - Agnifilo                    4165

1   Q    And you were interested in exploring that possibility,
2   fair to say?
3   A    Yeah, if there's no other option, yes, of course.  I was
4   -- I'm always interested in making the best of the situation.
5   Q    All right.  But you agree with me, in the writings that
6   we looked at, you didn't ever say I'm just going to try to
7   make the best of a bad situation; you never wrote that in the
8   things that we read?
9   A    Yeah, I couldn't say that to Keith.  I wasn't allowed to
10  talk about The Vow.
11  Q    But again, I am just asking about what you did or didn't
12  say to Keith.
13  A    Okay, you just want yes or no.
14  Q    You never said that to Keith; right?
15  A    Not at that time.
16  Q    What you said to Keith, from what we looked at, that's
17  already in evidence, is that you are wondering about how to
18  have a life of joy; correct?
19  A    Yes.
20        MR. AGNIFILO:  Your Honor, I'm not sure when we want
21  to take the break, given our new schedule.  Keep going?
22        THE COURT:  Just keep going.
23  Q    All right, 654, I believe is already in evidence.  It is
24  a series of e-mails between you and Allison, and we are going
25  to go to the first one.

1          MS. PENZA:  Your Honor, may we have a brief sidebar?

2          THE COURT:  All right.  What we will do is we will

3   take our morning break.

4              All rise for the jury.

5              (Jury exits the courtroom.)

6          THE COURT:  All right, the witness may stand down.

7   Do not discuss your testimony with anyone.

8              (Witness steps down.)

9          THE COURT:  All right.  Everyone may be seated.

10         MS. PENZA:  Your Honor, I don't think we actually

11  need a sidebar, I can address in open court.  It is very

12  difficult for me to monitor whether an e-mail is in or out as

13  Mr. Agnifilo is putting it on the screen.  So if there is any

14  question about what e-mails are in or out, we should resolve

15  that now.

16         THE COURT:  I didn't see it on my list.

17         MS. PENZA:  It's not, but that puts me in a

18  difficult position in the moment of a questioning to be

19  looking at the list to try to figure out for him whether the

20  exhibit is in or out.

21         THE COURT:  All right, so we are going to add to

22  your travail.  I want both sides to provide me with a list of

23  all the -- of all of the documents that have been admitted

24  into evidence and to do so on a continuing daily basis by the

25  beginning of the next day.  That solves the problem right

Nicole - cross - Agnifilo                    4167

1   there.  It is just more work for you, but --

2             MS. PENZA:  Your Honor --

3             THE COURT:  I am just going to do it, because -- I

4   mean, I'm keeping a record here, but that means I have to go

5   back and forth, too, so that's where we are.

6             MS. PENZA:  We have been doing that, so it's not a

7   problem.  It's just that, in the moment, if an e-mail is about

8   to be shown and it is not on the list, I don't want to be

9   announcing to the jury that's it's not -- I just don't think

10  it is my place to be having that dialogue with Mr. Agnifilo.

11            THE COURT:  All right.  Thank you.

12            MR. AGNIFILO:  Judge, in terms of the admissibility,

13  the Government has cherry-picked e-mails between --

14            THE COURT:  Yeah, but that's -- with their witness,

15  and now you are cross-examining and there are certain e-mails

16  that have not been admitted are hearsay on cross-examination.

17  That's the way I learned evidence and maybe I was going to a

18  law school that didn't have a decent faculty, but that's how I

19  learned evidence anyway.  You know, I could go back.

20            MR. AGNIFILO:  You'd do very well.  You'd do very

21  well, I'm sure, but the hearsay rule is actually the same.

22  There is no distinction in the hearsay rule when the defendant

23  is not on the e-mail.  I agree, when the defendant is on the

24  e-mail then they get a party admission exception to the

25  hearsay rule that I don't get.  But that's not the issue.  But

Nicole - cross - Agnifilo                    4168

1   when we are talking about e-mails between Allison and this

2   witness, hearsay on direct is no different than hearsay on

3   cross.  So, if it's not hearsay on direct, I don't know how it

4   is hearsay on cross.  It is presumably admitted for the same

5   state of mind, not for the truth; if it was being offered for

6   the truth, it wouldn't have been admitted because it would

7   have been hearsay.

8          So, all I am trying to do is to complete the

9   narrative of the dozens or scores of e-mails between Allison

10  and this witness that the Government put in on their direct

11  examination.  The hearsay rules are the same for me on

12  cross-examination.  They were admitted on direct because they

13  are an exception to the hearsay rule; they should be admitted

14  on cross because they are an exception to the hearsay rule.

15         MS. PENZA:  Your Honor, if he is talking about

16  Nicole's statements, we have offered them in the context of

17  e-mail chains.  So, for example, the very last e-mail that Mr.

18  Agnifilo was looking to put up was the defendant's response to

19  her -- or her response to him, without the defendant

20  responding.  Her e-mails were offered in the context of their

21  effect on Ms. Mack, or on the defendant, but that's what they

22  were offered for.

23         MR. AGNIFILO:  That's just one exception.  Another

24  exception is the state of mind of the declarant.  It doesn't

25  have to be that it has an effect on the listener; that is a

Nicole - cross - Agnifilo                    4169

1   well-established hearsay exception.  Another well-established

2   hearsay exception is that it is not being offered for the

3   truth; it is being offered for the state of mind of the person

4   making the statement, which is directly relevant, where the

5   Government time and time again said, well, looking back now at

6   things now, how do you feel.  The Court can't now prevent me

7   from actually showing what the witness said at the time,

8   especially in light of -- under normal hearsay rules, I get to

9   show what the witness thought at the time.  It is especially

10  relevant when the Government is doing this change in

11  perspective.  I mean, the relevant fact -- the relevant time

12  period isn't 2019.  The relevant time period is when these

13  events are taking place, 2016, 2017, and the way that we are

14  going to get to that is by putting in the e-mails of the

15  person who's now saying she has had this change in

16  perspective, and she is allowed to come here and say I've had

17  a change in perspective.  But I am also then allowed to say,

18  yeah, but back in 2017 this is what you thought, and we know

19  what you thought because you sent an e-mail.

20          MS. PENZA:  That's hearsay, Your Honor.  He wants to

21  put in an e-mail for the truth of the statements at the time.

22  He can ask her what she thought and he can impeach her, if she

23  doesn't say it, but that is hearsay.

24          THE COURT:  It would be helpful if the Court

25  received in advance the impeachment material so the Court

Nicole - cross - Agnifilo                    4170

1    could review it with some time to go through it and then not

2    have to make an immediate decision on admissibility.  So, for

3    the rest of the trial, whichever party is cross-examining a

4    witness, when you advise the Court about the name of the

5    witness two days ahead of time, the Court requires that you

6    provide the Court with the impeachment material ex-parte and

7    then I will deal with it in a more orderly way.

8            So I didn't get anything on this witness on

9    impeachment.  Did I?  Did I get a single anything?

10           MR. AGNIFILO:  No.

11           THE COURT:  But I didn't have that rule in effect.

12   So now I have the rule in effect.

13           My decision on the exhibit stands.  You have your

14   exception.  We will take ten minutes.

15           MS. PENZA:  Thank you.

16           (Recess taken.)

17           THE COURT:  Bring in the witness, please.

18           (Witness resumes stand.)

19           THE COURT:  Bring in the jury.

20           (Jury enters the courtroom.)

21           THE COURT:  Please be seated.

22           You may continue your cross-examination.

23           The witness is reminded that she is still under

24   oath.

25   BY MR. AGNIFILO:

Nicole - cross - Agnifilo                    4171

1   Q     Nicole, do you recall at some point being upset that you

2   had changed your name a number of different times?

3   A     Yeah, I mean, I love my full name, but for acting like I

4   would use my middle name for a little bit, my mom's maiden

5   name, and then I wanted to go back to my last name.  So -- but

6   it's all my name.  It's just...

7   Q     Were you concerned at one point that you had ruined your

8   acting career by the way you changed your name?

9   A     Yeah, I just, like, thought I had made it a bit harder

10  for people because I had used my middle name right at first

11  and then I was, like, no, I'll just use my last name.  And

12  that's just a little bit confusing to casting directors and,

13  like, the industry, because what are they going to call you.

14  So there was a point in time where, like, I was really overly

15  stressed out about that.  Obviously, now, it's like not that

16  big of a deal in the grand scheme of things, but at the time

17  it felt -- it was, it made it harder for, like, casting

18  directors to make sense of things.  So I really thought that,

19  when my brain would spin out, I would think, like, oh, my God,

20  what did I do?  You know, you can always bounce back from

21  things, but yeah, I just felt like that was not the smartest.

22  Q     Right.  But, for a period of time, you were very

23  distraught at the fact that you thought that you had changed

24  your name to the degree that you had kind of really hurt your

25  acting career?

Nicole - cross - Agnifilo                4172

1    A    Yeah, but honestly I think that was just me more stressed

2    out about other things and, like, you know, sometimes when you

3    make a small thing mean a huge thing because you are actually

4    just stressed in general, but I made it be about that, which

5    it wasn't necessarily about.  I don't want to use the word

6    projecting, but it is like displacing my anxiety and making it

7    about like, oh, I made this mistake instead of, oh, I actually

8    just don't know how to kind of move forward right now.

9    Q    And you agree with me, you made a big deal out of it in

10   many things that you have said to people about changing your

11   name and your acting career?  I mean, you really focused on it

12   as a potential thing that really set you back?

13   A    Yes, I did loop on it.  It is embarrassing, but, yeah, I

14   did loop on it.

15   Q    What do you mean by loop on it?

16   A    Just I worried about it.

17   Q    You were getting in trouble for not being ready, not

18   answering ready when Allison would do readiness drills;

19   correct?

20   A    Yes.

21   Q    And you know where the concept of readiness came from;

22   correct?

23             MS. PENZA:  Objection.

24             THE COURT:  You may answer.

25   A    I knew one place that they had said it came from, yes.

                    Nicole - cross - Agnifilo                    4173

1    Q    Go ahead.

2    A    The way that it was first presented to me was that, like,

3    the whole community would do readiness at 3:00 p.m. and, like,

4    if someone wasn't ready, then they would make sure that they

5    were okay in both the United States and in Mexico.

6    Q    Okay.

7    A    And that's where the idea originated from, yeah.

8    Q    Okay.  Tell us about that, focus on the Mexico part.

9              MS. PENZA:  Objection, Your Honor.

10             THE COURT:  Can you lay a foundation for this?

11             MR. AGNIFILO:  Sure.

12   Q    You had a specific understanding that readiness stemmed

13   from Mexico; correct?

14   A    That was how the original, but our readiness was very

15   different from that readiness.  That readiness was one time a

16   day, 3:00 p.m., you just checked in to say that you were ready

17   and you were safe.  The readiness that we had to do, we had to

18   be ready 24 hours a day, wherever we are, and respond in sixty

19   seconds so that -- what Allison said was so that we were

20   constantly thinking about our commitment to The Vow and so

21   it's, like, they knew where we were at all times, which was

22   ridiculous.

23   Q    The general concept of readiness stemmed from Mexico;

24   right?

25   A    I don't know.  That's what I was told originally.

                    MDL      RPR      CRR      CSR

Nicole - cross - Agnifilo                    4174

1  Q    Do you remember telling the FBI that --

2              MS. PENZA:  Objection.

3  Q    -- it came from Mexico, that the idea came from Mexico?

4              MS. PENZA:  Objection, Your Honor.

5              THE COURT:  You may answer.

6  A    I believe it did come from Mexico, so I probably said

7  that.

8  Q    Okay.  We're going to look at something that's in

9  evidence as 659.  This is 11 pages of e-mails between you and

10  Allison Mack.  We're going to start on page 10.

11            This is an e-mail from May 12th and it is from you;

12  correct?

13  A    Yes.

14  Q    Okay, so just a couple of things.  So you make reference

15  here, all that drama in my head.  What are you talking about

16  there?

17  A    I'm not sure.

18  Q    And at the bottom, you say:  I literally just want to eat

19  everything in my fridge to feel better, LOL, and I want to run

20  and hide.  I'm not going to, but I'd like to.

21            Why do you write that?

22  A    I would assume that I was feeling very emotional and, you

23  know, sometimes when you're emotional, like, you don't want to

24  feel what you are feeling.  So, you know, I was like I'd

25  really love some chocolate.

Nicole - cross - Agnifilo                    4175

1  Q     All right.  Then from May 13th, it is on page 9 of the

2  same exhibit, you write your goal is to be optimistic and

3  trusting, to stop fighting so hard.  First challenge, this job

4  is not exactly turning out as I had planned or what was

5  promised.

6              What job are you talking about there?

7  A     I'm talking about the nightclub.

8  Q     And where were you working at the time?

9  A     Like the actual name of the place?

10  Q     If you remember.

11  A     Of course I remember.

12  Q     Okay.

13  A     It's called PHD.

14  Q     All right.  And you are saying you are not making as much

15  as money as they told me we would and it's getting a little

16  stressful.

17              Now, were you working full-time?

18  A     I was, yeah.  Just sometimes, when you were working in

19  the middle of the week, you wouldn't make as much on the

20  weekends and, you know, it actually ended up being, like,

21  overall fine.  But, yeah, there were definitely stressful

22  points, because any waiting-table circumstances you are at the

23  -- it depends on how many people come in.  It depends on how

24  much money they're spending.  You know, you can't predict that

25  and it's -- yeah.

Nicole - cross - Agnifilo                    4176

1    Q    Your income varies?

2    A    Yeah, your income varies.

3    Q    About what were you making in May of 2016, at the -- is

4    it a restaurant?

5    A    It's a nightclub.

6    Q    What were you making about?

7    A    In May, I'm not sure.

8    Q    Can you give me a ballpark?

9    A    Maybe like 700 a week.

10   Q    Okay.

11   A    Wait, hold on.  Sorry.

12        I think like it was about 3,000 a month, I would

13   say.

14   Q    3,000 a month?

15   A    Yeah.  Something around there.

16   Q    All right.  You had often said that you wanted to be a,

17   quote, bad ass, right?  Is that a term that you would use?

18   A    Yes.

19   Q    What did you mean by that term?

20   A    I don't know.  I guess it kind of means you, like, don't

21   take crap from anyone or, like, you kind of know -- to me,

22   that's someone who is, like, strong in, like, who they are and

23   doesn't let... yeah, just someone who is -- who knows who they

24   are and is strong and doesn't let someone else, like, make

25   them feel bad or, like, tell them what to do.  Or, I mean

1  quite literally, like someone, like, who could fight and

2  protect themselves.  I mean, you know, as an actress, you are

3  always kind of, like, it's really cool to be trained for a

4  part like how to fight, actually.  Especially when you're

5  little.

6  Q    Right.  Did you take martial arts when you were younger?

7  A    I did karate.

8  Q    For how long?

9  A    I got to be like a purple/brown belt.  I don't know, a

10 few years.  I started when I was in third grade.

11 Q    Were you interested in pursuing other types of -- sort of

12 like physical, you know, martial arts-type stuff when you were

13 older?

14 A    Absolutely.  Keith would say he's going to bring like

15 Krav Maga -- I think that's how you say it -- champions to

16 come and train us, which never happened.

17 Q    What is Krav Maga, for those of us who don't know?

18 A    It's a type of fighting.

19 Q    Like a martial arts-type of fighting?

20 A    Yes.  I've actually never taken a class, so I don't

21 totally know, but that's what I thought.

22 Q    Okay.  All right.  So we are going to go to page 7 of the

23 same exhibit, and you write:

24        I had such a wonderful walk with Keith.  It was

25 really great and made me think about things and I felt

Nicole - cross - Agnifilo                    4178

1   comfortable and connected, which has been hard for me lately.

2   It's all really got me thinking about what I want for my life.

3   I woke up tired but happy.

4           You wrote that, right?

5   A    Yes.

6           (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Nicole - cross - Agnifilo                4179

1   CROSS-EXAMINATION CONTINUES

2   BY MR. AGNIFILO:

3   Q    All right, and this is from your journal May 18th, 2016?

4   A    Yes.

5   Q    And then below it you say:  I had a wonderful meeting

6   with Geoffrey today.

7            Who's Geoffrey?

8   A    He is another actor and dancer that -- he worked with The

9   Source, but he's also, I mean successful in his own right on

10  Broadway.

11  Q    And then you go on to say:  Not sure if it is the right

12  thing for me to move forward with at the moment.  Keith

13  thought it might be a good opportunity, but also might be a

14  distraction, so I'd like to talk things through with him a bit

15  more, but Geoffrey and I had a wonderful talk and I left

16  feeling so inspired.

17           Right?

18  A    Yes.  Can you just give me a minute to read the whole

19  thing?

20  Q    Yes, let me put it just all on one.  Here you go.

21           (Pause.)

22  A    Yeah, okay.

23  Q    Okay.  So, and one of the other things you write here is

24  Allison is sort of being hard on you, correct?

25  A    Yes.

Nicole - cross - Agnifilo                          4180

1   Q    Going to the page 6 of the same exhibit.

2        (Exhibit published.)

3   Q    You write on May 19th, 2016:  Today was a good day.  Woke

4   up to an obey text from A.

5        What is that?

6   A    That was like she gave me an assignment.

7   Q    Okay, and do you remember what it was?

8   A    Yeah, I say right after.  I had to text for permission

9   every time I wanted to eat something.

10  Q    And now you also said:  I actually enjoyed the process of

11  the day.

12       What do you mean by that, what's the process of the

13  day?

14  A    I'm not sure, but I would say that sometimes what would

15  happen that would make this more confusing is, like, you know,

16  the first time you would have an exercise to do, like, yeah,

17  it's weird -- it's really weird to have to text someone every

18  time you eat, but you do, like, learn things.

19       So, again, like, it's not that I didn't learn

20  something that day.  Like, I was, like, oh, okay, like, maybe

21  I ate mindlessly, you go by and you grab something, or

22  whatever it is.  It's like the first time you might learn

23  something, but then it's like, do you want to do that for the

24  rest of your life?  No.

25  Q    Now, the last thing that you say in this paragraph is:

Nicole - cross - Agnifilo                         4181

1  Plus, I got insight into what I'm struggling with in terms of

2  being submissive.

3              What are you referring to there?

4  A    So, yeah, I mean it was always just brought up that I was

5  defiant and I wasn't good at listening or trust -- I wasn't

6  good at trusting them.  So being submissive was part of

7  trusting Allison.  It was part of the relationship.

8  Q    What specific conversation did you have with either Keith

9  or Allison about you and being submissive?

10 A    I don't remember.  I don't know.  I don't know what this

11 is referring to.

12 Q    Okay.  Did you have a conversation with Keith at any

13 point about a fantasy that you had?

14 A    No, not that I know of.

15 Q    Did you ever have a conversation with Keith about a

16 fantasy of being submissive?

17             MS. PENZA:  Objection.

18 A    No, I don't think so.

19 Q    You don't think so --

20             THE COURT:  That's overruled.  Go ahead.

21 BY MR. AGNIFILO:

22 Q    So you said you don't think so?

23 A    No.

24 Q    Okay.  Are you sure you didn't?

25 A    Yes.

Nicole - cross - Agnifilo                    4182

1   Q    You're sure you never had a conversation with Keith about

2   a fantasy that you had about being submissive?

3   A    No.

4           THE COURT:  All right, next question then.  Three

5   times and you're done.

6           MR. AGNIFILO:  All right.

7   BY MR. AGNIFILO:

8   Q    So this particular passage:  I got insights into what I'm

9   struggling with in terms of being submissive; what are you

10  referring to?

11  A    I'm referring to the master/slave relationship and that I

12  am struggling with it.

13  Q    You then go on to say:  I had a great Source workout this

14  morning.  We explored fear.  I'm getting better and better at

15  leading sliders and Eduardo and I had a great point talk.

16          Who's Eduardo?

17  A    He was another kind of like teacher that worked with The

18  Source and I worked with him a lot.

19  Q    And what's -- you say a great point talk.

20          What is that?

21  A    Point talks were, like, we would watch a movie and then

22  you talk about the point of the movie.  So why the movie was

23  written, what the writer was trying to say, which I -- I

24  really enjoyed.  You know, I had before and I still continue

25  after, like watching movies and then trying to understand why

Nicole - cross - Agnifilo                    4183

1   the movie was written, why it was created, what thought the

2   writer or the director, the message that they were trying to

3   say with the movie.

4   Q    And then you write, and you're talking about Eduardo

5   here:  And he called me out on how I start to go deep and then

6   pull away and go the surface again.  It was a good insight.

7   A    Yeah.

8   Q    Did you think that was true, did you think that was a

9   good insight?

10  A    Looks like it, but -- yeah.

11  Q    All right, we are going to go to the next page of the

12  exhibit.  It's page 5.  And you write an entry here at

13  May 22nd -- May 22nd, 5:46 a.m.

14           You're up late at night quite frequently, correct?

15  A    Yeah, I worked until 5:00 a.m.

16  Q    Right.  And here you say:  Two shifts, twelve hours, high

17  heels, skintight dress, popping one-thousand-dollar bottles,

18  yep, that was my night.  How was yours?

19           How often would you work at the nightclub in a week?

20  A    Sometimes, like -- sometimes five days, sometimes four.

21  It depends on when they scheduled me.

22  Q    Okay.  All right, page 4 of the same exhibit.  We'll

23  start down here (indicating) May 23rd.

24           I realized I'm filled with anger.  Anger at my

25  situation, anger at myself, but that I am also choosing to be

SAM      OCR      RMR      CRR      RPR

1   angry and that I can choose to feel something else.

2            I think you talked about this on direct examination

3   if I'm not mistaken?

4   A    Yeah, I did.

5   Q    Right.  Now, what are you angry about?

6   A    The situation that I'm in.

7   Q    What situation is that?

8   A    That I have to answer to someone all of the time.

9   Q    You agree with me you don't say that, right?

10  A    Yeah, because I'm writing it to Allison.

11  Q    And on many occasions you expressed anger with your

12  acting career, correct?

13  A    I don't know if I do that.

14  Q    Weren't you angry at the fact that you felt that you

15  damaged your acting career by how you changed your name?

16  A    No, I was angry at myself, not angry at my acting career.

17  Q    Okay, so angry at yourself.

18           You've been angry at yourself, correct?

19  A    Yeah, before, of course.

20  Q    Right.  And you were angry at yourself from time to time

21  before you ever joined The Vow, correct?

22  A    Yes.

23  Q    And you were angry at your living situation in the city,

24  right?

25  A    No, I had a great living situation in the city.

Nicole - cross - Agnifilo                    4185

1   Q    Okay, so we are going to go to the first page of this

2   exhibit.

3            (Exhibit published.)

4   BY MR. AGNIFILO:

5   Q    It's 6:00 a.m.  I'm just getting back -- I'm just getting

6   to bed and I'm insanely angry right now, beyond angry because,

7   once again, I've gotten back to the city and my life is a mess

8   here.

9            Right; that's what you wrote?

10  A    Yeah, because Allison was -- I had just moved and on

11  every day off Allison was having me come up to Albany and I

12  didn't have any time to unpack my stuff.  And I'm like,

13  definitely a person that I need my space organized so that I

14  can think straight.  So my living situation was -- was like my

15  roommate and where we lived was great, but I couldn't unpack

16  my stuff.

17  Q    And you're angry about it?

18  A    Yeah, I am angry about it.  It's making me -- it's making

19  my life very hard to, like, navigate.

20  Q    And you go on to say:  Nothing is organized and I have so

21  much to catch up on.  Right?

22  A    Yes.

23  Q    So what you're angry about here on June 1st, in terms of

24  the city, is that different than what you're angry about on

25  May 23rd, 2016?

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                4186

1   A    Well, I would say -- I would say all of this anger is,

2   like, displaced.  I'm angry at the situation.  I mean I say it

3   right there.

4   Q    All right, we are going to go to page -- actually, we'll

5   go up here (indicating.)  This is from May 25th.

6        You say:  I feel alive today.  I feel like I am

7   reconnecting with a part of myself that I've been disconnected

8   from for the last couple months.

9        Was that true?

10  A    It looks like it.

11  Q    Okay.  And then kind of in the middle of that paragraph

12  you say:  We had a great ongoing workout today.

13       What kind of workout?  Do you remember what kind of

14  workout you had?

15  A    Yeah, it was -- well, can I read the whole thing?

16  Q    Oh, please, take your time.

17       (Pause.)

