4357

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      :   18-CR-204(NGG)
4
            Plaintiff ,         :
5                                   United States Courthouse
        -against-               :   Brooklyn, New York
6
KEITH RANIERE, et al.,         :
7                                   June 11, 2019, Tuesday
            Defendant.          :   9:15 a.m.
8
    - - - - - - - - - - - - X
9
                    TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
            UNITED STATES DISTRICT JUDGE, and a jury.
11
APPEARANCES:
12
For the Government:        RICHARD P. DONOGHUE
13                         United States Attorney
                           BY: MOIRA K. PENZA, ESQ.
14                             TANYA HAJJAR, ESQ.
                               MARK LESKO, ESQ.
15                         Assistant United States Attorneys
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201

17  For the Defendant:     BRAFMAN & ASSOCIATES, P.C.
                           767 Third Avenue
18                         New York, New York 10017
                           BY: MARC A. AGNIFILO, ESQ.
19                             TENY ROSE GERAGOS, ESQ.

20                         DEROHANNESIAN & DEROHANNESIAN
                           677 Broadway
21                         Albany, New York 12207
                           BY:  PAUL DerOHANNESIAN, II, ESQ.
22                             DANIELLE R. SMITH, ESQ.

23
Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
24                  Official Court Reporter
                    E-mail:  SMaceRPR@gmail.com
25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

SAM      OCR      RMR      CRR      RPR

Proceedings                                    4358

```
 1              (In open court - jury not present.)
 2              (Judge NICHOLAS G. GARAUFIS entered the courtroom.)
 3         THE COURT:  All right, bring in the defendant.
 4              (Defendant entered the courtroom.)
 5         THE COURT:  Where is Ms. Penza?  Is it my vision or
 6    is she not here?
 7         MS. HAJJAR:  She should be here momentarily,
 8    Your Honor.
 9         THE COURT:  Well, everyone sit down, and we will
10    wait on Ms. Penza.
11              (Pause.)
12         MS. PENZA:  So sorry.
13         THE COURT:  All right.
14         MS. PENZA:  Good morning.  I apologize.
15         THE COURT:  Let's have appearances, and then we'll
16    move on from there.
17         MS. PENZA:  Moira Penza, Tanya Hajjar, and Mark
18    Lesko for the United States.  Good morning, Your Honor.
19              Also at counsel table, Special Agent Michael Lever
20    and Paralegal Specialist Teri Carby.
21         THE COURT:  Thank you.  Good morning.
22              Yes.
23         MR. AGNIFILO:  Good morning, Your Honor.
24              Marc Agnifilo, Teny Geragos, Paul der Ohannesian,
25    and Danielle Smith for Keith Raniere, who is with us this
```

Proceedings                                         4359

1    morning.

2            Good morning.

3            THE COURT:  Good morning, everyone.  Please be

4    seated.

5            Well, you've been busy overnight.

6            MR. AGNIFILO:  I don't sleep anymore, Judge.

7            THE COURT:  Well, I don't sleep at night worrying

8    about the fact that you don't sleep at night.

9            MR. AGNIFILO:  I know.  I'll call you.

10           THE COURT:  No, thank you.

11           All right, I do not need oral argument here.  On the

12   issue of the details of the irrevocable trust, the fact of the

13   trust was, as you pointed out in your letter, has already been

14   ruled on, right?

15           MR. AGNIFILO:  Yes.

16           THE COURT:  So the fact of the trust can come in.

17           MR. LESKO:  Your Honor, if I may?

18           THE COURT:  Oh.

19           MR. LESKO:  Just briefly.  I think we've reached an

20   agreement that we would enter the fact of the trust and the

21   total amount available, and not get into which firm was paid

22   what.

23           THE COURT:  Available at the beginning of the --

24   when the trust, in total, when it was created and added to and

25   added to and added to?

Proceedings                                     4360

1          MR. LESKO:  Yes, the total amount available for the

2    defense.

3          THE COURT:  I am seeing some visuals here.  Yes?

4          MR. AGNIFILO:  So what I'd like to do, I think we

5    have five minutes.  I don't know that I'm comfortable with the

6    whole amount because it is going to so many parties, and I

7    don't know that I want to get into all of that.

8          THE COURT:  Well, figure out how to do it.  Figure

9    it out.

10         MR. AGNIFILO:  So if -- but if we can get five

11   minutes, we might be able to --

12         THE COURT:  Good.  I want that.  That's good.

13         MR. LESKO:  Thank you, Your Honor.

14         THE COURT:  That's a solution, let's try to make it

15   happen.  All right, that takes care of that.

16         The two matters that are brought to the Court by the

17   Government, did you want to say something without going into

18   details or --

19         MR. AGNIFILO:  Can we do it at the side?  It will

20   take really just two minutes.  Can we just do that?  I will be

21   very, very quick.

22              (Sidebar held.)

23

24              (Continued on following page.)

25













Proceedings                                              4367

1              (In open court - jury not present.)

2              THE COURT:  Okay.

3              All right, I would just point out that the Court has

4    received some impeachment evidence from the defense, which are

5    for in-camera review, and we are reviewing that evidence.

6              MR. AGNIFILO:  Thank you.

7              THE COURT:  All right?  Thank you.

8              Okay.  Let's bring in the witness and the jury.

9              (Witness entered the courtroom and resumed the

10   stand.)

11             (Jury enters.)

12             THE COURT:  Please be seated.

13             Good morning, members of the jury.

14             THE JURORS:  Good morning.

15             THE COURT:  All right, at this time, we will

16   continue the direct examination of Jay.

17             You may proceed, Mr. Lesko.

18             MR. LESKO:  Thank you.

19             THE COURT:  I remind the witness that she is still

20   under oath.

21

22             (Continued on the following page.)

23

24

25

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                    4368

**J A Y**,

   previously called as a witness by the Government, having

   been previously duly sworn/affirmed by the Courtroom

   Deputy, was examined and testified further under

   oath as follows:

DIRECT EXAMINATION CONTINUING

BY MR. LESKO:

Q    Good morning.

A    Good morning, everyone.

Q    You can pull your microphone close, if you like.

        So, Jay, did you have a -- form an impression of how

other women in the community perceived the defendant?

A    Yes.

Q    What was that impression?

A    The impression was that their way -- they had a lot of

adoration, almost a little bit of an obsession, and -- but

they, you know, revered Keith.

Q    Were you sexually attracted to the defendant?

A    No.

Q    So let's go back to the conversation with India, just

before you joined The Vow.  Okay?

A    All right.

Q    During that conversation, did she tell you that after

joining The Vow you would have to provide additional

collateral?

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                4369

1  A    I'm sorry, can you repeat that?

2  Q    You provided the four pieces of collateral to join

3  The Vow, right?

4  A    Correct.

5  Q    Did India tell you that you would, after joining The Vow,

6  have to provide more collateral or additional collateral?

7  A    She didn't tell me that I would need to when I joined,

8  but afterwards that was now a thing that I had to start doing.

9  Q    And how often did you have to provide additional

10  collateral?

11  A    Kind of like rent, you had to submit new collateral the

12  first of every month.

13  Q    And had you known this requirement, this monthly

14  collateral requirement, would it have changed your mind about

15  joining The Vow?

16  A    Absolutely.

17  Q    Why so?

18  A    Because I understood that, okay, fine, you need to

19  protect the secrecy.  So the first collateral seemed, like,

20  sensible to a certain degree.

21       But afterwards, that just -- it was scary.  It's

22  like, why would I have to keep submitting collateral, and keep

23  telling them more things about me.  It was -- it was -- it was

24  really scary.

25  Q    Did you provide monthly collateral?

SAM     OCR     RMR     CRR     RPR

Jay - direct - Lesko                                    4370

1  A    I did.

2  Q    And what types of collateral did you provide?

3  A    I provided photos that were either sexy or unattractive,

4  and more video secrets.

5  Q    Secrets about yourself?

6  A    Correct.

7  Q    And who did you provide this monthly collateral to?

8  A    At first, it was to India.  But then I was invited to

9  collaborate in a Dropbox, so I directly submitted to there.

10 Q    And what is Dropbox?

11 A    Dropbox is an application where you can store

12 information, kind of like an iCloud.

13 Q    And who invited you to join the Dropbox, was it a group?

14 A    India invited me, but there was a group in there.

15 Q    Okay.  And could you just explain how the collateral to

16 the Dropbox process worked?

17 A    Yes.  So you were asked to -- or not asked, you were told

18 to put in your collateral there on the 1st.  And then shortly

19 after they said it would be deleted, within 24 hours.

20 Q    I am going to show you what I believe is admitted as

21 Government's Exhibit 446-R.

22        MR. LESKO:  Just checking with Ms. Carby.

23        Yes, okay, this has been admitted.

24 BY MR. LESKO:

25 Q    And you can look on your screen.

Jay - direct - Lesko                                    4371

```
 1                  (Exhibit published.)

 2    BY MR. LESKO:

 3    Q    I am showing you the -- I'll zoom out.

 4         Can you see that?

 5    A    Yes.

 6    Q    Okay.  What is the first page of Government's 446-R?

 7    A    It's one of the pages on the Dropbox, with different

 8    folders that has brands and workouts.

 9    Q    Is this -- is this a screenshot of the Dropbox folder?

10    A    Yes.

11    Q    And do you know who took that screenshot?

12    A    I did.

13    Q    Show you the second page of Government's 446-R.

14                  (Exhibit published.)

15    Q    Do you recognize that page?

16    A    Yes.

17    Q    Is that also a screenshot you took?

18    A    Yes.

19    Q    And so is that the group that you mentioned earlier?

20    A    Correct.

21    Q    And could you name the group, please?

22    A    Allison Mack, Danielle Roberts.  It says "Danielle

23    exo-eso," which is Danielle Roberts' other e-mail, India

24    Oxenberg, myself, and Michele.

25    Q    And did you later learn who all these people were?
```

SAM     OCR     RMR     CRR     RPR

1  A    Yes.

2  Q    Okay.  Who were they?

3  A    They were people in Allison's little sort of circle, as

4  well as -- and as well as, technically, my housemate.

5  Q    Okay.  And I am going to show you this -- I think this

6  second page cuts off at the bottom, so I am going to show you

7  the bottom of the second page of Government's 446-R.

8          (Exhibit published.)

9  BY MR. LESKO:

10  Q    Do you recognize that page?

11  A    Yes.

12  Q    And I think we left off with Michele.

13          Are there any other names mentioned on that -- on

14  that page?

15  A    Nicole.

16  Q    And was Nicole also a member of Allison's circle?

17  A    Yes.

18  Q    And is this a screenshot that you took?

19  A    Yes.

20  Q    And just very quickly, the last page.

21          (Exhibit published.)

22  Q    Do you recognize the last page of Government's 446-R?

23  A    Yes.

24  Q    And what is that?

25  A    It's an invitation to join Dropbox.

Jay - direct - Lesko                                    4373

1              It says:  Hi, Jay, India Oxenberg invited you to

2     edit the folder Collateral iTribe on Dropbox.  And it says:

3     India said, here is your file to upload collateral.  Once it

4     is uploaded, it will be taken off line.

5     Q    Okay.  And was that the invitation to join the Dropbox

6     group?

7     A    Yes.

8     Q    And was -- again, that was your screenshot?

9     A    Yes.

10    Q    Did all of the monthly collateral -- did you upload

11    collateral to the Dropbox?

12    A    Yes.

13    Q    Did it always remain there or did it get deleted

14    eventually?

15    A    It got deleted eventually.

16    Q    And did you have an understanding regarding what India

17    did with your collateral?

18    A    It was a vague understanding, but she said that the

19    collateral would go into a safe, and that it would be

20    protected.

21    Q    A physical safe?

22    A    That's what she said.

23    Q    Do you know where the safe was located?

24    A    No.

25    Q    Do you remember a time when collateral was on a

SAM       OCR       RMR       CRR       RPR

1   zip drive?

2   A    Yes.

3   Q    And a zip drive, describe what a zip drive is.

4   A    A zip drive is like this little device that holds memory

5   for computer and files.

6   Q    So could you explain the time when collateral was on a

7   zip drive?

8   A    Yes.  There was a zip drive that was located in Allison's

9   apartment, not the house that I lived in.  And Allison wasn't

10  there, and India asked me if I could grab it for her.  And she

11  said:  Be careful, it has the collateral, just be safe with

12  it.

13         So I went to Allison's house, got it from the table,

14  and brought it to her.

15  Q    Did that concern you?

16  A    Yes.

17  Q    Why?

18  A    Because it just showed how careless they were being.

19  Obviously, having my own collateral, it made me scared that

20  anyone could see it, anything could have happened to it, and

21  that it wasn't secure and protected.

22  Q    So at this point, when you first start providing the

23  monthly collateral, what was your understanding of the purpose

24  of the monthly collateral?

25  A    Well, they said that it was to make your word stronger,

SAM     OCR     RMR     CRR     RPR

Jay - direct - Lesko                    4375

1   as to uphold your commitments.

2   Q    Did that understanding change later?

3   A    Yes.

4   Q    What was your later understanding?

5   A    My later understanding is that they wanted to blackmail

6   us with it.

7   Q    So you mentioned that India discussed the master/slave

8   relationship with you, is that right?

9   A    Yes.

10  Q    So what was your reaction when she -- when she explained

11  that she was your master and you were her slave?

12  A    Well, she prefaced me and she said that the name dynamic

13  was very controversial, and that it's meant to raise feelings

14  for you to go through.  And then she explained that it's kind

15  of like in karate, master/sensei, yoga, guru, master.

16         So because she expressed it in that way, because

17  India to me was just very disarming, I didn't really think

18  much of it.  I was just like, oh, okay, it's just a word, it's

19  not gonna mean anything.

20  Q    Are you familiar with the term -- well, you mentioned the

21  term "circle."

22         What was a circle?

23  A    A circle, to my knowledge, is the circle of slaves

24  that -- that had the same master.

25  Q    And whose circle -- were you part of a circle?

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                          4376

1   A    Yes.

2   Q    And whose circle were you part of?

3   A    India's circle.

4   Q    Okay.  And was India part of a circle?

5   A    Yes.

6   Q    And whose circle was India a part of?

7   A    Allison's.

8   Q    Were you aware of other circles in The Vow?

9   A    No.  I knew they existed, I just didn't know who they

10  were.

11  Q    So let's talk about assignments that you received during

12  your time in The Vow.  Okay?

13  A    Okay.

14  Q    Did you receive assignments -- you received assignments

15  from India, right?

16  A    Yes.

17  Q    And I think you mentioned at least one assignment from

18  Allison?

19  A    Yes.

20  Q    Did you receive additional assignments from Allison?

21  A    Yes.

22  Q    Are you familiar with the term "acts of care"?

23  A    Yes.

24  Q    What is an act of care?

25  A    It was labeled "acts of care for your M," which stood for

Jay - direct - Lesko                                      4377

1   master.  And it was, basically, things that you were supposed

2   to do for your master to help make their life easier, make

3   them feel good.  Things of that nature.

4   Q    And did you perform acts of care?

5   A    Yes.

6   Q    Did you perform acts of care for India?

7   A    Yes.

8   Q    What did you do?

9   A    I would do things like buy her a mani/pedi or, like, pay

10  for her massage.  Also, I knew that she liked poems and memes,

11  so I would send her different memes and poems.

12  Q    What's a meme?

13  A    It's something online, where it's like a picture and like

14  a quote or something, and something kind of usually funny.

15  Q    Did you give her gifts?

16  A    Yes.

17  Q    What did you give her?

18  A    I got her some jewelry.

19  Q    Did you give anyone else jewelry?

20  A    Yes.

21  Q    Who?

22  A    Allison.

23  Q    Who paid for the jewelry?

24  A    I did.

25  Q    And were you -- were you compensated or paid for any of

Jay - direct - Lesko                                    4378

1   these acts of care?

2   A    No.

3   Q    In fact, were you ever paid for any of the assignments

4   that you completed when you were part of The Vow?

5   A    No.

6   Q    Are you familiar with the term "acts of self-denial"?

7   A    Yes.

8   Q    What are they?

9   A    So it was one of the assignments, where you -- there was

10  three different acts of self-denial.  One was for one week,

11  one month, and one year.  And, basically, you just had to give

12  something up for that time duration.

13  Q    And what was the purpose of an act of denial?

14  A    I was told that it helped build your discipline.  And

15  also, like, build comfortability with discomfort.

16  Q    Did you perform acts of denial?

17  A    Yes.

18  Q    Could you -- what kind of things did you give up?

19  A    So I really love cookies, and I mean -- so that was one

20  of the things that I gave up for a month.  As well as the year

21  one I decided that I wanted to be celibate, so I put that on

22  there as well.

23  Q    So you remained celibate for a period of time?

24  A    That was on my list, yes.

25  Q    As part of The Vow, did you participate in something

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                   4379

1   called "readiness"?

2   A     Yes.

3   Q     And what was readiness?

4   A     Readiness was a drill where either India or a random

5   number would message me with a question mark.  And so at any

6   time of the day, whether it's 3:00 a.m., 6:00 a.m., you had to

7   answer to the question mark with RM within one minute or

8   someone would be punished.

9   Q     And what did "RM" stand for?

10  A     Ready master.

11  Q     And how did you communicate to respond to readiness?

12  A     Usually, Telegram.

13  Q     And what is Telegram?

14  A     Telegram is an encrypted app, where you can self-destruct

15  messages.  And it's supposed to be, like, private.

16  Q     And did anyone tell you to use Telegram to respond to

17  readiness?

18  A     Yes.

19  Q     Who?

20  A     India.

21  Q     Now, these punishments that people received, were you

22  ever told the types of punishments that people received for

23  your failures?

24  A     India said that sometimes it would be, like, taking a

25  longer cold shower.  Being woken up in the middle of the

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                    4380

1    night, like 3:00 a.m., and then have to stand for 30 minutes

2    and things like that.

3    Q    Were you ever punished?

4    A    Yes.

5    Q    How were you punished?

6    A    Thankfully, India was nice.  So I only had to do -- I

7    mean, I mainly only did journalling on my failures.

8    Q    As part of The Vow, were you sometimes assigned to do

9    errands or chores?

10   A    Yes.

11   Q    Could you describe them, please?

12   A    I had to perform services for Allison, as far as cleaning

13   her house, doing her laundry and things like that.

14   Q    How about groceries, did you help with groceries?

15   A    I did help pick up groceries for her.

16   Q    Were you paid for that work?

17   A    No.

18   Q    When you decided to join The Vow, were you told that you

19   would have to complete these types of assignments?

20   A    No.

21   Q    Now, we've discussed Allison frequently.

22        Who is Allison Mack?

23   A    Allison Mack is an actress from the television show

24   Smallville.  She was also the head of The Source, and she was

25   my grand master.

SAM     OCR     RMR     CRR     RPR

Jay - direct - Lesko                                    4381

1   Q    And you lived with Allison when you were in Albany?

2   A    I lived in the house that she owned, and I would

3   frequent -- would frequently visit her apartment.

4   Q    So she had two residences?

5   A    Correct.

6   Q    And she stayed in the apartment?

7   A    Yes.

8   Q    And you and others stayed in a house?

9   A    Yes.

10  Q    Okay.  And where was the house again?

11  A    7 Generals Way in Clifton Park.

12  Q    And who -- you've mentioned this, but who lived in the

13  house with you?

14  A    Danielle Roberts, Michele, Souki.

15  Q    Showing you what's in evidence as Government's 47.

16           (Exhibit published.)

17  BY MR. LESKO:

18  Q    Do you recognize that photograph?

19  A    Yes.

20  Q    Who is that?

21  A    Danielle Roberts.

22  Q    And she stayed in the house with you?

23  A    Yes.

24  Q    Showing you Government's 28 in evidence.

25           (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                    4382

1   Q      Do you recognize that photograph?

2   A      Yes.

3   Q      Who is that?

4   A      Michele.

5   Q      And she stayed in the house as well?

6   A      Yes.

7   Q      When you first joined The Vow, were you aware of -- that

8   anyone else was a member of The Vow, other than India?

9   A      No.

10  Q      Did you later learn that Allison was part of The Vow?

11  A      Yes.

12  Q      How did that happen?

13  A      Well, I wanted to join The Source, and so it was very

14  expensive and I couldn't afford it.  So India suggested that I

15  talk to Allison, since it was her company, to see if I could

16  work something out.

17          So when I went to ask Allison about it, she later

18  revealed to me that she was my grand master.

19  Q      And what was your reaction?

20  A      I was a little shocked and surprised and a little

21  excited.

22  Q      Why were you excited?

23  A      Because the way that I perceived her at that time, she

24  seemed very caring.  As well as she was an actress, and I'm an

25  actress, so I thought that she would be someone that I could

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                              4383

1  learn things about the industry from.

2  Q    Did your perception of Allison change over time?

3  A    Yes.

4  Q    How so?

5  A    I would say that it changed from thinking that she was a

6  good person to then a very emotionally abusive, vindictive,

7  manipulative, hurtful person.

8  Q    Did you and Allison figure out a way for you to pay for

9  The Source?

10 A    Yes.

11 Q    Could you explain that?

12 A    So I put either 2 or $3,000 for the deposit.  And we

13 worked out an agreement, where I would have to enroll three

14 people and then it would be paid off.  And if not, I would be

15 able to make payment plans to -- in lieu of the money.

16 Q    And you may have discussed this earlier, but did you have

17 a payment plan in place for one of the earlier classes?

18 A    Um --

19 Q    The ESP class?

20 A    With the ESP, I paid for all the intensives, those were

21 paid up.  But I did end up doing Ethos, I believe is what it

22 was called, and it was like an ongoing ESP class.  And those

23 were payments.

24 Q    So when you learned that Allison was your grand master,

25 was it your understanding that you owed her obedience?

Jay - direct - Lesko                                            4384

1   A     Yes.

2   Q     And did you owe anyone else obedience?

3   A     India.

4   Q     So you've talked about personal information about your

5   childhood and your history.

6           Did you reveal that information about yourself to

7   Allison?

8   A     Yes.

9   Q     Did you reveal it to India?

10  A     Yes.

11  Q     And did you explain to them that -- well, do you

12  know the -- what is the -- you're familiar with the term

13  "vulnerabilities"?

14  A     Yes.

15  Q     What are vulnerabilities?

16  A     Vulnerabilities were things that -- I guess, that make

17  you feel vulnerable.  But it's kind of more like you would

18  list it, like what are the different -- what are your

19  vulnerabilities, like --

20  Q     Was that a NXIVM term?

21  A     Yes.  Yes.

22  Q     And did you, in the course of discussions with India and

23  Allison, indicate that your vulnerabilities were in part

24  because of the sexual abuse that you experienced?

25  A     Yes, that was a big vulnerability.

Jay - direct - Lesko                                    4385

1    Q    So let's talk about Delegates for a moment.  Okay?

2         You explained what Delegates was.  Did you perform

3    services in connection with Delegates?

4    A    Yes.

5    Q    So briefly, what were they?

6    A    So when I worked for Delegates, I would do the errands,

7    the tasks, the assistant work, like, the assistant type work,

8    as well as massages and the Reiki.

9         And then outside of that, my unpaid work from

10   Delegates would be I helped India format policies, do some

11   administrative stuff for her.

12   Q    So that was -- that part of it was unpaid, the

13   administrative work?

14   A    Yes.

15   Q    And the service work was paid?

16   A    Yes.

17   Q    Do you recall how much you were paid an hour?

18   A    Around 18, $18 an hour.

19   Q    Did you make a lot of money when you were working at

20   Delegates?

21   A    No.

22   Q    When you were in The Vow, were you instructed to recruit

23   other slaves?

24   A    Yes.

25   Q    Could you explain that?

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                    4386

1   A    Originally, India just said to make a list in my head of

2   other women that I thought would benefit from the program,

3   that would like it, and that would be good.

4              And then shortly after, the mental list turned into

5   it needed to be a written list, which escalated into it needed

6   to be a list that was categorized and so forth.

7   Q    And did you compile information about potential recruits?

8   A    Yes.

9   Q    Could you tell us what that information was?

10  A    It was photos, like from Instagram, just information

11  about them.  And it was usually verbal, where I'd tell India

12  and Allison, oh, this girl, she does this, she models, she

13  wants to do this and that.  And, like, I think she would be

14  great.  So just like mini profiles on them.

15  Q    Did you show Instagram photographs of potential recruits

16  to Allison and India?

17  A    Yes.

18  Q    And did they ever comment or react to the photographs?

19  A    They would say, like, she's attractive and she looks cute

20  and things like that.

21  Q    Did being cute or being attractive, did that seem to be

22  one of the criteria used to select recruits?

23  A    Not for me personally, but just my friends did happen to

24  be attractive.

25  Q    How about for Allison and India?

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                          4387

1    A     Yes.  Not particularly India.  But with Allison, she did

2    show an interest in that category.

3    Q     Did you ever recruit anyone as your slave?

4    A     Yes.

5    Q     Who?

6    A     Val.

7    Q     Who was Val?

8    A     Val was a friend of mine from Los Angeles, who also took

9    the five-day with me.

10   Q     And what did Val do for a living?

11   A     A model, an actress, and also a dancer.

12   Q     Would you characterize Val as being attractive?

13   A     Yes.

14   Q     And could you please describe how you recruited Val into

15   The Vow?

16   A     Yes.  Me and Val went to Vancouver together to do

17   The Source program, where she met Allison.  And I thought she

18   would be good for it.

19         I did mention it, but I personally didn't want to

20   have a slave then because everything was just -- it was just

21   like a lot to grasp in my own mind of being a part of The Vow.

22   But Allison, after meeting her said, I love Val, I want her to

23   be in it.  I think she'd be great for you.

24         So then I talked to Val and asked different

25   questions that would, like, prompt her to see if she'd want to

Jay - direct - Lesko                    4388

1    do it; which eventually led to a conversation being had at a

2    party after the intensive with me, Allison, and Val.

3            I proceeded to attempt to enroll her and recruit

4    her, but I failed.  So Allison just jumped in and just pretty

5    much recruited her right then and there.

6    Q    And was this an instantaneous recruitment?

7    A    Yes.

8    Q    Did anyone reach out to India?

9    A    Yes.

10   Q    How did that happen?

11   A    So we -- after -- Val pretty much wanted to join right

12   then and there.  And this was a very unorthodox way of being

13   recruited, which Allison explained, like, listen, you -- no

14   one ever really knows who their master or grand master is

15   right away like this.

16           But because she was so excited to join, we then

17   phoned in India with a video call.  And she introduced her as,

18   like, this is your grand master.  Because I was her master.

19   So Allison was her great grand master.

20   Q    And did you have an impression as to how Val viewed

21   Allison?

22   A    Yes.  Val had a lot of adoration and admiration for

23   Allison, you know, because she's an actress and all these

24   things.  So Val was really excited to be in a more personal

25   relationship with Allison.

Jay - direct - Lesko                                    4389

1    Q    So this all happened at the same moment?

2    A    Yes.

3    Q    So Allison basically accepted Val into The Vow at that

4    moment, is that right?

5    A    Yes.  It was, you're in.  And then, now you've got to get

6    your collateral.

7    Q    And was this normal, was this a normal procedure?

8    A    No.

9    Q    How so?

10   A    Well, for my personal experience, I only knew that it was

11   India for a while.  All the information was given to me

12   periodically over time.  I, basically, felt like I was on an

13   island by myself and couldn't talk to anyone, except for

14   India.

15        Whereas, with Val, she got a lot of information

16   up front.  And it just happened a lot quickly for her.

17   Q    Did Allison tell Val about the brand or tattoo?

18   A    Yes.

19   Q    What did she say?

20   A    She said that part of it is that you'd get a brand, but

21   it's like -- she's, like, but really, it's like a tiny tattoo.

22   She said, it's a sisterhood thing, and that it represents the

23   symbols of the elements.

24   Q    Did she in that conversation mention that the brand was,

25   in fact, someone's initials?

SAM     OCR     RMR     CRR     RPR

Jay - direct - Lesko                              4390

1    A    No.

2    Q    Did Allison tell Val about the life commitment?

3    A    She did say that it was a lifetime commitment, like a

4    sorority.

5    Q    So lots of information about The Vow was shared with Val?

6    A    Yes.

7    Q    Was Val told that any men were involved with The Vow?

8    A    No.

9    Q    So did Val ultimately provide collateral?

10   A    Yes.

11   Q    And to who?

12   A    To me.

13   Q    And what was that collateral?

14   A    One of them was a video that we staged.  So since she was

15   a model and actress, reputation, we made it look like she did

16   cocaine.  It was just sugar or, like, flour.  So we staged

17   that video.  That was one of them.

18   Q    Was there any other collateral?

19   A    Yes.  Allison expressed that it needed to be something

20   that was heavily weighted, and Val -- Val's sister was

21   applying for this government official office position.  And so

22   she wrote a letter and had it notarized, saying that her

23   sister was a terrorist, along with an envelope to the address

24   of that office.

25   Q    And did you receive this collateral from Val?

SAM       OCR       RMR       CRR       RPR

Jay - direct - Lesko                    4391

1    A    Yes.

2    Q    How did you receive it?

3    A    The letter she just handed to me.  And the video, I

4    believe she air dropped it.

5    Q    To your computer?

6    A    I think to my phone.

7    Q    To your phone.

8         And what did you do with it?

9    A    I sent it to India.

10   Q    Both the video and the letter?

11   A    Yeah -- well, the letter, I was able to hand it to India.

12   Q    Do you recall a time when Val was going to cancel a trip

13   to Albany?

14   A    Yes.

15   Q    What happened?

16   A    Allison had requested for Val to come to Albany to spend

17   time with us.  But Val booked a dance gig, and so she said

18   that she couldn't come.

19        So I let Allison know that, oh, Val booked a job, so

20   she's not gonna be able to come.  And Allison looked at me and

21   said, well, maybe you need to remind her that she doesn't have

22   a choice.

23   Q    And so what did you do?

24   A    So I relayed the message to Val and said, hey, Allison

25   said to, like, remind you that you don't have a choice.

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                  4392

1   Q    And did she not have a choice?

2   A    No.

3   Q    Did she travel to Albany, Val?

4   A    Yes, she did.

5   Q    Did you try to recruit other women into The Vow?

6   A    Yes.

7   Q    Were you successful?

8   A    No.

9   Q    Other than Val, when recruits were first pitched on

10  The Vow, was the master/slave relationship discussed?

11  A    I'm sorry, can you repeat that, please?

12  Q    Other than the recruitment of Val, in your experience,

13  when other slaves were recruited, were they told about the

14  master/slave relationship initially?

15  A    I'm not actually sure how it worked for everybody else.

16  Q    No.  For you?

17  A    For me, no.

18  Q    Was there a time when you worked on an app, like an app

19  for a phone, in connection with The Vow?

20  A    Yes.

21  Q    Could you explain that?

22  A    It was the very early stages, and Allison asked me to

23  start thinking about different ideas because they wanted to

24  create an app.  Basically, an app to do mass recruitment.

25          So she said to think of, like, a game or a way that

SAM      OCR      RMR      CRR      RPR

1    we could get women into The Vow, but with different levels of

2    commitment.  Like, she said there would be lifers, like us, or

3    there would be people that were just, like, in the group.

4    Q    Did you have an understanding regarding the long-term

5    plan for The Vow?

6    A    Yes.

7    Q    What was it?

8    A    She explained that the more people that were in The Vow,

9    meant the more people that they had voting power, buying

10   power.  So, basically, if we wanted to say, hey, like, buy

11   this, or don't vote for this or vote for this, with the click

12   of a button everyone would be, like, on board.

13

14            (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Jay - direct - Lesko                                    4394

1  BY MR. LESKO:   (Continuing.)

2  Q    Now, I think you mentioned that before you joined The Vow

3  you weren't told about the brand or tattoo; right?

4  A    Right away, no.

5  Q    Were you eventually told about a brand or tattoo?

6  A    Yes.

7  Q    What were you told?

8  A    I was told that as part of the group you would get a

9  brand, but it was expressed to me as it's like -- it's like a

10 tiny tattoo.

11 Q    Who told you that?

12 A    India.

13 Q    And did she tell you what the tattoo, what it depicted?

14 A    No, she was very vague.

15 Q    Did Allison ever explain what the tattoo depicted?

16 A    There was a time when I asked Allison if I could see her

17 brand, Oh, can I see your brand.  She said, No, like I didn't

18 deserve the right to see it but she said, Oh, it's a beautiful

19 symbol.

20 Q    Did you think that you were going to get this tattoo?

21 A    I thought eventually that was something that would

22 happen.

23 Q    What did you think you were getting?

24 A    Something that would be a tiny tattoo.

25 Q    Did you think that you were actually going to be branded?

Jay - direct - Lesko                                          4395

1    A    No.

2    Q    Did you think that you were going to be burned?

3    A    No.

4    Q    Did you ever end up receiving a brand?

5    A    No.

6    Q    Do you know whether other women in The Vow received a

7    brand?

