4615

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    :   18-CR-00204(NGG)
4
               Plaintiff ,      :
5                                    United States Courthouse
         -against-              :   Brooklyn, New York
6
   KEITH RANIERE, et al.,       :
7                                    June 12, 2019, Wednesday
               Defendant.       :   9:30 a.m.
8
     - - - - - - - - - - - - X
9
                   TRANSCRIPT OF TRIAL
10        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
           UNITED STATES DISTRICT JUDGE, and a jury
11
   APPEARANCES:
12
   For the Government:         RICHARD P. DONOGHUE
13                             United States Attorney
                               BY: MOIRA K. PENZA, ESQ.
14                                 TANYA HAJJAR, ESQ.
                                   MARK LESKO, ESQ.
15                             Assistant United States Attorneys
                               271 Cadman Plaza East
16                             Brooklyn, New York 11201

17 For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                               767 Third Avenue
18                             New York, New York 10017
                               BY: MARC A. AGNIFILO, ESQ.
19                                 TENY ROSE GERAGOS, ESQ.

20                             DEROHANNESIAN & DEROHANNESIAN
                               677 Broadway
21                             Albany, New York 12207
                               BY:  PAUL DerOHANNESIAN, II, ESQ.
22                                 DANIELLE R. SMITH, ESQ.

23
   Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
24                         Official Court Reporter
                           E-mail:  SMaceRPR@gmail.com
25 Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

Proceedings                                4616

1              (In open court - jury not present.)

2          (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

3               (The defendant entered the courtroom.)

4          THE COURT:  Please be seated.

5          Appearances.

6          MS. PENZA:  Moira Penza, Tanya Hajjar, and Mark

7    Lesko for the United States.

8          Good morning, Your Honor.

9          Also at counsel table is Special Agent Michael Lever

10   and Paralegal Specialist Teri Carby.

11         MR. AGNIFILO:  Good morning, Your Honor.

12         Marc Agnifilo, Teny Geragos, Paul der Ohannesian,

13   and Danielle Smith, for Keith Raniere, who is present with us

14   as well.

15         Good morning, Your Honor.

16         THE COURT:  Good morning.

17         All right, I have a letter here from the defense

18   about the irrevocable trust and how it should be handled in

19   the charge.

20         Have you seen it?

21         MS. PENZA:  I have, Your Honor.  I don't have a copy

22   with me.

23         THE COURT:  Well, here.  We have one for you.

24         MS. PENZA:  Thank you.

25         THE COURT:  Why don't you look at it at a break

Proceedings                                   4617

1    and --

2             MS. PENZA:  Okay.

3             THE COURT:  -- let me know whether you think that in

4    its current form it is appropriate or not.

5             MS. PENZA:  We will, Your Honor.

6             THE COURT:  All right?

7             MS. PENZA:  Thank you.

8             MR. LESKO:  Your Honor, I went back through my notes

9    last night, I neglected to ask just a couple of questions.  I

10   would ask permission to just ask those questions of

11   Investigator Guerci, just a handful.  It will take a minute.

12            MR. AGNIFILO:  No objection.

13            THE COURT:  All right, fine.

14            MR. LESKO:  Thank you, Judge.

15            THE COURT:  All right, let's bring in the jury.

16            (Pause.)

17            MR. LESKO:  Should we get the witness, Your Honor?

18            THE COURT:  Yes, let's bring in the witness.

19            (Witness enters the courtroom and resumes the

20   stand.)

21            (Jury enters.)

22            THE COURT:  Please be seated, everyone.

23            Good morning, members of the jury.

24            THE JURORS:  Good morning.

25            THE COURT:  We are going to have a few more

Proceedings                    4618

1    questions on direct for the current witness, and then we will

2    turn to cross-examination.

3            Mr. Lesko, go ahead.

4            MR. LESKO:  Thank you.

5            THE COURT:  I remind the witness he is still under

6    oath.

7            THE WITNESS:  Yes, sir.

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jay - direct - Lesko                         4619

1  **RICHARD GUERCI**,

2       previously called as a witness by the Government, having

3       been previously duly sworn/affirmed by the Courtroom

4       Deputy, was examined and testified further under

5       oath as follows:

6  DIRECT EXAMINATION CONTINUES

7  BY MR. LESKO:

8  Q    Good morning, Investigator Guerci.

9  A    Good morning.

10 Q    I just have a few more questions for you.

11 A    Yes, sir.

12 Q    I am going to show you what's in evidence as

13 Government's 725.  We went through this.

14       This is the schedule you prepared regarding charges

15 related to Pamela Cafritz's American Express card account

16 ending in Nos. 42002, is that right?

17 A    Yes, it is.

18 Q    And the schedule that you prepared involved charges from

19 November 7th, the date -- November 7th, 2016, the date of

20 Pamela Cafritz's death.

21       Until -- what is the last date of the charges that

22 you reviewed?

23 A    February 8th, 2018.

24 Q    Okay.  And could you just tell us what the total amount

25 of charges were on the American Express credit card from

Guerci - cross - Agnifilo                    4620

1   November 7th, 2016, until February 8th, 2018?

2   A     Approximately, $135,000.

3   Q     And in your review of the -- the statements related

4   Ms. Cafritz's American Express card account ending 42002, was

5   Pamela Cafritz an authorized user of that card?

6   A     Yes, she was.

7   Q     And were there any other authorized users of that card?

8   A     Not based on the information from the statements or

9   information I obtained from American Express, no, there were

10  not.

11  Q     Thank you.

12              MR. LESKO:  No more questions.

13              THE COURT:  All right, cross-examination, please.

14              MR. AGNIFILO:  Thank you, Your Honor.

15  CROSS-EXAMINATION

16  BY MR. AGNIFILO:

17  Q     Good morning, Investigator Guerci.

18  A     Good morning.

19  Q     We know each other, we've worked on other cases together?

20  A     Yes, sir.

21  Q     I'm Marc Agnifilo.  I represent Keith Raniere.  I am

22  going to ask you some questions this morning.  I won't have

23  you on there long.

24              If I ask you a question that is not clear to you,

25  just ask me to rephrase it.  I'm happy to do that.

SAM      OCR      RMR      CRR      RPR

1    A    Thank you.  I will, sir.

2    Q    All right.  So you covered this yesterday.  I'm referring

3    now to Government's Exhibit 724 in evidence.

4          This is what we were looking at yesterday as the

5    "Petition for Resignation of Executor and Appointment of

6    Successor Executor" for the will of Pam Cafritz, correct?

7          (Exhibit published.)

8    A    Yes.  Uh-hum.

9    Q    All right.  And I think that we looked at, as attachment

10   to that same exhibit, is the actual will of Pam Cafritz,

11   right?

12   A    Yes.

13   Q    Okay.  And I think we also looked at yesterday, this is

14   page 3 of the petition, the different people that are sort of

15   named in the will.

16         (Exhibit published.)

17   BY MR. AGNIFILO:

18   Q    And Keith Raniere is the one on the bottom, correct?

19   A    Yes, correct.

20   Q    And it indicates that he is the sole beneficiary of the

21   estate through his beneficial interest in the Pamela Anne

22   Cafritz Living Trust, Nominated Trustee of the Pamela Anne

23   Cafritz Living Trust, right?

24   A    That's what it indicates, yes.

25   Q    And he stands to be the sole beneficiary of the estate

Guerci - cross - Agnifilo                    4622

1  through the trust, correct?

2  A    Based on this document, yes.

3  Q    Okay.  So while he is -- he is resigning his position as

4  executor of the will, he still stands to -- he's not resigning

5  his position as sole beneficiary of the trust by this

6  document, right?

7  A    Not based on this document.

8  Q    Okay.  And in no other documents that you looked at, did

9  Keith Raniere give up his standing as the sole beneficiary of

10 the estate, correct?

11 A    None that I reviewed.

12 Q    Okay.  So just -- I don't do trust and estates work for a

13 living, so I am just going to ask you some questions.  If you

14 know the answer, great.  If not, we'll just move on.

15 A    Okay.

16 Q    Okay.  So one of the things that happens in a will is

17 that there's an executor, correct?

18 A    That's my understanding, yes.

19 Q    Okay.  And the executor does certain executive-type

20 things in regards to the will, determines, you know, how

21 property is going to be handled, sort of handles the will

22 because the person who wrote the will is deceased, correct?

23 A    My limited knowledge in this area, that's my

24 understanding.

25 Q    Okay.  And I think -- let me make sure of this.  If I'm

SAM      OCR      RMR      CRR      RPR

Guerci - cross - Agnifilo                    4623

1   not mistaken, I think we covered this yesterday.

2           Rosa Laura Junco stood to be the executor if Keith

3   Raniere was not the executor.  So Keith was the primary

4   executor and Rosa Laura was the secondary executor?

5   A    That's correct, yes.

6   Q    Okay.  And so what Keith was doing, he was giving up his

7   rights to be the executor, causing Rosa Laura to be the

8   executor, correct?

9   A    Yes.

10  Q    All right.  I want to go through some of the records.

11          MR. AGNIFILO:  I'll find them, Judge.

12  BY MR. AGNIFILO:

13  Q    722.

14  A    Okay.

15          (Exhibit published.)

16  Q    722, I think we talked about yesterday.  These are

17  American Express records, right?

18  A    Well, 722 is the certificate of authenticity in the

19  records, yes.

20  Q    Right.  So it's the authenticating certificate from

21  someone from American Express saying that these are the

22  authentic American Express records, which comprise the balance

23  of these being -- of 722, right?

24  A    Yes.

25  Q    All right.  So I just want to go through a few of those.

Guerci - cross - Agnifilo                              4624

1    A    Okay.

2    Q    Okay.  And looking at your Exhibit 725 for a minute, bear

3    with me.

4    A    No problem.

5             (Exhibit published.)

6    Q    725 is your chart, correct?

7    A    Yes.

8    Q    All right.  And here you're talking about an account

9    ending 42002, correct?

10   A    Yes.

11   Q    Do you know if that account had a prior account number

12   before it was 42002?

13   A    In fact, it did, yes.

14   Q    Okay.  All right.  So we are going to go through some of

15   those records.

16   A    Okay.

17   Q    This is Government's Exhibit 722-2.  It's already in

18   evidence.

19             (Exhibit published.)

20   BY MR. AGNIFILO:

21   Q    And -- okay.  So here (indicating) and we are just really

22   focused on the account number for a minute.

23             It's Pamela Anne Cafritz.  It's the account with a

24   closing date of January 11th, 2015.  So she is alive?

25   A    Yes.

Guerci - cross - Agnifilo                    4625

1  Q    Okay.  It's more than a year -- more than a
2  year-and-a-half before her death, correct?
3  A    Correct.
4  Q    And the account here is account ending 2-41004.
5        Do you see that?
6  A    Yes, I do.
7  Q    Okay.  And just by way of comparison, you already said
8  that the number changed, it changed because when you were
9  charting it, it was ending in 42002, correct?
10  A    Yes, for the period of time.
11  Q    Got it.  All right.  So let's go through some of these
12  records.
13        All right.  I'm going to direct your attention to
14  Government Exhibit 722, page 84.
15        (Exhibit published.)
16  BY MR. AGNIFILO:
17  Q    All right.  So this is Pamela Anne Cafritz, closing date
18  of August 11th, 2015.
19        Do you see that?
20  A    I do.
21  Q    All right.  And we are going to go to one of the pages of
22  this particular monthly statement, which is noted as
23  Government's 722-87.
24        (Exhibit published.)
25  Q    And I am going to have you look at this entry, which is

SAM      OCR      RMR      CRR      RPR

Guerci - cross - Agnifilo                    4626

1     the second entry there.

2            And it shows a Delta Airlines flight for Marianna,

3     correct?

4     A    It does, yes.

5     Q    Okay.  And so this is, you'll agree with me, this is the

6     fourth page of this monthly statement from Pam Cafritz,

7     correct?

8     A    Yes.

9     Q    All right.  So what we're seeing in Pam Cafritz's

10    account, a full -- over a year before she passed away, is we

11    have Marianna flying on a Delta flight, it looks like, between

12    JFK and Mexico City, correct?

13           (Exhibit published.)

14    A    That's what this suggests, yes.

15    Q    All right.  We are going to fast forward to

16    Government's 722, page 132.

17           (Exhibit published.)

18    Q    Page 132 of Government 722 is another Pamela Anne Cafritz

19    American Express account statement, this one with a closing

20    date of December 11th, 2015, correct?

21    A    Yes.

22    Q    All right.  So Pam is alive here, correct?

23    A    Correct.

24    Q    And we are going to go to page 4.

25           (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Guerci - cross - Agnifilo                    4627

1    BY MR. AGNIFILO:

2    Q    And we see here at the bottom on November 12th, 2015,

3    there are Delta Airline flights for -- the first entry is

4    Keith Raniere to go to, it looks like, Rochester, Minnesota by

5    way of Detroit.

6              Do you see that?

7    A    I do.

8    Q    Okay.  And then under that we have Marianna from the same

9    date, November 12th, 2015, going from the same place to the

10   same place, right?

11   A    Correct.

12   Q    All right.  And then the last of these three entries is

13   Pam Cafritz, who appears to be traveling with Keith and

14   Marianna, going from -- going to Rochester, Minnesota by way

15   of Detroit.

16             Do you see that?

17   A    Yes, I do.

18   Q    And this -- again, this is all on Pam's credit card,

19   right?

20   A    Yes.

21   Q    Okay.  We are going to fast forward.  This is

22   Government's Exhibit 722, page 200.

23             (Exhibit published.)

24   Q    This is Pam Cafritz, her account, with a closing date of

25   5/11/16.

1           Do you see that?

2   A    I do.

3   Q    And I think one of the things you testified to yesterday

4   is that there was -- there were expenditures after Pam had

5   passed away to Speedpay National Grid 2.

6           Do you remember those?

7   A    I do.

8   Q    All right.  I think you said that was a utility company?

9   A    That is a utility company, yes.

10  Q    Okay.  And so here we see payments to that utility

11  company from Pam's credit card while Pam is alive,

12  on April 11th, 2016, correct?

13  A    I do see that, yes.

14  Q    And if we continue on in this exhibit, we see at the

15  bottom here, we see it looks like airlines tickets for Pam

16  Cafritz from 4/28/16.

17          Do you see that?

18          (Exhibit published.)

19  A    I do.  I see it's for -- it looks like it's for baggage

20  charges.

21  Q    Yes, for baggage charges?

22  A    Yes.

23  Q    Let's go to the next page.

24          (Exhibit published.)

25  BY MR. AGNIFILO:

Guerci - cross - Agnifilo                    4629

1   Q    And I think we have baggage charges also on the next page

2   for Marianna as well, correct?

3   A    Yes --

4   Q    And then --

5   A    -- on 4/28/16.

6   Q    I'm sorry.  I cut you off.

7   A    On 4/28/16, yes.

8   Q    Right.  And then we have an upgrade charge from that same

9   date for Marianna, correct?

10  A    Yes, we do, right.

11  Q    All on Pam's credit card?

12  A    Yes.

13  Q    Okay.  The next date we have Pam's AMEX card closing date

14  June 10th, 2016, right?

15            (Exhibit published.)

16  A    Yes.

17  Q    Okay.  And we have some entries here on the top.  We have

18  "Amazon Marketplace."

19            Do you see that?

20  A    I do.

21  Q    And we have "Anthropology"?

22  A    I do see that on June 3rd --

23  Q    Okay.  And --

24  A    -- and June 4th.

25  Q    And do you remember if those were some of the places --

SAM     OCR     RMR     CRR     RPR

Guerci - cross - Agnifilo                    4630

1   some of the stores that had charges from Pam's credit card

2   after she passed away, the Amazon Marketplace and

3   Anthropology?

4   A    They were, in fact, yes.

5   Q    Okay.  Fast forward.  This is Government Exhibit 722,

6   page 280.

7              (Exhibit published.)

8   BY MR. AGNIFILO:

9   Q    Do you see that at the bottom?  There you go.

10             And this is Pam Anne Cafritz's American Express card

11  with a closing date of 10/11/16.

12  A    Yes.

13  Q    Do you see that?

14  A    Yes, sir.

15  Q    Okay.  And it shows a number of airlines reservations

16  here from 9/23/16.  First we see Pam Cafritz traveling on

17  American Airlines, it looks like, to Dallas.

18             Do you see that?

19             (Exhibit published.)

20  Q    That looks like a miscellaneous -- like a tax associated

21  with an airlines reservation?

22  A    I see that, yes.

23  Q    Okay.  And then under it there is Pam Cafritz for a

24  passenger ticket, a flight it looks like, between Albany and

25  Dallas?

Guerci - cross - Agnifilo                    4631

1   A    I do see that, yes.

2   Q    All right.  And then under that we have Marianna, looks

3   like a passenger ticket between Albany and Dallas?

4   A    Yes.

5   Q    And then under that we have Keith Raniere, a passenger

6   ticket between Albany and Dallas?

7   A    Yes, I see that as well.

8   Q    And I think a couple of pages later in that same monthly

9   statement, we have -- we have Keith Donato.

10           (Exhibit published.)

11  BY MR. AGNIFILO:

12  Q    I think we talked about him yesterday?

13  A    Yeah, we referenced charges to him yesterday.

14  Q    Right.

15           And so this is a charge to Keith Donato from Pam

16  Cafritz's credit card while she was alive, correct?

17  A    Yes.

18  Q    Now, as part of your investigation, do you know if Pam

19  and Marianna and Keith were living together?

20  A    Not based -- not based on my knowledge.  I'm not certain.

21  Q    So you were just looking at the finances?

22  A    Yes.

23  Q    Okay.  All right.  We are going to look at the next -- it

24  looks like the next month.  This is Pam Anne Cafritz's

25  American Express card, closing date 11/10/16.

Guerci - cross - Agnifilo                    4632

1          Do you see that there?

2          (Exhibit published.)

3    A    I do.

4    Q    I'm going to go to one particular page in this monthly

5    statement, and we are going to look at the bottom.

6          (Exhibit published.)

7    Q    And on her credit card we see a -- it looks like a

8    passenger airline travel for Marianna between, it looks like,

9    to Washington National Airport?

10   A    From Washington National, yes.

11   Q    Yes.

12         Then on the next page we have airline reservations

13   for Pam Cafritz and for Keith Raniere, correct?

14         (Exhibit published.)

15   A    I see that on 10/16, yes.

16   Q    And that's all on Pam's credit card and reflected in that

17   monthly statement, correct?

18   A    Yes, sir.

19   Q    And I want to talk about -- you talked about a defense

20   trust yesterday, right?

21   A    Yes.

22   Q    Okay.  Do you have -- it's your chart, 705, and you were

23   using it for reference.

24         Do you have it in front of you?

25   A    I do not at this time, no.

SAM      OCR      RMR      CRR      RPR

Guerci - cross - Agnifilo                    4633

1   Q    You don't?  All right.

2            MR. AGNIFILO:  Bear with us.  Mr. Lesko is going to

3   save the day.

4            THE WITNESS:  No problem.

5            MR. AGNIFILO:  I have a copy.  Mine has some notes

6   on it, but I don't care.

7            THE COURT:  For the witness?

8            MR. AGNIFILO:  Yes, for the witness, Judge.

9            Can I approach the witness, Your Honor?

10           THE COURT:  Yes, you may.

11           THE WITNESS:  Thank you.

12  BY MR. AGNIFILO:

13  Q    Did you have reason to total up the number of law firms

14  that were drawing money from the trust?

15  A    Did I have reason to?  I did do it.

16  Q    Okay.  That's good enough.

17           You did do it?

18  A    Yes, I did do it.

19  Q    All right.  And what was the total number of law firms?

20  A    I'd have to count them up.  I don't recall specifically.

21  Q    Could you do that?

22           Let me ask you a question.  It's more than 15?

23  A    (No response.)

24  Q    I don't want to put words in your mouth.  Take your time.

25  A    (Witness complies.)

Guerci - cross - Agnifilo                    4634

1        Yes, between law firms and individual lawyers that
2   were paid, it's in excess of 15.
3   Q    Okay.  And could you tell, is it in excess of 20?
4   A    It was in or about 20.
5   Q    Okay.  All right.
6   A    I do have a breakdown of it, but I don't have it before
7   me.
8   Q    Right.  That's all right.
9        And these were law firms that represented different
10  people or entities that figured one way or another into the
11  Government's investigation in this case, correct?
12  A    That's clearly my understanding, yes.
13  Q    Okay.  And so it wasn't just individual human beings, it
14  was also corporations, correct?
15  A    Law firms, yes.
16  Q    No.  No.  I'm saying the law firms represented
17  corporations.
18  A    Oh, in the investigation?
19  Q    Yes.
20  A    Yes.
21  Q    And one particular firm, do you know Quarles & Brady, is
22  that one of the firms that got funding from the trust?
23  A    Yes, they were clearly a firm that was paid from this
24  trust.
25  Q    Okay.  And do you know if they represented Lauren

Guerci - cross - Agnifilo                     4635

1    Salzman?

2    A    I don't know who they represented.

3    Q    I think one of the things we went through yesterday is,

4    we went through -- and I think it's Government's Exhibit 801.

5              (Exhibit published.)

6    Q    Do you remember talking about this yesterday, Mr. Guerci,

7    about the records of border crossings?

8    A    I do, yes.

9    Q    And just to go through some of the contents of this --

10             THE COURT:  That's in evidence, correct?

11             MR. AGNIFILO:  It is.  It is.  It is, Judge.

12             THE COURT:  Go ahead.

13             MR. AGNIFILO:  It was put in evidence in the direct.

14             THE COURT:  Right.  Yes.  Yes.

15   BY MR. AGNIFILO:

16   Q    Okay.  So one of the entries here relates to someone

17   named -- yes, Camila.

18             (Exhibit published.)

19             MR. LESKO:  Objection, Your Honor.

20             MR. AGNIFILO:  It's not in evidence?

21             (Exhibit no longer published.)

22             THE COURT:  Is only the cover page in evidence; is

23   that it?

24             MR. LESKO:  And the last page.

25   Q    Is this something you prepared?

SAM      OCR      RMR      CRR      RPR

Guerci - cross - Agnifilo                          4636

1             MR. AGNIFILO:  Can we just show it to the witness,

2   just the witness?

3             THE COURT:  Sure.  One minute.

4             Go ahead.

5             MR. AGNIFILO:  Okay.

6   BY MR. AGNIFILO:

7   Q    Mr. Guerci, is this something that you prepared as part

8   of Government's Exhibit 801?

9   A    No, nothing I prepared, nor is it anything I've seen

10  before.

11  Q    Did you ever see this before?

12  A    That particular document?

13  Q    Yes.

14  A    No.

15  Q    You never saw this before?

16  A    Not that document, no.

17            MR. AGNIFILO:  Your Honor, can we have a sidebar for

18  a second?

19            THE COURT:  Go ahead.

20            (Sidebar held.)

21

22            (Continued on following page.)

23

24

25

```
                          Sidebar                          4637
```

1          (The following sidebar occurred outside the hearing
2     of the jury.)
3          THE COURT:  Okay.
4          MR. AGNIFILO:  First, I'm somewhat confused because
5     what we were given as 801 is this (indicating), which has all
6     of these -- let me -- just give me one second, which has these
7     attachments to it.  I understood this was one document.
8          It also has a seal from the U.S. Department of
9     Homeland Security.  So I don't know that -- I don't know what
10    the basis would be to not have it in evidence.
11         MR. LESKO:  Your Honor, the Exhibit 801 redacts all
12    of the names, except for Lisa Chenoa, and it's just one page
13    and it relates to the crossing of a person using the name Lisa
14    Chenoa.
15         So there is no other document related to any other
16    individuals who may have crossed.
17         So this is the exhibit.  I'm holding it.  It's a
18    two-page exhibit with redactions on the first page.
19         MR. AGNIFILO:  All right, so --
20         MS. GERAGOS:  I think the confusion here is that
21    wasn't the exhibit we were given.  So Mr. Agnifilo -- when
22    Mr. Agnifilo didn't object to it, it's because we -- the
23    exhibit that we had was a lengthy exhibit.
24         So I think that there's a bit of confusion, because
25    we're operating -- we're just --

                SAM      OCR      RMR      CRR      RPR

Sidebar                                              4638

1        MR. AGNIFILO:  We were given this, yes, with certain
2   redactions, but with all of the content as the exhibit.
3        MR. LESKO:  Your Honor, this document was admitted.
4   We showed it to the witness before Your Honor admitted the
5   exhibit.  It was shown to defense counsel at the time.
6        I mean, this is the exhibit.  That's (indicating)
7   not the exhibit.
8        MR. AGNIFILO:  So, do you have an objection to
9   putting this in, not through this witness?
10       MS. PENZA:  I have to look at it.  That's in your
11  case.  If you want to put on a case --
12       MR. AGNIFILO:  We'll put it in on our case.
13       MS. PENZA:  We have to review this is the short
14  answer.
15       THE COURT:  Can we go on to something else while you
16  review it?
17       MR. LESKO:  I'll also note, this witness has not
18  reviewed these records.
19       MR. AGNIFILO:  I am not going to do it through this
20  witness, but I want the evidence in.  We'll do it on our case,
21  if we have to.
22       THE COURT:  Then we don't have to decide anything
23  now, which is exactly where I wanted to be.
24       MR. AGNIFILO:  All right, then that's where we are.
25  Thank you.

Sidebar                                          4639

1          THE COURT:  Thank you.

2          (Sidebar concluded.)

3

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                      4640
```

1          (In open court - jury present.)

2          THE COURT:  All right, let's move ahead.

3   BY MR. AGNIFILO:

4   Q    I have a couple of questions about what's been admitted

5   into evidence as Government's Exhibit 718.

6          (Exhibit published.)

7   Q    718 is the "Certificate of Authority of Business Records"

8   for American Express records concerning someone named Daniela

9   Bergeron.

10  A    Yes, that's correct.

11  Q    And I think you covered these two things yesterday.

12         I think you said on June the 5th, 2017, there was a

13  payment for $1,730.90, correct?

14  A    No, I said that was a credit.

15  Q    I'm sorry.  I'm sorry.  A credit.

16  A    There was a credit for that amount --

17  Q    Right.  Right.

18  A    -- on that date.

19  Q    And before that, you have -- what is that?  What's that

20  entry at 5/28/17?

21  A    There was a charge on the account to XR, LLC, for

22  $1,730.90.

23  Q    Right.  And then you're seeing the credit about a week or

24  so later, correct?

25  A    Yes, on June 5th.

```
                        Sidebar                      4641
```

1    Q    Okay.  And did you -- as part of your research, did you

2    see if that was something called Extreme Restraints, LLC?

3    A    That's my understanding.

4    Q    And so this was a purchase by Daniela Bergeron?

5    A    On her credit card.

6    Q    On her credit card?

7    A    Yes.

8    Q    I want to go over some of the Kathy Russell records with

9    you that you reviewed yesterday.  This is Government's

10   Exhibit 761 in evidence.

11             (Exhibit published.)

12   Q    Do you see that?

13   A    Yes, I do.

14   Q    Okay.  And I think you discussed briefly one particular

15   entry --

16             THE COURT:  This is in evidence?

17             MR. AGNIFILO:  It is, Judge, yes.

18             THE COURT:  All right, go ahead.

19   BY MR. AGNIFILO:

20   Q    -- one particular entry on December 24th, 2004, correct?

21   A    That's one of the ones I highlighted, yes.

22   Q    Right.  And was this the -- this is a Sunoco, and was it

23   in Clifton Springs?

24   A    Yes --

25   Q    Okay.

```
                              Sidebar                        4642

1    A      -- for $26.36.

2    Q      All right.  And that's in the United States between

3    Rochester and Buffalo?

4    A      Yes.

5

6             (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Guerci - cross - Agnifilo                    4643

1    BY MR. AGNIFILO:  (Continuing.)

2    Q    When you reviewed -- you reviewed records of one person

3    crossing the border, a Lisa Chenoa; correct?

4    A    Yes.

5    Q    Did you review whether Kathy Russell crossed the border?

6    A    I did not.

7    Q    And, finally, I want to go through some debit card

8    records.

9    A    Okay.

10   Q    And some other records, Key Bank records.  And this is

11   all in evidence as Government Exhibit 721.  Okay.  Now, I

12   think you testified that at a certain point Keith Raniere

13   started signing checks in his own name on Pam Cafritz's

14   account; correct?

15   A    Yes, that's correct.

16   Q    Let me show you some examples.

17          THE COURT:  This is in evidence?

18          MR. AGNIFILO:  It is, Judge.  721.

19          THE COURT:  Okay.

20   Q    So we're looking at 721, page 378.

21          (Exhibit published.)

22   BY MR. AGNIFILO:

23   Q    And so here, for example, we have a check from January

24   20, 2017; correct?

25   A    Yes.

SN        OCR        RPR

                        Guerci - cross - Agnifilo                4644

1   Q     And by this point Pam Cafritz has passed away; right?

2   A     She has.

3   Q     And Keith Raniere is clearly signing his own name, Keith

4   Raniere?

5   A     He is.

6   Q     To your knowledge did the bank ever reject any of these

7   checks?

8   A     Not to my knowledge, no.

9   Q     And just to continue, he signs the next one Keith Raniere

10  on January 27, 2017; correct?

11  A     He does.

12  Q     All right.  And then the next one on the same date,

13  January 27, 2017; correct?

14  A     Yes, he does.

15  Q     And he signs his own name regularly on all the checks

16  that you had in that one report that you filled out, correct,

17  the report that you did?

18  A     Yes, for that period of time he did.

19  Q     You have no evidence that he ever signed Pam Cafritz's

20  name as Pam Cafritz?

21  A     Not to the best of my knowledge.

22  Q     Okay.  What your chart showed is that at a certain point

23  in time after Pam passed away Keith started signing Keith

24  Raniere to that account; right?

25  A     Yes, up to a certain point, yes.

                        SN      OCR      RPR

Guerci - redirect - Lesko                          4645

1   Q    And I think what you also said was the bank processed all

2   of those checks to your knowledge; correct?

3   A    They did, yes.

4         MR. AGNIFILO:  I don't have anything else.  Thank

5   you.

6         THE COURT:  Redirect?

7         MR. LESKO:  Could I have just one moment?

8         (Pause in proceedings.)

9         MR. LESKO:  Just a few questions, Your Honor.

10        THE COURT:  All right.  You may go ahead.

11        MR. LESKO:  Thank you, Judge.

12  REDIRECT EXAMINATION

13  BY MR. LESKO:

14  Q    I just have a few questions for you, Investigator Guerci.

15  Sir, you were asked questions about Mr. -- the defendant's

16  role as the executor of Ms. Cafritz's estate, do you remember

17  that on cross-examination?

18  A    Yes.

19  Q    Are you generally familiar with the duties and

20  responsibilities of an executor of an estate?

21  A    Generally.

22  Q    Okay.  So executors of estates are allowed, in limited

23  instances, to incur expenses related to the administration of

24  an estate?

25  A    That's been my understanding, yes.

Guerci - redirect - Lesko                    4646

1    Q    So, I'm showing you Government 725.

2              THE COURT:  In evidence?

3              MR. LESKO:  In evidence, yes.

4    BY MR. LESKO:

5    Q    And I'm going to show you the fourth page of 725.  So, in

6    your experience, would the purchase of a cashmere sweater and

7    a Donegal blazer for $4,457 be the sort of an expense that an

8    executor be allowed to incur?

9    A    Not based on my knowledge, no.

10   Q    And would -- we went through probably dozens of -- strike

11   that.  Would chiropractic treatments be typically allowable

12   expenses incurred by an executor?

13   A    Not based on my knowledge, no.

14   Q    So, Mr. Agnifilo asked you questions about the schedule

15   you prepared related to the trust created by Ms. Bronfman to

16   pay defense legal expenses.  Do you remember that?

17   A    Yes.

18   Q    And that's the trust, I think you testified previously,

19   that Ms. Bronfman provided $14 million to?

20   A    Yes, it is.

21   Q    And Mr. Agnifilo asked you a specific question about a

22   specific law firm, do you remember that?

23   A    Yes, he did.

24   Q    Did the -- did the majority or vast bulk of the payments

25   out of that $14 million trust, did they go to just a few law

SN        OCR        RPR

Guerci - recross - Agnifilo                              4647

1    firms?

2    A    No, it went to many.  The majority of it went to a few

3    law firms.

4    Q    Just a very few?

5    A    Yes, the majority of the funds.

6              MR. LESKO:  No further questions.

7              MR. AGNIFILO:  I have one question.

8              THE COURT:  Go ahead.

9    RECROSS-EXAMINATION

10   BY MR. AGNIFILO:

11   Q    Do you know if Marianna was buying things on Pamela's

12   credit card, for instance the cashmere blazer?

13   A    Do I know that?  I do not.

14   Q    One last question, do you have any reason to think that

15   Pam would object to these purchases?

16             MR. LESKO:  Objection.

17             THE COURT:  Sustained.

18             With regard to the $14 million in the irrevocable

19   trust, are you opining on or have an understanding of whether

20   the payment of those funds to various lawyers for other

21   defendants and the person creating the trust is appropriate or

22   legal?

