4868

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        :    18-CR-00204(NGG)

          Plaintiff ,            :

                                 :    United States Courthouse
     -against-                   :    Brooklyn, New York

KEITH RANIERE, et al.,           :

                                 :    June 13, 2019, Thursday
          Defendant.             :    9:30 a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:        RICHARD P. DONOGHUE
                           United States Attorney
                           BY: MOIRA K. PENZA, ESQ.
                               TANYA HAJJAR, ESQ.
                               MARK LESKO, ESQ.
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                           767 Third Avenue
                           New York, New York 10017
                           BY: MARC A. AGNIFILO, ESQ.
                               TENY ROSE GERAGOS, ESQ.

                           DEROHANNESIAN & DEROHANNESIAN
                           677 Broadway
                           Albany, New York 12207
                           BY:  PAUL DerOHANNESIAN, II, ESQ.
                               DANIELLE R. SMITH, ESQ.

Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                4869

1              (In open court - jury not present.)

2              (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

3                  (Defendant entered the courtroom.)

4              THE COURT:  Appearances, please.

5              MS. PENZA:  Moira Penza, Tanya Hajjar, Mark Lesko

6    for the United States.  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MS. PENZA:  Also at counsel table is Special Agent

9    Michael Lever and Paralegal Specialist Teri Carby.

10             THE COURT:  All right, good morning.

11             MR. AGNIFILO:  Good morning, Your Honor.  Marc

12   Agnifilo, Teny Geragos, Paul der Ohannesian, and Danielle

13   Smith for Keith Raniere, who is with us this morning in court.

14   Good morning.

15             THE COURT:  Good morning, everyone.  All right,

16   please be seated.

17             Okay.  You have more for the witness?

18             MS. HAJJAR:  Yes, Your Honor.

19             THE COURT:  All right.

20             MS. HAJJAR:  Not too much longer.

21             THE COURT:  Anything else?

22             Okay.  Let's bring in the witness.

23             Please bring in the jury.

24             (The witness entered the courtroom and resumed the

25   stand.)

Proceedings                                 4870

1          (Pause.)

2          (Jury enters.)

3          THE COURT:  Please be seated.

4          Good morning, members of the jury.

5          THE JURORS:  Good morning.

6          THE COURT:  All right, let's continue with the

7    examination of the witness.

8          MS. HAJJAR:  Thank you, Your Honor.

9          THE COURT:  I remind the witness that he is still

10   under oath.

11         THE WITNESS:  Yes, Your Honor.

12

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Booth - direct - Hajjar                    4871

1   **BRIAN BOOTH**,

2        previously called as a witness by the Government, having

3        been previously duly sworn/affirmed by the Courtroom

4        Deputy, was examined and testified further under oath as

5        follows:

6   DIRECT EXAMINATION RESUMED

7   BY MS. HAJJAR:

8   Q    Good morning, Examiner Booth.

9   A    Good morning.

10  Q    Examiner Booth, I am going to show you what's in evidence

11  as Government Exhibit 550.

12            (Exhibit published.)

13  Q    And yesterday we were discussing the reports you

14  generated in connection with the folders within the "Studies"

15  folder, is that right?

16  A    Yes.

17  Q    And you testified to a number of images, but one from

18  each of these folders?

19  A    Yes.

20  Q    Now, is there one folder that we didn't review the

21  contents of, Examiner Booth?

22  A    I think it was the last folder.

23  Q    The last folder.

24            And you testified regarding EXIF data in connection

25  with a single image from each of those folders?

SAM    OCR    RMR    CRR    RPR

Booth - direct - Hajjar                    4872

1   A    Yes, I did.

2   Q    With respect to Government's Exhibit 508, which was the

3   first image we looked at, you testified that that was created

4   based on the EXIF data in December of 2005?

5   A    Yes.

6   Q    And with respect to 509, you testified that was with

7   respect to November 2005?

8   A    Yes.

9   Q    And with respect to the images in the remainder of the

10  folders, that's from folder BJ103005 through Msk101905, what

11  was the month and year of the images that we looked at

12  yesterday?

13  A    That was October of '05.

14  Q    Examiner Booth, you testified that you also created a

15  report with respect to the images in this folder, V110205, is

16  that right?

17  A    That's correct.

18  Q    Now, I'd like you to direct your attention to Government

19  Exhibit 518-A through U.

20       MS. HAJJAR:  May I approach the witness, Your Honor?

21       THE COURT:  Yes.

22  BY MS. HAJJAR:

23  Q    Examiner Booth, can you just look at those exhibits?

24  A    (Witness complies.)  I have.

25  Q    Are those exhibits images that were also reflected in

SAM      OCR      RMR      CRR      RPR

1   your report with respect to that folder?

2   A    Yes, they were.

3           MS. HAJJAR:  Your Honor, the Government offers

4   Government Exhibit 518-A through U.

5           MR. Der OHANNESIAN:  No objection.

6           THE COURT:  All right, Government Exhibit 518-A

7   through U received in evidence.

8           (Government's Exhibits 518-A through 518-U were

9   received in evidence.)

10          MS. HAJJAR:  Your Honor, can I just retrieve

11  the book?

12          THE COURT:  Yes, you may.

13          MS. HAJJAR:  Your Honor, at this time, I would like

14  to ask that the images be published to the jury alone with

15  Special Agent Rees, if that's all right with Your Honor.

16          THE COURT:  All right.

17          (Images shown to the jury alone.)

18  BY MS. HAJJAR:

19  Q    Examiner Booth, the images that comprise those exhibits,

20  some of them are located in this folder (indicating), is that

21  right?

22  A    Correct.

23  Q    And what is the name of that folder?

24  A    It's 2005-11-02-0422-20.

25  Q    And the remaining images are located in this folder

Booth - direct - Hajjar                    4874

1    (indicating)?

2    A    Yes.

3    Q    What's the name of that folder?

4    A    2005-11-24-0814-46.

5    Q    And the title of the main folder that contains both those

6    folders?

7    A    That is V110205.

8    Q    Now, in connection with the report you created, was there

9    EXIF data for each of these photographs within that folder?

10   A    Yes, there was.

11   Q    I am showing you --

12             MS. HAJJAR:  Can I show something just to the

13   witness, Your Honor?

14             THE COURT:  Go ahead.

15             (Exhibit published to the witness alone.)

16   BY MS. HAJJAR:

17   Q    I am showing you what's marked for identification as

18   Government Exhibit 504-B.

19   A    No.

20             THE COURT:  Go ahead.

21             MS. HAJJAR:  Thank you.

22   Q    Can you see that, Examiner Booth?

23             MS. HAJJAR:  May I approach the witness with it,

24   Your Honor?

25             THE COURT:  Yes, go ahead.

1    BY MS. HAJJAR:

2    Q    Do you recognize this exhibit?

3    A    Yes, I do.

4    Q    And is this the EXIF data for the images that we just

5    discussed?

6    A    Yes.

7         MS. HAJJAR:  Your Honor, the Government offers

8    Government Exhibit 504-B into evidence.

9         MR. Der OHANNESIAN:  No objection.

10         THE COURT:  All right, Exhibit 504-B is received in

11    evidence.

12         (Government's Exhibit 504-B was received in

13    evidence.)

14         MS. HAJJAR:  May I publish it, Your Honor?

15         THE COURT:  Yes, let us see.

16         (Exhibit published.)

17         THE COURT:  Okay.  All right.

18         MS. HAJJAR:  Thank you.

19    Q    Examiner Booth, this exhibit is not the entirety of the

20    report you created with respect to that folder, is that right?

21    A    No, it isn't.

22    Q    It's just the EXIF data?

23    A    Yes.

24    Q    Okay.  And so for the first page of Government

25    Exhibit 504, that's the first image we looked at, Image --

Booth - direct - Hajjar                    4876

1   sorry, just referring to Government Exhibit 550, that's the

2   first image here (indicating)?

3              (Exhibit published.)

4   A    Yes, it is.

5   Q    And what is the EXIF image make and model?

6   A    The make is a Cannon EOS 20D.

7   Q    And the date and time?

8   A    The date/time original is 2005:11:02 17:59:16.

9   Q    And that's November 2nd, 2005?

10  A    Yes, it is.

11  Q    Turning to page 11 of the same exhibit, it's the same

12  camera for Image 0151.

13              And what's the date and time?

14  A    The original date and time is 2005:11:02 17:59:25.

15  Q    And that's, again, November 2nd?

16  A    Yes, it is.

17              THE COURT:  Do you have the serial number of the

18  camera?

19  BY MS. HAJJAR:

20  Q    So turning your attention, Examiner Booth, to page 16 of

21  that exhibit.

22              (Exhibit published.)

23  Q    That's, again, the Cannon EOS 20D camera?

24  A    Yes.

25  Q    And what's the serial number?

Booth - direct - Hajjar                                    4877

1   A    The serial number is 1420908348.

2   Q    Is that the same serial number as all of the images we've

3   been discussing this far?

4   A    Yes, I believe it is.

5   Q    Turning your attention to page 31, this is for

6   Image 0153.

7             The same camera associated with this?

8   A    Yes.

9   Q    What's the date and time?

10  A    The date/time original is 2005:11:02 17:59:34.

11  Q    And turning to page 41, this is for Image 154.  What's

12  the date and time?

13  A    Date/time original is 2005:11:02 17:59:47.

14  Q    The following image, which is on page 51.  The date and

15  time?

16  A    The time original is 2005:11:02 18:00:22.

17  Q    For the following image, Image 156, is that, again,

18  November 2nd, 2005?

19  A    Yes.

20  Q    And the following image, again, November 2nd, 2005?

21  A    Yes, it is.

22  Q    And the same for the following image, 158?

23  A    Yes, it is.

24  Q    The following image as well, 159?

25  A    Yes, it is.

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                                    4878

1   Q    And 160, the same, November 2nd, 2005?

2   A    Yes.

3   Q    And the same for 161?

4   A    Yes.

5   Q    As well as 162?

6   A    Yes.

7   Q    As well as 163?

8   A    Yes.

9   Q    Now, I want to direct your attention quickly to

10  Government Exhibit 550 again.

11          (Exhibit published.)

12  BY MS. HAJJAR:

13  Q    Each of the images we looked at were dated November 2nd,

14  2005.

15          Are they within the folder titled 2005-11-02?

16  A    Yes, they are.

17  Q    Okay.  The remaining images are within 2005-11-24, is

18  that right?

19  A    Correct.

20  Q    And so starting with the first image of that segment,

21  which is -- what's the name of the first image in that folder?

22  A    That is IMG_0104.

23  Q    Sorry.  I'll just zoom in a bit on Government

24  Exhibit 550.

25  A    Oh, 184.

Booth - direct - Hajjar                              4879

1    Q     Okay.

2          So the remaining images span from Image 184 through

3    Image 191, is that right?

4    A     Correct.

5    Q     So with respect to the EXIF data for Image 184, what's

6    the date and time?

7    A     The date/time original is 2005:11:24.

8    Q     So that image was taken November 24th, 2005?

9    A     Correct.

10   Q     And is it the same camera, Cannon camera?

11   A     Yes, it is.

12   Q     And turning to the -- page 146 for that image, is it the

13   same serial number?

14   A     Yes, it is.

15   Q     Then turning to the following image, Image 185, is the

16   date and time the same -- the -- not the time, necessarily,

17   but the date, November 24th, 2005?

18   A     Yes, it is.

19   Q     And for the following image, 186, is this also the same

20   date, November 24th, 2005?

21   A     Yes, it is.

22   Q     And the next image as well, the same date?

23   A     Yes, it is.

24   Q     And Image 188, the following image, same date?

25   A     Yes, it is.

SAM      OCR      RMR      CRR      RPR

Booth - direct - Hajjar                          4880

1    Q     And image --

2              THE COURT:  We can't see the number.

3              MS. HAJJAR:  I'm sorry.  There we go.

4              THE COURT:  Go ahead.

5    BY MS. HAJJAR:

6    Q     Image 189, the same date?

7    A     Yes, it is.

8    Q     The last image, which is Image 190, is it the same date?

9    A     Yes, it is.

10   Q     Did you observe anything about the times of the images in

11   sequence?

12   A     The times, in general, weren't -- as far as -- as far as

13   the seconds are concerned, were sporadic.  So they're not in

14   one-second order.  So it's not like 28 seconds, 29 seconds,

15   30 seconds.  They're grouped in -- a little off.  So I gather

16   that just would be standard.

17   Q     What do you mean by --

18   A     They're not just scattered around.  They were not in an

19   order, just like where it's one second, every two seconds you

20   get a picture.  So it doesn't seem to be a timer, it seems to

21   be just normal usage of a camera.

22   Q     Can you explain that?  What do you mean?

23   A     Well, you might take a picture every one or two seconds.

24   And, you know, depending if you're at a party, you know how

25   many pictures you take at a party.  You're not taking one

Booth - cross - der Ohannesian                    4881

1  every two seconds and it's timed every two seconds, unless you

2  have it on a timer.  So it's going to be sporadic.

3  Q    So it's not regular, in other words, the images -- the

4  time and -- the specific time of each image in sequence?

5  A    Yeah, it's not a regular pattern where it's every two

6  seconds.  So it does not appear to be on a timer.

7  Q    And, Examiner Booth, the EXIF data we just examined, they

8  reflect two dates on which the images were taken?

9  A    Yes.

10  Q    November 2nd, 2005, and November 24th, 2005?

11  A    Correct.

12         MS. HAJJAR:  No further questions, Your Honor.

13         THE COURT:  Cross-examination.

14  CROSS-EXAMINATION

15  BY MR. der OHANNESIAN:

16  Q    Good morning.  Is it Mr. Booth?

17  A    Yes, it is.

18  Q    Is that your official title that I should use?

19  A    You may.

20  Q    Okay, thank you.

21         In terms of the material you reviewed, is it only

22  your material that you reviewed?

23  A    Yes.

24  Q    Do you understand my -- did you review any material

25  prepared by anyone else, either from the FBI, any other lab or

SAM     OCR     RMR     CRR     RPR

Booth - cross - der Ohannesian                    4882

1   any other person?

2   A    Well, I'm a coach.  So I actually have a trainee that was

3   with me at the time that was actually putting their hands on,

4   on some of the stuff, as we did it.  We did it in tandem.

5   Q    Other than you and your trainee, did anyone else provide

6   you with information concerning the digital items which you

7   examined?

8   A    No, I did -- everything else was done by hand.

9   Q    And I believe you, on direct, explained that you're

10  dealing with something called "digital evidence," is that the

11  phrase you used?

12  A    Yes, it is.

13  Q    And is that how you would refer to the information that

14  you have testified about concerning these images?

15  A    Yes, I would.

16  Q    And your examination of the hard drive would be a

17  forensic examination of that hard drive, correct?

18  A    Yes, it would be.

19  Q    And the same with respect to the data card, is that

20  correct?

21  A    Yes, it would be.

22  Q    You were indicating yesterday that you want to be very

23  careful when you examine digital evidence, is that correct?

24  A    That is correct.

25  Q    Because digital evidence can be altered in the course of

Booth - cross - der Ohannesian                    4883

1   examination, correct?

2   A    Yes, it can.

3   Q    And digital evidence can be damaged in the course of

4   handling, correct?

5   A    It could be.

6   Q    And digital evidence can be destroyed through improper

7   handling, correct?

8   A    Correct.

9   Q    And that's why you testified you took special precautions

10  to preserve the digital evidence that you were asked to

11  examine in this case, correct?

12  A    Correct.

13  Q    In terms of the steps in digital forensics, the first

14  step would be identifying the evidence that you want to

15  collect?

16  A    Correct.

17  Q    That does not involve you, correct?

18  A    No, it does.

19  Q    That would be someone in the field who would do that?

20  A    Well, it depends on how you identify identification,

21  is -- when it comes to me in a lab, I have to identify the

22  item as it is to me in the lab.

23  Q    In terms of the information -- or excuse me.

24       In terms of the devices to collect, were you

25  involved in that process in this case?

SAM     OCR     RMR     CRR     RPR

Booth - cross - der Ohannesian                    4884

1  A    No, I was not.

2  Q    And then the next step would be to collect the item,

3  correct?

4  A    If the meaning of collect, you mean obtaining the digital

5  information off of it?

6  Q    No, to the physical item, the hard drive, the thumb

7  drive, a camera.

8          You don't collect the physical item from the scene?

9  A    I am capable of doing that.  But in this instance, I have

10 not.

11 Q    And that's my question.

12         In this case, you did not collect the physical

13 evidence, correct?

14 A    No, I did not.

15 Q    And you weren't asked to?

16 A    No, I wasn't.

17 Q    And then the next step would be preserving the digital

18 evidence.

19         Is that something you were involved with?

20 A    Yes, it is.

21 Q    And then after you preserve it, you analyze it, correct?

22 A    Yes.

23 Q    And that's what you did.

24         And then the final step would be reporting the

25 results of your examination, correct?

Booth - cross - der Ohannesian                    4885

1   A    Yes.

2   Q    And part of collecting the evidence would be placing the

3   evidence in a bag, correct?

4   A    That's one means.

5   Q    And identifying it or tagging it to identify what it is?

6   A    Yes.

7   Q    Now, in this case, when you received Government

8   Exhibit 503, the Western Digital drive, was it bagged?

9   A    I think it was in a paper bag.

10  Q    But you --

11  A    It was an evidence -- an evidence paper bag that was

12  sealed.

13  Q    Do you have any records or notes, which would reflect the

14  condition of Government Exhibit 503, the Western Digital

15  drive, at the time you received it?

16  A    Not in front of me, no, I do not.

17  Q    When you say not in front of you, does it exist?

18  A    We -- we take great care in making sure that we document

19  as we receive items.

20  Q    And what kind of documentation would exist, which relates

21  to your examination of Government Exhibit 503 at the time you

22  received it?

23  A    Well, we take typewritten notes as we go along,

24  contemporaneously, to make sure that we can recreate any steps

25  that we make during the exam process.  So if we need to

SAM      OCR      RMR      CRR      RPR

Booth - cross - der Ohannesian                    4886

1   recreate them or if another examiner needs to recreate them,

2   we can do that.

3   Q     And would those typewritten notes reflect the condition

4   or how you received Government Exhibit 503?

5   A     Yes, it would.

6   Q     Whether it was a paper or plastic bag?

7   A     Yes, it would.

8   Q     And whether it was sealed or not?

9   A     Correct.

10  Q     Do you know, without referring to those notes, whether

11  you received Government Exhibit 503 in a sealed or unsealed

12  bag?

13  A     From what I recall, it was sealed.  We -- we had to open

14  up the seals on all the evidence that we got.

15  Q     And with respect to Government Exhibit 520, the Cannon

16  camera, do you recall if that was in a sealed bag when you

17  received it?

18  A     No, that -- that was in a box, a cardboard box.  And, no,

19  the box, itself, was not sealed at the time.

20  Q     So the Cannon camera, which is Government Exhibit 520,

21  was not in a bag, correct?

22  A     The Cannon camera was in a Cannon camera bag in a brown

23  paper box.

24  Q     Okay.  And was there any seal with respect to the box

25  that the camera was in?

Booth - cross - der Ohannesian                    4887

1   A    Yes, there was a seal on the top of the box.  But I

2   understand the camera was used the day before in court and

3   had, at least at that point, been unsealed.

4   Q    Okay.  So what date was the camera unsealed?

5   A    I -- I don't know at that point.

6   Q    Do you have notes that reflect when the box with the

7   camera was unsealed?

8   A    No, I don't know.

9   Q    Do you have notes and records?

10  A    My notes reflect what -- how I received the item.

11  Q    And that would reflect the condition of the camera being

12  in an unsealed box when you received it?

13  A    Yes.  I always -- we mention of what the box was in, what

14  color the box was in.  Whether it was in a paper bag or if it

15  was in a plastic/cellophane bag, we note that.

16  Q    And do you usually receive electronic evidence in

17  unsealed boxes or bags?

18  A    Not always.  Sometimes the case agents would have needed

19  to look at the item beforehand, and they might have unsealed

20  it.  So it doesn't always come to us sealed.

21  Q    And when an agent unseals evidence, a record is made of

22  that?

23  A    Not always.

24  Q    Should a record be made of when evidence is opened or

25  unsealed?

SAM      OCR      RMR      CRR      RPR

Booth - cross - der Ohannesian                4888

1   A    No, I don't think so.  It doesn't necessarily need to be.

2   Q    Is it fair to say you have no idea when the box with the

3   camera was unsealed?

4   A    No, I do not.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

Booth - Cross - Der Ohannesian                    4889

1    BY MR. DER OHANNESIAN (Continuing):

2    Q    Would it be fair to say you have no information on what

3    happened to the camera prior to the time that you examined it?

4    A    Well, with the evidence sheet, we know a path of who has

5    gotten the evidence at any point in between me and it actually

6    being obtained out in the field.

7    Q    And who was it that had access to the camera or the box

8    prior to the time of your examination of it?

9    A    I don't have that evidence sheet in front of me to be

10   able to refer.

11   Q    If you had that evidence sheet, could you answer that

12   question?

13   A    Yes, I could.

14   Q    And with respect to Government Exhibit 524, the LEXAR

15   card, was that submitted to you in a bag of some sort?

16   A    Yeah, it was a cellophane bag.

17   Q    Was it a sealed cellophane bag?

18   A    No, it was not.

19   Q    Was Government Exhibit 524, LEXAR datacard, in the box?

20   A    Yes, it was.

21   Q    The box you previously described with the camera?

22   A    Yes.

23   Q    Was there a separate piece of paper which would identify

24   who, if anyone, had access to that datacard prior to your

25   examination of it?

LAM      OCR      RPR

Booth - Cross - Der Ohannesian                    4890

1   A    Any time we have a piece of evidence and it obtains other

2   evidence in it -- say you have a laptop and you have a CD-ROM

3   inside.  We always package up the extra evidence that we've

4   obtained from the device in with the original evidence.

5              We don't always modify or change and put it on

6   separate chains.  We keep it all together to show that it's

7   reflective of coming through that item.  We put a NYC barcode

8   number to identify it as something that came from the parent.

9   Q    The NYC barcode, is that applied by someone like

10  yourself, Mr. Booth, in the CART lab?

11  A    Yes, it is.

12  Q    That's not applied by an agent in the field.

13  A    No, it's only by CART examiners.

14  Q    So, only when it gets to CART does that NYC CART number

15  get on the device.

16  A    Yes.

17  Q    Have you produced your notes and records to the

18  prosecution in this case concerning the condition of these

19  items when you received it?

20  A    No, I did not.

21  Q    Were you ever asked by the prosecution in this case to

22  produce the notes and records pertaining to your evidence

23  collection and examination in this case?

24  A    I was asked if I had notes, but, at this point, my notes

25  aren't complete.  So, my report is my notes.  My report won't

LAM        OCR        RPR

Booth - Cross - Der Ohannesian                    4891

1  be done until all processing is complete, and processing was

2  ongoing up until a couple days ago with some of these items.

3           MS. HAJJAR:  Your Honor, can we have a sidebar?

4           THE COURT:  All right.

5

6           (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAM       OCR       RPR

Sidebar                                                    4892

1              (The following occurred at sidebar.)

2              MS. HAJJAR:  I just don't want there to be any

3    misunderstanding with the jury.  He's saying CART notes.  He

4    means the CART examiner under him, Virginia Donnelly, the

5    primary examiner.  I don't want there to be a

6    misunderstanding that Mr. Booth -- that these are his notes.

7    I think he's referring to them as CART's notes with respect

8    to the receipt of this evidence and chain of custody.

9              It's fine if we're moving on, but I don't want there

10   to be a misimpression with respect to that.

11             MR. DER OHANNESIAN:  He said he had notes that would

12   answer these questions.  That's the reason they have notes, to

13   know the condition of the evidence.  They haven't been

14   produced, and I think the defense is entitled to them,

15   certainly after the direct examination, at least.

16             And I specifically asked for them this morning

17   because when I read his testimony yesterday, there were other

18   references to there probably may be notes in this case.  I

19   didn't realize this existed also.  That's why we'd be entitled

20   to that.

21             And I think there are some important issues and I've

22   only scratched the surface of it.  And I didn't realize this

23   problem until a second ago.  I think I'm entitled to it,

24   whether his assistant made it or he did.

25             MS. HAJJAR:  We don't have the notes, your Honor.

Sidebar                                                    4893

1   They're Ms. Donnelly's 3500.  We can obtain them, but they're

2   not -- he testified yesterday he received the forensic image

3   from Ms. Donnelly and he testified that he was not -- he never

4   said I was the one who imaged the devices.

5          Those notes that reflect the way that they were

6   obtained by CART are in Ms. Donnelly's possession.  If the

7   defense wants to call Ms. Donnelly, we can obtain the notes

8   and we can complete the circle if that's an issue.

9          MR. DER OHANNESIAN:  I'm not asking to call anybody,

10  I want the prosecution to fulfill its obligation under

11  Rule 16, 3500.

12         And I don't want them to show up later as a response

13  to my cross-examination.  I think it's grossly unfair to say

14  oh, we do have evidence, that it was sealed --

15         THE COURT:  You've just been told they don't have

16  that evidence.

17         MS. HAJJAR:  We don't have them currently, but if

18  this is an issue we can ask -- we do not have them, but we can

19  ask Ms. Donnelly if she has the notes, if you'd like them, or

20  call Ms. Donnelly to establish --

21         MR. DER OHANNESIAN:  I think the testimony also

22  referred to photographs, which was my first indication that

23  there may be more than we were given.  That's why I checked

24  again last night.

25         Are there photographs?

LAM      OCR      RPR

```
                          Sidebar                    4894
```

1        MS. HAJJAR:  I believe you were provided with

2   photographs through Special Agent Christopher Mills, who

3   photographed every piece of evidence.

4        MR. DER OHANNESIAN:  I'm talking about photographs

5   of his examination.

6        MS. HAJJAR:  What I believe Mr. Booth is saying is

7   that when CART received them, the primary examiner Virginia

8   Donnelly, if she had taken photographs, we don't have them.

9   But if this is an issue, we can call her, we can get that

10   material.

11        MR. DER OHANNESIAN:  Donnelly was identified as a

12   trainee.  I do want any notes or photographs that relate to

13   the examination and the condition of the evidence when it was

14   received.

15        MS. HAJJAR:  We can get Ms. Donnelly, your Honor, if

16   this is an issue for the defense.

17        MR. DER OHANNESIAN:  I don't think I need Donnelly,

18   I think I just need the records.  I don't think it's Donnelly.

19   He said these are the records that he has that he used and how

20   it's done.

21        If he has someone assisting him, that's fine, but I

22   think that the testimony that we just received entitles me to

23   receive that material as 3500 material.  And it's not

24   speculative and, believe me, it's not irrelevant in this case.

25        MR. AGNIFILO:  I think it's Rule 16 for scientific

Sidebar                                              4895

1    evidence.  I don't think it's a matter of 3500.

2           Here, we have the right to know under Rule 16 the

3    steps that were taken in the creation of scientific evidence.

4    And it sounds like maybe because this particular account

5    wasn't indicted all that long ago --

6           I'm not trying to find fault with anybody.  We have

7    to protect the record and protect this particular issue.

8           THE COURT:  Maybe we'll take the day off and look

9    for notes.  That's where we are.

10          MS. HAJJAR:  That's fine, your Honor.

11          MR. DER OHANNESIAN:  I don't think we need all day.

12          THE COURT:  Really?  How do you know where this

13   person is?  She may be off today.

14          Couldn't you have subpoenaed?

15          You knew who was going to testify.

16          MR. DER OHANNESIAN:  Your Honor, it's not our duty

17   to subpoena.  The duty is under 3500 and Rule 16.

18          THE COURT:  Yeah, I know about duties.

19          MR. DER OHANNESIAN:  I specifically asked this

20   morning again when I had a question to the prosecutors.  I

21   received no response.  It's not like -- as I said, I think

22   there may be photographs based on his testimony on direct.

23          MS. HAJJAR:  Your Honor, this was never raised an

24   issue except for this morning.  We're happy to find

25   Ms. Donnelly and see if there were additional photographs.

LAM      OCR      RPR

Sidebar                                                    4896

1   But it's not this witness' 3500 and it's not Rule 16.  Whether

2   their CART took photographs that are in the possession of

3   Ms. Donnelly we can certainly find out, but I only heard about

4   this this morning.

5              MR. AGNIFILO:  Just to complete the point, I raised

6   in opening court, I think right after this count was indicted,

7   that we needed all of the Government's materials on this

8   because we were being asked to go to trial in a very short

9   amount of time.

10             THE COURT:  No, no, you weren't asked to go to

11  trial, you insisted ongoing to trial in a short amount of

12  time.  Please don't.  What we have gone through on this --

13             MR. AGNIFILO:  I'm saying --

14             THE COURT:  The short amount to trial is you made

15  that record that you needed to have a trial immediately.  I

16  could have done this in the fall.

17             MR. AGNIFILO:  Your Honor, we haven't --

18             THE COURT:  I mean, really, this accommodated

19  everyone's schedule, not mine.

20             MR. AGNIFILO:  I'm not finding fault with the trial

21  date.

22             THE COURT:  I'm just saying the short amount of

23  trial argument raises the specter of how we were pushed to

24  trial.  So, we've tried the case and now let's see if these

25  notes exist.

Sidebar                                              4897

1          Send somebody out there -- there are certainly

2     enough people in this room -- to go find them.  See if the

3     notes exist.  And you can finish the rest of your

4     cross-examination.  Let me know before it's over, that's all.

5          If we can't find the person or the notes don't

6     exist, we'll take it up.

7          MS. PENZA:  Your Honor, may I be excused to try

8     to --

9          THE COURT:  Please.

10         MS. PENZA:  Thank you.

11         THE COURT:  Well, can you talk about something else

12    for a while?

13         MR. DER OHANNESIAN:  Sure.

14         THE COURT:  Great.

15

16         (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Booth - Cross - Der Ohannesian                    4898

1          (Sidebar ends; in open court.)

2          THE COURT:  Please continue.

3    BY MR. DER OHANNESIAN:

4    Q    Mr. Booth, the records that you refer to in terms of the

5    condition of the evidence when you receive it, do you consider

6    those part of your records that you use in this case?

7    A    Yes, I do.

8    Q    And in this case, you were working with another

9    individual who was a trainee, correct?

10   A    Yes.

11   Q    And were the two of you generating notes and information

12   together?

13   A    Yes, she was typing up the notes.  I had to verify the

14   notes that she takes.

15   Q    So, there's not two different sets of notes, one for the

16   trainee and one for you?

17   A    Well, I did the camera.  When I received the camera, I

18   did my own notes on the camera.

19   Q    Were there photographs in this case as you examined the

20   evidence?

21   A    Yes, I think I definitely made the -- I made my FET take

22   photos of the items as we did them.

23   Q    Have you produced those photos to the prosecution?

24   A    It's been months.  I may have.

25          Those aren't something that I normally wind up

Booth - Cross - Der Ohannesian                    4899

1  producing.  Those are for us to refer to, make sure of the

2  condition of the item when we received it.

3  Q    And the photos would help you do that correct?

4  A    They could.  It's not mandated that we do it, but I do it

5  as a good faith practice.

6  Q    In this case, you took photos to have a record of the

7  condition of the evidence when you received it?

8  A    I did it in this instance?  No, I did not.

9  Q    You had your assistant?

10  A    I don't know off the top of my head if I had my assistant

11  do it.  It was months ago.

12  Q    And do you know the date the evidence was collected in

13  this case?

14  A    No, I do not.

15  Q    Do you have any information, like a property receipt done

16  at the scene, which would reflect any date as to when the item

17  was collected at a scene?

18  A    That goes along with the piece of property that you're

19  talking about.  So, I'd have to produce that piece of evidence

20  here with the property sheet to be able to tell you.

21  Q    So, you would have that information in front of you when

22  you do the examination.  You don't have it here today.

23  A    No, I do not.

24  Q    One of the concerns -- you talk about a process, which I

25  want to make sure we understand, that you took in this case

Booth - Cross - Der Ohannesian                    4900

1    with the evidence and break it down by particular pieces of

2    evidence.

3           The first step, you said, was to duplicate the

4    electronic data is that, correct?

5    A    It's a forensic backup.

6    Q    And by "backup," it's a separate piece of electronic

7    information, correct?

8    A    Yes, it is.

9    Q    And I think the process you described yesterday, your

10   word was right blocking, correct?

11   A    We use a right blocker to block the device as we copy it.

12   Q    And a right blocker is a separate device that attaches to

13   the subject computer?

14   A    Or device.

15   Q    Any device, be it a computer, a thumb drive, a cell

16   phone.

17   A    Yes.

18   Q    So this right blocker attaches to the subject device,

19   whatever that may be, and wherever you will transfer the

20   information to, correct?

21   A    Correct.

22   Q    And that's good practice as a forensic examiner?

23   A    Yes, it is.

24   Q    It's necessary practice.

25   A    Yes.

Booth - Cross - Der Ohannesian                    4901

1    Q    And did you right block with respect to the datacard

2    which is Government Exhibit 524?

3    A    Yes, I did.

4    Q    So, right blocking is something you do even with a device

5    which might be the datacard from a camera, correct?

6    A    Correct.

7    Q    And do you know the date on which you did your right

8    blocking for the Government Exhibit 503, the Western Digital

9    external hard drive?

10   A    No, I don't know the date off the top of my head.

11   Q    Do you have a record of that?

12   A    Yes, we'll have a record back at the lab.

13   Q    Is that part of your notes?

14   A    Yes.

15   Q    And with respect to Government Exhibit 524, I believe you

16   called it a media card; is that your phrase?

