5122

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :    18-CR-00204(NGG)

         Plaintiff ,             :

      -against-               :    United States Courthouse
                              Brooklyn, New York

KEITH RANIERE, et al.,         :
                              June 14, 2019, Friday
         Defendant.              :    9:30 a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:          RICHARD P. DONOGHUE
                             United States Attorney
                             BY: MOIRA K. PENZA, ESQ.
                                 TANYA HAJJAR, ESQ.
                                 MARK LESKO, ESQ.
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York 11201

For the Defendant:           BRAFMAN & ASSOCIATES, P.C.
                             767 Third Avenue
                             New York, New York 10017
                             BY: MARC A. AGNIFILO, ESQ.
                                 TENY ROSE GERAGOS, ESQ.

                             DEROHANNESIAN & DEROHANNESIAN
                             677 Broadway
                             Albany, New York 12207
                             BY:  PAUL DerOHANNESIAN, II, ESQ.
                                  DANIELLE R. SMITH, ESQ.

Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                          5123

1              (In open court - jury not present.)

2         (Judge NICHOLAS G. GARAUFIS entered the courtroom.)

3              THE COURT:  Good morning.

4              MS. PENZA:  Good morning, Your Honor.

5              (Defendant entered the courtroom.)

6              THE COURT:  Appearances.

7              MS. PENZA:  Moira Penza, Tanya Hajjar, and Mark

8    Lesko for the United States.  Special Agent Michael Lever and

9    Paralegal Specialist Teri Carby are also at counsel table.

10             Good morning.

11             THE COURT:  Good morning.

12             MR. AGNIFILO:  Good morning, Your Honor.  Marc

13   Agnifilo, Teny Geragos, Paul der Ohannesian, and Danielle

14   Smith for Keith Raniere, who is with us here this morning in

15   court.

16             Good morning.

17             THE COURT:  Good morning, everyone.

18             MR. der OHANNESIAN:  Good morning, Judge.

19             THE COURT:  All right, please be seated.

20             I am going to start by discussing some scheduling

21   issues.

22             As I noted earlier, we have three jurors who have

23   travel commitments, I would say, beginning with Juror 11 on

24   6/23, Juror 5 on 6/25, and Juror 6 on 6/27.

25             And the schedule that we outlined on Friday makes it

Proceedings                                          5124

1  likely that the jury would not receive the case until sometime

2  late on Wednesday and that would only give the jury either two

3  days, Thursday and Friday; or three days, if they were willing

4  to sit on Saturday, to resolve the case.

5          And it would appear to me that with the -- I am

6  looking at the list of evidence in the case, I have not

7  counted, but it is a lot.  And the fact that there are going

8  to be extensive instructions of over a hundred pages, and that

9  this is a racketeering indictment, that it is going to take a

10  good deal of time for them to sort through everything.

11          So accordingly, I am going to push the whole thing

12  forward, closer.  I need to have a charge conference tomorrow

13  at 11:00 a.m.  And let's make sure that the defendant is

14  produced for that.

15          Monday morning we will have closing arguments, we

16  will start closing arguments.  And I am going to ask everyone

17  to tighten up their closing arguments, not to leave anything

18  out, but to make their closing arguments focused and robust,

19  but not expansive, if at all possible.

20          I am not telling you how much time.  I am not

21  limiting you.  You can speak as long as you need to.  But just

22  remember, the sooner we get this case to the jury, the more

23  likely it is that we won't need to replace a juror and then

24  start from scratch.

25          And I am going to tell the jury that what we are

Proceedings                               5125

1    trying to do is to give this case to them as early in the week

2    as possible.  And also tell them that if they are unable --

3    if they haven't reached a verdict by Friday, and they are

4    willing to sit on Saturday, that we can accommodate that as

5    well.

6                But they need to know that we are trying to get this

7    to them as quickly as possible.

8                Any comments?

9                MR. AGNIFILO:  Nothing from us.

10               MS. PENZA:  No, Your Honor.

11               THE COURT:  All right, 11:00 a.m. tomorrow for a

12   charge conference.

13               Has everyone received the first draft of the charge?

14               MR. AGNIFILO:  We have.

15               MS. HAJJAR:  Yes, Your Honor.

16               THE COURT:  All right, and we have received the

17   Government's language.

18               Now, I also have two letters from the Government.  I

19   think there's the -- is there -- the forfeiture letter.  Do we

20   need to talk -- oh, hi.  Ms. Orenstein, come on up.

21               What is the Government's position on the jury

22   dealing with -- potentially dealing with forfeiture?

23               MS. ORENSTEIN:  Your Honor, our position is that

24   because we are not seeking any specific assets, but only a

25   forfeiture money judgment, that there is no right to retain

Proceedings                              5126

1   the jury to determine that.

2           We could do it all on papers, or if we need a

3   hearing we can do that later on, but not with the jury.

4           THE COURT:  All right, thank you.

5           And I would like to hear from the defense on that,

6   whether orally now or at a later date.

7           MR. AGNIFILO:  Well, I think Ms. Orenstein is

8   correct, but I do want to just check a couple of things on --

9           THE COURT:  Okay.

10          MR. AGNIFILO:  -- and if that's right, then we'll

11  agree.

12          THE COURT:  All right, just let me know.

13          Okay.  Thank you, Ms. Orenstein.  Have a nice day.

14          MS. ORENSTEIN:  Thank you.

15          THE COURT:  Okay.  Anything else before we start?

16          About how much more do you have?

17          MS. PENZA:  I really believe 45 minutes, Your Honor.

18          THE COURT:  All right.  And then the defense?

19          MR. AGNIFILO:  We are definitely going to finish

20  before lunch.

21          THE COURT:  Okay.  At the break, we will have a

22  break, I need to take a short matter.  So I just wanted to let

23  you know about that.  Okay.

24          MS. PENZA:  I'm sorry, Your Honor, just very

25  briefly.

1          Government Exhibits 505 and 505-A were discussed at

2    sidebar yesterday, and were offered by the Government.

3          I believe Your Honor overruled the objection as to

4    them, but we wanted to formally admit them, because I don't

5    think they have been admitted yet.

6          THE COURT:  Do you want to just do it in front of

7    the jury?  Is it all right if we do it right here?

8          MR. AGNIFILO:  You can do it here, Judge.

9          THE COURT:  All right, 505 and 505-A are objected

10   to, correct?

11         MR. AGNIFILO:  I'm --

12         MS. PENZA:  There was -- they were -- that was in

13   relation to Ms. Hajjar's witness, Brian Booth, so...

14         MR. der OHANNESIAN:  I think we -- our objections

15   were on the record and you overruled them.

16         THE COURT:  And you are renewing the objection?

17         MR. der OHANNESIAN:  Yes.

18         THE COURT:  All right.

19         MR. der OHANNESIAN:  Yes.

20         THE COURT:  The objections are overruled.  505 and

21   505-A are received in evidence.

22         (Government's Exhibits 505 and 505-A were received

23   in evidence.)

24         THE COURT:  Let's bring in the witness.

25         (Witness enters the courtroom and resumes the

Proceedings                                              5128

1    stand.)

2              MS. PENZA:  Your Honor, if I may, before the jury --

3    or even as they come in, but 619 is another exhibit that was

4    admitted, but I think the transcript is in error and has the

5    wrong number.  So we just wanted to confirm that 619 is in

6    evidence.

7              MR. AGNIFILO:  That's fine.

8              THE COURT:  All right, 619 is in evidence.  Thank

9    you.

10             (Jury enters.)

11             THE COURT:  Please be seated, everyone.

12             Members of the jury, good morning.

13             THE JURORS:  Good morning.

14             THE COURT:  Before we continue with the testimony of

15   the witness, I'd like to go over the schedule with you again.

16             After reviewing the vacation commitments of three of

17   the jurors, and consulting with the attorneys for both sides,

18   I am revising the schedule.

19             Tomorrow we will have the conference on the jury

20   charge.  Of course, you won't be here, but we will be able to

21   resolve any issues having to do with the jury charge, and

22   prepare a final jury charge for you tomorrow.

23             On Monday we were not going to sit, we were going to

24   have the jury charge discussion, but we are going to sit.  And

25   we are going to start closing arguments on Monday morning at

                SAM      OCR      RMR      CRR      RPR

Proceedings                                          5129

1    9:30.

2              So that gives us an extra day next week.  All right?

3    So that Monday and part of Tuesday, at least, we will have the

4    oral argument of the parties, and then I will give you the

5    charge as to the law.  And then you will begin your

6    deliberations probably, hopefully, early on Wednesday.

7              And that gives you Wednesday, Thursday, and Friday.

8    And if you have not reached a verdict, and it is possible for

9    you to sit on Saturday, I am more than willing to have you sit

10   on Saturday if you are able to resolve any open issues.

11             If the jury has not reached a verdict by Saturday

12   the law is as follows, and I just want to share it with you,

13   without making any comment on any meaning that it would have

14   for you:

15             That if a juror who is deliberating is no longer

16   able to deliberate, the first alternate would take over for

17   that juror, and the deliberations would have to start from the

18   beginning.  So to make it less likely that that becomes

19   necessary, we are trying to provide more days next week for

20   you to deliberate.

21             So this is all in an effort to move the case along

22   and to give you the time next week to carefully consider all

23   of this substantial evidence in the case, and the law as I am

24   going to give it to you in the charge.  So I just wanted to

25   advise you about that.

Proceedings                              5130

1          If we get to the point late next week during

2   deliberations where there's a question of whether to sit on

3   Saturday, I will be back with you about that.

4          So, at this point, we will continue with the direct

5   examination of the witness.

6          The witness is advised that he is still under oath.

7          Ms. Penza.

8          MS. PENZA:  Thank you, Your Honor.

9          Your Honor, may I -- oh.

10

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5131

1   **MICHAEL WENIGER,**

2        called as a witness by the Government, having been

3        previously duly sworn/affirmed by the Courtroom Deputy,

4        was examined and testified further under oath as follows:

5   DIRECT EXAMINATION

6   BY MS. PENZA:

7   Q    This is -- I am showing what's already in evidence as

8   Government Exhibit 669.

9             (Exhibit published.)

10  Q    Special Agent Weniger, good morning.

11  A    Good morning.

12  Q    Yesterday when we looked at this was the website from the

13  NXIVM, this was the NXIVM website regarding Keith Raniere?

14  A    Yes.

15  Q    And it had his biography --

16  A    Yes.

17  Q    -- what purported to be his biography?

18             And it talked about him taking PhD-level mathematics

19  and science classes?

20  A    Yes.

21  Q    And then we looked very briefly at Government

22  Exhibit 670, which was the defendant's transcript, is that

23  right?

24  A    That's correct.

25  Q    Okay.  And so I just want to go through some of the

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                     5132

1    classes that he took.

2          So starting -- I mean, if we just -- and we won't go

3    through all of his entire transcript, but looking at fall

4    1978, there is a number of C's in various classes, organic

5    chemistry, intermediate mechanics, is that right?

6    A    That's correct.

7    Q    And then -- and there are some higher level courses on

8    the next page, is that right?

9    A    It appears so, yes.

10   Q    And as of -- as of spring 1979, the defendant was placed

11   on probation?

12   A    That's correct.

13   Q    At that time, his GPA was a 2.26 -- a 2.49, rather?

14   A    Yes.

15   Q    And then if we look fall 1980, there is an F in general

16   physiology, an F in advanced ordinary differential equations,

17   an F in theoretical physics, and an F in quantum mechanics?

18   A    That's correct.

19   Q    Okay.  And it says he was placed on probation, and that

20   there was actually academic dismissal on 12/31/80?

21   A    Yes.

22   Q    And then go down further, there is a D in experimental

23   physics?

24   A    Correct.

25   Q    Okay.  And then that leads to the final GPA of 2.26?

Weniger - direct - Penza                                    5133

1    A    Yes.

2    Q    I am going to be jumping around topics a little bit this

3    morning, Special Agent.

4            In the course of your investigation, did you review

5    any e-mails and other documents related to the -- to various

6    financial arrangements?

7    A    Yes.

8    Q    So we are just going to look at a couple of those.

9            Showing you what's in evidence as Government

10   Exhibit 1383.

11           (Exhibit published.)

12   BY MS. PENZA:

13   Q    Are you -- are you familiar with this -- are you familiar

14   with this document?

15   A    I am, yes.

16   Q    Okay.  And do you know what this was in relation to?

17   A    I believe this was in relation to exo/eso, a company that

18   was -- that was operated by Danielle.

19           I should explain.  Exo/eso is one of the umbrella

20   companies under NXIVM.

21   Q    Okay.  And I know the screen is going in and out, but I

22   can -- why don't --

23           MS. PENZA:  Your Honor, may I just approach the

24   witness and ask him while we're waiting?

25           THE COURT:  Yes, you may.

Weniger - direct - Penza                    5134

1  BY MS. PENZA:

2  Q    Special Agent Weniger, I am just going to ask you some

3  questions about this document.

4         Government Exhibit 1383, who is this document to and

5  from?

6  A    The document is to Danielle, and it is sent from Clare

7  Bronfman.

8  Q    Okay.  And that's the Danielle who -- is that -- is that

9  the Danielle who did the branding in this case?

10  A    That's correct.

11  Q    Okay.  And then who is copied on this e-mail?

12  A    Adrienne Styles, Sahajo, Rebecca Davis, Bonnie Piese, and

13  the defendant.

14  Q    And do you know a number of those people to be involved

15  in exo/eso?

16  A    Yes, I do.

17  Q    And does this document discuss payments to various

18  individuals?

19  A    Yes, it does -- or at least percentages.

20  Q    And so can you just read the percentages that are listed

21  here?

22  A    Well, I should mention that the -- the portion that's

23  drafted here is in red, which according to the -- or excuse

24  me, magenta, appears to be -- oh, I'm sorry.

25         It says -- it states 70 percent to the mentor,

Weniger - direct - Penza                    5135

1    10 percent to the place owner, 10 percent to corporate, and

2    10 percent to Keith.

3    Q    And is that consistent with other documents that you've

4    reviewed, this idea of 10 percent of proceeds going to the

5    defendant?

6    A    Yes, it is.

7              THE COURT:  You can go back to the lectern.  And the

8    ELMO is working.

9              MS. PENZA:  Thank you, Your Honor.

10             THE COURT:  You're welcome.

11   BY MS. PENZA:

12   Q    Showing you what's in evidence as Government

13   Exhibit 1827.

14             Are you familiar with this document?

15   A    Yes, I am.

16   Q    Okay.  And --

17             A JUROR:  Excuse me.

18   Q    -- at the bottom of the e-mail --

19             A JUROR:  Excuse me.

20             MS. PENZA:  Yes.

21             A JUROR:  It wasn't working.  Now it is.

22             THE COURT:  Okay.  Please let me know any time that

23   something like that happens.

24             Go ahead.

25   BY MS. PENZA:

Weniger - direct - Penza                    5136

1  Q    At the bottom there is a forwarded message from someone

2  named Matt Burbach to John Sandweg.

3          Do you know who John Sandweg is?

4  A    I do.

5  Q    Who is he?

6  A    John Sandweg is the former acting director of Immigration

7  and Customs, and has since gone out on his own to start a

8  immigration consulting firm.

9  Q    Okay.  And do they do other types of consulting as well?

10 A    That's my understanding, yes.

11 Q    And what was their involvement, just very generally, in

12 this case?

13 A    My understanding is that Clare Bronfman was in regular

14 contact and had hired Mr. -- Mr. Sandweg.

15 Q    And is this e-mail in reference to Marianna's visa?

16 A    Yes.

17 Q    Okay.  And so I just want to read -- so here it says --

18 it's talking about a notice of a gift from Keith Raniere to

19 Marianna?

20 A    Yes.

21 Q    Is that right?

22          Do you have a -- from review of other documents, and

23 documents that we are going to look at in a second, do you

24 have an understanding of what's happening here?

