UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

         -against-

KEITH RANIERE

                     Defendant.
_____

**MEMORANDUM & ORDER**

**18-CR-204 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On June 19, 2019, following a six-week trial, a jury convicted Defendant Keith Raniere of racketeering, racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking. (Jury Verdict (Dkt. 735).) On October 27, 2020, this court sentenced Raniere principally to a 120-year term of imprisonment. (Stc'g Mem. (Dkt. 966) at 18-19.) At that time, the court directed the Government to submit any claims of restitution within 90 days. (*Id*. at 20; Tr. of Oct. 27, 2020 Stc'g of Keith Raniere ("Stc'g Tr.") (Dkt. 1002) at 154.)

On January 27, 2021, the Government provided the court with copies of the restitution requests it had received from putative victims, a letter setting forth its proposed methodology for evaluating those requests, and its recommendations regarding restitution. (*See* Jan. 27, 2021 Letter re Restitution ( "Gov't Restitution Ltr.") (Dkt. 997); Ex. A. to Restitution Ltr. ("Gov't Recommendations").) In an order dated January 27, 2021, the court acknowledged receipt of the Government's submission and indicated that it would award restitution after the Defendant had an opportunity to respond. (*See* Jan. 27, 2021 ECF Order.) Raniere filed a response on March 23, 2021. (*See* Raniere Letter in Reply to Gov't's Request for Restitution ("Raniere Restitution Ltr.") (Dkt. 1018).)

1

The court has reviewed the parties' submissions and has made certain factual and legal determinations, as set forth below, that will guide the terms of its forthcoming restitution order. The court has also identified certain issues that warrant further briefing and, where available, supplemental evidence. Accordingly, the court DIRECTS the parties to submit supplemental letter briefs, along with any necessary exhibits and affidavits, and for the Government to submit a revised set of restitution recommendations that are consistent with the findings of fact and legal conclusions set forth below. [1]

## I.    BACKGROUND

Raniere was convicted of seven counts of conviction, as follows:

- Count One: Racketeering Conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963(a). (Presentence Investigation Report ("PSR") ¶ 2.)

- Count Two: Racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963(a). (PSR ¶ 3.)

- Count Six: Conspiracy to provide and obtain forced labor, in violation of 18 U.S.C. § 1594(b). (PSR ¶ 20.)

- Count Seven: Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1349 and 1343. (PSR ¶ 21.)

- Count Eight: Sex Trafficking Conspiracy, in violation of 18 U.S.C. §§ 1594(c) and 1591(b)(1). (PSR ¶ 22.)

---

[1] The court requests that the Government, in making its revised restitution recommendations, specify for each recommended award exactly which of the claimed losses it regards as compensable, and the amount(s) that it recommends awarding in order to compensate for those losses, so that the court and Defendant can easily discern how the Government arrived at the total figures for each of its recommended awards.

- Count Nine: Sex Trafficking of Jane Doe 5, in violation of trafficking of 18 U.S.C. §§ 1591(a)(1), (a)(2), and (b)(1). (PSR ¶ 23.)

- Count Ten: Sex Trafficking of Jane Doe 8, in violation of trafficking of 18 U.S.C. §§ 1591(a) and (b)(1). (PSR ¶ 24.)

The two racketeering counts of conviction are predicated on numerous indictable acts including, inter alia, sexual exploitation of a minor, Jane Doe 2; identity theft and conspiracy to commit identify theft of multiple individuals (Jane Doe 1, James Loperfido, Edgar Bronfman, Sr., Jane Doe 3, and Jane Doe 7); trafficking and document servitude of Jane Doe 4; and sex trafficking and forced labor of Jane Doe 5. (PSR ¶¶ 4, 6-7, 9-11,13-15, 17-27.) Counts Six, Seven, and Eight concern conspiracies by Raniere and his co-defendants to obtain labor, assets, and the performance of sexual acts from lower-ranking members of a secret organization known as "DOS." (PSR ¶¶ 20-22.) Counts Nine and Ten concern the sex trafficking of two individual lower-ranking DOS members. (PSR ¶¶ 23-24.)

To date, 100 putative victims have submitted requests for restitution, including Jane Doe 2, Jane Doe 4, Jane Doe 5, Jane Doe 8, and James Loperfido, as well as several additional lower-ranking members of DOS, and many individuals who were not affiliated with DOS but who nonetheless claim that they were harmed by Raniere and his co-defendants' criminal conduct. (*See* Gov't Restitution Ltr.)

## II.     LEGAL STANDARD

In evaluating restitution claims, the court recognizes that "the Government bears the burden of proving a victim's actual loss by a preponderance of the evidence." *United States v. Finazzo*, 850

F.3d 94, 117 (2d Cir. 2017).[2] The Second Circuit has "never used the term 'actual' in this context to mean 'mathematically precise'" or "adopted a one-size-fits-all standard of precision for application in restitution cases." *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013). Rather, what is required is "only a reasonable approximation of losses supported by a sound methodology." *Id.* at 196.

Two statutes relevant to this case provide for mandatory restitution for victims of certain crimes.[3] First, the Trafficking Victims Protection Act of 2000 ("TVPA") provides for mandatory restitution for "the full amount of the victim's losses" for crimes including forced labor, sex trafficking, and document servitude. 18 U.S.C. § 1593(b)(1). In Raniere's case, counts Six (forced labor conspiracy), Eight (sex trafficking conspiracy), Nine (sex trafficking of Jane Doe 5), and Ten (sex trafficking of Jane Doe 8) are covered offenses that give rise to mandatory restitution under the TVPA, as is Racketeering Act Nine (forced labor and document servitude of Jane Doe 4). The TVPA defines "victim" as "the individual harmed as a result of a crime under this chapter." *Id.* § 1593(c).

Under the TVPA, victims are entitled to full compensation for "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim," including, inter alia, "medical services relating to physical, psychiatric, or psychological care," "lost income," and "reasonable attorneys' fees." *Id.* §§ 1593(b)(3),

---

[2] When quoting cases and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

[3] As noted below, the court believes that Jane Doe 2 may be entitled to mandatory restitution under an additional statute, the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, and it asks the parties to address her eligibility to recover under that statute in their subsequent letter briefs. *See* 18 U.S.C. § 2259.

2259(c)(2). A victim's compensable losses under the TVPA also include "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id*. § 1593(b)(3).

