UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------- X

UNITED STATES OF AMERICA,

Case No. 18-CR.-204 (NGG)

v.

KEITH RANIERE,

Defendant.

-------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT KEITH RANIERE'S MOTION FOR RULE 33 RELIEF**

Dated:   June 21, 2022
         Tucson, AZ

Keith Alan Raniere
Register #: 57005-177
US Penitentiary Tucson
9300 S Wilmot Rd
Tucson, AZ 85756

## INTRODUCTION

Mr. Raniere respectfully informs the Court that there was not enough time for the issues in this motion to go through Mr. Tully's extensive and rigorous review process. Yet in the interest of justice, Mr. Raniere seeks to raise them and brings the instant motion *pro se*.

Mr. Raniere moves the Court for an immediate evidentiary hearing based on newly discovered evidence pursuant to Fed. R.Crim. P. 33. The newly discovered evidence includes (1) three computer expert reports ("Expert Reports"), re-attached from Mr. Tully's Rule 33 ("Tampering Rule 33", Dkt. 1169), (2) select email excerpts between an adversary of Raniere, Frank Parlato, and Neil L. Glazer ("Glazer-Parlato Emails"), and (3) eight affidavits from potential defense witnesses (" Witness Affidavits").

In the Tampering Rule 33, the three experts concluded to a scientific certainty that government actors created, destroyed and changed digital evidence used to convict Mr. Raniere of possession of child pornography and sexual exploitation of a child. The experts are pro-law-enforcement and were disturbed by their findings showing illegal conduct on the part of government agents. In their century of combined experience, they have never seen anything like this before.

Assistant US Attorney Kevin Trowel of the Eastern District of New York found the experts' disturbing findings of government malfeasance, which occurred in this Court, to be "frivolous." See Exhibit C at Bates 002 point 3. This Court chose not to designate this government conduct, proven by credible experts, to be a substantial issue, instead choosing to defer ruling on Mr. Tully's Rule 33 (Dkt. 1169).

In this motion, Mr. Raniere offers newly discovered evidence that further illustrates the scope of the government's unlawful actions in his case. In addition to the government's

premeditated creation, planting, and adjustment of digital evidence, the newly discovered evidence, including the experts' reports, also demonstrates precise and specific perjury among the major government witnesses, including government agents, as well as government intimidation of potential defense witnesses. This constitutes an indisputable structural error.

Mr. Raniere respectfully requests that this Court examine the additional issues, determine that these issues are substantial, as per Fed. R. Crim. P. 37(a)(3), and grant an immediate evidentiary hearing to determine the extent of the historic level of proven government criminal activity in this case.

## LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Expert reports of Dr. Kiper, Mr. Abrams, and Mr. Norris |
| B | Defense Trial Exhibit 945 (Chain of Custody of Camera and CF Card) |
| C | AUSA Kevin Trowel's Opposition to Motion to Stay |
| D | Witness Affidavits |
| E | Affidavit from Frank Parlato, Jr., Critic of Raniere |
| F | Supplemental Affidavits and Attachments from Nicole Clyne, Eduardo Asunsolo, and Suneel Chakravorty |
| G | Select Excerpts from Post-Trial Podcasts and Docuseries |

## BACKGROUND

### I. Testimony Pertinent to the FBI Tampering Issue

Mr. Raniere was convicted of racketeering and racketeering conspiracy. Three of the racketeering predicate acts were child pornography and two instances of sexual exploitation of a child. See Dkt. 430. AUSA Penza said of these charges, "*the child pornography is ... at the*

*heart of our racketeering conspiracy.*" See Transcript 3/18/19 at 19:15. She also said,"the alleged victim of the child pornography charges [Camila] goes throughout this case ... *there's very little evidence in this case that does not relate to that victim.*" (emphasis added) See Transcript 4/4/19 at 13:8-11.

On April 3, 2019, three weeks after the superseding indictment that included the new charges relating to Camila, Glazer wrote to Parlato that Camila would not be testifying[1], but that "Moira [AUSA Penza] told [him], and this is a quote, '*we have all the evidence we need.*'" (emphasis added) See Exhibit E, Attachment 2 at Bates 007.

