

2022 JUN 21  PM 11: 29

CLERK
U.S. DISTRICT COURT
E.D.N.Y.


# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

KEITH RANIERE,

Defendant.

No. 18-cr-204 (NGG) (S-2)

**AFFIDAVIT OF
MICHELE HATCHETTE**

MICHELE HATCHETTE, duly swears and affirms as follows:

1.     I am 33 years old.  I grew up in  Harlem, New York City; I graduated from Pitzer College in 2009. I live in Brooklyn, New York. I am represented by counsel, specifically Justin Greenblum, Esq, and I affirm that this affidavit is the truth, the whole truth and nothing but the truth.

2.     I took my first 5-day introductory intensive in Executive Success Programs (ESP) in June 2013 in New York City, New York.  I completed the remaining 11 days of the introductory intensive course in November 2013 in Albany, New York. Following the completion of this first course, between 2013 and 2018, I took intensives/curriculum with The Source, Jness, and Society of Protectors (SOP) and was a Multicultural Development Specialist (MDS)/ teacher for Rainbow Cultural Garden which was an early childhood education program. I became a coach in ESP in 2015 and in October 2015, I knowingly and enthusiastically accepted Allison Mack's invitation to join the sorority which is now known as DOS.

3.     At its core, I experienced DOS to be an organization for women who wanted to overcome their greatest fears to accomplish their goals. For me, it was a profound experience

whereby I gained more confidence and trust in myself. There were several practices I took on that helped me strengthen my character, expand my awareness of how my decisions impact others, and I became more disciplined - all of which I'd been seeking to build within myself prior to my invitation into the group because I knew growth in these areas would help me become a more compassionate human and effective leader in several areas of my life.

4.      I believe I would have been a critical defense witness at the trial in the matter of United States v. Keith Raniere as I was in a unique position to speak of my experience in DOS as another woman whom Ms. Mack invited into and mentored within the organization.  However, as will be explained in detail later, I was threatened by the prosecution and feared an unfounded indictment if I did testify.  Given that there was only one woman who testified that was mentored by Ms. Mack in DOS who testified at Mr. Raniere's trial (Nicole, one of the government's key witnesses related to the Sex Trafficking and Forced Labor charges), I believe my experiences of Ms. Mack's mentorship and my time within DOS would have offered an important perspective in the jury's understanding of the positive nature of the group which I received.  Additionally, my close proximity and consistent communication with Nicole throughout the approximate nine months we were in DOS together made me privy to the practices Nicole experienced and an eye-witness to how Nicole reacted and interacted with others in the group, which were markedly different from Nicole's trial testimony.

5.      At Mr. Raniere's trial, Nicole was asked by the prosecutor if there were things, had she known prior to joining DOS, that would have affected her decision to join the group, to which she replied, "Yea, I guess the first one would be that apparently I was giving up my free will and that I couldn't make my own decisions. But that eventually there would have to be more collateral added on and that I would have no say in whether or not I gave it, like it would be

2

demanded. I mean there were so many things that were added on later once you were, like, sealed into this situation." (Tr. 3863)

6.　　Though Nicole's statement about DOS supports the governments theory that women were giving up their free will, I would have testified that my experience of the reality was, in fact, the opposite. I experienced all of the practices within DOS as an opportunity to build the character and discipline I needed to achieve my goals.  For example, prior to DOS I struggled at times to follow through on commitments I would make both professionally and within personal relationships.  After communicating this to Ms. Mack, she recommended I journal for a few weeks on how my lack of follow through impacted those who were counting on me to deliver on  my promises which motivated me to figure out how I could be more reliable such situations.  As I worked towards this goal, I found more freedom and trust within myself and that I had a greater capacity to manage the increasing complexity of my career and personal responsibilities, which was exactly what I was hoping to gain from DOS.

7.　　On the subject of collateral, Nicole testified that the process of submitting and offering collateral was problematic for her.  In contrast, I would have testified that my experience of gathering and submitting collateral was not problematic for me as it was explained to me that the collateral was simply a way to demonstrate my commitment to keep the confidentiality of the group private while also affirming my voluntary membership into the group.  Prior to my first conversation with Ms. Mack about DOS, I was already seeking opportunities that could help me challenge my fears and limitations that I perceived as roadblocks standing between me and my goals, so the arrangement of this mentorship was a welcomed invitation that I considered with great care over the course of a few weeks. My final decision to accept this invitation was ultimately driven by my desire to prioritize my personal

3

003

growth and development and I knowingly joined DOS because I trusted that Ms. Mack would do her best to guide and mentor me in the achievement of my goals, for life. Ms. Mack certainly followed through on this promise and commitment to me and I benefited greatly from her care and leadership during the entirety of my time in DOS. I can say with absolute certainty that I was provided with all the necessary information I needed to make such an informed choice and commitment and am grateful I did as I continue to see the positive impacts of the training and mentorship I received during that time.

8.      At the time Ms. Mack invited me to join DOS, she informed me that if I accepted this invitation, I would be agreeing to have her as my master and I her slave. After asking Ms. Mack what the nature of our relationship would be under titles, I understood that within this context, as stated above, that Ms. Mack would be committing her life to help me achieve my greatest goals and that someday I would mentor other women in the same way. Therefore, I felt comfortable enough with that arrangement to move forward.

9.      At Mr. Raniere's trial, the prosecutor asked Nicole to explain what her understanding of DOS was prior to joining, to which she replied, "A woman's mentorship where Allison would mentor me in life and that was going to like push me into my fears..." (Tr. 3862) She then added, "So, then I was told that, like, the way the mentorship was communicated, it was a master-slave relationship." (Tr. 3863) Nicole's testimony that she was told of the master/slave relationship within DOS only after joining is, I believe, false. I was enrolled into DOS before Nicole and as just mentioned above, was informed prior to joining that the relationship would have this "master/slave" dynamic. Additionally, Ms. Mack explained to me, Nicole and the two other women she'd invited into DOS, in several group conversations when we discussed the process of inviting women we knew into the group, that all women must be informed that they

4

would be entering into a master/slave relationship, that there will be a brand, that they must wear some type of jewelry as a symbol of their commitment to their growth, and that it would be a lifetime vow sealed with collateral. My account of Ms. Mack's leadership within our group would have shown the unliklihood that Ms. Mack would have withheld the master/slave dynamic from Nicole. My testimony regarding the enrollment process into DOS would have stood in stark contrast to the government's theory, supported by Nicole's referenced statement, that women were somehow misinformed and deceived into joining the group. Again, my experience was that I was presented with all the necessary information to evaluate whether or not I wanted to join DOS *before* making the decision and I made sure to communicate these same critical points to women I later invited into the group so they too had this information. It was my desire to share this testimony with the courts because I believed it would help clarify what I perceived as the inaccurate theory purported by the government that women were deceived and forced into joining DOS. However, after being threatened by the prosecutors on this case, which I will explain in further detail below, I feared they would follow through on their stated threat to punish me for my simple desire to share my experiences with the jury.

10.    The invitation process into DOS is further supported by Lauren Salzman's testimony when she explained the enrollment protocol that all women were supposed to follow when inviting others to learn about and potentially join the group. Ms. Salzman stated, "They were given basically the pitch, you know, come to learn about lifetime vow of obedience master/slave concepts, the collar and the brand. Then they had agreed to join after learning those things and then they were fully collateralized. So they were not considered completely enrolled until they were fully collateralized." (Tr. 1621)

11.     It is also important to note that many women who were invited to DOS and chose not to join. For example, I would have testified that there were several women I invited into DOS, who voluntarily gave collateral to learn about it, yet once they learned about the organization and what it entailed, they declined. They all remained friends with me and some expressed gratitude for the invitation, even though they felt it was not for them.

12.     When I accepted the invitation to join DOS, I was mostly focused on using the process to achieve my goals.  However, I also had an opportunity to build deep, meaningful friendships with other women, especially the additional three (Nicole, India and Danielle) who were also being mentored by Ms. Mack in DOS (note: the four of us referred to ourselves as a "circle" and I will use this term moving forward in reference to this group).  Within our circle, we formed a unique bond with one another and over time, I considered these women to be both dear friends and sisters.  While Ms. Mack was still mentoring each of us individually, the four of us built a trust and reliability with one another which at times inspired us to mentor each other and even initiate the development of practices that were unique to our circle because we were inspired by the process and training we were experiencing in DOS. For example, there was a series of practices that Nicole, India and Ms. Mack created together that involved things like walking meditation and watching or reading something inspirational each day. After doing the practices for over a month, Nicole, India and Ms. Mack shared their experience with me and Danielle. Nicole, in particular, expressed great enthusiasm for how meaningful and beneficial the practices were.

13.     At some point, Nicole, India, Danielle and myself, independent from Ms. Mack, decided to create a special written commitment with one another in what we  called our "creed."

In the process of carefully crafting this document over a period of weeks, Nicole sent an unsolicited email to the group describing her thoughts, feelings, and ambitions (See Exhibit A).

14.     This email flatly contradicts Nicole's claim that she was motivated throughout her time in DOS solely out of fear of her collateral being released. This was an unsolicited email expressing her unfiltered thoughts about the nature and benefit of the "readiness" practice and her choice to join DOS, "I chose to join the vow to push through my fears and live the life experience that I want to. To live a full life. I chose to join the vow to understand and experience that freedom and joy come from the inside, from the internal and not from the external." Nicole demonstrates her understanding of the purpose and intent of DOS and speaks very positively, which is in stark contrast to her testimony where she paints a negative picture of the same subjects.

15.     It is important to note that this email was sent on January 3, 2017. On January 4, 2017, Nicole, Danielle and myself received an email from India (forwarded from Sylvie) asking for help transcribing audios for Ms. Cafritz's memorial (See Exhibit D). According to her testimony, Nicole spent about five hours transcribing these audios and the government used this to substantiate the Forced Labor charge against Mr. Raniere.

16.     I would have also been able to provide the jury with a comprehensive account of the relationship between the women in my circle and our relationship with Ms. Mack. The four of us were in regular communication with each other via text and email, co-mentoring one another in the pursuit of our personal goals. As well, India, Danielle and I all lived in the Albany area and often spent time with one another socially to grab coffee, go for walks, attend events, etc. Although Nicole lived in Brooklyn, she would meet with us and Ms. Mack each week via

video chat for our weekly check-in. Nicole also visited Albany at times and we would make an effort to all get together in person while she was in town.

17.     Our weekly check-in was a time for us to share whatever was on our minds, our struggles, our wins, and ask for guidance and help from everyone present. We shared openly and vulnerably about anything we wished and began to hold each other accountable to the standards each woman wanted for herself, all of this without the direction of Ms. Mack. These check-ins built a foundation for the four of us to continue to take initiative in ways that had nothing to do with Ms. Mack or Mr. Raniere, and we did so because we were inspired by how much we were benefiting from our shared commitment to these practices.

18.     At trial, Nicole testified that her relationship with India was used against her to make Allison "happy" for the "benefit" of Mr. Raniere (p.3951: 18-25 & p.3952: 1-5). I would have been able to offer a critical perspective on Nicole's claim, as it was not my experience that Ms. Mack "used" the women against each other as Nicole described. On the contrary, I remember several times that Ms. Mack shared her excitement when someone achieved a goal and that Ms. Mack was always contemplating how she could be of more support to us. My experience of Ms. Mack is that she would do anything to help us achieve our goals and I cannot recall a single moment in the three years I was in DOS that Ms. Mack did anything to compromise the well-being of me, Nicole, Danielle, or India. Similarly, not once in three years did Nicole, Danielle or India ever indicate to me that they felt used against one of the others.  If India, Danielle or Nicole had at any point expressed to me that they were feeling forced or coerced in some way, I would have taken action immediately to cease its continuation.

