UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA,         Case No. 1:18-cr-00204-NGG-VMS

       - v. -               MEMORANDUM OF LAW IN REPLY
                           TO THE GOVERNMENT'S OPPOSITION
                           TO THE DEFENDANT'S REQUEST FOR
KEITH RANIERE,                   A NEW TRIAL
                 Defendant.
-----------------------------------------------------x

## PRELIMINARY STATEMENT

On behalf of Keith Raniere, we respectfully submit this letter in reply to the government's memorandum in response to Mr. Raniere's Rule 33 motion for a new trial. *See*, Gov. Opp., ECF Nos. 1198, 1213.

Seven Defense experts, including four former FBI CART examiners, have concluded that key evidence - a camera's memory card and hard drive - was extensively doctored, and that government personnel were involved in this fraud. Joint Expert Declaration, Attached as Exhibit A, ECF No. 1225-1. The government knowingly used the doctored evidence to secure a conviction. In response, the government contends that (1) the evidence is not doctored, based on a report by their expert Loveall, (2) there is "overwhelming" evidence of guilt apart from the disputed digital evidence, and (3) the Defense has not introduced any "newly discovered evidence," a threshold requirement for a Rule 33 motion. ECF No. 1213. We refute these points below and demonstrate that an evidentiary hearing is necessary to fairly and conclusively address these issues.

True to past form, in its opposition to Mr. Raniere's Rule 33 Motion for a New Trial, the government first calls attention to the fact that this is "Raniere's third attempt to obtain a new trial." ECF No. 1213 at 2. They do so in an attempt to minimize, discredit, and dismiss the

serious and credible allegations contained in Mr. Raniere's current Rule 33 motion. Although the first two Rule 33 motions were denied, this motion is not "entirely without merit," as the government claims. Quite the opposite, as seven prominent experts in the field of computer forensics, four of whom are former FBI forensic examiners, have unanimously concluded that the alleged child pornography evidence "at the heart" of the government's case was *extensively* falsified. The photos were planted, and timestamps were manipulated to give the appearance that the subject was fifteen years old. ECF No. 1225-1. Further, the prosecution admitted that key evidence was altered while in their custody. ECF No. 1213 at 11, n.6.

These experts are not hired guns, and their sworn affidavits are not included as a last-ditch attempt to obtain a new trial. To the contrary, their affidavits are the result of months spent forensically analyzing the digital evidence in question. Such an opportunity was impossible for trial counsel and his expert to do on the eve of trial, in the middle of trial, and, most especially, during the trial's last three days of evidence of a six-and-a-half-week trial. Even now, crucial pieces of discoverable material continue to be withheld from defense experts, though the government readily provided these materials to its own post-trial expert for its opposition.

The present assertions constitute 1) newly discovered evidence after trial; 2) obtained by exercising due diligence; 3) which is material; 4) not cumulative; and 5) certainly would have resulted in an acquittal on some, if not all, of the counts of which Mr. Raniere was convicted. Fed. R. Crim. P. 33(a); *United States v. Forbes*, 790 F. 3d 403 (2d. Cir. 2015); *United States v. Owen*, 500 F. 3d 83 (2d. Cir. 2007). As set forth below, the Defense has demonstrated that the allegations contained in the expert declarations were not "known to the defendant prior to trial, but became newly available after trial." *Owen*, 500 F.3d at 89. In addition, the government provided newly disclosed evidence in their opposition and their expert agrees that evidence was

altered while in their possession. ECF No. 1213-3 at ¶ 10. This warrants dismissal or, at the very least, a new trial. As to the other expert technical findings, the experts' disagreements regarding the import of the anomalies contained in the digital evidence create issues of fact that must be resolved at a hearing.

In addition, as these anomalies go to the heart of the charges against Mr. Raniere, when it is proven during a hearing that these anomalies are the result of government tampering, it will not only erode trust in the jury's verdicts against Mr. Raniere, but it will also raise serious and fundamental questions about the FBI's role in his prosecution. Indeed, the government cannot possibly claim there was "overwhelming evidence of guilt" if the memory card and hard drive used against Mr. Raniere were falsified. These devices contained the photos and the metadata needed to argue illegality; without them, the child pornography charges are rendered baseless. Further, the government's involvement in, and concealment of, the malfeasance is at issue, casting doubt on the integrity of their prosecution. As such, at the very least, an evidentiary hearing is necessary and must be ordered.

## ARGUMENT AND APPLICABLE LAW – RULE 33

**A.     The Evidence Is "Newly Discovered," and the Government Prevented Its Earlier Discovery.**

The government claims that the sworn expert findings, which contain detailed scientific analyses of the forensic evidence produced at trial, cannot constitute "newly discovered evidence" under Rule 33. ECF No. 1213, Page 2. It claims that, because a defense expert had the opportunity to examine some of these materials – relating solely to the hard drive, not the camera's memory card – before trial at the office of the FBI's Computer Analysis Response Team (Hereafter "CART"), and because trial counsel elected to cross-examine the government's

expert during trial, the previously undiscovered evidence of malfeasance and tampering does not qualify as "newly discovered," rendering the instant motion as "untimely." ECF No. 1213, Page 3. The government is wrong. Further, the government ignores the newly disclosed evidence *they* provided in their opposition about their involvement in altering the original, unpreserved digital evidence – a critical fact they withheld until more than four years after trial.

