## PRELIMINARY STATEMENT

The case and 120 year, 1,440 months, sentence against Keith Raniere (hereinafter referred to as "Mr. Raniere") tragically encompasses what can be analogized to a comedy of errors and is ripe for § 2255 review and relief. Despite the esteemed caliber of defense counsel involved, and their pursuit of justice on Mr. Raniere's behalf there was ineffective assistance of counsel committed at every stage of the prosecution and in his direct appeal; by his attorneys[1] during pre-trial, trial, sentencing, restitution and in the direct appeal.

Mr. Raniere's prejudicial sentence, which was not objected to by trial counsel on these grounds or at all appellate counsel, is in excess of the maximum authorized by the Guidelines; a statutory maximum of term of life imprisonment. For inmates matching Mr. Raniere's same Guidelines calculation – 2G2.1, Total Offense Level of 43, Criminal History Category I - from fiscal years 2006 through and including 2023, the average sentence was 390 months and the median 360 months. *See* Ex. 4, Declaration of Mark H. Allenbaugh, Esq., former staff attorney in the Office of General Counsel to the U.S. Sentencing Commission.

Never brought before this Honorable Court is the evidence of the violations of the Constitution and laws of the United States that were pervasive in the search of 8 Hale Drive, Halfmoon, NY, from which the allegedly seized digital evidence was obtained. This very digital evidence was at the "heart of the [government's ] racketeering conspiracy" and was presented to the jury who convicted Mr. Raniere. As presented herein, 2 post-conviction defense experts, a former FBI Senior Evidence Technician and a retired FBI and OIG Special Agent, both concluded that the search was deliberately and fraudulently staged, violating FBI protocols and

---

[1] Counsel who handled Mr. Raniere's pre-trial, trial, and sentencing will be referred to herein as "trial counsel". Counsel who handled Mr. Raniere's restitution hearing will be referred to herein as "restitution counsel". Counsel who handled Mr. Raniere's direct appeal will be referred to as "appellate counsel".

1

effectively fabricating evidence, through falsely staged search photos, which were presented to the jury. (Ex. 1, Ex. 2, Ex. 3)

They determined: that the search personnel list included a Special Agent who did not participate in this search and did not include a canine who was present; that the Evidence Recovery Log was pre-filled; key evidence, the camera and its camera card, which were not properly photographed, and the hard drive were pre-choreographed to be collected as number 1 and 2 in the search; there was manufacturing of scenes to take incriminating evidence photographs; pervasive improper log entries; and lack of "in place" photographs; amongst other violations of search protocol.

"This coordinated fabrication of evidence undermines the integrity of the entire search and renders all seized evidence unreliable ... and raises serious questions about the credibility of the investigation and subsequent prosecution." (Ex. 1, Search Report at 27). A fish rots from the head down. The planting and staging of evidence, coupled with systematic and omnipresent government malfeasance, involving multiple government personnel across multiple departments and in the various stages of Mr. Raniere's prosecution, must be examined.

### JURISDICTION

This Court sentenced Mr. Raniere and therefore has jurisdiction pursuant to 28 U.S.C. § 2255 to hear his habeas corpus petition and to grant the relief requested.

### TIMELINESS

Mr. Raniere's original petition was filed timely under 28 U.S.C. § 2255(f)(1) on April 17, 2024. The Hon. Nicholas G. Garaufis, USDJ granted extensions of the deadline to file the amended petition to November 28, 2024. (Doc. 1271) This amended petition is therefore timely and complies with the Court's Order.

## PROCEDURAL HISTORY

The Court is familiar with this case's background. Some of the claims presented herein, despite some factual overlap with the Rule 33s relating to issues of digital evidence falsification, which were denied by this Court and are the subject of the pending consolidated appeal (*US v. Raniere*, 2nd Cir., 24-778), are legally distinct, as they are predicated upon ineffective assistance of counsel or contain additional facts not previously raised.

## LEGAL STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

It is axiomatic that a finding of ineffective assistance of counsel (hereinafter referred to "IAC") constitutes a violation of the Sixth Amendment and that this Court has jurisdiction to adjudicate such a claim. Indeed, the Second Circuit has repeatedly stated it "prefer[ence] to address claims of ineffective assistance of counsel in collateral proceedings, rather than on direct appeal." *United States v. Mena*, 361 Fed. App'x. 242, 244 (2d Cir. 2010). *See also United States v. Alcantara-Soler*, 210 F.3d 355, 2000 WL 427068, at *1 (2d Cir. 2000) (expressing "a preference for addressing claims of ineffective assistance of counsel on collateral attack instead of direct appeal"). This Court therefore has jurisdiction to adjudicate Mr. Raniere's claims of ineffective assistance of counsel.

## LEGAL STANDARDS APPLICABLE TO CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

"The guarantee of counsel in criminal trials protects the fundamental right to a fair trial afforded by the Sixth Amendment." *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001). *See also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process"). "To give substance to this right, counsel must be reasonably effective." *Lindstadt*, 239 F.3d at 198. Put differently, the essence of an ineffective-assistance claim is that counsel's

3

unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and verdict rendered suspect." *man*, 477 U.S. at 374.

In general, a claim of ineffective assistance of counsel must establish that: (1) "counsel's performance was deficient," which requires a "showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance prejudiced the defendant," which requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994) ("To establish a constitutional claim of ineffective assistance of counsel, a convicted defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the defense, the likely outcome of the proceeding would have been different").

To establish a claim of ineffective assistance of counsel at sentencing, a defendant "must demonstrate a reasonable probability that, but for counsel's deficiencies with respect to the sentencing matters, the petitioner would have received a lesser term of imprisonment." *Whaley v. United States*, Case Nos. 20-CV-01863 (JMA), 2024 WL 2847141, at *7 (E.D.N.Y. June 5, 2024) (citing *Glover v. United States*, 531 U.S. 198, 203 (2001). *See also United States v. Henry*, Case No. 17-CV-02133 (PKH), 2017 WL 6757581, at 2 (W.D. Ark. Dec. 11, 2017) (adjudicating claim of "ineffective assistance counsel for failure 'to argue in favor of a mitigated sentence based upon application of 18 U.S.C. § 3553(a) and case law precedent'").

4

**ARGUMENT**

I.  **Trial Counsel Was Ineffective For Failing to Challenge the Staged and Fraudulent Search of 8 Hale**

    A.  **Factual Background**

On March 27, 2018, FBI agents executed a search warrant at 8 Hale Drive in Halfmoon, New York. 2 post-conviction experts, former FBI Senior Evidence Technician Kenneth DeNardo and retired FBI and OIG Special Agent and former FBI Assistant Special Agent in Charge Mark Daniel Bowling, independently reviewed the FBI's search photos and evidentiary logs.

Mr. DeNardo, who served 23 years in the FBI, including in roles such as a Senior Evidence Technician for the FBI and a member of the Evidence Response Team (ERT), and who conducted hundreds of searches, concluded:

> "In my expert opinion, based on the FBI's own photos and logs, the search at 8 Hale Drive, Halfmoon, NY was deliberately and premeditatedly staged. Of the 9 search team members, 4 were complicit in this fraudulent conduct, with 2 serving as key orchestrators: Special Agents Elliot McGinnis and Christopher Mills. In my 23 years of experience with the FBI, I have never seen a search with this magnitude of malfeasance." (Ex. 1, Search Report[2] at 3).

His key findings are directly quoted below:

> "**1. Pre-Filled Personnel List:** Before arriving at the site, Special Agent ("SA") Elliot McGinnis pre-filled the personnel list and further violated FBI protocol by signing the personnel list as other agents, including an agent, SA Kevin McGee, who did not participate in this search.

> **2. Pre-Filled Evidence Recovery Log:** Before even arriving at the search, SA McGinnis pre-filled the evidence recovery log with item entries, including room labels, locations, and a pre-assigned sequence of discovery. This is evidenced by crossed-out entries on a later page of the log that correspond to items already listed on an earlier page, albeit in a different sequence, revealing a pre-choreographed effort to fit a predetermined narrative rather than the required real-time documentation. This constitutes evidence fabrication.

---

[2] Note that the exhibits for the search report are attached as Exhibit 2.

**3. Improper Log Entries:** SA McGinnis improperly signed as SA Mills for 32 out of 40 entries (80%) in the evidence recovery log, violating FBI protocol and further eroding the log's reliability and enabling potential evidence tampering.

**4. Failure to Log All Search Personnel, Such as a Canine:** A canine present at the search was not logged by team leader SA Christine Doyle or its handler, constituting knowing violations of FBI protocol that mandates all personnel on-site be documented, for accountability.

**5. Choreographed Targeting of Key Evidence:** The Canon camera and Western Digital hard drive in the upstairs study, labeled Room F, were intentionally prioritized in the staging of the search as the first 2 items collected, even though standard procedure would have started with Room A downstairs. Their prioritization demonstrates foreknowledge of their locations and importance. This directly contradicts the government's claim of an 'accidental' discovery of their evidentiary importance 11 months later.

