# EXHIBIT 6

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,           :      18-CR-00204 (NGG)
                                           24-CV-02925 (NGG)
                Plaintiff,          :

-against-                           :      DECLARATION

KEITH RANIERE, et al.,              :

                Defendant.          :
--------------------------------------------------X
```

I, Keith Alan Raniere, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. I, Keith Alan Raniere (hereinafter referred to as "I", "my", or "me") am the Defendant herein and submit this Declaration in support of my 28 U.S.C. 2255 habeas corpus petition.

**Arrest and Removal from Mexico**

2. In March 2018, I was on an extended visit in Mexico, legally. I had a tourist visa to remain in Mexico for 180 days from my date of entry. As per my attached visa, 01 116026002, I entered on November 10, 2017 and had permission to stay until May 9, 2018.

3. The circumstances of my arrest and removal from Mexico will forever be etched in my mind. I remember all of the details of my removal from Mexico vividly. On the afternoon of March 25, 2018, around 3 pm or after, I became aware that the villa I was staying in was surrounded by numerous masked men, armed with machine guns and wearing bullet proof vests. Some of these men were let into the villa and made their way to the bedroom in which I was staying.

1

4.     There were approximately 5 federal police officers who were in the bedroom with Lauren Salzman and me. When they entered, the federal police officers had their guns held in readiness. I was in the closet, with the door open, and on the phone with Clare Bronfman. I came out of the closet and slid the phone to Lauren Salzman. I got down on the ground and was handcuffed by the federal officers.

5.     Once handcuffed, one of the federal police officers held out a piece of paper, with my photograph on it, that was in English. I read it out loud to Lauren who spoke what I was saying into the phone to Clare. The paper said that it was from the Eastern District of New York and had AUSA Moira Kim Penza's name on it. The paper also had the charges of sex trafficking in it and I believe forced labor.

6.     The federal police, in their broken English, made it clear to me that they had a warrant for my arrest and were making the arrest for the woman, New York, prosecutor for committing the crimes listed in the paper.

7.     At no point in time was I asked by any of the federal police officers to show them my visa or for any form of identification. My U.S. passport, containing my Mexican visa, was easily in reach. It was in a travel pouch on the floor, against the night table, next to the bed.

8.     I was escorted out of the villa in handcuffs and placed in a federal police vehicle, a marked patrol vehicle with the words "Policia Federal" on it. The federal police vehicle, and at least 2 others police vehicles, drove at a high rate of speed to an official Mexican governmental building which was closed. I sat in the car with the officers for at minimum 1 hour. We were waiting for someone to come and unlock the building.

9.     Once the building was unlocked, I was escorted into it and onto an elevator. I was met by an English speaking man named Francisco. His nametag said Francisco Anton on it, but I

2

believe that his name was Francisco Antonio. He told me that he was unaware who the individuals were who brought me into the building and that he had never seen anything like this.

10. I told Francisco that I did want to waive any of my rights. I asked him multiple times for a lawyer and to speak with someone from the American consulate. I was not given an attorney and was not met by an American consular official. I made it clear to Francisco that I did not want to waive any of my rights and that I wanted to have representation.

11. Francisco told me that normally when someone is being extradited that it takes weeks, sometimes longer.

12. I have read and reviewed the official Mexican documentation. On page 13, 14 and 16 it states that I swore under oath and made statements. I would never take an oath or make a statement without an attorney.

13. Although I asked for both, at various points during my detention, I was not informed of my right to speak with a consular representative or to a legal representative.

14. I was not informed of any of my rights during the arrest or at any point during my detention. I was not provided with any of the paperwork in my official Mexican documentation.

15. I was not asked to sign any paperwork.

16. After leaving the official Mexican governmental building, I understood that the individual I was being brought to was a doctor. At his office, the doctor came in and did not conduct a thorough examination. He did not treat my shoulder which was injured when I was being handcuffed. One of the officers put a boot on my shoulder, which caused it to be injured for approximately 1 month. After a short period of time, the federal officers I was with signed a form and I left with them.

3

17. Late in the evening on March 25, 2018 or right after midnight on March 26, 2018, I was transported to the airport, where I was held overnight until around 5 am. I was kept in a small room with 2 officers. I again asked for a lawyer and to speak with someone from the American consulate.

18. At no point during my detention was my request for legal counsel or a consular representative granted and provided to me.