18  A    Yes, okay.  What was the question?

19  Q    What was the workout?

20  A    Yeah, if I remember correctly, I think that Allison was

21  teaching another, like, ongoing Source and that I went up to

22  help, but an ongoing workout would be a Source workout.

23  Q    Okay.  And then you say after that:  And then watched one

24  of Keith's forums and then had another workout.  Right?

25  A    Yeah, that's why I think that it was, like, another kind

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                          4187

1   of -- I don't remember what the difference was called, but

2   like a, like, three-week course.  Like, not an ongoing once a

3   week, but like a three-week because Emi was taking it that

4   time and I came up for a few days and, like, sat in on the

5   classes.

6   Q    And Emi is Emiliano?

7   A    Emiliano, yes.

8   Q    And then we are going to go to the top.  It starts on the

9   previous page, so let me show you that.  So page 3 of the same

10  exhibit.

11            (Exhibit published.)

12  BY MR. AGNIFILO:

13  Q    It's an entry you have from May 25th, 2016.  Do you see

14  that?

15  A    Yes.

16  Q    Okay.  And I'm looking at the bottom line there.  You

17  write:  I had a great and challenging talk with KR today.

18            Do you remember it?

19  A    Do I remember that specific talk?

20  Q    Yes.  I know it's a long time ago.  No?

21  A    No.

22  Q    And you go to say:  He gave me the submission --

23  A    I said "A" gave me.

24  Q    Sorry, right.  "A" gave me the mission of putting myself

25  in a vulnerable position and submitting to KR and wherever the

Nicole - cross - Agnifilo                4188

1  walk led, which I did.  It led many places and I was

2  completely exhausted by the end of it.

3           What are you talking about?

4  A    I'm not sure.

5  Q    Because you write:  Submitting to KR and wherever the

6  walk led.

7           Where did the walk lead?

8  A    I don't know if that was the -- I don't know.

9  Q    Do you think that might have been what happened with the

10 table?

11 A    I don't know.

12 Q    Okay.  Was that what you were about to say, because you

13 were going to say something and then you stopped.

14          Is that what you were going to say?

15 A    Say what?

16 Q    About the table.

17 A    I don't know.

18 Q    Okay.  So you say:  Wherever the walk led, which I did.

19 It led many places.

20          Are you talking about geographic places or are you

21 talking about emotional places?  What places?

22 A    I'm not sure.

23 Q    And then you say:  And I was completely exhausted by the

24 end of it.

25          Right?

Nicole - cross - Agnifilo                                    4189

1    A    Yeah.

2    Q    And this is, this is an entry, just so we're clear, on

3    May 25th, 2016, right?

4              (Exhibit published.)

5    BY MR. AGNIFILO:

6    Q    I'll do it so you can see it all in one shot.

7    A    Yeah, no, I understand.

8    Q    All right.

9              Now, going back to the first page of this exhibit, I

10   know we've read the first part of it, but I just want to go

11   through the whole thing and then I have a couple questions for

12   you.

13             This is a journal entry from May the 31st at

14   6:00 a.m.  You say:  It's 6:00 a.m.  I'm just getting to bed

15   and I'm insanely angry right now, beyond angry because, once

16   again, I've gotten back to the city and my life is a mess

17   here, nothing is organized and I have so much to catch up on.

18   I was so on board with the convo "A" and I had this morning

19   about the benefits of coming to Albany and taking full

20   advantage of the time I have up there, watching movies and

21   working in my art.  And I am done fighting the growing

22   process, it's obviously good for me.  And even though it's

23   very emotional and uncomfortable, I can feel it helping.  I'm

24   excited about embracing The Vow and working more with Keith.

25             When you say "working more with Keith," what are you

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4190

1   talking about?

2   A     Like I said in my direct, after what happened, I guess it

3   seemed like I passed some kind of test and Keith was

4   interested in, like, working on life stuff with me more.

5   Like, I don't know, this is just what Allison had told me.

6   Q     But here you're not talking about whether Keith wants to

7   do something or not, you're saying:  I'm excited about

8   embracing The Vow and working more with Keith.

9          You're talking about yourself in this passage,

10  correct?

11  A     Right.  But where did I get that from?  It was Allison

12  saying, like, Keith wanted to work more with me.

13  Q     But you agree with me that when you have a criticism

14  about something that Allison is doing, you're not shy about

15  telling Allison your criticism?

16  A     That's not true.  I was -- I -- I tend to -- actually,

17  I'm, like, surprised sometimes.  But no, I was always careful

18  that if I -- you know, it's like walking on eggshells.  So

19  you're always careful about how much you're saying and how not

20  to, like -- well, 'cause if I pushed her too far I would have

21  to, like, do some kind of punishment or who knows what she

22  would say.  And it was always, like -- I was always trying to

23  placate the situation and --

24  Q     You're back in the city when you write this, correct?

25  A     Yes.

Nicole - cross - Agnifilo                              4191

1    Q    Okay.  And what, you have a computer and you sit at your

2    computer and you write these journal entries?

3    A    Sometimes I would write them on the -- so I'd take the

4    subway home from work and sometimes you have to wait, like,

5    you know, at night you have to wait half an hour or something

6    for the subway, so I would write them on my phone sometimes

7    when I was waiting for the subway.

8    Q    Okay, but you chose, though, you chose to actually write

9    that you were excited about working more with Keith.

10            You chose to write those words, correct?

11   A    Yes.

12   Q    But then you say:  But coming back every week to an

13   unorganized home and hectic life here feels so awful, words

14   cannot even express how stressful and bad it feels to me.  It

15   makes me hate the whole growing process because I can't catch

16   up and it fills my whole body with this raged up anger and

17   pain, which clearly feels awful.

18            Right, you write this?

19   A    Yes.

20   Q    Now, you're saying that when you wrote this, I think you

21   said on direct examination that what you described happened on

22   the table had only happened within a day or so beforehand,

23   correct?

24   A    Yeah, that's what I thought.

25   Q    Okay.  And what you write, what you choose to write on

Nicole - cross - Agnifilo                      4192

1    your computer when you're in New York City is:  I'm excited

2    about embracing The Vow and working more with Keith.

3              Right, that's what you wrote?

4    A    Yeah.

5    Q    Do you remember learning around the first week of June

6    that Keith was involved in The Vow?

7    A    Yes.

8    Q    And how exactly did you learn that?

9    A    He told me.

10   Q    Okay.  And tell us about the circumstances under which he

11   told you.

12   A    I believe I already said it in direct, but he took me to

13   the library and, like, sat me down and told me.

14   Q    And what did he say?

15   A    That --

16             MS. PENZA:  Objection.

17             THE COURT:  You may answer.

18   A    Just that he was Allison's master, which made him my

19   grand master.  And I think this might have been when he

20   started calling it DOS, but I could be wrong.  I'm not a

21   hundred percent on that.

22             And just he told me a little bit about what The Vow

23   was.  That's it.

24   Q    Okay.

25             Now, when did the two of you, you and Keith, start

1   an intimate relationship?

2   A    I don't -- it was -- I don't remember exactly.  I think

3   it was like two walks later that he first kissed me, but I

4   don't remember after that.  I don't remember when anything

5   started to get, like -- when anything else happened.

6   Q    Okay.

7          And you alluded to this on direct examination, did

8   he have trouble maintaining an erection?

9   A    Sometimes.

10  Q    Not all the time?

11  A    I guess -- I don't know.  I don't know, I'm not with him

12  all the time.

13  Q    I understand.  Well, I'm only asking about when you're

14  with him.

15  A    Oh.

16  Q    But you had -- you and he had --

17          THE COURT:  I'm sorry.  Let me just.

18          MR. AGNIFILO:  Yes.

19          THE COURT:  I want to caution the gallery that they

20  are not to make any sounds, comments, remarks of any kind.

21  This is a very serious matter and it must be taken with the

22  greatest sense of probity.  So I don't want to have to say

23  that again.  I appreciate everyone's cooperation.

24          So go ahead.

25          MR. AGNIFILO:  Thank you, Your Honor.

Nicole - cross - Agnifilo                          4194

1    BY MR. AGNIFILO:

2    Q     You and Keith had sexual intercourse?

3    A     Yes.

4    Q     Was it -- do you remember how many times that you

5    actually had sexual intercourse?

6    A     No, but my guess would be, like, five -- four or five in

7    that ten months.

8    Q     Okay.

9

10                (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

Nicole - cross - Raniere                              4195

1   BY MR. AGNIFILO:

2   Q    And I think you said on direct examination and I will

3   only ask a few more questions on this and then we will move

4   on, but I think you said on direct examination that you and

5   Keith had oral sex; correct?

6   A    Yes.

7   Q    And that was in both directions?

8   A    Yes.

9   Q    Okay.  I think you said at one point you realized that

10  Allison had other slaves; correct?

11  A    Yes.

12  Q    And when about did you first know that?

13  A    Maybe the end of July, beginning of August, is when I met

14  or I found out about India.

15  Q    Okay.  And how did you find out about India?

16  A    She told me.

17  Q    India did?

18  A    Yeah.

19  Q    And that was the first -- that was the first person you

20  found out was a different one of Allison's slaves; correct?

21  A    Yes.

22  Q    And do you remember the next person?  And just use first

23  names just so we're careful.

24  A    I met Michele and Danielle at the same time.

25         MR. AGNIFILO:  One second, Judge.  May I have a

Nicole - cross - Raniere                    4196

1   moment?

2              THE COURT:  Surely.

3              (Pause in proceedings.)

4              MR. AGNIFILO:  Thank you.

5              I'm going to mark for identification, just for the

6   witness and the parties, Defendant's Exhibit 941.

7              THE COURT:  That is Government's --

8              MR. AGNIFILO:  No, Judge, defense 941.

9              THE COURT:  Okay.

10  BY MR. AGNIFILO:

11  Q    Can you see who's in that photograph?

12  A    Yeah.

13             MR. AGNIFILO:  Your Honor, we offer it at this point

14  as Defendant's 941.

15             MS. PENZA:  No objection.

16             THE COURT:  Defendant's 941 is received in evidence

17  and published to the jury.

18             (Defendant's Exhibit 941 received in evidence.)

19             (Exhibit published.)

20  BY MR. AGNIFILO:

21  Q    Can you tell us who that is, everyone in that photo?

22  A    Can you see where I'm pointing?

23  Q    Who is that?

24  A    That's Danielle, that's Jay, that's Michele, India,

25  Valerie and I can't -- I can't really tell.  I want to say

SN      OCR      RPR

Nicole - cross - Raniere                                    4197

1    that's Souki, but I can't tell.  That person right here in

2    glasses.  It's not very clear who she is.

3    Q    All right.  That's fine.  Okay.  And so who are all of

4    these people to you?

5    A    Girls that I met through The Vow.

6    Q    So you mentioned India.  This is India; right?

7    A    Yeah.

8    Q    And you said India was the first other person that you

9    knew of that was another one of Allison's slaves; correct?

10   A    Yes.

11   Q    And then above her is Michele; correct?

12   A    Yeah.

13   Q    And Michele was another one of Allison's slaves as well;

14   correct?

15   A    Yes.

16   Q    And this is Jay, you said?  And who brought Jay in?

17   A    India.

18   Q    And this is Danielle; right?

19   A    Yes.

20   Q    And I think you said Danielle was a doctor?

21   A    Yeah.

22   Q    And Danielle did the brandings?

23   A    Yes.

24   Q    And who did you say this was?

25   A    Valerie.

SN        OCR        RPR

Nicole - cross - Raniere                    4198

1          MR. AGNIFILO:  Your Honor, may I give the witness

2     the original?  It might be clearer.

3          THE COURT:  Of course.

4          MR. AGNIFILO:  Thank you.

5          (Counsel approaches.)

6     A    Thank you.

7     BY MR. AGNIFILO:

8     Q    Now that you have the original, just take a look at it

9     and tell me if you think it's Souki?

10    A    Yes, it's Souki.

11    Q    I can take it.  Thank you very much.

12         I want to show you another picture just for

13    identification as 942.

14         THE COURT:  Go ahead.

15    Q    Defense Exhibit 942, can you see who's in that

16    photograph?

17    A    Yes.

18         MR. AGNIFILO:  Your Honor, we offer it as 942.

19         MS. PENZA:  No objection.

20         THE COURT:  Exhibit -- Defendant's Exhibit 942 is

21    received in evidence.

22         (Defendant's Exhibit 942 received in evidence.)

23         (Exhibit published.)

24         THE COURT:  Go ahead.

25    BY MR. AGNIFILO:

Nicole - cross - Raniere                        4199

1   Q    And who is in that photograph?

2   A    India, Michele and Allison.

3   Q    Okay.  And I'm going to show you 943.

4           MR. AGNIFILO:  Just for identification, Judge.

5           THE COURT:  Hold on.

6           MR. AGNIFILO:  Yup.

7           THE COURT:  Go ahead.

8   Q    943.  Do you recognize who's in that photograph; right?

9   A    Yes, the same people.

10          MR. AGNIFILO:  We offer it as 943.

11          MS. PENZA:  No objection.

12          THE COURT:  Defendant's Exhibit 943 is received in

13  evidence.

14          (Defendant's Exhibit 943 received in evidence.)

15          (Exhibit published.)

16          MR. AGNIFILO:  I'm not sure if we can publish it.

17          THE COURT:  Sure.

18          (Exhibit published.)

19          THE COURT:  Okay.

20  BY MR. AGNIFILO:

21  Q    So, that's who?

22  A    India.

23  Q    That's who?

24  A    Michele.

25  Q    And that is?

                    SN        OCR        RPR

Nicole - cross - Raniere                           4200

1   A     Allison.

2   Q     Now, you said at one point some of you guys went to

3   Michele's house in the Berkshires; correct?

4   A     Yes.

5   Q     And who went exactly?

6   A     India, Michele, Danielle, Allison and I.

7   Q     And is this the first time that you guys as a group had

8   done anything like this?

9   A     Yes.

10  Q     And you drove up?

11  A     Uh-huh.

12  Q     You have to answer yes or no.

13  A     Yes.

14  Q     And I think you said you went hiking?

15  A     Yes.

16  Q     And you said you liked that, you like hiking?

17  A     I do.

18  Q     You're fairly outdoorsy, fair to say?

19  A     Yes.

20  Q     You're a good skier?

21  A     Yes.

22  Q     And you ski with your family out west; correct?

23  A     Yes.

24  Q     And you like hiking, you like being outside; right?

25  A     I do.

SN        OCR        RPR

Nicole - cross - Raniere                    4201

1   Q     Okay.  And what was -- it was for a weekend?

2   A     Yes.

3   Q     Was the weekend fun?

4   A     Parts of it.

5   Q     Okay.  You guys had fun together; right?

6   A     At times, yes.

7   Q     I'm not saying that every moment of any relationship is

8   always fun, but you guys enjoyed each others' company; right?

9   A     Yeah.  They're nice girls.

10  Q     And you guys had long talks about life and your dreams

11  and each other; right?

12  A     Well, we had one lunch where basically it was just, like,

13  a shaming session or, like, Allison would point out where each

14  one of us was doing things wrong or was like should be ashamed

15  and that was not fun.

16  Q     And were there times when this would happen, even these

17  sort of sessions, that you guys would laugh good naturedly

18  (sic) at what was happening?

19  A     Yeah.  You always try to make the best of a situation.

20  Q     All right.  And Allison was doing it to all of you;

21  right?

22  A     Yes.

23  Q     So I think in one of the exhibits we looked at in direct

24  examination, they referred to you as The Brat?

25  A     Yeah.

Nicole - cross - Raniere                    4202

1   Q    And how did you get that nickname?

2   A    I don't know.  I don't know.  I don't actually know.

3   Q    And India was The Princess?

4   A    Yeah.

5   Q    And how did she get that nickname?

6   A    I think part of it was sort of a play on that, like, she

7   had actual, like, actual royalty blood or she was a descendent

8   of someone in actuality.  I don't remember where her

9   grandmother was from.  And then the other part was then --

10  like, apparently, you know, India only liked doing what she

11  liked to do.  Like, which I didn't really get from her.  But,

12  yeah, that she was, like a princess.  She was spoiled, she

13  grew up in Los Angeles and things like that.  I'm not sure.

14  Q    I think that on direct examination you looked at

15  Government Exhibit 653.  653 is in evidence.

16       (Exhibit published.)

17  Q    This is from Allison to you and Michele and India and

18  Danielle?

19  A    Yes.

20  Q    And just so it's clear, the Danielle that we're talking

21  about here is not Daniella Padilla; that's a different person?

22  A    Yeah.

23  Q    And Allison writes, "The past three days were profound

24  for me.  I understood what it meant to be responsible."

25       This is right after your Berkshire trip; correct?

Nicole - cross - Raniere                          4203

1    A    Yes.

2    Q    And do you remember the Berkshires being in October of

3    2016?

4    A    Yes.

5    Q    The leaves were changing?

6    A    Yeah.  And it was right around Michele's birthday.

7    Q    And she goes on to write, "I understood what it meant to

8    be responsible.  I understood what it meant to be vulnerable.

9    I met you for what felt like the first time and I understood

10   me because I understand you."

11           Do you believe that Allison was genuinely looking

12   out for your best interests?

13           MS. PENZA:  Objection.

14           THE COURT:  You can answer.

15   A    I did not think that.

16   Q    And did you feel that way at the time?

17   A    Through the entire process I wanted to believe that and I

18   wanted to trust her, but, no, I did not think that.

19   Q    Okay.  Now, Allison spent a great deal of time with you,

20   correct; talking to you, e-mailing you, getting your journal

21   entries; correct?

22   A    Yes.

23   Q    And do you recall if you pretty much sent her journal

24   entries every day if not -- I mean, every day pretty much?

25   A    She asked me to.

Nicole - cross - Raniere                    4204

1    Q    And you did?

2    A    Yes.

3    Q    And you wrote -- sometimes you would write a page or more

4    and sometimes you would write half a page; right?

5    A    I imagine, yes, it changed.

6    Q    So you go to the second page of the same document.  She

7    writes to you, "Please have your commitment for the week

8    written and submitted before the end of the day tomorrow."  Do

9    you see that there?

10   A    Yes.

11   Q    Okay.  And then we have different entries.  We have "The

12   Princess, 500 calories, no food post 5 p.m. unless permission

13   granted by M."  That's Allison; correct?

14   A    Which one?  I thought you were reading Princess.

15   Q    Yeah.  "500 calories, no food post 5 p.m. unless

16   permission by M"; right?

17   A    Yes.

18   Q    An M is who?

19   A    So that's India and M would be Allison.

20   Q    Okay.  And then, "M, 600 calories, no food post 5 p.m.

21   unless permission granted by my M"; right?

22   A    Yes.

23   Q    And by this point you know that's Keith?

24   A    I do, yes.

25   Q    And she goes on to say, "My M reminded me today that I

SN        OCR        RPR

Nicole - cross - Raniere                                    4205

1   had given my word I would remain under 600 calories as a

2   discipline until I reached 106 pounds.  I got prideful and

3   conveniently forgot this commitment because it didn't suit me

4   at the moment.  This is very bad and I will fix it by

5   maintaining this count as precisely as I can, no matter the

6   circumstances or location."  That's what she writes; correct?

7   A    Yes.

8   Q    The Clown.  Who is The Clown?

9   A    Michele.

10  Q    And there's just question marks.  There's no entry.  The

11  Brawn is who?

12  A    Danielle.

13  Q    Okay.  Now, Danielle was sort of in very good shape,

14  correct, physical shape?

15  A    Yes.  She taught exo|eso.  So she was, like, did sort of

16  yoga.  She was in great shape.  She danced as well.

17  Q    What's exo|eso?

18  A    It was another company under the NXIVM umbrella that

19  focused on the physical.

20  Q    I think you said that you felt India was on a 500-calorie

21  diet for a year?

22  A    Yeah, it never seemed to end.

23  Q    Do you recall if she was on a 500-calorie diet for a much

24  more limited period of time for a specific reason?

25  A    Well, she was on -- so, she was on it to get to, I think,

Nicole - cross - Raniere                    4206

1   107, if I'm remembering correctly, and I don't even know if

2   she actually ever did get to that.  So then it would be

3   like -- it was just an ongoing thing because she wasn't

4   getting there, as far as I understood.

5   Q    Now --

6   A    She may have gotten a little lower at some point.

7   Q    Now, at this point in time you're still in an intimate

8   relationship with Keith; correct?

9   A    Well, when was -- what --

10  Q    So we're talking the end of the October 2016.

11  A    Yeah.  Yes, I think it would have been, like, pretty new,

12  if I remember correctly.

13  Q    Do you remember writing him an e-mail on the same day

14  that this e-mail was written that you miss him?

15  A    No.

16          MR. AGNIFILO:  Just for the witness --

17  identification, Exhibit 929, Defense 929.

18  Q    Do me a favor don't read it out loud.  Just read it to

19  yourself.

20  A    (Reviewing.)

21          Yeah.

22  Q    So, do you remember telling him om October 29th that you

23  miss him?

24  A    Yes, but if you read the whole e-mail it's, "I think I

25  must be starting to trust you more," which, like, if you

Nicole - cross - Raniere                    4207

1   really pay attention to what's going on, Allison was always

2   telling me to trust him.  It was always about trusting him and

3   Allison.  And so, like, yeah, I was probably trying to give in

4   and trust him and let down my guard a little bit.

5           MR. AGNIFILO:  Your Honor, I would offer this as

6   Defense Exhibit 929.

7           MS. PENZA:  The Government objects.

8           THE COURT:  I will allow it.

9           (Defendant's Exhibit 929 received in evidence.)

10          (Exhibit published.)

11  BY MR. AGNIFILO:

12  Q    Just so it's clear, this is Defendant's Exhibit 929.

13  It's from you to Keith Raniere; correct?

14  A    Yes.

15  Q    And it says, "Raindrops of trust," and you say, "I think

16  I must be starting to trust you more.  You're on my mind as

17  much as you usually are, which is quite often, but now I'm

18  actually letting myself miss you, so yeah, but that is my

19  long-winded way of saying I miss you, that I am looking

20  forward to seeing you this coming week and that I am thinking

21  of you as you make the hard decision you're faced with from

22  now until Monday, sending you and Pam love; right?

23  A    Yes.

24          (Continued on the following page.)

25

SN        OCR        RPR

Nicole - cross - Agnifilo                                          4208

1  CROSS-EXAMINATION (Continuing)

2  BY MR. AGNIFILO:

3  Q    Why did you write the last part, sending you and Pam

4  love?

5  A    Pam was really sick at this point.

6  Q    Okay.  And Pam would die shortly after you wrote this;

7  correct?

8  A    Yes.

9  Q    Did you know Pam?

10 A    No.

11 Q    Did you and Keith talk about Pam?

12 A    Yeah, he talked about her a lot.

13 Q    Okay.  And that didn't upset you or make you jealous in

14 any way, correct, that he would talk about Pam a lot to you?

15 A    No.

16 Q    And, so, what you're saying here is that you miss him and

17 you look forward to seeing him this coming week.  Did you mean

18 that when you wrote that to him?

19 A    Yeah, I guess this would probably be one of the times

20 when I was just trying to -- yeah, I was trying to be really

21 supportive.  I think it is hard when somebody is losing

22 somebody and I was -- it makes me really sad now, but I was

23 really trying, and I was really trying to trust him and I was

24 really trying to support him and I didn't...yeah.

25 Q    And I understand you feel differently now, but at the

Nicole - cross - Agnifilo                    4209

1    time, you cared for him?

2    A    I'm a very empathetic person.  I don't know that I --

3    like -- I don't know.  I always felt a little conflict.  Well,

4    more than a little, but....

5    Q    But you?

6    A    I don't know that I would say that.

7    Q    But you would agree with me that you are actually

8    expressing the conflict in this e-mail, I think I must be

9    starting to trust you more?  That's how you start it?

10   A    Yeah, I know, and that makes me really angry because it's

11   like there's so much manipulation going on from Allison

12   telling me to trust him and then you're on my mind as much as

13   you usually are.  That was another tactic that they used.

14   Like, constantly Allison would tell me to reach out to Keith,

15   blah, blah, and you could never get him off your mind because

16   it was supposed to be like The Vow and all these things, like,

17   you're thinking about him all the time with readiness.  It

18   just makes me angry now because it's so much manipulation.

19   Q    I'm really just asking you about what --

20   A    No, you can't, like --

21   Q    What you wrote to --

22             THE COURT:  Wait.  What were you going to say?

23   A    Just certain things you can't take out of context of what

24   was going on in the situation.