8    A    Yes.

9    Q    What did they receive?

10   A    It -- from what I've seen, it's a very disgusting,

11   disturbing mark which eventually scarred where it had, like,

12   puffed-up skin and something that looks really painful.

13   Q    And was the -- were the brands that you've seen, were

14   they actually symbols?

15   A    No.

16   Q    What were they?

17   A    Initials.

18   Q    Of who?

19   A    KR, and on some of them it also had an additional AM.

20   Q    And who was KR?

21   A    Keith Raniere.

22   Q    And who was AM?

23   A    Allison Mack.

24   Q    Did you actually ever see, physically see, a brand?

25   A    Yes.

SN        OCR        RPR

Jay - direct - Lesko                                    4396

1   Q    Whose brand did you see?

2   A    Audry's.

3   Q    Did you later see photographs of brands?

4   A    Yes.

5   Q    When was that?

6   A    A little bit before everything hit the media.

7   Q    Did you learn that you had to wear something as part of

8   The Vow?

9   A    Yes.

10  Q    What?

11  A    It was called a collar, but how Allison described it was,

12  like, Oh, you know, it can just be a piece of jewelry that you

13  don't take off.  I wear a belly chain.  I think it's sexy.

14  It's just something like that.

15  Q    Were you told what the collar symbolized?

16  A    The collar was supposed to symbolize that you belonged --

17  that you were forever attached to your master.

18  Q    Were you required to consult with your master regarding

19  life decisions?

20  A    Yes.

21  Q    Would you explain that?

22  A    Basically before making any major decisions, like, career

23  or just life things, you were asked to consult -- not asked

24  but you were supposed to consult your master and sometimes

25  journal about it.

SN        OCR        RPR

Jay - direct - Lesko                    4397

1   Q      Showing you what I believe is in evidence --

2              MR. LESKO:  I will ask Mrs. Carby, Government 30?

3   Yes?

4   Q      Okay.  Showing you what's in evidence as Government's 30.

5              (Exhibit published.)

6   Q      Do you recognize that exhibit?

7   A      Yes.

8   Q      Who is that?

9   A      Nicole.

10  Q      And who is Nicole?

11  A      Nicole is a friend and someone who was in The Vow and she

12  was also my Source ongoing class coach.

13  Q      Was she an actress?

14  A      Yes.

15  Q      And did Nicole spend time in Allison's house, the house

16  that you were residing in?

17  A      She would visit the house sometimes but she mostly stayed

18  in Allison's apartment.

19  Q      At some point were you asked to do something with Nicole?

20  A      Yes.

21  Q      What was that?

22  A      I was with Nicole and we were ask to take a survey that

23  was created by Allison and it was a survey that had to do with

24  sexuality.

25  Q      And specifically how did it have to do with sexuality?

SN        OCR        RPR

Jay - direct - Lesko                    4398

1   A    There were questions like what were you into sexually,

2   what turned you on, what are your different preferences, have

3   you ever been with women.  It was like a questionnaire.

4   Q    And did you complete this questionnaire?

5   A    Yes.

6   Q    With Nicole?

7   A    Yes.

8   Q    Where were you when you did this?

9   A    In Allison's apartment.

10  Q    What did you do with the questionnaire after you finished

11  it?

12  A    I sent it to Allison.

13  Q    Did you ever learn what happened to your questionnaire?

14  A    No.

15  Q    Do you have an understanding now as to why you were asked

16  to complete this questionnaire?

17  A    Yes.

18            MR. AGNIFILO:  Objection.

19            THE COURT:  Sustained.

20  BY MR. LESKO:

21  Q    Was it ever explained to you why you were asked to

22  complete this questionnaire?

23  A    When Allison said that, when she gave it to us, she said

24  that it was to it was something that she was developing so she

25  just wanted to find out.

SN        OCR        RPR

Jay - direct - Lesko                    4399

1   Q    Do you think Allison was being truthful then?

2   A    No.

3   Q    What did you think the questionnaire was for?

4           MR. AGNIFILO:  Objection, Your Honor.

5           THE COURT:  Sustained.

6   BY MR. LESKO:

7   Q    Did you later reach an understanding as to the purpose of

8   the questionnaire?

9           MR. AGNIFILO:  Objection, Judge.

10          THE COURT:  You may answer.

11  A    Can you repeat the question?

12  Q    Did you later reach an understanding as to the purpose of

13  the questionnaire?

14  A    Yes.

15  Q    What was your understanding?

16  A    To give information to Keith about our sexuality and

17  different things for his information.

18  Q    So you mentioned volleyball and I think you explained a

19  little bit about how volleyball worked but could you explain

20  in detail how volleyball worked in NXIVM?

21  A    Yes.  Pardon me.  So volleyball was held at the sports

22  barn.  There was two volleyball courts.  There was the A team

23  and the B team.  The A team was were Keith and people that

24  were strong volleyball players where you had to be invited and

25  the B team was for fun and anyone could play there.  So, many

1    people would come to Albany for intensives and there were

2    chairs around the volleyball courts so people would attend,

3    mostly women, and sit there and watch the volleyball game.

4    Q    And would anything happen during the breaks in the games?

5    A    Yes.

6    Q    What?

7    A    So, during the breaks, Keith would, like, step out and

8    there would basically be, like a line of people waiting to

9    talk to him.  So he would have little one-on-one times and go

10   on mini-walks and hold their hands and have a mini-walking

11   meeting.

12   Q    Did you notice a particular way people greeted the

13   defendant?

14   A    Yes.

15   Q    How?

16   A    Everyone would kiss him on the lips.

17   Q    What was your reaction to people kissing him on the lips?

18   A    At first it was kind of strange, but then I also saw the

19   males do it, too.  I still thought it was a little strange,

20   but I just thought maybe this is just like a different way of,

21   you know, expressing, like a hello, like in France people kiss

22   people.

23   Q    Did people bring gifts for the defendant?

24   A    Yes.

25   Q    What sort of gifts?

Jay - direct - Lesko                                    4401

1  A     He had a sweet tooth, so people would bring chocolates

2  and candies and treats and they would leave it on his chair.

3  Q     When you were part of The Vow were you required to attend

4  volleyball?

5  A     Yes.

6  Q     How did you know that?

7  A     Because there was a time when I wasn't feeling well and I

8  did not attend volleyball and Keith noticed and told Allison

9  and so Allison reprimanded me and said that it's mandatory

10 that we go to volleyball, that it's rude and disrespectful if

11 we don't and we need to show our support.

12 Q     And after that did you attend volleyball regularly?

13 A     Yes.

14 Q     Was there a time during volleyball when the defendant

15 touched you?

16 A     Yes.

17 Q     Could you explain that, please?

18 A     Yes.  It was after volleyball and a group of us were in

19 conversation and it was really strange.  We were talking about

20 something and out of nowhere he used his finger and draws a

21 circle around my belly button on my stomach.

22 Q     And what was your reaction?

23 A     My reaction was I was in shock.  Being someone who's been

24 sexually abused before, I have a high sense of awareness to my

25 body and it was just really weird.  I felt uncomfortable.  I

1   felt like my space was being invaded.

2   Q     Did you say anything?

3   A     No.

4   Q     Why not?

5   A     I think because I was in shock.  You know, there was

6   other people there, but the fact that it happened, I mean,

7   it's almost kind of, like, it was a bit traumatizing where I

8   didn't know how to react.

9   Q     So, let's go back a bit to the 11-day intensive.  That

10  was, I think, in November of 2016 and you mentioned that you

11  took a walk with the defendant?

12  A     Yes.

13  Q     And that was in Albany?

14  A     Yes.

15  Q     Actually in the NXIVM community; is that fair to say?

16  A     Yes.

17  Q     Was this considered a big deal?

18  A     Yes.

19  Q     Would you explain that, please?

20  A     So, Keith wasn't really accessible to anyone who just

21  took the courses.  He never even attended them.  So it was,

22  like, a big deal.  It was known that if you go on a walk with

23  Keith, your whole life will change.  It's like a dream come

24  true.  So when I took a walk with him, other people noticed

25  that had been in the program for a long time, oh, wow why are

1   you going on a walk with Keith?  I'm like, I'm supposed to

2   talk about a T-shirt company.  And people would make remarks

3   like, Did you invent something to save the environment?  It

4   was strange.

5   Q    And I think you discussed that you got the defendant's

6   information.  Did you -- and you ended up setting up a walk?

7   A    Yes.

8   Q    What time of day was the walk?

9   A    It was after 1 a.m.

10  Q    Could you just describe this walk with the defendant,

11  this first walk?

12  A    Yes.  So, he messaged me and asked if I was up.  I said

13  yes.  And he said to walk out of the house to meet him, like,

14  on the street essentially in Clifton Park, and it was like --

15  awkward is not the word for it but it was kind of like -- I

16  didn't really know how to be comfortable and react because

17  this is like a big deal and I didn't know what to talk about.

18  So at first it was a little awkward so it was like a

19  getting-to-know-you kind of walk.

20          We chatted for a bit.  He would ask some questions

21  about me or he asked if I had any questions for him.  So it

22  was, you know, very -- not shallow, but like a soft kind of

23  conversation.  I don't know.  But later we did end up talking

24  about the T-shirt company and he said that -- I told him my

25  ideas and he said that he already had a company.  He was

Jay - direct - Lesko                                    4404

1  waiting for someone to give it over to because it wasn't

2  working out with whoever it was before.  He said he had screen

3  print machines, connections with Diesel in Mexico and he was

4  just waiting for the right person.

5  Q    And what was Diesel?

6  A    Diesel is a clothing brand.

7  Q    And, so, did he offer to help you with the T-shirt

8  company during this walk?

9  A    He basically expressed interest, but it wasn't finalized

10 in that walk.

11 Q    Was it your intent to make money, make a profit off of

12 this company idea?

13 A    Yes.

14 Q    Did you understand that the defendant had built

15 businesses with other people?

16 A    Yes.

17 Q    How did you understand that?

18 A    There was different companies in NXIVM that other people

19 were the head of and also it was known that he has thousands

20 of patents and starts all of these businesses.  Like, if

21 you're special, he will start a business with you.

22 Q    So after this first walk did you go on additional walks

23 with the defendant?

24 A    Yes.

25 Q    And what time -- what times did those walks happen?

1  A    They were always in the early morning hours.

2  Q    And did the defendant ever say anything flattering to you

3  on those walks?

4  A    Yes.

5  Q    What did he say?

6  A    He basically asked or he would say that I was special

7  like, Do you know that you're special?  And I said, Yeah, I

8  feel like I'm special.  And he would say, But did you know

9  that you're special?  And, like -- I don't know.  Do you feel

10 like this special connection with us, in between us?  And I

11 said, Yes, because I felt like there was.  I felt like who I

12 thought he was this person that wanted to change the world,

13 that was doing these things, these remarkable things, and

14 that's really internally who I am.  And so, yeah, great; we're

15 on the same team.  And so these were, like, the kinds of

16 things that he said.

17 Q    So let's talk about after you moved to Albany.  Did you

18 continue to speak to the defendant about the T-shirt company

19 idea?

20 A    Yes.

21 Q    And could you explain how that happened?

22 A    Yes.  He said to write, like, a business plan.  So me and

23 my friend Jacob who I was doing the T-shirt company with as

24 well, we came up with different ideas.  We wrote like a whole

25 e-mail of the plan, how it had to do with charity and the

Jay - direct - Lesko                    4406

1  artist and sustainability and I sent that to Keith.

2  Q    And what was his reaction?

3  A    His reaction -- his feedback that he gave was that there

4  was a lot of great ideas there, but he said that the charity

5  aspect wouldn't really work because it's hard to have

6  charities that have integrity; like, you don't really know

7  where the money is going and that that wouldn't be a good

8  aspect.

9  Q    Was the defendant particularly responsive to you

10  regarding the T-shirt company idea?

11  A    Initially, yes.

12  Q    Did that change?

13  A    Yes.

14  Q    Explain, please.

15  A    So, when he messaged me when I was on my way back to L.A.

16  and said, well, if you're serious about starting the T-shirt

17  company, the sooner you come back the better.  I did

18  eventually move to Albany per that -- per that message with

19  that intention and when I got there, you know, I would see

20  him.  But whenever I would get to talking about the T-shirt

21  company, okay, when are we going to go on a walk and talk

22  about this, he would make plans to go on a walk and cancel and

23  then became more distant in regards to the T-shirt company.

24  Q    Did that frustrate you?

25  A    Yes.

Jay - direct - Lesko                    4407

1   Q    Did you ever express your frustration to the defendant?

2   A    Yes.

3   Q    What was his reaction?

4   A    I messaged him after and he said, Oh, I'm sorry.  I'm so

5   busy.  Maybe we'll get another walk in, like, soon about it.

6   And I said that, you know, this is, like, a little irritated.

7   I don't remember exactly what I said, but along the lines that

8   I came there to do that and he messaged me back saying, You

9   seem cranky.

10  Q    Did you and the defendant discuss becoming partners in

11  this business at some point?

12  A    Yes.

13  Q    Did the defendant ever help you start this T-shirt

14  business?

15  A    No.

16  Q    Did you ever start the business?

17  A    No.

18  Q    Now, we've discussed what a circle was.  Was there -- you

19  were in India's circle; is that right?

20  A    Yes.

21  Q    Was there anyone else in India's circle?

22  A    Rachel.

23  Q    And who was Rachel?

24  A    She was my friend that introduced me to India and

25  essentially to the program.

SN        OCR        RPR

Jay - direct - Lesko                                    4408

1   Q     And Valerie was your slave?

2   A     Yes.

3   Q     And she was under you?

4   A     Yes.

5   Q     You became aware of who was in Allison's circle?

6   A     To a varying degree.

7   Q     And when did that happen?

8   A     It happened because there would be moments where we were,

9   like, gathered together, with Allison, spending time with her

10  and she would talk about things about The Vow with everyone

11  present, so at that point because it's secret obviously we

12  wouldn't be having this conversation unless everyone was in

13  it.

14  Q     Did Allison ever tell you that someone specific was in

15  her circle?

16  A     Yes.

17  Q     Who did she say was her slave in her circle?

18  A     Nicole.

19  Q     Did Allison ever let you talk to another slave about The

20  Circle?

21  A     There was only one slave that she let me, like, directly

22  speak to other than India.

23  Q     Who was that?

24  A     Souki.

25  Q     And was Nicole Allison's slave?

SN        OCR        RPR

Jay - direct - Lesko                                      4409

1   A    Yes.

2   Q    Danielle Roberts?

3   A    Yes.

4   Q    Michele?

5   A    Yes.

6   Q    Souki?

7   A    Souki I believe was Michele's.

8   Q    Did Michele have any other slaves?

9   A    Yes.

10  Q    Who?

11  A    Zoraida.

12  Q    The names that you saw on the Dropbox folder, did that --

13  did that help you determine who were Allison's slaves?

14  A    Yes.

15  Q    And when you saw those names, what was your reaction?

16  A    My reaction was that I wasn't surprised, but also it made

17  me feel a little bit better.  It made me feel like I wasn't in

18  this by myself and that all of those people are also going

19  through what I'm going through essentially.

20  Q    Now you talked about The Source.  Did you do any work for

21  The Source?

22  A    Yes.

23  Q    What did you do?

24  A    I did things like help with the social media.  I sent out

25  the weekly assignments and things like that.

1    Q      Were you ever paid for that work?

2    A      No.

3    Q      Did you have an understanding as to what that work was

4    going towards?

5    A      Yes.

6    Q      What was it going towards?

7    A      Since I didn't recruit anyone for The Source, Allison

8    said, well, some of the ways that you can work it off would be

9    to do those tasks.

10   Q      Did you ever set an hourly rate or an amount related to

11   the amount of work you did for the Source?

12   A      No.  She just said to keep track of the hours and that we

13   would figure it out.

14   Q      As part of The Vow were you required to take walks?

15   A      Yes.

16   Q      Could you describe those walks, please?

17   A      Yes.  We were required to go on 20-minute walks of

18   contemplation where you just walk silently and think about

19   your life.

20   Q      How many of those walks did you take, approximately?

21   A      Well, it was one of the daily assignments.  So I had to

22   do them every day.

23   Q      Were you ever required to write transcripts?

24   A      Yes.

25   Q      Could you explain that, please?

Jay - direct - Lesko                                          4411

1  A    Yes.  There was a member in the community who passed
2  away, I believe her name was Pamela Cafritz and when she
3  passed away, we were required to make transcripts from these
4  interviews.
5  Q    And what were the transcripts for?
6  A    I believe her memorial.
7  Q    And did that process take -- take time?
8  A    Yes.
9  Q    How much time?
10 A    Several hours.
11 Q    Were you paid for writing those transcripts?
12 A    No.
13 Q    As part of The Vow, did you receive instructions
14 regarding your diet?
15 A    Yes.
16 Q    What were they?
17 A    Initially, I had to start off with 1,000 calories and all
18 of this is calculated on an app.  It was 1,000 and then it
19 went down to 800 and then the last it ended going to 600 or
20 500 calories per day.
21 Q    So at some point you were eating only 500 calories per
22 day?
23 A    Yes.
24 Q    How did it make you feel?
25 A    I was very hungry.  It was very frustrating and also one

Jay - direct - Lesko                              4412

1   of the aspects of it -- it evolved into having to do, like,

2   math equations with each item; where we had to measure it and

3   weigh it on a scale and then eventually also take pictures of

4   it and that also led to eventually having to ask permission to

5   eat.

6   Q    And this weighing and math equations and pictures, that

7   all related to the food you were allowed to eat?

8   A    Yes.

9   Q    Did you lose weight during this time period?

10  A    Yes.

11  Q    Were you required to record your weight?

12  A    Yes.

13  Q    Did you do that?

14  A    Yes.

15  Q    How often?

16  A    We had to do it every morning before we take -- before we

17  eat, I would have to send it to India.

18  Q    And how did you send it to India?

19  A    Via a telegram.

20  Q    And before you ate were you required to do anything else?

21  A    Yes.

22  Q    Other than weighing in?

23  A    Do you mean just before I ate in general?

24  Q    In the morning before you ate, I think you indicated that

25  you were required to weigh yourself.  Were you required to do

SN        OCR        RPR

Jay - direct - Lesko                                4413

1   anything else?

2   A    Yes.

3   Q    What were you required to do?

4   A    So, every morning right when we wake up I would have to

5   say, Good morning, M, for master, to India; as well as take

6   three-minute cold sure -- or two or three minutes.

7   Q    And were you told why you had to take a cold shower?

8   A    I was told that the cold showers would help with your

9   comfortability (sic) or discomfort to push on that.

10  Q    And when you asked permission to eat, who did you ask

11  permission from?

12  A    India.

13  Q    Did you notice whether anyone else in the community was

14  dieting?

15  A    Yes.

16  Q    Could you explain that, please?

17  A    Everyone in the house was dieting and I noticed that

18  because everyone was doing the measuring, the picture-taking,

19  and we were all eating the same foods pretty much.

20  Q    Did anyone seem particularly unhealthy to you?

21  A    Yes.

22  Q    Who?

23  A    Definitely Allison.  India got very, very thin.  Souki as

24  well.  Everyone just honestly looked very -- like, their skin

25  wasn't looking lively and they were looking tired as well as I

1  know that several people weren't getting their menstrua cycle

2  and I overheard someone that their hair was starting to fall

3  out.

4  Q    Did you ever receive any direction regarding your pubic

5  hair?

6  A    Yes.

7  Q    What was the direction?

8  A    The direction was from India saying that I couldn't get

9  Brazilian waxes anymore and that I needed to grow my pubic

10  hair region.

11  Q    What was your reaction?

12  A    I was really annoyed and irritated.

13  Q    Did you express that to India?

14  A    Yes, but not in that way.

15  Q    How did you do that?

16  A    I just told her I don't understand why do I have to do

17  this and she explained that getting waxes in that style of

18  grooming was propaganda from the porn industry.  Doing that

19  was violence against women.

20  Q    So did you ever fail any of these instructions?

21  A    Yes.

22  Q    And did you receive punishments?

23  A    Yes.

24  Q    And was it journaling, is that the type of punishment?

25  A    Yes.

1  Q     Any other punishments?

2  A     Well, when I would fail with the food, that's when I had

3  to start doing -- asking for permission.

4  Q     Okay.  Was there a time when you were reprimanded for the

5  way you dressed?

6  A     Yes.

7  Q     Explain that, please.

8  A     Because I was in Albany and I wasn't trying to impress

9  anyone, my attire was a lot of hoodies and sweatpants and I

10 didn't put makeup on.  And, so, I was given an assignment from

11 India to do acts of self care, which basically was to put

12 makeup on, be put together, dress more nice.

13 Q     Was there a time when you did not wear a bra?

14 A     Yes, I wore a leotard and I didn't wear a bra with that

15 and Allison said that -- she said that it was fine but that

16 some other people, like older women in the community, felt

17 uncomfortable and, so, that I needed to wear a bra.

18 Q     Did this instruction that you make yourself up, did that

19 relate at all to volleyball?

20 A     Yes.

21 Q     How so?

22 A     So, first it was just general, like, okay, take care of

23 your -- get ready, but India specifically said that especially

24 when you go to volleyball it's very important that you look

25 your best.

Jay - direct - Lesko                                           4416

1   Q     Did you have an understanding as to why India said that?

2   A     Yes.

3   Q     What's your understanding?

4   A     My understanding is that I was basically being put on

5   display for Keith and it was an opportunity for him to see how

6   I'm looking.

7   Q     Shortly after this self-care assignment that you received

8   to make yourself up, did Allison contact you and tell you that

9   she had to discuss something important with you?

10  A     Yes.

11  Q     What did she say?

12  A     She basically called me and said, hey, I want to talk to

13  you about something.  It's really important.  I'm going to

14  call you, like, later this week.

15  Q     And did she call you?

16  A     Yes.

17  Q     And what did she say?

18  A     First she prefaced it with, You've been doing so great.

19  Everyone in the community loves you.  You've been so amazing.

20  She asked me about the self-respect, self care-assignments and

21  she's, like, Yes, you know just with the bra thing you need to

22  be more discrete and we need to -- we're special so how we

23  dress is really important.  And then she prefaced that and

24  segued into -- she said, well, me and India have been talking

25  and we wanted to give you this special assignment.  It's an

                        SN      OCR      RPR

Jay - direct - Lesko                                    4417

1   honor and a privilege.  It's something that you need to be

2   very discrete with and me and India have both done this

3   assignment -- and at this point my Spidey senses are going

4   off, and she said that the assignment is for me to seduce

5   Keith and have him take a naked picture of me and send it to

6   India to prove that I did it.

7   Q    And what was your reaction?

8   A    I basically -- like, my mind was just blown.  It was like

9   my whole world was crumbling.  It was basically my worst

10  nightmare come to life because, like, what would be the worst

11  thing?  Like, I joined this thing.  I think it's so great and

12  people would warn me, Oh, you've got to be careful and the

13  worst thing would be that it was a cult and I would -- and of

14  course wanted to sleep with me and that's what that was.

15  Q    Were you told that other women had done this?

16  A    Yes, that only privileged women that had the honor of

17  that assignment, had been given that.

18  Q    Were you supposed to keep the assignment a secret?

19  A    Yes.

20  Q    Who told you that?

21  A    Allison.

22  Q    This is during a phone call; is that right?

23  A    Correct.

24  Q    Where was Allison?

25  A    In San Diego.

1  Q    So did you -- what was your response to Allison when she

2  gave you this assignment?

3  A    Well, I was in shock.  And I was really uncomfortable so

4  I was trying to find the words and I was like, I -- I don't

5  understand.  Like, what is this for?  And she said, well,

6  you -- this is going to help you get rid of all of your sexual

7  abuse trauma and I was like, I don't understand.  Like, I'm

8  still in love with my ex-boyfriend.  This makes me really

9  uncomfortable and I said, Does Keith know about The Vow?  And

10 she said no.

11          And at this point I am still feeling that's super

12 weird, like, why would I use Keith to do this thing, you know,

13 isn't he going to think this is weird?  And she said, Just say

14 it's the most vulnerable thing you could do.

15 Q    Did you discuss with Allison the issue of celibacy?

16 A    Yes.

17 Q    What did she say?

18 A    Well, when I was pushing back and seeing my confusion and

19 uncomfortability (sic) with it, she said, well, you're

20 celibate anyway and what's one person?  After I said I was

21 still in love with my ex-boyfriend and I -- I was pushing back

22 and then she said, well, don't you still feel like you have

23 disintegrations around your sexual abuse and around men?  And

24 so for me I just said -- I said, yeah, I guess.  She said,

25 well, this is how you're going to get rid of all of those.

Jay - direct - Lesko                                          4419

1           So in that moment, I realized that I didn't have an

2    option.  I realized this is something that she expects me to

3    do.  So, I internally basically I feel like I went kind of

4    like a double agent; that I needed to get -- pardon my French,

5    that I needed to get the fuck out of there.  So I just kind of

6    softly pretended to go along with it so I could plan my

7    escape.

8    Q     How did the call end?

9    A     The call ended with Allison -- first she said, You can

10   talk to India about her experience.  You know, you can call me

11   and ask me any questions and before she ended the call she

12   said, And I give you permission to enjoy it.

13   Q     During this conversation were you thinking about your

14   collateral?

15   A     Yes.

16   Q     How?

17   A     I was just thinking about all the collateral that they

18   had on me and, like, well, what was I going to do.  I needed

19   to get out of this situation and what are they going to do

20   with my collateral.

21   Q     When Allison gave you permission to enjoy it, what was

22   your reaction?

23   A     Again, sorry pardon if I curse, but internally I was just

24   like, you fucking bitch.  I was horrified and enraged with the

25   fact that she would try to re-traumatize me and say that doing

1    something sexual with someone that I obviously didn't want to

2    do that with would heal my sexual trauma.  I was disgusted.

3    Q    So, what was -- just to be precise, what was your

4    understanding of the assignment that Allison gave you?

5    A    My understanding of the assignment was to seduce Keith

6    which she mentioned in the conversation, that since it has to

7    be discrete I needed to send him notes and send him pictures.

8    No one finds out, but that the seduction process ending up

9    with me doing sexual things and having sex with him and having

10   him take a photo of me obviously to blackmail me to then send

11   it to India.

12   Q    Why did you think you were supposed to have sex with the

13   defendant?

14   A    There was a number of reasons why I felt that way.  One

15   of them, she stated the thing about celibacy.  Obviously, I

16   give you permission to enjoy it, which wouldn't make sense.

17   Okay, to seduce someone.  That's just a word.  That's a

18   seduction, an action; to seduce someone with the intention to,

19   like, do sexual things with them.

20           So, that is one of the actions, but with the

21   intention to complete that assignment.  So, yeah, it just --

22   all of it felt like that's what it was.  Have me have sex with

23   him.  Seduce him, have sex with him and then also, enjoy the

24   seduction process.  She knew about my prior sexual history,

25   that I was trying to deal with certain areas and I felt she

Jay - direct - Lesko                           4421

1  was using that against me and thinking that I would go along

2  that route.

3  Q    What happened after you got off the phone with Allison?

4  A    Well, I was in my room in the basement and I just felt

5  like the walls were spinning.  I just felt like the whole room

6  was spinning.  I, like, was dizzy.  I, like, almost blacked

7  out and, shortly after, I get on my laptop and I just start

8  Googling everything.  Mind you, I had done all of this

9  Googling stuff before, but there was always an answer or a

10 reason to, like, the bad things online.  But I went deeper in

11 the Google search and then I saw this thing where it mentioned

12 something about him having a harem and I was just like, oh my

13 God, this is true.  Like, this is all true.  And I just

14 basically started planning my escape.

15 Q    So, you had done some internet research previously?

16 A    Yes.

17 Q    And who did you discuss that research with?

18 A    India.

19 Q    And what did India say?

20 A    It was before I even took the five-day and there was a

21 lot of, like, bad press on the internet.  So I asked India, I

22 was like, hey, there's all of this weird stuff on the

23 internet, what's up with that?  And basically her main story

24 was that there was someone who, like, a son of a very

25 prominent media family who took the intensive and then

Jay - direct - Lesko                                    4422

1  realized that his family business was unethical.  So then the

2  parents were angry and did a smear campaign.  India also said,

3  it's so funny because all of these people that were saying

4  these bad things, it was reported that they had child

5  pornography.

6  Q     So after receiving the special assignment, this

7  assignment to have sex with the defendant, did you talk with

8  India about it?

9  A     Yes.

10  Q     What did the two of you discuss?

11  A     Well, I saw her the following day and I was just, like,

12  hey, I got that special assignment.  Oh, okay, how do you feel

13  and I was like, you know, it's kind of -- like, I don't really

14  know.  Like, I wanted to ask is you, like, what was your

15  experience like.  What did you do and what was it.  And she

16  said that she didn't really want to tell me about her

17  experience.  She wanted me to have my own experience, but she

18  just said that it was amazing.  And that Keith's body was --

19  he's like surprisingly more fit as well as the fact that he

20  liked to be pursued.  He kind of likes to play hard to get.

21  So you'll figure it out.

22  Q     What was your reaction to India's comments?

23  A     I kind of just looked at her, like, not like she was

24  crazy but, like, you know, like -- you know, I found it very

25  strange and I felt bad for her.

Jay - direct - Lesko                                          4423

1   Q    Did you have suspicions that other women in the NXIVM

2   community were having sexual relationships with the defendant?

3   A    I'm sorry, can you repeat that?

4   Q    Did you have suspicions that other women in the NXIVM

5   community were having sexual relationships with the defendant?

6   A    Yes.

7   Q    Who?

8   A    Allison, as well as Nicole.

9   Q    So after receiving the assignment, doing the internet

10  research, talking to India, did you make any decisions as to

11  what were you going to do regarding The Vow?

12  A    Yes.

13  Q    What did you decide?

14  A    Well, I decided first and foremost I needed to get out of

15  Albany and also that I needed to protect myself along with

16  certain people that were in there that I cared about.

17  Q    And so what did you do?

18  A    So, I knew I had to play along.  Thankfully I had a

19  family trip to Mexico planned that they were already aware of

20  that was going to be coming up shortly so I just knew that I

21  had to play along for a little bit.  Also, because I had

22  access to the Dropbox and other peoples' collateral, I decided

23  to take screenshots of the other peoples' collateral.

24  Q    And, so, the screenshots of the Dropbox folder itself

25  that we previously discussed, was that part of the screenshots

1    that you took?

2    A    That was part of it.

3    Q    What was your time frame?  How long did you have before

4    your trip to Mexico?

5    A    Just a few weeks.

6    Q    And during that time period did you have contact with the

7    defendant?

8    A    Yes.

9    Q    Could you describe that, please?

10   A    Yes.  Mostly it was just messaging.  So I would -- in the

11   conversation I would send, like, a heart or, like, a heart

12   face and things like that.

13   Q    How did you think you could go a few weeks without

14   completing the assignment?

15   A    Because I had the original pushback, I already knew -- I

16   felt like, okay, they're not going to push on me to, like,

17   complete this right now because I'm in a fragile state along

18   with the lines that he likes to be pursued which would

19   obviously take a little bit more time.

20   Q    So, you mentioned you took out of the Dropbox other

21   collateral?

22   A    Correct.

23   Q    So why did you do that?

24   A    I did that to protect myself and to, as insurance that if

25   they tried to blackmail me, that I would have some leverage to

1   get them to not.

2   Q    And you mentioned you were concerned about other people

3   that you cared about in The Vow?

4   A    Yes.

5   Q    Who were they?

6   A    Rachel, that was my friend, along with Val.  As well as

7   Souki.

8   Q    And so the way -- describe -- you took screenshots of the

9   collateral; is that right?

10  A    Yes.  So basically I knew I had to play along for X

11  amount of time because the new collateral came in the first of

12  every month.  I needed to lay low to have the collateral come

13  up so I could have copies of those collaterals.

14  Q    Describe the collateral that you saw in the Dropbox

15  folder?

16  A    There were naked photos of women, particularly focused in

17  the groin area with the heavy pubic hair region making these

18  kind of interesting faces.  There were photos of women

19  looking, like, unattractive; video secrets, as well as there

20  was a letter from India.  It was like a statement letter

21  saying that Nicki and Allison Mack that she believes that they

22  were such an amazing couple and in love and that the wedding

23  ceremony was very beautiful.

24  Q    Were Allison and Nicki married?

25  A    Not to my knowledge.  Not, like, really married.

SN       OCR       RPR

Jay - direct - Lesko                                    4426

1   Q    So the pubic hair depicted in some of the photos did you

2   become aware that the defendant had a preference for a lot of

3   pubic hair?