23             THE WITNESS:  Am I opining on that?  I am not.

24             THE COURT:  You are not.

25             THE WITNESS:  No.

Guerci - recross - Agnifilo                    4648

1          THE COURT:  Okay.  Anything else?

2          MR. LESKO:  No, Your Honor.

3          MR. AGNIFILO:  No.

4          THE COURT:  You may stand down.  You are excused.

5          THE WITNESS:  Thank you.

6          (Witness excused.)

7          THE COURT:  You may call your next witness.

8          MR. LESKO:  The Government calls Dr. Keith Donato,

9   Your Honor.

10         (Witness sworn/affirmed.)

11         THE COURT:  Please be seated and state and spell

12  your full name for the record.

13         THE WITNESS:  Keith Donato.  K-E-I-T-H D-O-N-A-T-O.

14         THE COURT:  You may inquire.

15         MR. LESKO:  Thank you, Judge.

16         (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Donato - direct - Lesko                                      4649

1   **KEITH DONATO**,

2               called by the Government, having been

3               first duly sworn, was examined and testified

4               as follows:

5   DIRECT EXAMINATION

6   BY MR. LESKO:

7   Q    Good morning.

8   A    Good morning.

9   Q    Dr. Donato, where do you live?

10  A    Ballston Spa, New York.

11  Q    Is that in Upstate, New York?

12  A    Correct.

13  Q    Is it near Albany?

14  A    Yes, just north of Albany.

15  Q    And what do you do for a living?

16  A    I'm a chiropractor.

17  Q    And could you describe your practice as a chiropractor?

18  A    Yes.  I treat many different musculoskeletal overuse,

19  sports-injury-type conditions and injuries.

20  Q    And you're a doctor?

21  A    Correct.

22  Q    What type of a doctor are you?

23  A    A doctor of chiropractic.

24  Q    And what's is the name of your practice?

25  A    I just use my name, Keith Donato DC.

Donato - direct - Lesko                                    4650

1    Q    And how long have you been in practice?

2    A    23 years.

3    Q    Do you have a license?

4    A    Yes, I do.

5    Q    And where is your office?

6    A    My office is in Saratoga Springs, New York.

7    Q    Are you familiar with an organization called NXIVM?

8    A    Yes.

9    Q    How are you familiar with NXIVM?

10   A    I treated many of the people involved in the

11   organization.

12   Q    Can you name some of them?

13   A    Yes.   Keith Raniere, Nancy Saltzman, Lauren Saltzman, Pam

14   Cafritz, Mark Vicente, Daniella Padilla, Loreta Garza,

15   Marianna, Jimena Garza, Omar Boone, Edgar Boone, Esther

16   Carlson, Kathy Russell.   Those are the ones that immediately

17   come to my mind.

18   Q    And we're going to be talking a little bit about

19   Marianna.   Let's call her Marianna.

20   A    Okay.

21   Q    Do you see Mr. Raniere in the courtroom today?

22   A    Yes, I do.

23   Q    Can you describe him by an article of clothing that he

24   may be wearing?

25   A    He's wearing the burgundy sweater.

Donato - direct - Lesko                                    4651

1          THE COURT:  All right.  Let the record reflect the

2    witness identified the defendant.

3    BY MR. LESKO:

4    Q    Can you tell us how the defendant became a patient of

5    yours?

6    A    Keith came to my office.  I believe it was around 2008,

7    as a patient.

8    Q    And could you describe the circumstances under which he

9    became a patient?

10   A    Yeah, I mean, what was most notable to me or different

11   than most of my patients was that I would say I was prepped

12   for when I was going to begin treating him.  I believe either

13   Clare Bronfman, Barbara Jeske or Nancy Saltzman; I can't

14   remember exactly who, just kind of prepared me that, you know,

15   Keith was -- was kind of lived a monk-like existence, for lack

16   of a better term; that he didn't drive so he would be being

17   brought to his appointments.  Somebody would be paying for his

18   appointments, making appointments for him.  So I was just kind

19   of prepped, as I said, that that was a little bit odd compared

20   to 99 percent of my adult patients.

21   Q    Did you have an understanding as to the defendant's role

22   in NXIVM?

23   A    Yes.  That part of the prep was that Keith was, you know,

24   the -- the leader or the brains of this self-empowerment group

25   and everyone spoke very highly of him and looked up to him.

Donato - direct - Lesko                                    4652

1   Q    And so you were told that he would not pay for himself?

2   A    Correct.

3   Q    So how -- did you have an understanding as to --

4   regarding how you would be compensated for treating the

5   defendant?

6   A    I just believed that whoever was prepping me let me know

7   that whoever was bringing him -- initially I didn't know who

8   would be bringing him, but it was said that whoever brings him

9   will be paying for his visits so don't expect -- he's not

10  going to be paying so collect the compensation from whoever

11  brought him.

12  Q    And how do you in your business handle booking

13  appointments and receiving compensation?

14  A    Well, I'm a one-man show so I do it all.  I schedule

15  everyone, I collect payments.  I make statements up so it's

16  all me.

17  Q    And do you remember the first time you treated the

18  defendant?

19  A    Other than what I stated as far as being prepped and

20  someone bringing him and other than that it was nothing

21  unordinary about it.

22  Q    Do you recall how you were paid?

23  A    Yeah.  Again, I can't remember who paid for that first

24  visit.  I may have been Clare Bronfman or Pam Cafritz but he

25  didn't pay.  I know that.

SN        OCR        RPR

Donato - direct - Lesko                    4653

1   Q    So how often did you treat the defendant?

2   A    I would see Keith regularly, sometimes weekly depending

3   on his activity level which at times could be substantial.  I

4   may not see him for a little while based on scheduling or what

5   was going on but for a period of time I would say I saw him

6   regularly, weekly, every other week.

7   Q    Did you treat him for injuries?

8   A    Yes, yeah, I treated him for injuries.  It was treatment

9   for overuse activity level and even kind of preventive care, I

10  would think.  He, like many of the people in the community,

11  looked at the type of work I did as kind of part of their

12  healthcare regimen so I saw him regularly.

13  Q    Did you actually put your hands on his body?

14  A    Yes.

15  Q    Can you describe the sort of treatments that you provided

16  to the defendant?

17  A    Well, the technique that I do is very soft-tissue based,

18  meaning it's kind of an advanced form of massage or soft

19  tissue so a lot of the work that I did not only on Keith but a

20  lot of my patients is hands-on myofacial sort of work.

21  Q    The defendant first became a patient in what year again?

22  A    2008.

23  Q    And when did he stop being your patient?

24  A    I believe it was around the fall of 2017.

25  Q    So during that time period when the defendant would

SN        OCR        RPR

1   arrive for treatments, would he arrive alone or was he

2   accompanied by anyone else?

3   A     Most of the time -- he was always accompanied by someone

4   else and most of the time he was accompanied by Pam Cafritz

5   and Marianna.

6   Q     And during the times when he was accompanied by Pam

7   Cafritz and Marianna, who paid for his treatment?

8   A     Pam Cafritz always paid.

9   Q     And how would she do that?

10  A     She always paid with a credit card.

11  Q     And describe how that physically happened, would she

12  provide you the card, would she swipe the card?  How would

13  that work?

14  A     Well, originally I had kind of a bit of an antiquated

15  credit card system where someone would hand me the card, I

16  would slide it and the paper would come out and I would hand

17  the paper to her and she would sign it.  And over the last few

18  years I upped my technology to using what's called a square

19  reader, which is an app on my phone that I can plug a strip

20  reader into and I would slide the card.  The process would go

21  through, I would hand the patient my phone, which has an area

22  to sign on, they would sign, press "Charge" and that's mostly

23  the way it would go.

24  Q     So let's just discuss this square reader just briefly.

25  A     Sure.

Donato - direct - Lesko                                    4655

1    Q    Was it a little device that plugs into your phone?

2    A    Yes.

3    Q    And it has the ability to swipe a card through it?

4    A    Exactly, into the -- into the headphone jack.  That's

5    where I plug it in and it has a little slot for a credit card

6    to slide through and it reads the strip on the card and the

7    screen spins around as it's processing the card.  Once the

8    charge is accepted, it pulls up a screen for the cardholder's

9    signature.

10   Q    And you use the Square app on your phone to do all of

11   this?

12   A    Correct, yes.

13   Q    Is there an alternative way to process a credit card on

14   the Square app?

15   A    Yes, there's a chip reader and there's also manual

16   entries.  So on the app, if someone does not have the card

17   with them and I press "Charge," it goes to manual card entry,

18   I would press that to access that screen and a screen, much

19   like a phone with numbers, comes up and the patient can then

20   manually punch in the numbers for their credit card and the

21   expiration date.

22   Q    Very well.  And you give them your phone and they sit and

23   punch the numbers in?

24   A    Correct.  Sometimes I'll hold it for them.  But mostly

25   they're manually entering and I'm not holding anyone's cards.

Donato - direct - Lesko                                    4656

1    Q    Did there come a time when you began holding regular

2    appointments for members of the NXIVM community outside of

3    your office for NXIVM members?

4    A    Yes.

5    Q    When did that happen?

6    A    It was August of 2016.

7    Q    Could you describe those situations, please?

8    A    Well, around that time Pam Cafritz, her -- she had

9    become, her health had deteriorated to the point that travel

10   became difficult for her and at that point Clare Bronfman had

11   requested if I would be willing to spend a day at a location.

12   It turned out to be Nancy Salzman's house to treat everyone

13   and at the time I was treating so many of the community, it

14   worked out for me schedule-wise to be able to just condense

15   everybody into one day and go down to Nancy's house.  And I

16   liked Pam and I was fine easing the burden of travel on her at

17   that time.

18   Q    And do you remember, you may have said it, do you

19   remember the day of the week?

20   A    It was mainly Wednesdays.  It may have changed once or

21   twice in the scheduling.  But 99 percent of the times it was

22   Wednesdays.

23   Q    So, did you schedule those appointments with people at

24   NXIVM?

25   A    I didn't do any of the scheduling.  That was part of the

Donato - direct - Lesko                    4657

1   agreement with Clare and Clare initially was doing all the

2   scheduling --

3   Q    Let me stop you there.  At some point did someone named

4   Sylvie take over the scheduling?

5   A    Yeah, Sylvie took over the scheduling.

6   Q    So you would go to Nancy Salzman's house and do

7   appointments; is that right?

8   A    Correct.

9   Q    Do you remember where in Nancy Saltzman house you did

10  these --

11  A    Yeah, in the basement.

12  Q    How did you get paid when you went to Nancy Salzman's

13  house?

14  A    Well, because of the Square, the mobile app on the

15  Square, I could bring my reader with me and everyone I treated

16  with generally would bring a card with them and would be able

17  to pay me right after the treatment at Nancy's house.

18  Q    Did you treat the defendant at Nancy Salzman's house?

19  A    Yes.

20  Q    How were you paid when you treated the defendant?

21  A    The payment continued the same.  Pam Cafritz always paid.

22  Q    So did you become aware that Pam Cafritz passed away?

23  A    Yes, I did.

24  Q    And did you continue to see the defendant as a patient

25  after she passed away?

Donato - direct - Lesko                                    4658

1    A    Yes.

2    Q    And where -- where were those treatments?  Were they at

3    Nancy Salzman's or at your office?

4    A    No.  They were still at Nancy Salzman's house.

5    Q    And, so, how were you paid for those treatment sessions,

6    the ones involving the defendant after Pam Cafritz passed

7    away?

8    A    After Pam passed away, Marianna took over responsibility

9    for covering the payments for Keith's visits and her visits

10   also.

11   Q    Okay.  And, so, describe how that would work, how would

12   that process happen?

13   A    Well, the last view visits before Pam passed, she began

14   to forget her credit card regularly and she would ask me if

15   she could manually punch in the numbers for her card and I had

16   no problem with that.

17             After she passed and Marianna took over the

18   payments, the manual entry continued pretty much from that

19   time forward from when I said Pam initially began the manual

20   entry.

21   Q    Let me break this down.  So before Pam started

22   deteriorating, her health deteriorating, did she always swipe

23   the card, to the best of your knowledge?

24   A    Yes, absolutely.

25   Q    And then she starts to decline and she starts to manually

Donato - direct - Lesko                                    4659

1    enter the numbers into your app?

2    A    Correct.

3    Q    And then when Marianna started paying for the defendant's

4    treatment, did she manually enter the numbers into your app?

5    A    Yes, every time.

6    Q    And did you have an understanding as to what credit card

7    number she was entering into the app?

8    A    I did not.  I assumed it was her card.

9    Q    Do you have an understanding now?

10   A    I do.

11   Q    What's your understanding?

12   A    That they were -- Marianna was using Pam Cafritz's card.

13   Q    Do you recall if the defendant ever in the whole time

14   that you treated him if he ever actually conducted the

15   payment?

16   A    I believe one time he may have run out to -- at my

17   office, Pam forgot her card every once in a while and I

18   believe one time Keith ran back in and handed me the card for

19   payment, one time.

20   Q    And was that before Pam Cafritz died?

21   A    Yes.

22   Q    Were there instances where you would perform treatment on

23   the defendant and no would was there to pay for it?

24   A    Yes.

25   Q    What would happen then?

SN        OCR        RPR

Donato - direct - Lesko                4660

1  A    Well, I generally would say to Keith who's covering --

2  who's paying today.  I knew he wasn't paying for the treatment

3  so I would ask him and he would either say Marianna would be

4  coming by or Pam would be coming by, prior to Pam's passing of

5  course, or Marianna will call you.  So I knew I would have to

6  have coordinate with someone -- with Marianna for payment.

7  Q    And did that -- did that happen?

8  A    Yes.

9  Q    Was there a time when you weren't paid for your services?

10 A    Never.

11      MR. LESKO:  Your Honor if I could show an exhibit

12 just to the witness, please.

13      THE COURT:  All right.

14      MR. LESKO:  Thank you.

15 Q    Dr. Donato, I'm going to show you what's been marked for

16 identification as Government Exhibit 710.  Do you recognize

17 this exhibit?  And I will show you the multiple pages.

18 They're allel pretty much identical?

19 A    Yes.

20 Q    You've reviewed this exhibit haven't you?

21 A    Yes.

22 Q    Without getting into the details what's included in this

23 exhibit?

24 A    Well, payment amount, date, where it was collected, what

25 device was used, who paid for the visit, the last four digits

SN        OCR        RPR

Donato - direct - Lesko                              4661

1   of a card number, a receipt number and it has a deposited

2   amount which is less than the actual charge amount because of

3   the Square reader charge and it says "Fees" and it indicates

4   "swiped" which means a card was swiped.

5   Q    Let me step back for a moment.  Are these receipts or

6   records that you received for payments you received for

7   treating the defendant?

8   A    Yes.

9   Q    And do they range from September 7, 2016 through -- I

10  show you the last page November 8, 2017.

11  A    Yes.

12        MR. LESKO:  Your Honor we would offer Government

13  Exhibit 710.

14        MR. AGNIFILO:  No objection.

15        THE COURT:  That is exhibit?

16        MR. LESKO:  710.

17        THE COURT:  All right.

18        (Government Exhibit 710 received in evidence.)

19        (Exhibit published.)

20  BY MR. LESKO:

21  Q    So these are the receipts from the Square reader

22  transactions involving the defendant; is that right?

23  A    Yes.

24  Q    Let's look at the first page.  I'm going to ask you a few

25  questions about the first page here.  So, it goes without

Donato - direct - Lesko                4662

1   saying -- the receipt, does it show an amount?

2   A    Yeah, yes.

3   Q    Okay.  And it shows the date and time; is that right?

4   A    Yes.

5   Q    And the time -- okay.  Obviously it shows your name, the

6   name of the practice; is that right?

7   A    Yes.

8   Q    And the device, when it says "Keith's iPhone" is that

9   referring to your phone?

10  A    Yes it is.

11  Q    And the "Paid By," what does the "Paid By" indicate?

12  A    That's the name of the cardholder.

13  Q    And then it goes through amounts and then this line, is

14  that where the Square receipt indicates the last four digits

15  of the American Express card that was used?

16  A    Yes.

17  Q    And it gives some sort of number to the receipt; is that

18  right?

19  A    Yes.

20  Q    And then you mentioned the amount deposited is more than

21  the amount actually billed; is that right?

22  A    No --

23  Q    I'm sorry, less than -- I'm sorry, why is it less?

24  A    That's the fee charged by Square for their service, for

25  their credit card processing service.

SN        OCR        RPR

Donato - direct - Lesko                4663

1   Q    That makes sense, okay.  And then -- under "Fees" it

2   indicates this sort of way the transaction was conducted; is

3   that right?

4   A    Yes.

5   Q    So what does "Swiped" mean?

6   A    "Swiped" is again when I have the -- the swipe -- I put

7   the jack into my phone and I swipe the card through the

8   reader.  So that's when I actually -- the card is used to

9   swipe -- to process the transaction.

10  Q    Okay.  So I'm going to go to -- I'm going to just very

11  quickly show you the second page.  That's September 14, 2016.

12  At the bottom it indicates "Swiped;" is that right?

13  A    Yes.

14  Q    September, is that clear -- September 21, 2016 at the

15  bottom "Swiped"; is that right?

16  A    Yes.

17  Q    September 28th, "Swiped"; is that right?

18  A    Yes.

19  Q    October 12, 2016, "Swiped"?

20  A    Yes.

21  Q    Okay.  And then October 19th, at the bottom there, did

22  the method -- did the method of payment change?

23  A    Yes.

24  Q    And so how did it change?

25  A    Well, it indicates under "Fees" that the transaction was

Donato - direct - Lesko                    4664

1   keyed in and that's -- that's what I explained earlier about

2   one of the options for payment is when I pull up a screen on

3   my phone that a patient can manually enter in numbers if they

4   don't have their card with them.

5   Q    And is this the time period when Pam Cafritz's health was

6   declining?

7   A    I believe so, based on the date, yes.

8   Q    So there's a payment on November 2, 2016 and that's a

9   keyed payment; is that right?

10  A    Yes.

11  Q    And then the next record is dated November 16, 2016,

12  right after Pam Cafritz's death.  And does that indicate a

13  type of -- the method of payment?

14  A    Yes.  It indicates "Keyed."

15  Q    Okay.  And, so, have you reviewed the remaining

16  invoices -- or receipts, I'm sorry, in this Exhibit 710?

17  A    Yes, I have.

18  Q    Okay.  And from this date November 16, 2016, until the

19  last record -- the last receipt dated November 8, 2017, how

20  many receipts are there?

21  A    There are 35.

22  Q    And so those would correspond to 35 treatments over the

23  course of approximately a year; is that accurate?

24  A    Yes.

25  Q    And what are the amounts charged in those 35 receipts?

Donato - direct - Lesko                          4665

1   A     They range from 145 to $285.

2   Q     And why the difference?

3   A     Well, based on some days I just -- I just treated Keith.

4   Some days I treated Keith and Marianna.  The times of

5   treatment also varied, different days based on what I was

6   treating for.

7   Q     Okay.  Did each -- did you treat the defendant on each of

8   these 35 occasions?

9   A     Yes.

10  Q     And so the charges may have reflected treating the

11  defendant and someone else like Marianna?

12  A     Yeah, any charges that were not just Keith would be

13  always, would always be Keith and Marianna.

14  Q     And these charges -- for these charges were they -- were

15  they always charged to the Pamela Cafritz's credit card, the

16  American Express with the number ending 2002?

17  A     Yes.

18

19             (Continued on the following page.)

20

21

22

23

24

25

Donato - direct - Lesko                                4666

1   BY MR. LESKO:   (Continuing)

2   Q     Did they -- did the charges on Pamela Cafritz's card,

3   credit card after her death always go through?

4   A     Yes.

5   Q     Were they ever declined or kicked back or anything?

6   A     Never.

7   Q     Okay.  So what, if anything, did you observe about the

8   physical condition of the female patients that you treated

9   that were associated with NXIVM?

10  A     There were some women that were skinny.

11  Q     And was that noticeable?

12  A     Yes.

13  Q     And did you ever express concern about that and,

14  particularly, the health of patients' diets in connection with

15  the NXIVM patients?

16  A     I did have a particular conversation with a patient,

17  Jimena Garza, about her caloric intake based on her, what I

18  would say lack of muscle density and how often she was, she

19  was coming in with injuries and how much she recorded she was

20  exercising.

21  Q     And what did you tell her?

22  A     Well, my suspicion initially was that she was maybe not

23  providing herself with enough nutrition and supplementation

24  based on the amount of exercise, exercising she was doing and

25  by the fact that she was getting injured so often.

Donato - direct - Lesko                                    4667

1  Q     Okay.  Did you ever have a discussion with the defendant

2  about low caloric intake?

3  A     Yes.  Keith and I spoke one time about -- he, he was, he

4  was talking about, you know, the body's ability to function

5  under lower caloric intakes during times of hunting,

6  gathering, things like that, where it was between hunts that

7  the body's physiology was capable of, of functioning at lower

8  caloric intakes during those periods.

9  Q     During the time period that you treated the defendant,

10  when you were physically manipulating him, did he have a body

11  type consistent with someone who ingested a very low amount of

12  calories?

13  A     Professionally, I would say no based on his muscle

14  density and his, again, recorded to me activity amount and

15  level of intensity.

16  Q     During the time that you treated women patients, women

17  patients associated with NXIVM, did they indicate to you a

18  need to be near their cell phones during their treatments?

19  A     Yes, there was a period of time that did take place.

20  Q     And could you describe that, please?

21  A     I mean, I always remember it being somewhere around

22  3 o'clock, a number, whatever female patients I may have

23  around that time who was very, "I need to keep my phone near

24  me," and it became such a constant with some of the women in

25  the community that I, my curiosity got the best of me and I

CMH        OCR        RMR        CRR        FCRR

Donato - direct - Lesko                    4668

1    said, What's going on with all of this, you know, phones at

2    3 o'clock?  You know, it was always 3 o'clock.  And they told

3    me it was part of this women's empowerment group that they

4    were all part of and responding to text messages within a

5    certain period of time was part of persistency drills that

6    they were all engaged in, a part of.

7    Q    And do you recall who explained that to you?

8    A    I remember speaking with Allison Mack about it a few

9    times.  Lauren Salzman and I spoke about it a few times.

10   Loreta Garza also was one that I remember speaking with and

11   her grabbing her phone during treatments.

12   Q    And you treated Allison Mack?

13   A    Yes, I did.

14   Q    Was she a regular patient of yours?

15   A    I treated Allison a number of times but I wouldn't say

16   she was regular.  I saw her more sporadically.

17            MR. LESKO:  Nothing further, Your Honor.

18            MR. AGNIFILO:  Just a couple of questions.

19            THE COURT:  All right.  The witness is excused --

20            MR. AGNIFILO:  No.  No.  I do have a couple of

21   questions.

22            THE COURT:  You have questions?

23            MR. AGNIFILO:  I do.

24            THE COURT:  Then you are not excused.

25            Okay.

Donato - cross - Agnifilo                    4669

1    CROSS-EXAMINATION

2    BY MR. AGNIFILO:

3    Q    Good morning, Dr. Donato.  I only have a couple of

4    questions for you.  My name is Marc Agnifilo.  I'm Keith

5    Raniere's lawyer.  If I ask you a question that is in any way

6    not clear, just ask me to rephrase it and I have no problem at

7    all with that.

8    A    Okay.

9    Q    You never noticed any of the women that you said were

10   kind of skinny suffering from hair loss, right?

11   A    No, I did not.

12   Q    And you never saw that any of them seemed malnourished,

13   correct?

14   A    I did see some that were malnourished.

15   Q    Was that Loreta?

16   A    No, it was not.

17   Q    Who was it?

18   A    Sylvie and also Pamela Cafritz.

19   Q    And did Sylvie, when did you first see her, when did you

20   first meet her?

21   A    I don't remember exactly but I would say 2012, 2013, in

22   that time frame.  I don't have the exact date in front of me.

23   Q    And was she very skinny when you first met her in 2012,

24   '13?

25   A    Yes, she was.

Donato - cross - Agnifilo                    4670

1   Q    And did she gain weight as time went on at different

2   periods of time?

3   A    If she did, it was imperceptible.

4   Q    And how many different women in NXIVM would you say you

5   treated, if you had to ballpark the number?

6   A    Thirty to 35.

7   Q    Okay.  Over what period of time are we talking?

8   A    2007 until 2018.

9   Q    Okay.  And do you -- I just want to direct your attention

10  to one particular page of the government exhibit we just were

11  talking about.  This is page -- 710 is the exhibit and it's

12  page, page 42.

13          MR. AGNIFILO:  I'm just going to show this to the

14  doctor for a second.

15          THE COURT:  This is in evidence.

16          MR. AGNIFILO:  It is, Judge, as Government

17  Exhibit 710.

18          THE COURT:  Go ahead.

19  Q    This is a $145 payment from October 11, 2017, correct?

20  A    Yes.

21  Q    Okay.  And by this point, Pam has been, had passed away

22  about 11 months before?

23  A    I don't -- she had passed, I guess, yes, in 2016, the

24  fall.  Okay.  That sounds about right.

25  Q    Right.  And you didn't think anybody was doing anything

Donato - cross - Agnifilo                    4671

1    wrong when you were, this payment was processed, correct?

2              MR. LESKO:  Objection.  Objection.

3              THE COURT:  Sustained.

4    Q    Would you have processed the payment if you thought it

5    was wrong?

6    A    Would I have?

7    Q    Yeah.

8    A    No, I would not have.

9              MR. AGNIFILO:  I have nothing else, Judge.

10             THE COURT:  All right.  Anything else?

11             MR. LESKO:  Nothing, Your Honor.  May we have a

12   brief sidebar though?

13             THE COURT:  Yes, we will.

14             MR. LESKO:  Thank you.

15             THE COURT:  The witness is excused.

16             You may stand down.

17             (Witness excused.)

18             (Continued on next page.)

19

20

21

22

23

24

25







Sealed by Order of the Court                    4674

(Continued on next page.)

4675

1              (In open court.)

2              THE COURT:  All right.  We're going to take a

3      mid-morning break a little early.

4              All rise for the jury.

5              (Jury exits.)

6              THE COURT:  All right.  Ten minutes.

7              MR. AGNIFILO:  Before we go, our request would be

8      that you give whatever agreed upon proposed instruction

9      regarding the trust now, not as a jury instruction, but as

10     something, you know, at this point.

11             THE COURT:  An instruction?

12             MR. AGNIFILO:  Just in how to evaluate the trust.

13             THE COURT:  Well, do you have a suggestion?

14             MS. PENZA:  Your Honor, we don't believe one is

15     necessary but we are, we do object to the statement in here

16     that the government -- I don't think it's necessary to inform

17     them that the government and the Court were advised at an

18     early stage of the proceeding of the financial arrangements.

19             THE COURT:  You have got to go slower.

20             MS. PENZA:  Excuse me?

21             THE COURT:  Speak slower.

22             MS. PENZA:  Yes, Your Honor.

23             THE COURT:  Speak up.  People can't hear you in the

24     back.

25             MS. PENZA:  And then the statement, "Therefore it is

4676

1    important you keep in mind there is nothing about this

2    financial arrangement that is improper and it is not being

3    offered for that reason," we object to that sentence.

4         We are fine with the idea that there is nothing

5    improper about one party paying for the representation of

6    another party, but we don't agree necessarily that there is

7    nothing about this financial arrangement that is improper.  So

8    I think that is a misleading statement.

9         THE COURT:  All right.  My problem is that while

10   that first statement is accurate, the one party, one person

11   could pay for somebody else's legal representation, it happens

12   all the time, all right, but in the circumstances of this

13   litigation, there has been no evidence presented one way or

14   another as to whether something inappropriate was the genesis

15   of this arrangement to have Clare Bronfman pay for the

16   representation of the other defendants in the case.  I don't

17   know that.  We haven't had testimony on that.

18        I think the general presumption is fine, but to make

19   a bold statement without any evidence which is why I asked the

20   question of the former IRS agent after receiving your proposed

21   charge on the subject, I don't know that I can be telling the

22   jury one way or another whether in this circumstance, nothing

23   untoward happened.  I mean, the fact is it is very unusual to

24   have that sort of situation where one defendant is paying for

25   the representation of five other defendants.  I have asked

4677

1  informally about this and I never received a positive response

2  from any of my colleagues, but that's just hearsay.

3          If we were to have a separate trial on the question,

4  we might learn something or not learn something, but I don't

5  think it is my job to tell the jury one way or the other

6  whether in these circumstances, there is anything about the

7  arrangement which is inappropriate.  How would I reach that

8  conclusion to share that with the jury?

9          MR. AGNIFILO:  Well, one of the ways that the Court

10  endeavored to reach that conclusion would be in the <u>Curcio</u>

11  hearings we had.  I know that's -- the point of the <u>Curcio</u>

12  hearing isn't an objective answer to the question.  I

13  appreciate that.  It's putting the defendant on notice of a

14  potential conflict.  And I, I don't -- I mean, maybe the way

15  that Your Honor handled it with the Special Agent, former

16  Special Agent is, you know, the most that we're going to do,

17  but I did request the charge and I -- but I understand what

18  the Court is saying.  I don't want to push the envelope and,

19  you know, Your Honor asked the former Special Agent Guerci the

20  question and Special Agent Guerci gave an answer.

21          THE COURT:  I think that -- so I think that the

22  general statement at the beginning of that proposed charge is

23  appropriate, but I don't want to give the jury the impression

24  that the Court has some understanding of whether, in every

25  manifestation of this arrangement, everything was done

4678

1  lawfully, not for an improper purpose.  That's just going too

2  far.  I had a Curcio hearing.  I didn't put anyone, you know,

3  through extensive questioning about their discussions with

4  their lawyers, their discussions with other defendants or

5  proposed defendants.  I think that would have been

6  inappropriate.  So, I think, as much as I can do is say that

7  it's not -- and I don't think that the jury would, I think the

8  jury would reach the conclusion, I guess, that if the Court

9  says there is nothing illegal about a third party, another

10 person paying for the representation of a defendant, that

11 should be enough.

12             MR. AGNIFILO:  That's fine.  That's fine.

13             THE COURT:  All right.

14             MR. AGNIFILO:  Very good, Judge.

15             MS. PENZA:  Thank you, Your Honor.

16             MR. AGNIFILO:  Is that something that Your Honor is

17 open to giving at this point rather than in the final

18 instructions?

19             THE COURT:  Oh, you want it now?

20             MR. AGNIFILO:  I do.  I do.  That's why I, that's

21 why I sent it to you at whatever ungodly hour.

22             THE COURT:  It's not unusual in this case.

23             MR. AGNIFILO:  No, it's not.

24             THE COURT:  Any objection?  I really don't have an

25 objection.  I can do that right after the break.

4679

1           MS. PENZA:  We don't have an objection.

2           THE COURT:  Yes.  I'm happen to do it.

3           MR. AGNIFILO:  Thank you.

4           THE COURT:  Okay.  We'll take ten minutes.

5           (Recess taken.)

6           (In open court; jury not present.)

7           THE COURT:  Let's bring in the jury.

8           (Jury enters.)

9           THE COURT:  Please be seated.

10          Members of the jury, you will recall that during the

11   testimony of Investigator Richard Guerci, there was evidence

12   presented regarding a $14 million irrevocable trust created by

13   Clare Bronfman to assist with the legal fees of other

14   individuals.

15          Please be advised that there is nothing improper

16   about one party paying for the legal representation of another

17   party.  You may, if you see fit, consider this financial

18   arrangement as part of the government's evidence that an

19   enterprise existed.  That is an issue solely for you to

20   consider, but I am admitting information of this financial

21   arrangement for that purpose and for no other.

22          All right.  The government may call its next

23   witness.

24          MS. HAJJAR:  Thank you, Your Honor.  The government

25   calls Rick Ross.

Ross - direct - Hajjar                    4680

1        THE CLERK:  Please raise your right hand.

2            (The witness is duly sworn/affirmed by clerk.)

3        THE CLERK:  Please have a seat.

4            Please state and spell your full name for the

5  record.

6        THE WITNESS:  Rick Alan Ross, R-I-C-K, A-L-A-N,

7  R-O-S-S.

8        THE COURT:  You may inquire.

9        MS. HAJJAR:  Thank you.

10  DIRECT EXAMINATION

11  BY MS. HAJJAR:

12  Q    Good morning, Mr. Ross.

13  A    Good morning.

14  Q    How old are you?

15  A    Sixty-six.

16  Q    And where were you born?

17  A    Cleveland, Ohio.

18  Q    Where did you live growing up?

19  A    Phoenix, Arizona.

20  Q    What do you do for a living?

21  A    I'm the founder and executive director of the Cult

22  Education Institute.  I do intervention work to help families

23  get their loved ones out of groups called cults and I'm the

24  author of the book, "Cults Inside Out:  How people get in and

25  can get out."

Ross - direct - Hajjar                                    4681

1   Q     How did you initially get involved in the subject of

2   cults or other groups?

3   A     A nursing home where my grandmother lived when she was in

4   her 80s was infiltrated by a controversial group.  They sought

5   jobs on the paid professional staff.  They targeted the

6   elderly.  My grandmother was confronted.  I found out about it

7   and it drew me in to become an anti-activist and a community

8   organizer in Phoenix.