17   A    SD?

18   Q    SD?

19   A    SD card.  I think it's CF card coming from the camera, if

20   I'm not mistaken.

21   Q    You called it CF card?

22   A    Yes, compact flash.

23   Q    Is that a little, very small --

24   A    It's a little bigger than a standard SD card that people

25   are used to seeing in the cameras these days.  It's a little

Booth - Cross - Der Ohannesian                    4902

1    fatter because it's mainly used for speed.  An SD card is

2    usually around the size of your thumb; these cards area a

3    little bigger and they fit into a bigger slot in cameras.

4           They're really not in use as much anymore.

5    Q    When you say "not in use," because this is a much older

6    product?

7    A    Yes, and we've moved on since then on SD card

8    capabilities.

9    Q    We have it in evidence, in any event, the size of it and

10   what it is.  Maybe while you mention it, we could use it now.

11          I'd like to show you Government Exhibit 524.

12          (Exhibit published to the jury.)

13   Q    This is the device that you said what was not in the

14   camera, correct?

15   A    No, it was not.

16   Q    It was in the box --

17   A    Yes.

18   Q    -- is your recollection.

19          And how do you call that?

20   A    If you turn it over, I think it's a CF card, compact

21   flash, CF.  That's the common letters we use to call these

22   cards.

23   Q    And there's a similar device used on modern cameras but

24   it's smaller, more compact, and holds more information?

25   A    Correct.

Booth - Cross - Der Ohannesian                    4903

1   Q    Do you know the date on which you first examined the

2   Canon camera, Government Exhibit 503?

3   A    I think it was 6/10 or 6/11.

4   Q    Of what year?

5   A    Of this year.

6   Q    2019?

7   A    Yes.

8   Q    Did you examine the Western Digital drive around the same

9   time that you examined the camera?

10  A    No.  The Western Digital drive was done months ago, from

11  what I recall.

12  Q    And was the media card examined in June of 2019 or at

13  some other time, if you know?

14  A    I wasn't analyzing a camera at that time.

15  Q    Which time?

16  A    At that.

17  Q    June 2019?

18  A    No, we're talking months ago when we first got the

19  Western Digital hard drive.  We didn't receive a camera with

20  that.

21  Q    Do you know when you received the camera?

22  A    I just received it recently.

23  Q    So, your forensic examination in this case took place in

24  different months.

25  A    Yes.

Booth - Cross - Der Ohannesian                           4904

1    Q     How about different years?

2    A     Possibly.

3    Q     In terms of the devices you examined in this case, one

4    was, you said, a Western Digital hard drive, correct?

5    A     Yes, it is.

6    Q     And you were shown that on direct examination, correct?

7    A     Yes.

8              MR. DER OHANNESIAN:  Ms. Hajjar, the Western Digital

9    drive?

10             (Exhibit published to the jury.)

11   Q     Can you see this well enough to identify this as the

12   drive that you examined?

13   A     Yes, I can.

14   Q     And this is the sticker here that you indicated is

15   applied at the CART lab, correct?

16   A     Correct.

17   Q     This device has no markings on it when it's collected at

18   the scene, correct?

19   A     I am sure they put some markings.  Possibly if they put

20   it in a bag, they put markings on the outside of the bag.

21   Q     I'm talking about on the device.

22   A     No, not other than these that I know of, no.

23   Q     This one you received in a sealed bag, correct?

24   A     Yes.

25   Q     Does this look like the bag you got it in?

Booth - Cross - Der Ohannesian                    4905

1          (Exhibit published to the jury.)

2    A    Yes it does.

3    Q    This tells you the date that the agent may have collected

4    it, March 27?

5    A    Yes.

6    Q    You said there was no sealed bag for the camera, correct?

7    A    No.  It was a box that I received it in.

8    Q    And there was no sealed bag for the LEXAR card, correct?

9    A    I don't recall it being sealed.

10          (Exhibit published to the jury.)

11   Q    This hard drive, this cannot be accessed without being

12   connected to another device, correct?

13   A    Correct.

14   Q    It's like a thumb drive; by itself, you can't just look

15   at what's on it without connecting it with something, correct?

16   A    Correct.

17   Q    Now, you mentioned a LaCie hard drive, correct, LaCie?

18   A    I don't recall mentioning a LaCie hard drive.  Unless

19   you're talking about in other pieces of evidence --

20          MR. DER OHANNESIAN:  Ms. Hajjar?

21          (Exhibit published to the jury.)

22   Q    Very quickly, can you read Exhibit 560 on it?

23   A    Government Exhibit 560.

24   Q    And see on the back there's a CART signature?

25   A    Yes, I do.

LAM      OCR      RPR

Booth - Cross - Der Ohannesian                    4906

1    Q    Are those your initials?

2    A    No, those are Virginia Donnelly's initials.

3    Q    That date of 9/11/18, what is that?

4    A    That's the date that she had received the evidence and

5    did a physical query of it to make sure she had serial

6    numbers, things of that nature.

7    Q    Does that mean it was examined on that date or not?

8    A    That's when the examination starts.

9             (Exhibit published to the jury.)

10   Q    On this card here, Government Exhibit 524, there's a date

11   of -- can you read it?

12   A    2/22/19.

13   Q    Is that when you first examined?

14   A    No, that's not.

15   Q    What was the date you first examined this card?

16   A    I have my initials on there and it's 6/10 of 19 and 11.

17   Sorry, I couldn't tell from the tint.

18   Q    Is this what you're referring to?

19   A    Yes.

20   Q    It says 6/10/19?

21   A    Yes.

22   Q    And your initials?

23   A    Yes.

24   Q    On February 22, 2019, what happened?

25   A    Those are initials of Steven Flatley.

Booth - Cross - Der Ohannesian                4907

1   Q     Who is Steven Flatley?

2   A     He's another senior examiner at our lab.

3   Q     Mr. Flatley examined this?

4   A     He had received it on the 2/22 of 19, I see.

5   Q     We'll come back to this card.

6           There were other items that you examined too that

7   are in the reports that were placed in evidence by the

8   prosecutor that you testified about?

9   A     Yes.

10  Q     You understand my question?

11  A     Yes I do.

12  Q     This is Government Exhibit 504-A.

13          (Exhibit published to the jury.)

14  Q     Can you read that okay?

15  A     I can read it.

16  Q     The evidence list is where you indicate the items that

17  were examined by the CART lab?

18  A     Yes.

19  Q     Standard practice is what you did here, to list

20  everything; is that correct?

21  A     This is something that's -- it's not standard, it's what

22  AD Lab does for all evidence items that you put into it.

23  Q     Again, AD Lab is a software used by forensic examiners?

24  A     Yes, it is.

25  Q     So, the first device here says Western Digital external

Booth - Cross - Der Ohannesian                    4908

1   drive; do you see that?

2   A    Yes, I do.

3   Q    Is that the external drive -- is that the Western Digital

4   hard drive that you testified about on direct examination?

5   A    No, it is not.

6   Q    That's a separate Western Digital device, correct?

7   A    Yes.

8   Q    And the reason you know that's not the one that you

9   testified about is the serial number?

10  A    Yes, plus the NYC sticker that we assign it.

11  Q    And then the next item is a LaCie external hard drive.

12            Is that the LaCie drive we just looked at?

13  A    I believe it is.  I'd have to look at the NYC sticker,

14  but I think that's the only LaCie thing that we have in this

15  list.

16  Q    I'll put it up here for you.

17            (Exhibit published to the jury.)

18  A    23726, yes, I think that does match.

19  Q    Third item is a Western Digital external hard drive?

20  A    Yes, I see that.

21  Q    Is that the Western external drive that you examined and

22  testified about on direct examination?

23  A    Yes, it is.

24  Q    And the next item is a USB drive.  I'll turn it over.

25            Have you read it?

1  A    Yes.

2  Q    Identified as a Toshiba drive, correct?

3  A    Correct.

4  Q    Next device is a tower.

5       Is "tower" a brand name?

6  A    No, that's just a description that we gave to the device.

7  Q    So, "tower" would be like a computer tower?

8  A    I would have to reference that with something else, but

9  this is the hard drive that was obtained.  Her description was

10  "tower hard drive."

11  Q    Whose description?

12  A    Virginia Donnelly's, as she was typing it in.

13  Q    As you look at this report, Exhibit 504-A, do you know

14  what kind of device "tower" is here?

15  A    Not off the top of my head.

16  Q    It's identified as being 500 gigabytes?

17  A    Yes, it's a hard drive of 500 gigabytes.  That, I know

18  for sure.

19  Q    Then there's a LaCie external of 500 gigabytes?

20  A    That's the one you showed before.

21  Q    That's the one I showed you.

22       And on the first page, I had referenced the LaCie

23  external one terabyte.  Is that a different device?

24  A    It has to be a different device, yes.

25  Q    Can you tell by looking at the lab sticker?

Booth - Cross - Der Ohannesian                    4910

1  A    Yes, because this one is 23730 and the other one matched

2  the one that you showed me.

3           (Exhibit published to the jury.)

4  A    This is 726 and we just got to the 722.

5  Q    As with the Western hard drives, there were two LaCie

6  drives.

7  A    Yes.

8  Q    You can't tell just by looking at a device, correct?

9  A    Usually not.  That's why we put the sticker on.

10 Q    That's why you take the steps you do, so you know what

11 LaCie we're talking about, correct?

12 A    Correct.

13 Q    And then the next device was a USB, 120 gigabytes; do you

14 see that?

15 A    Yes.

16 Q    That was examined in this case?

17 A    Correct.

18 Q    And then a compact flash card?

19 A    Correct.

20 Q    Is that compact flash card the same as Government Exhibit

21 524?

22 A    No, it is not.

23           (Exhibit published to the jury.)

24 Q    So, on this report, the LEXAR drive, Government Exhibit

25 524, is not referenced, correct?

Booth - Cross - Der Ohannesian                    4911

1   A    No, it's not.

2   Q    Now, in terms of the JPEG images that you testified

3   about, what's the rough size of a JPEG image?

4   A    JPEGs can get very large in size.

5   Q    How about the ones you examined in this case?

6   A    I wasn't referencing the size, to tell you the truth.

7   Q    Is that something that's a gigabyte?

8   A    Could be.

9   Q    Do you know how many images were on the, let's say --

10  A    There were over 200 on the CF card.  I know that.

11  Q    The CF card being Exhibit 524?

12  A    Yes.

13  Q    Is that total images?

14  A    There are close to 300 images, I think, in total with

15  card space that I recovered.

16          (Exhibit published to the jury.)

17  Q    And you said this card was -- I think it says it on it --

18  two gigabytes?

19  A    Yes.

20  Q    And how many gigabytes in a terabyte?

21  A    How many gigabytes?

22  Q    Yes.

23  A    A thousand megabytes equal a gig.  A thousand gigs equal

24  a terabyte.

25  Q    So, a terabyte would be a lot of information?

Booth - Cross - Der Ohannesian                    4912

1    A    Yes, quite a bit.

2    Q    And if you want me to show you these for this question, I

3    will.

4         Do you know about how much digital data was in the

5    devices that were examined referenced in Exhibit 504?

6    A    As far as raw data, you're talking about?

7    Q    Space.

8         Does my question makes sense, first of all?

9    A    It makes sense, but not in the way that we use it in

10   forensics.  We usually don't look at the amount of data that's

11   roughly on a drive because we also could do compression when

12   we wind up imaging files on our hard drives.  We like to

13   compress them down so they don't take as much space on the

14   network as we're working with them.

15        So, unless I was actually asked to do an audit on

16   the amount of total space that was used on a hard drive, I

17   wouldn't have those numbers here with me.

18   Q    Let me approach it this way:  The first device had one

19   terabyte of information?

20   A    Yes.

21   Q    The second device had one terabyte?

22   A    Correct.

23   Q    The third device had 500 gigabytes?

24   A    Correct.

25   Q    Half a terabyte?

LAM      OCR      RPR

1   A     Yes.

2   Q     Next device had four gigabytes?

3   A     Yes.

4   Q     Next device had 500 gigabytes?

5   A     Yes.

6   Q     Next device had 500 gigabytes?

7   A     Yes.

8   Q     Half a terabyte, correct?

9   A     Correct.

10  Q     The next device, 120, that's the capacity of the device,

11  right?

12  A     Capacity, yes.

13  Q     That's what all these numbers I'm referring to on this

14  exhibit are the capacity, right?

15  A     Correct.

16  Q     All the devices that we just went through on Exhibit

17  504-A were forensically examined by the Federal Bureau of

18  Investigation?

19  A     Yes.

20  Q     And report was generated with respect to those devices?

21  A     No, a report wasn't generated on those devices.  Only on

22  1B16 was a report generated, that I know of.

23  Q     If you felt there was anything of value to the

24  investigators and prosecutors, you would have generated report

25  on those cases?

Booth - Cross - Der Ohannesian                4914

1          MS. HAJJAR:  Objection.

2          THE COURT:  You may answer.

3    A    If the case agent had asked for anything that he found of

4    interest on any of the drives, a report would be generated

5    from them.

6    Q    Did you refer in your direct testimony to a Dell

7    Dimension computer?

8    A    I didn't refer.  I think I saw the file path that

9    indicated a Dell Dimension.

10   Q    Was that file path on all of the images about which you

11   testified on direct examination?

12   A    No.

13   Q    Do you know which ones the Dell Dimension was not

14   associated with?

15   A    I don't have any reference to that on any of the other

16   devices we have.

17   Q    Do you know on which images the Dell -- do you know on

18   which images to which you testified the Dell Dimension

19   computer was associated?

20   A    1B16 was the one that we saw a file path that mentioned a

21   Dell Dimension.

22   Q    What is 1B16?

23   A    It is an external Western Digital hard drive.

24   Q    So, the Western drive which is in evidence as Government

25   Exhibit 503 was associated with a Dell Dimension computer?

Booth - Cross - Der Ohannesian                    4915

1   A     I have the file path that references a Dell Dimension.

2   As far as an association, I can't make that determination

3   because I don't have a Dell Dimension to refer back to, which

4   would have been plugged into it.

5   Q     That's my next question:  You didn't have a Dell

6   Dimension computer to look at, correct?

7   A     No, I did not.

8   Q     That's why there are certain things you can't tell when

9   you don't have that Dell Dimension computer, correct?

10  A     Exactly.

11  Q     Do you have any knowledge of that Dell Dimension computer

12  existing anyplace?

13  A     We've done a query over all the devices that were

14  actually gathered at the scene, and I asked the case agent

15  federal come across any Dell Dimension -- and the model number

16  is referred to in there -- and we've come back as not having

17  that device.

18  Q     So, the absence of the Dell Dimension computer was a

19  topic of your discussion with the case agents, correct?

20  A     Yes, it was.

21  Q     Because you would have liked to have had that, correct?

22  A     Definitely.

23  Q     And it would help you in rendering opinions in this case,

24  correct?

25  A     Yes.

Booth - Cross - Der Ohannesian                    4916

1   Q    And when you talk about the evidence collected in this

2   case, you're referring to all the evidence collected in this

3   case of an electronic nature, correct?

4   A    Yes.

5   Q    Not just that one location, correct?

6   A    Well, I wouldn't know the locations, I'm just noting what

7   evidence is referred to in this case that the case agent might

8   have access to.

9   Q    So, you aren't limiting it to just the residence or a

10  TAIL drive where a device was located, you just said, Is there

11  any Dell Dimension collected in this case?

12  A    Yes.

13

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Booth - cross - der Ohannesian                    4917

1    (Continuing)

2    Q    The Canon camera, which we haven't looked at yet

3    together, let me first show you an exhibit number for the

4    record, Exhibit 520.

5              (Exhibit published.)

6    A    I see.

7    Q    And I know you referenced a serial number.  Is there a

8    date of manufacturer for this item?

9    A    Not that I see.

10   Q    Did you look into what the date of manufacture was?

11   A    I didn't.  I know my case agent has.  Not the actual

12   manufacturer of it, but when the lot was normally developed at

13   this time, from what I understand.

14   Q    You don't have that?  You don't know what it is?

15   A    No, I don't.

16   Q    So you don't know how long this camera has been in this

17   world; correct?

18   A    In production or just when they made this model camera

19   specifically?

20   Q    When they made this camera or when this model was in

21   production.

22   A    I know it was in production back right before 2005 or

23   sometime.

24   Q    You don't know whether it was 2004, 2003?

25   A    No, I don't.

Booth - cross - der Ohannesian                    4918

1   Q     2002.

2   A     No.

3   Q     Canon EOS has been around a long, long time?

4   A     Oh, EOS cameras definitely have, yes.

5   Q     Back to the 1980s?

6   A     Yes.

7   Q     This one has a battery?

8   A     Yes, it does.

9   Q     Did you examine the battery?

10  A     The battery is not charged and we try to do a little

11  trick where we try to boost the battery to try to allow it to

12  take a charge, and I attempted that, and the battery wouldn't

13  take a charge.

14  Q     Is that what happens to batteries when the device isn't

15  used for a long period of time?

16  A     Yes.  If they're not continuously charged, they can lose

17  charge completely, and then they're not recoverable.

18  Q     And with respect to Exhibit 520, what, if any, forensic

19  examination did you conduct?

20  A     Of the camera itself besides the physical looking at the

21  camera?

22  Q     Right.

23  A     That was it.

24  Q     There was no internal examination of this device;

25  correct?

Booth - cross - der Ohannesian                    4919

1   A    I wasn't able to power it up.

2   Q    On the same exhibit, 520, looking at the side here.  You

3   see where it says open?

4   A    Yes.

5   Q    Do you know what that is?

6   A    That is a slot for a CF card.

7   Q    That would presumably where Exhibit 524 goes?

8   A    Yes.

9   Q    And again, 524 cannot be used without a device; correct?

10  A    Correct.

11  Q    It has to be attached to something?

12  A    Yes.

13  Q    A camera would be one device it could be attached to?

14  A    Yes.

15  Q    But there were other external devices to which 524 could

16  be attached; correct?

17  A    Yes.

18  Q    You earlier said that you asked the case agent or agents

19  in this case about the Dell Dimension computer?

20  A    I asked if there was any reference to a Dell Dimension

21  in, I think the exact model number that was stated.

22  Q    And who do you mean by -- what is the name of that agent

23  or agents that you asked?

24  A    Mike Lever.

25  Q    And when you were asking about this Canon camera, and

Booth - cross - der Ohannesian                    4920

1  some historical information or biographical information about

2  the camera, who was the case agent that you spoke to?

3  A    That was the same case agent.

4  Q    Any other agents besides Michael Lever?

5  A    No.

6  Q    Now, are you the first representative of the FBI to

7  examine the Government Exhibit 503, the Western Digital drive?

8  A    Yeah, from what I know, yes.  I was the only person --

9  Q    Are you the first person in the FBI --

10  A    -- besides -- besides my trainee with me.

11  Q    Which would be at or about the same time?

12  A    At the same time.  We were sitting together.

13  Q    And with respect to Government Exhibit 520, the Canon

14  camera, would you be the first representative of the FBI to

15  look at the camera?

16  A    No, I was not.

17  Q    Who would be the first person?

18  A    Stephen Flatley.

19  Q    And Stephen Flatley, is that the person whose initials

20  are on Government Exhibit 524?

21  A    Yes.

22  Q    And I think that was February 22, 2019.

23  A    If I was going by his sticker, yes.

24  Q    Should we look at the sticker of the camera to see if

25  it's the same date?

Booth - cross - der Ohannesian                    4921

1    A    Well --

2    Q    Let's look at Exhibit 520.

3         Is there anything on the camera that tells you when

4    this was first examined by the representative of the FBI?

5    A    No.  The evidence sheet would show the date that Stephen

6    actually got it.

7    Q    So there's nothing on the device; correct?

8    A    No.

9    Q    And this doesn't have a bag, plastic or paper, with any

10   markings on it to look at either; right?

11   A    No, it's got a box.

12   Q    A box?

13   A    Yes.

14   Q    And the box would have -- would that have when

15   Mr. Flatley looked at it?

16   A    It would have when he received it.  With the evidence

17   sheet, that always goes along with our evidence.

18        MR. der OHANNESIAN:  May I approach the witness,

19   Your Honor.

20        No, I can put it on the screen just for the witness.

21        THE COURT:  Just one moment.

22        Go ahead.

23        MR. der OHANNESIAN:  I'm going to show you what's

24   been marked Defense Exhibit 945.

25   Q    Do you recognize this?

Booth - cross - der Ohannesian                    4922

1   A    Yes, I do.

2   Q    What is this?

3   A    This is the sheet that came with the evidence.

4   Q    Looking at the next page.  When you say the evidence,

5   does this -- well, let me go back to page 1.

6            Does -- this is just for one piece of evidence or is

7   it for more?

8   A    This is just for the digital camera, the Canon camera.

9   Q    And looking at the second page of Defense Exhibit 945, is

10  there anything on that page that helps refresh your

11  recollection as to when any representative of the FBI first

12  examined the Canon camera?

13  A    You'd have to scroll down because I'm not seeing the

14  whole sheet.

15  Q    There's another page, too, if you don't see it here.

16  A    Okay.  You will have to show me the second sheet.

17  Q    The second sheet is actually the third sheet of this

18  exhibit so we're clear on the record.

19  A    Yes, I do see that Stephen Flatley had gotten it around

20  2/22 of 19, which is the same as the sticker.

21  Q    And while we're on this, does this help refresh your

22  recollection as to when you first examined the Canon camera in

23  evidence?

24  A    Yes.  I first got the camera on 6/10.

25  Q    And then?

VB        OCR        CRR

Booth - cross - der Ohannesian                          4923

1  A    Then the next day I did the examination and handed it
2  back.
3  Q    Would 6/10, 6/11 be at or about the time you had that
4  discussion with Special Agent Lever about the camera?
5  A    No.
6  Q    Would it be before that?
7  A    Which discussion about the camera are you talking about?
8  Q    The biographical information about the camera.
9  A    Do you mean as far as...
10 Q    How long it's been around in existence.
11 A    No, this was something that was referenced when Steve
12 first got the camera back on 2/22.
13 Q    So it would have been before you had it on June 10th?
14 A    Yes, this is a long time ago.
15      MR. der OHANNESIAN:  Government's Exhibit 524.
16 Q    Is there -- do you know the exact date that you first
17 examined 524?
18 A    That would on 6/11.
19 Q    Let's talk about some of the electronic information,
20 digital evidence in general, and then talk about this case.
21      When you examine, you said an image, you generate
22 something you called a hash value?
23 A    Correct.
24 Q    And a hash value, you said, is an identifying piece of
25 information about an image?

Booth - cross - der Ohannesian                                    4924

1    A    Yes, it is.

2    Q    And there are different types of hash values?

3    A    Yes, there are.

4    Q    MD5s been around a long time?

5    A    Yes.

6    Q    And I think you said it was, you say, like a fingerprint?

7    A    We look at it as akin to a fingerprint.

8    Q    Akin?

9    A    Yeah.

10   Q    Because it is possible to have two different images with

11   the same MD5 value; correct?

12   A    It is a possibility, but there's almost an impossibility.

13   And then there's ways that I can explain that possibility.

14   Q    Well, my -- there's a possibility you said?

15   A    Yes.

16   Q    And there's many images on the internet displaying two

17   different messages with the same hash value; correct?

18   A    I don't know that there's many, but I know there are

19   some.

20   Q    And you've seen those images; correct?

21   A    Are you talking about graphic messages or forensic

22   images?

23   Q    Photographic images.

24   A    No, I haven't seen all the MD5 collision messages that

25   are on the net.

Booth - cross - der Ohannesian                    4925

1  Q    Were there issues with MD5 that led forensic examiners to
2  adopt a different hash value system?
3  A    No.  There was no reason for someone to adopt a different
4  hash value system, but there was a collision, as they call it,
5  with an MD5 collision.
6  Q    And a collision is another way of saying two pictures
7  with the same --
8  A    Not two pictures, two files.
9  Q    And is there something called SHA hash value?
10 A    Yes.  Secure hash algorithm.
11 Q    And is that used by some forensic labs?
12 A    Yes, it is.
13 Q    Is it used by the FBI?
14 A    We use it alongside the MD5 cache, but the MD5 is what we
15 use exclusively.
16 Q    When you say use it alongside, did you use the SHA1 hash
17 value alongside the MD5 value in this case?
18 A    No, I did not.
19 Q    The SHA1 value is also used even on home cameras;
20 correct?
21 A    It's used on many different devices.
22 Q    First developed by the National Security Agency?
23 A    If I recall, yes.
24 Q    And there's been issues with SHA1 also; correct?
25 A    Yes.

Booth - cross - der Ohannesian                    4926

1   Q    And it's led to a further revision called SHA256.

2   A    No.  SHA256 was developed well before they ever found an

3   issue with SHA1.

4   Q    And there is an SHA2?

5   A    Yes, there is.

6   Q    And that's considered the latest in terms of SHA hash

7   value systems?

8   A    Not necessarily.

9   Q    SHA2 is more advanced than SHA1?

10  A    It's a tougher algorithm, that's for sure.

11  Q    When you saw tougher algorithm, again, trying to deal

12  with this issue of whether two images will have the same hash

13  value; correct?

14  A    Two images will not have the same hash value.  Two files

15  can.

16  Q    And two files, that's what you're talking about the

17  collision; correct?

18  A    Yes.

19  Q    Two files having the same hash value.

20       So you reported an acquisition hash value for the

21  images in this case; correct?

22  A    Yes.

23  Q    That's not something that you testified about on direct

24  other than you did it; correct?

25  A    Correct.

Booth - cross - der Ohannesian                    4927

1    Q    And then the discussion about metadata.  There are

2    different types of metadata; correct?

3    A    Correct.

4    Q    And some come from the file system; is that correct?

5    A    Correct.

6    Q    I think you touched on that yesterday; correct?

7    A    Yes, I did.

8    Q    A file system could be an operating system?

9    A    Yes.

10   Q    It could be Windows?

11   A    Those are different -- different devices that use them.

12   Operating systems use file systems in order to be able to

13   store their data.

14   Q    And different -- Linux is an operating system?

15   A    Yes.

16   Q    Apple is an operating system?

17   A    Yes.

18   Q    And then there are versions of each of those; correct?

19   A    Of the file systems, yes.  And of different kind of

20   operating systems that run also.

21   Q    And with respect to your analysis in this case, were you

22   able to determine the operating system which was utilized?

23   A    In which way?

24   Q    For the Western Digital device.

25   A    No, I was not.

VB        OCR        CRR

Booth - cross - der Ohannesian                    4928

1    Q    That's because you didn't have the Dell Dimension
2    computer; correct?
3    A    Not necessarily.  There were three computers that were
4    listed under those backup folders.  Any one of those could
5    have been used to actually have this device plugged into it.
6    Q    So there were three devices that had been connected to
7    this hard drive at some point?
8    A    I don't know if they were connected.  I just know there
9    was a file system, a folder named after a file system.
10   Q    So --
11   A    Or a computer.
12   Q    Did you want to say something else?
13   A    The folders were named after a computer, a type of
14   computer.  So we have a Dell Dimension.  I think there was a
15   Mac that was named as a folder.
16   Q    Correct.
17   A    I'm not thinking that the computer actually generates
18   those.  I'm thinking that someone just names a folder.  And
19   I'm not assuming that someone had to attach to that computer,
20   but that's the only information we have to go on.  So we need
21   to try to run down all that information to see if we can find
22   one.
23   Q    Not having access to any of those three computers makes
24   it more difficult to identify data, metadata from the
25   operating system; correct?

VB        OCR        CRR

Booth - cross - der Ohannesian                    4929

1   A    From the OS, from the FS, the file system itself, to see

2   if something's been plugged in, yes, in that respect, it is

3   hard.

4   Q    Was there any other reason that you wanted to see that

5   Dell Dimension computer?

6   A    Well, if I had that Dell Dimension computer, I would do a

7   full workup of that computer.  And I would look to see if that

8   USB drive was plugged it, when it was plugged in, how often it

9   was plugged in, what letter was generated when it was plugged

10  in, how the files were copied to and from it, things of that

11  nature.

12  Q    There's also, I think -- I don't know if you used the

13  word application metadata?

14  A    Yeah, it could be file metadata.

15  Q    That's, for example, on a Word file?

16  A    Yes.

17  Q    To say who created the document; right?

18  A    Yes, an author would be named sometimes.

19  Q    When you get the software for Word you put the name in,

20  could be Brian's computer or Brian Booth; right?

21  A    Correct.

22  Q    But somebody else can use Brian's computer, the document

23  would still have metadata saying Brian Booth; correct?

24  A    Correct.

25  Q    And then there's also embedded metadata?

Booth - cross - der Ohannesian                    4930

1    A    Yes, there is.

2    Q    Is that something you discussed in this case?

3    A    We were talking about the embedded metadata for a .jpg

4    file.

5    Q    For what?

6    A    On a .jpg file.

7    Q    Now, metadata can be changed; correct?

8    A    It can.  Depending on what type of metadata you're

9    talking about, and how hard it is, really depends on what

10   version or what type of metadata you're talking about.

11   Q    And metadata can be changed by the end-user?

12   A    Yes.

13   Q    The end-user being the person who's at the computer;

14   right?

15   A    Sometimes, yes.

16   Q    So you go on your computer, anyone can, and change the

17   date and time; correct?

18   A    Yes.

19   Q    You can change the year; correct?

20   A    Yes.

21   Q    That can be done at any time?

22   A    It depends on what operating system and what type of

23   security you have on the operating system.  If you have a

24   laptop from your corporation, they may block you from doing

25   that.

Booth - cross - der Ohannesian                4931

1    Q    But here you don't know what, if any, security was on any

2    of the operating systems involved in the images that you

3    testified about; correct?

4    A    You're talking about the Restistive, the 1B numbers or

5    are you talking about --

6    Q    From the Western Digital, yes, the 1B.

7    A    The 1B is an external hard drive.  It can be plugged into

8    any type of operating system.  I have no knowledge of it.

9    Q    Also, there can be automatic actions that can change the

10   metadata?

11   A    In some software can do that, yes.

12   Q    When we talk about automatic actions, computer antivirus

13   software can change metadata?

14   A    It would actually quarantine something if it deemed it to

15   be an issue, but I don't know about it changing metadata.  It

16   depends on what kind of metadata you're talking about right

17   how, because there's --

18   Q    Some metadata?

19   A    There's various different metadatas that we're talking

20   about in this courtroom, so you're throwing a very broad stick

21   at this.

22   Q    We'll narrow down.

23        But with respect to metadata, the copying process

24   or -- can affect metadata?

25   A    Yes, it can.

                    VB       OCR       CRR

Booth - cross - der Ohannesian                    4932

1   Q    When we say copying process, what do you mean by that?

2   A    If you drag and drop a file or a folder from one device

3   to a USB device, or a thumb drive, and then take it to another

4   one and copy and drag it, it could do that.  That will change

5   metadata.

6   Q    Backing up a computer can be an automatic function;

7   correct?

8   A    Yes, it can.

9   Q    Like an office can back up every night its files?

10  A    Correct.

11  Q    And that would change the metadata?

12  A    It could.

13  Q    And I think you said data changes, metadata changes, as

14  it moves across computers.

15  A    Yes, it does.  File system metadata.

16  Q    And that's something that happened with respect to this

17  Western hard drive; correct?

18  A    In possibility, it could.

19  Q    Pardon?

20  A    Considered in a possibility, it could.

21  Q    So you can backdate metadata?

22  A    You can change a computer's date and time and then copy

23  data on to it and have it backdated in that sense.

24  Q    And is there something called time stomping?

25  A    Yes, there is.

VB        OCR        CRR

Booth - cross - der Ohannesian                          4933

1   Q     Is there that different from just backdating, time
2   stomping?
3   A     That's very close to -- if you want to use a similar term
4   to say, you can use that as a term for it.
5   Q     There's actually softwares that do that for you?
6   A     It could.  It's not something normally out there in use.
7   Q     And somebody with hacking skills might know about time
8   stomping software?
9   A     Yes.
10  Q     That's something you've seen?
11  A     Yes, I have.
12  Q     And you talked about a file creation date yesterday?
13  Yes?
14  A     Yes, I have.
15  Q     So you had information concerning -- yesterday did you
16  testify to the file creation date for any of the images from
17  the Western Digital drive?
18  A     I think I mentioned one file creation date in particular.
19  Q     Do you remember what that date was?
20  A     It was a 2003 date.
21  Q     And then the last modified date is when the user last
22  modified a file?
23  A     That's usually what happens.
24  Q     When you say usually, there's other ways that last modify
25  date can be there; correct?

VB        OCR        CRR

Booth - cross - der Ohannesian                    4934

1   A    Yes.

2   Q    For example?

3   A    Well, from moving computers across from one computer to

4   another, if you've got a file system that is a very, what we

5   call a young file system, like something we use with floppy

6   disks, they don't actually hold on to all that data because

7   newer file systems can hold modified data, access data, much

8   differently.

9          So sometimes when you move the files across, a

10  creation date would be made, but a last access date wouldn't

11  be created completely.  You'd only have a date.  So in some

12  ways you can actually modify dates and times as you move

13  across different file systems.

14  Q    And that's not something you're able to determine without

15  examining the computers along the way?

16  A    Not unless we have them in our hand, no.

17  Q    So, for example, in this case, we know there was a Dell

18  Dimension computer?

19  A    I don't know that, but if you're telling me.

20  Q    Your analysis reflected a path that said Dell Dimension?

21  A    Yes, I do.

22  Q    And you said there were two other computers?

23  A    Two other file paths that indicated other computers.

24  Q    Like an Apple?

25  A    Like an Apple computer, yes.

1  Q    What was the third?

2  A    It was another Dell computer.

3  Q    And then you mentioned last access date?

4  A    Yes, I did.

5  Q    And last access date can have many meanings also;

6  correct?