25 A    My understanding is that, and I am not an immigration

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                    5137

1   specialist, but my understanding is that a gift is being made,

2   and then -- with the prospect of investment in order to obtain

3   a visa.  There is a particular type of visa that is available

4   and -- in the event that a certain -- a certain amount of --

5   is invested in -- in the U.S.

6   Q     Okay.

7              (Exhibit published.)

8   BY MS. PENZA:

9   Q     And the defendant responds to Clare Bronfman or

10  forward -- here and says:  I don't have the money yet to make

11  this gift.  I won't even be able to assess that for a while,

12  but Pam had a desire to make this gift, which can be done from

13  her estate or something like that.

14             And this is on December 21st, 2016?

15  A     Yes.

16  Q     Okay.  And so at -- December 21st, 2016, the defendant

17  says:  I don't have the money yet to make this gift?

18  A     That's correct.

19  Q     And then do you know whether there was -- there were

20  funds transmitted to Marianna?

21  A     Yes.

22  Q     Okay.  And who ended up transmitting those funds?

23  A     I believe Clare Bronfman's assistant transferred those

24  funds, and they're -- Clare Bronfman's funds were transferred,

25  ultimately.

Weniger - direct - Penza                    5138

1   Q    Okay.  And I am showing you what's in evidence as

2   Government Exhibit 1829.

3            (Exhibit published.)

4   BY MS. PENZA:

5   Q    Are you familiar with this?

6   A    Yes.

7   Q    Okay.  And where did we -- do you know where we obtained

8   this, this document and the page behind it?

9   A    I am not certain.  Maybe from the estate, but I'm not

10  certain.

11  Q    Are you familiar with something called Steiner

12  Redevelopment?

13  A    Yes, it's in the Brooklyn Navy Yard.

14  Q    Okay.  And was this -- was that part of this investment

15  visa, there was going to be an investment in this -- the

16  Brooklyn Navy Yard?

17  A    That's right, yes.

18  Q    Okay.  And do you know whether we received documents from

19  Steiner Redevelopment?

20  A    I assume that's where this comes from.

21  Q    Okay.  And this is a check that was -- that is dated

22  February 3rd, 2017?

23  A    Correct.

24  Q    And the remitter is Michele Tarzia?

25  A    Yes.

Weniger - direct - Penza                          5139

1   Q    And who is Michele Tarzia in relation to Clare Bronfman?

2   A    Michele Tarzia is a bookkeeper for a number of Clare

3   Bronfman's companies.

4   Q    Okay.  And it's a check for $525,000?

5   A    That's right.

6   Q    And then this is a Notice of Gift?

7   A    Yes.

8   Q    And it is dated January 30th, 2017?

9   A    Yes.

10  Q    Okay.  And it's from Clare Bronfman?

11  A    Correct.

12  Q    Again, jumping topics.

13            THE COURT:  What exhibit was that, again?

14            MS. PENZA:  That was Exhibit 1829, Your Honor.

15            THE COURT:  1829, okay.  Thank you.

16  BY MS. PENZA:

17  Q    Special Agent Weniger, are you familiar with something

18  called a sheriff's ID?

19  A    I am.

20  Q    Can you just explain what a sheriff's ID is?

21  A    Sure.  Certain counties within the State of New York,

22  their sheriff's offices will -- will -- assuming that you

23  provide the appropriate documents, will create an

24  identification card.  It's similar to, like, a New York City

25  identification card that one can get.

Weniger - direct - Penza                    5140

1           And it's just for purposes of -- of -- of utilizing

2    as an identification card.  It's not specific to, I think --

3    you know, it's -- it's for any citizen that resides within

4    that county.

5    Q    Now, showing you what's in evidence as Government

6    Exhibit 1819.

7           (Exhibit published.)

8    BY MS. PENZA:

9    Q    Is this something that you're familiar with?

10   A    Yes.

11   Q    Okay.  And is this a -- this is a subset of a larger

12   attachment that was attached to this e-mail?

13   A    Correct.

14   Q    Okay.  So can you just -- can you just explain the

15   "To"/"From" and the attachments?

16   A    Certainly.  So the "To" is from a Proton e-mail that we

17   have associated with the defendant.  The "From" is also,

18   obviously, from the defendant.  It was sent on November 25th

19   of 2017, and it is a forward of a super backup to an SM -- to

20   SMS messages.

21   Q    Okay.  And the -- the full document that was actually

22   attached, is that approximately 2,000 pages?

23   A    Correct.

24   Q    Have you reviewed every page of that?

25   A    I have not.

Weniger - direct - Penza                    5141

1   Q    In general, can you explain -- were -- did you -- did you

2   review it enough to have a sense of what the document was?

3   A    It appeared to be SMS messages.

4   Q    Whose SMS messages?

5   A    The defendant's.

6   Q    I am just going to point you to -- in this specific

7   portion, were there specific messages that you are going to

8   highlight for us?

9   A    Yes.

10  Q    And so who are those messages between?

11  A    Those messages are between the defendant and Kristin

12  Keeffe.

13  Q    And what is the -- the -- is the -- when is the timing of

14  these messages?

15  A    The timing is during Daniela's transport back to Mexico

16  after she was in the room.

17  Q    And so, obviously, the type is a little difficult to see

18  here.  Were you able to make some sense out of it?

19  A    Yes.

20  Q    Okay.  And was there something in particular that was --

21  that was helpful?

22  A    The -- the types, the -- if it -- the reference to Type 1

23  and Type 2 was -- I was able to determine which -- which

24  individual was the sender and the recipient.

25  Q    And did the type actually refer to the direction that

Weniger - direct - Penza                      5142

1   the --

2   A    Yes.

3   Q    -- that the message was going?

4        And was Type 1 incoming and Type 2 outgoing?

5   A    That's right.

6   Q    So Type 2 messages are being sent from the defendant?

7   A    That's right.

8   Q    And we won't go through all of these, but starting here

9   (indicating), this is a Type 1 message?

10  A    Correct.

11  Q    And who is it from?

12  A    (No response.)

13  Q    Sorry.  Can you see?

14  A    Kristin Keeffe.

15  Q    Sorry.  This one (indicating)?

16  A    Oh, excuse me.  Lauren Salzman.

17  Q    Okay.  And this message is being sent on February 10th,

18  2012?

19  A    Correct.

20  Q    Okay.  And can you just try to read it,

21  without reading -- it appears that where there's an apostrophe

22  or something like that, there is a little abbreviation for

23  that.

24        But if you could just read, generally, what it says.

25  A    Sure.

                SAM    OCR    RMR    CRR    RPR

Weniger - direct - Penza                          5143

1              I'd like to go to sleep in the next half hour.  I

2    will set my alarm for 7:00 a.m.  You can wake me any time

3    between now and then.  I plan to go to Wilton at 8:00.

4    Q    And then does that message actually continue?

5    A    It appears so, yes.

6    Q    And how does it continue?

7    A    8:15 a.m. with Kristin.  XO.

8    Q    And from Lauren Salzman?

9    A    Correct.

10   Q    And Wilton, can you just remind us what Wilton is?

11   A    12 Wilton Court was the residence where Daniela was --

12   that the -- that her entire family lived.

13   Q    Okay.  And just here (indicating), was this the -- was

14   this the phone number you were able to associate with Kristin

15   Keeffe?

16   A    That's right.

17   Q    And how were you able to associate that with Kristin

18   Keeffe?

19   A    From the contacts within Lauren Salzman's telephone.

20   Q    And if we just start here (indicating), can you read --

21   and this is Type 1, so this is an incoming message?

22   A    That's right.

23   Q    Okay.  And so can you read the incoming message?

24   A    My biggest concern is her lack of aspiration in light of

25   her shortcomings.  She seems aware that she is a certain way,

SAM      OCR      RMR      CRR      RPR

Weniger - direct - Penza                        5144

1   but doesn't care.  I hope to talk.

2   Q    And then does it -- does the -- does the message

3   continue?

4   A    Yes.

5   Q    Can you read --

6   A    Tonight about the reality of what her life will be like

7   versus what it could have been and how drastic this is.

8   Q    Okay.  And then here (indicating), Type 2, what does that

9   indicate?

10  A    It's a response.

11  Q    Okay.  And this is also -- so this is a response from the

12  defendant, and then to the same number?

13  A    Yes.

14  Q    So to Kristin Keeffe?

15  A    Correct.

16  Q    And so what does the defendant say?

17  A    Be careful she does not catch on, think it is a game...

18  Q    And then if you -- if you can -- and then does Kristin

19  Keeffe respond?

20  A    Yes.

21  Q    And how does she respond?

22  A    What do you mean, catch on to what?

23  Q    And then what does the defendant say?

24  A    That she thinks you are trying to sell her --

25  Q    Does it look like "sell" is in quotation marks?

Weniger - direct - Penza                    5145

1   A     Yes.

2            -- sell her instead of presenting reality...

3   Q     And Kristin responds:  Got it, no selling?

4   A     Correct.

5   Q     And these messages, they are being sent on February 11th,

6   2012?

7   A     That's right.

8   Q     Then -- okay.  So starting here (indicating), do you see

9   where my finger is pointing?

10  A     Yes.

11  Q     Okay.  This is a message -- this is a Type 2 message, so

12  a message from the defendant?

13  A     That's right.

14  Q     And this is on February 13th, 2012?

15  A     Yes.

16  Q     And the defendant -- what does the defendant say?

17  A     Anything more?  Are you okay?

18  Q     Okay.  And then is this where Kristin responds?

19  A     Yes.

20  Q     And what does she say?  And there's --

21  A     Yes, I am --

22  Q     And there's three responses in a row?

23  A     That's correct.

24  Q     Can you just read the whole thing?

25  A     Sure.

Weniger - direct - Penza                          5146

1          Yes, I am fine, thank you for asking.

2          She behaves in a way that is very unnatural.  It's

3    creepy in a way, although I am unafraid.  I think her joy

4    comes from boundary pushing and boundary destruction.

5          I do not think she minds going to Mexico, nor is she

6    worried about money.  She must have come up with a plan in her

7    head.  The short period where she exhibited fear ended at

8    lunch.

9    Q    And then does the defendant -- does the defendant

10   respond?

11   A    He does.

12   Q    And what does he say to Kristin?

13   A    It may be she thought you were trying to scare her.  The

14   natural game playing reaction to that is confidence.  If she

15   were scared, she could not give up the control by letting you

16   know.

17   Q    And then does the defendant continue on?

18   A    Yes.

19   Q    Can --

20   A    Remember, for her it is only about control.

21   Q    And then he continues on again?

22   A    Likewise, the visible overeating.

23   Q    And then does Kristin respond?

24   A    Yes.

25   Q    And what does she say?

Weniger - direct - Penza                    5147

1   A    Hmmm, need to process that.  What do you advise?

2   Q    And then does the defendant respond?

3   A    Yes.

4   Q    And what does he say?

5   A    Even if left on a dirt road going nowhere, she will

6   justify and play a game.

7   Q    And then does he continue?

8   A    Yes.

9   Q    What does he say?

10  A    I believe currently she is incapable of remorse or truly

11  admitting she is wrong.

12  Q    And then Kristin responds:  Agreed, with a sad face?

13  A    That's right.

14  Q    Okay.  And then does the defendant say something else?

15  A    Yes.

16  Q    And what does he say?

17  A    Before Bobo leaves, she should understand she was tested

18  several times, like your comment to her about her father

19  supporting her.  Each time she answers predictably and behaves

20  predictably, with pride and as a game, with no acting

21  conscience.

22  Q    Okay.  And then showing you the next page.  And does the

23  defendant continue on again?

24  A    Yes.

25  Q    And what does he say?

Weniger - direct - Penza                          5148

1   A     Even if she found herself alone on a dirt road in Mexico

2   without money, she would either still play the game or justify

3   her situation with self-pity.  She would never have the true

4   recognition she made a bad mistake.

5   Q     And then it -- and then there is another one?

6   A     She is incapable of truly and deeply admitting she is

7   wrong.

8   Q     And do you have a -- were you able to tell from these

9   messages when the defendant and Kristin Keeffe were exchanging

10  these messages?

11  A     Yes.  As I said earlier, this appears to be during the

12  trip from Clifton Park to the border.

13  Q     Special Agent Weniger, I am going to switch topics again.

14        During the course of your investigation, you,

15  obviously, investigated DOS, is that correct?

16  A     That's correct.

17  Q     And in your investigation of DOS, did you come -- were --

18  did part of your investigation involve reviewing nude images?

19  A     It did.

20

21              (Continued on the following page.)

22

23

24

25

Weniger - direct - Penza                    5149

1    BY MS. PENZA:   (Continuing.)

2    Q    And just in general, was there a commonality to these

3    nude images?

4    A    Yes.  The majority were -- were close-up, inner-labia

5    shots and there were also photographs that would include

6    vaginal shots, but also include the woman's face.

7    Q    In general did there also seem to be a significant amount

8    of pubic hair in the photos?

9    A    Yes.

10   Q    Were -- do you know whether some of these photographs

11   were collateral that you reviewed?

12   A    Some were, yes.

13   Q    Now, since -- since your investigation, are you aware of

14   any collateral being released?

15   A    Yes.

16   Q    Okay.  Can you explain?

17   A    During the course of this trial, I viewed a video that

18   was on Mexico television of the branding ceremony of Sarah,

19   Sarah being the individual that originally went to The New

20   York Times in November of 2017 and discussed her experience

21   with DOS.

22   Q    And was anybody else in the video?

23   A    There were other people.  However, the other people's

24   faces were blurred.

25   Q    Was Sarah's face blurred?

SN        OCR        RPR

Weniger - direct - Penza                            5150

1    A    It was not.

2    Q    And what state of -- were you able to tell from the video

3    clip what state of undress the people were in?

4    A    The majority of the people within the video, I would say

5    within the --

6              MR. AGNIFILO:  Your Honor, could we have a quick

7    sidebar?

8              THE COURT:  Yes.

9              (Sidebar held outside of the hearing of the jury.)

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25









SEALED - SIDEBAR - SEALED                    5154

SEALED - SIDEBAR - SEALED                              5155

1

2

3

4

5    (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Weniger - direct - Penza                               5156

1    (Continuing.)

2    BY MS. PENZA:

3    Q    Special Agent Weniger, I'm showing you what's in evidence

4    as Government Exhibit 550.  Are you familiar with this

5    document?

6    A    Yes.

7    Q    Okay.  And is this a file structure from a hard drive

8    that you're familiar with?

9    A    Yes, of the hard drive that was discussed yesterday.

10   Q    And this was the file structure from the various folders

11   of photographs that were reviewed?

12   A    That's correct.

13   Q    Are you personally familiar with these -- with these

14   files and the photos within them?

15   A    I am, yes.

16   Q    You've reviewed them yourself?

17   A    I have.

18   Q    Okay.  Can you -- was there anything in common about the

19   way that the Studies folders were labeled that you were able

20   to -- or was there -- was there a particular pattern to the

21   way the folders were structured or were labeled, rather?

22   A    Yes.  The folders began with either initials or the first

23   letter of a nickname for the individuals that were depicted in

24   the images inside that particular photo.  Obviously what

25   follows appears to be a date.

SN        OCR        RPR

Weniger - direct - Penza                    5157

1   Q    And from your work -- did you actually discover these

2   files yourself personally?

3   A    Yes, I did.

4   Q    And when you reviewed them, were the individuals

5   recognizable to you, within the folders?

6   A    The vast majority of them were and ultimately I was able

7   to ascertain -- not necessarily immediately with all of them,

8   but ultimately, yes.

9   Q    And how do you go about doing that?

10  A    Just comparing images of -- of other available images of

11  individuals that I was aware of from the course of the

12  investigation.

13  Q    Fair to say in this case there were a lot of photos and

14  videos in order -- that that could be compared to?