Second, the Mandatory Victim Restitution Act of 1996 ("MVRA") requires that defendants convicted of certain crimes, including crimes of violence or offenses against property that cause a "physical injury or pecuniary loss" to "an identifiable victim," "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c). The MVRA applies to certain of Raniere's crimes of conviction, including racketeering, racketeering conspiracy, and wire fraud conspiracy. (*See* PSR ¶ 166.)

The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id*. § 3663A(a)(2). "In restricting its definition of 'victim' to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that have a sufficiently close connection to the conduct at issue." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015). Thus, the MVRA's "definition of 'victim' governs the calculation of the reimbursable loss itself." *Id*.

"[C]ourts have uniformly read [the MVRA] to provide for restitution payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." *United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000). However, the MVRA "does not authorize the court to order a defendant to pay restitution to any person who was not a victim" of an offense

of conviction. *United States v. Reifler*, 446 F.3d 65, 121 (2d Cir. 2006). "While the language [in the MVRA's definition of 'victim'] expands what it is that will give rise to compensable loss when a scheme, conspiracy or pattern is involved, the reference point to which such conspiracy is tied remains the 'offense' of which the defendant has been convicted." *In re Local #46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds*, 568 F.3d 81, 87 (2d Cir. 2009). In other words, conduct committed "in the course of the scheme or conspiracy [may] be considered as a basis for determining compensable harm" only if the "scheme, conspiracy, or pattern of criminal activity" that encompasses that conduct is an element of the offense of conviction. *Id*.

Where more than one defendant has contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant." 18 U.S.C. § 3664(h). If a defendant owes restitution to multiple victims, "the court may provide for a different payment schedule for each victim" based on the victims' economic circumstances and the nature and extent of their losses. *Id*. § 3664(i).

## III.   DISCUSSION

The Government recommends that the court award restitution to 25 of the 100 putative victims who submitted claims in connection with this case. [4] (*See* Gov't Recommendations.) The Government identifies 18 of those 25 claimants as victims under § 1593 of the TVPA. The other claimants, including the seven to

---

[4] Based on the representations in the Government's letter of January 27, the court includes in this tally Jane Doe 4, for whom the Government has not yet formally recommended a specific restitution award because it was not able to review her request in connection with its prior submission and recommendation. (*See* Gov't Restitution Ltr. at 4, 4 n.3.)

whom the Government recommends that restitution be awarded and 75 more to whom the Government recommends that no award be made, are not identified as victims under the TVPA. (*Id.*) The court considers first which of the claimants are entitled to restitution under the TVPA and, for those who are eligible victims, which of their losses are recoverable. It then conducts a similar analysis with respect to the MVRA.

**A.    Restitution Pursuant to Trafficking Victims Protection Act of 2000**

1.    Identification of Relevant Victims

The TVPA defines "victim" as "the individual harmed as a result of a crime under this chapter." 18 U.S.C. § 1593(c). The Government identifies 18 of the 100 individuals who have submitted requests for restitution as victims within the meaning of Section 1593 of the TVPA.

Raniere was convicted of two separate counts of sex trafficking, in violation of 18 U.S.C. § 1591, pertaining to victims Jane Doe 5 ("Nicole") and Jane Doe 8 ("Jay"). Because sex trafficking in violation of § 1591 is a covered crime under the TVPA, Jane Doe 5 and Jane Doe 8 are plainly entitled to restitution under § 1593. Additionally, Raniere's conviction for racketeering was predicated, in part, on the trafficking for labor and services and document servitude of Jane Doe 4 ("Daniela") – conduct that is criminal under 18 U.S.C. §§ 1590 and 1592. The court requests that the parties' supplemental letter briefs address the question of whether a victim of a predicate racketeering act that is a covered offense under § 1593 is a victim within the meaning of the TVPA. Assuming, for now, that victims of covered offenses are entitled to restitution under § 1593 even if such offenses were not crimes of conviction themselves, but rather were committed in furtherance of a racketeering enterprise, the court finds that Jane Doe 4 is entitled to restitution under § 1593.

Raniere was also convicted of sex trafficking conspiracy and forced labor conspiracy, in connection with his role in a scheme that used coercive and illegal means to compel lower-ranking DOS members to engage in uncompensated labor and sexual activity. Those conspiracy crimes are covered offenses under the TVPA. The testimony at Raniere's trial made clear that lower-ranking DOS members (referred to as "slaves") performed unpaid labor and, in some cases, engaged in sexual activity, and that they did so at the direction of higher-ranking DOS members ("masters"), in response to acute social, financial, and emotional pressures designed and imposed by Raniere and his co-conspirators. In convicting Raniere of these crimes, the jury determined that the defendants' conduct met the elements of federal forced labor and sex trafficking offenses. Accordingly, the court finds that all lower-ranking DOS members who performed uncompensated labor and services or who engaged in sexual activity, in connection with their membership in DOS and at the direction of higher-ranking DOS members, are victims of a covered offense under the TVPA and are entitled to restitution under § 1593.

Thus, in the court's view, a putative victim is entitled to recover under § 1593 if the court finds by a preponderance of the evidence that: (1) she was a lower-ranking "slave" member of DOS[5] between February 2016 and June 2017; and (2) in connection with her membership in DOS and at the behest of a higher-ranking DOS "master," she either performed unpaid labor or services, engaged in sexual activity, or both. All restitution claimants who meet these criteria are statutorily entitled to recover the full amount of their losses under the TVPA.

---

[5] For purposes of this analysis, the court considers DOS members who were not "first-line masters," and who therefore were "slaves" to other female "masters" within DOS and not directly to Raniere himself, to be "lower-ranking." (See PSR ¶¶ 84-85.)

*a.    Victims Entitled to Restitution Under TVPA*

The court finds, by a preponderance of the evidence, that the following individuals are victims of sex trafficking offenses, forced labor offenses, or both, and that they are therefore entitled to restitution under the TVPA.

**Daniela ████████ ("Jane Doe 4," "Daniela"):** As stated above, Racketeering Act Nine, which the jury found the Government had proved in support of Count Two, for racketeering, charged Raniere with the document servitude and trafficking for labor and services of Jane Doe 4. Assuming that victims of predicate racketeering acts that are covered offenses under § 1593 may receive restitution under the TVPA, the court finds that Jane Doe 4 is a victim within the meaning of that statute.