The alleged victim, Camila, who was at the "heart" of the case did not testify in the trial. The government relied upon FBI Senior Examiner Brian Booth to date the photos to establish her age in them. SFE Booth, testified that EXIF data of the photos on the hard drive had dates in 2005. See Trial Transcript 6/13/19 at 4876:8-9. He testified EXIF data is "purposely designed [to be more difficult to alter]" and it is the "best evidence" of when the photos were taken. See Trial Transcript 6/12/19 at 4820:12-4; 4830:3-11.

SFE Booth also testified that evidence "does not always come to us sealed" and chain of custody "does not always need to be kept." See Trial Transcript 6/13/19 at 4887 - 4889.

These have been established as lies in the Tampering Rule 33 based on FBI protocol and Dr. Kiper's report. See Dkt. 1169 at 14 ¶ 3.

FBI Special Agent Christopher Mills testified to the seizure of the devices at 8 Hale. See Trial Transcript 6/10/19 at 4290. He lied that after collection, the camera had been handled according to the FBI protocol, though he correctly describes the protocol. This was established in Mr. Tully's supplement to the Tampering Rule 33. See Dkt. 1176 at 9 ¶ 1.

---

[1] See Ms. Clyne's affidavit in Exhibit F for email exchanges between her and Camila shortly after the accidental discovery of the photos and before the Second Superseding Indictment (Dkt. 430) was issued..

3

On September 27, 2018, in a pre-trial discovery hearing, AUSA Hajjar explained that discovery materials had been taking longer to be produced to the defense, but that not everything had to go through their vendor. Other times, such as "an 8 Hale camera... [w]e just pulled out the pictures and gave them everything. That search is done." See Transcript 9/27/18 at 35:3-17. The camera and CF card had not been turned over to a forensic examiner. The extraction of pictures was done outside of normal FBI protocol.

It is worth noting that during his testimony, SA Mills had custody of the camera and CF card. See Exhibit D at Bates 003. This means that while he was giving testimony, the items had already been unsealed or they were unsealed afterward, and before he turned them over to SFE Booth.

SA Mills testified that the camera and hard drive were the first two items seized at 8 Hale. Agents seemed to home in on the items. See Trial Transcript 6/10/19 at 4294:22 - 4295:19; 4304:16 - 4307:5; 4308:1 - 4308:23. Dr. Kiper wrote of this, "It was as if the FBI agents knew what would eventually be 'found' on those devices and used at trial." See Exhibit A at 51.

Glazer represented Daniela, the sister of Camila. Daniela testified that she managed the computers and backups at 8 Hale Drive. See Trial Transcript 5/28/19 at 2572:9-17. On November 7, 2017, around the time that the EDNY investigation began, Glazer informed Mr. Parlato that he had started working with law enforcement. He wrote:

> "I am not working on the civil litigation angle at the moment, there are far more important matters to resolve. There are moving pieces you are unaware of, *interested eyes beyond the Albany region... We are learning precise locations of evidence, we need time to get rock solid warrants.*" (emphasis added) See Exhibit E, Attachment 2 at Bates 004.

4

A Selection of Oddities in the Trial:

There were a number of things that occurred in the trial, with respect to this digital evidence, that are peculiar:

- Daniela and Lauren Salzman were never asked to identify their own photos on the hard drive, nor the camera that was used, yet they were both asked to describe the photos and the camera.
- Neither of them were asked to identify the alleged photos of Camila, despite both knowing her well and Daniela being her sister. Only FBI SA Michael Weniger identified Camila as being the one in the photos.
- Lauren Salzman testified Mr. Raniere took two photos of her, yet on the hard drive there were six in Lauren's folder on the drive.
- Daniela testified that presence or lack of a visible appendectomy scar would determine Camila's age in the photo. However, she was not asked to view the photos to confirm whether or not there was a scar.[2]
- The alleged photos of Camila belonged inside a folder dated the month and day as Daniela's anniversary with Mr. Raniere (November 2).
- FBI SA Michael Lever was able to identify a fifteen-year-old Camila in the accidentally discovered photos, yet even her friends sometimes cannot distinguish between her and her sisters.[3]

II. Government Handling of Potential Defense Witnesses

---

[2] See Ms. Clyne's affidavit in Exhibit F.
[3] See Mr. Asunsolo's affidavit in Exhibit F.