19.     Furthermore, had I not been threatened and intimidated by the prosecution, I would have explained to the jury how and why DOS members would sometimes take on some

8

act of discomfort, like a cold shower, when one of us would fail at a commitment we'd set for ourselves. For example, I could have referenced a WhatsApp conversation I had with India which demonstrates my offering to take on a consequence for India if she thought it would help her move through a failure she was consistently struggling to overcome (See Exhibit B). It is evident in this chat that India and I, on our own, initiated and created an action plan together and Ms. Mack did not force this upon us because she was not involved.

20. Nicole's testimony gave, in my opinion, a false and misrepresented perspective of what DOS was like for all the women who were mentored by Ms. Mack because her description of several events and the nature of DOS in general, do not match my experience. I believe this was undoubtedly influenced by the government, which advanced a theory that the women who Ms. Mack mentored, in particular, were there only to serve as "sex slaves" for Mr. Raniere. This is absolutely false based on my experience. I would have been able to testify to an experience in DOS that would have been the opposite of being sex trafficked. Me and the other women in my circle, including Nicole, were adults with our own financial resources who lived independently, and had all the liberties and privileges that any educated woman from a supportive family would have. Most importantly membership into DOS was voluntary and any woman at any point in her process of evaluating her decision to join, was free to decline the invitation. I was never asked or "commanded" by Ms. Mack to have sex with Mr. Raniere or any person for that matter as a requirement of my membership in DOS. Furthermore, I firmly attest that I never advised, encouraged, nor required women I later mentored in DOS, to have sex with Mr. Raniere or anyone else as a requirement of their membership in DOS. The government took Nicole's accounts of her experiences in DOS as though that was the universal experience of DOS. But Nicole's description of DOS could not be more opposite to my time spent in the group where I

learned to become more grounded and confident which has helped me succeed in my career and flourish in my personal relationships. My account of my time in DOS is shared among several other women who were in DOS who still feel they benefited greatly from their experience.

21.     It was a central tenet of the government's theory that the collateral was an ever-present factor that compelled women in DOS to do certain things they did not want to do. This is absolutely false based on my experience.   In the almost two years that I was in communication with the other women in my circle in DOS, we failed several times (individually and collectively) at different practices and our collateral was never released, threatened to be released nor was this even a fear of mine, or a fear anyone in our circle, including Nicole, ever expressed. Within DOS, my experience was that consequences were created and agreed-upon by the women in the circle and were not imposed by Ms. Mack or Mr. Raniere. The only time I ever felt coerced or threatened, as it related to my involvement in DOS, was by the government when they were conducting their investigation and tried to persuade me to adopt their understanding of the situation and their theories (more on this later).

22.     Moreover, the exposure of collateral, as I recall, was never factored into our group activities or practices.   Although Nicole testified at trial that she was in constant fear of her collateral being released and stated that, "[I]f we didn't obey, then the fist collateral would be released," (4017: 23-24) I witnessed on a several occasions Nicole freely "disobey" as she states and opt out of activities or conversations which never resulted in the exposure of her collateral.

23.     Furthermore, and in connection with the Forced Labor charges,  18 U.S. Code § 1589 defines one aspect of Forced Labor as "knowingly provides or obtains the labor or services of a person (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person

10

would suffer serious harm or physical restraint.   One of the acts qualified as forced labor, according to the government, as supported by Nicole's testimony, was when she read and reviewed a series of articles written by Mr. Raniere.  I also read and reviewed these articles and did not fear I would "suffer serious harm or physical restraint".  I would have been able to provide testimony that Nicole expressed that she enjoyed reading the articles and wanted to re-read some of the articles when she had more time (See Exhibit F).  This information, I believe, would have dismantled and rendered incredible Nicole's claims on this point, ultimately serving to drastically undermine the government's presented evidence of forced labor.

24.    The government also claimed that Nicole was a victim of Forced Labor when she transcribed audios for Pamela Cafritz's. However, I also transcribed some of the audios for the service and attest that doing so was completely voluntary and driven by my desire to support memorializing Ms. Cafritz. I would have provided testimony that the memorial service was coordinated by a small group of people, including Sylvie and India, who reached out to several other people within the community for help in the planning process. Nicole and I were asked by India to transcribe these videos so it was not a directive from Mr. Raniere or Ms. Mack. Contrary to the government's claims, this effort was not part of DOS and if I or Nicole felt we did not have enough time to complete the transcriptions of the audios (provided by Sylvie), there were several people within the community we could have reached out to as replacements for the task.

25.    Additionally, I would have offered insight into the testimony of Sylvie, another one of the government's witnesses at the trial of Keith Raniere. Sylvie was my coach in ESP for approximately three years.  As my coach, she and I checked in weekly on the progress of my goals and she would often reach out and check in with me outside of those standing meetings.

11

Throughout the three years she coached me, we also became close friends and she was a positive support in my life and helped me achieve many things I wanted to accomplish, most notably in helping me train for my third half marathon where I finally broke my fastest time.

26.     Given that much of Sylvie's direct testimony focused on the alleged emotional damages Sylvie claims she incurred as a result of her time in Jness, my relationship with Sylvie would have been critical information for the jury to show that my experience of Sylvie was that she was an enthusiastic leader within ESP and Jness who helped many men and women, including myself.

27.     In 2015, Sylvie invited me to join a social media/marketing company and our first client was Jness. Through working together on a Jness marketing campaign, I was inspired by Sylvie's leadership and her ability to communicate the humanitarian values and goals of the company. Sylvie's enthusiasm about Jness is further evidenced by an email Sylvie sent on September 8, 2015 where she expresses her excitement about a proposal for a social media campaign (See Exhibit E).

28.     Additionally, a year later, on September 20, 2016, Sylvie wrote a description of her skills and why they demonstrated that she was a good fit to lead social media and marketing initiatives for Jness (See Exhibit C). As the project manager and leader of the rebranding strategy for Jness, Sylvie demonstrated to me that she had a deep understanding of the concepts taught in Jness and was thus entrusted to convey the values of the company publicly, through their online presence. Sylvie, to me, embodied so much of the great aspects of Jness. My experience of Sylvie's enthusiasm for Jness and being a leader in the social media company that helped celebrate women, would have been important as a contrast to Sylvie's description of Jness as the reason she began to feel negatively about herself and other women (p.291: 15-25 & 292: 1-3).

29.     When the prosecution asked Sylvie how the Jness curriculum impacted the way she made decisions, Sylvie replied, "I just felt like I couldn't trust myself in what I thought was going on and what was right and wrong." (Tr. 307-308) Had I not been intimidated and threatened by the prosecution, I would have offered testimony that I believed Sylvie was a strong coach and I trusted Sylvie's ability to guide me in making decisions because I'd witnessed her grow and become more seemingly confident in herself in the three years she coached me. Moreover, she was compassionate, consistent, and confident in coaching me.

30.     In sum, my trial testimony would have seriously undermined the testimony of Nicole, and would have been wholly inconsistent with the government's core premise of the Forced Labor and the Sex Trafficking charges. My testimony would have been significant to this case: I was identically situated to Nicole within DOS and would have provided critical information to the jury about the nature of the events and many of the experiences to which Nicole and Sylvie testified. Additionally, I would have provided critically important information about the genuine nature and goals of DOS from as I understood them based on my perspective lived experience.  However, Mr. Raniere and the jury were denied this perspective through the actions of the government who demonstrated to me that they were not open to my account of what did and did not happen.

31.     I was approached by the FBI on or about March of 2018, at which time I declined to speak with the agents in the absence of an attorney. I hired an attorney named Justin Greenblum, Esq., who at the time was a partner at Carter Ledyard & Milburn LLP in New York City. The prosecution explained to me, through my attorney, that I was a witness. The government never identified me as a target or a subject, rather as merely a witness. As a result, Mr. Greenblum and I decided to accept the government's proposal for a proffer interview.

The May 22, 2018 Proffer

32.      On May 22, 2018, my attorney and I appeared for a proffer interview at the U.S. Attorney's Office, attended by, among others, AUSA Moira Kim Penza and FBI Special Agents Michael Weniger and Michael Lever. Based on the actions and statements of the government representatives, it was apparent to me that the prosecution was not interested in hearing or accepting my account of the relevant events.  Instead, the prosecution attempted to convince me to agree with the government's view of the events.

33.      For instance, the prosecution told me that the only reason I engaged with assignments in DOS was because I feared my collateral would be released. I disagreed with the government's assertion because I was fully aware from the moment I joined DOS that my collateral was for the purpose of solidifying my commitment to myself to push into my fears as a means to achieve my goals. The collateral I chose and offered willingly did not extend nor apply in any situations where I may have failed to uphold a commitment or complete an assignments. I had to reiterate this truth several times to the prosecutors and agents, but they were not open to the truth. The government maintained that I felt pressured, threatened or coerced into completing assignments and that collateral was "held over my head" throughout my time in DOS.  The government repeatedly told this to me, as if they knew something about my own life that I did not know.  I countered multiple times that based on my experience the collateral was not intended to be used as force or coercion, that it was never used in this way, and that I was not afraid, concerned or worried that it would be used this way.  Had any woman shared with me that she felt the collateral was being used in this way or had I felt that it was being used against me personally, I would have addressed it with Ms. Mack because it would have been of great concern to me.

14

34.     I had believed the government sought to speak to me so they could hear my perspective, but instead it seemed their goal was to tell me my perspective. I explained repeatedly that the purpose of the collateral was to strengthen my commitment to my growth through my lifetime vow within DOS. I further explained that I had a very positive experience when I gathered and submitted my first batch of collateral to learn about the existence of DOS as a guarantee that I would keep the existence of the group confidential (whether I joined the group after learning about it, or not). The collateral I gave to Ms. Mack during this time and in the years following were all of my choosing.   I expressed to the government that this first step, which took almost two weeks to complete, was a fluid process which I embarked upon with the consistent support of and communication with Ms. Mack. Once I learned about DOS from Ms. Mack and expressed I wanted to join the group, Ms. Mack explained that additional collateral would be required to make my voluntary membership official. Given my desire to prioritize my growth under the guidance of Ms. Mack, and whom I trusted implicitly, I knowingly, willingly and enthusiastically accepted her invitation into the sisterhood and solidified my commitment and word to uphold my lifetime vow with further collateral. The prosecutor, however, continued to display incredulity to what I was explaining. At one point, the prosecutor raised her voice in disbelief of my ownership of my decisions, insisting instead that I only acted out of fear because I felt threatened. The prosecutor even went to the extent of saying things to me that I felt were accusatory, sexually graphic and out of line to try to further persuade me. It seemed clear to me that the government was trying to manipulate me into saying that my decision to join DOS and anything I did thereafter, including any contact I had with Mr. Raniere, was without my consent and I was in constant fear that Ms. Mack would expose my collateral. What the government continually refused to acknowledge or allow was that I actively and voluntarily accepted my

invitation to DOS because it was in full alignment with my aspirations to grow and become the best version of myself. As the prosecutor continued to push me to adopt her/the government's narrative that I felt coerced by Ms. Mack and Mr. Raniere, I felt this prosecutor, Moira Kim Penza, was the one in fact trying to coerce me into adapting my experience for her/their benefit and gain. I was unwilling to state anything outside of the truth as far as I understood it and that did not seem to satisfy Ms. Penza.