The digital evidence at issue related only to the charges added in the second superseding indictment. Prior to that filing, trial counsel had no reason to have it forensically analyzed. However, when the government filed its second superseding indictment, trial counsel asked for severance of the new charges contained therein so that he could have the relevant digital evidence forensically analyzed. The Court denied his request.

From that point forward, trial counsel repeatedly tried to gain access to the crucial evidentiary items and corresponding forensic reports, but the government either consistently delayed or emphatically denied his access. For instance, the government only disclosed the chain of custody for the camera and CF card – which revealed mishandling of the items by agents including SA Rees and false testimony by SA Mills – only *after* these agents had testified. In doing so, the government prevented the Defense from cross-examining these agents on these material points. The government's late and partial disclosure resulted in trial counsel's inability to adequately investigate and uncover the assertions being made now. A brief timeline related to the disclosure of the items that the experts analyzed is instructive.

**<u>Relevant Time Periods:</u>**

The evidence at issue, which was painstakingly analyzed for months by defense experts post-conviction, consists of materials produced by the government from the Western Digital Hard Disc Drive (WD HDD) (1B16) and the camera's memory card (1B15a) – a compact flash

card (CF card) – both of which were recovered on March 27, 2018, from 8 Hale Drive. On October 5, 2018, the government disclosed a forensic copy of the WD HDD only. A forensic copy of the CF card has never been disclosed and remains undisclosed to this day despite repeated requests by the Defense, and past promises and assertions of full disclosure by the prosecution. On February 21, 2019, the government alleged that it accidentally discovered contraband photos on the WD HDD, and trial counsel was instructed to return his copy, which he did.

On March 13, 2019, twenty-six days before the start of jury selection, the government brought a second superseding indictment, based on the alleged contraband photos.

On March 15, 2019, trial counsel was permitted to inspect the WD HDD at the location of the FBI's CART. Despite submitting the camera and memory card for CART analysis on February 22, 2019, the government still had not mentioned the memory card, disclosed its relevance, provided a copy, or offered an inspection. DX 945.

On March 18, 2019, trial counsel filed a motion to sever the new charges contained in the second superseding indictment stating, "[A] responsible and appropriate defense to these four-day-old charges involves the retention of a computer forensic expert to review the metadata and determine certain essential facts concerning this fourteen-year-old electronic evidence. This may not be done in twenty-six days." ECF No. 436 (emphasis added). On that same day, during a conference with the Court, in support of his motion to sever, trial counsel further highlighted the necessity to sever the counts in order to receive a fair trial, stating:

> "[T]he four defense lawyers representing Mr. Raniere went to the FBI on Friday which is the only place we can look at these documents because it's contraband. I've spoken to a computer forensic expert on Friday after I saw the images and I said we have a trial date on April 8th, can you do the forensic analysis……and he said, 'I don't know that I can.' He says, 'I don't

know that I've ever had to do this kind of computer forensic analysis in less than three weeks' time." Status Conference, March 18, 2019, Pages 8-9.

Raniere's trial counsel elaborated, "Your Honor at the end of the day is not going to sever the racketeering acts and we don't think you're going to move the trial because Raniere has been such a loud, squeaky wheel about it, but it's an impossible position to put us in." Later, trial counsel stated, "We are ready to try this case with a jury coming in here April 8th but we don't think we can be in a position to try the brand new charges that are now five days old." *Id*, at Page 7. The motion to sever was denied and the trial date remained. The government had still not disclosed any relevance of the camera's memory card.

Later, the government re-produced the WD HDD drive without the alleged contraband photos and provided it to the defense. However, upon inspection, the alleged contraband images were still contained on the device, albeit in another form. As such, defense counsel alerted the government to their error, and once again returned the device.

On April 6, 2019, the government finally provided a copy of the WD HDD, not containing any of the alleged contraband photos in any form. Despite promising to "produce everything," the government had yet to mention the camera's memory card or its relevance to the child pornography charges. (*Id.* at 13:12-16.)

On April 22, 2019, jury selection began. During jury selection, trial counsel diligently informed the Court, "[W]e have repeatedly asked the government to provide reports concerning the search of the backup hard drive from which the child pornography was allegedly recovered. As of the date of this motion, the government has not provided us with any such reports. In fact, when asked recently when we are going to get these reports, the prosecution stated that the reports were not completed but that the government would make the reports available when the

FBI completed them." ECF No. 577, Paragraph 4. (Emphasis added). Still at this point, the government had not disclosed the relevance of the memory card, any reports, or a copy.

On April 24, 2019, on the third day of jury selection, the government disclosed the FTK report for the metadata on the WD HDD as well as an FTK report for a "Lexar card." The FTK report for the "Lexar card" was Flatley's April 11, 2019, FTK report for the CF card, an indirect notification of its relevance. Yet no forensic copy was provided, nor offered for inspection.

It was not until April 29, 2019, that the government disclosed the FTK report for the WD HDD, which included not just the metadata for the 22 alleged contraband photos, but an additional 146 photos. The government relied on the entire range of photos to argue the timeframe of the 22.