**6. Manufactured Bookshelf Scene:** Agents manufactured a false scene on a bookshelf, adding items—including 2 sex trafficking books of unknown origin, due to not being photographed "in place", likely planted —to create incriminating evidence photographs. These books, directly related to the main alleged crime linked to the search, were not collected. In my expert opinion, this constitutes evidence fabrication. Note that the search photographs were presented to the jury.

**7. Planted and Uncollected Camera:** A second camera, whose origin is unknown due to the lack of an "in place" photograph, was falsely staged, labeled, and photographed as evidence but inexplicably left behind. Leaving a documented camera behind defies logic in a search explicitly focused on collecting photographic evidence, strongly supporting my conclusion that this camera was likely planted.

**8. Incompetent Evidence Photos:** The Canon camera, containing the memory card, is not clearly visible in any evidence photograph, and no photograph of the memory card itself was taken.

**9. Intentional Mislabelling of Evidence:** A silver/gray LaCie hard drive was mislabeled and photographed as Item 2, whereas Item 2 in the log is listed as a black Western Digital hard drive. I determined that this mislabeling was likely intentional.

**10. Chain of Custody Abruptly Ends Following 'Accidental Discovery':** The Western Digital hard drive's chain of custody contains no entries after SA Michael Lever checked it out of Evidence Control on February 22, 2019—months before it was purportedly presented at trial— with no record that it was ever returned, raising serious concerns about the handling and integrity of this critical evidence."
(*Id.* at 4-5).

Mr. Bowling independently reviewed the evidence and concurred with Mr. DeNardo's analysis and conclusions, stating, "I agree with Mr. DeNardo's findings in their entirety... During my nearly 20 years in the FBI, I have never seen a search executed with this level of corrupt and illegal behavior." (Ex. 3, Declaration of Mark Daniel Bowling, at 1-3).

## B. Analysis

It is well-established that a constitutional right exists not to be deprived of liberty based on false evidence fabricated by a government officer. See *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998); *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997). The Second Circuit in *Zahrey v. Coffey* held that fabricated evidence by a government officer, which was used to influence the jury, caused deprivation of the defendant's liberty. *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000); *see also Jovanovic v. City of New York*, 486 Fed.Appx. 149, 152 (2d Cir. 2012).

A search is unreasonable if it exceeds the terms of the warrant that authorized it. *Simon v. City of New York*, 893 F.3d 83, 93 (2d Cir. 2018).

Where a search and seizure was performed in violation of a defendant's Fourth Amendment's rights, the exclusion of such wrongfully obtained evidence as the fruit of the improper search and seizure serves to "deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011) (external citations omitted). The basis of this well-settled exclusionary rule is founded upon the constitutional and due process rights which all individuals are afforded, and which is stated clearly in the Supreme Court's holding in *United States v. Calandra*, 414 U.S. 338, 347 (1974):

> "The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .' Under this rule, evidence obtained in

violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *Weeks v. United States*, 232 U.S. 383, 34 (1914); *Mapp v. Ohio*, 367 U.S. 643 (1961). This prohibition applies as well to the fruits of the illegally seized evidence. *Wong Sun v. United States*, 371 U.S. 471 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)."

Trial counsel's failure to investigate and challenge the fraudulent 8 Hale search constituted "objectively deficient" performance under *Strickland*. Despite receiving the FBI's photographs approximately 9 months before trial and the search evidentiary logs in the 3500 materials pre-trial, trial counsel failed to review them or retain an expert to evaluate their legitimacy.

But for counsel's failure to challenge the search and expose its deliberate staging, there is a reasonable probability that the evidence seized from 8 Hale, including the camera, its memory card, and hard drive, would have been suppressed due to the exclusionary rule. As a result, the government could not have met its burden on Racketeering Acts 2, 3, and 4, which were premised on these devices. The resulting prejudice to Mr. Raniere was that this conduct was factored into his sentence and he was deemed a sex offender.

II.     **Trial and Appellate Counsel's Failures to Challenge Mr. Raniere's Sentence**

A. **Trial Counsel's Failure to Present Argument Concerning Unwarranted Sentencing Disparity**

According to the attached Declaration of Mark H. Allenbaugh, a former staff attorney to the U.S. Sentencing Commission and co-founder of SentencingStats.com, Inc., since *United States v. Booker*, 543 U.S. 220 (2005), the average sentence for Mr. Raniere's same Guidelines calculation -2G2.1, with a Total Offense Level ("TOL") of 43 in Criminal History Category ("CHC") I, was only 390 months and the median just 360 months. Ex. 4 at 4, ¶ 8. "Mr. Raniere's greater-than-life sentence of 1,440 months was the second highest." Ex. 4 at 1.

"Statistically speaking, Mr. Raniere's sentence suffers from disparity in the extreme." Ex. 4 at 6, ¶ 12.

207 inmates nationwide, with Guidelines calculation 2G2.1, TOL 43, CHC I were also subject to a statutory maximum term of life imprisonment. However, "The Commission codes life at 470 months", Ex. 4 at 9, ¶ 9, which is roughly 39 years.

Thus, consistent with the vast majority of similarly situated defendants, had counsel made this Court aware of the calculation error and statistical evidence of the sentences imposed on those similarly situated to Mr. Raniere, it is likely that this Court would have imposed a below-Guidelines sentence, i.e., less-than-life, or that the appellate court would have remanded. This is especially so as there is no indication in the record that this Court would have inevitably imposed a life sentence—let alone one for 120 years. Accordingly, this Court should vacate Mr. Raniere's sentence.

## B. Objectively Unreasonable Advocacy

Mr. Raniere was found guilty of Counts 1, 2, 8, 9, and 10, which all carried statutory maximum penalties of life. He also was found guilty of Counts 6 and 7, which both carried a statutory maximum penalty of 20 years.

Rather than following the instructions of the Guidelines, the Court instead imposed less than life sentences on the life-eligible counts and added those together to obtain 120 years. As detailed in the Judgment, ECF No. 969 at 4, the Court created 4 groups of offenses, picked an arbitrary sentence for each group nowhere dictated by the Guidelines, and then added together the sentences imposed on each of the four groups to reach 120 years.

Not only was this method incorrect, but it constituted an **upward departure**. It is beyond serious dispute that a sentence of 120 years exceeds a life sentence as no human could possibly

serve such a sentence in its entirety. Accordingly, Mr. Raniere was entitled to notice of such as required by Fed. R. Crim. Proc. 32(h). Notably, since *Booker,* Mr. Raniere is the only defendant within the Second Circuit with his particular Guidelines calculation to have received a sentence greater than life. *See* Ex. 4 at 6, ¶ 13 (Declaration of Mark Allenbaugh).

Mr. Raniere suffered significant prejudice by counsel's failure to object both at the district and appellate levels to these procedural errors all of which was compounded by counsel's failure to address any of the 18 U.S.C. § 3553(a) sentencing factors. For example, the sentencing memorandum that trial counsel submitted for Mr. Raniere (Docket No. 925) failed to present any argument concerning the 18 U.S.C. § 3553(a) sentencing factors[3] – written advocacy that fell well below that which a reasonable attorney would write in a sentencing memorandum

Indeed, trial counsel did not even mention 18 U.S.C. § 3553(a) until Page 83 of Mr. Raniere's 85-page sentencing memorandum. In doing so, trial counsel failed entirely to argue how those factors supported the 15-year sentence he requested let alone how a life sentence would create unwarranted disparity. In fact, in the section of Mr. Raniere's sentencing memorandum entitled "Under Title 18, United States Code, Section 3553, This Court Should Not Impose More Than A Fifteen-Year Sentence," trial counsel did not actually address any of the 18 U.S.C. § 3553(a) sentencing factors.

Indeed, this Court told trial counsel that it intended to consider the 18 U.S.C. § 3553(a) sentencing factors and even articulated what those factors are, stating the following:

> So at this time, the Court will consider, as I have calculated the
> sentencing range, I am now going to turn to fact that are outlined
> in *18 United States Code Section 3553(a)*. Under *Section 3553(a)* I

---

[3] By contrast, this Court noted that "[t]he government has submitted a lengthy sentencing memorandum addressing the 3553(a) factors." (Docket No. 1002 at 136:708.)

must consider several factors in imposing the sentence, including the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense, the need for the sentence to afford adequate deterrence, and the need to protect the public.

*See* Docket No. 1002 at 105:8-11-18 (italics in original).

## C. Trial Counsel's Failure to Present Argument Concerning the 18 U.S.C. § 3553(a) Sentencing Factors At Mr. Raniere's Sentencing Hearing

At Mr. Raniere's sentencing hearing, trial counsel presented virtually no argument concerning the 18 U.S.C. § 3553(a) sentencing factors. Rather, counsel's only references to the § 3553(a) factors appear on Page 115 of the sentencing transcript (where he stated that "[t]he point I'm trying to make, Judge, is [Mr. Raniere] did a lot of good things in his life. That's a heartland 3553 factor") (Docket No. 1002 at 115:8-10) and Page 125 of the sentencing transcript (where he stated that "my point in talking about intent and the circumstances of the offense certainly goes to a 3553 factor because it's the nature and circumstances of the offense") (Docket No. 1002 at 125:21-23). Most distressingly, trial counsel did not even address the 18 U.S.C. § 3553(a) sentencing factors after this Court repeatedly implored him to do so. *See* Docket No. 1002 at 114:16 ("Why don't you talk about the factors?"), 114:18 ("I am interested in the factors") and 114:20 ("I am interested in the factors").