19. On the morning of March 26, 2018, I was placed on a flight to the United States in handcuffs. I was accompanied by Mexican authorities and we sat in the back of the plane. When the plane landed, I was escorted off of the plane before any of the other passengers deplaned and immediately was taken into custody by the FBI. It was clear to me that this was a coordinated effort between Mexican and American authorities.

20. I discussed the circumstances of my arrest and detention with my trial counsel, as described in ¶ 2 - ¶ 9, in response to their questions about how I was brought from Mexico to the United States. Although I requested him to do so, lead counsel did not pursue the issue.

**The Search of 8 Hale Drive, Halfmoon, New York**

21. Since 8 Hale Drive was purchased in 2004, I utilized it as a study and at various times as a place to live. At all times between 2004 to November 2017, I was intimately familiar with the contents of 8 Hale Drive.

22. During the pendency of the prosecution against me, including during the trial, I was never shown the 8 Hale Drive search records, including the 6 page Evidence Collected Item Log, and photographs by my attorneys or anyone else.

23. Before the "accidental discovery" of alleged contraband photos, my attorneys gave me limited information about the search and what was recovered. I made the assumption

4

that that things were being done properly in my case by the government and that my attorneys would do their job and carefully check and analyze the discovery materials turned over to them.

24. Despite the search photos being disclosed in the August 3, 2018 discovery disclosure and the search records being turned over with the 3500 materials, I was not provided with the search records or photographs until after my trial. At that point, I immediately identified numerous issues within the search records and photographs. This ultimately led to the retention of a former FBI expert, Kenneth DeNardo, to analyze these materials in depth.

25. At all times that I was there, 8 Hale Drive was left unlocked. When I returned from my first trip to Mexico in October 2017, I visited 8 Hale Drive and the door was open and then when I went back to Mexico in November 2017, I left the door unlocked.

26. There were certain items in the photographs that absolutely were not mine, did not belong to me and to my knowledge, were not ever present at 8 Hale. Some examples of this are:

   a. I did not own or possess the second camera depicted as Item 5 in photograph GX 502A-37;

   b. The CD titled *Heaven in Exile* depicted as Item 9 in photograph GX 502A-41 seen on top of the refrigerator;

   c. I did not own or possess the 2 sex trafficking books depicted in photograph GX 502A-65; and

   d. The Rubik's cube (3x3) depicted as Item 36 in photographs GX 502A-71 and GX 502A-72; and

   e. I did not own or possess the DVD, a documentary about sex trafficking, depicted as Item 29 in photograph GX 502A-61 is.

5

28.     I noticed that there was a white dog paw in photograph GX 502A-68 and there was no dog listed on the personnel log or elsewhere.

29.     I observed that several items appeared intentionally moved around and staged in different photographs including the *Charlotte's Web* book, GX 502A-29 and GX 502A-62, and a book entitled *Seven Life Lessons of Chaos,* GX502A-35 and GX 502A-56.

30.     I noticed multiple other problems with and inconsistencies in the Evidence Collected Item Log and Crime Scene Sign-in Log.

**Digital Evidence Investigation**

31.     Immediately after the "accidental discovery" of the alleged contraband photos on February 21, 2019, I informed my lead counsel that the discovery had been planted. My lead counsel dismissed the possibility of planting.

32.     I have significant experience with computers, dating back to the early 1970s, including work in information technology, programming, and data recovery roles for the New York State Department of Labor and Division of Parole. As a private contractor, I taught various courses about computers to government employees. Additionally, I have numerous computer patents. I shared my expertise in computers with my attorneys and asked them to use my technical requests, obtaining materials from the government, in my defense.

33.     I repeatedly requested access to specific data structures on the hard drive, including FAT1, FAT2, and the directory table. FAT1 can show layering; the sequence in which files were saved. Comparing FAT1 and FAT2 can reveal manipulation. The directory table is needed for the FAT analysis.

34.     Despite my requests, I did not receive access to these data structures. I did not have any direct contact with the digital forensic expert retained in my case, had no input into

6

which expert was retained on my behalf and nor was I aware of their findings or analysis prior to my trial. I did not see any of the defense expert's work product.

35. At trial, counsel advised me not to scrutinize the government's forensic reports too closely in front of the jury to avoid giving the impression that I was examining photos of naked women.

36. Upon briefly reviewing the government's digital evidence reports at trial, I noticed discrepancies suggesting photo manipulation and planting:

  a. Twenty-two (22) photos of Ivy should have been on the hard drive but were not.

  b. The photos of Ivy (IMG_0021-0041) were on the report of the camera's memory card, however they were not kept on any memory card, because multiple people had access to and used the camera. This inconsistency indicated to me that those photos had been planted on the memory card.