25             THE COURT:  Go ahead.

MDL      RPR      CRR      CSR

1  Q    Well, I'm asking what you're communicating to Keith.

2  You're sending an e-mail that you know Keith is going to

3  receive; correct?

4  A    Absolutely.

5  Q    And the e-mail that you know Keith is going to receive

6  has you saying, "I think I must be starting to trust you more.

7  You're on my mind as much as you always are, which is quite

8  often, but now I'm actually letting myself miss you."

9        You know Keith is going to get that e-mail and

10  you're sending him that e-mail; right?

11  A    Yes.

12  Q    You say so, yeah, that is my long-winded way of saying I

13  miss you," right?  You said that to him?  That's what you

14  wrote?

15  A    Yeah.

16  Q    Do you remember where you were when you wrote this?

17  A    It's the 29th, so maybe we were somewhere in the

18  Berkshires.

19  Q    "And that I'm looking forward to seeing you this coming

20  week and that I'm thinking of you as you make the hard

21  decisions you're faced with from until on Monday."  Do you

22  know what's going to happen on Monday?  You're writing this on

23  Saturday.

24  A    I'm not sure.

25  Q    Now, I think you said on direct examination that while

Nicole - cross - Agnifilo                 4211

1  you were in a relationship with Keith you had often sent him

2  loving messages.

3  A    I don't really consider it a relationship, but, yes, I

4  did say that.

5  Q    So, in -- we'll use time periods.  So, in the fall of

6  2016, the winter of '16 into '17, the spring of 17, and then

7  sort of tapering off like in the early part of the summer

8  2017, during that period of time, you had very often sent him

9  loving messages; correct?

10 A    During all of that time?

11 Q    At different parts during that general time period.

12 A    I would send kind and supportive messages, yes.

13 Q    You called him "love"?  You referred to him as "love";

14 correct?

15 A    Yes.  But I also call a lot of other people love.

16 Q    You would call him love and you would send hearts in the

17 -- did you communicate by WhatsApp?  Is that how you

18 communicated?

19 A    WhatsApp.  Yeah, for a while text messages or WhatsApp or

20 Telegram.  I don't know.  I didn't keep track of all those.  I

21 send a lot of hearts to everyone.

22 Q    And you often would ask him if you could come sleep in

23 the library; correct?

24 A    Yes.  So, Allison had given me -- so I was supposed to

25 ask Keith, like, when it was best for me to come up to Albany,

MDL      RPR      CRR      CSR

Nicole - cross - Agnifilo                    4212

1   like, and I was supposed to ask when I could stay in the

2   library.  And, to be honest, sometimes it was better -- I

3   could actually sleep in the library because it was dark and I

4   didn't have a bed in Allison's house.  So if I slept in

5   Allison's house, after a while, I wouldn't sleep in her bed,

6   but I would sleep on the floor.  So the library, between those

7   two options, was sometimes better.

8   Q    And you agree that prior to when you would come to Albany

9   to sleep in the library, you very often would ask Keith what

10  his schedule was so that you could spend time together, you

11  and him in the library?

12  A    No.  As I just said, Allison would tell me, like, you

13  need to come up but you ask Keith what his preference is, what

14  his scheduling preference is, and it wasn't library time.  It

15  was like, oh, I still thought maybe that they were going to be

16  working with me to become a better artist and, like, the walks

17  about, like, psychology and stuff like that.  So, Keith was

18  supposed to be this person that knew all this stuff.  Like, at

19  times I did want to walk, go on a walk, and, like, find out if

20  any -- you know, like I would learn anything that would help

21  me in my life.  Like, at that time, that's what I thought.

22  Q    And you and Keith went on a lot of walks; right?

23  A    Yes, we did.

24  Q    And very often Keith would be the one to ask you if you

25  were free or willing to go on a walk; correct?

Nicole - cross - Agnifilo                                    4213

1   A      Yes.

2   Q      And then sometimes you would ask Keith if he was free and

3   willing to go on a walk; right?

4   A      On a walk, yes.

5   Q      And aside from walks, there were times when you

6   explicitly asked Keith to have intimate contact with him?

7   A      Yeah, I think there were a few times, but -- I don't

8   know.  Yes.

9   Q      Yes.  You would send him messages and you would

10  explicitly say that you wanted to have sex with him?

11  A      I only know one message that says that.

12  Q      What's the one you're thinking of?

13  A      I just -- I thought that this was my future and that I

14  was in an arranged-marriage situation, so I had been -- yeah,

15  like, I was obviously, like, celibate during this whole time

16  other than Keith, and, so, I don't know.

17  Q      So what's the message you're thinking of?

18         MS. PENZA:  Objection, Your Honor.

19  A      I don't know when the date was.

20  Q      I'm not asking the date.  What did you say?

21         MS. PENZA:  Objection, Your Honor.

22         THE COURT:  Sustained.

23         THE WITNESS:  Do I answer?

24  Q      No, no.

25         THE COURT:  Sustained means don't answer.

Nicole - cross - Agnifilo                    4214

1          MR. AGNIFILO:  Your Honor, can we have a quick
2    sidebar?
3          THE COURT:  No.
4    Q    You could only remember one time when you sent him a
5    message asking him to have -- be intimate with you?
6    A    Yes.
7    Q    Do you remember telling him that hot, rough sex --
8          MS. PENZA:  Objection.
9          THE COURT:  Sustained.
10          MR. AGNIFILO:  Your Honor, can we approach?
11          THE COURT:  No.
12   Q    Do you remember sending him a WhatsApp message on May 30,
13   2017?
14   A    No.
15          MR. AGNIFILO:  I'm going to show just for the
16   witness.
17          THE COURT:  All right.
18          MR. AGNIFILO:  First I want to show you the page
19   with the date.  This is just for the witness.
20          THE COURT:  That is fine.
21   Q    May 30, 2017.  Do you see that date?  The message I am
22   going to show you is on the next page.  I'm trying to see if
23   you see the date.
24   A    Okay.
25   Q    Then this is the next page.

Nicole - cross - Agnifilo                    4215

1   A    May...I don't know.  It doesn't say my name anywhere on
2   this.
3   Q    Let me show you another page of this.  Do you remember
4   breaking your arm at one point?
5   A    Yes.
6   Q    I'm just going to show you something.  I am just going to
7   ask you to look at it.
8   A    Sure.  Yep.
9   Q    Did you break your arm in the spring of 2017?
10  A    I did.
11  Q    Your left wrist; correct?
12  A    No.  My right.
13  Q    You broke your right wrist?
14  A    It's in the mirror.
15  Q    Got you.  Very good.
16       And I'm going to ask you again...
17  A    That doesn't mean that that was --
18       THE COURT:  I'm sorry.  He has to ask the question
19  first.
20       Ask the question, please.
21       MR. AGNIFILO:  Yes.
22  Q    Did you send him a message saying some hot, rough sex --
23       MS. PENZA:  Objection.
24       THE COURT:  Sustained.
25       MR. AGNIFILO:  Your Honor, could we please approach?

Nicole - cross - Agnifilo                    4216

1          THE COURT:  No.

2          Does this document refresh your recollection as to

3    whether you offered to have sex with the defendant on that

4    date?

5          THE WITNESS:  No.

6          THE COURT:  Next question.

7    Q    You sent -- you sent Keith Raniere a number -- you had a

8    WhatsApp account at the time?

9    A    Yes.  Yeah, I did.

10   Q    And you communicated with him by way of the WhatsApp;

11   correct?

12   A    Yes.

13   Q    All right.

14   A    I still have that same WhatsApp account.

15   Q    Did you give your WhatsApp messages to the Government?

16   A    I think so. I gave them my whole phone.

17   Q    Did you delete your account at one point?

18   A    I don't think so.  I deleted my Telegram because that was

19   -- that was supposed to be just for The Vow when it was locked

20   and I didn't want to have anything to do with it anymore, but

21   I didn't delete my WhatsApp.

22   Q    Are these Telegram messages?  Can you tell?

23   A    It doesn't say.

24   Q    Can you tell?  You know Telegram?

25   A    They might be.

Nicole - cross - Agnifilo                    4217

1  Q    Okay.  And did you communicate with Keith Raniere by
2  Telegram?
3  A    I remember it mostly being WhatsApp, but it might have.
4  I communicated with Allison over Telegram.
5  Q    And at one point you deleted your Telegram account?
6  A    Yeah, I deleted it right after I left.
7  Q    And you never gave those Telegram message to the
8  Government?
9  A    Yeah.  I was actually really bummed that I couldn't
10  because I accidentally -- well, not accidentally.  I purposely
11  deleted the account.  But I obviously didn't foresee any of
12  this afterwards.  I absolutely would have given it to them.
13          MR. AGNIFILO:  Your Honor, what I would like to do
14  is can I give the witness these documents to sit with and see
15  if this refreshes her recollection about this being the
16  Telegram account that we are talking about?
17          THE COURT:  Yes, you may.
18          MR. AGNIFILO:  Thank you.
19  Q    Feel free.  You can go through those.
20  A    Some of these seem like they're from -- I remember some
21  of these.
22  Q    When I asked you which wrist you broke and I got the
23  wrong one --
24  A    Uh-huh.
25  Q    -- you pointed out that you took a picture in a mirror.

MDL        RPR        CRR        CSR

Nicole - cross - Agnifilo                    4218

1   How did you know that?

2   A    Well, because how would I have taken it?  Logic.  I had

3   the camera in my hand and took it of my broken wrist.

4   Q    You can hold it out and take it way.  But you knew --

5   A    No, but the camera was in the picture.

6   Q    But you knew -- you knew you took that picture of

7   yourself in a mirror; right?  That was you?

8   A    Yes.

9   Q    And that was you taking a picture of yourself?  You saw

10  that; right?

11  A    Yeah, with a hat on and a sweater and my broken arm.

12  Q    Are these your messages with Keith Raniere?

13  A    Some of these are, but it doesn't say my name at the top

14  and it doesn't say like -- I don't know if every single one of

15  them is from me.  There's like a lot.

16  Q    Do you recognize what you said?  Do you recognize things

17  that you are describing?

18  A    Some of the stuff yeah.

19          MR. AGNIFILO:  Your Honor, we offer these as

20  exhibits for the defense to show the nature of the

21  relationship.

22          THE COURT:  Do you want to --

23          MS. PENZA:  The Government objects.

24          THE COURT:  The objection is overruled.  No.  I mean

25  you're overruled.  Sustained on the objection.

Nicole - cross - Agnifilo                    4219

1          We can discuss it at lunch time.

2          MR. AGNIFILO:  All right.  Can we do it --

3          THE COURT:  We can do it.  But why don't you go to

4   the next question.

5   Q    When did you delete your Telegram account?

6   A    Very shortly after I left DOS.

7   Q    And --

8   A    It like kind of scared me.  I don't know.  I didn't want

9   any bad vibes on my phone anymore.

10  Q    And when you deleted your Telegram account, you deleted

11  all of your Telegram messages between you and Keith Raniere;

12  right?

13  A    I guess.  I didn't know that that's how it worked, but I

14  just didn't want Telegram on my phone anymore.

15  Q    When you deleted your Telegram account, you didn't know

16  you were deleting your Telegram messages with Keith Raniere?

17  A    I didn't ever want to see, blugh, messages with him

18  again, or Allison, I was just skeeved out by the whole thing.

19  Q    So as a result, since you deleted your Telegram messages,

20  you weren't able to give them to the Government; correct?

21  A    Yeah, but I had -- yeah, I gave them everything else.

22          MR. AGNIFILO:  Your Honor, what time does the court

23  want to take the lunch break?  Do you still want to do the one

24  o'clock?

25          THE COURT:  Yes.

MDL       RPR       CRR       CSR

Proceedings                                              4220

1          MR. AGNIFILO:  Can we take it now?

2          THE COURT:  Sure.  We can take it now.  We will do

3    45 minutes for lunch.  All rise for the jury.

4          (Jury exits the courtroom.)

5          THE COURT:  All right.  The witness may step down.

6    Do not discuss your testimony with anyone.

7          (Witness steps down.)

8          THE COURT:  Everyone maybe seated.

9          Go ahead.  You have the floor.

10          MR. AGNIFILO:  Thank you, Judge.  I absolutely must

11    be permitted to examine through this witness what this witness

12    actually said in realtime to Mr. Raniere about her desire to

13    have an ongoing, intimate relationship with him.  There's no

14    basis to preclude this evidence.

15          THE COURT:  All right.  I hear you.

16          Why would there be a basis?  Just asking.

17          MS. PENZA:  Why would there be a basis to permit

18    these?

19          THE COURT:  To preclude the evidence.

20          MS. PENZA:  To preclude the messages?

21          THE COURT:  Yes.

22          MS. PENZA:  So, Your Honor, first of all, there's no

23    authentication of these.  These are screen shots of messages.

24    It says deleted account at the top.  I don't know whether

25    there's a back and forth that's missing.  The witness has said

Proceedings                                                4221

1   there are some she remembers.  If there are specific messages

2   that she remembers and that are otherwise admissible and Mr.

3   Agnifilo can lay the proper foundation, that's fine.  But text

4   messages in general, even if it's the only witness' statement,

5   are hearsay.  So he is stuck with her answer on impeachment.

6           If he asks her have you said multiple times that you

7   want to have sex with the defendant and he tries to refresh

8   her recollection with something that she has never seen before

9   and she doesn't recognize and it doesn't refresh her

10  recollection, he's stuck.  That's the way the rules of

11  evidence work.  If the defendant wishes to take the stand and

12  he says these are her messages and there's some other way of

13  them coming in, then maybe there's a proper foundation laid.

14  But there certainly has not been anything that I've seen so

15  far.  So to go from her looking at them, saying I recognize

16  some, can't recognize the others, to having Mr. Agnifilo offer

17  entire set of text messages into evidence just is nonsensical.

18          (Continued on following page.)

19

20

21

22

23

24

25

Proceedings                                              4222

1    (Continuing.)

2          MR. AGNIFILO:  Your Honor, I think it's absolutely

3    relevant and I think she laid a foundation.  She said that she

4    deleted the account, that's why it says deleted account.  So

5    that's actually consistent with it being hers.

6          There are pictures, photographs of her that she's

7    taking of her at a time when she has a broken arm.  There are

8    going to be other things that -- and I can -- I can more than

9    amply lay the foundation for different things that she did,

10   that she would know of, that she is writing in these messages.

11         It's -- it's -- it is meant to show a relationship,

12   a relationship in realtime.  A relationship between this

13   witness and my client, and that is absolutely relevant when

14   this witness is being put up as a sex-trafficking victim and

15   she has testified that she's begrudgingly in this

16   relationship, she's not really wholeheartedly in this

17   relationship.

18         Why are we concerned about letting the jury see the

19   actual evidence, to see the actual texts?  This is what juries

20   do best.  They will figure out whether this is an authentic,

21   genuine, from the heart --

22         THE COURT:  No, no, no, no.  If you want to

23   authenticate it, bring in somebody from the company to say

24   that this is an authentic part of this individual's account

25   and then the authenticity of it, at least, is laid.

SAM      OCR      RMR      CRR      RPR

Proceedings                                          4223

1          She did not authenticate it.  She said some of it
2     sounds right and some of it sounds like I don't know.
3          MR. AGNIFILO:  Judge, I can ask specific questions
4     about specific -- the reason we got this far is because I
5     asked her a question that I think I have every right to ask
6     about did you ever say this certain thing to the defendant,
7     and the objection was sustained, which at a sex trafficking
8     trial I don't understand.
9          THE COURT:  Wait a minute.  You asked her a question
10    about whether she ever asked to have sex with the defendant.
11         MR. AGNIFILO:  Right.
12         THE COURT:  And she was allowed to do that and she
13    said:  I remember one occasion.  I think that's what she said.
14         And then I expected that you were going to put a
15    document in front of her or several documents and ask her in
16    order to refresh her recollection that she did it like five
17    times or three times or eight times.  That is the way to do
18    it.  I mean that is the way we do it in other trials.
19         MR. AGNIFILO:  Judge, I can also --
20         THE COURT:  Why are we not doing that here?
21         MR. AGNIFILO:  Because that's not the only way to do
22    it.  Another way to do it --
23         THE COURT:  That's my way.
24         MR. AGNIFILO:  So, Judge, then I gave her the
25    messages.  That's why she ended up getting the messages.  I

SAM      OCR      RMR      CRR      RPR

Proceedings                                    4224

1   showed her the message on the ELMO.

2        THE COURT:  You gave her a pile of documents.  You

3   did not identify a page.

4        MR. AGNIFILO:  At first I did.

5        THE COURT:  You let her look through a whole pile of

6   documents, so then if she recognizes that page or a page as

7   being hers and she looks at it, you point it out to her, and

8   she says:  That refreshes my recollection, you know, on such

9   and such a date I asked him to have sex with me and on such

10  and such a date I asked him to have sex with me, and so on.

11  That is refreshing her recollection.  It does not mean you can

12  put in all these documents that she doesn't have.

13       MR. AGNIFILO:  Judge, this is a witness who does not

14  want her recollection refreshed.  And this is a witness who

15  deleted this account for a reason.  We are starting from a

16  standpoint of a witness who deleted her own account.  She

17  doesn't want her recollection refreshed and I don't have to

18  accept her answers.  That's why I -- and the way it happened,

19  Judge, is I showed her a specific page and I showed her the

20  page before it so she could see the date and she said:  My

21  name's not on this.

22       So then I gave her the entirety of the chats and she

23  said, yes, some of these I remember and some of these is me

24  because it's -- it's me taking a photograph of my broken arm.

25       THE COURT:  Right, and specifically you could have

SAM      OCR      RMR      CRR      RPR

Proceedings                                4225

1    then gone to the next question and said, here's page 22, do

2    you recall having said this on such and such a date in a text

3    message using -- Telegram?

4            MR. AGNIFILO:  Telegram.

5            THE COURT:  Never heard of it, but okay.

6            -- Telegram to the defendant, and she can either say

7    yes or no and you are stuck with her answer.

8            MR. AGNIFILO:  But I don't --

9            THE COURT:  That's the way it works.

10           MR. AGNIFILO:  I don't think I am stuck with her

11   answer when I have a chat from her.  I am not stuck with her

12   answer.  I have her chats that she deleted.  She should -- she

13   should not be permitted to delete chats with the defendant

14   because she doesn't like the content of the relationship.  She

15   doesn't like the truth of the relationship, so she deletes the

16   chats and then I'm stuck with the fact that she deleted the

17   chats.  That's not fair.

18           MS. PENZA:  Your Honor, may I make a record, please?

19           THE COURT:  Sure.

20           MS. PENZA:  I think it's rich that this argument is

21   being made when the defendant's phone is being hidden in

22   Mexico and that's why we're stuck with screenshots of the

23   phone.

24           THE COURT:  Yes, where is the phone anyway?

25           MR. AGNIFILO:  I don't have the phone.

SAM        OCR        RMR        CRR        RPR

Proceedings                                           4226

1          THE COURT:  Surprising.

2          MR. AGNIFILO:  It's surprising or not.

3          THE COURT:  You have no idea where it is?

4          MR. AGNIFILO:  I don't know where the phone is.

5          MS. PENZA:  Well, then it certainly --

6          THE COURT:  How did you get the screenshots?

7          MR. AGNIFILO:  We got them early on in the case.

8          THE COURT:  Well, you got them early on from --

9          MS. PENZA:  From whom?

10         THE COURT:  -- from ether?

11         MR. AGNIFILO:  Judge, you know --

12         THE COURT:  Look, this is not a joke.

13         MR. AGNIFILO:  I'm taking as this serious as I've

14  taken anything.

15         THE COURT:  What I am telling you is if you are

16  going to secrete the source of this evidence, then you are

17  stuck with my ruling and that's it.

18         I am not playing games with this defendant or with

19  anybody else in this courtroom.

20         MR. AGNIFILO:  Judge --

21         THE COURT:  You can ask and let her answer, and then

22  you can argue if you believe that she is not being forthright,

23  you can argue that to the jury on your closing argument.

24  That's it.

25         We'll take 40 minutes for lunch.

SAM      OCR      RMR      CRR      RPR

Proceedings                                        4227

1          MS. PENZA:  Thank you.

2          (The defendant exited the courtroom.)

3          (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

4          (Luncheon recess taken.)

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR     CRR      RPR

Proceedings                                                4228

1                **A F T E R N O O N   S E S S I O N**

2              (In open court - jury not present.)

3         (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

4              (Defendant entered the courtroom.)

5                (Witness resumed the stand.)

6         THE COURT:  Let's have a sidebar.

7

8         (Sidebar held.)

9         (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25









Sealed Sidebar - By Order of the Court                    4232

(Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Proceedings                                    4233

1          (In open court - jury present.)

2          THE COURT:  Okay, let's bring in the jury.

3          (Jury enters.)

4          THE COURT:  Please be seated, everyone.

5          You may continue your cross-examination.  I remind

6    the witness that she is still under oath.

7

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nicole - cross - Agnifilo                    4234

1   **NICOLE**,

2       previously called as a witness by the Government, having

3       been previously duly sworn/affirmed by the Courtroom

4       Deputy, was examined and testified further under oath as

5       follows:

6   CROSS EXAMINATION

7   BY MR. AGNIFILO:

8   Q    Good afternoon, Nicole.

9   A    Hi.

10  Q    I am going to ask you some more questions.  If I ask you

11  a question that is not clear, just ask me to rephrase it or

12  ask a different question.  I'm happy to do that.  Okay?

13  A    Okay.

14  Q    Before we broke for the lunch break we were talking, you

15  had mentioned that Pam at one point was very, very ill;

16  correct?

17  A    Yes.

18  Q    Okay.  And that, in fact, she soon thereafter passed

19  away, right?

20  A    Yes.

21  Q    I think on direct examination you told us that you did

22  some work on Pam's memorial, is that right?

23  A    Yes, I did.

24  Q    What did you do exactly?

25  A    We were asked by Allison, as like an assignment, to

SAM    OCR    RMR    CRR    RPR

Nicole - cross - Agnifilo                    4235

1   listen and transcribe things that Pam had said about life.  I

2   think -- all I know is that I was just supposed to write down

3   what I was hearing, like through a transcribing -- through

4   typing it.

5   Q    Okay.

6        Hadn't you said to Keith that anything that you

7   could do for the Pam memorial you'd be happy to do?

8   A    I don't know.  I don't remember saying that, but --

9   Q    I mean you -- I think you said before, before lunch, you

10  know, you're an empathetic person and your heart went out to

11  Keith because he was about to lose Pam, who you knew he had a

12  very long-term relationship with, correct?

13  A    Yes, I could imagine that would be hard for anyone.

14  Q    Right.  And the Pam memorial was something that you knew

15  meant a lot to Keith because you guys discussed it, right?

16  A    Yeah, I think we discussed it at one point; yes.

17  Q    And do you remember saying at one point to him:  You

18  know, if there's anything I can do as part of the memorial,

19  you know, kind of count me in type thing?

20  A    No.

21  Q    No, you don't think you ever said that to him?

22  A    I don't remember saying that.  And it wasn't -- the way

23  Allison put it, you had to do this by 5:00 a.m., which meant I

24  couldn't sleep because it had to be turned in by 5:00 a.m.

25  Like, was that ever necessary?

SAM     OCR     RMR     CRR     RPR

Nicole - cross - Agnifilo                4236

1   Q    And, what, there was a movie made, there was a movie made

2   about Pam's life?

3   A    I don't remember -- there were like different, like the

4   whole thing was set up like different stations that talked

5   about different parts of Pam's life.

6   Q    And what specifically did you work on, do you remember?

7   A    No.

8   Q    Okay.  And Souki worked on it as well, to your knowledge;

9   right?

10  A    I think so, but I can't be a hundred percent sure.

11  Q    Okay.  And a lot of people, from what you could see a lot

12  of people worked on Pam's memorial, right?

13  A    Well, I know everyone in my group had to.

14  Q    Okay, and in addition to people in your group, there was

15  a lot of work done by a lot of people, right?

16  A    I think so.

17  Q    Okay.

18  A    It was a big memorial.

19  Q    Right.  And this was all part of the memorial service for

20  Pam, for her passing, correct?

21  A    Yes.

22  Q    Did you really expect to be paid?

23  A    You sort of grew to not expect to be paid doing things in

24  NXIVM because often you weren't, but I don't remember thinking

25  about that.  I just remember that I -- that I was frustrated

SAM     OCR     RMR     CRR     RPR

Nicole - cross - Agnifilo                    4237

1   that it was given to me as such a short timeline and that we

2   had to turn it in and I had to stay up for 23 hours straight

3   to get it in, which, like -- and that it was used under DOS as

4   like an assignment.  That's what I was upset about.