4   A    I'm sorry, can you repeat that, please?

5   Q    Did you become aware that the defendant had a preference

6   for a lot of pubic hair?

7   A    Yes.

8   Q    Could you explain that?

9   A    I think that was part of -- in his generation that was

10  probably the theme, as well as I just noticed a lot of the

11  women had very overgrown hair areas, as well as with my

12  assignment.

13          MR. LESKO:  So, Your Honor I'm going to publish

14  Exhibit 448-R that is in evidence.  If we could have this

15  published just for the jury.  And I'm turning off my monitor

16  and if we could turn off the monitors to the gallery.  I think

17  the jury's monitors are all positioned appropriately.

18          May I proceed?

19          THE COURT:  Let me just check.  Are the monitors to

20  the public off?

21          MR. LESKO:  They're both off.

22          THE COURT:  Okay.  Go ahead.

23          THE WITNESS:  Pardon me, Your Honor.  May I use the

24  restroom?

25          THE COURT:  Yes, of course.  Why don't we just have

SN        OCR        RPR

Jay - direct - Lesko                                    4427

1    the -- let's just have the witness use the lavatory and come

2    back.

3                    THE WITNESS:  Thank you.

4                    THE COURT:  You may step down and we'll wait.

5                    (Witness steps down.)

6                    (Pause in proceedings.)

7

8                    (Continued on the following page.)

Jay - direct - Lesko                                    4428

1    (Continuing)

2             (Witness resumes stand.)

3             THE COURT:  All right.

4             THE WITNESS:  Thank you for your patience.

5             THE COURT:  Okay, Mr. Lesko, you may continue.

6             MR. LESKO:  Thank you, Your Honor.

7             I'm going to show you briefly some photographs that

8    are included and admitted as Government's Exhibit 448-R.  I

9    can't see them, so if you could tell me if you -- actually, I

10   can see them.

11   DIRECT EXAMINATION (Continued)

12   BY MR. LESKO:

13   Q     Do you recognize that photograph?

14   A     Yes.

15   Q     What is that photograph?

16   A     It's a photograph of Danielle Roberts and her pubic

17   region.

18   Q     Is that region blurred out?

19   A     Yes.

20   Q     Was that how it was when you -- is that one of the pieces

21   of collateral that you took a screen shot of?

22   A     Yes.

23   Q     Was her private parts pixillated in the actual photograph

24   that you took?

25   A     No, it was clear.

Jay - direct - Lesko                    4429

1    Q    Okay.  Is Danielle smiling in that photograph?

2    A    No.

3              MR. LESKO:  Showing you the second page of

4    Government's Exhibit 448-R.

5    Q    Do you recognize that photograph?

6    A    Yes.

7    Q    What's that a photograph of?

8    A    Michelle.  And her pubic region.

9    Q    Okay.  Is that another photograph of collateral that you

10   took a screen shot of?

11   A    Yes.

12   Q    Is Michelle smiling in that photograph?

13   A    Yes.

14   Q    Okay.

15             MR. LESKO:  Third page of Government's

16   Exhibit 448-R.

17   Q    Do you recognize that photograph?

18   A    Yes.

19   Q    What is that?

20   A    A photo of Michelle naked.

21   Q    Were her private parts pixillated in the exhibit in the

22   photograph, are they blurred out?

23   A    They're blurred out, yes.

24   Q    They weren't blurred out when you took the photograph --

25   A    Correct.

Jay - direct - Lesko                              4430

1   Q      -- of this picture?

2          Is Michelle smiling in that photograph?

3   A      Like a weird, dog-faced smirk.

4          MS. PENZA:  Last page of Government's Exhibit 448-R.

5   Q      Again, are these photographs of Michelle?

6   A      Yes.

7   Q      Are these screen shots that you took of this collateral?

8   A      Yes.

9   Q      Okay.

10         MS. PENZA:  Okay.  Your Honor, I think we can

11  probably turn the screens on, if that makes sense.

12         THE COURT:  All right.

13  Q      So have you met Nicki?

14  A      Yes.

15  Q      And have you seen her interact with Allison Mack?

16  A      Yes.

17  Q      Do you believe them to be in a -- did you believe them to

18  be in a romantic relationship?

19  A      No.

20  Q      Why not?

21  A      Well, one, when they interacted, it was just friendly.

22  It wasn't anything out of the ordinary.  Also she didn't come

23  around a lot.  She didn't live with Allison in the apartment.

24  India actually lived and slept in the same bed as Allison.

25  Q      Did you know whether or not Nicki was a U.S. citizen?

Jay - direct - Lesko                                              4431

1    A    I believe she was not.

2    Q    Do you know where she was from?

3    A    Canada.

4    Q    Have you yourself been married?

5    A    Yes.

6    Q    Were you married to a friend?

7    A    Yes.

8    Q    Was he gay?

9    A    Yes.

10   Q    And was he older than you?

11   A    Yes.

12   Q    Was that a fraudulent marriage?

13   A    Yes.

14   Q    How old were you at the time?

15   A    Twenty.

16   Q    And was your husband a United States citizen?

17   A    No.

18   Q    And did you make misrepresentations to officials about

19   that marriage?

20   A    Yes.

21   Q    Did you get paid for that marriage?

22   A    Yes.

23   Q    Did you get divorced?

24   A    Yes.

25   Q    How long after you got married did you get divorced?

Jay - direct - Lesko                                          4432

1   A    Shortly after a year.

2   Q    So when you first arrived, say, January of 2017 in

3   Albany, did you communicate with Allison Mack about the

4   defendant?

5   A    I'm sorry?

6   Q    Did you communicate with Allison Mack, either in person

7   or by e-mail, about the defendant?

8   A    During -- I'm sorry, what time?

9   Q    January, February time period.  Early on after you

10  arrived in Albany.

11  A    Oh, so when I first got to Albany?

12  Q    Yes.

13  A    Yes.

14  Q    And did you, on occasion, admit that you wanted to have a

15  closer relationship with the defendant?

16  A    Yes.

17  Q    And the assignment that you received to seduce or have

18  sex with the defendant, do you recall approximately when that

19  happened?

20  A    Maybe like, March, April.  Maybe around -- I feel like

21  March, April time of 2017.

22  Q    So after you had been in Albany for several months?

23  A    Yes.

24  Q    So during your time in The Vow, if you failed your

25  assignments, did you believe there was a risk that your

Jay - direct - Lesko                                    4433

1   collateral would be released?

2   A    I'm sorry.  Can you repeat that, please?

3           It's -- the mic, it feels like a little bit hard to

4   hear you.

5   Q    Okay.  Sorry.

6   A    That's better.

7   Q    During your time when you were in The Vow, did you

8   believe that if you failed your assignments, there was a risk

9   that your collateral would be released?

10  A    Not with the minor ones, but with the major one, yes.

11  Q    How about if you told anyone about The Vow?  Would that

12  jeopardize your collateral?

13  A    Yes.

14  Q    What about the assignment to seduce and have sex with the

15  defendant?  If you did not complete that, would that

16  jeopardize your collateral?

17  A    Yes.

18  Q    What if you left The Vow?  Do you think that would

19  jeopardize your collateral?

20  A    Yes.

21  Q    How did that make you feel?

22  A    It made me feel trapped.  I was terrified.  It made me

23  really scared for my safety, for the well-being of my friends

24  and family.

25  Q    And how did you think the collateral would be used

VB        OCR        CRR

Jay - direct - Lesko                                    4434

1    against you?

2    A    I felt like they would publish it somewhere and have, you

3    know, just have it out in the world.

4    Q    So did you ultimately leave The Vow?

5    A    Yes.

6    Q    And could you describe how that happened?

7    A    Well, it was a bit of a process.  So when I left, I went

8    to Mexico, to the family vacation.  Thankfully I could take my

9    cat with me.  And I was there and I just knew once I was in

10   California, which is where I'm from, I would be okay, because

11   they weren't there.

12           So I just basically said that my grandma, which one

13   of them was ill, but I just -- I played it up that she was

14   really ill and that I needed to be there.  And then that's how

15   I slowly started to get away from them.  But I needed to get

16   my car back from Allison.  My friends were in it, so it was a

17   very drawn-out kind of process.  And I wouldn't say that I

18   officially left until May 30th, when everything kind of blew

19   up.

20   Q    And had you lent your car to Allison?

21   A    Yes.

22   Q    And where was your car?

23   A    In San Diego.

24   Q    And so during this time period -- and you said that there

25   was some sort of incident on May 30th; is that right?

Jay - direct - Lesko                          4435

1    A    Yes.

2    Q    And so from the time that you arrived on the West Coast

3    to the May 30th time frame, were you communicating with India

4    and Allison?

5    A    Yes, but not as much.

6    Q    And were you doing all of the required assignments and so

7    forth related to The Vow?

8    A    I started doing less of them and reporting less things.

9    Q    Did there come a time when you had a conversation with

10   India about your collateral?

11   A    Yes.

12   Q    Could you describe that conversation.

13   A    Yes.

14        I went to San Diego to see Allison's play and to

15   retrieve my car.  So after the play, Allison instructed for me

16   and India to walk back to her San Diego apartment.  So during

17   this walk, I was talking to India and I said, hey, so if I

18   wanted to -- if I decided I wanted to leave, as long as I

19   don't say anything about the group, nothing will happen to my

20   collateral; right?

21        And she says, well, you're already in the group.

22        And I go, I know, but when I gave you the collateral

23   at the beginning, you said that it was only to protect the

24   secrecy of the group.  So if I wanted to leave, nothing will

25   happen to my collateral; right?

Jay - direct - Lesko                    4436

1          And then she like, pushed back a little bit and she

2    said, this is a lifetime commitment.  You're already in.

3          And at that point I felt threatened, so I said, are

4    you threatening me?  Because I feel like I'm being threatened

5    right now.

6          And then at this point we already arrived to the

7    front of Allison's apartment.  So she came down and broke up

8    the conversation.

9    Q    And at this point, had you already collected the other

10   collateral that we just viewed?

11   A    Yes.

12   Q    And did that -- how did that make you feel, that you had

13   that other collateral?

14   A    It made me feel better.  It didn't make me feel like

15   completely safe, because they still had my collateral, but it

16   did help me feel a little bit more empowered in the situation.

17   Q    So after this discussion with India, did you end up

18   getting your car back from Allison?

19   A    Not that night, but eventually, yes.

20   Q    Explain how that happened, please.

21   A    So I Ubered to the play to get my car, and Allison gave

22   me my keys, but she misled me as to where the car actually

23   was.  So I had to come back the following day, and I was in a

24   car with Michelle and Danielle, Allison and India, and they

25   were going to drop me off where my car was.  Prior to that, we

Jay - direct - Lesko                                    4437

1   dropped off India at the train station.

2   Q    And what happened next?

3   A    So we're dropping India off.  I was sitting in the car

4   and I didn't help her take out her luggage from the trunk.  So

5   then Allison reprimanded me in front of everyone and said,

6   you're so lazy.  You're so ungrateful.  You're so rude.  You

7   don't appreciate anything that she's done for you.  And she

8   just basically berated me.

9   Q    How did that make you feel?

10  A    I was shocked and I felt sad and I, you know, I felt

11  attacked.

12  Q    What happened next?

13  A    So after we dropped off India, we go to where my car was

14  located, which was in a parking garage.  And India -- I'm

15  sorry.  Allison, she just basically says, I don't understand,

16  like, you were so about the program.  Like, you've been so

17  distant.

18          And I don't want to just like run away from the

19  situation.  I'm like a person, I like to talk about things and

20  like, just move through it.  And I said, honestly, that

21  special assignment really freaked me out, and it really scared

22  me, and I started Googling everything and -- and it really

23  freaked me out.

24  Q    What did she say in response?

25  A    She said -- she just became very dramatic and said, are

Jay - direct - Lesko                                        4438

1   you saying you -- you thought that I was an accomplice to a

2   child molester?

3            And I looked at her and I said, yes, that's what I

4   thought.

5   Q    What was Allison's reaction?

6   A    She just said, I just feel like I failed you.  I can't

7   believe that's what you think.

8            And then we got to my car and it was just, like,

9   fairly silent and then her attitude went from, like, feeling

10  that she feels bad to being, like, mean to me.

11  Q    Did you eventually get your car?

12  A    Yes.

13  Q    Okay.  And did Allison leave?

14  A    Yes.

15  Q    Afterwards, did you have contact with Allison?

16  A    Yes.

17  Q    Could you describe that please.

18  A    Yes.

19           She sent me like a YouTube video, or something like

20  an inspiring quote or something like that, and this time her

21  tone is very nice.  And she's like, I know I'm only here for a

22  short period.  I would love to spend some quality time with

23  you.  Souki's coming down and she knows how much I care about

24  Souki.  I know she would love to see you.

25           And so I agreed to meet with them.

                      VB      OCR      CRR

Jay - direct - Lesko                            4439

1   Q     And did you meet with them?

2   A     Yes.

3   Q     So during this time period, were you confused about

4   The Vow?

5   A     Yes.

6   Q     Would you explain that.

7   A     It was really confusing.  Obviously, I had my intuition,

8   like, what I felt was right and wrong, but then, like, I

9   formed relationships with these people.  I trusted them.  You

10  know, I also had people that I cared about in -- in The Vow.

11  So it was really confusing.  Especially after that

12  conversation where I, you know, told Allison, hey, like, I

13  think this is -- I don't know what's going on, but this is not

14  right.

15         I feel like she tried to get in my head a little bit

16  and then seeing Souki, who I love and like, so happy, it was

17  really emotionally and internally, like, really messing me up.

18  On top of the fact that I couldn't talk to anyone about this

19  stuff.  It was really challenging.

20  Q     Did there come a time when you had dinner in Los Angeles

21  with Allison?

22  A     Yes.

23  Q     So what happened?  Explain the dinner.

24  A     Well, Allison said that I needed to go to the dinner to

25  meet with her and Val and Rachel.  I actually didn't go to the

VB        OCR        CRR

Jay - direct - Lesko                    4440

1    dinner aspect, I just came towards the end.  In my mind, you

2    know, I'm already like irritated that I had to keep showing

3    up.  I had to keep showing face a little bit.  So they

4    eventually leave.

5             And I am with Allison by myself and we go to

6    another, different parking garage, and as we're walking in,

7    she says, you know, you can do this any way that you want to.

8    You could do this as hard or as easy and slow and fast as

9    you'd like.  We just want to help you.

10            And I told her, listen, like, I just want to live my

11   life as an artist.  I'm going to Maui, like, this program

12   isn't working for me.

13            And she goes, well, like, how can we help you?  We

14   just want to help you.

15            And I said, listen, just back off.  Like, just back

16   off.

17            And that was the last time I saw Allison.

18   Q    Okay.  Did she react to you when you said back off?

19   A    Yes.  Again, the fake waterworks and saying, I just -- I

20   feel like I failed you.  And in her own little bubble of

21   emotion.

22            And I said to her -- I said, it's nothing personal

23   but if you want to feel that way, you're entitled to feel that

24   way.

25   Q    And why did you say that?

1  A    It was like a NXIVM term, where it's, like, you have to

2  take ownership of your feelings.  So it was kind of my little

3  way to, like, jab at her with her own phrasings.

4  Q    After that conversation, did you ever talk with Allison

5  Mack again?

6  A    No.

7  Q    So just so the timeline's clear.  You entered The Vow in

8  November of 2016; is that right?

9  A    Correct.

10 Q    Okay.  And did you leave it on May 30th?  Is at that the

11 date or is there another date?

12 A    No, there was -- that was the official, like, leaving.

13 Q    So what happened on May 30th?  Before that.  Was there a

14 party planned just before May 30th?  May of 2017?

15 A    Yes.  India had invited me to a birthday party that she

16 was going to be having in Malibu.

17 Q    Did you go?

18 A    I did not.

19 Q    Okay.  During that time period, did you and India discuss

20 Vow?

21 A    Yes.

22 Q    What did you discuss?

23 A    We both agreed that it made more sense for her to take on

24 Vow as I've now become unavailable.

25 Q    And to the best of your knowledge, had India discussed

1   that with Val?

2   A    Yes.

3   Q    And did you want to discuss that with Val?

4   A    Yes.

5   Q    So did you make a plan to do that?

6   A    Yes.

7   Q    And at that time, was there supposed to be some sort of

8   ceremony in June?

9   A    Yes.

10  Q    What was your understanding of the ceremony?

11  A    How India described it, she said that there was a special

12  ceremony, and I needed to go to Albany on June 1st and, it was

13  also during coach summit, so I said, I don't understand why I

14  need to go.  I'm not a coach.

15        And she said, it's just a special ceremony and your

16  sisters are going to be there, and it's important that you're

17  present.  I later learned from Zoraida that it was actually

18  going to be a branding ceremony.

19  Q    And did you go to Albany in June for that ceremony?

20  A    No.

21  Q    Did you make it appear as if you were planning on going?

22  A    Yes.

23  Q    So did you ultimately meet with Val?

24  A    Yes.

25  Q    And when did you meet?

Jay - direct - Lesko                                    4443

1   A    We met on May 30th.  For me, it was -- she was my friend,

2   so I wanted to say something in person.  But I couldn't tell

3   her everything, because I just didn't want to ring any alarms.

4            So we went on this hike, and at the beginning of the

5   hike she gets a phone call, and then she's, like, really

6   stressed out and freaking out.

7            And I, like, hey, like, what's going on?  And she

8   said, India's mom keeps calling me, and she's freaking me out.

9   She just texted me.

10           I said, what did the text say?

11           And the text said, please do not go on that plane to

12  Albany.  You are involved in illegal activities you may not be

13  aware of.  Please call me.

14  Q    So what happened next?

15  A    So I took that as a sign from God and go, well, I'm just

16  going to tell her everything.  Like, I'm -- so then we go on

17  this hike.  I tell her about the special assignment.  I tell

18  her, like, that's why I'm leaving.  I don't know what's really

19  going on, but, like, this is not good.

20  Q    What happened next?

21  A    Next, during the middle of the hike, Bonnie, who was a

22  high-up in ESP, calls her and says, like, hey, can I trust

23  you?  Like, you're involved with really dangerous women.

24  You're going to a branding ceremony.  Like, you know, she's

25  just, like telling her, like, this is really unsafe.

Jay - direct - Lesko                    4444

1    Q    So did you and Val meet with anyone later that day?

2    A    Yes.  So she told Bonnie that I was with her, but Bonnie

3    was really paranoid that, like, I might be, like, a bad person

4    in it.  And she assures her, like, no.  She actually is

5    getting out herself.  So then there's kind of like this secret

6    meeting that happens with Catherine's mom, Bonnie, and a few

7    other women that I knew and didn't know that were involved

8    with NXIVM.

9    Q    Was Val concerned about her collateral?

10   A    Yes.

11              MR. AGNIFILO:  Objection, Your Honor.

12              THE COURT:  Sustained.

13              The jury will disregard the answer.

14              Go ahead.

15   Q    Did Val ever express to you that she was concerned about

16   her collateral?

17   A    She was concerned before giving the collateral.  And then

18   while on the hike, she was in hysterics.  She was balling.

19   She was freaked out.  Like, she loves her family.

20              So especially with that letter for the terrorism,

21   she was just completely petrified.

22   Q    Did Val end up going to Albany?

23   A    No.

24   Q    Did she end up getting branded?

25   A    No.

Jay - direct - Lesko                                    4445

1   Q     Did you have a discussion with Zoraida?

2   A     Yes.

3   Q     And what did the two of you discuss?

4          MR. AGNIFILO:  Objection, Your Honor.

5          MR. LESKO:  I will rephrase it.

6          THE COURT:  Please.

7   Q     Did you have a discussion about the collateral that you

8   had photographed with Zoraida?

9   A     Yes.

10  Q     And what did you say to Zoraida?

11  A     Well, Zoraida was under Michelle, and I already knew

12  that.  So she came to me as a friend, not knowing that I was

13  in it.  But just said, I'm in this thing, like, I'm really

14  worried.  I can't talk about it, and as soon as she said that,

15  I said, listen, I know what you're talking about it.  Don't

16  worry.  Like, I'm doing things to help take care of it, and

17  just let her know that not to be afraid and to stop talking to

18  Michelle.

19  Q     Had she given collateral to Michelle?

20  A     Yes.

21  Q     Did Zoraida ultimately get branded?

22  A     No.

23  Q     So at some point in this process, did you -- did you

24  reach a point where you came to accept or make peace with the

25  fact that your collateral would be released?

Jay - direct - Lesko                                    4446

1   A      Yes.

2   Q      Could you explain that.

3   A      So during this time, you know, I felt very bounded by the

4   fact that I had the collateral and all of that fear.  I would

5   consider myself a spiritual person, and I just approached it

6   in the way that, like, okay.  What am I going to do?  What is

7   the worst thing that could happen?  You know, other than if

8   they tried to physically attack me; would be that my

9   collateral would be released.

10          And I just had a moment with myself and just

11  liberated myself emotionally, mentally, and was, like, you

12  know what?  If the worse thing that happens to me is they show

13  the collateral.  Fine.  But, like, no one was going to be able

14  to trap me like that.

15          So I accepted the fact that that could happen and

16  that's what led me to be able to do what I needed to do.

17  Q      How did that make you feel?

18  A      Liberated.  Scared at first, but then at the end of day,

19  it was -- it is what it is, you know.  It was going to be what

20  it was going to be and I was ready to -- to live with that.

21  Q      At some point, did you eventually give the collateral

22  that you took along with Danielle and Michelle, did you give

23  that to anyone else?

24  A      Yes.

25  Q      Could you explain that.

1   A    I sent it to my ex-boyfriend, and also to -- I didn't

2   send it, but I later on, after all this happened, met with

3   Mark Vicente and Catherine, as they were trying to get things

4   together to get the FBI to investigate.  And Mark and Bonnie

5   said that they're known to sue people a lot and blackmail and

6   frame people.  So they thought it would be more safe for me to

7   give the collateral to Mark, just in case they tried to frame

8   me, and say that I was, like, the mastermind.

9   Q    To your knowledge, did NXIVM go after people?

10  A    Yes.

11  Q    Could you explain that.

12  A    It's known in the lawsuits, like, the people who were

13  against NXIVM, that they would be sued.  Like Clare Bronfman.

14          MR. AGNIFILO:  I object, Your Honor.

15          THE COURT:  Sustained.

16  Q    Without getting into specifics, was it your understanding

17  that NXIVM would go after people?

18  A    Yes.

19          MR. LESKO:  Your Honor, may I show an exhibit just

20  to the witness?

21          THE COURT:  Sure.

22          Go ahead.

23          MR. LESKO:  And, Your Honor, I'm going to show for

24  identification an exhibit, Government's 447, that has been

25  previously, in part, admitted subject to connection.

Jay - direct - Lesko                                    4448

1              THE COURT:  Yes.

2              MR. LESKO:  The earlier 447 was a one-page

3    exhibit and the replacement 447 is a five-page exhibit, for

4    the record.

5              THE COURT:  All right.

6              MR. LESKO:  Thank you.

7              So Jay, I'm going to show you, up on the screen, the

8    first page of Government's Exhibit 447.

9    BY MR. LESKO:

10   Q    Do you recognize that exhibit?

11   A    Yes.

12   Q    And without getting into the details, is that an

13   exhibit -- is that an e-mail sent to you from an attorney?

14   A    Yes.

15   Q    And then subsequently forwarded to your attorney?

16   A    Yes.

17   Q    At the top.

18             MR. LESKO:  The second page of Government's

19   Exhibit 447.

20   Q    Do you recognize that page?

21   A    Yes.

22   Q    And without getting into the details, is that a letter in

23   Spanish that you received?

24   A    Yes.

25   Q    And that's just a portion of it?

VB        OCR        CRR

Jay - direct - Lesko                                      4449

1    A     Correct.

2    Q     Was that a screen shot of it?

3    A     Yes.

4    Q     Okay.

5              MR. LESKO:  I am actually going to not use the third

6    page.

7              The fourth page.

8    Q     Is that a full screen shot of the letter in Spanish?

9    A     Yes.

10   Q     And is that the letter that you received?

11   A     Yes.

12             MR. LESKO:  And the fourth page of Government's

13   Exhibit 447.

14   Q     Is that a translation of the letter in Spanish?

15   A     Yes.

16   Q     And is that the letter that you received?

17   A     Yes.

18             MR. LESKO:  Your Honor, we'd offer Government's

19   Exhibit 447.

20             MR. AGNIFILO:  No objection.

21             THE COURT:  All right.  Government's Exhibit 447,

22   pages 1, 2, 4 and 5 are received in evidence.

23             (Government's Exhibit 447, pages 1, 2, 4 and 5

24   received in evidence.)

25   BY MR. LESKO:

Jay - direct - Lesko                          4450

1   Q    So Jay, let's talk about the first page of Government's

2   447.

3            Could you -- the middle part of that exhibit, is

4   that an e-mail that you received from someone?

5   A    The translation part?

6            (Exhibit published.)

7   Q    The e-mail in the middle, from Diego Ruiz Duran?

8            Do you see that?

9   A    Yes.

10  Q    Is that dated October 11th, 2017?

11  A    Yes.

12  Q    Okay.  Could you read that e-mail.

13  A    Dear Jay, my name is Diego Ruiz Duran, and I am an

14  attorney whose services have been engaged by NXIVM, Mexico.  I

15  took the liberty of writing to you to let you know that the

16  State's Attorneys office in Mexico has issued some directives

17  against you and other individuals.

18           Attached please find such directives which will also

19  be presented to you via certified mail.  You should know that

20  I also took the liberty to translate such document to English

21  for your understanding.

22           Best regards, Bufete Ruiz Duran.

23  Q    Okay.  And was the Spanish letter, which is the fourth

24  page of Government's 447 --

25           (Exhibit published.)

```
                    Jay - direct - Lesko                4451
```

1    Q    -- was that the letter referenced in that e-mail?

2    A    Yes.

3    Q    Okay.  And is there a date on this letter?  We will go

4    through the translation, but is there a date on this letter?

5    A    October 11th, 2017.

6    Q    And your name would have been right here?

7    A    Correct.

8    Q    And do you recognize that name that I'm pointing to right

9    now?

10   A    Yes.

11   Q    What is that name?

12   A    Alejandro Betancourt.

13   Q    Do you know who Alejandro Betancourt is?

14   A    I didn't know him personally, but I knew he was a high-up

15   in NXIVM.

16   Q    Okay.  And let's look at the last page of Government's

17   447.

18            MR. LESKO:  Strike that.

19            Yes, Government's 447, last page.

20            (Exhibit published.)

21   Q    And this translation of the letter, could you read the

22   second paragraph.

23   A    Yes.

24            Stop, abstain and refrain from incurring in any type

25   of intimidation, acts of nuisance, or disturbances against

Jay - direct - Lesko                              4452

1   Alejandro Betancourt, legal representative of NXIVM, Mexico,

2   or against NXIVM, Mexico, or against any clients and/or person

3   with any sort of relation to the company referred herein.

4   Q    And could you read the last paragraph, please.

5   A    Additionally, take notice that failure to comply with

6   such measures shall bring along the imposition of urgency

7   measures as provisioned by Article 104 of the National Code of

8   Criminal Procedures.  Such measures vary from a warning up to

9   an arrest for 36 hours alongside criminal responsibilities

10  that shall arise.  Respectfully, State Attorney Agent Fernando

11  Jose Gomez.

12  Q    Did you have any connection with NXIVM, Mexico?

13  A    No.

14  Q    Do you know why you got this letter?

15  A    An intimidation tactic.

16  Q    Did you end up retaining an attorney?

17  A    Yes.

18  Q    And is that the attorney referenced on the e-mail, Neil

19  Glazer?

20  A    Correct.

21  Q    So -- so Jay, was your collateral ever returned to you?

22  A    No.

23  Q    Did you eventually determine that the defendant was in

24  charge of the vow?

25  A    Yes.

Jay - direct - Lesko                              4453

1   Q    Would you have joined The Vow if you had known the

2   defendant was in charge of it?

3   A    Absolutely not.

4   Q    Would you have provided collateral if you knew the

5   defendant was in charge of The Vow?

6   A    No.

7   Q    You testified that you previously held the defendant in

8   high esteem; is it fair to say?

9   A    I'm sorry.  Can you repeat at that, please.

10  Q    You testified that early on you held the defendant in

11  high esteem?

12  A    Yes.

13  Q    Do you feel that way about him now?

14  A    No.

15  Q    How do you feel about him now?

16       MR. AGNIFILO:  I object, Your Honor.

17       THE COURT:  Sustained.

18       MR. LESKO:  No further questions, Your Honor.

19       THE COURT:  All right.  We are going to take our

20  morning break.

21       All rise for the jury.

22       (Jury exits.)

23       (In open court; outside the presence of the jury.)

24       THE COURT:  The witness may stand down.  Do not

25  discuss your testimony with anyone.

VB          OCR          CRR

Jay - direct - Lesko                                    4454

 1              (Witness excused.)

 2              THE COURT:  Everyone may be seated.

 3              How long do you think your cross will take?

 4              MR. AGNIFILO:  Not -- less than a half an hour.

 5              THE COURT:  And then the next witness is?

 6              MR. LESKO:  Anthony Valenziano, Your Honor.

 7              THE COURT:  Who is?

 8              MR. LESKO:  He's an attorney who is involved with

 9      the lawsuit where the videotapes, altered videotapes were

10      produced.

11              THE COURT:  All right.  We will take a ten-minute

12      break now.

13              MR. LESKO:  Your Honor, if I could ask.  We have

14      received some of the impeachment material, but I believe one

15      item was submitted for in camera review and we have not -- oh,

16      we have that?

17              MR. AGNIFILO:  You do now.  I'm about to hand it to

18      you.

19              Do you have it?

20              MS. PENZA:  No.

21              MR. AGNIFILO:  Now, they have it.

22              THE COURT:  Okay.

23              MS. PENZA:  Your Honor, also, just a preview for the

24      Court.  We do have another witness lined up today, a law

25      enforcement officer.  I think that will take us to the end of

Jay - direct - Lesko                          4455

1    the day, but we have another witness whose flight was delayed.

2    So we only have two more witnesses for today.

3              THE COURT:  You mean we might end early today?

4              MS. PENZA:  Potentially.

5              THE COURT:  Potentially.  All right.

6              MR. LESKO:  And we are still on track.

7              THE COURT:  Got it.  Okay.  Thank you very much for

8    letting me know.

9              All right.  Let's take our break.

10             (Recess taken.)     (In open court.)

11             (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

12             THE COURTROOM DEPUTY:  All rise.

13             THE COURT:  All right.  Bring in the witness.

14             MR. AGNIFILO:  Did Your Honor make a decision on

15   that piece of evidence?  Because I think it will come up on

16   the cross of this witness.

17             THE COURT:  Yes.  On the piece of evidence, yes,

18   before the witness comes in.

19             Mr. Lesko.

20             MR. LESKO:  I'm sorry.  Was this the 2002?

21             THE COURT:  The love note, if you will.

22             MR. LESKO:  We have no objection to...

23             MS. PENZA:  To impeachment.

24             MR. LESKO:  To impeachment; correct.

25             THE COURT:  Could we wait a moment before the

                    VB      OCR      CRR

Jay - cross - Agnifilo                    4456

1    witness comes in?  Thank you.

2              This is not -- it is the letter from the witness to

3    Mr. Raniere; right?

4              MR. LESKO:  That's my understanding, yes.

5              THE COURT:  Yes.  Friday, April 26th, 2017.

6              MR. LESKO:  If Mr. Agnifilo intends to use it

7    properly as impeachment material, or to refresh her

8    recollection, we would not object.  If he's trying to admit it

9    as he has with other similar items, as substantive evidence,

10   we would obviously object to that.

11             THE COURT:  Well.

12             MR. AGNIFILO:  I think it's an exception to the

13   hearsay rule.  It's the witness's state of mind.  It's a very

14   clear statement of her state of mind as of that day and we

15   think it's an exception under 8033.

16             THE COURT:  I will allow you to put it in.

17             All right.  Let's bring in the witness.

18             (Witness resumes stand.)

19             (Jury enters.)

20             THE COURT:  Please be seated.

21             Cross-examination.

22             MR. AGNIFILO:  Thank you, Your Honor.

23   CROSS EXAMINATION

24   BY MR. AGNIFILO:

25   Q    Good morning, Jay.

VB        OCR        CRR

Jay - cross - Agnifilo                    4457

1   A    Good morning.

2   Q    My name is Mark Agnifilo.  I represent Keith Raniere.

3        I'm going to ask you some questions, not too long,

4   20, 30 minutes, tops.  If I ask you a question that is not

5   clear to you, please feel free to ask me to rephrase the

6   question.  I will be happy to do that; okay?

7   A    Absolutely.

8   Q    All right.

9        Just reviewing some of your direct testimony.  You

10  said that when you took the initial five-day intensive, you

11  said you really -- you were impressed by it.  You liked it.