9   Q     Did you create a website which is now called The Cult

10  Education Institute?

11  A     Yes.  I originally launched a website as an archive of

12  information about destructive authoritarian groups,

13  controversial groups, many called cults, in 1996, and it

14  became a very large database.

15  Q     In 1996, what was that database called?

16  A     The domain name entry point was RickRoss.com.

17  Q     At some point did you sell that domain name?

18  A     Yes.  When the rapper Rick Ross became so famous, about

19  50 percent of my traffic and bandwidth was being consumed by

20  people that wanted to hear Rick Ross rap.  So I sold the

21  domain name and the portal became CultEducation.com, and I

22  changed the name from the Rick Ross Institute to the Cult

23  Education Institute.

24  Q     Can you explain to the members of the jury what kind of

25  materials you publish on your website in the database you're

Ross - direct - Hajjar                    4682

1   describing?

2   A     It would include articles about various groups and

3   leaders and subjects.  It would include court documents,

4   research papers, just an array of research material that's

5   available to the public.  Anyone can use the site.  And

6   there's also a large message board, public, where people can

7   post their comments if, if they are former members of a group,

8   affected families.  There are approximately 150,000 entries

9   that have accumulated on that message board.

10  Q     And in terms of the content of the materials in the

11  database, even though the name has changed over time, has the

12  general contents that you publish remained the same?

13  A     No.  The contents have remained the same and I would

14  think that pretty much all of the articles and material that

15  was originally posted and archived in 1996 is still there.  It

16  just simply grows and it's under constant construction.

17  Q     Can you name some of the individuals and groups that

18  you've written about on your website?

19  A     Charles Manson, Moses David Berg, the leader of Children

20  of God, L. Ron Hubbard, the founder of the Church of

21  Scientology, and then there's a huge section on clergy abuse.

22  Any clergy person that I have, I've accumulated a very large

23  database on that has been sued, that has been arrested for

24  sexual abuse.  There's a huge subsection on polygamist groups

25  that have gotten in trouble with the law, particularly

Ross - direct - Hajjar                                  4683

1    regarding child abuse and labor violations.

2          And there are many groups that are not necessarily

3    criminal or negative, but that because there are myths about

4    them and misinformation, the Institute has articles that kind

5    of bring clarity to that.  For example, witches and Wicca or

6    Satanism or the Free Masons, which there are been many

7    conspiracy theories about which have turned out to be bogus.

8    The Institute has a lot of material to disabuse people that

9    might believe conspiracy theories about these groups.

10   Q    Are there common characteristics of the groups or

11   individuals that you choose to publish about?

12   A    Yes.  Typically, the groups have authoritarian leaders

13   that have absolute control over their followers with little,

14   if any, meaningful accountability and, second, that they have

15   been accused of exercising undue influence over their

16   followers and, finally, that to some degree, they have been

17   accused and there have been allegations or criminal procedures

18   against them for exploiting and doing harm to their followers

19   in some way, shape or form.

20   Q    Have you been sued by individuals or organizations about

21   which you posted materials or articles?

22   A    Yes.  I've been sued five times by different

23   organizations that sought to have all the information at the

24   database removed that was there about them.

25   Q    Are you familiar with an organization called NXIVM or

Ross - direct - Hajjar                              4684

1    Executive Success Programs?

2    A      Yes.

3    Q      Were you sued by NXIVM?

4    A      Yes.

5    Q      When?

6    A      I believe in 2002.

7    Q      What were you sued for?

8    A      I was sued over the articles of two doctors, a forensic

9    psychiatrist and a clinical psychologist who wrote reports

10   about what was then called Executive Success Program based on

11   the notes of their course curriculum, their incentives, and

12   these reports were critical of Executive Success Programs and,

13   subsequently, I was sued in an effort to remove those reports

14   from the database.

15   Q      And do you recall what the lawsuit was alleging, what was

16   the basis for the lawsuit?

17   A      Defamation was one claim, I believe, and then also

18   copyright infringement, trade secret violation.  There was a

19   number of claims made.  I think there was a claim made that

20   somehow I was in competition with Executive Success Programs

21   and that that was a claim.

22   Q      Was that lawsuit resolved against you?

23   A      Yes, it was.  It ended with the lawsuit being dismissed

24   on a motion for summary judgment and it never went to trial.

25   Q      When was it dismissed?

Ross - direct - Hajjar                    4685

1  A    In two thousand -- I believe in December, I'm thinking,
2  2017.
3  Q    And so the lawsuit was pending from when it was initiated
4  in 2002 or thereabouts until 2017?
5  A    The lawsuit went on for 14 years.  It began in New York.
6  It was originally filed in the Albany area and then at the
7  time, I lived in New Jersey as did some of my co-defendants
8  and so the lawsuit was then re-filed in New Jersey and
9  continued for 14 years.
10 Q    During the course of the lawsuit, did you, did there come
11 a time where you met Keith Raniere?
12 A    Yes.
13 Q    Do you see him in the courtroom today?
14 A    Yes.
15 Q    Can you identify him by where he's sitting or an article
16 of clothing?
17 A    He is the man with the maroon sweater.
18         THE COURT:  All right.  Let the record indicate that
19 the witness has identified the defendant.
20         MS. HAJJAR:  Thank you.
21 Q    Mr. Ross, just backing up a bit, how did you first learn
22 about NXIVM?
23 A    A family approached me concerned about loved ones that
24 were involved in the Executive Success Programs.
25 Q    And who approached you?

Ross - direct - Hajjar                    4686

1    A    Morris and Rochelle Sutton.

2    Q    And approximately when was that?

3    A    I believe that was in 2002.

4    Q    Prior to 2002, were you aware of NXIVM?  Had you ever

5    heard of it?

6    A    No.

7    Q    And what happened after your you were contacted by the

8    Suttons?

9    A    I met with them.  I talked about their concerns.  They

10   were very concerned about their adult children.  I believe

11   there were three that were involved with Executive Success

12   Programs, later known as NXIVM, including a daughter and a

13   son-in-law and they retained me to work for them.

14   Q    And what did you do after they raised their concerns to

15   you?

16   A    I -- they also hired a private investigator because

17   little was known by me or really available information about

18   this group and so they retained a private investigator.  The

19   investigator found information about Keith Raniere, about his

20   company called Consumer Buyline and the lawsuits filed against

21   Consumer Buyline by, I think, as many as 20 Attorney Generals

22   in various states.  And also they, the private investigator

23   obtained some literature disseminated by Executive Success

24   Programs describing what they did and how they did it to some

25   degree.  So it was rather general.  It certainly indicated the

Ross - direct - Hajjar                    4687

1    type of group it was and what they were engaged in.

2              THE COURT:  Can I just ask a question to clarify

3    something?

4              MS. HAJJAR:  Of course.

5              THE COURT:  In what capacity did they retain your

6    services?

7              THE WITNESS:  They retained me as a private

8    consultant with the idea that we would do an intervention or a

9    series of interventions to get their adult children out of

10   Executive Success Programs.

11             THE COURT:  Thank you.

12             Go ahead.

13   Q    Did you, in fact, later conduct such interventions?

14   A    Yes.

15   Q    Did you -- based on these early, the early research that

16   you did or the materials that you reviewed, did you form an

17   impression of NXIVM?

18   A    Yes.

19   Q    And what was that impression?

20             MR. AGNIFILO:  Object to the form of the question,

21   Judge.

22             THE COURT:  Sustained.

23   Q    Mr. Ross, do you agree to perform interventions every

24   time you are asked to do so?

25   A    No.

Ross - direct - Hajjar                    4688

1   Q     Okay.  What do you do in order to decide whether or not

2   to agree to undertake an intervention?

3   A     I look at the group in question, I may cooperate with a

4   private investigator, I gather information to determine if the

5   group warrants any type of intervention and I listen to the

6   family members and I do my own independent research.

7   Q     And in this case, and with respect to NXIVM, did your,

8   did you take any steps to determine whether or not you would

9   agree to conduct the intervention that the Suttons requested

10  of you?

11  A     Yes.

12  Q     What was that?

13  A     Well, I did research on Executive Success Programs and I

14  came to the conclusion that it was a kind of human potential

15  seminar selling group and that they engaged in what has often

16  been called large group awareness training, or an LGAT, and I

17  had been sued by just such a group, Landmark Education, that

18  has a seminar called The Forum.  And I recognized very quickly

19  that Executive Success Programs was very similar to Landmark

20  Education and I, I realized why the family was concerned,

21  because I had received complaints about Landmark Education for

22  years and some of those complaints mirrored what the Suttons

23  were concerned about and I agreed to take on these

24  interventions and be retained by them.

25              (Continued on next page.)

Ross - direct - Hajjar                        4689

1   EXAMINATION CONTINUES

2   BY MS. HAJJAR:

3   Q     Did you attempt to conduct an intervention with the

4   Suttons' son, Michael Sutton?

5   A     Yes.

6   Q     Was it successful?

7   A     No, it failed.

8   Q     And can you describe to the jury what happened?

9   A     Well, the Suttons planned this intervention to take place

10  in Florida during the holidays in December.  And they brought

11  Michael, they asked Michael to join them at a beach club in

12  Boca Raton.  And his brother, Jeffrey, also was there with his

13  wife.

14        And then the Suttons introduced me to Michael.  And

15  then we started to have a discussion, which is what an

16  intervention is, is a discussion.  And they would talk about

17  their concerns, why they had brought me in.

18        I would talk about LGAT, Large Group Awareness

19  Training.  The familiar patterns that I saw in Executive

20  Success Programs that paralleled other groups that I had dealt

21  with.  I talked about coercive persuasion techniques,

22  influence techniques, thought reform; and, again, compared

23  that in parallel to some of the practices and training that I

24  saw happening with Executive Success Programs.

25        And, of course, in the process of the intervention

Ross - direct - Hajjar                    4690

1    Michael would speak at length, and he would talk about his

2    experience.  And it was then that I learned that Keith Raniere

3    was -- had a special title of Vanguard.  That they celebrated

4    his birthday during Vanguard week.

5            And the group took on more significance, in the

6    sense that it was more -- it became clearer to me that this

7    was a personality-driven group defined by a -- a leader, and a

8    leader's philosophy.  And it became eerily reminiscent of

9    Scientology and L. Ron Hubbard, and the personality-driven

10   nature of that group, which was based on Hubbard's writings

11   and his philosophy.

12           And so this discussion went on with Michael for

13   days, I think two or three days.  And he was very courteous,

14   very reasonable, but he kept talking on his cell phone with

15   Nancy Salzman, he would -- he would call her or she would call

16   him back.  And even in the presence of his parents and myself,

17   he would go -- he would talk to her and she would coach him.

18           And it became obvious to me how much power and

19   control the group had over Michael.  And eventually, Nancy

20   Salzman and -- persuaded him to discontinue the discussion;

21   and eventually, to not agree to have any more discussions with

22   his parents about their concerns or -- or look at any research

23   material or anything.

24           And at that point, the intervention effort ended.

25   And it was a failure.

Ross - direct - Hajjar                                    4691

1    Q     Where did these discussions take place?

2    A     They initiated in Florida in Boca Raton, but they

3    continued at the Suttons' home in New Jersey in Elberon.  And

4    then later also in Manhattan, at the Suttons' business offices

5    in Manhattan.

6    Q     And during these discussions, who was physically present?

7    A     Morris Sutton and Rochelle Sutton and Jeffrey Sutton.

8    And then some of the meetings that occurred at the business

9    offices in Manhattan were -- were just Jeffrey Sutton, myself,

10   and Michael Sutton.

11   Q     What is the point of an intervention?

12   A     The point of an intervention is to stimulate critical

13   thinking, to get an individual to reflect and think about what

14   they're involved in.  And to look at the dynamics of the

15   group, the methodology of the group, and try to understand how

16   the group works, and how the group may have undue influence

17   over the individual and how that may have been accomplished.

18              And -- and -- and what the motivation, perhaps, may

19   be, if the group is making demands on the person.  And, in

20   particular, if the group is making extreme demands, hopefully,

21   the person will reflect on whether or not it's really worth it

22   for them to comply, for them to continue.

23              And so often, in my experience, when people become

24   involved in groups like this, they're -- they're making

25   decisions in a bubble and they really aren't getting any

Ross - direct - Hajjar                              4692

1   outside feedback.  They're not really percolating with their

2   critical thinking and they're just relying, instead, on

3   reenforcement from other people in the group.  And they become

4   socially isolated.

5           So the idea of the intervention is to open that

6   up --

7           MR. AGNIFILO:  Your Honor, I'm sorry.  I'm going to

8   object.  Can we have a quick sidebar?

9           THE COURT:  Sure.

10          MR. AGNIFILO:  Thank you.

11          (Sidebar held.)

12

13          (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Sidebar                                              4693

1          (The following sidebar occurred outside the hearing

2   of the jury.)

3              MR. AGNIFILO:  Your Honor --

4              THE COURT:  Yes.

5              MR. AGNIFILO:  -- I think a juror wants your

6   attention, Judge.

7              MS. PENZA:  Judge, the juror is waiving.

8              (Sidebar interrupted.)

9

10             (In open court - jury present.)

11             THE COURT:  Did someone raise his hand?  Just the

12  machine.  Thank you.  We got it.

13             (Sidebar resumed.)

14

15             (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

```
                            Sidebar                        4694
```

1            (The following sidebar occurred outside the hearing

2    of the jury.)

3            MR. AGNIFILO:  I objected because I think we're well

4    into the realm of expert testimony with the witness's last

5    very long answer.

6            We did not get expert witness notice of this

7    witness, and my understanding is he was going to testify to

8    his lawsuit.  But for him now to be giving opinions, as these

9    are clearly expert opinions that he's been giving.  He's never

10   been noticed as an expert.

11           THE COURT:  All right, I understand.

12           MS. HAJJAR:  We're not offering him as an expert,

13   Your Honor.  He is a fact witness.  He has strongly held

14   views, which I'm sure Mr. Agnifilo will have opportunity and

15   will cross-examine him about.  But he -- these -- his opinions

16   precipitated what he did, which led to the lawsuit.

17           So we're not offering this opinion as expert

18   testimony, and we can qualify that or move on, but we're

19   not -- that's not what the purpose of the testimony is.

20           MR. AGNIFILO:  Whatever they classify it, this is a

21   person speaking as an expert.  He's giving his opinion

22   about -- about, you know, how different groups operate.

23           He's clearly not in the realm of things that he's

24   seeing and observing, in terms of things that are in front of

25   his face.  He's talking about opinions in a general way with

Sidebar                                                4695

1    his breadth of research.  It's clearly expert testimony and we

2    object.

3            THE COURT:  Why don't you focus your questions more

4    directly on the issues in this case?

5            MS. HAJJAR:  Yes.

6            THE COURT:  You can do it that way.

7            MS. HAJJAR:  Thank you, Your Honor.

8            THE COURT:  And, I mean I am happy to give an

9    instruction that this is not an expert witness, that his

10   testimony is based on his experiences, but I don't think that

11   that makes any sense at this point.

12           MS. HAJJAR:  I agree.

13           THE COURT:  But you will let me know.

14           MR. AGNIFILO:  All right, Judge.  Thanks.

15           THE COURT:  Thank you.

16           (Sidebar concluded.)

17

18           (Continued on the following page.)

19

20

21

22

23

24

25

Ross - direct - Hajjar                    4696

1              (In open court - jury present.)

2              THE COURT:  All right, let's continue.

3    EXAMINATION CONTINUING

4    BY MS. HAJJAR:

5    Q    Mr. Ross, how many interventions have you participated

6    in, in your career?

7    A    More than 500.

8    Q    Okay.  Are you often hired by family members of the

9    person for whom you agree to conduct an intervention?

10   A    Yes, it's typically the parents, but it could be the

11   adult children concerned about a parent.  It could be a

12   spouse, it could be a boyfriend or a girlfriend.

13   Q    Now, you testified that with respect to Michael Sutton,

14   Mr. Sutton remained polite throughout, although the

15   intervention was not successful.

16              Were there times where the intervention did not go

17   so amicably?

18   A    Not from the standpoint where -- Michael Sutton may have

19   commented at times that he didn't appreciate the intervention,

20   that he would like to spend more time playing tennis, more

21   time enjoying the beach, and less time talking with me and his

22   parents about Executive Success Programs.  And that became --

23   he became more so after his conversations with Nancy Salzman.

24   Q    And in the past, Mr. Ross, was there an occasion where

25   you were civilly sued as a result of an intervention that you

Ross - direct - Hajjar                    4697

1    conducted?

2    A    Yes.

3    Q    Okay.  Can you tell the jury just briefly about that?

4    A    I was retained by a woman around 1990, her name is Kathy

5    Tonkin, and she was concerned about her two minor children,

6    one of whom she claimed had been sexually abused in a

7    particular group.

8         And she wanted to get her family out of the group.

9    She had six children.  And she left with three of them, but

10   three remained behind and -- and would not go with her and

11   stayed in the group.

12        And at first, she retained me to do interventions

13   with her two minor children, boys that were -- I think one was

14   14 and one was, I think, 12 or 13 at the time.

15        But later, she retained me to do an intervention

16   with her 18-year-old son who had become of legal age.  And she

17   hired security, she held her son against his will, and at a

18   safe house.  And I agreed to do what has often been called an

19   involuntary deprogramming with her son.  It was not

20   successful.

21        He then called the police when -- when he was let

22   go, you know.  At a certain point his mom decided, we are

23   done, we've shared everything we can with her son, Jason

24   Scott.  And so we said:  You're -- you're free to go.  And he

25   called the police and I was arrested.  There were security

Ross - direct - Hajjar                    4698

1   people that were arrested.

2          After some time, we went to trial.  I was found not

3   guilty of all charges.

4          Subsequently, a lawyer, who is now the lead counsel

5   for the Church of Scientology, Kendrick Moxon, offered to sue

6   me on behalf of Jason Scott.  And I was sued in federal court

7   and I lost that lawsuit and a judgment against me was entered

8   for over $2 million.

9          Needless to say, I went bankrupt.  The bankruptcy

10  judge said that the judgment could not be discharged, due to

11  the fact that it was deemed malicious, that I violated his

12  civil rights by holding him, despite the fact that his mother

13  was always present.  And she actually had hired me, but she

14  was never charged, nor was she ever sued.

15         Subsequently, Jason left the group that he was in,

16  that his mother considered to be a cult, and he returned to

17  his mother.  And then he contacted me and he said, I want to

18  settle the judgment against you.  And the judgment was settled

19  for $5,000, which I gave Jason, on the condition that I

20  provide him with 200 hours of my services.

21         He had been married in the group and he wanted me to

22  deprogram his wife.  He had two children with his wife.  And

23  he left the group, but his children remained.  And he was in a

24  similar situation, ironically, that his mother was once in.

25  And he wanted me to help him free his family.

SAM      OCR      RMR      CRR      RPR

Ross - direct - Hajjar                    4699

1         That never happened.  His wife divorced him and he

2    really lost his family.  But the lawsuit and the judgment --

3    the judgment that came out of that lawsuit was settled in

4    19 -- I believe it was 1995 or '96.

5    Q    Did Jason Scott ever reconcile with his mother, as far as

6    you know?

7    A    Yeah, he did reconcile with his mother.  In fact, I met

8    with them together.  And it was -- it was -- it was very

9    difficult for his mother to go through all of that, but she

10   did, and she forgave him for whatever misunderstandings or

11   unhappiness there was between them.

12        And I decided, as a result of the Jason Scott case

13   and what I went through, that no matter how compelling a

14   family's narrative was or their pleas regarding a particular

15   situation, that I would never again agree to do an involuntary

16   intervention with an adult.  That is, someone of -- 18 years

17   of age or older.

18        Though, I would continue to do interventions, often

19   working with Children's Services, for young people, minor

20   children, under the direct supervision of their legal guardian

21   if they had been extracted from a destructive cult.

22   Q    Now, moving back -- when was the Jason Scott

23   intervention, what year was that?

24   A    1990.

25   Q    Okay.  And so moving now to 2002 again, were you -- after

SAM      OCR      RMR      CRR      RPR

Ross - direct - Hajjar                    4700

1    the failed intervention with -- with Michael, did you conduct

2    another intervention with his sister?

3    A    Yes.

4    Q    Okay.  Can you -- did you agree to conduct that

5    intervention?

6    A    Yes.

7    Q    What happened?

8    A    Well, Stephanie Franco came to the Suttons' home in

9    Elberon and we talked with her.  She was very amenable.  She

10   was very happy, actually, to talk about what were her concerns

11   about Executive Success Programs.

12            What we did not know was that Stephanie had deep

13   misgivings about the training, that she harbored doubts about

14   what was happening.  And so we had a long discussion.  And at

15   the end, she decided that she would discontinue any

16   involvement with Executive Success Programs.

17   Q    Did Stephanie Franco provide you with anything?

18   A    Stephanie Franco had the study notes from the course

19   curriculum, from the program and the training, in a bound -- a

20   binder.  And that included notes that were distributed by

21   Executive Success Programs, and also her own handwritten notes

22   regarding her training and -- and -- her comments regarding

23   her training, on how she was feeling and what she was doing.

24            And she gave those notes in the binder to her

25   brother, Jeffrey.  And Jeffrey then gave them to me in order

SAM     OCR     RMR     CRR     RPR

Ross - direct - Hajjar                    4701

1    for me to give them to the doctors, so that they could make

2    reports.

3           At one point, Michael, when he was talking with

4    Nancy Salzman, Nancy Salzman said:  Wouldn't it be interesting

5    to get expert opinions on what we're doing, rather than just

6    what I thought?

7           And so I gave Michael a list of experts, and two of

8    those experts included Dr. John Hochman and Dr. Paul Martin.

9    And so the family thought, let's follow through, following

10   Nancy Salzman's advice, and have reports done by these

11   doctors.  And now that we have these extensive notes, the

12   doctors have something to study and -- and come to a

13   conclusion with.

14          And so I gave the notes to the doctors and they

15   wrote reports.  Dr. Hochman wrote one report.  Dr. Martin

16   wrote two reports.  And then I published the reports on the

17   website that was then called The Ross Institute, which was

18   then RickRoss.com.

19   Q    Who retained Dr. Hochman and Dr. Martin?

20   A    Morris and Rochelle Sutton.

21   Q    And the reports that they completed, they gave them to

22   you to publish on your website?

23   A    Well, they gave them to me to share with Michael Sutton.

24   And I went to -- with Jeffrey to meet with Michael Sutton, and

25   we tried to encourage Michael to read the reports and consider

Ross - direct - Hajjar                          4702

1   them.  But Michael, at that point, was not willing to do that.

2          And so the reports, with the permission of the

3   doctors and the Suttons, I published through the website and

4   database.

5   Q    Why did you publish them on your database?

6   A    My feeling was that Executive Success Programs was a

7   destructive program, and that it was hurting people and that

8   it had the potential to hurt more people.  And in the public

9   interest, per the mission statement of the Institute, I made

10  those reports public and put them online, so that anyone could

11  access them and read them.

12  Q    What happened after you published the reports on your

13  website?

14  A    I was -- I was threatened with legal action, was one of

15  the outcomes.  And then I also would periodically receive

16  calls from people who were affected by the training, thanking

17  me for publishing the -- the reports.

18          But I think the most immediate thing that happened

19  that -- that was of concern was that I was being threatened

20  with litigation.

21  Q    Did you -- how did you respond to those legal warnings?

22  A    I consulted a -- attorneys.  Attorneys assured me that

23  the claims being made were baseless.  Though, they warned

24  me --

25  Q    Without going into the discussions with your attorney,

Ross - direct - Hajjar                    4703

1   did you do anything with respect to the materials posted on

2   your website?

3   A    I -- I refused to remove them from the database.  I

4   refused to take them down.

5   Q    Were you ultimately sued by NXIVM?

6   A    Yes.

7   Q    And where was the lawsuit initially filed?

8   A    The lawsuit was initially filed in New York, in the area

9   of Albany.

10  Q    Did it later change venue?

11  A    Yes.

12  Q    Where was it filed later?

13  A    In New Jersey.

14  Q    Was the lawsuit filed in federal court?

15  A    Yes.

16  Q    And this was a civil lawsuit?

17  A    Yes.

18  Q    Were there other defendants in the lawsuit?

19  A    Yes.

20  Q    Who?

21  A    Drs. John Hochman, Paul Martin, Morris and Rochelle

22  Sutton, Stephanie Franco, and myself and the Institute.

23  Q    And the plaintiff for the lawsuit was?

24  A    Executive Success Programs/NXIVM, and I believe -- I

25  don't know if Keith Raniere was actually on the lawsuit, but

              SAM      OCR      RMR      CRR      RPR

Ross - direct - Hajjar                                    4704

1    the issue was copyright regarding his material.

2    Q    And that was -- the basis for that were the reports that

3    you had published, the doctors' reports you had published on

4    your website?

5    A    Yes, the claim was that by quoting the study notes,

6    copyright and trade secret violations had occurred, and that

7    they should be taken down.

8    Q    And the reports excerpted portions of the materials that

9    Stephanie Franco had provided you with?

10   A    Yes.

11             MS. HAJJAR:  Your Honor, may I show something to the

12   witness?

13             THE COURT:  Yes, you may.

14   BY MS. HAJJAR:

15   Q    I am showing you what's marked for identification as

16   Government Exhibit 620.

17             Do you see that, Mr. Ross?

18   A    Yes.

19   Q    And what -- do you recognize this exhibit?

20   A    Yes.

21   Q    What is it?

22   A    These are the collected notes of Executive Success

23   Programs that were given to Stephanie Franco.

24   Q    And were they the same materials that Stephanie Franco

25   later gave to you?

SAM      OCR      RMR      CRR      RPR

Ross - direct - Hajjar                    4705

1   A     Yes.

2              MS. HAJJAR:  Your Honor, the Government offers

3   Government Exhibit 620 into evidence.

4              MR. AGNIFILO:  No objection.

5              THE COURT:  What is that?

6              MR. AGNIFILO:  No objection.

7              THE COURT:  All right, Government's Exhibit 620 is

8   received in evidence.

9              Publish it to the jury.

10             (Government's Exhibit 620 was received in evidence.)

11             (Exhibit published.)

12  BY MS. HAJJAR:

13  Q     Now, Mr. Ross, is this the same form as you initially saw

14  the materials that were given to you?

15  A     It's somewhat different.  I don't remember it having

16  Stephanie's name on it or -- or the date, in particular.

17             I -- I remember it -- the notes being in a -- in a

18  black binder that you could open and take pages in and out of,

19  but it's -- I -- I looked at this, and this is the same.  It's

20  just a copy in a different binder.

21  Q     The materials, themselves, the content is the same?

22  A     Yes.

23  Q     Okay.  I am going to direct your attention to what's

24  marked as -- at the bottom as SF-6 of Government Exhibit 620.

25  I'm going to zoom in a bit.

Ross - direct - Hajjar                    4706

1              (Exhibit published.)

2    BY MS. HAJJAR:

3    Q    Mr. Ross, do you see where the -- it says:  "16-Day

4    Intensive"?

5    A    Yes.

6    Q    Can you please read the paragraph that follows?

7    A    This profoundly transformational experience begins at

8    8:00 a.m. and goes to 9:00 p.m. virtually every day for the

9    duration.  There are lunch and dinner breaks, as well as short

10   breaks between practices or modules.  Students don't want to

11   leave at the end of the day!

12              There is the option of attending this course in

13   five- or seven-day segments.  Tuition $7,500.

14   Pre-registration 14 days in advance, discount price $6,000.

15   $1,000 nonrefundable deposit required to reserve.  50 percent

16   total tuition required two weeks prior to start date.

17   Remainder paid first day of class.

18   Q    And the top here, this is a -- this is about Executive

19   Success Programs, this page?

20   A    "Our school is designed to change" --

21   Q    I'm sorry, Mr. Ross, I just wanted to highlight for you

22   that this -- you are reading from a page where the title is

23   "Executive Success Programs"?

24   A    Yes.

25              (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

Ross - direct - Hajjar                    4707

BY MS. HAJJAR:   (Continuing.)

1  Q    And the remainder of the first few pages of this exhibit

2  contain class schedule and tuition schedules; is that right?

3  A    That's correct.

4  Q    I'm going to turn your attention to what's marked as FS-8

5  from these materials.  Can you read the text that follows post

6  16-day intensive training program options moving up the Stripe

7  Path fast track?

8            Can you see that?

9  A    Yes.  Many of our six-day intensive graduates desire to

10  move up the Stripe Path as quickly as possible, becoming part

11  of our team and spreading this mission.  It is our goal to

12  make this process achievable.  We want to train you so that

13  you reach your maximum potential and became more effective in

14  working with others.  We find that renewing two additional

15  16-day intensives and participation in the Ethos coaching

16  program (required to move up the Stripe Path) is the optimal

17  strategy in moving up to proctor as quickly as possible.

18  Q    And then do you see where it says options for your

19  repeating your second 16-day intensive?

20  A    Yes.

21  Q    Can you just read the first bulleted paragraph there?

22  A    Register an Ethos coaching program (1800/1440) and enroll

23  three participants in any 16-day intensive (remember, as a

24  result of three -- quote, "three and it's free," you will

Ross - direct - Hajjar                    4708

1    receive a refund on your 16-day intensive tuition.)  "Shadow

2    coach" duties such as food prep, cleaning, supply inventory,

3    chairs, audio/visual, et cetera, will be assigned.

4    Q    I'm going to just flip through a little bit of this.

5              Are you familiar with this context, Mr. Ross, the

6    white sash, yellow sash?

7    A    Yeah, these are the sashes that denote ranks of the

8    members of the group.

9    Q    And so where it says, yellow sash title, apprentice

10   coach, coach, can you read what's under edge qualification?

11   A    Edge qualification, two enrollments within four weeks,

12   rank earned within 12 weeks.

13   Q    And there are different texts written under one stripe

14   coach, two stripes, three stripes, four stripes and so on?

15   A    Yes.

16   Q    And then under orange sash, can you read the edge

17   qualification there?

18   A    Edge qualification has yellow edge in yellow sash rank no

19   longer than nine months.

20   Q    Okay.  These handwritten notes, do you know what these

21   were?

22   A    Yeah, this is the handwriting of Stephanie Franco

23   describing her reflections, her thoughts, while she's involved

24   in the training.

25   Q    And the materials that are included in this, in what was

Ross - direct - Hajjar                    4709

1  the binder that you received, some of them have titles:  Work

2  and Values, Self Esteem, Honesty and Disclosure, Communication

3  and Being at Cause?

4  A    Yes.

5  Q    I want to point your attention to Rules and Rituals,

6  marked SF-00033.

7            Are you familiar with these pages?

8  A    Yes.

9  Q    Can you just read the first paragraph under segment one,

10 Handshaking?

11 A    Handshaking is a sign of respect and affords us an

12 opportunity to make direct physical contact with others.  We

13 believe that many of society's problems have developed because

14 people have come to view each other as objects rather than

15 human beings.  The handshake is a way to greet others in every

16 professional and personal context and is a sign of response in

17 ESP.  Here in ESP, we use a two-handed handshake.  This

18 conveys warmth and a sense of community.  Placement of the

19 left hand denotes rank.  Individuals of higher rank place left

20 hand on the top.  Individuals of the same rank shake

21 vertically.  Lower rank places the left hand on the bottom.

22 Q    Mr. Ross, can you read what the numbers are up here?

23 A    12/2000.

24 Q    And I'm going to show you something that's already in

25 evidence as Government's Exhibit 1007.

Ross - direct - Hajjar                          4710

1              Do you see that?

2      A     Yes.

3      Q     And at the top, can you just read the numbers here?

4      A     1/2015.

5      Q     And looking at the third paragraph, is this also titled

6      Handshaking and has similar content in terms of what's being

7      described?

8      A     Yes.

9      Q     And the Rules and Rituals material in Government Exhibit

10     620 that follow, there are certain student notes related to

11     these segments, scripting, and a page entitled Student Self

12     Report; is that right?

13     A     Yes.

14     Q     Flipping to the back of this exhibit, on a page that is

15     marked SF-00329, can you read the top of this document,

16     Mr. Ross?

17     A     This is the 12-point Mission Statement by Keith Raniere.

18     Q     Are you familiar with the contents on this page?

19     A     Yes.

20     Q     And were some of these bulleted items quoted in the

21     expert report, in the doctor reports, that you published on

22     your website?

23     A     They may have been.  They certainly were reviewed by the

24     doctors.

25              MS. HAJJAR:  Can I show something to the witness

Ross - direct - Hajjar                                    4711

1    alone, Your Honor?

2          THE COURT:  Yes.  Go ahead.

3    Q    Mr. Ross, I'm showing you what's marked for

4    identification as Government Exhibit 609.

5          Do you see that?

6    A    Yes.

7    Q    Do you recognize this exhibit?

8    A    Yes.

9    Q    What is it?

10   A    It is the report that is made by -- submitted by Doctor

11   John Hochman.

12   Q    Is it the same report that you published on your website?

13   A    Yes.

14         MS. HAJJAR:  Your Honor, the Government offers

15   Government Exhibit 609.

16         MR. AGNIFILO:  No objection.

17         THE COURT:  All right.  Government Exhibit 609 is

18   received in evidence.

19         (Government's Exhibit 609 received in evidence.)

20         (Exhibit published.)