7  A    Yes.

8  Q    It can mean literally the last time someone accessed it;

9  correct?

10  A    Correct.

11  Q    And it can also mean the last time it was copied?

12  A    A last access date can be moved across one computer to

13  another, but the access date, if they're like devices, would

14  stay.  So unless you've actually opened up an item and looked

15  at it, it wouldn't change the last access date.

16  Q    So last access doesn't even mean last view?

17  A    In some cases, software will change the last access date

18  if you've opened it up.  But it's really software dependant.

19  Q    So last access date does not necessarily mean last

20  viewed?

21  A    Correct.

22  Q    But if a file is viewed, it would be reflected in an

23  access date?

24  A    If it's opened up?

25  Q    Yes.

Booth - cross - der Ohannesian                    4936

1    A    Depending on what piece of software.

2    Q    And in terms of file folders, files can be moved from one

3    folder to another; correct?

4    A    Yes.

5    Q    And you don't have that information when you examine a

6    hard drive such as this, whether files were moved or not?

7    A    Well, between devices, I do not.

8    Q    Or even when it was on a Dell Dimension, Dell computer or

9    Apple computer?

10   A    No, I do not.

11   Q    Does DOS script also impact the file names?

12   A    Does what?  Excuse me?

13   Q    DOS.  D-O-S script?

14   A    I don't know what you're referring to.

15   Q    Your examinations were at different times; correct?

16   A    As far as my two examinations here were at two different

17   times, yes.

18   Q    With respect to the images that you testified about this

19   morning, Government Exhibits 518, A through U, they're also

20   reflected in your report.

21        You understand my question?

22   A    As far as looking at the actual items themselves?

23   Q    Let me try to break it down then.

24        So Government Exhibit 518-A through U are like

25   images, printed images?

Booth - cross - der Ohannesian                4937

1   A    Okay, yes.

2   Q    In addition, you have a report that talks about those

3   images and the data for those images; correct?

4   A    Yes.

5   Q    And some of those were reviewed with you on direct

6   examination by the prosecutor; correct?

7   A    Correct.

8   Q    Do you know, without looking at your report, what the

9   file creation date is for each and every one of Government

10  Exhibit 518-A through U?

11  A    No, I'd have to see the report itself.

12  Q    Then we can do that.

13       MR. der OHANNESIAN:  This is Government

14  Exhibit 504-A.  I'm going to put it on the screen.

15       (Exhibit published.)

16  Q    Starting with -- first of all, can you read it?

17  A    The highlighted item?

18  Q    Yes, .jpg 150?

19  A    Yes, I can.

20       Would you like me to read it out loud?

21  Q    Does that help you recall the file creation date for .jpg

22  150?

23  A    Yes, it does.

24  Q    July 26th, 2003?

25  A    Correct.

Booth - cross - der Ohannesian                    4938

1   Q    151, file creation date.

2   A    Correct.

3   Q    Same?

4   A    2003.

5   Q    .jpg 152?

6   A    Correct.

7   Q    July 2003.

8        .jpg 153, July 2003?

9   A    Correct.

10  Q    .jpg 154, creation date of July 2003?

11  A    Yes.

12  Q    .jpg 155, creation date of July 26th, 2003?

13  A    Yes.

14  Q    .jpg 156, creation date of July 2003?

15  A    Correct.

16  Q    .jpg 160, a creation date of July 26th, 2003?

17  A    Correct.

18  Q    .jpg 161, creation date of July 26th, 2003?

19  A    Correct.

20  Q    .jpg 162, creation date of July 26th, 2003?

21  A    Correct.

22  Q    And .jpg 163, a creation date of July 26th, 2003?

23  A    Correct.

24  Q    So with respect to .jpg images 150 to 163, they were all

25  created, according to your forensic examination, on July 26th,

Booth - cross - der Ohannesian                    4939

1  2003; correct?

2  A    Yes.

3  Q    And in terms of the times, going back, we'll go

4  backwards.  That date, 2:05:16, 2:05:16, 2:05:15, 2:05:15,

5  2:05:15, 2:05:14, 2:05:14, 2:05:14, 2:05:13, 2:05:13?

6  A    Correct.

7  Q    2:05:12, 2:05:12, 2:05:12, and 2:05:11.

8         So on those, the first set of .jpg images, there was

9  a creation date of July 26th, 2013?

10 A    Correct.

11 Q    Now, with respect to .jpgs 184 to 191, which you talked

12 about this morning and yesterday, which were also contained in

13 Exhibit 518, do you know what the file creation date was for

14 those messages?

15 A    I recall, I thought they were 2003, also.

16 Q    Would you know for sure if you looked at --

17 A    The report would show it.

18 Q    The one we were just looking at?

19 A    Yes.

20 Q    So this is Exhibit 504-A.  This is the second set of

21 images that you testified about with the prosecution.  .jpg

22 184 creation date, July 26th, 2003, 2:05 p.m.?

23         185, July 26th, 2003?

24 A    Correct.

25 Q    205.

Booth - cross - der Ohannesian                    4940

1              .jpg 186, creation date, July 26th, 2003, 2:05 p.m.

2              .jpg 187, file creation, July 26th, 2003, 2:05 p.m.

3              .jpg 188, file creation, July 26th, 2003, 2:05 p.m.

4              .jpg 189, July 26th, 2003, 2:05 p.m.

5              .jpg 190, July 26th, 2003, 2:05 p.m.

6         And the last in this series from 184 to 191, file

7    creation date of July 26th, 2003, at 2:05 p.m.?

8    A    Correct.

9    Q    So looking at that, it's fair to say that for images 184

10   to 191, they have the same file creation date as .jpg images

11   150 to 163.

12   A    Yes.

13   Q    And in your opinion, is the metadata that was generated

14   with respect to file creation reliable?

15   A    No.

16   Q    Is it possible these images were created in 2004?

17   A    Yes.

18   Q    Is it possible they were created in 2005?

19   A    Yes.

20   Q    Is it possible they were created in 2006?

21   A    You can keep going on what dates.  I don't know.

22   Q    Right.  It could be 2008?

23   A    Yes.

24   Q    It could be 2010?

25   A    Correct.

VB        OCR        CRR

Booth - cross - der Ohannesian                    4941

1  Q    Because the file creation metadata is not reliable in
2  this case, according to you; correct?
3  A    The file -- the file system metadata for those dates and
4  times are not accurate.
5  Q    That issue has nothing to do with how you may have
6  conducted your examination; is that correct?
7  A    Correct.
8  Q    And these images which form the basis of the photographs
9  which were displayed today, also had modified dates on them?
10 A    Yes, they did.
11 Q    And do you remember what the modified date was for .jpg
12 images 150 to 163?
13 A    If I recall, it came back to a 2005 date.
14 Q    Okay.  And with respect to .jpg images 184 and 195, do
15 you recall what the file modified date was?
16 A    I think they call came back to 2005.
17 Q    And then did you determine in your analysis file access
18 dates?
19 A    No, I did not.
20
21             (Continued on following page.)
22
23
24
25

Booth - cross- der Ohannesian                    4942

1   EXAMINATION CONTINUES

2   BY MR. der OHANNESIAN:

3   Q    Again, I'm focusing on JPEG Images 150 to 163, and 184 to

4   191.

5             Looking, again, at Exhibit 284, starting with

6   Exhibit 150, did you determine an access date on that?

7   A    Software has produced an access date of 2010.

8   Q    And do you know what the access date -- now, there's no

9   time on that, right?

10  A    No, there's not.

11  Q    And was there an access date for the other JPEG images?

12  A    Yes, there were.

13  Q    Do you know what that access date was for each image,

14  JPEG 150 to 190?

15  A    I recall they were all alike.

16  Q    Well, let's make sure.

17  A    Okay.

18  Q    Let's not guess.

19            (Exhibit published.)

20  Q    Looking at JPEG 151, 152, 153, 154, 155, 156, 157, 158,

21  159, so far all generating the same access date?

22  A    Yes.

23  Q    Of 2/12/2010?

24  A    Yes.

25  Q    So this is refreshing you that you did do that, correct?

SAM      OCR      RMR      CRR      RPR

Booth - cross- der Ohannesian                    4943

1   A    Well, I didn't -- you asked me if I had -- if you would

2   rephrase how you said it.  You said --

3   Q    Generated or reported.

4   A    Well, I -- the system reported this information.  I'm not

5   reporting back with my past testimony.  We didn't talk about

6   access dates.

7   Q    Fair enough, you're absolutely correct.

8            So, JPEG 160, file access date, again, the same,

9   2/12/10; JPEG 161, which is a separate series of JPEGs that

10  you were asked about that were contained in Exhibit 518, also

11  has the access date of 2/12/2010; same for JPEG 162; yes?

12  A    Yes.

13  Q    And finally, JPEG 163, that also -- excuse me, that was

14  in the same series.

15           The next series begins with JPEG 184, that also,

16  though, has the same access date?

17  A    Correct.

18  Q    And, again, just quickly looking at 184, 185, which

19  starts at the bottom of page 46, access date of 2/12/2010,

20  same for 186, 187, 188, 189, 190 and 191, correct?

21  A    Correct.

22  Q    So for all these images your metadata reflected a last

23  access date of February 12th, 2010, correct?

24  A    Correct.

25  Q    And I think you said accessing does not necessarily mean

Booth - cross- der Ohannesian                    4944

1   viewing either, correct?

2   A    Not necessarily.

3   Q    Would it be fair to say that you have no information of

4   any file access date after February 12th, 2010 for any of

5   these images?

6   A    Not that I know of.

7   Q    Is there another form of metadata called thumbs.db or

8   thumbs database?

9   A    Yes.

10  Q    And is that something that you reviewed in this case?

11  A    That was processed, but as far as going in and reviewing

12  each of the thumb.db's, no, I did not.

13  Q    Do you have any notes concerning your findings on the

14  thumbs database?

15  A    No, I do not.

16  Q    But you did it?

17  A    We looked at it, yes.

18  Q    You didn't report it though?

19  A    No.

20  Q    And let's define what thumbs database is.

21  A    Well, thumbs.db is -- is part of the Microsoft operating

22  system that when you open up folders and view contents and you

23  usually see them come up in thumbnails, a thumbs.db file is

24  created in that folder to hold that data.

25            Depending on what file system you have, it can

SAM      OCR      RMR      CRR      RPR

Booth - cross- der Ohannesian                    4945

1   actually be saved in the user's data portion of the computer.

2   So instead of saving it in the folder, Windows 10 likes to

3   save it in a users data folder, and that will hold different

4   size versions of the thumbnails that you find in there, too.

5   Q    It's supposedly makes it more convenient or easier for

6   you to view the image?

7   A    To browse through, yes.

8   Q    And that is a form of metadata that forensic examiners

9   look at, correct?

10  A    Sometimes, yes.

11  Q    And that thumbs.db data or browsing should be after the

12  photo is taken?

13  A    Not necessarily.  Not all operating systems make a

14  thumb.db folder.

15  Q    Well, this case, the Western Digital did have a thumbs.db

16  on it, correct?

17  A    Yes, it had multiples.

18  Q    Okay.

19       And when there is thumbs.db, you can't view a file

20  before it exists, correct?

21  A    You can double click on it and open it.

22  Q    But the date and time of a thumbs.db entry cannot be

23  before the creation of the file?

24  A    No -- well, the thumbs.db might be there before you add

25  files into the folder.  So yes, a thumbs.db can be there and

Booth - cross- der Ohannesian                    4946

1    created before you add more files to it.

2    Q    Did you notice any anomalies in the thumbs database in

3    this case when we talk about JPEG images, any of the JPEG

4    images from 150 to 191?

5    A    And those were on 1B16, I gather?

6    Q    Yes.

7    A    Not that I had noticed.

8    Q    Did you notice that some of these files say they were

9    created an hour before they were created according to

10   thumbs.db?

11   A    No, I did not notice that.

12   Q    That wouldn't be good, would it?

13   A    I would want to look at it, but no, I wouldn't say it's

14   good or bad.

15   Q    Do any of the reports that you put into evidence in this

16   courtroom say anything about the thumbs database metadata?

17   A    No, it does not.

18   Q    Who determines whether to report the thumbs database data

19   in a forensic report?

20   A    An examiner would.

21   Q    Pardon?

22   A    An examiner would.

23   Q    Brian Booth?

24   A    Could be me, could be another examiner.

25   Q    And in this case, who would it be?

SAM       OCR       RMR       CRR       RPR

Booth - cross- der Ohannesian                    4947

1   A    Well, when I'm asked to produce the report, if I deemed

2   it necessary I would add it.

3   Q    So that's your -- your call?

4   A    It would be on my purview.

5              MR. der OHANNESIAN:  This would be a good time for a

6   break.

7              THE COURT:  Okay, let's take our morning break.

8              All rise for the jury.

9              (Jury exits.)

10             THE COURT:  All right.  Sir, you may step down.  Do

11  not discuss your testimony with anyone.

12             (Witness steps down.)

13             THE COURT:  Everyone may be seated.

14             (Witness exits the courtroom.)

15             MS. HAJJAR:  Your Honor, Ms. Donnelly is here and

16  she has brought with her all the aggregate notes involved in

17  this case.  We -- we can provide them to counsel and put her

18  on the stand, if necessary, to bridge that gap.

19             THE COURT:  You like to see the notes?

20             MR. der OHANNESIAN:  That's right.

21             THE COURT:  Just show defense counsel the notes so

22  that -- how many notes are there?

23             MS. HAJJAR:  I'm not sure, Your Honor.  I've never

24  seen them.  She's on her way with them for the two --

25             THE COURT:  Oh, she's not here yet?

SAM      OCR      RMR      CRR      RPR

Booth - cross- der Ohannesian                    4948

1           MS. HAJJAR:  I don't think so.

2           MS. PENZA:  I didn't think so.

3           MS. HAJJAR:  I think she's on her way, Your Honor.

4           THE COURT:  From 26 Federal Plaza?

5           MS. HAJJAR:  She's coming from 26 Federal Plaza,

6    yes.

7           THE COURT:  It's not a long trip.

8           MS. HAJJAR:  No.

9           MS. PENZA:  It isn't, Your Honor, but the notes

10   themselves, she had -- they were not finalized and so there is

11   a process where she had to obtain them.

12          Additionally, CART Analyst Flatley is in Africa

13   right now, so his notes had to be obtained as well.

14          So I know that Special Agent Lever has been working

15   diligently to get it all organized, but I'm not sure.  It's

16   not just a matter of getting over from 26 Federal Plaza.

17          THE COURT:  How much longer do you have?

18          MR. der OHANNESIAN:  In terms of my plan, about

19   20 minutes.  However, I would like to look at the notes before

20   I complete it.

21          THE COURT:  I understand.

22          MR. der OHANNESIAN:  And I don't object to being

23   broken up either.  If my cross-examination is broken up, it's

24   a logical time to do it.

25          THE COURT:  I think we ought to do it as one unit.

Booth - cross- der Ohannesian                    4949

1              MR. der OHANNESIAN:  Okay.

2              THE COURT:  So we will simply have to wait.

3              And then your next witness after this?

4              MS. HAJJAR:  I believe it would be Special Agent

5      Weniger, unless to the extent the notes present an issue we'll

6      call Virginia Donnelly to explain that further.  But if not,

7      our plan was Special Agent Weniger, case agent.

8              THE COURT:  And how long will he be on the stand on

9      direct?

10             MS. HAJJAR:  Approximately two hours, Your Honor.

11             THE COURT:  All right, we still might get done

12     today.

13             Why don't you let Mr. Reccoppa know when the notes

14     arrive.

15             MS. HAJJAR:  Will do.

16             THE COURT:  All right, and provide them to the

17     defense.

18             MS. HAJJAR:  Yes.

19             THE COURT:  Okay, thank you.

20             (The defendant exited the courtroom.)

21             (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

22             (Recess taken.)

23                 (In open court - jury not present.)

24             (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

25                 (The defendant exited the courtroom.)

SAM      OCR      RMR      CRR      RPR

Booth - cross- der Ohannesian                    4950

 1          THE COURT:  All right, case on trial.

 2          What is the status?

 3          MS. HAJJAR:  Your Honor, Ms. Donnelly is here.  We

 4  have two folders of her notes in photographs.  I don't expect

 5  it will take long for the defense to review, but a little

 6  while.  We're copying them now for defense counsel.

 7          THE COURT:  Well, I can send the jury to lunch for

 8  half an hour, and then we can resume --

 9          MS. HAJJAR:  That may makes sense, Your Honor.

10          THE COURT:  -- at like 20 to 1:00, and that way

11  defense will have a chance to look at the materials and to

12  complete the cross-examination and any redirect, and then move

13  on to the next witness and try to get it all done today.

14          MS. HAJJAR:  Yes, Your Honor.

15          MS. PENZA:  Yes, Your Honor.

16          THE COURT:  Any objection?

17          MR. der OHANNESIAN:  No.

18          THE COURT:  All right, that's what we will do.

19  Thank you very much.

20          We'll advise the jury.

21          MR. der OHANNESIAN:  You said about how long?

22          MR. AGNIFILO:  20 to 1:00.

23          MR. der OHANNESIAN:  20 to 1:00.

24          THE COURT:  20 to 1:00.

25          MR. der OHANNESIAN:  All right.

Booth - cross- der Ohannesian                    4951

1          THE COURT:  Okay; thank you.

2          (The defendant exited the courtroom.)

3          (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

4          (The defendant exited the courtroom.)

5          (Luncheon recess taken.)

6

7          (Afternoon session continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Proceedings                                          4952

1                    **AFTERNOON SESSION**

2              (In open court - jury not present.)

3         (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

4              (Defendant entered the courtroom.)

5              THE COURT:  All right, just a reminder, I need the

6    language on evidence seized pursuant to a search.

7              MS. HAJJAR:  We'll send it tonight, Your Honor.

8              THE COURT:  Good.  Okay.

9              And where are we about the notes?

10             MS. HAJJAR:  Your Honor, we've given a copy of the

11   notes -- of Ms. Donnelly's notes to -- and Mr. Flatley's notes

12   to counsel, who has reviewed them.

13             MR. der OHANNESIAN:  I have.  I'm prepared to go

14   forward.

15             THE COURT:  Okay.  We are just waiting for the

16   jurors to come up from lunch, and then we will get started.

17             Everyone may be seated.  Don't move.  We are going

18   to keep going.

19             About how much more do you have for this witness?

20             MR. der OHANNESIAN:  20, 25.

21             THE COURT:  Okay.

22             MR. der OHANNESIAN:  I think maybe five minutes with

23   the documents I got.

24             THE COURT:  Okay, thank you.

25             MS. PENZA:  Your Honor --

Proceedings                                                    4953

1          THE COURT:  Yes.

2          MS. PENZA:  -- we have a few documents that are in

3    dispute for Special Agent Weniger.  Other than that, I think

4    we are going to be able to enter all the remaining documents

5    on consent before his testimony begins.

6          Though, I would ask for a few more minutes before I

7    put that on the record with Mr. Agnifilo and Ms. Geragos, just

8    to make sure there is no question --

9          THE COURT:  Okay.  Go ahead.

10         MS. PENZA:  But would you -- would Your Honor like

11   to hear first about the documents in dispute?

12         THE COURT:  What is in dispute?

13         MR. AGNIFILO:  All right, Judge.  So we've consented

14   to about 95 percent of things.

15         What we haven't consented to is Government

16   Exhibit 668, which is a Times Union article from

17   February 12th, 2012.

18         THE COURT:  Well, what is that about?

19         MS. PENZA:  So, Your Honor, we're not putting in the

20   entire article.  This is just the cover page of the article.

21         And the reason it's important is because, as with --

22   as with the Forbes article, the Albany Times Union article was

23   something that caused a lot of -- in terms of -- in terms of

24   the Government's proof regarding the enterprise and actions

25   that were taken, a lot of that centers around the Albany Times

                  SAM     OCR     RMR     CRR     RPR

Proceedings                                              4954

1   <u>Union</u>, including several of its reporters, et cetera.

2           And so the front page shows that this was a big

3   deal.  This was the first -- this was the lead story in the

4   <u>Albany Times Union</u>.  It shows the date, and it shows that

5   there was going to be this four-part series.

6           So it is for the timing of these articles.  We are

7   not including the content of the articles in it.

8           THE COURT:  What is the problem?

9           MR. AGNIFILO:  She can get testimony about the date

10  of the article.  Ask the witness what date was the article.

11          MS. PENZA:  I think it's -- if Your Honor -- if Your

12  Honor sees it, I think it's important to see what this

13  actually was, like it -- that this was a big deal.

14          This wasn't just some small article in the middle of

15  the newspaper.  This was the lead story and it was going to be

16  covered for four days in a row.  And so I think that shows the

17  motive behind, basically, targeting the authors of this

18  article.

19          THE COURT:  You are going to ask the witness about

20  this?

21          MS. PENZA:  Yes, Your Honor.  Just -- not -- just to

22  put that one page into evidence and ask about that.

23          THE COURT:  Could I see it?

24          MS. PENZA:  Yes, Your Honor.  You have the one --

25          MR. AGNIFILO:  Your Honor, actually, what I -- what

SAM      OCR      RMR      CRR      RPR

Proceedings                                    4955

1    might be easier is, I will give Your Honor -- it's only maybe

2    five exhibits.  So I can just give them all to the Court.

3                THE COURT:  Thank you.

4                MS. PENZA:  And that will be --

5                THE COURT:  All right, next.

6                MS. PENZA:  I don't actually have it in front of me.

7    This one --

8                MR. AGNIFILO:  So the next one, so the next one I

9    know, Judge, is there is an unofficial transcript from RPI.

10               THE COURT:  And it has been -- there is a

11   declaration from the secretary and general counsel?

12               MR. AGNIFILO:  Of the unofficial transcript.

13               First of all, I don't know what the relevance of the

14   transcript is.  And second of all, I don't know what the

15   provenance of the unofficial transcript is.

16               MS. PENZA:  Well, the providence, Your Honor, is

17   evident from there.  And we -- so Special Agent Weniger will

18   testify that we provided a subpoena to RPI, and that we

19   received this record in response.

20               The relevance is, Your Honor, we are putting in,

21   without objection, the defendant's biography that was listed

22   on the NXIVM website, which -- which lauded him for his three

23   degrees from RPI and his taking of graduate-level math classes

24   and physics classes.  And I think his mediocre-to-failing

25   grades in those classes is certainly relevant.

Proceedings                                                4956

1            THE COURT:  And the next?

2            MR. AGNIFILO:  Your Honor -- I gave you my only

3    copy, Your Honor, unfortunately.

4            MS. PENZA:  I --

5            THE COURT:  There is something here -- hold on.

6            MS. PENZA:  Can you give us a little bit?  Then

7    we'll be able to tell you.

8            THE COURT:  I will give you a clue.

9            MR. AGNIFILO:  Okay, Judge.

10           THE COURT:  There is an e-mail sent from Joe J.

11   O'Hara --

12           MS. PENZA:  Oh, we are not seeking to admit that,

13   Your Honor.

14           THE COURT:  Well...

15           MR. AGNIFILO:  We are making life easier already.

16           THE COURT:  And then there is a Michele e-mail to

17   Allison Mack.

18           MS. PENZA:  Yes, Your Honor.  So at the -- it -- as

19   you can see, it -- this is a listing of Michele's collateral.

20   Michele was Allison's slave.  We are putting in -- or -- Your

21   Honor, a DOS -- labeled a DOS slave, of course.

22           THE COURT:  I see.

23           MS. PENZA:  But she was -- this is her listing of

24   collateral, but at the bottom she lists what she is still

25   demanding of her own slave, Michele's own slave, Souki.  And

Proceedings                                                    4957

1    so that's a co-conspirator.

2         MR. AGNIFILO:  I agree, that's a co-conspirator

3    statement.

4         THE COURT:  What is that?

5         MR. AGNIFILO:  I agree, it's a co-conspirator

6    statement.  We don't object.

7         THE COURT:  Okay, moving right along.

8         And then Meier, Barry Meier?

9         MS. PENZA:  Yes, Your Honor.  So the relevance of --

10   we are not offering that for its truth.  I don't think there

11   actually is any truth or falsity to it.

12        This is on October 10th, I believe, Your Honor, that

13   Mr. Raniere was contacted by Barry Meier of the New York Times

14   letting him know, again, that this was his last chance,

15   basically, to comment on a forthcoming article.

16        The very next day is the day that Jay gets the

17   threatening letter that we put into evidence from the Mexican

18   attorney.  And so the -- in our view, the timing is extremely

19   relevant of the notice to Mr. Raniere about the forthcoming

20   New York Times article.

21        THE COURT:  There was a New York Times article in

22   2017?

23        MS. PENZA:  October 20 -- yes, Your Honor.

24   October 2017, that was the one where Sara showed her brand,

25   and that's...

Proceedings                                    4958

1           THE COURT:  And you oppose that?

2           MR. AGNIFILO:  I just -- I think it's -- I think

3    it's hearsay and it raises sort of a troubling inference that

4    somehow Mr. Raniere would have had an obligation to respond,

5    because the article -- the --

6           THE COURT:  No one has an obligation to respond to

7    the media.

8           MR. AGNIFILO:  I understand, but --

9           THE COURT:  You know that would create the -- I

10   mean, you can ask the question on cross-examination.

11          MR. AGNIFILO:  Okay.

12          THE COURT:  That's about it?

13          MS. PENZA:  I think that's it for the objections.

14          THE COURT:  So you want to put in this face page

15   here (indicating)?

16          MS. PENZA:  Just that, yes, Your Honor.

17          MR. AGNIFILO:  Judge, we just -- we'd be happy to

18   consent to the timing of it.  I just don't think that the

19   article is relevant.  And I think --

20          THE COURT:  Well, it is not the article, it's just

21   the front page.

22          MR. AGNIFILO:  Well, but it -- that is even worse,

23   in a sense, because, you know, now we have him on the front

24   page, leaving the jury to speculate about things that really

25   are neither here nor there or -- nor are evidential,

SAM      OCR      RMR      CRR      RPR

Proceedings                                      4959

1   especially when we're willing to stipulate to the timing.

2            THE COURT:  You can show the witness that and

3   inquire about it, and I think that would be enough.

4            MS. PENZA:  So we won't admit that --

5            THE COURT:  Don't put that in.

6            MS. PENZA:  Okay.  Fair enough, Your Honor.

7            THE COURT:  The rest of the stuff can come in.

8            MS. PENZA:  The one last thing, which I failed --

9            THE COURT:  There is more?  I have got a jury that I

10  forced to come back.

11           MS. PENZA:  Sure.  No, no, no.  There's no --

12           THE COURT:  To eat quick and come back.  And

13  I don't --

14           MS. PENZA:  No problem, Your Honor.

15           THE COURT:  -- I don't want people throwing roast

16  beef sandwiches at me because they were forced to eat lunch

17  before lunch.

18           MS. PENZA:  I think we're -- we've made excellent

19  progress.  I think things will be very streamlined for --

20           THE COURT:  I am not a school teacher anymore, I got

21  out of that business.

22           MR. AGNIFILO:  You thought.

23           THE COURT:  I thought, I was hoping.

24           MR. AGNIFILO:  Yeah.

25           THE COURT:  So what else is there?

Proceedings                                        4960

1          MS. PENZA:  The last thing I was just going to say

2    is we have a hard copy of the Forbes article, and we were just

3    going to use it as a -- for demonstrative purposes today.  We

4    don't need to admit the actual article.

5          THE COURT:  All right, that is fine.

6          MR. AGNIFILO:  Very good.

7          THE COURT:  All right.

8          MR. AGNIFILO:  Can I retrieve my --

9          THE COURT:  Of course.  Please, please.

10         MR. AGNIFILO:  Thank you.  Thank you, Your Honor.

11         THE COURT:  Be my guest.

12         MR. AGNIFILO:  Thank you very much.

13         THE COURT:  All right, are we ready with the jury?

14         Okay.  Please bring in the witness.

15         (The witness entered the courtroom and resumed the

16   stand.)

17         (Jury enters.)

18         THE COURT:  All right, please be seated, everyone.

19         First of all, let me thank the jury for agreeing to

20   the adjustment of the schedule a little bit.  I thought that

21   because we had some administrative details to deal with, we

22   would rather deal with them while you were having lunch, and

23   then move ahead with the trial.

24         So, again, the parties and I thank you for

25   accommodating all of us.

Proceedings                                    4961

1          You may continue your --

2          MR. der OHANNESIAN:  Thank you.

3          THE COURT:  -- cross-examination of the witness.

4          The witness is reminded he is still under oath.

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

Proceedings                                              4962

1   **BRIAN BOOTH**,

2        previously called as a witness by the Government, having

3        been previously duly sworn/affirmed by the Courtroom

4        Deputy, was examined and testified further under oath as

5        follows:

6   CROSS-EXAMINATION CONTINUED

7   BY MR. der OHANNESIAN:

8   Q    Mr. Booth, I'm going to show you some items first.

9             MR. der OHANNESIAN:  Judge, this will just be for

10  the witness.

11            THE COURT:  All right, let me see.

12            Go ahead.

13  Q    This is Exhibit 945, which we looked at from this

14  morning.  And could you reiterate what 945 is?

15  A    945 is the package sheet from the digital camera piece of

16  evidence.

17  Q    And does this include the data card, Exhibit 524, or not?

18  A    From what I -- my understanding was that was what was

19  obtained outside the -- or inside the actual camera.

20  Q    So do you know if there is a separate document for the

21  data device?

22  A    No, there isn't.

23  Q    Then I want to show you document 960.

24            What is that?

25  A    It's a evidence bar code.  It's 1B16.  It's the -- one

SAM      OCR      RMR      CRR      RPR

Proceedings                                                    4963

1  red rope containing the Western Digital storage device.

2  Q     And what do you call this document?

3  A     This is the evidence sheet.

4  Q     And this would be for the Western Digital drive?

5  A     Yes.

6            MR. der OHANNESIAN:  I'll offer 945 and 960 at this

7  time.

8            MS. HAJJAR:  No objection.

9            THE COURT:  All right, Defense Exhibits 945 and 960

10  are received in evidence.

11           (Defendant's Exhibits 945 and 960 were received in

12  evidence.)

13  BY MR. der OHANNESIAN:

14  Q     Mr. Booth, Exhibits 945 and 960 are in evidence.  If you

15  need them to answer my questions, please ask me for them.

16  A     Okay.

17           MR. der OHANNESIAN:  This will be just for the

18  witness, Your Honor.

19  Q     This is several sheets of paper.  So what I am going to

20  do is show it to you directly, so you can look through all of

21  them, rather than my doing it from the ELMO.

22           MR. der OHANNESIAN:  Is that okay, Your Honor, if I

23  give it to the witness?

24           THE COURT:  Sure.

25           THE WITNESS:  (Witness complies.)

Proceedings                                                    4964

1    BY MR. der OHANNESIAN:

2    Q    First, the number on that exhibit on the front page, just

3    so I -- for the record, is DX what?

4    A    DX 961.

5    Q    And what is DX 961?

6    A    DX 961 is a rough draft of the examination notes.

7    Q    Are those the notes that you were referring to this

8    morning?

9    A    Yes, I am.

10   Q    That you said you didn't have?

11   A    Yes.

12   Q    That might help you answer some questions?

13   A    Yes.

14   Q    Does it contain the photos that were taken in this case

15   also?

16   A    Yes, they do.

17   Q    Okay.  And, again, if you need that to answer my

18   questions, to refresh your recollection, just let me know.

19          The first question is:  Are there any photos that

20   were taken of the box in which the Cannon camera and storage

21   device were located?

22   A    No, there wasn't.

23   Q    Now, you can answer that with certainty, correct?

24   A    Yes, because the -- because of the speed of having to do

25   the camera at this point, and that the camera was also

Proceedings                                                4965

1    produced in court already, that I just needed to

2    actually process the item, and get it -- get the item

3    processed.

4    Q    When you say the camera was produced in court, when was

5    that?

6    A    I think it was that morning, if I'm -- if I'm not

7    mistaken.  I wasn't in court, so I don't know.

8    Q    Will those notes in Exhibit 961 help you answer that

9    question, if you believe the camera was produced in some court

10   proceeding?

11   A    No.

12   Q    Okay.  That's just your guess?

13   A    Yeah, that was what I heard from someone on the squad.

14   So I don't know for sure.

15   Q    That's not reflected in the notes, correct?

16   A    No, it's not reflected in the notes.

17   Q    Does Exhibit 961 help you answer the question when the

18   Cannon camera and storage device were delivered to the FBI

19   CART office?

20   A    No, the evidence sheet would have that information.

21   Q    Is that one of the two exhibits that we just put in

22   evidence?

23   A    Yes, I would believe it would be.

24   Q    Looking at Exhibit 945.

25              (Exhibit published.)

Proceedings                                          4966

1    A    That's the Cannon camera?

2    Q    Yes.

3    A    Yes.

4    Q    And this morning, I think -- looking at the first page,

5    does that tell you when it came to the CART office?

6    A    You'll have to scroll down a little -- scroll up a little

7    bit, and it's up to the right.  It says when we received it.

8          (Exhibit published.)