15  A    Absolutely.

16  Q    So, I just want to go through each of the folders and

17  have you explain.

18        So, the first one starts 4L.  Who is the individual

19  depicted in those folders?

20  A    Lauren Saltzman.

21  Q    And does the 4L -- how does the 4L relate to Lauren

22  Saltzman?

23  A    My understanding was that the 4L was a nickname for

24  Forlorn, that the defendant would occasionally call Lauren

25  Saltzman, Forlorn and would use that abbreviation, 4L.

Weniger - direct - Penza                              5158

1   Q     And who was in the folder that begins with the letter A?

2   A     Angel Smith.

3   Q     That's just A for Angel?

4   A     Yes.  That's my understanding, yes.

5   Q     And then BJ?

6   A     Barbara Jeske.

7   Q     And were those photographs of Barbara Jeske inside the

8   folder?

9   A     Yes.

10  Q     And whose photographs were in the folder labeled D?

11  A     Dawn Morrison.

12  Q     And I won't say out loud the second initial, but there's

13  a first initial and a second initial, whose photographs do

14  those relate to?

15  A     Daniella and the second letter is consistent with her

16  last name.

17  Q     And the next folder beginning with J?

18  A     I believe that that particular folder had pictures that

19  depicted Barbara Bouchey and indicating a nickname that was

20  used -- during the course of the investigation, it was

21  determined that the nickname that was used was JA.

22  Q     Did that JA come out frequently during the course of the

23  investigation?

24  A     It was regularly used between the defendant and Barbara

25  Bouchey.

Weniger - direct - Penza                                    5159

1   Q      And folder beginning with L?

2   A      That folder depicted Loretta Garza.

3   Q      Is that the same Loretta Garza that was in DOS?

4   A      Yes, the DOS first line.

5   Q      And then the folder that begins MNP?

6   A      These images were of Mariana as well as Pam Cafritz.

7   Q      And M -- cap M with a little O?

8   A      This folder contained images of Monica Duran.

9   Q      Also a DOS slave?

10  A      Correct; also first line.

11  Q      And then this one, MSK?

12  A      This folder contained images of Kathy Russell and during

13  our investigation we determined a nickname commonly within the

14  community for Kathy Russell was Ms. K.

15  Q      And then the folder that starts V?

16  A      These images are the images that were shown yesterday and

17  they depict Camila and a nickname utilized for Camila -- there

18  were several, but Virgin Cami or VC.

19  Q      And you reviewed all of the photos in here; correct?

20  A      Yes.

21  Q      And can you describe generally, were the photos similar

22  in each of the folders?

23  A      Yes.

24  Q      And can you just describe that?

25  A      The majority of the images are photographs of -- vaginas

SN        OCR        RPR

Weniger - direct - Penza                5160

1   and inner labia of women.  Also there tended to be, and that's

2   how we identified them, by virtue of at least one facial shot

3   that also included a nude image.

4   Q    And, in addition to the dates, were there other things

5   that indicated the age of the photographs when you were

6   looking at them?

7   A    The photographs did appear to be dated and so one of the

8   things that we did was we tried to look at other items that

9   were within the photographs to see if we could determine, you

10  know, what point in time they were taken.

11              MS. PENZA:  Just one second, please.

12              (Pause in proceedings.)

13              (Exhibit published.)

14  BY MS. PENZA:

15  Q    I'm just going to show you -- I'm showing you -- I folded

16  it in half, but I'm showing you what's in evidence as

17  Government Exhibit 509-D from the folder that begins with the

18  letter A which I think you said was Angel Smith.  And was

19  there something about this photo that indicated the age of

20  these?

21  A    The telephone.  This other telephone that appears to be

22  by her left arm appears to be an older model Nokia.

23  Q    Is that a phone you actually had at one point in time?

24  A    It is, actually.  In approximately 2002, I had that phone

25  or a similar one.

Weniger - direct - Penza                    5161

1   Q     Did you keep it for a while?

2   A     I did, yes.

3               (Exhibit published.)

4   BY MS. PENZA:

5   Q     Again I'm going to fold it over, but I'm showing you

6   what's in evidence as Government Exhibit 516-A and this is

7   from the folder that was labeled with the M-o.  I think you

8   testified that was Monica Duran?

9   A     Yes.

10  Q     It's a little hard to see in here, but you see the VCR?

11  A     That's what it appeared to be, an older-model VCR.

12              (Exhibit published.)

13  BY MS. PENZA:

14  Q     And now the folders that you reviewed from the Studies

15  folder, how did they compare to the images that you reviewed

16  in the DOS context?

17  A     They were consistent.  The images in 2005 -- the images

18  we believe were taken in 2005 were consistent with the images

19  that were obtained either via collateral or otherwise by the

20  defendant.

21  Q     Did you find images in the defendant's e-mail account?

22  A     Yes.

23  Q     Okay.

24              MS. PENZA:  Your Honor may I just approach the

25  witness, please?

SN        OCR        RPR

Weniger - direct - Penza                    5162

1          THE COURT:  Yes, you may.

2          (Counsel approaches.)

3     BY MS. PENZA:

4     Q    Special Agent Weniger, I'm showing you what's already in

5     evidence as Government Exhibits 1806, 1807, 1809, 1810, 1811,

6     1812 and 1814.  Are you familiar with those?

7     A    Yes, I reviewed these this morning.

8     Q    Okay.  And were these -- I'll just go back to the podium

9     now because I have some questions.

10          Just looking at the dates of these, this is an

11    example of 1, this is Government Exhibit 1806.

12          (Exhibit published.)

13    BY MS. PENZA:

14    Q    And it's -- the forward was "Legal Citations"; is that

15    right?

16    A    That's correct.

17    Q    Are these in evidence?

18          MS. PENZA:  Yes, Your Honor.

19          THE COURT:  Okay.  Go ahead.

20    BY MS. PENZA:

21    Q    Was there anything to do with legal citations in the

22    attachments?

23    A    No.

24    Q    They're all nude pictures?

25    A    That's right.

Weniger - direct - Penza                            5163

1  Q    And it's an forward from Keith Raniere@ -- the original
2  e-mail is February 15 2016?
3  A    Yes.
4  Q    And it's keithraniere@yahoo.com?
5  A    Yes.
6  Q    And then that's forwarded on November 25, 2017 to this
7  karateairlinehen@protonmail.com?
8  A    Yes.
9  Q    And were all of the documents we looked at, were they
10 from similar time periods?
11 A    Yes.
12 Q    So, the original message would have been sent 2015, 2016
13 and then forwarded to the Protonmail account in November 2017?
14 A    Yes, that's right.
15 Q    These images from this 2015/2016 timeframe, are these
16 similarly consistent with the same types of images that you've
17 described?
18 A    Yes, they are.
19 Q    Special Agent Weniger, you said you also reviewed the
20 photographs that were in the folder marked V?
21 A    Yes.
22 Q    And those were photographs that you identified as being
23 of Camila?
24 A    Yes.
25 Q    Did you take any addition -- in addition to the steps

Weniger - direct - Penza                                   5164

1  that we talked about yesterday in terms of the forensics, were

2  there any other steps taken to identify her age in those

3  photos?

4  A    Yes.

5  Q    Can you explain?

6  A    Yes.  Late in the investigation but before trial began,

7  we had a conversation with a witness who indicated that Camila

8  had surgery when she was a teenager on her appendix.  At that

9  time we did two things; one, we verified that information.  We

10  looked back and re-reviewed the medical records that we were

11  already in possession of, obtained from McGinnis Medical

12  Clinic, which I think is already in evidence, and which did,

13  in fact, reflect an appendectomy when Camila was at the age of

14  16.

15        We also contacted the attorney for Camilla's -- a

16  sibling of Camila, and asked and requested a review for any

17  potential medical records that this individual was in

18  possession of.  In fact, we got back -- we learned that the

19  individual was in possession of X-rays related to this

20  particular surgery.  And, so, we reviewed those X-rays.  We

21  reached out to the radiology clinic in regards to the X-rays

22  and they referred us then to the hospital in which the

23  physician that saw Camila at the time and performed the

24  appendectomy and we were able to obtain the medical records

25  from that appendectomy.

Weniger - direct - Penza                          5165

1    Q    Okay.  So I'm showing you what's in evidence as

2    Government Exhibit 548.  Are these some of the records that

3    you obtained?

4              (Exhibit published.)

5    A    Yes.

6    Q    And just -- we've looked at these before, but Camila had

7    appendix surgery on January 9, 2007?

8    A    That's correct.

9    Q    And have you reviewed photographs of Camila from after

10   January 2007?

11   A    I have.

12   Q    And you've reviewed photographs up until how recently?

13   A    As recently -- of Camila?

14   Q    Yes.

15   A    Yes, as recently as 2007 -- excuse me 2017, 2018.

16   Q    And in those photographs is there any scar visible from

17   this appendix surgery?

18   A    In those photographs, there are.  The scars are reflected

19   in those photographs.

20   Q    After January 9, 2007, the scars were reflected?

21   A    Yes.

22   Q    And did you review those photographs and compare them

23   with the photographs that were within the Studies folder under

24   V?

25   A    Yes, I did.

Weniger - direct - Penza                              5166

1    Q    And what did you determine?

2    A    I determined that in the Studies folder those images do

3    not reflect a scar where the appendectomy occurred.

4    Q    And so what did that tell you?

5    A    That told me that the scar -- that those photographs were

6    taken before the appendectomy surgery in 2007.  I should add

7    that the appendectomy surgery occurred when Camila was 16

8    years old.

9    Q    One second, Special Agent.

10             (Pause in proceedings.)

11             MS. PENZA:  Your Honor, may I approach Special Agent

12   Weniger?

13             THE COURT:  Yes, you may.

14             (Counsel approaches.)

15   BY MS. PENZA:

16   Q    Special Agent Weniger, I'm showing you what are already

17   in evidence as Government Exhibits 530 and 518-F.  Are you

18   familiar with these photographs?

19   A    I am, yes.

20   Q    And can you -- can you explain them and compare them,

21   please?

22   A    Certainly, the photograph on the left is a nude image of

23   Camila and it does reflect -- when I say the photograph on the

24   left, it's Government Exhibit 530 and it reflects a scar on

25   her and on the lower right-hand side.

Weniger - direct - Penza                    5167

1   Q    And are you able to tell the date of that photograph?

2   A    We do have it.  I don't know it off the top of my head,

3   but I can tell you that it's a relatively recent photograph.

4   I believe 2017, 2018.

5   Q    She's branded in that photograph; is that right?

6   A    That's correct.

7   Q    And then can you compare it with the other photograph?

8   A    The photograph on the right which is Government Exhibit

9   518-F is the image -- one of the images that was shown to the

10  jury yesterday and it does not reflect a scar on her lower

11  abdominal region.

12          MS. PENZA:  Your Honor, these photographs have been

13  redacted.  May I ask permission to pass them around to the

14  jury?

15          THE COURT:  And they're Exhibit Number?

16          MS. PENZA:  518-F and 530 with redaction tape.

17          THE COURT:  Step up here.

18          (Counsel approaches.)

19          THE COURT:  All right, you may show them to the

20  jury.

21          MS. PENZA:  Thank you.

22          (Exhibits shown to jury.)

23  BY MS. PENZA:

24  Q    Special Agent Weniger, I'm turning to the last topic now.

25  Showing you what's in evidence as Government Exhibit 1469.

Weniger - direct - Penza                    5168

1          (Exhibit published.)

2    Q    Are you familiar with this?

3    A    Yes.

4    Q    Okay.  And can you just read the From and To in the

5    attachment?

6    A    The From is Michele Saltzman.  The To is Nancy Saltzman

7    and the subject is Jness KR Form 102412 for 10/24/12, part

8    two.

9    Q    Special Agent Weniger, do you know what a Jness form is?

10   A    Yes.

11   Q    Can you explain briefly?

12   A    It's a form typically where the defendant would come and

13   speak to a large group and questions would be asked to him and

14   of him and he would respond and answer.

15   Q    And have you actually reviewed a video forum that

16   corresponds to this document?

17   A    Yes.

18   Q    A video forum from October 24, 2012?

19   A    Yes.

20   Q    So this is what appears to be a transcript of sorts.

21   A    From that forum, correct.

22   Q    I just want to read this portion.  And this is -- when it

23   said K, based on your review of the video, would K correspond

24   to the defendant?

25   A    Yes.

SN        OCR        RPR

Weniger - direct - Penza                    5169

1   Q    I'm just going to read a portion here.  "Now, understand,

2   women.  Here's an interesting tidbit for you.  Do you know

3   that that -- there is a certain percentage of women that when

4   they get raped they have orgasm even if they don't want it.

5   There are even some women, a few that I've spoken to,

6   counseled, that they never had an orgasm in their life until

7   they were raped."

8   A    Yes.

9   Q    And at the bottom on the same topic, "Don't you feel like

10  you should throw her out?  Some guy who didn't even give any

11  damn about her came in did what you couldn't do, not even

12  caring about her?  Maybe you even work hard to do that.  You

13  feel totally insufficient, I think.  I mean, one of the things

14  about men, that's our whole thing.  We earn.  We want to be

15  worthy, we want to be given the laurels.  We want to be told

16  we are the champions.  How do you do that?  You have sex with

17  us.

18          "We beg, we beg all of our lives as little kids.

19  We're the ones who had to ask the women out on the date we are

20  the ones who get refused over and over again."

21  A    Yes.

22  Q    And I'm going to put up a portion that -- this

23  is Government Exhibit 1469.

24          (Exhibit published.)

25  Q    If you could read the highlighted portion.

Weniger - direct - Penza                                5170

1    A    Sure.  "I will tell you I've had in my past various

2    sexual experiences.  I've had sexual experiences with women

3    that have had other partners.  I have had other partners

4    myself and things like that and these things.  When you really

5    love someone, if you really love a woman and she wants to be

6    with another man, it may sadden you and you may feel deeply

7    insecure, but you are going to say Let it be.  If you care for

8    her and that is what she wants, do you really want to say, No,

9    you can't; I'm going to put you in your room?  That's not

10   love.  That's not love for her person.  You have to let it go.

11   It is a moral imperative to let her go."

12            (Exhibit published.)

13   Q    I'm now showing you what's in evidence as Government

14   Exhibit 1071.

15   A    Yes.

16   Q    Are you familiar with this?

17   A    Yes, I am.

18   Q    And this is -- what is the title of this?

19   A    *The Human Experiment*.

20   Q    And what does this say here?

21   A    Level II-C.

22   Q    Are you familiar with the different levels of curriculum

23   within NXIVM?

24   A    Yes.

25   Q    And can you just describe as an overview kind of the

SN        OCR        RPR

Weniger - direct - Penza                    5171

1  progression?

2  A    Certainly.  So, the kind of the Level I are the

3  intensives, the five-day and the 16-day.  And as you move up

4  into Level II and beyond, the -- kind of the rhetoric and the

5  curriculum appears to become more misogynistic as well as

6  there seems to be a great deal of sexual overtones.

7  Q    So just what was the name of this module within the human

8  experiment?

9  A    *Sex, Rape and Orgasm.*

10 Q    And can I just have you -- this says, "Rape as a metaphor

11 for orgasm"?

12 A    Yes.

13 Q    I'll actually have you read this portion.  Can you read

14 this portion, please?

15 A    Yes.  "In the case of rape, it's the same thing.  There

16 is the tension ultimately of being overcome, but release and

17 it is a sexual experience.  In a sense, it's the very act of

18 sex.  Most people feel inhibited during sex because they

19 believe it's bad and, therefore, do not reach orgasm during

20 the act of sex.  Often, women who have that report an

21 unexpected experience of freedom which occurs during rape.