**Nicole ████ ("Jane Doe 5," "Nicole"):** As stated above, Raniere's conviction on Count Nine concerned his sex trafficking of Jane Doe 5. The court therefore finds that she is a victim of a qualifying offense under the TVPA.

**████████████ ("Jane Doe 8," "Jay"):** As stated above, Raniere's conviction on Count Ten concerned his sex trafficking of Jane Doe 8. The court therefore finds that she is a victim of a qualifying offense under the TVPA.

**████████████ ("Jane Doe 6," "████████"):** According to testimony at trial, Jane Doe 6 was recruited into DOS by Lauren Salzman and served as Salzman's slave. (Tr. of Keith Raniere Trial ("Trial Tr.") at 1601:19-25, 1722:25-1723:10, 1770:21-1771:2.) She submitted "collateral" in connection with her membership in DOS, including financial assets and naked photographs. (*Id.* at 1723:21-1724:21.) She was branded on her pelvic area with the DOS brand. (*Id.* at 1753:23-1754:19.) The court therefore finds by a preponderance of the evidence that Jane Doe 6 was a lower-ranking member of DOS during the relevant period.

Salzman also testified that, in connection with her membership in DOS, that Jane Doe 6 sometimes functioned as a "personal assistant" for her, but that she preferred for Jane Doe 6 to perform "executive level administrative type work for DOS," such as conducting legal research and reviewing legal contracts. (*Id*. at 1673:6-1674:20.) Accordingly, the court also finds by a preponderance of the evidence that Jane Doe 6 performed uncompensated labor and services in connection with her participation in DOS. The court determines that Jane Doe 6 is a victim of a qualifying offense under the TVPA.

**Sylvie ▮▮▮▮ ("Sylvie"):** Sylvie testified at trial regarding her recruitment into DOS and her submission of collateral, including naked photographs and a letter with the potential to disrupt close family relationships, in connection with her membership. (*Id*. at 211:4-20, 213:3-214:15, 215:21-24.) The court finds by a preponderance of the evidence that she was a lower-ranking DOS member during the relevant period. Sylvie also testified that she was assigned by her DOS master to seduce Raniere, and that she had sexual contact with Raniere pursuant to that assignment. (*Id*. at 219:13-220:6, 252:6-254:15.) The court therefore finds by a preponderance of the evidence that Sylvie engaged in sexual activity in connection with her role in DOS. The court determines that Sylvie is a victim of a qualifying offense under the TVPA.

**India ▮▮▮▮ ("Additional Jane Doe 7," "India," "Additional DOS Victim 1"):** Multiple trial witnesses identified Additional Jane Doe 7 as a member of DOS: a slave who reported to Allison Mack and who recruited Jane Doe 8 and served as her master. (*See id*. at 4197:6-10, 4197:16-18, 4267:23-25, 4325:3-4328:3, 4333:20-4334:4, 5097:20-21.) The court finds by a preponderance of the evidence that Additional Jane Doe 7 was a lower-ranking member of DOS during the relevant period.

Lauren Salzman testified that Allison Mack informed her that she expected Additional Jane Doe 7 to begin having sexual contact

with Raniere in her capacity as Mack's slave. (*Id*. at 1794:1-8.) In a March 3, 2016 email exhange, Raniere wrote to Mack to confirm that "[Additional Jane 7] know[s] [that] to complete her [sic], she needs to take all of her clothes off while I am clothed, pose in the most revealing way, and have me take a picture of her with her phone to be immediately sent to you as proof." (*Id*. at 5099:7-17.) The following day, Raniere wrote to Mack, "Any news on [Additional Jane Doe 7]?" and Mack responded that Additional Jane Doe 7 had "changed her flight" would "reach out" to Raniere regarding "meeting again to complete the assignment." (*Id*. at 5097:23-5098:13.) According to the PSR, "Mack was notified by Raniere that [Additional Jane Doe 7] completed the assignment. At a later point, [Additional Jane Doe 7] had sexual contact with Raniere. She told Mack that Raniere performed oral sex on her." (PSR ¶ 119.)

Additional Jane Doe 7 gave a victim impact statement at Raniere's sentencing in which she described her participation in DOS, including being branded, and stated that she was "instructed to seduce Keith as a test of [her] loyalty" and engaged in "dozens of sexual encounters" with him that she "would never have consented to" if not for the fear of her DOS collateral being released. (Stc'g Tr. at 81:16-22, 82:2-10.)

In light of testimonial and documentary trial evidence suggesting that Raniere and Mack planned to assign Additional Jane Doe 7 to have sexual interactions with Raniere, the Probation Department's finding that Additional Jane Doe 7 had sexual contact with Raniere, and Additional Jane Doe 7's own description of "dozens" of sexual encounters that would not have occurred absent to her participation in DOS, the court finds by a preponderance of the evidence that Additional Jane Doe 7 engaged in sexual activity at the instruction of her DOS master and

in connection with her role in DOS. Accordingly, the court determines that Additional Jane Doe 7 is a victim of a qualifying offense under the TVPA.

**Sarah Edmondson ("Additional Jane Doe 13," "Sarah," "Jane Doe 11"):** At trial, Lauren Salzman testified that she recruited Additional Jane Doe 13 into DOS to serve as her slave, and that Additional Jane Doe 13 submitted collateral in connection with her DOS membership. (Trial Tr. at 1717:24-1721:22.) Additional Jane Doe 13 was branded on her pelvic area in connection with her membership in DOS. (*Id.* at 1748:22-1749:17.) The court therefore finds by a preponderance of the evidence that Additional Jane Doe 13 was a lower-ranking member of DOS during the relevant period.

At trial, Salzman testified that the concepts of "time and labor" were central to DOS in that slaves were expected to make a "full-time commitment to be always making [their] master more potent." (*Id.* at 1671:10-23.) She explained that she conveyed to her slaves that they "should be seeking to provide the most value in the time and labor they're providing," and that "labor dedicated to furthering the master" was a core component of their involvement in DOS. (*Id.* at 1673:1-1674:13, 1671:22-23.) The court therefore finds by a preponderance of the evidence, on the basis of Salzman's testimony, that DOS slaves who reported directly to Salzman were required to engage in uncompensated labor. Thus, even though Salzman did not describe specific assignments that she gave to Additional Jane Doe 13, the court finds that Additional Jane Doe 13 is a victim of a qualifying offense under the TVPA.