The government's alleged victim for the predicate acts of sex trafficking and forced labor was Nicole, a woman in her late twenties at the time. Both predicate acts require the element of coercion to be met. Specifically, "*a reasonable person of the same background and in the same circumstances* [would be compelled] to perform [the sex trafficking or forced labor act] ... in order to avoid incurring that harm." See 18 USC § 1589(c)(2).

The government argued that there was coercion because Nicole gave Allison Mack "collateral." See Trial Transcript 6/17/19 at 5388-6-17; 5413:5-8; 5414:1-2. Thus, Nicole was afraid her collateral would be released if she did not participate in the oral sex act with an adult Camila which Mr. Raniere organized and the government alleged to be sex trafficking. See *Id.* at 5409:4-21. The government applied the same argument of coercion to the alleged forced labor conduct.

Michele Hatchette and Danielle Roberts were DOS members in the same 'circle' as Nicole, under Mack. See Trial Transcript 6/7/19 at 4011:23 - 4012:2. They were all educated, adult women who gave collateral to Ms. Mack. They also participated in the video transcription task that the government alleged was part of the forced labor of Nicole. See Trial Transcript 6/7/19 at 4037:13-23; Exhibit D at Bates 011 ¶ 24; Exhibit D at Bates 038 ¶ 7.

Ms. Hatchette writes in her affidavit that in a proffer interview, the government "maintained that I felt pressured, threatened or coerced ... and that [DOS] collateral was 'held over my head'... I countered multiple times that based on my experience *the collateral was ... never used in this way, and that I was not afraid.*" See *Id.* at Bates 014 ¶ 33. Shortly before the trial, AUSA Penza told Ms. Hatchette's attorney that they would "*be likely to charge [her] with perjury*" if she did not meet with them a third time before taking the stand. See *Id.* at Bates 014 ¶

40. She writes, "This threat of perjury only came after my attorney informed them that I would most likely refuse to meet with them again or [be] willing [to] testify on their behalf." See *Id.*

Ms. Roberts writes in her affidavit that "collateral was used as a tool to back our promises to ourselves, like surety, not as a tool of fear, force, or blackmail." See *Id.* at Bates 038 ¶ 10. In her proffer, when she "offered a different motivation [for her experiences in DOS] other than coercion," AUSA Penza "seemed to get visibly upset." See *Id.* at Bates 041 ¶ 39. At the end of Ms. Roberts' second proffer interview, [AUSA Penza] ***threatened to subpoena [her]*** to testify in the trial against Mr. Raniere." See *Id.* at Bates 041 ¶ 46.

Ms. Clyne, one of the founding members of DOS who had been in DOS longer than any of the government witnesses, writes in her affidavit, "*I never witnessed any threats or negatives* [sic] *consequences enacted upon* [women leaving DOS] and I am most certainly not aware of anyone's collateral being released." (emphasis added) See *Id.* at Bates 045 ¶ 6. Less than a month before trial, with jury selection already in progress, Ms. Clyne received a grand jury subpoena after being recognized by AUSA Penza in the courthouse, where she was for an unrelated matter. Ms. Penza told Ms. Clyne's attorney, "***First, we are going to cut the head of the snake off and then we're coming for the body. This is not going away for her.***" See *Id.* at Bates 044 ¶ 5. Ms. Clyne concludes, "Had I not been frightened by the threat of retaliatory action by the Government, I would have chosen to testify." See *Id.* at Bates 047 ¶ 11.

Samantha LeBaron was a DOS member underneath government witness Sylvie. See Trial Transcript 5/8/19 at 276:22-23. She wrote in her affidavit that the government asked her "questions, to the effect of if I thought in DOS, they used fear to motivate me and at one point, one of the interviewers remarked something to the effect of, ***But we want her to answer [that they used fear].***" (emphasis added) See *Id.* at Bates 049 ¶ 18. In her interview, she recalls SA

7

Michael Weniger "raising his voice and hitting the table at times." See *Id.* at Bates 050 ¶ 25. AUSA Penza concluded the interview saying, "I am glad you are here in Brooklyn so that we can call you whenever we need you." See *Id.* at Bates 050 ¶ 29. Ms. LeBaron writes, "Because of the way I was treated during my interview I would have been too scared to testify on behalf of the defendants." See *Id.* at Bates 051 at ¶ 35.