35.     When I refused to adopt the government's view of my experience with Mr. Raniere and my time in DOS, the government continued to press me to change my account of events by showing me communications that Mr. Raniere appeared to have with another person. The prosecutor said there was something they wanted me to see because they thought it might "help" me and stated "this isn't something we normally do." The government then brought into the interview room a number of pages of written communications purportedly between Mr. Raniere and Camila.

36.     In particular, the government asked me to read the passages where Mr. Raniere makes reference to a "fuck toy." As directed, I read the portions of these passages. It is worth highlighting that these communications had nothing to do with me, and that the government had no purpose in showing me these communications other than to, I believe, to compel me to change my mind. I believe the only purpose the government had in showing these communications to me was to cause me to view Mr. Raniere in an unfavorable light and my interactions with him to have been crimes committed against me without my consent. After I read the communications, the prosecutor asked what I thought of reading them and I responded in substance that they were interesting. This prompted one of them to state, "that's all you thought after reading that?" Ms. Penza and the agents seemed surprised and disappointed that the

effort to manipulate me into changing my account was unsuccessful. At one point, an agent asked me, "aren't you angry about this?"

37.     It was apparent to me that the point of this proffer interview was not to investigate nor seek the truth about the actual nature of DOS, NXIVM, and the events that occurred. Rather, the prosecution's point was clearly to recruit me to the side of the prosecution and to manipulate my view of my relationship with Mr. Raniere as well as my view of DOS and my involvement in it.

June 4, 2018 Meeting

38.     On June 4, 2018, my attorney and I sat for another proffer at the U.S. Attorney's Office. The interview, which was attended by two prosecutors and several agents, was shorter than the first meeting and focused on my relationship with my DOS "slave" Souki. At the end of this second meeting, there was no indication that the government intended to call me as a government witness, nor was there an interest expressed in continuing to meet with me, as it was readily apparent that my truthful account of my experience was wholly inconsistent with the government's view, preconceived notions and limited understanding of NXIVM and DOS.

The government's Demand for a Third Meeting

39.     Shortly before the trial, the prosecutors contacted my lawyer, Justin Greenblum, to attempt to interview me for a third time. Because almost ten months had passed since the second interview and because it was apparent that I had refused to adopt the government's inaccurate views and the false narrative it had imposed upon me, I did not see a reason to spend more time meeting with the government, as I believed I had already told them everything about my experience. By this point, the government had shown that it was not interested in hearing my authentic account.

17

40.     When my attorney told Ms. Penza it was unlikely that I would meet with them again, Ms. Penza told Mr. Greenblum that they were interested in having me prep with them for trial because they were planning to call me as one of their witnesses and were prepared to subpoena me to testify if I declined their request. Ms. Penza advised Mr. Greenblum to encourage me to meet with them prior to taking the stand or else they would be likely to charge me with perjury. Given that I had met with the government twice and stated the truth as far as I knew it, based on my experience, it didn't make sense that they would pre-meditate such a charge before I even took the stand. This threat of perjury only came after my attorney informed them that I would most likely refuse to meet with them again or willing testify on their behalf. Again, I was unwilling to adhere to the wants of the government and in response, they tried to manipulate me into doing what they wanted for their own gain and agenda.

41.     This was a clear threat, understood as such by both myself and my attorney, Mr. Greenblum, that if I took the stand as a defense or government witness, without first coming into the U.S. Attorney's Office a third time and further proffering with the prosecution, the government would charge me with perjury. The threat of such an unjust, unsubstantiated, and retaliatory indictment was a great weight in my consideration of testifying for the defense or not. Despite believing that testifying for the defense would be the right thing to do, I faced enormous risks, based on Ms. Penza's threat, to not only myself, but to my family as well. Therefore, by the government threatening me with a perjury indictment, it was seeking to frighten me so that I would not provide truthful testimony to the jury, testimony that was inconsistent with the government's errant views and, as noted above, inconsistent with at least one critical government witness.

018

42.     Because of the government's threat to me that if I testified without engaging in a third proffer interview, my potential to be a witness for the defense carried the risk of a baseless indictment which only served to try to manipulate and coerce me into heading to the demands of the government. Had I testified, I would have provided material, relevant testimony about DOS and the fact that the collateral was not meant to be used extortionately or coercively, but rather to give weight to my vow, as the defense maintained in the opening and closing statements and as was reflected in the cross examination of the government's DOS witnesses. I would have testified also to the means used the government used to try to get me to change my account.

43.     However, the government's threats were both powerful and effective. Although I was available to testify as a defense witness, the risk of arrest and indictment was one I did not want to take and therefore I decided I was unwilling to testify. As a result, the defendant, Mr. Raniere, was deprived of my material, exculpatory witness testimony. Without my testimony, the jury lacked a critical account different from that provided by Nicole. The jury was denied a genuine perspective of DOS that was wholly inconsistent with that provided by the prosecution.

44.     I truly believe that the government had two goals in mind. The first was to get me to change my account. It pursued this goal by telling me that I had been coerced, that I was in fact not acting of my free will and that a crime was committed against me. When those tactics did not work, the government showed me the written communications between Mr. Raniere and Camila, evidently hoping that they would cause me to see Mr. Raniere differently and that I would agree to testify against him. But the government's version of the "facts" were not consistent with my experiences, and I was unwilling to give in to their pressure to change my story just to match theirs.

45.    The second goal was that once the government saw that it could not recruit me onto the side of the prosecution, they would threaten and intimidate me to ensure I would not testify for the defense. This is why they threatened to indict me with perjury. The threat worked. Rather than risk indictment, I decided that I would not testify.

46.    I have made this Affidavit knowingly, intentionally and of my own free will.

Dated:        October 14, 2020                         Respectfully,
              New York, NY

                                                       _Michele Hatchette_
                                                       Michele Hatchette

STATE OF _Massachusetts_      )
COUNTY OF _Berkshire_         )

I, _Michelle Laramee-Jenny_, a Notary Public, do hereby certify that on this 14th day of _October_, 2020, personally appeared before me _Michele Hatchette_, known to me to be the person whose name is subscribed to the foregoing instrument, and swore and acknowledged to me that she executed the same for the purpose and in the capacity therein expressed and that the statements contained herein are true and correct.



NOTARY PUBLIC

MICHELLE LARAMEE-JENNY
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
October 16, 2020

# EXHIBIT A



**Michele Hatchette** ███████████████

---

## Creed.
1 message

---

**N**███████████████████            Tue, Jan 3, 2017 at 3:17 PM
To: Michele Hatchette ███████████████   India Oxenberg ███████████████   Danielle@exoeso.com

Notes from 3AM contemplation...

Readiness is important as a reminder that there are things more important to uphold than my own comfort. A reminder that I want to value LOVE more than I value my own comfort.

Readiness represent the act of always being ready. Ready and connected to myself and connected to the vow, which for me represents being and becoming the best version of myself.

Readiness is a piece of the puzzle in making us bad ass's. Women to be reckoned with. It helps build quickness, efficiency and skill. All under pressure.

I chose to join the vow to push through my fears and live the life experience that I want to. To live a full life.

I chose to join the vow to understand and experience that freedom and joy come from the inside, from the internal and not from the external.

I chose to join the vow to build awareness and to build love within myself so that I can share it with the world around me.

I chose the vow to stay connected to the woman I want to be. To be the woman I want to be.

I found this quote to really resonate with me and what we are doing...
"She is quick and curious and playful and strong." Kate Spade.

A simple quote but so full for me.
She is...
Quick- Readiness
Curious- Emotional exploration and daily exercise. Impressed state.
Playful- (thinking of something to fill this... practicing joy works though)
Strong- Morning cold shower and 12 hour fasting...

Gave some purpose and why to what we are doing...  :)

# EXHIBIT B

 **India Oxenberg**

Not working   11:26 PM

:(   11:26 PM ✓✓

Let me see how I can fix it   11:26 PM

There's no where I can go that has privacy and service    11:27 PM

Unfortunately   11:27 PM

But I feel really anxious and I've already indulged a bunch I think I just need to break the enercia And sleep or something                              11:28 PM

Our check in is Sunday night also   11:28 PM

I just keep failing and then saying what ever like what we talked about on our call today 😳 but this happens when I start to feel bad with myself. Like my little do struggle around anxiety                              11:30 PM

OK love, we can check in tomorrow and you can write whenever. Remember, you're stronger than you think                              11:30 PM ✓✓

Don't buy your bs   11:30 PM ✓✓


Don't buy your bs  11:30 PM

Thanks. Right now I feel like an ass but I'll try and remember that  11:30 PM

I ate like 3 PB and j San twitches and 3 hit chocolate I want to barf  11:31 PM

I can't even write I'm drunk  11:31 PM

Ahahhahah  11:31 PM

Not really but i do feel like I don't have my back right now. But I also think im entertaining myself  11:31 PM

The tantrum is covering up whatever ur feeling, remember the exercises in sop when they talked about real strength? Think about the kind of India you want to be. Even if you fuck up, how would your best self deal with it?  11:32 PM

Hmm. Okay. Right  11:32 PM

Would it help you if I take on a penance?  11:32 PM

Hmm I think yes.  11:33 PM



And we do it to help each other  11:33 PM ✓✓

And the same for me.  11:33 PM

Cuz lord knows imma have my moments too!  11:33 PM ✓✓

I think that will help keep is both in check  11:33 PM ✓✓

The only thing that stopped me in sop was knowing my conscience group would need to walk an hour at midnight  11:33 PM

Damn  11:33 PM ✓✓

Ok, let's do this  11:33 PM ✓✓

But the parameters need to be clear.  11:34 PM

Propose a plan by tomorrow am?  11:34 PM


11:34 PM ✓✓

# EXHIBIT C

Gmail through ndeantorrole1



**Michele Hatchette** ████████████████████

---

## Rough ideas on roles..
1 message

---

**Sylvie** ████████████████                                          Tue, Sep 20, 2016 at 6:40 PM
To: Michele Hatchette ████████████████████

I think we also need:

Video media manager
Writers
Photographers
Strategists
People who can just post for minimal hourly rate.