On June 7, 2019, a month into the trial, case agent Michael Lever requested, against FBI protocol, for a second forensic examiner, Booth, to reexamine the CF card, due to Flatley being suddenly assigned to Ghana, Africa. Notably, in a previous trial, in 2016, Flatley had testified that metadata "can be modified at later dates," *United States v. Hirst*, 15-cr-643 (PKC) (S.D.N.Y. Apr. 18, 2022, at Trial Transcript hereafter, "Trial Tr.," at p. 935:24-936:9, that the FBI does <u>not</u> rely on metadata in determining when a file is created. *Id*. at p. 939:15-18, 951:9-13, that the FBI would require "some kind of corroborating evidence" to determine the creation date of a particular computer file, *Id*. at p.940:9-23, and that without other corroborative evidence, one cannot determine the creation date of a computer file based on metadata alone. *Id*. at p. 952:4-7). Damningly, Flatley's previous testimony was in direct opposition to the government's trial narrative. CF Raniere, supra, 18-cr-204-1 (NGG) (VMS) Trial Tr. at p. 5572.

On June 12, 2019, *on the third to last day of evidence*, the government provided trial counsel with a second FTK report for the CF card. This was Booth's June 11, 2019, FTK report,

which was fundamentally different, containing 37 additional files not present on Flatley's April 11, 2019, FTK report. The government misleadingly labeled this as a "Replacement" report. However, this was not simply a new report of existing evidence, but a new report of new evidence a *different* forensic copy of the CF card, which the government did not disclose or notify the Defense that it existed. Only after a review by Dr. Kiper was it revealed that this FBI report was a separate and distinct copy. This was a *de facto* violation of Fed. R. Crim P. 16(a)(1)(E), as it prevented the Defense from requesting an inspection. This second forensic copy was a fundamentally distinct piece of scientific evidence as it captured the contents of the CF card at a different point in time, six weeks into trial, whereas the first copy was created before trial. Further obfuscating the existence of the second copy, Booth misleadingly testified that in the FBI, they create only one "master copy" from the original evidence and then "don't touch it after that," and all subsequent copies for analysis are derived from the "master." Trial T. 4783:13-4784:1. This contradicted the fact that he himself had created a second copy from the original the day before.

On July 21, 2023, more than four years after trial, the government disclosed, *for the first time,* new evidence that a previously unknown "photograph technician" was the person who destroyed crucial metadata on the CF card by accessing it without a write-blocker. In its opposition motion, the government posited, "[H]aving no reason to believe that the metadata … of the camera card had any evidentiary value, … a photo technician cop[ied] the photographs from the camera in order to provide the photographs more expeditiously to defense counsel." ECF No. 1213 at 11, n.6. On January 9, 2024, the government revealed that this technician, who was omitted from the chain of custody and who accessed the original evidence, was a "Federal Bureau of Investigation" employee. ECF No. 1231 at 1.

**Argument:**

Rule 33 provides that, where a motion is based on 'newly discovered evidence,' such evidence which "was known by the defendant prior to trial but only became available after trial, does not qualify as new evidence that may provide the basis for a Rule 33 motion." *United States v. Owen*, 500 F.3d 83, 89-90 (2d. Cir. 2007). The reasoning for this is clear; there are surely unlimited potential experts who are willing to opine on various subjects to further an attempt to gain a new trial. However, those circumstances are inapposite to this case.

First, the government, on July 21, 2023, conceded that someone altered the memory card in FBI custody. ECF No. 1213 at 11, n.6.; Loveall Report, Doc. 1213-3 at ¶ 10. While the WD HDD and the CF card existed prior to trial, the hallmarks of the fraudulent tampering done to them were <u>not</u> detectable at the time, especially since most of the evidence of CF card tampering stems from the second copy of the CF card, which did not exist until the third-to-last day of trial evidence. Further, discovery necessary to detect the tampering was not disclosed to the defense until late in the trial process – after trial counsel had been denied a de facto continuance to properly forensically analyze other, previously disclosed digital evidence. The anomalies on the devices – the proof of the manual manipulation – took top forensic experts months to detect through painstaking analysis and testing and, thus, were impossible to detect before or during trial, especially given that the government never disclosed the copies of the CF card to trial counsel, or even that a second copy existed. *See*, ECF 1169-1. Even if the Defense had suspected misconduct, they were barred by Court order from investigating or discussing it at trial, as per the government's request: "Raniere is prohibited from presenting evidence or arguments concerning … alleged government misconduct in the course of this prosecution." (ECF No. 622 at 40.) The government highlights that the Second Circuit has cautioned that Rule

33 authority should only be used in "the most extraordinary circumstances." ECF 1213, Page 8, quoting *United States v. Ferguson*, 246 F. 3d 129 (2d Cir. 2001). This case is one of those circumstances.

Here, a retired FBI Special Agent, respected whistleblower, and prominent forensic examiner, has opined that "multiple, intentional alterations [to the WD HDD and CF card] constitute evidence of tampering" and that evidence was altered in the custody of the FBI. ECF No. 1192, Exhibit A. His conclusions have been independently corroborated by six other forensics experts, including three former FBI examiners. Most importantly, the government's late production of crucial pieces of digital evidence, which can take weeks and months – *not days* – to analyze, prevented trial counsel from being able to timely discover the tampering and manipulation of the digital evidence in this case. Indeed, their continued failure to provide a forensic copy of the CF card continues to prevent the Defense from fully discovering the extent of the tampering present here.