In addition, counsel failed to note Mr. Raniere's life expectancy. According to a study cited favorably by the Second Circuit in *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), an inmate can expect to lose two years of life expectancy for every year of incarceration. *Id.* at 186 n.2 (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State,*

*1989-2003*, 103 Am. J. of Pub. Health 523 (2013)). Applying the Patterson study to Mr. Raniere's life expectancy, this Court would have been apprised that any sentence requiring more than seven years of incarceration was a *de facto* life sentence for Mr. Raniere. Ex. _ at 9, ¶ 20 (Declaration of Mark Allenbaugh).

**D. Prejudice**

Mr. Raniere was clearly prejudiced by his counsel's objectively unreasonable advocacy at both the district court and appellate levels, as set forth above. First, Mr. Raniere has been designated to a high security facility—USP Tuscon. Upon information and belief, had he received a sentence no greater than life, he would have been designated to no higher than a medium security facility. *CITE ALAN*. Second, had counsel provided this Court with the § 3553(a) evidence and argument it repeatedly requested, it is reasonably probable that Mr. Raniere would have received a significantly lower sentence or that the Second Circuit would have found Mr. Raniere's 120-year sentence unreasonable. As noted in the Declaration of Mark Allenbaugh, Mr. Raniere's sentence is over five standard deviations away from the average sentence of 390 months for those similarly situated and "is over four times greater than what a recidivist murderer would typically receive." Ex. 4 at 7, ¶ 18 (noting that per the Commission's *2023 Sourcebook of Federal Sentencing Statistics* the average sentence for a defendant sentenced under USSG §2A1.1 (First Degree Murder) in Criminal History Category VI was just 333 months). Mr. Raniere's 120-year sentence clearly is of the kind that is so "'shockingly high' . . . that [it] serve[s] no valid public purpose." *Jenkins*, 854 F.3d at 187 (quoting *United States v. McGinn*, 787 F.3d 116, 129 (2d Cir. 2015)).

**E. Both Trial and Appellate Counsel Were Constitutionally Ineffective For Failing to Object to 1) The District Court's Plainly Incorrect Guidelines Calculation and 2) To The Court's Imposition of An Upward Departure Without Notice**

Assuming *arguendo* that the Court's Guidelines calculation was correct, i.e., that Mr. Raniere's Total Offense Level was 43 in Criminal History Category I, then the Court should

have imposed no more than a literal life sentence. Indeed, this is what the PSR recommended. Instead, in a rather *ad hoc* fashion in contravention of the express directives set forth in the Guidelines, the Court incorrectly imposed on Mr. Raniere a 1,440-month sentence, which necessarily constituted an upward departure as it was far more than a life sentence. In that regard, pursuant to Fed. R. Crim. Proc. 32(h), the Court was required to give reasonable notice of such a departure, which it did not do.

As these 2 procedural errors were manifest, it was prejudicial error for counsel to fail to object to them both at sentencing and most certainly on appeal. Had the Court correctly calculated the Guidelines, a life sentence would have constituted a within-Guidelines sentence. However, compounding counsel's failure to object to these procedural errors was counsel's failure to introduce statistical evidence of sentences imposed on similarly situated defendants statutorily subject to a life sentence. After all, "a primary objective of the Guidelines was to reduce unwarranted sentencing disparity by constraining and guiding the exercise of judicial sentencing discretion." Prof. Frank O. Bowman, III, *Sentencing Symposium: Fear of Law: Thoughts on Fear of Judging and the State of the Federal Sentencing Guidelines*, 44 St. Louis L.J. 299, 329 (2000); 18 U.S.C. § 3553(a)(6). This cannot be achieved without considering the sentences imposed on those similarly situated. *See, e.g., United States v. Jenkins*, 854 F.3d 181, 193-94 (2d Cir. 2017) (considering U.S. Sentencing Commission statistics on similarly situated offenders to find defendant's sentence "unreasonable" notwithstanding that it was within the Guidelines).

In *Jenkins*, the Second Circuit found defendant's within-Guidelines sentence problematic where "44.3% of cases of *non-production* child pornography offenses in 2010 involved courts' imposition of a below-Guidelines sentence." 854 F.3d at 193 n.6 (emphasis added; citation

omitted). Notably, in 2023, 60.8% of cases of *production* of child pornography offenses

sentenced under USSG §2G2.1[4] involving courts' imposition of a below-Guidelines sentence.

*See* U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* tbl. 32,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-

sourcebooks/2023/Table32.pdf.

### III. Trial Counsel Was Ineffective for Failing to Challenge the Illegal Search of the Camera and Memory Card

The 8 Hale search warrant did not authorize the search of the memory card's contents

because, "all of the files on the memory card were between 2005 and 2007[5], which is outside of

the authorized date range [of January 1, 2015 onwards]." (Ex. 5, Declaration of Stacy Eldridge

at ¶ 10). Further, "[t]he search warrant issued on February 22, 2019, for the child pornography,

only applied to the hard drive (1B16), and not the memory card."(*Id.* at ¶ 9). Trial counsel's

woeful failure to move for preclusion or suppression of the camera and its memory card on these

grounds was "objectively deficient". But for counsel's failure, there is a reasonable probability

that critical evidence, which was necessary to support the convictions as to the child

pornography and sexual exploitation predicate acts, would have been suppressed.

### IV. Trial Counsel Was Ineffective for Failing to Adequately Investigate and Challenge the Digital Evidence that Formed the Basis of the Child Pornography and Sexual Exploitation Charges
In addition to failing to uncover evidence of staging and planting during the search of 8

Hale, trial counsel also failed to uncover proof of digital falsification. This falsification provided

a separate basis for suppressing the hard drive and memory card—an issue trial counsel failed to

---

[4] Inclusive of all Total Offense Levels and Criminal History Categories but exclusive of any sentences receiving a departure pursuant to USSG §5K1.1.
[5] This excludes the last access dates of the active files that were altered to be September 19, 2018 while in FBI possession.

investigate or raise. Suppression would have required dismissal of the predicate acts, as the hard drive contained the alleged contraband photos, and the camera established federal jurisdiction. (Trial T. (6/17/19) at 5372:14-23).

The camera's memory card and hard drive, which formed the basis of the child pornography and sexual exploitation acts, were extensively falsified, as unanimously determined by 7 independent digital forensics experts, including 4 former FBI CART examiners. As outlined in the attached report by the 7 experts, the government's expert FBI Senior Computer Scientist David Loveall II[6] rebutted a subset of these findings. However, his rebuttals lacked evidence and in some cases are clearly, demonstrably false. Judicial notice of these deficiencies is requested herein. The report also analyzes in greater detail two key uncontested findings regarding the memory card.

Counsel's overall failure was a cascading effect of several individual, objective failures:

## A. Failure to Seek an Adjournment to Properly Analyze the Hard Drive

As the Court noted in its denial of the Rule 33, the defense failed to seek an adjournment, which would have been on consent, in order to allow their computer forensic expert to conduct a complete exam of the hard drive:

> "The defense initially raised concerns about their ability to analyze the evidence relating to the newly added predicate acts prior to the start of the trial, which was then scheduled for April 29, 2019. *(See, e.g.,* Defense Letter dated March 17, 2019 at 2; March 18, 2019 Status Conference Tr. (Dkt. 467) at 20:11-24 (noting that jury selection was to begin on April 8, 2019, with the trial to begin on April 29, 2019).) However, in a filing dated March 22, 2019, Mr. Raniere represented that he was ready for trial "even though the government has superseded the indictment" and he "request[ed] that the Court keep the dates for the current trial schedule." (Defense Mem. dated March 22, 2019 (Dkt. 456-1) at 2-4.) Given the conflicting statements from Mr. Raniere's

---

[6] The Loveall Report, the government's rebuttal, failed to meet the admissibility standards of Daubert, FRE 702, and 28 U.S.C. 1746, as argued in Mr. Raniere's pending appeal.

defense team, the Government sought to ensure that he was ready to proceed, after noting numerous times that it would consent to the trial's adjournment if necessary to allow his defense team time to conduct a forensic examination of the photographs and the pho- tographs' metadata. *(See, e.g.,* Gov. Mem. of Law dated March 29, 2019 (Dkt. 485) at 6-10.)" (Doc. 1256 at 3).

In the letter dated March 22, 2019, quoted by the Court, trial counsel stated, "if this Court moves the trial date, counsel will not be available to try the Raniere case until March of 2020 due to the following series of cases that have been scheduled around the Raniere trial schedule and around this Court's Order". (Doc. 456-1 at 3).

This was particularly egregious as trial counsel's own expert had warned that the analysis could not be completed in time, "He says, I don't know that I've ever had to do this kind of computer forensic analysis in less than three weeks' time" for charges of this magnitude. (Trial T. (3/18/2019) at 9:7-9). Jury selection began on April 22, 2019. Thus, trial counsel effectively limited their expert's ability to properly complete the requisite forensic analysis by failing to seek an adjournment.