  c. The Booth report on the hard drive contained anomalies, including:

    1. Photos placed in incorrect directories.

    2. File names with "-1," indicating it was a copy of the original file which can be a side effect of a type of a planting, using a technique called a record overlay when it is not done well. The original files were not there.

37. I communicated these observations and other discrepancies to my counsel during trial through written notes and notes written on the physical copies of the government's reports,. I pointed out errors in the evidence, such as photos of people in the wrong folders and data inconsistencies.

38. It is my understanding that my trial counsel has not been able to locate the physical copies of these reports which included my handwritten notes about the discrepancies.

7

**Requests of and Interactions with Trial Counsel**

39. I always told my trial counsel to preserve all of my rights and that I did not want to waive any of my rights (except the right to testify).

40. Before and during trial, I wanted to put on a defense. I wanted my attorneys to attack government witness' credibility by showing that they were lying, through evidence that the government provided and through investigation. During trial, I wanted trial counsel to cross-examine witnesses with inconsistent statements. Below are a few examples of trial strategy that I asked my attorneys to implement:

    a. I requested that trial counsel retain a sex trafficking expert and cult expert to provide testimony. For example, during trial, the alleged victim, Nicole, testified (Trial T., 06/7/19, 3960:15 – 3961:20) that I ask her if she wanted to be intimate or go for a walk. She testified that she chose to go for a walk and that I expressed disappointment "that [Nicole] chose to go on a walk instead." A sex trafficking expert could have explained to the jury that sex trafficking involves consequences for non-compliance; not just alleged expressions of disappointment and no subsequent consequence.

    b. The government's witness Mark Vicente testified about my alleged actions and inactions related to the cancellation of a SOP training; primarily that a group of men paid money to attend a training taught by me and that I cancelled and did not address the group of men. (Trial T., 05/13/19, 799:14 – 801:14). Mark Vicente's aforementioned testimony, that I did not address the group of men, is patently false. I brought this to my trial counsel's attention and indicated the existence of a video, in their possession, of the SOP training in question in which I am filmed addressing the

8

group of men. Mark Vicente addresses the group of men after me. Mark Vicente was in charge of overseeing the filming of this SOP training, which he organized. A member of my trial counsel told me that this video was in the government's discovery production and it had been located. I asked trial counsel to use the video to discredit him.

c. I requested that my trial counsel introduce evidence and arguments surrounding collateral.

d. At all times during my prosecution, I pushed for a focus on forensically analyzing the digital evidence.

e. Although I did waive my right to testify, I did not want to waive my right to put on a defense. I explicitly told trial counsel to confer with me before doing so.

41. In terms of the closing on my behalf, I asked my trial counsel:

a. Before and during trial, to incorporate visual aids, such as charts, into their closing statement, explaining that many people need more than words to fully understand the points being made.

b. I specifically pointed out to my trial counsel that the government had used multimedia throughout the whole trial, and I emphasized that incorporating similar visual aids or multimedia would be necessary to effectively reach the jury during closing and to rebut the government's arguments.

c. I requested that trial counsel go point by point, element by element, through the charges during my closing to ensure that the jury fully understood the defense's position on each charge.

9

42. Despite these suggestions, I deferred to my lead counsel's expertise and did not insist on these approaches because I respected his role as an experienced attorney. However, many of my concerns and suggestions were not implemented.

43. I asked my trial counsel to file a Rule 29 on my behalf, which was covered by my retainer agreement, as I do not like waiving my rights. A Rule 29 was not filed on my behalf.

**Sentencing**

44. I asked my trial counsel to include what I now understand to be 3553a factors in my sentencing memorandum. I provided him with pertinent background information about my life and a great majority of it was left out.

**Restitution Hearing**

44. I was not informed of the identities of the alleged restitution victims and was only provided their identifiers as numbers, not names. I was unable to ascertain who the majority of individuals seeking restitution were.

45. I requested that my restitution counsel present evidence regarding restitution claims, but my restitution attorneys advised me that I did not get to present evidence.

46. There are existing records that would have demonstrated that certain individuals who were granted restitution for alleged uncompensated labor had, in fact, been paid for their work.

47. With my complete oversight, input and review, this document was prepared for me by my 28 U.S.C. § 2255 counsel, Deborah J. Blum, Esq.

10

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on:  November 26th, 2024
              Tucson, Arizona

_____
KEITH ALAN RANIERE