5   Q    So you thought that you were helping commemorate Pam's

6   life as a DOS assignment?

7   A    Yeah, 'cause it was an assignment from Allison.

8   Q    Now, Allison and you would talk about all sorts of

9   different things; I mean Allison helped you with your career,

10  right?

11  A    Yeah.  In the beginning, yes, she set up those meetings

12  for me.

13  Q    Right, she set you up with a talent agency, right?

14  A    Yes.

15  Q    And did she get you an audition with a show, like a play?

16  A    An off-Broadway play.

17  Q    An off-Broadway play?

18  A    Hmmm.

19  Q    And you didn't think you should pay her for doing that,

20  right?

21  A    An introduction?

22  Q    I mean she was doing it because she was trying to help

23  you out as -- as friends or colleagues or however you want to

24  say it, right?

25  A    Yeah, I thought that was a little bit part of, like, what

1    the mentorship was supposed to be.  But also, yeah, I think in

2    the industry we always -- you always try to hook someone up if

3    you can, like give them a reference.  Because it's really hard

4    to get agency meetings, but if you have a reference it makes

5    it, like, so much easier, so...

6    Q    And you would all do favors for each other in the

7    community from time to time, right?

8    A    Yeah.

9    Q    Okay.  Now, just getting back to the issue of diet, was

10   it your understanding that Danielle was on a 1600-calorie-

11   a-day diet?

12   A    I think at one point because she worked out a lot, so I

13   don't know.  Yeah, I -- I couldn't tell you exactly how many,

14   because I was with India more, but I think that hers was

15   higher because she was like very -- she was very athletic and

16   she had a very athletic body type, so...

17   Q    Now, at one point were you working with two other women

18   to help them explore their sexuality through The Source tools?

19   A    Yeah, Allison had brought that up and thought it would be

20   a good idea for me; and I said, yeah, that's great.  I mean at

21   that point, I don't know, it's nice to help someone like feel

22   more comfortable if they're struggling because when you're

23   teaching Source classes, someone, like, brings an issue to you

24   and you might, like, help -- help them through that, but it

25   was at Allison's suggestion.

Nicole - cross - Agnifilo                    4239

1    Q    And the issue in this particular case that these two
2    women were contending with was the issue of sexuality, their
3    own sexuality?
4    A    Yeah.
5    Q    Okay.  And just tell the jury what you did.
6    A    I don't even remember.  I don't know, maybe I had them
7    work on a character that was comfortable with their sexuality
8    and that's one way to do it.  Like -- or like not even that,
9    'cause you could just do it with confidence.  Right?
10         So you just have someone practice, like, okay, like,
11   say you're doing a character that's really confident in her
12   body and she can just like kind of walk in her body.  Like how
13   would that feel?
14         I think what someone's looking for more in that
15   moment is confidence than -- than anything else.  They just
16   want to, like, feel good in their own body.  So it's like
17   okay, imagine you're playing a character that feels really
18   comfortable in their body.  Something like that.
19   Q    Right, but the term that you used specifically was not
20   confidence, it was sexuality.
21         You were helping these two people with their -- be
22   more sexual with their sexuality?
23   A    No, I mean that's not what I was actually doing.  It's
24   like the confidence, and then they can do what they want with
25   that confidence.

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4240

1          MR. AGNIFILO:  Give me one second.

2    BY MR. AGNIFILO:

3    Q    I want to show you -- now, you said that you did give

4    your phone to the Government and they got certain text

5    messages from your phone, correct?

6    A    Yes.

7    Q    All right.  I am going to show you what's been produced

8    in discovery.

9          MR. AGNIFILO:  This is Defense Exhibit 919, just for

10   the witness.

11         THE COURT:  Go ahead.

12   Q    Just for the time being, I am going to have you focus on,

13   just read it to yourself, it's that part right there.

14   (Indicating.)

15   A    (Witness complies.)  Okay, yes.

16   Q    Do you remember -- do you remember saying that you felt

17   like you were suppressing your own sexuality at different

18   times?

19   A    Yeah, I was.

20   Q    And do you remember this being an assignment with helping

21   these two women not suppress their own sexuality, be able to

22   express it more openly?

23   A    No, I don't.  I think it was just through The Source

24   classes Allison said:  Hey, these girls want to work on

25   sexuality; which, to me, in terms of the The Source and acting

Nicole - cross - Agnifilo                    4241

1    meant they want to work on characters.  Because the reason why
2    you would want to work on your sexuality in The Source would
3    be for character work.
4            So one of the -- one of the women, she was -- she's
5    beautiful and she would go out for a lot of sexier characters
6    and sometimes that, like, feels uncomfortable being in an
7    audition room like that, you know.
8            So I don't think we were working on suppressing.  I
9    think that was a different thing that I was saying.
10   Q    Now, you and Keith would talk about many different
11   topics, including movies, correct?
12   A    Yes.
13   Q    And you enjoy movies, you enjoy watching movies?
14   A    Of course.
15   Q    And one of the movies you and Keith discussed is the
16   movie Life is Beautiful, right, do you remember that?
17   A    Yes.
18   Q    And do you remember you and Keith discussing that it was
19   one of the more beautiful movies that each of you had seen?
20   A    Yes.  I remember I told Allison that I really loved that
21   movie.  It's a very beautiful movie.  And she said:  Oh,
22   that's Keith's favorite movie, you should talk to him about
23   it.  And we did talk about it.
24   Q    And do you recall if you had certain insights between --
25   well, let me just, in a nutshell, what's the movie about?

SAM      OCR      RMR      CRR      RPR

Nicole - cross - Agnifilo                    4242

1     Can you give us a quick -- a quick rundown of what
2  the movie is about?
3  A    Yeah.  So, it's about World War II and a family in Italy
4  gets taken to the concentration camps and the mom gets
5  separated from the dad and the son.  And the dad -- sorry,
6  it's just really emotional.  The dad, like, protects the son
7  through the whole story so he -- he doesn't know what's going
8  on.  They're in a concentration camp and yet he's trying to
9  protect his son, so he makes it into a game and, like, just
10  constantly puts himself at risk so that he can -- can shelter
11  his son from, like, the horrors that are going on in the
12  concentration camp.  And it's very -- it's very beautiful, but
13  it has a very sad ending.
14  Q    And do you remember you and Keith having a discussion
15  about that the commitment that the father had to his son, even
16  though it was painful and ended in pain, is kind of the same
17  kind of commitment that Keith is talking about, you know, when
18  it comes to DOS?
19  A    No.
20  Q    Do you remember having a conversation with Keith about
21  the father's commitment , the father's commitment to his son
22  from the movie?
23          MS. PENZA:  Objection, Your Honor.
24          THE COURT:  You can answer that question.
25  A    I mean not specifically, but I -- I don't -- I don't

SAM     OCR     RMR     CRR     RPR

Nicole - cross - Agnifilo                                4243

1    know.  I don't remember what we had talked about, except that

2    he liked the movie as well.

3              MR. AGNIFILO:  Bear with me one second.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nicole - cross - Agnifilo                                4244

1   BY MR. AGNIFILO:  (Continuing.)

2           MR. AGNIFILO:  I'm sorry, just give me one second,

3   Judge.

4   Q    I'll come back to it.

5           Do you remember you and Keith exchanging e-mails

6   about this?

7   A    No -- I do remember that he likes the movie as well.  I

8   don't remember what we talked about concerning it.

9   Q    Do you remember trying to schedule pizza nights between

10  you and Keith at the library?

11  A    I did that once and it was at another time when I was

12  really trying to make things work and I thought, hey, if I'm

13  going to do this and, like, this is my future, I would like to

14  have it -- because nothing that ever happened symbolized any

15  kind of -- I don't know.  It was always kind of, like,

16  uncomfortable and I thought I was never going to go on a date

17  again.  So that's what I thought.  I thought, well, why don't

18  I make it a date.  I also -- it never had happened but it was

19  one of my ideas for how to make things less awkward or try to

20  make that work.

21  Q    So you were doing things to try to sort of make -- make

22  the relationship better, bring you guys closer, fair to say?

23  A    At points in time where I didn't think that I had another

24  option, yes.  Yes.

25  Q    And what date were you branded, do you remember?

SN        OCR        RPR

1   A    I think around January 9, 2017, but I'm -- somewhere

2   around there.

3   Q    You're not sure of the exact date?

4   A    No.

5   Q    Do you remember sending Keith a text that it would be

6   good for the two of you to have sex before you were branded?

7   A    I have seen that text and it doesn't really make sense to

8   me, but I have seen that text.

9   Q    In the actual text you don't use -- you use, I would like

10  to F before I get branded?

11  A    Yeah, but it's weird because I say it in quotations and

12  it's also not how I normally speak so I don't know.  It just

13  seems weird.

14       MR. AGNIFILO:  This is Defense 922 for

15  identification only.

16       THE COURT:  Go ahead.

17  Q    My question when you've had a chance to read it is, "I'd

18  like to fuck before I get branded"; right?

19  A    Yes.

20  Q    Why did you say that to him?

21  A    No idea.

22  Q    You say, "It would be trickier after the branding";

23  correct?

24  A    Yes.

25  Q    And do you remember sending this to him on or about

SN        OCR        RPR

Nicole - cross - Agnifilo                                    4246

1   January 9, 2017 many?

2   A    I don't remember sending it but I will trust the phone.

3   Q    Okay.  Now do you say similar things at other times,

4   maybe not using the exact words or that particular words,

5   other things at other times indicating that you wanted to have

6   sex with Keith?

7   A    I don't remember.

8   Q    How many times would you say that you spent the night at

9   the library?

10  A    Quite a few times.

11  Q    10 times, 20 times, more or less?

12  A    Let me think.  Maybe, like, 20 times, somewhere around

13  there.

14  Q    Okay.  Do you remember sending him a text message on

15  Valentine's Day 2017?

16  A    I do.

17  Q    Do you remember what you wrote?

18            MR. AGNIFILO:  Objection.

19  A    Happy Valentine's?

20            MS. PENZA:  Your Honor --

21            THE COURT:  Did you say something?

22            MS. PENZA:  I said "Objection."

23            THE COURT:  I did not hear you.  Speak up.

24            MS. PENZA:  I'm sorry, Your Honor.  I will.

25            THE COURT:  Sustained.

Nicole - cross - Agnifilo                                    4247

1    BY MR. AGNIFILO:

2    Q    Do you remember specifically remember what you said to

3    him on Valentine's Day, 2017?

4    A    No, not the exact words.

5    Q    All right.  I'm going to show you --

6             MR. AGNIFILO:  Just for the witness, 927.  Defense

7    927.

8             MS. PENZA:  Your Honor, may we have a sidebar before

9    the next question?

10            THE COURT:  All right

11            (Sidebar held outside of the hearing of the jury.)

12            (Continued on next page.)

```
                        Sidebar                       4248
```

 1          (The following sidebar took place outside the
 2   hearing of the jury.)
 3          THE COURT:  What is the problem?
 4          MS. PENZA:  Your Honor, again, I just don't think
 5   that she's -- I think that Mr. Agnifilo can ask a question
 6   about whether there was a sexual message sent on Valentine's
 7   Day and then refresh her recollection and get that, but to
 8   elicit the exact words I think is hearsay and I don't think --
 9          THE COURT:  It is hearsay and I do not want to
10   debate it.  So --
11          MR. AGNIFILO:  But I'm not offering it for the
12   truth.  I don't think -- it's not capable of being true or
13   false.  It's all about the statement and the nature of the
14   statement, you know.
15          THE COURT:  Well, the statement itself is hearsay.
16          MR. AGNIFILO:  It's not hearsay because he can't
17   possibly be a six and she can't be a nine.  So it's not
18   hearsay because it's not offered for the truth.
19          MS. PENZA:  Just because there is a euphemism for
20   performing oral sex together does not make it not hearsay just
21   because she's not literally the number six.
22          MR. AGNIFILO:  It's not being offered for the
23   truth --
24          THE COURT:  You can ask the question in such a
25   question that does not require the exact words to be provided

Sidebar                                                        4249

1   and, then, if she says she does not remember, you can show her

2   the document and then you can ask her the question again and

3   you're stuck with the answer.  Either the answer is, yeah,

4   that refreshes my recollection; I said we're -- I was looking

5   forward to having oral sex with the defendant or it doesn't

6   refresh my recollection.  I think that is basically the way I

7   learned it.  But, you know, I do not know how you learned it.

8           MR. AGNIFILO:  And I'm not going to elicit -- this

9   person's sensibility and her sense of her own sexuality is

10  relevant and there's nothing wrong with it.

11          THE COURT:  You are way down the road on that

12  subject.  I do not think that you have been hamstrung in

13  finding out, you know, what her sexual sensibilities are.

14  She's been telling you that for the last two days, so --

15          Any questions?

16          MS. PENZA:  No.  I just want to raise that this is

17  about a year after the incident with the table that she's

18  already testified to so I think it's also highly misleading at

19  this point.

20          THE COURT:  I understand.  Try to do it my way and

21  then -- you know, like I have said a dozen times at least, you

22  have made your record.  All right?  Thank you.

23          MR. AGNIFILO:  Thank you.

24          (Sidebar ends.) (Continued on next page.)

25

                        SN       OCR       RPR

1    (Continuing.)

2            MR. AGNIFILO:  I'm going to show this just to the

3    witness, Your Honor.

4            THE COURT:  Go ahead.

5    BY MR. AGNIFILO:

6    Q    This is Defendant's Exhibit 927.  Do you recall sending

7    Mr. Raniere a highly sexualized message on Valentine's Day

8    2017?

9    A    Vaguely, but I was just trying to make him laugh.  It

10   wasn't like -- it wasn't supposed to be sexual.  It was just

11   supposed to make him laugh because this was, like, at a time

12   when Pam was -- the memorial for Pam was happening and I tried

13   to be nice and I looked up, like, Valentine's Day, like,

14   sayings.  And this one seemed appropriate for him.  It does

15   not mean I was interested in it, I thought it might make him

16   laugh.

17   Q    So, regardless of whether you're interested or not, do

18   you recall what you said?

19   A    I mean, I can see it on the screen.

20   Q    Is that what you wrote?  Is that what you recall?

21   A    I don't recall.  I mean, yeah, it looks like I wrote

22   that.

23   Q    And you're saying you were being -- you were being -- you

24   sent him this very sexualized message to make him feel better?

25   A    To make him laugh.

Nicole - cross - Agnifilo                    4251

1   Q     Right, because it was a sad --

2           THE COURT:  Sorry?

3           MR. AGNIFILO:  I thought Your Honor said something.

4           THE COURT:  No.

5           MR. AGNIFILO:  Okay.

6   BY MR. AGNIFILO:

7   Q     But at this point you and he were having an intimate

8   relationship; correct?

9   A     Sort of, if you call it that.

10  Q     What do you call it?

11  A     I don't know.  I don't think there's an actual name for

12  it.

13  Q     You said that you spent how many nights at the library?

14  A     Like 20.

15  Q     And you were having intimate contact with him; correct?

16  A     Sometimes.  Not every time I was in the library.

17  Q     Understood.  But sometimes in the library you were;

18  right?

19  A     Yeah.

20  Q     And you were going on walks together; right?

21  A     Yeah.

22  Q     And you even had issues at the time with your boss that

23  you had Keith help you with; correct?

24  A     Yes, but it sort of benefited them as well.  Allison and

25  Keith as well because then I had a schedule that was set and I

Nicole - cross - Agnifilo                         4252

1   wasn't, like, so spastically running back and forth.

2   Q    Right.  Your boss at the Tao Group was named ███████;

3   right?

4   A    Yeah.  Why is it important what my boss's name was?

5   Q    Because you showed Keith e-mails that you were sending

6   your boss so that Keith could help you with them; correct?

7               MS. PENZA:  Your Honor --

8               THE COURT:  The name of the boss -- she had a boss.

9   It could have been Neville Chamberlain for all we know.  She

10  admits she had a boss.  The testimony remains.  The name is

11  stricken.

12              MR. AGNIFILO:  Fine, fine.

13  BY MR. AGNIFILO:

14  Q    And, so, you -- my point is that you and Keith had

15  interactions about a lot of different things, in addition to

16  having an intimate relationship; right?

17  A    Yeah.  He was my grand master.

18  Q    Okay, but you -- you're being sweet to him and he's being

19  sweet to you.  Wasn't Keith sweet to you?

20  A    Sometimes.

21  Q    Did Keith ever yell at you?

22  A    No.  Him and Allison sort of like -- Allison yelled at me

23  and Keith would be nice to me.

24  Q    Right, I didn't ask Allison.  Keith.  Did Keith ever

25  raise his voice to you in anger?

SN        OCR        RPR

Nicole - cross - Agnifilo                    4253

1    A    No.

2    Q    Did Keith ever speak meanly to you or call you a name or

3    make you, you know, feel bad about yourself by being mean to

4    you and aggressive or anything like that?

5    A    He definitely made me feel bad about myself sometimes.

6    Q    He never threatened you; right?

7    A    No, that's not his thing.  He lets other people take care

8    of that.

9    Q    But I'm asking very specific questions.

10   A    Yeah, no.

11   Q    When Keith was with you -- when you and Keith were

12   together, he was always sweet to you; is that true?

13   A    Mostly.

14   Q    Okay.  If you wanted to talk to him about something, he

15   would talk to you about that thing; right?

16   A    Yes.

17   Q    And when you went on these walks sometimes there were

18   things that you wanted to talk about and you would talk about

19   those topics; right?

20   A    Sometimes.

21   Q    And then sometimes there were things that Keith wanted to

22   talk about and then you would talk about those topics; right?

23   A    Yes.

24   Q    And when you wanted to stay in the library did Keith ever

25   say no to you?

Nicole - cross - Agnifilo                4254

1  A    Yeah -- but -- a couple of times for various reasons but

2  it -- it's also just, like, draining on you to have to ask

3  permission to ask to stay somewhere, like, every time.  I did

4  not particularly like that.

5  Q    Right, because that -- that's -- that's where he was.  I

6  mean, it wasn't your house; right?

7  A    No.

8  Q    So you were staying there for free.  He never asked for

9  rent from you; right?

10  A    No.

11  Q    And, in fact, when you were nervous about your own

12  financial situation, he gave you access to money; right?

13  A    Yes.

14  Q    And do you recall -- do you recall one night making a

15  $5,000 tip at your job?

16  A    I mean, not particularly but also that's not exactly how

17  it works because there's 13 waitresses and when you make a tip

18  like that, then it's, like, divided up between everyone so it

19  was a very exciting night, but that's definitely not what I

20  made.

21  Q    But someone -- you didn't get the whole thing, but

22  someone gave you a $5,000 tip?

23  A    Sure, probably on, like, a $20,000 bill.

24  Q    Okay.  So, you would have to split the $5,000 tip with a

25  number of other people; right?

Nicole - cross - Agnifilo                    4255

1   A    Yeah.

2   Q    Did you go back to Keith and say, you know what, I don't

3   need $40 for the train because I got a 13th of a $5,000 tip?

4   A    Why would I have done that?

5   Q    So you didn't do it?

6   A    No.

7   Q    Right?

8   A    Right.

9   Q    Because you had complained to Keith how much you needed

10  money.  You would always go to him, I don't have enough money.

11  This is stressing me out; right?

12  A    Well, I didn't phrase it like that.

13  Q    How did you phrase it?

14  A    I think I was frustrated at The Vow and DOS and I was

15  frustrated with having to come up to Albany every week when I

16  had other bills, too, and I was trying to, like, again, build

17  my life and so I was frustrated about having to spend all of

18  this money coming up and down and that was part of what --

19  what I was using the money that he gave me for.

20  Q    Right.  And so to stop you from being frustrated he gave

21  you access to this money; right?

22  A    Yes.

23  Q    But you were making your own money.  You were making

24  money working in the nightclub; right?

25  A    Yeah.

SN        OCR        RPR

Nicole - cross - Agnifilo                    4256

1   Q    And on this one particular occasion you got a $5,000 tip
2   that had to be split and you never said to Keith, you know
3   what, I don't need your $40.  I got a 13th of a $5,000 tip?
4   A    I probably put it towards my rent.
5   Q    I'm not asking what you did with it.  I'm asking if you
6   mentioned to Keith that you got this very large -- how many
7   $5,000 tips did you get?
8   A    I don't know.  Like me, personally, working there?  I
9   have no idea.  It's a nightclub.  There's a lot of money that
10  comes through it.
11  Q    So maybe five or ten times you got $5,000 tips?
12  A    No, no.
13  Q    Give me an idea.
14  A    Maybe five -- I have literally no idea.
15  Q    You said maybe five?  I just didn't hear what you said.
16  A    I said I have no idea.
17  Q    But you remember this one particular time; right?
18  A    Not -- not specifically, no, but -- I don't specifically
19  remember that night.
20  Q    I don't mean remember the date, but do you remember
21  getting a $5,000 tip?
22  A    I don't.
23  Q    Okay.
24  A    Also I was still paying Allison back for The Source.  So
25  when I got extra money I then wrote it to Allison to pay her

SN        OCR        RPR

Nicole - cross - Agnifilo                    4257

1    back for The Source, so --

2    Q    And of the $10,000, how much did you spend?

3    A    I believe it ended up being 3,050, if I remember

4    correctly.

5    Q    And you kept track; right?

6    A    I did.

7    Q    Okay.  And did you pay any of that back?

8    A    I did not.

9    Q    Did you bring someone into DOS?

10   A    No.

11   Q    Did you speak to someone about bringing them into DOS?

12   A    Not -- not -- I did, like, one very, very first step, but

13   it never went anywhere further than that.

14   Q    Tell us what was the first step that you did.  Was this

15   around May, early May, 2017?

16   A    Yes.

17   Q    Okay.  So tell us what happened.

18   A    I asked my friend whether she, like, had any interest in

19   like, being mentored.

20   Q    By you?

21   A    I don't even know if I got that far.  Maybe just in

22   general.

23   Q    And I'm not asking names but, like, who was this person

24   to you?

25   A    She's another actress who I really care about.  She's

1    awesome.

2    Q    And it never came to pass?

3    A    Thank God, no.

4    Q    I'm just --

5    A    It's very stressful on me.  I'm sorry.

6    Q    So you had these preliminary conversations with this

7    other actress; right?

8    A    Yes.

9    Q    And did you ever have a secondary conversation?

10   A    No.

11   Q    Did you tell Allison that you were having these

12   conversations?

13   A    I had to, so, I told -- yes.

14   Q    Now, at some point -- withdrawn.

15         For a while, Allison knew nothing about your

16   relationship with Keith from you?

17   A    Yeah, Keith asked me not to say anything.

18   Q    Okay.  And for a while you didn't tell Allison you had an

19   intimate relationship with Keith; correct?

20   A    Correct.

21   Q    And then at a certain point did you tell him?

22   A    I think it's -- towards the end -- because I was

23   obviously very stressed out.  Like I said in my direct, I

24   would get really stressed out that I didn't have anyone to

25   talk to about what was happening between Keith and I.  So I

Nicole - cross - Agnifilo                    4259

1    didn't have anyone to talk to and then I think eventually he

2    gave me permission to talk a little bit more to Allison about

3    it.  But it was very close to when I left, so I don't remember

4    actually going into it much at all.

5    Q    At some point you realized -- let me back up.  In the

6    spring of 2017 a number of people started to leave NXIVM and

7    DOS; correct?

8    A    Yes.

9    Q    And I think one of the people you said on direct

10   examination was someone named Sarah Edmondson; correct?

11   A    Correct.

12   Q    And a number of other people left as well; correct?

13   A    Yes.

14   Q    And at some point you realized you didn't want to remain

15   in DOS; right?

16   A    Correct.

17   Q    And you spoke to Allison about leaving DOS; correct?

18   A    Correct.

19   Q    And Allison said you can leave and your collateral

20   wouldn't be released; correct?

21   A    It didn't quite go down that simply but, correct.

22   Q    Tell me how it went down.

23   A    I believe I explained it indirect, but there was a series

24   of things that happened and then we were in the car driving

25   and she got frustrated with me and she said, like, Why don't

Nicole - cross - Agnifilo                    4260

1   you just leave.  And I was like, what do you mean?  Because my

2   family.  And she said, well, what if your collateral would be

3   released.  And I was -- I mean, I was -- just trying to

4   process that and so that's a little more about how it went

5   down.