12  A    Yes, I had a very good response to it.

13  Q    Okay.  And just describe that in a little more detail for

14  us, if you could.  What did you respond to?  What spoke to

15  you?  How did it work for you?

16  A    The curriculum in itself, because it was in an intensive

17  time, there was a lot that we processed and went through.  And

18  with that, I had a lot of breakthroughs.

19        It gave me an opportunity to talk about a lot of

20  these vulnerable things and share it with people.  So there

21  was a bonding within that.

22  Q    And then you took the 11-day to make out the whole 16-day

23  intensive; correct?

24  A    That's correct.

25  Q    All right.  And what was the time period, ballpark,

Jay - cross - Agnifilo                                    4458

1  between the 5-day and the 11-day?

2  A    Well, the 5-day was August of 2016, and the 11-day was in

3  November of 2016.

4  Q    Okay.  And did you also have a high opinion of the 11-day

5  course as you had with the 5-day course?

6  A    Yes.

7  Q    Okay.  And now, you had an, at an earlier point in your

8  life, you had taken courses in Scientology; correct?

9  A    I'm sorry.  Can you repeat that, please?

10 Q    Sure.

11       At an earlier point in your life, had you taken any

12 Scientology courses?

13 A    Yes.

14 Q    Okay.  And did you take to that?  Did you enjoy those

15 courses?

16 A    To me, it felt like it was universal principles, but

17 dumbed down.

18 Q    Okay.  Scientology?

19 A    Correct.

20 Q    Okay.  And when you took the 5- day and the 11-day, you

21 thought that it was worthwhile.  These were worthwhile classes

22 for you.

23 A    Yes.

24 Q    Okay.  And now, in November of 2016, around that period

25 of time, you're living at 7 General's Way with Allison and

1    Souki and Danielle; correct?

2    A    No.

3    Q    Okay.  You were not living there?

4    A    At that time, no.

5    Q    Okay.  When did you start living there?

6    A    I owe officially moved there January 11th of 2017.

7    Q    Okay.  So how long did you live at 7 Generals Way, total?

8    A    From the officially moving in January, until when I left

9    and escaped back to California, that was about four or so

10   months.

11   Q    Okay.  And were you there the whole time?  The whole four

12   months?

13   A    In?

14   Q    That you were living there?  Did you live anywhere else?

15   Did you go away for any period of time during the period of

16   time that you were living at 7 Generals Way?

17   A    No.  I uprooted my whole life in LA to move to Albany.

18   So that then became my home base.  But I had to travel back to

19   Los Angeles frequently.

20   Q    Okay.  Now, at some point you started keeping a journal

21   that was part of what you were supposed to do, what India

22   wanted you to do; correct?

23   A    No.

24   Q    Okay.  When did you start keeping a journal?

25   A    I've been keeping a journal since middle school.

1    Q    Okay.  What you said, I think, in response to one of the

2    questions on direct examination, if India had ever punished

3    you and you said you were lucky, all India ever did was make

4    you keep a journal.

5              Do you remember saying that on direct?

6    A    That's not what I said.

7    Q    Okay.  What do you remember saying?

8    A    I said that she would give me journal assignments and,

9    thankfully, she was a nice master.  So my punishments were

10   mostly journaling.

11   Q    Okay.  Which is something you were doing anyway; correct?

12   Because you've been journaling since middle school.

13   A    So my journaling, my personal journaling was separate

14   from the journaling assignments.

15   Q    All right.  I'm going to show you something, just for you

16   to see.  I'm not going to ask any questions about it yet.  It

17   is Government's Exhibit 444, just for identification.

18             MR. AGNIFILO:  If I can just approach the witness,

19   Judge, and give it to her.

20             THE COURT:  Yes, you may.

21   Q    Just take a look.  I just gave you something that's

22   marked for identification as Government Exhibit 444.

23             Do you see that in front of you?

24   A    Yes.

25   Q    Okay.  And what is it?

Jay - cross - Agnifilo                                    4461

1   A    It is a copy of one of my journals.

2   Q    And is this a journal -- this is -- is this something

3   that you were keeping in connection with stuff that India was

4   having you do or is this your personal journal?

5   A    A multi-purpose journal.

6   Q    Okay.  So this is something you did on your own; right?

7   A    Some of this was things I did on my own.  Some of it was

8   related to assignments from The Vow.

9   Q    Okay.

10          MR. AGNIFILO:  And just -- if you could turn to

11  page 8.  So it's 444-8.  And I'm just going to ask you some

12  questions.

13  Q    All right.  So one of the things you talked about on

14  direct examination was acts of care; correct?

15  A    Correct.

16  Q    All right.  And you have journal entries concerning acts

17  of care here on page 8; correct?

18          MR. LESKO:  Objection.

19          THE COURT:  Overruled.

20          You may answer.

21          MR. LESKO:  Okay.

22          THE WITNESS:  Can you rephrase the question?

23          MR. AGNIFILO:  Okay.  Absolutely.

24  Q    I asked you if you talked about acts of care on direct

25  examination and you said that you did; right?

                    VB        OCR        CRR

Jay - cross - Agnifilo                              4462

1    A    You -- I'm sorry.  I'm just having trouble understanding

2    what you're actually asking me.

3

4                 (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jay - cross - Agnifilo                              4463

1   EXAMINATION CONTINUES

2   BY MR. AGNIFILO:

3   Q    And my question is this:  In your journal, looking at

4   page 8, you journaled -- you have entries in your journal

5   concerning acts of care, correct?

6   A    Yes.

7   Q    Okay.  Is that something you were doing on your own or is

8   that something you were doing with India?

9   A    This -- I mean, it has to do with The Vow.  This was a

10  specific, just -- I wouldn't even necessarily call this like a

11  journal -- well, I would call it a journal entry, that's more

12  emotion based.  This was like an outline of -- more of like

13  what the schedule of things that I needed to do.

14  Q    Okay.  And you journaled about The Source.  Do you

15  remember writing a great deal about The Source?

16  A    Yes.

17  Q    And I am going to have you direct your attention to

18  page 16 and then I am just going to ask you some questions.

19  So if you, just turn to page 16.

20  A    (Witness complies.)

21  Q    Now, as of January 2017, you had a positive view of The

22  Source, correct?

23  A    Yes.

24  Q    And tell the jury why.

25  A    So The Source intensive was for artists and performers

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                    4464

1   and actors, and the curriculum was really great.  A lot of the

2   exercises were really interesting and very different than any

3   other acting class that I had done before, and it helped get

4   to different emotional traumas and release them in different

5   ways.

6              So, most of it I found to be really great.

7   Q    And what other acting courses have you taken in your

8   life?

9   A    I've taken several different acting classes with

10  different acting teachers.

11  Q    And did you find The Source drastically different or

12  better than those acting courses?

13  A    I didn't find it better, necessarily.  It was a different

14  style of tapping into different parts that helped with me as

15  an artist.

16  Q    And different in what way?  Just give us a little bit

17  more description, different how?

18  A    Some of the exercises, there is an exercise where they

19  helped you make your face kind of contort.  It's kind of like

20  this weird thing where, because of the physiology of, like,

21  your face goes into this different place, it then helped

22  activate different emotional parts for me, personally.  Things

23  that I wasn't looking at, so it was just different exercises.

24  Q    Now, I think that at some point you said on direct

25  examination that you were on a limited calorie diet?

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                    4465

1    A    Yes.

2    Q    Okay.  And what were the different sort of daily limits

3    that you had at different points in time?

4    A    It varied.  It started with just a thousand calories, and

5    then it went to somewhere around 800, and then there were

6    times where it got to as low as to 500, 600.

7    Q    Okay.  And did you see any value in this for you?

8    A    How it was promoted to me was that it was allowing you to

9    look at, like, your cravings and discipline and things along

10   that arena.  But I quickly then would actually fail at these

11   assignments because the fact that I'm very into health and

12   wellness and that people weren't getting their periods and

13   were having a lot of health issues alarmed me that they

14   actually didn't know what they were doing.

15            Also, there was a time where I was taking, like fish

16   oil supplements, which are 150 calories for a tablespoon and I

17   had to count that into my allotted calories.

18            So I was literally eating -- like being told to not

19   eat, like, any food.

20   Q    My question was did you see value in it for you?

21   A    So, for a short period of time how it was promoted to me

22   seemed like it was valuable; however, that is not how I felt

23   about it.

24   Q    Okay.

25            Can you turn to page 26 of your journal?

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                                    4466

1    A    (Witness complies.)

2    Q    Do you remember thinking that it was helpful in terms of

3    pushing against your indulgent impulses?

4    A    Did you -- did you want me to read this so I can actually

5    refer back to it?

6    Q    If you -- if you can -- if you can recall what I'm asking

7    you, then you don't have to, but if there's something about

8    reading this that would refresh your recollection, then you

9    can use this to refresh your recollection.  So you could do it

10   either way you want.

11   A    Yeah, I would like to read this.

12   Q    Please do.

13   A    And then if you could re-ask me the question after I

14   finish.

15   Q    Please do.

16   A    Thank you.

17        (Pause.)

18   A    Okay, can you re-ask me the question, please?

19   Q    Absolutely.

20        Did you see value in your limited calorie

21   restrictions, in terms of you pushing against indulgences when

22   it comes to food?

23   A    Yes, in the beginning.

24   Q    Okay.  And when you say in the beginning, for how long a

25   period of time would you say that you saw the diet

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                    4467

1   restrictions as being valuable, just to you?

2   A    I would say in the beginning of having, you know, the

3   800-calorie, around there.  It didn't take me too long to see

4   the value, in that where I could see, oh, I do want to eat

5   that, but, oh, where is that coming from?  So really just in

6   the beginning part.

7   Q    Okay.  Did you see value in maintaining the diet as a

8   function almost of, say, keeping your word, keeping your

9   promise to yourself?

10  A    In the beginning.

11  Q    Okay.  I am going to ask -- turn to the next page, it's

12  page 27.

13  A    (Witness complies.)

14  Q    And, again, feel free to read it and I am just going to

15  ask you some questions.

16  A    Okay, I am going to take the time to read this.

17  Q    Take your time.

18           (Pause.)

19  A    Okay.

20  Q    Okay.  So one of the things, I think, during the time

21  when you saw value in the calorie restrictions, is that it

22  helped you keep your word, correct?

23  A    That's how it was promoted, yes.

24  Q    And -- and that's how you felt about it, right?

25  A    At first, yes.

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                          4468

1   Q    Okay.  And part of what was valuable is, I think you

2   said, that it was important to you that you be able to keep

3   your word, that you have that inner strength, correct?

4   A    Where are you -- where are you referencing that?

5   Q    If this is something that you would have believed back at

6   the time that you were doing this journalizing, or keeping

7   these journals.

8   A    I'm sorry, I don't understand your question.

9   Q    All right.  I'm going to come at it from a different

10  angle.

11         You testified on direct examination that your mother

12  left the family when you were young, correct?

13  A    Correct.

14  Q    Okay.  And there were times you would speak to India and

15  Allison about the fact that you wished your mother had better

16  discipline, correct?

17  A    Yes.

18  Q    And so that by you showing discipline in yourself, it's

19  something that you can essentially teach your mother that she

20  could have discipline the way you have discipline; is that

21  fair to say?  Is that something that you thought?

22  A    No.

23  Q    How would you put it?

24  A    I just don't understand, like, your --

25  Q    At some point you link your dieting, you link your

Jay - cross - Agnifilo                                4469

1   commitment to a limited calorie diet, to your mother and her

2   keeping her word to you; correct?

3   A    Not by my own really, like, choosing of that.  Like,

4   that's not a thought that I had come up with by myself.

5   Q    If you don't keep your word, you make it okay for your

6   mother not to keep her word; right?

7   A    That's what India said, yes.

8   Q    And that's what you wrote, right?

9   A    This was -- I wrote this because I had a failure, so this

10  was actually my punishment journaling.  So, I didn't really

11  know what to write and so that was one of the things that she

12  had said that it does that, so I wrote that as part of my

13  failure journal entry.

14  Q    What was your failure, do you remember?

15  A    I went over the calories.

16  Q    Okay.  So India wanted you to write this?

17  A    Correct.

18  Q    Okay.  So this is part of the journaling that you did

19  because India asked you to, correct?

20  A    Yes.

21  Q    Okay.  Now, do you recall you talked about being

22  presented with the special assignment, and you said that was

23  in March or April; do you remember that?

24  A    Yes.

25  Q    Okay.  I'm going to ask you to turn to a page of your

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                    4470

1   journal, which is page 56, and I am going to ask you to read
2   that to yourself.
3   A      (Witness complies.)
4   Q      Okay?
5   A      Uh-hum.
6   Q      So do you recall if the assignment that you were given
7   happened sometime before April 26th, 2017?
8   A      Yes.
9   Q      Okay.  And without getting into the substance, this is
10  you entering journal entries about that, correct?
11  A      A journal entry about that, yes.
12  Q      Right.  And after you were presented with the assignment,
13  you still didn't know how you felt about Keith, right?
14         You were not sure how you felt about Keith even
15  after the assignment was presented to you, is that true?
16  A      Yes.  I was very confused during that time.
17  Q      Okay.  And the assignment changed your perspective, fair
18  to say?
19  A      Yes.
20  Q      Because, before that, you had -- and I think you even
21  said on direct examination, you held Keith in very high
22  regard, correct?
23  A      Yes.
24  Q      Because you said, on direct examination, you wanted to do
25  important things for humanity in the world, correct?

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                                    4471

1    A    Yes.

2    Q    And one of the reasons you were interested in NXIVM and

3    in Keith is because you believed he and NXIVM were doing the

4    same things; correct?

5    A    That's what I thought.

6    Q    Right.  And that was your reason for staying in this

7    during the time that you were in it before the special

8    assignment, correct?

9    A    Yes.

10   Q    You genuinely thought they were doing good work --

11   A    Yes.

12   Q    -- right?

13        And how old were you when you -- when you took your

14   first five-day?

15        I'm sorry for making you do that.

16   A    I believe I was 26, right before I turned 27.

17   Q    Okay.  And you had had a lot of experiences in your life,

18   right?  You had an active life, right?

19   A    Yes.

20   Q    And you had tried certain things, like Scientology, that

21   you realized weren't for you, right?

22   A    Yes, I actually I had a manager who enrolled me in the

23   class.

24   Q    Right.

25   A    Which is why I took the Scientology.

SAM     OCR     RMR     CRR     RPR

Jay - cross - Agnifilo                4472

1    Q    And you didn't like it, right?

2    A    Yes, I quit shortly.

3    Q    Okay.  But you find this other thing, and you say, hey,

4    this might be what I've been looking for, and that's NXIVM;

5    correct?  And The Source and all the classes you were taking,

6    correct?

7    A    Yes, that's how I got involved.

8    Q    Right.  And I think you said the first time that you met

9    Keith you were very emotional to have met him, correct?

10   A    Yes.

11   Q    And tell us why, tell us what happened.  What are the

12   circumstances, the first time you ever meet Keith Raniere,

13   just tell us about what happened?

14   A    So for me, a lot of the emotion didn't come from just

15   meeting Keith as in the person, like, him and who he is.  It

16   was all the things that I had created and the feelings that I

17   had because of the curriculum and the experience that I had.

18   That, coupled with the belief that this person created this

19   curriculum with the intention to help people and being a part

20   of a community of people that wanted to do good, was really

21   moving for me.

22         So I attributed a lot of that gratitude to the

23   person that created the curriculum.

24   Q    Okay.  Now, after you were given the special assignment

25   you wrote a card to Keith, correct?

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                           4473

1    A    Yes.

2    Q    I want to show you -- the card and the envelope together

3    are marked as 1002-A for identification.

4           MR. AGNIFILO:  And I am just going to present them

5    to the witness, if I can, Judge.

6           THE COURT:  Go ahead.

7           THE WITNESS:  Thank you.

8           MR. AGNIFILO:  Just bear with me one second, Judge.

9           (Pause.)

10   BY MR. AGNIFILO:

11   Q    That's the card you wrote to Keith?

12   A    Yes.

13   Q    And there's a handwritten date on top?

14   A    Uh-hum.

15   Q    April 26th, 2017, yes?

16          MR. AGNIFILO:  Your Honor, we offer it.

17          MR. LESKO:  Objection.

18          THE COURT:  Overruled.

19          MR. AGNIFILO:  I have a copy of it here.

20          THE COURT:  Go ahead.

21          (Defendant's Exhibit 1002-A was received in

22   evidence.)

23          (Exhibit published.)

24   Q    It's in an envelope that has KR on it.  I think the front

25   of the card says:  Shit just got real.  And then:  Mr. Wobbles

Jay - cross - Agnifilo                                    4474

1   heart's you.

2              And then the card, itself, what you wrote.

3              (Exhibit published.)

4   BY MR. AGNIFILO:

5   Q    And what you write is:

6              Keith, I don't know what to say except thank you.

7   You are an incredible human being who has given so much to so

8   many people, including me.  You directly and inadvertently

9   have profoundly changed my life and perspective.  You have

10  helped me find my way back to me and to my love for humanity.

11  My path and journey has truly begun.  I'm feeling more bliss

12  and carrying a sense of myself in my experience.  I am headed

13  back to California to spend some much needed healing and

14  bonding time with my family, then who knows where.  I plan on

15  sitting in nature alone to write.  Writing poetry is where my

16  heart is calling me at the moment.  It has been for a while,

17  but I wasn't listening until now.  I am very excited to see

18  how my journey unfolds, embracing the struggle and surrender.

19  I'll be back.  How could I ever forget you?  You are

20  unforgettable.  Thank you, Keith.  With love.

21             And then you sign your whole name, but it's just J

22  there.  Correct?

23  A    Uh-hum.

24  Q    All right.

25             THE COURT:  You have to say yes or no.

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                                4475

1            THE WITNESS:  Okay.

2   A     Yes.

3   Q     And where were you when you wrote this card?

4   A     Albany, I believe.

5   Q     And you wrote this and -- how did you give it to him?

6   A     I believe I handed it to him.

7   Q     And do you remember where you and he were when you handed

8   it to him?

9   A     I believe, from my memory, a walk.

10  Q     Okay.  Now, how many walks did you take with Keith?

11  A     I don't know exactly how many, but a handful.

12  Q     Okay.  And how many walks did you take with Keith after

13  the special assignment that you described on direct

14  examination?

15  A     I think one.

16  Q     Okay.  Was this the only one?

17  A     I think so.

18  Q     Okay.  And is this -- is this -- why are you writing this

19  card?

20  A     I have multiple reasons why I wrote this card.  One of

21  them being as like a little bit of like a trail to, like, get

22  off my trail.  Hence, all of the hearts.  Also, too, because

23  at that time there was still a little bit of confusion in

24  regards to I knew Allison gave me that assignment.  She also

25  tried to put things into my head to make it something

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                    4476

1  different, so, like I said, I was really confused.  But I knew

2  that the assignment wasn't for me and that it wasn't good, but

3  at the same time, I'm a person who I could see the value of

4  things.

5          And I did want to say thank you because the

6  curriculum was helpful and I knew that I would never -- well,

7  thought I would never see him again.  So half of this was to

8  not let him suspect what I knew was going on and part of my

9  escape and, like, leave it so he wouldn't bother them so much.

10          Also, too, the line, How could I ever forget you?

11 When I told him that I was going to be leaving and that my

12 grandma was sick, you know, it was a way for me to have like a

13 solid out.  And he said, oh, you're just gonna forget me.  So

14 that's why I put how could I ever forget you, you are

15 unforgettable.

16 Q    Now, when you write the second line here:  You're an

17 incredible human being who has given so much to so many

18 people, including me; did you mean that?

19 A    At the time?

20 Q    Uh-hum.

21 A    There were parts of that that I meant.

22 Q    So I'm asking you, at the time that you wrote this card,

23 did you mean it and you said there are parts of that that you

24 meant?

25 A    Correct.

SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                                      4477

1   Q    Then you say:  You directly and inadvertently have

2   profoundly changed my life and perspective.

3            Did you mean that?

4   A    Yes.

5   Q    Okay.  And what did you mean by that?

6   A    Well, Keith does have -- would have some good phrases.

7   One of them was:  Are you the master of your life or is your

8   life the master of you?  And that was a profound statement

9   that he did tell it to me.  I don't think he originated that.

10  And I -- how I took that did change my perspective.

11  Q    Okay.  Then you say:  You have helped me find my way back

12  to me and to my love for humanity.

13           Did you mean that?

14  A    That one was kind of like I just kind of put something in

15  there, it was like a -- you know, a little fluff add.

16  Q    You and he on some of your walks before this walk, before

17  the assignment ever took place, would talk about your love of

18  humanity and his love of humanity, correct?

19  A    Yes.

20  Q    That was really one of -- one of the themes that you guys

21  would discuss, right, that you wanted to do something to help

22  humanity, to help people, correct?

23  A    Yes.

24  Q    Right.  And he would say he wants to help you do that,

25  right?

SAM     OCR     RMR     CRR     RPR

Jay - cross - Agnifilo                                    4478

1          MR. LESKO:  Objection.

2          THE COURT:  You may answer.

3   A    I'm sorry, can you repeat the question?

4   Q    Sure.

5          He would say that he wanted to help you with your

6   goal and your dream of helping humanity?

7   A    I don't know if he's ever actually said that.

8   Q    Not those exact words, that sentiment, in words or

9   substance?

10  A    There were -- there were different things that had come

11  up on the walk where, for instance, I had said I had a fear of

12  the dark.  And he said, oh, I can help you with that.  He

13  didn't say oh, I want to help you with your thing for

14  humanity, so it was kind of more specific things that he said

15  he would be able to.

16

17                (Continued on the following page.)

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

Jay - cross - Agnifilo                          4479

1   BY MR. AGNIFILO:   (Continuing.)

2   Q    Did he help you with your fear of the dark?

3   A    No.

4   Q    All right.  Then the next thing you say is, "My path and

5   journey has truly begun."  What are you saying there?

6   A    That's like, my, like, code way of saying, I'm going to

7   Maui, later.

8   Q    And then you say, "I'm feeling more bliss and carrying a

9   sense of myself of and experience."  Did you mean that, were

10  you feeling more bliss?

11  A    Yeah, because I knew I was leaving.

12  Q    That's not what you say in this card though; right?

13  A    This card was mostly a decoy so of course I'm not going

14  to -- I don't understand what you're saying.

15  Q    I'm asking you did you say that in your card and you're

16  saying no because now you're saying the card is a decoy?

17  A    I didn't write that in the card but as I was writing it I

18  was writing this card with specific intentions, but inside --

19  you were asking me what did I mean by that and what did I feel

20  and I was telling you what it is.

21  Q    Whose idea was it to write a card that was a decoy?

22  A    Mine.

23  Q    And whose idea was it to take screenshots of people's

24  collateral?

25  A    It was mine.

SN       OCR       RPR

Jay - cross - Agnifilo                                    4480

1    Q    And how did you make the choice?  How did you choose I'm

2    going to take this person's collateral and not that person's

3    collateral?  How did you make that choice?

4    A    I didn't do that.

5    Q    What collateral did you take, the four pictures we looked

6    at on direct examination; right?

7    A    Yes.

8    Q    Did you take any others?

9    A    I took what was in the -- in the Dropbox.

10   Q    All of it?

11   A    All of it except for one thing.

12   Q    You took more than -- the four screenshots that we looked

13   at on direct examination, that's not all the collateral you

14   took; correct?

15   A    Correct.

16   Q    You took other collateral as well?

17   A    I took whatever was available in that time.

18   Q    And do you remember how many images of collateral you

19   took?

20   A    I don't.

21   Q    And did you think that was honest?

22   A    What do you mean?

23   Q    Does that -- do you think that was honest that you would

24   take someone's collateral and then, what, you said you gave it

25   to your ex-boyfriend?

SN        OCR        RPR

Jay - cross - Agnifilo                                    4481

1   A    I was allowed to be in that Dropbox so I felt like I had

2   access to it and my intention with getting those pictures were

3   never to show them, but merely to protect myself because of

4   the blackmail that they had on me that they could have used

5   against me.

6   Q    When did you give it to your ex-boyfriend?

7   A    I gave it to him -- I don't know when.

8   Q    And how did you give it to him?

9   A    Via e-mail.

10  Q    You e-mailed it to your ex-boyfriend?

11  A    For safety measures.

12  Q    And where was he?

13  A    At his home.

14  Q    And what state is that in?

15  A    California.

16  Q    And how -- so you e-mailed it to him just through regular

17  e-mail?

18  A    Yes.

19  Q    And why did you choose to e-mail it to him?

20  A    He is a person that I trust.  I told him not to open it.

21  I told him to just put it in there, do not look at it and

22  that's why.  And he also knew the situation that I was in.

23  Q    And then you said you gave it to Mark Vicente?

24  A    Correct.

25  Q    Who did you give it to first, your ex-boyfriend or Mark

Jay - cross - Agnifilo                                    4482

1   Vicente?

2   A     My ex-boyfriend.

3   Q     How soon after giving it to your ex-boyfriend did you

4   give it to Mark Vicente?

5   A     I'm not entirely sure, but I gave it to Mark Vicente

6   after March 30th.

7   Q     And I think you testified on direct examination that you

8   were involved in a sham marriage?

9   A     It was a fraudulent marriage, yes.

10  Q     Okay.  And who was this person that you married?

11  A     It was my friend who's gay and who had a job working in

12  the states for a long time but the business went under and at

13  that time gay marriage was not legal.

14  Q     And so who suggested a fraudulent marriage?

15  A     My friend did.  He asked if I would be able to help him.

16  Q     And you said okay; right?

17  A     Yes.  I was 20 and I knew that I wasn't going to meet the

18  person that I was supposed to be in love with, yes.

19  Q     But you didn't do it as a favor, did you?

20  A     I did do it to help my friend.

21  Q     And to get $18,000?

22  A     He did offer to pay me.

23  Q     And you -- and you got married to this person and he gave

24  you $18,000; right?

25  A     That's incorrect.

Jay - cross - Agnifilo                                    4483

1   Q     So how much did you get?

2   A     I think maybe half of that.

3   Q     Do you remember telling the FBI you got $18,000?

4   A     I did not say that.

5   Q     Let me direct your attention -- this is 3500-J-12, page

6   three.  I'm just going to show you to you.

7            You were interviewed by the FBI and the people from

8   the U.S. Attorney's Office on December 27, 2018?

9   A     Yes.

10  Q     And this other person's name was Conrad?

11  A     Yes.

12  Q     And you said that Conrad paid you a total of $18,000;

13  right?

14  A     I was offered that much.  It was the original agreement,

15  but the actual money that I obtained was not that amount.

16  Q     Do you remember telling the FBI, though, that you were

17  paid a total of approximately $18,000?

18  A     I don't remember exactly what I said, but I said that

19  that was the original agreement.

20  Q     So, you're saying what you told the FBI is that it was

21  the original agreement, but you got paid something less;

22  that's what you're saying now?

23  A     Yes.

24  Q     Do you remember being in an interview with people from

25  the United States Attorney's office, some of whom are at the

Jay - cross - Agnifilo                    4484

1   table here and Special Agents from the FBI?

2          MR. LESKO:  Objection.

3          THE COURT:  Sustained.

4   BY MR. AGNIFILO:

5   Q    Do you remember telling the FBI specifically that you

6   were paid, not offered, a total of $18,000?

7          MR. LESKO:  Objection.

8          THE COURT:  Sustained.  Asked and answered.

9   BY MR. AGNIFILO:

10  Q    So, as you sit here today, what are you saying you were

11  paid?

12  A    Like, I don't know exactly what the amount was, but it

13  was less than 18,000.

14  Q    And was that honest?  Entering a fraudulent marriage, was

15  that honest?

16  A    No, that wasn't the right thing to do.

17  Q    And the matter was investigated by federal agents; right?

18  A    Yes.

19  Q    And you were interviewed by the federal agents; right?

20  A    Not afterwards.  Only the initial interview to try and

21  obtain it.

22  Q    So how many times were you interviewed by federal agents

23  in connection with your fraudulent marriage?

24  A    Only the initial attempting to get the license interview.

25  Q    And you lied to the agents; right?

SN      OCR      RPR

Jay - cross - Agnifilo                                    4485

1   A    Yes.

2   Q    What did you lie about?

3   A    That we were in a real, romantic relationship.

4   Q    So, when -- and where did this happen?  Where was this

5   interview?

6   A    In Los Angeles, I believe.

7   Q    At a government office; right?

8   A    Yes.

9   Q    And, so, you were summoned down there to be interviewed

10  by the federal agents in connection with this marriage;

11  correct?

12  A    We had a date to meet with the people there to try to

13  obtain the visa, yes.

14  Q    And you had a plan with Conrad that you were going to go

15  down there and lie to the agents, right?

16  A    That was -- the plan was to -- yeah, that was that.

17  Q    And that's what you did.  You went down and you lied to

18  the agents and you had this fraudulent marriage; correct?

19  A    Yes.

20  Q    And you didn't tell the agents that you were doing it for

21  money; right?

22  A    No, or that he was gay.

23  Q    Or that you were in love with him and wanted to marry

24  him; right?

25  A    Correct.

1           MR. AGNIFILO:  Your Honor, nothing else.

2           THE COURT:  Redirect?

3    REDIRECT EXAMINATION

4    BY MR. LESKO:

5    Q    I just have a few questions.  Mr. Agnifilo showed you

6    this card that you provided the defendant, Government's --

7    strike that.  Defense Exhibit 1002-A, I believe?

8           THE COURT:  Yes.

9    Q    Why were you in Albany in late April?

10   A    To get the rest of my things.

11   Q    At that time, at the end of April, did you know that the

12   defendant was the head of DOS?

13   A    I had the suspicions that he was.

14   Q    But did you know?

15   A    I wasn't completely sure that it was him.

16   Q    And did DOS still have your collateral?

17   A    Yes.

18   Q    Were you worried about that?

19   A    Yes.

20   Q    Mr. Agnifilo asked you about providing the collateral

21   from the other people that you screenshotted (sic) off of

22   Dropbox.  Do you remember that?

23   A    Yes.

24   Q    You said you gave it to your ex-boyfriend?

25   A    Yes.

Jay - recross - Agnifilo                                    4487

1    Q    You said you gave it to him for safety measures.  Do you

2    remember that?

3    A    Yes.

4    Q    What did you mean by that?

5    A    What I mean by that is that I didn't know how far these

6    people were willing to go and just in case something were to

7    happen to me, I wanted that evidence to be somewhere,

8    somewhere else other than on me in case of something

9    happening.

10   Q    You were asked some questions about whether or not you

11   were honest.  Do you remember that?

12   A    Yes.

13   Q    Do you think it was honest that you were not told that

14   the defendant was the head of DOS?

15   A    No.

16   Q    Do you think it was honest that your collateral was kept?

17   A    No.

18   Q    Do you think it was honest that you were ordered to have

19   sex with the defendant?

20   A    No.

21         MR. LESKO:  No further questions, Your Honor.

22         MR. AGNIFILO:  Very briefly.

23   RECROSS-EXAMINATION

24   BY MR. AGNIFILO:

25   Q    Just to be clear, you were never ordered to have sex with

SN        OCR        RPR

Jay - recross - Agnifilo                                4488

1    the defendant; right?

2    A    My feeling of what that assignment was, was to have sex

3    with Keith.

4    Q    I'm talking about the words, I'm not talking about your

5    feeling.  The words were to seduce Keith; right?

6    A    Those were the words she used.

7    Q    And you said that you kept the other people's collateral

8    for safekeeping by giving it to your ex-boyfriend.  Did you go

9    to the police at that point?

10   A    No.

11            MR. AGNIFILO:  Nothing further.

12            THE COURT:  Anything further?

13            MR. LESKO:  No.

14            THE COURT:  All right.  The witness is excused.

15            You may stand down.

16            (Witness excused.)

17            THE COURT:  The Government may call its next

18   witness.

19            MR. LESKO:  Thank you, Your Honor.  The Government

20   calls Anthony Valenziano.

21            THE COURTROOM DEPUTY:  Raise your right hand.

22            (Witness sworn/affirmed.)

23            THE COURTROOM DEPUTY:  Have a seat.  Please state

24   and spell your name for the record.