21   BY MS. HAJJAR:

22   Q    Mr. Ross, did this article, report, Government Exhibit

23   609 become part of the court case, the lawsuit that you've

24   referred to before?

25   A    Yes.

SN        OCR        RPR

Ross - direct - Hajjar                              4712

1    Q    And can you just read the title, please?

2    A    A Forensic Psychiatrist Evaluates ESP.

3    Q    And what's the date?

4    A    February 2003.

5    Q    And the author?

6    A    John Hochman, M.D.

7    Q    Okay.  And there, under introduction, the reports notes:

8    I have reviewed a manual for a 16-day, ten hours a day, large

9    group awareness training called Executive Success Programs

10   which also calls itself ESP.

11             Is this, the manual that is referenced here, the

12   same materials that we were just discussing?

13   A    Yes.

14   Q    And then this is -- this report has several pages, but

15   looking at the bottom of the first page and looking at one

16   example:

17             Of further concern -- the manual states in italics

18   -- we find our students don't want to leave at the end of the

19   day.  Since participants have been experiencing a day

20   scheduled to start at 8 a.m. and to end at 10 p.m., under

21   usual circumstances most participants would be tired and eager

22   to go to see friends and family, to get a night's rest, to

23   prepare for another long day starting at 8 a.m.

24             Is this paragraph, Mr. Ross, referring to the

25   materials that we reviewed?

SN        OCR        RPR

Ross - direct - Hajjar                    4713

1   A    Yes.

2   Q    And the basis for the lawsuit was these excerpts of

3   material that were quoted from the Franklin material?

4   A    Yes.

5   Q    This report is critical of ESP and -- fair to say?  Of

6   ESP and all the materials that were -- that we reviewed?

7   A    Yes.

8           MS. HAJJAR:  Your Honor, I would like to show the

9   witness another exhibit marked for identification.

10          THE COURT:  Go ahead.

11  Q    Mr. Ross, I'm showing you what's marked for

12  identification as Government Exhibit 610.

13          Do you recognize this exhibit?

14  A    Yes.

15  Q    What is it?

16  A    It's a critical analysis of the Executive Success

17  Programs Inc., authored by Paul Martin Ph.D., Clinical

18  Psychologist.

19  Q    Is this one of the reports that was published on your

20  website that formed the basis of the lawsuit?

21  A    Yes.

22          MS. HAJJAR:  Your Honor, the Government offers

23  Government Exhibit 610 into evidence.

24          MR. AGNIFILO:  No objection.

25          THE COURT:  Government Exhibit 610 is received in

Ross - direct - Hajjar                                4714

1    evidence.

2              (Government's Exhibit 610 received in evidence.)

3              (Exhibit published.)

4    BY MS. HAJJAR:

5    Q    What is the date of this article?

6    A    February 12, 2003.

7    Q    And this was authored by Doctor Paul Martin?

8    A    Yes.

9    Q    Now, the footnotes at the end of this article refer to

10   some ESP materials; is that right?

11   A    Yes.

12   Q    Now, I just want to look at a few parts of this report.

13   The program spells out a new version of good and bad; this is

14   at the bottom of the second page of Government Exhibit 610.

15            Here is a sampling from the workshop:  When we were

16   little children, we learned bad when someone yelled no or

17   that's bad, stop.  We learned good when we were rewarded in

18   some way.  This sort of learning is inconsistent and limiting

19   because, in order to have a full understanding of each

20   concept, we would have to examine every example of good and

21   every example of bad.

22            Now, is this one of these items that's excerpted

23   from the material because of the footnote here that refers to

24   the materials?

25   A    Yes.

SN        OCR        RPR

Ross - direct - Hajjar                                    4715

1    Q    And then this -- this writing that follows:

2              In the course of the program, normal terms such as

3    good and bad are redefined.  Good becomes prosurvival and bad

4    counter-survival or destructive of value.  Rules, according to

5    ESP, are fear-based and ethics are internalized.

6              Now that's not taken from the materials, correct?

7    A    Yes.

8    Q    What follows is the author's report?

9    A    Yes.

10   Q    Now, the mission statement that we looked at briefly, I

11   just want to point to one page.  This is page four of the

12   article.

13             Can you read the paragraph starting at number five?

14   A    Number five maintains that there is no ultimate victims.

15   What does this mean?  How far do we take human responsibility?

16   Is a raped woman somewhat responsible for her rape?  Is a

17   battered wife somewhat responsible for her battering?  Is an

18   employee subject to a mean, dishonest boss somehow not a

19   victim?  Are slaves in some manner not victims?  Are those hit

20   and hopelessly crippled by a drunk driver not victims?  Are

21   those accidentally paralyzed by the slip of a surgeon's knife

22   not victims?  What does Raniere have to say to this?  The

23   normal definition of victim, according to the Oxford

24   Dictionary of the English Language is, quote:  A person

25   harmed, injured or killed as a result of a crime or accident;

Ross - direct - Hajjar                    4716

1    2, a person who is tricked or duped.  End quote.

2         Common observation teaches that there are victims.

3    ESP appears to make victimhood seem as unnatural as sensing

4    the brisk chill on one's cheek on the morning of the first

5    autumn frost.

6    Q    Mr. Ross, where the report says number five maintains

7    that there are no ultimate victims, I'm just showing you again

8    the last page of the binder you were referring to.

9         And does that text appear here:  There are no

10   ultimate victims?

11   A    Yes, that's part of the 12-point mission statement by

12   Keith Raniere.

13   Q    And so this report excerpted that small portion, but the

14   remainder of the paragraph was critical of this piece?

15   A    Yes.

16         MS. HAJJAR:  Your Honor, I would like to show

17   something to the witness alone.

18         THE COURT:  Go ahead.

19   Q    I'm showing you what's marked for identification as

20   Government Exhibit 611.

21         Do you recognize this exhibit?

22   A    Yes.

23   Q    What is it?

24   A    It is titled:  Robert J. Lifton's *Eight Criteria of*

25   *Thought Reform*, as applied to the Executive Success Programs.

Ross - direct - Hajjar                                  4717

1    It was written by Paul Martin, Ph.D., Clinical Psychologist,

2    and it was published on the Institute website February 12th,

3    2003.

4    Q    Was this one of the reports that were published on your

5    website and formed the basis of the lawsuit?

6    A    Yes.

7              MS. HAJJAR:  Your Honor, the Government offers

8    Government Exhibit 611.

9              MR. AGNIFILO:  I do object, Your Honor.

10             Oh, I'm sorry, this is the second -- I don't object.

11   This is the second of the reports that were part of the

12   lawsuit, that's fine.

13             THE COURT:  All right.  Government Exhibit 611 is

14   received in evidence.

15             (Government's Exhibit 611 received in evidence.)

16             (Exhibit published.)

17   BY MS. HAJJAR:

18   Q    This is the same author, Mr. Ross, Doctor Paul Martin,

19   the same author of the other article that we just looked at?

20   A    Yes, Doctor Martin authored two reports.

21   Q    Okay.  Do you know who Robert Jay Lifton is?

22   A    Yes.

23   Q    Who is he is, generally?

24   A    Robert Jay Lifton is a psychiatrist who taught at Harvard

25   Medical School and John Jay School of Law.  He wrote the book

Ross - direct - Hajjar                    4718

1   *Thought Reform and the Psychology of Totalism*, which was

2   published in 1961.  And he is the author of I think an

3   important paper, *Cult Formation,* that was published in Harvard

4   in 1981, denoting the core elements of the destructive cult.

5   Lifton's book, *Thought Reform and the Psychology of Totalism*,

6   remains a kind of seminal benchmark book that's a study of

7   how, through coercive persuasion techniques, an individual can

8   be drawn into a situation of undue influence.  Lifton

9   specifically studied POW's that were held by North Korea

10  during the Korean conflict, and he interviewed them and that

11  formed the basis of his study of thought reform that

12  ultimately was the book published in 1961.

13  Q    And this report, does it cite to and in other words

14  involve part of Robert Jay Lifton's books and ideas?

15  A    The book *Thought Reform and the Psychology of Totalism*

16  has a chapter, chapter 22, that lists eight criteria by which

17  Lifton says that if those criteria are evident in a program,

18  they are using thought reform techniques.  And he lists those

19  eight criteria and explains them, and he says that if at least

20  six of the eight are evident in a group, in its dynamics, in

21  its training, a thought reform program is ongoing and evident.

22  Q    And so in Doctor Martin's report, where it begins with

23  milieu control and all of these topics here, are these

24  references to the -- to the eight factors that you just

25  referred to?

SN        OCR        RPR

Ross - direct - Hajjar                    4719

1  A    Those are, in fact, the eight criteria that Lifton lists

2  in his book *Thought Reform and the Psychology of Totalism.*

3  They are the criteria that he would evaluate any group or

4  program to establish whether it does or does not use thought

5  reform.

6  Q    I just want to look at one of these here.  This is

7  Section 4, it's called *The Cult of Confession,* and I would

8  just like you to read this paragraph starting with "serious

9  and often not so serious sins".

10  A    As serious and often not so serious sins are defined by

11  the group, are to be confessed either privately to a personal

12  monitor or publicly to the group at large, Lifton, quote:

13          Confession is serious beyond its ordinary religious,

14  legal and therapeutic expression to the point of becoming a

15  cult in itself.  There is the demand that one confess to

16  crimes one has not committed, to sinfulness that is

17  artificially induced, in the name of a cure that is

18  artificially imposed.  Such demands are made possible not only

19  by the ubiquitous human tendencies toward guilt and shame, but

20  also by the need to give expression to these tendencies.  In

21  totalist's hands, confession becomes a means of exploiting

22  rather than offering solace for these vulnerabilities.  The

23  assumption underlying total exposure is the environment's

24  claim to total ownership of each individual self within it.

25  The cult of confession makes it virtually impossible to obtain

Ross - direct - Hajjar                    4720

1    a reasonable balance between worth and humility.

2    Q    The paragraph you just read, Mr. Ross, does this relate

3    to or quote from Lifton?

4    A    Yes.

5    Q    But the paragraphs that follow, are these portions that

6    are excerpted from the materials we reviewed, the Stephanie

7    Franco materials?

8    A    Yes.

9    Q    And so that upon completion of the mission statement, all

10   recite, Thank you, Vanguard, as tribute to its author, and it

11   says Rules and Rituals, 12/2000, page four, is this what

12   follows, after this first paragraph, references to ESP?

13   A    Yes.

14   Q    And did that become the subject of the lawsuit?

15   A    Yes.

16   Q    And number six, Loading the Language, can you read that

17   paragraph, please?

18   A    The group develops a jargon in many ways unique to

19   itself, often not understandable to outsiders.  This jargon

20   consists of numerous words and phrases which the members

21   understand, or think they do, but which really act to dull

22   one's ability to engage in critical thinking.

23             Lifton, quote:  The language of the totalist

24   environment is characterized by the thought terminating

25   cliche.  The most far-reaching and complex of human problems

SN        OCR        RPR

1    are compressed into brief, highly reductive,

2    definitive-sounding phrases easily memorized and easily

3    expressed.  These become the start and finish of any

4    idealogical analysis.  Totalist language then is repetitiously

5    centered on all-encompassing jargon.  Prematurely abstract,

6    highly categorical, relentlessly judging, and to anyone but

7    its most devoted advocates deadly dull.  In Lionel Trilling's

8    phrase, quote:  The language of non-thought.

9    Q    And the parts that follow that paragraph, Mr. Ross, are

10   they also excerpted portions of the materials from Stephanie

11   Franco?

12   A    Yes, they're examples that are cited from the material by

13   Paul Martin, linked to what Lifton calls loading language.

14   Q    Now, at some point, were you contacted by a writer for

15   Forbes magazine?

16   A    Yes.

17   Q    And what happened when you were contacted by the -- by

18   the reporter?

19   A    He said that he was going to do an article about

20   executive coaching, executive seminars, training of

21   executives, and that he -- and that he wanted to explore that

22   area and write an article about it.  And he wanted to know

23   what groups I was aware of that did that type of training and

24   offered those type of seminars, and I gave him the names of

25   groups such as Landmark Education, Executive Success Programs

Ross - direct - Hajjar                          4722

1    and others.

2    Q    And was the Forbes magazine article in fact published?

3    A    Yes.

4    Q    Was that magazine article referenced in the lawsuit that

5    was filed against you?

6    A    I believe so.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Ross - direct - Hajjar                           4723

1  BY MS. HAJJAR:  (Continuing)

2  Q    Let me just show you what's marked --

3          MS. HAJJAR:  For identification, Your Honor.

4  Q    -- as Government Exhibit 608.

5          THE COURT:  608?

6          MS. HAJJAR:  Yes.

7          THE COURT:  All right.  For identification.

8  Q    Mr. Ross, do you see this exhibit?

9  A    Yes.

10 Q    Do you recognize it?

11 A    Yes.

12 Q    What is it?

13 A    This is the article that became a cover story for Forbes

14 magazine titled "The Cult of Personality" that was published

15 on October 13, 2003 and written by Michael Freedman, the

16 reporter that contacted me.

17         MS. HAJJAR:  The government offers Government

18 Exhibit 608 into evidence.

19         MR. AGNIFILO:  We object.

20         THE COURT:  Sidebar.

21         (Continued on next page.)

22

23

24

25

Sidebar                                                    4724

1              (The following occurred at sidebar.)

2              THE COURT:  Okay.  The objection is?

3              MR. AGNIFILO:  It's unduly prejudicial, a Forbes

4    article, and I don't know why, how that advances the ball for

5    the jury.  It's totally prejudicial and irrelevant.  So it's a

6    403 basis and relevance basis.

7              THE COURT:  Okay.

8              MS. HAJJAR:  It's not prejudicial.  We're not

9    offering it for its truth.  What we're offering it for, a few

10   things, is that Rick Ross is quoted in this magazine article,

11   and Edgar Bronfman, as saying that ESP is a cult, NXIVM is a

12   cult, and this precipitated the entire, whatever happened

13   after that that we've heard testimony about, efforts to

14   install a key logger on Mr. Bronfman's computer, the idea of

15   Rick Ross and Mr. Bronfman taking down NXIVM and ESP.  It came

16   because of this article and that's important to establish,

17   Your Honor, and the time frame as well.

18             MR. AGNIFILO:  I don't see why that should make the

19   article be a piece of evidence.  I've been saddled many times

20   with having to have a document that's not been entered into

21   evidence that I have to ask questions about and I think that's

22   appropriate for this as well.

23             MS. HAJJAR:  Your Honor, I don't know why this is

24   considered unduly prejudicial.  There's a description of

25   Executive Success Programs.  It's not too dissimilar from the

Sidebar                                                    4725

1    testimony we've heard.  Counsel hasn't identified any part of

2    it that appears prejudicial.  I'm just not sure what that is.

3              MR. AGNIFILO:  I mean, to have an article say that

4    it's a cult I think is unnecessary and prejudicial.  We have a

5    witness who's giving his, you know, testimony.  We don't need

6    it from an article.

7              MS. HAJJAR:  We're not offering it for the fact that

8    it is a cult.

9              MS. PENZA:  This is one of the subjects of the box.

10   Michael Freedman is one of the people who there was, there was

11   banking, banking information was obtained upon.  Like, these

12   are the -- I just wanted to raise that with you.

13             MR. AGNIFILO:  They can elicit those facts.

14             MS. HAJJAR:  But this -- the jury should be able to

15   see the fact that, in fact, Bronfman was quoted as saying, I

16   think it's a cult.  This precipitated all the things that

17   followed.  We heard snippets of testimony from witnesses that

18   they were under the impression that this, this was a big deal

19   for defendant, this was a big deal for NXIVM and ESP and this

20   is the article.  Once more, it was filed in the lawsuit.  It's

21   filed as part of the public filings in Rick Ross's case as

22   part of the damages that NXIVM purportedly sustained as a

23   result of this, of what Rick Ross said and others said.

24             MS. PENZA:  There was testimony about boxes of these

25   being brought in to the NXIVM center when this came out.

Sidebar                                                        4726

1          THE COURT:  What do you mean, boxes?

2          MS. PENZA:  Like, they bought many, many copies of

3   this.  This was a huge deal.  Even, Your Honor, with

4   Special Agent Weniger, I'm going to be introducing e-mails

5   from 2003 following this article with Clare Bronfman that show

6   the, like, beginning of the end of this never ending saga

7   about Clare Bronfman.  This is a key piece of evidence.

8          THE COURT:  I'll allow it with a limiting

9   instruction.

10          (End of sidebar conference.)

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ross - direct - Hajjar                     4727

1              (In open court.)

2              THE COURT:  Government Exhibit 608 which is a Forbes

3    magazine article from 2003 is admitted into evidence over

4    objection with a limiting instruction that it is not offered

5    for the truth of the matters asserted, but in order to

6    establish the steps that were taken by those interested in and

7    involved with the issues in this case.

8              All right.  Go ahead.

9              MS. HAJJAR:  Thank you.

10             (So marked.)

11   BY MS. HAJJAR:

12   Q    So, Mr. Ross, directing you to the first part of

13   Government Exhibit 608, the title of the article, can you read

14   it?

15   A    "Cult of personality."

16             MS. HAJJAR:  Sorry, Your Honor.  May I publish it to

17   the jury?

18             THE COURT:  Of course.  Okay.

19   Q    Can you read the title, please?

20   A    "Cult of personality."

21   Q    And it was published in Forbes magazine on October 13,

22   2003?

23   A    Yes.

24   Q    And is this the cover of the article?

25   A    Yes.

Ross - direct - Hajjar                    4728

1   Q    Now, turning your attention to the last paragraph of this

2   first page, can you read starting from "Detractors"?

3   A    Detractors say he runs a cult-like program aimed at

4   breaking down his subjects psychologically, separating them

5   from their families and inducting them into a bizarre world of

6   messianic pretensions, idiosyncratic language and ritualistic

7   practices.  "I think it's a cult," says Bronfman.  Though he

8   once took a course and endorsed the program, he hasn't talked

9   to his daughters in months and has grown troubled over the

10  long hours and emotional and financial investment they have

11  been devoting to Raniere's group.  One daughter, Clare, 24,

12  has lent the program $2 million at 2.5 percent interest.  The

13  senior Bronfman says.  (She denies this.)

14  Q    Mr. Ross, do you recall how this article became part of

15  the lawsuit that was filed against you?

16  A    I don't recall specifically, but I think it was alluded

17  to.

18  Q    And were you alluded to in this article?

19  A    I was quoted.

20  Q    Okay.  And I'm going to turn your attention to the end,

21  the last paragraphs here where the article says:  The family

22  hired Rick A. Ross, a Jersey City, New Jersey specialist in

23  cults to intervene to no avail.  And there's a description of

24  the lawsuit and references to Stephanie Franco.

25            This was information about the events you just

Ross - direct - Hajjar                    4729

1   described, Mr. Ross?  These were included in the article that

2   form the basis of the lawsuit?

3   A    Yes.

4   Q    Mr. Ross, you testified that the lawsuit against you

5   lasted for 14 years?

6   A    Yes.

7   Q    Was it costly for you?

8   A    No.

9   Q    Why not?

10  A    I was represented by a team of lawyers pro bono including

11  Peter Skolnik who came from the law firm of Lowenstein Sandler

12  in New Jersey, in Roseland.  Also, Douglas Brooks, a

13  practicing attorney in the Boston area.  Public Citizen which

14  is an advocacy organization in Washington, D.C. also helped as

15  did the Berkman Center of Law at Harvard University and

16  another lawyer, I can't recall his name, briefly helped in the

17  area of Albany, New York before the lawsuit was transferred to

18  New Jersey.

19          So I was very fortunate to have a team of pro bono

20  lawyers working for free because they believed that there were

21  First Amendment issues, freedom of speech, freedom to

22  criticize, and they decided that this was something that they

23  wanted to help with and for years, they helped and they never

24  charged me a penny or even collected any money from me for

25  their costs.

Ross - direct - Hajjar                    4730

1    Q    Were the other defendants in the lawsuit also represented
2    pro bono without cost?
3    A    The pro bono team did cover Dr. Paul Martin.  They -- and
4    they covered me and the Institute.  They did not cover the
5    Suttons who spent a great deal of money defending themselves
6    over a period of years.  They did not cover Stephanie Franco
7    who spent money covering her legal costs over the years.  And
8    they did not cover John Hochman who was in California and
9    who -- I'm not quite sure how John covered his legal fees.
10   For a while, he worked, he was working for the University of
11   California as a teacher and some of his legal costs may have
12   been borne by the school.  I'm not quite certain, but I know
13   that the pro bono team did not cover John Hochman.
14   Q    Now, at some point, Mr. Ross, were you contacted about
15   your personal financial information?
16   A    Yes.
17   Q    Can you explain that?
18   A    A man by the name of Joseph O'Hara that was once
19   associated with Keith Raniere contacted me and then a reporter
20   for a newspaper called Metroland in the area of Troy and
21   Albany contacted me.  His name is Chet Hardin.  And they told
22   me that --
23             MR. AGNIFILO:  Your Honor --
24             THE COURT:  Yes.  That's an objection as to what
25   they told him?

Ross - direct - Hajjar                          4731

1          MR. AGNIFILO:  What's the question?

2          THE COURT:  Is there an objection?

3          MR. AGNIFILO:  There is an objection.

4          THE COURT:  As to what they told him?

5          MR. AGNIFILO:  That's right.

6          THE COURT:  Yes.  That is sustained.

7          MS. HAJJAR:  Your Honor, well, I'll try a different

8    way.

9          THE COURT:  Okay.  Go ahead.

10   Q    Mr. Ross, were you provided with anything by these

11   individuals?

12   A    Yes.

13   Q    What were you provided with?

14   A    They provided me with copies of my bank statements and

15   phone records that were private.

16   Q    And --

17          THE COURT:  Had you requested those from them?

18          THE WITNESS:  No.

19          THE COURT:  Go ahead.

20          MS. HAJJAR:  Your Honor --

21          THE COURT:  Go ahead.

22   Q    Did they communicate to you where the banking information

23   was from?

24   A    Yes.

25          MR. AGNIFILO:  Objection, Judge.

Ross - direct - Hajjar                                    4732

1              THE COURT:  Overruled.

2              You may answer.

3    A    That private investigators hired by NXIVM had obtained my

4    private banking records and my private phone records.

5    Q    Did you come to learn that a company called Interfor had

6    been hired by NXIVM?

7    A    Yes.

8    Q    Did you file a counterclaim against Interfor in a lawsuit

9    that you've been testifying about?

10   A    Yes.

11   Q    And was it, in part, related to the obtaining of your

12   banking information?

13   A    Yes.

14   Q    Had you previously known about Interfor?

15   A    Yes.

16   Q    What happened?

17   A    I was contacted by Interfor and they said that they

18   represented and were working with a mother who was concerned

19   about her daughter being involved with Executive Success

20   Programs and that she wanted my help.  And they arranged for a

21   meeting at their offices in Manhattan and I met the head of

22   Interfor, Juval Aviv, and I met a woman who said she was a

23   mother of a NXIVM participant.  Interfor said that they were

24   working with her to help her.  She then retained me, signed a

25   fee agreement, gave me a check for a retainer for my services,

Ross - cross - Agnifilo                              4733

1   and her hope was to do an intervention, she said, to get her

2   daughter out of NXIVM.

3   Q    What did you later come to learn about that intervention,

4   proposed intervention?

5   A    That it was all faked, that the mother was acting and she

6   was not really a mother of a NXIVM participant, that Interfor

7   was, in fact, working for NXIVM and that the whole thing was a

8   setup.

9   Q    Did any -- did this intervention go forward?

10  A    No.

11  Q    And did this interaction with Interfor become part of

12  your counterclaim in the lawsuit?

13  A    I think it was alluded -- I think it was alluded to, yes.

14          MS. HAJJAR:  Your Honor, I have no further questions

15  for this witness.

16          THE COURT:  Cross-examination.

17  CROSS-EXAMINATION

18  BY MR. AGNIFILO:

19  Q    Good afternoon, Mr. Ross.

20  A    Good afternoon.

21  Q    My name is Marc Agnifilo.  I represent Keith Raniere.

22  I'm going to ask you some questions.  If I ask you a question

23  that you do not understand, ask me to rephrase it and I'll do

24  that.  Okay?

25  A    Okay.

Ross - cross - Agnifilo                    4734

1    Q    Do you know who Kristin Keeffe is?

2    A    Yes.

3    Q    Who is it?

4    A    Someone who was once involved with NXIVM and who was

5    closely associated with Keith Raniere.

6    Q    They had a child together, right?

7    A    That's what I've been told.

8    Q    What role did Kristin Keeffe play, to your knowledge, in

9    this bit with Interfor that you just described for the jury?

10   A    My understanding is that she was involved and that she

11   helped NXIVM and Keith Raniere and did work for them as an

12   assistant regarding some of their activities which would

13   include Interfor.

14   Q    Okay.  You have no idea what Kristin Keeffe and Keith

15   Raniere did or did not talk about, right?

16   A    I did not witness any of their conversations.

17   Q    Now, getting to the Sutton family situation, how many

18   individual times did you have interventions with Michael

19   Sutton?

20   A    Well, we had -- we met in Boca Raton, Florida, and that

21   would be for two or three days.  Then we later met at the

22   Sutton's residence in Elberon, New Jersey.  That would have

23   been for a day, possibly there were two meetings.  I know

24   there was at least one.  And then we also met at the company

25   offices, the Sutton's company, in Manhattan and that was with

Ross - cross - Agnifilo                              4735

1   Jeffrey Sutton, myself and Michael Sutton.  So there were

2   different meetings at different days at different locations.

3   Q    And in preparation for the first intervention, the one in

4   Boca Raton, Florida, did you learn certain things about

5   Michael Sutton's situation in his family?

6   A    No.

7   Q    Okay.  Did you learn that he had a daughter?

8   A    No, not before the intervention.

9   Q    When did you learn that?

10  A    During the time of the intervention, there was a point

11  where he brought that up and I learned about that and his

12  parents discussed it with me.

13  Q    Okay.  The Suttons, was it an Orthodox Sephardic family?

14  A    Yes.

15  Q    And Michael had a daughter with a woman who is not in the

16  community?

17  A    Yes.

18  Q    And the family did not accept Michael's daughter who was

19  from a woman not in the community, correct?

20  A    Yes.

21  Q    And wasn't that one of the big concerns that Michael had

22  that, on the one hand, I have this daughter, I want to be a

23  father to my daughter, but my family is not accepting my

24  daughter or the daughter's mother, correct?

25  A    I think that was a vulnerability that Keith Raniere

Ross - cross - Agnifilo                              4736

1   exploited, that he recognized that Michael had this conflict

2   in his family, and he drilled down into it in order to

3   manipulate Michael.

4   Q     Did I ask you anything about Keith Raniere just now?

5   A     You asked me about Michael Sutton and I explained to you

6   what actually happened with Michael Sutton and what role his

7   daughter played in the situation.

8   Q     So I want to talk about what you understood Michael

9   Sutton's situation was.  Okay?

10  A     All right.

11  Q     So this came out in the first intervention?

12  A     I think so.  It came out at some point.

13  Q     And Michael Sutton spoke to you at great length about the

14  fact that if he chose his Orthodox family, he would not have a

15  relationship with his daughter?

16  A     No, he did not say that.

17  Q     What did he say about that?

18  A     He said he was troubled, that his family did not accept

19  his daughter.

20  Q     And he wanted to have a relationship with his daughter,

21  correct?

22  A     He did have a relationship with his daughter.

23  Q     And he wanted to have a relationship with his daughter

24  and he wanted his family to accept his daughter, correct?

25  A     He wanted his family to accept his daughter, yes.

Ross - cross - Agnifilo                              4737

1   Q     And you were aware of the fact that his family was not

2   prepared to accept his daughter?

3   A     That is what they said.

4   Q     So, ultimately, you said the first intervention went over

5   the course of two days?

6   A     It was about two or three days.

7   Q     And what are you doing all that time?

8   A     Well, it was, it was kind of chopped up because Michael

9   would say, "I want to go play tennis," "I don't want to talk

10  anymore," and so it was dependent upon Michael and what he

11  thought was reasonable.  So we would actually a lot of the

12  time be talking on the beach under a beach umbrella because

13  Michael would say, "I want to be on the beach."  And so he

14  would take breaks and we would talk for a while and then he

15  might say, "That's enough, I'm going to go play tennis," or

16  whatever, but there were hours during a two or three day

17  period that we did talk about his family's concerns and NXIVM.

18  Q     And during these -- and for the timing, I'm just talking

19  about that first intervention in Boca Raton.  There were times

20  during this first intervention where Michael is speaking

21  positively of NXIVM, correct?

22  A     Yes.

23  Q     And what is he saying?

24  A     He's saying it's given something to me and he would go

25  into their kind of question format where he would ask me

CMH        OCR        RMR        CRR        FCRR

Ross - cross - Agnifilo                    4738

1   questions as he had been trained to ask through their

2   training.  And I would say to him, Michael, will you please

3   just talk to me and not speak to me in that way regarding

4   NXIVM and that I think that you should just speak for yourself

5   rather than communicate according to their guidelines.  And

6   then he would break through and just kind of talk

7   spontaneously rather than robotically.  And I found that he

8   was a very kind man, a very nice man, and I realized that he

9   thought there were positive things about NXIVM but there were

10  also negative things and we discussed that as well.

11  Q    So in this first intervention, he talked to you about

12  positive things and negative things about NXIVM, fair to say?

13  A    Well, he focused on the positive though he admitted

14  things like the singular importance of Keith Raniere, his

15  title of Vanguard, that Nancy Salzman was the prefect, and how

16  they celebrated his birthday for Vanguard Week and so forth.

17        And I told him, Michael, this sounds like a cult of

18  personality rather than a legitimate seminar selling company

19  and it sounds to me, like, basically what they're selling is

20  you have to think like and act like and be like Keith Raniere

21  and that he is the prototype and that everyone is supposed to

22  be a clone.  And I said, Is that really what you want in your

23  life?  And so we talked deeply about some of these issues

24  though, as I said, Nancy Salzman was often buzzing in his ear

25  and talking to him and coaching him.

Ross - cross - Agnifilo                    4739

1   Q    And one of the things that he would talk to you about

2   during this first intervention is the problems he was having

3   with his family, correct?

4   A    Not really.  He -- it was clear to me, and I can see from

5   their interaction, a very loving family.  Morris and Rochelle

6   Sutton, who died during the 14 years of litigation at

7   different points from cancer, they loved Michael with every

8   fiber of their being.

9   Q    They didn't love their granddaughter.

10  A    They did not have a relationship with her.  They never

11  said they did not love her or care about her but they

12  expressed great love for Michael.  And, in fact, Morris and

13  Michael had both bought matching Porsches and they were very

14  close, they were like pals, and it was -- there was a very

15  loving family.

16  Q    But you'll agree with me that when Michael had a daughter

17  with a woman out of the, outside of the Sephardic Orthodox

18  community, that marked a drastic change in Michael's

19  relationship with his parents?

20  A    His parents were not happy about that but it was, it was

21  evident to me from the way that they talked, from the way

22  Michael talked, that they all loved each other despite that

23  disagreement.

24  Q    But despite the fact that the parents loved Michael, the

25  parents let Michael know they would have nothing to do with

Ross - cross - Agnifilo                    4740

1   Michael's daughter, their granddaughter, fair to say?

2   A    They did not have a relationship with their

3   granddaughter, that is --

4   Q    And they didn't have a relationship with the

5   granddaughter because they didn't want a relationship with

6   Michael's daughter, correct?

7            MS. HAJJAR:  Objection, Your Honor.

8            THE COURT:  You may answer.

9   A    They did not meet with the granddaughter and they openly

10  discussed that in front of me and -- but, again, it was clear

11  to me that they loved Michael, that Michael loved them, but

12  they had this disagreement about his daughter.

13  Q    Now, and so how does the first intervention in Boca Raton

14  end?

15  A    It ends kind of loosely with the feeling that there will

16  be other talks, there will be more discussion, and Nancy

17  Salzman had said there should be more experts opining about

18  our training and offering opinions other than myself and so

19  that's how John Hochman and Paul Martin, the doctors, became

20  involved because they are both experts and so they wrote their

21  expert reports.

22  Q    Now, at one point, did you get a cease-and-desist letter

23  from John Hochman's lawyer in 2006?

24  A    I don't recall.  I know that John settled.  He won the

25  lawsuit and it was dismissed, but then Keith Raniere and NXIVM

Ross - cross - Agnifilo                    4741

1   filed, I think, for an appeal and John decided to settle and I

2   don't recall, though John and I were on very friendly terms

3   and he never called me about anything that I can recall

4   specifically.

5   Q    Do you remember getting a cease-and-desist letter from

6   his lawyer to take John Hochman's report off of your website?

7   A    No, I don't, I don't recall that exactly.  I don't recall

8   taking it down.  In fact, it's still up.

9

10              (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Ross - cross - Agnifilo                                    4742

1  CROSS-EXAMINATION CONTINUES

2  BY MR. AGNIFILO:

3  Q    No, I'm not asking if you took it down, I'm asking if you

4  got a cease-and-desist order from John Hochman's lawyer

5  directing you to take John Hochman's report off of your

6  website in 2006?