9    A    You're going down.  You need to go up.

10   Q    What's the date?

11   A    You need to go up.

12         THE COURT:  To the top of the page?

13         THE WITNESS:  Yes, top of the page.

14         THE COURT:  Hold on.

15         MR. der OHANNESIAN:  This can be for the jury.

16         THE COURT:  Yes, I know.  I just want it to be up.

17         Yeah, okay.

18         (Exhibit published.)

19         THE WITNESS:  And you need to move it to the left a

20   little bit, so I can see it.

21         MR. der OHANNESIAN:  Here you go.

22         THE WITNESS:  3/27 of '18.

23   BY MR. der OHANNESIAN:

24   Q    So March 27th, 2018, is when the Cannon camera and

25   Exhibit 524 were delivered to the lab?

SAM      OCR      RMR      CRR      RPR

Proceedings                                                    4967

1   A     Yes.

2   Q     And do your notes now, Exhibit 961, help you answer the

3   question when the Cannon camera and storage device, 524, were

4   first examined by the CART unit?

5   A     The -- the -- my notes reflect when I examined and had

6   access to the Cannon camera.

7   Q     Okay.  And that's what --

8   A     And only -- and only me having access to that.

9   Q     And what do your notes reflect?

10  A     I received it on 6/10 of '19.

11  Q     June 10th, 2019?

12  A     Yes.

13  Q     And then you generated a report, correct?

14  A     Correct.

15  Q     And February 22nd is when the CART office first put an

16  evidence sticker on the device, correct?

17  A     Correct.

18  Q     And then June 11th is your initials when you did your

19  work with this device, correct?

20  A     Correct.

21  Q     You prepared a report concerning the metadata obtained

22  from the storage device, which is Exhibit 524, correct?

23  A     Correct.

24  Q     Exhibit 521, which is in evidence, contains information

25  about metadata associated with images from this electronic

Proceedings                                                   4968

1   device, correct?

2   A    Correct.

3   Q    It's okay to call it an electronic device?

4   A    Yes, you can.

5   Q    And when we talk about the metadata in this case for this

6   card, it would include when it was created, correct?

7   A    The metadata will have a date/time that would say a

8   created date.

9   Q    When it was accessed?

10  A    It will have an access time/date.

11  Q    And when it was modified?

12  A    And modified dates, yes.

13  Q    And was this device also taken through the process of

14  write copied -- write protected?

15  A    When it was in my hands it was write protected, yes.

16  Q    Can you tell me when that was?

17  A    That happened on 6/11.

18  Q    And, again, the reason you write protect to be -- the --

19  whether it's a hard drive or a piece of data, like this data

20  disk, forensically you don't access it directly, correct?

21  A    No, we don't.

22  Q    And that's what you described yesterday to the

23  prosecutor, that's what you described to me this morning,

24  correct?

25  A    Correct.

Proceedings                                                    4969

1    Q    And that's very, very important, correct?

2    A    Yes, it is.

3    Q    Because you want to maintain the integrity of the

4    electronic evidence?

5    A    Yes, I do.

6    Q    I'd like to take you to -- this is page 84 of

7    Exhibit 521.  And I'd like to begin with JPEG on top here,

8    224.

9              (Exhibit published.)

10   BY MR. der OHANNESIAN:

11   Q    First of all, I want to make sure you can read that.

12   A    I can see it.

13   Q    You say that this image was created on March 9th, 2006?

14   A    That's the created date that's --

15   Q    Yes?

16   A    That's the created date that's listed for the file.

17   Q    It was modified on March 9, 2006?

18   A    That's the modified date that's reflected from the file

19   system.

20   Q    And then it was accessed, correct, on a certain date?

21   A    Yes, I see it's been accessed.

22   Q    It was accessed on September 19, 2018, correct?

23   A    Correct.

24   Q    Look at exhibit -- the same exhibit, Image 225.

25              The next item reflects what might be called "carved

Proceedings                                        4970

1   data"?

2   A    Yes.

3   Q    Okay.  It doesn't mean the image doesn't exist on the

4   computer, though, correct?

5   A    Well, if you're talking about the EXIF HTML, is that what

6   you're referencing?

7   Q    No.  Well, for example, right below it you see Image 225?

8   A    Yes.

9   Q    Let's continue.  Image 225 created in March 9, 2006,

10  correct?

11  A    Correct.

12  Q    Modified in 2006 and it was accessed on September 19,

13  2018, correct?

14  A    Correct.

15  Q    And that's according to what you're reading off this

16  Exhibit 524, correct?

17  A    Correct.

18  Q    And Image 227, that was also accessed on September 19,

19  2018, correct?

20  A    Correct.

21  Q    Exhibit [sic] 228 was accessed on September 19, 2018?

22  A    Which number again, excuse me?

23  Q    228.

24  A    Yes.

25  Q    Image 229, that was also accessed on September 19, 2018,

SAM     OCR     RMR     CRR     RPR

Proceedings                                                     4971

1    correct?

2    A     Correct.

3    Q     Image 230 was accessed on September 19, 2018, correct?

4    A     Correct.

5    Q     Image 231, JPEG, accessed on September 19, 2018?  Is that

6    what the access date is?

7    A     Is that a question or --

8    Q     Yes.  My question is:  Does your report, in Exhibit 521-A

9    of the Government, reflect that JPEG Image 231 was accessed on

10   September 19, 2008 [sic]?

11   A     Correct.

12   Q     Does your report reflect that Image 233 was accessed on

13   September 19, 2018?

14   A     Correct.

15          THE COURT:  Could you repeat that?

16          MR. der OHANNESIAN:  Yes.

17   BY MR. der OHANNESIAN:

18   Q     Does your report reflect that JPEG Image 233 was accessed

19   by September 19 -- on September 19, 2018?

20   A     Correct.

21   Q     Image 234, JPEG, accessed on September 19, 2018?

22   A     Correct.

23   Q     Image 235 accessed on September 19, 2018?

24   A     Correct.

25   Q     Image 236 accessed on September 9, 2018?

Proceedings                                    4972

1    A      Correct.

2    Q      Image 237, on page 89 continuing into page 90, accessed

3    on September 9, 2018?

4    A      Correct.

5    Q      Image 238 accessed on September 19, 2018?

6    A      Correct.

7    Q      JPEG 241 accessed on September 19, 2018?

8    A      Correct.

9    Q      There is no entry for JPEG 242 in the report.

10            On JPEG 243, that was accessed on September 19,

11   2018?

12            THE COURT:  He can't see it.

13            MR. der OHANNESIAN:  I'm sorry.

14            THE WITNESS:  Yes.

15            (Exhibit published.)

16   BY MR. der OHANNESIAN:

17   Q      Is that correct?

18   A      Correct.

19   Q      The metadata for JPEGs 224, 225, 227 to 241, and 243 from

20   Government Exhibit 524, the media card, changed after it was

21   collected on March 27, 2018, correct?

22   A      The access dates appear to be.

23   Q      The metadata for Exhibit 524, the media card, reflects

24   that the digital evidence on Exhibit 524 changed while it was

25   in the possession of the FBI, correct?

Proceedings                                          4973

1   A    Which -- which metadata are you specifically --

2   Q    The date accessed.

3   A    You're talking from the file system?

4   Q    I'm talking about the data that we just looked at.

5   A    That file system data appears to have been changed.

6   Q    When we say "changed," it was changed while it was in the

7   possession of the FBI?

8   A    If I'm taking the dates on when we received it, it would

9   appear so.

10  Q    And the dates that you received just now came from your

11  report, correct?

12  A    Yes.

13  Q    That you generated as evidence in the case against --

14  United States against Keith Raniere, correct?

15  A    Yes.

16  Q    The goal of forensic examination is to preserve the

17  electronic data, so that the metadata doesn't change, correct?

18  A    Correct.

19  Q    Do you know the name of the person who accessed the SD or

20  media card, Exhibit 524, on September 19, 2018?

21  A    No, I do not.

22  Q    Do you have any record in any piece of evidence or notes

23  that reflects the accessing of Government Exhibit 524 by any

24  representative of the FBI on September 19, 2018?

25  A    No, I do not.

Proceedings                                              4974

1   Q    Based on your forensic examination of the Western Digital

2   drive, or Government Exhibit 524, do you have any digital

3   evidence that Keith Raniere knew the content of any of the

4   electronic images on either Government Exhibit 503 or 524?

5   A    I don't know Mr. Raniere, so I would never know what he

6   knows.

7   Q    Do you have any -- based on your forensic examination, do

8   you have any digital evidence as to the identity of any

9   individual who at any time may have accessed any information

10  on the Western Digital hard drive?

11  A    I do not know.

12  Q    Based on your forensic examination, do you have any

13  digital evidence of the identity of any individual who may

14  have accessed any electronic information on Government

15  Exhibit 524?

16  A    I don't know who had access to this.

17  Q    And based on your forensic examination of Government

18  Exhibit 503 or 504, do you know the identity of any person who

19  took any particular image about which you have testified

20  before this grand jury -- before this jury?

21  A    I just know people's pictures that are in the images,

22  that's it.

23  Q    You don't know the identity of any person who would have

24  been behind the camera at any particular time --

25  A    No.

                SAM      OCR      RMR      CRR      RPR

Proceedings                                      4975

1   Q      -- fair to say?

2   A      Fair.

3              MR. der OHANNESIAN:   Nothing else, Your Honor.

4   Thank you.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Booth - redirect - Hajjar                    4976

1    (Continuing.)

2                THE COURT:  Redirect?

3                MS. HAJJAR:  Yes, briefly, Your Honor.

4    REDIRECT EXAMINATION

5    BY MS. HAJJAR:

6    Q    Good afternoon, Examiner Booth.

7    A    Good afternoon.

8    Q    Mr. DerOhannesian talked a lot about metadata previously

9    with you.

10   A    Yes.

11   Q    He asked you questions about various types of metadata,

12   is that right, on cross-examination?

13   A    Yes.

14   Q    He didn't once mention EXIF data; is that right?

15   A    Correct.

16   Q    You spent the majority of your testimony on direct

17   examination referring to EXIF data?

18   A    Yes, I did.

19   Q    Why is that?

20   A    There's two types of metadata.  There's the stuff that

21   you find on file systems which is called file system metadata,

22   and then there is metadata that is embedded into images and

23   into audio files and things of that nature.  That's EXIF data.

24   And EXIF data is actually put inside the file.  Unlike the

25   metadata that we've talked about previously which is attached

SN        OCR        RPR

Booth - redirect - Hajjar                    4977

1    outside of the file by the operating system.  The file system

2    moves that along from place to place with it.  So, at any

3    point of giving that movement from place to place, there are

4    times that things can get modified.

5             But when it comes to EXIF data, it used to be it

6    would only be hard-coded in.  You couldn't modify it.  And

7    only during changes during the years did they open up that you

8    could change the author's name of a photo or even a Word

9    document that you might have.  You can always go in and change

10   the author and put comments in and things like that and that's

11   metadata for a Word file.  But when it comes to photos, they

12   still keep you from changing dates and times.  It's not easy

13   to change those.  You have to go through special processes to

14   change those things.

15            Adobe will allow you to copy a photo and modify it

16   and it will take some of that metadata over, but it will

17   actually put in that.  Adobe has modified their system.

18   They're taking steps to show that, listen, if you manipulate

19   this we're going to show it in some sense.  It's very rare

20   that I've found someone has been changing metadata within a

21   photo and that time and date does not change from place to

22   place.  It stays embedded in the photo.  So, there's no

23   outside constraint that's changing it, from an OS, from an

24   Apple computer to a Dell computer.

25            So these things stay consistent.  Those are prime

Booth - redirect - Hajjar                          4978

1    places I need to look because unless someone is sitting doing

2    that hacking attempt to trying to do that, which I didn't see

3    that with this drive, I would have to assume all those dates

4    are reflected going all the way through.  Those are embedded

5    when you take the picture.

6              I mean, you can go through your cell phone and see

7    the times and dates and geo locations, too.  If you try to

8    modify those dates, you'll find you can do it yourself very

9    easily.  In that sense, it's very important data here.  And,

10   make no mistake, that's the data that I'm after as a forensic

11   examiner.  I can rely on that time and date.  I can't rely on

12   the date that someone else put on the files.

13   Q    What's most reliable in terms of all the metadata that

14   was discussed thus far in your examination on direct and on

15   cross?

16   A    The EXIF data.

17   Q    Okay.  Is that better, more reasonable than the created

18   date?

19   A    It's the most reliable.

20   Q    Is it better than -- more reliable than the modified

21   date?

22   A    Yes.

23   Q    Is it more reliable than the access date?

24   A    Yes.

25   Q    Is it more reliable than the thumb DB metadata?

Booth - redirect - Hajjar                    4979

1   A    Yes.

2   Q    Is it more reliable than metadata that might have been

3   imposed based on an OS or operating system?

4   A    Oh, definitely.

5   Q    Every single same type of metadata that was discussed on

6   cross-examination of -- and EXIF data, if you were to

7   determine which of those was the most reliable which, would it

8   be?

9   A    The serial number of the camera and the time and the

10  date.

11  Q    On the EXIF data?

12  A    Yes.

13  Q    Okay.  Is it kind of misleading to just talk about -- if

14  you talk about metadata and you don't talk about EXIF data,

15  can that get confusing or misleading?

16          MR. DEROHANNESIAN:  Objection to the form.

17          THE COURT:  Sustained as to form.

18  BY MS. HAJJAR:

19  Q    I want to show you, Examiner Booth, just one of the

20  images and this is -- I'm showing you Government Exhibit 550

21  in evidence.

22          (Exhibit published.)

23  Q    This is the Studies folder that we were talking about?

24  A    Yes.

25  Q    What -- which -- the Studies folder, which piece of

Booth - redirect - Hajjar                              4980

1   digital evidence is that from; the camera or the hard drive?

2   A    It's from the hard drive.

3   Q    And the hard drive, does that reflect any change in

4   access date or modified date or creation date as of the time

5   it got to the FBI?

6   A    No.

7   Q    So the images that were looked at in the context of this

8   case from the hard drive, they -- no change in any of those --

9   that metadata --

10  A    No.

11  Q    -- is that right?  Okay.

12          And looking at the first file in the 11-V1010202005

13  is in here 110205V.  That's image 115?

14  A    Yes.

15  Q    Mr. DerOhannesian went through each of these.  I'm not

16  going to do every single one, but he went through the creation

17  date, the access date and the modified date for each of these

18  files; right?

19  A    Correct.

20  Q    And he pointed out to you that the creation date was

21  2003.  He pointed out the access date was 2010 and the

22  modified date was 2005; is that right?

23  A    That's correct.

24  Q    But he didn't show you the -- that's for image 150,

25  right?

SN        OCR        RPR

Booth - redirect - Hajjar                4981

1    A    Yes.

2    Q    And what's this on top, the corresponding file to image

3    150?

4    A    What AD Lab does is it opens up the JPEG file and looks

5    at the EXIF data, extracts it and saves it as an HTML file so

6    you can view it outside in this kind of form.

7    Q    What's this?  Why is it separate?

8    A    The information is still there in the JPEG file, but in

9    order for us to show the contents of what's in the JPEG file,

10   besides the picture that you've already seen, we need to

11   extract that EXIF data and save it as, in this case, an HTML

12   file, so when you click on it on the screen you can see

13   contents of that information.

14   Q    Showing you Government 504-B. Is this the related EXIF

15   data?

16   A    Yes, it is.

17   Q    And this shows the EXIF photo date time original of

18   November 5, 2005?

19   A    Correct.

20   Q    Now, all of the images in that red binder, all of the

21   images in the V110205, do they have corresponding EXIF data?

22   A    Corresponding?

23   Q    Like, for each of the image files that we looked at that

24   were in the red binder?

25   A    We had EXIF data.

Booth - redirect - Hajjar                    4982

1   Q     They had EXIF data?

2   A     Yes.

3   Q     For each of those did they correspond to November 2nd

4   2005 or November 24th 2005?

5   A     Yes, they did.

6   Q     Consistently?

7   A     Consistently.

8   Q     Notwithstanding difference in the creation date?

9   A     No changes in the date.

10  Q     And notwithstanding the fact that the modified or the

11  access date may be different than that?

12  A     No.

13  Q     Is there any other corroborating information, in your

14  view, as to the date?

15          MR. DEROHANNESIAN:  Object to the form of the

16  question.

17          THE COURT:  Could you -- could you change the

18  question?

19  BY MS. HAJJAR:

20  Q     Is there any other information that you found significant

21  with respect to the date that was -- the EXIF data date?

22  A     Well, the fact that there's so many dates that are in the

23  EXIF data.  Say I did have a modification software, I would

24  have to change quite a bit of dates.  I mean, I would have to

25  go through, you know, a bunch of evidence, number one.  But

SN      OCR      RPR

Booth - redirect - Hajjar                          4983

1    then I have to change -- in EXIF data there are dates all up

2    and down that including zero numbers, models of cameras,

3    things of that nature.  So there's quite a bit of data to go

4    through and when you modify a date and time an EXIF date and

5    time in a JPEG, you take the chance of modifying it to where

6    it destroys the JPEG and that's why adobe likes to make a copy

7    when they wind up changing EXIF data in the file because they

8    don't want to take the risk of actually ruining the JPEG file.

9           So this is one of the reasons why a lot of software

10   don't go in and do a lot of changes to the EXIF data.  Even if

11   you wanted to just change the author, you're taking a chance

12   that you can change the data.

13   Q    What about the folder names themselves?  I know you

14   testify on cross-examination that you're not in the head of

15   the user who had access to these files or who created these

16   folders, but is there any comparison you can make between the

17   EXIF data the filed folders?

18   A    The EXIF data and the file folder names image.

19   Q    The EXIF data for these images are in a folder titled

20   November 24, 2005?

21   A    Yes.

22   Q    And the EXIF data for these images which relate to

23   November 2, 2005 are in a folder with a consistent date and

24   time?

25   A    Yes.

Booth - redirect - Hajjar                    4984

1  Q     And what about the -- I know you don't -- do you have --

2  are you aware of the significance of this first letter in this

3  folder name?

4  A     No, no.

5  Q     But the -- the numbers that remain, 110205?

6  A     That reflects the date.

7  Q     Is that similar to the rest of the letters and numbers

8  you see up that are within this file structure of the Studies

9  folder?

10 A     Yes, it looks like someone put the date and time

11 associated with two letters.

12 Q     I'm going to direct your attention to the bottom of

13 Government Exhibit 550.  The PSA file, did you look at the PSA

14 files associated with each of these images to?

15 A     Yes, I did.

16 Q     Can you talk a little bit about PSA files and what they

17 are?

18 A     They're Photoshop album files and these are files that

19 are generated by Adobe Elements.  I don't know if anyone has

20 ever seen some of the software.  It used to come embedded on a

21 lot of Dell software.  When you used to get a Dell computer

22 you sometimes would get Adobe Elements would come along with

23 it.  But it's a piece of software that can allow you to browse

24 and look at a whole bunch of photos at one time like in Apple

25 and associate music with the album.  It's, like, a digital

Booth - redirect - Hajjar                      4985

1  photobomb of sorts, but just opening up some of the image

2  files in Adobe will start to generate a PSA file like this,

3  and what's interesting about PSA files is they hold a lot of

4  information.  Some of it is your file structure.  What else is

5  in your file structure that's associated with your file

6  itself.  When you open it up, it's like an Excel spreadsheet

7  and you can see all of the files that were associated at that

8  date and time in there.

9  Q    What about the timing of the PSA files as it relate to

10  the original image?

11  A    They match.  They're the same times and dates.

12  Q    So the -- a file created by Adobe matched roughly the

13  EXIF data of the image creation time which, in this case, was

14  2005 throughout?

15  A    Yes.

16  Q    You were asked a few questions on cross-examination about

17  the number of digital items recovered in this case.  Were you

18  the examiner for each of those items?

19  A    For the ones that were listed, I was -- the ones that

20  were listed on the report were put into the -- they were given

21  to me in my training so all of those items were put in and

22  processed.  As far as the ones that we're focused on at this

23  point, it just 1-B-16.

24  Q    And the 1-B-16 is this, again, the digital hard drive

25  that contained the -- the Studies folder that we've been

SN        OCR        RPR

Booth - redirect - Hajjar                    4986

1    talking about?

2    A    Correct.

3    Q    I think you were asked something on cross-examination

4    about significance or evidentiary value of the remainder of

5    the items.  Did you -- did you search these other items, these

6    other items of digital evidence, you personally?

7    A    Not all of them, no.

8    Q    Were the case agents involved in the searches for these

9    items?

10   A    Yes.

11   Q    For items probative into the investigation of the case?

12   A    Yes.

13   Q    The notes you were provided with by Mr. DerOhannesian,

14   those are notes by -- who drafted those notes?

15   A    Virginia Donnelley.  She's a special agent that I'm

16   training.

17   Q    And she is also a CART examiner?

18   A    Yes, she's a CART examiner in training.

19   Q    And I want to talk a little bit about the camera.  I

20   think Stephen Flatley's name came up with regard to the camera

21   and you testified that you examined the camera quite recently;

22   in June of this -- of this year?

23   A    Yes.

24   Q    Did someone -- does another CART examiner examine the

25   camera before you?

1  A    Yes.  Stephen Flatley looked at that camera before me.

2  Q    Did the Government ask you to testify here today and

3  create another report instead of Stephen Flatley?

4           MR. DEROHANNESIAN:  Objection.

5           THE COURT:  Overruled, you may answer.

6  A    Yes.

7  Q    Why?

8           MR. DEROHANNESIAN:  Objection.

9  A    Where --as ITS forensic examiners, we -- as senior

10 examiners we're in demand so we go all over the globe.  We're

11 in constant usage, I guess you would say, and right now

12 Stephen Flatley is out on assignment in Ghana.  So he's not

13 able to be here because he's on operation.

14 Q    Is that why you created another report very recently with

15 respect to the camera?

16 A    Yes.

17          MS. HAJJAR:  No further questions, Your Honor.

18          THE COURT:  Recross?

19 RECROSS-EXAMINATION

20 BY MR. DEROHANNESIAN:

21 Q    You agree that any metadata, whether it's EXIF data or

22 other data can be changed and altered; correct?

23 A    Yes, EXIF data can be altered.

24 Q    And there's a variety of different ways that that can

25 happen; correct?

Booth - recross - DerOhannesian                    4988

1    A    Yes, it can.

2    Q    Companies can remove -- if you send a photo to Facebook,

3    do they take off that data?

4    A    Yes, they actually strip off the data.

5    Q    So Facebook, Twitter that's what they do?

6    A    Yes, they do.

7    Q    And then they use that information for their commercial

8    purposes?

9    A    I wouldn't know.

10   Q    That's another way.  There's commercial processes that do

11   that?

12   A    I would gather.

13   Q    And with respect to Mr. Flatly, I think you said his

14   initials are on here, Exhibit 524 from February 22, 2019;

15   correct?

16   A    Correct.

17   Q    And that's when he first looked at this Exhibit 524;

18   correct?

19   A    All I know is that he received it on that date.  I have

20   no idea exactly what he's done on the camera.

21             MR. DEROHANNESIAN:  Thank you.  I have nothing else.

22             THE COURT:  Anything further?

23             MS. HAJJAR:  Just two questions, Your Honor.

24   FURTHER REDIRECT EXAMINATION

25   BY MS. HAJJAR:

SN        OCR        RPR

Weniger - direct - Penza                          4989

1   Q     Examiner Booth, the images you looked at, do they come

2   from Facebook or another company?

3   A     No, they did not.

4   Q     Where did they come from?

5   A     They came from a Canon camera.

6            MS. HAJJAR:  Thank you, Your Honor.  Nothing

7   further.

8            THE COURT:  Anything further?

9            MR. DEROHANNESIAN:  No, Your Honor, thank you.

10           THE COURT:  All right.  The witness may stand down.

11           You are excused.

12           (Witness excused.)

13           THE COURT:  All right.  The Government may call its

14   next witness.

15           MS. PENZA:  Thank you, Your Honor.  The Government

16   calls Special Agent Michael Weniger to the stand.

17           THE COURT:  Very well.

18           (Witness sworn/affirmed.)

19           THE COURTROOM DEPUTY:  Please state and spell your

20   full name for the record.

21           THE WITNESS:  Michael Weniger, M-I-C-H-A-E-L

22   W-E-N-I-G-E-R.

23           (Continued on the next page.)

24

25

Weniger - direct - Penza                    4990

1   **MICHAEL WENIGER**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5   DIRECT EXAMINATION

6   BY MS. PENZA:

7   Q    Good afternoon Special Agent Weniger.

8   A    Good afternoon.

9   Q    Where do you work?

10  A    I work for the Federal Bureau of Investigation.

11  Q    How long have you worked there?

12  A    About nine years.

13  Q    Are you part of a specific squad?

14  A    I am, yes.

15  Q    And what is that?

16  A    My squad is -- is Criminal 2 or C-2 and we work civil

17  rights, hate crimes and occasionally human trafficking.

18  Q    Can you give us a bit of your background from prior to

19  joining the FBI?

20  A    Sure.  Before coming to the Bureau, I was an officer in

21  the United States Army.

22  Q    And then what did you do there?

23  A    I was an attorney -- I was a JAG, an Army JAG.  I was a

24  prosecutor at one point.  I also did legal assistance and

25  things of that nature.

Weniger - direct - Penza                              4991

1   Q    Why did you -- why did you decide to switch careers?

2   A    To be honest with you, I had always planned to come to

3   the Bureau assuming things worked out, and I was fortunate

4   enough that they did.

5   Q    You went straight from JAG to the Bureau?

6   A    I did, yes.

7   Q    Now, have you been involved in a criminal investigation

8   into the defendant Keith Raniere and others?

9   A    Yes, I have.

10  Q    How long have you been working that investigation?

11  A    Since approximately October of 2017.

12  Q    And what has your role in that investigation been?

13  A    I, along with Special Agent Lever, and Investigator

14  Fontanelli have been the case agents assigned to the case.

15  Q    What does it mean to be a case agent?

16  A    It means we're handling the day-to-day of the

17  investigation; dealing with or interacting with the United

18  States Attorney's Office, conducting surveillance, executing

19  search warrants, executing arrests, you know, receiving

20  records, reviewing records, interviewing witnesses, finding

21  witnesses, all sorts of things.

22  Q    So you've had to deal with me since October of 2017?

23  A    I have been that fortunate, yes.

24  Q    Special Agent Weniger -- one second.  I'm showing you

25  what's in evidence as Government Exhibit 204.  Are you

Weniger - direct - Penza                          4992

1  familiar with this?

2  A    Yes, I am.

3  Q    Okay.  And do you know where this was recovered from?

4  A    I do.

5  Q    Can you just explain?  And I'm going to put it down next

6  to me.

7  A    It was recovered from 3 Oregon Trail in Clifton Park or

8  Waterford -- I believe it's Clifton Park which was the

9  residence of Nancy Saltzman.

10 Q    Did you participate in that search?

11 A    I did not.

12 Q    Why not?

13 A    My wife was due that week and, so, I -- I was under

14 strict towards to stay within a two-hour radius of the

15 hospital.

16 Q    And you followed those orders?

17 A    I did, yes.

18 Q    Have you since reviewed evidence that was recovered from

19 that search?

20 A    I have, yes.

21 Q    And have you reviewed the contents of what's marked as

22 Government Exhibit 204?

23 A    Yes.

24 Q    And can you just explain generally what it is?

25 A    So, there's a number of loose documents located within

Weniger - direct - Penza                                    4993

1    the box and then there's a great deal of -- a large number of

2    file folders each with labels and names on the top of those

3    folders.

4    Q    So we've looked at -- have you been present in court most

5    days?

6    A    I have, yes.

7    Q    So you know that we've looked through a number of those

8    folders at various times?

9    A    Yes.

10   Q    And so just explain kind of what was in the folders

11   generally?

12   A    Sure.  I mean, there were various things but there was a

13   common theme amongst them and there were documents that

14   purported to contain financial information for the individuals

15   that were listed or labeled, found within the label of the

16   file folders.

17   Q    And were you able to categorize -- were you able to put

18   any -- the people who -- an entity that there were folders

19   for, were you able to categorize those into any specific

20   groups?

21   A    Yes.  Throughout the course of the investigation as well

22   as conducting some additional research, I was able to

23   determine kind of what -- what -- kind of what category each

24   individual may have fallen into.

25   Q    And did you prepare a PowerPoint to help -- to help show

Weniger - direct - Penza          4994

1    that to the jury?

2    A    Yes, I did.

3    Q    I'm not going to actually play the PowerPoint.  I'm going

4    to show you slides from the PowerPoint on the ELMO.  I think

5    it will be a little easier for shifting purposes.

6              MS. PENZA:  I should mark this.  I'm sorry, let me

7    ask Mrs. Carby what I should mark it as for identification

8    purposes.

9              (Pause in proceedings.)

10             MS. PENZA:  Your Honor, on consent of the defense

11   I'm going to be showing Special Agent Weniger pages from what

12   has been marked for identification purposes only as Government

13   Exhibit 1830?

14             THE COURT:  1830 for identification.

15   Q    Special Agent Weniger, I'm showing you the first page

16   of -- is this the first page of the PowerPoint presentation

17   you put together?

18   A    Yes.

19   Q    And, so, can you explain were two of the categories that

20   you put people into from the box that we're looking at, local

21   press and national press?

22   A    Yes.  And when I say local press, local to the location

23   upon which the box was and the file folders were located and

24   seized.

25   Q    Can you just walk us through the list, please?

Weniger - direct - Penza                              4995

1    A     Sure.  So the first three -- excuse me, four, names were

2    names that were associated with the Albany Times Union

3    newspaper and the last two names were names of individuals

4    that were associated with Metroland, which is a -- or which

5    was -- I believe it's now defunct, but it was also a

6    periodical in the Albany area.

7    Q     I'm sorry, Special Agent Weniger.

8              MS. PENZA:  May we publish this to the jury on

9    consent of the defense?

10             MR. AGNIFILO:  We consent.

11             THE COURT:  Okay.

12             (Exhibit published.)

13   BY MS. PENZA:

14   Q     And, so, on the left you were walking through the local

15   press?

16   A     Correct.

17   Q     And how about the national press?

18   A     In that regard, those three names were individuals that

19   worked for Forbes magazine.  I should also add that a number

20   of these names were writers that wrote stories that were in

21   relation to or about Mr. -- the defendant and/or Nxivm.

22   Q     Special Agent Weniger, I'm showing you what is a version

23   of what's in evidence as Government Exhibit 608 and this is --

24             MS. PENZA:  Let me put this on the ELMO.

25             THE COURT:  This is for the jury?

SN        OCR        RPR

Weniger - direct - Penza                    4996

1          MS. PENZA:  Yes, Your Honor.

2          (Exhibit published.)

3    BY MS. PENZA:

4    Q    And can you explain what this is?

5    A    This is the Forbes magazine cover that -- I believe that

6    the article has already been discussed to some extent, but

7    that's the cover, the actual cover, of the magazine.

8    Q    Okay.  And the date on this was -- can you see?

9    A    Yes, October 13 of 2003.

10   Q    And is that the -- is that the defendant that's on the

11   cover?

12   A    Yes.

13   Q    Turning to page 88 of the hard copy magazine is that the

14   title of the article, Cult of Personality?

15   A    Yes.

16   Q    And the author's name is Michael Freedman?

17   A    Yes.  Mr. Freedman is one of the individuals that's

18   listed on the PowerPoint that we found a folder in relation to

19   Mr. Freedman.

20   Q    So let's look at Michael Freedman's folder as an example.

21   This is the folder and it says "Michael Freedman"?

22   A    Yes.

23   Q    And, so, can you just walk us through -- is this

24   representative of the types of documents that were inside the

25   folders?

Weniger - direct - Penza                          4997

1    A    Yes, it is.

2    Q    Can you walk us through this document?

3    A    To some extent.  As a general matter, it lists particular

4    banking institutions and it also provides account numbers,

5    indicates the type of account and the account balance as well

6    as the signatory and the beneficiary of those accounts.  There

7    were similar kind of constructs, but there were other -- other

8    similar documents that cited additional information to include

9    account balances as well as initial deposits.

10

11              (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Weniger - Direct - Penza                          4998

1   BY MS. PENZA (Continuing):

2   Q    And then there is information here that says "level one"?

3   A    Yes.  So, there were also -- what we determined was --

4   yes, the levels of the type of searches appears to be on the

5   left-hand side of these types of the document.

6   Q    Okay.  And I'm sorry, did I cut you off?

7   A    No.

8   Q    So, for all of the individuals that are going to be on

9   this PowerPoint, were there either folders or other

10  information about them in Government Exhibit 204?

11  A    That's correct.

12  Q    Let's look at the next page.

13       Are these two more categories of individuals whose

14  information was found in Government Exhibit 204?

15  A    That's correct.  There were folders for these individuals

16  and what were purported to be banking information related to

17  these folks.

18  Q    And can you just walk through them for us?

19  A    Sure.  So, Joseph Bruno, who was a New York State

20  senator; Eliot Spitzer, who at the time was the New York State

21  Attorney General; David Soares, who was the District Attorney

22  in Albany County; Charles Schumer, who is a U.S. senator;

23  Steve Pigeon and Roger Stone, who are both -- I have them

24  listed as political operatives.  They were lobbyists.

25       At one time, I believe Mr. Pigeon was actually a

Weniger - Direct - Penza                    4999

1  politician and had been elected to office.

2  Q    Do you know whether any of these people were working for

3  NXIVM?

4  A    I do.  Well, based upon our investigation, we determined

5  that there were occasions where NXIVM hired these individuals

6  or certainly had communications with them.