22 Women actually become hypersensitive to the sensation of sex

23 because the issue of it being bad or inappropriate does not

24 exist during rape; freeing them to achieve orgasm.  It's

25 almost as though they don't experience their normal fears

SN        OCR        RPR

1   regarding sex which frees them to feel this sensation.  This

2   is often a very confusing experience for them because they

3   don't want to like what is happening to them yet they have

4   orgasm.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Weniger - Direct - Penza                              5173

1   BY MS. PENZA (Continuing):

2   Q    This is Module 9 from the Human Experiment.

3        Can you just read the top?

4   A    The Human Experiment:  Module 9.  Abuse, rights, and

5   injury.

6   Q    And can you -- it says here:  Expert groups.  Discuss the

7   following in three rounds:  What is abuse?  What does it mean

8   to abuse someone?  Are all abuses against right?  Why would

9   someone want to abuse babies?  If someone comes from a country

10  where adults orally stimulate children and they find out

11  according to American culture they have been abused, have

12  they?  Who did the abusing?  Who is the injured party?  Who

13  injured them?

14       Can you read this one?

15  A    A person at age six had a sexual experience with three

16  adults, two male and one female, one of which was a priest

17  another was their parent, and the third was a neighbor.  This

18  experience involved almost every time of sex and violence.

19  The person is now 50 years old with no physical effects.

20  Q    Can you read what follows that?

21  A    Number seven, how were they injured?  Were they abused?

22  What if they enjoyed it, were they abused?  What if they later

23  find out it was only a dream, were they still abused?  When

24  does a hypothesis of past become abuse?  What present data, if

25  any, is needed to support this?

LAM        OCR        RPR

Weniger - Direct - Penza                    5174

1   Q    I'm just going to have you read starting with the top of

2   the highlighted portion.

3   A    If someone comes from a country where adults orally

4   stimulate children and they find out according to American

5   culture they have been abused, have they?

6            Answer, Yes.

7            Who did the abusing?

8            The abuser is our culture, our society.

9            Who is the injured party?

10           The person who suffered the abuse is the injured

11  party.

12           Where is the injury if an adult parent has sex with

13  a child and the child enjoys it?

14           The person who suffered the abuse is injured.

15  Parents are not supposed to have sex with children in our

16  society.  If a parent does have sex with a child, it

17  undermines the societal definition of the parent.  The child

18  will go forth and either never disclose it or live with the

19  fact that the parent is not a standard parent.

20  Q    And then it says:  Is this a problem?  You have to think

21  this through.

22  A    That's correct.

23  Q    And then I'll go down to this portion.

24           Can you read starting here?

25  A    Sure:  Sex.  An adult and a child are having sex.  What's

Weniger - Direct - Penza                              5175

1   the difference between the child feeling good about being

2   tickled and being stimulated?

3           Answer, One may say nothing, but there's a

4   possibility of disease transfer and pregnancy.  This makes it

5   a slightly different act.  In the case of pregnancy, it is a

6   profound act.

7   Q    Can you continue?

8   A    Is there anything wrong with feeling good through sex?

9           There is sex that involves disease transfer and no

10  procreation.  There is also sex that minimally involves

11  disease transfer and no procreation.  For example, an adult

12  manually stimulates the child.  Should the child be allowed to

13  masturbate the adult?  Should the adult be allowed to

14  masturbate the child?

15          Answer, These are things students have to think out

16  for themselves.  We are raising the issues on how to think

17  about the issue and generate an opinion.  Be careful as head

18  trainer not to give an opinion.

19  Q    Special Agent Weniger, the last thing I'm going to show

20  you is two videos.

21          MS. PENZA:  Mrs. Carby, can you please cue up

22  Government Exhibit 1005?

23          And Special Agent Weniger, are you familiar with

24  this video?

25  A    Yes.

Weniger - Direct - Penza                    5176

1              THE COURT:  It's in evidence?

2              MS. PENZA:  It is in evidence, your Honor.

3   Q    Can you just describe -- the jury has seen this video

4   before, correct?

5   A    Yes.

6   Q    It was played during Sylvie's testimony?

7   A    Correct.

8   Q    Can you just explain briefly what the setting is?

9   A    This is a Jness meeting, and it involves women of all

10  ages, to include what appear to be teenagers.

11  Q    And there are also women who are DOS slaves in this

12  video?

13  A    Yes, that's correct.

14             MS. PENZA:  Mrs. Carby can you please play starting

15  at 29:22 -- sorry 12:58.

16             (Video plays; video stops.)

17             THE COURT:  If you want, I can have the midmorning

18  break and then you can come back and play that.

19             MS. PENZA:  I only have two videos and that's it for

20  testimony.

21             THE COURT:  The audio can't be heard.

22             MS. PENZA:  Understood, of course.  I'm just letting

23  your Honor know this will be it for my testimony.

24             THE COURT:  We'll take our mid-morning break.  All

25  rise for the jury.

Weniger - Direct - Penza                         5177

1          (Jury exits.)

2          THE COURT:  You may stand down.

3          (Witness leaves the stand.)

4          THE COURT:  I have a premotion conference to do

5     right now and we'll resume in ten minutes.  We're bringing in

6     someone from IT to go over the availability of the audio.

7          MS. PENZA:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          (Recess taken.)

10         THE COURT:  Let's bring in the witness, let's bring

11    in the jury, let's go.

12         (Witness resumes the stand.)

13         THE COURT:  About how long do you think the cross

14    will be?

15         MR. AGNIFILO:  Less than an hour.

16         THE COURT:  After that, I have another matter.

17    First, we have other things to do.

18         (Jury enters.)

19         THE COURT:  Please be seated, everyone.

20         Ms. Penza, you may continue your examination.

21         MS. PENZA:  Thank you your Honor.

22         Mrs. Carby, can we please play Government Exhibit

23    1,005 already in evidence starting at 12:58.

24         (Video plays; video stops.)

25         MS. PENZA:  Thank you, Mrs. Carby.

LAM        OCR        RPR

1    BY MS. PENZA:

2    Q    Special agent Weniger, this is Nancy Salzman speaking

3    here?

4    A    Yes, it is.

5    Q    She's reading from a piece of paper?

6    A    She is.

7    Q    Are you familiar with the process of how Nancy Salzman

8    would get the material for these Jness trainings?

9    A    Yes.

10   Q    Can you explain?

11   A    The curriculum -- our understanding is the curriculum was

12   generated by virtue of what they would term "downloads" by the

13   Defendant.  So, the Defendant would sit with Nancy Salzman and

14   sometimes others and essentially provide his thoughts on a

15   particular subject matter, and that information would be

16   either recorded and later -- would typically be recorded and

17   transcribed by Nancy Salzman or others and then placed into

18   the curriculum such as you have here.

19   Q    It's the Defendant who is creating the curriculum

20   originally?

21   A    That is correct.

22   Q    For this specific video, were you able to determine --

23   were you able to actually review a different video that showed

24   this process?

25   A    Yes.

Weniger - Cross - Agnifilo                    5179

1      MS. PENZA:  Mrs. Carby, may we show what's already

2  in evidence as Government Exhibit 1003, beginning at 29:22.

3  Q    Sorry, before I start the video, do you know who was in

4  this video?

5  A    The Defendant's depicted as well as I believe Nancy

6  Salzman, as well as I think Allison Mack is on Skype or

7  something similar to Skype, and Marianna.

8  Q    Is that Allison Mack's voice we just heard at the very

9  beginning?

10  A    Yes.

11      MS. PENZA:  And Mrs. Carby, can we start at 29:22,

12  please?

13      (Video plays; video stops.)

14  Q    Special Agent Weniger, is that consistent with the Jness

15  training that we just watched?

16  A    Yes, it is.

17      MS. PENZA:  No further questions.

18      THE COURT:  Cross-examination.

19  CROSS-EXAMINATION

20  BY MR. AGNIFILO:

21  Q    Good morning, Special Agent Weniger.

22  A    Good morning, sir.

23  Q    I'm going to ask you some questions.  First, I know we've

24  been speaking through the trial, but I'm Marc Agnifilo, I'm

25  obviously representing Keith Raniere.

Weniger - Cross - Agnifilo                    5180

1          I'm going to ask you some questions.  If I ask you a

2    questions that's unclear to you, please feel free to ask me to

3    repeat it or put it differently.  I'm happy to do that.

4    A    Understood.  Thank you.

5    Q    Fair to say you saw a tremendous amount and you recovered

6    a tremendous amount of audio tapes and videotapes of Keith

7    Raniere speaking about various subjects, correct?

8    A    That's true, yes.

9    Q    And I think that you're the case agent, so you heard some

10   of the testimony in the trial that there were something like

11   2,000 modules of about two hours each, correct?

12   A    Yes.

13   Q    And fair to say only a small portion, probably less than

14   one-tenth of one percent, of everything that he said has been

15   played at this trial?

16   A    That's true.

17   Q    Now, incidentally -- and I'm just asking -- do you know

18   who that was speaking in that last videotape?

19          Do you know if it was Dani Padilla or Marianna or do

20   you not know?

21   A    I was under the impress it was Marianna.

22   Q    Fair to say you're not sure?

23   A    I'm not certain.

24   Q    Couple questions.  I want to go back.  I want to go sort

25   of through the order that you went through in the direct.  And

Weniger - Cross - Agnifilo                    5181

1    I'm going to only refer to things that are in evidence either

2    as Government Exhibit 1401, which I think is the oakhaven

3    e-mail account, or the box that we're talking about that was

4    recovered at Nancy Salzman's house, which is 204, and I think

5    the copy of the box is 204-A.  So, I'm just going to ask you

6    some questions about certain things that are in those

7    materials.

8              You spoke a lot in the beginning of your testimony

9    yesterday about Canaprobe; do you remember all that stuff?

10   A    Yes.

11   Q    I'm going to show you -- this is 1401.  It's a particular

12   page of 1401, ending 820.

13             MR. AGNIFILO:  This is all in evidence, so we can

14   show it to the jury.

15             THE COURT:  Okay.

16             MR. AGNIFILO:  Thank you, Judge.

17             (Exhibit published to the jury.)

18   Q    So, this is an e-mail from Richard Marier.  And I think

19   you were saying yesterday Richard Marier is the principal of

20   Canaprobe?

21   A    Yes.

22   Q    And he's sending this to Clare and to the oakhaven

23   e-mail, and the oakhaven e-mail is Kristin Keeffe?

24   A    That's my understanding.

25   Q    And the date of this is March 11, 2009, at 12:14 p.m.,

Weniger - Cross - Agnifilo                    5182

1   right?

2   A    Yes.

3   Q    Do you have an understanding that Canaprobe kind of came

4   onboard a little bit before this, like maybe January,

5   February, 2009?

6   A    I think it actually may have been a little earlier than

7   that, 2008.

8   Q    Do you know when in 2008, ballpark?

9   A    I don't.

10  Q    Here, what we have here is we have Marier, on behalf of

11  Canaprobe, sending this to Clare and to Kristin at her e-mail

12  address.  And it looks like that they're doing certain

13  searches and there's an invoicing for that, correct?

14  A    Yes.

15  Q    So, we're going to look at some of the specifics.  The

16  first one we're going to look at -- and this is from the box,

17  it's a copy -- let me give you a little more scope on this.

18  Here we go.

19          So, you saw a number of these general types of

20  reports, correct?

21  A    Yes, sir.

22  Q    For a variety of different folks, right?

23  A    Yes, sir.

24  Q    And this one is in particular for Rick Ross, who

25  testified at the trial here, right?

Weniger - Cross - Agnifilo                    5183

1   A    I believe Rick Ross Institute.

2   Q    Right, Rick Ross Institute.

3        And I think what you said on direct examination

4   yesterday is you had reason to believe that a lot of the

5   information in these reports from Canaprobe was false.

6   A    Yes.

7   Q    So, I just want to go through this in a tiny bit more

8   detail.

9        First of all, on top it says:  This is an interim

10  report from April 30, 2009.

11       Correct?

12  A    Yes.

13  Q    You understand this to be report from Canaprobe, correct?

14  A    Yes, sir.

15  Q    And just so the jury understands what's happening is

16  Canaprobe gets hired, and then Canaprobe is asked to do kind

17  of financial and background investigations into a number of

18  different people, right?

19  A    That's my understanding, yes, sir.

20  Q    And here's the report on Rick A. Ross Institute, and I

21  just want to go through some of the entries here.

22       What they are claiming is that the Rick A. Ross

23  Institute has bank accounts in Nassau, Bahamas; do you see

24  that?

25  A    I see it, yes.

Weniger - Cross - Agnifilo                 5184

1   Q    In Monte Carlo, in Switzerland, another one in

2   Switzerland, Grand Cayman in Cayman Islands, Jersey, and then

3   in Hong Kong.

4         And I don't think the Jersey here is New Jersey,

5   it's a different Jersey, right?

6   A    I'm uncertain.

7   Q    That's all right.

8         Do you have every reason to believe that this

9   information is false, that the Rick A. Ross Institute does not

10  have bank accounts in Switzerland and all these other places?

11  A    I don't know.  I'm unaware.

12  Q    Do you know, I mean -- when did you start being an FBI

13  agent?  What year?

14  A    2011.

15  Q    Do you know if in 2011 and after it was possible to even

16  get information out of Swiss banks?

17  A    I don't know.

18         What I can say is that there was a point in time

19  where it was acknowledged by Clare Bronfman that the

20  information was not accurate.

21  Q    At some point, I think you're aware, Clare Bronfman sued

22  Canaprobe, correct?

23  A    Yes, sir.

24  Q    In Quebec?

25  A    Yes, sir.

Weniger - Cross - Agnifilo                    5185

1    Q    In the Province of Quebec, in Canada, correct?

2    A    Yes.

3    Q    And the nature of the suit was that Canaprobe was giving

4    false information in the reports that it was getting paid for,

5    correct?

6    A    Yes, sir.

7    Q    But here, we're talking -- so, this is specific to the

8    Rick Ross Institute.  And what Canaprobe is telling NXIVM in

9    this report is that the Rick A. Ross Institute has all these

10   foreign bank accounts in these different locations, correct?

11   A    That's what it appears.

12   Q    Right, that's what it's saying.  Okay.

13        This is part of the same, in the same box of

14   material.

15        (Exhibit published to the jury.)

16   Q    Here, we have Richard Marier to Kristin and still talking

17   orders.

18        And we're talking now the spring of 2000; right --

19   may 25, 2009 rather, right?

20   A    Yes, sir.

21   Q    I think what you said yesterday is that the point of

22   contact, Clare Bronfman was paying the bill for Canaprobe;

23   right, that's what your investigation showed?

24   A    That's what the e-mail accounts and the invoices

25   reflected.

Weniger - Cross - Agnifilo                    5186

1    Q    But the point of contact for Canaprobe was Kristin at the

2    oakhaven account, right?

3    A    That's fair to say, yes.

4    Q    And there's a lot of back-and-forth e-mail traffic

5    between Richard Marier and Kristin at the oakhaven account,

6    right?

7    A    Yes.  Occasionally, Clare Bronfman's account would also

8    be -- she would also be a recipient of e-mails, but only

9    occasionally.

10   Q    So, it was -- as a general point of contact, it was

11   Kristin with an occasional e-mail to Clare, right?

12   A    That's correct.

13   Q    And fair to say -- tell me if this is a fair statement --

14   that when Clare was brought in, it usually tended to do with

15   an invoicing or some aspect of payment?

16   A    That's fair, yes.

17   Q    We're going to look at another Rick Ross Institute

18   report.

19              (Exhibit published to the jury.)

20   Q    And here we have Rick Ross Institute, and then at the

21   bottom, about two-thirds of the way down, there's an

22   indication of a beneficiary, Ross Corp.; do you see that?

23   A    Yes, sir.

24   Q    So, what this is basically saying -- and we're not

25   talking about whether it's true or false at the moment, we're

LAM      OCR      RPR

Weniger - Cross - Agnifilo                    5187

1   just saying what this report is reporting -- that the Rick A.