███████████ **("Amanda"):** Lauren Salzman testified at trial that she recruited Amanda into DOS. (*Id.* at 1732:8-9.) She testified that Amanda submitted collateral including sexually explicit photographs and material that, if released, could have negatively affected her own professional status and her romantic

partner's employment. (*Id*. at 1732:13-22.) She was branded on her pelvic area, on the same day as Lauren Salzman's other DOS slaves. (*Id*. at 2197:8-15.) The court therefore finds by a preponderance of the evidence that Amanda was a lower-ranking member of DOS during the relevant period.

In addition to Salzman's testimony about the centrality of labor and a "full-time commitment" to her slaves' involvement in DOS, she specifically testified that she directed her slaves to "review[] legal contracts and d[o] legal research." (*Id*. at 1671:10-23, 1674:5-13.) Salzman also testified that Amanda was an attorney, and Amanda's restitution claim lists "[l]egal for Lauren" as a DOS assignment to which she devoted 30 hours. (*See id*. at 1732:10-12; ▮▮▮▮▮▮▮ Restitution Worksheet.) The court therefore finds by a preponderance of the evidence that Amanda engaged in uncompensated labor in connection with her role in DOS, and it determines that she is a victim of a qualifying offense under the TVPA.

*b.    Putative TVPA Victims Not Entitled to Restitution on the Basis of Existing Record*

At this time, the court cannot find by a preponderance of the available record evidence that the following individuals were victims of forced labor and/or sex trafficking offenses. The court will consider sworn testimony submitted by the parties in connection with their subsequent letter briefs that relates to these individuals' eligibility for restitution under the TVPA, including testimony that corroborates or disputes facts set forth in the PSR or Victim Impact Statements.

**Camila ▮▮▮▮▮▮ ("Jane Doe 2," "Camila"):** Trial testimony established that Jane Doe 2 was a member of DOS, but as a "first-line master" rather than a lower-ranking slave. (*Id*. at 1509:15-23, 1738:3-1739:7.) While she participated in at least one DOS-related sexual encounter with Raniere and Jane Doe 5, the testimony at trial did not establish whether her participation in that

encounter was specifically compelled by her involvement with DOS. (*See* PSR ¶ 107.) Nor does the trial testimony establish by a preponderance of the evidence that she engaged in uncompensated labor compelled by her membership in DOS. Accordingly, the court lacks sufficient evidence to conclude, at this time, that Jane Doe 2 is a statutory victim of Raniere's forced labor or sex trafficking offenses under the TVPA. If presented with unrebutted sworn testimony describing Jane Doe 2's performance of uncompensated work or participation in a sexual act in connection with her role in DOS and at the direction of a higher-ranking DOS member to whom she owed obedience, the court would be better positioned to determine that Jane Doe 2 is a qualifying victim under the TVPA.

The court also notes that Jane Doe 2 may be entitled to mandatory restitution under 18 U.S.C. § 2259, which provides for full restitution for victims of child pornography offenses. Covered offenses under that statute include 18 U.S.C. § 2252, which the jury found that Raniere had violated as a predicate act for his racketeering conviction. (*See* PSR ¶¶ 2, 8.) The court encourages the parties to address the question of Jane Doe 2's eligibility for restitution under § 2259 in their supplemental letter briefs.

██████████ (**"Additional Jane Doe 34," "**████**," "Additional DOS Victim 3"):** Multiple trial witnesses referred in their testimony to Additional Jane Doe 34 as a DOS slave who reported to Additional DOS Victim 2, a DOS slave who served under Mack. (*See id.* at 1865:15-25, 4408:19-4409:7, 5104:11-13.) The Government introduced into evidence at trial an email from Additional DOS Victim 2 to Mack describing collateral that Additional Jane Doe 34 had submitted and the expectation of additional forthcoming collateral. (*Id.* at 5103:18-5104:24.) The court therefore finds by a preponderance of the evidence that Additional Jane Doe 34 was a lower-ranking member of DOS during the relevant period.

The PSR states that Mack and Additional DOS Victim 2 directed Additional Jane Doe 34 "to read and edit 100 articles for Raniere during a one-month period" and "encouraged [her] to have a sexual relationship with Raniere." (PSR ¶ 121.) Raniere objected to this portion of the PSR on the grounds that it was based on the accounts of putative victims who had not testified. (Raniere Obj. to PSR at 22.) Additional Jane Doe 34 submitted a Victim Impact Statement that describes "being groomed to be a sexual partner for [Raniere]" and engaging in repeated sexual activity with him. (███████████ Victim Impact Stmt. at 6-7.) However, because the only accounts of Additional Jane Doe 34 engaging in uncompensated labor or sexual activity are from unsworn sources, the court cannot find by a preponderance of the evidence at this time that Additional Jane Doe 34 was a victim of forced labor or sex trafficking in connection with her role in DOS.

███████████ ("**Additional Jane Doe 36**," "██████"): Jane Doe 8 testified that she recruited Additional Jane Doe 36 into DOS to be her slave, at Mack's urging and with Mack's assistance, and that she collected collateral from Additional Jane Doe 36. (*Id.* at 4387:3-4388:19, 4390:9-4391:6.) The court therefore finds by a preponderance of the evidence that she was a lower-ranking member of DOS.

At trial, the Government published into evidence an email exchange between Additional Jane Doe 36 and Raniere, in which they made plans to meet outside at approximately 4:15 a.m. for a "walk," after Raniere asked if she was "available at all hours of the night." (*Id.* at 5107:9-5109:13.) In a Victim Impact Statement submitted to the court, Additional Jane Doe 36 describes how Mack groomed her for a sexual relationship with Raniere but implies that no such relationship was consummated. (██████ ███████ Victim Impact Stmt. at 1.) Additional Jane Doe 36 does describe, in her statement, performing uncompensated work including data entry as an aspect of her participation in

DOS. (*Id.*) However, because the court does not have sworn testimony regarding Additional Jane Doe 36's unpaid labor, it cannot at this time find by a preponderance of the evidence that she performed such labor.