Brian Elliot is a graduate of Stanford University, Harvard Kennedy School, and Harvard Business School. See *Id.* at Bates 052 ¶ 2. He co-founded an LGBT advocacy group to win marriage equality in New York State when he learned of NXIVM. See *Id.* He was never involved in DOS. See *Id.* at Bates 052 ¶ 8. He writes in his affidavit, "I remember the prosecution asking me about the use of "collateral" in NXIVM and why I did not view it as blackmail. I explained that my understanding of collateral and its use within NXIVM was that it was a voluntary tool used by consenting parties for personal growth. My understanding of collateral was based not only on what I had learned from NXIVM courses, but also from Behavioral Economics research from Yale University, which I had found on a public website called Stikk.com." He recalls the prosecution got "frustrated and [seemed] unsatisfied with what I was sharing." See *Id.* at Bates 053 ¶ 13.

After the trial, Brian Elliot helped his brother, Marc Elliot, to plan a public speech, entitled, "Who's Next? The Rise of Character Assassination and Loss of Human Decency." See *Id.* at Bates 054 ¶ 21. According to Mr. Marc Elliot, the talk was inspired by his "journey of beating Tourette's syndrome with the help of NXIVM, a group misrepresented as a sex cult in the media." See *Id.* at Bates 058 ¶ 14. Days after Mr. Marc Elliot publicly advertised the talk on social media, AUSA Penza called the brothers' shared attorney, demanded they immediately cancel the talk and said something to the effect of "If it weren't for the First Amendment, I

would be coming after them." See *Id.* at Bates 054 ¶ 22 - Bates 055 ¶ 25. Both brothers interpreted this as a terrifying threat, so much so that they immediately moved out of New York City. See *Id.* at Bates 055 ¶ 30; Bates 059 ¶ 18. Additionally, Mr. Brian Elliot severed ties with longtime friends who were involved with NXIVM. See *Id.* at Bates 055 ¶ 29.

In total there are eight witness' affidavits describing their encounters with the prosecution team. They are Michele Hatchette, Danielle Roberts, Nicki Clyne, Samantha LeBaron, Sahajo Haertel, Brian Elliot, Marc Elliot, and Brandon Porter. See Exhibit D.

### III. Glazer and the Civil Lawsuit

Daniela and Nicole were government witnesses in the trial. Nicole and Daniela were both represented in the criminal case by class-action attorney Neil Glazer. See Trial Transcript 6/10/19 at 4268:10-11; Trial Transcript at 5/31/19 at 3275:6-20. Catherine Oxenberg introduced Nicole to Glazer on November 3, 2017, before the DOJ investigation began. See Trial Transcript 6/10/19 at 4268. From then onwards, Glazer represented at least fifteen witnesses interviewed by the government and was present for at least thirty-three interviews. See Dkt. 853 at 2. It would have been clear to the government that Glazer's work, time expenditures, and travel expenses from trips from his base in Philadelphia to New York was in contemplation of an impending civil suit. Daniela testified she did not intend to file a lawsuit. See Trial Transcript 5/31/19 at 3275-3276. The Glazer-Parlato Emails contain emails where Glazer discusses the progress of his civil lawsuit.[4] See Exhibit E. Additionally, the background of facts cited in Mr. Agnifilo's prior Rule 33 (Dkt. 853) is adopted here.

---

[4] Additionally, see Mr. Chakravorty's affidavit in Exhibit F, Attachment 1.

9

In one email exchange, on June 9, 2018, Glazer asked Parlato to take down a blog post naming Daniela. He wrote, *"I am more devoted to Dani's well-being than any other client,"* (emphasis added) and followed up with, ""I implore you to please take down the post. You do not, and cannot, know all of the implications of this...*We represent dozens, growing by the day.* The criminal investigation is massive and *the civil action will be unprecedented. That is soon."* (emphasis added) See Exhibit E, Attachment 2 at Bates 005 - 006.