---

📄 **Team - Roles & Responsibilities S██docx**
   95K

**Writers**

| Name | Sylvie's description | Current Role |
|------|---------------------|--------------|
| *Michele* | Creative and expressive with a sensitivity to human nature, Michele can create soulful written pieces, and digital communications needed to deliver instructions or internal/external comms. | Scripting intros for Social Media<br><br>Internal/External official communications<br><br>Interviewing for Women of Jness<br><br>Blog posts |
| *Marisa* | A real nurturer and mother; Marisa is diligent, committed, precise and caring. She will bring care and wisdom to the writing team, and holds the capacity to make it safe for women to share their true selves vulnerably, then put those experiences into words. | Take over the blog; specifically Women of Jness project and be responsible for ensuring that all current blogs are re-worked and ready for site.<br><br>I think she can also write more extended pieces for external clients. |
| *Chelsea* | As both a Data and Spin Expert in the Knife, Chelsea is a digital thinker and able create precise, concise documents and as well as bringing a fun, young and playful energy to the Social Media realm. She has a lot of empathy and is sensitive. She is also pretty open to feedback. Writer, creater, ideas machine. | She tried doing a blog series about Women she was inspired by and that she thought represented Jness.<br><br>Brainstorming with Social Media teams.<br><br>Worked with Michele to try to help her take on Pam's profile, she wasn't really there yet writing wise. |

**Social Media**

| Name | Sylvie's description | Current Role |
|---|---|---|
| Rosa | A hidden gem; Rosa has a vast resume in the corporate realm which includes leadership roles in sales and communications. She is diligent, reliable and keen to bring fresh ideas, discipline and commitment to the team. Head of strategy, data collection/transforming data into strategy. | Manages communications@jness.com<br><br>Brainstormer for clients and campaigns<br><br>Manages and tracks Instagram for Nxivm and Jness |
| Chelsea | | Brainstorming with Social Media teams. |

*Designers/Branders*

| Name | Sylvie's description | Current Role |
|------|----------------------|--------------|
| *Veronica* | An expert in the field of Illustration and Design, beautiful visuals with a Jness flair are provided by Veronica. For example; logos, illustrations and templates for websites, Social Media campaigns and PR Manuals. | *Illustration*<br><br>*Template creation*<br><br>*Brand design*<br><br>*Website imagery* |
| *?* | *I think we need more here..* | |

Leadership

| Name | Sylvie's description | Current Role |
|------|---------------------|--------------|
| Sylvie | I have Knife Analyst skills in Logic, Spin as well as project management experience, a rank of 3 Stripe Coach in ESP and professional experience in corporate world. I have experience with project management, quality control, leadership and follow through. I have marketing experience, communications experience, people management experience and a willingness to take on responsibility (and all that comes with it!). I am extremely loyal. My heart is in this and with all of you. | Oversight of team/Project Manager<br><br>Writing editing/quality control<br><br>Client pitches/interface & relationship with client<br><br>Approve strategies/ideas/facilitate brainstorms |

# EXHIBIT D

 Gmail

**Michele Hatchette** ████████████

---

## Fwd: Please Transcribe ASAP
2 messages

---

**India Oxenberg** ████████████                                    Wed, Jan 4, 2017 at 11:25 AM
To: ████████████                    Danielle Roberts <danielle@exoeso.com>, Michele Hatchette
<█████

Here you go! Let's split it up on the chat.

Sent from my iPhone

Begin forwarded message:

> **From:** Sylvie ████████████
> **Date:** January 4, 2017 at 11:19:04 AM EST
> **To:** India Oxenberg ████████████
> **Subject: Please Transcribe ASAP**
>
>
> Hey you!
>
> Please
>
> To save time on the back end, please have you/your transcribers follow this formatting guide:
> Testimonial Formatting
>
> It should end up looking something like:
> Testimonial - EDGAR
>
> Let me know if you have any questions!
>
> xo

---

**India Oxenberg** ████████████  >                                Wed, Jan 4, 2017 at 3:27 PM
To: Michele Hatchette ████████████
Cc: Danielle Roberts <danielle@exoeso.com>

India Oxenberg

████████████

Begin forwarded message:

**From:** Sylvie ████████████
**Subject: Please Transcribe ASAP**
**Date:** January 4, 2017 at 11:19:04 AM EST
**To:** India Oxenberg ████████████

[Quoted text hidden]

---



# EXHIBIT E

 Gmail

**Michele Hatchette** ███████████████

## Jness - Campaign Calendar

1 message

**Sylvie** ███████████████                                    Tue, Sep 8, 2015 at 1:11 PM
To: Marianna ███████████    ████    ████ Pamela Cafritz ███████████████
Bcc: ███████████████

Pam & Marianna,

We had an awesome first meeting! Thank you so much for this opportunity.. I am very excited!

This is the campaign calendar we are proposing. We have come up with the abstract concept (at the top of each box) and then the ideas that fall into that category (smaller text underneath.)

We are now meeting weekly on Tuesdays at 12pm.

Before our next meeting, would you be willing to give us feedback on this calendar? We would like to start working with the first quarter, and define a clear next step, for our next meeting a week today!

Sylv xo

---

📄 **Jness Campaign Ideas Sept 9.docx**
106K

# Declaration of Danielle Roberts

1. My name is Danielle Roberts, DO, MS.
2. I currently reside in St. Francis, Wisconsin.
3. I graduated from Binghamton University Cum Laude in 2003 with a degree in Psychobiology. I completed a dual degree as a Doctor of Osteopathic Medicine with a Masters in Clinical Nutrition in 2008. I completed my Family Practice Residency in 2011. Since, I have served our communities as a hospitalist in 4 different hospitals from 2012-2017, as a Medical Director of an Integrative Medical Practice from 2011-2013, and as an entrepreneur creating and developing 4 different movement and wellness systems and certifications for prevention from 2013-2018, one of which was implemented in 3 countries.
4. I was a second-line member of DOS and was invited by Allison Mack.
5. I served as the primary branding artist for those who got a brand.
6. I have key information I could have offered to the defense counsel in Keith Raniere's case to dispel much of the testimony that was given at trial about how DOS worked, its procedures and practices, the branding process, and my experiences in DOS with Allison Mack, and India and Nicole who were in my circle.
7. I could have given direct testimony that would have challenged Nicole's narrative in general, and specifically about her spending a few hours transcribing videos with me, for Pamela Cafritz's memorial service, which the Government argued was "forced labor."
8. As a second-line member of DOS, I directly experienced the processes and protocols being developed and implemented by the first line.
9. My testimony would have attested to the rigorous and thoughtful enrollment process each woman would have undergone who decided to join, and the conditions surrounding the collateral.
10. This would have clearly illustrated that the collateral was used as a tool to back our promises to ourselves, like surety, not as a tool of fear, force, or blackmail as was alleged by the Government and by Nicole.
11. I believe much of my testimony would have helped to dispel, if not completely dismantle, the Government's theory of sex trafficking and forced labor. I was similarly situated to Nicole, both of us being in the same circle of DOS.
12. In addition, I have been a close friend and business partner of Mr. Raniere.
13. I had known him for approximately six years at the time of the trial.
14. I had worked very closely with him for four years building our company exo | eso, and I worked very closely with him and his closest chosen family in caring for Ms. Pamela Cafritz in her two-year struggle with metastatic renal cancer before she passed away in 2016.
15. I cared for Ms. Cafritz in their home and, at the end, around the clock.

16. As such a close friend, I could have offered essential and reliable testimony as to the consistency of Mr. Raniere's character and conduct.
17. I believe my testimony would have strongly contradicted the handful of Government witnesses' narrative of Mr. Raniere's alleged sinister intent.
18. Instead of being afforded an uninfluenced right to testify under oath as to the nature and purpose of DOS and my experience, I was threatened and intimidated into silence by the actions of U.S. Governmental agencies, including the EDNY, which I will describe below, and significant media pressure.
19. In and around Oct. 2017, the time when Mr. Raniere and five others were being indicted, the New York Times published an article that criticized NYS Governor, Andrew Cuomo, for choosing not to investigate my medical license.
20. In the summer of 2017, the Office of Professional Medical Conduct (OPMC), part of the NYS Health Department, had already issued a written decision, in response to a complaint from Ms. Sarah Edmondson, stating that my actions as a branding artist for DOS was NOT the practice of medicine.
21. Two days after the New York Times article, the OPMC, in contravention of their prior decision, launched an investigation into my private and professional life.
22. This decision (to act outside of their jurisdiction) cost me my contract as a hospitalist at Columbia St. Mary's Hospital (which I had served loyally for 5 years) and every other job I tried to pursue over the next 2 years in the medical field. This was the beginning of dismantling my reputation, credibility, and financial stability.
23. The OPMC threatened me with a salacious, highly exaggerated statement of charges to subpoena information from me, and other women (not related to the practice of medicine and quite possibly to try to collect further information in relation to Mr. Raniere's criminal case).
24. These initial allegations are very different from the allegations the Health Dept. finally published against me about three years later. The Health Dept. continually found ways to try to intimidate me to surrender my license, including highlighting their right to use any information I may state as testimony to defend my medical license and livelihood, as grounds for criminal charges. Clearly discouraging me from testifying in any way in relation to the federal case.
25. OPMC prosecutor, Jeffery Conklin indicated that any testimony I gave in my medical hearing could be used to support a criminal indictment, thus inextricably linking the federal case and my medical hearing. Therefore, any evidence uncovered or testimony given by me (or others) in my hearing could have been used in the federal case to challenge the prosecutors narrative.
26. The women that were subpoenaed through my case, also pleaded the 5th amendment for fear of prosecutorial retaliation, reputational damage, and financial consequence.

27. Seeing I was not amendable to surrendering my license (and that I would likely testify at my own hearing), my hearing was held in abeyance for approximately 2 years, until September 2019, when the federal trial was complete (June 2019) and convictions made.

28. It is precatory that the OPMC present a case to the state board no more than 90 days after an initial interview is offered to a physician/defendant. It was 2 years before the OPMC moved my hearing forward. In order to justify their delay, and divergence from their standard, they offered another "initial" interview so that the hearing would be within the "90 day window". This was a severe deviation from the standard, during which I was unable to work, and timed exactly with the progression of the criminal trial.

29. The consequences of these unjustified tactics and actions led to the loss of my livelihood.

30. I had to sell my home and most of my possessions and eventually had to change careers to support myself and pay legal fees.

31. In addition to the significant intimidation and financial duress I was placed under, the Federal Government invaded and threatened our community, followed us in our cars, sat outside our homes in their vehicles, and raided Ms. Salzman's home just a few blocks from my home.

32. As a gesture of cooperation, NXIVM had closed their offices and I was sufficiently intimidated that I closed my company, exo|eso™ as well.

33. I sought legal representation and was represented by attorney Michael Kelton, Esq. of Abrams Fensterman, LLP for my matters with the OPMC and attorney Daniel Stein, Esq. of Mayer Brown, LLP for any matters pertaining to possible criminal charges. In April 2018, the prosecutor's in Mr. Raniere's case informed Mr. Stein that they wanted to speak with me.

34. Mr. Stein offered that I comply, if they offered me protection from prosecution.

35. Then-Assistant US Attorney Moira Kim Penza, the lead prosecutor, granted limited immunity. The limited protections of the proffer agreement stated that the proffer agreement did not constitute a cooperation agreement. Should there be any criminal exposure for me discovered in the course of the interview, that my participation in the proffer and continued cooperation would be helpful in resolving such issues.

36. However, Ms. Penza stated that she was not making any promises to resolve any matter in any particular fashion.

37. It became clear to me that if I was of help to the prosecution, it would be beneficial to me.

38. There were many moments over the course of the two, full eight-hour-long proffer sessions that Ms. Penza seemed very fixed in her viewpoints about NXIVM and DOS; especially pertaining to my experience and perspectives regarding the collateral I voluntarily gave in exchange for mentorship (however unconventional), and the incorporation of Mr. Raniere's initials into the meanings of the brand.

39. When I shared my viewpoints, based on my personal experiences, she often seemed to get visibly upset and perseverated on those specific points and others that offered a different motivation other than coercion.