While it is true that "Rule 33 does not allow for a new trial based on evidence that could have been discovered before trial," the circumstances of this case highlight the impossibility of the Defense being able to previously discover such evidence. *See*, *United States v. Bout*, 144 F. Supp. 3d 477 (S.D.N.Y. 2015). This, too, is subject to an evidentiary hearing. The government failed to disclose crucial pieces of the relevant digital evidence until less than four weeks before the start of jury selection and, even so, those items were only available to be inspected at specific locations. In addition, reports detailing the government's relevant examination of such material were not completed, and thus not disclosed to the Defense, until the tail end of the government's case-in-chief. Thus, while in the abstract this material may have been theoretically "available," in practicality, it was not. Moreover, other crucial pieces of discovery, as detailed in the Defense's

motion to compel post-judgment material and exculpatory discovery, have still never been provided. As such, it is unquestionable that the ability to analyze and discover the discrepancies within the material was impossible to do before, or during, the trial.

Therefore, for many reasons, the government's reliance on *Massaro v. United States*, No. 97 CIV. 2971 (MGC), 1998 WL 241625, at *2(S.D.N.Y. May 12, 1998), is sorely misplaced. First, in *Massaro*, the Defense's motion for a new trial was denied by the Court because the post-trial examination performed on a bullet was not newly discovered evidence, as the defendant was offered a continuance prior to trial specifically to examine the bullet, which he declined. Here, no such continuance was offered. More importantly, a de facto continuance <u>was</u> requested here. Trial counsel implored the Court to sever the charges contained in the superseding indictment because he would not have enough time to have the digital evidence that pertained to the new charges examined before trial. ECF No. 46; Status Conference, March 18, 2019, Pages 7-9. Indeed, as the government concedes, up until this time, neither the government nor trial counsel had "any reason to believe" this digital evidence had "any evidentiary value." ECF No. 1213 at 11, n.6. Nonetheless, trial counsel's request was denied.

Second, and most importantly, the attempt to equate a bullet with digital evidence and, more specifically - metadata, is preposterous. A bullet may be examined in hours. The amount of time needed to examine the digital evidence in this case was far different, as digital evidence is orders of magnitude more complicated than a bullet. Indeed, there are a limited number of standardized tests and procedures regarding examination of physical evidence, such as a bullet. While ballistics comparisons, latent print examinations, and trace evidence may all be performed on bullet shells and casings, testing the relevant digital evidence here before or during trial was impossible given the government's late disclosure of some relevant items and continuing refusal

to disclose other relevant items. Dr. Kiper himself spent 404.5 hours examining these materials before drafting his findings. *See*, Supplemental Kiper Declaration, Attached as Exhibit B. This is because detecting digital fraud is complex, requiring sifting through billions of data attributes to uncover anomalies and then testing to rule out plausible explanations. Here, trial counsel was given less than two months to hire an expert to examine the WD HDD, once a redacted copy was finally given. In addition, he was given crucial reports in the eleventh hour of trial and *was never given access to the CF card*. This cannot correlate to the opportunity to examine a bullet that was given to the Defense in *Massaro*.

Third, in *Massaro*, the Defense was given the opportunity to access the bullet before the trial began. Here, the government withheld, *and continues to withhold*, the majority of the evidence contained within the CF card copies. It only disclosed the FTK report for Booth's second forensic copy during the last few days of trial. Indeed, the government admits these items were altered, as the government now concedes that the CF card was "unintentionally" accessed without a write blocker, and that "having no reason to believe that the metadata of the contents of the [CF] card had any evidentiary value, law enforcement agents directed that a photograph technician copy the photographs from the camera card in order to provide the photographs more expeditiously to defense counsel." ECF No. 1213, Page 11, n.6. Setting aside the incredulity of this claim, these are unique and unprecedented circumstances, as a crucial piece of evidence was improperly accessed, and one of the forensic copies created from the CF card – which was radically different than the previously disclosed version and created in violation of FBI Digital Evidence Policy Guide, Section 3.3.11.2 – was not provided to the Defense until the end of the government's case. Circumstances such as this cannot credibly be compared with one where the

government offered the Defense the opportunity to physically inspect a bullet before the commencement of a trial, and the Defense chose not to do so.

Essentially, the government is arguing that the revelation that uncovered exculpatory information that was meticulously hidden *by government witnesses* within the metadata of the disclosed devices and their forensic reports, is not newly discovered. They are wrong. Rule 33 allows "broad discretion upon a trial court…to order a new trial," should the Defense show that "evidence was discovered after trial" and "that the evidence could not with due diligence have been discovered before or during the trial." *Bout*, 144 F. Supp. 3d 477 (S.D.N.Y. 2015). Here, the government's own conduct is itself responsible for the fraud, and fraud, by its nature is clandestine and purposely hidden from easy detection. This is exponentially true when dealing with digital fraud. The expert reports here are based on digital evidence and metadata that was newly discovered per *Bout*, as it plainly could not have been discovered by trial counsel within the imposed time. It took Dr. Kiper, a top digital forensic expert, over four hundred hours in reviewing the devices to conclude that the evidence was manipulated. Not satisfied, an additional six experts were hired to review Kiper's conclusions. They, in turn, verified and augmented his findings. These discoveries could only have been revealed at this time, after countless hours of review by trained forensic experts, and thus, are "new." Moreover, the core claim of intentional tampering with the memory card and government complicity by Defense experts was contingent upon materials all disclosed during the last three days of trial evidence, six weeks into the trial; reaching this conclusion alone required over 200 hours. *See,* Kiper Declaration, Attached as Exhibit B.  As such, the Defense's Rule 33 motion is properly based on "newly discovered evidence."