Further, Mr. Raniere, who has a significant background in computers, told trial counsel the alleged contraband was planted. He "repeatedly requested access to specific data structures on the hard drive" that could have shown data manipulation, such as the FAT-1, FAT-2, and directory table. (Ex. 6, Declaration of Keith Raniere, at 6 ¶ 33).

But for trial counsel's failure to seek an adjournment to properly analyze the hard drive, there is a reasonable probability that critical evidence supporting its suppression would have emerged prior to the commencement of trial.

### B. Failure to Seek an Adjournment to Analyze the Memory Card and Obtain the First Forensic Copy:

The prosecution disclosed the memory card's use through Flatley's report on the third day of jury selection. However, the defense failed to request and obtain a copy of the first forensic

image.[7] Counsel failed to request an adjournment to analyze the first forensic copy of the card. This oversight deprived the defense of critical evidence, including the discovery of falsification in specific files (e.g., Photos 21–41 and 224–243). (Ex. 7, Joint Technical Summary, at 10-13, 14; Government Exhibit 521A, Flatley FTK Report)

### C. Failure to Seek Dismissal Due to Spoliation:

Trial counsel elicited testimony on cross that revealed access without a write blocker to the camera's unpreserved memory card on September 19, 2018, before any CART forensic copy was created to preserve its original contents, and therefore equals spoliation. (Ex. 8, Joint Process Summary at 1, "The card was irretrievably altered in FBI custody prior to forensic preservation".) However, trial counsel failed to close the loop by not seeking the exclusion of the camera and its memory card or a curative instruction of an adverse inference. Trial counsel's failure to raise this argument was objectively deficient and prejudiced Mr. Raniere by allowing tainted evidence to be used at trial.

### D. Failure to Revisit the Prohibition on Raising Government Misconduct:

Counsel failed to revisit and challenge the Court's blanket prohibition against raising government misconduct despite clear evidence of it emerging during trial. Examples include:

- o **Unprotected Access and Spoliation:** Booth confirmed on 6/13/19 that the memory card was improperly accessed without a write blocker on 9/19/18. (Trial T. (6/13/19) at 4968:18 - 4973:12).
- o **Unauthorized Access by FBI Agents:** Trial counsel dropped the ball by failing to properly analyze the chain of custody, disclosed on June 12, 2019, which revealed mishandling of the unpreserved camera and memory card by SAs Rees and Lever before they were sent to CART. (Ex. 8 at 1, n.2).
- o **False Government Agent Testimony:** SA Mills falsely testified on June 10, 2019, that the camera was properly handled, solely by CART., which is contradicted by the chain of custody. (Trial T. (6/10/19) at 4307:8-18). Additionally, SFE Booth testified, in relation to the memory card, which he received unsealed; that receiving unsealed evidence in the FBI CART lab was not extraordinary. (Ex. 8 at 3-4). It is criminal procedure 101 that evidence is

---

[7] This argument is separate from the Rule 33 arguments; which did not claim that the first forensic image constitutes "newly discovered evidence" (although its production was sought in the related Motion to Compel, Doc. 1192). It is raised here as a standalone ineffective assistance of counsel claim.

supposed to be sealed. Trial counsel failed to seek exclusion or, alternatively, an adverse inference instruction.

At any of these junctures, trial counsel should have requested that the Court modify the blanket prohibition to allow for the appropriate relief and effective and competent cross-examination.

Each individual failure would have yielded evidence of falsification, but cumulatively there is a high probability that it could have altered the landscape through application of the exclusionary rule.

Mr. Raniere reserves his right to revisit and amend these claims depending upon the resolution of his consolidated appeal.

## V.   Trial and Appellate Counsel Were Ineffective for Failing to Adequately Challenge the Illegal Search of the Hard Drive

### A.  Trial Counsel's Failure

Trial counsel filed a motion to suppress the photos from the hard drive, arguing that the alleged contraband photos discovered on the hard drive were outside the time scope of the warrant, and agents would have known they were out of bounds to be in the folder containing those photos. (Doc. 580).

However, trial counsel failed to argue that the FBI should not have been searching the hard drive whatsoever because **nothing** on the hard drive was within the authorized date scope of the 8 Hale search warrant. Therefore  no "plain view" discovery or exception would be possible. Trial counsel further failed to challenge SA Lever's Affidavit in Support of the Second Search Warrant - that the discovery occurred while "the FBI were continuing a search of the [hard

drive], as authorized by the 8 Hale Warrant". (Doc. 594-2). If FBI protocol were followed in Mr. Raniere's case, there would be no continuing search. (Ex. 5 at ¶ 11, 22).

The legal significance of this omission is clear: the agents were not "lawfully in a position" to view the photos, a requirement for the plain view doctrine under *Horton v. California*, 496 U.S. 128, 142 (1990). Any discovery of alleged contraband was therefore unlawful, and the subsequent warrant issued on February 22, 2019, was invalid under the fruit of the poisonous tree doctrine. See *Segura v. United States*, 468 U.S. 796, 804 (1984).

Trial counsel's failure caused clear prejudice. But for counsel's oversight, there is a reasonable probability that the contents of the hard drive, including the alleged contraband photos, would have been suppressed. Since these photos formed the basis for the child pornography and sexual exploitation charges, their exclusion would have fundamentally altered the outcome of the trial, as they were "at the heart" of the government's racketeering case.

### B. Appellate Counsel's Failure

The defense filed a motion to suppress evidence on the grounds that files obtained from the hard drive were outside the temporal scope of the 8 Hale warrant, which explicitly limited searches to materials from 2015 onward. The Court denied this motion and appellate counsel failed to appeal this denial. This was "objectively deficient" performance by appellate counsel, as the Court's decision was clearly erroneous. The Court denied the suppression motion based on 2 points:

1. "[a]lthough the [2005 Files] were created in 2005, they are within the scope of the 8 Hale Warrant because they are evidence of multiple Subject Offenses involving Raniere that occurred in 2015 or later" (Doc. 618 at 5), and

This is flawed because the Subject Offenses that the Court references, the child pornography and sexual exploitation predicate acts, were unindicted. It is circular and illogical to use acts that were not yet to be indicted to justify an unlawful search that led to it.

This case is distinguished from the 2 cases that the Court cites to, *United States v. Graziano*, 558 F. Supp. 2d 304 (E.D.N.Y. 2008) and *United States v. Fumo*, No. 06-319, 2007 WL 3232112 (E.D. Pa. Oct. 30, 2007). *Graziano* and *Fumo* address scenarios where it was unclear whether files fell within the warrant's scope. Here, it was facially obvious that the 2005 files were outside of the warrant's explicit temporal limits, based on their metadata.

2. "[e]ven if the [2015 Files] were outside the scope of the 8 Hale Warrant...[this] [C]ourt would not suppress them because they fall within the plain view exception to the Fourth Amendment's Warrant requirement." (Doc. 618 at 6).

Recently, the Southern District of New York dealt with temporal limitations on warrants relating to the physical search of properties in *United States v. Wey*, 256 F.Supp.3d 355 (S.D.N.Y. 2017), but cited to controlling Second Circuit precedent regarding the importance of particularity when it comes to searches of digital or electronic materials. In evaluating this principle, the *Wey* Court stated, in pertinent part:

> "The fact that the Warrants at issue in this motion targeted— and the Search fruits ultimately consisted overwhelmingly of—electronically stored information implicates at least two additional considerations. First, as the Second Circuit has recognized, "[w]here ... the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013). That is because the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *United States v. Ganias,* 824 F.3d 199, 217 (2d Cir. 2016) *(en banc)*. As such, "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is

enormous"—a "threat [that] is compounded by the nature of digital storage." *Galpin*, 720 F.3d at 447. Indeed, the Government, once it has obtained authorization to search a hard drive, may in theory "claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant," thus presenting a " 'serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant.'" *Id.* (citations omitted). *Wey*, 256 F.Supp.3d at 382-83.

In its ruling, the Court effectively disregarded the Fourth Amendment protections explicitly developed under *Galpin* and *Ganias*. But for appellate counsel's failure to make the above argument, there is a reasonable probability that the motion to suppress would have been reversed, resulting in the suppression of the alleged contraband on the hard drive and thereby the dismissal of the child pornography and sexual exploitation acts. Thus, prejudice is established.

## VI.     Government Fraud Caused Structural Error, Warranting Relief

The malfeasance in the search of 8 Hale is raised for the first time in this motion. Related systematic government misconduct concerning the falsified camera's memory card and hard drive, alleged CP evidence that was reportedly collected during this search, is pending appeal as newly discovered evidence and *Brady* claims. (*US v. Raniere*, 2nd Cir., 24-778). Respectfully, while this Court denied the latter findings in the Rule 33, the search findings add a new and critical dimension, revealing interconnected actions that are part of a broader campaign of government wrongdoing and together establish a new and materially distinct claim.