6   Q     And do you remember sending Allison an e-mail around June

7   20, 2017?

8   A     The e-mail that I was leaving?  Is that what you're

9   referring to?

10  Q     Yes.

11  A     Yes.

12  Q     Okay.

13          MR. AGNIFILO:  Your Honor, I don't believe this is

14  in evidence.  I'm going to show it to the witness for

15  identification purposes.

16          THE COURT:  Go ahead.

17          MR. AGNIFILO:  It's Defense 936 for identification.

18  Actually give me one second.

19          (Pause in proceedings.)

20  BY MR. AGNIFILO:

21  Q     All right.  I'm going to show you 936.  Let me make it

22  bigger so you can see it.  That's from you to Allison Mack on

23  June 20, 2017?

24  A     Yes.

25  Q     And it goes through that whole page and it goes on to the

SN        OCR        RPR

Nicole - cross - Agnifilo                    4261

1    second page; correct?

2    A     Yes.

3              MR. AGNIFILO:  Your Honor we offer it at this time.

4              MS. PENZA:  Objection.

5              THE COURT:  Sustained.

6    BY MR. AGNIFILO:

7    Q     This is your statement of your reasons for leaving DOS;

8    right?

9    A     It was an e-mail that I wrote to Allison when I was

10   leaving.

11   Q     And at this particular time you had already had the

12   conversation with Allison about the fact that your collateral

13   would not be released; right?

14   A     Yes.  So I was just reiterating it here.

15   Q     Okay.  And what were you saying?

16   A     That I was leaving because my collateral would not be

17   released.

18   Q     And you --

19   A     And I wanted to take responsibility for my own life.

20   Q     And you expressed that you were thankful to her; correct?

21   A     Yeah, I do write that.

22   Q     I think -- and you expressed being thankful to Keith as

23   well; correct?

24   A     Can I see the second page again?

25              (Continued on the following page.)

SN        OCR        RPR

Nicole - cross - Agnifilo                    4262

1   CROSS EXAMINATION

2   BY MR. AGNIFILO:  (Continuing)

3   Q    Sure.

4   A    I feel like it's much more to Allison.

5   Q    Okay.  But at one point, do you agree with me, you

6   express to Allison that the hardest thing was to let Allison,

7   India and Keith down; correct?

8   A    Yeah, because they made it feel like, if I was leaving, I

9   was letting everyone down and it just felt like a lot of

10  pressure on me.

11  Q    And you go on to say that you are eternally thankful for

12  everything that you guys have done for you and that they've

13  taught you; correct?

14          MS. PENZA:  Objection, Your Honor.

15          THE COURT:  You may answer.

16  A    You guys could be referring to Allison and India.

17  Q    You agree that you had just made reference to Allison,

18  India and Keith in the previous sentence?

19  A    Yeah, I did.

20  Q    And you were thankful for the unconditional love that

21  Allison showed you; correct?

22  A    I was completely misguided as to what had actually

23  happened.

24  Q    I am just asking what you communicated to Allison when

25  you were leaving DOS.

MDL      RPR      CRR      CSR

Nicole - cross - Agnifilo                                    4263

1   A    Yeah, I was writing this kind e-mail.  I also didn't want
2   to upset anyone before I left.
3   Q    Now, at one point, I think on direct examination, you
4   told us about the last time -- I guess the last time you saw
5   Keith, which is around June 26, 2017, does that sound about
6   right?
7   A    Yes.
8   Q    And you rented a car?
9   A    I did.
10  Q    And you drove up to Albany?
11  A    I did.
12  Q    When you got up to Albany, who did you see before seeing
13  Keith?
14  A    Allison, India, Michelle and Danielle.
15  Q    And then, for a while, you were waiting for Keith?
16  A    Yes.
17  Q    Was it volleyball?
18  A    Yes.
19  Q    Was it a Friday?  Do you remember?
20  A    I thought it was a Monday or a Tuesday, but...
21  Q    Okay.  They played volleyball on different days?
22  A    I think so.
23  Q    All right.  So you were waiting for Keith for a while,
24  and you're getting sick of waiting, and you are communicating
25  to him in writing that you're thinking about leaving soon;

MDL        RPR        CRR        CSR

1  correct?

2  A    Yeah, I was super frustrated.  I felt it was like I tried

3  to give them the exact times I would be up there and I felt

4  like it was just, like, another one of his tactics to just

5  make me wait around, like, all night and I didn't appreciate

6  that.

7  Q    All right.  Did you tell him that he added to your life?

8  A    That night?

9  Q    Yeah.

10  A    I don't remember.

11  Q    Did you tell him that he taught you so much?

12  A    Umm...

13  Q    In the written communication?

14  A    Oh, I have no idea.

15  Q    Did you tell him that you would always cherish the walks

16  that you and he had?

17  A    I don't know.

18  Q    Now, when you saw him, where were the two of you when you

19  saw each other on June 26th?

20  A    The normal area that you walk, like, it's like a loop

21  around Allison's house, Clifton Park.

22  Q    This is fairly early in the morning?  I mean like two or

23  three a.m.-type thing?

24  A    Yeah, I think he was three -- somewhere around three.

25  Q    And eventually you did see Keith?  Right?

Nicole - cross - Agnifilo                                              4265

1    A    Yes.

2    Q    And I think you said, on direct examination, he asked you

3    if he was ever going to see you again?

4    A    Right.

5    Q    Right?

6    A    Yes.

7    Q    And I think you also said he asked you if he was ever

8    going to speak to you again; right?

9    A    Yes.

10   Q    And I think he also asked you if you were going to say

11   bad things about him; right?

12   A    Right.

13   Q    He didn't raise his voice with you; right?

14   A    It's not his style.

15   Q    Did he seem sad?

16   A    Yeah, but he is kind of like always -- the world was

17   always weighing on him in some way or another.

18   Q    He was always a little sad?

19   A    Yeah.

20   Q    Did he seem especially sad when he was talking to you at

21   the idea that he may never see you or speak to you again?

22   A    Maybe.

23   Q    Because you were -- the two of you were standing next to

24   each other; right?

25   A    Yeah.

Nicole - cross - Agnifilo                    4266

1   Q    Did he say he was sad?  Did he actually say the words I'm
2   sad that I'm never going to see you and speak to you again?
3                MS. PENZA:  Objection.
4                THE COURT:  You may answer.
5   A    I don't remember.
6   Q    And then you -- how long would you say this last
7   conversation was between the two of you?
8   A    I don't know, like my adrenaline was pretty high at that
9   point, and I remember I was pretty nervous.  So the timeline,
10  I only remember very little of that last walk, so I'm not
11  sure, but it... I think I started driving home around 4:00, so
12  maybe it was an hour.  4:00 or 5:00, I don't know.
13  Q    And do you remember when you got home at 7:40 in the
14  morning, you sent him a message that you got home safely?
15  A    No, I don't remember that.
16  Q    No?
17  A    I remember he sent me a message, a quote from Man's
18  Search for Meaning, which, I don't know, I found kind of
19  annoying because it -- it takes man's search for meaning out
20  of context, which is also what they did a lot is take great
21  writers and great thinking concepts and take them a little bit
22  out of context, which messes with your head.  I remember
23  getting that text, but...
24  Q    Do you remember that being the next day?
25  A    I thought it was right when I got home that I had that

Nicole - cross - Agnifilo                    4267

1   text, but I couldn't tell you exactly when.

2   Q    And after that, have you spoken to him?

3   A    No.

4   Q    And for a while you weren't really talking to anybody.

5   So we are talking like, you know, in the summer of 2017, so,

6   you know, July into August, you're really not -- you're just

7   kind of laying low, fair to say?

8   A    Kind of laying low and I put myself in therapy.

9   Q    And do you recall, at some point in late August, getting

10  a message from Mark Vicente's wife Bonnie?

11  A    I remember her sending me one nice text, saying like I

12  hope you're okay, if you want to reach out and talk, I'm here

13  for you.  But, again, I just kind of wanted to stay away from

14  everything, so I didn't talk to anyone.

15  Q    Do you remember --

16  A    I appreciated it, though.

17  Q    Do you remember having communications with Catherine

18  Oxenberg on October 31, 2017, around then?

19  A    I don't remember exactly when, but I did talk to

20  Katherine at some point.

21  Q    And then you guys met in the City?

22  A    Umm, yeah.

23  Q    And at that point, was India still in DOS, to your

24  knowledge?

25  A    Umm, to my knowledge, yes.

Nicole - cross - Agnifilo                    4268

1   Q    Okay.  And is that one the things that you discussed with

2   Katherine Oxenberg when you met her for lunch?

3   A    Yes.

4   Q    And at one point, Katherine Oxenberg gives you names of

5   people that you can talk to; do you remember that, on November

6   3rd?

7   A    No.

8   Q    Do you remember the name Rick Ross?

9   A    Oh, yeah.  I never talked to him, though.

10  Q    Okay.  And do you remember the name Neil Glazer?

11  A    Yeah, that's my lawyer.  But I don't think I got it from

12  Katherine.

13  Q    Do you remember Katherine sending you Neil Glazer's name

14  and contact information?

15  A    I do.  Sorry, I thought it was Jay that had sent that.

16  But maybe, I -- I did get Neil's information.

17  Q    And then another lawyer named Art Middlemiss, do you

18  remember that name?

19  A    No.

20  Q    And why are you -- what are you going to do with these

21  three names?  Why are you getting three names from Katherine

22  Oxenberg?

23  A    Well, what I was told at the time was that Rick Ross was

24  like a specialist in --

25          MS. PENZA:  Objection.

MDL      RPR      CRR      CSR

Nicole - cross - Agnifilo                    4269

1          THE COURT:  Sustained.

2   Q    Again, I'm not asking about any conversations you had

3   with people.

4          At the time, were you looking for a lawyer?

5   A    Yeah, I was thinking, as like the letter that you saw

6   earlier today or yesterday, I can't remember, I was -- yeah, I

7   mean, look, when I came out, like everything was kind of crazy

8   and Mark Hildreth kept saying to me, like, you should get a

9   lawyer, and I just wanted to stay out of all the drama.  But,

10  like, eventually it was kind of, like, okay, now I would like

11  to protect myself.  Like, just things were still weird and I

12  didn't want to get caught in some crazy crossfire of not

13  knowing my rights, and also they did still have my collateral

14  and I was sort of feeling like safe enough to be, like, okay,

15  do I have rights for that?  I didn't understand, like -- it

16  was just so overwhelming, so definitely getting a lawyer

17  seemed like the responsible thing to do.

18  Q    Was there talk about a civil lawsuit against NXIVM and

19  Keith Raniere?

20  A    No.

21  Q    Do you remember having a conversation with Frank Parlato

22  in November of 2017?

23  A    Not particularly in November, but I had a couple

24  conversations with him.

25  Q    And did he call you or did you call him?

Nicole - cross - Agnifilo                 4270

1   A     Originally, I e-mailed him to have him take me off of all

2   the things on his site, because I did not want anything to do

3   with anything, anything NXIVM related, anything DOS related.

4   I just wanted to move on with my life and he said that I

5   needed to call him for him to take the stuff down and I,

6   unfortunately, did not have a lawyer yet, so I tried to handle

7   things myself.

8   Q     And did he pressure you to be involved in a lawsuit?

9   A     In like a civil lawsuit?

10  Q     Yes.

11  A     No.

12  Q     Do you remember telling that to the FBI?

13        MS. PENZA:  Objection.

14  A     No.

15        THE COURT:  You may answer that.

16  A     Can you repeat the question?

17  Q     Sure, do you remember telling the FBI that Frank Parlato

18  pressured you to join a lawsuit against NXIVM?

19  A     No.

20  Q     Okay, I'm just going to show you something.  I'm just

21  going to show you one page and have you read it to yourself.

22        This is 3500-N, number one, it's page 4 of that

23  document.

24        THE COURT:  All right.

25  Q     I'm just going to have you read this to yourself.

MDL       RPR       CRR       CSR

Nicole - cross - Agnifilo                    4271

1   A    Okay.

2   Q    Do you remember telling the FBI -- this is your first

3   interview with them, so it would have been on November 9,

4   2017, that Frank Parlato was pressuring you to join a lawsuit

5   against NXIVM and also speak with law enforcement regarding

6   NXIVM?

7            MS. PENZA:  Objection, Your Honor.

8            THE COURT:  I will allow it.

9   A    Yeah, he was.  He was scaring me.

10  Q    All right, so tell us --

11  A    But not a lawsuit.  Sorry.  I'm sorry.  He was pressuring

12  me to talk to people and to tell him information.  He said at

13  one point he had my collateral.  It was like -- I was -- oh,

14  my God.  It was incredibly -- it was like again?  I have to go

15  through this again?  Like are you kidding me right now?  And

16  at that point I got a lawyer, because I was like I cannot do

17  this again.  Someone else can not be telling me that they have

18  my collateral, like this is unbelievable.

19           So I got scared.

20  Q    Okay.

21           THE COURT:  I'd like to have a sidebar.

22           MR. AGNIFILO:  Yes, sure.

23           (Sidebar held outside the hearing of the jury.)

24           (Continued on the next page.)

25





Nicole - cross - Agnifilo                4274

1        THE COURT:  Okay.  Nicole, I have a quick question

2   for you.

3        THE WITNESS:  Yes.

4        THE COURT:  The last question that was asked by

5   counsel, do you have any evidence or indication that Mr.

6   Parlato's claims are true or not true?

7        THE WITNESS:  No, I have no idea.

8        THE COURT:  So you have no idea whether he has the

9   material or does not have the material or where the material

10  is?

11       THE WITNESS:  I don't know.

12       THE COURT:  It hasn't been returned to you?

13       THE WITNESS:  No.

14       THE COURT:  Okay.  I wanted to make that clear for

15  the jury, that people make claims that may not be true, and

16  you have no independent knowledge of whether his claim is

17  accurate or inaccurate or made up of whole cloth.

18       THE WITNESS:  Yeah, I don't know.

19       THE COURT:  All right.  Thank you.

20       Let's keep going.

21  BY MR. AGNIFILO:

22  Q    Fair to say, you took what Mr. Parlato said to you as a

23  threat?  Is that fair?

24  A    I was just very uncomfortable, yeah.  Well, I was very

25  uncomfortable with the situation and I... yes.

Nicole - cross - Agnifilo                                    4275

1    Q    And what did Mr. Parlato ask you to do?  What do you

2    recall him asking you to do?

3              MS. PENZA:  Objection.

4              THE COURT:  Sustained.

5    Q    All right.  Following up on -- just following up, because

6    you -- I had asked you initially, and I want you to tell me

7    what you remember and don't remember, if you had told the FBI

8    that Frank Parlato was pressuring you to join a lawsuit

9    against NXIVM?

10             Do you remember when I asked you that question?

11             THE COURT:  I will allow that question.

12   A    Yeah, I have no recollection of that.

13   Q    Now, this is the second question:  Do you remember

14   telling that to the FBI?

15             Regardless of whether you remember Frank Parlato

16   saying that to you, do remember telling that to the FBI?

17   A    I don't.

18   Q    Your first interview, you don't remember?

19   A    No.

20   Q    Second question:  Do you remember Frank Parlato telling

21   you that you should go to law enforcement because of what

22   happened to you?

23   A    Yeah, I do remember him telling me that.

24   Q    Okay.  And you told that to the FBI as well; correct?

25   A    Yeah.

Nicole - cross - Agnifilo                    4276

1   Q    Now, you said that you had several conversations with

2   Frank Parlato; is that right?

3   A    Yeah.

4   Q    Are these all in sort of a limited period of time or do

5   you talk to him over a course of weeks or so?

6   A    I feel like it was all in a very limited period of time.

7   Q    Okay.

8   A    I tried to cut that off as fast as possible.

9   Q    And your lawyer, Mr. Glazer is here today, right?  He is

10  the gentleman, my colleague here to my left, right?

11  A    Yes.

12  Q    Are you intending to bring a civil suit?

13  A    No.

14  Q    No?

15  A    No.

16  Q    You have no intentions of bringing a civil suit?

17  A    Like me, personally?

18  Q    You and other people.

19  A    Not me, personally.

20  Q    Do you intend to be part of a class-action lawsuit?

21  A    No.

22  Q    I'm not -- I am going to ask you the question, I'm not

23  asking you for anything that you and Mr. Glazer discussed,

24  okay, so when I ask you this question, it is not conversations

25  between you and Mr. Glazer, okay?

Nicole - cross - Agnifilo                                    4277

1    A    Okay.

2    Q    Have you discussed with anybody else the prospect of

3    bringing a class-action lawsuit against NXIVM?

4    A    No.

5    Q    You haven't discussed with Jay, for instance?

6    A    No.  No.

7    Q    When was the last time you spoke to Mark Vicente?

8    A    I couldn't -- a long time ago.  I haven't spoken to him

9    since I left or anything.

10   Q    Do you recall having a conversation with Souki about the

11   making of a documentary?

12   A    Yeah, she mentioned it to me.

13   Q    Okay.  And you have not played any role in that?

14   A    No.  I don't want anything to do with it.

15   Q    Understand.  Do you remember you and Souki discussing a

16   20/20 episode, the show 20/20, the TV show?

17   A    No.

18   Q    Do you remember that there was a broadcast about NXIVM on

19   20/20?

20   A    I do.  I didn't watch it.

21   Q    I'm not going to get into anything that was said; I just

22   want to ask if you had certain conversations.

23        At a certain point you started speaking to the FBI

24   and the U.S. Attorney's Office; correct?

25   A    Correct.

MDL        RPR        CRR        CSR

Nicole - cross - Agnifilo                    4278

1   Q     At a certain point, you realized -- you know that other

2   people were talking to the FBI and the U.S. Attorney's Office;

3   correct?

4   A     Yes.

5   Q     And fair to say, you and certain of these other people

6   would talk after you went in to the FBI, or the other person

7   went in to the FBI; correct?

8   A     It wasn't like particularly -- Souki and I would talk

9   sometimes about our own experiences and what we went through,

10  but it didn't necessarily correlate with going in to the FBI.

11  Q     Do your remember having written communications with Souki

12  or with Jay about when each of them, including yourself, would

13  go and speak to law enforcement?

14  A     No.

15  Q     Give me a second.

16        I am going to show you -- just for identification --

17        MR. AGNIFILO:  This is just for the witness, Judge.

18        THE COURT:  All right.

19  BY MR. AGNIFILO:

20  Q     Defense 905.

21  A     Okay.

22  Q     Do you remember having conversations with other people

23  about, you know, just got done at the U.S. Attorney's Office,

24  went for seven hours, things along those lines?

25  A     I don't remember saying that, but it looks like I said

Nicole - cross - Agnifilo                          4279

1    that to Souki.

2    Q    Okay, and do you remember --

3    A    Not a lot of people can relate to what you're going

4    through.

5    Q    No, I am not -- I'm just asking the questions.

6    A    Okay.

7    Q    And do you remember having similar conversations with

8    Jay?

9    A    No.  Jay was in Los Angeles.  Souki was in New York.

10            MR. AGNIFILO:  Just give me one second, Judge.

11            THE COURT:  Sure.

12   Q    I think you said, on direct examination, that your

13   godmother is a psychologist?

14   A    She was, for the Court system.

15   Q    Okay.  Not in New York, somewhere else?

16   A    Los Angeles.

17   Q    And you had a roommate named Katie?

18   A    Yes.

19   Q    And you guys were close?

20   A    Yes.

21   Q    And I think you said, on direct examination, you have a

22   close, loving, wonderful family that supports you; correct?

23   A    I do.

24   Q    And how long were you in DOS?

25   A    Almost a year and a half, a year and four months.

Nicole - cross - Agnifilo                          4280

1  Q    Okay.  And you even got to the point where you had

2  preliminary conversations about bringing someone else into DOS

3  in May of 2017; right?

4  A    I did not think there was an out, at that point, but it

5  was a lot of pressure from Allison and it is also something

6  that I am incredibly ashamed of.

7  Q    Okay, I understand.

8          MR. AGNIFILO:  Your Honor, I don't think I have

9  anything else at this point.  Thank you.

10         THE COURT:  All right.  Redirect?

11         MS. PENZA:  Just briefly, Your Honor.

12         THE COURT:  All right.

13

14         (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

Nicole - redirect - Penza                              4281

1   REDIRECT EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    Good afternoon, Nicole.

4   A    Good afternoon.

5   Q    When you -- the text messages that Mr. Agnifilo showed

6   you between you and Souki, did you discuss any content of what

7   had happened in your interviews with the FBI?

8   A    No.

9   Q    And is that something that we asked you not to discuss

10  with other people?

11  A    Yes.

12  Q    And did you agree to do that?

13  A    Yes.

14  Q    Now, Mr. Agnifilo asked some questions about a friend of

15  yours who you asked her interest in a mentorship program?

16  A    Yes.

17  Q    And you got emotional and said that it was stressful to

18  think about.

19           Can you explain that?

20  A    Well, I think I didn't want to bring anyone into DOS.  I

21  understood that we were supposed to, but there were several

22  conversations where I said I didn't want to.  In fact,

23  directly to Keith I said I didn't want to because I didn't

24  want to put someone through what I had been through.  And he

25  laughed at me and said I hadn't been through that much.

SAM      OCR      RMR      CRR      RPR

Nicole - redirect - Penza                        4282

1          I just I didn't want to bring anyone in because I

2     still -- I still wasn't sure what the hell I was in.  And I

3     think that a part of me, like, really wanted to believe, like,

4     when Allison started putting so much pressure on us to recruit

5     someone and I was -- and I hadn't, and I didn't want to, but

6     like then also Keith would say sometimes that, like, Don't you

7     want a good friend of yours to be on this, like, life journey

8     with you?

9          It's like when it's phrased like that, you sort of

10    think, well, I would like one of my friends on a life journey

11    with me; I just don't want them to have to go through these,

12    like, crazy things that I'm going through.  And I think my

13    logic part of the time was that, like, I could protect her and

14    I could make it what I thought it was supposed to be.  I know

15    it's so, so ridiculously stupid, but like I thought that maybe

16    I could make -- make -- be the mentor to her that I thought I

17    was gonna have and then I could, like, protect her, which I'm

18    so, so glad that nothing happened.

19         But I text Allison afterwards and I told her that I

20    had spoken to my friend and that I hadn't wanted to, but I did

21    it so she wouldn't have to punish me.

22    Q    And you said that thank God that that didn't go forward?

23    A    Thank God, yes.  Just -- yes.  In a million different

24    ways, thank God.

25    Q    During cross-examination Mr. Agnifilo asked if the

SAM      OCR      RMR      CRR      RPR

Nicole - redirect - Penza                              4283

1   defendant was ever sweet to you.  Right?

2   A    Yes.

3   Q    Were there times he was not sweet to you?

4   A    Just sometimes he would say things like:  You know, well,

5   you're -- you're 29 years old and you have nothing to show for

6   your life.  He would say:  I'm gonna say something mean right

7   now.  You're 29 and you have nothing to show for your life.

8   That's just where you're at right now.

9   Q    Did he also call you prideful and defiant?

10  A    Yeah, all the time.

11  Q    He told you that he had to destroy you?

12  A    In order to, like, break me in order to -- to rebuild me.

13  Q    And you had to ask permission for a lot of things with

14  the defendant?

15  A    Yes.

16  Q    Permission to stay at the library?

17           MR. AGNIFILO:  Your Honor, can we just not have

18  leading?

19  A    Yes.

20  Q    Did you have to ask permission to cut your hair?

21           MS. PENZA:  Oh.

22           THE COURT:  Don't lead the witness.

23           MS. PENZA:  Understood, Your Honor.

24  BY MS. PENZA:

25  Q    Did you have to ask permission for anything related to

              SAM    OCR    RMR    CRR    RPR

Nicole - redirect - Penza                    4284

1    your body?

2    A    So I had to ask Allison for permission to cut my hair and

3    she told me to ask Keith for permission or she asked Keith for

4    me, I don't remember, but I got permission from both of them.

5    Q    Okay.  You asked for your collateral back at some point?

6    A    Yes.

7    Q    Did you ever receive your collateral back?

8    A    No.

9    Q    In the exhibit, do you remember seeing that your request

10   for collateral had been forwarded?

11   A    Yeah.

12   Q    Did the defendant ever contact you about your collateral?

13   A    No.

14   Q    Has he ever tried to return your collateral?

15   A    No.

16   Q    Do you think that's sweet?

17   A    No.

18         MS. PENZA:  Just a couple more questions.

19   BY MS. PENZA:

20   Q    Nicole, would you ever have had sex with the defendant if

21   he hadn't been your grand master?