25            THE WITNESS:  Anthony Valenziano, A-N-T-H-O-N-Y

Jay - recross - Agnifilo                                         4489

1    V-A-L-E-N-Z-I-A-N-O.

2              THE COURT:  You may inquire.

3              MR. LESKO:  Thank you, Your Honor.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN      OCR      RPR

1   A N T H O N Y   V A L E N Z I A N O,

2        called as a witness by the Government, having been

3        first duly sworn/affirmed by the Courtroom Deputy, was

4        examined and testified as follows:

5   DIRECT EXAMINATION

6   BY MR. LESKO:

7   Q    Good afternoon.

8   A    Good afternoon.

9   Q    Mr. Valenziano, what's your profession?

10  A    I'm an attorney.

11  Q    And where do you work?

12  A    I currently work at the law firm of Sherman Wells

13  Sylvester & Stamelman located in Florham Park.

14  Q    And we'll call that Sherman Wells; okay?

15  A    Sounds good.

16  Q    What's your position at the firm?

17  A    I'm counsel to the firm.

18  Q    Did you work at a firm before Sherman Wells?

19  A    Yes, I did.

20  Q    Where did you work?

21  A    Riker Danzig Scherer Hyland & Perretti LLP in Morristown,

22  New Jersey.

23  Q    When did you start at Riker Scherer (sic)?

24  A    I started at Riker Danzig.  That's the colloquial.  I

25  started at Riker Danzig in October of 2009.

Valenziano - direct - Lesko                    4491

1    Q    And what was your position then?

2    A    I was an associate when I started.

3    Q    And could you sort of explain your transition from Riker

4    Danzig to Sherman Wells?

5    A    Of course.  I started at Riker Danzig in October of 2009

6    after finishing my clerkship in federal court in New Jersey.

7    I worked there for approximately five years, a little less,

8    when myself and a group of my colleagues decided to leave

9    Riker Danzig and start a new firm which is now Sherman Wells.

10   Q    Are you familiar with somebody named Tony Sylvester?

11   A    Yes, Mr. Sylvester is a colleague of mine.  He was a

12   partner of Riker Danzig when I started there and he is one of

13   the founding partners of Sherman Wells.

14   Q    Did the firms Sherman Wells and Riker Danzig have a

15   client named Stephanie Franco?

16   A    Yes, we did.

17   Q    And did the firm represent Ms. Franco in litigation?

18   A    Yes, both Riker Danzig and Sherman Wells represented ms.

19   Franco as well as Morris and Rochelle's son.

20   Q    And who were the other parties in that litigation?

21   A    The lawsuit was brought by NXIVM, as well as First

22   Principle against my clients, Stephanie Franco and the

23   Suttons.  Also involved were Rick Ross and his entity, The

24   Ross Institute.  Mr. Raniere was a party as well.

25   Q    Was Executive Success Program a party?

SN        OCR        RPR

Valenziano - direct - Lesko                4492

1  A    Executive Success Program I believe was a formerly known

2  as to NXIVM.  They were referenced in the caption as a party

3  in that way.

4  Q    And when did this litigation begin?

5  A    August of 2003.

6  Q    And where did the litigation begin?

7  A    It started by way of order to show cause in the Northern

8  District of New York.

9  Q    Is that in federal court in the Northern District of New

10 York?

11 A    Yes, I'm sorry.

12 Q    Could you just describe the litigation for us, please?

13 A    Sure.  I will have to give some context.  The action

14 arose in approximately starting in 2000 and I'll give some

15 background.  Ms. Franco is Morris Sutton's daughter.  Rochelle

16 Sutton is Morris Sutton's wife.  Rochelle was Stephanie's

17 stepmother.  The Suttons had a son by the name of Michael

18 Sutton who started taking NXIVM courses I believe in 2000.

19 Michael tried to persuade Stephanie to take NXIVM intensives

20 starting in 2000.

21      Ultimately at some point in time, both Michael

22 Sutton and Nancy Salzman came down to Jersey where the Suttons

23 and Ms. Franco lived to try to persuade not just Stephanie but

24 other members of the Sutton family to attend NXIVM intensives.

25 There was a presentation given.  Ms. Saltzman made reference

1   to a radical new technology called the Rational Inquiry Method

2   which the NXIVM intensives are based on.  She represented to

3   Ms. Franco and others that it was much different than any

4   other courses that were out there in terms of

5   self-improvement; that it could cure blindness, induce weight

6   loss and that it was taught by Mr. Raniere and that he was the

7   smartest man in the world and he had taught over 400,000

8   people and the like.  And Michael also was trying to persuade

9   Stephanie as well.

10          Stephanie ultimately agreed to attend.  Ms. Franco

11  had a long history of attending classes such as

12  neurolinguistics programming.  I'll use NLP.  So she was

13  interested in going based on her prior experience.  She wanted

14  to do something different and Ms. Saltzman represented to her

15  that it was much different.

16          Ms. Franco attends an intensive in Albany, New York

17  starting in June of 2001.  As part of the process she signed

18  an application and credit card authorization authorizing them

19  to charge her credit card approximately $2,200 to attend the

20  five-day intensive.  As part of that, she had agreed not to

21  disclose certain materials she learned at NXIVM for her own

22  financial benefit, effectively.

23          She goes to Albany in June.  She receives a binder

24  of materials.  It's a three-ring binder which included

25  coursework and reading materials on the intensives.  She uses

Valenziano - direct - Lesko                    4494

1    the binder at the intensive.  She extends her stay for another

2    eleven days.  She stays a total of 16 days.  During the

3    intensives, she, as part of the litigation claimed that

4    certain representations were made that startled her, one of

5    which was, I believe, Mr. Raniere had said that taxes should

6    be optional, that also he disclosed an issue regarding his

7    involvement in Consumer Byline which was an entity that was

8    ultimately shut down by the State of New York by consent

9    decree.

10             MR. AGNIFILO:  I object to all of this, Judge.  He

11   can talk about the litigation, but --

12             THE COURT:  The State of New York discussion is out.

13             Go ahead, next question.

14   BY MR. LESKO:

15   Q    So, what did Ms. Franco -- what was the issue with the

16   binder if you could focus on that?

17   A    Ms. Franco ended up leaving the intensive after 16 days.

18   She took the binder home with her.  No one had asked her to

19   return it.  She ends up going back for another five days of

20   intensive work in August of 2001.  She does not interest her.

21   She decides to leave and she puts the binder in her closet.

22   Several months later the Sutton family was increasingly

23   concerned with Michael Sutton's detachment from the family and

24   one of the Sutton relatives had sought the help of Rick Ross

25   to see if they could get Michael to stop going to NXIVM.

Valenziano - direct - Lesko                4495

1           As part of this process there was a discussion

2      whereby someone raised that Stephanie still had her binder.

3      One of her family members asked her for the binder.  She

4      provided the binder to them which was in turn provided to

5      Mr. Ross.

6                Mr. Ross then turned the binder over to two

7      professors who were tasked with writing three articles

8      critiquing NXIVM's practices and methods against some sort of

9      framework to determine whether or not it was cult-like.  Those

10     articles were prepared and posted on Mr. Ross' website in the

11     late spring of 2003 and shortly thereafter the lawsuit was

12     filed.

13     Q     Who brought the initial lawsuit?

14     A     NXIVM and First Principles.  First Principles being --

15     our understanding was it was the licensee of the Rational

16     Inquiry Method.  They actually owned the intellectual property

17     and licensed it to NXIVM for use.  So they were both the

18     plaintiffs.

19     Q     And this was an order to show cause proceeding; is that

20     right?

21     A     Yes.

22     Q     Was the order to show cause granted or denied?

23     A     It was denied.

24     Q     Ultimately, did your client file any claims against NXIVM

25     or other parties?

SN        OCR        RPR

Valenziano - direct - Lesko                    4496

1   A     She did.  She filed a counterclaim against NXIVM and she

2   filed what was a third-party complaint against Nancy Saltzman.

3   Q     Ultimately was this case transferred?

4   A     It was.

5   Q     When was it transferred?

6   A     It was transferred in 2006.  The original docket number

7   under the consolidated matters in the Northern District was

8   03-1051.  It was transferred to the District of New Jersey in

9   2006 with a new docket number of 06-1051.

10  Q     Does that have a -- in federal court there's a CV in the

11  middle to signify civil?

12  A     Yes.  It was 06-CV-1051.

13  Q     And who was -- who was the judge on the case?

14  A     At the time it was transferred it was Judge Cavanaugh.

15  Ultimately he retired in approximately 2013.  Ultimately the

16  Honorable Katharine S. Hayden undertook the matter.

17  Q     And who was the assigned Magistrate Judge?

18  A     At all times the Honorable Mark Falk.

19  Q     And you mentioned that the defendant was a party in this

20  litigation.  Could you describe how -- how and why he was

21  added?

22  A     Mr. Ross asserted a third-party complaint against

23  Mr. Raniere.  The crux of it was an invasion of privacy claim

24  effectively.

25  Q     And what was the invasion of privacy claim?

1    A    Mr. Ross claimed that NXIVM as well as Mr. Raniere and

2    others retained investigators to improperly search through his

3    trash and invade his -- find his bank records; something to

4    that effect.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Valenziano - direct - Lesko                    4498

1    (Continuing)

2    Q    You recall the name of that investigator?

3    A    I believe it was the firm of Interfor -- I-N-T-E-R-F-O-R.

4    Q    Were the Suttons ultimately released or dismissed from

5    the case?

6    A    Both Morris and Michelle passed prior to the termination

7    of the claims against them.  They were ultimately dismissed by

8    way of summary judgment, I believe, in 2017.

9              Ms. Franco had one outstanding claim against her at

10   the time when the Suttons were dismissed -- their estates were

11   dismissed.

12   Q    Was there a trial date scheduled for Mr. Franco?

13   A    There was.

14   Q    When was it?

15   A    February 6th of 2018.

16   Q    Did the case go to trial?

17   A    No.

18   Q    What happened?

19   A    It was resolved.

20   Q    Is the case itself technically still open?

21   A    Yes, technically.

22   Q    Why?

23   A    There was a third-party claim asserted by Interfor

24   against NXIVM based on an indemnification agreement between

25   the parties that's tried to conclusion before a -- in a bench

Valenziano - direct - Lesko                    4499

1    trial before Judge Hayden, and the decision still remains

2    pending.  So, the matter is technically open.

3    Q    So, did you actively participate in this case during the

4    time that you were at both Sherman Wells and Riker Danzig?

5    A    Yes, I did.  From approximately early 2013 until

6    Ms. Franco was dismissed.

7    Q    Did you appear in Federal Court in New Jersey in this

8    case?

9    A    Yes.

10   Q    As part of your responsibilities in the case, are you

11   required to oversee what's called discovery?

12   A    Yes, I am.

13   Q    Could you explain what discovery is in Federal

14   litigation.

15   A    Sure.

16        Parties, when they're sued or assert claims, are

17   entitled to serve requests, written requests for documents or

18   written responses to questions and they're generally limited.

19   And we, you know, as part of any Federal litigation we're

20   involved in, the firm served written requests on NXIVM for

21   documents and written responses to questions.

22   Q    And you're familiar with those discovery requests?

23   A    Yes.  I have reviewed them.

24   Q    And you're familiar with the discovery that was produced

25   in the case?

1    A     Yes.

2    Q     Are you familiar with any discovery disputes in the case?

3    A     Yes, I am.

4    Q     So, at some point, approximately 2007-2008 time period,

5    did your firm, representing Ms. Franco, request the production

6    of certain videotapes?

7    A     We did.

8    Q     And why were the videotapes requested?

9    A     For a couple reasons.

10         Ms. Franco had affirmative counterclaims against

11   NXIVM and Nancy Salzman for consumer fraud.  We felt that the

12   tapes, the firm felt that the tapes would demonstrate that

13   many of the representations that were made to Ms. Franco prior

14   to her attending were false or misleading.

15         The other reason was one of the DVDs was demarcated

16   Forbes.  One of the issues in our case was a Forbes article

17   written in 2003 that was part of NXIVM's case against

18   Ms. Franco.  We wanted that DVD.

19         And the other reason was there were certain things

20   that Ms. Franco claimed were said to her at the intensives

21   when she was attending that we thought were helpful to our

22   case including, you know, mention of not paying taxes or other

23   issues that startled Ms. Franco that we wanted to see on the

24   video.  And they did have, at least they had identified, DVDs

25   of when she was attending.  So, we wanted those.

Valenziano - direct - Lesko                      4501

1   Q    July 1st, 2008, were some of those videotapes ultimately
2   produced?
3   A    Based on my review of the file, yes, they were.
4   Q    Approximately how many?
5   A    Thirty-five.
6   Q    And were an additional number of videotapes produced?
7   A    At some point in time later, another 22 were produced --
8   yes, 22.
9   Q    So a total of 57 videotapes; is that right?
10  A    Yes.
11  Q    And did you review those videotapes?
12  A    I have, yes.
13  Q    Were you preparing for the trial in February of 2018?
14  A    I was preparing for trial up until February 5th, 2018,
15  yes.
16  Q    And in that connection, did you review the videotapes?
17  A    I did.
18  Q    Okay.
19       MR. LESKO:  Your Honor, may I approach the witness?
20  It's probably easier for me to do it that way.
21       THE COURT:  You may.
22       MR. LESKO:  Just before I do that, I'm going to show
23  the witness Government's Exhibit 605.  And I believe that
24  Exhibit has been previously admitted subject to connection by
25  Mr. Vicente.

Valenziano - direct - Lesko                    4502

1          THE COURT:  All right.

2          MR. LESKO:  May I approach?

3          THE COURT:  Yes.

4          MR. LESKO:  I'm showing you what has been marked for

5    identification as Government's Exhibit 605, two stacks.  Take

6    a moment to review those Exhibits.

7          THE WITNESS:  Okay.

8    Q    Do you recognize those DVDs?

9    A    I do.

10   Q    What are they?

11   A    Those are the DVDs that were produced to all the

12   defendants in the Franco litigation.

13   Q    And did you have occasion to review those DVDs recently?

14   A    Yes.

15   Q    When did you do that?

16   A    On June 6th, 2019.

17   Q    Okay.  And how do you know that?

18   A    Because I initialed and dated each of these 57 DVDs.

19   Q    So, you took a look at each of those 57 DVDs?

20   A    Yes, I did.

21   Q    And these were the DVDs produced in the Stephanie Franco

22   Federal case in the United States District Court in

23   New Jersey?

24   A    These were the DVDs that were produced to my firm, as

25   well as the other parties to the case, in that litigation,

VB        OCR        CRR

Valenziano - direct - Lesko                    4503

1    yes.

2              MR. LESKO:  Your Honor, we'd offer Government's

3    Exhibit 605.

4              MR. AGNIFILO:  Can we have a brief side-bar?  Or we

5    could do it over the lunch.  Whatever Your Honor prefers.

6              THE COURT:  We can break for lunch now.

7              MR. LESKO:  Your Honor, it may make sense, I could

8    probably ask a couple more questions that might not be...

9              THE COURT:  Ask your questions.

10             MR. LESKO:  Okay.

11   Q    Did you receive a subpoena related to this matter that

12   related to the videotapes?

13   A    My firm received the subpoena, yes.

14   Q    And did you take any action in response to complying with

15   that subpoena?

16   A    The firm did.  We supplied what was requested.

17   Q    And are these videotapes that you've identified

18   Government's Exhibit 605, the videotapes that were collected?

19   A    They are.

20   Q    Did you have personal involvement in the collection of

21   those videotapes?

22   A    I did.

23   Q    Were they ultimately produced to the FBI?

24   A    They were.

25   Q    Okay.

Valenziano - direct - Lesko                    4504

1              MR. LESKO:  We'd offer 605.

2              MR. AGNIFILO:  I do have an objection.

3              THE COURT:  Well, come.

4              MR. AGNIFILO:  Okay.

5              THE COURT:  Let's resolve it now.

6              (Side-bar conference held on the record out of the

7    hearing of the jury.)

8

9              (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                                        4505

1              (Side-bar.)

2         THE COURT:  Yes.

3         MR. AGNIFILO:  The objection is that Vicente never

4    said that any of the tapes that he was shown are the ones that

5    necessarily correspond to those produced in the lawsuit.

6    Vicente couldn't say that anything was altered or anything was

7    changed and why the -- that these tapes are admissible because

8    I don't think that Vicente said enough to give any confidence

9    that tapes were altered and that altered tapes were produced

10   in a lawsuit.

11        MR. LESKO:  Your Honor, Mark Vicente testified

12   directly that he altered -- he participated in altering

13   videotapes.  He looked at a number of the DVDs that are in

14   this Exhibit 605 and offered extensive testimony about the

15   types of editing that were reflected on those videos as being

16   the types of editing that he directed be done on the

17   videotapes.  And these are the videotapes.  I mean, this is

18   the witness who was involved in responding to the subpoena,

19   collecting the actual videotapes from the files.  These are

20   the videotapes that were produced in that litigation.

21             So, and Mr. Vicente did say that he did not, I

22   believe his recollection was that he did not review the

23   videotapes at the time that they were altered, but that his

24   team was the one, were the ones that were responsible for the

25   actual editing of the videotapes.

Side-Bar                                                   4506

1          So, I think there's more than ample foundation here

2     for admission of these videotapes.

3          THE COURT:  What is the purpose of admitting them,

4     so I have a better understanding.

5          MR. LESKO:  This is a Racketeering Act.  This is the

6     basis of the Racketeering Act; the altering of these

7     videotapes and production of the videotapes in an official

8     proceeding, which is the Federal case in the District of

9     New Jersey.

10          I mean, Mr. Vicente's testimony is not really

11     relevant or necessary to admit the videotapes themselves.  I

12     mean, it's, I think just based on the witness's testimony

13     alone they've been properly authenticated.  We've established

14     the proper foundation.  So, Mr. Vicente's testimony obviously

15     goes to the editing that happened of the videotapes, but the

16     tapes themselves I think are properly admissible.

17          MR. AGNIFILO:  To complete the record.  I objected

18     when Vicente testified that he didn't have -- he never said

19     these are the specific tapes.  So, it's a continuation of the

20     same objection.

21          THE COURT:  All right.  I am going to overrule the

22     objection.

23          (Side-bar end.)

24          (Continued on following page.)

25

VB        OCR        CRR

Proceedings                                                    4507

1              (In open court.)

2              THE COURT:  All right, the objection is overruled.

3              Government's Exhibit 605 is received in evidence.

4              (Government's Exhibit 605 received in evidence.)

5              MR. LESKO:  Thank you, Your Honor.  Now we are going

6    to move on to another section.

7              THE COURT:  All right.

8              At this time we are going to take our lunch break.

9              All rise for the jury.

10             (Jury exits.)

11             (In open court; outside the presence of the jury.)

12             THE COURT:  The witness may stand down.

13             Please, do not discuss your testimony with anyone.

14             THE WITNESS:  Of course, Your Honor.

15             THE COURT:  All right, we will take 45 minutes for

16   lunch.

17

18             (Continued on following page with AFTERNOON

19   SESSION.)

20

21

22

23

24

25

                        VB       OCR       CRR

Proceedings                                                    4508

1                          AFTERNOON SESSION:

2                (In open court - jury not present.)

3                (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

4                THE COURTROOM DEPUTY:  All rise.

5                THE COURT:  Please, bring in the witness.  Is there

6       a witness?

7                MR. LESKO:  There is a witness, but we would like to

8       discuss one matter, Your Honor, briefly.  It's something we

9       talked about earlier.

10               THE COURT:  All right, wait on the witness.

11               All right, go ahead.

12               MR. LESKO:  Thank you, Your Honor.

13               We just wanted to get some guidance from the Court

14      regarding the CDF trust documents.  This is the Clare Bronfman

15      trust.

16               THE COURT:  Yes.

17               MR. LESKO:  Just so the Court is aware, we have the

18      Wells Fargo bank records and we have a schedule that has been

19      prepared that indicates and lists both deposits and

20      disbursements as well as payees.  A typical schedule.

21               THE COURT:  There is nothing typical about that

22      schedule.

23               MR. LESKO:  Well, this is true.  The format is

24      typical.

25               And just to sort of go to the bottom line here; we

Proceedings                                          4509

1   do think the amounts that were deposited into the trust are

2   highly relevant and, I think, consistent with the Court's

3   order.

4              THE COURT:  We are not going to -- just the amounts.

5   Not with regard to the payees or how much was paid to the

6   payees.

7              MR. LESKO:  Correct.

8              THE COURT:  My sense is that would be somewhat

9   prejudicial and I do not think we ought to do that.

10             MR. AGNIFILO:  That's fine.

11             So, there will be the amount that goes into the

12  trust.

13             THE COURT:  Yes, 14 million.  It is a round number,

14  so to speak.

15             MR. AGNIFILO:  Right.

16             THE COURT:  Fourteen million.

17             How are you going to do it?  You can redact all of

18  the rest of it.

19             MR. LESKO:  I think the, what we would like to do is

20  admit the bank statements and then, not publish them to the

21  jury, ask the witness to indicate where deposits were made

22  into the trust.

23             THE COURT:  All right.

24             MR. LESKO:  And then afterwards, we will do a full

25  redaction and then the Exhibit would be ready for the jury.

Proceedings                                          4510

1          THE COURT:  You are going to have the witness go

2    through every deposit, is that it?

3          MR. LESKO:  There are not that many, Your Honor.  I

4    think it's a total of six or seven.

5          MR. AGNIFILO:  And then what are we going to admit

6    in terms of -- forgetting the amounts of the money, which I

7    understand is off-limits, but what are we going to admit into

8    evidence in items of who's getting the money?  The whole array

9    of people?  I'm just trying to understand.

10         THE COURT:  Who is getting the money?

11         MR. AGNIFILO:  Yes.  So...

12         THE COURT:  Lawyers.

13         MR. AGNIFILO:  I mean, but are we going to be able

14   to establish that Lauren Salzman's lawyer was paid from the

15   trust, we were paid from the trust, other people were paid

16   from the trust?  I'm just trying to get an idea of what is

17   going to happen.

18         THE COURT:  Who is going to be the witness on this?

19         MR. LESKO:  An IRS investigator.

20         THE COURT:  Let the IRS investigator indicate how

21   many people received some payment from the trust.  It is a lot

22   of people, not just five or six counsel for the defendants who

23   were charged.  I mean, there were --

24         MR. AGNIFILO:  In excess of 20.

25         THE COURT:  -- a lot of lawyers, including lawyers

                    VB        OCR        CRR

Proceedings                                      4511

1    who never showed up here.

2              MR. AGNIFILO:  That is true.

3              THE COURT:  That is true.

4              MR. LESKO:  Your Honor, it may make sense if

5    Your Honor allows me to lead the witness a little bit just to

6    get through this.

7              THE COURT:  Yes, yes, yes.  As long as you do not

8    identify who got how much.  Then we are okay.

9              MR. LESKO:  Okay.

10             THE COURT:  Because I think it would be very

11   prejudicial to identify just two sets of lawyers, even though

12   there have been many lawyers who received payment.  So, that

13   is it.

14             Do you plan to call the grantor of the trust?

15             MR. LESKO:  No.

16             THE COURT:  Okay.

17             Is there anything else?

18             So, this afternoon.  Let's talk about this

19   afternoon.  How much more?

20             MR. LESKO:  I'm almost done with this witness, I'd

21   say five, ten minutes.

22             MR. AGNIFILO:  A short cross-examination, ten

23   minutes tops.

24             THE COURT:  Then?

25             MR. LESKO:  So, if we get to Investigator Guerci by

Proceedings                                          4512

1    say 2:30, I do not think I have until the end of the day.  I

2    think we will be done in two hours or less, and that includes

3    cross-examination.

4              MR. AGNIFILO:  I don't know exactly what they're

5    going to go through.  I don't see a very long cross, though.

6              THE COURT:  And that is it for today?

7              MR. LESKO:  That's all we have for today,

8    Your Honor.

9              THE COURT:  Well, I cannot say I am disappointed.

10             MR. AGNIFILO:  This means we will get our letter in

11   at 2:00 a.m.

12             THE COURT:  Another letter?

13             MR. AGNIFILO:  No, Judge, I hope there is no more

14   need for a letter.

15             THE COURT:  Okay.

16             So, let's get the witness in here and then the jury.

17   Thank you for your cooperation.

18             (Witness resumes stand.)

19             THE COURT:  Do you think we need to meet at 9:15

20   tomorrow?

21             MS. PENZA:  No, we don't, Your Honor.

22             (Jury enters.)

23             THE COURT:  Please be seated.

24             You may continue your examination of the witness.

25             The witness is reminded he is still under oath.

VB        OCR        CRR

Valenziano - direct - Lesko                    4513

1          THE WITNESS:  Of course, Your Honor.

2          THE COURT:  Okay.

3    DIRECT EXAMINATION

4    BY MR. LESKO:

5          MR. LESKO:  Your Honor, may I just show an

6    Exhibit to the witness, please?

7          THE COURT:  Let's see what we've got here.

8          Okay, go ahead.

9          MR. LESKO:  I am showing you what's been marked for

10   identification as Government's Exhibit 619.

11   Q    Do you recognize that Exhibit?

12   A    Yes, I do.

13   Q    Is it an e-mail from Joseph Waala to a number of

14   attorneys, including Anthony Sylvester?

15   A    Yes, it is.

16         MR. LESKO:  Your Honor, we'd offer Government's

17   Exhibit 619.

18         MR. AGNIFILO:  We object, Your Honor.

19         THE COURT:  Oh.

20         MR. LESKO:  Your Honor, I can add some questions.

21         THE COURT:  Go ahead.

22   Q    Is this a document that was produced in response to a

23   subpoena in this case?

24   A    It was.

25   Q    Was it produced by your law firm?

VB        OCR        CRR

Valenziano - direct - Lesko                4514

1    A    It was.

2    Q    And was it a record that your law firm would typically

3    keep in the normal course of its business?

4    A    Yes, both Riker Danzig and Sherman Wells would keep a

5    correspondence file for all litigations, including the Franco

6    litigation.  Mr. Kaufman was an attorney of Riker Danzig at

7    the time this e-mail was sent, as well as Mr. Sylvester.

8    Q    So this record was, in fact, kept in the regular course

9    of business of the law firm?

10   A    Yes.

11          MR. LESKO:  Your Honor, we offer Government's

12   Exhibit 619.

13          THE COURT:  Objection overruled.

14          MR. AGNIFILO:  May I have just a quick voir dire,

15   Judge?  Just two questions.

16          THE COURT:  Go ahead.

17

18          (Continued on following page.)

19

20

21

22

23

24

25

VB        OCR        CRR

Valenziana - direct - Lesko                    4515

1   VOIR DIRE EXAMINATION

2   BY MR. AGNIFILO:

3   Q    Good afternoon.

4   A    Good afternoon.

5   Q    My name is Marc Agnifilo.  I represent Keith Raniere.

6        You're not one of the parties to this e-mail,

7   correct?

8   A    I am not.

9   Q    Okay.  Were you working on this case at the time?

10  A    I was not.

11       MR. AGNIFILO:  Your Honor, I object to the e-mail.

12       THE COURT:  Any other questions from the Government?

13  DIRECT EXAMINATION RESUMED

14  BY MR. LESKO:

15  Q    To your knowledge, who did Mr. Waala represent in the

16  litigation?

17  A    NXIVM.

18       THE COURT:  I am going to allow it.

19       Go on.

20       (Government's Exhibit 619 was received in evidence.)

21       MR. LESKO:  Thank you, Your Honor.

22  BY MR. LESKO:

23  Q    So this is an e-mail from Mr. Waala, and you described to

24  a number of other mostly -- are they all attorneys there?

25  A    Yes, it appears so.

Valenziana - direct - Lesko                    4516

1   Q     And what's the subject of the e-mail?

2   A     NXIVM Corp., et al versus Sutton, et al, 06-1051.

3   Q     Okay.

4         And this e-mail was from Joseph Waala on Harold

5   Kofman, is that right?

6   A     Yes.

7   Q     Can you read the first paragraph of the letter, please?

8   A     Sure.

9         First, we apologize for any delay in getting the few

10  remaining materials to you.  As you know, we already produced

11  additional documents to you on May 2 and June 26, 2008.  Since

12  the requested tapes are being produced to you exactly as they

13  are kept in the ordinary course, we presume there will be no

14  dispute.  Also at your request we have converted the 35

15  requested course tapes to DVDs.  This process took some time,

16  but is now complete.  We were able to locate the Ethos

17  questionnaires I mentioned we were still searching for and

18  these are being provided.

19        MR. LESKO:  Your Honor, I don't believe the jury can

20  see the exhibit, I'm sorry.

21        (Exhibit published.)

22        THE COURT:  Okay, there it is.

23  BY MR. LESKO:

24  Q     All right, so this, just to paraphrase what you just

25  read, this statement indicates that the tapes -- and these are

SAM     OCR     RMR     CRR     RPR

Valenziana - direct - Lesko                    4517

1   the tapes that we've been discussing?

2   A    The 35 described in this e-mail would have been 35 of the

3   57 we discussed earlier, yes.

4   Q    Okay.  And that's in Government's Exhibit 605.

5             And it states that requested tapes are being

6   produced to you exactly as they are kept in the ordinary

7   course, is that right?

8   A    That's what the e-mail says, yes.

9   Q    Okay.  Okay.

10            Now, I am going to show you --

11            MR. LESKO:  If I could just show this exhibit to the

12   witness, Your Honor.

13            THE COURT:  Go ahead.

14   BY MR. LESKO:

15   Q    I am going to show you Government's Exhibit 618.

16            Do you recognize that exhibit?

17   A    I do.  It appears to be an e-mail from our file from

18   Joseph Waala to several attorneys.  This appears to have been

19   Mr. Kofman's copy of that e-mail.

20   Q    And is that e-mail sort of a cover e-mail attaching

21   another document?

22   A    Yes, there's a PDF attached, which was a letter, a

23   transmittal letter.

24   Q    And was this a letter from Mr. Waala?

25   A    It appears to be, yes.

Valenziana - direct - Lesko                    4518

1   Q    Okay.  Dated July 1st, 2008?

2   A    Yes.

3   Q    And it's to, among other people, Mr. Kofman?

4   A    Yes.

5   Q    And are these records that your law firm would have kept

6   in the regular course of its business?

7   A    Yes.

8   Q    And are these records, in fact, records that were kept in

9   the ordinary course of your -- of the law firm's business?

10  A    Yes.

11  Q    And as we've discussed previously, Mr. Waala was NXIVM's

12  attorney?

13  A    Yes.

14         MR. LESKO:  Your Honor, we'd offer Government's 618.

15         MR. AGNIFILO:  We object, Judge.

16         THE COURT:  All right, Government's 618 is received

17  in evidence over objection.

18         (Government's Exhibit 618 was received in evidence.)

19         THE COURT:  Next.

20         MR. LESKO:  Your Honor, if we could publish the

21  exhibit to the jury, please.

22         THE COURT:  Sure.

23         (Exhibit published.)

24  BY MR. LESKO:

25  Q    Okay, so this is the first page of Government's 618.  We

SAM    OCR    RMR    CRR    RPR

1    discussed this previously.

2            What's the date of the e-mail?

3    A    July 1, 2008.

4    Q    And what's the subject matter?

5    A    NXIVM versus Sutton.

6    Q    That's the lawsuit we've been discussing?

7    A    Yes.

8    Q    And it indicates this is a -- it's attaching a PDF

9    letter, is that right?

10   A    Yes.

11   Q    And in the "to" line, among others, it's being sent to

12   Anthony Sylvester and Harold Kofman, is that right?

13   A    Yes.

14   Q    And they're lawyers at your firm?

15   A    They were -- at the time they were both lawyers at Riker

16   Danzig, yes.

17   Q    So the second page of Government's 618, the date of that

18   letter?

19   A    Also July 1, 2008.

20   Q    And it's sent from Joseph Waala?

21   A    Yes.

22   Q    And the "re" line, the "re" line, does that relate to the

23   Franco lawsuit that we've been discussing?

24   A    Yes, that appears to be the full caption of the primary

25   action; yes.

Valenziana - direct - Lesko                4520

1  Q    And that's, we talked about this, but this is the docket

2  number (indicating)?

3  A    Yes.

4  Q    And what are thee initials right here?

5  A    DMC was the district judge who handled the matter.  The

6  Honorable Dennis Cavanaugh, now retired; and the MF is the

7  magistrate who is still the magistrate on the matter, the

8  Honorable Mark Falk.

9  Q    Okay.  And this letter, in sum and substance, this letter

10 is a cover letter that involves the production of materials,

11 right?

12 A    Yes, it appears upon review that this is the cover letter

13 producing, among other things, the 35 DVDs.

14 Q    Okay.  And the date of this letter?

15 A    July 1st, 2008.

16 Q    And those 35 DVDs, those are some of the DVDs that are

17 included in Government's 605?

18 A    Yes.

19 Q    I should have asked you this, I apologize.

20       On Government's 618 in evidence, what is the date of

21 that e-mail from Mr. Waala?

22       (Exhibit published.)

23 A    July 1st, 2008.

24 Q    Okay.

25       MR. LESKO:  Now, if I could show an exhibit just to

SAM     OCR     RMR     CRR     RPR

Valenziana - direct - Lesko                    4521

1    the witness, please.