7  A    As I recall, John Hochman signed over copyright of his

8  article to NXIVM and Keith Raniere and, therefore, John no

9  longer held copyright.

10        And if I did receive such a letter, which I may

11  have, I received many, many letters through that litigation

12  over the years, it would be, in effect, void because John did

13  not have copyright.

14        I -- I don't recall receiving a letter from the

15  copyright holder that John had signed it over to, specifically

16  NXIVM, saying that -- that they were invoking copyright and

17  wanted the article taken down.  And I did not take down the

18  article and there was no legal action to invoke copyright to

19  take down the article.

20  Q    Well, part of the -- of what NXIVM wanted in the lawsuit

21  was for you to take down the articles, fair to say?

22  A    That is what they wanted, but the articles were never

23  taken down and there was no specific legal action regarding

24  copyright on John Hochman's article.

25  Q    Do you remember John Hochman -- you're saying you don't

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                    4743

1    remember, you're not saying it didn't happen.

2          You're saying you don't remember getting the

3    cease-and-desist letter from John Hochman's lawyer?

4    A    I don't recall that.  I know that whatever letters I

5    received were immediately handed over to my attorney.  So

6    Peter Skolnik or other lawyers would have reviewed any

7    communication regarding legal matters concerning NXIVM.

8    Q    All right, so let's get to the second intervention for

9    Michael Sutton.

10          Where is that one?

11   A    Well, it would be a continuation of the ongoing

12   conversation that we were having.  And the second meeting that

13   I had with him, I believe, was at the family residence in

14   Elberon, New Jersey.

15   Q    Okay.  And tell us about that intervention.  And let me

16   just back you up.

17          How much time passed between Boca Raton and now the

18   intervention in New Jersey?

19   A    I'm not sure.

20   Q    Days, weeks?

21   A    It could have been days, weeks.

22   Q    Okay.

23   A    And then we convened at the family's home in Elberon; and

24   Morris Sutton was there, Rochelle Sutton was there, I was

25   there, and Michael.  Jeffrey, I think, was also there,

Ross - cross - Agnifilo                                         4744

1    Michael's brother.

2    Q    Do you remember the Sutton s asking you to take the

3    material off your website?

4    A    Yes.

5    Q    And when did the Suttons ask you to take the material off

6    your website?

7    A    That was after they felt that the intervention had -- my

8    intervention work was done.  I had met with Stephanie, I had

9    met with their other daughter and her husband, their

10   son-in-law, and they felt the intervention work for me was

11   done.  They no longer wished me to do any work and they did

12   ask me if I would consider taking the articles down.

13   Q    And didn't they say to you that they wanted to try and

14   repair the -- this is the parents, they wanted to repair the

15   relationship with Michael?

16   A    They said they wanted the articles down and they felt

17   that that might have some positive affect.

18   Q    And you told them no?

19   A    Yes, I did.  And I explained that these articles were

20   important to help other people, and that this was the type of

21   work that needed to be online so that no other families would

22   be hurt as theirs was.  And I told them that I doubted whether

23   it would really make a difference in their relationship, but

24   that it would make a difference for many, many other families,

25   as I would hear from them over the years that the articles

Ross - cross - Agnifilo                    4745

1  remained available online.

2  Q    Now, how long were you on retainer from the Suttons?

3  A    For a period of, maybe, months.

4  Q    And do you recall what they paid you?

5  A    I can't recall the exact amount, but it may have been

6  somewhere in the neighborhood of $500 a day or $50 an hour.

7  It may have been higher than that.

8         I can't -- I can't recall the exact agreement that

9  we had, which would have been in, I believe, 2002.

10  Q    Okay.  And do you remember what you were paid in total

11  for the services you rendered to the Suttons?

12  A    It would have been thousands of dollars.

13  Q    Tens of thousands of dollars?

14  A    No, no.

15  Q    Now, at one point you said in your first intervention

16  with Michael it was mentioned that -- I think you said Nancy

17  Salzman said something along the lines of there are no --

18  there are no experts.  It would be nice to have experts

19  opining on NXIVM, or something along those lines.

20         Correct?

21  A    Well, NXIVM had a teaching that you -- you seek expert

22  opinion to establish the facts or -- or -- or have a better

23  knowledge base.  That is their claim.  And so she encouraged

24  Michael to get additional expert opinion.  And he brought that

25  up to me, talked to me about it, and then I actually followed

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                                    4746

1   through.

2   Q    And -- and so you hired John Hochman and Paul Martin,

3   correct?

4   A    Morris and Rochelle Sutton actually hired them, but I --

5   I conveyed to them the study notes, and then they did their

6   reports.

7            Paul Martin resided in Ohio near Columbus.  And John

8   Hochman in Los Angeles.

9   Q    So you didn't find Hochman and Martin, you're saying the

10  Suttons did?

11  A    No, I'm saying they were on the list that Michael asked

12  me.  Michael said:  Who would be other experts that could

13  opine about the training from this perspective of is it or is

14  it not a destructive cult?

15           And I gave a number of names, including John Hochman

16  and Paul Martin.  I also mentioned Margaret Singer, Robert J.

17  Lifton, Stephen Kent.  There were a number of people that I

18  mentioned, but we have -- the Suttons eventually hired the two

19  doctors that wrote the reports.

20  Q    Okay.

21           And you mentioned another, another person,

22  Mr. Lifton?

23  A    Robert J. Lifton.

24  Q    Right.  And you said he's well-known as a -- as someone

25  who's written about cults and similar matters, right?

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                                              4747

1   A    He's written about cults, but his most important work
2   really, the work that many people discuss relative to cults is
3   his book, <u>Thought Reform and the Psychology of Totalism</u>.
4   Q    Now, Mr. Lifton, he didn't review the NXIVM situation,
5   correct?
6   A    No, he was not retained by the family.
7   Q    Paul Martin in his second report referred to the
8   Lifton -- the eight Lifton factors, correct?
9   A    He -- he referred to the criteria written by Lifton in
10  Chapter 22 of his book, <u>Thought Reform and the Psychology of</u>
11  <u>Totalism</u>, to establish whether or not a thought reform program
12  is ongoing.
13  Q    And Mr. Martin, was Paul Martin paid for his two
14  articles?
15  A    Dr. Martin was paid to do an expert report.
16  Q    And he was paid, ultimately, by the Suttons, correct?
17  A    Yes.
18  Q    And John Hochman was paid by the Suttons?
19  A    Yes.
20  Q    And the purpose of these three reports was to get Michael
21  Sutton out of NXIVM, right?
22  A    They -- the Suttons felt that Michael had requested
23  expert opinion.  He wanted to talk to someone or have reports
24  from someone other than me, and they felt that by him reading
25  these reports by respected experts in the field, it might

Ross - cross - Agnifilo                            4748

1   influence his thinking.  It might, you know, cause him to dig

2   deeper and do more research himself and that might lead to him

3   leaving NXIVM.

4           But I think the Suttons' bottom line was that

5   education is good and -- and it can't be a negative thing,

6   really, in this sense.  And so, whatever Michael would get

7   from it, he would get from it; and they wanted to give him as

8   much as possible.

9   Q    You were getting paid by Michael's parents, right?

10  A    Yes.

11  Q    Michael wasn't paying you?

12  A    No.

13  Q    And Michael's parents wanted Michael out of NXIVM, right?

14  A    They felt it was a bad influence in his life and causing

15  him problems, and they felt the same way about how it had

16  affected Stephanie Franco and their daughter, her sister, and

17  her husband.

18  Q    And so Michael Sutton's parents were paying you to get

19  Michael and the other kids who were in NXIVM out of NXIVM,

20  right?

21  A    Basically, they were -- were paying me to present a

22  critical analysis, critical information; and their hope was

23  that after they heard that information, that they would decide

24  to leave.  Yes.

25  Q    And you got the Hochman and Martin reports to further

Ross - cross - Agnifilo                                    4749

1    your mission in getting Michael out of NXIVM?

2    A    I think the family hoped, and I hoped, that when Michael

3    read those reports, which as far as I know he refused to

4    review them with Jeffrey and I when we came to the office in

5    Manhattan.  They hoped, and I hoped, that that might stimulate

6    him to critically evaluate what was going on and to reconsider

7    his commitment to NXIVM.

8    Q    Didn't he tell you, in substance, these are just tools

9    that you're using against him to try and get you out of NXIVM?

10   A    I think Michael was extensively coached.  I witnessed the

11   coaching firsthand when we were in Boca Raton, and I think

12   that he was much more amenable and open to looking at things.

13   And then it just seemed like the more he was coached, the more

14   he shut down.

15              And at -- at some point he just at the offices said,

16   I'm done.  I don't want to talk to you anymore.  I don't want

17   to discuss this anymore.  Jeffrey was sad, but that was the

18   end.

19   Q    When you say you saw firsthand he was coached, did you

20   ever see him speaking to anybody in NXIVM, other than Nancy

21   Salzman on the phone?

22   A    No, I saw him speaking with Nancy Salzman and I heard her

23   voice, and he identified her as Nancy Salzman repeatedly.

24   Q    And was that only in Boca Raton or was that at other

25   times as well?

Ross - cross - Agnifilo                          4750

1    A     That was in Boca Raton.

2    Q     Okay.  So let's talk about the second intervention where

3    he's not speaking.

4              MR. AGNIFILO:  Yes, Judge.

5              THE COURT:  I think it's time.

6              MR. AGNIFILO:  Yes, that's good, Judge.

7              THE COURT:  Then we'll go on with the rest of your

8    cross after lunch.

9              MR. AGNIFILO:  Yes, that's fine, Judge.  Yes.

10             THE COURT:  All right, we will take an hour for

11   lunch.

12             All rise for the jury.

13             (Jury exits.)

14             THE COURT:  All right, the witness may stand down.

15   Do not discuss your testimony with anyone.

16             (Witness steps down.)

17             THE COURT:  Everyone may be seated.

18             About how much more do you have?

19             MR. AGNIFILO:  Twenty minutes.

20             THE COURT:  Okay.  I think at some point we need to

21   advise the jury about the future of the case, and I would like

22   the parties to discuss it with each other, and so that at some

23   point either today or tomorrow, I can give the jury an idea of

24   what the rest of the schedule is.

25             MR. AGNIFILO:  Very good, Your Honor.

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                          4751

1           MS. PENZA:  Your Honor, may we actually ask for an

2    hour-and-15-minute lunch because we have a custodian here and

3    we have a little bit of a technical issue?  And if we do that

4    we'll be able to --

5           THE COURT:  Okay, that's fine, an hour-and-15.

6           MS. PENZA:  Thank you.

7           MR. AGNIFILO:  Thank you, Your Honor.

8           (The defendant exited the courtroom.)

9           (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

10          (Luncheon recess taken.)

11

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      4752

1                    **AFTERNOON SESSION**

2                 (In open court - jury not present.)

3            (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

4            (The defendant entered the courtroom.)

5            THE COURT:  Okay.  Do we have something we have to

6    do before we start?

7            MS. PENZA:  No, Your Honor.

8            MR. LESKO:  Your Honor, did Your Honor want to

9    discuss a representation to the jury about the schedule of the

10   trial?

11           (Defendant entered the courtroom.)

12           THE COURT:  Well -- please be seated in the back.

13           Did you have a discussion about it?

14           MR. AGNIFILO:  We have, Judge.

15           THE COURT:  Who would like to jump in?

16           MR. LESKO:  Well, I'll jump in.  I --

17           THE COURT:  Well, it is the Government's case.  And

18   then we will get to the defense.

19           How much longer do we have to go, do we think?  I am

20   not limiting you to what you tell me, but it would be good to

21   be able to tell the jury, give them an idea of what lies

22   ahead.  But if you don't want to do it now, we can do it

23   tomorrow.

24           MR. LESKO:  So maybe we could advise the jury that

25   we may only have a few witnesses left that may only take

SAM     OCR     RMR     CRR     RPR

Proceedings                                                      4753

1     another day, but nothing is certain and all of that.

2              THE COURT:  And we may have court on Friday.  We may

3     have testimony on Friday?

4              MR. AGNIFILO:  We may.  I think the view is that we

5     also may not, but I leave that to Your Honor.

6              THE COURT:  We may or may not have testimony on

7     Friday, but we expect that next week we will have closing

8     arguments --

9              MR. AGNIFILO:  That's right.

10             THE COURT:  -- and the charge?

11             MR. AGNIFILO:  That's right.

12             THE COURT:  I think that's a fair thing to do.

13             By the way, if you have a proposed charge on

14    evidence obtained pursuant to searches, you should give it to

15    me.

16             MS. HAJJAR:  All right, Your Honor.

17             THE COURT:  Okay?

18             And if we do not have testimony on Friday, then we

19    will have a charge conference on Friday.  All right?

20             MR. AGNIFILO:  All right.

21             THE COURT:  And you should have the draft charge by

22    tomorrow.

23             MR. AGNIFILO:  Very good, Judge.

24             THE COURT:  All right, let's call in the witness and

25    the jury.

SAM      OCR      RMR      CRR      RPR

Proceedings                                                  4754

1              (The witness enters the courtroom and resumes the

2    stand.)

3              (Jury enters.)

4              THE COURT:  Please be seated, everyone.

5              All right, before we complete cross-examination, let

6    me just advise the jury, I have been discussing with the

7    parties the schedule.

8              And I anticipate that we will have testimony

9    tomorrow and, perhaps, Friday.  Now, this is only tentative,

10   so please don't hold me to this, but testimony tomorrow and,

11   perhaps, Friday.

12             And then next week, on Monday, we would have closing

13   arguments.  And then on Tuesday, we will have the charge to

14   the jury that I will give to you.  And the charge will be read

15   to you, and then you will have it.  Each of you will have it

16   with you in the jury room when you deliberate, so you won't

17   have to take notes while I am giving you the charge.

18             Then you will retire to consider your verdict.

19             So that is our hope and our current plan, subject to

20   revision.  I hope I made that as imprecise as possible.

21             Okay.  All right, let's continue with

22   cross-examination.

23             MR. AGNIFILO:  Thank you.

24             THE COURT:  I remind the witness that he is still

25   under oath.              (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                    4755

**RICK ROSS**,

 1      previously called as a witness by the Government, having

 2      been first duly sworn/affirmed by the Courtroom Deputy,

 3      was examined and testified under oath as follows:

 4  CROSS-EXAMINATION RESUMED

 5  BY MR. AGNIFILO:

 6  Q    Good afternoon, Mr. Ross.

 7  A    Good afternoon.

 8  Q    Now, in addition to the Michael Sutton intervention, you

 9  did an intervention with one of Michael's sisters, correct?

10  A    Yes.

11  Q    And one's name you can remember, and one's name you can't

12  remember, am I right?

13  A    That's correct.

14  Q    All right.  The one whose name you can't remember is

15  married to Aaron, right?

16  A    Yes.

17  Q    Okay.  And the one -- and then there is Stephanie Franco,

18  who is the other sister, correct?

19  A    Yes.

20  Q    All right.  And just to recap, Franco had literature that

21  she had from when she took a NXIVM coursework, correct?

22  A    Yes.

23  Q    Okay.  And she gave that literature to you?

24  A    She actually gave it to her brother, Jeffrey.  And

Ross - cross - Agnifilo                        4756

1    Jeffrey gave it to me.

2    Q    Okay.  So you ended up with it, you ended up with the

3    exact same literature that Stephanie got from the coursework,

4    correct?

5    A    Yes.

6    Q    And you understood that there was a confidentiality

7    agreement that Stephanie had signed when she took the course?

8    A    No.

9    Q    You didn't know that?

10   A    No.

11   Q    When did you learn that for the first time?

12   A    When Stephanie Franco was on -- was on her way to her

13   lawyer after we were served, she told me, and it was the last

14   conversation I had with her, that she was being told that she

15   was in violation of a confidentiality agreement.

16           Later -- and I asked her, was there an agreement,

17   and she said no.  And then later, it turned out that she had

18   signed a Visa charge slip, which in very, very small print had

19   something about confidentiality that she was not aware of.

20   Q    But -- she signed a what?  I didn't hear what you said.

21   A    She signed a -- a credit card slip.  You know, she signed

22   her signature on a credit card charge for payment to NXIVM or

23   ESP, and in very small print on that slip there was something

24   pertaining to confidentiality.  And she was not aware of it

25   until after she was served and -- and she became aware of the

Ross - cross - Agnifilo                                    4757

1    fine print of that slip.

2    Q    Have you seen that?

3    A    I think I may have seen it once in the course of the

4    litigation, but I certainly had not seen it before I was -- I

5    was served.

6              And Stephanie Franco, herself, said that I had not

7    signed a confidentiality agreement in the last conversation I

8    had with her.

9    Q    Okay.  Ultimately, the confidentiality agreement was

10   produced as part of the lawsuit, correct?

11   A    I believe so, yes.

12   Q    And confidentiality agreements are common in business,

13   that's your experience, correct?

14   A    Not necessarily, but --

15   Q    So --

16   A    -- there certainly are confidentiality agreements, yes.

17   Q    Right.  I mean, different companies use confidentiality

18   agreements when they don't want someone else to use their

19   information in ways that they don't intend, correct?

20   A    I think that there are confidentiality agreements, yes.

21   Q    And you are aware of litigation going on in -- other than

22   your case, over confidentiality agreements, right?

23   A    Well, NXIVM v. Ross became a court precedent regarding

24   the nature of a confidentiality agreement.  And what the Court

25   ruled -- NXIVM v. Ross became a court precedent for the

Ross - cross - Agnifilo                    4758

1   setting aside of a confidentiality agreement in the public

2   interest.

3          And the federal court ruled that regardless of the

4   confidentiality agreement that Stephanie Franco had, that the

5   public interest trumped the confidentiality agreement.  And,

6   therefore, they ruled against Mr. Raniere and NXIVM.

7          And NXIVM v. Ross was upheld by the United States

8   Supreme Court, which refused to review that case finding.  And

9   NXIVM v. Ross is now a precedent setting case.

10  Q    Okay.  So you said a lot of things just there.  Let's

11  unpack it.

12  A    All right.

13  Q    Okay.  So at the time, the case was in the Northern

14  District of New York, correct?

15  A    Yes.

16  Q    Okay.  And from the Northern District of New York, it was

17  appealed to the United States Court of Appeals to the Second

18  Circuit, correct?

19  A    Yes.

20  Q    Okay.  And the issue, you tell me if this is the way you

21  remember it from your involvement in it, is that NXIVM was

22  claiming you and the others violated their confidentiality

23  agreement, because there was a confidentiality agreement

24  signed by Stephanie Franco that she would keep the information

25  confidential, that's one side of it?

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                    4759

1   A    That was NXIVM's claim.

2   Q    Right.  Your side of it is, even if we did violate the

3   confidentiality agreement, we have a First Amendment Fair Use

4   right to use the information on -- to put the information on

5   your website, is that right?

6   A    That -- there was a Fair Use that was cited by the

7   Circuit Court.  And then in addition to that, they also set

8   aside the confidentiality agreement as a means of having a

9   basis to remove the articles from the database.

10  Q    Right.  So tell me if this is your recollection:

11       The Second Circuit acknowledged the existence of the

12  confidentiality agreement, but basically said the First

13  Amendment trumped the confidentiality agreement, and so it was

14  you used -- what the Second Circuit said was that they would

15  use the information fairly under the Fair Use doctrine.

16       Am I getting this right?

17  A    No.

18  Q    All right.  So tell me how I'm wrong.

19  A    That's -- that's part of it, but also what the -- my

20  understanding of the Second Circuit ruling was that because

21  the information was in the public interest, that the

22  confidentiality agreement did not trump the public interest.

23  Q    Right.

24  A    So the public had a right to see the reports, regard less

25  of the confidentiality agreement.

Ross - cross - Agnifilo                         4760

1   Q    Okay.  But at the end of the day, there was a

2   confidentiality agreement that was trumped by the First

3   Amendment Fair Use right, correct?

4   A    That was only part of what the -- what the second court

5   found.  And that's why NXIVM v. Ross is a precedent setting

6   decision, because it also has a direct effect on the power of

7   a confidentiality agreement to gag people from being able to

8   release information in the public interest.

9   Q    Okay.  If it's in the public interest?

10  A    Yes.

11  Q    And then NXIVM sought a petition for a writ of certiorari

12  to the Supreme Court of the United States, and that was

13  denied?

14  A    Yes.

15  Q    So the Supreme Court never heard the case, they just --

16  they denied it?

17  A    They allowed the Second Circuit's decision to stand and

18  they did not reverse it or agree to hear it.

19  Q    Right.  So let's talk for a minute about these -- a

20  little bit more about these reports, the three reports that

21  you put on your website.

22       Is Paul Martin a PhD?

23  A    Yes.

24  Q    In what?  What's his PhD in?

25  A    In psychology.

SAM    OCR    RMR    CRR    RPR

Ross - cross - Agnifilo                              4761

1   Q    And John Hochman is a medical doctor?

2   A    He's a medical doctor, a psychiatrist.

3   Q    Did Paul Martin interview Michael Sutton?

4   A    No.

5   Q    Did John Hochman interview Michael Sutton?

6   A    No.

7   Q    Did Paul Martin interview anybody in the Sutton family?

8   A    No.

9   Q    Did John Hochman interview anybody in the Sutton family?

10  A    No.

11  Q    Did Paul Martin interview anybody in NXIVM?

12  A    I don't believe so.  He read -- he read the notes and he

13  studied their -- their literature, which was extensive.

14  Q    Did he interview anybody in NXIVM?

15  A    I don't believe so.

16  Q    Okay.  Did John Hochman interview anybody in NXIVM?

17  A    I don't believe so.

18  Q    Did either Paul Martin or John Hochman take any NXIVM

19  courses?

20  A    No.

21  Q    Did Paul Martin or John Hochman speak with anyone who did

22  take a NXIVM course?

23  A    I don't think so.

24  Q    So did either of them speak with Stephanie Franco?

25  A    I don't recall that they spoke with Stephanie Franco.

Ross - cross - Agnifilo                                    4762

1   Q    Did -- all they had was the course materials, that's it?

2   A    Yeah.  They were quite extensive, as you can see, and

3   very detailed.

4   Q    You gave them the course materials?

5   A    Yes.

6   Q    And they did no other research before writing these

7   reports, right?

8   A    Well, they had a basis of knowledge in this field, and

9   they had dealt with other large group awareness training

10  seminar selling companies and other groups very similar to

11  NXIVM.  So they drew upon that experience, that well of

12  experience.

13        And then they had the literature, the study notes,

14  which were quite detailed.  Plus, they had Stephanie Franco's

15  additional handwritten notes reflecting on the course

16  material.

17        So they had quite a bit.

18  Q    I am talking about actual information specific to NXIVM.

19  Nothing other than --

20  A    The -- the --

21  Q    Let me just finish the question.

22        Nothing other than the Stephanie Franco materials

23  that you gave them, there was no other research done --

24  A    All --

25  Q    -- into NXIVM?

Ross - cross - Agnifilo                                    4763

1    A    All of that material was produced by NXIVM for its

2    students, and it gives you the inner workings of what goes on

3    in NXIVM.  And Stephanie Franco's notes further extend upon

4    that.

5             So what we're talking about is a large amount of

6    material that details, in quite -- quite a detailed way, what

7    NXIVM is all about.  What the courses are all about, how they

8    work.  What kind of communication there is between NXIVM

9    members.  Who is bad, who is good.  What is good, what is bad.

10            All of their -- it's a wealth of material --

11   Q    Are you aware --

12   A    -- that the doctors reviewed.

13

14            (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Ross - cross - Agnifilo                                    4764

1   BY MR. AGNIFILO:   (Continuing.)

2   Q    Are you aware that there are 2,000 modules of information

3   that have been created in NXIVM?

4   A    Well, there are many modules, but I think that that core

5   material is indicative of what is at the core of NXIVM and the

6   doctors had that material to review.

7   Q    How many of the 2,000 modules have you reviewed?

8   A    Not 2,000.

9   Q    1,000?

10  A    I doubt it.

11  Q    20?

12       MS. HAJJAR:   Objection, Your Honor --

13  A    I've reviewed -- I've reviewed the --

14  Q    The judge is considering an objection.

15       THE COURT:   You may answer.   Go ahead.

16  A    I've reviewed the material that has been produced as

17  evidence in this case.

18  Q    You reviewed the Stephanie Franco written materials;

19  correct?

20  A    Yes.

21  Q    Have you seen a single module that Keith Raniere --

22  A    You're talking about the videos that they produced?

23  Q    Yeah.

24  A    I may have glimpsed some of them.   I've interviewed a

25  number of NXIVM participants, people who have done the

SN        OCR        RPR

Ross - cross - Agnifilo                    4765

1   modules, people who have done the courses.  I've talked to

2   many of those past participants.

3   Q    Did Paul Martin or John Hochman speak to any of those

4   people?

5   A    I don't believe they cite that in their report.  They

6   cite the core material of NXIVM.

7   Q    And did Paul Martin or John Hochman review any of 2,000

8   modules before they wrote their reports?

9   A    They reviewed the material that they were given which is

10  in evidence.

11  Q    Were these reports peer-reviewed?  Were the reports, the

12  Martin and Hochman reports, were they peer-reviewed?

13  A    No.

14  Q    What is peer review?

15  A    Peer reviewed would mean that there were other people in

16  the field that would read these articles and perhaps they

17  would do this in preparation before an article was published

18  in what's called a peer-review journal.  So, for example, they

19  might be peer reviewed by other mental health professionals

20  and then it would be published in a mental health professional

21  journal.

22  Q    Did you tell Mr. Hochman, Dr. Hochman, I'm sorry.  Did

23  you tell Dr. Hochman that the report that he would prepare

24  would be kept in the strictest confidence and be shown to one

25  single person; that being the person you're doing the

Ross - cross - Agnifilo                           4766

1   intervention on?

2   A    I don't recall telling John that.  And, in fact, I asked

3   John for permission to publish the report subsequent to him

4   completing it and I understood that it would be published and

5   it would be online and be available to anyone that had

6   internet access.

7   Q    I'm going to show you to refresh your recollection --

8              THE COURT:  Wait.

9              MR. AGNIFILO:  I'm sorry, Judge?

10             THE COURT:  You are going to refresh his

11  recollection?

12             MR. AGNIFILO:  Yes.  No one is seeing it, right?

13             THE COURT:  No, but --

14             MR. AGNIFILO:  I think he said he didn't recall.

15             THE COURT:  He did not recall if -- okay.  In that

16  case, go ahead.

17  BY MR. AGNIFILO:

18  Q    I'm going to ask you to look at paragraph six, the part

19  that's highlighted.

20  A    (Reviewing.)

21        Okay.

22             THE COURT:  Question.

23  Q    Yes.  Do you now recall whether you told Dr. Hochman that

24  the report would be kept in the strictest confidence and shown

25  only to one ESP student from the Sutton family?

SN        OCR        RPR

Ross - cross - Agnifilo                          4767

1   A    No, I did not tell Dr. Hochman that.  In fact, quite the

2   opposite.  I told Dr. Hochman that his article would be

3   published online and it would be accessible to anyone with an

4   electronic device that had internet access.

5   Q    Did you hire Dr. Hochman to do a scientific of NXIVM?

6   A    I did not hire Dr. Hochman.  He was hired by the Suttons

7   to do a report based on his long-standing expertise in the

8   field of studying destructive cults.

9   Q    Do you consider this report a scientifically sound

10  report?

11  A    I consider it an expert report.

12  Q    What's the difference in your mind between an expert

13  report and a scientifically sound report?

14  A    Well, Dr. Hochman could have done additional research and

15  the peer review like you mentioned, but it was an expert

16  report nevertheless and I think he arrived at conclusions

17  based on his review of NXIVM materials which he had access to

18  and read.

19  Q    How much was he paid for the report, do you know?

20  A    I don't know.

21  Q    Now, I think you spoke about Edgar Bronfman.  I think you

22  spoke about Edgar Bronfman a little bit on direct examination;

23  do you remember that?

24  A    Yes.

25  Q    Have you ever met him?

Ross - cross - Agnifilo                                        4768

1   A    No.

2   Q    Have you ever spoken to him on the phone?

3   A    I don't recall speaking to him on the phone, no.

4   Q    Do you recall you gave -- you gave Edgar Bronfman's name

5   to the Forbes reporter?

6   A    I may have mentioned that he took a course.  I don't

7   remember it specifically.

8   Q    And how much money has Edgar Bronfman sent you?

9   A    Edgar Bronfman wrote a check for $5,000 which was for a

10  legal defense fund regarding the lawsuit filed against me by

11  Landmark Education which is another group that sells seminars

12  and trains people.

13  Q    So, Edgar Bronfman wrote you a $5,000 check in connection

14  with another lawsuit?

15  A    Yes.

16  Q    Not this lawsuit?

17  A    No.

18  Q    This lawsuit was going on at the time that he sent you

19  the check, no?

20  A    I don't think so, but I'm not sure.  I don't recall

21  exactly, but I know that the check was for the legal deference

22  fund regarding Landmark Education.

23         MR. AGNIFILO:  All right.  This is already in

24  evidence as Government Exhibit 204-A and this particular

25  exhibit -- within 204-A is Bates stamped ending 922.

Ross - cross - Agnifilo                                    4769

```
 1              (Exhibit published.)
 2  Q     Is that the check?
 3  A     Yes.  It looks -- it looks to be the check, yes.
 4  Q     All right.  So if this is the check, this is in 2004,
 5  that means the NXIVM lawsuit was ongoing at that point; right?
 6  A     Yes.
 7  Q     But you're saying that this -- and it says "Contribution"
 8  at the bottom there from Edgar Bronfman; right?
 9  A     Yes.
10  Q     You're saying this check wasn't for the NXIVM lawsuit; it
11  was for another lawsuit?
12  A     Yes.  I was being sued by Landmark Education at the same
13  time.
14  Q     And how did you go about communicating to Edgar Bronfman
15  that you needed money in connection with this other lawsuit?
16  A     I think he received a fundraising letter or e-mail.
17  Q     And by this point on -- you -- this isn't the only check
18  that you got from Edgar Bronfman; right?
19  A     It is -- no, that is the only check.
20  Q     I'm going to show you Government Exhibit 204-A.  This is
21  ending 921.
22              (Exhibit published.)
23  Q     Isn't this another check?
24  A     Yes, it is.  I don't recall this check.  It's from an
25  earlier date.
```

Ross - cross - Agnifilo                                4770

1   Q     Right.  It's a $2,500 check from November 10, 2003 from

2   Edgar Bronfman to the Ross Institute; right?

3   A     Yes.

4   Q     Why is he sending you $2,500 then?

5   A     It was a contribution.

6   Q     For what?

7   A     For the institute to further its work, to pay for the

8   costs of constructing the database and putting more

9   information online.

10  Q     Do you have a specific recollection now of why you got

11  this check?

12  A     I would assume that -- I send out a fundraising letter

13  annually, one fundraising letter and I assume that this was a

14  response to that fundraising letter.  I remember the $5,000

15  check, but quite frankly I didn't remember this check for

16  2,500.

17  Q     Okay.  Did you get any other checks?

18  A     No, not --

19          THE COURT:  Other checks from --

20  Q     From Edgar Bronfman?

21  A     I only recall the one check from 5,000, but obviously the

22  other check for 2,500 was also from Edgar Bronfman so it

23  appears that the total would be 7,500.

24  Q     This is also Government Exhibit 204-A ending 923?

25          (Exhibit published.)

Ross - cross - Agnifilo                                      4771

1   Q    This is a third check?

2   A    I don't -- it seems to me like this was one check for

3   5,000 for the legal defense fund for Landmark Education and

4   then you've shown another check from a year previous in

5   response to a fundraising letter.  I don't recall this check.

6   It's a different date.

7   Q    I want to put it so you can see the two $5,000 checks at

8   the same time.  I think I'm going to do that.  Hold on.

9          (Exhibit published.)

10  Q    Just so you can see there's two $5,000 checks.  You see

11  that; right?

12  A    One is dated in December of 2004 and one is dated in July

13  of 2004.

14  Q    Okay.  So we discussed the July 2004 one.  That was the

15  first check that we talked about.  You said that was a

16  contribution in connection with your Landmark lawsuit.  What's

17  this $5,000 check?

18  A    I'm sure it was a contribution.  I don't -- it may have

19  been a response to a general fundraising letter, but there

20  were fundraising letters that went out about the Landmark

21  Education lawsuit and, in fact, there were -- at one point

22  there were three groups suing me simultaneously.

23  Q    And who was that?

24  A    Landmark Education -- well, there were -- there was the

25  Gentle Wind Project in Maine, there was Landmark Education,

Ross - cross - Agnifilo                          4772

1    there was Pure Bride Ministries in Florida and then there was

2    the Church of Immortal Consciousness in Arizona, and I seem to

3    recall at one point there were three of them suing me

4    simultaneously.  I know Landmark Education and NXIVM were both

5    suing me simultaneously and they were -- I believe there was a

6    third group as well.

7    Q    And was Lowenstein Sandler representing you in the

8    Landmark case too?

9    A    Yes.

10   Q    So, you said that they didn't charge you a dime but you

11   had a legal defense fund?

12   A    What I would do with these checks would be -- in regards

13   to the Landmark case, is I would endorse the check and hand it

14   to Lowenstein Sandler because that check would go towards

15   costs and the costs were far in excess of the donations that

16   were received, so I would then give it to Lowenstein Sandler.