7  Q    Not all of them?

8  A    Not all of them.

9  Q    So, which ones on this list?

10  A    Mr. Pigeon, Mr. Stone.  In terms of hiring, I believe

11  it's those two.

12  Q    Did they also work with Mr. Bruno?

13  A    Yes.

14  Q    And now on the right?

15  A    These are the names of four judges, and these are

16  individuals that we were able to determine at one time or

17  another had oversaw cases involving NXIVM and/or the

18  Defendant.

19  Q    So, within Government Exhibit 204 was what was purported

20  to be banking information for these federal judges?

21  A    That's correct.

22          On this --

23  Q    Please, go ahead.

24  A    On this slide, on the left-hand column, these are

25  individuals that had some relationship to the litigation

Weniger - Direct - Penza                                    5000

1   involving Rick Ross, who I believe you heard from yesterday;

2   obviously, Mr. Ross, Rick Ross Institute.  And then Morris

3   Sutton, who was a defendant in that lawsuit.

4          As well, the final name there is Juval Aviv.  Mr.

5   Aviv owned a private investigation firm called Interfor.  That

6   particular firm was hired by NXIVM for purposes of conducting

7   investigations in relation to some of the folks that are also

8   in the file base.

9   Q    And if we look on the next page -- the right-hand side of

10  the same page?

11  A    These are individuals that are associated with Edgar

12  Bronfman.  Edgar Bronfman, obviously, is the first one

13  there -- there's a file folder for him -- as well as Stephen

14  Herbits, who was a witness in this trial, the world Jewish

15  Congress, as well as Israel Singer.  Israel Singer is

16  associated with and at one time was part of the World Jewish

17  Congress, played a role, employed by.

18  Q    Showing you Page 4 of what's marked for identification as

19  Government Exhibit 1830?

20  A    On the left-hand column, that is Kristin Snyder.  Kristin

21  Snyder, I believe we've heard some information in relation to

22  Kristin Snyder during the course of this trial.

23         And then Heidi Clifford.  Heidi Clifford was Kristin

24  Snyder's partner.

25  Q    Just very briefly, Kristin Snyder, your understanding of

LAM        OCR        RPR

Weniger - Direct - Penza                    5001

1   how she relates to this case, without going into too much

2   detail.

3   A    Sure.  Kristin Snyder had taken a number of courses with

4   NXIVM.  And at one point, she was taking a course in Alaska

5   and disappeared, leaving information about what her intentions

6   were.

7   Q    Was she ultimately presumed dead by the State of Alaska?

8   A    Yes.

9   Q    Let me just go back for one second.

10          MS. PENZA:  Your Honor, may I have the Elmo just for

11  Special Agent Weniger for a moment?

12          THE COURT:  Okay.

13  Q    Special Agent Weniger, are you familiar with the document

14  that I'm showing you?

15  A    Yes.

16  Q    And is this the cover page of an *Albany Times Union*

17  article?

18  A    Yes, it is.

19  Q    And can you explain -- and what is the date on this?

20  A    February 12, 2012.

21  Q    And the title is:  Secrets of NXIVM?

22  A    That's correct.

23  Q    Can you just explain -- at some point, did the *Albany*

24  *Times Union* cover the Defendant and NXIVM around that time?

25  A    Frequently.  Before 2012 as well.

Weniger - Direct - Penza                    5002

1  Q    Without going into the details of their coverage, can you

2  just elaborate a little bit more on that?

3  A    The Secrets of NXIVM was a six-part series that the

4  *Albany Times Union* ran, but, again, they had had a number of

5  articles both before and after this particular day.

6  Q    And at this particular point in time, this was the

7  secrets of NXIVM series that were you talking about?

8  A    That's right.

9  Q    And fair to say that the Defendant was on the cover?

10 A    Yes.

11 Q    And it ran for basically the entire week?

12 A    Yes.

13        Actually, I may have been mistaken.  I believe it

14 was a six-part series, but looking at that it may have been a

15 four-part series.  Either way, it was a number of days that

16 coverage was provided.

17 Q    Was the topic of Kristin Snyder something that was

18 covered by the *Albany Times Union*?

19 A    Yes, it was.

20 Q    Just going back to Page 4, can you explain the right-hand

21 side?

22 A    Yes.  Yuri Plyam, as well as Castle Trading, and I

23 believe his spouse Natalia Plyam, were individuals who had

24 business dealings that did not go particularly well with NXIVM

25 as well as the Defendant, and they were involved in litigation

LAM        OCR        RPR

Weniger - Direct - Penza                              5003

1   with -- NXIVM was involved in litigation with Yuri Plyam as

2   well as Castle Trading.

3   Q    Showing you Page 5, can you explain who these people are?

4   A    Sure.  I think as a general matter, all of the

5   individuals -- I shouldn't say that.  The vast majority of the

6   individuals that had folders within the box were individuals

7   that had some type of criticism of NXIVM and/or the Defendant.

8         These individuals, Deke Sharon was an a cappella --

9   he's famous within the a cappella community and at one time

10  was critical of the Defendant; David Touretzky was a professor

11  at Carnegie Mellon who was critical of the Defendant; Toni

12  Natalie at one point in time dated the Defendant and was

13  involved in litigation with him for a significant period of

14  time; Carlos Rueda was, I believe, a psychologist -- he was a

15  psychologist or psychiatrist, but he was cited in a number of

16  newspaper articles providing opinions as to NXIVM and kind of

17  their curriculum and teachings.

18        And then there were folders that bore the names of

19  individuals that were representing NXIVM at some point in

20  time, their own lawyers, as well as the attorneys that

21  represented their adversaries -- when I say "their"

22  adversaries, I mean NXIVM adversaries -- in legal proceedings.

23  Q    Do you know approximately how long ago Toni Natalie dated

24  the Defendant?

25  A    I believe that relationship ended in approximately 1998,

LAM      OCR      RPR

Weniger - Direct - Penza                    5004

1    somewhere in that time frame.  Certainly by the early 2000s it

2    was over.

3    Q    And were any of the individuals who are listed here

4    referenced in the *Forbes* article?

5    A    Yes.  Mr. Rueda being one of them, but I believe there

6    were a number.

7    Q    Turning to Page 90 of the hard copy version of the *Forbes*

8    article, up here is there reference to Toni Natalie telling

9    Forbes that she believes Raniere brainwashed her?

10   A    Yes.

11   Q    And over here, there's a description of a 28-year-old

12   woman, and then it says her psychiatrist Carlos Rueda says in

13   the last three years he has treated two others who have taken

14   a NXIVM class.

15   A    Correct.

16   Q    Those are two individuals whose purported banking

17   information was found in Nancy Salzman's home in this box?

18   A    Yes.

19   Q    In addition to those folders with the banking

20   information, was there anything else of note within Government

21   Exhibit 204?

22   A    I mean, there was quite a bit that was of interest.

23   There was -- it appears that they were able to obtain the

24   state police files in relation to the Kristin Snyder

25   disappearance and later determination that she was deceased,

Weniger - Direct - Penza                    5005

1    there were a number of handwritten notes and things of that

2    nature, and there were also electronic communications that

3    reflected and appeared to be associated with the banking

4    transactions that we've -- not banking transactions, excuse

5    me, banking information that we've taken a look at already.

6    Q    E-mail?

7    A    Yes.

8    Q    Can you -- after seeing that information, did you take

9    any further investigative steps?

10   A    Yes, we did.

11          Again, we reviewed all of the information within the

12   box.  And once we determined that there was some type of

13   connection between the banking information and the electronic

14   e-mail addresses, we requested and received search warrants

15   for two specific e-mail addresses.

16   Q    And what were those two e-mail addresses?

17   A    One being oakhaven.haven@gmail.com, the other being

18   thebeacon2009@gmail.com.

19   Q    And those are already in evidence as Government Exhibit

20   1399 and Government Exhibit 1401, respectively?

21   A    Yes.

22   Q    And did you receive search warrant returns from those two

23   accounts?

24   A    We did.

25   Q    And did you personally review those returns?

Weniger - Direct - Penza                              5006

1    A     I did.

2    Q     Were you able to determine the primary users of those

3    accounts?

4    A     Yes.

5    Q     Can you explain?

6    A     So, for thebeacon2009@gmail.com, the subscriber that was

7    actually listed was an individual by the name of Emiliano

8    Salinas, who was part of the Defendant's inner circle.

9            The oakhaven.haven@gmail.com I believe listed the

10   subscriber as simply oakhaven; however, reviewing the e-mail

11   account it became relatively apparent that the individuals who

12   were using it or was primarily Kristin Keeffe.

13   Q     And was there any interplay between those two e-mail

14   accounts?

15   A     Yes, there were communications between those two accounts

16   and they were consistently corresponding with one another.

17   Q     Can you just give us a very high level overview of what

18   you found through your analysis of those two accounts?

19   A     Well, the oakhaven account being used by, primarily,

20   Kristin Keeffe was what was utilized in order to acquire the

21   purported banking information that is found within the hard

22   copy files in 1B53, which is -- I forget the Government

23   exhibit number that you're looking at, but the box that is

24   sitting next to you.

25   Q     Government Exhibit 204?

LAM     OCR     RPR

Weniger - Direct - Penza                    5007

1   A     Yes.

2         And that information was then -- was often just

3   used, but then there was communications between oakhaven.haven

4   as well as thebeacon2009 e-mail account in order to what

5   appears to be verify the information that was being received,

6   the banking information that was being received from an

7   outside source, which we determined to be a private

8   investigation firm that's located in Canada.

9   Q     And what is the name of that firm?

10  A     Canaprobe, which is owned or was owned -- it may still be

11  in existence, I'm not quite sure, but was operated by an

12  individual named Richard Marier.

13  Q     Now, as part of this PowerPoint did you put together

14  e-mails and other portions of these two accounts to kind of

15  walk the jury through how these accounts were used?

16  A     I did.

17  Q     So let's look at Government -- at Page 6 of what's marked

18  for identification purposes as Government Exhibit 1830.

19        Can you explain what this is?

20  A     Sure.  As mentioned a little bit ago, the oakhaven.haven

21  account was often utilized in order to contact Richard Marier,

22  who was operating the private investigation firm in Canada

23  called Canaprobe.  And this is a reflection as to the type of

24  requests that would be made by, again, what we deemed to be

25  Kristin Keeffe using the oakhaven.haven e-mail address to

Weniger - Direct - Penza                              5008

1   request the particular banking information from the private

2   investigation firm.

3              And in this instance -- oftentimes she would attach

4   or attached to these e-mails would be spreadsheets, but in

5   this instance in the body of the e-mail maple it just shows

6   how the request would be made and it would provide what we

7   would call pedigree or biological information or kind of just

8   particular information that's relevant to the individual and

9   may be of assistance to the private investigation firm in

10  terms of identifying their bank account.

11  Q    So, here this is for Carlos Rueda?

12  A    Yes.

13  Q    So, there is an address, a date of birth, his license

14  number, and his position as chairman of the department of

15  psychiatry at Our Lady of Mercy Hospital in New York City?

16  A    Yes.

17  Q    As well as some other information?

18  A    Yes.

19  Q    So, that information is sent by oakhaven.haven@gmail.com

20  to Richard Marier?

21  A    Yes.

22  Q    Then what is this next page?

23             This is Page 7 of what's marked for identification

24  as Government Exhibit 1830.

25  A    This is just a reflection of what would oftentimes come

LAM      OCR      RPR

Weniger - Direct - Penza                              5009

1    back, the type of information that would be received.  So, in

2    this instance, for purposes of Mr. Rueda, it reflects that

3    there was a Safra Bank account, it has the account number, and

4    it indicates the date it was open as well as the initial

5    deposit.

6              So, this is just, again -- we've reviewed kind of

7    one of these, these type of documents already, but I just

8    included this to try to show the jury the type of document

9    that would be received back.

10   Q    So, fair to say for all of these documents which look

11   similar, there would be this request and then receipt of

12   information?

13   A    Yes, that's right.

14   Q    And you would see it in both the e-mail account and in

15   Government Exhibit 204?

16   A    Yes, the hard copies.

17   Q    And it says at the bottom:  Investigate further accounts

18   and levels at your discretion.

19   A    Yes.

20   Q    And this is another page?

21   A    Yes, it is.

22   Q    And this says:  Inadvertent or deliberate premature

23   disclosure of or informal attempts to validate this

24   information is likely to fatally compromise the continued

25   existence of this information, may result in civil and/or

Weniger - Direct - Penza                    5010

1  criminal liability, and must be strictly and absolutely

2  avoided.

3  A    Yes.

4  Q    Was that at the back of most of these returns that were

5  received?

6  A    I think most of them, yes.

7  Q    Can you explain what this is?

8  A    A lot of times, this is just a reflection of what would

9  be received in response.  So, two slides back, I believe, or

10 three slides back was the request.  This slide shows the

11 response and how it's received.  And, so, oftentimes it would

12 come in via fax, and that fax would be sent to the e-mail

13 account of oakhaven, and that, again, being an account that we

14 believe to be associated with Kristin Keeffe.

15 Q    Now, in your review of the oakhaven account, were you

16 able to determine who was paying for Canaprobe?

17 A    Yes, we were.

18 Q    And who was that?

19 A    Clare Bronfman.

20 Q    Showing you what's Page 10 of Government Exhibit 1830,

21 marked for identification, can you explain this?

22 A    Sure.  So, what's highlighted here and the reason I

23 identified this particular e-mail was because it reflects the

24 individual that was receiving the invoices.  And, so, we saw a

25 number of these types of e-mails, but this particular one was

LAM        OCR        RPR

Weniger - Direct - Penza                          5011

1    sent directly to Ms. Bronfman.

2            And it does reflect some of the names I think that

3    we've already discussed early on in terms of the names of the

4    file folders.  So, here you see Plyam, you see Ross,

5    presumably Rick Ross -- Yuri Plyam being the other one -- and

6    then O'Hara, which is a name that -- there were also documents

7    associated with O'Hara, Joseph O'Hara, in the file box.

8    Q    Just to be clear, this is an e-mail from Richard Marier,

9    richard@canaprobe.com, to clarewebb21@aol.com?

10   A    That's right.

11   Q    Do you know that to be an e-mail address associated with

12   Clare Bronfman?

13   A    I do, yes.

14   Q    And it's copying oakhaven.haven@gmail.com?

15   A    Yes.

16   Q    It says:  Hi.  I hope you are well.  The invoice for

17   services rendered addressed to Ms. Bronfman will be in the

18   amount of $39,750.

19            Is that right?

20   A    That's correct.

21   Q    As agreed, no hard copy will be made and it will not be

22   detailed.

23            And then it breaks down the invoice.

24   A    Yes.

25   Q    So, it says 53 searches at $750, $39,750?

Weniger - Direct - Penza                          5012

1    A     Yes.

2    Q     So, fair to say it looks like each search cost $750?

3    A     Math is not my forte, but that would appear correct, yes.

4    Q     And just to -- so, some of these e-mails that we're

5    looking at, were there also copies of the same -- some of the

6    same e-mails in Government Exhibit 204?

7    A     Yes, that's how we identified the e-mail addresses that I

8    indicated we requested search warrants for.

9    Q     So, as we're going through this PowerPoint, the e-mails

10   are either in Government Exhibit 204 or in 1399 or 1401, all

11   of which are in evidence?

12   A     Yes, yes.

13   Q     Now, is this an e-mail sending another invoice?

14   A     Yes, I think the next few slides reflect that.

15         So, this just indicates that there's an invoice,

16   but, in this instance, the invoice is being sent to oakhaven,

17   as opposed to Clare Bronfman; however, the invoice or at least

18   the PDF attached to it was in the name of Clare Bronfman.

19   Q     And the attachment says Bronfman3950, correct?

20   A     Yes.

21   Q     And this was the invoice?

22   A     Yes, that's right.

23   Q     This is September 11, 2009?

24   A     Yes.

25   Q     And customer, Bronfman?

Weniger - Direct - Penza                              5013

1   A     Yes.

2   Q     Ms. Clare Bronfman?

3   A     That's correct.

4   Q     In Clifton Park, New York?

5   A     Yes.

6   Q     And then it's not a detailed invoice; is that fair to

7   say?

8   A     Simply services rendered, yes.

9   Q     It says services rendered and then it says $134,250?

10  A     That's correct.

11        THE COURT:  Are you aware of how much money

12  Ms. Bronfman paid in all to this investigative firm?

13        THE WITNESS:  Your Honor, I have a general idea.  I

14  believe that it was upwards of $400,000.

15        THE COURT:  Okay.  Thank you.

16        MS. PENZA:  Thank you, your Honor.

17  Q     And October 29, 2009, is this another invoice?

18  A     Yes, it is.  And I --

19  Q     I'm sorry.

20  A     We'll see it on the next slide.

21        I pulled this particular slide or I created this

22  particular slide because this one does provide at least a

23  little bit more detail in relation to the services that were

24  rendered.  So, as you can see on the left-hand side, it

25  reflects that banking sweep services in relation to Rick A.

LAM      OCR      RPR

Weniger - Direct - Penza                          5014

1    Ross and Al were conducted.

2    Q    Again, it's to customer Clare Bronfman?

3    A    Yes.

4    Q    And it's:  Re:  Rick A. Ross?

5    A    Yes.

6    Q    And this is March 3, 2009?

7    A    That's correct.

8    Q    And, so, did this repeat throughout the oakhaven account,

9    both these requests and returns and invoices?

10   A    Yes.

11   Q    You reviewed the whole account?

12   A    I did, yes.

13   Q    Now, did you make this slide that explains the interplay

14   between the oakhaven and thebeacon2009 accounts?

15   A    I did, yes.

16   Q    I'm going to put that down, and this is Page 15 of

17   Government Exhibit 1830, what's marked for identification as

18   Government Exhibit 1830.

19           Can you just explain?

20           And if it's helpful to walk through what you've

21   written, feel free toe do so.

22   A    Certainly.

23           So, there was -- what we found, before I kind of get

24   into the slide, what we found was that the information being

25   received from Canaprobe was then being vetted and/or verified

1    through communications that were between NXIVM or Kristin

2    Keeffe and another private investigation firm; however, there

3    were layers of communication between Kristin Keeffe and that

4    private investigation firm.  But the account information that

5    NXIVM was receiving from Canaprobe was being forwarded down

6    the chain and vetted.

7           So, the first bullet there just reflects that a

8    request would be sent with similar names and account

9    information that was being received from Canaprobe and that

10   information was being sent to thebeacon2009 account, which was

11   being used by Emiliano Salinas.  In turn, Emiliano Salinas or

12   that account was forwarding the requests to an individual by

13   the name of Federico Valenzuela Pena at Vinko Capital.

14   Q    Do you know where that's located, Vinko Capital?

15   A    I believe Mexico.

16   Q    Okay.

17   A    And then we were able to determine that Pena was

18   forwarding those requests to an individual named James

19   Mulvaney and Mulvaney was acquiring information, the requested

20   information.

21          Once that information was received, it was then

22   forwarded back up that chain as a general matter.

23   Q    So, it goes from Kristin Keeffe to Emiliano to Frederico

24   Pena to Mulvaney and then back up the chain from Mulvaney to

25   Pena to Emiliano Salinas back to Keith?

Weniger - Direct - Penza                    5016

1   A    It appears so, yes.

2   Q    In your training and experience, do you have any

3   understanding as to the reason for all of these levels?

4   A    It certainly seemed as though it was an effort to, you

5   know, skew the source and kind of create some various layers

6   to the requests, information requests.

7   Q    By "skew," does it mean it's harder to kind of trace the

8   source?

9   A    Yes.

10       MR. AGNIFILO:  Your Honor, I'm sorry, I'm going to

11  object to this testimony, your Honor.

12       THE COURT:  You can cross-examine on it.

13       Continue.

14  Q    Mr. Mulvaney, where is Mr. Mulvaney located?

15  A    It appears that he was located in New York.

16  Q    Is there any reason that you know of why the requests

17  would have to go from Kristin Keeffe in Albany to Mr. Mulvaney

18  in New York City by way of Mexico?

19  A    Not that I know of, no.

20  Q    So, then, can you explain what happens after that?

21  A    Once the information is acquired, it appears to move back

22  up that chain and eventually ending up in response e-mails

23  from Emiliano Salinas to Kristen Keeffe as well as, at least

24  in some instances, the Defendant and Nancy Salzman.

25       (Continued on the following page.)

Weniger - direct - Penza                    5017

1   EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    Okay.  We'll go into detail later, but was there any

4   other evidence that the information would be given to the

5   defendant?

6   A    Could you clarify?  I'm sorry.

7   Q    And rather than just looking at The Beacon account and

8   looking at Government Exhibit 204, reviewing the other

9   evidence in this case, were there other indications that the

10  information from Canaprobe went to the defendant?

11          MR. AGNIFILO:  I object to the form of the question.

12          THE COURT:  You may answer.

13  A    Yes, I mean I think there were.  There were outside

14  e-mails, if that's what you're referring to.

15          There were e-mails that were -- that reflected that

16  the defendant was aware of Mr. Marier, Canaprobe, and he

17  specifically discusses with Kristin Keeffe the relationship

18  that NXIVM had with -- with Canaprobe.

19  Q    Anything else we need to go over on this slide?

20  A    No, I don't believe so.

21  Q    Now, showing you page 16 of what's marked for

22  identification as Government Exhibit 1830, and can you explain

23  this page, please?

24          (Exhibit published.)

25  A    This is just the subscriber information that we received

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5018

1    in relation to the search warrant for TheBeacon2009@gmail.com.

2              And, again, it reflects that the individual or

3    subscriber is Emiliano Salinas and it also reflects, I

4    believe, an e-mail address -- yes, recovery e-mail as

5    EmilianoSalinas@gmail.com.

6    Q    That's right there (indicating)?

7    A    Yes.

8    Q    Okay.  So name Emiliano Salinas and recovery e-mail

9    EmilianoSalinas@gmail.com?

10   A    Yes.

11             It's also worth noting there on -- that this

12   particular account was created on June 12th of 2009, and that

13   surrounds the same time period that -- that these

14   communications were had -- were occurring.

15   Q    Thank you.

16             Showing you page 17 of what's marked for

17   identification as Government Exhibit 1830.

18   A    Yes.

19             (Exhibit published.)

20   BY MS. PENZA:

21   Q    Can you explain what this is?  I'll show you the

22   left-hand side first.

23   A    So this is -- this is a request for information.  And

24   this identifies bank accounts that I believe were received or

25   banking information that I believe was received by Kristin

Weniger - direct - Penza                        5019

1   Keeffe at the Oak Haven address from Canaprobe, and then it

2   also reflects account numbers.

3           As I said at the beginning, what it appeared to be

4   happening was Kristin Keeffe was receiving information from

5   Canaprobe, banking information from Canaprobe, and then

6   attempting to verify that information through a separate

7   private investigative firm.  This e-mail reflects that the

8   banking information received from Canaprobe was then sent to

9   Emiliano Salinas starting the chain to get to the next private

10  investigator to verify.

11  Q    Okay, so let's just look at a few things.

12          So the date of this e-mail is June 13th, 2009?

13  A    Yes.

14  Q    So that's the day after the account was created?

15  A    Yeah.  I believe so, yes.

16  Q    And the subject line is "19 total love your e-mail

17  address..."?

18  A    Yes.

19  Q    And then let's just walk through some of the names.

20          Are these names that are similar to the names that

21  we saw in the box?

22  A    That's correct, yes.

23  Q    So we see Rick Ross Institute, Rick A. Ross, and Harry

24  Separpho, do you know who that is?

25  A    I do not.

SAM        OCR        RMR        CRR        RPR

Weniger - direct - Penza                    5020

1    Q     Deke Sharon, do you know who that is?

2    A     Yes, he's the --

3    Q     You mentioned him?

4    A     He is a prominent name, apparently, in the acapella

5    world.

6    Q     Okay.  And we won't go through all of them, but we see

7    Joe O'Hara, Chet Hardin, and there are multiple -- for some of

8    these people appear twice.  So there's, I guess, Citibank

9    Bahamas for Rick A. Ross Institute and then a UBS Geneva for

10   Rick Ross Institute?

11   A     Yes.

12   Q     And then Chet Hardin, Dennis Yusko, Joe O'Hara, Kristen

13   Snyder?

14   A     Yes, correct.

15   Q     And then showing you slide 18, this is the forward to

16   Federico Pena that you described?

17   A     Yes.

18   Q     So this is the same e-mail we just looked at; is that

19   right?

20   A     It's the same e-mail with the exception of the sender and

21   the recipient.

22   Q     Okay.  So if we look up here (indicating), so this was --

23   this was Oak Haven to The Beacon on June 12th, 2009, the 19

24   total love your e-mail address?

25   A     Correct.

Weniger - direct - Penza                          5021

1   Q    And then it's forwarded by TheBeacon2009@gmail.com to

2   Federico Pena, the next day?

3   A    Yes.

4   Q    Showing you slide 20.

5            (Exhibit published.)

6   A    I simply included this slide because it appears that the

7   original list was paired down by -- by the Oak Haven address.

8   So they just kind of limited the number of names and banking

9   information that they were requesting.

10  Q    And it says six most important?

11  A    Yes.

12  Q    Including Rick Ross and Joe O'Hara and Kristen Snyder?

13  A    Correct.

14  Q    And was that also forwarded to Mr. Pena?

15  A    It was, yes.

16  Q    I don't speak Spanish, but do these seem to be saying

17  they're the most important ones?

18  A    He seems to be, yes.

19  Q    You do speak a little Spanish, is that right?

20  A    Very minimal.

21  Q    I am showing you slide 22.

22           (Exhibit published.)

23  Q    And can you explain this?

24  A    So I included this particular slide just to show that --

25  that Kristin Keeffe was aware that the -- these e-mails were

Weniger - direct - Penza                        5022

1   being forwarded.

2          It simply just reads:  Okay, data forwarded to the

3   pertinent person.  Love E.

4          And I included this e-mail simply to show that the

5   forwards -- not only were the forwards happening, not only was

6   the information that Kristin Keeffe was providing to Emiliano

7   Salinas being forwarded by Emiliano Salinas, but that Kristin

8   Keeffe was aware of it.  And -- and that is seen by virtue of

9   the -- the fact that, you know, it's being -- the content of

10  the e-mail, itself.

11  Q    And showing this e-mail from Federico Pena to Emiliano

12  Salinas.

13          (Exhibit published.)

14  Q    Can you just generally what this is?

15  A    So this is the information that was being received back

16  from Mr. Pena.

17  Q    And this would be the information?

18  A    That's the type of information that was being received in

19  response.

20  Q    Okay.  So there would say, that's an example where it

21  says Chet Hardin, is that right?

22  A    Correct.

23  Q    And provides that information?

24  A    Yes.

25  Q    And would he actually send screenshots?

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5023

1    A     These are -- these are pulled from the actual e-mails,

2    yes.

3    Q     Page 24, is this -- ah, yes.

4    A     I included these -- I'm sorry.

5    Q     Nope, go ahead.

6    A     I included this particular e-mail because not only was

7    the information being forwarded to the Oak Haven e-mail

8    address, but it was also being sent to an e-mail address

9    associated with the defendant.

10   Q     Okay, so this was an e-mail sent directly from The Beacon

11   2009 to both the Oak Haven account, which is Kristin Keeffe

12   and KeithRaniere@yahoo.com?

13   A     Yes.

14   Q     And this is Pena's information being forwarded by

15   Emiliano to them?

16   A     That's correct, yes.

17   Q     Okay, I am showing you this e-mail.  This is page 25 of

18   the exhibit.  It's referring to Government Exhibit 1399 at

19   page 100.

20              (Exhibit published.)

21   Q     Can you explain this?

22   A     Well, as I mentioned it, in terms of the overall premise

23   or what I believe to be the premise as to what was being done,

24   this e-mail kind of demonstrates that to some extent.  I can

25   read the content.

Weniger - direct - Penza                          5024

1   Q     Yes, please do.

2   A     This is the one that bounced yesterday.  It wasn't the

3   Luxembourg one, but the Citibank Bahamas one -- in parentheses

4   -- (Rick Ross Institute.)  This is a commercial bank and my

5   friend is of the opinion that this is a checking account.

6   Apparently, the account exists and everything matches, so

7   either it's closed or the recipient did not accept the funds.

8   (He says probably the second one.)

9   Q     And did the defendant reply to that e-mail?

10  A     He does reply to particular e-mails.  I'm not quite sure

11  if it was this e-mail or not.

12  Q     Well, let me show you the next slide.

13            Is this the response from the defendant?

14            (Exhibit published.)

15  A     Yes, it is.

16  Q     And so how did the defendant respond?

17  A     I did not receive the image with this...  Only a blank...

18  Q     But he is responding, acknowledging receipt of this

19  e-mail?

20  A     That's why I included it, yes.

21  Q     Showing you slide 27.  And this is referencing Government

22  Exhibit 1399, Page 116.

23            (Exhibit published.)

24  BY MS. PENZA:

25  Q     Go ahead, please.

1  A    This entire e-mail is relatively relevant.  However, I

2  did pull a particular line out, and that does -- that -- that

3  is in relation to kind of the purpose behind this or what I

4  believe to be.

5  Q    So let's go through the e-mail and maybe I should get --

6         MS. PENZA:  Sorry, one second, Your Honor.

7         (Pause.)

8  Q    We can start reading.  I just noted that part of it will

9  be cut off at the end.

10  A    Sure.

11         Would you like me to start reading?

12  Q    Yes, please.

13  A    Dear K.  Again, this is an e-mail from Emiliano Salinas

14  sent on July 6th, 2009 to Keith Raniere, the Oak Haven e-mail

15  address, which we believe to be associated with Kristin Keeffe

16  and to Nancy@nxivm.com, which we believe to be associated with

17  Nancy Salzman.  The subject being a forward:  Records.

18  Q    I am actually just going to swap this out for a second so

19  that you have the full e-mail in front you, courtesy of

20  Mr. Agnifilo.

21         (Exhibit published.)

22  A    Dear K.  Here is an update on the legal projects I am

23  involved in.

24         With respect to the info on the Luxembourg bank and

25  Ross' personal account there.  This is a privately owned bank

Weniger - direct - Penza                    5026

1   specializing in private banking and wealth management that is

2   of difficult access, especially for someone with the profile

3   of the person we are investigating, or rather very in line

4   with his profile (professional defrauder and blackmailer.)  My

5   friend is of the opinion that due to the type of bank this is,

6   the amount deposited is probably not small and something he

7   probably wants to keep out of reach and knowledge.

8   (Luxembourg is a semi-regulated fiscal paradise that asks very

9   few questions when it comes to the origin of funds.)  He is

10  looking for more detailed information.

11            Next paragraph.

12            That is the only refund that has not bounced yet.

13  On Friday we sent a request for confirmation that the funds

14  arrived in the account.  It can take up to 21 days for that

15  confirmation to happen.

16  Q    Okay, so let me stop you there.

17            Can you explain what your understanding is of the

18  first two paragraphs?

19  A    My understanding, and, again, my limited understanding,

20  but what it does appear is happening is that certain small

21  amounts or, what I would say, kind of testers are being sent

22  to the accounts that have been identified by Canaprobe to

23  determine whether, in fact, they are accounts associated with

24  the people that Canaprobe claims that they are associated.

25  Q    And let me just ask you at this point:

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5027

1          Do you know whether all of this information that
2    Canaprobe was actually providing was, in fact, true
3    information?
4    A    Do I -- do I know whether it was true?
5    Q    Yes.
6    A    I believe the vast majority, if not all of it, was not
7    true, but I'm not certain.
8    Q    Okay, there ended up sometime -- is it fair to say
9    sometime later there ended up being a dispute about whether
10   this was real information or not?
11   A    Correct.
12   Q    Is your impression at this time -- what is your
13   impression at this time about whether the -- I'm sorry.
14          Based on your review of the documents, were you able
15   to glean an understanding of whether the participants at this
16   time believed that the information from Canaprobe was true?
17   A    Well, they certainly -- it -- the documents reflect that
18   they seemed to believe it was.  However, they also were,
19   again, conducting verification-type activities to determine
20   whether it was true.  In my review.
21   Q    They were -- is it your understanding from your review
22   that they were seeking real banking information on these
23   individuals?
24   A    Absolutely.
25   Q    Okay, so can you just continue, please?

Weniger - direct - Penza                    5028

1   A    With respect to the legal cases, here is an update of

2   where we stand.  O'Hara, I sent a list of questions to Kristin

3   to clarify some points that are needed to determine if we can

4   proceed legally against him in Mexico.  I --

5   Q    Let me just stop you right there.

6            What is your understanding of that?

7   A    I mean we have seen that NXIVM was -- was attempting to

8   take legal action, both civil and criminally, against

9   defectors and critics in Mexico.

10  Q    Now this was in 2009, is that right?

11  A    That's correct.

12  Q    Was that practice something that was limited to 2009?

13  A    No, it was not.

14  Q    Do you know whether there were any indications of that

15  recently?

16  A    Yes.  In regards to -- to DOS, I think we saw it with Jay

17  as well, and also some additional folks, not to just simply

18  include Jay.

19  Q    Can you continue?  I'm sorry for interrupting you.

20  A    You didn't interrupt.  I'm done.

21  Q    Oh, I'm sorry, continue reading.  I interrupted your

22  reading.

23  A    Barbara, the lawyers say that it is possible to sue here

24  in Mexico (in Monterey specifically since Edgar has his

25  residence there) for blackmail.  He will sent me an

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5029

1    appropriate cost by the end of the week (Friday, July 10th.)

2    Q    Do you have an understanding of who the "Barbara" is

3    there?