2   Ross Institute has an account in UBS in Jersey that is in the

3   name of Ross Corp.; do you see that there?

4   A    Yes, sir.

5   Q    Great.  Thanks.

6            Then there's a follow-up.  This is a report that

7   comes from Canaprobe to Kristin Keeffe by e-mail.  It's from

8   October 1, 2009, and I'm just going to read a certain part of

9   it.

10           It says:  Mr. Ross is currently and has, it appears,

11  at least since the early 2000s, been engaged in a cartel of

12  individuals who are laundering profits by removing them from

13  U.S. jurisdictions and secreting them in under unknown

14  tax-sheltered zones.

15           It goes on to say -- I'm now looking down here -- it

16  I'll read the whole thing.

17           Up until the late 1990s, Mr. Ross was in a poor

18  financial condition and heavily in debt.  In 2001, Mr. Ross

19  founded his institute, which almost from its inception was

20  engaged in coerced deprogramming for which Mr. Ross was found

21  liable in civil actions.

22           Let me just stop there for a second.  Just to be

23  clear, there's no indication that Mr. Ross is involved in

24  international money laundering, right?

25  A    Again, I don't believe so.  I don't have any evidence of

LAM      OCR      RPR

Weniger - Cross - Agnifilo                    5188

1    that.

2    Q    But that's what this report that's sent to Kristin is

3    telling her, that Canaprobe has found this international money

4    laundering being committed by Rick Ross.  That's what the

5    report says.

6    A    Yes.

7    Q    And then down here, it says:  Mr. Ross' background and

8    expertise as a cult deprogrammer appears to be merely a

9    fabrication and his expertise seems to be most profound as a

10   confidence man.

11           I think yesterday at one point you said on direct

12   examination that it seems like Kristin Keeffe at times is

13   paranoid.

14   A    I said that there was a sense of paranoia within the

15   community.

16   Q    Right.

17   A    I think we were looking at a specific e-mail written by

18   Kristin Keeffe.

19   Q    That's right.  Let's look at this.

20           This is from October 1, 2009, and Canaprobe is

21   submitting to Kristin a report that says these things that we

22   just talked about, right?

23   A    That's true.

24   Q    So, just in terms of who we're talking about, we're

25   talking about Kristin Keeffe -- this is Government Exhibit

1    1822.  Let me see if I can find what I'm looking for here.

2            I think this is the part we talked about yesterday.

3    I just want to read the whole thing with you.

4            (Exhibit published to the jury.)

5    Q    It starts at the bottom, from August 27, 2009, and it's

6    from Kristin to Keith; do you see that there?

7    A    Yes, sir.

8    Q    It says:  Had a weird night.  Got a little nervous for

9    three reasons.  First, quote/unquote knocks wood painters

10   happened to be here --

11           Going to the next page.

12           -- beginning the 27th and going through the week.

13   Coincidence?  They are painting the windows so they can study

14   everything in our house.  They are doing 3 Flintlock too.

15   They started this morning.

16           Second, there are was a strange old man

17   quote/unquote walking by our house last night but with dress

18   shoes on.  What was weird too was how he never looked at

19   Gaelyn and I.  We were in the front yard and being really

20   noisy.  I've never seen him before, and I know all the

21   neighbors by sight.  I then even drove my car by him and

22   slowed it to look at him, and he didn't turn his head to look

23   at me.

24           Also, yesterday there was a big black pickup in

25   front of our house.  It looked like he was taking a phone

Weniger - Cross - Agnifilo                          5190

1   camera picture.  I immediately went outside and he kept

2   explaining and explaining and explaining how he was lost.  I

3   thought he went way overboard.

4              Last night, I slept with the lights on, the interior

5   doors open, and all the windows shut.  I had nightmares of

6   people trying to get in until about 3 or 4 a.m.

7              How's it going there?

8              This is from Kristin to Keith, correct?

9   A    Yes.

10  Q    This is the same Kristin that's getting all these e-mails

11  from Canaprobe, so let's go through a little bit more of these

12  e-mails.

13             At one point yesterday, I think you talked about

14  Carlos Rueda; do you remember?

15  A    Yes, sir.

16  Q    Do you remember who he was?

17  A    A psychiatrist that was cited in some articles that

18  were -- cited in some articles that negatively sort of showed

19  the defendant and NXIVM.  Also, if I recall correctly, he saw

20  some people who had left the NXIVM community as patients.

21  Q    And, so, this is a report from Canaprobe sent to Kristin

22  on August 10, 2009, and it's in regard to this person that you

23  just referred to, Carlos Rueda, correct?

24  A    Yes, sir.

25  Q    And it has some account information here.  Safra Bank,

LAM      OCR      RPR

Weniger - Cross - Agnifilo                    5191

1  you see that here, Safra Bank with a bank account number?

2  A    Yes.

3  Q    And that's Safra Bank New York, then there's another,

4  Safra Bank Luxembourg.  And the account beneficiary that

5  Canaprobe sends to Kristin Keeffe for Carlos Rueda is Rick

6  Ross, right?

7  A    Yes, sir.

8  Q    So, here is Canaprobe sending information to Kristin

9  Keeffe that this person, Carlos Rueda, who, as you said, was

10 critical in some articles of NXIVM, has this financial

11 relationship in the form of an account beneficiary with Rick

12 Ross; right, that's what this says?

13 A    It does, yes.

14 Q    And, again, you have no reason to believe that's true.

15 A    I don't.

16 Q    You don't have any reason to believe that Rick Ross

17 has -- is an account beneficiary in a Safra Bank Luxembourg

18 account to Carlos Rueda, correct?

19 A    I know we just never took that next step in identifying

20 and actually trying tracking down the...

21 Q    Right.  You can't say it's false because you're saying

22 you didn't investigate it yourself, right?

23 A    Yes, sir.

24 Q    Also, you have no indication that Rick Ross has any --

25 being the case agent in this case, you have no indication that

LAM        OCR        RPR

Weniger - Cross - Agnifilo                    5192

1   Rick Ross has any financial relationship of this nature with

2   Carlos Rueda, correct?

3   A    That's correct.

4   Q    Another person that Canaprobe sends a report to Kristin

5   on is Frank Parlato, right?

6   A    Yes.

7   Q    Another person is Senator Charles Schumer, right?

8   A    Yes, sir.

9   Q    And, again, just so it's clear, there's no indication, in

10  fact, that sitting Senator Schumer has bank accounts at UBS

11  Geneva, UBS in the Bahamas, UBS in Luxembourg, UBS in Hong

12  Kong, UBS in Panama, Safra Bank in Geneva, Safra Bank in

13  Luxembourg, Safra Bank in the Bahamas, there's no indication

14  of any such -- other than this report, there's no indication

15  that anything like that is remotely true, right?

16  A    I simply don't know.

17  Q    But what we know is that Canaprobe is sending Kristin

18  Keeffe this information in this report about Senator Schumer.

19  A    Yes.

20  Q    Peter Skolnik, was Peter Skolnik Rick Ross' lawyer in the

21  civil litigation?

22  A    That's my understanding, yes, sir.

23  Q    So, here's a report from Canaprobe sent to Kristin about

24  Peter Skolnik.  And what we see here, the account beneficiary

25  is Rick Ross.

Weniger - Cross - Agnifilo                    5193

1           So, what Canaprobe is telling Kristin Keeffe is that

2    Rick Ross' lawyer Peter Skolnik is in a financial relationship

3    with Rick Ross in the form of this bank account that's in

4    Euros with the beneficiary being Ross Corp., correct?

5    A    It appears so, yes.

6

7           (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAM      OCR      RPR

Weniger - cross - Agnifilo                    5194

1   BY MR. AGNIFILO:   (Continuing.)

2   Q    Now, at one point in the records that you reviewed, did

3   you see sort of a breakdown, you know, sort of a table made

4   either by Kristin or by somebody else that was in these

5   records?

6   A    Are you referencing the e-mail accounts or are you

7   referencing the box or --

8   Q    In the box, and I think it was also in the e-mail

9   account?

10  A    I do recall --

11  Q    Okay.

12  A    -- this and there were a number of spreadsheets and

13  tables just like you referenced.

14  Q    Okay.  Just for the sake -- because it's easier to go

15  through it all.

16         (Exhibit published.)

17  Q    So, here, Birthright Holdings.  Birthright Holdings, was

18  that believed to be -- well, let me back up a second.

19         Edgar Bronfman is associated with something called

20  Birthright; is that right?

21  A    Yes.

22  Q    Remind the jury a little bit about that.

23  A    I don't have a full understanding, but I think it's in

24  relation to young people in the Jewish community that are in

25  the United States to have an opportunity to go back to Israel.

1   That's my understanding, but I could be wrong.

2   Q    That's fine.

3   A    And I think the charity is set up to allow that to

4   happen.

5   Q    Got it.  What we see here is that the account beneficiary

6   Birthright Holdings has a benefactor, according to Canaprobe,

7   of Rick Ross; right?

8   A    Yes.

9   Q    So what this would suggest to anyone receiving it, like

10  Kristin Keefe, is that Edgar Bronfman has this connection,

11  financial connection, to Rick Ross; right?

12  A    It would appear so.

13          (Exhibit published.)

14  BY MR. AGNIFILO:

15  Q    And then there are a number of other individual things

16  listed here; Birthright Holdings, you see the beneficiary is

17  Ross Corp.; Birthright Holdings, Ross Corp.  There's a number

18  of these.  Go to the next page.  Joe O'Hara is someone that we

19  discussed during the course of the trial; right?

20  A    Yes, sir.

21  Q    And remind the jury again, who is Joe O'Hara?

22  A    Joe O'Hara at one point was a contractor for NXIVM.  He

23  left at a certain point and -- not on amicable terms, on poor

24  terms.

25  Q    Got it.  And one of the things that Canaprobe told

Weniger - cross - Agnifilo                    5196

1    Kristin Keefe in the form of these reports and that sheet is

2    that Joe O'Hara has a financial relationship to Rick Ross;

3    right?  That's what this table indicates.

4    A    Yes, sir.

5    Q    We talked about Mr. Rueda earlier; correct?

6    A    Yes.

7    Q    And here in the table it indicates that Rueda has a

8    financial relationship with Rick A. Ross in that Luxembourg

9    bank account and Ross Corp. in Geneva; correct?

10   A    Yes.

11   Q    And Skolnik has a financial relationship with Rick A.

12   Ross and Ross Corp.; correct?

13   A    That's --

14   Q    Accord to go this information.

15   A    Yes.

16   Q    I think you said it -- is it District Attorney Soares?

17   Am I saying it the right way?

18   A    I don't know.  He was the Albany County district

19   attorney.

20   Q    Soares, I'm not sure how to say it myself, is listed

21   here.  He's listed as one of the people that Canaprobe sent a

22   report on; correct?

23   A    He's listed in this chart and information requested was

24   listed.

25   Q    And so what Canaprobe indicated was that he has a

SN        OCR        RPR

Weniger - cross - Agnifilo                    5197

1   financial relationship with Ross Corp. as well; right?

2   A    Yes.

3   Q    I think you mentioned Mr. Touretzky yesterday in your

4   direct testimony.  Do you remember that?

5   A    Yes, sir.

6   Q    And just remind us who that was again?

7   A    He was a professor, I think, at Carnegie Mellon at one

8   point.  He's written some critical material on NXIVM and the

9   defendant.

10  Q    What Canaprobe is telling Keefe is that Touretzky has a

11  relationship with Rick A. Ross Holdings in Luxembourg; right?

12  A    Yes.

13  Q    Now, the box that was found as Nancy Salzman's house, it

14  had a number of handwritten notes in it; right?

15  A    It did, yes.

16  Q    Did you have reason to believe that those were Kristin

17  Keefe's notes?

18  A    If you're referencing one in particular -- I do think

19  that there was material in the box that was Kristin Keefe's.

20  Q    I'm going to show you some individual ones and my

21  question for you is whether you think that it's Kristin

22  Keefe's.

23           (Exhibit published.)

24  Q    And, again, this is all from the box that was recovered

25  from Nancy Salzman's house.  It's just one particular page.

Weniger - cross - Agnifilo                    5198

1  Did you ever -- take a look at it.

2  A    (Reviewing.)

3         Is there more to the document, sir?

4  Q    I can -- is that too small?  Can you read that okay?

5  A    No.  That's perfect.

6  Q    Okay.

7  A    (Reviewing.)

8         Okay.

9  Q    And, fair to say in the materials that were in this box

10 were many, many, many pages of handwritten notes; correct?

11 A    That's right.

12 Q    Okay.  And this is just one such page of maybe hundreds

13 of pages of handwritten notes?

14 A    There was a lot.

15 Q    And here -- you'll agree with me, here there's a

16 reference to, it looks like, Marier, Richard Marier?

17 A    Yes.

18 Q    And there's a reference to Michael Sutton; right?

19 A    Yes, sir.

20 Q    And these are notes, "Do we want to hire Marier for any

21 of our cases?"  Do you see that there?

22 A    Yes.

23 Q    "What can O'Hara do or give to the authorities?"  Do you

24 see that?

25 A    Yes.

Weniger - cross - Agnifilo                    5199

1   Q     "Follow up with Bob."  Do you see that?

2   A     Yes.

3   Q     And do you know if there was a lawyer for NXIVM at the

4   time named Bob Crockett?

5   A     Yes.

6   Q     And then here there's, "Ask Nancy, Lauren, Karen, Dawn,

7   Kathy, admin, everyone, about these records."  Do you see all

8   of that there?

9   A     Yes.

10  Q     And I'm just going to go to the next page.

11         (Exhibit published.)

12  BY MR. AGNIFILO:

13  Q     You should feel free to read any of this you like.  I'm

14  going to direct your attention just to a couple of things.

15  A     Should I --

16  Q     If there's something else that catches your attention and

17  you want to say something about it, that's fine too, but I'm

18  just going to ask you the highlighted parts.

19  A     (Reviewing.)

20         Okay.

21  Q     So, here, I mean, "What about subpoenas, hedge funds in

22  New York that was in touch with O'Hara, depose them about

23  Ross?  Ask FU e-mails or records."  Do you see that there?

24  A     Yes.

25  Q     Here it says, "Get Verizon subpoena and letter production

SN        OCR        RPR

Weniger - cross - Agnifilo                    5200

1  of Ross calls"; correct?

2  A    Yes.

3  Q    And then, "Subpoena Fed Ex, DGL, UPS for shipments by

4  Ross"; right?

5  A    Yes.

6  Q    Do you have an opinion as to whether this is Kristin

7  Keefe's writing?

8  A    I can tell you I don't know.  There were certain e-mails

9  in the box related to Keith and she did appear to have control

10 of some of the documents in the box.

11 Q    Because there many, many of the Oak Haven e-mails in the

12 box; correct?

13 A    Yes and I think there was also handwritten notes related

14 to Gaelen.

15 Q    And just to be clear, Kristin and Keith have a child,

16 Gaelen?

17 A    Yes.

18       THE COURT:  Say that again.

19 Q    Kristin and Keith Raniere have Gaelen and I think you

20 said that's your understanding?

21 A    Yes.

22       (Exhibit published.)

23 Q    And here I think that we have reference to Interfor

24 Productions.  Do you see that there?

25 A    Yes.

Weniger - cross - Agnifilo                              5201

1    Q    And then I think the reference to, "Check with Kathy.

2    When did we have trouble with the WA IRS?"  Do you know if

3    that stands for Washington state?

4    A    Yes, I think it was discussed during the trial.

5    Q    And, so, fair to say there's ongoing notes, handwritten

6    notes of different things, legal things, you know, related to

7    Rick Ross and the Suttons and other legal matters that are in

8    handwriting that are in this box that was recovered from Nancy

9    Saltzman's house?

10   A    That's fair to say.

11   Q    Was there anything in the box that indicated that, aside

12   from the fact that it was inside Nancy Salzman's house, that

13   it was Nancy Salzman's stuff in the box?