**Additional Putative Victims:** The court also finds that it has insufficient record evidence, apart from unsworn Victim Impact Statements, to corroborate eight additional putative TVPA victims' involvement in DOS or performance of unpaid labor and/or sexual acts pursuant to such involvement. Some of these individuals were not discussed in the trial testimony at all; others were mentioned briefly, but the testimony did not establish any details of their recruitment into DOS, position in DOS, participation in obligatory DOS rituals, or performance of unpaid labor or sexual acts in connection with their DOS membership. The individuals in question are: (1) ███████████ ("Additional Jane Doe 8"); (2) ███████████ ("Additional Jane Doe 14")[6]; (3) ███████ ("Additional Jane Doe 15"); (4) ███████ ("Additional Jane Doe 25"); (5) ███████ ("Additional Jane Doe 30"); (6) ███████ ("Additional Jane Doe 35"); (7) ███████; and (8) ███████.

2.      Identification of Compensable Losses

Eligible victims under the TVPA are entitled to mandatory restitution totaling the "full amount of [their] losses," including "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses

---

[6] While the Government did not identify Additional Jane Doe 14 as a putative TVPA victim, the court notes that her Victim Impact Statement, a version of which she read at Raniere's sentencing, suggests that she was a member of DOS and that she had a sexual relationship with Raniere. (*See* Stc'g Tr. at 87:5-88:25.) The court therefore includes her among the putative DOS victims who have submitted restitution claims, but for whom the court lacks sufficient evidence to find are "victim[s]" within the meaning of the TVPA.

involving the victim." 18 U.S.C. §§ 1593(b)(3), 2259(c)(2). Recoverable losses include "medical services relating to physical, psychiatric, or psychological care;" "physical and occupational therapy or rehabilitation;" "necessary transportation, temporary housing, and child care expenses;" "lost income;" "reasonable attorneys' fees, as well as other costs incurred;" and "any other relevant losses incurred by the victim." *Id*. § 2259(c)(2). Additionally, victims under the TVPA recover "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id*. § 1593(b)(3).

*a.      Medical Services*

With regards to medical care costs, the court agrees with the Government's recommendation that losses are compensable only if supported by a letter from a licensed or credentialed medical provider, counselor, or social worker. (*See* Gov't Restitution Ltr. at 6.) As a general matter, the court finds that the defendants imposed on DOS slaves numerous physical and psychological burdens in order to perpetuate sex trafficking and forced labor offenses, including sleep deprivation, extreme food deprivation and compulsory weight loss, stress and psychological abuse, branding, and unwelcome sexual activity. These burdens, which were integral to defendants' commission of the relevant offenses, were the proximate cause of a wide range of medical care needs, including but not limited to cosmetic surgery for brand removal and potentially extensive mental health care.

With respect to mental health care, the court is prepared to find by a preponderance of the evidence that Defendants' criminal conduct proximately caused the full extent of DOS victims' psychological and psychiatric care needs, absent compelling evidence of a separate and unrelated mental health issue that

was not exacerbated by Defendants' conduct. Defense counsel argues that the court should reduce restitution awards to account for victims' psychological harms that predated their involvement with DOS and Raniere. (*See* Raniere Restitution Ltr. at 28.) In support, it cites to the Northern District of New York's decision in *United States v. Pearson*, in which the court reduced victims' restitution awards "because [they] presented with some mental health issues prior to [their] involvement with Defendant, [and] the Court cannot conclude that the full extent of the mental health interventions [they] now require[] are causally related to Defendant's crimes." No. 04-cr-340 (TJM), 2009 WL 2383025, at *4-5 (N.D.N.Y. July 30, 2009).

One of the cruelest aspects of Raniere and his co-defendants' conduct is the way that they preyed upon victims' preexisting vulnerabilities and past traumas in order to debase and control them, often under the guise of healing or self-improvement. In doing so, the defendants compounded and intensified victims' preexisting psychological issues. Thus, even where a victim might have benefitted from mental health care absent her participation in DOS, the extent and magnitude of her need for such care following her involvement with DOS may be the proximate result of the defendants' actions. The court is not well positioned to disentangle the psychological harms that a victim may address through the receipt of mental health care, let alone to apportion the costs of such care among underlying harms, and it will not do so absent clear evidence that the forced labor and/or sex trafficking of a specific victim did not give rise to the full extent of her psychological care needs.

The court adopts the Government's recommendation that, where a medical provider has given an estimated range for a victim's future psychological or psychiatric care costs, the court should award restitution based on the midpoint of that range. (*See* Gov't Restitution Ltr. at 6.) The court also adopts the Government's

recommendation that the cost of cosmetic surgery for brand removal be estimated as $2,500, based on the cost quoted to Jane Doe 6 by a medical provider specializing in laser skin treatment. (*See id*.) Subject to these parameters, and to the other parameters discussed above, the court finds that TVPA victims' relevant medical care costs, including mental health care costs, are the proximate result of Defendants' commission of forced labor and sex trafficking offenses and are therefore fully compensable.

b.      *Nxivm-Related Costs*

Several TVPA victims seek restitution for expenses incurred as a result of their participation in Nxivm and its programming, including tuition for ESP seminars and other Nxivm courses, membership fees for Nxivm groups, costs of "EM" sessions, and travel and housing costs incurred in order to attend Nxivm programming. As a general matter, the court finds that the defendants' forced labor and sex trafficking offenses, which pertain specifically to DOS, are not the proximate cause of DOS members' costs related to Nxivm programming. Many of the victims were recruited into DOS after they had already become involved with Nxivm and its programming, and insofar as they participated in Nxivm programming during the period in which they belonged to DOS, such participation can likely be attributed to their involvement with the larger Nxivm community.

At this time, the court is not aware of any evidence providing a direct causal link between the covered offenses and Nxivm-related costs. Absent further evidence that the defendants caused specific victims to incur specific Nxivm programming, housing, or travel costs in connection with the forced labor and/or sex trafficking of those victims, the court cannot direct the reimbursement of TVPA victims for these costs.

*c.*      *Uncompensated Work*

TVPA victims are entitled to recover the value of their unpaid labor and services, calculated as "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3). The victims performed labor and services not for a single employer, but rather for the benefit of DOS masters to whom they were indentured. Because the Fair Labor Standards Act ("FLSA") applies only to employers who earn at least $500,000 in annual revenue, *see* 29 U.S.C. § 203(s)(1)(A)(ii), DOS masters are not covered employers and their slaves do not have the protection of minimum wage and overtime guarantees under the FLSA. Accordingly, the value of the victims' labor must be calculated based on the "gross income or value to the defendant." 18 U.S.C. § 1593(b)(3).