Weeks before the trial, on April 3, 2019, he wrote to Parlato:, *"I am building a civil case and have more than 80 clients* to serve, and it grows by the week." (emphasis added) See *Id.* at Bates 007. Nicole also testified that they did not intend to file a civil lawsuit and that she had not discussed the matter with anyone. See Trial Transcript 6/10/19 at 4276-4277.

On January 28 2020, after the trial, Glazer filed a civil lawsuit against Raniere, Bronfman and others. There were over 80 plaintiffs. Daniela and Nicole were among them. See Dkt. 1 in 1:20-cv-00485.

## LEGAL STANDARD

Rule 33 of the Federal Rules of Criminal Procedure provides that, "Upon defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "In evaluating a Rule 33 motion, the court must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation," keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) (emphasis added). Relief under Rule 33 is based on whether:

(1) the evidence [was] newly discovered after trial;

(2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain evidence;

(3) the evidence is material;

(4) the evidence is not merely cumulative or impeaching; and

(5) the evidence would likely result in an acquittal. United States v. Forbes, 790 F. 3d 403, 406-407 (2d Cir. 2015).

## ARGUMENT

I. **Mr. Raniere is Entitled to an Evidentiary Hearing Based on Newly Discovered Evidence of Perjury by Four Major Government Witnesses and Subornation of Perjury by the Government**

A. <u>Applicable Law</u>

When a government witness commits perjury, the conviction must be set aside "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir. 1982) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976))

Where the government had either actual knowledge of witness perjury, or, at a minimum, should have known of it, reversal is virtually automatic. *United States v. Wallach.* 935 F.2d 445 (2d Cir. 1991).

When a testifying *government agent* commits perjury, the prosecution is imputed with knowledge of the perjury:

- That knowing perjury by a federal agent who is involved in the prosecution can constitute "knowing use by the prosecution" is supported by case law in this Circuit regarding

11

*Brady* disclosure requirements. *United States v. Sanchez*, 813 F. Supp. 241, 247 (S.D.N.Y. 1993), *aff'd*, 35 F.3d 673 (2d Cir. 1994).

- In *United States v. Morell*, 524 F.2d 550 (2d Cir. 1975), the court held that "[w]hile the prosecutor cannot be charged with the failure to produce information in the possession of any government official, in this case it seems fair to view [the agent] as an arm of the prosecutor." *United States v. Sanchez*, 813 F. Supp. at 247 (internal citations omitted).

- In *Pina v. Henderson*, 752 F.2d 47 (2d Cir. 1985), the Second Circuit distinguished government officials who may be treated as an "arm of the prosecutor" from those who may not. *United States v. Sanchez*, 813 F. Supp. at 247. The court in *Pina* held that a parole officer who "did not work in conjunction with either the police or the prosecutor" was not sufficiently linked with the prosecution so as to impute the officer's knowledge to it. *Pina v. Henderson*, 752 F.2d at 49; *See also United States v. Sanchez*, 813 F. Supp. at 247. However, a police officer who "did testify in [the] trial and was the investigating officer," was found to be an "arm of the prosecution" whose knowledge was to be attributed to the prosecution. *United States v. Pina*, 752 F.2d at 50.

- "Whether knowledge is to be imputed from a government agent to the prosecution for *Brady* purposes is instructive in determining whether knowing perjury by a government agent should be considered 'knowing use' by the prosecution. Cases establishing the latter proposition have often relied on case law developed to address the former." *United States v. Sanchez*, 813 F. Supp. at 247.