40. I recall one instance in particular where, for around fifteen minutes, she argued with me about my experience of collateral. I explained that collateral was a tool I chose to use to build self-trust and self-reliance, to back my promises and that it was not, nor was it intended to be, a tool of coercion or extortion. My attorney eventually needed to step in to point out her behavior and redirect her.

41. She displayed the same behavior when discussing the intent and meaning behind what I was told the incorporation of Mr. Raniere's initials meant in the symbol that was created by the 1st line members. She again was insistent the meaning was related to control, possession, and coercion, when that was not my opinion at all.

42. By the end of the interview on May 11, 2018, it became clear to me that Ms. Penza had solely two possible viewpoints: 1) I was a co-conspirator of a massive criminal enterprise, or 2) I was a victim of the situation that had been brainwashed and couldn't think for myself.

43. It did not seem to me that she was open to the possibility, which I believe to be the truth, that this group of people, including Keith Raniere, was innocent and well-intended, even if some mistakes were made.

44. Consistent with my observation, at the end of the first interview she offered me victim support services so that I could be properly treated for the abuse that she decreed that I had undergone, even though I did not, and do not feel, I was abused nor can I measure objectively any destruction of my life or life's work by the practices I engaged in in DOS. In fact, I experienced quite the opposite and I conveyed that in my proffer interviews.

45. Ms. Penza's comments to me at the end of the first interview indicated to me that she had dismissed my testimony, my positive experience, and rendered me incompetent in her mind in order to maintain her theory of the case and the foundation she needed to "win."

46. At the end of the second interview, she threatened to subpoena me to testify in the trial against Mr. Raniere. I made it clear I was not interested in helping her.

47. I also knew that if I were to testify in support of the defense, Mr. Raniere, she may change her mind about me, if it served her, and I could then become a co-conspirator in her assessment, open to indictment, even though I had done nothing wrong or criminal.

48. Based on my initial direct experiences with Ms. Penza, she seemed disinterested in the truth and unwilling to examine any contrary perspective to one of abuse and coercion.

49. I was effectively intimidated from giving crucial testimony to the case.

50. Ms. Penza did not choose to call me to testify.

51. The actions of Ms. Penza were the straw that broke the camel's back and successfully intimidated me from testifying in the criminal proceedings.

52. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on June 15, 2022 at St. Francis, Wisconsin.



Danielle Roberts

State of Nevada

County of Clark

Signed and sworn to (or affirmed) before me

on 06/14/2022 by Danielle Roberts.

Jaclene Elyse Dobbins-Baptiste
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 21-1883-01
Expires December 12, 2025

Notarized online using audio-video communication

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 18-cr-204 (NGG) (S-2) |
| - v. - | **AFFIDAVIT OF NICOLE CLYNE** |
| KEITH RANIERE, | |
| Defendant. | |

NICOLE CLYNE, duly swears and affirms as follows:

1.  I am 37 years old. I grew up in Vancouver, Canada and I currently live in Kings County, New York. As of April 2018, after Mr. Raniere's arrest, I was represented by counsel, specifically Edward Sapone, Esq., and I affirm that this affidavit is the truth, the whole truth and nothing but the truth.

2.  I was introduced to Executive Success Programs (ESP) by Sarah (last name not being included) and I took a five-day training in November of 2005 in Albany, NY. I completed a 16-day training in August of 2006, and went on to become a coach and participate in other trainings. The curriculum and the community impressed me so much that I eventually decided to move to Albany. During my time there, I developed close personal relationships with many people in the community, including Keith Raniere.

3.  I was present in Mexico during Mr. Raniere's arrest and traveled back to the United States after the complaint against Mr. Raniere was made public. The arrest came as a shock and I was eager to cooperate with the investigation. When special agents Michael Lever and Michael Weniger showed up to arrest Allison Mack (an arrest for which I was also present), I told them I

was interested in coming in and speaking with them because I believed I could offer exculpatory information. I gave them the name of my lawyer with the intention of making myself available to provide the Government with any and all information they might desire.

4.    After Ms. Mack's arrest, the prosecution reached out to my attorney, Mr. Sapone, saying they wanted to speak with me. Mr. Sapone offered that I would speak with the prosecution if they offered some sort of protection from prosecution, such as statutory or letter immunity or a non-prosecution agreement. He also offered to first engage in an attorney proffer so that the prosecutors could determine whether they wanted to bring me in for a proffer interview. Mr. Sapone informed me that the prosecution's response was that they were not interested in an attorney proffer, and declined to offer any sort of protection. He also informed me that when he asked the prosecutors to provide him with a summary of any evidence against me so we could make an informed decision about how to proceed, the prosecutors declined. Under these circumstances, Mr. Sapone and I chose to not speak with the Government. I intended to provide my testimony, and everything I knew, to the defense, with the hope that my exculpatory testimony could be heard at trial.

5.    On April 7, 2019, after accompanying my lawyer to the Brooklyn Courthouse to observe an unrelated case, I happened to pass Mr. Raniere's prosecutors in the hallway. Although we had never met, lead prosecutor Moira Kim Penza appeared to recognize me. Two days later, and with less than a month until Mr. Raniere's trial, I received a Grand Jury subpoena. Jury selection had already begun, so my attorney and I reasonably assumed the investigation for his trial had concluded. According to Mr. Sapone, when he called Ms. Penza regarding the subpoena immediately after receiving it, she made the following chilling statement: "First, we are going to cut the head of the snake off and then we're coming for the body. This is not going away for her."

2

At this point, although I desired to testify, due to what I perceived as a retaliatory threat, coupled with their Grand Jury subpoena, my lawyer advised me not to testify and I complied.

6.      It is my belief that the Government knew I would testify in a manner wholly inconsistent with their core premise that DOS was created and existed for the purpose of sex trafficking and forced labor. More specifically, I would have testified that women chose to participate in DOS voluntarily and benefitted greatly from its practices. When I observed women want to and inevitably leave DOS, I never witnessed any threats or negatives consequences enacted upon them by Mr. Raniere or other women in DOS; and I am most certainly not aware of anyone's collateral being released. I would have testified that DOS had a notable and worthy purpose that many sincere, law-abiding women, such as myself, were participating in. I would have testified that I represented DOS accurately and consistently when I invited someone, most particularly relating to Mr. Raniere's involvement or lack of involvement. Additionally, I would have testified that I was never asked by Mr. Raniere to commit criminal acts, nor did I witness any crimes such as sex trafficking, forced labor, or others.

7.      Had I given testimony, I would have provided the jury and the Court with an entirely different perspective about NXIVM, DOS and Keith Raniere than what was presented by the prosecution and its witnesses, namely Nicole, Jay, Sylvie, Lauren Salzman and Mark Vicente. Having known, and had close friendships with, the latter three witnesses for over ten years, I would have offered my own personal experience and thoughts on the matters discussed at trial. This experience would have contradicted much of the testimony heard at trial and the subsequent conclusions made about important events, people and practices. Also, having been involved in DOS for longer than any of the witnesses, my testimony would have brought to light many inconsistencies and inaccuracies presented at trial about the organization.

3

045

8.      I was present for a number of the events described by Ms. Salzman at trial, including a 2015 trip to Fiji, a 2016 trip to Woodstock, Ms. Salzman's branding ceremony, Mr. Raniere's arrest and I would have provided my own personal experience of these events. Although these events did not relate directly to Mr. Raniere's charges, they did serve to support a specific view of Mr. Raniere that my testimony would have countered.

9.      I have deep sympathy for Ms. Salzman and the dilemma she faced before entering into a cooperation agreement with the Government. Once she did, I imagine she felt tremendous pressure to offer beneficial testimony that would secure the prosecution's recommendation for leniency in her sentence. I also imagine she learned a number of difficult, personal things from the Government during the time leading up to the trial that left her distraught, and may have contributed to the dramatic difference in her testimony to how I perceived her the last fifteen years.

10.     In addition to offering an entirely different point of view to that of Ms. Salzman, I would have countered testimony brought forth by the prosecution's witness, Nicole, specifically relating to her claims of being a victim of sex trafficking and forced labor. Just one example being that when a woman failed to complete an assignment in DOS, her collateral was not released. I certainly never threatened anyone nor attempted to coerce anyone in any way. I supported women in the direction of their stated goals and have not received any direct statements to contradict this. I am adamantly opposed to any organization that threatens women, or men, in any way.

11.     In sum, if I had been able to testify, I would have shared my personal experience, and offered additional supporting evidence in my testimony. I believe I would have given the Court and the jury a vastly different perspective on DOS and the complex and nuanced relationships that were the focus of Mr. Raniere's trial. The salacious media attention surrounding the NXIVM community, fueled by the Frank Report, created an environment conducive to an atmosphere of

false perception, and much of this was echoed by the Government's claims. These perceptions

wholly contradicted my own direct experience and the knowledge I have about Mr. Raniere,

NXVIM and DOS over the last decade. Had I not been frightened by the threat of retaliatory action

by the Government, I would have chosen to testify.

      12.    I have made this Affidavit knowingly, intentionally and of my own free will.

Dated:      October 19, 2020                     Respectfully,
              New York, NY

                                                  NICOLE CLYNE

STATE OF _New York_  )
COUNTY OF _Kings_    )

I, _Allison Thompson_, a Notary Public, do hereby certify that on this _19_ day of _October_, 2020 personally appeared before me _Nicole Clyne_, known to me to be the person whose name is subscribed to the foregoing instrument, and swore and acknowledged to me that she executed the same for the purpose and in the capacity therein expressed and that the statements contained herein are true and correct.

_____
NOTARY PUBLIC

                           ALLISON THOMPSON
                    Notary Public - State of New York
                         No. 01TH6099607
                       Qualified in Kings County
                       My Commission
                       Expires Sept. 29, 20 23

5

047

# Declaration of Samantha Le Baron

1. My name is Samantha Le Baron.
2. I currently reside in Sarasota, Florida and I am 33 years old.
3. I grew up in Le Baron, Chihuahua in Mexico, I have a BA degree in Multidisciplinary Studies specializing in Language Acquisition, Language Development, and Social Sciences. I am trilingual and have been dedicated professionally to the fields of human potential, women's studies, education, and economic development, I am currently developing a new ceramic product line.
4. I started in ESP in July 2014; I became Nancy Salzman's assistant in September that same year. I became a coach in ESP at the beginning of 2016 and joined DOS in September 2016.
5. In March 2018 FBI agents came to Clifton Park, NY, and served me with a Grand Jury subpoena when I was at Nancy Salzman's house.
6. I had never gotten a subpoena before. I did not even know what it was or how to pronounce the word.
7. When the FBI agents were outside, I went to open the door and as I tried to go outside it seemed that one of the agents got scared and wanted to grab their gun, I stayed inside and through the cracked door they asked, "Are you Samantha Le Baron?"
8. I identified myself and they gave me the document and left.
9. The subpoena identified me as a target of the investigation.
10. I never ended up attending a Grand Jury.
11. I went to talk to the Government with my attorney on May 4th, 2018
12. The interview was attended by me, my attorney's partner, the lead prosecutor, Moira Kim Penza, and at least four other individuals who I believe were FBI agents.
13. I believe among those FBI agents were Lever and Weniger. I believe Lever was present at the interview, I don't remember him asking questions, only at the end they asked him if he had any other questions for me.
14. I believe the interview lasted for at least four hours.