In addition, as stated above, in its opposition memo on July 21, 2023, the government disclosed for the first time that an unnamed FBI "photograph technician" accessed the camera card, altering crucial metadata before trial, and, that they were aware of this mishandling of critical evidence, and yet, withheld this information until four years after the trial. ECF No. 1213 at 11, n.6. Further, this FBI "photo technician" was not listed on the chain of custody and, thus, their access was undocumented. This newly disclosed admission, innocuously buried in a footnote, reveals several material procedural violations, and strongly supports, if not outright proves, that crucial evidence was covertly handled and intentionally manipulated while in the possession of the government. Four former FBI examiners have all unanimously concluded that this misconduct is unprecedented in their 55 years of combined service to the FBI and that there is no legitimate purpose for such actions. *See* ECF No. 1235-1. By virtue of making this disclosure on July 21, 2023, in its opposition, the government itself fatally destroys its own argument against this evidence being newly discovered. The government added to this new evidence by identifying the "photo technician" as an unnamed FBI employee. ECF No. 1231 at 1. These new revelations are material, as they establish that multiple FBI agents targeted this evidence, committed intentional misconduct that risked their termination, and the original evidence was manipulated while in government custody, such that crucial data was destroyed forever. ECF No. 1235-1. As such, the camera and its memory card should never have been admitted at trial. Furthermore, because the government withheld the existence and identity of the FBI "photo technician" and lead case agent SA Lever's involvement, Mr. Raniere was denied his Sixth Amendment right to fully confront these crucial witnesses at trial.

To this same point, a forensic copy of the CF card has never been disclosed to the Defense, despite repeated requests, including in the Defense's motion-to-compel, which the

government failed to address, and despite the government making this evidence available to their expert for their opposition. Because the Defense is entitled to disclosure of this evidence, as discussed below, it is axiomatic that when it is received, it will be "newly discovered" evidence. This plain fact, independent of any other, also proves fatal to any government argument against evidence being newly discovered.

Lastly, the government's accidental discovery claim is not credible and must be subject to an evidentiary hearing. Three years after the trial, and while this Rule 33 was pending, "The Vow," a documentary, aired on HBO, and included and interview with former lead prosecutor Moira Penza. In it, she stated, of the alleged child pornography evidence, "Once we knew about the picture taking, picture keeping, it was a matter of finding those. And when I mean, that is game-changing evidence." The Vow, S2, Ep. 6, 15:20-15:38 (HBO 2022). This interview plainly contradicts the government's current position, which is that the photos were accidentally discovered. Instead, Penza's statement suggests a targeted search for the photos had been underway, and it contradicts SA Lever's sworn affidavit to the Court in which he states that the discovery of these photos was accidental. *See*, Second Lever Aff. Most importantly, this revelation lends further support to the Defense expert reports which demonstrate that this electronic evidence was tampered with.


**B.  The Evidence is Material And Certainly Would Have Resulted In An Acquittal On Some, If Not All, Of The Counts Of Which Mr. Raniere Was Convicted.**

Generally, Rule 33 relief is warranted only if the defendant demonstrates that "the evidence is so material and non-cumulative and that its admission 'would probably lead to an acquittal.'" *U.S. v. Spinelli,* 97 CR 209, *7 (E.D.N.Y. October 30, 2007). However, as this Court

has recognized, "[T]he standard differs when the government has failed to disclose evidence favorable to the defense." *Id*. Constitutional error occurs "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The evidence in question, when put in context of the overall prosecution, is crucial. Eleven months after a search and seizure at 8 Hale, FBI agents reportedly accidentally discovered 22 photos of alleged child pornography on a hard drive, linked to a specific Canon camera and memory card also seized from 8 Hale. *See*, Second Lever Aff. This turned a case about disputed conduct of adults into one now involving an alleged minor, with charges of possession and production of child pornography. *See*, Second Superseding Indictment, ECF No. 430.

These new charges depended on the determination of the age of the subject in the photos. The subject did not testify, and her age, not immediately apparent from the photos, was inferred from metadata—timestamps and folder names—purportedly dating the photos to 2005, making the subject fifteen. This metadata and the camera's memory card linked the photos to the seized Canon camera, which was alleged to have been used by Mr. Raniere. The validity of these charges against Mr. Raniere depended on the hard drive, camera, and its memory card. Without the competency of this digital evidence, these critical charges could not stand.

Again, to be clear, the Defense does not allege, as the Court stated, that "the photos are fabricated." ECF No. 1224. We are not disputing the existence or the content of the photos themselves. It was the photo's alleged 2005 timing, not the subject's immediate visual appearance, which is at issue. The experts' findings reveal that the tamperer(s) manipulated the

digital evidence—files, timestamps, folders, and metadata—on the memory card and hard drive. The goal was to falsely "simulate a 2005 timeframe," making it appear that 2005 is when the photos were taken, and by that particular Canon camera linked to Mr. Raniere, and saved to that hard drive. Exhibit A, ECF No. 1225-1 at ¶ 2, 3.