They demonstrate government malfeasance that is far more premeditated, pervasive, and systematic than previously known, bringing the total FBI/DOJ personnel implicated in systematic misconduct in this case to at least 15 and extending the impact of the malfeasance to now also

include evidence collection and the staged "accidental discovery" within evidence review.[8] Further, they materially undermine the credibility of FBI agents involved in handling and reviewing the alleged contraband evidence, as highlighted in the table below. These constitute material disputes of fact with the evidence and testimony presented at trial, requiring an evidentiary hearing to resolve.

*Table 1: Newly Discovered Information*

| Known Prior to this Claim | Newly Discovered |
|---|---|
| The falsified contraband evidence was "accidentally discovered" 9 weeks before trial. | Its "accidental discovery" was false. The evidence was specifically targeted and pre-selected as Items 1 and 2 in the search, positioned to be the first items seen by the jury in search photos, almost a year earlier. (Ex. 1 at 12-16). SA Lever, the lead case agent, reported this "accidental discovery". (Doc. 594-2). |
| Between SFE Flatley's exam and SFE Booth's creation and analysis of a prohibited second forensic copy directly from the memory card, 37 additional photo files appeared on Booth's report, 28 intentionally manipulated, raising the unresolved question of whether they were planted between SFE Flatley's and SFE Booth's analysis. (Ex. 7 at 2). This concern is heightened by the transfer of the memory card from SA Mills to SFE Booth in an unsealed bag. (Doc. 1169-1 at PageID # 21382). | SA McGinnis and SA Mills, who each held the camera and memory card between SFE Flatley and SFE Booth, were directly involved in fraudulent conduct during the search. (Ex. 1; Defense Exhibit 945). |
| SA Mills falsely testified that the camera was handled properly according to protocol, solely within CART. (Trial T. (6/10/19) at 4307:8-18). | During his testimony, SA Mills falsely represented the search as routine and omitted his participation in the fraudulent staging of 8 Hale. (Trial T. (6/10/19)). |

---

[8] See Ex. 1, Ex. 8, and Table 2 below.

This claim is brought under newly discovered evidence, as it materially expands the newly discovered evidence claim currently pending on appeal, or in the alternative, it is brought as ineffective assistance of counsel. *See Strickland v. Washington* 466 U.S. 668, 682 (1984).

The question before the Court is whether the totality of this government malfeasance was systematic and pervasive enough such that the trial could not "reliably serve its function as a vehicle for determination of guilt or innocence", causing a structural error. *See Rose v. Clark,* 478 U.S. 570, 577-78 (1986). If the Court were to reject this claim, it would be allowing all of the following as within tolerance:

- Pre-choreographing a search and evidentiary log to create a narrative of guilt.[9]
- Using items of unknown origin to create and photograph false scenes during the search.[10]
- Falsely signing as other agents and creating fraudulent documentation of evidence collection.[11]
- Failure to return evidence to Evidence Control, or failure for Evidence Control to log all transfers of evidence[12]
- Using a secret FBI photo technician to manipulate unpreserved evidence, deliberately concealing their access from the chain of custody, and only disclosing their involvement 4+ years post-trial[13]
- Secretly[14] creating and using a prohibited, unproduced, and unverified second copy of digital evidence.[15]

---

[9] *See* Ex. 1 at 5-10, 12-16

[10] *See* Ex. 1 at 16-21

[11] *See* Ex. 1 at 5, 6, 9, and 10

[12] *See* Ex. 1 at 25-26

[13] *See* Ex. 8 at 1-2

[14] The term "secretly" is used because SFE Booth knowingly omitted the creation of the second copy at trial, testified to the correct protocol that only one forensic copy is allowed, and misleadingly recorded that his "exam" was approved by SSA Trenton Schmatz, despite it involving a prohibited re-exam, which Booth and Schmatz knew was a violation of protocol. (Ex. 8 at 3).

[15] Ex. 8 at 3.

*Table 2: The Systematic and Pervasive Nature of the Government Malfeasance*

| Stage of the Case | # Agents involved in malfeasance | Description |
|---|---|---|
| Evidence Collection | 9 | Involved in fraudulent staging of the search:[16]<br>- SA Elliot McGinnis<br>- SA Christopher Mills<br>- SA Tracee Mergen<br>- TFO Brett Hochron<br><br>Involved in knowing violations of FBI protocol relating to the[17] search:<br>- SAs McGinnis, Mills, Mergen and TFO Hochron<br>- SA Anthony Hingle<br>- TFO Vincent Augeri<br>- SA Timothy Coll<br>- SA Michelle Pherson<br>- SA Christine Doyle |
| Evidence Handling / Review | 3 | Involved in knowing mishandling and circumvention of CART:[18]<br>- SA Maegan Rees<br>- SA Michael Lever<br>- unidentified FBI "photo tech" |
| CART Forensic Examination | 3 | Knowingly violated FBI protocol by secretly creating and using a prohibited second copy of the memory card at trial:[19]<br>- SA Michael Lever<br>- SSA Trenton Schmatz<br>- SFE Brian Booth |
| Statements to the Court and at Trial | 3 | Reported a false "accidental discovery":<br>- SA Michael Lever[20]<br>Provided knowingly false testimony[21]:<br>- SA Christopher Mils<br>- SFE Brian Booth |

---

[16] *See* Ex. 1 at 27

[17] *See* Ex. 1 at 6, 9, 10-11

[18] *See* Ex. 8 at 1-2

[19] *See* Ex. 8 at 3

[20] *See* Doc. 594-2

[21] Ex. 7 at 4; Ex. 8 at 3.

| Post-Trial | 1 | Made a critical, impossible and misleading statement that was used to blocked defense access to the withheld 2 forensic copies:<br>- SCS David Loveall II[22] |
| --- | --- | --- |

## VII. Trial Counsel Was Ineffective for Failing to Challenge the Defendant's Apprehension and Forcible Removal from Mexico

### A. Factual Background

On February 14, 2018, the United States Attorney's Office – Eastern District of New York obtained a sealed arrest warrant from The United States District Court for the Eastern District of New York (hereinafter referred to as "EDNY") So Ordered by The Hon. Lois Bloom, USMJ. The sealed arrest warrant was obtained based on allegations of Sex Trafficking by Coercion, Sex Trafficking Conspiracy, and Conspiracy to Commit Forced Labor. *See* Docs.1, 3[23] & 8-1. These are extraditable offenses in Mexico.[24]

Immediately after obtaining the sealed arrest warrant, United States authorities "actively worked with Mexican immigration officials to locate [Mr. Rainere]." Doc. 8-1 at 4. After 5 ½ weeks of formal intergovernmental cooperation by the US government[25] and Mexico, armed Mexican federal police, "Policía Federal", arrested Mr. Raniere on March 25, 2018. *See* Ex. 6 at ¶ 8. The Mexican federal police referenced the charges in the EDNY sealed arrest warrant[26] as

---

[22] *See* Ex. 7 at 7-10

[23] The arrest warrant was unsealed on March 26, 2018 by The Hon. Steven M. Gold, USMJ. Doc. 3.

[24] Treaty on Extradition, U.S.-Mex., art. 2 & app. note 6, May 4, 1978, 31 U.S.T. 5059.

[25] *See.* Doc 8-1, March 26, 2018 letter to arraignment USMJ from AUSAs Moira Kim Penza and Tanya Hajjar at 4: "[f]or over a month and a half, since the arrest warrant in this case was issued, the government has actively worked with Mexican immigration officials to locate the defendant."

[26] The official Mexican documentation, as cited to below, shows that the arrest warrant was stamped by Mexican officials on the same day that it was Ordered to be unsealed by The Hon. Steven M. Gold, USMJ. Doc. 3.

the basis for his detention. Lauren Salzman (hereinafter referred to as "Ms. Salzman"), a cooperating government witness, was present with Mr. Raniere in Mexico on March 25, 2018 and detailed his arrest during her trial testimony on May 21, 2019:

> "I could see outside the window that federal police with machine guns and bulletproof vests, some of them wearing masks were like surrounding the property". (Trial T. (5/21/2019) at 1889:5-8).

> "[E]ventually they kicked down the door and they held me on the floor with four machine guns pointed at me" (*Id.* at 1890:8-10).

> "[H]e came out, they put him on the floor ..., they handcuffed him and then ... they let him stand up and they let him see the piece of paper and basically he called out to me what the allegations were, that they were out of the Eastern District of New York, that he was being accused of sex trafficking and I can't remember what else and then they took him." (*Id.* at 1890:25 – 1891:6).

> "[T]his was the most life or death situation that I was in". *Id.* at 1891:24-25.

In *The Vow*, a HBO docuseries that explores the criminal prosecution of Mr. Raniere, there is live video footage of the events testified to by Ms. Salzman, as aired on WTEN, an affiliate of ABC. The real-time footage shows armed Mexican law enforcement leading Mr. Raniere out of the villa where he was staying, in handcuffs, and saying in Spanish "we have a warrant for his arrest". Mr. Raniere is placed into a police vehicle with the words "Policía Federal" written on its side. *The Vow,* Season 1, Episode 9, HBO (Oct. 18, 2020).