22   A    No.

23   Q    And when you left DOS did you ever consider having sex

24   with the defendant again?

25   A    No.

SAM     OCR     RMR     CRR     RPR

1     MS. PENZA:  No further questions.

2     MR. AGNIFILO:  I have nothing.

3     THE COURT:  All right, the witness is excused.  You

4   may stand down.

5     (Witness steps down and exits the courtroom.)

6     A JUROR:  Your Honor, can I use the restroom?

7     THE COURT:  Yes, we are going to take our break now.

8     All right, we will take our afternoon break.

9     All rise for the jury.

10    (Jury exits.)

11    THE COURT:  All right, everyone may be seated.

12    Will the defense retrieve the screenshots, please?

13    Did you want to --

14    MR. AGNIFILO:  It doesn't have to be on the side.

15    THE COURT:  Fine, go ahead.

16    MR. AGNIFILO:  So, we were presented with a number

17  of exhibits for the next -- I think for the next witness.  We

18  are just going to need a little bit of time, not a lot of

19  time.  Since we have a break now, we might be able to just do

20  it over the break just to go over them because I think we are

21  going to have objections to some of them.

22    MS. PENZA:  Your Honor, that's fine.  I think we

23  can -- as long as there won't be an objection.  This witness

24  is going to testify about the device that these documents were

25  seized from.  A different agent is going to actually publish

1    the documents.

2           So we can discuss with the defense, as long as

3    there's not going to be an objection down the road that they

4    weren't introduced through this witness, we can seek to

5    introduce them later as being from that device.  So we will

6    speak about it.

7           THE COURT:  All right, let's take 15 minutes.  All

8    right, thank you.

9           (The defendant exited the courtroom.)

10          (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

11          (Recess taken.)

12          (In open court - jury not present.)

13          (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

14          (Defendant entered the courtroom.)

15          THE COURT:  Do we need to have a discussion?

16          MR. AGNIFILO:  No, we think we've worked it out.

17   We're not going to do anything with this witness, and by the

18   time the next witness comes that's actually going to put these

19   in to publish them, we will have had more time to look at

20   them.  So I think that solves it.

21          THE COURT:  Oh.

22          MS. PENZA:  So there won't be any objection with the

23   next witness --

24          MR. AGNIFILO:  Correct.

25          MS. PENZA:  -- that these were not retrieved from

Nicole - redirect - Penza                    4287

1   the device that this witness is going to testify about.

2          MR. AGNIFILO:  That' right.

3          THE COURT:  Oh, very well.

4          Let's bring in the jury.

5          How long on direct?

6          MS. HAJJAR:  45 minutes, Your Honor, or less.

7          MS. GERAGOS:  A few questions on cross, I imagine.

8   I haven't heard the direct yet, but I imagine just a few

9   questions.

10         THE COURT:  Okay.  And then you are ready with the

11  next witness after that?

12         MS. PENZA:  Your Honor, actually, may I just have

13  one minute to make sure that that's fully -- can I just run

14  outside to make sure that that's coordinated?

15         Thank you.

16         (Pause.)

17         (Jury enters.)

18         THE COURT:  Please be seated.

19         The Government may call its next witness.

20         MS. HAJJAR:  The Government calls Christopher Mills.

21         (The witness takes the stand.)

22         THE COURTROOM DEPUTY:  Please raise your right hand.

23         Do you solemnly swear the testimony you shall give

24  to the Court will be the truth, the whole truth, and nothing

25  but the truth, so help you God?

1          THE WITNESS:  Yes.

2          THE COURTROOM DEPUTY:  Please have a seat and please

3     state and spell your full name for the record.

4          THE WITNESS:  My name is Christopher Mills.  First

5     name C-H-R-I-S-T-O-P-H-E-R, last name M-I-L-L-S.

6          THE COURT:  All right, you may inquire.

7          MS. HAJJAR:  Thank you, Your Honor.

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mills - direct - Hajjar                                    4289

1  C H R I S T O P H E R   M I L L S,

2        called as a witness by the Government, having been

3        first duly sworn/affirmed by the Courtroom Deputy, was

4        examined and testified under oath as follows:

5  DIRECT EXAMINATION

6  BY MS. HAJJAR:

7  Q    Good afternoon, Agent Mills.

8  A    Good afternoon.

9  Q    Where do you work?

10  A    I currently work at the FBI in New York City.

11  Q    And are you a Special Agent?

12  A    I am, yes.

13  Q    How long have you been a Special Agent with the FBI?

14  A    About three years.

15  Q    Are you currently assigned to a particular squad?

16  A    Yes.  I am on a squad known as C-2; like I said, in the

17  New York office.

18  Q    Are you familiar with a criminal investigation into Keith

19  Raniere?

20  A    Yes.

21  Q    When did you first become involved in that investigation?

22  A    I first became involved in -- towards the end of 2017 and

23  roughly into the beginning of 2018.

24  Q    And what types of investigative steps have you taken as

25  part of this investigation?

SAM     OCR     RMR     CRR     RPR

Mills - direct - Hajjar                    4290

1  A    I have assisted with the delivery of subpoenas to various

2  individuals, as well as participation in a search and an

3  arrest.

4  Q    Drawing your attention to March 27th, 2018, were you

5  involved in executing a search warrant on a property?

6  A    Yes.

7  Q    Where was that?

8  A    That was 8 Hale Drive in Halfmoon, New York.

9  Q    And, Agent Mills, can you just generally describe to the

10  jury what the process is for conducting the search of a

11  residence?

12  A    Sure.  So, a search warrant that we conduct is generally

13  carried out in -- in the morning.  So usually around 6 or

14  7:00 a.m.  We will arrive at the residence and, of course,

15  confirm that we are at the proper residence at that time.

16  After we approached the residence, we will then do what we

17  call a knock-and-announce, in which we will attempt to find

18  out if anyone is presently inside the residence, whether

19  they're asleep or awake or what have you.

20       If we attempt to knock and announce again and no

21  response is received, then we may have to force entry in a

22  number of different ways.  So if we do, then we will force

23  entry due to no one being present and conduct a sweep or a

24  check of the residence to ensure that no one is present.  And

25  once we've done that, make sure no one's there and everyone is

SAM      OCR      RMR      CRR      RPR

Mills - direct - Hajjar                    4291

1    safe, then we'll proceed with the search, itself, which would

2    start with the taking of photos.

3    Q    And is that the process that took place in the search of

4    8 Hale Drive that day?

5    A    Yes.

6    Q    Did you have a specific role in the execution of the

7    search warrant at 8 Hale Drive?

8    A    Yes.  So my role was, as being one of the agents present,

9    I was to assist with evidence collection and documentation, as

10   well as being responsible for the taking of the photos on that

11   day.

12   Q    What time did you get to 8 Hale that day?

13   A    It was approximately 7:00 a.m.

14   Q    And was there a team with you?

15   A    There was a team, mostly comprised of agents from the

16   New York office, as well as the Albany office.

17   Q    And what happened after you arrived at 8 Hale Drive?

18   A    So as mentioned in the process, we arrived at the scene,

19   the residence, and conducted the knock-and-announce.  We did

20   that a few times, communicating who we were and that we had a

21   search warrant.  And after waiting a reasonable amount of

22   time, determined that no one was present at the residence and

23   made forced entry.

24   Q    Was anyone in the residence?

25   A    There was no one present.

Mills - direct - Hajjar                     4292

1   Q    What did you do in the course of executing the search

2   warrant?

3   A    So as we entered the room or entered the residence, like

4   I said, we want to make a sweep of the residence to make sure

5   no one else is present.  We didn't have any indication anyone

6   was, but, of course, we want to still make sure for safety.

7   And we checked out the first floor, as well as the second

8   floor, and found that no one was home.  And at that point we

9   determined it to be acceptable to start the search at that

10  point.

11  Q    Approximately what time was the search completed?

12  A    We finished the search and left the residence around

13  12:30 p.m.

14  Q    Can you describe the residence?

15  A    Sure.  So, the residence was a two-story townhome.  It

16  was a small sidewalk that led to the front entrance.  And

17  after you entered the first floor, there would be a kitchen on

18  your immediate left and if you continued to walk forward, you

19  would enter immediately into the living room of the first

20  floor, which had a large piano in the left corner, a couch on

21  the right side, and a spiral staircase in the far corner.  And

22  there was also a small bathroom on the first floor.

23          If you proceeded to the staircase in the far corner

24  and went upstairs, you'd be immediately -- immediately see a

25  bathroom, which had a sauna in it.  If you continued to move

Mills - direct - Hajjar                          4293

1    through the bathroom, the sauna would lead to a hot tub and a

2    small living or seating space.  And above this -- above the

3    hot tub and the seating space was a lofted bed.  And then

4    along the walls of the second floor were white boards, which

5    were near an office space that had computer desks and chairs.

6              MS. HAJJAR:  Your Honor, can I show something to the

7    witness for identification only?

8              THE COURT:  Yes, you may.

9    BY MS. HAJJAR:

10   Q    I am showing you, Agent Mills, what's marked for

11   identification as Government Exhibit 501.

12             Do you recognize this exhibit?

13   A    Yes.

14   Q    What is it?

15   A    So, this is a sketch of the -- of the residence showing

16   the first -- first and second floor, as well as the loft.

17   Q    And does this diagram fairly and accurately depict the

18   layout of 8 Hale Drive?

19   A    Yes.

20             MS. HAJJAR:  Your Honor, the Government offers

21   Government Exhibit 501 into evidence?

22             MS. GERAGOS:  May I just confer with Ms. Hajjar

23   briefly, Your Honor?

24             THE COURT:  Yes, you may.

25             (Pause.)

SAM      OCR      RMR      CRR      RPR

```
                      Mills - direct - Hajjar                  4294
```

1        MS. GERAGOS:  No objection.

2        THE COURT:  All right, Government Exhibit 501 is

3   received in evidence.

4        You may publish to the jury.

5        MS. HAJJAR:  Thank you.

6        (Government's Exhibit 501 was received in evidence.)

7        (Exhibit published.)

8   BY MS. HAJJAR:

9   Q    All right, Agent Mills, can you see this?

10  A    Yes.

11  Q    And so does this diagram depict the two floors of 8 Hale

12  Drive and then the lofted area you described?

13  A    Yes.

14  Q    Can you show us where on Government Exhibit 501 you

15  entered the residence?

16  A    Sure.  So --

17  Q    You should be able to draw.

18  A    Yes.  (Indicating) so just where the green line is, just

19  to the left of the letter C would be the front door.

20  Q    And where did you go from there, in terms of initiating

21  the search?

22  A    So, we had a team that entered the residence.  So,

23  obviously, we keep moving in different spaces.  You see the

24  bathroom right away there on your right side (indicating.)  We

25  proceeded to move forward towards the open area here

```
            SAM      OCR      RMR      CRR      RPR
```

Mills - direct - Hajjar                    4295

1  (indicating) with some agents moving towards the kitchen and

2  some agents moving towards the living room (indicating.)  And

3  then once again, once we determined that the space is clear

4  and no one else is present, then we would have made movements

5  towards the spiral staircase in the corner.

6  Q    Which led to the second floor, which is depicted to the

7  right of that?

8  A    Right.  So then the spiral staircase up here (indicating)

9  in the top right corner of the second -- second floor sketch,

10  which led then to this space (indicating), which is the second

11  floor bathroom, which also contained the sauna.  And then

12  proceeding through there to the area which had the hot tub.

13        So the lofted bed was positioned above the hot tub,

14  which is depicted in the third part of the sketch.  And then

15  finally from there moving into the hot tub and seating room

16  area, which opened up into this space over here (indicating)

17  which had the white boards and computer tables and desks.

18  Q    That's the office?

19  A    That would be the office space.

20  Q    Agent Mills, you testified that your role was, in part,

21  to take photographs?

22  A    Yes.

23  Q    Can you explain that process to the jury and what the

24  point of that is?

25  A    Sure.  So the -- the photographs are taken at the very

Mills - direct - Hajjar                    4296

1    beginning of the process and we just refer to them as entry

2    photographs.  And we want to take photographs of the initial

3    entry that we make to determine, of course, that we're at the

4    right address and what the view of the entryway is.

5          We also want to assign a letter to each space or

6    room of the residence.  So you see the letters on this sketch

7    here represent those spaces or those rooms in which we are

8    taking the photos.  So that way when we take the photos, we

9    can identify which room or space they came from.

10         And as we move throughout the residence, we take

11   photos of various items, different views of each room, as well

12   as photos of each identified piece of evidence.

13         And then as we proceed from that, we would take exit

14   photographs on the way out to show how we left the residence

15   and what it was like when we left, basically.

16   Q   Was there a written log that accompanied your

17   photographs?

18   A   Yes, we always complete a -- a photo log every time we do

19   a search.

20

21         (Continued on the following page.)

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Mills - direct - Hajjar                    4297

1    BY MS. HAJJAR:  (Continuing.)

2    Q    Did you complete the photo log in this case?

3    A    Yes.

4    Q    What about the written description that accompanied the

5    log?

6    A    Yes.

7              MS. HAJJAR:  Can I show the witness something marked

8    for identification, Your Honor?

9              THE COURT:  All right.

10   BY MS. HAJJAR:

11   Q    Agent Mils, I'm showing you what's been marked for

12   identification as Exhibit 502.  Do you recognize this exhibit?

13   A    Yes.

14   Q    What is it?

15   A    This is the photo log which identifies the photos by each

16   number.  It identifies the location where they were found --

17   where the photographs were taken, I should say.

18             MS. HAJJAR:  The Government offers 502 into

19   evidence.

20             MS. GERAGOS:  No objection.

21             THE COURT:  Government Exhibit 502 is received in

22   evidence.

23             (Government Exhibit 502 received in evidence.)

24             (Exhibit published.)

25   BY MS. HAJJAR:

Mills - direct - Hajjar                    4298

1   Q    On the top, Agent Mills, does that reflect the date on

2   which the photographs were taken?

3   A    Yes, March 27, 2018.

4   Q    And this is the location, 8 Hale Drive Half Moon, New

5   York?

6   A    Yes.

7   Q    Can you tell us what's going on here; the list of photo

8   numbers and the description?

9   A    Sure.  The photos and the far left column is the number

10  which corresponds to the order in which they were taken and

11  then "Description" is describing where the photos were taken.

12  So, for example, number six was in room A.  So that would

13  indicate that that was a photo, of course, taken in Room A and

14  the various descriptions are just helpful background for

15  information on where the photos were taken.

16  Q    And this exhibit has several pages of all the photographs

17  that were taken?

18  A    Yes.

19        MS. HAJJAR:  Your Honor, may I show something else

20  to the witness?

21        THE COURT:  Go ahead.

22  Q    Agent Mills, I'm showing you what's marked for

23  identification as Government Exhibit 502-A.  Do you recognize

24  this disk?

25  A    Yes.

Mills - direct - Hajjar                    4299

1   Q    And what is it?

2   A    This is the disk that contains all the photos.

3        MS. HAJJAR:  Your Honor, the Government offers

4   Government Exhibit 502-A.

5        MS. GERAGOS:  No objection.

6        THE COURT:  502-A is received in evidence.

7        (Government Exhibit 502-A received in evidence.)

8        THE COURT:  Next.

9        (Exhibit published.)

10  Q    Agent Mills, have you identified a subset of photographs

11  that you chose to show the jury?

12  A    Yes.

13  Q    And do these photographs depict the areas that were

14  searched as well as the items that were covered as part of

15  that search?

16  A    Yes.

17       MS. HAJJAR:  At this point we would like to switch

18  the PowerPoint, Your Honor.

19       THE COURT:  Is this in evidence?

20       MS. HAJJAR:  It is.  All the photographs are in

21  evidence, Your Honor.

22       THE COURT:  All right.

23       (Exhibit published.)

24  BY MS. HAJJAR:

25  Q    Agent Mills, I'm showing you Government Exhibit 502-A-1.

Mills - direct - Hajjar                                            4300

1   Is this the first photograph that you took?

2   A    Yes.

3   Q    Could you describe what it depicts?

4   A    This is the photo log which is completed every time we

5   conduct a search and in this one it's identifying the date,

6   March 27, 2018, with myself listed as the photographer and the

7   location, 8 Hale Drive, Half Moon, New York.

8   Q    And then the second photograph, is this entrance to 8

9   Hale Drive?

10  A    Yes.  And that's what the address 8 depicted above the

11  entryway is.

12  Q    And turning to the next, 502-A-3, is this what the

13  property looked like when you opened the door, when you

14  entered?

15  A    Yes.

16  Q    Turning to 502-A-5, can you explain what the A is?

17  A    Sure.  So the A represents -- in this case it's the

18  kitchen.  So the A represents the first space or room that we

19  came across entering the residence and it's just labeled for

20  the sake of organization.

21          THE COURT:  So you placed that label on the wall, is

22  that it?

23          THE WITNESS:  Correct.

24          THE COURT:  Go ahead.

25  BY MS. HAJJAR:

SN        OCR        RPR

Mills - direct - Hajjar                          4301

1   Q    Is that the same area that was depicted in the sketch
2   that we looked at a moment ago?
3   A    Yes.  The photos would correspond to the sketch with the
4   appropriate layout.
5   Q    Okay.  Turning to the next slides, 502-A-6 and A-7, are
6   those photographs depicting 8 Hale Drive from the kitchen?
7   A    Yes.
8   Q    And that spiral staircase at the far end of the
9   residence, is that the spiral staircase you described earlier,
10  Agent Mills?
11  A    Yes.
12  Q    And turning to 502-A-10, what -- where was this
13  photograph taken, what does it depict?
14  A    So this was taken in the far right corner of the first
15  floor living space.  So this is basically the view from
16  standing right next to the spiral staircase and this is
17  looking into the other corner of the room as well as the far
18  corner of the room where the kitchen was and there's a large
19  piano in that corner.
20  Q    What's on the piano?
21  A    I believe it was mothballs.  There was a tarp originally
22  on top of the piano and when we removed it just to make sure
23  no one else was present, there appeared to be a large number
24  of mothballs present.
25  Q    And then turning to 502-A-12, is this the spiral

Mills - direct - Hajjar                    4302

1   staircase at the end?

2   A    Yes.

3   Q    That leads to the second floor?

4   A    Yes.

5   Q    Agent Mills, looking at 502-A-20, what does that

6   photograph show?

7   A    So, this is the second floor of the residence and that is

8   the hot tub and then the background of the photo looking

9   farther into the picture is the sauna.

10  Q    And the hot tub is covered with boxes it looks like?  It

11  was covered up at the time you arrived at the property?

12  A    Right, so there was a cover on it as well as several

13  boxes and other items on top of that.

14  Q    Now, turning to Government Exhibit 502-A-24, can you

15  describe what this photograph depicts?

16  A    Sure.  So this is the second floor.  This is the office

17  space so you can see the white board on the right along

18  with -- a long desk or table and several computers and

19  computer chairs.

20  Q    And is this the white board as it appeared to you at the

21  time?

22  A    Yes.

23  Q    Can you describe, did you notice anything about what's

24  written on the white board?

25  A    There's some items on the white board that seemed to be

SN        OCR        RPR

Mills - direct - Hajjar                      4303

1   drawings or depictions of what was currently located inside

2   the residence on the second floor.  So, for example, the

3   drawing on the middle right there, the refrigerator, microwave

4   and toaster was also found -- that exact setup was found in

5   the residence as well, just on the other side of the room.

6   And there were other various written things with math

7   equations and just various words and letters.

8   Q    And Agent Mills, again, this photograph was taken on

9   March 27, 2018 when you entered the property?

10  A    Yes.

11  Q    Have you reviewed what's in evidence as Government

12  Exhibit 175?

13  A    Yes.

14  Q    Okay.  I'm going to turn back to a still from that,

15  what's in evidence as Government Exhibit 175.  And just

16  turning to a still from that video clip, can you describe

17  what's in the back of what's depicted on the white board in

18  Joint Exhibit 175-A-1?

19  A    So, what's written on the white board in this photo here

20  appears to be pretty much unchanged from the white board that

21  was seen on March 27, 2018.

22  Q    And do you see on the left -- on the left side of this

23  exhibit above the monitor, there's a drive with a blue lit-up

24  circle?

25  A    Yes.

Mills - direct - Hajjar                    4304

1  Q    Can you indicate that on Government Exhibit 175-A-1?

2  A    (Indicating.)

3  Q    And that is directly to the left of the drawings that

4  you're describing on the white board?

5  A    Correct.

6  Q    And then turning back to Government Exhibit 502-A-26.

7  502-A-27 and 28, these are more photographs of the white

8  board?

9  A    Yes.

10 Q    And this is on March 27, 2018?

11 A    Yes.

12 Q    What is -- turning to 502-A-30, what is -- and 31, what

13 do these slides depict?

14 A    So this is the lofted bed which was led to by a set of

15 stairs and the bed was above the hot tub.

16 Q    Now, showing you Government Exhibit 502-A-32, can you

17 describe what this photograph depicts?

18 A    Sure.  So the there's a note there with the number one.

19 So number one represents evidence item number one.  So, in

20 this case, this photo was taken underneath the desk or table

21 and was assigned number one based on being the first evidence

22 item that was found.

23 Q    And what's the point of photographing where evidence is

24 found?

25 A    So we want to photograph -- we call it "in place" to

Mills - direct - Hajjar                    4305

1   photograph where this item was found and in this case the item

2   was found directly below the desk or table.

3   Q    And is this item, item one, reflected on the photographic

4   log that you looked at -- that you showed the jury earlier?

5   A    It's not the first photo.  It's the first item.

6   Q    The item one?

7   A    Evidence item one.

8   Q    Item one noted on that log?

9   A    Yes.

10          MS. HAJJAR:  Your Honor, may I approach the witness?

11          THE COURT:  Yes, you may.

12          (Counsel approaches.)

13  BY MS. HAJJAR:

14  Q    I'm going to show you, Agent Mills, what's marked as

15  Government's Exhibit 520 and 524.  Have you seen these

16  exhibits?

17  A    Yes.

18  Q    What are these?

19  A    So, this camera here is the camera that was inside the

20  bag of the item identified as item number one and then this is

21  the card found inside of this camera.

22  Q    And Government Exhibit 520 is the camera and 524 is the

23  card inside that camera?

24  A    Yes.

25          MS. HAJJAR:  Your Honor, the Government offers

                    Mills - direct - Hajjar                4306

1    Government Exhibit 520 and 524 in evidence.

2              MS. GERAGOS:  No objection.

3              THE COURT:  All right.  Government Exhibits 520 and

4    524 are received in evidence.

5              (Government Exhibits 520 and 524 received in

6    evidence.)

7    BY MS. HAJJAR:

8    Q    Showing you 502-A-33, is this the same -- is this the

9    same camera as Government Exhibit 520 and the bag that you

10   found it in?

11   A    Yes.

12   Q    Okay.

13             MS. HAJJAR:  Your Honor, may we just switch the ELMO

14   for a moment?

15             (Pause in proceedings.)

16             MS. HAJJAR:  Thank you Your Honor.  I just want to

17   show -- publish Government Exhibit 520.

18             (Exhibit published.)

19   Q    Agent Mills, what's the make of the camera?

20   A    It's a Canon camera.

21   Q    Turning your attention to the back of Government Exhibit

22   520, can you read the serial number or the number that's

23   listed at the bottom?

24   A    Sure.  It's 1420908348.

25   Q    And can you see below that where it says "Canon

Mills - direct - Hajjar                                      4307

1   Incorporated"?

2   A    Yes.  It says "Canon Incorporated, made in Japan."

3   Q    And Government Exhibit 524, this is the card that was in

4   the camera at the time?

5   A    Yes.

6   Q    What happens when you recover a piece of digital evidence

7   like Government Exhibit 520 and 524?

8   A    So, when we receive -- when we recover digital evidence,

9   we have a process in which we bring the digital evidence back

10  to our office and if we want the evidence to be reviewed, we

11  would submit a request to our CART team.  And the CART is the

12  Computer Analysis Response Team and they is have specialists

13  who are computer evidence examiners who would review that

14  evidence for us or assisted us in reviewing the evidence with

15  us.

16  Q    And is that what happened in this case with Government

17  Exhibit 520?

18  A    Yes.

19         MS. HAJJAR:  Your Honor, may I switch back to the

20  PowerPoint, please?  Thank you.

21  BY MS. HAJJAR:

22  Q    So turning now, Agent Mills, to Government Exhibit

23  502-A-34, can you describe what this photograph shows?