2              Thank you, Your Honor.

3    BY MR. LESKO:

4    Q    I am showing you Government's -- what's been marked for

5    identification as Government's 617.

6              Do you recognize this first page of this document?

7    A    I do.

8    Q    And I'll turn to the second.  Do you recognize the second

9    page?

10   A    I do.

11   Q    Turn to the third page.  Do you recognize the third page?

12   A    I do.

13   Q    Without getting into the substance of the document, what

14   is Government's 617?

15   A    This is a letter from Anthony Sylvester to the Honorable

16   Mark Falk, dated July 1st, 2008, regarding the NXIVM versus

17   Sutton matter.

18   Q    And was this a letter regarding outstanding discovery

19   matters in the case?

20   A    Yes.  This was a letter regarding, based on my review,

21   outstanding discovery issues.

22   Q    And was this a practice of Magistrate Judge Falk?

23   A    Yes, virtually every Magistrate Judge in the District of

24   New Jersey when there is a dispute over written discovery or

25   any sort of discovery dispute, rather than engage in motion

Valenziana - direct - Lesko                    4522

1   practice would require the parties to put in a letter their

2   positions and send it to the Court to see if he or she can

3   resolve it.

4   Q    So is this a joint letter, in essence?

5   A    Based on my review, yes, this is a joint letter.

6   Q    Okay.  And so it includes statements from your firm, your

7   former firm, Riker Danzig?

8   A    Yes.

9   Q    And it includes statements from Mr. Waala, is that

10  correct?

11  A    Yes.  Where you see the bolded plaintiff's response, that

12  would delineate plaintiff's response to a discovery issue that

13  we had raised in the letter.

14  Q    And plaintiff's response would have reflected NXIVM's

15  response, is that correct?

16  A    Yes, they were the plaintiff in the matter.

17  Q    Is this a document that your firm keeps in the ordinary

18  course of its business?

19  A    Yes.  Actually, if you look at the top right-hand corner,

20  the 16889/2 is the file number.  Usually poo-poo writing on

21  letters, but sometimes people mark it to make sure it gets in

22  the right file, so...

23  Q    So this letter was actually kept in the ordinary course

24  of the business of the firm?

25  A    Yes, absolutely.

Valenziana - direct - Lesko                    4523

1          MR. LESKO:  Your Honor, we would offer Government's

2    617.

3          MR. AGNIFILO:  Same objection, Judge.

4          THE COURT:  All right, Government's Exhibit 617 is

5    received in evidence over objection.

6          (Government's Exhibit 617 was received in evidence.)

7          MR. LESKO:  Okay, if we could publish 617, Your

8    Honor.

9          Thank you.

10         (Exhibit published.)

11   BY MR. LESKO:

12   Q    So looking at the first page of Government's 617, it's

13   addressed to Magistrate Judge Falk, is that correct?

14   A    Yes.

15   Q    And, again, the Franco, your litigation, 06-CV-1051, is

16   that the docket number?

17   A    Yes, that's the docket number.

18   Q    And this letter was submitted by Anthony Sylvester,

19   right?

20   A    Yes, we -- Riker Danzig, Mr. Sylvester had prepared this

21   letter, yes.

22   Q    And so any -- let's turn to a representation.

23         In the first paragraph, the second page but first --

24   the paragraph with the title Plaintiff's Response, where did

25   that information come from, those sentences under the heading

Valenziana - direct - Lesko                4524

1   Plaintiff's Response?

2   A    As this was a joint letter, that would have been provided

3   by plaintiff's counsel.

4   Q    And that's counsel for NXIVM?

5   A    Yes.

6   Q    Okay, so look at the -- on the second page of

7   Government's 617, could you read the first paragraph of the

8   second category of plaintiff's response?

9   A    Plaintiff's Response:  The 35 videotapes demanded by

10  defendants are being produced today, July 1, and plaintiffs

11  have advised defendants of such.  Collecting, duplicating and

12  converting the tapes into DVDs at defendant's request took

13  some time, but they were produced today in unedited fashion as

14  requested.  There should be no further disputes with regard to

15  these tapes.

16  Q    Okay.  So -- so, those 35 videotapes are included in

17  Government's 605 that you previously reviewed?

18  A    Yes.

19  Q    And the representation of NXIVM's counsel was that they

20  were produced in unedited fashion?

21  A    Yes.

22  Q    And this representation was ultimately made to Magistrate

23  Judge Falk, is that right?

24  A    Yes, it is e-filed with the court.

25  Q    I probably asked this, I am getting a little old.

Valenziana - direct - Lesko                    4525

1          The date of that letter?

2   A     July 1, 2008.

3   Q     Thank you.  That was Government's 617.

4          So, how many lawyers represented NXIVM in this

5   litigation?

6   A     Lawyers or law firms?

7   Q     Let's start with law firms.

8   A     Approximately 10 or 11 law firms.  Some of that was local

9   counsel work, just because they had lawyers who were not

10  admitted to the district.  But over the course of the case

11  that I was involved in, they had -- not -- over the course of

12  the case they had, at least, ten law firms.

13  Q     Okay.  How many lawyers total?

14  A     I, quite frankly, couldn't tell you.

15  Q     And this litigation with respect to your clients,

16  Stephanie Franco, lasted how long?

17  A     Ms. Franco was sued in August in 2003.  She was formally

18  dismissed March 15th, 2018.

19  Q     Fifteen years?

20  A     Fourteen-and-a-half, yes.

21  Q     And litigation in two federal districts, is that right?

22  A     Yes, yes.

23  Q     All over a binder?

24  A     Yes.

25  Q     So during your review of the videotapes to prepare for

Valenziana - direct - Lesko                    4526

1    trial, did you determine that they were suspicious at all?

2    A    Upon our review, things that our client, Ms. Franco, had

3    told us we might find in DVDs that covered her time there

4    weren't there.  So that did raise a concern on our part that

5    they may have -- that they weren't fullsome DVDs.

6    Q    Did you have any other concerns?

7    A    During the course of the litigation, there were many

8    discovery disputes with NXIVM.  At one point they had been

9    sanctioned --

10              MR. AGNIFILO:  I object.

11              THE COURT:  Sustained.

12   BY MR. LESKO:

13   Q    So were there related discovery disputes that that led to

14   suspicions about the videotapes, without going into the

15   details of that?

16   A    We were -- we all -- we -- we had -- we had concerns that

17   we were not getting a fullsome production.

18   Q    How about the tapes, themselves, the appearance of the

19   tapes, was there anything about the appearance of the tapes

20   that created concern?

21              MR. AGNIFILO:  Your Honor, leading, objection to the

22   leading.

23              THE COURT:  Sustained.

24   BY MR. LESKO:

25   Q    Was there anything about the videotapes, themselves, that

SAM      OCR      RMR      CRR      RPR

Valenziana - cross - Agnifilo                    4527

1    led you to become concerned?

2    A    Upon review, there were tapes that appeared to have jump

3    cuts in them that would seem to be skipping around.

4    Q    Did you do anything in response to these concerns?

5    A    Internally we discussed retaining an expert to review the

6    DVDs and opine as to whether or not they had been edited.

7    Ultimately, though, it was cost prohibitive.

8    Q    Was this an expensive case for Ms. Franco?

9    A    Absolutely -- it was expensive for her family, yes.

10             MR. LESKO:  No further questions, Your Honor.

11             THE COURT:  Cross-examination.

12   CROSS-EXAMINATION

13   BY MR. AGNIFILO:

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    I just have a few questions for you, nothing -- nothing

17   too major.

18             I am going to show you, you were looking at

19   Government Exhibit 619 when you were on direct examination.

20             (Exhibit published.)

21   Q    When did you start working on this case?

22   A    I worked on the case starting in 2013.  I put in a formal

23   appearance in the matter in August of 2014.

24   Q    Okay, so what you just put into evidence are letters and

25   things from five years before you started working on this

Valenziana - cross - Agnifilo                4528

1  case; fair to say?

2  A    That's fair to say.

3  Q    So we didn't look at the second paragraph of this letter,

4  e-mail, rather, from July 2nd.

5         And it says:  Not to belabor this point, but I

6  clearly stated the tape was lost and my co-counsel's notes

7  from the meeting confirm this.  You stated it was destroyed,

8  just as you argued in your Rule 37 motion, that Ms. Keeffe

9  intentionally destroyed e-mails after she testified to losing

10 them in 2006.  The notion that I would represent to you at a

11 meet-and-confer that my client destroyed evidence when, in

12 fact, that evidence was unintentionally misplaced is absurd.

13 As you know, Ms. Keeffe is available to testify as to the

14 circumstance of which the tape was lost.

15         Do you know who Ms. Keeffe is?

16 A    I know of Ms. Keeffe, yes.

17 Q    What do you know of her?

18 A    She was, at this time, the -- an employee of NXIVM who

19 was involved in, I guess, producing documents.

20 Q    Okay.  Did you understand her to be the head of the Legal

21 Department at the time?

22 A    I did not understand her to be the head of the Legal

23 Department, no.

24 Q    But you understood her to be playing a role in the

25 production of discovery in the case, correct?

Valenziana - cross - Agnifilo          4529

1   A    Yes.  Ms. Keeffe was -- she was a 30(b)(6) witness in the

2   case, I believe, on certain matters, yes.

3   Q    Okay, so just explain what a 30(b)(6) witness, just tell

4   the jury what that is.

5   A    Sure, a 30(b)(6) witness if you serve a deposition notice

6   with topics for an entity, obviously an entity can't testify,

7   a person has to testify.

8   Q    We do criminal work.

9   A    I know, I know.

10        A 30(b)(6) witness is a person who testifies on

11  behalf of the company as to certain topics that are identified

12  by the other party.

13        So Ms. Keeffe was designated by NXIVM to testify

14  about certain topics that the parties had identified in the

15  litigation.

16  Q    All right.  Now, do you know that one of the things that

17  took so long in the progress of the case that you reviewed on

18  direct examination is that while the case was in the Middle

19  District of New York there was an interlocutory appeal to the

20  Second Circuit?

21  A    I do know about that, yes.

22  Q    Was that on what's known as a fair use issue?

23  A    The case originally started with claims of a violation of

24  the Lanham Act and copyright infringement against both

25  Ms. Franco and Mr. Ross.  The Northern District threw those

Valenziana - cross - Agnifilo                4530

1   claims out.  An appeal was taken to the Second Circuit.  The

2   decision was affirmed, and I believe NXIVM filed what is a

3   Petition For Certiorari asking the United States Supreme Court

4   to review the case, and that was ultimately denied.

5   Q    Just very briefly, so the Northern District of New York

6   is the trial level court, correct?

7   A    Yes.

8   Q    Okay.  And then one step above that is the Second Circuit

9   Court of Appeals, right?

10  A    Yes.

11  Q    So what happens is an appeal was taken from the trial

12  level court, in this case the Northern District of New York,

13  to the Second Circuit Court of Appeals, correct?

14  A    Yes.

15  Q    Okay.  And the fair use -- the Second Circuit ruled

16  against NXIVM in the Second Circuit, correct?

17  A    Yes.

18  Q    All right.

19          So the NXIVM lawyers sought a petition for a Writ of

20  Certiorari, which is a review of the Second Circuit's decision

21  by the Supreme Court of the United States, correct?

22  A    Yes.

23  Q    And then the case came all the way back to the Northern

24  District of New York, right?

25  A    Yes.

Valenziana - cross - Agnifilo                    4531

1    Q    Okay.  And then at some point it went from the Northern

2    District of New York to the District of New Jersey?

3    A    Yes, I believe it came back in '05 and was transferred to

4    the District of New Jersey in '06.

5    Q    Okay.

6         And when you said that NXIVM had 10 or 11 lawyers,

7    you don't mean all at one time, right?

8    A    No, no, they had a succession of law firms, where one

9    would either resign or be relieved and they would get a new

10   law firm, and it just -- that way, yes.

11   Q    And I think what you said is sometimes there would be

12   sort of a primary law firm and then local counsel, correct?

13   A    Yes.

14   Q    And that's not uncommon, right?

15   A    You need local counsel if you want to practice in the

16   District of New Jersey and you're not admitted to it --

17   Q    Right.

18   A    -- it's common.

19   Q    So in other words, do you remember the name Bob Crockett,

20   is that a lawyer that you remember?

21   A    I do.

22   Q    Okay.  Bob Crockett was from California?

23   A    Yes.

24   Q    And when Bob Crockett would appear, he would appear in

25   conjunction with a local lawyer from New Jersey, correct?

Valenziana - redirect - Lesko                4532

1   A    Mr. Crockett originally appeared on behalf of Ms. Keeffe.

2   He had local counsel -- he didn't have local counsel

3   originally because he was with the firm of Latham and Watkins,

4   which actually had admitted lawyers to the district.

5          When he reappeared for NXIVM years later, he did

6   have local counsel who sponsored his admission.

7   Q    Okay.  And ultimately, Ms. Franco ended up settling her

8   case, correct?

9   A    All matters between the parties were resolved amicably,

10  yes.

11  Q    All right.

12         MR. AGNIFILO:  I don't have any other questions,

13  Judge.  Thank you.

14  Q    Thank you.

15  A    You're welcome.

16         THE COURT:  Anything else?

17         MR. LESKO:  Yes, Your Honor.

18         MR. AGNIFILO:  Hold on.  I was giving it to you.

19  REDIRECT EXAMINATION

20  BY MR. LESKO:

21  Q    So Ms. Keeffe was mentioned --

22  A    Yes.

23  Q    -- by Mr. Agnifilo?

24  A    Yes.

25  Q    Was she a party to the lawsuit?

Valenziana - redirect - Lesko                    4533

1    A    She was.

2    Q    Who brought her into the lawsuit?

3    A    Mr. Ross did.

4    Q    And was she dismissed as a party at some point?

5    A    Mr. Ross voluntarily dismissed his claims against

6    Ms. Keeffe after -- go ahead, I'm sorry.

7    Q    Do you know why that happened?

8    A    Yes, I believe I do.  Ms. Keeffe at some point in time

9    left the employ of NXIVM, I believe in around 2014, and as a

10   result of that Mr. Ross decided to terminate his claims

11   against her.

12   Q    So 15 years of litigation -- the litigation was brought

13   by NXIVM initially against Ms. Franco?

14   A    Yes.

15   Q    15 years of litigation?

16   A    Yes, against all three; Mr. and Mrs. Sutton and

17   Ms. Franco, yes.

18   Q    A Second Circuit appeal -- is it fair to say a Second

19   Circuit appeal is a fairly expensive piece of law to purchase

20   if you're a client?

21   A    Yes.

22   Q    It's expensive?

23   A    Yes.

24   Q    NXIVM, 30 lawyers.  How many law firms again?

25   A    At least 10.

SAM      OCR      RMR      CRR      RPR

Valenziana - redirect - Lesko                    4534

1   Q     How much did the case settle for?

2   A     There were -- there were three components of the

3   settlement.

4         One was Ms. Franco authorized NXIVM to give a

5   statement -- Ms. Franco authorized NXIVM to give a statement

6   that she had authored written questions proposed to us that we

7   responded to, and actually -- actually, I just want to be

8   clear here.  I know I received a subpoena for the settlement

9   agreement.  The case ultimately settled.  Ms. Franco agreed to

10  pay $1.

11  Q     $1?

12  A     Yeah.

13         MR. LESKO:  No further questions.

14         THE COURT:  Anything else?

15         MR. AGNIFILO:  No, Judge.

16         THE COURT:  All right the witness is excused.  You

17  may stand down.

18         (Witness steps down.)

19         THE COURT:  All right, the Government may call its

20  next witness.

21         MR. LESKO:  Thank you, Your Honor.  The Government

22  calls investigator Rick Guerci.

23         (The witness enters the courtroom and takes the

24  stand.)

25         THE COURTROOM DEPUTY:  Sir, please raise your right

SAM     OCR     RMR     CRR     RPR

Valenziana - redirect - Lesko                    4535

1    hand.

2          Do you solemnly swear the testimony you shall give

3    to the Court will be the truth, the whole truth, and nothing

4    but the truth, so help you God?

5          THE WITNESS:  I do.

6          THE COURTROOM DEPUTY:  Please have a seat.

7          THE WITNESS:  Thank you.

8          THE COURTROOM DEPUTY:  And please state and spell

9    your full name for the record.

10          THE WITNESS:  Richard W. Guerci, G-U-E-R-C-I.

11          THE COURT:  You may inquire.

12          MR. LESKO:  Thank you, Your Honor.

13

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

Guerci - direct - Lesko                                    4536

1    R I C H A R D    G U E R C I,

2         called as a witness by the Government, having been

3         first duly sworn/affirmed by the Courtroom Deputy, was

4         examined and testified under oath as follows:

5    DIRECT EXAMINATION

6    BY MR. LESKO

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    So, where do you work?

10   A    I currently work for a company called ASRC Mission

11   Services, but I currently work as a contract financial

12   investigator for the IRS Criminal Division in New York City

13   field office.

14   Q    And what does ASRC Mission Services do?

15   A    Among other things, they provide contract employees to

16   the IRS to assist them in their investigative and asset

17   forfeiture programs, which in those positions include

18   analysts, as well as financial investigators.

19   Q    And how long have you been employed by ASRC Mission

20   Services?

21   A    For approximately ten years.

22   Q    And what are your responsibilities at IRS criminal

23   investigations?

24   A    My primary role is to provide guidance and investigative

25   assistance to the field office on investigations involving all

SAM       OCR       RMR       CRR       RPR

Guerci - direct - Lesko                    4537

1    types of financial crimes, including money laundering and

2    asset forfeiture.

3    Q    Where were you employed before you joined ASRC Mission

4    Services?

5    A    Prior to that I was a special agent of the IRS in the

6    New Jersey field office that's the IRS Criminal Division.

7    Q    How long were you a IRS special agent?

8    A    For approximately 26 years.

9    Q    Did you retire?

10   A    Yes, I did, in June of 2009.

11   Q    What were your responsibilities when you were an IRS

12   Special Agent?

13   A    My primary role there was to investigate financial crimes

14   including all violations of the Internal Revenue laws and all

15   related offenses, which including money laundering statutes,

16   as well as violations of the Bank Secrecy Act.

17   Q    Did you hold any specific positions as a special agent?

18   A    Yes.  I was the agency representative at the Organized

19   Crime Drug Enforcement Task Force, which was located in the

20   DEA, Drug Enforcement Administrative offices in Newark, New

21   Jersey.

22        I was also certified as an expert witness in the

23   area money laundering, as well as Bank Secrecy Act violations.

24   Q    Do you have any certifications?

25   A    I'm certified as an anti-money laundering specialist

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                    4538

1    which is a certificate I hold through an association, which is

2    referred to as the Association of Certified Money Laundering

3    Specialists.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                                          4539

1    BY MR. LESKO:  (Continuing.)

2    Q    Have you provided any training as an instructor in this

3    area?

4    A    Yes, I provided numerous seminars and presentations to

5    not only IRS special agents but agents in local law

6    enforcement and I've also provided training such as that to

7    professional organizations including bankers, attorneys, as

8    well as accountants.

9    Q    Approximately how many money laundering and currency

10   crimes investigations have you participated in?

11   A    Over the course of my career, hundreds.

12   Q    In your career have you had occasion to review and

13   analyze credit card and bank records?

14   A    Yes, on many, many occasions I have.

15   Q    Have you created summaries of those records to assist

16   investigators or to assist trials?

17   A    Yes, I have.

18   Q    How many times?

19   A    Countless number of times.

20   Q    Now, these summaries, do you have a term you use for

21   these summaries?

22   A    Very simply I would refer to them as summary schedules or

23   just schedules.

24   Q    Now, did you review credit card records and bank

25   statements related to a person name the Pamela Cafritz in this

Guerci - direct - Lesko                              4540

1   case?

2   A    Yes, I did.

3   Q    And did you prepare schedules of those statements?

4   A    Yes, I did as well.

5   Q    I'm going to be dealing with a number of records and so

6   if I step forward it's just because I'm pulling piles off the

7   table.

8   A    Yes.

9   Q    I apologize.

10         So, before we discuss some of those records, I would

11  like to show you an exhibit.

12         MR. LESKO:  Your Honor, if I could just show this

13  exhibit to the witness, please.

14         THE COURT:  Sure.  Go ahead.

15  Q    Investigate Guercio, I'm going to show you Government's

16  Exhibit 1108.

17  A    Yes, sir.

18  Q    Is that a death certificate for an individual?

19  A    Yes, it is.  It's a death certificate for an individual

20  identified as Pamela Anne Cafritz dated November 7, 2016.

21  Q    Let's read it and we can get into some of the content.

22         And on the second page, is that a declaration of the

23  custodian of records related to the death certificate?

24  A    Yes, it is.

25         MR. LESKO:  Your Honor, we offer Government's

1    Exhibit 1108.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  Okay.  Government's Exhibit 1108 is

4    received in evidence.

5              (Government's Exhibit 1108 received in evidence.)

6              (Exhibit published.)

7    BY MR. LESKO:

8    Q    Do you see the sticker at the bottom?

9    A    I do.

10   Q    Government's Exhibit 1108.  Again, what's the name of the

11   subject on the death certificate?

12   A    Pamela Anne Cafritz.

13   Q    And what is -- does the document reflect her address at

14   the time of her death?

15   A    Yes, it does.

16   Q    What is the address?

17   A    21 Oregon Trail, Half Moon, New York.

18   Q    And I'm going to point you to a section of the

19   certificate that says "Date of Death."  What is the date of

20   the death?

21   A    November 7, 2016.

22   Q    And what is the time of death?

23   A    2:48 p.m.

24   Q    Okay.  And without going into detail, it also lists other

25   information including the cause of death; is that correct?

Guerci - direct - Lesko                          4542

1    A    Yes, it does.

2    Q    And the funeral home that was used and so forth; is that

3    right?

4    A    Yes, it does.

5             MR. LESKO:  Your Honor, if I could show the next

6    exhibit to the witness.  Thank you, Your Honor.

7    BY MR. LESKO:

8    Q    Investigator Guercio, I'm going to show you an exhibit

9    that's marked for identification.

10            THE COURT:  Go ahead.

11            MR. LESKO:  It's back on my screen.

12            THE COURT:  Go ahead.

13   Q    It is marked for identification purposes as Government

14   Exhibit 724.  It's a 30-plus page document.  I'll scroll

15   through it so you can see it.  Are you familiar with this

16   document?

17   A    Yes, I am.

18   Q    Okay.  What is this document?

19   A    It's a petition for resignation of executorship.

20   Q    And who is the petitioner?

21   A    Rosa Laura Junco De La Vega.

22   Q    And what is the estate involved in this proceeding,

23   what's the estate?

24   A    The estate of Pamela A. Cafritz or Pamela Anne Cafritz.

25   Q    And is this a court filing?

Guerci - direct - Lesko                    4543

1   A    Yes, it is.

2   Q    In what court?

3   A    In the Surrogate Court in the State of New York in the

4   County of Saratoga.

5   Q    What's the date of the filing?

6   A    Filed on June 21st of 2018.

7           MR. LESKO:  Your Honor, we would offer Government's

8   724.

9           MR. AGNIFILO:  No objection, Your Honor.

10          THE COURT:  1108?

11          MR. LESKO:  724.

12          THE COURT:  Have we put in 1108?

13          MR. LESKO:  Yes, Your Honor.

14          THE COURT:  Without objection.

15          MR. AGNIFILO:  Yes, without objection.

16          THE COURT:  They're both in.  Let's go.

17          (Government Exhibit 724 received in evidence.)

18          MR. LESKO:  Thank you, Judge.

19  BY MR. LESKO:

20  Q    So, let's read a little bit of this exhibit, Government

21  Exhibit 724, paragraph one.  Could you read paragraph one?

22  A    Certainly.  "Pamela A. Cafritz (the decedent) died on

23  November 7, 2016, a resident of Saratoga County, New York,

24  leaving a last will and testament dated April 18th of 2016

25  (the will), a copy of which is attached hereto as Exhibit A."

SN       OCR       RPR

Guerci - direct - Lesko                                    4544

1   Q    Okay.  Could you read paragraph two, please?

2   A    Certainly.  "The will nominated Keith Raniere (Keith) as

3   primary executor.  Keith renounced his appointment as primary

4   executor by executing a renunciation of nominated executor

5   and/or trustee, a copy of which is attached hereto as Exhibit

6   B."

7   Q    And does paragraph three in essence state that Rosa Laura

8   upon Keith's -- upon the defendant's renouncement became the

9   executor of the will; is that correct?

10  A    That's correct, yes.

11  Q    On February 21st of 2018?

12  A    That's correct.

13  Q    And then paragraph four simply states that Rosa Laura was

14  the sole executor of the will; is that correct?

15  A    That's what it states, yes.

16  Q    Okay.  I'm going to now turn you again in Government's

17  724 to Exhibit A.  I show you Exhibit A, okay?

18  A    Yes, sir.

19  Q    What is Exhibit A?

20  A    The will of Pamela Anne Cafritz.

21  Q    And I'm turning to page 14 of the will, which is the

22  second-to-last page of Exhibit A.  Does that page list the

23  witnesses to the will?

24  A    Yes, it does.

25  Q    So who is the first witness to the will of Pam Cafritz?

Guerci - direct - Lesko                    4545

1    A    The first witness is Daniela Bergeron.

2    Q    What is Daniela Bergeron's listed address?

3    A    8 Raleigh Drive in Clifton Park, New York.

4    Q    Who is the second witness to the Pam Cafritz will?

5    A    Loreta Garza Davila.

6    Q    And what is the address for Loreta Garza Davila?

7    A    It appears to be 15 Farmview Lane in Waterford, New York.

8    Q    Does that page reflect the date that the will was

9    executed?

10   A    Yes, it does.

11   Q    What's the date?

12   A    April 18th of 2016.

13   Q    I'm going to go back to the petition itself and this is

14   the first page of Government's 724.  I'm going to take you to

15   the third page of the petition itself.  And there's a chart.

16   Could you describe that chart to the jury?

17   A    Sure.  It's a chart that identifies certain individuals

18   that are involved in this document, which includes their name

19   and address, their relationship to the decedent and their

20   interest.

21   Q    And is the defendant listed on that chart?

22   A    Yes, it is.

23   Q    So what is the address provided for the defendant?

24   A    It indicates that Keith Raniere's address is 3 Flintlock

25   Lane in Clifton Park, New York.

SN        OCR        RPR

Guerci - direct - Lesko                                    4546

1   Q    Does it indicate his relationship to Ms. Cafritz?

2   A    It does.

3   Q    What does it say?

4   A    It indicates none.

5   Q    Does the chart indicate the defendant's interest with

6   respect to the estate?

7   A    Yes, it does.

8   Q    Could you read that, please?

9   A    It indicates, "The sole beneficiary of the estate through

10  his beneficial interest in the Pamela Anne Cafritz living

11  trust, nominated trustee of the Pamela Anne Cafritz living

12  trust."

13  Q    So, does that mean the defendant was the sole beneficiary

14  of the Cafritz estate?

15  A    That's what it indicates, yes.

16  Q    And that he was trustee of her living trust?

17  A    That's what it states, yes.

18  Q    Let's look at Exhibit B to the petition.  Again, we're

19  still in Government's 724.  This is Exhibit B.

20  A    Okay.

21       (Exhibit published.)

22  Q    Do you see this document?

23  A    Yes, I do.

24  Q    What is the title of this document?

25  A    Renunciation of nominated executor and/or Trustee.

1    Q    Okay.  And who is renunciating the executorship in this

2    document?

3    A    Keith Raniere.

4    Q    And does it list an address for Mr. Raniere?

5    A    It does.

6    Q    And this is his executorship in the Cafritz estate?  Is

7    that how this reads?

8    A    That's what it indicates, yes.

9    Q    And, again, it goes further down to mention that Rosa

10   Laura Junco would be replacing him; is that correct?

11   A    Yes, that's what it states.

12   Q    And what's the date of this renunciation?

13   A    December 20th of 2017.

14   Q    Now, does this document appear to be notarized?

15   A    It does.

16   Q    And can you tell where this document was notarized?

17   A    It was notarized in Guadalajara, Mexico.

18   Q    And does it say that Mr. Raniere personally appeared

19   before the notary?

20   A    That's what it states, yes.

21   Q    And going to the next page, this document is in Spanish;

22   is that right?

23   A    It appears to be, yes.

24   Q    And does it appear to be a similar sort of notary form?

25   A    It does, yes.

Guerci - direct - Lesko                    4548

1   Q    And does it include the defendant's name?

2   A    Yes, it does.

3   Q    And what's the date?

4   A    December 20th of 2017.

5   Q    So that's the same date as reflected on the English

6   notary form; is that right?

7   A    Yes, it is.

8   Q    And I will show you the -- go two pages later.  Does this

9   appear to be a translation?

10  A    Yes, it does.

11  Q    Of the Spanish document that we just looked at?

12  A    It appears to be, yes.

13  Q    Okay.  And if you could -- this is in the city of

14  Guadalajara, Mexico; is that right?

15  A    Yes.

16  Q    And this is a statement by a notary?

17  A    Yes, it is.

18  Q    And could you just read up until the end of the address?

19  A    Certainly.  "That Keith Alan Raniere appeared before me

20  and declared that he was born in New York, United States of

21  America on August 26, 1960.  He is single.  His address is 3

22  Flintlock Lane, Clifton Park, New York, United States of

23  America.

24  Q    Okay.  And then there's an attestation.  Does it indicate

25  that Mr. Raniere appeared before this notary?

Guerci - direct - Lesko                4549

1   A    It does, yes.

2   Q    And is there a signature?

3   A    Yes, there is.

4   Q    And who is the signature from?

5   A    Keith Raniere.

6   Q    Okay.

7           MR. LESKO:  May I approach the witness, Your Honor?

8           THE COURT:  Yes.

9           (Counsel approaches.)

10  Q    Investigator Guerci, I'm going to show you what's been

11  marked for identification as Government's 722, 723 -- strike

12  that.  722 and 725.

13  A    Okay.

14  Q    Do you recognize -- let's start with 722.  Do you

15  recognize that document?

16  A    Yes, I do.

17  Q    What is that?  It's a stack of documents.

18  A    It's a stack of documents which contain American Express

19  records for an individual identified as Pamela Anne Cafritz

20  which also includes a certificate of authenticity from a

21  representative from American Express.

22  Q    And what is the date span of the records if you could let

23  us know?

24  A    It looks like they spanned from January of 2015 through

25  February of 2018.

SN        OCR        RPR

Guerci - direct - Lesko                                4550

1   Q    Okay.  And then do you recognize Government Exhibit 725?

2   A    I do, yes.

3   Q    What is that exhibit?

4   A    That's a summary schedule that I prepared summarizing the

5   information that's contained in a portion of the record which

6   runs from a period of November 7, 2016 through December 8,

7   2018.

8   Q    Okay.  And actually I will show you 723.  Do you

9   recognize 723?

10  A    I do, yes.

11  Q    What is Government's 723?

12  A    It's an additional production that was produced by

13  American Express and includes a certificate of authenticity

14  and includes a series of three checks that were provided in a

15  supplemental production by American Express.

16          MR. LESKO:  Your Honor, we offer Government's 722,

17  723 and 725.

18          MR. AGNIFILO:  No objection to those three exhibits.

19          THE COURT:  All right.  Government Exhibits 722, 723

20  and 725 are received in evidence.

21          (Government's Exhibits 722, 723 and 725 received in

22  evidence.)

23  Q    Let's start with one of the statements.  Give me a moment

24  if you could.

25  A    Sure.

Guerci - direct - Lesko                4551

1            (Exhibit published.)

2    Q    So I'm going to show you one of the statements.  On

3    Government's 722.  And are these the statements that you

4    analyzed in the schedule?

5    A    It's a part of the statements, yes.

6    Q    So --

7            MR. AGNIFILO:  Could you give the page number of the

8    exhibit?

9            MR. LESKO:  GX 722-368.

10            THE COURT:  Let me see what I can do.  Hold on.

11    Better?  All right.  Now it's working.  Thank you.  Go ahead.

12            It's been published to the jury so go ahead.

13            MR. LESKO:  Thank you, Your Honor.

14    BY MR. LESKO:

15    Q    All right.  So let's look at -- could you describe for

16    the jury what is on page one of this statement?

17    A    It's just indicates that it's a Platinum card in the name

18    of Pamela Anne Cafritz with a closing date of 5/11 of '17 and

19    it's an account ending in number 2-42002.  It also contains

20    balance and payment information.

21    Q    And like most -- a lot of credit cards, points, accrual

22    of points; is that right?

23    A    Yes.

24    Q    Payment information; is that correct?

25    A    It is, yup.

Guerci - direct - Lesko                    4552

1   Q    Balance information; is that right?

2   A    It's all correct, yes.

3   Q    And then all sorts of information like customer service

4   information?