17   Q    And tell me -- maybe it's here and maybe I can't see it,

18   tell me if that's what you did here with the $5,000 check?

19   A    Which check is this?

20   Q    This is the first one we talked about.

21   A    In July?

22   Q    Yes, the July check.

23   A    The check was deposited to the Institute account, but

24   ultimately the funds went to pay for costs at Lowenstein

25   Sandler.

Ross - cross - Agnifilo                    4773

1   Q    All right, you just said you endorsed it over.

2   A    I thought I did.  I was mistaken.

3   Q    You just deposited this into your account?

4   A    It was deposited into the Institute account and then the

5   funds went to Lowenstein Sandler.

6   Q    The only reason -- there's nothing that indicates that.

7   There's nothing on the check that indicates what you did with

8   the check, other than you put it into your account; correct?

9            MS. HAJJAR:  Objection.

10           THE COURT:  Sustained.

11  Q    We'll look at the other $5,000 check.

12           Do you see anything there that you endorsed this

13  over to Lowenstein Sandler?

14  A    No, it was deposited to the Institute account according

15  to the endorsement on the back.

16  Q    And then the $2,500 check, it's not terribly clear, but

17  can you tell was any endorsement made to Lowenstein Sandler?

18  A    It appears to be, again, paid into the Institute account.

19  Q    How do you -- how do you go about making income?  I mean

20  in your current situation.

21  A    I do intervention work.  I lecture.  I have been involved

22  in entertainment projects and, also, I testify as an expert

23  witness in court proceedings.

24  Q    Umm --

25  A    And I also have written a book and write.

Ross - cross - Agnifilo                          4774

1   Q    Right, so -- but doing interventions is a primary way of
2   you making income and it has been over the last many years;
3   correct?
4   A    It's one of -- it's one of the ways in which I earn
5   income, yes.
6   Q    And you have a number of private clients just like the
7   Sutton's; right?
8   A    I have had -- I have done more than 500 interventions
9   since 1982, so there have been many other clients that I've
10  had like the Sutton's.
11  Q    Did you speak with someone named Mark Vicente?
12  A    Yes.
13  Q    When did you speak with him?
14  A    After he left NXIVM.
15  Q    And how did that come about?
16  A    Mark Vicente called me.
17  Q    Do you remember about when he called you?
18  A    No.  He would have called me after he left NXIVM.
19  Q    And you spoke to him once or more than once?
20  A    More than once.
21  Q    I'm not asking specific conversations; what were the
22  topics that you discussed?
23  A    His recovery.  He told me that he had been in another --
24          THE COURT:  I do not want you to say what he told
25  you.

SN        OCR        RPR

Ross - redirect - Hajjar                    4775

1   Q    Yeah, just general topics.

2   A    His recovery.  His recovery and how he was doing.

3   Q    When was the last time you spoke to him?

4   A    I think I've spoken with him within the last two months.

5   Q    Do you recall when specifically?

6   A    No.

7            MR. AGNIFILO:  Your Honor, would you give me just

8   one second?

9            THE COURT:  Sure.

10           (Pause in proceedings.)

11           MR. AGNIFILO:  Your Honor, I have nothing else.

12           THE COURT:  Very well, any redirect?

13           MS. HAJJAR:  Just very briefly Your Honor.

14           THE COURT:  Go ahead.

15  REDIRECT EXAMINATION

16  BY MS. HAJJAR:

17  Q    Mr. Ross, Mr. Agnifilo showed you some checks.  Have you

18  seen those checks anytime recently, do you know where they

19  came from?

20  A    Well, I don't know.  I don't recall all three of those

21  checks, but I do see that they were made payable to The Ross

22  Institute some years ago.

23  Q    I'm going to show you Government Exhibit 204.

24           (Exhibit published.)

25  Q    Have you ever seen this folder before?

SN        OCR        RPR

Ross - redirect - Hajjar                                    4776

1    A    No.

2         MR. AGNIFILO:  Your Honor, I think this is all

3    beyond the scope of --

4         THE COURT:  Oh, no.

5         Go ahead.

6    BY MS. HAJJAR:

7    Q    And the checks that Mr. Agnifilo showed you, have you

8    ever seen those checks before in that form?  That he had

9    showed them to you before?

10   A    I don't recall.  I recall the one check for 5,000, but I

11   don't recall the other two checks.

12        MS. HAJJAR:  Your Honor, may I approach the witness?

13        THE COURT:  Yes, you may.

14        (Counsel approaches.)

15   Q    I just handed you Government Exhibit 204 in its entirety.

16   Could you just take a look at it?

17   A    (Reviewing.)  Yes.

18   Q    Have you seen that before, Mr. Ross?

19   A    No.

20   Q    What's the name on the top of that folder?

21   A    It's my name, Ross, Rick A.

22   Q    What's in it, generally, the content of that folder?

23   A    Personal information about me, marked private and

24   confidential.

25   Q    You testified in response to questions on

Ross - redirect - Hajjar                              4777

1  cross-examination about checks Mr. Bronfman gave you.  Do you

2  know if Mr. Bronfman was sympathetic to your cause?

3  A    I believe he had concerns about his daughters, but he

4  never talked to me and told me that he was concerned about a

5  cause.

6  Q    You never spoke to him about that but you did receive

7  contributions in your efforts against the litigations you were

8  embroiled in with various groups?

9  A    Yes.

10              MS. HAJJAR:  No further questions, Your Honor.

11              THE COURT:  Recross.

12              MR. AGNIFILO:  No, Your Honor.

13              THE COURT:  All right.  The witness is excused.

14              You may stand down, sir.

15              And please retrieve the exhibit.

16              MS. HAJJAR:  Thank you, Your Honor.

17              (Witness excused.)

18              THE COURT:  Call your next witness.

19              MS. HAJJAR:  Your Honor, the Government calls Brian

20  Booth.

21              THE COURTROOM DEPUTY:  Please raise your right hand.

22              (Witness sworn/affirmed.)

23              THE COURTROOM DEPUTY:  State and spell your name for

24  the record.

25              THE WITNESS:  Brian Booth, B-R-I-A-N B-O-O-T-H.

Booth - direct - Hajjar                              4778

1   **BRIAN BOOTH**,

2            called by the Government, having been

3            first duly sworn, was examined and testified

4            as follows:

5   DIRECT EXAMINATION

6   BY MS. HAJJAR:

7   Q    Good afternoon Mr. Booth.

8   A    Good afternoon.

9   Q    Where do you work?

10  A    I work for the Federal Bureau of Investigation.

11  Q    And what is your title?

12  A    Information technology specialist/forensic examiner.

13  Q    How long have you held that position?

14  A    I've held that position since 2007.

15  Q    Are you a senior forensics examiner?

16  A    Yes.

17  Q    How long have you been a senior forensics examiner?

18  A    I've been a senior examiner for over ten years now.

19  Q    What does it mean to be a senior forensics examiner?

20  A    There's a certain amount of training that we need.  We

21  have tests that we have to go through, and we have to do

22  certain projects, and we have a senior exam that we have to

23  fill out and take part in that's very lengthy.  It's about a

24  half a day.

25  Q    Are you familiar with the term CART?

Booth - direct - Hajjar                    4779

1   A    Yes, I am.

2   Q    What does CART stand for?

3   A    It stands for Computer Analysis Response Team.

4   Q    Are you part of a CART team?

5   A    Yes, I am, in New York.

6   Q    What are your responsibilities?

7   A    As a forensic examiner, my job is to -- to protect and

8   process and present digital evidence for courtroom testimony.

9   Q    And when you say digital evidence, do you mean, like,

10  cellphones and laptops, electronic devices?

11  A    Yes, any kind of electronic device.

12  Q    Have you received training in the field of forensic

13  examination of electronic devices?

14  A    Yes, I have.

15  Q    Can you briefly describe to the jury the kind of training

16  you've received?

17  A    All of our basic training has to deal with A+ and Net+,

18  which is a CompTIA course.  Those are all basic computer

19  training courses for technicians.  I then had three or four

20  different courses that we had to take within the Bureau.

21  Those were taught down at Quantico.  Those are part of our

22  basic Wintel, which is an intel-based processing systems

23  course.

24          We then have some basic courses after that that are

25  mostly specific just for the way the Bureau runs and how we do

SN        OCR        RPR

Booth - direct - Hajjar                    4780

1    our paperwork.  Those are all of our basic courses.

2    Q    Would you just breakdown what your training involves for

3    the jury, what that means for someone who's a layperson?

4    A    For the layperson's term, we take any kind of digital

5    media that we get, we take it down to the zeros and ones, and

6    we make sure we forensically handle it very carefully to make

7    sure we don't modify anything that's on that device.  It could

8    be your cell phone; it could be your hard drive; it could be a

9    server in a server system.  It could be a car, for that

10   matter, because we now do cars.  We even make sure that we get

11   all the zeros and ones off of the system, and we save them on

12   the side, and then we're able to review them.  We have a case

13   agent that has a chance to even look through this stuff, for

14   what we were working for at the time in the Bureau, and they

15   want what's important and we produce reports for them for

16   courtroom testimony.

17   Q    Do you use specialized software to analyze electronic

18   devices?

19   A    Yes, we do.

20   Q    Have you received training in using that software?

21   A    Yes, I have.

22   Q    Do you have an estimate of approximately how many pieces

23   of digital evidence you've reviewed?

24   A    Thousands.

25   Q    Now, in connection with your testimony here today, did

SN        OCR        RPR

Booth - direct - Hajjar                    4781

1   you review some electronic evidence?

2   A    Yes, I did.

3   Q    Are you familiar with what a forensic image is?

4   A    Yes, I am.

5   Q    And can you explain that to the jury, what a forensic

6   image is?

7   A    A forensic image is taking a piece of digital media and

8   what we do is we put it behind a write blocker, which is a

9   device to make sure we don't alter the device in any way.  We

10  read the information that's on the digital media and we save

11  it -- what commonly would be referred to in the real world as

12  a type of like a zip file, if you've ever used a zip file to

13  compress data and hold it.  A forensic image is a type of a

14  zip file, it's like a container.  It holds all the information

15  we get off of the hard drive and we wind up saving it to a

16  file format, which we call an EO1.  That's what we use now.

17  It's an EnCase file.  I've had extensive training in EnCase

18  and I've used that file system for now pretty much my whole

19  career.

20  Q    Does a forensic image contain all the digital material

21  that's on a piece of digital evidence?

22  A    Yeah, it actually includes more; not just the information

23  from the actual device, but what type of device it is too.

24  And in all of those zeros and ones that we obtain from the

25  device, we look at the geometry of the device.  We also put it

1  through what's called a hash algorithm and that's to make sure

2  that the data is exactly the same as the data we're taking off

3  the device.

4  Q    When you examine digital evidence, where physically do

5  you work?

6  A    At 26 Federal Plaza.

7  Q    Is there a laboratory that you work in?

8  A    Yes, we have a CART laboratory.

9  Q    And initially, when you first examine a piece of digital

10 evidence, what steps if any do you take to secure the data

11 that's on that piece of evidence?

12 A    Well, we first make sure that all the evidence that's

13 brought down to us is referred exactly to what's on the

14 evidence sheet that we receive.  So we make sure that the

15 numbers aren't -- for some reason they brought the wrong piece

16 of evidence.  The next thing we do is we make complete photos

17 of all of our pieces of evidence, and that's just to do a

18 physical verification of all of the items that we have and try

19 to make sure that the state the item came in doesn't get

20 altered in any way on the outside.  The next way is now the

21 physical protecting of the item.  We use a write blocker, as I

22 said before, and what that is it's an external little block

23 that has a chip on it and what that chip does is that any time

24 you hook a device up to a Windows computer, every time you

25 hook up, say, a flashcard or a USB device to a Windows

1  computer, the first thing Windows wants to do is talk to it

2  and in talking to that thumb drive you have it alters the

3  evidence as it's doing that.  So what we want to make sure is

4  nothing happens like that to that device.  So we take our

5  device, in this case, I remember it was an external hard

6  drive, we hook up that to our box and then we hook that up to

7  our computer.  The computer then can read through the device,

8  while stopping all the writes to the actual hard drive, and we

9  can read all the data off and save it as an EO1 file.

10 Q    You're calling it a write blocker; is it fair to say that

11 the software or hardware you're using prevents writing onto

12 that piece of evidence?

13 A    Yeah.  It's really important that we don't alter that

14 evidence at all.  We want to make it as pristine also possible

15 and put it back into the evidence vault the same way that we

16 got it.  We don't touch it after that.  The file that we

17 create from it is the only thing we use after that.  So, if

18 for some reason we have a problem with our file, we can always

19 go back to that piece of evidence that we have.

20 Q    And do you -- the resulting file, do you sometimes call

21 that a working copy?

22 A    Yeah.  We first make a master copy, we put that into

23 evidence.  So now we not only have the original, but we have a

24 master copy, and then the copy we use to make all of these

25 copies we use for our working copy and that we do all our

1    processing on.

2    Q     How do you verify that the copies match up?

3    A     Well, previously I mentioned that we use what's called a

4    hash algorithm, and what that is -- it's a very complex word

5    it sounds like, but it's really quite simple.  It's a

6    mathematical equation and what we do is we look at a hard

7    drive, and that's comprised of zeros and ones on this hard

8    drive, that's the data.  So every word file that you use,

9    every text message you send back and forth, is comprised of a

10   whole bunch of zeros and ones and what we do is we take this

11   hash algorithm, which I said is a mathematical equation, and

12   send the zeros and ones through it and the result that comes

13   out is a big, long number.  Now the thing is, if I had, say, a

14   text file and I changed just one period on that text file,

15   that big long equation that comes out is going to be a

16   different number just by changing one period on that one

17   sheet.  So what we use this hash value for is to make sure

18   that if anything gets changed on a hard drive, like a zero to

19   a one on this hard drive, that this whole function that we

20   wind up putting the zeros and ones through would be different

21   and we know something has been changed.  So it's our

22   verification.

23          The one that we use for hash is Message Digest 5,

24   called the MD5 verification, and we use it on everything from

25   hard drives, to folders to just a file.  So constantly we use

Booth - direct - Hajjar                    4785

1   MD5 to verify that files haven't been changed from me burning

2   it onto a disk for you to then later look at, to going back to

3   the original evidence and making sure that what we have as a

4   copy hasn't changed.

5

6              (Continued on the following page.)

SN        OCR        RPR

Booth - Direct - Booth                                    4786

1    BY MS. HAJJAR (Continuing):

2    Q    I'm going to show you what's in evidence as Government

3    Exhibit 503.

4              (Exhibit published to the jury.)

5    Q    Showing you what's in evidence as 503, Examiner Booth,

6    are you familiar with this item?

7    A    Yes, I am.

8    Q    How do you know?

9    A    The CART lab puts a sticker on every item that we wind up

10   getting into our lab, and that NYC number is corresponding to

11   one of the items that we wind up taking in and doing an exam

12   on.

13   Q    That's the sticker up top here, New York CART Lab, and

14   the NYC number?

15   A    Yes, it is.

16   Q    And this information is also CART information?

17   A    Yeah.  That's the standard practice.  We have to put the

18   case number, initials, and a date, and where it's derived

19   from.

20              And that one is saying part of 1B16, which is the

21   number that the Bureau winds up giving to the item when we

22   receive it.

23   Q    That's the 1B16 you're referring to, right down here?

24   A    Yes, it is.

25   Q    Are you familiar with these initials?

W. Name - direct/cross - Atty                    4787

1   A     Yes.  That's VD, for Virginia Donnelly.

2   Q     And who is Virginia Donnelly?

3   A     She is my trainee.

4         So, when I was going through the processing of this

5   case with her, she was actually physically putting her hands

6   and putting the labels and things on the evidence.  So, she

7   signs that she had actually seen and handled the evidence.

8   Q     And this Government Exhibit 503, this is a Western

9   Digital hard drive; is that right?

10  A     Yes, it is.

11  Q     And there's a serial number there.

12        You can see at the bottom?

13  A     Uh-huh.

14  Q     Was a forensic image created of that hard drive,

15  Government Exhibit 503?

16  A     Yes, it was.

17  Q     And was the image created using the steps you described

18  to the jury previously?

19  A     Yes.

20  Q     Did there come a time at which you had access to that

21  forensic image?

22  A     Yes.

23  Q     And what, if anything, did you do to analyze Government

24  Exhibit 503, that drive?

25  A     We take that EO1 file and we use a piece of software

LAM      OCR      RPR

W. Name - direct/cross - Atty                    4788

1    called AD Lab, and that's one of the major premier forensic

2    softwares that are out there on the market.  Using that

3    software, we're able to categorize all the files that are on

4    the hard drive.  We're also able to carve out data that might

5    have been deleted.  We're also able to find deleted files that

6    might have been left on the drive.  We also can open up ZIP

7    files, see what's inside of those, look inside PDF files and

8    see what's inside of those.

9               It really helps us to categorize and go through a

10   vast amount of data because this might have been one hard

11   drive, but sometimes we get large, large amounts of data.

12   Q    And that Access Data Lab, is that a special kind of

13   forensic software?

14   A    It's one of the major producers of forensic software

15   right now.

16   Q    Do you have training in using this software particularly?

17   A    Yes.  I've been certified to use AD Lab.

18   Q    I want to show you what's marked for identification as

19   Government Exhibit 550.

20              THE COURT:  Go ahead.

21   Q    Do you recognize this exhibit?

22   A    Yes.

23   Q    What is this?

24   A    This is a directory tree of what was obtained from the

25   hard drive.

W. Name - direct/cross - Atty                    4789

1          MS. HAJJAR:  Your Honor, the Government offers

2    Government Exhibit 550.

3          MR. DER OHANNESIAN:  No objection.

4          THE COURT:  All right.  550 is received in evidence.

5          (Government Exhibit 550 so marked.)

6          (Exhibit published to the jury.)

7          MS. HAJJAR:  Thank you, your Honor.

8    Q    So, this is 550.  Examiner Booth, can you just kind of

9    start at the top?

10         You see at the top where it says 1B16 WD HD 500GB?

11   A    Yes.

12   Q    What does that refer to?

13   A    That's the common name that we gave to the image after it

14   was imaged and brought into the system.  We like to take

15   common names instead of the EO1 label that we call the file.

16         We put it in a friendly name so when the case agent

17   reviews and looks at stuff, he'll be able to know that this is

18   Item 1B16 which was marked by us when it came in, and that is

19   a western Digital hard drive, 500 gigabyte.

20   Q    When you say friendly names, you mean a nontechical name

21   so the case agent know what you're talking about?

22   A    Yes.

23   Q    Here, the friendly name is 1B16 WD HD 500GB?

24   A    Yes.  The case agent would understand what that means.

25   Q    What about 1B16 is the piece of information the case

W. Name - direct/cross - Atty                    4790

1    agent will recognize?

2    A    When we wind up putting things into evidence, they all

3    get associated numbers with them, and it starts out 1B1 in the

4    FBI when you start a case.  And every piece of evidence that

5    you add to the evidence chain as it gets bigger, you have

6    bigger numbers.

7    Q    "WD," is that Western Digital?

8    A    Yes.

9    Q    And the 500GB is the storage capacity of the device?

10   A    Yes, it is.

11   Q    Looking below that, can you just describe what this --

12   you called it a "directory tree."

13            Can you describe what this depicts?

14   A    The first thing on top, it talks about a partition.  A

15   partition is the area of a hard drive that has been sectioned

16   out for use.

17            If anyone has used a computer before, you usually

18   see what's, like, a C drive.  That is one partition on your

19   computer, and that's an area that your computer has been

20   allocated to be able to store something.  The lowest level

21   that you can store something is in a partition.

22            And in this Western Digital, we only had one

23   partition and it's called Partition 1.

24   Q    Under Partition 1, do you see Musica Fat32?

25   A    Yes.

W. Name - direct/cross - Atty                4791

1   Q     What does that mean?

2   A     That's the volume name that was given to that.

3           So, sometimes we see a "C:" sign.  That's the volume

4   name that Windows winds up giving to your main volume when you

5   start up your computer.  But if you add, say, a thumb drive,

6   sometimes you'll see, like, a D drive show up.  That's a

7   volume name that's been given to that.

8           Sometimes you can name them whatever you'd like,

9   and, in this case, someone has gone and renamed it to Musica.

10  So, not only would you, say, have a D drive if you plugged

11  this into your computer, possibly, but you'll see Musica pop

12  up because that's what he named the drive.

13  Q     What about root?

14          I'm looking right here, what is "root"?

15  A     Root would be the lowest place that you can wind up

16  saving data.

17          So, in root for your local computer at home, that

18  would be your C drive.  So, when you look at your C drive on

19  your computer, that's essentially what is called root.

20  Q     And these subfolders, some of them have little

21  cross-outs.

22          Do you know what that signifies?

23  A     Yes.  That means they've been deleted.

24  Q     And these plus symbols, does that indicate there are

25  subfolders underneath here?

W. Name - direct/cross - Atty                    4792

1    A    Yes.

2    Q    Do you see where it says FLAC Keith and FLAC Library?

3    A    Yes.

4    Q    Do you know what "FLAC" means?

5         Does that signify anything to you?

6    A    FLAC is an audio format as far as a naming convention is

7    concerned.

8    Q    What kind of audio format?

9    A    It's an uncompressed audio format.

10        Like, WMA is a Windows-based audio format, which is

11   very compatible.  They are both "lossless," as we call them.

12   They are file formats that don't lose any quality once you

13   save them.

14   Q    Are they considered higher quality in terms of the

15   quality of the music than, say, an MP3?

16   A    They're the best quality you can have.  They are CD

17   quality.

18   Q    Do you see under here "Monkey Music February 08"?

19   A    Yes.

20   Q    And below that, "Backups," is that -- and below that, BKP

21   Delta Dimension 8300.

22        The way that this is oriented, are these subfolders

23   underneath Backups?

24        In other words, do these folders appear inside

25   Backups based on the structure of this directory tree?

W. Name - direct/cross - Atty                    4793

1   A    Yes, they do.

2   Q    And I want to direct your attention to "Studies," the

3   folder here.

4            So, can you just slowly read the folder names that

5   appear below Studies?

6   A    The first folder is AL122505; the next folder is A11005;

7   the third folder is BJ103005; the fourth folder is D100705;

8   the fifth folder is DF101905; the sixth folder is J101605; the

9   seventh, I think I'm on, is L102805; the eighth is MNP102005;

10  ninth is M0101805; and the next is MSK101905; and the last

11  folder is V110205.

12  Q    And the first one up top is 4 -- I want to maybe zoom in

13  on that -- that's 4L, right?

14  A    Yeah, 4L122505.

15  Q    The titles of these folders, do they appear default or

16  custom-made?

17  A    They don't look like a machine has made them.

18  Q    How is that?

19  A    Well, typical machine names would name something that

20  would go in some sort of an order, and I'm not seeing order.

21  It almost looks like date orders that are being put there with

22  letters in front of them.

23  Q    You mean date orders like 4L122505?

24  A    Yeah.

25  Q    Like day, month, year?

LAM      OCR      RPR

W. Name - direct/cross - Atty                    4794

1   A     Looking down at some of the folders, even in the B11

2   after that, you've got an actual date range in there that

3   appears to be in the folder structure.  So, I'm assuming that

4   that's what's being done above.

5   Q     When you see up top, My Music, My Pictures, My Videos,

6   are you familiar with software that would automatically create

7   those folders?

8   A     Yes.  This looks under a user data portion of a Windows

9   computer.  Usually Windows XP and above, up until 10, have

10  used My DVDs, My Music, My Pictures kind of folders.

11  Q     If I were to buy a Windows laptop, it might have folders

12  like that named similar to those?

13  A     Yes.

14  Q     But the folders down here, they are not familiar to you

15  in terms of any kind of software that would create those?

16  A     They are not standards for Windows at all.

17  Q     Now, you mentioned the folders within the V110205 folder,

18  there are two folders under that.

19  A     I see them.

20  Q     The folders above them, though, the ones with letters and

21  numbers that you just read, do they have subfolders too?

22  A     Yes, they do.

23  Q     Why can't you see them on Government Exhibit 550?

24  A     Well, they haven't been opened to be able to be viewed at

25  this point.  This was presented just to see what was

W. Name - direct/cross - Atty                    4795

1   underneath one of them, at the last one.

2   Q    You created this exhibit, but you only expanded the last

3   folder.

4        But if you had expanded these, you would see

5   expanded file folders and images within them?

6   A    Yes.

7   Q    In addition to Government Exhibit 550, did you create a

8   folder directory file listing of all the files that are on the

9   Western Digital 1B16 device?

10  A    Yes.  As a standard practice when we create our images,

11  that gets created at the same time, a directory file listing.

12  Q    Very generally, did you review the contents of all those

13  files?

14  A    Yes, I looked at them.

15  Q    Were some of them music files?

16  A    Yes.

17  Q    Do you recall any in particular?

18  A    I remember Genesis.

19  Q    And classical music, did you see that?

20  A    Yes, some child classical music I saw.

21  Q    Ultimately, did you prepare certain reports as to the

22  data that was obtained from Government Exhibit 550?

23  A    Yes.

24  Q    Did these reports pertain to specific files within the

25  Western Digital hard drive that the case agents bookmarked for

LAM      OCR      RPR

W. Name - direct/cross - Atty                    4796

1    you?

2    A    Yes.

3    Q    Can you explain to the jury what the process is of

4    bookmarking?

5    A    When a case agent winds up seeing a file structure like

6    this, on the bottom he also sees the files underneath that he

7    can actually choose each of these files that he's seeing and

8    right click and save them as a bookmark.

9         What that does is it saves that file off under

10   another tab that they can later ask us to create a report for,

11   which will include that file so he can then take it and put it

12   on a disc and take it here to court.  We can name those

13   bookmarks whatever we'd like; usually, to reference what we're

14   saving at that point or what wave we're referencing.

15   Q    Did the reports you create, did some of them -- did

16   nearly all of them deal with the Studies folder?

17   A    Yes.

18   Q    And the reports dealt with different subfolders

19   underneath the Studies folder?

20   A    Yes, they did.

21        MS. HAJJAR:  May I show something that's marked just

22   for identification to the witness?

23        THE COURT:  Go ahead.

24   Q    I'm going to go show you a series of exhibits starting

25   with a disc that's marked Government Exhibit 505.  I'll turn

W. Name - direct/cross - Atty                    4797

1  it over for you as well.

2         Do you recognize this exhibit?

3  A    Yes, I do.

4  Q    Is your name and initials on this disc?

5  A    Yes, it is.

6  Q    And what is the contents of this disc?

7  A    This is one of the AD Lab reports that I made for the

8  agents that he had bookmarked as Studies folder.

9  Q    I'm going to show you what's marked for identification as

10  Government Exhibit 505A.

11         Do you see that?

12  A    Yes, I do.

13  Q    This is a very large paper document.

14         Is 505A the same -- is this a printout of the

15  material on the disc that you created?

16  A    Yes, it is.

17         MS. HAJJAR:  The Government offers Government

18  Exhibit 505 and 505A.

19         MR. DER OHANNESIAN:  May I address at sidebar

20  several items?

21         THE COURT:  Sure.

22

23         (Continued on the following page.)

24

25

LAM      OCR      RPR

Sidebar                                                          4798

1          (The following occurred at sidebar.)

2          MR. DER OHANNESIAN:  I'd like to address

3   prospectively some exhibits at once.

4          This report, as well as some others -- not all -- to

5   which I won't object, have images on them of adults.  In

6   addition, there's going to be several offers of adults engaged

7   in sexual acts; sometimes, with my client.

8          My objection is to the visual representations in

9   this report.  I object to the extent they are duplicated again

10  in separate documents.  I object that any of the images of the

11  adults involve individuals either not subject of the

12  indictment, not part of the inner circle, lacking a

13  relationship with the charged offense.

14         They reflect prejudice in that they go more to

15  sexual lifestyle of the accused rather than any count of the

16  indictment.  They are excessive because there's over 167

17  images that will be offered -- I can give you the exhibit

18  numbers -- of these adults.  They don't involve the

19  racketeering acts relating to child pornography.  They are not

20  necessary to put in; that is, the adult images.

21         In the case of Lauren Salzman, there's insufficient

22  foundation for images since there was not the opportunity to

23  question her about those images.  And they are unnecessarily

24  duplicative also.  There's no need for 167 plus the images in

25  the reports.

```
                        Sidebar                    4799
```

1         I will not object to the report and there is, I

2    believe, at least one that doesn't have the images.

3              (In open court.)

4         THE COURT:  Could I ask that everyone please be

5    seated and quiet?  The jury is in the courtroom.  It's not

6    appropriate for the jurors to overhear conversations of the

7    gallery.

8              If I have to ask the question again, everybody

9    goes -- everybody -- out of the courtroom.  I've said this

10   before and I'm not going to say it again.

11             (Sidebar continues.)

12        THE COURT:  The jury is looking right at these

13   people and they're having conversations.  One more time,

14   everybody goes, including the reporters.  Everybody goes.

15   They can go watch somewhere else.  This is number two.

16             I'm sorry to interrupt you, sir.

17        MR. DER OHANNESIAN:  Do I need to repeat?

18        THE COURT:  No, I heard what you said.

19             Let me hear from the Government.

20        MS. HAJJAR:  Your Honor, this is critical evidence

21   for the child exploitation charges.  It's reports dealing with

22   images in every folder.  There are eleven folders, including

23   the folder that contains the child pornography.

24             We're not going to go through every image, but this

25   contains metadata for all the images in the drive.

```
                            Sidebar                     4800
```

1           THE COURT:  How do the images of adults in this

2     situation have relevance to the conduct which is alleged as a

3     racketeering act?

4           MS. HAJJAR:  Basically, your Honor, it establishes

5     the time frame.

6           So, Lauren Salzman testified these photos were taken

7     of her in 2005.  Daniela testified these photographs were

8     taken of her in 2005.  The metadata bears that out.

9           But in addition, your Honor, the type of photographs

10    that are depicted in these folders are exactly the same kind

11    the Defendant later receives as part of DOS.  So, it

12    establishes the entire course of conduct, the basis for the

13    means and methods that we've charged, which is that the

14    Defendant obtained, among other things, nude photographs as a

15    means of control and to satisfy sexual desire.

16          THE COURT:  I see.

17          There's more?

18          MS. HAJJAR:  I'll note also that at least three of

19    the women depicted are first-line DOS slaves; Daniela,

20    Marianna, Pam Cafritz.  These are women the jury have heard

21    about.

22          THE COURT:  How much of this are you planning to put

23    in?

24          MS. HAJJAR:  Not much in terms of publication except

25    for the metadata, your Honor, which will be significant.  But

Sidebar                                                    4801

1   we don't expect to -- one of the images per folder and we're

2   going to elicit the metadata for those images, but we are

3   admitting all of them.

4           THE COURT:  And the metadata goes to the timing of

5   the receipt of the photographs --

6           MS. HAJJAR:  Yes.

7           THE COURT:  -- into the hard drive?

8           MS. HAJJAR:  Yes, when they were created, which is

9   of significant importance in the case.

10          MR. DER OHANNESIAN:  My objection is not to the

11  metadata, it's to the images.  Because they have the metadata

12  is why it's unnecessary to put in images of adults.

13          DOS doesn't exist until long after that, until 2015

14  or so.  So, it's remote also to try to connect it to DOS.

15  It's the images I'm objecting to, not the metadata.

16          Again, one of the reports does not have any images,

17  so there's no issue there.

18          MS. HAJJAR:  That's the one with the images redacted

19  because of child pornography.  But your Honor, we've set forth

20  in the means and methods for a long-range racketeering

21  conspiracy.

22          THE COURT:  I'm going to see where you're going with

23  it.  I'm going to overrule the objection subject to seeing

24  where the testimony goes and how much of it there is.

25          Next?

LAM      OCR      RPR

```
                        Sidebar                    4802
```

1            MR. DER OHANNESIAN:  I'll have this objection on

2       other exhibits.  I don't want to have to come back up here.

3                 THE COURT:  Go ahead, make your record.

4                 MR. DER OHANNESIAN:  It's the same objection that I

5       just made as to other images of adults for the same reason.

6       So, rather than have to repeat it...

7                 THE COURT:  You have your exception.

8                 MR. DER OHANNESIAN:  To any adult images coming in

9       for the reasons that I said.