4    A    I suspect that this is Barbara Bouchey, yes.

5    Q    Based on your investigation and your experience in this

6    case, do you know of any relationship between Barbara Bouchey

7    and Edgar Bronfman?

8    A    I believe this is a reference to Edgar Bronfman.

9    Q    Oh, excuse me, sorry.

10           And then can you continue after here (indicating)?

11   A    He -- he will send me an appropriate -- an approximate

12   cost by the end of week (Friday, July 10th.)

13           Ross, et al.  The lawyers are still trying to figure

14   out how to legitimize the banking information we have in the

15   Ross, et al case in case we need our lawyers in Albany to

16   present it.  This is still pending.

17   Q    Okay, now, that I think was the part that you had called

18   out in the PowerPoint?

19   A    Correct.

20   Q    And why was that?

21   A    Because it's in relation -- it appears that it's in

22   relation to the banking information that -- that they were

23   receiving from both Canaprobe and other sources.

24   Q    And so from your review of these documents and others,

25   did you have an understanding of whether there was any --

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5030

1   whether lawyers in Albany were -- were aware of the details of

2   what was happening with the Canaprobe -- with Canaprobe?

3   A    I believe they were, yes.

4   Q    In Albany?

5   A    Yes.

6   Q    And then there is -- then it continues on.  And can you

7   explain this e-mail?

8   A    I just included this.  It does include -- the "to" line

9   includes the defendant, as well as an e-mail address

10  associated with Nancy Salzman, as well as Kristin Keeffe.

11        And I included it simply because it discusses

12  compensation or what -- what was being quoted to -- to those

13  three individuals, or at least the people you see in those

14  accounts.

15  Q    Okay, so these were accounts, though, that you were

16  familiar with, correct?

17  A    Yes.

18  Q    Okay.  So Emiliano to the defendant, Nancy and Kristin

19  Keeffe at the Oak Haven account?

20  A    Yes.

21  Q    And it says here:  The quotes from our friend.  I'm

22  translating and explaining his e-mail.

23        The cost for each operation is $1,200 for the first

24  operation in a given U.S. state, plus 300 to 600 depending on

25  the bank per additional operation in the state; and then there

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5031

1   is a price of 3,000 for the Bahamas and 4,000 for Europe and

2   the amount of time it will take?

3   A    That's right.

4   Q    Okay.  And this is an e-mail from Jim Mulvaney to

5   Federico Pena?

6              (Exhibit published.)

7   A    Yes.  I think the full e-mail is below it, but this kind

8   of completes the link between, or at least the chain.

9              Obviously, we were able to acquire Mr. Salinas's

10  e-mail, as well as the e-mail associated with Kristin Keeffe.

11             We weren't able to or we did not request a search

12  warrant for purposes of the e-mail account of Mr. Pena.

13  However, I included this, and this is included in the forward,

14  just to show -- show that Mr. Mulvaney was the end kind of --

15  was the end recipient of the request.

16  Q    And it says:  If the operatives simply visit the

17  institutions demanding immediate response, they may find

18  themselves being served by bankers less experienced who will

19  not take the time to carefully evaluate the records to

20  identify the useful information.  A quick answer is not always

21  the right answer?

22  A    Yes.

23  Q    Were they looking -- do you know whether they were

24  looking to go to specific people?

25  A    I don't.  I mean what I can say is that it appears that

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5032

1   they were -- they were using banking insiders in order to

2   acquire information.  That's what it appears.  I can't say

3   that definitively.

4   Q    Are you aware of another way that that information could

5   have been provided?

6   A    Another way that what information?

7   Q    That information would have been provided other than a

8   bank insider, if it were true?

9   A    I mean through a legal process.

10  Q    But without, outside of legal process?

11  A    (No response.)

12  Q    Outside of a subpoena or search warrant?

13  A    No, I don't -- I don't believe so.

14  Q    And is this the full chain that you were talking about?

15              (Exhibit published.)

16  A    It is.  So this, again, the relevance here is that it

17  shows the -- the line of communication or the chain of

18  communication, and it also includes the e-mail account for the

19  defendant.

20  Q    So Federico Pena forwards that e-mail from Jim Mulvaney

21  to Emiliano Salinas at The Beacon 2009 and says:  I'll reply

22  as soon as you tell me.

23              And then Emiliano forwards that to the defendant and

24  to Kristin Keeffe and says:  Apparently, there was another

25  misunderstanding.  This is Jim 's reply to our mail asking for

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5033

1    the results?

2    A    Yes.

3    Q    And is this an e-mail from -- this is slide 32 and it

4    references Government Exhibit 1399, page 158.

5            And this is from Emiliano Salinas to the defendant,

6    is that right?

7    A    Yes.

8    Q    It says:  Here is the name and position of Jim.  Check

9    out these links to have more data on who he is.  Love, E?

10   A    That's correct.

11   Q    And were these -- did you -- did you check out these

12   links?

13   A    I -- I tried to, yes.  I think I did.  Yes, I did.

14   Q    And you ended up -- you explained earlier who Jim

15   Mulvaney is?

16   A    Yes.

17   Q    Slide 33, and this references Government Exhibit 1399,

18   page 169.

19           (Exhibit published.)

20   Q    This is --

21   A    So if you -- if you -- if you take a look at the bottom

22   of the e-mail or, excuse me, the document, you will see that

23   that's the beginning of the -- the original e-mail we were

24   discussing where Mr. Mulvaney speaks of -- of banking

25   insiders.

Weniger - direct - Penza                    5034

1          There's additional pages to this particular e-mail,

2     but it is a forward of that -- of that -- that e-mail, the

3     banking insiders e-mail, which goes up and -- and through

4     Mr. Salinas and eventually gets to Oak Haven, as well as the

5     defendant.

6          I pulled this particular e-mail because of Kristin

7     Keeffe's response; and that response being:  Never send to

8     Keith.  Ever.  Please don't forget this again.  XO.

9

10          (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                         5035

1    BY MS. PENZA:   (Continuing.)

2    Q    Are you aware of communications between Kristin Keefe and

3    the defendant about this process?

4    A    Yes.  I mean, he's on prior e-mails in relation to it.

5    Q    And is he on other e-mails as well?

6    A    Yes.

7    Q    And, so, this was the e-mail we just looked at.  This was

8    the one that was forwarded to the defendant and then, fair to

9    say, here Kristin is telling Emiliano "never send to Keith

10   ever"?

11   A    That's right.

12   Q    Last -- lastly, showing you slide 34 and this is a

13   reference to Government Exhibit 1399 at page 194.  And this is

14   from Emiliano to Kristin at the Oak Haven account and the

15   subject line is, "Judicial order in Mexico.  Hey, K, we are

16   moving on and trying to get a judicial order in Mexico on the

17   Ross case.  Could we have a talk about the potential charges

18   that will be involved?  I will call you later.  Take care, E."

19   A    Yes.

20   Q    Remind us, who -- what is Emiliano Salinas' position in

21   Mexico?

22   A    He's the son of a former president in Mexico.  He's also

23   Harvard-educated.  He's a bright man and played a large role

24   in both Nxivm/ESP Mexico as well as Nxivm/ESP in the United

25   States.

SN      OCR      RPR

1    Q    Were there -- within the e-mails that you -- I think

2    that's the end of your PowerPoint, but within the e-mails that

3    you reviewed was there ever discussion of different levels of

4    information?

5    A    There were, yes.  So Cannaprobe would send -- and we

6    referenced to one at a certain point, but the banking

7    documents and the requests often were made for purposes or by

8    Kristin Keefe for level one or level two or level three or

9    level four information.  I wasn't initially aware as to what

10   that was, but what it appeared is that, depending upon kind of

11   the specificity and, I guess for lack of a better term,

12   intrusiveness of the requested information, the level -- the

13   levels would increase.  I believe the price would also

14   increase, too.

15              MS. PENZA:  Your Honor, at this time the Government

16   moves into evidence Government Exhibit 1822 without objection,

17   I believe.

18              MR. AGNIFILO:  Correct.

19              THE COURT:  1822 is received in evidence.

20              (Government Exhibit 1822 received in evidence.)

21              (Exhibit published.)

22   BY MS. PENZA:

23   Q    Special Agent Weniger, I'm showing you what's marked in

24   evidence as Government Exhibit 1822.  And it's a 22-page

25   document.  Are you familiar with this?

Weniger - direct - Penza                    5037

1  A    Yes, I am.

2  Q    And the final -- and this is a long e-mail chain?

3  A    It is.

4  Q    And who is this e-mail chain between?

5  A    Kristin Keefe and the defendant.

6  Q    And this e-mail chain, it begins on August 26, 2009?

7  A    Yes.

8  Q    And, so, the e-mail we looked at from Kristin Keefe to

9  Emiliano saying, "Never to send the information to Keith,"

10 that was on August 30, 2009?

11 A    Correct.

12 Q    So right in the middle of this chain?

13 A    Yes.

14 Q    Let's walk through some of this.  So, starting --

15 starting at the bottom of page 21 is there an e-mail from the

16 defendant to Kristin Keefe saying, "What's going on with

17 Richard.  Write back so I know you received this"?

18 A    Yes.

19 Q    And from your review of this chain, is it clear to you

20 who Richard is?

21 A    It appears to be Richard Marier from Cannaprobe.

22 Q    And then Kristin writes back, is that correct?

23 A    Yes.

24 Q    And then the defendant writes, "What did he say about the

25 two-level explorations that came in, et cetera?

SN       OCR       RPR

Weniger - direct - Penza                          5038

1   A    Yes.

2   Q    And this discussion of the two levels, two-level, is

3   that -- is that what you were explaining before?

4   A    Yes, correct.

5   Q    And so there's different levels of how much information

6   you're going to get or it appears?

7   A    It appears so, yes.

8   Q    And on August 26, 2009, does the subject line switch to

9   Happy Birthday?

10  A    It does, yes.

11  Q    Is that the defendant's birthday?

12  A    Yes.

13  Q    From this chain, are you able to tell where the defendant

14  and Kristin Keefe are?

15  A    Yes, they're at Vanguard Week at a lake.  I believe Lake

16  George.

17  Q    We won't go through all of this.  On August 26, 2009

18  there's more back and forth and then she asks the defendant to

19  call her and says, I have news from him on a related matter

20  and this is another what gives with Richard."

21       So that's in response to what gives with Richard

22  from the defendant?

23  A    Yes.

24  Q    And the defendant writes back, I am not sure, but I will

25  try.  Kristin writes, It's not an emergency or anything, just

SN      OCR      RPR

Weniger - direct - Penza                    5039

1    interesting, possible helpful data from Rich about our

2    resort-hopping friend.

3           Do you have a belief as to who the resort-hopping

4    friend is?

5    A    So, there was a belief amongst -- it appears that there

6    was a belief that Ms. -- that the defendant as well as others

7    thought Kristin Snyder was still alive and that she was moving

8    from place to place.  I can't say for certain that that's who

9    they're referencing, but I do know that they sent private

10   investigators to Key West and I believe Palm Springs in

11   California.

12   Q    And were there other --

13   A    Looking for her under the --

14   Q    And this reference to our resort-hopping friend, were

15   there ever codes used by the defendant and Kristin Keefe?

16   A    In this e-mail in particular, it does appear to be a

17   coded language, yes.

18   Q    Kristin Keefe, here is another e-mail from the defendant,

19   What about the second level, which ones?  Results?

20   A    Yes.

21   Q    Okay.  Skipping ahead to page 14 on August 27, 2009,

22   there's a long e-mail from Kristin that starts at the bottom

23   of this page; is that right?

24   A    Yes.

25   Q    And so it says, "First, I got a little nervous for three

Weniger - direct - Penza                    5040

1  little reasons.  First, Knoxwoods painters happened to be here

2  beginning the 27th and going through the week.  Coincidence?

3         Do you have an understanding of what that meant?

4  A    So, Knoxwoods is the development that the defendant as

5  well as Kristin Keefe lived in at that time and, you know,

6  there's a Homeowners Association there.  So I'm assuming that

7  there was painting going on in the neighborhood and maybe it

8  appears to their particular kind of stretch of townhouses.

9  Q    And it says, They are painting the windows so they can

10 study everything in our house.  They're doing 3 Flintlock too.

11 They started this morning?

12 A    Yes.

13 Q    From your review of this case, can you describe any kind

14 of paranoia that seemed to exits?

15 A    I think just this paragraph, and as we go even the

16 following paragraphs, kind of reflect that there was a certain

17 level of paranoia.  There was also certain times during the

18 investigation that we learned that when there were vehicles in

19 Knoxwoods that were unfamiliar, oftentimes that would be

20 reported to the defendant.  And, again, what we're seeing here

21 is kind of similar concern for people that were unknown in

22 terms of them being in the community.

23 Q    The next paragraph talks about a strange man and a car

24 driving by?

25 A    Yes.

Weniger - direct - Penza                    5041

1  Q    And then she provides some information about her son with

2  the defendant; correct?

3  A    Yes.

4  Q    And then -- and here it says, Steve called me back and

5  wants to know where we are at.  I was on the other line so

6  called him and haven't heard yet.  I'm inclined to tell him we

7  are considering his suggestions, but I am having a hard time

8  reaching my people because of the communications limitations.

9  I spoke to Andy.  Steve's trial will be over Friday through

10 Monday.  He has not heard back from Dones' alleged attorney

11 and has called him three times.  I told him keep trying.  We

12 want confirmation on that before we respond to her.

13         Do you know who Dones is?

14 A    Susan Dones was a member of the Nxivm 9, a group of

15 women -- a group of people that left Nxivm as a group that

16 included also Barbara Bouchey and others.

17 Q    Coffey is prepared to meet with us post-trial to discuss

18 taking us to the state police?

19 A    Yes.

20 Q    Richard called me at 12:30.  I was on both lines.  It

21 went to voicemail, but he wouldn't call unless he had data.

22 I'm working on preparing for the O'Hara depo.

23         Do you know what that means?

24 A    I believe that it's in reference to a deposition that was

25 to occur that -- where Jeff O'Hara would be deposed in a civil

Weniger - direct - Penza                    5042

1   litigation.

2   Q    And was that supposed to be happening right around this

3   time?

4   A    It was.

5   Q    And then it says, There's a charity called Sinai

6   Charities.  Peter Skolnik is a very well-known attorney in

7   some circles, although its Ross and his corps. that are his

8   bread and butter at the end of the day, even if there are

9   efforts on behalf of certain charities in between.

10       Then:  Rich says Pigeon will be calling me shortly

11   with a layered opinion and Rich has interesting thoughts about

12   Snyder's disappearance.  He thinks she might have emigrated to

13   another country/island country or at least inquired about

14   doing so.

15       I want to be clear that Alaska had found that she

16   was dead; correct?

17   A    Yes.

18   Q    They determined she had committed suicide?

19   A    Yes.

20   Q    And you said that the police file on Kristin Snyder was

21   within Government Exhibit 204?

22   A    At least a portion of it, yes.

23   Q    And this is from the defendant saying, Might be

24   fascinating question to ask about --

25       This is the defendant to Kristin Keefe:  Might be a

Weniger - direct - Penza                              5043

1   fascinating question to ask about conversations to Sinai to

2   see if smokes twitches.

3            Do you have an understanding of that?

4   A    Not entirely, although if you look at the e-mail below,

5   it's referencing Skolnik.  Skolnik was an attorney that

6   represented Mr. Ross in the litigation between Nxivm and Rick

7   Ross and, so, Skolnik is relevant in that regard.  And kind of

8   what the prior e-mails were suggesting was that Skolnik had

9   some type of interface with Sinai charities and so it's not

10  entirely clear.

11  Q    Okay.  But Kristin says, I agree!  And then the defendant

12  responds, I'm getting worried.  Any more news from R?  And

13  then Kristin says, Yes, sending hard copy of what mentioned

14  today and I received verbal on Snyder?

15  A    Yes.

16  Q    And then the defendant responds, And Pigeon's song?

17  A    Yes.  I will say that that appears to be, you know,

18  somewhat coded language in relation to Steve Pigeon, one of

19  the individuals that's found within the box.

20  Q    And she responded, Nothing specific about Pigeon's song?

21  A    Correct.

22  Q    And he says, "What about all the other stuff?

23  A    Yes.

24  Q    And, so, here Kristin Keefe says, Little Richard has

25  nothing new, but their temporary problem is over.

SN        OCR        RPR

1            This is on August 28th.  The defendant responds, If

2    R is leaving on Sunday, when/how will we get his products?  We

3    need them for V Week.  What about the two-layer products he

4    said he had from his distributor?

5            Does that again appear to be coded language?

6    A    Yes, it does.

7    Q    About the same type of information that we've been

8    discussing?

9    A    Yes, the banking sweeps that they were -- they were

10   utilizing with Cannaprobe.

11   Q    And there's more back and forth and then it says -- Keith

12   Raniere to Kristin Keefe:  I don't know if you will get this.

13            Is it fair to say it looks like they may be having

14   some cell service difficulties by the lake during this e-mail?

15   A    Yes.

16   Q    I don't know if you will get this.  I looked at the R

17   thingy on his two new quote creations, did not finish his

18   second layer.  No topping, but both have an explicit middle

19   eastern feel.  When are you back?

20            Do you have any understanding of what that is?

21   A    Not entirely.  I do -- it does appear to be referencing

22   kind of the layering or the level of bank sweeps.

23   Q    And again it seems to be in code?

24   A    Yes.

25   Q    Okay.  And Kristin writes:  Yeah, I know I'm checking on

Weniger - direct - Penza                    5045

1    the toppings.  FYI, I reminded Richard yesterday to make us

2    only one layer dishes if the topping is different than the

3    layer; to do two layers only when the first topping is the

4    same.  He's erred so far and cooked two layers each time no

5    matter what.  It's turning out pretty tasty.  Maybe we should

6    stick to the two-layer, two-topping dish across the board.

7    I'll be back tonight.  Want to meet?

8               And the defendant responds, Yes, although the middle

9    eastern recipes seem obvious.  I might want to be sure of what

10   goes into each of the dishes.  Maybe our Mexican chef will

11   tell us.

12              Did you have an understanding of who the Mexican

13   chef was?

14   A    What I suspect is that the Mexican chef is in relation to

15   the e-mails that we've already looked at in relation to

16   Emiliano Salinas, Mr. Federico Pena and that kind of lead.

17   Q    And then Kristin says, Okay.  I will confirm that recipe

18   with R.  I hear our Mexican chef will have some dishes ready

19   today.  If that's the case, I'll come back sooner.

20              Just -- I won't go through too much more of this,

21   but from Kristin to Keith on August 29, 2009, I'm putting

22   together additional docs on O'Hara and on my way to pick up

23   the O'Hara criminal presentation?

24   A    Correct.

25   Q    Page five, Keith is writing on -- the defendant is

Weniger - direct - Penza                    5046

1    writing on August 29, 2009:  Any more R?  M?  Kristin writes

2    back, "Nope, although expecting more from R."  And then the

3    defendant writes back, "Cool.  Is M going to tell us more

4    about his kidney beans and liver mix.  Why can't he get that

5    published?  If they come up with as good a recipe will we be

6    able to publish.  Again, does this appear to be code?

7    A    Yes, it does?

8    Q    And you don't know exactly what this means?

9    A    I don't, no.

10   Q    Kristin writes, his supplier is out of town till Monday

11   and has been all week.  I think if we have a better recipe we

12   can arrange to collaborate with his supplier directly?

13   A    Yes.

14   Q    Okay.  And this e-mail from Keith Raniere to Kristin

15   Keefe, I will tell you when I see you in Ohio.  On another

16   note, did you notice how little news coverage the deal thing

17   is getting?

18        Do you know what that's a reference to?

19   A    Again, I don't -- I want to make clear I don't know

20   definitively what it's a reference to.  I can tell you that

21   around this time Morris Sutton, who lived in the Deal, New

22   Jersey area and we did find actually in the box as well an

23   article in relation to the Sephardic community and arrests

24   that had been made in that community.

25        THE COURT:  Ms. Penza, I'm going to want to take a

1    break soon.

2         MS. PENZA:  Yes, Your Honor.  I'm finished with this

3    document in one minute and I think that will be a perfect

4    time, if that's okay.

5         THE COURT:  That is fine.

6    BY MS. PENZA:

7    Q    And, so, I'll skip ahead to the second page and looking

8    here the defendant writes on August 31, 2009, Hey, what's

9    going on with O'Hara, birthright, Bob, goodies for Mr. O'Hara,

10   Mike, little R's kitchen, et cetera?

11   A    Yes.

12   Q    Do you know what some of those things are or do you have

13   a belief as to what some of those things are?

14   A    Yes, O'Hara again is another reference to Joseph O'Hara

15   and the litigation related to him.  Birthright is also -- is a

16   charity that's associated with Edgar Bronfman.  Bob, I'm not

17   entirely certain.  Goodies for Mr. O'Hara, again it seems to

18   be a reference to Joseph O'Hara.  Little R's kitchen seems to

19   be the quote unquote dishes, or levels of banking sweeps that

20   were being conducted by Richard Marier and Cannaprobe, but I

21   think what --

22        One of the things that was important from my review

23   of this was it showed that the legal -- while Kristin Keefe

24   was the head of the legal department in Nxivm, the actions

25   that were being taken were communicated to the defendant by

Proceedings                                              5048

1    Kristin and being requested by the defendant.

2    Q    And this just goes on for a little bit more back and

3    forth?

4    A    Yes.

5              MS. PENZA:  Your Honor, I think this would be a good

6    point to take a break.

7              THE COURT:  All right.  Let's take an afternoon

8    break.  All rise for the jury.

9              (Jury exits.)

10             (In open court.)

11             THE COURT:  How much more do you have for this

12   witness?

13             MS. PENZA:  Your Honor, I still think approximately

14   an hour, maybe a little bit more, but I will enter the rest of

15   the exhibits and I will only show them if absolutely

16   necessary.

17             THE COURT:  All right.  And how long is your cross

18   going to be?  Just tell me.

19             MR. AGNIFILO:  I don't know because we still have

20   another hour of direct.  I'll try to get done by the end of

21   the day.

22             THE COURT:  Well, it is not going to happen.

23             MR. AGNIFILO:  Well, it could, it could.

24             THE COURT:  It could?

25             MR. AGNIFILO:  Well, it probably won't, but I will

Proceedings                                              5049

1    try.  I know it would make the jury's life easier if I did.

2    Let me see what the hour of direct is like and then I'll do

3    what I can.

4              THE COURT:  Otherwise, I will bring the jury in

5    tomorrow morning and we will just continue.  So work your

6    magic.

7              MS. PENZA:  Yes, Your Honor.

8              THE COURT:  You may stand down.

9              (Witness stands down.)

10             THE COURT:  Take your ten minutes.

11             (Recess taken.)

12

13             (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                              5050

1   (Continuing)

2           MS. PENZA:  Your Honor, may we be heard?

3           THE COURT:  Not until the Defendant is here.  If

4   both sides are smiling, I'm in trouble.  Let's wait for the

5   Defendant.

6           (Defendant enters.)

7           THE COURT:  Yes.

8           MS. PENZA:  Your Honor, I think one thing I've

9   learned during this trial is I'm very bad at estimating how

10  long my directs are.

11          THE COURT:  Oh, I hadn't noticed.

12          MS. PENZA:  So, I think, having reviewed over the

13  break, it is unlikely I will finish today, probably go

14  slightly over tomorrow.

15          In light of that, we've spoken -- and I don't think

16  it makes sense to really try to rush through.  I looked to see

17  if it would be possible, but I don't think it will be.

18          In light of that, I think the parties are jointly

19  hoping that we would go tomorrow and then have the charge

20  conference on Monday and close on Tuesday, if that would be

21  amenable to your Honor.

22          THE COURT:  Well, tell me about tomorrow.

23          What will we accomplish tomorrow?

24          Is it a full day?  Is it a partial day.

25          MS. PENZA:  Yes, it will be a partial day.  I expect

Proceedings                                              5051

1   at most to need a half-hour tomorrow.

2          MR. AGNIFILO:  I would imagine if Ms. Penza goes a

3   half an hour I can probably finish around the time of the

4   break.  Maybe I'd go over a little past the break, but

5   definitely finished by lunch.

6          THE COURT:  And you would be resting tomorrow?

7          MS. PENZA:  Yes, your Honor.

8          THE COURT:  After this witness?

9          MS. PENZA:  Yes, your Honor.

10         THE COURT:  And then we have to -- at that point, we

11  have to have a Rule 29.

12         MR. AGNIFILO:  Yes, Judge.

13         THE COURT:  And then you have to tell me whether

14  you're putting on a case and whether the Defendant wishes to

15  testify, as is his Constitutional right.  We have a process to

16  go through even if you don't put on a case.

17         So, I need the jury here until the middle of the

18  day, is what we're saying.  At least until noon, I would

19  imagine.

20         MR. AGNIFILO:  I would imagine somewhere around

21  noon, I think that's right, but I think before lunch.  I think

22  we'll be done with the jury before lunch.

23         THE COURT:  We'll work out the issue of lunch with

24  the jury.

25         MR. AGNIFILO:  And would the Court be open to the

Proceedings                                              5052

1    charge conference on Monday rather than tomorrow?

2              THE COURT:  Yes, of course.  I think that works out

3    fine.

4              MS. PENZA:  Thank you very much.

5              THE COURT:  What I'll do, can I e-mail the charge to

6    you?

7              MR. AGNIFILO:  That would be great, Judge.

8              MS. PENZA:  Yes, that would be great.

9              THE COURT:  We'll e-mail it.  It's ready in draft.

10             If we do this, I would appreciate it, since we have

11   so much extra time, that the parties, after they look at the

12   charge, if they can discuss possible modifications of the

13   charge to which they would agree, rather than raising

14   everything at the charge conference initially.

15             But where you can't agree, of course we'll discuss

16   it.

17             MR. AGNIFILO:  What might make sense if we end up

18   getting the charge at some point later today and we'll have

19   some time after we let the jury out tomorrow --

20             THE COURT:  You're going to get it tonight.

21             MR. AGNIFILO:  That's great, Judge.

22             MS. PENZA:  Thank you.

23             MR. AGNIFILO:  Perfect.

24             THE COURT:  I will tell the jury that we're doing a

25   half-day tomorrow, they are off on Monday, and we'll have

Proceedings                                              5053

1  closing arguments on Tuesday.

2          About how long is your closing expected to be?

3          Oh, I'm sorry.

4          Mr. Lesko, how long is the closing expected to be?

5          MR. LESKO:  No more than four hours.

6          THE COURT:  And your closing, about the same?

7          MR. AGNIFILO:  I imagine it would be a little bit

8  less.

9          THE COURT:  So, we're going to have a full day of

10 closings and we may even have the rebuttal on Wednesday before

11 I give the jury charge.

12         MR. AGNIFILO:  Can I throw something out?

13         THE COURT:  You've been throwing something out since

14 I walked in the door.

15         What else?

16         MR. AGNIFILO:  Have you ever charged first and

17 summed up after?

18         THE COURT:  You know, I've spoken to judges about

19 that, and there are judges who feel very strongly about it.

20 But I've been charging juries for a long time.  I'm more

21 comfortable charging after the closing arguments because when

22 the parties give their closings and say, "You're likely to

23 hear from the judge that..." and maybe it's a little off.  I

24 want to be the one to speak last.

25         And, in fact, I would also point out that what I may

                    LAM      OCR      RPR

Proceedings                            5054

1   do -- it's a very long charge -- I may share the honors with

2   my law clerks and have them read parts of the charge, selected

3   portions the charge, to the jury.

4            How many pages is it, 100?

5            THE LAW CLERK:  140.

6            THE COURT:  140 pages.  So, it's a lot of talking.

7   So, depending on how I feel at the time, we'll make those -- I

8   just wanted to let you know about that.  Judges do it all the

9   time, I know.  We have some judges here in our courthouse who

10  do it.  I've never done it before, but I think this is the

11  right case for it.

12           Anything else?  Is there more?

13           Then I have a letter from the defense about an item

14  to put in the charge.  You should discuss that among

15  yourselves.

16           MR. AGNIFILO:  Very good.  We will.

17           THE COURT:  I have the letter dated June 9; have you

18  seen it?

19           MS. HAJJAR:  Yes, with respect to the good faith

20  charge, your Honor?

21           THE COURT:  Yes, exactly.

22           MS. HAJJAR:  We've seen it.

23           THE COURT:  You have something else?

24           I want to bring the jury back.

25           MS. PENZA:  I just want to put exhibits on the

Proceedings                                          5055

1   record.

2              THE COURT:  Go ahead.

3              MS. PENZA:  Ms. Geragos made a photocopy of my list.

4   It's my handwritten list, but it may be helpful as I read

5   through them because they're not in order, your Honor.

6              THE COURT:  Sure.

7              MS. PENZA:  The Government moves into evidence

8   Government Exhibits 58, 1806, 1807, 1809, 1810, 1811, 1812,

9   1814, 669, 18 --

10             THE COURT:  668, it says.

11             MS. PENZA:  I know.  I realize that's the *Times*

12  *Union* article, sorry.

13             THE COURT:  Go ahead.

14             MS. PENZA:  669, 670 over the defense objection,

15  1383, 1827, 1829, 1267, 1071, 1005, 548 -- sorry, 548 is

16  already in, 1822, 1214, 1491 through 96, 1427, 1429, 1433,

17  1443, 1455, 1456, 1457, 1435, 1445, 1480, 374, 373, 376, 1820,

18  1821 over objection, 1392, 1482, 1327, 1326, 1803, 1805, 1287,

19  1817, 1818, 671, 1828, 1801, 59, 9, and 38.

20             THE COURT:  Noting objections.

21             MR. AGNIFILO:  That's correct, that's consistent

22  with our understanding, Judge.

23             THE COURT:  Those exhibits are received in evidence.

24             (Government Exhibits 58, 1806, 1807, 1809, 1810,

25  1811, 1812, 1814, 669, 670, 1383, 1827, 1829, 1267, 1071,

Proceedings                                     5056

1    1005, 1822, 1214, 1491 through 96, 1427, 1429, 1433, 1443,

2    1455, 1456, 1457, 1435, 1445, 1480, 374, 373, 376, 1820, 1821,

3    1392, 1482, 1327, 1326, 1803, 1805, 1287, 1817, 1818, 671,

4    1828, 1801, 59, 9, and 38 so marked.)

5              THE COURT:  Anything else?

6              MS. PENZA:  I'm sorry, your Honor, one brief moment.

7              (Pause in proceedings.)

8              MS. PENZA:  Your Honor, 1819, if I didn't read it

9    out, the Government moves in.

10             And then I'll check out one other thing, but I can

11   do it at the time.

12             THE COURT:  I don't have it here.  Okay.  1819.

13             MS. PENZA:  It's on the top left under *Forbes*.

14             THE COURT:  I see.

15             MS. GERAGOS:  I don't think 1816 was read either,

16   which was an objection Mr. Agnifilo withdrew.  It was the

17   Michele e-mail, if I remember correctly.

18             MS. PENZA:  Yes I'm sorry.

19             THE COURT:  All right.  They will be added to that

20   list that you have provided.  Thank you very much for the

21   help.

22             (Government Exhibits 1816 and 1819 so marked.)

23             MS. SMITH:  You're very welcome.

24             THE COURT:  Then we have a plan.  What I will tell

25   the jurors is that we're going to have a half-day tomorrow,

LAM      OCR      RPR

Proceedings                                                    5057

1    that Monday will be a day off, and Tuesday we expect that we

2    will have closing arguments.

3                MR. LESKO:  Your Honor, do you have a time for

4    Monday for the charge conference in mind?

5                THE COURT:  No.  10 o'clock would be good.

6                MS. HAJJAR:  Mr. Trowel expects to join us.

7                Would that be okay with your Honor?

8                THE COURT:  Oh, Mr. Trowel, the phantom.  That's

9    fine.

10               MS. HAJJAR:  Thank you.

11               THE COURT:  What I'd like you to do, as I said

12   before, is to have discussions about potential changes to the

13   jury instructions so that if there's something that you all

14   can agree on, revisions that you can agree on, you can present

15   them, and, if they seem reasonable, we can just implement

16   them.

17               MS. HAJJAR:  We'll do that.  Thank you.

18               THE COURT:  And then we'll discuss areas where you

19   have fundamental disagreement.

20               MS. PENZA:  Thank you, your Honor.

21               THE COURT:  Let's bring in the jury.  Let's bring in

22   the witness too.

23               (Witness resumes the stand; jury enters.)

24               THE COURT:  Please be seated, everybody.

25               Members of the jury, thank you very much for your

Proceedings                                          5058

1  patience.  We've been trying to work out the schedule for the
2  rest of the trial.  Let me inform you as follows:
3           Tomorrow, we will have half a day of trial.
4  Hopefully, that will complete the period of testimony that
5  we've been having.  And then you'll have lunch and that will
6  be it for the day.
7           On Monday, we will be busy here going over the draft
8  charge as to the law.  I'll be meeting with the lawyers for
9  both sides to review the draft that I'm providing to the
10  parties as to the jury charge, which I will give you later in
11  the week.  So, you won't be here on Monday.
12           Tuesday, we will have closing arguments.  The
13  Government will go first, then the defense will go, and then
14  there will be rebuttal by the Government.  That's the process.
15  If it spills over into Wednesday morning, it just means that
16  I'll start charging the jury a little later in the day on
17  Wednesday.
18           I'll charge the jury as to the law on Wednesday, and
19  you will retire to consider your verdict on Wednesday
20  afternoon.  And then your deliberations, obviously, will be
21  secret.
22           That's the process that we have sketched out.  Is it
23  finalized?  I think it's likely to occur that way.  We've
24  thought a lot about it and we very much appreciate the time
25  that you're giving to this case.  So, we wanted to tell you

Weniger - Direct - Penza                           5059

1   what to anticipate for next week so that you can make your

2   plans accordingly.