14   A    Not that I can recall, but I will say that I haven't kind

15   of been back in there for a little bit of time.

16   Q    Now, at some point Kristin Keefe left the community?

17   A    She did.

18   Q    And she took Gaelen with her?

19   A    Yes.

20   Q    And do you know if when she left the community she just

21   left the box at Nancy's house?

22              MS. PENZA:  Objection.

23              THE COURT:  Sustained.

24   BY MR. AGNIFILO:

25   Q    Your investigation led you to conclude that much, if not

Weniger - cross - Agnifilo                    5202

1   all, of the stuff in the box was Kristin's; correct?

2   A    I don't know if I can fairly say that.  I can say that

3   she was on the e-mails and Gaelen was referenced in the note.

4   I will also say she was a legal liaison for NXIVM for a period

5   of time.

6   Q    And did you reach a conclusion that of the handwritten

7   notes that are in the box they were written by the same

8   person?

9   A    I did not reach a conclusion.

10  Q    Did you reach a conclusion that it was more than one

11  person?

12  A    Frankly, I don't -- I would have to kind of look.  I

13  wasn't looking for that.

14  Q    Fair enough.  I'm just going to look at a few more

15  handwritten entries and we're just taking a small sample of

16  everything that's in the box.

17             (Exhibit published.)

18  BY MR. AGNIFILO:

19  Q    Here on top it's the Sunday, December 26th.  It doesn't

20  have a year.  "Work log seven hours."  It says, "Review

21  Crockett memo again"; right?

22  A    Yes.

23  Q    And then down here it says "Two hours writing up response

24  to Bob's memo, get computer fixed"; right?

25  A    Yes.

Weniger - cross - Agnifilo                    5203

1    Q    Does it seem to be the same handwriting as the other

2    handwriting that we've looked at?  I can show you

3    representative samples.  I know you're not a handwriting

4    expert.  I'm really asking for your opinion.

5    A    They do look similar.

6    Q    There's a handwritten entry asking if somebody knows

7    Roger Stone.  Do you see that?

8    A    Yes, sir.

9    Q    A handwritten entry, "Where do the Suttons live in

10   Florida"?

11   A    I can't read that bottom.

12   Q    I think it says, "Where do the Suttons live in Florida

13   compared to Rick Ross phone records?"

14   A    Okay.

15          (Exhibit published.)

16   BY MR. AGNIFILO:

17   Q    More stuff about Rick Ross and then we're going to move

18   on to something else in a little bit.

19          "Ross called somebody many, many times."  Do you see

20   that there.  It looks like Jeff Jacobson possibly?

21   A    Yes.

22   Q    "What about all of Ross' KY calls?  Who is this person

23   with these phone numbers?"  Do you see all that there?

24   A    Yes.

25   Q    Okay.  "Subpoena Ross' AZ phone," Arizona phone, right?

SN        OCR        RPR

Weniger - cross - Agnifilo                    5204

1    A    Yes.

2    Q    All right.  Now, also in the box there are e-mails to

3    Kristin from this -- it seems like an investigation company

4    called Pallorium.  Do you remember seeing these?

5    A    I do.

6    Q    And did you have any understanding of what Pallorium did

7    or what their involvement was with Kristin Keefe?

8    A    I believe in the e-mail address reflects the last name

9    Rambam.  Steve Rambam -- I believe Steven Rambam is a private

10   investigator and -- I apologize, your specific question?

11   Q    That's okay.  That was exactly it.  You know, did you

12   have -- did you have familiarity with Pallorium and you said

13   Steve Rambam was a private investigator for Pallorium?

14   A    Correct, and did work for NXIVM.

15   Q    Correct.  And, so, here is Steve Rambam from Pallorium

16   sending an e-mail Kristin Keefe; right?

17   A    Yes.

18   Q    And this seems to be in regard to the situation of the

19   woman who went missing in Alaska; right?

20   A    Yes.

21   Q    Okay.  And we have Kristin Keefe being in contact with

22   Pallorium and Pallorium, in the form of Steve Rambam, writing

23   back saying, "Public records, research, media research,

24   contact with detachment AST," whatever that is, "draft letter

25   to Anchorage Police Department, calls to state troopers,

SN        OCR        RPR

Weniger - cross - Agnifilo                          5205

1   called to Soares, police departments."  All of these different

2   tasks that Pallorium seems to be doing and reporting back to

3   Kristin Keefe on; correct?

4   A    Yes.

5   Q    And then we have another Steve Ramdam e-mail to Kristin

6   Keefe from October 15, 2009 and it's basically -- Ramdam is

7   advising that during October 8, 2009 to October 12, 2009 an

8   investigation was conducted in Key West, Florida, mentioning a

9   few places.  "This investigative activity was conducted in

10  order to pursue specific leads provided by you to this office

11  indicating that Kristin Snyder, possibly using the alias Kaye

12  Snyde, recently received mail or packages at this USPS

13  location and that Kristin Snyder was a possible holder of

14  lockbox or another post off box at this location."  Correct?

15  A    That's what it says, correct.

16  Q    And, so, this is basically Kristin having e-mail

17  correspondence with Steve Ramdam in regard to the Kristin

18  Snyder situation; correct?

19  A    Yes.

20  Q    And these different leads that it seems like Kristin is

21  directing Ramdam to take; correct?

22  A    It's not clear from the e-mails where the direction is

23  coming from.  Obviously the results are coming back to Kristin

24  Keefe.

25  Q    All right.  One more of these Ramdam e-mails.  There's --

Weniger - cross - Agnifilo                    5206

1    Ramdam says that, "As discussed on 8 October 2009, an attempt

2    was made to conduct investigations and interviews at the

3    'Caribbean guest house' in Key West, Florida."  Right?  And

4    that's Ramdam to Kristin Keefe; correct?

5    A    I think I actually discussed this a little bit yesterday

6    in terms of the -- the message or the e-mail back and forth

7    with Keith in regards to the resort-hopping -- I think they

8    referenced the resort-hopping friend.

9    Q    Right.

10   A    And I suspect that they may have been referencing Kristin

11   Snyder.

12   Q    More investigation.  It seems to be the same subject, but

13   this time in Palm Springs, California?

14   A    Yes, sir.

15              (Exhibit published.)

16   BY MR. AGNIFILO:

17   Q    Okay.  Now, one of the things that was in the box that

18   you found at Nancy Salzman's house was this document, which is

19   in evidence as part of that exhibit.  This is an affidavit

20   from Michael Sutton and I'm just going to read portions of

21   this to you.  It says, "Michael Sutton being duly sworn

22   deposes and says" --

23              THE COURT:  I'm sorry.

24              MS. PENZA:  Objection, Your Honor.

25              MR. AGNIFILO:  It's in evidence.

SN        OCR        RPR

Weniger - cross - Agnifilo                    5207

1          THE COURT:  I have a question.

2          MR. AGNIFILO:  Sure, Judge.

3          THE COURT:  Is this an executed affidavit?

4          MR. AGNIFILO:  No, I'm going to get -- it's not.

5     It's not.  It was in Kristin Keefe's box.

6          THE COURT:  If you are going to speak to it, you

7     need to say there is no county indicated and he did not sign

8     it if he did not sign it.

9          MR. AGNIFILO:  That's fine.

10         THE COURT:  This is a draft.

11         MR. AGNIFILO:  Okay.

12         THE COURT:  I did not hear the word "draft."

13         MR. AGNIFILO:  Okay, Judge.  I am going to get to

14    the whole thing, I promise.

15         THE COURT:  No, no.  I want to start with what it is

16    and make clear what it is not and then you can read it.  Read

17    it if you like.

18

19              (Continued on the following page.)

20

21

22

23

24

25

1    (Continuing.)

2              MS. PENZA:  Your Honor, the Government does not want

3    it offered for the truth of Michael Sutton's statements.

4              THE COURT:  Well, if it is a draft, it doesn't mean

5    anything in terms of the truth because he is not verifying it

6    to be true, so we should not be discussing it in that context.

7              MR. AGNIFILO:  Very good, Judge.

8              THE COURT:  If you want to read the draft that was

9    in the file, you can do that.

10             MR. AGNIFILO:  Thank you, Judge.

11             THE COURT:  Sure.

12   EXAMINATION CONTINUES

13   BY MR. AGNIFILO:

14   Q    So this is the third page, right?

15             Let me just show you the whole thing and then we'll

16   talk about it.

17   A    Yes, sir.

18   Q    This is the cover.  This is the first page.

19             (Exhibit published.)

20   Q    All right, and it's in regard to NXIVM Corporation

21   against The Ross Institute, correct?

22   A    Yes, sir.

23   Q    All right.  And then there is a second page.

24             (Exhibit published.)

25   Q    Do you see the whole thing there?

Wegiener - cross - Agnifilo                         5209

1   A    Yes.

2   Q    And then there is a third page, and that is the entirety

3   of this document, correct?

4   A    It appears so, yes.

5   Q    And this was in the Kristin Keeffe box, correct?

6   A    I think -- I mean I'm assuming you're right.  I don't

7   specifically recall this document.

8   Q    Okay.

9        And so what it says is:  I am the son of defendants

10  Morris and Rochelle Sutton, the Suttons.  My family, the

11  Suttons, are prominent members of the Orthodox Sephardic

12  Jewish communities of Brooklyn, New York and Deal, New Jersey.

13       The Sephardim first emigrated to New York from the

14  Middle East, Syria in the early 1900's.  In 1935 the head

15  rabbis of our community passed a declaration known as The

16  Edict.  The Edict is a rabbinical threat of complete

17  religious, familial and social non-acceptance of a marriage

18  and/or a child born outside of the community.  To my

19  knowledge, no other Jewish community in the world has such an

20  extreme rule.  The Edict has been affirmed by the leading

21  rabbis of every generation of our community from 1935 through

22  2000 -- through to 2006.

23       At the time I was introduced to NXIVM, I was a

24  partner and vice president at Lollytogs, an international

25  clothing manufacturing conglomerate headquartered in New York

SAM      OCR      RMR      CRR      RPR

Weginer - cross - Agnifilo                    5210

1  City founded by my father, Morris Sutton.  Also at this time

2  my daughter, whom I had secretly fathered outside the

3  Sephardic community with my non-Jewish former girlfriend,

4  lived with me part-time and was supported by me.  I informed

5  my parents of my love for my daughter and my desire to spend

6  time with her and be the best father I could be.  My father

7  expressed a strong disagreement with my decision.  The stress

8  of living double lives and the guilt of hiding a daughter I

9  adore put me in a state of poor physical and mental health.

10         Noticing my decline, a friend recommended me to a

11  NXIVM training as a resource to help me resolve my conflicts.

12  I applied for and took a NXIVM three-day training course and

13  discovered that NXIVM's courses are designed to build ethics

14  and honesty in both individuals and the workplace.  I enjoyed

15  the classes and became an avid student.  Not long after, my

16  health and outlook on life improved and I began to publicly

17  disclose that I had a non-Jewish daughter.  My father refused

18  to recognize his granddaughter.  He insisted I pay off my

19  daughter's mother and never see her or my child again.  I

20  refused.

21         I, in turn, informed him of my decision to leave the

22  family business, that I would be pursuing other business

23  ventures, including a more enhanced level of participation

24  with NXIVM.  My father would not accept this.  A son born

25  within our community is groomed his whole life to take his

SAM        OCR        RMR        CRR        RPR

Wegi ner - cross - Agnifilo                          5211

1   place within his father's business.  The loss of my respect --

2   the loss of respect -- I'm sorry -- the loss of respect my

3   father felt that I -- that I and the family would engender as

4   a result of my decision was completely intolerable to him.  He

5   blamed NXIVM and threatened to use his considerable resources

6   to destroy NXIVM if I did not change my mind.

7           As part of this effort, defendant Rick Ross was

8   hired by my parents.  On several occasions he requested from

9   me copies of NXIVM's confidential program materials.  I

10  informed him that the materials were confidential and that I

11  could not provide that to him.

12          My half-sister is defendant Stephanie Franco.

13  Stephanie informed me that she would like to attend the NXIVM

14  training.  I was thrilled, believing her support could win

15  over the rest of the family and change my parents' minds about

16  my non-Sephardic child and support my decision to leave the

17  family business.

18          At the time, I believed Stephanie worked solely as a

19  social worker in private practice and as a part-time professor

20  at Rutgers University.  I was not aware, nor did Stephanie

21  inform me, of her position as a corporate trainer with NXIVM

22  competitor with Taibi Kahler Associates.  Had I known this, I

23  would not have and could not have, cosigned to endorse any of

24  Stephanie's enrollment contracts for NXIVM's programs given

25  their strict noncompete and confidentiality clause.

Weginer - cross - Agnifilo                    5212

1              Right, that's what this says?

2              THE COURT:  Is there a question?

3              MR. AGNIFILO:  What's that?

4              THE COURT:  Is there a question for the witness?

5              MR. AGNIFILO:  Yes, Judge.  Yes.

6    BY MR. AGNIFILO:

7    Q    And now, you had some familiarity with the Ross

8    litigation, correct?

9    A    A minimal amount, yes.

10   Q    Okay.  And you heard -- and you heard Rick Ross testify,

11   right?

12   A    I definitely heard some of his testimony.

13   Q    And one of the things that he testified to was that, in

14   fact, Michael had this situation with a child who was born of

15   a woman not in the Sephardic community, right?

16   A    Yes.

17   Q    And one of the things he testified to --

18              MS. PENZA:  Objection, Your Honor.

19              THE COURT:  Overruled.

20              Next.

21   BY MR. AGNIFILO:

22   Q    -- was that his sister, Stephanie Franco, had provided

23   the materials from the NXIVM training course, correct?

24   A    Yes.

25   Q    And that was the subject of the lawsuit, right?

Wegi”ner - cross - Agnifilo                          5213

1   A     That was, I think, one factor in the lawsuit, yes.  One

2   issue.

3   Q     One of the things in the box found at Nancy Salzman's

4   apartment -- house, rather, is this letter from the attorneys

5   Tompkins Maguire.

6              Do you see that there?

7              (Exhibit published.)

8   A     Yes.

9   Q     Before we go to that, have you ever seen the signed

10  affidavit that we reviewed?

11  A     Just a moment ago?

12  Q     Yes.

13  A     I don't -- I don't believe so.

14  Q     No, okay.  All right, do you know if that affidavit was

15  signed by --

16             MS. PENZA:  Objection.

17             THE COURT:  You may answer.

18  A     I don't know, I'm uncertain.

19  Q     Have you ever looked in the case file at Document 137 --

20             MS. PENZA:  Objection.

21             THE COURT:  Is this in evidence?

22             MR. AGNIFILO:  It's not in evidence, but it's on Pacer.

23             MS. PENZA:  Your Honor, may we have a sidebar, please?

24             (Sidebar held.)

25             (Continued on the following page.)

```
                           Sidebar                        5214
```

1          (The following sidebar occurred outside the hearing
2    of the jury.)
3          THE COURT:  All right, I am not allowing Mr. Sutton
4    to testify by affidavit.  So that is where we're going.
5          Get on to the next matter.  I am not allowing it.
6    It is not happening.  So just get going.
7          MR. AGNIFILO:  All right.
8          (Sidebar concluded.)
9
10         (Continued on the following page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Weniger - cross - Agnifilo                    5215

1              (In open court - jury present.)

2    EXAMINATION CONTINUING

3    BY MR. AGNIFILO:

4    Q    So this letter from Tompkins Maguire makes reference to

5    certain subpoenas.

6              Do you see that, there?

7    A    Yes, sir.

8    Q    And do you know if these were subpoenas for Rick Ross'

9    Verizon Communications cellphone, T-Mobile and other

10   cellphones, cellphone data?