The Government's proposed methodology for calculating the value of DOS victims' unpaid labor looks to the nature of the work performed, identifies a relevant job classification used by New York State's Bureau of Labor Statistics, and uses the mean hourly wage for that job classification from the year in which the work was performed to determine the value of the defendant's work on a per-hour basis. (*See* Gov't Restitution Ltr. at 8-9.) Thus, for example, the Government uses the mean hourly wage for the job classification "typist" for a DOS victim who transcribed recordings, and it uses the mean hourly wage for the job classification "executive administrative assistant" for a DOS victim who performed administrative work. (*See* ███████████ Restitution Worksheet; ███████████ Restitution Worksheet.) The Government uses the mean hourly wage for the job classification "personal care and service worker" in order to calculate the value of DOS victims' labor for the hours spent "on

call" in order to satisfy DOS masters' expectation of slaves' 24-hour "readiness." (*See* Gov't Restitution Ltr. at 8-9.)

The court finds that this is a sound methodology for approximating the value of DOS victims' unpaid labor. The nature of the victims' labor and services, and the circumstances under which they were obtained, are so unusual that ascribing an appropriate job classification and hourly wage is a difficult task. The Government's recommended method assumes that the victims, if fairly compensated, would have been paid the mean salary for the recognized category of labor that most closely approximates the work they performed. The court agrees that applying this assumption allows for a reasonable approximation of the value of the victims' labor. If the defense believes that certain job classifications recommended by the Government overstate the value of the work performed by victims, it may seek to persuade the court to use alternative job classifications in applying this methodology.

Several TVPA victims seek restitution not only for the specific work assignments they performed at the behest of their DOS masters, but also for their obligation to be "on call" for their DOS masters at every hour of the day and night. In connection with that responsibility, they seek to recover the mean salary of a "personal care and service worker" for every hour of their membership in DOS during which they were not performing other labor. (*See, e.g.*, ██████████████ Worksheet; ███████ ████████ Worksheet; ██████████████ Worksheet.) DOS slaves were subjected to "readiness" drills that required them to respond to a master's message within sixty seconds, at any hour, or be "punished." (Trial Tr. at 4378:25-4379:10.) The purpose of these drills, they were told, was to ensure that they were "constantly thinking about [their] commitment to [DOS]" and that their masters "knew where [they] were at all times." (*Id.* at 4173:17-21.) A slave's punishment for failing to meet a master's

"readiness" demands included, in some instances, being paddled with a leather strap on her bare bottom. (*Id*. at 1635:3-6, 1636:16-1637:1.) DOS masters intended for their slaves to understand that their "master was supposed to [be their] highest priority and that [their] main job as a slave was to always be thinking about them . . . and that should be the highest priority always above all other things." (*Id*. at 1642:1-5.)

Raniere questions the appropriateness of compensating victims for 24 hours of daily labor. (Raniere Restitution Ltr. at 22.) The court recognizes the unusualness of this form of "labor," which defies easy comparison to any kind of work that exists in the regular economy. But the idiosyncratic nature of DOS slaves' "readiness" obligations does not negate the fact that they demanded lower-ranking DOS members be perpetually available, at the exclusion of other activities or opportunities to earn income. Trial testimony revealed at least one instance in which a DOS slave was required to forgo a paid work opportunity because it conflicted with her commitment to DOS. (See *id*. at 4391:12-4392:4.) The Second Circuit has recognized that a court may award restitution to victims of forced labor on the basis of 24-hour workdays for which they worked in an "on call" capacity. *See United States v. Sabhnani*, 599 F.3d 215, 255-57 (2d Cir. 2010). The court therefore agrees with the Government that DOS victims' restitution awards must compensate them for the exclusive, around-the-clock nature of their commitment. Moreover, because DOS slaves were required to respond to the whims of their masters (and, in some cases, to those of Raniere) at any hour, without notice, the court finds that their on-call obligations were sufficiently analogous to the work of a "personal care and service worker" to render that an appropriate job classification.

*d.*    *Attorneys' Fees and Legal Costs*

Several TVPA victims have submitted claims for recovery of attorneys' fees incurred in connection with these proceedings.

Insofar as TVPA victims retained legal counsel in connection with their involvement with the Government's investigation, their trial testimony, their victim impact statements, their restitution claims, or any other matters related to these criminal proceedings, such costs are fully compensable. Claims for attorneys' fees and legal costs must be supported by statements from victims' counsel attesting to the work performed, and by worksheets describing the work performed and the hours and rates billed. The court will not award restitution for attorneys' fees and legal costs incurred in connection with any separate legal proceedings, including any civil litigation.

### B. Restitution Pursuant to Mandatory Victim Restitution Act of 1996

### 1. Identification of Relevant Victims

As noted above, the MVRA provides for mandatory restitution for persons who are "directly and proximately harmed as a result of the commission" of a qualifying criminal offense, including persons harmed by criminal conduct committed in the course of a scheme or conspiracy. 18 U.S.C. § 3663A(a)(2). Qualifying offenses include crimes of violence and crimes against property, including those "committed by fraud or deceit," insofar as they result in either bodily injury or property loss or damage. *Id.* § 3663A(c)(1), (b). Identifying individuals who meet the MVRA's definition of "victim" therefore requires that the court examine the covered offenses and, where applicable, the criminal conduct committed in the course of a criminal conspiracy or scheme to determine which putative victims were directly and proximately harmed.

**DOS Members:** Count Seven, which charged Raniere and certain co-defendants with wire fraud conspiracy, is based on the defendants' scheme to obtain lower-ranking DOS members' money and property, including rights to assets, credit card authorizations, and sexually explicit photographs and videos, as

"collateral" for their involvement in DOS. (PSR ¶ 21.) Where the Government establishes by a preponderance of the evidence that an individual was a lower-ranking DOS member who provided money or property as "collateral," that individual is a victim of this offense – even if there is insufficient evidence to establish that she was also a victim of forced labor or sex trafficking.

The court finds that DOS slaves were victims of wire fraud conspiracy if they furnished collateral that included monetary assets, rights or access to monetary assets, or sexually explicit photographs or videos of themselves. However, the court does not find by a preponderance of the evidence that every piece of collateral furnished by a DOS slave was sufficient to render its provider a victim of wire fraud conspiracy. In particular, trial testimony established that DOS members often recorded accusations, confessions, or secrets with the potential to harm or embarrass their subjects (usually either the DOS member herself or a close family member) as collateral. The court does not find, by a preponderance of the evidence, that a DOS member was a victim of wire fraud conspiracy where the only collateral she provided was a statement of this nature.