- "And where cases involve both nondisclosure and perjury, courts consider them jointly under the rubric of 'prosecutorial misconduct.'" *Id.* at 248. (internal citations omitted)

- "In fact, the argument to charge the prosecution with knowledge of a government agent's perjury is even stronger than the argument to impute knowledge of *Brady* material. While the prosecution's failure to disclose relevant information might be due to a negligent lack of communication, perjury by a government agent can only be a knowing, intentional decision to lie by a member of the institution which is charged to uphold the law and seek just convictions. Therefore, it is a short step indeed to apply case law regarding *Brady* obligations to instances of perjury." *Id.* ·

The Glazer-Parlato Emails are newly discovered for they were not known to the defense until after trial. The defense would not have been able to obtain these emails prior to trial and thus exercised their due diligence. It is well-known that Mr. Parlato is staunchly opposed to Mr. Raniere and has been for many years. He only offered select parts of these emails after he saw their potential significance once he began investigating the allegation of FBI tampering. Not only would it not have made sense for Mr. Raniere's trial counsel to subpoena Mr. Parlato, Mr. Parlato is a journalist and enjoys a well-established legal privilege of protecting his sources.

Additionally, Mr. Raniere holds Mr. Parlato to be responsible for crafting and disseminating a false, hate narrative against him and his organization. He believes this narrative was engineered to inspire public outrage through exaggeration. This public outrage, supported by a 'mad dog' media, allowed this prosecution to commit malfeasance, which is historical in its premeditation, complexity, the number of actors involved, the high-profile nature of the case, and the credible scientifically certain proof of the malfeasance.

In including Mr. Parlato's evidence in this motion, Mr. Raniere is *not in anyway* condoning Mr. Parlato's conduct against him or Mr. Parlato's conduct against anyone who had been involved in his organization NXIVM, or in DOS.

As a separate issue, the Glazer-Parlato Emails show that Glazer was working on a civil lawsuit before and during the criminal investigation, even just weeks before trial began and he considered Daniela "his favorite" client. Based on his involvement with government witnesses before the trial and Daniela's critical role in the case, and the fact that Daniela *was* in fact a plaintiff in the post-trial civil lawsuit, Mr. Raniere concludes that it is shown that Daniela lied about not intending to file a civil lawsuit. That she was Glazer's favorite client and he had been contemplating filing his suit before the trial belies her testimony on this point. Similarly, it is shown that Nicole also lied about not intending to file a civil suit or discussing the matter with anyone. It defies common sense that Glazer would bring a civil lawsuit, have dozens of plaintiffs in the weeks before trial, but *never* had discussed the matter with one of this top clients and one of the key government witness for sex trafficking.

The Glazer-Parlato emails are also material to the tampering issue. Mr. Glazer writes about "precise locations" and roughly four months later, this comment is solidified as agents strangely collect the camera and hard drive as the top priority, bypassing and ignoring dozens of other evidentiary items along the way.

In the Tampering Rule 33 motion, it is established that the Expert Reports are newly discovered, the defense exercised due diligence, and it is material, not merely cumulative or impeaching, and would likely result in acquittal based on its revelation of extensive government criminal tampering with – according to AUSA Penza – the lynchpin evidence that was at the "heart" of the government's case.

The Expert Reports also demonstrate that SFE Booth and SFE Mills committed perjury about the integrity and competence of the digital evidence. Indeed, given the multiple violations of protocol, including those by SA Rees and SA Lever, the perjury was evidently to hide from the jury that the evidence was incompetent and had been falsified by the government.

Additionally, it is telling that SFE Booth lied repeatedly about EXIF data and chain of custody and *yet he told the truth* about the camera and CF card being given to him unsealed. Unsealed evidence is a critical issue of admissibility. This evidence was at the "heart" of the case. To admit to this issue of admissibility would, on the face of it, appear to be a serious risk. That SFE Booth was willing to do so means either he was certain that it would be admitted regardless or there was some benefit to him, or both. The only benefit to him from admitting break in the chain of custody is that it provided SFE Booth plausible deniability of his involvement in the tampering, for the tampering on the CF card could have taken place before it was given to him, while it was in the custody of SA Elliot McGinnis, or SA Mills. See Exhibit B at Bates 003 ¶ 3. Because the prosecution failed to correct SFE Booth's perjurious testimony about chain of custody, and this Court did not intervene, the jury was taught that a broken chain of custody is not abnormal in the FBI.