15. As soon as I arrived, I was told that I wasn't a target and they thought I was a victim. I was surprised because the subpoena had indicated I was a target.

16. I remember, shortly after arriving, that AUSA Moira Kim Penza, in a quiet voice, asked the other agents, "Is she American? Does she have citizenship?"

17. The Government began asking me basic questions about my family and where I'm from, and I remember feeling very scared and even shaking. They assured me that they were there to help me and they said they "knew I was a victim."

18. I remember them asking me leading questions, to the effect of if I thought in DOS, they used fear to motivate me and at one point, one of the interviewers remarked something to the effect of, "But we want her to answer [that they used fear]."

19. It seemed to me that the Government officials were confused, as they seemed to assume DOS had bad intentions and I gave them my perspective that even if I felt fearful at times when my "Master" was trying to motivate me it didn't mean that she had bad intentions or wasn't acting for the sake of my benefit, or my growth.

20. Another leading question that I recall being asked by Ms. Penza was, "At V-Week [Vanguard Week], what was something that was going on that was bad?" I remember thinking the question presupposed there was something bad happening which I didn't believe; I remember responding, "I don't understand the question," and it seemed they were frustrated by my answer.

21. I remember sharing my opinion about Sarah Edmondson where I expressed that I felt she was one of the people causing the trouble [disenrolling people in NXIVM], and at this point, I noticed Ms. Penza get defensive, she started raising her voice at me, she interrupted me and did not allow me to say what I thought.

22. This gave me the further impression that the Government agents had made their minds up and did not want to hear my honest perspective, as it did not conform to their narrative.

23. I remember that the Government asked me, among other things, if I had a relationship with Keith Raniere. They also asked me about Sylvie, Monica, and if I owed money to ESP. They asked me why I thought Keith Raniere lied

on the website and when I answered Moira Penza told me that Keith Raniere was a liar, and she repeated this statement at least twice during the interview. She seemed to have a strong dislike for Keith.

24. I remember, when I was telling them about my future plans, they told me that I was a "smart woman" and I "should go and do something else."

25. During the interview, I remember the Government agent, which I identify as Weniger, raising his voice and hitting the table at times; I felt scared, and I did not feel comfortable at all. It also felt inconsistent with what he was telling me, he kept saying "I'm trying to help you" but at the same time he was being rough with me. It seemed he was not content with my answers and that by yelling somehow, I would change my testimonial.

26. Whenever I qualified my answers with phrases like "in my opinion" or "in my experience," Ms. Penza raised her voice and said, in what I felt was a rude tone, "We know it's your experience!"

27. I remember the Government agents telling me and my attorney, "We know you don't think you are a victim, but we think you are a victim."

28. They told me that in psychology, it sometimes takes time to realize you are a victim. With this statement I assumed they meant I would later come to realize that I was abused which was not my experience.

29. Before I left, I recall Ms. Penza telling me, "I am glad you are here in Brooklyn so that we can call you whenever we need you."

30. I was never called back for a second interview, nor was I called to testify.

31. I left the interview scared of the Government, for simply not agreeing with their narrative. They did not seem to like that I would not agree to take on their label of victim and that I had contrary viewpoints to theirs on ESP, DOS, and some of the so-called victims, who were, at one time, my close friends.

32. Regarding my relationship with Sylvie, she was a coach at the Albany Center, this is how I met her; she was my mentor in Mobius [an advanced training], I knew her but never interacted much. We were very different.

33. When she invited me to DOS she asked if I wanted to go for a walk, I said yes because I wanted to make more friends. She asked me questions about what I

wanted in my life, what I was looking for and she said she thought she had something that might help me.

34. In DOS I was never asked to diet or to count calories. I did do what was called acts of care, like running errands for Sylvie or walking her dog, she always told me I didn't have to do them if I didn't want to. There were many times when Sylvie asked me to do things and I didn't do them, at some point she even told me she was tired of telling me what to do because I wouldn't follow through. The only consequence there was for me not doing as I was told was a simple conversation exploring why I had failed.

35. Because of the way I was treated during my interview I would have been too scared to testify on behalf of the defendants. Nevertheless, I was never asked to testify.

36. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on June 14, 2022 at Sarasota, FL, United States of America.



**Mohamud Aden**

REGISTRATION NUMBER
7898118
COMMISSION EXPIRES
March 31, 2026

Commonwealth of Virginia

City of Alexandria

Samantha Le Baron

Samantha Le Baron

The foregoing instrument was subscribed and sworn

before me on 06/14/2022 by Samantha Le Baron.

Mohamud Aden

7898118

My commission expires: 03/31/2026

Notarized online using audio-video communication

# Declaration of Brian Elliot

1. My name is Brian Elliot and I am writing to document my experience interacting with the U.S. Government in the case of the United States vs. Keith Raniere et. al.
2. I am an entrepreneur who has started or cofounded several businesses and nonprofit initiatives, including a national network of summer camps for children whose parents have/had cancer, a nationally recognized mentoring program for deaf children, and an LGBT rights organization. I have a B.A in Public Policy from Stanford University, an M.P.A. from the Harvard Kennedy School, and an M.B.A. from Harvard Business School, where I was both a Zuckerman and George Fellow, and named a Harvard Business School Social Entrepreneurship Fellow.
3. I was introduced to Executive Success Programs (ESP) while I was running the LGBT advocacy organization that I founded in New York City shortly after I finished graduate school. Our mission was to help win marriage equality in New York State. I enrolled in my first ESP course because I was struggling to manage the day-to-day stresses and demands involved in leading an organization.
4. My first ESP intensive was transformational; it had a positive and lasting impact on both my personal and professional life. After taking the course, I noticed that my stress levels had lowered significantly, my confidence and ability to fundraise had dramatically increased, and I had become more compassionate with others with whom I disagreed. I had gotten so much value and personal insight from the course that I decided to take many more courses offered through NXIVM companies in the years that followed. Their effects on my life were similarly profound and undeniable. I found that the more courses I took, the more of a centered, goal oriented, self-disciplined, and emotionally balanced leader I became. I found the level of education of many NXIVM courses to be on par with, or even more advanced, than the classes in my formal education, particularly in the areas of understanding ethics, emotionality, leadership, and productivity.
5. After being a student of ESP for a couple of years, I decided to become an ESP coach, and several years later, a trainer. I eventually opened an ESP Center in San Francisco with the hopes of providing other entrepreneurs such an impactful personal growth education. I deeply enjoyed helping people achieve results similar to my own.
6. Throughout the approximately 7 years that I was a participant and a coach in the organization, I did not witness any conduct that I believed was criminal.
7. On or about March 25, 2018, I was subpoenaed to testify in front of a federal Grand Jury.
8. I was confused and troubled as to why I was subpoenaed. At the time, my understanding was that the criminal investigation had to do with allegations regarding a women's group, DOS. I had no knowledge of DOS prior to its existence becoming public in June 2017, and I was never involved with it.
9. I was also surprised that I was asked to meet in person with the Government twice throughout the proceedings of the case, which I did.
10. During my interface with the Government, I recall a few interactions that were problematic and very concerning to me.
11. The first interaction was communicated to me through my attorney, who relayed his initial conversation between him and the lead prosecutor, Assistant US Attorney Moira Kim Penza. He told me that he had called Ms. Penza prior to my Grand Jury

testimony to share with her a preview of the responses that my brothers and I would be offering at that hearing. I remember my attorney summarizing his interaction with Ms. Penza by stating that, unhappy with his position, she "literally screamed" at him on their call. My attorney, who was once a former AUSA himself, said that he had never experienced someone behave like that towards a fellow attorney and that her lack of professionalism was astounding to him. Even before my attorney debriefed me from his call, I was already bewildered as to why my brothers and I— with no prior knowledge of DOS before it went public—were being subpoenaed in the first place. But after hearing about this prosecutor's conduct towards my attorney, I became even more concerned about the tactics the Government might use with me, if that's how they treated my attorney. I had never been questioned before by a prosecutor. Knowing that this prosecutor "screamed" at my attorney left me amply fearful heading into my Grand Jury appointment.

12. Secondly, in my first in-person meeting with the Government in April of 2018, my impression of that meeting was that the Government was looking for me to respond in certain ways to their questions and was frustrated when my truthful responses about my experiences in NXVIM did not conform to their narrative.

13. In one instance, I remember the prosecution asking me about the use of "collateral" in NXIVM and why I did not view it as blackmail. I explained that my understanding of collateral and its use within NXIVM was that it was a voluntary tool used by consenting parties for personal growth. My understanding of collateral was based not only on what I had learned from NXIVM courses, but also from Behavioral Economics research from Yale University, which I had found on a public website called Stikk.com (and to my knowledge has no relationship to NXIVM).

14. I illustrated my understanding and experience of using collateral by sharing an example of how I had used it myself: A friend and fellow classmate of mine from Harvard (who had also taken NXIVM courses), developed an accountability "buddy system" that involved the use of money as collateral. I shared that we had designed a weekly check-in system to help us improve our self-discipline and be more successful in our respective entrepreneurial ventures. We each made weekly commitments to ourselves (such as: "Make five fundraising calls,") and reported to each other to ensure we completed each weekly task. To give "teeth" to the commitments I made and to incentivize myself to follow through with them, I gave $500 to my accountability partner to hold "in escrow" for me. If I ever failed to do my self-defined weekly task by the deadline I had set, I told my friend it was his job to donate my $500 to an "anti-charity" (a charity whose mission goes against my personal values—this idea I had gotten from Stikk.com). This $500 served as the additional "weight" I needed to ensure I followed through on my commitment. Because I put this additional weight behind my goal, I always followed through with my commitment (thus, my friend never had to send in the $500). Over time, my self-discipline dramatically improved—far more than it ever had prior to me using collateral as a tool for personal growth.

15. I understood that this type of setup with collateral may have been hard for an outsider to understand; and more, an outsider without context of the intricacies of the whole set up might believe that my friend was holding my $500 as a tool to manipulate my behavior. However, both of us knew this set up was, in fact, entirely voluntary because I set up the commitment and the terms (if anything, I was using *him* as a tool to help *me*). I chose an appropriate collateral and gave direction to my friend on how to use it in such a way that would specifically motivate me to achieve

my own self-defined weekly goals. In order for the setup to work, I had to trust that he would actually send in the $500 to an anti-charity that I specified if I ever failed to do my weekly task.

16. In addition to sharing my understanding of collateral, I also shared with the prosecution that before DOS had become public, the interactions I had with other NXIVM community members about collateral were all in line with the understanding that I had outlined—that individuals chose what collateral would be helpful for them to uphold their own goals and that collateral was given to a trusted friend in the same type of an "accountability buddy" setup. It was only after DOS became public that I began to see some peoples' perspectives about the voluntary nature of collateral change. ·

17. After I shared this type of information with the prosecutors at my proffer session, I recall them getting frustrated and being seemingly unsatisfied with what I was sharing. I then recall them pushing me to agree with their narrative that collateral was indeed blackmail, even though that narrative was wholly inconsistent with my own experience of what it was. It was also wholly inconsistent with how I saw NXIVM community members use collateral for years—as a voluntary, proactive mechanism of self-motivation and accountability.

18. In the prosecution's follow-up questions, they asked me how I *felt* about the way some people used collateral and if that *felt* weird to me, separate from my rational thoughts on the matter, which I had just explained to them in detail.