There is no question that evidence that tends to show that the images were altered is material. The government's entire theory as to these counts hinged on the jury believing that the images were taken using the seized Canon camera, which the government argued was the same camera that Lauren Salzman and Daniela testified Mr. Raniere used in 2005, though neither witness was asked to identify the seized camera. The government needed the jury to credit its argument that the forensic evidence was consistent with the purported dates on which Mr. Raniere photographed other women, Lauren Salzman and Daniela, to create a timeline from which the jury could infer that Mr. Raniere also took the alleged contraband photographs of Camila during the time that the subject would have been underage. The government represented to the Court that the metadata of the photographic images in the eleven folders within the WD HDD, including the folder that purportedly contained child pornography, was critical evidence for the child exploitation charges. Trial Transcript at Page 4799, Lines 20-23. The government also informed the Court that the photographs' metadata was of "significant importance in the case," as such metadata "goes to the timing and receipt of the photographs and when they were created." Id. at Page 4800, Page 24.

Here, at the very least, the newly discovered evidence would have resulted in an acquittal on the child exploitation and possession of child pornography charges. First, neither the electronic devices nor the files that formed the evidentiary basis for these charges are competent evidence. Nonetheless, moving past that, the government's evidence as to those charges was

scant. Camila did not testify, and therefore, the government had no direct evidence that Mr. Raniere took lascivious photographs of her in 2005 when she was 15 years old. The only evidence to support this charge was weak: images of Camila found in a backup folder on a hard drive that was used to allegedly back up files from at least three different computers in a location where countless people had access.

Had the jury learned that the FBI agents, other government personnel, or someone working alongside them had manually added photographs onto the WD HDD and the CF card to make both devices corroborate the government's narrative regarding the contraband photographs and that the dates of photographs and folder names that the government relied upon as proof had been manipulated, it would have viewed the forensic evidence in an entirely different light. Indeed, the jury would have questioned whether the prosecution's contention that the photographs were taken in 2005 was accurate. Likewise, there would be no reason to forge folder names to make them seem like they were autogenerated in 2005. Such reasonable doubt would have resulted in the acquittal of Mr. Raniere of the most heinous charges of child exploitation and possession of child pornography.

More importantly, the two witnesses who corroborated the identity of the person in the photos as Camila are less than credible. First, Camila did not testify, and the government relied on others to identify her identity and age in the photos, which were not shown to the witnesses and did not show Camila's face. One of those witnesses, Daniela, committed perjury at the trial by knowingly lying about her intention, plan, and role in bringing a civil lawsuit against Raniere and others for monetary damages. Indeed, on January 28, 2020, seven months after the guilty verdict in this case, Daniella, among many other plaintiffs, filed a civil suit against Raniere seeking monetary damages. *See, Mark Vicente v. Keith Raniere,* 20-cv-485 (EK-SMG)

(E.D.N.Y. Jan. 28, 2020). Daniela was under oath and knowingly gave false testimony on a matter related to her bias toward the defendant, namely whether she was planning to sue him. She testified that she was not planning on bringing civil lawsuits, yet she was front and center in the lawsuit filed just seven months after the verdict. The same lawyer who represented Daniela during at least ten meetings with the government and during all five days of her testimony, was the attorney representing the Plaintiffs. This is clearly intentional false testimony. The other witness who identified Camila in the photos, SA Michael Weniger, had never met her. Trial T. 5163:19-23.

In addition, Camila's post-trial affidavit, attached as an exhibit to the government's reply brief, is similarly incredible. Camila's untested affidavit should not be credited by this Court, particularly when she chose not to testify and be subjected to cross-examination. The Confrontation Clause and the cases that construe it hold that "[c]ross examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308. 316. 94 S. Ct. 1105 (1974). The Supreme Court has held that "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Id* at 316-317 (*citing Green v. McElroy*, 360 U.S. 474, 496, 76 S. Ct. 1400, 1413 (1959).). Here, Mr. Raniere had no such opportunity to cross-examine Camila. Notably, Camila also joined the lawsuit against Mr. Raniere. Finally, Camila's position has shifted from her pre-trial stance. In pre-trial letters to Mr. Raniere, previously submitted to the Court, a 28-year-old Camila expressed her belief in Mr. Raniere's innocence. She also admitted that she was struggling emotionally and financially." In this light, the $507,997.45 that was awarded to her in restitution, and the $249,200.00 awarded to her sister Daniela, may give

context for her change in position. Restitution Hearing Transcript, Page 38, Lines 24-25; Page 40, Lines 6-10.

Camila's post-trial declaration also contains critical inconsistencies. In it, Camila claims there was only one single photo session in 2005, "no more than 2-3 months after September 18, 2005." Camila Post-Trial Decl., Doc. 1213-1 at ¶ 8. She claimed certainty of the timing because "it was the only time he took photographs of me like that." *Id*. at ¶ 10 Yet, her sentencing statement contradicts this, as she alleged multiple photo sessions at age 15. Sentencing Hearing Transcript, Page 21 Lines 7-13. The hard drive shows photos allegedly taken in two sessions, November 2 and 24, 2005, further conflicting with her post-trial declaration. Additionally, an email from Daniela on November 2, 2005, notes construction being done at 8 Hale, in which she states that "They are doing some work at Hale and have everything covered in plastic for a couple of days now." Government Exhibit 609. This contradicts the photo metadata on the hard drive, which indicates photos were taken that day at 8 Hale. It also contradicts the name of the folder containing these photos, "2005-11-02-0440-20", which suggests the photos were downloaded to a Dell computer, which allegedly existed and was located at 8 Hale, on the same day. Kiper Report, Doc. 1178-2 at Bates 008-009; Trial Transcript at Page 2569 Line 19, Page 2571, Line 24. This supports that those alleged contraband photos' timestamps and their folder names on the hard drive were fabricated.