The official Mexican governmental documentation for this operation (hereinafter referred to as "official Mexican documentation"), obtained on November 23, 2022 on Mr. Raniere's behalf by Mexican Attorney Jorge Alberto de la Garza, includes the arrest warrant and it is stamped March 26, 2019. (Ex. 9, Declaration of Jorge de la Garza, Attachment 1 at 023-024). The official Mexican documentation does not contain a Mexican arrest warrant; it shows that Mr. Raniere underwent a visa verification procedure. (*Id.*, Attachment at 001).

Attorney de la Garza states, "[v]isa verification checks in Mexico do not involve the federal police. A visa check in Mexico is conducted by the INM, possibly with the assistance of local police; but certainly not by federal police." (*Id.* at 3 ¶ 8). At the time of his arrest, Mr. Raniere was in possession of a valid Mexican visa. (*Id.* at 4 ¶ 15). As per Attorney de la Garza, "[i]t is not legally reasonable for INM to conduct a visa verification for an individual with a valid visa." (*Id.* at 4 ¶ 16)

Attorney de la Garza opined, "[t]he circumstances of Mr. Raniere's removal by armed federal police and pre-textual "deportation" hearing, in under 24 hours, amounts to a forceful extradition disguised as a deportation proceeding. This should have been contested by his defense attorneys during the pendency of his prosecution." (*Id* at 6 ¶ 24).

It is clear that this operation was intended to bring Mr. Raniere back to the United States from Mexico for criminal prosecution. The official Mexican documentation includes a flight ticket, American Airlines flight no. 396 on March 26, 2018 from Puerta Vallarta to Dallas/Fort Worth, Texas, **purchased by the FBI on March 25, 2018** through Carlson Wagonlit Travel SatoTravel (currently known as CWTSatoTravel). CWTSatoTravel provides travel services exclusively for U.S. military and civilian government agencies.[27]

Notably, the FBI purchase receipt for the flight for Mr. Raniere on March 25, 2018, is the day before there was an official Mexican deportation decision, indicated by the stamps on the official Mexican documentation file, dated March 26, 2018.

On March 26, 2018, at 7:06am, Mr. Raniere was flown to Dallas, Texas in handcuffs, accompanied by Mexican law enforcement. *See* Ex. 6 at ¶19. Upon arrival, he was immediately handed over to FBI agents. (*See Id.*). The government has characterized these events as an

---

[27] See CWT Sato Travel, *What We Offer*, https://www.cwtsatotravel.com/what-we-offer.html (last visited Nov. 28, 2024).

immigration matter by Mexican immigration officials. (Doc. 8-1). After his trial, former AUSA Moira Kim Penza, lead prosecutor in Mr. Raniere's prosecution, described his removal from Mexico as a deportation; "Raniere was deported". ( Ex. 10, Transcript of November 1, 2022 Bonzani Memorial Lecture by former AUSA Moira Kim Penza, at 12:19).

A direct appeal was filed with the Second Circuit Court of Appeals on May 7, 2021 (*US v. Raniere*, 2d Cir., 20-3520, Doc. 102). The direct appeal did not address the extradition treaty abuse as it was unknown to appellate counsel at that time because the Mexican immigration file was obtained on November 23, 2022. (Ex. 9 at 2 ¶ 4). As such, Mr. Raniere is raising this for the first time in his habeas petition and he "can demonstrate … cause for failing to raise the issue, and prejudice resulting therefrom". *Rosario v. United States*, 16 F.3d 729, 732 (2d Cir. 1998).

The US-Mexico Extradition Treaty, Treaty Number: TIAS 9656, was signed on May 4, 1978 and went into effect on January 25, 1980.

B. THE ABUSE OF TREATY WARRANTS DIVESTITURE OF JURISDICTION

As opined by Attorney de la Garza, the circumstances of Mr. Raniere's arrest and removal from Mexico amounted to an "extradition disguised as a deportation hearing. (Ex. 9 at ¶ 24). As shown below, the US government abused the extradition treaty to obtain Mr. Raniere and as such, the abuse of treaty warrants divestiture of this Court's jurisdiction.

Trial counsel was aware of the circumstances of Mr. Raniere's arrest and removal from Mexico. *See* Ex. 6 ¶ 20. Trial counsel's failure to pursue this legitimate challenge, as is routinely done in high-profile cases, could have led to dismissal of the case if successful. Trial counsel's failure to do so constitutes objectively deficient performance under *Strickland*.

1. **There was formal intergovernmental cooperation and as such,** *Ker-Frisbie* **is inapplicable.**

The formal intergovernmental cooperation and the government acting in its official legal

capacity are made clear from the following non-inclusive points:

(1) On March 26, 2018, immediately following Mr. Raniere's arrest by the FBI in Texas, the EDNY prosecution asserted to the Court that the government and Mexican immigration officials actively worked together to locate Mr. Raniere. (Doc. 8-1, Pg. 4)

(2) The Mexican authority's reliance on an EDNY arrest warrant in the apprehension of Mr. Raniere. (Trial T. (5/21/19) at 1890:25 – 1891:6); *The Vow,* Season 1, Episode 9, HBO (Oct. 18, 2020); Ex. 6 at ¶ 6). The official Mexican documentation relating to Mr. Raniere's detention and removal, including the EDNY arrest warrant, was stamped on March 26, 2018, the day after Mr. Raniere's deportation proceeding, resulting from the visa verification. (Ex. 9, Attachment 1).

(3) The FBI purchased Mr. Raniere's flight back on March 25, 2018, using CWTSato, "a travel agency that works exclusively for The United States military and government." (Ex. 9 at 6 ¶ 23) This purchase receipt was included in the official Mexican documentation. (Ex. 9, Attachment 1 at 033-034).

(4) The FBI took immediate custody of Mr. Raniere upon his arrival in Texas. (Ex. 6 at ¶ 19).

(5) An identification packet in English with Mr. Raniere's pedigree information, his suspected residences, a picture of him in Mexico, and his US birth certificate is contained in the official Mexican documentation. (Ex. 9, Attachment 1 at 022, 025-029).

*Ker-Frisbie* is inapplicable to Mr. Raniere's case. *Ker-Frisbie* applies to **extralegal**

conduct, not **formal** intergovernmental conduct when the US government is acting in its official

legal capacity; as it did in Mr. Raniere's matter. The *Ker-Frisbie* doctrine is inapplicable "where

a treaty was violated in bringing the defendant to the United States". *United States v. Umeh,* 527

Fed. Appx. 57, 64 (2d. Cir. 2013) citing to *United States v. Alvarez-Machain,* 504 U.S. 655, 662

(1992). The US-Mexico Extradition Treaty was violated in returning Mr. Raniere to the United States, as demonstrated below.

## 2. This intergovernmental conduct used the Extradition Treaty.

This operation, albeit improperly, mirrored Articles of the US-Mexico Extradition Treaty and its processes. This shows the treaty was invoked.

- Officials from both countries mutually agreed to execute this operation, mirroring Article 1(1), "Obligation to Extradite"
- The offenses in the EDNY arrest warrant were extraditable offenses, satisfying Article 2(1) and 2(4), "Extraditable Offenses".
- An EDNY arrest warrant was used and facts and personal information permitting Mr. Raniere's identification and information concerning his possible location were provided by the US government. (Ex. 9, Attachment 1 at 022-029). This mimics Article 10(2) and 10(3), "Provisional Arrest Warrant"
- The FBI purchased Mr. Raniere's flight, mirroring Article 12, "Expenses".
- Through the purchase, by the FBI, of Mr. Raniere's return flight to Texas, the date and place of Mr. Raniere's surrender by Mexico were agreed to. This mirrors Article 14(3), "Decision and Surrender".

Critically, before the Mexican deportation resolution was stamped on March 26, 2018, and thereby made official, the FBI had already purchased Mr. Raniere's ticket the day prior. This shows this was not a deportation. This was a formal operation solely done to acquire the US citizen defendant for US prosecution, which is circumscribed by the US-Mexico Extradition Treaty.

## 3. This intergovernmental conduct violated the Extradition Treaty

The formal process of an extradition was not followed. Mr. Raniere was flown back to the US less than 24 hours after his arrest by federal police officers in Mexico. Therefore, the US government's use and subsequent violation of the US-Mexico Extradition Treaty constitutes an abuse of the treaty. As held in the seminal case, *Cook v. United States*, 288 U.S. 102 (1933), the United States cannot acquire jurisdiction through the violation of a treaty.

### C. THE DOCTRINE OF SPECIALTY REQUIRES DISMISSAL OF ALL CHARGES BEYOND THOSE CONTAINED IN THE FEBRUARY 14, 2018 SEALED ARREST WARRANT

This intergovernmental operation was in substance an extradition, albeit one carried out through abuse of and in violation of the extradition treaty. As such it should be considered a *de facto* extradition and the Doctrine of Specialty applies; requiring dismissal of all charges beyond those contained in the February 14, 2018 sealed arrest warrant.

The Doctrine of Specialty is "'a principle of international law that prohibits a defendant from being tried on charges other than those for which he was extradited.'" *United States v. Lara*, 67 Fed. Appx. *72, *73 (2d Cir. 2003) citing to *United States v. Levy*, 25 F.3d 146, 159 (2d. Cir. 1994).