24  A    I don't have anything on the screen.

25         THE COURT:  I am sorry.  Go ahead.

Mills - direct - Hajjar                    4308

1   Q    Can you describe what this photograph shows?

2   A    Yes.  So this is the still of the same office space as

3   seen before and item number two, which is on top of the

4   bookshelf here, is a gray or silver hard drive.

5   Q    Is there -- and this is directly to the left of a white

6   board with a lot of equations on it?

7   A    Yes.  So the white board with the equations is to the

8   right and the book shelf to the right with the hard drive to

9   the left.

10              MS. HAJJAR:  Your Honor, may I approach the witness?

11              THE COURT:  Yes, you may.

12              (Counsel approaches.)

13   BY MS. HAJJAR:

14   Q    I show you what's been marked for identification as

15   Government Exhibit 502.  Showing you what's marked for

16   identification as Government Exhibit 503.  Do you recognize

17   this exhibit?

18   A    Yes.

19   Q    What is it?

20   A    This is a hard drive.  The brand is, I believe, Western

21   Digital.

22   Q    Is there a serial number on that exhibit?

23   A    Yes.  It is WCAS81365334.

24              MS. HAJJAR:  Your Honor, the Government offers

25   Government Exhibit 503 into evidence.

SN        OCR        RPR

Mills - direct - Hajjar                    4309

1          MS. GERAGOS:  No objection.

2          THE COURT:  All right.  Government Exhibit 503 is

3     received in evidence.

4          (Government Exhibit 503 received in evidence.)

5     BY MS. HAJJAR:

6     Q    Agent Mills --

7          MS. HAJJAR:  I'm sorry, Your Honor, may I switch the

8     ELMO just for a moment?

9          THE COURT:  Sure.  Go ahead.

10    BY MS. HAJJAR:

11    Q    I wanted to show you, Agent Mills, the back of Government

12    Exhibit 503 where you read the serial number.  Do you see

13    that?

14    A    Yes.

15    Q    Do you see up top where this device was manufactured and

16    assembled?

17    A    Yes.  It says "Assembled in Thailand with drive

18    manufactured in Malaysia or Thailand."

19    Q    Do you see the front of Government Exhibit 503, the

20    circle?

21    A    Yes.

22    Q    Agent Mills, was this one of the devices that was also

23    provided to CART for their analysis and review?

24    A    Yes.

25         MS. HAJJAR:  Your Honor, if I could move back to the

Mills - direct - Hajjar                              4310

1    PowerPoint.

2              THE COURT:  Go ahead.

3    BY MS. HAJJAR:

4    Q    Turning then to -- skip to 502-A-46, can you describe

5    what this photograph depicts?

6    A    Sure.  So this is, once again, underneath the desk or the

7    table in the office space.  And you see item number 14, so

8    that's evidence item number 14, the gray or silver hard drive.

9    Q    Just going back for a moment --

10             MS. HAJJAR:  Can I approach the witness, Your Honor?

11             THE COURT:  Yes, you may.

12             MS. HAJJAR:  I'd like to show the witness what's

13   been marked for identification as Government Exhibit 506.

14             (Counsel approaches.)

15   BY MS. HAJJAR:

16   Q    I'm showing you actually what's marked as 560, Agent

17   Mills.  Do you recognize this exhibit?

18   A    Yes.

19   Q    What is it?

20   A    It's the hard drive and brand LaCie.

21

22             (Continued on the following page.)

23

24

25

SN        OCR        RPR

Mills - direct - Hajjar                          4311

1    DIRECT EXAMINATION

2    BY MS. HAJJAR:   (Continuing)

3    Q    Was that the item 14 that you recovered from 8 Hill

4    Drive?

5    A    Yes.

6           MR. Der OHANNESIAN:  Your Honor, the Government

7    offers Exhibit 560.

8           MS. GERAGOS:  No objection.

9           THE COURT:  Received in evidence.

10          (Government's Exhibit 560 received in evidence.)

11   Q    Agent Mills, can you read the serial number on this drive

12   as well?

13   A    It is 164400534.

14   Q    Agent Mills, was Government Exhibit 560 one of the

15   devices that was provided to CART for analysis and review?

16   A    Yes.

17   Q    During the course of your search of 8 Hill Drive, did you

18   see papers and documents addressed to Keith Raniere?

19   A    Yes.

20   Q    And did you see letters and other items also addressed to

21   Keith Raniere?

22   A    Yes.

23   Q    Did you have any further involvement with searching these

24   items after they were provided to CART?

25   A    No.

1          MS. HAJJAR:  No further questions, Your Honor.

2          THE COURT:  Cross-examination.

3    CROSS EXAMINATION

4    BY MS. GERAGOS:

5    Q    Good afternoon, Agent Mills.  My name is Teny Geragos.  I

6    represent Keith Raniere.  Nice to meet you.

7    A    Good afternoon.

8    Q    I just have a few questions for you.

9          MS. GERAGOS:  I will be using the ELMO, Judge.

10         THE COURT:  Very well.  Here you go.

11         MS. GERAGOS: Thanks.

12   Q    I will start with what we were just looking at, which is,

13   this is 502-A-34 and I guess this is pretty dark here.  This

14   is Government Exhibit 503, which is just what we are looking

15   at.  Do you see the blue light there?

16   A    No.

17   Q    That was only in Government Exhibit 175; correct?

18   A    I believe so, yes.

19   Q    Was this plugged into anything?

20   A    I would not know at that moment.

21   Q    Okay.  Did you personally retrieve it?

22   A    Did I personally retrieve the device itself?

23   Q    Yes.

24   A    For evidence collection, yes.

25   Q    But you just don't remember if it was actually plugged

Mills - cross - Geragos                          4313

1    into anything?

2    A    I don't recall, but I did not unplug it.

3    Q    Okay.  And then item number -- I'll move to the next one.

4         Actually, I will go to Government Exhibit 502-A-42.

5    We didn't look at this on direct.  Can you see -- I will zoom

6    in -- these are addressed to someone named Monkey; correct?

7    A    Yes.

8    Q    And it has hearts next to the name?

9    A    Yes.

10   Q    Okay.  And lastly, Government Exhibit 502-A-46, is this

11   underneath the desk we were just looking at?

12   A    Yeah.

13   Q    And this was Government Exhibit 560.  That's the one you

14   just identified on direct examination; correct?

15   A    Yes.

16   Q    Was this plugged into anything?

17   A    I don't recall.

18   Q    Did you personally retrieve this device?

19   A    Yes.

20   Q    There were a number of books on the book shelf; correct?

21   A    Yes.

22   Q    There were about five book shelves of books?

23   A    Approximately, I would say so, yes.

24   Q    Did you seize all of those books?

25   A    No.

Mills - cross - Geragos                    4314

1    Q    Just some of the electronic devices?

2    A    Some of the electronic devices and some of the books.

3    Q    Just one last question.  Government Exhibit 502-A-51, we

4    didn't look at this on direct, but this was taken from the

5    shelf as well; right?  I mean, sorry, the desk?

6    A    I believe this was on top of the desk.

7    Q    On top of the desk.  Can you tell this has human pain

8    schedule here?  Can you tell?  I know it is hard to read.

9    A    Not really, no.

10   Q    And 502-A-52, is that a calculator also that you took?

11   A    I believe so, yes.

12   Q    All right.  Was the door of the house locked when you got

13   there?

14   A    It was.

15   Q    It was.  And you had to enter and then see if anybody was

16   inside?

17   A    Correct.

18           MS. GERAGOS: Nothing else, Your Honor.

19           THE COURT:  Thank you.

20           Anything else?

21           MS. HAJJAR:  No, Your Honor.

22           THE COURT:  The witness is excused.  You may stand

23   down, sir.

24           THE WITNESS:  Thank you.

25           THE COURT:  You're welcome.

Jay - direct - Lesko                              4315

1          (Witness steps down.)

2          THE COURT:  The Government may call its next

3    witness.

4          MR. LESKO:   The Government calls Jay, Your Honor.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6    **JAY**,

7       called by the Government, having been duly

8       sworn, was examined and testified as follows:

9          THE COURTROOM DEPUTY:  Please have a seat.

10         THE COURT:  You may inquire.

11         MR. LESKO:  Thank you, Your Honor.

12   DIRECT EXAMINATION

13   BY MR. LESKO:

14   Q    Good afternoon.

15   A    Good afternoon, everyone.

16   Q    Jay, how old are you?

17   A    29.

18   Q    And where are you from?

19   A    I'm from Southern California.

20   Q    Could you describe growing up in Southern California?

21   A    Yes, it was very sunny.  I was raised by my grandparents,

22   along with my two siblings, and I had a fairly rough and

23   traumatic childhood, but there was also a lot of love.

24   Q    Were you interested in modeling and acting as a child?

25   A    Yes.

Jay - direct - Lesko                              4316

1    Q    Did you start modeling when you were in school?

2    A    Yes.  I did some print work, so like taking photos for

3    magazines and for different campaigns and things like that.

4    Q    How old were you when you started modeling?

5    A    A little bit before 16.

6    Q    And how far did you go in school?

7    A    I did some community college.

8    Q    What's your profession?

9    A    I'm an actress, a model, as well as a writer.

10   Q    What sort of work have you done as a model?  Let's start

11   with a model.

12   A    Different print ads, working for different clothing

13   companies, also Grand Ambassador modeling.

14   Q    How about acting?  What sorts of acting work have you

15   done?

16   A    I've had some small featured roles in major productions,

17   as well as short films and I even have produced my own

18   project.

19   Q    So you have been in movies?

20   A    Yes.

21   Q    Where do you reside?

22   A    Los Angeles.

23   Q    So, I'd like to draw your attention to the summer of

24   2016, okay?

25   A    Okay.

MDL        RPR        CRR        CSR

Jay - direct - Lesko                                    4317

1    Q    Are you familiar with a company named NXIVM?

2    A    Yes.

3    Q    What is NXIVM?

4    A    Well, NXIVM, what I thought it was, was a humanitarian

5    personal development company.

6    Q    Are you familiar with a program called Executive Success

7    Program?

8    A    Yes.

9    Q    What is Executive Success Program?

10   A    It was the personal development program that was supposed

11   to be based under ethics and humanitarianism.

12   Q    Was the Executive Success Program known as ESP?

13   A    Yes.

14   Q    And was ESP under NXIVM?

15   A    Yes.

16   Q    In the summer of 2016, did you attend an ESP course?

17   A    Yes.

18   Q    What was that course?

19   A    I'm sorry?

20   Q    What was the class?  What was the course?

21   A    It was the five-day intensive.

22   Q    Where did you take the five-day insensitive?

23   A    It was in Culver City at a rented space.

24   Q    And that's in Los Angeles?

25   A    Yes.

Jay - direct - Lesko                                        4318

1   Q     How did you get introduced to NXIVM?

2   A     Well, I first learned of NXIVM because of my friend

3   Rachel.  She had several clients of hers that were coaches in

4   the program, including India Oxenberg, who was also her

5   friend.  So, I heard about  the program through Rachel, as

6   well meeting India.

7   Q     Had you known India before meeting her through Rachel?

8   A     Yes, we met once briefly.

9   Q     And why did you take the ESP intensive, the five-day

10  intensive?  Why were you interested in taking that?

11  A     Because of my traumatic childhood and healing wounds,

12  I've always been into personal development.  And after the

13  presentaton, I thought it was something that would be able to

14  help me.

15  Q     Was the five-day intensive part of a larger intensive?

16  A     Yes, it was part of the 16-day intensive.

17  Q     And you just took the five-day in Los Angeles?

18  A     Yes.

19  Q     Who taught that five-day intensive in Los Angeles?

20  A     Jim Del Negra.

21  Q     Did you subsequently take the rest of the 16-day or the

22  rest of the 11-day intensive?

23  A     Yes.

24  Q     Where did you take the 11-day?

25  A     In Upstate New York, in Albany.

Jay - direct - Lesko                                        4319

1   Q    When did you take the 11-day intensive?

2   A    I took it in November of 2016.

3   Q    And, so, why did you take the 11-day intensive after

4   taking the five-day intensive?

5   A    Well, I really fell in love of with the five-day.  I had

6   a lot of profound shifts and I was really excited to complete

7   the rest of it.

8   Q    So, when you were first in the five-day intensive, did

9   you become familiar with anybody named Keith Raniere?

10  A    Yes.

11  Q    Who was Keith Raniere?

12  A    Keith Raniere was promoted as like the kind of guru, the

13  guy who started NXIVM and created the curriculum.  He was also

14  promoted as master martial artist and one of the smartest men

15  in the world.

16  Q    And that was discussed during the five-day intensive in

17  Los Angeles?

18  A    Yes.

19  Q    Was there a specific title that people used to refer to

20  the defendant?

21  A    Yes.

22  Q    What was that title?

23  A    Vanguard.

24  Q    Do you see Mr. Raniere here in the courtroom?  Take a

25  look around.

Jay - direct - Lesko                              4320

1    A    Yes.

2    Q    Can you identify him by an article of clothing he is

3    wearing?

4    A    Black sweater.

5         THE COURT:  The witness has identified the

6    defendant.

7         MR. LESKO:  Thank you, Your Honor.

8    Q    So, in addition to the five-day intensive and the 11-day

9    intensive, did you take any other NXIVM courses or classes?

10   A    Yes.

11   Q    What did you take?

12   A    I took The Source intensive, as well as a Jness weekend.

13   Q    The Source intensive that you took, where was that

14   located?

15   A    In Vancouver, Canada.

16   Q    And who taught The Source in Vancouver?

17   A    Allison Mack.

18   Q    Did anyone teach The Source with her?

19   A    Mark Hildreth.

20        MR. LESKO:  Your Honor, I am going to show you an

21   exhibit in evidence.  If I could use the ELMO to show it to

22   the jury.

23        THE COURT:  Go ahead.

24        MR. LESKO:  Thank you.

25   Q    So I'm showing you Government Exhibit 39.  Do you

Jay - direct - Lesko                          4321

1    recognize that photograph?

2    A    Yes.

3    Q    Who is that a photograph of?

4    A    Allison Mack.

5    Q    And the Jness, you took a Jness class.  What type of

6    Jness class?

7    A    It was a Jness weekend.

8    Q    Where was that located?

9    A    It was in Albany, at the home of Rosa Laura.

10   Q    How much did the five-day -- did you pay for the five-day

11   intensive?

12   A    Yes.

13   Q    How much did it cost?

14   A    I'd say roughly around 5,000, give or take.

15   Q    Was there a fee associated with the 11-day intensive?

16   A    Yes.

17   Q    How much was that?

18   A    Give or take, upwards to almost like 10,000.

19   Q    And was there a fee associated with The Source?

20   A    Yes.

21   Q    How much was that fee?

22   A    11,000.

23   Q    And same question with respect to Jness, was there a fee

24   for the Jness weekend?

25   A    Yes, it was $500.

Jay - direct - Lesko                          4322

1   Q    So, starting with the five-day intensive, did you pay for

2   that five-day intensive?

3   A    Yes.

4   Q    And how did you get the money to pay for that intensive?

5   A    It was money that I had made from jobs that I was

6   actually saving for a trip to Hawaii.

7   Q    So, your own money?

8   A    Yes.

9   Q    And did you pay for the 11-day intensive?

10  A    Yes.

11  Q    How did you pay for that?

12  A    Initially, I could only afford to do the middle five-day,

13  but after taking that, it was suggested that I stay by Keith,

14  as well other people suggested that I just stay, and I was

15  able to get a personal loan from a friend.

16  Q    Okay.  We will talk about The Source and Jness.  In

17  Jness, did you pay for Jness, the $500?

18  A    Yes.

19  Q    Okay.  And The Source program that you participated in,

20  how did you pay for that?

21  A    I paid for the deposit and for the rest I was supposed to

22  recruit people per Allison in order to pay for the rest.

23  Q    Okay.  Are you still in debt from the money that you paid

24  to participate in the NXIVM programs?

25  A    Yes.

Jay - direct - Lesko                                    4323

1    Q    How much are you in debt?

2    A    Roughly a few thousand dollars.

3    Q    Do you still owe your friend of yours part of that

4    initial personal loan that you received?

5    A    Yes.

6    Q    So when you went to -- you went to Albany in November of

7    2016; is that right?

8    A    Correct.

9    Q    And that was to take, initially, the middle five-day

10   intensive, but then you stayed for the full 11 days; is that

11   correct?

12   A    Yes.  That is correct.

13   Q    So when you were  Albany, where did you stay in November

14   of 2016?

15   A    I stayed in the home that belonged to Allison Mack in the

16   basement.

17   Q    Do you remember the address?

18   A    7 Generals Way.

19   Q    So was India Oxenberg present during the initial five-day

20   in Los Angeles?

21   A    Yes.

22   Q    Was India Oxenberg present during the 11-day intensive in

23   Albany?

24   A    Yes.

25   Q    And I'm going to show you what's in evidence as

Jay - direct - Lesko                                      4324

1    Government Exhibit 56.  Do you recognize that photograph?

2    A     Yes.

3    Q     Who is that a photograph of?

4    A     India Oxenberg.

5    Q     At some point during the 11-day intensive in Albany, did

6    you take a walk with India?

7    A     Yes.

8    Q     And what did the two of you discuss?

9    A     Well, on the walk she gave me a little bit of information

10   about this group that she was a part of.  She described it as

11   a women's-only secret society.  Her whole thing around it is

12   that she said it was -- it helped her more in life than NXIVM

13   and that it was a secret society to help women with mentorship

14   program, so these women can build character and discipline and

15   be these strong forces of light in the world.

16   Q     And what was your reaction?

17   A     I was excited and it sounded like something interesting

18   and something that I had been wanting.

19                (Continued on following page.)

20

21

22

23

24

25

Jay - direct - Lesko                                    4325

1   EXAMINATION CONTINUES

2   BY MR. LESKO:

3   Q    Did India suggest that you might be the right sort of

4   person for this secret society?

5   A    Yes, she said that she thought I would be perfect for it

6   and that it would help me grow and reach my goals.

7   Q    And did she give you of a lot of information about this

8   secret society at that time?

9   A    No.

10  Q    Did she tell you that you needed to do something to find

11  out more about this secret society?

12  A    Yes.

13  Q    What did she say?

14  A    She said that because there's a lot of high-powered women

15  in it, that it had to be very -- it had to be secret.  So in

16  order to find out more, you had to submit something, a piece

17  of collateral in order to protect its secrecy.

18  Q    Did she mention that the group was controversial in any

19  respects?

20  A    Yes, she said that the way that they help people grow can

21  be controversial to, like, I guess the average person, that

22  it's kind of like a -- like a -- like a bad ass women almost

23  boot camp kind of thing.

24  Q    And did India explain to you what she meant by

25  collateral?

Jay - direct - Lesko                                    4326

1   A     She did.

2   Q     What did she say?

3   A     Well, she had explained that because it's so secret, they

4   needed a piece of collateral to protect its secrecy.  And so

5   that you needed three pieces of collateral to protect your

6   word, so that way, say, if you didn't want to do it or as long

7   as, you know, you never say anything, it's fine.

8   Q     Did she describe the three pieces of collateral that were

9   required?

10  A     Yes.

11  Q     What were they?

12  A     It was something that had to be financial, family-related

13  and reputation.

14  Q     Could the collateral be fictional or made up?

15  A     Yes.

16  Q     And at that point what was your understanding of the

17  purpose of this collateral?

18  A     My understanding that it was merely to protect the

19  secrecy of the group so if you learn about it, you just will

20  never talk about its existence.

21  Q     So did you decide you wanted to learn more about this

22  secret society?

23  A     Yes.

24  Q     And what was it about the secret society that appealed to

25  you?

Jay - direct - Lesko                    4327

1    A    Well, for me, having had, like, a traumatic childhood and

2    growing and wanting to be the best version of myself, I

3    thought it would be something that would be great, as far as

4    being with other women that wanted to be empowered, that

5    wanted to help each other, and it just seemed like something

6    that would be great for me.

7    Q    Okay.  So did you provide collateral?

8    A    Yes.

9    Q    What did you provide initially?

10   A    Initially, I provided, like, video secrets, as well as a

11   notarized letter.

12   Q    So when you say video secrets, what do you mean?

13   A    Well, one of the secrets was a video of me sharing about

14   being molested by my uncle.

15   Q    So let's talk about that for just a moment.

16        When you say video secrets, are you talking about

17   yourself making statements on a video?

18   A    Yes.

19   Q    Okay.  And these are about secrets about your life?

20   A    Correct.

21   Q    And one of the videos was -- involved you telling about

22   how your uncle molested you, is that right?

23   A    Yes.

24   Q    And you -- did you give that to anyone?

25   A    Yes, I gave it to India.

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                    4328

1    Q    And how did you give it to India?

2    A    I think I air dropped it to her or sent it to her via

3    text.

4    Q    So had you been, in fact, molested by your uncle?

5    A    Yes.

6    Q    Are you okay?

7    A    Yeah, I'm okay.

8    Q    How old were you?

9    A    I was 12.

10   Q    And did this abuse, did it happen just once or was it a

11   repeated abuse?

12   A    There was multiple times.

13   Q    Was your uncle ever charged?

14   A    Not that I know of.

15   Q    And how did this affect you?

16   A    Well, it created a lot of issues with trust, issues with

17   males.  It created, I guess, like a lot of emotional

18   distortions.  You know, different insecurities and different

19   fears.

20   Q    Now, you testified you had a tough childhood, right?

21   A    (Nodding.)

22   Q    Could you describe your parents?

23   A    Yes.  My parents, they -- I, basically, kind of had a

24   reverse Cinderella childhood where when I was really little I

25   had a really great upbringing.  I was in a nice house and

Jay - direct - Lesko                                              4329

1    things like that and my mom was a nurse.  And then it

2    reversed, so I went from that to my parents being involved

3    with drugs and my mom leaving when I was like five years old.

4    And so, they were -- had their own journey and were involved

5    with drugs, and I later ended up being raised by my

6    grandparents who adopted me and my brother and sister.

7    Q    Did your mom get arrested?

8    A    Yes.

9    Q    Did she go to jail?

10   A    Yes.

11   Q    Did your dad get arrested?

12   A    Yes.

13   Q    Did he go to jail?

14   A    Uh-hum.

15   Q    Was that for drugs?

16   A    Yes.

17   Q    So this second piece of collateral, I think you

18   mentioned, was a notarized letter, is that right?

19   A    Yes.

20   Q    And what was in the letter?

21   A    In the letter, it was about me admitting an indiscretion

22   that I had while I was still in a relationship with someone.

23   Q    Did you provide any additional collateral initially?

24   A    Yes.

25   Q    What else?

Jay - direct - Lesko                                    4330

1    A    There was also a sex tape with me and my boyfriend at the

2    time.

3    Q    A videotape?

4    A    Yes.

5    Q    And was there a fourth videotape?

6    A    Yes.

7    Q    And what was on the fourth videotape?

8    A    On the fourth one was a video confession about me making

9    out with one of my girlfriends and that her boyfriend gave me

10   money afterwards.

11   Q    And so why was the fourth videotape required?

12   A    Because the other ones didn't fall in each category, so

13   it wasn't enough to learn more.

14   Q    So this submission of the four pieces of collateral, did

15   you do that all at once or was it a process?  Was it -- did

16   you submit them one by one?

17   A    I submitted them one by one.  It was definitely a little

18   bit of a process.

19   Q    And were you discussing the collateral with India during

20   this process?

21   A    Yes.  Because it was really confusing and she -- she gave

22   me examples for herself, like she would share, like, family

23   secrets or she turned in family heirlooms and just explained

24   that it just needed to be really weighted just to make sure

25   that, you know, I would hold my word and never discuss the

Jay - direct - Lesko                                        4331

1    group's existence.

2    Q    So was this collateral, the combination of collateral,

3    was it significant for you?

4    A    Yes.

5    Q    Do you know why the letter was notarized?

6    A    Yes.  Because it had to be that it was, like, a true

7    statement, I guess is what the reason behind the notarizing

8    was for.

9    Q    So at some point after all the collateral is submitted --

10   oh, I should ask you this:

11            How were the additional pieces of collateral

12   submitted to India, were they submitted to India?

13   A    Yes.

14   Q    And how were they submitted to India?

15   A    The videos, again, it was either air dropped or text

16   messaged to her; and with the notarized letter, I just -- I

17   gave it to her.

18   Q    Okay.

19            At some point did you learn that you had been

20   accepted into the secret society?