5   A    Yes.

6   Q    And so forth?

7   A    Yup.

8   Q    Turning to Government's 722, page 370, could you describe

9   what that page contains?

10  A    That's a detail of some of the charges that were placed

11  on the account.  For example, the first line you see on April

12  28th of 2017 there's a charge to Zappos.com for $160.50 and

13  other charges as well during that period.

14  Q    Okay.  As we move through the exhibit this is page 371.

15  It just reflects a number of charges; is that right?

16  A    Yes.  It's similar information that I just described,

17  charges to the account.

18  Q    Next page, 372, more charges; is that right?

19  A    Yes, correct.

20  Q    Okay.  And then I just want to point one out just for

21  future reference.  The -- this charge on April 26, 2017, what

22  is that charged to?

23  A    Keith Donato PC, which is a chiropractor.

24  Q    What's the amount?

25  A    $240.

Guerci - direct - Lesko                    4553

1   Q     And underneath Dr. Donato's name it says

2   squareup.com/receipts.  What does that indicate?

3   A     It would indicate that the method of payment was through

4   a payment processor that was utilized by Mr. Keith Donato.

5   It's a payment processing device that people can utilize to

6   obtain payment for services or goods that were provided to a

7   customer and it's something that can be done through a small

8   electronic device like a phone, an iPad or a computer.

9   Typically it's done with a device attached to that device and

10  they can swipe the card and that would initiate the payment

11  itself.

12  Q     And for those that may be familiar, it's that little,

13  like, white swipe box that you can plug into a phone or an

14  iPad?

15  A     Yes.

16  Q     We don't need to belabor this, but on page --

17  Government's 722, page 373, there's a box for interest

18  accrual; is that right?

19  A     Yes, there is.

20  Q     And then some form language about the card, the page, and

21  then these are just -- these are additional pages, 376, 377,

22  378, all seem to include boilerplate language related to the

23  card?

24  A     Yes.

25  Q     Was this the type of information on the statement that

Guerci - direct - Lesko                                    4554

1   you reviewed and analyzed?

2   A     Yes, they all appear to be the same.

3   Q     And so this statement reflects -- I will show you it

4   again.  It reflects charges in April of 2017; is that right?

5   A     Yes, that's correct.

6   Q     And, so, that would have been approximately how many

7   months after Pam Cafritz died?

8   A     Approximately five or six months.

9   Q     So I would like to turn now to Government's 725.

10          (Exhibit published.)

11  Q     Is that the -- is that the schedule you prepared of

12  Pamela Cafritz's American Express records?

13  A     Yes, it is.

14  Q     And why don't you explain to the jury what's reflected on

15  your schedule?

16  A     Okay.  Up on top it just identifies the account

17  information which includes Ms. Cafritz's name, an American

18  Express card the portion of the account number, the address

19  listed on the account.  Moving from left to right, it

20  indicates the date of the transaction.  It would be the date

21  it actually posted to the statement itself.  That would be

22  reflected.  The second would be just a description of a bank

23  description which would be who the actual servicer was that

24  actually initiated the charge.

25          The third box would be the service description which

Guerci - direct - Lesko                                    4555

1   would just be a summary of whatever information was provided

2   on the statement that might give some detail about what was

3   actually purchased.  The fourth column is the purchase amount,

4   the amount of money that was actually charged to the card.

5   The next column is the payment or credit amount.  Within that

6   would be refunds that were issued on the card as well as any

7   payments that were sent in.  You know, whether it was

8   electronically or via hard copy check.

9           The next column is the source of the payment, you

10  know, where the payment actually came from and then the final

11  column is nothing more than a running balance of debits and

12  credits to the accounts.

13  Q    And you calculated that running balance; is that right?

14  A    Yes.

15  Q    Okay.  So, let's discuss some of the charges on this Pam

16  Cafritz American Express.  I would like to turn your attention

17  to this charge on November 7, 2016.  What is that charge?

18  A    It's a charge to Parkland Ambulance Service for

19  $3,539.50.

20  Q    Was that on the date of Pam Cafritz's death?

21  A    Yes, it was.

22  Q    I would like to turn your attention to the first charge

23  on November 15, 2016.  What is that charge?

24  A    Charged to Amazon marketplace, you know, which gave

25  somewhat a description of a book store for an amount of

SN        OCR        RPR

Guerci - direct - Lesko                    4556

1   $245.41.

2   Q    Now, are there a number of charges in the records to

3   Amazon and Amazon Marketplace?

4   A    There are throughout the statements that I reviewed, yes.

5   Q    Okay.  Turning to the next page of Government's 725.  The

6   second charge on November 16th, would you describe that

7   charge, please?

8   A    It was a charge to Keith Donato DC which I indicated

9   earlier is a chiropractor utilizing a Square device for a

10  method of payment for an amount of $265.

11  Q    Okay.  There are two charges or there's four, but the

12  last two charges on November 16th are Restoration Hardware.

13  Could you describe those charges?

14  A    Yes, they appear to be for home furnishings for -- the

15  first one for $1,471.25 and the second one which is also for

16  what appears to be home furnishings for $1,484.09.

17  Q    Okay.  November 23rd, what's that charge?

18  A    It's another charge to Keith Donato, chiropractor,

19  utilizing a Square device for amount an of $265.

20  Q    November 25th, check payment, what does that reflect?

21  A    It shows that there was a check received as payment on

22  the account from the Key Bank account ending in 8784 from an

23  account that was maintained by Pamela Cafritz for $12,546.70.

24  Q    Are we going to be reviewing those Key Bank records in a

25  moment?

SN      OCR      RPR

Guerci - direct - Lesko                    4557

1    A    Yes, we are.

2    Q    11/29, the next page, what's that charge?

3    A    The charge to Lucky Pet, Inc. which indicated it was a

4    pet shop, pet food.  It was also referenced for $68.90.

5    Q    11/30, what's that charge?

6    A    It's another charge to Keith Donato, the chiropractor,

7    again utilizing a Square device for $265.

8    Q    December 7th, what's that charge?

9    A    Another charge to Keith Donato for $265.

10   Q    December 8th, what's that charge?

11   A    Charge to Domino's Pizza, store 3554 in Brooklyn, New

12   York for restaurant charges for $20.50.

13   Q    That's a store in Brooklyn?

14   A    That's in Brooklyn, New York, yes.

15   Q    December 16th, what's that charge?

16   A    Charge to Polo referencing 00128 for an order at

17   gsicommerce.com for $1,049.67.

18   Q    And, just so the record is clear, I'm pointing out

19   individual transactions in Government's 725, but each page

20   contains a number of other transactions; is that correct?

21   A    Yes, they do.

22   Q    Okay.  December 20, 2016, what's Blair's Sauces?

23   A    It's for groceries/sundries for $166.

24

25              (Continued on the following page.)

SN        OCR        RPR

Guerci - direct - Lesko                    4558

1    (Continuing)

2    Q    December 20th, what's that charge?

3    A    Charged to Neiman Marcus for cashmere blend sweater,

4    Donegal soft blazer, for $4,457.62.

5    Q    December 21st, what's that charge?

6    A    It's another charge to Keith Donato, chiropractor, for

7    $265.

8    Q    December 22nd, what's that charge?

9    A    Charge to Neiman Marcus, with a service description of

10   print/Wales 2, for $4,269.30.

11   Q    January 4th, what's that charge?

12   A    Another charge to Keith Donato, chiropractor, for $265,

13   also using a Square device.

14   Q    Another payment on January 6th; is that right?

15   A    Yes.

16   Q    And January 7th, what's that charge?

17   A    Charge to Bergdorf Goodman, which is a department store,

18   for $11,350.56.

19   Q    January 11th, what's that charge?

20   A    Another charge to Keith Donato, chiropractor, for $265.

21   Q    January 18th, what's that charge?

22   A    Another charge to Keith Donato, chiropractor, for $265.

23   Q    January 25th, what's that charge?

24   A    Charge to Keith Donato, chiropractor, for $174.

25   Q    Another payment on January 26th?

Guerci - direct - Lesko                           4559

1   A    Yes.  For $29,390.32 from the KeyBank account ending in

2   8784, which was in the name of Pam Cafritz.

3   Q    February 1st, what's that charge?

4   A    Charge to Keith Donato utilizing a Square device for

5   $174.

6   Q    February 10th, what's that reflect?

7   A    That reflects a credit or a refund from Bergdorf Goodman,

8   a department store, for $9,346.45.

9   Q    February 15th, what's that charge?

10  A    Charge to Keith Donato, chiropractor, for $264.

11  Q    March 1st, what's that charge?

12  A    A charge from Keith Donato utilizing a Square device

13  again for $225.

14  Q    March 29th, what's that charge?

15  A    It's a charge for speed pay, National Grid, for $500.98.

16  Q    And National Grid is a utility.  Is that some sort of

17  utility?

18  A    My understanding it's a utility company that provides

19  electric and gas services in Upstate New York.

20  Q    April 19th, what's that charge?

21  A    It's another charge to Keith Donato, chiropractor, for

22  $250.

23  Q    April 26th, what's that charge?

24  A    Another charge to Keith Donato, chiropractor, for $240.

25  Q    May 3rd, what's that charge?

Guerci - direct - Lesko                    4560

1    A       Another charge to Keith Donato, chiropractor, for $185.

2    Q       May 10th, what's that charge?

3    A       Another charge to Keith Donato, chiropractor, for $145.

4    Q       May 15th, 2017, what's that charge?

5    A       It's a charge by Executive Success Programs for $3,140.

6    Q       And so how many months had Pam Cafritz been dead by that

7    time?

8    A       At this point, approximately seven months.

9    Q       May 17th, 2017, what's that charge?

10   A       It's another charge to Keith Donato, chiropractor, for

11   $230.

12   Q       May 23rd?

13   A       Another charge to Keith Donato for $145.

14   Q       Bottom of the page, May 30th, what does that transaction

15   reflect?

16   A       This is a credit refund for $1,389 from Executive Success

17   Programs.

18   Q       June 7th, what does that reflect?

19   A       It's another charge from Keith Donato, chiropractor, for

20   $275.

21   Q       And following that, that's three charges for Restoration

22   Hardware.  What's the second of the three?

23   A       The second one is for $1,435.94, which indicates it was

24   for home furnish or home furnishings.

25   Q       June 14th?

Guerci - direct - Lesko                    4561

1  A    That's another charge to Keith Donato for $240.   That's

2  Keith Donato, the chiropractor.

3  Q    June 15th, what is that transaction?

4  A    That's an online payment for $16,391.49 from a KeyBank

5  account ending in 8784, which was in the name of Pamela

6  Cafritz.

7  Q    June 21st?

8  A    That's another charge to Keith Donato, chiropractor, for

9  $145.

10  Q    June 28th?

11  A    Another charge from Keith Donato, chiropractor, for $285.

12  Q    July 5th?

13  A    A charge from Keith Donato, chiropractor, for $235.

14  Q    July 10th?

15  A    It's a charge from St. Peter's Hospital for $402.55.

16  That's the last of three charges on that date.

17  Q    July 12th?

18  A    Charge from Keith Donato, chiropractor, for $235.

19  Q    July 18th, the first one?

20  A    First one is a charge from Restoration Hardware for home

21  furnishings, for $2,853.69.

22  Q    July 19th?

23  A    Another charge from Keith Donato, chiropractor, for $240.

24  Q    July 20th?

25  A    Charge there from a company called Baby Be Mine for

VB        OCR        CRR

Guerci - direct - Lesko                              4562

1   something that was indicated as service for $79.98.

2   Q    Based upon your review of the statements, at this point

3   in time, did the card start to be used to purchase a number of

4   baby-related items?

5   A    Yes, it did.

6   Q    7/26?

7   A    Another charge to Keith Donato, chiropractor, for $235.

8   Q    August 1st?

9   A    Charged by Keith Donato, chiropractor, for $145.

10  Q    August 4th?

11  A    Charged by a company called Owlet Baby Care, Inc., for

12  $299.99.

13  Q    August 1st?

14  A    On August 1st there's two charges, the second being from

15  Prosvent LLC for $109.75.

16  Q    August 15th?

17  A    The charge to a company called Americord Registry LLC for

18  $4,998.

19  Q    And do you know what Americord Registry is?

20  A    I do.

21  Q    What is it?

22  A    It's a company that collects stem cells from newborn

23  umbilical cords, you know, for potential future use for the

24  treatment of different blood diseases such as leukemia.

25  Q    Okay.  August 16th?

```
                    Guerci - direct - Lesko              4563
```

1   A    The last one on that date was a charge for Keith Donato,

2   chiropractor, for $284.

3   Q    September 6th?

4   A    Another charge to Keith Donato, chiropractor, for $286.

5   Q    September 13th?

6   A    Another charge to Keith Donato, chiropractor, for $275.

7   Q    September 20th, 2017?

8   A    Another charge to Keith Donato, chiropractor, for $284.

9   Q    September --

10        MR. LESKO:  Strike that.

11  Q    September 27th, 2017?

12  A    Another charge to Keith Donato, chiropractor, for $245.

13  Q    October 4th?

14  A    Another charge to Keith Donato, chiropractor, for $284.

15  Q    October 6th?

16  A    The charge there for Sachs Direct for $1,159.18.

17  Q    October 11th?

18  A    Another charge for Keith Donato, chiropractor, for $145.

19  Q    November 8th?

20  A    Another charge to Keith Donato, chiropractor, for $145.

21  Q    And throughout, are there various KeyBank payments of the

22  balance owed?

23  A    There are, either via check or online payments, yes.

24  Q    Okay.

25        Last page, 1/27?

Guerci - direct - Lesko                    4564

1   A    There's a charge to Donato's Pizza for $35.13.

2   Q    January 30th?

3   A    There's a charge there from Prosvent LLC for $109.75.

4   Q    February 1st?

5   A    Another charge to Donato's Pizza for $24.66.

6   Q    February 4th?

7   A    There's a charge to Sirius XM Radio, Inc., for radio

8   service, for $218.55.

9   Q    February 5th?

10  A    Charge to Netflix.com for $11.99.

11  Q    Okay.

12       MR. LESKO:  I'm showing you what's been admitted as

13  Government's 723.

14       (Exhibit published.)

15  Q    These are supplemental American Express records; is that

16  right?

17  A    Yes, they are.

18  Q    Okay.  And let's take a look at the first page.

19       What does that first page reflect?

20  A    It's a copy of a check payable to American Express from

21  an account at KeyBank in the name of Pamela Cafritz that was

22  issued on January 19th, 2017, for $29,390.32.  As it indicates

23  down in the memo section for AMEX CC payment, and it was

24  signed by Keith Raniere.

25  Q    Okay.  So -- and this is drawn on Pam Cafritz's KeyBank

VB       OCR       CRR

Guerci - direct - Lesko                    4565

1    account?

2    A     KeyBank account ending in 8784, yes.

3    Q     Okay.  And does that correspond to some records we're

4    going to be taking a look at in a moment?

5    A     It does.

6    Q     And how many months after Pam Cafritz died was this check

7    written?

8    A     This was approximately two months, two-and-a-half months

9    after.

10   Q     We will take a look at the second page of Government's

11   723.

12            Describe what's on the second page third page, I'm

13   sorry.

14   A     Yes.  This is also a check payable to American Express

15   from the same Pamela Cafritz account at KeyBank ending in

16   8784, that was written on November 23rd, 2016, for $12,546.70.

17   And in the memo section it indicates Pamela Anne Cafritz, and

18   lists a number 42002, and this was signed by Keith Raniere.

19   Q     Okay.  And how many days after Ms. Cafritz died was this

20   check written?

21   A     This was approximately two weeks after.  Approximately

22   16 days in total.

23   Q     And last page of Government's 723.

24            Could you describe what's reflected on that page?

25   A     Yes.  This is also a check payable to American Express

Guerci - direct - Lesko                           4566

1    from an account at KeyBank in the name of Pamela Cafritz,

2    ending in 8784, that was written on December 29th, 2016, for

3    $1,265.68.  In the memo section it indicates AMEX CC payment.

4    And this was signed by Keith Raniere.

5    Q    That's on December 29th, 2016?

6    A    That's correct.  December 29th, yes.

7    Q    Okay.

8            MR. LESKO:  Your Honor, may I approach the witness?

9            THE COURT:  Yes, you may.

10           MR. LESKO:  Thank you.

11           Investigator Guerci, I'm going to show you what's

12   been marked for identification as Government's 721, 726 and

13   727.

14   Q    Could you identify those exhibits for the jury?

15   A    Yes.  Exhibit 721 are bank records from KeyBank for an

16   account in the name of Pamela Cafritz, which ends in account

17   number 8784.  It also includes an affidavit from a

18   representative from KeyBank, which is a certificate of

19   authentication.

20           Schedule 726 is a summary that I prepared for the

21   period November 1st of 2016 through June 29th of 2018, which

22   summarizes some of the information that was contained on the

23   statements within this account, which also included checks,

24   deposit tickets and deposited items.

25           Government Exhibit 727 is a summary of some of the

                    Guerci - direct - Lesko                    4567

1   checks that were written on this account during that same time

2   period, which were actually written and signed, I should say,

3   by Keith Raniere.  It's a summary schedule as well.

4   Q    Thank you.

5              MR. LESKO:  Your Honor, we'd offer Government's 721,

6   726 and 727.

7              MR. AGNIFILO:  No objection to any of those

8   exhibits, Judge.

9              THE COURT:  All right.

10             Government Exhibits 721, 726 and 727 are received in

11  evidence.

12             (Government's Exhibits 721, 726 and 727 received in

13  evidence.)

14             THE COURT:  You may publish them.

15             MR. LESKO:  Thank you, Your Honor.

16             (Exhibit published.)

17             MR. LESKO:  Turning your attention initially to

18  Government's 721.  And this is page 343 of Government's 721.

19             (Exhibit published.)

20             See if we can zoom in.

21  Q    These bank records, they include copies of cleared

22  checks; is that how that works?

23  A    Yes, they're part of the production, yes.

24  Q    Okay.  So check number 125 at the bottom.

25             Do you see that?

                    VB       OCR       CRR

Guerci - direct - Lesko                    4568

1    A    I do.

2    Q    Okay.  Describe that check, please.

3    A    That's a check drawn on the account of Pamela Cafritz,

4    account number ending in 8784, which was written on

5    November 18th of 2016, to an individual identified as Prospero

6    Ramos for $722.50, which was signed by Pamela Cafritz.  Or

7    appears to be signed by Pamela Cafritz.

8    Q    And in your experience and based upon your training, does

9    that appear to be an actual signature?

10   A    It does not.  It may be a stamp.

11   Q    Signature stamp?

12   A    Looks like a stamp, yes.

13   Q    Okay.  And the date on the check?

14   A    Date is November 18th of 2016.

15   Q    So approximately how many days after Pam Cafritz died was

16   that check signed?

17   A    Approximately 11 days.

18   Q    Okay.  Turning your attention to Government's Exhibit

19   621, page 371.  Check number 1471.

20        Could you describe that check for the jury, please.

21   A    Sure.  That's a check drawn on the account of Pamela

22   Cafritz at KeyBank, account ending in 8784, which was written

23   or I should say payable to Buyers Advocate, Inc., for $15,000.

24   And it's dated November 7th, 2016.

25   Q    And who signed it?

VB        OCR        CRR

Guerci - direct - Lesko                    4569

1   A    Pamela A. Cafritz.

2   Q    Okay.  Was that the day she died?

3   A    It was.  Based on her death certificate, yes.

4   Q    And do you know what Buyer's Advocate, Inc. is?

5   A    That was a company that was actually in her name.

6   Q    At some point did the defendant start signing these

7   checks --

8   A    Yes.

9   Q    -- on the Cafritz account?

10  A    Yes, he did.

11  Q    Okay.  So you've seen some of these, but in the bank

12  records, let's take a look at check number 2003.

13            Could you describe that check.

14            THE COURT:  Excuse me, let me ask this.

15            Did you learn whether the defendant had signing

16  authority on the -- on Ms. Cafritz's account?

17            THE WITNESS:  Not based on information that was

18  provided by the bank.  It did not appear that he did.

19            THE COURT:  All right.

20            Go ahead.

21  Q    And just to explain that banks have signature cards; is

22  that right?

23  A    Yes.

24  Q    And did the defendant have a signature card for this

25  account?

VB        OCR        CRR

Guerci - direct - Lesko                    4570

1    A    Not based on the information that was provided to me, no.

2    Q    Okay.  So go ahead.  I think I stopped you.  If you could

3    continue explaining.

4              THE COURT:  No, I stopped him.

5              MR. LESKO:  Oh, I'm sorry.

6    Q    You were stopped.

7              THE COURT:  Go ahead.

8    Q    Continue.

9    A    With respect to check 2003, it's a check payable to

10   American Express that was written on January 19th, 2017, for

11   $29,390.32, which was signed by Keith Raniere, and as

12   indicated in the memo section, it was for AMEX CC payment.

13   Q    All right.  Let's turn your attention -- we could

14   probably get this in right before the break -- to Government's

15   Exhibit 727 in evidence.

16   A    Okay.

17             (Exhibit published.)

18             MR. LESKO:  If I can line this up correctly.

19   Q    Okay.  727, what does that reflect?

20   A    It's a summary schedule of checks that were signed by

21   Keith Raniere on the account that we're referencing, which is

22   the KeyBank account, in the name of Pamela Cafritz.

23   Q    Okay.  So let's do this quickly.  We talked about

24   American Express payments.

25             11/28, is there an American Express payment?

1   A    Yes, there was a payment to American Express for

2   $12,546.70.

3   Q    Okay.  Two lines down from that, 11/28, November 28th on

4   Government's 727.

5        What does that check reflect?

6   A    It's a check to Progressive Insurance for $587 for a

7   policy number 47997281.

8   Q    So an insurance payment?

9   A    Yes.

10  Q    December 29th, 2016, what is that check for?

11  A    That's a check for $142.48 to Louis Petraccione & sons,

12  Inc., for what appears to be plumbing services, invoice number

13  161059.

14  Q    January 9th, 2017.  That is an E-check.  What is an

15  E-check?

16  A    It would be an electronic check that would be forwarded.

17  So instead of a physical check that would be mailed, let's

18  say, there would be something that would be transmitted

19  electronically.  In the form of a check, though.

20  Q    Okay.  January 26th?

21  A    That was a withdrawal or a check, I should say, for --

22  payable to American Express for $29,390.32 for AMEX CC

23  payment.

24  Q    February 24th, what is that check for?

25  A    It's a check for $350 to an individual identified as

Guerci - direct - Lesko                    4572

Siobhan, for -- in the notation section said Single EMS.

Q    Next check, February 24th?

A    That's payable to National Grid for $138.01 for account number 52440-02130 for 2 Flintlock Lane, and that was for what appeared to be utilities.

Q    All right.  March 10th, 2017, what's that check for?

A    Check payable to Audi Financial, Inc., for $1,734.60.

Q    Does that appear to be a car payment?

A    It does.

Q    May 5th, 2017?

A    Check payable to Concord Court Association for $169 for pool and tennis, for a period from December 1st to 11/30 of 17.

Q    Okay.  May 8th, 2017?

A    Check for $45 payable to Samantha LeBaron, for personal assistance.

Q    May 24th, 2017?

A    Check payable to Clare Bronfman for $65,847.68.

Q    Last page, 6/21, 2017?

A    Check payable to the Town of Halfmoon for $33.38, for account number 05020300 for water at 2 Flintlock, from 12/1/16 through March 8th of 17.

Q    Okay.  July 20th, 2017?

A    Check payable to Patrick Maloney for $3,700 for work completion to house.  And all of these notation sections is

Guerci - direct - Lesko                    4573

1    information that is a summary of information that was

2    contained on the checks themselves.  So that's where that

3    information came from.

4    Q    And so the housework on completion to house to Patrick

5    Maloney, by July 20, 2017, how long had Pamela Cafritz been

6    dead?

7    A    Approximately eight months.

8    Q    Okay.  So all of these checks that you reviewed and

9    analyzed that were signed by the defendant out of this Pam

10   Cafritz account.

11          What were the total amount, dollar amount of the

12   checks?

13   A    $328,305.84.

14          MR. LESKO:  Okay.  Your Honor, I think this would be

15   a good time or time for a break.

16          THE COURT:  All right.  Let's take our afternoon

17   break.  All rise for the jury.

18          THE COURTROOM DEPUTY:  All rise.

19          (Jury exits.)

20          (In open court; outside the presence of the jury.)

21          THE COURT:  You may stand down, sir.

22          THE WITNESS:  Thank you.

23          THE COURT:  Do not discuss your testimony with

24   anyone.

25          (Witness excused.)

Guerci - direct - Lesko                         4574

1          THE COURT:  About how much more do you have on

2    direct?

3          MR. LESKO:  I'm trying, Your Honor.

4          THE COURT:  You are trying.

5          MR. LESKO:  I hope to go more quickly.

6          THE COURT:  Well, that really did not answer my

7    question.

8          MR. LESKO:  I am going to try to be done before

9    5:00.

10         MR. AGNIFILO:  I would probably have -- honestly, I

11   think I can probably shorten my cross-examination if I had the

12   evening because we just really got a lot of this stuff in the

13   last --

14         THE COURT:  I will give you the evening.

15         MR. AGNIFILO:  Yes.  But I probably could do it in

16   an hour tomorrow morning.

17         THE COURT:  An hour?  Okay.

18         MR. AGNIFILO:  On the outside.

19         THE COURT:  That is fine.  Whatever you need.  I am

20   not telling you how much time to take.  I am just trying to

21   move things along in order to establish some efficiencies.

22         MR. LESKO:  Understood, Your Honor.  I think the

23   back part of this will go much quicker.

24         THE COURT:  All right.  Let's take ten minutes.

25   Thank you.  (Recess taken.)    (Continued on following page.)

Guerci - direct - Lesko                    4575

1              (In open court - jury not present.)

2              (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

3         THE COURT:  Okay, are we ready?

4         MR. LESKO:  Yes, Your Honor.

5         THE COURT:  All right, let's bring in the witness,

6    bring in the defendant, and then we'll bring in the jury.

7              (Defendant entered the courtroom.)

8         THE COURTROOM DEPUTY:  I'll go get the jury.

9         THE COURT:  Okay.

10             (The witness resumed the stand.)

11             (Pause.)

12             (Jury enters.)

13        THE COURT:  Please be seated, everyone.

14        Mr. Lesko, you may continue your examination.

15        MR. LESKO:  Thank you, Your Honor.

16        THE COURT:  The witness is reminded he is still

17   under oath.

18        THE WITNESS:  Thank you, Your Honor.  Yes.

19   DIRECT EXAMINATION

20   BY MR. LESKO:

21   Q    All right.  Investigator Guerci, we are going to take a

22   look at Government's Exhibit 726 in evidence.

23             (Exhibit published.)

24   Q    Could you briefly describe what that schedule depicts?

25   A    That's a summary of -- summary schedule of the account

                SAM    OCR    RMR    CRR    RPR

Guerci - direct - Lesko                                    4576

1    for Pamela Cafritz at Key Bank with Account No. ending in

2    8784.  It's a summary of all the activity in the account from

3    November 1st of 2016 to June 29th of 2018.

4    Q    Okay.  And we'll start with some of the transactions

5    after November 7th, 2016; the date of Pam Cafritz's death.

6    Okay?

7    A    Yes, sir.

8    Q    Okay.  And what I'd like to do with these records is, I

9    am going to ask you to either describe the purchase, itself,

10   or the purchase and amount.  Okay?

11   A    Okay.

12   Q    So I don't need an amount for every purchase.

13   A    Yes, sir.

14   Q    Or every transaction.

15   A    Okay.

16   Q    All right.  Let's start with Check No. 1473 on

17   November 10th.  Who is that check to?

18   A    Juliana Vicente.

19   Q    And what was it for?

20   A    Bookkeeping and mileage.

21   Q    Okay.  November 14, 2016, Check No. 180 -- Check No. 81.

22   Who was that to, and what was the amount?

23   A    It was Dr. Danielle Roberts for $230.

24   Q    November 21st, "Bill Pay," what was that payment?

25   A    It was a payment to PAH Mortgage Corporation for

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                    4577

1    $1,387.93.

2    Q    December 2nd, withdrawal, direct withdrawal.  What was

3    that for?

4    A    That was for Knox Woods for $91 for association dues.

5    Q    December 9th, 2016, Check No. 1469.  Who was that to?

6    A    That was to Kathy Russell.

7    Q    And how much was it for?

8    A    $1,040.

9    Q    Right above that, on December 9th, a deposit.  Where was

10   that deposit from?

11   A    It was from Ethical Value Exchange, LLC.

12   Q    And what was the amount?

13   A    $1,269.48.

14        THE COURT:  Okay.

15   BY MR. LESKO:

16   Q    So December 16th, 2016, "Debit card payment."  What was

17   that for?

18   A    It was for a Villa Pizza for 900 -- for $9.90.

19   Q    All right.  December 19th, Villa Pizza, is that right?

20   A    Yes.

21   Q    December 19th, another charge to Villa Pizza, is that

22   right?

23   A    Yes.

24   Q    $12?

25   A    For $12, yes.

Guerci - direct - Lesko                    4578

1   Q    Okay.  12/22/2016, debit card, is that LaBella Pizzas?

2   A    Yes, for $5.

3   Q    And below that, 12/23/2016, what's that debit card for?

4   A    Dunkin' Donuts for $6.92.

5          THE COURT:  And these charges were on the American

6   Express card?

7          THE WITNESS:  No, sir.  These were -- this is a

8   summary of the bank account at Key Bank in the name of Pamela

9   Cafritz.  So these are debit card transactions from that bank

10  account.

11         THE COURT:  Debit card?

12         THE WITNESS:  Yes.  Yes.

13         MR. LESKO:  All right.

14         THE COURT:  How does a debit card work?

15         THE WITNESS:  It's similar to a credit card, it's

16  just it's a direct transfer from the account.  The money comes

17  right out of the account; instead of a credit card, where a

18  there is a credit balance, and then you have to pay the card

19  on a monthly basis.

20         THE COURT:  The money automatically leaves the

21  account and goes to the payee?

22         THE WITNESS:  That's correct, yeah.  There's no

23  credit extended.  It's just a direct withdrawal from the

24  account, so funds have to be available.

25         THE COURT:  Okay.

Guerci - direct - Lesko                 4579

1          MR. LESKO:  Okay.

2          THE COURT:  But was there anyone else who had access

3    to that debit card, according to the records you found?

4          THE WITNESS:  Not based on the records that I

5    obtained from the bank, no.

6          THE COURT:  All right.

7    BY MR. LESKO:

8    Q    And to be fair, can you determine who actually used the

9    debit cards reflected in the transactions that you've

10   scheduled?

11   A    No, not based on this information, I cannot.

12   Q    Okay.  January 17th, 2017, what is that transaction?

13   A    For $37.50, there was a transaction to Bow Tie Criterion

14   Cinemas.

15   Q    January 25th, 2017, what is that transaction?

16   A    For $889.05, there is a payment to Stephen Dautel,

17   dentist.

18   Q    And without having to go by date, on page 4 of your

19   schedule, is it fair to say there are a number of purchases of

20   pizza, Cracker Barrel, that type of thing?

21   A    Yes, there are.

22   Q    Okay.  Is that throughout the schedule, a number of pizza

23   purchases?

24   A    Yes, there are.

25   Q    Okay.  So I'd like -- March 3rd, 2017, is that a deposit?

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                    4580

1    A    Yes, it is.

2    Q    Who is that from?

3    A    Clare Bronfman for $15,000.

4    Q    So on May 15th, 2017, there is another deposit.  What's

5    the amount of that deposit?

6    A    $150,000.

7    Q    And where was that deposit received from?

8    A    It came from another account that was maintained at

9    Key Bank, which was an account in the name of Pamela Cafritz

10   as well.  And it was an account ending in 8213.

11   Q    The next page, page 9 of your schedule, June 30th, 2017,

12   is that another deposit from that account?

13   A    Yes, it is.

14   Q    What's the amount?

15   A    $150,000.

16   Q    July 24th, 2017, what's that transaction?

17   A    The transaction for $185.07 to Birth with Love Midwifery.

18   Debit card transaction.

19   Q    Okay.  The next page, page 12 of your schedule,

20   September 5th, 2017, another deposit.  Where is that deposit

21   from?

22   A    It's from the same account, 8 -- ending in 8213, which

23   was another Key Bank account in the name of Pamela Cafritz.

24   Q    Okay.  And are the majority of deposits into this account

25   from that bank account that you've just described?

Guerci - direct - Lesko                    4581

1    A    Most of them are, yes.

2    Q    October 10th, 2017, where is that deposit from?

3    A    It's also from that same account ending in 8213 for

4    $50,000.

5    Q    October 27th, 2017, another deposit?

6    A    Another deposit from the same account ending in 8213,

7    which was another account maintained by Pamela Cafritz.