10                THE COURT:  Exactly.

11                Anything else?  Thank you.

12

13                (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                  LAM      OCR      RPR
```

Booth - Direct - Hajjar                    4803

1          (Sidebar ends; in open court.)

2          THE COURT:  You may continue your examination.

3          MS. HAJJAR:  Thank you, your Honor.

4          May I publish Government Exhibit 505?

5          THE COURT:  Yes.

6          MS. HAJJAR:  Thank you, your Honor.

7          (Exhibit published to the jury.)

8   BY MS. HAJJAR:

9   Q    Examiner Booth, you testified that Government Exhibit 505

10  was one of the reports that you generated in connection with

11  the 1B16 Western Digital hard drive; is that right?

12  A    Yes.

13  Q    And does it contain -- the report, does it contain all of

14  the data in the Studies folder that we looked at or just the

15  subset?

16  A    Just a subset.

17          MS. HAJJAR:  Your Honor, can I approach the witness?

18          THE COURT:  Yes, you may.

19  Q    Examiner Booth, I've handed you a binder.  I'd like you

20  to direct your attention to the following Government exhibits

21  which are in that binder:  Government Exhibit 508-A through

22  -F, 509-A through -O, 510-A through -O.

23          THE COURT:  Hold on a second.

24          MS. HAJJAR:  Sorry, your Honor.

25          THE COURT:  508-A through -F.  Go on.

Booth - Direct - Hajjar                           4804

1           MS. HAJJAR:  509-A through -O, 510-A through -L,

2   511-A through -L, 512-A through -I, 513-A through -P, 514-A

3   through -P, 515-A through -KK, 516-A through -H, 517-A through

4   -O, and 519-A through -HH.

5   Q    Examiner Booth, are these images that are also reflected

6   in Government Exhibit 505, the report you created?

7   A    Yes, they are.

8           MS. HAJJAR:  Your Honor, the Government offers those

9   exhibits into evidence.

10          THE COURT:  Objection?

11          MR. DER OHANNESIAN:  For the issues discussed at

12  sidebar.

13          THE COURT:  Your objections are noted.

14          Let's go over this.  It's 505-A through -F?

15          MS. HAJJAR:  508-A through -F.

16          THE COURT:  508-A through -F, 509-A through -O?

17          MS. HAJJAR:  Yes.

18          THE COURT:  510-A through -L?

19          MS. HAJJAR:  Yes.

20          THE COURT:  511-A through -L?

21          MS. HAJJAR:  Yes.

22          THE COURT:  512-A through -I.

23          MS. HAJJAR:  Yes.

24          THE COURT:  513-A through -P?

25          MS. HAJJAR:  Yes.

Booth - Direct - Hajjar                    4805

1          THE COURT:  And then 514-A through?

2          MS. HAJJAR:  -P.

3          THE COURT:  And then 515-A through?

4          MS. HAJJAR:  -KK.

5          THE COURT:  516?

6          MS. HAJJAR:  -A through -H.

7          517-A through -O, and 519-A through -HH.

8          THE COURT:  All right.  All those exhibits are

9  admitted into evidence over objection.

10          (Government Exhibits 508-A through -F, 509-A through

11  -O, 510-A through -L, 511-A through -L, 512-A through -I,

12  513-A through -P, 514-A through -P, 515-A through -KK, 516-A

13  through -H, 517-A through -O, and 519-A through -HH so

14  marked.)

15          MS. HAJJAR:  Thank you, your Honor.

16  Q    I'll show you a disc marked for identification as well,

17  Examiner Booth.

18          Do you recognize this exhibit?

19  A    It's not on the screen.

20          Yes, I recognize it.

21  Q    Is there a name and initials on this disc?

22  A    Yes, there is.

23  Q    And what does this disc contain?

24  A    This was the lab report of the bookmarked items of

25  suspected CP.

LAM      OCR      RPR

Booth - Direct - Hajjar                          4806

1   Q     Is this part of 1B16, the Western Digital hard drive?

2   A     Yes.

3   Q     And this is a report you created and a disc you created?

4   A     Yes, it is.

5              MS. HAJJAR:  The Government offers Government

6   Exhibit 506.

7              MR. DER OHANNESIAN:  No objection subject to the

8   same issue.

9              THE COURT:  Subject to the same issue, yes.

10  Government Exhibit 506 is admitted into evidence.

11             (Government Exhibit 506 so marked.)

12             THE COURT:  Want to leave it up on the screen for a

13  minute so I can show it to the jury?

14             (Exhibit published to the jury.)

15  Q     This is the report you created, Examiner Booth?

16  A     Yes, it is.

17             THE COURT:  Go ahead.

18  Q     Did you create a redacted report of this as well?

19  A     Yes, I did.

20  Q     I'd like to show you what's marked for identification as

21  Government Exhibit 504.

22             Do you recognize that exhibit?

23  A     Yes, I do.

24  Q     Is your name on this disc as well?

25  A     Yes, it is.

Booth - Direct - Hajjar                                    4807

1    Q    What's on this exhibit, Government Exhibit 504?

2    A    This is the exact report of the previous one you just

3    showed of another disc, but we've redacted all the images that

4    were on the disc.

5              THE COURT:  All the?

6              THE WITNESS:  All the graphic images.

7              THE COURT:  Any objection?

8              MR. DER OHANNESIAN:  This is 504 or 504-A?

9              MS. HAJJAR:  This is 504.

10             MR. DER OHANNESIAN:  No objection, subject to the

11   issues I raised at sidebar.

12             THE COURT:  Government Exhibit 504 is received in

13   evidence.

14             (Government Exhibit 504 so marked.)

15             MS. HAJJAR:  Can I show the examiner, the witness,

16   one more thing, your Honor, for identification?

17             THE COURT:  Go ahead.

18   Q    This is 504-A, is this the printout of the report that

19   you just -- is this a printout of Government Exhibit 504?

20   A    Yes, it is.

21

22             (Continued on the following page.)

23

24

25

Booth - direct - Hajjar                          4808

1   (Continuing.)

2              MS. HAJJAR:  The Government also offers Government

3   Exhibit 504-A.

4              MR. DerOHANNESIAN:  No objections to this one, there

5   are no issues.

6              THE COURT:  There are no issues.

7              All right, Government's Exhibit 504-A is received in

8   evidence.

9              (Government's Exhibit 504-A was received in

10  evidence.)

11             MS. HAJJAR:  Your Honor, can we switch the laptop,

12  to be able to show -- to publish Government Exhibit 505?

13             THE COURT:  Sure.

14             (Exhibit published.)

15  EXAMINATION CONTINUES

16  BY MS. HAJJAR:

17  Q    Examiner Booth, can you describe the reports that you

18  create, are some of them in HTML format and some of them in

19  PDF?

20  A    Yeah, we produced a report in both formats.

21  Q    Why?  What's the advantage to having it in HTML format?

22  A    Just that you can go through a link structure, like a

23  web page, to be able to find more pages of something that you

24  might be -- have interest in.  So we don't have to produce

25  everything on one page, which could be too voluminous to

                    Booth - direct - Hajjar                4809

1  scroll through.

2  Q    And are there hyperlinks in the HTML formats of certain

3  reports?

4  A    Yes.

5  Q    I'd like to show you what's in evidence as Government

6  Exhibit 505 in HTML format.  And is this --

7              MS. HAJJAR:  May I publish it, Your Honor?

8              THE COURT:  To the courtroom?

9              MS. HAJJAR:  Yes, Your Honor.

10             THE COURT:  Go ahead.

11             (Exhibit published.)

12  BY MS. HAJJAR:

13  Q    And is this what the first page looks like of the

14  hyperlinked version?

15  A    Yes, it is.

16  Q    Okay.

17             MS. HAJJAR:  And if I could click on "Case

18  Information" on the left-hand side.

19             (Exhibit published.)

20  Q    What is shown here?

21  A    This is the basic case information that's generated from

22  AD Lab Report.

23  Q    Okay.  And up at the top where it says "Version," can you

24  just describe what the -- what is said up there?

25  A    That actually tells the reviewer what version of FTK was

Booth - direct - Hajjar                    4810

1    used; or in this case, AD Lab.

2           I'll just stress that AD Lab and Forensic Toolkit

3    are synonymously used alike.  They are both the same product,

4    it's just one is an enterprise-based product and one not.  And

5    in this case it uses both names, AccessData Forensic Toolkit

6    Version 6.31.

7           MS. HAJJAR:  And if we can click on "Evidence List."

8           (Exhibit published.)

9    BY MS. HAJJAR:

10   Q    What does this show?

11   A    In the session that we did with AD Lab, we enter all the

12   evidence that's presented to us at the moment.  And this shows

13   all the evidence that was presented to us in that session.

14   Q    And what does "Display Name" refer to?

15   A    It is that friendly name that I explained before when we

16   were looking at the file tree, where we try to create a name

17   that the case agent would be able to identify what that

18   evidence item is.

19   Q    And so turning to the third item, 1B16 WD HD 500

20   gigabyte, is that the friendly name you described earlier?

21   A    Yes, it is.

22   Q    In this case, does this report refer to only one of the

23   items in the evidence list?

24   A    Yes.

25   Q    Which one?

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                                4811

1   A    The 1B16 item.

2   Q    And I want to direct your attention, but don't click on

3   the section entitled "Bookmarks."

4            Can you describe what this shows?

5   A    As the agent had gone through and reviewed their items,

6   they decided that -- to make bookmarks of things that were

7   under different sub-folders.  Each of these bookmarks contain

8   the items that the agent had deemed necessary to place into a

9   bookmark file.

10  Q    And are these the same folder names that we were looking

11  at earlier in the directory structure file you -- that you

12  were showing the jury?

13  A    Yes.

14  Q    So that same 4L-122505, et cetera, those were the --

15           THE COURT:  Slow down.

16           MS. HAJJAR:  Sorry, Judge.

17  BY MS. HAJJAR:

18  Q    The 4L-122505 and so on, those folders are ones that are

19  listed on the left-hand side?

20  A    Yes, they were.

21  Q    Now, scrolling down to "File Paths" on Government

22  Exhibit 505, just clicking "File Paths," can you describe what

23  this shows, this page?

24  A    This is the file directory listing, like I had shown

25  earlier -- or what was shown earlier, that I had produced.

Booth - direct - Hajjar                    4812

1   Q    Okay.  And these are the same in terms of the direct --

2   the structural directory of the -- of the hard drive, this

3   sort of demonstrates the same thing?

4   A    Yes.

5   Q    In here --

6            MS. HAJJAR:  If we could just scroll down a bit.

7   Q    -- there are some -- there are lots of extra files, is

8   that right?

9   A    Yes, there is.

10  Q    Can you explain that?

11  A    Well, when we view the file directory normally, like you

12  do on your C drive, it doesn't show the items that have been

13  deleted or what we call "carved out" also.

14           Carving out a file allows us to get things that were

15  deleted and lost.  So a file might have extra information at

16  the end of it, that when we delete the file we can't just

17  recover by looking at it on our home computers.

18           Our specialized software can go in and look for

19  those zeros and ones that are associated with, say, graphics

20  or Word files, and carve those things out of the free space,

21  and save them again for us to look at later.

22  Q    And so these -- what you see here, "Carved JPEG,"

23  "Carved JPEG," can you explain what this is, what we're seeing

24  here?

25  A    "Carved" and the number "JPEG" is a file that AD Lab was

Booth - direct - Hajjar                    4813

1    able to find and resurrect.  And in doing that, it has to give

2    it a name because these files have been deleted, the names

3    have been lost.  So they give it a name, "Carved," along with

4    a file after it that usually goes in order.

5           So as it finds a file, it will give a new number.

6    And just keep going further down with new numbers.

7    Q    And without clicking on these files, are some of them

8    distorted Carve files?

9    A    Yes, because JPEGs aren't always fully recoverable.  So

10   depending on where I found it on the hard drive, you might

11   only get the top part of an image file.  Sometimes you might

12   just get a middle section.  But mostly, it starts reading for

13   a JPEG from the top down and recovers it in that kind of a

14   format.

15          So a lot of them when you only find partial, it will

16   only find, say, half of the JPEG picture that we were able to

17   recover.

18   Q    What about metadata for Carved files, is there something

19   unusual about that?

20   A    Well, metadata for Carved files can be found.  And

21   sometimes we can just find the metadata without the file, so

22   it's a remnant of a file that's no longer there.

23          So what metadata is, is information about data.  It

24   could be information on who authored your Word document.

25   Things of that nature are called metadata.  So it's data about

SAM     OCR     RMR     CRR     RPR

Booth - direct - Hajjar                    4814

1   data.

2          So we are able to recover some metadata that are for

3   files that should be there or were deleted and are no longer

4   there.

5   Q    And sometimes are you unable to recover that metadata in

6   full?

7   A    Unfortunately, yes.

8          MS. HAJJAR:  Let's just scroll down to

9   Folder Mo101805.  This is near the bottom.

10         (Exhibit published.)

11  BY MS. HAJJAR:

12  Q    And, again, Examiner Booth, we're scrolling through.

13         These are all images that were either recovered from

14  or present in the drive you examined?

15  A    Correct.

16         MS. HAJJAR:  If we could click on Image 0078 in a

17  new tab.

18         (Exhibit published.)

19  BY MS. HAJJAR:

20  Q    Okay.  So the JPEGs that you -- that are -- do

21  they correspond to a visual image that's accessible in the

22  report?

23  A    Yes, this is actually the actual item.  It forwards you

24  to that item on the disk.

25  Q    Okay.  So IMG_0078 corresponds to this image?

Booth - direct - Hajjar                                    4815

1    A    Yes.

2             MS. HAJJAR:  Can we flip back to the report, please?

3             (Exhibit published.)

4    BY MS. HAJJAR:

5    Q    And so the Carved images, they have different numbers

6    that are immediately underneath IMG_0078?

7    A    Right.

8    Q    Do they correspond to it in some way?

9    A    They -- they were found in the free space behind the

10   image.  So any free space that was behind, and if they could

11   find associated images, say, in what's called slack space or

12   allocated space that's no longer used, it tries to get those

13   images out also.  So those are found within the back part of

14   the image file here.

15   Q    Can you just very, very generally explain, like, slack

16   space and unallocated space?

17            Can you just explain what that is in layperson's

18   terms as much as you can?

19   A    Yeah, if -- if -- think of it as having a library.  And

20   where do you store your books in a library -- are on the

21   shelves.  But how do you get to them?

22            And for the older bunch of us there -- that are in

23   this courtroom, you used to use a card catalogue, right?  You

24   used to go to a card catalogue to find out where that book is,

25   and then go off to the shelf and find your book.

                    SAM     OCR     RMR     CRR     RPR

Booth - direct - Hajjar                          4816

1       When a librarian wanted to get rid of a book, how
2   easy it would be just to be able to take the card out and just
3   throw away the card.  You would never know where that book is
4   on that shelf, right?
5       So, essentially, that's what Windows winds up doing.
6   We wind up with Windows just deleting.  When we delete a file,
7   it doesn't really get rid of the file.  It just goes to that
8   card catalogue, takes the card and throws it away.
9       Now, it marks that area where that book in their
10  library reference would be.  So if you wanted to put a new
11  book up on a shelf and put a new card in, you can do that.
12  But when you go to that library shelf, you are going to find a
13  book there where you want to put your new book.  In that
14  instance, you wind up taking out that old book and putting in
15  a new book.
16      So that's how we wind up carving out all this
17  information.  Because the information is still there, it's
18  just that we've lost the location on where it's supposed to
19  be.
20  Q    So in that analogy, is the carved JPEG like a lost book,
21  a book that doesn't have a spot?
22  A    Yes, very -- very closely, yeah.  That's a good analogy
23  for it.
24  Q    And the third file under there, IMG_0078.exif.html --
25  A    Yes.

Booth - direct - Hajjar                    4817

1    Q    -- can you explain what that is?

2    A    That directly relates to the image file, itself.  It is a

3    file that is metadata that is embedded within the JPEG image.

4         So I told you we have these image files, they're

5    called JPEGs.  Inside that JPEG there is actually a section at

6    the very beginning of the file that you don't see when looking

7    at the picture, that tells you tons of information.

8         It could be where you took the picture, if you did

9    it on a camera phone.  It could be who authored it.  It could

10   be time and date information.  It could be lenses that they

11   use, if they used a nice camera.  Tons of information is put

12   in there.

13   Q    And this particular EXIF, E-X-I-F, file, which is

14   IMG_0078, that corresponds to the JPEG we just looked at?

15   A    Yes.  What AD Lab does is it goes into that image,

16   extracts that data, and saves it in a format that you can view

17   it.

18   Q    Before we click on that exif.html file, can you just

19   explain to the jury what EXIF data is?

20   A    EXIF data is exchangeable image file format.  It's a

21   standard.  It's been around for quite some time.  It was

22   developed over in Japan back in the early 2000s to be able to

23   add extra information to both JPEG files, which are graphic

24   files, and TIFF files, which are also graphic files.  One is

25   compressed, one isn't.

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                    4818

1          But what's important about it is that they're able

2     to use this information mainly for, say, news agencies that

3     have incredible amounts of photos and they need to track,

4     number one, maybe who took the photo, when it was taken, maybe

5     the geolocation of the data that were -- where it was taken.

6     And that's how these news broadcasts are very easily able to

7     go look at -- look for photos and find a whole pool of photos

8     that might have been from one section of town, for instance.

9          In this case, this EXIF data holds a lot of

10    information about this.  And mainly, it's mostly about, say,

11    the author, the photographer, and the dates and times and

12    things like that.

13    Q     Is EXIF data considered metadata?

14    A     Yes, it is.

15    Q     And how does EXIF data get captured in an image, in a

16    JPEG, for example?

17    A     Well, there's multiple ways that can happen.  The most

18    common way is for the actual device, whether or not it be a

19    camera or your phone, when you take the picture, the device

20    will actually place that into the JPEG file.

21          Scanners can do this also.  It originally, years

22    ago, was developed for when you use a scanner to actually

23    embed this stuff into a JPEG file.

24    Q     Is there something unique about EXIF data?

25    A     What's interesting about JPEG information with EXIF data

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                                    4819

1  is that when you move the JPEG, the information stays within

2  the JPEG.  So camera models, things of that nature, they go

3  with it wherever it goes.

4  Q    Can you explain that?  What do you mean, like, "they go

5  with it," and they stay the same?

6  A    Well, say you want to put it on a thumb drive and then

7  take it to your friend's computer.  Times and dates change as

8  you move across different kind of computers.

9         If you take it to a Apple computer, and then take it

10  to, say, a Linux, which is a different type of computer, and

11  then take it to your Windows computer, times and dates can

12  change from that movement, depending on whether or not the

13  computers' dates are on or off in different ways, or if

14  someone's backdated a computer, or for some reason, the

15  battery on your computer has been wiped out.

16         A lot of times we used to turn on old computers and

17  it used to ask us for the date because of the fact that the

18  battery that holds the date and time information had been

19  lost.  And then you wind up having to put the new time and

20  date in.

21         But with EXIF data, once it's embedded in a picture,

22  it doesn't matter how many times you move it around.  It stays

23  into that photo and it's very hard to remove.  In fact, most

24  commercial software will not touch EXIF data.  It will allow

25  you maybe to add data to it, but even in that sense, it's

SAM        OCR        RMR        CRR        RPR

Booth - direct - Hajjar                         4820

1    very -- it's very able to be corrupted.

2              So if you use, say, Photoshop to touch a photo like

3    a JPEG, chances are Photoshop is gonna remove the metadata

4    completely or it's gonna add "Edited by Adobe Photoshop,"

5    which is their way of just trying to protect the data from

6    being corrupted.

7    Q    But is EXIF -- does EXIF data remain the same when you --

8    even if you tried to open it in an Adobe product?

9    A    In that sense, the photo stays the same.  The EXIF data

10   might be modified to let you know that you've tried to modify

11   it in an Adobe product.

12   Q    Is there a particular reason why EXIF data is more

13   difficult to alter?

14   A    They purposely designed it that way.

15   Q    Do you know --

16   A    It's mainly to be able to store information.  And they

17   don't want data to be moved around and changed, especially

18   time and date information.  Those things are very hard for the

19   consumer to be able to modify, unless you wind up getting

20   software that's just developed to do that.

21              MS. HAJJAR:  Can we click on the EXIF.html file for

22   IMG_0078?

23              (Exhibit published.)

24   BY MS. HAJJAR:

25   Q    What does this page reflect?

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                          4821

1  A    This reflects the EXIF data obtained from a file called

2  IMG_0078.JPEG.

3  Q    And do you see at the top where it says

4  "exif.image.make"?

5  A    Yes, I do.

6  Q    And what is after that?

7  A    It says "Cannon."

8  Q    Okay.  And what about "exif.image.model"?

9  A    It says a "Cannon EOS 20D."

10 Q    And what does that reflect?

11 A    That reflects a model of camera that took the picture.

12 Q    Looking down at "EXIF photo date time original," can you

13 read what's -- what's -- what's after that?

14 A    "2005:10:18 20:33:30."

15 Q    What does that reflect?

16 A    That reflects a date and time format.

17 Q    So that's October 18th, 2005?

18 A    Yes, it is.

19 Q    And what about the -- what about right below it,

20 "exif.photo.date time digitized"?

21 A    That is when the item is actually saved on the card while

22 you're using the camera.

23       Do you want me to read that?

24 Q    Is it exactly the same as the one you read before?

25 A    It is exactly the same.

Booth - direct - Hajjar                           4822

1   Q     Why is that?

2   A     Well, because depending on how this -- how fast your

3   camera is, and how you're storing your data, you might see

4   some wedding photographers, they like to hold the camera, but

5   they have a wire coming from it to a little hard drive.  And

6   they store some of their pictures on hard drives instead of

7   putting it right in the -- in the camera.

8              But in this case, this -- this reflects that the

9   time was so quick it didn't have time to register a different

10  second.  So this is showing that it's very fast saving the

11  data from the time the picture is taken to the time that it

12  actually gets put on the card.

13  Q     But in theory, you could see a little lag time between

14  those two?

15  A     You possibly could, yes.

16             MS. HAJJAR:  Then I'd like to scroll down to --

17  sorry, just "EXIF photo flash."

18             (Exhibit published.)

19  BY MS. HAJJAR:

20  Q     Do you see that?  It's two above the long string of

21  digits.

22  A     Yes.

23  Q     What does that reflect?

24  A     That reflects whether or not the flash has been used or

25  not, and what level it was used at.

Booth - direct - Hajjar                    4823

1  Q    And the other things that are listed here:  "Shutter

2  speed value," "aperture value," "exposure bias value," are

3  these features of the image, itself, in the camera?

4  A    Well, it's where the camera was as it took the picture.

5  So it captured all that kind of information.  How fast the

6  shutter speed was moving.  How much light it was allowing to

7  go into the lens.  How the lens was focused then on at that

8  point.  Exposure value, how much -- like I said, how much

9  light is being put into the system at that one point.

10          It's a lot of data that it winds up saving.

11  Q    So all this data is captured at the time that the -- that

12  the image is produced, is that right?

13  A    Yes.

14  Q    It's stamped on the image in some way?

15  A    Yes, it is.

16          MS. HAJJAR:  Can we scroll down a little bit?  There

17  is a lot of data associated with this.

18          Like, just scroll down to "EXIF Cannon serial

19  number."  Just right there above "EXIF Cannon camera info."

20  BY MS. HAJJAR:

21  Q    Do you see "EXIF Cannon serial number"?

22  A    Yes, I do.

23  Q    Can you read that, please?

24  A    "EXIF Cannon serial number:  1420908348."

25          MS. HAJJAR:  Your Honor, can we switch to the ELMO,

Booth - direct - Hajjar                                        4824

1   please, for a bit?

2   BY MS. HAJJAR:

3   Q    I'd like to show you what's in evidence as Government

4   Exhibit 520.

5              (Exhibit published.)

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                                4825

1   BY MS. HAJJAR:  (Continuing.)

2   Q    Showing you what's in evidence already as Government

3   Exhibit 520.  It's a little blurry, but do you see that,

4   Examiner Booth?

5   A    Yes.

6   Q    Are you familiar with this?

7   A    Yes, I am.

8   Q    Have you also prepared a report with respect to this

9   camera?

10  A    Yes.

11  Q    Is it a Canon camera?

12  A    Yes, it is.

13  Q    Do you see the serial number there?

14  A    Yes, I do.

15  Q    Could you read it out?

16  A    1420908348.

17  Q    I'm showing you what's in evidence as Government Exhibit

18  524.

19           (Exhibit published.)

20  BY MS. HAJJAR:

21  Q    Have you seen this before?

22  A    Yes, I have.

23  Q    Okay, how do you -- how do you recognize it?

24  A    I have my initials on it.  I examined this card.

25  Q    And did you produce a report as well for this card?

Booth - direct - Hajjar                              4826

1    A    Yes, I did.

2          MS. HAJJAR:  Your Honor, can I show something just

3    to the witness, please.

4          THE COURT:  Go ahead.

5    BY MS. HAJJAR:

6    Q    I'm showing you what's been marked as Government Exhibit

7    521.  Do you recognize this exhibit?

8    A    Yes, I do.

9    Q    Did you conduct a forensic examination of the data

10   extracted from the camera that I just showed you?

11   A    Yes, I did.

12   Q    What's on this exhibit?

13   A    These are the images and the files that were contained on

14   the camera card that was presented to me.

15   Q    And showing you for identification Government Exhibit

16   521-A, is this a hardcopy printout of the report on the disk?

17   A    Yes it is.

18         MS. HAJJAR:  Your Honor, the Government offers

19   Government Exhibits 521 and 521-A.

20         MR. AGNIFILO:  Subject to the issues we addressed.

21         THE COURT:  Yes.  Government Exhibits 521 and 521-A

22   are received in evidence.

23         (Government Exhibits 521 and 521-A received in

24   evidence.)

25         (Exhibit published.)

Booth - direct - Hajjar                    4827

1   BY MS. HAJJAR:

2   Q    Now, I would like to show you what's already in

3   evidence -- a portion of what's already in evidence as

4   Government Exhibit 505-A.  And I showed you the HTML version.

5   I'm just going to show you the printout at this point.  So,

6   these are the studies folders, the folders that we reviewed

7   earlier?

8   A    Yes, it is.

9   Q    Okay.  I'm going to turn to page 453 of this exhibit.

10  Now, is that the same -- does this reflect the same image that

11  we were just looking at, IMG_0078?

12  A    Yes, it does.

13  Q    And are there other file attributes associated with this

14  image on this page of the report?

15  A    Yes.  We have the MD5 hash that was generated

16  automatically by AD Lab when I produced the report.

17  Q    Let's go through it a little bit.  So, first of all,

18  the -- the name at the top, this is the exit data up here.

19  This is the data we were just looking at?

20  A    Yes.

21  Q    And below that, this is the image that it corresponds to?

22  A    Correct.

23  Q    And what is the created date?

24  A    Created dates are made when an item hits a digital media

25  plot.  It's something that could be pulled off the internet

SN        OCR        RPR

Booth - direct - Hajjar                          4828

1   when it lands on your hard drive, this could be when you take

2   a picture and it lands on your phone, this could be when you

3   wind up saving something to a thumb drive.  So as something

4   gets put onto an item, it gets a created date.

5   Q    What's an access date?

6   A    The access date is the last time you opened it up and

7   viewed something.  Whether or not you open up a Word file.

8   You can open it and not look at it or just scan it and not

9   change it and close it, you will get a different access date

10  change.

11  Q    And the modified date?

12  A    The modified date is anytime you've done any type of

13  manipulation to whatever file you're looking at.  It will

14  record that.

15  Q    Now just to note, the image name, IMG_000078, where does

16  that name come from?

17  A    There's two methods.  One could be developed from

18  whatever source you're making it from.  So, your phone, as

19  you're taking pictures, we usually wind up putting DCM maybe

20  or IMG as an initial and then the number of photos as you take

21  photos, it will just keep incrementing them.  Or if you want

22  to do it manually, you can make a file name by a certain name

23  if you wanted to.

24  Q    And this name is how it appeared on the hard drive?

25  A    Yes, it is.

SN        OCR        RPR

Booth - direct - Hajjar                              4829

1  Q    And what accounts -- you see the created date is 2003,

2  modified date '05, access 2010.  What accounts for the

3  differences in those dates or what could account for those

4  differences?

5  A    Well, dates, times, and modified dates, they're all

6  deriving from the operating system, and from the file system

7  of the actual hard drive.  As I told you, with our library

8  reference, we have a card catalog that refers back to where we

9  find data.  All of this data, that date and times and access

10  times, they're all derived within the computer file system on

11  where things are on the hard drive.

12         As you move things from one computer to another, if

13  the times are different and they're different types of file

14  systems, they'll get a new created time and if dates are wrong

15  they can be manipulated.  So there's times that things can

16  change going from one computer to another.  Usually, if

17  anything, it would be the created time that would be changed.

18  Sometimes you can get a created date that's after your

19  modified date, which happens when you just happen to move to a

20  different type of file system later on after you've had the

21  file.

22         But in this case it's actually reversed.  Somehow it

23  got changed to where the date is well, well, before then what

24  might be the first modified date or a modified date.

25  Q    You testified that the EXIF data shows the date and time

SN        OCR        RPR

Booth - direct - Hajjar                                    4830

1   associated with this image is October 18, 2005?

2   A    Yes.

3   Q    And so between the dates here and the EXIF data, what's

4   the best evidence of when this photograph was taken?

5   A    Well, the best reference is the EXIF data because that

6   gets put into the JPEG file and it's not easily modifiable and

7   it moves with the file the same way from device to device, no

8   matter where you place it.  It has nothing to do with the

9   bearing of a file system at all or the dates and times

10  associated with it.  So it's on its own, but are created at

11  the same time that you take the picture.

12  Q    And does the EXIF data match roughly one of the dates

13  here?

14  A    Yes, it does.

15  Q    Which one?

16  A    The modified date.

17  Q    Now, I would like to look -- you can direct your

18  attention to what's the path here.  What does the path

19  reflect?

20  A    When we looked at earlier and saw the directory file tree

21  and how all the sub-folders moved out, you can see the

22  different folders underneath the files and folders.  This is

23  the path on how you would find that data.  The same way you

24  would look down the file tree and find the data, this shows it

25  to you in a linear format.

Booth - direct - Hajjar                    4831

1  Q    And so this image is found or located in a folder and I'm

2  just -- this is StudiesMO101805 and then a subfolder; is that

3  right, is that --

4  A    That's what the slash is, yes.

5  Q    And the subfolder is 2005-10180744-20?

6  A    Yes.

7  Q    Okay.

8  A    Correct.

9  Q    And then that's where the file is actually located in

10 this -- in this folder?

11 A    Yes.

12 Q    And so the subfolder date appears to match the EXIF data

13 in this case?

14 A    Yes, it appears to.

15 Q    Examiner Booth you testified about carved images.  Could

16 you remind the jury what that is?

17 A    A carved image is looking at an allocated space that's

18 not currently used by your computer that might have remnants

19 of other files and what AD Lab does is it goes into those

20 allocated areas, but that aren't being used, and looks for

21 JPEGs that might have been remnants that were left from

22 behind -- not just remnants, all different types of files we

23 can do it for.

24 Q    I want to show you page 325 of this report.  The same

25 report.  Can you explain what this reflects?

Booth - direct - Hajjar                    4832

1   A    This reflects a carved image that was obtained underneath

2   a TN.4/cache folder area.  On the 1B16 drive.

3   Q    What does that mean?

4   A    AD Lab has gone and underneath what's called a subfolder

5   of L102805.  It was able to find a file called TN.4/cache and

6   within that cache, we were able to pull out a JPEG.

7   Q    Is that -- is that the lost books that have a

8   corresponding card, is that sort of the analogy you were using

9   before?

10  A    Yes.

11  Q    And just looking at this carved image, there's no -- not

12  applicable is what's listed under created date, access date,

13  modified date.  Do you know why that might be?

14  A    As soon as -- if I go back to the library analogy, as

15  soon as you threw that card away, that card might have had the

16  date and time and information of when that book was taken.

17  And now if we just throw the card away to where we find it in

18  the row maybe the book doesn't have all of that information.

19  So in that sense here, we would lose all of that information

20  about a file when it's recovered.

21  Q    Is there one thing about the file attributes here that

22  would help you identify that image if you saw it again?

23  A    Yes, the MD5 hash algorithm would definitely help us find

24  it.

25  Q    If you saw another image with the same MD5 hash, how do

SN        OCR        RPR

Booth - direct - Hajjar                    4833

1    you know that they're the same?

2    A    Well, because of the long algorithm that we put all in

3    zeros and ones that we get from that file.  We put that

4    through the algorithm and the result is -- it's like a

5    thumbprint.  It's something that's very unique to a file.

6    It's akin to a thumbprint.

7              We use that term all the time.  In this sense, it

8    would verify that one file hasn't changed from another file,

9    so if I duplicate this image hundreds of times on a CD and

10   then run the MD5 on that file, it should match the same here

11   and if it doesn't then it's been changed.

12             MS. HAJJAR:  Your Honor, I'm moving to a new topic

13   and I don't know if Your Honor wants to take --

14             THE COURT:  Does the jury want to take a short

15   break?  Let's take five minutes and get back to work here.

16             (Jury exits.)

17             (In open court.)

18             THE COURT:  You can go.

19             (Witness steps down.)

20             MS. HAJJAR:  Your Honor, can I just mention one

21   thing?

22             THE COURT:  Yes.

23             MS. HAJJAR:  Your Honor, just two items.  The

24   custodian, I believe, is here, Your Honor.  Maybe we can just

25   try to get this witness to testify immediately after the break

SN        OCR        RPR

Proceedings                                                   4834

1    just to get him on and off the stand.

2              THE COURT:  This is the custodian from where?

3              MS. HAJJAR:  From Yahoo, Your Honor.

4              THE COURT:  Any objection?

5              MR. AGNIFILO:  No.

6              THE COURT:  Let's do it.

7              MS. HAJJAR:  The only thing, Your Honor, at this

8    point we do have the photographs, explicit photographs for the

9    jury.  We have them in binders and we wanted to ask Your

10   Honor, rather than publishing them to the gallery --

11             THE COURT:  How many of these are you planning on

12   showing to the jury?

13             MS. HAJJAR:  Just one from each folder.  So, 11.

14             THE COURT:  You have a folder with 11?

15             MS. HAJJAR:  We have the full folder, Your Honor,

16   with all of the images.  I was only going to refer the jury to

17   the 11 that we expect to introduce meta data for.

18             THE COURT:  You're going to give them how many

19   binders?

20             MS. HAJJAR:  We have one binder for each juror with

21   all of the images, but I'll only refer them to where there was

22   testimony on the meta data associated with that image.

23             THE COURT:  So you don't have -- you don't have a

24   binder with the 11 images specifically without anything else?

25             MS. HAJJAR:  No, Your Honor.  We prepared the

SN        OCR        RPR

Proceedings                                                  4835

1    binders exactly as they appeared in the file structure that

2    the Examiner Booth testified to.

3                THE COURT:  I'll ask the jurors only to turn to the

4    pages that you want them to make note of.  Do you have one for

5    me?

6                MS. HAJJAR:  Yes, Your Honor.

7                MR. AGNIFILO:  And for the defense?

8                MS. HAJJAR:  Yes.

9                THE COURT:  Absolutely.  Anything else?

10               MS. HAJJAR:  That's it, Your Honor.  Thank you.

11               (Recess taken.)

12               (In open court.)

13               THE COURT:  Let's bring in the new witness, please,

14   from Yahoo.

15               (Witness approaches.)

16               THE COURT:  All right, let's bring in the jury.

17               (Jury enters.)

18               THE COURT:  Please be seated.  Members of the jury,

19   this is not the forensics individual from the FBI, but a very

20   brief witness who we need to take out of turn by consent of

21   the parties.

22               So, call your witness, please.

23               MS. PENZA:  Thank you, Your Honor, the Government

24   calls Brian Harrington.

25               (Witness sworn/affirmed.)

Proceedings                                      4836

1          THE COURTROOM DEPUTY:  Have a seat and state and

2    spell your full name for the record.

3          THE WITNESS:  Brian Harrington, B-R-I-A-N

4    H-A-R-R-I-N-G-T-O-N.

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SN        OCR        RPR

Harrington - direct - Penza                    4837

1    **BRIAN HARRINGTON**,

2                called by the Government, having been

3                first duly sworn, was examined and testified

4                as follows:

5                THE COURT:  You may inquire.

6    DIRECT EXAMINATION

7    BY MS. PENZA:

8    Q    Good afternoon Mr. Harrington.

9    A    Good afternoon.

10   Q    Where do you work?

11   A    I work at Oath Holdings, Inc.

12   Q    Is that okay if I call that Oath?

13   A    Yes.

14   Q    And what type of business is Oath?

15   A    Oath is a global media technology company that offers

16   services and products such as Yahoo Mail, Yahoo Search and

17   Tumblr.

18   Q    Where is Oath's headquarters?

19   A    Sunnyvale, California.

20   Q    And is that where you work?

21   A    Yes.

22   Q    What do you do there?

23   A    I'm a senior legal specialist and a custodian of records.

24   Q    What are your responsibilities?

25   A    I respond to legal process for accountholder records and

Harrington - direct - Penza                    4838

1    testify as needed.

2    Q    Now, what is Yahoo Mail?

3    A    Yahoo Mail is a service via the World Wide Web where a

4    user can go and create an e-mail address to send, draft,

5    store, and receive electronic communications.

6    Q    And do your -- the responsibilities that you described

7    before that you have, do those relate to Yahoo Mail as well?

8    A    Yes.

9            MS. PENZA:  Just one moment, Your Honor.

10           THE COURT:  Yes, all right.

11           (Pause in proceedings.)

12           MS. PENZA:  Your Honor, may I approach the witness?

13           THE COURT:  Yes, you may.

14           (Counsel approaches.)

15   BY MS. PENZA:

16   Q    Mr. Harrington, I'm showing you what's marked for

17   identification as Government Exhibit 1824 and Government

18   Exhibit 1825.  Are you familiar with those?

19   A    Yes, I am.

20   Q    AND does Government Exhibit 1824 contain a true and

21   correct copy of a search warrant returned on the e-mail

22   account KeithRaniere@Yahoo.com?

23   A    Yes.

24   Q    And does Government Exhibit 1825 contain a true and

25   correct copy of CamillasCastle@Yahoo.com and IM --

SN        OCR        RPR

Harrington - direct - Penza                    4839

1   A      IMK-1000-A, I believe.

2   Q      At Yahoo.com?

3   A      Correct.

4          MS. HAJJAR:  Your Honor, the Government offers

5   Government Exhibit 1824 and 1825 into evidence.

6          MR. AGNIFILO:  No objection.

7          THE COURT:  All right government exhibits 1824 and

8   1825 are received in evidence.

9          (Government Exhibits 1824 and 1825 received in

10  evidence.)

11         MS. PENZA:  Your Honor, may I have the ELMO just for

12  the witness and counsel?

13         THE COURT:  Go ahead.

14  BY MS. PENZA:

15  Q    Mr. Harrington, I'm showing you what's marked for

16  identification purposes as Government Exhibit 1826, are you

17  familiar with this document?

18  A    Yes, I am.

19  Q    And can you just explain generally what this is?

20  A    It is the business records containing the subscriber

21  details for the account, KeithRaniere@Yahoo.com.

22         MS. HAJJAR:  Your Honor, the Government offers

23  Government Exhibit 1826 into evidence.

24         MR. AGNIFILO:  I think with a very small redaction,

25  there's no problem.

Harrington - direct - Penza                    4840

1          MS. HAJJAR:  Yes, I'll take it out right now.

2          MR. AGNIFILO:  Then we don't object.

3          THE COURT:  All right.  Government Exhibit 1826 is

4   admitted.

5          (Government Exhibit 1826 received in evidence.)

6          MS. PENZA:  Thank you.

7          (Exhibit published.)

8   BY MS. PENZA:

9   Q    So, very quickly Mr. Harrington, this is for the Yahoo

10  Mail name Keith Raniere@Yahoo.Com?

11  A    Yes, that's correct.

12  Q    And it lists alternate communication channels.  What are

13  alternate communication channels?

14  A    Alternate communication channels are either a phone

15  number or an e-mail address that the account holder can add if

16  they choose to after making the account.

17

18          (Continued on the following page.)

19

20

21

22

23

24

25

SN          OCR          RPR

Harrington - Direct - Penza                    4841

1    BY MS. PENZA (Continuing):

2    Q    So, there's an e-mail address, the first four letters of

3    which are A-R-I-A and then there's a period and then there's

4    something redacted @gmail.com?

5    A    Yes.

6    Q    And then there's a phone number, 518 and then it ends in

7    7890?

8    A    That is correct.

9    Q    And it says:  Full name, Mr. Keith Raniere?

10   A    Correct.

11   Q    And birthday, August 26, 1960?

12   A    Yes.

13           MS. PENZA:  Thank you, your Honor.  No further

14   questions.

15           MR. AGNIFILO:  I have no questions.

16           THE COURT:  The witness is excused.  You may stand

17   down, sir.  Have a good trip.

18           THE WITNESS:  Thank you.

19           (Witness excused.)

20           THE COURT:  All right.  Bring back the prior

21   witness.

22           (Brian Booth resumes the stand.)

23           THE COURT:  I remind the witness he is still under

24   oath and may be seated.

25           THE WITNESS:  Thank you.

Proceedings                                        4842

1              THE COURT:  Okay.  You may inquire.

2              MS. HAJJAR:  Thank you, your Honor.

3              Your Honor, I'd like to offer a stipulation into

4    evidence that we just marked as Government Exhibit 252.

5              THE COURT:  Go ahead.

6              MS. HAJJAR:  May I publish and read it into the

7    record?

8              THE COURT:  Any objection, 252, stipulation?

9              MS. HAJJAR:  The signed stipulation.

10             MR. DER OHANNESIAN:  Okay.  No objection.

11             THE COURT:  Okay.  Government Exhibit 252 is

12   received in evidence.

13             MS. HAJJAR:  Thank you, your Honor.

14             (Government Exhibit 252 so marked.)

15             THE COURT:  You may publish it to the jury.

16             (Exhibit published to the jury.)

17             MS. HAJJAR:  This is Government Exhibit 252:

18             It is hereby stipulated and agreed by and between

19   the United States of America, by Assistant United States

20   Attorneys Moira Kim Penza, Tanya Hajjar, and Mark J. Lesko,

21   and by the Defendant Keith Raniere, by the undersigned counsel

22   that the individuals depicted in the following Government

23   exhibits currently marked for identification are as follows:

24   Government Exhibit 508-E depicts Lauren Salzman; Government

25   Exhibit 509-A through -D, -F, -H, and -J through -L depict

                    LAM      OCR      RPR

Proceedings                                              4843

1   Angel Smith; Government Exhibit 510-G and -K depict Barbara

2   Jeske; Government Exhibit 511-A through -B, -E, -F through -K,

3   and -L depict Dawn Morrison; Government Exhibit 512-A through

4   -C, -F, and -H through -I depict Daniela; Government Exhibit

5   513-B, -I through -J, and -O depict Barbara Bouchey;

6   Government Exhibit 514-A, -E, and -F depict Loreta Garza;

7   Government Exhibit 515-A and -B depict Pamela Cafritz and

8   Marianna, from left to right; Government Exhibit 516-A, -E

9   through -H, depicts Monica Duran; and Government Exhibit

10  517-A, -D through -E, and -G through -J depict Kathy Russell.

11  This stipulation, marked as Government Exhibit 252, is

12  admissible in evidence.

13          THE COURT:  All right.

14          MS. HAJJAR:  At this time, your Honor, I'd ask that

15  we be permitted to distribute binders to the jurors and to

16  your Honor.

17          THE COURT:  Yes, you may do so.  But before you do,

18  I'd like to ask the jurors to cooperate.

19          These binders have photographic documentation among

20  them.  You are only going to be asked to look at certain tabs,

21  certain pages.  And I ask you not to look at any of the other

22  pages, as only I think eleven of the photographs are going to

23  be discussed during the testimony of this witness?

24          Is that correct?

25          MS. Hajjar:  Yes, your Honor.

LAM     OCR     RPR

Proceedings                                          4844

1          THE COURT:  Thank you for your cooperation.

2          (Pause in proceedings.)

3          THE COURT:  Anyone else need a binder?  Okay.

4      And defense has the binder?

5          MR. DER OHANNESIAN:  We do.

6          THE COURT:  Go ahead.

7          MS. HAJJAR:  Your Honor, can we switch the laptop,

8  please?

9          THE COURT:  Go ahead.

10         MS. HAJJAR:  And if we could open what's in evidence

11  as Government Exhibit 505?

12         THE COURT:  Go ahead.

13         MS. HAJJAR:  If you could click to:  File path, all

14  items.

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Booth - direct - Hajjar                          4845

1    **BRIAN BOOTH**,

2         called as a witness, having been previously duly

3         sworn, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MS. HAJJAR (Continuing):

6    Q    Examiner Booth, have you reviewed the contents of this

7    binder that you have in front of you?

8    A    I don't have it on my visual.

9    Q    Do you have a binder, a physical binder, in front of you?

10   A    Physical binder, yes.

11   Q    And does the binder and the tabs within it -- just

12   generally -- reflect the folders that are listed that we

13   discussed in the Studies folder?

14   A    Yes, they do.

15   Q    In other words, the tabs correspond to the folder names

16   that we -- that you read through before?

17   A    Yes, they do.

18   Q    So, does the binder contain tabs for each of the folders

19   except the last one?

20   A    Yes.

21        MS. HAJJAR:  So, if we could scroll in the report to

22   the first folder, 4L122505.

23   Q    I'm going to direct you to that corresponding tab and the

24   tab for E, which is Government Exhibit 508 in the binders.

25   So, the tab is 4L122505 and the tab is E, Government Exhibit

Booth - direct - Hajjar                      4846

1   508-E in the binders.

2           MS. HAJJAR:  Could we click on the EXIF data for

3   IMG_0207, please?

4   Q    Examiner Booth, does this EXIF data relate to Government

5   Exhibit 508-E that's in your binder?

6   A    I don't have it to reference to.  All I have is the

7   photo.

8           THE COURT:  Here, it's on the screen.

9           Got it now?

10          THE WITNESS:  Yes, I do.  Thank you, sir.

11  A    Yes, it does.

12  Q    And, so, Government Exhibit 508-E in the binders

13  corresponds to metadata that you can see in IMG_0207.jpg.

14  A    Yes, it does.

15  Q    Can you read out the EXIF image make and model?

16  A    The make is Canon, the model is EOS 20D.

17  Q    And the date and time original and digitized, please?

18  A    The date and time original is 2005:12:26 and 3:1:40.

19          THE COURT:  3:01:40, that's 3 o'clock in the

20  morning; is that the time?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Go ahead.

23  Q    If you could scroll down to the EXIF Canon serial number,

24  is that the same serial number that you saw before?

25  A    Yeah, that was how it is.

Booth - direct - Hajjar                         4847

1   Q    And showing you what's in evidence as Government Exhibit

2   252 --

3        MS. HAJJAR:  Sorry, your Honor, can we switch back

4   to the Elmo briefly?

5        THE COURT:  That's fine.

6   Q    Can you read out the text next to Government Exhibit

7   508-E?

8   A    GX508-E depicts Lauren Salzman.

9        MS. HAJJAR:  Can we switch back, your Honor?

10       THE COURT:  Go ahead.

11       MS. HAJJAR:  Could we publish it, your Honor.

12       THE COURT:  Sure.

13       (Exhibit published to the jury.)

14       MS. HAJJAR:  Ms. Carby, could we go back to the

15  report and just click the EXIF data only for the following

16  image, which is IMG_0208?

17  Q    Now, just looking at the EXIF photo date time original --

18       MS. HAJJAR:  And could we switch back to 0207 and

19  scroll up?

20  Q    -- do you see any difference between the two?

21       If we switch back and forth between them, is there a

22  small difference?

23  A    Yes, there is.

24  Q    What is that?

25  A    It's changed by a couple seconds as far as the time is

LAM      OCR      RPR

Booth - direct - Hajjar                                    4848

1    concerned.

2    Q    Given what the date time original corresponds to, does

3    that make sense to you?

4    A    Yes, that makes total sense.

5    Q    How?

6    A    Well, typically when people use cameras, they don't take

7    a picture every one second or two seconds after each other in

8    order.  They can be off by different seconds.

9    Q    If you were to take photos in sequence, you might expect

10   that the date and time would be slightly later in the second

11   photo?

12   A    Yes, I would.

13   Q    I want to direct your attention to EXIF photo focal

14   length, which is right above the EXIF photo maker note.

15   A    I see it.

16        MS. HAJJAR:  And then if we can switch to the image

17   prior, IMG_0207.

18   Q    Do you see something different?

19   A    Yes, I do.

20   Q    What does that refer to; do you know?

21   A    It's showing an adjustment on the actual lens of the

22   camera itself.

23        MS. HAJJAR:  If we can go back to the original

24   report and scroll to folder A111005.

25        I direct the witness to the A111005 tab in the

LAM       OCR       RPR

Booth - direct - Hajjar                    4849

1    binder, the jury as well, and the A tab.

2              And if you could, click the EXIF data for IMG_0164.

3    Q    Examiner Booth, does this EXIF data, this metadata,

4    reflect the same image that's depicted in Government Exhibit

5    509-A?

6    A    Yes, it does.

7    Q    And, again, does this refer to the Canon EOS20D camera?

8    A    The Canon EOS 20D, yes.

9    Q    What's the date and time associated with this image?

10   A    Date and time original is 2005:11:10 20:22:18.

11   Q    This is November 10, 2005?

12   A    Yes, it is.

13             MS. HAJJAR:  Can you scroll down to the serial

14   number?

15   Q    Is this the same serial number?

16   A    Yes, it is.

17   Q    Examiner Booth, have you looked at the serial number for

18   many of these images?

19   A    Yes, I have.

20   Q    Is it always the same Canon serial number?

21   A    Yeah, they're consistent.

22             MS. HAJJAR:  Now if we could return to the report

23   and scroll --

24             THE COURT:  Ms. Hajjar, did you want the jury to

25   look at these images now?

Booth - direct - Hajjar                4850

1           MS. HAJJAR:  Yes.  I had referred them to that tab.

2           THE COURT:  The prior one, though.

3           MS. HAJJAR:  Yes, one for each folder, as we

4   discussed, your Honor.

5           THE COURT:  So, 4L122505E was the first one?

6           MS. HAJJAR:  Yes.

7           THE COURT:  And you're referring the jury to that.

8           MS. HAJJAR:  Government Exhibit 508-E.  And Examiner

9   Booth had testified regarding the date on that file.

10          THE COURT:  And, so, you were referring that to the

11  jury.

12          MS. HAJJAR:  Yes, your Honor.

13          THE COURT:  It wasn't clear to me.  So, the jury has

14  seen that and they've seen 509-A.

15          All right.  Keep going.

16          MS. Hajjar:  Thank you, your Honor.

17          If you could go back to the report, Ms. Carby, and

18  scroll down to the folder titled EJ103005.

19          And I'll direct the jury to the tab that has the

20  same folder name, and it's letter G.  510-G is the Government

21  exhibit that the corresponds.

22          And if we could, click on IMG_0144.exif.html.

23  Q    Examiner Booth, does this image and the EXIF data that's

24  associated with it correspond to Government Exhibit 510-G?

25  A    Yes, it does.

LAM      OCR      RPR

Booth - direct - Hajjar                    4851

1   Q    And what's the date and time associated with this image?

2   A    The original date time original is 2005:10:30 18:01:14.

3   Q    And in this case, is that the same as the digitized

4   version?

5   A    Yes, it is.

6   Q    Are these images again from the Canon camera with the

7   same serial number?

8   A    You'd have to scroll down.

9   Q    We'll do that.

10  A    Yes, it does.

11        MS. HAJJAR:  Now, if we could switch to the next

12  folder, which is D101705.

13  Q    And I'll direct you, Examiner Booth, and the jury to Tab

14  F, which contains Government Exhibit 511-F.

15        MS. HAJJAR:  And if we could click on

16  IMG_0064-1.exif.html.

17  Q    Examiner Booth, does this data -- is this the data that

18  corresponds with Government Exhibit 511-F?

19  A    Yes, it does.

20  Q    And is this also the same Canon camera?

21  A    Yes, it is.

22  Q    And can you read the date the original date and time,

23  please?

24  A    The date time original is 2005:10:17 22:02:00.

25        MS. HAJJAR:  If we could switch to the next folder,

Booth - direct - Hajjar                    4852

1   which is DF101905.

2   Q    And I'll direct you to the binder Tab C, which contains

3   Government Exhibit 512-C?

4        MS. HAJJAR:  You can click on IMG_0092.exif.html.

5   Q    Examiner Booth, what's the date and time associated with

6   this image?

7   A    The date time original is 2005:10:19 19:33:09.

8   Q    Now, Examiner Booth, the images that we -- the EXIF data

9   associated with the images we've been looking at, have they

10  all been in Chosen 5 thus far?

11  A    Yes, they have.

12  Q    Do they correspond, roughly, to the string of numerals

13  that's next to the initials or the letters at the front of

14  that folder name?

15  A    Yes, they do.

16  Q    So, scrolling to the next folder, which is J101605 and

17  directing you to Tab B, which contains Government Exhibit 513?

18       MS. HAJJAR:  If we could, open the EXIF data, which

19  is IMG_0044.

20  Q    Examiner Booth, is this the EXIF data that corresponds to

21  that image?

22  A    Yes, it is.

23  Q    What is the date associated with this image?

24  A    Date time original is 2005:10:17 16:53:22.

25       MS. HAJJAR:  And if we could scroll to the next

Booth - direct - Hajjar                              4853

1   folder, which is L103805 -- 28.

2

3           (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAM       OCR       RPR

Booth - direct - Hajjar                    4854

1    (Continuing)

2                THE COURT:  L102805?

3                MS. HAJJAR:  Yes.

4                THE COURT:  Go ahead.

5    EXAMINATION CONTINUING

6    BY MS. HAJJAR:

7    Q    And I'll direct your attention to Tab A, which contains

8    Government Exhibit 514, and that's IMG__0110.exif.html.

9                And does this EXIF data correspond with that image?

10   A    Yes, it does.

11   Q    And what is the date and time associated with this image?

12   A    The date/time original is 2000 -- 2005:10:295:11:16.

13   Q    And that's October 29th, 2005?

14   A    Yes, it is.

15               MS. HAJJAR:  If we could scroll to the next folder,

16   which is Mnp102005.

17               And I'll direct the jury's attention to the first

18   tab, which is Tab A, which contains Government Exhibit 515-A.

19   Q    Before looking at any EXIF data, Examiner Booth, I just

20   want to -- can you just scroll down through Mnp102005?

21               Are there multiple folders, multiple images in this

22   group?

23   A    Yes, there are.

24   Q    Multiple sub-folders within it?

25   A    Yes.

Booth - direct - Hajjar                         4855

1   Q     So we are just going to look at the very first one, which

2   is -- I just want you to read the sub-folder, what the title

3   is of that sub-folder starting with 2005.

4   A     Mnp102005.

5   Q     And right below that the sub-folder, what is that

6   sub-folder titled?

7   A     2005-10-20-0640-31.

8   Q     And if we could open IMG__0099, the first image, the EXIF

9   data associated with it, and is this the EXIF data that's

10  associated with Government Exhibit 515-A?

11  A     Yes, it is.

12  Q     And is this, again, the Cannon camera, the same one that

13  we've been referring to?

14  A     Yes, it is.

15  Q     Can you read the date/time, please?

16  A     The date/time original is 2005:10:20 16:20:13.

17  Q     And we scroll now to the folder titled Mo101805, and I am

18  just referring the witness and the jury to the first tab,

19  Tab 516-A.  Tab A, if we could.

20        Examiner Booth, can you just read the first folder,

21  it's Mo101805, and what's the folder name under that?

22  A     The folder name is 2005-10-18-0744-20.

23  Q     And if we could open IMG_0075.exif.html.

24        This is the EXIF data associated with that image?

25  A     Yes, it is.

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                    4856

1   Q     And what's the date and time?

2   A     The date/time original is 2005:10:18 20:33:09.

3   Q     And that October 18th, 2005, that matched the folder name

4   that you looked at a moment ago?

5   A     Yes, I believe it did.

6              MS. HAJJAR:  Can you just go back to the report,

7   please?

8   BY MS. HAJJAR:

9   Q     It's October 18th, 2005 and, again, reflected above?

10  A     Correct.

11  Q     And the second-to-last folder is Msk101905, and the first

12  tab, which is tab -- which contains Government Exhibit 517-A.

13             MS. HAJJAR:  Could we look at IMG_0079.exif.html?

14  Q     And does this refer to that image?

15  A     Yes, it does.

16  Q     And, again, the same camera was used?

17  A     Yes, a Cannon EOS 20D.

18  Q     And what's the date and time associated with this image?

19  A     Date/time original is 2005:10:19 18:54:09.

20             MS. HAJJAR:  And so, Your Honor, just know we're

21  finished with the binder.  So I just wanted --

22             THE COURT:  We can collects the binders.

23             MS. HAJJAR:  We can collect them.

24  Q     Examiner Booth, you testified that you also created a

25  report of the card that was within the camera?

Booth - direct - Hajjar                          4857

1   A     Yes, I did.

2   Q     And I'd like to show you what's already in evidence as

3   Government Exhibit 521-A.

4            MS. HAJJAR:  If I could switch to the ELMO, please,

5   Your Honor.

6            THE COURT:  Okay.

7   BY MS. HAJJAR:

8   Q     And is this the -- turn to the third page of this report.

9            Is this the report that corresponds with the

10  forensic analysis you did of the card associated with the

11  camera?

12           THE WITNESS:  I don't have it, Your Honor.

13           THE COURT:  Okay, one moment.  Go ahead.

14           THE WITNESS:  Thank you.

15  A     Yes, it is.

16  Q     Okay.  And looking at evidence list, how can you tell?

17  A     It's the display name that I wound up giving for the card

18  in the evidence list.  I can tell by that.

19  Q     And this display name, is that the way you can match it

20  to the device that you analyzed?

21  A     Yes, plus underneath the evidence path is the path I

22  created to save the evidence file, and the ID number and name

23  is underneath it also.  Multiple ways that we verify.

24  Q     I just want to show you.  Turning to page 131 of this

25  report.

SAM      OCR      RMR      CRR      RPR

                          Booth - direct - Hajjar                    4858

1              THE COURT:  This is in evidence?

2              MS. HAJJAR:  Yes, Your Honor, this is in evidence.

3    It's Government Exhibit 521-A.

4              THE COURT:  Okay, go ahead.

5              MS. HAJJAR:  It's the same report.  It's just an

6    excerpted copy.

7    BY MS. HAJJAR:

8    Q     Do you see that, Examiner Booth?

9    A     Yes, I do.

10   Q     And what does "file path" refer to?

11   A     This is the directory structure that the items that were

12   found on the card were located.

13   Q     And so this LEXAR CF2 GB card, is that the card that was

14   in the camera that you analyzed?

15   A     Yes, it was.

16   Q     What is -- do you see below that, LEXAR MEDIA, FAT16?

17   A     Yes.

18   Q     What does that refer to?

19   A     That's a designation that the card had been given, as far

20   as the partitioning.

21             MS. HAJJAR:  Your Honor, it's 5 o'clock.  I don't

22   know -- I do have a bit more.

23             THE COURT:  All right, we'll recess for the evening.

24             Members of the jury, please remember it is important

25   that you follow my instruction that you not discuss this case

                    SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                            4859

1    with anyone, not your family, friends, business associates and

2    not your fellow jurors.

3            In addition, you must not read, listen to, watch or

4    access any accounts of this case on any form of media, such as

5    newspapers, TV, radio, podcasts or the Internet.  No research

6    or seek outside information about any aspect of the case.

7            Do not communicate with anyone about the case on

8    your phone, whether through e-mail, text messaging or any

9    other means, through any blog or website, or by way of any

10   social media, including Facebook, Twitter, Instagram, YouTube

11   or other similar sites.

12           You must not consider anything you may have read or

13   heard about the case outside of this courtroom, whether you

14   have read it before or during jury selection or during this

15   trial.  And do not visit any of the locations identified

16   during the course of jury selection and trial.

17           And we will see you tomorrow morning.  We will start

18   at 9:30.  If you are taking notes, please leave them in the

19   jury deliberation room.

20           All rise for the jury.

21           (Jury exits.)

22

23           (Continued on the following page.)

24

25

SAM        OCR        RMR        CRR        RPR

Proceedings                                            4860

1          (In open court.)

2          THE COURT:  All right.  Please be seated.

3          About how much more do you have?

4          Have a good evening.  We will see you tomorrow.

5          THE WITNESS:  Thank you, Your Honor.

6          (Witness steps down.)

7          THE COURT:  How much longer?

8          MS. PENZA:  30 to 45 minutes, Your Honor.

9          THE COURT:  Any more pictures?

10         MS. PENZA:  The child pornography, Your Honor.

11         THE COURT:  And for those you're not passing out a

12  book, are you?

13         MS. PENZA:  We would propose, Your Honor -- we only

14  have one copy of this.

15         THE COURT:  Why don't we do what we did the other

16  day and show it only to the jury and turn off the rest of the

17  video.

18         MS. PENZA:  We had thought, Your Honor, that the

19  agent could display it to the jury and give them the

20  opportunity to look at that single binder, Your Honor.

21         THE COURT:  You can do it that way.  That's fine.

22         MS. PENZA:  Okay.  There's a certain -- as Your

23  Honor knows, there's aspects -- in terms of identifying the

24  individual, these are highly-quality photos, and there's only

25  one copy.  We would briefly display it to the jury and ask

Proceedings                                                    4861

1    that they briefly look at it, and that's it in terms of the

2    photographs.

3              MR. AGNIFILO:  What was the procedure again?

4              THE COURT:  There's a binder?

5              MS. PENZA:  Yes.

6              THE COURT:  It has one photo in it?

7              MS. PENZA:  No, Your Honor, I'm sorry.  It's one

8    binder.  It has each of the photographs that's been charged.

9    So it has 18 or so images of child pornography in it.

10             THE COURT:  I see.  And you're going to ask the

11   jurors to look at all 18 images.

12             MS. PENZA:  Briefly, Your Honor.  We'll have the

13   agent who is in custody of the images, display the images very

14   briefly to the jury and then allow them to accept the images,

15   not for a lengthy period of time, but to have an opportunity

16   to look at the images themselves.

17             MR. AGNIFILO:  Would the agent approach the jury to

18   do that?

19             MS. PENZA:  Yes.

20             MR. AGNIFILO:  I would object to that.  I think the

21   book could be passed and they can look at it as they deem

22   necessary.  Face-to-face, I don't want that.  If they want

23   look, if they don't want to look.

24             THE COURT:  It might coerce the jurors to look at

25   the images; is that the argument?  Why don't we have one of

SN        OCR        RPR

Proceedings                                          4862

1    the attorneys do it.  I don't understand.  After this, what we

2    had today -- I will allow the agent.  He's in custody of it.

3    They're images of child pornography.  It's very serious and

4    the agent can show it to them and then they can pass it to the

5    jury.  Anyone who wants to look further can look and anyone

6    who doesn't want to look further doesn't have to look, and

7    then we'll be done with this portion of the case.

8              MS. PENZA:  Yes, Your Honor.

9              THE COURT:  And after that, that's it?

10             MS. PENZA:  That's it for this witness, Your Honor,

11   and then there's one additional witness tomorrow.

12             THE COURT:  How much do you have for the witness.

13             MR. AGNIFILO:  Hour, hour and 15.

14             THE COURT:  And then there's one more witness after

15   that?

16             MS. PENZA:  Yes, Your Honor, our case agent,

17   approximately two hours on direct.

18             THE COURT:  And on cross?

19             MR. AGNIFILO:  Probably less than an hour.

20             THE COURT:  Which will take us into the middle of

21   the afternoon, I guess.

22             MR. AGNIFILO:  Sounds about right.

23             THE COURT:  And then you'll rest your case.

24             MS. PENZA:  We expect to, Your Honor.

25             THE COURT:  You expect to.  Okay.

Proceedings                                    4863

1          And then I'll hear from the defense.

2          MR. AGNIFILO:  Yes, sir.  Can I go back to the issue

3   that I raised at sidebar and maybe do it at sidebar PSR?

4          THE COURT:  No.  We did it.  I am not doing it

5   again.  Once is enough in this case.  Send me a letter.  You

6   are good at that.  After 6 a.m., if you do not mind.

7          MR. AGNIFILO:  Okay, Judge.  We're done for the day.

8          MS. PENZA:  Thank you, Your Honor.

9

10

11     (Matter adjourned to Thursday, June 13, 2019 at 9:30 a.m.)

12

13                            ooo0ooo

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

4864

I N D E X

WITNESS                                                          PAGE

RICHARD GUERCI

    DIRECT EXAMINATION CONTINUES BY MR. LESKO          4619

    CROSS-EXAMINATION BY MR. AGNIFILO                 4620

    REDIRECT EXAMINATION BY MR. LESKO                 4645

    RECROSS-EXAMINATION BY MR. AGNIFILO               4647


KEITH DONATO

    DIRECT EXAMINATION BY MR. LESKO                   4649

    CROSS-EXAMINATION BY MR. AGNIFILO                 4669


RICK ALAN ROSS                                                  4680

    DIRECT EXAMINATION BY MS. HAJJAR                  4680

    CROSS-EXAMINATION BY MR. AGNIFILO                 4733

    CROSS-EXAMINATION RESUMED BY MR. AGNIFILO         4755

    REDIRECT EXAMINATION BY MS. HAJJAR                4775

4865

# I N D E X

**WITNESS**                                                    **PAGE**


**BRIAN BOOTH**

    DIRECT EXAMINATION BY MS. HAJJAR                4778


**BRIAN HARRINGTON**

    DIRECT EXAMINATION BY MS. PENZA                 4837

    DIRECT EXAMINATION RESUMED BY MS. HAJJAR        4845

4866

**E X H I B I T S**

Government Exhibit 710                                    4661

Government's Exhibit 620                                  4705

Government's Exhibit 609                                  4711

Government's Exhibit 610                                  4714

Government's Exhibit 611                                  4717

Government Exhibit 608                                    4727

Government Exhibit 550                                    4789

Government Exhibits 508-A through -F, 509-A

through -O, 510-A through -L, 511-A through

-L, 512-A through -I, 513-A through -P,

514-A through -P, 515-A through -KK, 516-A

through -H, 517-A through -O, and 519-A

through -HH                                              4805

Government Exhibit 506                                    4806

4867

**E X H I B I T S**

Government Exhibit 504                          4807

Government's Exhibit 504-A                      4808

Government Exhibits 521 and 521-A              4826

Government Exhibits 1824 and 1825             4839

Government Exhibit 1826                         4840

Government Exhibit 252                          4842

SAM      OCR      RMR      CRR      RPR