3           So, that said, we're going to go until five,

4   Ms. Penza is examining the witness, and then most likely we'll

5   have the cross-examination tomorrow morning.

6           As I understand it, this is the Government's last

7   witness.

8           MS. PENZA:  Yes, your Honor.

9           THE COURT:  All right.  Let's go forward then.

10          I remind the witness he is still under oath.

11          THE WITNESS:  Yes, your Honor.

12  BY MS. PENZA:

13  Q    Special Agent Weniger, there are some individuals -- we

14  talked about various individuals when we went through

15  Government Exhibit 204 and through thebeacon, oakhaven

16  accounts.

17          One of those individuals was Toni Natalie; is that

18  right?

19  A    Yes.

20  Q    And one was Barbara Bouchey?

21  A    Yes.

22  Q    And we also talked about Kristin Keeffe.

23  A    We did, yes.

24  Q    Do you know whether -- did Kristin Keeffe at some point

25  leave the NXIVM community?

LAM      OCR      RPR

Weniger - Direct - Penza                                    5060

1    A    Yes.  I believe it was approximately 2014.

2    Q    I'm showing you what's in evidence as Government exhibit

3    374.

4              (Exhibit published to the jury.)

5    Q    Do you see that document?

6    A    I do.

7    Q    And are you familiar with this e-mail?

8    A    Yes.

9    Q    And this is an e-mail from Ricardo M. Olmedo Gaxiola, and

10   the subject line is re Kristin Keeffe to Clare Bronfman; is

11   that right?

12   A    That's correct.

13   Q    Do you know who this person is, Ricardo?

14   A    I believe he appeared on some of the kind of cease and

15   desist letters that we've seen in the case.

16   Q    Do you understand him to be an attorney in Mexico?

17   A    Yes.

18   Q    So, he has appeared in other places in this case?

19   A    Yes.

20   Q    And this is an e-mail from Alejandro Betancourt -- I mean

21   to Alejandro Betancourt.

22              Do you know who Alejandro Betancourt is?

23   A    Yes.  Alex Betancourt was -- I'm sorry.

24   Q    Go on.

25   A    He was kind of a senior member within NXIVM ESP.

Weniger - Direct - Penza                          5061

1   Q    So, this is to Alejandro Betancourt from Clare Bronfman

2   on May 29, 2017, and it says:  Forward Kristin Keeffe.

3             And it says:  Most recent I have on KK.

4   A    Yes.

5   Q    And there's a picture here?

6   A    Yes.

7   Q    Can you just -- do you have an understanding of what this

8   type of picture is?

9   A    It appears to be a surveillance photo, either taken -- it

10  appears to be taken with a video recording device and that's

11  just a still frame.

12  Q    Does it appear from this picture that she knows she's

13  being photographed?

14  A    No.

15  Q    It appears she does not?

16  A    Correct.

17  Q    And this is on January -- the time on this photo is

18  January 18, 2016?

19  A    Yes.

20  Q    So, this e-mail is May 29, 2017.  I'm showing you -- and

21  I think -- I'm sorry, you said she had left the community

22  about three years prior; is that right?

23  A    I think it was 2014, yes.

24            (Exhibit published to the jury.)

25  Q    Showing you what's in evidence as Government Exhibit 373,

LAM        OCR        RPR

Weniger - Direct - Penza                           5062

1    this is an e-mail from Clare Bronfman to Ricardo Olmedo

2    Gaxiola again?

3    A    Yes.

4    Q    It says:  This is what she looked like about eight months

5    ago.

6    A    Yes.

7    Q    And this is forwarded then to Alejandro Betancourt, and

8    it says:  Forward, Barbara Bouchey.  Most recent on BB.

9    A    Correct.

10   Q    Is this a picture of Barbara Bouchey?

11   A    It is a picture of Barbara Bouchey.

12   Q    At this point in time, in 2017, approximately how long

13   had Barbara Bouchey been gone from the NXIVM community?

14   A    I am not -- I think she left in 2009, if I'm correct.

15   I'm not certain, but I think it was 2009.

16   Q    Quite a bit of time?

17   A    Yes.

18              (Exhibit published to the jury.)

19   Q    I'm showing you what's in evidence as Government Exhibit

20   376.  This is another e-mail from May 8, 2017?

21   A    Yes.

22   Q    And it's also from Clare Bronfman to Olmedo Gaxiola -- to

23   Ricardo?

24   A    Yes.

25   Q    And it says:  This is from a few years ago.  Her hair is

LAM      OCR      RPR

Weniger - Direct - Penza                5063

1   naturally very dark.

2          And the subject line is:  Toni Natalie.

3   A    It is, yes.

4   Q    And there is an e-mail to Alejandro Betancourt from Clare

5   Bronfman, and it says:  Forward, Toni Natalie.  Most recent on

6   her.  Her hair could be blonde or dark.

7   A    Yes.

8   Q    How long -- this is now May 8, 2017.

9          How long had it been since Toni Natalie had been

10  with the Defendant?

11  A    Approximately 20 years, almost 20 years.

12  Q    During the course of your investigation, did you have

13  occasion to look into whether there had been any political

14  contributions by members of NXIVM?

15  A    Yes, I did.

16  Q    Can you just explain why you did that?

17  A    So, during the course of interviews with individuals in

18  this case, we obtained information that there was kind of the

19  bundling of campaign contributions, meaning that individuals

20  were making individual donations and being reimbursed for

21  those individual donations for a larger holding.  And, so, we

22  located that and we did see evidence of that, yes.

23  Q    And did you do that work yourself?

24  A    Yes.

25  Q    And is there something called the Federal Election

Weniger - Direct - Penza                    5064

1   Commission?

2   A    Yes.

3   Q    And can you just generally explain what that is?

4   A    The Federal Election Commission tracks donations, so

5   individual donations as well as group donations.

6            So, you can -- it has a searchable site that the

7   anyone, myself or anyone in this room, could go to and take a

8   look as to who has donated and to whom.

9   Q    Without going into the details, what is your

10  understanding about whether there are specific limits as to

11  how much someone can contribute to a campaign?

12  A    There are individual campaign limitations or -- yes,

13  throughout.

14  Q    So, I'm showing you what's in evidence as Government

15  Exhibit 1482.

16           (Exhibit published to the jury.)

17  Q    Are you familiar with this document?

18  A    Yes.

19  Q    And first I'm going to turn to the last page of the

20  document, which is a screen shot.  And it's a little difficult

21  to see, but maybe you can just explain the interface of the

22  FEC website?

23  A    So, you can provide search terms on the left-hand side

24  there and you can also then search individual names.  So, the

25  individual donor names, on the left-hand side you see the

Weniger - Direct - Penza                    5065

1    names of people that have been searched, and then it also

2    reflects the campaign and/or candidate that the donation was

3    provided to.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weniger - direct - Penza                    5066

1   EXAMINATION CONTINUES

2   BY MS. PENZA:

3   Q    So this is where you would enter the -- it's called

4   contributor name?

5   A    Yes.

6   Q    And so this was the results for those people that you

7   entered?

8   A    That's correct.  Then also on the bottom left-hand side

9   you can search a particular timeframe.

10  Q    And is that something you did?

11  A    Yes.

12  Q    And so we'll just -- so the names that you searched here,

13  Mark Vicente, Nancy Salzman, Clare Bronfman, Sara Bronfman,

14  Pam Cafritz, Barbara Bouchey, Kristin Keeffe, Michelle

15  Salzman, Sheryl Ose, Nina Cowell, Dazzle Ekblad, John

16  Bartolomei, Ben Myers and Rebecca Freeman?

17  A    Yes.

18  Q    I think the jury is very familiar with some of these

19  individuals, but who is Sheryl Ose?

20  A    She was also a member of the NXIVM community for a time

21  period.

22  Q    Nina Cowell?

23  A    Same.  She was part of the NXIVM nine that left, I

24  believe, in 2009.

25  Q    John Bartolomei?

Weniger - direct - Penza                    5067

1  A    Yes, John Bartolomei was an attorney that also had

2  dealings with NXIVM.

3  Q    Dazzle Ekblad?

4  A    She was a member of the NXIVM community for a period.

5  Q    And Rebecca Freeman?

6  A    Same.

7  Q    And so just walking through these, so there is a

8  contribution from Clare Bronfman to Hillary Clinton for

9  president on March 14th, 2017 [sic] and it's $2,300?

10 A    Yes.

11 Q    Once Ms. Bronfman, if we assume for the minute that that

12 would be the maximum, would she be able to contribute another

13 $2300 in her own name directly?

14 A    I don't believe so, no.

15 Q    And so then there's Pam Cafritz, Hillary Clinton for

16 president, same receipt date and same amount?

17 A    That's correct.

18       I do want to make one caveat.  I think, and my

19 understanding is that in the primary that the individual

20 donation is limited in the primary, and then once the general

21 election comes, I think you can donate again.  I'm not certain

22 on that, but that's my understanding.

23 Q    Okay.  But whatever time -- whatever point in time you

24 are where there is a maximum donation, you can only make that

25 maximum donation once, is that --

Weniger - direct - Penza                                5068

1    A    Correct.

2    Q    -- correct?  Okay.

3         And then Rebecca Freeman, with the same amount?

4    A    Yes.

5    Q    Kristin Keeffe, same amount?

6    A    Yes.

7    Q    Do you have an understanding from your review of e-mails

8    and other documents in this case what Kristin Keeffe's

9    finances were like?

10   A    I believe that they were limited.

11        (Exhibit published.)

12   BY MS. PENZA:

13   Q    A few one for Sheryl Ose, but Michelle Salzman, March

14   14th, 2007, $2,300?

15   A    Yes.

16   Q    Nancy Salzman, same date, $2,300?

17   A    Yes.

18   Q    And same campaign.

19        And then there is a blank spot, there is a

20   redaction.  Is this because there was a different Ben Myers?

21   A    Yes.

22   Q    And then John Bartolomei, this is now April 13th, 2007,

23   there is a different date?

24   A    Correct.

25   Q    And it's $2,300?

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5069

1    A    Yes.

2    Q    Barbara Bouchey, $2,300?

3    A    Yes.

4    Q    Sara Bronfman?

5    A    Yes.

6    Q    Nina Cowell, $2,300?

7    A    Correct.

8    Q    Dazzle Ekblad, $2,300?

9    A    Yes.

10   Q    Ben Myers, $2,300?

11   A    Yes.

12   Q    And Mark Vicente, $2,300?

13   A    That's right.

14   Q    And those are all on the same date as well?

15   A    Yes.

16   Q    And the same campaign?

17   A    Correct.

18   Q    This is the Ben Myers this --

19   A    Yes.

20   Q    -- we're familiar with?

21   A    That is correct, yes.

22   Q    All right, I am going to turn to some e-mails that are to

23   or from the kunterre@nycap.rr.com account.

24        Are you familiar with that account?

25   A    I am, yes.

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5070

1    Q    And whose account was that?

2    A    That was -- the name is Karen Unterreiner, but the

3    account was utilized by the defendant.

4    Q    So just showing you an e-mail that's in evidence,

5    Government's Exhibit 1435, this is an e-mail from that account

6    to someone named Eric, and it says:  Rereconnect.  And it

7    says:  Hi, it's me, Keith Raniere.  Is that right?

8    A    Yes.

9    Q    And then it says:  It would be nice to here from you.

10   Still at the same address, phone number and e-mail.  This

11   e-mail account is kunterre@ at nycap dot rr.com.  Kunterre is

12   a standard contraction of Karen Unterreiner, no funny jokes,

13   at least said out loud.  I don't know if we are on a

14   love-and-wet-kisses basis.  So regards, Keith?

15   A    Correct.

16   Q    And there were a number of other e-mails that made

17   clear -- many other e-mails that made clear that this account

18   was the defendant's?

19   A    Yes.

20   Q    Through the course of your investigation, did you review

21   e-mails related to Clare Bronfman's relationship with her

22   father?

23   A    I did, yes.

24   Q    And can you just explain generally those e-mails and --

25   and what their nexus was to the defendant?

Weniger - direct - Penza                          5071

1   A    In terms -- in terms of the e-mails, there was definitely

2   appeared to be a strained relationship in relation to Edgar

3   Bronfman and Clare Bronfman.  And the defendant's guidance and

4   advice was frequently sought by -- by Clare Bronfman, in terms

5   of her relationship with her father.

6   Q    Did the e-mails also -- did -- did the e-mails give you

7   any insight into the nature of Clare Bronfman's relationship

8   with the defendant?

9   A    Yes.

10  Q    Okay, can you explain that?

11  A    It appeared to be an intimate relationship based upon

12  some of the things that were discussed.

13  Q    Sexual?

14  A    Yes.

15  Q    At times, at least?

16  A    Yes.

17  Q    I am showing you what's in evidence as Government

18  Exhibit 1427.

19          (Exhibit published.)

20  BY MS. PENZA:

21  Q    Okay, and this is an e-mail from clarewebb21@aol.com to

22  the defendant?

23  A    Yes.

24  Q    And it says:  Dear Keith.  Thank you.  So I've been

25  thinking about your question.  As I begin to open my eyes, I

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                                          5072

1    am recognizing the responsibility I hold in the position I am

2    in.  When I combine that with the knowledge I have learned

3    from you, I feel like I have this huge responsibility.  I

4    would like your help in fully understanding it and in the best

5    ways to go about using the position I am in to have a

6    forward-moving and positive effect in the world.

7              I am very unlearned in business and would love some

8    help in that area.  I feel that my family is walking into some

9    very large business deals with their eyes closed and I do not

10   hold sufficient credibility, and certainly not the knowledge

11   to help.  I would like you to teach and advise me in these

12   areas and in exchange?  Love, Clare.

13             And this is sent on May 29th, 2003?

14   A    Yes.

15   Q    And the defendant responds:  A slave for eternity...?

16   A    Yes.

17   Q    Read the end of your last correspondence below.

18   Actually, why me?  What specifically do you want to achieve

19   through and by the end of this life?  Love Keith.

20   A    Correct.

21   Q    And would Clare Bronfman continue to remain loyal to the

22   defendant?

23   A    Yes.

24   Q    I am showing you what's in evidence as Government

25   Exhibit 1429.

SAM        OCR        RMR        CRR        RPR

Weniger - direct - Penza                    5073

1              (Exhibit published.)

2     BY MS. PENZA:

3     Q     And this is an e-mail from Clare to the defendant.

4              I'm not sure where things are with my father and I.

5     Yes, he walked out.  I acted impulsively and extremely

6     mindlessly.  This is where my recognition of just how mindless

7     I can be came from.

8              And then it says:  I am seeing how I act in the

9     world.  I am also seeing the reality of how my father reacts,

10    which I was unwilling to look at before.  I will never know

11    the extent of the damage I have caused to my father, myself,

12    you, Nancy, the organization, or the world.  I would really

13    appreciate your help in starting to heal the damage.  I would

14    like to apologize.

15             And then it says -- the defendant responds?

16    A     Yes.

17    Q     And he says:  With respect to the damage, any way I can

18    help, I will.  I think the healing must come from you and your

19    father.  I think for you, because of age, status and

20    personality type, it is simpler.  For your father because he

21    is a world leader, it is much more complicated.

22             And then it goes on:  Your father would need to come

23    to term with how his postulates and actions in general relate

24    to the rest of his life and position.  Let me know what you

25    think is appropriate to repair the damage from your position.

Weniger - direct - Penza                    5074

1    I will help you as much as I can.  You may want to understand

2    speaking with honor and thought objects better.  Ask Michelle

3    or Nancy to help you better understand these things and how

4    they relate to ethical breaches.

5              That's June 3rd, 2003?

6    A    Yes.

7    Q    And that's a few months before the Forbes article comes

8    out?

9    A    That's right.

10   Q    And so I am showing you what's in evidence as Government

11   Exhibit 1433.

12             (Exhibit published.)

13   BY MS. PENZA:

14   Q    And this is a forward from Clare to -- is

15   Prefect@nxivm.com, whose e-mail address is that?

16   A    Nancy Salzman.

17   Q    It says:  Subject forward:  Letter, and it says:  This is

18   the latest and my proposed response?

19   A    Yes.

20   Q    And does this e-mail attach a letter from Edgar Bronfman?

21   A    It does.

22   Q    So let's turn to that.

23             And so June 26th, 2003, this is from -- this is

24   from -- Clare is saying this is from Edgar Bronfman?

25   A    Yes.  Would you like me to read it?

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                                    5075

1    Q    Sure, please.

2    A    My dear Clare.  I don't -- I don't know what you're up

3    to, but it's very destructive.  I have a hunch that you think

4    you are doing God's work in trying to get me back to,

5    quote/unquote, the course.  Perhaps, from where you stand you

6    are, but I have tried to tell you that I don't trust where

7    Nancy is coming from or where she's going as far as this

8    family is concerned.  I will not renew my studies with her,

9    nor will I shill for her.  There seems to be a conspiracy to

10   turn me away from Jan.

11   Q    Can I just stop you for a second?

12        Who is Jan?

13   A    His spouse.

14   Q    Okay.  Continue, please.

15   A    That will not happen.  She, like everyone else, is not

16   perfect, but our relationship is solid and even if someone as

17   strong and willful, as well as capable, as Nancy tries to do

18   it harm, we will not be sundered.  My health is good.  She

19   watched -- she watched what I eat and encourages me to diet

20   without making a crusade of it.  I am dieting successfully, as

21   well as working out at the gym with Pete, the best trainer I

22   ever encountered.

23        I am busy absorbing all the interviews I did for my

24   book, which I hope will be as important as the subject, the

25   Jewish future.  That's who I am and that's what I do.  I care

Weniger - direct - Penza                    5076

1  enormously about the Jewish future and I think it's in dire

2  straights.  I hope my book will make -- will help make a

3  difference.

4          I regret your inability to have a relationship.  I

5  nonetheless love you.  Pops.

6  Q    And this is -- this e-mail -- that -- the attachment to

7  the first page that we looked at is actually a letter-EML, is

8  that right?

9  A    Right.

10  Q    So it actually attached the e-mail from Edgar Bronfman,

11  and then the letter that was attached to that?

12  A    Yes.

13  Q    Okay.  So let's just look at that for one second.

14          (Exhibit published.)

15  BY MS. PENZA:

16  Q    And it's from Y-E-H-I-E-L-M?

17  A    Yes.

18  Q    I'm not sure I pronounced that right.  Yehielm@aol.com?

19  A    Correct.

20  Q    And it's June 26th, 2003 to clarewebb21@aol.com?

21  A    Right.

22  Q    Subject line:  Letter?

23  A    Yes.

24  Q    And it says:  I wrote this after we had our abysmal

25  conversation.  Love, pops.

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                     5077

1   A    Yes.

2   Q    And then turning back to the first page, Clare says:

3        Dear Nancy.  This is the latest and my proposed

4   response.

5        And then it says:  Dear Dad.  You say I'm not

6   listening to you.  Do you remember projection?

7        And then it goes on.  Did you not tell me you were

8   going to write to Nancy?  Is it not normal that I ask?  You

9   never told me otherwise.  I find it interesting how you

10  persistently come up with ways to blame Nancy and punish Sara

11  and I.

12       And then it goes on.

13       So fair to say this was a draft letter Clare was

14  writing?

15  A    Correct, yes.

16  Q    And then it says -- so in this e-mail from Clare to

17  Nancy, she says:  Please let me know what you think.  I am

18  trying to be more inductive.  Although I'm not even sure if I

19  should respond.  I'm really learning about love and all the

20  meaning attached to it.  I also want to thank you, Nancy.  I

21  would be a mess right now if it was not for your help.

22       Is that right?

23  A    Yes.

24  Q    Okay.  And then Nancy forwards this e-mail to the

25  defendant?

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                                5078

1    A    Yes.

2    Q    And says:  My darling Vanguard, I received this from

3    Clare after no communication since her last visit.

4         For some period of time did Clare Bronfman live in

5    New York City --

6    A    Yes.

7    Q    -- before moving up to Albany full-time?

8    A    Yes.

9    Q    I'm at a loss.  What do you think?  Things here are good,

10   lots of ups and downs in the mission.  Love and kisses in all

11   the right places.  Your P.

12   A    Correct.

13   Q    So Nancy is forwarding that that we saw to the defendant?

14   A    Yes.

15   Q    And were there a number of these communications where

16   there would be a forward to the defendant about Nancy's

17   communications with Clare?

18   A    Yes.

19   Q    Showing you what's in evidence as Government's

20   Exhibit 1443.  Again, from the Yehielm@aol.com.  This is a

21   forwarded message from Nancy to the defendant.

22         Is that right?

23   A    Yes.

24   Q    And forward:  IDB?

25   A    Yes.

Weniger - direct - Penza                     5079

1   Q     Is there a bank called Israeli Discount Bank?

2   A     There is.

3   Q     And it says -- and it's a forward, and it says:  I got

4   this copy of the letter from Clare.  What do you think?  Love

5   and wet kisses, P.

6              And this is on June 27th, 2004.

7              And then the message below is from Yehielm@aol.com

8   to queserasera76@hotmail.com and clarewebb21@aol.com?

9   A     Right.

10  Q     Do you have an understanding of whose e-mail address that

11  is?

12  A     I'm uncertain, it potentially is Sara Bronfman.

13  Q     I had a meeting this morning with Matthew.  Who is

14  Matthew?

15  A     Matthew Bronfman is -- is Clare's stepbrother, excuse me.

16  Brother, I believe a half-brother.

17  Q     Okay.

18             And it says:  Yesterday afternoon with the two of

19  you was very important to me.  I have a few issues with

20  Albany, which we should discuss.  For instance, this claim of

21  saving the world is extreme and not credible.  The fact that

22  Nancy was set to borrow money from Clare at well below the

23  market still bothers me.  A young woman died in Alaska and

24  some people blame Nancy's diagnosis.  I have no idea how much

25  money you've put into Albany, nor will I ask, but that too is

Weniger - direct - Penza                    5080

1    a minor issue.  Having the sessions go from 8:00 a.m. until

2    10:00 p.m. is extreme and it's what cults do to gain dominance

3    over their victims.  A group led by two people who call

4    themselves Vanguard and Prefect certainly sounds like a cult.

5                 I'd like to get those issues cleared up and I hope

6    I'm not expected to be an advocate.  I have assumed a neutral

7    position and I shall maintain it unless there is some reason

8    for me not to.  I'm not sure whether or not Nancy was aware of

9    our meeting and whether or not she's guiding you in your

10   relationship with me.  That may sound harsh, but you do

11   understand my unease or, at least, I hope you do.  You have

12   both written me ghastly letters.  You both seem to be doing

13   extremely well and I'm happy for you.  Tons of love.  Pops.

14               From your review of the e-mails, did you have an

15   understanding about whether Nancy was guiding the relationship

16   between Clare and her father?

17   A    Yes, she was.

18   Q    Yes, she was?

19   A    Yes.

20   Q    And so that was forwarded to the defendant?

21   A    It was.

22   Q    And showing you what's in evidence as Government

23   Exhibit 1455.

24               (Exhibit published.)

25   BY MS. PENZA:

                  SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5081

1    Q     Is this another example of an e-mail from Clare to the
2    defendant where she talks about -- where she talks about her
3    father?
4    A     Yes, it is.
5    Q     Okay.  And she says that she met with him?
6    A     Yes.
7    Q     And that's October 25th, 2005?
8    A     Yes.
9    Q     November 9th, 2005, an e-mail from Clare Bronfman to the
10   defendant.
11              (Exhibit published.)
12   BY MS. PENZA:
13   Q     And it says:  Dear Keith.  I was happy to see you last
14   night.  I'm excited to be on the team.
15              THE COURT:  Just slow down a little.
16              MS. PENZA:  Yes, Your Honor, I'm sorry.
17   Q     I was a little emotional last night during the meeting
18   with the strategy team with regards to dad.  I -- I feel -- I
19   feel conflicted in seeing the data and thought object of him
20   being dad.  I was thinking about it today and a recent
21   conversation we had and I think it represents an inner
22   conflict in my struggle of might is right versus civilization.
23   And it goes on.
24              And so at this point in time, what is your
25   understanding about this -- this description of the meeting

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                                5082

1   with the strategy team with regards to dad?

2   A    As to who it consisted of, I'm sorry?

3   Q    No, just generally.

4   A    That there was -- there was group decision-making being

5   done in regards to Clare Bronfman's relationship with her

6   father and her interactions with her father.

7   Q    And this is November 9th, 2005?

8   A    Correct.

9   Q    And showing you Government Exhibit 1457, December 29th,

10  2005.

11          (Exhibit published.)

12  BY MS. PENZA:

13  Q    Is this another e-mail where Clare Bronfman is reporting

14  to her father -- reporting to the defendant regarding her

15  father?

16  A    Yes.

17          MS. PENZA:  Your Honor, may I approach the witness?

18          THE COURT:  Yes.

19  Q    Special Agent Weniger, I am showing you what are in

20  evidence already as Government Exhibits 1491-R, 1492-R,

21  1493-R, 1494-R, 1495-R, as well as Government Exhibits 1214,

22  1491, 1492, 1493, 1494 and 1495.

23          Can you just take a look at those for a second?

24  A    Certainly.  (Witness complies.)

25  Q    And I am just going to ask you some questions about those

Weniger - direct - Penza                            5083

1    generally.  I just wanted to show them all to you first.

2         Thank you.

3    A    Thank you.

4    Q    Special Agent Weniger, the documents that were Government

5    Exhibits 1491-R through 1496-R, were those all admitted by

6    Steve Herbits?

7    A    They were.

8    Q    You were present for his testimony?

9    A    Yes.

10   Q    And can you just generally describe kind of how those

11   exhibits relate to Government Exhibits 1214 and then 1491,

12   1492 -- 1491 through 1496?

13   A    They're interactions between -- generally the vast

14   majority of those e-mails were interactions between

15   Mr. Herbits and Clare Bronfman, and then also oftentimes

16   including or being forwarded then to the defendant for

17   purposes of guidance.

18   Q    Okay.  So the e-mails that were redacted, that were shown

19   to Mr. Herbits, those included the back-and-forth between --

20   between Clare Bronfman and Mr. Herbits, is that right?

21   A    Generally, yes.

22   Q    And then if we look at the other documents, so Government

23   Exhibit 1214 I don't think we introduced a redacted version

24   with Mr. Herbits, but if you look at the e-mail we start in

25   November 2008.  This is the e-mail.  It starts November 2008

Weniger - direct - Penza                    5084

1    and it's Clare Bronfman to Steve Herbits:

2           Steve, I'm confused.  I was under the impression

3    that dad had asked you to come in and help resolve this

4    situation, that he wanted to help us turn things around and

5    confided in you to do so.  If you do not want to or feel that

6    you are not able to, just tell me and I can find someone who

7    is able to.

8           And then we looked at -- we did look at this e-mail

9    before, typical friend or enemy.  And then it continues from

10   Mr. Herbits.

11          And then this was the e-mail we had looked at from

12   Clare Bronfman to Mr. Herbits saying:  Steve, I apologize if I

13   have offended you any way -- in any way, and then it goes on.

14   I certainly do not consider you a puppet and your feeling this

15   way points only to my misuse of your help.  There is evidence

16   on a lot of things and you are correct, there is someone

17   involved in a different way.  Your observations were very

18   astute.  We also have evidence of clear prejudice, wrongdoing

19   and intent to destroy NXIVM's reputation by a different party.

20          The times union has written many front-page stories

21   all supporting those who have damaged us with their criminal

22   acts.  They have failed to seek any of the facts, even to the

23   point that they have published Hochman's work without his

24   permission.

25          Who is Hochman?

Weniger - direct - Penza                          5085

1    A     Dr. Hochman has been discussed in prior testimony and

2    wrote a critical report in relation to NXIVM.

3

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                          5086

1   BY MS. PENZA: (Continuing.)

2   Q    And published several articles with false evidence and

3   then refused to meet with or interview the company's

4   president.  The owner of this entity is George Hearst.

5           Is George Hearst one of the individuals whose

6   purported banking information was in Government Exhibit 204?

7   A    That's correct, yes.

8   Q    I'm sure you recollect the situation back in the '70s

9   with Patty Hearst.  In the case brought against her, she

10  defended herself through accusations of brainwashing.

11          Who's Patty Hearst?

12  A    Just as explained.

13  Q    As any person who values their intelligence is aware

14  brainwashing implies a lack of free will and has been

15  scientifically debunked.  Then it goes on:  I do believe that

16  if Hearst were to understand we do not brainwash people, we

17  teach tools of logic and critical thinking, things might be

18  different.  I do know that Bill Clinton in his last day in

19  office pardoned Patty.  He might be able to help.

20          And then, As it relates to the funding of Rick Ross,

21  I do not need to know who is doing what.  I just want this to

22  stop.  I'm sorry if I mistakenly attempted to direct you.  I

23  also believe you can rapidly facilitate the proper indictment

24  and conviction of Rick Ross and Joseph O'Hara?

25  A    Yes.

                         Weniger - direct - Penza                    5087

1   Q     And then, Mr. Herbitz responds, Including a detective

2   with no leads is blind.  You guys have everything to gain and

3   a lot to lose done badly.  Others are not so at risk.

4           Then is this an example of Clare Bronfman sending to

5   the defendant an example of a response?

6   A     Yes.

7   Q     So she's sending a draft?

8   A     That's correct, yes.

9   Q     And the other e-mails, let's look quickly, she would be

10  forwarding those e-mails to the defendant in some instances?

11  A     Yes.

12  Q     I'm sorry.  That was Government Exhibit 1491 that I just

13  showed?

14  A     It was.

15  Q     I'm going to show you what's in evidence as Government

16  Exhibit 1480.

17          (Exhibit published.)

18  Q     And this is an e-mail from Clare Bronfman to Loreta Garza

19  with the subject line Docs; is that right?

20  A     Yes.

21  Q     And it has two attachments?

22  A     Yes.

23  Q     And one is an Excel sheet and then there's another

24  attachment?

25  A     Yes.

Weniger - direct - Penza                    5088

1    Q     I'm going to go to the other attachment.  And is this

2    letter written from Clare?

3    A     It appears to be, yes.

4    Q     Okay.  Would you read it, please?

5    A     Sure.  Hola, Ale.  Okay, here is a link to the head of

6    the Department of Justice, the link being http://en --

7    Q     You don't have to read the link.

8    A     Okay.  Current position held by Eric Holder.  This is

9    clearly the best connection and best process.  However, I

10   believe there are other options.  There is also the head of

11   the department of each state or region in each state.  A lot

12   of the time they need quote, unquote jurisdiction.  However, I

13   believe with the right connections we can create jurisdiction

14   and make things happen.  Our case affects so many people from

15   all over the world.  It is not hard to find jurisdiction if

16   they are not trying to use it as an excuse to not prosecute.

17   So other options are Southern District of New York or Northern

18   which is not so easy.  This guy is lazy and prejudiced but,

19   again, with the right relationship... and, again, the link to

20   the Northern District of New York.

21          These are two, but if someone has a relationship

22   with someone of this position, we can figure things out...

23   also there are politicians who put them into power who if they

24   tell them to jump, they say how high, so there are options

25   like those.  Also, good to know our opposition is Steve

Weniger - direct - Penza                            5089

1   Herbits who is very close to Clinton, D'Amato and the Jewish

2   mafia.  His power, which predominantly was acquired from my

3   father is not to be taken for granted.  This is why we are

4   where we are.  He and his connections are Goliath.  Let me

5   know if you need more.  Thank you.  Love, Cx.

6   Q    In your review of e-mails does Clare Bronfman often sign

7   things as Cx?

8   A    Yes.

9   Q    And do you know who Ale is?

10  A    I do not.

11  Q    But it's being forwarded by Loreta Garza?

12  A    Yes.

13  Q    Do you know what Loreta Garza's position was in Mexico?

14  A    Loreta Garza was responsible for Rainbow Cultural Gardens

15  and she also owned -- was one of the higher-ranking members of

16  the organization.  She was also a member of DOS.

17  Q    Would she also have connections within Mexico as far

18  as --

19  A    Oh, yes.  Loreta Garza comes from a family that is very

20  well-connected in terms of the media, the media industry in

21  Mexico.

22  Q    Okay.  And, so here if they are trying -- if they are

23  not -- so, first of all, let me just start with this idea of

24  jurisdiction.  Can you explain that a little bit?

25  A    I mean, it's in quotes so when you say explain, I think

Weniger - direct - Penza                    5090

1    it -- there's an idea that jurisdiction can essentially be --

2    the sense I'm getting from this is that jurisdiction can be

3    made wherever it needs to be made.

4    Q    Just generally looking at these things, references to the

5    Attorney General, the Southern District of New York, is that

6    the U.S. Attorneys Office's counterpart in Manhattan?

7    A    Yes.

8    Q    You work with them sometimes?

9    A    Yes.

10   Q    And then the Northern District of New York, that would be

11   our counterpart up in the Northern District of New York?

12   A    Yes, which covers Albany.

13   Q    Sir, are these references to prosecutor's offices?

14   A    Yes.

15   Q    So, in general, what is your sense of this e-mail?

16   A    It's just -- it's -- it seems to be an idea or kind of a

17   concept as to how enemies of Nxivm can be prosecuted, how they

18   can find ways to prosecute enemies.

19   Q    And in your understanding and review of this case, was

20   there -- were there attempts to have various critics or people

21   who were perceived as enemies indicted criminally?

22   A    Yes.

23   Q    I'm going to switch topics and ask you some questions

24   about some of the documents related to DOS.  If that's okay?

25   A    Certainly.

SN        OCR        RPR

Weniger - direct - Penza                    5091

1           MS. PENZA:  Your Honor, may I approach Special Agent
2    Weniger?
3           THE COURT:  Yes you may.
4           (Counsel approaches.)
5    BY MS. PENZA:
6    Q    Special Agent Weniger, I'm showing you what's in evidence
7    as Government Exhibit 1327.  Are you familiar with that
8    document?
9    A    I am, yes.
10   Q    Okay.  And it's hefty.  I wanted to bring it over to you.
11   And is this an e-mail -- I'll go back to the podium.  Give me
12   one second, please.
13          And what is this document?  Can you just explain
14   very generally what this is?
15   A    Sure.  It's the DOS book that we've heard a bit about in
16   terms of being drafted by the first line of DOS.
17   Q    And, so, we went through a lot of the DOS book during
18   Lauren Salzman's testimony; is that right?
19   A    We did, yes.
20   Q    And, so, this is -- on this cover e-mail on January 13,
21   2017 Rosa Laura Junco -- could you remind us who Rosa Laura
22   Junco is?
23   A    Rosa Laura Junco is a first-line DOS slave and also
24   master of a number of women.
25   Q    And she sends to the defendant, Find below the eight

1   chapters each in a separate document for easy access.  Thank

2   you for this opportunity, XO.

3   A    Yes.

4   Q    And there are eight chapters that are attached to this

5   document?

6   A    Yes.

7   Q    And this document is sent from the defendant's Yahoo

8   account to keithraniere@protonmail.com; is that right?

9   A    That's correct.

10  Q    Can you explain what Protonmail is?

11  A    Protonmail is -- it's a highly secure e-mail service and

12  it's located outside of the U.S.  So it's difficult for U.S.

13  law enforcement and other countries' law enforcements to

14  acquire.

15  Q    Around this time, November 25, 2017, were you -- were you

16  trying to determine where the defendant's location was?

17  A    At that time?

18  Q    Yes.

19  A    Yes, we were.

20  Q    And that would continue for several months?

21  A    Correct.

22  Q    During that time did you attempt to -- what types of

23  things did you do to try to locate him?

24  A    We did a number of things.  First, we were looking on the

25  phone records and things of that nature.  We were also looking

Weniger - direct - Penza                          5093

1    for -- at one point we attempted to get his own e-mails and

2    see if there was an up-to-date use.  And then we looked at

3    other people's phone records to see if there was other contact

4    with the defendant.  We noticed at a certain point he began to

5    stop using his normal electronic means as well as his

6    telephone number.

7    Q    And did that make it more difficult for you to locate

8    him?

9    A    It did.

10   Q    And so you were able to -- if you contact Yahoo, is there

11   information -- typically if somebody is using a Yahoo account,

12   that could help law enforcement figure out where their

13   location is?

14   A    Yes, yes.

15   Q    Now Protonmail, when someone is using Protonmail is law

16   enforcement able to get information from Protonmail?

17   A    No, generally not.

18   Q    Do you know where they're located?

19   A    I want to say Sweden, but I'm under oath.  I'm not

20   certain of that.

21   Q    Okay.  But not -- typical process doesn't work?

22   A    Correct.

23   Q    And, so, around this time, November 25, 2017, was there

24   something going on with -- was there a pattern between the

25   defendant's Yahoo account and this Protonmail account?

Weniger - direct - Penza                    5094

1   A    Yes.  He seemed to forward a large number of his e-mails

2   from the Yahoo account to the Proton account and when I say a

3   large amount, the vast majority of the e-mails that he sent

4   were sensitive in nature, either related to DOS or otherwise.

5   Q    Showing you what's in evidence as Government Exhibit

6   1326, this is an e-mail.  Again this is an e-mail that starts

7   from Rosa Laura Junco and on October 15, 2016; is that right?

8   A    Yes.

9   Q    And then again is this another one of these e-mails where

10  we see it being forwarded from Keith Raniere at Yahoo.com to

11  Keith Raniere at protonmail.com in November of 2017?

12  A    Yes.

13  Q    And the e-mail from Rosa Laura Junco says, Find attached

14  the document promised.  The letter S stands for what you can

15  imagine!!  What did the S stand for?

16  A    S was typically used for -- S was used for slave and M

17  was used for master.

18  Q    And this is a document describing something called The

19  Game?

20  A    Yes.

21  Q    We have heard testimony about The Game before?

22  A    We have, yes.

23  Q    And, so at the bottom there's different levels about The

24  Game; is that right?

25  A    There are, yes.

SN        OCR        RPR

Weniger - direct - Penza                                  5095

1    Q    And I just one to look at some of these levels.  This

2    says, Psychological profile, collateral obtained, personal

3    ethics/life issue questions answered?

4    A    Correct.

5    Q    And then there's Level 5, Vulnerability profile.

6    Collateral obtained:  Dare questionnaires, answered

7    vulnerability, testing their boundaries, rules indoctrination,

8    their willingness to be vulnerable?

9    A    Yes.

10   Q    And then at the bottom this says, Measurement of

11   collateral; is that right?

12   A    It does, yes.

13   Q    It says, Collateral can be assessed and measured in the

14   following scales.  Areas:  A collateral is submitted affecting

15   a specific area or areas.  The more areas are affected, the

16   stronger it is.  Each area affected is worth five points;

17   work, family, social credibility, important people affected,

18   assets, wealth, possessions, rights.

19          And then there's, Proof of authenticity.  How much

20   can we prove the collateral is authentic?  This determines how

21   much the collateral is actionable.

22          Right?

23   A    That's what it says, yes.

24   Q    And then it says, To strengthen a collateral, review how

25   you can take it to higher levels based on the below.  Level 1,

Weniger - direct - Penza                              5096

1   electronic information, typed information.  Level 2,

2   information with a signature, information in their own

3   handwriting, photo.  Level 3, information notarized, audio

4   stating the information.  Level 4, legal document including

5   checks, titles, et cetera or video"?

6   A    Yes.

7   Q    And then, Depth of collateral.  How much would revealing

8   the collateral affect their life?  For final measurement of

9   collateral, add the above points --

10           So each of those things have a level of points; is

11  that right?

12  A    Yes.

13  Q    And multiply as follows:  Becomes an inconvenience the,

14  numbers of points times .5.  Loses an important comfort,

15  number of points, times 1.  Affects by limiting options

16  temporary, number points times 2.  Affects by limiting options

17  permanently, number of points times 3.  Affects freedom and

18  all experience of self, number of points times 4?

19  A    Yes.

20  Q    Showing what's in evidence as Government Exhibit 1803, is

21  this a series of e-mails between -- again, is this an e-mail

22  from Keith Raniere at Yahoo.com to a Protonmail account?

23  A    Yes.

24  Q    To karateairlinehen@protonmail.com?

25  A    Right.

1   Q     And that was a Protonmail account that the defendant

2   uses?

3   A     We believe so, yes.

4   Q     And this is an e-mail sent on March 4, 2016 to the

5   defendant?

6   A     Correct.

7   Q     And it says, Source payments?  Hey you, I am so sorry to

8   bug you but I have not been paid --

9             Sorry, this is from Allison Mack to the defendant?

10  A     That's right, yes.

11  Q     And it says:  Hey you.  I'm so sorry to bug you but I

12  have not been paid as a head trainer for The Source since last

13  year and I'm struggling a little with income.  Clare says she

14  cannot approve the payments until you review them.  Is there

15  some way you can review them sooner than later?  I know you

16  are slammed, so if there is any way that I can help make this

17  simpler, please let me know.  I will try to figure out how to

18  be more streamlined with this too.  I love you master XO, A.

19            And the defendant responds, Yes.  Any news on India?

20            And I think we've heard a lot of testimony that

21  India was one of Allison Mack's slaves?

22  A     Yes, she was.

23  Q     And, so, the defendant -- the defendant is responding to

24  Allison Mack's e-mail about The Source money with this

25  question:  Any news on India?

Weniger - direct - Penza                5098

1   A    Yes.

2   Q    And Allison Mack writes back, She is here with me now

3   working on changing her flight?

4   A    Correct.

5   Q    And then Allison writes back, she has changed her flight.

6   Is really emotional as money is tight, but totally see the

7   value in what the lesson is and how it is moving her ahead.

8   She sees how this relates to her whole life.  It is good.  She

9   should reach out to you re meeting again to complete the

10  assignment.  XO, A?

11  A    Correct.

12  Q    And so that e-mail was on March 4th?

13  A    Yes, of 2016.

14  Q    And then this is -- this is another -- showing you

15  Government Exhibit 1805.

16         (Exhibit published.)

17  Q    This is another one of those forwards to Protonmail in

18  November of 2017?

19  A    Yes.

20  Q    And just skipping ahead to the middle part.  It says, Got

21  in touch with Steve Heyworth's assistant.

22         Do you know who Steve Heyworth is?

23  A    Yes.

24  Q    Who was Steve Heyworth?

25  A    I believe he was an individual that was contacted by the

Weniger - direct - Penza                              5099

1   first line for the purposes of looking for branding and

2   branding information or, like, a seminar on branding, but also

3   to actually conduct branding.

4   Q    And then there is a statement, As well I've been thinking

5   lots about, quote, The Program.  I am so looking forward to

6   getting started.  Is there something I can do to move it

7   ahead?  And then here is an e-mail from the defendant.  And he

8   says, "Does India know to complete her, she needs to take all

9   of her clothes off while I am clothed, pose in the most

10  revealing way and have me take a picture of her with her phone

11  to be immediately sent to you as proof?

12  A    Yes.

13  Q    And Allison Mack response, Wahoo, with a smiley face?

14  A    Yes.

15  Q    And that was one day before the e-mail about India

16  changing her flights?

17  A    Correct.

18  Q    Showing you what's in evidence as Government Exhibit

19  1287, are you familiar with this document?

20  A    Yes.

21  Q    Okay.  And, so, fair to say there is -- it starts with a

22  back and forth between Nicole and Allison -- and Allison Mack?

23  A    Yes.

24  Q    And turning here, on October -- so on October 20th

25  Allison forwards the back and forth to -- sorry, let me just

Weniger - direct - Penza                              5100

1   show you this.  On October 20, 2016 Allison forwards the chain

2   to the defendant and writes:  I am not sure what to do?

3   A     Yes.

4   Q     And then the defendant writes back, what aren't you sure

5   of?  What are your options?  What bothers you the most?

6   A     Yes.

7   Q     Okay.  And Allison -- and this is -- and Allison writes

8   back on October 21, 2016 at 11:40 a.m.?

9   A     She does.

10  Q     October 21, 2016, where -- you were present for Nicole's

11  testimony?

12  A     I was.

13  Q     Okay.  Where does October 21st fit in?

14  A     I believe this is -- this is where -- is this the meeting

15  in -- I'm not quite sure, to be honest with you.  I think this

16  is the meeting where she's met in New York City by Allison

17  Mack.

18

19                (Continued on the following page.)

20

21

22

23

24

25

SN        OCR        RPR

Weniger - Direct - Penza                                    5101

1    BY MS. PENZA (Continuing):

2    Q    October 21, 2016?

3    A    I'm not quite certain.

4    Q    So, can you read this e-mail, please?

5    A    I don't know how to help her see the value of what we are

6    doing when she seems so committed to not.  I feel I have to

7    force her into believing this is good, all the while she is

8    screaming and yelling how much it is not.

9            It bothers me that she is stilling working with

10   another life coach.  I didn't know she was doing this until

11   she mentioned her, quote/unquote, coach in the letter, and,

12   yet, it doesn't feel okay for me to tell her she can't do

13   that.

14           Her tantrums are working on me and I don't know how

15   to make it better, as part of me wants to let her go, she

16   seems so unhappy, like we are killing her dreams, her spirit,

17   her life.  It is rough and her need to believe this is true

18   makes it seem unresolvable.  She seems like she refuses to

19   change her perspective.  I don't know what to do about that.

20           I question my approach with her.  I feel like maybe

21   if I was more integrated, more loving, more present, more

22   attentive she wouldn't feel this way.  My impulse is to just

23   give her more of what she wants, but I know this isn't good

24   either.

25           Options:  One, spend more time with her.  Connect

Weniger - Direct - Penza                     5102

1   with her hourly to check in and make sure she is okay.

2          Two, be more hard on her, more force.  Tell her to

3   leave her coach, stop complaining, give her a challenging task

4   she has to do in order to break her.

5          Three, command her to move here.  Bring her close so

6   I can keep a better eye on her and work with her more

7   directly/intimately.

8          Four, let her out of The Vow.  Let her go

9   completely.

10          Five, back off all together.  Don't let her out of

11   Vow but let her struggle without chasing her and see how she

12   does.

13          Six, be honest with her re my experience of her

14   struggle and how it effects her and me and you.  Teach her the

15   effects of her behavior in a loving/nonpunishing way so she

16   can see what she is doing and, hopefully, be inspired to

17   change it herself.

18          Are there things I am not seeing?

19          Thank you for your guidance in this, M.  She is a

20   toughy.

21          XO, A.

22   Q    Showing you what's in evidence as Government Exhibit

23   1816.

24          (Exhibit published to the jury.)

25   Q    Is this an e-mail change between Michele and Allison?

LAM      OCR      RPR

Weniger - Direct - Penza                                      5103

1    A     Yes.

2    Q     This is November 19, 2016?

3    A     Yes.

4    Q     And it says -- why don't I read the first part and then

5    you can read the second part?

6    A     Before we move forward, I apologize, if we could go back

7    to the last e-mail.  I just want to check a date, because you

8    had asked me a question...

9    Q     I did ask you a question.

10   A     You did.

11   Q     Are you recollecting when this was?

12   A     It's shortly -- I am not, actually.  My apologies.

13   Q     Special Agent Weniger, do you remember when Nicole had

14   the table assignment?

15   A     Yes, I'm sorry.  This is right immediately -- I believe

16   this is immediately -- no, I'm not recollecting.  My

17   apologies.

18   Q     Okay.  So, we'll go back to 1816, Michele to Allison

19   Mack.

20          Hi, M.  I forgot two things from my list that I

21   already submitted.  Here's the update for mine.  Already

22   submitted -- what you have -- sexual child abuse accusation,

23   there are two of those; child abuse/statutory rape letter;

24   flash drive with nude photos and sex tape; and a notarized

25   letter turning over an inheritance to my dad's house in

LAM        OCR        RPR

Weniger - Direct - Penza                5104

1    Sheffield.

2            Is that where the Berkshires house was?

3    A    Yes, correct.

4    Q    Nude photos of myself and a sexual video of me.

5    A    Yes.

6    Q    And then created but not yet submitted -- I'll just go

7    over -- a letter to someone saying I got pregnant, cheated on

8    him and ended up having an abortion; a video of me to my

9    mother, telling her that my dad sexually abused me as a child.

10   It goes on.

11           And then at the bottom, it says:  And from Souki.

12           Who was Souki in relation to Michele?

13   A    Souki was Michele's slave.

14   Q    And this has things that she submitted?

15   A    Correct.

16   Q    And there are certain letters, there's a renunciation of

17   inheritance, there is another letter about sexual abuse.

18   A    Correct.

19   Q    And it goes on, and then at the bottom, Michele writes:

20   I told her she still owes me five more pieces in addition to

21   what has not been submitted and then there will be another

22   piece that needs to be submitted in December.

23   A    Yes.

24           (Exhibit published to the jury.)

25   Q    Showing you what's in evidence as Government 1817, can

LAM      OCR      RPR

Weniger - Direct - Penza                    5105

1   you read this e-mail and explain the from and to?

2   A    Sure.  This e-mail is from Allison Mack, the date is

3   November 23, 2016, and it is to her -- all of her slaves, her

4   direct slaves.  The subject is:  Assignments.

5            Note:  When you submit your monthly collateral to

6   me, you will upload it to a Dropbox file I just shared with

7   you called, quote, collateral.  You will label it in a file

8   which includes your initials and the date submitted, e.g.,

9   IO11.27.16.  You will tell me right when you have uploaded the

10  file.  I will then go into the file and download the data on

11  to a secure external drive.  Please do not send anything in

12  any other form, e-mail, or format.

13           Copy?

14           XO, A.

15  Q    That's Allison sending it to all four of her slaves?

16  A    Correct.

17  Q    So, that was November 23, 2016?

18  A    Yes.

19           (Exhibit published to the jury.)

20  Q    Showing you what's in evidence as Government Exhibit

21  1818, this is on November 24, 2016?

22  A    Yes.

23  Q    Here, is Allison requesting certain questions about

24  collateral?

25  A    Correct.

LAM        OCR        RPR

Weniger - Direct - Penza                    5106

1    Q    Asks to list the collateral, a description of the

2    collateral, who has the collateral, what area of your life is

3    effected.  And this list, work, family, social credibility,

4    important people effects, assets, rights, other, were those

5    similar to what we saw in the game e-mail?

6    A    Yes.  Also, number six as well.

7    Q    Number six, can you explain that?

8    A    Proof of authenticity in terms of level.

9              Level 1:  A, electronic info; B, typed.

10             Level 2:  A, photo; B, signed; C, in your own

11   handwriting.

12             Level 3:  A, notarized; B, audio recording.

13             Level 4:  A, legal document; B, video.

14             And then number seven, depth of effect:  Creates an

15   inconvenience; loses an important comfort; temporarily limits

16   options; D, permanently limits options E, damages freedom an

17   all experience of self.

18             We saw that as well in the game e-mail.

19   Q    And then it says:  I need this information before

20   tomorrow at 7:00 p.m.

21   A    Yes.

22   Q    Closing doors, making commitments, building trust.  Let's

23   get strong.  XO, A.

24   A    Yes.

25   Q    So, this is sent on November 24, 2016?

1   A    Yes.

2   Q    That's a little more than a month after Rosa Laura Junco

3   sent the game document to the Defendant; is that right?

4   A    That's right.

5            MS. PENZA:  May I just have one moment, please?

6            THE COURT:  Yes.

7            (Pause in proceedings.)

8            (Exhibit published to the jury.)

9   Q    Showing you what's in evidence as Government Exhibit

10  1801, is this another one of the e-mails forwarded from the

11  Defendant to his protonmail account?

12  A    Yes.

13  Q    Who is this an e-mail chain between?

14  A    This is an e-mail chain between Valerie, who is a DOS

15  slave, and Keith Raniere.

16  Q    Can you just remind us how Valerie fits in in the chain?

17  A    She's in Allison Mack's line.

18  Q    Do you remember who her master --

19  A    What's that?

20  Q    I'm going to show you what's in evidence as Defense

21  Exhibit 941.

22            (Exhibit published to the jury.)

23  A    Yes.

24  Q    Is Valerie in that picture?

25  A    Yes, she is.

Weniger - Direct - Penza                    5108

1    Q    Can you just circle on your screen who she is?

2    A    Sure.

3    Q    Not working?

4         Is this her?

5    A    Correct.

6    Q    And, so, this is an e-mail chain between the Defendant

7    and Valerie?

8    A    Yes.

9    Q    Starting on March 4, 2017, the Defendant says:  Instead

10   of your having to rearrange your schedule, maybe we can walk

11   on Sunday later, after the intensive if you like.  I'm not

12   absolutely sure I'll be available, but it is likely.

13   A    Yes.

14   Q    Valerie writes:  Yes, I would love to walk with you.

15   Just in case you need to reach me quicker, here's my number.

16   A    Yes.

17   Q    The Defendant responds:  Where are you staying?

18        She says:  Checking in about tonight.  Do you have

19   an idea of time?

20   A    Yes.

21   Q    The Defendant responds:  Are you available at all hours

22   of the night?  I suspect I will be up all night and I often

23   walk in the middle of the night and early morning.

24   A    Yes.

25   Q    And then it goes on.  And then reading here, can you read

Weniger - Direct - Penza                    5109

1   Valerie's e-mail on March 5, 2017?

2   A    Heading to get some sleep.  Setting my alarm for

3   4:00 a.m.  I will check my e-mail then.  Not sure how to

4   coordinate specific meeting place, but I am at India's.  And

5   if you set a time in this response, at 4:00 a.m. I will check

6   and I will be outside ready at the time you give.  Here is my

7   number again.  If you want to meet in the middle of the night,

8   I'm a light sleeper so a text will wake me and I will come

9   meet.  Signed, Valerie.

10  Q    How did the Defendant respond?

11  A    I'll text you and meet you outside; likely, more around

12  4:15 a.m. or later.

13              (Exhibit published to the jury.)

14  Q    Showing you what's in evidence as Government Exhibit

15  1267, can you explain what this is?

16  A    Yes.  This is a e-mail from Rosa Laura Junco to Keith

17  Raniere, the Defendant, on September 10, 2015.  And it reads:

18  Find below the schedule and costs of the program I propose.

19              It's in relation to the girls school that Rosa Laura

20  Junco was starting.

21  Q    Can you explain what this is?

22  A    This appears to be the schedule that she was proposing.

23  It includes the names Lauris and Carlotta's schedule.

24  Q    Do you know who they are?

25  A    I'm familiar with Lauris.  I believe Lauris is Rosa Laura

LAM      OCR      RPR

1    Junco's daughter.

2    Q    Do you know how old she is?

3    A    Presently, I'm not sure, but she's a teenager.

4    Q    She's a teenager and a teenager on September 10, 2015?

5    A    Yes.

6    Q    Not 18 yet?

7    A    Not 18 yet.

8         (Exhibit published to the jury.)

9    Q    Showing you what's in evidence as Government Exhibit

10   1325, this is another e-mail that the Defendant forwarded to

11   himself on November 25, 2017?

12   A    Yes.

13   Q    To one of his two protonmail accounts that we've looked

14   at?

15   A    Yes.

16   Q    And it forwards an e-mail from October 4, 2015, from Rosa

17   Laura Junco?

18   A    Yes.

19   Q    Can you read this e-mail, please?

20   A    Yes.

21         Hello, M.  I fear I may be affecting Lauris and your

22   possibility for success.  I used to easily feel inspired and

23   alive.  I feel now crippled to operate my daily life.  I am

24   being a crappy SL.

25   Q    Can you tell what "SL" is an abbreviation for?

Weniger - Direct - Penza                    5111

1    A    Slave.

2         I can't find the inspiration to become uplifting,

3    regaining some hope.

4         What triggered this state has been experiencing the

5    complexity of your life and commitments and knowing

6    intuitively that it will only get more complex and

7    complicated.  I love you and have enough of a conscience to

8    want only what's best for you and serve you.  I don't want to

9    add more to your burdens.

10        Wanting anything from you automatically makes me a

11   burden, so I can't allow that.  Part of me feels love, but the

12   other part of me feels neglected, doomed to miss out.  I

13   should know better than to want petty things.

14        I humbly share this because it may be affecting

15   Lauris, keeping her away from you.  If I don't experience my

16   commitment to you joyfully, I cannot genuinely projectively

17   want that for my daughter, and she probably feels that.

18   Personally, I feel it's a phase that I will outgrow, but we

19   don't have time.  I have failed to overcome it and I want your

20   thoughts before I do more damage.

21        I am 100 percent clear that you are what I want for

22   my daughter and, obviously, for myself.

23        I am sorry for my shortcomings.  Frown face.  RL.

24   Q    Special Agent Weniger, in the course of your

25   investigation, did you review various items that indicated

Weniger - Direct - Penza                    5112

1   whether or not the members of the first line were sexually

2   involved with the Defendant?

3   A    Yes.

4   Q    And can you just explain?

5   A    Yes.  So, we were able to -- during the course of our

6   investigation, we were able to review e-mails and

7   correspondence, and, also, just photographs that were

8   exchanged between the first-line DOS slaves and the Defendant.

9   And they were sexually -- suggestive of a sexual relationship.

10               (Exhibit published to the jury.)

11  Q    Showing you what's in evidence as Government Exhibit

12  1828, this is, again, an e-mail forwarded from a protonmail

13  account, from one of his protonmail accounts?

14  A    Yes.

15  Q    And it's a forward from Allison Mack on March 4, 2016?

16  A    Correct.

17  Q    I won't ask you the date where it goes in relation to

18  Nicole, but maybe we can talk about that in the morning.

19               Here, it says:  I wanted to reach out to you both

20  and thank you for this morning.

21  A    Yes.

22  Q    I arrived home and looked at myself in the mirror, and

23  what I saw was such beauty and grace.  I am new to this, to

24  being with more than one person, to exploring and

25  experimenting with my body and others in a free and open way,

Weniger - Direct - Penza                          5113

1    to sharing and releasing and relaxing and enjoying.

2    A    Yes.

3    Q    The level of vulnerability is high and I feel nervous and

4    insecure.

5    A    Yes.

6    Q    And then just skipping -- were you able to tell from this

7    e-mail who Allison sent this to other than the Defendant?

8    A    I believe Daniela Padilla.

9    Q    And at the bottom, it says:  I love that I smell like a

10   mixture of you both.

11   A    Yes.

12   Q    So, at least as of March 4, 2016, does this show

13   something about Allison's Mack's sexual relationship with the

14   Defendant?

15   A    Correct, yes.

16           MS. PENZA:  Your Honor, may I have the Elmo?

17           Maybe I can ask everyone to move their screens and

18   just have the Elmo for the parties and the jury.

19           (Exhibit published to the jury.)

20   Q    Special Agent Weniger, I'm showing you what's in evidence

21   as Government Exhibit 671.

22           Can you describe what this picture is?

23   A    Yes.  This would be what was termed a "family photograph"

24   that was -- were typically conducted at the beginning of

25   meetings amongst the DOS first line.

Weniger - Direct - Penza                              5114

1   Q     And the does the Government have family photographs other

2   than of the first line in its possession?

3   A     Yes.

4   Q     Of other than the first line?

5   A     I'm sorry.

6   Q     Does the Government have family photographs of any other

7   of the circles, other than the first line?

8   A     No, but we are aware that others did conduct family

9   photographs.

10  Q     And is this, what is described as a, quote, family

11  photograph, how does this compare to what has been described

12  as a family photograph for lower ranking slaves?

13  A     It's consistent.

14  Q     Can you just describe who everyone is and just generally

15  what they look like?

16  A     Sure.  So, beginning on the left-hand side of the photo

17  is Daniela Padilla, after her is Loretta Garza, Allison Mack,

18  Monica Duran, Nicki Clyne, and Rosa Laura Junco.

19          From the first line, there do appear to be two

20  individuals missing, one being Camila and the second being

21  Lauren Salzman.

22  Q     And was this photo dated November 2016?

23  A     Yes.  So, it predated the involvement of Lauren Salzman.

24  Q     So, Lauren Salzman was not yet a first-line DOS slave?

25  A     Correct.

Weniger - Direct - Penza                              5115

1   Q    I know there are black bars covering here, but, in

2   general, would it be fair to describe all of the individuals

3   as having a fair amount of pubic hair showing?

4   A    Yes.

5            (Exhibit published to the jury.)

6   Q    One last topic.  Showing you what's in evidence as

7   Government Exhibit 669, are you familiar with this document?

8   A    Yes.

9   Q    Fair to say that as of when you became involved in this

10  case, in October 2017, that this was on a NXIVM website?

11  A    Yes.

12  Q    And this is a biography of the Defendant?

13  A    It is.

14  Q    I want to bring you to right here.  Can you read starting

15  with the second paragraph starting here?

16  A    Sure.

17            Keith Raniere entered Rensselaer Polytechnic

18  Institute, RPI, at age 16.  From his first semester onward, he

19  began taking Ph.D.-level mathematics courses, ultimately

20  taking most of the graduate level physics and mathematics

21  courses available at the time.  Upon graduating, he became

22  RPI's first triple major, earning degrees in mathematics,

23  biology, and physics, with minors in philosophy and psychology

24  and an expertise in computer science.

25            (Exhibit published to the jury.)

Weniger - Direct - Penza                                    5116

1    Q    And we'll look at this a little bit more in the morning,

2    but showing you what's in evidence as Government Exhibit 670

3    and turning to the second page, can you tell me what this

4    document is?

5    A    Sure.  This is Mr. Raniere's transcript from RPI.

6    Q    And, again, we'll go over it a little bit more tomorrow

7    because we're getting to the end of the day, but is this

8    Mr. Raniere's final GPA?

9    A    Yes, it is.

10   Q    Can you read what it was?

11   A    2.26.

12        MS. PENZA:  Your Honor, I think this would be a good

13   place to end for the day.

14        THE COURT:  All right.

15        Members of the jury, we're going to adjourn for the

16   day and we're going to return again tomorrow morning at 9:30

17   and we'll have half-day of testimony.

18        I remind you that it's important that you follow my

19   instruction that you not discuss the case with anybody; not

20   your family, friends, business associates, and not your fellow

21   jurors.

22        Also, you must not read, listen to, watch, or access

23   any accounts of this case on any form of media, such as

24   newspaper, TV, radio, podcast, or the internet, or research or

25   seek outside information about any aspect of the case.

LAM       OCR       RPR

Weniger - Direct - Penza                    5117

1              And do not communicate with anyone about the case on

2      your phone, whether through e-mail, text messaging, or any

3      other means, by any blog or website or by way of any social

4      media, including Facebook, Twitter, Instagram, YouTube, or

5      other similar sites.

6              Also, remember you should not consider anything you

7      may have read or heard about the case outside of this

8      courtroom previously, whether you read it before or during

9      jury selection or the trial, and do not visit any of the

10     locations identified during the course of the jury selection

11     and trial.

12             If you are taking notes, please leave them in the

13     jury deliberation room.  We'll see you tomorrow morning at

14     9:30.  Thank you for your attention.

15             All rise for the jury.

16             (Jury exits.)

17

18             (Continued on the following page.)

19

20

21

22

23

24

25

Proceedings                                          5118

1  (Continuing.)

2           (In open court - jury not present.)

3           THE COURT:  All right, Special Agent, you may step

4  down.

5           THE WITNESS:  Thank you, sir.

6           (Witness steps down.)

7           THE COURT:  Anything else from the Government for

8  tonight?

9           MS. HAJJAR:  No, Your Honor.

10          THE COURT:  Anything else from the defense?

11          MR. AGNIFILO:  Nothing from us, Your Honor.

12          MS. GERAGOS:  Just one thing, Your Honor.

13          THE COURT:  Everyone in the back may be seated.

14          MS. GERAGOS:  Ms. Penza read from Government

15  Exhibit --

16          THE COURT:  I'm sorry.

17          MS. GERAGOS:  Ms. Penza read from Government

18  Exhibit 1325, but we didn't admit that one before.  So I

19  just --

20          MS. PENZA:  Oh, I'm sorry.

21          THE COURT:  But you didn't --

22          MS. GERAGOS:  She didn't admit it before.

23          THE COURT:  Is there an objection?

24          MS. GERAGOS:  No, we consented.

25          MR. AGNIFILO:  No.

Proceedings                                        5119

1           MS. PENZA:  Oh, thank you, Your Honor.  So the

2     Government moves 1325 into evidence.

3           THE COURT:  Right.  1325 is receives in evidence.

4           (Government's Exhibit 1325 was received in

5     evidence.)

6           THE COURT:  And I will get an updated list of all of

7     the exhibits tomorrow morning, which I am very much looking

8     forward to.  It is now on two pages, single-spaced.

9           MS. SMITH:  Yes, it is getting long.

10          THE COURT:  All right.  Anything else?

11          MS. PENZA:  No, Your Honor.  Thank you.

12          THE COURT:  See you tomorrow morning.

13          Thank you, everybody.

14          (The defendant exited the courtroom.)

15          (Judge NICHOLAS G. GARAUFIS exited the courtroom.)

16

17     (Matter adjourned to Friday, June 14, 2019 at 9:30 a.m. )

18

19                          ooo0ooo

20

21

22

23

24

25

            SAM      OCR      RMR      CRR      RPR

5120

1                          I N D E X

2

3    WITNESS                                           PAGE

4

5      BRIAN BOOTH

6          DIRECT EXAMINATION RESUMED BY MS. HAJJAR        4871

7          CROSS-EXAMINATION BY MR. der OHANNESIAN         4881

8          CROSS-EXAMINATION RESUMED BY MR. der OHANNESIAN 4962

9          REDIRECT EXAMINATION BY MS. HAJJAR              4976

10         RECROSS-EXAMINATION BY MR. DEROHANNESIAN        4987

11         REDIRECT EXAMINATION BY MS. HAJJAR              4988

12

13

14     MICHAEL WENIGER

15         DIRECT EXAMINATION BY MS. PENZA                 4990

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

5121

1                    **E X H I B I T S**

2

3

4    Government's Exhibits 518-A through 518-U        4873

5

6    Government's Exhibit 504-B                       4875

7

8    Defendant's Exhibits 945 and 960                 4963

9

10   Government's Exhibit 1822                         5036

11

12   Government's Exhibits 58, 1806, 1807, 1809,

13   1810, 1811, 1812, 1814, 669, 670, 1383,

14   1827, 1829, 1267, 1071, 1005, 1822, 1214,

15   1491 through 96, 1427, 1429, 1433, 1443,

16   1455, 1456, 1457, 1435, 1445, 1480, 374,

17   373, 376, 1820, 1821, 1392, 1482, 1327,

18   1326, 1803, 1805, 1287, 1817, 1818, 671,

19   1828, 1801, 59, 9, and 38                        5055

20

21   Government's Exhibits 1816 and 1819              5056

22

23   Government's Exhibit 1325                         5119

24

25

SAM      OCR      RMR      CRR      RPR