11   A    I don't recall specifically.

12   Q    And this is, again, from the box that we've been talking

13   about.

14             This is the case we're talking about, the NXIVM

15   against Morris Sutton, Rochelle Sutton case, correct?

16   A    Yes, sir.

17   Q    Okay.  And you see subpoena to produce documents,

18   correct?

19   A    Yes.

20   Q    To Verizon in this case, Verizon Communications?

21   A    Yes, sir.

22   Q    Okay.  Do you know if NXIVM got Rick Ross' cellphone data

23   from a subpoena?

24   A    I don't know definitively.  I can say that there were

25   phone records in -- in the box.  I don't recall if they were

SAM        OCR        RMR        CRR        RPR

Weniger - cross - Agnifilo                    5216

1    Mr. Ross' or not.

2    Q    Not a problem.

3         Fair to say inside the box was a number of documents

4    related to the Kristen Snyder disappearance in Alaska,

5    correct?

6    A    Yes.

7    Q    And one of them was this.

8         (Exhibit published.)

9    BY MR. AGNIFILO:

10   Q    And this is a portion of what seems to be a document

11   filed in connection with that missing person's file?

12   A    Could you just give me one moment?  I'm sorry.

13   Q    Take your time.  Take your time.  Let me zoom in a little

14   so you can see it easier.  Here you go.

15        (Pause.)

16   A    Yes, sir, sorry about that.

17   Q    That's all right.

18        All right; so, basically, this seems to be a page of

19   a report from the missing person's file in the Alaska case

20   with Ms. Snyder, correct?

21   A    Yes, sir.

22   Q    And it discusses here that there was -- you know, she was

23   acting in a -- I'm just going to read part of it.

24        At approximately 7:00 p.m. her roommate/domestic

25   partner, Heidi Clifford, concerned because of Ms. Snyder's

Weniger - cross - Agnifilo                    5217

1   recent bizarre behavior, discussions of suicide, laying in

2   snow to kill herself, contacted the Anchorage Police

3   Department to report Ms. Snyder missing.  Ms. Clifford also

4   contacted a friend of Ms. Snyder, Kenneth Powers, and they

5   began a search of the Anchorage area.  Ms. Snyder's vehicle

6   was located near Miller's Landing in Seward, Alaska at

7   2120 hours on February 7th, 2003.  A note inside the vehicle

8   indicated that Snyder was planning to commit suicide, ending

9   with quote, "No need to search for my body," end quote.

10              On the morning of February 8th, 2003 Miller's

11  Landing Resort personnel discovered a storage shed containing

12  kayaks and gear had been broken into and an old kayak was

13  missing.  The storage shed was close to where Snyder's vehicle

14  was located.  On February 8th, 2003 and February 9th, 2003 a

15  large search effort was conducted in and around Resurrection

16  Bay.  The search consisted of Alaska State Troopers, Seward

17  Area Fire, EMS volunteers and the U.S. Coast Guard, Forest

18  Service law enforcement, the Seward Police Department, Civil

19  Air Patrol and friends of Snyder, many of whom are part of an

20  organized search and rescue team as part of the Nordic Ski

21  Club.  After two full days of active searching, no sign of

22  Ms. Snyder was located.  CAP flight was accompanied on 2/4/03

23  with negative results.

24              Right, that's what this says?

25  A    Yes.

Weniger - cross - Agnifilo                    5218

1  Q    And did you find in the box all sorts of documents

2  related to this situation?

3  A    Yes.

4  Q    For instance, there was a document that had to do with

5  the high and low tides in Resurrection Bay in those materials?

6  A    Yes.

7  Q    Okay.

8  A    I think that was part the police file.

9  Q    Right, right, right.

10        And it seemed like the -- a large portion, if not

11  all, of the police file was in these materials, correct?

12  A    Yes.  We -- we, ultimately, did get the entire file, but

13  it was -- the vast majority of the documents from the file

14  that the Alaska State Police had were also in that box.

15  Q    And I think on -- I think during the Government's direct

16  case there was evidence of someone named Alana Chenoa

17  traveling over the border from the United States on Christmas

18  Eve 2004?

19  A    Ashana Chenoa.

20  Q    I'm sorry, Ashana Chenoa, right?

21  A    Yes.

22  Q    Was there any indication that Kathy Russell crossed the

23  border based on any official records?

24  A    There was an indication based upon her credit card

25  statements that she traveled to the -- the border.

Weniger - cross - Agnifilo                    5219

1    Q    Right.  And there's -- there's a credit card purchase in

2    a town in the United States not too far from Rochester,

3    correct?

4    A    I'm sorry, say that one more time.

5    Q    Sure.  I think there's a credit card purchase from a

6    place called Clifton Springs, New York?

7    A    Yes, sir.

8    Q    And Clifton Springs, New York, tell me if this is right,

9    is sort of on Route 80 on the way to Buffalo, but in New York

10   State?

11   A    It's on the high -- off the highway, I'm not quite sure

12   which --

13   Q    Right.

14   A    -- but it's the route out -- out to Niagara Falls.

15   Q    Right.

16        And now, the document that you had for Ashana Chenoa

17   showing that she crossed the border on New Year's eve, 2004,

18   do you remember what kind of document it was?

19   A    It was -- well, I'm not quite sure what kind of document.

20   We received that information from Immigration and Homeland

21   Security Investigation.

22   Q    Okay.  And did you receive any similar document for Kathy

23   Russell?

24   A    No.

25   Q    Now, in addition to the Kathy Russell credit card report

SAM     OCR     RMR     CRR     RPR

Weniger - cross - Agnifilo                    5220

1   putting her in Clifton Springs on Christmas Eve 2004, there

2   was also records indicating that Kristin Keeffe was in -- in

3   the Niagara Falls area on Christmas Eve, 2004, is that

4   correct?

5   A    That's correct; yes, sir.

6   Q    And I am going to show you -- this is the way we got it.

7        (Exhibit published.)

8   BY MR. AGNIFILO:

9   Q    All right, hold on.  Let me see if I can zoom in there a

10  little bit.  Hold on.

11       All right, do you recognize these documents?

12  A    Yes, sir.

13  Q    Okay.

14  A    I've seen them.

15  Q    And these are -- these are things that you uncovered as

16  part of your investigation, correct?

17  A    They were things that I saw during the course of my

18  investigation, yes.

19  Q    Right.  And here (indicating) it appears -- it appears

20  that these are similar receipts, and this one is a little bit

21  easier to read, so I am going to read this one first then

22  we'll go to the other one.

23       This is a Niagara Falls Days Inn Denny's Restaurant

24  in Niagara Falls, correct?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Weniger - cross - Agnifilo                    5221

1    Q     And the date on this one is -- it's -- do you know who

2    wrote that in?

3    A     12/19, I do not.

4    Q     I think it's 12/29.

5    A     I'm sorry.

6    Q     Okay.

7    A     I'm sorry.

8    Q     All right.  And there is a total there, but that's from,

9    if this date is correct, that's December 29th, correct?

10   A     Yes, sir.

11   Q     All right.  And now there's another receipt, which seems

12   to be similar to the first receipt, although it's not as clear

13   on top, that there's handwriting there from 12/24, correct?

14   A     I can't really make it out.

15   Q     Let me show you another document.  Hold on one second.

16   Bear with me one second.

17         I want to show you, this was also in -- I think this

18   was part of the Government's case.

19         So we have Denny's Restaurant, 12/24, do you see

20   that?

21   A     Yes, sir.

22   Q     And Denny's Restaurant, 12/29, do you see that?

23   A     Yep.

24   Q     Okay.  And just in terms of the amounts, the Denny's

25   Restaurant from 12/24 is $48.74, do you see that?

Weniger - cross - Agnifilo                          5222

1   A      Yes.

2   Q      And the Denny's Restaurant from 12/29 is $101.49, right?

3   A      Yes.

4   Q      So going to what we were just looking at before, the

5   dates of the two Denny receipts.

6          You know that one says 12/29, right?

7   A      Handwritten in, yes.

8   Q      Yes.  And that's $101.49?

9   A      Yes.

10  Q      And then the other one is handwritten 12/24, right?

11  A      Yes.

12  Q      $48.74?

13  A      Yes, sir.

14  Q      Right.

15         And did this lead you to conclude that Kristin

16  Keeffe was, at least, in Niagara Falls on Christmas Eve of

17  2004?

18  A      We believe that -- that Kristin Keeffe was in Niagara

19  Falls.

20  Q      Okay.  I think on direct examination you talked about

21  this document, which is a $525,000 check; correct?

22         (Exhibit published.)

23  A      Yes, sir.

24         MR. AGNIFILO:  One second.

25         (Pause.)

Weniger - cross - Agnifilo                    5223

1   BY MR. AGNIFILO:

2   Q    To Marianna, correct?

3   A    Yes.

4   Q    All right.  And have you ever -- have you ever seen

5   the -- do you know what an I-526 file is?

6   A    No, I don't.

7   Q    All right.

8        Do you know if there -- have you ever seen the visa

9   file that was filed on behalf of Marianna?

10  A    I -- I don't recall.

11  Q    Okay.

12  A    We may have gotten it.  We have his working the case with

13  us --

14  Q    Okay.

15  A    -- so I'm just not certain.

16  Q    Right.

17       Do you know if there's anything improper about this,

18  about this gift?

19  A    I -- I don't.

20  Q    Okay.  And talking -- getting back to Canaprobe for a

21  second, do you know if there's anything legally improper about

22  the Canaprobe investigation?

23  A    I think that there -- I mean in terms of acquiring

24  confidential banking information for -- for other individuals,

25  there are -- I believe, I'm no longer a practicing attorney.

SAM      OCR      RMR      CRR      RPR

Weniger - cross - Agnifilo                    5224

1   Q    That's okay.

2   A    -- but my understanding is that that could potentially

3   fall within to a criminal statute, potentially.

4   Q    Do you know what the rules are in Quebec?

5   A    I do not.

6   Q    And Canaprobe was in Quebec?

7   A    Canaprobe was, yes.

8          MR. AGNIFILO:  Give me one second, Judge.

9          THE COURT:  Sure.

10         (Pause.)

11  BY MR. AGNIFILO:

12  Q    Special Agent Weniger, I think you spoke yesterday and I

13  think you said that NXIVM sometimes went after people in

14  lawsuits and criminal investigations that were sort of

15  frivolous based on because they were their enemies, correct?

16  A    I -- I do know that they had enemies, and I do know that

17  they were very litigious.

18  Q    Okay.  Some of the people that they -- that they focused

19  on were, in fact, convicted of crimes, correct?

20  A    That's true.

21         MS. PENZA:  Objection, Your Honor.

22  Q    And one person --

23         THE COURT:  I'm sorry?

24         MS. PENZA:  Objection, and move to strike.

25         THE COURT:  Sustained.  And the answer is stricken.

Weniger - cross - Agnifilo                                    5225

1              Next.

2    BY MR. AGNIFILO:

3    Q    So not all of these litigations were frivolous, correct?

4    A    In terms of the outcome -- when you say -- I guess I'm

5    trying to understand, civil, criminal, what are you asking?

6    Q    Let's talk about civil, civil ones first.

7    A    Okay.

8    Q    Not all of the civil litigations that they engaged in

9    were frivolous, correct?

10   A    No.

11   Q    There were computer hackings done, correct?

12   A    (No response.)

13   Q    In fact, that were done against them?

14   A    I don't necessarily know if that's correct.  I don't --

15   Q    Do you know who John Tighe is?

16   A    I -- yes, I know that -- that name.

17   Q    And John Tighe hacked into the NXIVM computer, correct?

18   A    I don't believe -- I don't believe so.

19   Q    Do you know if he pled guilty to that?

20   A    I don't.

21   Q    You don't, okay.  In state court in the --

22              MS. PENZA:  Objection, Your Honor.

23              THE COURT:  Sustained.  He doesn't know.

24              Next.

25              MR. AGNIFILO:  All right.

SAM      OCR      RMR      CRR      RPR

Weniger - cross - Agnifilo                    5226

1   BY MR. AGNIFILO:

2   Q    There were lawsuits against someone named Yuri Plyam,

3   correct?

4   A    Yes, sir.

5   Q    And Clare won that lawsuit, correct?

6   A    My understanding is that it was successful, yes.

7   Q    I think you were saying, getting back to Canaprobe for

8   one second, I think you said at one point there was a second

9   investigation firm that some of the Canaprobe information was

10  being shared with.

11            Do you remember?

12  A    I -- I'm sorry.

13  Q    No.  Do you remember testifying to that?

14  A    Yes, that's -- that's what it appeared by virtue of the

15  e-mails, kind of this layered system.

16  Q    Did it appear to you that at some point the people in

17  NXIVM realized that Canaprobe was sending them false

18  information?

19  A    Yes.

20  Q    And do you know if they were checking that false

21  information with this other investigation firm?

22  A    That's what it appeared.

23  Q    Okay.

24  A    Yes.

25  Q    And do you know if that's what led to the conclusion

SAM      OCR      RMR      CRR      RPR

Weniger - redirect - Penza                    5227

1    that, in fact, Canaprobe was giving them false information,

2    which led to Clare Bronfman suing them in Quebec?

3    A    I believe that's right.

4         MR. AGNIFILO:  Your Honor, I think I have nothing

5    else, but let me just check.

6         (Pause.)

7         MR. AGNIFILO:  I am told I have nothing else.

8         Thank you, Judge.

9         THE COURT:  All right, thank you.

10        Redirect.

11        MS. PENZA:  Just very briefly, Your Honor.

12        THE COURT:  Go ahead.

13   REDIRECT EXAMINATION

14   BY MS. PENZA:

15   Q    Hello again, Special Agent Weniger.

16   A    Hi.

17   Q    Just a couple questions.

18        I am just showing you, Mr. Agnifilo showed you this

19   interim report on Peter Skolnik, is that right?

20        (Exhibit published.)

21   A    Yes.

22   Q    And this was on August 27th, 2009?

23   A    That's what the -- the -- yes, that's what it reflects.

24   Q    Okay.  And so I am just showing you, we went over this

25   yesterday, Government Exhibit 1822.  And I am just showing you

SAM      OCR      RMR      CRR      RPR

Weniger - redirect - Penza                    5228

1   on August 27th, 2009, this was the document we looked at that

2   was the correspondence between Keith Raniere and Kristin

3   Keeffe, is that right?

4   A    Yes.

5   Q    And the defendant sends Kristin Keeffe an e-mail that

6   says:  Anything, with a sad face?

7   A    Yes.

8   Q    And then it says:  There is a charity called Sinai --

9   Kristin Keeffe writes back:  There is a charity called Sinai

10  Charities.  Peter Skolnik is a very well-known attorney in

11  some circles.  Although it's Ross and his corps that are his

12  bread and butter at the end of the day, even if there are

13  efforts on behalf of charities in between.

14  A    Yes.

15  Q    And then the defendant, and this is the same day that

16  Peter Skolnik's information is provided to Kristin, correct?

17  A    Yes.

18  Q    And then the defendant writes, August 27th, 2009, and

19  I'll just go to the middle one:  Is it that Skolnik apparently

20  does some work for the Sinai Charity in the chain of events?

21       And then again, still on August 27th:  Yes, Skolnik

22  did work for Sinai, which was sponsored by his client.

23       And then is it the defendant who writes:  Might be a

24  fascinating question to ask about contributions to Sinai if

25  smoke twitches?

SAM      OCR      RMR      CRR      RPR

Weniger - redirect - Penza                              5229

1    A     Yes.

2    Q     So based on this, what can you say about whether the

3    information from Canaprobe was being conveyed from Kristin

4    Keeffe to the defendant?

5    A     It certainly appears that it was.

6    Q     And other than just this document, did there appear to be

7    a back-and-forth between the defendant and Kristin Keeffe?

8    A     There did.

9

10                 (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

Weniger - Redirect - Penza                              5230

1   BY MS. PENZA (Continuing):

2   Q    Do you have any evidence that Kristin Keeffe ever acted

3   alone, without the Defendant's permission?

4   A    Could you ask the question one more time?

5   Q    Do you have any evidence from this case that Kristin

6   Keeffe ever acted alone, without going through the Defendant?

7              MR. AGNIFILO:  Object to the form of the question.

8              THE COURT:  Sustained.  Rephrase the question.

9   Q    Do you know -- based on your investigation, do you know

10  whether Kristin Keeffe ever acted without going through the

11  Defendant?

12  A    The Defendant was the individual that everyone went to

13  for purposes of permission, to include within the legal

14  department and the legal liaison, Kristin Keeffe being the

15  legal liaison.

16  Q    You talked with Mr. Agnifilo about Kristin Keeffe's

17  paranoia.

18             In the course of your investigation, have you had

19  any evidence that the Defendant was paranoid?

20  A    Yes.  There were others within the community that would

21  regularly report to him the observance of different vehicles

22  and things of that nature.  We saw it in the WhatsApp chat

23  that was mentioned in prior testimony and, also, we heard from

24  a number of witnesses that that was pretty much the regular

25  occurrence.

Weniger - Redirect - Penza                5231

1   Q    And I think you testified already to this, but when did

2   Kristin Keeffe leave the community?

3   A    I believe 2014.

4   Q    After she left, have you reviewed any communications

5   between the Defendant and others about any of the individuals

6   that we've talked about?

7   A    I'm sorry, ask that question one more time, please.

8   Q    After Kristin Keeffe had left, so after 2014, are there

9   still communications between the Defendant and others about

10  some of the individuals that we've looked at?

11  A    Oh, absolutely.

12  Q    And just quickly showing you what's in evidence as -- and

13  that would include who?

14  A    Toni Natalie, Barbara Bouchey, Kristin Keeffe.  I mean,

15  essentially all of the individuals that were -- that NXIVM

16  sought banking information.

17  Q    And continued throughout?

18  A    Yes, continued after Kristin Keeffe left.

19  Q    When the controversy about DOS came to the forefront, was

20  there still discussion then about other individuals being

21  involved?

22  A    Yes, there was this kind of conspiratorial thought.

23  Q    Can you explain that a little bit?

24  A    There was an effort -- my understanding is there was an

25  effort made by the organization to somehow tie those that had

Weniger - Redirect - Penza                    5232

1   spoken out about DOS to the prior defectors that were

2   outspoken.

3   Q    Did you have any evidence of that sort of conspiracy?

4   A    No.

5   Q    And just showing you this e-mail -- we looked at it

6   yesterday -- this is from 2015?

7           (Exhibit published to the jury.)

8   A    Yes.

9   Q    So, where Clare writes --

10           THE COURT:  I'm sorry, what's the exhibit number?

11           MS. PENZA:  I'm sorry, your Honor.  Government

12   Exhibit 1480.

13           THE COURT:  All right.

14           (Exhibit published to the jury.)

15   Q    When Clare writes:  Also good to know our opposition is

16   Steve Herbits, who is very close to Clinton, D'Amato, and the

17   Jewish mafia.  His power is not to be taken for granted.  That

18   is why we are here.  He and his connections are Goliath.

19   A    Yes.

20   Q    As of 2015, was Kristin Keeffe still within the

21   community?

22   A    I don't believe so, no.  I think she left 2014.

23           MS. PENZA:  Thank you.

24           No further questions, your Honor.

25           THE COURT:  Recross?

Weniger - Recross - Agnifilo                5233

1           MR. AGNIFILO:  One second.

2           THE COURT:  Sure.

3           (Pause in proceedings.)

4    RECROSS-EXAMINATION

5    BY MR. AGNIFILO:

6    Q    I only have a couple of questions for you, Special Agent

7    Weniger.

8           Do you know if for a period of time there was a

9    paternity petition pending in Surrogate's Court filed by Keith

10   Raniere because Kristin had taken Gaelyn?

11   A    I recall something about that, yes.

12   Q    And do you know if that was pending for a period of time,

13   for many years?

14   A    That, I don't know.  I'm uncertain.

15          I do know that --

16          MS. PENZA:  Your Honor, I ask that the witness not

17   continue.

18          THE COURT:  You can ask the next question.

19   Q    If you don't know, I don't want you to speculate.  If you

20   don't know, that's fine.

21          MR. AGNIFILO:  I have nothing else, your Honor.

22          Thank you.

23          THE COURT:  Anything else from the Government?

24          MS. PENZA:  No, your Honor.

25          THE COURT:  Witness is excused.  You may stand down.

Proceedings                                                5234

1          THE WITNESS:  Thank you, your Honor.

2          (Witness excused.)

3          THE COURT:  The Government may call its next

4    witness.

5          MS. PENZA:  Your Honor, the Government rests its

6    case.

7          THE COURT:  Very well.  At this time, members of the

8    jury, we're going to take a short recess and then bring you

9    back.

10          All rise for the jury.

11          (Jury exits.)

12          THE COURT:  Please be seated.

13          Does the defense have a motion?

14          MR. AGNIFILO:  Yes, your Honor.

15          We move to dismiss certain counts of the indictment

16    as being insufficient in terms of the evidence and the

17    testimony elicited at the trial.  We simply don't believe

18    there has been sufficient evidence --

19          THE COURT:  Can you speak more into the microphone

20    so everybody can hear you better?  Thank you.

21          MR. AGNIFILO:  We don't believe there's been

22    sufficient evidence of an enterprise.  We would think that

23    there's insufficient evidence of the enterprise, we think

24    there's insufficient evidence of the various racketeering acts

25    that comprise Counts One and two.

Proceedings                    5235

1        And we can make a more specific motion, but, at this

2    point, we believe that there's insufficient evidence in regard

3    to the counts and in regard to the racketeering acts.

4        MS. HAJJAR:  Your Honor, the Government can make a

5    more specific proffer should the defense wish to make a more

6    fulsome argument, but there's more than sufficient evidence

7    for this case to go to the jury.

8        Lauren Salzman, Daniela, Mark Vicente all testified

9    regarding the enterprise, regarding the racketeering acts,

10   regarding the fact that the enterprise, the purpose of it was

11   to promote the Defendant, and that the Defendant committed

12   these racketeering acts because of his position as the leader

13   of the enterprise.

14       But should the Defendant make a more specific

15   argument, we're happy to respond, your Honor.

16       MR. AGNIFILO:  Your Honor, for the moment, I want to

17   focus on the absence of evidence of commercial sex in regard

18   to the sex trafficking counts and -- acts, rather.

19       I don't think there's been anything elicited that

20   would amount to legally sufficient evidence that there was

21   commercial sex in this case and we move to dismiss in specific

22   those particular charges.

23       THE COURT:  All right.

24       Yes?

25       MS. HAJJAR:  There certainly was, your Honor.  The

Proceedings                                           5236

1    commercial sex act is defined as any sex act on account of

2    which anything of value is given to or received by any person.

3    And in this case, there was ample testimony through Lauren

4    Salzman, among others, that access to Keith Raniere, access to

5    the Defendant, meant increased financial opportunities, meant

6    access to money.  Nicole testified that she was, in fact,

7    provided with cash as a direct result of her sexual

8    relationship with the Defendant.

9            Here, the Government has proven that the DOS

10   first-line masters maintained their position, which directly

11   translated to access to money, access to financial

12   opportunities with the Defendant, as a result of tasking their

13   slaves to have sex with the Defendant.  And that nexus was

14   amply shown by e-mail correspondence, including the e-mail

15   correspondence between Allison Mack and the Defendant with

16   regard to India, Nicole's testimony, and Jay's testimony.

17           So, that commercial sex aspect, your Honor, has been

18   proven and should go to the jury.

19           THE COURT:  Anything else?

20           MR. AGNIFILO:  No, your Honor.

21           THE COURT:  The Court concludes that there is

22   sufficient evidence of the enterprise and the commercial sex

23   acts to go to the jury for consideration.  The motion is

24   denied.

25           And at this point, the Court requests to know

Proceedings                                                5237

1   whether it's the intention of the Defendant to testify on his

2   own behalf, and then I can query the Defendant regarding that.

3              Mr. Agnifilo?

4              MR. AGNIFILO:  Just give me one minute, Judge.

5              (Pause in proceedings.)

6              MR. AGNIFILO:  Your Honor, thank you for the time.

7              THE COURT:  Yes.

8              MR. AGNIFILO:  We've spoken.  I've spoken with my

9   client about the matter.  My client does not wish to testify.

10             THE COURT:  All right.  Let me address this directly

11  to Mr. Raniere.

12             Mr. Raniere, you have the right under the

13  Constitution of the United States --

14             You can stay seated, that's fine.

15             You have the right under the Constitution of the

16  United States to testify in your behalf, if you wish to do so.

17  On the other hand, if you decide not to testify, the Court

18  will instruct the jury that you have the absolute right under

19  the Constitution of the United States not to testify and the

20  fact that you are not testifying cannot be considered in any

21  way by the jury in connection with its determination of

22  whether you've broken the law.

23             So, I will instruct the jury should you decide not

24  to testify that they cannot take that into account against you

25  when reviewing the evidence in the case; do you understand

LAM      OCR      RPR

Proceedings                                                    5238

1   that?

2            THE DEFENDANT:  I do, your Honor.

3            THE COURT:  And have you discussed your right to

4   testify with your attorneys?

5            THE DEFENDANT:  I have, your Honor.

6            THE COURT:  Have they answered all your questions

7   about your right to testify?

8            THE DEFENDANT:  They have, your Honor.

9            THE COURT:  Do you understand that the choice to

10  testify or not testify reposes with you and you alone?

11           THE DEFENDANT:  I do, your Honor.

12           THE COURT:  And are you satisfied as a result of

13  your conversations with your attorneys that your decision not

14  to testify is made voluntarily and is made in such a way that

15  it reflects your decision not to testify?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  Is there anything else you'd like me to

18  ask of your client?

19           MR. AGNIFILO:  No, thank you.

20           THE COURT:  Thank you.

21       I find that the Defendant has knowingly and

22  voluntarily waived his right to testify in this trial.

23           Let's bring back the jury.

24           MS. PENZA:  Your Honor, one thing.  I'm sorry.

25           The Government does want to put on the record that

Proceedings                                          5239

1   it has offered to the defense to make any of its witnesses

2   available to them.  That includes our two cooperating

3   witnesses, including Lauren Salzman, who testified earlier in

4   the trial.

5           That offer has -- no one has taken us up on that

6   offer, and, so, we just want to put that on the record, that

7   the defense does not wish us to make anyone available for

8   their case.

9           THE COURT:  Is that correct?

10          MR. AGNIFILO:  Yes, that's correct.

11          THE COURT:  All right.

12          Are you planning to put on a case?

13          MR. AGNIFILO:  No, Judge.

14          THE COURT:  Do you want me to take the jury out and

15  do the Rule 29 motion again once I have ascertained that

16  you're not putting on a case?

17          I'm willing to do that.

18          MR. AGNIFILO:  No, I'm not requesting.

19          THE COURT:  Do you understand what I'm saying?

20          MS. HAJJAR:  Yes, your Honor.

21          THE COURT:  Is there any desire by the Government to

22  have me go through that again?

23          MS. HAJJAR:  I don't believe there's any need.  If

24  there's a motion...

25          THE COURT:  Just checking.

Proceedings                                              5240

1          (Jury enters.)

2          THE COURT:  Please be seated.

3          Mr. Agnifilo.

4          MR. AGNIFILO:  The defense rests as well.

5          THE COURT:  Thank you.

6          Members of the jury, this concludes the evidentiary

7    portion of the case.  The next step will be closing arguments

8    by the Government and the defense and the rebuttal by the

9    Government, to be followed by the charge as to the law, which

10   the Court will give you at that point, and then you will

11   retire to consider your verdict.

12         So, on Monday morning, I'd like you to try to be

13   here, everyone to be here, as close to 9 o'clock as possible

14   so we can move right into the closing arguments, and we'll

15   take it from there.

16         At this time, I'm going to remind you that it's very

17   important that you follow my instruction that you not discuss

18   the case with anyone; not your family, friends, or business

19   associates, and not your fellow jurors.

20         In addition, you must not read, listen to, watch, or

21   access any accounts of this case on any form of media, such as

22   newspapers, TV, radio, podcasts, or the internet, nor research

23   or seek outside information about any aspect of the case.

24         Please do not communicate with anyone about the case

25   on your phone, whether through e-mail, text messaging, or any

LAM        OCR        RPR

Proceedings                                          5241

1    other means; through any blog or website or by way of any

2    social media, including Facebook, Twitter, Instagram, YouTube

3    or other similar sites.

4            You must not consider anything you may have read or

5    heard about the case outside this courtroom, whether you read

6    it before or during jury selection or during this trial.  And

7    do not visit any of the locations identified during the course

8    of jury selection or trial.

9            So, we're going to adjourn for the day and get a

10   good rest over the weekend, and then we'll proceed with

11   closing arguments on Monday morning.  And, as always, on

12   behalf of the parties, the Court thanks you for your attention

13   to this case.

14           All rise for the jury.

15           (Jury exits.)

16           THE COURT:  Please be seated.

17           Is there anything else from the Government for

18   today?

19           MS. PENZA:  No, your Honor.

20           THE COURT:  And your motion was made at the end of

21   the Government's case.

22           MR. AGNIFILO:  Right.

23           THE COURT:  Do you need to make it again?

24           MR. AGNIFILO:  I don't feel the need to.

25           THE COURT:  I'm just making sure.

Proceedings                                          5242

1           And is there anything else?

2           MR. AGNIFILO:  No, there's not from us.

3           THE COURT:  Thank you.

4           Tomorrow morning at 11:00 a.m., we're going to have

5   the charge conference.  Since it's not a normal court day, I

6   would appreciate it if whoever is interested in attending the

7   charge conference from either the media or the public advise

8   the marshals that they intend to be here so that if we don't

9   have enough room in the gallery, that we could also utilize

10  the overflow room and the media room.  And that way, we can

11  avoid tomorrow morning having an immediate difficulty with

12  seating everybody who may wish to be here.

13          I think that's basically it.  Monday morning we're

14  going to try to start at 9:00 a.m. because we expect closings

15  to be lengthy.

16          So, the last question is, who is doing the initial

17  closing for the Government, your Honor?

18          MS. PENZA:  I am, your Honor.

19          THE COURT:  And how long do you think your closing

20  is going to take?

21          You haven't been very successful with these --

22          MS. PENZA:  I know that, your Honor, which I

23  apologize for, but I will keep it under four hours.

24          THE COURT:  All right.

25          And the defense?

LAM      OCR      RPR

Proceedings                                          5243

1          MR. AGNIFILO:  I'll be under four hours also.

2          THE COURT:  And then for rebuttal?

3          MR. LESKO:  Hour or less.

4          THE COURT:  So, my sense is that we can get to the

5   charge sometime relatively early on Tuesday.  And, as I said,

6   I'm going to have my law clerks assist me with the charge,

7   providing the charge to the jury.

8          All right, that's it.  Thank you very much.

9

10         (Matter adjourned until Saturday, June 15, 2019 at

11  11 o'clock a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    LAM      OCR      RPR

5244

1                           I N D E X

2

3     WITNESS                                         PAGE

4

5        MICHAEL WENIGER

6            DIRECT EXAMINATION BY MS. PENZA          5131

7            CROSS-EXAMINATION BY MR. AGNIFILO        5179

8            REDIRECT EXAMINATION BY MS. PENZA        5227

9            RECROSS-EXAMINATION BY MR. AGNIFILO      5233

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

5245

**E X H I B I T S**

Government's Exhibits 505 and 505-A                    5127