Based on these parameters, court finds by a preponderance of the evidence that the following individuals are victims of the defendants' wire fraud conspiracy, on the basis of trial testimony establishing that they secured their membership in DOS by providing as "collateral" rights to assets, sexually explicit photographs or videos of themselves, or other money or property: Jane Doe 5 ("Nicole") (Trial Tr. at 3852:23-3853:4); Jane Doe 6 ("███████") (*id*. at 1723:21-24, 1724:19-21.); Jane Doe 8 ("Jay") (*id*. at 4329:23-4330:4); Sylvie (*id*. at 213:19-214:15.); Additional Jane Doe 13 ("Sarah") (*id*. at 1719:16-20); Additional Jane Doe 34 ("██████") (*id*. at 5104:11-17); and Amanda (*id*. at 1732:17-22). Notably, the Government has not yet been able to establish by a preponderance of the evidence that one of these

individuals – Additional Jane Doe 34 – meets the definition of "victim" under the TVPA. Additional former members of DOS may be entitled to restitution under the MVRA, if the Government provides additional evidence that establishes, by a preponderance, that they furnished money or property as collateral.

**Non-DOS Victims Entitled to Restitution:** In addition to crimes related to his leadership role in DOS, Raniere was convicted of racketeering and racketeering conspiracy on the basis of numerous criminal predicate acts. To determine the victims of Raniere's racketeering offenses, the court must look to the predicate racketeering acts which the jury found, beyond a reasonable doubt, that Raniere had committed.

The jury found that Raniere had committed a number of identity theft offenses with specific victims: Jane Doe 1, James Loperfido, Edgar Bronfman, Sr., Jane Doe 3, and Jane Doe 7. (*See* PSR ¶¶ 4-5, 10-11, 13, 19.) Accordingly, all of these individuals are victims of crimes committed in furtherance of the racketeering scheme for which Raniere was convicted. Of these victims, only James Loperfido has submitted a claim for restitution.

Additionally, the jury found that Raniere and others had conspired to alter records for use in an official proceeding, in violation of 18 U.S.C. § 1512(k), by directing individuals in the Nxivm community to remove portions of videotapes that were to be produced in discovery in a copyright lawsuit in the U.S. District Court for the District of New Jersey. (*See* PSR ¶ 12.) Nxivm's counterparties requested the production of certain Nxivm videotapes in support of their claim that Nxivm's curriculum contained false statements and violated consumer protection laws. (*Id*. ¶ 81.) Acting on Raniere's instructions, Nxivm members edited out segments of the videos that contained false claims, and Nxivm then produced the edited tapes while claiming that they were unedited. (*Id*. ¶ 82.)

At trial, an attorney who had represented three of Nxivm's counterparties in the case – Stephanie Franco, her father Morris Sutton, and her stepmother Rochelle Sutton (collectively, "the Sutton family") – testified that the litigation lasted nearly fifteen years, and the Sutton family has submitted a restitution claim seeking over $2.8 million in compensation for litigation costs. (*See* Trial Tr. at 4525:15-20, 4533:12-17; Gov't Recommendations at 2.) The Sutton family's attorney testified that counsel reviewed the edited videotapes in preparation for trial, and that counsel suspected the tapes had been altered and considered retaining an expert to opine on that matter. (Trial Tr. at 4501:1-17, 4525:25-4527:7.)

The court finds by a preponderance of the evidence that Nxivm's production of fraudulent evidence in federal district court litigation caused pecuniary losses to the Sutton family by requiring their lawyers to spend time reviewing the altered tapes and determining how to proceed in response. However, the court does not find that all litigation costs incurred by the Sutton family in its civil litigation against Nxivm are the proximate result of the alteration of evidence produced in discovery: many of those expenses would have been incurred even if Nxivm had produced the unaltered videotapes.

**Individuals Not Entitled to Restitution:** Absent further evidence, the court finds that individuals other than those identified above, more than 80 of whom have submitted restitution claims, are not victims of Raniere's crimes within the meaning of the MVRA. This group includes five claimants to whom the Government recommend that the court award restitution: Adrian ██████████ ("Adrian"), the brother of Jane Does 2, 3, and 4, who seeks to recover for uncompensated labor and psychological care, and Toni Natalie, Barbara Bouchey, Susan Dones, and ████ ██████, each of whom seeks to recover primarily for litigation

costs she incurred in defending against vexatious litigation initiated by Raniere and his co-conspirators.

The MVRA provides for restitution only to the victims of a defendant's crimes, not to every person victimized by his harmful or improper actions. While the jury found that Raniere committed forced labor offenses, the charges relating to those offenses were specific to uncompensated work performed by members of DOS. Accordingly, the uncompensated labor and services performed by Adrian and other members of the Nxivm community, separate from DOS, are outside the scope of the specific crimes of conviction, and therefore such harms are not compensable under the MVRA. Similarly, while the court has seen ample evidence that Raniere habitually bullied and terrorized his detractors and perceived enemies through aggressive litigation, funded by co-defendant Clare Bronfman and designed to push his critics past the brink of financial ruin, that conduct is not a part of any of the crimes of which he was convicted.

Many other individuals who immersed themselves in the Nxivm community, paying for its programming and subscribing to its teachings, now seek to recover for the costs of their tuition, books, housing, and travel, and for the mental health care that they require as they seek to heal the psychological damage wrought by the defendants' conduct. The court recognizes that Raniere generated participation in Nxivm's programs through coercive and manipulative tactics, which may cause many former participants to reasonably believe that they were cheated, misled, or pressured into paying the price of participation. The court is sympathetic to the financial toll that involvement in the Nxivm community took on so many individuals. Even so, the court cannot find by a preponderance of the evidence, on the existing record, that any such costs were the proximate result of Raniere and his co-defendants' covered offenses. Rather, as the Government acknowledges, "the causal link between the defendants'

criminal conduct and any losses incurred as a result of the purchase of Nxivm classes and travel is too attenuated to satisfy the [MVRA's] proximate cause requirement." (Gov't Restitution Ltr. at 5.)

Many, if not all, of these claimants have suffered legitimate losses as a result of Raniere and his co-defendants' abusive, manipulative, and vexatious conduct. In finding these claimants' alleged losses to be uncompensable under the MVRA, the court makes no findings with respect to the validity or severity of their claimed losses, and it does not suggest that those losses are unworthy or less worthy of restitution in any moral sense. Notwithstanding that the harms they have suffered are beyond the scope of those losses that the court can order the defendant to redress, the court extends to these claimants both its sympathy and its admiration for their resilience.

2.    Identification of Compensable Losses

Eligible victims under the MVRA are entitled to mandatory restitution tailored to the nature of the offense. Victims of offenses "resulting in damage to or loss or destruction of property" receive the return of the property or, "if return is . . . impossible, impracticable, or inadequate," payment equivalent to the property's value. 18 U.S.C. § 3663A(b)(1). Victims of offenses "resulting in bodily injury" are entitled to recover the costs of medical care and "related professional services" relating to mental health care, the costs of "necessary physical and occupational therapy and rehabilitation," and lost income that resulted from the offense. *Id.* § 3663A(b)(2). All victims under the MVRA are entitled to reimbursement for lost income and expenses, including child care and transportation, "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4).

Raniere's covered offenses under the MVRA – wire fraud conspiracy, and identity theft crimes and conspiracy to alter records for

use in an official proceeding in furtherance of a racketeering enterprise – are crimes resulting in damage to, loss of, or destruction of property. While all of these crimes deprived victims of property, they did so in a manner that defies easy valuation. The court finds that the Government has not yet established that any victims under the MVRA are entitled to restitution beyond the costs incurred (including lost income) in participating in the Government's investigation, prosecution, and related proceedings.

The collection of DOS members' collateral through the wire fraud conspiracy deprived them of certain tangible assets but also, more fundamentally, of control over information and images to which they ascribed high personal value. That deprivation of control caused them to endure an array of injuries and losses, the magnitude of which far exceeds any objective monetary value of the property that the defendants obtained. The court believes it is within its authority to order the defendants to return qualifying MVRA victims' collateral to them, and it has reason to think that such an order would be a relief to victims who continue to worry about the exposure of their collateral by Raniere's remaining adherents.[7] But the mere return of collateral at this late stage, long after its rightful owners submitted to the injustices and indignities of DOS membership, would be inadequate compensation for the damage wrought. To the extent the Government can provide a reasonable approximation of the value of victims' collateral in this context, the court will order restitution in accordance with that estimate.

---

[7] The court encourages the Government, in its forthcoming submission, to address whether it recommends that the court order the return of DOS members' collateral as one aspect of restitution for the victims of the wire fraud conspiracy offense. And, if so, the court seeks the Government's input into how such an order may be enforced.

Similarly, identity theft victims were deprived of the exclusive use of and control over the use of their identity. That "property" cannot feasibly be returned to them, and the mere cessation of the theft is inadequate to compensate for the injuries that it caused. Accordingly, if the Government can reasonably approximate the value of the damage incurred by Loperfido, he is entitled to recover an amount commensurate with that value, in addition to reimbursement for lost income and costs incurred through his participation in the investigation and trial.

Finally, while the court finds that Nxivm's production of altered videotapes in response to a civil litigation discovery request caused the Sutton family's lawyers to expend additional time on the case, and, therefore, caused the Sutton family to incur additional legal costs, the Government has not yet provided a reasonable approximation of those costs. The court cannot discern from the current record, including the Sutton family's restitution claim and supporting documentation, what portion of the Sutton family's legal costs is directly attributable to the unlawful alteration of evidence. Thus, in order for the court to award restitution to the Sutton family on this basis, the Government must reasonably approximate the amount of losses incurred by the Sutton family as a proximate result of this predicate racketeering act.

## IV.  CONCLUSION

In light of the above analysis, the court directs the parties to file supplemental letter briefs, and to append to them any relevant supplemental evidence, that address the following issues: (1) whether a victim of a predicate racketeering act that is a covered offense under § 1593 is a victim within the meaning of the TVPA; (2) whether Jane Doe 2 is entitled to restitution under 18 U.S.C. § 2259; (3) whether there is sufficient evidence to establish that any of the claimants discussed in section III.A.1.b. of this opinion are victims under the TVPA; (4) whether any qualifying TVPA

victims are entitled to recover for Nxivm-related costs; and (5) whether appropriate methodologies exist by which the court can reasonably approximate the value of MVRA victims' lost property. The parties may address any additional issues that they consider relevant to the subject of restitution including, if applicable, any evidence that they believe the court overlooked in the foregoing analysis. The court asks that the Government submit a revised set of restitution recommendations that is consistent with this analysis, with the underlying bases for all recommended awards explained in detail.

Accordingly, the court DIRECTS the parties to submit supplemental letter briefs, along with any necessary exhibits and affidavits, according to the following schedule:

- The Government shall submit a letter brief, along with a revised set of restitution recommendations, by June 21, 2021.

- Mr. Raniere shall submit a responsive letter brief by July 5, 2021.

- The Government may submit a reply letter brief by July 9, 2021.

The court will hold a supplemental sentencing hearing for Mr. Raniere during the week of July 12 or July 19, 2021. At that hearing, the court will hear argument from the parties, if needed, and order restitution. The parties are DIRECTED to contact the court's Deputy to schedule the hearing. Defense counsel is DIRECTED to inform the court by May 28, 2021 whether Mr. Raniere consents to the hearing being held by videoconference.[8] The Government

---

[8] *See* Pub. L. No. 116-136, § 15002(b)(2), (4) (allowing for sentencings in criminal cases to be conducted by videoconference if the chief judge of the court "specifically finds … that … felony sentencings under Rule 32 of the

is DIRECTED to provide to the court by May 28, 2021 its recommended redactions to this Memorandum & Order, so that the court may file it on the public docket without exposing victims' identities or sensitive personal information.

SO ORDERED.

Dated:     Brooklyn, New York
           May 21, 2021

                                          /s/ Nicholas G. Garaufis
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge

---

Federal Rules of Criminal Procedure cannot be conducted in person without seriously jeopardizing public health and safety" and the district judge in the case finds that delaying sentencing would seriously harm the interests of justice, so long as the defendant consents to the proceedings being held by video teleconference); U.S. District Court for the E.D.N.Y. Admin. Order Nos. 2021-4-1, 2021-5 (finding that sentencing proceedings should continue to be held remotely to the maximum extent possible and authorizing individual judges to hold such proceedings by videoconference).