Note also that AUSA Hajjar questioned SFE Booth and Mills. Given AUSA Hajjar's comments during the September 27, 2018 hearing, it appears AUSA Hajjar likely knew that the camera was not handled according to protocol, and thus proactively elicited false testimony from Mills. However, even if AUSA Hajjar did not know her witnesses perjured themselves, which would require assuming egregious incompetence and negligence on her part, it does not matter. AUSA Hajjar, and in fact the entire prosecution team, is imputed with knowledge of Booth's and Mills' perjury, for they are government agents who testified.

Thus, this Court should grant a complete reversal of Mr. Raniere's conviction on all charges, not only because this falsified digital evidence was at the "heart" of the case but because anything less would condone structural error in the form of government criminal malfeasance, reliably proven, that involved, at a minimum, multiple government agents breaking protocol, spoliating and manipulating evidence, and perjuring themselves repeatedly.

## II. Mr. Raniere is Entitled to an Evidentiary Hearing Based on Newly Discovered Evidence of Government Intimidation of Potential Defense Witnesses

### A. Applicable Law

The Second Circuit has held that, "[u]nder certain circumstances, intimidation or threats that dissuade a potential witness from testifying may infringe a defendant's due process rights...." *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir.1988) (internal citations omitted). "The circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's 'free and unhampered choice' to testify." *Id.* "That interference may involve threats of prosecution...or other intimidating conduct...that was *designed* to intimidate." *Id.* (internal citations omitted); *See also United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (holding that "[t]he government's 'suggestion' destroyed the choice of [the witness] to testify freely.").

This Circuit has a three-part test to demonstrate a due process violation based on the government's intimidation of witnesses. The defendant must show:

(1) that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,

(2) bad faith on the part of the government, and

16

(3) that the absence of fundamental fairness infected the trial.

*United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019); *See also United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *Buie v. Sullivan*, 923 F.2d 10, 11 (2d Cir. 1990)

B. Analysis

The affidavits from eight potential defense witnesses are newly discovered. The specifics and extent of the government's intimidation tactics were not known to the defense until after trial, in part because the witnesses to it were silenced. The prosecution team successfully silenced these material potential witnesses, including the key and exculpatory witnesses, Ms. Hatchette and Ms. Roberts, through threats, including misuse of the Grand Jury process and the threat of a perjury prosecution. Government agents scared these potential witnesses from being willing to testify or support the defense. Thus Mr. Raniere could not have discovered this information and thus acted with due diligence. All of the witness affidavits affirm and corroborate with consistency the means and methods of the government agents tasked with menacing these, and other individuals. In particular, the affidavits of Ms. Hatchette and Ms. Roberts are particularly exculpatory for they were similarly situated to Nicole and would have *prima facie* invalidated the government's theory of serious harm stemming from the DOS collateral. The sex trafficking and forced labor charges would have been shown to be invalid. The affidavits of Ms. LeBaron and Mr. Brian Elliot confirm the government's refusal to accept an alternative viewpoint on DOS collateral, which was the keystone of their case on the aforementioned charges. That Mr. Marc Elliot's intimidation occurred after trial shows that even *after* a guilty verdict on all counts, the prosecution team was insistent on suppressing and silencing any counter-narrative. This shows the prosecution was in pursuit of winning, not truth.

This Court should not condone the prosecution's violation of Mr. Raniere's due process nor their Orwellian tactics of methodically silencing ordinary, law-abiding civilians through fear of imprisonment.

## CONCLUSION

The newly discovered evidence reveals multiple government actors were involved in criminal malfeasance that was executed over an 18+ month period and was orchestrated to deprive Mr. Raniere of his constitutional rights and to dishonestly win a conviction. Mr. Raniere moves this Court to grant him all available relief under Rule 33 of the Federal Rules of Criminal Procedure that to the Court may appear just and proper.

In particular, Mr. Raniere moves this Court to grant a public evidentiary hearing so that he, and the public, are allowed to ask the pertinent questions of our public servants.

FILED
2022 JUN 21 PM 11:20
CLERK
U.S. DISTRICT COURT
E.D.N.Y.

Dated: June 16, 2022, Respectfully submitted,

*(signature)*

Keith Alan Raniere