19. I found their questions about my feelings on the matter strange because I understood justice to be based on thoughtful and objective evaluation, not the whims of how people might *feel* about certain topics or about what is uncomfortable for them. As a gay man who, until this last decade, was denied the freedom to marry because it *"felt* unnatural" to many people, I was well aware that people's *feelings* about uncomfortable matters (including those that involve consenting adults) can cloud actual justice and rational thought about those matters. I recall sharing that some of the practices with collateral that I had heard about "felt" odd to me, but that I didn't think that made them wrong.

20. The final and most concerning act the Government took in this case was an intimidation tactic used on my brothers, Marc Elliot and Justin Elliot, and myself in which the prosecution used a direct threat to suppress public discourse about character assassination in the media and its relationship to the justice system.

21. Inspired by conversations and ideas to promote honorable civil discourse in the media, in mid-June 2019, Marc posted to social media an advertisement for a talk he was going to give entitled, "Who's Next?: The Rise of Character Assassination and the Loss of Human Decency." An alternate title of this talk was "Kindness Above All: The Rise of Character Assassination and the Loss of Human Decency." The talk was not intended to discuss matters, evidence, nor witnesses in the ongoing NXIVM trial. I had helped Marc develop some of the content for this talk.

22. On or about June 24, 2019, my brothers and I received a call from our attorney. My recollection of this call included my attorney saying that the prosecution was "infuriated" by Marc's post and that they demanded he immediately cancel the talk.

23. I recall my attorney saying that Ms. Penza took this post as a direct attack on her integrity.

24. Based on this call with Ms. Penza, my attorney believed she would do anything she could to pursue all three brothers if Marc carried through with his speech.

25. I recall my attorney relaying that Ms. Penza said something to the effect of, "If it weren't for the First Amendment, I would be coming after them." This made no sense to me, because if our actions were only intended to be exercising First Amendment rights and raising public awareness about upholding principles of justice and human kindness in the media, I thought: "Why would that be grounds for the prosecution to 'come after' anyone?"

26. Our attorney said that Ms. Penza viewed Marc's talk as a "recruitment for NXIVM." This was troubling and confusing to hear for several reasons:

27. First, it wasn't even clear to me if NXIVM still existed as an actual entity at that time, and thus "recruitment for NXIVM" certainly was not one of the aims of the talk.

28. Furthermore, Marc's talk was intended to be distinct from NXIVM. I recall that the talk he had practiced with me was about the perils of character assassination in modern society and its potential harmful impacts. I recall Marc's experience of character assassination while being part of NXIVM as one of many examples he discussed in his talk.

29. Our attorney, a former AUSA himself, explained the playbook for how easy it is for the government to make anyone appear to be criminal, particularly in RICO cases. In light of the threat I had understood the government to have tendered, I made the difficult decision to immediately sever ties with dozens of longtime friends, colleagues, and business partners who were part of the community that had formed around NXIVM. I also ceased helping my brother develop his talk. I made these decisions not because of knowledge of criminal activities or intent related to the talk, but because I feared the threat of malicious prosecution if I did not comply.

30. Within two weeks, I had left New York City and moved to my Midwestern hometown. On account of the government's threat, I had to completely rebuild my life, my social network, and my business. All the while, I still could not see what was wrongful about my brother posting a talk about the loss of human decency in public discourse and the negative effects of character assassination in society and in our justice system. I was very concerned about the Government's attempt to suppress free speech in this instance.

31. If anything, my experience with the Government's threat illustrated one of the very points my brother's talk was trying to make—prejudice against anyone who was part of the NXIVM community spurred the erosion of due process and the allowance of miscarriages of justice. Nonetheless, given the high-profile nature of this case and the degree to which I saw character assassination used as a prosecutorial tactic in the case, I chose to step away from my involvement in my brother's thwarted public education campaign altogether.

32. Now, almost four years later, I am sharing these occurrences at risk of instigating a similar retaliatory reaction from the Government.

33. Once I reestablished communications with many longtime friends who had been part of the NXIVM community, I learned that the experiences of intimidation I had with the Government was not an isolated case.

34. Having studied public policy and government in both my undergraduate and master's education and having long been committed to social justice, I felt it was my civic duty to share my experience so that these concerns could be evaluated alongside the testimony of others to ensure that due process was upheld.

35. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to

those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on June 15, 2022 at St. Louis, Missouri

Brian Elliot

State of Florida

County of Miami-Dade

This foregoing instrument was acknowledged before me by means of online notarization,

this 06/15/2022 by Brian Elliot.   Type of Identification Produced _PASSPORT.

Nathaly Fernandez

Online Notary

NATHALY FERNANDEZ
Notary Public - State of Florida
Commission # HH 185428
Expires on October 12, 2025

Notarized online using audio-video communication

# Declaration of Marc Elliot

1. My name is Marc Elliot and I currently reside in Tucson, AZ.
2. At the age of nine, I was diagnosed with a neurological disorder called Tourette's Syndrome due to incessant vocal and motor tics that interfered with every aspect of my life. It was estimated I ticced around 25 million times and every medical professional concluded my condition was uncontrollable and incurable.
3. I later completely overcame my Tourettes in 2013, drawing from innovations from courses in emotional intelligence (taught by NXIVM), using only mind over body, and sheer will. Over the last fifteen years my message of compassion, tolerance and overcoming adversity has reached all across the globe.
4. While suffering with Tourettes, I was introduced to courses on emotional intelligence called Executive Success Program (ESP), a course under the NXIVM umbrella. I found the courses to be profound, life changing, and moved me in such a way to be a better person that after two years of taking courses I decided to pursue becoming a trainer in ESP. Thus, from 2009 to 2017, I dedicated my life to be the best version of myself, to be more compassionate, more open, more principled and worked with other people to do the same in their own lives.
5. From 2012 to 2017, I also worked with NXIVM to help other individuals with severe Tourettes to overcome their symptoms and live a life free of this often debilitating disorder. In short, my life was dedicated to helping people.
6. In March of 2018, while at my house in Albany, NY with my brothers, Justin Elliot and Brian Elliot, FBI agents knocked on our door and told us that my brothers and I were being subpoenaed to a grand jury, and they informed us that Keith Raniere had been arrested. I remained silent, as I was in shock. Their tone and demeanor was accusatory, as if we were presumed to be part of something horrible and complicit in criminal activity.
7. I retained an attorney who explained to me that any misstep at the grand jury could lead to serious exposure and problems, and so I took the advice of my attorney and exercised my right to exercise the Fifth Amendment.
8. Our attorney informed the lead prosecutor, Assistant US Attorney Moira Kim Penza, that we would all do so. Our attorney relayed to us she was furious. He said he had never seen a prosecutor conduct herself in the way she did. He said in every circumstance like this, the government would not require his clients to attend the grand jury since it would be a waste of time and

resources. Instead, Ms. Penza insisted we show up, knowing full well we would plead the fifth in response to every question.

9.  I had printed out on a piece of paper the exact phrase I would say every time the prosecutor would ask me a question. The lawyers drilled it into us, that under no circumstances can we veer from that statement. Doing so could jeopardize our fifth amendment rights and again create unwanted exposure. Although I knew I hadn't done anything, I felt afraid.

10. At the grand jury, the situation felt very intense. My brothers and I waited in a small room, while one of us would go at a time in front of the grand jury. Even though I knew I would say that I plead the fifth every single time, I felt afraid that I might misspeak.

11. As I sat on the stand, Mrs. Penza's tone was tense. She asked me many questions about my life and my participation in NXIVM. She asked about my Tourettes, about my speaking career, and many other things that seemed completely unrelated to any criminal activity. Her line of questioning about my Tourretes suggested I might be making it all up.

12. At the end of the day, Ms. Penza got noticeably upset with our attorney, something he said has never seen in his whole career. She was upset that we invoked our Fifth Amendment rights and didn't answer any questions. Instead of leaving early, Ms. Penza prolonged the day and brought us in front of a judge where she continued her complaint about us.

13. I left that day scared and confused by what had just happened and Ms. Penza's intemperance, which seemed to be highly aberrant, according to my attorney, who himself had been an AUSA.

14. In the summer of 2019, on June 18, I published a Facebook post promoting a new speaking presentation I had planned, entitled, "Who's Next? The Rise of Character Assassination and Loss of Human Decency." (See attachment below). The subtitle read, "Inspired by Marc's journey of beating Tourette's syndrome with the help of NXIVM, a group misrepresented as a sex cult in the media." I launched this presentation in response to hateful blog posts against me on the Frank Report. The presentation was about my journey of overcoming Tourettes through ESP trainings, what I believed was the character assassination of NXIVM and the NXIVM community, by way of a false media narrative, and how to deal with this adversity through love. I intended to also talk about the teachings of non-violence notable figures such as Dr. Martin Luther King Jr. and other notable thinkers.

15. On June 19, 2019, the jury had delivered a guilty verdict. About a week later on June 24, 2019, my attorney asked to have a call with my brothers and me.

16. On the call, my attorney shared that Ms. Penza had called him to tell him that she took my marketing post about the presentation as a "personal attack on her integrity." She shared that if it were not for the First Amendment, she would have already arrested me. My attorney made it clear she shared if I proceeded with putting the presentation on, there would be a very high likelihood that I would be arrested. I was never told what charge I would have been indicted for.

17. I asked my lawyer if she knew, or if he had told her, that what I would be talking about revolved around my story of beating Tourettes. He had said he did mention that to her and that when he shared that she responded, "Sounds like recruitment to me." Thus, she could inaccurately allege that this talk was seen as recruitment for NXIVM, even though it was no longer in business, and I could be considered part of the vaguely defined racketeering enterprise in the criminal case, referred to as Mr. Raniere's "inner circle" of friends and colleagues..

18. I felt devastated and scared after the call with my attorney. I did not have the courage then to stand up against the threats and find out if the prosecutor was bluffing or not. I canceled the event, paused my speaking career and moved out of NYC.

19. Even though the trial had finished, the prosecutor's conduct made it clear to me she would go as far as pursuing an indictment against me, simply for publicizing my experience with NXIVM and Keith Raniere.

20. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on March 19, 2022 at Tucson, Arizona

*Marc Brandon Elliot*
_____
Marc Elliot

NOTARY PUBLIC
STATE OF TEXAS

Eric Brown
_____
ID NUMBER
132741318
COMMISSION EXPIRES
October 21, 2024

*Eric Brown*

ATTACHMENT



# Declaration of Prem Sahajo Haertel-Kozak

1.      My name is Prem Sahajo Haertel-Kozak.

2.      I currently reside in Berlin, Germany and I am 39 years old.

3.      I have a Bachelor's degree in European Politics and a Master's degree in Post-colonial Politics (focusing on Poststructuralist Philosophy). I have worked in Education, Counseling, Research, and Management.

4.      I participated in, and worked with various NXIVM companies over a 10-year period. I was also a member of DOS for two-and-a-half years.

5.      My overall experience with NXIVM and DOS, and their respective leaderships and participants, was positive, and I did not personally experience any abuse or ever witness anyone being abused.

6.      During my time in DOS, I personally knew and interacted with most of the former DOS members who now claimed to have had negative experiences during that time. I do not believe that any DOS members were the victims of a criminal offense, nor that anyone was coerced or abused.

7.      On June 30, 2017, Frank Parlato publicly posted my name, picture, and bio on a list of women he speculated might be "sex slaves" of Keith Raniere. I have never been a sex slave, nor have I ever, to my knowledge, met a sex slave. I believe sex slavery is a heinous crime.

8.      The Frank Report continued to make very serious and false accusations against the sorority and its members, including me. Because of this contorted and false media narrative, my membership and association with DOS, my private and personal choices,

and my lifestyle (both true and false) were being misrepresented, judged, and attacked in the public domain.

9. Over the next six months, I lost my work, my community, and many of my friends. Many of my friends and family were either trying to "save me" from something I did not participate in, or harass me and accuse me of doing something I did not do.

10. On October 17, 2017, The New York Times published an article about the sorority, DOS, making it an overnight international story, and inferring that every woman in DOS was either a victim or a perpetrator. I was neither.

11. Those who did not denounce Keith Raniere or DOS were followed and harassed by media, the public, and former friends. In the fall of 2017, the FBI began investigating DOS and its members in relation to charges of sex trafficking and forced labor.

12. I have never been a victim of, or witnessed, sex trafficking or forced labor of any kind, nor have I ever, to my knowledge, met a victim of these egregious crimes.

13. In the Spring of 2018, two FBI agents visited me at my residence in Clifton Park, NY, and told me they wanted to ask me some questions. They informed me that if I did not speak to them then, they would serve me with a subpoena. I was nervous and scared as I had never seen, let alone spoken to, FBI agents. I was a foreigner and guest in the USA, and I did not know what rights I had. I told them that I would not speak with them without an attorney present and they handed me a subpoena.

14. I hired an attorney whom I met once in person for about an hour to tell him about my experiences and answer whatever questions he had for me.

15. My attorney communicated with the Government concerning the Grand Jury Subpoena and then informed me of my legal rights and what options I had.

062

16. Ultimately, I decided to assert my Fifth Amendment privilege, not because I believed I had done anything wrong – I did not do anything wrong – but rather because it was clear that the Government was proceeding on the premise that any woman who was a member in DOS that either had recruited members or considered doing so was a potential co-conspirator and therefore could also be charged.

17. Because it was a RICO case, it was my understanding that anyone associated with either Keith Raniere or DOS could become a target in a federal investigation.

18. My attorney told me that the Government had agreed that any further contact with me would need to go through my attorney first. My lawyer then informed me that I would likely not need to speak to them or testify.

19. Leading up to the public trial of Keith Raniere, I had not been contacted by my attorney again and believed the matter to be settled as over a year had passed since receiving the initial subpoena and the trial was about to start.

20. On May 8, 2019, I decided to attend the second day of Keith Raniere's trial since it was open to members of the public, of which I am one.

21. At the end of that day, when the doors opened and I went to exit the courtroom with all the other attendees, an FBI agent, who I believe to have been FBI Special Agent Michael Lever, was waiting outside and immediately handed me a subpoena the moment I stepped out of the courtroom.

22. I felt reprimanded for no other reason than showing up that day.

23. The subpoena did not contain a date or time for when I was commanded to appear in court (see Attachment 1 below). It looked like it was hand-written in haste that day,

after spotting me at the trial because it had no specificity and, to my knowledge, they have not followed up on that subpoena to this very day, over three years later.

24.     I do not believe this subpoena was in good faith with the intent to call me as a trial witness, based on the last-minute timing of the subpoena and the fact that the Government was aware I did not wish to speak to them. I believe the subpoena was given to me *because* I was attending the trial, as an attempt to threaten and punish me.

25.     I wanted to attend as much of the trial as possible to show my support for my friend Mr. Raniere, and to see and hear for myself (firsthand) what evidence was being presented. However, after receiving the subpoena, I chose not to go back again because I was afraid of what additional punitive measures the Government might take. My attorney strongly advised me not to attend the trial further as I would only be, in his words, "poking the bear."

26.     In serving me this hastily drafted, undated subpoena, the Government succeeded in intimidating me and scaring me off from further attending this public trial.

27.     Before the trial, they had agreed that all further communication would go through my lawyer. I believe by publicly handing me this subpoena, in plain sight of everyone, including journalists leaving the courtroom, who would report on it, the prosecution sent a warning to other friends or fellow supporters who merely wanted to attend the trial, for fear that they too may be reprimanded and served a subpoena while they attended the proceedings. If just attending the trial was met this way, it also sent a message that anyone supportive of the defense should stay away from this case. They should not express any kind of support or help, whether they considered testifying or merely wanting to show solidarity.

28.     After I got the subpoena in front of everyone, I hurried away from the building, press, and many bystanders. Once I was far away enough and alone, I broke down and cried for a good 20 minutes before calling my lawyer. I was in shock. I felt bullied, intimidated, and punished by the FBI and prosecution, not for doing anything bad or wrong, but merely for showing up at the trial.

29.     I personally know of three other individuals who were further deterred from attending the trial based on what they heard had happened to me.

30.     I believe giving me the subpoena that day was an intimidation tactic because, to my knowledge, the prosecution has not to this day ever followed up on the un-dated subpoena they handed me three years ago when I left court that day.

31.     I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed on Jul 14, 2022, at Berlin, Germany.

_____
Prem Sahajo Haertel-Kozak

065

# Attachment 1

F. #2017R01840

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  18-CR-204 (NGG) (VMS) |
| Keith Raniere et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:  Prem Sahajo Haertel

YOU ARE COMMANDED to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Courtroom No.:  4D-South |
|---|---|
| U.S. District Court, Eastern District of New York 225 Cadman Plaza East, Brooklyn, NY  11201 | Date and Time: |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:



Date:  5/8/19

**DOUGLAS C. PALMER**
CLERK OF COURT

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  the United States of America _____ , who requests this subpoena, are:

Assistant U.S. Attorneys Moira Penza and Tanya Hajjar
U.S. Attorney's Office, Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201
Moira.Penza@usdoj.gov, Tanya.Hajjar@usdoj.gov
(718) 254-6454, -6109

7

# ALL-PURPOSE ACKNOWLEDGMENT

State/Commonwealth of ___VIRGINIA___ )
)
☐ City ☑ County of ___Henrico___ )

On ___06/14/2022___ before me, ___Dequan Winborne___,
_Date_ _Notary Name_

personally appeared ___Prem Sahajo Haertel-Kozak___
_Name(s) of Signer(s)_

☐ personally known to me **-- OR --**

☐ proved to me on the basis of the oath of _____ **-- OR --**
_Name of Credible Witness_

☑ proved to me on the basis of satisfactory evidence: ___passport___
_Type of ID Presented_

to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and by proper authority, and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which the individual(s) acted, executed the instrument for the purposes and consideration therein stated.

WITNESS my hand and official seal.

Electronic Notary Public

Notary Public Signature: _____

Notary Name: ___Dequan Winborne___

Notary Commission Number: ___7940580___

Notary Commission Expires: ___06/30/2025___

_Notarized online using audio-video communication_

Dequan Winborne

REGISTRATION NUMBER
7940580

COMMISSION EXPIRES
June 30, 2025

---

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: ___Declaration___

Document Date: ___06/14/2022___ Number of Pages (w/ certificate): ___8___

Signer(s) Other Than Named Above: ___N/A___

| Capacity(ies) Claimed by Signer(s) | Capacity(ies) Claimed by Signer(s) |
|---|---|
| Signer's Name: Prem Sahajo Haertel-Kozak | Signer's Name: N/A |
| ☐ Corporate Officer Title: N/A | ☐ Corporate Officer Title: N/A |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☑ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian of Conservator | ☐ Trustee ☐ Guardian of Conservator |
| ☐ Other: N/A | ☐ Other: N/A |
| Signer Is Representing: Herself | Signer Is Representing: N/A |

( 8 )

## <u>Declaration of Brandon B. Porter</u>

1. My name is Brandon B. Porter. I am a resident of the State of Iowa. I am 48 years old.

2. I am trained and educated as a physician and scientist. In 2006, I earned an M.D. and a Ph.D.

3. I trained in Internal Medicine in the state of Iowa until 2009 and then started practice as a hospitalist physician in Albany, NY.

4. From 2001 until 2018, I participated in Executive Success Programs (ESP) and NXIVM education programs.

5. I met with a criminal defense attorney in January of 2018. My attorney contacted the investigating federal prosecutors in the Eastern District of New York, and he was told that I was not a target of their criminal investigation regarding Keith Raniere.

6. My attorney told the prosecutors to contact him if anything were to come up.

7. However, on April 17, 2019, FBI agents came to my home in Waterford, NY, to personally serve a criminal subpoena in the matter of USA vs. Keith Raniere on me. They did this despite knowing that I was represented by counsel. The FBI agents misrepresented the contents of the subpoena and tried to interview me without my counsel being present.

8. My children were scared that I was going to be arrested.

9. The government's subpoena demanded medical records from 2007 for a patient who lived in New York. I wasn't practicing medicine in New York in 2007. Since this is information that is public or readily available, the prosecutors either knew or should have known this.

10. The subpoena demanded for records related to Camila, the person who the government claimed was the victim of child pornography at the hands of Keith Raniere.

11. While experts later proved the evidence supporting the child pornography claims were false and due to FBI corruption of the photograph files, at the time, I took the government subpoena to threaten to irrevocably connect me with a potential victim of child pornography if I decided to testify for Keith Raniere.

12. My counsel tried to contact the lead prosecutor, Assistant US Attorney Moira Kim Penza, to ask about the subpoena. He never received a response.

13. Since Mr. Raniere's trial was set for May 7, 2019, less than three weeks away. I interpreted this hand-delivered subpoena by FBI agents as an intimidation tactic to get me to not be involved in the trial.

14. I made this conclusion for the following reasons: a) despite being represented by counsel, the prosecutors had armed FBI agents personally serve a subpoena, b) the subpoena was for information that the prosecutors knew, or should have known, that I was unlikely to have, c) the prosecutors never replied to my lawyer's inquiry into the subpoena, and d) the subpoena was delivered just three weeks before the trial.

15. During Keith Raniere's trial, I heard a story about a friend and former DOS participant, Sahajo Haertel-Kozak, who attended one day of the trial and was hastily given a false subpoena from a Federal prosecutor.

16. Also, near the end of Keith Raniere's trial, another friend, Marc Elliot, was threatened with indictment through his lawyer, by Assistant US Attorney Moira Kim Penza, if he gave a planned public speech about character assassination and how people attacked him and NXIVM and how to overcome differences with love. He did not perform the speech

and wouldn't even share with me the speech he was planning to make out of fear of retribution by the Assistant US Attorney.

17. These friends of mine were performing constitutionally protected acts and had committed no crimes. It was chilling to me to experience this type of intimidation from a group of people who's roles were to seek the truth of the matter, as opposed to seeking to scare their "opposition" into silence.

18. I understood that, in a RICO case, simple association with a government target could turn into my being indicted. The aforementioned intimidating actions led me to believe, and fear, that these federal prosecutors and FBI agents were willing to suppress information that contradicted their false narratives about NXIVM, DOS, and Keith Raniere.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except as to those matters stated upon information and belief. As to those matters, I believe them to be true.

Executed June 14, 2022

Brandon B. Porter



ERIKA BIBIAN
Commission Number 832590
My Commission Expires
6 15 24