This Court previously described the government's corroborating evidence as "substantial" and "significant." Decision, Page 4 at ¶ 2, Page 7 at ¶ 1, Page 9 at ¶ 2. The Court asserted that this evidence showed Mr. Raniere took nude photos of Camila when she was fifteen. Id. However, as discussed, a detailed examination of the evidence disproves this conclusion. For instance, the government refers to a vague alleged text message from when

Camila was 24, referencing "pictures" from "way back," though the alleged text contains no specifics about when or what pictures. ECF No. 1213 at 19. Claiming that this is evidence of child pornography taken in 2005 is unfounded. The government also cites a handful of alleged messages which they argue suggests a relationship beginning at age 15; however, the messages provide no concrete evidence regarding the charges in question. ECF No. 1213 at 19. Legal photos of Daniela and Lauren they cite as from 2005 are proven to have been planted, undermining their credibility. *Id.* Even the argument about the lack of an appendectomy scar falls apart with photos in discovery of Camila in her twenties showing no scar. *Id.* at n.7.

Accordingly, at the very least, Mr. Raniere's convictions for child exploitation and possession of child pornography would have resulted in an acquittal had the jury been aware of the strong evidence of tampering with the camera card while in FBI custody. Invalidating these charges would require a re-evaluation of the entire case, as the government said these charges were "at the heart" of their case and "there is very little evidence in this case that does not relate to that [alleged] victim [of the child pornography charges]." Pre-Trial T. 3/18/19 at 19:14-16; Pre-Trial T. 4/4/19 at 13:6-11.

### C. <u>Expert Forensic Findings – Evidentiary Hearing Necessary</u>

The findings and conclusions contained in the expert reports are explosive and devastating to both the law enforcement agencies as well as the case against Mr. Raniere itself on a structural level[1]. They are material and noncumulative and their admission would likely lead to an acquittal. *United States v. Siddiq*, 959 F. 2d 1167 (2d. Cir. 1992). Indeed, the 22 alleged contraband photos recovered on the WD HDD which comprised the child pornography and child

---

[1] If this Court finds that this systematic, intentional government misconduct caused a structural error, harmless error analysis would not apply, and Mr. Raniere's presumption of innocence would automatically be restored.

exploitation racketeering acts, could have been transferred to the hard drive and/or belonged to any number of people who had access to the hard drive. Thus, the government needed to show that the alleged contraband photos originated from the CF card from the Canon camera that had been linked to Mr. Raniere. Therefore, the digital evidence contained on the CF card is absolutely crucial, yet it had not been analyzed by the Defense before trial, *nor could it have been*, due to the late and only partial disclosure by the government.

Seven independent experts, including four former FBI examiners, analyzed the evidence that the government has made available, and all seven have concluded that there is definitive proof, to a scientific certainty, of manipulation and falsification of evidence. *See*, Joint Expert Declaration, ECF No. 1225-1; *Raniere, supra,* 18-cr-204-1 (NGG) (VMS) Dkt. 1169 at Ex. D, E, & F. If true, an acquittal on all, or some, of the charges would have been probable. The government hired an expert, David Loveall, to rebut the findings of the seven defense experts. ECF 1213. However, Loveall only addressed Dr. Kiper's Technical Findings. He did not address any of Dr. Kiper's Process Findings, nor any findings from the other undersigned experts. Indeed, although Mr. Loveall states, "[M]any of the conclusions set forth in the Kiper Report are misleading or erroneous… [and he] repeatedly ignores plausible explanations for observed phenomena in favor of allegations of tampering," Loveall agreed with Technical Findings 3 and 6 and, as to Technical Findings 1, 2, 4, 5, and 7, Loveall provided only hypotheticals of what he alleges could have occurred. *See*, Joint Expert Declaration, ECF No. 1225-1, ¶ 5-7. For each, he did not provide proof of how his theory explains the specific observed phenomenon. Thus, these do not constitute valid scientific explanations or conclusions. This conflicts with the Court's initial opinion that Loveall "refut[ed] Kiper's key findings… [and] offer[ed] a far more plausible and convincing explanation" than tampering. ECF No. 1224 at 10. Ultimately, Mr. Loveall did

not disprove any of the findings of evidence manipulation and implicitly agreed with two of them. *Id at* ¶ 10; Loveall Decl. at ¶ 9. He also claimed to have "procured a Dell Dimension 8300-20090330" to conduct testing, but no such computer model exists. Loveall Decl. at ¶ 17; Joint Expert Affidavit, ¶ 4. Finally, the absence of a date on Loveall's report may undermine its legal validity, as a date is required by the statute it cites, 28 U.S.C. 1746.

The Defense alleges that 37 files, present in the Booth report but absent from the Flatley report, were added to the memory card between Flatley's copy being created and Booth's copy being created, indicates that additional intentional tampering with the digital evidence occurred while in FBI custody. However, Loveall asserts that the discrepancies of 37 files is due to different software settings used by Booth and Flatley, not tampering. Yet, he fails to mention that Flatley and Booth used the same version of the same software and should have followed the same forensic protocol. He also fails to provide any proof, such as any specifics about these settings which would account for the discrepancies, nor any reason why Flatley would exclude these 37 key photo files. He then asserts that he compared the two forensic copies and found them "identical," but crucially, he offers no "hash values" to back this up. ECF No. 1225-1, ¶ 11-13. These "hash values" are the digital fingerprints required to make such a claim. Compounding these issues, and damaging the reliability of his opinions, Loveall uses the wrong evidence labels for the copies. He says he determined the 'disk images [forensic copies] of 1B15 and 1B15a were identical,' but 1B15 and 1B15a represent different items (the camera and the memory card, respectively). Loveall Decl., ECF 1213-3. Given Loveall's critical reliance on the unconfronted forensic work product of Flatley, who was unavailable to testify, these questions must be resolved in an evidentiary hearing.

We concede that there is a clear, drastic, and unexplained differing of opinion between the seven defense experts and the government's expert, as well as disputes of material fact. As the seven independent forensic examiners maintain, "[T]he camera card and the hard drive were extensively tampered with. Hundreds of files were planted, staged, and manipulated across both devices. Given admitted government misconduct, including violating evidence protocols, providing evidence to unidentified and unauthorized personnel, and altering the original camera card, the involvement of government personnel in this evidentiary fraud is inescapable – an unprecedented finding in our combined 150+ years of forensic experience." ECF No. 1225-1 at ¶ 16. As such, due to the intricacies, expertise, and import of the forensic and procedural evidence at issue, an evidentiary hearing is required to more fully explore the findings of these experts, including government expert Loveall, where each will be subjected to the crucible of cross-examination.

Moreover, the obvious should not be overlooked; government tampering of evidence is a *Brady* violation and is a fundamental violation of Due Process. The first forensic examiner of the CF card, Flatley, indisputably had contrary opinions to the government's trial narrative as his previous testimony proves. However, the government did not disclose a statement by Flatley regarding his stance on the unreliability of metadata. Instead, even though Flatley was the only witness regarding the government's most important evidence, the government did not call him to testify during the first five weeks of trial. Instead, on the third-to-last day of evidence, the government called Booth, who took the stand and testified in a manner contradictory to Flatley regarding the reliability of creation dates, and in a way that fit the government's theory. Further, Booth's trial testimony is easily disproven by not only the seven forensic experts, but by

performing a rudimentary internet search on how easily metadata can be manipulated. ECF No. 1169, Ex. D, Pages 42-47.

 

    D.  **The Government Should Be Compelled To Provide Post-Judgment Discovery**

       The Defense, while respecting the Court's ruling, continues to request that the government provide post-judgment discoverable and exculpatory material. ECF No. 1192. The items include (1) the Booth and Flatley forensic copies of the CF card and corresponding FTK log files from both April 11, 2019, and June 11, 2019, and (2) all CART examination notes. There is no legitimate reason not to provide these items, particularly considering both Booth and Flatley forensic copies of the camera card, and the original, was provided to the government's expert to review in support of their memorandum in opposition. This camera card is certainly exculpatory, as highlighted by the government's confirmation that the evidence was altered in FBI custody and that they allowed an unauthorized FBI employee, whose identity they continue to conceal, to break the chain of custody and alter this evidence before it was preserved. ECF No. 1213 at 11, n.6; Loveall Decl., ECF 1213-3 at ¶ 3. Furthermore, the camera card was extensively falsified, according to the analysis of seven independent digital forensic experts, including four former FBI examiners. ECF. No. 1169-1 at Bates 194-252; Dkt. 1192 at Bates 14-199. Thus, there is a strong likelihood that it contains additional proof of forgery, which by its nature is exculpatory. The Defense continues to respectfully requests the information relating to the FBI "photo tech," outlined in ECF No. 1230.

<u>**CONCLUSION**</u>

       We have presented compelling evidence, including government admissions, FBI documents, and affidavits from former FBI experts, that detail government misconduct involving

key figures such as SA Lever, SA Mills, and an unnamed FBI "photograph technician." These serious allegations, supported by credible evidence, underscore the urgent need for an evidentiary hearing to thoroughly investigate and address these concerns. At a minimum, the alteration of key original evidence by unauthorized FBI personnel, the concealment of this action and the other FBI personnel involved, from the Defense, and the subsequent use of this tampered evidence to convict Mr. Raniere, clearly breached his right to a fair trial. This includes his right to fully confront the evidence and witnesses against him, notably the undisclosed FBI photograph technician. This not only compromised the integrity of the trial but also fundamentally violated the principles of justice, demanding, in the least, an evidentiary hearing.

For the above reasons, and according to Rule 33 of the Federal Rules of Criminal Procedure, Mr. Raniere respectfully requests that this Court vacate the judgment of his conviction and order a dismissal, or grant him a new trial or, in the alternative, order an evidentiary hearing and order the government to disclose the requested evidence.


Dated: April 22, 2024                                    Respectfully submitted,


                                                         /s/ Arthur L. Aidala_____
                                                         /s/ Michael Jaccarino_____
                                                         Aidala, Bertuna & Kamins, P.C.
                                                         546 5th Avenue, 6th Floor
                                                         New York, New York 10036


                                                         /s/ Joseph M. Tully_____
                                                         Tully & Weiss Attorneys at Law
                                                         713 Main Street
                                                         Martinez, California  94553