As opined in *United States v. Levy*, 947 F.2d 1032, 1034 (2d Cir. 1991):

"The Doctrine of Specialty limits the authority of a domestic criminal court to charges "specially brought to the attention" of the foreign government that has delivered a defendant pursuant to extradition. *Fiocconi v. Attorney General*, 462 F.2d 475, 478 (2d. Cir. 1972), *cert. denied*, 409 U.S. 1059, 34 L. Ed. 2d 511, (1972) *see United States v. Rauscher,* 119 U.S. 408 (1986). Though the doctrine is sometimes expressed as a protection against being "*tried* by the requesting state for an offense other than one for which [the defendant] was extradited," *Restatement (Third) of Foreign Relations* § 477(1)(a) (1987) (emphasis added).

US- Extradition Treaty, May 4, 1978, U.S.-Mexico, 31 U.S.T. 5061, Article 17, Rule of Specialty: "1. A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted nor be extradited by that Party to a third State." The Rule of Specialty detailed within Article 17 authorizes the person extradited to be prosecuted for an additional offense if it is "based on the same group of facts established in the request for extradition and in the documents presented in its support".

The official Mexican documentation solely contains support for prosecution for the criminal charges contained in the arrest warrant. Mr. Raniere's additional charges are not "based on the same group of facts" and are thus violative of the Doctrine of Specialty. *See also United States v. Biba*, 2017 U.S. Dist. LEXIS 223267* (E.D.N.Y. March 6, 2017)

Mr. Raniere has standing to raise the Doctrine of Specialty because Mexico has not explicitly waived the application. *See Antwi v. United States*, 349 F.Supp.2d 663 (S.D.N.Y. 2004); *US v. Rauscher*, 119 U.S. 407, 418-19 (1886).

## VIII.   Trial Counsel Was Ineffective for Failing to Challenge the Lack of Subject Matter Jurisdiction for Several Counts

### A. The Sex Trafficking of Nicole (Count 6)

The government charged Mr. Raniere with the sex trafficking of Nicole, pursuant to 18 U.S.C. § 1591, based on a single act of oral sex performed upon Nicole by another woman, directed by Mr. Raniere. (Doc. 430 at 21; Trial T. (6/17/19) at 5413:9-5414:6). Trial counsel failed at multiple junctures to challenge whether the required interstate commerce element for subject matter jurisdiction was met. Trial counsel did not raise this in pre-trial motion practice; did not seek a Bill of Particulars to articulate the government's theory as to interstate commerce which was not specified in any of the indictments; and neglected to raise this challenge in its oral Rule 29 application and in summation.

In closing, the prosecution argued that this element "can be met in many ways, but at least because Nicole took either Amtrak or Greyhound to and from Albany the day [May 31, 2016] of that assignment [the sex act] -- Amtrak or a bus, a commercial bus. The use of these modes of transportation affect interstate commerce." (Trial T. (6/17/19) at 5416:13-20). However, this theory is fundamentally flawed because:

- **Nicole did not travel to Albany on May 31, 2016.** Nicole testified she was already in Albany on or prior to May 30, 2016. (Trial T. (6/7/19) at 3939:16-25; 3917:5-6; 3921:11).

- **Nicole's travel was unrelated to the sex act.** Neither Nicole nor Allison, who arranged her travel, knew about the sex act in advance; this was one of Nicole's routine weekly trips to Albany. (Trial T. (6/7/19) at 3904:9-3905:1; 3927:14-23; 3934:2-10; 3923-3924).

The trip was unrelated to the alleged sex act. Thus, the prosecution failed to establish that "Defendant's conduct was in or affecting interstate or foreign commerce." (Doc. 728 at 94). In *Mortensen v. United States*, 322 U.S. 369 (1944), the Supreme Court held under the Mann Act that interstate travel must be directly tied to an illicit purpose. A round trip "[i]f innocent when it began, it remained so until it ended," and therefore does not satisfy the interstate commerce requirement. (*Id.* at 375).

While this charge involves 18 U.S.C. § 1591, not the Mann Act, 18 U.S.C. § 2421, this innocent roundtrip rule applies because the prosecution argued that the interstate commerce element was satisfied by Nicole's travel for the purpose of the sex act. The innocent roundtrip rule has been applied to charges other than the Mann Act. *See e.g., United States v. Botticello*, 422 F.2d 832, 834 (2d Cir. 1970) (reversing conviction of 18 U.S.C. § 1952 due to interstate travel requiring some more intimate relationship between the trip and the performance of wrongful acts).

Just as in *Mortensen*, where the travel was unrelated to alleged illegal conduct, Nicole's routine and "innocent" travel cannot satisfy the interstate commerce element. As a result, the Court lacked subject matter jurisdiction over Counts 5[28]and 6, which were based solely on this conduct, and each resulted in 40-year concurrent sentences.

---

[28] The prosecution argued in closing that the evidence of the sex trafficking conspiracy included not just the conduct relating to Nicole but also to Sylvie and India. However, at sentencing, the Court found that Sylvie and India were not victims of the sex trafficking conspiracy, by a preponderance of the evidence. (Sentencing Transcript (10/27/20) at 11:8-13)

Trial counsel's failure to raise this jurisdictional argument was "objectively deficient" under *Strickland*, as it ignored a fundamental defect in the case. Had this issue been raised by trial counsel at the close of the government's case, there is a reasonable probability the outcome would have been different in that the Counts 5 and 6 could have been dismissed, thereby satisfying *Strickland*'s prejudice prong.

### B. The Attempted Sex Trafficking of Jay (Count 7)

The government charged Mr. Raniere with the attempted sex trafficking of Jay, pursuant to 18 U.S.C. § 1591, as Count 7. The government failed to establish the necessary interstate commerce element and trial counsel failed to challenge this.

On January 11, 2017, Jay moved to Albany (Trial T. at 4342:25-4343:3). In March or April 2017, she was assigned within DOS to have Mr. Raniere, who also lived in Albany, take a nude photograph of her (Trial T. at 4432:17-23). She did not complete this assignment (hereinafter referred to as "the assignment"), which is the alleged attempted sex trafficking act.

Here, the prosecution's theory of interstate commerce hinges on Jay's travel between Albany and Los Angeles, through JFK airport; "interstate commerce is [a]ffected [sic] by Jay's flights in and out of J.F.K. from California." (Trial T. (6/17/19) at 5419:6-7.) However, by Jay's own admission, these trips to and from Los Angeles were strictly for employment purposes, such as modeling for print advertisements and serving as a poker host. (Trial T. at 4343:22 - 4345:2). Her travel during this time period was completely unrelated to DOS. There is no nexus between her travel and it being for the specific purpose of the assignment in question. As such, these were "innocent round trips" with no connection to the assignment, and therefore fail to show the substantial connection to interstate commerce.

Trial counsel's failure to challenge the lack of an interstate commerce nexus for Count 7 was objectively deficient, as it ignored a fundamental defect in the government's case both pre-trial and at trial. Had this argument been raised, there is a reasonable probability the outcome would have been different in that the Count 7 could have been dismissed, as it resulted in a 40-year sentence; thereby *Strickland*'s prejudice prong is satisfied.

## IX. Appellate Counsel Was Ineffective for Failing to Challenge the Conviction as to Count 7 Under the Law of the Case Doctrine

Appellate counsel failed to challenge the conviction for Count 7, Attempted Sex Trafficking of Jay, by applying the Court's own reasoning at sentencing. Both Sylvie and Jay were assigned the same task: to have a nude photograph taken by Mr. Raniere; Jay did not complete the task, while Sylvie did. (Trial T. (6/17/19) at 5418:5-6).

At sentencing, the Court declined to include Sylvie in the Guidelines calculations for sex trafficking and in the conspiracy to commit sex trafficking. The Court ruled:

> "[T]he Government has not established by a preponderance of the evidence, that either Sylvie or additional DOS Victim 1 were victims of sex trafficking or a conspiracy to commit sex trafficking." (Sentencing Transcript (10/27/20) at 11:8-13)

Since Sylvie's completion of the assignment failed to meet the preponderance of the evidence standard, then logically, Jay's failure to complete it cannot satisfy the higher beyond-a-reasonable-doubt standard required for conviction.

By failing to highlight this glaring inconsistency, appellate counsel overlooked a critical argument under the law of the case that could have undermined Mr. Raniere's conviction for Count 7 and its 40-year sentence. This failure constitutes "objectively deficient performance" under *Strickland.* There is a reasonable probability that, but for this oversight, the conviction and sentence for Count 7 would have been vacated, satisfying the prejudice prong of *Strickland.*

## X.    Trial Counsel Was Ineffective for Failing to File a Rule 29 Motion

At the close of the government's case, trial counsel made a woefully deficient Rule 29 oral application which "fell below an objective standard of reasonableness". After 21 days of trial testimony, in a high-profile case with 7 charged counts, including 1 count of Racketeering and and 1 count of Racketeering Conspiracy, with a shared set of 11 predicate acts, trial counsel made a 15-line argument as their Rule 29 oral application. (Trial T. (6/14/19) at 5234:21-5235:3; 5235:16-22).

Trial counsel argued that there was legally insufficient evidence to establish the element of commercial sex, a requisite element of the sex trafficking counts and acts, and moved for dismissal. (Trial T. (6/14/19) at 5235:16-22). Trial counsel did not make any specific arguments to support this position.

In his oral application, counsel trial acknowledged that he could "make a more specific motion". (*Id.* at 5235:1). Yet, trial counsel did not do so and then failed to submit a Rule 29 on behalf of Mr. Raniere after the verdict. Trial counsel's retainer with Mr. Raniere obligated his firm to "cover all legal services required to resolve the case, such to include … post trial motions related to the trial itself." By definition, a Rule 29 is a post trial motion related to the trial.

At the close of trial on June 19, 2019, trial counsel informed Judge Garaufis that there would be post-trial motions and the Court set a July 10, 2019 deadline for them. (*Id. at* 5751:25-5752:1) Thereafter, with the consent of the prosecution, on July 5, 2019, trial counsel requested a 20 day filing extension, which the Court denied. (Doc. 748). Trial counsel did not file a Rule 29.

Trial counsel's failure to adequately argue the Rule 29 motion prejudiced Mr. Raniere's defense. An example of an adequate analysis for the commercial sex element is detailed in the attached Appendix (*see* Exhibit 11). A properly argued Rule 29 motion would have highlighted

these deficiencies, creating a reasonable probability that some or all charges would have been dismissed.

## XI. Trial Counsel Was Ineffective for Failing to Adequately Challenge the Constitutionality of the RICO Definition

While trial counsel challenged the overarching legality of the RICO charges under the language of the statute, they failed to inform and formally motion the Court that the overly broad RICO definition impeded the defense's ability to proceed to trial. The definition in practice prevented the defense from being able to call key defense witnesses, as doing so could subject them to criminal liability.

The government charged that Mr. Raniere and his "inner circle" was an informal group that constituted an enterprise for purposes of satisfying the RICO statute; the vague purpose of the enterprise was to "promote Keith Raniere and his objectives." (Doc. 50, Pg. 2-3, Doc. 430, Pg. 1-4) Under the Court's definition of RICO, without limitation or ties to a traditional criminal enterprise, any individual with whom Mr. Raniere had associated with, either in his personal or professional life, stood at risk of being charged as a "co-conspirator".

This RICO definition had a chilling effect by deterring potential key witnesses from offering to testify out of fear of the threat of a RICO indictment or other governmental action.[29] It impeded all aspects of the defense, including the ability to speak with potential witnesses who likely had favorable information to the defense. These witnesses could have provided exculpatory and impeachment material that the defense could have used to debunk the government's narrative. Several declarations obtained post-trial substantiate this. (Doc. 1178-5).

---

[29] Post-trial, Mr. Raniere became aware that the government made key potential witnesses aware of their possible criminal liability within RICO or other negative repercussions for them testifying for the defense. (Doc. 1178). .

Trial counsel's failure to protect Mr. Raniere's Sixth Amendment right to mount a complete defense; which was significantly curtailed by this RICO definition "cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight". *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (internal quotation marks omitted).

Trial counsel's failure was prejudicial to Mr. Raniere because it deprived him of being able to call witnesses who would have provided favorable testimony. This testimony would have directly contradicted key elements of the DOS-related charges and impeached the testimony of key government witnesses. Counsel's failure creates a reasonable "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Michele Hatchette (hereinafter referred to as "Ms. Hatchette") like Nicole, was a second-line member of DOS, under Allison Mack. Thus, for the purposes of evaluating coercion under 18 U.S.C. § 1591(e)(2)(A), Ms. Hatchette was a "a reasonable person of the same background and in the same circumstances." See 18 U.S.C. § 1591(e)(5). Her experiences in DOS stand in stark contrast to what Nicole testified to. As relevant to the elements of the sex trafficking and forced labor offenses, she would have testified to the intention behind collateral as one of voluntary accountability, not coercion, that there was not an ever-present fear of collateral being released or threatened to be used, and that each step of the recruitment process was based on informed consent. (Doc. 1178-5 at Bates 001-020). Had the jury heard Ms. Hatchette's testimony, and that of other similar witnesses, there is a reasonable probability that they would have determined that the requisite element of coercion, argued by the government to be "stemming from the collateral", was not met. Their testimony would have also undermined the validity of the DOS-related charges. (Trial T. (6/17/19) at 5414:1-2).

## XII. Appellate Counsel Was Ineffective for Failing to Appeal the Confrontation Clause Violation Related to Alleged Text Communications with Camila

Appellate counsel appealed the admission of the alleged text messages[30], as well as other evidence, under Fed. R. Evid. 401 and 403 for their prejudicial nature. However, appellate counsel failed to argue that the Court's admission of the messages between Mr. Raniere and Camila, over trial counsel's objection, violated the Confrontation Clause. (Trial T. (6/5/19) at 3426:21-3428:10)

These messages violated the Confrontation Clause. In his ruling, the court referenced the "[text] communications from Mr. Raniere [and Camila] referencing the photos from way back" and inferred based upon "way back"[31] that this was referring to the photos on the hard drive purportedly taken in 2005. (Doc. 1256 at 4). However, the texts themselves provide no direct support for this conclusion, lacking any reference to specific dates, times, ages, nudity, or other incriminating details or content. In his ruling, the Court referenced the "[text] communications from Mr. Raniere [and Camila] referencing the photos from way back" and improperly inferred that the photos were taken in 2005 to support the conviction. (Doc. 1256 at 4). However, the texts themselves provide no direct support for this conclusion, lacking any reference to specific dates, times, ages, nudity, or other incriminating details or content.

It is logical to deduce that they were relied upon by the jury for the truth of their assertions, as evidenced by the Court's reliance on them to deny the Rule 33 motion. Trial counsel was unable

---

[30] These text messages are herein called "alleged text messages" because they refer to the contents of .TXT files, attached to the emails and purportedly exported from WhatsApp, which the government claimed contained communications between Mr. Raniere and Camila. The file lacked metadate verifying its origin, authenticity, or accuracy and identified "Unknown Caller" as the sender, which the prosecution attributed to Mr. Raniere. (Trial T. (6/5/19) at 3444:2-6; 3445:2-15; 3452:19-3453:11) Additionally, as an exported file, it would not have included deleted messages, further undermining its reliability.

[31] In addition to other trial evidence. Note that one such piece of trial evidence was the government's contention that the lack of a visible appendectomy scar in the photos indicated Camila's age; however, trial counsel failed to present photos of Camila as an adult where her scar is sometimes visible and sometimes not, which upon information and belief were turned over in discovery.

to cross-examine Camila to clarify critical issues, such as the vagueness of the phrase "photos from way back," which the court, in its post-trial ruling, baselessly interpreted as referring to specific alleged contraband photos on a hard drive. The Court's reliance on this unsupported inference strongly suggests that the jury likely adopted the same unsubstantiated interpretation.

This is precisely the harm the Confrontation Clause is designed to prevent: allowing untested testimonial evidence to establish critical facts without the reliability safeguards of adversarial testing required by *Crawford*.

Failure to raise this preserved Confrontation Clause violation constitutes objectively deficient performance under *Strickland*, as reasonable appellate counsel would not overlook such a compelling constitutional issue tied to the sole victim of the child predicate acts.

The prejudicial impact of this error is clear. The prosecution relied on these messages to support key allegations in Racketeering Acts 2, 3, and 4. Had appellate counsel raised the Confrontation Clause issue, there is a reasonable probability the appellate court would have reversed these convictions. The likely remedy would have been exclusion of the text messages or a remand for a new trial, where Mr. Raniere could cross-examine a witness on the messages' authenticity, context, and content. Either outcome would have fundamentally undermined the prosecution's case, satisfying the second prong of *Strickland*.

## XIV.    Counsel Was Ineffective in Failing to Contest an Unconstitutional Supervisory Release Ban

The Court imposed a supervisory release condition barring Mr. Raniere from associating with anyone "affiliated" with NXIVM, ESP, or DOS, even though none of these organizations were charged or adjudicated as criminal enterprises. (Doc. 969 at 9). Despite the reasonable of a prohibition, based upon the victim impact statement's, this unconstitutional and vague prohibition

is now used by the Bureau of Prisons to deny him all social visitation in a facility where visitation is otherwise allowed. Thus, sentencing counsel's failure to contest this condition has prejudiced Mr. Raniere. This Court must invalidate this condition.

**XVI.   An Evidentiary Hearing is Necessary, Requested, and Would Be Useful to the Court**

§ 2255(b) provides as follows:

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."

§ 2255(b).

In the instant case, Mr. Raniere has pleaded, presented evidence, and shown through the applicable law, that his sentence and conviction are violative of his constitutional rights. Even in the light most favorable to the government, it cannot be argued that Mr. Raniere is entitled to no relief. As such, Mr. Raniere respectfully requests that this Honorable Court Order an evidentiary hearing pursuant to 28 U.S.C. § 2255(b).

Dated: November 29, 2024

Respectfully submitted,

\s\ Deborah J. Blum

By:    Deborah J. Blum
       DEBORAH J. BLUM, ESQ.
       Attorney for Defendant-Appellant
       225 Broadway, Suite 715
       New York, New York 10007
       T: (646) 535-2586