21   A    Yes.

22   Q    And how did you learn that?

23   A    India just saying, I'm your mentor.  And I was -- it was

24   kind of already known, like, that I wanted to do it.  And so,

25   basically, I was in it, but I just needed to turn in all of

Jay - direct - Lesko                                          4332

1    the collateral to make it official.

2    Q    Did India mention to you that the society had a name?

3    A    Not at that moment, but like a few days later or so she

4    did call it The Vow.

5    Q    And was that the actual name of the organization?

6    A    I had learned later that it was actually called DOS.

7    Q    And did you learn, ever learn any other names for The Vow

8    or DOS?

9    A    Yes, Allison would kind of joke around and called it The

10   Agency.

11   Q    And did you have an understanding as to why she called it

12   The Agency?

13   A    Yes.  It was because her slaves were all, like, actresses

14   and models and were beautiful, so it was like a joke as if

15   she's, like, running an agency.

16   Q    Now, after you were accepted into The Vow, and we'll call

17   it The Vow, okay, did India share with you a lot of

18   information about The Vow?

19   A    Not right away, everything was kind of like a long, drawn

20   out kind of process.

21   Q    Okay.  So what did you learn about The Vow initially

22   after joining it?

23   A    Initially after joining, again, it's like everything was

24   like concentrated and spread out.

25             So, to the best of my memory, but I learned a little

Jay - direct - Lesko                                4333

1    bit later that the dynamic of what it was called, which was a

2    master/slave dynamic.

3    Q    Okay.  Did she discuss the type of commitment that was

4    required?

5    A    Yes, she said it's a lifetime commitment.  So for me I

6    just thought, great, it's like I'm gonna have sorority sisters

7    and just be a part of my personal growth for the rest of my

8    life is what I thought.

9    Q    Did she explain that you would have a mentor?

10   A    Yes.

11   Q    And was the mentor the master, is that how that worked?

12   A    Yes, but at first she said:  I'm gonna be your mentor.

13   So the name master/slave didn't come up 'til later.

14   Q    And did you -- did India say that she had a meant other?

15   A    Yes.

16   Q    Did you know who that was --

17   A    No -- I'm sorry.

18   Q    -- initially?

19   A    I'm sorry; no.

20   Q    The master/slave relationship, how did you learn that?

21   A    Pardon me.

22         We went on a walk and she told me.  She prefaced me

23   first and she just said, so I'm gonna tell you like what we're

24   actually called.  And she said, it's very controversial and

25   it's meant to be shocking and it's meant to raise up different

Jay - direct - Lesko                          4334

1  feelings.  But she said it's kind of like in karate, you have

2  your sensei and your master and your guru, and so she said, so

3  I'm actually your master and you are actually my slave and

4  that's just what it's called.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                           4335

1  BY MR. LESKO:   (Continuing.)

2  Q    When you first joined The Vow, did India give you any

3  assignments?

4  A    Yes.

5  Q    And what were the initial assignments?

6  A    Mainly just journaling.

7  Q    And what do you mean by journaling?

8  A    She would give me journal assignments like contemplate

9  what a wise woman is, contemplate the kind of woman you want

10 to be, like what are those characteristics and things like

11 that.

12 Q    Do you keep a journal regularly?

13 A    On my own, yes.

14 Q    And so did you know what she was referring to when she

15 asked you to write journal entries?

16 A    Yes.

17 Q    And did you do that?

18 A    Yes.

19 Q    And who picked the topics?

20 A    India.

21 Q    Did Allison Mack give you any assignments?

22 A    Yes.

23 Q    What assignments did she give you?

24 A    Allison initially -- she first gave me an assignment to

25 read the book *Chasm of Fire*.

Jay - direct - Lesko                                     4336

1   Q    And what is *Chasm of Fire*?

2   A    It's a book about a woman's journey to enlightenment and

3   she goes to India and she meets her master who helps her break

4   through different, like, patterns and mental things to gain

5   enlightenment.

6   Q    And were you required to do anything during your reading

7   of the *Chasm of Fire*?

8   A    Yes.

9   Q    What was that?

10  A    I had to -- after every chapter that I would read, I

11  would have to basically kind of send her, like, a book report

12  of what it was about and how I felt about it.

13  Q    Were you paid for these reports?

14  A    No.

15  Q    So, when you joined The Vow were you told that men were

16  part of the organization?

17  A    No.

18  Q    Would you have joined The Vow if you had been told that a

19  man or men was involved in the organization?

20  A    Absolutely not.

21  Q    Why not?

22  A    Because, no offense to men, but there are just some

23  things that men don't understand that only women do and

24  because of everything that I had been through and my mother

25  not being present, I definitely wanted to form more bonds with

SN        OCR        RPR

Jay - direct - Lesko                          4337

1    women and it just made sense.  It wouldn't make sense if there

2    was a man running things.

3    Q    So let's go back to the 11-day intensive in Albany in

4    November of 2016, okay?  During that 11-day intensive, did you

5    meet the defendant?

6    A    Yes.

7    Q    So, can you describe your first meeting with the

8    defendant?

9    A    Yes.  I had just arrived to Albany for the first time and

10   India picked me and a few other students up from the bus

11   station or the bus stop and we went straight to volleyball.

12   Q    And what was volleyball?

13   A    Volleyball was a NXIVM activity that happened a couple of

14   times a week.

15   Q    And was the defendant playing volleyball?

16   A    Yes.

17   Q    Okay.  And what happened at volleyball?

18   A    Well, my first time attending, I went and that's when I

19   first saw and met Keith and prior to that because I was so

20   moved from the five-day and because I believed that it was an

21   organization where people really wanted to do good, I had,

22   like, this admiration for what I believed, like, Keith was

23   doing.

24          So when I first met him, it was emotional -- kind of

25   like this, and I introduced myself and said thank you for

SN        OCR        RPR

Jay - direct - Lesko                    4338

1    creating this curriculum and helping me.  And I was

2    overwhelmed with emotion and then he grabbed my hand and sat

3    me down on the bench and we just kind of chatted and he, like,

4    tried to console me and make me feel better.

5    Q    I think you explained it a bit, but why did you get so

6    emotional?

7    A    I'd say because the kind of person that I am is I really

8    want to do good things in the world and I guess it was a

9    surprise for me before taking the course to find people that

10   actually -- that I felt actually wanted to do that.  So for me

11   it was really inspiring and encouraging and, so, because I had

12   so much breakthrough with the curriculum, I attributed that,

13   obviously to myself and to the curriculum, but to the fact

14   that I thought Keith created it.  I was just grateful.

15          So I had all of these emotions of thinking that, oh,

16   I'm meeting someone who also wants to do good and, like,

17   meeting all of these people that also want to do good and, so,

18   it -- I was just really emotional.

19   Q    So during the 11-day intensive, the program itself, did

20   you -- were you ever involved in a discussion about a T-shirt

21   company?

22   A    Yes.

23   Q    Can you discuss that, please?

24   A    So during the intensive, because I'm a writer and I like

25   to just come up with slogans for things, I kept coming up with

SN        OCR        RPR

Jay - direct - Lesko                                    4339

1    these terms and someone said oh, you should put that on a

2    T-shirt and other people were, like, that would be great.  I

3    was, like, okay, but I couldn't think of anything.  So me and

4    my friend off-the-cuff said let's start a humanitarian T-shirt

5    line.  My ex-boyfriend had a T-shirt company, so I was very

6    well-versed in how to do that.

7              And, so, word got out that I wanted to start a

8    T-shirt company and multiple people, Jim Del Negro, India,

9    Allison came up to me, like, oh, you should talk to Keith.  He

10   has a T-shirt company.  You should talk to Keith.

11   Q    Did you end up talking to get about the T-shirt company?

12   A    Yes.

13   Q    When was the first time you talked to Keith about the

14   T-shirt company idea?

15   A    I approached him at volleyball and told him that I was

16   referred to go to him to talk about this T-shirt company

17   because I already had an idea and apparently he had one.

18   Q    This was another volleyball session, not the first one

19   you went to?

20   A    Correct.

21   Q    And what was his reaction?

22   A    He said he did have a T-shirt company business and I

23   should get his information from Allison.

24   Q    And did you get the information from Allison?

25   A    Yes.

SN        OCR        RPR

Jay - direct - Lesko                                    4340

1    Q    And do you remember what information you received?

2    A    His phone number to use WhatsApp.

3    Q    And did you contact the defendant?

4    A    Yes.

5    Q    How did you contact him?

6    A    Via WhatsApp, through a message.

7    Q    And did you arrange a meeting with the defendant?

8    A    Yes.

9    Q    And did you meet with him?

10   A    Yes.

11   Q    And how did that happen?

12   A    It was -- we didn't set, like, an exact time.  He just

13   said different days that he would possibly be available and to

14   just -- he'll see if I'm up because sometimes he takes, like,

15   his walks late and so I just had my phone ready and then he

16   messaged me, probably sometime after 1 a.m., and then I met

17   him to go on a walk.

18   Q    Okay.  We'll talk about that walk in just a moment.  Back

19   to the 11-day intensive.  After the 11-day intensive ended,

20   did you leave Albany?

21   A    Yes.

22   Q    And what was the next NXIVM class that you took?

23   A    The Source.

24   Q    And that was in Vancouver?

25   A    Yes.

SN        OCR        RPR

Jay - direct - Lesko                                4341

1    Q     What was The Source?

2    A     The Source was an intensive program that was more geared

3    towards artists, actresses or actors and performers.

4    Q     And when did you take The Source?

5    A     In December of 2016.

6    Q     During this time period, the November/December time

7    period of 2016 were people trying to convince you to move to

8    Albany?

9    A     Yes.

10   Q     Who was trying to convince you?

11   A     India and Allison.

12   Q     And what were they saying?

13   A     They basically just said that it would be a good idea for

14   me to move to Albany so I could work on myself.

15   Q     Did the defendant ever contact you?

16   A     Yes.

17   Q     And how did the defendant contact you?

18   A     He messaged me on WhatsApp after I went back to Albany

19   before I returned to L.A. and he said, if you're serious about

20   starting this T-shirt company, the sooner you come back, the

21   better.

22   Q     And at this point you were in The Vow?

23   A     Yes.

24   Q     So during this same time period, the end of 2016, were

25   you still doing modeling work?

Jay - direct - Lesko                                    4342

1    A    Yes.

2    Q    And how would you characterize your modeling career at

3    this point in time?

4    A    I would say that it was at a high point and ready for,

5    like, a big transition and up-leveling.  I had just gotten an

6    agent.  I was booking commercials and booking print jobs and I

7    was basically ready to go to the next level.

8    Q    So it was going well?

9    A    Yes.

10   Q    And at this point did you decide to move to Albany?

11   A    I'm sorry?

12   Q    Did you decide to move to Albany?

13   A    Not right away, but I did end up moving to Albany.

14   Q    Was that an easy decision for you?

15   A    No, not at all.

16   Q    Why not?

17   A    Well, first when India and Allison tried to convince me I

18   wasn't into it because my career was doing -- going really

19   well, although I did see that there could be some benefits to

20   working on myself, but until Keith messaged me about the

21   T-shirt company, I was kind of like, you know what, I can come

22   back to my career.  I'll be stronger internally.  I can start

23   this T-shirt company, make some money, like hang out with the

24   trade.

25   Q    So do you remember when you moved to Albany?

SN        OCR        RPR

Jay - direct - Lesko                                    4343

1   A     Yes.

2   Q     What was that?

3   A     January 11, 2017.

4   Q     And I think you just described it, but the reasons for

5   moving to Albany was to work on yourself and the T-shirt

6   company?

7   A     Yes.  And I've always had an entrepreneurial spirit, so I

8   thought it would be a good idea.  I would have Keith mentor me

9   on being an entrepreneur.  Start a T-shirt company, make money

10  and work on my internal being.

11  Q     Did you take anything with you when you went to Albany?

12  A     Yes, most of my things, whatever I didn't sell or get rid

13  of, and my cat.

14  Q     What's your cat's name?

15  A     Nico.

16  Q     Where did you live in Albany?

17  A     I lived in Allison's house that she owned at 7 Generals

18  Way in the basement.

19  Q     Is that where you stayed when you took the 11-day

20  intensive?

21  A     Yes.

22  Q     So during the time period that you lived in Albany did

23  you travel back and forth to Los Angeles?

24  A     Yes.

25  Q     And why were you doing that?

Jay - direct - Lesko                                          4344

1    A    Because I couldn't make any money in Albany and I still
2    had a lot of bills.
3    Q    And were you making money in Los Angeles?
4    A    Yes.
5    Q    How were you making money in Los Angeles?
6    A    It was ranging from booking print jobs, working different
7    gigs, as well as -- yeah, that's it.
8    Q    Were you working at poker games?
9    A    Yes, that's some of the gigs that I was working at.
10   Q    What were you doing?
11   A    I was a poker host.  So I would serve drinks, give people
12   massages and also serve them food.
13   Q    Now, when you say "print jobs" is that, is that
14   advertisements with your photographs in them?  Is that what
15   print jobs are?
16   A    Yes.  For instance, I did a coffee bean ad.  So a picture
17   of me with a cappuccino and they get put on buses or
18   billboards and things like that.
19   Q    And you would fly back and forth; is that right?
20   A    Yes.
21   Q    And when you flew to New York, what airport did you
22   typically arrive at?
23   A    Usually JFK.
24   Q    And about how many times, if you can estimate, did you
25   travel back and forth between New York and Los Angeles during

                         SN      OCR      RPR

Jay - direct - Lesko                    4345

1    this time period?

2    A      Several times.

3

4                    (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jay - direct - Lesko                                      4346

1    DIRECT EXAMINATION

2    BY MR. LESKO: (Continuing)

3    Q    And who paid for all this travel?

4    A    I did.

5    Q    And after you got to Albany, did you actually make money?

6    A    In Albany?

7    Q    Yes.

8    A    Not really.

9    Q    So did you attempt to make money?

10   A    I did attempt to make money.

11   Q    And how did you do that?

12   A    I was working for India in her Delegates program.

13   Q    What was Delegates?

14   A    Delegates was a company that India and Keith started.

15   It's similar to Task Rabbit, so, basically, it's like a

16   service providing people that need help with, like, assistance

17   stuff or cleaning or giving people rides and things like that.

18   Q    And generally speaking, who were the employees at

19   Delegates?

20   A    There were people part of the NXIVM community, usually

21   younger people.  There were a few teenage girls from Mexico

22   that were in it and a few other people in the community.

23   Q    Do you know why the teenage girls from Mexico were in the

24   community?

25   A    I'm not entirely sure, but they said they were there for

MDL        RPR        CRR        CSR

Jay - direct - Lesko                            4347

1    some sort of special schooling.

2    Q    And did those teenage girls from Mexico, did they attend

3    any NXIVM programs while you were there?

4    A    The one that I am aware of was the Jness weekend.

5    Q    And were sexual topics discussed in front of them?

6    A    Yes.

7    Q    Do you recall their reaction?

8    A    Yes.

9    Q    What was it?

10   A    They were really uncomfortable and other teenage girls

11   were giggling, hiding, and kind of laughing.

12   Q    Did you provide any services while you were working at

13   Delegates?

14   A    Yes.

15   Q    Describe them, please.

16   A    Well, when I was hired through Delegates, I would do

17   things like run errands, drop off food.  Also, I was hired to

18   do reiki, and just different errands like that and cleaning.

19   Q    What is reiki?

20   A    Reiki is an energy healing modality.

21   Q    And describe it, please.

22   A    So, unlike massage, it's something where you have to get

23   initiated into reiki and you use, like, energy from elements

24   to help find people's elements and putting like, say, good

25   energy into those areas to help people feel better.

Jay - direct - Lesko                    4348

1    Q     So is it sort of like a massage?

2    A     Sort of like a massage.

3    Q     Do you give massages professionally?

4    A     I am certified in Lomi Lomi, which is a massage, but I

5    don't do that for a trade.  But I can't -- I wouldn't consider

6    myself to be a healer and able to do that.

7    Q     If you had stayed in Los Angeles as opposed to moving to

8    Albany, could you have made more money?

9    A     Yes.

10   Q     While you were in Albany, did Allison Mack ever ask you

11   questions about the defendant?

12   A     Yes.

13   Q     What sort of questions would she ask?

14   A     At just really random times she would ask me so what do

15   you think of Keith?  How do you feel about Keith?  Things

16   along those lines.

17   Q     And what was your reaction?

18   A     It was really awkward because it was just random.  We

19   would be driving so, she'd be, like, so what do you think

20   about Keith?  And I didn't really know what to say and I would

21   say oh, he seems cool, he seems nice.  It was just really

22   weird.

23   Q     While you were in Albany, did Allison or India ever tell

24   you that the defendant had asked about you?

25   A     Yes.

MDL       RPR       CRR       CSR

Jay - direct - Lesko                                      4349

1    Q    And could you tell us about that?

2    A    Like say I would go and hangout with India and she would

3    say oh, Keith was asking about you today and he was checking

4    in on you and seeing how you were doing.

5    Q    Were you encouraged to develop a relationship with the

6    defendant?

7    A    Yes.

8    Q    Who did that?

9    A    India and Allison and really within the community it was

10   this kind of this thing where if you're lucky enough to have

11   Keith as a mentor, it's life changing.  You know, most people

12   tried to foster a relationship with him.

13   Q    And initially, after moving to Albany, did you have

14   contact with the defendant?

15   A    Yes.

16   Q    What sort of contact?

17   A    Well, messaging, and also I would see him at volleyball

18   and sometimes we'd go on walks.

19   Q    Did you ever run errands for the defendant?

20   A    I ran errand to the defendant but not for Keith.

21   Q    What sort of errands?

22   A    I -- as part of the Delegates, I would have to drop off

23   food.  Almost every time that I worked Delegates I would end

24   up having to drop off food for him.

25   Q    Did you end up taking walks with him?

Jay - direct - Lesko                    4350

1   A    Yes.

2   Q    After you delivered the food, did you leave right away or

3   did you stay and talk with the defendant?

4   A    It was different every time.  Usually I would chat with

5   him for a little bit and then there also would be times where

6   he would invite me inside and just chat inside the house for a

7   little bit.

8   Q    Do you have an understanding now of why you were having

9   so much contact with the defendant after moving to Albany?

10  A    Yes.

11          MR. AGNIFILO:  Object to the form of the question,

12  Judge.

13          THE COURT:  Sustained.

14  Q    Why do you think you were having so much contact with the

15  defendant right after moving to Albany?

16          MR. AGNIFILO:  I object to the form the question.

17          THE COURT:  Sustained.

18  A    I'm sorry, can you repeat that, please?

19          THE COURT:  He will repeat it in a different form.

20          THE WITNESS:  Okay.

21  Q    This amount of contact with the defendant, was it usual

22  or unusual for somebody who was new to the community?

23  A    Very unusual.

24  Q    Do you have an understanding as to why this unusual level

25  of contact was occurring with the defendant?

MDL       RPR       CRR       CSR

Jay - direct - Lesko                    4351

1              MR. AGNIFILO:  I object.

2              THE COURT:  Overruled.  You may answer.

3     A    Can you repeat that, please?

4     Q    Do you have an understanding as to why this unusual level

5     of contact with the defendant was happening?

6     A    Yes.

7     Q    What was that understanding?

8     A    My understanding now is that I was being groomed to be a

9     part of his harem.

10    Q    Did you have an impression of how other people in the

11    community perceived the defendant, other women in the

12    community?

13    A    Yes.

14    Q    What was that understanding?

15    A    He was very revered.

16             MR. AGNIFILO:  I'm sorry, I am going to move to

17    strike the answer that she gave before.

18             THE COURT:  Overruled.  I think -- why don't we

19    break for the day.  It is after five o'clock.

20             MR. LESKO:  Very well.

21             THE COURT:  We can convene tomorrow.  The witness is

22    excused.  You may step down.  Do not discuss your testimony

23    with anyone and we will resume at 9:15 tomorrow morning.

24             You may leave.

25             THE WITNESS:  Thank you very much.

Jay - direct - Lesko                    4352

1              THE COURT:  Very well.

2              (Witness steps down.)

3              THE COURT:  All right.  Everyone may be seated.

4              Members of the jury, this concludes testimony for

5    today.  I remind you that it is very important that you follow

6    my instruction that you not discuss the case with anyone, not

7    your family, friends, or business associates, and not your

8    fellow jurors.

9              Also, you must not read, listen to, or watch any

10   accounts of this case in any form of media, including

11   newspapers, TV, radio, podcast or the internet.  And you

12   should not research or seek outside information about the

13   case.

14             Also, do not communicate with anyone about the case

15   on your phone, whether through e-mail, text messaging or any

16   other means, through any blog or website, or by way of any

17   social media, including Facebook, Twitter, Instagram, YouTube

18   or other similar sites.  And you must not consider anything

19   you may have read or heard about the case outside this

20   courtroom whether you read it before or during jury selection

21   or during this trial.  And do not visit any of the locations

22   identified during the course of the jury selection or trial.

23             We will see you tomorrow morning at 9:15.  All rise

24   for the jury.

25             (Jury exits the courtroom.)

Jay - direct - Lesko                                      4353

 1              THE COURT:  Anything else?

 2              MS. PENZA:  Not from the Government.

 3              MR. AGNIFILO:  Can I make a one-minute record,

 4     Judge?

 5              THE COURT:  Sure.

 6              MR. AGNIFILO:  Judge, this repeated sort of system

 7     questions for each witness, that looking back at it, what did

 8     you think by a certain set of facts and the witnesses, just

 9     like in this case, I thought I was being groomed to join a

10     harem, that's not the witness testifying to eyewitness

11     observations.  This is a lay witness that's here to talk about

12     what she saw, what she heard, what she did.  She is not an

13     expert.  She is certainly not an expert on another person's

14     intention in the context of her own life.  It's highly

15     prejudicial.  It's been going on throughout the Government's

16     case in chief and I object to it and I renew my motion to

17     strike.

18              THE COURT:  Thank you.  Mr. Lesko, do you want to

19     comment on that?

20              MR. LESKO:  Your Honor, I mean, I think it is highly

21     relevant, and not only with respect to this witness but for

22     other witnesses and victims, that the jury understand their

23     understanding of what happened to them and particularly after

24     they were, in essence, deprogramed.

25              And in this specific instance, that understanding

Jay - direct - Lesko                                    4354

1    happened very quickly after the witness received an assignment

2    to have contact with the defendant.  So, it actually is

3    particularly relevant for this witness because it was an

4    instantaneous recognition of what was going on.

5              THE COURT:  Then what you need to do is ascertain

6    from the witness when this happened so that we know that it

7    wasn't just something that the person thought up last week

8    before she testified.  If it affected her behavior in removing

9    herself from the organization, then it is relevant.  If it is

10   something that she read in all of the media reports, in the

11   *New York Times* magazine, for instance, and other places, and

12   *Forbes* magazine, then it is a different story.  Then it is not

13   what she ascertained at about the time that she removed

14   herself from the organization.  I think that is a key to

15   whether this such testimony is appropriate and relevant to the

16   case.

17             MR. LESKO:  We will be offering detailed testimony

18   on this.

19             THE COURT:  All right.  We will see.  Thank you.  And

20   you have your record.

21             (Matter adjourned to June 11, 2019 at 9:15 a.m.)

22

23                          ooo0ooo

24

25

4355

I N D E X

WITNESS                                              PAGE


  NICOLE
      DIRECT EXAMINATION BY MS. PENZA           4104
      CROSS-EXAMINATION BY MR. AGNIFILO         4114
      CROSS RESUMED BY MR. AGNIFILO:            4234


  CHRISTOPHER MILLS
      DIRECT EXAMINATION BY MS. HAJJAR          4289
      CROSS EXAMINATION BY MS. GERAGOS          4312


  JAY
      DIRECT EXAMINATION BY MR. LESKO           4315

SAM     OCR     RMR     CRR     RPR

4356

1                                **E X H I B I T S**

2

3

4        Government's Exhibit 667                          4106

5

6        Defendant's Exhibit 941                           4196

7

8        Defendant's Exhibit 942                           4198

9

10       Defendant's Exhibit 943                           4199

11

12       Defendant's Exhibit 929                           4207

13

14       Government's Exhibit 501                          4294

15

16       Government Exhibit 502                            4297

17

18       Government Exhibit 502-A                          4299

19

20       Government Exhibits 520 and 524                   4306

21

22       Government Exhibit 503                            4309

23

24       Government's Exhibit 560                          4311

25

                    SAM      OCR      RMR      CRR      RPR