8    Q    What's that amount?

9    A    $30,000.

10   Q    October 27th, 2017, Check No. 2308, could you describe

11   that transaction?

12   A    It was a check payable to Loreta Garza for $1,700, which

13   indicated "Reimbursement for security cameras."

14   Q    For security cameras?

15   A    That's what it indicated, yes, on the check.

16   Q    November 9th, 2017, another deposit?

17   A    Yes.

18   Q    Or transfer?

19   A    That was a transfer into the account from --

20   Q    What's the amount?

21   A    -- from the account ending in 8213, in the name of Pamela

22   Cafritz.

23   Q    And the amount?

24   A    $25,000.

25   Q    Okay.  So -- and there are -- are there a number of other

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                    4582

1  similar transfers or deposits from that same 8213, Pam Cafritz

2  bank account?

3  A    Yes, there are.

4  Q    Okay.  So the last page of Government's 726, did you

5  tally up all of the disbursements and deposits?

6  A    Yes, I did.

7  Q    So in this account -- and this is from November 1st,

8  2016?

9  A    Yes, to June 29th, 2018.

10 Q    And what were the total amount of disbursements out of

11 this bank account?

12 A    Total disbursements were $736,856.49.

13 Q    And what were the total amount of deposits into the

14 account?

15 A    $695, $661.96.

16      THE COURT:  I'm sorry.  You said "dollars."

17      THE WITNESS:  I'm sorry.  $695,661.96.  Thank you.

18      MR. LESKO:  Okay.

19      THE COURT:  Okay.

20      MR. LESKO:  Your Honor, at this time, I am going to

21 offer Government's 728 through 759, 728 through 759, which are

22 all e-mail chains forwarded, ultimately, to the defendant from

23 Clare Bronfman.

24      MR. AGNIFILO:  We do not object, Judge.

25      THE COURT:  All right, Government Exhibits 728 to

SAM     OCR     RMR     CRR     RPR

Guerci - direct - Lesko                    4583

1   759 are received in evidence.

2          (Government's Exhibits 728 through 759 were received

3   in evidence.)

4          MR. LESKO:  Thank you, Your Honor.

5   BY MR. LESKO:

6   Q    Investigator Guerci, have you reviewed these e-mail

7   chains?

8   A    Yes, I have.

9   Q    So let's take a look at a couple.

10          The first is Government Exhibit 728.

11          (Exhibit published.)

12   Q    So let's start at the top.  This is -- what is the date

13   of that e-mail at the top?

14   A    November 22nd, 2016.

15   Q    And who is it from?

16   A    Clare Bronfman.

17   Q    And who is it to?

18   A    Keith Raniere.

19   Q    And are there any attachments?

20   A    Yes, there are.  There are two.

21   Q    Okay.  So it's a little confusing, but are there -- we'll

22   get into the e-mail, itself.

23          But getting into the -- looking at the later pages

24   of the exhibit, are they some of the American Express

25   statements that you discussed previously related to Pamela

Guerci - direct - Lesko                         4584

1    Cafritz?

2    A    Yes, that's a copy of one of the statements.

3    Q    Okay.  And then let's look at the e-mails.

4             So second page of Government's 728.

5             (Exhibit published.)

6    BY MR. LESKO:

7    Q    Is this an e-mail from Michele Tarzia?

8    A    Yes, it is.

9    Q    November 21st, 2016?

10   A    Yes, it is.

11   Q    To Clare Bronfman?

12   A    Yes.

13   Q    And can you read in what the e-mail states?

14   A    Yes.  It says:  Clare, I need to pay Amex -- I'm sorry, I

15   need to pay Pam's Amex.  Balance is $12,546.70 (due on

16   Friday.)  I can pay by transfer from her Key Bank account.

17   The Amex is also still being used....

18   Q    Okay.  So the first page of Government's 728 at the

19   bottom here, is the bottom e-mail from Clare Bronfman?

20   A    Yes, it is.

21   Q    And is it to Michele Tarzia?

22   A    It is.

23   Q    And does it seem -- does it appear to be a response to

24   that previous e-mail that you just read?

25   A    It does, yes.

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                                  4585

1    Q    And what does Clare Bronfman say in response to Michele

2    Tarzia's e-mail?

3    A    Oh, shit.  Okay.  Let me figure this all out...  I think

4    it's Marianna.  Did you receive the checks from Balu?  And can

5    you please send me the cc report to forward to Keith for his

6    approval?

7    Q    Okay.  Now, above -- above that, November 22nd, 2016,

8    does Clare Bronfman forward this chain to the defendant?

9    A    Could you please move that down?

10   Q    I'm sorry.

11   A    It's actually blocking my screen.

12        Thank you.

13   Q    This e-mail right here (indicating) --

14   A    Yes.

15   Q    -- from Clare Bronfman to the defendant?

16   A    Yes.

17   Q    And could you read in the e-mail that Ms. Bronfman sent

18   the defendant.

19   A    Yes.  It says:  Hey, I'm just forwarding these to you for

20   review and approval...  Cx.

21   Q    Okay.  I am going to show you Government's 734.

22        (Exhibit published.)

23   BY MR. LESKO:

24   Q    I will show you, again, the last pages of it.  Are they

25   transaction records related to the American Express that we've

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                          4586

1   discussed?

2   A    Yes, that's a summary of the account activity during that

3   specified period.

4   Q    Okay.  And that's an attachment to this e-mail,

5   Government's 734.  So let's start from the beginning.

6            So, is this an e-mail from that name (indicating)?

7   A    Yes, Amanda Auspelmyer.

8   Q    And the date?

9   A    June 14th, 2017.

10  Q    And it's to who?

11  A    Clare Bronfman.

12  Q    And cc who?

13  A    Michele Tarzia.

14  Q    And what does Amanda say to Clare Bronfman?

15  A    Hi, Clare.  Pam's Amex report is attached for your

16  review.  The total balance due is $17,030.28.  Can we pay

17  this?  Let me know if you have any questions.  Thanks, Amanda.

18  Q    Okay.  First page of Government's 734, right above -- and

19  the e-mail that you just read, sorry, that's going out of

20  focus, does Clare Bronfman forward that request by e-mail to

21  the defendant?

22  A    Yes.

23  Q    And is that on June 14th, 2017?

24  A    Yes, it is.

25            (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Guerci - direct - Lesko                            4587

1   BY MR. LESKO:   (Continuing.)

2   Q     So, I'm now showing you Government's 735.

3                 (Exhibit published.)

4   Q     Okay.  So, is this -- it's a separate exhibit, but is

5   this the same e-mail we just discussed from Amanda to Clare

6   Bronfman about the balance on the American Express report?

7   A     Yes, it reflects the same information.

8   Q     It's the same information as Government's 734?

9   A     Yes.  It appears to be, yes.

10  Q     And it's forwarded.  And does the last e-mail in the

11  chain dated June 14, 2017, is that from the defendant to Clare

12  Bronfman?

13  A     Yes, it is.

14  Q     And what does the defendant say in that e-mail?

15  A     "Yup, pay it," dot, dot, dot.

16  Q     Now, did you review additional e-mails where Ms. Bronfman

17  forwarded similar requests to pay the balance owed on this

18  American Express card?

19  A     Yes, I did.

20  Q     Okay.  And I'm just going to show you these very quickly,

21  but --

22                (Exhibit published.)

23  Q     Government's 729, is that a forward to the defendant

24  requesting payment for the American Express?

25  A     Yes, with an attachment.

Guerci - direct - Lesko                                    4588

1    Q    Okay.  And is it fair to say that Government's 730, 731,

2    732, 733, 736, 737, 738, 739, 740, 741, 2 -- 742, 743, 744,

3    745, 746.  I believe this goes all the way through

4    Government's 759.  Before I ask the question --

5             MR. LESKO:  Before I ask the question, may I

6    approach the witness, Your Honor?

7             THE COURT:  Yes you may.

8             (Approaches.)

9    BY MR. LESKO:

10   Q    So all of the exhibits that I just mentioned and I will

11   have you take a brief review of them --

12   A    (Reviewing.)

13            Yes, these are the documents I reviewed.

14   Q    All of those exhibits, do they involve e-mails forwarded

15   to the defendant related to balances owed on the Cafritz

16   American Express card?

17   A    Yes.

18   Q    Investigator Guerci, I would like to -- do you recall

19   reviewing records, business records received from American

20   Express related to an American Express card transaction

21   involving a cardholder named Daniela Bergeron?

22   A    I did, yes.

23   Q    And were the statements from approximately January 8,

24   2017 through April 7, 2019?

25   A    To the best of my recollection, that's the period, yes.

Guerci - direct - Lesko                    4589

1   Q    And those -- those records are reflected in Government's
2   718?
3   A    Yes.
4             MR. LESKO:  We'd offer Government's 718.
5             MR. AGNIFILO:  One second, Judge.
6             THE COURT:  Sure.
7             MR. AGNIFILO:  No objection, Judge.
8             THE COURT:  All right.  Government Exhibit 718 is
9   received in evidence.
10            (Government's Exhibit 718 received in evidence.)
11            MR. LESKO:  Thank you, Your Honor.
12            (Exhibit published.)
13  BY MR. LESKO:
14  Q    Investigator Guerci, I'm going to turn your attention to
15  win Government's 718.  Let's start with page 49.  Does this
16  reflect that this statement relates to cardholder named
17  Daniela Bergeron?
18  A    It does, yes.
19  Q    What's the account number on the card?
20  A    The ending numbers are 1-22008.
21  Q    Okay.  And the closing date for this statement is what
22  date?
23  A    June 7th of 2017.
24  Q    So on the next page -- Government 718, page 51, do you
25  see a credit reflected on the statement?

SN        OCR        RPR

Guerci - direct - Lesko                    4590

1   A    I do, yes.

2   Q    What is that credit?  Could you describe it?

3   A    It's a credit to a company referenced as XR LLC for

4   $1,730.90.  It's a company in California.

5   Q    Okay.  Two pages later, page 52.  Do you see a

6   transaction on May 26, 2017 involving XR LLC?

7   A    I do, yes.

8   Q    Could you describe that transaction for us?

9   A    It's a transaction for $922.74, XR LLC in California.

10  Q    Okay.  And then two down from that, May 28th, is there

11  another transaction involving XR LLC?

12  A    There is, yes.

13  Q    What's that amount?

14  A    $1,730.90.

15  Q    And does that correspond to the credit we just saw?

16  A    It does.

17  Q    Investigator Guerci, did you review American Express

18  business records relating to a cardholder named Kathy L.

19  Russell from a time period January 14, 2003 through January 14

20  2006?

21  A    Yes, I did.

22  Q    And did you assist in preparing a separate document,

23  Government Exhibit 761-A that reflects a statement with the

24  closing date of January 15, 2005?

25  A    I've reviewed it.  I didn't prepare it.

SN        OCR        RPR

Guerci - direct - Lesko                    4591

1  Q    Okay.  You reviewed that exhibit?

2  A    I did, yes.

3       MR. LESKO:  Your Honor, we'd offer Government's 761

4  and 761-A.

5       MR. AGNIFILO:  No objection, Judge.

6       THE COURT:  All right.  Government Exhibits 761 and

7  761-A are received in evidence.

8       (Government Exhibits 761 and 761-A received in

9  evidence.)

10      (Exhibit published.)

11      MR. LESKO:  Thank you, Your Honor.

12 BY MR. LESKO:

13 Q    This is the stack of 761; is that correct?

14 A    Yes, it is.

15 Q    And it's a collection of statements over that time period

16 we just discussed; right?

17 A    Yes, uh-huh.

18 Q    And 761-A, the cardholder name is what?

19 A    Kathy L. Russell.

20 Q    Account number?

21 A    Ending in 4-22002.

22 Q    Closing date?

23 A    January 15, 2005.

24 Q    I would like to turn you to the fourth page of that

25 statement.  Do you see a transaction on December 4, 2004?

Guerci - direct - Lesko                          4592

1    A    I do.

2    Q    What's that charge?

3    A    Sunoco in Little Falls, New York for $44.50.

4    Q    And a transaction on December 24th?

5    A    I do.

6    Q    What's that transaction?

7    A    Also a transaction at Sunoco in Clifton Springs, New York

8    $26.36.

9              MR. LESKO:  Your Honor, if I could show an exhibit

10   just to the witness, please.

11             THE COURT:  Go ahead.

12   BY MR. LESKO:

13   Q    Okay.  Investigator Guerci, showing you what's been

14   marked for identification as Government's 804, do you

15   recognize that exhibit?

16   A    I do, yes.

17   Q    And is that a death certificate?

18   A    It is from the State of Oregon.

19   Q    For a person named the Ashana Chenoa?

20   A    Yes.

21             MR. LESKO:  We offer Government Exhibit 804.

22             MR. AGNIFILO:  No objection.

23             THE COURT:  Government Exhibit 804 is received in

24   evidence.

25             (Government Exhibit 804 received in evidence.)

Guerci - direct - Lesko                          4593

1              (Exhibit published.)

2     BY MR. LESKO:

3     Q     And so this is a death certificate from the State of

4     Oregon?

5     A     It is, yes.

6     Q     And it's for someone named Ashana Chenoa?

7     A     Yes.

8     Q     What is the date of death?

9     A     January 2, 2003.

10    Q     Okay.  And what is her date of birth?

11    A     Date of birth is April 11, 1978.

12    Q     And what was her occupation?

13    A     It's listed as bartender.

14    Q     Does the location appear to be on a street?

15    A     Yes, it is.

16    Q     And what is the cause of death?

17    A     Head and neck injuries which appear to have resulted from

18    an automobile crash.

19              MR. LESKO:  Your Honor, if I could just show the

20    next exhibit to the witness briefly.

21              THE COURT:  Yes.

22    Q     Investigator Guerci, I'm showing you what's been marked

23    for identification as Government's 803, a two-page exhibit.

24              Do you recognize that exhibit?

25    A     I do.

SN      OCR      RPR

Guerci - direct - Lesko                    4594

1    Q     What is that exhibit?

2    A     That is -- well, the first part of it is a certification

3    from an individual from the State of Alaska and he's

4    transmitting a driver's license.

5    Q     Okay.

6              MR. LESKO:  We'd offer Government's 803.

7              MR. AGNIFILO:  No objection.

8              THE COURT:  All right.  Government Exhibit 803 is

9    received in evidence.

10             (Government Exhibit 803 received in evidence.)

11             (Exhibit published.)

12   BY MR. LESKO:

13   Q     And that first page is the certification; is that right?

14   A     It is, yes.

15   Q     Okay.  The second page, is that a copy of the driver's

16   license?

17   A     A copy of the driver's license for Ashana Chenoa.

18   Q     And the date of birth?

19   A     April 11, 1978.

20   Q     So Ashana Chenoa?

21   A     Yes.

22   Q     And what state is this?

23   A     Anchorage, Alaska.

24   Q     And again the birth date?

25   A     April 11, 1978.

Guerci - direct - Lesko                    4595

1     MR. LESKO:  If I could show the next two just to the

2  witness, Your Honor.

3     THE COURT:  Go ahead.

4  Q    Investigator Guerci, is that a -- showing you

5  Government's 805 is that an obituary in the Anchorage Daily

6  News dated January 10, 2003?

7  A    Yes, that's what it appears to be.

8  Q    Okay.  And Government's 801, the first page -- let's see

9  if it comes into focus.  What is Government's 801 if you could

10  describe what page one is?

11  A    It's a certification from the Department of Homeland

12  Security, which is a text record which is being provided for

13  information relating to Lisa Chenoa, date of birth, April 11,

14  1978.

15  Q    Are these the official records from Homeland Security?

16  A    Yes.

17  Q    And the next page, without going into the actual

18  substance, is this a record reflecting what's called a person

19  encounter?

20  A    Yes, that's what it is.

21     MR. LESKO:  Your Honor, we offer Government's 805

22  and 801.

23     MR. AGNIFILO:  No objection.

24     THE COURT:  All right.  Government Exhibits 805 and

25  801 are received in evidence.

SN      OCR      RPR

Guerci - direct - Lesko                     4596

1           MR. LESKO:  Thank you.

2           (Government Exhibits 805 and 801 received in

3     evidence.)

4           (Exhibit published.)

5     BY MR. LESKO:

6     Q    So, the obituary is from January 10, 2003 in the

7     Anchorage Daily News.  On the far left, who's obituary is

8     that?

9     A    That's for Ashana Chenoa.

10    Q    Does that indicate that she indeed passed away in a car

11    accident in Portland, Oregon?

12    A    Yes, it does.

13    Q    Does it indicate that she was born on April 11, 1978?

14    A    It does.

15    Q    And that was January 10, 2003, right?

16    A    I believe that's the date.

17    Q    Now let's look at Government Exhibit 801, the second

18    page.

19          (Exhibit published.)

20    Q    Okay, so, this indicates the encounter start date on the

21    form?

22    A    January 1, 2001.

23    Q    Okay.  And the encounter end date?

24    A    December 31, 2006.

25    Q    And the name of the person encountered?

Guerci - direct - Lesko                4597

1   A     Lisa Chenoa.

2   Q     And is this a U.S. Customs and Borer Protection form?

3   A     Yes, it is.

4   Q     Indicating a person encounter of some sort?

5   A     That's what it indicates, yes.

6   Q     And the date of birth of Lisa Chenoa who was encountered

7   by Customs and Border Protection, what was the date of birth?

8   A     April 11, 1978.

9   Q     And what was the date and time of the encounter?

10  A     The date of the encounter was December 24th of 2004 at

11  1517 or 3:17 p.m.

12  Q     Okay.  And where was this encounter, the type?

13  A     It was from a vehicle, the individual was located in the

14  vehicle.

15  Q     And the site code?

16  A     The Lewiston—Queenston Bridge crossing.

17  Q     Do you know if that's in Canada?

18  A     It's the Canada, Niagara Falls border, I believe.

19  Q     Okay.

20        MR. LESKO:  Your Honor, may I approach the witness?

21        THE COURT:  Yes, you may.

22        (Approaches.)

23  BY MR. LESKO:

24  Q     Investigator Guerci, I'm showing you Government's 704 and

25  705 for identification.  Do you recognize those exhibits?

Guerci - direct - Lesko                                         4598

1    A     Yes.

2    Q     Without going into details about their contents, what is

3    Government Exhibit 704?

4    A     704 is -- are bank records provided by Wells Fargo Bank.

5    Q     And certified bank records?

6    A     Yes, they are.

7    Q     Is it for a trust of some sort?

8    A     Yes, it is.

9    Q     And what's the name of the trust?

10   A     CDF Irrevocable Trust Jason D. Jones, trustee.

11   Q     If you look at Government's 705, could you describe

12   Government 705?

13   A     It's a summary of the account activity that was contained

14   within this account for the period May 17, 2018 through

15   October 31, 2018.

16           MR. LESKO:  Your Honor, we would offer in a redacted

17   form Government 704 and 705.

18           MR. AGNIFILO:  We object to 705.

19           MR. LESKO:  May we have a sidebar briefly?

20           (Sidebar held outside of the hearing of the jury.)

21           (Continued on next page.)

22

23

24

25

SN        OCR        RPR

```
                           Sidebar                        4599
```

1                (The following sidebar took place outside the

2      hearing of the jury.)

3                THE COURT:  I thought we had resolved this.

4                MR. LESKO:  He's going to mark it for identification

5      and not in evidence.  I don't want Investigator Guerci to have

6      to futz through this exhibit.

7                THE COURT:  I do not want him to either.

8                MR. LESKO:  He did the calculations.

9                THE COURT:  Let's get the calculations in.

10               MR. LESKO:  I won't seek to admit it.  We'll just

11     use it to refresh his memory.

12               THE COURT:  Okay, thank you.

13               (Sidebar ends.)

14               (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Guerci - direct - Lesko                    4600

1    (Continuing.)

2              THE COURT:  All right.  704 and 705.

3              MR. LESKO:  We're just going to offer 704 at this

4    point, Your Honor.

5              THE COURT:  Okay.  Any objection to 704?

6              MR. AGNIFILO:  Not to 704.

7              THE COURT:  704 is admitted into evidence.

8              (Government Exhibit 704 received in evidence.)

9              THE COURT:  705?

10             MR. LESKO:  705 we may need to refresh Investigator

11   Guerci's recollection, but we're not seeking to admit it.

12             THE COURT:  That is fine.

13             MR. LESKO:  With your permission, Your Honor, we're

14   just going to discuss 704.  We're not going to publish it

15   because it needs redactions.

16             THE COURT:  Okay.

17             MR. LESKO:  Thank you.

18             THE COURT:  Proceed.

19   BY MR. LESKO:

20   Q    Investigator Guerci is the CDF Trust a trust created by

21   Clare Bronfman?

22   A    Yes, it is.

23   Q    And is it a trust where the proceeds are used or have

24   been used to fund counsel for defendants in this case?

25   A    Yes.  Based on my analysis of the account, that's

Guerci - direct - Lesko                    4601

1    accurate.

2    Q    And have the proceeds of the trust been used to fund

3    consultants for the defense in this case?

4    A    Yes, as well.

5    Q    And have you reviewed the trust bank records?

6    A    Yes, I have.

7    Q    And without getting into who was specifically paid and

8    what they were specifically paid, did you sort of calculate

9    the total amount of disbursements -- I'm sorry, of deposits

10   into this trust?

11   A    I did, yes.

12   Q    And do you recall, and I can refresh your memory if you

13   need to look at Government's 705, but do you recall the

14   amount, the total amount of deposits, into the trust?

15   A    It was approximately $14 million.

16   Q    Okay.  Was it $14,035,556?

17   A    That sounds correct.  If that's what's reflected on the

18   statement, yes, or on the schedule.

19   Q    And do you recall whether or not most of those funds were

20   deposited by Clare Bronfman?

21   A    Yes, most of them were.

22   Q    Do you recall whether someone named Jack Levy deposited

23   any amounts into the trust?

24   A    Yes.  There was also a small deposit from an individual

25   identified as Jack Levy.

1   Q    For $1,030?

2   A    Yes, that sounds correct.

3   Q    Do you recall or do you know, were legal costs associated

4   with Ms. Bronfman's defense paid for out of this trust?

5   A    They appear to have been --

6   Q    Investigator Guerci, are you familiar with a court

7   document system by the name of PACER?

8   A    Yes, I am.

9   Q    And what is PACER?

10  A    It's public access to federal court records.  It's an

11  electronic access which is something that you can go on and

12  you can do research on ongoing or former cases.

13  Q    And does PACER allow you to access official court filings

14  and court documents?

15  A    Yes, it does.

16  Q    And you can pull the document -- you can call the

17  document and print it; is that correct?

18  A    Yes, you can.

19  Q    Okay.

20       MR. LESKO:  I'm showing what's been marked as

21  Government's 762 just to Investigator Guerci.

22       THE COURT:  Go ahead.

23  Q    Do you see Government's 762?

24  A    Yes, I do.

25  Q    And based upon the heading, does it appear to be a

Guerci - direct - Lesko                    4603

1    document that was retrieved from that PACER system that you

2    described?

3    A    Yes, it certainly does.

4    Q    Does it relate to a filing in United States District

5    Court for the Northern District of Texas?

6    A    Yes, it does.

7    Q    The Dallas division?

8    A    Yes.

9    Q    Does it appear to involve a case involving the defendant?

10   A    It does.

11   Q    And does it appear to be some -- a filing from the

12   defendant?

13   A    It does, yes.

14            MR. LESKO:  Your Honor, we offer Government 762.

15            MR. AGNIFILO:  No objection.

16            THE COURT:  All right.  Government Exhibit 762 is

17   received in evidence.

18            (Government Exhibit 762 received in evidence.)

19   BY MR. LESKO:

20   Q    So this is -- who are the defendants in this case?

21   A    Microsoft Corporation and AT&T Corp.

22   Q    And the plaintiff is the defendant?

23   A    Keith Raniere, yes.

24   Q    And --

25            THE COURT:  I'm sorry, plaintiff -- plaintiff in the

Guerci - direct - Lesko                    4604

1    Texas case is --

2           MR. LESKO:  Is Keith Raniere.  I'll say Keith

3    Raniere.

4           THE COURT:  Go ahead.

5    BY MR. LESKO:

6    Q    What is the title of this document?

7    A    Declaration of Keith Raniere in Support of Plaintiff's

8    Opposed Emergency Motion for Stay of Fee Order Pending Appeal.

9    Q    And could you read -- and is it a declaration from

10   Mr. Raniere?

11   A    Yes, it is.

12   Q    The second page, is it signed by Mr. Raniere?

13   A    It is, yes.

14   Q    Okay.  And read paragraph two, please.

15   A    "I do not have access to monies of over $400,000 by

16   December 30, 2016.  Therefore, I am unable to comply with the

17   Court's order."

18   Q    Okay.  Okay.

19          MR. LESKO:  Your Honor, could I consult with my

20   colleagues very briefly?

21          THE COURT:  Sure.

22          MR. LESKO:  Thank you.

23          (Pause in proceedings.)

24   BY MR. LESKO:

25   Q    Okay, if you could just start with paragraph three, could

SN       OCR       RPR

Guerci - direct - Lesko                    4605

1    you read the start of paragraph three.  It will carry over

2    into the next page.

3    A    Certainly.  "I realize the litigation to protect my

4    patents in suit has been costly.  The litigation has been

5    gratuitously funded by First Principles LLC which controls the

6    intellectual property of NXIVM Corporation, the executive

7    training company for which I was the conceptual founder.

8    NXIVM has no interest in the patents in suit and has no

9    obligation or arrangement with me to fund this Texas

10   litigation nor share in its proceeds."

11   Q    Could you read the fourth paragraph?

12   A    "Subject to my Appellate rights to challenge the merits

13   and computation of the amount and fees and the dismissal of my

14   case, I would not oppose an executable judgment issued against

15   me for the fees and costs of the defendants and I have no

16   problem with the employment of standard collection efforts

17   against me.  I declare, under the penalty of perjury, that the

18   foregoing is true and correct and that this declaration was

19   executed under the law of the United States on December 19,

20   2016."  Signed "Keith Raniere."

21   Q    And this is submitted under the penalty of perjury; is

22   that right?

23   A    Based on that last paragraph, yes.

24   Q    Okay.  Do you have any knowledge of whether or not the

25   defendant actually has any assets in his name?

SN        OCR        RPR

Guerci - direct - Lesko                                4606

1    A    None that I'm aware of.

2    Q    Going back to Government 727, these are the checks

3    written by the defendant out of the Pam Cafritz bank account?

4    A    Yes, they are.  That's a similar one.

5    Q    So this Government's 762, was submitted on December 19,

6    2016?

7    A    Yes.

8    Q    Essentially saying that the defendant didn't have assets?

9    A    That's what it indicates; correct.

10   Q    And just a couple weeks before, December 5th, the

11   defendant made an insurance payment out of that Pam Cafritz

12   bank account; is that right?

13   A    Yes.

14

15              (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Guerci - direct - Lesko                          4607

1    (Continuing)

2    Q    And roughly a month after the defendant paid an Amex bill

3    in the amount of $29,390.32 out of that same Pam Cafritz

4    KeyBank bank account?

5    A    Yes.

6              MR. LESKO:  No further questions, Your Honor.

7              MR. AGNIFILO:  Can we approach for a second?

8              THE COURT:  Sure.

9              (Side-bar conference held on the record out of the

10   hearing of the jury.)

11

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                                4608

1         (Side-bar.)

2         THE COURT:  Okay.

3         MR. AGNIFILO:  It's my request if I can start

4    tomorrow.  I think I can consolidate and be more efficient.

5         THE COURT:  Any objection --

6         MR. LESKO:  No, Your Honor.

7         THE COURT:  -- to that?

8         That is fine.

9         MR. AGNIFILO:  Okay.  Thank you, Judge.

10        THE COURT:  I will just tell the jury that we will

11   have the cross -- there is only 20 minutes anyway, and they

12   have had a long day.

13        MR. AGNIFILO:  Thank you, Judge.

14        THE COURT:  Okay.  Thank you.

15        MR. LESKO:  And Your Honor, just a reminder, I don't

16   believe we have to start at 9:15, tomorrow.

17        THE COURT:  Oh, I remember that.

18        (Side-bar end.)

19

20        (Continued on following page.)

21

22

23

24

25

Proceedings                                    4609

1          (In open court.)

2          THE COURT:  All right.  Rather than begin the

3    cross-examination tonight, I prefer to start tomorrow morning

4    and go through in the morning with the cross.  So we will

5    start and we will start at 9:30 tomorrow morning, and we will

6    have the cross and then we will go on to the next witness from

7    there.

8          Hopefully by Thursday I will have a better sense of

9    where we are with the balance of the trial, which I am sure

10   everyone on the jury has some interest in knowing about, as

11   does the Court.

12         THE JURY:  Yes.

13         THE COURT:  So I will consult with the parties and

14   as soon as I know, I will advise the jury.

15         So please be here at 9:30 tomorrow morning.  Do not

16   discuss your testimony with anyone.  You are excused for the

17   evening.

18         THE WITNESS:  Okay.  Thank you.

19         THE COURT:  Okay.

20         All right, Members of the Jury.  Let me remind you

21   that it is very important that you follow my instruction that

22   you not discuss the case with anyone, not your family,

23   friends, business associates and not your fellow jurors.

24         In addition, you must not read, listen to, watch or

25   access any accounts of this case on any form of media, such as

Proceedings                                                          4610

1    newspapers, TV, radio, podcasts or the internet, and nor

2    should you research or seek outside information about any

3    aspect of the case.

4              Please do not communicate with anyone about the case

5    on your phone, whether through e-mail, text messaging or any

6    other means, through any blog or website or by way of any

7    social media, including Facebook, Twitter, Instagram, YouTube

8    or other similar sites.

9              You must not consider anything you may have read or

10   heard about the case outside of this courtroom, whether you

11   read it before or during jury selection, or during this trial,

12   and do not visit any of the locations identified during the

13   course of jury selection and trial.

14             So we will see you tomorrow morning at 9:30.  Have a

15   good evening.

16             All rise for the jury.

17             (Jury exits.)

18             (In open court; outside the presence of the jury.)

19             THE COURT:  Is there anything else before we

20   adjourn.

21             From the Government?

22             MS. PENZA:  No, Your Honor.

23             THE COURT:  From the defendants?

24             MR. AGNIFILO:  No, Your Honor.

25             THE COURT:  All right, 9:30 tomorrow morning.

Proceedings                                            4611

1          Thank you, everyone.

2          ALL:  Thank you.

3

4          (Matter adjourned to Wednesday, June 12th, 2019 at

5    9:30 a.m.)

6

7                          ooo0ooo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4612

1                              I N D E X

2

3    WITNESS                                        PAGE

4

5      JAY

6         DIRECT EXAMINATION RESUMED BY MR. LESKO       4368

7         CROSS EXAMINATION BY MR. AGNIFILO             4456

8         REDIRECT EXAMINATION BY MR. LESKO             4486

9         RECROSS-EXAMINATION BY MR. AGNIFILO           4487

10

11     ANTHONY VALENZIANO

12        DIRECT EXAMINATION BY MR. LESKO               4490

13        DIRECT EXAMINATION CONT'D BY MR. LESKO        4513

14        VOIR DIRE EXAMINATION BY MR. AGNIFILO         4515

15        DIRECT EXAMINATION RESUMED BY MR. LESKO       4515

16        CROSS-EXAMINATION BY MR. AGNIFILO             4527

17        REDIRECT EXAMINATION BY MR. LESKO             4532

18

19

20     RICHARD GUERCI

21        DIRECT EXAMINATION BY MR. LESKO               4536

22

23

24

25

SAM      OCR      RMR      CRR      RPR

4613

**E X H I B I T S**

| | |
|---|---|
| Government's Exhibits 447, pages 1, 2, 4 and 5 | 4449 |
| Defendant's Exhibit 1002-A | 4473 |
| Government's Exhibit 605 | 4507 |
| Government's Exhibit 619 | 4515 |
| Government's Exhibit 618 | 4518 |
| Government's Exhibit 617 | 4523 |
| Government's Exhibit 1108 | 4541 |
| Government Exhibit 724 | 4543 |
| Government's Exhibits 722, 723 and 725 | 4550 |
| Government's Exhibits 721, 726 and 727 | 4567 |
| Government's Exhibits 728 through 759 | 4583 |

SAM     OCR     RMR     CRR     RPR

4614

1

2                        **E X H I B I T S**

3

4

5      Government's Exhibit 718                          4589

6

7      Government Exhibits 761 and 761-A                 4591

8

9      Government Exhibit 804                            4592

10

11     Government Exhibit 803                            4594

12

13     Government Exhibits 805 and 801                   4596

14

15     Government Exhibit 704                            4600

16

17     Government Exhibit 762                            4603

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR